UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KOTVA a.s., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW WEISS and WEISS ASSET | ) | |
| MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendants. | ) | C.A. No. 05-10679-RCL |
| | ) | |
| ANDREW WEISS, WEISS ASSET | ) | |
| MANAGEMENT LLC, K T, INC. and CVF | ) | |
| INVESTMENTS, LTD., | ) | |
| | ) | |
| Counterclaim-plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KOTVA a.s., MARTIN BENDA, RICHARD | ) | |
| HARAZIM, FORMINSTER ENTERPRISES, | ) | |
| LTD., SPV CO and JOHN DOES 1–5, | ) | |
| | ) | |
| Counterclaim-defendants. | ) | |
| | ) | |

## FIRST AMENDED ANSWER AND COUNTERCLAIM

## SUMMARY

Defendant and counterclaim-plaintiff Andrew Weiss ("Weiss") is a professor of

economics at Boston University.  He has advised the World Bank on the Czech Republic's

capital markets and is an authority on developing markets and their need for financial regulation.

He also operates a company that manages investments in the Czech Republic.  Among those

investments is a significant minority interest in the plaintiff, Kotva a.s ("Kotva").  In May of

2004, representatives of Forminster Enterprises Ltd. ("Forminster"), the majority shareholder of

Kotva, threatened to take Kotva's only valuable asset for itself and give the minority

shareholders nothing.  Weiss responded by authorizing lawyers in the Czech Republic to file lawsuits to protect the rights of the minority shareholders.

Forminster's first response was to approach Weiss and offer to purchase his investors' interest in Kotva.  However, Forminster would not agree to pay an amount equal to the proportional share of Kotva's value to which Weiss's investors were entitled.  When Weiss rejected Forminster's inadequate offers, Forminster adopted a second, more sinister approach. Forminster and its affiliates used their influence over Czech law enforcement to instigate a criminal prosecution of Weiss on sham charges of blackmail.  Although Weiss has not received formal notice of any charges, the press has reported that charges were brought.  Seeking to apply additional pressure, Forminster and its affiliates then used their control over Kotva to file this lawsuit against Weiss in Kotva's name.

Kotva is presently a corporate shell and alter ego to Forminster and its affiliates: counterclaim-defendants Forminster, Martin Benda ("Benda"), Richard Harazim ("Harazim"), SPV CO and John Does 1–5 (collectively the "Forminster Group").   The Forminster Group has conspired against Weiss and the shareholders of Kotva to convert the assets of Kotva for their own benefit.  Forminster is a private company, incorporated in Cyprus, and the conspirators keep the identity of its owners a closely-kept secret.  Harazim and Benda serve as the front men for Forminster, and hide the identities of the company's true beneficial owners.

According to reports in the Czech press and reports of Czech prosecutors and as detailed below, the Forminster Group controls proceeds looted in one of the most notorious frauds in the post-Communist history of the Czech Republic, a crime known as the "Trend Scandal" or "Trend Tunneling."  The Czech press adopted the word "tunneling" to describe the process by which a company's management embezzles the company's assets and moves them through a series of

intermediaries until the intended recipients of the assets are able to liquidate the assets and abscond with the loot. Most importantly for this case, the illegal proceeds obtained by the Forminster Group include its control over a majority of the shares of Kotva.

In the early 1990s, Kotva a.s. was a department store company with a large, valuable store location ("Department Store") in downtown Prague in the Czech Republic. A Czech investment fund known as the Trend Fund ("Trend") was the largest shareholder of Kotva a.s. According to press reports of the results of a government investigation, Trend's assets, including its shares in Kotva, were looted through a series of frauds, and the Kotva shares ended up in the control of the Forminster Group. As a result of the Trend Tunneling, the Forminster Group claims to own at least 55% of Kotva's shares.

As a result of Forminster's involvement in the Trend Tunneling, the High Court of Liechtenstein froze Forminster's accounts at a bank in Vaduz, Liechtenstein. Similarly, a Czech prosecutor froze Forminster's shares in Kotva a.s. because of suspicion that they were the proceeds of criminal activity. Thus, unable to liquidate their shares in Kotva, the Forminster Group decided to use their control over Kotva to sell the company's only valuable asset—its real estate—and keep all of the proceeds for itself, defrauding Kotva's minority shareholders and depriving the Trend victims of their rightful share of the proceeds.

## ANSWER

Defendants Weiss and Weiss Asset Management LLC ("WAM") (collectively, the "Defendants") answer the Complaint of Plaintiff Kotva a.s.:

## INTRODUCTION

The Introduction contains no averments within the meaning of Federal Rules of Civil Procedure 8 and 10 and requires no response. To the extent a response is required, the Defendants deny the factual allegations in the Introduction.

## JURISDICTION

1.      Paragraph 1 states a conclusion of law to which no response is required.

2.      Paragraph 2 states a conclusion of law to which no response is required.

3.      Paragraph 3 states a conclusion of law to which no response is required.

## PARTIES

4.      Admitted.

5.      Admitted.

6.      Admitted.

## FACTS

7.      Defendants are without knowledge or information sufficient to form a belief as to the truth of paragraph 7.

8.      Admitted.

9.      Defendants admit that Weiss Asset Management, LLC is an investment firm headquartered in Boston, Massachusetts.  Defendants further admit that Weiss owns a majority of Weiss Asset Management and controls Weiss Asset Management.  Defendants deny the remainder of paragraph 9.

10.     Defendants admit the first sentence of paragraph 10.  Defendants deny the second sentence of paragraph 10.

11.     Denied.

12.     Defendants admit the first sentence of paragraph 12.  Defendants deny the remainder of paragraph 12.

13.     Defendants admit that the Forminster Group installed new management at Kotva and called this a management change.  On information and belief, Defendants deny that the

purpose of installing new management was to effectuate a turnaround of Kotva's business.  By way of further answering, Defendants believe that the purpose of installing new management was to loot Kotva a.s. of its real estate.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the remainder of paragraph 13.

14.     Defendants are without knowledge or information sufficient to form a belief as to the truth of paragraph 14.

15.     Defendants are without knowledge or information sufficient to form a belief as to the truth of paragraph 15.

16.     Defendants are without knowledge or information sufficient to form a belief as to the truth of paragraph 16.

17.     Defendants are without knowledge or information sufficient to form a belief as to the truth of paragraph 17.

18.     On information and belief, Defendants deny that the purpose of this alleged transfer was "to effectuate the sale" of the Shopping Centre.  By way of further answering, Defendants believe that the purpose of the alleged transfer was to divert the proceeds from the sale of the Shopping Centre.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the remainder of paragraph 18.

19.     Defendants admit that during May 2004, the press reported a pending sale of the Shopping Centre to Irish investors.  Defendants deny the remainder of paragraph 19.

20.     Defendants admit that, on May 12, 2004, Weiss and Hoffmann met with Harazim and Benda.  Defendants admit that Harazim and Benda were, respectively, the CEO and chairman of the board of Kotva at that time but deny that Benda and Harazim held themselves

5

out as representatives of Kotva during the May 12, 2005 meeting.  Defendants deny the remainder of paragraph 20.

21.     Denied.

22.     Defendants admit that Gilroy commenced a lawsuit claiming that SPV KN is not the legal owner of the Shopping Centre and that Kotva is the legal owner of the Shopping Centre. Defendant Andrew Weiss further admits that he communicated with Hoffman and Ondrej Peterka from Boston and that Hoffman sent bills to Brookdale in Boston.  Defendant Weiss Asset Management denies that it communicated with Hoffman and Peterka from Boston. Defendants deny the remainder of paragraph 22.

23.     Defendants admit that Gilroy opened an account at the Securities Centre on June 23, 2004.  Defendants further admit that Gilroy purchased one share of Kotva for 430 CZK on June 24, 2004 and 134 shares of Kotva for 430 CZK per share on June 29, 2004.  Defendants deny the remainder of paragraph 23.

24.     Defendants admit that, on June 30, 2004, Gilroy filed a civil lawsuit against Kotva, KN and SPV KN in Prague challenging the transfers of the Kotva Shopping Centre from Kotva to KN and the subsequent transfer from KN to SPV KN and seeking a declaration that Kotva owns the Shopping Centre.  Defendants are without knowledge or information sufficient to form a belief as to the truth of whether KN and SPV KN were wholly owned by Kotva at the time of both transfers.  Defendants deny the remainder of paragraph 24.

25.     Defendants admit the first sentence of paragraph 25.  Defendants deny the remainder of paragraph 25.

26.     Defendants are without knowledge or information sufficient to form a belief as to the truth of paragraph 26.

27.    Defendants admit that, on August 17, 2004, Weiss sent the letter attached to the Complaint as Exhibit A to Martin Benda, who held himself out as a representative of Forminster. That document speaks for itself.  Defendants deny the remainder of paragraph 27.

28.    Defendants admit that an e-mail was sent on August 17, 2004 with Richard Harazim listed as the sender and that e-mail speaks for itself.  Defendants deny the remainder of paragraph 28.

29.    Defendants admit that, on August 23, 2004, Weiss sent the letter attached to the Complaint as Exhibit B to Martin Benda and Richard Harazim, who held themselves out as representatives of Forminster.  That document speaks for itself.  Defendants deny the remainder of paragraph 29.

30.    Defendants admit that, on November 23, 2004, Weiss sent the letter attached to the Complaint as Exhibit C to Martin Benda and Richard Harazim, who held themselves out as representatives of Forminster.  That document speaks for itself.  Defendants deny the remainder of paragraph 30.

31.    Denied.

32.    Admitted, except that Defendants deny that Weiss is the sole director of K T Inc.

33.    Defendants admit that, on December 23, 2004, Peterka sent a letter to Bryan David Paul Wilson, of Linklaters Prague, and that the letter contained the block quote in paragraph 33.  That letter speaks for itself.  Defendants deny the remainder of paragraph 33.

34.    Defendants admit the second sentence of paragraph 34, except that Defendants deny that Weiss's e-mail was in response to a communication from Kotva.  Defendants deny the remainder of paragraph 34.

35.    Denied.

36.    Denied.

37.    Defendants deny the first sentence of paragraph 37.  Defendants are without knowledge or information sufficient to form a belief as to truth of the remainder of paragraph 37.

38.    Defendants deny the first two sentences of paragraph 38.  Defendants neither admit nor deny the remainder of paragraph 38, but instead state that they reference material protected by the attorney-client privilege and which the plaintiff has obtained improperly.

39.    Denied.

40.    Defendants are without knowledge or information sufficient to form a belief as to the truth of paragraph 40.

41.    Defendants admit that Weiss held a video press conference in Boston on March 15, 2005.  Defendants further admit that Exhibit E contains a true and accurate copy of Weiss's written statement in English.  That document speaks for itself.   Defendants are without knowledge or information sufficient to form a belief as to whether the portion of Exhibit E written in Czech is a completely accurate translation of Weiss's written statement. Defendants deny the remainder of paragraph 41.

