UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KOTVA a.s. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 05-10679-RCL |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S MOTION TO DISMISS THE COUNTERCLAIMS AND/OR
TO STRIKE KT INC. AND CVF INVESTMENTS AS "COUNTERCLAIM PLAINTIFFS"**

## Introduction

In the Complaint, Plaintiff Kotva a.s. ("Kotva") detailed the black-mailing scheme of

Defendant Andrew Weiss ("Weiss"), and his Boston-based investment firm, co-Defendant Weiss

Asset Management, LLC ("WAM") (collectively, the "Weiss Defendants") whereby the

defendants utilized shell companies to purchase nominal shares of Kotva's stock and file

lawsuits in the Czech Republic solely to interfere with the announced $65 million sale of Kotva's

Prague Shopping Centre.  Weiss then demanded that Kotva purchase the 12% of Kotva shares

owned by a mutual fund he manages called Brookdale Opportunity Fund ("BGO") (seeking eight

times the publicly traded market value) with the carrot that he would get the suits dropped.  As a

result of the sham lawsuits, Kotva's sale of the Shopping Centre has been severely impaired,

costing the Company millions of dollars.  Kotva therefore has brought claims against the Weiss

Defendants for violations of the federal securities and racketeering laws, Chapter 93A, and

common law claims.

In response to the Complaint, the Weiss Defendants have filed a "Counterclaim" against Kotva, the Chairman of its Supervisory Board, Martin Benda ("Benda"), its CEO, Richard Harazim ("Harazim"), its majority shareholder, Forminster Enterprises LTD ("Forminster"), and its subsidiary SPV Co.[1]  Unlike the claims in the Complaint - - which are based on the Weiss Defendants' actions beginning in May 2004 - - the counterclaims contain a debris field of scandalous allegations dating back a decade (see, e.g. First Amended Answer and Counterclaim ("CC"), ¶40: "In 1995 and 1996, Trend's management embezzled Trend's assets, including Trend's shares in Kotva . . . On information and belief, multiple law enforcement personnel involved in the investigation of the Trend Scandal have either resigned or committed suicide under suspicious circumstances").

Even accepting the Robert Ludlum styled allegations as true, all the counterclaims suffer from a multitude of infirmities, including:

- The purported "counterclaim plaintiffs" lack standing to bring claims against Kotva;

- "Trend Tunneling" claims are barred by the statute of limitations; and

- None of the alleged activity attributed to Kotva has even a remote connection to Massachusetts and, therefore, the "Counterclaim Plaintiffs" cannot satisfy the "primarily and substantially" prong of Chapter 93A.

As a result of these fatal defects, all counterclaims asserted against Kotva should be dismissed.

Perhaps most fundamentally, two non-parties, KT, Inc. ("KT") and CVF Investments, Ltd. ("CVF") attempt to unilaterally assert themselves into this action as "counterclaim

---

[1] None of these parties apparently have even been served with the counterclaim.  As such, only Kotva is currently under any obligation to respond.

2

plaintiffs" when in fact Kotva filed no claims against them. These claims should be stricken all together.

## COUNTERCLAIM ALLEGATIONS

As demonstrated below, even accepting allegations of the counterclaim as true under Fed. R. Civ. P. 12(b)(6), the counterclaim is insufficient to state a cause of action and should be dismissed entirely. Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto, 332 F.3d 6, 19 (1st Cir. 2003) ("Rule 12(b)(6) is not entirely a toothless tiger - - - the threshold for stating a claim may be low, but it is real.") quoting Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 16 (1st Cir. 1989).

### The Forminster Group Conspiracy Theory

According to the counterclaim, the "Forminster Group" is a conspiracy "among Forminster, Benda, Harazim and others" (CC ¶13). Forminster owns 55% of Kotva, the plaintiff in this action. (CC ¶ 46). Harazim is Kotva's CFO. (CC ¶ 12). Benda is the Chairman of Kotva's Supervisory Board. (CC ¶ 11). In other words, according to the counterclaim, there is a "conspiracy" among Kotva's majority shareholder, its CEO, and its Chairman of the Supervisory Board.

### The "Tunneling" of the Assets of the Trend

Reduced to its essence, the counterclaim plaintiffs allege that "Trend" – which was a Czech investment fund formed in the 1990s after Czech industry was privatized – is the "rightful owner" of 32% of the shares of Kotva, and that through "a complicated series of transactions" dating back to 1995, Forminster instead gained control of the company.  (CC ¶¶ 19, 42-50).  It is difficult, if not impossible, to follow the counterclaim plaintiffs' story.  First, they claim that: "[i]n 1995 and 1996, Trend's management embezzled Trend's assets, including Trend's shares in

Kotva. (CC ¶ 42).[2]  Then, "members of the Forminster Group gained possession of the Kotva shares embezzled from Trend." (CC ¶ 45).  Thereafter, the Forminster Group purchased an additional ownership interest Kotva with "other assets embezzled from Trend." (CC ¶ 46). After alleged embezzlement upon embezzlement, Forminster purchased more than 55% of Kotva's shares. (CC ¶ 46).

The counterclaim plaintiffs fail to mention that Trend entered into a settlement with Forminster in December 1999 pursuant to which Trend acknowledged Forminster as the owner of 55% of the shares of Kotva.  See Complaint ¶12.  Nevertheless, by this action, the Weiss Defendants seek to ignore the settlement and raise derivative claims purportedly on behalf of Trend.

The counterclaim further alleges that "in 1997 a public prosecutor in the Czech Republic froze the Kotva shares held by the Forminster Group." (CC ¶ 47)  Because Forminster could not "convert their Kotva shares to cash," the counterclaim alleges the group instead "devised a scheme to separate the assets of Kotva a.s. from the frozen shares, liquidate those assets, and appropriate the cash proceeds from their own benefit." (CC ¶51).

To effectuate this scheme, the counterclaim alleges that the "Forminster Group caused Kotva a.s. to transfer the Department Store through a series of shell companies," ultimately to SPV KN. (CC ¶¶53-56).  In the end, the Department Store was sold by SPV KN to an Irish Company called Markland for approximately $65 million.  (CC ¶ 58).  As a result of the transfers:

> The proceeds from the sale of the Department Store will not be paid to Kotva or even another Czech company.  Instead, it appears that the purchase price for the SPV KN shares will be or has been paid to SPV Co or another Forminster-controlled entity that

---

[2] The embezzlement were "documented in detail" in a 1998 report of the Czech Public Prosecutor, and reported in 1998 magazine articles. (CC ¶ 44).

will distribute the proceeds of the sale among the Forminster Group rather than Kotva's shareholders.

