UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KOTVA a.s., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW WEISS and WEISS ASSET | ) | |
| MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendants. | ) | C.A. No. 05-10679-RCL |
| | ) | |
| ANDREW WEISS, WEISS ASSET | ) | |
| MANAGEMENT LLC, K T, INC. and CVF | ) | |
| INVESTMENTS, LTD., | ) | |
| | ) | |
| Counterclaim-plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KOTVA a.s., MARTIN BENDA, RICHARD | ) | |
| HARAZIM, FORMINSTER ENTERPRISES, | ) | |
| LTD., SPV CO and JOHN DOES 1–5, | ) | |
| | ) | |
| Counterclaim-defendants. | ) | |
| | ) | |

**COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN SUPPORT
OF THEIR MOTION TO TAKE JURISDICTIONAL DISCOVERY**

Kotva a.s., a Czech corporation, commenced this action, thereby invoking the jurisdiction

of this Court and the application of Massachusetts law.  Defendants and counterclaim-plaintiffs

(the "Weiss Parties") have counter-claimed asserting that Kotva's commencement of this action,

among other wrongful conduct, is an abuse of process designed to obtain unfair advantage against

the Weiss Parties with respect to resolution of disputes pending in the Czech Republic.  As set

forth in the Weiss Parties' counterclaim, Kotva is the corporate form front for Forminster

Enterprises Ltd., ("Forminster"), Martin Benda ("Benda") and Richard Harazim ("Harazim") (collectively, the "counterclaim-defendants"). They are all members of a conspiracy that is in the process of misappropriating the proceeds of the multi-million dollar sale of real estate in the Czech Republic. In furtherance of this conspiracy, the counterclaim-defendants—using their pervasive control over plaintiff Kotva a.s.—filed this lawsuit in Massachusetts. By doing so, they have subjected themselves to the jurisdiction of this Court. In order to present the Court with evidence that the counterclaim-defendants used Kotva to file this lawsuit, the Weiss Parties are entitled to take jurisdictional discovery.

## BACKGROUND

As described in more detail in the counterclaim, Forminster, Benda, and Harazim are in the process of looting Kotva, a Czech company whose only valuable asset is real estate in downtown Prague (the "Department Store"). Forminster is Kotva's majority shareholder. Benda is the chairman of Kotva's Supervisory Board. Harazim is Kotva's Chief Executive Officer. Through Benda and Harazim—who served as directors of Forminster for part of the time that they were officers and directors of Kotva and continue to represent Forminster in the Czech Republic— Forminster exerts pervasive control over Kotva. The counterclaim-defendants have used this control to sell the Department Store after structuring the transaction to secure the proceeds for their own benefit, to the detriment of Kotva's minority shareholders, including counterclaim-plaintiffs K T, Inc. and CVF Investments, Ltd.

In furtherance of these efforts, the counterclaim-defendants initiated criminal proceedings against Andrew Weiss in the Czech Republic and caused Kotva to file this case in Massachusetts. Moreover, Benda and Harazim were personally involved in the cross-border negotiations between

Weiss and Forminster that preceded the counterclaim-defendants' decision to pursue sham criminal and civil charges against Weiss.

## PROCEDURAL HISTORY

In April of 2005, Kotva filed a complaint against Andrew Weiss and Weiss Asset Management, LLC in this Court.   In May 2005, Weiss and Weiss Asset Management, along with K T, Inc. and CVF Investments Ltd. (collectively, the "Weiss Parties"), filed counterclaims against Kotva, Harazim, Benda and Forminster.  The counterclaims allege, among other things, that the counterclaim-defendants are members of a conspiracy; that one object of that conspiracy is to strip Kotva of the Department Store, sell the Department Store and distribute the proceeds among the members of the conspiracy; and that in furtherance of this conspiracy, Kotva filed this lawsuit against Weiss and Weiss Asset Management LLC.

More specifically, Harazim and Benda, on behalf of Forminster, and Weiss, on behalf of his investors, were negotiating over the sale of shares in Kotva and a Czech investment fund called Trend.  Harazim was the primary point of contact for Forminster, and he sent multiple emails into Massachusetts during these negotiations.  Benda was, according to Harazim, "in charge of [the] deal."   In order to gain unfair leverage over Weiss, Harazim and Benda caused Czech law enforcement to initiate criminal proceedings against Weiss for alleged "blackmail" during the negotiations.  Harazim admitted his role in these charges to the Prague Post.[1]  Unsatisfied with the Czech criminal proceedings, Harazim and Benda, on behalf of Forminster, then decided to "turn up the heat" by using their control over Kotva to cause it to file this lawsuit against Weiss in

---

[1]  Villu Arak, *The Trouble with Kotva*, PRAGUE POST, Feb. 17, 2005, *available at* http://www.praguepost.com/P03/2005/RE/0217/re1.php (last visited Dec. 13, 2005) (emphasis added) (attached at Ex. A)

Massachusetts. Like the sham criminal charges, this lawsuit is an effort by the counterclaim-defendants to misuse the courts and thereby gain an unfair advantage over Weiss.

On August 3, 2005, the Weiss Parties served a series of document requests and interrogatories on Kotva a.s. Kotva failed to provide adequate responses and the Weiss Parties filed a motion to compel. That motion has been referred to the recently appointed discovery master. These discovery requests cover, among other things, information relevant to the counterclaim-defendants' motions to dismiss. For example, the Weiss Parties requested that Kotva produce "[a]ll documents concerning the decision to initiate this lawsuit," but, after four months, Kotva has failed to produce a single document responsive to this request.

