UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ANDREW WEISS and WEISS ASSET ) | |
| MANAGEMENT, LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | C.A. No. 05-10679-RCL |
| ) | |
| ANDREW WEISS, WEISS ASSET ) | |
| MANAGEMENT LLC, K T, INC. and CVF ) | |
| INVESTMENTS, LTD., ) | |
| ) | |
| Counterclaim-plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| KOTVA a.s., MARTIN BENDA, RICHARD ) | |
| HARAZIM, FORMINSTER ENTERPRISES, ) | |
| LTD., SPV CO and JOHN DOES 1–5, ) | |
| ) | |
| Counterclaim-defendants. ) | |
| ) | |

## COUNTERCLAIM-PLAINTIFFS' OPPOSITION TO SPV CO'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Counterclaim-plaintiffs Andrew Weiss ("Weiss"), Weiss Asset Management LLC ("WAM"), K T, Inc. ("K T") and CVF Investments Ltd. ("CVF") (collectively, the "Weiss Parties") hereby submit their Opposition to the Motion to Dismiss of SPV CO. As described below, SPV CO has submitted itself to this Court's jurisdiction through the actions of its director Martin Benda. Mr. Benda participated in the planning, initiation and direction of this lawsuit through the plaintiff Kotva. The act of filing this lawsuit in Boston, Massachusetts, constitutes a

tortious abuse of process. This abuse of process is part and parcel of a larger scheme by which Mr. Benda and others have utilized their control over the Kotva corporate shell to divert assets to SPV CO, a way station for money on its way to other members of the Forminster Group.

## I.    FRAMEWORK FOR DECIDING JURISDICTIONAL MOTIONS

The Weiss Parties suggest that the Court first decide Harazim's and Benda's Motion to Dismiss before turning to SPV CO's Motion to Dismiss and Forminster's Motion to Dismiss. In their Opposition to Harazim's and Benda's Motion to Dismiss, the Weiss Parties explain why the filing of this lawsuit in Boston, and the pre-suit contacts and e-mails to Boston,[1] are sufficient contacts with Massachusetts for the Court to exercise jurisdiction over Richard Harazim and Martin Benda, who Harazim described as "in charge of this particular deal." As described more fully below, the Court should attribute the lawsuit-related contacts with Massachusetts of Kotva, Harazim and Benda to SPV CO and exercise jurisdiction over SPV CO on the basis of those contacts.

## II.    FACTUAL BACKGROUND RELATING TO SPV CO

Kotva commenced this lawsuit as part of the ongoing efforts of Richard Harazim, Martin Benda and others to use the proceeds of illegal activity to control Kotva and convert Kotva's assets for their own benefit and to the detriment of Kotva's minority shareholders. SPV CO plays an integral role in this scheme. It is the holding company for the proceeds of the sale of Kotva's most valuable asset—the Department Store in downtown Prague that was recently sold to a group of Irish investors. As described more fully in the Weiss Parties' Counterclaim and

---

[1] Since the Weiss Parties filed their opposition to Messrs. Harazim's and Benda's Motion to Dismiss, Richard Harazim has given deposition testimony in which he admits multiple contacts with Massachusetts related to the initiation of this lawsuit. Mr. Harazim has also traveled to Massachusetts to testify in this lawsuit on behalf of the plaintiff, Kotva. Thus, this case is indistinguishable from *Mobil Oil Corp. v. Advanced Environmental Recycling Technologies, Inc.,* 833 F. Supp. 437 (D. Del. 1993).

Opposition to Forminster's Motion to Dismiss, the majority shareholder of Kotva, Forminster Group, needed to liquidate Kotva's assets because its shares in Kotva were frozen by the Czech Government as suspected proceeds of illegal activity.

The Forminster Group structured the sale of the Department Store as a sale of stock in a Czech company called SPV KN.  The seller of the stock was SPV CO.  *See* Stock Purchase Agreement at 1 (attached hereto as Exhibit A).  Kotva claims that SPV CO is a 100% owned subsidiary of a 100% owned subsidiary of Kotva.  *See* Kotva's Resp. to Def.'s Third Set of Interrogatories at 4 (attached hereto as Exhibit B).  Under the Share Purchase Agreement, SPV CO was to receive the proceeds of the sale.  Ex. A §§ 5.3, 5.5, 5.6, at 12, 14–17.  According to counsel for Kotva, the proceeds of the sale of the Department Store, with the exception of money held in escrow, remains in a bank account owned by SPV CO.

SPV CO appears to have been specially created for the purpose of selling shares in SPV KN and receiving the proceeds of that sale.[2]  At the time of the sale, the sole non-Cypriot director of SPV CO was Martin Benda.  Czech Language Version of Share Purchase Agreement, Schedule 1A at KC1-2102 (attached hereto as Exhibit C).  Mr. Benda signed the share purchase agreement on behalf of SPV CO and "represented" SPV CO in the share purchase agreement. Ex. C at 36, Ex. A at 1.

A.    **The Declaration of Marek Kolibal**

Apparently, immediately after the sale of the Department Store closed on March 4, 2005, Martin Benda resigned as a director of SPV CO and was replaced by another Cypriot nominee director.  *Compare*  March 4, 2005 agreement signed by Martin Benda on behalf of SPV CO (attached hereto as Exhibit D) *with* Kolibal Decl. ¶ 1 (stating that Kolibal became a director of

---

[2] Indeed, its very name appears to be an abbreviation for Special Purpose Vehicle Company.

SPV CO on March 7, 2005). Kotva filed this lawsuit on April 6, 2005. Thus, Martin Benda appears to have resigned from SPV CO just before this lawsuit was filed, but after preparation to file this lawsuit had begun in January 2005. *See* January 19, 2005 board minutes of Kotva (referencing authorization of Richard Harazim to find a U.S. law firm to sue Professor Weiss) (attached hereto as Exhibit E).

There are a number of companies on Cyprus that provide nominee director services. One such group of companies is affiliated with Christodoulos G. Vassiliades & Co. Mr. Vassiliades assisted in establishing SPV CO and SPV CO claims that its sole place of business is at the same address as Mr. Vassiliades' company. *See* Letter from Chistodolous G. Vassiliades to Markland Holdings Limited (Jan. 28, 2005) (attached hereto as Exhibit F). Thus, the Cypriot nationals who presently serve as SPV CO's directors all appear to be nominee directors.

As a general matter, Cypriot nominee directors do not exercise independent judgment in the affairs of the companies on whose boards they serve. They are directors in name only, taking orders from off-shore individuals who truly control the Cyprus companies.

Martin Benda's past control over SPV CO belies Mr. Kolibal's statement that "SPV CO has no knowledge of or any involvement in any negotiations that Richard Harazim or Martin Benda may have had with Andrew Weiss or Weiss Asset Management regarding the purchase of shares in Kotva." Kolibal Decl. ¶ 14. Although it is likely true that Mr. Kolibal and his fellow Cypriot nominee directors have no such personal knowledge, during the period in which Mr. Benda was engaged in negotiations with Mr. Weiss, Mr. Benda was a director of SPV CO. SPV CO cannot cleanse itself of knowledge it considers undesirable to have by replacing Mr. Benda with a no-nothing Cypriot nominee who then provides sworn testimony to this Court in Mr. Benda's stead. Moreover, it is difficult to believe that Messrs. Harazim and Benda have severed

all ties with SPV CO, leaving three Cypriot directors with unfettered control over a bank account that counsel for Kotva claims contains millions of dollars.

## III.    ARGUMENT

### A.    The Legal Standards

"When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing . . . the 'prima facie' standard governs its determination." *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618–19 (1st Cir. 2001). "[I]n evaluating whether the prima facie standard has been satisfied, 'the district court is not acting as a factfinder; rather, it accepts properly supported proffers of evidence by a plaintiff as true and makes its ruling as a matter of law.'" *Id.* at 619 (citations omitted).

Thus, the Court must filter the counterclaim-plaintiffs' jurisdictional allegations through the three-prong test for establishing specific jurisdiction.[3]  The three-prong test for specific jurisdiction requires that the counterclaim-plaintiffs show that: (1) SPV CO's actions in the forum relate to the asserted cause of action; and (2) that SPV CO purposefully availed itself of the forum. *Ticketmaster-New York v. Alioto*, 26 F.3d 201, 206 (1st Cir. 1994) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) and *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  If the counterclaim-plaintiffs have met their burden under the first two prongs, then "[t]he defendant may nonetheless avoid having to defend in a strange place if it can establish that allowing the suit to go forward would be inconsistent with 'fair play and substantial justice.'" *Ticketmaster-New York*, 26 F.3d at 206.

Under this third and final prong, SPV CO has the opportunity to show the Court that, despite its contacts with and purposeful availment of the forum, it would be unreasonable to

---

[3] The Weiss Parties do not suggest that SPV CO is subject to general jurisdiction in Massachusetts.

subject it to personal jurisdiction.  In order to prevail, however, SPV CO "must present *a compelling case* that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477 (1985) (emphasis added). SPV CO must address the so-called "gestalt factors":  "These gestalt factors include: the defendant's burden of appearing; the forum State's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief; the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and the shared interest of the several States in furthering fundamental substantive social policies." *N. Laminate Sales, Inc. v. Davis*, 403 F.3d 14, 26 (1st Cir. 2005) (citing *Burger King Corp.*, 471 U.S. at 477).

If the Weiss Parties make a prima facie showing of any one of the following, the Court should attribute the filing of this lawsuit to SPV CO and, therefore, exercise jurisdiction over it: (a) Martin Benda was an agent of SPV CO and participated in the planning or initiation of this lawsuit; (b) SPV CO was part of a conspiracy with Kotva and the filing of this lawsuit was an act in furtherance of that conspiracy; or (c) Kotva is an alter ego of SPV CO.

As explained in more detail in the Weiss Parties' Opposition to Harazim's and Benda's Motion to Dismiss, the filing of this lawsuit in Massachusetts is sufficient to confer jurisdiction over the individuals and corporations responsible for planning, initiation and directing the filing and prosecution of this lawsuit.  *See* Opp. to Harzim's and Benda's Mot. to Dismiss § III.B, at 8–11; *Mobil Oil Corp.  v. Advanced Environmental Recycling Technologies, Inc.,* 833 F. Supp. 437 (D. Del. 1993).  In these circumstances, if the filing of this lawsuit is a contact attributable to SPV CO, then the Weiss Parties have met their burden under the first two prongs of the test for specific jurisdiction and SPV CO cannot meet its burden under the third prong.

**B.    The Court Should Attribute the Filing of this Lawsuit to SPV CO as a Contact with Massachusetts Because Martin Benda was a Director of SPV CO When the Lawsuit Was Filed**

"[I]t is clearly established that under basic principles of agency law, forum-related contacts made by an agent acting within the scope of an agency relationship are attributable to the principal." *In re Lernout & Hauspie Sec. Litig.*, 337 F. Supp. 2d 298, 314 (D. Mass. 2004) (citations omitted).

At all relevant times, including during negotiations with Mr. Weiss, the filing of criminal charges against Mr. Weiss in the Czech Republic and the preparation for the filing of this lawsuit, Mr. Benda was the only non-Cypriot director of SPV CO.  As such, he was the sole person exercising independent judgment on behalf of SPV CO.  Martin Benda was the company. As the designated recipient of the proceeds of the Department Store sale, SPV CO is a direct beneficiary of Kotva's lawsuit, which Messrs. Benda and Harazim brought to exert pressure over Professor Weiss in an attempt to "persuade" him to abandon his investors' claims in the Czech Republic.  If Messrs. Benda's and Harazim's efforts are successful, SPV CO will receive approximately $24,000,000 that is currently held in escrow, in addition to what it has already received for the sale of the Department Store.

Since the filing of this lawsuit is a forum-related contact of SPV CO's agent, Martin Benda, arising within the scope of the agency relationship, the Court should attribute the filing of this lawsuit to SPV CO for purposes of establishing personal jurisdiction.  As explained in more detail in their Opposition to Harazim's and Benda's Motion to Dismiss, the filing of this lawsuit is, alone, a sufficient forum-related contact to justify this Court's exercise of personal jurisdiction.

Richard Harazim has testified that the Board of Kotva approved the filing of this lawsuit, without any dissenting votes.  Mr. Harazim further testified that he was the sole conduit through

which Kotva engaged Massachusetts counsel and filed a lawsuit in Boston. Mr. Benda could not

have served in this role, because he does not speak English. However, Mr. Harazim also testified

that he and Mr. Benda, among others, "work closely together" on matters of significance such as

the dispute with Mr. Weiss.[4] Thus, the Weiss Parties have made a prima facie showing that Mr.

Benda was involved in the planning and initiation of this lawsuit and that he did so while serving

as the sole non-Cypriot director of SPV CO.

### C.   In the Alternative, the Court Should Attribute Kotva's Filing of this Lawsuit to SPV CO Because They Are Co-Conspirators and Pursuing This Lawsuit is an Act in Furtherance of the Conspiracy

Like Forminster, SPV CO argues that the First Circuit would not recognize the exercise

of personal jurisdiction over out-of-state defendants based solely on their conspiring with

defendants who have contacts with the forum in furtherance of the conspiracy. SPV CO Mem. at

9. Like Forminster, SPV CO is wrong.

At its core, the co-conspirator theory of personal jurisdiction is a logical outgrowth of the

well established—and uncontested—rule that an agent's contacts with a forum are attributable to

the principal. Co-conspirators are effectively each others' principals and agents. While it is true

that there is no First Circuit case in which the co-conspirator theory of jurisdiction was adopted,

the First Circuit has also never rejected this theory. Nor would it. Several other courts have

recognized this theory. *E.g.*, *Crompton Corp. v. Clariant Corp.*, 221 F. Supp. 2d 683 (M.D. La.

2002); *Dooley v. United Techs. Corp.*, 786 F. Supp. 65 (D.D.C. 1992); *Gemini Enterprises, Inc.*

*v. WFMY Television Corp.*, 470 F. Supp. 559 (M.D.N.C. 1979); *Socialist Workers Party v. Att'y*

*Gen. of the United States*, 375 F. Supp. 318 (S.D.N.Y. 1974).

---

[4] The transcript of Mr. Harazim's deposition is not yet available. This summary of part of Mr. Harazim's testimony is based on undersigned counsel's recollection and a rough version of the transcript provided through LiveNote. Once a copy of the transcript is available, the Weiss Parties will provide relevant portions to the Court.

Exercising jurisdiction over co-conspirators based on their membership in the conspiracy does not violate Due Process. Courts routinely impose consequences far more serious than personal jurisdiction in a civil case based on membership in a conspiracy. For example, in criminal cases, courts routinely admit statements that would otherwise be hearsay, increase sentences or even impose criminal liability when there otherwise would be none based on the defendant's membership in a conspiracy. *See United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977) (hearsay); U.S.S.G. § 1B1.3(a)(1)(B) (sentencing); *Pinkerton v. United States*, 328 U.S. 640 (1946) (criminal liability). There can be no serious suggestion that in so doing the courts have routinely denied criminal defendants Due Process. Moreover, rejecting a theory of personal jurisdiction over co-conspirators in civil cases on Due Process grounds would be inconsistent with the exercise of jurisdiction over out-of-state co-conspirators in criminal cases under the as strict or stricter constraints of the Sixth Amendment's venue provisions. *Cf. United States v. Uribe*, 890 F.2d 554 (1st Cir. 1989) (holding that venue for all co-conspirators is proper in a district in which any co-conspirator committed an overt act in furtherance of the charged conspiracy, even if a particular co-conspirator was not physically present in that district).

Accordingly, even if the Court were to find that Mr. Benda was not involved in the filing of this lawsuit, so long as Kotva's forum-related contacts were in furtherance of the Forminster Group's efforts to freeze out Kotva's minority shareholders, this Court has personal jurisdiction over all members of the conspiracy, including SPV CO.

**D.    In the Alternative, Kotva's Filing of This Lawsuit is Attributable to SPV CO Because SPV CO is Kotva's Alter Ego**

As this Court noted in *Giuliano v. Nations Title, Inc.*, 938 F. Supp. 78, 81 (D. Mass. 1996), the leading Massachusetts case for determining whether to pierce the corporate veil and exercise jurisdiction over a parent corporation for the acts of its subsidiary is *My Bread Baking*

9

*Co. v. Cumberland Farms, Inc.*, 353 Mass. 614 (1968). The Weiss Parties suggest that the Court apply this same framework for purposes of exercising jurisdiction over a subsidiary corporation based on the forum contacts of its parent. *My Bread* established two alternate methods for piercing the corporate veil:

> (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, **or** (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, **or** serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

*My Bread*, 353 Mass. at 619 (emphasis added).

SPV CO's relationship with Kotva meets either test. First, there is clearly active and direct participation by SPV CO's sole non-Cypriot director, Martin Benda, in the direction of Kotva's affairs. As Chairman of the Supervisory Board during the relevant time period, Martin Benda exercised "pervasive control" over Kotva. Kotva's minority shareholders have suffered injurious consequences as a result of this control, as Mr. Benda and others are in the process of freezing out the minority shareholders. Weiss and WAM have suffered the further injurious consequences of being the subject of Kotva's abuse of process in this action. Second, Martin Benda's dual roles as Chairman of Kotva's Supervisory Board and director of SPV CO establish "a confused intermingling of activity of two or more corporations engaged in a common enterprise with . . . serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting." *Id.* Accordingly, this Court may exercise personal jurisdiction over SPV CO as Kotva's alter ego. *Cf. Sorenson v. H&R Block, Inc.*, No. 99-10268-DPW, 2002 U.S. Dist. LEXIS 18689, at *16–*19 (D. Mass. Aug. 27, 2002)

(exercising personal jurisdiction under alter ego theory based on "pervasive control" over subsidiary, even under more stringent summary judgment standard).

Each of the cases SPV CO cites in its Memorandum is distinguishable from the case at hand. In *Wilson v. Holiday Inn Curacao N.V.*, 322 F. Supp. 1052, 1054 (D. Mass. 1971), the Court found no personal jurisdiction when "the plaintiff's claim against the [subsidiary] is wholly unrelated to the solicitation activities" undertaken by the parent as the subsidiary's agent in Massachusetts. In *Lechoslaw v. Fleet Bank*, No. 03-1923-A, 2004 WL 3091637, at *5–*6 (Mass. Super. Dec. 9, 2004), there was not even a claim by the plaintiff that the parent controlled the subsidiary, or acted on its behalf in Massachusetts. In *Andresen v. Diorio*, 349 F.3d 8 (1st Cir. 2003), the sole fact to distinguish the parent/subsidiary relationship from the typical parent/subsidiary relationship was that the subsidiary "had employed an interim president who formerly worked for" the parent: there were no overlapping board members. *Id.* at 12.

This case is more analogous to *Kleinerman v. Morse*, 26 Mass. App. Ct. 819 (1989), in which the Appeals Court found that there was personal jurisdiction over the out-of-state corporate parent under an alter ego theory. In *Kleinerman*, he parent corporation owned most, but not all, of the subsidiary's capital stock, just as Kotva claims to own, indirectly, all of SPV CO's stock. *Id.* at 821–22. In *Kleinerman*, the president of the parent corporation became the president of the subsidiary, just as Martin Benda was both the Chairman of Kotva's Supervisory Board and sole non-Cypriot director of SPV CO. *Id.* at 822. In view of the "[s]ignificant exercise of control" by the parent over the subsidiary and "significant intermingling of officers and directors between parent and subsidiary," the *Kleinerman* court found that there was personal jurisdiction. *Id.* at 823. This Court should make a similar finding under the similar facts of this case.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny SPV CO's Motion to Dismiss.

### REQUEST FOR ORAL ARGUMENT

The counterclaim-plaintiffs believe that oral argument may assist the Court and wish to be heard.  Accordingly, pursuant to Local Rule 7.1(d), the counterclaim-plaintiffs hereby request oral argument.

.                                           Respectfully Submitted,

ANDREW WEISS, WEISS ASSET
MANAGEMENT LLC, K T, INC. and CVF
INVESTMENTS LTD.

By their attorneys,

/s/ Benjamin A. Goldberger
Edward P. Leibensperger (BBO# 292620)
Benjamin A. Goldberger (BBO# 654357)
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts  02109-1775
(617) 535-4000

Dated: March 7, 2006

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 7, 2006.

/s/ Benjamin A. Goldberger
Benjamin A. Goldberger

BST99 1493871-2.072198.0012

Dated 20 December 2004

SPV CO Limited

and

CRQ Czech a.s.

# SHARE PURCHASE AGREEMENT

relating to the purchase of shares in SPV KN a.s.

Linklaters

Palác Myslbek
Na Příkopě 19
117 19 Prague 1

Telephone   (420) 221 622 111
Fax          (420) 221 622 199

Ref  BDXW/L-033253

KC 1-2641

**This Share Purchase Agreement (the "Agreement") is made on 20 December 2004**

**Between:**

(1)   **SPV CO Limited,** with its registered office at Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus, company registration no HE 148845, registered in Cyprus (the "**Seller**"), represented by Martin Benda, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1A;

(2)   **CRQ Czech a.s.,** with its registered office Prague 1, Národní 1435/6, Post Code 11000, Identification no. 27159256,registered in the Companies Register by the Regional Court in Prague, in Part B, File 9394 (the "**Buyer**"), and represented by Frank Walker, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1B;

(3)   **SPV KN a.s.**, with its registered office in Brno, Příkop 4, Post Code 602 00, Identification no. 26910705, registered in the Companies Register by the Regional Court in Brno, in Part B, File 4043 ("**SPV KN**"), represented by Ing. Richard Harazim, sole member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1C;

(4)   **KOTVA NEMOVITOSTI, k.s.,** with its registered office at Příkop 4, Brno, Post Code 602 00, Identification no. 26229048, registered in the Companies Register by the Regional Court in Brno, in Part A, File 16586 ("**Kotva**"), and represented by KOTVA OBCHODNÍ, a.s., represented by Ing. Michal Vlach, Chairman of the Board of Directors, Ing. Jiří Brada, member of the Board of Directors, and Ing. Pavel Richter, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1D;

(5)   **MARKLAND HOLDINGS Limited,** with its registered office at 19 Upper Fitzwilliam Street, Dublin 2, company registration no. 291167 registered under the laws of the Republic of Ireland ("**Markland**"), and represented by Frank Walker, a proxy. A copy of an extract from Companies House Ireland is annexed hereto at Schedule 2;

(6)   **KOTVA a.s.,** with its registered office at Náměstí Republiky 8, Praha 1. Identification no. 60193808, registered in the Companies Register by the Municipal Court in Prague, in Part B, File 2370 ("**KAS**"), and represented by Ing. Michal Vlach, Chairman of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1E; and

(7)   **KOTVA OBCHODNÍ, a.s.,** with its registered office at Příkop 4, Brno. Postal Code 602 00, Identification no. 26231735, registered in the Companies Register by the Regional Court in Brno, in Part B. File 3484 ("**KO**"), represented by Messrs Ing. Michal Vlach. Chairman of the Board of Directors. Ing. Jiří Brada and Ing. Pavel Richter, members of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1F;

(jointly referred to as the "**Parties**").

**Whereas:**

(A)   The Seller is a company validly established under the laws of Cyprus and is part of the KAS Group

---

A04677559/1.4/22 Dec 2004

KC 1-2642

(B)   SPV KN is the registered owner of the Property and is part of the KAS Group.

(C)   The Seller is undertaking steps to acquire 97% of the shares in SPV KN.

(D)   KAS is a holding company established under the laws of the Czech Republic and is the controlling person in relation to the Seller, SPV KN and to KO.

(E)   The Seller wishes to sell and the Buyer wishes to buy the Shares, and the KOTVA Trademarks under the terms and subject to the conditions set out herein.

## The Parties hereby agree as follows:

**1     Interpretation**

**1.1**   Construction

Any reference in this Agreement to an "Article", "Clause" or "Section" refers to the corresponding Article, Clause or Section of this Agreement, unless the context indicates otherwise. The headings of Articles, Clauses and Sections are provided for convenience only and should not affect the construction or interpretation of this Agreement. All words used in this Agreement should be construed to be of such gender or number as the circumstances require. The terms "include" or "including" indicate examples of a foregoing general statement and not a limitation on that general statement. Any reference to a statute refers to the statute, any amendments or successor legislation, and all regulations promulgated under or implementing the statute, as in effect at the relevant time. Any reference to a contract or other document as of a given date means the contract or other document as amended, supplemented and modified from time to time. Any reference to an amount in a given currency shall mean a similar amount in any other currency converted at the then applicable exchange rate.

**1.2**   Definitions

For the purposes of this Agreement, the following terms and variations on them have the meanings specified in this Clause 1.2:

"Adverse Consequence"   means any Liability, loss, damage (including incidental and consequential damages), claim, cost, deficiency, diminution of value, or expense (including the reasonable costs of investigation and defence, penalties, and reasonable legal fees and costs), whether or not involving a third-party claim;

"Building"   means building no. 656, located in the registration area of Staré Město, municipality section Staré Město, on plot no. 680, and further building registered therein without descriptive number or evidence number present on plot no. 1018/2. Both buildings are registered at the Real Estate Register hl. m. Praha, title no. 265, for Prague city, cadastral area Staré Město. A copy of an extract from the Real Estate Register is annexed hereto at Schedule 5;

"Business"   means the business of leasing non-residential premises in the Building or leasing the Contributed Property to third persons as tenants and providing related services;

KC 1-2643

| | |
|---|---|
| "Business Day" | means any day other than a public holiday as defined under Czech law or Austrian law or Irish law or a day that the Escrow Agent or the Buyer's bank is closed for business; |
| "Change of Control" | means: (a) KAS or Kotva ceasing to directly or indirectly control the Seller; or (b) KAS ceasing to control SPV KN or Kotva or KO, prior to the Closing Date; |
| "Closing" | means the hand-over of the Shares by the Seller to the Buyer through the Escrow Agent upon terms stipulated herein; |
| "Closing Date" | means the day on which the Closing takes place; |
| "Consent" | means any approval, consent, ratification, waiver or other expiration of a right to deny consent or other authorisation, provided either by a Governmental Body or other Person; |
| "Contemplated Transactions" | means all of the transactions to be carried out in accordance with this Agreement, including the purchase and sale of the Shares and the performance by the Parties of their obligations under this Agreement; |
| "Contract" | means any contract, agreement, commitment, understanding, lease, licence, franchise, warranty, guarantee, mortgage, note, bond, or other instrument or consensual obligation (whether written or oral and whether express or implied) that is legally binding; |
| "Commercial Code" | means the Czech Commercial Code, Act no. 513/1991 Coll., as amended; |
| "Companies Register" | means the register of company information, maintained by the regional courts in the Czech Republic; |
| "CZK" | means Czech Crowns, the official currency of the Czech Republic; |
| "Deposit" | means the sum of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) which has already been delivered to the Escrow Agent by Markland on behalf of the Buyer; |
| "Due Diligence" | means a process, during which the Kotva and the KAS Group provided Markland with requested data and information and provided the Buyer with all co-operation necessary to enable it to ascertain the legal status and condition of the Property and of Kotva and KAS, SPV KN and SPV CO; |
| "Encumbrance" | means any charge, claim, mortgage, easement, right of way, community or other material property interest, covenant, equitable interest, lien, option, pledge, security interest, preference, priority, right of first refusal, or other similar right of a third party of restriction; |
| "Escrow Account" | means the escrow account opened to facilitate the transaction envisaged hereunder; |
| "Escrow Agent" | ██████████████████████████████████████ |
| "Escrow Agreement" | means the contract concluded between the Seller, the Buyer, Kotva and Markland and the Escrow Agent, as amended; |

A04677559/1 4/22 Dec 2004

3

KC 1-2644

| | |
|---|---|
| "EUR" | means Euro, the official currency of the European Union; |
| "Financial Statements" | means the audited financial statements of SPV KN as at the Closing Date; |
| "Fixtures & Fittings" | means the list of fixtures an fittings annexed hereto at Schedule 11; |
| "Force Majeure" | means an event occurring out of the control of the Parties which results in breach of the obligations under the Agreement by one of the Parties, if the Party breaching the Agreement could not have avoided such event or breach of the Agreement despite having exercised maximum effort and care which may reasonably be required from such Party |

The Force Majeure shall mean in particular:

(a)    natural disaster;

(b)    war, war footing, invasion, mobilization or embargo;

(c)    uprising, revolution, rebellion, military regime or civil war;

(d)    radioactivity contamination from a nuclear facility or any other dangerous part of an explosive nuclear facility or a part of such facility;

(e)    discovery of archaeological findings, fossils, coins, precious objects and antiques, etc ;

(f)    terrorist attack; and

(g)    any act by a municipality or registered authority which delays, beyond the control of Kotva, the transfer/contribution of the Shares and the Kotva Trademarks to the Seller.

Force Majeure shall not include:

(a)    unfavourable weather conditions;

(b)    events that were known to Kotva or the Seller or to Markland or the Buyer prior to the signing hereof;

(c)    any changes of statutory regulations and technical standards;

(d)    any new statutory regulations or technical standards.

| | |
|---|---|
| "Gilroy" | means Gilroy Limited whose registered office is at 4 Pikioni Street Limassol, Cyprus; |
| "Gilroy Claim" | means the claim that Gilroy lodged on 30 June 2004 with the District Court for Prague 1 a copy of which is attached hereto at Schedule 9; |
| "Gilroy Settlement" | means the obtaining of a definitive and final ruling in respect of the Gilroy Claim; for purposes of this Agreement such definitive and final ruling is deemed to be also a final settlement between the parties to the Gilroy Claim, approved by the court or the withdrawl by Gilroy of the Gilroy Claim. |
| "Governmental | means any consent, licence, permit or registration issued. granted, or |

| | |
|---|---|
| Authorisation" | otherwise made available by or under the authority of any Governmental Body or pursuant to any law, including decisions of a court or other body on incorporation of a legal person and decisions of the Real Estate Register Office on registration at the Real Estate Register; |
| "Governmental Body" | means any of the following: |

    (a)    the executive ruling body of any state, region, city, village, or other jurisdiction;

    (b)    federal, state, local, municipal, foreign or other government or self-government;

    (c)    a budgetary or contributory governmental authority of any nature (including any governmental agency, branch, department, or other entity and any court or other tribunal);

    (d)    a multinational organisation incorporated pursuant to international law;

    (e)    a body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, policy, regulatory, or tax authority; or

    (f)    an official of any of the foregoing.

| | |
|---|---|
| "Indemnified Person" | means a Person entitled to an Share Purchase Price adjustment or damages under Clause 8.2 or Clause 8.3; |
| "Indemnifying Person" | means a Person obliged to pay a Share Purchase Price adjustment or damages to an Indemnified Person; |
| "J&T banka Mortgage" | means at the date of this Agreement a mortgage over the Property registered in favour of J & T banka, a.s. Identification no. 47115378, with its registered office Pobřežní 297/14, 186 00 Praha 8 (hereinafter referred to as "J&T banka") |
| "KAS Group" | means KAS and trade companies, all of them together or each one individually, under the centralised power and control of KAS, pursuant to §66a Art. 7 of the Commercial Code; |
| "Knowledge" | means knowledge of information relevant for this Agreement about any matter, fact or Person, being known to a Person; |
| "KO Lease" | means the lease to be entered into between SPV KN and KO on the Closing Date the text of which is annexed hereto at Schedule 5; |
| "Kotva's Indemnities" | is defined in Clause 8.3; |
| "Kotva Správcovská a.s." | means Kotva Správcovská a.s., with its registered office in Brno, Příkop 4, PSČ 60200, ID no. 26510081; |
| "KOTVA Trademark I" | means the collection of trademarks consisting of: word-device trademark KOTVA, registration no. 167478, registered in the Patent and Trademark Office of the Czech Republic and word-device trademark KOTVA, registration no. 167478 registered in the Patent and Trademark Office of the Slovak Republic; |

| | |
|---|---|
| "KOTVA Trademark II" | means the collection of trademarks consisting of: word-device and word only trademark KOTVA having been used by Kotva but not yet registered in Kotva's name in the Patent and Trademark Office of the Czech Republic for which registration Kotva has applied by the applications no 355 884 and 355 885 both filed with the Patent and Trademark Office of the Czech Republic on 1st of July 2004, with the priority right date of July the 1st 2004. The KOTVA Trademark II is further specified in an expert opinion dated 10 July 2004 annexed hereto as the Schedule 10; |
| "KOTVA Trademarks" | means collectively KOTVA Trademark I and KOTVA Trademark II |
| "Land" | means the collection of plots of land registered at the Real Estate Register hl m Praha, ownership deed no. 265, for Prague city, cadastral area of Staré Město, consisting of: plot no. 680 – built-up area and yard, plot no 683/1 – other area, plot no. 683/2 – other area, plot no. 683/3 other area, plot no 690/2 – other area, plot no. 690/3 – other area, plot no. 690/4 – other area, and plot no. 1018/2 – built-up area and yard. A copy of an extract from the Real Estate Register is annexed hereto at Schedule 4; |
| "Legal Requirement" | any valid legal regulation of any Governmental Body; |
| "Liabilities" | includes liabilities or obligations of any nature, whether known or unknown, whether obsolete, accrued, contingent or other, whether due or to become due or prescribed, and whether or not required to be reflected on a financial statement and "Liability" shall be construed accordingly; |
| "Markland's Indemnities" | is defined in Clause 8 2; |
| "Order" | any published and publicly available order, injunction, judgement, assessment. decree, ruling, or arbitration award of any Governmental Body or arbitrator; |
| "Ordinary Course of Business" | actions taken in the course of normal Business operation by SPV KN and/or by Kotva or the Seller or KO as the respective owner or manager of the Property, consistent with past practice of Kotva; |
| "Organisational Documents" | any deed, bylaws, regulations, certificate, statement, statute, or similar document adopted, filed or registered in connection with the creation, formation, or organisation of an entity, and any Contract among equity holders. partners or members of an entity; |
| "Person" | an individual or an entity, including a corporation, share company, limited liability company, partnership, trust, association, or any other body with legal personality separate from its equity holders or members; |
| "Proceeding" | any action, arbitration, audit, examination. investigation, hearing, litigation, or suit (whether civil, criminal, administrative, judicial or investigative, informal, public or private) commenced, brought, conducted, heard by or before, or otherwise involving, any |

---

6

KC 1-2647

|                              | Governmental Body or arbitrator; |
|------------------------------|----------------------------------|
| **"Property"**               | means the Building and the Land; |
| **"Proprietary Information"** | is defined in Clause 9 1; |
| **"Purchase Price"**         | means the total purchase price for the Shares and the KOTVA Trademarks in the sum of the Czech Crown equalling CZK 1,501,450,000 (one billion five hundred and one million four hundred and fifty thousand Czech Crowns) calculated as follows: |

      (i)     purchase price for the Shares CZK 1,366,450,000 (one billion three hundred and sixty six million four hundred and fifty thousand Czech Crowns) ("**Share Purchase Price**"),

      (ii)    purchase price for the Kotva Trademarks CZK 135,000,000 (one hundred and thirty five million Czech Crowns) ("**Trademarks Purchase Price**");

| **"Related Person"** | with respect to a particular Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person and, with respect to an individual, any other individual that is a member of the individual's family (by blood, marriage or adoption), a member of the individual's household, an entity in which the individual participates in management or an employee or employer of the individual. For the purposes of this definition, "control" means where a Person (or Persons acting in concert) acquires or agrees to acquire or has options over direct or indirect control: (a) of the affairs of that Person; or (b) more than 50 per cent of the total voting rights conferred by all the issued shares in the capital of that Person which are ordinarily exercisable in general meeting; or (c) of the composition of the main board of directors of a Person. For these purposes "Persons acting in concert", are Persons which actively co-operate, pursuant to an agreement or understanding (whether formal or informal), with a view to obtaining or consolidating or exercising control of that Person; |
|---|---|
| **"Rent Roll"** | means the up to date rent roll as at the date of this Agreement which truly and accurately records the existing lease relations concerning non-residential premises in the Building, a copy of which is annexed at Schedule 6; |
| **"Representative"** | with respect to a particular Person, any director, appointed officer, employee, consultant, agent, advisor, legal counsel, accountant, or other representative of that Person; |
| **"Retention"** | means the money retained in the Escrow Account following Closing in accordance with Clause 5 6 4 ; |
| **"Security"** | means the amount of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) that has been paid by Kotva on behalf of the Seller into the Escrow Account prior to the date hereof in order to secure a possible claim or claims of the Buyer against the Seller together with any interest thereon; |

| | |
|---|---|
| "**Shares**" | means the following ordinary bearer shares in certified form issued by SPV KN: |

| | | |
|---|---|---|
| | (a) | 10 shares of nominal value CZK 200,000 each with Nos. 1-10 issued on 10 November 2003; and |
| | (b) | 13 shares of nominal value CZK 100,000,000 each with Nos. 11-23 issued on 9 April 2004; and |
| | (c) | 2 shares of nominal value CZK 20,000,000 each with Nos. 24 and 25 issued on 9 April 2004; and |
| | (d) | 8 shares of nominal value CZK 1,000,000 each with Nos. 28-35 issued on 9 April 2004; and |
| | (e) | 2 shares of nominal value CZK 100,000 each with Nos. 37 and 38 issued on 9 April 2004; and |
| | (f) | 4 shares of nominal value CZK 10,000 each with Nos. 46-49 issued on 9 April 2004; |

| | |
|---|---|
| | the nominal value of which represents 97 per cent of the capital stock of SPV KN; |
| "**SPV Conclusion**" | the satisfaction of the conditions in Clause 3.1; |
| "**Tax**" or "**Taxes**" | means without limitation and whatever means by which it is levied all forms of taxation, statutory, governmental, state, local, foreign and municipal impositions, duties, contributions and levies including any tax imposed on any income, withholding tax, value added tax ("**VAT**"), road tax, real estate tax, real estate transfer tax, gift tax, inheritance tax, excise duties, customs or other duty, employment related levies, including social security contributions and contributions to complementary welfare and health insurance including both principal and potential related interest and penalties; |
| "**Threatened**" | an action or matter would be considered to have been "Threatened" if a demand or statement has been made (whether orally or in writing) or a notice has been given (whether orally or in writing), or any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such action or matter is likely to be asserted, commenced, taken or otherwise pursued in the future; and |
| "**Transfer Deed**" | means a Share Purchase Agreement to be concluded between the Seller and the Buyer effecting the transfer of the title to the Shares to the Buyer. |

## 2    Agreement on replacement of present obligations between several Parties by new obligations between all Parties

2.1    The Parties hereby agree pursuant to section 570 of the Act. No. 40/1964 Coll., the Civil Code, as amended, that their mutual obligations arising out of the Share Purchase Agreement concluded on 20 January 2004 (hereinafter referred to as the "**Present SPA**") between Kotva and Markland is replaced in their entirety by the obligations contained in the Agreement.

KC 1-2649

2.2 For avoidance of any doubt it is agreed that the Present SPA terminates in its whole scope on the moment when this Agreement comes into being so that this Agreement substitutes the Present SPA in the whole scope.

2.3 The Parties hereby agree to accession of the Seller, SPV KN, KAS, KO and the Buyer to this Agreement and the Seller, SPV KN, KAS, KO and the Buyer confirm by signing this Agreement they have acceded to the Agreement.

2.4 For avoidance of any doubt it is agreed that the termination of the Present SPA and its substitution by this Agreement as stipulated herein shall not give a rise to claim for return of any performance that has been already provided pursuant to the Present SPA

2.5 If the nature of rights and obligations under this Agreement enables so, the Seller's rights and obligations under this Agreement may be fulfilled and exercised by Kotva and the Buyer's rights and obligations under this Agreement may be fulfilled and exercised by Markland.

2.6 The Seller and Kotva are jointly and severally liable for the fulfilment of the obligations of either of them arising out of this Agreement. Kotva, KAS and KO jointly and severally guarantee the fulfilment of the Seller's and Kotva's obligations arising out of this Agreement. The Buyer and Markland are jointly and severally liable for the fulfilment of the obligations of either of them arising out of this Agreement

2.7 The Seller and the Buyer and Kotva and Markland shall use their best endeavours to execute an amendment to the Escrow Agreement within 20 Business Days of the date of this Agreement to enable the Escrow Agent to perform its duties in accordance with the terms and conditions of this Agreement.

## 3    Initial Obligations

The Initial Obligations are as follows:

3.1 Seller's Obligation - procuring of SPV Conclusion

3.1.1 The Seller is obliged to procure the valid and legal and effective transfer or contribution of the Shares and the KOTVA Trademarks to the Seller through a non-monetary investment contribution to the Seller by Kotva which is satisfactory to the Buyer, acting reasonably, which in the circumstances will mean the requirement of the Seller to procure a valid and clear legal opinion confirming the valid and legal and effective transfer or contribution of the Shares and the KOTVA Trademarks to the Seller through a non-monetary investment contribution to the Seller by Kotva. Such legal opinion will also include confirmation that the Seller is fully and effectually entitled to sell the Shares and the KOTVA Trademarks to the Buyer pursuant to the terms of this Agreement; and

3.1.2 The Seller is obliged to procure the application for registration in the Patent and Trademark Office of the Czech Republic and Slovak Republic respectively of the contribution of the KOTVA Trademarks to the Seller, in a form acceptable to the Buyer, acting reasonably

3.2 Buyer's Obligation - Legal Opinion

3.2.1 The Buyer will procure as soon as possible after the date hereof, but no later than 31 January 2005, that its lawyers agree with the Buyer's bank's lawyers a legal opinion in respect of the ownership of the Property by SPV KN and the Shares by SPV CO to enable the Buyer's bank to confirm that it is prepared to finance the transactions contemplated hereunder.

**3.3** Satisfaction of Initial Obligations

3.3.1 Within five Business Days of the satisfaction of any of the obligations referred to in Clauses 3.1 or 3.2, the party satisfying such condition shall serve notice of satisfaction on the other party.

**3.4** Failure to satisfy the conditions precedent

3.4.1 In the event that Kotva fails to satisfy the obligations under this Clause 3.1 by 31 January 2005, the Buyer and Markland may withdraw from this Agreement by either one of them serving five Business Days written notice on Kotva and the Seller. Markland shall be entitled to the immediate refund of the Deposit together with any interest thereon and a contractual penalty payable by Kotva in the sum of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied firstly from the Security.

3.4.2 In the event that the Buyer fails to satisfy the obligations under Clause 3.2.1 by 31 January 2005, the Seller or Kotva may withdraw from this Agreement by either one of them serving five Business Days written notice on the Buyer and Markland. The Seller shall be entitled to a contractual penalty payable by the Buyer in the sum of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied from the Deposit and te balance of such Deposit shall be retuned to the Buyer.

**4    SPV KN from its founding until Closing**

**4.1** Board of Directors of SPV KN

4.1.1 Kotva may only appoint a new member of SPV KN's Board of Directors or remove any of the existing members only with the prior written approval of the Buyer.

4.1.2 Kotva further undertakes that the members of the Board of Directors or other managers of SPV KN will not act outside of the Ordinary Course of Business and shall obtain prior written approval from the Buyer before making any non-operational decision or series of related decisions of a value in excess of CZK 157,500 (one hundred and fifty seven thousand five hundred Czech Crowns) except where this Agreement states to the contrary.

4.1.3 Kotva and/or the Seller, once it becomes majority shareholder of SPV KN, shall procure that the Board of Directors of SPV KN will observe and perform the obligations and undertakings as set out in Clause 6 and for the avoidance of doubt, any breach of such obligations and undertakings by the Board of Directors of SPV KN, if able to cause an Adverse Consequence to SPV KN and/or the Buyer and/or Markland of a sum in

excess of CZK 31,500 (thirty one thousand five hundred Czech Crowns), shall be regarded as a material breach of this Agreement which shall entitle the Buyer and Markland to withdraw pursuant to Clause 10 respecting the time period in Clause 8.5.

**4.2** Supervisory Board of SPV KN

4.2.1 Kotva may only appoint a new member of SPV KN's Supervisory Board or remove an existing one only with the prior written approval of the Buyer.

## 5 Sale and Transfer of Shares and KOTVA Trademarks; Closing

**5.1** Transfer of Shares

5.1.1 Subject to the terms and conditions of this Agreement the Seller and the Buyer undertake, within five (5) Business Days of the Purchase Price being paid into the Escrow Account in accordance with Clause 5.3, to conclude the Transfer Deed, and the Seller undertakes to sell the Shares and to transfer the title to the Shares to the Buyer, the Seller and the Buyer undertake to instruct the Escrow Agent to immediately release the Shares to the Buyer and the Buyer undertakes to buy the Shares from the Seller and to pay for the Shares the Share Purchase Price.

5.1.2 The terms and conditions of this Agreement not repeated in the Transfer Deed will apply to the transfer of the Shares under the Transfer Deed as if they were explicitly stipulated in the Transfer Deed.

**5.2** Transfer of the KOTVA Trademarks

5.2.1 Subject of the terms and conditions of this Agreement the Seller undertakes, within five (5) Business Days of the Purchase Price is paid into the Escrow Account in accordance with Clause 5.3, to conclude with SPV KN or the Buyer (such decision to be at the discretion of the Buyer provided that it shall not cause any material adverse effect to the Seller) the Kotva Trademarks transfer agreement in a form to be agreed by the Buyer, acting reasonably, and the Seller undertakes to sell and transfer the KOTVA Trademarks to SPV KN or the Buyer and the Buyer undertakes to:

(i) ensure that SPV KN or the Buyer will buy the KOTVA Trademarks; and

(ii) pay on behalf of SPV KN or in its own name for the KOTVA Trademarks the Trademark Purchase Price

5.2.2 SPV KN hereby agrees to sign all such documents as are required to effect the Kotva Trademarks transfer agreements referred to in Clause 5.2.1 above.

5.2.3 The terms and conditions of this Agreement not repeated in the KOTVA Trademarks transfer agreements will apply to the transfer of the KOTVA Trademarks under the the KOTVA Trademarks transfer agreements as if they were explicitly stipulated in the KOTVA Trademarks transfer agreements.

5.2.4    In the event that the Buyer decides about the transfer of the KOTVA Trademarks to SPV KN under Clause 5.2.1 and as a result of this decision any provision of this Agreement is directly or indirectly breached, neither Markland nor the Buyer may claim any right that it would otherwise have as a result of such breach.

5.3    Deposit and Purchase Price

5.3.1    The Deposit credited to the Escrow Account shall form part of the Purchase Price.

5.3.2    Within 20 Business Days of receipt or service by the Buyer of the notice of satisfaction of the last of the initial obligations, the Buyer shall credit to the Escrow Account the amount of CZK 1,363,950,000 (one billion three hundred and sixty three million nine hundred and fifty thousand Czech Crowns) representing the balance of the Purchase Price. In the event that on the date of payment of the balance of the Purchase Price, the Deposit or its part has been used to settle a Seller's claim according to this Agreement (other than the claim to receive the Purchase Price), the Buyer is obliged to balance the Purchase Price so that the total sum deposited by the Buyer (including the Deposit) represents the Purchase Price.

5.3.3    In the event that the Buyer fails to credit the Escrow Account as specified in Clause 5.3.2 the Buyer shall pay to the Seller a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) by way of forfeit of the Deposit which shall be released to the Seller within five (5) Business Days from the breach of this obligation. Upon settlement of this contractual penalty in favour of the Seller this Agreement immediately terminates.

5.3.4    Following Closing, if:

(i)    a breach of any of the Seller's or Kotva's obligations or representations or warranties is discovered which occurred prior to Closing; and

(ii)    the nature of that breach is such that it entitles the Buyer to compensation (by way of Share Purchase Price reduction or damages) in accordance with the terms of this Agreement,

then the parties shall apply to Arbitration pursuant to Clause 11.12 of this Agreement to ascertain that conditions (i) and (ii) of this Clause 5.3.4 have been satisfied and, if so determined in the arbitration award, then the Buyer shall be entitled to have recourse to the Escrow Account for the amount corresponding to the Adverse Consequence so discovered. The Seller shall be obliged to replenish the Escrow Account with the amount withdrawn on account of the breach within 20 Business Days of its removal by the Buyer until such time as all the monies standing to the credit of the Escrow Account have been released in accordance with the terms of the Escrow Agreement.

5.4    Action pending Closing

KC 1-2653

5.4.1   Kotva and the Seller shall collaborate fully with Markland and the Buyer, such collaboration to include but not be limited to Markland's and/or the Buyer's right to:

(i)   receive, after a request made by each of them, all information distributed to the directors of SPV KN and the Seller;

(ii)   attend, but not vote at, the meetings of the directors of SPV KN and the Seller; and

(iii)   have full access to all those books, records and other documentation of SPV KN and the Seller to which a director normally has access in relation to all matters concerning the operation of SPV KN and the Seller between the date of this Agreement and the Closing Date.

5.4.2   During such period Kotva and/or the Seller shall procure that neither SPV KN nor the Seller shall without the prior written consent of Markland:

(i)   incur or enter into any agreement or commitment involving any capital expenditure in excess of CZK 157,500 (one hundred and fifty seven thousand five hundred Czech Crowns) per annum which is not in the Ordinary Course of Business;

(ii)   enter into or amend any contract or commitment which is not in the Ordinary Course of Business or which involves or may involve a total annual expenditure or income in excess of CZK 500,000 (five hundred thousand Czech Crowns);

(iii)   incur any additional borrowings or incur any other indebtedness;

(iv)   save as required by law, make any amendment to the terms and conditions of employment (including, without limitation, remuneration and other benefits) of any employee, provide or agree to provide any gratuitous payment or benefit to any such person or any of their dependants, dismiss any employee or engage or appoint any additional employee;

(v)   acquire or agree to acquire or dispose of or agree to dispose of any material asset or material stocks or enter into or amend any material Contract or arrangement;

(vi)   take steps to procure the payment or settlement of any Liability generally in advance of the date on which book and other Liabilities are usually payable in accordance with the standard terms of the Seller's business or to extend the period to any particular debtor in which to make payment;

(vii)   delay making payment to any trade creditors generally beyond the date on which payment of the relevant trade debt should be paid in accordance with a credit period as authorised by the relevant creditors or (if different) the period extended by such creditors in which to make payment;

KC 1-2654

(viii)  amend, to any material extent, any of the terms on which goods, facilities or services are supplied, such supplies being material in the context of the Business, except where required to do so in order to comply with any Legal Requirement;

(ix)  enter into any guarantee, indemnity or other agreement to secure any obligation of a third party or create any encumbrance over any of its assets or undertaking;

(x)  allot, issue, redeem or repurchase any share capital of SPV KN and/or the Seller;

(xi)  enter into any contract reducing or depreciating the assets of SPV KN and/or the Seller;

(xii)  acquire or agree to acquire any share, shares or other interest in any Person;

(xiii)  declare, make or pay any dividend or other distribution to shareholders;

(xiv)  make any change to the practices or policies of SPV KN and/or the Seller;

(xv)  amend the Organisational Documents of SPV KN or the Seller; or

(xvi)  enter into any Contract or arrangement with a Related Person other than in the Ordinary Course of Business

5.4.3  Kotva and the Seller further undertake and undertake to procure that pending Closing each of them will:

(i)  continue those business activities which affect the Property, SPV KN or the Seller, only in the Ordinary Course of Business, save insofar as agreed in writing by the Buyer;

(ii)  take all reasonable steps to preserve its assets and Governmental Authorisations; and

(iii)  take all reasonable steps to preserve the validity of all Contracts to which they are a party which have an effect on the Property, SPV KN or the Seller.

5.5  Closing

5.5.1  The Closing shall occur within five (5) Business Days after receipt of the Purchase Price by the Escrow Agent.

5.5.2  The Seller shall, through the Escrow Agent, hand-over the Shares and shall hand-over the other documents referred to in Clause 5.6.1 and upon receipt of such Shares and other documents by the Buyer, the Closing of this transaction shall be deemed to occur. The title to the Shares including shareholder's rights shall pass to the Buyer upon Closing. The Purchase Price shall be settled by the Escrow Agent via the Escrow Account

5.6  Closing deliveries

KC 1-2655

5.6.1   At Closing Date, the Seller shall deliver to the Buyer through the Escrow Agent the items listed in sub-clause (a), (b) and (c) below and personally in respect of the remainder of the items listed below):

(a)     the Shares;

(b)     the Transfer Deed;

(c)     a hand-over protocol confirming the hand-over of the Shares;

(d)     an extract of SPV KN from the Commercial Register dated the Closing Date (fax copy is deemed to be a sufficient form);

(e)     written resignations of each member of the Board of Directors and the Supervisory Board of SPV KN and a resolution of the sole shareholder (or the Supervisory Board, as appropriate) of SPV KN taking note of the resignations in a form reasonably acceptable to the Buyer, to provide the resignations to take effect on the Closing Date;

(f)     resolution of the sole shareholder (or Supervisory Board, as appropriate) appointing new members of the Board of Directors and the Supervisory Board of SPV KN designated by the Buyer and advised to the Seller at least (5) Business Days prior to Closing in a form reasonably acceptable to the Buyer, to provide the appointments to take effect on the day immediately following the Closing Date;

(g)     the Powers of Attorney signed by each member of the Board of Directors of SPV KN to enable the Buyer to make the necessary post-Closing registration (or deletions) at the Commercial Register;

(h)     all SPV KN's Organisational Documents, including, but not limited to, the founding deed, articles of association and all applications regarding SPV KN's registration in the Commercial Register and all resolutions of the registration court;

(i)     all lease agreements in respect of the Property;

(j)     all title deeds and documents in respect of the Property;

(k)     all the financial and accounting books and records and returns of SPV KN completed up to Closing;

(l)     all other documents regarding SPV KN;

(m)     a certificate executed by the Seller and Kotva dated as of the Closing Date stating that: (i) all representations, warranties, obligations and undertakings as set forth under Clause 6 are fulfilled and are true and correct in all material respects as the Closing Date; and (ii) all actions required to be taken by Kotva, SPV KN and the Seller to effect Closing have been properly taken;

(n)     the KO Lease duly executed by KO;

(o)     certificates executed by the Seller and Kotva and their accountants, so far as they are authorised to do in accordance with Czech Law

confirming: (i) the successful payment and liquidation of any and all long-term debts or Liabilities, financial or otherwise, of SPV KN, the Seller and Kotva not arising in the Ordinary Course of Business which would affect SPV KN, the Seller or the Property; and (ii) that the Liabilities and debts, financial or otherwise of Kotva and the Seller arising in the Ordinary Course of Business which would affect SPV KN, the Seller or the Property amount to less than CZK 500,000 (five hundred thousand Czech Crowns);

(p)    a certificate executed by the accountants of SPV KN confirming what debts and Liabilities, financial or otherwise SPV KN has and that, save for day to day debts or Liabilities, financial or otherwise, that SPV KN has no other such debts or Liabilities, financial or otherwise;

(q)    a confirmation of discharge of the liability secured by the J&T banka Mortgage, signed by J&T banka in a form reasonably acceptable to the Buyer to enable the Buyer to remove the registration of such mortgage from the real estate register;

(r)    the list of tenant's security deposits as evidenced in the accounting of SPV KN, which list in detail the amounts provided by the individual tenants as security deposits;

(s)    evidence that the Seller has relinquished all authority and all rights to make any transactions on the SPV KN bank accounts (or that such accounts are frozen pending the Buyer completing the necessary bank mandates) and all banking records and account details and new mandate forms for the Buyer to complete and to give all assistance as required by the banks in this respect to ensure the proper transmission of the accounts;

(t)    applications for the registration of the transfer of the KOTVA Trademarks from Kotva to the Seller stamped by the Industrial Property Offices in the Czech Republic and Slovak Republic, as applicable; and

(u)    the Kotva Trademarks transfer agreements.

5.6.2    The documents listed in Clause 5.6.1 above shall be delivered by the Seller and Kotva to the Escrow Agent within ten (10) Business Days of the date of the written notice evidencing to the Buyer SPV Conclusion delivered in accordance with Clause 5.3.2 and following this, the Seller and the Buyer shall execute such confirmatory document as is required by the Escrow Agent and if either of them shall fail to execute such document as required by the Escrow Agent (save in the event of a dispute as to the actual delivery of the documentation) then a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) shall be payable to the other party.

5.6.3    the Escrow Agent shall release the following sums from the Escrow Account upon Closing:

(i)     to the Buyer, the sum of CZK 10,837,800 (ten million eight hundred and thirty seven thousand eight hundred Czech Crowns) in respect of three months rent and service charge as defined in the KO Lease as a security deposit thereunder;

(ii)    provided that the debt secured by the J&T banka Mortgage has not been discharged and the Seller has supplied evidence thereof to the Buyer which is reasonably acceptable to the Buyer, to J&T banka an amount equal to the amount required to discharge in full and final settlement all amounts secured by the J&T banka Mortgage, provided that the Escrow Agent received a letter from J&T banka confirming that such amount will be in full and final settlement of the debt secured by the J&T banka Mortgage and any and all claims;

(iii)   to the Seller the Trademark Purchase Price;

(iv)    to the Seller. the sum of CZK 925,000,000 (nine hundred and twenty five million Czech Crowns), less the amounts paid to the Buyer pursuant to Clauses 5.6.3(i) above and to J&T banka pursuant to Clause 5.6.3(ii) above and to the Seller pursuant to Clause 5.6.3(iii) above.

5.6.4   The balance of the Share Purchase Price, being the Retention, amounting to CZK 576.450,000 (five hundred and seventy six million four hundred and fifty thousand Czech Crowns), shall be retained by the Escrow Agent until such time as there has been Gilroy Settlement. However, if there has been Gilroy Settlement but either 9 months from the Closing Date have not elapsed or there are Proceedings pursuant to Clause 5.6.4(i) below, the Escrow Agent shall release the Retention to the Seller less the sum of CZK 189,000,000 (one hundred and eighty nine million Czech Crowns), which shall be retained in the Escrow Account until such time as the Buyer obtains a definitive and final ruling in respect of such Proceedings or the period of 9 months from the Closing Date elapsed and there are no Proceedings which ever is the later. For the avoidance of doubt, a court decision made on basis of a valid withdrawal is considered to be a definitive and final ruling

The Escrow Agent shall throughout the period of holding the Retention release to the Buyer upon the sole request of the Buyer the following sums:

(i)     In the event that anyone initiates any legal Proceedings the subject matter of which is a declaration of invalidity of legal acts based on which the Property has been transferred or contributed to Kotva and/or to the Seller, within nine months of the Closing Date, then the Buyer shall be entitled to unilaterally withdraw on each regular quarter day, being 1 January, 1 April, 1 July and 1 October, such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending the Buyer. SPV KN or Markland in any such Proceedings. Such amounts will be considered to be the Share Purchase Price adjustments. In the event that compensation of such costs are awarded by the court to

---

the Buyer in such Proceedings, then the Buyer shall return such sums as it recovers to the Seller once it has received them from the obliged person, such amounts again will be considered the Share Purchase Price adjustments.

(ii) On each regular quarter day, being 1 January, 1 April, 1 July and 1 October, such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending SPV KN under the Gilroy Claim; the request of the Buyer for such sums from the Retention must evidenced by a duly issued invoice from the Buyer's lawyers for the time being. Any payments under this Clause 5.6.4(ii) will be considered to be Share Purchase Price adjustments.

(iii) In the event that, under any tax regulations applicable up to the date of Closing, Kotva or SPV KN are assessed with Tax (in particular real estate transfer tax or VAT) in relation to the contribution of the Property, to SPV KN and Kotva, SPV KN or the Seller is liable to pay such Tax to the Financial Authorities, Kotva and the Seller undertakes to compensate SPV KN for such Tax and any corresponding penalty, interest or any other financial payment imposed by the Financial Authorities on SPV KN and such amount of Tax shall be retained in the Escrow Account by the Escrow Agent and shall only be released to the Seller following Gilroy Settlement upon receipt of the following:

(a) an original or an authenticated copy of the extract from the Real Estate Register showing the SPV KN as the exclusive owner of the Property which are free of any Encumbrances; it does not relate to any Encumbrances, which arise after the Closing has taken place or which are created by the Buyer;

(b) an original or an authenticated copy of the Tax return relating to the real estate transfer tax resulting from the contribution of the Property to SPV KN and a copy of an expert's valuation, both bearing a stamp of the Tax Collection Authority confirming that the Tax return, including the expert's valuation, have been duly submitted to the Tax Collection Authority; and

(c) original confirmation, issued by the appropriate Financial Authority, proving that neither Kotva nor the Seller or SPV KN have any tax liabilities in respect of any Tax and in particular real estate transfer tax resulting from the contribution of the Property to SPV KN.

Any payments under this Clause 5.6.4(ii) will be considered to be Share Purchase Price adjustments.

(iv) In the event that the Retention falls below the amount of CZK 31,500,000 (thirty one million five hundred thousand Czech Crowns) then the Seller and/or Kotva and/or KAS shall, within twenty (20) Business Days of the level falling below CZK

31,500,000 (thirty one million five hundred thousand Czech Crowns), ensure that sufficient funds are paid in to the Escrow Account to bring the level back up to at least CZK 31,500,000 (thirty one million five hundred thousand Czech Crowns).

(v)     The Seller and Buyer will agree to adjust the Share Purchase Price by deducting from the Share Purchase Price payable to the Seller and release to the Buyer one half of the difference between CZK 177,250,000 (one hundred and seventy seven million two hundred and fifty thousand Czech Crowns ) and the actual annual income due in accordance with the true and accurate Rent Roll as existing at the Closing Date in respect of the Property, excluding the Service charge, as agreed between the Seller and the Buyer not more than 2 Business Days prior to the Closing Date.

(vi)    For the avoidance of doubt, the sums referred to in this Clause 5.6.4 of this Agreement may be released to the Buyer upon the Buyer's sole request and shall be deposited in such account as the Buyer shall, in its own discretion, determine.

5.6.5   If the conditions under this Agreement or under the Escrow Agreement for releasing any funds from the Escrow Account to either of the Seller or the Buyer have been validly satisfied, save in respect of any monies to be released pursuant to Clause 5.6.4, the other party shall, upon a written invitation by the other party, countersign a joint instruction or any other document contemplated by the Escrow Agreement and deliver it to the other party within five days of the invitation being delivered. If the appropriate party does not satisfy the aforementioned obligation in a due and timely manner, it shall pay to the other party a contractual penalty of CZK 157,500,000 (one hundred and fifty-seven million five hundred thousand Czech Crowns).

5.6.6   Kotva and the Seller hereby confirm that the Fixtures & Fittings will remain at the Building following Closing and will become, if not already, the property of SPV KN.

## 6    Representations, Warranties and Obligations and Undertakings of KAS, Kotva and the Seller

KAS, Kotva and the Seller represent and warrant that the following representations and warranties contained in this Section 6 are true, correct and complete as at the date of signing this Agreement and Kotva, the Seller and KAS undertake to maintain them true, correct and complete during the entire term of effectiveness of this Agreement and to comply with all the obligations and undertakings contained in this Section 6 during the entire term of effectivness of this Agreement until Closing and in respect of those obligations and undertakings specified in Clause 6.5, for five years following the Closing Date:

6.1     General

(i)     Kotva, SPV KN, the Seller and KAS have been duly established and incorporated under the respective laws, being Czech, Czech, Cypriot and

Czech, and the share capital has been fully paid up in respect of each of them.

(ii) None of Kotva, SPV KN, the Seller or KAS has been declared bankrupt nor, and to the best their Knowledge, has any person delivered a petition for bankruptcy.

(iii) There is no Proceeding in progress, pending or Threatened against or relating to Kotva, SPV KN or the Seller or KAS except for the Gilroy Case and the 'Balfinder litigation' and there is no circumstance, matter or thing which might give rise to any such Proceeding by Kotva or SPV KN or the Seller or KAS or any shareholder thereof or any third party or to any governmental investigation relative to it, nor is there outstanding against Kotva or SPV KN or Seller or KAS any regulation, judgement, decree, injunction, rule or Order of any court, Governmental Body or arbitrator which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable.

(iv) None of Kotva, SPV KN, or the Seller nor KAS nor any of their directors and managers have committed any offence or failed to comply with any applicable Law which might give rise to any fine, penalty, default or commencement of Proceeding or any other liability which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable

(v) None of Kotva, SPV KN, or the Seller nor KAS is in default or breach of Organisational Documents or any licence, Governmental Authorisation, Contract or other instrument to which it is a party or by which it may be bound and there exists no state of facts which after notice or lapse of time, or both, would constitute such a default or breach, and all such licences, Governmental Authorisations, Contracts and documents are in good standing and Kotva, SPV KN or the Seller or KAS, as the case may be, are entitled to all benefits there under and none of Kotva. SPV KN, or the Seller or KAS have Knowledge of any of the above which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable.

(vi) Kotva and SPV KN and KAS are Tax resident only in the Czech Republic and will remain so (whilst under the control of the KAS Group) until at least five years from the Closing Date and neither Kotva nor SPV KN nor KAS has any Tax Liabilities whether actual or contingent in jurisdictions other than in the Czech Republic

(vii) The Seller is tax resident of Cyprus.

(viii) The corporate records supplied to Markland during Due Diligence contain complete and accurate records of all minutes of meetings held and all resolutions adopted by Kotva and in general meetings since SPV KN's incorporation and neither Kotva nor KAS have any Knowledge of any defects in the above or breaches thereof, or in the corporate governance of KAS, which would make this Agreement or the transactions contemplated in this Agreement invalid. void or voidable

---

(ix)   Kotva and the Seller have supplied the Buyer and/or Markland with all complete and accurate records of all minutes of meetings held and all resolutions adopted by SPV KN since its incorporation.

(x)   The books and records of Kotva and SPV KN fairly and correctly set out and disclose in all material respects the financial position of the Business of Kotva and all material financial transactions relating to the Business have been accurately recorded in such books and records since its incorporation and Kotva has no Knowledge of a breach of any of the above.

(xi)   None of Kotva, SPV KN, or the Seller or KAS is a party to any valid written or verbal Contract or any other document under the terms and conditions of which the performance by the Seller of this Agreement would result in the breach of an obligation, or might provide a reason for the termination or invalidity of this Agreement or the transactions contemplated in this Agreement, or which might preclude Kotva, SPV KN or the Seller or KAS from performing their obligations hereunder.

(xii)   With respect to the Property, SPV KN will not execute any new lease without the prior written consent of the Buyer, such consent not to be unreasonably withheld or delayed. If a response to such a request is not given by the Buyer within 10 Business Days of its delivery, this will be deemed consent to the execution of the new lease.

(xiii)   The Seller, SPV KN, Kotva shall not extend or agree to extend any existing lease without the prior written Consent of the Buyer, such consent not to be unreasonably withheld or delayed. If a response to such a request is not given by the Buyer within 10 Business Days of its delivery, this will be deemed consent to the extension of the existing lease.

(xiv)   All Consents necessary to fulfil the obligations of Kotva, SPV KN, the Seller or KAS to complete the SPV Conclusion and the connsumation of the transactions contemplated by this Agreement shall be provided by the Seller, SPV KN or by Kotva to the Buyer as soon as practicable after they are available.

(xv)   Kotva and/or SPV KN shall permit any Person nominated by Markland or the Buyer to oversee the day-to-day management of the Property which, for the avoidance of doubt, shall mean the internal management of the Kotva shopping centre by the on-site retail manager. Kotva and/or SPV KN undertake to provide assistance, advice and all information necessary to enable such Person to effectively learn the current management structure of the Property.

(xvi)   That in relation to those persons currently employed by Kotva or by the Seller there are no written Contracts of employment, mandate, consultancy or similar agreements with any employee, director or consultant of Kotva or of the Seller which are to be transferred to the Buyer or SPV KN on Closing either by operation of law or by virtue of any provision contained within any such employment agreements. Kotva and the Seller shall remain fully liable for all claims of redundancy payments or protective awards and for any liability, direct or indirect. resulting from the unfair or wrongful dismissal of any employee and shall fully and effectually indemnify. and continue to

KC 1-2662

keep indemnified, the Buyer in respect of any costs or expenses which may arise in connection therewith.

(xvii) The Seller and Kotva undertakes to ensure that, in relation to SPV KN, the entry into or completion of this Agreement will not directly or indirectly cause or contribute to the disallowance or non-availability of any Tax benefit or relief (whether by way of deduction, reduction, set-off, exemption, allowance or otherwise) from, against or in respect of which any Tax could or may be effectively reduced withdrawn, postponed, restricted or waived as a result of entry into or completion of this Agreement.

(xviii) As at the Closing Date neither SPV KN nor the Seller will have any joint or several liability in respect of any Tax incurred by or due from any other Person, as a transferee or successor, by contract, or otherwise.

(xix) Concerning SPV KN and/or the Seller, full liability has been accounted for or full provision or reserve has been made in the Financial Statements for all Taxes liable to be assessed or for which SPV KN is or may become accountable. Proper provision, reserve or liability for deferred Tax has been made in the Financial Statements.

(xx) No income or revenue in relation to SPV KN (as computed for Tax purposes) will arise or accrue in consequence of cancellation of provisions or reserves which have been claimed as deductions or charges for Tax purposes in computing profits (tax base) or loss carry-forwards (as computed for Tax purposes), other than income against which corresponding expense allowable as deductions or charges for Tax purposes in computing profit (tax base) or loss carry-forwards (as computed for Tax purposes), (e.g. write-off of a receivable or expenses incurred on repairs of tangible assets) can be set-off.

(xxi) Kotva shall procure that as at the Closing Date all of the accounts, books and records of SPV KN will be fully, properly and accurately up-to-date from the incorporation of each entity respectively, and will be maintained at a place and in a form that complies with the Commercial Code and all applicable Laws of the Czech Republic. All accounts, documents, reports and returns required by Law to be delivered or made to any Governmental Body will have been duly and correctly delivered or made by representatives of SPV KN and the Seller and will be delivered to the Buyer.

(xxii) Kotva shall procure that as at the Closing Date neither SPV KN nor the Seller will have any outstanding or undisclosed Taxes that were incurred on or before the Closing Date. SPV KN and the Seller have complied with all applicable Laws, rules and regulations relating to the payment and withholding of all Taxes. If the above mentioned declarations of the Seller prove to be incorrect the Seller shall immediately rectify this situation or shall immediately settle the tax for SPV KN or the Seller.

(xxiii) Enforceability; No Conflict

(a) Kotva, SPV KN, KAS and the Seller have the absolute and unrestricted right, power, and authority to execute and deliver this

Agreement and to perform their obligations under this Agreement, which actions have been duly authorised and approved by all necessary corporate actions of Kotva and the Seller and KAS, where relevant. This Agreement constitutes the legal, valid, and binding obligation of Kotva, KAS and the Seller, and is enforceable against Kotva, KAS and the Seller in accordance with its terms.

(b) Neither the execution nor the delivery of this Agreement by Kotva, KAS and the Seller, nor the consummation or performance of any of the contemplated Transactions by Kotva, KAS or by the Seller where relevant, will directly or indirectly (with or without notice or lapse of time), contravene any Contract to which Kotva, KAS or the Seller is a party or by which Kotva, KAS or the Seller may be bound, any Governmental Authorisation, Legal Requirement, or Order to which the Seller may be subject, any provision of Kotva's, KAS' or the Seller's Organisational Documents, or any resolution adopted by the board of directors or the shareholders of Kotva, KAS or the Seller, which was not disclosed to the Buyer during Due Diligence.

(xxiv) The Seller or Kotva (whoever is legally responsible) undertakes to enter into any and all documents and agreements, within 20 Business Days of the request of the Buyer, following the Closing to:

(a) permit the merger of SPV KN with the Buyer under the Laws of the Czech Republic;

(b) sign and/or issue any document as requested by the Buyer or Markland which can speed up the process of the merger referred to in (a) above (e.g. waiver of right to receive various reports on merger);

(c) waive any rights to any increased shareholding in the merged company or to any compensation payments upon the merger by reason of the dilution of shares or for any other reason; and

(d) ensure the continued operation of SPV KN or the merged company including any shareholders agreements.

(xxv) Kotva will advise Markland and the Buyer of any adverse or potential adverse economic situation of Kotva or KAS.

6.2 Kotva and/or the Seller (once it becomes the owner of the Shares) are obliged or undertake to procure that:

(i) The Board of Directors of SPV KN will obtain the prior written approval of Markland, such approval not to be unreasonably withheld, before carrying out anything not in the Ordinary Course of Business.

(ii) The following activities shall not be carried out without the prior written approval of Markland:

(a) amendment, modification or supplementation of the Organisational Documents of Kotva, the Seller or SPV KN;

(b) the liquidation, dissolution or winding-up of Kotva, KAS or SPV KN;

(c) the merger, consolidation, transformation or division of SPV KN; or

(d) the change or agreement to change of the share capital of SPV KN (whether by consolidation, sub-division, purchase, redemption, cancellation, allotment or issuance of any shares), the grant of any option over, or issuance of any instrument carrying rights of conversion into, any of its shares.

6.3 Kotva and the Seller (once it becomes owner of the Shares) are obliged or undertake to procure that SPV KN does not without the prior written approval of Markland:

(i) dispose of or transfer control of or interest in all or any material part of its business, property or assets, whether by a single transaction or series of related transactions, or acquire any business, property or assets which would, following such acquisition, constitute a material part of its Business, property or assets (for these purposes, any business, property or asset accounting to CZK 31,500 (thirty one thousand five hundred Czech Crowns) or any business, property or asset with a fair market value of CZK 31,500 (thirty one thousand five hundred Czech Crowns) or more shall be deemed material);

(ii) change or agree to change its share capital (whether by consolidating, subdividing, purchasing, redeeming, cancelling, allotting or issuing any shares), or grant any option over, or issue any instrument carrying rights of conversion into, any of its shares;

(iii) commence any new business not being reasonably ancillary or incidental to the Business;

(iv) replace its auditors;

(v) enter into, modify or terminate any Contract or make any payment that: (a) involves or will involve obligations or potential obligations that, because of their nature or significance, are or will be deemed to be unusual or extraordinary for companies engaging in activities similar to the Business; (b) is or will be otherwise than at arms length and on the best terms reasonably obtainable; or (c) is in excess of CZK 31,500 (thirty one thousand five hundred Czech Crowns);

(vi) give any guarantee or indemnity, other than in the normal course of business in relation to the supply of goods or services, which is in excess of CZK 31,500 (thirty one thousand five hundred Czech Crowns);

(vii) make any loan, or create any borrowings or other indebtedness in the nature of borrowings;

(viii) acquire or incorporate any subsidiary or acquire or dispose of shares (except the Shares in accordance with this agreement), equity interests or loan stock in any Person or enter into any joint venture, partnership or consortium arrangement;

KC 1-2665

(ix)   permit its interest in any Person to be diluted (whether by a disposal of shares held by it or by a new issue of shares);

(x)   declare any dividend or make any other distribution in respect of its shares, whether in cash or otherwise; nor

(xi)   determine the compensation payable by SPV KN to any officer or Director.

**6.4   Monthly Reports**

Kotva and/or the Seller shall procure that the Directors of SPV KN provide to Markland, no later than the fifteenth (15th) day of each calendar month, a report detailing the activities of SPV KN

**6.5   Transfers**

Kotva and the Seller, once it becomes a shareholder of SPV KN, shall procure that from the date of this Agreement until five years following the Closing Date, no shares in SPV KN owned by Kotva or the Seller are transferred (including by way of sale of enterprise, merger or winding-up) to a third party and no Encumbrance may be created over those shares except in accordance with and subject to the provisions of this Agreement  For the duration of this Agreement SPV KN must not, without the prior written consent of the Buyer, suffer a Change of Control.

## 7   Representations, warranties and Obligations and Undertakings of the Buyer and of Markland

The Buyer and Markland represents and warrants that the following representations and warranties are true, correct and complete as at the date of signing this Agreement and the Buyer and Markland undertake to maintain them true, correct and complete during the effectiveness of this Agreement up to Closing:

**7.1   Organisation**

The Buyer and Markland are duly established and incorporated and their share capitals have been fully paid up

**7.2   Enforceability; No Conflict**

7.2.1   The Buyer and Markland have the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and to perform their obligations under this Agreement, which obligations have been duly authorised and approved by all necessary corporate actions of the Buyer and Markland. This Agreement constitutes the legal, valid, and binding obligation of the Buyer and Markland, and is enforceable against the Buyer and Markland in accordance with its terms.

7.2.2   Neither the execution nor the delivery of this Agreement by the Buyer and by Markland nor the consummation or performance of any of the Contemplated Transactions by the Buyer or Markland will directly or indirectly (with or without notice or lapse of time), contravene any Contract to which the Buyer and/or Markland is a party or by which the Buyer and/or Markland may be bound, any Governmental Authorisation, Legal Requirement, or Order to which the Buyer and/or Markland may be subject,

any provision of their Organisational Documents, or any resolution adopted by the board of directors or the shareholders of the Buyer and/or Markland.

7.2.3    General

(i)    The Buyer and Markland have not been declared bankrupt nor, to the best Knowledge of the Buyer and Markland, has any person delivered a petition for bankruptcy in relation to it.

(ii)    There is no Proceeding in progress, pending or Threatened against or relating to the Buyer and Markland and there is no circumstance, matter or thing to the Knowledge of the Buyer and Markland which might give rise to any such Proceeding by a third Person or any shareholder thereof, nor to any governmental investigation relative to it, nor is there outstanding against the Buyer and Markland any regulation, judgement, decree, injunction, rule or order of any court, Governmental Body or arbitrator.

(iii)    The Buyer and Markland are not in default or breach of their Organisational Documents or any Contract to which they are a party or by which they may be bound and there exists no state of facts which after notice or lapse of time, or both, would constitute such a default or breach, and all such documents and Contracts are in good standing and the Buyer and Markland are entitled to all benefits thereunder.

(iv)    Markland is tax resident in the Republic of Ireland and the Buyer is tax resident in the Czech Republic.

(v)    The corporate records of the Buyer and Markland contain complete and accurate records of all minutes of meetings held and all resolutions adopted by the Buyer and/or Markland in general meetings since their incorporation and the Buyer and/or Markland have no knowledge of any of the above that might make this Agreement invalid, void or voidable.

(vi)    The books and records of the Buyer and Markland fairly and correctly set out and disclose in all material respects the financial position of the business of the Buyer and Markland and all material financial transactions relating to the business have been accurately recorded in such books and records since their incorporation and the Buyer and/or Markland have no Knowledge of a breach of any of the above.

(vii)    The Buyer and Markland are not a party to any valid written or verbal Contracts or any other document under the terms and conditions of which the performance by the Buyer and/or Markland of this Agreement would result in the breach of an obligation, or might provide a reason for the termination or invalidity of this Agreement, or which might preclude the Buyer and/or Markland from performing their obligations hereunder.

(viii)    All Consents and other co-operations necessary to fulfil this Agreement by the Buyer and Markland shall be provided by the

Buyer and Markland to the Seller and to the KAS Group upon their written request thereof

(ix)    The Buyer is obliged to conclude a Transfer Deed and trademark transfer agreements in accordance with Clause 5.1 and 5.2 and take over the Shares in accordance with Clause 5.5.

### 7.3    Due Diligence

Markland represents that during Due Diligence it had an option to ask for and did ask for information concerning the Property, Kotva and other members of the KAS Group and that the documents provided were and still are represented by Kotva and KAS to be satisfactory and of a standard to enable Markland and the Buyer to enter into this Agreement including their willingness to pay the Purchase Price subject to such retentions as are made hereunder. The Buyer and Markland agree that, on the basis of the information provided to them by the Sellers, the Purchase Price is reasonable and corresponds to the value of the Shares and the Kotva Trademark

## 8    Share Purchase Price Adjustment and Remedies

### 8.1    Survival; Right to Share Purchase Price Adjustment; Waiver

All obligations and undertakings and Share Purchase Price adjustment obligations in this Agreement and its Schedules, and any other certificate or document delivered pursuant to this Agreement will survive the Closing until the expiration of the relevant limitation period, i.e. preclusion or statutory limitations. Any claim by a Party based on a breach of any undertakings, representation or warranty made pursuant to this Clause 8.1 must be submitted to the breaching party prior to the expiration of the applicable limitation period. The right to Share Purchase Price adjustment, payment of damages or other remedy based on a breach such representations, warranties, covenants, and obligations will not be affected by any investigation conducted with respect to, or any Knowledge acquired (or capable of having been acquired) about, the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to Share Purchase Price adjustment, payment of damages, or other remedy based on such representation, warranty, covenant, or obligation

### 8.2    Share Purchase Price adjustment and Payment of Damages by Kotva

Kotva and the Seller shall jointly and severally reimburse and hold harmless Markland and the Buyer and the members of their Boards of Directors (collectively, the "**Markland's Indemnities**"). and shall pay (by way of deducting from the Share Purchase Price payable by the Buyer) to the relevant Markland's Indemnities the monetary value of any Adverse Consequence arising directly or indirectly, from or in connection with:

(a)    any breach of any representation, warranty covenant, obligation or undertaking made by Kotva and/or the Seller and /or KAS in this Agreement, or any other certificate or document delivered by Kotva and/or KAS and/or by the Seller pursuant to this Agreement;

(b)      any Liabilities of SPV KN existing at or arising out of a state of facts existing at or before the Closing Date, to the extent that such Liabilities are not reflected or reserved against in the Financial Statements;

(c)      any claim by any Person for brokerage or finder's fees or commissions or similar payments from the Seller, SPV KN or SPV CO in connection with any of the Contemplated Transactions; and

(d)      any and all Threatened or implemented Proceedings, demands or assessments incidental to any of the matters set forth in this Clause 8 2(a) to (c).

**8.3**      Share Purchase adjustment and Payment of Damages by Markland

The Buyer and Markland shall jointly and severally reimburse and hold harmless Kotva, the Seller, KAS Group, SPV KN and the members of the boards of directors of the aforementioned companies (the "**Kotva's Indemnities**"), and shall pay (by way of increasing the Share Purchase Price payable by the Buyer) to Kotva's Indemnities the monetary value of any Adverse Consequence arising directly or indirectly, from or in connection with:

(a)      any breach of any representation, warranty covenant, obligation or undertaking made by Markland or by the Buyer in this Agreement or in any certificate delivered by Markland or by the Buyer pursuant to this Agreement; and

(b)      any and all Threatened or implemented Proceedings, demands or assessments incidental to any of the matters set forth in Clause 8 3(a) above.

**8.4**      Procedure for Share Purchase Price adjustment

(a)      Immediately after: (i) receipt by an Indemnified Person of notice of the assertion of a third-party claim against it; or (ii) the Indemnified Person becoming aware that it has suffered an Adverse Consequence entitling it to a Share Purchase Price adjustment, the Indemnified Person will, if a claim is made against such Indemnified Person, give notice to the Indemnifying Person of the assertion of such claim or the Adverse Consequence as the case may be. An Indemnified Person's failure to notify an Indemnifying Person will not relieve the Indemnifying Person of any Liability that it may have to the Indemnified Person.

(b)      A claim for Share Purchase Price adjustment originates by the expiration of the protection time limit according to Clause 8 5, at which moment the sum payable under the Share Purchase Price adjustment shall be paid promptly by the Indemnifying Person to the Indemnified Person.

**8.5**      If any of the Parties discovers a Threatened Adverse Consequence to it for a reason which would entitle the another Party to Share Purchase Price adjustment or to withdraw from this Agreement, that Party shall notify the others accordingly. The Party who would but for the terms of this Clause 8 5 be the Indemnifying Party then has a protection time limit lasting 25 (twenty five) Business Days from the date of the delivery of the notification to remove the fact causing falsehood of the representation or remedy the breach of its obligation. If such Party does not do so, it is obliged to

pay to the other Party upon expiration of the protection time limit sufficient and full compensation for the Threatened or newly discovered Adverse Consequence. If later the Adverse Consequence does not materialise the Party receiving the compensation is obliged to return it.

8.6　　In the event that an Adverse Consequence is discovered, Kotva or the Seller shall remedy such situation as soon as possible following the discovery but in any event shall do so prior to Closing. If at Closing the Adverse Consequence still exists, the Buyer shall be entitled to deduct the amount of the Adverse Consequence from the Share Purchase Price.

8.7　　Any payments made under this Clause 8 hereof shall be treated as an adjustment to the Share Purchase Price paid by the Buyer for the Shares under the terms of the Agreement, with the exception of any contractual penalty payable hereunder.

8.8　　All sums payable by the Seller to the Buyer under this Agreement shall be paid free and clear of all deductions, withholdings, set-offs or counterclaims whatsoever save only as may be required by Law. If any deductions or withholdings are required by Law the Seller shall be obliged to pay to the Buyer such sum as will after such deduction or withholding has been made leave the Buyer with the same amount as it would have been entitled to receive in the absence of any such requirement to make a deduction or withholding.

8.9　　If any Tax authority charges to Tax any sum paid to the Buyer under this Agreement then the amount so payable shall be grossed up by such amount as will ensure that after payment of the Tax so charged, or which would have been so charged if any relief available to the Buyer were ignored, there shall remain a sum equal to the amount that would otherwise be payable under this Agreement.

## 9　　Post - Closing Confidentiality Duty

9.1　　For the purpose of this Agreement, confidential or proprietary information ("**Proprietary Information**") shall mean the information created, transferred, recorded or employed as part of, or otherwise resulting from the activities undertaken pursuant to this Agreement or the Schedules hereto which constitutes the confidential, proprietary or trade secret information of the disclosing Party. Proprietary Information of Kotva shall also include Proprietary Information of SPV KN and/or the Seller. Such information may be of, but not limited to, a business, organisational, technical or financial nature. The Parties understand and agree that all Proprietary Information of a disclosing Party shall be treated as confidential by the receiving Party. Each receiving Party shall use the same degree of care as it uses with regard to its own Proprietary Information to prevent disclosure, use or publication of the disclosing Party's Proprietary Information.

9.2　　Proprietary Information of the disclosing Party shall be held by the receiving Party as described in Clause 9.1 unless it is or has been:

(i)　　obtained legally and freely from a third Person without restriction;

(ii)　　independently developed by the receiving Party at a prior time or in a separate and distinct manner without benefit of any of the Proprietary Information of the disclosing Party and documented to be as such;

(iii)   made available by the disclosing Party for general release;

(iv)    made public as required by Law, applicable regulations or Order or stock exchange requirements; and

(v)     within the public domain or later becomes part of the public domain as a result of acts by someone other than the receiving Party and through no fault or wrongful act of the receiving Party.

9.3   A receiving Party may disclose Proprietary Information of a disclosing Party to directors, officers, and employees of the receiving Party or agents of the receiving Party including their respective brokers, lenders, insurance carriers or prospective purchasers who have specifically agreed in writing to nondisclosure of the terms and conditions hereof. Any disclosure hereof required by legal process pursuant to Clause 9.2(v) shall only be made after providing the disclosing Party with notice thereof in order to permit the disclosing Party to seek an appropriate protective order or exemption.

9.4   The provision of this Clause 9 shall be effective for a period of two years following the Closing Date.

9.5   If a court of competent jurisdiction determines that the length of time or any other restriction or portion thereof set forth in this Clause 9 is unduly restrictive and thereby unenforceable, such restriction shall be interpreted and applied to include as much of the restriction as will render the covenants in this Clause 9 valid and enforceable to the fullest extent permitted by applicable Law, and as so interpreted and applied such covenants shall remain in full force and effect. The Parties further agree that if a court of competent jurisdiction determines that any provision of this Clause 9 is invalid or against public policy, the remaining provisions of this Clause 9 shall not be affected thereby, and shall remain in full force and effect.

10   **Termination**

10.1   Markland and/or the Buyer shall be entitled to withdraw by written notice to Kotva or to the Seller from this Agreement only if: (i) there is a breach of the Kotva's or Seller's representations, warranties. obligations or undertakings in accordance with Clause 6 and the protection time limit in accordance with Clause 8.5 of this Agreement expires, or in other cases of a breach of the Kotva's or Seller's representations, warranties or obligations where this Agreement entitles Markland or the Buyer to withdraw from the contract; (ii) if either SPV Conclusion has not taken place by 31 January 2005, save in the event of Force Majeure, including inactivity of a relevant Governmental Body or through the fault of a third party that is not either directly or indirectly controlled by the Seller; or (iii) if Closing has not occurred by 31 March 2005 provided that no breach of this Agreement by the Buyer or Markland will have occurred by then.

10.2   If Markland and/or the Buyer withdraw from this Agreement pursuant to Clause 10.1 the Buyer shall be entitled (in addition to and without prejudice to all other rights or remedies available to it including the right to claim damages) to:

10.2.1   the return of the Deposit and, if appropriate the Purchase Price in accordance with the terms of the Escrow Agreement; and

10.2.2  a contractual penalty amounting to CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied firstly from the Security and then from other funds of the Seller as necessary.

10.3  Failure to exercise this right in accordance with Clause 10.2 shall not constitute a waiver of any other right of Markland and/or the Buyer arising out of any breach of the obligations and undertakings of Kotva and/or the Seller

10.4  Kotva and/or the Seller are entitled to withdraw from this Agreement by serving written notice on Markland and the Buyer if it shall be found that any of the representations and warranties of Markland and/or the Buyer in accordance with Clause 7 was untrue at the date of execution of this Agreement or by the Closing Date, and the protection time limit according to Clause 8.5 of this Agreement expires or in other cases of breach of Markland's or Buyer's obligations where the Seller is entitled to withdraw from this Agreement

10.5  In the event of failure by Kotva and/or the Seller to satisfy the SPV Conclusion by 31 January 2005, Markland and/or the Buyer may withdraw from this Agreement by serving five Business Days notice on the Seller and Kotva and the Buyer shall be entitled to a contractual penalty of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns). to be satisfied firstly from the Security and then from other funds of Kotva and/or of the Seller as necessary

10.6  If Kotva and/or the Seller withdraws from this Agreement pursuant to Clause 10.4 the Seller will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty in accordance with the relevant term of this Agreement of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) in case this Agreement does not set other contractual penalty to be satisfied firstly from the Deposit and then from other funds of Markland as necessary.

10.7  Failure to exercise this right in accordance with Clause 10.6 shall not constitute a waiver of any other right of Kotva and/or the Seller arising out of any breach of the obligations and undertakings of Kotva and/or the Buyer, however, settling the agreed contractual penalty causes the right to Share Purchase Price adjustment and possible other right to indemnification or damages against Markland and/or the Buyer to cease.

10.8  If Closing does not occur within the time limits envisaged in this Agreement (other than due to the fault of the Buyer or Markland), then the Buyer will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) to be satisfied firstly from the Security and then from other funds of Kotva, SPV KN and/or the Seller as necessary.

10.9  If Closing does not occur within the time limits envisaged in this Agreement (other than due to the fault of the Seller or Kotva), then the Seller will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) to be satisfied firstly from the Deposit and then from other funds of Markland as necessary

---

A04677559/1 4/22 Dec 2004

31

KC 1-2672

**10.10** The Parties are not entitled to the contractual penalties as above, if the other party does not comply with this Agreement due to the event of Force Majeure, including inactivity of a relevant Governmental Body or through the fault of a third party that is not either directly or indirectly controlled by Kotva, the Seller or the Buyer.

**10.11** In the event (i) that the breach of obligations of the Seller or of Kotva does not cause an Adverse Consequence or (ii) if the Seller or Kotva fully indemnifies the Buyer or Markland during the protection time limit stated in Clause 8.5, then Markland and/or the Buyer shall not be entitled to withdraw from this Agreement or claim a contractual penalty.

## 11   General Provisions

### 11.1   Expenses

Except as otherwise expressly provided in this Agreement, each Party will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of its Representatives.

### 11.2   Public Announcements

Any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued at such time and in such manner as the Parties mutually determine. None of the Parties will make any disclosure of the Purchase Price or other terms of the Contemplated Transactions to any Person, except with the prior written consent of the other Parties or as required by Legal Requirements or by law. The Parties will consult with each other concerning the means by which the Kotva's employees, customers and others having dealings with Kotva or the Seller will be informed of the Contemplated Transactions, and the Parties will have the right to be present for any such communication, if possible.

### 11.3   Notices

All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed given to a Party when: (a) delivered to the appropriate address by hand or by nationally recognised overnight courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment (subsequently delivered in written form within five days); or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested; in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number, e-mail address or individual as a Party may designate by notice to the other Parties):

**Kotva, KAS, KO and the Seller:**

Kotva NEMOVITOSTI, k.s.

| | |
|---|---|
| Address: | Příkop 4. Brno. Post Code 602 00 |
| Fax: | +420 224 801 230 |
| Tel: | +420 224 801 401 |
| Attention: | Martin Benda |

copy to

---

KC I-2673

Toman, Devátý and Partneři
Address:      Trojanova 12, 120 00 Prague 2
Fax:          +420 224 920 468
Tel:          +420 224 918 490
Attention:    Petr Toman

and

**Markland and the Buyer:**

Markland Holdings Limited
Address:      19 Upper Fitzwilliam Street, Dublin 2, Republic of Ireland
Fax:          00353 167 620 00
Tel:          00353 167 620 23
Attention:    Henry Prestage/Frank Walker/Aidan Scully

copy to

Linklaters v.o.s.
Address:      Palác Myslbek, Na Příkopě 19, 117 19 Praha
Fax:          +420 221 622 199
Tel:          +420 221 622 111
Attention:    Bryan Wilson

**11.4    Further Assurances**

The Parties agree:

11.4.1    to furnish, upon request, each other with such further information as requested;

11.4.2    to execute and deliver to each other such other documents; and

11.4.3    to do all such other acts, as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Contemplated Transactions.

**11.5    Incorporation of Schedules**

The Schedules identified in this Agreement are incorporated herein by reference and made a part of this Agreement.

**11.6    Entire Agreement and Modification**

This Agreement supersedes all prior agreements among the Parties with respect to its subject matter and constitutes (along with the documents delivered pursuant to this Agreement) a complete and exclusive statement of the terms of the agreement between the Parties regarding its subject matter. In the case of any inconsistency between the terms of this Agreement and the terms of the Transfer Deed or the KOTVA Trademarks transfer agreement, the terms of this Agreement shall prevail. This Agreement may not be amended, supplemented or otherwise modified except by a written agreement executed by all the Parties.

**11.7    Acknowledgement**

Markland and the Buyer acknowledge that they have not been induced to enter into this Agreement by any representation, warranty or undertaking not expressly

---

A04677559/1.4/22 Dec 2004

KC 1-2674

incorporated into it. Parties to this Agreement confirm that they have received independent legal advice relating to all the matters provided for in this Agreement, including the provisions of this Clause 11.7, and agrees, having considered the terms of this Clause 11.7 and the Agreement as a whole, that the provisions of this Clause 11.7 are fair and reasonable.

**11.8**    Time of the Essence

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**11.9**    Severability

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable. However, the transfer of the Shares and the transfer of KOTVA Trademarks are mutually dependant transactions pursuant to Section 275 (2) of the Commercial Code.

**11.10**    Assignments, Successors, and No Third Party Rights

No Party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Parties, such consent not to be unreasonably withheld, except that Markland may assign without the other Parties' consent any of its rights and delegate any of its obligations under this Agreement to any Related Person or any subsidiary of Markland or to any subsequent acquirer of the Shares or of all or substantially all of the business of the Buyer or any Related Person. This Agreement will apply to, be binding in all respects upon, and inure to the benefit of each of the Kotva's and/ or Seller's successors and permitted assigns and Markland's and/or the Buyer's successors and permitted assigns (whether by merger, consolidation, purchase of all or substantially all of its assets or otherwise). The Buyer will indemnify and hold harmless the Seller and KAS, and will pay to the Seller's Indemnities the monetary value of any Adverse Consequence arising, directly or indirectly, from or in connection with any breach of such a Buyer's successor. Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the Parties, any right, remedy, or claim under or with respect to this Agreement or any its provision except the rights as shall inure to a successor or assignee pursuant to this Clause 11.10.

**11.11**    Waiver

The rights and remedies of the Parties are cumulative and not alternative. Neither any failure nor any delay by any Party in exercising of any right, power, or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable Law, (a) no claim or right arising out of this Agreement or any of the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Party, and (b) no waiver that

may be given by a Party will be applicable except in the specific instance for which it is given.

**11.12  Arbitration**

This provision shall apply to all and any dispute or difference that may arise in connection with or the interpretation, performance or termination of this Agreement between the Parties, as well as the validity or settlement of this Agreement and of the relationship established by this Agreement (the "**Dispute**"). The Parties shall make every effort to resolve any Dispute out of court, if possible. If they are unable to reach an out-of-court settlement, any of the Parties shall have the right to file a petition for the Dispute to be resolved before the Court of Arbitration attached to the Economic Chamber of the Czech Republic and the Agrarian Chamber of the Czech Republic in accordance with Acts nos. 216/1994 Coll., as amended, and 223/1994 Coll., as amended, under said Court's Rules of Arbitration, by three arbitrators. The language of the proceedings shall be Czech and the venue of the proceedings shall be Prague. The chairman of the arbitration tribunal shall be authorised to decide on procedural issues at his own discretion. If the disputing Parties reach conciliation before the above Court as part of the arbitration proceedings, no justification needs to be attached to the arbitral award that will endorse the conciliation between the disputing Parties. The Party that is defeated in such a Dispute shall reimburse the other Party for all of its legal expenses in addition to the costs of the arbitration proceedings adjudicated to it by the arbitration tribunal. In proceedings before the above Court of Arbitration, the Parties shall take an active attitude and shall be helpful to the Court in the resolution of the Dispute, especially as regards giving explanations, furnishing evidence and documents, etc., and shall acknowledge its arbitral award without any reservations, and shall carry out the arbitral award voluntarily. If a Party refuses to carry out the arbitral award referred to in the preceding sentence, the other Party has the right to file a petition for the execution of the decision with the court of law having jurisdiction over the place and merit of this dispute.

**11.13  Governing Law**

This Agreement will be governed by and construed under the laws of the Czech Republic without regard to its conflicts of law principles, in particular the Czech Commercial Code.

**11.14  Counterparts**

This Agreement will be executed in four counterparts, each of which will be deemed to be an original copy of this Agreement and which, when taken together, will be deemed to constitute one and the same document. The Agreement is executed in the English (2 counterparts) and Czech (two counterparts) languages, and the Czech language version shall prevail.

The Parties have executed this Agreement as of the date indicated in the first sentence of this Agreement.

By:

Seller:

---

A04677559/1 4/22 Dec 2004

KC 1-2676

**SPV CO Limited**


Name:

Title:


By:

**KOTVA NEMOVITOSTI k. s.**


Name:

Title:


By:

**KOTVA a.s.**

Name:

Title:


By:

**KOTVA OBCHODNÍ, a.s.**


Name:

Title:


By:

Buyer:

**CRQ Czech a.s.**


Name:

Title:


By:

**Markland Holdings Limited**


Name:

Title:

KC 1-2678

**Schedule 1**
**Extracts from Commercial Register**

**Schedule 2**
**Extract from Companies House**

KC 1-2680

**Schedule 3**
**INTENTIONALLY DELETED**

KC 1-2681

**Schedule 4**
**Extract from Real Estate Register**

**Schedule 5**
**KO Lease**

**Schedule 6**
**Rent Roll**

**Schedule 7**
**INTENTIONALLY DELETED**

**Schedule 8**
**INTENTIONALLY DELETED**

**Schedule 9**

**Gilroy Claim**

**Schedule 10**

**Expert Opinion**

**Schedule 11**

**List of Fixtures & Fittings**

i

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s.             ) | |
|                         ) | |
|                         ) | |
|            Plaintiff,          ) | Case No. 05-10679-RCL |

KOTVA a.s.

           Plaintiff,         )      Case No. 05-10679-RCL

             v.

ANDREW WEISS and WEISS ASSET
MANAGEMENT, LLC

           Defendants.

## OBJECTIONS AND RESPONSES OF KOTVA A.S. TO
## DEFENDANTS' THIRD SET OF INTERROGATORIES

       Pursuant to Fed. R. Civ. P. 33, Local Rule 33.1, Plaintiff, Kotva, a.s. ("Kotva") hereby

responds to the Third Set of Interrogatories of Defendants Andrew Weiss and Weiss Asset

Management, LLC (collectively "Weiss").

## GENERAL OBJECTIONS

      I.       Kotva objects to each interrogatory to the extent it seeks information that is

beyond the scope of Rules 26 or 33 of the Federal Rules of Civil Procedure, is beyond the proper

scope of discovery because of the attorney client relationship, prepared in anticipation of

litigation or trial or constitutes attorney work product, or is otherwise immune from discovery.

      II.       In providing answers to these interrogatories, Kotva does not in any way waive or

intend to waive but rather intends to preserve the following:

           a.       All objections as to competency, relevancy, materiality and admissibility;

   b.  All rights to object on any ground to the use of any of the Answers herein, including the trial of this or any other action;

   c.  All objections as to vagueness or ambiguity; and

   d.  All rights to object on any ground to any further interrogatories or other discovery requests involving or related to any of the interrogatories in Weiss' First Set of Interrogatories.

  III.  Privileged information responsive to any interrogatory below is not being provided. Kotva does not waive, and intends to preserve and is preserving the attorney client privilege, the work product doctrine, and every other privilege with respect to each and every answer, document or other repository of information protected by such a privilege.

  IV.  Kotva objects to the Instructions and/or Definitions contained in the Interrogatories to the extent that they attempt to impose obligations on Kotva that are inconsistent with and/or in addition to those required under the Federal Rules of Civil Procedure and the Local Rules.

  V.  Kotva objects to the Interrogatories to the extent each interrogatory contains several subparts and therefore exceeds the number of interrogatories permitted under Fed. R. Civ. P. 33(a).

  VI.  Kotva objects to the Interrogatories to the extent that they demand production of any information containing any confidential, proprietary and/or trade secret information.

  VII.  Kotva's answers to the Interrogatories are qualified by the General Objections. Failure to restate any General Objection in response to a particular interrogatory does not

constitute a waiver of such General Objection. By responding to these Interrogatories, Kotva

does not waive any asserted objection.

**Interrogatory No. 1**

Please identify the legal and beneficial owners of an interest, including shares of stock or a partnership interest, in each of the Listed Companies, for the period from January 1, 2000 until to present.

**Response to Interrogatory No. 1**

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly

burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the

discovery of admissible evidence. Plaintiff further objects to this interrogatory to the extent it

seeks information concerning entities unaffiliated with Plaintiff. Plaintiff also objects to the

extent this interrogatory has been previously asked and fully responded to by Plaintiff. (See

Defendants' Second Set of Interrogatories, No. 1 and response thereto). Subject to the foregoing

General and Specific Objections, Plaintiff responds as follows:

a.    Forminster Enterprises, Ltd.

Unknown.

b.    Kotva, a.s.

Kotva's approximately 694,209 shares are publicly traded on the Czech securities market,

and there are currently approximately 7,700 shareholders. Given that Kotva's shares are publicly

traded, Kotva's ownership changes regularly. Shareholders currently owning more than 10% of

Kotva's outstanding shares are:

| | | |
|---|---|---|
| Forminster Enterprises Limited/Sprint | 385,038 shares | 55.74% |
| Ardmore Risk Management Limited | 97,753 shares | 14.08% |

HSBC Bank plc                81,082 shares           11.92%

Kotva cannot identify those persons who have an "indirect ownership interest" in Kotva's shares.

    b.    <u>Kotva Nemovitosti ("KN")</u>

Kotva owns 100% of KN.

    c.    <u>SPV KN</u>

Pursuant to the Share Purchase Agreement with Markland, (which has been produced to Defendants) SPV KN was sold to Markland in connection with the department store sale in 2005, and Plaintiff does not know the current ownership status of SPV KN.

    d.    <u>SPV Co., Ltd. "(SPV")</u>

SPV is owned 100% by KN. In further answering, see response to Interrogatory 1(c) and the documents produced in response to Defendants' document requests (Bates No. K5106).

    f-j.    Unknown. Interrogatory 1(f-j) seeks information regarding entities that have no relationship to Plaintiff, and Plaintiff has no information or documents responsive to this interrogatory concerning such entities.

    k.    <u>Kotva správcovská a.s.</u>

K Spra is owned 100% by Kotva Parking s.r.o.

    l.    <u>Kotva obchodni' a.s. ("KO")</u>

Kotva owns 100% of KO.

    m.    <u>Kotva Parking s.r.o. ("KP")</u>

Kotva owns 100% of KP.

    n.    <u>Kotva International, Ltd. ("KI")</u>

Kotva sold KI sometime ago and the current status is not known of Kotva. Kotva will supplement its answer if information responsive to this interrogatory is discovered.

4

**Interrogatory No. 2**

Please identify the directors, officers and managers of the Listed Companies, for the period from January 1, 2000 until the present.

**Answer No. 2**

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this interrogatory to the extent the information is publicly available to Defendants. Subject to the foregoing General and Specific Objections, Plaintiff responds as follows: Pursuant to Fed. R. Civ. P. 33(d), with respect to the Kotva owned Czech entities (i.e. Kotva a.s.; Kotva Nemovitosti; Kotva Správcovská a.s.; Kotva Obchodní a.s.; Kotva Parking s.r.o.), the identities of individuals who served as officers, directors and managers since 2000 may be ascertained from Kotva's annual reports, which will be produced to Defendants.

The directors, officers and managers of SPV C.O. are as follows:

Marek Kolíbal
SPVCO
Pavlou 15
Ledra House
Aglos Andreas
P.C. 1105
Nicosia, Cyprus


Paraskevas Zacharoullis
SPVCO
Pavlou 15
Ledra House
Aglos Andreas
P.C. 1105
Nicosia, Cyprus

Elena Makrigiorgi
SPVCO
Pavlou 15
Ledra House
Aglos Andreas
P.C. 1105
Nicosia, Cyprus

**Interrogatory No. 3**

Please identify all documents, including but not limited to meeting minutes, concerning any meetings of shareholders, directors or supervisory board members of the Listed Companies at which one or more of the following topics was discussed: (a) the sale or potential sale of the Department Store; (b) the value of the Department Store; (c) the value of Kotva a.s. or its shares; (d) any transfer of the Department Store or an entity owning the Department Store from one person to another; (e) Weiss, WAM, K T, Inc. or CVF Investments, Ltd., Weiss Capital LLC or Vladimir Hoffmann; (f) this lawsuit; (g) criminal complaints or proceedings in the Czech Republic in which Andrew Weiss, Vladimir Hoffman or Edita Simkova are defendants or potential defendants, or (h) Kotva's relationship with Forminster Enterprises Ltd.

**Answer No. 3**

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly

burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the

discovery of admissible evidence. Notwithstanding the foregoing General and Specific

Objections, Plaintiff responds as follows: Plaintiff has produced the documents identified in

Interrogatory No. 3 and, pursuant to Fed. R. Civ. P. 33(d), the answer to this interrogatory may

be ascertained or derived from the documents produced by Plaintiffs in response to Defendants'

document requests.

**Interrogatory No. 4**

Please identify any describe in detail all agreements between and among the Listed Companies from the period January 1, 2000 to the present, including but not limited to, any promissory notes, loans, mortgages, security interests, option agreements, other contracts, and agreements on inter-company allocation of revenues or expenses.

6

**Answer No. 4**

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly

burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the

discovery of admissible evidence. Notwithstanding the foregoing General and Specific

Objections, Plaintiff responds as follows: Pursuant to Fed. R. Civ. P. 33(d), the answer to this

interrogatory may be ascertained or derived from Kotva's annual reports, which identify any

such inter-company agreements and/or allocation of revenues and expenses to the extent such

allocations occurred.

**Interrogatory No. 5**

Please identify any powers of attorney issued by one or more of the Listed Companies,
including but not limited to powers of attorney naming Miroslav Hálek, for the period from
January 1, 1996 to the present.

**Answer No. 5**

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly

burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the

discovery of admissible evidence. Plaintiff further objects to this interrogatory to the extent

Defendants seek documents dating back to 1996, which is beyond the scope of discovery

permitted by the Discovery Master. Notwithstanding the foregoing General and Specific

Objections, Plaintiff is unaware of any powers of attorney naming Miroslav Hálek from 2000 to

the present.

**Interrogatory No. 6**

For each and every interrogatory response in which Kotva claims that it is unable to
answer, in whole or in part, please describe in detail the efforts Kotva took to gather responsive
information.

7

**Answer No. 6**

Plaintiff is able to and has fully answered the foregoing interrogatories.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS 17 DAY OF FEBRUARY, 2006.

_____
Richard Harazim

As to objections:

_____
Joel G. Beckman (BBO #553086)
William C. Nystrom (BBO#559656)
Daniel J. Pasquarello (BBO# 647379)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: February 17, 2006

## CERTIFICATE OF SERVICE

I, Daniel Pasquarello, hereby certify that on February 17, 2006 I caused and a true copy of the foregoing document to be served by email and First Class mail postage pre-paid upon all counsel of record.

_____
Daniel Pasquarello

8

Dne 20 prosince 2004

SPV CO Limited

a

CRQ Czech a.s.

# SMLOUVA O KOUPI AKCIÍ

ve společnosti SPV KN a.s

Linklaters

Palác Myslbek
Na Příkopě 19
117 19 Praha 1

Telefon:    (420) 221 622 111
Fax:        (420) 221 622 199

Ref. BDXW/L-033253

KC 1-2063

Tato Smlouva o koupi akcií (dále jen „tato Smlouva") byla uzavřena dne 20. prosince 2004

mezi:

(1) společností **SPV CO Limited**, se sídlem Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus, registrační č. společnosti HE 148845, registrovanou na Kypru (dále jen „**Prodávající**") zastoupenou Martinem Bendou, ředitelem společnosti. Kopie výpisu z obchodního rejstříku je připojena k této Smlouvě jako Příloha 1A;

(2) společností **CRQ Czech a.s.**, se sídlem Praha 1, Národní 1435/6, PSČ 11000, IČO 27159256, zapsanou v obchodním rejstříku vedeném Krajským soudem v Praze, v oddíle B, vložce 9394 (dále jen „**Kupující**"), kterou zastupuje Frank Walker, člen představenstva. Kopie výpisu z obchodního rejstříku je připojena k této Smlouvě jako Příloha 1B;

(3) společností **SPV KN a.s.**, se sídlem Brno, Příkop 4, PSČ 602 00, IČO 26910705, zapsanou v obchodním rejstříku vedeném Krajským soudem v Brně, v oddíle B, vložce 4043 (dále jen „**SPV KN**"), kterou zastupuje Ing. Richard Harazim, jediný člen představenstva. Kopie výpisu z obchodního rejstříku je připojena k této Smlouvě jako Příloha 1C;

(4) společností **KOTVA NEMOVITOSTI, k.s.**, se sídlem Příkop 4, Brno, PSČ 602 00, IČO 26229048, zapsanou v obchodním rejstříku vedeném Krajským soudem v Brně, v oddíle A, vložce 16586 (dále jen „**Kotva**"), a zastoupenou společností KOTVA OBCHODNÍ, a. s., kterou zastupují Ing. Michal Vlach, předseda představenstva, Ing. Jiří Brada, člen představenstva, a Ing. Pavel Richter, člen představenstva. Kopie výpisu z obchodního rejstříku je připojena k této Smlouvě jako Příloha 1D;

(5) společností **MARKLAND HOLDINGS Limited**, se sídlem 19 Upper Fitzwilliam Street, Dublin 2, registrační č. společnosti 291167, registrovanou podle zákonů Irské republiky, (dále jen „**Markland**"), kterou zastupuje Frank Walker, zmocněnec na základě plné moci. Kopie výpisu z Registru společností Irské republiky je připojena k této Smlouvě jako Příloha 2;

(6) společností **KOTVA a.s.**, se sídlem Náměstí Republiky 8, Praha 1, IČO 60193808, zapsanou v obchodním rejstříku vedeném Městským soudem v Praze, v oddíle B, vložce 2370 (dále jen „**KAS**"), kterou zastupuje Ing. Michal Vlach, předseda představenstva. Kopie výpisu z obchodního rejstříku je připojena k této Smlouvě jako Příloha 1E; a

(7) společností **KOTVA OBCHODNÍ, a.s.**, se sídlem Příkop 4, Brno, PSČ 602 00, IČO 26231735, zapsanou v obchodním rejstříku vedeném Krajským soudem v Brně, v oddíle B, vložce 3484 (dále jen „**KO**"), kterou zastupují Ing. Michal Vlach, předseda představenstva, Ing. Jiří Brada a Ing. Pavel Richter, členové představenstva. Kopie výpisu z obchodního rejstříku je připojena k této Smlouvě jako Příloha 1F.

( společně dále jako „**Smluvní strany**")

**Vzhledem k tomu, že**

(A)  Prodávající je společností platně založenou podle zákonů Kyperské republiky a je součástí Skupiny KAS;

(B)  SPV KN je zapsaným vlastníkem Majetku а je součástí Skupiny KAS;

(C)  Prodávající podniká kroky k nabytí 97% akcií v SPV KN;

(D)  KAS je holdingovou společností založenou podle zákonů České republiky a je ovládající osobou ve vztahu k Prodávajícímu, SPV KN a ke KO;

(E)  Prodávající si přeje prodat a Kupující si přeje koupit Akcie a Ochranné známky KOTVA za podmínek uvedených v této Smlouvě,

**se Smluvní strany dohodly takto:**

1     **Interpretace**

1.1     Výklad

Veškeré odkazy v této Smlouvě na „článek", „ustanovení" nebo „odstavec" odkazují na odpovídající článek, ustanovení nebo odstavec této Smlouvy, nevyplývá-li ze souvislostí něco jiného. Nadpisy článků, ustanovení a odstavců mají pouze usnadnit orientaci a nemají vliv na pojetí ani výklad této Smlouvy Veškeré výrazy použité v této Smlouvě mají takový mluvnický rod či číslo, jak vyžadují okolnosti Pojmy „zahrnovat" nebo „včetně" označují příklady předcházejících obecných výroků a nikoli jejich vyčerpávající vymezení. Odkaz na zákon je odkaz na příslušný zákon, jeho změny, dodatky a následné úpravy a veškeré předpisy vyhlášené na jeho základě nebo jeho prováděcí předpisy platné v daném okamžiku. Odkaz na smlouvu nebo jiný dokument určitého data znamená smlouvu nebo jiný dokument ve znění pozdějších dodatků, doplňků a úprav. Odkaz na částku v určité měně znamená podobnou částku v jakékoli jiné měně převedenou podle v té době platného směnného kursu

1.2     Definice

Pro účely této Smlouvy budou mít následující pojmy a jejich varianty význam uvedený v tomto Odstavci 1.2:

„Akcie"                         znamenají kmenové akcie na majitele v listinné podobě vydané SPV KN, a sice:

(a)  10 akcií o nominální hodnotě 200 000 Kč označených čísly 1-10 vydané 10 listopadu 2003; a

(b)  13 akcií o nominální hodnotě 100.000 000 Kč označených čísly 11-23 vydané 9 dubna 2004; a

(c)    2 akcie o nominální hodnotě 20 000 000 Kč označených čísly 24 a 25 vydané 9. dubna 2004; a

(d)    8 akcií o nominální hodnotě 1 000 000 Kč označených čísly 28-35 vydané 9. dubna 2004; a

(e)    2 akcie o nominální hodnotě 100 000 Kč označených čísly 37 a 38 vydané 9. dubna 2004; a

(f)    4 akcie o nominální hodnotě 10 000 Kč označených čísly 46-49 vydané 9. dubna 2004;

jejichž jmenovitá hodnota představuje 97 % základního kapitálu SPV KN;

„Budova"    znamená budovu č. p. 656 v katastrálním území Staré Město, část obce Staré Město na pozemku p. č. 680 a dále budovu v katastrálním území Staré Město, část obce Staré Město, bez čísla popisného nebo evidenčního na pozemku p. č. 1018/2. Obě budovy jsou zapsány na LV 265, katastrální území Staré město, obec Praha, vedeném katastrálním úřadem pro hl. m. Prahu. Kopie výpisu z katastru nemovitostí je součástí této Smlouvy jako Příloha 5;

„Běžný obchodní styk"    jednání SPV KN a/nebo společnosti Kotva nebo Prodávajícího nebo společnosti KO jakožto vlastníků nebo správců Majetku uskutečněné při běžné činnosti v rámci Podnikání, které je v souladu s dosavadní obvyklou praxí společnosti Kotva;

„Daň" nebo „Daně", popř. „Daňový"    znamená bez omezení a bez ohledu na způsob výběru veškeré formy zdanění, zákonné, vládní, státní, místní, zahraniční a obecní dávky, poplatky, příspěvky a odvody včetně Daně z příjmů, srážkové Daně, Daně z přidané hodnoty (dále jen „DPH"), Daně silniční, Daně z nemovitosti, Daně z převodu nemovitostí, Daně darovací, Daně dědické, spotřebních Daní, celních a jiných poplatků, dávek souvisejících se zaměstnáním včetně příspěvků na sociální pojištění a příspěvků na důchodové a zdravotní připojištění zahrnující jak jistiny, tak i případné úroky a penále;

„Datum uzavření"    znamená den, kdy dojde k Uzavření;

„Důvěrné informace"    jsou definovány v odstavci 9.1;

„EUR"    znamená euro, oficiální měnu Evropské unie;

„Gilroy"    znamená společnost Gilroy Limited se sídlem 4 Pikioni Street, Limassol, Kypr;

„Hrozící"    žaloba nebo věc se považuje za „Hrozící", jestliže byl učiněn požadavek nebo prohlášení (ústní nebo písemné) nebo bylo učiněno

oznámení (ústní nebo písemné) nebo nastala jiná událost nebo existuje jiná okolnost, která by Osobu jednající s řádnou péčí vedla k závěru, že taková žaloba nebo věc bude v budoucnosti pravděpodobně uplatněna, zahájena, učiněna nebo jinak prosazována;

„Hypotéka J&T banky"    znamená zástavní právo na Majetek, které je ke dni této Smlouvy zapsáno ve prospěch J&T banky, a.s , IČ 47115378, se sídlem Pobřežní 297/14, 186 00 Praha 8 (dále jen „J&T banka")

„Inventář a vybavení"    Znamená seznam inventáře a vybavení připojený k této Smlouvě v Příloze č 11

„Jistota"    znamená částku 15 750 000 Kč (patnáct milionů sedm set padesát tisíc korun českých), s případným úrokem, kterou společnost Kotva převedla za Prodávajícího na Vázaný účet před uzavřením této Smlouvy pro účely zajištění potenciální pohledávky nebo pohledávek Kupujícího vůči Prodávajícímu;

„Kč"    znamená koruny české, zákonnou měnu České republiky;

„Kotva Správcovská a.s."    znamená společnost KOTVA SPRÁVCOVSKÁ a s , se sídlem Brno, Příkop 4, PSČ 60200, IČ 26510081;

„Kupní cena"    znamená celkovou kupní cenu za Akcie a Ochranné známky KOTVA v českých korunách ve výši 1.501.450 000 Kč (jedna miliarda pět set jeden milion čtyři sta padesát tisíc korun českých), rozpočtenou takto:

(i) kupní cena za Akcie je 1 366 450 000 Kč (slovy: jedna miliarda třista šedesát šest milionů čtyřista padesát tisíc korun českých) („Kupní cena za Akcie"), a

(ii) kupní cena za Ochranné známky KOTVA je 135 000 000 Kč (slovy: jedno sto třicet pět milionů korun českých) („Kupní cena za Ochranné známky");

„Majetek"    znamená Budovu a Pozemky;

„Nájemní smlouva s KO"    znamená nájemní smlouvu, kterou uzavřou SPV KN a KO k Datu uzavření, jejíž znění je součástí této Smlouvy jako Příloha 5;

„Nepříznivý důsledek"    znamená jakýkoli Závazek, ztrátu, škodu (včetně náhodných a následných škod), nárok, náklad, nedostatek, snížení hodnoty či výdaj (včetně nákladů na šetření a právní obranu, pokut a odůvodněných soudních poplatků a odměn právním zástupcům) bez ohledu na to, zda se jedná o nárok třetí strany;

„Odškodňovaná osoba"    znamená Osobu, která má nárok na úpravu Kupní ceny za Akcie nebo odškodnění podle odstavce 8 2 nebo odstavce 8 3;

„Odškodňující osoba"    znamená Osobu povinnou uhradit úpravu Kupní ceny za Akcie nebo odškodnit Odškodňovanou osobu;

„Obchodní rejstřík"    znamená rejstřík údajů o společnostech vedený krajskými soudy v České republice;

„Obchodní zákoník"    znamená Obchodní zákoník České republiky, zákon č. 513/1991 Sb. ve znění pozdějších změn či doplňků;

„Odškodňovaná osoba Kotva"    je definováno v odstavci 8.3;

„Odškodňovaná osoba Markland"    je definováno v odstavci 8 2;

| | |
|---|---|
| „Ochranné známky KOTVA" | znamená společně ochrannou známku KOTVA I a ochrannou známku KOTVA II; |
| „Ochranná známka KOTVA I" | znamená soubor těchto ochranných známek: kombinovaná ochranná známka KOTVA, číslo zápisu 167478, zapsaná v rejstříku ochranných známek vedeném Úřadem průmyslového vlastnictví České republiky, a kombinovaná ochranná známka KOTVA, číslo zápisu 167478, zapsaná v rejstříku ochranných známek vedeném Úřadem průmyslového vlastnictví Slovenské republiky; |
| „Ochranná známka KOTVA II" | znamená soubor těchto ochranných známek: kombinovaná a slovní ochranná známka KOTVA, společností Kotva již používaná, avšak dosud neregistrovaná jménem společnosti Kotva u Úřadu průmyslového vlastnictví České republiky, o jejíž zápis společnost Kotva požádala přihláškami č. 355 884 a č. 355 885, obě podány u Úřadu průmyslového vlastnictví České republiky 1 července 2004 s právem přednosti ode dne 1 července 2004. Ochranná známka KOTVA II je dále specifikována ve znaleckém posudku ze dne 10. července 2004, který je připojen ke Smlouvě jako Příloha 10; |
| „Orgán" | znamená jakýkoliv: |

(g)   celostátní, krajský, městský, obecní nebo okresní orgán či orgán s jinou působností státní správy;

(h)   federální, národní, místní, městský, zahraniční či jiný orgán státní správy nebo samosprávy;

(i)   rozpočtovou nebo příspěvkovou organizaci jakékoli povahy (včetně státních organizací, složek, ministerstev nebo jiných subjektů a veškerých soudů či jiných tribunálů);

(j)   nadnárodní organizaci zřízenou podle mezinárodního práva;

(k)   orgán, jenž vykonává nebo má právo vykonávat správní, výkonnou, soudní, zákonodárnou, politickou, regulační či daňovou pravomoc jakéhokoli druhu, nebo

(l)   úřední osobu jakéhokoli výše zmíněného orgánu.

| | |
|---|---|
| „Organizační dokumenty" | znamenají jakoukoli zakládající listinu, společenskou smlouvu, stanovy, vnitřní předpisy, osvědčení, prohlášení, statut nebo podobný dokument přijatý, podaný či zapsaný v souvislosti s vytvořením, založením či uspořádáním daného subjektu, jakož i jakoukoli Smlouvu mezi akcionáři, společníky či členy daného subjektu; |
| „Osoba" | znamená fyzickou osobu nebo právnickou osobu včetně družstev, akciových společností, společností s ručením omezeným, obchodních společností, nadací, sdružení či jakýchkoli jiných subjektů s právní subjektivitou odlišenou od právní subjektivity svých akcionářů nebo členů; |
| „Podnikání" | znamená pronájem nebytových prostor v Budově nebo pronájem Majetku třetím osobám jako nájemcům a poskytování souvisejících služeb; |

„Pozemky"          znamená soubor parcel zapsaných na LV č 265, katastrální území Staré Město, obec Praha, vedeném katastrálním úřadem pro hl město Prahu, který zahrnuje: parc č 680 – zastavěná plocha a nádvoří, parc č 683/1 – ostatní plocha, parc č 683/2 – ostatní plocha, parc č 683/3 – ostatní plocha, parc č 690/2 – ostatní plocha, parc č 690/3 – ostatní plocha, parc č 690/4 – ostatní plocha, a parc č 1018/2 – zastavěná plocha a nádvoří Kopie výpisu z katastru nemovitostí je součástí této Smlouvy jako Příloha 4;

„Pracovní den"      znamená jakýkoli jiný den než den pracovního klidu nebo státem uznaný svátek či den pracovního volna podle zákonů České republiky, Rakouské republiky nebo Irské republiky nebo den, kdy Správce vázaného účtu nebo banka Kupujícího nemá úřední hodiny;

„Právní audit"      znamená proces, během něhož společnost Kotva a skupina KAS poskytli společnosti Markland požadované údaje a informace a poskytli Kupujícímu veškerou součinnost nezbytnou k tomu, aby mohl určit právní postavení a stav Majetku a společností Kotva a KAS, SPV KN a SPV CO;

„Právní předpis"    Jakýkoli platný právní předpis vydaný jakýmkoliv Orgánem;

„Propojená osoba"   znamená ve vztahu k určité Osobě jinou Osobu přímo či nepřímo ovládající takovou Osobu nebo Osobu takovou Osobou ovládanou nebo Osobu, která je s takovou Osobou společně ovládána, ve vztahu k fyzické osobě znamená každou jinou fyzickou osobu, která je členem rodiny této fyzické osoby (na základě pokrevního příbuzenství, manželství či osvojení), člena domácnosti této fyzické osoby, subjekt, na jehož řízení se taková osoba podílí, nebo zaměstnance nebo zaměstnavatele takové osoby Pro účely této definice „ovládat" znamená stav, kdy Osoba (nebo Osoby jednající ve shodě) získá nebo se zaváže získat nebo má možnost získat přímou či nepřímou kontrolu nad: (a) záležitostmi této Osoby, nebo (b) více než 50 % všech hlasovacích práv spojených se všemi akciemi této Osoby, která jsou běžně vykonatelná na valné hromadě, nebo (c)

                    složením představenstva Osoby Pro tento účel se „Osobami jednajícími ve shodě" rozumějí Osoby, které aktivně spolupracují na základě smlouvy nebo dohody (formální či neformální) na záměru získat nebo posílit nebo vykonávat kontrolu nad touto Osobou;

„Převodní listina"  znamená smlouvu o koupi Akcií, která bude uzavřena mezi Prodávajícím a Kupujícím, na jejímž základě dojde k převodu vlastnického práva k Akciím na Kupujícího;

„Příkaz"            znamená jakýkoli zveřejněný a veřejně dostupný příkaz, nařízení, rozsudek, nález, výměr či rozhodčí nález jakéhokoli Orgánu či rozhodce;

„Řízení"  znamená jakékoli jednání, arbitráž, audit, zkoumání, šetření, slyšení, soudní spor či proces (ať již povahy občanské, trestní, správní, soudní nebo vyšetřovací, formální či neformální, veřejnoprávní či soukromoprávní), které započne nebo vykonává anebo na němž se jinak podílí jakýkoli Orgán nebo rozhodce;

„Seznam nájemců"  znamená aktuální seznam nájemců k datu podpisu této Smlouvy, který věrně a přesně zachycuje existující nájemní vztahy v souvislosti s nebytovými prostory v Budově, jehož kopie tvoří Přílohu 6;

„Skupina KAS  znamená společnost KAS a další obchodní společnosti, všechny společně nebo každou z nich jednotlivě, ovládané a kontrolované z jednoho ústředí společností KAS podle § 66a odst 7 Obchodního zákoníku;

„Smlouva"  znamená jakoukoli smlouvu, dohodu, závazek, ujednání, nájem, licenci, koncesi, záruku, garanci, hypotéku, dlužní úpis, obligaci či jiný nástroj nebo konsensuální závazek (ať již písemný či ústní, výslovný či konkludentní), který je právně závazný;

„Smlouva o vázaném účtu"  znamená smlouvu o vázaném účtu uzavřenou mezi Prodávajícím, Kupujícím, společností Kotva a Správcem vázaného účtu ve znění pozdějších změn či doplňků;

„Správce vázaného účtu"  ███████████████████████████████████████████

„Souhlas"  znamená jakékoli schválení, shodu, ratifikaci, vzdání se práva nebo jiný zánik práva na odmítnutí souhlasu nebo jiné schválení, poskytnuté Orgánem nebo jinou Osobou;

„Účetní závěrka"  znamená auditovanou účetní závěrku SPV KN k Datu uzavření;

„Úřední povolení"  znamená jakýkoli souhlas, povolení, svolení nebo registraci vydanou, udělenou či jinak poskytnutou jakýmkoli Orgánem či z jeho moci nebo podle jakéhokoli Právního předpisu, včetně rozhodnutí soudu nebo jiného orgánu o registraci právnické osoby a rozhodnutí katastrálního úřadu o zápisu do katastru nemovitostí;

„Ustavení SPV"  znamená splnění podmínek specifikovaných v článku 3.1;

„Uzavření"  znamená předání Akcií Prodávajícím Kupujícímu prostřednictvím Správce vázaného účtu za podmínek stanovených v této smlouvě;

„Vázaný účet"  Znamená vázaný účet zřízený pro usnadnění transakce prováděné podle této Smlouvy;

„Vypořádání Gilroy"  znamená získání konečného a pravomocného rozhodnutí ve věci Žaloby Gilroy; pro účely této Smlouvy se za takové konečné a pravomocné rozhodnutí považuje také konečný smír (narovnání) mezi stranami ve věci Žaloby Gilroy schválený soudem nebo zpětvzetí Žaloby Gilroy;

„Vyšší moc"          znamená událost, která nastala nezávisle na vůli Smluvních stran a způsobila porušení povinností podle této Smlouvy jednou ze Smluvních stran, jestliže Smluvní strana, která tuto Smlouvu porušila, nemohla takové události nebo porušení této Smlouvy zabránit přes veškerou snahu a péči, které lze od takové Smluvní strany rozumně požadovat

Vyšší moc znamená zejména:

(a)     přírodní pohromu;

(b)     válku, válečný stav, invazi, mobilizaci nebo embargo;

(c)     povstání, revoluci, vzpouru, vojenský režim nebo občanskou válku;

(d)     radioaktivní zamoření z jaderného zařízení nebo jiné nebezpečné částí výbušného jaderného zařízení nebo části takového zařízení;

(e)     objevení archeologických nálezů, zkamenělin, mincí, vzácných předmětů a starožitností atd ;

(f)     teroristický útok; a

(g)     jakékoli jednání úřadu státní správy nebo registračního úřadu, v jehož důsledku se nezávisle na vůli společností Kotva zpozdí převod/vklad Akcií a Ochranných známek KOTVA Prodávajícímu

Za Vyšší moc se nepovažují:

(h)     nepříznivé povětrnostní podmínky;

(i)     události, které byly společnosti Kotva nebo Prodávajícímu nebo společnosti Markland nebo Kupujícímu známy před podpisem této Smlouvy;

(j)     jakékoli změny Právních předpisů a technických norem;

(k)     jakékoli nové Právní předpisy nebo technické normy;

„Zádržné"          znamená peníze zadržené na Vázaném účtu po Uzavření podle článku 5.6.4;

„Zákonný požadavek"          znamená jakýkoli platný a zákonný požadavek jakéhokoli Orgánu;

„Záloha"          znamená částku 157 500.000 Kč (sto padesát sedm milionů pět set tisíc korun českých), která již byla převedena Správci vázaného účtu společností Markland jménem Kupujícího;

„Zamýšlené transakce"          znamenají transakce, jež mají být provedeny v souladu s touto Smlouvou, včetně koupě a prodeje Akcií a plnění ostatních závazků podle této Smlouvy Smluvními stranami;

„Zástupce"          znamená ve vztahu k určité Osobě člena představenstva, vedoucího pracovníka, pověřeného pracovníka, zaměstnance, konzultanta, zmocněnce, poradce, právního poradce, účetního či jiného zástupce dané Osoby;

| | |
|---|---|
| „Zatížení" | znamená jakékoli zatížení, nárok, hypotéku, věcné břemeno, právo průchodu, spoluvlastnické nebo jiné podstatné majetkové právo, závazek, oprávnění, zadržovací právo, opci, zástavu, právo ze zajištění, přednost, prioritu, předkupní právo nebo jiné podobné právo třetích osob či omezení; |
| „Závazky" | zahrnují závazky či povinnosti jakékoli povahy, ať již známé či neznámé, obsolentní, vzniklé, podmíněné nebo jiné, ať již splatné nebo zatím nesplatně, prekludované nebo promlčené, a to bez ohledu na to, zda je předepsáno jejich uvedení ve finančním výkazu; pojem „Závazek" bude vykládán obdobně; |
| „Znalost" | znamená znalost informací týkajících se této Smlouvy o jakékoli záležitosti, skutečnosti nebo Osobě, které jsou známé kterékoli Osobě; |
| „Změna kontroly" | znamená, že: (a) KAS nebo Kotva přestane přímo či nepřímo ovládat Prodávajícího, nebo (b) KAS přestane ovládat SPV KN nebo Kotvu či KO před Datem uzavření; a |
| „Žaloba Gilroy" | znamená žalobu, kterou společnost Gilroy podala 30 června 2004 u Obvodního soudu pro Prahu 1 a jejíž kopie je přiložena k této smlouvě jako Příloha 9 |

## 2   Dohoda o nahrazení stávajících závazků mezi některými Smluvními stranami novými závazky mezi všemi Smluvními stranami

2.1   Smluvní strany se tímto dohodly, v souladu s ust  § 570 zákona č 40/1964 Sb Občanského zákoníku ve znění pozdějších předpisů, že jejich vzájemné závazky vzniklé ze Smlouvy o koupi akcií uzavřené dne 20 ledna 2004 (dále jen „Dosavadní Smlouva o koupi akcií ") mezi společnostmi Kotva a Markland, budou nahrazeny v celém svém rozsahu závazky, které jsou obsaženy v této Smlouvě

2.2   Aby se předešlo veškerým pochybnostem, je dohodnuto, že Dosavadní Smlouva o koupi akcií bude ukončena v celém svém rozsahu v okamžiku, kdy tato Smlouva vstoupí v platnost, takže tato Smlouva nahradí Dosavadní Smlouvu o koupi akcií v celém jejím rozsahu.

2.3   Smluvní strany tímto souhlasí s přistoupením Prodávajícího, SPV KN, KAS, KO a Kupujícího k této Smlouvě a Prodávající, SPV KN, KAS, KO a Kupující potvrzují podepsáním této Smlouvy, že přistupují k této Smlouvě.

2.4   Aby se předešlo veškerým pochybnostem, je dohodnuto, že ukončení Dosavadní Smlouvy o koupi akcií a její nahrazení touto Smlouvou, jak je zde stanoveno, nedává vzniknout nároku na vrácení jakéhokoli plnění, jež bylo poskytnuto ještě podle Dosavadní Smlouvy o koupi akcií.

2.5   Jestliže to povaha práv a povinností dle této Smlouvy umožňuje, práva a povinnosti Prodávajícího podle této Smlouvy může vykonávat a plnit společnost Kotva a práva a povinnosti Kupujícího podle této Smlouvy může vykonávat a plnit společnost Markland.

2.6   Prodávající a Kotva jsou společně a nerozdílně odpovědni za splnění svých závazků vyplývajících z této Smlouvy. Kotva, KAS a KO společně a nerozdílně ručí za

splnění závazků Prodávajícím a Kotvy vyplývajících z této Smlouvy. Kupující a Markland jsou společně a nerozdílně odpovědni za splnění svých závazků vyplývajících z této Smlouvy

2.7    Prodávající a Kupující a Kotva a Markland vyvinou maximální úsilí k tomu, aby uzavřeli do 20 pracovních dnů ode dne podpisu této Smlouvy dodatek ke Smlouvě o vázaném účtu, aby umožnily Správci vázaného účtu vykonávat jeho úkoly v souladu s podmínkami této Smlouvy

## 3    Vstupní povinnosti

Vstupní povinnosti jsou následující:

3.1    Povinnosti Prodávajícího – zajištění Ustavení SPV:

3.1.1    Prodávající je povinen zajistit platný, zákonný a účinný převod nebo vklad Akcií a Ochranných známek KOTVA do Prodávajícího prostřednictvím nepeněžitého vkladu do Prodávajícího učiněný společností Kotva, přijatelný pro přiměřeně jednajícího Kupujícího, což za daných okolností znamená obstarání jasného právního stanoviska Prodávajícím, které potvrdí platný a účinný převod či vklad Akcií a Ochranných známek KOTVA do Prodávajícího prostřednictvím nepeněžitého vkladu společnosti Kotva do Prodávajícího. Takové právní stanovisko musí rovněž obsahovat potvrzení, že Prodávající je plně a právoplatně oprávněn prodat Akcie a Ochranné známky KOTVA Kupujícímu; a

3.1.2    Prodávající je povinen zajistit podání přihlášek k registraci vkladu Ochranných známek KOTVA do Prodávajícího na Úřadech průmyslového vlastnictví České republiky a Slovenské republiky ve formě přijatelné pro přiměřeně jednajícího Kupujícího

3.2    Povinnost Kupujícího – Právní stanovisko

3.2.1    Kupující v co možná nejkratší době po uzavření této Smlouvy, nejpozději pak do 31 ledna 2005, zajistí, aby se jeho právní zástupci dohodli s právními zástupci banky Kupujícího na právním stanovisku ve věci vlastnictví Majetku společností SPV KN a vlastnictví Akcií společnosti SPV CO tak, aby banka Kupujícího mohla potvrdit, že je připravena poskytnout financování níže popsaných transakcí;

3.3    Splnění vstupních povinností

3.3.1    Strana, která splní jakoukoli povinnost specifikovanou v článku 3 1 nebo článku 3.2 oznámí splnění takové povinnosti druhé straně do pěti Pracovních dní

3.4    Nesplnění vstupních povinností

3.4.1    V případě, že Kotva nesplní vstupní povinnosti specifikované v článku 3.1 do 31 ledna 2005, jsou Kupující a Markland oprávněni od této Smlouvy odstoupit písemným oznámením odeslaným kterýmkoliv z nich společnosti KOTVA a Prodávajícímu. Odstoupení poté nabude účinnosti pět Pracovních dní ode dne jeho doručení. Markland bude mít poté nárok na okamžité vrácení Zálohy spolu s veškerými úroky k ní přirostlými a dále na

smluvní pokutu .účí Kotvě ve výší 15.750 000 Kč (patnáct milionů sedm set padesát tisíc korun českých), přičemž k její úhradě bude v první řadě použito Jistoty

3.4.2    V případě, že Kupující nesplní vstupní podmínku specifikovanou v článku 3.2 1 do 31 ledna 2005, jsou Prodávající a Kotva oprávněni od této Smlouvy odstoupit písemným oznámením odeslaným kterýmkoliv z nich Kupujícímu a společnosti Markland Odstoupení poté nabude účinnosti pět Pracovních dní ode dne jeho doručení Prodávající bude mít poté nárok na smluvní pokutu, vůčí Kupujícímu ve výší 15 750 000 Kč (patnáct milionů sedm set padesát tisíc korun českých), přičemž k její úhradě bude v první řadě použito Zálohy Zůstatek Zálohy bude po zaplacení smluvní pokuty vrácen Kupujícímu.

# 4    SPV KN od založení do Uzavření

### 4.1    Představenstvo SPV KN

4.1.1    Kotva je oprávněna jmenovat nového člena představenstva SPV KN nebo odvolat některého dosavadního člena představenstva pouze s předchozím písemným souhlasem Kupujícího.

4.1.2    Kotva se dále zavazuje, že členové představenstva SPV KN nebo jiní vedoucí SPV KN nebudou činit jiné úkony než ukony v rámci Běžného obchodního styku a obstarají si před přijetím jakéhokoliv neprovozního rozhodnutí nebo série souvisejících rozhodnutí v hodnotě přesahující 157.500 Kč (sto padesát sedm tisíc pět set korun českých) nejprve písemný souhlas Kupujícího, vyjma situací, kdy tato Smlouva stanoví jinak.

4.1 3    Kotva anebo Prodávající (poté, co se stane většinovým akcionářem SPV KN) se zavazují zajistit, aby představenstvo SPV KN dodržovalo a plnilo povinností a závazky stanovené v článku 6, a pro vyloučení pochybností se Strany dohodly, že jakékoli porušení těchto povinností a závazků představenstvem SPV KN, které je způsobilé vyvolat Nepříznivý důsledek pro SPV KN a/nebo Kupujícího a/nebo Markland ve výší přesahující 31.500 Kč (třícet jeden tisíc pět set korun českých), bude považováno za závažné porušení této Smlouvy ze strany Prodávajícího, jež bude Kupujícího opravňovat k odstoupení od této Smlouvy podle článku 10 (při dodržení lhůty stanovené v odstavci 8.5).

### 4.2    Dozorčí rada SPV KN

4.2.1    Kotva může jmenovat nového člena dozorčí rady SPV KN nebo odvolat některého dosavadního člena dozorčí rady pouze s předchozím písemným souhlasem Kupujícího.

# 5    Prodej a převod Akcií a Ochranných známek KOTVA; Uzavření

### 5.1    Převod Akcií

5.1.1    Za podmínek této Smlouvy se Prodávající a Kupující zavazují, do pětí (5) Pracovních dnů po zaplacení Kupní ceny na Vázaný účet v souladu s odstavcem 5 3, uzavřít Převodní listinu a Prodávající se zavazuje prodat

Akcie a převést vlastnické právo k Akciím na Kupujícího, Prodávající a Kupující se zavazují dát pokyn Správci vázaného účtu k okamžitému uvolnění těchto Akcií Kupujícímu a Kupující se zavazuje koupit Akcie od Prodávajícího a zaplatit za Akcie Kupní cenu za Akcie

5.1.2    Podmínky této Smlouvy, které nebudou výslovně uvedeny v Převodní listině, se budou vztahovat i na převod Akcií na základě Převodní listiny, jako kdyby byly v Převodní listině výslovně uvedeny

## 5.2    Převod Ochranných známek KOTVA

5.2.1    Za podmínek této Smlouvy se Prodávající zavazuje, že do pěti (5) Pracovních dnů po zaplacení Kupní ceny na Vázaný účet v souladu s odstavcem 5 3, uzavře Prodávající s SPV KN nebo Kupujícím (rozhodnutí o této osobě je plně v kompetenci kupujícího za předpokladu, že tímto rozhodnutím nevznikne Prodávajícímu jakákoli ujma) dohody o převodu Ochranných známek KOTVA ve formě odsouhlasené Kupujícím jednajícím přiměřeně a Prodávající se zavazuje prodat a převést Ochranné známky KOTVA na SPV KN nebo na Kupujícího a Kupující se zavazuje, že:

(i)    zajistí, aby SPV KN nebo Kupující koupil Ochranné známky KOTVA; a

(ii)    zaplatí jménem a na účet SPV KN nebo jménem svým a na svůj účet Kupní cenu Ochranných známek

5.2.2    SPV KN se tímto zavazuje k podepsání jakýchkoli dokumentů, které budou nutné k účinnosti dohod o převodu Ochranných známek KOTVA specifikovaných v článku 5 2 1 výše

5.2.3    Podmínky této Smlouvy, které nebudou výslovně uvedeny v dohodách o převodu Ochranných známek KOTVA, se budou vztahovat i na převod Ochranných známek KOTVA na základě dohod o převodu Ochranných známek KOTVA, jako kdyby byly v dohodách o převodu Ochranných známek KOTVA výslovně uvedeny

5.2.4    Pro případ, že Kupující rozhodne o převodu Ochranných známek KOTVA na SPV KN dle ustanovení 5 2.1 a v důsledku tohoto rozhodnutí dojde přímo či zprostředkovaně k porušení jakéhokoli ustanovení této Smlouvy, nemůže se Markland nebo Kupující domáhat práv, která by mu jinak v důsledku takového porušení příslušela

## 5.3    Záloha a Kupní cena

5.3.1    Záloha poukázaná na Vázaný účet tvoří část Kupní ceny

5.3.2    Do 20 Pracovních dnů od obdržení oznámení o splnění poslední vstupní povinnosti Kupujícím, Kupující poukáže na Vázaný účet částku CZK 1.363 950 000 (jedna miliarda tři sta šedesát tři miliony devět set padesát tisíc korun českých), která představuje zůstatek Kupní ceny V případě, že k datu platby zůstatku Kupní ceny byla Záloha nebo její část použita na vyrovnání pohledávky Prodávajícího podle této Smlouvy (kromě pohledávky na zaplacení Kupní ceny), je Kupující povinen dorovnat Kupní cenu tak, aby částka složená Kupujícím (včetně Zálohy) představovala částku Kupní ceny

KC 1-2075

5.3.3  V případě, že Kupující nesloží na Vázaný účet částku(y) jak je uvedeno v odstavci 5.3 2, zaplatí Kupující Prodávajícímu smluvní pokutu ve výši 157 500 000 Kč (sto padesát sedm milionů pět set tisíc korun českých) formou propadnutí Zálohy, která bude vyplacena Prodávajícímu do pěti (5) Pracovních dní od porušení tohoto závazku Uhradou této smluvní pokuty Prodávajícímu je tato Smlouva okamžitě zrušena.

5.3.4  Jestliže následně po Uzavření:

    (i)  bude zjištěno porušení některého prohlášení, záruky či závazku Prodávajícího nebo Společnosti Kotva, které nastalo před Uzavřením; a

    (ii)  charakter tohoto porušení je takový, že Kupujícího opravňuje k náhradě (ve formě snížení Kupní ceny za Akcie či náhrady škody) v souladu s podmínkami této Smlouvy,

pak se Smluvní strany obrátí na rozhodčí soud v souladu odstavcem 11 12 této Smlouvy aby stanovil, zda podmínky (i) a (ii) tohoto odstavce 5 3 4 byly splněny, a pokud toto bude v rozhodčím nálezu zjištěno, Kupující bude oprávněn čerpat z Vázaného účtu částky odpovídající Nepříznivému důsledku takto stanovené Prodávající bude povinen doplnit Vázaný účet o částku vybranou z důvodu porušení této Smlouvy do 20 Pracovních dnů od jejího čerpání Kupujícím a Vázaný účet takto doplňovat do doby, než veškeré peníze uložené na Vázaném účtu budou uvolněny v souladu se Smlouvou o Vázaném účtu

5.4  Ukony před Uzavřením

5.4.1  Kotva a Prodávající budou v plném rozsahu spolupracovat s Marklandem a Kupujícím, součástí této spolupráce bude zejména právo společností Markland a/nebo Kupujícího:

    (i)  dostat na požádání kteréhokoliv z nich veškeré informace poskytnuté členům představenstva SPV KN a Prodávajícího;

    (ii)  učastnit se jednání představenstva SPV KN a Prodávajícího, avšak bez hlasovacího práva, a

    (iii)  mít uplný přístup ke všem účetním knihám, záznamům a ostatní dokumentaci SPV KN a Prodávajícího, k nimž má obvykle přístup člen představenstva v souvislosti se všemi záležitostmi týkajícími se činností SPV KN a Prodávajícího mezi datem této Smlouvy a Datem uzavření

5.4.2  Během tohoto období Kotva anebo Prodávající zajistí, že ani SPV KN ani Prodávající bez předchozího písemného souhlasu společnosti Markland:

    (i)  neuzavřou smlouvu nebo nepřijmou závazek týkající se investičních výdajů přesahujících částku 157 500 Kč (sto padesát sedm tisíc pět set korun českých) ročně které nejsou v rámci Běžného obchodního styku;

    (ii)  neuzavřou nebo nezmění jakoukoli smlouvu nebo závazek, který není v rámci Běžného obchodního styku nebo který představuje

nebo by mohl představovat celková roční výdaje nebo příjem přesahující 500 000 Kč (pět set tisíc korun českých);

(iii)   nevypůjčí si další prostředky nebo nezvýší své zadlužení;

(iv)   pokud to nebude vyžadovat Právní předpis, nebudou měnit podmínky pracovního poměru (včetně veškerých odměn a jiných výhod) žádného zaměstnance, neposkytnou ani se nezaváží poskytnout takové osobě nebo osobám na ní závislých žádnou bezdůvodnou platbu nebo výhodu, nepropustí žádného zaměstnance ani nepřijmou či nejmenují dalšího zaměstnance;

(v)   nenabudou ani nedají souhlas k nabytí a neprodají ani se nezaváží dát na prodej žádný významný majetek nebo zásoby ani neuzavřou či nezmění žádnou podstatnou smlouvu nebo ujednání;

(vi)   nepodniknou kroky k tomu, aby zařídily platbu nebo úhradu jakéhokoli Závazku před datem, kdy jsou v souladu s běžnými obchodními podmínkami Prodávajícího účetní nebo jiné Závazky obvykle splatné, ani neprodlouží lhůtu splatnosti žádnému dlužníkovi;

(vii)   neopozdí zaplacení pohledávek z obchodního styku ve lhůtě, kdy by měla být v souladu s lhůtou splatnosti stanovenou příslušnými věřiteli příslušná pohledávka z obchodního styku uhrazena (nebo (pokud se liší) v dodatečné lhůtě k placení poskytnuté příslušnými věřiteli);

(viii)   nezmění podstatným způsobem žádné podmínky, za nichž je dodáváno zboží, zařízení nebo služby, jedná-li se o dodávky podstatné pro Podnikání, pokud tak nemusejí učinit, aby vyhověly určitému Zákonnému požadavku;

(ix)   neuzavřou smlouvu o záruce, odškodnění nebo jinou smlouvu na zajištění závazku třetí osoby ani nezatíží svá aktiva nebo podnik;

(x)   nepřidělí, nevydají, nesplatí nebo neodkoupí zpět žádný akciový kapitál SPV KN a/nebo Prodávajícího;

(xi)   neuzavřou žádnou smlouvu, v jejímž důsledku by došlo ke zmenšení nebo snížení hodnoty majetku SPV KN a/nebo Prodávajícího;

(xii)   nenabudou nebo se nezaváží nabýt obchodní podíl, akcie nebo jinou účast v jakékoli Osobě;

(xiii)   neschválí, neprovedou či nevyplatí žádnou dividendu nebo jinou výplatu akcionářům;

(xiv)   nezmění zásady činnosti nebo vnitřní předpisy SPV KN a/nebo Prodávajícího;

(xv)   nezmění Organizační dokumenty SPV KN nebo Prodávajícího; nebo

(xvi)  neuzavřou žádnou Smlouvu nebo ujednání s Propojenou osobou kromě těch, jež jsou v rámci Běžného obchodního styku nezbytné

5.4.3  Kotva a Prodávající dále zavazují ve vztahu k sobě a dále se zavazují zajistit, že do Uzavření každý z nich:

(i)  bude nadále provozovat podnikatelské aktivity, které mají vliv na Majetek, SPV KN nebo Prodávajícího, pouze v rámci Běžného obchodního styku, pokud Kupující písemně neschválí něco jiného;

(ii)  podnikne přiměřená opatření k zachování svého majetku a Úředních povolení;

(iii)  podnikne veškerá přiměřená opatření k zachování platnosti všech Smluv, jejichž je smluvní stranou a které mají vliv na Majetek, SPV KN nebo Prodávajícího

5.5  Uzavření

5.5.1  K Uzavření dojde do pěti (5) Pracovních dní po obdržení Kupní ceny Správcem vázaného účtu.

5.5.2  Prodávající předá prostřednictvím Správce vázaného účtu Akcie a ostatní dokumenty uvedené v odstavci 5.6 1 a na základě potvrzení o přijetí těchto Akcií a ostatních dokumentů Kupujícím se Uzavření této transakce považuje za uskutečněné  Vlastnické právo k Akciím včetně akcionářských práv přejdou Uzavřením na Kupujícího Kupní cena bude uhrazena prostřednictvím Správce vázaného účtu přes Vázaný účet.

5.6  Dokumenty předávané při Uzavření

5.6.1  Při Uzavření Prodávající předá Kupujícímu prostřednictvím Správce vázaného účtu dokumenty uvedené v odstavci (a), (b) a (c) níže a veškeré ostatní dokumenty uvedené níže předá osobně:

(a)  Akcie;

(b)  Převodní listinu;

(c)  předávací protokol o předání Akcií;

(d)  výpis z obchodního rejstříku společnosti SPV KN s datem dne Uzavření (faxová kopie se považuje za dostatečnou formu);

(e)  písemná odstoupení z funkce všech členů představenstva a dozorčí rady SPV KN a rozhodnutí jediného akcionáře SPV KN (popřípadě rozhodnutí dozorčí rady) potvrzující taková odstoupení ve formě přijatelné pro Kupujícího tak, aby odstoupení nabyla účinnosti k Datu Uzavření;

(f)  rozhodnutí jediného akcionáře (popřípadě dozorčí rady) o jmenování nových členů představenstva a dozorčí rady SPV KN nominovaných Kupujícím. Nominace nových členů budou Prodávajícímu oznámeny Kupujícím nejméně pět (5) Pracovních dní před Uzavřením  Rozhodnutí musí být ve formě přijatelné pro Kupujícího tak, aby jmenování byla účinná ke dni bezprostředně následujícímu po Datu Uzavření;

(g)     plné moci podepsané každým členem představenstva SPV KN, tak aby Kupujícímu bylo umožněno po Uzavření provést nezbytný zápis do (výmaz z) obchodního rejstříku;

(h)     všechny Organizační dokumenty SPV KN, včetně zejména zakladatelské listiny, stanov a všech návrhů týkajících se zápisu SPV KN do obchodního rejstříku a všech rozhodnutí rejstříkového soudu;

(i)     všechny nájemní smlouvy ve vztahu k Majetku;

(j)     veškeré nabývací listiny a dokumenty související s Majetkem;

(k)     všechny finanční a účetní knihy a záznamy a podání SPV KN do Uzavření;

(l)     veškeré další dokumenty týkající se SPV KN;

(m)     osvědčení vydané Prodávajícím a společností Kotva datované ke dni Uzavření potvrzující že: (i) veškerá prohlášení, záruky, povinnosti a závazky stanovené níže v článku 6 jsou splněny a jsou pravdivé a správné ve všech uvedených bodech k Datu Uzavření; a (ii) veškerá opatření, jejichž provedení bylo požadováno na společnosti Kotva, SPV KN a Prodávajícího k uskutečnění Uzavření, byla náležitě uskutečněna;

(n)     nájemní smlouvu KO řádně podepsanou za KO;

(o)     osvědčení podepsaná Prodávajícím a společností Kotva a jejich účetními potvrzující (v rozsahu, v jakém jsou k tomu oprávnění v souladu s českými Právními předpisy): (i) úspěšné splacení či zrušení veškerých finančních nebo jiných dlouhodobých dluhů nebo Závazků, společnosti SPV KN, Prodávajícího a společnosti Kotva, jež nepocházejí z Běžného obchodního styku, a které by měly vliv na SPV KN, Prodávajícího nebo na Majetek; a (ii) že dluhy a Závazky, finanční nebo jiné, společnosti Kotva a Prodávajícího vzniklé v rámci Běžného obchodního styku, které by měly vliv na SPV KN, Prodávajícího nebo na Majetek, činí méně než 500 000 Kč (pět set tisíc korun českých);

(p)     osvědčení podepsaná účetními SPV KN, kterými potvrzují jaké finanční nebo jiné dluhy a Závazky má SPV KN a že SPV KN nemá žádné jiné takové finanční nebo jiné dluhy a Závazky, s výjimkou běžných finančních nebo jiných dluhů a Závazků,

(q)     potvrzení o zániku pohledávky zajištěné Hypotékou J&T banky podepsané J&T bankou ve formě přijatelné pro Kupujícího, které umožní Kupujícímu zajistit výmaz zástavního práva zajišťujícího pohledávku zajištěnou Hypotékou J&T banky z Katastru nemovitostí,

(r)     seznam záloh (kaucí) zaplacených nájemníky tak, jak je evidován v účetnictví SPV KN, a který podrobně uvádí částky odvedené jednotlivými nájemníky jako zálohy kauce;

(s)     doklad, že Prodávající se zřekl a zrušil veškerá oprávnění a nároky na provádění transakcí s bankovními účty SPV KN (nebo, že takové účty byly zmrazeny do té doby než si Kupující obstará nezbytná pověření) zavazuje doplněné a vyplněné veškeré bankovní záznamy, bankovní údaje a nové zplnomocňující formuláře pro Kupujícího, a poskytne v tomto ohledu veškerou pomoc požadovanou bankami, aby zajistil řádné převedení účtů;

(t)     žádosti o registrace převodů Ochranných známek KOTVA z Kotvy na Prodávajícího potvrzené (orazítkované) Úřadem průmyslového vlastnictví České republiky, resp. Slovenské republiky; a

(u)     Dohody o převodu Ochranných známek KOTVA

5.6.2   Dokumenty uvedené výše v odstavci 5 6 1 předají Prodávající a Kotva Správci vázaného účtu nebo Kupujícímu do deseti (10) Pracovních dnů po dni doručení písemného oznámení, ohlašujícího Kupujícímu Ustavení SPV v souladu s odstavcem 5 3 2, a poté Prodávající a Kupující podepíší souhlasné prohlášení ve formě požadované Správcem vázaného účtu; jestliže někdo z nich nepodepíše takové prohlášení, jak Správce vázaného účtu požaduje (s výjimkou situace, kdy vznikne spor o přesném datu doručení konkrétního dokumentu), pak musí druhé straně zaplatit smluvní pokutu ve výši 157 500 000 Kč (sto padesát sedm milionů pět set tisíc korun českých).

5.6.3   Správce vázaného účtu uvolní následující částky z Vázaného účtu k okamžiku Uzavření:

(i)     Kupujícímu částku Kč 10 837 800 (deset milionů osm set třicet sedm tisíc osm set korun českých) představující tříměsíční nájemné a poplatek za služby, tak jak je určena v Nájemní smlouvě KO jako záloha na nájemné (kauce);

(ii)    za předpokladu, že pohledávka zajištěná Hypotékou J&T banky nebyla splacena a Prodávající o této skutečnosti podal Kupujícímu důkaz, který je pro Kupujícího přijatelný, uvolní Správce vázaného účtu J&T bance částku ve výši potřebné k úplnému splacení pohledávky a případných dalších nároků zajištěné Hypotékou J&T banky na základě dopisu obdrženého Správcem vázaného účtu od J&T Banky potvrzujícího, že takový obnos bude plným a konečným splněním pohledávky zajištěné hypotékou J&T banky a případných dalších nároků;

(iii)   Prodávajícímu Kupní cenu za Ochranné známky;

(iv)    Prodávajícímu částku 925 000.000 Kč (devět set dvacet pět miliónů korun českých), sníženou o částky vyplacené Kupujícímu podle odstavců 5 6 3 (i) výše a J&T bance podle odstavce (ii) výše a Prodávajícímu podle odstavce (iii) výše

5 6.4   Zbytek Kupní ceny za Akcie, tj. Zádržné ve výši 576 450.000 Kč (pět set sedmdesát šest miliónů čtyři sta padesát tisíc korun českých), bude zadrženo Správcem vázaného účtu do té doby, než dojde k Vypořádání Gilroy. Pokud dojde k Vypořádání Gilroy avšak dosud neuběhla lhůta 9

měsíců od Data uzavření nebo probíhají Řízení uvedená v odstavci 5 6 4 (i), je Správce vázaného účtu povinen uvolnit Prodávajícímu Zádržné snížené o částku 189 000 000 Kč (jedno sto osmdesát devět miliónů korun českých), kterou musí dále zadržovat na Vázaném účtu do té doby, než bude vydáno konečné a pravomocné rozhodnutí ohledně těchto Řízení nebo pokud taková Řízení nejsou, dokud neuběhne lhůta 9 měsíců od Data uzavření Pro vyloučení pochybností se stanoví, že konečným rozhodnutím se rozumí rovněž rozhodnutí soudu o zastavení řízení vydané na základě zpětvzetí žaloby

Správce vázaného účtu je během období držení Zádržného povinen vyplatit Kupujícímu na základě žádosti Kupujícího následující částky:

(i) v případě, že jakákoli Osoba dá během devíti měsíců po Datu Uzavření podnět k jakémukoli Řízení, jehož předmětem bude určení neplatnosti právních úkonů, na jejichž základě byl Majetek převeden nebo vložen do společnosti Kotva a/nebo do Prodávajícího, je Kupující jednostranně oprávněn čerpat vždy prvního dne každého čtvrtletí, tj. 1 ledna, 1 dubna, 1. července a 1 října, takové částky ze Zádržného, jaké jsou nezbytné pro plnou náhradu nákladů a výdajů na právní zástupce Kupujícího vynaložených na bránění práva SPV KN, Kupujícího či Marklandu v takových Řízeních. Tyto částky budou považovány za úpravu Kupní ceny za Akcie V případě, že soud přizná Kupujícímu náhradu takových nákladů, Kupující vrátí tyto částky Prodávajícímu, jakmile je Kupující obdrží od osoby povinné k jejich placení; takto vrácené částky budou taktéž považovány za úpravu Kupní ceny za Akcie.

(ii) Vždy prvního dne každého čtvrtletí, tj. 1. ledna, 1 dubna, 1 července a 1 října, takové částky ze Zádržného, jaké jsou nezbytné pro plnou náhradu nákladů a výdajů na právní zástupce Kupujícího vynaložených na obranu SPV KN v Řízení o Žalobě Gilroy; požadavek Kupujícího na uvolnění takovýchto částek ze Zádržného musejí být doloženy fakturou řádně vystavenou právními zástupci Kupujícího Veškeré částky vyplacené podle tohoto ustanovení 5.6 4 (ii) budou považovány za úpravu Kupní ceny za Akcie

(iii) V případě, že na základě jakéhokoliv Daňového Právního předpisu platného v období do dne Uzavření, vznikne společnosti Kotva nebo SPV KN Daňová povinnost (zejména Daň z převodu nemovitostí nebo DPH) v souvislosti s vkladem Majetku do SPV KN a společnosti Kotva, a SPV KN nebo Prodávající tak bude povinen zaplatit tuto Daň finančním úřadům, Kotva a Prodávající se zavazují nahradit SPV KN tuto Daň a veškeré odpovídající pokuty, úroky nebo jakékoli jiné finanční platby uložené finančními úřady SPV KN a částka odpovídající uvedené Dani bude zadržena na Vázaném účtu Správcem vázaného účtu a bude uvolněna Prodávajícímu pouze po Vypořádání Gilroy na základě předložení těchto dokumentů:

(a)  originálu nebo ověřené kopie výpisu z katastru nemovitostí, dokládajícího, že SPV KN je výlučným vlastníkem Majetku, který je prost jakýchkoli Zatížení; netýká se to Zatížení, která vzniknou poté, co dojde k Uzavření, nebo která zřídí Kupující,

(b)  originálu nebo ověřené kopie daňového přiznání k Dani z převodu nemovitostí vyplývající z vkladu Majetku do SPV KN a kopie znaleckého posudku, obojí opatřené razítkem finančního úřadu, potvrzující, že daňové přiznání, včetně znaleckého posudku, bylo řádně doručeno finančnímu úřadu, a

(c)  originálu potvrzení, vydaného příslušným finančním úřadem, potvrzujícího, že ani Kotva ani Prodávající nebo SPV KN nemají žádné Daňové nedoplatky na žádné Dani, zejména na Dani z převodu nemovitostí vyplývající z vkladu Majetku do SPV KN;

Přičemž jakékoli plnění podle tohoto odstavce 5.6.4 (ii) bude považováno za úpravu Kupní ceny za Akcie.

(iv)  V případě, že výše Zádržného poklesne pod částku 31 500 000 Kč (třicet jeden milión pět set tisíc korun českých), Prodávající a/nebo Kotva a/nebo KAS je povinen do dvaceti (20) Pracovních dnů od poklesu jejich výše pod 31.500.000 Kč (třicet jeden milión pět set tisíc korun českých) zajistit, aby byly na Vázaný účet poukázány dodatečné prostředky tak, aby bylo opět dosaženo výše nejméně 31.500.000 Kč (třicet jeden milión pět set tisíc korun českých).

(v)  Prodávající a Kupující dohodnou, že upraví Kupní cenu za Akcie a odečtou z Kupní ceny za Akcie a uvolní zpět Kupujícímu částku rovnající se polovině rozdílu mezi částkou Kč 177.250.000 (sto sedmdesát sedm miliónů dvě stě padesát tisíc korun českých ) a částkou odpovídající skutečným celoročním příjmům v souladu s věrným a přesným Seznamem nájemníků, jak existuje k Datu Uzavření ve vztahu k Majetku, vyjma Poplatku za služby. O této úpravě se Prodávající a Kupující musí dohodnout nejméně 2 Pracovní dny před Datem Uzavření.

(vi)  Pro vyloučení pochybností, částky uvedené v tomto odstavci 5.6.4 této Smlouvy mohou být uvolněny Kupujícímu na základě žádosti Kupujícího (přičemž taková žádost bude k jejich uvolnění dostačující) a budou uloženy na takový účet, jaký určí Kupující podle svého vlastního uvážení.

5.6.5  Jestliže podmínky stanovené touto Smlouvou nebo Smlouvou o vázaném účtu pro uvolnění prostředků z Vázaného účtu Prodávajícímu nebo Kupujícímu budou splněny (s výjimkou částek uvolňovaných podle odstavce 5.6.4), Prodávající či Kupující podepíše, na písemné vyzvání druhého z nich, společný pokyn nebo jiný dokument předpokládaný Smlouvou o vázaném účtu a předá jej druhé straně do pěti dnů od obdržení takové výzvy. Jestliže povinná strana řádně a včas nesplní tuto povinnost,

je povinna uhradit druhé Smluvní straně smluvní pokutu ve výši 157 500 000 Kč (sto padesát sedm miliónů pět set tisíc korun českých)

5.6.6    Kotva a Prodávající tímto potvrzují, že inventář a vybavení zůstanou v Budově i po Uzavření a stanou, pokud se již nestaly, majetkem SPV KN

## 6    Prohlášení, záruky, povinnosti a závazky společností KAS, Kotva a Prodávajícího

KAS, Kotva a Prodávající prohlašují a zaručují, že následující prohlášení a záruky obsažené v tomto článku 6 jsou pravdivá, správná a úplná k datu podpisu této Smlouvy a Kotva, Prodávající a KAS se zavazují zajistit aby byla pravdivá, správná a úplná po celou dobu účinnosti této Smlouvy a dále se zavazují dodržovat veškeré povinnosti a závazky obsažené v článku 6 po celou dobu účinnosti této Smlouvy až do Uzavření, a ve vztahu k jejich povinnostem a závazkům uvedeným v odstavci 6 5, po dobu pěti let následujících po Datu uzavření:

6.1    Obecné

(i)    Společnosti Kotva, SPV KN, Prodávajícího a KAS byly řádně založeny a vznikly podle příslušného práva, jemuž podléhají, tj  českého, českého, kyperského a českého, a jejich základní kapitál byl splacen u každé z nich v plné výši

(ii)    Na společnosti Kotva, SPV KN, Prodávajícího nebo KAS nebyl prohlášen konkurs a podle jejich nejlepšího Vědomí nikdo nepodal návrh na prohlášení konkursu

(iii)    Neexistuje žádné probíhající, zahajované nebo Hrozící Řízení vůči nebo ve vztahu ke společnostem Kotva, SPV KN nebo Prodávajícímu nebo KAS vyjma Žaloby Gilroy a Žaloby Balfindor, neexistuje žádná okolnost, záležitost nebo věc, která by mohla vyvolat ze strany společností Kotva nebo SPV KN nebo Prodávajícího nebo KAS nebo jejich akcionářů nebo třetí osoby takové Řízení anebo související šetření státních orgánů, a nebyl ani vůči společnostem Kotva nebo SPV KN nebo Prodávajícímu nebo KAS vydán příkaz, rozsudek, výnos, zákaz, rozhodnutí nebo Nařízení žádného soudu, Orgánu nebo rozhodce, které by způsobily, že tato Smlouva nebo v ní Zamýšlená transakce bude prohlášena za neplatnou, neúčinnou nebo relativně neplatnou.

(iv)    Společnosti Kotva, SPV KN, Prodávající a KAS ani jejich ředitelé a vedoucí se nedopustili žádného přestupku ani se nedopustili jednání, které by bylo v rozporu s příslušnými Právními předpisy a jež by mohlo mít za následek pokutu, penále, nesplnění povinnosti nebo zahájení Řízení nebo jinou odpovědnost, kvůli níž by tato Smlouva nebo v ní Zamýšlená transakce mohla být prohlášena za neplatnou, neúčinnou nebo relativně neplatnou

(v)    Společnosti Kotva, SPV KN, Prodávající a KAS dodržují a neporušili své Organizační dokumenty nebo jakoukoli licenci, Úřední povolení Smlouvu nebo jiný dokument, jehož jsou smluvní stranou nebo kterým jsou vázáni, ani neexistuje stav, který by po upozornění nebo uplynutí lhůty nebo po obojím představoval takové nedodržení nebo porušení, a všechny takové licence, Úřední povolení Smlouvy nebo jiné dokumenty jsou platné a

v řádném stavu a Kotva, SPV KN, Prodávající a KAS mají nárok na všechna plnění a oprávnění z nich; společnosti Kotva, SPV KN, Prodávající a KAS si nejsou vědomy žádného z výše uvedených pochybení, které by způsobilo, že tato Smlouva nebo v ní Zamýšlená transakce bude prohlášena za neplatnou, neúčinnou nebo relativně neplatnou

(vi)    Kotva, SPV KN a KAS jsou Daňovými rezidenty pouze v České republice a zůstanou jimi (pokud budou pod kontrolou Skupiny KAS) nejméně po dobu pěti let od Data uzavření a Kotva ani SPV KN ani KAS nemají žádné skutečné nebo podmíněné Daňové Závazky v jiných jurisdikcích kromě České republiky

(vii)   Prodávající je Daňovým rezidentem na Kypru

(viii)  Společenstevní dokumenty předané Marklandu v průběhu Právního auditu obsahují úplné a přesné záznamy všech zápisů z vykonaných jednání a všech usnesení přijatých společností Kotva a na valných hromadách SPV KN od jejího vzniku a Kotva ani KAS si nejsou vědomy, že by některý z těchto dokumentů mohl způsobit neplatnost nebo neúčinnost této Smlouvy nebo v ní Zamýšlené transakce

(ix)    Kotva a Prodávající předali Kupujícímu a/nebo Marklandu veškeré úplné a přesné záznamy všech zápisů z vykonaných jednání a všech usnesení přijatých společností SPV KN od jejího založení

(x)     Účetní knihy a záznamy společností Kotva a SPV KN ve všech podstatných ohledech pravdivě a řádně zachycují a zobrazují finanční stav Podnikání společnosti Kotva a všechny podstatné finanční transakce týkající se Podnikání byly v těchto účetních knihách a záznamech přesně zaznamenány od jejich založení a Kotva si není vědoma žádného pochybení ve výše uvedených záležitostech

(xi)    Společnosti Kotva, SPV KN, Prodávající ani KAS nejsou smluvními stranami žádné platné písemné nebo ústní Smlouvy nebo jiného dokumentu, podle jehož podmínek by plnění této Smlouvy Prodávajícím vedlo k porušení nějakého závazku nebo by mohlo zakládat důvod pro ukončení nebo neplatnost této Smlouvy nebo v ní Zamýšlených transakcí, nebo který by mohl zabránit společnostem Kotva, SPV KN nebo Prodávajícímu nebo KAS plnit jejich závazky podle této Smlouvy

(xii)   Pokud jde o Majetek, SPV KN nepodepíše žádnou novou nájemní smlouvu bez předchozího písemného souhlasu Kupujícího, který takový souhlas bezdůvodně neodepře ani neodloží. Pokud Kupující na takovou žádost do 10 Pracovních dnů od jejího doručení neodpoví, bude to považováno za souhlas s podpisem nové nájemní smlouvy

(xiii)  Prodávající, SPV KN a Kotva neprodlouží ani se nezaváží prodloužit žádnou stávající nájemní smlouvu bez předchozího písemného souhlasu Kupujícího, který takový souhlas bezdůvodně neodepře ani neodloží Pokud Kupující na takovou žádost do 10 Pracovních dnů od jejího doručení neodpoví, bude to považováno za souhlas s prodloužením stávající nájemní smlouvy.

(xiv)  Veškeré Souhlasy nezbytné k plnění závazků společností Kotva, SPV KN, Prodávajícího nebo KAS provést Ustavení SPV a dokončit transakce, Zamýšlené touto Smlouvou poskytne Prodávající, SPV KN nebo Kotva Kupujícímu co nejdříve, jakmile budou k dispozici

(xv)  Kotva a/nebo SPV KN umožní Osobě, kterou určí Markland nebo Kupující, sledovat běžné každodenní řízení Majetku, jímž se pro vyloučení pochybností, se rozumí vnitřní řízení obchodního domu Kotva vedoucím pracovníkem pro maloobchod přítomným na místě Kotva a/nebo SPV KN se zavazují poskytnout pomoc, radu a veškeré informace nezbytné k tomu, aby se tato Osoba mohla efektivně seznámit se současnou strukturou řízení Majetku.

(xvi)  Ve vztahu k osobám, které Kotva nebo Prodávající v současné době zaměstnává, neexistují žádné písemné pracovní, mandátní, poradenské nebo podobné Smlouvy se žádným zaměstnancem, členem představenstva nebo poradcem společnosti Kotva nebo Prodávajícího, které mají být převedeny na Kupujícího nebo SPV KN ke dni Uzavření buďto na základě Právního předpisu, nebo na základě některého ustanovení obsaženého v takových pracovních smlouvách Kotva nebo Prodávající zůstanou plně zodpovědnými za všechny nároky na odstupné při výpovědi z důvodu nadbytečnosti nebo za stanovené ochrany pracovníků a za každý přímý či nepřímý závazek vyplývající z nespravedlivého nebo neoprávněného propuštění jakéhokoli zaměstnance a v plném rozsahu a účinně odškodní a budou pokračovat v odškodňování Kupujícího v souvislosti s veškerými náklady nebo výdaji, které mohou v důsledku toho vzniknout.

(xvii)  Prodávající a Kotva se zavazují zajistit, že ve vztahu k SPV KN uzavření nebo plnění této Smlouvy přímo či nepřímo nepovede či nepřispěje k zániku či znemožnění využití jakékoli Daňové výhody nebo úlevy (ve formě odpočtu, snížení, započtení, výjimky, slevy nebo v jiné formě) týkající se jakékoli Daně, která by mohla být účinně snížena, zrušena, odložena, omezena nebo prominuta se anebo by mohla jinak zaniknout v důsledku uzavření nebo plnění této Smlouvy

(xviii)  K Datu Uzavření nebudou SPV KN ani Prodávající společně ani nerozdílně odpovídat za žádnou nesplněnou Daňovou povinnost vzniklou na základě smlouvy nebo způsobenou či splatnou jakoukoli Osobou jakožto nabyvatelem nebo právním nástupcem nebo vzniklou jiným způsobem

(xix)  Pokud se týká SPV KN a/nebo Prodávajícího, v Účetní závěrce byly v plném rozsahu zaúčtovány veškeré Daňové závazky nebo v plném rozsahu vytvořeny rezervy na veškeré Daně, které mají být vyměřeny nebo za které SPV KN je nebo se může stát odpovědnou V Účetní závěrce bylo zaúčtováno řádné splacení, rezerva nebo závazek na odloženou Daň

(xx)  Ve vztahu k SPV KN a Prodávajícímu nevznikne ani nebude dosažen žádný příjem nebo výnos (vypočtený pro Daňové účely) v důsledku zrušení rezerv, které byly při výpočtu zisku (daňového základu) nebo daňové ztráty odečitatelné v dalších obdobích (vypočtené pro Daňové účely) účtovány jako odpočty nebo náklady pro Daňové účely, s výjimkou příjmu, proti

němuž mohou být započteny odpovídající výdaje uznatelné jako odpočty nebo náklady pro Daňové účely při výpočtu zisku (daňového základu) nebo daňové ztráty odečítatelné v dalších obdobích (vypočtené pro Daňové účely) (např. odpis pohledávky nebo výdajů vzniklých při opravě hmotných aktiv)

(xxi) Kotva zajistí, že k Datu uzavření budou všechny účty, účetní knihy a záznamy SPV KN a Prodávající obsahovat úplné, řádné a přesné aktuální údaje od okamžiku vzniku každého subjektu a budou uloženy na místě a v podobě, která bude v souladu s obchodním zákoníkem a všemi příslušnými Právními předpisy České republiky Veškeré účty, dokumenty, zprávy a přiznání, které musejí být podle Právních předpisů zaslány nebo předloženy jakémukoliv Orgánu, zástupci SPV KN a Prodávajícího řádně a správně odešlou nebo předloží a budou též doručeny Kupujícímu

(xxii) Kotva zajistí, že k Datu uzavření nebudou SPV KN ani Prodávající mít žádné neuhrazené nebo neznámé Daně, které vznikly do Data uzavření včetně SPV KN a Prodávající vyhověly všem Právním předpisům, pravidlům a nařízením, týkajícím se plateb a srážek všech Daní Pokud se výše uvedená prohlášení Prodávajícího ukážou jako nesprávná, Prodávající tento stav ihned napraví nebo okamžitě uhradí daň za SPV KN nebo Prodávajícího

(xxiii) Vymahatelnost; absence konfliktu

(a) Kotva, SPV KN, Prodávající a KAS mají absolutní a neomezené právo, pravomoc a oprávnění uzavřít a podepsat tuto Smlouvu a vykonávat své povinnosti podle této Smlouvy, což bylo řádně povoleno a schváleno všemi potřebnými úkony společnosti Kotva KAS, a Prodávajícího Tato Smlouva zakládá zákonnou, platnou a závaznou povinnost společnosti Kotva a Prodávajícího a KAS, a je vůči společnosti Kotva a Prodávajícímu a KAS vymahatelná v souladu s jejími podmínkami

(b) Uzavřením ani podpisem této Smlouvy ze strany společnosti Kotva, KAS a Prodávajícího, ani uskutečněním nebo provedením některé Zamýšlené transakce společností Kotva, KAS nebo Prodávajícím, nedochází k přímému či nepřímému porušení (po nebo i bez oznámení či uplynutí lhůty), žádné Smlouvy, jejíž je Kotva, KAS nebo Prodávající smluvní stranou nebo kterou je Kotva, KAS nebo Prodávající vázán, žádného Úředního povolení, Zákonného požadavku nebo Příkazu, které se mohou na Prodávajícího vztahovat, žádného ustanovení Organizačních dokumentů Společnosti Kotva, KAS nebo Prodávajícího, ani žádného usnesení přijatého představenstvem nebo akcionáři společnosti Kotva, KAS nebo Prodávajícího, se kterým nebyl Kupující seznámen během Právního auditu

(xxiv) Prodávající nebo Kotva (podle toho, kdo je ze zákona odpovědný) se zavazuje uzavřít všechny dohody a podepsat všechny dokumenty, do 20 pracovních dnů od požadavku Kupujícího po Uzavření, aby:

(a) mohla být povolení fúze SPV KN s Kupujícím podle Právních předpisů České republiky;

(b)    podepsali a/nebo vystavili jakýkoli dokument na žádost Kupujícího nebo Marklandu, který může urychlit proces slučování uvedený výše v bodu (a) (např. vzdání se práva dostávat různé zprávy o fúzi);

(c)    se zřekli práv na jakékoli zvýšení podílu akcií ve sloučené společnosti nebo na jakékoli vyrovnání či doplatky z titulu fúze v důsledku zředění jejich akciového podílu nebo z jakéhokoli jiného důvodu; a

(d)    zajistili pokračování činnosti SPV KN nebo sloučené společnosti včetně veškerých dohod akcionářů

(xxv)    Kotva poskytne Marklandu a Kupujícímu konzultace při každé nepříznivé nebo potenciálně nepříznivé ekonomické situaci společnosti Kotva nebo KAS.

6.2    Jakmile se Kotva a/nebo Prodávající stane vlastníkem Akcií, je až do Data Uzavření povinna nebo se zavazuje zajistit následující:

(i)    Představenstvo SPV KN si před jakýmkoli jednáním mimo Běžný obchodní styk opatří předchozí písemný souhlas společnosti Markland, který tento souhlas bezdůvodně neodepře

(ii)    Bez předchozího písemného souhlasu společnosti Markland nebudou prováděna následující opatření:

(a)    změny, úpravy nebo doplňky Organizačních dokumentů společnosti Kotva, Prodávajícího nebo SPV KN;

(b)    likvidace, zrušení nebo zastavení činnosti společností Kotva, nebo SPV KN;

(c)    fúze, splynutí, transformace nebo rozdělení SPV KN; nebo

(d)    změna nebo schválení změny základního kapitálu SPV KN (ať už splynutím, dílčím rozdělením, nákupem, zpětným odkoupením, stornováním, novou emisí nebo vydáním jakýchkoli akcií), poskytnutí opce, nebo vydání nějakého nástroje s oprávněním k výměně za akcie.

6.3    Kotva a Prodávající (jakmile se stanou vlastníky Akcií) jsou povinni nebo se zavazují zajistit, že SPV KN bez předchozího písemného souhlasu společnosti Markland:

(i)    neprodá ani nepřevede kontrolu nebo podíl na celém svém podniku, majetku nebo aktivech nebo jejich podstatné části, ať už v jedné transakci nebo v řadě souvisejících transakcí, nebo nenabude jakýkoli podnik, majetek nebo aktiva, která by po takovém nabytí tvořila podstatnou součást jejího Podniku, majetku nebo aktiv (pro tyto účely bude za podstatný považován podnik, majetek nebo aktivum s účetní hodnotou 31 500 Kč (třicet jeden tisíc pět set korun českých) nebo podnik, majetek nebo aktivum s tržní hodnotou 31.500 Kč (třicet jeden tisíc pět set korun českých) a vyšší);

(ii)    nezmění ani nedohodne změnu základního kapitálu SPV KN (ať už splynutím, dílčím rozdělením, nákupem, zpětným odkoupením,

stornováním, novou emisí nebo vydáním jakýchkoli akcií), nebo poskytnutí opce či vydání nějakého nástroje s oprávněním k výměně za akcie;

(iii)    nezačne podnikat v novém předmětu podnikání, který nebude dostatečně sloužit danému Podnikání nebo s ním souviset;

(iv)    nevymění své auditory;

(v)    neuzavře, nezmění nebo neukončí žádnou Smlouvu ani neprovede žádnou platbu, která: (a) zakládá nebo bude zakládat potenciální závazky, jež díky svému charakteru nebo významu jsou nebo budou považovány za neobvyklé nebo mimořádné pro společnosti s podobnými činnostmi jako je Podnikání; (b) bude obsahovat ustanovení, která nejsou v obchodním styku obvyklá a nepřinášejí nejlepší možné podmínky; nebo (c) přesáhne částku 31 500 Kč (třicet jedna tisíc pět set korun českých);

(vi)    neposkytne žádnou záruku nebo příslib odškodnění mimo běžný obchodní styk v souvislosti s dodávkami zboží nebo služeb, které by přesahovaly částku 31 500 Kč (třicet jedna tisíc pět set korun českých);

(vii)    neposkytne žádnou půjčku či úvěr a nepůjčí si prostředky ani nevytvoří jiné zadlužení ve formě půjčky;

(viii)    nenabude či nezaloží dceřinou společnost nebo nenabude či neprodá akcie (s výjimkou akcií v souladu s touto Smlouvou), obchodní podíly nebo dluhopisy v jakékoli Osobě ani nevstoupí do společného podniku, sdružení či konsorcia;

(ix)    nepřipustí, aby se snížil její obchodní podíl v jakékoli Osobě (ať už prodejem akcií, které vlastní, nebo novou emisí akcií);

(x)    nevyhlásí dividendu či neprovede jinou výplatu ve vztahu ke svým akciím ať již v peněžité nebo jiné formě; ani

(xi)    nestanoví odměny, které by SPV KN vyplácela svým funkcionářům nebo členům představenstva

6.4    Měsíční zprávy

Kotva a/nebo Prodávající se zavazují zajistit, že členové představenstva SPV KN budou společnosti Markland nejpozději k patnáctému (15) dni každého kalendářního měsíce předkládat zprávu o činnosti SPV KN.

6.5    Převody

Jakmile se Kotva a Prodávající stanou akcionáři SPV KN, zavazují se zajistit, že od data této Smlouvy po dobu pěti let následujících po Datu uzavření nebudou žádné akcie SPV KN vlastněné společností Kotva nebo Prodávajícími převedeny (včetně prostřednictvím prodeje podniku, fúze nebo likvidace) na třetí osobu a nedojde ani k žádnému Zatížení těchto akcií, pokud to nebude v souladu s ustanoveními této Smlouvy. Po dobu trvání této Smlouvy SPV KN nesmí bez předchozího písemného souhlasu Kupujícího připustit Změnu kontroly.

7  Prohlášení, záruky, povinnosti a závazky Kupujícího a společnosti Markland

Kupující a Markland prohlašují a zaručují, že následující prohlášení a záruky jsou pravdivá, správná a úplná k datu podpisu této Smlouvy a Kupující a Markland se zavazují zajistit aby byla pravdivá, správná a úplná po celou dobu účinnosti této Smlouvy až do Uzavření:

7.1  Organizace

Kupující a Markland jsou společnosti řádně založené a zaregistrované a jejich kmenový kapitál byl v plném rozsahu splacen

7.2  Vymahatelnost; absence konfliktu

7.2.1  Kupující a Markland mají absolutní a neomezené právo, pravomoc a oprávnění uzavřít a podepsat tuto Smlouvu a plnit své závazky vyplývající z této Smlouvy, což bylo řádně povoleno a schváleno všemi potřebnými ukony Kupujícího a Marklandu Tato Smlouva zakládá zákonnou, platnou a závaznou povinnost Kupujícího a Marklandu, a je vůči nim vymahatelná v souladu s jejími podmínkami

7.2.2  Uzavřením ani podpisem této Smlouvy ze strany Kupujícího a Marklandu ani uskutečněním nebo provedením některé Zamýšlené transakce Kupujícím nebo Marklandem nedochází k přímému či nepřímému porušení (po nebo i bez oznámení či uplynutí lhůty, žádné Smlouvy, jejíž je Kupující a/nebo Markland smluvní stranou nebo jíž je Kupující a/nebo Markland vázán, žádného Úředního povolení, Právního předpisu nebo Příkazu, které se mohou na Kupujícího a/nebo Markland, vztahovat, žádného ustanovení jejich Organizačních dokumentů ani žádného usnesení přijatého představenstvem nebo akcionáři Kupujícího a/nebo Marklandu

7.2.3  Obecné

(i)  Na Kupujícího ani na Markland nebyl prohlášen konkurs, ani podle nejlepšího Vědomí Kupujícího a Marklandu na ně nebyl podán návrh na prohlášení konkursu

(ii)  Neexistuje žádné probíhající, zahajované nebo Hrozící Řízení vůči nebo ve vztahu ke Kupujícímu a Marklandu a neexistuje žádná okolnost, záležitost nebo věc, která by podle Znalostí Kupujícího a Marklandu mohla skrze třetí osobu anebo její akcionáře vyvolat takové Řízení anebo související šetření státních orgánů, a nebyl ani vůči Kupujícímu a Marklandu vydán příkaz, rozsudek, výnos, zákaz, rozhodnutí nebo nařízení žádného soudu, Orgánu nebo rozhodce.

(iii)  Kupující a Markland dodržují a neporušily své Organizační dokumenty nebo jakoukoli Smlouvu, jejíž jsou smluvní stranou nebo kterou mohou být vázány, a ani neexistuje stav, který by po upozornění nebo uplynutí lhůty nebo po obojím představoval takové nedodržení nebo porušení, a všechny takové dokumenty a Smlouvy jsou platné a v řádném stavu a Kupující a Markland mají nárok na všechna plnění z nich

(iv)  Markland je daňovým rezidentem v Irské republice a Kupující je daňovým rezidentem v České republice.

(v)  Firemní záznamy Kupujícího a Marklandu obsahují úplné a přesné záznamy všech zápisů z vykonaných jednání a všech usnesení přijatých Kupujícím a/nebo Marklandem na valných hromadách od jejich založení a Kupující a/nebo Markland si nejsou vědomy ničeho z výše uvedeného, kvůli čemuž by tato Smlouva mohla být prohlášena za neplatnou, neúčinnou nebo pochybnou

(vi)  Účetní knihy a záznamy Kupujícího a Markland ve všech podstatných ohledech pravdivě a řádně zachycují a zobrazují finanční stav podnikání Kupujícího a Marklandu a všechny podstatné finanční transakce týkající se podnikání byly v těchto účetních knihách a záznamech přesně zaznamenány od jejich založení a Kupující a/nebo Markland si nejsou vědomy žádného porušení výše uvedených zásad

(vii)  Kupující ani Markland nejsou smluvní stranou žádné platné písemné nebo ustní Smlouvy nebo jiného dokumentu, podle jehož podmínek by plnění této Smlouvy Kupujícím a/nebo Marklandem mohlo vést k porušení nějakého závazku nebo by mohlo být důvodem pro ukončení nebo neplatnost této Smlouvy, anebo který by mohl zabránit Kupujícímu a/nebo Marklandu plnit jeho závazky podle této Smlouvy

(viii)  Veškeré Souhlasy a jiné součinnosti nezbytné pro plnění této Smlouvy Kupujícím a Marklandem poskytnou Kupující a Markland Prodávajícímu a Skupině KAS na základě jejich písemné žádosti

(ix)  Kupující je povinen uzavřít a podepsat Převodní listinu a dohody o převodech Ochranných známek KOTVA v souladu s odstavci 5 1 a 5 2 a převzít Akcie v souladu s odstavcem 5 5

7.3  **Právní audit**

Markland prohlašuje, že v průběhu Právního auditu měl možnost vyžádat si a vyžádal si informace o Majetku, společnosti Kotva a ostatních členech Skupiny KAS a že poskytnuté dokumenty předložené společností Kotva a KAS byly a stále jsou na dostatečné úrovni, aby umožnily Marklandu a Kupujícímu uzavřít tuto Smlouvu včetně jejich ochoty zaplatit Kupní cenu za podmínek zadržení určitých částek Kupní ceny tak, jak jsou upraveny v této Smlouvě, Kupující a Markland souhlasí, že na základě informací, jež jim poskytl Prodávající, je Kupní cena přiměřená a odpovídá hodnotě Akcií a Ochranných známek Kotva

# 8  Úprava Kupní ceny za Akcie a další opravné prostředky

8.1  **Pokračování platnosti; právo úpravu Kupní ceny za Akcie; vzdání se práva**

Všechny povinnosti a závazky, včetně závazků k úpravě Kupní ceny za Akcie obsažené v této Smlouvě a v jejich Přílohách a dalších potvrzeních nebo dokumentech podepsaných či předložených podle této Smlouvy budou platit i po Uzavření, a to až do uplynutí příslušné lhůty, tj. prekluze nebo promlčení Jakýkoli nárok Smluvní strany z titulu porušení závazku, prohlášení nebo záruky vznesený podle tohoto odstavce 8 1 musí být porušující straně předložen před dnem uplynutí příslušné lhůty Právo na úpravu Kupní ceny za Akcie, náhradu škody nebo jiný

opravný prostředek založené na porušení takových prohlášení, záruk, závazků a povinností nebude dotčeno žádným zkoumáním ani získanou Znalostí (nebo Znalostí, která mohla být získána) ohledně přesnosti nebo nepřesnosti, úplnosti či dodržování takového prohlášení, záruky, závazku nebo povinnosti. Vzdáním se jakékoli podmínky založené na přesnosti nebo úplnosti některého prohlášení nebo záruky nebo na plnění nebo dodržování některého závazku nebo povinnosti nebude dotčeno právo na úpravu Kupní ceny za Akcie, náhradu škody nebo jiný opravný prostředek založený na takovém prohlášení, záruce, závazku nebo povinnosti

8.2     Úprava Kupní ceny za Akcie a náhrada škody společností Kotva

Kotva a Prodávající společně a nerozdílně uhradí a před vznikem škody ochrání Markland a Kupujícího a členy jejich představenstev (souhrnné označení **"Odškodňovaná osoba Markland"**), a uhradí (snížením Kupní ceny za Akcie) příslušné Odškodňované osobě Markland peněžitou hodnotu každého Nepříznivého důsledku vzniklého přímo či nepřímo v důsledku následujících skutečností nebo v souvislosti s nimi:

(a)     každé porušení prohlášení, záruk, ujednání, povinnosti nebo závazku, který učinila Kotva a/nebo Prodávající a/nebo KAS v této Smlouvě, nebo jiném osvědčení nebo dokumentu vystaveném či uzavřeném společností Kotva a/nebo KAS a/nebo Prodávajícím podle této Smlouvy;

(b)     veškeré Závazky SPV KN existující nebo vzniklé ze stavu věcí daného do Data Uzavření včetně, pokud takové Závazky nejsou uvedeny nebo na ně nebyly vytvořeny rezervy v účetní závěrce;

(c)     každá pohledávka jakékoli Osoby na zprostředkovatelskou odměnu nebo poplatek či provizi nebo podobné platby od Prodávajícího, SPV KN nebo SPV CO v souvislosti s některou Zamýšlenou transakcí; a

(d)     veškerá Hrozící nebo zahájená Řízení, nároky nebo uložené poplatky týkající se záležitostí uvedených v tomto odstavci 8 2 (a) až (c)

8.3     Úprava Kupní ceny za Akcie a náhrada škody společností Markland

Kupující a Markland společně a nerozdílně uhradí a před vznikem škody ochrání Kotvu, Prodávajícího, Skupinu KAS, SPV KN a členy představenstev těchto společností (souhrnné označení **"Odškodňovaná osoba Kotva"**), a zaplatí (navýšením Kupní ceny za Akcie) příslušné Odškodňované osobě Kotva peněžitou hodnotu každého Nepříznivého důsledku vzniklého přímo či nepřímo v důsledku následujících skutečností nebo v souvislosti s nimi:

(a)     každé porušení prohlášení, záruk, ujednání, povinnosti nebo závazku který učinil Markland nebo Kupující v této Smlouvě nebo jiném osvědčení vystaveném či uzavřeném společností Markland nebo Kupujícím podle této Smlouvy; a

(b)     veškerá Hrozící nebo zahájená Řízení, nároky nebo uložené poplatky týkající se záležitostí uvedených v odstavci 8 3 (a) výše

8.4     Postup při úpravě Kupní ceny za Akcie

(a)     Bezprostředně poté, jakmile: (i) Odškodňovaná osoba obdrží oznámení o tom, že třetí osoba proti ní vznáší nárok; nebo (ii) Odškodňovaná osoba

zjistí, že utrpěla Nepříznivý důsledek opravňující ji k úpravě Kupní ceny za Akcie, Odškodňovaná osoba, pokud je proti takové Odškodňované osobě vznášen nárok, oznámí Odškodňující osobě vznesení takového nároku, případně Nepříznivý důsledek. Pokud Odškodňovaná osoba neuvědomí Odškodňující osobu, nebude tím Odškodňující osobu zbavena Odpovědnosti, kterou může vůči Odškodňované osobě mít

(b)    Nárok na úpravu Kupní ceny Akcií vzniká vypršením ochranné lhůty podle odstavce 8 5, a od tohoto okamžiku je Odškodňující osoba povinna bezodkladně zaplatit částku úpravy Kupní ceny Akcií Odškodňované osobě

8.5    Jestliže některá Smluvní strana zjistí, že jí Hrozí Nepříznivý důsledek z důvodu, který by druhou Smluvní stranu opravňoval k úpravě Kupní ceny za Akcie nebo odstoupení od této Smlouvy, bude tato Smluvní strana o tom ostatní Smluvní strany informovat Smluvní strana, která by (kdyby nebylo ustanovení tohoto odstavce 8 5) byla Odškodňující smluvní stranou, má pak ochrannou lhůtu v délce 25 (dvaceti pěti) Pracovních dnů od data doručení výzvy k odstranění příčiny nepravdivosti prohlášení, nebo napravení porušení svého závazku V případě, že tato Smluvní strana tak neučiní, je povinna zaplatit druhé Smluvní straně po uplynutí ochranné lhůty dostatečnou a úplnou náhradu za Hrozící nebo nově zjištěný Nepříznivý důsledek Pokud později Nepříznivý důsledek nenastane, Smluvní strana, která obdržela z tohoto titulu plnění, je povinna jej vrátit

8.6    Bude-li zjištěn Nepříznivý důsledek, Kotva nebo Prodávající jsou povinni takovou situaci napravit v nejkratší možné době po tomto zjištění, avšak v každém případě tak učiní ještě před Uzavřením Jestliže při Uzavření Nepříznivý důsledek stále ještě trvá, je Kupující oprávněn odečíst částku Nepříznivého důsledku od Kupní ceny za Akcie

8.7    Veškeré platby podle tohoto článku 8 budou považovány za úpravu Kupní ceny za Akcie zaplacené Kupujícím za Akcie podle podmínek této Smlouvy s výjimkou případných plateb smluvní pokuty

8.8    Veškeré částky, které má Prodávající podle této Smlouvy zaplatit Kupujícímu, budou uhrazeny beze všech odpočtů, srážek, započtení nebo protinároků, pokud to nebude vyžadováno Právními předpisy V případě, že podle příslušných Právních předpisů musí být provedeny odpočty nebo srážky, Prodávající je povinen zaplatit Kupujícímu takovou částku, aby po provedení odpočtu nebo srážky zůstala Kupujícímu stejná částka, na jakou by měl nárok, pokud by povinnost provést takový odpočet nebo srážku neexistovala

8.9    V případě, že správce Daně vyměří Daň na jakoukoli částku zaplacenou Kupujícími podle této Smlouvy, pak bude tato splatná částka zvýšena o takovou částku, aby po zaplacení takto vyměřené Daně (nebo Daně, která by byla vyměřena, kdyby zůstaly případné úlevy, které může Kupující využít, nevyužity) zůstala částka odpovídající částce, která by byla jinak splatná podle této Smlouvy.

## 9    Závazky po Uzavření

9.1    Pro účely této Smlouvy se za důvěrné Informace nebo informace tvořící předmět duševního vlastnictví či obchodního tajemství (dále jen „Důvěrné Informace") považují informace vytvořené, převedené, zaznamenané nebo použité v rámci

činností konaných podle této Smlouvy nebo jejích Příloh nebo z nich jinak vyplývající, které představují důvěrné informace nebo informace tvořící předmět duševního vlastnictví nebo obchodní tajemství poskytující Smluvní strany Důvěrné informace společnosti Kotva budou též zahrnovat Důvěrné informace SPV KN a/nebo Prodávajícího Tyto informace mohou být zejména povahy obchodní, organizační, technické nebo finanční Smluvní strany berou na vědomí a dohodly se, že přijímající Smluvní strana bude s veškerými Důvěrnými informacemi poskytující Smluvní strany nakládat jako s důvěrnými Každá přijímající Smluvní strana bude postupovat se stejnou péčí, s jakou postupuje ve vztahu ke svým vlastním Důvěrným informacím, aby zamezila zpřístupnění, použití nebo zveřejnění Důvěrných Informací poskytující Smluvní strany

9.2    S Důvěrnými informacemi poskytující Smluvní strany bude přijímající Smluvní strana nakládat v souladu s odstavcem 9 1, pokud nejsou nebo nebyly:

(i)    získány legálně a oprávněně od třetí Osoby bez omezení;

(ii)    nezávisle vypracovány přijímající Smluvní stranou již dříve nebo samostatným a odlišujícím způsobem bez využití Důvěrných informací poskytující Smluvní strany a tato skutečnost bude doložena;

(iii)    zpřístupněny poskytující Smluvní stranou ke všeobecnému zveřejnění;

(iv)    zveřejněny podle požadavků Právních předpisů, platných nařízení nebo Příkazu nebo podle potřeb burzy cenných papírů; a

(v)    veřejně dostupné nebo se později stanou veřejně dostupnými v důsledku jednání jiné osoby než přijímající Smluvní strany a bez zavinění nebo protiprávního jednání přijímající Smluvní strany

9.3    Smluvní strana může zpřístupnit Důvěrné informace poskytující Smluvní strany členům představenstva, funkcionářům a zaměstnancům přijímající Smluvní strany nebo zástupcům přijímající Smluvní strany včetně jejích zprostředkovatelů, věřitelů, pojišťovatelů nebo potenciálních kupců, kteří se výslovně písemně zaváží, že zachovají mlčenlivost o podmínkách této Smlouvy. Jakékoli zpřístupnění této Smlouvy vyžadované v rámci soudního řízení podle odstavce 9 2 (v) bude provedeno pouze poté, co bude tato skutečnost sdělena poskytující Smluvní straně, aby tato mohla žádat o vydání příslušného ochranného opatření nebo udělení výjimky před zveřejněním

9.4    Ustanovení tohoto článku 9 bude účinné po dobu dvou let následujících po Datu uzavření.

9.5    Jestliže soud s příslušnou pravomocí rozhodne, že lhůta nebo jiné omezení nebo jeho část uvedené v tomto článku 9 je nepatřičně omezující a tudíž nevymahatelné, bude takové omezení vykládáno a aplikováno tak, aby zahrnovalo takovou míru omezení, že závazky v tomto článku 9 budou platné a vymahatelné v největším možném rozsahu v rámci platných Právních předpisů, a tyto závazky takto vykládané a aplikované zůstanou plně platné a účinné. Smluvní strany se dále dohodly, že pokud soud s příslušnou pravomocí určí, že některé ustanovení tohoto článku 9 je neplatné nebo odporuje veřejnému pořádku, nebudou tím zbývající ustanovení tohoto článku 9 dotčena a zůstanou plně platná a účinná

10    Ukončení Smlouvy

10.1    Markland a/nebo Kupující mají právo odstoupit od této Smlouvy písemným oznámením adresovaným společnosti Kotva nebo Prodávajícímu, avšak pouze tehdy, jestliže: (i) dojde k porušení prohlášení, záruk, povinností a závazků Společnosti Kotva nebo Prodávajícího podle článku 6 a vyprší ochranná lhůta podle odstavce 8 5 této Smlouvy, nebo v ostatních případech kdy za porušení prohlášení, záruk, závazků Společnosti Kotva nebo Prodávajícího, dává tato Smlouva Marklandu nebo Kupujícímu právo odstoupit od Smlouvy; (ii) nedojde k Ustavení SPV do 31 ledna 2005, kromě případů Vyšší moci včetně nečinnosti příslušného Orgánu nebo zavinění třetí Osoby, která není přímo či nepřímo kontrolována Prodávajícím; nebo (iii) Uzavření nenastane ke dni 31 března 2005, avšak za předpokladu, že zároveň do té doby nedojde k porušení této Smlouvy Kupujícím nebo Marklandem

10.2    Jestliže Markland a/nebo Kupující od této Smlouvy odstoupí podle odstavce 10 1, bude mít Kupující nárok (kromě všech ostatních práv nebo opravných prostředků, které má Kupující k dispozici, včetně práva na náhradu škody, a bez jejich omezení) na:

10.2.1    vrácení Zálohy a případně Kupní ceny v souladu s podmínkami Smlouvy o vázaném účtu, a

10.2.2    smluvní pokutu ve výši 15 750 000 Kč (patnáct milionů sedm set padesát tisíc korun českých), jež bude uhrazena nejprve z Jistoty a poté podle potřeby z ostatních prostředků Prodávajícího.

10.3    Neuplatnění tohoto práva v souladu s odstavcem 10 2 neznamená vzdání se jakéhokoli jiného práva Marklandu a/nebo Kupujícího vzniklého v důsledku porušení povinností a závazků společností Kotva a/nebo Prodávajícího

10.4    Kotva a/nebo Prodávající mají právo odstoupit z této Smlouvy písemným oznámením zaslaným společnosti Markland nebo Kupujícímu, bude-li zjištěno, že některá z prohlášení a záruk Marklandu a/nebo Kupujícího podle článku 7 byla ke dni podepsání této Smlouvy nebo k Datu Uzavření nesprávná, a vyprší ochranná lhůta podle odstavce 8 5 této Smlouvy, nebo v ostatních případech porušení povinností Marklandu nebo Kupujícího, pokud je Prodávající oprávněn odstoupit z této Smlouvy.

10.5    V případě, že Kotva a/nebo Prodávající nesplní podmínku Ustavení SPV do dne 31. ledna 2005, mohou Markland a/nebo Kupující od této Smlouvy odstoupit písemným oznámením se lhůtou pěti Pracovních dnů od jeho doručeným Prodávajícímu a společnosti Kotva a Kupující je oprávněn požadovat smluvní pokutu 15.750 000 Kč (patnáct milionů sedm set padesát tisíc korun českých), která bude uhrazena nejprve z Jistoty a poté podle potřeby z ostatních prostředků společnosti Kotva a/nebo Prodávajícího

10.6    Jestliže Kotva a/nebo Prodávající odstoupí od této Smlouvy podle odstavce 10 4, Prodávající bude mít nárok (kromě všech ostatních práv nebo opravných prostředků, které má Prodávající k dispozici, včetně práva na náhradu škody, a bez jejich omezení) na smluvní pokutu v souladu s příslušnými ustanoveními této Smlouvy ve výši 157 500.000 Kč (sto padesát sedm milionů pět set tisíc korun českých), pokud tato Smlouva nestanoví jinou smluvní pokutu, přičemž smluvní

pokuta bude uhrazena nejprve ze Zálohy a poté podle potřeby z ostatních prostředků společnosti Markland

10.7 Neuplatnění tohoto práva podle odstavce 10.6 neznamená vzdání se jakéhokoli jiného práva společnosti Kotva a/nebo Prodávajícího vzniklého v důsledku porušení povinností a závazků společností Kotva a/nebo Kupujícího, avšak uhrazením dohodnuté smluvní pokuty zaniká právo na úpravu Kupní ceny za Akcie a případné jiné právo na odškodnění nebo náhradu škody vůči Marklandu a/nebo Kupujícímu

10.8 Jestliže se Uzavření neuskuteční ve lhůtě stanovené touto Smlouvou z důvodů jiných než porušení povinností Kupujícího a/nebo Marklandu, bude mít Kupující nárok (kromě všech ostatních práv nebo opravných prostředků, které má Kupující k dispozici, včetně práva na náhradu škody, a bez jejich omezení) na smluvní pokutu ve výši 157 500 000 Kč (sto padesát sedm milionů pět set tisíc korun českých) jež bude uhrazena nejprve z Jistoty a poté podle potřeby z ostatních prostředků společnosti Kotva, SPV KN a/nebo Prodávajícího.

10.9 Jestliže se Uzavření neuskuteční ve lhůtě stanovené touto Smlouvou z důvodů jiných než porušení povinností Prodávajícího či společnosti Kotva, bude Prodávající oprávněn (kromě všech ostatních práv nebo opravných prostředků, které má Prodávající k dispozici, včetně práva na náhradu škody, a bez jejich omezení) požadovat smluvní pokutu 157 500 000 Kč (sto padesát sedm milionů pět set tisíc korun českých) jež bude uhrazena nejprve ze Zálohy a poté podle potřeby z ostatních prostředků společnosti Markland

10.10 Smluvní strany nemají nárok na výše uvedené smluvní pokuty, pokud druhá Smluvní strana poruší tuto Smlouvu v důsledku Vyšší moci, včetně nečinnosti příslušného Orgánu nebo zavinění třetí osoby, která není přímo či nepřímo kontrolována společností Kotva, Prodávajícím nebo Kupujícím.

10.11 V případě, že (i) porušení povinností Prodávajícího nebo společnosti Kotva nepřivodí Nepříznivý důsledek nebo (ii) jestliže Prodávající nebo Kotva v plném rozsahu odškodní Kupujícího nebo Markland během ochranné lhůty stanovené v odstavci 8.5, nebudou Markland a/nebo Kupující mít právo od této Smlouvy odstoupit nebo požadovat smluvní pokutu.

## 11  Obecná ustanovení

11.1 Výdaje

Není-li v této Smlouvě výslovně stanoveno jinak, každá Smluvní strana ponese své vlastní výdaje vzniklé v souvislosti s přípravou, uzavřením a plněním této Smlouvy této Smlouvy a Zamýšlených transakcí, včetně veškerých poplatků a výdajů svých zástupců.

11.2 Veřejná oznámení

Veškerá veřejná oznámení nebo podobná sdělení týkající se této Smlouvy nebo Zamýšlených transakcí budou vydána v době a způsobem, jež Smluvní strany určí po vzájemné dohodě. Žádná ze Smluvních stran neprozradí Kupní cenu nebo jiné podmínky Zamýšlených transakcí žádným jiným Osobám, ledaže by k tomu získaly předchozí písemný souhlas druhé Smluvní strany nebo bude-li to vyžadováno Právním předpisem či Zákonným požadavkem  Smluvní strany navzájem projednají

prostředky, jimiž budou o Zamýšlených transakcích informováni zaměstnanci společnosti Kotva, její zákazníci a další Osoby jednající se společností Kotva nebo Prodávajícím, přičemž Smluvní strany budou mít právo být u takového sdělování přítomny, pokud to bude možné

11.3  Oznámení

Veškerá oznámení, souhlasy, vzdání se práv a ostatní sdělení podle této Smlouvy musejí být učiněna písemně a budou považována za doručená Smluvní straně, když: (a) budou doručena na příslušnou adresu osobně nebo celostátně uznávanou kurýrní službou (s vyplacenými náklady);  (b) budou zaslána faxem nebo elektronickou poštou s potvrzením přenosu přenosovým zařízením (a následně zaslána písemně do pěti dnů); nebo (c) budou přijata či odmítnuta adresátem, pokud byla zaslána doporučeně s doručenkou na následující adresy, faxová čísla nebo e-mailové adresy a označena (jménem a funkcí) jako určená k rukám níže uvedené osoby (nebo na jinou adresu, faxové číslo, e-mailovou adresu či osobě, jež může Smluvní strana určit formou oznámení ostatním Smluvním stranám):

**Kotva, KAS, KO a Prodávající:**

Kotva NEMOVITOSTI, k s.
Adresa:        Příkop 4, Brno, PSČ 602 00
Fax:           +420 224 801 230
Tel :          +420 224 801 401
K rukám:       Martin Benda

Kopie:

Toman, Devátý a Partneři
Adresa:        Trojanova 12, 120 00 Prague 2
Fax:           +420 224 920 468
Tel:           +420 224 918 490
K rukám:       Petr Toman

a

**Markland a Kupující:**

Markland Holdings Limited
Adresa:        19 Upper Fitzwilliam Street, Dublin 2, Republic of Ireland
Fax:           00353 167 620 00
Tel.:          00353 167 620 23
K rukám:       Henry Prestage/Frank Walker/Aidan Scully

Kopie:

Linklaters v o s.
Adresa:        Palác Myslbek, Na Příkopě 19, 117 19 Praha
Fax:           +420 221 622 199
Tel:           +420 221 622 111
K rukám:       Bryan Wilson

11.4  Další ujištění

Smluvní strany se zavazují:

11.4.1    poskytnout si navzájem na požádání další požadované informace;

11.4.2    vyhotovit a doručit si další požadované dokumenty a

11.4.3    provést takové další úkony, které druhá Smluvní strana může rozumně požadovat pro naplnění účelu této Smlouvy a Zamýšlených transakcí.

## 11.5    Začlenění Příloh

Přílohy popsané v této Smlouvě se do ní začleňují odkazem na ně a jsou součástí této Smlouvy

## 11.6    Úplná smlouva a změny

Tato Smlouva nahrazuje všechna předchozí ujednání mezi Smluvními stranami týkající se jejího předmětu a představuje (spolu s dokumenty předloženými podle této Smlouvy) úplné a výlučné stanovení podmínek dohody mezi Smluvními stranami ve vztahu k jejímu předmětu. V případě rozporů mezi ustanoveními této Smlouvy a ustanoveními Převodní listiny nebo smluv o převodech Ochranných známek KOTVA budou přednostně platit ustanovení této Smlouvy Tato Smlouva může být pozměněna, doplněna nebo jinak upravena výhradně formou písemného ujednání podepsaného všemi Smluvními stranami.

## 11.7    Potvrzení

Markland a Kupující potvrzují, že je k uzavření této Smlouvy nevedlo žádné prohlášení, záruka nebo závazek, které v ní nejsou výslovně uvedeny Smluvní strany této Smlouvy potvrzují, že obdržely nezávislé právní rady ve vztahu ke všem ustanovením této Smlouvy, včetně ustanovení tohoto odstavce 11.7, a po zvážení podmínek tohoto odstavce 11 7 a Smlouvy jako celku potvrzují, že ustanovení tohoto odstavce 11 7 jsou spravedlivá a přiměřená

## 11.8    Čas jako podstatná podmínka

Ve vztahu ke všem datům a lhůtám stanoveným nebo zmíněným v této Smlouvě je čas podstatnou podmínkou Smlouvy

## 11.9    Oddělitelnost

V případě, že soud s příslušnou pravomocí prohlásí některé ustanovení této Smlouvy za neplatné nebo neúčinné, ostatní ustanovení této Smlouvy zůstanou plně platná a účinná Ustanovení této Smlouvy, které bude prohlášeno za neplatné nebo nevynutitelné pouze z části nebo do určité míry, zůstane plně platné a účinné v rozsahu, v němž nebude prohlášeno za neplatné nebo nevynutitelné Nicméně, převod Akcií a převod KOTVA Ochranným známek jsou na sobě vzájemně závislými transakcemi podle ustanovení paragrafu 275 (2) Obchodního zákoníku.

## 11.10    Postoupení, nástupci a neexistence práv třetích osob

Žádná Smluvní strana není oprávněna postoupit žádná svá práva nebo převést žádné své závazky podle této Smlouvy bez předchozího písemného souhlasu ostatních Smluvních stran, které takový souhlas bezdůvodně neodepřou, s tím, že Markland může bez souhlasu ostatních Smluvních stran postoupit svá práva a delegovat své závazky podle této Smlouvy na jakoukoli Propojenou osobu nebo dceřinou společnost společnosti Markland nebo následného nabyvatele Akcií nebo celého podniku Kupujícího či Propojené osoby nebo podstatné části takového

podniku. Tato Smlouva bude platit pro nástupce a schválené nabyvatele společnosti Kotva a/nebo Prodávajícího a nástupce a schválené nabyvatele společnosti Markland a/nebo Kupujícího (v důsledku fúze, splynutí, koupě všech jeho aktiv nebo jejich podstatné části nebo z jiného důvodu) a bude pro ně závazná ve všech aspektech a ve prospěch každého z nich. Kupující odškodní a před vznikem škody ochrání Prodávajícího a KÁS a zaplatí Odškodňované osobě Prodávajícího odškodnění částku rovnající se peněžité hodnotě každého Nepříznivého důsledku, vzniklého přímo či nepřímo následkem nebo ve spojitosti s jakýmkoli porušením ze strany takového nástupce Kupujícího. Žádné ustanovení nebo odkaz v této Smlouvě nebudou vykládány tak, že jakákoli Osoba kromě Smluvních stran získá jakékoli právo, opravný prostředek nebo nárok podle této Smlouvy nebo některého jejího ustanovení nebo ve spojitosti s nimi kromě práv, která vzniknou nástupci nebo nabyvateli podle tohoto odstavce 10 10

### 11.11    Vzdání se práva

Práva a opravné prostředky Smluvních stran jsou kumulativní a nikoli alternativní. Pokud kterákoli ze smluvních stran neuplatní či nevyužije některá ze svých práv, pravomocí či výhod podle této Smlouvy nebo podle kterýchkoli dokumentů ve Smlouvě zmíněných anebo se při jejich uplatňování dostane do prodlení, nebude to považováno za vzdání se takovéhoto práva, pravomocí či výhody a jednotlivé či částečné využití takového práva, pravomocí či výhody neznemožní jiné ani pozdější využití takového práva, pravomocí či výhody ani jiného práva, pravomocí či výhody. V maximálním rozsahu, který umožňují platné Právní předpisy, (a) může jedna Smluvní strana zcela nebo částečně zrušit nárok nebo právo vyplývající z této Smlouvy nebo z kterýchkoli dokumentů ve Smlouvě zmíněných tím, že se takového nároku nebo práva vzdá nebo zřekne, pouze písemným dokumentem podepsaným druhou Smluvní stranou a (b) Smluvní strana se vzdá svého práva vždy pouze s platností pro konkrétní situaci, na kterou se vzdání takového práva vztahuje

### 11.12    Rozhodčí řízení

Toto ustanovení bude platit pro veškeré spory nebo neshody, které mohou mezi Smluvními stranami vzniknout v souvislosti s touto Smlouvou nebo jejím výkladem, plněním nebo ukončením, jakož i s platností nebo vypořádáním této Smlouvy a vztahů touto Smlouvou založených (dále jen „**Spor**"). Smluvní strany vyvinou maximální úsilí, aby jakýkoli Spor, bude-li to možné, vyřešily mimosoudním jednáním. V případě, že nebudou schopny dosáhnout mimosoudní dohody, kterákoli Smluvní strana bude oprávněna podat návrh na vyřešení Sporu před Rozhodčím soudem při Hospodářské komoře České republiky a Agrární komoře České republiky v souladu se zákony č 216/1994 Sb., v platném znění, a 223/1994 Sb., v platném znění, podle jeho Řádu, a to třemi rozhodci. Jazykem rozhodčího řízení bude čeština a místem řízení bude Praha. Předseda rozhodčího senátu bude oprávněn rozhodovat o procesních otázkách dle vlastního uvážení. V případě, že Smluvní strany uzavřou v rámci rozhodčího řízení před výše uvedeným Rozhodčím soudem smír, rozhodčí nález, který bude potvrzovat smír mezi Smluvními stranami ve sporu, nemusí obsahovat zdůvodnění. Smluvní strana, která takový Spor prohraje, nahradí druhé Smluvní straně kromě nákladů přiznaných Rozhodčím tribunálem také veškeré další náklady vynaložené druhou Smluvní stranou v souvislosti s rozhodčím řízením. K řízení před výše uvedeným Rozhodčím soudem budou Smluvní strany přistupovat aktivně a budou Rozhodčímu soudu pomáhat při řešení Sporu, zejména pokud se týká poskytování vysvětlení, předkládání důkazů a

dokumentů atd , a rozhodčí nález uznají bez výhrad a dobrovolně jej splní  Jestliže Smluvní strana odmítne splnit rozhodčí nález uvedený v předchozí větě, druhá Smluvní strana má právo podat návrh na výkon rozhodnutí k místně a věcně příslušnému obecnému soudu

11.13   Rozhodné právo

Tato Smlouva a její výklad se řídí právním řádem České republiky, zejména obchodním zákoníkem České republiky, bez ohledu na kolizně právní normy.

11.14   Stejnopisy

Tato Smlouva je vyhotovena ve čtyřech stejnopisech, z nichž každý má platnost originálu této Smlouvy, a jež společně tvoří jeden a tentýž dokument. Tato Smlouva byla vyhotovena v anglickém jazyce (dva stejnopisy) a českém jazyce (dva stejnopisy), přičemž rozhodné znění bude v českém jazyce

Smluvní strany podepsaly tuto Smlouvu v den uvedený v první větě této Smlouvy.

Podpis:

**Prodávající:**

**SPV CO Limited**

Jméno:

Funkce:

Podpis:

**KOTVA NEMOVITOSTI k. s.**

Jméno:   KOTVA OBCHODNI , a.s.

Funkce:   KOMPLEMENTÁŘ

Podpis:

**KOTVA a.s.**

Jméno:

Funkce: *[handwritten]*

Podpis: *[signature]*

KOTVÁ OBCHODNÍ, a.s.

Jméno: Jiří Brada     *[handwritten]*     *[handwritten]*

Funkce: člen představenstva     *[handwritten]*     *[handwritten]*

*[signatures]*

Podpis:

Kupující:

CRQ Czech a.s.

*[signature: F. Walter]*

Jméno: FRANK WALTER

Funkce: DIRECTOR

Podpis:

Markland Holdings Limited

*[signature: F. Walter]*

Jméno: FRANK WALTER

Funkce: DIRECTOR

*[handwritten]*
CPV KN a.s.
Richard Haig Funn
Člen představenstva

*[signature]*

A04683759/4 0/ 20 Dec 2004

37

KC 1-2100



ΚΥΠΡΙΑΚΗ REPUBLIC    ΔΗΜΟΚΡΑΤΙΑ OF CYPRUS

*1A*

HE  148845

HE 44

THE COMPANIES LAW, CAP 113
Section 15(1)

CERTIFICATE OF INCORPORATION

IT IS HEREBY CERTIFIED that,

**SPV CO. LIMITED**

has this day been incorporated under the Companies Law, Cap 113 as a Limited

Liability Company

Given under my hand in Nicosia on the 27th of  May, 2004

(Sgd.) S. PAPAIOANNOU
Act gRegistrar of Companies

TRANSLATED TRUE COPY
(Sgn.) CHR. NICOLAOU
for Registrar of Companies
27 May, 2004

KC 1-2101



ΚΥΠΡΙΑΚΗ ΔΗΜΟΚΡΑΤΙΑ
REPUBLIC OF CYPRUS

HE 148845

MINISTRY OF COMMERCE, INDUSTRY AND TOURISM
DEPARTMENT OF REGISTRAR OF
COMPANIES AND OFFICIAL RECEIVER
NICOSIA

27 May, 2004

CERTIFICATE

SPV CO. LIMITED

It is hereby certified that, in accordance with the records kept by this Department, the following are the Directors and Secretary of the above Company:

| Directors | Country of Nationality |
|---|---|
| **MARTIN BENDA** | Czech Republic |
| Borac, 46 Zdar Nad Sazavou 592 61, Czech Republic | |
| **EVANGELOS GREGORIOU** | Cyprus |
| Epidavrou, 17A Drosia, P C 6036, Larnaca, Cyprus | |
| **PARASKEVAS ZACHAROULLIS** | Cyprus |
| Karaiskaki, 8 Aradippou, Larnaka, Cyprus | |

| Secretary | Country of Nationality |
|---|---|
| **PARASKEVAS ZACHAROULLIS** | Cyprus |
| Karaiskaki, 8 Aradippou, Larnaka, Cyprus | |

(Sgn.) CHR. NICOLAOU
For Registrar of Companies

KC 1-2102

**Příloha 5**
**Nájemní smlouva KO**

**Příloha 6**
**Seznam nájemníků**

# CONTRACT ON LEASE OF NON-RESIDENTIAL PREMISES

This contract on the lease of Non-Residential Premises as defined in Article 1 3 (hereinafter referred to as the "Lease") has been concluded between the following

## CONTRACTING PARTIES:

(1)  **SPV KN a.s.**, with its registered office in Brno, Příkop 4, Poste Code 602 00, Identification No 26910715 recorded in the Commercial Register administered by the Regional Court in Brno in File B Part 4043, represented by Ing. Richard Harazim, Chairman of the Board of Directors, (hereinafter referred to as "the Lessor"); the address for delivery in the Czech Republic: Náměstí Republiky 8, Praha 1; the relevant extract from the Commercial Register forms Annex No. 1 to this Lease; and

(2)  **KOTVA OBCHODNÍ, a.s.**, with its registered office in Brno, Příkop 4, Poste Code 602 00, Identification No 26231735, recorded in the Commercial Register administered by the Regional Court in Brno in Part B, File 3484, represented by Michal Vlach, chairman of the Board of Directors and Jiri Brada and Pavel Richter, members of the Board of Directors (hereinafter referred to as "the Lessee"); the address for delivery in the Czech Republic: Náměstí Republiky 8, Praha 1; the relevant extract from the Commercial Register forms Annex No 2 to this Lease

1  **Introductory Provisions and Definitions**

1.1  The Lessor and the Lessee are members of the holding company KOTVA a.s., with its registered office in Praha 1, Náměstí Republiky 8, Identification No. 60193808, recorded in the Commercial Register administered by the Municipal Court in Prague, in Part B, File 2370. In relation to KOTVA a s , the Lessor and the Lessee are controlled entities. The relevant extract from the Commercial Register of KOTVA a s. forms Annex No. 3 to this Lease

1.2  For the purposes of this Lease, the building No 656 on the plot of land parcel index 680 in Staré Město quarter, the cadastral district 727024 Staré Město, recorded in the Ownership Deed No. 265 at the Cadastral Office Praha-město means the "Property" The extract from the Real Estate Cadastre (the Ownership Deed No 265) forms Annex No. 4 to this Lease The Lessor declares that it is the full and unlimited owner of the Property and that it has full rights to conclude this Lease

1.3  **In this Lease the Non-Residential Premises** are those premises (the "Premises") which are situated in the Property in:

1.3.1  The 2nd basement of a total area of 160 m$^2$, consisting of non-residential premises of areas of 64 m$^2$ and 96 m$^2$ (hereinafter referred to as "Basement 2");

1.3.2  The 1st basement of a total area of 468 m$^2$, consisting of non-residential premises of areas of 31 m$^2$, 78 m$^2$, 66 5 m$^2$, 13 m$^2$, 84 5 m$^2$ and 195 m$^2$ (hereinafter referred to a "Basement 1");

1.3.3  The ground floor of a total area of 317 m$^2$, consisting of non-residential premises of areas of 150 m$^2$, 30 m$^2$, 25 m$^2$, 95 m$^2$ and 17 m$^2$;

1.3.4    1st floor of a total area of 1,602 m², consisting of non-residential premises of areas of 452 m², 259 m², 216 m², 675 m²;

1.3.5    3rd floor of a total area of 1,528 m², consisting of non-residential premises of areas of 570 m², 931 m² and 27 m²;

1.3.6    4th floor of a total area of 738 m², consisting of non-residential premises of areas of 164 m², 520 m², 27 m², 20 m² and 7 m²;

1.3.7    5th floor of a total area of 246 m², consisting of non-residential premises of areas of 51 m² and 195 m²; and

1.3.8    6th floor of a total area of 109 m², consisting of non-residential premises of areas of 12 m² and 97 m²

Eight plans showing the Premises, one for each individual basement or floor, form Annex No. 5 to this Lease

2    **Subject of the Lease of Non-Residential Premises**

2.1    Under this Lease, the Lessee leases from the Lessor the non-residential Premises

2.2    The amount, maturity date, method of payment and duration of the lease of the Premises shall be set in accordance with the terms of Articles 6 and 7 of this Lease

3    **Purpose of the Lease of Non-Residential Premises**

3.1    Under this Lease, the Lessee leases from the Lessor, in accordance with the provisions of Article 2.1, the Premises for a definite period of time from the date of execution of the Lease until the expiry of the following 36 calendar months (the "Term")

3.2    The Lessee is entitled to use the individual Premises only for those retail activities for which each is used as at the date of execution of this Lease. The purpose of use of each of the Premises is indicated on the plans attached to this Lease at Annex No. 5 and the Lessor declares that the Premises are leased for the purposes for which they are so designated in the approval of the building for use

3.3    The Lessee may not use any part of the leased Premises for purposes other than those indicated on the plans attached at Annex No. 5 without the prior written consent of the Lessor, such consent not to be unreasonably withheld

3.4    The Lessee may not sub-lease the leased Premises without the prior written consent of the Lessor, such consent not to be unreasonably withheld

4    **Hand-over of the Leased Premises**

4.1    The Lessor has acquainted the Lessee with the condition of the Premises and delivers them to the Lessee in a condition which is fit for the purpose for which they are leased and the Lessee agrees that the Premises are so fit for those purposes.

4.2    The Premises will be handed over to the Lessee in the condition described in the handover protocol which is to be signed by both parties.

5    Modifications and Maintenance of the Premises

5.1    Unless otherwise agreed beforehand by the parties, maintenance work will be carried out or arranged by the Lessor The cost of operation of the Premises includes the payment for all maintenance work which is needed in order to ensure that the Premises may be used for the purpose agreed in this Lease

5.2    The Lessee is not entitled, without the prior written consent of the Lessor, to perform any work in the Premises that could affect the building as a whole, such as drilling or perforation of the load-bearing walls, floors, partition walls separate adjoining spaces, or any other work which could affect the heating, air-conditioning or common facilities, shop windows, signs or equipment visible from outside of the Premises, or any other work which could affect public safety.

5.3    The Lessee is obliged to present to the Lessor for its prior written consent, any plans and designs pertaining to building modifications and changes of the Premises that the Lessee wishes to carry out during the term of the Lease  The Lessor reserves the right to refuse such modifications and changes

5.4    In the event that building materials used by the Lessee are prohibited by law and legal regulations or contain asbestos and/or other prohibited substances, the Lessor may require the Lessee to remove them at any time, including after the termination of this Lease, at the Lessee's own cost, responsibility and risk.

6    Rent Payment

6.1    The rent for the Premises under this Lease amounts, according to the agreement of the parties, to the total amount of CZK 33,000,000 (in words: thirty three million Czech crowns) for the whole Term  The rent shall be paid in the first year of the term and so the monthly rent for the first 12 months shall be CZK 2,750,000 (in words: teo million and seven hundred and fifty thousand Czech Crowns)which shall be paid monthly in advance no later than on the 5th day of the each calendar month for which it is being paid, on the basis of an proforma tax document

7    Cost of Operations

7.1    The Cost of Operations includes the cost incurred in respect of:

(a)    cleaning of the common areas and the Premises and waste collection therefrom;

(b)    maintenance, operation, repairs and renovations of any kind of the common areas, installation of common distribution systems and equipment, such as bearing structures or floors, escalators, lifts, various distribution systems, decorations, external thoroughfares and green areas, etc ;

(c)    safety service in the common areas and in the Premises;

(d)    fire-protection and safety;

(e)    heating of the common areas and of the Premises;

(f)    cooling or ventilation of the common areas and of the Premises;

(g)    lighting and water delivery to the common areas and to the Premises; and

(h)    provision of electricity to the common areas and to the Premises

7.2    The Cost of Operations shall be paid monthly during the whole Term the initial instalments amounting to CZK 862,600 (in words: eight hundred and sixty two thousand, six hundred Czech crowns) due no later than on the 5th day of the each calendar month for which it is being paid, on the basis of an proforma tax document.

7.3    The Cost of Operations determined in Article 7.2 will be indexed as of 1 April of each calendar year, using the Consumer Price Index issued by the Czech Statistics Office. Should the Consumer Price Index be published later than on 1 April, the new increased Cost of Operations will be calculated back to 1 April and the Lessee will be obliged to pay the difference. Under no circumstances may the use of this index lead to a decrease of the Cost of Operations in comparison to the previous year

7.4    The Lessee undertakes to pay duly and in time the whole amount of the rent, including the Cost of Operations. In the case of the late payment of either the rent or the Cost of Operations, the Lessor shall be entitled to default interest at the legal rate. The Lessee is obliged to pay such interest within 7 days following the delivery of the Lessor's written notice that such interest is due

7.5    The payment of the Cost of Operations of the Non-Residential Premises is recurred with a contractual fine and the right of the Lessor to withdraw from this Lease.

7.6    Upon the execution of this Lease, the Lessee shall deposit, to an account to be determined by the Lessor, an amount corresponding to 3 months' rent and Cost of Operations (amounting to CZK 10,837,800) hereinafter together referred to as the "Security Sum") Where the Lessee is in default with payment of the rent or Cost of Operations or other obligations under this Lease, the Lessor shall be authorised to satisfy his claim, including any contractual fine, by recourse to the Security Sum

7.7    Within one month of the expiry of the first anniversary of this Lease and provided there are no arrears of rent or Cost of Operations, then the Lessor will return to the Lessee the sum of CZK 4,837,800 from the Security Sum

7.8    Upon termination of this Lease, as provided for herein or in accordance with applicable law, such Security Sum will be used by the Lessor to return the Premises to the condition the Premises were in on the commencement of this Lease in the event that the Lessee did not leave the Premises in such condition. Furthermore, the Lessee shall be responsible, as an additional obligation hereunder, for any additional payments which may be required in order to return the Premises to such condition If the Premises are in substantially the same condition as at the commencement of this Lease, or if the work necessary to be done on the Premises costs less than the full amount of the Security Sum, the Lessee shall return any unused portion of the Security Sum to the Lessee within one month of the termination of this Lease. For the avoidance of doubt, the Premises as referred to in this Article 7 shall exclude Basement 1 and Basement 2

## 8    Rights and Duties of the Lessee

8.1    The Lessee is obliged to use the Premises in compliance with the applicable Lessor's operating rules.

8.2    The Lessee is obliged to have the following insurance policies:

8.2.1    property insurance of its facilities and all equipment located in the leased Premises;

8.2.2    business interruption policy; and

8.2.3    third party liability insurance policy covering damages made to property and to individuals

8.3    The Lessee undertakes to ensure that the Lessor be granted access to the Premises on the basis of its prior written notice, in order that the Lessor may inspect at any time the use and the level of wear and tear on the Premises and the utility networks situated in the Premises

8.4    The Lessee is obliged to notify the Lessor of any defects or damage caused on the Premises or the Property which becomes known to it, such notification to be made in writing and without undue delay. In the case of an emergency the defect or damage must be notified to the Lessor immediately

8.5    The Lessee is obliged to maintain any and all equipment located in the Premises in a usable condition. The Lessee is obliged at its own cost to take care of its equipment, particularly electrical equipment, located in the Premises, and to inspect such equipment in compliance with all relevant regulations.

8.6    The Lessee is obliged to maintain the Premises as well as all access areas to them in clean and good condition

8.7    The Lessee is obliged to accommodate the execution of any and all works considered necessary by the Lessor in view of the requisite maintenance, preservation and improvement of the Property and of the Premises or in view of building modifications, such as a superstructure extension, both in the Premises as well as in other parts of the common parts or its surroundings, at any time during the Term. In case of an excessive reduction of the Lessee's possibility to use the Premises during such works (particularly in the case of long lasting or excessively burdening works), the Lessee is entitled to claim an appropriate reduction in the rent

## 9    Rights and obligations of the Lessor

9.1    The Lessor undertakes to maintain the Premises, at his own expense, in a condition corresponding to the purpose of the Lease as specified in the plans attached as Annex No 5 to this Lease.

9.2    The Lessor undertakes to ensure the due supply of the services specified in Article 7 1 of this Lease.

9.3    The Lessor is obliged to have property insurance covering the Property in which the Premises are located.

9.4    The Lessor shall be entitled to enter the Premises at any time in order to check the maintenance, safety and cleanliness of the Premises. In the event that defects are detected, the Lessor shall be entitled to provide any necessary cleaning and/or maintenance work Should the Lessor detect any defect or damage whose cleaning and/or maintenance work is in responsibility of the Lessee, he is obliged to notify the Lessee and require such repair to be carried out within ten working days or such longer time limit as the works may require If the Lessee fails to commence and

proceed diligently and complete the works as agreed, the Lessor shall be entitled to undertake such work itself at the cost of the Lessee

## 10    Relocation of Premises

10.1    The Lessee will agree to the Lessor relocating the Premises or any part thereof throughout the Term on the following terms and conditions:

10.1.1    the Lessor will give to the Lessee three (3) months written notice of the proposed relocation;

10.1.2    the Lessor will not relocate the Lessee more than twice in any year, herein meaning 1 January to 31 December;

10.1.3    any relocation will be on the same floor as the current Premises or a floor below;

10.1.4    any relocation area shall be of a similar quality to the Premises, approximately the same dimensions and shall correspond so far as the Lessor is able to the surrounding tenant mix;

10.1.5    the Lessor will reimburse to the Lessee the reasonable, proper and demonstrable costs of the relocation; and

10.1.6    the Lessor will, following any relocation, provide the Lessee with three (3) months free advertising on the local internal radio, on the information panel above the escalators and by displaying an information notice at the original Premises

10.2    The Lessor and the Lessee will work together to ensure that the actual time that the Lessee is unable to trade is reduced to a minimum and the Lessee will re-open and commence to trade in the relocated premises as soon as it is able

10.3    The Lessor and the Lessee will both execute an amendment to this Lease to record the relocation of the Premises

## 11    Sanctions

11.1    For the purposes of this Lease, sanctions mean those contractual fines which are incurred as a consequence of a substantial or a non-substantial infringement of this Lease and which do not represent a lump sum or a substitution of compensation of damage to the individual contracting parties  The amount of such contractual fines are not to be limited

11.2    The entitlement to a contractual fine may arise either as a consequence of a substantial or a non-substantial infringement of the Lease

11.2.1    A substantial infringement means the infringement of those Lessee obligations specified in the provisions of Articles 7 2, 7 6, and 8 of this Lease as well as an infringement of the Lessor's obligation specified in Article 9 1

11.2.2    A non-substantial infringement means the infringement of any further obligations and duties of the Lessor or the Lessee which are assumed in accordance with the provisions of this Lease

A03207012/4 0                                6                                KC 1-2110

11.3    For each substantial infringement of the Lease, the damaged party, for whose benefit or protection the infringed provision served, shall be authorised to receive a contractual penalty in the amount of CZK 1,000,000 (in words: one million Czech crowns)

11.4    For each non-substantial infringement of the Lease, the damaged party, for whose benefit or protection the infringed provision served, shall be authorised to receive a contractual penalty in the amount of CZK 100,000 (in words: one hundred thousand Czech crowns)

11.5    Contractual penalties must be paid within 5 days following the delivery of a written notice from the Lessor to the Lessee (or vice versa as the case may be) that such a contractual penalty has become due

The compensation of damage incurred as a consequence of the infringement of this Lease will be paid as a real damage so caused and if due to the Lessor, can be deducted from the Security Sum

## 12    Return of the Premises following Termination of the Lease

12.1    The Lessee undertakes that in the case of termination of the Lease or expiry of the Term, it shall vacate the Premises no later than on the day of termination or last day of the Term (whichever shall be applicable) and that he shall deliver the vacated premises back to the Lessor on that same day

12.2    The Lessee must return the Premises to the Lessor in the condition corresponding to their ordinary wear and tear. The returned Premises must be clean and painted Any damage or excessive wear must be removed by the Lessee at his own expense or he must pay upon written request from the Lessor the amount subsequently incurred for such removal and for putting the Premises in a satisfactory condition which corresponds to their ordinary wear

12.3    Upon the return of the Premises and the keys by the Lessee to the Lessor, a hand-over protocol shall be executed by the parties.

## 13    Termination of the Lease

13.1    Each contracting party is entitled to withdraw from this Lease if the other contracting party substantially infringes this Lease in a manner as set out in Article 11 2 1

13.2    Despite withdrawal from the Lease, entitlement to the contractual fine or to the compensation of damage continues to exist.

13.3    Upon withdrawal from this Lease, this Lease ceases to exist as of the date of the withdrawal

13.4    Each of the parties is entitled to terminate the Lease by notice in accordance with those termination reasons set out in Sec 9 (2) and (3) of the Act No 116/1990 Coll, on Lease and Sub-Lease of Non-Residential Premises The termination period amounts to two months starting on the first day of the calendar month following the delivery of the termination notice.

## 14    Confidentiality

14.1    The contracting parties hereby undertake not to disclose to any third party any information which fulfils the parameters of a commercial secret according to Sec 17 of the Commercial Code (the **"Confidential Information"**) and which is acquired in connection with negotiations leading to the conclusion of this Lease or at any time during its term  The contracting parties further undertake not to use such Confidential Information in any circumstances, with the following exceptions:

14.1.1    With prior written consent of the other contracting party;

14.1.2    Where the obligation to disclose confidential information arises by law or corresponding legal regulation; and

14.1.3    Where the disclosure of Confidential Information is to third persons bound by the same obligation of confidentiality, such as legal or tax advisors

14.2    For the purposes of this Lease, Confidential Information does not mean information which is publicly available at the moment of its use or disclosure

## 15    Other Provisions

15.1    This Lease has been made out in the English language in 2 counterparts of each language, one for each contracting party  Each language counterpart has the validity of the original

15.2    For the purposes of this Lease, correspondence shall be delivered to the addresses given in the heading of this Lease in respect of the individual contracting parties, to the attention of their statutory organ, by mail as a registered letter  If the addressee fails to receive a letter, or reject receipt of a letter which is then returned as not delivered, the date of delivery shall be considered to be the date of its proven sending

15.3    This Lease is governed by Czech law, namely by the Act No  116/1990 Coll , on Lease and Sub-Lease of Non-Residential Premises, the Act No  513/1991 Coll , the Commercial Code and by all other applicable legal regulations

15.4    If one provision of this Lease is or becomes invalid or ineffective, this will not affect the other provisions of this Lease which will remain **"valid and effective"**. In such a case, the contracting parties undertake to substitute the invalid/ineffective provision with a valid/effective provision, which will correspond as closely as possible to the originally intended commercial purpose of the invalid/ineffective provision  Until such time, the corresponding wording of the generally binding legal regulations of the Czech Republic will apply

15.5    This provision applies, (unless this is at variance with the cogent legal norms), to any disputes and discrepancies which could arise in connection with or during the interpretation, realisation or termination of this Lease between the contracting parties, as well as to the settlement of this Lease and the relationship founded by this Lease, including disputes about the validity and/or effectiveness of this Lease (hereinafter referred to as **"the Disputes"**)  The parties will try to resolve all Disputes where possible, by extra-judicial settlement  If such extra-judicial settlement is not possible, each one of the parties is entitled to lodge a complaint (file an action etc ) for the resolution of the dispute by the Arbitration Court at the Economic Chamber of

the Czech Republic and the Agrarian Chamber of the Czech Republic in accordance with the Act No 216/1994 Coll according to its Arbitration Rules, by three arbitrators. The presiding judge of the arbitration senate is authorised to resolve matters connected with the proceedings. In the case where, as a part of the arbitration proceedings before the appointed arbitration court, the parties in dispute reach a compromise, then the arbitration award, by which the compromise of the parties in dispute will be approved, need not be justified. The unsuccessful party to a Dispute will be obliged to pay the cost of the proceedings in accordance with the regulations on costs as relating to the above mentioned Arbitration Court to the other contracting party, in addition to the cost the legal representation. The contracting parties are obliged to act actively in the framework of the proceedings before the appointed arbitration court and to be helpful in the resolution of the Disputes, in particular during the explanation of the proofs, supporting documents, etc., to accept the arbitration award of the court without reservations and to fulfil the terms of such an award fully and voluntarily. If one party rejects the fulfilment of the arbitration award as specified in the preceding sentence of this provision, the other party will be authorised to submit, at the court with local and factual jurisdiction, its proposal for execution of the decision.

15.6   The Annexes with upward serial numbers, as specified in the text, are enclosed to this Leases its integral parts

15.7   The Contracting Parties understand the Lease and they attach their signatures freely and seriously, not in distress or under strikingly disadvantageous conditions

In Prague, on the day [_____]

_____          _____

SPV KN a s                                      KOTVA OBCHODNÍ, a s

## Annex 1

Extract from the Commercial Register

**Annex 2**

Extract from the Commercial Register

**Annex 3**

Extract from the Commercial Register

**Annex 4**

Extract from the Real Estate Register

**Annex 5**

Plans

# REDACTED

# KC 1-2119 – 1-2123

# PRESENTED TO SPECIAL MASTER

Příloha 7
Úmyslně vynecháno

**Příloha 8**
**Úmyslně vynecháno**

**Příloha 9**
**Žaloba Gilroy**

**PP**

**PETERKA & PARTNERS**
Advokátní kancelář, Law Offices, Cabinet d'avocats

*13C 171/2004*

*v )*

*G --*

*022331*
*2 2 -07- 2004*

Obvodní soud pro Prahu 1
Ovocný trh 14
110 00 Praha 1

V Praze dne 30 června 2004

| | |
|---|---|
| Žalobce: | **GILROY LIMITED**<br>se sídlem Pikioni, 4, Limassol, Kyperská republika<br>zastoupený Mgr. Ondřejem Peterkou, advokátem zapsaným ČAK pod reg<br>č. 4245, vykonávajícím advokacii jako společník kanceláře PETERKA &<br>PARTNERS v.o.s. se sídlem Na Příkopě 15, 110 00 Praha 1 (plná moc<br>právního zástupce přiložena) |
| Žalovaný č. 1: | **KOTVA a.s.**<br>se sídlem Praha 1, Náměstí Republiky 8<br>IČ: 60 19 38 08<br>zapsaná v obchodním rejstříku vedeném Městským soudem v Praze<br>v oddíle B., vložka 2370<br>(dále jen „Kotva" nebo „žalovaný č. 1") |
| Žalovaný č. 2: | **KOTVA NEMOVITOSTI, k.s.**<br>se sídlem 602 00 Brno, Příkop 4<br>IČ: 26 22 90 48<br>zapsaná v obchodním rejstříku vedeném Krajským soudem v Brně v oddíle<br>A., vložka 16 586<br>(dále jen „Kotva Nemovitosti" nebo „žalovaný č. 2") |
| Žalovaný č. 3: | **SPV KN, a.s.**<br>se sídlem 602 00 Brno, Příkop 4<br>IČ: 26 91 07 05<br>zapsaná v obchodním rejstříku vedeném Krajským soudem v Brně v oddíle<br>B , vložka 4043<br>(dále jen „SPV KN" nebo „žalovaný č. 3") |

## Žaloba na určení vlastnického práva k nemovitostem

Čtyřikrát
Soudní poplatek ve výši 3 000 Kč zaplacen kolky
Doručeno osobně na podatelnu soudu

Přílohy:
Dle seznamu příloh na poslední straně žaloby

PETERKA & PARTNERS v.o.s

Na Příkopě   15/503
CZ - 110 00   Praha 1
tel : +420 272 143 400
fax: +420 272 143 470
www.cabinet.cz
obchodní rejstřík: Městský soud v Praze
oddíl A, vložka 42561
IČ: 26 16 97 20

## 1.　SPECIFIKACE ÚČASTNÍKŮ, PŘEDMĚT ŘÍZENÍ, PŘÍSLUŠNOST SOUDU

### 1.1.　Specifikace účastníků

Žalobce je akcionářem žalovaného č. 1.

Žalovaný č. 1 je obchodní společností, která byla do roku 2000 zapsána v katastru nemovitostí jako výlučný vlastník nemovitostí specifikovaných níže v bodě 1.2. Jak vyplývá z dále uvedeného, je žalovaný č. 1 takovýmto výlučným vlastníkem dosud.

Žalovaný č. 2 je obchodní společností, která byla v katastru nemovitostí evidována jako výlučný vlastník nemovitostí specifikovaných níže v bodě 1.2, a to na základě prohlášení[1] o nemovitém vkladu učiněného žalovaným č. 1 v roce 2000. Vznikl přeměnou společnosti KOTVA NEMOVITOSTI, a.s.[2]

Žalovaný č. 3 je obchodní společností, jejímž jediným společníkem je žalovaný č. 2. V současné době je žalovaný č. 3 v katastru nemovitostí evidován jako vlastník nemovitostí specifikovaných níže v bodě 1.2.

### 1.2.　Předmět řízení

Žalobce se touto žalobou domáhá, aby soud svým rozhodnutím ve smyslu ustanovení § 80 písm. c) zákona č. 99/1963 Sb., občanského soudního řádu (dále jen OSŘ), určil, že žalovaný č. 1 je vlastníkem těchto nemovitostí:

- budova č.p. 656 (obč. vyb.) příslušná k části obce Staré Město, nacházející se na stavební parcele parc. č. 680;
- budova bez č.p./č.ev. (obč. vyb.) příslušná k části obce Staré Město, nacházející se na stavební parcele parc. č. 1018/2;
- pozemek parc. č. 680 (zastavěná plocha a nádvoří) o výměře 4385 m²;
- pozemek parc. č. 683/1 (ostatní plocha) o výměře 851 m²;
- pozemek parc. č. 683/2 (ostatní plocha) o výměře 2963 m²;
- pozemek parc. č. 683/3 (ostatní plocha) o výměře 2 m²;
- pozemek parc. č. 690/2 (ostatní plocha) o výměře 25 m²;
- pozemek parc. č. 690/3 (ostatní plocha) o výměře 49 m²;
- pozemek parc. č. 690/4 (ostatní plocha) o výměře 9 m²;
- pozemek parc. č. 1018/2 (zastavěná plocha a nádvoří) o výměře 1 m²;

všechny uvedené nemovitosti jsou zapsány Katastrálním úřadem pro hlavní město Prahu na listu vlastnictví č. 265 vedeném pro obec Praha, katastrální území Staré Město (dále tyto nemovitosti souhrnně označovány: „Obchodní dům KOTVA").

---

[1] Na základě ustanovení § 60 odst. 1 zákona č. 513/1991 Sb., obchodní zákoník (dále jen „ObchZ").

[2] Společnost KOTVA NEMOVITOSTI, a.s. změnila svoji právní formu z akciové společnosti na společnost komanditní. Ke změně právní formy došlo rozhodnutím valné hromady ze dne 20. května 2003; rozhodnutí rejstříkového soudu o zápisu přeměny nabylo právní moci ke dni 15 srpna 2003.

KC 1-2128

2

**1.3.    Příslušnost soudu**

Věcná příslušnost okresního (obvodního) soudu je dána na základě ustanovení § 9 odst. 1 OSŘ, neboť z ustanovení § 9 odst. 2 a 3 OSŘ a ani z jiných ustanovení nevyplývá, že by byla v prvním stupni dána příslušnost soudu krajského

K příslušnosti místní žalobce odkazuje na ustanovení § 88 písm g) OSŘ, dle kterého je příslušným soud, v jehož obvodu je nemovitost, týká-li se řízení práva k ní. Obchodní dům KOTVA jakožto soubor nemovitostí je umístěn v obvodu Obvodního soudu pro Prahu 1.

K důkazu:

- výpis ze Střediska cenných papírů,
- výpisy z obchodního rejstříku ohledně žalovaných,
- doklady o existenci žalobce,
- výpis z katastru nemovitostí (LV č. 265 pro k ú. Staré Město),
- výroční zprávy žalovaného č 1 za roky 2000, 2001 a 2003,
- s výhradou důkazů dalších.

**2.    EXISTENCE NALÉHAVÉHO PRÁVNÍHO ZÁJMU ŽALOBCE NA URČENÍ, JEHOŽ SE DOMÁHÁ V TOMTO ŘÍZENÍ**

Nejvyšší soud České republiky ve svém rozhodnutí sp. zn. 3 Cdo 1338/96[3] ze dne 27. března 1997) zaujal právní názor, dle kterého určovací žaloba podle § 80 písm. c) OSŘ má místo v případech, kdy:

- lze její  pomocí eliminovat stav ohrožení práva či nejistoty v právním vztahu a k odpovídající nápravě nelze dospět jinak a

- účinněji než jiné  právní prostředky vystihuje obsah a povahu příslušného právního vztahu a jejím prostřednictvím lze dosáhnout úpravy tvořící určitý právní rámec, který je zárukou odvrácení budoucích sporů účastníků.

V intencích tohoto judikátu je přípustné podání určovací žaloby směřující k tomu, aby údaj o vlastnictví nemovitostí uvedený v katastru nemovitostí odpovídal skutečnému právnímu stavu[4]. Takovou žalobu obvykle podává subjekt, který se považuje za vlastníka předmětné nemovitosti. Z aktuální rozhodovací praxe Nejvyššího soudu však lze dovodit, že určovací žalobu může podat rovněž osoba, která je společníkem, resp. akcionářem takového subjektu

Takto v řízení pod sp. 29 Odo 767/2002 Nejvyšší soud dospěl k závěru, že akcionář má naléhavý právní zájem na podání určovací žaloby, jíž se domáhá vyslovení neplatnosti smlouvy, kterou akciová společnost převádí ve smyslu § 476 obchodního zákoníku svůj podnik, resp. jeho část, na jiný subjekt. Mimo jiné Nejvyšší soud uvedl: „...  *uzavření smlouvy o prodeji části podniku může mít významný vliv na právní poměry společnosti, jejímiž je akcionářem, a tedy zprostředkovaně i na jeho právní poměry, např. právě (ve vazbě na obsah smlouvy) na výši jejího podílu na likvidačním zůstatku* "

---

[3] Publikováno v časopise Soudní judikatura (civilní) č. 3/1997 na str. 58 a násl. pod číslem Jc 21/1997.

[4] Na základě rozhodnutí o určovací žalobě lze provést příslušný záznam do katastru nemovitostí ve smyslu ustanovení § 7 odst. 1 zák. č. 265/1992 Sb., o zápisech vlastnických a jiných věcných práv k nemovitostem

Analogicky je nutno dovodit oprávnění akcionáře žalovat na určení vlastnického práva k souboru nemovitostí, který představuje hlavní majetkovou složkou podnikání akciové společnosti (zde Obchodní dům KOTVA[5] v hodnotě přinejmenším 1,39 miliardy korun).

Význam vlastnictví takovéto hlavní majetkové složky a jeho dopad do právních poměrů akcionáře lze nejlépe vysvětlit na porovnání postavení akcionáře v situaci, kdy akciová společnost je vlastníkem takové majetkové složky, se situací, kdy takový majetek nevlastní

V situaci, kdy akciová společnost je vlastníkem takovéto majetkové složky:

- může jejím prodejem v daném účetním období dosáhnout výrazného zisku, čímž dojde k praktickému naplnění práva akcionáře uvedeného v ustanovení § 155 odst. 1 ObchZ, dle kterého se akcionář podílí na zisku společnosti;

- došlo-li by k likvidaci akciové společnosti, nepochybně by se v podílu akcionáře na likvidačním zůstatku příznivě promítnula získaná kupní cena za takovouto majetkovou složku (opět ustanovení § 155 odst. 1 ObchZ);

- akcionář má možnost na valné hromadě rozhodovat o podnikatelské činnosti žalovaného č. 1, která je determinována právě vlastnictvím a užíváním takovéto majetkové složky; čímž je dán praktický obsah oprávnění akcionáře podílet se na řízení společnosti (opět ustanovení § 155 odst. 1 ObchZ).

Pokud by akciová společnost vlastníkem této hlavní majetkové složky nebyla, shora uvedená oprávnění akcionáře by měla zcela jiný obsah, neboť společnost by zejména v souvislosti s vlastnictvím (a případným budoucím převodem) této majetkové složky nemohla realizovat žádné příjmy, od nichž by se odvíjelo naplnění práva akcionáře na podíl na zisku, resp. na podíl na likvidačním zůstatku

V tomto konkrétním případě žalobce ještě poukazuje na to, že možnost efektivního výkonu jeho akcionářských práv (a tedy i význam rozhodnutí dle této žaloby pro jeho právní poměry) je umocněna tím, že je rovněž akcionářem TREND VIF, který dle žalobcova přesvědčení je vlastníkem hlavního akciového podílu v žalovaném č. 1.

Pro úplnost považuje žalobce za nutné dodat, že zcela shodný právní názor jako v rozsudku pod sp. zn. 29 Odo 767/2002 vyslovil Nejvyšší soud i v dřívějším rozsudku ze dne 5. listopadu 2002 pod sp. zn. 29 Odo 535/2001 a z hlediska řešení této právní otázky je možno již považovat soudní judikaturu za konstantní

K důkazu:

- výpis ze Střediska cenných papírů,
- znalecký posudek oceňující hodnotu Obchodního domu KOTVA,
- s výhradou důkazů dalších.

---

[5] V případě Obchodního domu KOTVA lze navíc uvažovat o tom, zda takto dominantní a relativně samostatná součást podniku nenaplňuje znaky části podniku (tj. samostatné organizační složky) s tím, že s ní nelze disponovat jinak než podle příslušných kogentních ustanovení obchodního zákoníku (prodej nebo nájem části podniku) Jistě z dokumentů, kterými žalovaný č. 1 formálně odůvodňoval vyvedení Obchodního domu KOTVA na jiný subjekt, bude možné dohledat dostatek faktických údajů pro takovýto závěr

**3.    DŮVODY, PRO KTERÉ ŽALOVANÝ Č. 1 NIKDY NEPOZBYL VLASTNICKÉ PRÁVO K OBCHODNÍMU DOMU KOTVA A JE TEDY NADÁLE JEHO VLASTNÍKEM**

**3.1.    Působení osob spojených s Ing. Miroslavem Hálkem v TREND VIF a IF MERCIA**

Počátek stávajících zásadně problematických vztahů, k jejichž řešení (a zejména k odvrácení dalších budoucích sporů ve smyslu shora citovaného rozhodnutí Nejvyššího soudu 3 Cdo 1338/96) má přispět rozsudek vydaný v tomto řízení, se váže k TREND VIF[6] a k investičnímu fondu MERCIA, a s [7] v období let 1995 až 1997.

V rámci kupónové privatizace byl TREND VIF velmi úspěšný (mediální tváře Michael Kocáb a Martin Kratochvíl) a v jeho portfoliu byly akcie významných českých podniků, jejichž hodnota výrazně přesahovala miliardu korun, včetně akcií žalovaného č. 1.

V roce 1995 manažerskou kontrolu TREND VIF převzala skupina osob okolo společnosti Královéhradecká brokerská, a s.[8], reprezentovaná zejména Ing. Miroslavem Hálkem.

V době tohoto převzetí měl TREND VIF vlastní jmění ve výši cca 1,45 mld. korun.

Následovala řada transakcí, jejímž účelem bylo tento majetek, včetně akcií žalovaného č. 1, protiprávně a ke škodě TREND VIF vyvést na osoby ze skupiny Ing. Miroslava Hálka. Nástrojem tunelování TREND VIF byly právní úkony, které jsou podrobně popsány např. ve Zprávě nuceného správce TREND VIF ze dne 22. února 1997, ve zprávě Ministerstva financí ze dne 21. 1. 1998, č.j. 102/90 17697, týkající se šetření obchodů s cennými papíry z portfolia TREND VIF a v obžalobě náměstka krajského státního zástupce JUDr. Vladislava Kusaly proti Ing. Hálkovi a spol. ze dne 30. září 1998. Zejména v obžalobě je rovněž nejdetailněji popsáno personální propojení všech osob podílejících se na těchto transakcích (str. 25 a násl.).

V důsledku těchto transakcí poklesla hodnota vlastního jmění TREND VIF k 31. 12. 1996 na 116 mil. korun, tedy více než o 90 %.

Zcela obdobný průběh měla i účast Královéhradecké brokerské, a.s. na hospodaření Investičního fondu MERCIA, a s.

**3.2.    Demonstrativní výčet podstatných protiprávních úkonů subjektů spojených s Ing. Miroslavem Hálkem a týkajících se přímo či nepřímo akcií žalovaného č. 1**

Jednotlivé úkony směřující k obohacení protiprávně jednajících osob jsou popsány v obou shora uvedených zprávách a v obžalobě. Vzhledem k rozsáhlosti jednání žalobce na tyto dokumenty odkazuje a činí jejich obsah v částech týkajících se přímo i nepřímo[9] akcií žalovaného č. 1, součástí žalobních tvrzení. V této žalobě žalobce tedy uvádí pouze několik případů

---

[6] TREND – všeobecný investiční fond a s , se sídlem 500 02 Hradec Králové, Škroupova 441, IČO: 45 24 51 77 (dále jen „TREND VIF")

[7] Investiční fond MERCIA, a s , se sídlem Praha 2, Londýnská 53, IČO: 15 05 41 01

[8] Společnost KRÁLOVÉHRADECKÁ BROKERSKÁ, a s (nyní Brněnská obchodní, a s , v konkurzu), IČO: 60 91 41 22, dříve se sídlem Hradec Králové, Škroupova 9, nyní se sídlem Brno, Lipová 27.

[9] Tj. například vyváděním finančních prostředků z TREND VIF tak, aby za tyto prostředky jiné zúčastněné subjekty mohly nakupovat akcie žalovaného č 1 (viz bod 3 2 2).

nejzávažnějšího jednání, kterým byl TREND VIF poškozen, a které dle obžaloby naplňují skutkovou podstatu trestného činu[10].

Žalobce uvádí dvě skupiny hlavních protiprávních úkonů subjektů spojených s Ing. Hálkem. Typově jsou tyto úkony charakterizovány na str. 24 obžaloby

První skupinu (viz čl. 3.2.1. této žaloby) představují úkony, kterými byly protiprávně vyváděny akcie žalovaného č. 1 z majetku TREND VIF.

Druhou skupinu (viz čl. 3.2.2.) představují úkony, kterými byly vyváděny finanční prostředky z TREND VIF (a rovněž z IF Mercia), za které subjekty spojené s Ing. Hálkem hradily kupní cenu akcií žalovaného č. 1 kupovaných od třetích osob.

Samozřejmě všechny níže popsané úkony mají vzhledem k tomu, že jimi dle obžaloby byla naplněna skutková podstata trestného činu a tedy byly v rozporu se zákonem, i své občanskoprávní implikace, spočívající nejčastěji v tom, že takové úkony jsou bez dalšího neplatné[11].

Pokud jde o hodnocení jednání popsaného v obou uvedených zprávách jakožto trestných činů, odkazuje žalobce na obžalobu proti obviněným Ing. Miroslavu Hálkovi a spol. podanou Krajským státním zastupitelstvím v Hradci Králové dne 30. září 1998, sp. zn. KZv 323/97.

### 3.2.1.   Vyvádění akcií žalovaného č. 1 z majetku TREND VIF

### 3.2.1.1. Nevýhodné obchody s akciemi žalovaného č. 1

Zpráva nuceného správce uvádí na str. 21: „Dne 28.5 1996 prodal investiční fond prostřednictvím SCP společnosti KHB 152 935 kusů akcií společnosti KOTVA, a.s za cenu 400,-- Kč. Téhož dne investiční fond koupil od KHB 152 935 ks akcií společnosti KOTVA, a.s zpět avšak za cenu 952,- Kč za jeden kus a následně je investiční fond prodal společnosti IFM, a.s. opět za cenu 400,-- Kč Viz dokumenty přiložené k článku 14 11 této zprávy Tato transakce způsobila investičnímu fondu ztrátu 168 840 240,-Kč "

### 3.2.1.2.   Antedatování smluv směřující k tomu, aby ve spojení s ujednáním o smluvních pokutách bez jakéhokoliv protiplnění byly z majetku TREND VIF vyvedeny akcie žalovaného č. 1

Obžaloba na str. 24 uvádí následující: „Uzavírání antedatovaných smluv bylo v podstatě jen nástrojem k provedení jiných, výše popsaných transakcí Takto byly pravděpodobně uzavřeny smlouvy, které byly v neprospěch fondu zajištěny vysokými smluvními pokutami. Prokázat se však podařilo jen antedataci smlouvy ze dne 10.1 1996 s IFM, a.s Tímto postupem docházelo k poškozování fondu v době, kdy Ministerstvo financí ČR pozastavilo obchodování s cennými papíry z portfolia fondu "

---

[10] Ohledně kvalifikace trestných činů, kterých se dle obžaloby osoby okolo Ing. Hálka dopustily (často jako členové zločinného spolčení), odkazuje žalobce na příslušné pasáže obžaloby, zejm. str. 7, 8, 11, 12, 13, 14, 16, 19 a 20.

[11] Pro úplnost žalobce rovněž uvádí, že při většině obchodů s akciemi žalovaného č. 1 bylo porušeno (nebo v návaznosti na předchozí manipulaci kursem akcií obchozeno) ustanovení § 17 odst 3 zákona č 248/1992 Sb., o investičních společnostech a investičních fondech, ve znění do 30 června 1996 (dále jen „ZISF") stanovící, že investiční fond je povinen cenný papír prodat jen za nejvyšší cenu, za kterou jej bylo možné při vynaložení odborné péče prodat

Podstatu antedatované smlouvy označené datem 10. ledna 1996 popisuje zpráva nuceného správce na str. 12 a násl , obžaloba např. na str. 27 a dále ve stručnosti na str. 2 zpráva Ministerstva financí takto: „10.1 1996 – IFM, a s  podepsala smlouvu o převodu 200 000 ks akcií Kotvy z portfolia fondu za celkovou sumu 360 000.000,– Kč  Na základě této smlouvy získala IFM, a s  ve formě smluvní pokuty 60 000 ks Kotvy bez jakékoliv protihodnoty "

### 3.2.1.3. Nerespektování předběžného opatření týkajícího se akcií žalovaného č. 1

Obžaloba uvádí na str. 31: „Dne 24 1.1997 Ing  Miroslav Hálek jako předseda představenstva a generální ředitel IFM a s  rozhodl o převodu 361 375 ks akcií Sokolovské uhelné a s  a 30 000 ks akcií Kotvy a s  z účtu IFM č  100200879133 ve Středisku cenných papírů Praha na účet Královéhradecké brokerské a s  (KHB) přesto, že bylo IFM a s  Usnesením Krajského soudu Hradec Králové č.j  Nc 542/96 ze dne 21 1 1997, doručeným IFM, a s  dne 23 1 1997, uloženo zdržet se nakládání výše uvedenými akciemi  Usnesení bylo IFM a s  doručeno dne 23 1 1997 a téhož dne se s ním Ing  Hálek seznámil prostřednictvím JUDr  Karla Kavalíra, kterému udělil plnou moc k prostudování spisu  Přesto, že věděl o předběžném opatření soudu, rozhodl o převodu výše uvedených akcií na společnost KHB a s , která akcie následně převedla na účet zahraniční firmy Forminster Enterprises Ltd…."

### 3.2.2.   Užití finančních prostředků TREND VIF a IF MERCIA k tomu, aby společnosti okolo KHB, a.s. nakupovaly akcie žalovaného č. 1 na svůj účet

### 3.2.2.1.   Zneužití peněžních prostředků investičních fondů ve prospěch osob okolo KHB, a.s.

Zpráva nuceného správce v čl. 8.9  uvádí následující: „Jak dokazuje výpis z bankovního účtu investičního fondu u IPB, a s  č ú 103745574 ze dne 7.9.1995 a zejména pak příkaz k úhradě z téhož dne, management investičního fondu převedl částku ve výši 112 000 000,– Kč na bankovní účet společnosti KHB, která ji použila ke koupi 70 077 kusů akcií společnosti KOTVA, a s  za cenu 1 800,- Kč za kus od společnosti Brno Broker Group, a.s , jak dokazuje potvrzení o uzavření smlouvy ze dne 4.9.1995  Potvrzení o uzavřeném obchodu ze dne 4.9 1995 je přiloženo k této zprávě pod článkem 14.15. Tyto akcie koupila KHB svým jménem a na svůj účet a byly poslézé převedeny, dle informací, které nucená správa získala, na jednu ze společnosti ovládanou managementem investičního fondu

K tomuto je na str. 3 zprávy Ministerstva financí doplněno, že dne 25.9.1995 KHB koupila dalších 28 033 ks akcií žalovaného č. 1 za 49.057.750,-- Kč svým jménem a na svůj účet a v návaznosti na popis obchodu s Brno Broker Group, a.s. je vysloven závěr: „KHB za cizí peněžní prostředky (175 196 350,- Kč) koupila cenné papíry na vlastní účet."

### 3.2.2.2.   Získávání finančních prostředků investičních fondů prostřednictvím ujednání o smluvních pokutách

Zpráva Ministerstva financí na str. 10 uvádí[12]: „Metoda smluvních pokut spočívala v uzavírání smluv, které vytvářely smluvní závazky pro investiční fond, které následně investiční fond nesplnil, a které smlouva penalizovala neobvykle vysokými smluvními pokutami. Vzhledem k formě smluv, jejich právnímu rozboru a ojedinělé výši smluvních pokut je podezření, podpořené i o získané

---

[12] Shodně Zpráva nuceného správce na str  12 a násl , tato metoda vyvádění majetku je rovněž popsána na mnoha stranách obžaloby.

*důkazy, že skutečným předmětem těchto smluv nebyl převod akcií, ale umělé vytvoření závazku investičního fondu a vybrání majetkových hodnot investičního fondu.*

*Touto metodou zmizely z investičního fondu následující částky.*

    a) *Částka 126 000 000,- Kč, kterou získala společnosti IFM, a s  na základě smlouvy ze dne 10.1.1996  Tato smluvní pokuta byla uhrazena ve formě převodu 60 000 kusů akcií KOTVY v hodnotě 108 000 000,- Kč*

    b) *Částka 45 617 000,- Kč, kterou získala společnost Moravská Zemská, a s  na základě smlouvy ze dne 10.7.1996*

    c) *Částka 44 896 666,- Kč, kterou získala společnost Lidová obchodní společnost, s t o  na základě smlouvy ze dne 17 7 1996*

    d) *Částka 73 718 000,- Kč, kterou získala společnost Moravská zemská, a s  na základě smlouvy ze dne 22  7  1996  Viz dokument přiložený v čl  14  8  této zprávy.*

    e) *Částka 70 526 475,- Kč, kterou získala společnost Sokolovský investiční fond, a s  na základě smlouvy ze dne 24  7  1996 "*

### 3.2.2.3. Neplacení kupních cen za akcie a 30-letá splatnost kupní ceny

Tyto dvě metody popisuje zpráva nuceného správce na str. 13-15 následovně. K metodě neplacení kupncích cen za akcie uvádí: *„Tato velmi prostá metoda spočívala v uzavírání smluv se společnostmi, které následně nesplatily kupní cenu za koupi akcií z portfolia investičního fondu  Takto převedený majetek byl následně převeden na společnosti ovládané managementem investičního fondu "* Následuje výčet takto uzavřených smluv, přičemž ztráta TREND VIF z těchto obchodů přesahuje 350 milionů korun.

Metodu 30-leté splatnosti popisuje nucený správce takto: *„Metoda popsaná v tomto článku spočívala v uzavírání smluv, na základě kterých investiční fond prodával akce z portfolia investičního fondu společnostem ovládaným managementem investičního fondu, za cenu, jejíž splatnost byla stanovena v měsíčních splátkách a rozložena na dobu 30-ti let"* Takto byly uzavřeny smlouvy v hodnotě 336 841 700,- Kč.

### 3.3.  Vyvedení majetku z TREND VIF a IF MERCIA na společnost Forminster[13] spojenou s Ing. Hálkem

Zúčastněným osobám se zejména shora popsanými způsoby podařilo prakticky veškerý majetek ve formě cenných papírů vyvedený z TREND VIF zpeněžit a  jeho následným prodejem se obohatit. Toto zamýšlely učinit i ohledně akcií žalovaného č  1. Po zavedení nucené správy realizovaly sérií převodů, kterou nucený správce popisuje na str  21 a 22 své zprávy, přičemž jediným cílem těchto převodů bylo vyhnout se účinkům právních kroků nuceného správce směřujících ke vrácení akcií žalovaného č  1 do majetku TREND VIF.

Takto byly akcie žalovaného č  1 převedeny až na společnost Forminster. Ohledně personálního propojení společnosti Forminster s Ing. Hálkem a účelu převodu akcií žalovaného č  1 na Forminster žalobce poukazuje na následující pasáže obžaloby (str. 25).

*„Obchodování a převody akcií Kotvy, a s  byly nejvýznamnějším zájmem obviněných. Akcie Kotvy patřily v době před  4 8.1995 ke klíčovým investičn fondu  Cílem tehdejšího managementu investičního fondu bylo a stále je převést akcie Kotvy na společnosti ovládané Ing. Hálkem a spol. a dalšími nákupy, k nimž používali i prostředky fondu, dosáhnout v Kotvě majoritního podílu*

---

[13] Forminster Enterprises Limited, se sídlem 20 Queen Frederica Street, El Greco House, Nicosia, Kypr (dále jen „Forminster")

*Akcie Kotvy jsou i v současnosti v centru zájmu společností kolem Ing. Hálka a spol. I v průběhu nucené správy se uskutečnilo několik převodů akcií Kotvy mezi osobami a společnostmi a významnou osobou bude zřejmě Jiří Mareš, spolužák Ing. Hálka, přes kterého byly převáděny akcie Kotvy zpět na společnosti ovládané Ing. Hálkem. V době, kdy bylo Krajským soudem v Hradci Králové rozhodnuto nepravomocně o zákazu nakládání akciemi Kotvy Královéhradeckou brokerskou, došlo na pokyn KHB k převodu akcií Kotvy na společnost Forminster Enterprises, ltd, se sídlem na Kypru, k jejímž peněžním účtům má Ing. Hálek konkrétní oprávnění*

*Aktivity skupiny Ing. Hálka nezastavilo ani rozhodnutí o nucené správě a z posledních zjištění je zřejmé, že jejich snaha ovládnout Kotvu a majetek Trendu trvá do dnešního dne a ani trestní řízení a umístění ve vazbě není překážkou. Ještě před zahájením trestního stíhání došlo k převodu části akcií Kotvy na Forminster Enterprises, Ltd Se sídlem na Kypru a pak k prodeji této společnosti Královéhradecké společnosti a s a společnosti Bonit kapital, a s., Brno, a KHB, přejmenovaná na Brněnskou obchodní, a s je v současnosti ve stavu po podání návrhu na prohlášení konkursu. Podle posledních zjištění i v průběhu vazby Ing. Hálka byly jim podepisovány důležité listiny v souvislosti s účty společnosti Forminster Enterprises Ltd u LGT bank ve Vaduzu v Lichtenštejnsku "*

Dále je propojení společnosti Forminster s Ing. Hálkem a dalšími osobami zřejmé z toho, že podobně jako obchod s akciemi žalovaného č. 1 byl realizován obchod s akciemi společnosti Sokolovská uhelná, a.s (jeho popis viz str. 7 zprávy Ministerstva financí, z níž vyplývá, že po převodu akcií Sokolovské uhelné, a.s. z KHB na Forminster obratem byly tyto akcie společnosti Forminster dále prodány, a to se ziskem ve výši 135 milionů korun) V této souvislosti žalobce odkazuje rovněž na str. 9 této zprávy, v níž je rovněž personální propojení se společností Forminster popsáno.

Všechny právě uvedené skutečnosti jsou zcela zásadní při posuzování úkonů týkajících se Obchodního domu KOTVA, neboť tyto úkony činili členové statutárních orgánů, kteří byli zvoleni právě společností Forminster, ohledně které "žaloba poukazuje na spojení s Ing. Hálkem. **Všechny výroční zprávy žalovaného č. 1 od roku 2000 uvádí, že Forminster je jeho ovládající osobou[14].**

3.4.    Opatření státního zástupce – blokace akcií žalovaného č. 1

Opatřením státního zástupce však akcie žalovaného č. 1 byly v roce 1997 zablokovány na majetkovém účtu společnosti Forminster v SCP. Tedy je zřejmé, že ze samotných akcií žádný výnos z trestné činnosti realizovat přinejmenším v dohledné době nelze.
Nicméně akcie představují majoritní podíl na společnosti vlastnící budovu a pozemky v hodnotě dosahující přibližně jeden a půl miliardy korun. Společnosti Forminster není dosud žádným opatřením soudu či státního orgánu zakázán výkon hlasovacích práv a tedy má možnost docílit i v tomto směru prospěchu z trestného činu, resp. má možnost legalizovat výnos z trestné činnosti.

Žalobce níže popíše, že v současné době probíhají kroky směřující k tomu, aby bylo obcházeno opatření státního zástupce, kterým je blokováno nakládání s akciemi žalovaného č. 1.

---

[14] Výroční zpráva za rok 2001 a za rok 2003 toto uvádí na str 3, výroční zpráva za rok 2000 toto uvádí na str. 2

**3.4.1.** *Označení shora popsaného protiprávního jednání jakožto legalizace výnosů z trestné činnosti v rozhodnutích příslušných orgánů*

V této souvislosti žalobce považuje za vhodné připomenout definici uvedenou v ustanovení § 1a odst. 1 zákona č. 61/1996 Sb., o některých opatřeních proti legalizaci výnosů z trestné činnosti a o změně a doplnění souvisejících zákonů:

*„Legalizací výnosů z trestné činnosti (dále jen „legalizace výnosů") se pro účely tohoto zákona rozumí jednání sledující zakrytí nezákonného původu výnosu z této činnosti s cílem vzbudit zdání, že jde o příjem nabytý v souladu se zákonem. Není přitom rozhodující, zda k takovému jednání došlo zcela nebo zčásti na území České republiky. Uvedené jednání spočívá zejména*
*a) v přeměně nebo převodu majetku s vědomím, že pochází z trestné činnosti, za účelem jeho utajení nebo zastření jeho původu nebo za účelem napomáhání osobě, která se účastní páchání takové činnosti, aby unikla právním důsledkům svého jednání,*
*b) v utajení nebo zastření skutečné povahy, zdroje, umístění, pohybu majetku a nakládání s ním nebo změny práv vztahujících se k majetku s vědomím, že tento majetek pochází z trestné činnosti,*
*c) v nabytí, držbě, použití majetku nebo nakládání s ním s vědomím, že pochází z trestné činnosti,*
*d) ve zločinném spolčení osob nebo jiné formě součinnosti za účelem jednání uvedeného pod písmeny a), b) nebo c) "*

Pokud jde o hodnocení shora popsaného jednání jako úkonů směřujících k legalizaci výnosů z trestné činnosti, poukazuje žalobce na to, že obžaloba na str. 30 uvádí následující:

*„Část výtěžku z uvedené trestné činnosti byla následně v částce 151,237.425,-Kč převedena dne 31.1.1997 z účtu KHB, a s u IPB č. 100200878/5100 na pokyn Libora Páva na účet firmy Forminster Enterprises Limited (FEL) č. 0123414AA u LGT Bank v Lichtenštejnsku, který Ing. Hálek na základě generální plné moci od firmy FEL dne 26.11.1996 založil. V přepočtu pak byla na účet u LGT Bank v Lichtenštejnsku dne 5.2.1997 uložena částka ve výši 5,422.251 USD, odpovídající výše uvedené částce v Kč. Z této částky byly dne 14.2.1997 poukázány 2 miliony USD na účet firmy Presley Industries u stejné banky č. 0123415AA, který Ing. Hálek rovněž založil dne 26.11.1996 na základě generální plné moci od uvedené firmy. Ve stejný den, tj. 14.2.1997 pak byla poukázána částka ve výši 2.964.287,21 USD, odpovídající částce 82,768.765,-Kč zpět na účet KHB, a s. Za tuto částku KHB převedla dne 30.1.1997 na účet firmy FEL u SCP založený na žádost Ing. Vlasníka a Páva 384.971 ks akcií Kotvy, získaných trestnou činností z portfolii investičních fondů Trend a Mercia "*

Dále v předběžném opatření vydaném Zemským soudem Lichtenštejnského knížectví dne 4. listopadu 1997, kterým byly zablokovány finanční prostředky na bankovním účtě společnosti Forminster, se po popisu právě uvedeného převáděcího finančních prostředků na bankovní účet a z bankovního účtu Forminster uvádí: *„Z výše zmíněných vyšetřování vyplývá podezření na praní peněz podle § 165 trestního zákoníku. Je třeba vycházet ze skutečnosti, že neznámí pachatelé se pokusili prostřednictvím převodu podvodně získaných peněz na konta v Lichtenštejnsku s eventuálním následným převodem zatajit společnosti Trend VIF a.s místo uložení zisku z prodeje cenných papírů, popřípadě z dalších obchodů, a obzvláště znemožnit sledování toku peněz "*

Rovněž v přípisu Vrchního státního zastupitelství v Praze adresovaného dne 29.8.2002 ve věci Obviněného Ing. Miroslava Hálka, kterým byl Zemský soudem Lichtenštejnského knížectví požádáno o uvolnění peněz za účelem jejich zaslání na účet společnosti TREND VIF a MERCIA, se uvádí: *„S odvoláním na článek 1 odstavec 1 Evropské úmluvy o vzájemné pomoci ve věcech trestních ze dne 20. dubna 1959, dále s odkazem na Úmluvu o praní, vyhledávání, zadržování a konfiskaci výnosů ze zločinů ze dne 18.12.1995. Dne 27.11.2001 Nejvyšší státní zastupitelství*

*České republiky pod sp. zn. 2 NZt 749/2001 převzalo, k žádosti Knížecího Lichtenštejnského státního zastupitelství, trestní řízení vedené v Lichtenštejnském knížectví proti Miroslavu Hálkovi V Lichtenštejnském knížectví bylo vedeno trestní řízení proti Miroslavu Hálkovi pro trestné činy praní špinavých peněz, zločinné spolčení a další podle příslušných trestněprávních ustanovení lichtenštejnského trestního zákona "*

Konečně, žalobce poukazuje na to, že rovněž Zpráva Ministerstva financí ČR obsahuje na str. 4 pasáž nadepsanou Podezření na možné legalizování výnosů z trestné činnosti. O tomto podezření zpráva pojednává rovněž na str. 6 a 7 (ohledně akcií společnosti Sokolovská uhelná, a.s.) V závěru (str. 9) zpráva uvádí: *„U osob začleněných do této skupiny vzniká důvodné podezření, že jejich aktivity jsou financovány pomocí majetkových hodnot z portfolií fondů. S touto skupinou spolupracuje další skupina osob, která legalizuje výnosy trestné činnosti, tj. organizování zdánlivých meziřemenních pomocí tradičních aktivit při praní špinavých peněz, tj. organizování zdánlivých mezifiremních obchodů, provádění bankovních operací ve třetích státech, umělé zvyšování zisků jinak legálně fungujících firem.*

*Do této skupiny osob je nutné zařadit společnosti*
- *Forminster Enterprises Limited*
- *Burzovní společnost Egretta, a.s.*
- *Atlanta Safe, a.s.*
- *Severní brokerská, a.s.*
- *DYNAMIC PARTNERS, a.s.*
- *Sokolovský IF, a.s.*
- *Fyzické osoby Anatolij Salamatin, Jiří Mareš."*

### 3.4.2. Obcházení účelu opatření státního zástupce

Z právě uvedeného jasně vyplývá, že opatření státního zástupce spočívající v blokaci akcií žalovaného č. 1, které jsou nyní na účtě společnosti Forminster, mělo zcela jasný účel, a to přinejmenším do doby skončení policejního šetření zamezit tomu, aby s výnosem z trestné činnosti, který dle shora citovaných relevantních rozhodnutí, resp. dle obžaloby představují akcie žalovaného č. 1 (v počtu 384 971 kusů) představují, nebylo možné jakkoliv nakládat a aby společnost Forminster a s ní spjaté subjekty nemohla v souvislosti s vlastnictvím akcií žalovaného č. 1 realizovat jakýkoliv neoprávněný majetkový prospěch.

Nepochybně účelem opatření státního zástupce je, aby majetek žalovaného č. 1, který jakožto jeho majoritní akcionář ovládá Forminster v důsledku důsledku jednání označeného obžalobou jako trestný čin, nebyl z majetku žalovaného č. 1 nijak převáděn.

Zejména z účelu opatření státního zástupce (i s přihlédnutím na shora zmíněný zákaz legalizace výnosů z trestné činnosti) vyplývá, že nesmějí být činěny žádné úkony, které směřují k tomu, aby se majetek žalovaného č. 1 zmenšil nebo aby byla prováděna jakákoliv jeho transformace způsobem, kdy by (byť i jen teoreticky) vzniklo riziko, že nad takovýmto transformovaným majetkem žalovaný č. 1 nebude mít přímou kontrolu. Vzhledem ke shora popsaným úkonům příslušných orgánů několika států vycházejících z podezření na praní peněz, je zcela zřejmé, že žádný z úkonů společnosti Forminster při výkonu akcionářských práv a žádný z úkonů členů statutárních orgánů jmenovaných de facto společností Forminster jakožto ovládající osobou, nesmí v tomto ohledu vyvolávat jakékoliv pochybnosti.

V daném případě však nejenže hlavní majetková hodnota, tj. Obchodní dům KOTVA, byla vyvedena z majetku žalovaného č. 1, ale jsou činěny další úkony, které vedou k tomu, že žalovaný č. 1 zcela ztratil nad touto majetkovou hodnotou kontrolu.

Dosud byly provedeny tyto úkony:

1. Žalovaný č. 1 vložil Obchodní dům KOTVA do své dceřinné společnosti, kterou v danou dobu byl žalovaný č. 2 V době vkladu byl žalovaný č. 1 jediným akcionářem žalovaného č. 2;

2. Žalovaný č. 1 rozhodl jako jediný akcionář žalovaného č. 2 o transformaci žalovaného č. 2 na komanditní společnost, čímž došlo k tomu, že:

      a) zásadním způsobem se snížil podíl žalovaného č. 1 na zisku žalovaného č. 2 a na jeho likvidačním zůstatku (v současnosti má žalovaný č. 1 podíl na zisku ve výši necelých 50 %, podíl na likvidačním zůstatku 40%, ačkoliv jeho vklad představuje 98,6 % všech vkladů do společnosti – žalovaného č. 2 ),

      b) vzhledem k tomu, že žalovaný č. 1 se stal komanditistou žalovaného č. 2, nepodílí se na obchodním vedení žalovaného, tedy se transformací žalovaný č. 1 fakticky vzdal možnosti ovlivňovat hospodaření žalovaného č. 2.

3. Žalovaný č. 2 vykonávající jako jediný akcionář žalovaného č. 3 působnost jeho valné hromady přijal rozhodnutí o zvýšení základního kapitálu o 1.390.000.000 Kč, tj. ze stávající výše 2 000 000 Kč na novou výši základního kapitálu 1.392.000.000 Kč. Ke zvýšení základního kapitálu došlo upsáním nových akcií s tím, že všechny akcie byly nabídnuty k upsání jedinému akcionáři – žalovanému č. 2. Nové akcie byly splaceny nepeněžitým vkladem – Obchodním domem KOTVA Takto se žalovaný č. 3 stal vlastníkem Obchodního domu KOTVA.

Jak již bylo uvedeno shora, opatření státního zástupce spočívající v blokaci akcií žalovaného č. 1 se samozřejmě vztahuje na majetek žalovaného č. 1, který je blokovanými akciemi v širším slova smyslu reprezentován.

Již učiněnými kroky se podařilo společnostmi Forminster a statutárním orgánům žalovaného č. 1, které Forminster jako hlavní akcionář jmenoval, oddělit vlastnictví akcií žalovaného č. 1 od hlavní majetkové hodnoty, kterou v době uvalení opatření státního zástupce žalovaný č. 1 měl, tj. od Obchodního domu KOTVA, a tuto majetkovou hodnotu převést na subjekt, na jehož základním kapitálu se žalovaný č. 1 vůbec nijak nepodílí.

Praktický důsledek již učiněných kroků je tedy takový, že opatření státního zástupce prakticky pozbývá smysl.

V této souvislosti je rovněž podstatné, že žalovaný č. 3 má akcie na majitele. Tedy při případném převodu těchto akcií se nikdo nedozví (a to dokonce ani orgány Policie), že k takovémuto převodu došlo. Nebude možné dohledat podmínky převodu (zejm. osobu kupujícího, výši kupní ceny, zda bylo poskytnuto její zajištění, zda kupní cena byla uhrazena). Takto nelze zcela vyloučit riziko, že tyto akcie budou vyvedeny mimo skupinu společností skupiny KOTVA bez zaplacení kupní ceny a že takový kupující převede akcie na další subjekt, čímž příjem z prodeje akcií bude realizován zcela mimo společnosti skupiny KOTVA. Vzhledem ke shora uvedenému popisu obchodů realizovaných skupinou okolo Ing. Hálka je patrně pochopitelné, že žalobce pojímá tuto obavu.

### 3.4.3.  Důsledky obcházení opatření státního zástupce

Samozřejmě žalobce jako akcionář žalovaného č. 1 nemá zájem na tom, aby takovýmto způsobem a k jeho újmě přetrvávalo riziko, že bude fakticky dokončen proces, který různé orgány (viz citace shora) označily jako legalizaci výnosů z trestné činnosti dokončen, a proto podává tuto žalobu.

Jistě nelze pochybovat o tom, že shora uvedené, ačkoliv primárně se jedná o záležitost práva trestního, má rovněž své důsledky občanskoprávní. Nepochybně obecně všechny právní úkony, které směřují k legalizaci výnosů z trestné činnosti, jsou protiprávní ve smyslu ustanovení § 39 občanského zákoníku (rozpor se zákonem). Vzhledem k tomu, že z tohoto důvodu jsou neplatné všechny shora vyjmenované právní úkony, jejichž předmětem bylo nakládání s Obchodním domem KOTVA, je žalovaný č. 1 i nadále jeho vlastníkem[15].

Zcela závěrem žalobce poukazuje na to, že ve shora popsaném kontextu vyniká preventivní charakter této žaloby, neboť rozhodnutí o ní je způsobilé zabránit vzniku dalších soudních sporů, zřejmě i s mezinárodním prvkem (viz shora citované rozhodnutí Nejvyššího soudu ČR sp. zn 3 Cdo 1338/96 týkající se existence naléhavého právního zájmu na určení existence právního vztahu).

K důkazu:

- zpráva nuceného správce TREND VIF ze dne 22. února 1997 včetně dokumentů uvedených v její příloze,
- zpráva Ministerstva financí ze dne 21. 1. 1998, č.j. 102/90 17697,
- obžaloba proti obviněným Ing. Miroslavu Hálkovi a spol. podaná Krajským státním zastupitelstvím v Hradci Králové dne 30. září 1998, sp. zn. KZv 323/97,
- úplný výpis z obchodního rejstříku TREND VIF,
- zpráva Střediska cenných papírů ohledně převodu akcií žalovaného č. 1 z TREND VIF na Forminster (nechť vyžádá soud),
- prohlášení vkladatele ze dne 10. října 2000 ohledně převodu Obchodního domu KOTVA z žalovaného č. 1 na žalovaného č. 2,
- úplný výpis z obchodního rejstříku ohledně žalovaného č. 2,
- notářský zápis JUDr. Václava Halbicha ze dne 20. 5. 2003 č NZ 235/203, N 317/2003 (obsahuje rozhodnutí o změně právní formy žalovaného č. 2, včetně nového znění společenské smlouvy, dokládá pokles podílu na zisku, vypořádacího podílu a podílu na likvidačním zůstatku),
- výpis z katastru nemovitostí (LV č. 265 pro k ú. Staré Město),
- výroční zprávy žalovaného č. 1 za rok 2000, 2001 a 2003,
- rozhodnutí Knížecího zemského soudu ve Vaduzu, Lichtenštejnské knížectví o zmrazení peněžních prostředků na účtech Forminsteru a Presley Industries,
- žádost Vrchního státní zastupitelství ze dne 29. 8. 2002 pod č.j. VI VZv 3/2002 – 1597 o právní pomoc – dožádání Knížecího zemského soudu ve Vaduzu, Lichtenštejnské knížectví, ze dne 29. 8. 2002,

---

[15] Žalobce nepovažuje za nutné zabývat se na tomto místě neplatností právních úkonů týkajících se akcií žalovaného č. 1, neboť jeho právní postavení ovlivňují úkony týkající se Obchodního domu KOTVA. Žalobce v této souvislosti rovněž uvádí, že je mu známo, že mezi osobami, které zastupovaly TREND VIF a Forminster, byla v roce 1999 uzavřena dohoda, na jejímž základě se měl TREND VIF v budoucnu zdržet zpochybňování vlastnického práva Forminsteru k akciím žalovaného č. 1. Nicméně vzhledem k tomu, že právní úkony, které nejenže jsou absolutně neplatné pro rozpor se zákonem, ale kterými byly dokonce spáchány trestné činy, nemohou být následně legalizovány uzavřením dohody o narovnání, nepovažuje žalobce za potřebné se zde podrobněji touto dohodou zabývat.

- opatření státního zástupce o zablokování převodů akcií emitovaných žalovaným č 1 (nechť vyžádá soud),
- znalecký posudek oceňující hodnotu Obchodního domu KOTVA,
- s výhradou dalších důkazů.

## 4.    ZÁVĚR, ŽALOBNÍ PETIT

Žalobce shora popsal důvody, pro které jsou převody Obchodního domu Kotva ze žalovaného č 1 na žalovaného č 2 a ze žalovaného č. 2 na žalovaného č. 3 neplatné a pro které zůstává majitelem nemovitostí i nadále žalovaný č. 1. Rovněž tak žalobce doložil svůj naléhavý právní zájem na určení vlastnického práva k Obchodnímu domu KOTVA soudem.

Z důvodů shora uvedených žalobce navrhuje, aby soud po projednání věci vydal tento

### ROZSUDEK:

I.    Určuje se, že žalovaný č. 1 je výlučným vlastníkem těchto nemovitostí:

- budovy č.p. 656 (obč. vyb.) příslušná k části obce Staré Město, nacházející se na stavební parcele parc. č. 680;
- budovy bez č.p /č.ev. (obč. vyb.) příslušná k části obce Staré Město, nacházející se na stavební parcele parc. č. 1018/2;
- pozemku parc. č. 680 (zastavěná plocha a nádvoří) o výměře 4385 m$^2$;
- pozemku parc. č. 683/1 (ostatní plocha) o výměře 851 m$^2$;
- pozemku parc. č. 683/2 (ostatní plocha) o výměře 2963 m$^2$;
- pozemku parc. č. 683/3 (ostatní plocha) o výměře 2 m$^2$;
- pozemku parc. č. 690/2 (ostatní plocha) o výměře 25 m$^2$;
- pozemku parc. č. 690/3 (ostatní plocha) o výměře 49 m$^2$;
- pozemku parc. č. 690/4 (ostatní plocha) o výměře 9 m$^2$;
- pozemku parc. č. 1018/2 (zastavěná plocha a nádvoří) o výměře 1 m$^2$;

vše v katastrálním území Staré Město a obci Praha.

II.    Žalovaní jsou povinni společně a nerozdílně nahradit žalobci náklady řízení do 3 dnů od právní moci tohoto rozsudku.

GILROY LIMITED
Mgr. Ondřej Peterka
Advokát v plné moci

KC 1-2140

14



9

## TOMAN, DEVÁTÝ & PARTNEŘI
### ADVOKÁTNÍ KANCELÁŘ

Trojanova 12
120 00 Praha 2
tel /fax:  + 420 224 918 490
tel /zázn : + 420 918 491
fax:   + 420 224 920 468
e-mail:  ak@iustitia.cz

Advokáti:
JUDr. Stanislav Devátý, Dr.
Mgr. Jan Nekola
JUDr Jaroslav Novák, Ph D.
JUDr Jitka Pokorná
JUDr Zuzana Sniltková, Ph D
JUDr. Petr Toman

OBVODNÍ SOUD PRO PRAHU 1
PRAHA 1, OVOCNÝ TRH 14
Došlo
dne:    2 0 -08- 2004

Obvodní soud pro Prahu 1

Ovocný trh 14/587

112 94    Praha 1

Ke sp. zn. 13 C 131/2004

| | |
|---|---|
| Žalobce: | **GILROY LIMITED**<br>se sídlem Pikiony 4, Limassol, Kyperská republika |
| zastoupen: | **Mgr. Ondřejem Peterkou, advokátem,**<br>ČAK 4245, advokátní kancelář PETERKA & PARTNERS<br>v.o.s., se sídlem Na Příkopě 15, Praha 1 |
| Žalovaný 1: | **KOTVA a.s.**<br>se sídlem Praha 1, Nám. Republiky 8, IČ 60193808 |
| Žalovaný 2: | **KOTVA NEMOVITOSTI, k.s.**<br>se sídlem Příkop 4, Brno, IČ 26229048, |
| Žalovaný 3: | **SPV KN, a.s.**<br>se sídlem Brno, Příkop 4, IČ 26910705 |
| všichni zastoupeni: | JUDr. Petrem Tomanem, advokátem |

JUDr. Petr TOMAN
advokátní kancelář Trojanova 3, Praha 2 *advokát*
ČAK č. 0685
Trojanova 12, 120 00 Praha 2
Tel.: 224 918 490-1, fax 224 920 468
IČ 40436570, DIČ: CZ6203031890

# Vyjádření
žalovaných k žalobě o určení vlastnického práva k
nemovitostem

*dvojmo*
*plná moc*

KC 1-2141

Žalobou ze dne 30. 6. 2004 se žalobce ve smyslu § 80 litera c) o.s.ř. domáhá určení, že žalovaný 1 je vlastníkem nemovitosti: *budovy čp. 656 postavené v části obce Staré Město na pozemku parc. č. 680, zastavěná plocha a nádvoří, a souvisejících pozemků, vše zapsáno v katastru nemovitostí vedeném Katastrálním úřadem pro hlavní město Prahu katastrální pracoviště Praha, na listu vlastnictví č. 265 pro katastrální území Staré město, obec Praha* (dále jen OD KOTVA)

Žalovaní žalobou uplatněný nárok na určení právního vztahu neuznávají a ve lhůtě stanovené usnesením soudu podávají toto

# v y j á d ř e n í

## I.
## Nedostatek věcné legitimace a neexistence naléhavého právního zájmu

Dle § 80 litera c) o.s.ř. lze žalobou uplatnit, aby bylo rozhodnuto o určení, zda tu právní vztah nebo právo je či není, je-li na tom naléhavý právní zájem. Nezbytným předpokladem úspěšnosti určovací žaloby tak je, že účastníci mají věcnou legitimaci a že na požadovaném určení je naléhavý právní zájem.

### Nedostatek aktivní věcné legitimace žalobce

Aktivní věcnou (hmotně právní) legitimaci k podání žaloby na určení práva či právního vztahu má ten, kdo je účasten právního vztahu či práva, o něž v řízení jde, nebo ten, jehož právní sféry se sporný právní vztah nebo sporné právo týká.

Žalobce není účasten na právech ani právních vztazích k OD KOTVA a ani nic takového netvrdí. Žalovaní jsou narozdíl od žalobce přesvědčeni, že práva a právní vztahy k OD KOTVA se ani žádným způsobem nedotýkají jeho právní sféry.

Žalobce se akcionářem žalovaného 1 stal dávno poté, kdy žalovaný 1 vložil OD KOTVA do základního kapitálu žalovaného 2 a rovněž poté, co žalovaný 2 dne 27. 2. 2004 rozhodl o vkladu OD KOTVA do základního kapitálu žalovaného 3 (dne 27. 2. 2004 žalobce ještě nebyl akcionářem). <u>V době, kdy došlo k převodu vlastnického práva k OD KOTVA a kdy již byly splněny všechny podmínky pro převod OD KOTVA z žalovaného 2 na žalovaného 3, žalobce nebyl akcionářem OD KOTVA a tyto převody nemohly mít žádný dopad do jeho právní sféry.</u> Žalobce přitom mohl uvedené skutečnosti zjistit (a nepochybně zjistil) z veřejných zdrojů, jako jsou katastr nemovitostí či obchodní rejstřík apod.

Dlužno dodat, že uvedené převody by se ale nijak žalovaných nedotkly právní sféry žalobce ani kdyby se stal akcionářem již před převodem OD KOTVA z žalovaného 1 na žalovaného 2. Na právním postavení žalobce jako akcionáře žalovaného 1 by se uskutečněním uvedeného převodu totiž nic nezměnilo – žalobce by byl stále akcionářem žalovaného 1 a obsah jeho akcionářských práv stanovený obchodním zákoníkem by zmíněným převodem majetku nedoznal žádných změn.

Žalobce není v řízení aktivně věcně legitimován, neboť není účastníkem práv či právních vztahů, o něž v řízení jde, a tyto práva či právní vztahy se ani jinak nedotýkají

2

KC 1-2142

jeho právní sféry.

## Neexistence naléhavého právního zájmu žalobce na požadovaném určení

Ustálená judikatura obecných soudů vychází ze závěru, podle nichž naléhavý právní zájem je dán zejména tam, kde by bez určení práva či právního vztahu bylo <u>právo žalobce nebo právní vztah, na kterém je účasten,</u> ohroženo, popřípadě tam, kde by se bez tohoto určení <u>jeho právní postavení stalo nejistým</u>. O takový vztah se jedná, jestliže rozhodnutí soudu může zjednat určitost, jistotu a jasnost právních vztahů účastníků, mezi nimiž až do té doby byla existence právního vztahu neurčitá, nejistá a nejasná. <u>Ve smyslu ust. § 80 lit. c) o.s.ř. tedy nejde o jakýkoliv zájem, který by opravňoval žalobce k žalobě na určení, ale o zájem právní a naléhavý.</u>

Žalobce je akcionářem žalovaného 1, a to s jednou akcií odpovídající podílu ve výši 0,00000144 % základního kapitálu žalovaného 1. Komplexní právní úprava práv a povinností akcionáře akciové společnosti je obsažena v obchodním zákoníku. Příslušná ustanovení obchodního zákoníku pak přesně stanoví jakými prostředky se akcionář může svých práv domáhat. Mezi tyto prostředky však rozhodně nepatří žaloba o určení práv či právních vztahů, jejímiž účastníky jsou třetí osoby a akciová spol.nost, jíž je žalobce akcionářem. Opačný závěr by nepochybně vedl k absurdním důsledkům - totiž, že kterýkoliv akcionář akciové společnosti by mohl žalovat na určení neplatnosti jakékoliv smlouvy uzavřené touto společností, a to pouze s odůvodněním, že se mu nezdá pro společnost výhodná. Akcionář, kterému se kupř. nepodaří prosadit jeho zájmy na valné hromadě, by tímto způsobem mohl velmi efektivně šikanovat společnost, jíž je akcionářem.

Žalobce se v žalobě dovolává rozhodnutí Nejvyššího soudu ČR ze dne 7. 5. 2003 vydané pod sp. zn. 29 Odo 767/2002, v němž byla připuštěna existence naléhavého právního zájmu akcionáře na určení neplatnosti smlouvy uzavřené mezi společností, jíž je akcionářem, a třetí osobou.

**Z uvedeného judikátu Nejvyššího soudu ČR však rozhodně nevyplývá, že akcionář má naléhavý právní zájem na určení práva či právního vztahu za jakýchkoliv okolností.**

Tento judikát řeší konkrétní situaci, kdy nucený správce bývalé Investiční a poštovní banky, a.s. převedl podnik banky na nabyvatele - ČSOB, a.s., a to, vzhledem k hospodářské situaci v IPB, a.s., za zcela mimořádných a nestandardních podmínek.

Popsanou situaci, kterou se zabýval Nejvyšší soud ČR v rozhodnutí citovaném žalobcem, jistě nelze srovnávat se situací, jež je předmětem žaloby v tomto případě, a to z následujících důvodů:

- žalobce je majitelem pouze jedné akcie žalovaného 1 o nominální hodnotě 1 000,- Kč při základním kapitálu žalovaného 1 ve výši 694.209.000,- Kč, z čehož vyplývá, že škoda, která by mohla vzniknout žalobci na likvidačním zůstatku je ve srovnání s hodnotou majetku, jehož určení vlastnictví se žalobce proti žalovaným domáhá, zcela nepatrná,
- žalobce nabyl akcii žalovaného dávno poté, kdy již dle jeho názoru neplatným právním úkonem žalovaný 1 přišel o vlastnictví OD KOTVA, a rovněž poté, kdy již byly splněny všechny zákonné podmínky pro převod OD KOTVA z majetku

KC 1-2143

žalovaného 2 do majetku žalovaného 3 (žalobce tyto skutečnosti nepochybně zjistil
ještě před nákupem akcie žalovaného 1, když tuto evidentně nabyl právě a pouze za
účelem podání žaloby),

- vložení OD KOTVA do dceřiné společnosti řádně schválila valná hromada
žalovaného 1 a uvedené usnesení valné hromady nebylo v zákonné lhůtě napadeno
žalobou některého z akcionářů,

- žalovaný 1 vložil OD KOTVA do základního kapitálu žalovaného 2 v hodnotě určené
znaleckým posudkem a stejným způsobem byly tyto nemovitosti oceněny při jejich
vkladu do základního kapitálu žalovaného 3 – majetek žalovaného 1, jehož je žalobce
akcionářem, se tedy uvedenými převody nezmenšil,

- žalovaný 3, který je v současné době vlastníkem OD KOTVA, je řízen žalovaným 1, a
to prostřednictvím jeho dceřiných společností, které jsou žalovaným 1 jako jedinou
ovládající osobou celého holdingu zcela ovládány; není tedy určovací žaloba obstát
a domnívat, že by převody nemovitostí byly způsobilé zbavit žalovaného 1 jeho majetku
či vlivu na nakládání a správu s tímto majetkem (došlo toliko k transformaci
majetkové struktury do holdingového uspořádání).

**Z uvedeného vyplývá, že na požadovaném určení nemá žalobce naléhavý právní zájem.**

Neexistence naléhavého právního zájmu, resp. nedostatek aktivní věcné legitimace na straně
žalobce, je tedy samostatným a prvořadým důvodem, pro který nemůže určovací žaloba obstát
a který sám o sobě bez dalšího vede k jejímu zamítnutí. V souladu s ustálenou soudní
judikaturou přitom platí, že soud v prvé řadě zjišťuje, zda je žalobce k podání žaloby aktivně
věcně legitimován a zda je na požadovaném určení naléhavý právní, přičemž zjistí-li, že tomu
tak není, žalobu bez dalšího zamítne. V této souvislosti lze citovat z rozhodnutí Nejvyššího
soudu ČR ze dne 27. 3. 1997 vydaného pod sp. zn. 3 Cdon 1338/96, dle něhož „*Zamítá-li
soud žalobu na určení, zda tu právo nebo právní vztah je či není, pro nedostatek naléhavého
právního zájmu na takovém určení, je vyloučeno, aby současně žalobu přezkoumal po stránce
věcné* ".

**S ohledem na výše uvedené skutečnosti, žalovaní navrhují, aby soud, aniž by se zabýval
její věcnou stránkou, žalobu zamítl z důvodu nedostatku aktivní věcné legitimace na
straně žalobce a neexistence naléhavého právního zájmu na požadovaném určení.**

## II.
## Skutková tvrzení a právní závěry obsažené v žalobě

Jak bylo uvedeno výše, soud by se v tomto případě neměl zabývat věcnou stránkou žaloby,
žalovaní tedy nepovažují za nutné vyjadřovat se ke všem skutkovým tvrzením žalobce a
z nich vyvozeným právním závěrům. Za vhodné považuje uvést některá základní a
nezpochybnitelná fakta, na jejichž základě lze učinit jednoznačný závěr o účelovosti
jednotlivých tvrzení žalobce, jakož i žaloby jako celku.

Žalovaní uvádějí níže následující skutečnosti s tím, že jsou schopni jejich pravdivost kdykoliv
doložit:

1) Dne 21. 12. 1999 uzavřela společnost FORMISTER ENTERPRISES LIMITED, se sídlem Diagorou street, Kermia House, Office 601, Nicosia, Kypr, reg. číslo 78692 (dále jen FEL) se společností TREND – VIF, a.s., IČ 45245177, se sídlem Škroupova 441, Hradec Králové (dále jen TERND) Dohodu o narovnání. Tato dohoda učinila mezi stranami nesporným, že FEL je oprávněným majitelem akcií žalovaného 1, proti čemuž se FEL zavázal zaplatit na účet TRENDU částku 350.000.000,- Kč. Platnost této dohody akceptoval následně i správce konkurzní podstaty TRENDU společně s konkurzním soudem. Na základě této dohody byla zastavena všechna do té doby probíhající soudní řízení a zrušena všechna předběžná opatření zakazující navrhovateli nakládat s předmětnými akciemi

2) Dne 4. 9. 1998 uzavřel FEL formou notářského zápisu Dohodu o narovnání s IF MERCIA, a.s., IČ 15054101, se sídlem Londýnská 53, Praha 2 (dále jen MERCIA), která byla dne 9. září 1998 formou soudního smíru schválena Krajským obchodním soudem v Praze (sp. zn. 46 Cm 260/97) Na základě této dohody bylo učiněno rovněž nesporným, že FEL je řádným majitelem akcií žalovaného 1, proti čemuž se FEL zavázal zaplatit na účet MERCIE částku 35.000.000,- Kč. Platnost této dohody následně akceptoval rovněž nucený správce jmenovaný Komisí pro cenné papíry.

3) Výše uvedenými dohodami o narovnání se zabývala také Komise pro cenné papíry, a to na jednáních dne 19. 4. 1999 a následně dne 21. 12. 1999. Výsledkem těchto jednání byla především skutečnost, že Komise cenných papírů nezpochybnila platnost uzavřených dohod s TRENDEM a MERCIÍ a akceptovala částky, které se v nich FEL zavázal zaplatit oběma investičním fondům.

4) V současné době skutečně probíhá trestní řízení proti ing Miroslavu Hálkovi a spol., v tomto řízení však nebyl předložen žádný důkaz o majetkovém či personálním propojení FEL s ing. Hálkem, některým s dalších obviněných v této kauze či jakoukoliv ze společností ovládaných ing. Hálkem, příp. dalšími spoluobviněnými.

5) Žádný z členů současných statutárních orgánů žalovaných nebyl v souvislosti s převody majetku investičních fondů TREND VIF a MERCIA popisovanými v žalobě trestně stíhán.

6) Převody vlastnického práva k OD KOTVA z žalovaného 1 na žalovaného 2 a dále na žalovaného 3 nejsou a nebyly předmětem žádného trestního řízení.

7) Příkazem k registraci pozastavení práva nakládat s cennými papíry podle § 27 odst. 3 písm. d) zákona č. 591/1992 Sb., o cenných papírech ze dne 12. 5. 1997 Krajské státní zastupitelství v Hradci Králové pozastavilo právo FEL převádět akcie žalovaného 1, toto rozhodnutí však nebrání FEL hlasovat s akciemi žalovaného 1 na valné hromadě, tj. přijímat rozhodnutí nezbytná pro další podnikatelskou činnost žalovaného 1

:

Převážná část žaloby obsahuje popis trestné činnosti ing. Miroslava Hálka a spol., ke které mělo docházet v letech 1995 až 1997 v souvislosti se správou majetku investičních fondů TREND VIF a MERCIA, kteroužto ing. Hálek vykonával prostřednictvím společnosti KRÁLOVEHRADECKÁ BROKERSKÁ, a.s. (nyní Brněnská obchodní, a.s.), IČ 60914122, se sídlem Lipová 27, Brno.

5



Žalobce pak bez uvedení jakýchkoliv důkazů pro takové tvrzení konstatuje, že převody vlastnického práva k OD KOTVA z žalovaného 1 na žalovaného 2, resp. žalovaného 3 má dojít k legalizaci výnosů z trestné činnosti ing. Hálka a spol., z čehož dovozuje jejich absolutní neplatnost pro rozpor se zákonem ve smyslu § 39 občanského zákoníku

Z ust. § 135 o.s.ř. vyplývá, že v občanském soudním řízení není soud oprávněn sám posuzovat, zda došlo ke spáchání trestného činu či nikoliv

Jak bylo již uvedeno výše, nebylo ohledně jednání, jimiž byla OD KOTVA převedena do majetku jejich dceřiných společností, zahájeno žádné trestní řízení. Tyto převody rovněž nejsou předmětem trestního řízení vedeného proti ing. Hálkovi a spol. a s jeho trestní činností ani jinak nesouvisí

Žalobcem tvrzené důvody pro absolutní neplatnost napadených převodů OD KOTVA tak nemohou obstát, neboť soud není v tomto řízení oprávněn je posuzovat. Žalobce přitom žádné, z hlediska tohoto řízení relevantní důvody pro absolutní neplatnost jednotlivých převodů OD KOTVA neuvádí. Žalobce si je nepochybně této skutečnosti vědom, což pouze umocňuje účelovost jím podané žaloby.

## III.

S ohledem na výše uvedené skutečnosti žalovaní navrhují, aby soud žalobu zamítl a přiznal žalovaným náhradu nákladů soudního řízení

V Praze dne 19 srpna 2004

KOTVA a.s.
KOTVA NEMOVITOSTI, k.s.
SPV KN, a.s.

KC 1-2146

**Příloha 10**
**Znalecký posudek**

Příloha 1
Výpisy z obchodního rejstříku

Dated 4th March 2005

SPV CO. Limited

and

CRQ Czech a.s.

## AGREEMENT ON THE TRANSFER OF TRADEMARKS

in accordance with the provisions of section 269 (1) of Act No. 513/1991 Coll., the Commercial Code, as amended, taking into account the provisions of section 15 of Act No. 441/2003 Coll., on Registered Trademarks, as amended

Linklaters

Palác Myslbek
Na Příkopě 19
117 19 Prague 1

Telephone (420) 221 622 111
Facsimile (420) 221 622 199

Ref L-033253

THIS AGREEMENT is concluded on 4th March between:

(1)     **SPV CO Limited**, with its registered office at Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus, company registration no HE 148845, registered in Cyprus, represented by Martin Benda (the "**Transferor**"); and

(2)     **CRQ Czech a.s.**, with its registered office Prague 1, Národní 1435/6, Post Code 11000, Identification no. 27159256, registered in the Companies Register by the Municipal Court in Prague, in Part B, File 9394, and represented by Aidan Scully and Frank Walker (the "**Acquirer**")

Whereas:

(A)     The Transferor has legally and validly acquired the trademarks and the applications for trademark registrations as specified hereunder (clause 1.1) through a non-monetary contribution (the "**Contribution**") to its issued and authorised share capital in consideration to issuing the shares representing the whole issued and authorized share capital. The sole member of the Transferor, the company **KOTVA NEMOVITOSTI, k.s.** of Brno, Příkop 4, Post code: 60200, Czech Republic (hereinafter referred to as "**KN**") was the only subscriber of the issued and authorized share capital and has paid up the issued shares of the Transferor representing the issued and authorized share capital by a non-monetary contribution a part of which were the said trademarks.

(B)     The above mentioned transfer of (i) the Czech trademark having the registration No. 167478 and (ii) the applications for trademark registrations from KN to the Transferor has been registered with the Industrial Property Office of the Czech Republic in Prague.

(C)     The transfer of the Slovak trademark having the registration No. 167478 from KN to the Transferor has not been registered yet. The application for registration of this transfer from KN to the Transferor has been filed with the Industrial Property Offices of Slovakia in Bratislava.

## 1     Subject matter of the Agreement

1.1     The subject matter of this Agreement is the transfer, for a consideration, of the registered trademarks specified in Schedule 1 hereto (hereinafter referred also to as the "**Registered Trademarks**") and the unregistered trademarks specified in Schedule 2 hereto (hereinafter referred also to as the "**Unregistered Trademarks or Applications**") being the applied designations as on the date of signing of this Agreement (hereinafter collectively referred to as the "**Trademarks**") from the Transferor to the Acquirer

1.2     By this Agreement the Transferor transfers to the Acquirer for a consideration the Trademarks specified in Schedule 1 and 2 hereto for all products and services for which they are registered or being registered in the case of the Unregistered Trademarks and/or for which they have been used originally by KN and then after the Contribution has been made by the Transferor whilst they have become commonly known to the public and the Acquirer accepts these Trademarks.

## 2     Obligations and representations of the Transferor

2.1     On the date of signing of this Agreement the Transferor shall deliver to the Acquirer originals of certificates of registration in the register maintained by the Industrial Property Offices of the Czech Republic in Prague and Slovakia in Bratislava (the "**Offices**") in respect of all the registered trademarks being transferred. At the same time the Transferor shall deliver to the Acquirer copies of the Applications of the Unregistered Trademarks as

specified in Schedule 2 along with respective documents related to the procedure of registration of these trademarks. The Parties shall execute a record of delivery and acceptance of the original certificates of registration, applications of the Unregistered Trademark as well as other related documents in the form of Schedule 3 hereto.

2.2    The Transferor declares that as at the date of signing of this Agreement it is the rightful owner of the above-mentioned registered trademarks registered in the registers maintained by the Offices, that there is nothing preventing the transfer of these registered trademarks to the Acquirer, and that no third party has any rights to these registered trademarks (e.g. licence or pledge). The Transferor further declares that as at the date of signing of this Agreement it is the rightful owner of the Unregistered Trademarks as specified in Schedule 2. The Unregistered Trademarks have been used by the Transferor in commercial relationships and by such use these applied designations (the Applications No. 355 884 and 355 885 filed with the Patent and Trademark Office of the Czech Republic) have acquired resolving ability in relation to the goods and services for which the registration is being required.

2.3    The Transferor shall provide the Acquirer all necessary cooperation in respect of all respective procedures towards the Offices in connection of the transfer of the Trademarks consisting of (i) changing the registration of the Registered Trademarks and (ii) transfer of the Applications from the Transferor to the Acquirer as regards the Unregistered Trademarks. If the Offices require an additional written approval to the transfer of the Trademarks, the Transferor shall grant the Acquirer such approval without undue delay and no later than 10 days from the date on which it receives the request of the Acquirer.

2.4    The Transferor further declares that (i) it transfers to the Acquirer all its trademarks, (ii) does not own any trademarks with the exception of trademarks listed in Schedule 1 and Schedule 2 hereof, (iii) in the last 5 years the Transferor did not transfer any trademarks in its ownership to third persons nor did the Transferor established or allowed to establish any other rights of third persons to the trademarks (i.e. license, pledges) and (iv) the Transferor is not aware of the fact that any of trademarks owned by the Transferor were anytime transferred to third persons in the past nor that any other rights of third persons were established to the trademarks. The Transferor is obliged to secure that these representations is valid at the time of signing of this Agreement.

## 3    Obligations and representations of the Acquirer

3.1    The Acquirer declares that the products and services for which the Registered Trademarks are registered and the Unregistered Trademarks having been applied are the subject of its business, which fulfils the condition for acquisition of these registered trademarks.

3.2    The Acquirer undertakes to accept the Trademarks according to this Agreement and pay the Transferor the Price according to article 4.1 of this Agreement

3.3    The Acquirer will file an application for registration of the transfer of the Registered Trademarks and will file an application for the transfer of the Applications from the Transferor to the Acquirer in the register of registered trademarks maintained by the Office within 10 calendar days of the date of signing of this Agreement. The transfer of Slovak trademark having the registration No. 56381 will be operated from the first applicant (KN) through the Transferor to the Acquirer.

4    **Price**

4.1    The price according to this Agreement means the price for the transfer of all the Trademarks specified in Section 1 above (the **"Price"**). The price has been agreed by the parties in a total amount of CZK 135,000,000 (Czech Crowns) (in words: one hundred and thirty five million Czech crowns).

4.2    The Price is agreed exclusive of any value added tax (**"VAT"**). The Acquirer shall not pay to the Transferor any VAT charged on the top of the Price.

4.3    The Price in full has been paid by the Acquirer to the Transferor on the date hereof.

4.4    The taxable supply for VAT purposes is taking place on the day on which the transfer of Trademarks becomes effective

4.5    The Transferor is obliged to deliver to the Acquirer an invoice relating to the transfer of Trademarks and fulfilling the requirements of a tax document according to the Czech VAT Act including the Transferor's VAT number within 15 days after the day of taxable supply.

5    **VAT Warranties**

5.1    The Transferor warrants to the Acquirer that:-

    5.1.1    it is properly registered for VAT in Cyprus;

    5.1.2    it has no fixed establishment in the Czech Republic as defined for VAT purposes

5.2    The Acquirer warrants to the Transferor that:-

    5.2.1    it is properly registered for VAT in the Czech Republic.

5.3    The Transferor shall indemnify the Acquirer for any loss suffered by the Acquirer in respect of any VAT reassessed to the Acquirer or in respect of any VAT deduction claimed in the Acquirer's VAT returns and not accepted by a tax authority by virtue of a breach of warranty under this paragraph or by virtue of not delivering to the Acquirer the invoice fulfilling the requirements of a tax document as determined in paragraph 4.4 of this Agreement

6    **Final provisions**

This Agreement becomes valid and effective on the date it is signed  This Agreement becomes effective in relation to third parties upon the registration of the (i) change of the owner of the Registered Trademarks and (ii) transfer of the Applications for registration of the Unregistered Trademarks to the Acquirer in the register of registered trademarks maintained by the Offices  Schedule 1 and Schedule 2 containing the specification of the Trademarks are an indivisible part of this Agreement.

---

This Agreement is executed in two counterparts in English with each of the parties receiving one counterpart of each language version.

In Vienna on 4th March 2005

Transferor

Martin Benda

SPV CO

Acquirer

Frank Walker    and    Aidan Scully

CRQ Czech a.s

Schedule 1
List of Registered Trademarks to be Transferred

| Trademark | Type | Date Registered | Application No. | Registration No. | Classes | Registered with |
|---|---|---|---|---|---|---|
| KOTVA | Word-Device | 6 December 1989 | 56381 | 167478 | 3,14,18,21,24,25,28 | Prague Office |
| KOTVA | Word-Device | 6 December 1989 | 56381 | 167478 | 3,14,18,21,24,25,28 | Bratislava Office |

Schedule 2

**List of Unregistered Trademarks the Applications for which to be Transferred**

| Trademark | Type | Date of filing the application | Application No. | Date of pre-emptive right | Classes | Applied for with |
|---|---|---|---|---|---|---|
| KOTVA | Word-Device | 1 July 2004 | 355 885 | 1 July 2004 | 3,5,8,9,11,12,13,14,15, 16,17,18,20,21,22,23, 24,25,26,27,28,29,30, 31,32,33,34,35,36,39, 41,42,43,44,45 | Prague Office |
| KOTVA | Word Only | 1 July 2004 | 355 884 | 1 July 2004 | 3,5,8,9,11,12,13,14,15, 16,17,18,20,21,22,23, 24,25,26,27,28,29,30, 31,32,33,34,35,36,39, 41,42,43,44,45 | Prague Office |

KC 1-2016

Schedule 3
## Record of Delivery and Acceptance of the Original Certificates of the Registered Trademarks and applications and other documents related to the Unregistered Trademarks

SPV CO, with its registered office at Agiou Pavlou 15, Ledra House, Agios Andreas, P.C 1105, Nicosia, Cyprus, company registration no HE 148845, registered in Cyprus, represented by Martin Benda, as the **Transferor**; and

CRQ Czech a.s., with its registered office Prague 1, Národní 1435/6, Post Code 11000, Identification no. 27159256, registered in the Companies Register by the Regional Court in Prague, in Part B. File 9394, and represented by Aidan Scully and Frank Walker, as the **Acquirer**

### hereby certify

1.     that the Transferor has delivered to the Acquirer originals of certificates of registration of Registered Trademarks of the Transferor as specified in Schedule 1 to this Agreement.

2.     that the Transferor has delivered to the Acquirer copies of the applications to registration of the unregistered trademarks as specified in Schedule 2 to this Agreement including all correspondence of the applicant (KN) with the Patent and Trademark Office of the Czech Republic in relation to the procedure of registration of the Unregistered Trademarks.

In Vienna on 4th March 2005

Transferor:                           Acquirer:

SPV CO                                CRQ Czech a.s.

Martin Benda                          Frank Walker          and     Aidan Scully

A0448267.1/2 2/28 Feb 2005

3

KC 1-2017

**Zápis ze zasedání představenstva společnosti KOTVA a.s.,**
IČ: 60193808, se sídlem: Praha 1, Náměstí republiky 8, konaného
dne 19. ledna 2005 od 13.00 hod.
v OD KOTVA, na adrese: náměstí Republiky 8, Praha 1

Program:

- **Nárok na náhradu škody proti Andrew Weissovi a spol. – další postup**

Představenstvo je přítomno ve složení:

Marek Kolíbal, předseda představenstva
Jiří Kvapil, člen představenstva
JUDr. Miloslav Sobola, člen představenstva

jako host se účastnil Ing. Richard Harazim, ředitel společnosti

V úvodu zasedání pan Marek Kolíbal, předseda představenstva konstatoval, že dnešní zasedání bylo řádně svoláno písemnou pozvánkou, kterou přítomní členové představenstva obdrželi v souladu se stanovami společnosti.

Navrhl aby zapisovatelem dnešního zasedání byl zvolen JUDr. Miloslav Sobola.

Protože nebylo jiných návrhů ani připomínek, nechal o svém návrhu nechal hlasovat.

Všichni členové představenstva hlasovali pro a usnesení navržené předsedou představenstva o volbě JUDr. Miloslava Soboly zapisovatelem dnešního zasedání představenstva bylo přijato.

Poté předseda představenstva zrekapituloval současný stav společnosti KOTVA a.s. v důsledku útoků ze strany Andrew Weisse a spol. Uvedl, že podanými žalobami (žaloby společnosti GILROY LIMITED a KT, Inc. o určení vlastnického práva k nemovitostem OD KOTVA) došlo k blokaci značné částky protiplnění od zahraničního partnera dle uzavřené SPA. Blokace peněžních prostředků a nemožnost jejich užívání k podnikání přitom způsobuje škodu společnosti, resp. vnukovské společnosti SPV CO. LIMITED. Zdůraznil, že tato škoda každým dnem trvání blokace v důsledku účelově podaných žalob narůstá.

Přítomní členové představenstva vyjádřili s tvrzeními předsedy souhlas. JUDr. Sobola navrhl,

K5079

1/ z hlediska českého práva je spojení obou žalobců, tj. společností GILROY a KT s Andrew Weissem problematické;

2/ délka soudního řízení by i v případě kladného výsledku nemusela vést k úspěchu, tj. reálnému vymožení škody, a to nejen v důsledku očekávatelné značné doby trvání řízení, ale i z hlediska možného výkonu rozhodnutí, kdy tento by byl stěží realizovatelný.

Podstatně větší šance na úspěch v případném soudním sporu by však mohlo přinést uplatnění nároků na náhradu škody přímo v USA s ohledem na existenci dostatečného množství důkazů dodaných Ing. Hoffmannem i případný výkon rozhodnutí. Případné uplatnění nároků společnosti v USA by pak bylo jistě podstatně dražší než v České republice. Navíc, nikdo z nás nemá dostatečné znalosti o způsobu právní ochrany v USA, zejména přípustnosti případné žaloby a jejích šancí na úspěch."

Předseda představenstva poté uvedl, že představenstvo by mělo v otázce dalšího postupu vůči oběma společnostem, resp. Andrew Weissovi, zaujmout relevantní stanovisko. Sám poté navrhl, aby byla ověřena pozice společnosti v případném sporu v USA. Navrhl, aby představenstvo společnosti přijalo toto usnesení:

„Představenstvo společnosti pověřuje Ing. Richarda Harazima, generálního ředitele, aby:

1/ vyhledal a oslovil vhodnou právní kancelář v USA s požadavkem na zhodnocení pozice společnosti v případném sporu;

2/ zjistil odhadované maximální náklady spojené s případným uplatněním nároku v USA;

3/ o výsledcích výše uvedených zjištění bezodkladně informoval představenstvo společnosti."

O předneseném návrhu nechal poté předseda představenstva hlasovat.

Hlasováno bylo zvednutím ruky. Všichni přítomní členové představenstva hlasovali pro přijetí usnesení navrženého předsedou představenstva.

**Předseda představenstva konstatoval, že jim navržené usnesení o postupu ve věci uplatnění nároků společnosti na náhradu škody proti Andrew Weissovi byl platně přijato.**



K5080

# CHRISTODOULOS G. VASSILIADES & CO.

*Advocates - Legal Consultants*

Nicosia, 28 January, 2005

**TO:**

Markland Holdings Limited

19 Upper Fitzwilliam Road

Dublin 1

Republic of Ireland

### LEGAL OPINION
### IN THE MATTER OF INCORPORATION PROCEDURE OF
### THE CYPRUS COMPANY SPV CO. LIMITED
### AND ITS OBLIGATIONS UNDER AGREEMENTS
### TO WHICH IT IS A PARTY

We the undersigned, Messrs Christodoulos G. Vassiliades & Co , Advocates-Legal Consultants, of Nicosia Cyprus and lawyers entrusted with the incorporation of the company **SPV.CO LIMITED** ("the Company") have been instructed to advise on the following matters:

(a) The validity of the incorporation of the Company to the Registrar of Companies in Cyprus;

(b) The validity of the process of payment of the issued share capital of the Company which has been subscribed by KOTVA NEMOVITOSTI, K S through a non monetary contribution of shares and trademarks in accordance to the Agreement on Transfer of Trademarks and Shares as a Non-Cash Contribution a copy of which is attached herewith as Schedule 1 (hereinafter referred to as "the Agreement") To this effect we have noted the document listed in Schedule 2 namely the Minutes of the Unlimited partners of KOTVA NEMOVITOSTI K.S. (hereinafter referred to as the Minutes")

15 Agiou Pavlou Str.. LEDRA HOUSE, Agios Andreas, 1105 Nicosia, CYPRUS
TEL: + 357 22 556677, FAX: + 357 22 556688   E-MAIL: vasslaw@cy net  HTTP://www.vasslaw.com
MAILING ADDRESS: P.O.Box 24444, P.C. 1703 Nicosia, CYPRUS

K2648

# CHRISTODOULOS G. VASSILIADES & CO.
### Advocates - Legal Consultants

(c) The capacity of the Company to enter into any agreements that create legal rights and obligations to the Company in accordance to the laws of its country of incorporation and in particular the capacity to enter into the said Agreement and or the Share Purchase Agreement between the Company and CRQ Czech a.s. relating to the purchase of shares in SPV KN a.s , copy of which is attached herewith as Schedule 3 (hereinafter referred to as "the SPA")

(d) The validity of the execution of the Agreement and SPA when signed solely on behalf of the Company by one of the Company's directors namely Mr Martin Benda.

We confirm that we have considered the Agreement, the Minutes and the SPA and based on (i) all applicable laws (ii) all public Registers in Cyprus (iii) the Memorandum and Articles of Association of the Company and all relevant statutes, laws and regulations of Cyprus, we are pleased to confirm and opine on the following:

### I. Incorporation Procedure of the Company

1. The Company was incorporated in Cyprus on 27th of May 2004 as an international business company under registration number 148845. The Registrar of Companies has issued the respective certificate of incorporation and we confirm that the incorporation was carried out validly and effectively.

2. The registered office of the Company is situated at Agiou Pavlou 15, LEDRA HOUSE, Agios Andreas, 1105 Nicosia, Cyprus. The Registrar of Companies has issued the official certificate of registered office.

3. The directors of the Company are Mr Evangelos Gregoriou of Epidavrou 17A, Drosia, P.C 6036, Larnaca, Cyprus, Mr Paraskevas Zacharoullis of Karaiskaki 8, Aradippou, Larnaka, Cyprus and Mr Martin Benda of Borac 46, Zdar Nad Sazavou 592 61, Czech Republic. (hereinafter referred to as "the Directors")



K2649

CHRISTODOULOS G. VASSILIADES & CO.
*Advocates · Legal Consultants*

4. The said Messrs Evangelos Gregoriou and Paraskevas Zacharoullis are acting as nominee directors of the Company and their duties are only carried out in accordance to the instructions provided to them by the shareholders of the Company or in accordance to the indemnity documentation which has been signed by the shareholders of the Company

5. The secretary of the Company is Mr Paraskevas Zacharoullis of Karaiskaki 8, Aradippou, Larnaka, Cyprus.

6. The Registrar of Companies has issued the official certificate of Directors and Secretary.

7. The authorized share capital of the Company is equal to CZK 4,000,000,000 (four billion Czech Crowns) divided into 400 shares of CZK 10,000,000 each.

8. The issued share capital of the Company consists of 148 shares of CZK 10,000,000 each, and is registered and issued and allotted in the name of KOTVA NEMOVITOSTI, K S. a limited partnership, having identification number 26229048, of Brno, Prikop 4, 60200 Prague, Czech Republic. The Registrar of Companies has issued the official certificate of shareholders

9. All the payable stamp duties as well as all other fees payable to the Registrar of Companies for the Company's incorporation with such share capital as described above in paragraphs 7 and 8 and for obtaining all the respective certificates confirming the structure of the Company namely the certificate of incorporation, directors and secretary, shareholders, registered office and the Memorandum and Articles of Association, were all paid immediately upon submission of the application for Company's incorporation. The total amount paid to the Registrar of Companies was CYP£24,208 (twenty four thousand two hundred and eight Cyprus pounds) and no further sums are outstanding in relation to the Company's incorporation procedure.

10 We confirm that the Company has been incorporated in accordance to all the requirements as stated in and or provided for by the Companies Act, CAP 113



K2650

CHRISTODOULOS G. VASSILIADES & CO.
*Advocates - Legal Consultants*

and as such it may enter into any and all transactions as permitted by its Memorandum of Association and the law in the manner described by its Articles of Association and the law

**II. *The Agreement and the Minutes under Cyprus law: Legal effect and Validity for non-monetary contribution***

1. The Company has any and all respective rights and obligations accrued by the terms or provisions of the Agreement referred to in Schedule 1 hereof.

2. The Company's capital has been paid and or contributed in the manner described in the Minutes

By the execution of the Agreement and the Minutes and in view of Paragraph III (1) hereof the requirement for the non-monetary payment of the issued share capital of the Company which consists of 148 shares of CZK 10,000,000 each, having been subscribed and being registered and issued and allotted in the name of KOTVA NEMOVITOSTI, K.S. a limited partnership, having identification number 26229048, of Brno, Prikop 4, 60200 Prague, Czech Republic, is satisfied

**III. *Capacity of the Company to enter into the Agreement and the SPA***

1. By virtue of the Company's Memorandum of Association the Company is entitled "to enter into any agreement or contract and do any act with any state, governmental, municipal or other authority body or organ or with any person as in the circumstances may be considered necessary, to the attainment of the objects of the Company".

2. The Company is fully authorized and entitled to be a party to the Agreement referred to in Schedule 1 and the SPA referred to in Schedule 3 hereof.



K2651

# CHRISTODOULOS G. VASSILIADES & CO.
*Advocates - Legal Consultants*

### IV. Sole signature on the Agreement and SPA

1. Article 3 of the Articles of Association of the Company confirms the appliance of Part I of Table A of the First Schedule of the Companies Law (hereinafter referred to as "Table A").

2. Article 80 of Table A clearly states that the business of the Company shall be managed by the Directors who may exercise all such powers of the Company.

3. According to Section 31 of the Articles of Association of the Company the quorum necessary for the transaction of business of directors may be fixed by them and until so fixed one director shall form a quorum.

4. The Company may via its authorized representative in the manner considered under paragraphs III (2) and (3) hereof of, negotiate and review and execute or validly sign and deliver or otherwise deal in any respective manner which the Company may deem fit or proper. This provision is subject to provisions of I (3) and I (4) hereof.

### VI. Miscellaneous

1. No authorisations, approvals, consents, licences, exemptions, filings, registrations, notarisations and other requirements of governmental, judicial and public bodies and authorities of or in Cyprus are required or advisable in connection with the entry into, performance, validity, and enforceability of the Agreement and the Minutes.

2. No stamp, registration, documentary or similar tax is payable in respect of the entry into, performance or enforcement of the Agreement and the Minutes or to render them admissible in evidence.



K2652

# CHRISTODOULOS G. VASSILIADES & CO.
*Advocates - Legal Consultants*

3. No deduction or withholding, whether on account of tax or otherwise, will be required from any payment by the Company under the Agreement and the Minutes

4. Neither the Company nor its assets is entitled to immunity from suit, execution, attachment or other legal process in Cyprus.

5. The Company's payment obligations under the Agreement and the Minutes rank at least equally or rateably in all respects with its other unsecured indebtedness.

6. No proceedings have been started or other steps taken for the winding-up or dissolution of the Company or the appointment of a receiver, trustee or similar officer of any of its assets or revenues

## VI. Conclusion

1. We are pleased to confirm that the Company has been duly incorporated under the Laws of Cyprus and is validly registered in and in good standing with the Cyprus Companies register and has the capacity to sue or be sued in its own name.

2. The Company has the capacity to enter into the Agreement and the SPA as well as in other Agreements (so long as these other Agreements are within the provisions of the Company's Memorandum and Articles of the Company) whether governed by the laws of its country of incorporation or otherwise and to perform and comply with all the obligations accrued thereof.

3. All legal actions, conditions and things required by the laws of Cyprus were taken, fulfilled or done to:

(a)    enable the Company to enter into the Agreement and the SPA



K2653

## CHRISTODOULOS G. VASSILIADES & CO.
*Advocates - Legal Consultants*

(b)    ensure that the rights and obligations of the Company under the Agreement and the Minutes are legally binding, valid and enforceable; and

(c)    make the Documents admissible in evidence a court of law in Cyprus

4. (a)    The entry of the Company into the Agreement and the SPA and or the subject matter of the Minutes namely the non-monetary contribution of the share capital of the Company would not violate:

   (i)    any present law or regulation in Cyprus; or

   (ii)    the constitutional documents of the Company; or

   (iii)    any agreement to which the Company is a party or which is binding upon it

5    The Agreement and the Minutes are sufficient in order to perform valid and effective non-monetary contribution to the Company and upon execution of the Agreement and the Minutes attached herewith as Schedules 1 and 3 the valid and effective non-monetary contribution has been constituted.

6.    The constitution of the Company provides that Martin Benda is duly authorised to execute the Agreement and the SPA and or any other Agreements on behalf of the Company in his capacity as Director of the Company.

7    This Opinion shall be governed by and construed in accordance with the Laws of    the Republic of Cyprus and is strictly limited to the matters specifically stated herein. It is not to be read as extending by implication to any other matter.

8.    This opinion is addressed to you solely for your benefit and solely for the purpose of the Agreements. In addition, it may be relied upon by Anglo-Irish Bank Corporation plc and any successors in title to your interest in the



K2654

# CHRISTODOULOS G. VASSILIADES & CO.
*Advocates - Legal Consultants*

company, being specifically SPV KN to which the Documents relate. It is not to be relied upon by anyone else or for any other purpose without our express consent.

Sincerely Yours

Christodoulos G. Vassiliades & Co.

K2655