UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ANDREW WEISS and WEISS ASSET ) | |
| MANAGEMENT, LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | C.A. No. 05-10679-RCL |
| ) | |
| ANDREW WEISS, WEISS ASSET ) | |
| MANAGEMENT LLC, K T, INC. and CVF ) | |
| INVESTMENTS, LTD., ) | |
| ) | |
| Counterclaim-plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| KOTVA a.s., MARTIN BENDA, RICHARD ) | |
| HARAZIM, FORMINSTER ENTERPRISES, ) | |
| LTD., SPV CO and JOHN DOES 1–5, ) | |
| ) | |
| Counterclaim-defendants. ) | |
| ) | |

**COUNTERCLAIM-PLAINTIFFS' MOTION FOR LEAVE TO FILE FURTHER
MATERIALS IN OPPOSITION TO JURISDICTIONAL MOTIONS**

Pursuant to Local Rule 7.1(b)(3), counterclaim-plaintiffs Andrew Weiss, Weiss Asset

Management LLC, K T, Inc. and CVF Investments Ltd. (collectively, the "Weiss Parties"),  by

and through their attorneys, hereby move for leave to file portions of the transcript, including an

exhibit, of a deposition of the plaintiff, K-T-V Invest a.s. (formerly known as Kotva a.s.).  These

transcript excerpts and exhibit contain evidence directly relevant to the motions to dismiss for

lack of personal jurisdiction filed by Richard Harazim, Martin Benda, Forminster Enterprises Ltd. and SPV CO.  In further support of their Motion, the Weiss Parties state:

1.     Each of the counterclaim-defendants other than K-T-V Invest has filed a motion to dismiss for lack of personal jurisdiction.  These motions are governed by the "prima facie" standard.  *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618–19 (1st Cir. 2001).  "[I]n evaluating whether the prima facie standard has been satisfied, 'the district court is not acting as a factfinder; rather, it accepts properly supported proffers of evidence by a plaintiff as true and makes its ruling as a matter of law.'"  *Id.* at 619 (citations omitted).  The Weiss Parties have already submitted sufficient evidence to satisfy this standard.  On February 22 and 23, 2006, Richard Harazim offered testimony as a 30(b)(6) designee of K-T-V Invest that conclusively establishes that the contacts with Massachusetts surrounding the filing of this lawsuit should be imputed to Messrs. Harazim and Benda, Forminster and SPV CO for purposes of deciding their motions to dimisss.[1]  Accordingly, the Court should consider this additional evidence when evaluating whether the Weiss Parties have met the prima facie standard.

2.     The exhibits to this motion include excerpts from the copy of the "official" version of the transcript of Mr. Harazim's deposition, which counsel for the Weiss Parties recently received.  Mr. Harazim has not yet reviewed and signed this version of the transcript.

3.     Mr. Harazim traveled to Boston, Massachusetts to testify in this lawsuit as the 30(b)(6) designee of the plaintiff.  *See* Ex. A.

4.     Mr. Harazim testified that he contacted Nystrom, Beckman & Paris LLP, a Massachusetts law firm, to file this lawsuit.  Ex. B, 369:1–2.  Mr. Harazim further testified that

---

[1] Pursuant to Federal Rule of Civil Procedure 32, the Court may properly consider the excerpts from the deposition as counsel for Messrs. Benda and Harazim, SPV CO and Forminster were all given reasonable notice of the deposition and counsel for Messrs. Benda and Harazim and SPV CO was present at the deposition on behalf of his other client, Kotva.

he repeatedly called his attorneys in Massachusetts, sent information to his attorneys in Massachusetts "[s]everal times" and sent multiple emails to Massachusetts in order to file this lawsuit. *Id.* 368:6–15, 368:24–369:13. Mr. Harazim's testimony reveals that he was fully involved in the decision to file this lawsuit in Boston, agreed with the decision and reviewed multiple drafts of the Complaint before it was filed. *Id.* 371:1–375:5. These admitted contacts with Massachusetts are sufficient for this Court to exercise personal jurisdiction over Mr. Harazim. *See* Opp. to Benda's and Harazim's Motion to Dismiss § III.B, at 8–11.

5. Mr. Harazim made it clear that the officers and directors of K-T-V Invest consulted and reached unanimous agreement with respect to the plan to pressure Mr. Weiss by both a criminal complaint in the Czech Republic and this civil action in Boston:

Q. Was [Mr. Benda] consulted about the decision on August 18, 2004?

A. Yes, he was.

Q. Did he agree with the decision to file the criminal complaint against Mr. Weiss?

A. Yes.

Q. Was the vote of the board of Kotva on August 18, 2004 unanimous?

A. Yes.

Q. Did Mr. Benda provide information to Mr. Vlach for purposes of the criminal complaint?

A. Let me clarify something. We all work very closely together. We are meeting each other several times a day, and all significant subjects are subject to, I could say, continuous discussions. Yes, Mr. Benda of course consulted with Mr. Vlach on the filing of the criminal complaint.

\* \* \* \*

Q. And, in particular, was it your practice to report to Mr. Benda as chair [of the Supervisory Board]?

MR. BECKMAN: Objection.

> A.    Not formally.  Informally, yes, I explained we were informing each other about everything what was going on.

Ex. C, 326:3–19; 327:12–17.

This testimony is sufficient to impute Mr. Harazim's and K-T-V Invest's contacts with Massachusetts to Mr. Benda, then the Chairman of K-T-V Invest's Supervisory Board, and SPV CO, the Cypriot company of which Mr. Benda was the sole director not acting as a nominee during the relevant time period.

6.    Messrs. Harazim and Benda were directors of Forminster at the time that they became officers and directors of Kotva.  *See* Opp. to Forminster's Motion to Dismiss Ex. B.  Mr. Harazim claims that when he became a director he did not know the true owners of Forminster, but rather that he was hired by a lawyer, Petr Toman. Ex. D, 54:8–21.  Based on Mr. Harazim's testimony, it seems that, other than Mr. Toman, the only people to have ever acted on behalf on Forminster in the Czech Republic are Mr. Benda, Mr. Harazim, Miroslav Hálek, and Michal Vlach.  Mr. Harazim testified:

> Q.    In the entire time from 1998 to today, is there anyone else from Forminster that you've dealt with, other than Mr. Toman or Mr. Benda, when he was a member of the Board of Directors of Forminster?
>
> A.    I believe that nobody else like this exists.
>
> * * * *
>
> Q.    After Mr. Benda left the Board of Forminster, it is your testimony that the only person you knew to act on behalf of Forminster was Mr. Toman?
>
> MR. BECKMAN:  Objection.
>
> A.    I know that in certain, specific administrative matters, I know that Mr. Vlach was helping them, as well, but -- to represent Forminster, but, as far as I know, only Petr Toman was representing Forminster.
>
> Q.    What matters are you referring to where Mr. Vlach did something on behalf of Forminster?

4

A.  He had some sort of power of attorney to submit some official documents or something like that.

Q.  When?

A.  When?  I think he still has it.

Ex. E, 349:2–16.

Mr. Vlach is the Chairman of the Board of Directors of K-T-V Invest and the individual who contacted the Czech police to instigate criminal proceedings against Andrew Weiss.  *See* Ex. F, 277: 4–11.  Mr. Vlach did so after a unanimous vote of the Kotva board authorizing the use of criminal proceedings as a tactic against Mr. Weiss.  *See* Ex. C, 326:6–11.

In addition to being the representative of Forminster, Mr. Toman is the lawyer representing K-T-V Invest in the Czech litigation at the center of K-T-V's complaint in this case and the individual designated to receive notices for the Kotva Group in the contract for the purchase and sale of the Department Store.  *See* Ex. G § 11.3, at 32–33 (purchase and sale agreement); Ex. H at 15 (KC1-2141) (addendum to purchase and sale agreement).[2]

This significant overlap in roles among the individuals controlling the plaintiff, K-T-V Invest, and representing its majority shareholder, Forminster Enterprises Ltd., are sufficient to impute all lawsuit-related contacts with Massachusetts by K-T-V Invest and Mr. Harazim, Forminster's former director, to Forminster for purposes of exercising personal jurisdiction over Forminster.

7.     As Mr. Harazim's deposition testimony conclusively establishes that this Court may exercise personal jurisdiction over each of the counterclaim-defendants, the Court should

---

[2] The English version of the purchase and sale agreement produced by Kotva and marked at Mr. Harazim's deposition did not have the contents of the "Schedules" attached.  Exhibit H is a copy of "Schedule 9" from the Czech version of the purchase and sale agreement produced by Kotva.

grant the Weiss Parties leave to submit the attached deposition excerpts and exhibits in opposition to the counterclaim-defendants' motions to dismiss.

.                                          Respectfully Submitted,

                                           ANDREW WEISS, WEISS ASSET
                                           MANAGEMENT LLC, K T, INC. and CVF
                                           INVESTMENTS LTD.

                                           By their attorneys,


                                           /s/ Benjamin A. Goldberger
                                           Edward P. Leibensperger (BBO# 292620)
                                           Benjamin A. Goldberger (BBO# 654357)
                                           McDermott Will & Emery LLP
                                           28 State Street
                                           Boston, Massachusetts  02109-1775
                                           (617) 535-4000

Dated: March 21, 2006


### CERTIFICATE OF CONSULTATION PURSUANT TO LOCAL RULE 7.1

I hereby certify that counsel for the Weiss Parties conferred with counsel for all other parties and attempted in good faith to resolve or narrow the issues presented by this Motion, but was unsuccessful.

                                           /s/ Benjamin A. Goldberger
                                           Benjamin A. Goldberger


### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 21, 2006.

                                           /s/ Benjamin A. Goldberger
                                           Benjamin A. Goldberger

BST99 1495624-1.072198.0012

Richard Harazim                                    02/22/2006

1

1          VOLUME 1, PAGES 1 - 234

2             EXHIBITS 1 - 22

3      IN THE UNITED STATES DISTRICT COURT

4      FOR THE DISTRICT OF MASSACHUSETTS

5                    No. 05-10679-RCL

6   - - - - - - - - - - - - - - - - - - - - - - - -

7   KOTVA a.s.,                    CERTIFIED ORIGINAL
                                    LEGALINK BOSTON
8             Plaintiffs

9        vs.

10  ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,

11            Defendants

12  _____

13  ANDREW WEISS, WEISS ASSET MANAGEMENT LLC,

14  KT, INC. and CVF INVESTMENTS, LTD.,

15            Counterclaim-Plaintiffs,

16        v.

17  KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM,

18  FORMINSTER ENTERPRISES, LTC., SPV CO. and

19  JOHN DOES 1-5,

20            Counterclaim-Defendants.

21  - - - - - - - - - - - - - - - - - - - - - - - -

22    VIDEOTAPED RULE 30(b)(6) DEPOSITION OF KOTVA a.s.

23        BY AND THROUGH RICHARD HARAZIM

24      Tuesday, February 22, 2006 10:02 a.m

Richard Harazim                                                02/22/2006

2

```
 1               McDermott, Will & Emery

 2            28 State Street, Boston, MA 02109

 3         Reporter:   Janet M. Konarski, RMR, CRR

 4                   LegaLink Boston

 5         320 Congress Street, Boston, MA 02210

 6                   (617)542-0039

 7    APPEARANCES:

 8

 9    MCDERMOTT, WILL & EMERY

10    (By Edward P. Leibensperger, Esquire,

11    Benjamin A. Goldberger, Esquire, and

12    Sylvia Kratky, Esquire)

13    28 State Street

14    Boston, Massachusetts 02109

15    (617)535-4000

16    Counsel for the Defendants/Counterclaim-Plaintiffs

17

18    NYSTROM, BECKMAN & PARIS LLP

19    (By Joel G. Beckman, Esquire)

20    10 St. James Avenue

21    Boston, Massachusetts 02116

22    (617)778-9100

23    Counsel for the Plaintiff/Counterclaim-Defendant

24    - Continued -
```

1    Q.  Did you contact Mr. Beckman?

2    A.  Yes.

3    Q.  All right. Did anyone else from Kotva

4    have any contact with Mr. Beckman or his law firm?

5    A.  Only me.

6    Q.  How many times did you call Mr. Beckman's

7    law firm before the filing of the complaint?

8        MR. BECKMAN:  Objection.  I'm instructing

9    you not to answer that.  Actually, go ahead.  Answer

10   it.

11   A.  I have no idea.

12   Q.  More than once, though?

13       THE INTERPRETER:  Yes.

14   A.  Of course.

15       THE INTERPRETER:  Yes.

16   Q.  Did you come to the United States to talk

17   with Mr. Beckman before the filing of the lawsuit?

18       MR. BECKMAN:  Go ahead.  Answer it.

19   A.  I didn't.

20       MR. BECKMAN:  Let me just note for the

21   record I've given you wide latitude, but again it

22   relates not to the subject matter, and you were denied

23   jurisdictional discovery.

24   Q.  Did you send information, documents to

1    Mr. Beckman in connection with the commencement of this

2    lawsuit?

3        A.  I did.

4        Q.  How many times did you send information to

5    Mr. Beckman?

6            MR. BECKMAN:  If you know.  Go ahead.

7        A.  I don't know.  That's it.  Several times.

8        Q.  And did you e-mail Mr. Beckman in

9    Massachusetts in connection with the commencement of

10   this lawsuit?

11       A.  I did.

12       Q.  Do you know how many e-mails you sent?

13       A.  No.

14       Q.  Okay.  When did you first contact

15   Mr. Beckman?

16       A.  When?  It's a rough guess, but I would say

17   January, February.

18       Q.  What is your best memory?

19       A.  My best memory is say January.

20       Q.  Of 2005?

21       A.  2005.

22           MR. LEIBENSPERGER:  I'm going to mark as

23   the next exhibit the Complaint filed in this case.

24              (Complaint

1      marked Exhibit 37.)

2            MR. LEIBENSPERGER:  That's Exhibit --

3            COURT REPORTER:  Thirty-seven.

4            MR. LEIBENPERGER:  -- thirty-seven.

5       Q.   Take a moment, Mr. Harazim, and look at

6    what has been marked Exhibit 37.  It's a document

7    entitled "Complaint."  Did you read this document

8    before it was filed in court?

9       A.   I am not sure if I really read the last

10   version, but I am sure I read all previous drafts.

11      Q.   So, you read drafts of the agreement -- I

12   mean of the complaint?

13      A.   Yes.

14      Q.   Did anyone else at Kotva read drafts of

15   the complaint?

16      A.   This material was discussed in the board

17   of directors' meeting.

18            MR. BECKMAN:  I have to instruct the

19   witness do not disclose any privileged communications

20   between me and you that you may have shared with the

21   board.

22      Q.   Did -- my question was:  Did anyone else

23   at Kotva read the drafts of the complaint?

24            MR. BECKMAN:  This may implicate work

1    product, actually.  I don't think I'm going to let him

2    answer this.

3         MR. LEIBENSPERGER:  Are you instructing

4    him not to answer?

5         MR. BECKMAN:  I want to hear the answer.

6         (Witness conferred with counsel.)

7         MR. BECKMAN:  He can answer.

8         A.  From a technical point of view, no.  But,

9    from a practical point of view, the basis of this, of

10   this complaint, its format, the way how it was

11   prepared, the content all this was discussed many

12   times.

13        Q.  Did you satisfy yourself with respect to

14   the complaint that it was accurate?

15        A.  Yes.

16        Q.  And did you satisfy yourself that the

17   complaint was complete?

18        MR. BECKMAN:  Objection.

19        A.  Yes.  I believe so.

20        MR. LEIBENSPERGER:  Could we mark this as

21   the next exhibit.

22             (Minutes of January 19, 2005

23        meeting marked Exhibit 38.)

24   BY MR. LEIBENSPERGER:

1    Q.   Mr. Harazim, can you identify what

2    Exhibit 38 is?

3    A.   This is a record from the meeting of the

4    Board of Directors of Kotva.

5    Q.   On what date?

6    A.   It says January 19, 2005.

7    Q.   Was it at this meeting of the Board of

8    Directors that a decision was made to file the civil

9    complaint in Boston?

10    A.   I believe that it's possible to be said,

11    that we can say it this way, although, although here

12    it's being said -- although at the point one on Page 2

13    it's saying that the Board of Directors is giving the

14    task to Mr. Richard Harazim, CEO, that he should search

15    for and address suitable law firm in United States with

16    the request to elevate the position of the company in

17    the possible court case.  And, second, to find

18    estimated maximal cost connected with the possible case

19    in United States, and for the fact about the results of

20    the above findings immediately inform the Board of

21    Directors.

22    Q.   Was it this meeting that gave you the

23    authority then to hire Mr. Beckman's firm and file the

24    Complaint?

1      A.  Yes.

2          Q.  And did you recommend that course of

3    action to the forward?

4          A.  Rephrase it, please.  I didn't get it.

5          Q.  Did you recommend that course of action to

6    the board?

7          A.  Which course of action?

8          Q.  I'm sorry, I said that course of action,

9    meaning did you recommend to the board that a civil

10   lawsuit be filed against Mr. Weiss in Boston?

11          MR. BECKMAN:  Let me just caution you, do

12   not disclose privileged communications that you had

13   with me.

14          MR. LEIBENSPERGER:  My question was what

15   you recommended to the board?

16          A.  I gave the board results of our

17   discussions, and the Board of Directors decided on it.

18          Q.  My question was whether you were in favor

19   of doing it?

20          MR. BECKMAN:  You're asking if he,

21   personally?

22          MR. LEIBENSPERGER:  Yes.

23          MR. BECKMAN:  I don't care.

24          A.  Yes.

1          Q.   All right.  And you said that to the

2     board?

3          A.   I identified myself with the opinion of

4     the Board of Directors, because they had the same

5     opinion as I did.

6          Q.   In Exhibit 37, the complaint, there are

7     attachments to it, and if you could turn to the

8     attachment which is a November 23, 2004 letter from

9     Mr. Weiss.

10              MR. BECKMAN:  What exhibit number letter

11     is it?

12              MR. LEIBENSPERGER:  It's Exhibit C.

13          Q.   Have you found it?

14          A.   Yes.

15          Q.   In Paragraph 2 of this letter, it says,

16     "Since we do not exert control over --"

17              MR. BECKMAN:  Hold on.  We're on

18     Exhibit C.  It doesn't say that.

19          A.   Exhibit C is something else.

20              MR. GOLDBERGER:  On mine it is.

21              MR. LEIBENSPERGER:  Exhibit C.

22              THE INTERPRETER:  This is what is under

23     Exhibit C.

24          Q.   Okay.  In Paragraph 2?

1    complaint?

2         MR. BECKMAN:  Let me hear his answer,

3    before, see if it discloses.  I'm not sure where you're

4    going with this, Ned.

5         THE INTERPRETER:  Can I translate it or

6    it's okay?

7         MR. LEIBENSPERGER:  Translate the

8    question, please.

9         THE INTERPRETER:  So, the question was why

10   did you consult with a second firm about proceeding

11   against the second person?

12        A.  Workload.  That's the only reason.  We

13   distribute work evenly among these two.

14        Q.  My question is:  Who at Kotva was

15   responsible for the decision to file the Peterka

16   complaint?

17        A.  Because I don't recall any board meeting

18   about that, so it means that I had to do that decision.

19        Q.  With respect to the board meeting that we

20   looked at on August 18, 2004, was Mr. Benda present for

21   that board meeting?

22        A.  I don't think so.

23        Q.  Can you find the exhibit that the, of the

24   board meeting minutes.  It's 31.  Now that you've seen

1    Exhibit 31, can you say whether Mr. Benda was present?

2        A.  He was not.

3        Q.  Was he consulted about the decision on

4    August 18, 2004?

5        A.  Yes, he was.

6        Q.  Did he agree with the decision to file the

7    criminal complaint against Mr. Weiss?

8        A.  Yes.

9        Q.  Was the vote of the board of Kotva on

10   August 18, 2004 unanimous?

11       A.  Yes.

12       Q.  Did Mr. Benda provide information to

13   Mr. Vlach for purposes of the criminal complaint?

14       A.  Let me clarify something.  We all work

15   very closely together.  We are meeting each other

16   several times a day, and all significant subjects are

17   subject to, I could say, continuous discussions.  Yes,,

18   Mr. Benda of course consulted with Mr. Vlach on the

19   filing of the criminal complaint.

20       Q.  Let me direct your attention to

21   Exhibit 29.  What is Mr. Benda's title at Kotva?  And

22   what is your title?

23       A.  Mr. Benda, he's the chairman of the

24   supervisory board.  And I was CEO until the

1    December 1st, 2005.

2        Q.  All right.  In August of 2004, what was

3    your position, and what was Mr. Benda's position?

4        A.  I believe that Mr. Benda was still a

5    chairman of the supervisory board, and I was CEO.  And

6    I am not sure when I left the board of, the supervisory

7    board in Kotva.  I'm not sure when I left it.

8        Q.  All right.  As CEO of Kotva, did you

9    report to Mr. Benda?

10        A.  According to the Czech customs, the CEO is

11    responsible to a Board of Directors.

12        Q.  And, in particular, was it your practice

13    to report to Mr. Benda as chair?

14            MR. BECKMAN:  Objection.

15        A.  Not formally.  Informally, yes, I

16    explained we were informing each other about everything

17    what was going on.

18        Q.  In Exhibit 29, if you turn to Page W4229,

19    do you see the paragraph numbered five?  It states

20    "Mr. Benda, who is in charge of this particular deal,

21    is leaving for a holiday and will not be back before

22    Monday, 13 September."  What did you mean by that

23    statement?

24        A.  This was just a business tactic how to

1    obtain some more time during the negotiations.

2        Q.  Was Mr. Benda in charge of the deal?

3        A.  No.  Not officially.

4        Q.  So, that was a false statement when you

5    said it in this e-mail?

6            MR. BECKMAN:  Objection.

7        A.  It was a business tactic.

8        Q.  Business tactic or not, it was an

9    incorrect statement?

10           MR. BECKMAN:  Objection.

11           THE INTERPRETER:  First, I am not sure if

12   Mr. Benda went for the holidays or not.  And, in any

13   case, it was a good --

14       A.  It was a good excuse for us to gain some

15   time.

16       Q.  As chair of the supervisory board, was he

17   unofficially in charge of the deal?

