UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s.,<br><br>   Plaintiff,<br><br> v.<br><br>ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,<br><br>   Defendants.<br>—————————————————<br>ANDREW WEISS, WEISS ASSET MANAGEMENT LLC, K T, INC. and CVF INVESTMENTS, LTD.,<br><br>   Counterclaim-plaintiffs,<br><br> v.<br><br>KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM, FORMINSTER ENTERPRISES, LTD., SPV CO and JOHN DOES 1–5,<br><br>   Counterclaim-defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. 05-10679-RCL<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS

As described in defendants' Counterclaim, the Forminster Group brought this lawsuit in the name of the Kotva corporate shell as part of its efforts to gain leverage over Andrew Weiss. The selection of Kotva as the plaintiff was a deliberate attempt to shield other members of the Group, including SPV CO, from this Court's jurisdiction. Taking all of the allegations of Kotva's Complaint as true, however, reveals a fatal flaw to Kotva's Complaint: Kotva has suffered no damage. The entity that held title to the Shopping Centre real estate, the subject

matter of the entire Complaint, was not Kotva.  Nor was Kotva the entity that was entitled to receive the proceeds of the sale of the Shopping Centre. If there were a fraud or blackmail scheme that caused a delay in the sale of the Shopping Centre and the hold back of a portion of the proceeds of that sale in escrow as alleged in the Complaint, those damages were incurred by SPV CO, not Kotva.  Yet SPV CO, in response to defendants' Counterclaim, asserts that this Court lacks personal jurisdiction over it.  On the basis of the facts in the Complaint, Kotva is not the injured party and, thus, its Complaint should be dismissed.

Equally as fatal, regardless of whether the plaintiff is Kotva or SPV CO, the Complaint fails to state a cognizable claim for securities fraud or RICO.  As evidenced by the Complaint, neither Kotva nor SPV CO were purchasers or sellers of securities as required by decades-old Supreme Court precedent and neither were harmed by a single predicate act that is part of a pattern of continuing criminal activity as required by the RICO Act.  The Complaint also fails to state a claim for common law fraud or violation of Chapter 93A.

## I. THE FACTS FOR PURPOSES OF THIS MOTION

"The standard for evaluating a Rule 12(c) motion for judgment on the pleadings is essentially the same as the standard for evaluating a Rule 12(b)(6) motion.  The trial court must accept all of the non-movant's well-pleaded factual averments as true, and draw all reasonable inferences in his favor."  *Pasdon v. City of Peabody*, 330 F. Supp. 2d 22, 24 (D. Mass. 2004).  Thus, for purposes of this Motion, the Court should assume that the following allegations are true:

### A. The Blackmail Allegations

Andrew Weiss and Weiss Asset Management LLC ("WAM") (collectively, the "Defendants") control a block of approximately 12% of the shares (the "CVF Shares" or "Brookdale Shares") of the plaintiff, Kotva, a public company incorporated in the Czech

2

Republic.  Compl. ¶¶ 4, 9, 10.[1]  Weiss met with representatives of Kotva in May 2004.  *Id.* ¶ 20.

During this meeting, Weiss stated that he was aware that Kotva was planning on selling real

estate (the "Shopping Centre").  *Id.*  Weiss also "first broached the subject of Kotva

'repurchasing'" the CVF Shares, but demanded more than they were worth.  *Id.*  "Weiss

conveyed that he was an important businessman [and] that he could make serious problems for

Kotva."  *Id.*  The Kotva representatives refused to purchase the CVF Shares.  *Id.* ¶¶ 20–21.

> Jilted by Kotva, Weiss thereafter devised a scheme from his Boston,
> Massachusetts office to blackmail Kotva into buying the Brookdale shares at an
> exorbitant price.
>
> Specifically, Weiss and WAM utilized the services of Vladimir Hoffmann
> ("Hoffmann"), a Czech national, to act as a straw man in negotiations with Kotva
> and to place a stranglehold on Kotva's sale of the Shopping Centre by
> commencing a lawsuit claiming that the wholly owned Kotva subsidiary SPV KN,
> which had acquired the Shopping Centre in April 2004, was not the legal owner
> of the Shopping Centre, but that Kotva itself was the legal owner.

*Id.* ¶¶ 21–22.

The Defendants directed Hoffmann to use a Cyprus company called Gilroy to file a civil

lawsuit against Kotva and two of its subsidiaries.  *Id.* ¶¶ 23–24.  Gilroy filed a lawsuit on June

30, 2004 challenging the transfer of the Kotva Shopping Centre from Kotva to its subsidiaries

and seeking a declaration that Kotva owns the Shopping Centre.  *Id.* ¶ 24.  After causing the

Gilroy lawsuit to be filed, Weiss continued to offer the CVF Shares to Kotva's representatives

throughout the period from August to November of 2004.  *Id.* ¶¶ 27–31.  However, Kotva

continued to refuse to purchase the CVF Shares.  *Id.*

On December 23, 2004, the Defendants caused K T, Inc. to file "a lawsuit against Kotva,

with virtually identical allegations as the Gilroy action."  *Id.* ¶¶ 32, 35.  "Weiss [] made ever

---

[1] In the fall of 2005, Kotva changed its name to K-T-V Invest a.s.  However, the Defendants will
refer to the plaintiff as "Kotva" in this memorandum for the sake of clarity as the Complaint
refers to the plaintiff as Kotva.

increasing price demands on Kotva . . . with the carrot that he would 'attempt to influence' Gilroy and K T to drop the suits." *Id.* at 2. Kotva never purchased the CVF Shares. *Id.* ¶¶ 27–31.

> As a result of the Gilroy and KT actions, which purported to challenge SPV KN's ownership of the Shopping Centre, Kotva was unable to effectuate the sale of the Shopping Centre as written for over eight months, losing the benefit of sales proceeds amounting to 1.52 billion CZK ($65.3 million USD). When the deal finally closed, the buyer held back 567 million CZK ($24.3 million USD) from the Shopping Centre sale (37% of the sales price), which Kotva cannot utilize until the Gilroy and KT lawsuits are conclusively resolved in the Czech courts.

*Id.* ¶ 37. Kotva also suggests that the Defendants' actions "threatened Kotva's efforts to refinance a loan," but Kotva does not allege that it was actually unable to refinance the loan or suffered any actual damages relating to the loan. *Id.* ¶ 38. Thus, the sole damage Kotva alleges: (1) was caused by the filing of the Gilroy and K T lawsuits; and (2) relates to its failure to receive the proceeds of the sale of the Shopping Centre as quickly as it would have liked.

However, a cursory examination of the actual contract for the sale of the Shopping Centre reveals that Kotva was never going to receive any of the proceeds of the sale.[2] The Forminster Group structured the sale of the Shopping Centre as one in which SPV CO would sell stock in another company that had title to the Shopping Centre and, in exchange, SPV CO would receive money. *See* Exhibit A, at 1 (defining "Seller"), 16–17 (providing that proceeds of sale go to the "Seller").[3] Thus, SPV CO, rather than Kotva, was to receive the proceeds of the sale of the

---

[2] Since Kotva references the contract for the sale of the Shopping Centre throughout its Complaint and relies on its provisions for its allegations of damage, the Court may consider the contract on a motion for judgment on the pleadings without converting the motion into a motion for summary judgment. *E.g.*, *Beddall v. St. Str. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998).

[3] The contract begins with a cast of characters on pages 1–2. SPV CO is the "Seller." Kotva a.s., which is referred to as KAS, "is the controlling person in relation to the Seller" and other entities in the KAS Group. CRQ Czech is the "Buyer." The Seller (SPV CO) is to sell to the

Shopping Centre, including any money released from the escrow account on the resolution of the Gilroy and K T lawsuits. *Id.* §§ 5.6.3, 5.6.4; Exhibit B (amending purchase and sale contract to accord same treatment for K T lawsuit as for Gilroy lawsuit).

**B.    The Fraud Allegations**

In an attempt to manufacture federal statutory claims, Kotva tries to convert allegations of a "blackmail scheme" into claims of securities fraud, RICO, mail fraud, wire fraud and common law fraud. *See* Compl. at 1 (describing Defendants' conduct as "an audacious stock fraud scheme"). However, the only allegedly false statements Kotva identifies are:

1.    "We will attempt to influence Gilroy to withdraw the complaint questioning ownership of assets by Kotva a.s. Since we do not exert control over Gilroy and Balfindor or petitions submitted by them, we cannot guarantee a withdrawal of the complaint. The sale agreement shall be conditional on withdrawal of the existing lawsuit where Gilroy is the plaintiff." Statement by Weiss to Martin Benda and Richard Harazim on August 23, 2004. Compl. ¶ 29, Ex. B.

2.    Identical statement by Weiss to Martin Benda and Richard Harazim on November 23, 2004. Compl. ¶ 30, Ex. C.

3.    "K T is not controlled by Weiss Asset Management; however, if a satisfactory resolution of all matters can be achieved, I would try to persuade K T to settle its lawsuits, and I am highly confident that I would be successful in that endeavor." Statement by Weiss of unspecified date to unspecified individual or individuals affiliated with Kotva. Compl. ¶ 34.

With respect to Kotva's fraud allegations, the Complaint is remarkable not only for the hyperbole of the allegations, but also for what it is missing. Kotva does not allege: (1) that anyone acting on behalf of Kotva believed any of the three listed statements; (2) that Kotva took any action as a result of any of the three statements; (3) that Kotva was damaged by any of the

---

Buyer (CRQ Czech) certain trademarks and 97% of the shares of another company in the KAS Group—SPV KN. SPV KN "is the registered owner of the Property." In return, SPV CO is to receive the Purchase Price of 1,501,450,000 CZK.

three statements; or even (4) that Weiss *intended* that anyone at Kotva believe any of the three statements. Instead, Kotva states that it "suspected" Weiss was behind the Gilroy lawsuit, commenced a plan to "'smoke out' Weiss' interest in Gilroy;" and then "uncovered documents which reveal that the Weiss Defendants directed, controlled and funded the Gilroy action." *Id.* ¶¶ 26–29. Likewise, Kotva knew that Weiss controlled K T. *Id.* ¶¶ 32–35.

Indeed, taking Kotva's core "blackmail" allegations as true, the essence of the alleged scheme was that Kotva *believe the exact opposite* of the three allegedly false statements: namely, that Weiss controlled Gilroy and K T and had the ability to cause the withdrawal of the lawsuits—the "leverage" Kotva claims Weiss used in order to "extort" Kotva into buying CVF's shares in Kotva—a purchase that never occurred.

## II.   BECAUSE SPV CO WAS TO RECEIVE THE PROCEEDS OF THE SALE OF THE SHOPPING CENTRE, KOTVA CANNOT BRING CLAIMS ON ITS BEHALF

It is indisputable that Kotva's sole role under the contract for sale of the Shopping Centre was to guarantee certain obligations of SPV CO. Kotva was not to receive a dime from the sale of the Shopping Centre. Yet, all of the damages Kotva alleges relate to it not receiving the proceeds of the sale of the Shopping Centre as quickly as it would have liked. *See* Compl. ¶¶ 37–39 (entitled "The Damage Caused by the Weiss Defendants' Stock Scheme").

Kotva's inability to bring claims for damages suffered by another corporate entity is clear under well-settled law.[4] Even were it not, it would be particularly inappropriate to permit Kotva to assert claims for damages suffered by SPV CO when SPV CO has refused to waive service of process or consent to the jurisdiction of this Court and indeed has challenged personal

---

[4] The fact that SPV CO is owned by a company that, in turn, is owned by a company in which Kotva has a partnership interest is of no moment. Kotva is still not the proper plaintiff.

jurisdiction on the grounds that it is a separate corporate entity from Kotva. *See* SPV CO's Mot. to Dismiss. The Court should not permit Kotva to invoke or ignore the corporate form of SPV CO at its convenience.

Each of Kotva's claims requires proof of damages and therefore must be dismissed.

**A.    "Injury to Business or Property" is an Essential Element of a Civil RICO Claim (Counts II and III)**

In order to maintain a claim for civil RICO, the plaintiff must allege that it suffered an "injury to business or property" as a result of one or more predicate acts. 18 U.S.C. § 1964(c); *see Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 274 (1992) (holding that only those claimants who can demonstrate a direct injury may bring suit for RICO violations); *George Lussier Enters. v. Subaru of New Eng., Inc.*, 393 F.3d 36, 51 (1st Cir. 2004) ("To have standing in a civil RICO claim, plaintiffs must show 'some direct relation between the injury asserted and the injurious conduct alleged.'"). As described above, the damages described in the Complaint were not suffered by Kotva. Any injury to business or property that was incurred was incurred by SPV CO. Accordingly, the Court should enter judgment for the Defendants on the RICO claims (Counts II and III).

**B.    Damage is an Essential Element of Each of Kotva's Common Law Claims (Counts V, VI and VII) and Securities Fraud Claim (Count I)**

Kotva has failed to plead an essential element of fraud, abuse of process and tortious interference with advantageous business relations—damage.[5] *See Eureka Broadband Corp. v. Wentworth Leasing Corp.*, 400 F.3d 62, 68 (1st Cir. 2005) (requiring that the plaintiff prove that

---

[5] For purposes of this Motion, the Court should assume that Kotva's contention that U.S. law governs all of its claims is true. *See* Kotva's Memorandum of Law in Support of Its Motion to Dismiss "Counterclaim-Plaintiffs" K T and CVF at 1 ("[A]ll of Kotva's claims are based on U.S. law."). The Defendants continue to believe that there are serious unresolved choice of law questions with respect to common law claims where the allegations establishing one or more essential elements of the claim are based on events that took place in the Czech Republic.

it acted upon a false representation to its damage for common law fraud); *Fabre v. Walton*, 436 Mass. 517, 519 n.3 (2002) ("The elements of the tort of abuse of process are: (1) process was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage.") (internal quotation marks omitted); *Pembroke Country Club, Inc. v. Regency Savings Bank, S.B.*, 62 Mass. App. Ct. 34, 38 (2004) ("The elements of a case of tortious interference with an advantageous business relationship [include that] the plaintiff was damaged by that interference."). Accordingly, the Court should enter judgment for the Defendants on these claims.

Likewise, "[t]o state a cause of action under the federal securities laws, a plaintiff must allege: . . . that plaintiff relied on such misrepresentations or omissions to his detriment." *Steiner v. Unitrode Corp.*, 834 F. Supp. 40, 42 (D. Mass. 1993). Since Kotva alleges no damages, the Court should enter judgment for the Defendants on Counts I, V, VI and VII.

## C.    "Loss of Money or Property" is an Essential Element of a Chapter 93A Claim (Count IV)

"[L]oss of money or property" is also an essential element of a claim under Chapter 93A, § 11. M.G.L. ch. 93A, § 11; *Baldassari v. Pub. Fin. Trust*, 369 Mass. 33, 45 (1975). Since Kotva has not alleged that it lost money or property, the Court should enter judgment for the Defendants on Count IV as well.

## III.    KOTVA'S SECURITIES FRAUD CLAIM MUST BE DISMISSED BECAUSE KOTVA DID NOT BUY OR SELL SECURITIES (COUNT I)

The "audacious stock fraud scheme" alleged by Kotva was an attempt by Weiss to sell to Kotva the shares of Kotva owned by CVF. Compl. at 1–3. The sale, however, never occurred. *Id.* ¶¶ 27–36. Kotva's failure to allege that it purchased or sold securities is independently fatal to its claim in Count I that the Defendants violated the Securities Exchange Act of 1934 and Rule 10b-5. Compl. ¶ 50. Since the Supreme Court's 1975 decision in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 725, 730–31 (1975), only those plaintiffs who "actually purchased or

actually sold" securities may assert civil claims for violations of §10(b) or Rule 10b-5.  Lower courts have erected a mountain of caselaw confirming this threshold rule of private securities fraud cases.  *E.g.*, *Ont. Pub. Svc. E'ees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 31–32 (2d Cir. 2004); *Brannan v. Eisenstein*, 804 F.2d 1041, 1045 (8th Cir. 1986); *In re Bank of Boston Corp. Sec. Litig.*, 762 F. Supp. 1525, 1531–32 (D. Mass. 1991).  Simply put, "[t]o state a cause of action under the federal securities laws, a plaintiff must allege: . . . that he purchased or sold securities . . ."  *Steiner v. Unitrode Corp.*, 834 F. Supp. 40, 42 (D. Mass. 1993).  Accordingly, the Court must dismiss Kotva's securities fraud claim for failure to plead an essential element of the claim: that Kotva purchased or sold securities.[6]

## IV.    KOTVA'S COMMON LAW FRAUD AND SECURITIES FRAUD CLAIMS FAIL BECAUSE KOTVA HAS NOT AND CANNOT PLEAD, WITH PARTICULARITY, RELIANCE TO ITS DETRIMENT (COUNTS I AND VI)

Kotva has failed to plead, with particularity as required by Rule 9(b), that it relied to its detriment on any of the Defendants' alleged false statements.  Reliance to one's detriment is an essential element of common law fraud.  *E.g.*, *Eureka Broadband Corp. v. Wentworth Leasing Corp.*, 400 F.3d 62, 68 (1st Cir. 2005) (listing reasonable reliance to one's detriment as an element of common-law fraud); *Nei v. Burley*, 388 Mass. 307, 311 (1983) ("Reliance is an element of actionable fraud.").  It is also an essential element of securities fraud.  *E.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 205–06 (1976) (quoting Senate Report for elements of private action under Securities Act of 1934); *Steiner v. Unitrode Corp.*, 834 F. Supp. 40, 42 (D. Mass.

---

[6] At one point, Kotva does makes an attempt to allege fraud in connection with the purchase or sale of securities by third parties, but a third party's purchase or sale of securities cannot confer standing on Kotva.  *See* Compl. ¶ 50 (alleging fraud in connection with purchases of securities by Gilroy and K T).  Nor can SPV CO maintain a claim for securities fraud as it cannot allege it bought or sold securities at an inappropriately high or low price as a result of relying on one or more of the Defendants' allegedly false statements.

1993) (requiring, for securities fraud claim, "that plaintiff relied on such misrepresentations or omissions to his detriment").

The Complaint is devoid of any description of what Kotva did or did not do as a result of the alleged false statements, what Kotva would have done differently, or how the alleged false statements are linked to any damages. Accordingly, Kotva's common law fraud and securities fraud claims fail as a matter of law. *See Russell v. Cooley Dickinson Hosp.*, 437 Mass. 443, 459 (2002) ("Without establishing an inducement to act or forbearance, the plaintiff cannot meet her burden of proving misrepresentation at trial."). Likewise, SPV CO cannot assert a claim for common law fraud or securities fraud because it too did not rely to its detriment on any representations made by the Defendants.

