UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s.,<br><br>      Plaintiff,<br><br>v.<br><br>ANDREW WEISS and<br>WEISS ASSET MANAGEMENT, LLC,<br><br>      Defendants.<br><br>ANDREW WEISS;<br>WEISS ASSET MANAGEMENT, LLC;<br>K T, INC.; and<br>CVF INVESTMENTS, LTD.,<br><br>      Counterclaim-Plaintiffs,<br><br>v.<br><br>KOTVA a.s.; MARTIN BENDA;<br>RICHARD HARAZIM;<br>FORMINSTER ENTERPRISES, LTD.;<br>SPV CO and JOHN DOES 1-5,<br><br>      Counterclaim-Defendants. | Civil Action No. 05-10679-RCL |

**FORMINSTER ENTERPRISES, LTD.'S RESPONSE TO
COUNTERCLAIM-PLAINTIFFS' MOTION FOR LEAVE TO FILE
<u>FURTHER MATERIALS IN OPPOSITION TO JURISDICTIONAL MOTIONS</u>**

Forminster Enterprises, Limited ("FEL"), a Cyprus company that has never done any business in the United States, has moved to dismiss the action against it for lack of jurisdiction. FEL so moved because it has no contacts with Massachusetts and no legal or factual basis for asserting jurisdiction exists. Nothing about the Counterclaim-plaintiffs' motion for leave to file further materials in opposition to the Counterclaim-defendants' motions to dismiss for lack of

personal jurisdiction supports the claim that FEL is subject to personal jurisdiction in Massachusetts. The Counterclaim-plaintiffs (hereinafter the "Weiss Parties") offer the Court a handful of excerpts from the Rule 30(b)(6) deposition of Kotva a.s. ("Kotva"), the company which originally filed this suit. These excerpts do not accurately portray what Mr. Richard Harazim, Kotva's Rule 30(b)(6) designee, said about the relationship between Kotva and FEL, nor do they support the strained conclusions that the Weiss Parties seek to draw from them.

Therefore, FEL respectfully requests that the Weiss Parties' motion to file further materials be denied, and that FEL's motion to dismiss be allowed. If the Court is inclined to review the additional materials, FEL respectfully requests that the Court accept the additional excerpts from the Kotva deposition attached hereto at Exhibit A. *See Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 123 (1st Cir. 2006) (in deciding motion to dismiss for lack of personal jurisdiction Court may rely on uncontradicted facts offered by defendants); *Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n.*, 142 F.3d 26, 34 (1st Cir. 1998) (when evaluating a motion to dismiss for lack of personal jurisdiction, courts will "add to the mix facts put forward by the defendants, to the extent that they are uncontradicted.").

**A.     Conceding That FEL Has Never Had Any Contact With Massachusetts, the Weiss Parties Improperly Seek to Attribute the Acts of Others to FEL.**

This Court only has personal jurisdiction over FEL if the Weiss Parties can establish that: (1) the claims asserted against FEL arise out of or relate to FEL's activities in Massachusetts; (2) FEL purposefully availed itself of the privilege of conducting activities in Massachusetts; and (3) the exercise of jurisdiction is consonant with "fair play" and "substantial justice." *See Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994). Indeed, as shown in FEL's motion to dismiss and supporting memorandum and affidavits, FEL has no contacts with this jurisdiction, and has never availed itself of this forum. The Weiss Parties' counterclaim does not allege that FEL ever

engaged in any act in Massachusetts, nor does it allege that FEL ever purposefully availed itself of this forum. Similarly, the excerpts from Kotva's Rule 30(b)(6) deposition attached to the Weiss Parties' motion also do not allege that FEL has had any deliberate contact with Massachusetts.

Lacking any evidence of contacts by FEL with Massachusetts, the Weiss Parties instead have proffered an assortment of dubious propositions which they argue will allow the alleged acts of others to be attributed to FEL. They claim that once the Court attributes these alleged acts to FEL, the Court should then feel free to summon the Cyprus company into this jurisdiction. Specifically, the Weiss Parties, contrary to the evidence, say that Richard Harazim is FEL's "agent." Also contrary to the evidence, the Weiss Parties say that Kotva, a publicly traded company, is a "shell," and that the unanimous decision of Kotva's board to file suit against Andrew Weiss and Weiss Asset Management in Massachusetts can somehow be attributed to FEL, Kotva's majority shareholder. Finally, the Weiss Parties advance a "conspiracy theory" of personal jurisdiction that the First Circuit has expressly declined to recognize, and that at least one District Court has summarized as "frivolous". *See In re New Motor Vehicles Canadian Export*, 307 F. Supp. 2d 145, 157-58 (D. Me. 2004). FEL has addressed the glaring legal and factual weaknesses of these jurisdictional arguments in earlier filings with this Court. *See FEL's Memorandum in Support of Motion to Dismiss* (docket entry no. 35); *FEL's Reply Memorandum in Support of Its Motion to Dismiss* (docket entry no. 63). The excerpts from Kotva's deposition that the Weiss Parties offer to the Court supports their arguments for personal jurisdiction over FEL similarly do not advance the Weiss Parties' claims.

B.   **Kotva's Deposition Testimony Does Not Support the Weiss Parties' Argument That This Court Has Personal Jurisdiction Over FEL.**

The Weiss Parties' theories of personal jurisdiction do not find any support in Kotva's Rule 30(b)(6) deposition testimony. The Weiss Parties' motion for leave to file further materials unsuccessfully tries to make the following series of arguments: First, the Weiss Parties wrongfully conclude that the Mr. Harazim's testimony shows that in addition to an attorney, Petr Toman, "the only people to have ever acted on behalf of Forminster in the Czech Republic are Mr. Benda, Mr. Harazim, Miroslav Hálek, and Michal Vlach." *Motion for Leave to File Further Materials* at ¶ 6. The Weiss parties take this broad assertion, couple it with the assertion that several of these individuals also had a role in the management of Kotva, and urge the Court to conclude that the "significant overlap in roles among the individuals controlling the plaintiff, [Kotva], and representing its majority shareholder, Forminster Enterprises Ltd., are sufficient to impute all lawsuit-related contracts with Massachusetts by [Kotva] and Mr. Harazim, Forminster's former director, to Forminster for purposes of exercising personal jurisdiction over Forminster." *Id.* This line of argument ignores all evidence of chronology, pays no regard to the corporate separateness of Kotva and FEL, and is directly refuted by other statements made by Mr. Harazim during the deposition. Moreover, as a matter of jurisdictional analysis, the Weiss Parties' sweeping assertions about FEL do not suffice to demonstrate that FEL purposefully availed itself of this forum nor that the exercise of personal jurisdiction would be consonant with fair play and substantial justice.

