UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s.,<br><br>       Plaintiff,<br><br>  v.<br><br>ANDREW WEISS and WEISS ASSET<br>MANAGEMENT, LLC,<br><br>       Defendants.<br><br>ANDREW WEISS, WEISS ASSET<br>MANAGEMENT LLC, K T, INC. and CVF<br>INVESTMENTS, LTD.,<br><br>     Counterclaim-plaintiffs,<br><br>  v.<br><br>KOTVA a.s., MARTIN BENDA, RICHARD<br>HARAZIM, FORMINSTER ENTERPRISES,<br>LTD., SPV CO and JOHN DOES 1–5,<br><br>     Counterclaim-defendants. | C.A. No. 05-10679-RCL |

## MEMORANDUM IN SUPPORT OF
## ANDREW WEISS'S MOTION FOR PROTECTIVE ORDER

As a precursor to this civil action, Kotva filed a criminal complaint against Andrew
Weiss in the Czech Republic alleging the same purported "blackmail" that is the gravamen of
this civil suit. In cooperation with Czech authorities, Kotva secretly recorded audio and video of
meetings with Mr. Weiss's local representatives, including his Czech attorney. While the
blackmail charge is, on the merits, preposterous, the criminal proceedings are still ongoing. In

that context, and given Kotva's refusal to respond to repeated discovery requests regarding the collusive criminal investigation, a deposition of Mr. Weiss in this case should be deferred.

Defendants respectfully request this Court to exercise its broad discretion in controlling discovery to enter a protective order precluding the plaintiff from taking Mr. Weiss's deposition pending the resolution of the criminal proceedings that the plaintiff itself orchestrated and initiated. Permitting the plaintiff to proceed with Mr. Weiss's deposition at this time would serve only to amplify the unfair advantage that Kotva has gained and is attempting to enlarge by initiating criminal proceedings.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The plaintiff, Kotva or K-T-V,[1] is a corporate shell controlled by Forminster Enterprises Ltd., its majority shareholder.[2] Throughout the operative events described in K-T-V's complaint, K-T-V's CEO and Chairman of the Supervisory Board were Richard Harazim and Martin Benda. Messrs. Benda and Harazim were installed at K-T-V while still directors of Forminster, but have since formally resigned their posts at Forminster to be replaced by nominee directors.[3] Likewise, the Chairman of K-T-V's Board of Directors, Michal Vlach, is a former Forminster director who still holds a power of attorney to act on behalf of Forminster today.[4] Mr. Vlach is also the individual who filed the criminal complaint against Mr. Weiss in the Czech Republic.[5]

---

[1] In 2005, after filing this case, Kotva changed its name to K-T-V Invest a.s.

[2] *See* Exhibit A, Deposition of K-T-V by and through Richard Harazim (not yet signed by deponent), 352:5–353:24 (confirming translation of K-T-V's annual report indicating that Forminster is the "controlling person" of K-T-V); Exhibit B, Share Purchase Agreement at 2 (describing K-T-V (f/k/a "KAS") as a "holding company")

[3] *See* Exhibit C (Certificates of Cypriot Ministry of Commerce, Industry & Tourism).

[4] *See* Ex. A, 349:2–351:3, Ex. C.

[5] Ex. A, 277:4–13.

Forminster's true owners remain hidden behind a series of nominee directors and shareholders.[6]   Even Richard Harazim, who worked for Forminster, became a director of Forminster, and served as CEO of K-T-V—a company controlled by Forminster—claims he does not know who is behind the company.[7]   Rather, Mr. Harazim states that he was hired by a lawyer, Petr Toman, and never asked nor was told who his true employers were.   Not coincidentally, Mr. Toman also represents the K-T-V subsidiary that sold the Department Store that is at the center of K-T-V's case and represents K-T-V in the associated civil litigation in the Czech Republic.[8]   The other name partner in Mr. Toman's law firm, Stanislav Devátý, is the former head of the Czech Republic's secret police.[9]   In this position, Mr. Devátý had access to thousands of investigative files on ordinary Czech citizens and government employees, including police and prosecutors.   Mr. Toman also served as the spokesman for the 17th of November Commission, which reviewed tens if not hundreds of thousands of files gathered by the secret police under communist rule.[10]   Together, Messrs. Toman and Devátý wield considerable power in the Czech Republic.

---

[6] Forminster's shareholders have, as early as September 1998, been nominees selected to conceal the identity of who truly owns and operates Forminster.  *See* Exhibit D at 1 (Certificates of Cypriot Ministry of Commerce, Industry & Tourism) (listing Ledra Nominees Ltd. and Ledra Trustees Ltd. as shareholders).  From November 30, 1999—the date Messrs. Harazim and Benda became directors of Forminster—to May 24, 2005, Forminster's two shareholders were both nominees claiming the same address as the four present nominee directors claim as their "residence."  This address, 4 Diagorou Street, Kermia House, 6th Floor, Office 601, 1097 Nicosia, Cyprus, is the office of a Cypriot law firm.  *See* Exhibit E (excerpts from law firm's website).  On May 25, 2005, all of Forminster's shares were consolidated under a single nominee at the same address, Indvecta (Nominees) Ltd.  Exhibit D at 3.

[7] Ex. A, 54:8–56:8.

[8] Exhibit B at 32–33 (listing Mr. Toman as the person to receive notice on behalf of the seller of the Department Store); Exhibit F (filing in associated civil case listing Mr. Toman as representative of K-T-V).

[9] *See* Exhibit G (biographies of Messrs. Toman and Devátý)

[10] *Id.*

As described more fully in the Counterclaim, Forminster gained control over K-T-V as a result of one of the most notorious frauds in the post-Communist history of the Czech Republic—the Trend Tunneling.[11]  More specifically, Forminster's control over a majority of the shares of K-T-V results from the embezzlement of those shares from the Trend Fund—a fact obliquely acknowledged on multiple occasions by former Forminster director and K-T-V CEO Richard Harazim.[12]

In 2002, Weiss Capital LLC took over management of investments in Trend and K-T-V. In the course of trying to liquidate those investments, Mr. Weiss became embroiled in a legal dispute with the Forminster Group. In retaliation for mounting legal challenges to the Forminster Group's efforts to loot K-T-V, and in an effort to gain unfair leverage over Mr. Weiss, the Forminster Group caused K-T-V to initiate criminal proceedings against Mr. Weiss in the Czech Republic and to file this civil lawsuit in Boston.  Although the criminal and civil complaints were filed in the name of K-T-V, it is clear that Forminster is controlling K-T-V.

On August 27, 2004, K-T-V filed a criminal complaint against Mr. Weiss and others with the Czech police.  For the next five months, K-T-V and the Czech police jointly and secretly gathered evidence to use against Mr. Weiss and his local representative.  They videotaped meetings, searched confidential files, and seized attorney-client communications.[13]    On

---

[11] *See* Counterclaim ¶¶ 42–52 (citing and quoting documents such as September 30, 1998 Report of the Hradec Králové Deputy Regional Public Prosecutor and freezing order of High Court of Liechtenstein Court); Counterclaim Ex. 2 (press articles relating to Trend Tunneling); Exhibit H (report of Czech Ministry of Finance).

[12] *See* Exhibit I (Wall Street Journal article) ("In an interview, Mr. Harazim acknowledged that the transactions leading from Trend to Forminster 'might not be entirely legal when examined all together.'").

[13] *See* Exhibit A, 310:6–310:16 (acknowledging videotaping of certain meetings); 311:24–313:4 (refusing to confirm whether October 18, 2004 meeting was taped); K-T-V's Memorandum in Support of Motion to Compel at 18 ("Indeed, the Czech Police have seized documents and

February 4, 2005, the Czech press reported that a criminal investigation of Mr. Weiss had begun and that he was to be charged with extortion. The Czech Government has yet to formally serve Mr. Weiss with a copy of the resolution that the police forwarded to the prosecutor. However, Mr. Weiss was recently served with a subpoena to testify at the U.S. Attorney's Office in Boston in response to a request by the Czech Government under the Mutual Legal Assistance Treaty. Counsel for Mr. Weiss are challenging that subpoena.[14]

On April 6, 2005, K-T-V filed this civil lawsuit against Mr. Weiss and Weiss Asset Management LLC in Boston. The defendants, along with counterclaim-plaintiffs K T, Inc. and CVF Investments Ltd., filed counterclaims on June 15, 2005 against K-T-V and other counterclaim-defendants. Four of the counterclaim-defendants, Forminster Enterprises Ltd., Richard Harazim, Martin Benda and SPV CO, have filed motions to dismiss for lack of personal jurisdiction. The Court has yet to rule on those motions. K-T-V filed a motion to dismiss, which the Court denied in January 2006, except as to the Weiss Parties' Chapter 93A claim. In March 2006, K-T-V filed a second motion seeking dismissal of some, but not all, of the counterclaims. In April 2006, the Defendants filed a motion for judgment on the pleadings, seeking dismissal of all claims in K-T-V's Complaint.

K-T-V did not request any documents until December 2005 and did not notice any depositions until March 24, 2006, when it sent seven deposition notices by regular mail, including a deposition notice for Mr. Weiss.

---

communications between Weiss, Hoffmann, and an attorney, Peterka, in connection with the criminal investigation, some of which were previously available and are attached as exhibits to the Complaint.").

[14] The associated filings are under seal, as initiated by the U.S. Attorney's Office.

In contrast, the defendants promptly served written discovery requests at the beginning of August 2005 and noticed a deposition of K-T-V for December 2005. K-T-V designated Mr. Harazim as its witness. Mr. Harazim's deposition was delayed until February 2006. When it finally took place, it was suspended in order to accommodate the witness's travel schedule, because Mr. Harazim was unprepared to answer certain questions within the scope of the 30(b)(6) notice and, as described in more detail below, because Mr. Harazim refused to answer questions concerning the pending criminal proceedings. K-T-V also continues to improperly withhold videotapes and audiotapes specifically requested by defendants in August 2005 on the ground that producing them would be "improper" in view of the pending criminal proceedings. Even were this a valid ground for K-T-V to refuse discovery—it is not— K-T-V did not object on this ground when it responded to the defendants' document requests in September 2005 or *even acknowledge the tapes' existence* at that time.

## II.    THE LEGAL STANDARD

Federal Rule of Civil Procedure 26(c)(2) provides that "for good cause shown, the court . . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . that the disclosure or discovery may be had only on specified terms and conditions, including a designation of the time or place."

District courts have "wide latitude" and "broad discretion" in designing protective orders. *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 532 (1st Cir. 1993); *see Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 91 (1st Cir. 1996) ("It is well settled that the trial judge has broad discretion in ruling on pre-trial management matters, and we review the district court's denial of discovery for abuse of its considerable discretion."). In exercising this broad discretion, the Court should take guidance from the substantial body of case law relating to stays of civil

proceedings pending the outcome of parallel criminal proceedings. Mr. Weiss seeks much narrower relief than a complete stay. However, the interests implicated are analogous.

Although "[i]t is not inherently unconstitutional . . . to proceed with parallel civil and criminal proceedings," courts often exercise their inherent discretionary authority to stay civil proceedings pending the outcome of parallel criminal proceedings in order to protect defendants' constitutional rights, among other reasons. *Digital Equip. Corp v. Currie Enterprises*, 142 F.R.D. 8, 11 (D. Mass. 1991). Courts frequently make use of this authority to ensure that a defendant is not unfairly burdened by defending both a civil and criminal matter at the same time.[15] "The touchstone, of course, is that a district court's discretionary power to stay civil proceedings in deference to parallel criminal proceedings should be invoked when the interests of justice counsel in favor of such a course." *Microfinancial, Inc. v. Premier Holidays Int'l*, 385 F.3d 72, 78 (1st Cir. 2004):

_____

[15] *See, e.g.*, *McNutt v. Hayleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1257–58 (11th Cir. 2005) (noting stay of qui tam case pending outcome of parallel criminal investigation and proceedings); *Kmart Corp. v. Aronds*, 123 F.3d 297 (5th Cir. 1997) (refusing to grant writ of mandamus overturning stay of civil RICO suit pending outcome of parallel criminal proceedings); *Crawford & Sons, Ltd. Profit Sharing Plan v. Besser*, 298 F. Supp. 2d 317 (E.D.N.Y. 2004) (staying civil RICO case pending the resolution of a parallel criminal case); *Javier H. v. Garcia-Botello*, 218 F.R.D. 72 (W.D.N.Y. 2003 (staying civil case until close of evidence in parallel criminal case); *Bridgeport Harbour Place I, LLC v. Ganim*, 269 F. Supp. 2d 6 (D. Conn. 2002) (staying discovery in view of parallel criminal case, but requiring answer to complaint and scheduling briefing for motion to dismiss); *Walsh Sec., Inc. v. Cristo Property Mgmt.*, 7 F. Supp. 2d 523 (D.N.J. 1998) (staying discovery in civil case in view of parallel criminal investigation in which defendants were unindicted targets); *Twenty First Century Corp v. LaBianca*, 801 F. Supp. 1007 (E.D.N.Y. 1992) (staying civil case pending outcome of parallel criminal case); *Estate of Gaither v. Dist. of Columbia*, C.A. No. 03-1458 (CKK), 2005 U.S. Dist. LEXIS 35426 (D.D.C. Dec. 2, 2005) (denying motion to lift stay that had been in place for over two years "until completion of the related criminal case"); *Wilson v. Nat'l Ass'n of Letter Carriers, Branch No. 2730*, C.A. No. 01-2736 "F"(4), 2005 U.S. Dist. LEXIS 17816 (E.D. La. Aug. 10, 2005) (describing stay of civil proceedings from March 2002 to October 2004 in view of parallel criminal investigation); *Johnson v. New York City Police Dept.*, No. 01-Civ-6570 (RCC) (JCF), 2003 U.S. Dist. LEXIS 12111 (S.D.N.Y. July 16, 2003) (staying § 1983 action pending outcome of parallel state court criminal proceeding).

Notwithstanding that each instance is sui generis, the case law discloses five factors that typically bear on the decisional calculus: (i) the interests of the civil plaintiff in proceeding expeditiously with the civil litigation, including the avoidance of any prejudice to the plaintiff should a delay transpire; (ii) the hardship to the defendant, including the burden placed upon him should the cases go forward in tandem; (iii) the convenience of both the civil and criminal courts; (iv) the interests of third parties; and (v) the public interest. To this list we add (vi) the good faith of the litigants (or the absence of it) and (vii) the status of the cases.

*Microfinancial*, 385 F.3d at 78 (citations omitted).

## III.    A PROTECTIVE ORDER SERVES THE INTERESTS OF JUSTICE

### A.    An Analysis of the *Microfinancial* Factors Indicates that a Protective Order is Warranted

#### 1.    K-T-V's Interest in Proceeding Expeditiously with the Litigation is Not Prejudiced by the Entry of a Protective Order

Mr. Weiss seeks a very narrow protective order. Rather than a stay of the entire litigation, he seeks to postpone only his deposition until the resolution of the parallel Czech criminal proceedings instigated by the plaintiff. On March 24, 2006, the plaintiff noticed six other depositions, which it is free to conduct.[16] Discovery initiated by Defendants has yet to be completed. The first deposition noticed by Defendants in November 2005 was delayed until February 2006 and then suspended in part to accommodate the witness's travel schedule and in part as a result of the improper refusal of the witness to answer questions, as described in more detail below. The defendants also noticed, on March 3, 2006, a second deposition that has yet to

---

[16] Some of the individuals whose depositions K-T-V noticed are not parties or presently associated with any party and K-T-V may need to subpoena those individuals to secure their deposition testimony.

be scheduled.  In short, the parties have plenty of discovery to conduct.  Sequencing a single deposition will not delay this case significantly, if at all.[17]

Moreover, even if the protective order did delay the resolution of this case, K-T-V can point to no prejudice that it would suffer.  The operative events underlying K-T-V's affirmative case are recent and there is little risk of memories fading.

Finally, K-T-V can hardly be heard to complain about any delay resulting from the need to coordinate fairly this civil case with the criminal proceedings in the Czech Republic, which it initiated.  Had K-T-V not improperly used its influence over Czech law enforcement as leverage in this commercial dispute, none of the issues raised by this motion would exist.

         2.      K-T-V's Conduct, Including Its Conduct in This Litigation, Argues in Favor of a Protective Order

K-T-V's conduct throughout this litigation, from the moment it filed its Complaint, evidences the sort of bad faith misuse of the legal system that provides further justification for a protective order.  Not satisfied with initiating criminal proceedings against Mr. Weiss in the Czech Republic, K-T-V filed this suit.  Its banner headline: Andrew Weiss, an investment manager, engaged in "an audacious stock fraud scheme" and violated the Securities Exchange Act.  *See* Compl. at 1–3, 15–16.  However, K-T-V fails to allege three of the four prerequisites for a securities fraud claim, "1) that [it] purchased or sold securities; 2) that defendants misrepresented or omitted material facts in connection with that purchase or sale; . . . and 4) that plaintiff relied on such misrepresentations or omissions to his detriment."  *Steiner v. Unitrode Corp.*, 834 F. Supp. 40, 42 (D. Mass. 1993) (listing four prerequisites for "stat[ing] a cause of

---

[17] Should the Czech criminal proceedings still be pending as of the date that fact discovery is set to close, Mr. Weiss will make a further application to the Court for a protective order and appropriate extension to the fact discovery period.

action under the federal securities laws"). In fact, there was no transaction at all between the plaintiff and the Weiss Defendants. Likewise, K-T-V's scandalous allegations of RICO violations are defective on their face for multiple independent reasons. *See* Defs.' Mem. in Supp. of Mot. for Judgment on the Pleadings at 7, 10–16 (attached hereto as Exhibit J). For example, K-T-V accuses Mr. Weiss of extortion for threatening to file civil lawsuits and then causing those lawsuits to be filed in the Czech Republic. This is not a crime—it is his right under the U.S. and Czech constitutions and international law.[18] A fair reading of the K-T-V Complaint is that it was drafted not for purposes of obtaining relief under the federal statutes it cites, but rather as a vehicle to make defamatory statements about Mr. Weiss while seeking the protection of immunity associated with defamatory statements made in pleadings. K-T-V continued this practice of slinging mud by issuing subpoenas in the name of the U.S. Courts to Mr. Weiss's investors stating that Mr. Weiss had been indicted in the Czech Republic—an allegation that is simply not true.

K-T-V then instituted months of delay by refusing to produce admittedly non-confidential documents unless the Weiss Parties agreed to a blanket confidentiality order. When K-T-V finally moved for a protective order as required by the Discovery Master, the Discovery

---

[18] *See, e.g.*, *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088 & n.2 (11th Cir. 2004) (holding that neither threats to litigate nor actual litigation can constitute extortion under federal law); *Deck v. Eng'd Laminates*, 349 F.3d 1253, 1257–58 (10th Cir. 2003) ("[W]e join a multitude of other courts in holding that meritless litigation is not extortion under § 1951."); *I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265, 267 (8th Cir. 1984) ("We cannot agree that the threat [to bring a civil action] alleged here constituted the infliction of 'fear' for purposes of the extortion statute."); *Dias v. Bogins*, No. 97-1612, 1998 U.S. App. LEXIS 536, at *2 (1st Cir. Jan. 13, 1998) (unpublished) ("[A] threat to sue . . . is not extortion under federal law."); *Di Giambattista v. McGovern*, No. 92-1168, 1992 U.S. App. LEXIS 23569, at *10 (1st Cir. Sept. 4, 1992) (unpublished) (same).

Master found that K-T-V had failed to meet its burden of demonstrating that the information at issue was even confidential.

Finally, and most audaciously, K-T-V is using the criminal proceedings in the Czech Republic not only as a weapon against Mr. Weiss, but also as a shield against legitimate discovery.  So far, K-T-V's refusals to provide discovery because of the criminal proceedings has manifested itself in two ways.

First, on August 3, 2005, the Weiss Parties requested, among other things, "[a]ll documents concerning communications between or among [several individuals and companies], *including but not limited to audio and video recordings of those communications*."  Exhibit K, Doc. Req. No. 34 (emphasis added).  K-T-V responded that it would produce "documents concerning communications between or among Kotva, Richard Harazim, Martin Benda, Andrew Weiss and Weiss Asset Management LLC, Ondrej Peterka, Vladimir Hoffman, [and] Georgiy Nikitin." *Id.*  K-T-V did not produce any videotapes or audio tapes or even acknowledge that such tapes existed.

During a deposition of K-T-V, however, K-T-V's CEO Richard Harazim testified that K-T-V videotaped several meeting between Vladimir Hoffmann and representatives of K-T-V and that the videotapes "are stored in our law office." Ex. A, 310:1–311:12.  K-T-V listed some of these tapes as "evidence" in its criminal complaint. *Id.*, 310:17–310:22.  To this day, K-T-V continues to withhold these videotapes—despite its blanket agreement to produce all such documents in September 2005—on the grounds that producing them might somehow compromise the Czech police investigation of Mr. Weiss.  This is a wholly improper ground for K-T-V to withhold relevant documents.

Second, during the deposition, counsel for K-T-V repeatedly instructed the witness not to answer questions on the grounds that doing so might "compromise" the Czech criminal investigation.  For example:

```
BY MR. LEIBENSPERGER:

     Q.   After August 27, 2004, are you aware of
any tape recordings of conversations with Mr. Hoffmann?

          THE INTERPRETER:  This is the area where
I, after consultation with my Czech lawyer, I am not
supposed to talk about.  This is because it's connected
to the investigation of Mr. Weiss, and because
Mr. Weiss never received the statement about start of
the criminal proceedings against him in the Czech
Republic, from the Czech Republic.  I would, if I would
talk about it, I may state something which could
obstruct the police investigation.

     A.   Compromise.

          THE INTERPRETER:  Compromise.

     Q.   Regardless, are you aware that there are
tape recordings of Mr. Hoffmann after August 27, 2004?

          MR. BECKMAN:  Let me just interject.
Based on the advice of Czech counsel, Kotva is
prohibited from disclosing the police investigation
or -- and because it would result in compromising the
police investigation until after the complaint of the
```

charges is served upon Mr. Weiss.  So, he can't answer
those, because it revolves around Czech criminal
police.

       Q.   I press for an answer regardless of the
statements of counsel.

       A.   I will not answer that.

* * * *

       Q.   Is it your position that you will refuse
to testify about anything that happened after
August 27, 2004, with respect to the criminal
investigation?

       A.   This is the instructions which I got from
my Czech lawyers, which they gave me in order for me
not to break Czech law.

Ex. A, 283:1–284:3, 285:16–22.  On March 30, 2006, counsel for K-T-V stated that he will continue to maintain this objection until Mr. Weiss is formally served with the Czech Police's "resolution" describing the accusations against him.

These instructions not to answer are in direct violation of the Rules.  Federal Rule of Civil Procedure 30(d)(1) provides that "[a] person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30(d)(4)."  The grounds asserted by the plaintiff do not relate to privilege or a limitation directed by the Court.  It has been over a month since the deposition was suspended, yet the plaintiff has not filed a motion under Rule 30(d)(4).

K-T-V's repeated claims that it need not produce documents or answer questions in a deposition in view of the Czech criminal proceedings are inconsistent with its refusal to postpone the deposition of Mr. Weiss until the criminal proceeding has terminated. Additionally, by failing to provide discovery in a timely fashion, K-T-V impedes Mr. Weiss's ability to prepare for his deposition.

        3.      Mr. Weiss Would Suffer Hardship in the Absence of a Protective Order

The near identity of K-T-V's claims in this case and K-T-V's claims in the Czech criminal proceeding make this an exceptionally strong case for deferring the deposition of Mr. Weiss. As the D.C. Circuit explained:

> Other than where there is specific evidence of agency bad faith or malicious governmental tactics, the strongest case for deferring civil proceedings until after completion of criminal proceedings is where a party under indictment for a serious offense is required to defend a civil or administrative action involving the same matter. The noncriminal proceeding, if not deferred, might undermine the party's Fifth Amendment privilege against self-incrimination, expand rights of criminal discovery beyond the limits of Federal Rule of Criminal Procedure 16(b), expose the basis of the defense to the prosecution in advance of criminal trial, or otherwise prejudice the case. If delay of the noncriminal proceeding would not seriously injure the public interest, a court may be justified in deferring it.

*SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375–76 (D.C. Cir. 1980) (en banc).

Although Mr. Weiss is not under indictment, it is clear that he is a target of a criminal investigation, orchestrated by the plaintiff, relating to nearly identical allegations as the plaintiff makes in this case. K-T-V has an active role in both the civil and criminal proceedings and is the moving force behind both. This collusion between K-T-V and the Czech police creates an unfair situation in which the investigative power of the Czech police is enlarged through K-T-V's use of this Court's discovery rules and K-T-V's investigative powers and leverage is increased through the criminal investigation. If the Court does not enter a protective order, Mr. Weiss will be unfairly forced to choose whether to exercise his constitutional rights in a criminal case and

suffering the consequence in a civil case. This is exactly the sort of unfair advantage K-T-V seeks to secure through its influence over Czech law enforcement.

Moreover, this case involves the very sort of malicious tactics by the plaintiff in cooperation with law enforcement referenced in *Dresser*. As described above, K-T-V worked hand-in-hand with the Czech police to secretly gather evidence, including attorney-client privileged material, and to initiate the criminal complaint. The close relationship between K-T-V and the Czech officials conducting the criminal proceeding are another factor justifying deferring Mr. Weiss's deposition. *Cf. United States v. 4003-4005 5th Ave.*, 55 F.3d 78, 83 (6th Cir. 1995) (describing need for "special consideration" to be given to Fifth Amendment interests of defendant when civil plaintiff controls decision to initiate criminal proceedings).

In one sense, this case is not unique. The Czech legal system is marred by corruption.[19] It is unfortunately all too common for well-connected corporations and individuals to initiate criminal proceedings in attempts to prevail in otherwise ordinary commercial disputes.[20] Such is the case here. In another sense, however, this case is unique because K-T-V is also attempting to use this Court as part of its efforts to gain leverage over Mr. Weiss. By deferring Mr. Weiss's

---

[19] *See, e.g.*, State Department 2005 Report on Human Rights violations in the Czech Republic (noting "widespread corruption at all levels of government" and stating "Police corruption was a problem."); Jeffrey M. Jordan, "Patronage and Corruption in the Czech Republic", SAIS Review, Vol. XXII no. 2 (Summer-Fall 2002), 19–52; L. Lizal & E. Kocenda, "State of Corruption in Transition: Case of the Czech Republic," Emerging Markets Review, Vol. 2, no. 2, June 2001, 138–160; David S. Altshuler, "Tunneling towards capitalism in the Czech Republic," Ethnography, Vol. 2(1): 115–138, 121–122 (March 2001) (all articles and reports attached as Exhibit L).

[20] For example, in March 2006 an international arbitration panel entered a partial award against the Czech Government in a Bilateral Investment Treaty proceeding initiated by Nomura International plc / Saluka Investments BV. In the months leading up to this decision against the Czech Republic, criminal proceedings were initiated against Nomura's local representative. *See* Exhibit M (Nomura press release).

deposition, the Court can minimize the unfairly prejudicial impact of K-T-V's decision to pursue both civil and criminal charges against Mr. Weiss at the same time.

4.    The Convenience of the Civil and Criminal Courts and the Status of the Cases Militate Towards the Entry of a Protective Order

The convenience of the respective courts in view of the status of the cases favors the entry of a protective order. This case is relatively young, having been pending for approximately one year. The Court has not yet ruled on who the proper parties are to this dispute. There are presently pending motions to dismiss filed by four parties and a motion to drop two other parties as counterclaim-plaintiffs. Moreover, the Defendants have filed a motion for judgment on the pleadings. If the Court grants the Defendants' motion and dismisses the Complaint, then the Court need not consider whether K-T-V has an interest in the speedy resolution of its claims, as it will have no claims remaining.

Finally, judicial efficiency would be served by resolution of the criminal case before this case. *See United States v. Mellon Bank N.A.*, 545 F.2d 869, 872–73 (3d Cir. 1976) (finding no abuse of discretion in staying civil case when "resolution of the criminal case would moot, clarify, or otherwise affect various contentions in the civil case."); *Crawford & Sons, Ltd. Profit Sharing Plan v. Besser*, 298 F. Supp. 2d 317 (E.D.N.Y. 2004) (staying civil case when "a conviction or acquittal in the criminal action may negate or buttress some or all of the plaintiffs' claims"). The criminal case relates to this case in two ways. First, K-T-V's allegations in the criminal case parallel its allegations in this case. Second, K-T-V's initiation of criminal proceedings against Mr. Weiss—along with the filing of this lawsuit—is the basis for Weiss's counterclaim for abuse of process.[21]    Once the criminal proceedings are resolved favorably to

---

[21] The Court denied K-T-V's 12(b)(6) motion to dismiss Weiss's abuse of process claim.

Mr. Weiss, that fact will be admissible against K-T-V. *See Fishman v. Brooks*, 396 Mass. 643, 652 (1986) (merits of underlying action relevant to showing that process was/was not used for an ulterior purpose).

          5.       The Interests of Third Parties and the Public Are Not Implicated

The interests of third parties are not implicated by the requested protective order. Nor is the interest of the public. There is a "presumption that the public has an interest in the prompt resolution of civil cases." *Microfinancial*, 385 F.3d at 79 n.4. However, as described above, the protective order will not delay this case significantly, if at all.

**B.      Other Courts Have Stayed Litigation in Comparable Circumstances**

As the First Circuit acknowledged in *Microfinancial*, each case is unique and a protective order must be crafted to the specifics of the particular case. However, this Court may take guidance from other courts faced with comparable circumstances that have stayed litigation pending the outcome of parallel criminal proceedings.

In *Wehling v. CBS*, 608 F.2d 1084 (5th Cir. 1979), the Fifth Circuit reversed a district court decision dismissing a lawsuit, rather than staying it, when the plaintiff asserted his Fifth Amendment rights in response to discovery initiated by a party who the plaintiff asserted was cooperating with a government investigation of the plaintiff. The plaintiff sought a stay until the criminal statute of limitations would have run out, a three year period. "Although a three-year hiatus in the lawsuit is undesirable from the standpoint of both the court and the defendant, permitting such inconvenience seems preferable at this point to requiring plaintiff to choose between his silence and his lawsuit." *Id.* at 1089. Thus, the Fifth Circuit concluded that the district court abused its discretion in denying the plaintiff's motion for a protective order.

Likewise, in *Kaeppler v. Jas. H. Matthews & Co.*, 200 F. Supp. 229 (E.D. Pa. 1961), the district court entered a protective order postponing the deposition of one of the plaintiff's

employees who was indicted for tax evasion. Notwithstanding the fact that, at the time, the Rules gave priority to discovery by defendants, the Court entered an order providing that all other discovery be completed before the deposition of the employee facing criminal charges.

More recently, in *SEC v. Healthsouth Corp.*, 261 F. Supp. 2d 1298, 1325–26 (N.D. Ala. 2003), the Court stayed civil proceedings in view of an ongoing criminal investigation. The defendant in *Healthsouth* was the subject of an investigation, rather than an indictment. Like K-T-V, the civil plaintiff—the SEC—obtained evidence from law enforcement officials involved in the parallel criminal investigation. *Id.* at 1325. Like K-T-V, the SEC on multiple occasions raised "the fact of an ongoing criminal investigation . . . to stymie defendant's . . . efforts at discovery." *Id.* 1306. In one such instance, the SEC, like K-T-V, improperly refused to provide an audio recording made in collaboration with law enforcement. *Id.* at 1305–06. In view of these facts, and the amplified threat to the defendants' constitutional rights in view of the fact that the SEC was "conducting a de facto criminal investigation using nominally civil means," the court stayed the civil case pending the outcome of the criminal proceedings. *Id.* at 1326.

In this case, where the relief sought is not a total stay of the proceedings, but rather a more limited protective order sequencing a single deposition, the Court should exercise its broad discretion by ordering the deferral of the deposition

IV.    __CONCLUSION__

For the above reasons, the Court should grant Mr. Weiss's Motion for a Protective Order.

.                                        Respectfully Submitted,

                                         ANDREW WEISS

                                         By his attorneys,


                                         /s/ Benjamin A. Goldberger
                                         Edward P. Leibensperger (BBO# 292620)
                                         Benjamin A. Goldberger (BBO# 654357)
                                         McDermott Will & Emery LLP
                                         28 State Street
                                         Boston, Massachusetts  02109-1775
                                         (617) 535-4000

Dated: April 7, 2006

__CERTIFICATE OF SERVICE__

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 7, 2006.

                                         /s/ Benjamin A. Goldberger
                                         Benjamin A. Goldberger

BST99 1497636-5.072198.0012

1          VOLUME 1, PAGES 1 - 234

2             EXHIBITS 1 - 22

3      IN THE UNITED STATES DISTRICT COURT

4       FOR THE DISTRICT OF MASSACHUSETTS

5             No. 05-10679-RCL

6    - - - - - - - - - - - - - - - - - - - - - - - -

7   KOTVA a.s.,

8          Plaintiffs

9       vs.

10  ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,

11         Defendants

12  _____

13  ANDREW WEISS, WEISS ASSET MANAGEMENT LLC,

14  KT, INC. and CVF INVESTMENTS, LTD.,

15         Counterclaim-Plaintiffs,

16      v.

17  KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM,

18  FORMINSTER ENTERPRISES, LTC., SPV CO. and

19  JOHN DOES 1-5,

20         Counterclaim-Defendants.

21  - - - - - - - - - - - - - - - - - - - - - - - -

22    VIDEOTAPED RULE 30(b)(6) DEPOSITION OF KOTVA a.s.

23       BY AND THROUGH RICHARD HARAZIM

24      Tuesday, February 22, 2006 10:02 a.m.

1        Q.   Is that correct?

2        A.   Yes.

3        Q    Is this the record you were referring to

4    as showing who the shareholders are?

5        A    No, no.  This is a record that shows who

6    the directors are.  There must be similar to this

7    record which shows who the shareholders were.

8        Q.   Were the shares of Forminster that were --

9    let me start over.  Were the shares at Forminster at

10   November 30, 1999 held by nominees?

11       A.   I believe so.

12       Q.   Do you know who the beneficial owners were

13   of the shares of Forminster on November 30, 1999?

14       A    No.

15       Q.   Did you ever ask that question?

16       A.   No.

17       Q.   Was there a reason you did not ask that

18   question?

19       MR. BECKMAN:  Objection.  You may answer.

20       A.   There was no special reason.  I just

21   didn't ask.

22       Q.   You were aware in November, 1999 of the

23   allegation in the press that Forminster had committed

24   criminal acts?

Harazim, Richard Vol 1   2/22/2006  10:02:00 AM

1          MR. BECKMAN:  Objection

2      Q.   Were you aware of those?

3      A    Yes.

4      Q.   And so didn't you want to know who the

5  owners of Forminster were, before you signed up to be

6  on the Board of Directors?

7      A.   I wanted to know who the shareholders were

8  not

9      Q.   Okay   And what did you do in that regard?

10      A.   I asked the law firm, Mr. Toman, if he can

11  assure me that I don't work for Mr. Hßlek, and I got

12  that insurance -- assurance, I'm sorry

13      Q.   What way did Mr  Toman give you that

14  assurance?

15          MR  BECKMAN:  Objection.  You may answer.

16      A    Just told me so.

17      Q.   Did he give you anything in writing?

18      A.   No

19      Q    Was there anyone else that you wanted to

20  be assured of as not being a shareholder of Forminster?

21      A.   Well, I said Mr. Hßlek or anybody from his

22  group

23      Q.   So, to be clear here, you asked Mr. Toman

24  whether Mr. Hßlek or anyone from his group were

1    shareholders of Forminster, correct?

2        A.  Yes.

3        Q.  And his answer to you was?

4        A.  No

5        Q.  Did you do anything further to learn the

6    identities of the beneficial shareholders of

7    Forminster?

8        A.  No.

9        Q.  How long did you stay a member of the

10   Board of Directors of Forminster?

11       A.  Once again, I don't remember exactly the

12   day, but I believe it was still Autumn, 2002.

13           MR. LEIBENSPERGER:  Let's mark the next

14   exhibit.

15               (Certificate dated May 6, 2002

16        marked Exhibit 8.)

17           MR. LEIBENSPERGER:  This will be

18   Exhibit 8.

19   BY MR. LEIBENSPERGER:

20       Q.  Exhibit 8 is another certificate

21   referencing you as a member of the Board of Directors

22   of Forminster at May 6, 2002.  Is that correct?

23       A.  Yes.

24       Q.  And so were you a member of the Board of

1          VOLUME 2, PAGES 235 - 403

2          EXHIBITS 23 - 40

3      IN THE UNITED STATES DISTRICT COURT

4      FOR THE DISTRICT OF MASSACHUSETTS

5              No. 05-10679-RCL

6      - - - - - - - - - - - - - - - - - - - - - - - - -

7    KOTVA a.s.,

8          Plaintiffs

9        vs.

10   ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,

11         Defendants

12   _____

13   ANDREW WEISS, WEISS ASSET MANAGEMENT LLC,

14   KT, INC. and CVF INVESTMENTS, LTD.,

15         Counterclaim-Plaintiffs,

16       v.

17   KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM,

18   FORMINSTER ENTERPRISES, LTC., SPV CO. and

19   JOHN DOES 1-5,

20         Counterclaim-Defendants.

21   - - - - - - - - - - - - - - - - - - - - - - - - -

22    CONTINUED VIDEOTAPED DEPOSITION OF KOTVA a.s.

23      BY AND THROUGH RICHARD HARAZIM

24    Wednesday, February 23, 2006 9:44 a.m

1          THE INTERPRETER:  Nobody knew that

2     Mr. Weiss is behind Gilroy case.

3          Q.   My question was different.  When you

4     learned of the Gilroy lawsuit, did you think that

5     lawsuit was an illegal procedure?

6          A.   Yes.  I believed that the real purpose of

7     this, this lawsuit is different than the face one, the

8     face value of it.

9          THE INTERPRETER:  Thank you.

10         Q.   Did you believe that the filing of the

11    Gilroy lawsuit was a criminal act?

12         MR. BECKMAN:  Objection.  Calls for a

13    legal conclusion.  How is he supposed to answer that?

14    You can answer, though.  Go ahead.

15         THE INTERPRETER:  Just filing the lawsuit,

16    no.  But, when you -- when the money were asked for

17    pulling --

18         A    Extorting, extorting money in order to

19    drop the lawsuit, yes.  That is a criminal act.

20         Q.   So, your view of a criminal act was the

21    request to have the shares purchased after the lawsuit

22    was filed?

23         MR. BECKMAN:  Objection.

24         A.   I understand this situation as follows:

1   My understanding of the situation is as follows:  If

2   somebody brings the lawsuit for a different purpose

3   than the lawsuit states or looks like, and then he

4   requires money to take the lawsuit back, to recall it

5   back --

6        A.   To drop

7           THE INTERPRETER:  To drop it, thank you.

8   Then I believe that this is a criminal act

9        Q.   What was the stated claim in the Gilroy

10  lawsuit?

11       A.   The lawsuit stated or claimed that the

12  building doesn't belong to the KN company, but belongs

13  to KAS

14       Q.   KAS is Kotva a.s.?

15       A.   Right.  And KN is Kotva Nemovitosti real

16  estate, and KAS is Kotva shareholding company.

17           MR. LEIBENSPERGER:  Let me mark this as

18  the next exhibit.

19              (E-mail dated August 5, 2004

20          marked Exhibit 24.)

21  BY MR. LEIBENSPERGER:

22       Q.   Exhibit 24 is an e-mail from Mr. Prestage

23  to you, Mr. Harazim, dated August 5, 2004.  In

24  Paragraph -- strike that.  Underneath the Prestage

1    BY MR. LEIBENSPERGER:

2        Q.   After August 27, 2004, are you aware of

3    any tape recordings of conversations with Mr. Hoffmann?

4            THE INTERPRETER:  This is the area where

5    I, after consultation with my Czech lawyer, I am not

6    supposed to talk about.  This is because it's connected

7    to the investigation of Mr. Weiss, and because

8    Mr. Weiss never received the statement about start of

9    the criminal proceedings against him in the Czech

10   Republic, from the Czech Republic.  I would, if I would

11   talk about it, I may state something which could

12   obstruct the police investigation.

13       A.   Compromise.

14           THE INTERPRETER:  Compromise.

15       Q.   Regardless, are you aware that there are

16   tape recordings of Mr. Hoffmann after August 27, 2004?

17           MR. BECKMAN:  Let me just interject.

18   Based on the advice of Czech counsel, Kotva is

19   prohibited from disclosing the police investigation

20   or -- and because it would result in compromising the

21   police investigation until after the complaint of the

22   charges is served upon Mr. Weiss.  So, he can't answer

23   those, because it revolves around Czech criminal

24   police.

1       Q.   I press for an answer regardless of the

2    statements of counsel.

3       A.   I will not answer that.

4       Q.   Again, you will have to come back for

5    further deposition.

6          MR. BECKMAN:  He's happy to come back

7    after Mr. Weiss --

8       A.   The moment Mr. Weiss accepts or confirms

9    the receiving of those documents, that the criminal

10   proceedings are against him started, I may talk about

11   it the whole day.

12      Q.   Do you have at Kotva copies of any tape

13   recordings of or transcripts after August 27, 2004?

14      A    We have copies of the criminal complaint,

15   and I am not able to discuss the contents.  I am not

16   allowed to discuss the contents.

17          COURT REPORTER:  One second.  Can we go

18   off?

19          THE VIDEOGRAPHER:  Going off the record.

20   The time is 11:32 a.m.

21          (A brief recess was taken.)

22          THE VIDEOGRAPHER:  Going back on the

23   record.  The time is 11:34 a.m.

24          MR. LEIBENSPERGER:  The record should

1    reflect that we went off the record, because the court

2    reporter had a glitch in her machine and needed to call

3    a recess.

4    BY MR. LEIBENSPERGER:

5        Q.  My last question, sir, was:  Do you have

6    at Kotva copies of any tape recordings or transcripts

7    of conversations after August 27, 2004?

8        A.  I am -- I cannot answer that question,

9    because Mr. Weiss will have to be interviewed by the

10   police in this matter, and I cannot release any

11   information from the criminal file which may obstruct

12   this investigation.

13       Q.  My question is simply whether you have

14   copies or tapes or transcripts?

15       A.  I don't have them.

16       Q.  Is it your position that you will refuse

17   to testify about anything that happened after

18   August 27, 2004, with respect to the criminal

19   investigation?

20       A.  This is the instructions which I got from

21   my Czech lawyers, which they gave me in order for me

22   not to break Czech law.

23       MR. BECKMAN:  Let me say this, just to

24   move this along, Rule 30(b)(6), the notice that you

1      Q.  I asked you before whether there were

2   video recordings of the August meetings.  Do you now

3   recall that there are?

4      A.  I thought that we were talking only about

5   the meeting from August 2nd.

6      Q.  All right.  Between August 2nd and

7   August 27, were there meetings between Mr. Hoffmann and

8   Mr. Benda?

9      A.  Yes.

10      Q.  How many?

11      A.  I can only read it, but I don't remember

12   it.  There were four meetings.

13      Q.  And how many were videotaped?

14      A.  Kotva tried to record all of them.

15      Q.  By video?

16      A.  Yes.  Video recording.

17      Q.  Do you have the video recordings?

18      A.  The video recordings are not usable

19   because of their technical quality.  We didn't use them

20   during that court -- during this case.  And they are

21   stored in our law office.

22      Q.  Okay.  They're listed as evidence in this

23   letter, correct?

24          THE INTERPRETER:  It was, we were thinking

1      about it. We were considering it

2          A    They were meant to be evidence, yes.

3          MR. LEIBENSPERGER:  Again, we demand the

4      production of that, those videotapes. We've requested

5      them. They were not produced, and I think this has

6      really hampered our ability to take discovery from

7      Mr. Harazim.

8          MR. BECKMAN:  Well, you can create your

9      record, but we'll consider your request.

10         MR. LEIBENSPERGER:  You already responded

11     to the request that you would produce all audiotapes

12     and videotapes, and you haven't done it

13     BY MR. LEIBENSPERGER:

14         Q.   After the police -- well, strike that.

15     Start over. Before August 27, 2004, were you

16     consulting with the police in any way?

17         A.   No.

18         Q.   And so is it correct that the police had

19     no idea about any of this until August 27, 2004?

20         A.   Correct

21         Q.   After August 27, 2004, you continued to

22     have communications with Mr. Weiss and his associates?

23         A.   Yes

24         Q.   Do you recall that there was a meeting on

1    October 18, 2004?

2              THE INTERPRETER:  October 18?

3              MR. LEIBENSPERGER:  Yes.

4         A.  With whom?

5         Q.  With yourself, Mr. Benda, Mr. Prestage,

6    Mr. Peterka, and Mr. Hoffmann?

7         A.  Yes, I do.

8         Q.  Where did that meeting take place?

9         A.  In the office of Mr. Peterka.

10        Q.  Was that meeting taped?

11        A.  I can't answer based on the same grounds.

12        Q.  So, you won't answer that question?

13        A.  I won't answer that question.

14             MR. BECKMAN:  State the grounds.  State it

15   in English.

16             THE WITNESS:  I can't, because I might

17   compromise the police investigation.

18        Q.  It was in Mr. Peterka's office?

19        A.  Yes.

20             THE INTERPRETER:  Yes.

21        Q.  Do you know whether the meeting was

22   videotaped?

23        A.  I cannot answer, because I might

24   compromise the police investigation.

1      Q.  Do you have a copy of any audio or

2    videotape of the October 18 meeting?

3      A.  I, by answering that, I would indicate if

4    it was made or not, and I cannot do that.

5      Q.  Was Mr. Prestage aware on October 18,

6    2004, that you were not sincerely negotiating for the

7    purchase of the shares?

8          MR. BECKMAN:  Objection.

9      A.  Mr. Prestage was informed about the whole

10   situation, which was necessary, because at that meeting

11   Mr. Hoffmann and Mr. Peterka submitted to him,

12   according to my opinion, again, illegal proposal.  And

13   it was necessary to prepare Mr. Prestage about this

14   situation, so he was informed about it or briefed.

15     Q.  If you go back to Exhibit 29 -- wrong

16   exhibit.  I have to find the right exhibit.

17         (Discussion off the record.)

18         MR. GOLDBERGER:  It's already in, I think.

19   I'm sorry, October 18?

20         MR. LEIBENSPERGER:  Yes.

21     Q.  At the October 18, 2004 meeting, do you

22   recall that Mr. Prestage stated that Markland might be

23   willing to buy some BGO shares?

24         THE INTERPRETER:  Mr. Prestage was asked

1    question one more time.

2         Q.  After Mr. Benda left the Board of

3    Forminster, it is your testimony that the only person

4    you knew to act on behalf of Forminster was Mr. Toman?

5         MR. BECKMAN:  Objection.

6         A.  I know that in certain, specific

7    administrative matters, I know that Mr. Vlach was

8    helping them, as well, but -- to represent Forminster,

9    but, as far as I know, only Petr Toman was representing

10   Forminster.

11        Q.  What matters are you referring to where

12   Mr. Vlach did something on behalf of Forminster?

13        A.  He had some sort of power of attorney to

14   submit some official documents or something like that.

15        Q.  When?

16        A.  When?  I think he still has it.

17        Q.  Have you seen that power of attorney?

18        A.  I did not see it.  It was described to me.

19        Q.  Who described it to you?

20        A.  Mr. Vlach.

21        Q.  Do you know who signed the power of

22   attorney on behalf of Forminster?

23        A.  I don't know.

24        Q.  What did Mr. Vlach tell you he was doing

1    for Forminster?

2        A.   Mr. Vlach told me that he's helping Petr

3    Toman with some small matters.

4        Q.   Is Mr. Vlach being paid by Forminster for

5    his activities on its behalf?

6        A.   No.

7        Q.   How do you know that?

8        A    At some occasion, there was a request

9    which came from Toman to verify what is the mutual

10   relationship between people from Kotva and from FEL,

11   from Forminster, and we were talking about that.

12       Q.   Mr. Vlach is on the Board of Directors of

13   Kotva?

14       A.   That's correct

15       Q    And this power of attorney he holds from

16   Forminster still exists today, and can you tell us when

17   it started?

18           MR. BECKMAN:  Objection.

19       A    I don't know when it --

20       Q.   Was it 2002, when you went off the board

21   of Forminster?

22           MR. LEIBENSPERGER:  Can we answer the

23   question?

24           THE VIDEOGRAPHER:  Please.

1          MR. LEIBENSPERGER:  Then we have to stop

2     to change tapes

3          A   I don't know.

4          MR. LEIBENSPERGER:  We'll have to stop to

5     change tapes

6          THE VIDEOGRAPHER:  This marks the end of

7     Tape No. 2 in the deposition of Richard Harazim.  Going

8     off the record.  The time is 2:28 p.m.

9          MR. LEIBENSPERGER:  We'll also take a

10    five-minute break.

11          (A recess was taken.)

12          THE VIDEOGRAPHER.  Here begins Videotape

13    No. 3 in the February 23rd deposition of Richard

14    Harazim.  Going on the record.  The time is 2:36 p.m.

15    BY MR. LEIBENSPERGER:

16          Q.  Mr. Harazim, as we changed tapes, I was

17    asking you about when Mr. Vlach's power of attorney

18    from Forminster started

19          A.  I am not sure.  I think it's the power of

20    attorney is relatively young.

21          Q.  When you were on the Board of Directors of

22    Forminster, did Mr. Vlach have a power of attorney for

23    Forminster?

24          A.  I believe not.

Harazim, Richard Vol. 2  2/23/2006  9:44:00 AM

1      Q.   And when you say "relatively young," did

2   he have the power of attorney for Forminster in 2004,

3   2005?

4      A.   This is the way I think so.

5      Q.   Do you have the exhibit which is the Kotva

6   annual report in the stack?

7         MR. GOLDBERGER:  I believe that is six or

8   so.

9      Q.   And if you would turn -- actually, may I

10  have the exhibit, and I'll try to find the page.  I'm

11  directing you to Page 3, which is K5475, and there is a

12  heading under the letter "D".  Does that say

13  description of the structure of the parent company?

14     A.   No.

15     Q.   What does it say?

16     A.   The corporation concern.  The description

17  of the structure of the concern and concern is the big,

18  big corporation.

19     Q.   Okay.  If I could have the exhibit again,

20  please.  I want to ask the translator to read, to

21  translate the paragraphs under that subsection.

22        THE INTERPRETER:  The description of the

23  structure of the concern.  The company Kotva

24  Shareholding Company is in the sense of the

1    Paragraph 66A of the trade law of the companies with

2    majority ownership shareholder and is Vladimir Sosoba

3    [phonetic].

4        A.   Control person.

5            THE INTERPRETER:  Control person, yes.

6        Q.   Is a control person?

7            THE INTERPRETER:  Is being controlled by

8    somebody.  Being controlled by somebody.  The

9    controlling person, the person -- next paragraph.  The

10   controlling person, the person which in the sense of

11   the stated paragraph of the trade law in fact or

12   legally exercised directly or indirectly decisive

13   influence on running or operation of the company of the

14   other person.  The person being controlled; that is,

15   company's mother company, is company Forminster

16   Enterprises, Ltd., located at 20 Queen Frederica

17   Street, El Greco House, Nicosia Kypr.

18       Q.   Kypr is Cyprus?

19           THE INTERPRETER:  Cyprus.  Thank you.

20       Q.   Did the interpreter read that paragraph

21   correctly?

22       A.   More or less.

23       Q.   Is there anything that you different with?

24       A.   No.  I think it's all right.

Dated 20 December 2004

SPV CO Limited

and

CRQ Czech a s

# SHARE PURCHASE AGREEMENT

relating to the purchase of shares in SPV KN a s

Linklaters

Palác Myslbek
Na Příkopě 19
117 19 Prague 1



Telephone  (420) 221 622 111
Fax        (420) 221 622 199

Ref  BDXW/L-033253

KC 1-2641

KC1-2641

**This Share Purchase Agreement (the "Agreement") is made on 20 December 2004**

**Between:**

(1)   **SPV CO Limited,** with its registered office at Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus, company registration no HE 148845, registered in Cyprus (the "**Seller**"), represented by Martin Benda, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1A;

(2)   **CRQ Czech a.s.,** with its registered office Prague 1, Národní 1435/6, Post Code 11000, Identification no. 27159256, registered in the Companies Register by the Regional Court in Prague, in Part B, File 9394 (the "**Buyer**"), and represented by Frank Walker, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1B;

(3)   **SPV KN a.s.**, with its registered office in Brno, Příkop 4, Post Code 602 00, Identification no. 26910705, registered in the Companies Register by the Regional Court in Brno, in Part B, File 4043 ("**SPV KN**"), represented by Ing. Richard Harazim, sole member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1C;

(4)   **KOTVA NEMOVITOSTI, k.s.,** with its registered office at Příkop 4, Brno, Post Code 602 00, Identification no. 26229048, registered in the Companies Register by the Regional Court in Brno, in Part A, File 16586 ("**Kotva**"), and represented by KOTVA OBCHODNÍ, a.s., represented by Ing. Michal Vlach, Chairman of the Board of Directors, Ing. Jiří Brada, member of the Board of Directors, and Ing. Pavel Richter, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1D;

(5)   **MARKLAND HOLDINGS Limited,** with its registered office at 19 Upper Fitzwilliam Street, Dublin 2, company registration no. 291167 registered under the laws of the Republic of Ireland ("**Markland**"), and represented by Frank Walker, a proxy. A copy of an extract from Companies House Ireland is annexed hereto at Schedule 2;

(6)   **KOTVA a.s.,** with its registered office at Náměstí Republiky 8, Praha 1, Identification no 60193808, registered in the Companies Register by the Municipal Court in Prague, in Part B, File 2370 ("**KAS**"), and represented by Ing. Michal Vlach, Chairman of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1E; and

(7)   **KOTVA OBCHODNÍ, a.s.,** with its registered office at Příkop 4, Brno, Postal Code 602 00, Identification no. 26231735, registered in the Companies Register by the Regional Court in Brno, in Part B, File 3484 ("**KO**"), represented by Messrs Ing. Michal Vlach, Chairman of the Board of Directors, Ing. Jiří Brada and Ing. Pavel Richter, members of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1F;

(jointly referred to as the "**Parties**")

**Whereas:**

(A)   The Seller is a company validly established under the laws of Cyprus and is part of the KAS Group

---

A04677559/1 4/22 Dec 2004

1

(B)    SPV KN is the registered owner of the Property and is part of the KAS Group

(C)    The Seller is undertaking steps to acquire 97% of the shares in SPV KN

(D)    KAS is a holding company established under the laws of the Czech Republic and is the controlling person in relation to the Seller, SPV KN and to KO.

(E)    The Seller wishes to sell and the Buyer wishes to buy the Shares, and the KOTVA Trademarks under the terms and subject to the conditions set out herein.

**The Parties hereby agree as follows:**

**1    Interpretation**

    **1.1**    Construction

Any reference in this Agreement to an "Article", "Clause" or "Section" refers to the corresponding Article, Clause or Section of this Agreement, unless the context indicates otherwise. The headings of Articles, Clauses and Sections are provided for convenience only and should not affect the construction or interpretation of this Agreement. All words used in this Agreement should be construed to be of such gender or number as the circumstances require. The terms "include" or "including" indicate examples of a foregoing general statement and not a limitation on that general statement. Any reference to a statute refers to the statute, any amendments or successor legislation, and all regulations promulgated under or implementing the statute, as in effect at the relevant time. Any reference to a contract or other document as of a given date means the contract or other document as amended, supplemented and modified from time to time. Any reference to an amount in a given currency shall mean a similar amount in any other currency converted at the then applicable exchange rate.

    **1.2**    Definitions

For the purposes of this Agreement, the following terms and variations on them have the meanings specified in this Clause 1.2:

| | |
|---|---|
| **"Adverse Consequence"** | means any Liability, loss, damage (including incidental and consequential damages), claim, cost, deficiency, diminution of value, or expense (including the reasonable costs of investigation and defence, penalties, and reasonable legal fees and costs), whether or not involving a third-party claim; |
| **"Building"** | means building no. 656, located in the registration area of Staré Město, municipality section Staré Město, on plot no. 680, and further building registered therein without descriptive number or evidence number present on plot no. 1018/2. Both buildings are registered at the Real Estate Register hl. m. Praha, title no. 265, for Prague city, cadastral area Staré Město. A copy of an extract from the Real Estate Register is annexed hereto at Schedule 5; |
| **"Business"** | means the business of leasing non-residential premises in the Building or leasing the Contributed Property to third persons as tenants and providing related services; |

KC 1-2643

KC1-2643

| | |
|---|---|
| "Business Day" | means any day other than a public holiday as defined under Czech law or Austrian law or Irish law or a day that the Escrow Agent or the Buyer's bank is closed for business; |
| "Change of Control" | means: (a) KAS or Kotva ceasing to directly or indirectly control the Seller; or (b) KAS ceasing to control SPV KN or Kotva or KO, prior to the Closing Date; |
| "Closing" | means the hand-over of the Shares by the Seller to the Buyer through the Escrow Agent upon terms stipulated herein; |
| "Closing Date" | means the day on which the Closing takes place; |
| "Consent" | means any approval, consent, ratification, waiver or other expiration of a right to deny consent or other authorisation, provided either by a Governmental Body or other Person; |
| "Contemplated Transactions" | means all of the transactions to be carried out in accordance with this Agreement, including the purchase and sale of the Shares and the performance by the Parties of their obligations under this Agreement; |
| "Contract" | means any contract, agreement, commitment, understanding, lease, licence, franchise, warranty, guarantee, mortgage, note, bond, or other instrument or consensual obligation (whether written or oral and whether express or implied) that is legally binding; |
| "Commercial Code" | means the Czech Commercial Code, Act no. 513/1991 Coll., as amended; |
| "Companies Register" | means the register of company information, maintained by the regional courts in the Czech Republic; |
| "CZK" | means Czech Crowns, the official currency of the Czech Republic; |
| "Deposit" | means the sum of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) which has already been delivered to the Escrow Agent by Markland on behalf of the Buyer; |
| "Due Diligence" | means a process, during which the Kotva and the KAS Group provided Markland with requested data and information and provided the Buyer with all co-operation necessary to enable it to ascertain the legal status and condition of the Property and of Kotva and KAS, SPV KN and SPV CO; |
| "Encumbrance" | means any charge, claim, mortgage, easement, right of way, community or other material property interest, covenant, equitable interest, lien, option, pledge, security interest, preference, priority, right of first refusal, or other similar right of a third party of restriction; |
| "Escrow Account" | means the escrow account opened to facilitate the transaction envisaged hereunder; |
| "Escrow Agent" | ██████████████████████████████████████ |
| "Escrow Agreement" | means the contract concluded between the Seller, the Buyer, Kotva and Markland and the Escrow Agent, as amended; |

| | |
|---|---|
| "EUR" | means Euro, the official currency of the European Union; |
| "Financial Statements" | means the audited financial statements of SPV KN as at the Closing Date; |
| "Fixtures & Fittings" | means the list of fixtures an fittings annexed hereto at Schedule 11; |
| "Force Majeure" | means an event occurring out of the control of the Parties which results in breach of the obligations under the Agreement by one of the Parties, if the Party breaching the Agreement could not have avoided such event or breach of the Agreement despite having exercised maximum effort and care which may reasonably be required from such Party |

The Force Majeure shall mean in particular:

(a)   natural disaster;

(b)   war, war footing, invasion, mobilization or embargo;

(c)   uprising, revolution. rebellion, military regime or civil war;

(d)   radioactivity contamination from a nuclear facility or any other dangerous part of an explosive nuclear facility or a part of such facility;

(e)   discovery of archaeological findings, fossils, coins, precious objects and antiques, etc ;

(f)   terrorist attack; and

(g)   any act by a municipality or registered authority which delays, beyond the control of Kotva. the transfer/contribution of the Shares and the Kotva Trademarks to the Seller

Force Majeure shall not include:

(a)   unfavourable weather conditions;

(b)   events that were known to Kotva or the Seller or to Markland or the Buyer prior to the signing hereof;

(c)   any changes of statutory regulations and technical standards;

(d)   any new statutory regulations or technical standards

| | |
|---|---|
| "Gilroy" | means Gilroy Limited whose registered office is at 4 Pikioni Street Limassol, Cyprus; |
| "Gilroy Claim" | means the claim that Gilroy lodged on 30 June 2004 with the District Court for Prague 1 a copy of which is attached hereto at Schedule 9; |
| "Gilroy Settlement" | means the obtaining of a definitive and final ruling in respect of the Gilroy Claim; for purposes of this Agreement such definitive and final ruling is deemed to be also a final settlement between the parties to the Gilroy Claim, approved by the court or the withdrawl by Gilroy of the Gilroy Claim |
| "Governmental | means any consent, licence, permit or registration issued, granted. or |

---

KC 1-2645

KC1-2645

Authorisation"              otherwise made available by or under the authority of any
                            Governmental Body or pursuant to any law, including decisions of a
                            court or other body on incorporation of a legal person and decisions
                            of the Real Estate Register Office on registration at the Real Estate
                            Register;

"Governmental Body"         means any of the following:

                            (a)   the executive ruling body of any state, region, city, village, or
                                  other jurisdiction;

                            (b)   federal, state, local, municipal, foreign or other government or
                                  self-government;

                            (c)   a budgetary or contributory governmental authority of any
                                  nature (including any governmental agency, branch,
                                  department, or other entity and any court or other tribunal);

                            (d)   a multinational organisation incorporated pursuant to
                                  international law;

                            (e)   a body exercising, or entitled to exercise, any administrative,
                                  executive, judicial, legislative, policy, regulatory, or tax
                                  authority; or

                            (f)   an official of any of the foregoing

"Indemnified Person"        means a Person entitled to an Share Purchase Price adjustment or
                            damages under Clause 8 2 or Clause 8 3;

"Indemnifying Person"       means a Person obliged to pay a Share Purchase Price adjustment or
                            damages to an Indemnified Person;

"J&T banka Mortgage"        means at the date of this Agreement a mortgage over the Property
                            registered in favour of J & T banka, a.s. Identification no. 47115378,
                            with its registered office Pobřežní 297/14, 186 00 Praha 8 (hereinafter
                            referred to as "J&T banka")

"KAS Group"                 means KAS and trade companies, all of them together or each one
                            individually, under the centralised power and control of KAS, pursuant
                            to §66a Art 7 of of the Commercial Code;

"Knowledge"                 means knowledge of information relevant for this Agreement about
                            any matter, fact or Person, being known to a Person;

"KO Lease"                  means the lease to be entered into between SPV KN and KO on the
                            Closing Date the text of which is annexed hereto at Schedule 5;

"Kotva's Indemnities"       is defined in Clause 8 3;

"Kotva Správcovská          means Kotva Správcovská a s., with its registered office in Brno,
a.s."                       Příkop 4, PSČ 60200, ID no 26510081;

"KOTVA Trademark I"         means the collection of trademarks consisting of: word-device
                            trademark KOTVA, registration no 167478, registered in the Patent
                            and Trademark Office of the Czech Republic and word-device
                            trademark KOTVA, registration no 167478 registered in the Patent
                            and Trademark Office of the Slovak Republic;

| | |
|---|---|
| "KOTVA Trademark II" | means the collection of trademarks consisting of: word-device and word only trademark KOTVA having been used by Kotva but not yet registered in Kotva's name in the Patent and Trademark Office of the Czech Republic for which registration Kotva has applied by the applications no 355 884 and 355 885 both filed with the Patent and Trademark Office of the Czech Republic on 1st of July 2004, with the priority right date of July the 1st 2004. The KOTVA Trademark II is further specified in an expert opinion dated 10 July 2004 annexed hereto as the Schedule 10; |
| "KOTVA Trademarks" | means collectively KOTVA Trademark I and KOTVA Trademark II |
| "Land" | means the collection of plots of land registered at the Real Estate Register hl m Praha, ownership deed no. 265, for Prague city, cadastral area of Staré Mésto, consisting of: plot no 680 – built-up area and yard, plot no 683/1 – other area, plot no 683/2 – other area, plot no 683/3 other area, plot no 690/2 – other area, plot no 690/3 – other area, plot no. 690/4 – other area, and plot no 1018/2 – built-up area and yard A copy of an extract from the Real Estate Register is annexed hereto at Schedule 4; |
| "Legal Requirement" | any valid legal regulation of any Governmental Body; |
| "Liabilities" | includes liabilities or obligations of any nature, whether known or unknown, whether obsolete, accrued, contingent or other, whether due or to become due or prescribed, and whether or not required to be reflected on a financial statement and "Liability" shall be construed accordingly; |
| "Markland's Indemnities" | is defined in Clause 8 2; |
| "Order" | any published and publicly available order, injunction, judgement, assessment. decree. ruling, or arbitration award of any Governmental Body or arbitrator; |
| "Ordinary Course of Business" | actions taken in the course of normal Business operation by SPV KN and/or by Kotva or the Seller or KO as the respective owner or manager of the Property, consistent with past practice of Kotva; |
| "Organisational Documents" | any deed, bylaws, regulations, certificate, statement, statute, or similar document adopted, filed or registered in connection with the creation, formation, or organisation of an entity, and any Contract among equity holders. partners or members of an entity; |
| "Person" | an individual or an entity, including a corporation, share company, limited liability company, partnership, trust, association, or any other body with legal personality separate from its equity holders or members; |
| "Proceeding" | any action, arbitration, audit, examination. investigation, hearing, litigation, or suit (whether civil, criminal, administrative, judicial or investigative, informal, public or private) commenced. brought, conducted, heard by or before. or otherwise involving. any |

KC1-2647

|  | Governmental Body or arbitrator; |
|---|---|
| "Property" | means the Building and the Land; |
| "Proprietary Information" | is defined in Clause 9.1; |
| "Purchase Price" | means the total purchase price for the Shares and the KOTVA Trademarks in the sum of the Czech Crown equalling CZK 1,501,450,000 (one billion five hundred and one million four hundred and fifty thousand Czech Crowns) calculated as follows: |

    (i)    purchase price for the Shares CZK 1,366,450,000 (one billion three hundred and sixty six million four hundred and fifty thousand Czech Crowns) ("**Share Purchase Price**"),

    (ii)   purchase price for the Kotva Trademarks CZK 135,000.000 (one hundred and thirty five million Czech Crowns) ("**Trademarks Purchase Price**");

| "Related Person" | with respect to a particular Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person and, with respect to an individual, any other individual that is a member of the individual's family (by blood, marriage or adoption), a member of the individual's household, an entity in which the individual participates in management or an employee or employer of the individual. For the purposes of this definition, "control" means where a Person (or Persons acting in concert) acquires or agrees to acquire or has options over direct or indirect control: (a) of the affairs of that Person; or (b) more than 50 per cent of the total voting rights conferred by all the issued shares in the capital of that Person which are ordinarily exercisable in general meeting; or (c) of the composition of the main board of directors of a Person. For these purposes "Persons acting in concert", are Persons which actively co-operate, pursuant to an agreement or understanding (whether formal or informal), with a view to obtaining or consolidating or exercising control of that Person; |
|---|---|
| "Rent Roll" | means the up to date rent roll as at the date of this Agreement which truly and accurately records the existing lease relations concerning non-residential premises in the Building, a copy of which is annexed at Schedule 6; |
| "Representative" | with respect to a particular Person, any director, appointed officer, employee, consultant, agent, advisor, legal counsel, accountant, or other representative of that Person; |
| "Retention" | means the money retained in the Escrow Account following Closing in accordance with Clause 5.6.4 ; |
| "Security" | means the amount of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) that has been paid by Kotva on behalf of the Seller into the Escrow Account prior to the date hereof in order to secure a possible claim or claims of the Buyer against the Seller together with any interest thereon; |

| "Shares" | means the following ordinary bearer shares in certified form issued by SPV KN: |
|---|---|

(a)  10 shares of nominal value CZK 200,000 each with Nos 1-10 issued on 10 November 2003; and

(b)  13 shares of nominal value CZK 100,000.000 each with Nos. 11-23 issued on 9 April 2004; and

(c)  2 shares of nominal value CZK 20,000,000 each with Nos. 24 and 25 issued on 9 April 2004; and

(d)  8 shares of nominal value CZK 1,000,000 each with Nos. 28-35 issued on 9 April 2004; and

(e)  2 shares of nominal value CZK 100,000 each with Nos 37 and 38 issued on 9 April 2004; and

(f)  4 shares of nominal value CZK 10,000 each with Nos 46-49 issued on 9 April 2004;

the nominal value of which represents 97 per cent of the capital stock of SPV KN;

| "SPV Conclusion" | the satisfaction of the conditions in Clause 3 1; |
|---|---|
| "Tax" or "Taxes" | means without limitation and whatever means by which it is levied all forms of taxation, statutory, governmental, state, local, foreign and municipal impositions, duties, contributions and levies including any tax imposed on any income, withholding tax, value added tax ("VAT"), road tax, real estate tax. real estate transfer tax, gift tax, inheritance tax, excise duties. customs or other duty. employment related levies, including social security contributions and contributions to complementary welfare and health insurance including both principal and potential related interest and penalties; |
| "Threatened" | an action or matter would be considered to have been "Threatened" if a demand or statement has been made (whether orally or in writing) or a notice has been given (whether orally or in writing), or any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such action or matter is likely to be asserted, commenced, taken or otherwise pursued in the future; and |
| "Transfer Deed" | means a Share Purchase Agreement to be concluded between the Seller and the Buyer effecting the transfer of the title to the Shares to the Buyer |

## 2    Agreement on replacement of present obligations between several Parties by new obligations between all Parties

2.1    The Parties hereby agree pursuant to section 570 of the Act No 40/1964 Coll , the Civil Code, as amended, that their mutual obligations arising out of the Share Purchase Agreement concluded on 20 January 2004 (hereinafter referred to as the "Present SPA") between Kotva and Markland is replaced in their entirety by the obligations contained in the Agreement

**2.2**   For avoidance of any doubt it is agreed that the Present SPA terminates in its whole scope on the moment when this Agreement comes into being so that this Agreement substitutes the Present SPA in the whole scope.

**2.3**   The Parties hereby agree to accession of the Seller, SPV KN, KAS, KO and the Buyer to this Agreement and the Seller, SPV KN, KAS, KO and the Buyer confirm by signing this Agreement they have acceded to the Agreement

**2.4**   For avoidance of any doubt it is agreed that the termination of the Present SPA and its substitution by this Agreement as stipulated herein shall not give a rise to claim for return of any performance that has been already provided pursuant to the Present SPA

**2.5**   If the nature of rights and obligations under this Agreement enables so, the Seller's rights and obligations under this Agreement may be fulfilled and exercised by Kotva and the Buyer's rights and obligations under this Agreement may be fulfilled and exercised by Markland

**2.6**   The Seller and Kotva are jointly and severally liable for the fulfilment of the obligations of either of them arising out of this Agreement. Kotva, KAS and KO jointly and severally guarantee the fulfilment of the Seller`s and Kotva`s obligations arising out of this Agreement. The Buyer and Markland are jointly and severally liable for the fulfilment of the obligations of either of them arising out of this Agreement

**2.7**   The Seller and the Buyer and Kotva and Markland shall use their best endeavours to execute an amendment to the Escrow Agreement within 20 Business Days of the date of this Agreement to enable the Escrow Agent to perform its duties in accordance with the terms and conditions of this Agreement

**3    Initial Obligations**

The Initial Obligations are as follows:

**3.1**   Seller's Obligation - procuring of SPV Conclusion

    **3.1.1**   The Seller is obliged to procure the valid and legal and effective transfer or contribution of the Shares and the KOTVA Trademarks to the Seller through a non-monetary investment contribution to the Seller by Kotva which is satisfactory to the Buyer, acting reasonably, which in the circumstances will mean the requirement of the Seller to procure a valid and clear legal opinion confirming the valid and legal and effective transfer or contribution of the Shares and the KOTVA Trademarks to the Seller through a non-monetary investment contribution to the Seller by Kotva Such legal opinion will also include confirmation that the Seller is fully and effectually entitled to sell the Shares and the KOTVA Trademarks to the Buyer pursuant to the terms of this Agreement; and

    **3.1.2**   The Seller is obliged to procure the application for registration in the Patent and Trademark Office of the Czech Republic and Slovak Republic respectively of the contribution of the KOTVA Trademarks to the Seller, in a form acceptable to the Buyer, acting reasonably

**3.2**   Buyer's Obligation - Legal Opinion

---

KC1-2650

3.2.1    The Buyer will procure as soon as possible after the date hereof, but no later than 31 January 2005, that its lawyers agree with the Buyer's bank's lawyers a legal opinion in respect of the ownership of the Property by SPV KN and the Shares by SPV CO to enable the Buyer's bank to confirm that it is prepared to finance the transactions contemplated hereunder

3.3    Satisfaction of Initial Obligations

3.3.1    Within five Business Days of the satisfaction of any of the obligations referred to in Clauses 3 1 or 3 2, the party satisfying such condition shall serve notice of satisfaction on the other party

3.4    Failure to satisfy the conditions precedent

3.4.1    In the event that Kotva fails to satisfy the obligations under this Clause 3 1 by 31 January 2005, the Buyer and Markland may withdraw from this Agreement by either one of them serving five Business Days written notice on Kotva and the Seller Markland shall be entitled to the immediate refund of the Deposit together with any interest thereon and a contractual penalty payable by Kotva in the sum of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied firstly from the Security

3.4.2    In the event that the Buyer fails to satisfy the obligations under Clause 3 2 1 by 31 January 2005, the Seller or Kotva may withdraw from this Agreement by either one of them serving five Business Days written notice on the Buyer and Markland. The Seller shall be entitled to a contractual penalty payable by the Buyer in the sum of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied from the Deposit and te balance of such Deposit shall be retuned to the Buyer

4    **SPV KN from its founding until Closing**

4.1    Board of Directors of SPV KN

4.1.1    Kotva may only appoint a new member of SPV KN's Board of Directors or remove any of the existing members only with the prior written approval of the Buyer

4.1.2    Kotva further undertakes that the members of the Board of Directors or other managers of SPV KN will not act outside of the Ordinary Course of Business and shall obtain prior written approval from the Buyer before making any non-operational decision or series of related decisions of a value in excess of CZK 157,500 (one hundred and fifty seven thousand five hundred Czech Crowns) except where this Agreement states to the contrary

4.1 3    Kotva and/or the Seller, once it becomes majority shareholder of SPV KN, shall procure that the Board of Directors of SPV KN will observe and perform the obligations and undertakings as set out in Clause 6 and for the avoidance of doubt, any breach of such obligations and undertakings by the Board of Directors of SPV KN, if able to cause an Adverse Consequence to SPV KN and/or the Buyer and/or Markland of a sum in

KC1-2651

excess of CZK 31,500 (thirty one thousand five hundred Czech Crowns), shall be regarded as a material breach of this Agreement which shall entitle the Buyer and Markland to withdraw pursuant to Clause 10 respecting the time period in Clause 8.5.

4.2    Supervisory Board of SPV KN

4.2.1    Kotva may only appoint a new member of SPV KN's Supervisory Board or remove an existing one only with the prior written approval of the Buyer

## 5    Sale and Transfer of Shares and KOTVA Trademarks; Closing

5.1    Transfer of Shares

5.1.1    Subject to the terms and conditions of this Agreement the Seller and the Buyer undertake, within five (5) Business Days of the Purchase Price being paid into the Escrow Account in accordance with Clause 5.3, to conclude the Transfer Deed, and the Seller undertakes to sell the Shares and to transfer the title to the Shares to the Buyer, the Seller and the Buyer undertake to instruct the Escrow Agent to immediately release the Shares to the Buyer and the Buyer undertakes to buy the Shares from the Seller and to pay for the Shares the Share Purchase Price.

5.1.2    The terms and conditions of this Agreement not repeated in the Transfer Deed will apply to the transfer of the Shares under the Transfer Deed as if they were explicitly stipulated in the Transfer Deed.

5.2    Transfer of the KOTVA Trademarks

5.2.1    Subject of the terms and conditions of this Agreement the Seller undertakes, within five (5) Business Days of the Purchase Price is paid into the Escrow Account in accordance with Clause 5.3, to conclude with SPV KN or the Buyer (such decision to be at the discretion of the Buyer provided that it shall not cause any material adverse effect to the Seller) the Kotva Trademarks transfer agreement in a form to be agreed by the Buyer, acting reasonably, and the Seller undertakes to sell and transfer the KOTVA Trademarks to SPV KN or the Buyer and the Buyer undertakes to:

(i)    ensure that SPV KN or the Buyer will buy the KOTVA Trademarks; and

(ii)    pay on behalf of SPV KN or in its own name for the KOTVA Trademarks the Trademark Purchase Price

5.2.2    SPV KN hereby agrees to sign all such documents as are required to effect the Kotva Trademarks transfer agreements referred to in Clause 5.2.1 above.

5.2.3    The terms and conditions of this Agreement not repeated in the KOTVA Trademarks transfer agreements will apply to the transfer of the KOTVA Trademarks under the the KOTVA Trademarks transfer agreements as if they were explicitly stipulated in the KOTVA Trademarks transfer agreements.

KC1-2652

5.2.4   In the event that the Buyer decides about the transfer of the KOTVA Trademarks to SPV KN under Clause 5.2.1 and as a result of this decision any provision of this Agreement is directly or indirectly breached, neither Markland nor the Buyer may claim any right that it would otherwise have as a result of such breach.

5.3   Deposit and Purchase Price

5.3.1   The Deposit credited to the Escrow Account shall form part of the Purchase Price.

5.3.2   Within 20 Business Days of receipt or service by the Buyer of the notice of satisfaction of the last of the initial obligations, the Buyer shall credit to the Escrow Account the amount of CZK 1,363,950,000 (one billion three hundred and sixty three million nine hundred and fifty thousand Czech Crowns) representing the balance of the Purchase Price. In the event that on the date of payment of the balance of the Purchase Price, the Deposit or its part has been used to settle a Seller's claim according to this Agreement (other than the claim to receive the Purchase Price), the Buyer is obliged to balance the Purchase Price so that the total sum deposited by the Buyer (including the Deposit) represents the Purchase Price.

5.3.3   In the event that the Buyer fails to credit the Escrow Account as specified in Clause 5.3.2 the Buyer shall pay to the Seller a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) by way of forfeit of the Deposit which shall be released to the Seller within five (5) Business Days from the breach of this obligation. Upon settlement of this contractual penalty in favour of the Seller this Agreement immediately terminates.

5.3.4   Following Closing, if:

(i)   a breach of any of the Seller's or Kotva's obligations or representations or warranties is discovered which occurred prior to Closing; and

(ii)   the nature of that breach is such that it entitles the Buyer to compensation (by way of Share Purchase Price reduction or damages) in accordance with the terms of this Agreement,

then the parties shall apply to Arbitration pursuant to Clause 11.12 of this Agreement to ascertain that conditions (i) and (ii) of this Clause 5.3.4 have been satisfied and, if so determined in the arbitration award, then the Buyer shall be entitled to have recourse to the Escrow Account for the amount corresponding to the Adverse Consequence so discovered. The Seller shall be obliged to replenish the Escrow Account with the amount withdrawn on account of the breach within 20 Business Days of its removal by the Buyer until such time as all the monies standing to the credit of the Escrow Account have been released in accordance with the terms of the Escrow Agreement.

5.4   Action pending Closing

KC 1-2653

KC1-2653

5.4.1   Kotva and the Seller shall collaborate fully with Markland and the Buyer, such collaboration to include but not be limited to Markland's and/or the Buyer's right to:

   (i)      receive, after a request made by each of them, all information distributed to the directors of SPV KN and the Seller;

   (ii)     attend, but not vote at, the meetings of the directors of SPV KN and the Seller; and

   (iii)    have full access to all those books, records and other documentation of SPV KN and the Seller to which a director normally has access in relation to all matters concerning the operation of SPV KN and the Seller between the date of this Agreement and the Closing Date

5.4.2   During such period Kotva and/or the Seller shall procure that neither SPV KN nor the Seller shall without the prior written consent of Markland:

   (i)      incur or enter into any agreement or commitment involving any capital expenditure in excess of CZK 157,500 (one hundred and fifty seven thousand five hundred Czech Crowns) per annum which is not in the Ordinary Course of Business;

   (ii)     enter into or amend any contract or commitment which is not in the Ordinary Course of Business or which involves or may involve a total annual expenditure or income in excess of CZK 500.000 (five hundred thousand Czech Crowns);

   (iii)    incur any additional borrowings or incur any other indebtedness;

   (iv)     save as required by law. make any amendment to the terms and conditions of employment (including, without limitation, remuneration and other benefits) of any employee. provide or agree to provide any gratuitous payment or benefit to any such person or any of their dependants, dismiss any employee or engage or appoint any additional employee;

   (v)      acquire or agree to acquire or dispose of or agree to dispose of any material asset or material stocks or enter into or amend any material Contract or arrangement;

   (vi)     take steps to procure the payment or settlement of any Liability generally in advance of the date on which book and other Liabilities are usually payable in accordance with the standard terms of the Seller's business or to extend the period to any particular debtor in which to make payment;

   (vii)    delay making payment to any trade creditors generally beyond the date on which payment of the relevant trade debt should be paid in accordance with a credit period as authorised by the relevant creditors or (if different) the period extended by such creditors in which to make payment;

KC1-2654

(viii)   amend, to any material extent, any of the terms on which goods, facilities or services are supplied, such supplies being material in the context of the Business, except where required to do so in order to comply with any Legal Requirement;

(ix)   enter into any guarantee, indemnity or other agreement to secure any obligation of a third party or create any encumbrance over any of its assets or undertaking;

(x)   allot, issue, redeem or repurchase any share capital of SPV KN and/or the Seller;

(xi)   enter into any contract reducing or depreciating the assets of SPV KN and/or the Seller;

(xii)   acquire or agree to acquire any share, shares or other interest in any Person;

(xiii)   declare, make or pay any dividend or other distribution to shareholders;

(xiv)   make any change to the practices or policies of SPV KN and/or the Seller;

(xv)   amend the Organisational Documents of SPV KN or the Seller; or

(xvi)   enter into any Contract or arrangement with a Related Person other than in the Ordinary Course of Business

5.4.3   Kotva and the Seller further undertake and undertake to procure that pending Closing each of them will:

(i)   continue those business activities which affect the Property, SPV KN or the Seller, only in the Ordinary Course of Business, save insofar as agreed in writing by the Buyer;

(ii)   take all reasonable steps to preserve its assets and Governmental Authorisations; and

(iii)   take all reasonable steps to preserve the validity of all Contracts to which they are a party which have an effect on the Property, SPV KN or the Seller

## 5.5   Closing

5.5.1   The Closing shall occur within five (5) Business Days after receipt of the Purchase Price by the Escrow Agent

5.5.2   The Seller shall, through the Escrow Agent, hand-over the Shares and shall hand-over the other documents referred to in Clause 5.6.1 and upon receipt of such Shares and other documents by the Buyer, the Closing of this transaction shall be deemed to occur The title to the Shares including shareholder's rights shall pass to the Buyer upon Closing The Purchase Price shall be settled by the Escrow Agent via the Escrow Account

## 5.6   Closing deliveries

5.6.1    At Closing Date, the Seller shall deliver to the Buyer through the Escrow Agent the items listed in sub-clause (a), (b) and (c) below and personally in respect of the remainder of the items listed below):

(a)    the Shares;

(b)    the Transfer Deed;

(c)    a hand-over protocol confirming the hand-over of the Shares;

(d)    an extract of SPV KN from the Commercial Register dated the Closing Date (fax copy is deemed to be a sufficient form);

(e)    written resignations of each member of the Board of Directors and the Supervisory Board of SPV KN and a resolution of the sole shareholder (or the Supervisory Board, as appropriate) of SPV KN taking note of the resignations in a form reasonably acceptable to the Buyer, to provide the resignations to take effect on the Closing Date;

(f)    resolution of the sole shareholder (or Supervisory Board, as appropriate) appointing new members of the Board of Directors and the Supervisory Board of SPV KN designated by the Buyer and advised to the Seller at least (5) Business Days prior to Closing in a form reasonably acceptable to the Buyer, to provide the appointments to take effect on the day immediately following the Closing Date;

(g)    the Powers of Attorney signed by each member of the Board of Directors of SPV KN to enable the Buyer to make the necessary post-Closing registration (or deletions) at the Commercial Register;

(h)    all SPV KN's Organisational Documents, including, but not limited to, the founding deed, articles of association and all applications regarding SPV KN's registration in the Commercial Register and all resolutions of the registration court;

(i)    all lease agreements in respect of the Property;

(j)    all title deeds and documents in respect of the Property;

(k)    all the financial and accounting books and records and returns of SPV KN completed up to Closing;

(l)    all other documents regarding SPV KN;

(m)    a certificate executed by the Seller and Kotva dated as of the Closing Date stating that: (i) all representations, warranties, obligations and undertakings as set forth under Clause 6 are fulfilled and are true and correct in all material respects as the Closing Date; and (ii) all actions required to be taken by Kotva, SPV KN and the Seller to effect Closing have been properly taken;

(n)    the KO Lease duly executed by KO;

(o)    certificates executed by the Seller and Kotva and their accountants. so far as they are authorised to do in accordance with Czech Law

KC 1-2656

KC1-2656

confirming: (i) the successful payment and liquidation of any and all long-term debts or Liabilities, financial or otherwise, of SPV KN, the Seller and Kotva not arising in the Ordinary Course of Business which would affect SPV KN, the Seller or the Property; and (ii) that the Liabilities and debts, financial or otherwise of Kotva and the Seller arising in the Ordinary Course of Business which would affect SPV KN, the Seller or the Property amount to less than CZK 500,000 (five hundred thousand Czech Crowns);

(p)     a certificate executed by the accountants of SPV KN confirming what debts and Liabilities, financial or otherwise SPV KN has and that, save for day to day debts or Liabilities, financial or otherwise, that SPV KN has no other such debts or Liabilities, financial or otherwise;

(q)     a confirmation of discharge of the liability secured by the J&T banka Mortgage, signed by J&T banka in a form reasonably acceptable to the Buyer to enable the Buyer to remove the registration of such mortgage from the real estate register;

(r)     the list of tenant's security deposits as evidenced in the accounting of SPV KN, which list in detail the amounts provided by the individual tenants as security deposits;

(s)     evidence that the Seller has relinquished all authority and all rights to make any transactions on the SPV KN bank accounts (or that such accounts are frozen pending the Buyer completing the necessary bank mandates) and all banking records and account details and new mandate forms for the Buyer to complete and to give all assistance as required by the banks in this respect to ensure the proper transmission of the accounts;

(t)     applications for the registration of the transfer of the KOTVA Trademarks from Kotva to the Seller stamped by the Industrial Property Offices in the Czech Republic and Slovak Republic, as applicable; and

(u)     the Kotva Trademarks transfer agreements

5.6.2   The documents listed in Clause 5.6.1 above shall be delivered by the Seller and Kotva to the Escrow Agent within ten (10) Business Days of the date of the written notice evidencing to the Buyer SPV Conclusion delivered in accordance with Clause 5.3.2 and following this, the Seller and the Buyer shall execute such confirmatory document as is required by the Escrow Agent and if either of them shall fail to execute such document as required by the Escrow Agent (save in the event of a dispute as to the actual delivery of the documentation) then a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) shall be payable to the other party

5.6.3   the Escrow Agent shall release the following sums from the Escrow Account upon Closing:

(i)     to the Buyer, the sum of CZK 10,837,800 (ten million eight hundred and thirty seven thousand eight hundred Czech Crowns) in respect of three months rent and service charge as defined in the KO Lease as a security deposit thereunder;

(ii)    provided that the debt secured by the J&T banka Mortgage has not been discharged and the Seller has supplied evidence thereof to the Buyer which is reasonably acceptable to the Buyer, to J&T banka an amount equal to the amount required to discharge in full and final settlement all amounts secured by the J&T banka Mortgage, provided that the Escrow Agent received a letter from J&T banka confirming that such amount will be in full and final settlement of the debt secured by the J&T banka Mortgage and any and all claims;

(iii)   to the Seller the Trademark Purchase Price;

(iv)    to the Seller, the sum of CZK 925,000,000 (nine hundred and twenty five million Czech Crowns), less the amounts paid to the Buyer pursuant to Clauses 5 6 3(i) above and to J&T banka pursuant to Clause 5 6 3(ii) above and to the Seller pursuant to Clause 5 6 3(iii) above.

5.6.4   The balance of the Share Purchase Price, being the Retention, amounting to CZK 576,450,000 (five hundred and seventy six million four hundred and fifty thousand Czech Crowns), shall be retained by the Escrow Agent until such time as there has been Gilroy Settlement. However, if there has been Gilroy Settlement but either 9 months from the Closing Date have not elapsed or there are Proceedings pursuant to Clause 5 6 4(i) below, the Escrow Agent shall release the Retention to the Seller less the sum of CZK 189,000,000 (one hundred and eighty nine million Czech Crowns), which shall be retained in the Escrow Account until such time as the Buyer obtains a definitive and final ruling in respect of such Proceedings or the period of 9 months from the Closing Date elapsed and there are no Proceedings which ever is the later. For the avoidance of doubt, a court decision made on basis of a valid withdrawal is considered to be a definitive and final ruling

The Escrow Agent shall throughout the period of holding the Retention release to the Buyer upon the sole request of the Buyer the following sums:

(i)     In the event that anyone initiates any legal Proceedings the subject matter of which is a declaration of invalidity of legal acts based on which the Property has been transferred or contributed to Kotva and/or to the Seller, within nine months of the Closing Date, then the Buyer shall be entitled to unilaterally withdraw on each regular quarter day, being 1 January, 1 April, 1 July and 1 October, such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending the Buyer, SPV KN or Markland in any such Proceedings Such amounts will be considered to be the Share Purchase Price adjustments In the event that compensation of such costs are awarded by the court to

the Buyer in such Proceedings, then the Buyer shall return such sums as it recovers to the Seller once it has received them from the obliged person, such amounts again will be considered the Share Purchase Price adjustments

(ii)    On each regular quarter day. being 1 January, 1 April. 1 July and 1 October. such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending SPV KN under the Gilroy Claim; the request of the Buyer for such sums from the Retention must evidenced by a duly issued invoice from the Buyer's lawyers for the time being Any payments under this Clause 5 6 4(ii) will be considered to be Share Purchase Price adjustments.

(iii)    In the event that, under any tax regulations applicable up to the date of Closing, Kotva or SPV KN are assessed with Tax (in particular real estate transfer tax or VAT) in relation to the contribution of the Property, to SPV KN and Kotva, SPV KN or the Seller is liable to pay such Tax to the Financial Authorities, Kotva and the Seller undertakes to compensate SPV KN for such Tax and any corresponding penalty, interest or any other financial payment imposed by the Financial Authorities on SPV KN and such amount of Tax shall be retained in the Escrow Account by the Escrow Agent and shall only be released to the Seller following Gilroy Settlement upon receipt of the following:

(a)    an original or an authenticated copy of the extract from the Real Estate Register showing the SPV KN as the exclusive owner of the Property which are free of any Encumbrances; it does not relate to any Encumbrances, which arise after the Closing has taken place or which are created by the Buyer;

(b)    an original or an authenticated copy of the Tax return relating to the real estate transfer tax resulting from the contribution of the Property to SPV KN and a copy of an expert's valuation, both bearing a stamp of the Tax Collection Authority confirming that the Tax return, including the expert's valuation, have been duly submitted to the Tax Collection Authority; and

(c)    original confirmation, issued by the appropriate Financial Authority, proving that neither Kotva nor the Seller or SPV KN have any tax liabilities in respect of any Tax and in particular real estate transfer tax resulting from the contribution of the Property to SPV KN

Any payments under this Clause 5.6 4(ii) will be considered to be Share Purchase Price adjustments.

(iv)    In the event that the Retention falls below the amount of CZK 31,500,000 (thirty one million five hundred thousand Czech Crowns) then the Seller and/or Kotva and/or KAS shall, within twenty (20) Business Days of the level falling below CZK

KC1-2659

31,500,000 (thirty one million five hundred thousand Czech Crowns), ensure that sufficient funds are paid in to the Escrow Account to bring the level back up to at least CZK 31,500,000 (thirty one million five hundred thousand Czech Crowns).

(v)     The Seller and Buyer will agree to adjust the Share Purchase Price by deducting from the Share Purchase Price payable to the Seller and release to the Buyer one half of the difference between CZK 177,250,000 (one hundred and seventy seven million two hundred and fifty thousand Czech Crowns ) and the actual annual income due in accordance with the true and accurate Rent Roll as existing at the Closing Date in respect of the Property, excluding the Service charge, as agreed between the Seller and the Buyer not more than 2 Business Days prior to the Closing Date

(vi)    For the avoidance of doubt. the sums referred to in this Clause 5.6.4of this Agreement may be released to the Buyer upon the Buyer's sole request and shall be deposited in such account as the Buyer shall, in its own discretion, determine.

5.6.5   If the conditions under this Agreement or under the Escrow Agreement for releasing any funds from the Escrow Account to either of the Seller or the Buyer have been validly satisfied, save in respect of any monies to be released pursuant to Clause 5.6.4, the other party shall, upon a written invitation by the other party. countersign a joint instruction or any other document contemplated by the Escrow Agreement and deliver it to the other party within five days of the invitation being delivered. If the appropriate party does not satisfy the aforementioned obligation in a due and timely manner. it shall pay to the other party a contractual penalty of CZK 157,500,000 (one hundred and fifty-seven million five hundred thousand Czech Crowns)

5.6.6   Kotva and the Seller hereby confirm that the Fixtures & Fittings will remain at the Building following Closing and will become, if not already, the property of SPV KN

## 6    Representations, Warranties and Obligations and Undertakings of KAS, Kotva and the Seller

KAS, Kotva and the Seller represent and warrant that the following representations and warranties contained in this Section 6 are true, correct and complete as at the date of signing this Agreement and Kotva, the Seller and KAS undertake to maintain them true, correct and complete during the entire term of effectiveness of this Agreement and to comply with all the obligations and undertakings contained in this Section 6 during the entire term of effectivness of this Agreement until Closing and in respect of those obligations and undertakings specified in Clause 6 5, for five years following the Closing Date:

6.1     General

(I)     Kotva, SPV KN, the Seller and KAS have been duly established and incorporated under the respective laws, being Czech, Czech, Cypriot and

KC1-2660

Czech, and the share capital has been fully paid up in respect of each of them

(ii)    None of Kotva, SPV KN, the Seller or KAS has been declared bankrupt nor, and to the best their Knowledge, has any person delivered a petition for bankruptcy

(iii)   There is no Proceeding in progress, pending or Threatened against or relating to Kotva, SPV KN or the Seller or KAS except for the Gilroy Case and the 'Balfinder litigation' and there is no circumstance, matter or thing which might give rise to any such Proceeding by Kotva or SPV KN or the Seller or KAS or any shareholder thereof or any third party or to any governmental investigation relative to it, nor is there outstanding against Kotva or SPV KN or Seller or KAS any regulation, judgement, decree, injunction, rule or Order of any court, Governmental Body or arbitrator which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable

(iv)    None of Kotva, SPV KN, or the Seller nor KAS nor any of their directors and managers have committed any offence or failed to comply with any applicable Law which might give rise to any fine, penalty, default or commencement of Proceeding or any other liability which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable

(v)     None of Kotva, SPV KN, or the Seller nor KAS is in default or breach of Organisational Documents or any licence, Governmental Authorisation. Contract or other instrument to which it is a party or by which it may be bound and there exists no state of facts which after notice or lapse of time, or both, would constitute such a default or breach, and all such licences. Governmental Authorisations, Contracts and documents are in good standing and Kotva, SPV KN or the Seller or KAS, as the case may be, are entitled to all benefits there under and none of Kotva. SPV KN, or the Seller or KAS have Knowledge of any of the above which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable

(vi)    Kotva and SPV KN and KAS are Tax resident only in the Czech Republic and will remain so (whilst under the control of the KAS Group) until at least five years from the Closing Date and neither Kotva nor SPV KN nor KAS has any Tax Liabilities whether actual or contingent in jurisdictions other than in the Czech Republic

(vii)   The Seller is tax resident of Cyprus

(viii)  The corporate records supplied to Markland during Due Diligence contain complete and accurate records of all minutes of meetings held and all resolutions adopted by Kotva and in general meetings since SPV KN's incorporation and neither Kotva nor KAS have any Knowledge of any defects in the above or breaches thereof, or in the corporate governance of KAS, which would make this Agreement or the transactions contemplated in this Agreement invalid. void or voidable

KC 1-2661

KC1-2661

(ix)    Kotva and the Seller have supplied the Buyer and/or Markland with all complete and accurate records of all minutes of meetings held and all resolutions adopted by SPV KN since its incorporation

(x)     The books and records of Kotva and SPV KN fairly and correctly set out and disclose in all material respects the financial position of the Business of Kotva and all material financial transactions relating to the Business have been accurately recorded in such books and records since its incorporation and Kotva has no Knowledge of a breach of any of the above.

(xi)    None of Kotva, SPV KN, or the Seller or KAS is a party to any valid written or verbal Contract or any other document under the terms and conditions of which the performance by the Seller of this Agreement would result in the breach of an obligation, or might provide a reason for the termination or invalidity of this Agreement or the transactions contemplated in this Agreement, or which might preclude Kotva, SPV KN or the Seller or KAS from performing their obligations hereunder.

(xii)   With respect to the Property, SPV KN will not execute any new lease without the prior written consent of the Buyer, such consent not to be unreasonably withheld or delayed. If a response to such a request is not given by the Buyer within 10 Business Days of its delivery, this will be deemed consent to the execution of the new lease.

(xiii)  The Seller. SPV KN, Kotva shall not extend or agree to extend any existing lease without the prior written Consent of the Buyer. such consent not to be unreasonably withheld or delayed. If a response to such a request is not given by the Buyer within 10 Business Days of its delivery, this will be deemed consent to the extension of the existing lease.

(xiv)   All Consents necessary to fulfil the obligations of Kotva. SPV KN. the Seller or KAS to complete the SPV Conclusion and the connsumation of the transactions contemplated by this Agreement shall be provided by the Seller, SPV KN or by Kotva to the Buyer as soon as practicable after they are available.

(xv)    Kotva and/or SPV KN shall permit any Person nominated by Markland or the Buyer to oversee the day-to-day management of the Property which, for the avoidance of doubt, shall mean the internal management of the Kotva shopping centre by the on-site retail manager. Kotva and/or SPV KN undertake to provide assistance, advice and all information necessary to enable such Person to effectively learn the current management structure of the Property

(xvi)   That in relation to those persons currently employed by Kotva or by the Seller there are no written Contracts of employment. mandate. consultancy or similar agreements with any employee. director or consultant of Kotva or of the Seller which are to be transferred to the Buyer or SPV KN on Closing either by operation of law or by virtue of any provision contained within any such employment agreements  Kotva and the Seller shall remain fully liable for all claims of redundancy payments or protective awards and for any liability. direct or indirect, resulting from the unfair or wrongful dismissal of any employee and shall fully and effectually indemnify. and continue to

KC 1-2662

KC1-2662

keep indemnified, the Buyer in respect of any costs or expenses which may arise in connection therewith.

(xvii)    The Seller and Kotva undertakes to ensure that, in relation to SPV KN. the entry into or completion of this Agreement will not directly or indirectly cause or contribute to the disallowance or non-availability of any Tax benefit or relief (whether by way of deduction, reduction, set-off, exemption, allowance or otherwise) from, against or in respect of which any Tax could or may be effectively reduced withdrawn, postponed, restricted or waived as a result of entry into or completion of this Agreement.

(xviii)   As at the Closing Date neither SPV KN nor the Seller will have any joint or several liability in respect of any Tax incurred by or due from any other Person, as a transferee or successor, by contract, or otherwise.

(xix)     Concerning SPV KN and/or the Seller, full liability has been accounted for or full provision or reserve has been made in the Financial Statements for all Taxes liable to be assessed or for which SPV KN is or may become accountable. Proper provision, reserve or liability for deferred Tax has been made in the Financial Statements.

(xx)      No income or revenue in relation to SPV KN (as computed for Tax purposes) will arise or accrue in consequence of cancellation of provisions or reserves which have been claimed as deductions or charges for Tax purposes in computing profits (tax base) or loss carry-forwards (as computed for Tax purposes), other than income against which corresponding expense allowable as deductions or charges for Tax purposes in computing profit (tax base) or loss carry-forwards (as computed for Tax purposes), (e.g. write-off of a receivable or expenses incurred on repairs of tangible assets) can be set-off.

(xxi)     Kotva shall procure that as at the Closing Date all of the accounts, books and records of SPV KN will be fully, properly and accurately up-to-date from the incorporation of each entity respectively, and will be maintained at a place and in a form that complies with the Commercial Code and all applicable Laws of the Czech Republic. All accounts, documents, reports and returns required by Law to be delivered or made to any Governmental Body will have been duly and correctly delivered or made by representatives of SPV KN and the Seller and will be delivered to the Buyer

(xxii)    Kotva shall procure that as at the Closing Date neither SPV KN nor the Seller will have any outstanding or undisclosed Taxes that were incurred on or before the Closing Date. SPV KN and the Seller have complied with all applicable Laws, rules and regulations relating to the payment and withholding of all Taxes. If the above mentioned declarations of the Seller prove to be incorrect the Seller shall immediately rectify this situation or shall immediately settle the tax for SPV KN or the Seller

(xxiii)   Enforceability; No Conflict

(a)    Kotva, SPV KN, KAS and the Seller have the absolute and unrestricted right, power, and authority to execute and deliver this

---

KC1-2663

Agreement and to perform their obligations under this Agreement, which actions have been duly authorised and approved by all necessary corporate actions of Kotva and the Seller and KAS, where relevant This Agreement constitutes the legal, valid, and binding obligation of Kotva, KAS and the Seller, and is enforceable against Kotva, KAS and the Seller in accordance with its terms

(b)     Neither the execution nor the delivery of this Agreement by Kotva, KAS and the Seller, nor the consummation or performance of any of the contemplated Transactions by Kotva, KAS or by the Seller where relevant, will directly or indirectly (with or without notice or lapse of time), contravene any Contract to which Kotva, KAS or the Seller is a party or by which Kotva, KAS or the Seller may be bound, any Governmental Authorisation. Legal Requirement, or Order to which the Seller may be subject, any provision of Kotva's, KAS' or the Seller's Organisational Documents, or any resolution adopted by the board of directors or the shareholders of Kotva, KAS or the Seller, which was not disclosed to the Buyer during Due Diligence

(xxiv)   The Seller or Kotva (whoever is legally responsible) undertakes to enter into any and all documents and agreements, within 20 Business Days of the request of the Buyer, following the Closing to:

(a)     permit the merger of SPV KN with the Buyer under the Laws of the Czech Republic;

(b)     sign and/or issue any document as requested by the Buyer or Markland which can speed up the process of the merger referred to in (a) above (e g  waiver of right to receive various reports on merger);

(c)     waive any rights to any increased shareholding in the merged company or to any compensation payments upon the merger by reason of the dilution of shares or for any other reason; and

(d)     ensure the continued operation of SPV KN or the merged company including any shareholders agreements

(xxv)    Kotva will advise Markland and the Buyer of any adverse or potential adverse economic situation of Kotva or KAS.

6.2   Kotva and/or the Seller (once it becomes the owner of the Shares) are obliged or undertake to procure that:

(i)     The Board of Directors of SPV KN will obtain the prior written approval of Markland, such approval not to be unreasonably withheld, before carrying out anything not in the Ordinary Course of Business

(ii)    The following activities shall not be carried out without the prior written approval of Markland:

(a)     amendment, modification or supplementation of the Organisational Documents of Kotva, the Seller or SPV KN;

KC1-2664

(b) the liquidation, dissolution or winding-up of Kotva, KAS or SPV KN;

(c) the merger, consolidation, transformation or division of SPV KN; or

(d) the change or agreement to change of the share capital of SPV KN (whether by consolidation, sub-division, purchase, redemption, cancellation, allotment or issuance of any shares), the grant of any option over, or issuance of any instrument carrying rights of conversion into, any of its shares

6.3    Kotva and the Seller (once it becomes owner of the Shares) are obliged or undertake to procure that SPV KN does not without the prior written approval of Markland:

(i) dispose of or transfer control of or interest in all or any material part of its business, property or assets, whether by a single transaction or series of related transactions, or acquire any business, property or assets which would, following such acquisition, constitute a material part of its Business, property or assets (for these purposes, any business, property or asset accounting to CZK 31,500 (thirty one thousand five hundred Czech Crowns) or any business. property or asset with a fair market value of CZK 31.500 (thirty one thousand five hundred Czech Crowns) or more shall be deemed material);

(ii) change or agree to change its share capital (whether by consolidating, subdividing, purchasing, redeeming, cancelling, allotting or issuing any shares), or grant any option over, or issue any instrument carrying rights of conversion into, any of its shares;

(iii) commence any new business not being reasonably ancillary or incidental to the Business;

(iv) replace its auditors;

(v) enter into, modify or terminate any Contract or make any payment that: (a) involves or will involve obligations or potential obligations that, because of their nature or significance, are or will be deemed to be unusual or extraordinary for companies engaging in activities similar to the Business; (b) is or will be otherwise than at arms length and on the best terms reasonably obtainable; or (c) is in excess of CZK 31,500 (thirty one thousand five hundred Czech Crowns);

(vi) give any guarantee or indemnity, other than in the normal course of business in relation to the supply of goods or services, which is in excess of CZK 31.500 (thirty one thousand five hundred Czech Crowns);

(vii) make any loan, or create any borrowings or other indebtedness in the nature of borrowings;

(viii) acquire or incorporate any subsidiary or acquire or dispose of shares (except the Shares in accordance with this agreement). equity interests or loan stock in any Person or enter into any joint venture, partnership or consortium arrangement;

---

KC 1-2665

KC1-2665

(ix)  permit its interest in any Person to be diluted (whether by a disposal of shares held by it or by a new issue of shares);

(x)  declare any dividend or make any other distribution in respect of its shares, whether in cash or otherwise; nor

(xi)  determine the compensation payable by SPV KN to any officer or Director.

**6.4  Monthly Reports**

Kotva and/or the Seller shall procure that the Directors of SPV KN provide to Markland, no later than the fifteenth (15th) day of each calendar month, a report detailing the activities of SPV KN

**6.5  Transfers**

Kotva and the Seller, once it becomes a shareholder of SPV KN, shall procure that from the date of this Agreement until five years following the Closing Date, no shares in SPV KN owned by Kotva or the Seller are transferred (including by way of sale of enterprise, merger or winding-up) to a third party and no Encumbrance may be created over those shares except in accordance with and subject to the provisions of this Agreement  For the duration of this Agreement SPV KN must not, without the prior written consent of the Buyer, suffer a Change of Control

**7  Representations, warranties and Obligations and Undertakings of the Buyer and of Markland**

The Buyer and Markland represents and warrants that the following representations and warranties are true, correct and complete as at the date of signing this Agreement and the Buyer and Markland undertake to maintain them true, correct and complete during the effectiveness of this Agreement up to Closing:

**7.1  Organisation**

The Buyer and Markland are duly established and incorporated and their share capitals have been fully paid up

**7.2  Enforceability; No Conflict**

7.2.1  The Buyer and Markland have the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and to perform their obligations under this Agreement, which obligations have been duly authorised and approved by all necessary corporate actions of the Buyer and Markland  This Agreement constitutes the legal, valid, and binding obligation of the Buyer and Markland, and is enforceable against the Buyer and Markland in accordance with its terms

7.2.2  Neither the execution nor the delivery of this Agreement by the Buyer and by Markland nor the consummation or performance of any of the Contemplated Transactions by the Buyer or Markland will directly or indirectly (with or without notice or lapse of time), contravene any Contract to which the Buyer and/or Markland is a party or by which the Buyer and/or Markland may be bound, any Governmental Authorisation, Legal Requirement, or Order to which the Buyer and/or Markland may be subject,

KC1-2666

any provision of their Organisational Documents, or any resolution adopted by the board of directors or the shareholders of the Buyer and/or Markland.

7.2.3    General

(i)    The Buyer and Markland have not been declared bankrupt nor, to the best Knowledge of the Buyer and Markland, has any person delivered a petition for bankruptcy in relation to it

(ii)    There is no Proceeding in progress, pending or Threatened against or relating to the Buyer and Markland and there is no circumstance, matter or thing to the Knowledge of the Buyer and Markland which might give rise to any such Proceeding by a third Person or any shareholder thereof, nor to any governmental investigation relative to it, nor is there outstanding against the Buyer and Markland any regulation, judgement, decree, injunction, rule or order of any court, Governmental Body or arbitrator

(iii)    The Buyer and Markland are not in default or breach of their Organisational Documents or any Contract to which they are a party or by which they may be bound and there exists no state of facts which after notice or lapse of time, or both, would constitute such a default or breach, and all such documents and Contracts are in good standing and the Buyer and Markland are entitled to all benefits thereunder

(iv)    Markland is tax resident in the Republic of Ireland and the Buyer is tax resident in the Czech Republic

(v)    The corporate records of the Buyer and Markland contain complete and accurate records of all minutes of meetings held and all resolutions adopted by the Buyer and/or Markland in general meetings since their incorporation and the Buyer and/or Markland have no knowledge of any of the above that might make this Agreement invalid, void or voidable

(vi)    The books and records of the Buyer and Markland fairly and correctly set out and disclose in all material respects the financial position of the business of the Buyer and Markland and all material financial transactions relating to the business have been accurately recorded in such books and records since their incorporation and the Buyer and/or Markland have no Knowledge of a breach of any of the above

(vii)    The Buyer and Markland are not a party to any valid written or verbal Contracts or any other document under the terms and conditions of which the performance by the Buyer and/or Markland of this Agreement would result in the breach of an obligation, or might provide a reason for the termination or invalidity of this Agreement, or which might preclude the Buyer and/or Markland from performing their obligations hereunder.

(viii)    All Consents and other co-operations necessary to fulfil this Agreement by the Buyer and Markland shall be provided by the

KC 1-2667

KC1-2667

Buyer and Markland to the Seller and to the KAS Group upon their written request thereof.

(ix)    The Buyer is obliged to conclude a Transfer Deed and trademark transfer agreements in accordance with Clause 5.1 and 5.2 and take over the Shares in accordance with Clause 5.5.

**7.3    Due Diligence**

Markland represents that during Due Diligence it had an option to ask for and did ask for information concerning the Property, Kotva and other members of the KAS Group and that the documents provided were and still are represented by Kotva and KAS to be satisfactory and of a standard to enable Markland and the Buyer to enter into this Agreement including their willingness to pay the Purchase Price subject to such retentions as are made hereunder. The Buyer and Markland agree that, on the basis of the information provided to them by the Sellers, the Purchase Price is reasonable and corresponds to the value of the Shares and the Kotva Trademark.

**8    Share Purchase Price Adjustment and Remedies**

**8.1    Survival; Right to Share Purchase Price Adjustment; Waiver**

All obligations and undertakings and Share Purchase Price adjustment obligations in this Agreement and its Schedules, and any other certificate or document delivered pursuant to this Agreement will survive the Closing until the expiration of the relevant limitation period, i.e. preclusion or statutory limitations. Any claim by a Party based on a breach of any undertakings, representation or warranty made pursuant to this Clause 8.1 must be submitted to the breaching party prior to the expiration of the applicable limitation period. The right to Share Purchase Price adjustment, payment of damages or other remedy based on a breach such representations, warranties, covenants, and obligations will not be affected by any investigation conducted with respect to, or any Knowledge acquired (or capable of having been acquired) about, the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to Share Purchase Price adjustment, payment of damages, or other remedy based on such representation, warranty, covenant, or obligation.

**8.2    Share Purchase Price adjustment and Payment of Damages by Kotva**

Kotva and the Seller shall jointly and severally reimburse and hold harmless Markland and the Buyer and the members of their Boards of Directors (collectively, the "**Markland's Indemnities**"), and shall pay (by way of deducting from the Share Purchase Price payable by the Buyer) to the relevant Markland's Indemnities the monetary value of any Adverse Consequence arising directly or indirectly, from or in connection with:

(a)    any breach of any representation, warranty covenant, obligation or undertaking made by Kotva and/or the Seller and /or KAS in this Agreement, or any other certificate or document delivered by Kotva and/or KAS and/or by the Seller pursuant to this Agreement;

KC1-2668

(b)    any Liabilities of SPV KN existing at or arising out of a state of facts existing at or before the Closing Date, to the extent that such Liabilities are not reflected or reserved against in the Financial Statements;

(c)    any claim by any Person for brokerage or finder's fees or commissions or similar payments from the Seller, SPV KN or SPV CO in connection with any of the Contemplated Transactions; and

(d)    any and all Threatened or implemented Proceedings, demands or assessments incidental to any of the matters set forth in this Clause 8 2(a) to (c)

**8.3**    Share Purchase adjustment and Payment of Damages by Markland

The Buyer and Markland shall jointly and severally reimburse and hold harmless Kotva, the Seller, KAS Group, SPV KN and the members of the boards of directors of the aforementioned companies (the "**Kotva's Indemnities**"), and shall pay (by way of increasing the Share Purchase Price payable by the Buyer) to Kotva's Indemnities the monetary value of any Adverse Consequence arising directly or indirectly, from or in connection with:

(a)    any breach of any representation, warranty covenant, obligation or undertaking made by Markland or by the Buyer in this Agreement or in any certificate delivered by Markland or by the Buyer pursuant to this Agreement; and

(b)    any and all Threatened or implemented Proceedings, demands or assessments incidental to any of the matters set forth in Clause 8 3(a) above

**8.4**    Procedure for Share Purchase Price adjustment

(a)    Immediately after: (i) receipt by an Indemnified Person of notice of the assertion of a third-party claim against it; or (ii) the Indemnified Person becoming aware that it has suffered an Adverse Consequence entitling it to a Share Purchase Price adjustment, the Indemnified Person will, if a claim is made against such Indemnified Person, give notice to the Indemnifying Person of the assertion of such claim or the Adverse Consequence as the case may be An Indemnified Person's failure to notify an Indemnifying Person will not relieve the Indemnifying Person of any Liability that it may have to the Indemnified Person

(b)    A claim for Share Purchase Price adjustment originates by the expiration of the protection time limit according to Clause 8 5, at which moment the sum payable under the Share Purchase Price adjustment shall be paid promptly by the Indemnifying Person to the Indemnified Person.

**8.5**    If any of the Parties discovers a Threatened Adverse Consequence to it for a reason which would entitle the another Party to Share Purchase Price adjustment or to withdraw from this Agreement. that Party shall notify the others accordingly The Party who would but for the terms of this Clause 8 5 be the Indemnifying Party then has a protection time limit lasting 25 (twenty five) Business Days from the date of the delivery of the notification to remove the fact causing falsehood of the representation or remedy the breach of its obligation If such Party does not do so, it is obliged to

KC1-2669

pay to the other Party upon expiration of the protection time limit sufficient and full compensation for the Threatened or newly discovered Adverse Consequence. If later the Adverse Consequence does not materialise the Party receiving the compensation is obliged to return it.

8.6    In the event that an Adverse Consequence is discovered, Kotva or the Seller shall remedy such situation as soon as possible following the discovery but in any event shall do so prior to Closing. If at Closing the Adverse Consequence still exists, the Buyer shall be entitled to deduct the amount of the Adverse Consequence from the Share Purchase Price.

8.7    Any payments made under this Clause 8 hereof shall be treated as an adjustment to the Share Purchase Price paid by the Buyer for the Shares under the terms of the Agreement, with the exception of any contractual penalty payable hereunder.

8.8    All sums payable by the Seller to the Buyer under this Agreement shall be paid free and clear of all deductions, withholdings, set-offs or counterclaims whatsoever save only as may be required by Law. If any deductions or withholdings are required by Law the Seller shall be obliged to pay to the Buyer such sum as will after such deduction or withholding has been made leave the Buyer with the same amount as it would have been entitled to receive in the absence of any such requirement to make a deduction or withholding.

8.9    If any Tax authority charges to Tax any sum paid to the Buyer under this Agreement then the amount so payable shall be grossed up by such amount as will ensure that after payment of the Tax so charged, or which would have been so charged if any relief available to the Buyer were ignored, there shall remain a sum equal to the amount that would otherwise be payable under this Agreement.

9    **Post - Closing Confidentiality Duty**

9.1    For the purpose of this Agreement, confidential or proprietary information ("**Proprietary Information**") shall mean the information created, transferred, recorded or employed as part of, or otherwise resulting from the activities undertaken pursuant to this Agreement or the Schedules hereto which constitutes the confidential, proprietary or trade secret information of the disclosing Party. Proprietary Information of Kotva shall also include Proprietary Information of SPV KN and/or the Seller. Such information may be of, but not limited to, a business, organisational, technical or financial nature. The Parties understand and agree that all Proprietary Information of a disclosing Party shall be treated as confidential by the receiving Party. Each receiving Party shall use the same degree of care as it uses with regard to its own Proprietary Information to prevent disclosure, use or publication of the disclosing Party's Proprietary Information.

9.2    Proprietary Information of the disclosing Party shall be held by the receiving Party as described in Clause 9.1 unless it is or has been:

(i)    obtained legally and freely from a third Person without restriction;

(ii)    independently developed by the receiving Party at a prior time or in a separate and distinct manner without benefit of any of the Proprietary Information of the disclosing Party and documented to be as such;

KC1-2670

(iii)    made available by the disclosing Party for general release;

(iv)    made public as required by Law, applicable regulations or Order or stock exchange requirements; and

(v)    within the public domain or later becomes part of the public domain as a result of acts by someone other than the receiving Party and through no fault or wrongful act of the receiving Party.

9.3    A receiving Party may disclose Proprietary Information of a disclosing Party to directors, officers, and employees of the receiving Party or agents of the receiving Party including their respective brokers, lenders, insurance carriers or prospective purchasers who have specifically agreed in writing to nondisclosure of the terms and conditions hereof. Any disclosure hereof required by legal process pursuant to Clause 9.2(v) shall only be made after providing the disclosing Party with notice thereof in order to permit the disclosing Party to seek an appropriate protective order or exemption.

9.4    The provision of this Clause 9 shall be effective for a period of two years following the Closing Date.

9.5    If a court of competent jurisdiction determines that the length of time or any other restriction or portion thereof set forth in this Clause 9 is unduly restrictive and thereby unenforceable, such restriction shall be interpreted and applied to include as much of the restriction as will render the covenants in this Clause 9 valid and enforceable to the fullest extent permitted by applicable Law, and as so interpreted and applied such covenants shall remain in full force and effect. The Parties further agree that if a court of competent jurisdiction determines that any provision of this Clause 9 is invalid or against public policy, the remaining provisions of this Clause 9 shall not be affected thereby, and shall remain in full force and effect.

## 10    Termination

10.1    Markland and/or the Buyer shall be entitled to withdraw by written notice to Kotva or to the Seller from this Agreement only if: (i) there is a breach of the Kotva's or Seller's representations, warranties, obligations or undertakings in accordance with Clause 6 and the protection time limit in accordance with Clause 8.5 of this Agreement expires, or in other cases of a breach of the Kotva's or Seller's representations, warranties or obligations where this Agreement entitles Markland or the Buyer to withdraw from the contract; (ii) if either SPV Conclusion has not taken place by 31 January 2005, save in the event of Force Majeure, including inactivity of a relevant Governmental Body or through the fault of a third party that is not either directly or indirectly controlled by the Seller; or (iii) if Closing has not occurred by 31 March 2005 provided that no breach of this Agreement by the Buyer or Markland will have occurred by then.

10.2    If Markland and/or the Buyer withdraw from this Agreement pursuant to Clause 10.1 the Buyer shall be entitled (in addition to and without prejudice to all other rights or remedies available to it including the right to claim damages) to:

10.2.1    the return of the Deposit and, if appropriate the Purchase Price in accordance with the terms of the Escrow Agreement; and

10.2.2   a contractual penalty amounting to CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied firstly from the Security and then from other funds of the Seller as necessary

10.3   Failure to exercise this right in accordance with Clause 10.2 shall not constitute a waiver of any other right of Markland and/or the Buyer arising out of any breach of the obligations and undertakings of Kotva and/or the Seller

10.4   Kotva and/or the Seller are entitled to withdraw from this Agreement by serving written notice on Markland and the Buyer if it shall be found that any of the representations and warranties of Markland and/or the Buyer in accordance with Clause 7 was untrue at the date of execution of this Agreement or by the Closing Date, and the protection time limit according to Clause 8.5 of this Agreement expires or in other cases of breach of Markland's or Buyer's obligations where the Seller is entitled to withdraw from this Agreement

10.5   In the event of failure by Kotva and/or the Seller to satisfy the SPV Conclusion by 31 January 2005, Markland and/or the Buyer may withdraw from this Agreement by serving five Business Days notice on the Seller and Kotva and the Buyer shall be entitled to a contractual penalty of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns), to be satisfied firstly from the Security and then from other funds of Kotva and/or of the Seller as necessary

10.6   If Kotva and/or the Seller withdraws from this Agreement pursuant to Clause 10.4 the Seller will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty in accordance with the relevant term of this Agreement of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) in case this Agreement does not set other contractual penalty to be satisfied firstly from the Deposit and then from other funds of Markland as necessary.

10.7   Failure to exercise this right in accordance with Clause 10.6 shall not constitute a waiver of any other right of Kotva and/or the Seller arising out of any breach of the obligations and undertakings of Kotva and/or the Buyer, however, settling the agreed contractual penalty causes the right to Share Purchase Price adjustment and possible other right to indemnification or damages against Markland and/or the Buyer to cease.

10.8   If Closing does not occur within the time limits envisaged in this Agreement (other than due to the fault of the Buyer or Markland), then the Buyer will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) to be satisfied firstly from the Security and then from other funds of Kotva, SPV KN and/or the Seller as necessary

10.9   If Closing does not occur within the time limits envisaged in this Agreement (other than due to the fault of the Seller or Kotva), then the Seller will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) to be satisfied firstly from the Deposit and then from other funds of Markland as necessary

---

KC 1-2672

KC1-2672

10.10  The Parties are not entitled to the contractual penalties as above, if the other party does not comply with this Agreement due to the event of Force Majeure, including inactivity of a relevant Governmental Body or through the fault of a third party that is not either directly or indirectly controlled by Kotva, the Seller or the Buyer.

10.11  In the event (i) that the breach of obligations of the Seller or of Kotva does not cause an Adverse Consequence or (ii) if the Seller or Kotva fully indemnifies the Buyer or Markland during the protection time limit stated in Clause 8 5, then Markland and/or the Buyer shall not be entitled to withdraw from this Agreement or claim a contractual penalty

## 11    General Provisions

### 11.1    Expenses

Except as otherwise expressly provided in this Agreement, each Party will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of its Representatives.

### 11.2    Public Announcements

Any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued at such time and in such manner as the Parties mutually determine  None of the Parties will make any disclosure of the Purchase Price or other terms of the Contemplated Transactions to any Person, except with the prior written consent of the other Parties or as required by Legal Requirements or by law  The Parties will consult with each other concerning the means by which the Kotva's employees, customers and others having dealings with Kotva or the Seller will be informed of the Contemplated Transactions, and the Parties will have the right to be present for any such communication, if possible

### 11.3    Notices

All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed given to a Party when: (a) delivered to the appropriate address by hand or by nationally recognised overnight courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment (subsequently delivered in written form within five days); or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested; in each case to the following addresses. facsimile numbers or e-mail addresses and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number, e-mail address or individual as a Party may designate by notice to the other Parties):

**Kotva, KAS, KO and the Seller:**

Kotva NEMOVITOSTI. k s.

| | |
|---|---|
| Address: | Příkop 4. Brno, Post Code 602 00 |
| Fax: | +420 224 801 230 |
| Tel: | +420 224 801 401 |
| Attention: | Martin Benda |

copy to

---

KC1-2673

Toman, Devátý and Partneři
Address:      Trojanova 12, 120 00 Prague 2
Fax:          +420 224 920 468
Tel:          +420 224 918 490
Attention:    Petr Toman

and

**Markland and the Buyer:**

Markland Holdings Limited
Address:      19 Upper Fitzwilliam Street, Dublin 2, Republic of Ireland
Fax:          00353 167 620 00
Tel:          00353 167 620 23
Attention:    Henry Prestage/Frank Walker/Aidan Scully

copy to

Linklaters v.o.s.
Address:      Palác Myslbek, Na Příkopě 19, 117 19 Praha
Fax:          +420 221 622 199
Tel:          +420 221 622 111
Attention:    Bryan Wilson

11.4    Further Assurances

The Parties agree:

11.4.1    to furnish, upon request, each other with such further information as requested;

11.4.2    to execute and deliver to each other such other documents; and

11.4.3    to do all such other acts, as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Contemplated Transactions.

11.5    Incorporation of Schedules

The Schedules identified in this Agreement are incorporated herein by reference and made a part of this Agreement.

11.6    Entire Agreement and Modification

This Agreement supersedes all prior agreements among the Parties with respect to its subject matter and constitutes (along with the documents delivered pursuant to this Agreement) a complete and exclusive statement of the terms of the agreement between the Parties regarding its subject matter. In the case of any inconsistency between the terms of this Agreement and the terms of the Transfer Deed or the KOTVA Trademarks transfer agreement, the terms of this Agreement shall prevail. This Agreement may not be amended, supplemented or otherwise modified except by a written agreement executed by all the Parties.

11.7    Acknowledgement

Markland and the Buyer acknowledge that they have not been induced to enter into this Agreement by any representation, warranty or undertaking not expressly

A04677559/1 4/22 Dec 2004

KC 1-2674

KC1-2674

incorporated into it. Parties to this Agreement confirm that they have received independent legal advice relating to all the matters provided for in this Agreement, including the provisions of this Clause 11.7, and agrees, having considered the terms of this Clause 11.7 and the Agreement as a whole, that the provisions of this Clause 11.7 are fair and reasonable.

**11.8** Time of the Essence

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence

**11.9** Severability

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable. However, the transfer of the Shares and the transfer of KOTVA Trademarks are mutually dependant transactions pursuant to Section 275 (2) of the Commercial Code

**11.10** Assignments, Successors, and No Third Party Rights

No Party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Parties, such consent not to be unreasonably withheld, except that Markland may assign without the other Parties' consent any of its rights and delegate any of its obligations under this Agreement to any Related Person or any subsidiary of Markland or to any subsequent acquirer of the Shares or of all or substantially all of the business of the Buyer or any Related Person. This Agreement will apply to, be binding in all respects upon, and inure to the benefit of each of the Kotva's and/ or Seller's successors and permitted assigns and Markland's and/or the Buyer's successors and permitted assigns (whether by merger, consolidation, purchase of all or substantially all of its assets or otherwise). The Buyer will indemnify and hold harmless the Seller and KAS, and will pay to the Seller's Indemnities the monetary value of any Adverse Consequence arising, directly or indirectly, from or in connection with any breach of such a Buyer's successor. Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the Parties, any right, remedy, or claim under or with respect to this Agreement or any its provision except the rights as shall inure to a successor or assignee pursuant to this Clause 11.10

**11.11** Waiver

The rights and remedies of the Parties are cumulative and not alternative. Neither any failure nor any delay by any Party in exercising of any right, power, or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable Law, (a) no claim or right arising out of this Agreement or any of the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Party, and (b) no waiver that

KC 1-2675

KC1-2675

may be given by a Party will be applicable except in the specific instance for which it is given

**11.12**  Arbitration

This provision shall apply to all and any dispute or difference that may arise in connection with or the interpretation, performance or termination of this Agreement between the Parties, as well as the validity or settlement of this Agreement and of the relationship established by this Agreement (the "**Dispute**"). The Parties shall make every effort to resolve any Dispute out of court, if possible. If they are unable to reach an out-of-court settlement, any of the Parties shall have the right to file a petition for the Dispute to be resolved before the Court of Arbitration attached to the Economic Chamber of the Czech Republic and the Agrarian Chamber of the Czech Republic in accordance with Acts nos. 216/1994 Coll., as amended, and 223/1994 Coll., as amended, under said Court's Rules of Arbitration, by three arbitrators. The language of the proceedings shall be Czech and the venue of the proceedings shall be Prague. The chairman of the arbitration tribunal shall be authorised to decide on procedural issues at his own discretion. If the disputing Parties reach conciliation before the above Court as part of the arbitration proceedings, no justification needs to be attached to the arbitral award that will endorse the conciliation between the disputing Parties. The Party that is defeated in such a Dispute shall reimburse the other Party for all of its legal expenses in addition to the costs of the arbitration proceedings adjudicated to it by the arbitration tribunal. In proceedings before the above Court of Arbitration, the Parties shall take an active attitude and shall be helpful to the Court in the resolution of the Dispute, especially as regards giving explanations, furnishing evidence and documents, etc., and shall acknowledge its arbitral award without any reservations, and shall carry out the arbitral award voluntarily. If a Party refuses to carry out the arbitral award referred to in the preceding sentence, the other Party has the right to file a petition for the execution of the decision with the court of law having jurisdiction over the place and merit of the dispute

**11.13**  Governing Law

This Agreement will be governed by and construed under the laws of the Czech Republic without regard to its conflicts of law principles, in particular the Czech Commercial Code

**11.14**  Counterparts

This Agreement will be executed in four counterparts, each of which will be deemed to be an original copy of this Agreement and which, when taken together, will be deemed to constitute one and the same document. The Agreement is executed in the English (2 counterparts) and Czech (two counterparts) languages, and the Czech language version shall prevail

The Parties have executed this Agreement as of the date indicated in the first sentence of this Agreement

By:

**Seller:**

A04677559/1 4/22 Dec 2004

KC 1-2676

KC1-2676

**SPV CO Limited**


Name:

Title:


By:

**KOTVA NEMOVITOSTI k. s.**


Name:

Title:


By:

**KOTVA a.s.**

Name:

Title:




By:

**KOTVA OBCHODNÍ, a.s.**


Name:

Title:


By:

KC 1-2677

KC1-2677

**Buyer:**

**CRQ Czech a.s.**


**Name:**

**Title:**


By:

**Markland Holdings Limited**


**Name:**

**Title:**

**Schedule 1**
**Extracts from Commercial Register**

KC1-2679

**Schedule 2**
**Extract from Companies House**

KC1-2680

**Schedule 3**
**INTENTIONALLY DELETED**

KC1-2681

**Schedule 4**
**Extract from Real Estate Register**

KC1-2682

**Schedule 5**
**KO Lease**

KC1-2683

**Schedule 6**
**Rent Roll**

KC 1-2684

KC1-2684

**Schedule 7**
**INTENTIONALLY DELETED**

KC1-2685

**Schedule 8**
**INTENTIONALLY DELETED**

KC 1-2686

KC1-2686

**Schedule 9**

**Gilroy Claim**

46

KC 1-2687

KC1-2687

**Schedule 10**

**Expert Opinion**

KC1-2688

**Schedule 11**

**List of Fixtures & Fittings**

KC1-2689



ΚΥΠΡΙΑΚΗ
REPUBLIC

ΔΗΜΟΚΡΑΤΙΑ
OF CYPRUS

C.C.2

No.: 78962

## MINISTRY OF COMMERCE, INDUSTRY & TOURISM
## DEPARTMENT OF REGISTRAR OF COMPANIES
## AND OFFICIAL RECEIVER
## NICOSIA

**30 June 2005**

### CERTIFICATE

### FORMINSTER ENTERPRISES LIMITED

It is hereby certified that in accordance with the records kept by this Department the following were the Directors and Secretary of the above company as at 30 11 1999:

| Directors | Nationality | Residential Address |
|---|---|---|
| RICHARD HARAZIM | Czech Republic | 174 Skorkovskeho 636 00 Brno Czech Republic |
| MARTIN BENDA | Czech Republic | 46 Borac C Czech Republic |
| JOHN MOFFITT | American | 14 Bilkova Prague 1 Czech Republic |
| MICHAEL BLUHM | American | 4 U. Nikolajky Prague 5 Czech Republic |

| Secretary | Residential Address |
|---|---|
| INDILAW SECRETARIAL LIMITED | 4 Diagorou Street Kermia House, Office 601 Nicosia |

M. MARKIDOU
For Actg Registrar of Companies

/LH



ΚΥΠΡΙΑΚΗ
REPUBLIC

ΔΗΜΟΚΡΑΤΙΑ
OF CYPRUS

C.C.2

No.: 78962

**MINISTRY OF COMMERCE, INDUSTRY & TOURISM**
**DEPARTMENT OF REGISTRAR OF COMPANIES**
**AND OFFICIAL RECEIVER**
**NICOSIA**

**30 June 2005**

## CERTIFICATE

## FORMINSTER ENTERPRISES LIMITED

It is hereby certified that in accordance with the records kept by this Department the following were the Directors and Secretary of the above company as at 6.5.2002:

| Directors | Nationality | Residential Address |
|---|---|---|
| RICHARD HARAZIM | Czech Republic | 174 Skorkovskeho<br>636 00 Brno<br>Czech Republic |
| MARTIN BENDA | Czech Republic | 46 Borac C<br>Czech Republic |
| JOHN MOFFITT | American | 14 Bilkova<br>Prague 1<br>Czech Republic |
| MICHAEL VLACH | Czech Republic | 10 Galandauerova<br>Brno<br>Czech Republic |

| Secretary | Residential Address |
|---|---|
| INDILAW SECRETARIAL LIMITED | 4 Diagorou Street<br>Kermia House, Office 601<br>Nicosia |

M. MARKIDOU
For Actg Registrar of Companies

/LH



KYΠΡΙΑΚΗ     ΔΗΜΟΚΡΑΤΙΑ
REPUBLIC      OF CYPRUS

C.C.2

No.: 78962

MINISTRY OF COMMERCE, INDUSTRY & TOURISM
DEPARTMENT OF REGISTRAR OF COMPANIES
AND OFFICIAL RECEIVER
NICOSIA

30 June 2005

## CERTIFICATE

## FORMINSTER ENTERPRISES LIMITED

It is hereby certified that in accordance with the records kept by this Department the following were the Directors and Secretary of the above company as at 31 10 2002:

| Directors | Nationality | Residential Address |
|---|---|---|
| DOXA PERICLEOUS | Cypriot | 4 Diagorou Street Kermia House 6th Floor, Flat 601 1097 Nicosia |
| RENA DAVID | Cypriot | 4 Diagorou Street Kermia House 6th Floor, Flat 601 1097 Nicosia |
| ANTHONY INDIANOS | Cypriot | 4 Diagorou Street Kermia House 6th Floor, Flat 601 1097 Nicosia |
| ANDREAS PAPASIANTIS | Cypriot | 4 Diagorou Street Kermia House 6th Floor, Flat 601 1097 Nicosia |

| Secretary | Residential Address |
|---|---|
| INDILAW SECRETARIAL LIMITED | 4 Diagorou Street Kermia House, 6th Floor, Flat 601 1097 Nicosia |

M. MARKIDOU

For Actg Registrar of Companies

/LH



KYΠPIAKH          ΔHMOKPATIA
REPUBLIC          OF CYPRUS

C.C. 1

No. 78962

MINISTRY OF COMMERCE, INDUSTRY AND TOURISM
DEPARTMENT OF REGISTRAR OF COMPANIES
AND OFFICIAL RECEIVER
NICOSIA

30 June 2005

## CERTIFICATE

### FORMINSTER ENTERPRISES LIMITED

It is hereby certified that in accordance with the records kept by this Department the following were the Shareholders of the above company as at 3.9.1998:

| Name and Address | Class (Value) | No. of Shares |
|---|---|---|
| LEDRA NOMINEES LTD<br>20 Vas. Frederick Street<br>El Greco House, Office 104<br>Nicosia | ORDINARY (CYP 1,00) | 500 |
| LEDRA TRUSTEES LTD<br>20 Vas. Frederick Street<br>El Greco House, Office 104<br>Nicosia | " | 500 |

For Actg Registrar of Companies.

Sgd   .ls: PAPADOPOULOU

/i II



KYΠPIAKH
REPUBLIC

ΔΗΜΟΚΡΑΤΙΑ
OF CYPRUS

C.C. 1

No. 78962

### MINISTRY OF COMMERCE, INDUSTRY AND TOURISM
### DEPARTMENT OF REGISTRAR OF COMPANIES
### AND OFFICIAL RECEIVER
### NICOSIA

**30 June 2005**

## CERTIFICATE

### FORMINSTER ENTERPRISES LIMITED

It is hereby certified that in accordance with the records kept by this Department the following were the Shareholders of the above company as at 30.11.1999:

| Name and Address | Class (Value) | No. of Shares |
|---|---|---|
| INDVECTA (NOMINEES) LTD<br>4 Diagorou Street<br>Kermia House, Office 601<br>Nicosia | ORDINARY (CYP 1,00) | 500 |
| CYRENA (NOMINEES) LTD<br>4 Diagorou Street<br>Kermia House, Office 601<br>Nicosia | " | 500 |

For Acts/Registrar of Companies.

/LH



ΚΥΠΡΙΑΚΗ     ΔΗΜΟΚΡΑΤΙΑ
REPUBLIC     OF CYPRUS

C.C. 1

No. 78962

MINISTRY OF COMMERCE, INDUSTRY AND TOURISM
DEPARTMENT OF REGISTRAR OF COMPANIES
AND OFFICIAL RECEIVER
NICOSIA

30 June 2005

## CERTIFICATE

### FORMINSTER ENTERPRISES LIMITED

It is hereby certified that in accordance with the records kept by this Department
the following were the Shareholders of the above company as at 25 5 2005:

| Name and Address | Class (Value) | No. of Shares |
|---|---|---|
| INDVECTA (NOMINEES) LTD<br>4 Diagorou Street<br>Kermia House, 6th Floor, Office 601<br>1097 Nicosia | ORDINARY (CYP 1,00) | 1.000 |

For Actg Registrar of Companies

Sgo ) R' ΒΑΡΝΑΧΩΡΟΟLOU

/I.H



## COSTAS INDIANOS & CO

## ADVOCATES & LEGAL CONSULTANTS

### ESTABLISHED 1924

# Specialized in Corporate & Business Law and Shipping Law



### ENTER

# CONTACT
# Costas Indianos & Co - Advocates & Legal Consultants

4, Diagoras street, Kermia House, 6th floor, flat 601
P.O.Box 21574, CY 1510  Nicosia, CYPRUS
Telephone: +357-22 67 52 31 / Fax: +357-22 66 96 78
e-mail: indianos@indianos.com.cy



## COSTAS INDIANOS & CO - Advocates & Legal Consultants

THE FIRM:  COSTAS INDIANOS & CO - ADVOCATES & LEGAL CONSULTANTS

   

Antonis.C. Indianos (1899-1968)       Costas. A. Indianos (1942-2001)

The Law Firm, one of the oldest in Cyprus, was founded by the late **Antonis C. Indianos**, M.A. (Oxon), Barrister-at-Law, in 1924, in the town of Limassol and was known then as A. C. Indianos - Advocate.The late A.C. Indianos was the Criminal Lawyer par excellence in the island and in later years when he moved his office to Nicosia (1942), the firm's business expanded to encompass commercial, insurance and corporate activities.

**Costas A. Indianos** joined the firm in 1965 after studying in Oxford M.A. (Oxon).After the passing away in 1968 of the late A.C. Indianos the firm's name was changed to **Costas Indianos & Co, Advocates & Legal Consultants.** Between 1977-1983 he served as a member of the International Secretariat of the Council of Europe in Strasbourg, France, in the Department of Economic and Social Activities. Costas Indianos was a practising lawyer with wide experience and specialization in shipping & martime, commercial, business and corporate law. His brother Antonis Emiliou Indianos (University of Athens) joined the firm in 1975. He served on the bench as a Judge of most of the District Courts of Cyprus until 2001. He is now a practising lawyer in Larnaca and an expert in criminal law.

Anthony Indianos (University of Aix-Marseilles / Maastricht), lawyer and son of Costas Indianos joined the firm in 1999. He is currently heading the Law Firm and is fluent in English, French and Greek. The main office is situated in Nicosia with an office in Larnaca. It includes five lawyers, shipping and corporate consultants and one internal accountant. It has a solid local and international client  base and possesses an extensive

international network of business contacts.



**AREAS OF PRACTICE** **CLIENT BASE** **CYPRUS** **OFFICES**
**BACK**



## TOMAN, DEVÁTÝ & PARTNEŘI
### ADVOKÁTNÍ KANCELÁŘ

Trojanova 12
120 00 Praha 2
tel /fax:  + 420 224 918 490
tel /zázn.: + 420 224 918 491
fax:       + 420 224 020 408
e-mail:    ak@lusdda.cz

Advokáti:
JUDr Stanislav Devátý, Dr.
Mgr. Jan Nekola
JUDr Jaroslav Novák, Ph D
JUDr Jitka Pokorná
JUDr Zuzana Smíšková, Ph D
JUDr Petr Toman

OBVODNÍ SOUD PRO PRAHU 1
PRAHA 1, OVOCNÝ TRH 14

Doslo
dne:   2 6 -08- 2004

Obvodní soud pro Prahu 1

Ovocný trh 14/587

112 94    Praha 1

Ke sp. zn. 13 C 131/2004

| | |
|---|---|
| Žalobce: | **GILROY LIMITED**<br>se sídlem Piklony 4, Limassol, Kyperská republika |
| zastoupen: | **Mgr. Ondřejem Peterkou, advokátem,**<br>ČAK 4245, advokátní kancelář PETERKA & PARTNERS<br>v.o.s., se sídlem Na Příkopě 15, Praha 1 |
| Žalovaný 1: | **KOTVA a.s.**<br>se sídlem Praha 1, Nám. Republiky 8, IČ 60193808 |
| Žalovaný 2: | **KOTVA NEMOVITOSTI, k.s.**<br>se sídlem Příkop 4, Brno, IČ 26229048, |
| Žalovaný 3: | **SPV KN, a.s.**<br>se sídlem Brno, Příkop 4, IČ 26910705 |
| všichni zastoupeni: | JUDr. Petrem Tomanem, advokátem, Petr TOMAN<br>advokátní kancelář Trojanova 3, Praha 2 advokát<br>ČAK č. 0695<br>Trojanova 12, 120 00 Praha 2<br>Tel.: 224 918 490-1, faxi 224 920 468<br>IČ: 43126570 DIČ: CZ6403031890 |

## Vyjádření
žalovaných k žalobě o určení vlastnického práva k
nemovitostem

*dvojmo*
*plná moc*

KG 1-2141

Žalobou ze dne 30  6  2004 se žalobce ve smyslu § 80 litem c) o.s.ř  domáhá určení, že žalovaný 1 je vlastníkem nemovitosti: *budovy čp  656 postavené v části obce Staré Město na pozemku parc  č  680, zastavěná plocha a nádvoří, a souvisejících pozemků, vše zapsáno v katastru nemovitostí vedením Katastrálním úřadem pro hlavní město Prahu katastrální pracoviště Praha, na listu vlastnictví č  265 pro katastrální území Staré město, obec Praha* (dále jen OD KOTVA)

Žalovaní žalobou uplatněný nárok na určení právního vztahu neuznávají a ve lhůtě stanovené usnesením soudu podávají toto

<h1 style="text-align:center">v y j á d ř e n í</h1>

<h2 style="text-align:center">I.</h2>

## Nedostatek věcné legitimace a neexistence naléhavého právního zájmu

Dle § 80 litem c) o.s ř  lze žalobou uplatnit, aby bylo rozhodnuto o určení, zda tu právní vztah nebo právo je či není, je-li na tom naléhavý právní zájem. Nezbytným předpokladem úspěšnosti určovací žaloby tak je, že účastníci mají věcnou legitimaci a že na požadovaném určení je naléhavý právní zájem.

### Nedostatek aktivní věcné legitimace žalobce

Aktivní věcnou (hmotně právní) legitimaci k podání žaloby na určení práva či právního vztahu má ten, kdo je účasten právního vztahu či práva, o něž v řízení jde, nebo ten, jehož právní sféry se sporný právní vztah nebo sporné právo týká

Žalobce není účasten na právech ani právních vztazích k OD KOTVA a ani nic takového netvrdí. Žalovaní jsou narozdíl od žalobce přesvědčeni, že práva a právní vztahy k OD KOTVA se ani žádným způsobem nedotýkají jeho právní sféry

Žalobce se akcionářem žalovaného 1 stal dávno poté, kdy žalovaný 1 vložil OD KOTVA do základního kapitálu žalovaného 2 a rovněž poté, co žalovaný 2 dne 27  2  2004 rozhodl o vkladu OD KOTVA do základního kapitálu žalovaného 3 (dne 27. 2  2004 žalobce ještě nebyl akcionářem). V době, kdy došlo k  převodu vlastnického práva k OD KOTVA a kdy již byly splněny všechny podmínky pro převod OD KOTVA z žalovaného 2 na žalovaného 3, žalobce nebyl akcionářem OD KOTVA a tyto převody nemohly mít žádný dopad do jeho právní sféry. Žalobce přitom mohl uvedené skutečnosti zjistit (a nepochybně zjistil) z veřejných zdrojů, jako jsou katastr nemovitostí či obchodní rejstřík apod.

Dlužno dodat, že uvedené převody by se dle názoru žalovaných nedotkly právní sféry žalobce ani kdyby se stal akcionářem již před převodem OD KOTVA z žalovaného 1 na žalovaného 2  Na právním postavení žalobce jako akcionáře žalovaného 1 by se uskutečněním uvedeného převodu totiž nic nezměnilo – žalobce by byl stále akcionářem žalovaného 1 a obsah jeho akcionářských práv stanovený obchodním zákoníkem by zmíněným převodem majetku nedoznal žádných změn

Žalobce není v řízení aktivně věcně legitimován, neboť není účastníkem práv či právních vztahů, o něž v řízení jde, a tyto práva či právní vztahy se ani jinak nedotýkají

2

jeho právní sféry.

### Neexistence naléhavého právního zájmu žalobce na požadovaném určení

Ustálená judikatura obecných soudů vychází ze závěru, podle nichž naléhavý právní zájem je dán zejména tam, kde by bez určení práva či právního vztahu bylo právo žalobce nebo právní vztah, na kterém je účasten, ohroženo, popřípadě tam, kde by se bez tohoto určení jeho právní postavení stalo nejistým. O takový vztah se jedná, jestliže rozhodnutí soudu může zjednat určitost, jistotu a jasnost právních vztahů účastníků, mezi nimiž až do té doby byla existence právního vztahu neurčitá, nejistá a nejasná. Ve smyslu ust. § 80 lit. c) o.s.ř. tedy nejde o jakýkoliv zájem, který by opravňoval žalobce k žalobě na určení, ale o zájem právní a naléhavý.

Žalobce je akcionářem žalovaného 1, a to s jednou akcií odpovídající podílu ve výši 0,00000144 % základního kapitálu žalovaného 1. Komplexní právní úprava práv a povinností akcionáře akciové společnosti je obsažena v obchodním zákoníku. Příslušná ustanovení obchodního zákoníku pak přesně stanoví jakými prostředky se akcionář může svých práv domáhat. Mezi tyto prostředky však rozhodně nepatří žaloba o určení práv či právních vztahů, jejímiž účastníky jsou třetí osoby a akciová společnost, jíž je žalobce akcionářem. Opačný závěr by nepochybně vedl k absurdním důsledkům - totiž, že kterýkoliv akcionář akciové společnosti by mohl žalovat na určení neplatnosti jakékoliv smlouvy uzavřené touto společností, a to pouze s odůvodněním, že se mu nezdá pro společnost výhodná. Akcionář, kterému se kupř. nepodaří prosadit jeho zájmy na valné hromadě, by tímto způsobem mohl velmi efektivně šikanovat společnost, jíž je akcionářem.

Žalobce se v žalobě dovolává rozhodnutí Nejvyššího soudu ČR ze dne 7. 5. 2003 vydané pod sp. zn. 29 Odo 767/2002, v němž byla připuštěna existence naléhavého právního zájmu akcionáře na určení neplatnosti smlouvy uzavřené mezi společností, jíž je akcionářem, a třetí osobou.

Z uvedeného judikátu Nejvyššího soudu ČR však rozhodně nevyplývá, že akcionář má naléhavý právní zájem na určení práva či právního vztahu za jakýchkoliv okolností.

Tento judikát řeší konkrétní situaci, kdy nucený správce bývalé Investiční a poštovní banky, a.s převedl podnik banky na nabyvatele - ČSOB, a.s , a to, vzhledem k hospodářské situaci v IPB, a s., za zcela mimořádných a nestandardních podmínek.

Popsanou situaci, kterou se zabýval Nejvyšší soud ČR v rozhodnutí citovaném žalobcem, jistě nelze srovnávat se situací, jež je předmětem žaloby v tomto případě, a to z následujících důvodů:

- žalobce je majitelem pouze jedné akcie žalovaného 1 o nominální hodnotě 1 000,- Kč při základním kapitálu žalovaného 1 ve výši 694.209.000,- Kč, z čehož vyplývá, že škoda, která by mohla vzniknout žalobci na likvidačním zůstatku je ve srovnání s hodnotou majetku, jehož určení vlastnictví se žalobce proti žalovaným domáhá, zcela nepatrná,
- žalobce nabyl akcii žalovaného dávno poté, kdy již dle jeho názoru neplatným právním úkonem žalovaný 1 přišel o vlastnictví OD KOTVA, a rovněž poté, kdy již byly splněny všechny zákonné podmínky pro převod OD KOTVA z majetku

1

žalovaného 2 do majetku žalovaného 3 (žalobce tyto skutečnosti nepochybně zjistil
ještě před nákupem akcie žalovaného 1, když tuto evidentně nabyl právě a pouze za
účelem podání žaloby),

- vložení OD KOTVA do dceřiné společnosti řádně schválila valná hromada
žalovaného 1 a uvedené usnesení valné hromady nebylo v zákonné lhůtě napadeno
žalobou některého z akcionářů,

- žalovaný 1 vložil OD KOTVA do základního kapitálu žalovaného 2 v hodnotě určené
znaleckým posudkem a stejným způsobem byly tyto nemovitosti oceněny při jejich
vkladu do základního kapitálu žalovaného 3 – majetek žalovaného 1, jehož je žalobce
akcionářem, se tedy uvedenými převody nezmenšil,

- žalovaný 3, který je v současné době vlastníkem OD KOTVA, je řízen žalovaným 1, a
to prostřednictvím jeho dceřiných společností, které jsou žalovaným 1 jako jedinou
ovládající osobou celého holdingu zcela ovládány; není tedy nejmenší důvod se
domnívat, že by převody nemovitostí byly způsobilé zbavit žalovaného 1 jeho majetku
či vlivu na nakládání a správu s tímto majetkem (došlo toliko k transformaci
majetkové struktury do holdingového uspořádání)

Z uvedeného vyplývá, že na požadovaném určení nemá žalobce naléhavý právní zájem.

Neexistence naléhavého právního zájmu, resp. nedostatek aktivní věcné legitimace na straně
žalobce, je tedy samostatným a prvořadým důvodem, pro který nemůže určovací žaloba obstát
a který sám o sobě bez dalšího vede k jejímu zamítnutí. V souladu s ustálenou soudní
judikaturou přitom platí, že soud v prvé řadě zjišťuje, zda je žalobce k podání žaloby aktivně
věcně legitimován a zda je na požadovaném určení naléhavý právní, přičemž zjistí-li, že tomu
tak není, žalobu bez dalšího zamítne. V této souvislosti lze citovat z rozhodnutí Nejvyššího
soudu ČR ze dne 27. 3. 1997 vydaného pod sp zn. 3 Cdon 1338/96, dle něhož „Zamítá-li
soud žalobu na určení, zda tu právo nebo právní vztah je či není, pro nedostatek naléhavého
právního zájmu na takovém určení, je vyloučeno, aby soudčasně žalobu přezkoumal po stránce
věcné "

S ohledem na výše uvedené skutečnosti, žalovaní navrhují, aby soud, aniž by se zabýval
její věcnou stránkou, žalobu zamítl z důvodu nedostatku aktivní věcné legitimace na
straně žalobce a neexistence naléhavého právního zájmu na požadovaném určení.

## II.
## Skutková tvrzení a právní závěry obsažené v žalobě

Jak bylo uvedeno výše, soud by se v tomto případě neměl zabývat věcnou stránkou žaloby,
žalovaní tedy nepovažují za nutné vyjadřovat se ke všem skutkovým tvrzením žalobce a
z nich vyvozeným právním závěrům Za vhodné považuje uvést některá základní a
nezpochybnitelná fakta, na jejichž základě lze učinit jednoznačný závěr o účelovosti
jednotlivých tvrzení žalobce, jakož i žaloby jako celku

Žalovaní uvádějí níže následující skutečnosti s tím, že jsou schopni jejich pravdivost kdykoliv
doložit:

4                                                  KO 1-2144

1) Dne 21. 12. 1999 uzavřela společnost FORMISTER ENTERPRISES LIMITED, se sídlem Diagorou street, Kermia House, Office 601, Nicosia, Kypr, reg. číslo 78692 (dále jen FEL) se společností TREND – VIF, a.s., IČ 45245177, se sídlem Škroupova 441, Hradec Králové (dále jen TERND) Dohodu o narovnání. Touto dohodu učinili mezi stranami nesporným, že FEL je oprávněným majitelem akcií žalovaného 1, proti čemuž se FEL zavázal zaplatit na účet TRENDU částku 350.000.000,- Kč. Platnost této dohody akceptoval následně i správce konkurzní podstaty TRENDU společně s konkurzním soudem. Na základě této dohody byla zastavena všechna do té doby probíhající soudní řízení a zrušena všechna předběžná opatření zakazující navrhovateli nakládat s předmětnými akciemi

2) Dne 4. 9. 1998 uzavřel FEL formou notářského zápisu Dohodu o narovnání s IF MERCIA, a.s., IČ 15054101, se sídlem Londýnská 53, Praha 2 (dále jen MERCIA), která byla dne 9. září 1998 formou soudního smíru schválena Krajským obchodním soudem v Praze (sp. zn. 46 Cm 260/97) Na základě této dohody bylo učiněno rovněž nesporným, že FEL je řádným majitelem akcií žalovaného 1, proti čemuž se FEL zavázal zaplatit na účet MERCIE částku 35.000.000,- Kč. Platnost této dohody následně akceptoval rovněž nucený správce jmenovaný Komisí pro cenné papíry

3) Výše uvedenými dohodami o narovnání se zabývala také Komise pro cenné papíry, a to na jednáních dne 19. 4. 1999 a následně dne 21. 12. 1999. Výsledkem těchto jednání byla především skutečnost, že Komise cenných papírů nezpochybnila platnost uzavřených dohod s TRENDEM a MERCIÍ a akceptovala částky, které se v nich FEL zavázal zaplatit oběma investičním fondům

4) V současné době skutečně probíhá trestní řízení proti ing. Miroslavu Hálkovi a spol., v tomto řízení však nebyl předložen žádný důkaz o majetkovém či personálním propojení FEL s ing. Hálkem, některými z dalších obviněných v této kauze či jakoukoliv ze společností ovládaných ing. Hálkem, příp. dalším spoluobviněnými

5) Žádný z členů současných statutárních orgánů žalovaných nebyl v souvislosti s převody majetku investičních fondů TREND VIF a MERCIA popisovanými v žalobě trestně stíhán

6) Převody vlastnického práva k OD KOTVA z žalovaného 1 na žalovaného 2 a dále na žalovaného 3 nejsou a nebyly předmětem žádného trestního řízení.

7) Příkazem k registraci pozastavení práva nakládat s cennými papíry podle § 27 odst. 3 písm. d) zákona č. 591/1992 Sb., o cenných papírech ze dne 12. 5. 1997 Krajské státní zastupitelství v Hradci Králové pozastavilo právo FEL převádět akcie žalovaného 1, toto rozhodnutí však nebrání FEL hlasovat s akciemi žalovaného 1 na valné hromadě, tj. přijímat rozhodnutí nezbytná pro další podnikatelskou činnost žalovaného 1

Převážná část žaloby obsahuje popis trestné činnosti ing. Miroslava Hálku a spol., ke které mělo docházet v letech 1995 až 1997 v souvislosti se správou majetku investičních fondů TREND VIF a MERCIA, kteroužto ing. Hálek vykonával prostřednictvím společnosti KRÁLOVEHRADECKÁ BROKERSKÁ, a.s. (nyní Brněnská obchodní, a.s.), IČ 60914122, se sídlem Lipová 27, Brno.

5

KC 1-2145

Žalobce pak bez uvedení jakýchkoliv důkazů pro takové tvrzení konstatuje, že převody vlastnického práva k OD KOTVA z žalovaného 1 na žalovaného 2, resp. žalovaného 3 má dojít k legalizaci výnosů z trestné činnosti Ing Hálka a spol., z čehož dovozuje jejich absolutní neplatnost pro rozpor se zákonem ve smyslu § 39 občanského zákoníku

Z ust. § 135 o s.ř vyplývá, že v občanském soudním řízení není soud oprávněn sám posuzovat, zda došlo ke spáchání trestného činu či nikoliv

Jak bylo již uvedeno výše, nebylo ohledně jednání, jimiž byla OD KOTVA převedena do majetku jejich dceřiných společností, zahájeno žádné trestní řízení Tyto převody rovněž nejsou předmětem trestního řízení vedeného proti Ing Hálkovi a spol. a s jeho trestní činností ani jinak nesouvisí

Žalobcem tvrzené důvody pro absolutní neplatnost napadených převodů OD KOTVA tak nemohou obstát, neboť soud není v tomto řízení oprávněn je posuzovat, Žalobce přitom žádné, z hlediska tohoto řízení relevantní důvody pro absolutní neplatnost jednotlivých převodů OD KOTVA neuvádí. Žalobce si je nepochybně této skutečnosti vědom, což pouze umocňuje účelovost jím podané žaloby.

### III.

S ohledem na výše uvedené skutečnosti žalovaní navrhují, aby soud žalobu zamítl a přiznal žalovaným náhradu nákladů soudního řízení

V Praze dne 19 srpna 2004

KOTVA a.s.
KOTVA NEMOVITOSTI, k.s.
SPV KN, a.s.

6

KC 1-2146

Page 1 of 1



# JUDr. Petr Toman



He is the senior partner, founder and manager of the law office.

He graduated from the **Faculty of Law of the Masaryk's University in Brno** in 1984 (former University of Jan Evangelista Purkyně). Since then, he has worked in legal profession. He became lawyer in 1987. From 1990 to 1992 he was a deputy to the Federal Assembly of the Czech and Slovak Federal Republic. He was the spokesman to the Committee of 17th November. He was and still is an active participant in the legislative process. In his long legal practice he has engaged himself both in litigation and other legal and contractual work. He engages himself in obligation relations, investments, and civil, business and constitutional law.

JUDr. Petr Toman is entered in the register of lawyers kept by the Slovak Bar Association and, therefore, entitled to provide his legal services also in the Slovak Republic.

He publishes actively; with his colleague, JUDr. Stanislav Devátý, Dr., he is the author of the book "Protection of Good Reputation and of the Names of Legal Entities" (Ochrana dobré pověsti a názvu právnické osoby) issued by Linde, 2001.

Language command in the profession: Czech







# JUDr. Stanislav Devátý, Dr.

He has been a senior partner of the lawyer's office since 2000.

He is a graduate from the **Faculty of Law of the Charles' University in Prague**. In the period before November 1989 he was active politically in the dissident movement. In the years 1990 to 1992 he was a deputy to the Federal Assembly of the Czech and Slovak Federal Republic. From 1992 to 1996 he was the director of the **Security Information Service – BIS**. He became Ph.D. in 1998. Since 1997, he has engaged himself only in his lawyer's practice, particularly in the fields of preservation of human rights and liberties, criminal law, protection of personality rights and human honour and dignity, constitutional law, and related issues in other legal branches.

He publishes actively; with his colleague, JUDr. Petr Toman, he is the author of the book Protection of Good Reputation and of the Names of Legal Entities (Ochrana dobré pověsti a názvu právnické osoby) issued by Linde, 2001.

Language command in the profession: Czech





MINISTRY OF FINANCE OF   Prague, 5 February 1998
THE CZECH REPUBLIC     Letenská 15, Praha 1
                        ▪ Tel: 57041111
                        ▪ Fax: 57042788

No. File:  101/11 572/1998
Re:  Report of the Securities Authority of the Ministry of Finance
No. Ref.:
Prepared by:   Ing. Ježková, Tel. 5704 4606
Enclosures:    2 - (9 + 3 pages)

Regional Public Prosecutor's Office

Hradec Králové

Attention to: Dr. Kusala

Zieglerova 189

502 13 Hradec Králové

You will find the following documents enclosed hereto:
Report - partial inquiry in transactions with securities from the portfolio of the Tr_ _:     d
V.I F. a.s. investment fund (9 pages)ů

Supplement to the Report of the Securities Authority, dated 21 January 1997.

                          Ing. František Jakulb
                          acting director
                          of the Securities Authority

MINISTRY OF FINANCE OF    Prague, 21 January 1998
THE CZECH REPUBLIC

No. File:   102/90 176/97
Re:   Report – Partial inquiry into transactions with securities from the portfolio of he
Trend V.I.F. a.s. investment fund

Object of the Report: Partial inquiry into transactions with securities from  he
portfolio of the Trend V.I.F. a.s. investment fund

## *Contents of the Report:*

1. Objectives
2. Short history
3. Review of cash-flows
4  Review of securities flows
5. Conclusion

It is necessary to say in the very beginning that in the course of mapping a qu te
unclear situation in the sphere of shifts of assets from the TREND and /Men a/
investment funds dozens of entities were analysed which took   part in squeez ng
them. This analysis reflects substantial transfers of assets only. This analy is
focuses on the securities transactions and assets transfers which might  )e
considered to institute bodies of economic criminal acts. It maps the situati n
concerning the mentioned Funds as from the mid - 1991 to the mid - Decemler
1997 whilst it pays attention, in particular, to the destiny of securities sold from t  e
fund's portfolio for abnormally low prices. This report has been prepared on t  e
basis of (tabular) abstracts issued by the Securities Centre as well as on the rep  rt
of Ing. Emil Bušek, the Receiver. dated 22 February 1997.

I. Tasks

1. To provide documentation for investigating and prosecuting bodies with t  e
aim to prove the origin of securities held on accounts of Formins  er
Enterprises LTD. Atlanta Safe, BS Egretta, DYNAMIC PAERTNERS a  s
and Mr. Mareš and Mr.Salamatin

*13*

2. To provide documentation for investigating and prosecuting bodies with the aim to prove the origin of financial funds on accounts of Forminter Enterprises LTD" companies where Forminster Enterprises paid for 384, 71 shares of OD Kotva by selling 770,000 shares of Sokolovská uhel ná společnost to Atlanta Safe on 21 January 1997 and 27 January 1997.

3. To provide documentation for controlling bodies and, as the case may be, for investigating and prosecuting bodies with the aim to establish whe! er BS Egretta violated the law when buying in OD Kotva shares. BS Egn tta gathered approximately 94,000 shares for some CZK 120 million.

4. To prove whether some other entities active on the capital mar et (securities traders and/or investment companies and/or funds) did ot violate applicable laws when trading in underlying securities.

II. Short History

- 18 February 1991 - date of establishment of the TREND V.I.F. a.s. b a sold founder - Montované stavby Praha Co.
- 10 January 1992 - date of entry of the TREND V.I.F. in the Trade Registe
- 11 November 1992 - date of transfer of a part of founder's shares to n w shareholders - BONTON a.s., Bankovní dům Skala, a.s., Art Product on K a.s.
- 28 February 1995 - date of establishment of the TREND Investm nt Company a.s.
- 7 March 1995 - date of the mandate contract concluded between ne TREND V.I.F. a.s. and the TREND Investment Company a.s. (effective as from 1 March 1995)
- 2 August 1995 - the mandate contract amendment date - the notice per d was prolonged from six to eighteen months as from the notice date
- 3 August 1995 - date of Memorandum on the Fund's Functioning signed by Mr. Michael Kocáb and Ing. Miroslav Hálek
- 4 August 1995 - date of take-over of (management) of the TREND V I F. a.s., transfer of the investment company's shares to KHB

14

- 4 August 1995 - granting powers to Ing. Libor Páv and Ing. Miroslav Vlastník to dispose of the portfolio
- 4 August 1995 - 31 October 1998 - KHB mediated all securities transactions not only for the TREND but also for IF Mercia
- 7 September 1995 - the management of the TREND V.I.F. transferred the amount of CZK 112 million to a bank account of KHB which used it to buy 70,077 shares of OD Kotva for CZK 1,800 per share from Brno Broker Group a.s. (accrding to a statements from a bank account of the TREND V.I.F. kept with IPB, dated 7 September 1995
- 25 September 1995 - KHB bought another 28,033 shares of OD Kotva for CZK 49,057,750 CZK
  - these securities were bought by KHB on its own behalf and account (confirmation on the conclusion of the contract, dated 4 September 1995).

in CZK



| | 014 | 140 | 1900085130929 | 1646 | | 806 | 1,800.00 | KOTVA | 70.077 | 126.138.600 |
| | 014 | 140 | 1902485303656 | 1646 | | 890 | 1,750.00 | KOTVA | 28.033 | 49.057.750 |

- 24 August 1995 - Ing. Aleš Machaliček, the member of the initial Board of Directors, resigned
- 25 August 1995 JUDr. Oldřich Lichtenberg, the member of the initial Board of Directors, resigned
- 29 August 1995 - Ing. Aleš Tomek, the member of the initial Board of Directors, resigned
- 23 September 1995 - new Board of Directors of the TREND V.I.F. a.s. was elected
  - Ing. Miroslav Hálek (Chairman)
  - Ing. Jan Kavalír
  - Ing. Petr Kožený
  - Lubomír Štěpán
  - Ivo Halava
- 20 November 1995 - Mr. Martin Kratochvíl and Mr. Michael Kocáb resigned from the Board of Directors of the fund;

15

after 20 November 1995 - protests filed by Mr. Martin Kratochvíl and Mr. Michael Kocáb with the Ministry of Finance of the Czech Republic with the aim of pointing at illegal actions and developments in the TREND V.I.F. a.s.

- 23 November 1995 – date of holding the TREND V.I.F.'s general meeting
  - headquarters of the TREND V.I.F. moved to Hradec Králové
  - September limiting shareholders' voting rights by 20,000 votes
  - tightening up conditions of appointment and dismissal of members of the Board of Directors and the Supervisory Board (97 per cent of shareholders present)
- 31 December 1995 - the TREND V.I.F's claims against KHB amounted to CZK 169,115,339.43. This sum should with the highest probability include CZK 112 million as of 7 September 1995.
- 10 January 1996 - IMF a.s. signed an agreement on the transfer of 200,000 shares of OD Kotva from the fund's portfolio for the sum of CZK 360,000,000. On the basis of this agreement, dated 10 January 1996, IMF a.s. obtained in the form of a conventional fine 60,000 shares of OD Kotva without any consideration.

SCP data:                                                                in CZK

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| SCP | 014 | 103 | 980002112141.5 | IFM | | FINLK | 391120 | KOTVA | 31,763 | 11,466,262 |
| SCP | 014 | 103 | 980040200365.1 | IFM | | P. Horák | 400.00 | TOTVA | 97,005 | 33,800,000 |
| SCP | 014 | 116 | 980404200044.58 | IFM | | TJUMQ-VIF | 400.00 | KOTVA | 130,000 | 60,800,000 |
| | | | | | | | | Total | 257,733 | 66,341,583 |

**Note: There are discrepancies between SCP data and agreements.**

- 10 January 1996 - IFM received CZK 128,000,000 from the TREND-V.I.F. in the form of a conventional fine.
- .......... 1996 - M. Michal Plachta decided to dissolve the company of Consult Invest s.r.o.
- 15 April 1996 - the validity of the general meeting held was contested by Mr. Kocáb and Mr. Kratochvíl who brought the case before the Regional Court in Hradec Králové
- 24 April 1996 a brokerage agreement on arranging securities purchase and sale was concluded which bound KHB to arrange securities purchase and sale on

behalf of The Trend - V.I.F for consideration and on the basis of orders of he latter

- 29 May 1996 - Consult Invest s.r.o. entered into liquidation
- 24 July 1996 - the Ministry of Finance decided to suspend trading on the Tren d - V.I.F.' s portfolio account kept at the Securities Centre
- 18 September 1996 - KHB gave a notice of withdrawal from the broker ge agreement
- 18 October 1996 - the notice period lapsed
- 29 October 1996 - the mandate contract between the TREND - V.I F a.s. anc IS Trend was terminated by mutual agreement
- 31 October 1996 - the Ministry of Finance of the Czech Republic decided to impose receivership upon the TREND - V.I.F
- 7 November 1996 - effective date of the above mentioned decision
- 30 January 1997 - KHB sold 56 per cent of OD KOTVA to Forminster Enterpri es LTD for the sum of CZK 82,768,765
- 5 February 1997 - payment of CZK 151,000,000 from KHB is credited to Forminster Enterprises LTD; suspicion exists that these are yields from crimi ial activities
- 14 February 1997 - to Forminster Enterprises LTD paid for shares of OD KOT 'A CZK 82,768,765 (transferred as on 30 January 1997); the payer used the mor ey from 5 February 1997
- 14 February 1997 - payment of USD 2,000,000 made by Forminster Enterpri es LTD to the benefit of PRESLEY INDUSTRIES (having headquarters on the Bahamas Islands, account in a Liechtenstein bank); a power of attorney isst ed for KHB to have access to the PRESLEY INDUSTRIES account exists
- 5 November 1977 - a Liechtenstein court froze Forminster Enterprises L D' account due to suspicion on frauds in The Trend

Transfers of OD KOTVA in the TREND after KHB left.
24 July 1996 - the Ministry of Finance decided to suspend trading in securities of the Tread's portfolio account in the Securities Centre; the account was ma le available for the transfer as of 29 July 1996 and blocked once again on 30 J ily

17

1996; in accordance with orders on a KHB diskette transfers of CZK 0.01 took place on the accounts of the Trend but also on those of IF Marcia.

III. Cash Flows

1. Misuse of monies of investment funds to the benefit of persons close to K IB a.s.

- 7 September 1995 11 - Management of the Trend - V.I.F. transferred a sum of 112,000,000 to the bank account of KHB which applied them to buy 70,077 shares of OD Kotva for the price of CZK 1,800 per share from Burzo Broker Group a.s. as stems from the bank account statement of the TREND - V.I.F. kept at IPB, dated 7 September 1995
- 25 September 1995 - KHB bought additional 28,033 shares of OD KOTVA for CZK 49,057,750
  - KHB bought the securities in question on its own behalf and account (confirmation on the conclusion of the contract, dated 4 September 1995.

in CZK



| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ICF | 774 | ICF | 10900031126520 | IPB | | 995 | 1,800.00 | KOTVA | 70,077 | 115,138,600.0 |
| ICF | 774 | ICF | 2401947073513[?] | KHB | | 995 | 1,710.09 | KOTVA | 28,083 | 44,957,753.00 |

Conclusion: KHB bought securities for not own money (CZK 175,196,350) on own account.

- 31 December 1995 - The TREND - V.I.F.'s claim against KHB amounted to CZK 169,115,339.43. It is highly probable that a part of this claim is represented by CZK 112 million as of 7 September 1995

2. Discrepancies between data from the Securities Centre and those contained in agreements

10 January 1996 - IMF a.s signed a contract on the transfer of 200,000 shares of OD Kotva from the fund's portfolio for the total price of CZK 360,000,000. On the

basis of this agreement, dated 10 January 1996 60,000 shares of OD Kotva with out any consideration in the form of a conventional fine.

SCP data:                                                                    in C ZK

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ŠMĚNA | 01/1 | 10B | 1004/03/17.4216 | KM | | FMAŁ 3 | 3H1 DD | MOR VS. | 22.742 | 11,446 DE3 81 |
| SCP | 011 | 10B | 1004/03/T08/2041 | 1 M | | ŠMĚNA | 409 00 | MOT VA | 82,083 | 32,601 000 9F |
| SCP | 094 | 210 | 1005/03/04-46.30 | 2 M | | 1000/43/ME | 409 00 | KOTVA | 136 000 | 25 402 020 2- |
| | | | | | | | 1 MF | 252.702 | 39 946 062 Z- |

**Note: Discrepancies between data from the Securities Centre and tho se contained in underlying agreements exist.**

   3. Conventional fines agreed to the detriment of the investment fund

- 10 January 1996 - IFM received from the TREND - V.I.F. CZK 126,000,000 in  he form of a conventional fine. It was impossible for the fund to fulfil its obligati n, (i.e. to transfer the shares sold to IFM) since the underlying shares were pledg ed to the benefit of BONTON a.s. (80,000 shares)
- 10 July 1996 - the TREND - V.I.F. paid a conventional fine of CZK 45,617,00( to the company of MORAVSKÁ ZEMSKÁ a.s.
- 17 July 1996 - the TREND - V.I.F. paid a conventional fine of CZK 44,896,00( to the company of Lidová obchodní společnost s.r.o.
- 24 July 1996 - the TREND - V.I.F. paid a conventional fine of CZK 73,718,00( to the company of MORAVSKÁ ZEMSKÁ a.s.

   4. Suspicion as to the possible laundering of yields from criminal activities

- 5 February 1997 - A KHB payment of CZK 151,000,000 was received by Forminster Enterprises LTD. A suspicion as to the possible laundering of yie ds from criminal activities exists.
- 14 February 1997 - Forminster Enterprises LTD paid for the shares of  )D KOTVA a sum of CZK 82,768,765 (transferred on 30 January 1997);  he transferor applied money as from 5 February 1997
- 14 February 1997 - payment of USD 2,000,000 made by Forminster Enterpri es LTD to the benefit of PRESLEY INDUSTRIES (having headquarters on  he

19

Bahamas Islands, account in a Liechtenstein bank); a power of attorney issued for KHB to have access to the PRESLEY INDUSTRIES account exists

- 1 September 1997 - as from 1 September 1997 BS Egretta paid more than CZK 121,000,000 for purchases of shares of OD KOTVA

5. Other possible criminal activities of the Tread's management

**The purchase price is to become due and payable in 30 years:**

A. Agreement, dated 1 March 1996, between the TREND - VIF and IFM totalling CZK 88,000,000

B. Agreement, dated 4 June 1996, between the TREND - VIF and IFM totalling to CZK 48,841,700

- Thus the fund's management concluded - under remarkably unfavourable conditions and without having the claims secured in any way - agreements totalling CZK 136,841,700 and maturing in thirty years

**Set-off of claims and liabilities against IFM a.s.**

Claims of the fund against IFM resulting from thirty-year agreements and claims of IFM against the fund from unpaid high conventional fines were set-off.

IV. Flows of Securities

1. OD KOTVA prices manipulation

4 April 1996 - the quoted price amounted to CZK 840.00
22 May 1996 - the quoted price amounted to CZK 361
In this connection both investment funds sold 21,360 shares for CZK 10,327,449 only whilst at the price of CZK 840 they could have got CZK 17,942,400 The resulting loss: about CZK 7 million.
There is only one explanation of manipulations which forced the price to go down by 232 % within just one month: Low prices were more advantageous for the then prepared „criminal" transfers of OD KOTVA shares from funds' portfolios.

in CZK

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

**2. Loss transactions of the investment funds Trend and Mercia (OD Kotva shares)**

in CZK

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

**Note: Both investment funds lost at least CZK 153 million in these transactions**

**3. Transfers of OD KOTVA shares intended to show the connection between the Trend, Mercia and Forminster**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

**Conclusion:** Shares of OD Kotva held by the Trend and Mercia investment funds were transferred to the account of the FORMINSTER ENTERPRISES LTD. in the Securities Centre through the accounts of related persons.

**4. Unpaid price of shares**

21

- 22 August 1995 - date of agreement on the transfer of securities from the portfolio of the Trend - V.I.F. to the Consult Invest s.r.o. which paid for them to the fund 25 per cent of the purchase price only. The following securities are concerned:
  - 150,000 shares of SPT Telecom
  - 50,000 shares of Chemopetrol
  - 50,000 shares of Synthesia
- 23 March 1995 - Consult Invest s.r.o. contractually transferred not paid shares to FIREX a.s.; this enabled FIREX to obtain the shares in question for a fraction price in connection with a conventional fine for not observing the term of transaction.
- .. April 1996 - Mr. Michal Plachta decided to dissolve the Consul Invest s.r.o.
- 29 May 1996 - Consult Invest s.r.o. entered into liquidation.

in CZK

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ECP | CH | 100 | 150KA3003200 | Consult I. | | TREND-VIF | 2,148.00 | SPT TELECOM | 150,000 | 244,610,403.0 |
| ECP | CH | 100 | 100SNE000644 | Consult I. | | TREND-VIF | 685.00 | CHEMOPETROL | 50,400 | 47,300,000.00 |
| ECP | CH | 100 | 100SYN000219 | Consult I. | | TREND-VIF | 641.00 | SYNTHESIA | 50,900 | 47,050,000.00 |
| | | | | | | | | Total | | 478,405,600.0 |

**Conclusion: The Consult Invest's liability from these securities transactions against the TREND equals CZK 365,175,000.**

## 5. Trading in shares of Chemopetrol

in CZK

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ECP | CH | 100 | 100KO002100B | KHB | | KHB | TREND-VIF | 1,110.00 | CHEMOPETROL | 250 | 322,000.00 |
| ECP | CH | 100 | 100KO002400B | KHB | | KHB | IF banks | 1,110.00 | CHEMOPETROL | 3,009 | 3,360,000.00 |
| ECP | CH | 100 | 100XXX2X2009 | TREND-VIF | KHB | KHB | 1,235.00 | CHEMOPETROL | 3,360 | 10,147,000.00 |
| ECP | CH | 100 | 100KO006140B | KHB | | KHB | 1,067.00 | CHEMOPETROL | 11,000 | 11,004,000.00 |
| ECP | CH | 100 | 100M15O00525 | Natril | | KHB | 1,067.00 | CHEMOPETROL | 15,000 | 17,500,000.00 |
| ECP | CH | 100 | 100N11221100 | KHB | | KHB | 1,115.00 | CHEMOPETROL | 1,000 | 3,140,000.00 |
| ECP | CH | 100 | 100KO401200 | KHB | | Natril | 1,067.00 | CHEMOPETROL | 8,000 | 7,900,000.00 |
| | | | | | | | | Total | 53,400 | 54,640,000.0 |

**Conclusion: Within the framework of transactions with the investment funds KHB realised a profit of CZK 1,845,000.**

9. Suspicion as to the laundering of yields from criminal activities. Shares of Sokolovská uhelná from the funds' portfolios were sold for abnormally low prices to companies related to KHB.

- 20 January 1997 - date of agreement between KHB and Atlanta Safe on the transfer of 770,000 shares of Sokolovská uhelná for CZK 400,232,000 (this information was provided by representatives of the present management of the TREND-V.I.F a.s.).

Conclusion: Atlanta Safe a.s. paid for the transfer of underlying shares to the KHB bank account (in accordance with the agreement it is the account No. 100200878/5100) in spite of the fact that it bought the underlying shares from Forstminster Enterprises Limited.

- ..... January 1997 - KHB sold shares of Sokolovská uhelná to the Cypriot Forstminster Enterprises Limited (357,000 shares x CZK 320).

- 27 January 1997 - FORSTMINSTER ENTEPRISES LIMITED sold 357,000 shares of Sokolovská uhelná to Atlanta Safe s.r.o. for the price of CZK 700 per share.

⇒ The profit of FORSTMINSTER ENTEPRISES LIMITED = CZK 135,000,000.

Review of trading in shares of Sokolovská uhelná

23

[table - illegible data]

**Conclusion: The Forminster's profit from these transactions amounted to CZK 135 million.**

**10. Suspicion that BS Egretta has bought in shares of OD Kotva for funds squeezed from the investment funds.**

- 1 September 1997 - from 1 September 1997 BS Egretta has paid more than CZK 121,000,000 for shares of OD Kotva

in CZK

[table - illegible data]

**11. Unusual transactions of IFM: shares were transferred just for CZK 0.01**

in CZK

[table - illegible data]

**Conclusion: Suspicion exists that also portfolios of other entities involved in collective investing have been inflicted damages.**

Conclusions

Shares of OD Kotva, Sokolovská uhelná, Mostecká uhelná, S ?T Telecom, Synthesia, Chemopetrol and other companies were sold fr )m portfolios of both funds for a suspiciously low prices. These shares were s )ld for unusually low prices not equivalent to the performance provided in ie form of transfers of underlying securities. Such transfers of securities w re carried out by a group of corporate entities and individuals related to Královehradecká brokerská a.s. This group consists of:

- IFM a.s.
- GENTA a.s.
- FIREX, akciová společnost
- Moravská zemská, a.s.
- Lidová obchodní společnost, as.
- Consult Invest, s.r.o.

Entities and individuals who are members of this group are reasona ly under suspicion of financing their activities on the account of funds' portfoli )s assets. With this group another group co-operates which launders the yiel Is resulting from criminal activities of the former through traditional metho Is used for such purposes, i e. organisation of transactions between compani :s seemingly executed in the normal course of business, arrangement of banking transactions in third countries or artificially increased profits of otherwise legally operating companies. This group consists of:

- Forminster Enterprise Limited
- Burzovní společnost Egretta, a.s.
- Atlanta Safe, a.s.
- Severní brokerská, a s.
- Dynamic Partners, a.s.
- Sokolovský IF, a s.

2 5

- and individuals:
- Anatolij Salamatin, Jiří Mareš

Data from the Securities Centre clearly confirm that some securities were transferred to the accounts of members of the second group on the basis of spurious transaction between individual companies from portfolios of both investments funds through the account of members of the first group.

The management of VIF- TREND a.s. could, in our opinion, commit the following offences:

1. Violation of duties in managing assets of other persons; § 255 of the Penal Code
2. Misuse of information in commerce; § 128 of the Penal Code
3. Fraud; § 250 of the Penal Code
4. Conspiracy; § 163a

Violation of provision of the Statute No. 248/1992 Coll.
   (a) violation of  § 5a 3 thereof
   (b) violation of § 17.4 thereof
   (c) violation of § 17.3 in wording valid before 1 July 1996.

At the same time a gross violation of Articles 1.3 and 1.5 of the Statutes of Fund in accordance with which the objective of the investment policies is the maximisation of yields and diversification of risks.

Task to be settled:

Within the framework of extraordinary control measures taken against Atlanta Safe a.s. it is necessary to establish numbers of accounts to which the company sent funds in connection with transfer of shares of Sokolovská uhelná;

A suspicion appears that BS Egretta finances its purchases of shares of OD K( lva
by monies obtained from the investments funds of TREND and Mercia. Therefor :, it
is necessary to prove the origin of financial means in BS Egretta's companies;
It is necessary to carry out an extraordinary control in certain entities of collec ive
investing which violated the Statute No. 248/1992 Coll.

47



**Supplement to the UCP Report of 21 January 1998**

This supplement is intended to map the <u>major transfers of assets</u> from he Investment fund of TREND - V.I F., a.s. between 4 August 1994 and 15 Janu iry 1998. The information below are based on abstracts from the Register of ie Securities Centre. If necessary, this material can be widened so as to map busin ss transactions up to the present day.

A. **Damages incurred by the investment fund of TREND - V.I.F. throu gh financial transactions**

**1. Conventional fines**

The method of conventional fines consisted in concluding agreements creat ng conventional duties for the investment fund which were consequently not fulfil ed thereby whilst leading to abnormally high conventional fines. With respect to t e form of such agreement, their legal analysis and unique amounts of conventio al fines a suspicion exists supported also by evidence obtained that the act al object of such agreements was not the transfer of shares but an artificial creati n of a duty on the side of the investment fund and squeezing assets thereof.

Thus, the following amounts disappeared from the fund:

a) CZK 126,000,000 received by IFM a.s. on the basis of an agreement, dated 0 January 1996. The conventional fine was paid in the form of transfer of 60,0 0 shares of OD Kotva which value amounted to CZK 108,000,000.

b) CZK 45,617,000 received by MORAVSKÁ ZEMSKÁ a s on the basis of n agreement, dated 10 July 1996.

c) CZK 44,896,666 received by LIDOVÁ OBCHODNÍ SPOLEČNOST s.r.o. n the basis of an agreement. dated 17 July 1996.

d) CZK 73,718,000 received by MORAVSKÁ ZEMSKÁ a.s. on the basis of n agreement, dated 10 July 1996.

e) CZK 70,526,475 received by Sokolovský investiční fond, a.s. on the basis of an agreement, dated 24 July 1998.

**2. Unpaid purchase price of shares**

This method consisted in concluding agreements with companies which consequently did not pay the price for shares purchased from the investment fund's portfolio. Assets transferred in such way were later transferred to a company controlled by the management of the investment fund.

Thus, the following amounts disappeared from the fund:

a) shares of TELECOM a.s. for a total price of CZK 396,000,000 on the basis of an agreement, dated 22 August 1995, concluded with the company of CONZULT INVEST, s.r.o., which paid to the fund only 25 % of the amount in question.

   Loss: CZK 297,675,000

b) shares of CHEMOPETROL, a.s., for a total price of CZK 47,950,000 000 on the basis of an agreement, dated 22 August 1995, concluded with the company of CONZULT INVEST, s.r.o., which paid to the fund only 25 % of the amount in question.

   Loss: CZK 35,962,500

c) shares of SYNTHESIA, a.s., for a total price of CZK 42,050,000 000 on the basis of an agreement, dated 22 August 1995, concluded with the company of CONZULT INVEST, s.r.o., which paid to the fund only 25 % of the amount in question.

   Loss: CZK 31,537,500

These shares were on the basis of an agreement signed on 23 August 1995 between Conzult Invest s.r.o. and FIREX,a.s. transferred to the latter which is directly connected with the group close to KHB both from the point of view of ownership and personal relations. The agreement on the transfer of shares from Conzult Invest, s.r.o. to FIREX, a.s. contained a clause on a conventional fine between these two contracting parties which, practically, enabled FIREX ,a.s. to

29

receive the underlying shares for only a fraction of their price. i.e for CZK 135,000,000 only.

### 3. Thirty-year maturity

This method consisted in concluding agreements on the basis of which the investment fund sold shares from its portfolio to companies controlled by the management of the fund for a price to be paid in monthly instalments during thirty years.

Agreements concluded:

Agreement, dated 1 March 1996 with IFM, a.s. for CZK 88,000,000;
Agreement, dated 4 June 1996 with IFM, a.s. for CZK 248,841,700;

Thus, the investment fund concluded agreements under remarkably unfavourable conditions and without any legal security for 30 years representing CZK 336,841,700.

### 4. Unnecessary direct transactions

This method consisted in executing direct transactions on the Stock Exchange by the company of KHB on the basis of the fund's orders in April 1996. In that month the investment funds repeatedly sold a certain number of shares of Sokolovská uhelná, a.s. only to buy them back for the same price and in the same quantity later at the same day.

In connection with just four transactions of this type executed in April 1996 KHB charged the fund an aggregate amount of CZK 1,899,320.

### 5. Use of the fund's monies for KHB' own transactions

The management of the investment fund transferred an amount of CZK 112,000,000 to the bank account of KHB which used it to buy 77,000 shares of OD Kotva for a price of CZK 1,800 per share from Brno Broker Group, s.s. KHB bought these shares on own behalf and account.

The total claim of the fund against KHB equaled to CZK 169,000,000 as at 31 December 1995

B. Losses incurred by the investment fund of TREND - V.I.F. through trading in shares

1. Loss-making trading of TREND-V.I.F. in shares of OD Kotva

On 26 May 1996 the fund transferred shares of OD Kotva to KHB, a.s. which owns the TREND Investment Company managing the fund KHB immediately sold the underlying shares back to the fund for a price more than twice as high as that for which it bought the shares in question from the same fund. In the same way also IMF a.s. made business with the TREND Investment Fund; this company has been interconnected both by property and personally with KHB. The TREND itself lost some CZK 76,000,000 as a result of such transfers.

2. Loss-making trading of TREND-V.I.F. in shares of Sokolovská uhelná

The fund sold shares of Sokolovská uhelná for an abnormally low price to I. IF a.s. from where the underlying securities were transferred to accounts of other related persons (GENTA, a.s., Mr. Jiří Mareš, KHB, a.s., OD KOTVA, a.s 0. On 20 January 1997 77,000 shares of Sokolovská uhelná were transferred to the Cypriot company of FORMINSTER ENTERPRISES LTD for prices which represented approximately one half of a current market price of the underlying shares.

31



FORMAT FOR PRINTING
sponsored by



**July 18, 2005**

EUROPEAN BUSINESS NEWS

# Prague's Free-Market Pain

**U.S. Investor's Soured Deal
Reflects Post-Privatization Hazards**

**By NICK CAREY**
**DOW JONES NEWSWIRES**
*July 18, 2005; Page A10*

PRAGUE -- The Kotva department store looms dark and decrepit in this city's downtown, a monument to mid-1970s Communist architecture and now to legal disputes stemming from the Czech Republic's tumultuous rush into capitalism.

Disputes over ownership go back to its privatization almost a decade ago and have culminated in a legal tangle that is getting attention from the U.S. Embassy here over whether shareholders' rights are being protected in this new member country of the European Union.

**DOW JONES REPRINTS**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

The dispute involves a majority stake in Kotva AS, the holding company of the seven-story store. It pits U.S. investor Andrew Weiss, whose Weiss Asset Management manages $350 million, primarily for American private investors, against Forminster Enterprises Ltd., a Cypriot-registered company whose ownership couldn't be determined.

The dispute escalated after Forminster sold its stake in March to Irish property company Markland Holdings Ltd. for €56 million ($67.4 million), despite a Czech court order freezing Forminster's stake in Kotva and blocking any sale of company property until the dispute is resolved. Forminster representatives say the company legally sidestepped the court



**Hot Properties**

A dispute over Prague's Kotva department store, above, highlights lingering pitfalls for foreigners even as the Czech Republic attracts sizable new investments. Below, foreign direct investment, in billions:

Source: OECD                                                                *Forecast

order by transferring the department store to a subsidiary for sale. State Prosecutor Frantisek Fila says Czech police are investigating the property transfer.

The battle over Kotva highlights the Czech Republic's mixed track record with foreign investors. The country has drawn the most investment per capita in Central and Eastern Europe, thanks to its central location and low-cost, highly skilled work force. Investors starting from scratch here say that apart from a slow judicial system, hefty bureaucracy and corruption -- common complaints throughout the region -- they are satisfied.

Still, some investors buying into companies or forming partnerships with local businessmen have run into problems. In 2003, the Czech government paid $354 million in damages to U.S. businessman Ronald Lauder, after a Czech arbitration court ruled Mr. Lauder was unfairly squeezed out of television station TV Nova by his Czech partner and that the government had failed to protect him.

In the 1990s, the poorly regulated sale of state-owned companies following communism's demise here often resulted in asset stripping, as majority owners siphoned off assets from newly privatized companies. The practice was so common that "tunneling," the Czechs' term for it, has become synonymous for many people with all that went wrong during the transition to a free-market economy from a centrally planned system.

The dispute over Kotva, which dates to transactions that began in the mid-1990s, also highlights complaints about the Czech judiciary and law enforcement. After eight years, no lawsuits nor criminal charges filed in the matter have come to trial. In a report issued last month, the World Bank said countries in the region, from the Czech Republic to Russia, must do "much more" to tackle problems of judicial inefficiency.

Mr. Weiss, who also is a professor of economics at Boston University, says

in a suit he has filed in Prague that Forminster obtained its 56% share in Kotva fraudulently from a now-bankrupt investment fund called Trend. Mr. Weiss's company owns 40% of Trend and 12% of Kotva, and he says he is defending his shareholder rights in each. Forminster says Mr. Weiss tried to blackmail the company into buying him out and has sued him in U.S. district court in Massachusetts and in Prague.

Share-transfer records from the Prague Stock Exchange, plus government and police investigation records, show a web of transactions, starting in the mid-1990s, moving Kotva shares through shell companies from Trend to Forminster. All these companies were linked to Miroslav Halek, Trend's majority owner at the time. Meanwhile, throughout 1996, Mr. Weiss's fund was building a 40% stake in Trend. Mr. Weiss says he was unaware at the time of any suspect share deals.

On May 28, 1996, Trend sold 150,000 Kotva shares to a second company at $16 a share, according to transaction records. Forty-eight minutes later Trend bought back 140,000 shares at $39 each. Two minutes after that, Trend sold 140,000 shares to a third company for $16. The quoted price for Kotva stock on the Prague Stock Exchange that day was more than $20.

A Czech Finance Ministry report in January 1998 estimated Trend had a loss of $3 million through these three transactions. A 1999 Deloitte & Touche study commissioned by a company linked to Forminster said the transactions had no "apparent commercial reason."

Eleven people, including Mr. Halek, have been charged twice by the state prosecutor's office with fraud in connection with the dealings in Trend. Both times the charges were dismissed, as the court ruled the defense received insufficient time to prepare for the case. Mr. Fila, the prosecutor, says fresh charges relating to suspect transactions with Kotva shares were filed against the same 11 people July 13 in Czech district court.

Mr. Fila also filed charges of money laundering against Mr. Halek relating to an account in Liechtenstein that Mr. Halek opened in the mid-1990s in Forminster's name after he obtained power of attorney from Forminster. The high court in Liechtenstein in 1997 froze that account until all property disputes over Trend are resolved.

Forminster attorney Jan Nekola says Mr. Halek had a power of attorney from Forminster throughout the process of transferring Kotva shares and opened the Liechtenstein account for the company, but he says Mr. Halek no longer is involved with the company and that he can't divulge who owns it. Neither Mr. Halek nor his legal representatives could be reached for comment, and his whereabouts couldn't be ascertained.

Mr. Nekola says Forminster settled with Trend representatives in 2000. In 2002, a London arbitration court ruled the settlement was void because it harmed shareholders. Richard Harazim, the Forminster-appointed chief executive of Kotva, says the arbitration ruling "has no impact under Czech law." In an interview, Mr. Harazim acknowledged that the transactions leading from Trend to Forminster "might not be entirely legal when examined all together." He added, "Under Czech law, ownership is defined by possession. Forminster possesses the shares."

Mr. Harazim defends the sale of Kotva to Markland despite the court order freezing Forminster's shares. The frozen "shares were not sold," he says, "merely the assets." A Markland spokesman declined to comment on sale details, but said lawyers advised it was a "clean property deal."

**Write to** Nick Carey at nick.carey@dowjones.com[1]

**URL for this article:**
http://online.wsj.com/article/0,,SB112163587682687750,00.html

**Hyperlinks in this Article:**
**(1)** mailto:nick.carey@dowjones.com

Copyright 2005 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s., )<br><br>Plaintiff, )<br><br>v. )<br><br>ANDREW WEISS and WEISS ASSET )<br>MANAGEMENT, LLC, )<br><br>Defendants. )<br>————————————————————— )<br>ANDREW WEISS, WEISS ASSET )<br>MANAGEMENT LLC, K T, INC. and CVF )<br>INVESTMENTS, LTD., )<br><br>Counterclaim-plaintiffs, )<br><br>v. )<br><br>KOTVA a.s., MARTIN BENDA, RICHARD )<br>HARAZIM, FORMINSTER ENTERPRISES, )<br>LTD., SPV CO and JOHN DOES 1–5, )<br><br>Counterclaim-defendants. )<br>————————————————————— ) | C.A. No. 05-10679-RCL |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
## MOTION FOR JUDGMENT ON THE PLEADINGS

As described in defendants' Counterclaim, the Forminster Group brought this lawsuit in

the name of the Kotva corporate shell as part of its efforts to gain leverage over Andrew Weiss.

The selection of Kotva as the plaintiff was a deliberate attempt to shield other members of the

Group, including SPV CO, from this Court's jurisdiction.   Taking all of the allegations of

Kotva's Complaint as true, however, reveals a fatal flaw to Kotva's Complaint:  Kotva has

suffered no damage.  The entity that held title to the Shopping Centre real estate, the subject

matter of the entire Complaint, was not Kotva.  Nor was Kotva the entity that was entitled to receive the proceeds of the sale of the Shopping Centre. If there were a fraud or blackmail scheme that caused a delay in the sale of the Shopping Centre and the hold back of a portion of the proceeds of that sale in escrow as alleged in the Complaint, those damages were incurred by SPV CO, not Kotva.  Yet SPV CO, in response to defendants' Counterclaim, asserts that this Court lacks personal jurisdiction over it.  On the basis of the facts in the Complaint, Kotva is not the injured party and, thus, its Complaint should be dismissed.

Equally as fatal, regardless of whether the plaintiff is Kotva or SPV CO, the Complaint fails to state a cognizable claim for securities fraud or RICO.  As evidenced by the Complaint, neither Kotva nor SPV CO were purchasers or sellers of securities as required by decades-old Supreme Court precedent and neither were harmed by a single predicate act that is part of a pattern of continuing criminal activity as required by the RICO Act.  The Complaint also fails to state a claim for common law fraud or violation of Chapter 93A.

## I.     THE FACTS FOR PURPOSES OF THIS MOTION

"The standard for evaluating a Rule 12(c) motion for judgment on the pleadings is essentially the same as the standard for evaluating a Rule 12(b)(6) motion.  The trial court must accept all of the non-movant's well-pleaded factual averments as true, and draw all reasonable inferences in his favor."  *Pasdon v. City of Peabody*, 330 F. Supp. 2d 22, 24 (D. Mass. 2004).  Thus, for purposes of this Motion, the Court should assume that the following allegations are true:

### A.     The Blackmail Allegations

Andrew Weiss and Weiss Asset Management LLC ("WAM") (collectively, the "Defendants") control a block of approximately 12% of the shares (the "CVF Shares" or "Brookdale Shares") of the plaintiff, Kotva, a public company incorporated in the Czech

2

Republic. Compl. ¶¶ 4, 9, 10.[1]  Weiss met with representatives of Kotva in May 2004. *Id.* ¶ 20. During this meeting, Weiss stated that he was aware that Kotva was planning on selling real estate (the "Shopping Centre"). *Id.*  Weiss also "first broached the subject of Kotva 'repurchasing'" the CVF Shares, but demanded more than they were worth. *Id.*  "Weiss conveyed that he was an important businessman [and] that he could make serious problems for Kotva." *Id.*  The Kotva representatives refused to purchase the CVF Shares. *Id.* ¶¶ 20–21.

> Jilted by Kotva, Weiss thereafter devised a scheme from his Boston, Massachusetts office to blackmail Kotva into buying the Brookdale shares at an exorbitant price.
>
> Specifically, Weiss and WAM utilized the services of Vladimir Hoffmann ("Hoffmann"), a Czech national, to act as a straw man in negotiations with Kotva and to place a stranglehold on Kotva's sale of the Shopping Centre by commencing a lawsuit claiming that the wholly owned Kotva subsidiary SPV KN, which had acquired the Shopping Centre in April 2004, was not the legal owner of the Shopping Centre, but that Kotva itself was the legal owner.

*Id.* ¶¶ 21–22.

The Defendants directed Hoffmann to use a Cyprus company called Gilroy to file a civil lawsuit against Kotva and two of its subsidiaries. *Id.* ¶¶ 23–24.  Gilroy filed a lawsuit on June 30, 2004 challenging the transfer of the Kotva Shopping Centre from Kotva to its subsidiaries and seeking a declaration that Kotva owns the Shopping Centre. *Id.* ¶ 24.  After causing the Gilroy lawsuit to be filed, Weiss continued to offer the CVF Shares to Kotva's representatives throughout the period from August to November of 2004. *Id.* ¶¶ 27–31.  However, Kotva continued to refuse to purchase the CVF Shares. *Id.*

On December 23, 2004, the Defendants caused K T, Inc. to file "a lawsuit against Kotva, with virtually identical allegations as the Gilroy action." *Id.* ¶¶ 32, 35.  "Weiss [] made ever

---

[1] In the fall of 2005, Kotva changed its name to K-T-V Invest a.s.  However, the Defendants will refer to the plaintiff as "Kotva" in this memorandum for the sake of clarity as the Complaint refers to the plaintiff as Kotva.

increasing price demands on Kotva . . . with the carrot that he would 'attempt to influence' Gilroy and K T to drop the suits." *Id.* at 2.  Kotva never purchased the CVF Shares. *Id.* ¶¶ 27–31.

> As a result of the Gilroy and KT actions, which purported to challenge SPV KN's ownership of the Shopping Centre, Kotva was unable to effectuate the sale of the Shopping Centre as written for over eight months, losing the benefit of sales proceeds amounting to 1.52 billion CZK ($65.3 million USD).  When the deal finally closed, the buyer held back 567 million CZK ($24.3 million USD) from the Shopping Centre sale (37% of the sales price), which Kotva cannot utilize until the Gilroy and KT lawsuits are conclusively resolved in the Czech courts.

*Id.* ¶ 37.  Kotva also suggests that the Defendants' actions "threatened Kotva's efforts to refinance a loan," but Kotva does not allege that it was actually unable to refinance the loan or suffered any actual damages relating to the loan. *Id.* ¶ 38.  Thus, the sole damage Kotva alleges: (1) was caused by the filing of the Gilroy and K T lawsuits; and (2) relates to its failure to receive the proceeds of the sale of the Shopping Centre as quickly as it would have liked.

However, a cursory examination of the actual contract for the sale of the Shopping Centre reveals that Kotva was never going to receive any of the proceeds of the sale.[2]  The Forminster Group structured the sale of the Shopping Centre as one in which SPV CO would sell stock in another company that had title to the Shopping Centre and, in exchange, SPV CO would receive money. *See* Exhibit A, at 1 (defining "Seller"), 16–17 (providing that proceeds of sale go to the "Seller").[3]  Thus, SPV CO, rather than Kotva, was to receive the proceeds of the sale of the

---

[2] Since Kotva references the contract for the sale of the Shopping Centre throughout its Complaint and relies on its provisions for its allegations of damage, the Court may consider the contract on a motion for judgment on the pleadings without converting the motion into a motion for summary judgment. *E.g.*, *Beddall v. St. Str. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998).

[3] The contract begins with a cast of characters on pages 1–2. SPV CO is the "Seller."  Kotva a.s., which is referred to as KAS, "is the controlling person in relation to the Seller" and other entities in the KAS Group.  CRQ Czech is the "Buyer."  The Seller (SPV CO) is to sell to the

Shopping Centre, including any money released from the escrow account on the resolution of the

Gilroy and K T lawsuits.  *Id.* §§ 5.6.3, 5.6.4; Exhibit B (amending purchase and sale contract to

accord same treatment for K T lawsuit as for Gilroy lawsuit).

### B.    The Fraud Allegations

In an attempt to manufacture federal statutory claims, Kotva tries to convert allegations

of a "blackmail scheme" into claims of securities fraud, RICO, mail fraud, wire fraud and

common law fraud.  *See* Compl. at 1 (describing Defendants' conduct as "an audacious stock

fraud scheme").  However, the only allegedly false statements Kotva identifies are:

1.    "We will attempt to influence Gilroy to withdraw the complaint
    questioning ownership of assets by Kotva a.s.  Since we do not exert
    control over Gilroy and Balfindor or petitions submitted by them, we
    cannot guarantee a withdrawal of the complaint.  The sale agreement shall
    be conditional on withdrawal of the existing lawsuit where Gilroy is the
    plaintiff."  Statement by Weiss to Martin Benda and Richard Harazim on
    August 23, 2004.  Compl. ¶ 29, Ex. B.

2.    Identical statement by Weiss to Martin Benda and Richard Harazim on
    November 23, 2004.  Compl. ¶ 30, Ex. C.

3.    "K T is not controlled by Weiss Asset Management; however, if a
    satisfactory resolution of all matters can be achieved, I would try to
    persuade K T to settle its lawsuits, and I am highly confident that I would
    be successful in that endeavor."  Statement by Weiss of unspecified date
    to unspecified individual or individuals affiliated with Kotva.  Compl.
    ¶ 34.

With respect to Kotva's fraud allegations, the Complaint is remarkable not only for the

hyperbole of the allegations, but also for what it is missing.  Kotva does not allege: (1) that

anyone acting on behalf of Kotva believed any of the three listed statements; (2) that Kotva took

any action as a result of any of the three statements; (3) that Kotva was damaged by any of the

---

Buyer (CRQ Czech) certain trademarks and 97% of the shares of another company in the KAS
Group—SPV KN.  SPV KN "is the registered owner of the Property."  In return, SPV CO is to
receive the Purchase Price of 1,501,450,000 CZK.

three statements; or even (4) that Weiss *intended* that anyone at Kotva believe any of the three statements. Instead, Kotva states that it "suspected" Weiss was behind the Gilroy lawsuit, commenced a plan to "'smoke out' Weiss' interest in Gilroy;" and then "uncovered documents which reveal that the Weiss Defendants directed, controlled and funded the Gilroy action." *Id.* ¶¶ 26–29. Likewise, Kotva knew that Weiss controlled K T. *Id.* ¶¶ 32–35.

Indeed, taking Kotva's core "blackmail" allegations as true, the essence of the alleged scheme was that Kotva *believe the exact opposite* of the three allegedly false statements: namely, that Weiss controlled Gilroy and K T and had the ability to cause the withdrawal of the lawsuits—the "leverage" Kotva claims Weiss used in order to "extort" Kotva into buying CVF's shares in Kotva—a purchase that never occurred.

## II.    BECAUSE SPV CO WAS TO RECEIVE THE PROCEEDS OF THE SALE OF THE SHOPPING CENTRE, KOTVA CANNOT BRING CLAIMS ON ITS BEHALF

It is indisputable that Kotva's sole role under the contract for sale of the Shopping Centre was to guarantee certain obligations of SPV CO. Kotva was not to receive a dime from the sale of the Shopping Centre. Yet, all of the damages Kotva alleges relate to it not receiving the proceeds of the sale of the Shopping Centre as quickly as it would have liked. *See* Compl. ¶¶ 37–39 (entitled "The Damage Caused by the Weiss Defendants' Stock Scheme").

Kotva's inability to bring claims for damages suffered by another corporate entity is clear under well-settled law.[4] Even were it not, it would be particularly inappropriate to permit Kotva to assert claims for damages suffered by SPV CO when SPV CO has refused to waive service of process or consent to the jurisdiction of this Court and indeed has challenged personal

---

[4] The fact that SPV CO is owned by a company that, in turn, is owned by a company in which Kotva has a partnership interest is of no moment. Kotva is still not the proper plaintiff.

jurisdiction on the grounds that it is a separate corporate entity from Kotva. *See* SPV CO's Mot. to Dismiss. The Court should not permit Kotva to invoke or ignore the corporate form of SPV CO at its convenience.

Each of Kotva's claims requires proof of damages and therefore must be dismissed.

### A. "Injury to Business or Property" is an Essential Element of a Civil RICO Claim (Counts II and III)

In order to maintain a claim for civil RICO, the plaintiff must allege that it suffered an "injury to business or property" as a result of one or more predicate acts. 18 U.S.C. § 1964(c); *see Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 274 (1992) (holding that only those claimants who can demonstrate a direct injury may bring suit for RICO violations); *George Lussier Enters. v. Subaru of New Eng., Inc.*, 393 F.3d 36, 51 (1st Cir. 2004) ("To have standing in a civil RICO claim, plaintiffs must show 'some direct relation between the injury asserted and the injurious conduct alleged.'"). As described above, the damages described in the Complaint were not suffered by Kotva. Any injury to business or property that was incurred was incurred by SPV CO. Accordingly, the Court should enter judgment for the Defendants on the RICO claims (Counts II and III).

### B. Damage is an Essential Element of Each of Kotva's Common Law Claims (Counts V, VI and VII) and Securities Fraud Claim (Count I)

Kotva has failed to plead an essential element of fraud, abuse of process and tortious interference with advantageous business relations—damage.[5] *See Eureka Broadband Corp. v. Wentworth Leasing Corp.*, 400 F.3d 62, 68 (1st Cir. 2005) (requiring that the plaintiff prove that

---

[5] For purposes of this Motion, the Court should assume that Kotva's contention that U.S. law governs all of its claims is true. *See* Kotva's Memorandum of Law in Support of Its Motion to Dismiss "Counterclaim-Plaintiffs" K T and CVF at 1 ("[A]ll of Kotva's claims are based on U.S. law."). The Defendants continue to believe that there are serious unresolved choice of law questions with respect to common law claims where the allegations establishing one or more essential elements of the claim are based on events that took place in the Czech Republic.

it acted upon a false representation to its damage for common law fraud); *Fabre v. Walton*, 436 Mass. 517, 519 n.3 (2002) ("The elements of the tort of abuse of process are: (1) process was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage.") (internal quotation marks omitted); *Pembroke Country Club, Inc. v. Regency Savings Bank, S.B.*, 62 Mass. App. Ct. 34, 38 (2004) ("The elements of a case of tortious interference with an advantageous business relationship [include that] the plaintiff was damaged by that interference."). Accordingly, the Court should enter judgment for the Defendants on these claims.

Likewise, "[t]o state a cause of action under the federal securities laws, a plaintiff must allege: . . . that plaintiff relied on such misrepresentations or omissions to his detriment." *Steiner v. Unitrode Corp.*, 834 F. Supp. 40, 42 (D. Mass. 1993). Since Kotva alleges no damages, the Court should enter judgment for the Defendants on Counts I, V, VI and VII.

### C.    "Loss of Money or Property" is an Essential Element of a Chapter 93A Claim (Count IV)

"[L]oss of money or property" is also an essential element of a claim under Chapter 93A, § 11. M.G.L. ch. 93A, § 11; *Baldassari v. Pub. Fin. Trust*, 369 Mass. 33, 45 (1975). Since Kotva has not alleged that it lost money or property, the Court should enter judgment for the Defendants on Count IV as well.

### III.    KOTVA'S SECURITIES FRAUD CLAIM MUST BE DISMISSED BECAUSE KOTVA DID NOT BUY OR SELL SECURITIES (COUNT I)

The "audacious stock fraud scheme" alleged by Kotva was an attempt by Weiss to sell to Kotva the shares of Kotva owned by CVF. Compl. at 1–3. The sale, however, never occurred. *Id.* ¶¶ 27–36. Kotva's failure to allege that it purchased or sold securities is independently fatal to its claim in Count I that the Defendants violated the Securities Exchange Act of 1934 and Rule 10b-5. Compl. ¶ 50. Since the Supreme Court's 1975 decision in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 725, 730–31 (1975), only those plaintiffs who "actually purchased or

actually sold" securities may assert civil claims for violations of §10(b) or Rule 10b-5. Lower courts have erected a mountain of caselaw confirming this threshold rule of private securities fraud cases. *E.g.*, *Ont. Pub. Svc. E'ees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 31–32 (2d Cir. 2004); *Brannan v. Eisenstein*, 804 F.2d 1041, 1045 (8th Cir. 1986); *In re Bank of Boston Corp. Sec. Litig.*, 762 F. Supp. 1525, 1531–32 (D. Mass. 1991). Simply put, "[t]o state a cause of action under the federal securities laws, a plaintiff must allege: . . . that he purchased or sold securities . . ." *Steiner v. Unitrode Corp.*, 834 F. Supp. 40, 42 (D. Mass. 1993). Accordingly, the Court must dismiss Kotva's securities fraud claim for failure to plead an essential element of the claim: that Kotva purchased or sold securities.[6]

## IV.   KOTVA'S COMMON LAW FRAUD AND SECURITIES FRAUD CLAIMS FAIL BECAUSE KOTVA HAS NOT AND CANNOT PLEAD, WITH PARTICULARITY, RELIANCE TO ITS DETRIMENT (COUNTS I AND VI)

Kotva has failed to plead, with particularity as required by Rule 9(b), that it relied to its detriment on any of the Defendants' alleged false statements. Reliance to one's detriment is an essential element of common law fraud. *E.g.*, *Eureka Broadband Corp. v. Wentworth Leasing Corp.*, 400 F.3d 62, 68 (1st Cir. 2005) (listing reasonable reliance to one's detriment as an element of common-law fraud); *Nei v. Burley*, 388 Mass. 307, 311 (1983) ("Reliance is an element of actionable fraud."). It is also an essential element of securities fraud. *E.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 205–06 (1976) (quoting Senate Report for elements of private action under Securities Act of 1934); *Steiner v. Unitrode Corp.*, 834 F. Supp. 40, 42 (D. Mass.

---

[6] At one point, Kotva does makes an attempt to allege fraud in connection with the purchase or sale of securities by third parties, but a third party's purchase or sale of securities cannot confer standing on Kotva. *See* Compl. ¶ 50 (alleging fraud in connection with purchases of securities by Gilroy and K T). Nor can SPV CO maintain a claim for securities fraud as it cannot allege it bought or sold securities at an inappropriately high or low price as a result of relying on one or more of the Defendants' allegedly false statements.

1993) (requiring, for securities fraud claim, "that plaintiff relied on such misrepresentations or omissions to his detriment").

The Complaint is devoid of any description of what Kotva did or did not do as a result of the alleged false statements, what Kotva would have done differently, or how the alleged false statements are linked to any damages. Accordingly, Kotva's common law fraud and securities fraud claims fail as a matter of law. *See Russell v. Cooley Dickinson Hosp.*, 437 Mass. 443, 459 (2002) ("Without establishing an inducement to act or forbearance, the plaintiff cannot meet her burden of proving misrepresentation at trial."). Likewise, SPV CO cannot assert a claim for common law fraud or securities fraud because it too did not rely to its detriment on any representations made by the Defendants.

## V.    KOTVA'S RICO CLAIMS SUFFER FROM ADDITIONAL INCURABLE DEFECTS (COUNTS II AND III)

Kotva's RICO claims are defective for several independent reasons. First, as described above, Kotva has failed to allege an injury to business or property as a result of any RICO predicates. Second, Kotva has failed to allege conduct that would constitute extortion, mail fraud, or wire fraud—the only predicate acts it identifies in its Complaint. Third, Kotva fails to allege a pattern of racketeering activity. Finally, even assuming there was an "audacious stock fraud scheme," Kotva's RICO claims are barred by the Private Securities Litigation Reform Act. Even were SPV CO the plaintiff rather than Kotva, these deficiencies would remain, requiring dismissal of the two RICO counts.

### A.    Kotva Has Failed to Allege Sufficient Facts to Support a Violation of the Federal or State Extortion Statutes

It is well-settled that the threat of litigation or the filing of litigation cannot serve as the basis for a charge of extortion under the Hobbs Act or as a RICO predicate act. *E.g.*, *See Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088 & n.2 (11th Cir. 2004) (holding that neither threats to

litigate nor actual litigation can constitute extortion under federal law); *Deck v. Eng'd Laminates*, ¶349 F.3d 1253, 1257–58 (10th Cir. 2003) ("[W]e join a multitude of other courts in holding that meritless litigation is not extortion under § 1951."); *I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265, 267 (8th Cir. 1984) ("We cannot agree that the threat [to bring a civil action] alleged here constituted the infliction of 'fear' for purposes of the extortion statute."); *Dias v. Bogins*, No. 97-1612, 1998 U.S. App. LEXIS 536, at *2 (1st Cir. Jan. 13, 1998) (unpublished) ("[A] threat to sue . . . is not extortion under federal law."); *Di Giambattista v. McGovern*, No. 92-1168, 1992 U.S. App. LEXIS 23569,  at *10 (1st Cir. Sept. 4, 1992) (unpublished) (same).

Since the Gilroy and K T litigation (and the threat thereof) are the only threats identified by Kotva in support of its extortion allegation, Kotva has failed to plead the predicate act of extortion.  Kotva cannot evade these well-established limits on what constitutes extortion by citing the Massachusetts extortion statute, M.G.L. ch. 265, § 25.  Although the caselaw under this statute is not as well-developed as the caselaw relating to its federal counterpart, undersigned counsel have found no Massachusetts case holding that the mere threat of litigation or filing of litigation can constitute extortion.  Rather, the statute by its plain language requires a "malicious[]" threat.  Such a threat is an "essential element[] of § 25." *Broderick v. Roache*, 751 F. Supp. 290, 294 (D. Mass. 1990).  Invoking the protection of the courts by threatening to file a lawsuit cannot be "malicious" within the meaning of § 25.  Any contrary rule would convert petitioning activity that is protected by the Constitutions of both the United States and Massachusetts into a criminal act.

> Moreover, in order for a state extortion offense to qualify as a predicate act under the federal RICO statute, the conduct must be capable of being generically classified as extortionate: that is, "obtaining something of value from another with his consent induced by the wrongful use of force, fear or threats." *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409–10, 154 L. Ed. 2d 991, 123 S. Ct. 1057 (2003) (quoting the Model Penal Code).  In light of our decision in

*Pendergraft*, we doubt that the filing of a lawsuit could ever be "wrongful" for the purposes of RICO.  *See also I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265, 267–68 (8th Cir. 1984) (threats to sue, even if groundless or in bad faith, may be tortious under state law but do not come within the federal extortion statute).

*Raney*, 370 F.3d at 1088 n.2.  Thus, if the Massachusetts statute were broad enough to sweep in threats of litigation, that conduct still cannot serve as a predicate act under federal RICO law.

### B.    Kotva Fails to Allege the Essential Elements of Mail Fraud or Wire Fraud or Identify Any Damage Resulting from the Alleged Fraud

Even under a generous reading of the Complaint, Kotva has not alleged mail or wire fraud with the requisite specificity required by Rule 9(b).  *See New England Data Svcs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987) ("We hold that Rule 9(b) requires specificity in the pleading of RICO mail and wire fraud.").  This failure to describe with particularity the alleged scheme to defraud or connect the alleged fraud with any damage is not a mistake in drafting or a failure due to lack of effort.  Rather, the facts of this case simply do not fall within the general rubric of fraud.

Kotva alleges that it was damaged as a result of the filing of the Gilroy and K T lawsuits.  *See* Compl. ¶¶ 37–39.  Nowhere in its Complaint does Kotva allege how any of Weiss's three allegedly false statements caused it any harm.  Moreover, Kotva fails to allege that Weiss even intended that Kotva believe any of the three allegedly false statements or that they were part of a scheme to defraud.  An allegation of specific intent to defraud and identification, with particularity, of the scheme to defraud are necessary elements of any wire fraud or mail fraud claim.  *United States v. Woodward*, 149 F.3d 46, 54 (1st Cir. 1998) ("To support a conviction for mail or wire fraud, the government must prove beyond a reasonable doubt: (1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud . . . ."); *United States v. Rosen*, 130 F.3d 5, 9 (1st Cir. 1997) (same, but focused on mail fraud).

Kotva's allegations boil down to the following: (a) Weiss threatened civil litigation; (b) Weiss filed civil litigation; (c) Weiss "blackmailed" Kotva by demanding that Kotva purchase the CVF Shares in exchange for dropping the civil litigation; and (d) Weiss attempted to defraud Kotva by telling Harazim and Benda that Weiss did not control the plaintiffs in the civil litigation. These allegations do not describe a scheme to defraud. The plaintiff cannot, by repeating the word "fraud" or one of its variants as a mantra, magically transform its factual allegations into mail fraud or wire fraud. Although the Court is generally required to take all well-plead allegations in the complaint as true, "[t]he court is free, however, to disregard bald assertions, unsupportable conclusions, and opprobrious epithets." *Brown v. Credit Suisse First Boston LLC (In re Credit Suisse First Boston Corp.)*, 431 F.3d 36, 45 (1st Cir. 2005). The idea that Weiss intended that the alleged victims of his "blackmail scheme" believe that he was powerless to relieve the pressure on which the alleged blackmail relied is exactly the sort of "unsupportable conclusion" that this Court can and should reject on a motion for judgment on the pleadings. The very language Kotva uses in its Complaint confirms that its wire fraud and mail fraud allegations are a sham. In paragraphs 65 and 66, Kotva alleges that the Defendants "agreed to commit and did commit [mail and wire] fraud" by using the mails and wires "to ***extort*** Kotva" rather than as part of a scheme to defraud Kotva. Compl. ¶¶ 65–66 (emphasis added).

Thus, Kotva has failed to plead the essential elements of mail fraud or wire fraud. Even if it had, Kotva has failed to allege any damages stemming from the Defendants' alleged wire fraud or mail fraud. As demonstrated above, all of Kotva's alleged damages flow from the *filing* of the Gilroy and K T lawsuits. *See* Compl. ¶¶ 37–39. Thus, alleged false statements about those lawsuits cannot be the proximate cause of any damage to Kotva. Thus, any predicate act relying on those false statements cannot serve as the basis for a RICO claim. *See Holmes v. Sec.*

*Investor Prot. Corp.*, 503 U.S. 258, 274 (1992) (requiring that plaintiff in civil RICO case prove that RICO predicate was proximate cause of damages). Since Kotva did not suffer any damage from the alleged predicate acts of wire or mail fraud and the conduct alleged by Kotva cannot, as a matter of law, constitute extortion, Kotva has failed to plead that it suffered damage to business or property as the result of a single RICO predicate. This failure is an independent reason that Kotva's RICO claim is dead on arrival. *See Camelio v. Am. Fed.*, 137 F.3d 666, 679 & n.2 (1st Cir. 1998) ("When a plaintiff attempts to base a civil RICO claim on § 1962(c), that claim cannot succeed unless the injuries of which the plaintiff complains were caused by one or more of the specified acts of racketeering.").

## C.    Kotva Fails to Allege a Pattern of Racketeering Activity

All of Kotva's RICO allegations stem from a single alleged blackmail scheme. As such, they do not constitute a "pattern" within the meaning of the RICO statute. As the First Circuit has explained, "to prove a 'pattern of racketeering activity,' one must show separate predicate acts that 1) are 'related,' and 2) 'amount to or pose a threat of continued criminal activity.'" *Apparel Art Int'l v. Jacobson*, 967 F.2d 720, 722 (1st Cir. 1992) (Breyer, C.J.) (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

> [T]his definition does not encompass a single criminal event, a single criminal episode, a single "crime" (in the ordinary, nontechnical sense of that word). . . . . To hold otherwise would mean that many individual bank robberies, frauds, drug sales, embezzlements, and other crimes as well would automatically fall within the scope of the RICO statute, a result contrary to RICO's basic purpose. *See H.J. Inc.*, 492 U.S. at 239 ("A pattern is not formed by 'sporadic activity.'") (quoting S. Rep. No. 617, 91st Cong., 1st Sess. 158 (1969)). . . . . [H]owever courts express the point, they have consistently held that a single episode does not constitute a "pattern," even if that single episode involves behavior that amounts to several crimes (for example, several unlawful mailings). *See, e.g., Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 31 (1st Cir. 1987) (single bribe paid in three installments, each constituting a mail fraud violation, did not make out "pattern"); *J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 820–21 (7th Cir. 1991); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1417–19 (3d Cir.), *cert. denied*, 115 L. Ed. 2d 1007, 111 S. Ct. 2839 (1991).

*Id.* at 722–23.  Thus, by failing to plead a single predicate act that is separate and distinct from the Defendants' alleged "extortion" of Kotva—acts that took place over a course over a matter of months—Kotva has failed to allege a "pattern" of racketeering activity that poses a threat of continued criminal activity.  *Id.* (noting that thirteen months was a relatively short period of time, Congress was concerned with long-term criminal conduct and holding that several instances of criminal behavior that were part of a "single effort to obtain (and to keep) one $ 96 million Defense Department contract" did not constitute a pattern for purposes of RICO).

    **D.**    **<u>Kotva's RICO Claims are Barred by the Private Securities Litigation Reform Act</u>**

18 U.S.C. § 1964(c), as amended by the Private Securities Litigation Reform Act of 1995, Pub L. No. 104-67 (the "PSLRA"), provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962 [unless the action was brought] against any person that is criminally convicted in connection with the fraud."  If, as Kotva repeatedly alleges, the RICO conduct here is "conduct that would have been actionable as fraud in the purchase or sale of securities," s*ee* Compl. at 1 (describing conduct as "an audacious stock fraud scheme"); *id.* at 3 (referring to "Weiss' fraudulent stock scheme"); *id.* (noting claim against the Defendants for "violations of the Federal Securities and Exchange Act of 1934"); *id.* at 12 (describing "The Damage Caused by the Weiss Defendants' Stock Scheme"); *id.* at 15–16 (alleging, as Count I, a violation of the federal securities laws), then there can be no RICO claim.[7]

---

[7] As described above, Kotva has failed to plead essential elements of its fraud allegations. Accordingly, Kotva's RICO claim fails for lack of any cognizable predicate acts.  If Kotva had properly plead fraudulent conduct, such conduct cannot serve as the basis of a RICO claim under the PSLRA.  Either way, the RICO claim must be dismissed.

Since Kotva asserts that its fraud allegations concern conduct actionable as securities fraud, Kotva cannot rely on that allegedly fraudulent conduct for a civil RICO claim. The fact that Kotva lacks standing to bring a securities fraud claim does not overcome the bar erected by the PSLRA. The conduct at issue is, according to Kotva, actionable as fraud in the purchase or sale of securities regardless of whether Kotva is the proper plaintiff for such an action. *Cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. -- (Mar. 21, 2006), slip op. at 12, 16 (making distinction between whether plaintiff was holder/purchaser/seller of securities and whether complaint alleges fraud "in connection with the purchase or sale of securities") (attached hereto as Exhibit C). Thus, Kotva's allegations of fraud are barred by the PSLRA.

## VI.    THE COURT MUST DISMISS KOTVA'S CHAPTER 93A CLAIM UNDER THE LAW OF THE CASE DOCTRINE (COUNT IV)

Finally, during the January 23, 2006 hearing on Kotva's Motion to Dismiss, the Court identified a flaw in the Weiss Parties' claims under Chapter 93A, § 11 in that the parties were not acting in trade or commerce with respect to this intracorporate dispute. *See Riseman v. Orion Research, Inc.*, 394 Mass. 311, 313-14 (1985); *Zimmerman v. Bogoff*, 402 Mass. 650, 662-63 (1980); *Kurker v. Hill*, 44 Mass. App. Ct. 184, 190-91 (1998); *Horizon House-Microwave, Inc. v. Bazzy*, 21 Mass. App. Ct. 190, 200 (1985); *Newton v. Moffie*, 13 Mass. App. Ct. 462, 467 (1982). For this reason, just as the Weiss Parties may not maintain a Chapter 93A claim against Kotva, Kotva may not maintain a Chapter 93A claim against the Defendants.

## VII.    <u>CONCLUSION</u>

For the above reasons, the Court should enter judgment on the pleadings dismissing all counts of Kotva's Complaint.

.                                                    Respectfully Submitted,

                                                     ANDREW WEISS and WEISS ASSET
                                                     MANAGEMENT LLC

                                                     By their attorneys,


                                                     /s/ Benjamin A. Goldberger
                                                     Edward P. Leibensperger (BBO# 292620)
                                                     Benjamin A. Goldberger (BBO# 654357)
                                                     McDermott Will & Emery LLP
                                                     28 State Street
                                                     Boston, Massachusetts  02109-1775
                                                     (617) 535-4000

Dated: April 4, 2006

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 4, 2006.

                                                     /s/ Benjamin A. Goldberger
                                                     Benjamin A. Goldberger

BST99 1494002-6.072198.0012

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ANDREW WEISS and WEISS ASSET | ) |
| MANAGEMENT, LLC | ) |
| | ) |
| Defendants. | ) |
| | ) |

Case No. 05-10679-RCL

## OBJECTIONS AND RESPONSES OF PLAINTIFF TO COUNTERCLAIM-PLAINTIFFS ANDREW WEISS, WEISS ASSET MANAGEMENT LLC, K T INC., AND CVF INVESTMENTS, LTD.'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

The plaintiff, Kotva a.s. ("Kotva"), hereby responds to Counterclaim-plaintiffs

Andrew Weiss, Weiss Asset Management LLC, K T Inc., and CVF Investments, Ltd.'s

(collectively "Counterclaim-plaintiffs") First Request for Production of Documents

("First Request") as follows:

## GENERAL OBJECTIONS

The following general objections apply to and are incorporated by reference into

each of Kotva's specific responses to the document production requests contained herein.

I.        Kotva is providing this response to the First Request, and is producing

documents pursuant thereto, without waiver of or prejudice to their rights, at any later

time, to raise objections to:

(a)        the relevance, materiality or admissibility of:

A.        the First Request or any part thereof;

1

     B. statements made in this response to the First Request or any part
      thereof; or

     C. any document produced pursuant to this response; or

  (b) any further demand for discovery involving or relating to the matters
    raised in the First Request.

  II. The specific responses set forth below and Kotva's production pursuant

thereto are based upon information currently available after diligently searching within

the time available of the documents in Kotva's possession, custody or control. Kotva

may, in the future, obtain or locate additional documents responsive to the First Request

and may identify or determine additional information relevant to its specific responses to

the First Request. Kotva objects to the First Request to the extent it purports to demand

production of documents not in Kotva's possession, custody or control or to require a

search of files that do no reasonably relate to one or more of the specific document

production requests contained in the First Request. Kotva reserves the right at any time

to revise, correct, add to, supplement, modify or clarify the specific responses set forth

below or the production made pursuant thereto.

  III. Kotva objects to the First Request to the extent it demands production of

any document covered by the attorney-client privilege, the work product doctrine or any

other applicable privilege. In the event Kotva produces any privileged document, its

production is inadvertent and does not constitute a waiver of privilege.

  IV. Kotva objects to producing any requested documents to the extent that the

production of said documents will be oppressive, unduly burdensome, unreasonably

expensive or will require an unreasonable investigation.

  V. Kotva objects to the Instructions and/or Definitions contained in the First

Request to the extent that they attempt to impose obligations upon Kotva that are

2

inconsistent with and/or in addition to those required under the Federal Rules of Civil Procedure.

VI.     Kotva objects to the First Request to the extent it demands production of any document containing any confidential, proprietary and/or trade secret information.

VII.     Kotva objects to the production of any document falling within one of the General Objections set forth above or the specific objections set forth below.  In the event any document falling within such an objection is or may be produced by Kotva, its production is inadvertent and does not constitute a waiver of the objection with respect to the produced document or any other document.  Moreover, a statement by Kotva that it will produce documents responsive to a particular request or falling within a particular description means that Kotva will produce all documents within its possession, custody or control that: (a) are responsive to the particular request or fall within the particular description in question; (b) have been located by Kotva after a diligent search; and (c) do not fall within one of the General Objections set forth above or within any of the objections contained in the specific responses set forth below.  Furthermore, such a statement is not an acknowledgement or an admission that any document responsive to the particular request or falling within the particular description in question currently exists or has ever existed.

## SPECIFIC OBJECTIONS AND RESPONSES

Request No. 1:

The purchase and sale agreement for the purchase of the Department Store by the Irish Investors, including any side letters or side agreements.

3

Response:

Subject to the General Objections, upon entry of a Confidentiality Order, and consent of the buyer, Kotva will make available for inspection and copying documents responsive to Request No. 1.

Request No. 2:

The agreement setting forth the terms by which the buyer is holding back $24.3 million, as described in paragraph 37 of the Complaint.

Response:

Subject to the General Objections, upon entry of a Confidentiality Order, and consent of the buyer, Kotva will make available for inspection and copying documents responsive to Request No. 2.

Request No. 3:

All documents concerning the negotiations for the sale of the Department Store referenced in paragraph 17 of the Complaint.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly burdensome, seeks information irrelevant to this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, the foregoing General Objections, the consent of the buyer and upon entry of a Confidentiality Order, Kotva will make available for inspection and copying documents responsive to Request No. 3

Request No. 4:

All communications between Kotva and Jones Lang LaSalle concerning the Department Store.

4

Response:

Subject to the General Objections and upon entry of a Confidentiality Order, Kotva will make available for inspection and copying documents responsive to Request No. 4 to the extent they exist.

Request No. 5:

The October 2003 future purchase contract referenced in paragraph 17 of the Complaint.

Response:

Subject to the General Objections, upon entry of a Confidentiality Order, and consent of the buyer, Kotva will make available for inspection and copying documents responsive to Request No. 5.

Request No. 6:

The January 2004 purchase agreement referenced in paragraph 17 of the Complaint.

Response:

Subject to the General Objections, upon entry of a Confidentiality Order, and consent of the buyer, Kotva will make available for inspection and copying documents responsive to Request No. 6.

Request No. 7:

All documents concerning the sale of the Department Store to the Irish Investors.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly burdensome, seeks information irrelevant to this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding these objections and the foregoing General Objections, upon entry of a Confidentiality Order,

5

and consent of the buyer, Kotva will make available for inspection and copying

documents responsive to Request No. 7.

Request No. 8:

All documents concerning the disposition of the proceeds of the sale of the Department
Store.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Subject to these objections and the foregoing General Objections, and upon the

entry of a Confidentiality Order, Kotva will produce documents concerning the receipt

and holding of the proceeds of the sale of the Department Store.

Request No. 9:

The settlement agreement referenced in paragraph 12 of the Complaint.

Response:

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 9.

Request No. 10:

Ernst & Young's recommendation referenced in paragraph 14 of the Complaint.

Response:

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 10.

6

Request No. 11:

The press reports referenced in paragraph 19 of the Complaint.

Response:

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 11 to the extent they exist.

Request No. 12:

All documents, including any audio or video recordings, concerning the May 12, 2005
meeting among Benda, Harazim, Weiss and Hoffmann.

Response:

Kotva does not have any documents responsive to this request.

Request No. 13:

All refusals of one or more banks to refinance Kotva's loans as described in paragraph 13
of the Complaint.

Response:

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 13 to the extent they exist.

Request No. 14:

All documents concerning the efforts to sell Kotva referenced in paragraph 13 of the
Complaint.

Response:

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 14 to the extent they exist.

7

Request No. 15:

All documents concerning communications between or among the counterclaim-plaintiffs and/or their attorneys.

Response:

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 15 to the extent they exist.

Request No. 16:

The documents referred to as "multiple internal documents" in paragraph 43 of the Complaint.

Response:

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 16.

Request No. 17:

All documents concerning the methods Kotva used to gain access to the documents described in Request Nos. 15 and 16.

Response:

Kotva has no documents responsive to this request.

Request No. 18:

All documents concerning the transfer of the Department Store from Kotva a.s. to Kotva Nemovitosti.

8

Response:

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 18.

Request No. 19:

All documents concerning the transfer of the Department Store from Kotva Nemovitosti
to SPV KN.

Response:

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 19.

Request No. 20:

All documents concerning the transfer or sale of shares in SPV KN.

Response:

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 20.

Request No. 21:

All documents concerning Kotva's decision to seek a buyer for the Department Store,
including but not limited to all documents Kotva relied on to make that decision.

Response:

Kotva objects to this request on the basis that it overly broad, unduly burdensome,

seeks information irrelevant to this litigation, and is not reasonably calculated to lead to

the discovery of admissible evidence.

9

Request No. 22:

All communications between Kotva and Czech law enforcement concerning Andrew Weiss.

Response:

Subject to the General Objections and upon entry of a Confidentiality Order, Kotva will make available for inspection and copying documents responsive to Request No. 22.

Request No. 23:

All documents concerning the decision to initiate criminal charges against Andrew Weiss in the Czech Republic.

Response:

Kotva objects to Interrogatory No. 23. Kotva did not "initiate" criminal charges against Andrew Weiss; the Czech prosecutors did.

Request No. 24:

All documents concerning the decision to initiate this lawsuit.

Response:

Kotva objects to Interrogatory No. 24 because it seeks the production of documents protected by the attorney-client privilege and the work product doctrine.

Request No. 25:

All documents concerning Case No. 0250 in the London Court of International Arbitration.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly burdensome, seeks information irrelevant to this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence.

10

Request No. 26:

All documents concerning the legal fees referenced in Kotva's Concise Statement of the Case submitted to the Court as part of the parties' Joint Statement (page 5).

Response:

Kotva objects to this request to the extent it calls for documents protected by the attorney-client and attorney work product privileges.

Subject to these objections and the foregoing General Objections, Kotva will produce copies of legal bills at the appropriate time when the Court is considering Kotva's application for legal fees.

Request No. 27:

All documents concerning the lost business opportunities referenced in Kotva's Concise Statement of the Case submitted to the Court as part of the parties' Joint Statement (page 5).

Response:

Subject to the General Objections and upon entry of a Confidentiality Order, Kotva will make available for inspection and copying documents responsive to Request No. 27 to the extent they exist.

Request No. 28:

All documents concerning the value of the Department Store or the value of Kotva a.s.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly burdensome, seeks information irrelevant to this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence.

11

Request No. 29:

Such documents as are sufficient to identify the membership of Kotva's board of directors and Supervisory Board at all points in time since Kotva was founded.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence. In addition, the requested

information can be obtained from public documents.

Request No. 30:

Such documents as are sufficient to determine how each shareholder of Kotva voted in elections for members of the board of directors and supervisory board.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Request No. 31:

Such documents as are sufficient to determine how each member of the supervisory board voted in elections for members of the board of directors.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Request No. 32:

All documents concerning the decision to change Kotva's corporate governance from a single board system to a dual-board system.

12

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Request No. 33:

All documents concerning communications between the Listed Companies and any
government, including the United Kingdom, Czech Republic, Cyprus, France, the United
States and any of their political subdivisions, concerning: ownership of the Department
Store, one or more of the counterclaim-plaintiffs, or any allegations of criminal activity
by: (a) the Listed Companies; (b) Miroslav Hálek; (c) Vladimir Hoffmann; or (d) Andrew
Weiss.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Request No. 34:

All documents concerning communications between or among the Kotva and/or
Forminster Enterprises Ltd. and/or Richard Harazim and/or Martin Benda and/or SPV
CO and/or Andrew Weiss and/or Georgiy Nikitin and/or Weiss Asset Management LLC
and/or K T, Inc. and/or CVF Investments Ltd. and/or Weiss Capital LLC and/or Ondrej
Peterka and/or Vladimir Hoffmann and/or Edita Simkova and/or James Woolf, including
but not limited to audio and video recordings of those communications.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence. Subject to these objections

and the General Objections and upon entry of a Confidentiality Order, Kotva will make

documents concerning communications between or among Kotva, Richard Harazim,

13

Martin Benda, Andrew Weiss and Weiss Asset Management LLC, Ondrej Peterka,

Vladimir Hoffman, Georgiy Nikitin available for inspection and copying.

Request No. 35:

All documents concerning the legal and beneficial owners of an interest, including shares
of stock or a partnership interest, in each of the Listed Companies, for the period from
January 1996 until the present.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence,

Request No. 36:

All documents concerning the identities and addresses of the directors, officers and
managers of the Listed Companies, for the period from January 1996 until the present.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.  In addition, this information

can be obtained from public documents.

Request No. 37:

All documents concerning the minutes of any meetings of shareholders, directors or
supervisory board members of the Listed Companies, from January 1996 to the present.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

14

Request No. 38:

All documents concerning the relationships between or among two or more of the Listed Companies, for the period from January 1996 to the present.

Response:

      Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Request No. 39:

All documents concerning any agreements between or among two or more of the Listed Companies, for the period from January 1996 to the present.

Response:

      Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Request No. 40:

All documents concerning any power of attorney issued by one or more of the Listed Companies, including but not limited to powers of attorney naming Miroslav Hálek, for the period from January 1996 to the present.

Response:

      Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Request No. 41:

All documents concerning the formation of one or more of the Listed Companies.

15

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Request No. 42:

All documents concerning communications between J&T Securities or J&T Banka and
any other entity concerning the purchase of shares in Kotva or the purchase of options to
purchase shares in Kotva.

Response:

Kotva does not have any documents responsive to this request.

Request No. 43:

All documents concerning communications between Kotva and a person or persons in
Massachusetts, including but not limited to phone logs and phone bills.

Response:

Subject to the General Objections, and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 43 to the extent they exist, excluding all communications with counsel.

Request No. 44:

All documents concerning the settlement of any claim or lawsuit brought by one or more
of the Woolf Companies against one or more of the Listed Companies.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

16

Request No. 45:

All documents concerning the sale by the Woolf Companies to the Listed Companies of shares in Kotva or options to purchase shares in Kotva.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly burdensome, seeks information irrelevant to this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence.

Request No. 46:

Any interim or final report authored by Deloitte Touche Tohmatsu or one of its predecessor companies concerning its investigation into allegations of tunneling of assets from a large Czech Republic Department Store.

Response:

Kotva does not have any documents responsive to this request.

Respectfully submitted,

KOTVA a.s.

By its attorneys,

Joel G. Beckman (BBO #553086)
William C. Nystrom (BBO#559656)
Dana A. Zakarian (BBO#641058)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated:  September 6, 2005

17

## CERTIFICATE OF SERVICE

    I hereby certify that on September 6, 2005 I caused a copy of the foregoing document to be served by facsimile and First Class Mail upon all defendants.

Joel G. Beckman

| Home | Issues & Press | Travel & Business | Youth & Education | About State Department |

Under Secretary for Democracy and Global Affairs > Bureau of Democracy, Human Rights, and Labor > Rele
Rights > 2005 > Europ

# Czech Republic

Country Reports on Human Rights Practices  - 2005
Released by the Bureau of Democracy, Human Rights, and Labor
March 8, 2006

The Czech Republic is a constitutional democracy of approximately 10 2 million persons  The bicameral parliament elects as head of state a president, who then appoints a prime minister as head of government Free and fair elections held in 2002 resulted in a coalition government led by the Social Democratic Party Although civilian authorities generally maintained effective control of the security services, some members of the security forces committed human rights abuses

The government generally respected and protected the human rights of its citizens; however, the following human rights problems were reported:

- occasional violence and use of excessive force by the police
- lengthy pretrial delays
- widespread corruption at all levels of government
- violence and discrimination against women and children
- trafficking in persons
- violence and discrimination against the Romani minority

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a  Arbitrary or Unlawful Deprivation of Life

There were no reports that the government or its agents committed arbitrary or unlawful killings

b  Disappearances

There were no reports of politically motivated disappearances

c  Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law prohibits such practices; however, there were reports that police occasionally used excessive force Unlike in previous years, there were no reports that police mistreated Roma

The office for the documentation and investigation of the crimes of communism (UDV) continued to investigate actions taken by government authorities and Communist Party members during the 1948-1989 Communist regime  According to the office, 25 former Communist-era secret police (StB) officers were prosecuted for their participation in antidissident raids in the Asanace operation (a concerted campaign of harassment, torture, and abuse directed at opponents of the Communist regime during the 1970s and 1980s)  Eighteen former secret policemen were sentenced to prison, with two additional sentences still pending; five other cases were still

under investigation. Since 1989 the government has convicted 90 former StB officials and sentenced 26 to prison.

In September two former secret police agents were charged with the torture and persecution of dissidents during the 1970s. The trial was pending at year's end.

There were no developments in the case of police brutality alleged by a Briton and a New Zealander in April 2004. At year's end no action had been taken on their appeal of the decision to dismiss the case for lack of evidence.

The police reportedly used excessive force against concert attendees in July (see section 2.b.)

In January two police officers, Marek Vrastil and Karel Berousek, were convicted of assaulting a Romani family in their home in Popovice u Jicina in 2003. One officer received a 20-month suspended sentence and 4 years' probation, the other received a 1-year suspended sentence and 3 years' probation. The judge stated at the sentencing that the prosecution had not adequately proven racial motives for the attack. In 2004 the three other police officers tried for the attack were found not guilty by the district court in Jicin.

The government increased awareness among police and prosecutors of racially and ethnically motivated crimes by integrating Roma-specific issues into training programs; gathering data on victimization rates; and researching anti-extremist strategies. Police and prosecutors showed greater awareness of the seriousness of crimes with racial and ethnic motivations, but observers nevertheless criticized the effectiveness and timeliness with which such crimes were investigated (see section 5).

Prison and Detention Center Conditions

Prison conditions generally met international standards, and overcrowding decreased during the year. The government permitted visits by independent human rights observers.

A July 2004 amendment to the law requiring half of an inmate's earnings from prison work to be returned to the government as reimbursement for damages, prison costs, or court costs spurred protest by roughly one-third of the one thousand inmates at Vinarice prison.

d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention, and the government generally observed these prohibitions.

Role of the Police and Security Apparatus

The national police are responsible for enforcing the law and maintaining order and were generally effective in doing so. The internal security service, an intelligence and information gathering service with no powers of arrest, reports to parliament and to the prime minister. Police corruption was a problem. The Ministry of Interior oversees the police, and the ministry's inspectorate is responsible for investigating allegations of police misconduct. The government continued to implement police reforms that included oversight measures, improved methods for reporting corruption, and better education and training for police.

According to Ministry of Justice records, the government conducted 115 bribery investigations during the year and convicted 89 public officials of abuse of authority. Of the 107 officials convicted for all corruption-related offenses, only 8 were sentenced unconditionally, with sentences of up to 5 years in prison. Many observers were dissatisfied with the minor cases of corruption often pursued by investigators, and with the generally ineffective investigations and prosecutions of larger-scale malfeasance.

During the year the government continued efforts to recruit Roma to serve in law enforcement and to improve police relations with the Romani community (see section 5).

Arrest and Detention

Persons suspected of crimes were apprehended openly, with warrants based on sufficient evidence and issued by a prosecutor, and brought before an independent judiciary. Police may detain persons without

charge for up to 48 hours, during which time they have the right to counsel at government expense, although they may not contact family members. After 48 hours, police must have determination from a judge and prosecutor that the suspect will be charged before they can detain the suspect further. When the judge and prosecutor decide to charge the suspect, the suspect may contact family members. In some instances a judge may allow a person to be detained for up to 90 days before charges are formally filed to allow further criminal investigation ("investigative detention"). The law provides for bail except for certain serious crimes or to prevent witness tampering.

Lengthy pretrial detention was a problem. Under the law except for "exceptionally grave" offenses, pretrial detention may last no longer than two years. In practice the average length of pretrial detention during the year rose to 147 days, compared with 145 days in 2004. Thirty-five pretrial detainees were held for longer than 2 years, approximately 1.2 percent of all pretrial detainees. A suspect may petition investigating authorities at any time for release from detention.

Amnesty

During the year the president granted 51 amnesties for persons released from prisons or detention centers.

e. Denial of Fair Public Trial

The law provides for an independent judiciary, and the government generally respected this provision; however, judicial effectiveness was hampered by political influence, structural and procedural deficiencies, and a lack of training and resources. There were allegations of judicial corruption, particularly surrounding bankruptcy and commercial courts. In April Usti nad Labem regional court judge Jiri Berka was arrested and charged with criminal conspiracy and other acts. The pretrial investigation was ongoing at year's end.

The court system consists of district, regional, and high courts. The Supreme Court is the highest court of appeal, but a separate Constitutional Court adjudicates the constitutionality of legislation. Judges are nominated by the minister of justice and appointed for life by the president. The senate confirms Constitutional Court judges. Defendants may appeal the decisions of the district courts through several judicial layers to the Supreme Court. Noncriminal cases are handled by the administrative court system, of which the highest court is the supreme administrative court.

During the year several events occurred that damaged public perception of the judiciary's independence from improper political influence. In September long-time Chief State Prosecutor Marie Benesova was removed from her position following a series of disputes with Justice Minister Pavel Nemec. Benesova was widely respected for her tough stand against corruption, and her removal led to concern that future prosecutors may be insufficiently insulated from political pressures.

In August the government extradited a member of the Qatari royal family who had been a long-time resident of Prague and who had been convicted of four counts of sexual abuse of minors. The government did so despite concerns that he would not face serious punishment in Qatar, and many observers questioned the ability of victims to seek legal redress through the court system.

In January 2004 the Ministry of Justice established a new hotline for citizens to report suspected judicial corruption. Through October the hotline received and reviewed 57 calls during the year, compared with 263 in all of 2004. An additional 47 written complaints were received, compared with 137 in 2004. Of all corruption complaints received, 56 percent concerned judges, 9 percent involved prosecutors, and 19 percent concerned other officials. The ministry resolved 68 percent of all reports through a direct response; 17 percent were forwarded to the corruption police for further investigation.

Trial Procedures

The law provides for the right to a fair trial, and an independent judiciary generally enforced this right.

Trials are public, but juries are not used. Instead, a panel of judges rules on guilt or innocence in serious cases, with all other cases heard by a single judge. Defendants have the right to be present and to consult with an attorney in a timely manner and at state expense. Defendants may confront or question witnesses against them, and present witnesses and evidence on their own behalf. Defendants and their attorneys have

access to government-held evidence relevant to their cases. Defendants are presumed innocent and have a right of appeal. The law extends these rights to all citizens

There is a significant backlog of cases. During the year the European Court for Human Rights (ECHR) received approximately one thousand complaints from Czech citizens, most related to the extended length of court proceedings

Political Prisoners

There were no reports of political prisoners

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions, and the government generally respected these prohibitions in practice. However, there were reports of local governments using various methods to evict Romani residents. The government continued to investigate allegations of the forced sterilization of Romani women and prosecute accused perpetrators (see section 5)

Several cases involving the alleged involuntary sterilizations of Romani women proceeded in the courts. In September 2004 the European Roma Rights Center (ERRC) accused the government of continuing the forced sterilization policies of the former Communist regime. The ERRC and its partners asserted that this practice continued well after the fall of the regime and argued that often the victim's consent was either not obtained at all or was obtained under circumstances that rendered informed consent impossible

Over the last 30 years a total of 78 women (10 of whom were non-Roma) have complained about forced sterilizations to the office of the ombudsman for human rights. During the year the ombudsman referred five cases against health systems workers and administrators for further criminal investigation and possible prosecution. Investigations were ongoing at year's end

In November the district court in Ostrava ordered the Ostrava hospital to apologize to Helena Ferencikova, a Romani women sterilized in 2001 following the birth of her second child. Ferencikova appealed the decision in order to seek monetary damages. The appeal was pending at year's end.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The law provides for freedom of speech and of the press, and the government generally respected these rights in practice. In October the NGO Reporters Without Borders issued a report citing the country for its strong protection of press freedoms

The law mandates prison sentences between six months and three years for persons who deny Communist crimes or the Nazi Holocaust. Speech inciting hatred based on race, religion, class, nationality, or other group affiliation is also illegal and carries a sentence of up to three years in prison.

The government can enforce legislation banning hate speech by stopping unauthorized concerts, gatherings, or activities (see section 2.b ). In two separate incidents in July and November, police halted neo-Nazi concerts in Zlata Olesnice and Libovske Udoli, respectively

Denis Gerasimov, who was charged by police in January 2004 for having Nazi propaganda in his bag, was first found innocent in October 2004. His second trial concluded in April and resulted in another acquittal

The independent media were active and expressed a wide variety of views without restrictions.

Observers criticized the December decision of Cesky Televise (the publicly funded, government-owned television station) to cancel Bez Obalu, a popular program of political satire. The cancellation immediately followed criticism of the show by Prime Minister Paroubek, who had been frequently satirized on the program. Although the station cited the cost of producing the show as a factor in the decision, it also stated that it had applied the same standard of political balance that is used for news broadcasts

There were no government restrictions on the Internet or academic freedom.

b. Freedom of Peaceful Assembly and Association

Freedom of Assembly

The law provides for freedom of assembly, and the government generally respected this right in practice; however, the government may legally restrict meetings that promote hatred and intolerance, advocate the suppression of individual or political rights, or jeopardize the safety of participants. Permits normally are required for demonstrations, but police did not interfere with spontaneous, peaceful demonstrations during the year.

The government may enforce legislation banning hate speech by stopping unauthorized concerts, gatherings, or activities (see section 2.a.). In July several hundred police in the western town of Mlynec forcefully dispersed individuals at an annual outdoor techno concert called "CzechTek" because the concert had not been adequately registered. Many nongovernmental organizations (NGOs) and observers alleged that police used excessive force in breaking up the concert. Dozens of injuries among both concertgoers and police resulted, and many fans were arrested. Following an outcry by media and human rights groups, the interior ministry initiated an investigation into the incident and cleared the police leadership of wrongdoing, although individual officers may face prosecution or disciplinary action at the conclusion of the investigation, which was ongoing at year's end. Two of the 18 concertgoers detained by police were formally charged with acts of violence against police. Their cases were pending at year's end.

Freedom of Association

The law provides for freedom of association, and the government generally respected this right in practice. Organizations, associations, foundations, and political parties were required to register with local officials or the interior ministry. The law prohibits political party activities on university campuses but students are permitted to form their own political groups.

c. Freedom of Religion

The law provides for freedom of religion, and the government generally respected this right in practice.

All religious groups officially registered with the culture ministry are eligible to receive limited tax benefits and government subsidies. In order to qualify for first-tier status, which provides tax exemption, groups must have 300 adult permanent resident members. If a group wishes to attain the second-tier registration level, which confers specific additional rights (such as teaching religion in state schools, delegating persons to perform clerical activities in the military, qualifying for government financial subsidies, and being entitled to perform marriages and establish church schools), the group is required to have been registered for 10 years and to obtain signatures equal to 1 per every 1,000 citizens based on the last census, or approximately 10,200 persons. Very few smaller or less-established religions were able to obtain the required signatures to obtain second-tier registration. Several unregistered religious groups have criticized the law as discriminatory against smaller religions. Religious organizations also have the option to register as a civic association rather than go through the tiered registration process. Religious groups registered prior to 1991, such as the small Jewish community, are not required to meet these conditions for registration. There are 26 officially recognized religious groups.

Unregistered religious groups may not legally own communal property, so they often formed civic-interest associations for this purpose. Unregistered religious groups otherwise were free to assemble and worship as they chose, and their members issued publications without interference.

There were no developments in the 2004 plans to construct mosques in Teplice and Orlova.

In January the supreme administrative court upheld the culture ministry's 2002 decision to abolish the state office that had administered confiscated Catholic Church lands since the late 1700s. According to Catholic Church officials, this point of contention with the government, along with several other issues, slowed progress in the resolution of restitution claims. Although the government was committed to the restitution of Jewish and

Catholic property seized under Nazi or Communist governments, the restitution of Catholic property was extremely slow and contentious in practice

Societal Abuses and Discrimination

The country had a Jewish population of several thousand persons. There were a few anti-Semitic incidents during the year.

For example, in April vandals destroyed several tombstones in the Jewish cemetery in Hroznetin. Police investigation of the crime resulted in no arrests

In February following charges of anti-Semitism by the Israeli ambassador, the local company Mountfield canceled a series of television advertisements featuring a derogatory and stereotypical portrayal of an orthodox Jew

Following parliament's February 2004 approval of a law designating a Holocaust Remembrance Day, ceremonies were held on January 27 in Prague.

For a more detailed discussion, see the _2005 International Religious Freedom Report_

d. Freedom of Movement within the Country, Foreign Travel, Emigration, and Repatriation

The law provides for these rights, and the government generally respected them in practice.

The law prohibits forced exile, and the government did not employ it

Protection of Refugees

The law provides for the granting of asylum or refugee status in accordance with the 1951 UN Convention relating to the Status of Refugees and its 1967 protocol, and the government has established a system for providing protection to refugees. In practice the government provided protection against _refoulement_, the return of persons to a country where they feared persecution. The government granted refugee status or asylum

The government also provided temporary protection to individuals who may not qualify as refugees under the 1951 convention and the 1967 protocol and provided it to approximately 78 persons during the year.

Current law establishes a list of "safe countries of origin" from which applicants are unlikely to be granted refugee status, but it does not automatically bar such applications. Applicants whose cases were denied could appeal to the appropriate regional court. In May parliament amended the law to require regional court decisions to be reviewed by a five-judge panel, which refers cases requiring further attention to the supreme administrative court. The amended law also stipulates that only exceptional cases may be appealed to the supreme administrative court following a rejection by the regional court. During the year over 4,000 persons applied for asylum, approximately 1,500 fewer than in 2004, continuing a downward trend that experts attributed to EU rules for applying for asylum. The government granted asylum to 251 persons, according to the interior ministry.

In August the Constitutional Court issued a decision that either asylum hearings be conducted in a language comprehensible to the applicant, or that the government provide an interpreter. This ruling was prompted by the appeal of Vasyl Petriv, who had been denied asylum in 2003 but asserted that he had not understood the proceedings, which were conducted in the Czech language. Petriv received asylum after the Constitutional Court ruling.

The government cooperated with the office of the UN High Commissioner for Refugees and other humanitarian organizations in assisting refugees and asylum seekers

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides citizens the right to change their government peacefully, and citizens exercised this right in

practice through periodic, free, and fair elections held on the basis of universal suffrage.

Elections and Political Participation

The most recent national elections were held in November 2004 for the senate, and were considered free and fair. Individuals and parties could freely declare their candidacy and stand for election.

In March the Romani Democratic Social Party was established to become involved in the coordination of government programs targeting Roma. In March the party announced its intention to field candidates in the 2006 general legislative elections.

Women and ethnic minorities were generally underrepresented in politics and government. There were 33 women in the 200-seat chamber of deputies and 10 women in the 81-seat senate. There were 2 women in the 20-member cabinet.

There were no members of minorities in the 200-seat chamber of deputies, the 81-seat senate, or the 20-member cabinet. One justice on the Constitutional Court was an ethnic Slovak. Of the estimated 150 thousand to 175 thousand Roma in the country, few were integrated into political life (see section 5). Few Roma served in local government, although some were appointed to advisory positions in government ministries, and each region appoints a Romani coordinator to monitor and mediate problems affecting the Romani community.

Government Corruption and Transparency

Throughout the year corruption and abuse of office remained major problems.

Numerous polls highlighted public concern with corruption and low levels of public trust in the integrity and honesty of both government officials and political parties. The perception of widespread corruption and official abuse has fostered an environment of public mistrust of mainstream political parties. Transparency International reported that current procurement statutes were complicated and vulnerable to manipulation, that oversight mechanisms were weak, and that conflict of interest laws were generally ineffective. Biannual governance and anticorruption studies compiled by the World Bank have charted substantial and steady deterioration in the country since 1996 in indices of "government effectiveness," "regulatory quality," "rule of law," and "control of corruption."

On April 27, Prime Minister Stanislav Gross resigned in the midst of a corruption scandal over his ownership of a luxury apartment in Prague in spite of earning a modest government salary. During the subsequent controversy additional questions surfaced regarding other financial and business activities of both Gross and his family. Gross was replaced by Regional Development Minister Jiri Paroubek. The decision by police in December to close the case for lack of evidence was met with widespread public outcry.

In January the media reported that Gross, while serving as interior minister in 2002, had formed a special police unit that reported only to him and whose existence was concealed from parliament, the public, and other government entities. The unit operated in secrecy for two years, reportedly gathering information on political and business figures until its dissolution by the interior ministry.

In August Prime Minister Paroubek dismissed his chief aide, Jiri Dolezel, over allegations of corruption involving the privatization of the Unipetrol group. The aide reportedly solicited a $200 thousand (approximately 5 million CZK) bribe during the sale of Unipetrol to a Polish company. In October Paroubek reluctantly authorized a parliamentary inquiry into the Unipetrol privatization. The investigation was ongoing at year's end.

During the year the media exposed several appointees or associates of Gross and Paroubek as alleged or confirmed members of the former Communist secret police. These individuals held office despite a lustration (vetting) law prohibiting certain former Communist Party officials, People's Militia members, and suspected secret police officials from holding a wide range of elected and appointed positions.

In October Marian Kus, a member of the ruling Social Democratic party executive committee, was forced to temporarily step down from his position during an investigation into charges that he had forged his lustration certificate, a document certifying that a person has been vetted by the government and (usually) cleared of

cooperation with the Communist secret police

A 2004 allegation that an opposition member of parliament had attempted to bribe another parliamentarian prior to a confidence vote in the government was investigated by police and dismissed for lack of evidence, with no action taken against either party.

In April 2004 18 customs officials working at the Moravia border were accused of accepting bribes of between $6 and $12 (151 to 302 CZK) from truck drivers seeking expedited inspections at the border. Their trial began in June and was ongoing at year's end.

Seven government ministries (justice, interior, agriculture, finance, transport, and regional development) have hotlines for citizens to report instances of corruption and malfeasance by ministry employees. Three other agencies have set up email addresses specifically for the public to report corruption. The Ministry of Interior received 6,019 emails and 450 calls to its hotline (compared to 6,334 emails and 480 calls in 2004); most were requests for information on corruption. Only 35 of these calls and emails reported corruption; 5 of these alleged police corruption, and 30 concerned officials in other ministries. The ministry forwarded these 35 to the corruption police for further investigation.

The law provides for public access to government information. The government provided such access in practice for citizens and noncitizens, including foreign media. No prohibitive fees were used, and applicants may appeal a decision about information release within 15 days of a decision or if the time limit for processing a request is exceeded.

Section 4 Government Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A number of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Government officials were generally cooperative and responsive to their views.

In August the chamber of deputies expanded the powers of the government ombudsman, whose functions include the protection of human rights, including in cases involving people in jails, asylum institutions, and health and social institutions. The ombudsman can recommend, but not initiate, cases for prosecution or redress to other authorities.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

The law prohibits discrimination based on race, gender, disability, language, or social status; however, societal discrimination against women and Roma persisted, and trafficking in persons was a problem.

Women

The extent of violence against women was difficult to assess, but recent studies indicated that the problem was more widespread than reflected in official statistics. A 2003 Czech Academy of Science poll indicated that 59 percent of female respondents had experienced violence at least once in their lives and that most of these assaults were unreported. Approximately 23 percent of these victims had told no one of the attack. The few women who did report the incidents credited police with recommending that they seek specialized treatment and legal advice in addition to filing a police report.

The law recognizes domestic violence as a distinct crime, and those who commit acts of violence against relatives or domestic partners may receive sentences of up to three years in prison and longer under aggravated circumstances. Government efforts to investigate and prosecute cases of domestic violence improved dramatically during the year. Police investigated 421 cases of domestic violence, resulting in 134 convictions. Unconditional sentences were handed down for 26 offenders; the rest received suspended sentences or other penalties, including fines. In 2004 108 cases were investigated, with only one conviction resulting. Police reported that investigations continued to be hampered by the reluctance of many victims to report domestic violence or to testify against their partners.

The law prohibits rape, including spousal rape, and the government effectively enforced these provisions in

practice. The law provides penalties for rape of 2 to 15 years in prison.

Many experts consider rape dramatically underreported. In the first 6 months of the year, there were 257 reported rapes, all of which were investigated. Police investigated 422 alleged rapes, resulting in 157 convictions. Unconditional sentences were handed down to 94 offenders, 48 of whom received sentences of 5 to 15 years' imprisonment. Although the number of investigations and convictions declined slightly from 2004, experts noted an upward trend in the number of rape convictions since 2001, which they attributed to improved police training, public awareness campaigns, and greater interaction and cooperation of police with NGOs, all of which have gradually facilitated victims' willingness to report the crime and to testify in court.

Police continued to train a few specialized personnel in handling cases of domestic violence and working with social service agencies. The government provided police and other professionals with training materials to better identify cases of domestic violence and sexual abuse. Koordona, an association of 13 NGOs, issued materials for victims to inform them of their rights and options. NGOs continued to distribute a specialized training manual for health care workers.

Victims of rape and domestic abuse could seek psychological counseling through a number of hotlines and crisis centers. NGOs reported that 107 government-supported shelters for such victims were located in most major cities and towns. NGOs also provided medical and social assistance to women on a local level. NGOs reported that there were not enough spaces available in shelters to meet the demand.

There were allegations during the year that forced sterilization of Romani women had taken place in previous years (see section 1 f.).

The law does not specifically prohibit prostitution, but it may be banned, limited, or regulated by local governments. Pimping is specifically prohibited. Prostitution was widespread in border areas and major cities throughout the country. NGOs reported that sex tourism was a problem and involved both female and male prostitutes, some of them juveniles.

Trafficking in women was a problem (see section 5, Trafficking).

The law prohibits sexual harassment; however, the government did not effectively enforce this provision in practice, and sexual harassment remained a problem. In August a survey commissioned by the labor and social affairs ministry found that 28 percent of women and 22 percent of men had experienced sexual harassment in the workplace. The report also indicated that sexually suggestive behavior was common in the workplace and often not considered harassment. A March 1 amendment to the law places the burden of proof on the person accused of sexual harassment. Those found guilty of sexual harassment can be fined up to approximately $2,750 (70,000 CZK), dismissed from work, or sentenced to prison.

Women and men are equal under the law, including under family law, property law, and in the judicial system. Although women constituted approximately half of the labor force, they were more likely than men to be employed in professions with a lower median salary. According to recent statistics, women's median wages lagged behind those of men by almost 25 percent. The unemployment rate for women exceeded that for men, and a disproportionately small number of women held senior positions. The council for equal opportunities for men and women monitored gender issues and advised the government on its efforts to enforce equal gender rights.

Children

The government is committed to children's right and welfare. The government provides free and compulsory education through age 15. The UN Children's Fund (UNICEF) reported a primary school enrollment rate of 90 percent from 2000 to 2004. Most children continued through secondary school. There were no statistics available on Romani attendance rates.

Girls and boys enjoyed equal access to government-provided health care and education at all levels.

Romani children were enrolled at disproportionately high rates in the remedial education system. However, the government continued taking steps to address the problem during the year. In May the ECHR heard a case brought by the ERRC on behalf of Romani students in Ostrava and other communities who were placed in

remedial schools. The ECHR was unlikely to return a verdict following the government's announcement in January that it would abolish remedial schools. The government began closing certain remedial schools and integrating others by transferring slower students into new, "special" classes. NGOs reported mixed results with some regions effectively carrying out the new policy, while others suffered from an exodus of non-Romani Czechs.

Child abuse was a common problem. The law prohibits family violence, physical restraint, sexual abuse, and other forms of abuse of minors. During the year police investigated 643 cases, resulting in 845 offenders being prosecuted and 442 convicted under child negligence laws. In 2004 676 cases were investigated, resulting in 555 convictions. In 2004 676 cases were investigated, resulting in 555 convictions under child abandonment and endangerment laws. NGOs estimated that approximately 50 children died annually from domestic violence.

Although there were some reports that members of the Romani community married before reaching the legal age of 18, underage marriage was not a significant problem in the country.

The commercial sexual exploitation and trafficking of children was a problem (see section 5, Trafficking).

Children were engaged in prostitution for survival without third party involvement. NGOs have reported that many teenage prostitutes were either runaways or products of orphanages and the foster care system. Some NGOs asserted that orphanages did not prepare young teens adequately to be self-sufficient upon reaching legal adulthood. A special police team was formed in 2004 specifically to deal with the sexual exploitation of children in Cheb, a town on the German border where sex tourism was a problem.

Male adolescents, some as young as 13 years old, engaged in prostitution for survival. NGOs that worked with these children attributed the problem to a dysfunctional foster care system that failed to provide adequate job skills for a modern economy while preventing unwanted children from being adopted by capable parents.

Trafficking in Persons

The law prohibits trafficking in persons; however, trafficking to, from, and, to a smaller extent, within the country for sexual exploitation and forced labor was a problem.

Amendments passed in 2004 criminalize all forms of trafficking, including both internal and cross-border trafficking. Penalties for trafficking, including for the purpose of forced labor, include prison terms of 2 to 15 years and are generally commensurate with those for rape and sexual assault. Traffickers may also be prosecuted for organized prostitution and pimping, which are punishable by a prison term of up to 12 years if the victim is under the age of 15; however, penalties were significantly lower in practice.

The security policy department of the Ministry of Interior and the organized crime division of the national police had primary responsibility for combating trafficking, and worked to enhance coordination and cooperation with local and city police as well. The former first deputy of minister of the interior was assigned to be the national coordinator for trafficking issues. The security policy department was charged with collecting, analyzing, and reporting on all information relating to trafficking; monitoring the implementation of the national antitrafficking strategy; and overseeing all aspects of the model of support and protection of victims of trafficking in persons.

Although the government investigated and prosecuted cases of trafficking in persons, conviction rates were low. During the year police investigated 18 trafficking cases. Twelve of these cases were prosecuted, resulting in 20 convictions under the trafficking statute. Eight offenders received unconditional sentences of 1 to 5 years in prison, and 12 received suspended sentences. The authorities successfully prosecuted 12 traffickers in 2004, although only 3 of the convictions resulted in prison sentences of more than 1 year. During 2004 over 200 persons were charged with pimping, with 69 convictions resulting. Pimping charges were often used to prosecute traffickers because of the complexity of the trafficking statute.

The organized crime unit within the national police had a special department dedicated and specifically trained to combat trafficking in persons. The unit worked closely with its counterparts in Interpol and Europol, and also cooperated extensively with the European Union and other foreign countries in the investigation and prosecution of trafficking cases.

The country was increasingly a transit and destination country rather than a source country for trafficking victims  The majority of women trafficked into and through the country were from Ukraine, Russia, Belarus, Moldova, Lithuania, Romania, Bulgaria, Slovakia, China, and Vietnam; many were destined for the sex trade  They were usually trafficked onward into Western Europe and elsewhere, including the United States, sometimes via third countries  Czech women were trafficked into Western Europe (primarily Germany, Austria and the Netherlands) to work as prostitutes, though there have been cases of Czech victims as far away as Japan and Mexico  A small number of Czech women were trafficked to the United States  Foreign and Czech women and children were also trafficked within the country, often from areas of low employment, to Prague and the border regions with Germany and Austria and were occasionally sold from one organized trafficking unit to another  Small numbers of Czech men were trafficked to the United States for coerced labor

Local sex trafficking victims were generally young women between 18 and 29 years of age from areas of high unemployment  Romani women were at the highest risk of being trafficked internally, often by a friend or relative  Girls raised in state-run homes, such as orphanages, were also at particular risk  According to government authorities, women already working as prostitutes were also particularly vulnerable to traffickers  Trafficked women were frequently offered jobs as models, maids, waitresses, and dancers through employment agencies and then forced into prostitution  Once in a destination country, traffickers ensured victims' compliance by confiscating their travel documents and using isolation, drug and alcohol dependence, violence, threats of violence toward the victim or her family, and the threat of arrest and deportation  Police reported that traffickers increasingly relied on violence to secure their victims' cooperation

Labor trafficking remained a significant issue; the interior ministry reported that it was the most common form of trafficking in the country  The International Organization for Migration (IOM) and the NGO La Strada released a study during the year documenting victims from a wide variety of countries, including the former Soviet Union, South Asia, China, and Vietnam  Victims were both male and female and varied widely in age and in social and educational status  Local employers ranged from single families to local subsidiaries of major multinational European retail chains  The study carefully documented the highly sophisticated and organized nature of the organized crime syndicates that conducted trafficking operations  Although there were no available estimates of the numbers of victims trafficked into the country for labor, both government and NGO sources conceded that the problem was widespread

Most traffickers were members of organized crime groups, often from Russia, Bulgaria, Ukraine, the former Yugoslavia, and East Asia, and worked in cooperation with local citizens  Domestic traffickers often served as a link between those in Russia and Ukraine and those in Western Europe

There was no direct evidence of government complicity in, or tolerance of, trafficking in persons; however, NGOs suspected individual members of the border police of assisting illegal border crossings related to trafficking

The government cooperated with IOM and NGOs to provide services to trafficking victims and to train police and investigators in how to handle trafficking cases

The government provided psychological and social assistance to victims for 30 days; the victim had to decide within this period whether or not to cooperate with authorities  Victims who chose not to assist police with prosecution were offered voluntary return to their home countries; victims choosing to cooperate were eligible for residency visas for the duration of the criminal proceedings  Victims who cooperated with police were eligible at the end of criminal proceedings to apply for permanent residency on humanitarian grounds  By the end of the year 35 women had entered the model program and had contributed testimony or information against trafficking organizations

Observers criticized the fact that trafficking victims who cooperated with investigations had limited opportunities to obtain permanent residency  NGOs pointed out that recent changes in the law made it much more difficult for trafficking victims to apply for asylum, which granted them legal status to remain until a ruling was made on their asylum case (which can take years), rather than to cooperate with authorities under the program and generally be returned to their home countries once proceedings were concluded  Though victims may apply for permanent residency at the conclusion of their cooperation with the police, it was not automatically granted; only a few victims had been awarded such residency  During the year the government improved police training on recognizing victims for referral to the program

Because of the stigma attached to trafficking, victims were frequently hesitant to return to their families or seek social service providers.

The crime prevention division of the interior ministry continued to implement a national strategy against trafficking. The Ministry of Justice organized several training sessions in trafficking issues for judges and prosecutors, and the Ministry of Interior continued offering training to police.

The interior ministry worked with the IOM to produce a demand-reduction campaign targeted at consumers of sexually exploited women and children in the areas along the country's border with Germany. The progress of the project was slowed by the difficulty of collecting such sensitive information from clients of sexual services. The NGO Caritas visited schools and asylum and reception centers to conduct awareness campaigns among potential victims about the risks of trafficking and the entrapment and coercion strategies used by traffickers. Other NGOs which also received government funding, such as La Strada and Rozkos Bez Rizika (Pleasure Without Risk), conducted seminars and published and distributed literature about the dangers of trafficking.

In September the government created the interdisciplinary committee on trafficking, which includes representatives from various ministries and NGOs. The committee met for the first time in November to begin coordinating the implementation of various requirements of the national antitrafficking strategy.

Persons with Disabilities

The law prohibits discrimination against persons with disabilities in employment, education, access to health care, or the provision of other state services, and the government generally enforced these provisions effectively; however, persons with disabilities were unemployed at disproportionately higher rates.

The law mandates access to buildings for persons with disabilities, and the government generally enforced these provisions in practice. Although access improved during the year, many buildings and modes of public transportation remained inaccessible. In Prague 26 of the 50 subway stations were wheelchair accessible; however, the majority of stations in the city center remained inaccessible. A growing number of bus lines and municipal tram lines were accessible to persons with disabilities. Most public schools lacked barrier-free access for students, although there was at least one barrier-free school in each district.

Following heavy international criticism from governments and NGOs for the use of caged beds in psychiatric facilities, the government decided in July 2004 to remove caged and netted beds from its mental health institutions by the end of that year. However, the ban was not fully implemented in practice because the government did not fully fund the transition, and cage and netted beds were only replaced as more modern means of restraint were brought into service. By the end of the year all caged beds had been eliminated from health care facilities, but a small number of netted beds still remained. In May an amendment to the law was passed to severely limit the use of such beds, pending their replacement and removal from the system. The beds may only be used to protect the patient or others from injury, and institutions must carefully document their use and immediately notify the patient's legal representative. Although the new amendment established much stricter guidelines regarding the conditions and use of restraints, NGOs criticized the law for not specifying which forms of restraint were appropriate for psychiatric patients. Netted beds remained legal for use in long-term care facilities for adults and children. There were no official statistics as to the number of beds in use during the year. In 2004 the government reported that of 9,657 beds in the country's psychiatric facilities, approximately 20 were cage beds and 100 were netted beds.

In August the government approved a national plan to aid persons with disabilities. The plan was drafted with the participation of the government council for disabled citizens, a permanent advisory body responsible for protecting the rights of persons with disabilities. The government's initial efforts to implement the plan focused on improving the quality and responsiveness of social programs serving persons with disabilities.

National/Racial/Ethnic Minorities

After ethnic Slovaks, the largest minority was the Romani population, estimated at between 150 thousand and 175 thousand persons. Roma faced disproportionately high levels of poverty, unemployment, interethnic violence, and illiteracy. Despite constitutional prohibitions against discrimination, there was no framework to implement those provisions in the civil or criminal law. Roma continued to face discrimination from potential employers and local and school officials, with only incremental improvements in recent years.

During the year latent societal discrimination against Roma often manifested itself in incidents of violence. Members and sympathizers of skinhead organizations were the most frequent perpetrators of interethnic violence, particularly against Roma and other "dark-skinned" persons. An estimated seven thousand skinheads were active in the country, although some observers believed the actual figure was higher.

Unlike in previous years, there were no incidents of police violence against Roma.

In September three men attacked a Romani couple in Prague. The victims were treated at a local hospital; the perpetrators were arrested and charged with assault and with the suppression of human rights and freedoms. The case was still pending at year's end.

In May a Prague court awarded a Romani student approximately $4 thousand (100 thousand CZK) as compensation for the brutal 2002 attack against him at a tram stop by four non-Romani youths.

There were no developments in the cases of assaults on Roma in Ostrava, Broumov, and Krnov in 2004.

The law prohibits employment discrimination based on ethnicity; however, Roma continued to face discrimination in both employment and education. Precise figures for unemployment among Roma were unavailable, but the rate was disproportionately high. Some employers refused to hire Roma and asked local labor offices not to send Romani applicants for advertised positions.

Continuing a trend from previous years, Roma were increasingly able to find redress in court in cases of employment discrimination. For example, in March a Prague court found the Scorpion Club fashion boutique guilty of racial discrimination for not considering a Romani applicant for an advertised job opening. The boutique had been videotaped refusing to consider Vera Dunkova for the position and, minutes later, offering job information to a non-Romani applicant. The court awarded Dunkova approximately $1 thousand (25 thousand CZK) and ordered an apology from the boutique.

Roma also faced discrimination in housing and other areas of everyday life. Police responded to complaints that some restaurants, bars, and other public places refused service to Roma and posted signs prohibiting their entry. Human rights groups reported that some municipalities attempted to force Romani families to leave, employing such tactics as evicting them from municipally-owned homes for alleged lapses in rent payments or coercing them to sign agreements that they did not understand that were then used to curtail existing housing contracts. While the human rights commissioner publicly criticized these evictions, the law affords municipalities substantial autonomy in such actions.

In October the Bohomin mayor and local officials attempted to evict dozens of families (most of whom were Romani) from their apartments following the municipal purchase of their low-income hostel from its private owner. According to numerous NGOs, there were no provisions for adequate housing for the displaced families. When the action was challenged in the courts, several families were ultimately allowed to stay for the duration of the court case, but the town employed several coercive measures, such as shutting off the tenants' utilities and using private security guards to restrict access to the remaining families. Police did not intervene in the case. The issue was ultimately resolved when a compromise was brokered through NGOs to allow the relocation of the remaining families. At year's end, the town was seeking to collect payment from the families for the security guards the town employed at the site.

In March a regional court in Ostrava ordered the owner of a club that refused service to three Romani patrons to pay a $1,200 (approximately 30,000 CZK) fine and apologize to the trio for lowering their human dignity. A waitress involved in the incident was also fined.

There were allegations during the year that forced sterilization of Romani women had taken place in previous years (see section 1.f.).

The interministerial commission for Roma community affairs, which included 12 government and 14 Romani representatives, as well as the commissioner for human rights and his deputy, continued to take an active role in resolving disputes between Romani communities and their non-Romani neighbors. The commission also promoted antidiscrimination initiatives in housing and education. The Roma affairs coordinator of the Ministry of Foreign Affairs continued to function as the ministry's liaison with Romani groups, NGOs, and the diplomatic

community

Other Societal Abuses and Discrimination

Homosexuals face occasional incidents of violence, usually in Prague where they are more visible. The government took a few steps to address prejudice against gays. In December the lower house of parliament passed a law that recognizes the legal validity of gay civil partnerships.

Section 6 Worker Rights

a. The Right of Association

The law provides workers with the right to form and join unions of their choice without previous authorization or excessive requirements, and workers exercised this right in practice. Approximately 20 percent of the workforce was unionized, and the trend of steady decline in union membership continued. Most union members belonged to unions affiliated with the Czech-Moravian Chamber of Trade Unions, a national umbrella organization.

The law prohibits antiunion discrimination; however, the government did not effectively enforce this provision, and union discrimination occurred. Common discriminatory practices included firing union leaders, denying union members entry to meetings between employees and management, refusing to provide office space for unions, forcing members to cancel their memberships, offering financial incentives to dissolve union organization within a company, disparaging unions in statements to employees, monitoring union members, and refusing to withhold union dues. If found guilty of antiunion discrimination, employers are required to reinstate workers fired for union activity, although the court procedure was generally slow.

b. The Right to Organize and Bargain Collectively

The law allows unions to conduct their activities without interference, and the government protected this right in practice. The law provides for collective bargaining, which generally was carried out by unions and employers on a company basis. The scope for collective bargaining was more limited for civil servants, whose wages were regulated by law. However, the International Confederation of Free Trade Unions reported in 2004 that some employers attempted to prevent workers from organizing by means of direct and indirect pressure and attempted to render collective agreements null and void.

Workers have the legal right to strike if mediation efforts fail, with the exception of those in critical sectors such as health care, nuclear energy, oil and gas pipelines, air traffic control, firefighting, and telecommunications; workers in these industries have access to mediation. The law requires unions to provide employers with a list of strikers at least one day before a strike. There were no major strikes during the year.

There are no export processing zones.

c. Prohibition of Forced or Compulsory Labor

The law prohibits forced or compulsory labor, including by children; however, there were reports that such practices occurred (see section 5). According to the labor ministry, approximately 300 North Korean women worked in extremely harsh conditions in garment and leather factories in several locations throughout the country. The women were kept in tightly controlled environments, and their earnings were deposited into an account controlled by the North Korean embassy. The labor ministry investigated their situation and concluded that although the situation was "troubling" in several aspects, the women were working voluntarily.

d. Prohibition of Child Labor and Minimum Age for Employment

The government effectively enforced laws and policies to protect children from exploitation in the workplace. The law stipulates a minimum working age of 15 years, although children with disabilities who completed special schools could work at the age of 14 years. Employment conditions for children aged 15 to 18 were subject to strict safety standards. The Ministry of Labor and Social Affairs effectively enforced these regulations in practice.

The commercial sexual exploitation and trafficking of children was a problem (see section 5).

e  Acceptable Conditions of Work

The labor ministry sets and enforces minimum wage standards  The national minimum wage was approximately $287 (7,185 CZK) per month and provided a decent standard of living for a worker and family

The law provides for a 40-hour workweek with at least 2 days of rest, and requires a paid break of at least 30 minutes during the standard 8-hour workday  Employers may establish up to eight hours per week of mandatory overtime, subject to the consent of the employee (in the form of the collective bargaining agreement or contract stipulating overtime), although the local employment office may permit additional mandatory overtime. Premium pay for overtime was dictated by the provisions of the employee's contract  The labor ministry effectively enforced standards for working hours and breaks.

The office of labor safety effectively enforced health and safety standards  Workers have the right to refuse work endangering their life or health without risking the loss of their employment, and they exercised this right in practice

**Updates | Frequent Questions | Contact Us | Email this Page | Subject Index | Search**
The Office of Electronic Information, Bureau of Public Affairs, manages this site as information from the U.S. State Department. External links to other Internet sites be construed as an endorsement of the views or privacy policies contained therein
**FOIA | Privacy Notice | Copyright Information | Other U.S. Governmen Information**
FIRSTGOV



*SAIS Review* vol. XXII no. 2 (Summer–Fall 2002)

# Patronage and Corruption in the Czech Republic

*Jeffrey M. Jordan*

*Corruption was endemic to the communist system of the Soviet bloc prior to its collapse in 1989, and Czechoslovakia was no exception. In the postcommunist Czech Republic, corruption remains a deeply rooted problem. A corrupt elite political and business class has emerged to exploit opportunities for illicit profit that are inherent in the process of postcommunist transition. Corruption has inflicted damage upon the Czech economy, prolonged the process of transition, and imposed costs on Czech taxpayers. It has also damaged democracy and for some, delegitimized the political system. There are three potential explanations for the continuation of elite corruption in the Czech Republic. First, preconditions amenable to corrupt behavior are still in place in the Czech Republic, as in other postcommunist countries. Second, high-level corruption lies in corrupt networks that are firmly embedded in the Czech government and have become worse over the past four years. Lastly, external corrupt networks, most notably the Russian mafia and intelligence services, effectively exploit the favorable conditions for corruption, to strengthen their own presence in the Czech Republic and to exert greater influence throughout the government.*

Corruption was endemic to the communist system of the Soviet bloc prior to its collapse in 1989, and Czechoslovakia was no exception. This corruption generally arose from shortages inherent to the communist system, and usually took the form of bribery. Such behavior became generally accepted since, in a dysfunctional and illegitimate system, the rule of law was subordinate to the pursuit of personal well-being. This idea was encapsulated in the communist-era Czech axiom: "If you do not steal from the state, you rob your family."

Corruption remains a deeply rooted malignancy in the postcommunist Czech Republic, and the problem has become in-

Jeffrey Jordan recently received his M.A. in International Relations from Johns Hopkins University-SAIS. This essay earned him first prize in the annual *SAIS Review* student essay contest. An earlier version of this essay appeared in Radio Free Europe's online journal, *East European Perspectives* (Prague), 20 February/6 March 2002, <www.rferl.org>.

19

creasingly serious, particularly in the past four years, under the current Social Democrat-led government. Transparency International, an anticorruption watchdog, underlined the seriousness of Czech corruption in its Corruption Perceptions Index 1997, which ranked the Czechs twenty-seventh out of fifty-two countries.[1] In 2001, the Czech Republic dropped to forty-seventh out of ninety-one countries surveyed. More to the point, in 1997, the Czechs were tied with the Belgians; now they are tied with the Bulgarians.[2] Ironically, the government that has overseen this backsliding was elected on an anticorruption platform and has implemented an official, though largely ineffectual, "Clean Hands" campaign.

> "If you do not steal from the state, you rob your family."

Administrative corruption still persists as it did during the period of communism. Poorly paid bureaucrats demand bribes to augment their incomes and bribe-payers have come to view the practice as a normal cost of doing business. However, while communist-era corruption was largely driven by shortages, the desire to subvert the state, and the occasional need to bribe an obstinate bureaucrat, corruption in the postcommunist Czech Republic has often coincided with market-oriented reforms. The transition to a market economy, characterized by partially implemented reforms and systemic ambiguity, created huge opportunities for well-placed politicians, bureaucrats, and their cronies to exploit lingering market distortions for their own benefit. This occurred on an enormous scale, enriching a few and leaving Czech taxpayers with the bill. From the lowest level of functionaries to the highest level of official governance, a considerable part of the Czech bureaucracy is infected with corruption. At the top levels, the stakes are extremely high and opportunities abound for the entrepreneurial politician to benefit from the privatization of remaining state-controlled industries, the awarding of pubic contracts, or from simply turning a blind eye toward the misdeeds of other profiteers. Sadly, those few who have

> Sadly, those few who have remained above the fray, such as President Vaclav Havel, have been discounted as astute moralists, but ineffectual politicians.

remained above the fray, such as President Vaclav Havel, have been discounted as astute moralists, but ineffectual politicians. Meanwhile, postrevolution euphoria has faded into disillusion as the country that seemed to harbor the greatest potential to transform itself into a "normal" Western country after 1989 regresses into its old communist habits. According to Freedom House, a human rights group, "corruption in the Czech Republic has long passed the stage of occasional unrelated bribes to government officials." Rather, "it exists on a national scale as a sophisticated enterprise that is parallel with public service."[3]

There are three possible explanations for elite corruption in the Czech Republic. First, preconditions amenable to corrupt behavior are still in place in the Czech Republic, as in other postcommunist countries. Lingering problems and widespread habits, overlaid with new freedoms, have made the Czech Republic a fertile ground for corruption. Membership in the North American Treaty Organization (NATO) and prospective membership in the European Union (EU) have yet to curb corrupt behavior, as the Czechs have been content to reap the benefits of these institutions without fully adopting their practices. In fact, the Czechs have become increasingly ambivalent toward their affiliation with these institutions. The second explanation for high-level corruption lies in power politics. Corrupt networks are firmly embedded in the Czech government. The very nature of the current "Opposition Agreement" between the Social Democrats and the Civic Democrats, by which the Social Democrats have been able to govern, is a recipe for corruption, and has allowed a communist-crony network within the Social Democratic party to gain influence in the government. Lastly, external corrupt networks, most notably the Russian mafia and intelligence services, effectively exploit these favorable conditions for corruption—including the ascendancy of old-guard communists in the government—to strengthen their presence in the Czech Republic and to exert greater influence throughout the Czech government.

## Postcommunist Malaise: A Context for Corruption

Corruption has taken deep root in the Czech Republic as a result of the "postcommunist malaise" that affects all countries undergoing postcommunist transition. In the Czech context, this malaise takes on a peculiarly national flavor when combined with a growing ambivalence toward the West and the responsibilities that

"rejoining the West" entails. Postcommunist malaise is generally described as the dissonance between the forty years of austerity experienced throughout the Eastern Bloc's communist systems and the new freedoms thrust upon these ill-prepared societies in 1989. These transitioning countries have come to find out that unbridled freedom is not the cure for a postcommunist hangover. In the Czech Republic, these problems pervade the political and economic spheres.

People do not change overnight; and the same corrupt practices that were acceptable during communism do not simply vanish with the appearance of liberal democracy and a market-based economy. New freedoms have merely provided new avenues of profit for those in a position to exploit them. Moreover, the administrators of the market economy, both in business and in government, are often the same individuals who pulled the levers of power in communist Czechoslovakia. The common perception is that the rule of law has failed to adequately regulate the workings of this new system, and that those in power can unscrupulously manipulate the laws to their own benefit. This view is summed up in a 1999 headline in the Czech newspaper, *Lidove noviny*: "Czechs have reached the conclusion that the state will not protect them from lawlessness."[4] The article goes on to say that a growing number of Czechs have no faith in the justice system and no trust in the government. In fact, 70 percent of respondents to a survey last year indicated their belief that the country is run by organized crime.[5]

> New freedoms have merely provided new avenues of profit for those in a position to exploit them.

The Czech economy suffers from this postcommunist hangover as well. Forty years of Soviet domination left the Czech Republic with a dysfunctional economy and the colossal challenge of transforming it into a functioning marketplace. Sadly, government attempts to bring about an effective transformation have only served to prolong the hangover. Indeed, the privatization of Czech enterprises often worked to directly benefit the former communist leaders and their cronies, who were able to grab state assets on the cheap. Conversely, schemes to distribute ownership of state assets to the public, such as Vaclav Klaus's voucher privatization, gave people only the illusion of participation. In re-

ality, absent the effective rule of business law or common recognition of private property rights, the door remained open to fraud perpetrated by financially savvy "entrepreneurs."[6] In sum, Czech privatization efforts have been a disaster for the national economy, and the current government is still dealing with the macroeconomic results of these decisions.[7]

Furthermore, the government is under intense pressure to generate cash flow for its own budget and to assist Czech enterprises in remaining afloat. Domestically, politicians face a discontented electorate that is nostalgic for the communist social safety net and frustrated by unmet expectations of economic growth and rising living standards. Yet the government must also work to reduce budget deficits and undertake further economic reform in time to qualify for the first wave of EU enlargement. Readily available, if nonrecurring, sources of income lie in remaining assets to be privatized—including some of the largest assets yet, such as Czech Telecom, Transgas, Ceske Radiokomunicace, and the national energy producer, CEZ—and in the collection of communist-era debts from Russia, Iran, Iraq, Syria, Libya, and other developing countries. Another oft-employed strategy is the promotion of Czech exports abroad, which helps alleviate the immediate problem of unemployment, injects much needed liquidity into the economy, and generates additional tax revenue. The challenges of market reform are indeed daunting, but as the current government has shown, every challenge contains an opportunity. The current ministers have shown little compunction at exploiting every opportunity for personal gain.

> The current ministers have shown little compunction at exploiting every opportunity for personal gain.

### "Neo-Svejkianism"

The Good Soldier Svejk still lives. Svejk, the archetypal Czech passive rebel created by Jaroslav Hasek in his early 1920s novel, *The Good Soldier Svejk*, remained outwardly obedient to his Austrian masters, but privately pursued his own interests, and usually undermined the authorities through insubordination disguised as ineptitude. By all appearances, the Czechs have been guided by Svejk in their recent relations within NATO and the EU. The Czech Republic maintains a formal affiliation with the West through its

membership in NATO and its inclusion in the list of EU candidates, yet it has wavered in its political will to shoulder the costs and responsibilities that such an association entails. The Czechs joined NATO in spite of a relatively low level of public support for it, and in its first major test as an ally during the Kosovo war, the government moved quickly to dissociate itself from the campaign. Support for EU membership has also started to wane in the face of seemingly continuous directives and criticism from Brussels regarding the implementation of the *aquis communautaire*. The Czechs have grown increasingly resentful at what they regard as outside interference in their internal affairs.[8] According to recent polls, only 46 percent of Czechs support EU membership, and only 20 percent consider Czech accession to the EU to be of long-run importance to the country.[9]

The Czech postcommunist malaise takes on a distinctively local flavor when it is overlaid with this growing ambivalence toward the West. The fact that Czech partnership with the West is voluntary rather than coerced provides the government with leeway to pursue interests that diverge from, or even oppose, those of its Western partners. The Czech "neo-Svejkian" posture toward NATO and the EU often means saying one thing and doing another.

> Today, the Soldier Svejk is sowing the seeds of postcommunist corruption.

The revival of Svejk in the postcommunist context produces a dangerous mixture of norms, practices, problems, and personalities remaining from the country's communist past, juxtaposed with a newfound freedom that is detached from all sense of responsibility. Today, the Soldier Svejk is sowing the seeds of postcommunist corruption.

### With Machine Guns and Ammo for All

The confluence of postcommunist malaise and diffidence toward the West is notoriously evident in the Czech Republic's role in the international arms trade. The Czech economy has long maintained a significant military-industrial component, and communist Czechoslovakia was a principal supplier to the Soviet bloc and other anti-Western regimes during the Cold War.[10] After the Cold War, the industry began to suffer as a result of global military spending cuts and the loss of these traditional markets, which led to growing unemployment. Attempts to transform the arms indus-

try were unsuccessful and strongly resisted by the arms lobby, which still retained protectors in high places in the government. More recently, the Czech government renewed its emphasis on arms production and trade in order to capitalize on a relatively advanced segment of its industry. The Foreign Ministry has supported this policy by tasking commercial and military representatives at Czech missions worldwide with the promotion of Czech weapons exports.[11] In addition, the Czech military maintains huge stockpiles of obsolete weapons, ammunition, and equipment, often under lax security. Sales of this equipment, both official and illicit, have also created much controversy.[12]

Transparency International characterizes the arms trade as "hard-wired for corruption" due to the inherent opacity that surrounds weapons transactions.[13] The Czechs, in particular, have developed a reputation for nontransparency and moral ambiguity in their official arms trade. In contrast to EU countries, which publish annual reports on arms sales, the Czech Ministry of Industry and Trade keeps its figures secret.[14] Recent clients of the Czech Ministry of Defense

> The Czechs, in particular, have developed a reputation for nontransparency and moral ambiguity in their official arms trade.

have included Syria, Cambodia, Algeria, Angola, and Sri Lanka. In Sri Lanka, the Czechs have been instrumental in arming government forces in a bloody civil war, even in the midst of peace negotiations between the two sides.[15] In 1999, the Czechs proceeded with the sale of tanks and airplanes to Yemen with full knowledge that Yemen previously re-exported tanks to Sudan.[16] More recently, two days after the September 11 attacks, Czech Foreign Minister Jan Kavan negotiated the sale of Czech L-39 military aircraft to Yemen, a state high on the U.S. Central Intelligence Agency's watch-list of countries that tolerate international terrorism.

Finally, illicit arms trade has flourished with the support of outside Russian "business interests," and with the seeming inability of the Czech secret services (BIS) to stem the outflow of surplus weapons.[17] In one famous case, a Russian-financed Czech firm, Agroplast, almost succeeded in selling six Mig-21's to North Korea, in spite of close monitoring by the BIS.[18] The extent of the

trade, the seeming ease with which it is conducted, the official opacity that surrounds it, and the inability of the secret service to curtail it suggest the possibility of official complicity and corruption in these transactions. The Czech Republic seems to have resumed its old place as rogue arms supplier par excellence. According to the journalist Jaroslav Kmenta:

> In a way, it is a tradition. The Czech Republic has very good relations from the past with these countries. The Czech Republic has a number of receivables from the communist era there. It is still trying to have them repaid. Czech businessmen have really 'special' relations with local politicians and authorities. Because of its risky nature, any deal with such a country, both legal and illegal, increases the value of the bid. The amount of money involved is able to shut the eyes of politicians, officials or businessmen in Prague over problems that might arise.[19]

Such behavior flies directly in the face of Czech commitments to its NATO allies and future EU partners. Although it has not yet signed the EU Code of Conduct on Arms Exports, the Czech Republic has agreed to abide by it. The Code of Conduct is intended to prevent arms transfers to human rights abusers, areas of violent conflict, and countries that might export weapons to unauthorized third parties. To justify its actions, the Czech government insists that none of its authorized trades are technically illegal (i.e., trade with embargoed countries). Instead, the government can comfortably claim plausible deniability, arguing that it cannot be held responsible for what happens to the goods after they are delivered. Foreign Ministry spokesman Ales Pospisil put forth this government position, with just a touch of sarcasm, following a controversial sale to Sri Lanka:

> I don't want to sound cynical, but for any country, the most important thing is that the trade is correct within international law. Of course, it would be much nicer to trade with Western Europe or the United States – it would be crystal clear that no gun would be misused. But this is reality.[20]

In response, the West has resorted to the use of "sticks" in order to make its position clear. In 1999, after its repeated warnings were ignored, Washington threatened sanctions to convince the Czechs to ban the sale of air conditioning and ventilation systems to a nuclear plant under construction in Iran.[21]

Since the Iran affair, the Czechs have sought to avoid a similar recurrence by resorting to old-style secret diplomacy. This is

most apparent in the government's dealings with Iraq. An official visit to Baghdad by government and business leaders in early 2000 encompassed all the elements of the current Czech malaise. Iraq was one of communist Czechoslovakia's principal trading partners and the Czechs still hold about $500 million in receivables from Iraq, but trade between the two has been substantially curtailed as a result of the UN embargo. Also, Radio Free Europe/Radio Liberty (RFE/RL) broadcasts from Prague to Iraq have further damaged economic and diplomatic relations between the two countries and provoked legitimate concerns about the possibility of a terrorist strike on RFE's headquarters in the center of Prague. The Czech government under Prime Minister Milos Zeman has clearly tried to dissociate itself from what it insists is a U.S. initiative.[22] The delegation to Iraq ostensibly intended to discuss the possibility of renewing trade relations and resolving outstanding debts, and to present the Czech point of view concerning RFE/RL.[23] The Foreign Ministry characterized the visit as "routine diplomatic talks," but if this had been the case, why was it kept under the utmost secrecy for the next ten months, including the names of those comprising the delegation?

The government finally divulged the list of participants under threat of a lawsuit by Senator Michal Zantovsky. The mission was organized by Miroslav Slouf, a former communist functionary who is Zeman's chief advisor, and an increasingly suspicious element in the current government. It included Deputy Foreign Minister Hynek Kmonicek, three representatives of Vitkovice Iron Works, and, most peculiarly, Milan Jedlicka, a Czech-American with an alleged criminal past that includes a conviction in the United States for cocaine smuggling and fraud, as well as an investigation for the murder of a U.S. drug enforcement agent.[24] It is still unknown exactly what transpired in these "diplomatic talks" and what Slouf might have promised to his hosts. Members of the delegation give conflicting accounts, and some still deny their participation, including Jedlicka. Allegedly, Jedlicka was brought in as a representative of Magna Oil, a U.S. firm that purchases Iraqi oil in the UN Oil for Food Program. The Czechs planned to employ his expertise in funneling Iraqi oil onto the world market in anticipation of accepting Iraqi crude as payment for Czech goods. The delegation reports that it had no success in obtaining Iraqi orders.

Given its established tendencies in the arms trade, as well as the presence of Slouf and Jedlicka in the Baghdad delegation, the

reestablishment of Czech commercial connections with Iraq through secret diplomatic missions is a worrisome development. The Iraqi secret service is very active in Prague and the Czech BIS has proven singularly inept in restricting its operations. Iraq has made no secret of its desire to acquire the "miraculous" Czech Tamara radar, which is thought to be able to track even the U.S. stealth fighter-bomber. Since the bankrupt firm that produces the Tamara was privatized in 1993, it has not sold a single radar, but strangely four of the six it reportedly had in inventory went missing in late 1999. These radars are thought to have disappeared while the firm's most recent owner was in prison for tax evasion, fraud, and embezzlement, though the BIS insists that it would know if there had been a theft. In the meantime, the company was recently sold again, while the Czech government was engaged in a losing battle to reclaim control of the copyrighted Tamara technology.[25] Given these circumstances, one can easily wonder if Iraq may soon have a much upgraded radar system to track Allied planes in its airspace.

Regardless of the actual outcome of this mission, the Czech government's self-interested attempt at appeasement of a brutal dictatorship, particularly with regard to RFE/RL, from which the Czechs directly benefited while under their own totalitarian regime, finds an ironic historical parallel with another infamous round of "diplomatic talks." Could Baghdad have been Munich in reverse?

### Power Politics: Cooperative Opposition

A corrupt network exists within the Czech political class, one that has exploited the vulnerabilities of the Czech system for its own profit while consolidating its hold on power. However, this network is not exclusively centered around money. It is further strengthened by "mutual knowledge of guilt and the chance to use this for [mutual] blackmail."[26] The network has two main components. The first is the power bloc formed by the so-called "Opposition Agreement" between the Social Democrats (CSSD) and the Civic Democratic Party (ODS). The second is the powerful communist-crony network that has emerged within the CSSD, with possible ties to the Russian mafia and intelligence services

The Opposition Agreement was hatched after the mid-1998 election when the CSSD failed to attain the majority needed to form a government. Rather than entering a coalition with the four other center-right opposition parties, CSSD chairman Milos

Zeman concluded this agreement with Vaclav Klaus's right-of-center, neoliberal ODS, in spite of Klaus's late-1997 fall from grace in a corruption scandal that sank his government and tainted his party. Under the Opposition Agreement, the ODS vows not to support a vote of "no confidence" against Zeman's government. In exchange, several ODS party members obtained key government posts, including Klaus's leadership of the Chamber of Deputies. Given the political rivalry between these two parties and their ideological opposition to one another, real reform of the government is all but impossible under the Opposition Agreement. The ODS maintains the illusion of being a genuine opposition party, and relations between the two parties are reduced to their lowest common denominator—catering to special interests vested in the power bloc and achieving a *modus vivendi* to divide the spoils of power. In this unhappy marriage of political enemies, the two parties appear to have grown content with political sparring in public while privately turning a blind eye to one another's misdeeds. According to Czech journalist Jan Machacek, most of the public disputes seem to occur just before a deal is concluded between the two. One cannot help but wonder if the fighting is simply a smokescreen to provide political cover while pockets are lined on both sides. There is too much opacity, too many clear conflicts of interest, and too much cooperation between the two parties in recent privatizations, procurement tenders, and other "political deals" for such questions not to be raised—too much smoke for there not to be a huge fire.[27]

> One cannot help but wonder if the fighting is simply a smokescreen to provide political cover while pockets are lined on both sides.

A cornerstone of the CSSD's 1998 election platform was an Italian-styled "Clean Hands" anticorruption campaign. This was highly popular with the electorate following Vaclav Klaus's scandal-ridden ODS administration. The campaign aimed to root out financial corruption in privatizations and in each of the government ministries. Each ministry had its own Clean Hands coordinator, and the Minister Without Portfolio, Jaroslav Basta, chaired the initiative. Within a year, however, the program stalled and was officially cancelled due to lack of success. From the outset, Clean Hands was characterized by insincerity and opportunism on the

part of both parties. The CSSD saw the chance to firmly establish itself as the moral authority in the anticorruption fight, while the ODS was able to cast itself as the repentant sinner seeking absolution. In reality, the two parties were engaged in constant disputes over the running of the campaign: Basta was charged with incompetence, and later with using investigations for political or personal purposes; the ODS was charged with obstructionism as party members now had influence over investigations concerning alleged misdeeds of fellow-ODS members.[28]

Last summer, one year before the upcoming election, the program was resurrected after three years of dormancy. Where the government had previously conceded defeat, Prime Minister Zeman now claimed victory, saying that Clean Hands had resulted in the investigation of 4,300 people for serious economic crimes. Czech voters remained more skeptical as few of the robber barons of privatization were actually convicted.[29] In fact, a mid-2000 survey showed that 84 percent of Czechs believed that bribes and connections were responsible for not-guilty verdicts in trials of those accused of economic crime. Seventy-six percent attributed such verdicts to political pressure.[30] Last August, the Clean Hands campaign was transferred from the political level to the institutional level. State attorneys now oversee the campaign in cooperation with police units investigating serious economic and financial crime.[31]

### Corrupting Economic Policy

There has been an increasing tendency on the part of the CSSD-ODS bloc to base important economic policy decisions on political criteria. Yet these political considerations do not necessarily follow party ideology; rather, they reflect personal and political opportunism and a desire for raw power. Significant opportunities to exploit political and economic power still exist, including decisions regarding the fate of several state-owned companies, the restructuring of bankrupt firms, the sale of a colossal amount of nonperforming loans, the collection of communist-era debts, and the allocation of major public contracts. Opportunities for "entrepreneurial" politicians are boundless.

A tremendous amount of economic power has recently been consolidated around one agency. By virtue of the recent creation of the *Ceska Konsolidacni Agentura* (CKA), a "garbage can" for commercial loans gone bad, economic policy is now more than ever

susceptible to political manipulation by vested interests. The CKA unified the existing state agencies involved in bad debt collection. Rather than placing legal and economic experts on CKA's board, the government staffed it with political appointees: three members of parliament from the CSSD and four from the ODS.[32] Their economic power lies not only in the mechanism by which CKA's losses are to be covered by privatization income and other state sources, but also in the wealth of information they can easily obtain concerning pending bankruptcies and privatizations. Furthermore, the agency represents a wellspring of potential political favors—in the form of party sponsorship or direct payments to individuals—since many prospective buyers of the debt are the same tunnelers and asset-strippers who originated them, and who have the greatest information on the real value of the collateral.[33] In order to provide "smokescreen" cover to the real issue of political control over this vitally powerful agency, the politicians on the board were initially granted exorbitant salaries for their services. In the public relations firestorm that followed this announcement, the salaries were rescinded, creating the impression for the uninformed public that the problem was solved.[34] However, the costs to Czech taxpayers could be enormous. Political control over industrial restructuring has already driven the costs of Czech restructuring to 40 percent of GDP, making the Czech privatization process the most expensive in the world. No end appears in sight. The CKA currently administers a 270 billion-crown portfolio of bad assets that will soon swell to 450 billion. Through the CKA, about 23 percent of Czech GDP will be subject to the political whim of seven politicians.[35]

Toward the end of 2001, with only about six months left until the mid-June elections, the government declared its intention to complete several of the largest privatizations to date. These included the national energy producer, CEZ, the chemical holding company Unipetrol, Transgas, Czech Telecom, Ceske Radiokomunikace, and even a portion of Prague's Ruzyne Airport. Questions were immediately raised as to why the government was in such a hurry, particularly since the most recent series of comparably sized transactions had taken three-and-a-half years to complete. According to Machacek, the motives for this latest initiative lie instead in the exercise of power:

> The ministers want to enjoy the power of this decision-making so some future government will not be able to  No one is 100 percent sure at the moment that any form of the current CSSD/

susceptible to political manipulation by vested interests. The CKA unified the existing state agencies involved in bad debt collection. Rather than placing legal and economic experts on CKA's board, the government staffed it with political appointees: three members of parliament from the CSSD and four from the ODS.[32] Their economic power lies not only in the mechanism by which CKA's losses are to be covered by privatization income and other state sources, but also in the wealth of information they can easily obtain concerning pending bankruptcies and privatizations. Furthermore, the agency represents a wellspring of potential political favors—in the form of party sponsorship or direct payments to individuals—since many prospective buyers of the debt are the same tunnelers and asset-strippers who originated them, and who have the greatest information on the real value of the collateral.[33] In order to provide "smokescreen" cover to the real issue of political control over this vitally powerful agency, the politicians on the board were initially granted exorbitant salaries for their services. In the public relations firestorm that followed this announcement, the salaries were rescinded, creating the impression for the uninformed public that the problem was solved.[34] However, the costs to Czech taxpayers could be enormous. Political control over industrial restructuring has already driven the costs of Czech restructuring to 40 percent of GDP, making the Czech privatization process the most expensive in the world. No end appears in sight. The CKA currently administers a 270 billion-crown portfolio of bad assets that will soon swell to 450 billion. Through the CKA, about 23 percent of Czech GDP will be subject to the political whim of seven politicians.[35]

Toward the end of 2001, with only about six months left until the mid-June elections, the government declared its intention to complete several of the largest privatizations to date. These included the national energy producer, CEZ, the chemical holding company Unipetrol, Transgas, Czech Telecom, Ceske Radiokomunikace, and even a portion of Prague's Ruzyne Airport. Questions were immediately raised as to why the government was in such a hurry, particularly since the most recent series of comparably sized transactions had taken three-and-a-half years to complete. According to Machacek, the motives for this latest initiative lie instead in the exercise of power:

> The ministers want to enjoy the power of this decision-making so some future government will not be able to  No one is 100 percent sure at the moment that any form of the current CSSD/

32  *SAIS Review*  Summer–FALL 2002

> ODS power bloc will survive the elections, so the thinking is, let's not leave the fruits of power for anyone who might succeed us.

Machacek's predictions seem to have been confirmed by more recent developments. In keeping with its emerging practice, the government directly appointed advisors for the sale of the three utilities rather than submitting the selection process to competitive bids.[36] In a similar fashion, the government chose the winner in the Radiokomunikace privatization rather than submitting it to a competitive bid.[37] Viewed in the most favorable light, the transaction can only be characterized as government negligence of its fiduciary responsibility to Czech taxpayers. The sale also has the key ingredients of a crony-privatization: lack of competition, lack of transparency, and a drastically undervalued purchase price.

> Viewed in the most favorable light, the transaction can only be characterized as government negligence of its fiduciary responsibility to Czech taxpayers.

Initially, it seemed that the government had also found its favored buyer for CEZ, although competitive bidding was supposedly still in process. The special care the government gave to the French state energy firm, Electricité de France (EdF), raised many eyebrows. Several meetings between the two parties, including a visit to Paris by five members of parliament from the CSSD and the ODS, followed by a trip by Minister of Industry and Trade Gregr, raised concerns over favoritism among the other competing bidders. Both of these visits coincided with major modifications to the privatization terms that took other bidders by surprise. In January of this year, the government decided to abandon a public tender offer for the CEZ privatization in favor of a direct sale. Despite disqualification in two previous rounds of the tender process, EdF was still in the running. Informed observers speculated that the government's public courting of other interested buyers, like German energy giant RWE, was merely a ploy to encourage EdF to raise its price and meet the government's terms for the sale.[38] Interestingly, EdF's advisor was the Vienna-based European Privatization and Investment Corporation (EPIC), which is headed by Vladimir Motlik. EPIC is also the publisher of the Czech tab-

loid *Super*, which is known to be friendly toward ODS, possibly because Motlik is a long-time friend and tennis partner of Vaclav Klaus.[39] In the end, however, all contestants for CEZ, including EdF, eventually withdrew their bids as a result of the government's constant changes to the conditions of the sale. Without a buyer for the utility, the government recently undertook an equally controversial domestic restructuring of the industry.[40]

*Cultivating Friendly Media*
This Motlik-Klaus connection is only one component of the ruling bloc's patronage of "friendly" media sources. Conversely, the government has used all instruments available to suppress and intimidate media that takes a more critical stance. Vladimir Zelezny's TV Nova has been very gracious in its reporting on the ODS-CSSD Opposition Agreement, always dutifully presenting the ODS as a true opposition party and never exposing the truth behind this cynical *modus vivendi*.[41] In return, the government has treated Nova with the utmost

> The government has used all instruments available to suppress and intimidate media that takes a more critical stance.

benevolence. It recently extended Nova's license for another twelve years for free, although Czech taxpayers may have to foot the bill for a possible $23 billion judgement against the country as a result of Zelezny's misdealings with U.S. businessman Ronald Lauder.[42]

The Klaus-Motlik-Zelezny circle would have had cause to celebrate had the CEZ privatization been completed as originally envisaged. The tabloid *Super*, which lauds the ODS and trashes its political opponents, including anyone close to President Havel, is owned by EPIC.[43] EPIC would have realized an enormous profit by advising EdF in the CEZ tender. *Super* and Nova, already close through other connections, agreed to merge their advertising businesses last year. Motlik and Zelezny have both been generous in their sponsorship of the ODS, and Nova has been particularly vocal in its endorsement of Klaus as the next president.[44] Although the CEZ—EdF transaction failed in the end, the conflicts of interest along the way were clear and present, and the episode is just one of the many that supports President Havel's characterization of the Czech political-economy as "mafia-capitalism."

Klaus has proven equally efficient in disposing of his enemies on the airwaves. In June of last year, the director of Czech TV's (CT) political programming department, Martin Mrnka, was dismissed by interim CT director, Jiri Balvin, over some trivial management mistakes. However, his dismissal closely followed the airing of a program entitled "Tentacles of Corruption," which Klaus described as "tendentious, expedient and tantamount to an attack against the democratic system in the Czech Republic." The head of CT's public relations explained the timing of Mrnka's dismissal as an "unfortunate coincidence."[45] Several months later, Balvin was elected to be general director of CT for the next six years. One member of the council that elected him suggested that political pressure played an important role in his appointment.[46]

*The Mysterious Mr. Slouf*

Another central component of this corrupt network within the government involves the ascendancy of old-guard communists to positions of influence in the CSSD. Allegations of communist complicity have surrounded several ministers for some time. Foreign Minister Jan Kavan's purported cooperation with the secret police (StB) while he was living in Britain in the 1970s was widely publicized.[47] Several formerly high-ranking communists have recently been appointed to cabinet posts in the government by Interior Minister Stanislav Gross and by Minister without Portfolio Karel Brezina. Gross and Brezina, (then) at ages 30 and 27, respectively, are the two youngest members of the government. Opposition party members speculate that the CSSD is compensating for their lack of experience by having them appoint older "Bolshevik" advisors.[48] The encouragement behind such appointments likely comes from the mysterious but powerful influence of Miroslav Slouf.

Miroslav Slouf, Prime Minister Zeman's chief advisor, is a former high-ranking communist *apparatchik*. He joined CSSD in the early 1990s, and has since had a growing, if insidious, influence in the party. Well connected to his old Soviet-era network and well practiced in its ways, he is a serious political force in the current government. Stories of his business dealings, contacts, and capabilities have attained mythical proportion. He is allegedly both willing and able to buy support with favors, and many are thought to be obligated to him for past services performed. Those who do not feel duly grateful are allegedly held at bay by compromising information he holds and the influence he wields. His involvement in the Iraq trip and his connection with Milan Jedlicka are certain,

but there are still more questions than answers as to what they exactly mean. In any case, Slouf's Baghdad trip and the Slouf-Jedlicka connection, especially with regard to Jedlicka's involvement in planning Zeman's proposed 2000 trip to the United States, have attracted attention at the highest levels of the U.S. government. Many believe that the Czech government's ties to Slouf and Jedlicka prompted the United States to cancel Zeman's visit, though official sources neither confirm or deny it.[49]

Slouf's role in several conspiracies aimed at discrediting Zeman's political opponents is fairly well established, though he and Zeman deny any involvement in or knowledge of such affairs, and lower level aides have generally taken the blame. In the "Olovo Affair," detailed plans to attack the reputation of Petra Buzkova, a high-ranking CSSD member and vocal opponent of Zeman, were leaked to journalists at the Czech daily *Mlada fronta Dnes*. All evidence pointed to Slouf's involvement, but two lower level aides, Vratislav Sima and Zdenek Sarapatka, took the fall.[50] In the "Stirin Affair," the director of Stirin Castle came under pressure to corroborate a story, allegedly concocted by Zeman and Kavan, accusing former Foreign Minister Josef Zieleniec of bribing journalists at the castle. In spite of Slouf's apparent involvement, he somehow avoided the official blame while Foreign Ministry official Karel Srba, who also played an instrumental role, got sacked.[51]

Efforts to intimidate and discredit political opponents make a good scandal and are certainly worthy of rebuke, but by now the Czechs have grown accustomed to intrigue and can recognize it when they see it. Much more alarming is Slouf's alleged drive to capture control of the police force. On 13 March 2000, President Havel tasked the BIS with investigating apparent attempts by "one concrete person" to destabilize two elite units of the police squad, the Office for Uncovering Organized Crime (UOOZ) and the Section for Uncovering Corruption (SPOK). Havel's suspicion arose from a series of anonymous letters concerning the state of investigation of a number of serious crimes. The investigations had started to falter as early as 1996, but since the CSSD came to power, the inability of the police to successfully prosecute cases "assumed almost incredible dimensions."[52] Indeed, over the previous five years, damages to the Czech economy from "tunneling" (the pillaging of corporate assets from within by owners and managers, leaving behind only a hollow shell for unsuspecting shareholders) and tax evasion had exceeded 250 billion crowns; yet not a single important case was successfully closed. It appeared that

certain crimes were receiving protective cover from high places, particularly the investigations of mysterious Swiss accounts held by the ODS, major cases of asset stripping, and political scandals such as the Stirin affair.

Havel's curiosity was also piqued by the opposing verdicts of Zeman and Interior Minister Vaclav Grulich on the work of the heads of these units. While Grulich evaluated their work positively, Zeman termed it "far from brilliant." Zeman's assessment may provide some insight into an effort by those close to him to remove and replace the leadership of the police force. Grulich privately confided to Havel that Slouf was indeed trying to influence personnel decisions at the highest levels in the force. Grulich also made a public statement to this effect shortly before he was involuntarily dismissed from office by Zeman and replaced by Stanislav Gross.

The heads of the two departments had already come under other forms of direct pressure. SPOK head Evzen Sirek had been accused of accessing top secret computer files from his home personal computer, but was later cleared of guilt. However, the mere fact that a criminal investigation had occurred would be enough to ensure that Sirek never passed security screening, thus severely limiting his career.[53] Not long afterward, Zdenek Machacek, the head of the UOOZ unit that specializes in investigating the Russian mafia, was arrested and detained on trumped up charges of blackmail.[54] It is this latter case that is most informative here since the attorney representing the star witness against Machacek is a man named Josef Doucha.

Josef Doucha, a former police investigator, was Slouf's top choice for president of the police force. In 1996, as a UOOZ investigator, Doucha was criticized for cultivating contacts that "exceeded the framework of police work" with the Russian and Ukrainian mafias. It was because of these contacts that Doucha was denied the top post at UOOZ.[55] Doucha currently works as an attorney, and in addition to representing the star witness in the blackmail case against former anti-Russian mafia unit police chief Machacek, he represents a group of Russian "entrepreneurs" with apparent links to the Russian mafia. In fact, Doucha's and Machacek's paths had crossed previously. In 1995, Machacek was the lead investigator in the largest mafia "round-up" to date. About two hundred people were arrested in a raid on U Holubu restaurant in Prague, where mafia bosses were said to be dividing spheres of influence. Doucha currently represents some of those detained

in the operation.[56] Naturally, Havel became concerned when he learned that Slouf was pressing hard to have Doucha named as police president.

Havel's announcement of the investigation sparked immediate criticism both by CSSD and ODS members. The two parties immediately proposed changes to the Czech constitution that would remove the president's powers over the BIS.[57] Shortly after the investigation began, Zeman removed Minister Without Portfolio Jaroslav Basta from office. Basta had been in charge of the government's "Clean Hands" campaign, and its lack of success was cited as the cause for his dismissal. Basta had also been in charge of the Czech intelligence services, including the BIS. After his removal, authority over the BIS was assigned to Deputy Prime Minister Vladimir Spidla, Zeman's heir apparent and close ally, but a man with no experience in intelligence.[58]

A couple months later, newly appointed Deputy Police President Vaclav Jakubik announced the results of the investigation: there were "no serious shortcomings" and both elite police units were "working effectively."[59] This outcome, which at the time was hailed as a victory and a vindication for President Havel, must be examined more closely. Immediately after the investigation began, control over the BIS was shifted to Zeman's protégé, Spidla. Notwithstanding this, the BIS has proven itself inept time and again. Most importantly, it was later revealed that Vaclav Jakubik, the official who announced the conclusion of the investigation, is connected, through a chain of business partners and companies, to one of the most powerful and dangerous bosses of the Russian mafia, Sergei Mikhailov.[60]

The UOOZ has been on Mikhailov's trail for quite some time, but he appears to have a very influential friend in Mr. Jakubik, who now oversees the antimafia unit.[61] However, because of Jakubik's dubious business contacts as well as previous professional infractions, his security vetting by the National Security Office (NBU) was held in limbo for almost two years after his appointment, meaning that he could not access classified information. He was only able to remain in his position because of a series of special dispensations granted by Interior Minister Gross. Recently, however, Jakubik was granted security clearance by NBU director, Tomas Kadlec, even though the NBU employee responsible for investigating his application refused Jakubik clearance. In the controversy that followed this revelation of political influence in the security clearance process, the only person to be sacked was Jitka

Smidova, the NBU employee whose verdict was overturned. The inconsistent application of security vetting criteria is striking: former SPOK head Sirek is denied clearance due to a previous investigation in which he was cleared of guilt, while Jakubik is granted clearance over the head of an NBU employee who had serious concerns about *ongoing* business contacts that are very suspicious to say the least. Such inconsistencies were enough to provoke inquiries by NATO Secretary General George Robertson about the apparent political protection of certain officials and the serious security risks they pose to the Czech Republic, and, by extension, to NATO.[62]

By all appearances, the communist-criminal network that operates both in and out of the government has succeeded in increasing its influence in what are probably the two most crucial police divisions in the Czech Republic today. And it was all accomplished under the political cover of a BIS investigation of the forces initiated by a well-intended President Havel. If accurate, Mr. Slouf could certainly congratulate himself.

One must seriously wonder about Prime Minister Zeman's awareness of and involvement in his chief advisor's exploits. Is Slouf a "rogue" within the CSSD, or is he Zeman's right hand? Available evidence points to the latter. Slouf's activities are clearly beneficial to Zeman's government, if detrimental to democracy. He has been instrumental in helping the CSSD-ODS bloc consolidate a great deal of power, he has been useful in dealing with actual and potential political opponents, and he has assisted in covering the trail of guilt left by those in power. Yet in spite of all the scandals, the loud calls by journalists and members of opposition parties for Slouf's dismissal, and even a recent criminal investigation of Slouf for embezzlement, Zeman does not fire him. Furthermore, Zeman's responses to revelations of Slouf's machinations are generally evasive, demonstrating a lack of desire for transparency and democratic accountability on his part.[63] When President Havel confronted Zeman with his suspicions of Slouf's pressure on the police force, Zeman was unconcerned. According to Havel's aide, "We were surprised at Zeman laughing loudly at the idea. He considered it a good joke while it sends shivers down my spine."[64] One plausible explanation for the Zeman-Slouf relationship seems to be that Slouf operates under orders from Zeman, and Zeman simply plays dumb when questions are raised. Alternatively, it is possible that Zeman is not kept fully apprised of Slouf's activities. But his response when these activities are disclosed suggests that Slouf

has his tacit approval. Either way, whether by direct order or *carte blanche*, Zeman is implicated in Slouf's power-play.

### From Russia with Love

Several recent BIS reports have documented efforts by both the Russian mafia and Russian intelligence to gain influence over sections of the Czech government and economy. According to *Jane's Intelligence Review*, "the Russian mafia has strong links with the Russian intelligence apparatus."[65] As it has become more entrenched and powerful, this Russian mafia-intelligence network has exerted a corrupting influence on Czech institutions. As discussed in the previous section, this external network may have already gained a foothold in the Czech police, and possibly even in sections of the Czech government under Prime Minister Zeman.

> As it has become more entrenched and powerful, this Russian mafia-intelligence network has exerted a corrupting influence on Czech institutions.

One only needs to take a ten-minute walk through idyllic downtown Karlovy Vary to gain a sense of the continuing Russian presence in the Czech Republic. The town is marked by street signs printed in Russian, and the streets are filled with Russian *nouveaux riches*. There is even a newly constructed Russian Orthodox church. Certain hotels and spas cater exclusively to Russian customers. But Karlovy Vary's foreign clientele are not there just for the healing waters. According to a 1997 BIS report, the Russian intelligence services are firmly entrenched there, and have purchased a significant amount of real estate in town. There has also been a steady wave of immigration from Russia to Karlovy Vary. The editor of the local Russian language newspaper estimates about fifteen thousand full-time Russian residents while, interestingly, the mayor of Karlovy Vary estimates only one to two hundred. The majority of these immigrants allegedly got rich during the Russian privatization process, and they still maintain business connections with Russia's industrial heartland, oil fields, and arms factories. The old Soviet crony network remains strong in Karlovy Vary, and it enjoys the convenience of a daily nonstop flight between Karlovy Vary and Moscow.[66]

In its 2000 annual report, the BIS cites the ongoing attempt by the Russian secret services to gain influence in the Czech gov-

ernment. Their interest has grown because of events like the opening of the Temelin nuclear power plant and Czech accession to NATO. Russian intelligence has attempted to infiltrate various Czech ministries in order to influence decision making and to discredit the Czech Republic abroad. It has also focused on raising questions within the Czech Republic concerning the costs and appropriateness of NATO membership.[67]

The same 2000 BIS report, as well as statements from the Ministry of Interior, cite a parallel rise in mafia activity along with a shift in tactics by the mafia. Already firmly entrenched in the Czech Republic, the mafia is now branching into legal businesses such as financial and real estate investments, trade in raw materials, and manufacturing. Using the capital generated in other countries from criminal enterprises, the mafia is setting up such legitimate businesses in the Czech Republic. It is also seeking to gain influence over the economic spheres in which it operates, and over the government that regulates them. According to the Ministry of Interior:

> They attempt to penetrate economic spheres, gain interest in strategic economic sectors, and they try to cause corruption of state administration and influence decision making. They try to establish their members or collaborators in bodies of state power and political parties.[68]

One economic sphere that mafia elements appear to have penetrated is the $3.6 billion in debt owed by the Russian government to the Czech government. Approximately $2.5 billion of this amount was retired in January of this year in a highly irregular transaction involving a very suspicious intermediary called Falkon Capital. Observers, including an array of journalists covering the deal in the two countries, as well as the French and Swiss secret services, suspect that the transaction may have been part of an elaborate money laundering scheme. The transaction itself was highly complex and shrouded in secrecy on all sides. The net result was that the Czech government received about twenty billion crowns (roughly $540 million) from Falkon and cancelled $2.5 billion of the debt owed by Russia. Although this represents a seemingly paltry 20 percent collection rate on the debt, it nonetheless represents 3 percent of the government's election year budget. Since the agreements among the Czechs, the Russians, and Falkon have remained classified, experts and journalists must deduce the details of the transaction based on leaked information and inter-

views with Russian and Czech officials. However, there are still many questions as to what actually transpired.

It is not known where Falkon, a tiny firm that was recently recapitalized last November with about $70,000, obtained the $540 million with which it purchased the debt from the Czech government. But what is known is equally strange—that this small, unknown firm received approximately $700 million dollars from the Russian government in what observers say was "record time." The money that Falkon received in exchange for its rights to the Russian debt took a circuitous route, the actual point of origin remaining unknown. All that is known is that the funds flowed through the Russian state-owned electricity monopoly, United Energy Systems (UES), including about sixty-five of its subsidiaries, and then through the French branch of a Moscow bank called AKB Eurofinance, to Deutsche Bank, and then to Falkon. The funds that flowed from UES to Falkon seem to be from one of two possible sources: the Russian government transferred $1.35 billion to UES, and UES also borrowed $700 million from Russian Sberbank. Of this $2 billion flow to UES, $700 million found its way to Falkon through the path just described. In addition, UES will compensate Falkon over the next several years with an additional $30 million in electricity on very favorable terms, which Falkon then plans to export.

There are many problems with this. Obviously, a tremendous amount of money appears to be missing. While a portion of the funds that originally went to UES were used to settle UES tax liabilities to the government, intercompany loans among its subsidiaries, and to make a loan to Gazprom, there is at least $635 million of the funds transferred from the Russian government to UES, supposedly as part of the debt transaction, that did not reach Falkon. On the Czech side, the only information to transpire is that Falkon received $700 million and that the government received about $540 million, leaving $160 million available for unspecified ends.

There are also many unanswered questions about how Falkon became involved in these transactions.[69] After the transaction was complete, the government finally conceded that the Russian side had insisted on Falkon's involvement, without which the Czechs would not receive any payment, and cited that the Russians were also binding all parties to secrecy about the transaction. Prior to the sale of the debt, the BIS investigated Falkon as part of the normal security clearance for such a transaction. The BIS actually had prior knowledge of Falkon as the firm had tried to contract with

the government for the collection of some debts from Libya in 1997, but then–Finance Minister Ivan Pilip had rejected Falkon's offer due to BIS concerns about the alleged Russian mafia connections of two of Falkon's Georgian principals, Paata Mamaladze and his partner, Vaza Kiknavelidze. In addition, one of the other founders, who is no longer known to be active in the firm, had been a member of the GRU, Russia's military intelligence service.[70] The BIS again cited risks in the current transaction due to Mamaladze's continued indirect ownership of the firm, even though he had formally stepped down from his board position. It was Mamaladze who negotiated the current transaction on behalf of Falkon. The BIS was also concerned about Falkon's uncertain financial wherewithal. According to BIS chief Frantisek Bublan: "We screened them and informed the government that the company is not exactly solvent and that their intention might be to launder money."[71] In the end, this security vetting process proved to be irrelevant as the deal structure changed at the very last minute. The BIS had not been informed about the involvement of, and thus had not investigated, the apparent financing agent for the transaction—AKB Eurofinance.

By the time the transaction was executed, the Czech government was well aware of the risks involved, but it did not consider the risks sufficient to justify calling off the deal. Apparently the Russian contention that they "know Falkon well" was enough. Perhaps the amount of money involved for the state budget, for party coffers, or possibly for personal use was enough to justify this lapse in judgment. The Russian newspaper *Vedomosti* quoted a U.S. representative of UES, David Hurn, as saying "Falkon supposedly financed several programs of the Czech government from this money."[72] The response of government ministers when questioned about the deal is generally to claim ignorance, to refuse to talk about it, or to pass responsibility on to someone else. Deputy Finance Minister Ladislav Zelinka, the chief negotiator of the deal for the Czech side, is a bit more Machiavellian:

> You know, I am not interested in Russian rackets and schemes. That is their business. For me, it is essential that here we have twenty billion and that the department of financial analyses which reports to me states this money is not dirty.[73]

When challenged by opposition parties in parliament to give an explanation of the transaction, Prime Minister Zeman offers this classic bit of obfuscation:

PATRONAGE AND CORRUPTION IN THE CZECH REPUBLIC    43

Let some of us stop behaving like a resentful and indolent blockhead, who, after he himself is unsuccessful, criticizes the working results of others. I wish people would stop acting like those who announce to the world that they are going to save it and then do not even manage to save themselves. To put it briefly, I would hope that no one behaves in the manner of—in truth—the [opposition] Quad Coalition.[74]

Zeman thus registers the Falkon transaction as a diplomatic coup, even though it has further muddied the name of his country abroad. Prague essentially helped to defraud the Paris club, to which Russia is obligated to repay $130 billion before obligations to other creditors. However, these international agreements stipulate that payments are to be made on a government-to-government level. By engaging Falkon, the Czechs were able to break in line ahead of their Western allies. And Zeman's coup was not a good deal by comparable standards—while the Czechs recovered 20 percent of the cancelled debt, the Slovaks recovered over one-third of their debt this year, and the Germans, French, and Italians do not give discounts on Russian debt at all.

Of course, in addition to skirting international agreements and double-crossing allies, the Falkon transaction may have a more sinister side. *Respekt* journalist Jaroslav Spurny clearly outlines the criminal possibilities in which the Czech government may now be complicit:

Falkon simply enabled the Russians to release money from their budget as if it was earmarked for the amortization of debts, while keeping it somewhere for uncontrollable usage, corruption, propaganda, and other necessities in the struggle for power. In return, the company was given the attractive opportunity to launder tens of billions of crowns that it may account for as received 'installments' from Russia, no matter what kind of money it actually is.[75]

The Falkon transaction, which Zeman heralded as a huge success for the Czech Republic, is only the latest in a series of conspiracy theories that have hounded the Zeman government. It has not been proven that money laundering occurred, though there is also not enough evidence to rule it out, and the governments involved do not seem to be inter-

> Washington has become apprehensive about the Czechs as a security risk within NATO.

ested in proving the conspiracy theorists wrong. Still less is known about the possible involvement of people like Slouf, Doucha, and Jakubik in this scheme. Time will hopefully tell. At present, however, interested observers, such as the United States, consider the presence of such individuals at high posts in the government bureaucracy, with their potentially dangerous contacts with Russian mafia and intelligence organizations, to be just cause for concern. According to Karel Kovanda, the Czech ambassador to NATO, Washington has become apprehensive about the Czechs as a security risk within NATO. He adds that it is possible that the U.S. Senate will not ratify Czech accession to the ATOMAL treaty, which provides NATO members with classified information about U.S. and British nuclear weapons, for fear that some of these secrets may fall into the wrong hands.[76]

## Looking Ahead

*"Tva vlada, lide, se k tobe navratila."* "People, your government has returned to you." Vaclav Havel borrowed Tomas Masaryk's words, delivered in 1918 upon the founding of the first Czechoslovak Republic, for his 1990 New Year's Day speech. In 1990, as in 1918, the statement was an honest pledge to the Czechoslovak people as well as a call to the responsibility that their new freedom would entail. However, the response of most Czechs to continued corruption has been a retreat into passivity and continued acceptance of corruption as a norm. Following the release of the Transparency International index, a poll revealed that 52 percent of Czechs consider their nation to be corrupt. Over 40 percent also said that corruption has always existed, exists now, and will always exist, and that it is thus useless to try to fight it. Moreover, only 4 percent said they were ready to report corruption.[77]

> The response of most Czechs to continued corruption has been a retreat into passivity and continued acceptance of corruption as a norm.

The ruling power bloc has done its utmost to take the government back from the people. In its *Nations In Transit* report, Freedom House cites a steady decline in democratization, press independence, and rule of law, and an increase in corruption in recent years. Yet the Czech people have remained startlingly acquiescent

to such negative developments. It is possible that disgust has led
to apathy. It is also possible that they are not fully aware of the
costs that they must individually bear as a result of widespread
corruption.[78] It is admittedly easier for individual citizens to work
within the corrupt system as it exists than to stand against it. Citi-
zen-based initiatives have been too few and far between, and the
current government has been suspicious of nongovernmental or-
ganizations. The Czechs are still coming to terms with the burden
of responsibility that accompanies their new freedom, and the cost
that each member of society must bear to defend it. Until Czech
society at large is willing to bear this burden, conditions will re-
main ripe for continued corruption.[79]

In addition to pressure from below, institutional reform
must accompany any serious battle against corruption. The pub-
lic bureaucracy, the court system, and, as discussed earlier, local
law enforcement continue to be subject to political pressure. Cor-
rupt or corruptible individuals must be removed from service, and
the institutions themselves detached from the possibility of politi-
cal influence.

In the political sphere, this year's mid-June elections must
not result in another government founded on an Opposition
Agreement. Special interests, both within and behind the CSSD
and ODS, are already working to preserve the current bloc. Hopes
previously rested on the ability of the Quad Coalition parties to
garner the support needed to gain a spot in the government.[80]
However, following a financial scandal involving one of the coali-
tion members, the Civic Democratic Alliance (ODA), the coalition
disbanded. Two of the former Quad Coalition parties, the Chris-
tian Democratic Union (KDU-CSL) and the Freedom Union (US-
DEU), have decided to remain in coalition with one another.
Candidatures that would have gone to the ODA will now be of-
fered to independent candidates.[81] Yet it is unlikely that this coa-
lition can muster enough combined electoral support to form a
government excluding either the CSSD or ODS. In any event, a
governing coalition comprised of the KDU-CSL, the US-DEU, and
either the CSSD or the ODS would still be vastly preferable to a
renewal of the CSSD-ODS Opposition Agreement. However, the
KDU-CSL and the US-DEU are currently divided over their pre-
ferred coalition partners. Such differences must be overcome in
order to break the hold of the CSSD-ODS power bloc, and to re-
store true balance to the Czech government, which is in dire need
of the chastening tension of credible political opposition.[82]

46    *SAIS Review*   Summer–FALL 2002

Finally, the Czechs need continual outside "encouragement" to clean up their act. Organs like NATO and the EU are well positioned to pressure the government into adopting and abiding by the standards and values embraced by the West. This influence is all the more imperative given the efforts of external criminal networks to further corrupt the system. The EU is particularly important since most Czechs recognize, whether they will admit it or not, that their future lies with full integration into Europe. It should be made clear that to become part of Europe, and to fully participate in its institutions, the Czechs must not only adopt a body of laws, regulations, and standards, but they must put them into practice. In the most recent EU annual report on the Czech Republic, overt criticism of the state of Czech corruption was conspicuously absent. This was to be the last report before accession decisions were made, so it was politically imperative to cast the Czech Republic in a positive light.[83] At the same time, however, Brussels must know that admitting a still dysfunctional Czech Republic into the European club is not good for anybody. If both sides are serious about enlargement, the challenge posed by endemic corruption must be faced head-on.

> Organs like NATO and the EU are well positioned to pressure the government into adopting and abiding by the standards and values embraced by the West.

*Notes*

[1] Transparency International, "Corruption Perception Index 1997," <www.gwdg.de/~uwvw/rank-97.htm> (2 May, 2002)
[2] Transparency International, "New index highlights worldwide corruption crisis," press release, 27 June 2001 <http://www.transparency.org/cpi/2001/cpi2001.html> (14 June 2002)
[3] Adrian Karanycky, Alexander Motyl, and Amanda Schnetzer, eds., *Nations In Transit 2001* (New Brunswick: Transaction Publishers for Freedom House, 2001), 166.
[4] Quoted in Karanycky et al., *Nations In Transit 2001*, 165.
[5] Karanycky et al., *Nations In Transit 2001*, 165.
[6] Czech privatization generated minimal income for the government as assets were either given away or sold for bargain prices. Direct foreign investment was effectively blocked by the various privatization schemes employed, and by the political imperative to avoid selling "the family silver." Finally, the majority of

Czech industry was never restructured; in addition, it remained unaccountable to shareholders, uncompetitive, and directly dependent upon state subsidies or heavily indebted to state-owned banks. Jan Machacek, "'After battle, everyone's a general,' but privatization needed one," *Prague Business Journal*, 28 September 2001.

[7] Fiscal budget deficits tripled between 1997 and 2000, to 46.1 billion crowns (3.7 percent of GDP). Unemployment increased to 9.3 percent in 1999 from 3.6 percent in 1996 due to flagging or bankrupt enterprises. While these trends are not exclusively the result of the privatization methods chosen by the government, the direct costs of bankruptcies and ongoing subsidies, as well as the arrested development of competitive industry, have certainly contributed to the current economic woes. "Czech Republic, EIU Country Profile 2001," *The Economist Intelligence Unit*, 30, 50-51.

[8] Matthew Rhodes, "Czech Malaise and Europe," *Problems of Post Communism* 47, no. 2 (March/April 2000): 58-59.

[9] European Commission, "Applicant Countries Eurobarometer 2001: Public Opinion in the Countries Applying for European Union Membership," March 2002 <http://europa.eu.int/comm/public_opinion> (2 May 2002). See also, *Prague Business Journal*, 16 July 2001.

[10] Following a tradition that dated back to the days of the Austro-Hungarian Empire, Czechoslovakia was one of the largest arms producers in the world. By the late 1980s, the industry employed well over ninety thousand people and accounted for about half of the country's foreign trade. During the Cold War, Czechoslovakia was a principal supplier of arms to areas of Cold War conflict, including Iraq, Ethiopia, Syria, Sudan, Libya, Algeria, India, and Vietnam. The Czechs were also a favored supplier to numerous terrorist organizations and they developed a bad reputation worldwide for indiscriminate sales of explosives and machine guns to such networks. The Czech plastic explosive, Semtex, was employed in the Lockerbie bombing in 1988. "Czech Arms Deals Burgeoning Even After Transition," *Respekt*, 18 June 2001.

[11] Pavla Novakova, "Soldiers and Diplomats Will Promote Czech Weapons Abroad," *Lidove noviny* (Prague), 4 October 2000.

[12] "Czech Arms Deals Burgeoning Even After Transition," *Respekt*, 18 June 2001.

[13] Joe Roeber, "The arms bazaar: hard-wired for corruption," *TI Newsletter*, June 2001 <http://www.transparency.org/newsletters/2001.2/third.html> (14 June 2002).

[14] James Pitkin, "Weapons of Choice," *Prague Post*, 23 May 2001.

[15] Ibid.

[16] Jaroslav Spurny, "War Is... a Racket," *Respekt*, 18 March 2002.

[17] BIS is the civilian counterintelligence division of the secret service.

[18] In 1999, the BIS acknowledged that one of the largest international arms smuggling groups had been operating in the Czech Republic for a number of years, and that, in spite of its close surveillance of the operation, numerous illicit transactions had been completed. A company called Agroplast, officially engaged in mineral mining and waste glass processing, had been supplying countries like Libya, Iran, and North Korea with weapons from former Eastern Bloc arms depots. In March of that year, several company representatives were detained in Azerbaijan in connection with the export of six MIG-21 aircraft from the Czech Republic to North Korea. According to the BIS, the smugglers

operated from Russia, and the company was financed by Russian banks. Two company executives had also been detained in Russia, but the benevolent intervention of Moscow mayor Luzhkov secured their release. "BIS: Weapons Trading Group Operated in Czech Republic," *Mlada fronta Dnes* (Prague), 12 October 1999.

[19] Jaroslav Kmenta, "Czech Firms Still Trying Business With Risky Countries," *Mlada fronta Dnes*, 28 February 2000.

[20] James Pitkin, "Weapons of Choice," *Prague Post*, 23 May 2001.

[21] Additional complexities surrounding the transaction suggest that there was more to it than meets the eye. The Czech firm, ZVVZ Milevsko, was contracted by a Russian general contractor, Atomstroyexport, for the project. The wife of current Chamber of Deputies' Chairman Vaclav Klaus is a member of ZVVZ's board of directors. Moreover, the transaction had been approved by the Czech Ministry of Industry and Trade for a year before anyone took issue with it. "Prague Seeks to Ease US Concern at N-Tech for Iran," *CTK Czech News Agency*, 23 February 2000.

[22] Minister of Industry and Trade, Miroslav Gregr, even proposed that the United States reimburse the Czechs for lost trade resulting from RFE/RL broadcasts to Iran and Iraq. Adela Knapova, *Respekt*, 1 February 2000.

[23] The Czechs also have legitimate security concerns about the presence of RFE/RL in the center of Prague. In 1998, a BIS investigation uncovered a plan by Iraq to bomb the building, but the Iraqi agent in charge of the operation defected to Britain. The BIS only informed the United States after the fact. Jindrich Sidlo, *Respekt*, 15 February 2000.

[24] Not all three of these "representatives" were actually employed by Vitkovice. The Slouf-Jedlicka connection has aroused sufficient suspicion in the U.S. government to justify personal warnings by former U.S. Ambassador John Shattuck to both Prime Minister Zeman and Foreign Minister Kavan, and by Secretary of State Albright to President Havel. Jedlicka's later involvement in organizing Zeman's planned fall 2000 trip to the United States is thought to have been the reason for the trip's cancellation by the U.S. government, though this is staunchly denied by Zeman. Pavla Novakova, "The Secret Iraqi Mission Ended in Failure," *Respekt*, 16 November 2000.

[25] The Defense Ministry frantically searched for the 1993 contract assuring the government's right to control the technology, but to no avail. See Thomas Horejsi, "In Pardubice, Four 'Miraculous' Tamara Radars are Unaccounted For," *Respekt*, 10 September 1999; "Iraq Interested in Tamara Radar Systems Plans for Sale," *Lidove noviny*, 10 September 1999; "Czech Secret Service Denies Sale of Antiradar Device," *Pravo* (Prague), 11 September 1999; "Czech Ministry Tries to Stop Tamara Firm Sale," *Lidove noviny*, 6 October 1999; "Iraqi Agents Seek Information on Czech Komar-2 Radar," *Pravo*, 8 December 1999.

[26] Jan Machacek, "Macek's consultancy case lifts the cover on privatization 'fees,'" *Prague Business Journal*, 17 September 2001.

[27] Jan Machacek, "CSSD-ODS opposition agreement: Here today and, very likely, here to stay," *Prague Business Journal*, 2 July 2001.

[28] "Constitutional Watch," *East European Constitutional Review*, 8, nos. 1–2 <http://www.law.nyu.edu/eecr/vol8num1-2/constitutionwatch/czech.html> (2 May 2002).

[29] "Czech premier defends cabinet-sponsored anti-corruption campaign," *CTK Czech News Agency*, 11 June 2001.

[30] Jitka Goetzova, "Kavan Expects Praise from the EU for Wiping Out Economic Crime," *Pravo*, 25 July 2000.

[31] Jiri Kubik, "Clean Hands is Coming to an End," *Mlada fronta Dnes*, 15 August 2001.

[32] Since CKA is not a bank, it will not fall under Czech National Bank regulations concerning transparency. Its original management was dismissed following the recent resignation of former Finance Minister Pavel Mertlik. Mertlik was an opponent of "enterprising political interests."

[33] In such circumstances, an entrepreneur could actually repurchase his own loan at a steep discount, regain title to the collateral, and have the Czech taxpayers cover the difference.

[34] Jan Machacek, "State leaping into privacy and grabbing power while the media sleep," *Prague Business Journal*, 1 October 2001.

[35] The figure is based on the GDP for 2000, estimated at 1,968 billion crowns. Assets in the CKA amount to approximately 45,000 crowns per capita. See "Czech Republic, EIU Country Profile 2001," 52 (Note: 1 USD equals 37.6 Czech crowns; *The Economist*, 1 December 2001). See also Hana Lesenarova, "Gregr's investment council puts finishing touch on an old plan," *Prague Business Journal*, 8 October 2001.

[36] These appointments represent only a few examples of a trend toward invoking an "emergency" procurement clause and bypassing the tender process altogether. The Office of Protection of Economic Competition, which oversees procurement law, has yet to seriously investigate any of these instances. Also, even when the tender process is employed, there have been numerous recent examples of opacity and suspected corruption in selecting winning bids.

[37] Strangely, the winner, TDC (formerly Tele Danmark), was chosen without even negotiating a price. TDC purchased Radiokomunikace for 6.8 billion crowns and is now in the process of breaking the firm up and selling it off in parts—the mobile phone division alone is expected to fetch fifteen to twenty billion crowns.

[38] Jan Machacek, "Too much power concentrated in too few hands a bad thing for the public," *Prague Business Journal*, 4 February 2002.

[39] Marek Prazak and Jiri Nadoba, "Further Fouls in the Tender for the CEZ," *Mlada fronta Dnes*, 2 November 2001.

[40] Machacek, "Privatization unplugged."

[41] A peculiar friendship has blossomed between Klaus's ODS and Vladimir Zelezny's TV Nova, by far the most popular TV station in the country. In 1997, Klaus threatened Nova with a 100 million-crown lawsuit following an inaccurate report concerning his alleged ownership of a Swiss villa. Zelezny and Klaus settled the matter out of court, and the two have since embarked on a very profitable friendship. Jan Machacek, "The odious and the ominous in Klaus' meeting with Zelezny," *Prague Business Journal*, 26 November 2001.

[42] Lauder provided the funding for Nova's start-up in 1994, but Zelezny was able to force him out and retain the broadcast license through a technicality in Czech law in 1999. Last year, a Prague court legitimized this, recognizing Nova's commercial and legal status. Zelezny is also the subject of numerous other lawsuits pending in Czech courts, some relating to tax evasion charges worth about 18 million crowns. See ibid. and Marius Dragomir, "Court ruling on CME bad PR for CR," *Prague Business Journal*, 24 September 2001.

[43] While people like Klaus, Motlik, and Zelezny might plausibly argue that the investigative weekly, *Respekt*, serves a similar function as a mouthpiece for President Havel, it is doubtful that *Respekt*'s owner, Karel Schwarzenberg, has a similar vested interest in Havel's political success.

[44] Jan Machacek, "The odious and the ominous in Klaus' meeting with Zelezny," *Prague Business Journal*, 26 November 2001.

[45] Mrnka had also headed CT during a crisis in 2000, when employees of the station protested and started their own broadcasts in response to the appointment of new management they believed was biased in favor of the ODS. See "Head of Czech TV political programmes axed following Speaker's criticism," *CTK Czech News Agency*, 11 June 2001.

[46] Marius Dragomir, "Balvin elected to head Czech Television; member says council was pressured," *Prague Business Journal*, 5 November 2001.

[47] Evidence of Kavan's willful cooperation remains inconclusive, even though a book purporting to expose Kavan's StB file sparked a heated controversy. "UK Publicist Holding Czech Minister's StB File Since 1991," *CTK Czech News Agency*, 23 May 2000.

[48] "Sula: Bolshevization of Politics Legalising Communist Past," *CTK Czech News Agency*, 10 April 2000.

[49] At the time of Zeman's planned visit, Jedlicka was apparently trying to arrange the sale of U.S. F-16 fighters to the Czech Republic. While this may account for his involvement in Zeman's trip, it offered no solace to the U.S. government to have an alleged gangster with established connections to Iraq arranging the sale of U.S. military technology. Jaroslav Spurny and Jindrich Sidlo, "Miroslav Slouf, Our Man in NATO," *Lidove noviny*, 19 September 2000.

[50] The journalists who published the leaked story later faced criminal prosecution for failing to reveal their source, but they were subsequently pardoned by President Havel. "Prime Minister Zeman Will Dismiss Advisors Sima and Sarapatka," *Pravo*, 25 August 2000.

[51] Before he was dismissed, Srba had been in charge of the "Clean Hands" anticorruption program at the Foreign Ministry. Jiri Kubik and Sabina Slonkova, "Czech Official in Charge of 'Clean Hands' Involved in Blackmail, Corruption," *Mlada fronta Dnes*, 26 June 2001.

[52] Jaroslav Spurny, "The President Is Pulling on the Emergency Brake; Purges in Elite Police Squad Underway," *Lidove noviny*, 14 March 2000.

[53] Following the BIS investigation, Sirek was fired by the new Deputy Police President, Vaclav Jakubik. See ibid.

[54] Machacek's trial, along with that of another officer accused with him, is currently in progress. Numerous irregularities surrounded the investigation and Machacek was indicted in spite of a solid alibi—he was abroad on holiday when the alleged incident occurred. "Former Czech Anti-Mafia Unit Head on Trial—Framed by Mafia?" *Hospodarske noviny*, 5 September 2001.

[55] Ondrej Neumann, "Ruml Knew About Contacts with Mafia," *Lidove noviny*, 25 October 1996.

[56] "Former Czech Anti-Mafia Unit Head on Trial—Framed by Mafia?" *Hospodarske noviny*, 5 September 2001.

[57] Although the President can task the intelligence services, ultimate responsibility and authority over them lies with the government.

[58] Jiri Kominek, "Unsure Future for Czech Intelligence Services," *Jane's Intelligence Review* 12, no. 5 (1 May 2000): 16–17.

[59] "Czech Premier loses dispute over work of elite police units," *Lidove noviny*, 19 July 2000.

[60] One former business partner is longtime master StB spy, Miroslav Cemus.

[61] Mikhailov was also present at U Holubu during Machacek's famous raid, and he received a ten-year prohibition on entering the Czech Republic. Jindrich Sidlo and Jakub Unger, "Policeman's Problem: Mafia? Police Corps' Number Two Has Problems Passing Security Clearance," *Mlada fronta Dnes*, 12 October 2001.

[62] Jaroslav Spurny, "Security clearance finished, forget it," *Respekt*, 25 March 2002.

[63] When questioned about Jedlicka's involvement in the proposed US trip, and about the alarm expressed by U.S. officials, Zeman offhandedly dismissed the whole issue and denied any such conversation with (then) U.S. Ambassador John Shattuck. He claimed that their conversation had instead focused on trade relations between the two countries and jibbed the press with the comment that "the export of cheeses is far less attractive to the media than some Mafioso." See, "Zeman has denied Respekt's assertion that he is not going to the US because of a Mafioso," *Pravo*, 19 September 2000.

[64] "Havel Suspects Slouf of Trying to Destabilize Police," *Mlada fronta Dnes*, 28 March 2000.

[65] Kominek, "Unsure Future for Czech Intelligence Services."

[66] Walter Mayr, "Brothers, to the Sun, to Karlovy Vary," *Hamburg Der Spiegel*, 24 April 2000.

[67] "Czech secret service accuses Russia of attempts to penetrate ministries," *CTK Czech News Agency*, 24 October 2001.

[68] "Mafias operating in Czech Republic adopt more classy approach," *Mlada fronta Dnes*, 12 July 2001.

[69] Journalists who have tried to ascertain more about Falkon have found only a series of dead ends. The company does not maintain a website, and its representatives refuse to answer any questions. The address listed as its headquarters in the Prague commercial registry is that of a Dominican monastery, but the gatekeeper of the monastery insists he has only heard of Falkon as a result of the constant inquiries made as to its whereabouts. Also, the registered address in Prague of Paala Mamaladze, one of Falkon's main principals, is nonexistent. Other principal members of the firm are two Swiss brothers named Moser, from the small town of Neuhausen, where Falkon also has an office. Two journalists from *Respekt* magazine visited the office to inquire about the transaction and, not surprisingly, were unable to garner information from firm representatives. What was surprising was that, in this town of 7,000, nobody seemed to have heard of the Moser brothers or of this hometown firm, Falkon Capital, currently making such a name for itself in the world of high-profile sovereign debt collection.

[70] Roman Kupchinsky, "The Two Headed Falkon—One Scenario," *Crime, Corruption and Terrorism Watch*, Radio Free Europe/Radio Liberty 2, no. 5 (11 February 2002), <www.rferl.org>.

[71] Jan Kovalik and Jaroslav Spurny, "The Swiss falcon shows the white feather," *Respekt*, 29 October 2001.

[72] Jaroslav Spurny, "The dark path of Russian billions," *Respekt*, 18 March 2002.

[73] Jaroslav Spurny, "Russia's debt a prime-time issue again," *Respekt*, 21 January 2002.

[74] "Milos Zeman: Do Not Behave Like Blockheads," *Lidove noviny*, 8 February 2002.

[75] Spurny, "Russia's debt a prime-time issue again."

[76] James Pitkin, "U.S. hedges on giving up classified nuclear data," *The Prague Post*, 6 March 2002.

[77] "Poll shows majority of population consider Czech Republic 'corrupt nation,'" *Czech News Agency CTK*, 11 July 2001.

[78] The potential economic impact of political control over the privatization process and corporate restructurings could be enormous, particularly since the Czechs are already among the most heavily taxed people in the world. Karanycky et al., *Nations In Transit 2001*, 168.

[79] The large public outcry against political appointments made at Czech TV in late 2000 could certainly be seen as a step in the right direction.

[80] This genuine political opposition in the current government was principally led by the center-right, pro-Western Christian Democratic Union and Freedom Union.

[81] *Prague Business Journal*, 7 February 2002.

[82] Jan Machacek, "CSSD-ODS opposition agreement: Here today and—very likely—here to stay," *Prague Business Journal*, 2 July 2001.

[83] Internal EU politics also obscured the truth in this latest report. For example, irregularities in EdF's courting of the Czech government in the CEZ privatization were ignored, most probably because of lobbying from the French state-owned electricity producer. Jan Machacek, "EU report reveals special interests and little about real problems," *Prague Business Journal*, 19 November 2001.

Case 1:05-cv-10679-WGY    Document 98-15    Filed 04/07/2006    Page 23 of 33



**ELSEVIER**

Emerging Markets Review
2 (2001) 137–159



www.elsevier.com/locate/econbase

# State of corruption in transition: case of the Czech Republic

Lubomír Lízal[a,b,c], Evžen Kočenda[a,b,c,*]

[a]CERGE-EI, Box 882, 7 Politických Vězňů, Prague 111-21, Czech Republic
[b]W. Davidson Institute, University of Michigan Business School, Michigan, MI, USA
[c]CEPR, London, UK

Received 15 February 2001; received in revised form 15 March 2001; accepted 15 March 2001

## Abstract

Corruption has a negative impact on society and economy. The transition process in Central and Eastern Europe (CEE) uncovered dormant possibilities for corruption and the necessity for appropriate steps to be taken. We document on the state of corruption in the Czech Republic and the measures introduced to fight it. We cover sectors of society and economy according to their importance of a consequential corruption hazard. We also described the government's program of anticorruption and its achievements and failures. The state of corruption in the country, measured by the Corruption Perception Index, presents a serious problem since the index does not improve as the transition process advances. Numerous comparative studies, however, suggest that corruption is a more prominent feature in a number of other transition countries. We believe that the substantial change of approach to the institutional framework is necessary in order to prevent and fight corruption successfully. © 2001 Elsevier Science B.V. All rights reserved.

JEL classifications: H50; I20; K42; O17; P27; Z13

Keywords: Corruption; Institutions; Transition; Hidden economy; State administration

* Corresponding author. Tel.: +420-2-24005149; fax: +420-2-24227143.
E-mail address: evzen.kocenda@cerge.cuni.cz (E. Kočenda).

1566-0141/01/$ - see front matter © 2001 Elsevier Science B.V. All rights reserved.
PII: S 1 5 6 6 - 0 1 4 1 ( 0 1 ) 0 0 0 1 4 - 0

# 1. Introduction

It is widely acknowledged, as well as supported by numerous studies, that corruption has a negative impact on economy and society. The economic and social transformation in Central and Eastern European (CEE) countries inevitably created and enhanced opportunities where corruption could easily flourish. Corruption in the transition countries has become more severe as these countries increase their openness and involvement in international communities and organizations. This analysis aims to document the state of corruption in the Czech Republic and the measures introduced to fight it.

With a dramatic change in the Czech political regime in 1989, the whole process of social and economic transformation initiated changes in the environment of corruption. There exist particular shifts in corruption from one area to another that occurred along with economic and legal transformation, which sometimes led to a growth in large-scale corruption. Corruption shifted primarily from the sphere of general services and sales to the region of state administrative services.

In order to understand the evolution of corruption under the new conditions of the transition process we have to tackle, at least briefly, the historical roots and origins of corruption. A comparison with corruption common under the communist regime, which was based mainly on mutual friendly services, and time-dependent evolution of corruption, shows that the legislation was quite appropriate to punish classical bribery and corruption of state officials. It was, however, completely inappropriate to prevent the newly emerged forms of corruption associated with rent seeking.

Moreover, the former approach based on the services, small gifts and small financial bribes has sustained up to date, and is the norm of behavior and negotiation in state administration. In the past, the general public perceived any part of the state administration as a repressive body. Since the state was an 'enemy', small-scale misuse and theft of public goods and services became part of the passive opposition against the communist regime. Of course, after 40 years such behavior had to become not only a socially acceptable norm but sometimes a norm of behavior.

Notably, the general public does not perceive state administration at any level as a socially prestigious and valuable occupation. The income of the administration is relatively low and almost no income differentiation exists. Consequently, the state administration is not a competitive job opportunity on the labor market, and does not attract skilled people. With administrative staff that is often unqualified and unable to make independent decisions, the prevailing tendency is to delegate responsibility to resolve pertinent matters to a higher level administrative structure. In addition, clerks often compensate their feelings of non-importance with unfriendly behavior and bureaucratic rigidity towards the general public. All state administration requires that citizens use specific parts of the administration according to their residency status. This means that not only the procedure depends on the interpretation of rules by the regional (local) office but also that citizens cannot use administration in another region. Furthermore, semi-private institutions, like

*L. Lízal, E. Kočenda / Emerging Markets Review 2 (2001) 137–159*    139

major health insurance companies, are mimicking the state administration behavior.

These roots might be the main reason why recent changes, which are presented to the public as a harmonization with the EU norms, represent a visible increase in the power of state administration in its discretionary decisions.[1]

With this account in mind, we can divide corruption, albeit somehow artificially, into two dominant forms:

1. High-level corruption involving elected and senior public officials: This category covers, in particular, financing of political parties and their election campaigns, parliamentary lobbying and public tenders at any level of state administration. Lobbying, at high-level administration does not generally contain features of the transparent process often found in Western democracies. Instead, it resembles rent seeking activities of political and business influential groups. Rose-Ackerman (1999) provides a comprehensive analysis of the relationship of corruption and government, specifically in cases of corruption that occur at the highest levels of government and involve major government projects and programs.

2. Low-level corruption involving mid and low level bureaucrats: This classification refers to municipalities and all forms of public service provided by the state through regional and local agencies, as well as state guaranteed health care. Such a level also entails informal links among private companies and low-level state bureaucracy. According to the recent EBRD survey (EBRD, 1999), the main obstacles to the growth of small and medium enterprises (SME) are anti-competitive practices and corruption, followed by taxes and business regulations. A priority for the next decade of transition is to embrace competition policy that focuses on reducing barriers to business start-ups, introducing measures to combat corruption and crime and hardening the budget constraints on declining industrial enterprises. Lízal and Svejnar (2000) show that problems with soft-budget constraints persist in the Czech economy, mainly via the banking sector. Thus, credit-related corruption possibilities are well warranted and need to be studied.

Furthermore, spread of corruption embraces direct economic activities as well as less direct ways through the administrative processes. On the macroeconomic level, the costs of corruption should be emphasized in terms of economic growth. During the transition process the fight against corruption is expensive and cannot be seen as being independent from the reform of the state. If certain reforms are not made, corruption is likely to continue to be a problem regardless of actions directly aimed at curtailing it.

The comparison of the relative influence of corruption of state bureaucrats on

---

[1] For example, there are proposed changes in the hunting law to prevent poaching. The new law would put the status of hunters on the same level as that of policemen, however, without the qualification requirements the police must meet.

*L. Lízal, E. Kočenda / Emerging Markets Review 2 (2001) 137–159*



Fig. 1.  Administrative corruption: bribes as a share of annual revenues per firm.

the enterprise undertaking is outlined in Fig. 1, where the estimated shares of firms' annual revenues used for unofficial payments 'to get things done' are plotted (World Bank, 2000). The comparison is based on a survey conducted on the basis of face-to-face interviews with firm managers or owners during the period June through August 1999 in the listed countries. In each country more than 100 firms were interviewed. Larger samples were used in Poland, Ukraine and Russia. The samples were fairly representative of the domestic economies with specific quotas placed on size, sector, location and export orientation. We can see that the Czech Republic, together with Slovakia, is regarded as the least favorable among the Central European countries after Russia.

## 2. Sector comparison of dominant forms of corruption

We now proceed with a classification and description of the dominant forms of corruption according to the different sectors of society where corruption appears.

Although all forms of corruption are socially and economically dangerous, we can divide the sectors into four groups according to their importance in the prevention of corruption and consequential hazard to society. The first group consists of sectors, which were also designed to fight corruption and to guarantee legal status. The second group consists of various methods of state administration. The third area consists of services provided by the state and society to the general public and the fourth involves the private sector.

Despite the fact that we provide the possible means of corruption, there is little evidence in criminal prosecution of all these forms. Therefore, we include major

*L. Lízal, E. Kočenda / Emerging Markets Review 2 (2001) 137–159*    141

Table 1
Question: in which area is bribery most prevalent? (by %)[a,b]

| Sector | 1989 | Sector | 1998 |
|---|---|---|---|
| State administration | 3 | State administration | 31 |
| Sales and repair | 11 | Judicatory system | 15 |
| Health services | 21 | Health services | 15 |
| Transport, construction materials | 5 | Police | 9 |
| Services | 31 | Services | 9 |
| Education | 1 | Education | 2 |
| Restaurants | 3 | Restaurants | 2 |
| Retail Sales | 26 | Army | 0 |

[a]Source: Výzkumný ústav obchodu, 1989. $N = 1643$ data for Czechoslovakia.
[b]Source: GfK, Praha, April 1998. $N = 967$, data for Czech Republic.

known cases as illustrative examples whenever possible. Our division is made in such a way that the members of a subsequent category have more incentive to corrupt the members of the preceding one. Therefore, the hierarchy we use describes mainly the methods of receiving bribes. However, one should keep in mind that corruption is not strictly a one-way process.

Table 1 illustrates how the perception of bribery by ordinary citizens has changed over the first decade of the transition process. The results are taken from GfK (1998). Two major changes are immediately visible. Services and sales in general, e.g. all categories that were already almost completely privatized, show a dramatic decline in perceived corruption. State administration, on other hand, records an almost ten-fold increase in corruption perceived by citizens.

Based on the above comparison of categories where bribery may occur the following hierarchical division of corruption can be observed:

1. Police, state prosecution, judicatory and court systems, including parliament and government;
2. tax and fiscal authorities, licensing laws and procedures, public tenders, monopoly regulation and state, local and municipal administrations;
3. education, health care and social care; and
4. private businesses and citizens.

All the institutions, with the exception of private firms (fourth category), are fully or partly financed through public budgets. There is always a possibility for the representative of a group to try to corrupt any member(s) of the previous (upper) category to increase either financial means allocated or competence on usage of the allocated funds. One of the main reasons for the presence of corruption in private businesses is the persistent presence of soft budget constraints.

In the following sub-sections we list the possible methods of corruption for each part of the above.

## 2.1. Police and investigation

A major sustaining conceptual problem prevails from the communist past, and is common to both the general public and state administration. The police are still viewed as a repressive part of state administration and not as a major contributor to crime prevention and their authority and public appearance are perceived only to keep public order.

In particular, the most susceptible to the low-level corruption are those sections of police that are in direct contact with the general public. The main reasons for corruption include inadequate incentive schemes, inadequate technical equipment and, in certain cases, undefined legal status, poor management and control, and poor management of human resources and qualifications.

All corruption in the police involves the misuse of power while not each misuse of power involves corruption. The exact form of corruption depends on the specific situation and varies within the specific departments (criminal, traffic, foreign and border service, and so on). The most visible part involves traffic police since traffic fines (especially those for speeding) are more or less arbitrary and certain fines are collected on the spot.

We can identify two basic types of police power misuse related to corruption. The first involves the various forms of crime cover-ups. The second is just the opposite, finding non-existent criminal acts in the anticipation of possible promotion and pay rise. The aforementioned form of corruption starts from receiving free services, slow acting or inaction during investigation, racketeering, providing cover for criminal acts, hiding evidence, protectionism and providing information on the status of a criminal investigation. In 1999, 345 policemen were investigated for more than 500 criminal delinquencies. The highest proportion of police delinquencies was found among officials under the age of 29, with services shorter than 5 years (report of the Police for 1999).

## 2.2. State prosecution (state attorney offices)

State prosecution is designed to monitor investigations and to decide whether an indictment should be filed or not. A prosecutor at a higher level can always override the decision of a lower-level prosecutor. Such controlling mechanisms make the possibility to corrupt more complex and hence the corruption is less likely. On the other hand, the prosecutors' decisions can waste a police investigation and a corrupt high-level prosecutor can virtually paralyze the system. A specific feature is that prosecutors can decide independently of each other. This, of course, opens a space for corruption, especially in cases where the interpretation of the law is not straightforward.

## 2.3. Judicatory and court systems including Parliament and Government

The judges are independent of the state in the Czech Republic and only the law limits them. Such a feature makes their decision making independent of the

interests of any group. On the other hand, the tradition in the decisions is to focus more on the formal aspects of the case than to interpret the law (extensive interpretation).

This is driven not only by the nature of Continental law but also by historical tradition. The decision making in transition periods when the laws are not adequate to the rapidly changing environment, has severe limitations compared to the case-law approach, or at least, a more extensive approach in the case judgement.

Looking at the recent past, vast amounts of *legal* economic cases would be considered illegal in the West (e.g. so-called Ponti's scheme and others) while Czech legislation does not explicitly mention these types of behavior as illegal. Therefore, the whole Czech stock market became almost worldwide infamous because of its lack of transparency, price manipulation and abuse of power by shareholders with majority stakes. However the situation improved when the Exchange and Securities Commission was established and new laws were approved by Parliament.[2]

The current government has declared its interest to fight corruption and its program 'Clean Hands' was a major election topic.[3] On the other hand, its effort cannot be seen as fully credible. Both major parties in the Czech Republic, social democrats and civic democrats, are under investigation for use of illegal funds, misuse of economic information and tax evasion.[4]

As a final note, unfortunately, there is quite a lot of lobbying in the Lower House of Parliament. We can ascertain this based of the amendments and modifications suggested (and approved) during the final (third) reading. These modifications become a part of the new law (if accepted) even although they were not mentioned during previous readings. A perfect illustration is the Property Execution Act. The intention of the law was to allow better debt repayment in cases of default and indirectly to speed up the bankruptcy procedures. However, in the third round all firms were excluded so only citizens' properties could be levied on.

### 2.4. Tax and fiscal area

The Czech laws are quite strict in the collection of income taxes and there are

---

[2] The initial attitude towards the privatisation process and the regulation of the stock exchange can be illustrated by a controversial statement made by former Minister of Finance, Mr Klaus: 'I do not know a method to distinguish dirty and clean money in practice, to do so would mean to cast doubts about the process of small privatisation; I think it would not be a good decision', in an interview for the Czech Press Agency (CTK), September 27, 1991.

[3] More on this can be found in another section.

[4] Former Minister of Finance in the current social democrats' government is investigated for asset stripping. A former minister responsible for EU co-ordination was found to have illegal deposits abroad and is suspected of receiving provisions and tax evasion. Moreover, one of the Prime Minister's advisors was publicly accused of blackmailing and the case is under investigation. Civic democrats are suspected of illegal financing; Swiss police confirmed this suspicion in part by acknowledging the existence of a suspicious account in one Swiss bank, investigation is still under process.

only a few possibilities for leakage. However, there exist small groups of officials at the Ministry of Labor and Social Affairs and at the Ministry of Finance who can forgive fines for late payment of taxes and social security. The decisions are in reality made ad hoc, the procedure has no rules that would describe the process and therefore, justify the exceptions granted. Moreover, the existence of such groups is not known to the general public, hence, the citizens (small ordinary taxpayers) do not know that they can apply for a pardon.

Although the tax law is quite transparent, the associated laws on health insurance and social security are more complex and less transparent. The employees do not see from their paychecks that two thirds of the social and health payment is constructed as a payroll tax and directly paid by the employer. An opinion poll held on this topic by the STEM agency in 1998 indicated that, according to respondents, the rich should pay higher taxes, approximately 25% of their net income. Such a perception is in sharp contrast to reality since at that time the high-income brackets defined tax payments as 39% of net income. An illustrative example of average shares of income tax, various taxes like payroll and a net income, can be found in Turnovec (1999).

The remaining segments of the fiscal system and administration are more problematic. There are quite common frauds in value-added tax (VAT) collection and the collection of consumption (excise) taxes and custom duties. These frauds are estimated in billions of Czech crowns (CZK) with links to international crime.[5] In this area we face not only corruption but also highly organized international criminal activities. A popular scheme in the middle of the 1990s can serve as a good example. Imported oil (petroleum) products were declared for heating purposes but in reality were used for truck fuel. The unpaid consumption tax comprised of more than one half of the final sale. The total state revenue from truck fuel consumption tax was 17.5 billion UK in 1996 and the loss in tax revenues was estimated at 2.5 billion CZK. Of course, such activity required at least a passive attitude by the state administration.

During the first half of the 1990s the evasion from payment of consumption tax, oil, alcoholic beverages and cigarettes was alarming. Currently, each pack of cigarettes has to have a fee stamp and the method of stamping is under consideration for alcoholic beverages as well. Additionally, the value-added tax is misused for tax crimes. According to the tax law the financial office (i.e. the state) has to refund the VAT to the exporter. Therefore, fictional exports, or overvalued exports, can generate substantial cash.

All these mentioned crimes require at least passive co-operation of the tax authority or custom authority, which is also a part of the fiscal administration. Quite common are cases of imports, which have a declared low value to reduce import duty. The most prevalent cases were the imports of used cars where the declared custom value was estimated to be only one tenth of the real value.

---

[5]Similar cases were reported to occur in Poland and Hungary.

## 2.5. Licensing

Licensing is used to regulate access mainly in areas of telecommunications, radio and television broadcasting, insurance and finance, foreign trade with selected commodities (armaments or goods with existing import quotas) and mining. The procedure of licensing should be transparent and, if possible, single-criteria, or the selecting criteria of multi-criteria tender should be at least an integral part of the license provided. There are well-known cases from the past where the license procedure resulted in a suspicious conclusion.

### 2.5.1. Banking and finance

At the beginning of the transition the state allowed new entries and it became very easy to receive a banking license. All new small banks had liquidity problems or were tunneled and had to merge or go bankrupt. The state responded by freezing the issue of new licenses instead of a more professional and prudent regulation. Only later the banking sector regulation became more advanced.

The investment funds, newly established during voucher privatization, became, with several exceptions, a synonym for asset stripping and abuse of small shareholders. There existed no effective regulation of investment funds. The complete lack of stock market regulation speeded up the process of dishonesty through obvious price manipulation. This is also a reason why there is strong opposition to the existence of a compulsory private pension fund scheme, although the pay-as-you-go pension system is getting into huge deficit and the prospects look bad.

The situation on the insurance market is more optimistic despite the fact that the regulation is quite similar to that used for investment funds. So far only one insurance company has gone bankrupt. On the other hand, the market is still not fully open and licensing is limited.

### 2.5.2. Telecommunications

The monopoly fixed line provider has had its exclusive rights granted until January 1st, 2001. The reason is that in the past, the fixed line network required enormous investments. Therefore, during the privatization process a strategic partner was selected and in exchange for a commitment to build and modernize the network such exclusivity was granted. As an experiment, in several regions small local companies were licensed to provide the fixed lines, however, the incumbent controls 99.9% of all lines (OECD, 1999).

The exclusive right on building the fixed end-line network was questioned in the past since it may slow down the speed of wiring the whole country. However, no direct evidence was found although, the case was reopened by the press during the investigation of illegal sponsoring of political parties.

In 1999, a third license for a mobile telephone (GSM) provider was granted. Although the license was based on multi-criteria choice, certain promises were not part of the license conditions. Moreover, the winning pricing scheme offered in the tender was handicapped by additional disadvantageous conditions, like cash deposits or long-term interminable contracts.

### 2.5.3. Radio and TV broadcasting[6]

A classical example of high-level lobbying is the case of the free terrestrial license. The original tender involved many criteria. The license was granted to the firm that offered low price and a program having intellectually higher standards than the (state) public TV broadcast. Once the license was granted, the law was changed in a way that the program composition is not a part of the license and the TV company became highly commercialized. Quite recently, an open fight for the complete control of this highly profitable firm started between the Czech license holder and a foreign investor. Fortunately, there exists a sufficient amount of radio frequencies to grant enough licenses to prevent the above situation in radio broadcasting.

### 2.6. Public tenders

Most cases of corruption that are disclosed in the media are connected with public tenders both at the state and municipal levels. Pre-selection of the prospective supplier is one of the most cited flaws. The selection of the pre-selected firm to sign a contract is done by the means of custom-made conditions in the tender, custom tailored weighting of criteria or even by changing the tender conditions during the tender process. Such non-standard behavior is highly susceptible and opens broad opportunities for corruption to materialize. The available means to disclose a possible manipulation in the aforementioned schemes are quite limited.

Such a behavior during transition is in line with the exposition of Acemoglu and Verdier (2000) who argue that room for corruption is created by transferring resources from one party to another by government interventions. As corruption often undermines the purpose of the intervention, the government tries to prevent it. By doing so it may create rents for bureaucrats, induce the misallocation of resources and increase the size of the bureaucracy. Preventing all corruption is excessively costly and may involve a certain fraction of bureaucrats accepting bribes. Moreover, Stiglitz (1999) argues that privatization created an opportunity to collect all expected future bribes in their discounted value at the time of privatization.

Public tenders that lead to public investments may have a negative economic impact due to corruption associated costs. Equally important is an impact on the economy in general. Tanzi and Davoodi (1997) argue that corruption, particularly political or 'grand' corruption, distorts the entire decision-making process connected with public investment projects. The degree of distortions is higher with weaker auditing institutions. They present evidence from various countries that higher corruption is associated with higher public investment, lower government revenues, lower expenditures on operations and maintenance and a lower quality of public infrastructure. The evidence also shows that corruption increases public investment while reducing its productivity. These are five channels through which

---

[6]A special law governs Czech television (as a public service).

corruption lowers growth. These findings are supported by Mauro (1995) who investigated the impact subjective indices of corruption on economic growth and found supportive evidence that corruption lowers investment, thereby lowering economic growth. Therefore, in countries with high corruption, very high public sector investments should be evaluated with caution. Since the total aggregate investment to GDP ratio in the Czech Republic is one of the highest among the CEE countries (CESTAT, 1999), the argument made by Mauro could be applied for the Czech Republic as well.

### 2.7. Monopoly regulation

As in the cases of public tenders and licensing, the state uses discretion to regulate the monopolies (Lízal, 2000; Kočenda and Čábelka, 1999). In addition, there exists no independent regulator or regulatory office. Although the existing regulatory institutions are formally independent, they are financed by and sub-ordinated to the founding (supervisory) ministry. According to the law and existing regulations, any disputes should be settled either by the ministry or by the regulatory office. Such an institutional arrangement will have to be abolished with the accession to the EU.

In most of the network industries the state controls the majority stake in the utilities companies (Kočenda, 1999). On the other hand, the state should behave as an independent regulator, which creates an obvious incentive problem. Such a problem cannot be solved independently on the state. Of course, the absence of clear rules opens up the space for higher level corruption, although there are no proven cases. In addition, almost every monopolistic provider has to have a license. This applies not only on large utilities but also on small local monopolies like local heat suppliers.

Regulatory issues were extensively discussed by Johnson et al. (1998) who recently used cross-country regressions to explain the size of the unofficial economy in regions of Latin America, OECD countries and transition economies in Central and Eastern Europe (CEE). They found evidence that countries with more regula-tion tend to have a higher share of the unofficial economy in total GDP. They also found that a higher tax burden leads to more unofficial activity and countries with more corruption tend to have a larger unofficial economy. Findings of Lacko (2000) support such a view with evidence from the transition CEE countries. Stagnation or further increase in the size of hidden economy was experienced in the economies of the former Soviet Union, while an explicit declining tendency could be seen in more advanced transition countries.

### 2.8. State, local and municipal administrations

Earlier in the text it was mentioned that the public administration is still not perceived as a service to the general public paid by the taxpayers but as an annoying structure to be tolerated and dealt with only in the case of necessity. What is felt as a major flaw of the administration is that frequently, the officials

seek reasons why not to proceed. They search for bureaucratic mistakes and do not seek methods on how to help the asking citizen to achieve his/her goal. Currently, the administration proceeds only if the action is explicitly permitted by the existing regulation. The logic would suggest proceeding in all cases that are not explicitly forbidden or illegal.

As a final illustration we provide a quite frequent, although not fully legal practice used during renovation or construction of family houses. It is actually easy to start the construction work without a permit and then ask the District Construction Office for a subsequent permit with a small fine to be paid. The risk of not getting the permit is extremely low and this method is often easier than to ask for all the permits before construction. Such behavior perversely saves a lot of time and, hence, money.

Another area of behavior apt for potential corruption concerns local authorities. The local administration, especially municipalities, often put state or municipal property as a collateral to back a third person's private loans. Such behavior is not only highly questionable but also creates opportunity for corruption to emerge. In this context, the sale of a part of a National Preserve on a municipal territory serves as a flagrant example.

### 2.9. Education

A major problem of higher education (except for the lack of finances) is its limited supply. Certain fields at universities or high schools face excessive demand, which is up to 10 times the capacity. Last year, there was a case at the Law Department of a major university, where entry exams were sold for CZK 100 000 (approx. $3000). No one was prosecuted or held responsible. The suggested yearly tuition is approximately 10 times less than the aforementioned sum. Since the government is not in favor of introducing tuition fees at the state universities due to its possible social impact, the current situation paradoxically favors students from wealthier families.[7]

Most higher education is still publicly financed. The private schools also receive a state supplement but lately the scrutiny for private schools to receive such a supplement became excessively harsh. Such conduct may result in reduced government spending on education in general.[8] Furthermore, the other corruption possibilities include the preferential treatment or acceptance of selected students whose parents are able to pay extra tuition or to lobby for state finance.

### 2.10. Health care

Historically, the Czechs are used to receiving health care as a free service

---

[7]We do not mention one's high moral standards as an obvious attitude against obtaining entry-exams answers for money.

[8]Mauro (1998) argues that corruption is found to reduce government spending on education in a cross-section of countries.

*L. Lízal, E. Kočenda / Emerging Markets Review 2 (2001) 137–159*

provided by the state. In the centrally planned era a limited health supply existed and caused the tradition of 'gifts' for a service already received or to be received; the gifts ranged from flowers, books, coffee, alcohol to money.

Health care is provided through a mandatory health insurance scheme. All terms of the insurance, including premium and coverage, are determined by the state. However, the payment of health insurance is still not generally viewed as payment for the health service but rather as a tax. Health providers are not viewed as (private) businesses providing care and being paid through insurance companies, but as a part of the state service. This is also caused by the non-transparent system combining taxes, health insurance and various social insurance payments. Despite the fact that people view their health as a major asset, they do not often receive full information on the appropriate care needed and on its fair or real price.

Aside from the above, there exists pressure from the pharmaceutical industry toward the use of more profitable drugs and there is no definition of the standard health care covered by the insurance as guaranteed by the law. The regulation is ad-hoc and usually even retrospective, sometimes punishing the provider for past efficiency.

To sum up, the patient is usually not able to:

1. recognize that the service is adequate and treatment is ethical;
2. realize that the service is too expensive or redundant; and
3. discover that the provider has charged the insurance company for non-performed services or non-supplied drugs.

On the other hand, the insurance companies are abusing their power.[9] They pay late and the average overdue payment is well over 2 months. There exists a silent threat of contract cancellation from the dominant insurance companies towards the dependent health care providers. The providers are warned not to charge overdue interest and are even manipulated to sign agreement amendments that make the contract even more disadvantageous for them. Quite recently, the newly issued regulation worsened the situation, and the medical professional society claims that the change was adopted just to prevent the financial collapse of the state governed health insurance company. All this can be viewed as, at least, passive corruption.

*2.11. Social care*

This area concerns mainly state unemployment policy. There are two state unemployment policies. The active policy when the financial resources are allocated for the creation of jobs and the passive policy, the payment of unemployment

---

[9] Association of medical doctors filed a case against the dominant insurance company (VZP) at the Antimonopoly office.

*L. Lízal, E. Kočenda / Emerging Markets Review 2 (2001) 137–159*

benefits. The district labor offices govern both policies. A case study commissioned by the Ministry of Labor and Social Affaires in 1998 showed that more then 80 000 households misused the social safety net, mostly in connection with unemployment and welfare benefits. The Czech Republic has less than 3 million households in total and thus the misuse occurred in approximately 3% of them.

There were cases in the past when people registered as unemployed and received the benefits while working part-time or full time without a legal contract in the shadow economy, home or abroad. It may be questioned to what extent the officials were aware of the illegality of the claims.

More problematic, from the corruption point of view, might be the area of active policy. The rights of the district labor offices also define the possible ways of corruption. These rights include the selection of private businesses, which would receive a loan to retrain their employees, and also forgiveness of the repayment of the loan. The office can also provide aid to create jobs for fresh graduates or secured jobs and provide a loan to start a private business.

### 2.12. Private businesses

The most visible forms of corruption in private (and also semi-private) businesses involve the selection of pre-specified partners in public tenders. In the banking sector corruption is associated with the provision of loans for unreasonable or even non-existent projects. Such practices even led to the collapse of several banks and the loss of deposits. Bribes associated with corrupt behavior are not marginal and thus represent substantial costs. The distressing scope of such a phenomenon was revealed in the EBRD study (EBRD, 1999), which found that 26.3% of Czech companies admit giving bribes. Czech companies spend, on average, 4.5% of their annual income on bribes.[10]

It would be misleading to think about corruption only in terms of extra monetary costs. Corruption in private businesses is accompanied also with time spent by managers. Kaufmann and Shang-Jin (1999) found that firms that pay more bribes are also likely to spend more management time with bureaucrats to negotiate regulations and thus face higher human capital costs. Such a finding is based on data from three worldwide firm-level surveys that do not include the Czech Republic. However, we assert that bribe payments, management time wasted with bureaucrats and the cost of capital may be positively correlated across Czech firms.

Another perspective of corruption in private businesses is associated with hiding parts of their activities in order to reduce tax payments. Such conduct requires additional cover-up steps that involve bureaucratic corruption. We do not have a representative survey for the Czech Republic, however, we can use some proxies from other European transition countries. Johnson et al. (2000b) conducted a survey among the private manufacturing firms about the size of hidden unofficial

---

[10]According to the study, bribery is more prevalent in Poland and Hungary

*L. Lízal, E. Kočenda / Emerging Markets Review 2 (2001) 137–159*    151

Table 2
Question: did you ever give a bribe in the following sector?

| Sector | 1989[a] | 1998[b] |
|---|---|---|
| Personal services (hairdresser, etc.) | 61 | 45 |
| Health service | 42 | 31 |
| Purchase of durable goods | 39 | 2 |
| Repair services | 36 | 37 |
| Car repair services | 12 | 17 |
| State administration (any level) | 12 | 17 |
| Housing | 11 | 4 |
| Funeral services | 9 | 1 |
| To put child in a school of any level | 9 | 2 |
| To get a job or an advantage in a job | 6 | 7 |

[a] Source: Výzkumný ústav obchodu, 1989. $N = 1643$, data for Czechoslovakia.
[b] Source: GfK, Praha, April 1998. $N = 907$, data for Czech Republic.

activity. The firm-level regressions for the three Eastern European countries, namely Poland, Slovakia and Romania, documented that bureaucratic corruption is significantly associated with hiding output.

Hiding output is closely connected with poorer tax collection by state administration. In another survey Johnson et al. (2000) found the size of hidden unofficial activity to be much larger in Russia and Ukraine than in Poland, Slovakia and Romania. A comparison of cross-country averages has shown that managers in Russia and Ukraine face higher effective tax rates, worse bureaucratic corruption, greater incidence of Mafia protection and have less faith in the court system than in more advanced transition counterparts.

## 3. Measures of corruption

In the previous section we described and classified dominant forms of corruption according to different sectors of activity. Now we give a brief sketch on how such phenomenon is measured in two different ways.

There are two basic methods to measure corruption. The first one is based on the counts of discovered, monitored and prosecuted cases. It uses police statistics and statistics from the Department of Justice. Its major advantage is that these are hard numbers and well-founded figures. The disadvantage is that it is not able to measure latent corruption, i.e. the undiscovered cases. It means that in the highly corrupted environment where any true and independent investigation is impossible, such a measure can give an extremely low level of corruption.

The other method of measuring attempts to overcome the possible bias of the preceding method. Such a method involves opinion polls, surveys and case studies. Table 2 gives an account of an opinion poll held in 1989 and 1998. It shows decline in giving bribes for goods and services as they became more available with

Table 3
Comparison of the corruption perception index[a]

| Country | 1980–1985 | 1988–1992 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|
| Czech Republic | 5.13 | 5.20 | 5.37 (1.47) | 5.20 (0.47) | 4.8 (0.8) | 4.6 (0.8) | 4.3 (0.9) |
| Slovak Republic | 5.13 | 5.20 | Not evaluated | Not evaluated | 3.9 (1.6) | 3.7 (1.5) | 3.5 (1.2) |

[a]Source: Transparency International. Note: standard errors given in parentheses when available.

transformation of the country towards market economy. State administration is the only category that recorded a significant increase.

The above measures are less precise, however, they more realistically reflect the situation in the country and/or particular sector. According to this principle, the Transparency International constructs the so-called corruption perception index (CPI). The CPI has a maximum value of 10, which means no corruption is perceived, while the value 0 denotes the most corruptive environment. The Czech Republic ranks in the middle of the surveyed countries, as well as Poland and Hungary. In 1998, the Czech Republic was 37th out of 85 countries surveyed while a year later the country occupied 39th place among 99 countries. The last survey from 2000 contained 90 countries and the Czech Republic was 42nd. Table 3 illustrates how the value of the index has evolved over the past 20 years.

It is nothing to be happy about but according to the CPI the corruption environment in both the Czech and Slovak Republics is slowly gaining strength. Current forms of corruption have the same origin in the Czech and Slovak Republics due to their common experience in the former Czechoslovakia. The existing legal systems are also quite alike, which implies that if we observe one type of corruption in one of the Republics, there is a high probability that the very same corruption takes place in the other. Therefore, it is plausible to take known Slovak cases as supportive evidence.

Nevertheless, one of the main reasons for the split of the former Czechoslovak Federative Republic can be attributed to the uncontrolled power of the former Slovak political representation in 1992, which wanted to pursue privatization as a form of giveaways to its political supporters. Such practices are probably the major reasons why the CPI is almost 1 point lower for Slovakia compared to the Czech Republic, although the countries had the same starting point.

Constructing the CPI on a regular basis is only a small part of work that the Transparency International does to help fight corruption worldwide. The organization was founded in 1993 in Berlin, Germany, as an international organization to help fight against bribery and corruption. This non-governmental organization (NGO) aims to involve all components of civil society — state administration, the private sector, entrepreneurs and individual citizens — in creating a multilevel system against corruption.

Table 4
Question: which government or governments, in your opinion, contributed to the spreading of corruption and bribery in our country?[a]

| Government | Years | % |
|---|---|---|
| Communist Govt.'s. in the past | 1948–1989 | 26 |
| Govt. (Federal) of Mr Čalfa | 1990–1992 | 5 |
| Govt. (Republic) of Mr Pithart | 1990–1992 | 4 |
| Govt. of Mr Klaus | 1993–1997 | 26 |
| Govt. of Mr Tošovský | 1997–1998 | 0 |
| Govt. of Mr Zeman | 1998–present | 3 |
| None | | 0 |

[a] Source: GfK, Praha, 1999, $N = 1066$.

## 4. Anticorruption program of the Czech Republic

In 1997 the Government of the Czech Republic assigned the Minister of Interior to 'develop a concept of offensive methods for detecting corruption in civil service' (governmental decision No. 673/97 from October 29, 1997). Later on, the current administration defined a combat against corruption as one of its priorities. The original task, targeting corruption in the civil service, was extended by a government program of combating corruption in the Czech Republic (governmental decision No. 125/99 from February 17, 1999).

The great need to adopt the above measures was due to the past under the old centralized economic system as well as the passive approach of the state administration during the first years of the transition process. Indeed, such a state of affairs can be illustrated by the attitude of the public towards the government's responsibility in taking effective measures to prevent corruption. Table 4 presents results of an opinion poll carried out by GfK (1999) that is related to this matter.

It is understood that the concept of anti-corruption measures must be systematically linked with steps that deal with other social problems. Combating corruption should be conducted in an organized way with the aim to prevent any new sources of corruption to emerge. No abrupt solutions should be taken because they could be counterproductive or even threaten the economy or civil rights and freedoms, instead of curbing corruption. Thus the goal of the Program of Combating Corruption is to:

1. describe the nature and objectives of combating corruption;
2. define its principal methods and means;
3. propose specific measures to be taken in respective areas;
4. define responsibilities and a time schedule; and
5. indicate the method of monitoring.

As stated earlier, the priority in combating corruption is to focus on corruption in the public sector, among top civil service officials, judges, state attorneys,

policemen, custom officers, officials collecting taxes and state control institutions. Such corruption is most dangerous for the stability of a country and could hinder an effective procedure against other forms of corruption and illegal activities. The Law on the Civil Service would be a systemic measure that could complement the program in combating corruption in this area. Such a law should define the legal position and responsibilities of civil servants in the aforementioned administrative bodies, including limitations imposed on their other sources of income and their disciplinary liability. While being on the agenda, the Law did not materialize yet. A further objective of the Program is to deal with corruption in the private sector.

The program does not plan for any new institutions to be set up or new regulations to be adopted. Existing rules and institutions should be exploited instead, as well as the potential of the Czech civil society. In that respect, the program does not rule out possible co-operation of government with NGOs. If the situation calls for new institutions to be established, this would be based on a principle of minimum financial support from the state budget. The program aims to increase the extent of power for financial and tax authorities, as well as for police forces that deals with economic crime.

### 4.1. Educational program

In order to increase awareness about corruption and the ability of civil servants to fight it, the government introduced an administration wide educational program involving officials from various administrative bodies. Three Ministries, the Ministry of Justice, the Ministry of Interior and the Ministry of Education, Youth and Sports, were assigned to work on several educational projects to increase awareness of the general public as well as civil servants.

The project on the national training of civil servants is focused primarily on preventing corruption. Another project focuses on education and discussion panels for police officers, state attorneys and judges involved in corruption cases to provide detailed knowledge on corruption offences and relevant counteractions. More public oriented projects ask for preparation of various types of guidelines on social causes and consequences of corruption and methods of combating it, as well as the development of guidelines for civilian protection against corruption. As an ultimate goal, these projects are aimed to increase the public awareness of the dangers of corruption in any form and to locate the means to investigate and prevent it.

Because the government program to combat corruption is of a relatively recent nature there does not exist long-term evidence about its usefulness yet. Therefore, we are unable to evaluate it properly at this time.

### 4.2. Governmental program 'Clean Hands'

Czech political parties are connected with the economy in two principal ways. First, the members or persons affiliated with political parties form part of the management and supervisory boards in the companies where the state is able to

control. Second, is through 'loyal' persons that benefited from earlier phases of privatization thanks to their political connections.

The campaign 'Clean Hands' was audibly launched in 1998 by the current government to deal with fiscal crime and corruption. So far it has drawn an enormous amount of bad reviews from opposition parties and media for its very limited success. The legitimacy and transparency of this campaign have been questioned when it was announced that the composition of the investigating committee would be secret. The campaign itself has produced less than 50 cases so far with the former Finance Minister being the subject of one of them. It was admitted to be a failure and terminated in the early part of 2000.

In any event, the government in line with the promises made in its election program, set up an inter-ministerial commission in September 1998. The major task of this body was to co-ordinate anti-corruption policy, Within a year the Commission was given more than 3000 cases of possible corruption to inspect. So far more than 200 complaints were filed with the prosecution. Police have inspected approximately 70 complaints out of these and only 20 of these have been handled in the criminal proceedings (EC, 1999).

The police refuse to prosecute a vast amount of the filed cases since the quality of the dossiers is questionable. Also, sometimes there is no clear evidence whether a particular behavior is prosecutable since it is not explicitly prohibited by the law although its nature might be 'criminal' according to common sense.

### 4.3. (Dis)improvement of legal system amid proposed changes

As the results of the new anti-corruption program are questionable and the governmental actions are lacking co-ordination, personnel and equipment resources and appropriate legislation, the government decided to move in an easier direction. It proposed, and got approved in February 1999, an amendment to the Civil Code that increased the prison sentences for bribery from 5 to 8 years.

Although the anti-money laundering legislation is compatible with internationally required standards, there are several issues that need improvement. The tasks are divided among several agencies and ministries and there is an obvious lack of sufficient co-ordination. The Czech Republic has neither signed the Council of Europe Criminal Law Convention on Corruption of January 1999 nor ratified the 1997 OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

The proposed changes in the economic legislation comprise of property statements, changes in the monopoly regulation, further continuation of privatization and reform of public financing and financing of political parties. Additional changes include, e.g. prescribed wire transfers above a certain amount. The extent of the new legislation is still a subject of political debate since it can substantially affect citizens' rights.

Since the Czech Republic has a minority government and all legal changes require a majority support in The Parliament, there is a limited possibility for improvement. According to the 1998 European Commission report the achieved

legal changes were unsatisfactory. Similar appreciation can be found in the 1998 World Bank Country Study on the Czech Republic. The European Commission went on to cast doubt on whether the Czech Republic would be able to reach the required legal standards in time to maintain its place in the group of 'fast-track' accession countries. The reports of both institutions for 1999 were more favorable.

Nevertheless, the proposed changes are moving along the track of increased regulation and deterrence with high penalties but leave the current discretionary nature of economic regulation unchanged. Moreover, the intended changes would make the system less transparent, more complicated and, hence, increase the scope of possible corruption. As of now, there still exists special commissions at the Ministry of Finance and at the Ministry of Social Affairs and these commissions are allowed to forgive any penalties previously imposed at their discretion. These actions are completely unregulated, which opens a space for high-level corruption.

The government assessment of suggested remedies to corruption is based on old concepts of deterrence and does not involve the assessment of potential hazards introduced to the system nor the analysis of the existing ones and their elimination by a simple change. Therefore, we are quite skeptical about the positive effects; we expect that the implementation of all the suggested enhancements would create even more problems with corruption than solutions.

The Parliament also passed a Free Information Act. This act shall allow access to all state information with the exception of classified data. On the other hand, the current practice is that the bureaucracy is asking excessive 'processing' fees to prevent the revealing of this information.

The unsubstitutable role of free media in corruption prevention and policy supervision revealed itself during the crisis in the public television in December 2000. The mission of Czech Television is to serve the public through free and independent broadcasting over the entire territory of the Czech Republic. The law appoints two sources of revenue for Czech Television: the television license fee; and the corporation's own business activities, for which the law sets strict conditions. Czech Television is not subsidized out of the national budget. As a public service broadcaster, Czech Television is an open institution that answers to TV license-fee payers and respects the principles of public review, the Czech Television Council answers to the Czech Parliament, Czech Television regularly publishes reports on its operations. The recently nominated Council for Television Broadcasting has elected, in a hasty procedure less than 2 days long, on December 20, 2000, a new CEO of Czech Television. Part of the staff of the Czech TV opposed the election and began a strike. The main objections were: the Council was nominated based on political premises and consisted chiefly from members of political parties; and candidates for a new CEO were subject to political negotiations held between the two major parties prior to the election. Both deeds were against the Czech Television Act governing its independence from the state. The strike attracted nationwide support that grew as the new management started to fire protesting TV staff and commenced regular censorship of news broadcasts, along with switching-off TV broadcasting entirely. Several week long standoffs peaked by the resignation of the new CEO in between two extraordinary sessions

*L. Lízal, E. Kočenda / Emerging Markets Review 2 (2001) 137–159*          157

of Parliament. In January 2001, the deputies approved the new Czech Television Act and called down remaining members of the Council for Television Broadcasting. They also named an interim CEO. Paradoxically, the new version of the Czech Television Act even strengthens the influence of the political scene on television operation. The Senate voted this Act but the lower house overrode its vote.

According to political scientists, the situation reflects a deep political crisis in society. Political control of independent media constitutes an enormous potential for corruption and rent seeking. In the case of Czech TV, a spontaneous civic reaction prevented probably just temporarily, because of the flaws of the new Act, such a development.

In the summers of 1988 and 1989 the Institute of Business Research performed studies measuring the gray economy of the inefficient socialist society at that time. GfK, Praha, Ltd. obtained similar sets of data in 1998 (GfK, 1998). A comparative analysis of the two time-separated data sets suggested that instances of corrupt behavior are declining. The Transparency International (1999) published detailed comparisons in the analysis 'The State of Corruption after 10 Years'. Despite such findings, the area of (government) clerical services has become the most corruptible institutional environment in the eyes of Czech citizens.

However, we should not be overly optimistic because, as the report states 'The transformation of corruption from the sphere of general services and sales to state clerical services, together with the socially differentiated nature of the evaluation of the necessity of bribery, signals a change in the social function of corruption. Earlier, corruption primarily assured a better level of services and a supply of shortage goods. Today, a category of people are crystallizing for whom corruption is a working tool necessary for professional success. The current common trend is towards the concentration of corruption in the state administration and the creation of a group of people whose existence is strongly dependent on corruption'. And the aforementioned TV crisis puts another perspective into this conclusion.

## 5. Concluding remarks

The article should help the reader understand that the Czech Republic is systematically ranked the lowest in comparison with Central European countries with respect to the quality of the institutional environment and governance structure (Chapter 6, EBRD, 1999). In the absence of proper institutional mechanisms and sufficient protection of ownership rights the free market creates more opportunities for economic contests and economic manipulation. These are the roots of the problems and the remedies should focus on these underlying problems instead of problematic and ineffective campaigns fighting just the consequences.

The more complex the system is, the more likely are different loopholes, backdoors and contradictions. Once the state becomes unable to enforce every part of the law because of whatever reason, its reputation suffers. As in a devilish spiral to improve its reputation, it has the tendency to use more and more complex regulations, that again it is not able to fully enforce. In this environment of rapid

and unsystemic fixing of problems the quality of the legal framework deteriorates and, in addition, the lobby groups are better able to pursue exceptions (of whatever quality and reason) into the existing legal framework. A rent-seeking behavior becomes encouraged just to meet the 'exception' rule.[11] Proper means of lobbying are replaced by its shadow counterparts, if not corruption.

The best prevention of corruption is not only to make all procedures completely transparent, simple and lucid, but also, more importantly, to establish such an environment that minimizes the incentives to go around the rules even in the absence of punishment. One final positive example of such a successful change. In the early 1990s there were real problems to obtain a passport within several days in case of emergency, and informal ways to speed up the process had to be used. Currently, the people who need a passport to be issued earlier than within the regular 30 days can choose among faster services with different fees. There exists no incentives to go around the rules and even the state is able to collect additional fees.

The overall impression favors the persistent presence of corruption within the society and economy of the Czech Republic. Numerous comparative studies, however, suggest that corruption is a more prominent feature in other transition countries, with the former Soviet Union leading the pack. Nevertheless, the state of corruption in the country, measured by the corruption perception index, presents a serious problem since the index does not improve as the transition process advances. We believe that a substantial change of approach to the institutional framework is necessary in order to prevent and fight corruption successfully.

## Acknowledgements

An earlier draft of this paper served as a background study on corruption and anticorruption issues in the Czech Republic for the volume entitled Anticorruption in Transition: A Contribution to the Policy Debate, published by the World Bank, Washington, DC, 2000, ISBN 0-8213-4802-7. The authors acknowledge support of the World Bank, CERGE-EI, and the William Davidson Institute at the University of Michigan Business School during their research on this paper. The authors thank the Editor Javier Estrada for helpful suggestions. The usual disclaimer applies.

## References

Acemoglu, D., Verdier, T., 2000. The choice between market failures and corruption. Am. Econ. Rev. 90 (1), 194–211.
CESTAT, 1999. CESTAT Statistical Bulletin, Czech, Hungarian, Polish, Slovak, Slovenian, and Romanian Statistical Offices, various issues, Prague.

---

[11] For example, the current amended version of a relatively simple Income Tax Act of 1992 is now so complex and linked with other laws that it now contains more than two hundred times the phrase 'with exception of'.

EBRD, 1999. Transition Report, European Bank for Reconstruction and Development, London.

EC, 1999. Accession Report on the Czech Republic, European Commission, Brussels.

GfK, 1998. Korupční klima v ČR, Retrokorupce (Corruption Climate in the Czech Republic, Retrocorruption), GfK Prague, Internal Report No. 90 276.

GfK, 1999. Korupční klima v ČR 2 (Corruption Climate in the Czech Republic 2). GfK Prague, Internal Report No. 40/151.

Johnson, S., Kaufmann, D., Zoido-Lobatón, P., 1998. Regulatory discretion and the unofficial economy. Am Econ Rev 88 (2), 387–392.

Johnson, S., Kaufmann, D., McMillan, J., Woodruff, C., 2000a. Why do firms hide? Bribes and unofficial activity after communism. J Pub Econ Amsterdam 76 (31), 495–520.

Johnson, S., McMillan, J., Woodruff, C., 2000b. Entrepreneurs and the ordering of institutional reform: Poland, Slovakia, Romania, Russia and Ukraine compared source. Econ Transition 8 (1), 1–36.

Kaufmann, D., Shang-Jin, W., 1999. Does Grease Money Speed Up the Wheels of Commerce? NBER Working Paper No. 70933.

Kočenda, E., 1999. Residual state property in the Czech Republic. East Eur Econ 37 (5), 6–35.

Kočenda, E., Čábelka, Š., 1999. Liberalization in the energy sector: transition and growth. Osteuropa Wirtschaft 44 (1), 104–116.

Lacko, M., 2000. Hidden economy, an unknown quantity? Comparative analysis of hidden economies in transition countries, 1989–1995. Econ Transition 8 (1), 117–149.

Lízal, L., 2000. Koordinace ekonomické politiky ČR v síťových odvětvích s praxí EU 22 (Co-ordination of the Czech economic policy in network industries with practice in the EU). Finance Úvér 9, 488–502.

Lízal, L., Svejnar, J., 2000. Financial conditions and investment during the transition: evidence from Czech firms, CERGE-EI Working Paper No. 153.

Mauro, P., 1995. Corruption and growth. Quart J Econ 110 (3), 681–712.

Mauro, P., 1998. Corruption and the composition of government expenditure. J Pub Econ 69 (2), 263–279.

OECD, 1999. OECD Communication Outlook, OECD, Paris.

Rose-Ackerman, S., 1999. Corruption and Government: Causes, consequences, and Reform. Cambridge University Press, Cambridge, New York and Melbourne.

Stiglitz, J., 1999. Whither Reform. Annual Bank Conference on Development Economics, Washington, DC, p. 1999.

Tanzi, V., Davoodi, H., 1997. Corruption, Public Investment, and Growth, IMF Working Paper WP/97/139.

Turnovec, F. (Ed.), 1999. Czech Republic 1998, Facing Reality. CERGE UK, Prague.

Transparency International (1999) The State of Corruption after 10 Years, http://www.transparency.cz

World Bank, 2000. Anticorruption in Transition: A Contribution to the Policy Debate. The World Bank, Washington DC.

TALES FROM THE FIELD



Copyright © 2001 SAGE Publications (London, Thousand Oaks, CA and New Delhi)
Vol 2(1): 115–138[1466–1381(200103)2:1;115–138;016521]

# Tunneling towards capitalism in the Czech Republic

■   David S. Altshuler
    *University of Chicago*

A B S T R A C T  ■  Over the past decade, Czech society has been
bombarded with reporting on a variety of corruption scandals. The most
prominent example is *tunelování* [tunneling], a uniquely Czech form of
large-scale corruption rooted in privatization and post-socialist economic
reforms. Since it first appeared in print some time in 1996, *tunelování* has
become a staple of the Czech media and public discourses. Its ubiquity
makes it a useful lens through which to explore many significant issues in
post-socialist Czech society: tensions over the meanings of justice, morality,
emergent socioeconomic differences, national identity and international
reputation. This article explores the workings of *tunelování* and suggests
the ways these discourses gain meaning within the specific context of the
Czech transition.

K E Y  W O R D S  ■  financial corruption, morality, media discourses,
socioeconomic differences, post-socialism, Czech Republic, eastern Europe

On New Year's Eve in 1997, at the close of a year plagued by plunging econ-
omic indices, the Czech daily newspaper *Mladá fronta DNES* ran the
following editorial, 'How Might an Excess of Good News Affect the Popu-
lation':

> We have enriched world languages not only with the words *robot* and
> *Semtex*, but now even with the verb 'to tunnel' [*tunelovat*], to describe the

fastest, safest, and most productive way to get rich. The world should be grateful to us for this. Yet we still have many problems before us. Today's world is known as a global village and it is not going to be easy to convince it that our way is the right one. It would be enough for us to try at our borders, to convince our Western neighbors that their borders should also look like ours, lined with our representatives in the order: prostitute, garden gnome, vendor. prostitute, garden gnome, vendor. The world is going to have to decide quickly in what way and how fast to join us.[1]

For a long time, Czechs have collectively endured and imagined social adversity with equal doses of self-criticism and ironic humor, something not even 40 bleak years of socialism or the seemingly endless transition has changed. Since the mid-1990s, *tunelování* [tunneling], a uniquely Czech term to describe the illicit, large-scale liquidation of the capital and holdings of a company, bank or investment fund, has ranked among the most talked about post-socialist afflictions. Yet, unlike other forms of corruption, *tunelování* is technically not illegal according to current Czech laws. This way 'to steal without committing a crime'[2] has overshadowed the many positive free-market and democratic reforms to be instituted over the past decade, and has become something of a metaphor for the transition from socialism.

Czech perceptions of corruption have been the subject of exhaustive documentation, most notably by Transparency International (TI), whose annual results are frequently cited in the Czech press. In one recent survey, 80 percent of respondents cited corruption as the key to wealth, while half of them agreed that the poor are mainly people who are not in a position to take bribes. One quarter of the respondents supported the statement '*kdo chce jet, musí mazat*', which translates loosely as 'if you want to get somewhere, you have to pay up', while another quarter did not consider bribes as 'that bad of a thing'. Based on these and other findings, the Director of TI in the Czech Republic concluded that his country was 'morally devastated . . seriously ill and must be healed'[3]

The taint of corruption on Czech national culture is commonly attributed to state socialism, when the use of connections, influence, bribes and theft was oftentimes necessary to everyday survival. There are certain factors that help to account for the perception of corruption since then. The sheer amount of capital and number of persons involved in the privatization of an almost entirely state-owned economy has overwhelmingly transformed the relationships between people, money and business. For example, the financial sector, once an ordinary part of state administration, has experienced dramatic growth: between 1989 and 1997, the number of persons employed in just the state and private financial sectors grew from 25,000 to 93,000. This was accompanied by a rise in salaries from 98 to

174 percent of the national average.[4] And in the first wave of large privatization, the number of enterprises in the Czech Republic increased by almost 75 percent (Mertlík, 1995: 326). This expansion has created unprecedented possibilities for business, investment, financial services, but also speculation and corruption.

Local communities across the country have endured their share of property restitution scandals, bankruptcies, and fraudulent investment schemes, but most Czechs experience large-scale corruption vicariously through ubiquitous and often colorful media reporting. In their research, TI credits the media with distorting perceptions of the actual extent of corruption by creating the impression that business, bureaucracy and politics are governed by illicit machinations. While textual representation and everyday experience are discrete social phenomena, the circulation of images of corruption and *tunelování* has had a real impact on the Czech transition. Foreign investors, institutions and partners rely on data from TI and other organizations in deciding on government and private grants and loans. Incriminating statistics and reports have deterred investment and slowed down the pace of economic reforms and the integration of the Czech Republic into European and world structures.

The significance of these images was also evident in my own research in the Czech Republic. Between 1995 and 1998, I conducted fieldwork in Olomouc, a Moravian city with 100,000 inhabitants, and in Prague. The aim of this project was to examine the meanings of emergent socioeconomic differences in relation to modern Czech history and the ongoing reforms. Specifically, I sought to understand how the durable cultural ideologies of egalitarianism and morality both structured and were themselves transformed by new distinctions in ownership and wealth after 1989. The methodology consisted of extensive interviews with members of the new propertied class, in particular the new owners of privatized and recently established small shops and businesses, and the study of changing consumption habits and attitudes towards money.

I met people whose money was squandered in investment schemes, but to my knowledge none of the businesses I studied were tunneled or implicated in any large-scale scandal. Rather, my interest in popular images of corruption stems from the influence they exert on the meanings of business and wealth across Czech society. At times, they seemed of greater significance to the transition than more objective economic indices and conditions. Czechs view the re-institution of a private property regime with deep ambivalence. It is considered a natural expression of their membership in European society, yet the emergence of new economic and social disparities has run up against a moral ideology which tends to view private accumulation as inherently corrupt.

Critiques of power and wealth by people on the peripheries of these

changes were often bolstered by accusations of corruption, while entrepreneurs, landlords and even local politicians dismissed them as expressions of envy [*závist*], fueled by sensationalized media coverage of political and economic scandals in the country's newspapers and on several investigative reporting programs on television. But the effects of this marriage of corruption and capital were not dismissed by everyone. To some entrepreneurs I interviewed, it was the source of many of their day-to-day problems: the expectation of bribes among local bureaucrats in exchange for necessary permits and among bank officers for loans; the general lack of seriousness among business partners, who regularly failed to make payments on delivered goods; and even the gossip and rumors about their integrity in the local community. The owner of a ceramic tile shop in Olomouc summarized his predicament in this way: 'It simply doesn't occur to the average person that a small entrepreneur cannot run his business by stealing'[5] Like the factory workers, university professors and pensioners who helped me to understand the details of publicized scandals, or the participants in animated conspiracy theorizing in the local pub, I was a captive consumer of these images. The myriad media and more casual references to corruption, and the broader cultural assumptions embedded in them, enriched my understanding of post-socialism and capitalist culture in the Czech Republic.

In this article, I do not take up the impact of these representations on everyday experience. Rather, I consider the copious public discourse on *tunelování* to be a useful lens through which to explore many salient issues in Czech society: tensions over the meanings of justice, morality, emergent socioeconomic differences, national identity and international reputation. I also wish to suggest how this discourse itself relates to both post-socialism and Czech popular culture. Similar to transitional phenomena in other post-socialist countries (see for example, Konstantinov, 1996), both representations and elements of *tunelování* are strongly metaphorical: the image of the Czech transition as a tunnel from socialism to capitalism, or the centrality of 'as if', such that a tunneled firm appears 'as if' it simply had a run of bad luck. And by tempering self-criticism with ironic self-deprecating humor, writers engage with the nation's popular discursive traditions. Czechs often poke fun at aspects of their national character, both in everyday talk and intellectual venues. For example, smallness [*malost*], in the sense of the Czech Republic as a 'small nation' or in the image of the 'little Czech', can denote provincialism and small-mindedness while also expressing tongue-in-cheek patriotism, illustrated by the saying 'small, but ours' [*malé, ale naše*] (Sayer, 1998: 119). One might also see parallels between this brand of satire and what Macura (1993: 17–20) terms 'mystification': the use of self-critical, ironic humor by intellectuals during the 19th-century national revival in response to the 'false earnestness' of more serious nationalist projects[6] Similarly, and as the images of the Czech border in the

opening quote of this article vividly illustrate, some critics have found in *tunelování* an antidote to more sober critiques of corruption.

I draw upon reporting in the country's major daily papers, which cater to a range of socioeconomic and political positions: *Mladá fronta DNES*, *Lidové noviny*, *Slovo*, *Právo*, and in weekly publications, including the intellectual weekly *Respekt* and news magazine *Týden*. To give a sense of the public debate on *tunelování* and the circulation of this discourse in Czech society, I also refer to letters to the editors printed in these papers and political statements.

## Tunneling towards capitalism

Prior to 1996, when *tunelování* first appeared in print in the context of corruption, the use of *tunel* was limited to the mining industry and the occasional reference to the Channel Tunnel.[7] Since then, *tunelování* has become a staple of reporting on corruption, but there is still much dispute about what it actually means. This was not rectified even with its codification in the dictionary *New Words in Czech* (Martincová et al., 1998: 311). Sandwiched between *třiděný odpad* [waste separated for recycling] and *turista, sexualní* [sex tourist], are the four forms of 'tunnel', each followed by examples of their colloquial usage:

> *tunelář*, n. One who tunnels. The company had a bright and promising future, until it was discovered by tunnelers; the tunneler's hundred million [crown] account; used by experts in the banking and finance sectors, criminal investigators. political addresses, and in the media.

> *tunelářský*, adj. Having to do with tunnelers. A big meeting of tunnelers here.

> *tunelování*, pres. part. A fraudulent financial operation, whose aim is to covertly drain capital from a successful company or bank; this manner of draining property. If three people from the top management conspire to tunnel a bank, nothing can save it; according to the police, it is the reason why banks are created today – in technical jargon, it is referred to as 'tunneling'

> *tunelovat*, v. To tunnel. To tunnel a bank; a citizen asks if the bank was tunneled, if someone intentionally ravaged or damaged it.

Although there are no sources to explain how *tunelování* came to describe this particular type of machination or trick [*finta*], depictions of the economic reforms are replete with tunnel imagery. For example, 'privatization in the dark' [*privatizace pod zhasnutým světlem*] has become a

standard definition of the Czech economic reforms, while one prominent economist described Czech society as 'passing through a "dark tunnel" at the end of which the reformers hoped to find light'.[8] And similar to the traditional meaning of tunneling, economic *tunelování* is also inherently subversive and destructive: tunnelers are said literally to burrow from one company to the next, draining capital on the inside, while leaving the hollowed-out facades intact. The image of *tunely* also has interesting parallels with *cestičky*, the 'little paths' which Czechs follow to accomplish sometimes illicit tasks, in the sense that both are spatial tropes used to describe movement through domains of laws and conventions.

The absence of a clear precedent or definition has itself been the source of controversy. Economist and former Prime Minister Václav Klaus, whose leadership oversaw privatization and related scandals, has more than once defended his government against charges of complicity by arguing that *tunelování* does not exist because no such word appears in any standard dictionary of economic theory.[9] The meaning of *tunelování* was also disputed in court in 1998, when one politician from České Budějovice sued another for accusing him of tunneling. After this accusation was aired on several television stations, the defendant and his lawyer agreed to apologize for using 'a word of which no one knows the exact meaning'. But the lawyer for the plaintiff, noting the inclusion of *tunelování* in the above-cited dictionary, summarized it as a synonym for theft. 'And I never stole or embezzled anything', added his client. As with other cases of tunneling, it was remanded by the judge. 'How and according to what paragraph are tunnelers to be prosecuted?' pondered one investigator working on the case.[10]

It is unsurprising that linguists, politicians, judges, police and journalists have been unable to pin down precisely an operation whose success is contingent upon the maintenance of a high degree of opacity and undetectability. There is, however, general agreement that the possibility for *tunelování* was created by the fast pace of Czech privatization. In 1992 and again in 1994, adult citizens were given the option to buy coupon vouchers for 1000 crowns (about $33), which entitled them to shares in national industries from a public listing.[11] Through the voucher system, the government intended to put stakes in property confiscated by the Communist regime in the hands of all citizens, thus (re)creating a nation of small shareholders and investors. Although many Czechs accrued modest profits on their investments, there were several important limits to the voucher program. Certain Czechs, such as the former political *nomenklatura*, factory managers, and black marketeers, were better positioned to take advantage of new investment opportunities. Exploiting insider knowledge, capital and influence, they rigged auctions of privatizing companies and bribed bureaucrats to falsify documents and bank officers to approve questionable loans. The

majority of Czechs – daunted by volatile market conditions and lacking connections or experience with capital and investments – turned to practically unregulated investment funds to manage their portfolios. Their investments were oftentimes squandered by these funds, sometimes due to poor business judgment but also premeditated design. Experts now agree that the rapid concentration of property rights, which at the time was considered to be crucial to the success of privatization, occurred at the expense of legal protection.[12] These unforeseen shortcomings of 'shock therapy' privatization led to a logical conclusion, best summarized by Mlčoch (1998: 955): 'After all – theft – if we can use this term – is usually the fastest way of transferring property rights'.

The recipe followed by the major tunnelers was deceptively simple. First, self-fashioned investors established funds to entice shareholders with what seemed like good money for their voucher books. Having acquired majority shares in strategic companies, these investors then established new and ostensibly independent offshoot firms. The next step was the liquidation of the capital of the parent company, investment fund or bank through the purchase of worthless shares at exorbitant prices, or sometimes through repeated and tangled rounds of buying and selling shares at a lighting fast pace. Finally, the 'profits' and evidence were transferred to numerous unrelated and often foreign bank accounts. Yet a successful tunnel depends upon the maintenance of a high degree of opacity: a dizzying number of personalities, companies, transfers and sums. Some tunnels were so carefully executed that prosecutors are still, after several years, unable to determine whether or not a tunnel was dug and, if so, how much money was tunneled.[13]

This complexity is illustrated by the tunneling of the Trend Fund, an investment company started by two popular artist-businessmen in the early 1990s.[14] With charisma and promises of profit, they lured over 100,000 citizens to invest their vouchers with Trend. In so doing, Trend acquired shares in several valuable national companies, including Kotva, the nation's largest department store. In the summer of 1995, the Trend Fund was sold to the Hradec Králové Brokerage Company (KHB), owned by Miroslav Hálek, for an undisclosed sum (but it was suspected to be in the hundreds of millions of crowns). Two weeks later, Trend sold a package of its most valuable shares to another company, Conzult Invest, for 487 million crowns, but Conzult only paid about one-quarter of the total selling price (135 million crowns). Conzult immediately sold the shares for the same total price to Firex (also owned by Hálek), but it, too, paid only 135 million crowns. Almost a year after these transactions, a court determined that Conzult Invest did not have enough funds to cover its debts (approximately 350 million crowns) and it was formally liquidated.[15]

Other Trend tunnels were dug much quicker. One morning in 1996,

Trend sold more than 150,000 shares in Kotva at 400 crowns per share at 7:59 a.m. to KHB; 48 minutes later, at 8:47 a.m., KHB sold a majority of the shares back to Trend at 952 crowns. And then two minutes later, at 8:49 a.m., Trend sold the shares to IFM, an ostensibly independent company later determined to be owned by the same Hálek (See Figure 1). Hálek tunneled 77 million crowns in 50 minutes, at the expense of Trend shareholders. Later that year, he sold a package of Kotva shares at a loss to a company in Cyprus (to avoid paying taxes). These funds were ultimately traced to a bank in Liechtenstein and the account of a Cypriot company owned by two Frenchmen representing another French citizen, allegedly of Czech descent.[16]

Prosecutors have argued that police did not provide sufficient evidence that the transactions had been planned in advance by Hálek and associates: 'At the time, no one had reason to suspect anything', conceded one state representative.[17] In 1999, over two years after the Ministry of Finance blocked trading with Trend shares, state prosecutors charged Hálek and associates with the theft of over 1 billion crowns (about $33 million). Hálek was facing 10 to 15 years in prison, but in 1999 his case was thrown out of court after the judge found evidence of carelessness in the police investigation.[18]

*Jako*

These kinds of illicit machinations are not unique to Czech capitalism, but the novelty of *tunelování* lay in its ambiguous legal status. *Tunelování*



LOSS = 77 million crowns

Source: Respekt, 10-16 March 1997

**Figure 1**   Minute-by-minute transfer of Kotva shares

Case 1:05-cv-10679-WGY     Document 98-17     Filed 04/07/2006     Page 1 of 16

cannot simply be equated with theft or embezzlement because the majority of tunnelers operate within the framework of existing legislation. They rely on practically untraceable transfers of capital and the thorny issue of demonstrating intent. Investigators have been left with the daunting task of tracing hundreds of connections between ostensibly independent companies and investors, and then gathering evidence to prove that the bankrupt shells of companies were not simply the product of poor business judgment. Other illicit investment schemes, pyramids and real estate scams operating in the Czech Republic have also profited from the legislative loophole requiring proof of intent for criminal prosecution.[19]

The logic of intent hinges on the notion *jako* [as if]: it was 'as if' a company went bankrupt due to poor business judgment, but it was intentionally tunneled. Banks knowingly furnished dubious investors with hundreds of millions of crowns in loans 'as if' they had submitted solid investment proposals; only later did investigators locate evidence of collaboration between majority shareholders and bank managements. Sources suggest that a high number of the loans issued by the country's banks were bad, while banks and borrowers carried on 'as if' the loans were good.[20] It was 'as if' these companies had been privatized, but in fact they were controlled by state-run financial institutions, which also owned the largest banks and privatization and investment funds. Appearances are crucial to the success of a tunnel: the empty shells of companies must continue to appear 'as if' they are solvent until the tunnel has been completed, so as not to arouse suspicion among shareholders or the authorities. The existence of multiple and competing realities, to which *tunelování* is indebted, is not limited to the post-socialist financial sector. For example, when my landlady sold the lease on her state-owned apartment on the black market, she described the transaction as *jako výměna* [an 'as if' exchange]. And the critic Milan Šimečka ties the meanings of *jako* to 'actually existing' socialism: 'In this country, we "as if" built communism, "as if" guided society scientifically, "as if" raised the standard of living, "as if" elected representatives with 99 percent of the vote, and "as if" did not see that everyone was working only for himself' (Šimečka, 1990: 105).[21] One conversation on the significance of surfaces and appearances to *tunelování* inspired a friend to recite the chorus of Josef Kajetán Tyl's comedy *Strakonický dudák*, written over 150 years ago: 'Many things glitter on the outside, on the inside is only smoke'.[22]

The perpetuation of this state of 'as if-ness' has been facilitated by the day-to-day workings of the Czech judicial system and the criminal code. Courts were ill prepared for the proliferation of cases stemming from privatization, property restitution and the rise in other forms of crime. Even if the authorities succeed in tracking down all of the transfers to build a case against tunnelers, prosecutors could expect a court hearing in a year, a

decision in three to four years and, with appeals, five to six years. By this time, the small shareholder has given up on ever seeing his money again.

Police have called for the reform of the criminal code, in particular paragraph 250, which requires proof of intent for criminal charges. One Prague investigator noted the absence of such a paragraph in neighboring Germany: 'There, one policy applies: You don't pay? You don't honor a contract? You've got problems, you should have paid, you should have kept your promise. It is an unambiguous crime . . . to prove what someone is thinking is a magical thing. They [lawmakers] are really asking too much from us'.[23] Legislators and politicians similarly point to the complexity of discerning precisely what types of transactions constitute *tunelování*. In a 1996 television interview, former Interior Minister Jan Ruml defended the government's policies in this way: 'Today it is very modern to speak of tunnels, and how someone tunneled a bank, how you call robbing a bank . . . but I cannot immediately call every dealing which includes unusual transactions as an attempt at tunneling a bank. Many times it was actually intended to save a bank but it didn't work out. But believe me, as soon as there is sufficient evidence that someone tunneled a bank, he will be held criminally responsible'.[24]

### 'Stealing is not normal!'

Foreign investors have also been swindled by tunnelers. Like many Czech small shareholders, they attribute *tunelování* to legislative loopholes but also to what they perceive as a general lack of respect for capitalism and private property. Societies have different ways of interpreting practices that on the surface appear to be the same, but what if they contradict the fundamental tenets of capitalist rationality? New York investor Howard I. Golden sent this letter to the editor of *Respekt*: 'I feel very strongly that the term *tunelování* to describe theft is an insult to its victims. The money of shareholders in the CS Funds was simply stolen and to use a euphemism like "*tunelování*" reduces the social stigma ascribed to this kind of crime'.[25] Harvey Schuster, another American investor, defended the decision to close his Prague-based investment management company after seven years, arguing that 'the basic understanding of capitalism is missing here. Some people think that capitalism is when you take something from my pocket when I'm not looking. Capitalism of course means that everyone gets rich. *Tunelování* is a bad word. What's going on in the Czech Republic is crime'.[26]

Moralizing from the West has not been limited to instances of *tunelování*. Around the same time that the first cases were being covered in the media, Microsoft ran an advertisement in several national publications which read: 'STEALING is NOT normal . . . not even software! And what about YOU?

Do you have CLEAN hands?'[27] (See Figure 2). And on the train home from Prague one day, I was bewildered to find printed on the back of my ticket: 'CZECHS DON'T STEAL HERE!' (See Figure 3). This message, a reference to notices posted in Austrian shops near the Czech border, was sponsored by the Helsinki Human Rights Organization, as part of their 'Don't Judge Groups, Judge People' campaign to combat racism in the Czech Republic.[28]

The undertone of these messages is that Czechs do not take any form of theft seriously, whether it's multi-million dollar embezzlement, copying Windows at the office or pocketing a chocolate bar in a local shop. However, contrary to the opinions of many western capitalists and critics, one could cite several examples from the Czech media that lament the backwardness of laws and the un-European legacy of socialist corruption, or express embarrassment as foreigners are victimized by tunnelers. *Tunelování* has been called a 'dark period' in the building of Czech capitalism, and both readers and journalists include it among the nation's other social ills stemming from the transition, such as unemployment, inflation, crime, homelessness, dropping buying power and the general sense of uncertainty experienced by many Czechs.[29] Politicians speak of the 'ravished nation of tunnelers and criminals' and squabble incessantly over whether or not 'a government which tolerates tunnelers is itself logically a government of tunnelers'.[30] And for many Czechs, the flood of privatization scandals has



**Figure 2**    Stealing is not normal ... not even software!



**Figure 3**   Czechs don't steal here

undermined the validity of these reforms and their trust in domestic banks and companies. 'Do you perhaps know of a firm which was privatized and not robbed?' asked one client at the Czech Savings Bank. One elderly woman conceded to a reporter: 'I believed in privatization, but now it seems like a disaster', while a fellow pensioner offered this synopsis of post-socialist economic reforms: 'To privatize means to tunnel'.[31] The deep sense of national embarrassment is expressed in this letter to the editor of *Slovo*: 'How does Europe, to which we want to return, see us? Karel Čapek enriched world languages with *robot*, and we with *tunelovat*. The per capita number of prisoners in the Czech Republic is second only to the US. Tourism in Prague is still high, but unfortunately this is also due to sex and drug tourists'.[32]

### 'Word of the year'

*Tunelování* may not readily present itself as a logical choice for public attention. Unlike pyramid schemes in Romania, in which an estimated 35 to 50 percent of all households participated (Verdery, 1995: 631), the majority of Czechs have never met a tunneler or lost money to *tunelování*. Rather, its appeal may be found within the broader context of the Czech transition from socialism. As we have seen, *tunelování* is corrupt but technically not illegal, which supports popular assumptions about 'weak' laws and the

in-effectiveness of police, courts and politicians in combating crime, while also feeding the Czech appetite for scandals and conspiracies. The roots of *tunelování* in rapid privatization are further evidence of the shortfalls of the economic reform programs. The dazzling sums of money which have been tunneled over the past several years are unprecedented in Czech society, such that these scandals represent something of a home-made drama which Czechs had previously witnessed only on shows like *Dallas*. Perhaps most importantly, Czechs are acutely aware of how images of corruption affect their reputation in the international community. As Macura (1993: 44) observes, during cataclysmic periods throughout history Czechs have experienced the feeling of 'standing on a stage, while the world (mankind, Europe) is watching'. Over the past several years, Czech self-perceptions of *kulturnost* [civility] have been undermined by reports of foreign capital disappearing into their tunnels, and international studies documenting their putative indifference towards corruption.

The breadth of references to *tunelování* in the press create the impression that Prague might soon sink into the *Vltava*. In a contest held by the daily paper *Lidové noviny* in 1997, *tunelování* was voted 'Word of the Year' (in 1998, it was 'lie').[33] This article noted that *tunelování* has come to describe practically any form of corruption, and pointed to the possibility of tunneling not only banks, investment funds and industries, but housing and agricultural collectives, bakeries, and even newsstands. Dům Mody, a department store in the center of Prague, and Barrandov, the national film studios, were each singled out as suspected targets of tunnelers, and in 1997 the director of Budvar, the original brewer of Budweiser beer, conceded to reporters: 'we could have easily tunneled Budvar, but we didn't'.[34]

*Tunelování* has also become a staple of local politics and political discourse. In 1997, the mayor of a village near Ostrava sued the former mayor and a local businessman for 'tunneling the village'; the two men were charged with falsifying the approval of a loan for over 100 million crowns, while the annual budget of the village was only 6 million crowns. In the following year, the Deputy Chairman of Prague 7 charged district representatives with tunneling public property, and the Freedom Union was suspected of tunneling another party, the Civic Democratic Alliance.[35] In a television interview, Miloš Zeman, the Chairman of the Social Democrats and one of the most vocal proponents of the word, charged the ruling party with attempting to tunnel his party's headquarters and summarized their relationship to *tunelování* in this way: 'Margaret Thatcher succeeded in building an actual tunnel. The tunnel under the English Channel. In contrast, the Czech Thatcherites are building a tunnel of a wholly different type'.[36] One writer argued that the obsession with *tunelování* among politicians itself represents nothing less than the 'tunneling of ideas', which 'is possible anywhere that in place of solving serious problems, people play games with words . . . a

number of politicians operate this game and in the pre-election period many of them have become champions at it'.[37] And one reader concluded ruefully: 'Today it's possible to tunnel everything, even truth'.[38]

While most authors portray corruption in a serious vein, humor and irony are also used in writing about *tunelování*. 'Wild Duck', a regular satire column appearing on the back page of the conservative, intellectual paper *Lidové noviny*, released the results of its own 'study'.[39] Reporters committed different crimes across the country, in an effort to determine which ones pay off and where. They found that crime is most lucrative in North and West Bohemia, and less so in South Bohemia, Bechyň, and Martinkovice. As for *tunelování*, they concluded: 'It is about equally advantageous across the entire country, similar to how it doesn't pay to be an honest sucker'.[40] Another Wild Duck column, entitled 'Zeman wants to tunnel NATO', speculates about the possibility of the Chairman of the Social Democrats using the international defense organization to strengthen his own party. General Secretary Javier Solan is 'quoted' saying: 'I do not rule out that Zeman might try to tunnel NATO. Czechs are capable of anything'.[41] The column was also first to publicize the creation of a 'new' political party, *Tunel*, founded by a well-known Czech tunneler, 'to speak to voters who are dissatisfied with the current economic situation'. Members of the party included individuals who have 'demonstrated something': the director of a tunneled bank, the former director of the coupon privatization program, and the illustrious Czech-Irish businessman Viktor Kožený.[42] Other authors have pointed to the humor of the word itself. One coal-miner reported this opportunity the obsession with *tunelování* presented him: 'It was enough for me to tell the doctor that I'm a "tunneler" and he laughed, asking if I didn't want him to prescribe a convalescence stay in the Bahamas', a popular tax haven for economic tunnelers.[43] And citing the success of *tunelování* and other Czech contributions to world languages, one reader of *Lidové noviny* found in the ongoing transition from socialism, inspiration for yet another potential neologism: *zákonokaz* [someone who defiles laws], based upon *penězokaz* [someone who devalues currency, that is, a counterfeiter].[44]

### Tunnelers as Czechs

Like other nations across the region, Czechs under socialism commonly used pronominal dichotomies – *my a oni* [we and they] – to express a range of morally based solidarities and differences: 'they', the factory directors, party functionaries and politicians, versus 'us', the honest, hard working, 'ordinary' people. Czechs still remain divided about relations to power, but membership in these categories has expanded to reflect new social and economic distinctions.

In both vernacular and more analytic contexts, Czechs draw upon these subject positions in their analyses of wealth, business and corruption. One reader put it this way: 'The *nouveaux riche*, who raked it in under the Bolsheviks and today continue to accumulate more property, follow the slogan "rake in even more"!' Similar sentiments have been echoed in the press: 'Czechs do not like their rich. They think that they got all of their money illegally, by abusing imperfect laws, from tunneling. For three-quarters of the nation, "wealthy person" and "criminal" are synonyms'.[45] Tunnelers in particular are not 'ordinary' Czechs, but 'them', big businessmen, commonly criticized for their arrogance, immorality and illicit wealth. Nor are they 'normal'. *Normální* has both socioeconomic and moral connotations, and is used to describe people without connections to politics and wealth. This sentiment is concisely put in this letter to the editor of *Metro*, a free paper distributed inside Prague metro stations: 'A normal Praguer is someone who has neither restituted [property through privatization] nor tunneled anything'.[46]

'We' and 'they' also function like shifters in linguistic analysis. While the values associated with each category appear to be stable and unchanging, their meanings and content are contingent upon the broader context of interaction.[47] The capacity for reversing the values of 'we' and 'they' is illustrated in this bifurcation of Czech society: 'One tunnels and the other complains . . . it's like in the 1970s and 1980s, when one group was making preserves and pickling vegetables while the other emigrated'.[48] In contrast to the positive evaluation of 'we', here it expresses the durable self-stereotype of Czechs as a nation of politically passive and apathetic critics who escaped inward, to their private lives and jars of conserves. Similarly, another author refers to this category of 'we' as *Čechačkové*, a pejorative diminutive of 'Czechs' which denotes small-mindedness and provincialism. The values of 'they' have also shifted. Tunnelers are not simply criminals but rather 'informed, worldly, courageous, and risk-taking', active in 'the big world of finance'.[49] They possess the coveted and even mythological qualities thought to be lacking among their more 'normal' compatriots: the ability to take care of themselves, create opportunities and make things happen.

### 'Czechs taught the world to tunnel'

Perhaps the most interesting media representations of tunnelers and their 'know-how' are those which suggest the possibility of reconciling this entrenched we/they dichotomy. In contrast to the above-cited distinction between 'normal' Czechs and tunnelers, one writer suggests that the only difference between 'us' and 'them' is the amount one steals: 'He who can't steal in large amounts can at least steal in small ones . . . in a country where

theft works as smoothly as an assembly line, it is only logical that people are drawn to it. Otherwise they are left feeling incomplete, like something isn't right. It's a national past time and a rather convenient one, so why not join in?'[50] And already in 1996, the logic of *tunelování*, unfathomable to foreign observers, was depicted by one author as second nature for Czechs: 'Just about every [Czech] child today knows how easy it is to tunnel a bank'.[51]

Yet when re-articulated within the context of an international East/West hierarchy, collective guilt is transformed into an ironic, tongue-in-cheek patriotism. Czechs take pride in their traditions of cosmopolitanism, democracy and openness to other cultures. However, the totalizing manner in which western late capitalist culture is asserting itself – its markets, ideologies and morals – shares obvious similarities to its Soviet predecessor: 'Today, instructors and emissaries have come here to teach us about human rights, to explain what Europe is, to reveal the secret of how to march from one economic success to the next. How many of them, during their stay in our "small Czech courtyard", realized it was precisely here that a phenomenon of world importance – *tunelování* – would express itself with such rare vividness [*plastičnost*]'.[52]

Similar to interpretations of petty corruption under socialism, which could be morally validated within the larger context of adversity, the media have found in *tunelování* the latest manifestation of the age-old Czech virtues of craftiness and cleverness. By substituting the morally charged we/they dichotomy with a nation-based East/West one, *tunelování* is imagined as a homespun reaction to the bombardment of Czech society by dollars, marks and the ideological and material trappings of capitalism. We have seen that not only inexperienced Czech small-shareholders have been duped by this craftiness, but even savvy American businessmen, inspiring the ironic assessment of tunnelers as 'our creative thinkers or geniuses' [*naši tvůrci, géniové*]. Here, the presumed reproduction of oppression since 1989 allows for the moral and ironic re-evaluation of social banditry as 'self-defense' against western capitalist culture.[53]

*Tunelování* has thrust this small country into the international spotlight, or so some authors would have us think. 'Czechs taught the world to tunnel', proclaimed one author, noting that 'two times in this century the Czech language has shown its genial ability to illuminate the situation in the world as a whole: *robot, tunelování*'.[54] Writers suggest, however optimistically, that 'in world languages *tunelování* has become a synonym for illegal economic operations in Central and Eastern Europe'.[55] Tunnelers have emerged from the depths of 'the stagnant Czech pond' and 'enhanced the dynamism and turbulence of international financial markets. . . . *Tunelování* is universal and global, reaching into all areas, from economics to politics and culture, from sports to intimate personal relations. It expands with an

insatiable voracity and craving, as impudence and tastelessness [*jako nestoudnost a nevkus*].[56] In this way, tunnelers have not been passively subsumed or swept wayside by the tides of western capitalism, but rather deconstruct its laws and rationality.

It is interesting that commodification, the fundamental metaphor of late capitalism, is presented as the means by which tunnelers and Czech society can overtake their western adversaries. As we have seen, writers have drawn parallels between *tunelování* and other prized, nefarious and more banal Czech exports: Čapek's *robot*, the explosive *Semtex*, and even the prostitutes and kitschy garden gnomes for sale along the Czech–German border. In *tunelování* these observers have further evidence of the popular proverb *Co je české, to je hezké* [Whatever is Czech is nice]: '*Tunelování* is the perfect crime . . . it is without question that if there was an interest in this commodity on the world market, it would be as successful as Czech beer. Its fame is slowly overtaking that of Czech apples, which aren't as big and shiny as others', a reference to unpopular quotas on the export of Czech apples to the EU.[57] And the potential exportability of this 'know-how' was not overlooked by the Czech press when several employees of the Japanese Casio company dug a 'classic Czech tunnel', transferring approximately $30 million to several accounts in American banks using falsified financial orders.[58]

## Conclusions

Actual corruption is a difficult phenomenon to research using conventional ethnographic methods. I did not learn details of large-scale scandals from first-hand accounts, and instead was forced to rely, like many Czechs, on reporting in the country's press. Although the analysis of media representations may be considered a non-standard ethnographic exercise, it enables the anthropologist to tease out important assumptions and values that may be either implicit or uninteresting to informants in the field, or simply might not arise in normal conversation. A number of provocative concepts discussed above – 'as if' and its relationship to intent and appearances, or the tunneling of ideas and truth – are certainly relevant to the broader experience of post-socialism. The study of corruption and its impact on everyday life would have to go beyond words and metaphors; nevertheless, I have tried here to suggest how *tunelování* may be understood as more than 'just a word'.

Like many terms which we rely upon to talk about East-Central Europe, such as reform, transition and ('real' or 'actually existing') socialism and capitalism, *tunelování* seems to mean nothing and everything at the same time. Tens of millions of dollars are thought to have been tunneled since the

mid-1990s, but *tunelování* has remained an empty word, often cited but understood by few. Yet representations of *tunelování* also crystallize, often in a vivid and intriguing way, many salient topics in contemporary Czech society. The transformation from an overwhelmingly state-owned, command economy to a thriving private, free-market one has brought about a change in the relationships between people, money and social justice. However, the concomitant rise in corruption has undermined the legitimacy of the transition from socialism. The success of tunnelers, and even of less suspect businessmen, is widely assumed to flow from positions and connections established during the prior regime. The ineffectiveness of police, legislators and courts in combating corruption is at best perceived as the product of incompetence, and at worst as further evidence that socialist privilege has been less transformed than reproduced: politicians and authorities do not prevent *tunelování* because they are all on some level implicated in or profiting from it. As Czechs might put it, they all 'have butter on their heads' [*mít máslo na hlavě*]. While *tunelování* is a transition phenomenon, its uses in public discourse reflect more durable critiques of wealth and power in Czech society.

Furthermore, images and surfaces – how things look on the outside – are crucial to how both Czechs and foreigners interpret the transition. Czechs are acutely aware of how the international attention to corruption and *tunelování* has tainted their national reputation, much like socialism did. They confront these stigmas at home, in the relatively low level of foreign investment and didactic remarks by foreign visitors, as well as on travels abroad. Stereotypes about the putative tolerance towards corruption have eclipsed the many successes of post-socialist reforms.

Finally, it is important not to overlook the mode of interpretation and discourse present in these reports. Tunnelers are not portrayed as actors in a stable social reality; rather, their actions and motives are thought to inhabit an elusive and ambivalent realm of 'as if', in which things are not always as they seem. Only in this way can *tunelování* be simultaneously understood as corrupt and legal. This co-existence of multiple realities shares interesting parallels with what Konstantinov (1996: 764) calls the 'transpositional, metaphorizing movement' of the post-socialist transition and transitional phenomena in his discussion of trader-tourism in Bulgaria. Yet the use of self-deprecating irony and humor in the conceptualization of corruption may be less familiar or intelligible to foreign audiences. While not all Czechs may appreciate these attempts at 'mystifying' the significance and potentiality of *tunelování* on the global market place, even the swindled small investor might find in them a familiar and Czech way of seeing things.

## Acknowledgements

Earlier versions of this article were presented at meetings of the American Association for the Advancement of Slavic Studies in 1999. and at the Anthropology of Europe Workshop and the conference 'Socializing Knowledge', both at the University of Chicago in 2000. I thank the participants, in particular Michael Burawoy and Stephen Sampson, for their interest and comments. John Comaroff, Dominic Boyer and the editors of *Ethnography* also provided helpful suggestions, many of which regretfully could not be taken up in this short essay. Dissertation research in the Czech Republic (1995–8) and writing, on which this essay is based, received generous financial support from IREX, the Wenner-Gren Foundation, the Soros Foundation and ACLS.

## Notes

1  'Jak asi může na obyvatelstvo působit přemíra dobrých zpráv' [How Might an Excess of Good News Affect the Population]. *Mladá Fronta DNES*, 31 December 1997. The author assumes responsibility for this and other translations from the Czech press.

2  'K milionům vede také cesta tunelem' [Tunnels also Lead to Millions], *Lidové noviny*, 31 July 1998.

3  These and other statistics and citations from Transparency International can be found at their Czech website: http://www.transparency.cz; and 'Zločiny těch nahoře' [Crimes of Those on Top], *Respekt*, 21 February 2000. According to their 1998 index of perceptions of corruption (CPI), the Czech Republic ranked 37th out of 85 countries. falling between Hungary (33) and Poland (40). Czech researchers have also produced rather incriminating statistics. One public opinion poll conducted in 1997 found that three-quarters of respondents think that the majority of public employees engage in corruption, while approximately one-third believe that all public employees accept bribes. See: 'Češi věří, že úplatky jsou běžné' [Czechs Believe that Bribes Are Common], *Lidové noviny*, 17 October 1997. The Czech press also cite Economist and World Bank annual statistics on the gray economy in select countries.

4  These figures from the Czech Statistical Yearbook are cited in Večerník (1999: 404).

5  Another take on this sentiment appeared in one paper: 'Enough small and middle businessmen already understand that nothing remains but to start doing business; they don't think about tunneling, because there is nothing left to tunnel'. See: 'Co dnes vlastně nabízí občanům politická scéna' [What Politics Really Offer Citizens Today], *Slovo*, 13 July 1999.

6  Current examples of this tradition include the fictional historical figure Jára

Cimrman, whose comic exploits are narrated by Zdeněk Svěrák and Ladislav Smoljak. In one synopsis of the inspiration behind their Cimrman theater in Prague, the authors posed the question: 'Why so much thinking, when it's important to laugh'.

7   The magazine *Týden* was apparently the first to refer to *tunelování*. See 'Slovo tunelování u nás za poslední dva roky zlidovělo' [The Word *Tunelování* Has Found Its Way into Common Usage over the Past Two Years], *Lidové noviny*, 28 December 1998.

8   Tomáš Ježek, the father of the Czech economic reforms, uses this phrase in his interview with Husák (1997: 91). Lubomír Mlčoch (1998: 952) is the author of the second statement.

9   'Má snad někdo podezření?' [Has Anyone Become Suspicious?], *Právo*, 7 October 1998; 'Dojde k vytunelování myšlení?' [Will It Come to the Tunneling of Thoughts?], *Slovo*, 11 June 1998.

10  'U soudu se pokoušeli o definici výrazu "tunelování"' [Courts Attempt to Define *Tunelování*]. *Lidové noviny*. 12 June 1998; 'Češi naučili svět tunelovat' [Czechs Taught the World to Tunnel], *Lidové noviny*, 29 September 1999.

11  Approximately 6 million Czech citizens participated in each wave of privatization (Večerník, 1996: 147–9). For interesting discussions of the 'fast' and 'wild' nature of Czech privatization, see Husák (1997), Mertlík (1995), and Mlčoch (1998).

12  For example, investment companies functioned in practically unregulated conditions, and the state has retained strategic control in two-thirds of 'privatized' industries (worth about $60 billion), perpetuating soft-budget strategies and ineffective management policies. The state has also remained the core investor in the major financial institutions which back the largest investment funds. Mlčoch (1998: 957) argues that many privatized companies are private in name only, and cites this ironic assessment of Czech privatization: 'a transformation from public ownership to public ownership'.

13  In the CS and Trend Funds, the first and largest cases of *tunelování*, economists now estimate losses at $40.6 million (1.3 billion crowns) and $34.4 million (1.1 billion crowns). respectively. See: 'Zkuste to znovou' [Try It Again]. *Respekt*, 3 January 2000.

14  'První velké ryby za mřížemi' [The First Big Fish Behind Bars], *Respekt*, 10 March 1997. For background information, see also 'Tajemství ackiových tunelů' [The Secret of 'Stock-Tunnels'], *Týden* 48 (1996). The partners later started the Trend Investment Company to manage the Trend Fund. The formation of a management company is significant because it grants a single individual the authority to dispose of shares without the consent of minority shareholders.

15  'První velké ryby za mřížemi' [The First Big Fish Behind Bars], *Respekt*, 10 March 1997.

16  'První velké ryby za mřížemi' [The First Big Fish Behind Bars], *Respekt*, 10

March 1997; 'Kotva u kyperských břehů' [Kotva on the Shores of Cyprus], *Respekt*, 2 June 1997.

17  'První velké ryby jdou před soud' [The First Big Fish Go to Court]. *Respekt*, 12 October 1998.

18  'Zkuste to znovu' [Try It Again], *Respekt*, 3 January 2000.

19  Across the country, investors seduced Czechs to invest their coupon books with the promise of big returns, but soon after filed for bankruptcy. Even though prosecutors are convinced that the money is hidden somewhere. lawyers for the investors have argued that their clients were also unwitting victims of some larger scheme. Real estate scams functioned similarly. Self-fashioned real estate investors accumulated down payments on houses they never built and on land they did not own.

20  In 1991–2, an estimated 30 percent of loans were non-performing (Benáček, 1994: 27). The number was expected to drop, but it has increased significantly. illustrated by the wave of bankruptcies in 1997.

21  In a personal communication. Stephen Sampson pointed out the similarities between these meanings of *jako* and the Romanian phrase 'form without foundation'.

22  *Povrchu se mnoho leskne, vnitřku je to dým* (Vavrousek, 1938: 161).

23  'Podvodníci unikají policii také kvůli špatnému zákonu' [Criminals Evade the Police Also Because of Bad Laws], *Mladá fronta DNES*, 29 April 1997.

24  'Debata' [Debate], *Česká Televize 1*, 22 September 1996.

25  Howard I. Golden was president of two firms operating in the Czech Republic: The Manhattan Funds, and Central European Privatization. *Respekt* 26 (1997). Other comments of his on the Czech capital market appeared in 'Tajemství ackiových tunelů' [The Secret of 'Stock-Tunnels'], *Týden* 48 (1996).

26  'Americký finančník Harvey M. Schuster řekl Právu: V České republice chybí politická vůle k ekonomickým změnám' [American Financier Harvey M. Schuster told *Právo*: There is a Lack of Will to Make Economic Reforms in the Czech Republic], *Právo*, 3 November 1998.

27  '*Normální je NEKRÁST . . . ani software! A co VY . . . máte ČISTÉ ruce?*'

28  '*Češi* [sic] *nekrást tady!*' This slogan was accompanied by the caption: 'If you've already seen a similar sign somewhere else abroad, you know exactly what it feels like to be a victim of racism. Maybe you should keep this feeling in mind next time you judge someone before you get to know him personally'. Holy (1996: 87) also discusses these types of notices.

29  For example, 'Ohlasy a dopisy' [Responses and Letters]. *Lidové noviny*, 19 November 1998.

30  This is Prime Minister Miloš Zeman's now famous proclamation: 'Vláda, která toleruje tuneláře, se sama logicky stává vládou tunelářů'. See 'Češi naučili svět tunelovat' [Czechs Taught the World to Tunnel], *Lidové noviny*, 29 September 1999.

31  'Většina občanů se hrozí privatizace bank a jejich následného vytunelování'
    [The Majority of People Fear the Privatization of Banks and Their Subse-
    quent Tunneling], *Slovo*, 14 January 1998

32  'Jak nás asi vnímá Evropa, do které se chceme zařadit?' [How Does Europe,
    Which We Want to Join, Perceive Us?], *Slovo*, 6 February 1998.

33  'Tunelování se stalo klíčovým slovem roku 1997' [Tunelování Was the Key
    Word of 1997], *Lidové noviny*, 7 February 1998; 'Podle účastníků ankety
    LN je pro rok 1998 nejvýstižnější slovo lež' [According to Participants in a
    Survey by *Lidové noviny*, 1998 Was Best Characterized by the Word 'Lie'],
    *Lidové noviny*, 29 December 1998.

34  'Drobní akcionáři se obávají, že Dům módy byl tunelován' [Small Investors
    Fear that *Dům Módy* was Tunneled], *Právo*, 7 May 1998; 'Dva testy
    spravedlnosti' [Two Tests of Justice], *Metro*, 11 May 1998; 'Vytunelovaný
    Barrandov' [Tunneled Barrandov], *Lidové noviny*, 10 May 1997; 'Budvar:
    Stoletý boj obra se trpaslíkem' [Budvar: One-Hundred Year Battle of the
    Giant and the Dwarf], *Mladá fronta DNES*, 9 June 1997

35  'Vytunelovat lze dnes patrně i obyčejnou vesnici' [Today it is Apparently
    Possible to Tunnel Even an Ordinary Village], *Lidové noviny*, 2 December
    1997; 'K bankám přibyla první vytunelovaná vesnice' [The First Village Has
    Joined the Ranks of Tunneled Banks], *Mladá fronta DNES*, 17 October
    1997; 'Odvolaný mistostarosta viní radnici Prahy 7 z tunelování' [Fired
    Deputy Chairman Accuses the Town Hall of Prague 7 of Tunneling], *Právo*,
    29 October 1998; 'Kdo tuneluje ODA?' [Who Is Tunneling ODA?], *Právo*,
    5 March 1998.

36  'Zprávy/Televizní deník' [Television News], *Prima TV*, 25 April 1997

37  'Dojde k vytunelování myšlení?' [Will It Come to the Tunneling of
    Thoughts?], *Slovo*, 11 June 1998

38  'Ohlasy a dopisy' [Responses and Letters], *Lidové noviny*, 31 March 1998.

39  Although I found that a wide range of readers were familiar with and could
    appreciate the type of irony and humor used in writing about *tunelování*.
    *Lidové noviny* and the type of satire portrayed in 'Wild Duck' have a
    stronger following among intellectuals and urbanites.

40  'České soudy totálně zešílely' [Czech Courts have gone Totally Mad],
    *Lidové noviny*, 15 February 1999

41  'Zeman chce vytunelovat NATO' [Zeman Wants to Tunnel NATO], *Lidové
    noviny*, 12 March 1998.

42  'Stehlík zakládá stranu Tunel' [Stehlík Founds the 'Tunel' Party], *Lidové
    noviny*, 11 April 1998. The names and personalities linked to corruption
    scandals are generally familiar to Czechs. *Lidové noviny* also published a
    list of the most important people associated specifically with *tunelování*:
    'Osoby, o kterých se mluvilo v souvislosti s tunelováním' [Individuals Who
    are Talked about in Connection with *Tunelování*], 7 February 1998.

43  'Tuneláře posílali lékaři na Bahamy' [Doctors Sent Tunnelers to the Bahamas], *Lidové noviny*, 24 August 1998.

44  'Uspěje i zákonokaz?' [Will "Zákonokaz" also Be Successful?], *Lidové noviny*, 4 March 1998.

45  'Z dopisů redakci' [Letters to the Editor], *Mladá fronta DNES*, 9 January 1995; 'Proč nesnášíme bohaté?' [Why Are We Intolerant of the Wealthy?], *Mladá fronta DNES*, 8 November 1999.

46  'Zápis do Guinessovy knihy nám unikl' [We Didn't Make It to the Guinness Book of World Records], *Metro*, 6 March 1998.

47  For a discussion of cultural dichotomies and shifters in socialist and post-socialist societies, see Gal and Kligman (2000).

48  'Země kompotářů' [A Country of Preserve-Makers], *Lidové noviny*, 17 December 1998.

49  'Čecháčkové a světáci' [Little Czechs and Worldly Czechs], *Právo*, 28 January 1999.

50  'Oni a my' [They and We]. *Lidové noviny*, 30 January 1999.

51  'Neviditelná ruka státu' [The Invisible Hand of the State]. *Slovo*, 21 October 1996.

52  'Čecháčkové a světáci' [Little Czechs and Worldly Czechs], *Právo*, 28 January 1999.

53  In my research, some Czechs similarly depicted petty theft under socialism as 'self-defense against a regime that nobody wanted'.

54  'Čecháčkové a světáci' [Little Czechs and Worldly Czechs], *Právo*, 28 January 1999.

55  'Slovo tunelování u nás za poslední dva roky zlidovělo' [The Word *Tunelování* Has Found Its Way into Common Usage over the Past Two Years]. *Lidové noviny*, 28 December 1998.

56  'Čecháčkové a světáci' [Little Czechs and Worldly Czechs], *Právo*, 28 January 1999.

57  'Mínění odjinud' [Opinions from Elsewhere], *Lidové noviny*, 17 March 1998.

58  'Tunel po česku postihl i Casio' [Czech Tunneling Has also Struck Casio], *Slovo*, 23 June 1998.

## References

Benáček, Vladimír (1994) 'Small Businesses and Private Entrepreneurship during Transition', *CERGE Working Papers* 53: 1–36.

Gal, Susan and Gail Kligman (2000) *The Politics of Gender after Socialism: A Comparative-Historical Essay.* Princeton, NJ: Princeton University Press.

Holy, Ladislav (1996) *The Little Czech and the Great Czech Nation: National*

*Identity and the Post-Communist Transformation*. Cambridge: Cambridge University Press.

Husák, Petr (1997) *Budování kapitalismu v Čechách: Rozhovory s Tomášem Ježkem*. Prague: Volvox Globator.

Konstantinov, Yulian (1996) 'Patterns of Reinterpretation: Trader-Tourism in the Balkans (Bulgaria) as a Picaresque Metaphorical Enactment of Post-Totalitarianism', *American Ethnologist* 23(4): 762–82.

Macura, Vladimír (1993) *Masarykovy boty a jiné semi(o)fejetony*. Prague: Pražská imaginace.

Martincová, Olga, Vladimír Mejstřík and Albena Rangelová (1998) *Nová slova v češtině: Slovník neologizmů*. Prague: Academia.

Mertlík, Pavel (1994) 'Czech Privatization: From Public Ownership to Public Ownership in Five Years?'. *Prague Economic Papers* 4: 321–36.

Mlčoch, Lubomír (1998) 'Czech Privatization: A Criticism of Misunderstood Liberalism', *Journal of Business Ethics* 17(9–10): 951–9.

Sayer, Derek (1998) *The Coasts of Bohemia: A Czech History*. Princeton, NJ: Princeton University Press.

Šimečka, Milan (1990) *Konec nehybnosti*. Prague: Lidové noviny.

Vavrousek, Bohumil (1938) *Josef Kajetán Tyl*. Prague: Státní nakladatelství.

Večerník, Jiří (1996) *Markets and People: The Czech Reform Experience in a Comparative Perspective*. Aldershot: Avebury.

Večerník, Jiří (1999) 'The Middle Class in the Czech Reforms: The Interplay between Policies and Social Stratification', *Communist and Post-Communist Studies* 32(4): 397–416.

Verdery, Katherine (1995) 'Faith, Hope and Caritas in the Land of the Pyramids: Romania, 1990 to 1994', *Comparative Studies in Society and History* 37(4): 625–69.

■ **DAVID ALTSHULER** is a doctoral candidate in the Department of Anthropology, University of Chicago. He is currently finishing his dissertation, which examines the relationship between moral ideology and socioeconomic change in the Czech Republic.
*Address*: Department of Anthropology, University of Chicago, 1126 East 59th Street, Chicago, IL 60637, USA.
[email: dsaltshu@midway.uchicago.edu] ■



Prague, 1 December 2005

### Czech Republic continues to abuse criminal process

Today, further criminal charges were brought against Nomura employee Eduard Onderka in connection with the IPB matter. This is a continuation of the abuse of criminal process to divert attention from the consequences of the state's giving IPB to CSOB at enormous public cost. These charges, being made fives years after the authorities began their investigation, appear to be timed specifically to divert attention from the imminent decision of the tribunal hearing Nomura's investor protection treaty claim against the Czech Republic. The courts previously have ruled that the Czech criminal authorities have acted improperly against Nomura in the IPB matter, and Nomura looks forward to Mr Onderka's exoneration.

For the record, Nomura denies these charges against Mr. Onderka and stands behind him.

"The only way I can interpret today's action is admitting, that it is a painful reminder of the former communist regime and an intolerable way for any EU member to behave," said Jiri Hrabovsky, press spokesperson for Nomura International plc in the Czech Republic. "We will be bringing this abuse of process to the attention of the relevant authorities of the European Union," continued Mr. Hrabovsky.

Further, Normura believes that this exercise is being motivated by CSOB. Recent media reports show that CSOB is very unhappy about how the criminal proceedings are being led and they have recently employed former politician Hana Marvanova to lobby and influence the highest public prosecutor in this case. The public statements of the supervising state prosecutor and the investigating police officer clearly show that both are failing to act independently, which represents abuse of process. Nomura condemns this interference and manipulation by CSOB.

Ends

**For further information please contact:**

| Name | Company | Telephone |
|---|---|---|
| Clare Williams | Nomura International plc | +44 20 7521 1079 |
| Jiří Hrabovský | Ewing Public Relations | +420 603 291 008 |

**Notes to editors:**

**The Nomura Group**
Nomura is a global financial services group dedicated to providing a broad range of financial services for individual, institutional, corporate and government clients. The Group offers a diverse line of competitive products

and value-added financial and advisory solutions through its global
headquarters in Tokyo, 133 branches in Japan, and an international
network in 28 countries; with regional headquarters in Hong Kong, London,
and New York. The Group's business activities include investment
consultation and brokerage services for retail investors in Japan, and, on a
global basis, brokerage services, securities underwriting, investment
banking advisory services, merchant banking, and asset management. For
further information about Nomura please visit our website at
www.nomura.com.

close
.

COPYRIGHT© NOMURA HOLDINGS, INC. ALL RIGHTS RESERVED.