42.    Denied.

43.    Defendants are without knowledge or information sufficient to form a belief as to whether internal documents were disclosed as a result of any charges.  Defendants deny the remainder of paragraph 43.

44.    Defendants neither admit nor deny the allegations in paragraph 44, but instead state that they reference material protected by the attorney-client privilege and which the plaintiff has obtained improperly.

45.    Denied.

46.      Defendants admit that, on October 25, 2004, Hoffman sent Weiss an email that includes the text quoted in paragraph 46 of the Complaint.  That e-mail speaks for itself.  Defendants deny the remainder of paragraph 46.

47.      Defendants admit that, on November 25, 2004, Weiss sent Hoffman the document attached to the Complaint as Exhibit G.  That document speaks for itself.  Defendants deny the remainder of paragraph 47.

48.      Denied.

## Count I

49.      Defendants incorporate by reference their responses to the allegations in the preceding paragraphs.

50.      Denied.

51.      Denied.

52.      Defendants admit that Weiss is a resident of Massachusetts and that Weiss Asset Management has its principal place of business in Massachusetts.  Defendants deny the remainder of paragraph 52.

53.      Denied.

54.      Denied.

## Count II

55.      Defendants incorporate by reference their responses to the allegations in the preceding paragraphs.

56.      Paragraph 56 states a conclusion of law as to which no response is required.

57.      Denied.

58.      Denied.

59.    Denied.

60.    Denied.

61.    Denied.

62.    Denied.

63.    Denied.

64.    Denied.

65.    Denied.

66.    Denied.

67.    Denied.

68.    Denied.

## Count III

69.    Defendants incorporate by reference their responses to the allegations contained in the preceding paragraphs.

70.    Denied.

## Count IV

71.    Defendants incorporate by reference their responses to the allegations contained in the preceding paragraphs.

72.    Paragraph 72 states a conclusion of law as to which no response is required.

73.    Denied.

74.    Denied.

75.    Denied.

76.    Denied.

## Count V

77.     Defendants incorporate by reference their responses to the allegations contained in the preceding paragraphs.

78.     Paragraph 78 states a conclusion of law as to which no response is required.

79.     Denied.

80.     Denied.

### Count VI

81.     Defendants incorporate by reference their responses to the allegations contained in the preceding paragraphs.

82.     Denied.

83.     Denied.

### Count VII

84.     Defendants incorporate by reference their responses to the allegations contained in the preceding paragraphs.

85.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the remainder of paragraph 85.

86.     Denied.

87.     Denied.

### REQUESTS FOR RELIEF

The Plaintiff's Requests for Relief are not averments within the meaning of Federal Rules of Civil Procedure 8 and 10 and require no response.  To the extent a response is required, Defendants request that the Court deny all of the Plaintiff's Requests for Relief.

### FIRST AFFIRMATIVE DEFENSE

Kotva a.s. is not a real party in interest.

## SECOND AFFIRMATIVE DEFENSE

The Plaintiff's claims are barred by the doctrine of unclean hands.

## THIRD AFFIRMATIVE DEFENSE

The Plaintiff has failed to state a claim on which relief can be granted.

## FOURTH AFFIRMATIVE DEFENSE

The Plaintiff has failed to plead fraud with particularity.

## FIFTH AFFIRMATIVE DEFENSE

The Plaintiff's claims are barred by estoppel.

## COUNTERCLAIM

Counterclaim-plaintiffs Andrew Weiss ("Weiss"), Weiss Asset Management LLC ("WAM"), K T, Inc. ("K T") and CVF Investments Ltd. for their Counterclaim against counterclaim-defendants Kotva a.s., Martin Benda, Richard Harazim, Forminster Enterprises, Ltd., SPV CO and John Does 1–5 state:

*Jurisdiction and Venue*

1.      The Court has subject matter jurisdiction over the Counterclaim under 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

2.      The Court has personal jurisdiction over the counterclaim-defendants because they have committed tortious acts in Massachusetts, including filing this lawsuit; transacted business in Massachusetts by sending correspondence into Massachusetts, including e-mails, soliciting business from Massachusetts residents; caused injury in Massachusetts by their actions outside of Massachusetts; and availed themselves of the jurisdiction of this Court.

3.      Venue is proper in the District of Massachusetts under 28 U.S.C. §§ 1391(a) and 1391(c) and because Kotva a.s. filed the original complaint in this District.

12

*Parties*

4.      Defendant and counterclaim-plaintiff Andrew Weiss is an individual residing in
Brookline, Massachusetts.

5.      Defendant and counterclaim-plaintiff Weiss Asset Management LLC is a
Delaware limited liability company with its principal place of business in Boston, Massachusetts.

6.      Counterclaim-plaintiff K T, Inc. is a Delaware corporation with its principal place
of business in Boston, Massachusetts.  It owns 1,000 shares of Kotva a.s. and 1,000 shares of
Trend.

7.      Counterclaim-plaintiff CVF Investments Ltd. is a Cyprus corporation with its
principal place of business in Nicosia, Cyprus.  It owns shares of Kotva a.s. and shares of Trend.
CVF Investments Ltd. is a nearly wholly owned subsidiary of Brookdale Global Opportunity
Fund ("BGO").  The interests of CVF Investments Ltd. in Kotva a.s. and Trend is referred to
generally and interchangeably as "CVF Investments' shares" or "BGO's shares."

8.      Plaintiff and counterclaim-defendant Kotva a.s. is a company organized under the
laws of the Czech Republic with its principal place of business in Prague, Czech Republic.

9.      Counterclaim-defendant Forminster Enterprises Ltd. ("Forminster") is a company
organized under the laws of Cyprus.  On information and belief, Forminster's principal place of
business is outside the United States.  The identity of its owners is a closely-kept secret.

10.     Counterclaim-defendant SPV CO is a company organized under the laws of
Cyprus.  On information and belief, SPV CO's principal place of business is outside the United
States.

11.     Counterclaim-defendant Martin Benda ("Benda") is an individual residing in the
Czech Republic.  Benda was a member of the board of Kotva a.s. for part or all of the period

from May 21, 1999 to March 8, 2004.  From March 8, 2004 to the present, Benda has been the Chairman of the Supervisory Board of Kotva a.s.  Forminster nominated Benda to Kotva's board and used its control over a majority of Kotva's shares to secure his election.  Benda also is or was a member of the board of Forminster and an agent of Forminster.  Finally, Benda is a director of SPV CO.

12.    Counterclaim-defendant Richard Harazim ("Harazim") is an individual residing in the Czech Republic.  Harazim is Kotva's general manager or chief executive officer.  Harazim was a member of the board of Kotva a.s. for part or all of the period from May 29, 1997 to March 8, 2004.  From March 8, 2004 to the present, Harazim has been a member of the Supervisory Board of Kotva a.s.  Forminster nominated Harazim to Kotva's board and used its control over a majority of Kotva's shares to secure his election.  Harazim also is or was a member of the board of Forminster and an agent of Forminster.

13.    Counterclaim-defendants John Does 1–5 are individuals residing in the Czech Republic and elsewhere outside the United States who are members of a conspiracy among Forminster, SPV CO, Benda, Harazim and others (collectively, the "Forminster Group").

14.    One object of the Forminster Group's conspiracy is to strip Kotva a.s. of its real estate, sell the real estate and distribute the proceeds among the members of the Forminster Group.

*Factual Allegations*

15.    Weiss Capital LLC is a Delaware limited liability company.

16.    In 2002, Weiss Capital took over the management of Brookdale Global Opportunity Fund ("BGO").  BGO is an investment fund.  Its subsidiary, CVF Investments Ltd., owns shares in Trend, a Czech investment fund, and shares in Kotva a.s.

17.    CVF Investments Ltd. has owned shares in Trend since 1996 and shares in Kotva a.s. since 1997.

18.    Trend's most valuable asset is a significant stake in Kotva a.s.  However, as described in more detail in paragraphs 42–60 below, these shares were embezzled in the mid-1990s and came into the possession of Forminster.

19.    K T, Inc. and CVF Investments Ltd. have both a direct interest in Kotva a.s. as shareholders and an indirect interest in Kotva as shareholders in Trend, which is the rightful owner of at least 32% of the shares of Kotva a.s.

20.    In September 2003, Weiss Capital entered into an agreement with Vladimir Hoffmann under which Hoffmann would assist BGO in liquidating CVF Investments' shares in Trend and Kotva a.s.  Hoffmann's agreement with Weiss Capital ended in October 2004.

21.    In September 2003, Harazim approached Hoffmann and suggested that Forminster might be interested in purchasing BGO's shares in Kotva.   A Forminster Group affiliate then offered to purchase BGO's Kotva shares for 20,000,000 CZK.  Weiss rejected this offer.

22.    J&T Securities then offered approximately 26,000,000 CZK for BGO's Kotva shares in December 2003.  On information and belief, J&T Securities also has commercial relationships with the Forminster Group.  Weiss rejected this offer as well.

23.    While attempting to purchase BGO's shares in Kotva, the Forminster Group was also attempting to sell Kotva's only valuable asset, a department store in downtown Prague (the "Department Store").

24.    On May 12, 2004, Weiss, Hoffmann, Benda and Harazim met in Prague.  At the meeting, Harazim told Weiss and Hoffmann that CVF Investments' shares in Kotva were worth

*nothing*. Harazim said that because CVF Investments is a minority shareholder of Kotva a.s. its shares in Kotva have no value.  Harazim further said that Kotva will never make any distributions to its shareholders and, therefore, Kotva's shareholders would not receive any of the proceeds of the sale of the Department Store. Harazim offered his opinion that there was nothing that Weiss could do about this, or the previous theft of Trend's assets.

25.    In June 2004, two of Kotva's shareholders, Balfindor and Gilroy, filed lawsuits in the Czech courts challenging actions taken by the Forminster Group.  Balfindor challenged actions taken at a Kotva general meeting.  Gilroy challenged the Forminster Group's efforts to move the Department Store from Kotva a.s. to other companies.

26.    In August 2004, Benda and Harazim approached Hoffmann and offered to purchase BGO's Kotva shares for 75,000,000 CZK.  Neither Benda nor Harazim specified what company within the Forminster Group would purchase those shares.  Weiss rejected this offer and made a counter-offer to sell BGO's Kotva shares for 131,000,000 CZK.

27.    On August 17, 2004, Harazim responded to the counter-offer by sending an email to a Weiss Capital employee in Boston, Massachusetts, stating:

> Unfortunately, your offer doesn't seem to deal with the lawsuits brought about by Balfindor and Gilroy against our company. Without resolving these and any other potential lawsuits against our company raised by BGO or by BGO controlled entities we won't be able to conclude any deal at all.
>
> Should you reconsider your position we can return to the discussion about the purchase price for Kotva shares held by BGO.

28.    Based on Harazim's email, Weiss amended his offer to sell BGO's shares for 131,000,000 CZK by including a promise not to initiate any legal challenges relating to the ownership of the Department Store and a promise to attempt to persuade Gilroy to withdraw its lawsuit challenging the transfer of the Department Store.