(CC ¶ 59).  This scheme damaged "counterclaim plaintiffs" KT and CVF "by preventing them from realizing the rightful return on their investments that the majority shareholders in Kotva a.s., the Forminster Group, have or expect to realize. (CC ¶ 60).[3]

**The Counterclaims Asserted Against Kotva**

Counts I, II, VI, VII and VIII have been brought against Kotva.

1.    The Weiss/WAM Counterclaims

Count I is for abuse of process and alleges that Kotva and the Forminster Group "exercised" its influence over Czech law enforcement to cause or attempt to cause criminal charges be brought against Weiss. (CC ¶ 62).   Count I also claims that the filing of this action by Kotva constitutes an abuse of process. (CC ¶ 65).

2.    The Weiss/WAM/KT/CVF Counterclaims

Count II is for conspiracy and alleges that "all [the] counterclaim defendants agreed to work together to loot Kotva's assets, abuse the Czech criminal process and abuse the Untied States civil process." (CC ¶ 69).  Count VII is a "catch-all" Chapter 93A claim.  It contains no specific allegations.  (CC ¶ 94).

3.    The KT/CVF Counterclaims

Count VI is for constructive trust and alleges that "[t]he Department Store, the bearer shares in SPV KN and/or the proceeds of the sale of the SPV bearer shares are subject to a constructive trust for the benefit of Kotva's shareholders, including counterclaim-plaintiffs KT, and CVF Investments, Inc (CC ¶ 90). Count VIII is for declaratory judgment brought by KT and

---

[3] There are no allegations that the entire "Trend Tunneling" saga damaged the only true "counterclaim plaintiffs" in this action, the Weiss Defendants.

CVF, seeking a declaration that the Department Store sale proceeds "belong to Kotva a.s. and its shareholders" instead of the Forminster Group. (CC ¶ 100). Count VIII also seeks a declaration that there is a dispute between KT/CVF and the Forminster Group "as to whether Forminster is the rightful owner of 55% of the shares of Kotva. (CC ¶ 101).

## ARGUMENT

### I.    Defendants Lack Standing To Assert Direct Claims Against Kotva

"The plaintiff generally must assert his own rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Franchise Tax Bd. of California v. Alcan Aluminum Ltd., 493 U.S. 331, 336 (1990).  In shareholder litigation, "[a]ctions to enforce corporate rights or redress injuries to a corporation cannot be maintained by a stockholder in his own name . . .*even though the injury to the corporation may incidentally result in the depreciation or destruction of the value of the* stock." Diva's Inc. v. City of Bangor, 2005 WL 1355142 *8 (1st Cir. 2005) (emphasis added).  Stated another way, to bring a direct action, a shareholder must demonstrate *a distinct injury* from other shareholders.  Hershey v. Donaldson, Lufkin & Jenrette Secs Corp., 317 F.3d 16, 22 (1st Cir. 2003).   Where the basis of an action is a wrong to the corporation, on the other hand, redress must be sought in a "derivative" action. Bessette v. Bessette, 385 Mass. 806, 809 (1982) (right of recovery for alleged overpayment to director belongs to corporation, not shareholder).

In this case, all the counterclaims - - with the exception of Count I for abuse of process -- are derivative.  Indeed, the Court need look no further than the requested relief:  in Count VI (constructive trust), KT and CVF request that the court create "a constructive trust for the benefit of Kotva's shareholders, including counterclaim-plaintiff KT and CVF." (CC ¶ 90).  In Count VIII (declaratory relief), KT and CVF seek a declaration that "[t]he sale proceeds [from the

Department Store] belong instead to Kotva a.s. and its shareholders. (CC ¶ 97). In short, each

and every counterclaim is premised on the fact that the "Forminster Group caused Kotva a.s. to

transfer the Department Store through a series of shell companies . . .designed to take more

easily the proceeds of the sale of the Department Store." (CC ¶ 53). Thus, all such purported

claims belong to Kotva, not to any particular shareholder of Kotva, and should be dismissed in

their entirety.

## II.    Defendants Have Not and Cannot Meet the Pleading Requirements of Fed. R. Civ. P. 23.1

The Weiss Defendants cannot re-cast their complaint as a derivative action. Fed. R. Civ.

P. 23.1 contains "heightened" pleading requirements that a party *must* satisfy to maintain a

shareholder derivative action. Landy v. D'Alessandro, 316 F. Supp. 2d 49, 56 (D. Mass. 2004)

("Failure to comply with Rule 23.1 for a challenged action results in dismissal of all claims that

rely on that challenged action."). Specifically, Rule 23.1 requires that (1) the pleading be

"verified;" (2) the plaintiff be "a shareholder at the time of the transaction of which the plaintiff

complains;" (3) the action not be "a collusive one to confer jurisdiction on a Court of the United

States which it would not otherwise have;" (4) the complaint allege "with particularity the

efforts, if any, made by the plaintiff to obtain the action [from the corporate directors];" and (5)

the plaintiff "fairly and adequately represent the interests of [similarly situated] shareholders."

See Fed. R. Civ. P. 23.1 ("The derivative action may not be maintained if it appears that the

plaintiff does not fairly and adequately represent the interests of the shareholders or members

similarly situated in enforcing the right of the corporation or association."); G. A. Enterprises,

Inc. v. Leisure Living Communities, Inc., 517 F.2d 24, 25-26 (1st Cir. 1975) (dismissing

shareholder claim because plaintiff did not fairly and adequately represent interests of other

similarly situated shareholders). These requirements are designed to prevent shareholder

derivative "strike suits" filed "with the hope of winning large attorney fees or private

settlements, [ ] with no intention of benefiting the corporation on behalf of which the suit is

theoretically brought." Greebel v. FTP Software, Inc., 194 F.3d 185, 191 n.5 (1st Cir. 1999).