On November 29, 2005, the Court conducted a status conference at 9:00 a.m. that lasted approximately fifteen minutes. In attendance were Edward Leibensperger and Benjamin Goldberger for the Weiss Parties; William Nystrom and Joel Beckman for Kotva;[2] and Jeffrey Clements and Ingrid Martin for Forminster. Mr. Clements, counsel for Forminster, reiterated his position, asserted earlier in telephone conversations with Mr. Goldberger, that Forminster would object to any jurisdictional discovery. On December 11, 2005, Dana Zakarian, representing Benda and Harazim, sent Mr. Leibensperger a letter confirming that Benda and Harazim would also object to any jurisdictional discovery. On December 16, 2005, Mr. Goldberger and Mr. Zakarian spoke by telephone for between fifteen and twenty minutes around noon. Mr. Zakarian reiterated his position on behalf of Benda and Harazim. Also on December 16, 2005, Mr. Goldberger and Ms. Martin spoke by telephone for between five and ten minutes, beginning at 10:10 a.m. Ms. Martin reiterated her position on behalf of Forminster. Undersigned counsel believe that further

---

[2] Mssrs. Nystrom and Beckman have since filed a motion to dismiss on behalf of Harazim and Benda.

discussions are unlikely to resolve or narrow the parties' dispute as to whether jurisdictional discovery is appropriate.

## **ARGUMENT**

Jurisdictional discovery is appropriate for "a diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of in personam jurisdiction . . . ." *United States v. Swiss Am. Bank, LTD.*, 274 F.3d 610, 625 (1st Cir. 2001). The First Circuit has recognized the difficulties in proving jurisdiction of a nonresident corporation and stated discovery is proper when a party "is somewhat unfamiliar with his adversary." *Whittaker Corp. v. United Aircraft Corp.*, 482 F.2d 1079 (1st Cir. 1973).

One of the counterclaims at issue is a counterclaim for abuse of process for the filing of this lawsuit. It is indisputable that if the Weiss Parties present evidence that a counterclaim-defendant caused the filing of this lawsuit, the Court has specific jurisdiction over that counterclaim-defendant. *See, e.g.*, *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,* 290 F.3d 42, 60–61 (1st Cir. 2002). Thus, Kotva's filing of this lawsuit is sufficient to confer specific jurisdiction over Kotva and all those acting in concert with it.

In order to impute Kotva's filing of this lawsuit to one of the counterclaim-defendants, the Weiss Parties may show any one of the following: (a) Kotva was an agent of the counterclaim-defendant;[3] (b) Kotva and the counterclaim-defendant were members of a conspiracy and the filing

---

[3] *See In re Lernout & Hauspie Sec. Litig.*, 2004 U.S.Dist. LEXIS 12141, at *37–41 (D. Mass. May 3, 2004) (holding that "it is clearly established that under basic principles of agency law, forum-related contacts made by an agent acting within the scope of an agency relationship are attributable to the principal") (citations omitted).

of the lawsuit was an act in furtherance of that conspiracy;[4] or (c) Kotva is an alter ego of the counterclaim-defendant.[5]

Additionally, Kotva must have filed this lawsuit by acting through one of its officers, directors or employees.  That individual is subject to specific jurisdiction in Massachusetts for a claim of abuse of process.  *See, e.g.*, *Trans Nat'l Travel, Inc. v. Sun Pac. Int'l, Inc.*, 10 F. Supp. 2d 79 (D. Mass. 1998) (holding that the court could exercise personal jurisdiction over the defendant through his contacts as a corporate representative).

Therefore, whichever individual contacted Massachusetts counsel and asked them to file this lawsuit on behalf of Kotva is subject to specific jurisdiction for an abuse of process claim arising out of Kotva's lawsuit.  This individual appears to be Richard Harazim, the person who signed Kotva's Rule 16.1 Certificate and interrogatory responses.  For example, in *Mobil Oil Corp. v. Advanced Environmental Recycling Technologies, Inc.,* 833 F. Supp. 437 (D. Del. 1993), the court found that it could exercise personal jurisdiction over a nonresident counterclaim-defendant because the counterclaim alleged that the underlying lawsuit was sham litigation brought as part of an on-going anti-competitive scheme, and the counterclaim-defendant had authorized the lawsuit. Thus, a Massachusetts court may exercise specific jurisdiction over Richard Harazim even if his sole contact with Massachusetts was committing an abuse of process by causing this lawsuit to be filed here.  Moreover, Harazim is also subject to personal jurisdiction because he purposefully directed multiple emails into Massachusetts while engaging in the negotiations that are a key part

---

[4] *See, e.g.*, *Glaros v. Perse*, 628 F.2d 679, 682 (1st Cir. 1980) (recognizing that jurisdiction over co-conspirators can be obtained when substantial acts are performed within the forum state in furtherance of a conspiracy that co-conspirators knew or should have known about).
[5] *See In re Lernout & Hauspie Sec. Litig.*, 337 F. Supp. 2d. 298, 313 (D. Mass 2004) (holding that jurisdiction can be found when a parent company exerts greater than normal control over the subsidiary).

of the counterclaim. Benda, who Harazim described as "in charge of this particular deal," likewise has sufficient contacts with Massachusetts by directing Harazim in his negotiations. *Workgroup Tech. Corp. v. MGM Grand Hotel*, 246 F. Supp. 2d. 102, 112 (D. Mass. 2003) (holding that the court could exercise personal jurisdiction over the defendant as a result of contacts including email because "but for" the contacts, the dispute in the case would not exist); *accord RF Tech. v. Applied Microwave Tech., Inc.,* 369 F. Supp. 2d 24, 32–33 (D. Me. 2005) (holding that personal jurisdiction is appropriate based in part on emails where those emails reflected an on-going relationship between the defendant and individuals in the forum).