18           MR. BECKMAN:  Objection.

19       A.  I don't think that there was one

20   particular person, who was responsible for this.

21       Q.  The deal is -- well, strike that.  The

22   decision to file the criminal complaint against

23   Mr. Weiss was approved by the board, correct?

24       A.  Yes.

1      Q.  Is that correct?

2      A.  Yes.

3      Q.  Is this the record you were referring to

4    as showing who the shareholders are?

5      A.  No, no.  This is a record that shows who

6    the directors are.  There must be similar to this

7    record which shows who the shareholders were.

8      Q.  Were the shares of Forminster that were --

9    let me start over.  Were the shares at Forminster at

10   November 30, 1999 held by nominees?

11     A.  I believe so.

12     Q.  Do you know who the beneficial owners were

13   of the shares of Forminster on November 30, 1999?

14     A.  No.

15     Q.  Did you ever ask that question?

16     A.  No.

17     Q.  Was there a reason you did not ask that

18   question?

19        MR. BECKMAN:  Objection.  You may answer.

20     A.  There was no special reason.  I just

21   didn't ask.

22     Q.  You were aware in November, 1999 of the

23   allegation in the press that Forminster had committed

24   criminal acts?

Harazim, Richard Vol. 2  2/23/2006  9:44:00 AM

1    going to ask the questions, and I ask you to quit

2    filling the record and taking the time, the limited

3    time that we have with this witness with your filling

4    the record with these statements.

5        MR. BECKMAN:  You've had two days of

6    deposition.  You won't simply say what subject matter

7    out of 1 through 15 does this pertain to?  That's all

8    I'm asking.

9        Q.  I believe the question I have pending to

10   you, Mr. Harazim, is whether you know for whom Cyrena

11   Nominees, Ltd. was acting as a nominee?  Do you know?

12       A.  I don't know.

13       Q.  You testified yesterday that you were

14   engaged by Mr. Toman on behalf of Forminster in 1997?

15       A.  I don't think that I said that.

16       Q.  Was it 1998?

17       A.  1998?

18       Q.  I didn't get the date right.  You were

19   engaged by Forminster in 1998 with Mr. Toman acting on

20   behalf of Forminster?

21       A.  To the best of my memory, yes.

22       Q.  In the entire time from 1998 to today, is

23   there anyone else from Forminster that you've dealt

24   with, other than Mr. Toman or Mr. Benda, when he was a

1     member of the Board of Directors of Forminster?

2          A.   I believe that nobody else like this

3     exists.

4          MR. BECKMAN:  Did he get that translation

5     right, if you know?

6          THE WITNESS:  Yes.

7          THE INTERPRETER:  Thank you.

8          Q.   Did you ever have a power of attorney from

9     Forminster?

10         A.   I don't recall having a power of attorney

11    from Forminster.

12         Q.   And after Mr. Benda left the Board of

13    Directors of Forminster, did he still represent

14    Forminster in any capacity?

15         A.   I don't know anything like that.

16         Q.   Just to be clear, so is it your

17    understanding he did not or that you don't know?

18         A.   To my knowledge, he did not represent.

19         THE INTERPRETER:  As far as --

20         Q.   So, after Mr. Benda left the Board of

21    Forminster, the only person that you would know as

22    representing Forminster would be Mr. Toman, correct?

23         MR. BECKMAN:  Objection.  Objection.

24         THE INTERPRETER:  Could you repeat the

Harazim, Richard Vol 2 2/23/2006 9:44:00 AM

1    question one more time.

2        Q.  After Mr. Benda left the Board of

3    Forminster, it is your testimony that the only person

4    you knew to act on behalf of Forminster was Mr. Toman?

5        MR. BECKMAN:  Objection.

6        A.  I know that in certain, specific

7    administrative matters, I know that Mr. Vlach was

8    helping them, as well, but -- to represent Forminster,

9    but, as far as I know, only Petr Toman was representing

10   Forminster.

11       Q.  What matters are you referring to where

12   Mr. Vlach did something on behalf of Forminster?

13       A.  He had some sort of power of attorney to

14   submit some official documents or something like that.

15       Q.  When?

16       A.  When?  I think he still has it.

17       Q.  Have you seen that power of attorney?

18       A.  I did not see it.  It was described to me.

19       Q.  Who described it to you?

20       A.  Mr. Vlach.

21       Q.  Do you know who signed the power of

22   attorney on behalf of Forminster?

23       A.  I don't know.

24       Q.  What did Mr. Vlach tell you he was doing

1    for Forminster?

2        A.  Mr. Vlach told me that he's helping Petr

3    Toman with some small matters.

4        Q.  Is Mr. Vlach being paid by Forminster for

5    his activities on its behalf?

6        A.  No.

7        Q.  How do you know that?

8        A.  At some occasion, there was a request

9    which came from Toman to verify what is the mutual

10   relationship between people from Kotva and from FEL,

11   from Forminster, and we were talking about that.

12       Q.  Mr. Vlach is on the Board of Directors of

13   Kotva?

14       A.  That's correct.

15       Q.  And this power of attorney he holds from

16   Forminster still exists today, and can you tell us when

17   it started?

18           MR. BECKMAN:  Objection.

19       A.  I don't know when it --

20       Q.  Was it 2002, when you went off the board

21   of Forminster?

22           MR. LEIBENSPERGER:  Can we answer the

23   question?

24           THE VIDEOGRAPHER:  Please.

1          MR. LEIBENSPERGER:  Then we have to stop

2     to change tapes.

3          A    I don't know.

4          MR. LEIBENSPERGER:  We'll have to stop to

5     change tapes.

6          THE VIDEOGRAPHER:  This marks the end of

7     Tape No. 2 in the deposition of Richard Harazim.  Going

8     off the record.  The time is 2:28 p.m.

9          MR. LEIBENSPERGER:  We'll also take a

10    five-minute break.

11          (A recess was taken.)

12          THE VIDEOGRAPHER:  Here begins Videotape

13    No. 3 in the February 23rd deposition of Richard

14    Harazim.  Going on the record.  The time is 2:36 p.m.

15    BY MR. LEIBENSPERGER:

16          Q.   Mr. Harazim, as we changed tapes, I was

17    asking you about when Mr. Vlach's power of attorney

18    from Forminster started.

19          A    I am not sure.  I think it's the power of

20    attorney is relatively young.

21          Q.   When you were on the Board of Directors of

22    Forminster, did Mr. Vlach have a power of attorney for

23    Forminster?

24          A    I believe not.

1    question.

2        Q.  Yes.

3        A.  No.

4        Q.  You said earlier you went to the police on

5    August 27th?

6        A.  Yes.

7        Q.  Who went to the police?

8        A.  I believe that it was the chairman of the

9    Board of Directors.

10       Q.  Is that Mr. Vlach?

11       A.  Vlach.

12       Q.  Did anyone go with him?

13       A.  I don't know.

14       Q.  What documents did Mr. Vlach take to the

15   police on August 27?

16       A.  I don't know.

17       Q.  Did you review the complaint letter from

18   Kotva submitted to the police on August 27th?

19       A.  I wasn't participating in the creation of

20   this criminal complaint, and I didn't see it before it

21   was submitted to the police.

22       Q.  Why were you not participating?

23           THE INTERPRETER:  This wasn't my task,

24   task

Dated 20 December 2004

SPV CO Limited

and

CRQ Czech a s

# SHARE PURCHASE AGREEMENT

relating to the purchase of shares in SPV KN a s

Linklaters

Palác Myslbek
Na Příkopě 19
117 19 Prague 1

Telephone  (420) 221 622 111
Fax       (420) 221 622 199

Ref  BDXW/L-033253



KC 1-2641

KC1-2641

**This Share Purchase Agreement (the "Agreement") is made on 20 December 2004**

**Between:**

(1)   **SPV CO Limited,** with its registered office at Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus, company registration no HE 148845, registered in Cyprus (the "**Seller**"), represented by Martin Benda, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1A;

(2)   **CRQ Czech a.s.,** with its registered office Prague 1, Národní 1435/6, Post Code 11000, Identification no. 27159256,registered in the Companies Register by the Regional Court in Prague, in Part B, File 9394 (the "**Buyer**"), and represented by Frank Walker, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1B;

(3)   **SPV KN a.s.,** with its registered office in Brno, Příkop 4. Post Code 602 00, Identification no. 26910705, registered in the Companies Register by the Regional Court in Brno, in Part B. File 4043 ("**SPV KN**"), represented by Ing. Richard Harazim, sole member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1C;

(4)   **KOTVA NEMOVITOSTI, k.s.,** with its registered office at Příkop 4, Brno, Post Code 602 00, Identification no. 26229048. registered in the Companies Register by the Regional Court in Brno, in Part A, File 16586 ("**Kotva**"). and represented by KOTVA OBCHODNÍ, a.s., represented by Ing. Michal Vlach, Chairman of the Board of Directors, Ing. Jiří Brada, member of the Board of Directors, and Ing. Pavel Richter, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1D;

(5)   **MARKLAND HOLDINGS Limited,** with its registered office at 19 Upper Fitzwilliam Street, Dublin 2, company registration no 291167 registered under the laws of the Republic of Ireland ("**Markland**"), and represented by Frank Walker, a proxy. A copy of an extract from Companies House Ireland is annexed hereto at Schedule 2;

(6)   **KOTVA a.s.,** with its registered office at Náměstí Republiky 8. Praha 1. Identification no 60193808, registered in the Companies Register by the Municipal Court in Prague, in Part B, File 2370 ("**KAS**"), and represented by Ing. Michal Vlach, Chairman of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1E; and

(7)   **KOTVA OBCHODNÍ, a.s.,** with its registered office at Příkop 4, Brno. Postal Code 602 00, Identification no. 26231735, registered in the Companies Register by the Regional Court in Brno. in Part B. File 3484 ("**KO**"). represented by Messrs Ing. Michal Vlach. Chairman of the Board of Directors. Ing. Jiří Brada and Ing. Pavel Richter. members of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1F;

(jointly referred to as the "**Parties**")

**Whereas:**

(A)   The Seller is a company validly established under the laws of Cyprus and is part of the KAS Group

---

A04677559/1 4/22 Dec 2004

1

KC 1-2642

KC1-2642

(B)    SPV KN is the registered owner of the Property and is part of the KAS Group

(C)    The Seller is undertaking steps to acquire 97% of the shares in SPV KN

(D)    KAS is a holding company established under the laws of the Czech Republic and is the controlling person in relation to the Seller, SPV KN and to KO.

(E)    The Seller wishes to sell and the Buyer wishes to buy the Shares, and the KOTVA Trademarks under the terms and subject to the conditions set out herein.

**The Parties hereby agree as follows:**

**1      Interpretation**

    **1.1**    Construction

        Any reference in this Agreement to an "Article", "Clause" or "Section" refers to the corresponding Article, Clause or Section of this Agreement, unless the context indicates otherwise. The headings of Articles, Clauses and Sections are provided for convenience only and should not affect the construction or interpretation of this Agreement. All words used in this Agreement should be construed to be of such gender or number as the circumstances require. The terms "include" or "including" indicate examples of a foregoing general statement and not a limitation on that general statement. Any reference to a statute refers to the statute, any amendments or successor legislation, and all regulations promulgated under or implementing the statute, as in effect at the relevant time. Any reference to a contract or other document as of a given date means the contract or other document as amended, supplemented and modified from time to time. Any reference to an amount in a given currency shall mean a similar amount in any other currency converted at the then applicable exchange rate.

    **1.2**    Definitions

        For the purposes of this Agreement, the following terms and variations on them have the meanings specified in this Clause 1.2:

**"Adverse Consequence"**    means any Liability, loss, damage (including incidental and consequential damages), claim, cost, deficiency, diminution of value, or expense (including the reasonable costs of investigation and defence, penalties, and reasonable legal fees and costs), whether or not involving a third-party claim;

**"Building"**    means building no. 656, located in the registration area of Staré Město, municipality section Staré Město, on plot no. 680, and further building registered therein without descriptive number or evidence number present on plot no. 1018/2. Both buildings are registered at the Real Estate Register hl. m. Praha, title no. 265. for Prague city, cadastral area Staré Město. A copy of an extract from the Real Estate Register is annexed hereto at Schedule 5;

**"Business"**    means the business of leasing non-residential premises in the Building or leasing the Contributed Property to third persons as tenants and providing related services;

KC 1-2643

KC1-2643

| | |
|---|---|
| "Business Day" | means any day other than a public holiday as defined under Czech law or Austrian law or Irish law or a day that the Escrow Agent or the Buyer's bank is closed for business; |
| "Change of Control" | means: (a) KAS or Kotva ceasing to directly or indirectly control the Seller; or (b) KAS ceasing to control SPV KN or Kotva or KO, prior to the Closing Date; |
| "Closing" | means the hand-over of the Shares by the Seller to the Buyer through the Escrow Agent upon terms stipulated herein; |
| "Closing Date" | means the day on which the Closing takes place; |
| "Consent" | means any approval, consent, ratification, waiver or other expiration of a right to deny consent or other authorisation, provided either by a Governmental Body or other Person; |
| "Contemplated Transactions" | means all of the transactions to be carried out in accordance with this Agreement, including the purchase and sale of the Shares and the performance by the Parties of their obligations under this Agreement; |
| "Contract" | means any contract, agreement, commitment, understanding, lease, licence, franchise, warranty, guarantee, mortgage, note, bond, or other instrument or consensual obligation (whether written or oral and whether express or implied) that is legally binding; |
| "Commercial Code" | means the Czech Commercial Code, Act no. 513/1991 Coll., as amended; |
| "Companies Register" | means the register of company information maintained by the regional courts in the Czech Republic; |
| "CZK" | means Czech Crowns, the official currency of the Czech Republic; |
| "Deposit" | means the sum of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) which has already been delivered to the Escrow Agent by Markland on behalf of the Buyer; |
| "Due Diligence" | means a process, during which the Kotva and the KAS Group provided Markland with requested data and information and provided the Buyer with all co-operation necessary to enable it to ascertain the legal status and condition of the Property and of Kotva and KAS, SPV KN and SPV CO; |
| "Encumbrance" | means any charge, claim, mortgage, easement, right of way, community or other material property interest, covenant, equitable interest, lien, option, pledge, security interest, preference, priority, right of first refusal, or other similar right of a third party of restriction; |
| "Escrow Account" | means the escrow account opened to facilitate the transaction envisaged hereunder; |
| "Escrow Agent" | |
| "Escrow Agreement" | means the contract concluded between the Seller, the Buyer, Kotva and Markland and the Escrow Agent, as amended; |

KC1-2644

| | |
|---|---|
| "EUR" | means Euro, the official currency of the European Union; |
| "Financial Statements" | means the audited financial statements of SPV KN as at the Closing Date; |
| "Fixtures & Fittings" | means the list of fixtures an fittings annexed hereto at Schedule 11; |
| "Force Majeure" | means an event occurring out of the control of the Parties which results in breach of the obligations under the Agreement by one of the Parties, if the Party breaching the Agreement could not have avoided such event or breach of the Agreement despite having exercised maximum effort and care which may reasonably be required from such Party |

The Force Majeure shall mean in particular:

(a)     natural disaster;

(b)     war, war footing, invasion, mobilization or embargo;

(c)     uprising, revolution. rebellion, military regime or civil war;

(d)     radioactivity contamination from a nuclear facility or any other dangerous part of an explosive nuclear facility or a part of such facility;

(e)     discovery of archaeological findings, fossils, coins, precious objects and antiques, etc ;

(f)     terrorist attack; and

(g)     any act by a municipality or registered authority which delays, beyond the control of Kotva. the transfer/contribution of the Shares and the Kotva Trademarks to the Seller

Force Majeure shall not include:

(a)     unfavourable weather conditions;

(b)     events that were known to Kotva or the Seller or to Markland or the Buyer prior to the signing hereof;

(c)     any changes of statutory regulations and technical standards;

(d)     any new statutory regulations or technical standards

| | |
|---|---|
| "Gilroy" | means Gilroy Limited whose registered office is at 4 Pikioni Street Limassol, Cyprus; |
| "Gilroy Claim" | means the claim that Gilroy lodged on 30 June 2004 with the District Court for Prague 1 a copy of which is attached hereto at Schedule 9; |
| "Gilroy Settlement" | means the obtaining of a definitive and final ruling in respect of the Gilroy Claim; for purposes of this Agreement such definitive and final ruling is deemed to be also a final settlement between the parties to the Gilroy Claim, approved by the court or the withdrawl by Gilroy of the Gilroy Claim |
| "Governmental | means any consent, licence, permit or registration issued, granted. or |

KC1-2645

| | |
|---|---|
| Authorisation" | otherwise made available by or under the authority of any Governmental Body or pursuant to any law, including decisions of a court or other body on incorporation of a legal person and decisions of the Real Estate Register Office on registration at the Real Estate Register; |
| "Governmental Body" | means any of the following: |

    (a)   the executive ruling body of any state, region, city, village, or other jurisdiction;

    (b)   federal, state, local, municipal, foreign or other government or self-government;

    (c)   a budgetary or contributory governmental authority of any nature (including any governmental agency, branch, department, or other entity and any court or other tribunal);

    (d)   a multinational organisation incorporated pursuant to international law;

    (e)   a body exercising, or entitled to exercise. any administrative, executive. judicial. legislative, policy, regulatory, or tax authority; or

    (f)   an official of any of the foregoing

| | |
|---|---|
| "Indemnified Person" | means a Person entitled to an Share Purchase Price adjustment or damages under Clause 8 2 or Clause 8 3; |
| "Indemnifying Person" | means a Person obliged to pay a Share Purchase Price adjustment or damages to an Indemnified Person; |
| "J&T banka Mortgage" | means at the date of this Agreement a mortgage over the Property registered in favour of J & T banka, a.s. Identification no. 47115378, with its registered office Pobřežní 297/14, 186 00 Praha 8 (hereinafter referred to as "J&T banka") |
| "KAS Group" | means KAS and trade companies, all of them together or each one individually, under the centralised power and control of KAS, pursuant to §66a Art 7 of of the Commercial Code; |
| "Knowledge" | means knowledge of information relevant for this Agreement about any matter, fact or Person, being known to a Person; |
| "KO Lease" | means the lease to be entered into between SPV KN and KO on the Closing Date the text of which is annexed hereto at Schedule 5; |
| "Kotva's Indemnities" | is defined in Clause 8 3; |
| "Kotva Správcovská a.s." | means Kotva Správcovská a s., with its registered office in Brno. Příkop 4, PSČ 60200, ID no 26510081; |
| "KOTVA Trademark I" | means the collection of trademarks consisting of: word-device trademark KOTVA. registration no 167478, registered in the Patent and Trademark Office of the Czech Republic and word-device trademark KOTVA, registration no 167478 registered in the Patent and Trademark Office of the Slovak Republic; |

KC 1-2646

KC1-2646

| | |
|---|---|
| "KOTVA Trademark II" | means the collection of trademarks consisting of: word-device and word only trademark KOTVA having been used by Kotva but not yet registered in Kotva´s name in the Patent and Trademark Office of the Czech Republic for which registration Kotva has applied by the applications no 355 884 and 355 885 both filed with the Patent and Trademark Office of the Czech Republic on 1st of July 2004, with the priority right date of July the 1st 2004. The KOTVA Trademark II is further specified in an expert opinion dated 10 July 2004 annexed hereto as the Schedule 10; |
| "KOTVA Trademarks" | means collectively KOTVA Trademark I and KOTVA Trademark II |
| "Land" | means the collection of plots of land registered at the Real Estate Register hl m Praha, ownership deed no. 265, for Prague city, cadastral area of Staré Mésto, consisting of: plot no 680 – built-up area and yard, plot no 683/1 – other area, plot no 683/2 – other area, plot no 683/3 other area, plot no 690/2 – other area, plot no 690/3 – other area, plot no. 690/4 – other area, and plot no. 1018/2 – built-up area and yard A copy of an extract from the Real Estate Register is annexed hereto at Schedule 4; |
| "Legal Requirement" | any valid legal regulation of any Governmental Body; |
| "Liabilities" | includes liabilities or obligations of any nature, whether known or unknown, whether obsolete, accrued, contingent or other, whether due or to become due or prescribed, and whether or not required to be reflected on a financial statement and "Liability" shall be construed accordingly; |
| "Markland's Indemnities" | is defined in Clause 8 2; |
| "Order" | any published and publicly available order, injunction, judgement, assessment. decree. ruling, or arbitration award of any Governmental Body or arbitrator; |
| "Ordinary Course of Business" | actions taken in the course of normal Business operation by SPV KN and/or by Kotva or the Seller or KO as the respective owner or manager of the Property, consistent with past practice of Kotva; |
| "Organisational Documents" | any deed, bylaws, regulations, certificate, statement, statute, or similar document adopted, filed or registered in connection with the creation, formation, or organisation of an entity, and any Contract among equity holders. partners or members of an entity; |
| "Person" | an individual or an entity, including a corporation, share company, limited liability company, partnership, trust, association, or any other body with legal personality separate from its equity holders or members; |
| "Proceeding" | any action, arbitration, audit, examination. investigation, hearing, litigation, or suit (whether civil, criminal, administrative, judicial or investigative, informal, public or private) commenced. brought, conducted, heard by or before. or otherwise involving. any |

KC1-2647

|  | Governmental Body or arbitrator; |
| "Property" | means the Building and the Land; |
| "Proprietary Information" | is defined in Clause 9.1; |
| "Purchase Price" | means the total purchase price for the Shares and the KOTVA Trademarks in the sum of the Czech Crown equalling CZK 1,501,450,000 (one billion five hundred and one million four hundred and fifty thousand Czech Crowns) calculated as follows: |

(i)    purchase price for the Shares CZK 1,366,450,000 (one billion three hundred and sixty six million four hundred and fifty thousand Czech Crowns) ("**Share Purchase Price**"),