## V.    KOTVA'S RICO CLAIMS SUFFER FROM ADDITIONAL INCURABLE DEFECTS (COUNTS II AND III)

Kotva's RICO claims are defective for several independent reasons. First, as described above, Kotva has failed to allege an injury to business or property as a result of any RICO predicates. Second, Kotva has failed to allege conduct that would constitute extortion, mail fraud, or wire fraud—the only predicate acts it identifies in its Complaint. Third, Kotva fails to allege a pattern of racketeering activity. Finally, even assuming there was an "audacious stock fraud scheme," Kotva's RICO claims are barred by the Private Securities Litigation Reform Act. Even were SPV CO the plaintiff rather than Kotva, these deficiencies would remain, requiring dismissal of the two RICO counts.

### A.    Kotva Has Failed to Allege Sufficient Facts to Support a Violation of the Federal or State Extortion Statutes

It is well-settled that the threat of litigation or the filing of litigation cannot serve as the basis for a charge of extortion under the Hobbs Act or as a RICO predicate act. *E.g.*, *See Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088 & n.2 (11th Cir. 2004) (holding that neither threats to

litigate nor actual litigation can constitute extortion under federal law); *Deck v. Eng'd Laminates*, ¶349 F.3d 1253, 1257–58 (10th Cir. 2003) ("[W]e join a multitude of other courts in holding that meritless litigation is not extortion under § 1951."); *I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265, 267 (8th Cir. 1984) ("We cannot agree that the threat [to bring a civil action] alleged here constituted the infliction of 'fear' for purposes of the extortion statute."); *Dias v. Bogins*, No. 97-1612, 1998 U.S. App. LEXIS 536, at *2 (1st Cir. Jan. 13, 1998) (unpublished) ("[A] threat to sue . . . is not extortion under federal law."); *Di Giambattista v. McGovern*, No. 92-1168, 1992 U.S. App. LEXIS 23569,  at *10 (1st Cir. Sept. 4, 1992) (unpublished) (same).

Since the Gilroy and K T litigation (and the threat thereof) are the only threats identified by Kotva in support of its extortion allegation, Kotva has failed to plead the predicate act of extortion.  Kotva cannot evade these well-established limits on what constitutes extortion by citing the Massachusetts extortion statute, M.G.L. ch. 265, § 25.  Although the caselaw under this statute is not as well-developed as the caselaw relating to its federal counterpart, undersigned counsel have found no Massachusetts case holding that the mere threat of litigation or filing of litigation can constitute extortion.  Rather, the statute by its plain language requires a "malicious[]" threat.  Such a threat is an "essential element[] of § 25." *Broderick v. Roache*, 751 F. Supp. 290, 294 (D. Mass. 1990).  Invoking the protection of the courts by threatening to file a lawsuit cannot be "malicious" within the meaning of § 25.  Any contrary rule would convert petitioning activity that is protected by the Constitutions of both the United States and Massachusetts into a criminal act.

> Moreover, in order for a state extortion offense to qualify as a predicate act under the federal RICO statute, the conduct must be capable of being generically classified as extortionate: that is, "obtaining something of value from another with his consent induced by the wrongful use of force, fear or threats." *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409–10, 154 L. Ed. 2d 991, 123 S. Ct. 1057 (2003) (quoting the Model Penal Code).  In light of our decision in

> *Pendergraft*, we doubt that the filing of a lawsuit could ever be "wrongful" for the purposes of RICO. *See also I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265, 267–68 (8th Cir. 1984) (threats to sue, even if groundless or in bad faith, may be tortious under state law but do not come within the federal extortion statute).

*Raney*, 370 F.3d at 1088 n.2. Thus, if the Massachusetts statute were broad enough to sweep in threats of litigation, that conduct still cannot serve as a predicate act under federal RICO law.

### B.    Kotva Fails to Allege the Essential Elements of Mail Fraud or Wire Fraud or Identify Any Damage Resulting from the Alleged Fraud

Even under a generous reading of the Complaint, Kotva has not alleged mail or wire fraud with the requisite specificity required by Rule 9(b). *See New England Data Svcs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987) ("We hold that Rule 9(b) requires specificity in the pleading of RICO mail and wire fraud."). This failure to describe with particularity the alleged scheme to defraud or connect the alleged fraud with any damage is not a mistake in drafting or a failure due to lack of effort. Rather, the facts of this case simply do not fall within the general rubric of fraud.

Kotva alleges that it was damaged as a result of the filing of the Gilroy and K T lawsuits. *See* Compl. ¶¶ 37–39. Nowhere in its Complaint does Kotva allege how any of Weiss's three allegedly false statements caused it any harm. Moreover, Kotva fails to allege that Weiss even intended that Kotva believe any of the three allegedly false statements or that they were part of a scheme to defraud. An allegation of specific intent to defraud and identification, with particularity, of the scheme to defraud are necessary elements of any wire fraud or mail fraud claim. *United States v. Woodward*, 149 F.3d 46, 54 (1st Cir. 1998) ("To support a conviction for mail or wire fraud, the government must prove beyond a reasonable doubt: (1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud . . . ."); *United States v. Rosen*, 130 F.3d 5, 9 (1st Cir. 1997) (same, but focused on mail fraud).

Kotva's allegations boil down to the following: (a) Weiss threatened civil litigation; (b) Weiss filed civil litigation; (c) Weiss "blackmailed" Kotva by demanding that Kotva purchase the CVF Shares in exchange for dropping the civil litigation; and (d) Weiss attempted to defraud Kotva by telling Harazim and Benda that Weiss did not control the plaintiffs in the civil litigation. These allegations do not describe a scheme to defraud. The plaintiff cannot, by repeating the word "fraud" or one of its variants as a mantra, magically transform its factual allegations into mail fraud or wire fraud. Although the Court is generally required to take all well-plead allegations in the complaint as true, "[t]he court is free, however, to disregard bald assertions, unsupportable conclusions, and opprobrious epithets." *Brown v. Credit Suisse First Boston LLC (In re Credit Suisse First Boston Corp.)*, 431 F.3d 36, 45 (1st Cir. 2005). The idea that Weiss intended that the alleged victims of his "blackmail scheme" believe that he was powerless to relieve the pressure on which the alleged blackmail relied is exactly the sort of "unsupportable conclusion" that this Court can and should reject on a motion for judgment on the pleadings. The very language Kotva uses in its Complaint confirms that its wire fraud and mail fraud allegations are a sham. In paragraphs 65 and 66, Kotva alleges that the Defendants "agreed to commit and did commit [mail and wire] fraud" by using the mails and wires "to ***extort*** Kotva" rather than as part of a scheme to defraud Kotva. Compl. ¶¶ 65–66 (emphasis added).

Thus, Kotva has failed to plead the essential elements of mail fraud or wire fraud. Even if it had, Kotva has failed to allege any damages stemming from the Defendants' alleged wire fraud or mail fraud. As demonstrated above, all of Kotva's alleged damages flow from the *filing* of the Gilroy and K T lawsuits. *See* Compl. ¶¶ 37–39. Thus, alleged false statements about those lawsuits cannot be the proximate cause of any damage to Kotva. Thus, any predicate act relying on those false statements cannot serve as the basis for a RICO claim. *See Holmes v. Sec.*

*Investor Prot. Corp.*, 503 U.S. 258, 274 (1992) (requiring that plaintiff in civil RICO case prove that RICO predicate was proximate cause of damages). Since Kotva did not suffer any damage from the alleged predicate acts of wire or mail fraud and the conduct alleged by Kotva cannot, as a matter of law, constitute extortion, Kotva has failed to plead that it suffered damage to business or property as the result of a single RICO predicate. This failure is an independent reason that Kotva's RICO claim is dead on arrival. *See Camelio v. Am. Fed.*, 137 F.3d 666, 679 & n.2 (1st Cir. 1998) ("When a plaintiff attempts to base a civil RICO claim on § 1962(c), that claim cannot succeed unless the injuries of which the plaintiff complains were caused by one or more of the specified acts of racketeering.").

**C.    Kotva Fails to Allege a Pattern of Racketeering Activity**

All of Kotva's RICO allegations stem from a single alleged blackmail scheme. As such, they do not constitute a "pattern" within the meaning of the RICO statute. As the First Circuit has explained, "to prove a 'pattern of racketeering activity,' one must show separate predicate acts that 1) are 'related,' and 2) 'amount to or pose a threat of continued criminal activity.'" *Apparel Art Int'l v. Jacobson*, 967 F.2d 720, 722 (1st Cir. 1992) (Breyer, C.J.) (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

> [T]his definition does not encompass a single criminal event, a single criminal episode, a single "crime" (in the ordinary, nontechnical sense of that word). . . . . To hold otherwise would mean that many individual bank robberies, frauds, drug sales, embezzlements, and other crimes as well would automatically fall within the scope of the RICO statute, a result contrary to RICO's basic purpose. *See H.J. Inc.*, 492 U.S. at 239 ("A pattern is not formed by 'sporadic activity.'") (quoting S. Rep. No. 617, 91st Cong., 1st Sess. 158 (1969)). . . . . [H]owever courts express the point, they have consistently held that a single episode does not constitute a "pattern," even if that single episode involves behavior that amounts to several crimes (for example, several unlawful mailings). *See, e.g., Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 31 (1st Cir. 1987) (single bribe paid in three installments, each constituting a mail fraud violation, did not make out "pattern"); *J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 820–21 (7th Cir. 1991); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1417–19 (3d Cir.), *cert. denied*, 115 L. Ed. 2d 1007, 111 S. Ct. 2839 (1991).

*Id.* at 722–23.  Thus, by failing to plead a single predicate act that is separate and distinct from the Defendants' alleged "extortion" of Kotva—acts that took place over a course over a matter of months—Kotva has failed to allege a "pattern" of racketeering activity that poses a threat of continued criminal activity.  *Id.* (noting that thirteen months was a relatively short period of time, Congress was concerned with long-term criminal conduct and holding that several instances of criminal behavior that were part of a "single effort to obtain (and to keep) one $ 96 million Defense Department contract" did not constitute a pattern for purposes of RICO).

> ### D.    Kotva's RICO Claims are Barred by the Private Securities Litigation Reform Act

18 U.S.C. § 1964(c), as amended by the Private Securities Litigation Reform Act of 1995, Pub L. No. 104-67 (the "PSLRA"), provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962 [unless the action was brought] against any person that is criminally convicted in connection with the fraud."  If, as Kotva repeatedly alleges, the RICO conduct here is "conduct that would have been actionable as fraud in the purchase or sale of securities," s*ee* Compl. at 1 (describing conduct as "an audacious stock fraud scheme"); *id.* at 3 (referring to "Weiss' fraudulent stock scheme"); *id.* (noting claim against the Defendants for "violations of the Federal Securities and Exchange Act of 1934"); *id.* at 12 (describing "The Damage Caused by the Weiss Defendants' Stock Scheme"); *id.* at 15–16 (alleging, as Count I, a violation of the federal securities laws), then there can be no RICO claim.[7]

---

[7] As described above, Kotva has failed to plead essential elements of its fraud allegations. Accordingly, Kotva's RICO claim fails for lack of any cognizable predicate acts.  If Kotva had properly plead fraudulent conduct, such conduct cannot serve as the basis of a RICO claim under the PSLRA.  Either way, the RICO claim must be dismissed.

Since Kotva asserts that its fraud allegations concern conduct actionable as securities fraud, Kotva cannot rely on that allegedly fraudulent conduct for a civil RICO claim. The fact that Kotva lacks standing to bring a securities fraud claim does not overcome the bar erected by the PSLRA. The conduct at issue is, according to Kotva, actionable as fraud in the purchase or sale of securities regardless of whether Kotva is the proper plaintiff for such an action. *Cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. -- (Mar. 21, 2006), slip op. at 12, 16 (making distinction between whether plaintiff was holder/purchaser/seller of securities and whether complaint alleges fraud "in connection with the purchase or sale of securities") (attached hereto as Exhibit C). Thus, Kotva's allegations of fraud are barred by the PSLRA.

## VI.   THE COURT MUST DISMISS KOTVA'S CHAPTER 93A CLAIM UNDER THE LAW OF THE CASE DOCTRINE (COUNT IV)

Finally, during the January 23, 2006 hearing on Kotva's Motion to Dismiss, the Court identified a flaw in the Weiss Parties' claims under Chapter 93A, § 11 in that the parties were not acting in trade or commerce with respect to this intracorporate dispute. *See Riseman v. Orion Research, Inc.*, 394 Mass. 311, 313-14 (1985); *Zimmerman v. Bogoff*, 402 Mass. 650, 662-63 (1980); *Kurker v. Hill*, 44 Mass. App. Ct. 184, 190-91 (1998); *Horizon House-Microwave, Inc. v. Bazzy*, 21 Mass. App. Ct. 190, 200 (1985); *Newton v. Moffie*, 13 Mass. App. Ct. 462, 467 (1982). For this reason, just as the Weiss Parties may not maintain a Chapter 93A claim against Kotva, Kotva may not maintain a Chapter 93A claim against the Defendants.

## VII.    CONCLUSION

For the above reasons, the Court should enter judgment on the pleadings dismissing all counts of Kotva's Complaint.

.                                                    Respectfully Submitted,

                                                     ANDREW WEISS and WEISS ASSET
                                                     MANAGEMENT LLC

                                                     By their attorneys,


                                                     /s/ Benjamin A. Goldberger
                                                     Edward P. Leibensperger (BBO# 292620)
                                                     Benjamin A. Goldberger (BBO# 654357)
                                                     McDermott Will & Emery LLP
                                                     28 State Street
                                                     Boston, Massachusetts  02109-1775
                                                     (617) 535-4000

Dated: April 4, 2006

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 4, 2006.

                                                     /s/ Benjamin A. Goldberger
                                                     Benjamin A. Goldberger

BST99 1494002-6.072198.0012

Dated 20 December 2004

SPV CO Limited

and

CRQ Czech a.s.

# SHARE PURCHASE AGREEMENT

relating to the purchase of shares in SPV KN a.s.

Linklaters

Palác Myslbek
Na Příkopě 19
117 19 Prague 1

Telephone  (420) 221 622 111
Fax        (420) 221 622 199

Ref BDXW/L-033253

KC 1-2641

**This Share Purchase Agreement (the "Agreement") is made on 20 December 2004**

**Between:**

(1) **SPV CO Limited**, with its registered office at Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus, company registration no HE 148845, registered in Cyprus (the "**Seller**"), represented by Martin Benda, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1A;

(2) **CRQ Czech a.s.**, with its registered office Prague 1, Národní 1435/6, Post Code 11000, Identification no. 27159256, registered in the Companies Register by the Regional Court in Prague, in Part B, File 9394 (the "**Buyer**"), and represented by Frank Walker, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1B;

(3) **SPV KN a.s.**, with its registered office in Brno, Příkop 4, Post Code 602 00, Identification no. 26910705, registered in the Companies Register by the Regional Court in Brno, in Part B, File 4043 ("**SPV KN**"), represented by Ing. Richard Harazim, sole member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1C;

(4) **KOTVA NEMOVITOSTI, k.s.**, with its registered office at Příkop 4, Brno, Post Code 602 00, Identification no. 26229048, registered in the Companies Register by the Regional Court in Brno, in Part A, File 16586 ("**Kotva**"), and represented by KOTVA OBCHODNÍ, a.s., represented by Ing. Michal Vlach, Chairman of the Board of Directors, Ing. Jiří Brada, member of the Board of Directors, and Ing. Pavel Richter, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1D;

(5) **MARKLAND HOLDINGS Limited**, with its registered office at 19 Upper Fitzwilliam Street, Dublin 2, company registration no. 291167 registered under the laws of the Republic of Ireland ("**Markland**"), and represented by Frank Walker, a proxy. A copy of an extract from Companies House Ireland is annexed hereto at Schedule 2;

(6) **KOTVA a.s.**, with its registered office at Náměstí Republiky 8, Praha 1. Identification no. 60193808, registered in the Companies Register by the Municipal Court in Prague, in Part B, File 2370 ("**KAS**"), and represented by Ing. Michal Vlach, Chairman of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1E; and

(7) **KOTVA OBCHODNÍ, a.s.**, with its registered office at Příkop 4, Brno. Postal Code 602 00, Identification no. 26231735, registered in the Companies Register by the Regional Court in Brno, in Part B. File 3484 ("**KO**"), represented by Messrs Ing. Michal Vlach. Chairman of the Board of Directors. Ing. Jiří Brada and Ing. Pavel Richter, members of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1F;

(jointly referred to as the "**Parties**").

**Whereas:**

(A) The Seller is a company validly established under the laws of Cyprus and is part of the KAS Group

---

(B)    SPV KN is the registered owner of the Property and is part of the KAS Group.

(C)    The Seller is undertaking steps to acquire 97% of the shares in SPV KN.

(D)    KAS is a holding company established under the laws of the Czech Republic and is the controlling person in relation to the Seller, SPV KN and to KO.

(E)    The Seller wishes to sell and the Buyer wishes to buy the Shares, and the KOTVA Trademarks under the terms and subject to the conditions set out herein.

## The Parties hereby agree as follows:

**1    Interpretation**

**1.1**    Construction

Any reference in this Agreement to an "Article", "Clause" or "Section" refers to the corresponding Article, Clause or Section of this Agreement, unless the context indicates otherwise. The headings of Articles, Clauses and Sections are provided for convenience only and should not affect the construction or interpretation of this Agreement. All words used in this Agreement should be construed to be of such gender or number as the circumstances require. The terms "include" or "including" indicate examples of a foregoing general statement and not a limitation on that general statement. Any reference to a statute refers to the statute, any amendments or successor legislation, and all regulations promulgated under or implementing the statute, as in effect at the relevant time. Any reference to a contract or other document as of a given date means the contract or other document as amended, supplemented and modified from time to time. Any reference to an amount in a given currency shall mean a similar amount in any other currency converted at the then applicable exchange rate.