The first flaw in the Weiss Parties' reasoning is their claim that Mr. Harazim's testimony establishes who controlled FEL in 2005, when Kotva decided to take legal action against the Weiss Parties. By selectively choosing portions of Mr. Harazim's testimony, the Weiss Parties have obscured the fact that Mr. Harazim's work for FEL was limited to the period between 1998

4

and 2002.  As the transcript excerpts attached to this memorandum reflect, Mr. Harazim testified that **eight years ago**, in 1998, he was hired by FEL as a consultant to help negotiate a settlement between FEL and an entity called Trend.  *See* Exhibit A at 28-29, 31-32.  Mr. Harazim worked on these negotiations for FEL for approximately one year along with Mr. Martin Benda and Mr. Petr Toman's law firm.  *See* Exhibit A at 29-30.  Thereafter, from 1999 until 2002, Mr. Harazim and Mr. Benda served on FEL's board of directors.  *See* Exhibit A at 29; *Affidavit of Richard Harazim* ¶ 16 (docket entry no. 42).  Since 2002, Mr. Harazim has not had any role or other affiliation with FEL.  Notably, the Weiss Parties omitted from their filing the portion of Mr. Harazim's testimony where he states that, **"for about four years I have [had] nothing to do with Forminster."** *See* Exhibit A at 33.

Second, while Mr. Harazim's testimony shows that a handful of individuals have worked for both FEL and Kotva at various times, this does not show that Kotva is a mere corporate shell or that it is the alter ego of FEL.  The fact that Mr. Toman, a Czech attorney, has been retained by both Kotva and FEL does not demonstrate that one company is the alter ego of the other.  Similarly, Mr. Harazim's testimony that Mr. Vlach, who is the current Chair of Kotva's board, has helped FEL on "certain, specific administrative matters" which Mr. Harazim believed were "small matters" also does not show a significant overlap of control between Kotva and FEL.  *See Motion for Leave to File Further Materials*, Exhibit E at 349-350.[1]  Narrowing the focus to the matter at hand, the Weiss Parties point to no evidence that anyone acting on FEL's behalf requested or otherwise induced Kotva to take any action against the Weiss Parties.

Even if Mr. Harazim's testimony could support an inference that a few members of Kotva's board have a connection to FEL, nothing in Mr. Harazim's testimony shows that FEL

---

[1] The Weiss Parties' motion also makes reference to Miroslav Hálek as having acted on behalf of FEL, *see Motion for Leave to File Further Materials* ¶ 6, but they make no argument that Mr. Hálek is somehow employed by Kotva.

5

has acted beyond its role as the majority shareholder of Kotva. The fact that a majority shareholder has some degree of input or control over the company in which it holds stock is not enough to create jurisdiction over the majority shareholder through the acts of the company. *See Andersen v. Diorio*, 349 F.3d 8, 12 (1st Cir. 2003). As the First Circuit has recognized, a certain degree of financial and policy control "is inherent in ownership" and is not sufficient to impute the in-forum acts of a company to its parent or majority shareholder. *Id.*

### C.  Kotva's Testimony Does Not Support the Conclusion that FEL Was the Driving Force Behind Any of the Acts the Weiss Parties Argue May Serve as a Basis for Personal Jurisdiction.

In their opposition to FEL's motion to dismiss, the Weiss Parties have asserted that FEL is responsible for or somehow "conspired" to engage in one of the following three acts by others: 1) Kotva's decision to file suit in this Court in 2005; 2) Kotva's decision to file a criminal complaint against Andrew Weiss in the Czech Republic; and 3) Mr. Benda and Mr. Harazim's discussions with the Weiss Parties about the Kotva stock held by the Brookdale Global Opportunity Fund ("BGO"). These assertions have been shown to be groundless in previous filings, including the Affidavit of Richard Harazim. Now, the Kotva Rule 30(b)(6) deposition testimony further refutes these assertions.

####  1.  *Kotva's Decision to File Suit in the District of Massachusetts*

Mr. Harazim's testimony does not support the Weiss Parties' contention that FEL was somehow the true driving force behind the decision by Kotva's board to file suit against the Weiss Parties in this Court. Instead, the transcript excerpts offered by the Weiss Parties confirm that in early 2005, Kotva's board of directors held a meeting during which the board authorized Mr. Harazim to locate a law firm in the United States which would bring a civil action against the Weiss Parties. *Motion for Leave to File Further Materials*, Exhibit B at 372-375. Acting on

behalf of Kotva, Mr. Harazim then contacted the law firm of Nystrom, Beckman & Paris, LLP, and worked with the firm to draft the complaint. *Id.* At no point does Mr. Harazim's testimony suggest that FEL urged him to bring this suit or that FEL somehow unduly influenced the Kotva board's decision to file suit.

2. *Kotva's Decision to Bring a Criminal Complaint Against Andrew Weiss*

Similarly, Mr. Harazim's testimony did not offer any support for the Weiss Parties' contention that FEL had some significant role in Kotva's decision to bring a criminal complaint against Andrew Weiss. In the transcript excerpts attached hereto, Mr. Harazim explains that in August of 2004, he participated in a meeting of the Kotva board of directors in which it was decided that Kotva should file a criminal complaint against Mr. Weiss. *See* Exhibit A at 293-296. Again, at no point did Mr. Harazim testify that FEL exerted any improper influence on Kotva's board when this decision was made.