29.     On August 27, 2004, Harazim responded by email to a Weiss Capital employee in Boston, Massachusetts and demanded that any purchase of Kotva shares was conditioned on the withdrawal of "lawsuits filed by Gilroy AND Balfindor, not only Gilroy." Around the same date, Benda told Hoffmann that any purchase of Kotva shares was conditioned on the release of all claims that BGO had against the Forminster Group, including claims that Forminster's shares in Kotva really belong to Trend.

30.     The release of claims that Trend is the rightful owner of Forminster's shares in Kotva would effectively strip BGO's Trend shares of their value. A share in Trend is valuable primarily because Trend is the rightful owner of at least 32% of Kotva and Kotva is the rightful owner of a valuable piece of real estate or the proceeds from the sale of that real estate. Moreover, the shareholders of Trend have a claim against Forminster for the other assets that were tunneled from Trend. This tunneling provided the capital that Forminster used to buy additional shares in Kotva. Weiss could not agree to surrender these claims for nothing in return.

31.     Thus, in order to meet Harazim's and Benda's demands, Weiss amended his offer so that it (a) referenced Balfindor's lawsuit; (b) included BGO's shares in Trend in addition to BGO's shares in Kotva; and (c) increased the purchase price to reflect the value of BGO's Trend shares. Weiss enclosed with the new offer a detailed calculation supporting the valuation of BGO's holdings in both Kotva and Trend.

32.     Unwilling to pay CVF Investments the fair value of its shares, as reflected by the value of the Department Store, Harazim rejected this offer. Harazim repeatedly refused to respond to requests to explain why the purchase price Weiss suggested was too high or why the calculations Weiss presented were incorrect or inaccurate.

33.     Instead the Forminster Group responded by using its influence over Czech law enforcement to cause or attempt to cause a contrived criminal charge of blackmail to be brought against Weiss.  Harazim is quoted in the Czech press as having "filed a criminal complaint." This charge, if it has been brought, has no merit.  On information and belief, the essence of the Forminster Group's allegation is that Weiss threatened to bring lawsuits challenging the embezzlement of Trend's shares in Kotva and the transfers of the Department Store unless his investors received their fair share of the proceeds of the sale of the Department Store.  Even if this sort of conduct were criminal—it is not—it was Harazim and Benda rather than Weiss who demanded that any purchase of stock be linked to the withdrawal of lawsuits.

34.     The Forminster Group's motive in causing Czech law enforcement to bring the criminal charge was to obtain an unfair advantage over Weiss in its efforts to coerce Weiss to abandon his investors' claims in the Czech courts that were contrary to the Forminster Group's interests (the "Czech litigation").

35.     From August 2004 until January 2005, Harazim sent at least nine emails to Weiss and at least one other person in Massachusetts as part of the Forminster Group's efforts to pressure Weiss to abandon his investors' claims in the Czech litigation.  More specifically, in these emails dated August 17, 2004, August 27, 2004, December 1, 2004, December 3, 2004, December 7, 2004, December 8, 2004, December 15, 2004, January 4, 2005, and January 7, 2005, Harazim consistently sought to purchase shares in Kotva a.s. but conditioned any purchase on the termination of the Czech litigation.  Harazim purposefully directed each of these emails to recipients he knew to be residents of Massachusetts who worked in Massachusetts.

36.     Harazim sent these emails at the direction of Benda, who he described in an August 27, 2004 email as "in charge of this deal."

37.    On information and belief, Harazim also sent these emails at the direction of John Does 1–5.

38.    The Forminster Group then filed this civil case against Weiss. On information and belief, Benda and Harazim personally caused Kotva a.s. to bring this lawsuit, after receiving instructions to do so from Forminster and John Does 1–5.

39.    On information and belief, Benda, Harazim and/or John Does 1–5 sent multiple e-mails, letters and/or facsimile transmissions and made multiple telephone calls to their agents in Massachusetts in order to bring this lawsuit.

40.    The Forminster Group's bad faith motive in filing this case was to obtain an additional unfair advantage over Weiss in its efforts to coerce Weiss to abandon his investors' claims in the Czech litigation.

41.    Weiss and WAM have incurred and continue to incur damages in Massachusetts, including damage to reputation, disruption of their business, lost time and attorneys' fees, as a result of the Forminster Group's decisions to cause Czech law enforcement to bring the criminal charge and to cause Kotva to file this case.

*The Tunneling of the Assets of the Trend Fund*

42.    In 1995 and 1996, Trend's management embezzled Trend's assets, including Trend's shares in Kotva. The embezzlement of Trend's assets has been documented extensively in several Czech government reports and is commonly referred to as the "Trend Scandal" or "Trend Tunneling." The media has also reported extensively on the Trend Scandal[1] as well as several unusual events surrounding the investigation of the Trend Scandal. On information and

---

[1] Attached hereto as Exhibit 2 are some press articles about the Trend Scandal, with English translations.

belief, multiple law enforcement personnel involved in the investigation of the Trend Scandal
have either resigned or committed suicide under suspicious circumstances.

43.    Miroslav Hálek, who exerted managerial control over Trend at the time of the
embezzlement, also possessed a general power of attorney to act on behalf of Forminster during
the same time period.

44.    Hálek's connections to Forminster and personal involvement in the embezzling of
Trend's assets are documented in detail in several reports authored by Czech prosecutors. For
example, the Deputy Regional Public Prosecutor wrote:

> Dealings and transfers of shares of Kotva, a.s., represented the most significant
> object of interest for the defendants [Miroslav Hálek & Co.]. Kotva shares
> belonged among essential investments of the fund within the period before
> August 4, 1995. The aim of the previous management was, and still is, to transfer
> the shares of Kotva to companies controlled by Mr. Hálek and Co., and to gain
> majority shareholding in Kotva through other purchases, whereto they also used
> the resources of the fund. The Kotva shares are still in the focus of interest of Ing.
> Hálek's and Co. surrounding companies. Even within the period of the forced
> administration, several transfers of Kotva shares were accomplished, namely
> between persons and companies and Jiří Mareš, classmate of Mr. Hálek, through
> whom Kotva shares were transferred back to the companies controlled by Ing.
> Hálek, and who is, with a high probability, a significant person. At the time of
> adoption of a non-effective resolution by the Regional Court in Hradec Králové to
> prohibit any disposal with the shares of Kotva by Královehradecká brokerská, the
> transfer of Kotva shares to the company **Forminster Enterprises, Ltd.**, with the
> registered office at Cyprus, to whose financial accounts Ing. Hálek holds
> particular rights, was effectuated by an order of KHB.
>
> The activities of Mr. Hálek's group have not been stopped even by the decision
> about the forced administration [of Trend], and as it results from recent findings,
> their effort to take the control of Kotva and the assets of Trend continues up to the
> present and neither the criminal proceedings nor their placement in detention
> constitute any obstacle to it. Even before the commencement of criminal
> proceedings, the transfer of part of shares of Kotva to **Forminster Enterprises,
> Ltd.**, with its registered office at Cyprus, was effectuated and after that the
> company Královehradecká (brokerská) a.s. was sold to the company Bonit
> kapital, a.s., Brno. KHB, renamed to Brněnská obchodní, a.s., is now facing a
> petition for declaration of bankruptcy against it. According to recent findings,
> even within the period of his detention, Ing. Hálek signed important documents
> concerning the accounts of the **Forminster Enterprises, Ltd.** Company with
> LGT Bank in Vaduz in Liechtenstein.

September 30, 1998 Report of the Hradec Králové Deputy Regional Public Prosecutor (emphasis added).

45.     After a complicated series of transactions, members of the Forminster Group gained possession of the Kotva shares embezzled from Trend and, with those shares, control over Kotva.  The Forminster Group paid significantly less for Trend's Kotva shares than the shares were worth.

46.     The Forminster Group also used other assets embezzled from Trend to purchase shares in Kotva.  The Kotva shares Forminster obtained from Trend and the Kotva shares Forminster purchased with Trend's assets total more than 55% of Kotva's shares.

47.     As part of an investigation of the Trend Tunneling, in 1997 a public prosecutor in the Czech Republic froze the Kotva shares held by the Forminster Group, preventing Forminster from selling them.  In 2004, the Czech Constitutional Court affirmed the actions of the prosecutor, writing:

> In the opinion of the then Supervising Public Prosecutor of the Regional Public Prosecutor's Office in Hradec Kralove, the said securities were the subject of a crime or as the case may be, the proceeds of crime, and were totally and materially related to the commitment of a grievous crime against property.  The issuance of the injunction was meant to preclude the completion of the chain of illegal securities' transfers.

Czech Constitutional Court, Decision No. II US 267/03 (April 15, 2004).  Similarly, "[i]n the opinion of the High Public Prosecutor, [Forminster's shares in Kotva] are the proceeds of a crime committed by Ing. M. H[alek] and Co., which had been transformed into documentary securities and placed in the account of F[orminster] E[nterprises] Limited in the Prague Security Exchange Center."  Id.

48.     The Hradec Králové Public Prosecutor described the freeze of Forminster's Kotva shares as a narrow one, "specify[ing] exactly those securities that have been the subject matter of

crime, or the effects thereof," and not applying to securities "hav[ing] no connection to crime

whatsoever, or where such a connection, if assumed, cannot be deduced conclusively on the

basis of the evidence produced." May 13, 1997 Injunction of the Hradec Králové Public

Prosecutor, No. KZv 323/97.

49.    Around the same time, the High Court in Liechtenstein froze Forminster's

accounts at the LGT Bank in Vaduz, Liechtenstein on suspicion of money laundering and

conspiracy, among other crimes.

50.    Despite the Czech prosecutor's order freezing the Kotva shares held by the

Forminster Group, members of the Forminster Group were still able to vote those shares. The

Forminster Group controls at least 55% of the shares of Kotva. As majority shareholders, the

Forminster Group elects the board of Kotva and controls its management.

51.    Nevertheless, the freeze inconvenienced the Forminster Group. They could not

convert their Kotva shares into cash. Thus, they had to devise a scheme to separate the assets of

Kotva a.s. from the frozen shares of Kotva a.s., liquidate those assets, and appropriate the cash

proceeds for their own benefit.

52.    Since at least 1999, after electing board members of Kotva a.s., the Forminster

Group has, through its front-men, Benda and Harazim, exerted full control over Kotva a.s. and

actively directed all of its activities, including the bringing of this lawsuit. The Forminster

Group uses its pervasive control over Kotva a.s. to act in a selfish way, disregarding the interests

of Kotva a.s.'s minority shareholders. They use Kotva a.s. to serve the Forminster Group's

interests and defraud the minority shareholders.

53.    The Forminster Group caused Kotva a.s. to transfer the Department Store through

a series of shell companies.  These transfers have no legitimate business purpose but are instead

designed to allow the Forminster Group to take more easily the proceeds of the sale of the Department Store. Ultimately, the Department Store was sold to an Irish company called Markland for approximately $65 million.