Here, defendants meet *none* of the pleading requirements and, therefore, the complaint

must be dismissed.[4] As an initial matter, the "counterclaim" is not verified, which is reason alone

to dismiss it. See Fed. R. Civ. P. 23.1; Center v. Hampton Affiliates, Inc., 1978 WL 1097 *3 n.3

(S.D.N.Y. 1978) (dismissing action because complaint not verified and plaintiff did not fairly

and adequately represent interests of similarly situated shareholders). Neither the Weiss

Defendants nor KT, moreover, can satisfy the "contemporaneous ownership" requirement of

Rule 23.1.[5] The Weiss Defendants are not even shareholders of Kotva, and thus have no right to

maintain a derivative action. See Fed. R. Civ. P. 23.1; CHARLES ALAN WRIGHT & ARTHUR R.

MILLER, FEDERAL PRACTICE & PROCEDURE §1826 (2005) (to have standing plaintiff must own

stock at time of challenged transaction and throughout pendency of lawsuit). KT became a

shareholder in December 2004 *after* the purported illicit activity of the "Forminster Group" had

happened.[6] Nor does the "counterclaim" even attempt to meet the demand requirement, another

prerequisite to the maintenance of a derivative action. Gonzalez Turul v. Rogatol Distributors,

---

[4] Because the pleading defects cannot be remedied through amendment, no leave to re-plead should be granted. See Rockwell v. Cape Cod Hosp., 26 F.3d 254, 260 (1st Cir. 1994) (and cases cited therein).

[5] The counterclaim alleges that CVF is the owner of the "Brookdale Global Opportunity Fund" shares of Kotva, which were purchased in 1997. On the contrary, CVF did not become a registered shareholder of Kotva until December 27, 2004. Even accepting the allegations as true for purposes of this motion, however, cannot meet any of the other requirements of Rule 23.1.

[6] As set forth in Kotva's Complaint, the Weiss Defendants formed KT solely for the purpose of purchasing a nominal stake in Kotva, and then directed the company to file an action in the Czech Republic to block Kotva's sale of its Shopping Center. See Complaint ¶¶ 24, 32. The irony of KT turning around and now claiming injury as a Kotva shareholder cannot be ignored.

Inc., 951 F.2d 1, 3 (1st Cir. 1991) (dismissing derivative complaint for failure to allege demand or particular facts showing futility).[7]

Finally, the "counterclaim plaintiffs" in no way, shape or form "fairly and adequately" represent the interests of other Kotva shareholders. As Weiss' own written admissions make clear, all of his scandalous allegations are simply a "shake down" to try and force Kotva to purchase the BGO and Trend shares for eight times the fair market value. (Answer to Complaint ¶¶ 30, 34). Stated another way, the "counterclaim plaintiffs" have absolutely no interest in other Kotva shareholders – they simply want to "cash out" of what they now apparently view as a bad investment.[8] This is best typified by the fact that the "counterclaim plaintiffs" both seek to bring derivative claims *on behalf of* Kotva and sue Kotva *as a defendant* at the same time.

### III.    "Trend Tunneling" Claims are Barred by the Statute of Limitations

The counterclaim plaintiffs' claims against Kotva for conspiracy (Count II), constructive trust (Count VI), Chapter 93A (Count VII), and declaratory relief (Count VIII) are premised upon the alleged embezzlement by Forminster of Trend's shares in Kotva, which occurred in the "mid-1990's." (CC ¶ 18).[9] The applicable statute of limitations for the tort based claims is three years. See M.G.L. c. 260 §2A. The statute of limitations for the Chapter 93A claim is four years

---

[7] While the demand requirement is a procedural prerequisite to suit under Rule 23.1, the Court looks to the law of the state of incorporation to determine the substance of the demand required. Gonzalez, 951 F.2d at 2. In this regard, Czech law also has a demand requirement. Czech Commercial Code, §181 - 182, attached hereto as Exhibit A.

[8] The "counterclaim plaintiffs" also seek to enforce derivative claims apparently on behalf of Trend, which were settled almost six years ago. See Complaint ¶ 12

[9] For example, defendants seek a declaration (Count VIII) that "the Forminster Group is not the rightful owner of the shares of Kotva a.s." (CC ¶31). They also allege in their conspiracy claim (Count II) that the members of the Forminster Group "agreed to work together to loot Kotva's assets..." (CC ¶69).

M.G.L. c. 260 §5A.[10]  Therefore, as demonstrated below, Counts II, VI, VII, and VIII are all barred by the applicable statute of limitations.

The "discovery rule" provides that a cause of action accrues when the injured party "knows or in the exercise of reasonable diligence should know the facts giving rise to the cause of action." Frank Cooke, Inc. v. Hurwitz, 10 Mass. App. Ct. 99, 106 (1980).  The discovery rule does *not* require that a plaintiff have notice of a breach of duty before the cause of action accrues. Bowen v. Eli Lilly & Co., 408 Mass. 204, 208 (1990).

Where it is clear on the face of a complaint that the facts alleged are inherently knowable and that the plaintiff had notice of the facts underlying its claim, the issue may be decided as a matter of law on a motion to dismiss. Riley v. Presnell, 409 Mass. 239, 243 (1991); see also Dodds v. Cigna Securities, Inc., 12 F.3d 346, 352 n.3 (2d Cir. 1993) (resolution on motion to dismiss is appropriate where relevant facts "can be gleaned from the complaint").  The critical question, therefore, is whether the plaintiff's knowledge, actual or attributed, "was sufficient to stimulate further inquiry which was likely to alert it to a cause of action against a defendant." Hanson Housing Auth. v. Dryvit System, Inc., 29 Mass. App. Ct. 440, 446 (1990); see also Felton v. Labor Relations Comm'n., 33 Mass. App. Ct. 926, 928 (1992) (limitations period starts running when events occur or facts surface that would cause a reasonably prudent person in the plaintiff's position to become aware that he or she has been injured).  Thus, where such notice exists, the accrual date of the cause of action is the date of that first fact triggering a duty of further inquiry. Hanson Housing Auth., 29 Mass. App. Ct. at 446 (accrual occurs when facts

---

[10] It is unclear whether the counterclaim plaintiffs are asserting claims under the laws of Massachusetts or the Czech Republic.  In either scenario, the claims are time barred.  Pursuant to §§ 387- 397 of the Czech Commercial Code, the statute of limitations for business commercial contract obligations is four years.  Under Section 101 of the Czech Civil Code tort based claims have a three year limitations period.  The relevant code sections are attached hereto as Exhibit B.  Given that the outcome would be the same, the Court need not undertake any choice of law analysis and can apply the law of the forum state. Pure Distributors, Inc. v. Baker, 285 F.3d 150, 155 n.3 (1st Cir. 2002); Lambert v. Kysar, 983 F.2d 1110, 1114 (1st Cir. 1993).

stimulate further inquiry), <u>citing</u> <u>Errichiello v. Eli Lilly and Co.</u>, 618 F. Supp. 484, 486 (D. Mass. 1985).[11]

The counterclaims are replete with allegations confirming that the counterclaim plaintiffs were aware of and put on sufficient notice of the Trend tunneling scheme:

- Trend's most valuable asset is a significant stake in Kotva a.s. However, as described in more detail in paragraphs 42-60 below, these shares <u>were embezzled in the mid-1990s</u> and came into the possession of Forminster. (CC ¶ 18).