Thus, the Weiss Parties seek written discovery that is tailored to obtain information relating to the relationship among Kotva, Forminster, Benda, and Harazim and their decision to initiate this lawsuit through Kotva. The Court should allow the Weiss Parties to obtain this discovery so that the Court can examine all of the facts regarding how Forminster, Benda and Harazim were involved in the decision to bring the lawsuit against Andrew Weiss and Weiss Asset Management LLC in Massachusetts. These facts constitute a prima facie showing that the Court has personal jurisdiction. *See, e.g.*, *United States v. Swiss Am. Bank*, 274 F.3d 610, 618–19 (1st Cir. 2001) ("When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing . . . the 'prima facie' standard governs its determination.").[6]

---

[6] Under the prima facie standard, the Court should not consider the documents purporting to be affidavits submitted by the counterclaim-defendants. "[I]n evaluating whether the prima facie standard has been satisfied, 'the district court is not acting as a factfinder; rather it accepts properly supported proffers of evidence by a plaintiff as true and makes its rulings as a matter of law." *Swiss Am. Bank*, 274 F.3d at 619. (citations omitted). Furthermore, the documents submitted do not appear to have been sworn before an officer authorized to take oaths and, assuming that they were executed outside the United States, are not in proper form under 28 U.S.C. § 1746(1). This statute requires unsworn declarations that are executed outside of the United States submitted in lieu of affidavits include language in which the declarant submits to the jurisdiction of the United

(continued...)

The Weiss Parties have made out a colorable case for personal jurisdiction for each counterclaim-defendant that will be further supplemented if the Court permits discovery. Based on his signing of Kotva's Rule 16.1 Certificate and interrogatory responses, it appears that Harazim is intimately involved in the prosecution of this lawsuit. Moreover, in describing Kotva's parallel efforts to use Czech criminal process against Andrew Weiss, Harazim stated that "*we* filed a criminal complaint against him."[7] This lawsuit, like the sham criminal charges, is part of a concerted effort by the counterclaim-defendants to obtain an unfair advantage over Weiss in its efforts to coerce Weiss to abandon his investors' claims in the dispute between those investors and Forminster. In negotiating with Weiss over the value of these claims, Harazim identified Martin Benda as the person "in charge of this particular deal."[8] Thus, it stands to reason that Benda was involved in the decision to file this lawsuit, whose sole purpose is to increase Forminster's leverage in the negotiations.

Until 2002, Harazim and Benda were simultaneously officers/directors of Kotva and Forminster. The current directors of Forminster appear to be nominee directors of a corporate shell company created in Cyprus for the purposes of anonymity, tax avoidance or both. The shareholders of Forminster also appear to be nominee shareholders, a choice that appears to be designed to obscure the identity of the individuals who control Forminster, and through Forminster, Kotva. Notwithstanding the fact that Harazim and Benda are purportedly no longer formally directors of Forminster, they continue to represent Forminster's interests in the Czech

---

States courts for purposes of prosecution for making a false statement. *Compare id. with* 18 U.S.C. § 1623.

[7] Villu Arak, *The Trouble with Kotva*, PRAGUE POST, Feb. 17, 2005, *available at* http://www.praguepost.com/P03/2005/RE/0217/re1.php (last visited Dec. 13, 2005) (emphasis added) (attached at Ex. A)

[8] E-mail from Richard Harazim to Georgiy Nikitin (Aug. 27, 2004, 07:51) (attached as Ex. B).

Republic.  The Wall Street Journal has identified Richard Harazim as "the Forminster-appointed chief executive of Kotva" and accurately characterizes this dispute as one between Forminster and the Weiss Parties.[9]  Communications created contemporaneously during the negotiations among Weiss, Harazim and Benda over the value of the Weiss Parties' stake in Kotva confirm that Weiss—as well as those working with him—understood Benda and Harazim to be representatives of Forminster.[10]

The Weiss Parties have been diligent in pursuing discovery.  Indeed, they first sought discovery from Kotva on issues relating to personal jurisdiction on August 1, 2005..  Kotva has improperly failed to produce documents relevant to the question of personal jurisdiction—such as "[a]ll documents concerning the decision to initiate this lawsuit"—despite stating no objection to producing those documents.

---

[9] Nick Carey, "Prague's Free Market Pain," WALL ST. J., July 18, 2005, at A10 (attached as Ex. C).

[10] *See* Ex. D (referring to "the latest offer from Forminster") and Ex. E (predicting that "Forminster will withdraw its offer").

Because the Weiss Parties have presented a colorable claim of personal jurisdiction and have been diligent in pursuing discovery, the Court should grant their motion for jurisdictional discovery from Benda, Harazim and Forminster.

Respectfully Submitted,

ANDREW WEISS, WEISS ASSET
MANAGEMENT LLC, K T, INC. and CVF
INVESTMENTS, LTD.

By their attorneys,


/s/ Benjamin A. Goldberger
Edward P. Leibensperger (BBO# 292620)
Benjamin A. Goldberger (BBO# 654357)
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts  02109-1775
(617) 535-4000

Dated: December 20, 2005

BST99 1483897-5.072198.0012



## The trouble with Kotva

For the first time, the department store's embattled general director speaks out

By Villu Arak
Staff Writer, *The Prague Post*
Feb. 17, 2005

If the owners of the Kotva department store at namesti Republiky had their way, the superbly located building would have been sold last year to Markland, an Irish property firm. But the sale, which is yet to be concluded, has been mired in a war of words over its legal basis.

In the court of public opinion, Kotva's reputation has suffered from the company's inability to escape the shadow of the troubled Trend investment fund that once owned a minority stake in the department store. The current dispute, however, apparently stems from a 1999 settlement between Trend and Forminster Enterprises Ltd., which had previously acquired Kotva's majority shares.



DANA WILSON / The Prague Post

**Not responding to the rumors and criticism was a mistake,** Harazim now believes.

Businessman James Woolf, who has unsuccessfully sought to gain control of the department store, disputes the settlement, sources say. He is said to be seeking some Kotva stock on the basis of a 1998 option agreement between Trend and Deutsche Bank (DB, which acted through Morgan Grenfell, its fully owned subsidiary). The agreement was signed in lieu of the bank's funding of Trend's efforts to recover assets that had been removed from its portfolio. The agreement gave DB the option to buy, at a preset price, any Kotva shares that Trend recovered. However, as the funding ran out and the recovery effort was ended, Trend settled with Forminster, which kept its Kotva stake. Meanwhile, DB transferred its option rights to Flow Corporation, a company owned by James Woolf, who is disputing the legality of Trend's decision to settle. Last year, news of the shopping center's possible sale to Markland reportedly prompted Woolf to threaten legal action against the buyer. As a sale has not taken place yet, no lawsuit has been filed against the buyer.