(ii)   purchase price for the Kotva Trademarks CZK 135,000.000 (one hundred and thirty five million Czech Crowns) ("**Trademarks Purchase Price**");

|  |  |
| "Related Person" | with respect to a particular Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person and, with respect to an individual, any other individual that is a member of the individual's family (by blood, marriage or adoption), a member of the individual's household, an entity in which the individual participates in management or an employee or employer of the individual. For the purposes of this definition, "control" means where a Person (or Persons acting in concert) acquires or agrees to acquire or has options over direct or indirect control: (a) of the affairs of that Person; or (b) more than 50 per cent of the total voting rights conferred by all the issued shares in the capital of that Person which are ordinarily exercisable in general meeting; or (c) of the composition of the main board of directors of a Person. For these purposes "Persons acting in concert", are Persons which actively co-operate, pursuant to an agreement or understanding (whether formal or informal), with a view to obtaining or consolidating or exercising control of that Person; |
| "Rent Roll" | means the up to date rent roll as at the date of this Agreement which truly and accurately records the existing lease relations concerning non-residential premises in the Building, a copy of which is annexed at Schedule 6; |
| "Representative" | with respect to a particular Person, any director, appointed officer, employee, consultant, agent, advisor, legal counsel, accountant, or other representative of that Person; |
| "Retention" | means the money retained in the Escrow Account following Closing in accordance with Clause 5.6.4 ; |
| "Security" | means the amount of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) that has been paid by Kotva on behalf of the Seller into the Escrow Account prior to the date hereof in order to secure a possible claim or claims of the Buyer against the Seller together with any interest thereon; |

KC 1-2648

KC1-2648

| | |
|---|---|
| "Shares" | means the following ordinary bearer shares in certified form issued by SPV KN: |

(a) 10 shares of nominal value CZK 200,000 each with Nos. 1-10 issued on 10 November 2003; and

(b) 13 shares of nominal value CZK 100,000.000 each with Nos. 11-23 issued on 9 April 2004; and

(c) 2 shares of nominal value CZK 20,000,000 each with Nos. 24 and 25 issued on 9 April 2004; and

(d) 8 shares of nominal value CZK 1,000,000 each with Nos. 28-35 issued on 9 April 2004; and

(e) 2 shares of nominal value CZK 100,000 each with Nos. 37 and 38 issued on 9 April 2004; and

(f) 4 shares of nominal value CZK 10,000 each with Nos. 46-49 issued on 9 April 2004;

the nominal value of which represents 97 per cent of the capital stock of SPV KN;

| | |
|---|---|
| "SPV Conclusion" | the satisfaction of the conditions in Clause 3 1; |
| "Tax" or "Taxes" | means without limitation and whatever means by which it is levied all forms of taxation, statutory, governmental, state, local, foreign and municipal impositions, duties, contributions and levies including any tax imposed on any income, withholding tax, value added tax ("VAT"), road tax, real estate tax. real estate transfer tax, gift tax, inheritance tax, excise duties. customs or other duty. employment related levies, including social security contributions and contributions to complementary welfare and health insurance including both principal and potential related interest and penalties; |
| "Threatened" | an action or matter would be considered to have been "Threatened" if a demand or statement has been made (whether orally or in writing) or a notice has been given (whether orally or in writing), or any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such action or matter is likely to be asserted, commenced, taken or otherwise pursued in the future; and |
| "Transfer Deed" | means a Share Purchase Agreement to be concluded between the Seller and the Buyer effecting the transfer of the title to the Shares to the Buyer |

## 2 Agreement on replacement of present obligations between several Parties by new obligations between all Parties

2.1 The Parties hereby agree pursuant to section 570 of the Act No 40/1964 Coll , the Civil Code, as amended, that their mutual obligations arising out of the Share Purchase Agreement concluded on 20 January 2004 (hereinafter referred to as the "Present SPA") between Kotva and Markland is replaced in their entirety by the obligations contained in the Agreement

KC1-2649

**2.2**    For avoidance of any doubt it is agreed that the Present SPA terminates in its whole scope on the moment when this Agreement comes into being so that this Agreement substitutes the Present SPA in the whole scope.

**2.3**    The Parties hereby agree to accession of the Seller, SPV KN, KAS, KO and the Buyer to this Agreement and the Seller, SPV KN, KAS, KO and the Buyer confirm by signing this Agreement they have acceded to the Agreement

**2.4**    For avoidance of any doubt it is agreed that the termination of the Present SPA and its substitution by this Agreement as stipulated herein shall not give a rise to claim for return of any performance that has been already provided pursuant to the Present SPA

**2.5**    If the nature of rights and obligations under this Agreement enables so, the Seller's rights and obligations under this Agreement may be fulfilled and exercised by Kotva and the Buyer's rights and obligations under this Agreement may be fulfilled and exercised by Markland

**2.6**    The Seller and Kotva are jointly and severally liable for the fulfilment of the obligations of either of them arising out of this Agreement. Kotva, KAS and KO jointly and severally guarantee the fulfilment of the Seller's and Kotva's obligations arising out of this Agreement. The Buyer and Markland are jointly and severally liable for the fulfilment of the obligations of either of them arising out of this Agreement

**2.7**    The Seller and the Buyer and Kotva and Markland shall use their best endeavours to execute an amendment to the Escrow Agreement within 20 Business Days of the date of this Agreement to enable the Escrow Agent to perform its duties in accordance with the terms and conditions of this Agreement

**3**    **Initial Obligations**

The Initial Obligations are as follows:

**3.1**    Seller's Obligation - procuring of SPV Conclusion

    **3.1.1**    The Seller is obliged to procure the valid and legal and effective transfer or contribution of the Shares and the KOTVA Trademarks to the Seller through a non-monetary investment contribution to the Seller by Kotva which is satisfactory to the Buyer, acting reasonably, which in the circumstances will mean the requirement of the Seller to procure a valid and clear legal opinion confirming the valid and legal and effective transfer or contribution of the Shares and the KOTVA Trademarks to the Seller through a non-monetary investment contribution to the Seller by Kotva. Such legal opinion will also include confirmation that the Seller is fully and effectually entitled to sell the Shares and the KOTVA Trademarks to the Buyer pursuant to the terms of this Agreement; and

    **3.1.2**    The Seller is obliged to procure the application for registration in the Patent and Trademark Office of the Czech Republic and Slovak Republic respectively of the contribution of the KOTVA Trademarks to the Seller, in a form acceptable to the Buyer, acting reasonably

**3.2**    Buyer's Obligation - Legal Opinion

---

KC1-2650

3.2.1   The Buyer will procure as soon as possible after the date hereof, but no later than 31 January 2005, that its lawyers agree with the Buyer's bank's lawyers a legal opinion in respect of the ownership of the Property by SPV KN and the Shares by SPV CO to enable the Buyer's bank to confirm that it is prepared to finance the transactions contemplated hereunder

3.3   Satisfaction of Initial Obligations

3.3.1   Within five Business Days of the satisfaction of any of the obligations referred to in Clauses 3 1 or 3 2, the party satisfying such condition shall serve notice of satisfaction on the other party

3.4   Failure to satisfy the conditions precedent

3.4.1   In the event that Kotva fails to satisfy the obligations under this Clause 3 1 by 31 January 2005, the Buyer and Markland may withdraw from this Agreement by either one of them serving five Business Days written notice on Kotva and the Seller Markland shall be entitled to the immediate refund of the Deposit together with any interest thereon and a contractual penalty payable by Kotva in the sum of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied firstly from the Security

3.4.2   In the event that the Buyer fails to satisfy the obligations under Clause 3 2 1 by 31 January 2005, the Seller or Kotva may withdraw from this Agreement by either one of them serving five Business Days written notice on the Buyer and Markland. The Seller shall be entitled to a contractual penalty payable by the Buyer in the sum of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied from the Deposit and te balance of such Deposit shall be retuned to the Buyer

## 4    SPV KN from its founding until Closing

4.1   Board of Directors of SPV KN

4.1.1   Kotva may only appoint a new member of SPV KN's Board of Directors or remove any of the existing members only with the prior written approval of the Buyer

4.1.2   Kotva further undertakes that the members of the Board of Directors or other managers of SPV KN will not act outside of the Ordinary Course of Business and shall obtain prior written approval from the Buyer before making any non-operational decision or series of related decisions of a value in excess of CZK 157,500 (one hundred and fifty seven thousand five hundred Czech Crowns) except where this Agreement states to the contrary

4.1 3   Kotva and/or the Seller, once it becomes majority shareholder of SPV KN. shall procure that the Board of Directors of SPV KN will observe and perform the obligations and undertakings as set out in Clause 6 and for the avoidance of doubt, any breach of such obligations and undertakings by the Board of Directors of SPV KN, if able to cause an Adverse Consequence to SPV KN and/or the Buyer and/or Markland of a sum in

KC1-2651

excess of CZK 31,500 (thirty one thousand five hundred Czech Crowns), shall be regarded as a material breach of this Agreement which shall entitle the Buyer and Markland to withdraw pursuant to Clause 10 respecting the time period in Clause 8.5.

4.2   Supervisory Board of SPV KN

4.2.1   Kotva may only appoint a new member of SPV KN's Supervisory Board or remove an existing one only with the prior written approval of the Buyer.

## 5   Sale and Transfer of Shares and KOTVA Trademarks; Closing

5.1   Transfer of Shares

5.1.1   Subject to the terms and conditions of this Agreement the Seller and the Buyer undertake, within five (5) Business Days of the Purchase Price being paid into the Escrow Account in accordance with Clause 5.3, to conclude the Transfer Deed, and the Seller undertakes to sell the Shares and to transfer the title to the Shares to the Buyer, the Seller and the Buyer undertake to instruct the Escrow Agent to immediately release the Shares to the Buyer and the Buyer undertakes to buy the Shares from the Seller and to pay for the Shares the Share Purchase Price.

5.1.2   The terms and conditions of this Agreement not repeated in the Transfer Deed will apply to the transfer of the Shares under the Transfer Deed as if they were explicitly stipulated in the Transfer Deed.

5.2   Transfer of the KOTVA Trademarks

5.2.1   Subject of the terms and conditions of this Agreement the Seller undertakes, within five (5) Business Days of the Purchase Price is paid into the Escrow Account in accordance with Clause 5.3, to conclude with SPV KN or the Buyer (such decision to be at the discretion of the Buyer provided that it shall not cause any material adverse effect to the Seller) the Kotva Trademarks transfer agreement in a form to be agreed by the Buyer, acting reasonably, and the Seller undertakes to sell and transfer the KOTVA Trademarks to SPV KN or the Buyer and the Buyer undertakes to:

(i)     ensure that SPV KN or the Buyer will buy the KOTVA Trademarks; and

(ii)    pay on behalf of SPV KN or in its own name for the KOTVA Trademarks the Trademark Purchase Price

5.2.2   SPV KN hereby agrees to sign all such documents as are required to effect the Kotva Trademarks transfer agreements referred to in Clause 5.2.1 above.

5.2.3   The terms and conditions of this Agreement not repeated in the KOTVA Trademarks transfer agreements will apply to the transfer of the KOTVA Trademarks under the the KOTVA Trademarks transfer agreements as if they were explicitly stipulated in the KOTVA Trademarks transfer agreements.

KC1-2652

5.2.4    In the event that the Buyer decides about the transfer of the KOTVA Trademarks to SPV KN under Clause 5.2.1 and as a result of this decision any provision of this Agreement is directly or indirectly breached, neither Markland nor the Buyer may claim any right that it would otherwise have as a result of such breach.

5.3    Deposit and Purchase Price

5.3.1    The Deposit credited to the Escrow Account shall form part of the Purchase Price.

5.3.2    Within 20 Business Days of receipt or service by the Buyer of the notice of satisfaction of the last of the initial obligations, the Buyer shall credit to the Escrow Account the amount of CZK 1,363,950,000 (one billion three hundred and sixty three million nine hundred and fifty thousand Czech Crowns) representing the balance of the Purchase Price. In the event that on the date of payment of the balance of the Purchase Price, the Deposit or its part has been used to settle a Seller's claim according to this Agreement (other than the claim to receive the Purchase Price), the Buyer is obliged to balance the Purchase Price so that the total sum deposited by the Buyer (including the Deposit) represents the Purchase Price.

5.3.3    In the event that the Buyer fails to credit the Escrow Account as specified in Clause 5.3.2 the Buyer shall pay to the Seller a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) by way of forfeit of the Deposit which shall be released to the Seller within five (5) Business Days from the breach of this obligation. Upon settlement of this contractual penalty in favour of the Seller this Agreement immediately terminates.

5.3.4    Following Closing, if:

(i)    a breach of any of the Seller's or Kotva's obligations or representations or warranties is discovered which occurred prior to Closing; and

(ii)    the nature of that breach is such that it entitles the Buyer to compensation (by way of Share Purchase Price reduction or damages) in accordance with the terms of this Agreement,

then the parties shall apply to Arbitration pursuant to Clause 11.12 of this Agreement to ascertain that conditions (i) and (ii) of this Clause 5.3.4 have been satisfied and, if so determined in the arbitration award, then the Buyer shall be entitled to have recourse to the Escrow Account for the amount corresponding to the Adverse Consequence so discovered. The Seller shall be obliged to replenish the Escrow Account with the amount withdrawn on account of the breach within 20 Business Days of its removal by the Buyer until such time as all the monies standing to the credit of the Escrow Account have been released in accordance with the terms of the Escrow Agreement.

5.4    Action pending Closing

---

KC1-2653

5.4.1    Kotva and the Seller shall collaborate fully with Markland and the Buyer, such collaboration to include but not be limited to Markland's and/or the Buyer's right to:

(i)    receive, after a request made by each of them, all information distributed to the directors of SPV KN and the Seller;

(ii)    attend, but not vote at, the meetings of the directors of SPV KN and the Seller; and

(iii)    have full access to all those books, records and other documentation of SPV KN and the Seller to which a director normally has access in relation to all matters concerning the operation of SPV KN and the Seller between the date of this Agreement and the Closing Date

5.4.2    During such period Kotva and/or the Seller shall procure that neither SPV KN nor the Seller shall without the prior written consent of Markland:

(i)    incur or enter into any agreement or commitment involving any capital expenditure in excess of CZK 157,500 (one hundred and fifty seven thousand five hundred Czech Crowns) per annum which is not in the Ordinary Course of Business;

(ii)    enter into or amend any contract or commitment which is not in the Ordinary Course of Business or which involves or may involve a total annual expenditure or income in excess of CZK 500.000 (five hundred thousand Czech Crowns);

(iii)    incur any additional borrowings or incur any other indebtedness;

(iv)    save as required by law. make any amendment to the terms and conditions of employment (including, without limitation, remuneration and other benefits) of any employee. provide or agree to provide any gratuitous payment or benefit to any such person or any of their dependants, dismiss any employee or engage or appoint any additional employee;

(v)    acquire or agree to acquire or dispose of or agree to dispose of any material asset or material stocks or enter into or amend any material Contract or arrangement;

(vi)    take steps to procure the payment or settlement of any Liability generally in advance of the date on which book and other Liabilities are usually payable in accordance with the standard terms of the Seller's business or to extend the period to any particular debtor in which to make payment;

(vii)    delay making payment to any trade creditors generally beyond the date on which payment of the relevant trade debt should be paid in accordance with a credit period as authorised by the relevant creditors or (if different) the period extended by such creditors in which to make payment;

KC1-2654

(viii) amend, to any material extent, any of the terms on which goods, facilities or services are supplied, such supplies being material in the context of the Business, except where required to do so in order to comply with any Legal Requirement;

(ix) enter into any guarantee, indemnity or other agreement to secure any obligation of a third party or create any encumbrance over any of its assets or undertaking;

(x) allot, issue, redeem or repurchase any share capital of SPV KN and/or the Seller;

(xi) enter into any contract reducing or depreciating the assets of SPV KN and/or the Seller;

(xii) acquire or agree to acquire any share, shares or other interest in any Person;

(xiii) declare, make or pay any dividend or other distribution to shareholders;

(xiv) make any change to the practices or policies of SPV KN and/or the Seller;

(xv) amend the Organisational Documents of SPV KN or the Seller; or

(xvi) enter into any Contract or arrangement with a Related Person other than in the Ordinary Course of Business

5.4.3 Kotva and the Seller further undertake and undertake to procure that pending Closing each of them will:

(i) continue those business activities which affect the Property, SPV KN or the Seller, only in the Ordinary Course of Business, save insofar as agreed in writing by the Buyer;

(ii) take all reasonable steps to preserve its assets and Governmental Authorisations; and

(iii) take all reasonable steps to preserve the validity of all Contracts to which they are a party which have an effect on the Property, SPV KN or the Seller

5.5 Closing

5.5.1 The Closing shall occur within five (5) Business Days after receipt of the Purchase Price by the Escrow Agent

5.5.2 The Seller shall, through the Escrow Agent, hand-over the Shares and shall hand-over the other documents referred to in Clause 5 6.1 and upon receipt of such Shares and other documents by the Buyer, the Closing of this transaction shall be deemed to occur The title to the Shares including shareholder's rights shall pass to the Buyer upon Closing The Purchase Price shall be settled by the Escrow Agent via the Escrow Account

5.6 Closing deliveries

KC1-2655

5.6.1    At Closing Date, the Seller shall deliver to the Buyer through the Escrow Agent the items listed in sub-clause (a), (b) and (c) below and personally in respect of the remainder of the items listed below):

(a)    the Shares;

(b)    the Transfer Deed;

(c)    a hand-over protocol confirming the hand-over of the Shares;

(d)    an extract of SPV KN from the Commercial Register dated the Closing Date (fax copy is deemed to be a sufficient form);

(e)    written resignations of each member of the Board of Directors and the Supervisory Board of SPV KN and a resolution of the sole shareholder (or the Supervisory Board, as appropriate) of SPV KN taking note of the resignations in a form reasonably acceptable to the Buyer, to provide the resignations to take effect on the Closing Date;

(f)    resolution of the sole shareholder (or Supervisory Board, as appropriate) appointing new members of the Board of Directors and the Supervisory Board of SPV KN designated by the Buyer and advised to the Seller at least (5) Business Days prior to Closing in a form reasonably acceptable to the Buyer, to provide the appointments to take effect on the day immediately following the Closing Date;

(g)    the Powers of Attorney signed by each member of the Board of Directors of SPV KN to enable the Buyer to make the necessary post-Closing registration (or deletions) at the Commercial Register;

(h)    all SPV KN's Organisational Documents, including, but not limited to, the founding deed, articles of association and all applications regarding SPV KN's registration in the Commercial Register and all resolutions of the registration court;

(i)    all lease agreements in respect of the Property;

(j)    all title deeds and documents in respect of the Property;

(k)    all the financial and accounting books and records and returns of SPV KN completed up to Closing;

(l)    all other documents regarding SPV KN;

(m)    a certificate executed by the Seller and Kotva dated as of the Closing Date stating that: (i) all representations, warranties, obligations and undertakings as set forth under Clause 6 are fulfilled and are true and correct in all material respects as the Closing Date; and (ii) all actions required to be taken by Kotva, SPV KN and the Seller to effect Closing have been properly taken;

(n)    the KO Lease duly executed by KO;

(o)    certificates executed by the Seller and Kotva and their accountants. so far as they are authorised to do in accordance with Czech Law

confirming: (i) the successful payment and liquidation of any and all long-term debts or Liabilities, financial or otherwise, of SPV KN, the Seller and Kotva not arising in the Ordinary Course of Business which would affect SPV KN, the Seller or the Property; and (ii) that the Liabilities and debts, financial or otherwise of Kotva and the Seller arising in the Ordinary Course of Business which would affect SPV KN, the Seller or the Property amount to less than CZK 500,000 (five hundred thousand Czech Crowns);

(p)     a certificate executed by the accountants of SPV KN confirming what debts and Liabilities, financial or otherwise SPV KN has and that, save for day to day debts or Liabilities, financial or otherwise, that SPV KN has no other such debts or Liabilities, financial or otherwise;

(q)     a confirmation of discharge of the liability secured by the J&T banka Mortgage, signed by J&T banka in a form reasonably acceptable to the Buyer to enable the Buyer to remove the registration of such mortgage from the real estate register;

(r)     the list of tenant's security deposits as evidenced in the accounting of SPV KN, which list in detail the amounts provided by the individual tenants as security deposits;

(s)     evidence that the Seller has relinquished all authority and all rights to make any transactions on the SPV KN bank accounts (or that such accounts are frozen pending the Buyer completing the necessary bank mandates) and all banking records and account details and new mandate forms for the Buyer to complete and to give all assistance as required by the banks in this respect to ensure the proper transmission of the accounts;

(t)     applications for the registration of the transfer of the KOTVA Trademarks from Kotva to the Seller stamped by the Industrial Property Offices in the Czech Republic and Slovak Republic, as applicable; and

(u)     the Kotva Trademarks transfer agreements

5 6 2    The documents listed in Clause 5 6 1 above shall be delivered by the Seller and Kotva to the Escrow Agent within ten (10) Business Days of the date of the written notice evidencing to the Buyer SPV Conclusion delivered in accordance with Clause 5 3 2 and following this, the Seller and the Buyer shall execute such confirmatory document as is required by the Escrow Agent and if either of them shall fail to execute such document as required by the Escrow Agent (save in the event of a dispute as to the actual delivery of the documentation) then a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) shall be payable to the other party

5 6 3    the Escrow Agent shall release the following sums from the Escrow Account upon Closing:

(i)      to the Buyer, the sum of CZK 10,837,800 (ten million eight hundred and thirty seven thousand eight hundred Czech Crowns) in respect of three months rent and service charge as defined in the KO Lease as a security deposit thereunder;

(ii)     provided that the debt secured by the J&T banka Mortgage has not been discharged and the Seller has supplied evidence thereof to the Buyer which is reasonably acceptable to the Buyer, to J&T banka an amount equal to the amount required to discharge in full and final settlement all amounts secured by the J&T banka Mortgage, provided that the Escrow Agent received a letter from J&T banka confirming that such amount will be in full and final settlement of the debt secured by the J&T banka Mortgage and any and all claims;

(iii)    to the Seller the Trademark Purchase Price;

(iv)    to the Seller, the sum of CZK 925,000,000 (nine hundred and twenty five million Czech Crowns), less the amounts paid to the Buyer pursuant to Clauses 5 6 3(i) above and to J&T banka pursuant to Clause 5 6 3(ii) above and to the Seller pursuant to Clause 5 6 3(iii) above.