**1.2**    Definitions

For the purposes of this Agreement, the following terms and variations on them have the meanings specified in this Clause 1.2:

"Adverse Consequence"    means any Liability, loss, damage (including incidental and consequential damages), claim, cost, deficiency, diminution of value, or expense (including the reasonable costs of investigation and defence, penalties, and reasonable legal fees and costs), whether or not involving a third-party claim;

"Building"    means building no. 656, located in the registration area of Staré Mĕsto, municipality section Staré Mĕsto, on plot no. 680, and further building registered therein without descriptive number or evidence number present on plot no. 1018/2. Both buildings are registered at the Real Estate Register hl. m. Praha, title no. 265, for Prague city, cadastral area Staré Mĕsto. A copy of an extract from the Real Estate Register is annexed hereto at Schedule 5;

"Business"    means the business of leasing non-residential premises in the Building or leasing the Contributed Property to third persons as tenants and providing related services;

KC 1-2643

| | |
|---|---|
| "Business Day" | means any day other than a public holiday as defined under Czech law or Austrian law or Irish law or a day that the Escrow Agent or the Buyer's bank is closed for business; |
| "Change of Control" | means: (a) KAS or Kotva ceasing to directly or indirectly control the Seller; or (b) KAS ceasing to control SPV KN or Kotva or KO, prior to the Closing Date; |
| "Closing" | means the hand-over of the Shares by the Seller to the Buyer through the Escrow Agent upon terms stipulated herein; |
| "Closing Date" | means the day on which the Closing takes place; |
| "Consent" | means any approval, consent, ratification, waiver or other expiration of a right to deny consent or other authorisation, provided either by a Governmental Body or other Person; |
| "Contemplated Transactions" | means all of the transactions to be carried out in accordance with this Agreement, including the purchase and sale of the Shares and the performance by the Parties of their obligations under this Agreement; |
| "Contract" | means any contract, agreement, commitment, understanding, lease, licence, franchise, warranty, guarantee, mortgage, note, bond, or other instrument or consensual obligation (whether written or oral and whether express or implied) that is legally binding; |
| "Commercial Code" | means the Czech Commercial Code, Act no. 513/1991 Coll., as amended; |
| "Companies Register" | means the register of company information, maintained by the regional courts in the Czech Republic; |
| "CZK" | means Czech Crowns, the official currency of the Czech Republic; |
| "Deposit" | means the sum of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) which has already been delivered to the Escrow Agent by Markland on behalf of the Buyer; |
| "Due Diligence" | means a process, during which the Kotva and the KAS Group provided Markland with requested data and information and provided the Buyer with all co-operation necessary to enable it to ascertain the legal status and condition of the Property and of Kotva and KAS, SPV KN and SPV CO; |
| "Encumbrance" | means any charge, claim, mortgage, easement, right of way, community or other material property interest, covenant, equitable interest, lien, option, pledge, security interest, preference, priority, right of first refusal, or other similar right of a third party of restriction; |
| "Escrow Account" | means the escrow account opened to facilitate the transaction envisaged hereunder; |
| "Escrow Agent" | ███████████████████████████████ |
| "Escrow Agreement" | means the contract concluded between the Seller, the Buyer, Kotva and Markland and the Escrow Agent, as amended; |

| | |
|---|---|
| "EUR" | means Euro, the official currency of the European Union; |
| "Financial Statements" | means the audited financial statements of SPV KN as at the Closing Date; |
| "Fixtures & Fittings" | means the list of fixtures an fittings annexed hereto at Schedule 11; |
| "Force Majeure" | means an event occurring out of the control of the Parties which results in breach of the obligations under the Agreement by one of the Parties, if the Party breaching the Agreement could not have avoided such event or breach of the Agreement despite having exercised maximum effort and care which may reasonably be required from such Party |

The Force Majeure shall mean in particular:

(a)     natural disaster;

(b)     war, war footing, invasion, mobilization or embargo;

(c)     uprising, revolution, rebellion, military regime or civil war;

(d)     radioactivity contamination from a nuclear facility or any other dangerous part of an explosive nuclear facility or a part of such facility;

(e)     discovery of archaeological findings, fossils, coins, precious objects and antiques, etc ;

(f)     terrorist attack; and

(g)     any act by a municipality or registered authority which delays, beyond the control of Kotva, the transfer/contribution of the Shares and the Kotva Trademarks to the Seller.

Force Majeure shall not include:

(a)     unfavourable weather conditions;

(b)     events that were known to Kotva or the Seller or to Markland or the Buyer prior to the signing hereof;

(c)     any changes of statutory regulations and technical standards;

(d)     any new statutory regulations or technical standards.

| | |
|---|---|
| "Gilroy" | means Gilroy Limited whose registered office is at 4 Pikioni Street Limassol, Cyprus; |
| "Gilroy Claim" | means the claim that Gilroy lodged on 30 June 2004 with the District Court for Prague 1 a copy of which is attached hereto at Schedule 9; |
| "Gilroy Settlement" | means the obtaining of a definitive and final ruling in respect of the Gilroy Claim; for purposes of this Agreement such definitive and final ruling is deemed to be also a final settlement between the parties to the Gilroy Claim, approved by the court or the withdrawl by Gilroy of the Gilroy Claim. |
| "Governmental | means any consent, licence, permit or registration issued. granted, or |

KC 1-2645

| | |
|---|---|
| **Authorisation"** | otherwise made available by or under the authority of any Governmental Body or pursuant to any law, including decisions of a court or other body on incorporation of a legal person and decisions of the Real Estate Register Office on registration at the Real Estate Register; |
| "**Governmental Body**" | means any of the following: |

    (a)    the executive ruling body of any state, region, city, village, or other jurisdiction;

    (b)    federal, state, local, municipal, foreign or other government or self-government;

    (c)    a budgetary or contributory governmental authority of any nature (including any governmental agency, branch, department, or other entity and any court or other tribunal);

    (d)    a multinational organisation incorporated pursuant to international law;

    (e)    a body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, policy, regulatory, or tax authority; or

    (f)    an official of any of the foregoing.

| | |
|---|---|
| "**Indemnified Person**" | means a Person entitled to an Share Purchase Price adjustment or damages under Clause 8.2 or Clause 8.3; |
| "**Indemnifying Person**" | means a Person obliged to pay a Share Purchase Price adjustment or damages to an Indemnified Person; |
| "**J&T banka Mortgage**" | means at the date of this Agreement a mortgage over the Property registered in favour of J & T banka, a.s. Identification no. 47115378, with its registered office Pobřežní 297/14, 186 00 Praha 8 (hereinafter referred to as "**J&T banka**") |
| "**KAS Group**" | means KAS and trade companies, all of them together or each one individually, under the centralised power and control of KAS, pursuant to §66a Art. 7 of the Commercial Code; |
| "**Knowledge**" | means knowledge of information relevant for this Agreement about any matter, fact or Person, being known to a Person; |
| "**KO Lease**" | means the lease to be entered into between SPV KN and KO on the Closing Date the text of which is annexed hereto at Schedule 5; |
| "**Kotva's Indemnities**" | is defined in Clause 8.3; |
| "**Kotva Správcovská a.s.**" | means Kotva Správcovská a.s., with its registered office in Brno, Příkop 4, PSČ 60200, ID no. 26510081; |
| "**KOTVA Trademark I**" | means the collection of trademarks consisting of: word-device trademark KOTVA. registration no. 167478, registered in the Patent and Trademark Office of the Czech Republic and word-device trademark KOTVA, registration no. 167478 registered in the Patent and Trademark Office of the Slovak Republic; |

"KOTVA Trademark II"   means the collection of trademarks consisting of: word-device and word only trademark KOTVA having been used by Kotva but not yet registered in Kotva's name in the Patent and Trademark Office of the Czech Republic for which registration Kotva has applied by the applications no 355 884 and 355 885 both filed with the Patent and Trademark Office of the Czech Republic on 1st of July 2004, with the priority right date of July the 1st 2004. The KOTVA Trademark II is further specified in an expert opinion dated 10 July 2004 annexed hereto as the Schedule 10;

"KOTVA Trademarks"   means collectively KOTVA Trademark I and KOTVA Trademark II

"Land"   means the collection of plots of land registered at the Real Estate Register hl m. Praha, ownership deed no. 265, for Prague city, cadastral area of Staré Město, consisting of: plot no. 680 – built-up area and yard, plot no. 683/1 – other area, plot no. 683/2 – other area, plot no. 683/3 other area, plot no. 690/2 – other area, plot no. 690/3 – other area, plot no. 690/4 – other area, and plot no. 1018/2 – built-up area and yard. A copy of an extract from the Real Estate Register is annexed hereto at Schedule 4;

"Legal Requirement"   any valid legal regulation of any Governmental Body;

"Liabilities"   includes liabilities or obligations of any nature, whether known or unknown, whether obsolete, accrued, contingent or other, whether due or to become due or prescribed, and whether or not required to be reflected on a financial statement and "Liability" shall be construed accordingly;

"Markland's Indemnities"   is defined in Clause 8 2;

"Order"   any published and publicly available order, injunction, judgement, assessment. decree, ruling, or arbitration award of any Governmental Body or arbitrator;

"Ordinary Course of Business"   actions taken in the course of normal Business operation by SPV KN and/or by Kotva or the Seller or KO as the respective owner or manager of the Property, consistent with past practice of Kotva;

"Organisational Documents   any deed, bylaws, regulations, certificate, statement, statute, or similar document adopted, filed or registered in connection with the creation, formation, or organisation of an entity, and any Contract among equity holders. partners or members of an entity;

"Person"   an individual or an entity, including a corporation, share company, limited liability company, partnership, trust, association, or any other body with legal personality separate from its equity holders or members;

"Proceeding"   any action, arbitration, audit, examination. investigation, hearing, litigation, or suit (whether civil, criminal, administrative, judicial or investigative, informal, public or private) commenced, brought, conducted, heard by or before, or otherwise involving, any

|  | Governmental Body or arbitrator; |
|---|---|
| **"Property"** | means the Building and the Land; |
| **"Proprietary Information"** | is defined in Clause 9.1; |
| **"Purchase Price"** | means the total purchase price for the Shares and the KOTVA Trademarks in the sum of the Czech Crown equalling CZK 1,501,450,000 (one billion five hundred and one million four hundred and fifty thousand Czech Crowns) calculated as follows: |

      (i)     purchase price for the Shares CZK 1,366,450,000 (one billion three hundred and sixty six million four hundred and fifty thousand Czech Crowns) (**"Share Purchase Price"**),

      (ii)    purchase price for the Kotva Trademarks CZK 135,000,000 (one hundred and thirty five million Czech Crowns) (**"Trademarks Purchase Price"**);

| **"Related Person"** | with respect to a particular Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person and, with respect to an individual, any other individual that is a member of the individual's family (by blood, marriage or adoption), a member of the individual's household, an entity in which the individual participates in management or an employee or employer of the individual. For the purposes of this definition, "control" means where a Person (or Persons acting in concert) acquires or agrees to acquire or has options over direct or indirect control: (a) of the affairs of that Person; or (b) more than 50 per cent of the total voting rights conferred by all the issued shares in the capital of that Person which are ordinarily exercisable in general meeting; or (c) of the composition of the main board of directors of a Person. For these purposes "Persons acting in concert", are Persons which actively co-operate, pursuant to an agreement or understanding (whether formal or informal), with a view to obtaining or consolidating or exercising control of that Person; |
|---|---|
| **"Rent Roll"** | means the up to date rent roll as at the date of this Agreement which truly and accurately records the existing lease relations concerning non-residential premises in the Building, a copy of which is annexed at Schedule 6; |
| **"Representative"** | with respect to a particular Person, any director, appointed officer, employee, consultant, agent, advisor, legal counsel, accountant, or other representative of that Person; |
| **"Retention"** | means the money retained in the Escrow Account following Closing in accordance with Clause 5.6.4; |
| **"Security"** | means the amount of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) that has been paid by Kotva on behalf of the Seller into the Escrow Account prior to the date hereof in order to secure a possible claim or claims of the Buyer against the Seller together with any interest thereon; |

| "Shares" | means the following ordinary bearer shares in certified form issued by SPV KN: |
|---|---|
| | (a)    10 shares of nominal value CZK 200,000 each with Nos. 1-10 issued on 10 November 2003; and |
| | (b)    13 shares of nominal value CZK 100,000,000 each with Nos. 11-23 issued on 9 April 2004; and |
| | (c)    2 shares of nominal value CZK 20,000,000 each with Nos. 24 and 25 issued on 9 April 2004; and |
| | (d)    8 shares of nominal value CZK 1,000,000 each with Nos. 28-35 issued on 9 April 2004; and |
| | (e)    2 shares of nominal value CZK 100,000 each with Nos. 37 and 38 issued on 9 April 2004; and |
| | (f)    4 shares of nominal value CZK 10,000 each with Nos. 46-49 issued on 9 April 2004; |
| | the nominal value of which represents 97 per cent of the capital stock of SPV KN; |
| "SPV Conclusion" | the satisfaction of the conditions in Clause 3.1; |
| "Tax" or "Taxes" | means without limitation and whatever means by which it is levied all forms of taxation, statutory, governmental, state, local, foreign and municipal impositions, duties, contributions and levies including any tax imposed on any income, withholding tax, value added tax ("VAT"), road tax, real estate tax, real estate transfer tax, gift tax, inheritance tax, excise duties. customs or other duty. employment related levies, including. social security contributions and contributions to complementary welfare and health insurance including both principal and potential related interest and penalties; |
| "Threatened" | an action or matter would be considered to have been "Threatened" if a demand or statement has been made (whether orally or in writing) or a notice has been given (whether orally or in writing), or any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such action or matter is likely to be asserted, commenced, taken or otherwise pursued in the future; and |
| "Transfer Deed" | means a Share Purchase Agreement to be concluded between the Seller and the Buyer effecting the transfer of the title to the Shares to the Buyer. |

## 2    Agreement on replacement of present obligations between several Parties by new obligations between all Parties

2.1    The Parties hereby agree pursuant to section 570 of the Act. No 40/1964 Coll., the Civil Code, as amended, that their mutual obligations arising out of the Share Purchase Agreement concluded on 20 January 2004 (hereinafter referred to as the "**Present SPA**") between Kotva and Markland is replaced in their entirety by the obligations contained in the Agreement.

**2.2** For avoidance of any doubt it is agreed that the Present SPA terminates in its whole scope on the moment when this Agreement comes into being so that this Agreement substitutes the Present SPA in the whole scope.

**2.3** The Parties hereby agree to accession of the Seller, SPV KN, KAS, KO and the Buyer to this Agreement and the Seller, SPV KN, KAS, KO and the Buyer confirm by signing this Agreement they have acceded to the Agreement.

**2.4** For avoidance of any doubt it is agreed that the termination of the Present SPA and its substitution by this Agreement as stipulated herein shall not give a rise to claim for return of any performance that has been already provided pursuant to the Present SPA

**2.5** If the nature of rights and obligations under this Agreement enables so, the Seller's rights and obligations under this Agreement may be fulfilled and exercised by Kotva and the Buyer's rights and obligations under this Agreement may be fulfilled and exercised by Markland.

**2.6** The Seller and Kotva are jointly and severally liable for the fulfilment of the obligations of either of them arising out of this Agreement. Kotva, KAS and KO jointly and severally guarantee the fulfilment of the Seller's and Kotva's obligations arising out of this Agreement. The Buyer and Markland are jointly and severally liable for the fulfilment of the obligations of either of them arising out of this Agreement

**2.7** The Seller and the Buyer and Kotva and Markland shall use their best endeavours to execute an amendment to the Escrow Agreement within 20 Business Days of the date of this Agreement to enable the Escrow Agent to perform its duties in accordance with the terms and conditions of this Agreement

# 3    Initial Obligations

The Initial Obligations are as follows:

**3.1** Seller's Obligation - procuring of SPV Conclusion

**3.1.1** The Seller is obliged to procure the valid and legal and effective transfer or contribution of the Shares and the KOTVA Trademarks to the Seller through a non-monetary investment contribution to the Seller by Kotva which is satisfactory to the Buyer, acting reasonably, which in the circumstances will mean the requirement of the Seller to procure a valid and clear legal opinion confirming the valid and legal and effective transfer or contribution of the Shares and the KOTVA Trademarks to the Seller through a non-monetary investment contribution to the Seller by Kotva. Such legal opinion will also include confirmation that the Seller is fully and effectually entitled to sell the Shares and the KOTVA Trademarks to the Buyer pursuant to the terms of this Agreement; and

**3.1.2** The Seller is obliged to procure the application for registration in the Patent and Trademark Office of the Czech Republic and Slovak Republic respectively of the contribution of the KOTVA Trademarks to the Seller, in a form acceptable to the Buyer, acting reasonably

**3.2** Buyer's Obligation - Legal Opinion

3.2.1   The Buyer will procure as soon as possible after the date hereof, but no later than 31 January 2005, that its lawyers agree with the Buyer's bank's lawyers a legal opinion in respect of the ownership of the Property by SPV KN and the Shares by SPV CO to enable the Buyer's bank to confirm that it is prepared to finance the transactions contemplated hereunder.

**3.3    Satisfaction of Initial Obligations**

3.3.1   Within five Business Days of the satisfaction of any of the obligations referred to in Clauses 3.1 or 3.2, the party satisfying such condition shall serve notice of satisfaction on the other party.

**3.4    Failure to satisfy the conditions precedent**

3.4.1   In the event that Kotva fails to satisfy the obligations under this Clause 3.1 by 31 January 2005, the Buyer and Markland may withdraw from this Agreement by either one of them serving five Business Days written notice on Kotva and the Seller. Markland shall be entitled to the immediate refund of the Deposit together with any interest thereon and a contractual penalty payable by Kotva in the sum of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied firstly from the Security.

3.4.2   In the event that the Buyer fails to satisfy the obligations under Clause 3.2.1 by 31 January 2005, the Seller or Kotva may withdraw from this Agreement by either one of them serving five Business Days written notice on the Buyer and Markland. The Seller shall be entitled to a contractual penalty payable by the Buyer in the sum of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied from the Deposit and te balance of such Deposit shall be retuned to the Buyer.

**4    SPV KN from its founding until Closing**

**4.1    Board of Directors of SPV KN**

4.1.1   Kotva may only appoint a new member of SPV KN's Board of Directors or remove any of the existing members only with the prior written approval of the Buyer.

4.1.2   Kotva further undertakes that the members of the Board of Directors or other managers of SPV KN will not act outside of the Ordinary Course of Business and shall obtain prior written approval from the Buyer before making any non-operational decision or series of related decisions of a value in excess of CZK 157,500 (one hundred and fifty seven thousand five hundred Czech Crowns) except where this Agreement states to the contrary.

4.1.3   Kotva and/or the Seller, once it becomes majority shareholder of SPV KN, shall procure that the Board of Directors of SPV KN will observe and perform the obligations and undertakings as set out in Clause 6 and for the avoidance of doubt, any breach of such obligations and undertakings by the Board of Directors of SPV KN, if able to cause an Adverse Consequence to SPV KN and/or the Buyer and/or Markland of a sum in

---

excess of CZK 31,500 (thirty one thousand five hundred Czech Crowns), shall be regarded as a material breach of this Agreement which shall entitle the Buyer and Markland to withdraw pursuant to Clause 10 respecting the time period in Clause 8.5.

### 4.2 Supervisory Board of SPV KN

4.2.1 Kotva may only appoint a new member of SPV KN's Supervisory Board or remove an existing one only with the prior written approval of the Buyer.

## 5 Sale and Transfer of Shares and KOTVA Trademarks; Closing

### 5.1 Transfer of Shares

5.1.1 Subject to the terms and conditions of this Agreement the Seller and the Buyer undertake, within five (5) Business Days of the Purchase Price being paid into the Escrow Account in accordance with Clause 5.3, to conclude the Transfer Deed, and the Seller undertakes to sell the Shares and to transfer the title to the Shares to the Buyer, the Seller and the Buyer undertake to instruct the Escrow Agent to immediately release the Shares to the Buyer and the Buyer undertakes to buy the Shares from the Seller and to pay for the Shares the Share Purchase Price.

5.1.2 The terms and conditions of this Agreement not repeated in the Transfer Deed will apply to the transfer of the Shares under the Transfer Deed as if they were explicitly stipulated in the Transfer Deed.