3. *Mr. Benda and Mr. Harazim's Negotiations With Andrew Weiss*

Finally, Mr. Harazim's testimony also does not support the Weiss Parties' allegation that Mr. Benda and Mr. Harazim were trying to purchase the Weiss Parties' shares of Kotva on FEL's behalf. In the transcript excerpts attached hereto, Mr. Harazim states that in May 2004 he and Mr. Benda met with Mr. Weiss to discuss what the BGO intended to do with its shares in Kotva. *See* Exhibit A at 209. BGO is managed by Mr. Weiss's company, Weiss Capital LLC. *See Counterclaim* ¶ 14. At no point during that meeting did Mr. Benda or Mr. Harazim claim to be representing any company other than Kotva, and Mr. Harazim never told Mr. Weiss's representative, Mr. Vladimir Hofmann, that FEL would consider buying BGO's Kotva shares. *See Exhibit A* at 244-247. Nothing in Mr. Harazim's testimony supports the Weiss Parties' claim

7

that at any time after they ceased to be directors of FEL in 2002, either Mr. Harazim or Mr. Benda acted as or held themselves out to be FEL's agents.

**D.**     **Conclusion**

None of the deposition excerpts offered by the Weiss Parties advance their assertion that this Court has personal jurisdiction over FEL. In particular, the Weiss Parties' effort to use Mr. Harazim's testimony for support of their claim that there was "significant overlap" between Kotva and FEL is a disingenuous reading of Mr. Harazim's testimony. Furthermore, even if Mr. Harazim's statements could support the conclusion that certain individuals, such as Attorney Toman, who worked for Kotva and for FEL on some matters, such a showing is an insufficient basis for piercing Kotva's veil and attributing Kotva's acts to FEL. Since Mr. Harazim's testimony does not provide support for any of their three theories of jurisdiction, the motion for leave to file excerpts from his deposition should be denied. In the alternative, if the Court decides to review Mr. Harazim's testimony in evaluating the pending motions to dismiss for lack of personal jurisdiction, FEL respectfully asks the Court also to consider the portions of Mr. Harazim's deposition attached hereto at Exhibit A.

          Respectfully submitted,

          FORMINSTER ENTERPRISES, LTD.

          by its attorneys,

          /s/ Ingrid S. Martin
          _____
          Jeffrey D. Clements, BBO #632544
          Ingrid S. Martin, BBO #653632
          Clements & Clements, LLP
          50 Federal Street
          Boston, MA 02110
          617- 451-1800

DATED:  April 4, 2006

**CERTIFICATE OF SERVICE**

    I, Ingrid S. Martin, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants on April 4, 2006.

                                  /s/ Ingrid S. Martin
                                  _____
                                  Ingrid S. Martin

```
                                                         Page 1
 1                              VOLUME 1, PAGES 1 - 234
 2                                    EXHIBITS 1 - 22
 3             IN THE UNITED STATES DISTRICT COURT
 4            FOR THE DISTRICT OF MASSACHUSETTS
 5                              No. 05-10679-RCL
 6   - - - - - - - - - - - - - - - - - - - - - - - -
 7   KOTVA a.s.,
 8                    Plaintiffs
 9          vs.
10   ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,
11                    Defendants
12   _____
13   ANDREW WEISS, WEISS ASSET MANAGEMENT LLC,
14   KT, INC. and CVF INVESTMENTS, LTD.,
15                    Counterclaim-Plaintiffs,
16        v.
17   KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM,
18   FORMINSTER ENTERPRISES, LTC., SPV CO. and
19   JOHN DOES 1-5,
20                    Counterclaim-Defendants.
21   - - - - - - - - - - - - - - - - - - - - - - - -
22     VIDEOTAPED RULE 30(b)(6) DEPOSITION OF KOTVA a.s.
23            BY AND THROUGH RICHARD HARAZIM
24         Tuesday, February 22, 2006 10:02 a.m
```

Richard Harazim                                                                 02/22/2006

Page 26

1  yes, the paragraph relates to, among others, to -- it
2  relates to the actions of Kotva.
3      Q.  Does it relate to the Forminster shares of
4  Kotva?
5      A.  Yes.  It relates to the shares of Kotva,
6  which were in possession of Forminster.  Yes, it does.
7      Q.  Does it prohibit Forminster from selling
8  the shares it holds of Kotva?
9      A.  It says it restricts dealing with --
10     Q.  Go on.  Dealing with what?
11     A.  Yes.  It restricts dealing with the
12 actions, the shares.  It doesn't say about selling.  It
13 limits the dealing with them, rather than selling them.
14     Q.  I don't understand the distinction.
15     A.  I'm only answering the question.  Well,
16 whether this paragraph means that the Forminster cannot
17 sell those shares, I don't -- I cannot decide on that.
18     Q.  Isn't it true, sir, that you negotiated a
19 settlement with Trend that referenced this very order?
20     A.  Yes.
21     Q.  And it referenced the fact that pursuant
22 to this order, Forminster could not sell the shares it
23 had of Kotva?
24     A.  According to me, it is not true.  This

Page 27

1  paper does not say that Forminster cannot sell the
2  shares.  It says that it limits dealing with, dealing
3  with the shares of Kotva.  That means that the actions
4  cannot be transferred.
5      Q.  The actions or the shares?
6          THE INTERPRETER:  The shares.  I'm sorry.
7  Shares.  Shares.
8      Q.  So, I think I understand now.  You agree
9  that Exhibit 3 says that Forminster cannot transfer the
10 shares it holds of Kotva?
11     A.  Yes.  What it means.
12     Q.  Has this order, Exhibit 3, ever been
13 removed?
14     A.  Until I know, it was not.
15     Q.  To the best of your knowledge today, this
16 order still exists?
17     A.  Yes.  To my knowledge.
18         MR. LEIBENPERGER:  Please mark this as the
19 next exhibit.
20         (Settlement Agreement
21 marked Exhibit 4.)
22     Q.  Sir, Exhibit 5, correct?
23         MR. BECKMAN:  Four.
24     Q.  Sorry.  Exhibit 4 is a document produced

Page 28

1  by Kotva entitled "Settlement Agreement."  It is in
2  English.  Can you identify what this document is?
3      A.  It appears that it is -- it's a kind of a
4  draft.  It is an agreement between Forminster and
5  Trend.
6      Q.  Did you negotiate this settlement on
7  behalf of Forminster?
8      A.  Yes.
9      Q.  In -- is this -- excuse me.  Was this
10 settlement agreement signed?
11     A.  I'm not sure whether it was signed exactly
12 in this same form, because I see here, I see here some
13 notes that in principle such an agreement has been
14 signed.
15     Q.  Was the English version signed or was
16 there a Czech version signed?
17     A.  I believe that both forms, both Czech and
18 English, were signed.
19         MR. LEIBENSPERGER:  We would ask for the
20 production of the signed copy of this agreement.
21         MR. BECKMAN:  We'll look for it, if we
22 have it.  Absolutely.
23         THE WITNESS:  Kotva was not a participant.
24         MR. BECKMAN:  This is what you have.