54.    More specifically, Kotva a.s. first transferred the Department Store to a company it created called Kotva Nemovitosti. On information and belief, Benda was the chairman of the board of Kotva Nemovitosti at the time. The Forminster Group then caused Kotva a.s. to convert Kotva Nemovitosti from a wholly owned child corporation into a limited partnership in which Kotva a.s. had a right to less than half of the profits and liquidation surplus.

55.    The Forminster Group then further removed the Department Store from Kotva's shareholders by transferring the Department Store from Kotva Nemovitosti to another company called SPV KN. The Forminster Group used unregistered and untraceable bearer shares to establish ownership of SPV KN.

56.    On information and belief, when SPV KN first received the Department Store from Kotva Nemovitosti, Kotva Nemovitosti held all of the bearer shares evidencing the ownership of SPV KN. However, according to the Kotva's 2004 annual report, the Forminster Group moved the Department Store even further away from Kotva's shareholders by causing Kotva Nemovitosti to transfer 97% of the shares of SPV KN to a Cyprus company called SPV CO.

57.    SPV CO is part of the Forminster Group. SPV CO has as its registered seat the address: Ledra House, Agiou Pavlou 15, Agio Andreas, 1105 Nicosia, Cyprus. This address is also the registered seat of the law offices of Chistodoulos G. Vassiliades & Co., the law firm that established Forminster in 1996.

58.    According to Kotva's 2004 annual report, the Forminster Group effected the sale of the Department Store to CRQ Czech, a Czech company controlled by Markland, by transferring the bearer shares of SPV KN from SPV CO to CRQ Czech.

59.    Thus, the proceeds from the sale of the Department Store will not be paid to Kotva or even another Czech company.  Instead, it appears that the purchase price for the SPV KN shares will be or has been paid to SPV CO or another Forminster-controlled entity that will distribute the proceeds of the sale among the Forminster Group rather than among Kotva's shareholders.

60.    The Forminster Group's scheme has damaged counterclaim-plaintiffs K T and CVF Investments Ltd. by preventing them from realizing the rightful return on their investments that the majority shareholders in Kotva a.s., the Forminster Group, have or expect to realize.

<u>**Count I**</u>
**(Abuse of Process —**
**Counterclaim-Plaintiffs Andrew Weiss and Weiss Asset Management LLC v. All**
**Counterclaim-Defendants)**

61.    Paragraphs 1–60 are incorporated by reference as if set forth fully herein.

62.    The Forminster Group, including all counterclaim-defendants, used Czech criminal process by filing a criminal complaint and by exerting its influence over Czech law enforcement to cause or attempt to cause criminal charges to be brought against Weiss.

63.    This action had an ulterior and illegitimate purpose as described above.

64.    Counterclaim-plaintiff Weiss was damaged by this abuse of process as described above.

65.    The Forminster Group, including all counterclaim-defendants, used United States civil process by filing this lawsuit.

66.    This action had an ulterior and illegitimate purpose as described above.

67.    Counterclaim-plaintiffs Weiss and Weiss Asset Management were damaged by this abuse of process as described above.

## Count II
**(Conspiracy —  Counterclaim-Plaintiffs Andrew Weiss, Weiss Asset Management, K T, Inc. and CVF Investment Ltd. v. All Counterclaim-Defendants)**

68.    Paragraphs 1–67 are incorporated by reference as if set forth fully herein.

69.    The members of the Forminster Group, including all counterclaim-defendants, agreed to work together to loot Kotva's assets, abuse the Czech criminal process and abuse the United States civil process.

70.    The members of the Forminster Group have a peculiar power of coercion in that, as a group, they have access to and influence over at least one member of the Czech government, including the ability to cause Czech law enforcement to bring criminal charges to provide them with leverage in their commercial disputes.

71.    Counterclaim-defendants Kotva, Benda, Harazim, Forminster, SPV CO and John Does 1–5 have conspired to damage counterclaim-plaintiffs Weiss, Weiss Asset Management, K T, Inc. and CVF Investments Ltd. as described above.

## Count III
**(Conversion —
Counterclaim-Plaintiffs K T, Inc. and CVF Investments Ltd. v. Benda, Harazim, Forminster, SPV CO and John Does 1–5)**

72.    Paragraphs 1–71 are incorporated by reference as if set forth fully herein.

73.    Kotva a.s., either directly or through a wholly owned subsidiary, has or had the right to the proceeds from the sale of the Department Store.

74.    Counterclaim-defendants Benda, Harazim, Forminster, SPV CO and John Does 1–5 unlawfully seized control of Kotva's interest in the proceeds from the sale of the Department Store.  In so doing, the counterclaim-defendants deprived Kotva and its shareholders, including

counterclaim-plaintiffs K T and CVF Investments Ltd., of their rights to benefit from the value of the Department Store.

## Count IV
### (Unjust Enrichment —
### Counterclaim-Plaintiffs K T, Inc. and CVF Investments Ltd. v. Benda, Harazim, Forminster, SPV CO and John Does 1–5)

75.     Paragraphs 1–74 are incorporated by reference as if set forth fully herein.

76.     By selling the Department Store and keeping the proceeds for themselves, counterclaim-defendants Benda, Harazim, Forminster, SPV CO and John Does 1–5 have unjustly enriched themselves at the expense of counterclaim-plaintiffs K T, Inc. and CVF Investments Ltd.

## Count V
### (Breach of Fiduciary Duty / Abuse of Control —
### Counterclaim-Plaintiffs K T, Inc and CVF Investments Ltd. v. Benda, Harazim and Forminster)

77.     Paragraphs 1–76 are incorporated by reference as if set forth fully herein.

78.     Harazim is an officer of Kotva a.s., a member of its Supervisory Board and a former member of the board of directors of Kotva a.s.

79.     Benda is the Chairman of the Supervisory Board of Kotva a.s. and a former member of the board of directors of Kotva a.s.

80.     Since 1997, Forminster has controlled a majority of the shares of Kotva a.s. and, since at least 1999, has controlled Kotva a.s.'s board of directors.

81.     As an officer, director and supervisory board member of Kotva a.s., Harazim owes a fiduciary duty of utmost loyalty and good faith to Kotva and its shareholders.

82.     As a director and supervisory board member of Kotva a.s., Benda owes a fiduciary duty of utmost loyalty and good faith to Kotva and its shareholders.

83.    As the entity controlling a majority of the shares of Kotva a.s., Forminster owes Kotva's minority shareholders a duty not to misuse its majority vote.

84.    As supervisory board members of Kotva, Benda and Harazim owe a duty to Kotva's shareholders to monitor the board of directors.

85.    By directing and participating in the repeated transfers of the Department Store for the benefit of the Forminster Group rather than Kotva's shareholders, Harazim, Benda and Forminster breached their respective duties to Kotva's shareholders, including counterclaim-plaintiffs K T and CVF Investments Ltd.

86.    By using their influence over Kotva's board of directors to cause the board of directors to act to the detriment of Kotva and its shareholders, including counterclaim-plaintiffs K T and CVF Investments Ltd., Benda, Harazim and Forminster abused their control over Kotva's board of directors in violation of Czech Commercial Code § 66c.

87.    By allowing and encouraging the board of directors to strip Kotva of the Department Store and not ensuring that Kotva's shareholders would receive fair compensation in exchange, Benda and Harazim breached their duty to monitor Kotva's board of directors to the detriment of Kotva's shareholders, including counterclaim-plaintiffs K T and CVF Investments Ltd.

88.    Counterclaim-plaintiffs K T and CVF Investments Ltd. were damaged by these breaches of fiduciary duty and abuse of control as described above.

### Count VI
**(Constructive Trust —
Counterclaim-Plaintiffs K T, Inc. and CVF Investments Ltd. v. All Counterclaim-
Defendants)**

89.    Paragraphs 1–88 are incorporated by reference as if set forth fully herein.

90.    The Department Store, the bearer shares in SPV KN and/or the proceeds of the sale of the SPV KN bearer shares are subject to a constructive trust for the benefit of Kotva's shareholders, including counterclaim-plaintiffs K T and CVF Investments Ltd.

### Count VII
### (Unfair Competition and Unfair and Deceptive Trade Practices — Andrew Weiss, Weiss Asset Management, K T, Inc. and CVF Investments Ltd. v. All Counterclaim-Defendants)

91.    Paragraphs 1–90 are incorporated by reference as if set forth fully herein.

92.    The Forminster Group and its members are engaged in trade and commerce within the meaning of M.G.L. ch. 93A.

93.    Counterclaim-plaintiffs Weiss, WAM, K T, Inc. and CVF Investments Ltd. are engaged in trade and commerce within the meaning of M.G.L. ch. 93A.

94.    The Forminster Group's conversion, fraud, abuse of process, conspiracy and fraudulent transfers of the Department Store are unfair and deceptive trade practices.

95.    The Forminster Group engaged in these unfair and deceptive trade practices knowingly and willfully.

96.    As a result of these actions, the counterclaim-plaintiffs have suffered damages as described above.

### Count VIII
### (Declaratory Judgment — Counterclaim-Plaintiffs K T, Inc. and CVF Investments Ltd. v. All Counterclaim-Defendants)

97.    Paragraphs 1–96 are incorporated by reference as if set forth fully herein.

98.    There is a genuine controversy between counterclaim-plaintiffs K T, Inc and CVF Investments Ltd. on the one hand and Benda, Harazim, Forminster, SPV CO and John Does 1–5 on the other hand as to who should receive the proceeds of the sale of the Department Store.

99.    Benda, Harazim, Forminster, SPV CO and John Does 1–5 have obtained possession of the sale proceeds through unlawful means.  Accordingly, they have no right to those proceeds.

100.    The sale proceeds belong instead to Kotva a.s. and its shareholders.

101.    There is a genuine controversy between counterclaim-plaintiffs K T, Inc. on the one hand and Benda, Harazim, Forminster, SPV CO and John Does 1–5 on the other hand as to whether Forminster is the rightful owner of over 55% of the shares of Kotva.

102.    By unlawfully maintaining control of these shares, the Forminster Group is able to maintain control over Kotva and take actions to the detriment of minority shareholders including counterclaim-plaintiffs K T, Inc. and CVF Investments Ltd.

103.    The Forminster Group has no legal right to its Kotva shares because those shares were either stolen from Trend or represent the proceeds of other assets stolen from Trend.

## PRAYER FOR RELIEF

WHEREFORE, counterclaim-plaintiffs Andrew Weiss, Weiss Asset Management LLC, K T, Inc. and CVF Investments Ltd. respectfully request that this Court:

(a)    Enter judgment for the counterclaim-plaintiffs and against the counterclaim-defendants on all counts of the Counterclaim;

(b)    Impose a constructive trust on the proceeds of the sale of the Department Store;

(c)    Declare that the shareholders of Kotva a.s. are the owners of the proceeds of the sale of the Department Store;

(d)    Declare that the Forminster Group is not the rightful owner of the shares of Kotva a.s. to which it claims ownership;

(e)     Enter an Order requiring Benda, Harazim, Forminster and John Does 1–5 to disgorge the proceeds of the sale of the Department Store and transfer them to the shareholders of Kotva, a.s.;

(f)     Award damages on Counts 1, II, III, IV, V  and VII, including treble damages on Count VII;

(g)     Award the counterclaim-plaintiffs their costs;

(h)     Award the counterclaim-plaintiffs their attorneys' fees; and

(i)     Grant such other relief as the Court deems just and proper.