- In <u>1995 and 1996, Trend's management embezzled Trend's assets</u>, including Trend's shares in Kotva. <u>The embezzlement of Trend's assets has been documented extensively in several Czech government reports</u> and is commonly referred to as the "Trend Scandal" or "Trend Tunneling." The media has also reported extensively on the Trend scandal. . . (CC ¶ 42).

- The alleged embezzlement of Trend's assets was <u>"documented in detail in several reports authored by Czech prosecutors," dated September 30, 1998</u>. (CC ¶ 44).

- After a complicated series of transactions, members of the Forminster Group gained possession of the Kotva shares embezzled from Trend and, with those shares, control over Kotva. The Forminster Group paid significantly less for Trend's Kotva shares than the shares were worth. (CC ¶ 45).

- The Forminster Group also used other assets embezzled from Trend to purchase shares in Kotva. The Kotva shares Forminster obtained from Trend and the Kotva shares Forminster purchased with Trend's assets more than 55% of Kotva's shares. (CC ¶ 46).

- As part of an investigation of the Trend Tunneling, in 1997 a public prosecutor in the Czech Republic froze the Kotva shares held by the Forminster Group, preventing Forminster from selling them. (CC ¶ 47).

(emphasis added).

The counterclaim plaintiffs were required to bring their claims within three years (or four years for the Chapter 93A claim) from the date when the claims accrued. These purported

---

[11] Notice of cause of action does not mean that the plaintiff has to actually commence an inquiry or discover every fact necessary to prevail on its claim. A plaintiff need not understand the full extent or nature of any injury. <u>Olsen v. Bell Telephone Lab. Inc.</u>, 388 Mass. 171, 175 (1983). Nevertheless, the limitations period commences when the plaintiff is "informed of facts which *suggest* that she has been injured." <u>Gelormini v. Pignatiello</u>, 1994 WL 902947, *3 (Mass. Super. 1994), <u>citing</u> <u>Felton</u>, 33 Mass. App. Ct. at 927-28 (1992) (emphasis in original).

causes of action accrued when they discovered or had notice of the alleged cause of the harm. Zamboni v. Aladan Corp., 304 F. Supp. 2d 218, 223 (D. Mass. 2004) (cause of action accrues when plaintiff (1) knew or had sufficient notice that he was harmed; and (2) knew or had sufficient notice of the cause of the harm) citing Lindsay v. Romano, 427 Mass. 771, 774 (1998). Based on the allegations in the counterclaim, they were well aware of the Trend tunneling, and any potential claims arising from there - - at the absolute latest - - by April or September 1998, the dates of the media reports and the prosecutor's reports of the Trend scandal attached to their counterclaim. Therefore, Counts II and VI – VII are time barred and should be dismissed.

## IV.    The Chapter 93A Claim Should Be Dismissed In Its Entirety

Section 11 of Chapter 93A provides in relevant part as follows:

> No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method competition or the unfair or deceptive act or practice occurred primarily and substantially within the Commonwealth.

M.G.L. c. 93A, § 11.  Chapter 93A also requires that the plaintiff suffer "a loss of money or property."  Id.  Here, the counterclaim plaintiffs do not and cannot allege that Kotva's conduct occurred primarily and substantially in Massachusetts.  Because their claims are shareholder derivative claims, moreover, these parties have suffered no recompensable loss at all.

The sum and substance of the Chapter 93A claim is set forth in a single allegation:

> The Forminster Group's conversion, fraud, abuse of process, conspiracy and fraudulent transfers of the Department Store are unfair and deceptive trade practices.

CC ¶ 94.  Taking claims that allegedly support 93A liability one at a time, "conversion" (Count III) is not even asserted against Kotva and, therefore, cannot create Chapter 93A liability.  (CC ¶ 74).  Moreover, the transaction at issue (i.e., the sale of the Prague Department and purported conversion of the proceeds) is alleged to have occurred entirely outside of Massachusetts.

Likewise, there is no "fraud" or "fraudulent transfer" claims asserted at all. Even if they were, again the transactions all have occurred in the Czech Republic, and have absolutely no connection whatsoever to Massachusetts. The same is true for most of the "conspiracy" claim, in which the Weiss Defendants allege that Kotva and other parties "agreed to work together to loot Kotva's assets, abuse the Czech criminal process and abuse the United States civil process." (CC ¶ 69).

The <u>only</u> alleged conduct forming the basis of the Chapter 93A claim that occurred in Massachusetts is Kotva's filing of this lawsuit against the Weiss Defendants.[12] As demonstrated below, however, the counterclaim plaintiffs' "abuse of process" claim is subject to dismissal as well, and therefore, cannot form the basis of a 93A claim.

The Chapter 93A claims also fail because the counterclaim plaintiffs have not suffered a "loss of money or property," which is a statutory prerequisite. <u>See</u> M.G.L. ch. 93A §11. As set forth in § II, <u>infra</u>, all the counterclaim plaintiffs' claims (except for abuse of process) are derivative claims that belong not to them, but to Kotva. As such, these parties have suffered no loss of money or property, and their Chapter 93A claim must be dismissed. <u>See, Schaeffer v. Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C.</u>, 405 Mass 506, 514 (1989) (where claims are derivative, corporation suffers "loss of money or property" and shareholders therefore have no 93A cause of action).