As legal skirmishes have ground on behind the scenes, Kotva's management has withheld a public response to claims that the current owners of the Kotva building are not entitled to it. The department store's management chose to remain silent — until now. Kotva's general director, Richard Harazim, has decided it's time to take his case public. In an exclusive interview with *The Prague Post,* he contends that

**TIMELINE**
An abbreviated chronology of the battle over Kotva shares and assets

**THE TREND YEARS**

**1991** Musicians Martin

following the 1999 settlement, Kotva is perfectly entitled to sell its assets to any interested buyer and that outside claims to Kotva have no valid basis.

This is far from the final word in the Kotva matter; there are questions that Harazim either can't or won't answer. And new developments occur almost weekly. Watch these pages for updates.

**The Prague Post:** Kotva's reported sale to Markland last year is mired in rumors that any sale would run into legal disputes over Kotva's ownership. Departing from Kotva's policy, your decision to speak out was prompted by a recent article in this paper where such doubts were mentioned once again. Still, why speak out now?

**Richard Harazim:** I think it was proven that the strategy of being silent and hoping that it dies away was wrong. People took it as a sign of weakness. If you don't react to something false, people take it as if the allegations were true. But even more importantly, we probably wouldn't have come out if people that we didn't expect it from hadn't started using the same logic and approach of openly trying to scare investors away.

**TPP:** Why do you think these rumors are flying about?

**RH:** There are two sorts of people playing this card. One is represented by James Woolf, who somehow derives that he has a claim for the building, and therefore a potential sale of the building reportedly damages his rights. As far as we're concerned, his claims are virtual and have no foundation. Mr. Woolf mixes several legal cases into totally wrong conclusions, which doesn't prevent him from spreading his misguided claims to all potential interested parties.

Then there is another group of people who try to take advantage of our effort to find a suitable investor. They are a group of small shareholders who we believe are trying to blackmail us. In our opinion, they filed a case relating to the legal title of the building just to have leverage enabling them to ask for money in order to get rid of the lawsuits.

Kratochvil and Michal Kocab establish the Trend investment fund during the first wave of coupon privatization

**1995 August** Miroslav Halek's Kralovehradecka brokerska buys Trend's investment management arm for a sum said to be over 300 million Kc (over $12,820,513), about a third of the fund's value. The payment was reportedly taken out of Trend funds. At the time of the sale, Trend owned 16 percent of Kotva, which amounted to 13 percent of Trend's assets

**1995 December** Trend sells all of its Kotva stock for 1,080 Kc per share. Later that month, Trend spends 337 million Kc to buy a 31 percent stake in Kotva at 1,555 Kc per share. This is the biggest stake Trend will ever hold in Kotva

**1996 March** Trend unloads 9 percent of its Kotva shares to cover a contractual penalty

**1996 May** Trend dumps the remaining 22 percent stake in Kotva at 400 Kc per share. In the ensuing months, former Trend-owned shares in Kotva are mixed with non-Trend Kotva stock and find various new owners

**1996 November** The Finance Ministry puts Trend in forced administration, following the stripping of 1.1 billion Kc in assets from the fund by former managers. John Moffitt is hired to recover Trend's assets

The group has been headed by Andrew Weiss, a professor at Boston University, who is the chief investing officer of Weiss Asset Management [WAM]. WAM is an investment company controlling BGO (Brookdale Global Opportunity), an 11 percent shareholder in Kotva. Mr. Weiss met us in spring last year and requested that Kotva buy his shares; otherwise he would prevent us from talking to potential investors. We refused and we filed a criminal complaint against him, as we believed we had just experienced naked blackmail.

After our refusal to buy his shares, WAM did file lawsuits through no-name offshore structures so as to gain leverage for further 'negotiations' with Kotva. In this he was helped by Vladimir Hoffman and others working here in the Czech Republic. What happened to Hoffman [prosecutors charged him and another person with blackmail Feb. 4] must be a result of our complaints and the activities of Andrew Weiss and his group.

**TPP:** In 2002 Mr. Woolf unsuccessfully sought to buy Kotva. In 2004 there were reports that Irish property firm Markland was purchasing Kotva. According to media reports, Mr. Woolf then threatened to sue Markland if the sale went ahead. Did Markland purchase Kotva?

**RH:** That's something I can't deny or confirm. Markland was interested. We dealt with them and the outcome of the negotiations will be known soon. Why does Mr. Woolf act the way that he does? I have just one explanation in my mind: He wants the building. If we sell it to somebody else, he can't have the building. And he believes he has the instruments in his hand to either make it impossible for us to sell or to make it very difficult for us to sell — in which case he might squeeze some benefit for himself.

Should his threats scare away everybody, he is in the position to say, 'Look, you can get rid of the threat. But you will pay me this [much].' Which in fact is what is happening right now. Alternatively, if he does scare the investors away, he would then be the only one who can come and say, 'This is the bid and this is the best you can get,' because there is no one else to bid. ...