5.6.4    The balance of the Share Purchase Price, being the Retention, amounting to CZK 576,450,000 (five hundred and seventy six million four hundred and fifty thousand Czech Crowns), shall be retained by the Escrow Agent until such time as there has been Gilroy Settlement. However, if there has been Gilroy Settlement but either 9 months from the Closing Date have not elapsed or there are Proceedings pursuant to Clause 5 6 4(i) below, the Escrow Agent shall release the Retention to the Seller less the sum of CZK 189,000,000 (one hundred and eighty nine million Czech Crowns), which shall be retained in the Escrow Account until such time as the Buyer obtains a definitive and final ruling in respect of such Proceedings or the period of 9 months from the Closing Date elapsed and there are no Proceedings which ever is the later. For the avoidance of doubt, a court decision made on basis of a valid withdrawal is considered to be a definitive and final ruling

The Escrow Agent shall throughout the period of holding the Retention release to the Buyer upon the sole request of the Buyer the following sums:

(i)      In the event that anyone initiates any legal Proceedings the subject matter of which is a declaration of invalidity of legal acts based on which the Property has been transferred or contributed to Kotva and/or to the Seller, within nine months of the Closing Date, then the Buyer shall be entitled to unilaterally withdraw on each regular quarter day, being 1 January, 1 April, 1 July and 1 October, such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending the Buyer, SPV KN or Markland in any such Proceedings Such amounts will be considered to be the Share Purchase Price adjustments In the event that compensation of such costs are awarded by the court to

the Buyer in such Proceedings, then the Buyer shall return such sums as it recovers to the Seller once it has received them from the obliged person, such amounts again will be considered the Share Purchase Price adjustments

(ii)    On each regular quarter day, being 1 January, 1 April, 1 July and 1 October, such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending SPV KN under the Gilroy Claim; the request of the Buyer for such sums from the Retention must evidenced by a duly issued invoice from the Buyer's lawyers for the time being. Any payments under this Clause 5 6 4(ii) will be considered to be Share Purchase Price adjustments.

(iii)   In the event that, under any tax regulations applicable up to the date of Closing, Kotva or SPV KN are assessed with Tax (in particular real estate transfer tax or VAT) in relation to the contribution of the Property, to SPV KN and Kotva, SPV KN or the Seller is liable to pay such Tax to the Financial Authorities, Kotva and the Seller undertakes to compensate SPV KN for such Tax and any corresponding penalty, interest or any other financial payment imposed by the Financial Authorities on SPV KN and such amount of Tax shall be retained in the Escrow Account by the Escrow Agent and shall only be released to the Seller following Gilroy Settlement upon receipt of the following:

(a)    an original or an authenticated copy of the extract from the Real Estate Register showing the SPV KN as the exclusive owner of the Property which are free of any Encumbrances; it does not relate to any Encumbrances, which arise after the Closing has taken place or which are created by the Buyer;

(b)    an original or an authenticated copy of the Tax return relating to the real estate transfer tax resulting from the contribution of the Property to SPV KN and a copy of an expert's valuation, both bearing a stamp of the Tax Collection Authority confirming that the Tax return, including the expert's valuation, have been duly submitted to the Tax Collection Authority; and

(c)    original confirmation, issued by the appropriate Financial Authority, proving that neither Kotva nor the Seller or SPV KN have any tax liabilities in respect of any Tax and in particular real estate transfer tax resulting from the contribution of the Property to SPV KN

Any payments under this Clause 5 6 4(ii) will be considered to be Share Purchase Price adjustments.

(iv)   In the event that the Retention falls below the amount of CZK 31,500,000 (thirty one million five hundred thousand Czech Crowns) then the Seller and/or Kotva and/or KAS shall, within twenty (20) Business Days of the level falling below CZK

KC1-2659

31,500,000 (thirty one million five hundred thousand Czech Crowns), ensure that sufficient funds are paid in to the Escrow Account to bring the level back up to at least CZK 31,500,000 (thirty one million five hundred thousand Czech Crowns).

(v)    The Seller and Buyer will agree to adjust the Share Purchase Price by deducting from the Share Purchase Price payable to the Seller and release to the Buyer one half of the difference between CZK 177,250,000 (one hundred and seventy seven million two hundred and fifty thousand Czech Crowns ) and the actual annual income due in accordance with the true and accurate Rent Roll as existing at the Closing Date in respect of the Property, excluding the Service charge, as agreed between the Seller and the Buyer not more than 2 Business Days prior to the Closing Date

(vi)   For the avoidance of doubt. the sums referred to in this Clause 5.6.4of this Agreement may be released to the Buyer upon the Buyer's sole request and shall be deposited in such account as the Buyer shall, in its own discretion, determine.

5.6.5   If the conditions under this Agreement or under the Escrow Agreement for releasing any funds from the Escrow Account to either of the Seller or the Buyer have been validly satisfied, save in respect of any monies to be released pursuant to Clause 5.6.4, the other party shall, upon a written invitation by the other party. countersign a joint instruction or any other document contemplated by the Escrow Agreement and deliver it to the other party within five days of the invitation being delivered If the appropriate party does not satisfy the aforementioned obligation in a due and timely manner. it shall pay to the other party a contractual penalty of CZK 157,500,000 (one hundred and fifty-seven million five hundred thousand Czech Crowns)

5.6.6   Kotva and the Seller hereby confirm that the Fixtures & Fittings will remain at the Building following Closing and will become, if not already, the property of SPV KN

## 6    Representations, Warranties and Obligations and Undertakings of KAS, Kotva and the Seller

KAS, Kotva and the Seller represent and warrant that the following representations and warranties contained in this Section 6 are true, correct and complete as at the date of signing this Agreement and Kotva, the Seller and KAS undertake to maintain them true, correct and complete during the entire term of effectiveness of this Agreement and to comply with all the obligations and undertakings contained in this Section 6 during the entire term of effectivness of this Agreement until Closing and in respect of those obligations and undertakings specified in Clause 6.5, for five years following the Closing Date:

### 6.1    General

(I)    Kotva, SPV KN, the Seller and KAS have been duly established and incorporated under the respective laws, being Czech, Czech, Cypriot and

KC1-2660

Czech, and the share capital has been fully paid up in respect of each of them

(ii)   None of Kotva, SPV KN, the Seller or KAS has been declared bankrupt nor, and to the best their Knowledge, has any person delivered a petition for bankruptcy

(iii)   There is no Proceeding in progress, pending or Threatened against or relating to Kotva, SPV KN or the Seller or KAS except for the Gilroy Case and the 'Balfinder litigation' and there is no circumstance, matter or thing which might give rise to any such Proceeding by Kotva or SPV KN or the Seller or KAS or any shareholder thereof or any third party or to any governmental investigation relative to it, nor is there outstanding against Kotva or SPV KN or Seller or KAS any regulation, judgement, decree, injunction, rule or Order of any court, Governmental Body or arbitrator which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable

(iv)   None of Kotva, SPV KN, or the Seller nor KAS nor any of their directors and managers have committed any offence or failed to comply with any applicable Law which might give rise to any fine, penalty, default or commencement of Proceeding or any other liability which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable

(v)   None of Kotva, SPV KN, or the Seller nor KAS is in default or breach of Organisational Documents or any licence, Governmental Authorisation, Contract or other instrument to which it is a party or by which it may be bound and there exists no state of facts which after notice or lapse of time, or both, would constitute such a default or breach, and all such licences, Governmental Authorisations, Contracts and documents are in good standing and Kotva, SPV KN or the Seller or KAS, as the case may be, are entitled to all benefits there under and none of Kotva. SPV KN, or the Seller or KAS have Knowledge of any of the above which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable

(vi)   Kotva and SPV KN and KAS are Tax resident only in the Czech Republic and will remain so (whilst under the control of the KAS Group) until at least five years from the Closing Date and neither Kotva nor SPV KN nor KAS has any Tax Liabilities whether actual or contingent in jurisdictions other than in the Czech Republic

(vii)   The Seller is tax resident of Cyprus

(viii)   The corporate records supplied to Markland during Due Diligence contain complete and accurate records of all minutes of meetings held and all resolutions adopted by Kotva and in general meetings since SPV KN's incorporation and neither Kotva nor KAS have any Knowledge of any defects in the above or breaches thereof, or in the corporate governance of KAS, which would make this Agreement or the transactions contemplated in this Agreement invalid. void or voidable

(ix)    Kotva and the Seller have supplied the Buyer and/or Markland with all complete and accurate records of all minutes of meetings held and all resolutions adopted by SPV KN since its incorporation

(x)     The books and records of Kotva and SPV KN fairly and correctly set out and disclose in all material respects the financial position of the Business of Kotva and all material financial transactions relating to the Business have been accurately recorded in such books and records since its incorporation and Kotva has no Knowledge of a breach of any of the above.

(xi)    None of Kotva, SPV KN, or the Seller or KAS is a party to any valid written or verbal Contract or any other document under the terms and conditions of which the performance by the Seller of this Agreement would result in the breach of an obligation, or might provide a reason for the termination or invalidity of this Agreement or the transactions contemplated in this Agreement, or which might preclude Kotva, SPV KN or the Seller or KAS from performing their obligations hereunder.

(xii)   With respect to the Property, SPV KN will not execute any new lease without the prior written consent of the Buyer, such consent not to be unreasonably withheld or delayed. If a response to such a request is not given by the Buyer within 10 Business Days of its delivery, this will be deemed consent to the execution of the new lease.

(xiii)  The Seller. SPV KN, Kotva shall not extend or agree to extend any existing lease without the prior written Consent of the Buyer. such consent not to be unreasonably withheld or delayed. If a response to such a request is not given by the Buyer within 10 Business Days of its delivery, this will be deemed consent to the extension of the existing lease.

(xiv)   All Consents necessary to fulfil the obligations of Kotva. SPV KN. the Seller or KAS to complete the SPV Conclusion and the connsumation of the transactions contemplated by this Agreement shall be provided by the Seller, SPV KN or by Kotva to the Buyer as soon as practicable after they are available.

(xv)    Kotva and/or SPV KN shall permit any Person nominated by Markland or the Buyer to oversee the day-to-day management of the Property which, for the avoidance of doubt, shall mean the internal management of the Kotva shopping centre by the on-site retail manager. Kotva and/or SPV KN undertake to provide assistance, advice and all information necessary to enable such Person to effectively learn the current management structure of the Property

(xvi)   That in relation to those persons currently employed by Kotva or by the Seller there are no written Contracts of employment. mandate. consultancy or similar agreements with any employee. director or consultant of Kotva or of the Seller which are to be transferred to the Buyer or SPV KN on Closing either by operation of law or by virtue of any provision contained within any such employment agreements. Kotva and the Seller shall remain fully liable for all claims of redundancy payments or protective awards and for any liability. direct or indirect, resulting from the unfair or wrongful dismissal of any employee and shall fully and effectually indemnify. and continue to

KC 1-2662

KC1-2662

keep indemnified, the Buyer in respect of any costs or expenses which may arise in connection therewith.

(xvii) The Seller and Kotva undertakes to ensure that, in relation to SPV KN. the entry into or completion of this Agreement will not directly or indirectly cause or contribute to the disallowance or non-availability of any Tax benefit or relief (whether by way of deduction, reduction, set-off, exemption, allowance or otherwise) from, against or in respect of which any Tax could or may be effectively reduced withdrawn, postponed, restricted or waived as a result of entry into or completion of this Agreement.

(xviii) As at the Closing Date neither SPV KN nor the Seller will have any joint or several liability in respect of any Tax incurred by or due from any other Person, as a transferee or successor, by contract, or otherwise.

(xix) Concerning SPV KN and/or the Seller, full liability has been accounted for or full provision or reserve has been made in the Financial Statements for all Taxes liable to be assessed or for which SPV KN is or may become accountable. Proper provision, reserve or liability for deferred Tax has been made in the Financial Statements.

(xx) No income or revenue in relation to SPV KN (as computed for Tax purposes) will arise or accrue in consequence of cancellation of provisions or reserves which have been claimed as deductions or charges for Tax purposes in computing profits (tax base) or loss carry-forwards (as computed for Tax purposes), other than income against which corresponding expense allowable as deductions or charges for Tax purposes in computing profit (tax base) or loss carry-forwards (as computed for Tax purposes), (e.g. write-off of a receivable or expenses incurred on repairs of tangible assets) can be set-off.

(xxi) Kotva shall procure that as at the Closing Date all of the accounts, books and records of SPV KN will be fully, properly and accurately up-to-date from the incorporation of each entity respectively, and will be maintained at a place and in a form that complies with the Commercial Code and all applicable Laws of the Czech Republic. All accounts, documents, reports and returns required by Law to be delivered or made to any Governmental Body will have been duly and correctly delivered or made by representatives of SPV KN and the Seller and will be delivered to the Buyer

(xxii) Kotva shall procure that as at the Closing Date neither SPV KN nor the Seller will have any outstanding or undisclosed Taxes that were incurred on or before the Closing Date. SPV KN and the Seller have complied with all applicable Laws. rules and regulations relating to the payment and withholding of all Taxes. If the above mentioned declarations of the Seller prove to be incorrect the Seller shall immediately rectify this situation or shall immediately settle the tax for SPV KN or the Seller

(xxiii) Enforceability; No Conflict

(a) Kotva. SPV KN, KAS and the Seller have the absolute and unrestricted right, power, and authority to execute and deliver this

---

KC1-2663

Agreement and to perform their obligations under this Agreement, which actions have been duly authorised and approved by all necessary corporate actions of Kotva and the Seller and KAS, where relevant This Agreement constitutes the legal, valid, and binding obligation of Kotva, KAS and the Seller, and is enforceable against Kotva, KAS and the Seller in accordance with its terms

(b)  Neither the execution nor the delivery of this Agreement by Kotva, KAS and the Seller, nor the consummation or performance of any of the contemplated Transactions by Kotva, KAS or by the Seller where relevant, will directly or indirectly (with or without notice or lapse of time), contravene any Contract to which Kotva, KAS or the Seller is a party or by which Kotva, KAS or the Seller may be bound, any Governmental Authorisation. Legal Requirement, or Order to which the Seller may be subject, any provision of Kotva's, KAS' or the Seller's Organisational Documents, or any resolution adopted by the board of directors or the shareholders of Kotva, KAS or the Seller, which was not disclosed to the Buyer during Due Diligence

(xxiv)  The Seller or Kotva (whoever is legally responsible) undertakes to enter into any and all documents and agreements, within 20 Business Days of the request of the Buyer, following the Closing to:

(a)  permit the merger of SPV KN with the Buyer under the Laws of the Czech Republic;

(b)  sign and/or issue any document as requested by the Buyer or Markland which can speed up the process of the merger referred to in (a) above (e g  waiver of right to receive various reports on merger);

(c)  waive any rights to any increased shareholding in the merged company or to any compensation payments upon the merger by reason of the dilution of shares or for any other reason; and

(d)  ensure the continued operation of SPV KN or the merged company including any shareholders agreements

(xxv)  Kotva will advise Markland and the Buyer of any adverse or potential adverse economic situation of Kotva or KAS.

6.2  Kotva and/or the Seller (once it becomes the owner of the Shares) are obliged or undertake to procure that:

(i)  The Board of Directors of SPV KN will obtain the prior written approval of Markland, such approval not to be unreasonably withheld, before carrying out anything not in the Ordinary Course of Business

(ii)  The following activities shall not be carried out without the prior written approval of Markland:

(a)  amendment, modification or supplementation of the Organisational Documents of Kotva, the Seller or SPV KN;

KC1-2664

(b) the liquidation, dissolution or winding-up of Kotva, KAS or SPV KN;

(c) the merger, consolidation, transformation or division of SPV KN; or

(d) the change or agreement to change of the share capital of SPV KN (whether by consolidation, sub-division, purchase, redemption, cancellation, allotment or issuance of any shares), the grant of any option over, or issuance of any instrument carrying rights of conversion into, any of its shares

6.3 Kotva and the Seller (once it becomes owner of the Shares) are obliged or undertake to procure that SPV KN does not without the prior written approval of Markland:

(i) dispose of or transfer control of or interest in all or any material part of its business, property or assets, whether by a single transaction or series of related transactions, or acquire any business, property or assets which would, following such acquisition, constitute a material part of its Business, property or assets (for these purposes, any business, property or asset accounting to CZK 31,500 (thirty one thousand five hundred Czech Crowns) or any business. property or asset with a fair market value of CZK 31.500 (thirty one thousand five hundred Czech Crowns) or more shall be deemed material);

(ii) change or agree to change its share capital (whether by consolidating, subdividing, purchasing, redeeming, cancelling, allotting or issuing any shares), or grant any option over, or issue any instrument carrying rights of conversion into, any of its shares;

(iii) commence any new business not being reasonably ancillary or incidental to the Business;

(iv) replace its auditors;

(v) enter into, modify or terminate any Contract or make any payment that: (a) involves or will involve obligations or potential obligations that, because of their nature or significance, are or will be deemed to be unusual or extraordinary for companies engaging in activities similar to the Business; (b) is or will be otherwise than at arms length and on the best terms reasonably obtainable; or (c) is in excess of CZK 31,500 (thirty one thousand five hundred Czech Crowns);

(vi) give any guarantee or indemnity, other than in the normal course of business in relation to the supply of goods or services, which is in excess of CZK 31.500 (thirty one thousand five hundred Czech Crowns);

(vii) make any loan, or create any borrowings or other indebtedness in the nature of borrowings;

(viii) acquire or incorporate any subsidiary or acquire or dispose of shares (except the Shares in accordance with this agreement). equity interests or loan stock in any Person or enter into any joint venture, partnership or consortium arrangement;

KC1-2665

(ix)    permit its interest in any Person to be diluted (whether by a disposal of shares held by it or by a new issue of shares);

(x)    declare any dividend or make any other distribution in respect of its shares, whether in cash or otherwise; nor

(xi)    determine the compensation payable by SPV KN to any officer or Director.

**6.4    Monthly Reports**

Kotva and/or the Seller shall procure that the Directors of SPV KN provide to Markland, no later than the fifteenth (15th) day of each calendar month, a report detailing the activities of SPV KN

**6.5    Transfers**

Kotva and the Seller, once it becomes a shareholder of SPV KN, shall procure that from the date of this Agreement until five years following the Closing Date, no shares in SPV KN owned by Kotva or the Seller are transferred (including by way of sale of enterprise, merger or winding-up) to a third party and no Encumbrance may be created over those shares except in accordance with and subject to the provisions of this Agreement  For the duration of this Agreement SPV KN must not, without the prior written consent of the Buyer, suffer a Change of Control

**7    Representations, warranties and Obligations and Undertakings of the Buyer and of Markland**

The Buyer and Markland represents and warrants that the following representations and warranties are true, correct and complete as at the date of signing this Agreement and the Buyer and Markland undertake to maintain them true, correct and complete during the effectiveness of this Agreement up to Closing:

**7.1    Organisation**

The Buyer and Markland are duly established and incorporated and their share capitals have been fully paid up

**7.2    Enforceability; No Conflict**

7.2.1    The Buyer and Markland have the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and to perform their obligations under this Agreement, which obligations have been duly authorised and approved by all necessary corporate actions of the Buyer and Markland  This Agreement constitutes the legal, valid, and binding obligation of the Buyer and Markland, and is enforceable against the Buyer and Markland in accordance with its terms

7.2.2    Neither the execution nor the delivery of this Agreement by the Buyer and by Markland nor the consummation or performance of any of the Contemplated Transactions by the Buyer or Markland will directly or indirectly (with or without notice or lapse of time), contravene any Contract to which the Buyer and/or Markland is a party or by which the Buyer and/or Markland may be bound, any Governmental Authorisation, Legal Requirement, or Order to which the Buyer and/or Markland may be subject,

KC 1-2666

KC1-2666

any provision of their Organisational Documents, or any resolution adopted by the board of directors or the shareholders of the Buyer and/or Markland.

7.2.3    General

(i)    The Buyer and Markland have not been declared bankrupt nor, to the best Knowledge of the Buyer and Markland, has any person delivered a petition for bankruptcy in relation to it

(ii)    There is no Proceeding in progress, pending or Threatened against or relating to the Buyer and Markland and there is no circumstance, matter or thing to the Knowledge of the Buyer and Markland which might give rise to any such Proceeding by a third Person or any shareholder thereof, nor to any governmental investigation relative to it, nor is there outstanding against the Buyer and Markland any regulation, judgement, decree, injunction, rule or order of any court, Governmental Body or arbitrator

(iii)    The Buyer and Markland are not in default or breach of their Organisational Documents or any Contract to which they are a party or by which they may be bound and there exists no state of facts which after notice or lapse of time, or both, would constitute such a default or breach, and all such documents and Contracts are in good standing and the Buyer and Markland are entitled to all benefits thereunder

(iv)    Markland is tax resident in the Republic of Ireland and the Buyer is tax resident in the Czech Republic

(v)    The corporate records of the Buyer and Markland contain complete and accurate records of all minutes of meetings held and all resolutions adopted by the Buyer and/or Markland in general meetings since their incorporation and the Buyer and/or Markland have no knowledge of any of the above that might make this Agreement invalid, void or voidable

(vi)    The books and records of the Buyer and Markland fairly and correctly set out and disclose in all material respects the financial position of the business of the Buyer and Markland and all material financial transactions relating to the business have been accurately recorded in such books and records since their incorporation and the Buyer and/or Markland have no Knowledge of a breach of any of the above

(vii)    The Buyer and Markland are not a party to any valid written or verbal Contracts or any other document under the terms and conditions of which the performance by the Buyer and/or Markland of this Agreement would result in the breach of an obligation, or might provide a reason for the termination or invalidity of this Agreement, or which might preclude the Buyer and/or Markland from performing their obligations hereunder.

(viii)    All Consents and other co-operations necessary to fulfil this Agreement by the Buyer and Markland shall be provided by the

KC1-2667

Buyer and Markland to the Seller and to the KAS Group upon their written request thereof.

(ix)  The Buyer is obliged to conclude a Transfer Deed and trademark transfer agreements in accordance with Clause 5.1 and 5.2 and take over the Shares in accordance with Clause 5.5.