### 5.2 Transfer of the KOTVA Trademarks

5.2.1 Subject of the terms and conditions of this Agreement the Seller undertakes, within five (5) Business Days of the Purchase Price is paid into the Escrow Account in accordance with Clause 5.3, to conclude with SPV KN or the Buyer (such decision to be at the discretion of the Buyer provided that it shall not cause any material adverse effect to the Seller) the Kotva Trademarks transfer agreement in a form to be agreed by the Buyer, acting reasonably, and the Seller undertakes to sell and transfer the KOTVA Trademarks to SPV KN or the Buyer and the Buyer undertakes to:

(i) ensure that SPV KN or the Buyer will buy the KOTVA Trademarks; and

(ii) pay on behalf of SPV KN or in its own name for the KOTVA Trademarks the Trademark Purchase Price

5.2.2 SPV KN hereby agrees to sign all such documents as are required to effect the Kotva Trademarks transfer agreements referred to in Clause 5.2.1 above.

5.2.3 The terms and conditions of this Agreement not repeated in the KOTVA Trademarks transfer agreements will apply to the transfer of the KOTVA Trademarks under the the KOTVA Trademarks transfer agreements as if they were explicitly stipulated in the KOTVA Trademarks transfer agreements.

5.2.4     In the event that the Buyer decides about the transfer of the KOTVA Trademarks to SPV KN under Clause 5.2.1 and as a result of this decision any provision of this Agreement is directly or indirectly breached, neither Markland nor the Buyer may claim any right that it would otherwise have as a result of such breach.

**5.3**     Deposit and Purchase Price

5.3.1     The Deposit credited to the Escrow Account shall form part of the Purchase Price.

5.3.2     Within 20 Business Days of receipt or service by the Buyer of the notice of satisfaction of the last of the initial obligations, the Buyer shall credit to the Escrow Account the amount of CZK 1,363,950,000 (one billion three hundred and sixty three million nine hundred and fifty thousand Czech Crowns) representing the balance of the Purchase Price. In the event that on the date of payment of the balance of the Purchase Price, the Deposit or its part has been used to settle a Seller's claim according to this Agreement (other than the claim to receive the Purchase Price), the Buyer is obliged to balance the Purchase Price so that the total sum deposited by the Buyer (including the Deposit) represents the Purchase Price.

5.3.3     In the event that the Buyer fails to credit the Escrow Account as specified in Clause 5.3.2 the Buyer shall pay to the Seller a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) by way of forfeit of the Deposit which shall be released to the Seller within five (5) Business Days from the breach of this obligation. Upon settlement of this contractual penalty in favour of the Seller this Agreement immediately terminates.

5.3.4     Following Closing, if:

(i)     a breach of any of the Seller's or Kotva's obligations or representations or warranties is discovered which occurred prior to Closing; and

(ii)     the nature of that breach is such that it entitles the Buyer to compensation (by way of Share Purchase Price reduction or damages) in accordance with the terms of this Agreement,

then the parties shall apply to Arbitration pursuant to Clause 11.12 of this Agreement to ascertain that conditions (i) and (ii) of this Clause 5.3.4 have been satisfied and, if so determined in the arbitration award, then the Buyer shall be entitled to have recourse to the Escrow Account for the amount corresponding to the Adverse Consequence so discovered. The Seller shall be obliged to replenish the Escrow Account with the amount withdrawn on account of the breach within 20 Business Days of its removal by the Buyer until such time as all the monies standing to the credit of the Escrow Account have been released in accordance with the terms of the Escrow Agreement.

**5.4**     Action pending Closing

5.4.1   Kotva and the Seller shall collaborate fully with Markland and the Buyer, such collaboration to include but not be limited to Markland's and/or the Buyer's right to:

  (i)    receive, after a request made by each of them, all information distributed to the directors of SPV KN and the Seller;

  (ii)   attend, but not vote at, the meetings of the directors of SPV KN and the Seller; and

  (iii)  have full access to all those books, records and other documentation of SPV KN and the Seller to which a director normally has access in relation to all matters concerning the operation of SPV KN and the Seller between the date of this Agreement and the Closing Date.

5.4.2   During such period Kotva and/or the Seller shall procure that neither SPV KN nor the Seller shall without the prior written consent of Markland:

  (i)    incur or enter into any agreement or commitment involving any capital expenditure in excess of CZK 157,500 (one hundred and fifty seven thousand five hundred Czech Crowns) per annum which is not in the Ordinary Course of Business;

  (ii)   enter into or amend any contract or commitment which is not in the Ordinary Course of Business or which involves or may involve a total annual expenditure or income in excess of CZK 500,000 (five hundred thousand Czech Crowns);

  (iii)  incur any additional borrowings or incur any other indebtedness;

  (iv)   save as required by law, make any amendment to the terms and conditions of employment (including, without limitation, remuneration and other benefits) of any employee, provide or agree to provide any gratuitous payment or benefit to any such person or any of their dependants, dismiss any employee or engage or appoint any additional employee;

  (v)    acquire or agree to acquire or dispose of or agree to dispose of any material asset or material stocks or enter into or amend any material Contract or arrangement;

  (vi)   take steps to procure the payment or settlement of any Liability generally in advance of the date on which book and other Liabilities are usually payable in accordance with the standard terms of the Seller's business or to extend the period to any particular debtor in which to make payment;

  (vii)  delay making payment to any trade creditors generally beyond the date on which payment of the relevant trade debt should be paid in accordance with a credit period as authorised by the relevant creditors or (if different) the period extended by such creditors in which to make payment;

KC 1-2654

(viii)   amend, to any material extent, any of the terms on which goods, facilities or services are supplied, such supplies being material in the context of the Business, except where required to do so in order to comply with any Legal Requirement;

(ix)    enter into any guarantee, indemnity or other agreement to secure any obligation of a third party or create any encumbrance over any of its assets or undertaking;

(x)     allot, issue, redeem or repurchase any share capital of SPV KN and/or the Seller;

(xi)    enter into any contract reducing or depreciating the assets of SPV KN and/or the Seller;

(xii)   acquire or agree to acquire any share, shares or other interest in any Person;

(xiii)  declare, make or pay any dividend or other distribution to shareholders;

(xiv)   make any change to the practices or policies of SPV KN and/or the Seller;

(xv)    amend the Organisational Documents of SPV KN or the Seller; or

(xvi)   enter into any Contract or arrangement with a Related Person other than in the Ordinary Course of Business

5.4.3   Kotva and the Seller further undertake and undertake to procure that pending Closing each of them will:

(i)     continue those business activities which affect the Property, SPV KN or the Seller, only in the Ordinary Course of Business, save insofar as agreed in writing by the Buyer;

(ii)    take all reasonable steps to preserve its assets and Governmental Authorisations; and

(iii)   take all reasonable steps to preserve the validity of all Contracts to which they are a party which have an effect on the Property, SPV KN or the Seller.

## 5.5    Closing

5.5.1   The Closing shall occur within five (5) Business Days after receipt of the Purchase Price by the Escrow Agent.

5.5.2   The Seller shall, through the Escrow Agent, hand-over the Shares and shall hand-over the other documents referred to in Clause 5.6.1 and upon receipt of such Shares and other documents by the Buyer, the Closing of this transaction shall be deemed to occur. The title to the Shares including shareholder's rights shall pass to the Buyer upon Closing. The Purchase Price shall be settled by the Escrow Agent via the Escrow Account

## 5.6    Closing deliveries

5.6.1   At Closing Date, the Seller shall deliver to the Buyer through the Escrow Agent the items listed in sub-clause (a), (b) and (c) below and personally in respect of the remainder of the items listed below):

(a)   the Shares;

(b)   the Transfer Deed;

(c)   a hand-over protocol confirming the hand-over of the Shares;

(d)   an extract of SPV KN from the Commercial Register dated the Closing Date (fax copy is deemed to be a sufficient form);

(e)   written resignations of each member of the Board of Directors and the Supervisory Board of SPV KN and a resolution of the sole shareholder (or the Supervisory Board, as appropriate) of SPV KN taking note of the resignations in a form reasonably acceptable to the Buyer, to provide the resignations to take effect on the Closing Date;

(f)   resolution of the sole shareholder (or Supervisory Board, as appropriate) appointing new members of the Board of Directors and the Supervisory Board of SPV KN designated by the Buyer and advised to the Seller at least (5) Business Days prior to Closing in a form reasonably acceptable to the Buyer, to provide the appointments to take effect on the day immediately following the Closing Date;

(g)   the Powers of Attorney signed by each member of the Board of Directors of SPV KN to enable the Buyer to make the necessary post-Closing registration (or deletions) at the Commercial Register;

(h)   all SPV KN's Organisational Documents, including, but not limited to, the founding deed, articles of association and all applications regarding SPV KN's registration in the Commercial Register and all resolutions of the registration court;

(i)   all lease agreements in respect of the Property;

(j)   all title deeds and documents in respect of the Property;

(k)   all the financial and accounting books and records and returns of SPV KN completed up to Closing;

(l)   all other documents regarding SPV KN;

(m)   a certificate executed by the Seller and Kotva dated as of the Closing Date stating that: (i) all representations, warranties, obligations and undertakings as set forth under Clause 6 are fulfilled and are true and correct in all material respects as the Closing Date; and (ii) all actions required to be taken by Kotva, SPV KN and the Seller to effect Closing have been properly taken;

(n)   the KO Lease duly executed by KO;

(o)   certificates executed by the Seller and Kotva and their accountants, so far as they are authorised to do in accordance with Czech Law

---

KC 1-2656

confirming: (i) the successful payment and liquidation of any and all long-term debts or Liabilities, financial or otherwise, of SPV KN, the Seller and Kotva not arising in the Ordinary Course of Business which would affect SPV KN, the Seller or the Property; and (ii) that the Liabilities and debts, financial or otherwise of Kotva and the Seller arising in the Ordinary Course of Business which would affect SPV KN, the Seller or the Property amount to less than CZK 500,000 (five hundred thousand Czech Crowns);

(p)     a certificate executed by the accountants of SPV KN confirming what debts and Liabilities, financial or otherwise SPV KN has and that, save for day to day debts or Liabilities, financial or otherwise, that SPV KN has no other such debts or Liabilities, financial or otherwise;

(q)     a confirmation of discharge of the liability secured by the J&T banka Mortgage, signed by J&T banka in a form reasonably acceptable to the Buyer to enable the Buyer to remove the registration of such mortgage from the real estate register;

(r)     the list of tenant's security deposits as evidenced in the accounting of SPV KN, which list in detail the amounts provided by the individual tenants as security deposits;

(s)     evidence that the Seller has relinquished all authority and all rights to make any transactions on the SPV KN bank accounts (or that such accounts are frozen pending the Buyer completing the necessary bank mandates) and all banking records and account details and new mandate forms for the Buyer to complete and to give all assistance as required by the banks in this respect to ensure the proper transmission of the accounts;

(t)     applications for the registration of the transfer of the KOTVA Trademarks from Kotva to the Seller stamped by the Industrial Property Offices in the Czech Republic and Slovak Republic, as applicable; and

(u)     the Kotva Trademarks transfer agreements.

5.6.2   The documents listed in Clause 5.6.1 above shall be delivered by the Seller and Kotva to the Escrow Agent within ten (10) Business Days of the date of the written notice evidencing to the Buyer SPV Conclusion delivered in accordance with Clause 5.3.2 and following this, the Seller and the Buyer shall execute such confirmatory document as is required by the Escrow Agent and if either of them shall fail to execute such document as required by the Escrow Agent (save in the event of a dispute as to the actual delivery of the documentation) then a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) shall be payable to the other party

5.6.3   the Escrow Agent shall release the following sums from the Escrow Account upon Closing:

(i)     to the Buyer, the sum of CZK 10,837,800 (ten million eight hundred and thirty seven thousand eight hundred Czech Crowns) in respect of three months rent and service charge as defined in the KO Lease as a security deposit thereunder;

(ii)    provided that the debt secured by the J&T banka Mortgage has not been discharged and the Seller has supplied evidence thereof to the Buyer which is reasonably acceptable to the Buyer, to J&T banka an amount equal to the amount required to discharge in full and final settlement all amounts secured by the J&T banka Mortgage, provided that the Escrow Agent received a letter from J&T banka confirming that such amount will be in full and final settlement of the debt secured by the J&T banka Mortgage and any and all claims;

(iii)   to the Seller the Trademark Purchase Price;

(iv)   to the Seller. the sum of CZK 925,000,000 (nine hundred and twenty five million Czech Crowns), less the amounts paid to the Buyer pursuant to Clauses 5.6.3(i) above and to J&T banka pursuant to Clause 5.6.3(ii) above and to the Seller pursuant to Clause 5.6.3(iii) above.

5.6.4    The balance of the Share Purchase Price, being the Retention, amounting to CZK 576.450,000 (five hundred and seventy six million four hundred and fifty thousand Czech Crowns), shall be retained by the Escrow Agent until such time as there has been Gilroy Settlement. However, if there has been Gilroy Settlement but either 9 months from the Closing Date have not elapsed or there are Proceedings pursuant to Clause 5.6.4(i) below, the Escrow Agent shall release the Retention to the Seller less the sum of CZK 189,000,000 (one hundred and eighty nine million Czech Crowns), which shall be retained in the Escrow Account until such time as the Buyer obtains a definitive and final ruling in respect of such Proceedings or the period of 9 months from the Closing Date elapsed and there are no Proceedings which ever is the later. For the avoidance of doubt, a court decision made on basis of a valid withdrawal is considered to be a definitive and final ruling

The Escrow Agent shall throughout the period of holding the Retention release to the Buyer upon the sole request of the Buyer the following sums:

(i)     In the event that anyone initiates any legal Proceedings the subject matter of which is a declaration of invalidity of legal acts based on which the Property has been transferred or contributed to Kotva and/or to the Seller, within nine months of the Closing Date, then the Buyer shall be entitled to unilaterally withdraw on each regular quarter day, being 1 January, 1 April, 1 July and 1 October, such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending the Buyer. SPV KN or Markland in any such Proceedings. Such amounts will be considered to be the Share Purchase Price adjustments. In the event that compensation of such costs are awarded by the court to

the Buyer in such Proceedings, then the Buyer shall return such sums as it recovers to the Seller once it has received them from the obliged person, such amounts again will be considered the Share Purchase Price adjustments.

(ii)   On each regular quarter day, being 1 January, 1 April, 1 July and 1 October, such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending SPV KN under the Gilroy Claim; the request of the Buyer for such sums from the Retention must evidenced by a duly issued invoice from the Buyer's lawyers for the time being. Any payments under this Clause 5.6.4(ii) will be considered to be Share Purchase Price adjustments.

(iii)  In the event that, under any tax regulations applicable up to the date of Closing, Kotva or SPV KN are assessed with Tax (in particular real estate transfer tax or VAT) in relation to the contribution of the Property, to SPV KN and Kotva, SPV KN or the Seller is liable to pay such Tax to the Financial Authorities, Kotva and the Seller undertakes to compensate SPV KN for such Tax and any corresponding penalty, interest or any other financial payment imposed by the Financial Authorities on SPV KN and such amount of Tax shall be retained in the Escrow Account by the Escrow Agent and shall only be released to the Seller following Gilroy Settlement upon receipt of the following:

(a)   an original or an authenticated copy of the extract from the Real Estate Register showing the SPV KN as the exclusive owner of the Property which are free of any Encumbrances; it does not relate to any Encumbrances, which arise after the Closing has taken place or which are created by the Buyer;

(b)   an original or an authenticated copy of the Tax return relating to the real estate transfer tax resulting from the contribution of the Property to SPV KN and a copy of an expert's valuation, both bearing a stamp of the Tax Collection Authority confirming that the Tax return, including the expert's valuation, have been duly submitted to the Tax Collection Authority; and

(c)   original confirmation, issued by the appropriate Financial Authority, proving that neither Kotva nor the Seller or SPV KN have any tax liabilities in respect of any Tax and in particular real estate transfer tax resulting from the contribution of the Property to SPV KN.

Any payments under this Clause 5.6.4(ii) will be considered to be Share Purchase Price adjustments.

(iv)   In the event that the Retention falls below the amount of CZK 31,500,000 (thirty one million five hundred thousand Czech Crowns) then the Seller and/or Kotva and/or KAS shall, within twenty (20) Business Days of the level falling below CZK

31,500,000 (thirty one million five hundred thousand Czech Crowns), ensure that sufficient funds are paid in to the Escrow Account to bring the level back up to at least CZK 31,500,000 (thirty one million five hundred thousand Czech Crowns).

(v)    The Seller and Buyer will agree to adjust the Share Purchase Price by deducting from the Share Purchase Price payable to the Seller and release to the Buyer one half of the difference between CZK 177,250,000 (one hundred and seventy seven million two hundred and fifty thousand Czech Crowns ) and the actual annual income due in accordance with the true and accurate Rent Roll as existing at the Closing Date in respect of the Property, excluding the Service charge, as agreed between the Seller and the Buyer not more than 2 Business Days prior to the Closing Date.

(vi)   For the avoidance of doubt, the sums referred to in this Clause 5.6.4 of this Agreement may be released to the Buyer upon the Buyer's sole request and shall be deposited in such account as the Buyer shall, in its own discretion, determine.

5.6.5    If the conditions under this Agreement or under the Escrow Agreement for releasing any funds from the Escrow Account to either of the Seller or the Buyer have been validly satisfied, save in respect of any monies to be released pursuant to Clause 5.6.4, the other party shall, upon a written invitation by the other party, countersign a joint instruction or any other document contemplated by the Escrow Agreement and deliver it to the other party within five days of the invitation being delivered. If the appropriate party does not satisfy the aforementioned obligation in a due and timely manner. it shall pay to the other party a contractual penalty of CZK 157,500,000 (one hundred and fifty-seven million five hundred thousand Czech Crowns).

5.6.6    Kotva and the Seller hereby confirm that the Fixtures & Fittings will remain at the Building following Closing and will become, if not already, the property of SPV KN.

## 6    Representations, Warranties and Obligations and Undertakings of KAS, Kotva and the Seller

KAS, Kotva and the Seller represent and warrant that the following representations and warranties contained in this Section 6 are true, correct and complete as at the date of signing this Agreement and Kotva, the Seller and KAS undertake to maintain them true, correct and complete during the entire term of effectiveness of this Agreement and to comply with all the obligations and undertakings contained in this Section 6 during the entire term of effectivness of this Agreement until Closing and in respect of those obligations and undertakings specified in Clause 6.5, for five years following the Closing Date:

6.1    General

(I)    Kotva, SPV KN, the Seller and KAS have been duly established and incorporated under the respective laws, being Czech, Czech, Cypriot and

Czech, and the share capital has been fully paid up in respect of each of them.

(ii)     None of Kotva, SPV KN, the Seller or KAS has been declared bankrupt nor, and to the best their Knowledge, has any person delivered a petition for bankruptcy.

(iii)    There is no Proceeding in progress, pending or Threatened against or relating to Kotva, SPV KN or the Seller or KAS except for the Gilroy Case and the 'Balfinder litigation' and there is no circumstance, matter or thing which might give rise to any such Proceeding by Kotva or SPV KN or the Seller or KAS or any shareholder thereof or any third party or to any governmental investigation relative to it, nor is there outstanding against Kotva or SPV KN or Seller or KAS any regulation, judgement, decree, injunction, rule or Order of any court, Governmental Body or arbitrator which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable.