Page 29

1  Well, we'll deal with that.
2  BY MR. LEIBENSPERGER:
3      Q.  Now, what is the date of this settlement
4  agreement?
5      A.  I don't see it here.  I believe that it
6  was signed in December of 1999.
7      Q.  All right.
8      A.  But, here the date is not there.
9      Q.  At the time of this settlement agreement,
10 you worked for Forminster, correct?
11     A.  Yes.
12     Q.  How long did you work for Forminster?
13     A.  You mean how long was the work on this
14 particular agreement?  Was this the question?
15     Q.  No.  How long total did you work?
16     A.  It was one year on this project, and two
17 years as a director, and in total it's three years.
18     Q.  When did you first start doing any work
19 for Forminster?
20     A.  I'm not really sure, but we could say that
21 it could have been 1998.
22     Q.  Did you have a written employment
23 agreement with Forminster?
24     A.  No.  It was not about employment, no.

Richard Harazim                                                                02/22/2006

Page 30

1  Q. Was there anyone else engaged by
2  Forminster to negotiate this agreement?
3  A. Besides the lawyers, I was working also
4  with Mr. Martin Benda.
5  Q. Was Mr. Benda at this time, 1988 to 1999,
6  engaged by Forminster?
7  A. I believe, yes, because we were working on
8  this project together.
9  Q. All right. In connection with this
10 settlement agreement, who did you talk to at
11 Forminster?
12 A. These were lawyers, and a law firm Toman,
13 which I mentioned, and Martin.
14 Q. Anyone else?
15 A. No. I'm not aware of anyone else.
16 Q. From whom did you receive instructions
17 about Forminster's position on the agreement?
18 A. All the details, I was discussing with
19 these people that I mentioned.
20 Q. Mr. Benda and Mr. Toman?
21 A. And Mr. Toman, yes.
22 Q. No one else?
23 A. There were some other lawyers from the law
24 firm of Toman.

Page 31

1  Q. All right. If you'd turn to Page 2,
2  Paragraph 1, it says, "Trend cast doubt on the
3  ownership of FEL." FEL is Forminster, correct?
4  A. Forminster Enterprises.
5  Q. Let me start over. First Paragraph 1
6  says, "Trend cast doubt on the ownership of FEL to
7  shares." Did I read that correctly?
8      MR. LEIBENSPERGER: Did he say yes?
9      THE INTERPRETER: Yes.
10     MR. LEIBENSPERGER: Thank you.
11 Q. The shares being referred to are the
12 shares in Kotva, correct?
13     MR. LEIBENSPERGER: He said ano.
14 A. Yes.
15     MR. LEIBENSPERGER: We need a yes on the
16 record, if that is what he said.
17     THE INTERPRETER: Yes. I'm sorry.
18     MR. LEIBENSPERGER: Thank you.
19 Q. And this settlement, in this settlement --
20 excuse me, start over. In this settlement, Forminster
21 agreed to pay 350 million Czech crowns to Trend in
22 settlement of the claim?
23 A. To be very specific and accurate, this
24 $350 million was not only in relationship to the shares

Page 32

1  of Kotva -- crowns, apologies, 350 million crowns was
2  not related only to these shares, but it was also
3  concerning the other controversial issues between
4  Forminster and Trend.
5  Q. Is it correct to say that 310 million
6  crowns related to the shares of Kotva?
7  A. I have to find it, but I think it is so.
8  Q. Page 6, Paragraph 4.
9  A. Yes. It is so.
10 Q. Pursuant to the settlement agreement, it
11 was a condition to the payment of that money that the
12 order with respect to Forminster's shares of Kotva be
13 lifted by the Court?
14 A. No. It's the other way. If it is
15 translated exactly, the correct sequence of events was
16 the following: That all the faults that were connected
17 with the shares that were different complaints and the
18 blocking of the state prosecutor that will be lifted,
19 and afterwards the payment will be made.
20     MR. LEIBENSPERGER: Okay.
21 Q. The blocking of the state prosecutor is
22 what we referred to in Exhibit 3; is that correct?
23 A. I could, I would say yes, but there could
24 have been some other later, later orders about this,

Page 33

1  but I do not know whether everything was resolved by
2  this paper only. There could have been later on a new
3  order by the state prosecution at a later date.
4  Q. In 1999, when the settlement agreement was
5  made, the blocking was the Exhibit 3. Is that correct?
6  A. I presume.
7  Q. Has Forminster ever paid the 310 million
8  Czech crowns to Trend?
9  A. At the time when I was engaged by
10 Forminster, it was not. It was not paid.
11 Q. And why was it not paid?
12 A. Because the blocking was not lifted.
13 Q. That state of affairs is the same today,
14 correct?
15 A. I have for about four years I have nothing
16 to do with Forminster. I presume that it has remained
17 in the same status.
18 Q. You are aware today as an officer of Kotva
19 that Forminster's shares of Kotva are blocked?
20 A. I don't have any official resources to
21 know from this information, but I believe it is so.
22     MR. LEIBENSPERGER: Would you mark this as
23 the next exhibit.
24     (Mlada Fronta Dnes article

LegaLink Boston, a Merrill Company
(617) 542-0039

Richard Harazim                                                              02/22/2006