## JURY DEMAND

DEFENDANTS AND COUNTERCLAIM-PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

.                                          Respectfully Submitted,
                                          ANDREW WEISS, WEISS ASSET
                                          MANAGEMENT LLC, K T, INC. and CVF
                                          INVESTMENTS LTD.

                                          By their attorneys,


                                          /s/ Benjamin A. Goldberger
                                          Edward P. Leibensperger (BBO# 292620)
                                          Michael Kendall (BBO# 544866)
                                          Benjamin A. Goldberger (BBO# 654357)
                                          McDermott Will & Emery LLP
                                          28 State Street
                                          Boston, Massachusetts  02109-1775
                                          (617) 535-4000

Dated: June 15, 2005

## <u>CERTIFICATE OF SERVICE</u>

I, Benjamin A. Goldberger, hereby certify that on the 15th day of June, 2005, a true and correct copy of the foregoing document was served by overnight delivery on counsel of record for Kotva a.s.

/s/ Benjamin A. Goldberger
Benjamin A. Goldberger

EXHIBIT 1
SUMMARY OF COUNTERCLAIMS

| Count / Defendant | I Abuse of Process Weiss and WAM | II Conspiracy Weiss, WAM, K T and CVFI | III Conversion K T and CVFI | IV Unjust Enrichment K T and CVFI | V Breach of Fiduciary Duty / Abuse of Control K T and CVFI | VI Constructive Trust K T and CVFI | VII Unfair Trade Practices Weiss, WAM. K T and CVFI | VIII Declaratory Judgment K T and CVFI |
|---|---|---|---|---|---|---|---|---|
| Kotva a.s. | X | X |  |  |  | X | X | X |
| Forminster | X | X | X | X | X | X | X | X |
| SPV CO | X | X | X | X |  | X | X | X |
| Benda | X | X | X | X | X | X | X | X |
| Harazim | X | X | X | X | X | X | X | X |
| John Does 1–5 | X | X | X | X |  | X | X | X |

Lichtenštejnské důkazy o vytunelování Trendu

# Heslo: PIANO ČERNÝ

*Rekonstruujeme modelový příklad, jak vytunelovat investiční fond. TÝDEN získal dokumenty, které nasvědčují tomu, že tzv. prodej obchodního domu Kotva do zahraničí byl jen trikem.*

Kauza OD Kotva (tržní hodnota činí asi 2,885 miliardy korun) je bitvou v Čechách nevídaného rozměru. Je operřena několika vězněnými osobami, desítkami žalob, kampaněmi známých mediálních agentur i nebývalou koncentrací nejprestižnějších českých advokátů. Dříve než zrekonstruujeme případ na základě nejnovějších poznatků TÝDNE, shrňme jeho podstatu: firma Královéhradecká brokerská, a s (KHB), se podle dokumentů, které máme k dispozici, pokusila majoritní podíl Kotvy převést z investičního fondu Trend prostřednictvím zahraniční společnosti ve prospěch dosud nespecifikovatelných subjektů či osob Případ je jedním z nejkomplikovanějších v moderní historii komerčního práva u nás.

## Rekonstrukce kauzy Trend & Kotva

Fond Trend (založený Bankou Skala a Montovanými stavbami) využil politického zázemí Michaela Kocába a podnikatelských schopností Martina Kratochvíla k důvěryhodnému úspěchu v kuponové privatizaci. Prvním nebezpečím pro „otce zakladatele" fondu Trend byla aktivita spojená se sdružováním menších akcionářů a skupováním akcií. Trend se pokusil zabránit vzniku silné minoritní skupiny akcionářů, která by mohla vyměnit statutární orgány složené z „otců zakladatelů" Rozhodl se pro výplatu velmi slušných dividend (s předpokladem, že původní akcionáři fondu namísání dividendou, akcie neprodají) To však zjevně nestačilo a po několika měsících díkové opět prodávali akcie fondu investorovi, který je shromažďoval (šlo o firmu

Czech Value Fund, která v případu bude hrát podstatnou roli)

V únoru 1995 byla založena nová investiční společnost Trend, a s., se základním jměním 1 000 000 Kč, mezi jejímiž akcionáři byli i Michael Kocáb a Martin Kratochvíl Tato společnost pak fond Trend spravovala Její založení a existence se však zdají silně účelové Akcie správcovské společnosti Trend, a s., byly totiž 2 srpna 1995 prodány firmě Královéhradecká brokerská, a s. za 318,365 milionu korun. Jejím hlavním akcionářem byl Miroslav Hálek (nyní ve vazbě) Z tohoto obchodu měl Kocáb zisk 36,142 milionu Kč Že se jednalo o první a zásadní faul na akcionáře fondu Trend, je zřejmé z Kocábova prohlášení

v listopadu 1997: „V případě, že minoritním akcionářům fondu Trend nebude najeto k navrácení, tuto sumu nebudu chtít a použiji ji na nějaký dobročinný ale kontrolovatelný účel"

### Tunel hned na počátku

Noví správci z Královéhradecké brokerské uskutečnili první podivný obchod s akciemi již tři týdny poté, co je předsedou představenstva samotného fondu Trend, se postupně podařilo skoupil podíl v rozličných firmách různým způsobem celkem 65 % akcií Kotvy

O tento obchodní dům měla zájem právě již zmíněná společnost Czech Value Fund (CVF) Během roku 1996 proto koupila na kapitálovém trhu 37 procent akcií fondu Trend za zhruba 10 milionů dolarů a 1 listopadu byli zvoleni její zástupci - John Moffit a Michael Blum - do představenstva fondu O týden později, když oba zjistili, že fond již byl vytunelován, byla na jejich nátlak ministerstvem

správcovské investiční společnosti Trend, a s., včetně desetiprocentní provize Je třeba investé, že v téže době je šlé zůstávali v představenstvu fondu Trend Michael Kocáb a Martin Kratochvíl, avšak oba tvrdí, že v období, kdy fond prodával lukrativní akcie byli na dovolené v zahraničí

### Na řadu přišla Kotva

Koncem roku 1995 vlastnil Trend přibližně 20 procent akcí Kotvy Hálkovi, který byl tehdy už je ho majitelem správcovské společnosti, se

koupili Ve třech smlouvách prodali lukrativní akcie z Trendu (Telecom. Chemopetrol a Synthesia) společnosti Consul Invest (jejíž šéf je nyní ve vazbě) za 487 milionů korun Kupec zaplatil jen první splátku (135 milionů), zbytek zůstal dlužen dodnes, čímž Trend ztratil 352 milionů korun Akcie držel pár dnů a obratem je prodal firmě spřízněné s Královéhradeckou brokerskou

Porovnání čísel vede logicky k podezření, že šlo o pokrytí investic KHB za koupi



Ve vazbě. Miroslav Hálek (v popředí), bývalý předseda představenstva IF Trend obviněný vyšetřovatelem z trestného činu podvodu. (6. března 1997 na chodbě Krajského úřadu vyšetřovatel v Hradci Králové.)

financí uvolena na fond Trend
mocná správa. Londýnský
i ditel společnosti vlastnící
CVF pan Kingsnorth svého
času prohlásil, že odpověd-
nost za špatné hospodaření
s mi Trend nese spolu s Hál-
em a jeho představenstvem
s představenstvo předcházejí-
í tedy Michael Kocáb a jeho
i odcházejí

## Zablokování účtu

John Moffit, šéf CVF, však
začátkem roku 1997 přechází
za pomoci Michaela Kocába
i advokátní kanceláře Váňa,
Pergl a partneři (AK VPP) do
tvrdého útoku. Účty Trendu
byly rozhodnutím soudu
zablokovány, ale rozhodnutí
soudu se dostalo do Středisko
cenných papírů pozdě. Hálek
i spol proto stihli prodat
svým spřízněným firmám kon-
cem ledna 1997 z již zablo-
kovaných účtů Trendu asi
14 procent akcií Kotvy. Kro-
mě toho stahovali další akcie
a nakonec 30. ledna 1997
Hálek a spol balík o velikosti
56 % akcií Kotvy prodali za
80 milionů Kč kyperské firmě
Forminster Enterprises Limi-
ted (FEL) Začátkem března
se ocitli ve vazbě a 65 % akcií
Kotvy státní úředníci zablo-
covali Tak propukl naplno nevi-
daný právní spor mezi Hálkem
a Czech Value Fund

## Bitva advokátů

Advokáti z advokátní kancelá-
ře Váňa, Pergl a partneři ve
službách minoritního akcio-
náře Czech Value Fund vstupují
do orgánů fondu Trend
obnu již jako statutární
upci, ale zároveň Mgr.
... a t Pergl a Mgr Radek
rkha z AK VPP na valných
hromadách Kotvy vystupují za
Trend v roli právníků a podaří
se jim v přímém souboji zvít-
žit nad zástupci FEL Advokát
P gl prohlašuje v Právu
(2 10 1997): ... a teď jsme
dáli h oves sebe, jejich před-
se i s O to po hodinê
dal N držel to nervově
Pak se z oji dvě představo-
v na dvy Pergl vystavu-
je m plnou moc
V ... 1997 pověřuje
nový rad 56 procent Kot-
vy, kt up l kyperský FEL,
zastupe i in advokátní kan-
celář H De L o Toman

a partneři Do obchodního rej-
stříku však bylo 4 srpna
zapsáno představenstvo mino-
ritního vlastníka - tedy Czech
Value Fund
V srpnu 1997 je podepsána
další zvláštní smlouva: koncipient JUDr. Tomana bývalý
ředitel Bezpečnostní infor-
mační služby Stanislav Devátý
od starého hálkovského
představenstva koupil za
2,885 miliardy korun Kotvy
jako nemovitost (Stalo se tak
zaregistrováním na katastrál-
ním úřadě v Praze, součástí
operace bylo deklarované
zpětvzetí ) Smyslem této ope-
race byla snaha kyperské fir-
my FEL, kterou Tomanova
kancelář zastupovala, zabránit
jakémukoliv nakladání
s majetkem Kotvy V listopadu
1997 pak došlo ke zrušení
této smlouvy, protože údajné
nebezpečí neoprávněného
nakládání s nemovitostmi
pominulo



„PIANO ČERNÝ". Tak zní heslo umožňující operovat s kontem společ-
nosti kyperské firmy Forminster Enterprises Limited u LGT Bank in
Liechtenstein. Z dalšího dokumentu jsou patrné podpisové vzory zvláš-
tě na Forminster Enterprises Limited v LGT Bank in Liechtenstein. Jde
o důkaz o tom, že Hálek a spol. mohli s kontem volně disponovat.