---

[12] In this case, the center of gravity of the conduct or transactions giving rise to the Chapter 93A claim, by the counterclaim plaintiffs own admissions, all occurred overseas. (CC ¶¶ 42-60). In view of the admissions, there are no factual disputes, and there are no "findings of fact" or "center of gravity of the circumstances" for the Court to determine. <u>Kuwaiti Danish Computer Co. v. Digital Equipment Corp.</u>, 438 Mass. 459, 473 (2003); and, therefore can be decided at the motion to dismiss stage; <u>see also Fillmore v. Leasecomm.</u>, 2004 WL 3091642 *5-6 (Mass. Super. 2004) (Court, in applying <u>Kuwaiti</u>, granted motion to dismiss Chapter 93A claim because the alleged deception and alleged harm occurred outside of Massachusetts; therefore, the "center of gravity that gave rise to" Chapter 93A claim did not occur "primarily and substantially within Massachusetts). Consistent with <u>Kuwaiti Danish</u>, the Court's dismissal of defendants' Chapter 93A claims against Kotva is appropriate.

## V.    The Abuse of Process Claim Should Be Dismissed

The Supreme Judicial Court has set forth the elements of the tort of abuse process:

> To prevail on an abuse of process claim it must appear that the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed. The essential elements of the tort are (1) "process" was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage.

Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 775-76 (1986) (citations omitted). As reasoned by this Court, "[t]he essence of the tort of abuse of process is use of process as a threat or a club to coerce or extort some collateral advantage not properly involved in the proceeding." Broadway Management Services Ltd v. Cullinet Software, Inc. 652 F. Supp. 1501, 1503 (D. Mass. 1987).[13] In short, "to constitute a cause of action for abuse of process it must appear that the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed." Jones v. Brockton Public Markets, Inc., 369 Mass 387, 389 (1975) quoting Gabriel v. Borowly, 324 Mass. 231, 236 (1949); see also Broadway Management, 652 F. Supp. at 1503

---

[13] The Court in Broadway provided an excellent survey of case law in which an abuse of process claim was sustained because "the collateral benefits sought were well-defined and clearly outside the interests properly pursued in the proceeding." Id. at 1501. See, e.g., Datacomm, 396 Mass. at 775-76 (company's litigation was intentionally used as a marketing tool against competitor's trade show); Lorusso v. Bloom, 321 Mass. 9 (1947) (supplementary process used to collect twice on debt already paid); Jacoby v. Spector, 292 Mass. 366 (1935) (attachment of wages with malicious motive of harassing plaintiff and his employer so as to force plaintiff to contract to purchase household furniture); Reardon v. Saad, 262 Mass. 345, (1928) (attachment of property to enforce a claim known to be groundless); Malone v. Belcher, 216 Mass. 209, (1913) (filing for attachment of real property in order to prevent the owner's sale of the property to a third party); White v. Apsley Rubber Co., 181 Mass. 339 (1902) (maliciously procuring the arrest of plaintiff on criminal charge in order to compel him to abandon a claim of right of occupation of a certain house and actually to withdraw from its occupation); American Velodur Metal, Inc. v. Schinabeck, 20 Mass. App. Ct. 460 (1985) (commencing an action against wife for the purpose of coercing a favorable settlement in a divorce proceeding), cert. denied, 475 U.S. 1018 (1986); Carroll v. Gillespie, 14 Mass. App. Ct. 12 (1982) (party initiated criminal complaints without probable cause and with intention to use the criminal process to collect a civil debt). See also Stromberg v. Costello, 456 F. Supp. 848 (D. Mass. 1978) (party's application for a criminal complaint, maliciously, without probable cause, and for the purpose of inducing plaintiff to withdraw his civil action for amounts due would constitute an ulterior purpose).

("there must be intention to use process for coercion or harassment to obtain something <u>not</u> <u>properly part of the suit</u>.")  (emphasis added).

Kotva's Complaint was not filed for an ulterior purpose, and therefore cannot serve as the basis of an abuse of process.[14]   Kotva filed the case for the exact purpose for which it was designed: to seek redress from Weiss and WAM for blackmail and securities and racketeering laws violations.  <u>Jones</u>, 369 Mass at 391 (granting motion to dismiss on abuse of process claim because "defendant used the relevant process for the exact purpose for which it was designed"). Accepting as true the counterclaim allegations, Kotva reported to the Czech criminal authorities Weiss' blackmail scheme, and Weiss was subsequently indicted by the Czech government.  (CC ¶ 62).  Kotva also filed this action for securities and racketeering violations, Chapter 93A and common law claims.  Thus, as in <u>Jones</u>, Kotva used the process for its intended and designed purpose: to stop Weiss' blackmail and to recover damages.[15]

## VI.    <u>KT's and CVF's Claims Should Be Stricken</u>

In addition to the Weiss Defendants, two Kotva shareholders attempt to unilaterally insert themselves into this action as "counterclaim plaintiffs." KT Corporation ("KT"), a Delaware corporation with its principal place of business on Boston, Massachusetts (CC ¶ 6) and CVF Investments, LTD ("CVF") a Cypriot company (CC ¶ 7), are both controlled by the Weiss

---

[14] The Weiss Defendants also allege that they have incurred "damage to reputation, disruption of their business, lost time and attorney's fees as a result of the Forminster Group's decisions to cause Czech law enforcement to bring the criminal charge and to cause Kotva to file this case." CC ¶ 41.  As reasoned by the Court in <u>Broadway Management</u>, "no Massachusetts case has held that an intention to cause a party to expend substantial time and money to defend against the claims in a suit constitutes an 'ulterior motive.'" <u>Broadway Management</u>, 652 F. Supp at 1503.

[15] The counterclaim plaintiffs claim Kotva's "bad faith motive" in filing this action "was to obtain an additional unfair advantage over Weiss in an effort to coerce Weiss to abandon <u>his investors'</u> claims in the Czech litigation." (CC ¶ 40) (emphasis added).  Again, Weiss is now <u>admitting</u> that he controls KT and used the shell company as a front to assert claims against Kotva in the Czech Republic.  But, in any event, Kotva filed this action <u>because of</u> the Czech litigation.  This isn't "ulterior motive" - - it's the stated legitimate basis of the claims asserted by Kotva.

Defendants.  (Answer to Complaint ¶ 32); (CC ¶ 7).   KT became a Kotva shareholder on

December 21, 2004, when it purchased 1000 shares (Complaint ¶ 25, Answer to Complaint ¶25).