We say that James Woolf and, nowadays, also

LIFE AFTER TREND

**1997 January** Forminster Enterprises Ltd. buys 56 percent of Kotva. Soon thereafter, a state prosecutor blocks these shares in connection with an investigation concerning Miroslav Halek

**1997** Trend launches efforts to recover 47 percent (16 plus 31) of Kotva from Forminster. (Meanwhile, investment fund Mercia, a former Kotva shareholder, seeks to recover 37 percent of Kotva shares from Forminster.) Trend's Kotva share recovery efforts eventually involve over 30 lawsuits

**1998** Through a subsidiary, Deutsche Bank (DB) helps Trend pay off its debts and finance the Kotva share recovery. In lieu of the loan, DB gets the right to buy any Kotva shares that Trend recovers, at 1,350 Kc per share

**1999 March** The loan proceeds run out

**1999 May** Trend has less than 30,000 Kc in cash and no other assets that it can sell to pursue the share recovery. Debts start to mount and Trend's attorneys stop pursuing litigation. Opponents would later argue that more funding would have been made available had Trend pursued it

**1999 December** Forminster agrees to pay Trend 350 million Kc to settle the dispute over Kotva shares,

Deutsche Bank, don't have any legal basis [for their claims] and we won't yield to this pressure. We won't buy ourselves out of this pressure. We will try to explain to everyone that these are just empty threats. ... We've prepared legal measures that should help us to fight for our position.

**TPP:** You mentioned Deutsche Bank. [In 1998, its wholly owned subsidiary Morgan Grenfell gave Trend a loan to pay its debts and help finance Trend's share recovery. Supporting this loan, DB and Trend signed an option agreement whereby Trend had to offer DB any Kotva shares it recovered, for 1,350 Kc per share.] After Trend settled with Forminster in 1999, DB transferred the rights to this agreement to Flow Corporation, owned by James Woolf. Is this the basis upon which Mr. Woolf is basing his claim against Kotva?

**RH:** Yes, this must be how, somehow, he derived his claims against Kotva. This must be the source of why he believes that he has some right against Kotva. If there is a claim, it's against Trend. There is absolutely no way to somehow construe a claim against Kotva.

But once again, if it were only for Mr. Woolf, whose belief in his own ideas is famous, the reactions from our side wouldn't be so sensitive. It is also DB that interferes with our business nowadays, and that is something we have to react to. In our minds, it is totally improper for a bank of this magnitude to misuse the strength and position of an influential institution in order to gain an advantage for their client in a competition. What is even worse and more surprising, the methods adopted by them are beyond our belief.

**TPP:** What kind of methods are you referring to?

**RH:** The potential buyer's lawyers were contacted by a Mr. Redfern, who identified himself as speaking on behalf of DB and informed the law firm that DB requests 5 million euros [150 million Kc/$6.55 million] from the buyer. If they [DB] don't receive the money, they threatened intensified litigation. The lawyer answering the call was obviously interested what the legal basis for such litigation might be, but he was told that this will not be discussed.

and keeps the shares (The previous year, Forminster had signed a 35 million Kc settlement with Mercia)

**2000 January** Prior to the settlement coming into force, a Hradec Kralove court declares Trend bankrupt

**2000 February** DB transfers option rights to Flow Corporation, owned by James Woolf

**2000 March** Flow files a claim for financial damages in the Trend bankruptcy proceedings, arguing that Trend violated the option agreement by settling. The bankruptcy court has yet to decide on the claim

**2000 September** Flow submits a claim to the London Court of International Arbitration. Trend's bankruptcy trustee blocks Trend from spending money on defense, arguing that the proceedings are not in accordance with the bankruptcy law

**2002 February** London Arbitration Court finds that by ending the share recovery effort and by settling with Forminster, Trend breached its agreement with DB's subsidiary. As agreement rights have been transferred to Flow, Arbitrator Gary Born awards Flow 109 million Kc in damages. But Trend is bankrupt and the ruling has not been enforced. Kotva management argues that the award neither invalidates the Trend settlement nor suggests that Flow has any

We couldn't believe this. We wrote several letters [to people] all over DB complaining about this ridiculous interference with our contracts. Finally, we got hold of DB people in London, who first of all denied that Mr. Redfern acted on behalf of DB — but, incredibly, after some hesitation confirmed they did request the money and they still do.

Since then we have maintained a very interesting conversation in which we try to find out what exactly makes DB believe they have any legal title to any money. And DB repeats they simply want money from us or the investor; otherwise they [will] sue.

**TPP:** How do you plan to respond to Deutsche Bank's demands?

claim against Kotva

**2002** James Woolf makes an offer to purchase the Kotva building. The offer is deemed to undervalue the building and is rejected

**2004** News reports of Kotva's sale to Irish developer Markland prompt Woolf to promise legal action against the buyer should the deal go ahead

**2005** An announcement regarding the sale of Kotva's assets is expected

**RH:** We still can't believe we are dealing with official DB, and we try to get to relevant departments in DB that would examine the actions taken by DB up to now. After that we are prepared to address other institutions, including regulating bodies in Germany and the UK, not to speak about court actions.

**TPP:** Are you surprised that Deutsche Bank appears to share James Woolf's views?

**RH:** We had a meeting with James Woolf and Deutsche Bank. We explained our legal position and we asked them in three letters to tell us the exact source of why they believe that they are entitled to anything. They never responded with an explanation. I am sure that by now they do understand their legal position and yes, I am surprised by their actions.

**TPP:** Who are the current owners of Kotva?

**RH:** The owners are thousands of shareholders. In fact, it is nearly 8,000. Of course, some of them are bigger than others. The biggest one is Forminster [Enterprises Ltd.] with 56 percent of the shares. Then there are companies such as Fidea [Consulting] and BGO. There are three or four that you can name and the rest are minority shareholders from coupon privatization.

**TPP:** How did Forminster become Kotva's majority shareholder?

**RH:** That's something I only know from hearsay. I wasn't present when all of this happened.

I understand that Forminster acquired the shares from a broker in 1997 and some of these Kotva shares can be sourced back to Trend. The way I understand this, Trend came under the control of people from Hradec Kralove, Mr. [Miroslav] Halek and his group. I can't really discuss the issues between 1997 and 1999, because I wasn't involved. All I know is that in December 1999 there was a

settlement between Forminster and Trend. From there on, I don't think there can be any doubt as to who the [majority] shareholder is. The settlement should be the new start for Forminster. Forminster got its shares [and] Trend got its settlement with Forminster.