### 7.3   Due Diligence

Markland represents that during Due Diligence it had an option to ask for and did ask for information concerning the Property, Kotva and other members of the KAS Group and that the documents provided were and still are represented by Kotva and KAS to be satisfactory and of a standard to enable Markland and the Buyer to enter into this Agreement including their willingness to pay the Purchase Price subject to such retentions as are made hereunder. The Buyer and Markland agree that, on the basis of the information provided to them by the Sellers, the Purchase Price is reasonable and corresponds to the value of the Shares and the Kotva Trademark.

## 8   Share Purchase Price Adjustment and Remedies

### 8.1   Survival; Right to Share Purchase Price Adjustment; Waiver

All obligations and undertakings and Share Purchase Price adjustment obligations in this Agreement and its Schedules, and any other certificate or document delivered pursuant to this Agreement will survive the Closing until the expiration of the relevant limitation period, i.e. preclusion or statutory limitations. Any claim by a Party based on a breach of any undertakings, representation or warranty made pursuant to this Clause 8.1 must be submitted to the breaching party prior to the expiration of the applicable limitation period. The right to Share Purchase Price adjustment, payment of damages or other remedy based on a breach such representations, warranties, covenants, and obligations will not be affected by any investigation conducted with respect to, or any Knowledge acquired (or capable of having been acquired) about, the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to Share Purchase Price adjustment, payment of damages, or other remedy based on such representation, warranty, covenant, or obligation.

### 8.2   Share Purchase Price adjustment and Payment of Damages by Kotva

Kotva and the Seller shall jointly and severally reimburse and hold harmless Markland and the Buyer and the members of their Boards of Directors (collectively, the "**Markland's Indemnities**"), and shall pay (by way of deducting from the Share Purchase Price payable by the Buyer) to the relevant Markland's Indemnities the monetary value of any Adverse Consequence arising directly or indirectly, from or in connection with:

(a)  any breach of any representation, warranty covenant, obligation or undertaking made by Kotva and/or the Seller and /or KAS in this Agreement, or any other certificate or document delivered by Kotva and/or KAS and/or by the Seller pursuant to this Agreement;

---

KC1-2668

(b)     any Liabilities of SPV KN existing at or arising out of a state of facts existing at or before the Closing Date, to the extent that such Liabilities are not reflected or reserved against in the Financial Statements;

(c)     any claim by any Person for brokerage or finder's fees or commissions or similar payments from the Seller, SPV KN or SPV CO in connection with any of the Contemplated Transactions; and

(d)     any and all Threatened or implemented Proceedings, demands or assessments incidental to any of the matters set forth in this Clause 8 2(a) to (c)

8.3     Share Purchase adjustment and Payment of Damages by Markland

The Buyer and Markland shall jointly and severally reimburse and hold harmless Kotva, the Seller, KAS Group, SPV KN and the members of the boards of directors of the aforementioned companies (the "**Kotva's Indemnities**"), and shall pay (by way of increasing the Share Purchase Price payable by the Buyer) to Kotva's Indemnities the monetary value of any Adverse Consequence arising directly or indirectly, from or in connection with:

(a)     any breach of any representation, warranty covenant, obligation or undertaking made by Markland or by the Buyer in this Agreement or in any certificate delivered by Markland or by the Buyer pursuant to this Agreement; and

(b)     any and all Threatened or implemented Proceedings, demands or assessments incidental to any of the matters set forth in Clause 8 3(a) above

8.4     Procedure for Share Purchase Price adjustment

(a)     Immediately after: (i) receipt by an Indemnified Person of notice of the assertion of a third-party claim against it; or (ii) the Indemnified Person becoming aware that it has suffered an Adverse Consequence entitling it to a Share Purchase Price adjustment, the Indemnified Person will, if a claim is made against such Indemnified Person, give notice to the Indemnifying Person of the assertion of such claim or the Adverse Consequence as the case may be An Indemnified Person's failure to notify an Indemnifying Person will not relieve the Indemnifying Person of any Liability that it may have to the Indemnified Person

(b)     A claim for Share Purchase Price adjustment originates by the expiration of the protection time limit according to Clause 8 5, at which moment the sum payable under the Share Purchase Price adjustment shall be paid promptly by the Indemnifying Person to the Indemnified Person.

8.5     If any of the Parties discovers a Threatened Adverse Consequence to it for a reason which would entitle the another Party to Share Purchase Price adjustment or to withdraw from this Agreement. that Party shall notify the others accordingly The Party who would but for the terms of this Clause 8 5 be the Indemnifying Party then has a protection time limit lasting 25 (twenty five) Business Days from the date of the delivery of the notification to remove the fact causing falsehood of the representation or remedy the breach of its obligation  If such Party does not do so, it is obliged to

KC1-2669

pay to the other Party upon expiration of the protection time limit sufficient and full compensation for the Threatened or newly discovered Adverse Consequence. If later the Adverse Consequence does not materialise the Party receiving the compensation is obliged to return it.

8.6    In the event that an Adverse Consequence is discovered, Kotva or the Seller shall remedy such situation as soon as possible following the discovery but in any event shall do so prior to Closing. If at Closing the Adverse Consequence still exists, the Buyer shall be entitled to deduct the amount of the Adverse Consequence from the Share Purchase Price.

8.7    Any payments made under this Clause 8 hereof shall be treated as an adjustment to the Share Purchase Price paid by the Buyer for the Shares under the terms of the Agreement, with the exception of any contractual penalty payable hereunder.

8.8    All sums payable by the Seller to the Buyer under this Agreement shall be paid free and clear of all deductions, withholdings, set-offs or counterclaims whatsoever save only as may be required by Law. If any deductions or withholdings are required by Law the Seller shall be obliged to pay to the Buyer such sum as will after such deduction or withholding has been made leave the Buyer with the same amount as it would have been entitled to receive in the absence of any such requirement to make a deduction or withholding.

8.9    If any Tax authority charges to Tax any sum paid to the Buyer under this Agreement then the amount so payable shall be grossed up by such amount as will ensure that after payment of the Tax so charged, or which would have been so charged if any relief available to the Buyer were ignored, there shall remain a sum equal to the amount that would otherwise be payable under this Agreement.

## 9    Post - Closing Confidentiality Duty

9.1    For the purpose of this Agreement, confidential or proprietary information ("**Proprietary Information**") shall mean the information created, transferred, recorded or employed as part of, or otherwise resulting from the activities undertaken pursuant to this Agreement or the Schedules hereto which constitutes the confidential, proprietary or trade secret information of the disclosing Party. Proprietary Information of Kotva shall also include Proprietary Information of SPV KN and/or the Seller. Such information may be of, but not limited to, a business, organisational, technical or financial nature. The Parties understand and agree that all Proprietary Information of a disclosing Party shall be treated as confidential by the receiving Party. Each receiving Party shall use the same degree of care as it uses with regard to its own Proprietary Information to prevent disclosure, use or publication of the disclosing Party's Proprietary Information.

9.2    Proprietary Information of the disclosing Party shall be held by the receiving Party as described in Clause 9.1 unless it is or has been:

(i)    obtained legally and freely from a third Person without restriction;

(ii)    independently developed by the receiving Party at a prior time or in a separate and distinct manner without benefit of any of the Proprietary Information of the disclosing Party and documented to be as such;

---

KC1-2670

(iii)  made available by the disclosing Party for general release;

(iv)  made public as required by Law, applicable regulations or Order or stock exchange requirements; and

(v)  within the public domain or later becomes part of the public domain as a result of acts by someone other than the receiving Party and through no fault or wrongful act of the receiving Party.

9.3  A receiving Party may disclose Proprietary Information of a disclosing Party to directors, officers, and employees of the receiving Party or agents of the receiving Party including their respective brokers, lenders, insurance carriers or prospective purchasers who have specifically agreed in writing to nondisclosure of the terms and conditions hereof. Any disclosure hereof required by legal process pursuant to Clause 9.2(v) shall only be made after providing the disclosing Party with notice thereof in order to permit the disclosing Party to seek an appropriate protective order or exemption.

9.4  The provision of this Clause 9 shall be effective for a period of two years following the Closing Date.

9.5  If a court of competent jurisdiction determines that the length of time or any other restriction or portion thereof set forth in this Clause 9 is unduly restrictive and thereby unenforceable, such restriction shall be interpreted and applied to include as much of the restriction as will render the covenants in this Clause 9 valid and enforceable to the fullest extent permitted by applicable Law, and as so interpreted and applied such covenants shall remain in full force and effect. The Parties further agree that if a court of competent jurisdiction determines that any provision of this Clause 9 is invalid or against public policy, the remaining provisions of this Clause 9 shall not be affected thereby, and shall remain in full force and effect.

## 10  Termination

10.1  Markland and/or the Buyer shall be entitled to withdraw by written notice to Kotva or to the Seller from this Agreement only if: (i) there is a breach of the Kotva's or Seller's representations, warranties, obligations or undertakings in accordance with Clause 6 and the protection time limit in accordance with Clause 8.5 of this Agreement expires, or in other cases of a breach of the Kotva's or Seller's representations, warranties or obligations where this Agreement entitles Markland or the Buyer to withdraw from the contract; (ii) if either SPV Conclusion has not taken place by 31 January 2005, save in the event of Force Majeure, including inactivity of a relevant Governmental Body or through the fault of a third party that is not either directly or indirectly controlled by the Seller; or (iii) if Closing has not occurred by 31 March 2005 provided that no breach of this Agreement by the Buyer or Markland will have occurred by then.

10.2  If Markland and/or the Buyer withdraw from this Agreement pursuant to Clause 10.1 the Buyer shall be entitled (in addition to and without prejudice to all other rights or remedies available to it including the right to claim damages) to:

10.2.1  the return of the Deposit and, if appropriate the Purchase Price in accordance with the terms of the Escrow Agreement; and

---

KC1-2671

10.2.2    a contractual penalty amounting to CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied firstly from the Security and then from other funds of the Seller as necessary

10.3    Failure to exercise this right in accordance with Clause 10.2 shall not constitute a waiver of any other right of Markland and/or the Buyer arising out of any breach of the obligations and undertakings of Kotva and/or the Seller

10.4    Kotva and/or the Seller are entitled to withdraw from this Agreement by serving written notice on Markland and the Buyer if it shall be found that any of the representations and warranties of Markland and/or the Buyer in accordance with Clause 7 was untrue at the date of execution of this Agreement or by the Closing Date, and the protection time limit according to Clause 8.5 of this Agreement expires or in other cases of breach of Markland's or Buyer's obligations where the Seller is entitled to withdraw from this Agreement

10.5    In the event of failure by Kotva and/or the Seller to satisfy the SPV Conclusion by 31 January 2005, Markland and/or the Buyer may withdraw from this Agreement by serving five Business Days notice on the Seller and Kotva and the Buyer shall be entitled to a contractual penalty of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns). to be satisfied firstly from the Security and then from other funds of Kotva and/or of the Seller as necessary

10.6    If Kotva and/or the Seller withdraws from this Agreement pursuant to Clause 10.4 the Seller will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty in accordance with the relevant term of this Agreement of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) in case this Agreement does not set other contractual penalty to be satisfied firstly from the Deposit and then from other funds of Markland as necessary.

10.7    Failure to exercise this right in accordance with Clause 10.6 shall not constitute a waiver of any other right of Kotva and/or the Seller arising out of any breach of the obligations and undertakings of Kotva and/or the Buyer, however, settling the agreed contractual penalty causes the right to Share Purchase Price adjustment and possible other right to indemnification or damages against Markland and/or the Buyer to cease.

10.8    If Closing does not occur within the time limits envisaged in this Agreement (other than due to the fault of the Buyer or Markland), then the Buyer will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) to be satisfied firstly from the Security and then from other funds of Kotva, SPV KN and/or the Seller as necessary

10.9    If Closing does not occur within the time limits envisaged in this Agreement (other than due to the fault of the Seller or Kotva), then the Seller will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) to be satisfied firstly from the Deposit and then from other funds of Markland as necessary

KC 1-2672

KC1-2672

**10.10** The Parties are not entitled to the contractual penalties as above, if the other party does not comply with this Agreement due to the event of Force Majeure, including inactivity of a relevant Governmental Body or through the fault of a third party that is not either directly or indirectly controlled by Kotva, the Seller or the Buyer

**10.11** In the event (i) that the breach of obligations of the Seller or of Kotva does not cause an Adverse Consequence or (ii) if the Seller or Kotva fully indemnifies the Buyer or Markland during the protection time limit stated in Clause 8 5, then Markland and/or the Buyer shall not be entitled to withdraw from this Agreement or claim a contractual penalty

## 11    General Provisions

### 11.1    Expenses

Except as otherwise expressly provided in this Agreement, each Party will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of its Representatives

### 11.2    Public Announcements

Any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued at such time and in such manner as the Parties mutually determine  None of the Parties will make any disclosure of the Purchase Price or other terms of the Contemplated Transactions to any Person, except with the prior written consent of the other Parties or as required by Legal Requirements or by law  The Parties will consult with each other concerning the means by which the Kotva's employees, customers and others having dealings with Kotva or the Seller will be informed of the Contemplated Transactions, and the Parties will have the right to be present for any such communication, if possible

### 11.3    Notices

All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed given to a Party when: (a) delivered to the appropriate address by hand or by nationally recognised overnight courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment (subsequently delivered in written form within five days); or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested; in each case to the following addresses. facsimile numbers or e-mail addresses and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number, e-mail address or individual as a Party may designate by notice to the other Parties):

**Kotva, KAS, KO and the Seller:**

Kotva NEMOVITOSTI. k s
Address:      Příkop 4. Brno, Post Code 602 00
Fax:          +420 224 801 230
Tel:          +420 224 801 401
Attention:    Martin Benda

copy to

---

KC 1-2673

KC1-2673

Toman, Devátý and Partneři
Address:      Trojanova 12, 120 00 Prague 2
Fax:          +420 224 920 468
Tel:          +420 224 918 490
Attention:    Petr Toman

and

**Markland and the Buyer:**

Markland Holdings Limited
Address:      19 Upper Fitzwilliam Street, Dublin 2, Republic of Ireland
Fax:          00353 167 620 00
Tel:          00353 167 620 23
Attention:    Henry Prestage/Frank Walker/Aidan Scully

copy to

Linklaters v.o.s.
Address:      Palác Myslbek, Na Příkopě 19, 117 19 Praha
Fax:          +420 221 622 199
Tel:          +420 221 622 111
Attention:    Bryan Wilson

11.4    Further Assurances

The Parties agree:

11.4.1    to furnish, upon request, each other with such further information as requested;

11.4.2    to execute and deliver to each other such other documents; and

11.4.3    to do all such other acts, as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Contemplated Transactions.

11.5    Incorporation of Schedules

The Schedules identified in this Agreement are incorporated herein by reference and made a part of this Agreement.

11.6    Entire Agreement and Modification

This Agreement supersedes all prior agreements among the Parties with respect to its subject matter and constitutes (along with the documents delivered pursuant to this Agreement) a complete and exclusive statement of the terms of the agreement between the Parties regarding its subject matter. In the case of any inconsistency between the terms of this Agreement and the terms of the Transfer Deed or the KOTVA Trademarks transfer agreement, the terms of this Agreement shall prevail. This Agreement may not be amended, supplemented or otherwise modified except by a written agreement executed by all the Parties.

11.7    Acknowledgement

Markland and the Buyer acknowledge that they have not been induced to enter into this Agreement by any representation, warranty or undertaking not expressly

---

A04677559/1 4/22 Dec 2004

KC 1-2674

KC1-2674

incorporated into it Parties to this Agreement confirm that they have received independent legal advice relating to all the matters provided for in this Agreement, including the provisions of this Clause 11.7, and agrees, having considered the terms of this Clause 11.7 and the Agreement as a whole, that the provisions of this Clause 11.7 are fair and reasonable.

**11.8**    Time of the Essence

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence

**11.9**    Severability

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable. However, the transfer of the Shares and the transfer of KOTVA Trademarks are mutually dependant transactions pursuant to Section 275 (2) of the Commercial Code

**11.10**   Assignments, Successors, and No Third Party Rights

No Party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Parties, such consent not to be unreasonably withheld, except that Markland may assign without the other Parties' consent any of its rights and delegate any of its obligations under this Agreement to any Related Person or any subsidiary of Markland or to any subsequent acquirer of the Shares or of all or substantially all of the business of the Buyer or any Related Person This Agreement will apply to, be binding in all respects upon, and inure to the benefit of each of the Kotva's and/ or Seller's successors and permitted assigns and Markland's and/or the Buyer's successors and permitted assigns (whether by merger, consolidation. purchase of all or substantially all of its assets or otherwise) The Buyer will indemnify and hold harmless the Seller and KAS, and will pay to the Seller's Indemnities the monetary value of any Adverse Consequence arising, directly or indirectly, from or in connection with any breach of such a Buyer's successor Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the Parties, any, right, remedy, or claim under or with respect to this Agreement or any its provision except the rights as shall inure to a successor or assignee pursuant to this Clause 11 10

**11.11**   Waiver

The rights and remedies of the Parties are cumulative and not alternative Neither any failure nor any delay by any Party in exercising of any right, power, or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege To the maximum extent permitted by applicable Law, (a) no claim or right arising out of this Agreement or any of the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Party, and (b) no waiver that

KC1-2675

may be given by a Party will be applicable except in the specific instance for which it is given

**11.12** Arbitration

This provision shall apply to all and any dispute or difference that may arise in connection with or the interpretation, performance or termination of this Agreement between the Parties, as well as the validity or settlement of this Agreement and of the relationship established by this Agreement (the "**Dispute**"). The Parties shall make every effort to resolve any Dispute out of court, if possible. If they are unable to reach an out-of-court settlement, any of the Parties shall have the right to file a petition for the Dispute to be resolved before the Court of Arbitration attached to the Economic Chamber of the Czech Republic and the Agrarian Chamber of the Czech Republic in accordance with Acts nos. 216/1994 Coll., as amended, and 223/1994 Coll., as amended, under said Court's Rules of Arbitration, by three arbitrators. The language of the proceedings shall be Czech and the venue of the proceedings shall be Prague. The chairman of the arbitration tribunal shall be authorised to decide on procedural issues at his own discretion. If the disputing Parties reach conciliation before the above Court as part of the arbitration proceedings, no justification needs to be attached to the arbitral award that will endorse the conciliation between the disputing Parties. The Party that is defeated in such a Dispute shall reimburse the other Party for all of its legal expenses in addition to the costs of the arbitration proceedings adjudicated to it by the arbitration tribunal. In proceedings before the above Court of Arbitration, the Parties shall take an active attitude and shall be helpful to the Court in the resolution of the Dispute, especially as regards giving explanations, furnishing evidence and documents, etc., and shall acknowledge its arbitral award without any reservations, and shall carry out the arbitral award voluntarily. If a Party refuses to carry out the arbitral award referred to in the preceding sentence, the other Party has the right to file a petition for the execution of the decision with the court of law having jurisdiction over the place and merit of the dispute

**11.13** Governing Law

This Agreement will be governed by and construed under the laws of the Czech Republic without regard to its conflicts of law principles, in particular the Czech Commercial Code

**11.14** Counterparts

This Agreement will be executed in four counterparts, each of which will be deemed to be an original copy of this Agreement and which, when taken together, will be deemed to constitute one and the same document. The Agreement is executed in the English (2 counterparts) and Czech (two counterparts) languages, and the Czech language version shall prevail

The Parties have executed this Agreement as of the date indicated in the first sentence of this Agreement

By:

**Seller:**

A04677559/1 4/22 Dec 2004

KC 1-2676

KC1-2676

**SPV CO Limited**

Name:

Title:

By:

**KOTVA NEMOVITOSTI k. s.**

Name:

Title:

By:

**KOTVA a.s.**

Name:

Title:

By:

**KOTVA OBCHODNÍ, a.s.**

Name:

Title:

By:

KC1-2677

**Buyer:**

**CRQ Czech a.s.**


**Name:**

**Title:**


By:

**Markland Holdings Limited**


**Name:**

**Title:**

KC1-2678

**Schedule 1**
**Extracts from Commercial Register**

KC 1-2679

KC1-2679

**Schedule 2**
**Extract from Companies House**

KC1-2680

**Schedule 3**
**INTENTIONALLY DELETED**

**Schedule 4**
**Extract from Real Estate Register**

KC1-2682

**Schedule 5**
**KO Lease**

KC 1-2683

KC1-2683

**Schedule 6**
**Rent Roll**

KC1-2684

**Schedule 7**
**INTENTIONALLY DELETED**

KC1-2685

**Schedule 8**
**INTENTIONALLY DELETED**

KC1-2686

**Schedule 9**

**Gilroy Claim**

KC1-2687

**Schedule 10**

**Expert Opinion**

KC1-2688

**Schedule 11**

**List of Fixtures & Fittings**

Příloha 9
Žaloba Gilroy

v )    G —

**PP** **13C** **131/2004**

PETERKA & PARTNERS
Advokátní kancelář, Law Offices  Cabinet d'avocats

δ2334
2 2 -07- 2004

Obvodní soud pro Prahu 1
Ovocný trh 14
110 00 Praha 1

V Praze dne 30 června 2004

| | |
|---|---|
| Žalobce: | **GILROY LIMITED** |

se sídlem Pikioni, 4, Limassol, Kyperská republika
zastoupený Mgr Ondřejem Peterkou, advokátem zapsaným ČAK pod reg
č 4245, vykonávajícím advokacii jako společník kanceláře PETERKA &
PARTNERS v o s  se sídlem Na Příkopě 15, 110 00 Praha 1 (plná moc
právního zástupce přiložena)

| | |
|---|---|
| Žalovaný č. 1: | **KOTVA a.s.** |

se sídlem Praha 1, Náměstí Republiky 8
IČ: 60 19 38 08
zapsaná v obchodním rejstříku vedeném Městským soudem v Praze
v oddíle B., vložka 2370
(dále jen „Kotva" nebo „žalovaný č  1")

| | |
|---|---|
| Žalovaný č. 2: | **KOTVA NEMOVITOSTI, k.s.** |

se sídlem 602 00 Brno, Příkop 4
IČ: 26 22 90 48
zapsaná v obchodním rejstříku vedeném Krajským soudem v Brně v oddíle
A., vložka 16 586
(dále jen „Kotva Nemovitosti" nebo „žalovaný č  2")

| | |
|---|---|
| Žalovaný č. 3: | **SPV KN, a.s.** |

se sídlem 602 00 Brno, Příkop 4
IČ: 26 91 07 05
zapsaná v obchodním rejstříku vedeném Krajským soudem v Brně v oddíle
B , vložka 4043
(dále jen „SPV KN" nebo „žalovaný č  3")

## Žaloba na určení vlastnického práva k nemovitostem

Čtyřikrát
Soudní poplatek ve výši 3 000 Kč zaplacen kolky
Doručeno osobně na podatelnu soudu

**Přílohy:**
Dle seznamu příloh na poslední straně žaloby

PETERKA & PARTNERS v o s

Na Příkopě   15/583
CZ - 110 00   Praha 1
tel : +420 272 143 400
fax: +420 272 143 470
www cablnet cz
obchodní rejstřík Městský soud v Praze
oddíl A, vložka 43564
IČ: 26 16 97 20

KC 1-2127

## 1. SPECIFIKACE ÚČASTNÍKŮ, PŘEDMĚT ŘÍZENÍ, PŘÍSLUŠNOST SOUDU

### 1.1. Specifikace účastníků

Žalobce je akcionářem žalovaného č. 1

Žalovaný č. 1 je obchodní společností, která byla do roku 2000 zapsána v katastru nemovitostí jako výlučný vlastník nemovitostí specifikovaných níže v bodě 1 2 Jak vyplývá z dále uvedeného, je žalovaný č. 1 takovýmto výlučným vlastníkem dosud.