(iv)     None of Kotva, SPV KN, or the Seller nor KAS nor any of their directors and managers have committed any offence or failed to comply with any applicable Law which might give rise to any fine, penalty, default or commencement of Proceeding or any other liability which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable.

(v)      None of Kotva, SPV KN, or the Seller nor KAS is in default or breach of Organisational Documents or any licence, Governmental Authorisation, Contract or other instrument to which it is a party or by which it may be bound and there exists no state of facts which after notice or lapse of time, or both, would constitute such a default or breach, and all such licences, Governmental Authorisations, Contracts and documents are in good standing and Kotva, SPV KN or the Seller or KAS, as the case may be, are entitled to all benefits there under and none of Kotva. SPV KN, or the Seller or KAS have Knowledge of any of the above which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable.

(vi)     Kotva and SPV KN and KAS are Tax resident only in the Czech Republic and will remain so (whilst under the control of the KAS Group) until at least five years from the Closing Date and neither Kotva nor SPV KN nor KAS has any Tax Liabilities whether actual or contingent in jurisdictions other than in the Czech Republic

(vii)    The Seller is tax resident of Cyprus.

(viii)   The corporate records supplied to Markland during Due Diligence contain complete and accurate records of all minutes of meetings held and all resolutions adopted by Kotva and in general meetings since SPV KN's incorporation and neither Kotva nor KAS have any Knowledge of any defects in the above or breaches thereof, or in the corporate governance of KAS, which would make this Agreement or the transactions contemplated in this Agreement invalid. void or voidable

---

KC 1-2661

(ix)     Kotva and the Seller have supplied the Buyer and/or Markland with all complete and accurate records of all minutes of meetings held and all resolutions adopted by SPV KN since its incorporation.

(x)      The books and records of Kotva and SPV KN fairly and correctly set out and disclose in all material respects the financial position of the Business of Kotva and all material financial transactions relating to the Business have been accurately recorded in such books and records since its incorporation and Kotva has no Knowledge of a breach of any of the above.

(xi)     None of Kotva, SPV KN, or the Seller or KAS is a party to any valid written or verbal Contract or any other document under the terms and conditions of which the performance by the Seller of this Agreement would result in the breach of an obligation, or might provide a reason for the termination or invalidity of this Agreement or the transactions contemplated in this Agreement, or which might preclude Kotva, SPV KN or the Seller or KAS from performing their obligations hereunder.

(xii)    With respect to the Property, SPV KN will not execute any new lease without the prior written consent of the Buyer, such consent not to be unreasonably withheld or delayed. If a response to such a request is not given by the Buyer within 10 Business Days of its delivery, this will be deemed consent to the execution of the new lease.

(xiii)   The Seller, SPV KN. Kotva shall not extend or agree to extend any existing lease without the prior written Consent of the Buyer, such consent not to be unreasonably withheld or delayed. If a response to such a request is not given by the Buyer within 10 Business Days of its delivery, this will be deemed consent to the extension of the existing lease.

(xiv)    All Consents necessary to fulfil the obligations of Kotva, SPV KN, the Seller or KAS to complete the SPV Conclusion and the connsumation of the transactions contemplated by this Agreement shall be provided by the Seller, SPV KN or by Kotva to the Buyer as soon as practicable after they are available.

(xv)     Kotva and/or SPV KN shall permit any Person nominated by Markland or the Buyer to oversee the day-to-day management of the Property which, for the avoidance of doubt, shall mean the internal management of the Kotva shopping centre by the on-site retail manager. Kotva and/or SPV KN undertake to provide assistance, advice and all information necessary to enable such Person to effectively learn the current management structure of the Property.

(xvi)    That in relation to those persons currently employed by Kotva or by the Seller there are no written Contracts of employment, mandate, consultancy or similar agreements with any employee, director or consultant of Kotva or of the Seller which are to be transferred to the Buyer or SPV KN on Closing either by operation of law or by virtue of any provision contained within any such employment agreements. Kotva and the Seller shall remain fully liable for all claims of redundancy payments or protective awards and for any liability, direct or indirect. resulting from the unfair or wrongful dismissal of any employee and shall fully and effectually indemnify. and continue to

keep indemnified, the Buyer in respect of any costs or expenses which may arise in connection therewith.

(xvii)   The Seller and Kotva undertakes to ensure that, in relation to SPV KN, the entry into or completion of this Agreement will not directly or indirectly cause or contribute to the disallowance or non-availability of any Tax benefit or relief (whether by way of deduction, reduction, set-off, exemption, allowance or otherwise) from, against or in respect of which any Tax could or may be effectively reduced withdrawn, postponed, restricted or waived as a result of entry into or completion of this Agreement.

(xviii)  As at the Closing Date neither SPV KN nor the Seller will have any joint or several liability in respect of any Tax incurred by or due from any other Person, as a transferee or successor, by contract, or otherwise.

(xix)    Concerning SPV KN and/or the Seller, full liability has been accounted for or full provision or reserve has been made in the Financial Statements for all Taxes liable to be assessed or for which SPV KN is or may become accountable. Proper provision, reserve or liability for deferred Tax has been made in the Financial Statements.

(xx)     No income or revenue in relation to SPV KN (as computed for Tax purposes) will arise or accrue in consequence of cancellation of provisions or reserves which have been claimed as deductions or charges for Tax purposes in computing profits (tax base) or loss carry-forwards (as computed for Tax purposes), other than income against which corresponding expense allowable as deductions or charges for Tax purposes in computing profit (tax base) or loss carry-forwards (as computed for Tax purposes), (e.g. write-off of a receivable or expenses incurred on repairs of tangible assets) can be set-off.

(xxi)    Kotva shall procure that as at the Closing Date all of the accounts, books and records of SPV KN will be fully, properly and accurately up-to-date from the incorporation of each entity respectively, and will be maintained at a place and in a form that complies with the Commercial Code and all applicable Laws of the Czech Republic. All accounts, documents, reports and returns required by Law to be delivered or made to any Governmental Body will have been duly and correctly delivered or made by representatives of SPV KN and the Seller and will be delivered to the Buyer.

(xxii)   Kotva shall procure that as at the Closing Date neither SPV KN nor the Seller will have any outstanding or undisclosed Taxes that were incurred on or before the Closing Date. SPV KN and the Seller have complied with all applicable Laws, rules and regulations relating to the payment and withholding of all Taxes. If the above mentioned declarations of the Seller prove to be incorrect the Seller shall immediately rectify this situation or shall immediately settle the tax for SPV KN or the Seller.

(xxiii)  Enforceability; No Conflict

(a)   Kotva, SPV KN, KAS and the Seller have the absolute and unrestricted right, power, and authority to execute and deliver this

Agreement and to perform their obligations under this Agreement, which actions have been duly authorised and approved by all necessary corporate actions of Kotva and the Seller and KAS, where relevant. This Agreement constitutes the legal, valid, and binding obligation of Kotva, KAS and the Seller, and is enforceable against Kotva, KAS and the Seller in accordance with its terms.

(b)    Neither the execution nor the delivery of this Agreement by Kotva, KAS and the Seller, nor the consummation or performance of any of the contemplated Transactions by Kotva, KAS or by the Seller where relevant, will directly or indirectly (with or without notice or lapse of time), contravene any Contract to which Kotva, KAS or the Seller is a party or by which Kotva, KAS or the Seller may be bound, any Governmental Authorisation, Legal Requirement, or Order to which the Seller may be subject, any provision of Kotva's, KAS' or the Seller's Organisational Documents, or any resolution adopted by the board of directors or the shareholders of Kotva, KAS or the Seller, which was not disclosed to the Buyer during Due Diligence.

(xxiv)    The Seller or Kotva (whoever is legally responsible) undertakes to enter into any and all documents and agreements, within 20 Business Days of the request of the Buyer, following the Closing to:

(a)    permit the merger of SPV KN with the Buyer under the Laws of the Czech Republic;

(b)    sign and/or issue any document as requested by the Buyer or Markland which can speed up the process of the merger referred to in (a) above (e.g. waiver of right to receive various reports on merger);

(c)    waive any rights to any increased shareholding in the merged company or to any compensation payments upon the merger by reason of the dilution of shares or for any other reason; and

(d)    ensure the continued operation of SPV KN or the merged company including any shareholders agreements.

(xxv)    Kotva will advise Markland and the Buyer of any adverse or potential adverse economic situation of Kotva or KAS.

6.2    Kotva and/or the Seller (once it becomes the owner of the Shares) are obliged or undertake to procure that:

(i)    The Board of Directors of SPV KN will obtain the prior written approval of Markland, such approval not to be unreasonably withheld, before carrying out anything not in the Ordinary Course of Business.

(ii)    The following activities shall not be carried out without the prior written approval of Markland:

(a)    amendment, modification or supplementation of the Organisational Documents of Kotva, the Seller or SPV KN;

(b)    the liquidation, dissolution or winding-up of Kotva, KAS or SPV KN;

(c)    the merger, consolidation, transformation or division of SPV KN; or

(d)    the change or agreement to change of the share capital of SPV KN (whether by consolidation, sub-division, purchase, redemption, cancellation, allotment or issuance of any shares), the grant of any option over, or issuance of any instrument carrying rights of conversion into, any of its shares.

6.3    Kotva and the Seller (once it becomes owner of the Shares) are obliged or undertake to procure that SPV KN does not without the prior written approval of Markland:

(i)    dispose of or transfer control of or interest in all or any material part of its business, property or assets, whether by a single transaction or series of related transactions, or acquire any business, property or assets which would, following such acquisition, constitute a material part of its Business, property or assets (for these purposes, any business, property or asset accounting to CZK 31,500 (thirty one thousand five hundred Czech Crowns) or any business. property or asset with a fair market value of CZK 31,500 (thirty one thousand five hundred Czech Crowns) or more shall be deemed material);

(ii)    change or agree to change its share capital (whether by consolidating, subdividing, purchasing, redeeming, cancelling, allotting or issuing any shares), or grant any option over, or issue any instrument carrying rights of conversion into, any of its shares;

(iii)    commence any new business not being reasonably ancillary or incidental to the Business;

(iv)    replace its auditors;

(v)    enter into, modify or terminate any Contract or make any payment that: (a) involves or will involve obligations or potential obligations that, because of their nature or significance, are or will be deemed to be unusual or extraordinary for companies engaging in activities similar to the Business; (b) is or will be otherwise than at arms length and on the best terms reasonably obtainable; or (c) is in excess of CZK 31,500 (thirty one thousand five hundred Czech Crowns);

(vi)    give any guarantee or indemnity, other than in the normal course of business in relation to the supply of goods or services, which is in excess of CZK 31,500 (thirty one thousand five hundred Czech Crowns);

(vii)    make any loan, or create any borrowings or other indebtedness in the nature of borrowings;

(viii)    acquire or incorporate any subsidiary or acquire or dispose of shares (except the Shares in accordance with this agreement), equity interests or loan stock in any Person or enter into any joint venture, partnership or consortium arrangement;

KC 1-2665

(ix)    permit its interest in any Person to be diluted (whether by a disposal of shares held by it or by a new issue of shares);

(x)    declare any dividend or make any other distribution in respect of its shares, whether in cash or otherwise; nor

(xi)    determine the compensation payable by SPV KN to any officer or Director.

**6.4    Monthly Reports**

Kotva and/or the Seller shall procure that the Directors of SPV KN provide to Markland, no later than the fifteenth (15th) day of each calendar month, a report detailing the activities of SPV KN

**6.5    Transfers**

Kotva and the Seller, once it becomes a shareholder of SPV KN, shall procure that from the date of this Agreement until five years following the Closing Date, no shares in SPV KN owned by Kotva or the Seller are transferred (including by way of sale of enterprise, merger or winding-up) to a third party and no Encumbrance may be created over those shares except in accordance with and subject to the provisions of this Agreement  For the duration of this Agreement SPV KN must not, without the prior written consent of the Buyer, suffer a Change of Control.

## 7    Representations, warranties and Obligations and Undertakings of the Buyer and of Markland

The Buyer and Markland represents and warrants that the following representations and warranties are true, correct and complete as at the date of signing this Agreement and the Buyer and Markland undertake to maintain them true, correct and complete during the effectiveness of this Agreement up to Closing:

**7.1    Organisation**

The Buyer and Markland are duly established and incorporated and their share capitals have been fully paid up

**7.2    Enforceability; No Conflict**

7.2.1    The Buyer and Markland have the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and to perform their obligations under this Agreement, which obligations have been duly authorised and approved by all necessary corporate actions of the Buyer and Markland. This Agreement constitutes the legal. valid, and binding obligation of the Buyer and Markland, and is enforceable against the Buyer and Markland in accordance with its terms.

7.2.2    Neither the execution nor the delivery of this Agreement by the Buyer and by Markland nor the consummation or performance of any of the Contemplated Transactions by the Buyer or Markland will directly or indirectly (with or without notice or lapse of time), contravene any Contract to which the Buyer and/or Markland is a party or by which the Buyer and/or Markland may be bound, any Governmental Authorisation, Legal Requirement, or Order to which the Buyer and/or Markland may be subject,

any provision of their Organisational Documents, or any resolution adopted by the board of directors or the shareholders of the Buyer and/or Markland.

7.2.3   General

(i)     The Buyer and Markland have not been declared bankrupt nor, to the best Knowledge of the Buyer and Markland, has any person delivered a petition for bankruptcy in relation to it.

(ii)    There is no Proceeding in progress, pending or Threatened against or relating to the Buyer and Markland and there is no circumstance, matter or thing to the Knowledge of the Buyer and Markland which might give rise to any such Proceeding by a third Person or any shareholder thereof, nor to any governmental investigation relative to it, nor is there outstanding against the Buyer and Markland any regulation, judgement, decree, injunction, rule or order of any court, Governmental Body or arbitrator.

(iii)   The Buyer and Markland are not in default or breach of their Organisational Documents or any Contract to which they are a party or by which they may be bound and there exists no state of facts which after notice or lapse of time, or both, would constitute such a default or breach, and all such documents and Contracts are in good standing and the Buyer and Markland are entitled to all benefits thereunder.

(iv)    Markland is tax resident in the Republic of Ireland and the Buyer is tax resident in the Czech Republic.

(v)     The corporate records of the Buyer and Markland contain complete and accurate records of all minutes of meetings held and all resolutions adopted by the Buyer and/or Markland in general meetings since their incorporation and the Buyer and/or Markland have no knowledge of any of the above that might make this Agreement invalid, void or voidable.

(vi)    The books and records of the Buyer and Markland fairly and correctly set out and disclose in all material respects the financial position of the business of the Buyer and Markland and all material financial transactions relating to the business have been accurately recorded in such books and records since their incorporation and the Buyer and/or Markland have no Knowledge of a breach of any of the above.

(vii)   The Buyer and Markland are not a party to any valid written or verbal Contracts or any other document under the terms and conditions of which the performance by the Buyer and/or Markland of this Agreement would result in the breach of an obligation, or might provide a reason for the termination or invalidity of this Agreement, or which might preclude the Buyer and/or Markland from performing their obligations hereunder.

(viii)  All Consents and other co-operations necessary to fulfil this Agreement by the Buyer and Markland shall be provided by the

Buyer and Markland to the Seller and to the KAS Group upon their written request thereof

(ix)     The Buyer is obliged to conclude a Transfer Deed and trademark transfer agreements in accordance with Clause 5.1 and 5.2 and take over the Shares in accordance with Clause 5.5.

**7.3**    **Due Diligence**

Markland represents that during Due Diligence it had an option to ask for and did ask for information concerning the Property, Kotva and other members of the KAS Group and that the documents provided were and still are represented by Kotva and KAS to be satisfactory and of a standard to enable Markland and the Buyer to enter into this Agreement including their willingness to pay the Purchase Price subject to such retentions as are made hereunder. The Buyer and Markland agree that, on the basis of the information provided to them by the Sellers, the Purchase Price is reasonable and corresponds to the value of the Shares and the Kotva Trademark

## 8    Share Purchase Price Adjustment and Remedies

**8.1**    Survival; Right to Share Purchase Price Adjustment; Waiver

All obligations and undertakings and Share Purchase Price adjustment obligations in this Agreement and its Schedules, and any other certificate or document delivered pursuant to this Agreement will survive the Closing until the expiration of the relevant limitation period, i.e. preclusion or statutory limitations. Any claim by a Party based on a breach of any undertakings, representation or warranty made pursuant to this Clause 8.1 must be submitted to the breaching party prior to the expiration of the applicable limitation period. The right to Share Purchase Price adjustment, payment of damages or other remedy based on a breach such representations, warranties, covenants, and obligations will not be affected by any investigation conducted with respect to, or any Knowledge acquired (or capable of having been acquired) about, the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to Share Purchase Price adjustment, payment of damages, or other remedy based on such representation, warranty, covenant, or obligation

**8.2**    Share Purchase Price adjustment and Payment of Damages by Kotva

Kotva and the Seller shall jointly and severally reimburse and hold harmless Markland and the Buyer and the members of their Boards of Directors (collectively, the "**Markland's Indemnities**"). and shall pay (by way of deducting from the Share Purchase Price payable by the Buyer) to the relevant Markland's Indemnities the monetary value of any Adverse Consequence arising directly or indirectly, from or in connection with:

(a)     any breach of any representation, warranty covenant, obligation or undertaking made by Kotva and/or the Seller and /or KAS in this Agreement, or any other certificate or document delivered by Kotva and/or KAS and/or by the Seller pursuant to this Agreement;

---

KC 1-2668

(b)    any Liabilities of SPV KN existing at or arising out of a state of facts existing at or before the Closing Date, to the extent that such Liabilities are not reflected or reserved against in the Financial Statements;

(c)    any claim by any Person for brokerage or finder's fees or commissions or similar payments from the Seller, SPV KN or SPV CO in connection with any of the Contemplated Transactions; and

(d)    any and all Threatened or implemented Proceedings, demands or assessments incidental to any of the matters set forth in this Clause 8 2(a) to (c).

**8.3**    Share Purchase adjustment and Payment of Damages by Markland

The Buyer and Markland shall jointly and severally reimburse and hold harmless Kotva, the Seller, KAS Group, SPV KN and the members of the boards of directors of the aforementioned companies (the "**Kotva's Indemnities**"), and shall pay (by way of increasing the Share Purchase Price payable by the Buyer) to Kotva's Indemnities the monetary value of any Adverse Consequence arising directly or indirectly, from or in connection with:

(a)    any breach of any representation, warranty covenant, obligation or undertaking made by Markland or by the Buyer in this Agreement or in any certificate delivered by Markland or by the Buyer pursuant to this Agreement; and

(b)    any and all Threatened or implemented Proceedings, demands or assessments incidental to any of the matters set forth in Clause 8 3(a) above.