Page 206

1  transfer?
2      Q.  Yes, I do.
3      A.  Yes.
4      Q.  We can show you those tomorrow, but why
5  was there a need for additional instruments of transfer
6  to be signed in March?
7      A.  I didn't understand it, either.  It was a
8  request from Ling Latis [phonetic], I think they
9  needed, in addition to the SPA, they needed the actual
10 instrument of transfer.  We argued that this is the
11 instrument of transferring the SPA, but they insisted
12 on having a separate, very simple, I believe it was
13 like two pages, very simple contract, instrument of
14 transfer.  Maybe it was because there were -- the
15 principle was such that the escrow agent had the money,
16 and in return for various documents, sent the money to
17 SPV Co.  So, this document, this instrument of transfer
18 I think was one of the instruments against, instruments
19 against which the money actually was transferred.
20     Q.  To the best of your knowledge, did the
21 instruments of transfer in March of 2005 change the
22 terms of the deal in any respect?
23     A.  Not at all.
24     Q.  So, after the offer from JT Bank on behalf

Page 207

1  of a client for $1 million to Mr. Weiss, what was the
2  next thing that you heard with respect to the possible
3  purchase of BGO shares?
4          MR. BECKMAN:  Objection.  You may answer.
5      A.  The next I heard was that the deal just
6  didn't happen.
7      Q.  All right.  And how did you hear that?
8      A.  We were in contact with Mr. Hoffmann, so I
9  believe -- I don't remember the specifics, because I
10 was deeply involved in the deal, the SPA, and I didn't
11 believe that this would lead anywhere, so I really
12 don't know if he called us or called me, called Martin
13 if he saw him.  I don't know.  I just know that the
14 deal didn't happen.
15     Q.  Do you recall any meetings with
16 Mr. Hoffmann in the period from January, '04, up to May
17 of '04?
18     A.  We may have met, but I don't recall it
19 specifically.
20     Q.  Do you recall any communications about the
21 possible purchase of BGO shares up to May of 2004?
22         MR. BECKMAN:  Are you including May 12th?
23     Q.  No. I said up to May?
24         MR. BECKMAN:  May what?

Page 208

1      A.  Hoffmann informed us that the BGO was not
2  selling.  I don't know when and how.  And then there
3  must have been some communication in relation to the
4  meeting in May.  So, we probably talked over the phone.
5      Q.  All right.  I don't want you to speculate.
6  Just if you have a memory, that's -- I'm asking for it.
7      A.  I don't.
8      Q.  Between January and May 1, do you recall
9  any conversation with Hoffmann?
10     A.  I don't recall any specific meetings, and
11 I just know that he let us know that he's inviting
12 Mr. Weiss to Prague, and he would like us to meet him.
13     Q.  So, how did you hear about a possible
14 meeting with Mr. Weiss in Prague?
15         MR. BECKMAN:  Objection.  Asked and
16 answered.  You can answer again.
17     A.  Either through phone or maybe, maybe --
18 but I don't recall any meeting, so it must have been
19 through a phone.  He informed us that Mr. Weiss is
20 coming to Prague in May and that Mr. Hoffmann would
21 like us to meet him.
22     Q.  All right.  And did you agree to meet?
23     A.  We did agree to meet.
24     Q.  Did Mr. Hoffmann ask you or did he ask

Page 209

1  Mr. Benda for this meeting in May?
2      A.  I don't -- I don't recall, but since this
3  was a meeting that was supposed to be held in English,
4  it was clear that I would be participating, too.
5      Q.  All right.  What was your understanding --
6  well, first of all, let's establish do you remember
7  that meeting did occur then on May 12, 2004?
8      A.  I do.
9      Q.  Okay.  What was your understanding of the
10 purpose of the meeting on May 12, 2004?
11     A.  The purpose -- well, we expected that
12 Mr. Weiss would tell us what are his intentions, as far
13 as his ownership is concerned, and just expected that
14 we will be kind of officially let known what is the --
15 what is going on with BGO, because up until then the
16 contacts were through Mr. Golden.
17     Q.  Why did you agree to meet with Mr. Weiss
18 and Mr. Hoffmann?
19     A.  Well, it's a shareholder, an important
20 shareholder.
21     Q.  Well, were you still interested in helping
22 the acquisition of the BGO shares in some way when you
23 met on May 12, 2004?
24         MR. BECKMAN:  Objection.  You can answer.

Richard Harazim                                                                02/22/2006

Page 210

```
 1      A.  I think the position is, has been the
 2  same.  If there was a willing buyer, and if BGO wanted
 3  to sell, we'd be only glad.
 4      Q.  And you'd be willing to find a buyer?
 5          MR. BECKMAN:  Objection.
 6      A.  We're not finding a buyer, but we're
 7  willing to do what was in the possibilities to ask
 8  people.
 9      Q.  And had you told Mr. Hoffmann that you'd
10  have this meeting, and, depending on what was said, you
11  might be willing to try to find a potential buyer?
12          MR. BECKMAN:  Objection.
13      A.  I don't recall that that was discussed,
14  but I think that based on the previous experience it
15  was kind of understood.
16      Q.  And it was understood that Kotva, itself,
17  could not be the buyer?
18      A.  Yes.
19      Q.  So that Mr. Hoffmann was looking to you
20  and Mr. Benda to assist in finding a buyer?
21          MR. BECKMAN:  Objection.
22      A.  I don't know what his plans were.
23      Q.  You understood that that was the message
24  you had sent to Mr. Hoffmann, that the most you could
```

Page 211

```
 1  do would be to help find a buyer for the BGO shares?
 2          MR. BECKMAN:  Objection.  You've got to
 3  break that one down.
 4      A.  Frankly speaking, I thought that we were
 5  helping to establish Mr. Hoffmann's position.  We
 6  thought that we were helping him to show that he can
 7  invite us to -- we kind of understood that he -- that
 8  this betters his position.
 9      Q.  Why were you interested in bettering
10  Mr. Hoffmann's position?
11      A.  It had several issues at the same time.
12  We would hear what the plans of BGO are.  It couldn't
13  harm anything.  On the contrary.  If we rejected to go
14  to the meeting, we'd be worse off.  I think it's always
15  better to know.
16      Q.  Did you expect that the topic of the sale
17  of the BGO shares would come up at this meeting?
18          MR. BECKMAN:  Objection.
19      A.  It was a possibility.
20      Q.  So, you did expect that as a possibility?
21      A.  I didn't have any expectations.  It was a
22  possibility.
23      Q.  All right.  So, where did this meeting
24  take place?
```