## Bankovní dokumenty

Vraťme se však k zásadní otáz-
ce, otázce právoplatnosti důle-
žitých rozhodnutí a k otázce,
oč usilovala firma FEL.
V prosinci 1997 zrušil Vrch-
ní soud v Praze zápis minorit-
ního představenstva a na
bojovné prosincové valné hro-
madě Kotvy, kterou vedl
JUDr. Tomáš Sokol (pověřen
většinovým vlastníkem Tren-
du, tedy kyperskou společnos-
tí FEL), došlo ke zvolení nové-
ho představenstva. V něm se
z ničeho nic objevili zástupci
Českého investičního holdingu
(ČIH). Ten zastupovala další
přední advokátní kancelář
Kříž, Bělina & spol. Jak se
však mohl český investiční
holding objevit v této hře?
Holding ČIH koupil od kyper-
ského FEL opci na akcie Kot-
vy. (Této valné hromadě byl
přítomen mimo JUDr. Toman
a i JUDr. Josef Lžičař - takova

koncentrace nejrenomovaněj-
ších českých právníků nastala
v našich novodobých dějinách
poprvé )
ČIH je ryze český investor,
pro nějož je investice do akcií
Kotvy obchodem s únosnou
mírou rizika. Jeho zástupci
budou v orgánech Kotvy při-
nejmenším do té doby, než
soud rozhodne, komu zabloko-
vané akcie vlastně patří Role
ČIH se zdá v případě operací
týkajících se Kotvy spíše
náhodná

## „PIANO ČERNÝ"

Prosincová valná hromada
Kotvy tedy nedopadla pro
Czech Value Fund dobře a jen
několik dnů poté se objevuje
prohlášení advokátky
JUDr. Jirkové z advokátní kan-
celáře Váňa, Pergl a partneři
v LN (12 12 1997), že mají
důkazy o tom, že kyperská fir-
ma FEL byla pouze Hálkovou
schránkou TÝDNU se podařilo
část těchto dokumentů získat.
Pokud by se potvrdila jejich
pravost, podařil by se advoká-
tům husarský kousek (vzpo-
meňme si, že stejní právníci
vnesli jasno i do kauzy tunelo-
vání CS Fondů, když popsali
přesné toky peněz)
V případě Trendu by totiž
prolomili bankovní tajemství
lichtenštejnské banky LGT
Bank in Liechtenstein, kde
kyperská firma FEL měla svůj
účet Hálek si totiž měl „prona-
jmout" firmu FEL se svým
obchodem, coż má dokazovat
plná moc od kyperského FEL
pro nakládání s jeho kontem
ve prospěch Hálka a heslo pro
telefonické příkazy: „PIANO
ČERNÝ" Je nepravděpodob-
né, že by kyperský občan zvolil
heslo v češtině
Tento průlom však určitě
povede k objasnění celého pří-
padu. Hálek a spol. s největší
pravděpodobností využili spo-
lečnosti FEL k převodu majet-
ku z fondu Trend na akcie
Trendu Angličanům z
Czech Value Fund, který za
akcie Trendu zaplatili zhruba
10 milionů dolarů, a dalším
investorům se pak snad vrátí
peníze vložené do akcií fondu.
Případ neskončil. podle zasvě-
cených právníků může být
ještě vznesseno až padesát
žalob

JAROMÍR PISKOR ■
(Autor je volný reportér)

LIECHTENSTEIN EVIDENCE ON THE TUNNELING OF TREND

# Password: PIANO BLACK

Reconstruction of a model case of how to tunnel an investment fund: TYDEN has evidence supporting the suspicion that the so-called "sale" of Kotva Department Store to abroad was a mere fraudulent trick.

TÝDEN MAGAZINE 04/1998

The case of Kotva DS (with the market value of about 2,885 billion Czech Crowns) is a battle of unseen dimensions in the Czech Republic. It is spiced up with people turned in jail, dozens of court claims, campaigns of well-known PR agencies as well as an unusual concentration of the most prestigious Czech lawyers. Before we present to you our reconstruction of the case on the basis of the newest findings by TYDEN, let's focus on its fundamental aspects: the company Kralovehradecka brokerska, a.s., (KHB), has attempted, as the documents we have acquired show, to take the majority share in Kotva out of Trend and transfer it via a foreign company to the benefit of not yet specifiable persons or entities. The case is one of the most complicated ones in the modern history of commercial law in our country.

**Reconstruction of the case of Trend & Kotva**

The mutual investment fund Trend (founded by Skala Bank and the company Montovane stavby) took the advantage of the political background of Michael Kocab in combination with the business talents of Martin Kratochvil and won a credible success in the voucher privatization. The first activities perceived as a threat by the "founding fathers" of the fund were the activities concerning the grouping of small shareholders and the purchase and concentration of shares. Trend made an attempt to prevent a strong minority shareholders' group that would have the power of replacing the statutory bodies of the fund composed of the "founding fathers" from coming into existence by having made an offer of very good dividends (assuming that the original shareholders, satiated by such dividends, shall not get rid of their shares). However, this tactic did not prove effective enough and in a few short months, the investment vouchers holders (shareholders) started selling off their shares to the investor accumulating them again (the company Czech Value Fund, which shall turn out to play a significant role in the case later).

In February 1995, the new investment company Trend, a.s., was founded having the registered capital of CZK 1,000,000, amongst whose shareholders were also Michael Kocab and Martin Kratochvil. This company undertook the administration of Trend. Its foundation and existence alone, however, seem to be very purpose-sown, since the shares of the administrating company Trend, a.s., were, on 2 August 1995, sold to Kralovehradecka brokerska, a.s., for the price of CZK 318,365,000, whose major shareholder was Miroslav Halek (held in custody now). Kocab's profit from this deal came to be CZK 36,142,000. The fact that this transfer was the first and principal foul against Trend's shareholders is borne out in Kocab's public announcement of November 1997: "In the case that the assets of the minority shareholders are not returned to them, I will not accept this sum of money but give it up to some charitable purpose under good control."

**Tunnel from the beginning**

The new administrators of Trend from Kralovehradecka brokerska realized their first fishy deal with the shares already three weeks after their takeover of the administrating company. Under three contracts they sold the lucrative shares of Trend (Telecom, Chemopetrol and Synthesia) to the company Consult Invest (whose boss is in custody now) for 487 million Czech Crowns. The purchaser only paid up the first installment (135 million) owing the rest until today – and having Trend lose 352 million in result. Moreover, it only held the shares purchased for a couple of days and then resold it to a company tied to Kralovehradecka brokerska.

The simple comparison of the figures logically and immediately leads to a suspicion that this transaction served to cover the investment of KHB for the purchase of the administrating investment company Trend, a.s., including a 10% provision. We need to add at that time, Michael Kocab and Martin Kratochvil were still sitting on Trend's Board of Directors but both of them assert they were on holiday abroad and out of touch when the fund was selling the lucrative shares.

**Eyes on Kotva**

By the end of 1995, Trend owned about 20% of shares in Kotva. Halek, who was then not only the owner of the administrating company but already sat in the chair of the Chairman of the Board of Trend itself, gradually succeeded in gathering up 65% of shares in Kotva within all sorts of various companies.

The already mentioned Czech Value Fund (CVF) was interested in the Department Store and during 1996, it bought 37% of the shares in Trend on the capital market for about $ 10 million: on 1 November, the representatives of CVF, John Moffit and Michael Blum, were elected in the Board of Directors of the Fund. A week later, when they found out that the fund had already been tunneled out, the Ministry of Finance under their pressure imposed forced administration on Trend. The London executive of the company controlling CVF, Mr. Kingsnorth, once commented that it is not only the Board of Directors headed by Halek, who should be held responsible for the poor management of the fund, but also the previous Board of Directors, i.e. Kocab and his associates.

**Account Freezing**

John Moffit, the head of CVF, turns to fight back hard with the help of Michael Kocab and the law firm Vana, Pergl and Partners (AK VPP) in 1997. The accounts of Trend are frozen but the freezing order arrives at the Prague Security Center too late, which gives enough room to Halek and Co. to use their time and resell about 14% of the shares in Kotva from the frozen account to their crony companies by the end of January 1997. Besides that, they kept on removing other shares until they finally managed, on January 30, 1997, to sell the bulk of 56% shares in Kotva to the Cyprus company Forminster Enterprises Limited (FEL) for CZK 80 million. At the beginning of March, they were eventually put in custody and the governmental officials managed to freeze 65% of the shares in Kotva. This kicked off an unprecedented legal dispute between FEL and Czech Value Fund with violence.

**The battle of lawyers**

The lawyers from AK VPP hired by the minority shareholder, Czech Value Fund, enter the statutory bodies of Trend. They become the statutory representatives in April but at the same time Mgr. Robert Pergl and Mgr. Radek Blaha of AK VPP act in the role of Trend's attorneys at the general meetings of Kotva and they succeed in beating the reps of FEL in a head-on combat. As the attorney Pergl says in an interview for Pravo (newspaper) on October 27, 1997:"…and now we spoke over each others voices, me and their Chairman. And he gave it up in an hour – didn't have the nerves for it." In result, two Boards of Directors of Kotva emerge. Pergl draws up a power of attorney for himself.

In June 1997, the new owner of the 56% shares in Kotva, FEL from Cyprus, appoints as its attorney the law firm JUDr. Petr Toman and Partners. However, the Board of Directors nominated by the minority shareholder, i.e. Czech Value Fund, was already registered in the Commercial Register on August 4.

In August 1997, another fishy contract is signed: the junior lawyer of JUDr. Toman, the ex-head of the Security and Information Agency of the Czech Republic Stanislav Devaty buys Kotva as a real estate from the old Halek's Board of Directors for 2,885 billion Czech Cronws (it was achieved by the registration at the Land Registry of Prague, and the part of the transaction was the declared retraction of the contract after the fulfillment of certain conditions). The purpose of this transaction was the effort of the Cyprus company, being represented by Toman's law firm, to prevent any possible manipulation with the property of Kotva. In November 1997, this contract was cancelled since the danger of illegal disposition allegedly ceased to exist.

**Bank Documents**

But lets get back to the principal question of legality of the crucial decisions that were made and also to the one of what was FEL really after?

In December 1997, the Supreme Court in Prague abolished the registration of the minority Board of Directors and the new Board of Directors was elected at the inflammatory general meeting headed by JUDr. Tomas Sokol (appointed by the majority owner of Trend, the Cyprus company FEL). The new Board of Directors was partly made up of the reps of Czech Investment Holding (CIH). Out of the blue. CIH was represented by another leading law firm, Kriz, Belina & Co. But how did CIH get in the game? CIH bought an option for the shares in Kotva from Cyprus FEL. (By the way, personas like JUDr. Toman and JUDr. Lzicar were to be found at this general meeting – creating a concentration of the most renowned Czech lawyers per meter square unseen in our modern Czech history.)