CVF claims to have owned shares in Kotva since 1997 (CC ¶ 17).  These non-parties have no

right to simply add themselves into the case.  Fed. R. Civ. P. 24, 4 MOORE'S FEDERAL PRACTICE

§20.02[2][C] (3d ed. 2005); Thompson v. Boggs, 33 F.3d 847, 858 n.10 (7th Cir. 1994).  Rather,

Fed. R. Civ. P. 24 provides the appropriate avenue for a non-party to intervene.  Id.  As such, KT

and CVF must be stricken from the counterclaim all together.

### Conclusion

For all of the foregoing reasons, Kotva respectfully requests that the Counterclaim be

dismissed, and the allegations of KT and CVF be stricken entirely.

Kotva a.s.

By its attorneys,

/s/ Joel G. Beckman
Joel G. Beckman BBO#553086
William C. Nystrom BBO#559656
Nystrom Beckman & Paris LLP
10 St. James Ave., 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
Dated: June 29, 2005                    (617) 778-9110 (fax)

# EXHIBIT A

(5) If at the general meeting a shareholder intends to make counterproposals to proposals whose content was stated in the invitation to such general meeting or in a notification of its holding, or if a notarial deed must be drawn up on such general meeting's decision (resolution), he is obliged to deliver the written wording of his proposal or counterproposal to the company at least five working days before the holding of the general meeting. This shall not apply if nominations for the election of specific persons to company organs are involved. The board of directors shall publish the counterproposal, together with its opinion, if possible three days before the scheduled date of the general meeting.

*Commentary on section 180:*

*A shareholder is entitled to attend the general meeting and vote unless his right to vote is restricted. The number of his votes corresponds to the proportion of the nominal value of his shares in the company's registered capital, unless the maximum number of votes per shareholder and persons (undertakings) controlled by him is restricted in the statutes.*

### Section 181

(1) A shareholder or shareholders of a company whose registered (share) capital is higher than CZK 100 million and who have shares with a total nominal value exceeding 3% of the registered capital, and also a shareholder or shareholders of a company whose registered capital is CZK 100 million or less and who have shares with a total nominal value exceeding 5% of the registered capital, may ask the board of directors to convene an extraordinary general meeting to discuss proposed matters.

(2) The board of directors shall convene the extraordinary general meeting so that it is held no later than 40 days after it received the request for its convening. The time-limit under section 184(4) shall be shortened to 15 days. The board of directors is not entitled to change the agenda proposed for the general meeting. The board of directors may supplement the proposed agenda only with the consent of the persons who asked for a general meeting to be convened under subsection (1).

(3) If the board of directors fails to meet its duty under subsection (2), the court, acting on the basis of an application filed by the shareholder or shareholders referred to in subsection (1), shall authorize the shareholders to convene an extraordinary general meeting and to effect all the acts related thereto. The court may concurrently appoint a chairman for the extraordinary general meeting even without a motion to that effect.

(4) The invitation to the extraordinary general meeting, or the notice announcing that such meeting is to be held, must include the verdict of judicial ruling under subsection (3) and state which court issued it and the day when the ruling became legally effective. For the purposes of arranging such extraordinary general meeting, the authorized shareholders are entitled to request a statement from the registry of uncertificated securities.

(5) If the court authorizes (empowers) particular shareholders to convene an extraordinary general meeting, the cost of the judicial proceedings and the holding of extraordinary general meeting shall be settled by the company. The members of the board of directors shall be liable jointly and severally for the obligation to settle the costs of the judicial proceedings and the holding of such extraordinary general meeting. The company has the right to claim compensation for damage which arose to the company due to settlement of the said costs from the members of the board of directors.

*Commentary on section 181:*

*Section 181 protects the rights of minority shareholders. They can in writing request the board of directors to convene an extraordinary general meeting. Should the board of directors not convene an extraordinary general meeting so that it takes place within 40 days of receipt of the minority shareholders' request (application), the shareholders may petition the court to authorize them to convene the extraordinary general meeting themselves.*

*The costs of both the judicial proceedings and the convening of the extraordinary general meeting are to be settled by the company.*

Commercial Code                                                                 § 182

## Section 182

(1) At the request of the shareholder or shareholders referred to in section 181(1):

(a) the board of directors shall include the proposed matters on the agenda of the general meeting; if such request (application) is delivered after the sending out of invitations to the general meeting or after the publishing of a notice that such general meeting is to be held, the board of directors shall publish supplementary information on other matters to be included in the agenda of the general meeting at least 10 days prior to the general meeting. Such notice must be published in the manner determined by law and the statutes for convening a general meeting of shareholders; should the publishing of such notice be impossible, the matter may only be included in the agenda of the general meeting if the procedure under section 185(4) is used;

(b) the supervisory board shall examine the performance of the board of directors in the matters raised in the request (application);

(c) the supervisory board will assert any right to compensation for damage (damages) which the company has against a member of the board of directors;

(d) the board of directors will file a complaint (with the competent court) concerning outstanding part payment of the issue price against shareholders who are in default with such payment, or will apply the procedure under section 177.

(2) Should the supervisory board or the board of directors fail to comply with a request by a shareholder(s) without undue delay, such shareholder(s) [section 181(1)] may assert the right to damages or to settlement of the outstanding amount of the issue price (by filing a complaint with the competent court). A person other than a shareholder who filed such complaint, or a person empowered (authorized) by him, may not perform acts in law in the proceedings for the company or in the name of the company.

248

---

§ 182 - § 183                                                         Commercial Code

(3) Shareholders under section 181(1) may petition the court for appointment of an expert to examine a report on the relations between a controlled person and related persons under section 66a(12) if there are serious reasons for such examination, even when the prerequisites stipulated in section 66a(13) are not met.

*Commentary on section 182:*

*The board of directors will include matters raised by minority shareholders [as defined in section 181(1)] in the agenda of the general meeting.*

*The minority shareholders may also ask the board of directors either to file a complaint with the competent court against shareholders who are default on paying up the issue price of their shares or to proceed against them in accordance with section 177.*

*The supervisory board may be requested by the minority shareholders to review the performance (discharge) by the board of directors of duties specified in the shareholders' request and to claim damages against a member of the board of directors who is liable for such damage in the name of the company.*

*Should the board of directors or the supervisory board fail to comply with requests made by the minority shareholders, the shareholders can file a complaint with the court in the name of the company concerning damages or amounts outstanding on the issue price of shares.*

## Section 183
### Nullity of a General Meeting's Resolution

(1) The provisions of section 131 shall apply, as appropriate, to the nullification of a general meeting's resolution.