**TPP:** So Kotva has nothing to hide?

**RH:** No. The problem is, how do you prove that there is nothing? If there is direct reasoning, like, if James Woolf said, 'You breached my rights on this and this; I'm going to file a lawsuit,' you would have materials you would give to lawyers. They would study it. ... But how do you protect yourself from 'There is something. We're not going to reveal what it is, but we will sue after you buy'? It's impossible [to protect oneself]. Of course, the buyers' lawyers say that we must have hidden something from them. But there is nothing. You can't prove that something hasn't happened. That's the problem.

**TPP:** Forminster is registered in Cyprus. Who are the principals and are you in any way involved with the company?

**RH:** Not any more. ... That was the settlement that I was helping with. For a period of one year, I worked for them. Then, in the framework of the settlement, I became a director for Forminster. But that was only in the scope of the liabilities prescribed by the settlement. Since then, I don't have any relationship with Forminster at all. It's just a shareholder like everyone else.

**TPP:** But then there are some small shareholders who, you say, have an agenda to push. How would you describe your relationship with them? They have to be dealt with somehow.

**RH:** Right. It's a few of them who have an agenda. Never heard from the rest. In a certain way, I kind of understand their position. The principal mistake with Kotva is that it's on the stock exchange. I don't believe that we fulfill the conditions of any organizer of public market. We shouldn't be on the stock exchange and we shouldn't be on RM-S [off-exchange trading]. I don't think we fulfill just one of their conditions. The majority of the shares are blocked — Forminster can't trade its shares. The rest of the shares are concentrated with the remaining parties, and for free trade there are just a few shares.

It's difficult for larger shareholders to get rid of their shares. There is nearly zero liquidity on the market. But I don't think this is an excuse for them to press the company to take care of their shares. They should press whomever they wish: the organizer of the markets, or maybe the Finance Ministry, but we can't be forced to buy their shares.

**TPP:** As you said, Forminster's shares in Kotva continue to be frozen. How does that affect Kotva's possible sale?

**RH:** I'm talking from the position of the manager of Kotva, not from the position of Forminster. I'm not really concerned about the sale of shares. We're not selling the shares of Kotva. We're selling assets of Kotva as such. From this perspective, I don't really care what's happening to the shareholder structure. The important information is whether the board of directors that decides the sale is validly elected and whether we have the authority. This was the subject of due diligence, of course, with everybody.

**TPP:** How would you draw the red line between Trend and Kotva, so the two wouldn't be confused?

**RH:** If you imagine the total assets of Trend at a certain point in time, the number of shares in Kotva fluctuated. The biggest number of Kotva shares that they owned was 31 percent and even that was just for a short period of time. When Miroslav Halek and his guys gained control over Trend, I believe the value of the Kotva shares was something like 13 percent of Trend's portfolio and Trend owned 16 percent of Kotva. The link between Kotva and Trend is artificial and on purpose.

When John Moffitt [a financial consultant hired as Trend's chairman] started to fight for Trend's assets, he made a deliberate decision to build the fight on the name of Kotva. And if he hadn't run out of money in his effort, I am sure Kotva and Trend would be even less distinguishable.

Since then, you've seen the crazy shortcuts from Trend to Kotva. Like when *Czech Business Weekly* published an article in which they said that Kotva is an example of Czech tunneling skills. As if we here, in Kotva, have tunneled from the company! That's the general perception. I believe it's because John made a very good job of making Trend understood as Kotva.

In reality, Trend had an uncertain and disputed claim to recover a disputed amount of Kotva shares from Forminster. Trend then settled with Forminster. Even though the dispute is over, people still use the notoriety created for their own benefit. It's crazy. And it is even more crazy that after 10 years of investigation, it is still to be determined whether Halek's actions were criminal.

**TPP:** If and when Kotva's sale is announced, there would supposedly be a clean break from perceptions of the past. Given that you're not opposed to Kotva being purchased by an interested investor, how do you envision Kotva's immediate future?

**RH:** I'm not opposed to selling *assets* from Kotva to an interested buyer. It would mean exchanging the assets of Kotva for cash. Kotva wouldn't have to take care of the building. Instead, it would sit on a bank account and would have to devise ways to invest the money. The whole principle of enterprising in Kotva would change.

As far as the links to Trend and its troubled history, this will be over only when minority shareholders who try to squeeze the advantage from us trying to sell the building realize that the assets were sold and won't press any more. As for James Woolf, the same thing. Maybe, when the assets are sold, he will realize that he can't buy them anymore. That is the positive way. Or there is the negative way. As I said, we took some measures. There are some criminal complaints against various persons and there is going to be some litigation. Maybe, negatively, people will stop pushing their nose into Kotva when they learn that they just can't do it.

**TPP:** How much have these disputes distracted Kotva from doing what it is supposed to do — running a shopping center?

**RH:** A lot. Even in the main transaction where we negotiated the sale of the building, 30 percent was attributed to technical questions, the usual stuff that you would undergo when selling a building. About 70 percent was attributable to

the other things. If it wasn't for that, and we had the right buyer, the transaction would have been done already.

**TPP:** What would you like to see happen to Kotva in 2005?

**RH:** The best future for Kotva is to find an investor who offers a fair price and to sell the real estate. As long as Kotva is in its current situation, there will always be fights and disputes. But the building needs to be refurbished to fight the competition. So I would wish for the conclusion of a fair transaction by which the company would exchange its main assets and would start a completely new phase in its life.

**TPP:** If the building were sold, would you wish to remain in your current position, overseeing the daily activities of the shopping center?

**RH:** Not really. I've been in this position for five years. It's just about time to change. Even from a personal perspective, it would be welcome for me to open some new horizons.