Žalovaný č. 2 je obchodní společností, která byla v katastru nemovitostí evidována jako výlučný vlastník nemovitostí specifikovaných níže v bodě 1 2, a to na základě prohlášení[1] o nemovitém vkladu učiněného žalovaným č. 1 v roce 2000. Vznikl přeměnou společnosti KOTVA NEMOVITOSTI, a s [2]

Žalovaný č. 3 je obchodní společností, jejímž jediným společníkem je žalovaný č. 2. V současné době je žalovaný č. 3 v katastru nemovitostí evidován jako vlastník nemovitostí specifikovaných níže v bodě 1 2

### 1.2. Předmět řízení

Žalobce se touto žalobou domáhá, aby soud svým rozhodnutím ve smyslu ustanovení § 80 písm. c) zákona č. 99/1963 Sb., občanského soudního řádu (dále jen OSŘ), určil, že žalovaný č. 1 je vlastníkem těchto nemovitostí:

- budova č p. 656 (obč. vyb.) příslušná k části obce Staré Město, nacházející se na stavební parcele parc. č. 680;
- budova bez č p./č ev. (obč. vyb.) příslušná k části obce Staré Město, nacházející se na stavební parcele parc č 1018/2;
- pozemek parc. č. 680 (zastavěná plocha a nádvoří) o výměře 4385 m$^2$;
- pozemek parc. č. 683/1 (ostatní plocha) o výměře 851 m$^2$;
- pozemek parc č. 683/2 (ostatní plocha) o výměře 2963 m$^2$;
- pozemek parc. č. 683/3 (ostatní plocha) o výměře 2 m$^2$;
- pozemek parc č 690/2 (ostatní plocha) o výměře 25 m$^2$;
- pozemek parc č. 690/3 (ostatní plocha) o výměře 49 m$^2$;
- pozemek parc. č. 690/4 (ostatní plocha) o výměře 9 m$^2$;
- pozemek parc. č. 1018/2 (zastavěná plocha a nádvoří) o výměře 1 m$^2$;

všechny uvedené nemovitosti jsou zapsány Katastrálním úřadem pro hlavní město Prahu na listu vlastnictví č. 265 vedeném pro obec Prahu, katastrální území Staré Město (dále tyto nemovitosti souhrnně označovány: "Obchodní dům KOTVA").

---

[1] Na základě ustanovení § 60 odst. 1 zákona č. 513/1991 Sb., obchodní zákoník (dále jen "ObchZ")

[2] Společnost KOTVA NEMOVITOSTI, a s změnila svoji právní formu z akciové společnosti na společnost komanditní Ke změně právní formy došlo rozhodnutím valné hromady ze dne 20 května 2003; rozhodnutí rejstříkového soudu o zápisu přeměny nabylo právní moci ke dni 15 srpna 2003

**1.3.    Příslušnost soudu**

Věcná příslušnost okresního (obvodního) soudu je dána na základě ustanovení § 9 odst. 1 OSŘ, neboť z ustanovení § 9 odst. 2 a 3 OSŘ a ani z jiných ustanovení nevyplývá, že by byla v prvním stupni dána příslušnost soudu krajského.

K příslušnosti místní žalobce odkazuje na ustanovení § 88 písm. g) OSŘ, dle kterého je příslušným soud, v jehož obvodu je nemovitost, týká-li se řízení práv k ní. Obchodní dům KOTVA jakožto soubor nemovitostí je umístěn v obvodu Obvodního soudu pro Prahu 1.

K důkazu:

- výpis ze Střediska cenných papírů,
- výpisy z obchodního rejstříku ohledně žalovaných,
- doklady o existenci žalobce,
- výpis z katastru nemovitostí (LV č. 265 pro k ú. Staré Město),
- výroční zprávy žalovaného č 1 za roky 2000, 2001 a 2003,
- s výhradou důkazů dalších.

**2.    EXISTENCE NALÉHAVÉHO PRÁVNÍHO ZÁJMU ŽALOBCE NA URČENÍ, JEHOŽ SE DOMÁHÁ V TOMTO ŘÍZENÍ**

Nejvyšší soud České republiky ve svém rozhodnutí sp. zn. 3 Cdo 1338/96[3] ze dne 27. března 1997) zaujal právní názor, dle kterého určovací žaloba podle § 80 písm. c) OSŘ má místo v případech, kdy:

- lze její pomocí eliminovat stav ohrožení práva či nejistoty v právním vztahu a k odpovídající nápravě nelze dospět jinak a

- účinněji než jiné právní prostředky vystihuje obsah a povahu příslušného právního vztahu a jejím prostřednictvím lze dosáhnout úpravy tvořící určitý právní rámec, který je zárukou odvrácení budoucích sporů účastníků.

V intencích tohoto judikátu je přípustné podání určovací žaloby směřující k tomu, aby údaj o vlastnictví nemovitosti uvedený v katastru nemovitostí odpovídal skutečnému právnímu stavu[4]. Takovou žalobu obvykle podává subjekt, který se považuje za vlastníka předmětné nemovitosti Z aktuální rozhodovací praxe Nejvyššího soudu však lze dovodit, že určovací žalobu může podat rovněž osoba, která je společníkem, resp. akcionářem takového subjektu.

Takto v řízení pod sp. 29 Odo 767/2002 Nejvyšší soud dospěl k závěru, že akcionář má naléhavý právní zájem na podání určovací žaloby, jíž se domáhá vyslovení neplatnosti smlouvy, kterou akciová společnost převádí ve smyslu § 476 obchodního zákoníku svůj podnik, resp. jeho část, na jiný subjekt. Mimo jiné Nejvyšší soud uvedl: „ uzavření smlouvy o prodeji části podniku může mít významný vliv na právní poměry společnosti, jejímž je akcionářem, a tedy zprostředkovaně i na jeho právní poměry, např právě (ve vazbě na obsah smlouvy) na výši jeho podílu na likvidačním zůstatku "

---

[3] Publikováno v časopise Soudní judikatura (civilní) č. 3/1997 na str. 58 a násl pod číslem Jc 21/1997.

[4] Na základě rozhodnutí o určovací žalobě lze provést příslušný záznam do katastru nemovitostí ve smyslu ustanovení § 7 odst 1 zák. č 265/1992 Sb , o zápisech vlastnických a jiných věcných práv k nemovitostem

KC 1-2129

3

Analogicky je nutno dovodit oprávnění akcionáře žalovat na určení vlastnického práva k souboru nemovitostí, který představuje hlavní majetkovou složkou podnikání akciové společnosti (zde Obchodní dům KOTVA[5] v hodnotě přinejmenším 1,39 miliardy korun).

Význam vlastnictví takovéto hlavní majetkové složky a jeho dopad do právních poměrů akcionáře lze nejlépe vysvětlit na porovnání postavení akcionáře v situaci, kdy akciová společnost je vlastníkem takové majetkové složky, se situací, kdy takový majetek nevlastní.

V situaci, kdy akciová společnost je vlastníkem takovéto majetkové složky:

- může jejím prodejem v daném účetním období dosáhnout výrazného zisku, čímž dojde k praktickému naplnění práva akcionáře uvedeného v ustanovení § 155 odst. 1 ObchZ, dle kterého se akcionář podílí na zisku společnosti;

- došlo-li by k likvidaci akciové společnosti, nepochybně by se v podílu akcionáře na likvidačním zůstatku příznivě promítnula získaná kupní cena za takovouto majetkovou složku (opět ustanovení § 155 odst. 1 ObchZ);

- akcionář má možnost na valné hromadě rozhodovat o podnikatelské činnosti žalovaného č. 1, která je determinována právě vlastnictvím a užíváním takovéto majetkové složky; čímž je dán praktický obsah oprávnění akcionáře podílet se na řízení společnosti (opět ustanovení § 155 odst. 1 ObchZ)

Pokud by akciová společnost vlastníkem této hlavní majetkové složky nebyla, shora uvedená oprávnění akcionáře by měla zcela jiný obsah, neboť společnost by zejména v souvislosti s vlastnictvím (a případným budoucím převodem) této majetkové složky nemohla realizovat žádné příjmy, od nichž by se odvíjelo naplnění práva akcionáře na podíl na zisku, resp. na podíl na likvidačním zůstatku

V tomto konkrétním případě žalobce ještě poukazuje na to, že možnost efektivního výkonu jeho akcionářských práv (a tedy i význam rozhodnutí dle této žaloby pro jeho právní poměry) je umocněna tím, že je rovněž akcionářem TREND VIF, který dle žalobcova přesvědčení je vlastníkem hlavního akciového podílu v žalovaném č. 1.

Pro úplnost považuje žalobce za nutné dodat, že zcela shodný právní názor jako v rozsudku pod sp. zn. 29 Odo 767/2002 vyslovil Nejvyšší soud i v dřívějším rozsudku ze dne 5. listopadu 2002 pod sp. zn. 29 Odo 535/2001 a z hlediska řešení této právní otázky je možno již považovat soudní judikaturu za konstantní

K důkazu:

- výpis ze Střediska cenných papírů,
- znalecký posudek oceňující hodnotu Obchodního domu KOTVA,
- s výhradou důkazů dalších

---

[5] V případě Obchodního domu KOTVA lze navíc uvažovat o tom, zda takto dominantní a relativně samostatná součást podniku nenaplňuje znaky části podniku (tj. samostatné organizační složky) s tím, že s ní nelze disponovat jinak než podle příslušných kogentních ustanovení obchodního zákoníku (prodej nebo nájem části podniku). Jistě z dokumentů, kterými žalovaný č. 1 formálně odůvodňoval vyvedení Obchodního domu KOTVA na jiný subjekt, bude možné dohledat dostatek faktických údajů pro takovýto závěr.

KG 1-2130

4

3.    DŮVODY, PRO KTERÉ ŽALOVANÝ Č. 1 NIKDY NEPOZBYL VLASTNICKÉ
      PRÁVO K OBCHODNÍMU DOMU KOTVA A JE TEDY NADÁLE JEHO
      VLASTNÍKEM

<u>3.1.    Působení osob spojených s Ing. Miroslavem Hálkem v TREND VIF a IF MERCIA</u>

Počátek stávajících zásadně problematických vztahů, k jejichž řešení (a zejména k odvrácení dalších budoucích sporů ve smyslu shora citovaného rozhodnutí Nejvyššího soudu 3 Cdo 1338/96) má přispět rozsudek vydaný v tomto řízení, se váže k TREND VIF[6] a k investičnímu fondu MERCIA, a s [7] v období let 1995 až 1997

V rámci kupónové privatizace byl TREND VIF velmi úspěšný (mediální tváře Michael Kocáb a Martin Kratochvíl) a v jeho portfoliu byly akcie významných českých podniků, jejichž hodnota výrazně přesahovala miliardu korun, včetně akcií žalovaného č 1

V roce 1995 manažerskou kontrolu TREND VIF převzala skupina osob okolo společnosti Královéhradecká brokerská, a s [8], reprezentovaná zejména Ing. Miroslavem Hálkem

V době tohoto převzetí měl TREND VIF vlastní jmění ve výši cca 1,45 mld korun

Následovala řada transakcí, jejímž účelem bylo tento majetek, včetně akcií žalovaného č. 1, protiprávně a ke škodě TREND VIF vyvést na osoby ze skupiny Ing. Miroslava Hálka Nástrojem tunelování TREND VIF byly právní úkony, které jsou podrobně popsány např ve Zprávě nuceného správce TREND VIF ze dne 22 února 1997, ve zprávě Ministerstva financí ze dne 21. 1. 1998, č.j. 102/90 17697, týkající se šetření obchodů s cennými papíry z portfolia TREND VIF a v obžalobě náměstka krajského státního zástupce JUDr. Vladislava Kusaly proti Ing Hálkovi a spol ze dne 30 září 1998 Zejména v obžalobě je rovněž nejdetailněji popsáno personální propojení všech osob podílejících se na těchto transakcích (str 25 a násl.)

V důsledku těchto transakcí poklesla hodnota vlastního jmění TREND VIF k 31 12 1996 na 116 mil. korun, tedy více než o 90 %

Zcela obdobný průběh měla i účast Královéhradecké brokerské, a s na hospodaření Investičního fondu MERCIA, a s

<u>3.2.    Demonstrativní výčet podstatných protiprávních úkonů subjektů spojených s Ing.
         Miroslavem Hálkem a týkajících se přímo či nepřímo akcií žalovaného Č. 1</u>

Jednotlivé úkony směřující k obohacení protiprávně jednajících osob jsou popsány v obou shora uvedených zprávách a v obžalobě Vzhledem k rozsáhlosti jednání žalobce na tyto dokumenty odkazuje a činí jejich obsah v částech týkajících se přímo i nepřímo[9] akcií žalovaného č 1, součástí žalobních tvrzení V této žalobě žalobce tedy uvádí pouze několik případů

---

[6] TREND – všeobecný investiční fond a s , se sídlem 500 02 Hradec Králové, Škroupova 441, IČO: 45 24 51 77 (dále jen „TREND VIF")

[7] Investiční fond MERCIA, a s , se sídlem Praha 2, Londýnská 53, IČO: 15 05 41 01

[8] Společnost KRÁLOVÉHRADECKÁ BROKERSKÁ, a s (nyní Brněnská obchodní, a s , v konkurzu), IČO: 60 91 41 22, dříve se sídlem Hradec Králové, Škroupova 9, nyní se sídlem Brno, Lipová 27

[9] TJ. například vyváděním finančních prostředků z TREND VIF tak, aby za tyto prostředky jiné zúčastněné subjekty mohly nakupovat akcie žalovaného č 1 (viz bod 3 2 2)

5

nejzávažnějšího jednání, kterým byl TREND VIF poškozen, a které dle obžaloby naplňují skutkovou podstatu trestného činu[10].

Žalobce uvádí dvě skupiny hlavních protiprávních úkonů subjektů spojených s Ing. Hálkem Typově jsou tyto úkony charakterizovány na str. 24 obžaloby

První skupinu (viz čl. 3.2 ) této žaloby) představují úkony, kterými byly protiprávně vyváděny akcie žalovaného č. 1 z majetku TREND VIF

Druhou skupinu (viz čl. 3 2 2.) představují úkony, kterými byly vyváděny finanční prostředky z TREND VIF (a rovněž z IF Mercia), za které subjekty spojené s Ing. Hálkem hradily kupní cenu akcií žalovaného č. 1 kupovaných od třetích osob.

Samozřejmě všechny níže popsané úkony mají vzhledem k tomu, že jimi dle obžaloby byla naplněna skutková podstata trestného činu a tedy byly v rozporu se zákonem, i své občanskoprávní implikace, spočívající nejčastěji v tom, že takové úkony jsou bez dalšího neplatné[11].

Pokud jde o hodnocení jednání popsaného v obou uvedených zprávách jakožto trestných činů, odkazuje žalobce na obžalobu proti obviněnému Ing. Miroslavu Hálkovi a spol. podanou Krajským státním zastupitelstvím v Hradci Králové dne 30. září 1998, sp. zn. KZv 323/97.

### 3.2.1. Vyvádění akcií žalovaného č. 1 z majetku TREND VIF

#### 3.2.1.1. Nevýhodné obchody s akciemi žalovaného č. 1

Zpráva nuceného správce uvádí na str. 21: „Dne 28 5 1996 prodal investiční fond prostřednictvím SCP společnosti KHB 152 935 kusů akcií společnosti KOTVA, a s za cenu 400,-- Kč Téhož dne investiční fond koupil od KHB 152 935 ks akcií společnosti KOTVA, a s zpět avšak za cenu 952,- Kč za jeden kus a následně je investiční fond prodal společnosti IFM, a s opět za cenu 400,-- Kč Viz dokumenty přiložené k článku 14 11 této zprávy Tato transakce způsobila investičnímu fondu ztrátu 168 840 240,-Kč "

#### 3.2.1.2.    Antedatování smluv směřující k tomu, aby ve spojení s ujednáním o smluvních pokutách bez jakéhokoliv protiplnění byly z majetku TREND VIF vyvedeny akcie žalovaného č. 1

Obžaloba na str. 24 uvádí následující: „Uzavírání antidatovaných smluv bylo v podstatě jen nástrojem k provedení jiných, výše popsaných transakcí Takto byly pravděpodobně uzavřeny smlouvy, které byly v neprospěch fondu zajištěny vysokými smluvními pokutami Prokázat se však podařilo jen antidataci smlouvy ze dne 10 1 1996 s IFM, a s Tímto postupem docházelo k poškozování fondu v době, kdy Ministerstvo financí ČR pozastavilo obchodování s cennými papíry z portfolia fondu "

---

[10] Ohledně kvalifikace trestných činů, kterých se dle obžaloby osoby okolo Ing. Hálka dopustily (často jako členové zločinného spolčení), odkazuje žalobce na příslušné pasáže obžaloby, zejm str 7, 8, 11, 12, 13, 14, 16, 19 a 20.

[11] Pro úplnost žalobce rovněž uvádí, že při většině obchodů s akciemi žalovaného č 1 bylo porušeno (nebo v návaznosti na předchozí manipulaci kursem akcií obcházeno) ustanovení § 17 odst 3 zákona č 248/1992 Sb, o investičních společnostech a investičních fondech, ve znění ke 30 červnu 1996 (dále jen „ZISF") stanovící, že investiční fond je povinen cenný papír prodat jen za nejvyšší cenu, za kterou jej bylo možné při vynaložení odborné péče prodat

Podstatu antedatované smlouvy označené datem 10. ledna 1996 popisuje zpráva nuceného správce na str. 12 a násl., obžaloba např. na str. 27 a dále ve stručnosti na str. 2 zpráva Ministerstva financí takto: „10.1 1996 – IFM, a s podepsala smlouvu o převodu 200 000 ks akcií Kotvy z portfolia fondu za celkovou sumu 360 000.000,- Kč Na základě této smlouvy získala IFM, a s ve formě smluvní pokuty 60 000 ks Kotvy bez jakékoliv protihodnoty "

### 3.2.1.3. Nerespektování předběžného opatření týkajícího se akcií žalovaného č. 1

Obžaloba uvádí na str 31: „Dne 24 1.1997 Ing Miroslav Hálek jako předseda představenstva a generální ředitel IFM a s rozhodl o převodu 361 375 ks akcií Sokolovské uhelné a s a 30 000 ks akcií Kotvy a s z účtu IFM č 100200879133 ve Středisku cenných papírů Praha na účet Královéhradecké brokerské a s (KHB) přesto, že bylo IFM a s Usnesením Krajského soudu Hradec Králové č.j Nc 542/96 ze dne 21 1 1997, doručeným IFM, a s dne 23 1 1997, uloženo zdržet se nakládání výše uvedenými akciemi Usnesení bylo IFM a s doručeno dne 23 1 1997 a plnou moc k prostudování spisu Přesto, že věděl o předběžném opatření soudu, rozhodl o převodu výše uvedených akcií na společnost KHB a s, která akcie následně převedla na účet zahraniční firmy Formfuster Enterprises Ltd . "

### 3.2.2.    Užití finančních prostředků TREND VIF a IF MERCIA k tomu, aby společnosti okolo KHB, a.s. nakupovaly akcie žalovaného č. 1 na svůj účet

### 3.2.2.1.    Zneužití peněžních prostředků investičních fondů ve prospěch osob okolo KHB, a.s.

Zpráva nuceného správce v čl 8 9 uvádí následujíct: „Jak dokazuje výpis z bankovního účtu investičního fondu u IPB, a s č ú 103745574 ze dne 7 9.1995 a zejména pak příkaz k úhradě z téhož dne, management investičního fondu převedl částku ve výši 112 000 000,- Kč na bankovní účet společnosti KHB, která ji použila ke koupi 70 077 kusů akcií společnosti KOTVA, a s za cenu 1 800,- Kč za kus od společnosti Brno Broker Group, a.s, jak dokazuje potvrzení o uzavření smlouvy ze dne 4 9 1995 Potvrzení o uzavřeném obchodu ze dne 4 9 1995 je přiloženo k této zprávě pod článkem 14.15 Tyto akcie koupila KHB svým jménem a na svůj účet a byly poslze převedeny, dle informací, které nucená správa získala, na jednu ze společnosti ovládanou managementem investičního fondu

K tomuto je na str. 3 zprávy Ministerstva financí doplněno, že dne 25 9.1995 KHB koupila dalších 28 033 ks akcií žalovaného č 1 za 49 057 750,-- Kč svým jménem a na svůj účet a v návaznosti na popis obchodu s Brno Broker Group, a.s. je vysloven závěr: „KHB za cizí peněžní prostředky (175 196 350,- Kč) koupila cenné papíry na vlastní účet "