**8.4**    Procedure for Share Purchase Price adjustment

(a)    Immediately after: (i) receipt by an Indemnified Person of notice of the assertion of a third-party claim against it; or (ii) the Indemnified Person becoming aware that it has suffered an Adverse Consequence entitling it to a Share Purchase Price adjustment, the Indemnified Person will, if a claim is made against such Indemnified Person, give notice to the Indemnifying Person of the assertion of such claim or the Adverse Consequence as the case may be. An Indemnified Person's failure to notify an Indemnifying Person will not relieve the Indemnifying Person of any Liability that it may have to the Indemnified Person.

(b)    A claim for Share Purchase Price adjustment originates by the expiration of the protection time limit according to Clause 8 5, at which moment the sum payable under the Share Purchase Price adjustment shall be paid promptly by the Indemnifying Person to the Indemnified Person.

**8.5**    If any of the Parties discovers a Threatened Adverse Consequence to it for a reason which would entitle the another Party to Share Purchase Price adjustment or to withdraw from this Agreement, that Party shall notify the others accordingly. The Party who would but for the terms of this Clause 8 5 be the Indemnifying Party then has a protection time limit lasting 25 (twenty five) Business Days from the date of the delivery of the notification to remove the fact causing falsehood of the representation or remedy the breach of its obligation. If such Party does not do so, it is obliged to

pay to the other Party upon expiration of the protection time limit sufficient and full compensation for the Threatened or newly discovered Adverse Consequence. If later the Adverse Consequence does not materialise the Party receiving the compensation is obliged to return it.

8.6 In the event that an Adverse Consequence is discovered, Kotva or the Seller shall remedy such situation as soon as possible following the discovery but in any event shall do so prior to Closing. If at Closing the Adverse Consequence still exists, the Buyer shall be entitled to deduct the amount of the Adverse Consequence from the Share Purchase Price.

8.7 Any payments made under this Clause 8 hereof shall be treated as an adjustment to the Share Purchase Price paid by the Buyer for the Shares under the terms of the Agreement, with the exception of any contractual penalty payable hereunder.

8.8 All sums payable by the Seller to the Buyer under this Agreement shall be paid free and clear of all deductions, withholdings, set-offs or counterclaims whatsoever save only as may be required by Law. If any deductions or withholdings are required by Law the Seller shall be obliged to pay to the Buyer such sum as will after such deduction or withholding has been made leave the Buyer with the same amount as it would have been entitled to receive in the absence of any such requirement to make a deduction or withholding.

8.9 If any Tax authority charges to Tax any sum paid to the Buyer under this Agreement then the amount so payable shall be grossed up by such amount as will ensure that after payment of the Tax so charged, or which would have been so charged if any relief available to the Buyer were ignored, there shall remain a sum equal to the amount that would otherwise be payable under this Agreement.

## 9    Post - Closing Confidentiality Duty

9.1 For the purpose of this Agreement, confidential or proprietary information ("**Proprietary Information**") shall mean the information created, transferred, recorded or employed as part of, or otherwise resulting from the activities undertaken pursuant to this Agreement or the Schedules hereto which constitutes the confidential, proprietary or trade secret information of the disclosing Party. Proprietary Information of Kotva shall also include Proprietary Information of SPV KN and/or the Seller. Such information may be of, but not limited to, a business, organisational, technical or financial nature. The Parties understand and agree that all Proprietary Information of a disclosing Party shall be treated as confidential by the receiving Party. Each receiving Party shall use the same degree of care as it uses with regard to its own Proprietary Information to prevent disclosure, use or publication of the disclosing Party's Proprietary Information.

9.2 Proprietary Information of the disclosing Party shall be held by the receiving Party as described in Clause 9.1 unless it is or has been:

(i)     obtained legally and freely from a third Person without restriction;

(ii)    independently developed by the receiving Party at a prior time or in a separate and distinct manner without benefit of any of the Proprietary Information of the disclosing Party and documented to be as such;

(iii)    made available by the disclosing Party for general release;

(iv)    made public as required by Law, applicable regulations or Order or stock exchange requirements; and

(v)    within the public domain or later becomes part of the public domain as a result of acts by someone other than the receiving Party and through no fault or wrongful act of the receiving Party.

9.3    A receiving Party may disclose Proprietary Information of a disclosing Party to directors, officers, and employees of the receiving Party or agents of the receiving Party including their respective brokers, lenders, insurance carriers or prospective purchasers who have specifically agreed in writing to nondisclosure of the terms and conditions hereof. Any disclosure hereof required by legal process pursuant to Clause 9.2(v) shall only be made after providing the disclosing Party with notice thereof in order to permit the disclosing Party to seek an appropriate protective order or exemption.

9.4    The provision of this Clause 9 shall be effective for a period of two years following the Closing Date.

9.5    If a court of competent jurisdiction determines that the length of time or any other restriction or portion thereof set forth in this Clause 9 is unduly restrictive and thereby unenforceable, such restriction shall be interpreted and applied to include as much of the restriction as will render the covenants in this Clause 9 valid and enforceable to the fullest extent permitted by applicable Law, and as so interpreted and applied such covenants shall remain in full force and effect. The Parties further agree that if a court of competent jurisdiction determines that any provision of this Clause 9 is invalid or against public policy, the remaining provisions of this Clause 9 shall not be affected thereby, and shall remain in full force and effect.

## 10    Termination

10.1    Markland and/or the Buyer shall be entitled to withdraw by written notice to Kotva or to the Seller from this Agreement only if: (i) there is a breach of the Kotva's or Seller's representations, warranties, obligations or undertakings in accordance with Clause 6 and the protection time limit in accordance with Clause 8.5 of this Agreement expires, or in other cases of a breach of the Kotva's or Seller's representations, warranties or obligations where this Agreement entitles Markland or the Buyer to withdraw from the contract; (ii) if either SPV Conclusion has not taken place by 31 January 2005, save in the event of Force Majeure, including inactivity of a relevant Governmental Body or through the fault of a third party that is not either directly or indirectly controlled by the Seller; or (iii) if Closing has not occurred by 31 March 2005 provided that no breach of this Agreement by the Buyer or Markland will have occurred by then.

10.2    If Markland and/or the Buyer withdraw from this Agreement pursuant to Clause 10.1 the Buyer shall be entitled (in addition to and without prejudice to all other rights or remedies available to it including the right to claim damages) to:

10.2.1    the return of the Deposit and, if appropriate the Purchase Price in accordance with the terms of the Escrow Agreement; and

10.2.2   a contractual penalty amounting to CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied firstly from the Security and then from other funds of the Seller as necessary.

10.3   Failure to exercise this right in accordance with Clause 10.2 shall not constitute a waiver of any other right of Markland and/or the Buyer arising out of any breach of the obligations and undertakings of Kotva and/or the Seller

10.4   Kotva and/or the Seller are entitled to withdraw from this Agreement by serving written notice on Markland and the Buyer if it shall be found that any of the representations and warranties of Markland and/or the Buyer in accordance with Clause 7 was untrue at the date of execution of this Agreement or by the Closing Date, and the protection time limit according to Clause 8.5 of this Agreement expires or in other cases of breach of Markland's or Buyer's obligations where the Seller is entitled to withdraw from this Agreement

10.5   In the event of failure by Kotva and/or the Seller to satisfy the SPV Conclusion by 31 January 2005, Markland and/or the Buyer may withdraw from this Agreement by serving five Business Days notice on the Seller and Kotva and the Buyer shall be entitled to a contractual penalty of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns). to be satisfied firstly from the Security and then from other funds of Kotva and/or of the Seller as necessary

10.6   If Kotva and/or the Seller withdraws from this Agreement pursuant to Clause 10.4 the Seller will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty in accordance with the relevant term of this Agreement of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) in case this Agreement does not set other contractual penalty to be satisfied firstly from the Deposit and then from other funds of Markland as necessary.

10.7   Failure to exercise this right in accordance with Clause 10.6 shall not constitute a waiver of any other right of Kotva and/or the Seller arising out of any breach of the obligations and undertakings of Kotva and/or the Buyer, however, settling the agreed contractual penalty causes the right to Share Purchase Price adjustment and possible other right to indemnification or damages against Markland and/or the Buyer to cease.

10.8   If Closing does not occur within the time limits envisaged in this Agreement (other than due to the fault of the Buyer or Markland), then the Buyer will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) to be satisfied firstly from the Security and then from other funds of Kotva, SPV KN and/or the Seller as necessary.

10.9   If Closing does not occur within the time limits envisaged in this Agreement (other than due to the fault of the Seller or Kotva), then the Seller will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) to be satisfied firstly from the Deposit and then from other funds of Markland as necessary

**10.10** The Parties are not entitled to the contractual penalties as above, if the other party does not comply with this Agreement due to the event of Force Majeure, including inactivity of a relevant Governmental Body or through the fault of a third party that is not either directly or indirectly controlled by Kotva, the Seller or the Buyer.

**10.11** In the event (i) that the breach of obligations of the Seller or of Kotva does not cause an Adverse Consequence or (ii) if the Seller or Kotva fully indemnifies the Buyer or Markland during the protection time limit stated in Clause 8.5, then Markland and/or the Buyer shall not be entitled to withdraw from this Agreement or claim a contractual penalty.

## 11    General Provisions

### 11.1    Expenses

Except as otherwise expressly provided in this Agreement, each Party will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of its Representatives.

### 11.2    Public Announcements

Any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued at such time and in such manner as the Parties mutually determine. None of the Parties will make any disclosure of the Purchase Price or other terms of the Contemplated Transactions to any Person, except with the prior written consent of the other Parties or as required by Legal Requirements or by law. The Parties will consult with each other concerning the means by which the Kotva's employees, customers and others having dealings with Kotva or the Seller will be informed of the Contemplated Transactions, and the Parties will have the right to be present for any such communication, if possible.

### 11.3    Notices

All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed given to a Party when: (a) delivered to the appropriate address by hand or by nationally recognised overnight courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment (subsequently delivered in written form within five days); or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested; in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number, e-mail address or individual as a Party may designate by notice to the other Parties):

**Kotva, KAS, KO and the Seller:**

Kotva NEMOVITOSTI, k.s.

| | |
|---|---|
| Address: | Příkop 4. Brno. Post Code 602 00 |
| Fax: | +420 224 801 230 |
| Tel: | +420 224 801 401 |
| Attention: | Martin Benda |

copy to

KC I-2673

Toman, Devátý and Partneři
Address:      Trojanova 12, 120 00 Prague 2
Fax:          +420 224 920 468
Tel:          +420 224 918 490
Attention:    Petr Toman

and

**Markland and the Buyer:**

Markland Holdings Limited
Address:      19 Upper Fitzwilliam Street, Dublin 2, Republic of Ireland
Fax:          00353 167 620 00
Tel:          00353 167 620 23
Attention:    Henry Prestage/Frank Walker/Aidan Scully

copy to

Linklaters v.o.s.
Address:      Palác Myslbek, Na Příkopě 19, 117 19 Praha
Fax:          +420 221 622 199
Tel:          +420 221 622 111
Attention:    Bryan Wilson

**11.4    Further Assurances**

The Parties agree:

11.4.1    to furnish, upon request, each other with such further information as requested;

11.4.2    to execute and deliver to each other such other documents; and

11.4.3    to do all such other acts, as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Contemplated Transactions.

**11.5    Incorporation of Schedules**

The Schedules identified in this Agreement are incorporated herein by reference and made a part of this Agreement.

**11.6    Entire Agreement and Modification**

This Agreement supersedes all prior agreements among the Parties with respect to its subject matter and constitutes (along with the documents delivered pursuant to this Agreement) a complete and exclusive statement of the terms of the agreement between the Parties regarding its subject matter. In the case of any inconsistency between the terms of this Agreement and the terms of the Transfer Deed or the KOTVA Trademarks transfer agreement, the terms of this Agreement shall prevail. This Agreement may not be amended, supplemented or otherwise modified except by a written agreement executed by all the Parties.

**11.7    Acknowledgement**

Markland and the Buyer acknowledge that they have not been induced to enter into this Agreement by any representation, warranty or undertaking not expressly

KC 1-2674

incorporated into it. Parties to this Agreement confirm that they have received independent legal advice relating to all the matters provided for in this Agreement, including the provisions of this Clause 11.7, and agrees, having considered the terms of this Clause 11.7 and the Agreement as a whole, that the provisions of this Clause 11.7 are fair and reasonable.

**11.8**    Time of the Essence

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**11.9**    Severability

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable. However, the transfer of the Shares and the transfer of KOTVA Trademarks are mutually dependant transactions pursuant to Section 275 (2) of the Commercial Code.

**11.10**    Assignments, Successors, and No Third Party Rights

No Party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Parties, such consent not to be unreasonably withheld, except that Markland may assign without the other Parties' consent any of its rights and delegate any of its obligations under this Agreement to any Related Person or any subsidiary of Markland or to any subsequent acquirer of the Shares or of all or substantially all of the business of the Buyer or any Related Person. This Agreement will apply to, be binding in all respects upon, and inure to the benefit of each of the Kotva's and/ or Seller's successors and permitted assigns and Markland's and/or the Buyer's successors and permitted assigns (whether by merger, consolidation, purchase of all or substantially all of its assets or otherwise). The Buyer will indemnify and hold harmless the Seller and KAS, and will pay to the Seller's Indemnities the monetary value of any Adverse Consequence arising, directly or indirectly, from or in connection with any breach of such a Buyer's successor. Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the Parties, any right, remedy, or claim under or with respect to this Agreement or any its provision except the rights as shall inure to a successor or assignee pursuant to this Clause 11.10.

**11.11**    Waiver

The rights and remedies of the Parties are cumulative and not alternative. Neither any failure nor any delay by any Party in exercising of any right, power, or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable Law, (a) no claim or right arising out of this Agreement or any of the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Party, and (b) no waiver that

KC 1-2675

may be given by a Party will be applicable except in the specific instance for which it is given.

**11.12** Arbitration

This provision shall apply to all and any dispute or difference that may arise in connection with or the interpretation, performance or termination of this Agreement between the Parties, as well as the validity or settlement of this Agreement and of the relationship established by this Agreement (the "**Dispute**"). The Parties shall make every effort to resolve any Dispute out of court, if possible. If they are unable to reach an out-of-court settlement, any of the Parties shall have the right to file a petition for the Dispute to be resolved before the Court of Arbitration attached to the Economic Chamber of the Czech Republic and the Agrarian Chamber of the Czech Republic in accordance with Acts nos. 216/1994 Coll., as amended, and 223/1994 Coll., as amended, under said Court's Rules of Arbitration, by three arbitrators. The language of the proceedings shall be Czech and the venue of the proceedings shall be Prague. The chairman of the arbitration tribunal shall be authorised to decide on procedural issues at his own discretion. If the disputing Parties reach conciliation before the above Court as part of the arbitration proceedings, no justification needs to be attached to the arbitral award that will endorse the conciliation between the disputing Parties. The Party that is defeated in such a Dispute shall reimburse the other Party for all of its legal expenses in addition to the costs of the arbitration proceedings adjudicated to it by the arbitration tribunal. In proceedings before the above Court of Arbitration, the Parties shall take an active attitude and shall be helpful to the Court in the resolution of the Dispute, especially as regards giving explanations, furnishing evidence and documents, etc., and shall acknowledge its arbitral award without any reservations, and shall carry out the arbitral award voluntarily. If a Party refuses to carry out the arbitral award referred to in the preceding sentence, the other Party has the right to file a petition for the execution of the decision with the court of law having jurisdiction over the place and merit of the dispute.

**11.13** Governing Law

This Agreement will be governed by and construed under the laws of the Czech Republic without regard to its conflicts of law principles, in particular the Czech Commercial Code.

**11.14** Counterparts

This Agreement will be executed in four counterparts, each of which will be deemed to be an original copy of this Agreement and which, when taken together, will be deemed to constitute one and the same document. The Agreement is executed in the English (2 counterparts) and Czech (two counterparts) languages, and the Czech language version shall prevail.

The Parties have executed this Agreement as of the date indicated in the first sentence of this Agreement.

By:

**Seller:**

---

A04677559/1 4/22 Dec 2004

KC 1-2676

**SPV CO Limited**


Name:

Title:


By:

**KOTVA NEMOVITOSTI k. s.**


Name:

Title:


By:

**KOTVA a.s.**

Name:

Title:


By:

**KOTVA OBCHODNÍ, a.s.**


Name:

Title:


By:

**Buyer:**

**CRQ Czech a.s.**


**Name:**

**Title:**


By:

**Markland Holdings Limited**


**Name:**

**Title:**

**Schedule 1**
**Extracts from Commercial Register**

**Schedule 2**
**Extract from Companies House**

KC 1-2680

**Schedule 3**
**INTENTIONALLY DELETED**

KC 1-2681

**Schedule 4**
**Extract from Real Estate Register**

**Schedule 5**
**KO Lease**

**Schedule 6**
**Rent Roll**

KC 1-2684

**Schedule 7**
**INTENTIONALLY DELETED**

**Schedule 8**
**INTENTIONALLY DELETED**

**Schedule 9**

**Gilroy Claim**

**Schedule 10**

**Expert Opinion**

**Schedule 11**

**List of Fixtures & Fittings**

ı



Dated     14th February 2005

SPV CO Limited

and

CRQ Czech a s

# AMENDMENT NO. 1 TO SHARE PURCHASE AGREEMENT

relating to the purchase of shares in SPV KN a.s

Linklaters

Palác Myslbek
Na Příkopě 19
117 19 Prague 1

Telephone  (420) 221 622 111
Fax        (420) 221 622 199

Ref  BDXW/L-033253

KC 1-1958



## Amendment No.1 to the Share Purchase Agreement

**Between:**

(1)  **SPV CO Limited**, with its registered office at Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus, company registration no HE 148845, registered in Cyprus (the **"Seller"**), represented by Martin Benda, member of the Board of Directors

(2)  **CRQ Czech a.s.**, with its registered office Prague 1, Národní 1435/6, Post Code 11000, Identification no 27159256, registered in the Companies Register by the Regional Court in Prague, in Part B, File 9394 (the **"Buyer"**), and represented by Frank Walker and Aidan Scully, members of the Board of Directors

(3)  **SPV KN a.s.**, with its registered office in Brno, Příkop 4, Post Code 602 00, Identification no 26910705, registered in the Companies Register by the Regional Court in Brno, in Part B, File 4043 (**"SPV KN"**), represented by Ing Richard Harazim, sole member of the Board of Directors

(4)  **KOTVA NEMOVITOSTI, k.s.**, with its registered office at Příkop 4 Brno Post Code 602 00 Identification no 26229048, registered in the Companies Register by the Regional Court in Brno, in Part A, File 16586 (**"Kotva"**), and represented by KOTVA OBCHODNÍ, a s represented by Ing Michal Vlach, Chairman of the Board of Directors. Ing Jiří Brada member of the Board of Directors, and Ing Pavel Richter, member of the Board of Directors

(5)  **MARKLAND HOLDINGS Limited**, with its registered office at 19 Upper Fitzwilliam Street, Dublin 2, company registration no. 291167 registered under the laws of the Republic of Ireland (**"Markland"**), and represented by Frank Walker and Aidan Scully, directors