Page 212

```
 1      A.  In the French restaurant of Obec Nidum.
 2  O-B-E-C.
 3          THE INTERPRETER:  D-U-M.  Shall I spell it
 4  again?  O-B-C-E N-I-D-U-M.
 5      A.  That is not E.  O-B-E-C-N-I --
 6          THE INTERPRETER:  N-I-D-U-M.
 7      A.  D-U-M.
 8      Q.  Did you arrive at the restaurant before
 9  Mr. Hoffmann and Mr. Weiss?
10      A.  Well, first remember correctly, we met, we
11  came together with Martin, and I believe that we met
12  Mr. Hoffmann alone and that Mr. Weiss arrived later,
13  but I may -- well, I'm not sure about that.
14      Q.  Did you and Mr. Benda go to the restaurant
15  together?
16      A.  Yes.
17      Q.  And you don't have a recollection of
18  whether you got there first or whether Mr. Hoffmann and
19  Weiss got there first, one way or the other; is that
20  right?
21      A.  I don't have a recollection.
22      Q.  All right.  When all four of you arrived,
23  what do you recall was said first?
24      A.  The first thing was asking the formalities
```

Page 213

```
 1  if there were any inquiry from Mr. Weiss as to how does
 2  the sale proceed.  It was something like I hear you're
 3  selling the building, so what is the status?  We
 4  refused to comment on this, because, once again, it's
 5  impossible for one shareholder to be informed and the
 6  rest of the shareholders not, and that I think was the
 7  first point of friction, because Mr. Weiss got quite
 8  upset.
 9          After a short discussion about why we
10  can't and then where, how a shareholder can find out
11  about this, he got upset and left the meeting for a
12  minute.  I think he went to bar, and when he returned,
13  when he returned we got into the discussion of -- well,
14  of course, I don't remember it sentence by sentence,
15  but principally that the meaning of the discussion was
16  you have to buy my shares, and if you don't buy my
17  shares, I will block the sale of the building.  There
18  is no decent buyer in this world that will touch the
19  building.  Kotva is just a small fraction of the assets
20  that I manage, and I don't care if it goes bankrupt.  I
21  don't care about consequences.  I'm concerned about my
22  reputation, and if we start to fight, I have to finish
23  the fight until the end.  I've been in these situations
24  before.  If you think that I'm scared because of
```

54 (Pages 210 to 213)

Page 244

1  A.  This wasn't Mr. Hoffmann.  The main person
2  was Howard Golden.
3  Q.  But, Mr. Hoffmann was also involved in
4  those discussions, correct?
5      MR. BECKMAN:  Objection.
6  A.  It is possible.  I conclude that I know
7  him from the time.  But, his active participation
8  during those negotiations, I don't recall.
9  Q.  Is it fair to say you knew that
10 Mr. Hoffmann knew about the prior negotiations between
11 Forminster and Howard Golden?
12     MR. BECKMAN:  Objection.
13 A.  It is possible.
14 Q.  Do you know?
15     MR. BECKMAN:  Objection.
16 A.  I don't know.
17 Q.  Do you deny that you told Mr. Hoffmann
18 that Forminster would consider buying shares of Kotva
19 in September of 2003?
20 A.  Yes.
21 Q.  Have you -- strike that.  Did you tell
22 Mr. Hoffmann in September, 2003, that you were no
23 longer a representative of Forminster?
24 A.  I am not sure about that.  As I already

Page 245

1  said yesterday, that discussion was very general.
2  Q.  So, you don't recall whether you told him?
3  A.  No.
4  Q.  Did Mr. Hoffmann say anything to indicate
5  that he believed you were representing Forminster?
6      THE INTERPRETER:  That he believed that
7  you represent?
8  A.  I don't remember.  I don't recall.
9  Q.  At the May 12, 2004 meeting, did you say
10 that Kotva could not legally buy the shares of BGO?
11     MR. BECKMAN:  Objection.  You may answer.
12 A.  I believe that this argument was said,
13 said at the time.
14 Q.  It was said by you?
15 A.  Yes.
16 Q.  And it wasn't an argument.  It was your
17 belief, correct?
18 A.  At that meeting?
19 Q.  Yes.
20 A.  Yes.  That was my belief.
21 Q.  And you were confident that Kotva was
22 legally correct that it could not buy the BGO shares?
23     THE INTERPRETER:  Kotva?  Could you repeat
24 it one more time, please.

Page 246

1  Q.  And you were confident that Kotva was
2  legally correct that it could not buy the BGO shares?
3  A.  The discussion wasn't as much specific as
4  that.  I stated my opinion at that meeting that Kotva
5  is not interested and, as well, cannot or it is not
6  possible for Kotva to buy its own shares.
7  Q.  But, according to your testimony,
8  Mr. Weiss asked for a purchase of the shares?
9      MR. BECKMAN:  Objection.
10 A.  He insisted on the sale of the shares.
11 Q.  Did it occur to you that he was asking for
12 the purchase of the shares by someone, other than
13 Kotva?
14     THE INTERPRETER:  Can I clarify?  Was it
15 the sale of the shares was by Kotva or for Kotva?  In
16 order for me to translate correctly.
17 Q.  Did it occur to you that he was asking for
18 the purchase of the shares by someone other than Kotva?
19 A.  I didn't, didn't think about thought
20 process of Mr. Weiss.  I didn't explore his thinking.
21 Q.  Did it occur to you that Mr. Weiss
22 believed you and Mr. Benda were there as
23 representatives of Forminster?
24     MR. BECKMAN:  Objection.

Page 247

1  A.  We gave him our business cards, our Kotva
2  business cards, and it really didn't occur to me that
3  he would consider us to be somebody else, or
4  representatives of somebody else.
5  Q.  Previously, you were both an officer of
6  Kotva and a director of Forminster, correct?
7      MR. BECKMAN:  Objection.
8  A.  Yes.  Two years back.
9  Q.  So, my question is:  Did it occur to you
10 that Mr. Weiss believed you still were a representative
11 of both Kotva and Forminster?
12     MR. BECKMAN:  Objection.  Asked and
13 answered.
14 A.  This really did not occur to me.
15 Q.  All right.  And you never clarified to
16 Mr. Weiss in that meeting that you did not -- strike
17 that, that you were not there in any capacity for
18 Forminster?
19     MR. BECKMAN:  Objection.
20 A.  No.  After I introduced myself as a
21 director of Kotva, it really didn't occur to me to
22 explain which other companies I do not represent.
23 Q.  Did you say on May 12th that Kotva would
24 pay nothing for the BGO shares?