CIH is a purely Czech investor for whom the investment in the shares in Kotva represents a transaction with a bearable risk. Its representatives shall remain in the statutory bodies of Kotva at least until the decision is finally made as to who is the owner of the frozen shares in Kotva. The role of CIH in the transactions around Kotva seems to be rather a coincidence than anything else.

**"PIANO BLACK"**

The December general meeting of Kotva didn't work out too well then for Czech Value Fund; a few days later, a statement by JUDr. Jirkova of the law firm Vana, Pergl and Partners appears in the press (LN, December 12, 1997) saying that they possess evidence that Cyprus FEL was nothing but Halek's money chest. TYDEN managed to get a hold of a part of these documents of evidence. If their authenticity is proved, the lawyers would have managed a quire an impressive feat (let us remember that it was the same law firm that brought the light into the case of the tunneled out CS Funds, having disclosed and described the exact money flows used).

In the case of Trend it would mean that they were able to break through the bank secret of LGT Bank in Liechtenstein where the Cyprian FEL held its account. By their allegations, Halek was supposed to "hire" FEL for his own business, a fact that should be evidenced by FEL's power of attorney for Halek to handle its account, including the phone-banking password 'PIANO BLACK'. It is rather unlikely that a Cyprus citizen would have selected a password in the Czech language.

However, it seems certain that this breakthrough will lead to the clarification of the whole case. Halek and Co. have most likely used FEL to transfer the assets from Trend to the benefit of the various companies owed by them. Hopefully, the Britons of Czech Value Fund, having paid about 10 million Czech Crowns for the shares in Trend, as well as the other investors have finally began to see the chance of recovering their investments put into the shares of the fund. Although the story is not over with yet and the lawyers initiated in the case claim that about 50 more court claims may still be brought and tried.

JAROMIR PISKOR
*(an independent journalist)*

# Případ Trend: Co se dělo, všichni vědí, ale majetek se vrátí jen stěží

Jako prubířský kámen v oase vytunelovaných investičních fondů působí případ Trend. Na první pohled vzbuzuje optimismus - hlavní aktéři podvodu, spjatí s Královéhradeckou brokerskou jsou ve vazbě, aktivní vyšetřování a pomoc majetku je znázorněna na účtech ve Středních cenných papírů a minoritní akcionáři kolem Trendu ovládli obchodní dům Kotva. Jenž podíl roste a jiných hlav majetek. Je ale vše tak jasné a dočkají se původní vlastníci návratu svého majetku?

## Rozhýbat stát

## S jídlem roste chuť

## Jak získal Forminster peníze na nákup Kotvy

TREND — akcie — IFM

24. ledna rozhodl Krajský obchodní soud v Hradci Králové o zablokování akcií na účtu IFM. Toto rozhodnutí však souviselo zapomenut dovolit Středisku cenných papírů, takže Hálek a spol. byli vzas varováni a akcie stačili ještě převést.

KHB
24. 1. 1997
357 000 akcií po 320 Kč

smlouva z 2. 1. 1997 o prodeji → ATLANTA SAFE
357 000 akcií po 700 Kč

24. 1. 1997
357 000 akcií po 320 Kč

27. 1. 1997
357 000 akcií po 700 Kč

FORMINSTER

Zisk za tuto jedinou finanční operaci 135,6 milionu korun

## Tunel končí na Kypru

## Boj o Kotvu

## Koncipient a tři miliardy



Pražský obchodní dům Kotva - spory o vlastnictví k jeho prosperitě nepřispěly.
Foto Slovo - Jakub Holobrady

## Návrat majetku nejistý

## Lobbing nebo občanská povinnost?

---

## Vývoj situace okolo Trendu

leden 1991 Skupina čtyř subjektů - Mont&Art Production S a Banka Skala - zakládá investiční fond Trend

4. 8. 1995 Trend kupuje Královéhradecká brokerská.

srpen 1995 Trend umpluje získané obchod. kdy za akcie v hodnotě píti miliard korun po započtení nesmyslné velkých smluvních pokut dostal Trend pouze 150 milionů.

červenec 1996 Při podstatě pravdy fond kupuje britský Czech Value Fund za deset miliónů dolarů.

srpen 1996 Nový majitel dává první podněty ministerstvu financí

1. 11. 1996 Valná hromada Trendu ovládá nové statutární orgány. Představenstvu i dozorčí radu ovládl Czech Value Fund.

7. 11. 1996 Ministerstvo financí uvalilo na fond nucenou správu, nuceným správcem se stává Emil Buček. Bývalé představitele fondu však odmítají vydat účetnictví, to oddělaji až po čtrnácti dnech

24. 1. 1997 Soud zablokoval akcie Kotvy a Sokolovské uhelné na účtu IFM, tato rozhodnutí však odešlo jen Hálkovi a spol. a ne SCP, takže akcie ještě tentýž den obskidy do Forminsteru Později převod akcií Sokolovské z Forminsteru na Atlantu Safe vynesl kyperské společnosti 135 milionů korun.

30. 1. 1997 Forminster kupuje za necelých 83 miliónů korun 55,73 procent akcií Kotvy.

17. 2. 1997 Valná hromada na níž nucený správce konstatoval, že 95 procent majetku fondu byla vytunelováno a z původní 1,3 miliardy zbylo 41 miliónů.

5. a 6. 3. 1997 Vyšetřovatel obvinil z podvodu pět představitelů Královéhradecké brokerské a vyřešeních firem v čele s Miroslavem Hálkem. Kterýy zatímco po osm policie vyhledala celostátní pátrání, se za autoremoté ještě sám přihlásil. Dalších dvě osoby jsou zatímy v obnoví.

4. 1997 Soud zablokoval akcie Kotvy na účtu Forminsteru, postupně je na účtech různých společností zablokována většina akcií původního fondu Trend.

duben 1997 Majitelem Forminsteru se stává francouzská společnost Dura.

16. 5. 1997 Valná hromada Kotvy, zvolená čtyř představenstva akcionáři se navzájem odmítají uznat. Stejná situace i na valné hromadě 29. 5.

4. 8. 1997 Soud povádí jednání o vazbě prodloužení a zrušení pěti minoritních akcionářů kolem Trendu.

11. 8. 1997 Bývalý šéf BIS Stanislav Devátý, nyní koncipient v advokátní kanceláři Petra Tomana (právního zástupce Dury a Forminsteru) fingovanou smlouvou kupuje Kotvu za 2,8 miliardy korun. Výsledkem je slušná veselice nejasnosti o majetek Kotvy a její zablokování.

25. 8. a 11. 9. 1997 Soud zamítl dvě žádosti Trendu na předběžné opatření, které by zabránilo Forminsteru vykonávat akcionářská práva.

17. 9. 1997 Valná hromada Kotvy.

Stránku připravil Marek POKORNÝ

---

## Kocáb: Za to, jak fond skončil, cítím odpovědnost

### Tři rozporované nabídky

### Tunel stihli tunel



zakladatel Trendu Michael Kocáb

### Jeden ze způsobů, jak Trend přišel o majetek

28. května 1996 Trend → KHB
152 935 akcií Kotvy po 400 Kč
celkem 61.174 mil Kč

28. května 1996 - 8 hod. 30 min
139 000 akcií Kotvy po 952 Kč
celkem 132.328 mil Kč

28. května 1996 - 8 hod. 48 min
139 000 akcií Kotvy po 400 Kč
celkem 55.600 mil Kč

## TREND case – everybody knows what happened but the assets will hardly be restored

Slovo daily - September 18, 1997 - Prague

The TREND case seems to be the touchstone with regards to tunnelled investment funds. At first appearance, this case seems to arouse optimism, as the main participants in the fraud connected to Královéhradecká Brokerská are in custody, the majority of the embezzled assets is frozen in the accounts kept with the Securities Centre and the majority shareholders of TREND assumed control over Kotva department store, which represented Trend's main asset. However, is everything as clear as this and will the former owners get their property back?

TREND, from which its managers "drained" CZK 1.25 billion, was the first investment fund to be placed under forced administration. However, the steps undertaken in the investment funds by Královéhradecká brokerská were far from isolated in the Czech Republic. *"Such deals were by then commonly undertaken. Dozens of other similar deals – and I would not be surprised if there were hundreds – were undertaken even without being noticed"*, confirms the Stock Exchange analyst Michal Konečný from Komero.

### The taste grows with food

TREND was one of the most successful investment funds in coupon privatisation. Within both waves of the privatisation, more than 100.000 "DIKS" (designation of the holders of the investment coupons – remark of translator) put their points to this fund and its assets amounted to CZK 1.3 billion. However, very soon after the purchase of TREND from Michael Kocáb by Miroslav Hálek and his company Královéhradecká brokerská, the assets of the fund decreased to one twentieth. The managers of the fund could probably have effectuated even this step without difficulties. The whole group around Královéhradecká brokerská may thank its greed for more than half a year of custody.

As taste grows with food, Mr. Hálek tried to sell the empty shell of the investment fund to a foreign investor – the British Czech Value Fund belonging to a group of British Regents Funds. Before this the investment company Prag Invest had already started to buy up shares in TREND from the minority shareholders for this investor. Prag Invest warned the British investors about the bad state of TREND. The fund was, however, in far worse condition than the British investors anticipated, and consequently, they hired lawyers and started immediately to bombard the state authorities.

### To make the state move

*"The shareholders would not be able to do anything whatsoever. The Ministry would maybe put the fund under forced administration, but nothing more"* says Robert Pergl from the law office Váňa, Pergl and Partners, which took on the representation of Czech Value Fund and of the tunnelled TREND. *"The TREND case is completely clear. It was an absolute lack of professionalism and crooks are presently much more careful"* he alleges.

*"It was most difficult to make the state act and to compel it as well as all the other institutions, as for example the supervision over the capital market, to handle the case"*, he says. *"Initially, the state authorities were perplexed; they did not know what to do whatsoever. However, the situation soon made a turn"* he adds. The result of the efforts of the

shareholders was that, at the beginning of the May, the court took into the custody the first five participants in the fraud and one moth later, two other participants. The whole work of detecting the embezzled property was, however, several times incomprehensibly complicated by the court, which for example decided, at the end of the January, on the freezing of shares in Sokolovská uhelná and in Kotva in the accounts of the company IFM, but it delivered the freezing order only to the company IFM and failed to deliver it also to the Securities Centre. Consequently, the shares could have disappeared, on the same day, from the account. Within a further few days the court made a grave mistake for the second time, when it ordered, at the request of the Police, the freezing of all the accounts of KHB and of the companies linked to it, however, it confused the number of one of the accounts, in which there was deposited, by coincidence, all the money concerned – i.e. several hundred million Czech crowns. However, this failure contrived to be rectified.

**The tunnel ends in Cyprus**

The most valuable asset of TREND was represented by the majority block of the shares in KOTVA. These share also disappeared. However, the court finally succeeded in freezing these shares in the account of the Cyprus company Forminster Enterprises Limited.