(2) The fact that an invitation to a general meeting or a notification of the holding of a general meeting failed to state all the particulars under section 184(5)(c) or section 202(2)(a) and (d) shall constitute only a minor violation of a person's rights in the meaning of section 131(3)(a).

*Commentary on section 183:*

*A shareholder or member of the board of directors or supervisory board who lodges a protest against a certain resolution during*

249

# EXHIBIT B

Commercial Code | § 385 - § 387

**Section 385**

If, as a consequence of the breach of a contractual obligation by the other party, the aggrieved party has withdrawn from the contract, it has no right to compensation for damage caused by its failure to conclude in time a substitute contract for the purpose which was to be served by the contract from which the aggrieved party has withdrawn.

**Section 386**

(1) The right to damages may not be waived prior to the breach of an obligation (duty) from which damage may arise.
(2) The court may not reduce the amount of damages.

**Division XI**
**Statute of Limitations**

**Subdivision 1**
**Object of the Negative Prescription**

**Section 387**

(1) A right becomes statute-barred upon expiry of the period (of negative prescription) under the statute of limitations.
(2) All rights arising from contractual relationships are subject to the statute of limitations ("negative prescription", in Czech "promlčení"), with the exception of the right to cancel a contract concluded for an indefinite period of time.

*Commentary on sections 387 to 408:*

*The Commercial Code regulates fully the negative prescription of rights arising from business (commercial) contractual obligations. However, the general regulation of the negative prescription in the Civil Code applies to rights which arise from easements (section 151n et seq of the Civil Code), unjust enrichment (section 451 at seq of the Civil Code) and from the contracts stipulated in section 261(6) of the Commercial Code.*

*According to section 397 of the Commercial Code, the general period of the negative prescription is four years, compared with three years*

460

---

Commercial Code

in the Civil Code. The maximum length of the negative prescription (a period under the statute of limitations) is ten years from the day when it started to run for the first time. Ownership title does not become statute-barred.

**Subdivision 2**
**Consequences of Negative Prescription**

**Section 388**

(1) A right to performance of the other party's obligation shall not be extinguished by the negative prescription, but the right cannot be granted and adjudged by a court if the obligated party raises an objection concerning the negative prescription, once the right has become statute-barred (i.e. after the period of limitation has expired).
(2) However, even after the period the negative prescription has expired, the aggrieved party may assert its right as part of its defence or for the purposes of a set-off:
(a) if both rights pertain to the same contract, or to several contracts concluded on the basis of a single negotiation, or to several mutually connected negotiations; or
(b) if the right could have been exercised prior to expiry of the negative prescription for setting off a claim asserted by the other party.

**Section 389**

If a debtor has fulfilled his obligation after expiry of the negative prescription, he may not (later) claim the return of the object of his performance, even if he was unaware at the time of performance that the period of the negative prescription (statute of limitations) had already expired.

**Section 390**

If the right to perform an act in law has become statute-barred, the consequences of that act in law shall not become operative in respect of a person who raises an objection regarding the statute of limitations.

461

Commercial Code                                   § 391 - § 393

## Subdivision 3
## Beginning and Duration of Negative Prescription

### Section 391

(1) With regard to rights enforceable before a court, period of negative prescription begins to run on the day it was possible to assert the right before a court, unless this Code provides otherwise.

(2) With regard to rights concerning performance of an act in law (transaction), the period of negative prescription begins to run on the day it was possible to perform the act in law, unless this Code provides otherwise.

### Section 392

(1) With regard to the right to demand performance of an obligation, the period of negative prescription begins to run as of the day on which the obligation was to be performed, or as of the day when performance should have commenced (the due date). If the relationship of obligation involves the duty to perform a certain activity on a continuous basis, to desist from a certain activity, or to allow something, the period of negative prescription begins to run as of the day the duty was breached.

(2) With regard to the right to render part performance (i.e. fulfilment in instalments), the period of negative prescription runs separately for each part performance. If as a result of non-performance (non-fulfilment) of a part obligation, the entire obligation becomes due, the period of negative prescription begins to run as of the day on which the non-performed obligation is due.

### Section 393

(1) With regard to rights arising from a breach of duty, the period of negative prescription begins to run as of the day on which the duty is breached, unless a special regulation of the statute of limitations governs such rights differently.

462

---

Commercial Code

§ 393 - § 395

(2) With regard to rights arising from defects in things, the period of negative prescription begins to run as of the day of delivery of such things to the entitled party, or to a party appointed by the former, or on the day on which the duty to take delivery of such thing(s) is breached. In the case of claims arising from a quality warranty (guarantee), the period of negative prescription always begins to run as of the day on which timely notice of the defect is given within the period of the quality warranty. In the case of claims arising from legal defects, the period of negative prescription begins to run as of the day on which the right is asserted by a third party.

### Section 394

(1) With regard to rights which arise from withdrawal from a contract, the period of negative prescription commences to run as of the day when the entitled party withdraws from the contract.

(2) With regard to the right to return an already accomplished performance rendered under a void contract, the period of negative prescription begins to run as of the day when such performance is rendered.

(3) With regard to the right to damages under section 268, the period of negative prescription begins to run as of the day when such act in law became void.

### Section 395

With regard to the right to demand the handing over of a deposited or stored thing and the right to demand the handing over of articles (objects) in accordance with a contract on the depositing of securities and other valuables, the period of negative prescription begins to run as of the day of termination of the relevant contract on the deposit of a thing, on storing things or on the deposit of securities or other valuables. This does not affect the right to demand that the thing be handed over on the basis of ownership title.

463

### Section 396

In the case of the right to monetary (pecuniary) means deposited in a current or deposit account, the negative prescription begins to run as of the day on which the contract on keeping such accounts expires,

### Section 397

Unless this Code provides otherwise with regard to individual rights, the period of the statute of limitations is four years.

### Section 398

In the case of the right (claim) to damages, the period of the statute of limitations (negative prescription) begins to run as of the day when the aggrieved (injured) party learned, or could have learned, of the damage and of the identity of the party liable for its compensation; however, it shall expire no later than ten years from the day when such a breach of duty occurred.