Villu Arak can be reached at varak@praguepost.com

The Prague Post Online contains a selection of articles that have been printed in *The Prague Post,* a weekly newspaper published in the Czech Republic. Unauthorized reproduction is strictly prohibited. To order home or office delivery of The Prague Post, **click here**.

**Georgiy Nikitin**

| | |
|---|---|
| **From:** | Richard Harazim [richard.harazim@od-kotva.cz] |
| **Sent:** | Friday, August 27, 2004 7:51 AM |
| **To:** | Georgiy Nikitin |
| **Subject:** | Kotva shares |

Dear Mr. Nikitin

Thank you for your offer from 23.8.04. While we appreciate your offer and we are basically interested in buying the shares of Kotva from BGO we feel the following areas are problematic for us:

1. The purchase contract must be tied to lawsuits filed by Gilroy AND Balfindor, not only to Gilroy.

2. The purchase price is too high from several points of view. First of all, it is too high in general. It is much higher than the price on Stock exchange. Secondly, even if we disregarded this, we certainly wouldn't be able to sell the shares to another investor at the same price, which means we would have to decrease the share capital of Kotva. If it showed in the process of capital decrease that NAV is lower than the purchase price (the deal created a loss) - which is a certainty at the level suggested by you - we as a board would face risks that are not acceptable.

3. The process of acquiring more than 10 % of our own shares poses accounting and legal complications that must be consulted with our auditors and lawyers.

4. Due to the above we can't react as quickly as requested from us.

5. Mr. Benda who is in charge of this particular deal is leaving for a holiday and will not be back before Monday 13, September.

Therefore we suggest to prolong the negotiating period till the end of September.

Best regards

Richard Harazim

1



FORMAT FOR
PRINTING
sponsored by



Don't copy. Lead.®

**July 18, 2005**

EUROPEAN BUSINESS NEWS

# Prague's Free-Market Pain

**U.S. Investor's Soured Deal
Reflects Post-Privatization Hazards**

**By NICK CAREY**
**DOW JONES NEWSWIRES**
*July 18, 2005; Page A10*

PRAGUE -- The Kotva department store looms dark and decrepit in this city's downtown, a monument to mid-1970s Communist architecture and now to legal disputes stemming from the Czech Republic's tumultuous rush into capitalism.

Disputes over ownership go back to its privatization almost a decade ago and have culminated in a legal tangle that is getting attention from the U.S. Embassy here over whether shareholders' rights are being protected in this new member country of the European Union.

**DOW JONES REPRINTS**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

The dispute involves a majority stake in Kotva AS, the holding company of the seven-story store. It pits U.S. investor Andrew Weiss, whose Weiss Asset Management manages $350 million, primarily for American private investors, against Forminster Enterprises Ltd., a Cypriot-registered company whose ownership couldn't be determined.

The dispute escalated after Forminster sold its stake in March to Irish property company Markland Holdings Ltd. for €56 million ($67.4 million), despite a Czech court order freezing Forminster's stake in Kotva and blocking any sale of company property until the dispute is resolved. Forminster representatives say the company legally sidestepped the court



**Hot Properties**

A dispute over Prague's Kotva department store, above, highlights lingering pitfalls for foreigners even as the Czech Republic attracts sizable new investments. Below, foreign direct investment, in billions:

Source: OECD                                                                                                    *Forecast

order by transferring the department store to a subsidiary for sale. State Prosecutor Frantisek Fila says Czech police are investigating the property transfer.

The battle over Kotva highlights the Czech Republic's mixed track record with foreign investors. The country has drawn the most investment per capita in Central and Eastern Europe, thanks to its central location and low-cost, highly skilled work force. Investors starting from scratch here say that apart from a slow judicial system, hefty bureaucracy and corruption -- common complaints throughout the region -- they are satisfied.

Still, some investors buying into companies or forming partnerships with local businessmen have run into problems. In 2003, the Czech government paid $354 million in damages to U.S. businessman Ronald Lauder, after a Czech arbitration court ruled Mr. Lauder was unfairly squeezed out of television station TV Nova by his Czech partner and that the government had failed to protect him.

In the 1990s, the poorly regulated sale of state-owned companies following communism's demise here often resulted in asset stripping, as majority owners siphoned off assets from newly privatized companies. The practice was so common that "tunneling," the Czechs' term for it, has become synonymous for many people with all that went wrong during the transition to a free-market economy from a centrally planned system.

The dispute over Kotva, which dates to transactions that began in the mid-1990s, also highlights complaints about the Czech judiciary and law enforcement. After eight years, no lawsuits nor criminal charges filed in the matter have come to trial. In a report issued last month, the World Bank said countries in the region, from the Czech Republic to Russia, must do "much more" to tackle problems of judicial inefficiency.

Mr. Weiss, who also is a professor of economics at Boston University, says

in a suit he has filed in Prague that Forminster obtained its 56% share in Kotva fraudulently from a now-bankrupt investment fund called Trend. Mr. Weiss's company owns 40% of Trend and 12% of Kotva, and he says he is defending his shareholder rights in each. Forminster says Mr. Weiss tried to blackmail the company into buying him out and has sued him in U.S. district court in Massachusetts and in Prague.

Share-transfer records from the Prague Stock Exchange, plus government and police investigation records, show a web of transactions, starting in the mid-1990s, moving Kotva shares through shell companies from Trend to Forminster. All these companies were linked to Miroslav Halek, Trend's majority owner at the time. Meanwhile, throughout 1996, Mr. Weiss's fund was building a 40% stake in Trend. Mr. Weiss says he was unaware at the time of any suspect share deals.

On May 28, 1996, Trend sold 150,000 Kotva shares to a second company at $16 a share, according to transaction records. Forty-eight minutes later Trend bought back 140,000 shares at $39 each. Two minutes after that, Trend sold 140,000 shares to a third company for $16. The quoted price for Kotva stock on the Prague Stock Exchange that day was more than $20.