### 3.2.2.2.    Získávání finančních prostředků investičních fondů prostřednictvím ujednání o smluvních pokutách

Zpráva Ministerstva financí na str. 10 uvádí[12]: „Metoda smluvních pokut spočívala v uzavírání smluv, které vytvářely smluvní závazky pro investiční fond, které následně investiční fond nesplnil, a které smlouva penalizovala neobvykle vysokými smluvními pokutami. Vzhledem k formě smluv, jejich právními rozbory a ojedinělé výši smluvních pokut je podezření, podpořené i o získané jejich právními rozbory a ojedinělé výši smluvních pokut je podezření, podpořené i o získané

---
[12] Shodně Zpráva nuceného správce na str 12 a násl , tato metoda vyvádění majetku je rovněž popsána na mnoha stranách obžaloby

*důkazy, že skutečným předmětem těchto smluv nebyl převod akcií, ale umělé vytvoření závazku investičního fondu a vybrání majetkových hodnot investičního fondu*

*Touto metodou zmizely z investičního fondu následující částky*

a) *Částka 126 000 000,- Kč, kterou získala společnost IFM, a s na základě smlouvy ze dne 10 1 1996 Tato smluvní pokuta byla uhrazena ve formě převodu 60 000 kusů akcií KOTVY v hodnotě 108 000 000,- Kč*

b) *Částka 45 617 000,- Kč, kterou získala společnost Moravská Zemská, a s na základě smlouvy ze dne 10 7 1996*

c) *Částka 44 896 666,- Kč, kterou získala společnost Lidová obchodní společnost, s r o na základě smlouvy ze dne 17 7 1996*

d) *Částka 73 718 000,- Kč, kterou získala společnost Moravská zemská, a s na základě smlouvy ze dne 22 7 1996 Viz dokument přiložený v čl 14 8 této zprávy*

e) *Částka 70 526 475,- Kč, kterou získala společnost Sokolovský investiční fond, a s na základě smlouvy ze dne 24 7 1996 "*

### 3.2.2.3. Neplacení kupních cen za akcie a 30-letá splatnost kupní ceny

Tyto dvě metody popisuje zpráva nuceného správce na str 13-15 následovně. K metodě neplacení kupních cen za akcie uvádí: *„Tato velmi prostá metoda spočívala v uzavírání smluv se společnostmi, které následně nesplatily kupní cenu za koupi akcií z portfolia investičního fondu Takto převedený majetek byl následně převeden na společnosti ovládané managementem investičního fondu "* Následuje výčet takto uzavřených smluv, přičemž ztráta TREND VIF z těchto obchodů přesahuje 350 miliónů korun

Metodu 30-leté splatnosti popisuje nucený správce takto: *„Metoda popsaná v tomto článku spočívala v uzavírání smluv, na základě kterých investiční fond prodával akcie z portfolia investičního fondu společnostem ovládaným managementem investičního fondu, za cenu, jejíž splatnost byla stanovena v měsíčních splátkách a rozložena na dobu 30-ti let"* Takto byly uzavřeny smlouvy v hodnotě 336 841 700,- Kč

### 3.3. Vyvedení majetku z TREND VIF a IF MERCIA na společnost Forminster[13] spojenou s Ing. Hálkem

Zúčastněným osobám se zejména shora popsanými způsoby podařilo prakticky veškerý majetek ve formě cenných papírů vyvedený z TREND VIF zpeněžit a jeho následným prodejem se obohatit. Toto zamýšlely učinit i ohledně akcií žalovaného č 1. Po zavedení nucené správy realizovaly sérii převodů, kterou nucený správce popisuje na str 21 a 22 své zprávy, přičemž jediným cílem těchto převodů bylo vyhnout se účinkům právních kroků nuceného správce směřujících ke vrácení akcií žalovaného č 1 do majetku TREND VIF

Takto byly akcie žalovaného č 1 převedeny až na společnost Forminster. Ohledně personálního propojení společnosti Forminster s Ing. Hálkem a účelu převodu akcií žalovaného č 1 na Forminster žalobce poukazuje na následující pasáže obžaloby (str 25).

*„Obchodování a převody akcií Kotvy, a s byly nejvýznamnějším zájmem obviněných Akcie Kotvy patřily v době před 4 8 1995 ke klíčovým investicím fondu Cílem tehdejšího managementu investičního fondu bylo a stále je převést akcie Kotvy na společnosti ovládané Ing. Hálkem a spol. a dalšími nákupy, k nimž používali i prostředky fondu, dosáhnout v Kotvě majoritního podílu*

---

[13] Forminster Enterprises Limited, se sídlem 20 Queen Frederica Street, El Greco House, Nicosia, Kypr (dále jen „Forminster")

Akcie Kotvy jsou i v současnosti v centru zájmu společností kolem Ing Hálka a spol. I v průběhu nucené správy se uskutečnilo několik převodů akcií Kotvy mezi osobami a společnostmi a významnou osobou bude zřejmě Jiří Mareš, spolužák Ing Hálka, přes kterého byly převáděny akcie Kotvy zpět na společnosti ovládané Ing Hálkem. V době, kdy bylo Krajským soudem v Hradci Králové rozhodnuto nepravomocně o zákazu nakládání akciemi Kotvy Královéhradeckou brokerskou, došlo na pokyn KHB k převodu akcií Kotvy na společnost Forminster Enterprises, ltd, se sídlem na Kypru, k jejímž peněžním účtům má Ing Hálek konkrétní oprávnění

Aktivity skupiny Ing Hálka nezastavilo ani rozhodnutí o nucené správě a z posledních zjištění je zřejmé, že jejich snaha ovládnout Kotvu a majetek Trendu trvá do dnešního dne a ani trestní řízení a umístění ve vazbě není překážkou. Ještě před zahájením trestního stíhání došlo k převodu části akcií Kotvy na Forminster Enterprises, Ltd Se sídlem na Kypru a pak k prodeji této společnosti Královéhradecké společnosti a s a společnosti Bonii kapital, a s, Brno, a KHB, přejmenovaná na Brněnskou obchodní, a s je v současnosti ve stavu po podání návrhu na prohlášení konkursu Podle posledních zjištění i v průběhu vazby Ing Hálka byly jím podepisovány důležité listiny v souvislosti s účty společnosti Forminster Enterprises Ltd u LGT bank ve Vaduzu v Lichtenštejnsku "

Dále je propojení společnosti Forminster s Ing Hálkem a dalšími osobami zřejmé z toho, že podobně jako obchod s akciemi žalovaného č 1 byl realizován obchod s akciemi společnosti Sokolovská uhelná, a.s (jeho popis viz str 7 zprávy Ministerstva financí, z níž vyplývá, že po převodu akcí Sokolovské uhelné, a s. z KHB na Forminster obratem byly tyto akcie společnosti Forminster dále prodány, a to se ziskem ve výši 135 milionů korun) V této souvislosti žalobce odkazuje rovněž na str. 9 této zprávy, v níž je rovněž personální propojení se společností Forminster popsáno.

Všechny právě uvedené skutečnosti jsou zcela zásad: i při posuzování úkonů týkajících se Obchodního domu KOTVA, neboť tyto úkony činili členové statutárního orgánu, kteří byli zvoleni právě společností Forminster, ohledně které „bžaloba poukazuje na spojení s Ing. Hálkem. Všechny výroční zprávy žalovaného č. 1 od roku 2000 uvádí, že Forminster je jeho ovládající osobou[14].

3.4.    Opatření státního zástupce – blokace akcií žalovaného č. 1

Opatřením státního zástupce však akcie žalovaného č 1 byly v roce 1997 zablokovány na majetkovém účtu společnosti Forminster v SCP Tedy je zřejmé, že ze samotných akcií žádný výnos z trestné činnosti realizovat přinejmenším v dohledné době nelze

Nicméně akcie představují majoritní podíl na společnosti vlastnící budovu a pozemky v hodnotě dosahující přibližně jeden a půl miliardy korun. Společnosti Forminster není dosud žádným opatřením soudu či státního orgánu zakázán výkon hlasovacích práv a tedy má možnost docílit i v tomto směru prospěchu z trestného činu, resp. má možnost legalizovat výnos z trestné činnosti

Žalobce níže popíše, že v současné době probíhají kroky směřující k tomu, aby bylo obcházeno opatření státního zástupce, kterým je blokováno nakládání s akciemi žalovaného č 1.

---

[14] Výroční zpráva za rok 2001 a za rok 2003 toto uvádí na str 3, výroční zpráva za rok 2000 toto uvádí na str 2

KC 1-2135

### 3.4.1. Označení shora popsaného protiprávního jednání jakožto legalizace výnosů z trestné činnosti v rozhodnutích příslušných orgánů

V této souvislosti žalobce považuje za vhodné připomenout definici uvedenou v ustanovení § 1a odst 1 zákona č. 61/1996 Sb., o některých opatřeních proti legalizaci výnosů z trestné činnosti a o změně a doplnění souvisejících zákonů:

„Legalizací výnosů z trestné činnosti (dále jen „legalizace výnosů") se pro účely tohoto zákona rozumí jednání sledující zakrytí nezákonného původu výnosu z této činnosti s cílem vzbudit zdání, že jde o příjem nabytý v souladu se zákonem Není přítom rozhodující, zda k takovému jednání došlo zcela nebo zčásti na území České republiky Uvedené jednání spočívá zejména

a) v přeměně nebo převodu majetku s vědomím, že pochází z trestné činnosti, za účelem jeho utajení nebo zastření jeho původu nebo za účelem napomáhání osobě, která se účastní páchání takové činnosti, aby unikla právním důsledkům svého jednání,

b) v utajení nebo zastření skutečné povahy, zdroje, umístění, pohybu majetku a nakládání s ním, nebo změny práv vztahujících se k majetku s vědomím, že tento majetek pochází z trestné činnosti,

c) v nabytí, držbě, použití majetku nebo nakládání s ním s vědomím, že pochází z trestné činnosti,

d) ve zločinném společení osob nebo jiné formě součinnosti za účelem jednání uvedeného pod písmeny a), b) nebo c) "

Pokud jde o hodnocení shora popsaného jednání jako úkonů směřujících k legalizaci výnosů z trestné činnosti, poukazuje žalobce na to, že obžaloba na str 30 uvádí následující:

„Část výtěžku z uvedené trestné činnosti byla následně v částce 151,237 425,-Kč převedena dne 31 1 1997 z účtu KHB, a s u IPB č 100200878/5100 na pokyn Libora Páva na účet firmy Forminster Enterprises Limited (FEL) č 0123414AA u LGT Bank v Lichtensteinsku, který Ing. Hálek na základě generální plné moci od firmy FEL dne 26 11 1996 založil V přepočtu pak byla na účet u LGT Bank v Lichtensteinsku dne 5 2 1997 uložena částka ve výši 5,422.251 USD, odpovídající výše uvedené částce v Kč Z této částky byly dne 14 2 1997 poukázány 2 miliony USD na účet firmy Presley Industries u stejné banky č 0123415AA, který Ing Hálek rovněž založil dne 26 11 1996 na základě generální plné moci od uvedené firmy. Ve stejný den, tj 14 2 1997 pak byla poukázána částka ve výši 2 964 287,21 USD, odpovídající částce 82,768 765,-Kč zpět na účet KHB, a s Za tuto částku KHB převedla dne 30 1 1997 na účet firmy FEL v SCP založený na žádost Ing Vlasanika a Páva 384 971 ks akcií Kotvy, získaných trestnou činností z portfolii investičních fondů Trend a Mercia "

Dále v předběžném opatření vydaném Zemským soudem Lichtenštejnského knížectví dne 4. listopadu 1997, kterým byly zablokovány finanční prostředky na bankovním účtě společnosti Forminster, se po popisu právě uvedeného převádění finančních prostředků na bankovní účet a z bankovního účtu Forminster uvádí: „Z výše zmíněných vyšetřování vyplývá podezření na praní peněz podle § 165 trestního zákoníku. Je třeba vycházet ze skutečnosti, že neznámí pachatelé se pokusili prostřednictvím převodu podvodně získaných peněz na konta v Lichtensteinsku s eventuálním následným převodem zatají společnosti Trend VIF a s místo uložení zisku z prodeje cenných papírů, popřípadě z dalších obchodů, a obzvláště znemožnit sledování toku peněz "

Rovněž v přípisu Vrchního státního zastupitelství v Praze adresovaného dne 29.8 2002 ve věci Obviněného Ing. Miroslava Hálka, kterým byl Zemský soudem Lichtenštejnského knížectví požádáno o uvolnění peněz za účelem jejich zaslání na účet společnosti TREND VIF a MERCIA, se uvádí: „S odvoláním na článek I odstavec 1 Evropské úmluvy o vzájemné pomoci ve věcech trestních ze dne 20 dubna 1959, dále s odkazem na Úmluvu o praní, vyhledávání, zadržování a konfiskaci výnosů ze zločinů ze dne 18 12 1995 Dne 27 11 2001 Nejvyšší státní zastupitelství

*České republiky pod sp zn 2 NZt 749/2001 převzalo, k žádosti Knížecího Lichtenštejnského státního zastupitelství, trestní řízení vedené v Lichtenštejnském knížectví proti Miroslavu Hálkovi V Lichtenštejnském knížectví bylo vedeno trestní řízení proti Miroslavu Hálkovi pro trestné činy praní špinavých peněz, zločinné spolčení a další podle příslušných trestněprávních ustanovení lichtenštejnského trestního zákona "*

Konečně, žalobce poukazuje na to, že rovněž Zpráva Ministerstva financí ČR obsahuje na str 4 pasáž nadepsanou Podezření na možné legalizování výnosů z trestné činnosti. O tomto podezření zpráva pojednává rovněž na str 6 a 7 (ohledně akcií společnosti Sokolovská uhelná, a s) V závěru (str 9) zpráva uvádí: „*U osob začleněných do této skupiny vzniká důvodné podezření, že jejich aktivity jsou financovány pomocí majetkových hodnot z portfolii fondů S touto skupinou spolupracuje další skupina osob, která legalizuje výnosy trestné činnosti první skupiny, a to pomocí tradičních aktivit při praní špinavých peněz, tj organizování zdánlivých mezifiremních obchodů, provádění bankovních operací ve třetích státech, umělé zvyšování zisků jinak legálně fungujících firem*

Do této skupiny osob je nutné zařadit společnosti

- *Forminster Enterprises Limited*
- *Burzovní společnost Egretta, a s*
- *Atlanta Safe, a s*
- *Severní brokerská, a s*
- *DYNAMIC PARTNERS, a s*
- *Sokolovský IF, a s*
- *Fyzické osoby Anatolij Salamatin, Jiří Mareš "*

### 3.4.2. Obcházení účelu opatření státního zástupce

Z právě uvedeného jasně vyplývá, že opatření státního zástupce spočívající v blokaci akcií žalovaného č. 1, které jsou nyní na účtě společnosti Forminster, mělo zcela jasný účel, a to přinejmenším do doby skončení policejního šetření rozhodnutí, resp. dle obžaloby představují činnosti, který dle shora citovaných relevantních rozhodnutí, resp. dle obžaloby představují akcie žalovaného č. 1 (v počtu 384 971 kusů) představovali, nebylo možné jakkoliv nakládat a aby společnost Forminster a s ní spjaté subjekty nemohla v souvislosti s vlastnictvím akcií žalovaného č. 1 realizovat jakýkoliv neoprávněný majetkový prospěch.

Nepochybně účelem opatření státního zástupce je, aby majetek žalovaného č. 1, který jakožto jeho majoritní akcionář ovládá Forminster v důsledku důsledku jednání označeného obžalobou jako trestný čin, nebyl z majetku žalovaného č. 1 nijak převáděn.

Zejména z účelu opatření státního zástupce (i s přihlédnutím na shora zmíněný zákaz legalizace výnosů z trestné činnosti) vyplývá, že nesmějí být činěny žádné úkony, které směřují k tomu, aby se majetek žalovaného č. 1 zmenšil nebo aby byla prováděna jakákoliv jeho transformace způsobem, kdy by (byť i jen teoretický) vznikalo riziko, že nad takovýmto transformovaným majetkem žalovaný č. 1 nebude mít přímou kontrolu Vzhledem ke shora popsaným úkonům příslušných orgánů několika států vycházejících z podezření na praní peněz, je zcela zřejmé, že žádný z úkonů společnosti Forminster při výkonu akcionářských práv a žádný z úkonů členů statutárních orgánů jmenovaných de facto společností Forminster jakožto ovládající osobou, nesmí v tomto ohledu vyvolávat jakékoliv pochybnosti.

V daném případě však nejenže hlavní majetková hodnota, tj. Obchodní dům KOTVA, byla vyvedena z majetku žalovaného č. 1, ale jsou činěny další úkony, které vedou k tomu, že žalovaný č. 1 zcela ztratil nad touto majetkovou hodnotou kontrolu.

Dosud byly provedeny tyto úkony:

1 Žalovaný č 1 vložil Obchodní dům KOTVA do své dceřinné společnosti, kterou v danou dobu byl žalovaný č 2 V době vkladu byl žalovaný č. 1 jediným akcionářem žalovaného č. 2;

2. Žalovaný č 1 rozhodl jako jediný akcionář žalovaného č. 2 o transformaci žalovaného č 2 na komanditní společnost, čímž došlo k tomu, že:

    a) zásadním způsobem se snížil podíl žalovaného č 1 na zisku žalovaného č 2 a na jeho likvidačním zůstatku (v současnosti má žalovaný č 1 podíl na zisku ve výši necelých 50 %, podíl na likvidačním zůstatku 40%, ačkoliv jeho vklad představuje 98,6 % všech vkladů do společnosti – žalovaného č 2 ),

    b) vzhledem k tomu, že žalovaný č 1 se stal komanditistou žalovaného č. 2, nepodílí se na obchodním vedení žalovaného, tedy se transformací žalovaný č. 1 fakticky vzdal možnosti ovlivňovat hospodaření žalovaného č. 2

3. Žalovaný č. 2 vykonávající jako jediný akcionář žalovaného č 3 působnost jeho valné hromady přijal rozhodnutí o zvýšení základního kapitálu o 1.390.000.000 Kč, tj ze stávající výše 2.000.000 Kč na novou výši základního kapitálu 1 392.000.000 Kč. Ke zvýšení základního kapitálu došlo upsáním nových akcií s tím, že všechny akcie byly nabídnuty k upsání jedinému akcionáři – žalovanému č. 2. Nové akcie byly splaceny nepeněžitým vkladem – Obchodním domem KOTVA. Takto se žalovaný č 3 stal vlastníkem Obchodního domu KOTVA.

Jak již bylo uvedeno shora, opatření státního zástupce spočívající v blokaci akcií žalovaného č 1 se samozřejmě vztahuje na majetek žalovaného č. 1, který je blokovanými akciemi v širším slova smyslu reprezentován

Již učiněnými kroky se podařilo společnostmi Forminster a statutárním orgánům žalovaného č. 1, které Forminster jako hlavní akcionář jmenoval, oddělit vlastnictví akcií žalovaného č 1 od hlavní majetkové hodnoty, kterou v době uvalení opatření státního zástupce žalovaný č 1 měl, tj od Obchodního domu KOTVA, a tuto majetkovou hodnotu převést na subjekt, na jehož základním kapitálu se žalovaný č 1 vůbec nijak nepodílí

Praktický důsledek již učiněných kroků je tedy takový, že opatření státního zástupce prakticky pozbývá smysl.

V této souvislosti je rovněž podstatné, že žalovaný č 3 má akcie na majitele Tedy při případném převodu těchto akcií se nikdo nedozví (a to dokonce ani orgány Policie), že k takovémuto převodu došlo Nebude možné dohledat podmínky převodu (zejm. osobu kupujícího, výši kupní ceny, zda bylo poskytnuto její zajištění, zda kupní cena byla uhrazena) Takto nelze zcela vyloučit riziko, že tyto akcie budou vyvedeny mimo skupinu společností skupiny KOTVA bez zaplacení kupní ceny a že takový kupující převede akcie na další subjekt, čímž příjem z prodeje akcií bude realizován zcela mimo společnosti skupiny KOTVA Vzhledem ke shora uvedenému popisu obchodů realizovaných skupinou okolo Ing. Hálka je patrně pochopitelné, že žalobce pojímá tuto obavu

### 3.4.3. Důsledky obcházení opatření státního zástupce

Samozřejmě žalobce jako akcionář žalovaného č 1 nemá zájem na tom, aby takovýmto způsobem a k jeho újmě přetrvávalo riziko, že bude fakticky dokončen proces, který různé orgány (viz citace shora) označily jako legalizaci výnosů z trestné činnosti dokončen, a proto podává tuto žalobu.