(6)  **KOTVA a.s.**, with its registered office at Náměstí Republiky 8, Praha 1, Identification no. 60193808, registered in the Companies Register by the Municipal Court in Prague, in Part B, File 2370 (**"KAS"**), and represented by Marek Kolíbal, Chairman of the Board of Directors A copy of a resolution of the Board of Director made on 22 December 2004 by which Marek Kolíbal has been appointed to the function and the petition on registration of him in the Commercial Register as the Chairman of the Board of Directors is annexed hereto at Schedule 1G; and

(7)  **KOTVA OBCHODNÍ, a.s.**, with its registered office at Příkop 4, Brno, Postal Code 602 00, Identification no 26231735, registered in the Companies Register by the Regional Court in Brno, in Part B, File 3484 (**"KO"**), represented by Messrs Ing Michal Vlach, Chairman of the Board of Directors. Ing Jiří Brada and Ing Pavel Richter members of the Board of Directors

(jointly referred to as the **"Parties"**)

Terms and expressions capitalised and not otherwise defined in this amendment shall bear the same meaning as assigned to them in the Share Purchase Agreement dated 20 December 2004 entered into between the Parties (the **"SPA"**)

**The Parties hereby agree to the following amendment of the SPA (the "Amendment")**

1

1    Amendment of clause 1.2 -- Definition:

1.1    A new definition of the terms "KT", "KT Claim" and "KT Settlement" shall be incorporated into clause 1.2 of the SPA in alphabetical order as follows:

"KT"    means KT, Inc., whose registered seat is at 2711 Centerville Road, Suite 400, City of Wilmington, County of Newcastle, Delaware, USA

"KT Claim"    means the claim that KT lodged on 23 December 2004 with the District Court for Prague 1 under reference number 22 C 239/2004 a copyof which is attached at Schedule 9

"KT Settlement"    means the obtaining of a definitive and final ruling in respect of the KT Claim; for purposes of this Agreement such definitive and final ruling is deemed to be also a final settlement between the parties to the KT Claim, approved by the court or the withdrawal by KT of the KT Claim

2    Amendment of clause 5.6.4 of the SPA:

2.1    The first paragraph of the clause 5.6.4 shall be amended to read:

"The balance of the Share Purchase Price, being the Retention, amounting to CZK 576,450,000 (five hundred and seventy six million four hundred and fifty thousand Czech Crowns), shall be retained by the Escrow Agent until such time as there has been Gilroy Settlement **and KT Settlement**. However, if there has been Gilroy Settlement **and KT Settlement** but either 9 months from the Closing Date have not elapsed or there are Proceedings pursuant to Clause 5.6.4 (i) below, the Escrow Agent shall release the Retention to the Seller less the sum of CZK 189,000,000 (one hundred and eighty nine million Czech Crowns), which shall be retained in the Escrow Account until such time as the Buyer obtains a definitive and final ruling in respect of such Proceedings or the period of 9 months from the Closing Date has elapsed and there are no Proceedings which ever is the later. For the avoidance of doubt, a court decision made on the basis of a valid withdrawal is considered to be a definitive and final ruling."

2.2    The clause **5.6.4 (ii)** shall be amended to read:

"On each regular quarter day, being 1 January, 1 April, 1 July and 1 October, such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending SPV KN under the Gilroy Claim **and/or the KT Claim**, the request of the Buyer for such sums from the Retention must be evidenced by a duly issued invoice from the Buyer's lawyers for the time being. Any payments under this Clause 5.6.4(ii) 0 will be considered to be Share Purchase Price adjustments."

KC 1-1960

2.3    The first paragraph of the clause **5.6.4 (iii)** shall be amended to read:

"*In the event that, under any tax regulations applicable up to the date of Closing, Kotva or SPV KN are assessed with Tax (in particular real estate transfer tax or VAT) in relation to the contribution of the Property, to SPV KN and Kotva, SPV KN or the Seller is liable to pay such Tax to the Financial Authorities, Kotva and the Seller undertakes to compensate SPV KN for such Tax and any corresponding penalty, interest or any other financial payment imposed by the Financial Authorities on SPV KN and such amount of Tax shall be retained in the Escrow Account by the Escrow Agent and shall only be released to the Seller following Gilroy Settlement and KT Settlement upon receipt of the following*"

Whilst the rest of the clause 5.6.4 (iii) stays the same

3    Amendment of clause 6.1 of the SPA:

3.1    The first paragraph of the clause **6.1 (iii)** shall be amended to read:

"*There is no Proceeding in progress, pending or Threatened against or relating to Kotva, SPV KN or the Seller or KAS except for the Gilroy Claim, KT Claim and the 'Balfinder litigation' and there is no circumstance, matter or thing which might give rise to any such Proceeding by Kotva or SPV KN or the Seller or KAS or any shareholder thereof or any third party or to any governmental investigation relative to it, nor is there outstanding against Kotva or SPV KN or Seller or KAS any regulation, judgement, decree, injunction, rule or Order of any court, Governmental Body or arbitrator which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable.*"

4    Amendment of Schedule 9 to the SPA

4.1    Schedule 9 to the SPA shall be amended to include the KT Claim annexed hereto at Schedule 1

4    Counterparts

This Amendment will be executed in four counterparts, each of which will be deemed to be an original copy of this Amendment. The Amendment is executed in the English (2 counterparts) and Czech (two counterparts) languages, and the Czech language version shall prevail

The Parties have executed this Amendment as of the date indicated in the first sentence of this Amendment

By:

Seller:

SPV CO Limited

3

KC 1-1961

Name:       MARTIN BENDA

Title:        DIRECTOR

By:

KOTVA NEMOVITOSTI k. s.  ( KOTVA OBCHODNÍ, a s )

Name:      MICHAL VLACH          JIŘÍ BRADA          PAVEL RICHTER

Title:  CHAIRMAN OF THE BoD      MEMBER OF THE BoD      MEMBER OF THE BoD

By:

KOTVA a.s

Name:      MAREK KOLIBAL

Title:       CHAIRMAN OF THE BoD

By:

KOTVA OBCHODNÍ, a.s.

Name:  MICHAL VLACH          JIŘÍ BRADA          PAVEL RICHTER

Title:  CHAIRMAN OF THE BoD      MEMBER OF THE BoD      MEMBER OF THE BoD

By:

Buyer:

CRQ Czech a.s.

KC 1-1962

Name:

Title:

By:

**Markland Holdings Limited**

Name:

Title:

by :

SPV KN a s

Name.      RICHARD HARAZIM
Title.      MEMBER OF THE BoD

KC 1-1963

(Slip Opinion)          OCTOBER TERM, 2005          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. *v.* DABIT

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 04–1371.  Argued January 18, 2006—Decided March 21, 2006

Respondent Dabit filed a private securities fraud class action in federal court, invoking diversity jurisdiction to advance his state-law claims that petitioner, his former employer, fraudulently manipulated stock prices, causing him and other brokers and their clients to keep their overvalued securities.  The District Court dismissed his amended complaint, finding his claims pre-empted by title I of the Securities Litigation Uniform Standards Act of 1998 (SLUSA), which provides that no "covered class action" based on state law and alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" "may be maintained in any State or Federal court by any private party." 15 U. S. C. §78bb(f)(1)(A).  Vacating the judgment, the Second Circuit concluded that, to the extent the complaint alleged that brokers were fraudulently induced, not to sell or purchase, but to retain or delay selling, it fell outside SLUSA's pre-emptive scope.

*Held:* The background, text, and purpose of SLUSA's pre-emption provision demonstrate that SLUSA pre-empts state-law holder class-action claims of the kind Dabit alleges. Pp. 5–17.

  (a) The magnitude of the federal interest in protecting the integrity and efficiency of the national securities market cannot be overstated. The Securities Act of 1933 and the Securities Exchange Act of 1934 (1934 Act) anchor federal regulation of vital elements of this Nation's economy.  Securities and Exchange Commission (SEC) Rule 10b–5, which was promulgated pursuant to §10(b) of the 1934 Act, is an important part of that regulatory scheme and, like §10(b), prohibits deception, misrepresentation, and fraud "in connection with the purchase or sale" of a security.  When, in *Blue Chip Stamps* v. *Manor*

2      MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. *v.*
DABIT

Syllabus

*Drug Stores,* 421 U. S. 723, this Court limited the Rule 10b–5 private right of action to plaintiffs who were themselves purchasers or sellers, it relied on the widespread recognition that suits by nonpurchasers and nonsellers present a special risk of vexatious litigation that could "frustrate or delay normal business activity," *id.,* at 740. Pp. 5–8.

(b) Similar policy considerations prompted Congress to adopt legislation (Reform Act) targeted at perceived abuses of class actions—*e.g.,* nuisance filings and vexatious discovery requests—but this effort prompted members of the plaintiffs' bar to avoid the federal forum altogether. To stem the shift of class actions from federal to state courts, Congress enacted SLUSA. Pp. 8–10.

(c) Both the class and the securities here are "covered" within SLUSA's meaning, and the complaint alleges misrepresentations and omissions of material facts. The only disputed issue is whether the alleged wrongdoing was "in connection with the purchase or sale" of securities. Dabit's narrow reading would pre-empt only those actions in which *Blue Chip Stamps'* purchaser-seller requirement is met. Insofar as that argument assumes that the *Blue Chip Stamps* rule stems from Rule 10b–5's text, it must be rejected, for the Court relied on "policy considerations" in adopting that limitation, and it purported to define the scope of a private right of action under Rule 10b–5, not to define "in connection with the purchase or sale." When this Court has sought to give meaning to that phrase in the §10(b) and Rule 10b–5 context, it has broadly required that the alleged fraud "coincide" with a securities transaction, an interpretation that comports with the SEC's longstanding views. Congress can hardly have been unaware of this broad construction when it imported the phrase into SLUSA. Where judicial interpretations have settled a statutory provision's meaning, repeating the same language in a new statute indicates the intent to incorporate the judicial interpretations as well. That presumption is particularly apt here, because Congress not only used §10(b)'s and Rule 10b–5's words, but used them in another provision appearing in the same statute as §10(b). The presumption that Congress envisioned a broad construction also follows from the particular concerns that culminated in SLUSA's enactment, viz., preventing state private securities class-action suits from frustrating the Reform Act's objectives. A narrow construction also would give rise to wasteful, duplicative litigation in state and federal courts. The presumption that "Congress does not cavalierly pre-empt state-law causes of action," *Medtronic, Inc.* v. *Lohr,* 518 U. S. 470, 485, has less force here because SLUSA does not pre-empt any cause of action. It simply denies the use of the class-action device to vindicate certain claims. Moreover, tailored exceptions to SLUSA's pre-

Cite as: 547 U. S. ____ (2006)          3

Syllabus

emptive command—for, *e.g.*, state agency enforcement proceedings—demonstrate that Congress did not act cavalierly. Finally, federal, not state, law has long been the principal vehicle for asserting class-action securities fraud claims. Pp. 10–16.

(d) Dabit's holder class action is distinguishable from a typical Rule 10b–5 class action only in that it is brought by holders rather than sellers or purchasers. That distinction is irrelevant for SLUSA pre-emption purposes. The plaintiffs' identity does not determine whether the complaint alleges the requisite fraud, and the alleged misconduct here—fraudulent manipulation of stock prices—unquestionably qualifies as a fraud "in connection with the purchase or sale" of securities as the phrase is defined in *SEC* v. *Zandford,* 535 U. S. 813, 820, and *United States* v. *O'Hagan,* 521 U. S. 642, 651. Pp. 16–17.

395 F. 3d 25, vacated and remanded.

STEVENS, J., delivered the opinion of the Court, in which all other Members joined, except ALITO, J., who took no part in the consideration or decision of the case.

Cite as: 547 U. S. ____ (2006)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 04–1371

_____

## MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., PETITIONER v. SHADI DABIT

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[March 21, 2006]

JUSTICE STEVENS delivered the opinion of the Court.

Title I of the Securities Litigation Uniform Standards Act of 1998 (SLUSA) provides that "[n]o covered class action" based on state law and alleging "a misrepresenta-tion or omission of a material fact in connection with the purchase or sale of a covered security" "may be maintained in any State or Federal court by any private party." §101(b), 112 Stat. 3227 (codified at 15 U. S. C. § 78bb(f)(1)(A)).  In this case the Second Circuit held that SLUSA only pre-empts state-law class-action claims brought by plaintiffs who have a private remedy under federal law.  395 F. 3d 25 (2005).  A few months later, the Seventh Circuit ruled to the contrary, holding that the statute also pre-empts state-law class-action claims for which federal law provides no private remedy.  *Kircher* v. *Putnam Funds Trust*, 403 F. 3d 478 (2005).  The back-ground, the text, and the purpose of SLUSA's pre-emption provision all support the broader interpretation adopted by the Seventh Circuit.

I

Petitioner Merrill Lynch, Pierce, Fenner & Smith, Inc.

Opinion of the Court

(Merrill Lynch), is an investment banking firm that offers research and brokerage services to investors. Suspicious that the firm's loyalties to its investment banking clients had produced biased investment advice, the New York attorney general in 2002 instituted a formal investigation into Merrill Lynch's practices. The investigation sparked a number of private securities fraud actions, this one among them.[1]

Respondent, Shadi Dabit, is a former Merrill Lynch broker. He filed this class action in the United States District Court for the Western District of Oklahoma on behalf of himself and all other former or current brokers who, while employed by Merrill Lynch, purchased (for themselves and for their clients) certain stocks between December 1, 1999, and December 31, 2000. See App. 27a–46a. Rather than rely on the federal securities laws, Dabit invoked the District Court's diversity jurisdiction and advanced his claims under Oklahoma state law.

The gist of Dabit's complaint was that Merrill Lynch breached the fiduciary duty and covenant of good faith and fair dealing it owed its brokers by disseminating misleading research and thereby manipulating stock prices.[2] Dabit's theory was that Merrill Lynch used its misinformed brokers to enhance the prices of its investment banking clients' stocks: The research analysts, under management's direction, allegedly issued overly optimistic appraisals of the stocks' value; the brokers allegedly relied on the analysts' reports in advising their investor clients

--------------

[1] Merrill Lynch eventually settled its dispute with the New York attorney general.

[2] The complaint alleged, for example, that the prices of the subject stocks were "artificially inflated as a result of the manipulative efforts" of Merrill Lynch, and that Merrill Lynch, "acting as a central nerve center in the manipulation of various stocks . . . , perpetrated this stock manipulation through a variety of deceptive devices, artifices, and tactics that are the hallmarks of stock manipulation." App. 28a–29a.

and in deciding whether or not to sell their own holdings; and the clients and brokers both continued to hold their stocks long beyond the point when, had the truth been known, they would have sold. The complaint further alleged that when the truth was actually revealed (around the time the New York attorney general instituted his investigation), the stocks' prices plummeted.

Dabit asserted that Merrill Lynch's actions damaged the class members in two ways: The misrepresentations and manipulative tactics caused them to hold onto overvalued securities, and the brokers lost commission fees when their clients, now aware that they had made poor investments, took their business elsewhere.

In July 2002, Merrill Lynch moved to dismiss Dabit's complaint. It argued, first, that SLUSA pre-empted the action and, second, that the claims alleged were not cognizable under Oklahoma law. The District Court indicated that it was "not impressed by" the state-law argument, but agreed that the federal statute pre-empted at least some of Dabit's claims. *Id.*, at 49a–50a. The court noted that the complaint alleged both "claims and damages based on wrongfully-induced purchases" and "claims and damages based on wrongfully-induced holding." *Ibid.* While the "holding" claims, the court suggested, might not be preempted, the "purchasing" claims certainly were. The court dismissed the complaint with leave to amend to give Dabit the opportunity to untangle his "hopeless mélange of purchase-related and holding-related assertions." *Ibid.* (punctuation added).

Dabit promptly filed an amended complaint that omitted all direct references to purchases. What began as a class of brokers who "purchased" the subject securities during the class period became a class of brokers who "owned and continued to own" those securities. See *id.*, at 52a.

Meanwhile, dozens of other suits, based on allegations

similar to Dabit's, had been filed against Merrill Lynch
around the country on both federal- and state-law theories
of liability. The Judicial Panel on Multidistrict Litigation
transferred all of those cases, along with this one, to the
United States District Court for the Southern District of
New York for consolidated pretrial proceedings. Merrill
Lynch then filed its second motion to dismiss Dabit's
complaint. Senior Judge Milton Pollack granted the mo-
tion on the ground that the claims alleged fell "squarely
within SLUSA's ambit." *In re Merrill Lynch & Co., Inc.,*
2003 WL 1872820, *1 (Apr. 10, 2003).

The Court of Appeals for the Second Circuit, however,
vacated the judgment and remanded for further proceed-
ings. 395 F. 3d, at 51. It concluded that the claims as-
serted by holders did not allege fraud "in connection with
the purchase or sale" of securities under SLUSA. Al-
though the court agreed with Merrill Lynch that that
phrase, as used in other federal securities laws, has been
defined broadly by this Court, it held that Congress none-
theless intended a narrower meaning here—one that
incorporates the "standing" limitation on private federal
securities actions adopted in *Blue Chip Stamps* v. *Manor
Drug Stores,* 421 U. S. 723 (1975). Under the Second Cir-
cuit's analysis, fraud is only "in connection with the pur-
chase or sale" of securities, as used in SLUSA, if it is alleged
by a purchaser or seller of securities. Thus, to the extent
that the complaint in this action alleged that brokers were
fraudulently induced, not to sell or purchase, but to retain
or delay selling their securities, it fell outside SLUSA's pre-
emptive scope.[3]

After determining that the class defined in Dabit's

---

[3]The Court of Appeals also concluded that Dabit's lost commission
claims escaped pre-emption under SLUSA because they did not "allege
fraud that 'coincide[s]' with the sale or purchase of a security." 395
F. 3d, at 47 (quoting *SEC* v. *Zandford,* 535 U. S. 813, 825 (2002)). That
determination is not before this Court for review.

amended complaint did not necessarily exclude purchasers, the panel remanded with instructions that the pleading be dismissed without prejudice. The court's order would permit Dabit to file another amended complaint that defines the class to exclude "claimants who purchased in connection with the fraud and who therefore could meet the standing requirement" for a federal damages action, and to include only those "who came to hold [a Merrill Lynch] stock before any relevant misrepresentation." 395 F. 3d, at 45–46. Under the Second Circuit's analysis, a class action so limited could be sustained under state law. For the reasons that follow, we disagree.

## II

The magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated. In response to the sudden and disastrous collapse in prices of listed stocks in 1929, and the Great Depression that followed, Congress enacted the Securities Act of 1933 (1933 Act), 48 Stat. 74, and the Securities Exchange Act of 1934 (1934 Act), 48 Stat. 881. Since their enactment, these two statutes have anchored federal regulation of vital elements of our economy.