Page 292

1  A. I understand it in such a way that in the
2  criminal files are certain materials, which are not
3  accessible by either side.
4  Q. Does Kotva have access to any witness
5  statements that are in the police file?
6  A. I believe so.
7  Q. And do you have copies of those?
8  A. I don't have them.
9  Q. Does Kotva have them?
10 A. They will be in our law department.
11 Q. When I ask whether Kotva has something,
12 I'm including whether your lawyers in the Czech
13 Republic have them.
14 A. (Witness nodded.)
15 Q. So, does Kotva have copies of the
16 documents in the criminal file?
17 A. Yes.
18 Q. Did -- going back to Exhibit 30, did you
19 meet with Markland before filing the criminal
20 complaint?
21       THE INTERPRETER: You said my client or
22 Markland?
23       MR. LEIBENSPERGER: No. Markland.
24 M-A-R-K-L-A-N-D.

Page 293

1  A. I don't recall that.
2  Q. Your e-mail to Mr. Prestage tells him that
3  you will involve them in the process. Did you do that?
4  A. I am not sure when, but at some time we
5  told them that we submitted the criminal complaint.
6  Q. Did you tell them before you submitted the
7  criminal complaint?
8  A. I am not able to recall the date, but I
9  doubt it.
10       MR. LEIBENSPERGER: Mark this as the next
11 exhibit, please.
12          (Minutes of August 18, 2004
13          Board of Directors meeting marked
14          Exhibit 31.)
15 BY MR. LEIBENSPERGER:
16 Q. I've handed you a document marked
17 Exhibit 31. This was produced by Kotva. Can you
18 identify what it is?
19 A. This is, this is the notes or minutes from
20 the, from the meeting of the Board of Directors of
21 Kotva.
22 Q. On what date?
23 A. August 18.
24 Q. Did you make a presentation at this

Page 294

1  meeting?
2  A. I informed -- I provided information for
3  the Board of Directors.
4  Q. And did you provide information regarding
5  a potential claim against Mr. Weiss in the criminal
6  court?
7        THE INTERPRETER: Could you repeat, the
8  potential?
9  Q. Did you make a presentation about a claim
10 about Mr. Weiss in the criminal court?
11       THE INTERPRETER: Could you repeat it one
12 more time. I'm not exactly sure what you are trying to
13 say, and I want to translate it exactly.
14 Q. Did you make a presentation about a claim
15 against Mr. Weiss in the criminal court?
16       THE INTERPRETER: Under the claim, you
17 mean the criminal proceedings which were started?
18       MR. LEIBENSPERGER: No. Let me just start
19 over. Withdraw the question.
20       THE INTERPRETER: Okay.
21 BY MR. LEIBENSPERGER:
22 Q. At the board meeting on August 18, 2004,
23 did you make a presentation about a criminal complaint?
24 A. No. I evaluated what is the effect of the

Page 295

1  Gilroy case for the sale of Kotva, which is being
2  negotiated, and what is the situation, and about the
3  evidence which we have against the people, who were
4  creating this "scheme."
5  Q. Did you recommend to the board to file a
6  criminal complaint against Mr. Weiss?
7  A. Here it is said very strictly it is true
8  that there was discussion about that, and I expressed
9  my opinion that this is a criminal act, and Board of
10 Directors then decided to submit a criminal complaint.
11 Q. And you recommended that, correct?
12 A. I agreed with it that I believe that this
13 is a criminal act.
14       MR. LEIBENSPERGER: We have to go off the
15 record to change the videotape.
16       THE VIDEOGRAPHER: This marks the end of
17 Tape No. 1 in the February 23rd deposition of Richard
18 Harazim. Going off the record. The time is 11:54 a.m.
19       (A recess was taken.)
20       THE VIDEOGRAPHER: Here begins Videotape
21 No. 2 in the February 23rd deposition of Richard
22 Harazim. Going on the record. The time is 12:04 p.m.
23 BY MR. LEIBENSPERGER:
24 Q. Mr. Harazim, I'm still referring to

Page 296

1  Exhibit 31, which are the board minutes for August 18,
2  2004. Do you have those in front of you?
3      A.  Yes.
4      Q.  I'm going to ask the interpreter to
5  translate the minutes starting at the bottom of the
6  first page where it says "Richard Harazim," and going
7  on to the next page, and then I'll ask you,
8  Mr. Harazim, whether you agree with his translation.
9          THE INTERPRETER:  The first line is
10 partially illegible, but I think I was able to decipher
11 it, and it reads to me as follows:  Richard Harazim
12 submitted report about the case with Gilroy Company and
13 especially about how it -- and continues on the next
14 page -- fully fulfill the signs of the criminal action.
15 He proposed that the Board of Directors of the company
16 adopt following resolution.
17     Q.  Please read the resolution.
18         THE INTERPRETER:  Okay.  One, the Board of
19 Directors of Kotva agrees with submitting criminal
20 complaint against Andrew Weiss and Vladimir Hoffmann.
21 Second, Board of Directors of Kotva gives a task to the
22 chairman of the Board of Directors to prepare within 30
23 days of the written criminal complaint.
24     Q.  Do you accept that translation,

Page 297

1  Mr. Harazim?
2          THE INTERPRETER:  We were discussing how I
3  read the text, and you agree with my Czech reading of
4  the text and with the translation.
5      A.  I believe so that this is the way how it's
6  written there.  Can I return to one thing, please?
7  About what the files from the criminal files Kotva has
8  available and what files Kotva does not have available?
9      Q.  What is your answer?
10     A.  There was some confusion about it.  Kotva,
11 I said in English, Kotva copied the criminal file, and
12 whatever was available in the criminal file was sent
13 over to our American lawyers for production of
14 documents with the exception of the transcripts, which
15 were sealed by the police, transcripts of phone
16 conversations.  That is not something Kotva produced to
17 American lawyers, because it's a sealed part of the
18 file.
19     Q.  Did you produce to the -- your American
20 lawyers copies of the crinimal complaint?
21     A.  I expect so.
22     Q.  Did you produce to your American lawyers
23 copies of statements given by you and Mr. Benda to the
24 police?