The mode of acquisition by FEL of the money for the purchase of the shares in Kotva is particularly remarkable: FEL arranged the transfer of the shares in Sokolovská uhelná from KHB to Atlanta Safe and acquired by this sole business deal the unbelievable profit of CZK 135 million (see table). After the purchase of 55.73% of shares in Kotva for less than CZK 83 million, more than CZK 50 million remained with FEL. *"It is true that a profit of CZK 135 million from one business deal is unusual, but it is not prohibited by law. The Act on money laundering could however apply to this business deal and the person who undertook this deal should have reported it immediately to Ministry of Finance"*, estimates the analyst Konečný.

The shares in KOTVA were probably intended to be further transferred, however, before this could be effectuated, the court had finally frozen the account of FEL. Nevertheless, FEL, which was meanwhile bought by the French company DUNA with total assets amounting to CZK 200,000, alleges that it acquired the shares via a legitimate purchase and that it has no connection with KHB, which tunnelled TREND.

However, the brokers have a different opinion. *"These business deals prove an evident connection between KHB and FEL"*, alleges Mr. Pergl and he also points out that the majority block of shares was sold for half of the price for which the shares were sold at the time on the Stock Exchange. *"The bigger the block of shares is, the higher is the average price of one share. Not even a multiple of the price on the Stock exchange is exceptional"*, agrees Konečný.

**Lobbing or civil duty?**

Meanwhile, the state authorities finally started to work faster, which is showed, inter alia, by more than a dozen of the frozen accounts with shares, which originated from TREND. However, the majority shareholders allege that this is all due to Michael Kocáb who exploited his good connections. *"The court succumbed after more than one year to consistent media pressure and to the one-sided description of the situation that the heroes from Trend are saving the minority shareholders. In fact, they seek to assume control over KOTVA, which was legally purchased by FEL"*, alleges Mr. Petr Toman. *"The courts undoubtedly did not act*

*in our favour and were committing a lot of mistakes.*" counters Mr. Pergl and refers to the two above-mentioned mistakes of the commercial court in Hradec Králové.

Michael Kocáb does not deny that he negotiated about TREND with Ministers Ruml and Parkanová and with the Supreme Public Prosecutor Mr. Hrbotický, however, he defends himself against the charge of misuse of his contacts. "*It was not lobbying but a civil duty. When someone sees a thief, he should come forward. It is not a pleasure for me to be engaged in this case, but we have to understand that when you make your bed you must lie in it*", says Kocáb and adding that if he did not do anything he would certainly be charged with idleness. "*We have always played fairly, we tried to give the property back to the robbed,*" he adds.

**Battle for KOTVA**

Meanwhile, the battle for TREND was definitively transformed into the battle for KOTVA. In spring, two general meetings of the department store took place within a short time period, at which two groups of shareholders refused to acknowledge one another and elected their own Boards of Directors. The minority shareholders allege that FEL did not announce, after the acquisition of the majority block of shares, that it was acting in concert with KHB and simultaneously failed to offer publicly the purchase of shares, which is why FEL lost all voting rights for a one-year period. However, FEL counters that in such a case it would lose only shares exceeding 50%. Total prevention from the possibility of exercising the rights of a shareholder is too hard a sanction. "*This case is a precedent, no other court has ever decided on such a case,*" alleges Mr. Tomáš Pelikán, who specialises in commercial law. According to him, the legal provisions are not completely clear in this case. Nevertheless, the court has not decided yet on the cancellation of the exercise of the rights of the shareholders of FEL and it refused requests from the minority shareholders regarding the delivery of the interlocutory injunction preventing FEL from the possibility of voting at yesterday's general meeting.

Both parties have filed several petitions against one another, which must be now treated by the court. The commercial register registered, on August 4, the Board of Directors elected by the minority shareholders around the Czech Value Fund. This registration was, however, immediately questioned by the majority shareholders. The attorneys of both the parties filed also a complaint with the Bar Association against their colleagues and charged them thereby with unethical behaviour.

**Law clerk and three billion**

The case has gathered steam approximately a month ago. Kotva was bought from FEL through a purchase agreement by the former chief of BIS and current law clerk of Mr. Toman's law office, Stanislav Devátý, who has immediately admitted that the agreement was fake and that he hasn't got any money. "*If someone does something like that, he is absolutely hopeless. Attorneys at law should advise their clients and not purchase department stores for them and even admit to this as being a fake,*" says Pergl.

"*We were afraid that transfer of the real estate of Kotva to third persons was being prepared. The only lawful way how to foil this transfer was to make a seal at the Land Registry. The purpose is nothing else but sealing possible transfers until the court issues a final and binding decision on the ownership of Kotva,*" explains Mr. Toman.

Subsequently, Devátý and Forminster granted together a power of attorney to Michael Kocáb, authorising him exclusively to remove the lead seal from the Land Registry. Before this removal could have been effectuated he must have already received a signed agreement on the cancellation of the purchase agreement, which now lies with the notary. "*We needed again a trustworthy person, and so we chose the representative of the other party*," says Toman.

Kocáb, however, strictly objects to the abuse of his name. "*If I had accepted that, I would have in fact legalized all their steps,*" he says indignantly. At the same time he refuses to accept Toman's interpretation of all these steps. "*By doing this acrobatic step in public, they intended to achieve that the view that it would not be considered as tunnelling. If some famous person pick pockets pedestrians on the Wenceslas square, grimacing and screaming. I am not stealing, would that also be in order?*" chafes Kocáb. Mr. Tomáš Pelikán thinks that all this is just a useless racket. "*The legal act, which has not been made seriously, even if made in writing, is invalid according to law,*" he asserts.

### The return of the property is uncertain

The thing that the shareholders of Trend, and of the other tunnelled funds, are principally interested in is, however, not the dispute of the two shareholders over the department store, but the question whether the state will finally begin to chase these cases fiercely and, principally, whether it will return the stolen property to them. Certain advances have been made, but there is no decisive campaign against the depravity on the Czech Capital market.

The stock market's analysts doubt that the entire property will return to the shareholders of Trend, although the vast majority of its original shares are frozen in the accounts of the Securities Centre. "*New owners must win the eventual court disputes. The shares are not numbered and it will be difficult to determine who was their original owner,*" says Michal Konečný from Komero. According to him, the purchaser will always, bar some exceptions, prove that he acted in good faith. But Pergl thinks the opposite. "*We have informed all of them in press. Whoever monitors the capital market must also know that KHB and the companies connected with it sold the stolen shares,*" he says. "*No one will prove to anyone that he knew about this media campaign,*" opposes Konečný. "*We are Trend's attorneys at law, and therefore we must assert that they knew, and they will evidently assert that they did not. It is up to the court to decide,*" concludes Pergl.

**Table:**
**How FEL acquired the money for the purchase of KOTVA**



The Regional Commercial Court in Hradec Králové decided, on January 24, on the freezing of the shares in the account of IFM. The judge, however, failed to deliver this decision to the Czech Securities Centre and consequently, Mr. Hálek and Co. were warned in time and managed to transfer the shares.

TREND

shares

IFM

24.1. 1997
357,000
shares for
CZK 320
per share

The contract of 22.1 1997 on the purchase of 357,000 shares for CZK 700 per share

KHB

ATLANTA SAFE

24.1. 1997
357,000 shares
for
CZK 320 per
share

27.1. 1997
357,000 shares
for
CZK 700 per
share

FORMINSTER

**The profit of this sole financial operation amounts to CZK 135.6 million.**

```
Titulek:       Trend:Předání tunelářů soudu je signálem pro zahraniční
investory
Datum vydání:  2.10.1998
Čas vydání:    15:53
Klíčová slova: ČR; obchod; Trend; obžaloba
ID:            19981002F02034
Servis:        ece
Priorita:      4
Kategorie:     obo; zak; fin
```

Trend:Předání tunelářů soudu je signálem pro zahraniční investory

PRAHA 2.října (ČTK) - Předání tunelářů investičních fondů Trend a Mercia soudu je očekávaným signálem pro zahraniční investory. ČTK to v reakci na obžalobu sedmi osob stíhaných v případu vytunelování investičních fondů Trend a Mercia řekl současný člen představenstva Trendu John Moffitt. Jak dodal, případ je zlomovým pro celý český kapitálový trh.

Moffitt také připomněl, že tunelování Trendu je prvním případem v ČR, kde by měly být stíhané osoby obžalovány z trestného činu zločinného spolčení. Důkazy shromážděné v trestním řízení dokládají, že společnost Forminster Enterprises Limited, na níž byly převedeny z Trendu akcie Kotvy, stále ovládá Miroslav Hálek, který řídí boj proti Trendu dokonce i z vězení, dodal Moffitt

Na sedm osob stíhaných v případu vytunelování investičních fondů Trend a Mercia podal ve čtvrtek královéhradecký krajský státní zástupce obžalobu k tamnímu krajskému soudu. V současnosti je ve vazbě z obviněných pouze Miroslav Hálek. Jeden z největších případů poškození investičních fondů v ČR, kde škoda činí více než 1,3 miliardy korun, se tak dostává tímto krokem do závěrečné fáze.

Státní zástupce obžalované viní ze spáchání trestných činů zneužití informací v obchodním styku a zpronevěry spáchaných ve zločinném spolčení či pro účast na tomto spolčení. Pokud budou soudem uznáni vinnými, hrozí jim až 15 let vězení.

Marcela Prošková jw

---

**Title:** Trend: Handing over of tunnellers is signal for foreign investors
**Date of issue:** October 2, 1998
**Time of issue:** 15:53
**Key words:** Czech Republic; business; Trend; charges
**ID:** 19981002F02034
**Service:** ece
**Priority:** 4
**Category:** obo; zak; fin

Trend: Handing over of tunnellers is signal for foreign investors

PRAGUE, October 2, (Czech Press Agency) – The handing over of the tunnellers of the Trend and Mercia investment funds to the court is a long awaited signal for foreign investors, stated John Moffitt, a current member of the Board of Directors of Trend, to the Czech Press Agency, in reaction to the charges of seven people prosecuted in the case of the tunnelling of the Trend and Mercia investment funds. He added that this case represents a turning point for the whole Czech capital market.

Moffitt also mentioned that the tunnelling of the Trend fund is the first case in the Czech Republic where the persons are charged with the offence of criminal conspiracy.

The evidence collected in the criminal proceedings proves that the company Forminster Enterprises Limited, to which the shares in Kotva were transferred from Trend, is still controlled by Mr. Hálek, who is leading a battle against Trend even from prison, added Moffitt.

The Regional Public Prosecutor in Hradec Králové delivered to regional court, on Thursday, an indictment of seven people prosecuted in the case of the tunnelling of the Trend and Mercia investment funds. At the moment, from all the indicted persons, only Miroslav Hálek remains in custody. One of the greatest cases of causing damage to investment funds in the Czech Republic, where the damage amounts to almost CZK 1.3 billion, enters hereby into the final phase.

The Public Prosecutor indicted the accused persons with the criminal offences of insider dealing and embezzlement committed in a criminal conspiracy, or for participation in such a criminal conspiracy. Should the court find the accused guilty, they could be imprisoned for up to 15 years.

Marcela Prošková jw