### Section 399

Rights arising from damage caused to a consignment, or from late delivery of a consignment to the forwarder or carrier, become statute-barred after one year. In the case of rights arising from the entire destruction or loss of a consignment, the period of the statute of limitations begins to run as of the day when the consignment should have been delivered to the consignee and, in the case of other rights, as of the day when the consignment was delivered. In the case of wilful damage, the general period of the statute of limitations set out in section 397 shall apply.

### Section 400

A change in the person of the debtor or the creditor shall not affect the running of the period of negative prescription (statute of limitations).

### Section 401

The party against which a right is becoming statute-barred may extend the time of negative prescription by means of a written statement issued to the other party, even repeatedly; however, the total period of negative prescription may not exceed a period of 10 years from the date when it first began to run. Such a statement may be made even before the period of negative prescription begins to run.

## Subdivision 4
## Suspension and Interruption of the Time of Negative Prescription

### Section 402

The time of negative prescription is interrupted when the creditor, in order to satisfy or determine his rights, performs any act in law which, under the statutory provisions on judicial proceedings, is deemed to be the commencement of such proceedings, or as an assertion of the right in already initiated proceedings.

### Section 403

(1) The period of negative prescription (statute of limitations) is interrupted if the creditor initiates arbitration proceedings on the basis of a valid arbitration agreement in the manner specified in such an arbitration agreement, or in the rules governing such arbitration proceedings.

(2) If the commencement of arbitration proceedings cannot be determined under subsection (1), the arbitration proceedings shall be considered as having been initiated on the day when an application to commence arbitration proceedings was delivered to the other party at its seat, place of business, or residential address.

### Section 404

(1) If a right which is subject to the statute of limitations was asserted as a counterclaim in judicial or arbitration proceedings, the period of the statute of limitations relating to such a right is interrupted as of the day of the judicial or arbitration proceedings concerning the right

CHAPTER EIGHT
STATUTE OF LIMITATION
§ 100

(1) A right shall become statute-limitated unless it was exercised during the time period stipulated in this Act (§ 101 to 110). The court shall take the statute of limitation into consideration only upon an objection of the debtor. If the debtor appeals to the statute of limitation, the statute-limitated right can not be awarded to the creditor.

(2) All property rights except for ownership can become statute-limitated. The provision of § 105 shall not be affected by this rule. A lien shall not become statute-limitated before the secured receivable.

(3) Rights following from deposits on saving books or other kinds of deposits or deposits on current accounts shall not become statute-limitated until the end of the deposit relationship.

**Limitation period**
§ 101

Unless anything else is stipulated in the following provisions, the limitation period shall be three years long and shall start running from the day when the right could be exercised for the first time.

§ 102

As for rights that are to be asserted at first with an individual or a legal entity, the limitation period shall start running from the day when the right was asserted in this way.

§ 103

If the parties agreed on instalment performance, the limitation period of the individual instalments shall start running from their due day. If the whole debt becomes due because of non-fulfilment of one instalment (§ 565), the limitation period shall start running from the due day of the non-fulfilled instalment.

§ 104

As for rights following from insurance, the limitation period shall start running after the lapse of one year after the insurance event.

§ 105

As for right of the lawful heir to demand surrendering the inheritance (§ 485), the limitation period shall start running from the moment when the decision finishing the inheritance proceedings became final and conclusive.

§ 106

(1) Right to compensation of damage shall become statute-limitated in two years from the day when the damaged person learnt of the damage and of the liable person.

(2) The right to compensation of damage shall become statute limitated no later than in three years and, as for damages caused by intention, in ten years from the day when it came to the event from that the damage arose; this rule shall not apply to damages to health.

§ 107

(1) Right to demand surrendering of an unjustified enrichment shall become statute-limitated within two years from the day when the entitled person learnt of the unjustified enrichment and of the enriched person.

(2) The right to demand surrendering of the unjustified enrichment shall become statute-limitated no later than in three years and, as for an unjustified enrichment gained by intention, in ten years from the day when it came thereto.

(3) If participants of an invalid or cancelled agreement are obliged to return to one another all that they received according to it, the court shall take the limitation plea into consideration only if also the other participant could appeal to the statute of limitation.

§ 108

Rights from transport shall become statute-limitated within one year except for rights to compensation of damages from the transport of persons.

§ 109

Right corresponding to an easement shall become statute-limitated unless it is exercised for ten years.

§ 110

(1) A right that was awarded by a final and conclusive decision of the court or other authority shall become statute-limitated within ten years from the day when the liable party was to perform according to the decision. A right that was acknowledged by the debtor in writing as for its title and sum shall become statute-limitated within ten years from the day when it came to the acknowledgement; however, if a performance period was mentioned in the acknowledgement, the limitation period shall start running from the lapse of this performance period.

(2) The same limitation period shall apply also to individual instalments into that the performance was divided in the decision or the acknowledgement; the limitation period of the individual instalments shall start running from their due day. If the whole debt becomes due because of non-fulfilment of one instalment (§ 565), the ten-year limitation period shall start running from the due day of the non-fulfilled instalment.

(3) Interest and repeated performance shall become statute-limited within three years; however, if they were finally and conclusively awarded or acknowledged in writing, this limitation period shall apply only to interest and repeated performance that became due after the decision became final and conclusive or after the acknowledgement was done.

### Course of the limitation period
#### § 111
Change in the person of creditor or debtor shall have no influence on the course of the limitation period.

#### § 112
If the creditor exercises his right with a court or other competent authority during the limitation period and properly continues in the commenced proceedings, the limitation period shall not run from the moment of the exercise during the proceedings. This rule shall also apply to a finally and conclusively awarded right in case of that an enforcement of a decision was applied for with a court or other competent authority.

#### § 113
As for rights of persons who must have a legal representative or for rights against these persons, the statute of limitation shall not start until a representative is appointed to them. An already running limitation period shall go on running; however, it shall not end within one year after a legal representative is appointed to these persons or after this impediment expires otherwise.

#### § 114
As for a right between legal representatives on one side and minor children or other represented persons on the other, the limitation period shall neither start running nor go on running unless the matter is interest or repeated performance. The same rule shall apply also to rights between spouses.