A Czech Finance Ministry report in January 1998 estimated Trend had a loss of $3 million through these three transactions. A 1999 Deloitte & Touche study commissioned by a company linked to Forminster said the transactions had no "apparent commercial reason."

Eleven people, including Mr. Halek, have been charged twice by the state prosecutor's office with fraud in connection with the dealings in Trend. Both times the charges were dismissed, as the court ruled the defense received insufficient time to prepare for the case. Mr. Fila, the prosecutor, says fresh charges relating to suspect transactions with Kotva shares were filed against the same 11 people July 13 in Czech district court.

Mr. Fila also filed charges of money laundering against Mr. Halek relating to an account in Liechtenstein that Mr. Halek opened in the mid-1990s in Forminster's name after he obtained power of attorney from Forminster. The high court in Liechtenstein in 1997 froze that account until all property disputes over Trend are resolved.

Forminster attorney Jan Nekola says Mr. Halek had a power of attorney from Forminster throughout the process of transferring Kotva shares and opened the Liechtenstein account for the company, but he says Mr. Halek no longer is involved with the company and that he can't divulge who owns it. Neither Mr. Halek nor his legal representatives could be reached for comment, and his whereabouts couldn't be ascertained.

Mr. Nekola says Forminster settled with Trend representatives in 2000. In 2002, a London arbitration court ruled the settlement was void because it harmed shareholders. Richard Harazim, the Forminster-appointed chief executive of Kotva, says the arbitration ruling "has no impact under Czech law." In an interview, Mr. Harazim acknowledged that the transactions leading from Trend to Forminster "might not be entirely legal when examined all together." He added, "Under Czech law, ownership is defined by possession. Forminster possesses the shares."

Mr. Harazim defends the sale of Kotva to Markland despite the court order freezing Forminster's shares. The frozen "shares were not sold," he says, "merely the assets." A Markland spokesman declined to comment on sale details, but said lawyers advised it was a "clean property deal."

**Write to** Nick Carey at nick.carey@dowjones.com[1]

**URL for this article:**
http://online.wsj.com/article/0,,SB112163587682687750,00.html

**Hyperlinks in this Article:**
**(1)** mailto:nick.carey@dowjones.com

Copyright 2005 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

Odesláno:    10. listopadu 2004 16:35
Připojit:    E-mail Andy Nov 10 2004.doc
Předmět:    RE: Offer by Forminster

Please see info in the attached document
Best regards
Vlado

    -----Original Message-----
    From: Andrew Weiss [mailto:AWeiss@WeissAsset com]
    Sent: Tuesday, November 09, 2004 8:19 PM
    To: Vladimír Hoffmann; vlado1@volny cz
    Cc: Georgiy Nikitin; peterka@cabinet cz
    Subject: Offer by Forminster

    I am rejecting the latest offer from Forminster  andrew weiss


    Andrew Weiss, Ph D

    President and CIO

    Weiss Asset Management

    Office 617 778 7780

    Mobile 617 548 0580


This email is confidential and is intended solely for the addressee(s). If you are not an addressee  you must not disclose. copy circulate or in any other way use or rely on the Information contained in this email  If received in error  please notify the sender immediately and then delete this email  Any disclosure  copying  distribution or use of this communication is prohibited and may be unlawful

Any views or opinions expressed do not necessarily represent those of Weiss Asset Management or any affiliated companies  Please note that the content of this e-mail may be intercepted  monitored or recorded for compliance purposes  Sensitive personal data should not normally be transmitted by e-mail

Weiss Asset Management or any affiliated companies shall not be liable to the recipient or any third party for any loss or damage howsoever arising from this e-mail and/or its content  including loss or damage caused by virus  It is the responsibility of the recipient to ensure that the opening or use of this message and any attachments shall not adversely affect systems or data

Weiss Asset Management
29 Commonwealth Avenue
Boston  MA 02116
TEL: (617) 778-7780
FAX: (617) 778-7781
www.weissasset com


E-mail Andy, November 10, 2004

Dear Andy,                                                                K 0048

I have informed Martin Benda this morning about your decision to decline their offer. He told me, that when we met last time he in fact was insisting only on withdrawal of lawsuits against Kotva and its daughter companies concerning Kotva's property, not shares ! I called Mr. Peterka who was present at the meeting with Benda and he confirmed to me that Benda in fact insisted on withdrawal of all lawsuits. Although Benda promised to call me later today to clarify what exactly he meant I was unable to contact him this afternoon.

to the board of BGO, Oct. 25, 2004.

Dear Andy and Yossi,

I have not yet heard from either of you or the board concerning my detailed memo of Oct 21  I am very concerned that unless we respond in next few days Forminster will withdraw its offer to pay CZK 131m (currently worth about USD 5 25m) for BGO's Kotva shares  We have a national holiday (like the 4th of July in the US) on this Thursday and we received the offer last Monday and were supposed to respond by last Friday

I want to emphasize that I believe that this is the best settlement offer we can expect and this is the best time to settle  If we let this opportunity go by, we will have no options except to pursue the lawsuits with very uncertain results to occur a very long time in the future at a large expense to BGO  I am referring to my Memos of Oct 21 and 25 for the full argumentation

I believe that the calculations in my memos are reasonably accurate and self-explanatory  I have dealt just very briefly with the fact that our court system is not without problems and it would be quite rational for them to invest few tens of millions of Crowns in "consultants" to assist them in legal issues if BGO refuses to accept this offer

I need BGO's agreement to the settlement or if the board refuses to accept my recommendation, a rational explanation as to why the offer is not acceptable  I am afraid that my ability to continue to negotiate with them will be compromised if we refuse since they will not see me or BGO as reasonable counterparties and frankly I would be afraid for my physical safety as well

Please let me know BGO's response by Tuesday evening Oct 26th  our time so I can give a response to the other side before our long holiday weekend

Vlado

K 0081