Jistě nelze pochybovat o tom, že shora uvedené, ačkoliv primárně se jedná o záležitost práva trestního, má rovněž své důsledky občanskoprávní. Nepochybně obecně všechny právní úkony, které směřují k legalizaci výnosů z trestné činnosti, jsou protiprávní ve smyslu ustanovení § 39 občanského zákoníku (rozpor se zákonem) Vzhledem k tomu, že z tohoto důvodu jsou neplatné všechny shora vyjmenované právní úkony, jejichž předmětem bylo nakládání s Obchodním domem KOTVA, je žalovaný č. 1 i nadále jeho vlastníkem[15]

Zcela závěrem žalobce poukazuje na to, že ve shora popsaném kontextu vzniká preventivní charakter této žaloby, neboť rozhodnutí o ní je způsobilé zabránit vzniku dalších soudních sporů, zřejmě i s mezinárodním prvkem (viz shora citované rozhodnutí Nejvyššího soudu ČR sp. zn 3 Cdo 1338/96 týkající se existence naléhavého právního zájmu na určení existence právního vztahu)

K důkazu:

- zpráva nuceného správce TREND VIF ze dne 22 února 1997 včetně dokumentů uvedených v její příloze,
- zpráva Ministerstva financí ze dne 21 1. 1998, č.j. 102/90 17697,
- obžaloba proti obviněným Ing Miroslavu Hálkovi a spol podaná Krajským státním zastupitelstvím v Hradci Králové dne 30. září 1998, sp. zn KZv 323/97,
- úplný výpis z obchodního rejstříku TREND VIF,
- zpráva Střediska cenných papírů ohledně převodu akcií žalovaného č 1 z TREND VIF na Forminster (nechť vyžádá soud),
- prohlášení vkladatele ze dne 10 října 2000 ohledně převodu Obchodního domu KOTVA z žalovaného č. 1 na žalovaného č. 2,
- úplný výpis z obchodního rejstříku ohledně žalovaného č. 2,
- notářský zápis JUDr. Václava Halbicha ze dne 20 5 2003 č NZ 235/203, N 317/2003 (obsahuje rozhodnutí o změně právní formy žalovaného č. 2, včetně nového znění společenské smlouvy, dokládá pokles podílu na zisku, vypořádacího podílu a podílu na likvidačním zůstatku),
- výpis z katastru nemovitostí (LV č. 265 pro k ú Staré Město),
- výroční zprávy žalovaného č. 1 za rok 2000, 2001 a 2003,
- rozhodnutí Knížecího zemského soudu ve Vaduzu, Lichtenštejnské knížectví o zmrazení peněžních prostředků na účtech Forminsteru a Presley Industries,
- žádost Vrchního státní zastupitelství ze dne 29 8 2002 pod č.j. VI VZv 3/2002 – 1597 o právní pomoc – dožádání Knížecího zemského soudu ve Vaduzu, Lichtenštejnské knížectví, ze dne 29 8. 2002,

---

[15] Žalobce nepovažuje za nutné zabývat se na tomto místě neplatností právních úkonů týkajících se akcií žalovaného č 1, neboť jeho právní postavení ovlivňují úkony týkající se Obchodního domu KOTVA Žalobce v této souvislosti rovněž uvádí, že je mu známo, že mezi osobami, které zastupovaly TREND VIF a Forminster, byla v roce 1999 uzavřena dohoda, na jejímž základě se měl TREND VIF v budoucnu zdržet zpochybňování vlastnického práva Forminsteru k akciím žalovaného č 1. Nicméně vzhledem k tomu, že právní úkony, které nejenže jsou absolutně neplatné pro rozpor se zákonem, ale kterými byly dokonce spáchány trestné činy, nemohou být následně legalizovány uzavřením dohody o narovnání, nepovažuje žalobce za potřebné se zde podrobněji tímto dohodou zabývat.

- opatření státního zástupce o zablokování převodů akcií emitovaných žalovaným č 1 (nechť vyžádá soud),
- znalecký posudek oceňující hodnotu Obchodního domu KOTVA,
- s výhradou dalších důkazů

## 4.  ZÁVĚR, ŽALOBNÍ PETIT

Žalobce shora popsal důvody, pro které jsou převody Obchodního domu Kotva ze žalovaného č 1 na žalovaného č 2 a ze žalovaného č 2 na žalovaného č. 3 neplatné a pro které zůstává majitelem nemovitostí i nadále žalovaný č 1. Rovněž tak žalobce doložil svůj naléhavý právní zájem na určení vlastnického práva k Obchodnímu domu KOTVA soudem.

Z důvodů shora uvedených žalobce navrhuje, aby soud po projednání věci vydal tento

### ROZSUDEK:

I.     Určuje se, že žalovaný č. 1 je výlučným vlastníkem těchto nemovitostí:

- budovy č p. 656 (obč  vyb.) příslušná k části obce Staré Město, nacházející se na stavební parcele parc. č. 680;
- budovy bez č.p /č.ev. (obč. vyb.) příslušná k části obce Staré Město, nacházející se na stavební parcele parc. č. 1018/2;
- pozemku parc. č. 680 (zastavěná plocha a nádvoří) o výměře 4385 m$^2$;
- pozemku parc. č. 683/1 (ostatní plocha) o výměře 851 m$^2$;
- pozemku parc. č. 683/2 (ostatní plocha) o výměře 2963 m$^2$;
- pozemku parc. č. 683/3 (ostatní plocha) o výměře 2 m$^2$;
- pozemku parc. č. 690/2 (ostatní plocha) o výměře 25 m$^2$;
- pozemku parc. č. 690/3 (ostatní plocha) o výměře 49 m$^2$;
- pozemku parc. č. 690/4 (ostatní plocha) o výměře 9 m$^2$;
- pozemku parc č. 1018/2 (zastavěná plocha a nádvoří) o výměře 1 m$^2$;

vše v katastrálním území Staré Město a obci Praha.

II.    Žalovaní jsou povinni společně a nerozdílně nahradit žalobci náklady řízení do 3 dnů od právní moci tohoto rozsudku.

GILROY LIMITED
Mgr. Ondřej Peterka
Advokát v plné moci

9

# TOMAN, DEVÁTÝ & PARTNEŘI
### ADVOKÁTNÍ KANCELÁŘ

Trojanova 12
120 00 Praha 2
tel /fax:   + 420 224 918 490
tel /zázn : + 420 224 918 491
fax:         + 420 224 920 468
e-mail:    ak@iustitia.cz

Advokáti:
JUDr. Stanislav Devátý, Dr.
Mgr. Jan Nekola
JUDr. Jaroslav Novák, Ph D.
JUDr. Jitka Pokorná
JUDr. Zuzana Smítková, Ph D
JUDr. Petr Toman

OBVODNÍ SOUD PRO PRAHU 1
PRAHA 1, OVOCNÝ TRH 14

Došlo
dne:    2 6 -08- 2004

Obvodní soud pro Prahu 1

Ovocný trh 14/587

112 94    Praha 1

Ke sp. zn. 13 C 131/2004

| | |
|---|---|
| Žalobce: | GILROY LIMITED<br>se sídlem Pikiony 4, Limassol, Kyperská republika |
| zastoupen: | Mgr. Ondřejem Peterkou, advokátem,<br>ČAK 4245, advokátní kancelář PETERKA & PARTNERS<br>v.o.s., se sídlem Na Příkopě 15, Praha 1 |
| Žalovaný 1: | KOTVA a.s.<br>se sídlem Praha 1, Nám. Republiky 8, IČ 60193808 |
| Žalovaný 2: | KOTVA NEMOVITOSTI, k.s.<br>se sídlem Příkop 4, Brno, IČ 26229048, |
| Žalovaný 3: | SPV KN, a.s.<br>se sídlem Brno, Příkop 4, IČ 26910705 |
| všichni zastoupeni: | JUDr. Petrem Tomanem, advokátem, JUDr. Petr TOMAN<br>advokátní kancelář Trojanova 3, Praha 2 advokát<br>ČAK č. 0685 |

JUDr. Petr TOMAN advokát
ČAK č. 0685
Trojanova 12, 120 00 Praha 2
Tel: 224 918 490-1, faxi 224 920 468
IČ: 43426570, DIČ: CZ6203021890

# Vyjádření
žalovaných k žalobě o určení vlastnického práva k
nemovitostem

*dvojmo*
*plná moc*

KG 1-2141

Žalobou ze dne 30 6 2004 se žalobce ve smyslu § 80 litera c) o.s.ř domáhá určení, že žalovaný 1 je vlastníkem nemovitosti: *budovy čp 656 postavené v části obce Staré Město na pozemku parc. č 680, zastavěná plocha a nádvoří, a souvisejících pozemků, vše zapsáno v katastru nemovitostí vedeném Katastrálním úřadem pro hlavní město Prahu katastrální pracoviště Praha, na listu vlastnictví č 265 pro katastrální území Staré město, obec Praha* (dále jen OD KOTVA)

Žalovaní žalobou uplatněný nárok na určení právního vztahu neuznávají a ve lhůtě stanovené usnesením soudu podávají toto

## v y j á d ř e n í

## I.
## Nedostatek věcné legitimace a neexistence naléhavého právního zájmu

Dle § 80 litera c) o.s ř. lze žalobou uplatnit, aby bylo rozhodnuto o určení, zda tu právní vztah nebo právo je či není, je-li na tom naléhavý právní zájem. Nezbytným předpokladem úspěšnosti určovací žaloby tak je, že účastníci mají věcnou legitimaci a že na požadovaném určení je naléhavý právní zájem.

### Nedostatek aktivní věcné legitimace žalobce

Aktivní věcnou (hmotně právní) legitimaci k podání žaloby na určení práva či právního vztahu má ten, kdo je účasten právního vztahu či práva, o něž v řízení jde, nebo ten, jehož právní sféry se sporný právní vztah nebo sporné právo týká

Žalobce není účasten na právech ani právních vztazích k OD KOTVA a ani nic takového netvrdí. Žalovaní jsou narozdíl od žalobce přesvědčeni, že práva a právní vztahy k OD KOTVA se ani žádným způsobem nedotýkají jeho právní sféry

Žalobce se akcionářem žalovaného 1 stal dávno poté, kdy žalovaný 1 vložil OD KOTVA do základního kapitálu žalovaného 2 a rovněž poté, co žalovaný 2 dne 27 2 2004 rozhodl o vkladu OD KOTVA do základního kapitálu žalovaného 3 (dne 27. 2 2004 žalobce ještě nebyl akcionářem). V době, kdy došlo k převodu vlastnického práva k OD KOTVA a kdy již byly splněny všechny podmínky pro převod OD KOTVA z žalovaného 2 na žalovaného 3, žalobce nebyl akcionářem OD KOTVA a tyto převody nemohly mít žádný dopad do jeho právní sféry. Žalobce přitom mohl uvedené skutečnosti zjistit (a nepochybně zjistil) z veřejných zdrojů, jako jsou katastr nemovitostí či obchodní rejstřík apod.

Dlužno dodat, že uvedené převody by se dle názoru žalovaných nedotkly právní sféry žalobce ani kdyby se stal akcionářem již před převodem OD KOTVA z žalovaného 1 na žalovaného 2. Na právním postavení žalobce jako akcionáře žalovaného 1 by se uskutečněním uvedeného převodu totiž nic nezměnilo – žalobce by byl stále akcionářem žalovaného 1 a obsah jeho akcionářských práv stanovený obchodním zákoníkem by zmíněným převodem majetku nedoznal žádných změn

Žalobce není v řízení aktivně věcně legitimován, neboť není účastníkem práv či právních vztahů, o něž v řízení jde, a tyto práva či právní vztahy se ani jinak nedotýkají

KC 1-2142

jeho právní sféry.

### Neexistence naléhavého právního zájmu žalobce na požadovaném určení

Ustálená judikatura obecných soudů vychází ze závěru, podle nichž naléhavý právní zájem je dán zejména tam, kde by bez určení práva či právního vztahu bylo právo žalobce nebo právní vztah, na kterém je účasten, ohroženo, popřípadě tam, kde by se bez tohoto určení jeho právní postavení stalo nejistým. O takový vztah se jedná, jestliže rozhodnutí soudu může zjednat určitost, jistotu a jasnost právních vztahů účastníků, mezi nimiž až do té doby byla existence právního vztahu neurčitá, nejistá a nejasná. Ve smyslu ust. § 80 lit. c) o.s.ř. tedy nejde o jakýkoliv zájem, který by opravňoval žalobce k žalobě na určení, ale o zájem právní a naléhavý.

Žalobce je akcionářem žalovaného 1, a to s jednou akcií odpovídající podílu ve výši 0,00000144 % základního kapitálu žalovaného 1. Komplexní právní úprava práv a povinností akcionáře akciové společnosti je obsažena v obchodním zákoníku. Příslušná ustanovení obchodního zákoníku pak přesně stanoví jakými prostředky se akcionář může svých práv domáhat. Mezi tyto prostředky však rozhodně nepatří žaloba o určení práv či právních vztahů, jejímiž účastníky jsou třetí osoby a akciová společnost, jíž je žalobce akcionářem. Opačný závěr by nepochybně vedl k absurdním důsledkům - totiž, že kterýkoliv akcionář akciové společnosti by mohl žalovat na určení neplatnosti jakékoliv smlouvy uzavřené touto společností, a to pouze s odůvodněním, že se mu nezdá pro společnost výhodná. Akcionář, kterému se kupř. nepodaří prosadit jeho zájmy na valné hromadě, by tímto způsobem mohl velmi efektivně šikanovat společnost, jíž je akcionářem.

Žalobce se v žalobě dovolává rozhodnutí Nejvyššího soudu ČR ze dne 7. 5. 2003 vydané pod sp. zn. 29 Odo 767/2002, v němž byla připuštěna existence naléhavého právního zájmu akcionáře na určení neplatnosti smlouvy uzavřené mezi společností, jíž je akcionářem, a třetí osobou.

Z uvedeného judikátu Nejvyššího soudu ČR však rozhodně nevyplývá, že akcionář má naléhavý právní zájem na určení práva či právního vztahu za jakýchkoliv okolností.

Tento judikát řeší konkrétní situaci, kdy nucený správce bývalé Investiční a poštovní banky, a.s. převedl podnik banky na nabyvatele - ČSOB, a.s., a to, vzhledem k hospodářské situaci v IPB, a.s., za zcela mimořádných a nestandardních podmínek.

Popsanou situaci, kterou se zabýval Nejvyšší soud ČR v rozhodnutí citovaném žalobcem, jistě nelze srovnávat se situací, jež je předmětem žaloby v tomto případě, a to z následujících důvodů:

- žalobce je majitelem pouze jedné akcie žalovaného 1 o nominální hodnotě 1 000,- Kč při základním kapitálu žalovaného 1 ve výši 694.209.000,- Kč, z čehož vyplývá, že škoda, která by mohla vzniknout žalobci na likvidačním zůstatku je ve srovnání s hodnotou majetku, jehož určení vlastnictví se žalobce proti žalovaným domáhá, zcela nepatrná,
- žalobce nabyl akcii žalovaného 1 dávno poté, kdy již dle jeho názoru neplatným právním úkonem žalovaný 1 přišel o vlastnictví OD KOTVA, a rovněž poté, kdy již byly splněny všechny zákonné podmínky pro převod OD KOTVA z majetku

3

KG 1-2143

žalovaného 2 do majetku žalovaného 3 (žalobce tyto skutečnosti nepochybně zjistil
ještě před nákupem akcie žalovaného 1, když tuto evidentně nabyl právě a pouze za
účelem podání žaloby),

- vložení OD KOTVA do dceřiné společnosti řádně schválila valná hromada
  žalovaného 1 a uvedené usnesení valné hromady nebylo v zákonné lhůtě napadeno
  žalobou některého z akcionářů,

- žalovaný 1 vložil OD KOTVA do základního kapitálu žalovaného 2 v hodnotě určené
  znaleckým posudkem a stejným způsobem byly tyto nemovitosti oceněny při jejich
  vkladu do základního kapitálu žalovaného 3 – majetek žalovaného 1, jehož je žalobce
  akcionářem, se tedy uvedenými převody nezmenšil,

- žalovaný 3, který je v současné době vlastníkem OD KOTVA, je řízen žalovaným 1, a
  to prostřednictvím jeho dceřiných společností, které jsou žalovaným 1 jako jedinou
  ovládající osobou celého holdingu zcela ovládány; není tedy nejmenší důvod se
  domnívat, že by převody nemovitostí byly způsobilé zbavit žalovaného 1 jeho majetku
  či vlivu na nakládání a správu s tímto majetkem (došlo toliko k transformaci
  majetkové struktury do holdingového uspořádání)

Z uvedeného vyplývá, že na požadovaném určení nemá žalobce naléhavý právní zájem.

Neexistence naléhavého právního zájmu, resp. nedostatek aktivní věcné legitimace na straně
žalobce, je tedy samostatným a prvořadým důvodem, pro který nemůže určovací žaloba obstát
a který sám o sobě bez dalšího vede k jejímu zamítnutí. V souladu s ustálenou soudní
judikaturou přitom platí, že soud v prvé řadě zjišťuje, zda je žalobce k podání žaloby aktivně
věcně legitimován a zda je na požadovaném určení naléhavý právní, přičemž zjistí-li, že tomu
tak není, žalobu bez dalšího zamítne. V této souvislosti lze citovat z rozhodnutí Nejvyššího
soudu ČR ze dne 27. 3. 1997 vydaného pod sp. zn. 3 Cdon 1338/96, dle něhož „Zamítá-li
soud žalobu na určení, zda tu právo nebo právní vztah je či není, pro nedostatek naléhavého
právního zájmu na takovém určení, je vyloučeno, aby současně žalobu přezkoumal po stránce
věcné".

S ohledem na výše uvedené skutečnosti, žalovaní navrhují, aby soud, aniž by se zabýval
její věcnou stránkou, žalobu zamítl z důvodu nedostatku aktivní věcné legitimace na
straně žalobce a neexistence naléhavého právního zájmu na požadovaném určení.


## II.
## Skutková tvrzení a právní závěry obsažené v žalobě

Jak bylo uvedeno výše, soud by se v tomto případě neměl zabývat věcnou stránkou žaloby,
žalovaní tedy nepovažují za nutné vyjadřovat se ke všem skutkovým tvrzením žalobce a
z nich vyvozeným právním závěrům. Za vhodné považuje uvést některá základní a
nezpochybnitelná fakta, na jejichž základě lze učinit jednoznačný závěr o účelovosti
jednotlivých tvrzení žalobce, jakož i žaloby jako celku.

Žalovaní uvádějí níže následující skutečnosti s tím, že jsou schopni jejich pravdivost kdykoliv
doložit:

4

1) Dne 21. 12. 1999 uzavřela společnost FORMISTER ENTERPRISES LIMITED, se sídlem Diagorou street, Kermia House, Office 601, Nicosia, Kypr, reg. číslo 78692 (dále jen FEL) se společností TREND – VIF, a s, IČ 45245177, se sídlem Škroupova 441, Hradec Králové (dále jen TREND) Dohodu o narovnání. Tato dohoda učinila mezi stranami nespornými, že FEL je oprávněným majitelem akcií žalovaného 1, proti čemuž se FEL zavázal zaplatit na účet TRENDU částku 350.000.000,- Kč. Platnost této dohody akceptoval následně i správce konkurzní podstaty TRENDU společně s konkurzním soudem. Na základě této dohody byla zastavena všechna do té doby probíhající soudní řízení a zrušena všechna předběžná opatření zakazující navrhovateli nakládat s předmětnými akciemi

2) Dne 4. 9. 1998 uzavřel FEL formou notářského zápisu Dohodu o narovnání s H-MERCIA, a s, IČ 15054101, se sídlem Londýnská 53, Praha 2 (dále jen MERCIA), která byla dne 9. září 1998 formou soudního smíru schválena Krajským obchodním soudem v Praze (sp. zn. 46 Cm 260/97). Na základě této dohody bylo učiněno rovněž nesporným, že FEL je řádným majitelem akcií žalovaného 1, proti čemuž se FEL zavázal zaplatit na účet MERCIE částku 35.000.000,- Kč. Platnost této dohody následně akceptoval rovněž nucený správce jmenovaný Komisí pro cenné papíry

3) Výše uvedenými dohodami o narovnání se zabývala také Komise pro cenné papíry, a to na jednáních dne 19. 4. 1999 a následně dne 21. 12. 1999. Výsledkem těchto jednání byla především skutečnost, že Komise cenných papírů nezpochybnila platnost uzavřených dohod s TRENDEM a MERCII a akceptovala částky, které se v nich FEL zavázal zaplatit oběma investičním fondům

4) V současné době skutečně probíhá trestní řízení proti ing Miroslavu Hálkovi a spol, v tomto řízení však nebyl předložen žádný důkaz o majetkovém či personálním propojení FEL s ing. Hálkem, některým s dalších obviněných v této kauze či jakoukoliv ze společností ovládaných ing. Hálkem, příp. dalšími spoluobviněnými

5) Žádný z členů současných statutárních orgánů žalovaných nebyl v souvislosti s převody majetku investičních fondů TREND VIF a MERCIA popisovanými v žalobě trestně stíhán

6) Převody vlastnického práva k OD KOTVA z žalovaného 1 na žalovaného 2 a dále na žalovaného 3 nejsou a nebyly předmětem žádného trestního řízení.

7) Příkazem k registraci pozastavení práva nakládat s cennými papíry podle § 27 odst. 3 písm. d) zákona č. 591/1992 Sb., o cenných papírech ze dne 12. 5. 1997 Krajské státní zastupitelství v Hradci Králové pozastavilo právo FEL převádět akcie žalovaného 1, toto rozhodnutí však nebrání FEL hlasovat a akciemi žalovaného 1 na valné hromadě, tj. přijímat rozhodnutí nezbytná pro další podnikatelskou činnost žalovaného 1

:

Převážná část žaloby obsahuje popis trestné činnosti ing Miroslava Hálka a spol, ke které mělo docházet v letech 1995 až 1997 v souvislosti se správou majetku investičních fondů TREND VIF a MERCIA, kteroužto ing. Hálek vykonával prostřednictvím společnosti KRÁLOVEHRADECKÁ BROKERSKÁ, a.s. (nyní Brněnská obchodní, a s.), IČ 60914122, se sídlem Lipová 27, Brno.

5

KC 1-2145

Žalobce pak bez uvedení jakýchkoliv důkazů pro takové tvrzení konstatuje, že převody vlastnického práva k OD KOTVA z žalovaného 1 na žalovaného 2, resp. žalovaného 3 má dojít k legalizaci výnosů z trestné činnosti ing. Hálka a spol., z čehož dovozuje jejich absolutní neplatnost pro rozpor se zákonem ve smyslu § 39 občanského zákoníku

Z ust. § 135 o.s.ř. vyplývá, že v občanském soudním řízení není soud oprávněn sám posuzovat, zda došlo ke spáchání trestného činu či nikoliv

Jak bylo již uvedeno výše, nebylo ohledně jednání, jimiž byla OD KOTVA převedena do majetku jejich dceřiných společností, zahájeno žádné trestní řízení. Tyto převody rovněž nejsou předmětem trestního řízení vedeného proti ing. Hálkovi a spol. a s jeho trestní činností ani jinak nesouvisí

Žalobcem tvrzené důvody pro absolutní neplatnost napadených převodů OD KOTVA tak nemohou obstát, neboť soud není v tomto řízení oprávněn je posuzovat. Žalobce přitom žádné, z hlediska tohoto řízení relevantní důvody pro absolutní neplatnost jednotlivých převodů OD KOTVA neuvádí. Žalobce si je nepochybně této skutečnosti vědom, což pouze umocňuje účelovost jím podané žaloby.

### III.

S ohledem na výše uvedené skutečnosti žalovaní navrhují, aby soud žalobu zamítl a přiznal žalovaným náhradu nákladů soudního řízení

V Praze dne 19. srpna 2004

> KOTVA a.s.
> KOTVA NEMOVITOSTI, k.s.
> SPV KN, a.s.

6

KC 1-2146