Securities and Exchange Commission (SEC) Rule 10b–5, 17 CFR §240.10b–5 (2005), promulgated in 1942 pursuant to §10(b) of the 1934 Act, 15 U. S. C. §78j(b), is an important part of that regulatory scheme. The Rule, like §10(b) itself,[4] broadly prohibits deception, misrepresentation, and

_____

[4] Section 10(b) provides as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in

fraud "in connection with the purchase or sale of any
security."[5]   The SEC has express statutory authority to
enforce the Rule.  See 15 U. S. C. §78u (2000 ed. and Supp.
III).   Although no such authority is expressly granted to
private individuals injured by securities fraud, in 1946
Judge Kirkpatrick of the United States District Court for
the Eastern District of Pennsylvania, relying on "the
general purpose" of the Rule, recognized an implied right
of action thereunder.  *Kardon* v. *National Gypsum Co.*, 69
F. Supp. 512, 514.  His holding was adopted by an "over-
whelming consensus of the District Courts and Courts of
Appeals," *Blue Chip Stamps*, 421 U. S., at 730, and en-
dorsed by this Court in *Superintendent of Ins. of N. Y.* v.
*Bankers Life & Casualty Co.,* 404 U. S. 6 (1971).

A few years after *Kardon* was decided, the Court of
Appeals for the Second Circuit limited the reach of the
private right of action under Rule 10b–5.  In *Birnbaum* v.
*Newport Steel Corp.*, 193 F. 2d 461 (1952), a panel com-
posed of Chief Judge Swan and Judges Augustus and
Learned Hand upheld the dismissal of a suit brought on
behalf of a corporation and a class of its stockholders

---

contravention of such rules and regulations as the [SEC] may prescribe
as necessary or appropriate in the public interest or for the protection
of investors."  15 U. S. C. §78j(b).

[5] The text of the Rule is as follows:

"It shall be unlawful for any person, directly or indirectly, by the use
of any means or instrumentality of interstate commerce, or of the mails
or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to
state a material fact necessary in order to make the statements made,
in the light of the circumstances under which they were made, not
misleading, or

"(c) To engage in any act, practice, or course of business which
operates or would operate as a fraud or deceit upon any person,

"in connection with the purchase or sale of any security."  17 CFR
§240.10b–5 (2005).

Opinion of the Court

alleging that fraud "in connection with" a director's sale of his controlling block of stock to third parties violated Rule 10b–5. The court held that the Rule could only be invoked by a purchaser or seller of securities to remedy fraud associated with his or her own sale or purchase of securities, and did not protect those who neither purchased nor sold the securities in question but were instead injured by corporate insiders' sales to third parties. *Id.*, at 464. While the *Birnbaum* court did not question the plaintiffs' "standing" to enforce Rule 10b–5, later cases treated its holding as a standing requirement. See *Eason* v. *General Motors Acceptance Corp.*, 490 F. 2d 654, 657 (CA7 1973).

By the time this Court first confronted the question, literally hundreds of lower court decisions had accepted "*Birnbaum*'s conclusion that the plaintiff class for purposes of §10(b) and Rule 10b–5 private damages actions is limited to purchasers and sellers." *Blue Chip Stamps*, 421 U. S., at 731–732. Meanwhile, however, cases like *Bankers Life & Casualty Co.* had interpreted the coverage of the Rule more broadly to prohibit, for example, "deceptive practices *touching* [a victim's] sale of securities as an investor." 404 U. S., at 12–13 (emphasis added); see *Eason*, 490 F. 2d, at 657 (collecting cases). The "judicial oak which ha[d] grown from little more than a legislative acorn," as then-Justice Rehnquist described the rules governing private Rule 10b–5 actions, *Blue Chip Stamps*, 421 U. S., at 737, had thus developed differently from the law defining what constituted a substantive violation of Rule 10b–5. Ultimately, the Court had to decide whether to permit private parties to sue for any violation of Rule 10b–5 that caused them harm, or instead to limit the private remedy to plaintiffs who were themselves purchasers or sellers.

Relying principally on "policy considerations" which the Court viewed as appropriate in explicating a judicially crafted remedy, *ibid.*, and following judicial precedent

rather than "the many commentators" who had criticized
the *Birnbaum* rule as "an arbitrary restriction which
unreasonably prevents some deserving plaintiffs from
recovering damages," 421 U. S., at 738, the Court in *Blue
Chip Stamps* chose to limit the private remedy.  The main
policy consideration tipping the scales in favor of prece-
dent was the widespread recognition that "litigation under
Rule 10b–5 presents a danger of vexatiousness different in
degree and in kind from that which accompanies litigation
in general." *Id.*, at 739.  Even weak cases brought under
the Rule may have substantial settlement value, the Court
explained, because "[t]he very pendency of the lawsuit
may frustrate or delay normal business activity." *Id.*, at
740.  Cabining the private cause of action by means of the
purchaser-seller limitation would, in the Court's view,
minimize these ill effects.  The limitation of course had no
application in Government enforcement actions brought
pursuant to Rule 10b–5.  See *id.*, at 751, n. 14.

### III

  Policy considerations similar to those that supported the
Court's decision in *Blue Chip Stamps* prompted Congress,
in 1995, to adopt legislation targeted at perceived abuses
of the class-action vehicle in litigation involving nationally
traded securities.   While acknowledging that private
securities litigation was "an indispensable tool with which
defrauded investors can recover their losses," the House
Conference Report accompanying what would later be
enacted as the Private Securities Litigation Reform Act of
1995 (Reform Act), 109 Stat. 737 (codified at 15 U. S. C.
§§77z–1 and 78u–4), identified ways in which the class
action device was being used to injure "the entire U. S.
economy." H. R. Rep. No. 104–369, p. 31 (1995).  Accord-
ing to the Report, nuisance filings, targeting of deep-
pocket defendants, vexatious discovery requests, and
"manipulation by class action lawyers of the clients whom

Opinion of the Court

they purportedly represent" had become rampant in recent years. *Ibid.* Proponents of the Reform Act argued that these abuses resulted in extortionate settlements, chilled any discussion of issuers' future prospects, and deterred qualified individuals from serving on boards of directors. *Id.*, at 31–32.

Title I of the Reform Act, captioned "Reduction of Abusive Litigation," represents Congress' effort to curb these perceived abuses. Its provisions limit recoverable damages and attorney's fees, provide a "safe harbor" for forward-looking statements, impose new restrictions on the selection of (and compensation awarded to) lead plaintiffs, mandate imposition of sanctions for frivolous litigation, and authorize a stay of discovery pending resolution of any motion to dismiss. See 15 U. S. C. §78u–4. Title I also imposes heightened pleading requirements in actions brought pursuant to §10(b) and Rule 10b–5; it "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference' that the defendant acted with the required state of mind.'" *Dura Pharmaceuticals, Inc.* v. *Broudo,* 544 U. S. 336, 345 (2005) (quoting 15 U. S. C. §§78u–4(b)(1), (2)).

The effort to deter or at least quickly dispose of those suits whose nuisance value outweighs their merits placed special burdens on plaintiffs seeking to bring federal securities fraud class actions. But the effort also had an unintended consequence: It prompted at least some members of the plaintiffs' bar to avoid the federal forum altogether. Rather than face the obstacles set in their path by the Reform Act, plaintiffs and their representatives began bringing class actions under state law, often in state court. The evidence presented to Congress during a 1997 hearing to evaluate the effects of the Reform Act suggested that this phenomenon was a novel one; state-court litigation of

class actions involving nationally traded securities had
previously been rare. See H. R. Rep. No. 105–640, p. 10
(1998); S. Rep. No. 105–182, pp. 3–4 (1998). To stem this
"shif[t] from Federal to State courts" and "prevent certain
State private securities class action lawsuits alleging
fraud from being used to frustrate the objectives of" the
Reform Act, SLUSA §§2(2), (5), 112 Stat. 3227, Congress
enacted SLUSA.

## IV

The core provision of SLUSA reads as follows:[6]

> "CLASS ACTION LIMITATIONS.—No covered class ac-
> tion based upon the statutory or common law of any
> State or subdivision thereof may be maintained in any
> State or Federal court by any private party alleging—
> "(A) a misrepresentation or omission of a material
> fact in connection with the purchase or sale of a cov-
> ered security; or
> "(B) that the defendant used or employed any ma-
> nipulative or deceptive device or contrivance in con-
> nection with the purchase or sale of a covered secu-
> rity." *Id.*, at 3230 (codified as amended at 15 U. S. C.
> §78bb(f)(1)).[7]

A "covered class action" is a lawsuit in which damages are
sought on behalf of more than 50 people.[8]   A "covered

---

[6] SLUSA amends the 1933 Act and the 1934 Act in substantially
identical ways. For convenience and because they are more pertinent
here, we quote the amendments to the 1934 Act.

[7] Another key provision of the statute makes all "covered class ac-
tions" filed in state court removable to federal court. 112 Stat. 3230
(codified at 15 U. S. C. §78bb(f)(2)).

[8] "The term 'covered class action' means—
"(i) any single lawsuit in which—
"(I) damages are sought on behalf of more than 50 persons or pro-
spective class members, and questions of law or fact common to those
persons or members of the prospective class, without reference to issues
of individualized reliance on an alleged misstatement or omission,

Opinion of the Court

security" is one traded nationally and listed on a regulated national exchange.[9]  Respondent does not dispute that both the class and the securities at issue in this case are "covered" within the meaning of the statute, or that the complaint alleges misrepresentations and omissions of material facts.  The only disputed issue is whether the alleged wrongdoing was "in connection with the purchase or sale" of securities.

Respondent urges that the operative language must be read narrowly to encompass (and therefore pre-empt) only those actions in which the purchaser-seller requirement of *Blue Chip Stamps* is met.  Such, too, was the Second Circuit's view.  But insofar as the argument assumes that the rule adopted in *Blue Chip Stamps* stems from the text of Rule 10b–5—specifically, the "in connection with" language, it must be rejected.  Unlike the *Birnbaum* court, which relied on Rule 10b–5's text in crafting its purchaser-seller limitation, this Court in *Blue Chip Stamps* relied

———————

predominate over any questions affecting only individual persons or members; or

"(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or

"(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which—

"(I) damages are sought on behalf of more than 50 persons; and

"(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose." 112 Stat. 3232 (codified at 15 U. S. C. §78bb(f)(5)(B)).

[9] "The term 'covered security' means a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933, at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred. . . ."  112 Stat. 3232 (codified at 15 U. S. C. §78bb(f)(5)(E)).  Section 18(b) of the 1933 Act in turn defines "covered security" to include securities traded on a national exchange.  §77r(b).

chiefly, and candidly, on "policy considerations" in adopting that limitation. 421 U. S., at 737. The *Blue Chip Stamps* Court purported to define the scope of a private right of action under Rule 10b–5—not to define the words "in connection with the purchase or sale." *Id.*, at 749 ("No language in either [§10(b) or Rule 10b–5] speaks at all to the contours of a private cause of action for their violation"). Any ambiguity on that score had long been resolved by the time Congress enacted SLUSA. See *United States* v. *O'Hagan*, 521 U. S. 642, 656, 664 (1997); *Holmes* v. *Securities Investor Protection Corporation*, 503 U. S. 258, 285 (1992) (O'Connor, J., concurring in part and concurring in judgment); *id.*, at 289–290 (SCALIA, J., concurring in judgment); *United States* v. *Naftalin*, 441 U. S. 768, 774, n. 6 (1979); see also 395 F. 3d, at 39 (acknowledging that "[t]he limitation on standing to bring [a] private suit for damages for fraud in connection with the purchase or sale of securities is unquestionably a distinct concept from the general statutory and regulatory prohibition on fraud in connection with the purchase or sale of securities").

Moreover, when this Court *has* sought to give meaning to the phrase in the context of §10(b) and Rule 10b–5, it has espoused a broad interpretation. A narrow construction would not, as a matter of first impression, have been unreasonable; one might have concluded that an alleged fraud is "in connection with" a purchase or sale of securities only when the plaintiff himself was defrauded into purchasing or selling particular securities. After all, that was the interpretation adopted by the panel in the *Birnbaum* case. See 193 F. 2d, at 464. But this Court, in early cases like *Superintendent of Ins. of N. Y.* v. *Bankers Life & Casualty Co.,* 404 U. S. 6 (1971), and most recently in *SEC* v. *Zandford*, 535 U. S. 813, 820, 822 (2002), has rejected that view. Under our precedents, it is enough that the fraud alleged "coincide" with a securities transaction—

Opinion of the Court

whether by the plaintiff or by someone else. See *O'Hagan*, 521 U. S., at 651. The requisite showing, in other words, is "deception 'in connection with the purchase or sale of any security,' not deception of an identifiable purchaser or seller." *Id.*, at 658. Notably, this broader interpretation of the statutory language comports with the longstanding views of the SEC. See *Zandford*, 535 U. S., at 819–820.[10]

Congress can hardly have been unaware of the broad construction adopted by both this Court and the SEC when it imported the key phrase—"in connection with the purchase or sale"—into SLUSA's core provision. And when "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well." *Bragdon* v. *Abbott*, 524 U. S. 624, 645 (1998); see *Cannon* v. *University of Chicago*, 441 U. S. 677, 696–699 (1979). Application of that presumption is particularly apt here; not only did Congress use the same words as are used in §10(b) and Rule 10b–5, but it used them in a provision that appears in the same statute as §10(b). Generally, "identical words used in different parts of the same statute are . . . presumed to have the same meaning." *IBP, Inc.* v. *Alvarez*, 546 U. S. __, __ (2005) (slip op., at 11).

The presumption that Congress envisioned a broad construction follows not only from ordinary principles of statutory construction but also from the particular concerns that culminated in SLUSA's enactment. A narrow reading of the statute would undercut the effectiveness of the 1995 Reform Act and thus run contrary to SLUSA's

———————

[10] In *Zandford*, we observed that the SEC has consistently "maintained that a broker who accepts payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, violates §10(b) and Rule 10b–5." 535 U. S., at 819. Here, too, the SEC supports a broad reading of the "in connection with" language.

stated purpose, viz., "to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives" of the 1995 Act. SLUSA §2(5), 112 Stat. 3227. As the *Blue Chip Stamps* Court observed, class actions brought by holders pose a special risk of vexatious litigation. 421 U. S., at 739. It would be odd, to say the least, if SLUSA exempted that particularly troublesome subset of class actions from its pre-emptive sweep. See *Kircher*, 403 F. 3d, at 484.

Respondent's preferred construction also would give rise to wasteful, duplicative litigation. Facts supporting an action by purchasers under Rule 10b–5 (which must proceed in federal court if at all) typically support an action by holders as well, at least in those States that recognize holder claims. The prospect is raised, then, of parallel class actions proceeding in state and federal court, with different standards governing claims asserted on identical facts. That prospect, which exists to some extent in this very case,[11] squarely conflicts with the congressional preference for "national standards for securities class action lawsuits involving nationally traded securities." SLUSA §2(5), 112 Stat. 3227.[12]

In concluding that SLUSA pre-empts state-law holder class-action claims of the kind alleged in Dabit's complaint, we do not lose sight of the general "presum[ption] that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc.* v. *Lohr*, 518 U. S. 470,

---

[11] See 2003 WL 1872820, *1 (SDNY, Apr. 10, 2003) (observing that Dabit's holder claims rested "on the very same alleged series of transactions and occurrences asserted in the federal securities actions" filed against Merrill Lynch).

[12] See H. R. Rep. No. 105–640, p. 10 (1998) (the "solution" to circumvention of the Reform Act "is to make Federal court the exclusive venue for securities fraud class action litigation"); S. Rep. No. 105–182, p. 3 (1998) (identifying "the danger of maintaining differing federal and state standards of liability for nationally-traded securities").

Opinion of the Court

485 (1996). But that presumption carries less force here than in other contexts because SLUSA does not actually pre-empt any state cause of action. It simply denies plaintiffs the right to use the class action device to vindicate certain claims. The Act does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist.

Moreover, the tailored exceptions to SLUSA's pre-emptive command demonstrate that Congress did not by any means act "cavalierly" here. The statute carefully exempts from its operation certain class actions based on the law of the State in which the issuer of the covered security is incorporated, actions brought by a state agency or state pension plan, actions under contracts between issuers and indenture trustees, and derivative actions brought by shareholders on behalf of a corporation. 15 U. S. C. §§78bb(f)(3)(A)–(C), (f)(5)(C). The statute also expressly preserves state jurisdiction over state agency enforcement proceedings. §78bb(f)(4). The existence of these carve-outs both evinces congressional sensitivity to state prerogatives in this field and makes it inappropriate for courts to create additional, implied exceptions.

Finally, federal law, not state law, has long been the principal vehicle for asserting class-action securities fraud claims. See, *e.g.*, H. R. Conf. Rep. No. 105–803, p. 14 (1998) ("Prior to the passage of the Reform Act, there was essentially no significant securities class action litigation brought in State court").[13] More importantly, while state-

---

[13]Respondent points out that the Court in *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723 (1975), identified as a factor mitigating any unfairness caused by adoption of the purchaser-seller requirement that "remedies are available to nonpurchasers and nonsellers under state law." *Id.*, at 738, n. 9. He argues that this supports a narrow construction of SLUSA's pre-emption provision. But we do not here revisit the *Blue Chip Stamps* Court's understanding of the equities

law holder claims were theoretically available both before and after the decision in *Blue Chip Stamps*, the actual assertion of such claims by way of class action was virtually unheard of before SLUSA was enacted; respondent and his *amici* have identified only *one* pre-SLUSA case involving a state-law class action asserting holder claims.[14]  This is hardly a situation, then, in which a federal statute has eliminated a historically entrenched state-law remedy.  Cf. *Bates* v. *Dow Agrosciences LLC*, 544 U. S. 431, 449 (2005) (observing that a "long history" of state-law tort remedy "add[ed] force" to the presumption against pre-emption).

V

The holder class action that respondent tried to plead, and that the Second Circuit envisioned, is distinguishable from a typical Rule 10b–5 class action in only one respect: It is brought by holders instead of purchasers or sellers. For purposes of SLUSA pre-emption, that distinction is irrelevant; the identity of the plaintiffs does not determine whether the complaint alleges fraud "in connection with the purchase or sale" of securities.  The misconduct of which respondent complains here—fraudulent manipulation of stock prices—unquestionably qualifies as fraud "in connection with the purchase or sale" of securities as the phrase is defined in *Zandford*, 535 U. S., at 820, 822, and *O'Hagan*, 521 U. S., at 651.

The judgment of the Court of Appeals for the Second Circuit is vacated, and the case is remanded for further

─────────

involved in limiting the availability of private remedies under federal law; we are concerned instead with Congress' intent in adopting a pre-emption provision, the evident purpose of which is to limit the availability of remedies under state law.

[14]See Brief for Respondent 5 (citing *Weinberger* v. *Kendrick*, 698 F. 2d 61, 78 (CA2 1982) (approving a settlement that included holder claims brought pursuant to New York law)); see also Tr. of Oral Arg. 34–35.

Opinion of the Court

proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE ALITO took no part in the consideration or decision of this case.