Page 298

1      A.  I am not sure about it paper by paper.  We
2  copied, we copied the context of the criminal file, and
3  we sent it to United States.
4          MR. BECKMAN:  I don't have any statements.
5  I gave you everything that was provided by Kotva.  I
6  just want that to be clear.
7          MR. LEIBENSPERGER:  I was going there.  We
8  do not have any statements by Mr. Harazim or Mr. Benda
9  from counsel.
10         MR. BECKMAN:  Right.  Right.  I don't know
11 if -- well, you should answer.
12     A.  There are documents which are being
13 categorically added to the file, and it is possible
14 that at the time where -- at the time when we were
15 making copies those documents weren't there at the
16 time, but they are there now.
17     Q.  Do you have copies of statements by
18 yourself and Mr. Benda that were given to the police?
19     A.  I don't have a copy of my own statement to
20 the police.
21     Q.  Do your lawyers have that?
22     A.  In the copy which we had, there is my
23 statement for the police is not there.
24     Q.  Do you have Mr. Benda's statement for the

Page 299

1  police in your file?
2      A.  I don't know.  I was just, just -- I don't
3  know about Mr. Benda.  I was just looking for my own
4  statement, and I didn't find it.
5          MR. BECKMAN:  And I don't have a statement
6  from Mr. Benda, either.
7      A.  But, we can do the following now:  We will
8  make the complete copy now of the present file, and
9  with the thing, with the exception of the things which
10 are excluded before the complaint is presented
11 officially to the Mr. Weiss, we will -- we can present
12 it or send it.
13         MR. LEIBENSPERGER:  We request that.
14 Would you mark this as the next exhibit.
15         MR. BECKMAN:  Just so it's clear, if there
16 is anything in addition, I don't know if there is, but
17 we'll do that.  I don't think there is anything in
18 addition to what we've already given you, but I think
19 he wants to make sure.
20         MR. LEIBENSPERGER:  Well, I understand.
21         MR. BECKMAN:  That is, I've given
22 everything that we have.  I just want that to be clear.
23         MR. LEIBENSPERGER:  I understand that's
24 what you're saying, but he's saying that they'll go

Page 400

1 Q. And the filing of the KT lawsuit didn't
2 prolong it any more. Is that accurate?
3 A. KT --
4 MR. BECKMAN: Objection. You may answer.
5 A. KT is the same thing as Gilroy. It's the
6 same, same reasoning. The difference between -- I mean
7 where KT damages Kotva in addition to what Gilroy has
8 done is that it's two lawsuits, two independent courts,
9 and it's, therefore, the time. It may happen as it
10 happened that Gilroy has been resolved, but KT's
11 lawsuit is pending, and it may be pending, I don't
12 know, we haven't even received a copy of the lawsuit
13 from the Court. It could be years.
14 Q. With respect to the proceeds from the
15 sale, other than the escrow amount, you've not used
16 those for any independent projects of Kotva, correct?
17 A. Not yet.
18 Q. In any other way, does Kotva claim it's
19 been damaged by the actions of Mr. Weiss?
20 A. I'm not a lawyer, so once again, there may
21 be other damages, costs, expense, damages to
22 reputation. I don't know what. From the business
23 point of view, I see these two main actions, damages.
24 MR. BECKMAN: That is your best answer.

Page 401

1 It's not a subject matter of inquiry, so you can give
2 your best answer.
3 Q. Is -- does Kotva have to pay Mr. Beckman's
4 law firm in connection with this lawsuit?
5 A. Yes. That's damage. I was about to ask
6 if --
7 MR. BECKMAN: Don't. There is no question
8 pending.
9 THE WITNESS: It's 4:00.
10 MR. LEIBENSPERGER: Well, we will suspend
11 the deposition at your request, because you have a
12 plane to catch. And we'll probably have to have a
13 battle with Mr. Beckman about whether we will complete
14 the deposition after we get all the documents and the
15 other information we need. So, we'll suspend.
16 THE VIDEOGRAPHER: This concludes the
17 February 23rd deposition of Richard Harazim. The
18 number of tapes used today was three. Total number of
19 tapes used in the deposition is seven. Going off the
20 record. The time is 4:02 p.m.
21 (Deposition suspended.)
22
23
24

Page 402

1 E R R A T A   S H E E T
2 I, RICHARD HARAZIM, do hereby certify that I
3 have read the foregoing transcript of my testimony, and
4 further certify that it is a true and accurate record
5 of my testimony (with the exception of the corrections
6 listed below).
7 PAGE   LINE              CORRECTION
8 ____   ____   _____
9 ____   ____   _____
10 ____   ____   _____
11 ____   ____   _____
12 ____   ____   _____
13 ____   ____   _____
14 ____   ____   _____
15 ____   ____   _____
16 ____   ____   _____
17 ____   ____   _____
18 ____   ____   _____
19 ____   ____   _____
20 Signed under the pains and penalties this _____
21 day of _____, 2006.
22
23 _____
24 RICHARD HARAZIM

Page 403

1 C E R T I F I C A T E
2 COMMONWEALTH OF MASSACHUSETTS
3 SUFFOLK, SS.
4 I, Janet M. Konarski, a Registered Merit
5 Reporter and a Notary Public within and for the
6 Commonwealth of Massachusetts do hereby certify:
7 THAT RICHARD HARAZIM, the witness whose
8 testimony is hereinbefore set forth, was duly sworn by
9 me and that such testimony is a true and accurate
10 record of my stenotype notes taken in the foregoing
11 matter, to the best of my knowledge, skill and ability.
12 IN WITNESS WHEREOF, I have hereunto set my hand
13 this 6th day of March, 2006.
14
15
16 _____
   JANET M. KONARSKI
   Notary Public
17
18 My Commission Expires:
19 July 19, 2007
20
21
22
23
24