UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ANDREW WEISS and WEISS ASSET ) | |
| MANAGEMENT, LLC, ) | |
| ) | |
| Defendants. ) | C.A. No. 05-10679-RCL |
| ) | |
| ANDREW WEISS, WEISS ASSET ) | |
| MANAGEMENT LLC, K T, INC. and CVF ) | |
| INVESTMENTS, LTD., ) | |
| ) | |
| Counterclaim-plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| KOTVA a.s., MARTIN BENDA, RICHARD ) | |
| HARAZIM, FORMINSTER ENTERPRISES, ) | |
| LTD., SPV CO and JOHN DOES 1–5, ) | |
| ) | |
| Counterclaim-defendants. ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO COMPEL ANSWERS TO INTERROGATORIES AND DEPOSITION QUESTIONS, PRODUCTION OF DOCUMENTS, AND FOR EXPENSES AND SANCTIONS

The plaintiff continues to improperly resist discovery, claiming that it does not know the answers to interrogatories without exhausting the knowledge of its directors, officers, attorneys and other agents; refusing to answer questions put to its CEO at a deposition; and refusing to produce admittedly relevant, responsive documents. The Court should compel Kotva to provide complete, non-evasive answers to the Weiss Parties' discovery requests.

I.    **K-T-V MAY NOT REFUSE TO ANSWER INTERROGATORIES WHEN ITS OFFICERS, DIRECTORS OR ATTORNEYS KNOW THE ANSWERS**

   A.    **Facts and Procedural History**

The plaintiff ("Kotva" or "K-T-V"), has refused to answer several interrogatories, claiming that it does not know the answers.  One piece of information that K-T-V claims not to know is the identities, from January 1, 2000 to the present, of "the legal and beneficial owners of an interest, including shares of stock or a partnership interest" in Forminster and various associated entities or the identities of those persons having an "indirect ownership interest" in Forminster and, through Forminster, K-T-V. Exhibit A.[1]  This assertion defies belief and reflects

---

[1] **Interrogatory No. 1**

Please identify the legal and beneficial owners of an interest, including shares of stock or a partnership interest, in each of the Listed Companies, for the period from January 1, 2000 until to present.

**Response to Interrogatory No. 1**

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff further objects to this interrogatory to the extent it seeks information concerning entities unaffiliated with Plaintiff.  Plaintiff also objects to the extent this interrogatory has been previously asked and fully responded to by Plaintiff (See Defendants' Second Set of Interrogatories, No. 1 and response thereto).  Subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

a.    Forminster Enterprises, Ltd.

   Unknown.

b.    Kotva, a.s.

Kotva's approximately 694,209 shares are publicly traded on the Czech securities market, and there are currently approximately 7,700 shareholders.  Given that Kotva's shares are publicly traded, Kotva's ownership changes regularly.   Shareholders currently owning more than 10% of Kotva's outstanding shares are:

| | | |
|---|---|---|
| Forminster Enterprises Limited/Sprint | 385,038 shares | 55.74% |
| Ardmore Risk Management Limited | 97,753 shares | 14.08% |
| HSBC Bank plc | 81,082 shares | 11.92% |

Kotva cannot identify those persons who have an "indirect ownership interest" in Kotva's shares.

b.    Kotva Nemovitosti ("KN")

Kotva own 100% of KN.

lack of proper inquiry to determine the answer.

It is indisputable that K-T-V is controlled by Forminster.  Forminster controls a majority of K-T-V's shares; Richard Harazim and Martin Benda, the CEO and Chairman of K-T-V's Supervisory Board, were directors of Forminster when they were installed at K-T-V; and Michal Vlach, the Chairman of K-T-V's Board of Directors, is a former Forminster director who continues to hold a power of attorney to act on behalf of Forminster.[2]  Should there be any doubt, K-T-V's annual report admits in plain language that Forminster is the "controlling person" of K-T-V.[3]

From November 30, 1999 to October 30, 2002, Richard Harazim and Martin Benda were directors of Forminster.  *See* Exhibit B.  It was during this time that Forminster installed Messrs. Harazim and Benda as directors and officers of Kotva.  Mr. Harazim also worked for Forminster

---

c.    SPV KN

Pursuant to the Share Purchase Agreement with Markland, (which has been produced to Defendants) SPV KN was sold to Markland in connection with the department store sale in 2005, and Plaintiff does not know the current ownership status of SPV KN.

d.    SPV Co., Ltd. ("SPV")

SPV is owned 100% by KN.  In further answering, see response to Interrogatory 1(c) and the documents produced in response to Defendants' document requests (Bates No. K5106).

f-j.    Unknown.    Interrogatory 1(f-j) seeks information regarding entities that have no relationship to Plaintiff, and Plaintiff has no information or documents responsive to this interrogatory concerning such entities.

k.    Kotva správovská a.s.

K Spra is owned 100% by Kotva Parking s.r.o.

l.    Kotva obchodni' a.s. ("KO")

Kotva owns 100% of KO.

m.    Kotva Parking s.r.o. ("KP")

Kotva owns 100% of KP.

n.    Kotva International, Ltd. ("KI")

Kotva sold KI sometime ago and the current status is not known of Kotva.  Kotva will supplement its answer if information responsive to this interrogatory is discovered.

[2] Exhibit B; Exhibit C, 349:2–16.

[3] Exhibit C, 352:9–354:24.

before becoming a director.  Exhibit C, 29:2–30:15.  He was hired by a lawyer, Petr Toman, of

Toman Devátý and Partner.  *Id.* 17:10–14.  Mr. Harazim had the following to say with respect to

who owned Forminster at the time:

```
        Q.   Were the shares of Forminster that were --
let me start over.  Were the shares at Forminster at
November 30, 1999 held by nominees?
        A.   I believe so.
        Q.   Do you know who the beneficial owners were
of the shares of Forminster on November 30, 1999?
        A.   No.
        Q.   Did you ever ask that question?
        A.   No.
        Q.   Was there a reason you did not ask that
question?
             MR. BECKMAN:  Objection.  You may answer.
        A.   There was no special reason.  I just
didn't ask.
        Q.   You were aware in November, 1999 of the
allegation in the press that Forminster had committed
criminal acts?
             MR. BECKMAN:  Objection.
        Q.   Were you aware of those?
        A.   Yes.
        Q.   And so didn't you want to know who the
owners of Forminster were, before you signed up to be
on the Board of Directors?
        A.   I wanted to know who the shareholders were
not.
        Q.   Okay.  And what did you do in that regard?
        A.   I asked the law firm, Mr. Toman, if he can
assure me that I don't work for Mr. Hálek, and I got
that insurance -- assurance, I'm sorry .
        Q.   What way did Mr. Toman give you that
assurance?
             MR. BECKMAN:  Objection.  You may answer.
        A.   Just told me so.
        Q.   Did he give you anything in writing?
        A.   No.
        Q.   Was there anyone else that you wanted to
be assured of as not being a shareholder of Forminster?
        A.   Well, I said Mr. Hálek or anybody from his
group.
        Q.   So, to be clear here, you asked Mr. Toman
whether Mr. Hálek or anyone from his group were
```

```
        shareholders of Forminster, correct?
              A.    Yes.
              Q.    And his answer to you was?
              A.    No.
              Q.    Did you do anything further to learn the
        identities of the beneficial shareholders of
        Forminster?
              A.    No.
```

*Id.* at 54:8–56:8.  Thus, by K-T-V's own admission, Mr. Toman knew, at least as of 1999, who the beneficial owners of Forminster were.  Otherwise, he would have been unable to give Mr. Harazim the assurance he sought.  Mr. Toman acts as a principal attorney and agent of K-T-V to this day.[4]

In 2002, Messrs. Benda, Harazim and Vlach and the other individual serving as a director of Forminster resigned.  What little is known about their replacements is telling:  When Messrs. Benda and Harazim first became directors of Forminster, Forminster's Secretary was Indilaw Secretarial Limited, which lists its address as 4 Diagorou Street, Kermia House, 6th Floor, Flat 601,[5] 1097 Nicosia, Cyprus.  Indilaw Secretarial Limited has remained Forminster's Secretary at least through July 2005, and remains at the same address.  All four of Forminster's replacement directors—Doxa Pericleous, Rena David, Anthony Indianos and Andreas Papasiantis—also list their "residential addresses" as 4 Diagorou Street, Kermia House, 6th Floor, Flat 601, 1097 Nicosia, Cyprus.  Anthony Indianos is a Cypriot lawyer, who heads the law firm Costas Indianos & Co.  *See* Ex. F.  The address of the Costas Indianos firm is also 4 Diagorou Street, Kermia House, 6th Floor, Flat 601, 1097 Nicosia, Cyprus.  *Id.* at 1.[6]

---

[4] *See* Exhibit D (filing in Gilroy case); Exhibit E (Share Purchase Agreement listing Toman as recipient of notices).

[5] Sometimes, this portion of the address is listed as "Office 601."

[6] This firm appears to be in the business of providing nominee directors and a Cypriot mailing address to those who wish to control a company anonymously.  Using Google to search for the Costas Indianos firm's address, one can find multiple companies claiming to be located at this address.  Notably, the

Like Forminster's directors, Forminster's shareholders are also nominees selected to conceal the identity of who truly owns and operates Forminster. *See* Ex. G (listing Ledra Nominees Ltd. and Ledra Trustees Ltd. as shareholders). From November 30, 1999—the date Messrs. Harazim and Benda became directors of Forminster—to May 24, 2005, Forminster's two nominee shareholders both claimed the Costas Indianos law firm as their address. *Id.* at 2. On May 25, 2005, all of Forminster's shares were consolidated under a single nominee shareholder at the Costas Indianos firm. *Id.* at 3.

The individuals who control Forminster—and through Forminster, K-T-V—may have good reason to hide their identities. Ever since Forminster became involved with K-T-V and attempted to install Messrs. Benda and Harazim as directors, K-T-V has been at the center of a number of suspicious events. Vladimir Hoffmann—a Czech who was working with some of the Weiss Parties[7] from 2003 to 2004—summarized these events in an October 2004 memorandum, listing the following as "unusual events" in Forminster's history:

> 13 6 1998 - CEO of Kotva Jindrich Zeleznik suddenly died at the age of 52
> 25 10 1998 - Chalet of Martin Benda exploded
> 27 10 1998 - Car of Bronislav Becka (CIH) exploded
> 1998 - Flow East representatives claimed they were threatened and spied
> 30 8 1999 - Explosion in the sixth floor of Kotva near the office of the board
> Aug 2000 - Investigator Blahoslav Kavka committed suicide
> March 2001 - Prosecutor Vladislav Kusala resigned
> 2002 - Martin Razim, bankruptcy trustee of Trend resigned, privately claimed that he was threatened

Exhibit H.

At the time Forminster began to assert control over K-T-V, two rival boards—one

---

company listed in Kotva's 2002 annual report as the next largest Kotva shareholder behind Forminster can also be found at the Costas Indianos law firm. *See* 2002 Annual Report at 4 (attached hereto as Ex. I).

[7] The "Weiss Parties" refers to the defendants and counterclaim-plaintiffs Andrew Weiss, Weiss Asset Management LLC, K T, Inc. and CVF Investments Ltd.

associated with Forminster and one associated with another company called Czech Investment

Holding ("CIH")—were battling for control over K-T-V.  Apparently, Mr. Bečka of CIH and Mr.

Benda of Forminster took the battle to a new level.  Mr. Harazim had the following to say with

respect to Mr. Bečka,:

```
        Q.   Who is that?
        A.   Mr. Bechka is a businessman, who attracts
   bad luck.  He was shot in the head.  He had a crash in
   a helicopter.
                      * * * *
        Q.   And what connection did he have with
   Kotva?
        A.   He was somehow involved with Czech
   investment holding, and he served on the board of Kotva
   for some time.
                      * * * *
        Q.   And you said it was a famous story about
   him being shot in the head?
        A.   Well, he wasn't shot in the head.  That
   was the famous about it, because he was shot in the
   back, but he was shot from a very light weapon, so
   there were all sorts of discussions, where there was a
   lover or it was commercial or it was this or that.
                      * * * *
        Q.   And were there claims in the press that he
   was shot in connection with a business transaction?
        A.   There were wide speculations about from
   all possible angles.
        Q.   And did the speculation include the
   controversy over whether Forminster rightly held Kotva
   shares?
             MR. BECKMAN:  Objection.
        A.   The speculations were that this might have
   been because of his commercial disputes.  Kotva was
   named.  Chik [phonetic] was named.  Other companies
   were named.
```

Exhibit C, 386:15–388:21.[8]

_____

[8] With respect to the bomb that exploded at Kotva, Mr. Harazim states:

```
        Q.   At some time, did a bomb explode in
   Mr. Benda's office?
```

On August 3, 2005, the Weiss Parties served document requests and interrogatories on K-T-V seeking, among other things, to determine who truly owns Forminster.  K-T-V refused to produce any documents unless the Weiss Parties would sign a confidentiality agreement.  The Weiss Parties moved to compel.  In January 2006, the Discovery Master granted the Weiss Parties' motion to compel in large part.  However, with respect to some of the Weiss Parties' document requests, the Discovery Master denied the Weiss Parties' motion, writing:

> Requests nos. 35 through 41: DENIED. By agreement, counterclaim plaintiffs will seek the requested information about the interrelationships and agreements among the Listed Companies by means of interrogatories. Kotva shall respond to such interrogatories within 30 days of receipt. Thereafter, counterclaim plaintiffs may formulate more narrowly focused requests for production of documents.

On January 11, 2006, the Weiss Parties served a third set of interrogatories on K-T-V in compliance with the Discovery Master's Order.  K-T-V requested, and the Weiss Parties granted, an extension of time to answer.  On February 17, 2006 K-T-V submitted its answers.  K-T-V's answer to interrogatory number 1 is reproduced in footnote 1 above.  K-T-V's answer to interrogatory number 6 read:

**Interrogatory No. 6**

> For each and every interrogatory response in which Kotva claims that it is unable to answer, in whole or in part, please describe in detail the efforts Kotva took to gather responsive information.

```
                A.    Sometime before 2000, as well, yes.
* * * *
                Q.    Did you ever talk with Mr. Benda about
        that?
                A.    Yes.
* * * *
                Q.    Did Mr. Benda tell you who he thought had
        caused the explosion?
                A.    No.
```

Exhibit C, 389:6–390:3.

**Response to Interrogatory No. 6**

Plaintiff is able to and has fully answered the foregoing interrogatories.

The suggestion that K-T-V "fully answered the foregoing interrogatories" was and is disingenuous.[9]

B.    **Law**

Notwithstanding the controlling relationship between Forminster and K-T-V, K-T-V claims lack of knowledge as to who owns Forminster.   In any ordinary circumstance, a company would know who stands behind its controlling shareholder.  Moreover, the Weiss Parties have identified specific officers, directors and attorneys of K-T-V who must know who owns Forminster.  The individuals who control Forminster also control K-T-V and are the primary beneficiaries of the efforts to loot K-T-V.  Their identities are central to this case, yet K-T-V is improperly withholding their identities from the Weiss Parties.

Federal Rule of Civil Procedure 33(a) provides that when a party is a corporation, interrogatory responses must be signed by an individual, but that individual must "furnish such information as is available to *the party*."   (emphasis added).   Thus, it is improper for a corporation to claim lack of knowledge even if the individual—in this case Mr. Harazim—

---

[9] During a telephonic discovery conference held on March 10, 2006 from 12:00 p.m. to approximately 12:50 p.m. among Joel Beckman and William Nystrom representing K-T-V and Edward Leibensperger and Benjamin Goldberger representing the Weiss Parties, counsel for K-T-V asked counsel for the Weiss Parties to list the interrogatories for which K-T-V claimed lack of knowledge in its answer.  On March 13, 2006, Mr. Goldberger sent Mr. Beckman a letter identifying nine instances in which K-T-V claimed lack of knowledge and asked that K-T-V supplement its interrogatory answers by March 20, 2006.  *See* Ex. J. On April 7, 2006, K-T-V supplemented its response, but still claimed that it did not know the answers to certain interrogatories and refused to describe the efforts K-T-V took to gather responsive information. Instead, K-T-V interposed a number of boilerplate objections and made the conclusory statement "that it answered all interrogatories based upon the documents and information known to it."  *See* Ex. A.  During another telephonic discovery conference held on April 18, 2006 from 2:35 p.m. to 3:00 p.m. among Daniel Pasquarello (representing K-T-V), Benjamin Goldberger (representing the Weiss Parties) and David Jaffe (a paralegal working with Mr. Goldberger), counsel discussed this issue again and Mr. Goldberger stated that this motion would focus on the identities of the individuals who own Forminster.

signing the interrogatory responses lacks personal knowledge so long as one or more of its agents know the answer to the interrogatory.

> [K]nowledge of officers and employees of [K-T-V], relative to the subject matter of the instant cause, is imputed to the corporation itself. Thus, [Mr. Harazim] was duty bound to secure all information available to [K-T-V]. This would include information within the personal knowledge of former [K-T-V] employees, employed by [K-T-V] at the time this action commenced. Additionally, it would include information possessed by its corporate counsel.

*Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1210–11 (8th Cir. 1973) (citations and footnotes omitted; names of party and officer substituted); *see Hickman v. Taylor*, 329 U.S. 495, 504 (1947) ("A party clearly cannot refuse to answer interrogatories on the ground that the information sought is solely within the knowledge of his attorney"); *Axler v. Scientific Ecology Group, Inc.*, 196 F.R.D. 210, 212 (D. Mass. 2000) ("[A] party is charged with knowledge of what its agents know.") (quoting 8A WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2177); *Weddington v. Consol. Rail Corp.*, 101 F.R.D. 71, 75 (N.D. Ind. 1984) ("[T]here is a duty on the part of corporate entity to discover all information available to it through its officers, employees and others."); *Trejo v. Broadway Plaza Hotel*, No. 04 Civ 4005 (LTS) (DFE), 2006 U.S. Dist. LEXIS 5504 (S.D.N.Y. Feb. 10, 2006) ("A party must disclose facts in its attorney's possession even though the facts have not been transmitted to the party.") (quoting 8A WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2177).

Forminster is K-T-V's controlling shareholder. The suggestion that there is not a single officer, director, employee or attorney of K-T-V with any information about the true owners of Forminster defies belief. K-T-V must provide the Weiss Parties with the collective knowledge of *all* of its agents, not a subset of those agents who have convenient knowledge gaps. For example, Michal Vlach, the Chairman of K-T-V's board, has a power of attorney to act on behalf of Forminster. Petr Toman, K-T-V's attorney, has represented Forminster for at least eight

years, hired Mr. Harazim to work on Forminster's behalf and made representations to Mr. Harazim about the identity of Forminster's beneficial owners. The Court should order K-T-V to exhaust the knowledge of both of these individuals and all of its other agents and attorneys when answering the Weiss Parties' interrogatories.

## II.    K-T-V HAS IMPROPERLY REFUSED TO ANSWER DEPOSITION QUESTIONS

### A.    Facts and Procedural History

K-T-V filed a criminal complaint against Andrew Weiss in the Czech Republic on August 27, 2004.[10] Then, in April 2005, K-T-V commenced this lawsuit. In November 2005, the Weiss Parties noticed a 30(b)(6) deposition of K-T-V for December 2005. That deposition was delayed, at K-T-V's request, until late February 2006. K-T-V produced its CEO, Richard Harazim, as its 30(b)(6) designee. As described in more detail below, Mr. Harazim improperly refused to answer questions, claiming that his answers would somehow "compromise" the ongoing Czech criminal investigation that K-T-V initiated. On March 30, 2006, during a telephonic discovery conference that lasted from around 2:00 p.m. to around 2:20 p.m. among Joel Beckman and Daniel Pasquarello representing K-T-V and Benjamin Goldberger representing the Weiss Parties,[11] Mr. Beckman stated that he would continue to maintain objections to discovery based on the ongoing criminal investigation until Mr. Weiss was served with the Czech Police's resolution describing the accusations against him. During the April 18, 2006 discovery conference, Mr. Pasquarello again confirmed that Mr. Harazim would answer the questions he presently refuses to answer if Mr. Weiss is served with the resolution, but not before that time.

---

[10] *See* Exhibit C, 277:4–6.

[11] David Jaffe, a paralegal working with Mr. Goldberger, was also on the call.

Throughout the deposition of K-T-V, counsel for K-T-V repeatedly and improperly instructed the witness not to answer questions on the ground that answering might somehow interfere with the Czech criminal investigation that K-T-V initiated.  For example,

```
BY MR. LEIBENSPERGER:
        Q.    After August 27, 2004, are you aware of
any tape recordings of conversations with Mr. Hoffmann?
            THE INTERPRETER:  This is the area where
I, after consultation with my Czech lawyer, I am not
supposed to talk about.  This is because it's connected
to the investigation of Mr. Weiss, and because
Mr. Weiss never received the statement about start of
the criminal proceedings against him in the Czech
Republic, from the Czech Republic.  I would, if I would
talk about it, I may state something which could
obstruct the police investigation.
        A.    Compromise.
            THE INTERPRETER:  Compromise.
        Q.    Regardless, are you aware that there are
tape recordings of Mr. Hoffmann after August 27, 2004?
            MR. BECKMAN:  Let me just interject.
Based on the advice of Czech counsel, Kotva is
prohibited from disclosing the police investigation
or -- and because it would result in compromising the
police investigation until after the complaint of the
charges is served upon Mr. Weiss.  So, he can't answer
those, because it revolves around Czech criminal
police.
        Q.    I press for an answer regardless of the
statements of counsel.
        A.    I will not answer that.
                      * * * *
        Q.    Is it your position that you will refuse
to testify about anything that happened after
August 27, 2004, with respect to the criminal
investigation?
        A.    This is the instructions which I got from
my Czech lawyers, which they gave me in order for me
not to break Czech law.
```

Ex. C, 283:1–284:3, 285:16–22; *see also* 287:6–290:6; 291:4–8; 311:24–312:17; 312:21–313:4;

333:22–334:6.[12]

**B.    Law**

The repeated instructions not to answer questions directly violate the Rules.  Federal Rule of Civil Procedure 30(d)(1) provides that "[a] person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30(d)(4)."  The grounds asserted by the plaintiff do not relate to privilege or a limitation directed by the Court.  It has been over a month since the deposition was suspended, yet the plaintiff has not filed a motion under Rule 30(d)(4).[13]

Rule 30(d)(4) requires "a showing that the examination is being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or party."  Thus, even if K-T-V had filed the required motion, K-T-V can make no such showing.  The questions Mr. Harazim refused to answer sought relevant, admissible evidence.  Among other things, they related to recordings of meetings between representatives of the plaintiff and Vladimir Hoffmann at which K-T-V alleges Mr. Hoffmann blackmailed K-T-V at the direction of Mr. Weiss.

If the Czech government truly has concerns about Mr. Harazim providing complete testimony, it can move to intervene and stay this case pending the outcome of the Czech criminal proceedings.  This is the same remedy available to the U.S. government.  While discovery is

---

[12]  Additionally, K-T-V's witness refused to answer questions relating to information about financial accounts at the heart of K-T-V's damages claims.  K-T-V admitted that this information is relevant, but K-T-V claimed the information is confidential.  *Id.* 181:8–182:4, 202:9–203:1.  This information was the subject of K-T-V's motion for a protective order, which the Discovery Master denied on February 13, 2006.  K-T-V filed an objection to the Discovery Master's order. On April 8, 2006, the Court affirmed the Discovery Master's Order as an Order of the Court.  Kotva has not yet produced the documents at issue, but states that it is in the process of doing so.

[13]  K-T-V's failure to file a motion is in willful disregard of the rules.  Counsel for the Weiss Parties quoted the relevant portion of Rule 30 in a letter to counsel for K-T-V sent on March 3, 2006 and stated that "Mr. Harazim's refusals to answer do not fall within any of these categories and are not proper."  Ex. K.

ongoing, a private plaintiff has no right to refuse to respond to questions based on claims that a foreign government does not want the questions answered.  Accordingly, the Court should order K-T-V to respond to deposition questions without regard to the ongoing Czech criminal investigation.

**III.    K-T-V MUST PRODUCE ALL DOCUMENTS WITHIN THE POSSESSION, CUSTODY OR CONTROL OF ITS OFFICERS, DIRECTORS, ATTORNEYS OR CONTROLLING PARENT**

**A.    Facts and Procedural History**

On August 3, 2005, the Weiss Parties served the following document requests, to which K-T-V responded as follows:

**Request No. 22:**

All communications between Kotva and Czech law enforcement concerning Andrew Weiss.

**Response**

Subject to the General Objections and upon entry of a Confidentiality Order, Kotva will make available for inspection and copying documents responsive to Request No. 22.

**Request No. 34:**

All documents concerning communications between or among the Kotva and/or Forminster Enterprises Ltd. and/or Richard Harazim and/or Martin Benda and/or SPV CO and/or Andrew Weiss and/or Georgiy Nikitin and/or Weiss Asset Management LLC and/or K T, Inc. and/or CVF Investments Ltd. and/or Weiss Capital LLC and/or Ondrej Peterka and/or Vladimir Hoffmann and/or Edita Simkova and/or James Woolf, ***including but not limited to audio and video recordings of those communications***.

**Response:**

Kotva objects to this request on the basis that it is overly broad, unduly burdensome, seeks information irrelevant to this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence.  Subject to these objections and the General Objections and upon entry of a Confidentiality Order, Kotva will make documents concerning communications between or among Kotva, Richard Harazim, Martin Benda, Andrew Weiss and Weiss Asset Management LLC, Ondrej Peterka, Vladimir Hoffman, Georgiy Nikitin available

for inspection and copying.

**Request No. 42:**

All documents concerning communications between J&T Securities or J&T Banka and any other entity concerning the purchase of shares in Kotva or the purchase of options to purchase shares in Kotva.

**Response:**

Kotva does not have any documents responsive to this request.

Exhibit L (emphasis added).

*Videotapes:* On January 6, 2006, the Discovery Master ordered K-T-V to produce documents "forthwith." K-T-V produced a number of documents on January 17, 2006. K-T-V did not produce *any* videotapes or audiotapes.[14] Counsel for the Weiss Parties asked counsel for K-T-V if any such tapes existed in a letter sent on February 14, 2006. *See* Exhibit M. Counsel for K-T-V did not respond to this letter. However, during the deposition of K-T-V that commenced later that month, Richard Harazim, K-T-V's 30(b)(6) designee admitted that K-T-V's attorneys have videotapes that are relevant and responsive. Exhibit C, 310:1–311:12 (stating that videotapes "are stored in our law office"). Nevertheless, K-T-V continues to refuse to produce those videotapes—despite its blanket agreement to produce all such documents in September 2005—on the grounds that producing them might somehow compromise the Czech police investigation of Mr. Weiss. On April 18, 2006, Mr. Pasquarello informed Mr. Goldberger for the first time that K-T-V would soon be producing a document, written in Czech, from the Czech authorities asking K-T-V not to produce the videotapes.[15] As explained above, the request

---

[14] In contrast, the Weiss Parties produced responsive video and audio recordings on February 10, 2006 and February 14, 2006, respectively.

[15] On March 15, 2006, during a telephonic discovery conference that took place from around 4:40 p.m. to 4:45 p.m. between Messrs. Goldberger and Pasquarello, Mr. Pasquarello told Mr. Goldberger that he expected to be able to provide further information about the videotapes by that Friday. No further

of a foreign government not to produce relevant, responsive documents within a party's custody, possession or control is a wholly improper ground for K-T-V to withhold videotapes that it created, either on its own or in cooperation with the Czech police.

*Criminal Complaint:* When K-T-V first produced a copy of the formal criminal complaint it filed against Mr. Weiss, it provided a copy of the document with a page missing. *See* Exhibit N.[16]  On February 14, 2006, counsel for the Weiss Parties asked counsel for K-T-V to search for any drafts of the document.  *See* Exhibit M.  Later that month, the Weiss Parties informed K-T-V that a page or pages appeared to be missing.  Over a month later, K-T-V produced what it claims is the sole missing page.  Exhibit O.[17]  K-T-V has neither produced nor logged any drafts of this key document.

*Power of Attorney:* Richard Harazim, K-T-V's 30(b)(6) designee testified that Michal Vlach, the chairman of K-T-V's board of directors, has a power of attorney to represent K-T-V's majority shareholder, Forminster Enterprises Ltd.  Exhibit C, 349:2–16.  K-T-V has not

---

information was provided that week.  During the March 30, 2006 telephone conference, counsel for K-T-V again told Mr. Goldberger that more information about the videotapes would be provided by that Friday.  No further information was provided until April 18, 2006.  In order not to delay the schedule for the resolution of all discovery motions, counsel for the Weiss Parties will file this motion without the benefit of reading this document.

[16] The signature on the copy K-T-V produced is barely visible.  During the April 18, 2006 telephone conference, Mr. Pasquarello told Mr. Goldberger that that the signature was visible, but illegible, on his copy and that he would send the Weiss Parties another copy of that page.

[17] The font on the missing page appears to be a different size.  *Compare* Ex. N *with* Ex. O. Upon receiving the missing page, counsel for the Weiss Parties immediately raised the issue of the font with counsel for K-T-V, but received no response.  *See* Exhibit P.  Mr. Goldberger raised the issue again on April 12, 2006 during a telephone call with Mr. Pasquarello relating to the scheduling of discovery motion practice that lasted from approximately 10:55 a.m. to approximately 11:10 a.m. and forwarded a copy of the email request to Mr. Pasquarello during that telephone call.   Mr. Pasquarello responded by email that the font looked the same to him.  During the April 18, 2006 telephone call, Mr. Pasquarello and Mr. Goldberger again discussed the font issue and continued to discuss the issue in a subsequent telephone call on April 18, 2006 from approximately 4:05 p.m. to 4:15 p.m.  Mr. Pasquarello agreed to look for other copies of the missing page, but confirmed K-T-V's position that it has no drafts or other versions of this document in its possession, custody or control.

produced this document, despite an explicit written request served on March 3, 2006 and explicit oral request during a brief telephone conference between Messrs. Goldberger and Pasquarello on the afternoon of April 6, 2005.  Instead K-T-V claims that it has "produced all powers of attorney in its possession."  Ex. Q.[18]  Messrs. Pasquarello and Goldberger discussed this issue again briefly during the April 18, 2006 telephonic discovery conference, but were unable to reach an agreement.

*J&T Banka Documents:* Richard Harazim, K-T-V's 30(b)(6) designee, testified that while he was working for Forminster in 2001, he reached an agreement in principle for Forminster to purchase, for 50 million CZK, the Kotva shares owned by the Weiss Parties.[19]  Ex. C, 136:18– 138:23.  The transaction fell through.  *Id.*  In 2003, Vladimir Hoffmann, who was acting as Mr. Weiss's representative at the time, spoke with Mr. Harazim again about the purchase of the Kotva shares.  Mr. Hoffmann reported that:

> Harazim called me [on November 28, 2003] and told me they will make the firm bid for our Kotva shares on [December 1, 2003].   They will fax it to you and deliver the original to me.  The price will be USD 1 million and it will be valid for one week.

Ex. R.  On December 2, 2003, J&T Securities faxed an offer on behalf of an unnamed "client" to Weiss Asset Management, seeking to purchase Kotva shares for "USD 1 million," and holding

---

[18] **Request No. 17**

All documents concerning any power of attorney from Kotva or any of its subsidiaries or Forminster to one or more of the following persons:  Michal Vlach, Richard Harazim, Martin Benda or Petr Toman.

**Response:**

Kotva objects to this request to the extent it is not properly directed to Kotva.  Kotva further objects to the extent this request calls for documents protected by the attorney-client privilege and/or work product doctrine.  Subject to and without waiving its objections, Kotva states that it has already produced all powers of attorney in its possession.

[19] This agreement was negotiated before Mr. Weiss took over management of the company owning the shares.

the offer "valid for a period of 7 calendar days." Ex. S. On December 8, 2003, Mr. Hoffmann

informed Forminster (Mr. Harazim) that the offer was rejected. Ex. T.

Notwithstanding the documentary evidence, Mr. Harazim claims that he does not know

who J&T's client was. Ex. C, 153:16–158:22. K-T-V claims it has no documents relating to this

offer—or any other offer to purchase Kotva shares by J&T Banka or J&T Securities. These

representations are not credible.

J&T Bank has close ties to K-T-V and Forminster. K-T-V asked the buyer of the

Department Store to permit J&T Bank to act as escrow agent. The buyer refused, stating:

> J&T Banka appears regularly in the information we have been given regarding
> past transactions that are allegedly suspect and fraudulent. This Bank had a part
> [to] play in the past dealings of the Kotva / Trend / F[orminster] / Suringham
> issues.

Ex. U. When K-T-V sought refinancing of its $7,000,000 mortgage on the Department Store,

J&T Bank was there. Ex. C, 397:5–398:7.[20] Perhaps most tellingly, when Forminster and

K-T-V sought to negotiate a mutual non-aggression agreement with James Woolf—who was

raising claims analogous to those K-T-V alleges were made by the Weiss Parties—J&T Bank

bought out Mr. Woolf's shares in K-T-V on behalf of an unnamed client. *Id.*, 82:20–85:13;

391:10–14. K-T-V claims to not have control over documents relating to this purchase, despite

Mr. Harazim's admission that *he saw them in Kotva's lawyer's office. Id.*, 104:3–104:13. It is

simply not believable that K-T-V does not know the identity of J&T's client who bought Mr.

Woolf's K-T-V shares, does not know the identity of J&T's client who offered to purchase the

Weiss Parties' *12% stake* in K-T-V and lacks possession, custody or control over a single

---

[20] Notwithstanding the size of this loan and the fact that it was repaid out of the proceeds of the sale of the
Department Store—a deal Mr. Harazim negotiated—Mr. Harazim claims he does not know the name of
the loan officer at J&T Bank responsible for the loan. *Id.*, 398:8–20.

document relating to either transaction.[21]

*Other Document Requests*:  Several of K-T-V's responses to the Weiss Parties' Second Set of Document Requests raise parallel issues of what documents are within K-T-V's possession, custody and control.  *See* Ex. Q.  In response to these Requests, K-T-V repeated its claims that it has no documents relating to Woolf's agreement with J&T Banka[22] or Mr. Vlach's power of attorney from Forminster.[23]  K-T-V went on to make analogous claims with respect to

---

[21] Messrs. Pasquarello and Goldberger discussed this issue again briefly during the April 18, 2006 telephonic discovery conference, but were unable to reach an agreement.

[22] **Request No. 5:**

All documents concerning the documents responsive to Request No. 4, including but not limited to documents concerning the agreement between Woolf and J&T Bank.

**Response:**

Kotva objects to this request to the extent it calls for documents protected by the attorney-client privilege and/or work product doctrine.  Kotva further objects on the ground that this request is vague and unintelligible.   Subject to and without waiving its objections, Kotva will produce non-privileged documents that are responsive to this request to the extent they exist.  Further answering, Kotva has no documents concerning any agreement between Woolf and J&T Bank.

**Request No. 9:**

All documents concerning communications between Kotva, including those of Richard Harazim, Martin Benda or any attorney for Harazim, Benda or Kotva and J&T Bank regarding the purchase or potential purchase of Kotva shares from one or more of the Woolf companies, BGO, Vladimir Hoffmann, Andrew Weiss or any affiliated entity.

**Response:**

Kotva objects to this request to the extent it calls for documents protected by the attorney-client privilege and/or work product doctrine.  Kotva further objects to t his request as vague and unintelligible to the extent that the phrases "one or more of the Woolf companies" and "any affiliated entity" are undefined.  Subject to and without waiving its objections, Kotva states that it has no such documents.

**Request No. 12:**

Any documents concerning the purchase or offer to purchase, by Richard Harazim, Martin Benda, J&T Banka, J&T Securities, Forminster, or Kotva, of shares in Kotva a.s. from a minority shareholder from the period September 1, 2003 to the present.

**Response:**

Kotva objects to this request as not properly directed to Kotva.  Subject to and without waiving its objections, Kotva states that it has no such documents.

[23] **Request No. 17:**

All documents concerning any power of attorney from Kotva or any of its subsidiaries or Forminster to one or more of the following persons:  Michal Vlach, Richard Harazim, Martin Benda or Petr Toman.

documents relating to agreements or financial transactions between Forminster and three of K-T-V's officers and directors—Messrs. Benda, Harazim and Vlach;[24] Mr. Harazim's admitted negotiations in 2001 on behalf of Forminster to purchase shares in Kotva from Howard Golden;[25] threats of litigation by James Woolf and others similar to the ones K-T-V alleges were made by the Weiss Parties, but that did not ripen into actual litigation;[26] negotiations between Kotva or its

---

**Response:**

Kotva objects to this request to the extent it is not properly directed to Kotva. Kotva further objects to the extent this request calls for documents protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving its objections, Kotva states that it has already produced all powers of attorney in its possession.

[24] **Request No. 18:**

All documents, including checks, reflecting a financial transaction between Richard Harazim and/or Martin Benda on the one hand and Forminster on the other hand.

**Response:**

Kotva objects to this request as not properly directed to Kotva. Kotva further objects to this request as vague and ambiguous to the extent that the term "financial transaction is not defined. Subject to and without waiving its objections, Kotva states that it has no such documents.

**Request No. 19:**

All documents concerning any agreement between Forminster and one or more of the following persons: Richard Harazim, Martin Benda, Petr Toman, Michael Vlach.

**Response:**

Kotva objects to this request as not properly directed to Kotva. Subject to and without waiving its objections, Kotva states that it has no such documents.

[25] **Request No. 8:**

All documents concerning any actual or prospective agreement between Forminster and BGO or any other entity represented by Howard Golden to sell or purchase shares in Kotva and/or Trend or to sell or purchase options to sell or purchase shares in Kotva and/or Trend.

**Response:**

Kotva objects to this request as not properly directed to Kotva. Kotva further objects to this request as vague and unintelligible to the extent that the phrase "any other entity represented by Howard Golden" is undefined. Subject to and without waiving its objections, Kotva states that it has no such documents.

[26] **Request No. 3:**

All documents concerning any Threat of Litigation, including any documents concerning any settlement any claim associated with any Threat of Litigation.

**Response:**

Kotva objects to this request to the extent it calls for documents protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving its objections, Kotva will produce non-privileged documents that are responsive to this request to the extent they exist. Further answering,

affiliates and Vladimir Hoffmann or companies he controlled, including negotiations surrounding the purchase of Gilroy and the resolution of the Gilroy lawsuit that K-T-V claims caused it millions of dollars in damages;[27] and other areas.[28]   With respect to half of these requests (Nos. 8, 12, 17, 18, 19 and 21), Kotva raised the objection that the request was "not properly directed to Kotva," suggesting that responsive documents exist but that the Weiss Parties should have asked another one of the counterclaim-defendants for them.   The Court

---

Kotva states that it has no non-privileged responsive documents where there was no lawsuit filed against it.

[27] **Request No. 20:**

All documents concerning the person who owned or controlled Gilroy at the time the Gilroy lawsuit was resolved.

**Response:**

Kotva objects to the use of the term "resolved;" the Gilroy lawsuit was dismissed.  Kotva further objects to this interrogatory as vague.  Subject to and without waiving its objections, Kotva states that it has no such documents.

**Request No. 21:**

All documents created on or after May 12, 2004 concerning any negotiations or agreements between, on the one side, Vladimir Hoffmann, Gilroy and/or Balfindor and, on the other side, Forminster, Toman Devaty & Partners, including Petr Toman, J&T Securities, J&T Banka or Kotva, including Messrs. Harazim or Benda or any attorney for Kotva.

**Response:**

Kotva objects to this request as not properly directed to Kotva.  Kotva further objects to the extent this request calls for documents protected by the attorney-client privilege and/or work product doctrine.  Subject to and without waiving its objections, Kotva states that it has no such documents.

[28] **Request No. 23:**

All documents concerning financial transactions between Kotva, including those of Richard Harazim, Martin Benda or any attorney for Harazim, Benda or Kotva, and any person working for Czech law enforcement, including Pavel Broz and/or Dagmar Machova or any person with an oversight role in the Trend bankruptcy proceedings.

**Response:**

Kotva objects to this request as vague and ambiguous to the extent that the "financial transaction" is not defined.  Subject to and without waiving its objections, Kotva states that it has no such documents.

**Request No. 27:**

All documents concerning the methods Kotva used to identify David Waxman, QVT LLC and/or Kochis Fitzhugh as past or present investors in BGO.

**Response:**

Kotva objects to this request on the ground that it calls for information protected by the attorney-client privilege and/or work product doctrine.  Subject to and without waiving its objections, Kotva states that it has no such documents.

should not permit K-T-V to play games with its document responses, shielding documents from disclosure by keeping them somewhere other than in K-T-V's "official" files.

Counsel discussed these document requests during the 3:35 p.m. April 18, 2006 telephonic discovery conference, but were unable to reach an agreement as to the production of responsive documents.

### B.    Law

K-T-V may not resist discovery by refusing to provide documents on the grounds that they are not within K-T-V's possession, custody or control because the documents are held by their employees, directors or attorneys.  A corporation may act only through its directors, employees, attorneys and agents.  Accordingly, "[n]umerous courts have found that corporations have control over their officers and employees and that corporations may be required to produce documents in their possession." *Miniace v. Pac. Maritime Ass'n*, No. C-04-03506-SI, 2006 U.S. Dist. LEXIS 17127, at *7 (N.D. Cal. Feb. 13, 2006) (citing *Herbst v. Able*, 63 F.R.D. 135, 138 (S.D.N.Y. 1972) and *Riddell Sports, Inc. v. Brooks*, 158 F.R.D. 555, 558–559 (S.D.N.Y. 1994)). Thus, K-T-V must produce powers of attorney, drafts of documents and videotapes in the possession of Michal Vlach or other officers or directors.

Similarly, K-T-V must produce documents in the possession of its Czech attorneys.  *E.g.*, *Axler v. Scientific Ecology Group, Inc.*, 196 F.R.D. 210, 212 (D. Mass. 2000) ("[A] party must produce otherwise discoverable documents that are in his attorneys' possession, custody or control."); *Poole v. Textron, Inc.*, 192 F.R.D. 494, 501 (D. Md. 2000).  Such documents— particularly the videotapes K-T-V made and then provided to its attorneys—are within K-T-V's "control" for purposes of Rule 34.

Finally, to the extent that Forminster has an existence separate from Messrs. Benda, Harazim, Vlach and Toman, K-T-V must also produce documents in the possession, custody or

control of Forminster.  Generally, there are five alternative circumstances in which a subsidiary

must produce documents in the possession of a non-party parent:

> (1) the alter ego doctrine which warranted "piercing the corporate veil";
>
> (2) the subsidiary was an agent of the parent in the transaction giving rise to the lawsuit;
>
> (3) The relationship is such that the agent-subsidiary can secure documents of the principal-parent to meet its own business needs and documents helpful for use in litigation;
>
> (4) There is access to documents when the need arises in the ordinary course of business; and
>
> (5) subsidiary was marketer and servicer of parent's product (aircraft) in the United States.

*Camden Iron & Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438, 441–42 (D.N.J. 1991)

(summarizing *Gerling Int'l Ins. Co. v. C.I.R.*, 839 F.2d 131, 140–41 (3d Cir. 1988)).

The Forminster / K-T-V relationship meets four out of these five alternate criteria.  As

described in more detail in the Weiss Parties' Opposition to Forminster's Motion to Dismiss

(attached hereto as Exhibit V), Forminster and K-T-V are alter egos.  K-T-V has also acted as an

agent of Forminster in bringing this lawsuit and initiating the Czech criminal proceedings.

Finally, there is no indication that K-T-V is unable to obtain documents from Forminster

whenever it suits its purposes.  As described in detail above, K-T-V and its controlling parent,

Forminster, are so closely intertwined in personnel that K-T-V cannot reasonably claim that it

lacks "control" over documents in Forminster's possession.  Accordingly, the Court should order

K-T-V to obtain documents from Forminster in response to the Weiss Parties' discovery

requests. *See Addamax Corp. v. Open Software Found.*, 148 F.R.D. 462 (D. Mass. 1993)

(granting motion to compel despite claim by subpoena recipient that responsive documents were

in possession of parent); *Japan Halon, Co. v. Great Lakes Chem.  Corp.*, 155 F.R.D. 626 (N.D.

Ind. 1993) (deciding that foreign corporation that initiated lawsuit in U.S. could not withhold documents held by its foreign parent corporation in view of close relationship between corporations); *Camden Iron & Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438 (D.N.J. 1991) (holding that subsidiary had obligation to produce documents in possession of parent); *M.L.C., Inc. v. N. Am. Philips Corp.*, 109 F.R.D. 134, 136–38 (S.D.N.Y. 1986) (same); *Afros S.P.A. v. Krauss-Maffei Corp.*, 113 F.R.D. 127 (D. Del. 1986) (same).

Accordingly, the Court should order K-T-V to produce *all* documents in its custody, possession or control, including those in the possession, custody or control of its employees, officers, directors, attorneys and those of its controlling parent, Forminster.

## IV.    <u>CONCLUSION</u>

For the above reasons, the Court should order K-T-V to respond to the Weiss Parties' interrogatories; answer the Weiss Parties' questions at deposition and produce all documents within its custody, possession or control.

Respectfully Submitted,

ANDREW WEISS, WEISS ASSET
MANAGEMENT LLC, K T INC. and CVF
INVESTMENTS LTD.

By their attorneys,


/s/ Benjamin A. Goldberger
Edward P. Leibensperger (BBO# 292620)
Benjamin A. Goldberger (BBO# 654357)
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts  02109-1775
(617) 535-4000

Dated: April 19, 2006

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 19, 2006.

<div align="right">

/s/ Benjamin A. Goldberger
Benjamin A. Goldberger

</div>

BST99 1498568-5.072198.0012

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KOTVA a.s. | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 05-10679-RCL |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW WEISS and WEISS ASSET | ) | |
| MANAGEMENT, LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OBJECTIONS AND RESPONSES OF KOTVA A.S. TO
## DEFENDANTS' THIRD SET OF INTERROGATORIES

Pursuant to Fed. R. Civ. P. 33, Local Rule 33.1, Plaintiff, Kotva, a.s. ("Kotva") hereby

responds to the Third Set of Interrogatories of Defendants Andrew Weiss and Weiss Asset

Management, LLC (collectively "Weiss").

### GENERAL OBJECTIONS

I.     Kotva objects to each interrogatory to the extent it seeks information that is

beyond the scope of Rules 26 or 33 of the Federal Rules of Civil Procedure, is beyond the proper

scope of discovery because of the attorney client relationship, prepared in anticipation of

litigation or trial or constitutes attorney work product, or is otherwise immune from discovery.

II.     In providing answers to these interrogatories, Kotva does not in any way waive or

intend to waive but rather intends to preserve the following:

a.     All objections as to competency, relevancy, materiality and admissibility;

b.    All rights to object on any ground to the use of any of the Answers herein, including the trial of this or any other action;

c.    All objections as to vagueness or ambiguity; and

d.    All rights to object on any ground to any further interrogatories or other discovery requests involving or related to any of the interrogatories in Weiss' First Set of Interrogatories.

III.    Privileged information responsive to any interrogatory below is not being provided. Kotva does not waive, and intends to preserve and is preserving the attorney client privilege, the work product doctrine, and every other privilege with respect to each and every answer, document or other repository of information protected by such a privilege.

IV.    Kotva objects to the Instructions and/or Definitions contained in the Interrogatories to the extent that they attempt to impose obligations on Kotva that are inconsistent with and/or in addition to those required under the Federal Rules of Civil Procedure and the Local Rules.

V.    Kotva objects to the Interrogatories to the extent each interrogatory contains several subparts and therefore exceeds the number of interrogatories permitted under Fed. R. Civ. P. 33(a).

VI.    Kotva objects to the Interrogatories to the extent that they demand production of any information containing any confidential, proprietary and/or trade secret information.

VII.    Kotva's answers to the Interrogatories are qualified by the General Objections. Failure to restate any General Objection in response to a particular interrogatory does not

2

constitute a waiver of such General Objection. By responding to these Interrogatories, Kotva

does not waive any asserted objection.

## Interrogatory No. 1

Please identify the legal and beneficial owners of an interest, including shares of stock or
a partnership interest, in each of the Listed Companies, for the period from January 1, 2000 until
to present.

### Response to Interrogatory No. 1

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly

burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the

discovery of admissible evidence. Plaintiff further objects to this interrogatory to the extent it

seeks information concerning entities unaffiliated with Plaintiff. Plaintiff also objects to the

extent this interrogatory has been previously asked and fully responded to by Plaintiff. (See

Defendants' Second Set of Interrogatories, No. 1 and response thereto) Subject to the foregoing

General and Specific Objections, Plaintiff responds as follows:

a.    Forminster Enterprises, Ltd.

Unknown.

b.    Kotva, a.s.

Kotva's approximately 694,209 shares are publicly traded on the Czech securities market,

and there are currently approximately 7,700 shareholders. Given that Kotva's shares are publicly

traded, Kotva's ownership changes regularly. Shareholders currently owning more than 10% of

Kotva's outstanding shares are:

| | | |
|---|---|---|
| Forminster Enterprises Limited/Sprint | 385,038 shares | 55.74% |
| Ardmore Risk Management Limited | 97,753 shares | 14.08% |

HSBC Bank plc                    81,082 shares                  11.92%

Kotva cannot identify those persons who have an "indirect ownership interest" in Kotva's shares.

    b.    <u>Kotva Nemovitosti ("KN")</u>

Kotva owns 100% of KN.

    c.    <u>SPV KN</u>

Pursuant to the Share Purchase Agreement with Markland, (which has been produced to Defendants) SPV KN was sold to Markland in connection with the department store sale in 2005, and Plaintiff does not know the current ownership status of SPV KN.

    d.    <u>SPV Co., Ltd. "(SPV")</u>

SPV is owned 100% by KN. In further answering, see response to Interrogatory 1(c) and the documents produced in response to Defendants' document requests (Bates No. K5106).

    f-j.    Unknown. Interrogatory 1(f-j) seeks information regarding entities that have no relationship to Plaintiff, and Plaintiff has no information or documents responsive to this interrogatory concerning such entities.

    k.    <u>Kotva správcovská a.s.</u>

K Spra is owned 100% by Kotva Parking s.r.o.

    l.    <u>Kotva obchodni' a.s. ("KO")</u>

Kotva owns 100% of KO.

    m.    <u>Kotva Parking s.r.o. ("KP")</u>

Kotva owns 100% of KP.

    n.    <u>Kotva International, Ltd. ("KI")</u>

Kotva sold KI sometime ago and the current status is not known of Kotva. Kotva will supplement its answer if information responsive to this interrogatory is discovered.

**Interrogatory No. 2**

Please identify the directors, officers and managers of the Listed Companies, for the period from January 1, 2000 until the present.

**Answer No. 2**

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this interrogatory to the extent the information is publicly available to Defendants. Subject to the foregoing General and Specific Objections, Plaintiff responds as follows: Pursuant to Fed R. Civ. P. 33(d), with respect to the Kotva owned Czech entities (i.e. Kotva a.s.; Kotva Nemovitosti; Kotva Správcovská a.s.; Kotva Obchodni a.s.; Kotva Parking s.r.o.), the identities of individuals who served as officers, directors and managers since 2000 may be ascertained from Kotva's annual reports, which will be produced to Defendants.

The directors, officers and managers of SPV C.O. are as follows:

Marek Kolíbal
SPVCO
Pavlou 15
Ledra House
Aglos Andreas
P.C. 1105
Nicosia, Cyprus


Paraskevas Zacharoullis
SPVCO
Pavlou 15
Ledra House
Aglos Andreas
P.C. 1105
Nicosia, Cyprus

Elena Makrigiorgi
SPVCO
Pavlou 15
Ledra House
Aglos Andreas
P.C. 1105
Nicosia, Cyprus

## Interrogatory No. 3

Please identify all documents, including but not limited to meeting minutes, concerning any meetings of shareholders, directors or supervisory board members of the Listed Companies at which one or more of the following topics was discussed: (a) the sale or potential sale of the Department Store; (b) the value of the Department Store; (c) the value of Kotva a.s. or its shares; (d) any transfer of the Department Store or an entity owning the Department Store from one person to another; (e) Weiss, WAM, K T, Inc. or CVF Investments, Ltd., Weiss Capital LLC or Vladimir Hoffmann; (f) this lawsuit; (g) criminal complaints or proceedings in the Czech Republic in which Andrew Weiss, Vladimir Hoffman or Edita Simkova are defendants or potential defendants, or (h) Kotva's relationship with Forminster Enterprises Ltd.

## Answer No. 3

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing General and Specific Objections, Plaintiff responds as follows: Plaintiff has produced the documents identified in Interrogatory No. 3 and, pursuant to Fed. R. Civ. P. 33(d), the answer to this interrogatory may be ascertained or derived from the documents produced by Plaintiffs in response to Defendants' document requests.

## Interrogatory No. 4

Please identify any describe in detail all agreements between and among the Listed Companies from the period January 1, 2000 to the present, including but not limited to, any promissory notes, loans, mortgages, security interests, option agreements, other contracts, and agreements on inter-company allocation of revenues or expenses.

**Answer No. 4**

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly

burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the

discovery of admissible evidence. Notwithstanding the foregoing General and Specific

Objections, Plaintiff responds as follows: Pursuant to Fed. R. Civ. P. 33(d), the answer to this

interrogatory may be ascertained or derived from Kotva's annual reports, which identify any

such inter-company agreements and/or allocation of revenues and expenses to the extent such

allocations occurred.

**Interrogatory No. 5**

Please identify any powers of attorney issued by one or more of the Listed Companies,
including but not limited to powers of attorney naming Miroslav Hálek, for the period from
January 1, 1996 to the present.

**Answer No. 5**

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly

burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the

discovery of admissible evidence. Plaintiff further objects to this interrogatory to the extent

Defendants seek documents dating back to 1996, which is beyond the scope of discovery

permitted by the Discovery Master. Notwithstanding the foregoing General and Specific

Objections, Plaintiff is unaware of any powers of attorney naming Miroslav Hálek from 2000 to

the present.

**Interrogatory No. 6**

For each and every interrogatory response in which Kotva claims that it is unable to
answer, in whole or in part, please describe in detail the efforts Kotva took to gather responsive
information.

**Answer No. 6**

Plaintiff is able to and has fully answered the foregoing interrogatories

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS 17 DAY OF FEBRUARY, 2006.

Richard Harazim

As to objections:

Joel G. Beckman (BBO #553086)
William C. Nystrom (BBO#559656)
Daniel J. Pasquarello (BB0# 647379)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: February 17, 2006

**CERTIFICATE OF SERVICE**

I, Daniel Pasquarello, hereby certify that on February 17, 2006 I caused and a true copy of the foregoing document to be served by email and First Class mail postage pre-paid upon all counsel of record.

Daniel Pasquarello

8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KOTVA a.s.,<br><br>        Plaintiff,<br><br>    v.<br><br>ANDREW WEISS and WEISS ASSET<br>MANAGEMENT, LLC,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| ANDREW WEISS, WEISS ASSET<br>MANAGEMENT LLC, K T, INC. and CVF<br>INVESTMENTS, LTD.,<br><br>        Counterclaim-plaintiffs,<br><br>    v.<br><br>KOTVA a.s., MARTIN BENDA, RICHARD<br>HARAZIM, FORMINSTER ENTERPRISES,<br>LTD., SPV CO and JOHN DOES 1–5,<br><br>        Counterclaim-defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-10679-RCL |

## SUPPLEMENTAL OBJECTIONS AND RESPONSES OF PLAINTIFF TO DEFENDANTS ANDREW WEISS AND WEISS ASSET MANAGEMENT, LLC'S THIRD SET OF INTERROGATORIES TO THE PLAINTIFF

Pursuant to Fed. R. Civ. P. 33, Local Rule 33.1, Plaintiff, Kotva, a.s. ("Kotva")

hereby supplements its response to the Third Set of Interrogatories of defendants,

Andrew Weiss and Weiss Asset Management, LLC (collectively "Weiss").

## GENERAL OBJECTIONS

I.     Kotva objects to each interrogatory to the extent it seeks information that

is beyond the scope of Rules 26 or 33 of the Federal Rules of Civil Procedure, is beyond

the proper scope of discovery because of the attorney client relationship, prepared in anticipation of litigation or trial or constitutes attorney work product, or is otherwise immune from discovery.

II.    In providing answers to these interrogatories, Kotva does not in any way waive or intend to waive but rather intends to preserve the following:

a.    All objections as to competency, relevancy, materiality and admissibility;

b.    All rights to object on any ground to the use of any of the Answers herein, including the trial of this or any other action;

c.    All objections as to vagueness or ambiguity; and

d.    All rights to object on any ground to any further interrogatories or other discovery requests involving or related to any of the interrogatories in Weiss' First Set of Interrogatories.

III.    Privileged information responsive to any interrogatory below is not being provided. Kotva does not waive, and intends to preserve and is preserving the attorney client privilege, the work product doctrine, and every other privilege with respect to each and every answer, document or other repository of information protected by such a privilege.

IV.    Kotva objects to the Instructions and/or Definitions contained in the Interrogatories to the extent that they attempt to impose obligations on Kotva that are inconsistent with and/or in addition to those required under the Federal Rules of Civil Procedure and the Local Rules.

V.    Kotva objects to the Interrogatories to the extent each interrogatory
contains several subparts and therefore exceeds the number of interrogatories permitted
under Fed. R. Civ. P. 33(a).

VI.    Kotva objects to the Interrogatories to the extent that they demand
production of any information containing any confidential, proprietary and/or trade secret
information.

VII.    Kotva's answers to the Interrogatories are qualified by the General
Objections. Failure to restate any General Objection in response to a particular
interrogatory does not constitute a waiver of such General Objection. By responding to
these Interrogatories, Kotva does not waive any asserted objection.

**Interrogatory No. 2**

Please identify the directors, officers and managers of the Listed Companies, for
the period from January 1, 2000 until the present.

**Answer No. 2**

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable,
unduly burdensome, seeks irrelevant information, and is not reasonably calculated to lead
to the discovery of admissible evidence. Plaintiff further objects to this interrogatory to
the extent the information is publicly available to Defendants. Subject to the foregoing
General and Specific Objections, Plaintiff responds as follows: Pursuant to Fed R. Civ. P.
33(d), with respect to the Kotva owned Czech entities (i.e. Kotva a.s.; Kotva
Nemovitosti; Kotva Správcovská a.s.; Kotva Obchodni a.s.; Kotva Parking s.r.o.), the
identities of individuals who served as officers, directors and managers since 2000 may
be ascertained from Kotva's annual reports, which will be produced to Defendants.

The directors, officers and managers of SPV C.O. are as follows:

3

Marek Kolíbal
SPVCO
Pavlou 15
Ledra House
Aglos Andreas
P.C. 1105
Nicosia, Cyprus

Paraskevas Zacharoullis
SPVCO
Pavlou 15
Ledra House
Aglos Andreas
P.C. 1105
Nicosia, Cyprus

Elena Makrigiogi
SPVCO
Pavlou 15
Ledra House
Aglos Andreas
P.C. 1105
Nicosia, Cyprus

**Supplemental Response**:

Subject to and without waiving its objections, Kotva is gathering information

regarding the previous directors, officers and managers of SPV C.O. and will provide that

information in a further supplement.

**Interrogatory No. 6**

For each and every interrogatory response in which Kotva claims that it is unable
to answer, in whole or in part, please describe in detail the efforts Kotva took to gather
responsive information.

**Answer No. 6**

Plaintiff is able to and has fully answered the foregoing interrogatories.

**Supplemental Response**:

Kotva objects to this interrogatory to the extent it seeks information that is protected by the attorney/client privilege and work product doctrine. Kotva further objects that this interrogatory is overly broad, unreasonable, unduly burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving any objections, Kotva responds that it answered all interrogatories based upon the documents and information known to it. In its previous responses to interrogatories, Kotva stated that it filed a criminal complaint with Czech authorities but lacks knowledge or information sufficient to identify which individuals specifically initiated the criminal charges against Weiss (Kotva has produced the charging document that identifies a prosecutor); that it cannot identify the persons who have an "indirect ownership interest" in Kotva's shares; that it no longer owns Kotva International Ltd. and SPV KN and does not know the current ownership status of those entities; and that it lacks information or knowledge sufficient to identify the legal and beneficial owners of Forminster and the Bonalbo entities. To the extent that the Weiss Defendants are attempting to force Kotva to conduct independent research to acquire information to answer interrogatories, to provide information that is readily available to the Weiss Defendants, or to conduct research on the Weiss Defendants' behalf, the interrogatories are beyond the proper scope of discovery.

As to objections:

_____
Joel G. Beckman (BBO #553086)
William C. Nystrom (BBO#559656)
Daniel J. Pasquarello (BBO#647379)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated:  April 7, 2006


<u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on April 7, 2006 I caused a copy of the foregoing document to be served by Facsimile and First Class Mail upon all defendants.

_____
Joel G. Beckman

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY OF THE LAWS OF
THE UNITED STATES OF AMERICA ON THIS ⊥ DAY OF APRIL, 2006.

_____
Richard Harazim



ΚΥΠΡΙΑΚΗ   ΔΗΜΟΚΡΑΤΙΑ
REPUBLIC   OF CYPRUS

C.C.2

No.: 78962

**MINISTRY OF COMMERCE, INDUSTRY & TOURISM**
**DEPARTMENT OF REGISTRAR OF COMPANIES**
**AND OFFICIAL RECEIVER**
**NICOSIA**

**30 June 2005**

### CERTIFICATE

### FORMINSTER ENTERPRISES LIMITED

It is hereby certified that in accordance with the records kept by this Department the following were the Directors and Secretary of the above company as at 30 11 1999:

| Directors | Nationality | Residential Address |
|---|---|---|
| RICHARD HARAZIM | Czech Republic | 174 Skorkovskeho 636 00 Brno Czech Republic |
| MARTIN BENDA | Czech Republic | 46 Borac C Czech Republic |
| JOHN MOFFITT | American | 14 Bilkova Prague 1 Czech Republic |
| MICHAEL BLUHM | American | 4 U. Nikolajky Prague 5 Czech Republic |

| Secretary | Residential Address |
|---|---|
| INDILAW SECRETARIAL LIMITED | 4 Diagorou Street Kermia House, Office 601 Nicosia |

M. MARKIDOU
For Actg Registrar of Companies

/LH



ΚΥΠΡΙΑΚΗ **ΔΗΜΟΚΡΑΤΙΑ**
REPUBLIC **OF CYPRUS**

C.C.2

No.: 78962

## MINISTRY OF COMMERCE, INDUSTRY & TOURISM
### DEPARTMENT OF REGISTRAR OF COMPANIES
### AND OFFICIAL RECEIVER
### NICOSIA

**30 June 2005**

### CERTIFICATE

### FORMINSTER ENTERPRISES LIMITED

It is hereby certified that in accordance with the records kept by this Department the following were the Directors and Secretary of the above company as at 6.5.2002:

| Directors | Nationality | Residential Address |
|---|---|---|
| RICHARD HARAZIM | Czech Republic | 174 Skorkovskeho 636 00 Brno Czech Republic |
| MARTIN BENDA | Czech Republic | 46 Borac C Czech Republic |
| JOHN MOFFITT | American | 14 Bilkova Prague 1 Czech Republic |
| MICHAEL VLACH | Czech Republic | 10 Galandauerova Brno Czech Republic |

| Secretary | Residential Address |
|---|---|
| INDILAW SECRETARIAL LIMITED | 4 Diagorou Street Kermia House, Office 601 Nicosia |

M. MARKIDOU
For Actg Registrar of Companies

/LH



ΚΥΠΡΙΑΚΗ    ΔΗΜΟΚΡΑΤΙΑ
REPUBLIC    OF CYPRUS

C.C.2

No.: 78962

**MINISTRY OF COMMERCE, INDUSTRY & TOURISM
DEPARTMENT OF REGISTRAR OF COMPANIES
AND OFFICIAL RECEIVER
NICOSIA**

**30 June 2005**

**CERTIFICATE**

**FORMINSTER ENTERPRISES LIMITED**

It is hereby certified that in accordance with the records kept by this Department the following were the Directors and Secretary of the above company as at 31 10 2002:

| Directors | Nationality | Residential Address |
|-----------|-------------|---------------------|
| DOXA PERICLEOUS | Cypriot | 4 Diagorou Street Kermia House 6th Floor, Flat 601 1097 Nicosia |
| RENA DAVID | Cypriot | 4 Diagorou Street Kermia House 6th Floor, Flat 601 1097 Nicosia |
| ANTHONY INDIANOS | Cypriot | 4 Diagorou Street Kermia House 6th Floor, Flat 601 1097 Nicosia |
| ANDREAS PAPASIANTIS | Cypriot | 4 Diagorou Street Kermia House 6th Floor, Flat 601 1097 Nicosia |

| Secretary | Residential Address |
|-----------|---------------------|
| INDILAW SECRETARIAL LIMITED | 4 Diagorou Street Kermia House, 6th Floor, Flat 601 1097 Nicosia |

M. MARKIDOU

For Actg Registrar of Companies

/LH

1          VOLUME 1, PAGES 1 - 234

2              EXHIBITS 1 - 22

3      IN THE UNITED STATES DISTRICT COURT

4       FOR THE DISTRICT OF MASSACHUSETTS

5              No. 05-10679-RCL

6      - - - - - - - - - - - - - - - - - - - - - - - - -

7    KOTVA a.s.,

8          Plaintiffs

9        vs.

10   ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,

11        Defendants

12   _____

13   ANDREW WEISS, WEISS ASSET MANAGEMENT LLC,

14   KT, INC. and CVF INVESTMENTS, LTD.,

15        Counterclaim-Plaintiffs,

16      v.

17   KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM,

18   FORMINSTER ENTERPRISES, LTC., SPV CO. and

19   JOHN DOES 1-5,

20        Counterclaim-Defendants.

21   - - - - - - - - - - - - - - - - - - - - - - - - -

22     VIDEOTAPED RULE 30(b)(6) DEPOSITION OF KOTVA a.s

23       BY AND THROUGH RICHARD HARAZIM

24     Tuesday, February 22, 2006 10:02 a.m

1    representative, I was hired force.

2        Q.  You were hired by Forminster, correct?

3        A.  Yes.

4        Q.  And you said certain interests of

5    Forminster hired you.  Is that right?

6            MR. BECKMAN:  Objection.  You may answer

7    if you understand the question.

8        A.  No.  I don't understand the nature of the

9    question.

10       Q.  Who engaged you on behalf of Forminster?

11       A.  It was a law firm Toman, Toman Devaty and

12   Partners.

13       Q.  What individual?

14       A.  Petr Toman.

15       Q.  Did Mr. Toman have a power of attorney on

16   behalf of Forminster?

17       A.  I presume, yes.

18       Q.  Who gave him the power of attorney?

19       A.  I don't know that.

20       Q.  Is it your testimony under oath that you

21   do not know who at Forminster engaged Mr. Toman to

22   engage you?

23       A.  I don't know.

24       Q.  Did you receive compensation from

Harazim, Richard Vol 1  2/22/2006  10:02:00 AM

1    Well, we'll deal with that.

2    BY MR. LEIBENSPERGER:

3        Q.  Now, what is the date of this settlement

4    agreement?

5        A.  I don't see it here.  I believe that it

6    was signed in December of 1999.

7        Q.  All right.

8        A.  But, here the date is not there.

9        Q.  At the time of this settlement agreement,

10   you worked for Forminster, correct?

11       A.  Yes.

12       Q.  How long did you work for Forminster?

13       A.  You mean how long was the work on this

14   particular agreement?  Was this the question?

15       Q.  No.  How long total did you work?

16       A.  It was one year on this project, and two

17   years as a director, and in total it's three years.

18       Q.  When did you first start doing any work

19   for Forminster?

20       A.  I'm not really sure, but we could say that

21   it could have been 1998.

22       Q.  Did you have a written employment

23   agreement with Forminster?

24       A.  No.  It was not about employment, no.

1      Q.  Was there anyone else engaged by

2   Forminster to negotiate this agreement?

3      A.  Besides the lawyers, I was working also

4   with Mr. Martin Benda.

5      Q.  Was Mr. Benda at this time, 1988 to 1999,

6   engaged by Forminster?

7      A.  I believe, yes, because we were working on

8   this project together.

9      Q.  All right.  In connection with this

10   settlement agreement, who did you talk to at

11   Forminster?

12      A.  These were lawyers, and a law firm Toman,

13   which I mentioned, and Martin.

14      Q.  Anyone else?

15      A.  No.  I'm not aware of anyone else.

16      Q.  From whom did you receive instructions

17   about Forminster's position on the agreement?

18      A.  All the details, I was discussing with

19   these people that I mentioned.

20      Q.  Mr. Benda and Mr. Toman?

21      A.  And Mr. Toman, yes.

22      Q.  No one else?

23      A.  There were some other lawyers from the law

24   firm of Toman.

1      Q.  Is that correct?

2      A.  Yes.

3      Q.  Is this the record you were referring to

4    as showing who the shareholders are?

5      A.  No, no.  This is a record that shows who

6    the directors are.  There must be similar to this

7    record which shows who the shareholders were.

8      Q.  Were the shares of Forminster that were --

9    let me start over.  Were the shares at Forminster at

10   November 30, 1999 held by nominees?

11     A.  I believe so.

12     Q.  Do you know who the beneficial owners were

13   of the shares of Forminster on November 30, 1999?

14     A.  No.

15     Q.  Did you ever ask that question?

16     A.  No.

17     Q.  Was there a reason you did not ask that

18   question?

19        MR. BECKMAN:  Objection.  You may answer.

20     A.  There was no special reason.  I just

21   didn't ask.

22     Q.  You were aware in November, 1999 of the

23   allegation in the press that Forminster had committed

24   criminal acts?

Harazim, Richard Vol 1  2/22/2006  10:02:00 AM

1          MR. BECKMAN:  Objection.

2      Q.  Were you aware of those?

3      A.  Yes.

4      Q.  And so didn't you want to know who the

5   owners of Forminster were, before you signed up to be

6   on the Board of Directors?

7      A.  I wanted to know who the shareholders were

8   not.

9      Q.  Okay.  And what did you do in that regard?

10     A.  I asked the law firm, Mr. Toman, if he can

11   assure me that I don't work for Mr. Hßlek, and I got

12   that insurance -- assurance, I'm sorry .

13     Q.  What way did Mr. Toman give you that

14   assurance?

15          MR. BECKMAN:  Objection.  You may answer.

16     A.  Just told me so.

17     Q.  Did he give you anything in writing?

18     A.  No.

19     Q.  Was there anyone else that you wanted to

20   be assured of as not being a shareholder of Forminster?

21     A.  Well, I said Mr. Hßlek or anybody from his

22   group.

23     Q.  So, to be clear here, you asked Mr. Toman

24   whether Mr. Hßlek or anyone from his group were

1    shareholders of Forminster, correct?

2        A.  Yes

3        Q.  And his answer to you was?

4        A.  No.

5        Q.  Did you do anything further to learn the

6    identities of the beneficial shareholders of

7    Forminster?

8        A.  No.

9        Q.  How long did you stay a member of the

10   Board of Directors of Forminster?

11       A   Once again, I don't remember exactly the

12   day, but I believe it was still Autumn, 2002.

13           MR. LEIBENSPERGER:  Let's mark the next

14   exhibit.

15           (Certificate dated May 6, 2002

16       marked Exhibit 8.)

17           MR. LEIBENSPERGER:  This will be

18   Exhibit 8.

19   BY MR. LEIBENSPERGER:

20       Q.  Exhibit 8 is another certificate

21   referencing you as a member of the Board of Directors

22   of Forminster at May 6, 2002.  Is that correct?

23       A.  Yes.

24       Q.  And so were you a member of the Board of

1      A.  I don't want to be imprecise; therefore, I

2   don't want to go it.  The principle of the document was

3   that parties on one side, which was Deutsche Bank,

4   James Woolf and all the other entities --

5      Q.   Keep going.

6      A.  -- will not attack the entities on the

7   other side, which was Kotva and then on the other

8   entities, and the entities on the side of Kotva will

9   not attack Deutsche Bank and James Woolf.  It was a

10   mutual, mutual obligation not to attack.

11      Q.   Did the document also release Woolf's

12   claim for any interest in the real estates?

13         MR. BECKMAN:  Objection.  If you

14   understand.

15      A.  I don't know.  Can you rephrase, please.

16   I'd rather have it rephrased, please

17         MR. LEIBENSPERGER:  Sorry.

18      A.   I'd rather have it rephrased, the

19   question, please.

20      Q.   In this, we'll call it an indemnity

21   agreement --

22      A.  Let's call it indemnity agreement, yes.

23      Q.   In this indemnity agreement, did Woolf

24   give up any claim to a right to the real estate?

Harazim, Richard Vol 1  2/22/2006  10:02:00 AM

1          A.  No.  That wasn't the content of the

2    document.  The content was he will no more attack Kotva

3    or other entities, and Kotva will no more attack him.

4          Q.  What was the consideration for Mr. Woolf

5    to not attack anyone?

6               MR. BECKMAN:  Objection.

7          A.  There was no consideration.

8               MR. BECKMAN:  Objection.  You may answer.

9          A.  There was no consideration.  What happened

10   was Deutsche Bank intervening on behalf of James Woolf

11   was taken as a very serious step on our side, then we

12   prepared a lawsuit against Deutsche Bank, so in the end

13   it was mutual giving up of any hostile steps against

14   each other.  There was no consideration paid to James

15   Woolf.

16         Q.  Were the shares that James Woolf held in

17   Kotva acquired in this agreement?

18         A.  Not in this agreement.  No.

19         Q.  All right.  Have the shares of James Woolf

20   and Kotva been acquired?

21         A.  Shares of James Woolf were bought by a

22   third entity, not related to Kotva, but because it's

23   true that the business transaction was a trigger for

24   the settlement talks, James Woolf was selling his

1    claims against Trend, not against Kotva, against Trend,

2    and his shares in Kotva to a third party, and because

3    he was giving up the basis on which he was in my view

4    wrongly formulating claims against Kotva, he wanted to

5    be sure that with this gone, he's not open to our

6    attacks.

7         So, as a followup to the business

8    transaction by which James Woolf sold the instruments

9    that provided in his mind the leverage against the

10   building, he requested indemnity, and so did we,

11   because it eased our position with the Irish buyers.

12        Q.  So, a follow-up question on that.  To whom

13   did Woolf sell his claim in his shares in Kotva?

14        A.  I think was JT Bank.

15        Q.  Was JT Bank acting on behalf of someone

16   else?

17        A.  I have no idea.

18        Q.  Is it your testimony that JT Bank was not

19   acting on behalf of Kotva?

20        A.  It was not acting on behalf of Kotva.

21        Q.  Was JT Bank acting on behalf of you,

22   personally?

23        A.  No.

24        Q.  Was JT Bank acting on behalf of

1  Forminster?

2      A.  This is 2005.  I don't know what

3  Forminster was doing, but not to my knowledge.

4      Q.  So, you don't know whether JT Bank was --

5      A.  I don't know.

6      Q.  -- was acting on behalf of Forminster?

7      A.  Not to my knowledge.  I don't know.

8      Q.  All right.  Who is the record shareholder

9  of the shares previously owned by Woolf?

10      A.  I don't know.

11      Q.  And do you know who the beneficial owner

12  of the shares previously held by Woolf?

13      A.  No.

14      Q.  Have you ever seen a document

15  memorializing the sale by Woolf of his shares and claim

16  to JT Bank?

17      A.  If I saw the documents?

18      Q.  Did you see those documents?

19      A.  I think I did.

20      Q.  Do you recall what they were called?  I

21  mean what was the title of the documents?

22      A.  I think it was instrument of transfer or

23  something like that.

24      Q.  Do you have copies of those documents?

1      Q.  Who else on the Kotva side?

2      A.  I don't think anybody else.

3      Q   You testified earlier that you saw the

4   agreement between Woolf and JT Bank, right?

5      A.  Yes.

6      Q.  Okay.  Where did you see that?  Where were

7   you physically?

8      A.  I think in the lawyer's rooms.

9      Q.  I'm sorry.  In the lawyer's rooms.  Which

10   lawyers?

11      A.  I don't know who was preparing this one.

12   This may have been done by Toman's office.  It may have

13   been.

14      Q.  Was there a closing at Toman's office?

15      A.  I don't think there was anything like a

16   closing.

17      Q.  When did you see the agreement at Toman's

18   office?

19      A.  When we were preparing the indemnity

20   documents.

21      Q.  The what documents?

22      A   The indemnity documents.

23      Q.  Was Suringham a party to this indemnity?

24      A.  I don't recall.

1    Forminster possesses the shares.'"  Did you say that to

2    Mr. Carey?

3        A.  I don't know.  I have no trust in

4    Mr. Carey, so I don't know.  I didn't -- I didn't have

5    tape records of what I said to Mr. Carey.  I don't

6    know.

7        Q.  Is it you don't remember whether you said

8    that?

9        A.  It was three hours telephone discussion

10    with Mr. Carey, so I don't know if I said this

11    particular sentence or if I said something else, and if

12    you put it like this, I can only repeat that I have no

13    trust in Mr. Carey.

14        Q.  But, you might have said these quotes to

15    Mr. Carey?

16        MR. BECKMAN:  Objection.

17        A.  I might have said.  Might have said.

18        Q.  All right.  This morning you testified

19    about a period of time when Mr. Golden was on the board

20    of Kotva?

21        A.  Yes.

22        Q.  And it was during that period of time you

23    were on the board of both Kotva and Forminster,

24    correct?

1      A.  Correct.

2          Q.  Did you talk with Mr. Golden then about

3    the possibility of Forminster buying the BGO shares?

4      A.  Yes.

5          Q.  What did you say and what did he say about

6    that possibility?

7          A.  Once again, I can't remember what exactly

8    was said, but the principle was that Forminster would

9    buy shares of BGO, and if I remember correctly, there

10   was some option for the shares of Trend on the

11   question.  The business terms were agreed in principle,

12   but for some reason, later on the transaction just

13   didn't come through.

14         Q.  Can you place this in time, to the best of

15   your memory?

16     A.  2001.

17         Q.  And what were the business terms that you

18   had agreed upon?

19     A.  I don't remember correctly.  Very roughly,

20   I would say that Forminster offered like 50 million,

21   and I don't know if it was for the whole thing or if it

22   was just for the shares of Kotva.

23     Q.  50 million Czech crowns?

24     A.  Czech crowns.

1      Q.   That's a number that sticks in your head?

2      A.   (Witness nodded.)  That's a number that I

3   have in my head, yes.

4      Q.   And to the best of your memory, was that

5   the total for both BGO and the Trend shares or the --

6   sorry.  Let me start over.  Is that the total for both

7   the BGO shares in Kotva and Trend shares in Kotva?

8      A.   I don't recall.

9      Q.   Had that, did you come to the 50 million

10  as a result of a negotiation?

11     A.   Yes.

12     Q.   For example, did Mr. Golden want more than

13  that, and he came down?

14     A.   Of course, he wanted more, yes, yes.

15     Q.   And you had offered less, and you came up?

16     A.   Presumably.  This is just the -- yes.

17  That is normally when two parties try to strike a deal,

18  I just remember the structure; that is, that there was

19  discussion about the shares, and the shares of -- I

20  mean the shares of Kotva and the shares of Trend, and

21  as far as the Trend shares are concerned, the

22  discussion was not, was not about direct sale, but

23  about an option.

24     Q.   All right.  Now, in 2001, there had been a

1    Q.  All right.

2           (Discussion off the record.)

3           (Witness conferred with counsel.)

4           MR. BECKMAN:  Can we take a two-minute

5    break?

6           MR. LEIBENSPERGER:  Yes.  That's fine.

7           THE VIDEOGRAPHER:  Going off the record.

8    The time is 3:25 p.m.

9           (A recess was taken.)

10          (E-mail dated November 28, 2003

11    marked Exhibit 16.)

12          (Letter dated December 2, 2003

13    marked Exhibit 17.)

14          THE VIDEOGRAPHER:  Going back on the

15    record.  The time is 3:32 p.m.

16    BY MR. LEIBENSPERGER:

17          Q.  I have handed you what has been marked as

18    Exhibits 16 and 17.  The first is an e-mail from

19    Mr. Hoffmann to Dave Johnson, Andrew Weiss, Eiton

20    Nobrahim [phonetic] dated November 28, 2003, and the

21    second is a letter dated December 2, 2003.

22    Mr. Harazim, with respect to the Exhibit 16, it says

23    that "Harazim called me today and told me that they

24    will make the firm bid for our Kotva shares on Monday."

Harazim, Richard Vol 1  2/22/2006  10:02:00 AM

1    Do you see where I read that?

2         A.  Yes.

3         Q.  Did you call Mr. Hoffmann and indicate

4    that there would be a bid for the Kotva shares of BGO?

5         A.  I don't recall that particular situation,

6    but it's true that JT Bank acknowledged to us that they

7    had a client who would be willing to buy the shares,

8    and I probably informed Mr. Hoffmann about that, yes.

9         Q.  Did, had you contacted JT Bank to look for

10   a potential buyer of the shares?

11        A.  Yes, we did.

12        Q.  All right.  Who at JT Bank had you

13   contacted?

14        A.  Who at JT Bank?

15        Q.  Yes.

16        A.  This is something that was done by my

17   colleague, Martin Benda, and I believe he spoke to the

18   person signed here, but I didn't contact personally

19   anyone.

20        Q.  To the best of your knowledge, Mr. Benda

21   contacted JT Bank?

22        A.  Yes.

23        Q.  To find a potential buyer of the BGO

24   shares?

1       A.  I would say he just asked if there was

2    anybody interested in those shares.

3       Q.  And did you say that you believe he

4    contacted Mr. Semotan?

5       A.  I think so.

6       Q.  Who was the client of JT Bank, who made

7    the offer for the shares?

8       A.  I have no idea.

9       Q.  So, your testimony is you have no idea who

10   the -- well, I just said that.  Let me go back.

11   Exhibit 17 is a letter from JT Bank to Weiss Asset

12   offering to buy the Kotva shares held by BGO on behalf

13   of a client, correct?

14      A.  Correct.

15      Q.  And the offer is for 1 million U.S.

16   dollars?

17      A.  Yes.

18      Q.  How did you learn that JT Bank was going

19   to make this offer?

20      A.  Mr. Benda told me.

21      Q.  What did Mr. Benda tell you?

22      A.  That apparently JT would make an offer

23   either on behalf of its client or maybe for themselves,

24   and that's it.  Let's see if BGO accepts.

1      Q.   Was -- how did JT Bank know any amount to

2    make the offer for?

3      A.   JT Bank is a dealer in securities.  They

4    had relation to Kotva, because they provided a loan,

5    financing loan, operating loan to Kotva, and, moreover,

6    they showed interest in the building.  Therefore, I

7    believe that they had the means of how to establish the

8    value for themselves.

9      Q.   Did Mr. Benda tell you the name of the

10    client of JT Bank?

11      A.   No.

12      Q.   Do you believe that Mr. Benda knows the

13    client of JT Bank?

14        MR. BECKMAN:  Objection.  You can answer.

15      A.   I don't know.

16      Q.   From any way?  You don't know one way or

17    the other?

18      A.   No.

19      Q.   Did you ever learn the client of JT Bank

20    that made this offer?

21      A.   No.  The deal didn't come through.

22      Q.   No -- my question is --

23      A.   No.

24      Q.   -- did you ever learn the client?

Harazim, Richard Vol 1  2/22/2006  10:02:00 AM

1    A.  No.  No, I didn't.

2    Q.  Did you learn that the client of JT Bank

3    making the offer might have been Forminster?

4    A.  I don't know.

5    Q.  You don't know that it wasn't Forminster,

6    right?

7    A.  I don't know who the client was.

8    Q.  So, it could have been Forminster?  You

9    wouldn't know one way or the other?

10       MR. BECKMAN:  Objection.

11    A.  I wouldn't know.

12    Q.  Weren't you interested to know who would

13    become the shareholder replacing BGO?

14    A.  Not really.  That's enough.  No, not.

15    Q.  So, BGO was roughly 12 percent shareholder

16    of Kotva, correct?

17    A.  Yes.

18    Q.  And you testified you had an interest in

19    BGO being purchased, their shares being purchased,

20    correct?

21       MR. BECKMAN:  Objection.

22    A.  I agreed that such a situation would be

23    better, yes.

24    Q.  Right.  So, wouldn't you want to know

1    whether the buyer of the BGO shares could be someone,

2    who would be very problematic to Kotva?

3         MR. BECKMAN:  Objection.

4         A.  I didn't believe so.  I didn't believe so.

5         Q.  You didn't believe so about what?

6         A.  I didn't believe that there could be a

7    shareholder that would be more troublesome, no.

8         Q.  Now, in -- let me take a step back.

9    Exhibit 16 references that you called Hoffmann and told

10   him that the bid was coming, right?

11        MR. BECKMAN:  Objection.

12        A.  That's what it says.  I don't recall that

13   particular event.

14        Q.  What -- you don't recall the particular

15   event, but is it your best memory that you did let him

16   know that was happening, going to be happening?

17        MR. BECKMAN:  Objection.

18        A.  To my best memory, either me or Martin

19   must have called him and said the deal could come

20   through.

21        Q.  The deal could come through?

22        A.  Meaning there might be a buyer, yes.

23        Q.  Did you tell Mr. Hoffmann in November of

24   2003 that you had a deal with Markland for the

Harazim, Richard Vol 1  2/22/2006  10:02:00 AM

1      Q.   In what business?

2      A.   That's up to the Board of Directors to

3   present, because the company went through an abrupt

4   change.  The company was used to hold the department

5   store.  Now, it sits in a bank account.  So, it's in a

6   completely new situation, and it's up to the Board of

7   Directors to formulate a new way forward.

8      Q.   And the proceeds from the sale sit in a

9   bank account of SPV Co.?

10     A.   Yes.  Correct.

11     Q.   In Cyprus?

12          MR. BECKMAN:  Objection.  You don't have

13   to answer that.

14          MR. LEIBENSPERGER:  Well, you do have to

15   answer that.

16          MR. BECKMAN:  No.

17     Q.   Does it sit in a bank account in Cyprus?

18          MR. BECKMAN:  I'm instructing you not to

19   answer that question.  This is the subject for the

20   motion for protective order which we are taking up to

21   Judge Lindsay.

22          MR. LEIBENSPERGER:  The discovery master

23   has ruled that you should answer it, so you can follow

24   the instructions of your lawyer or not, but I'm asking

1    you for the name of the bank where that money is held?

2         MR. BECKMAN:  I'm instructing you not to

3    answer.

4         A.   Okay.  I'm not going to say that.

5         Q.   Is the money held in one place?

6         A.   Yes.

7         Q.   In one bank account?

8         A.   Yes.  Well, not the whole proceeds.  Just

9    the free proceeds.  The rest of the money blocked

10   thanks to the lawsuit of Gilroy and KT is sitting in an

11   escrow account, and that account doesn't belong to the

12   company.

13        Q.   I understand the escrow is different.

14   We'll talk about the escrow, but the money other than

15   in the escrow is held in one account in a place in

16   Cyprus; is that correct?

17        MR. BECKMAN:  Objection.  Don't answer

18   that.

19        A.   It is held in one account.

20        MR. LEIBENSPERGER:  I want to mark some of

21   the deal documents just so we have them identified, and

22   then ask a few questions about that.  So let's get

23   those out.  I'll try to do this as quickly as we can.

24   Would you mark this as the next exhibit.

1    exhibit the escrow agreement. It has been marked,

2    right?

3        A.  Right.

4        Q.  Okay. Exhibit 22. Is this a copy of the

5    escrow agreement relating to the retention amount, as

6    referred to in the SPA?

7        A.  Is it signed? Yes. This is the copy.

8    Yes.

9        Q.  Now, this document has blacked out the

10    name of the escrow agent. And I know Mr. Beckman

11    objects to giving that information, but I want to ask

12    you on the record for the name of the escrow agent?

13        MR. BECKMAN: I'm instructing you not to

14    answer the question.

15        MR. LEIBENSPERGER: Again, you know that

16    the discovery master has ruled that he should give us

17    that information?

18        MR. BECKMAN: And, again, you know that

19    we're planning on appealing pursuant to Judge Lindsay's

20    order appointing the discovery master.

21    BY MR. LEIBENSPERGER:

22        Q.  The -- is the escrow agent located in the

23    Czech Republic?

24        MR. BECKMAN: Objection. Don't answer

Harazim, Richard Vol 1  2/22/2006  10:02:00 AM

1    that question.

2         Q.  Is the escrow agent under the control of

3    Markland?

4         A.  No.

5         Q.  Is it under the control -- is it

6    independent of both Markland and Kotva?

7         A.  The escrow agent?

8         Q.  Yes.

9         A.  Yes.  It's independent.

10        Q.  Have there been any instructions from

11   Markland and Kotva to the escrow agent?  Since the time

12   it was established?

13        A.  To the escrow agent, no.  No.

14        Q.  If you'd look at --

15        A.  Actually, there was an instruction.

16        Q.  Okay.  What was the instruction?

17        A.  The instruction was to invest the

18   20 million, that indicated for the remaining 3 percent

19   shares to invest it, to invest it in, in an instrument.

20   I think money market, something.

21        Q.  What is the instruction to the escrow

22   agent as to how it should invest the escrow funds?

23        A.  I believe it's in money market.

24        Q.  What's the return of the escrow account?

1              VOLUME 2, PAGES 235 - 403

2              EXHIBITS 23 - 40

3          IN THE UNITED STATES DISTRICT COURT

4          FOR THE DISTRICT OF MASSACHUSETTS

5                  No. 05-10679-RCL

6      - - - - - - - - - - - - - - - - - - - - - - - -

7    KOTVA a.s.,

8          Plaintiffs

9        vs.

10   ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,

11         Defendants

12   _____

13   ANDREW WEISS, WEISS ASSET MANAGEMENT LLC,

14   KT, INC. and CVF INVESTMENTS, LTD.,

15         Counterclaim-Plaintiffs,

16       v.

17   KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM,

18   FORMINSTER ENTERPRISES, LTC., SPV CO. and

19   JOHN DOES 1-5,

20         Counterclaim-Defendants.

21   - - - - - - - - - - - - - - - - - - - - - - - -

22     CONTINUED VIDEOTAPED DEPOSITION OF KOTVA a.s.

23       BY AND THROUGH RICHARD HARAZIM

24     Wednesday, February 23, 2006 9:44 a.m.

Harazim, Richard Vol 2 2/23/2006 9:44:00 AM

1    question.

2        Q.  Yes.

3        A.  No.

4        Q.  You said earlier you went to the police on

5    August 27th?

6        A.  Yes.

7        Q.  Who went to the police?

8        A.  I believe that it was the chairman of the

9    Board of Directors.

10        Q.  Is that Mr. Vlach?

11        A.  Vlach.

12        Q.  Did anyone go with him?

13        A.  I don't know.

14        Q.  What documents did Mr. Vlach take to the

15    police on August 27?

16        A.  I don't know.

17        Q.  Did you review the complaint letter from

18    Kotva submitted to the police on August 27th?

19        A.  I wasn't participating in the creation of

20    this criminal complaint, and I didn't see it before it

21    was submitted to the police.

22        Q.  Why were you not participating?

23            THE INTERPRETER:  This wasn't my task,

24    task

1    BY MR. LEIBENSPERGER:

2        Q.   After August 27, 2004, are you aware of

3    any tape recordings of conversations with Mr. Hoffmann?

4            THE INTERPRETER:  This is the area where

5    I, after consultation with my Czech lawyer, I am not

6    supposed to talk about.  This is because it's connected

7    to the investigation of Mr. Weiss, and because

8    Mr. Weiss never received the statement about start of

9    the criminal proceedings against him in the Czech

10   Republic, from the Czech Republic.  I would, if I would

11   talk about it, I may state something which could

12   obstruct the police investigation.

13       A.   Compromise.

14           THE INTERPRETER:  Compromise.

15       Q.   Regardless, are you aware that there are

16   tape recordings of Mr. Hoffmann after August 27, 2004?

17           MR. BECKMAN:  Let me just interject.

18   Based on the advice of Czech counsel, Kotva is

19   prohibited from disclosing the police investigation

20   or -- and because it would result in compromising the

21   police investigation until after the complaint of the

22   charges is served upon Mr. Weiss.  So, he can't answer

23   those, because it revolves around Czech criminal

24   police.

1      Q.  I press for an answer regardless of the

2   statements of counsel.

3      A.  I will not answer that.

4      Q.  Again, you will have to come back for

5   further deposition.

6         MR. BECKMAN:  He's happy to come back

7   after Mr. Weiss --

8      A.  The moment Mr. Weiss accepts or confirms

9   the receiving of those documents, that the criminal

10  proceedings are against him started, I may talk about

11  it the whole day.

12     Q.  Do you have at Kotva copies of any tape

13  recordings of or transcripts after August 27, 2004?

14     A.  We have copies of the criminal complaint,

15  and I am not able to discuss the contents.  I am not

16  allowed to discuss the contents.

17        COURT REPORTER:  One second.  Can we go

18  off?

19        THE VIDEOGRAPHER:  Going off the record.

20  The time is 11:32 a.m.

21        (A brief recess was taken.)

22        THE VIDEOGRAPHER:  Going back on the

23  record.  The time is 11:34 a.m.

24        MR. LEIBENSPERGER:  The record should

1    reflect that we went off the record, because the court

2    reporter had a glitch in her machine and needed to call

3    a recess.

4    BY MR. LEIBENSPERGER:

5        Q.   My last question, sir, was:  Do you have

6    at Kotva copies of any tape recordings or transcripts

7    of conversations after August 27, 2004?

8        A.   I am -- I cannot answer that question,

9    because Mr. Weiss will have to be interviewed by the

10   police in this matter, and I cannot release any

11   information from the criminal file which may obstruct

12   this investigation.

13       Q.   My question is simply whether you have

14   copies or tapes or transcripts?

15       A.   I don't have them.

16       Q.   Is it your position that you will refuse

17   to testify about anything that happened after

18   August 27, 2004, with respect to the criminal

19   investigation?

20       A.   This is the instructions which I got from

21   my Czech lawyers, which they gave me in order for me

22   not to break Czech law.

23       MR. BECKMAN:  Let me say this, just to

24   move this along, Rule 30(b)(6), the notice that you

Harazim, Richard Vol. 2  2/23/2006  9:44:00 AM

1    that he won't answer, and then I'll move onto something

2    else.

3         MR. BECKMAN:  Well, I think you should try

4    to ask.  I don't know where you're going.  You can try

5    to ask them.

6         Q    Well, I asked you what tape recordings and

7    video recordings and transcripts you are aware of with

8    respect to Mr. Hoffmann and Mr. Weiss after August 27,

9    2004?

10        A    I have instruction, I have clear

11   instruction from my Czech lawyers until, until the

12   criminal -- until Mr. Weiss will be formally charged

13   with the criminal complaint, I cannot talk about it,

14   because I can be an obstruction for the Czech police

15   investigation, which is ongoing.

16        MR. BECKMAN:  Do you know now --

17        THE INTERPRETER:  Obstruct.

18        MR. BECKMAN:  Do you know, Ned, whether

19   Mr. Weiss has been served or not with the criminal

20   charges?

21        MR. LEIBENSPERGER:  I just want to ask the

22   questions here in the deposition.

23        MR. BECKMAN:  Because if he has, then the

24   witness is here, and he'll answer your question.  He'll

Harazim, Richard Vol 2 2/23/2006 9:44:00 AM

1    answer all your questions. If you can represent that

2    he's been served with the papers by the --

3        MR. LEIBENSPERGER: Well, I don't want to

4    get into a debate about the criminal procedure in the

5    Czech Republic, you know.

6        MR. BECKMAN: I'm not asking you to.

7        MR. LEIBENSPERGER: Because I don't know

8    what you mean by "served with the papers." You know,

9    there's not -- so, I don't want to represent anything

10   to you with respect to that.

11       MR. BECKMAN: Well, we all know that, and

12   I've seen the e-mails from McDermott, Will & Emery,

13   their efforts to contact the State Department, to delay

14   the service of those charges. If those charges have

15   been served upon Mr. Weiss, Mr. Harazim is here and

16   will answer all your questions with respect to the

17   police investigation.

18       MR. LEIBENSPERGER: Well, I take issue

19   with your description of what McDermott, Will & Emery

20   has attempted to do. But, I'm not going to opine about

21   the status of --

22       MR. BECKMAN: So, you won't tell us

23   whether he's been served or not?

24       MR. LEIBENSPERGER: This is not

1    appropriate. I am taking this deposition of

2    Mr. Harazim.

3        MR. BECKMAN: Well, you have to create the

4    record, because if you're making an issue --

5        MR. LEIBENSPERGER: I ask the questions,

6    and I think he should answer. I'm going to ask the

7    questions, and I think he should answer them. If he

8    will not answer them, then we'll deal with that with a

9    subsequent motion.

10        A. So, I already repeated and answer it until

11    Mr. Weiss will be formally served or charged, I cannot

12    talk about it, because I can be in the violation of the

13    Czech police law investigations

14        THE INTERPRETER: I was asking if I

15    translated it correctly.

16        Q. So, you will not answer my last question?

17        A. No. I can't.

18        Q. Who is your Czech lawyer?

19        A. Kubica Vladika.

20        Q. Is that a firm or an individual name?

21        A. This is a law firm.

22        Q. What is the name of the lawyer?

23        THE INTERPRETER: I can write it for you.

24        MR. LEIBENPERGER: Please. I want the

1    name of the individual lawyer. Did you give that?

2            THE INTERPRETER: This is one of the

3    lawyers. This is the name (indicating).

4        Q.   Kubica, is that the principal lawyer, who

5    is advising you?

6        A.   This is the lawyer with whom I talk about.

7        Q.   All right.

8            MR. LEIBENSPERGER: Would you give the

9    spelling of the name to the court reporter.

10       Q.   Prior to August 27, 2004, did you record

11   any conversations with Mr. Weiss?

12       A.   Did you recall or record?

13       Q.   Record?

14           THE INTERPRETER: Record. Oh, pardon. I

15   misunderstood.

16       A.   No. We did not.

17       Q.   Do you have any tape recordings of

18   Mr. Weiss?

19       A.   From the period of time?

20       Q.   We'll start with from the period of time

21   before August 27th?

22       A.   No.

23       Q.   Do you have any video recordings of

24   Mr. Weiss?

1    A.  From the period before?

2    Q.  We'll start with that, yes.

3    A.  No.

4    Q.  All right.  Are you aware of any tape

5    recordings of Mr. Weiss after August 27, 2004?

6    A.  I am referring to my previous answer that

7    I cannot answer that because of the police

8    investigation.

9    Q.  So, to make this shorter, if you won't

10   answer because of the police investigation, you can

11   just say, you know, I will not answer on the same

12   grounds.

13       Does Kotva have access to what is in the

14   police file in the investigation of Mr. Hoffmann and

15   Mr. Weiss?

16       THE INTERPRETER:  Yes.  Kotva has access

17   to those files, because the Kotva is the, is the --

18   A.  Damaged party here.

19   Q.  Does Kotva have copies of the documents

20   that are in the police file?

21   A.  Those which are accessible, we were

22   allowed to copy them.

23   Q.  You said those that "are accessible."  Is

24   there, do you have access to the entire file?

1        Q.  I asked you before whether there were

2    video recordings of the August meetings.  Do you now

3    recall that there are?

4        A.  I thought that we were talking only about

5    the meeting from August 2nd.

6        Q.  All right.  Between August 2nd and

7    August 27, were there meetings between Mr. Hoffmann and

8    Mr. Benda?

9        A.  Yes

10       Q.  How many?

11       A.  I can only read it, but I don't remember

12   it.  There were four meetings.

13       Q.  And how many were videotaped?

14       A.  Kotva tried to record all of them.

15       Q.  By video?

16       A.  Yes.  Video recording.

17       Q.  Do you have the video recordings?

18       A.  The video recordings are not usable

19   because of their technical quality.  We didn't use them

20   during that court -- during this case.  And they are

21   stored in our law office.

22       Q.  Okay.  They're listed as evidence in this

23   letter, correct?

24           THE INTERPRETER:  It was, we were thinking

1    about it  We were considering it.

2         A.   They were meant to be evidence, yes

3         MR. LEIBENSPERGER:  Again, we demand the

4    production of that, those videotapes.  We've requested

5    them.  They were not produced, and I think this has

6    really hampered our ability to take discovery from

7    Mr. Harazim.

8         MR. BECKMAN:  Well, you can create your

9    record, but we'll consider your request.

10        MR. LEIBENSPERGER:  You already responded

11   to the request that you would produce all audiotapes

12   and videotapes, and you haven't done it.

13   BY MR. LEIBENSPERGER:

14        Q.   After the police -- well, strike that.

15   Start over.  Before August 27, 2004, were you

16   consulting with the police in any way?

17        A.   No.

18        Q.   And so is it correct that the police had

19   no idea about any of this until August 27, 2004?

20        A.   Correct.

21        Q.   After August 27, 2004, you continued to

22   have communications with Mr. Weiss and his associates?

23        A.   Yes.

24        Q.   Do you recall that there was a meeting on

1    October 18, 2004?

2        THE INTERPRETER:  October 18?

3        MR. LEIBENSPERGER:  Yes.

4    A.  With whom?

5    Q.  With yourself, Mr. Benda, Mr. Prestage,

6    Mr. Peterka, and Mr. Hoffmann?

7    A.  Yes, I do.

8    Q.  Where did that meeting take place?

9    A.  In the office of Mr. Peterka.

10    Q.  Was that meeting taped?

11    A.  I can't answer based on the same grounds.

12    Q.  So, you won't answer that question?

13    A.  I won't answer that question.

14        MR. BECKMAN:  State the grounds.  State it

15    in English.

16        THE WITNESS:  I can't, because I might

17    compromise the police investigation.

18    Q.  It was in Mr. Peterka's office?

19    A.  Yes.

20        THE INTERPRETER:  Yes.

21    Q.  Do you know whether the meeting was

22    videotaped?

23    A.  I cannot answer, because I might

24    compromise the police investigation.

1    Q.   Do you have a copy of any audio or

2  videotape of the October 18 meeting?

3    A.   I, by answering that, I would indicate if

4  it was made or not, and I cannot do that.

5    Q.   Was Mr. Prestage aware on October 18,

6  2004, that you were not sincerely negotiating for the

7  purchase of the shares?

8        MR. BECKMAN:  Objection.

9    A.   Mr. Prestage was informed about the whole

10  situation, which was necessary, because at that meeting

11  Mr. Hoffmann and Mr. Peterka submitted to him,

12  according to my opinion, again, illegal proposal.  And

13  it was necessary to prepare Mr. Prestage about this

14  situation, so he was informed about it or briefed.

15    Q.   If you go back to Exhibit 29 -- wrong

16  exhibit.  I have to find the right exhibit.

17        (Discussion off the record.)

18        MR. GOLDBERGER:  It's already in, I think.

19  I'm sorry, October 18?

20        MR. LEIBENSPERGER:  Yes.

21    Q.   At the October 18, 2004 meeting, do you

22  recall that Mr. Prestage stated that Markland might be

23  willing to buy some BGO shares?

24        THE INTERPRETER:  Mr. Prestage was asked

Harazim, Richard Vol. 2  2/23/2006  9:44:00 AM

1    before, we met with Vlado this morning."  Do you see

2    where I read that?

3        A.  Yes.

4        Q.  KT refers to the KT lawsuit?

5        A.  KT refers to the whole situation with KT.

6    That is the lawsuit.

7           THE INTERPRETER:  I automatically switch

8    the language, and I sometimes translate twice, so I say

9    it in the same language, but it goes twice.  I

10    apologize.

11    BY MR. LEIBENSPERGER:

12        Q.  How was there -- how did a meeting with --

13    let me start over.  Vlado, as referred to in your

14    e-mail, is Mr. Hoffmann, correct?

15        A.  Yes.

16        Q.  How did a meeting get set up with

17    Mr. Hoffmann on January 11, 2005?

18        A.  I don't recall the specifics.  I don't

19    know how it was done.

20        Q.  Do you recall meeting with Mr. Hoffmann?

21        A.  I don't recall that specific meeting.

22        Q.  Do you recall whether this meeting in

23    January of 2005 with Mr. Hoffmann was tape recorded?

24           MR. BECKMAN:  Objection.

1       A.  I can't answer because of the same grounds

2   as before.

3       Q.  I'll ask the question:  Do you recall

4   whether it was videotaped?

5       A.  I can't answer, because I might compromise

6   the Czech police investigation.

7       Q.  Now, you go on in this e-mail to say,

8   "Apparently, their group split into two groups, now

9   with Vlado blackmailing through Gilroy and Weiss

10  through KT.  Unfortunately for us, this development

11  means there is no chance of dropping the Gilroy lawsuit

12  now as Vlado needs to keep the lawsuit alive as a

13  weapon against Weiss."  Do you need that translated?

14      A.  No.

15      Q.  Were you still hoping to resolve the

16  Gilroy lawsuit in January, 2005?

17          MR. BECKMAN:  Objection.

18      A.  Our hope was that we will be able to prove

19  that this is an extortion scheme and that the Courts

20  will act swiftly in this.

21      Q.  In January, 2005, Mr. Hoffmann had not

22  been informed that there was any criminal

23  investigation; is that right?

24          MR. BECKMAN:  Objection.

1    question one more time.

2        Q.  After Mr. Benda left the Board of

3    Forminster, it is your testimony that the only person

4    you knew to act on behalf of Forminster was Mr. Toman?

5        MR. BECKMAN:  Objection.

6        A.  I know that in certain, specific

7    administrative matters, I know that Mr. Vlach was

8    helping them, as well, but -- to represent Forminster,

9    but, as far as I know, only Petr Toman was representing

10   Forminster.

11       Q.  What matters are you referring to where

12   Mr. Vlach did something on behalf of Forminster?

13       A.  He had some sort of power of attorney to

14   submit some official documents or something like that.

15       Q.  When?

16       A.  When?  I think he still has it.

17       Q.  Have you seen that power of attorney?

18       A.  I did not see it.  It was described to me.

19       Q.  Who described it to you?

20       A.  Mr. Vlach.

21       Q.  Do you know who signed the power of

22   attorney on behalf of Forminster?

23       A.  I don't know.

24       Q.  What did Mr. Vlach tell you he was doing

1      Q.  And when you say "relatively young," did

2    he have the power of attorney for Forminster in 2004,

3    2005?

4      A.  This is the way I think so.

5      Q.  Do you have the exhibit which is the Kotva

6    annual report in the stack?

7         MR. GOLDBERGER:  I believe that is six or

8    so.

9      Q.  And if you would turn -- actually, may I

10   have the exhibit, and I'll try to find the page.  I'm

11   directing you to Page 3, which is K5475, and there is a

12   heading under the letter "D".  Does that say

13   description of the structure of the parent company?

14     A.  No.

15     Q.  What does it say?

16     A.  The corporation concern.  The description

17   of the structure of the concern and concern is the big,

18   big corporation.

19     Q.  Okay.  If I could have the exhibit again,

20   please.  I want to ask the translator to read, to

21   translate the paragraphs under that subsection.

22        THE INTERPRETER:  The description of the

23   structure of the concern.  The company Kotva

24   Shareholding Company is in the sense of the

1    Paragraph 66A of the trade law of the companies with

2    majority ownership shareholder and is Vladimir Sosoba

3    [phonetic].

4        A.   Control person.

5            THE INTERPRETER:  Control person, yes.

6        Q.   Is a control person?

7            THE INTERPRETER:  Is being controlled by

8    somebody.  Being controlled by somebody.  The

9    controlling person, the person -- next paragraph.  The

10    controlling person, the person which in the sense of

11    the stated paragraph of the trade law in fact or

12    legally exercised directly or indirectly decisive

13    influence on running or operation of the company of the

14    other person.  The person being controlled; that is,

15    company's mother company, is company Forminster

16    Enterprises, Ltd., located at 20 Queen Frederica

17    Street, El Greco House, Nicosia Kypr.

18        Q.   Kypr is Cyprus?

19            THE INTERPRETER:  Cyprus.  Thank you.

20        Q.   Did the interpreter read that paragraph

21    correctly?

22        A.   More or less.

23        Q.   Is there anything that you different with?

24        A.   No.  I think it's all right.

1         Q.   If you'd turn to Page -- I'm sorry.  May I

2    have that exhibit back, sir, and I will find the page

3    for you?

4              MR. LEIBENSPERGER:  I think I can find it.

5    It's missing.

6         Q.   All right, the exhibit -- hmm, Exhibit 6,

7    which is the copy of the Kotva annual report, produced

8    by Kotva, appears to be missing Page 15.  It goes from

9    Page 14 to 16.  Do you see that?

10        A.   I do.

11        Q.   And the --

12             THE INTERPRETER:  Yes, I do.

13        Q.   The numbering from Kotva is consecutive?

14             MR. BECKMAN:  We'll look for that.

15        Q.   Okay?  I'm going to show you -- I'm going

16   to show you a copy of the annual report that we pulled

17   off the web, which has the Page 15, and if you could

18   describe what that page is?

19        A.   The data of people responsible for the

20   annual report.

21        Q.   And then does it have a statement that you

22   swear to on Page 15?

23        A.   Could you repeat that?

24        Q.   On Page 15, is there a statement where you

1    "Woolf claims that Mr. Benda, Mr. Vlach and yourself

2    are all criminals and will be dealt with by the

3    police." Do you see that?

4        A.  I see that.

5        Q.  And immediately before that, he says that

6    "Mr. Woolf had said that seven people have already gone

7    to jail over the Kotva dealings to date and that one

8    man was shot in the head." Do you see that?

9        A.  I do see that.

10       Q.  Do you have any idea of what he was

11   referring to when he said "one man was shot in the

12   head?"

13       A.  I think he was relating to Mr. Bechka.

14   That was a famous case.

15       Q.  Who is that?

16       A.  Mr. Bechka is a businessman, who attracts

17   bad luck. He was shot in the head. He had a crash in

18   a helicopter.

19       Q.  Were those separate incidents?

20       A.  Yes.

21          MR. BECKMAN:  I hope so.

22       Q.  And what connection did he have with

23   Kotva?

24       A.  He was somehow involved with Czech

1    investment holding, and he served on the board of Kotva

2    for some time.

3        Q.  What time period?

4        A.  '97, '9, I don't know, before 2000, that

5    is.

6        Q.  Did you serve on the board with him at

7    some time?

8        A.  No.

9        MR. LEIBENSPERGER:  Did you get the

10   answer?

11       COURT REPORTER:  Yes.

12       THE WITNESS:  No. I said no.

13       Q.  You said that he served on the board until

14   maybe 2000?

15       A.  No. I said before 2000.

16       Q.  Oh. When did you -- you start on the

17   board at Kotva in 1999; isn't that right?

18       A.  In 2000.

19       Q.  Did you know this person?

20       A.  I met him.

21       Q.  And you said it was a famous story about

22   him being shot in the head?

23       A.  Well, he wasn't shot in the head. That

24   was the famous about it, because he was shot in the

1    back, but he was shot from a very light weapon, so

2    there were all sorts of discussions, where there was a

3    lover or it was commercial or it was this or that.

4        Q.   When did that event happen?

5        A.   I'm very poor on dates.  I really don't

6    know.

7        Q.   You had read stories in the press about

8    that?

9        A.   Yes.

10       Q.   And were there claims in the press that he

11   was shot in connection with a business transaction?

12       A.   There were wide speculations about from

13   all possible angles.

14       Q.   And did the speculation include the

15   controversy over whether Forminster rightly held Kotva

16   shares?

17           MR. BECKMAN:  Objection.

18       A.   The speculations were that this might have

19   been because of his commercial disputes.  Kotva was

20   named.  Chik [phonetic] was named.  Other companies

21   were named.

22       Q.   And when Kotva was named in this

23   speculation, what was said?

24       A.   I don't remember exactly the nature of the

1    speculation, but it was, like I said, very wild

2    speculations.

3        MR. BECKMAN:  Don't speculate.

4        MR. LEIBENSPERGER:  I'm asking him what he

5    recalls about what he read.

6        Q.  At some time, did a bomb explode in

7    Mr. Benda's office?

8        A.  Sometime before 2000, as well, yes.

9        Q.  Was there an investigation of that?

10       A.  I don't have much knowledge about this.

11       Q.  Can you be more specific about when it

12   occurred?  What year?

13       A.  That's what I can't.  I don't know the

14   year.

15       Q.  Did it occur before you were engaged by

16   Forminster?

17       A.  Yes.  That was before my time, yes.

18       Q.  Did you ever talk with Mr. Benda about

19   that?

20       A.  Yes.

21       Q.  Was he injured in the explosion?

22       A.  No.  He wasn't injured.

23       Q.  Was he there?

24       A.  I think he just happened to escape it.

1      Q.  Did Mr. Benda tell you who he thought had

2    caused the explosion?

3      A.  No.

4      Q.  If you turn the page of Exhibit 39 --

5      A.  I'm sorry.  Thirty-nine.

6      Q.  -- and I'm now referring to the portion of

7    this e-mail, which is a letter from Mr. Woolf to

8    Mr. Prestage.  There is a paragraph that reads, "We

9    have prepared a statement to the National Criminal

10    Intelligence Service Economic Crime Unit of the UK that

11    is being filed regarding some of the associated

12    companies of the alleged sellers."

13      Are you aware of any investigation at the

14    National Criminal Intelligence Service in the UK?

15      A.  I don't know if that institution exists.

16      Q.  Well, do I take it by that answer that

17    you're not aware of any --

18      A.  No.

19      Q.  -- investigation?

20      A.  No.

21      Q.  Are you aware of any investigation by any

22    entity in the UK?

23      A.  No.

24      Q.  Then in the second to the last Paragraph,

1    Mr. Woolf says, "We put you on notice that our claim is

2    against the owner of the property, known as Kotva." Is

3    that Kotva?

4            MR. BECKMAN: Objection.

5        A.   Hard to say what he meant. Yes.

6        Q.   So, were you aware in July of 2003 that

7    Mr. Woolf said he had a claim against Kotva, right?

8        A.   Right. We were aware that he said he had

9    a claim. Yes.

10       Q.   And did you have -- well, strike that. In

11   connection with the indemnity agreement you reached

12   with Mr. Woolf, you testified that Mr. Woolf's shares

13   in Kotva were sold to JT Bank?

14       A.   That is correct.

15       Q.   How did JT Bank get involved in that

16   transaction?

17           MR. BECKMAN: Objection. You may answer.

18       A.   I don't know.

19       Q.   Did Mr. Woolf find them or did someone

20   from Kotva find them?

21       A.   I don't know. I didn't find them.

22       Q.   Do you know that no one from Kotva found

23   them?

24       A.   I know about anybody who would be looking

1    one is Takac.

2        Q.  Do you know either one of those

3    individuals?

4        A.  I've never seen them.

5        Q.  Do you know anybody, do you personally

6    know anybody, who works at JT Bank?

7        A.  Personally, who works in JT Bank, I know

8    some people, so that I know who they are.  I don't know

9    them to be on the first names terms.

10       Q.  In what connection do you know them in any

11   respect?

12       A.  JT was providing a loan to Kotva.

13       Q.  When did they provide a loan to Kotva?

14       A.  They provided a loan, it's my guess

15   again --

16           MR. BECKMAN:  Don't guess.

17       A.  -- I think 2003.

18       Q.  Your best estimate?

19       A.  My best estimate is 2003, after the

20   financing bank, Union Bank went into bankruptcy.

21       Q.  And how long were they a lender to Kotva?

22       A.  The loan was due at the end of 2004, but

23   we were able to repay the loan only in March, 2005.

24       Q.  So, at the time of the closing with

1    Markland, you paid off the loan to JT Bank?

2        A.  That's right.

3        Q.  And how -- do you recall how much that

4    loan was?

5        A.  I recall a number of 196 million.

6        Q.  Crowns?

7        A.  Crowns.

8        Q.  Who was the loan officer responsible at JT

9    Bank?

10            MR. BECKMAN:  Objection.

11        Q.  For your account?

12        A.  I'm sorry.  I'm not following.

13            MR. BECKMAN:  Objection.

14        A.  I'm not following.

15        Q.  Who was the loan officer at JT for your

16    account?

17            MR. BECKMAN:  Kotva.

18        Q.  For Kotva's account?

19        A.  I don't know.  This was handled by the

20    financial department.

21        Q.  In this case, do you claim that there were

22    damages suffered by Kotva as a result of Mr. Weiss's

23    conduct?

24        A.  I do.



## TOMAN, DEVÁTÝ & PARTNEŘI
### ADVOKÁTNÍ KANCELÁŘ

Trojanova 12
120 00 Praha 2
tel /fax:  + 420 224 918 490
tel /zázn + 420 224 918 491
fax:       + 420 224 920 468
e-mail:   ak@lusddu.cz

Advokáti:
JUDr Stanislav Devátý, Dr.
Mgr. Jan Nekola
JUDr Jaroslav Novák, Ph D
JUDr Jitka Pobořilá
JUDr Zuzana Smítková, Ph D
JUDr Petr Toman

OBVODNÍ SOUD PRO PRAHU 1
PRAHA 1. OVOCNÝ TRH 14
Došlo
dne:    2 6 -08- 2004

Obvodní soud pro Prahu 1

Ovocný trh 14/587

112 94   Praha 1

Ke sp. zn. 13 C 131/2004

Žalobce:          **GILROY LIMITED**
                  se sídlem Piklony 4, Limassol, Kyperská republika

zastoupen:        Mgr. Ondřejem Peterkou, advokátem,
                  ČAK 4245, advokátní kancelář PETERKA & PARTNERS
                  v.o s., se sídlem Na Příkopě 15, Praha 1

Žalovaný 1:       **KOTVA n.s.**
                  se sídlem Praha 1, Nám. Republiky 8, IČ 60193808

Žalovaný 2:       **KOTVA NEMOVITOSTI, k.s.**
                  se sídlem Příkop 4, Brno, IČ 26229048,

Žalovaný 3:       **SPV KN, s.s.**
                  se sídlem Brno, Příkop 4, IČ 26210705

všemi zastoupeni: JUDr. Petrem Tomanem, advokátem, Petr TOMAN
                  advokátní kancelář Trojanova 3, Praha 2 advokát
                  ČAK č. 0605
                  Trojanova 12, 120 00 Praha 2
                  Tel: 224 918 490-1, fax 224 920 468
                  č.434055JD DIČLCZ6303031890

## V y j á d ř e n í
žalovaných k žalobě o určení vlastnického práva k
nemovitostem

dvojmo
plná moc

KO 1-2141

Žalobou ze dne 30 6 2004 se žalobce ve smyslu § 80 litera c) o.s.ř domáhá určení, že žalovaný 1 je vlastníkem nemovitostí: budovy čp 656 postavené v části obce Staré Město na pozemku parc. č 600, zastavěná plocha a nádvoří, a souvisejících pozemků, vše zapsáno v katastru nemovitostí vedeném Katastrálním úřadem pro hlavní město Prahu katastrální pracoviště Praha, na listu vlastnictví č 205 pro katastrální území Staré Město, obec Praha (dále jen OD KOTVA)

Žalovaní žalobou uplatněný nárok na určení právního vztahu neuznávají a ve lhůtě stanovené usnesením soudu podávají toto

## v y j á d ř e n í

## I.
### Nedostatek věcné legitimace a neexistence naléhavého právního zájmu

Dle § 80 litera c) o.s ř lze žalobou uplatnit, aby bylo rozhodnuto o určení, zda tu právní vztah nebo právo je či není, je-li na tom naléhavý právní zájem Nezbytným předpokladem úspěšnosti určovací žaloby tak je, že účastníci mají věcnou legitimaci a že na požadovaném určení je naléhavý právní zájem

### Nedostatek aktivní věcné legitimace žalobce

Aktivní věcnou (hmotně právní) legitimaci k podání žaloby na určení práva či právního vztahu má ten, kdo je účasten právního vztahu či práva, o něž v řízení jde, nebo ten, jehož právní sféry se sporný právní vztah nebo sporné právo týká

Žalobce není účasten na právech ani právních vztazích k OD KOTVA a ani nic takového netvrdí. Žalovaní jsou nazrozdíl od žalobce přesvědčeni, že práva a právní vztahy k OD KOTVA se ani žádným způsobem nedotýkají jeho právní sféry

Žalobce se akcionářem žalovaného 1 stal dávno poté, kdy žalovaný 1 vložil OD KOTVA do základního kapitálu žalovaného 2 a rovněž poté, co žalovaný 2 dne 27 2 2004 rozhodl o vkladu OD KOTVA do základního kapitálu žalovaného 3 (dne 27 2 2004 žalobce ještě nebyl akcionářem). V době, kdy došlo k převodu vlastnického práva k OD KOTVA a kdy již byly splněny všechny podmínky pro převod OD KOTVA z žalovaného 2 na žalovaného 3, žalobce nebyl akcionářem OD KOTVA a tyto převody nemohly mít žádný dopad do jeho právní sféry. Žalobce přitom mohl uvedené skutečnosti zjistit (a nepochybně zjistil) z veřejných zdrojů, jako jsou katastr nemovitostí či obchodní rejstřík apod

Dlužno dodat, že uvedené převody by se dle názoru žalovaných nedotkly právní sféry žalobce ani kdyby se stal akcionářem již před převodem OD KOTVA z žalovaného 1 na žalovaného 2 Na právním postavení žalobce jako akcionáře žalovaného 1 by se uskutečněním uvedeného převodu totiž nic nezměnilo – žalobce by byl stále akcionářem žalovaného 1 a obsah jeho akcionářských práv stanovený obchodním zákoníkem by zmíněným převodem majetku nedoznal žádných změn

Žalobce není v řízení aktivně věcně legitimován, neboť není účastníkem práv či právních vztahů, o něž v řízení jde, a tyto práva či právní vztahy se ani jinak nedotýkají

2

KO 1-2142

jeho právní sféry.

**Neexistence naléhavého právního zájmu Žalobce na požadovaném určení**

Ustálená judikatura obecných soudů vychází ze závěru, podle nehož naléhavý právní zájem je dán zejména tam, kde by bez určení práva či právního vztahu bylo ohroženo právo žalobce nebo právní vztah, na kterém je účasten, ohroženo, popřípadě tam, kde by se bez tohoto určení jeho právní postavení stalo nejistým O takový vztah se jedná, jestliže rozhodnutí soudu může zjednat určitost, jistotu a jasnost právních vztahů účastníků, mezi nimiž až do té doby byla existence právního vztahu neurčitá, nejistá a nejasná Ve smyslu ust. § 80 lit. c) o.s.ř. tedy nejde o jakýkoliv zájem, který by opravňoval žalobce k žalobě na určení, ale o zájem právní a naléhavý.

Žalobce je akcionářem žalovaného 1, a to s jednou akcií odpovídající podílu ve výši 0,00000144 % základního kapitálu žalovaného 1. Komplexní právní úprava práv a povinností akcionáře akciové společnosti je obsažena v obchodním zákoníku Příslušná ustanovení obchodního zákoníku pak přesně stanoví jakými prostředky se akcionář může svých práv domáhat. Mezi tyto prostředky však rozhodně nepatří žaloba o určení práv či právních vztahů, jejímiž účastníky jsou třetí osoby a akciová společnost, jíž je žalobce akcionářem Opačný závěr by nepochybně vedl k absurdním důsledkům - totiž, že kterýkoliv akcionář akciové společnosti by mohl žalovat na určení neplatnosti jakékoliv smlouvy uzavřené touto společností, a to pouze s odůvodněním, že se mu nezdá pro společnost výhodná Akcionář, kterému se kupř. nepodaří prosadit jeho zájmy na valné hromadě, by tímto způsobem mohl velmi efektivně šikanovat společnost, jíž je akcionářem

Žalobce se v žalobě dovolává rozhodnutí Nejvyššího soudu ČR ze dne 7 5 2003 vydané pod sp. zn. 29 Odo 767/2002, v němž byla připuštěna existence naléhavého právního zájmu akcionáře na určení neplatnosti smluvy uzavřené mezi společností, jíž je akcionářem, a třetí osobou

Z uvedeného judikátu Nejvyššího soudu ČR však rozhodně nevyplývá, že akcionář má naléhavý právní zájem na určení práva či právního vztahu za jakýchkoliv okolností.

Tento judikát řeší konkrétní situaci, kdy nucený správce bývalé Investiční a poštovní banky, a s převod podnik banky na nabyvatele - ČSOB, a s , o to, vzhledem k hospodářské situaci v IPB, a s , za zcela mimořádných a nestandardních podmínek

Popsanou situaci, kterou se zabýval Nejvyšší soud ČR v rozhodnutí citovaném žalobcem, jistě nelze srovnávat se situací, jež je předmětem žaloby v tomto případě, a to z následujících důvodů:

- žalobce je majitelem pouze jedné akcie žalovaného 1 o nominální hodnotě 1 000,- Kč při základním kapitálu žalovaného 1 ve výši 694 209 000,- Kč, z čehož vyplývá, že škoda, která by mohla vzniknout žalobci na likvidačním zůstatku je ve srovnání s hodnotou majetku, jehož určení vlastnictví se žalobce proti žalovaným domáhá, zcela nepatrná.
- žalobce nabyl akcii žalovaného dávno poté, kdy již dle jeho názoru neplatným právním úkonem žalovaný 1 přišel o vlastnictví OD KOTVA, a rovněž poté, kdy již byly splněny všechny zákonné podmínky pro převod OD KOTVA z majetku

žalovaného 2 do majetku žalovaného 3 (žalobce tyto skutečnosti nepochybně zjistil ještě před nákupem akcie žalovaného 1, když tuto evidentně nabyl právě a pouze za účelem podání žaloby),

- vložení OD KOTVA do dceřiné společnosti řádně schválila valná hromada žalovaného 1 a uvedené usnesení valné hromady nebylo v zákonné lhůtě napadeno žalobou některého z akcionářů,

- žalovaný 1 vložil OD KOTVA do základního kapitálu žalovaného 2 v hodnotě určené znaleckým posudkem a stejným způsobem byly tyto nemovitosti oceněny při jejich vkladu do základního kapitálu žalovaného 3 – majetek žalovaného 1, jehož je žalobce akcionářem, se tedy uvedenými převody nezmenšil,

- žalovaný 3, který je v současné době vlastníkem OD KOTVA, je řízen žalovaným 1, a to prostřednictvím jeho dceřiných společností, které jsou žalovaným 1 jako jedinou ovládající osobou celého holdingu zcela ovládány; není tedy nejmenší důvod se domnívat, že by převody nemovitostí byly způsobilé zbavit žalovaného 1 jeho majetku či vlivu na nakládání a správu s tímto majetkem (došlo toliko k transformaci majetkové struktury do holdingového uspořádání)

Z uvedeného vyplývá, že na požadovaném určení nemá žalobce naléhavý právní zájem.

Neexistence naléhavého právního zájmu, resp nedostatek aktivní věcné legitimace na straně žalobce, je tedy samostatným a prvořadým důvodem, pro který nemůže určovací žaloba obstát a který sám o sobě bez dalšího vede k jejímu zamítnutí. V souladu s ustálenou soudní judikaturou přitom platí, že soud v prvé řadě zjišťuje, zda je žalobce k podání žaloby aktivně věcně legitimován a zda je na požadovaném určení naléhavý právní, přičemž zjistí-li, že tomu tak není, žalobu bez dalšího zamítne. V této souvislosti lze citovat z rozhodnutí Nejvyššího soudu ČR ze dne 27. 3. 1997 vydaného pod sp zn 3 Cdon 1338/96, dle něhož „*Zamítá-li soud žalobu na určení, zda tu právo nebo právní vztah je či není, pro nedostatek naléhavého právního zájmu na takovém určení, je vyloučeno, aby současně žalobu přezkoumal po stránce věcné.*"

S ohledem na výše uvedené skutečnosti, žalovaní navrhují, aby soud, aniž by se zabýval její věcnou stránkou, žalobu zamítl z důvodu nedostatku aktivní věcné legitimace na straně žalobce a neexistence naléhavého právního zájmu na požadovaném určení.

## II.
## Skutková tvrzení a právní závěry obsažené v žalobě

Jak bylo uvedeno výše, soud by se v tomto případě neměl zabývat věcnou stránkou žaloby, žalovaní tedy nepovažují za nutné vyjadřovat se ke všem skutkovým tvrzením žalobce a z nich vyvozeným právním závěrům Za vhodné považují uvést některá základní a nezpochybnitelná fakta, na jejichž základě lze učinit jednoznačný závěr o účelovosti jednotlivých tvrzení žalobce, jakož i žaloby jako celku

Žalovaní uvádějí níže následující skutečnosti s tím, že jsou schopni jejich pravdivost kdykoliv doložit:

4

KO 1-2144

1) Dne 21. 12. 1999 uzavřela společnost FORMISTER ENTERPRISES LIMITED, se sídlem, Diagorou street, Kermia House, Office 001, Nicosia, Kypr, reg číslo 70692 (dále jen FEL ) se společností TREND – VIF, a s , IČ 45245177, se sídlem Škroupova 441, Hradec Králové (dále jen TERND) Dohodu o narovnání. Tato dohoda učinila mezi stranami nespornými, že FEL je oprávněným majitelem akcii žalovaného 1, proti čemuž se FEL zavázal zaplatit na účet TRENDU částku 350.000.000,- Kč. Platnost této dohody akceptoval následně i správce konkurzní podstaty TRENDU společně s konkurzním soudem. Na základě této dohody byla zastavena všechna do té doby probíhající soudní řízení a zrušena všechna předběžná opatření zakazující navrhovateli nakládat s předmětnými akciemi

2) Dne 4. 9. 1998 uzavřel FEL formou notářského zápisu Dohodu o narovnání s IF MERCIA, a s , IČ 15054101, se sídlem Londýnská 53, Praha 2 (dále jen MERCIA), která byla dne 9. září 1998 formou soudního smíru schválena Krajským obchodním soudem v Praze (sp. zn. 46 Cm 260/97) Na základě této dohody bylo učiněno rovněž nesporným, že FEL je řádným majitelem akcii žalovaného 1, proti čemuž se FEL zavázal zaplatit na účet MERCIE částku 35.000.000,- Kč. Platnost této dohody následně akceptoval rovněž nucený správce jmenovaný Komisí pro cenné papíry

3) Výše uvedenými dohodami o narovnání se zabývala také Komise pro cenné papíry, a to na jednáních dne 19. 4. 1999 a následné dne 21. 12. 1999. Výsledkem těchto jednání byla především skutečnost, že Komise cenných papírů nezpochybnila platnost uzavřených dohod s TRENDEM a MERCÍ a akceptovala částky, které se v nich FEL zavázal zaplatit oběma investičním fondům

4) V současné době skutečně probíhá trestní řízení proti Ing Miroslavu Hálkovi a spol , v tomto řízení však nebyl předložen žádný důkaz o majetkovém či personálním propojení FEL a Ing Hálkem, některými s dalších obviněných v této kauze či jakoukoliv ze společností ovládaných Ing Hálkem, příp. dalším spoluobviněnými

5) Žádný z členů současných statutárních orgánů žalovaných nebyl v souvislosti s převody majetku investičních fondů TREND VIF a MERCIA popisovanými v žalobě trestně stíhán

6) Převody vlastnického práva k OD KOTVA z žalovaného 1 na žalovaného 2 a dále na žalovaného 3 nejsou a nebyly předmětem žádného trestního řízení.

7) Příkazem k registraci pozastavení práva nakládat s cennými papíry podle § 27 odst. 3 písm. d) zákona č. 591/1992 Sb , o cenných papírech ze dne 12. 5. 1997 Krajské státní zastupitelství v Hradci Králové pozastavilo právo FEL převádět akcie žalovaného 1, toto rozhodnutí však nebránil FEL hlasovat s akciemi žalovaného 1 na valné hromadě, tj. přijímat rozhodnutí nezbytná pro další podnikatelskou činnost žalovaného 1

Převážná část žaloby obsahuje popis trestné činnosti Ing. Miroslava Hálka a spol , ke které mělo docházet v letech 1995 až 1997 v souvislosti se správou majetku investičních fondů TREND VIF a MERCIA, kteroužto Ing. Hálek vykonával prostřednictvím společnosti KRÁLOVEHRADECKÁ BROKERSKÁ, a s (nyní Brněnská obchodní, a s ), IČ 60914122, se sídlem Lipová 27, Brno

5

Žalobce pak bez uvedení jakýchkoliv důkazů pro takové tvrzení konstatuje, že převody vlastnického práva k OD KOTVA z žalovaného 1 na žalovaného 2, resp. žalovaného 3 má dojít k legalizaci výnosů z trestné činnosti Ing. Hálka a spol., z čehož dovozuje jejich absolutní neplatnost pro rozpor se zákonem ve smyslu § 39 občanského zákoníku

Z ust. § 135 o.s.ř. vyplývá, že v občanském soudním řízení není soud oprávněn sám posuzovat, zda došlo ke spáchání trestního činu či nikoliv

Jak bylo již uvedeno výše, nebylo ohledně jednání, jímiž byla OD KOTVA převedena do majetku jejich dceřiných společností, zahájeno žádné trestní řízení. Tyto převody rovněž nejsou předmětem trestního řízení vedeného proti Ing. Hálkovi a spol. a s jeho trestní činností ani jinak nesouvisí

Žalobcem tvrzené důvody pro absolutní neplatnost napadených převodů OD KOTVA tak nemohou obstát, neboť soud není v tomto řízení oprávněn je posuzovat. Žalobce přitom žádné, z hlediska tohoto řízení relevantní důvody pro absolutní neplatnost jednotlivých převodů OD KOTVA neuvádí. Žalobce si je nepochybně této skutečnosti vědom, což pouze umocňuje účelovost jím podané žaloby

III.

S ohledem na výše uvedené skutečnosti žalovaní navrhují, aby soud žalobu zamítl a přiznal žalovaným náhradu nákladů soudního řízení

V Praze dne 19 srpna 2004

KOTVA a s.
KOTVA NEMOVITOSTI, k.s.
SPV ICN, a.s.

6

KC 1-2146

Dated 20 December 2004

SPV CO Limited

and

CRQ Czech a s

# SHARE PURCHASE AGREEMENT

relating to the purchase of shares in SPV KN a s

Linklaters

Palác Myslbek
Na Příkopě 19
117 19 Prague 1



Telephone   (420) 221 622 111
Fax          (420) 221 622 199

Ref  BDXW/L-033253

KC 1-2641

KC1-2641

**This Share Purchase Agreement (the "Agreement") is made on 20 December 2004**

**Between:**

(1) **SPV CO Limited,** with its registered office at Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus, company registration no HE 148845, registered in Cyprus (the "**Seller**"), represented by Martin Benda, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1A;

(2) **CRQ Czech a.s.,** with its registered office Prague 1, Národní 1435/6, Post Code 11000, Identification no. 27159256, registered in the Companies Register by the Regional Court in Prague, in Part B, File 9394 (the "**Buyer**"), and represented by Frank Walker, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1B;

(3) **SPV KN a.s.**. with its registered office in Brno, Příkop 4. Post Code 602 00, Identification no. 26910705, registered in the Companies Register by the Regional Court in Brno, in Part B. File 4043 ("**SPV KN**"), represented by Ing. Richard Harazim, sole member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1C;

(4) **KOTVA NEMOVITOSTI, k.s.,** with its registered office at Příkop 4, Brno, Post Code 602 00, Identification no. 26229048. registered in the Companies Register by the Regional Court in Brno, in Part A, File 16586 ("**Kotva**"). and represented by KOTVA OBCHODNÍ, a.s., represented by Ing. Michal Vlach, Chairman of the Board of Directors, Ing. Jiří Brada, member of the Board of Directors, and Ing. Pavel Richter, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1D;

(5) **MARKLAND HOLDINGS Limited**, with its registered office at 19 Upper Fitzwilliam Street, Dublin 2, company registration no. 291167 registered under the laws of the Republic of Ireland ("**Markland**"), and represented by Frank Walker, a proxy. A copy of an extract from Companies House Ireland is annexed hereto at Schedule 2;

(6) **KOTVA a.s.,** with its registered office at Náměstí Republiky 8. Praha 1. Identification no 60193808, registered in the Companies Register by the Municipal Court in Prague, in Part B, File 2370 ("**KAS**"), and represented by Ing. Michal Vlach, Chairman of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1E; and

(7) **KOTVA OBCHODNÍ, a.s.,** with its registered office at Příkop 4, Brno. Postal Code 602 00, Identification no. 26231735, registered in the Companies Register by the Regional Court in Brno. in Part B. File 3484 ("**KO**"). represented by Messrs Ing. Michal Vlach. Chairman of the Board of Directors. Ing. Jiří Brada and Ing. Pavel Richter. members of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1F;

(jointly referred to as the "**Parties**")

**Whereas:**

(A) The Seller is a company validly established under the laws of Cyprus and is part of the KAS Group

---

A04677559/1 4/22 Dec 2004

1

KC 1-2642

KC1-2642

(B)    SPV KN is the registered owner of the Property and is part of the KAS Group

(C)    The Seller is undertaking steps to acquire 97% of the shares in SPV KN

(D)    KAS is a holding company established under the laws of the Czech Republic and is the controlling person in relation to the Seller, SPV KN and to KO.

(E)    The Seller wishes to sell and the Buyer wishes to buy the Shares, and the KOTVA Trademarks under the terms and subject to the conditions set out herein.

**The Parties hereby agree as follows:**

**1    Interpretation**

**1.1**    Construction

Any reference in this Agreement to an "Article", "Clause" or "Section" refers to the corresponding Article, Clause or Section of this Agreement, unless the context indicates otherwise. The headings of Articles, Clauses and Sections are provided for convenience only and should not affect the construction or interpretation of this Agreement. All words used in this Agreement should be construed to be of such gender or number as the circumstances require. The terms "include" or "including" indicate examples of a foregoing general statement and not a limitation on that general statement. Any reference to a statute refers to the statute, any amendments or successor legislation, and all regulations promulgated under or implementing the statute, as in effect at the relevant time. Any reference to a contract or other document as of a given date means the contract or other document as amended, supplemented and modified from time to time. Any reference to an amount in a given currency shall mean a similar amount in any other currency converted at the then applicable exchange rate.

**1.2**    Definitions

For the purposes of this Agreement, the following terms and variations on them have the meanings specified in this Clause 1.2:

"**Adverse Consequence**"    means any Liability. loss, damage (including incidental and consequential damages), claim, cost, deficiency, diminution of value, or expense (including the reasonable costs of investigation and defence, penalties, and reasonable legal fees and costs), whether or not involving a third-party claim;

"**Building**"    means building no. 656, located in the registration area of Staré Mĕsto, municipality section Staré Mĕsto, on plot no. 680, and further building registered therein without descriptive number or evidence number present on plot no. 1018/2. Both buildings are registered at the Real Estate Register hl. m. Praha, title no. 265. for Prague city, cadastral area Staré Mĕsto. A copy of an extract from the Real Estate Register is annexed hereto at Schedule 5;

"**Business**"    means the business of leasing non-residential premises in the Building or leasing the Contributed Property to third persons as tenants and providing related services;

KC 1-2643

KC1-2643

| | |
|---|---|
| "Business Day" | means any day other than a public holiday as defined under Czech law or Austrian law or Irish law or a day that the Escrow Agent or the Buyer's bank is closed for business; |
| "Change of Control" | means: (a) KAS or Kotva ceasing to directly or indirectly control the Seller; or (b) KAS ceasing to control SPV KN or Kotva or KO, prior to the Closing Date; |
| "Closing" | means the hand-over of the Shares by the Seller to the Buyer through the Escrow Agent upon terms stipulated herein; |
| "Closing Date" | means the day on which the Closing takes place; |
| "Consent" | means any approval, consent, ratification, waiver or other expiration of a right to deny consent or other authorisation, provided either by a Governmental Body or other Person; |
| "Contemplated Transactions" | means all of the transactions to be carried out in accordance with this Agreement, including the purchase and sale of the Shares and the performance by the Parties of their obligations under this Agreement; |
| "Contract" | means any contract, agreement, commitment, understanding, lease, licence, franchise, warranty, guarantee, mortgage, note, bond, or other instrument or consensual obligation (whether written or oral and whether express or implied) that is legally binding; |
| "Commercial Code" | means the Czech Commercial Code, Act no. 513/1991 Coll., as amended; |
| "Companies Register" | means the register of company information maintained by the regional courts in the Czech Republic; |
| "CZK" | means Czech Crowns, the official currency of the Czech Republic; |
| "Deposit" | means the sum of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) which has already been delivered to the Escrow Agent by Markland on behalf of the Buyer; |
| "Due Diligence" | means a process, during which the Kotva and the KAS Group provided Markland with requested data and information and provided the Buyer with all co-operation necessary to enable it to ascertain the legal status and condition of the Property and of Kotva and KAS, SPV KN and SPV CO; |
| "Encumbrance" | means any charge, claim, mortgage, easement, right of way, community or other material property interest, covenant, equitable interest, lien, option, pledge, security interest, preference, priority, right of first refusal, or other similar right of a third party of restriction; |
| "Escrow Account" | means the escrow account opened to facilitate the transaction envisaged hereunder; |
| "Escrow Agent" | |
| "Escrow Agreement" | means the contract concluded between the Seller, the Buyer, Kotva and Markland and the Escrow Agent, as amended; |

KC1-2644

| | |
|---|---|
| "EUR" | means Euro, the official currency of the European Union; |
| "Financial Statements" | means the audited financial statements of SPV KN as at the Closing Date; |
| "Fixtures & Fittings" | means the list of fixtures an fittings annexed hereto at Schedule 11; |
| "Force Majeure" | means an event occurring out of the control of the Parties which results in breach of the obligations under the Agreement by one of the Parties, if the Party breaching the Agreement could not have avoided such event or breach of the Agreement despite having exercised maximum effort and care which may reasonably be required from such Party |

The Force Majeure shall mean in particular:

(a)   natural disaster;

(b)   war, war footing, invasion, mobilization or embargo;

(c)   uprising, revolution. rebellion, military regime or civil war;

(d)   radioactivity contamination from a nuclear facility or any other dangerous part of an explosive nuclear facility or a part of such facility;

(e)   discovery of archaeological findings, fossils, coins, precious objects and antiques, etc ;

(f)   terrorist attack; and

(g)   any act by a municipality or registered authority which delays, beyond the control of Kotva. the transfer/contribution of the Shares and the Kotva Trademarks to the Seller

Force Majeure shall not include:

(a)   unfavourable weather conditions;

(b)   events that were known to Kotva or the Seller or to Markland or the Buyer prior to the signing hereof;

(c)   any changes of statutory regulations and technical standards;

(d)   any new statutory regulations or technical standards

| | |
|---|---|
| "Gilroy" | means Gilroy Limited whose registered office is at 4 Pikioni Street Limassol, Cyprus; |
| "Gilroy Claim" | means the claim that Gilroy lodged on 30 June 2004 with the District Court for Prague 1 a copy of which is attached hereto at Schedule 9; |
| "Gilroy Settlement" | means the obtaining of a definitive and final ruling in respect of the Gilroy Claim; for purposes of this Agreement such definitive and final ruling is deemed to be also a final settlement between the parties to the Gilroy Claim, approved by the court or the withdrawl by Gilroy of the Gilroy Claim |
| "Governmental | means any consent, licence, permit or registration issued, granted. or |

KC 1-2645

KC1-2645

| | |
|---|---|
| Authorisation" | otherwise made available by or under the authority of any Governmental Body or pursuant to any law, including decisions of a court or other body on incorporation of a legal person and decisions of the Real Estate Register Office on registration at the Real Estate Register; |
| "Governmental Body" | means any of the following: |

(a) the executive ruling body of any state, region, city, village, or other jurisdiction;

(b) federal, state, local, municipal, foreign or other government or self-government;

(c) a budgetary or contributory governmental authority of any nature (including any governmental agency, branch, department, or other entity and any court or other tribunal);

(d) a multinational organisation incorporated pursuant to international law;

(e) a body exercising, or entitled to exercise. any administrative, executive. judicial. legislative, policy, regulatory, or tax authority; or

(f) an official of any of the foregoing

| | |
|---|---|
| "Indemnified Person" | means a Person entitled to an Share Purchase Price adjustment or damages under Clause 8 2 or Clause 8 3; |
| "Indemnifying Person" | means a Person obliged to pay a Share Purchase Price adjustment or damages to an Indemnified Person; |
| "J&T banka Mortgage" | means at the date of this Agreement a mortgage over the Property registered in favour of J & T banka, a s. Identification no. 47115378, with its registered office Pobřežní 297/14, 186 00 Praha 8 (hereinafter referred to as "J&T banka") |
| "KAS Group" | means KAS and trade companies, all of them together or each one individually, under the centralised power and control of KAS, pursuant to §66a Art 7 of of the Commercial Code; |
| "Knowledge" | means knowledge of information relevant for this Agreement about any matter, fact or Person, being known to a Person; |
| "KO Lease" | means the lease to be entered into between SPV KN and KO on the Closing Date the text of which is annexed hereto at Schedule 5; |
| "Kotva's Indemnities" | is defined in Clause 8 3; |
| "Kotva Správcovská a.s." | means Kotva Správcovská a s., with its registered office in Brno. Příkop 4, PSČ 60200, ID no 26510081; |
| "KOTVA Trademark I" | means the collection of trademarks consisting of: word-device trademark KOTVA. registration no 167478, registered in the Patent and Trademark Office of the Czech Republic and word-device trademark KOTVA, registration no 167478 registered in the Patent and Trademark Office of the Slovak Republic; |

KC1-2646

| | |
|---|---|
| "KOTVA Trademark II" | means the collection of trademarks consisting of: word-device and word only trademark KOTVA having been used by Kotva but not yet registered in Kotva's name in the Patent and Trademark Office of the Czech Republic for which registration Kotva has applied by the applications no. 355 884 and 355 885 both filed with the Patent and Trademark Office of the Czech Republic on 1st of July 2004, with the priority right date of July the 1st 2004. The KOTVA Trademark II is further specified in an expert opinion dated 10 July 2004 annexed hereto as the Schedule 10; |
| "KOTVA Trademarks" | means collectively KOTVA Trademark I and KOTVA Trademark II |
| "Land" | means the collection of plots of land registered at the Real Estate Register hl. m. Praha, ownership deed no. 265, for Prague city, cadastral area of Staré Mésto, consisting of: plot no. 680 – built-up area and yard, plot no. 683/1 – other area, plot no. 683/2 – other area, plot no. 683/3 other area, plot no. 690/2 – other area, plot no. 690/3 – other area, plot no. 690/4 – other area, and plot no. 1018/2 – built-up area and yard. A copy of an extract from the Real Estate Register is annexed hereto at Schedule 4; |
| "Legal Requirement" | any valid legal regulation of any Governmental Body; |
| "Liabilities" | includes liabilities or obligations of any nature, whether known or unknown, whether obsolete, accrued, contingent or other, whether due or to become due or prescribed, and whether or not required to be reflected on a financial statement and "Liability" shall be construed accordingly; |
| "Markland's Indemnities" | is defined in Clause 8.2; |
| "Order" | any published and publicly available order, injunction, judgement, assessment. decree. ruling, or arbitration award of any Governmental Body or arbitrator; |
| "Ordinary Course of Business" | actions taken in the course of normal Business operation by SPV KN and/or by Kotva or the Seller or KO as the respective owner or manager of the Property, consistent with past practice of Kotva; |
| "Organisational Documents" | any deed, bylaws, regulations, certificate, statement, statute, or similar document adopted, filed or registered in connection with the creation, formation, or organisation of an entity, and any Contract among equity holders. partners or members of an entity; |
| "Person" | an individual or an entity, including a corporation, share company, limited liability company, partnership, trust, association, or any other body with legal personality separate from its equity holders or members; |
| "Proceeding" | any action, arbitration, audit, examination. investigation, hearing, litigation, or suit (whether civil, criminal, administrative, judicial or investigative, informal, public or private) commenced. brought, conducted, heard by or before. or otherwise involving. any |

KC 1-2647

KC1-2647

|  | Governmental Body or arbitrator; |
|---|---|
| "Property" | means the Building and the Land; |
| "Proprietary Information" | is defined in Clause 9.1; |
| "Purchase Price" | means the total purchase price for the Shares and the KOTVA Trademarks in the sum of the Czech Crown equalling CZK 1,501,450,000 (one billion five hundred and one million four hundred and fifty thousand Czech Crowns) calculated as follows: |

     (i)    purchase price for the Shares CZK 1,366,450,000 (one billion three hundred and sixty six million four hundred and fifty thousand Czech Crowns) ("**Share Purchase Price**"),

     (ii)   purchase price for the Kotva Trademarks CZK 135,000.000 (one hundred and thirty five million Czech Crowns) ("**Trademarks Purchase Price**");

| "Related Person" | with respect to a particular Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person and, with respect to an individual, any other individual that is a member of the individual's family (by blood, marriage or adoption), a member of the individual's household, an entity in which the individual participates in management or an employee or employer of the individual. For the purposes of this definition, "control" means where a Person (or Persons acting in concert) acquires or agrees to acquire or has options over direct or indirect control: (a) of the affairs of that Person; or (b) more than 50 per cent of the total voting rights conferred by all the issued shares in the capital of that Person which are ordinarily exercisable in general meeting; or (c) of the composition of the main board of directors of a Person. For these purposes "Persons acting in concert", are Persons which actively co-operate, pursuant to an agreement or understanding (whether formal or informal), with a view to obtaining or consolidating or exercising control of that Person; |
|---|---|
| "Rent Roll" | means the up to date rent roll as at the date of this Agreement which truly and accurately records the existing lease relations concerning non-residential premises in the Building, a copy of which is annexed at Schedule 6; |
| "Representative" | with respect to a particular Person, any director, appointed officer. employee, consultant, agent, advisor, legal counsel, accountant, or other representative of that Person; |
| "Retention" | means the money retained in the Escrow Account following Closing in accordance with Clause 5.6.4 ; |
| "Security" | means the amount of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) that has been paid by Kotva on behalf of the Seller into the Escrow Account prior to the date hereof in order to secure a possible claim or claims of the Buyer against the Seller together with any interest thereon; |

KC 1-2648

KC1-2648

| | | |
|---|---|---|
| **"Shares"** | | means the following ordinary bearer shares in certified form issued by SPV KN: |

| | | |
|---|---|---|
| | (a) | 10 shares of nominal value CZK 200,000 each with Nos 1-10 issued on 10 November 2003; and |
| | (b) | 13 shares of nominal value CZK 100,000.000 each with Nos. 11-23 issued on 9 April 2004; and |
| | (c) | 2 shares of nominal value CZK 20,000,000 each with Nos. 24 and 25 issued on 9 April 2004; and |
| | (d) | 8 shares of nominal value CZK 1,000,000 each with Nos. 28-35 issued on 9 April 2004; and |
| | (e) | 2 shares of nominal value CZK 100,000 each with Nos 37 and 38 issued on 9 April 2004; and |
| | (f) | 4 shares of nominal value CZK 10,000 each with Nos 46-49 issued on 9 April 2004; |

the nominal value of which represents 97 per cent of the capital stock of SPV KN;

| | |
|---|---|
| **"SPV Conclusion"** | the satisfaction of the conditions in Clause 3 1; |
| **"Tax" or "Taxes"** | means without limitation and whatever means by which it is levied all forms of taxation, statutory, governmental, state, local, foreign and municipal impositions, duties, contributions and levies including any tax imposed on any income, withholding tax, value added tax ("VAT"), road tax, real estate tax. real estate transfer tax, gift tax, inheritance tax, excise duties. customs or other duty. employment related levies, including social security contributions and contributions to complementary welfare and health insurance including both principal and potential related interest and penalties; |
| **"Threatened"** | an action or matter would be considered to have been "Threatened" if a demand or statement has been made (whether orally or in writing) or a notice has been given (whether orally or in writing), or any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such action or matter is likely to be asserted, commenced, taken or otherwise pursued in the future; and |
| **"Transfer Deed"** | means a Share Purchase Agreement to be concluded between the Seller and the Buyer effecting the transfer of the title to the Shares to the Buyer |

## 2    Agreement on replacement of present obligations between several Parties by new obligations between all Parties

2.1    The Parties hereby agree pursuant to section 570 of the Act No 40/1964 Coll , the Civil Code, as amended, that their mutual obligations arising out of the Share Purchase Agreement concluded on 20 January 2004 (hereinafter referred to as the **"Present SPA"**) between Kotva and Markland is replaced in their entirety by the obligations contained in the Agreement

---

KC1-2649

**2.2**   For avoidance of any doubt it is agreed that the Present SPA terminates in its whole scope on the moment when this Agreement comes into being so that this Agreement substitutes the Present SPA in the whole scope.

**2.3**   The Parties hereby agree to accession of the Seller, SPV KN, KAS, KO and the Buyer to this Agreement and the Seller, SPV KN, KAS, KO and the Buyer confirm by signing this Agreement they have acceded to the Agreement

**2.4**   For avoidance of any doubt it is agreed that the termination of the Present SPA and its substitution by this Agreement as stipulated herein shall not give a rise to claim for return of any performance that has been already provided pursuant to the Present SPA

**2.5**   If the nature of rights and obligations under this Agreement enables so, the Seller's rights and obligations under this Agreement may be fulfilled and exercised by Kotva and the Buyer's rights and obligations under this Agreement may be fulfilled and exercised by Markland.

**2.6**   The Seller and Kotva are jointly and severally liable for the fulfilment of the obligations of either of them arising out of this Agreement. Kotva, KAS and KO jointly and severally guarantee the fulfilment of the Seller´s and Kotva´s obligations arising out of this Agreement. The Buyer and Markland are jointly and severally liable for the fulfilment of the obligations of either of them arising out of this Agreement

**2.7**   The Seller and the Buyer and Kotva and Markland shall use their best endeavours to execute an amendment to the Escrow Agreement within 20 Business Days of the date of this Agreement to enable the Escrow Agent to perform its duties in accordance with the terms and conditions of this Agreement

**3    Initial Obligations**

The Initial Obligations are as follows:

**3.1**   Seller's Obligation - procuring of SPV Conclusion

    **3.1.1**   The Seller is obliged to procure the valid and legal and effective transfer or contribution of the Shares and the KOTVA Trademarks to the Seller through a non-monetary investment contribution to the Seller by Kotva which is satisfactory to the Buyer, acting reasonably, which in the circumstances will mean the requirement of the Seller to procure a valid and clear legal opinion confirming the valid and legal and effective transfer or contribution of the Shares and the KOTVA Trademarks to the Seller through a non-monetary investment contribution to the Seller by Kotva  Such legal opinion will also include confirmation that the Seller is fully and effectually entitled to sell the Shares and the KOTVA Trademarks to the Buyer pursuant to the terms of this Agreement; and

    **3.1.2**   The Seller is obliged to procure the application for registration in the Patent and Trademark Office of the Czech Republic and Slovak Republic respectively of the contribution of the KOTVA Trademarks to the Seller, in a form acceptable to the Buyer, acting reasonably

**3.2**   Buyer's Obligation - Legal Opinion

---

3.2.1    The Buyer will procure as soon as possible after the date hereof, but no later than 31 January 2005, that its lawyers agree with the Buyer's bank's lawyers a legal opinion in respect of the ownership of the Property by SPV KN and the Shares by SPV CO to enable the Buyer's bank to confirm that it is prepared to finance the transactions contemplated hereunder

3.3    Satisfaction of Initial Obligations

3.3.1    Within five Business Days of the satisfaction of any of the obligations referred to in Clauses 3 1 or 3 2, the party satisfying such condition shall serve notice of satisfaction on the other party

3.4    Failure to satisfy the conditions precedent

3.4.1    In the event that Kotva fails to satisfy the obligations under this Clause 3 1 by 31 January 2005, the Buyer and Markland may withdraw from this Agreement by either one of them serving five Business Days written notice on Kotva and the Seller Markland shall be entitled to the immediate refund of the Deposit together with any interest thereon and a contractual penalty payable by Kotva in the sum of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied firstly from the Security

3.4.2    In the event that the Buyer fails to satisfy the obligations under Clause 3 2 1 by 31 January 2005, the Seller or Kotva may withdraw from this Agreement by either one of them serving five Business Days written notice on the Buyer and Markland. The Seller shall be entitled to a contractual penalty payable by the Buyer in the sum of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied from the Deposit and te balance of such Deposit shall be retuned to the Buyer

4    **SPV KN from its founding until Closing**

4.1    Board of Directors of SPV KN

4.1.1    Kotva may only appoint a new member of SPV KN's Board of Directors or remove any of the existing members only with the prior written approval of the Buyer

4.1.2    Kotva further undertakes that the members of the Board of Directors or other managers of SPV KN will not act outside of the Ordinary Course of Business and shall obtain prior written approval from the Buyer before making any non-operational decision or series of related decisions of a value in excess of CZK 157,500 (one hundred and fifty seven thousand five hundred Czech Crowns) except where this Agreement states to the contrary

4.1 3    Kotva and/or the Seller, once it becomes majority shareholder of SPV KN, shall procure that the Board of Directors of SPV KN will observe and perform the obligations and undertakings as set out in Clause 6 and for the avoidance of doubt, any breach of such obligations and undertakings by the Board of Directors of SPV KN, if able to cause an Adverse Consequence to SPV KN and/or the Buyer and/or Markland of a sum in

KC1-2651

excess of CZK 31,500 (thirty one thousand five hundred Czech Crowns), shall be regarded as a material breach of this Agreement which shall entitle the Buyer and Markland to withdraw pursuant to Clause 10 respecting the time period in Clause 8.5.

**4.2**    Supervisory Board of SPV KN

4.2.1    Kotva may only appoint a new member of SPV KN's Supervisory Board or remove an existing one only with the prior written approval of the Buyer

## 5    Sale and Transfer of Shares and KOTVA Trademarks; Closing

**5.1**    Transfer of Shares

5.1.1    Subject to the terms and conditions of this Agreement the Seller and the Buyer undertake, within five (5) Business Days of the Purchase Price being paid into the Escrow Account in accordance with Clause 5.3, to conclude the Transfer Deed, and the Seller undertakes to sell the Shares and to transfer the title to the Shares to the Buyer, the Seller and the Buyer undertake to instruct the Escrow Agent to immediately release the Shares to the Buyer and the Buyer undertakes to buy the Shares from the Seller and to pay for the Shares the Share Purchase Price.

5.1.2    The terms and conditions of this Agreement not repeated in the Transfer Deed will apply to the transfer of the Shares under the Transfer Deed as if they were explicitly stipulated in the Transfer Deed.

**5.2**    Transfer of the KOTVA Trademarks

5.2.1    Subject of the terms and conditions of this Agreement the Seller undertakes, within five (5) Business Days of the Purchase Price is paid into the Escrow Account in accordance with Clause 5.3, to conclude with SPV KN or the Buyer (such decision to be at the discretion of the Buyer provided that it shall not cause any material adverse effect to the Seller) the Kotva Trademarks transfer agreement in a form to be agreed by the Buyer, acting reasonably, and the Seller undertakes to sell and transfer the KOTVA Trademarks to SPV KN or the Buyer and the Buyer undertakes to:

(i)    ensure that SPV KN or the Buyer will buy the KOTVA Trademarks; and

(ii)    pay on behalf of SPV KN or in its own name for the KOTVA Trademarks the Trademark Purchase Price

5.2.2    SPV KN hereby agrees to sign all such documents as are required to effect the Kotva Trademarks transfer agreements referred to in Clause 5.2.1 above.

5.2.3    The terms and conditions of this Agreement not repeated in the KOTVA Trademarks transfer agreements will apply to the transfer of the KOTVA Trademarks under the the KOTVA Trademarks transfer agreements as if they were explicitly stipulated in the KOTVA Trademarks transfer agreements.

KC1-2652

5.2.4    In the event that the Buyer decides about the transfer of the KOTVA Trademarks to SPV KN under Clause 5.2.1 and as a result of this decision any provision of this Agreement is directly or indirectly breached, neither Markland nor the Buyer may claim any right that it would otherwise have as a result of such breach.

5.3    Deposit and Purchase Price

5.3.1    The Deposit credited to the Escrow Account shall form part of the Purchase Price.

5.3.2    Within 20 Business Days of receipt or service by the Buyer of the notice of satisfaction of the last of the initial obligations, the Buyer shall credit to the Escrow Account the amount of CZK 1,363,950,000 (one billion three hundred and sixty three million nine hundred and fifty thousand Czech Crowns) representing the balance of the Purchase Price. In the event that on the date of payment of the balance of the Purchase Price, the Deposit or its part has been used to settle a Seller's claim according to this Agreement (other than the claim to receive the Purchase Price), the Buyer is obliged to balance the Purchase Price so that the total sum deposited by the Buyer (including the Deposit) represents the Purchase Price.

5.3.3    In the event that the Buyer fails to credit the Escrow Account as specified in Clause 5.3.2 the Buyer shall pay to the Seller a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) by way of forfeit of the Deposit which shall be released to the Seller within five (5) Business Days from the breach of this obligation. Upon settlement of this contractual penalty in favour of the Seller this Agreement immediately terminates.

5.3.4    Following Closing, if:

(i)    a breach of any of the Seller's or Kotva's obligations or representations or warranties is discovered which occurred prior to Closing; and

(ii)    the nature of that breach is such that it entitles the Buyer to compensation (by way of Share Purchase Price reduction or damages) in accordance with the terms of this Agreement,

then the parties shall apply to Arbitration pursuant to Clause 11.12 of this Agreement to ascertain that conditions (i) and (ii) of this Clause 5.3.4 have been satisfied and, if so determined in the arbitration award, then the Buyer shall be entitled to have recourse to the Escrow Account for the amount corresponding to the Adverse Consequence so discovered. The Seller shall be obliged to replenish the Escrow Account with the amount withdrawn on account of the breach within 20 Business Days of its removal by the Buyer until such time as all the monies standing to the credit of the Escrow Account have been released in accordance with the terms of the Escrow Agreement.

5.4    Action pending Closing

KC 1-2653

KC1-2653

5.4.1 Kotva and the Seller shall collaborate fully with Markland and the Buyer, such collaboration to include but not be limited to Markland's and/or the Buyer's right to:

(i) receive, after a request made by each of them, all information distributed to the directors of SPV KN and the Seller;

(ii) attend, but not vote at, the meetings of the directors of SPV KN and the Seller; and

(iii) have full access to all those books, records and other documentation of SPV KN and the Seller to which a director normally has access in relation to all matters concerning the operation of SPV KN and the Seller between the date of this Agreement and the Closing Date

5.4.2 During such period Kotva and/or the Seller shall procure that neither SPV KN nor the Seller shall without the prior written consent of Markland:

(i) incur or enter into any agreement or commitment involving any capital expenditure in excess of CZK 157,500 (one hundred and fifty seven thousand five hundred Czech Crowns) per annum which is not in the Ordinary Course of Business;

(ii) enter into or amend any contract or commitment which is not in the Ordinary Course of Business or which involves or may involve a total annual expenditure or income in excess of CZK 500.000 (five hundred thousand Czech Crowns);

(iii) incur any additional borrowings or incur any other indebtedness;

(iv) save as required by law. make any amendment to the terms and conditions of employment (including, without limitation, remuneration and other benefits) of any employee. provide or agree to provide any gratuitous payment or benefit to any such person or any of their dependants, dismiss any employee or engage or appoint any additional employee;

(v) acquire or agree to acquire or dispose of or agree to dispose of any material asset or material stocks or enter into or amend any material Contract or arrangement;

(vi) take steps to procure the payment or settlement of any Liability generally in advance of the date on which book and other Liabilities are usually payable in accordance with the standard terms of the Seller's business or to extend the period to any particular debtor in which to make payment;

(vii) delay making payment to any trade creditors generally beyond the date on which payment of the relevant trade debt should be paid in accordance with a credit period as authorised by the relevant creditors or (if different) the period extended by such creditors in which to make payment;

KC 1-2654

KC1-2654

(viii)    amend, to any material extent, any of the terms on which goods, facilities or services are supplied, such supplies being material in the context of the Business, except where required to do so in order to comply with any Legal Requirement;

(ix)    enter into any guarantee, indemnity or other agreement to secure any obligation of a third party or create any encumbrance over any of its assets or undertaking;

(x)    allot, issue, redeem or repurchase any share capital of SPV KN and/or the Seller;

(xi)    enter into any contract reducing or depreciating the assets of SPV KN and/or the Seller;

(xii)    acquire or agree to acquire any share, shares or other interest in any Person;

(xiii)    declare, make or pay any dividend or other distribution to shareholders;

(xiv)    make any change to the practices or policies of SPV KN and/or the Seller;

(xv)    amend the Organisational Documents of SPV KN or the Seller; or

(xvi)    enter into any Contract or arrangement with a Related Person other than in the Ordinary Course of Business

5.4.3    Kotva and the Seller further undertake and undertake to procure that pending Closing each of them will:

(i)    continue those business activities which affect the Property, SPV KN or the Seller, only in the Ordinary Course of Business, save insofar as agreed in writing by the Buyer;

(ii)    take all reasonable steps to preserve its assets and Governmental Authorisations; and

(iii)    take all reasonable steps to preserve the validity of all Contracts to which they are a party which have an effect on the Property, SPV KN or the Seller

## 5.5    Closing

5.5.1    The Closing shall occur within five (5) Business Days after receipt of the Purchase Price by the Escrow Agent

5.5.2    The Seller shall. through the Escrow Agent, hand-over the Shares and shall hand-over the other documents referred to in Clause 5.6.1 and upon receipt of such Shares and other documents by the Buyer, the Closing of this transaction shall be deemed to occur The title to the Shares including shareholder's rights shall pass to the Buyer upon Closing The Purchase Price shall be settled by the Escrow Agent via the Escrow Account

## 5.6    Closing deliveries

KC 1-2655

KC1-2655

5.6.1    At Closing Date, the Seller shall deliver to the Buyer through the Escrow Agent the items listed in sub-clause (a), (b) and (c) below and personally in respect of the remainder of the items listed below):

(a)    the Shares;

(b)    the Transfer Deed;

(c)    a hand-over protocol confirming the hand-over of the Shares;

(d)    an extract of SPV KN from the Commercial Register dated the Closing Date (fax copy is deemed to be a sufficient form);

(e)    written resignations of each member of the Board of Directors and the Supervisory Board of SPV KN and a resolution of the sole shareholder (or the Supervisory Board, as appropriate) of SPV KN taking note of the resignations in a form reasonably acceptable to the Buyer, to provide the resignations to take effect on the Closing Date;

(f)    resolution of the sole shareholder (or Supervisory Board, as appropriate) appointing new members of the Board of Directors and the Supervisory Board of SPV KN designated by the Buyer and advised to the Seller at least (5) Business Days prior to Closing in a form reasonably acceptable to the Buyer, to provide the appointments to take effect on the day immediately following the Closing Date;

(g)    the Powers of Attorney signed by each member of the Board of Directors of SPV KN to enable the Buyer to make the necessary post-Closing registration (or deletions) at the Commercial Register;

(h)    all SPV KN's Organisational Documents, including, but not limited to, the founding deed, articles of association and all applications regarding SPV KN's registration in the Commercial Register and all resolutions of the registration court;

(i)    all lease agreements in respect of the Property;

(j)    all title deeds and documents in respect of the Property;

(k)    all the financial and accounting books and records and returns of SPV KN completed up to Closing;

(l)    all other documents regarding SPV KN;

(m)    a certificate executed by the Seller and Kotva dated as of the Closing Date stating that: (i) all representations, warranties, obligations and undertakings as set forth under Clause 6 are fulfilled and are true and correct in all material respects as the Closing Date; and (ii) all actions required to be taken by Kotva, SPV KN and the Seller to effect Closing have been properly taken;

(n)    the KO Lease duly executed by KO;

(o)    certificates executed by the Seller and Kotva and their accountants. so far as they are authorised to do in accordance with Czech Law

KC 1-2656

KC1-2656

confirming: (i) the successful payment and liquidation of any and all long-term debts or Liabilities, financial or otherwise, of SPV KN, the Seller and Kotva not arising in the Ordinary Course of Business which would affect SPV KN, the Seller or the Property; and (ii) that the Liabilities and debts, financial or otherwise of Kotva and the Seller arising in the Ordinary Course of Business which would affect SPV KN, the Seller or the Property amount to less than CZK 500,000 (five hundred thousand Czech Crowns);

(p)    a certificate executed by the accountants of SPV KN confirming what debts and Liabilities, financial or otherwise SPV KN has and that, save for day to day debts or Liabilities, financial or otherwise, that SPV KN has no other such debts or Liabilities, financial or otherwise;

(q)    a confirmation of discharge of the liability secured by the J&T banka Mortgage, signed by J&T banka in a form reasonably acceptable to the Buyer to enable the Buyer to remove the registration of such mortgage from the real estate register;

(r)    the list of tenant's security deposits as evidenced in the accounting of SPV KN, which list in detail the amounts provided by the individual tenants as security deposits;

(s)    evidence that the Seller has relinquished all authority and all rights to make any transactions on the SPV KN bank accounts (or that such accounts are frozen pending the Buyer completing the necessary bank mandates) and all banking records and account details and new mandate forms for the Buyer to complete and to give all assistance as required by the banks in this respect to ensure the proper transmission of the accounts;

(t)    applications for the registration of the transfer of the KOTVA Trademarks from Kotva to the Seller stamped by the Industrial Property Offices in the Czech Republic and Slovak Republic, as applicable; and

(u)    the Kotva Trademarks transfer agreements

5.6.2    The documents listed in Clause 5.6.1 above shall be delivered by the Seller and Kotva to the Escrow Agent within ten (10) Business Days of the date of the written notice evidencing to the Buyer SPV Conclusion delivered in accordance with Clause 5.3.2 and following this, the Seller and the Buyer shall execute such confirmatory document as is required by the Escrow Agent and if either of them shall fail to execute such document as required by the Escrow Agent (save in the event of a dispute as to the actual delivery of the documentation) then a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) shall be payable to the other party

5.6.3    the Escrow Agent shall release the following sums from the Escrow Account upon Closing:

KC1-2657

(i)     to the Buyer, the sum of CZK 10,837,800 (ten million eight hundred and thirty seven thousand eight hundred Czech Crowns) in respect of three months rent and service charge as defined in the KO Lease as a security deposit thereunder;

(ii)    provided that the debt secured by the J&T banka Mortgage has not been discharged and the Seller has supplied evidence thereof to the Buyer which is reasonably acceptable to the Buyer, to J&T banka an amount equal to the amount required to discharge in full and final settlement all amounts secured by the J&T banka Mortgage, provided that the Escrow Agent received a letter from J&T banka confirming that such amount will be in full and final settlement of the debt secured by the J&T banka Mortgage and any and all claims;

(iii)   to the Seller the Trademark Purchase Price;

(iv)    to the Seller, the sum of CZK 925,000,000 (nine hundred and twenty five million Czech Crowns), less the amounts paid to the Buyer pursuant to Clauses 5 6 3(i) above and to J&T banka pursuant to Clause 5 6 3(ii) above and to the Seller pursuant to Clause 5 6 3(iii) above.

5.6.4   The balance of the Share Purchase Price, being the Retention, amounting to CZK 576,450,000 (five hundred and seventy six million four hundred and fifty thousand Czech Crowns), shall be retained by the Escrow Agent until such time as there has been Gilroy Settlement. However, if there has been Gilroy Settlement but either 9 months from the Closing Date have not elapsed or there are Proceedings pursuant to Clause 5 6 4(i) below, the Escrow Agent shall release the Retention to the Seller less the sum of CZK 189,000,000 (one hundred and eighty nine million Czech Crowns), which shall be retained in the Escrow Account until such time as the Buyer obtains a definitive and final ruling in respect of such Proceedings or the period of 9 months from the Closing Date elapsed and there are no Proceedings which ever is the later. For the avoidance of doubt, a court decision made on basis of a valid withdrawal is considered to be a definitive and final ruling

The Escrow Agent shall throughout the period of holding the Retention release to the Buyer upon the sole request of the Buyer the following sums:

(i)     In the event that anyone initiates any legal Proceedings the subject matter of which is a declaration of invalidity of legal acts based on which the Property has been transferred or contributed to Kotva and/or to the Seller, within nine months of the Closing Date, then the Buyer shall be entitled to unilaterally withdraw on each regular quarter day, being 1 January, 1 April, 1 July and 1 October, such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending the Buyer, SPV KN or Markland in any such Proceedings Such amounts will be considered to be the Share Purchase Price adjustments In the event that compensation of such costs are awarded by the court to

KC1-2658

the Buyer in such Proceedings, then the Buyer shall return such sums as it recovers to the Seller once it has received them from the obliged person, such amounts again will be considered the Share Purchase Price adjustments

(ii)    On each regular quarter day. being 1 January, 1 April. 1 July and 1 October. such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending SPV KN under the Gilroy Claim; the request of the Buyer for such sums from the Retention must evidenced by a duly issued invoice from the Buyer's lawyers for the time being Any payments under this Clause 5 6 4(ii) will be considered to be Share Purchase Price adjustments.

(iii)    In the event that, under any tax regulations applicable up to the date of Closing, Kotva or SPV KN are assessed with Tax (in particular real estate transfer tax or VAT) in relation to the contribution of the Property, to SPV KN and Kotva, SPV KN or the Seller is liable to pay such Tax to the Financial Authorities, Kotva and the Seller undertakes to compensate SPV KN for such Tax and any corresponding penalty, interest or any other financial payment imposed by the Financial Authorities on SPV KN and such amount of Tax shall be retained in the Escrow Account by the Escrow Agent and shall only be released to the Seller following Gilroy Settlement upon receipt of the following:

(a)    an original or an authenticated copy of the extract from the Real Estate Register showing the SPV KN as the exclusive owner of the Property which are free of any Encumbrances; it does not relate to any Encumbrances, which arise after the Closing has taken place or which are created by the Buyer;

(b)    an original or an authenticated copy of the Tax return relating to the real estate transfer tax resulting from the contribution of the Property to SPV KN and a copy of an expert's valuation, both bearing a stamp of the Tax Collection Authority confirming that the Tax return, including the expert's valuation, have been duly submitted to the Tax Collection Authority; and

(c)    original confirmation, issued by the appropriate Financial Authority, proving that neither Kotva nor the Seller or SPV KN have any tax liabilities in respect of any Tax and in particular real estate transfer tax resulting from the contribution of the Property to SPV KN

Any payments under this Clause 5.6 4(ii) will be considered to be Share Purchase Price adjustments.

(iv)    In the event that the Retention falls below the amount of CZK 31,500,000 (thirty one million five hundred thousand Czech Crowns) then the Seller and/or Kotva and/or KAS shall, within twenty (20) Business Days of the level falling below CZK

KC1-2659

31,500,000 (thirty one million five hundred thousand Czech Crowns), ensure that sufficient funds are paid in to the Escrow Account to bring the level back up to at least CZK 31,500,000 (thirty one million five hundred thousand Czech Crowns).

(v)   The Seller and Buyer will agree to adjust the Share Purchase Price by deducting from the Share Purchase Price payable to the Seller and release to the Buyer one half of the difference between CZK 177,250,000 (one hundred and seventy seven million two hundred and fifty thousand Czech Crowns ) and the actual annual income due in accordance with the true and accurate Rent Roll as existing at the Closing Date in respect of the Property, excluding the Service charge, as agreed between the Seller and the Buyer not more than 2 Business Days prior to the Closing Date

(vi)  For the avoidance of doubt. the sums referred to in this Clause 5.6.4of this Agreement may be released to the Buyer upon the Buyer's sole request and shall be deposited in such account as the Buyer shall, in its own discretion, determine.

5.6.5   If the conditions under this Agreement or under the Escrow Agreement for releasing any funds from the Escrow Account to either of the Seller or the Buyer have been validly satisfied, save in respect of any monies to be released pursuant to Clause 5.6.4, the other party shall, upon a written invitation by the other party. countersign a joint instruction or any other document contemplated by the Escrow Agreement and deliver it to the other party within five days of the invitation being delivered. If the appropriate party does not satisfy the aforementioned obligation in a due and timely manner. it shall pay to the other party a contractual penalty of CZK 157,500,000 (one hundred and fifty-seven million five hundred thousand Czech Crowns)

5.6.6   Kotva and the Seller hereby confirm that the Fixtures & Fittings will remain at the Building following Closing and will become, if not already, the property of SPV KN

## 6   Representations, Warranties and Obligations and Undertakings of KAS, Kotva and the Seller

KAS, Kotva and the Seller represent and warrant that the following representations and warranties contained in this Section 6 are true, correct and complete as at the date of signing this Agreement and Kotva, the Seller and KAS undertake to maintain them true, correct and complete during the entire term of effectiveness of this Agreement and to comply with all the obligations and undertakings contained in this Section 6 during the entire term of effectivness of this Agreement until Closing and in respect of those obligations and undertakings specified in Clause 6.5, for five years following the Closing Date:

6.1   General

(I)   Kotva, SPV KN, the Seller and KAS have been duly established and incorporated under the respective laws, being Czech, Czech, Cypriot and

KC 1-2660

KC1-2660

Czech, and the share capital has been fully paid up in respect of each of them

(ii)    None of Kotva, SPV KN, the Seller or KAS has been declared bankrupt nor, and to the best their Knowledge, has any person delivered a petition for bankruptcy

(iii)   There is no Proceeding in progress, pending or Threatened against or relating to Kotva, SPV KN or the Seller or KAS except for the Gilroy Case and the 'Balfinder litigation' and there is no circumstance, matter or thing which might give rise to any such Proceeding by Kotva or SPV KN or the Seller or KAS or any shareholder thereof or any third party or to any governmental investigation relative to it, nor is there outstanding against Kotva or SPV KN or Seller or KAS any regulation, judgement, decree, injunction, rule or Order of any court, Governmental Body or arbitrator which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable

(iv)    None of Kotva, SPV KN, or the Seller nor KAS nor any of their directors and managers have committed any offence or failed to comply with any applicable Law which might give rise to any fine, penalty, default or commencement of Proceeding or any other liability which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable

(v)     None of Kotva, SPV KN, or the Seller nor KAS is in default or breach of Organisational Documents or any licence, Governmental Authorisation, Contract or other instrument to which it is a party or by which it may be bound and there exists no state of facts which after notice or lapse of time, or both, would constitute such a default or breach, and all such licences, Governmental Authorisations, Contracts and documents are in good standing and Kotva, SPV KN or the Seller or KAS, as the case may be, are entitled to all benefits there under and none of Kotva. SPV KN, or the Seller or KAS have Knowledge of any of the above which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable

(vi)    Kotva and SPV KN and KAS are Tax resident only in the Czech Republic and will remain so (whilst under the control of the KAS Group) until at least five years from the Closing Date and neither Kotva nor SPV KN nor KAS has any Tax Liabilities whether actual or contingent in jurisdictions other than in the Czech Republic

(vii)   The Seller is tax resident of Cyprus

(viii)  The corporate records supplied to Markland during Due Diligence contain complete and accurate records of all minutes of meetings held and all resolutions adopted by Kotva and in general meetings since SPV KN's incorporation and neither Kotva nor KAS have any Knowledge of any defects in the above or breaches thereof, or in the corporate governance of KAS, which would make this Agreement or the transactions contemplated in this Agreement invalid. void or voidable

---

A04677559/1.4/22 Dec 2004

KC 1-2661

KC1-2661

(ix)    Kotva and the Seller have supplied the Buyer and/or Markland with all complete and accurate records of all minutes of meetings held and all resolutions adopted by SPV KN since its incorporation

(x)     The books and records of Kotva and SPV KN fairly and correctly set out and disclose in all material respects the financial position of the Business of Kotva and all material financial transactions relating to the Business have been accurately recorded in such books and records since its incorporation and Kotva has no Knowledge of a breach of any of the above.

(xi)    None of Kotva, SPV KN, or the Seller or KAS is a party to any valid written or verbal Contract or any other document under the terms and conditions of which the performance by the Seller of this Agreement would result in the breach of an obligation, or might provide a reason for the termination or invalidity of this Agreement or the transactions contemplated in this Agreement, or which might preclude Kotva, SPV KN or the Seller or KAS from performing their obligations hereunder.

(xii)   With respect to the Property, SPV KN will not execute any new lease without the prior written consent of the Buyer, such consent not to be unreasonably withheld or delayed. If a response to such a request is not given by the Buyer within 10 Business Days of its delivery, this will be deemed consent to the execution of the new lease.

(xiii)  The Seller, SPV KN, Kotva shall not extend or agree to extend any existing lease without the prior written Consent of the Buyer. such consent not to be unreasonably withheld or delayed. If a response to such a request is not given by the Buyer within 10 Business Days of its delivery, this will be deemed consent to the extension of the existing lease.

(xiv)   All Consents necessary to fulfil the obligations of Kotva, SPV KN. the Seller or KAS to complete the SPV Conclusion and the connsumation of the transactions contemplated by this Agreement shall be provided by the Seller, SPV KN or by Kotva to the Buyer as soon as practicable after they are available.

(xv)    Kotva and/or SPV KN shall permit any Person nominated by Markland or the Buyer to oversee the day-to-day management of the Property which, for the avoidance of doubt, shall mean the internal management of the Kotva shopping centre by the on-site retail manager. Kotva and/or SPV KN undertake to provide assistance, advice and all information necessary to enable such Person to effectively learn the current management structure of the Property

(xvi)   That in relation to those persons currently employed by Kotva or by the Seller there are no written Contracts of employment. mandate. consultancy or similar agreements with any employee. director or consultant of Kotva or of the Seller which are to be transferred to the Buyer or SPV KN on Closing either by operation of law or by virtue of any provision contained within any such employment agreements  Kotva and the Seller shall remain fully liable for all claims of redundancy payments or protective awards and for any liability. direct or indirect, resulting from the unfair or wrongful dismissal of any employee and shall fully and effectually indemnify. and continue to

KC1-2662

keep indemnified, the Buyer in respect of any costs or expenses which may arise in connection therewith.

(xvii)   The Seller and Kotva undertakes to ensure that, in relation to SPV KN, the entry into or completion of this Agreement will not directly or indirectly cause or contribute to the disallowance or non-availability of any Tax benefit or relief (whether by way of deduction, reduction, set-off, exemption, allowance or otherwise) from, against or in respect of which any Tax could or may be effectively reduced withdrawn, postponed, restricted or waived as a result of entry into or completion of this Agreement.

(xviii)  As at the Closing Date neither SPV KN nor the Seller will have any joint or several liability in respect of any Tax incurred by or due from any other Person, as a transferee or successor, by contract, or otherwise.

(xix)    Concerning SPV KN and/or the Seller, full liability has been accounted for or full provision or reserve has been made in the Financial Statements for all Taxes liable to be assessed or for which SPV KN is or may become accountable. Proper provision, reserve or liability for deferred Tax has been made in the Financial Statements.

(xx)     No income or revenue in relation to SPV KN (as computed for Tax purposes) will arise or accrue in consequence of cancellation of provisions or reserves which have been claimed as deductions or charges for Tax purposes in computing profits (tax base) or loss carry-forwards (as computed for Tax purposes), other than income against which corresponding expense allowable as deductions or charges for Tax purposes in computing profit (tax base) or loss carry-forwards (as computed for Tax purposes), (e.g. write-off of a receivable or expenses incurred on repairs of tangible assets) can be set-off.

(xxi)    Kotva shall procure that as at the Closing Date all of the accounts, books and records of SPV KN will be fully, properly and accurately up-to-date from the incorporation of each entity respectively, and will be maintained at a place and in a form that complies with the Commercial Code and all applicable Laws of the Czech Republic. All accounts, documents, reports and returns required by Law to be delivered or made to any Governmental Body will have been duly and correctly delivered or made by representatives of SPV KN and the Seller and will be delivered to the Buyer.

(xxii)   Kotva shall procure that as at the Closing Date neither SPV KN nor the Seller will have any outstanding or undisclosed Taxes that were incurred on or before the Closing Date. SPV KN and the Seller have complied with all applicable Laws, rules and regulations relating to the payment and withholding of all Taxes. If the above mentioned declarations of the Seller prove to be incorrect the Seller shall immediately rectify this situation or shall immediately settle the tax for SPV KN or the Seller.

(xxiii)  Enforceability; No Conflict

         (a)   Kotva, SPV KN, KAS and the Seller have the absolute and unrestricted right, power, and authority to execute and deliver this

KC1-2663

Agreement and to perform their obligations under this Agreement, which actions have been duly authorised and approved by all necessary corporate actions of Kotva and the Seller and KAS, where relevant This Agreement constitutes the legal, valid, and binding obligation of Kotva, KAS and the Seller, and is enforceable against Kotva, KAS and the Seller in accordance with its terms

(b)     Neither the execution nor the delivery of this Agreement by Kotva, KAS and the Seller, nor the consummation or performance of any of the contemplated Transactions by Kotva, KAS or by the Seller where relevant, will directly or indirectly (with or without notice or lapse of time), contravene any Contract to which Kotva, KAS or the Seller is a party or by which Kotva, KAS or the Seller may be bound, any Governmental Authorisation. Legal Requirement, or Order to which the Seller may be subject, any provision of Kotva's, KAS' or the Seller's Organisational Documents, or any resolution adopted by the board of directors or the shareholders of Kotva, KAS or the Seller, which was not disclosed to the Buyer during Due Diligence

(xxiv)     The Seller or Kotva (whoever is legally responsible) undertakes to enter into any and all documents and agreements, within 20 Business Days of the request of the Buyer, following the Closing to:

(a)     permit the merger of SPV KN with the Buyer under the Laws of the Czech Republic;

(b)     sign and/or issue any document as requested by the Buyer or Markland which can speed up the process of the merger referred to in (a) above (e g  waiver of right to receive various reports on merger);

(c)     waive any rights to any increased shareholding in the merged company or to any compensation payments upon the merger by reason of the dilution of shares or for any other reason; and

(d)     ensure the continued operation of SPV KN or the merged company including any shareholders agreements

(xxv)     Kotva will advise Markland and the Buyer of any adverse or potential adverse economic situation of Kotva or KAS.

6.2     Kotva and/or the Seller (once it becomes the owner of the Shares) are obliged or undertake to procure that:

(i)     The Board of Directors of SPV KN will obtain the prior written approval of Markland, such approval not to be unreasonably withheld, before carrying out anything not in the Ordinary Course of Business

(ii)     The following activities shall not be carried out without the prior written approval of Markland:

(a)     amendment, modification or supplementation of the Organisational Documents of Kotva, the Seller or SPV KN;

KC1-2664

(b)    the liquidation, dissolution or winding-up of Kotva, KAS or SPV KN;

(c)    the merger, consolidation, transformation or division of SPV KN; or

(d)    the change or agreement to change of the share capital of SPV KN (whether by consolidation, sub-division, purchase, redemption, cancellation, allotment or issuance of any shares), the grant of any option over, or issuance of any instrument carrying rights of conversion into, any of its shares

6.3    Kotva and the Seller (once it becomes owner of the Shares) are obliged or undertake to procure that SPV KN does not without the prior written approval of Markland:

(i)    dispose of or transfer control of or interest in all or any material part of its business, property or assets, whether by a single transaction or series of related transactions, or acquire any business, property or assets which would, following such acquisition, constitute a material part of its Business, property or assets (for these purposes, any business, property or asset accounting to CZK 31,500 (thirty one thousand five hundred Czech Crowns) or any business property or asset with a fair market value of CZK 31.500 (thirty one thousand five hundred Czech Crowns) or more shall be deemed material);

(ii)    change or agree to change its share capital (whether by consolidating, subdividing, purchasing, redeeming, cancelling, allotting or issuing any shares), or grant any option over, or issue any instrument carrying rights of conversion into, any of its shares;

(iii)    commence any new business not being reasonably ancillary or incidental to the Business;

(iv)    replace its auditors;

(v)    enter into, modify or terminate any Contract or make any payment that: (a) involves or will involve obligations or potential obligations that, because of their nature or significance, are or will be deemed to be unusual or extraordinary for companies engaging in activities similar to the Business; (b) is or will be otherwise than at arms length and on the best terms reasonably obtainable; or (c) is in excess of CZK 31,500 (thirty one thousand five hundred Czech Crowns);

(vi)    give any guarantee or indemnity, other than in the normal course of business in relation to the supply of goods or services, which is in excess of CZK 31.500 (thirty one thousand five hundred Czech Crowns);

(vii)    make any loan, or create any borrowings or other indebtedness in the nature of borrowings;

(viii)    acquire or incorporate any subsidiary or acquire or dispose of shares (except the Shares in accordance with this agreement). equity interests or loan stock in any Person or enter into any joint venture, partnership or consortium arrangement;

(ix)    permit its interest in any Person to be diluted (whether by a disposal of shares held by it or by a new issue of shares);

(x)    declare any dividend or make any other distribution in respect of its shares, whether in cash or otherwise; nor

(xi)    determine the compensation payable by SPV KN to any officer or Director.

**6.4    Monthly Reports**

Kotva and/or the Seller shall procure that the Directors of SPV KN provide to Markland, no later than the fifteenth (15th) day of each calendar month, a report detailing the activities of SPV KN

**6.5    Transfers**

Kotva and the Seller, once it becomes a shareholder of SPV KN, shall procure that from the date of this Agreement until five years following the Closing Date, no shares in SPV KN owned by Kotva or the Seller are transferred (including by way of sale of enterprise, merger or winding-up) to a third party and no Encumbrance may be created over those shares except in accordance with and subject to the provisions of this Agreement  For the duration of this Agreement SPV KN must not, without the prior written consent of the Buyer, suffer a Change of Control

**7    Representations, warranties and Obligations and Undertakings of the Buyer and of Markland**

The Buyer and Markland represents and warrants that the following representations and warranties are true, correct and complete as at the date of signing this Agreement and the Buyer and Markland undertake to maintain them true, correct and complete during the effectiveness of this Agreement up to Closing:

**7.1    Organisation**

The Buyer and Markland are duly established and incorporated and their share capitals have been fully paid up

**7.2    Enforceability; No Conflict**

7.2.1    The Buyer and Markland have the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and to perform their obligations under this Agreement, which obligations have been duly authorised and approved by all necessary corporate actions of the Buyer and Markland  This Agreement constitutes the legal, valid, and binding obligation of the Buyer and Markland, and is enforceable against the Buyer and Markland in accordance with its terms

7.2.2    Neither the execution nor the delivery of this Agreement by the Buyer and by Markland nor the consummation or performance of any of the Contemplated Transactions by the Buyer or Markland will directly or indirectly (with or without notice or lapse of time), contravene any Contract to which the Buyer and/or Markland is a party or by which the Buyer and/or Markland may be bound, any Governmental Authorisation, Legal Requirement, or Order to which the Buyer and/or Markland may be subject,

KC 1-2666

KC1-2666

any provision of their Organisational Documents, or any resolution adopted by the board of directors or the shareholders of the Buyer and/or Markland.

7.2.3   General

(i)   The Buyer and Markland have not been declared bankrupt nor, to the best Knowledge of the Buyer and Markland, has any person delivered a petition for bankruptcy in relation to it

(ii)   There is no Proceeding in progress, pending or Threatened against or relating to the Buyer and Markland and there is no circumstance, matter or thing to the Knowledge of the Buyer and Markland which might give rise to any such Proceeding by a third Person or any shareholder thereof, nor to any governmental investigation relative to it, nor is there outstanding against the Buyer and Markland any regulation, judgement, decree, injunction, rule or order of any court, Governmental Body or arbitrator

(iii)   The Buyer and Markland are not in default or breach of their Organisational Documents or any Contract to which they are a party or by which they may be bound and there exists no state of facts which after notice or lapse of time, or both, would constitute such a default or breach, and all such documents and Contracts are in good standing and the Buyer and Markland are entitled to all benefits thereunder

(iv)   Markland is tax resident in the Republic of Ireland and the Buyer is tax resident in the Czech Republic

(v)   The corporate records of the Buyer and Markland contain complete and accurate records of all minutes of meetings held and all resolutions adopted by the Buyer and/or Markland in general meetings since their incorporation and the Buyer and/or Markland have no knowledge of any of the above that might make this Agreement invalid, void or voidable

(vi)   The books and records of the Buyer and Markland fairly and correctly set out and disclose in all material respects the financial position of the business of the Buyer and Markland and all material financial transactions relating to the business have been accurately recorded in such books and records since their incorporation and the Buyer and/or Markland have no Knowledge of a breach of any of the above

(vii)   The Buyer and Markland are not a party to any valid written or verbal Contracts or any other document under the terms and conditions of which the performance by the Buyer and/or Markland of this Agreement would result in the breach of an obligation, or might provide a reason for the termination or invalidity of this Agreement, or which might preclude the Buyer and/or Markland from performing their obligations hereunder.

(viii)   All Consents and other co-operations necessary to fulfil this Agreement by the Buyer and Markland shall be provided by the

Buyer and Markland to the Seller and to the KAS Group upon their written request thereof.

(ix) The Buyer is obliged to conclude a Transfer Deed and trademark transfer agreements in accordance with Clause 5 1 and 5.2 and take over the Shares in accordance with Clause 5 5.

**7.3    Due Diligence**

Markland represents that during Due Diligence it had an option to ask for and did ask for information concerning the Property, Kotva and other members of the KAS Group and that the documents provided were and still are represented by Kotva and KAS to be satisfactory and of a standard to enable Markland and the Buyer to enter into this Agreement including their willingness to pay the Purchase Price subject to such retentions as are made hereunder. The Buyer and Markland agree that, on the basis of the information provided to them by the Sellers, the Purchase Price is reasonable and corresponds to the value of the Shares and the Kotva Trademark.

**8    Share Purchase Price Adjustment and Remedies**

**8.1    Survival; Right to Share Purchase Price Adjustment; Waiver**

All obligations and undertakings and Share Purchase Price adjustment obligations in this Agreement and its Schedules, and any other certificate or document delivered pursuant to this Agreement will survive the Closing until the expiration of the relevant limitation period, i e. preclusion or statutory limitations. Any claim by a Party based on a breach of any undertakings, representation or warranty made pursuant to this Clause 8 1 must be submitted to the breaching party prior to the expiration of the applicable limitation period. The right to Share Purchase Price adjustment, payment of damages or other remedy based on a breach such representations, warranties, covenants, and obligations will not be affected by any investigation conducted with respect to, or any Knowledge acquired (or capable of having been acquired) about, the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to Share Purchase Price adjustment. payment of damages, or other remedy based on such representation, warranty. covenant, or obligation.

**8.2    Share Purchase Price adjustment and Payment of Damages by Kotva**

Kotva and the Seller shall jointly and severally reimburse and hold harmless Markland and the Buyer and the members of their Boards of Directors (collectively. the "**Markland's Indemnities**"). and shall pay (by way of deducting from the Share Purchase Price payable by the Buyer) to the relevant Markland's Indemnities the monetary value of any Adverse Consequence arising directly or indirectly. from or in connection with:

(a) any breach of any representation, warranty covenant, obligation or undertaking made by Kotva and/or the Seller and /or KAS in this Agreement, or any other certificate or document delivered by Kotva and/or KAS and/or by the Seller pursuant to this Agreement;

KC1-2668

(b)     any Liabilities of SPV KN existing at or arising out of a state of facts existing at or before the Closing Date, to the extent that such Liabilities are not reflected or reserved against in the Financial Statements;

(c)     any claim by any Person for brokerage or finder's fees or commissions or similar payments from the Seller, SPV KN or SPV CO in connection with any of the Contemplated Transactions; and

(d)     any and all Threatened or implemented Proceedings, demands or assessments incidental to any of the matters set forth in this Clause 8 2(a) to (c)

**8.3**    Share Purchase adjustment and Payment of Damages by Markland

The Buyer and Markland shall jointly and severally reimburse and hold harmless Kotva, the Seller, KAS Group, SPV KN and the members of the boards of directors of the aforementioned companies (the "**Kotva's Indemnities**"), and shall pay (by way of increasing the Share Purchase Price payable by the Buyer) to Kotva's Indemnities the monetary value of any Adverse Consequence arising directly or indirectly, from or in connection with:

(a)     any breach of any representation, warranty covenant. obligation or undertaking made by Markland or by the Buyer in this Agreement or in any certificate delivered by Markland or by the Buyer pursuant to this Agreement; and

(b)     any and all Threatened or implemented Proceedings, demands or assessments incidental to any of the matters set forth in Clause 8 3(a) above

**8.4**    Procedure for Share Purchase Price adjustment

(a)     Immediately after: (i) receipt by an Indemnified Person of notice of the assertion of a third-party claim against it; or (ii) the Indemnified Person becoming aware that it has suffered an Adverse Consequence entitling it to a Share Purchase Price adjustment, the Indemnified Person will, if a claim is made against such Indemnified Person, give notice to the Indemnifying Person of the assertion of such claim or the Adverse Consequence as the case may be An Indemnified Person's failure to notify an Indemnifying Person will not relieve the Indemnifying Person of any Liability that it may have to the Indemnified Person

(b)     A claim for Share Purchase Price adjustment originates by the expiration of the protection time limit according to Clause 8 5, at which moment the sum payable under the Share Purchase Price adjustment shall be paid promptly by the Indemnifying Person to the Indemnified Person.

**8.5**    If any of the Parties discovers a Threatened Adverse Consequence to it for a reason which would entitle the another Party to Share Purchase Price adjustment or to withdraw from this Agreement. that Party shall notify the others accordingly The Party who would but for the terms of this Clause 8 5 be the Indemnifying Party then has a protection time limit lasting 25 (twenty five) Business Days from the date of the delivery of the notification to remove the fact causing falsehood of the representation or remedy the breach of its obligation If such Party does not do so, it is obliged to

---

KC1-2669

pay to the other Party upon expiration of the protection time limit sufficient and full compensation for the Threatened or newly discovered Adverse Consequence. If later the Adverse Consequence does not materialise the Party receiving the compensation is obliged to return it.

8.6    In the event that an Adverse Consequence is discovered, Kotva or the Seller shall remedy such situation as soon as possible following the discovery but in any event shall do so prior to Closing. If at Closing the Adverse Consequence still exists, the Buyer shall be entitled to deduct the amount of the Adverse Consequence from the Share Purchase Price.

8.7    Any payments made under this Clause 8 hereof shall be treated as an adjustment to the Share Purchase Price paid by the Buyer for the Shares under the terms of the Agreement, with the exception of any contractual penalty payable hereunder.

8.8    All sums payable by the Seller to the Buyer under this Agreement shall be paid free and clear of all deductions, withholdings, set-offs or counterclaims whatsoever save only as may be required by Law. If any deductions or withholdings are required by Law the Seller shall be obliged to pay to the Buyer such sum as will after such deduction or withholding has been made leave the Buyer with the same amount as it would have been entitled to receive in the absence of any such requirement to make a deduction or withholding.

8.9    If any Tax authority charges to Tax any sum paid to the Buyer under this Agreement then the amount so payable shall be grossed up by such amount as will ensure that after payment of the Tax so charged, or which would have been so charged if any relief available to the Buyer were ignored, there shall remain a sum equal to the amount that would otherwise be payable under this Agreement.

9    **Post - Closing Confidentiality Duty**

9.1    For the purpose of this Agreement, confidential or proprietary information ("**Proprietary Information**") shall mean the information created, transferred, recorded or employed as part of, or otherwise resulting from the activities undertaken pursuant to this Agreement or the Schedules hereto which constitutes the confidential, proprietary or trade secret information of the disclosing Party. Proprietary Information of Kotva shall also include Proprietary Information of SPV KN and/or the Seller. Such information may be of, but not limited to, a business, organisational, technical or financial nature. The Parties understand and agree that all Proprietary Information of a disclosing Party shall be treated as confidential by the receiving Party. Each receiving Party shall use the same degree of care as it uses with regard to its own Proprietary Information to prevent disclosure, use or publication of the disclosing Party's Proprietary Information.

9.2    Proprietary Information of the disclosing Party shall be held by the receiving Party as described in Clause 9.1 unless it is or has been:

(i)    obtained legally and freely from a third Person without restriction;

(ii)    independently developed by the receiving Party at a prior time or in a separate and distinct manner without benefit of any of the Proprietary Information of the disclosing Party and documented to be as such;

---

KC1-2670

(iii)    made available by the disclosing Party for general release;

(iv)    made public as required by Law, applicable regulations or Order or stock exchange requirements; and

(v)    within the public domain or later becomes part of the public domain as a result of acts by someone other than the receiving Party and through no fault or wrongful act of the receiving Party.

9.3    A receiving Party may disclose Proprietary Information of a disclosing Party to directors, officers, and employees of the receiving Party or agents of the receiving Party including their respective brokers, lenders, insurance carriers or prospective purchasers who have specifically agreed in writing to nondisclosure of the terms and conditions hereof. Any disclosure hereof required by legal process pursuant to Clause 9.2(v) shall only be made after providing the disclosing Party with notice thereof in order to permit the disclosing Party to seek an appropriate protective order or exemption.

9.4    The provision of this Clause 9 shall be effective for a period of two years following the Closing Date.

9.5    If a court of competent jurisdiction determines that the length of time or any other restriction or portion thereof set forth in this Clause 9 is unduly restrictive and thereby unenforceable. such restriction shall be interpreted and applied to include as much of the restriction as will render the covenants in this Clause 9 valid and enforceable to the fullest extent permitted by applicable Law, and as so interpreted and applied such covenants shall remain in full force and effect. The Parties further agree that if a court of competent jurisdiction determines that any provision of this Clause 9 is invalid or against public policy, the remaining provisions of this Clause 9 shall not be affected thereby, and shall remain in full force and effect.

## 10    Termination

10.1    Markland and/or the Buyer shall be entitled to withdraw by written notice to Kotva or to the Seller from this Agreement only if: (i) there is a breach of the Kotva's or Seller's representations, warranties, obligations or undertakings in accordance with Clause 6 and the protection time limit in accordance with Clause 8.5 of this Agreement expires. or in other cases of a breach of the Kotva's or Seller's representations, warranties or obligations where this Agreement entitles Markland or the Buyer to withdraw from the contract; (ii) if either SPV Conclusion has not taken place by 31 January 2005. save in the event of Force Majeure, including inactivity of a relevant Governmental Body or through the fault of a third party that is not either directly or indirectly controlled by the Seller; or (iii) if Closing has not occurred by 31 March 2005 provided that no breach of this Agreement by the Buyer or Markland will have occurred by then

10.2    If Markland and/or the Buyer withdraw from this Agreement pursuant to Clause 10.1 the Buyer shall be entitled (in addition to and without prejudice to all other rights or remedies available to it including the right to claim damages) to:

10.2.1    the return of the Deposit and, if appropriate the Purchase Price in accordance with the terms of the Escrow Agreement; and

10.2.2    a contractual penalty amounting to CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied firstly from the Security and then from other funds of the Seller as necessary

**10.3**    Failure to exercise this right in accordance with Clause 10.2 shall not constitute a waiver of any other right of Markland and/or the Buyer arising out of any breach of the obligations and undertakings of Kotva and/or the Seller

**10.4**    Kotva and/or the Seller are entitled to withdraw from this Agreement by serving written notice on Markland and the Buyer if it shall be found that any of the representations and warranties of Markland and/or the Buyer in accordance with Clause 7 was untrue at the date of execution of this Agreement or by the Closing Date, and the protection time limit according to Clause 8.5 of this Agreement expires or in other cases of breach of Markland's or Buyer's obligations where the Seller is entitled to withdraw from this Agreement

**10.5**    In the event of failure by Kotva and/or the Seller to satisfy the SPV Conclusion by 31 January 2005, Markland and/or the Buyer may withdraw from this Agreement by serving five Business Days notice on the Seller and Kotva and the Buyer shall be entitled to a contractual penalty of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns), to be satisfied firstly from the Security and then from other funds of Kotva and/or of the Seller as necessary

**10.6**    If Kotva and/or the Seller withdraws from this Agreement pursuant to Clause 10.4 the Seller will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty in accordance with the relevant term of this Agreement of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) in case this Agreement does not set other contractual penalty to be satisfied firstly from the Deposit and then from other funds of Markland as necessary.

**10.7**    Failure to exercise this right in accordance with Clause 10.6 shall not constitute a waiver of any other right of Kotva and/or the Seller arising out of any breach of the obligations and undertakings of Kotva and/or the Buyer, however, settling the agreed contractual penalty causes the right to Share Purchase Price adjustment and possible other right to indemnification or damages against Markland and/or the Buyer to cease.

**10.8**    If Closing does not occur within the time limits envisaged in this Agreement (other than due to the fault of the Buyer or Markland), then the Buyer will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) to be satisfied firstly from the Security and then from other funds of Kotva, SPV KN and/or the Seller as necessary.

**10.9**    If Closing does not occur within the time limits envisaged in this Agreement (other than due to the fault of the Seller or Kotva), then the Seller will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) to be satisfied firstly from the Deposit and then from other funds of Markland as necessary

KC 1-2672

KC1-2672

**10.10** The Parties are not entitled to the contractual penalties as above, if the other party does not comply with this Agreement due to the event of Force Majeure, including inactivity of a relevant Governmental Body or through the fault of a third party that is not either directly or indirectly controlled by Kotva, the Seller or the Buyer

**10.11** In the event (i) that the breach of obligations of the Seller or of Kotva does not cause an Adverse Consequence or (ii) if the Seller or Kotva fully indemnifies the Buyer or Markland during the protection time limit stated in Clause 8 5, then Markland and/or the Buyer shall not be entitled to withdraw from this Agreement or claim a contractual penalty

## 11    General Provisions

### 11.1    Expenses

Except as otherwise expressly provided in this Agreement, each Party will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of its Representatives

### 11.2    Public Announcements

Any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued at such time and in such manner as the Parties mutually determine  None of the Parties will make any disclosure of the Purchase Price or other terms of the Contemplated Transactions to any Person, except with the prior written consent of the other Parties or as required by Legal Requirements or by law  The Parties will consult with each other concerning the means by which the Kotva's employees, customers and others having dealings with Kotva or the Seller will be informed of the Contemplated Transactions, and the Parties will have the right to be present for any such communication, if possible

### 11.3    Notices

All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed given to a Party when: (a) delivered to the appropriate address by hand or by nationally recognised overnight courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment (subsequently delivered in written form within five days); or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested; in each case to the following addresses  facsimile numbers or e-mail addresses and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number, e-mail address or individual as a Party may designate by notice to the other Parties):

**Kotva, KAS, KO and the Seller:**

Kotva NEMOVITOSTI, k s
Address:       Příkop 4  Brno, Post Code 602 00
Fax:           +420 224 801 230
Tel:           +420 224 801 401
Attention:     Martin Benda

copy to

Toman, Devátý and Partneři
Address:        Trojanova 12, 120 00 Prague 2
Fax:            +420 224 920 468
Tel:            +420 224 918 490
Attention:      Petr Toman

and

**Markland and the Buyer:**

Markland Holdings Limited
Address:        19 Upper Fitzwilliam Street, Dublin 2, Republic of Ireland
Fax:            00353 167 620 00
Tel:            00353 167 620 23
Attention:      Henry Prestage/Frank Walker/Aidan Scully

copy to

Linklaters v.o.s.
Address:        Palác Myslbek, Na Příkopě 19, 117 19 Praha
Fax:            +420 221 622 199
Tel:            +420 221 622 111
Attention:      Bryan Wilson

11.4    Further Assurances

The Parties agree:

11.4.1    to furnish, upon request, each other with such further information as requested;

11.4.2    to execute and deliver to each other such other documents; and

11.4.3    to do all such other acts, as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Contemplated Transactions.

11.5    Incorporation of Schedules

The Schedules identified in this Agreement are incorporated herein by reference and made a part of this Agreement.

11.6    Entire Agreement and Modification

This Agreement supersedes all prior agreements among the Parties with respect to its subject matter and constitutes (along with the documents delivered pursuant to this Agreement) a complete and exclusive statement of the terms of the agreement between the Parties regarding its subject matter. In the case of any inconsistency between the terms of this Agreement and the terms of the Transfer Deed or the KOTVA Trademarks transfer agreement, the terms of this Agreement shall prevail. This Agreement may not be amended, supplemented or otherwise modified except by a written agreement executed by all the Parties.

11.7    Acknowledgement

Markland and the Buyer acknowledge that they have not been induced to enter into this Agreement by any representation, warranty or undertaking not expressly

KC 1-2674

KC1-2674

incorporated into it. Parties to this Agreement confirm that they have received independent legal advice relating to all the matters provided for in this Agreement, including the provisions of this Clause 11.7, and agrees, having considered the terms of this Clause 11.7 and the Agreement as a whole, that the provisions of this Clause 11.7 are fair and reasonable.

**11.8**   Time of the Essence

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**11.9**   Severability

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable. However, the transfer of the Shares and the transfer of KOTVA Trademarks are mutually dependant transactions pursuant to Section 275 (2) of the Commercial Code.

**11.10**   Assignments, Successors, and No Third Party Rights

No Party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Parties, such consent not to be unreasonably withheld, except that Markland may assign without the other Parties' consent any of its rights and delegate any of its obligations under this Agreement to any Related Person or any subsidiary of Markland or to any subsequent acquirer of the Shares or of all or substantially all of the business of the Buyer or any Related Person. This Agreement will apply to, be binding in all respects upon, and inure to the benefit of each of the Kotva's and/ or Seller's successors and permitted assigns and Markland's and/or the Buyer's successors and permitted assigns (whether by merger, consolidation, purchase of all or substantially all of its assets or otherwise). The Buyer will indemnify and hold harmless the Seller and KAS, and will pay to the Seller's Indemnities the monetary value of any Adverse Consequence arising, directly or indirectly, from or in connection with any breach of such a Buyer's successor. Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the Parties, any right, remedy, or claim under or with respect to this Agreement or any its provision except the rights as shall inure to a successor or assignee pursuant to this Clause 11.10.

**11.11**   Waiver

The rights and remedies of the Parties are cumulative and not alternative. Neither any failure nor any delay by any Party in exercising of any right, power, or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable Law, (a) no claim or right arising out of this Agreement or any of the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Party, and (b) no waiver that

KC 1-2675

KC1-2675

may be given by a Party will be applicable except in the specific instance for which it is given

**11.12** Arbitration

This provision shall apply to all and any dispute or difference that may arise in connection with or the interpretation, performance or termination of this Agreement between the Parties, as well as the validity or settlement of this Agreement and of the relationship established by this Agreement (the "**Dispute**"). The Parties shall make every effort to resolve any Dispute out of court, if possible. If they are unable to reach an out-of-court settlement, any of the Parties shall have the right to file a petition for the Dispute to be resolved before the Court of Arbitration attached to the Economic Chamber of the Czech Republic and the Agrarian Chamber of the Czech Republic in accordance with Acts nos 216/1994 Coll , as amended, and 223/1994 Coll , as amended, under said Court's Rules of Arbitration, by three arbitrators. The language of the proceedings shall be Czech and the venue of the proceedings shall be Prague. The chairman of the arbitration tribunal shall be authorised to decide on procedural issues at his own discretion. If the disputing Parties reach conciliation before the above Court as part of the arbitration proceedings, no justification needs to be attached to the arbitral award that will endorse the conciliation between the disputing Parties. The Party that is defeated in such a Dispute shall reimburse the other Party for all of its legal expenses in addition to the costs of the arbitration proceedings adjudicated to it by the arbitration tribunal. In proceedings before the above Court of Arbitration, the Parties shall take an active attitude and shall be helpful to the Court in the resolution of the Dispute, especially as regards giving explanations, furnishing evidence and documents, etc , and shall acknowledge its arbitral award without any reservations, and shall carry out the arbitral award voluntarily. If a Party refuses to carry out the arbitral award referred to in the preceding sentence, the other Party has the right to file a petition for the execution of the decision with the court of law having jurisdiction over the place and merit of the dispute

**11.13** Governing Law

This Agreement will be governed by and construed under the laws of the Czech Republic without regard to its conflicts of law principles, in particular the Czech Commercial Code

**11.14** Counterparts

This Agreement will be executed in four counterparts, each of which will be deemed to be an original copy of this Agreement and which, when taken together, will be deemed to constitute one and the same document. The Agreement is executed in the English (2 counterparts) and Czech (two counterparts) languages, and the Czech language version shall prevail

The Parties have executed this Agreement as of the date indicated in the first sentence of this Agreement

By:

**Seller:**

---

A04677559/1 4/22 Dec 2004

KC 1-2676

KC1-2676

**SPV CO Limited**


Name:

Title:


By:

**KOTVA NEMOVITOSTI k. s.**


Name:

Title:


By:

**KOTVA a.s.**

Name:

Title:


By:

**KOTVA OBCHODNÍ, a.s.**


Name:

Title:


By:

---

A04677559/1 4/22 Dec 2004

KC 1-2677

KC1-2677

**Buyer:**

**CRQ Czech a.s.**

**Name:**

**Title:**

By:

**Markland Holdings Limited**

**Name:**

**Title:**

KC1-2678

**Schedule 1**
**Extracts from Commercial Register**

KC1-2679

**Schedule 2**
**Extract from Companies House**

KC 1-2680

KC1-2680

**Schedule 3**
**INTENTIONALLY DELETED**

KC1-2681

**Schedule 4**
**Extract from Real Estate Register**

KC1-2682

**Schedule 5**
**KO Lease**

KC1-2683

**Schedule 6**
**Rent Roll**

**Schedule 7**
**INTENTIONALLY DELETED**

KC1-2685

**Schedule 8**
**INTENTIONALLY DELETED**

KC1-2686

**Schedule 9**

**Gilroy Claim**

KC1-2687

**Schedule 10**

**Expert Opinion**

**Schedule 11**

**List of Fixtures & Fittings**

KC1-2689



## COSTAS INDIANOS & CO

## ADVOCATES & LEGAL CONSULTANTS

### ESTABLISHED 1924

# Specialized in Corporate & Business Law and Shipping Law



ENTER

# CONTACT

# Costas Indianos & Co - Advocates & Legal Consultants

4, Diagoras street, Kermia House, 6th floor, flat 601
P.O.Box 21574, CY 1510  Nicosia, CYPRUS
Telephone: +357-22 67 52 31 / Fax: +357-22 66 96 78
e-mail: indianos@indianos.com.cy



## COSTAS INDIANOS & CO - Advocates & Legal Consultants

### THE FIRM: COSTAS INDIANOS & CO - ADVOCATES & LEGAL CONSULTANTS

  

Antonis.C. Indianos (1899-1968)    Costas. A. Indianos (1942-2001)

The Law Firm, one of the oldest in Cyprus, was founded by the late **Antonis C. Indianos,** M.A. (Oxon), Barrister-at-Law, in 1924, in the town of Limassol and was known then as A. C. Indianos - Advocate.The late A.C. Indianos was the Criminal Lawyer par excellence in the island and in later years when he moved his office to Nicosia (1942), the firm's business expanded to encompass commercial, insurance and corporate activities.

**Costas A. Indianos** joined the firm in 1965 after studying in Oxford M.A. (Oxon).After the passing away in 1968 of the late A.C. Indianos the firm's name was changed to **Costas Indianos & Co, Advocates & Legal Consultants.** Between 1977-1983 he served as a member of the International Secretariat of the Council of Europe in Strasbourg, France, in the Department of Economic and Social Activities. Costas Indianos was a practising lawyer with wide experience and specialization in shipping & martime, commercial, business and corporate law. His brother Antonis Emiliou Indianos (University of Athens) joined the firm in 1975. He served on the bench as a Judge of most of the District Courts of Cyprus until 2001. He is now a practising lawyer in Larnaca and an expert in criminal law.

Anthony Indianos (University of Aix-Marseilles / Maastricht), lawyer and son of Costas Indianos joined the firm in 1999. He is currently heading the Law Firm and is fluent in English, French and Greek. The main office is situated in Nicosia with an office in Larnaca. It includes five lawyers, shipping and corporate consultants and one internal accountant. It has a solid local and international client base and possesses an extensive

international network of business contacts.



**AREAS OF PRACTICE**  **CLIENT BASE**  **CYPRUS**  **OFFICES**
**BACK**



ΚΥΠΡΙΑΚΗ    ΔΗΜΟΚΡΑΤΙΑ
REPUBLIC    OF CYPRUS

C.C. 1

No. 78962

MINISTRY OF COMMERCE, INDUSTRY AND TOURISM
DEPARTMENT OF REGISTRAR OF COMPANIES
AND OFFICIAL RECEIVER
NICOSIA

30 June 2005

## CERTIFICATE

### FORMINSTER ENTERPRISES LIMITED

It is hereby certified that in accordance with the records kept by this Department
the following were the Shareholders of the above company as at 3 9 1998:

| Name and Address | Class (Value) | No. of Shares |
|---|---|---|
| LEDRA NOMINEES LTD<br>20 Vas Frederick Street<br>El Greco House, Office 104<br>Nicosia | ORDINARY (CYP 1,00) | 500 |
| LEDRA TRUSTEES LTD<br>20 Vas Frederick Street<br>El Greco House, Office 104<br>Nicosia | " | 500 |

For Actg Registrar of Companies

Sgd  for PAPADOPULOU

/l ll



ΚΥΠΡΙΑΚΗ     ΔΗΜΟΚΡΑΤΙΑ
REPUBLIC     OF CYPRUS

C.C. 1

No. 78962

### MINISTRY OF COMMERCE, INDUSTRY AND TOURISM
### DEPARTMENT OF REGISTRAR OF COMPANIES
### AND OFFICIAL RECEIVER
### NICOSIA

30 June 2005

## CERTIFICATE

### FORMINSTER ENTERPRISES LIMITED

It is hereby certified that in accordance with the records kept by this Department the following were the Shareholders of the above company as at 30 11 1999:

| Name and Address | Class (Value) | No. of Shares |
|---|---|---|
| INDVECTA (NOMINEES) LTD<br>4 Diagorou Street<br>Kermia House, Office 601<br>Nicosia | ORDINARY (CYP 1,00) | 500 |
| CYRENA (NOMINEES) LTD<br>4 Diagorou Street<br>Kermia House, Office 601<br>Nicosia | " | 500 |

For Actg Registrar of Companies

/LH



ΚΥΠΡΙΑΚΗ     ΔΗΜΟΚΡΑΤΙΑ
REPUBLIC     OF CYPRUS

C.C.  1

No. 78962

MINISTRY OF COMMERCE, INDUSTRY AND TOURISM
DEPARTMENT OF REGISTRAR OF COMPANIES
AND OFFICIAL RECEIVER
NICOSIA

30 June 2005

## CERTIFICATE

### FORMINSTER ENTERPRISES LIMITED

It is hereby certified that in accordance with the records kept by this Department
the following were the Shareholders of the above company as at 25 5 2005:

| Name and Address | Class (Value) | No. of Shares |
|---|---|---|
| INDVECTA (NOMINEES) LTD<br>4 Dingorou Street<br>Kermia House, 6th Floor, Office 601<br>1097 Nicosia | ORDINARY (CYP 1,00) | 1 000 |

For Actg Registrar of Companies

Sgo ) R  BAPNAGPOBLOU

/I.H



Confidential Memorandum to the board of the Brookdale Global Opportunity Fund
Prepared by: Vladimir Hoffmann
Prague, October 21, 2004

Dear Andy,

The purpose of this Memorandum is to summarize the latest developments in Kotva & Trend case to enable the Board of BGO to make informed decision

Negotiations, Price offers & Lawsuits

In the fall of 2003 I was approached by Mr Harazim, CEO of Kotva who offered CZK 20m for BGO's Kotva shares We declined this offer as too low and we received an increased and firm offer from J&T Banka who acted as a broker for Kotva with the price of USD 1m (about CZK 26m) We declined this offer at the end of 2003

In May 2004 you visited Prague and during our meeting with Messrs Benda and Harazim we were told by Mr Harazim that BGO's Kotva shares have no value, since they represent a minority interest and Kotva would never pay dividends or make any other distribution Following this we have hired Peterka & Partners and initiated several lawsuits questioning the ownership of Kotva property and Kotva shares

In August 2004 Mr Benda offered CZK 75m for BGO's Kotva shares The offer was conditional upon the withdrawal of all lawsuits filed by Gilroy and Balfindor We have responded by offering BGO's Kotva shares for CZK 131m and to withdraw Gilroy's lawsuit (lawsuit against ownership of Kotva property) Mr Benda responded rather vaguely that the price was too high and that they insist on withdrawal of all lawsuits, not only Gilroy's lawsuit He also asked for more time since he was leaving for holiday and since he asked his lawyers to provide their legal opinion on Kotva buying its own shares

During our meeting on Oct 18, 2004 Mr Benda said in the presence of Mr Peterka and myself that he would accept the price of CZK 131m provided that all lawsuits are withdrawn I have emphasized that our offer was conditional only upon the withdrawal of Gilroy's lawsuit and that it has expired at the end of August 2004 anyway Later, Messrs Prestage – representative of the Irish investors and Harazim joined the meeting Mr Prestage said, that it should not be a problem for him to pay part of the money intended for the Kotva property directly to us for Kotva's shares

Valuation of Kotva property

We were informed by Mr Woolf that the price of the property that the Irish investors agreed to pay was approx CZK 1,5 billion. This was confirmed to me also by another party who is involved in the Czech real-estate market The latest article published in Sunday Times on Oct 4th, 2004 has the price at EUR 54m, or approx CZK 1,7 billion This price was quoted also in the latest article published in the Czech Business Weekly on Oct. 11th, 2004

K 0075

The same group of Irish investors has bought two neighbouring buildings to Kotva at Revolucni 1 and 3 for CZK 496m in public auction  The comparative valuation is in the following table:

| Property | Built up area | Additional Ground | Total Serviceability | Overground Floors | Underground Floors | Price (CZK '000) | Price per Total Serviceability (CZK/sqm) |
|---|---|---|---|---|---|---|---|
| Kotva[1] | 4,385 | 3,900 | 39,575 sqm[2] | 7 | 3 | 1,700m | 42,956 |
| | | | | | | 1,500m | 37,902 |
| Revolucni 1+3[3] | 2,800 | ? | 20,500 sqm | 8 | 3 | 496m | 24,195 |

The comparison shows that even at CZK 1,5 billion Kotva is valued relatively expensive (by 50%) compared to the neighbouring Revolucni 1 and 3

Valuation of Kotva shares

We have estimated Kotva's liabilities, costs and taxes associated with the sale of the property at CZK 400m  The following table shows the NAV of BGO's 11,9% stake for the property price of CZK 1,5 and 1,7 billion

| Price of the property (CZK '000) | Liabilities (CZK '000) | Total NAV (CZK '000) | NAV of BGO's stake of 11,9 % (CZK '000) |
|---|---|---|---|
| 1,500,000 | 400,000 | 1,100,000 | 130,900 |
| 1,700,000 | 400,000 | 1,300,000 | 154,700 |

The alternative to the sale of Kotva shares is the pursuing of the lawsuits until the end  In the best case scenario Trend would end up with 212,935 shares of Kotva – which represents 30,7%  The following table shows the "pursuing of the lawsuits scenario" under the following assumptions:

1. Lawsuits will take 5 years
2. We will win all the lawsuits
3. The associated legal and other costs will be CZK 5m per year
4. Trend with BGO and other shareholders will take over Kotva and pursue the sale of property which will take 1 year (sale and distribution)
5. The price of the property less costs and taxes will be CZK 1,5 billion and the NAV of Kotva will be 1,1 billion
6. The appropriate discount rate of this project is 35% due to its very high risk

---

[1] Source: Jones Lang Lasalle
[2] Does not include 368 underground parking places
[3] Source: Naxos

K 0076

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Year | | | | | | |
| Costs (CZK '000) | -5 000 | -5 000 | -5 000 | -5 000 | -5 000 | -5 000 |
| Sale of Kotva for CZK 1,5bln, NAV 1,1bln | | | | | | 1 100 000 |
| Distribution to BGO from Kotva | | | | | | 130 900 |
| Distribution to Trend from Kotva | | | | | | 337 700 |
| Distribution from Trend to BGO | | | | | | 139 470 |
| Total Cash Flow BGO | -5 000 | -5 000 | -5 000 | -5 000 | -5 000 | 265 370 |

| | |
|---|---|
| NPV @ 35% (CZK '000) | 32 738 |

Due to the costs, time involved and high risk the NPV of "pursuing lawsuits" is very low at CZK 32,738m.

Risks

*Irish withdraw*
The first risk is that the Irish investors withdraw from the contract with Kotva. It is very unlikely that Kotva would be able to find another investor who would pay CZK 1,5-1,7 bln given the legal status of the property. That would mean that Forminster will not be able and willing to purchase BGO's shares

*Bankruptcy*
The only posibility to "clean" the property completely is to put it into bankruptcy. Forminster has used this method already at least on two ocasions: bankruptcy of Trend and bankruptcy of Sprint. In both cases Forminster was able to install bankruptcy administrator friendly to them Forminster has also demonstrated the ability to create huge artificial receivables in the past and they would very likely be by far the largest creditor of Kotva. High receivables in combination with the sale of the Property, or Kotva Nemovitosti at depressed price would mean zero or very low distribution to the shareholders

*Damages*
During our last meeting Mr. Benda said that Kotva has financing secured from banks only until the end of 2004. He said that the banks would not extend the credit if there is still lien on the property resulting from the lawsuits. That would cause damage to Kotva. It is possible that Forminster will try to sue us for damages resulting from this. Forminster might also secure financing from its own sources, siphon profits from Kotva through high interest and at the same time create the high receivable it needs to put Kotva to bankruptcy

*Violence*
Up to now Forminster used only legal methods in negotiations. However it was not always the case. The list of "unusual events" is quite extensive:

13.6.1998 – CEO of Kotva Jindrich Zeleznik suddenly died at the age of 52
25.10.1998 – Chalet of Martin Benda exploded
27.10.1998 – Car of Bronislav Becka (CIH) exploded
1998 – Flow East representatives claimed they were threatened and spied
30.8.1999 – Explosion in the sixth floor of Kotva near the office of the board
Aug.2000 – Investigator Blahoslav Kavka committed suicide

K 0077

*March 2001 – Prosecutor Vladislav Kusala resigned*
*2002 - Martin Razim, bankruptcy trustee of Trend resigned, privately claimed that he was*
*threatened*

Considering how much money is at stake for Forminster it is difficult to assess how they react
if pushed to the corner

Conclusion

Since the beginning of the negotiations Forminster has increased its offer from CZK 20m to
CZK 131m, or by 555%. The price of CZK 131m represents zero, or near to zero discount to
the NAV of Kotva This is very extraordinary for this kind of non-transparent companies. The
NPV of continuing the lawsuits is very low at approx CZK 33m The risks involved are
substantial

Even if we drop the lawsuits against Kotva we would still be able to work on Trend case and
we could initiate lawsuits for other property than Kotva – e g Sokolovska Uhelna We might
also sue former Trend directors for damages Depending on the outcome of Flow East's and
John Moffit's claims we might expect bankruptcy proceeds from Trend in the amount of USD
1-2m (even if Trend does not recover any additional assets) on top of the money received for
Kotva shares

Given the facts I recommend you to agree with Forminster on the price of CZK 131m or
close

I believe that if we do not bring this round of negotiations to the successful end we will not
get another chance in forseeable future To put my money where my mouth is I am willing to
reduce my success fee by 30% - which would leave BGO with more money This „voluntary
reduction" is valid until the end of October 2004

Best regards,

Vladimir Hoffmann

K 0078

# Výroční zpráva
# KOTVA a.s.
# za rok 2002

**I. TEXTOVÁ ČÁST**                                                                    str.

1 Základní údaje ............................................................ 2
2 Struktura koncernu, údaje o základním kapitálu a cenných papírech    3
3 Údaje o činnosti a finanční situaci ............................ 7
4 Údaje o statutárních a dozorčích orgánech, vedení
   společnosti a soudních sporech. .............................. 13
5. Očekávaná hospodářská a finanční situace a vývoj činnosti
   v roce 2003. ............................................................ 18


**II. ZPRÁVA PŘEDSTAVENSTVA O PODNIKATELSKÉ ČINNOSTI
A STAVU MAJETKU SPOLEČNOSTI.** ...................... 19

**III. ÚČETNÍ ZÁVĚRKA V NEZKRÁCENÉM ROZSAHU** ............ 22
PŘÍLOHA K ÚČETNÍ ZÁVĚRCE. ................................ 29

**IV. KONSOLIDOVANÁ ÚČETNÍ ZÁVĚRKA** .......................... 54
PŘÍLOHA KE KONSOLIDOVANÉ ÚČETNÍ ZÁVĚRCE ......... 56
ZPRÁVA AUDITORA KE KONSOLIDOVANÉ ÚČETNÍ ZÁVĚRCE    65

**V. ZPRÁVA O VZTAZÍCH MEZI OVLÁDAJÍCÍ A OVLÁDANOU OSOBOU
A O VZTAZÍCH MEZI OVLÁDANOU OSOBOU A OSTATNÍMI OSOBAMI
OVLÁDANÝMI STEJNOU OVLÁDAJÍCÍ OSOBOU** .............. 66

**VI. VÝROK AUDITORA** ................................................ 69

**VII. OSOBY ODPOVĚDNÉ ZA VÝROČNÍ ZPRÁVU A OVĚŘENÍ ÚČETNÍ
ZÁVĚRKY** .............................................................. 71

# I. Textová část

## 1. Základní údaje

| | |
|---|---|
| Obchodní firma (Název): | KOTVA a.s. |
| Sídlo: | nám. Republiky 8, Praha 1 |
| PSČ: | 113 88 |
| | |
| IČ: | 60193808 |
| DIČ: | 001-60193808 |
| | |
| Datum založení: | 22.12.1993 |
| Právní forma: | akciová společnost |
| Období: | doba neurčitá |

Rejstříkový soud oprávněný

k vedení obchodního rejstříku:      Městský soud v Praze

Číslo pod kterým je

společnost zapsána:      odd. B, vložka 2370

Předmět podnikání:      dle čl. IV stanov:

koupě zboží za účelem dalšího prodeje a prodej, hostinská činnost, výroba a prodej nenahraných nosičů zvukových nebo zvukově obrazových záznamů a prodej a půjčování nahraných zvukových a zvukově obrazových záznamů, pronájem motorových vozidel, silniční motorová doprava, provozování nestátního zdravotnického zařízení s druhem a rozsahem poskytované péče všeobecného lékařství, provozování parkovišť, garáží a odstavných ploch, praktický výcvik učňů, rozvod elektřiny

KOTVA a.s. byla založena dle právního řádu České republiky jako akciová společnost podle § 172 zákona č. 513/91 Sb. a byla zapsána do Obchodního rejstříku k 1. 1. 1994. Jediným zakladatelem společnosti je Fond národního majetku ČR, se sídlem v Praze 2, Rašínovo nábřeží 42, na který přešla část majetku státního podniku PRIOR-KOTVA, obchodní dům se sídlem Praha 1, náměstí Republiky 8, zapsaného v obchodním rejstříku vedeném u Obvodního soudu pro Prahu 1, oddíl Ps, vložka 140, podle § 11 odst. 2 zákona č. 92/91 Sb. o podmínkách převodu majetku státu na jiné osoby, ve znění zákona č. 210/93 Sb.

# 2. Struktura koncernu, údaje o základním kapitálu a cenných papírech

- **Popis struktury koncernu**

  Společnost ve smyslu ust. § 66a obchodního zákoníku je společností s většinovým společníkem (akcionářem) a je osobou ovládanou. Ovládající osobou je potom osoba (firma: FORMINSTER ENTERPRISES LIMITED, sídlo: 20 Queen Frederica Street, El Greco House, Nicosia, Kypr). Společnost s touto ovládající osobou tvoří koncern

  <u>Údaje o koncernu:</u>

  **A/ Společnost ovládající:**
    Obchodní firma (název): FORMINSTER ENTERPRISES LIMITED
    Sídlo: 20 Queen Frederica Street, El Greco House, Nicosia, Kypr
    Další údaje o ovládající společnosti nejsou společnosti známy
    Výše podílu, který opravňuje k hlasování na valné hromadě emitenta:    55,74%

  **B/ Společnost ovládaná:**
    Obchodní firma : KOTVA a s
    Sídlo:        Praha 1, nám Republiky 8
    IČ:           60193808

  Mezi společností ovládající a ovládanou není uzavřena tzv. ovládací smlouva

  **Definice dalších ovládaných osob:**
  1. KOTVA a s byla v roce 2002 vlastník 100% akcií KOTVA NEMOVITOSTI, a s, IČ: 26229048, se sídlem Brno, Příkop 4, zapsané v obchodním rejstříku Krajského soudu v Brně, oddíl B, vložka 3426
  2. KOTVA a s byla v roce 2002 vlastník 100% akcií KOTVA OBCHODNÍ, a s, IČ: 26231735, se sídlem Brno, Příkop 4, zapsané v obchodním rejstříku Krajského soudu v Brně, oddíl B, vložka 3484
  3. KOTVA a s byla v roce 2002 jediný společník obchodní společnosti Značková konfekcia s r o, IČ: 35689641, se sídlem Mickiewiczova 6, Bratislava, zapsané v obchodním registru Okresného súdu v Bratislave 1, oddíl Sro, vložka: 10928/B
  4. KOTVA a s byla v roce 2002 jediným společníkem KOTVA-středisko praktického vyučování, s r o, IČ: 26123193, se sídlem Praha 1, nám. Republiky 8, zapsané v obchodním rejstříku Městského soudu v Praze, oddíl C, vložka 72148
  5. KOTVA NEMOVITOSTI, a s vlastní od roku 2002 99% akcií společnosti KOTVA INTERNATIONAL LIMITED, č 522767 se sídlem Geneva Place, Waterfront Drive, P O. Box 3469, Road Town, Tortola, British Virgin Islands
  6. KOTVA a s byla v roce 2002 jediným společníkem společnosti SANDERSON s r o, IČ: 25666797 se sídlem Praha 3, Táboritská 1000/23, zapsané v obchodním rejstříku MěS v Praze, oddíl C, vložka 59498

- Společnost, tj. emitent ani osoba, na které má emitent přímý či nepřímý podíl přesahující 50% základního kapitálu nebo hlasovacích práv nedrží vlastní účastnické cenné papíry s výjimkou 3 471 ks akcií, které byly vráceny zaměstnanci v souladu se stanovami společnosti a které byly valnou hromadou společnosti, konanou 6 8 2001 změněny ze zaměstnaneckých na kmenové, takto zapsány soudem na základě usnesení Městského soudu v Praze čj F 86816/2001 ze dne 15 11 2001 a které budou po zákonném postupu společností zcizeny

- Jmenovitá hodnota povoleného nebo podmíněného zvýšení základního kapitálu a případná lhůta pro jeho zvýšení, okruh osob s právem na výměnu cenných papírů, přednostní upisování akcií a podmínky a postup při vydávání nových akcií se řídí platnými stanovami a obchodním zákoníkem

- Společnost nevlastní akcie, které nezakládají podíl na základním kapitálu

- Podmínky pro změny výše základního kapitálu a práv vyplývajících z jednotlivých druhů akcií ve stanovách společnosti nejsou přísnější než podmínky stanovené zákonem

- ## Osoby s podílem 5 % na hlasovacích právech emitenta:

  Uvádíme osoby dle údajů z výpisů z registru emitenta ze SCP v průběhu roku 2002, které má emitent k dispozici; nejedná se o data, ke kterým došlo ke změně vlastnictví akcií:

  | Specifikace osoby | Počet akcií | Podíl na hlasovacích právech |
  |---|---|---|
  | FORMINSTER ENTERPRISES LIMITED, 20 Queen Frederica Street El Greco House | 385 038 | 55,74% |
  | ARBEGE HOLDING LIMITED, Dingorou St.F1.601, CY-1010 Nicosia | 97 854 | 14,10% |
  | Bank of Bermuda /Guernsey/ Limited, St.Julians Avenue,St.Peter Port. Guernsey | 82 023 | 11.68% |
  | Melodia, spol s r o , Na hrázce 241, Hradec Králové | 56 000 | 8,10 % |

- ## Základní kapitál

  Výše upsaného základního kapitálu činí 694 209 000,- Kč a je zcela splacen  Základní kapitál je rozložen na 694 209 ks akcií  o jmenovité hodnotě po 1 000,- Kč  Všechny akcie znějí na majitele, jsou vydány v zaknihované podobě a jsou registrované

  Společnost nevydala žádné cenné papíry, které opravňují k uplatnění práva na výměnu za jiné účastnické cenné papíry nebo na přednostní úpis jiných účastnických cenných papírů

  V letech 1993-2002 nedošlo k žádným změnám ve výši základního kapitálu  Základní kapitál společnosti je 100% splacen

4

Pohyby vlastního jmění

| (tis. Kč) | 2000 | 2001 | 2002 |
|---|---|---|---|
| Vlastní jmění k 1. 1. | 518.347 | 454.992 | 465.707 |
| Výplata zaměstnaneckých akcií | -30 | -59 | |
| Platby na vrub sociálního fondu | -313 | | |
| Ztráta (zisk) běžného roku | -63.012 | 10 774 | 19.809 |
| Oceňovací rozdíly z přecenění majetku a závazků | | | -41 |
| Nerozdělený zisk minulých let | | | -36 |
| Vlastní jmění k 31. 12. | 454.992 | 465.707 | 485.439 |

- **Cenné papíry**

  Druh                          kmenové
  Forma                         na majitele
  Podoba                        zaknihovaná
  Počet kusů                    694 209 ks
  Připojené kupóny              ne
  ISIN                          CZ 0009048955
  Celkový objem emise           694 209 000,- Kč
  Jmenovitá hodnota akcie       1 000,-Kč

  Valná hromada konaná dne 6.8. 2001 rozhodla o změně zaměstnaneckých akcií na
  kmenové akcie na majitele. Společnost vykupuje zaměstnanecké akcie od odcházejících
  pracovníků. Usnesením Městského soudu v Praze ze dne 15. 11. 2001 byly vymazány
  akcie na majitele v počtu 3 471 ks a přeměněny na kmenové akcie na majitele. Prodej
  nebyl dosud realizován, neboť společnosti nebyl přidělen ISIN

- **Způsob převodu cenných papírů:**

  K převodu kmenových akcií dochází registrací převodu v zákonem stanovené evidenci
  na základě příkazu k registraci převodu (§ 21 z. č. 591/1992 Sb., o cenných papírech
  v platném znění). Převoditelnost akcií není omezena

- Výnos z akcie je zdaňován podle zákona ČNR č. 586/1992 Sb., o daních z příjmu ve
  znění pozdějších předpisů. Daň se vybírá srážkou při výplatě dividendy

- Emise cenných papírů byla přijata k obchodování na veřejných trzích:
  a) Burza cenných papírů Praha, a.s.
  b) RM - SYSTÉM, a.s.

- Akcie jsou evidovány ve Středisku cenných papírů

- Společnost nemá uzavřenu smlouvu s bankou nebo jinou k tomu oprávněnou osobu,
  jejímž prostřednictvím mohou majitelé akcií zdarma uplatňovat svá majetková práva
  spojená s těmito cennými papíry (výplata dividend)

- Popis práv vyplývajících z akcií:

  a) akcionář je oprávněn účastnit se valné hromady, hlasovat na ní, má právo požadovat a dostat na ní vysvětlení záležitostí týkajících se společnosti, je-li takové vysvětlení potřebné pro posouzení předmětu jednání valné hromady a uplatňovat návrhy a protinávrhy  S každou akcií o jmenovité hodnotě 1 000,- Kč je spojen jeden hlas  Dle stanov společnosti se nejprve hlasuje o návrhu svolavatele valné hromady  Společnost nevydala prioritní akcie s prioritními právy.

  b) akcionář má právo na podíl na zisku společnosti (dividendu), který valná hromada podle hospodářského výsledku schválila k rozdělení  Tento podíl se určuje poměrem jmenovité hodnoty jeho akcií k jmenovité hodnotě akcií všech akcionářů,

  c) akcionář má právo na podíl na likvidačním zůstatku  Likvidační zůstatek se dělí mezi akcionáře v poměru jmenovitých hodnot jejich akcií,

  d) dividenda je splatná do tří (3) měsíců ode dne, kdy valná hromada přijala usnesení o rozdělení zisku  Dividendy, jež nebylo možno vyplatit či doručit jejich adresátovi, budou uloženy na zvláštním bankovním účtu společnosti, přičemž oprávněné osoby si je po dobu čtyř (4) let ode dne splatnosti mohou vyzvednout v sídle společnosti po předložení příslušných dokladů  Právo na dividendu v případě neuplatnění akcionářem přechází na zákonného právního nástupce ve smyslu ustanovení občanského a obchodního zákoníku  V případě promlčení se uplatňuje obecná čtyřletá promlčecí lhůta podle § 397 obchodního zákoníku

  Další akcionářská práva vyplývají z obchodního zákoníku a stanov společnosti  Skutečnosti důležité pro uplatňování akcionářských práv společnost dle svých stanov uveřejňuje v celostátně distribuovaném deníku Lidové Noviny nebo týdeníku Obchodní Věstník

- Právo na přednostní úpis dosavadních akcionářů a omezení nebo vyloučení tohoto práva je v souladu s platným zákonem, dle současných platných stanov není upraveno

- Mezi veřejností je umístěno 29 340 ks akcií, na které připadá 29 340 000,- Kč základního kapitálu, tj  4,25 % z celkového základního kapitálu společnosti

- V roce 2002 ani v účetním roce předcházejícím nebyla učiněna veřejná nabídka převzetí akcií emitenta, činěná třetími osobami, ani veřejná nabídka převzetí akcií jiných společností činěná emitentem

6

# 3. Údaje o činnosti a finanční situaci

Textová část viz odd II Zpráva představenstva o podnikatelské činnosti a stavu majetku společnosti

| ROK | 2000 | 2001 | 2002 |
|---|---|---|---|
| Hospodářský výsledek za účetní období k 31.12. v t. Kč | -63 012 | 10 774 | 19 809 |
| Hospodářský výsledek/1 ks akcie v Kč | -90,77 | 15,52 | 28,54 |
| Dividendy | 0 | 0 | |
| Konsolidovaný hospodářský výsledek za účetní období k 31.12. v t. Kč | 247 702 | 238 473 | 60 410 |
| Konsolidovaný hospodářský výsledek/1 ks akcie v Kč | 356,82 | 343,52 | 87,02 |

## Údaje o tržbách:

a) Vývoj tržeb za prodané vlastní výrobky, služby a zboží v t. Kč

| ROK | 2000 | 2001 | 2002 |
|---|---|---|---|
| Tržby za vlastní výrobky | 2 430 | 0 | 0 |
| Tržby za služby | 123 157 | 99 093 | 56 972 |
| Tržby za zboží | 511 641 | 0 | 0 |

b) Rozlišení tržeb dle druhů činnosti v %:

| % tržeb | 2000 | 2001 | 2002 |
|---|---|---|---|
| Vlastní výrobky | 0,38 | 0 | 0 |
| Služby – nájemné,pronájmy zařízení | 10,77 | 0,15 | 2,50 |
| - ostatní služby | 8,55 | 99,85 | 97,50 |
| Tržby za zboží | 80,30 | 0 | 0 |

## Hlavní činnost dle druhu v t. Kč:

| | |
|---|---|
| Pronájmy zařízení, nájemné | 1.421 |
| Lékařské výkony od zdravotních pojišťoven | 786 |
| Služby právní,účetní, bezpečnostní | 25.232 |
| Ochranná známka-licence | 29.533 |
| CELKEM | 56.972 |

## Průměrný přepočtený počet zaměstnanců, řídících pracovníků a osobní náklady:

| | 2000 | | 2001 | | 2002 | |
|---|---|---|---|---|---|---|
| | počet pracovníků | osobní náklady (t.Kč) | počet pracovníků | osobní náklady (t.Kč) | počet pracovníků | osobní náklady (t.Kč) |
| řídicí pracovníci | 4,91 | 7 769 | 3,5 | 3 717 | 0,75 | 817 |
| ostatní pracovníci | 455 | 134 188 | 97,5 | 30 935 | 10,25 | 4 687 |
| celkem | 460 | 141 957 | 101,0 | 34 652 | 11 | 5 504 |

7

- **Investiční činnost:**
- investice uskutečněné v tuzemsku v letech 1999 až 2002:

| Období | Název investice | Pořizovací cena v tis. Kč | Způsob financování |
|--------|-----------------|---------------------------|--------------------|
| 1999 | Eskalátory *) | 46.700 | leasing |
| | Telefon.ústředna | 2.100 | vlastní zdroje |
| | Informační systémy | 1.500 | vlastní zdroje |
| | Modernizace prodejních odd. | 2.000 | vlastní zdroje |
| 2000 | Výtahy *) | 4.500 | leasing |
| | Rekonstrukce rozvodů vody -VZT | 2.650 | vlastní zdroje |
| | Rekonstrukce patrových rozvaděčů | 1.200 | vlastní zdroje |
| 2001 | Osobní automobil Mercedes | 102 | leasing, vlastní zdroje |
| 2002 | 0 | 0 | |

*) U leasingových smluv na eskalátory a výtahy byl v roce 2001 uskutečněn převod na nového nájemce KOTVA NEMOVITOSTI, a s

- finanční investice

| 2000 | 2001 | 2002 |
|------|------|------|
| 535 995 | 539 149 | 577 237 |

Počet a nominální hodnota podílových a ostatních cenných papírů a vkladů v tuzemsku a v zahraničí k 31 12 2002:

| Název společnosti | Podíl | Nominál. hodnota (Kč) | Cena pořízení (tis. Kč) | Opravná položka (tis. Kč) | Forma |
|-------------------|-------|-----------------------|-------------------------|---------------------------|-------|
| Artia, a. s. v likvidaci | 30 ks | 10.000 | 300 | 300 | listinná |
| Motokov, a. s. | 500 ks | 1.000 | 500 | 500 | zápis v SCP |
| Značková konfekcia s. r. o. | 100 % | | 150 | 150 | |
| KOTVA SPV s. r. o. | 100 % | | 100 | 0 | |
| KOTVA NEMOVITOSTI, n.s. | 100 % | 10 mil. | 536.383 | 0 | listinná |
| KOTVA OBCHODNI, a. s. | 100 % | 100.000 | 39.000 | 16.000 | listinná |
| SANDERSON, s.r.o. | 100 % | | 100 | 0 | |
| Kotva International Limited | 1% | 1 USD | 30 | 0 | |
| Celkem | | | 576.563 | 16.950 | |

8

- **Majetkové účasti:**

KOTVA a.s. byla v roce 2002 jediný akcionář vlastník 100% akcií:

**1) Obchodní firma:**      **KOTVA NEMOVITOSTI, a.s.**

| | |
|---|---|
| Právní forma: | akciová společnost |
| Sídlo: | Brno, Příkop 4 |
| IČO: | 26229048 |
| Datum založení: | 16 11 2000 |
| Hlavní předmět podnikání: | pronájem nemovitostí, bytů a nebytových prostor spočívající v poskytování základních služeb zajišťujících jejich řádný provoz, koupě zboží za účelem jeho dalšího prodeje a prodej, správa majetkových účastí, vyjma činností uvedených v § 3 zák č 455/1991 Sb |
| Výše upsaného zákl kapitálu: | 2 200 000 tis Kč |
| Výše a druhy rezerv: | 53 268 tis Kč – zákonná rezerva |
| | 14 775 tis Kč - odložený daňový závazek (pohledávka) |
| Výše zisku nebo ztráty: | - 99 962 tis Kč |

**2) Obchodní firma:**      **KOTVA OBCHODNÍ, a.s.**

| | |
|---|---|
| Právní forma: | akciová společnost |
| Sídlo: | Brno, Příkop 4 |
| IČO: | 26231735 |
| Datum založení: | 7 12 2000 |
| Hlavní předmět podnikání: | koupě zboží za účelem jeho dalšího prodeje a prodej |
| Výše upsaného zákl kapitálu: | 39 000.000,-Kč |
| Výše a druhy rezerv: | 93 t Kč – odložený daňový závazek (pohledávka) |
| Výše zisku nebo ztráty: | -21.493 t Kč |

KOTVA a.s. byla v roce 2002 jediný společník:

**1) Obchodní firma:**      **Značková konfekcia s.r.o.**

| | |
|---|---|
| Právní forma: | společnost s ručením omezeným |
| Sídlo: | Bratislava, Mickiewiczova 6, Slovenská republika |
| IČO: | 35689641 |
| Datum založení: | 26 4 1996 |
| Hlavní předmět podnikání: | koupě zboží za účelem jeho dalšího prodeje a prodej |
| Výše upsaného zákl kapitálu: | 200 000,-Sk |
| Výše a druhy rezerv: | 3 664 t Sk – rezerva na kursové ztráty |
| Hospodářský výsledek za uč období: | 287 t Sk |

**2) Obchodní firma:**     KOTVA-středisko praktického vyučování,
                           s r.o.
  Právní forma:          společnost s ručením omezeným
  Sídlo:                 Praha 1, nám Republiky 8
  IČO:                   26123193
  Datum založení:        25 10 1999
  Hlavní předmět podnikání:    poskytování praktické výuky studijních oborů
                           koupě zboží za účelem jeho dalšího prodeje
                           a prodej
  Výše upsaného zákl kapitálu:   100 000,-Kč
  Výše a druhy rezerv:   1 tis Kč – zákonný rezervní fond
  Výše zisku nebo ztráty po zdaněni:   0,--Kč

**3) Obchodní firma:**     SANDERSON s.r.o.
  Právní forma:          společnost s ručením omezeným
  Sídlo:                 Praha 3, Táboritská 1000/23
  IČO:                   25666797
  Datum založení:        13 5 1998
  Hlavní předmět podnikání:    koupě zboží za účelem jeho dalšího prodeje
                           a prodej
  Výše upsaného zákl kapitálu:   100 000,-Kč

**Další majetkové účasti:**

**1) Obchodní firma:**     KOTVA INTERNATIONAL LIMITED
  Sídlo:                 RN 522767, Geneva Place, Waterfront Drive,
                           P.O.Box 3469, Road Town, Tortola, British
                           Virgin Islands
  Majetkový podíl:       1% (1 000 ks akcií, nominální hodnota 1,-USD)
  Výše upsaného zákl kapitálu:   1 001 000,--USD
  Výše zisku nebo ztráty po zdaněni:   0,--USD

**2) Obchodní firma:**     MOTOKOV, a.s.
  Majetkový podíl:       500 ks akcií v nominální hodnotě 1 000,-Kč

**3) Obchodní firma:**     Artia, a.s. (v likvidaci)
  Majetkový podíl:       30 ks akcií v nominální hodnotě 10 000,-Kč

- KOTVA a s je majitelem ochranné známky kombinované „KOTVA" pod reg č 167 478 a na základě Licenční smlouvy o ochranné známce ze dne 28.2 2001 je KOTVA NEMOVITOSTI, a s IČO: 26229048 oprávněna k výkonu práv z průmyslového vlastnictví, užívat ochrannou známku Dále je majitelem ochranné známky slovní KOTVA pod reg č 173 919

10

**Výkaz zisků a ztrát v zkráceném rozsahu 2000-2002**

| | | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| 1. | PROVOZNÍ VÝNOSY | 850 434 | 140 663 | 199 015 |
| | Tržby za prodej zboží | 511 641 | | |
| | Výkony | 128 106 | 99 093 | 56 972 |
| | Tržby z prodeje majetku | 1 988 | 19 972 | 323 |
| | Ostatní provozní výnosy | 208 699 | 21 598 | 141 720 |
| 2. | PROVOZNÍ NÁKLADY | 894 119 | 103 983 | 154 103 |
| | Náklady na prodané zboží | 383 625 | | |
| | Spotřeba materiálu a energie | 31 860 | 3 472 | 795 |
| | Služby | 66 679 | 20 157 | 7 174 |
| | Osobní náklady | 141 957 | 36 632 | 6 404 |
| | Daně a poplatky | 363 | 139 | 77 |
| | Odpisy investičního majetku včetně zůstatkové ceny prodaného investičního majetku | 59 423 | 19 718 | 157 |
| | Ostatní provozní náklady | 210 212 | 23 865 | 139 496 |
| A. | PROVOZNÍ HOSPODÁŘSKÝ VÝSLEDEK | -43 685 | 36 680 | 44 912 |
| 3. | FINANČNÍ VÝNOSY | 245 | 2 088 | 675 |
| 4. | FINANČNÍ NÁKLADY | 31 473 | 24 957 | 26 091 |
| B. | HOSP. VÝSLEDEK Z FINANČNÍCH OPERACÍ | -31 228 | -22 869 | -25 416 |
| 5. | MIMOŘÁDNÉ VÝNOSY | 3 725 | 1 513 | 584 |
| 6. | MIMOŘÁDNÉ NÁKLADY | -9 029 | 4 550 | 429 |
| C. | MIMOŘÁDNÝ HOSPODÁŘSKÝ VÝSLEDEK | 12 754 | -3 037 | 155 |
| D. | HOSPODÁŘSKÝ VÝSLEDEK PŘED ZDANĚNÍM | -62 159 | 10 774 | 19 651 |
| | DAŇ Z PŘÍJMU ZA BĚŽNOU ČINNOST SPLATNÁ | 853 | | |
| E. | HOSPODÁŘSKÝ VÝSLEDEK ZA ÚČETNÍ OBDOBÍ | -63 012 | 10 774 | 19 809 |

## Rozvaha v zkráceném rozsahu 2000-2002

| | k 31.12.2000 | k 31.12.2001 | k 31.12.2002 |
|---|---|---|---|
| AKTIVA CELKEM | 783 386 | 778 498 | 589 458 |
| 1. Stálá aktiva | 573 981 | 560 744 | 582 689 |
| □ dlouhodobý nehmotný majetek | 2 702 | 70 | 3 |
| □ dlouhodobý hmotný majetek | 36 950 | 23 191 | 23 073 |
| pozemky | 23 000 | 23 000 | 23 000 |
| budovy, haly, stavby | | | 10 |
| samostatné movité věci | 9 637 | 55 | 63 |
| jiný hmotný investiční majetek | 1 884 | 136 | |
| nedokončené hmotné investice | 2 429 | | |
| □ finanční dlouhodobý majetek | 534 329 | 537 483 | 559 613 |
| 2. Oběžná aktiva | 200 589 | 215 672 | 6 755 |
| □ zásoby | 2 826 | | 0 |
| materiál | 2 826 | | |
| zboží | | | |
| □ dlouhodobé pohledávky | | | |
| □ krátkodobé pohledávky | 153 390 | 214 553 | 6 317 |
| pohledávky z obchodního styku | 151 835 | 178 973 | 931 |
| stát-daňové pohledávky | | 15 | 1 |
| pohledávky v podnicích s rozh.vlivem | 1 300 | 35 510 | 5 371 |
| jiné pohledávky | 255 | 55 | 14 |
| □ finanční majetek | 44 373 | 1 119 | 438 |
| 3. Ostatní aktiva | 8 816 | 2 082 | 14 |
| □ časové rozlišení | 8 726 | 2 069 | 1 |
| □ dohadné účty aktivní | 90 | 13 | 13 |
| PASIVA CELKEM | 783 386 | 778 498 | 589 458 |
| 1. Vlastní jmění | 454 992 | 465 707 | 485 439 |
| □ základní jmění celkem | 690 803 | 690 744 | 690 744 |
| základní jmění | 694 209 | 694 209 | 694 209 |
| vlastní akcie | -3 406 | -3 465 | -3 465 |
| □ kapitálové fondy | 34 | 34 | -7 |
| □ fondy ze zisku | 71 560 | 71 560 | 72 099 |
| zákonný rezervní fond | 71 560 | 71 560 | 72 099 |
| statutární a ostatní fondy | | | |
| □ hospodářský výsledek minulých let | -244 393 | -307 405 | -297 206 |
| □ hospodářský výsledek běžného období | -63 012 | 10 774 | 19 809 |
| 2. Cizí zdroje | 326 822 | 312 670 | 103 951 |
| □ rezervy | 10 000 | 10 000 | -122 |
| □ dlouhodobé závazky | 109 436 | 108 348 | 64 978 |
| □ krátkodobé závazky | 169 786 | 180 122 | 29 479 |
| z obchodního styku | 134 151 | 129 635 | 947 |
| k zaměstnancům | 6 970 | 1 670 | 278 |
| ze sociálního zabezpečení | 3 676 | 993 | 133 |
| vůči státu | 6 937 | 1 911 | 243 |
| závazky k podnikům s rozhodujícím vlivem | | 45 067 | 27 883 |
| jiné | 18 052 | 846 | 5 |
| □ bankovní úvěry | 37 600 | 14 200 | 9 616 |
| dlouhodobé | | 11 800 | 4216 |
| běžné | 16 600 | 2 400 | 5 400 |
| krátkodobé finanční výpomoci | 21 000 | | |
| 3. Ostatní | 1 572 | 121 | 68 |
| □ časové rozlišení | 1 531 | | 36 |
| □ dohadné účty pasivní | 41 | 121 | 32 |

# 4. Údaje o statutárních a dozorčích orgánech, vedení společnosti a soudních sporech

## 1.  Statutární a dozorčí orgány, vedení společnosti:

### Představenstvo:
- Martin Benda, r č  710908/3795, bytem Borač 46, okr  Žďár nad Sázavou – předseda představenstva
- John Moffitt, nar  16 července 1964, bytem Praha 1, Bílkova 14 – místopředseda, zánik funkce:12.11 2002
- Ing  Richard Harazim, r č  650310/1363, bytem Brno, Skorkovského 174, člen
- Ing  Irena Šmejcová, r.č. 735406/0285, bytem Praha 4, U Nových domů II 532/11, člen, zánik funkce 11 11 2002
- Ing  Michal Vlach, r č  660411/0183, bytem Brno, Galandauerova 10, člen, den vzniku funkce: 11 11 2002
- Ing  Jaromír David, r č  420511/429, bytem Brno, V Lužích 1, člen, den vzniku funkce: 12 11 2002

### Dozorčí rada:
- JUDr Luděk Krajhanzl, r č  540512/3405, bytem Praha 6, V udolí 493, člen, zánik funkce 17 1 2003
- Radim Polame, r č  520617/044, bytem Praha 4, Mnichovická 719/4, člen dozorčí rady zvolený zaměstnanci společnosti KOTVA a s
- Mgr. Martin Razim, r č  570514/0914, bytem Hradec Králové, P Hanuše 252, člen, zánik funkce: 14 2 2003
- Ing  Pavel Richter, r č 480524/409, bytem Brno, Rolnická č  7, člen, den vzniku funkce:14 2 2003

### Vedoucí zaměstnanci společnosti:
- generální ředitel – Ing  Richard Harazim
- ekonomický manažer – Ing  Jaromír David, CSc

Zaměstnanci nemají možnost učastnit se na základním kapitálu emitenta a řízení společnosti

Členové představenstva a dozorčí rady nevlastní akcie společnosti

Členům představenstva ani dozorčí rady neposkytla společnost žádné úvěry nebo půjčky, nepřevzala žádné záruky ani jištění za úvěry

- Plnění poskytnuté statutárním orgánům nebo jejich členům a členům dozorčích orgánů emitenta (v tis Kč) :

| v Kč | Peněžité příjmy | Z toho tantiémy | Naturální příjmy |
|---|---|---|---|
| Představenstvo | 720 | 0 | 0 |
| Dozorčí rada | 180 | 0 | 0 |
| Vedení společnosti | 649 | 0 | 0 |

- Plnění statutárním orgánům nebo jejich členům a členům dozorčí rady poskytnuté osobami v celém koncernu v rámci České republiky (včetně plnění od emitenta):

| v Kč | Peněžité příjmy | Tantiémy | Věcná plnění |
|---|---|---|---|
| Představenstvo | 2 160 | 0 | 0 |
| Dozorčí rada | 900 | 0 | 0 |

2. **Údaje o soudních, správních nebo rozhodčích řízeních společnosti vedených v běžném účetním obdobím a dvou předcházejících účetních obdobích:**

Na základě rozhodnutí Komise pro cenné papíry čj : 31/837/2000 ze dne 2 6 2000 bylo zrušeno předběžné opatření o pozastavení obchodování s veřejně obchodovatelnými akciemi vydanými společností KOTVA a s v zaknihované podobě v celkovém objemu 690 738 000,-Kč a zároveň bylo zastaveno správní řízení v této věci

Na základě pravomocného usnesení Krajského obchodního soudu v Praze č j.: 47 Cm 261/97-443 ze dne 22 5 2000, podle kterého se zastavuje řízení ve věci nároku, došlo k zániku předběžného opatření podle usnesení Krajského obchodního soudu v Praze čj : 261/97 (47 Cm 261/97-219), kterým bylo omezeno nakládání nemovitostmi ve vlastnictví společnosti

**Ostatní údaje o soudních, správních nebo rozhodčích řízeních:**

**I. Pohledávky v konkursním řízení:**
- A-B-Comp a s – Kč 21 251,50 – dosud neukončeno
- AD reklamní agentura – Kč 400 000 - . 12 2 1999 konkurs zrušen – majetek úpadce nepostačuje k úhradě nákladů konkursu
- AGU International s r o - Kč 3 910.- - skončeno - 30 60 Kč
- ALSIA TRADING, s.r.o. – Kč 5 787 60 – zrušeno pro nedostatek majetku 1 8 2000
- BLONDIE s r o – Kč 1 500,- - zrušeno 14 11 2000 pro nedostatek majetku
- B-BREMEX s r o – Kč 58 876.- konkursní řízení neukončeno
- Císařská huť. a s – Kč 3 917.- ukončeno bude poukázáno Kč 4.50
- CALEX Zlaté Moravce. a s – Sk 74 877.- dosud neukončeno
- Caster-o Kč 5 500,-Kč, konk říz. skončeno-podíl 0 00328994
- Centrotex. a s – 39 988,- dosud neukončeno
- Classic restaurant – Kč 17 500.- - konkurs zrušen majetek nepostačuje k úhradě nákladů
- Exico, a s – Kč 64 084,30 – dosud neukončeno
- East West Travel – Kč 60 895.- 21 2 2001 zrušen pro nedostatek majetku
- FIREX, a.s. – Kč 458 620.- dosud neukončeno
- Gen řed AGRAS – Kč 55 267.- - dosud neukončeno
- IBEX s r o – Kč 7 826.30 – dosud neukončeno

14

- J R Villmek. s r o. – Kč 848 903,- – dosud neukončeno
- Itec Motro n.s – 49 500.-Kč a 16.500,-Kč – přihláška do k ř
- IMPEX. n s Bratislava – Sk 1 155 126 24 – dosud neukončeno
- JEVIsport. s r o – Kč 16 470.- dosud neukončeno.
- Kastner. s r o – Kč 7 500,- – zrušen 25 9 2000 pro nedostatek majetku
- NADA. s r o – Kč 59 107,90 – dosud neukončeno
- Melodia, s r o – Kč 16 195 50 – dosud neukončeno
- Neapol Moda  s r o – Kč 2 968 996.20 – 16 2 2001 zrušen pro nedostatek majetku. likvidace  výmaz 3 12 2002
- Meopta  20 035 -Kč přihláška do k ř.
- Pronto Plus. n s – Kč 35 783.- dosud neukončeno
- SAS + KIA, s r o – Kč 507 400.- – popřeno Kč 73 2000 správcem konk podstaty  dosud neukončeno
- Slušovice JZD- 2x 490 200,-Kč , přihláška, dosud neskončeno
- SPRINT. n s  Brno – Kč 50 380,50 – dosud neukončeno
- SPRINT n s . IČ: 63079755, přihláška pohledávky 240 250 -Kč
- TIP TOP, s r o – Kč 145 640,- – dosud neukončeno
- TOSTA A87 355,- dosud neukončeno
- Tvrský Mirko – Kč 30 0000,- – 20.12 2000 zrušen pro úmrtí úpadce
- Universum . s r o – Kč 424 764.80 – ukončeno – přiznáno 2 138%
- Veselý Radovan – Kč 6 100,- – dosud neukončeno
- Velkoobchod Kilian – Kč 30 460.90 – dosud neukončeno
- Zádruha  dr  – Kč 7 120.- 28 2 2001 zrušen pro nedostatek majetku

## II. Pohledávky v soudním řízení

- AG Kult. fa Kčs 2491,50. 5517 - žaloba. pravomocný rozsudek. žádost o pomoc soudu dle § 26O o s ř
- Alsia Trading s r o  o Kčs 5 287 60  přihláška pohledávky do konkurzního řízení. konkurz zrušen  přiznáno v rozsudku MS v Praze
- Agrostroj Prostějov o Kčs 2 950 - žaloba  pravomocný rozsudek. výkon rozhodnutí-exekuce
- Alpha s r o  o Kč 21 060,- žaloba. pravomocný rozsudek. žádost o pomoc soudu při exekuci. neúspěšné
- A-B-Comp n s  o Kč 6 150 --žaloba. pravomocný platební rozkaz. žádost o pomoc soudu dle § 26O o s ř – zrušen konkurs
- A-B-Comp n s. o 15 101,50 Kč. žaloba. platební rozkaz. zrušen konkurs
- Assenov - Škoda Kč 2 150.- - trestní příkaz 17 2.1996
- AD rekl agentura s r o. o 400 000 --Kč. žaloba konkursní řízení zrušeno, rozsudek
- Balog A  o Kčs 27 950.-, žaloba. pravomocný rozsudek, výkon rozhodnutí -exekuce
- Balog E  o Kčs 4 631,-. žaloba . pravomocný rozsudek. výkon rozhodnutí- exekuce
- Balog J  o Kčs 9 855,-. žaloba. rozsudek. exekuce
- Balog R. o Kčs 3 455,-, žaloba  2 x výkon rozhodnutí-exekuce. zastaveno
- Brabec R. o Kčs 1 540 - pravomocný rozsudek, výkon rozhodnutí- exekuce
- Bimbo - rekl 152. 153, 173, o 9 300,--Kč žaloby  pravomocný rozsudek
- Banda Ernest o 112 22O,--Kč, žaloba  pravomocný rozsudek. soudní výkon rozhodnutí -exekuce
- Bona r  114/K/075/93 Kč 11 915.- žaloba  pravomocný rozsudek
- K Březinová  Motorest Kristinka o 8 769 --Kč, žaloba. pravomocný rozsudek  výkon rozhodnutí bezúspěšně proveden
- Blick – o Kč 45 410,- dosud neobdržen rozsudek MS v Praze
- Brožík -Eastern Prof models o 7 500,--Kč . žaloba. neprovedená exekuce
- Blondie s r o  o 1 500.--Kč  žaloba. platební rozkaz, přihláška do konkursu
- Bytoservis s r o. o 66 822,--Kč, platební rozkaz, § 260 o s ř
- Centrotex, rekl.č  9a/084/91 o Kčs 49 500.-žaloba. rozsudek. odvolání KOTVA n s  probíhá soudní řízení. konkurs
- ČSAD o Kčs 23 430.- žaloba. platební rozkaz dosud pravomocně nerozhodnuto
- Compact Techn. o Kčs 9 343 - žaloba Červenka. pravomocný rozsudek, soudní výkon rozhodnutí-exekuce neprovedena
- Cest kanc  GEO o Kčs 14 000.-Kč  žaloba  pravomocný rozsudek, návrh na soudní výkon rozhodnutí-exekuce. soupis proveden
- Class Praha dobropisy Kč 63 182 50 , žaloba. rozsudek. § 260 o s ř
- Calex - dobropis o 74 877.-žaloba, pravomocný rozsudek. soudní výkon rozhodnutí-exekuce. konkurs
- Classic restaurant o 20 000,--Kč  žaloba  konkurs zrušen malý majetek
- Colorlak s.p. fa Kč 15 178,20 –rozsudek. žádost 260 o s ř
- Dómová. žaloba o Kčs 26 922 - žaloba  pravomocný rozsudek. soudní výkon rozhodnutí-exekuce. nemá žádný majetek. neprovedena
- Družstvo Uno Břeclav o Kčs 19 935 -  rozsudek  v likvidaci. konkurs zrušen
- Drevoindustria Žilina o Kč 82 400,-žaloba. platební rozkaz. žádost o exekuci. nemají finance na účtu
- Duffi s r o  238 937,--Kč.ručitelský závazek  odvolání
- Euro-komex - náhrada škody Kč 15 880 žaloba. rozsudek. odvolání. vráceno MS v Praze
- Etic s r o o Kč 66 240 - žaloba. rozsudek. §260 o s ř – společníci cizinci
- Festi s r o  o Kčs 30 100 - žaloba  pravomocný rozsudek - výkon rozhodnutí-exekuce. § 260 o s ř

- Frič s.r.o Žilina. o Kč 15 619 - a 3 675 -žaloba. platební rozkaz. žádost o vyznačení právní moci. uhrazeno v exekuci částečně
- Ficena o 5 618,--Kč, žaloba. návrh na výkon rozhodnutí-exekuce. jsme v pořadí. propuštěn z VTOS
- Flieger o Kč 43 000.- pátrání po osobě v exekučním řízení
- Gen řed Agras v likvidaci o 55 267 --Kč. žaloba. pravomocný rozsudek. přihláška pohledávky - likvidační řízení
- Humanity Society o 102 713.50 Kč. trestná činnost, rozsudek, nutno právní moc a exekuci
- Hangurbadžo o 20 730.--Kč, žaloba, pravomocný rozsudek  výkon rozhodnutí-exekuce zastavena. neznáme jiné místo, kde jsou věci povinného
- Hrdý o 680.--Kčs. žaloba. rozsudek, exekuce únor 2003
- Hrubý /servisní služba / o 64 584,--Kč. žaloba. platební rozkaz. exekuce neprovedena. na adrese nebydlí
- Hefmánek Ing. o 21 500 --Kč, žaloba. pravomocný rozsudek. 2 x výkon rozhodnutí -exekuce
- Hadžala o 366.--Kč . 451,40 Kč - rozsudek.
- Hradecký. parking o 13 830.--Kč žaloba. exekuce  má jen vrtačku
- Holíková o 9 366.--Kč. platební rozkaz.
- Hajný - šeky - trestní příkaz.
- Hejbalík Daniel, škoda Kč 1 845,- trestní příkaz vést exekuci
- ing. HEIP Tran Van  fa Kč 34870 -- 22 722 - zavražděn
- Hejč Vladislav - škoda Kč 314 -- rozsudek
- Churvát - Topinka - neuhrazené faktury 21 520 --Kč. Kč 53 800 - - rozsudky. exekuce
- Impex  s r o. 5003/88 o 12 649,60 Kčs. žaloba. pravomocný rozsudek. přihláška pohledávky do konkurzního řízení
- Impex. r 4032/90 o 121654.--Kčs žaloba.pravomocný rozsudek. přihláška pohledávky do konkurzního řízení
- Impex o 154 922,76 Kčs. žaloba. pravomocný rozsudek  přihláška pohledávky do konkurzního řízení
- Interiér o 73 340.--Kčs. neuhr dobropisy, žaloba. pravomocný rozsudek. žádost soudu o pomoc -při exekuci. konkurs
- Impex. neuhr dobropisy Kč 822 685.13 Kč žaloba. soudní smír. příhláška pohledávky do konkurzního řízení
- IBC s.r o  Jinočany Kč 42 797 - - rozsudek.
- Jaroš V .náhrada škody 2 100 --Kč rozsudek  návrh na soudní výkon rozhodnutí-exekuce
- JZD Velke Výklepy o 9 500 --Kčs, žaloba. pravomocný rozsudek. z r 1995. likvidace družstva
- Jícha - škoda 1 650.--Kč výkon rozhodnutí-exekuce. na adrese neznámý
- Jet-Set, dobropis 3/94 o 48 070,--Kč . žaloba  rozsudek  jednatel zemřel
- Kopečný, fa Kčs 3 089.- a 4 752 - trestná činnost. pravomocný rozsudek. žádost na vězeňskou službu ČR. kde se vykonává výkon trestu,exekuce zastavena žádný majetek
- Král fa č  970713 Kčs 5 215.. žaloba. pravomocný rozsudek  dva návrhy na výkon rozhodnutí-exekuce  jsme v pořadí
- Kúblech fa Kčs 30 700.- žaloba. pravomocný rozsudek  návrh na soudní výkon rozhodnutí-exekuce
- Krákora fa Kčs 1 231,20, žaloba, rozsudek, výkon rozhodnutí
- Krákora Jindřich - nájemné 72 000,-Kč. žaloba. pravomocný rozsudek. návrh na soudní výkon rozhodnutí
- Kollár Pavel o Kč 9 650,-, rozsudek. exekuce. zastavení žádný majetek. část inv důchod
- Koldová neuhrazená fa Kč 32 840 - žaloba  pravomocný rozsudek  exekuce
- Knotek o 31 160,--Kč.žaloba.pravomocný rozsudek. návrh na soudní výkon rozhodnutí-exekuce. marná exekuce
- Kůřčka Petr – Kč 15 000,-  rozsudek  exekuce
- Kastner s r o  o 2 500.--Kč, žaloba. konkurs zrušen  pokračovat v exekuci
- KORAL  s r.o – Kč 14 157.94. rozsudek. exekuce
- Kučera - náhrada škody Kč 57 175.-, rozsudek. exekuce
- Lebanoramma. r 29/084/91 Kčs 21 600 --žaloba. nepravomocný rozsudek. nemožnost doručení účastníku, nový pokus o doložku pr moci
- Ing Lapikáš Lučenec - dbp  Kč 46 985 -žaloba  rozsudek, žádost o doložku právní moci, exekuce zastavena pro nepatrný majetek
- Lacko-trest činnost o 9 994 --Kč pravomocný rozsudek. návrh-dožádání vězeňské služby ČR.evidence vězňů neznámý pobyt
- Lněnička Tomáš náhrada škody Kč 3 616 - splácí
- Mirga. fa Kčs 13 970,- žaloba. pravomocný rozsudek. návrh na výkon rozhodnutí-exekuce
- My a svět. fa Kčs 14 650 - žaloba. rozsudek  družstvo v likvidaci
- Magnet Pardubice, neopr maj prospěch 662 400,-žaloba., rozsudek, exekuce
- Meopta fa Kčs 20 035,- žaloba.přihláška pohledávky do konkurzního řízení
- Mink fa Kč 4 020,- žaloba. rozsudek
- Merlin s.r.o  o 5 057,--Kč, žaloba. rozsudek. odvolání Merlinu  potvrzený rozsudek
- Macek Tomáš o 19 500.--Kč. rozsudek
- März Radek o 6 800,--Kč. trest příkaz
- Maxa Fr  o 6 300.--Kč. žaloba  IČ. pravomocný rozsudek. exekuce
- May Day Grup s r o  o 18 983 --Kč, platební rozkaz
- Nogol neuhrazené faktury Kč 6 830,- a Kč 9 854 -rozsudek, exekuce
- Nivela Trading s r o  o 3 200,--Kč, dobropis. rozsudek, neúčinná exekuce
- Nerudová Miroslava škoda Kč 1 390 -. rozsudek  podat exekuci
- Ocela Jan. 199 470.-Kč podvod, rozsudek
- OTF dobropisy Kč 220 526,-, 12 980 - žaloba, platební rozkaz. žádost o doložku právní moci, exekuce
- Opticentrum - škoda Kč 1550 099 - žaloba,pravomocný platební rozkaz. žádost o pomoc soudu § 260 o s ř
- Q-Ton -nezaplacené faktury. pl rozkaz, žádost dle § 260 neúčinná. nelze nalézt sídlo
- Ocílka o Kč 68 113.75  žaloba. rozsudek  exekuce neúčinná žádný majetek

16

- Průša / Lukona / o 6 820.–Kč žaloba. rozsudek. výkon rozhodnutí neúčinný. neznámý pobyt. bez data narození nelze zjistit
- Pospíšil náhrada škody Kčs 6 501.– žaloba. rozsudek. návrh na výkon rozhodnutí-exekuce. nebyly nalezeny postižitelné věci
- Poskočil VI. Kč 7 620.-. rozsudek. exekuce neúčinná. na nám známé adrese nebydlí. data narození neznámá
- Pavlík fa Kčs 4 838 .-rozsudek. exekuce neúčinná
- Pragorest neuhrazené fa Kčs 14 415,- žaloby. platební rozkaz. rozsudek
- Průcha - škoda Kč 750,- výkon rozhodnutí-exekuce
- Pratex s.p. Čadca o 2448.–Sk a 622 43 Sk. dobropisy. žaloba. pravomocný platební rozkaz
- Pozdíšek /KB.,ozn. FČ/ uznání závazku o 333 900,--Kč. žaloba. přiznáno. jeho odvolání
- Polínec o Kč 76 805.-, uznání dluhu z r.1997. splácí
- Rekonstrukce Praha fa Kčs 1 542.50 žaloba. pravomocný platební rozkaz. delimitace. neznámý subjekt
- Rus s.r o. o 3897.97 Kč,žaloba, rozsudek, podat exekuci
- Roubíčková FKSP 7 000.- (Veselá ručitel) srážky z platu KOTVA
- Stix I. trestná činnost Kč 9.300.–, rozsudek. výkon - rozhodnutí srážkami ze mzdy /exekuce/ - jsme v pořadí
- Š a Š fa Kčs 16 730,- a 6 835,- /Šoulová/ rozsudek 96
- Sadup - Škorpík fa Kčs 5 285 - rozsudek. exekuce
- Slušovice - o 2 X 490 200, žaloba. pravomocný rozsudek. návrh na soudní výkon rozhodnutí-exekuce.(přerušeno konkursem)
- Schydil - fa Kč 4 760,- žaloba. pravomocný rozsudek. dva návrhy na soudní výkon rozhodnutí-exekuce.
- Sainer - škoda Kč 2200,--Kč, rozsudek, exekuce, nezjištěná osoba
- Spektrum - dbp Kč 9 728.- . žaloba, dotaz dle 260 o s f
- Šumavan Unibras dobropisy 35 037.–Kč. žaloba. platební rozkaz. konkurs v roce 1997 vyhlášen. dozvěděli jsme se až v roce 1999.
- Šmíd Martin o l.985,50 Kč. žaloba. pravomocný rozsudek. návrh na soudní výkon rozhodnutí-exekuce.
- Svit Zlín 214 952 70 Kč /dobropisy /. žaloba. pravomocný rozsudek. žádost - pomoc soudu pro exekuci.konkurs přihláška. zrušení konkursu Vrchním soudem. na KS v Brně
- Slánsky o 80 000.--Kč. omylem 2 x poukázána platba. žaloba. splácí
- Štumper o 4363.--Kč. žaloba, pravomocný rozsudek
- Sdružení přátel div.umění o 70 000.--Kč. rozsudek. není k nalezení. exekuce
- Šmídová E. Kč 1 902.- rozsudek. exekuce
- Shilland and Co. O. Kč 6405,-, platební rozkaz
- TEWA Comeritz neuhrazené faktury Kč 22 755.- žaloba - pravomocný rozsudek. /v likvidaci/
- Tenkl - fa č. 1091 Kčs 54000.-, žaloba. rozsudek. návrh na soudní výkon rozhodnutí
- TJ Rozvoj o Kč 13 400,- rozsudek.
- Ivrdský - dobropis Kč 30 000.-žaloba. pravomocný rozsudek - návrh na soudní výkon rozhodnutí-exekuce. konkurs. zemřel
- Trendex - reklamace 33 130,--Kč. žaloba. rozsudek
- Tenders Group, o 5 040.-, rozsudek
- Wavrisch o 18 000.--Kč, FKSP. žaloba, návrh na soudní výkon rozhodnutí-exekuce
- Valenta, Sedláček 31 159.--Kč, splácí dluh
- Volák. Fliegr. Švngerko o 52 790.--Kč.trestná činnost, rozsudek. exekuce. návrh Voláka uhradit ve 3 splátkách
- Žaloudek o Kč 8 780.- pokračování v exekuci částečně uhrazeno
- Železná H. Kč 9 087.- rozsudek
- Yond Dynamic Promotion o 3500.--Kč. rozsudek

# 5. Očekávaná hospodářská a finanční situace a vývoj činnosti v roce 2003

Počátkem roku 2003 vedení společnosti vyhodnotilo dosavadní postup realizace záměru na zvýšení základního kapitálu ve společnosti KOTVA OBCHODNÍ, a s a k zásadnímu kapitálovému posílení této společnosti rozhodlo ve smyslu §59 odst 2 Obchodního zákoníku zastavit přechod majetkového práva k předmětu nepeněžitého vkladu V tomto smyslu byl podán dne 20 1 2003 návrh na zpětvzetí návrhu na zahájení řízení ze dne 3 9 2002 Rozhodnutím Katastrálního úřadu Praha-město bylo předmětné řízení zastaveno a nabylo právní moci dne 25 2 2003

S vědomím povinnosti zaplatit hodnotu nepeněžitého vkladu v penězích ve smyslu § 59 odst 2 Obchodního zákoníku byl stanoven postup zajištění potřebných finančních prostředků odprodejem částí aktiv společnosti KOTVA a s uvnitř společenství podniků KOTVA a získané finanční prostředky použít jako peněžitý vklad do základního kapitálu společnosti KOTVA OBCHODNÍ, a s ve výši 23 000 000,-Kč

Za tímto účelem byly předmětné pozemky v k ú Ruzyně odprodány V současné době je podán Návrh na vklad práva vlastnického na Katastrální úřad Praha-město

Na mateřské společnosti zůstávají zachovány činnosti vedení holdingu, finanční, správní a administrativní činnosti včetně správy majetkových podílů, mzdová účtárna a personální záležitosti a výkon zdravotního střediska

Hlavním předmětem podnikatelské činnosti je i nadále poskytování ekonomických služeb pro dceřině společnosti v omezeném rozsahu a realizace příjmů z pronájmu licenčních práv

Očekávaná hospodářská a finanční situace v roce 2003 v t.Kč:

| | |
|---|---|
| Tržby za prodej vl. výrobků a služeb | 43.720 |
| Přidaná hodnota | 40.535 |
| Provozní hospodářský výsledek | 34.875 |
| Hospodářský výsledek z finančních operací | -4.975 |
| Hospodářský výsledek za účetní období | 20.631 |

18

# II. Zpráva představenstva o podnikatelské činnosti a stavu majetku společnosti

V návaznosti na realizované změny vyplývající z majetkové restrukturalizace aktiv společnosti v letech 2000-2001 a následné organizační změny převodu rozhodujících aktivit souvisejících s řízením provozu obchodního domu KOTVA, spočívající v zajištění technického provozu objektu a řízení agendy pronájmu nebytových prostor na společnost KOTVA NEMOVITOSTI, a s , plnila společnost KOTVA a s pouze správní funkce především v rámci vnitrokoncernových služeb zajišťující podnikové účetnictví včetně mzdového, plánovací funkce, finanční servis včetně bankovních operací, personální agenda, vedení podnikových archivů a lékařská péče

V koncernovém majetkovém uspořádání bylo v roce 2002 hlavním předmětem činnosti kromě poskytování uvedených služeb především správa akciových účastí v dceřiných společnostech

Hlavními zdroji příjmů byly příjmy za poskytované služby a příjmy z pronájmu licenčních práv Celková finanční bilance společnosti v průběhu roku 2002 byla vyrovnaná a společnost dosáhla positivního hospodářského výsledku – zisku ve výši 19 809 tis Kč, což představuje nárůst oproti předchozímu roku téměř dvojnásobný

V oblasti výsledkových účtů kromě výnosů z běžné činnosti a k tomu zúčtovaných přiměřených nákladů byla realizována transakce související s pohledávkou společnosti vůči společnosti SPRINT, a s Na základě Smlouvy o postoupení pohledávky uzavřené mezi společnostmi KOTVA a s. a EUREX CONSULTANTS LIMITED byla na tuto společnost postoupena část pohledávky KOTVA a s vůči SPRINT, a s ve výši 122 mil Kč Na základě dohody obou stran pak následně se úplata za postoupenou pohledávku započetla proti pohledávce ve stejné výši, kterou měla společnost EUREX CONSULTANTS LIMITED vůči KOTVA a s Tímto započtením dohodou tyto vzájemné pohledávky zanikly

Uvedené operace se promítly v položkách ostatních provozních výnosů a nákladů v následujícím rozsahu:

| | | |
|---|---|---|
| výnosy: | 122 000 tis Kč | postoupení pohledávky ke SPRINT, a s na EUREX |
| | 10 000 tis Kč | rozpuštění rezervy za SPRINT, a s |
| | 660 tis Kč | postoupení pohledávky na KOTVA NEMOVITOSTI, a s |
| | 497 tis Kč | odpis nákladů KOTVA PARKING, s r o |
| náklady: | 135 000 tis Kč | zúčtování postoupení pohledávky na EUREX za SPRINT, a s |
| | | opravné položky |
| | 660 tis Kč | zúčtování postoupené pohledávky na KOTVA NEMOVITOSTI, a s |
| | 497 tis Kč | odpis nákladů KOTVA PARKING, s r o |
| | 733 tis Kč | odpis nedobytných pohledávek z provozu garáží |

V uplynulém období se realizoval prodej cenných papírů ve výši 200 tis Kč V souladu s podnikatelským záměrem stavebního rozšíření parkovacích stání v podzemních garážích KOTVA a dosažení vyššího využití parkovacích míst, založila společnost KOTVA a s obchodní společnost KOTVA PARKING, s r o, k datu 13 3 2002 se základním kapitálem 200 tis Kč, která měla provozovat podzemní garáže S ohledem na přetrvávající právní spory s předchozím nájemcem parkingu, byl obchodní podíl v této společnosti odprodán za účetní hodnotu

19

V oblasti majetkových účtů je společnost KOTVA a s  držitelem podílu akcií a obchodních podílů v celkové účetní hodnotě k 31 12 2002 – 577 237 tis  Kč – dlouhodobý finanční majetek, v následujících společnostech:

| | |
|---|---|
| 536 383 000,-Kč | KOTVA NEMOVITOSTI, a s |
| 39 000 000,-Kč | KOTVA OBCHODNÍ, a s |
| 150 000,-Kč | Značková konfekcia s.r o. |
| 100 000,-Kč | KOTVA-Středisko praktického vyučování, s r o |
| 300 000,-Kč | Artia a s |
| 500 000,-Kč | MOTOKOV, a s |
| 100 000,-Kč | Sanderson, s r o |
| 30 000,-Kč | KOTVA INTERNATIONAL Ltd |
| 674 000,-Kč | Značková konfekcia s r o  – půjčka |

Rozhodnutím jediného akcionáře KOTVA a s  ze dne 9 3 2001 a rozhodnutím Krajského soudu v Brně ze dne 18 10 2001 a ze dne 19 6 2002 o zápis změn do obchodního rejstříku byly vytvořeny základní předpoklady k  provedení zvýšení základního kapitálu KOTVA OBCHODNÍ, a s  upisováním akcií o částku  38 000 000,-Kč v počtu 380 kusů, jmenovitá hodnota 100 000,-Kč, druh kmenové, forma na jméno, podoba listinná  Splacení emisního kursu bylo provedeno peněžitým vkladem ve výši 15 000 000,-Kč započtením peněžité pohledávky vůči společnosti KOTVA OBCHODNÍ, a s , kterou měla společnost KOTVA a s  na základě Smlouvy o půjčce ze dne 18 1 2001 a upisováním akcií nepeněžitým vkladem, jehož předmětem jsou pozemky zapsané na listu vlastnictví 1130 pro katastrální území Ruzyně ve výši 23 000 000,-Kč

Z uvedeného důvodu podala společnost KOTVA a s  návrh na zahájení řízení o povolení vkladu do katastru nemovitostí ze dne 3 9 2002 vedeným pod č j  V-32304/02

Nahlédnutím do evidence nemovitostí u Katastrálního úřadu Praha-město společnost KOTVA a s  zjistila, že v době po splacení základního kapitálu formou Prohlášení vkladatele o vložení nemovitostí do základního kapitálu obchodní společnosti ze dne 26 3 2002 bylo u předmětné nemovitosti části dokumentovaných pozemků provedeno oddělení – bez vědomí vlastníka -- některých pozemků

S ohledem na výše uvedené a z opatrnosti pro případ odlišného posouzení Prohlášení vkladatele o vložení nemovitostí do základního kapitálu do obchodní společnosti ze dne 26 3 2002, učinila společnost KOTVA a s  dne 4 11 2002  Prohlášení vkladatele o vložení nemovitostí do základního kapitálu obchodní společnosti ve formě dodatku  V návaznosti na to byl podán Doplňující návrh na zahájení řízení o povolení vkladu do katastru č j  V-32304/02  Na výzvu Katastrálního úřadu byly dne 13 11 2002 uhrazeny poplatky za správní řízení

Na základě posouzení hospodářské a finanční situace společnosti KOTVA OBCHODNÍ, a s , která je součástí společenství podniků koncernu KOTVA ve 100% vlastnictví KOTVA a s , bylo vzájemnou dohodou rozhodnuto o kapitálovém posílení této společnosti a navýšení základního kapitálu ze strany KOTVA NEMOVITOSTI, a s  peněžitým vkladem ve výši 61.000 tis  Kč. Tímto postupem se 100% podíl držení akcií ze strany KOTVA a s  sníží na 39% a 61% je v držení KOTVA NEMOVITOSTI, a s  Tímto postupem však nebyla narušena holdingová vlastnická struktura, neboť 100% vlastníkem akcií KOTVA NEMOVITOSTI, a s  je nadále společnost KOTVA a s

V oblasti závazků došlo oproti předchozímu období k významnému poklesu  Objem dlouhodobých a krátkodobých závazků činí 92 861 tis  Kč, z toho nejvýznamnější představují

| | |
|---|---|
| 15 400 tis  Kč | zůstatek z půjčky 20 000 tis  Kč poskytnuté společnosti KOTVA OBCHODNÍ, a s |
| 52 978 tis  Kč | zůstatek ze závazku vůči firmě SPRINT, a s  v původní výši 135 000 tis  Kč převzatého společností KOTVA NEMOVITOSTI, a s |

V položce bankovních úvěrů zůstává ke splacení běžný bankovní úvěr GE-Capital bank ve výši 9 616 tis  Kč

Společnost řádně splácí veškeré splatné závazky

Na základě iniciativy společnosti KOTVA a s  a KOTVA NEMOVITOSTI, a s  byl podán návrh na zahájení Rozhodčího řízení ve věci pohledávek ke společnosti SPRINT, a s  Podle rozhodčího nálezu vydaného dne  16 10 2002 bylo rozhodnuto o povinnosti společnosti SPRINT, a s  zaplatit ve prospěch KOTVA a s  částku 135 000 tis  Kč a příslušné úroky k datu splacení dlužných částek

Na základě prohlášení konkurzu na společnost SPRINT, a s ze dne 6 11 2002 uplatnila společnost svoje pohledávky vůči této společnosti ve výši potvrzené rozhodčím nálezem  Uvedená pohledávka byla postoupena na společnost EUREX CONSULTANTS LIMITED

Dne  14.1 2002 odkoupila KOTVA a s  od společnosti SPRINT, a s  100% podíl ve společnosti SANDERSON s r o  ve výši 100 tis  Kč

V listopadu r  2002 byla provedena realizace dalších postupových kroků s cílem nalézt strategického partnera pro společnost  Jednotlivé transakce jsou realizovány ve smyslu doporučení podle projektu „Strukturální transakce KOTVA a s " zpracovaného renomovanou poradenskou firmou ERNST and YOUNG, s r o  v listopadu r  2000  Podle analýzy doposud provedených opatření byla provedena restrukturalizace aktiv společnosti založením dceřiných společností KOTVA NEMOVITOSTI, a s  a KOTVA OBCHODNÍ, a s  Dalším postupným krokem strukturální transakce bylo založení nové dceřiné společnosti v zahraničním teritoriu KOTVA INTERNATIONAL, Ltd  Základní kapitál činí 1 000 USD s nominální hodnotou 1USD/1 akcie

Na základě posouzení stavu výběrového řízení zaměřeného na vyhledání strategického/finančního partnera, bylo vyhověno požadavku zájemců, aby v tranzitní společnosti (zahraniční společnost ve vlastnictví KOTVA a s ) měla přiměřenou kapitálovou účast společnost vlastníka nemovitého majetku OD KOTVA, tj  KOTVA NEMOVITOSTI, a s  V této souvislosti byl vysloven souhlas s navýšením základního kapitálu společnosti KOTVA INTERNATIONAL, Ltd  o 1 mil  USD  Tímto postupem není narušen majetkový vztah v koncernu KOTVA, kdy KOTVA a s  vlastní 100% kapitálu ve společnosti KOTVA NEMOVITOSTI, a s

V roce 2002 společnost neuvedla na trh žádné nové významné výrobky, ani nerozvíjela nové významné činnosti

21

# V. Zpráva představenstva KOTVA a.s. o vztazích mezi ovládající a ovládanou osobou a mezi ovládanou osobou a ostatními osobami ovládanými stejnou ovládající osobou za účetní období roku 2002

Společnost ve smyslu ust § 66a obch zák je společností s většinovým společníkem (akcionářem) a je osobou ovládanou. Ovládající osobou je potom osoba (firma: FORMINSTER ENTERPRISES LIMITED, sídlo: 20 Queen Frederica Street, El Greco House, Nicosia, Kypr)

Společnost s touto ovládající osobou tvoří koncern

Mezi KOTVA a s a ovládající společností nebyla uzavřena žádná smlouva, ovládanou osobou nebylo poskytnuto ovládající osobě žádné plnění ani od ní přijato, a ovládaná osoba nepřijala a neuskutečnila žádné opatření v zájmu nebo na popud ovládající osoby

Mezi výše uvedenou ovládající společností a ovládanou společností KOTVA NEMOVITOSTI,a s byla uzavřena dne 25 6 2001 Dohoda podle § 269 odst 2 zákona č 513/1991 Sb , kterou se upravují práva smluvních stran v souvislosti s uzavřením Smlouvy o zřízení zástavního práva k nemovitostem se svolením k vykonatelnosti notářského zápisu , uzavřené mezi TREND-všeobecný investiční fond a s a KOTVA NEMOVITOSTI, a s dne 25 6.2001 ve formě notářského zápisu čj NZ 377/2001, N 406/2001 Touto smlouvou je ze strany KOTVA NEMOVITOSTI, a s zajištěna zřízením zástavního práva k nemovitostem KOTVA NEMOVITOSTI, a s , zapsaným na listu vlastnictví č 265 pro kat území Staré Město, obec Praha pohledávka společnosti TREND-všeobecný investiční fond a s vůči společnosti FORMINSTER ENTERPRISES LIMITED, sídlo: 20 Queen Frederica Street, El Greco House, Nicosia, Kypr) na zaplacení částky 350 000 000,-Kč (z titulu Dohody o narovnání uzavřené mezi FEL a TREND VIF z 21 12 1999)

Mezi ovládanou a ovládající společností nebyla uzavřena žádná jiná smlouva, ovládanou osobou nebylo poskytnuto ovládající osobě žádné plnění ani od ní přijato, a ovládaná osoba nepřijala a neuskutečnila žádné opatření v zájmu nebo na popud ovládající osoby

## I. DEFINICE DALŠÍCH OVLÁDANÝCH OSOB

1   KOTVA a.s. byla v roce 2002 vlastník 100% akcií KOTVA NEMOVITOSTI, a.s., IČ: 26229048, se sídlem Brno, Příkop 4, zapsané v obchodním rejstříku Krajského soudu v Brně, oddíl B, vložka 3426

2   KOTVA a.s. byla v roce 2002 vlastník 100% akcií KOTVA OBCHODNÍ, a.s., IČ: 26231735, se sídlem Brno, Příkop 4, zapsané v obchodním rejstříku Krajského soudu v Brně, oddíl B, vložka 3484

3   KOTVA a.s. byla v roce 2002 jediný společník obchodní společnosti Značková konfekcia s.r.o., IČ: 35689641, se sídlem Mickiewiczova 6, Bratislava, zapsané v obchodním registru Okresného súdu v Bratislave 1, oddíl Sro, vložka: 10928/B

4   KOTVA a.s. byla v roce 2002 jediným společníkem KOTVA-středisko praktického vyučování, s.r.o., IČ: 26123193, se sídlem Praha 1, nám Republiky 8, zapsané v obchodním rejstříku Městského soudu v Praze, oddíl C, vložka 72148

5. **KOTVA NEMOVITOSTI, a.s.** vlastní od roku 2002 99% akcií společnosti **KOTVA INTERNATIONAL LIMITED,** č 522767 se sídlem, Geneva Place, Waterfront Drive, P O Box 3469, Road Town, Torlola, British Virgin Islands

6 **KOTVA a.s** je jediným společníkem společnosti **SANDERSON s.r.o.,** IČ: 25666797 se sídlem Praha 3, TáborItská 1000/23, zapsané v obchodním rejstříku MěS v Praze, oddíl C, vložka 59498


## II. SMLOUVY UZAVŘENÉ MEZI OVLÁDAJÍCÍ A OVLÁDANOU OSOBOU KOTVA a.s. NEBO MEZI OVLÁDANOU OSOBOU KOTVA A.S. A OSTATNÍMI OSOBAMI OVLÁDANÝMI STEJNOU OVLÁDAJÍCÍ OSOBOU V ROCE 2002:

1. KOTVA a s uzavřela jako pronajímatel dne 31 12 2001 s KOTVA NEMOVITOSTI, a s jako nájemcem Smlouvu o pronájmu osobního automobilu s platností od 1 1.2002, podle které pronajímatel pronajímá nájemci osobní automobil MERCEDES-BENZ, typ C 32 AMG, za cenu nájemného 85 750,-Kč+DPH měsíčně

2. KOTVA a s uzavřela jako pronajímatel dne 31 12 2001 s KOTVA NEMOVITOSTI,a s jako nájemcem Smlouvu o pronájmu osobního automobilu s platností od 1 1 2002, podle které pronajímatel pronajímá nájemci osobní automobil TOYOTA, typ Carina 1,6 BEMDKW, za cenu nájemného 10 930,-Kč+DPH měsíčně

3. KOTVA a s uzavřela jako prodávající dne 31 12 2001 s KOTVA NEMOVITOSTI, a s jako kupujícím Kupní smlouvu na prodej vybraného hmotného majetku popsaného a oceněného v Posudku č 11-151-2001 znalcem KOPPREA-ZNALECKÝ ÚSTAV, spol s r o Praha za cenu 4 246 808,-Kč+DPH

4. KOTVA a s jako nájemce uzavřela dne 8.2 2002 s KOTVA NEMOVITOSTI, a s jako pronajímatelem Smlouvu o nájmu nebytových prostor, podle které nájemce najímá od pronajímatele 11 303 m2 nebytových prostor v 1 -9 podzemním podlaží OD Kotva za sjednané nájemné ve výši 800 000,-Kč+DPH měsíčně a touto smlouvou se zároveň sjednává rozsah služeb poskytovaných pronajímatelem nájemci v souvislosti s nájmem nebytových prostor za sjednanou cenu ve výši 400 000,-Kč+DPH měsíčně.

5. KOTVA a s jako objednatel uzavřela dne 25 2 2002 s KOTVA NEMOVITOSTI, a s jako zhotovitelem Smlouvu o poskytnutí služeb, podle které zhotovitel poskytuje objednateli služby nutné k zabezpečení provozu parkingu za sjednanou cenu 125 000,-Kč měsíčně

6. KOTVA a s uzavřela jako pronajímatel (nájemce) dne 31 12 2001 s KOTVA NEMOVITOSTI, a s jako podnájemcem Smlouvu o podnájmu osobního automobilu s platností od 1 1 2002, podle které pronajímá této společnosti osobní automobil MERCEDES-BENZ, typ C 32 AMG, za cenu nájemného 85 750,-Kč+DPH měsíčně Tato smlouva nahrazuje smlouvu uvedenou pod č 1 této zprávy

7. KOTVA a s. uzavřela jako prodávající dne 11 6.2002 s KOTVA NEMOVITOSTI, a s jako kupujícím Kupní smlouvu, podle které prodávající prodává kupujícímu osobní automobil TOYOTA, typ Carina 1,6 BEMDKW za sjednanou kupní cenu 150 000,-Kč

8. KOTVA a s uzavřela jako prodávající dne 18 6 2002 s KOTVA NEMOVITOSTI, a s jako s kupujícím Kupní smlouvu na prodej vybraného hmotného majetku popsaného v soupisu k této smlouvě za sjednanou cenu 18 040,-Kč+DPH

9. KOTVA a s jako postupitel uzavřela dne 2 10 2002 s KOTVA NEMOVITOSTI, a s jako postupníkem Smlouvu o postoupení pohledávky, podle které postupitel postupuje postupníku pohledávky uvedené v této smlouvě postupníku za sjednanou celkovou cenu ve výši 659 500,02 Kč

10. KOTVA a s  uzavřela jako prodávající dne 14 10 2002 s KOTVA NEMOVITOSTI,a s  jako kupujícím Kupní smlouvu, podle které prodávající prodává kupujícímu osobní automobil ŠKODA FELICIA EFF 41za sjednanou kupní cenu 44 500,-Kč

11. KOTVA a s  jako postupitel uzavřela dne 27 11 2002 s KOTVA NEMOVITOSTI, a s  jako postupníkem Smlouvu o postoupení pohledávky, podle které postupitel postupuje postupníku pohledávku za společnosti KOTVA PARKING s r o  ve výši 497 222,50 Kč za sjednanou celkovou cenu ve výši 497 222,50 Kč

12. KOTVA a s jako nájemce uzavřela dne 12 8 2002 s KOTVA NEMOVITOSTI, a s  jako pronajímatelem Dodatek č  3 ke Smlouvě o pronájmu nebytových prostor z 22 12 2000, podle kterého se cena nájemného mění a nově sjednává na částku 55,-Kč+DPH měsíčně s platností od 1 9 2002

13. KOTVA  a s   uzavřela  dne  28 6 2002   s KOTVA NEMOVITOSTI,  a s   Dohodu o vzájemných zápočtech, podle které se smluvní strany dohodly, že budou vzájemně započítávat nesplatné pohledávky

14. KOTVA  a s   uzavřela  dne  21 12 2002   s KOTVA NEMOVITOSTI,a s  a s KOTVA OBCHODNÍ,a s  Dodatek č  2 k Dohodě o poskytování služeb, podle kterého se pro období roku 2003 sjednává poskytování ekonomických služeb společností KOTVA a s  pro KOTVA NEMOVITOSTI,a s  za roční paušální cenu 11 020 000,-Kč a pro KOTVA OBCHODNÍ,a s  za roční paušální cenu 720 000,-Kč

15. KOTVA a s  jako prodávající uzavřela dne 27 2 2002 s KOTVA OBCHODNÍ,a s  jako kupujícím Kupní smlouvu, podle které prodávající prodává kupujícímu  zařízení pro výpočetní středisko za sjednanou cenu 41 200,-Kč

16. KOTVA a s  jako prodávající uzavřela dne 25 7 2002 s KOTVA OBCHODNÍ, a s  jako kupujícím Kupní smlouvu, podle které prodávající prodává kupujícímu server Dell 6300 za sjednanou cenu 70 000,-Kč+DPH

17. KOTVA a s  uzavřela jako prodávající dne 31 12 2001 s KOTVA OBCHODNÍ, a s  jako kupujícím Kupní smlouvu na prodej vybraného movitého a nehmotného majetku popsaného a oceněného v Posudku č 11-150-2001 znalcem KOPPREA-ZNALECKÝ ÚSTAV, spol  s r o  Praha za cenu 1 243 848,-Kč+DPH

18. KOTVA a s  uzavřela dne 21 3 2002 s KOTVA OBCHODNÍ,a s  Smlouvu o upsání akcií, podle které KOTVA a s  upisuje jako jediný akcionář akcie společnosti KOTVA OBCHODNÍ, a s  v nominální hodnotě 38 000 000,-Kč

19. KOTVA a s  na základě Prohlášení vkladatele o vložení nemovitosti do základního kapitálu ze dne 26.3 2002 splatila jako jediný akcionář emisní kurs upsaných akcií KOTVA OBCHODNÍ, a s  nepeněžitým vkladem ve výši 23 000 000,-Kč vložením nemovitosti

20. KOTVA a s  uzavřela dne 26 3 2002 s KOTVA OBCHODNÍ,a s  Dohodu o započtení pohledávek, podle které splatila  jako jediný akcionář KOTVA OBCHODNÍ,a s  započtením své peněžité pohledávky ve výši 15 000 000,-Kč vůči KOTVA OBCHODNÍ, a s  svůj peněžitý vklad ve výši 15 000 000,-Kč


III. ŽÁDNÉ JINÉ SMLOUVY MEZI KOTVA a.s. a PROPOJENÝMI OSOBAMI, PRÁVNÍ ÚKONY, UČINĚNÉ V ZÁJMU PROPOJENÝCH OSOB A OSTATNÍ OPATŘENÍ V ZÁJMU NEBO NA POPUD TĚCHTO OSOB PŘIJATÁ NEBO USKUTEČNĚNÁ OVLÁDANOU OSOBOU V ROCE 2002 NEBYLY USKUTEČNĚNY.

# VII. Údaje o osobách odpovědných za výroční zprávu a ověření účetní závěrky

Audit společnosti:

2000:      **Ernst and Young Audit, spol. s r.o.**
Praha 2, Mánesova 28
Auditorská licence KA ČR č 137
Ing Eva Dekastellová, dekret č 759

2001:      **BDO CS, spol. s r.o.**
Olbrachtova 5, Praha 4
Auditorská licence KA ČR č 18
Ing Radomír Kosina, CSc , dekret č 119
Ing Růžena Trnková, dekret č 373

2002:      **BDO CS, spol. s r.o.**
Olbrachtova 5, Praha 4
Auditorská licence KA ČR č 18
Ing Radomír Kosina, CSc , dekret č 119
Ing Růžena Trnková, dekret č 373

Prohlašuji, že údaje uvedené ve Výroční zprávě odpovídají skutečnosti a žádné podstatné okolnosti, které by mohly ovlivnit přesné a správné posouzení emitenta cenných papírů, nebyly vynechány

Veškeré dokumenty a materiály uváděné ve Výroční zprávě jsou k nahlédnutí v sídle společnosti

V Praze dne 28 4 2003

Ing Richard Harazim, generální ředitel KOTVA a s

# McDermott
# Will&Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington D C

Benjamin A Goldberger
Associate
bgoldberger@mwe com
617 535 4483

March 13, 2006

BY ELECTRONIC MAIL AND REGULAR MAIL

Joel G. Beckman
Nystrom Beckman & Paris LLP
10 St. James Ave., 16th Floor
Boston, MA 02116

Re:    <u>Kotva a.s. v. Andrew Weiss et al.</u>, C.A. No. 05-10679-RCL

Dear Joel:

As you requested when we spoke on Friday, enclosed are copies of Kotva's interrogatory responses with the various portions where Kotva claimed lack of knowledge highlighted. Please supplement, by March 20, 2006, Kotva's response to interrogatory number 6 of the Third Set of Interrogatories.

Also, on Friday you suggested that the Weiss Parties had narrowed the definition of Listed Companies in their Third Set of Interrogatories. I reviewed the document and confirmed that the definition had not been narrowed. I am enclosing a copy for your convenience. Additionally, the Discovery Master's Order of January 6, 2006 (also enclosed) does not narrow the definition of Listed Companies. Rather, it instructs Kotva to answer the interrogatories it agreed to in lieu of document requests for all the Listed Companies without any restriction or limitation. Please supplement, by March 20, 2006, Kotva's response to interrogatory number 1 of the Third Set of Interrogatories.

Truly,

Benjamin A. Goldberger

Enclosures

cc:    Edward P. Leibensperger (by email only)
       Daniel J. Pasquarello (by email only)

BST99 1495003-1 072198 0012

U.S practice conducted through McDermott Will & Emery LLP.
28 State Street Boston, Massachusetts 02109-1775 Telephone: 617 535 4000 Facsimile: 617 535 3800 www.mwe.com

# McDermott
# Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington D C

Benjamin A Goldberger
Associate
bgoldberger@mwe.com
617 535 4483

March 13, 2006

BY ELECTRONIC MAIL AND REGULAR MAIL

Joel G. Beckman
Nystrom Beckman & Paris LLP
10 St. James Ave., 16th Floor
Boston, MA  02116

Re:   <u>Kotva a.s. v. Andrew Weiss et al.</u>, C.A. No. 05-10679-RCL

Dear Joel:

As you requested when we spoke on Friday, enclosed are copies of Kotva's interrogatory responses with the various portions where Kotva claimed lack of knowledge highlighted.  Please supplement, by March 20, 2006, Kotva's response to interrogatory number 6 of the Third Set of Interrogatories.

Also, on Friday you suggested that the Weiss Parties had narrowed the definition of Listed Companies in their Third Set of Interrogatories.  I reviewed the document and confirmed that the definition had not been narrowed.  I am enclosing a copy for your convenience.  Additionally, the Discovery Master's Order of January 6, 2006 (also enclosed) does not narrow the definition of Listed Companies.  Rather, it instructs Kotva to answer the interrogatories it agreed to in lieu of document requests for all the Listed Companies without any restriction or limitation.  Please supplement, by March 20, 2006, Kotva's response to interrogatory number 1 of the Third Set of Interrogatories.

Truly,

Benjamin A. Goldberger

Enclosures

cc:   Edward P. Leibensperger (by email only)
      Daniel J. Pasquarello (by email only)

BST99 1495003-1 072198 0012

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KOTVA a.s., <br><br>     Plaintiff, <br><br>     v. <br><br> ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC, <br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 05-10679-RCL

|  |  |
|---|---|
| ANDREW WEISS, WEISS ASSET MANAGEMENT LLC, K T, INC. and CVF INVESTMENTS, LTD., <br><br>     Counterclaim-plaintiffs, <br><br>     v. <br><br> KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM, FORMINSTER ENTERPRISES, LTD., SPV CO and JOHN DOES 1–5, <br><br>     Counterclaim-defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## OBJECTIONS AND RESPONSES OF PLAINTIFF TO DEFENDANTS ANDREW WEISS AND WEISS ASSET MANAGEMENT, LLC'S FIRST SET OF INTERROGATORIES TO THE PLAINTIFF

Pursuant to Fed. R. Civ. P. 33 and Local Rule 33.1, plaintiff, Kotva, a.s.

("Kotva") hereby responds to the First Set of Interrogatories of defendants, Andrew

Weiss and Weiss Asset Management, LLC (collectively "Weiss").

## GENERAL OBJECTIONS

1.    Kotva objects to each interrogatory to the extent it seeks information that

is beyond the scope of Rules 26 or 33 of the Federal Rules of Civil Procedure, is beyond

the proper scope of discovery because of the attorney client relationship, prepared in anticipation of litigation or trial or constitutes attorney work product, or is otherwise immune from discovery.

II.    In providing answers to these interrogatories, Kotva does not in any way waive or intend to waive but rather intends to preserve the following:

a.    All objections as to competency, relevancy, materiality and admissibility;

b.    All rights to object on any ground to the use of any of the Answers herein, including the trial of this or any other action;

c.    All objections as to vagueness or ambiguity; and

d.    All rights to object on any ground to any further interrogatories or other discovery requests involving or related to any of the interrogatories in Weiss' First Set of Interrogatories.

III.    Privileged information responsive to any interrogatory below is not being provided. Kotva does not waive, and intends to preserve and is preserving the attorney client privilege, the work product doctrine, and every other privilege with respect to each and every answer, document or other repository of information protected by such a privilege.

IV.    Kotva objects to the Instructions and/or Definitions contained in the Interrogatories to the extent that they attempt to impose obligations on Kotva that are inconsistent with and/or in addition to those required under the Federal Rules of Civil Procedure and the Local Rules.

V.    Kotva objects to the Interrogatories to the extent each interrogatory contains several subparts and therefore exceeds the number of interrogatories permitted under Fed. R. Civ. P. 33(a).

VI.    Kotva objects to the Interrogatories to the extent that they demand production of any information containing any confidential, proprietary and/or trade secret information.

VII.    Kotva's answers to the Interrogatories are qualified by the General Objections. Failure to restate any General Objection in response to a particular interrogatory does not constitute a waiver of such General Objection. By responding to these Interrogatories, Kotva does not waive any asserted objection.

INTERROGATORY NO. 1:

Please identify the purchaser, seller, date, security name, security issuer, price and quantity of security bought and sold for each and every purchase or sale of securities that forms the basis for Count I of the Complaint.

Response:

Subject to the foregoing General Objections, Kotva responds as follows: (1) On June 23 or 24, 2004 Gilroy Ltd. ("Gilroy") purchased 1 share of Kotva from Vladimír Hoffman. Kotva lacks knowledge or information as to the price, but assumes approximately 430 CZK. Gilroy also purchased 1 share of Trend. Kotva lacks knowledge or information as to the price or the seller; (2) on June 29, 2004, Gilroy purchased 130 shares of Kotva at 430 CZK per share from Petr Ševčík, an employee of BH Securities, who opened the securities account for Gilroy. Vladimír Hoffman used to work for BH Securities. On the same day, Gilroy bought 4 shares from Petr Streitberg at 430 CZK. Petr Streitberg is a friend of Vladimír Hoffman; (3) on December 22, 2004,

KT Inc. ("KT") purchased 1,000 shares of Kotva at a price of 425 CZK per share from CSOB, as.; (4) on January 15, 2005, KT purchased 1,000 shares of Trend at a price of 1.50 CZK per share from CSOB, as.

Discovery is ongoing and Kotva reserves the right to supplement its answers to this interrogatory.

INTERROGATORY NO. 2:

Please provide a case statement containing all information called for by the Civil RICO Case-Statement Order found in the MANUAL FOR COMPLEX LITIGATION, FOURTH § 40.54 in the format called for by said Order. A copy of the Order is attached for your convenience.

Response:

Pursuant to defense counsel's letter of August 30, 2005, Interrogatory No. 2 has been withdrawn

INTERROGATORY NO. 3:

Please identify each and every one of the statements made by Weiss or WAM that Kotva contends was false and on which Kotva relied and, for each such statement, describe the action or actions Kotva took in reliance on that statement.

Response:

Kotva objects to this interrogatory on the grounds that it constitutes a contention interrogatory that may not be properly and completely answered until completion of discovery. Weiss and WAM's blackmail scheme, moreover, was not carried out solely on the basis of false statements, but also fraud by conduct, and fraud by omission, and Kotva objects to this interrogatory to the extent it wrongfully presumes the legal and factual foundation of Kotva's claims. As set forth in the complaint, for example, the blackmail scheme entailed "an act, practice or course of business that operated as a fraud or deceit upon Kotva." [Complaint ¶ 50]. Neither "false statements" nor "reliance",

4

therefore, are essential elements of Kotva's violations of securities laws claims at this time. Furthermore, Weiss honestly and no doubt sincerely threatened Kotva in the May 12, 2004 meeting referenced in ¶20 of the Complaint, so while not a false statement, was fraudulent conduct.

Notwithstanding these objections and subject to the foregoing General Objections, Kotva responds as follows: Written "false statements" made by Weiss and/or WAM to Kotva include Weiss' August 23, 2004 Letter to Kotva, attached as Exhibit B to the Complaint, wherein Weiss falsely claims that "we do not exercise control over Gilroy and Balfindor or petitions submitted by them . . ." Weiss repeats the same false statement in his November 23, 2004 letter to Kotva, attached to the Complaint as Exhibit C. In an email dated January 6, 2005, Weiss also stated "KT is not controlled by Weiss Asset Management; however, if a satisfactory resolution of all other matters can be achieved, I would try to persuade KT to settle its lawsuits and I am highly confident that I would be successful in that endeavor." The false statements ultimately caused the following actions and reactions: the delay of the Shopping Center's sale, the holdback by the buyer of US $24.3 million, payment of legal fees and lost business opportunities.

After fact discovery is completed, including the depositions of all witnesses and parties, Kotva will supplement its answers, if necessary, as provided in Fed. R. Civ. P. 26(e) and 33(c).

<u>INTERROGATORY NO. 4:</u>

For each count in the Complaint, state the basis for Kotva's claim.

Response:

Kotva objects to this interrogatory on the grounds that it constitutes a contention interrogatory that may not be properly and completely answered until completion of discovery. Kotva further objects on the grounds that Defendants seek, in a single interrogatory, to have Kotva "state the basis" for seven distinct counts and for 87 separate paragraphs of the Complaint. Notwithstanding these objections and subject to the foregoing General Objections, Kotva responds as follows: Kotva's 20-page complaint explains in detail the basis for each of its claims, known to date. After fact discovery is completed, including the depositions of all witnesses and parties, Kotva will supplement its answers, if necessary, as provided in Fed. R. Civ. P. 26(e) and 33(c).

INTERROGATORY NO. 5:

Identify all persons with knowledge concerning the initiation of this lawsuit or the initiation of criminal charges against Andrew Weiss in the Czech Republic.

Response:

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly burdensome, seeks irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is protected by the attorney/client privilege. Notwithstanding these objections and subject to the foregoing General Objections, Kotva responds as follows: This lawsuit was authorized by Kotva's Board of Directors and upon consultation with legal counsel, the substance of which is privileged. In further answering, Kotva lacks knowledge or information sufficient to form a belief as to the identity of the "persons" who "initiated" the indictment against Andrew Weiss in the Czech Republic, other than to believe the indictment was filed

6

following an investigation by the Czech prosecutors. Kotva reported to Czech authorities

Weiss' blackmail scheme which was registered by the police on August 27, 2004.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS ___5___ DAY

OF SEPTEMBER, 2005.

_____
Richard Harazim

As to objections:

_____
Joel G. Beckman (BBO #553086)
William C. Nystrom (BBO#559656)
Dana A. Zakarian (BBO#641058)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: September 6, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2005 I caused a copy of the foregoing document to be served by Facsimile and First Class Mail upon all defendants.

Joel G. Beckman

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ANDREW WEISS and WEISS ASSET | ) |
| MANAGEMENT, LLC, | ) |
| | ) |
| Defendants. | )    CA No. 05-10679-RCL |
| | ) |
| | ) |
| ANDREW WEISS, WEISS ASSET | ) |
| MANAGEMENT LLC, KT, INC. and CVF | ) |
| INVESTMENTS, LTD., | ) |
| | ) |
| Counterclaim-plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| KOTVA a.s., MARTIN BENDA, RICHARD | ) |
| HARAZIM, FORMINSTER ENTERPRISES, LTD., | ) |
| SPV CO AND JOHN DOES 1-5, | ) |
| | ) |
| Counterclaim-defendants. | ) |

**OBJECTIONS AND RESPONSES OF PLAINTIFF TO DEFENDANTS ANDREW
WEISS, WEISS ASSET MANAGEMENT, LLC, KT, INC., AND
CVF INVESTMENTS, LTD.'S SECOND SET OF
INTERROGATORIES TO THE PLAINTIFF**

Pursuant to Fed. R. Civ. P. 33 and Local Rule 33.1, plaintiff, Kotva, a.s.

("Kotva") hereby responds to the Second Set of Interrogatories of defendants, Andrew

Weiss, Weiss Asset Management, LLC, KT, Inc., and CVF Investments, Ltd.

(collectively the "Counterclaim plaintiffs").

1

## GENERAL OBJECTIONS

I.   Kotva objects to each interrogatory to the extent it seeks information that is beyond the scope of Rules 26 or 33 of the Federal Rules of Civil Procedure, is beyond the proper scope of discovery because of the attorney client relationship, prepared in anticipation of litigation or trial or constitutes attorney work product, or is otherwise immune from discovery.

II.  In providing answers to these interrogatories, Kotva does not in any way waive or intend to waive but rather intends to preserve the following:

a.   All objections as to competency, relevancy, materiality and admissibility;

b.   All rights to object on any ground to the use of any of the Answers herein, including the trial of this or any other action;

c.   All objections as to vagueness or ambiguity; and

d.   All rights to object on any ground to any further interrogatories or other discovery requests involving or related to any of the interrogatories in the Counterclaim plaintiffs' Second Set of Interrogatories.

III. Privileged information responsive to any interrogatory below is not being provided. Kotva does not waive, and intends to preserve and is preserving the attorney client privilege, the work product doctrine, and every other privilege with respect to each and every answer, document or other repository of information protected by such a privilege.

IV.  Kotva objects to the Instructions and/or Definitions contained in the Interrogatories to the extent that they attempt to impose obligations on Kotva that are

inconsistent with and/or in addition to those required under the Federal Rules of Civil

Procedure and the Local Rules.

V.    Kotva objects to the Interrogatories to the extent each interrogatory

contains several subparts and therefore exceeds the number of interrogatories permitted

under Fed. R. Civ. P. 33(a).

VI.    Kotva objects to the Interrogatories to the extent that they demand

production of any information containing any confidential, proprietary and/or trade secret

information.

VII.    Kotva's answers to the Interrogatories are qualified by the General

Objections. Failure to restate any General Objection in response to a particular

interrogatory does not constitute a waiver of such General Objection. By responding to

these Interrogatories, Kotva does not waive any asserted objection.

INTERROGATORY NO. 1:

Please identify all persons which have a direct or indirect ownership interest in Kotva a.s.
and all persons in which Kotva a.s. has a direct or indirect ownership interest, and for
each such person which is not a natural person, state the date of that entity's formation
and describe the reasons the entity was created.

Response:

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable,

unduly burdensome, seeks irrelevant information, and is not reasonably calculated to lead

to the discovery of admissible evidence. Notwithstanding these objections and subject to

the foregoing General Objections, Kotva responds as follows: Kotva's shares are

publicly traded on the Czech securities market, and there are currently approximately

7,700 shareholders. Given that Kotva's shares are publicly traded, Kotva's ownership

3

changes regularly. Shareholders currently owning more than 10% of Kotva's outstanding

shares are:

| | | |
|---|---|---|
| Forminster Enterprises Limited | 385,038 shares | 55.74% |
| Ardmore Risk Management Limited | 97,753 shares | 14.08% |
| HSBC Bank plc | 81,082 shares | 11.92% |

Kotva cannot identify those persons who have an "indirect ownership interest" in Kotva's shares.

Kotva owns 100% of Kotva Nemovitosti ("KN"), and Kotva Obchodni. These

entities were created for the following reasons: In 2000, Kotva found itself on the brink

of bankruptcy. Kotva sought to restructure its business operations to alleviate this threat

and to optimize its structure for a potential strategic financial sale. Ernst & Young

opined that Kotva could unlock the value of its assets by separating the property

ownership and the department store operations. Ernst & Young, therefore, suggested the

transfer of the Shopping Centre real estate from Kotva to a wholly owned subsidiary. To

this end, in late 2000, Kotva established two separate wholly owned subsidiaries: Kotva

Nemovitosti ("KN") and Kotva Obchondi. The shopping centre was transferred from

Kotva to KN in November 2000.

SPV KN as and SPV CO. Ltd. were created to effectuate the sale of the shopping

center to Markland Holdings, Ltd. KN transferred the shopping center to SPV KN,

which was 100% owned by KN. Pursuant to the Share Purchase Agreement with

Markland, Markland purchased the shares of SPV KN and paid the purchase price to SPV

CO. SPV CO., is and always has been 100% owned by KN, which is 100% owned by

Kotva. In further answering, pursuant to Fed. R. Civ. P. 33(c) the answer to this

4

interrogatory may be derived or ascertained by the Share Purchase Agreement and Ernst

& Young report, which will be provided upon the entry of a Confidentiality Order.

INTERROGATORY NO. 2:

Please identify all persons, including Kotva, its employees, officers, directors, agents, owners, attorneys and affiliates and the Irish Investors, their employees, officers, directors, agents, owners, attorneys and affiliates, who have knowledge regarding the purported sale of the Department Store to the Irish Investors, including the negotiations leading up to that sale and the disposition of the proceeds of that sale.

Response:

Kotva objects to this interrogatory to the extent it is overly broad, unduly

burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the

discovery of admissible evidence. Subject to these objections, Kotva responds that the

following persons have had the most knowledge concerning the sale of the Department

Store:

Richard Harazim, Kotva

Martin Benda, Kotva

Michael Vlach, Kotva

Jiří Brada, Kotva

Pavel Richtr, Kotva

Jaromír David, Kotva

Henry Prestage, Irish Investors

Frank Walker, Irish Investors

Aidan Scully, Irish Investors

5

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS $\underline{5}$ DAY

OF SEPTEMBER, 2005.

_____
Richard Harazim

As to objections:

_____
Joel G. Beckman (BBO #552086)
William C Nystrom (BBO#559656)
Dana A. Zakarian (BBO#641058)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: September 6, 2005

6

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2005 I caused a copy of the foregoing document to be served by Facsimile and First Class Mail upon all defendants.

Joel G. Beckman

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KOTVA, a.s. )<br><br>Plaintiff, )<br><br>v. )<br><br>ANDREW WEISS and WEISS ASSET )<br>MANAGEMENT, LLC, )<br><br>Defendants. ) | C.A. No. 05-10679-RCL |

## PLAINTIFF'S SUPPLEMENTAL RESPONSE TO
## DEFENDANTS' INTERROGATORY NUMBER 5

Pursuant to Fed. R. Civ. P. 33, Local Rule 33.1, and the January 7, 2006 Order of the Special Master, plaintiff, Kotva, a.s. ("Kotva") hereby supplements its response to the First Set of Interrogatories of defendants, Andrew Weiss and Weiss Asset Management, LLC (collectively "Weiss").

## GENERAL OBJECTIONS

I.       Kotva objects to each interrogatory to the extent it seeks information that is beyond the scope of Rules 26 or 33 of the Federal Rules of Civil Procedure, is beyond the proper scope of discovery because of the attorney client relationship, prepared in anticipation of litigation or trial or constitutes attorney work product, or is otherwise immune from discovery.

II.      In providing answers to these interrogatories, Kotva does not in any way waive or intend to waive but rather intends to preserve the following:

a.       All objections as to competency, relevancy, materiality and admissibility;

b.    All rights to object on any ground to the use of any of the Answers herein, including the trial of this or any other action;

c.    All objections as to vagueness or ambiguity; and

d.    All rights to object on any ground to any further interrogatories or other discovery requests involving or related to any of the interrogatories in Weiss' First Set of Interrogatories.

III.    Privileged information responsive to any interrogatory below is not being provided. Kotva does not waive, and intends to preserve and is preserving the attorney client privilege, the work product doctrine, and every other privilege with respect to each and every answer, document or other repository of information protected by such a privilege.

IV.    Kotva objects to the Instructions and/or Definitions contained in the Interrogatories to the extent that they attempt to impose obligations on Kotva that are inconsistent with and/or in addition to those required under the Federal Rules of Civil Procedure and the Local Rules.

V.    Kotva objects to the Interrogatories to the extent each interrogatory contains several subparts and therefore exceeds the number of interrogatories permitted under Fed. R. Civ. P. 33(a).

VI.    Kotva objects to the Interrogatories to the extent that they demand production of any information containing any confidential, proprietary and/or trade secret information.

VII.    Kotva's answers to the Interrogatories are qualified by the General Objections. Failure to restate any General Objection in response to a particular

2

interrogatory does not constitute a waiver of such General Objection. By responding to these Interrogatories, Kotva does not waive any asserted objection.

INTERROGATORY NO. 5:

Identify all persons with knowledge concerning the initiation of this lawsuit or the initiation of criminal charges against Andrew Weiss in the Czech Republic.

**Response:**

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly burdensome, seeks irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is protected by the attorney/client privilege and attorney work product doctrine. Notwithstanding these objections and subject to the foregoing General Objections, Kotva responds as follows: This lawsuit was authorized by Kotva's Board of Directors and upon consultation with legal counsel, the substance of which is privileged. In further answering, Kotva lacks knowledge or information sufficient to form a belief as to the identity of the "persons" who "initiated" the indictment against Andrew Weiss in the Czech Republic, other than to believe the indictment was filed following an investigation by the Czech prosecutor. Kotva reported to Czech authorities Weiss' blackmail scheme which was registered by the police on August 27, 2004.

**Supplemental Response:**

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly burdensome, seeks irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is protected by the attorney/client privilege and attorney work product doctrine. Notwithstanding these objections and subject to the foregoing General Objections, Kotva responds as follows:

3

<u>The Initiation of This Lawsuit</u>

This lawsuit was authorized by Kotva's Board of Directors and upon consultation with legal counsel, the substance of which is privileged. The members of the Board of Directors who authorized the filing of this lawsuit are:

| Name | Address | Last Known Place of Employment |
|---|---|---|
| Marek Kolíbal | c/o KTV invest, a.s. Naměsti Republiky 8, Praha 1 Prague, Czech Republic | Unknown (Entrepreneur/self-employed) |
| Jiří Kvapil | c/o KTV invest, a.s. Naměsti Republiky 8, Praha 1 Prague, Czech Republic | Unknown (Entrepreneur/self-employed) |
| JUDr. Miloslav Sobola | c/o KTV invest, a.s. Naměsti Republiky 8, Praha 1 Prague, Czech Republic | Unknown (Attorney/self-employed) |

Additionally, members of Kotva's Supervisory Board, and certain of Kotva's officers have knowledge concerning the initiation of this lawsuit. Those individuals are:

| Name | Address | Last Known Place of Employment |
|---|---|---|
| Richard Harazim former CEO of KTV invest | c/o KTV invest, a.s. Naměsti Republiky 8, Praha 1 Prague, Czech Republic | KTV invest, a.s. |
| Martin Benda Chairman of KTV invest Supervisory Board | c/o KTV invest, a.s. Naměsti Republiky 8, Praha 1 Prague, Czech Republic | KTV invest, a.s. |
| Mgr. Lucie Šimáčková Supervisory Board | c/o KTV invest, a.s. Naměsti Republiky 8, Praha 1 Prague, Czech Republic | Unknown (Attorney/self-employed) |
| Pavel Richter | c/o KTV invest, a.s. Naměsti Republiky 8, Praha 1 Prague, Czech Republic | KTV invest, a.s. |
| Jaromír David | c/o KTV invest, a.s. Naměsti Republiky 8, Praha 1 Prague, Czech Republic | KTV invest, a.s. |

| Name | Address | Last Known Place of Employment |
|---|---|---|
| Michal Vlach | c/o KTV invest, a.s. Naměsti Republiky 8, Praha 1 Prague, Czech Republic | KTV invest, a.s. |
| Jiří Brada | Ben&Co Naměsti Republiky 8, Praha 1 Prague, Czech Republic | Ben&Co |
| Bedřich Moulík | c/o KTV invest, a.s. Naměsti Republiky 8, Praha 1 Prague, Czech Republic | KTV invest, a.s. |

<u>Weiss's Criminal Indictment In The Czech Republic</u>

Kotva lacks knowledge or information sufficient to form a belief as to the identity of the persons who "initiated" the indictment against Andrew Weiss in the Czech Republic, other than to believe the indictment was filed following an investigation by the Czech prosecutor. Kotva did, however, report Weiss' blackmail scheme to the Czech authorities. That report was registered by the Czech police on August 27, 2004. The individuals at Kotva who have knowledge concerning Kotva's reporting Weiss' criminal activities to the Czech authorities are the same people as above with the exception of Mr. Sobola.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY OF THE LAWS OF
THE UNITED STATES OF AMERICA ON THIS ___ DAY OF JANUARY, 2006.

_____

Richard Harazim

As to objections:

_____

Joel G. Beckman (BBO #553086)
William C. Nystrom (BBO#559656)
Dana A. Zakarian (BBO#641058)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: January __, 2006

6

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2006 I caused a copy of the foregoing document to be served by hand delivery upon all defendants.

_____
Joel G. Beckman

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KOTVA a.s. | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ANDREW WEISS and WEISS ASSET | ) |
| MANAGEMENT, LLC | ) |
| | ) |
| Defendants. | ) |
| | ) |

Case No. 05-10679-RCL

## OBJECTIONS AND RESPONSES OF KOTVA A.S. TO DEFENDANTS' THIRD SET OF INTERROGATORIES

Pursuant to Fed. R. Civ. P. 33, Local Rule 33.1, Plaintiff, Kotva, a.s. ("Kotva") hereby responds to the Third Set of Interrogatories of Defendants Andrew Weiss and Weiss Asset Management, LLC (collectively "Weiss")

### GENERAL OBJECTIONS

I.      Kotva objects to each interrogatory to the extent it seeks information that is beyond the scope of Rules 26 or 33 of the Federal Rules of Civil Procedure, is beyond the proper scope of discovery because of the attorney client relationship, prepared in anticipation of litigation or trial or constitutes attorney work product, or is otherwise immune from discovery.

II.      In providing answers to these interrogatories, Kotva does not in any way waive or intend to waive but rather intends to preserve the following:

a.      All objections as to competency, relevancy, materiality and admissibility;

b    All rights to object on any ground to the use of any of the Answers herein, including the trial of this or any other action;

c.    All objections as to vagueness or ambiguity; and

d    All rights to object on any ground to any further interrogatories or other discovery requests involving or related to any of the interrogatories in Weiss' First Set of Interrogatories.

III.    Privileged information responsive to any interrogatory below is not being provided. Kotva does not waive, and intends to preserve and is preserving the attorney client privilege, the work product doctrine, and every other privilege with respect to each and every answer, document or other repository of information protected by such a privilege.

IV    Kotva objects to the Instructions and/or Definitions contained in the Interrogatories to the extent that they attempt to impose obligations on Kotva that are inconsistent with and/or in addition to those required under the Federal Rules of Civil Procedure and the Local Rules

V.    Kotva objects to the Interrogatories to the extent each interrogatory contains several subparts and therefore exceeds the number of interrogatories permitted under Fed. R. Civ. P  33(a).

VI.    Kotva objects to the Interrogatories to the extent that they demand production of any information containing any confidential, proprietary and/or trade secret information

VII    Kotva's answers to the Interrogatories are qualified by the General Objections Failure to restate any General Objection in response to a particular interrogatory does not

2

constitute a waiver of such General Objection. By responding to these Interrogatories, Kotva does not waive any asserted objection.

## Interrogatory No. 1

Please identify the legal and beneficial owners of an interest, including shares of stock or a partnership interest, in each of the Listed Companies, for the period from January 1, 2000 until to present.

## Response to Interrogatory No. 1

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this interrogatory to the extent it seeks information concerning entities unaffiliated with Plaintiff. Plaintiff also objects to the extent this interrogatory has been previously asked and fully responded to by Plaintiff. (See Defendants' Second Set of Interrogatories, No. 1 and response thereto). Subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

a.    Forminster Enterprises Ltd.

Unknown.

b.    Kotva, a.s.

Kotva's approximately 694,209 shares are publicly traded on the Czech securities market, and there are currently approximately 7,700 shareholders. Given that Kotva's shares are publicly traded, Kotva's ownership changes regularly. Shareholders currently owning more than 10% of Kotva's outstanding shares are:

| | | |
|---|---|---|
| Forminster Enterprises Limited/Sprint | 385,038 shares | 55.74% |
| Ardmore Risk Management Limited | 97,753 shares | 14.08% |

HSBC Bank plc                 81,082 shares          11.92%

Kotva cannot identify those persons who have an "indirect ownership interest" in Kotva's shares.

    b.    <u>Kotva Nemovitosti ("KN")</u>

Kotva owns 100% of KN

    c.    <u>SPV KN</u>

Pursuant to the Share Purchase Agreement with Markland, (which has been produced to

Defendants) SPV KN was sold to Markland in connection with the department store sale in 2005,

and Plaintiff does not know the current ownership status of SPV KN.

    d.    <u>SPV Co., Ltd. "(SPV")</u>

SPV is owned 100% by KN. In further answering, see response to Interrogatory 1(c) and

the documents produced in response to Defendants' document requests (Bates No. K5106).

    f-j    Unknown. Interrogatory 1(f-j) seeks information regarding entities that have no

relationship to Plaintiff, and Plaintiff has no information or documents responsive to this

interrogatory concerning such entities.

    k.    <u>Kotva správcovská a.s.</u>

K Spra is owned 100% by Kotva Parking s.r.o.

    l.    <u>Kotva obchodni' a.s. ("KO")</u>

Kotva owns 100% of KO

    m.    <u>Kotva Parking s.r.o. ("KP")</u>

Kotva owns 100% of KP.

    n.    <u>Kotva International, Ltd. ("KI")</u>

Kotva sold KI sometime ago and the current status is not known of Kotva. Kotva will

supplement its answer if information responsive to this interrogatory is discovered

**Interrogatory No. 2**

Please identify the directors, officers and managers of the Listed Companies, for the period from January 1, 2000 until the present.

**Answer No. 2**

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this interrogatory to the extent the information is publicly available to Defendants. Subject to the foregoing General and Specific Objections, Plaintiff responds as follows: Pursuant to Fed. R. Civ. P. 33(d), with respect to the Kotva owned Czech entities (i.e. Kotva a.s.; Kotva Nemovitosti; Kotva Správcovská a.s.; Kotva Obchodni a.s.; Kotva Parking s.r.o.), the identities of individuals who served as officers, directors and managers since 2000 may be ascertained from Kotva's annual reports, which will be produced to Defendants.

The directors, officers and managers of SPV C.O. are as follows:

Marek Kolíbal
SPVCO
Pavlou 15
Ledra House
Aglos Andreas
P.C. 1105
Nicosia, Cyprus


Paraskevas Zacharoullis
SPVCO
Pavlou 15
Ledra House
Aglos Andreas
P.C. 1105
Nicosia, Cyprus

Elena Makrigiorgi
SPVCO
Pavlou 15
Ledra House
Aglos Andreas
P.C. 1105
Nicosia, Cyprus

## Interrogatory No. 3

Please identify all documents, including but not limited to meeting minutes, concerning any meetings of shareholders, directors or supervisory board members of the Listed Companies at which one or more of the following topics was discussed: (a) the sale or potential sale of the Department Store; (b) the value of the Department Store; (c) the value of Kotva a s. or its shares; (d) any transfer of the Department Store or an entity owning the Department Store from one person to another; (e) Weiss, WAM, K T, Inc. or CVF Investments, Ltd , Weiss Capital LLC or Vladimir Hoffmann; (f) this lawsuit; (g) criminal complaints or proceedings in the Czech Republic in which Andrew Weiss, Vladimir Hoffman or Edita Simkova are defendants or potential defendants, or (h) Kotva's relationship with Forminster Enterprises Ltd

## Answer No. 3

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly

burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the

discovery of admissible evidence. Notwithstanding the foregoing General and Specific

Objections, Plaintiff responds as follows: Plaintiff has produced the documents identified in

Interrogatory No. 3 and, pursuant to Fed. R. Civ. P 33(d), the answer to this interrogatory may

be ascertained or derived from the documents produced by Plaintiffs in response to Defendants'

document requests

## Interrogatory No. 4

Please identify any describe in detail all agreements between and among the Listed Companies from the period January 1, 2000 to the present, including but not limited to, any promissory notes, loans, mortgages, security interests, option agreements, other contracts, and agreements on inter-company allocation of revenues or expenses

6

**Answer No. 4**

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing General and Specific Objections, Plaintiff responds as follows: Pursuant to Fed. R. Civ. P. 33(d), the answer to this interrogatory may be ascertained or derived from Kotva's annual reports, which identify any such inter-company agreements and/or allocation of revenues and expenses to the extent such allocations occurred.

**Interrogatory No. 5**

Please identify any powers of attorney issued by one or more of the Listed Companies, including but not limited to powers of attorney naming Miroslav Hálek, for the period from January 1, 1996 to the present.

**Answer No. 5**

Kotva objects to this interrogatory to the extent it is overly broad, unreasonable, unduly burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this interrogatory to the extent Defendants seek documents dating back to 1996, which is beyond the scope of discovery permitted by the Discovery Master. Notwithstanding the foregoing General and Specific Objections, Plaintiff is unaware of any powers of attorney naming Miroslav Hálek from 2000 to the present.

**Interrogatory No. 6**

For each and every interrogatory response in which Kotva claims that it is unable to answer, in whole or in part, please describe in detail the efforts Kotva took to gather responsive information.

7

<u>Answer No. 6</u>

Plaintiff is able to and has fully answered the foregoing interrogatories

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS 17 DAY OF
FEBRUARY, 2006

_____
Richard Harazim

As to objections:

_____
Joel G. Beckman (BBO #553086)
William C. Nystrom (BBO#559656)
Daniel J. Pasquarello (BBO# 647379)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: February 17, 2006

<u>CERTIFICATE OF SERVICE</u>

I, Daniel Pasquarello, hereby certify that on February 17, 2006 I caused and a true copy
of the foregoing document to be served by email and First Class mail postage pre-paid upon all
counsel of record.

_____
Daniel Pasquarello

8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s., <br><br> Plaintiff, <br><br> v. <br><br> ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC, <br><br> Defendants. <br><br> ANDREW WEISS, WEISS ASSET MANAGEMENT LLC, K T, INC and CVF INVESTMENTS, LTD., <br><br> Counterclaim-plaintiffs, <br><br> v. <br><br> KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM, FORMINSTER ENTERPRISES, LTD., SPV CO and JOHN DOES 1–5, <br><br> Counterclaim-defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 05-10679-RCL <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## THIRD SET OF INTERROGATORIES TO KOTVA A.S. FROM ANDREW WEISS, WEISS ASSET MANAGEMENT LLC, K T, INC. AND CVF INVESTMENTS LTD.

Pursuant to Federal Rule of Civil Procedure 33 and the January 6, 2006 Order of the Special Master, Andrew Weiss ("Weiss"), Weiss Asset Management LLC ("WAM"), K T, Inc. ("K T") and CVF Investments Ltd ("CVF") (collectively, the "Discovering Parties") hereby submit the following interrogatories to Kotva a.s.

## DEFINITIONS

Except as otherwise provided herein, the Discovering Parties hereby incorporate by reference all definitions in Andrew Weiss's and Weiss Asset Management LLC's First Set of

Interrogatories and Andrew Weiss's, Weiss Asset Management LLC's, K T, Inc.'s and CVF Investments Ltd.'s First Set of Requests for Production of Documents to Kotva as though fully set forth herein.

    1.    "Each and every interrogatory response" means: (a) a response to any interrogatory served in this case, including those in this set of interrogatories, those in a set of interrogatories already served and those in any future sets of interrogatories; and (b) Kotva's response to the Civil RICO case statement.

    2.    "Listed Companies" shall mean one or more of the following: (a) Forminster Enterprises, Ltd.; (b) Kotva a s.; (c) Kotva Nemovitosti; (d) SPV KN; (e) SPV CO; (f) Bonalbo Fiduciaries Ltd.; (g) Bonalbo Group Ltd.; (h) Bonalbo Management Ltd.; (i) Bonalbo Group U K. Ltd.; (j) Bonalbo Group Cyprus Ltd.; (k) Kotva správcovská a.s.; (l) Kotva obchodní a s.; (m) Kotva parking s r o.; and (n) KOTVA INTERNATIONAL LTD.

## INSTRUCTIONS

Except as otherwise provided herein, the Discovering Parties hereby incorporate by reference all instructions in Andrew Weiss's and Weiss Asset Management LLC's First Set of Interrogatories as though fully set forth herein.

## INTERROGATORIES

    1.    Please identify the legal and beneficial owners of an interest, including shares of stock or a partnership interest, in each of the Listed Companies, for the period from January 1, 2000 until the present.

    2.    Please identify the directors, officers and managers of the Listed Companies, for the period from January 1, 2000 until the present

BST99 1486872-2 072198 0012

3.    Please identify all documents, including but not limited to meeting minutes, concerning any meetings of shareholders, directors or supervisory board members of the Listed Companies at which one or more of the following topics was discussed: (a) the sale or potential sale of the Department Store; (b) the value of the Department Store; (c) the value of Kotva a.s. or its shares; (d) any transfer of the Department Store or an entity owning the Department Store from one person to another; (e) Weiss, WAM, K T, Inc. or CVF Investments, Ltd., Weiss Capital LLC or Vladimir Hoffmann; (f) this lawsuit; (g) criminal complaints or proceedings in the Czech Republic in which Andrew Weiss, Vladimir Hoffman or Edita Simkova are defendants or potential defendants, or (h) Kotva's relationship with Forminster Enterprises Ltd.

4.    Please identify and describe in detail all agreements between and among the Listed Companies from the period January 1, 2000 to the present, including but not limited to, any promissory notes, loans, mortgages, security interests, option agreements, other contracts, and agreements on inter-company allocation of revenues or expenses

5    Please identify any powers of attorney issued by one or more of the Listed Companies, including but not limited to powers of attorney naming Miroslav Hálek, for the period from January 1, 1996 to the present.

6.    For each and every interrogatory response in which Kotva claims that it is unable to answer, in whole or in part, please describe in detail the efforts Kotva took to gather responsive information

3

Respectfully Submitted,

ANDREW WEISS, WEISS ASSET
MANAGEMENT LLC, K T, INC. and CVF
INVESTMENTS LTD.

By their attorneys,

Edward P. Leibensperger (BBO# 292620)
Benjamin A. Goldberger (BBO# 654357)
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts 02109-1775
(617) 535-4000

Dated: January 11, 2006

## CERTIFICATE OF SERVICE

I, Benjamin A. Goldberger, hereby certify that on the 11th day of January, 2006, a true and correct copy of the foregoing document was served by hand on counsel for Kotva a.s

Benjamin A. Goldberger

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KOTVA A.S., | ) | |
| | ) | |
| | ) | Civil Action No. 05-10679-RCL |
| v. | ) | |
| | ) | |
| WEISS, ET AL. | ) | |

ORDER OF SPECIAL MASTER

After hearing held on this date, and all parties being represented and heard, it is hereby

ORDERED:

1. The Counterclaim Plaintiffs' Motion to Compel Production of Documents, and For Expenses and Sanctions, is hereby ALLOWED and production is to be made no later than January 17, 2005, with the following exceptions:

a. Request no. 28: The time period is limited to January 1, 2000 to date.

b. Requests no. 44 and 45: DENIED. The requests may be reframed more narrowly so that they target documents relevant to the instant allegations.

c. Requests nos. 35 through 41: DENIED. By agreement, counterclaim plaintiffs will seek the requested information about the interrelationships and agreements among the Listed Companies by means of interrogatories. Kotva shall respond to such interrogatories within 30 days of receipt. Thereafter, counterclaim plaintiffs may formulate more narrowly focused requests for production of documents.

By agreement between the parties, the answer to Interrogatory no. 5 will be supplemented by January 17, 2006.

The motion for expenses and sanctions is hereby DENIED without prejudice to renewal if

1

production is not made consistent with the terms of this Order.

2. Plaintiff's Request for Entry of Confidentiality Order is hereby DENIED. No good ground for such a blanket order has been demonstrated and the documents specifically identified as confidential (i.e., the purchase and sale agreement for the Department Store, the escrow agreement, documents concerning the negotiations and sale of the Department Store, and documents concerning the receipt and holding of the sale proceeds) have not been shown to warrant protection. The notion that confidentiality orders should be or are "routinely granted in most commercial cases" is rejected as inconsistent with Fed. R. Civ. P. 26(c). Similarly rejected is the proposition that the requesting party must "offer [a] good reason why the Court should not enter a confidentiality order." Moreover, the suggested procedure by which the plaintiff would unilaterally deem documents "confidential" and then place the onus upon the discovering party to move to remove the designation unfairly and improperly shifts the burden of proof.

Any party that withholds production on the ground of privilege or a claim of confidentiality must identify all withheld documents and state the grounds for non-production or protection in a production log. In order to expedite the resolution of issues with respects to claims of business confidentiality, the producing party must submit a copy of documents which are claimed to contain confidential information to the Special Master for *in camera* review, along with a motion for a protective order under Rule 26(c). Privileged documents need not be submitted for *in camera* review.

3. The Counterclaim Plaintiffs' Motion for Civil Rico Statement is hereby ALLOWED by agreement of the parties. The statement shall be filed and served no later than February 6, 2006.

2

4. The Counterclaim-Plaintiffs' Motion to Take Jurisdictional Discovery is hereby

DENIED. The motion seeks discovery which is not narrowly tailored to jurisdictional issues.

Moreover, the discovery requested is manifestly unnecessary in light of jurisdictional facts already

known to the counterclaim plaintiffs, and discovery which is ordered herein to be produced within

ten days. Finally, the motion is untimely in light of the currently scheduled hearing on the motions

to dismiss for lack of jurisdiction and no good cause for the delay has been demonstrated

So ordered this 6th day of January, 2006.


/s/ Jeanne M. Kempthorne
_____
Special Master

# McDermott
# Will&Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington D C

Edward P Leibensperger
Attorney at Law
eleibensperger@mwe.com
617 535 4046

March 3, 2006

BY FACSIMILE AND REGULAR MAIL

Joel G. Beckman, Esq.
Nystrom Beckman & Paris LLP
10 St. James Ave., 16th Fl.
Boston, MA  02116

Re:    Kotva a.s. v. Andrew Weiss et al.,
       C.A. No. 05-10679-RCL

Dear Joel:

I write to establish a schedule for Kotva to correct the serious deficiencies in its discovery responses and resume the 30(b)(6) deposition that we were unable to complete last week, in part as a result of Kotva's failure to adequately respond to the Weiss Parties' discovery requests.

Based on Mr. Harazim's testimony to date, it appears that Kotva has intentionally withheld documents that it had agreed to produce. More specifically, the following documents, among others, have not yet been produced:

1.    The page or pages missing from document K5085. I notified you that the document was incomplete the week before the deposition and asked you to produce any missing pages before we examined Mr. Harazim. You never responded.

2.    Drafts or other documents relating to document K5085.

3.    The recordings of communications between Mr. Hoffmann, Mr. Peterka and others and Kotva. Kotva stated in its responses to the Weiss Parties' first set of document requests that it would produce these documents. However, Kotva never even acknowledged the existence of any such recordings until Mr. Harazim admitted in his deposition that audio and video tapes exist. We demand production of the original tapes and the opportunity to make copies.

4.    Mr. Harazim admitted that Kotva has filed a criminal complaint against Mr. Peterka. This document falls within multiple requests for which Kotva stated it would produce documents.

Joel G. Beckman
March 3, 2006
Page 2

5.    Communications with J&T Banka or J&T Securities. Kotva stated it had no documents
      concerning communications between J&T Securities or J&T Banka and any other entity
      concerning the purchase of shares in Kotva or the purchase of options to purchase shares
      in Kotva. In view of Mr. Harazim's testimony, this seems inconceivable. We demand
      that Kotva search again, and include in the search the files of its agents and
      representatives, such as lawyers.

Additionally, you produced documents (requested in August 2005) to us on the morning of Mr.
Harazim's deposition. These documents included offers, written in Czech, by Messrs. Benda
and Harazim to purchase shares in Kotva from Mr. Weiss. Providing foreign language
documents that are at the core of this case on the morning of a deposition is not in keeping with
Kotva's obligations under the rules.

Finally, Kotva's answers to the Weiss Parties' Third Set of Interrogatories are wholly
inadequate. You agreed to answer these interrogatories so that the Discovery Master would not
order you to produce corresponding documents. We granted you a week's extension to provide
you additional time so that you would be able to provide a complete response. Instead, you
failed to identify a large number of documents and did not even attempt to answer interrogatory
number 6, notwithstanding Kotva's repeated statements that it is unable to answer other
interrogatories due to lack of knowledge. More specifically:

1.    The list of individuals who were directors, officers and managers of SPV CO from
      January 1, 2000 to the present is incomplete and inaccurate. You have produced
      documents indicating that Martin Benda was a director of that company during this time
      period.

2.    Kotva has failed to identify documents concerning meetings of Kotva and its subsidiaries
      at which each of the topics listed in interrogatory number 3 were discussed. Please
      provide us a *complete* list.

3.    Kotva's answer to Interrogatory No. 5 fails to identify a single power of attorney. It is
      inconceivable that the Listed Companies could have functioned without at least one such
      document within Kotva's possession, custody or control.

These failures to adequately respond to discovery frustrated the examination of Mr. Harazim.
Moreover, Mr. Harazim was not adequately prepared for each of the topics on the 30(b)(6)
notice. He repeatedly answered questions: "I do not know." Kotva did not meet its obligation to
prepare Mr. Harazim adequately for his deposition.

Additionally, Mr. Harazim improperly refused to answer questions on the advice of counsel
because of a purported fear of interfering with a criminal investigation in the Czech Republic.
Rule 30 clearly provides that "[a] person may instruct a deponent not to answer only when
necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a

Joel G. Beckman
March 3, 2006
Page 3

motion under Rule 30(d)(4)." Mr. Harazim's refusals to answer do not fall within any of these categories and are not proper. You also instructed Mr. Harazim to refuse to answer questions about the identities and locations of financial institutions notwithstanding the discovery master's order that this information be disclosed. These refusals to answer are likewise improper.

Lastly, you had agreed before the deposition began to two days of testimony by Mr. Harazim. Under the Rules, that is fourteen hours of deposition testimony. We have not even begun to approach that limit. Instead, you announced, for the first time on the morning of February 23, that Mr. Harazim would leave at 4:00 p.m. on the second day of his testimony. By scheduling his departing flight the way you did and not informing us of his early departure on the first day of testimony, it appears that you never had any intention of providing the fourteen hours to which you had agreed. We understand from the videographer that Mr. Harazim has testified for approximately eleven hours. We will complete the agreed-upon fourteen hours of examination and take whatever additional time is necessary to provide for complete discovery.

We demand that you supplement your discovery responses by March 10, 2006 and that we resume Mr. Harazim's deposition at 9:30 a.m. on March 15, 2006. This should provide Kotva with adequate time to fully prepare Mr. Harazim for his testimony.

In order to move this process ahead, please be prepared to discuss these issues and dates on Monday afternoon during our scheduled call.

Very truly yours,

Edward P. Leibensperger

cc:    Benjamin A. Goldberger

BST99 1493264-2 072198 0012

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KOTVA a.s. | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 05-10679-RCL |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW WEISS and WEISS ASSET | ) | |
| MANAGEMENT, LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**OBJECTIONS AND RESPONSES OF PLAINTIFF TO COUNTERCLAIM-PLAINTIFFS ANDREW WEISS, WEISS ASSET MANAGEMENT LLC, K T INC., AND CVF INVESTMENTS, LTD.'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS**

The plaintiff, Kotva a.s. ("Kotva"), hereby responds to Counterclaim-plaintiffs

Andrew Weiss, Weiss Asset Management LLC, K T Inc., and CVF Investments, Ltd.'s

(collectively "Counterclaim-plaintiffs") First Request for Production of Documents

("First Request") as follows:

**GENERAL OBJECTIONS**

The following general objections apply to and are incorporated by reference into

each of Kotva's specific responses to the document production requests contained herein.

I.    Kotva is providing this response to the First Request, and is producing

documents pursuant thereto, without waiver of or prejudice to their rights, at any later

time, to raise objections to:

(a)    the relevance, materiality or admissibility of:

A.    the First Request or any part thereof;

1

09/08/2005 16 07 FAX  6177785110          NISTROM BECKMAN & PARIS

    B.    statements made in this response to the First Request or any part thereof; or

    C.    any document produced pursuant to this response; or

  (b)    any further demand for discovery involving or relating to the matters raised in the First Request.

  II.    The specific responses set forth below and Kotva's production pursuant thereto are based upon information currently available after diligently searching within the time available of the documents in Kotva's possession, custody or control. Kotva may, in the future, obtain or locate additional documents responsive to the First Request and may identify or determine additional information relevant to its specific responses to the First Request. Kotva objects to the First Request to the extent it purports to demand production of documents not in Kotva's possession, custody or control or to require a search of files that do no reasonably relate to one or more of the specific document production requests contained in the First Request  Kotva reserves the right at any time to revise, correct, add to, supplement, modify or clarify the specific responses set forth below or the production made pursuant thereto.

  III.    Kotva objects to the First Request to the extent it demands production of any document covered by the attorney-client privilege, the work product doctrine or any other applicable privilege.  In the event Kotva produces any privileged document, its production is inadvertent and does not constitute a waiver of privilege

  IV.    Kotva objects to producing any requested documents to the extent that the production of said documents will be oppressive, unduly burdensome, unreasonably expensive or will require an unreasonable investigation.

  V.    Kotva objects to the Instructions and/or Definitions contained in the First Request to the extent that they attempt to impose obligations upon Kotva that are

inconsistent with and/or in addition to those required under the Federal Rules of Civil Procedure.

     VI.    Kotva objects to the First Request to the extent it demands production of any document containing any confidential, proprietary and/or trade secret information.

     VII.    Kotva objects to the production of any document falling within one of the General Objections set forth above or the specific objections set forth below. In the event any document falling within such an objection is or may be produced by Kotva, its production is inadvertent and does not constitute a waiver of the objection with respect to the produced document or any other document. Moreover, a statement by Kotva that it will produce documents responsive to a particular request or falling within a particular description means that Kotva will produce all documents within its possession, custody or control that: (a) are responsive to the particular request or fall within the particular description in question; (b) have been located by Kotva after a diligent search; and (c) do not fall within one of the General Objections set forth above or within any of the objections contained in the specific responses set forth below. Furthermore, such a statement is not an acknowledgement or an admission that any document responsive to the particular request or falling within the particular description in question currently exists or has ever existed.

### SPECIFIC OBJECTIONS AND RESPONSES

Request No. 1:

The purchase and sale agreement for the purchase of the Department Store by the Irish Investors, including any side letters or side agreements.

3

<u>Response:</u>

Subject to the General Objections, upon entry of a Confidentiality Order, and consent of the buyer, Kotva will make available for inspection and copying documents responsive to Request No. 1.

<u>Request No. 2:</u>

The agreement setting forth the terms by which the buyer is holding back $24.3 million, as described in paragraph 37 of the Complaint.

<u>Response:</u>

Subject to the General Objections, upon entry of a Confidentiality Order, and consent of the buyer, Kotva will make available for inspection and copying documents responsive to Request No. 2.

<u>Request No. 3:</u>

All documents concerning the negotiations for the sale of the Department Store referenced in paragraph 17 of the Complaint.

<u>Response:</u>

Kotva objects to this request on the basis that it is overly broad, unduly burdensome, seeks information irrelevant to this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, the foregoing General Objections, the consent of the buyer and upon entry of a Confidentiality Order, Kotva will make available for inspection and copying documents responsive to Request No. 3

<u>Request No. 4:</u>

All communications between Kotva and Jones Lang LaSalle concerning the Department Store

4

Response:

Subject to the General Objections and upon entry of a Confidentiality Order,
Kotva will make available for inspection and copying documents responsive to Request
No. 4 to the extent they exist.

Request No. 5:

The October 2003 future purchase contract referenced in paragraph 17 of the Complaint.

Response:

Subject to the General Objections, upon entry of a Confidentiality Order, and
consent of the buyer, Kotva will make available for inspection and copying documents
responsive to Request No. 5.

Request No. 6:

The January 2004 purchase agreement referenced in paragraph 17 of the Complaint.

Response:

Subject to the General Objections, upon entry of a Confidentiality Order, and
consent of the buyer, Kotva will make available for inspection and copying documents
responsive to Request No. 6.

Request No. 7:

All documents concerning the sale of the Department Store to the Irish Investors.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly
burdensome, seeks information irrelevant to this litigation, and is not reasonably
calculated to lead to the discovery of admissible evidence. Notwithstanding these
objections and the foregoing General Objections, upon entry of a Confidentiality Order,

5

and consent of the buyer, Kotva will make available for inspection and copying documents responsive to Request No. 7.

Request No. 8:

All documents concerning the disposition of the proceeds of the sale of the Department Store.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly burdensome, seeks information irrelevant to this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence.

Subject to these objections and the foregoing General Objections, and upon the entry of a Confidentiality Order, Kotva will produce documents concerning the receipt and holding of the proceeds of the sale of the Department Store.

Request No. 9:

The settlement agreement referenced in paragraph 12 of the Complaint.

Response:

Subject to the General Objections and upon entry of a Confidentiality Order, Kotva will make available for inspection and copying documents responsive to Request No. 9.

Request No. 10:

Ernst & Young's recommendation referenced in paragraph 14 of the Complaint

Response:

Subject to the General Objections and upon entry of a Confidentiality Order, Kotva will make available for inspection and copying documents responsive to Request No. 10.

Request No. 11:

The press reports referenced in paragraph 19 of the Complaint.

Response:

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 11 to the extent they exist.

Request No. 12:

All documents, including any audio or video recordings, concerning the May 12, 2005 meeting among Benda, Harazim, Weiss and Hoffmann.

Response:

Kotva does not have any documents responsive to this request.

Request No. 13:

All refusals of one or more banks to refinance Kotva's loans as described in paragraph 13 of the Complaint.

Response:

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 13 to the extent they exist.

Request No. 14:

All documents concerning the efforts to sell Kotva referenced in paragraph 13 of the Complaint.

Response:

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 14 to the extent they exist.

7

Request No. 15:

All documents concerning communications between or among the counterclaim-plaintiffs and/or their attorneys.

Response:

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 15 to the extent they exist.

Request No. 16:

The documents referred to as "multiple internal documents" in paragraph 43 of the Complaint.

Response:

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 16.

Request No. 17:

All documents concerning the methods Kotva used to gain access to the documents described in Request Nos 15 and 16.

Response:

Kotva has no documents responsive to this request.

Request No. 18:

All documents concerning the transfer of the Department Store from Kotva a.s. to Kotva Nemovitosti.

<u>Response:</u>

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No 18.

<u>Request No. 19:</u>

All documents concerning the transfer of the Department Store from Kotva Nemovitosti
to SPV KN.

<u>Response:</u>

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 19.

<u>Request No. 20:</u>

All documents concerning the transfer or sale of shares in SPV KN.

<u>Response:</u>

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 20.

<u>Request No. 21:</u>

All documents concerning Kotva's decision to seek a buyer for the Department Store,
including but not limited to all documents Kotva relied on to make that decision.

<u>Response:</u>

Kotva objects to this request on the basis that it overly broad, unduly burdensome,

seeks information irrelevant to this litigation, and is not reasonably calculated to lead to

the discovery of admissible evidence.

<u>Request No. 22:</u>

All communications between Kotva and Czech law enforcement concerning Andrew Weiss.

<u>Response:</u>

Subject to the General Objections and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 22.

<u>Request No. 23:</u>

All documents concerning the decision to initiate criminal charges against Andrew Weiss in the Czech Republic.

<u>Response:</u>

Kotva objects to Interrogatory No. 23. Kotva did not "initiate" criminal charges

against Andrew Weiss; the Czech prosecutors did.

<u>Request No. 24:</u>

All documents concerning the decision to initiate this lawsuit.

<u>Response:</u>

Kotva objects to Interrogatory No. 24 because it seeks the production of

documents protected by the attorney-client privilege and the work product doctrine.

<u>Request No. 25:</u>

All documents concerning Case No. 0250 in the London Court of International Arbitration.

<u>Response:</u>

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

10

Request No. 26:

All documents concerning the legal fees referenced in Kotva's Concise Statement of the Case submitted to the Court as part of the parties' Joint Statement (page 5).

Response:

Kotva objects to this request to the extent it calls for documents protected by the attorney-client and attorney work product privileges.

Subject to these objections and the foregoing General Objections, Kotva will produce copies of legal bills at the appropriate time when the Court is considering Kotva's application for legal fees.

Request No. 27:

All documents concerning the lost business opportunities referenced in Kotva's Concise Statement of the Case submitted to the Court as part of the parties' Joint Statement (page 5).

Response:

Subject to the General Objections and upon entry of a Confidentiality Order, Kotva will make available for inspection and copying documents responsive to Request No. 27 to the extent they exist.

Request No. 28:

All documents concerning the value of the Department Store or the value of Kotva a.s.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly burdensome, seeks information irrelevant to this litigation, and is not reasonably calculated to lead to the discovery of admissible evidence.

11

Request No. 29:

Such documents as are sufficient to identify the membership of Kotva's board of directors and Supervisory Board at all points in time since Kotva was founded.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence. In addition, the requested

information can be obtained from public documents.

Request No. 30:

Such documents as are sufficient to determine how each shareholder of Kotva voted in elections for members of the board of directors and supervisory board.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Request No. 31:

Such documents as are sufficient to determine how each member of the supervisory board voted in elections for members of the board of directors.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Request No. 32:

All documents concerning the decision to change Kotva's corporate governance from a single board system to a dual-board system.

12

<u>Response:</u>

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

<u>Request No. 33:</u>

All documents concerning communications between the Listed Companies and any
government, including the United Kingdom, Czech Republic, Cyprus, France, the United
States and any of their political subdivisions, concerning: ownership of the Department
Store, one or more of the counterclaim-plaintiffs, or any allegations of criminal activity
by: (a) the Listed Companies; (b) Miroslav Hálek; (c) Vladimir Hoffmann; or (d) Andrew
Weiss.

<u>Response:</u>

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

<u>Request No. 34:</u>

All documents concerning communications between or among the Kotva and/or
Forminster Enterprises Ltd. and/or Richard Harazim and/or Martin Benda and/or SPV
CO and/or Andrew Weiss and/or Georgiy Nikitin and/or Weiss Asset Management LLC
and/or K T, Inc. and/or CVF Investments Ltd. and/or Weiss Capital LLC and/or Ondrej
Peterka and/or Vladimir Hoffmann and/or Edita Simkova and/or James Woolf, including
but not limited to audio and video recordings of those communications.

<u>Response:</u>

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence. Subject to these objections

and the General Objections and upon entry of a Confidentiality Order, Kotva will make

documents concerning communications between or among Kotva, Richard Harazim,

13

Martin Benda, Andrew Weiss and Weiss Asset Management LLC, Ondrej Peterka,

Vladimir Hoffman, Georgiy Nikitin available for inspection and copying.

Request No. 35:

All documents concerning the legal and beneficial owners of an interest, including shares
of stock or a partnership interest, in each of the Listed Companies, for the period from
January 1996 until the present.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Request No. 36:

All documents concerning the identities and addresses of the directors, officers and
managers of the Listed Companies, for the period from January 1996 until the present.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence. In addition, this information

can be obtained from public documents.

Request No. 37:

All documents concerning the minutes of any meetings of shareholders, directors or
supervisory board members of the Listed Companies, from January 1996 to the present.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

14

Request No. 38:

All documents concerning the relationships between or among two or more of the Listed Companies, for the period from January 1996 to the present.

Response:

      Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Request No. 39:

All documents concerning any agreements between or among two or more of the Listed Companies, for the period from January 1996 to the present.

Response:

      Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Request No. 40:

All documents concerning any power of attorney issued by one or more of the Listed Companies, including but not limited to powers of attorney naming Miroslav Hálek, for the period from January 1996 to the present.

Response:

      Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Request No. 41:

All documents concerning the formation of one or more of the Listed Companies.

Response:

  Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Request No. 42:

All documents concerning communications between J&T Securities or J&T Banka and
any other entity concerning the purchase of shares in Kotva or the purchase of options to
purchase shares in Kotva.

Response:

  Kotva does not have any documents responsive to this request.

Request No. 43:

All documents concerning communications between Kotva and a person or persons in
Massachusetts, including but not limited to phone logs and phone bills.

Response:

  Subject to the General Objections, and upon entry of a Confidentiality Order,

Kotva will make available for inspection and copying documents responsive to Request

No. 43 to the extent they exist, excluding all communications with counsel.

Request No. 44:

All documents concerning the settlement of any claim or lawsuit brought by one or more
of the Woolf Companies against one or more of the Listed Companies.

Response:

  Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

16

Request No. 45:

All documents concerning the sale by the Woolf Companies to the Listed Companies of shares in Kotva or options to purchase shares in Kotva.

Response:

Kotva objects to this request on the basis that it is overly broad, unduly

burdensome, seeks information irrelevant to this litigation, and is not reasonably

calculated to lead to the discovery of admissible evidence.

Request No. 46:

Any interim or final report authored by Deloitte Touche Tohmatsu or one of its predecessor companies concerning its investigation into allegations of tunneling of assets from a large Czech Republic Department Store.

Response:

Kotva does not have any documents responsive to this request.

Respectfully submitted,

KOTVA a.s.

By its attorneys,

Joel G. Beckman (BBO #553086)
William C. Nystrom (BBO#559656)
Dana A. Zakarian (BBO#641058)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: September 6, 2005

17

J9/06/2005 16:09 FAX  8177789110        NYSTRUM BECKMAN & PARIS                    @ 036/036

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2005 I caused a copy of the foregoing document to be served by facsimile and First Class Mail upon all defendants.

Joel G. Beckman

# McDermott
# Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington D C

Edward P Leibensperger
eleibensperger@mwe com
617 535 4046

February 14, 2006

BY FAX AND REGULAR MAIL

Joel G. Beckman, Esq.
Nystrom Beckman & Paris LLP
10 St. James Ave., 16th Fl.
Boston, MA 02116

Re:    Kotva a.s. v. Andrew Weiss et al.,
       C.A. No. 05-10679-RCL

Dear Joel:

I write regarding the plaintiff's production of documents in this case  We are still reviewing the documents you provided, but have already identified some areas where we believe your client's response is deficient. They are:

1.      Kotva has produced only paper documents. In response to our request No. 34, Kotva stated that it would produce "documents concerning communications between or among Kotva, Richard Harazim, Martin Benda, Andrew Weiss and Weiss Asset Management LLC, Ondrej Peterka, Vladimir Hoffmann, [and] Georgiy Nikitin." Are there no video or audio recordings of any such communications?

2.      Document K5085 is a letter from Kotva to the Czech Police. It appears that Kotva has not produced any drafts of that letter. Do any drafts exist? Is this the only letter sent to the Czech Police?

3.      Document K5085 also concerns the May 12, 2004 meeting among Benda, Harazim, Weiss and Hoffmann  It references the meeting in the fourth paragraph. However, when Kotva responded to our request for documents concerning this meeting, it stated that it had no responsive documents. Are there other documents concerning this meeting in Kotva's possession, custody or control?

In view of the upcoming 30(b)(6) deposition, I ask that you conduct an additional search for responsive documents as soon as possible.

Finally, in view of the Special Master's February 13, 2006 Order, please produce all documents referenced on the enclosed log with only account numbers redacted.

Joel G. Beckman
February 14, 2006
Page 2

Thank you in advance for your prompt response.

Very truly yours,

Edward P. Leibensperger
cc:     Benjamin A. Goldberger, Esq.

Enclosure

BST99 1491636-1 072198 0012

KOTVA a.s. v. Andrew Weiss and Weiss Asset Management, LLC
Case No. 05-10679-RCL

**KOTVA'S LOG OF CONFIDENTIAL DOCUMENTS**

| Exhibit to Affidavit of Counsel | Bates Range | Description of Documents |
|---|---|---|
| A | KC 1-2149 – KC 1-2640 | Bank Statements identifying Escrow Account, Escrow Account Number, and SPV Co's Bank Account and Bank Account Number. |
| B | KC1 0001- KC1 0007 | Emails exchanged between and among Kotva and Markland identifying Kotva's subsidiaries' bank account numbers.<br>(Proposed redactions are in red) |
| C | KC1 0008- KC1 0284;<br>K 1548-K 1549;<br>K 3282-K 3283 | Emails exchanged between and among Kotva and Markland (and their respective counsel) and Escrow Agent identifying the parties' Escrow Account, Escrow Account number, and Escrow Agent.<br>(Proposed redactions are in red) |
| D | KC1 0285-1360 | Draft Agreements exchanged between and among Kotva and Markland (and their respective counsel) identifying the parties' Escrow Account, Escrow Account Number, and Escrow Agent.<br>(Kotva seeks to redact all references to the Escrow Account, Escrow Account Number, and the Escrow Agent. Redactions to be made in production set when resolved by Special Master) |

KOTVA a.s. v. Andrew Weiss and Weiss Asset Management, LLC
Case No. 05-10679-RCL
**KOTVA'S LOG OF CONFIDENTIAL DOCUMENTS**

| Exhibit to Affidavit of Counsel | Bates Range | Description of Documents |
|---|---|---|
| E | KC 1-1937 – KC 1-1957; KC 1-2018 – KC 1-2062; KC 1-2063 – KC 1-2148; KC 1-2641 – 1-2689 | Escrow Agreement; Joint Investment Instructions; March 4, 2005 Deposit Agreement; December 20, 2004 Share Purchase Agreement (in English & Czech). (Proposed Redactions are in red. Documents have been produced to defendants in redacted form) |
| F | KC 1-1776 - KC 1-1785; KC 1-1910- KC 1-1919; KC 1-1981- KC 1-2004; KC 1-1991- KC 1-2009; KC 1-2199- KC 1-2123. | Detailed listings of rents and revenues of ongoing leases and current tenants of the Kotva Department Store |

2

**KOTVA, a.s.**
**nám Republiky 8**
**Praha**

**Policie České republiky**
**Správa hl. města Prahy**
Služba kriminální policie a vyšetřování
Odbor hospodářské kriminality
Kongresová 2
140 00                    Praha 1

Věc: **Trestní oznámení**

Ve smyslu ustanovení § 158 trestního řádu podáváme tímto trestní oznámení na osobu:

**WEISS Andrew,** ( v příloze jsou doloženy jeho internetové stránky) a **Ing. Vladimír Hoffmann**, bytem Praha, Františkova 903

Které jsou důvodně podezřelé z trestných činů **Porušování závazných pravidel v hospodářském styku** ve smyslu ustanovení § 127 odst. 1, 2 trestního zákona, **Zneužívání informací v obchodním styku** dle ustanovení § 127 odst. 1, 2 trestního zákona a trestného činu **Podvodu** dle ustanovení § 250 odst. 1, 4 trestního zákona ve fázi pokusu dle § 8 odst. 1 trestního zákona a to tím, že

Dne 12. 5.2004 na jednání se statutárními zástupci oznamovatele panem Richardem Harazlmem a panem Martinem Bendou za přítomnosti pana Jaroslava Hoffmanna (zástupce pana prof. Weisse v ČR) požadoval odkoupení 12% základního jmění akcií společnosti Kotva, a.s. za cenu 4.000.000 USD. V případě, že nedojde k uvedenému obchodu zajistí zablokování nemovitosti OD Kotva a tím zásadním způsobem naruší Holdingu KOTVA jednání s možnými strategickými partnery a finančními institucemi o financování provozu OD Kotva a omezí dispozici s tímto majetkem ( není možno zapsat zástavní právo při přeúvěrování). Zástupci společnosti KOTVA, a.s odmítli na tento požadavek přistoupit. V současné době jmenovaný inicializoval kroky ve formě vykonstruovaných žalob jak dále uvedeno a poškozuje společnost KOTVA, a.s. a její dceřiné společnosti.

K5085

v případě, že nepřistoupí společnost na předložené požadavky k podání žaloby na určení vlastnictví k nemovitostem KOTVY, a.s.. Po podání žaloby dojde k návrhu na zápis poznámky o vlastnickém sporu do příslušného listu vlastnictví u katastru nemovitostí, který toto učiní ze zákonné povinnosti. Důsledkem tohoto bude, že žádná banka a ani nikdo jiný neposkytne přefinancování, protože nebude možno zapsat zástavní právo do doby rozhodnutí ve věci a stejně tak nebude možno změnit osobu vlastníka v případě prodeje. Následně kdy KOTVA nebude mít na uhrazení stávajícího úvěru bude nucena vyhlásit úpadek čímž dojde k zmrazení obchodních aktivit společnosti a hodnota jejích akcií bude klesat. V této situaci nebude pro společnost jiné východisko než na nabídku přistoupit, ale jak uvedl pan prof. Weiss bude to cena podstatně vyšší.

Na výše uvedené zástupci společnosti KOTVA, a.s upozornili pana prof. Weisse, že jím nastíněný scénář je nelegální a nejen, že vybočuje diametrálně z pravidel hospodářského styku ale je jednoznačně kvalifikovatelné jako trestná činnost. Z toho vyplývá, že zde bude odpovědnost za škodu jak v obchodně právní tak v trestně právní rovině. Na tuto argumentaci reagoval pan prof. Weiss s tím, že žalobu podá nemajetná offshorová společnost, ze které se náhrada škody nikdy nevysoudí a jejíž akcionáři jsou nezjistitelní a proto jeho jako majitele nemohou žádné soudy hnát k zodpovědnosti. Pokud jde o trestní odpovědnost ta by padala ne ředitele společnosti, což jsou zahraniční osoby proti, kterým vést trestní řízení na území ČR je velmi obtížné.

**Důkaz:**
- Výpověď Richarda Harazima – jde o osobu na straně poškozeného, která byla účastníkem jednání jak výše uvedeno. Podání vysvětlení podloží uvedená tvrzení.
- Výpověď Martina Bendy - jde o osobu na straně poškozeného, která byla účastníkem jednání jak výše uvedeno. Podání vysvětlení podloží uvedená tvrzení
- Výpověď Ing. Vladimíra Hoffmanna – jde o zástupce pana prof. Weisse. Vzhledem k nutnosti doložení vazby mezi touto osobou prof. Weissem a společnostmi, které jsou účastníky trestné právního jednání a předpokládaného důkazu konfrontace, by bylo vhodné jeho vysvětlení posunout do doby zajištění předmětných vazeb.

Dne 30. 6. 2004 byla u Obvodního soudu pro Prahu 1 podána společností GILROY LIMITED žaloba na určení vlastnického práva k nemovitostem. Předmětem žalobního návrhu je rozhodnutí soudu, že společnost KOTVA, a.s. je výhradním vlastníkem nemovitosti OD KOTVA v Praze 1, nám. Republiky 8.
Žalobce se domáhá z pozice akcionáře vlastnící 1 akcii společnosti KOTVA, a.s. výše uvedeného rozhodnutí. Na tomto místě je nutno zdůraznit, že akcii nabyl v době, kdy předmětné nemovitosti OD KOTVA již nebyly v jejím vlastnictví a argumentace

ochrany majetku žalobce (akcie má nominální hodnotu 1000,- Kč a n a trhu se obchoduje za cenu kolem 300,- Kč) je naprosto účelová.

**Důkaz:**
- Úplný výpis z Obchodního rejstříku společnosti KOTVA, a.s.
- Úplný výpis z Obchodního rejstříku společnosti KOTVA Nemovitosti, k.s.
- Úplný výpis z Obchodního rejstříku společnosti SPV KN, a.s.
- Výpis ze SCP Praha majitele účtu  GILROY LIMITED – nutno vyžádat na SCP
- Změnový výpis SCP emitenta KOTVA, a.s. – možno doložit oznamovatelem
- Žaloba na určení vlastnického práva k nemovitostem – příloha tohoto oznámení

Společnost GILROY LIMITED následně obeslala všechny subjekty Holdingu KOTVA s oznámením o podání předmětné žaloby společně s obchodními partnery a současně toto s návrhem na zápis plomby na list vlastnictví společnosti SPV KN, a.s. podala na příslušný Katastr nemovitostí v Praze. Uvedený správní orgán na LV zapsal poznámku o zahájení řízení na zápis plomby.

**Důkaz:**
- Dopis Mgr. Ondřeje Peterky – příloha oznámení
- Výpis z Katastru nemovitostí z LV společnosti SPV KN, a.s.

Tvrzení oznamovatele, že osoba pana Weisse zosnovala předmětnou žalobu vychází z následujících skutečností:

a) Žaloba na určení vlastnického práva k nemovitostem podaná společností GIlROY LIMITED v zastoupení  Mgr. Ondřeje Peterky
b) Žaloba na určení neplatnosti valné hromady podaná společností Balfindor, a.s. v zastoupení Mgr. Ondřeje Peterky
c) Žaloba na neplatnost valné hromady ze dne 20. června 2002  podaná Ing. Hoffmannem, spol. Brookdale Global Oportunity Fund a panem MUDr. Streitbergem, kde zastupuje prvního jmenovaného Mgr. Ondřej Peterka

Ve všech výše uvedených případech je právním zástupcem pan Ondřej Peterka. Současně se všechny uvedené žaloby opírají o naprosto totožná tvrzení, která byla použita poprvé panem Mgr. Peterkou ve vyjádření pana Ing. Hofmana spolupracovníka pana Weisse, který spravuje zahraniční fond Brookdale Global Oportunity Fund.

**Důkazy:**
- Žaloba na určení vlastnického práva k nemovitostem – příloha tohoto oznámení

K5087

- Žaloba na určení neplatnosti valné hromady – příloha tohoto oznámení
- Žaloba na neplatnost valné hromady ze dne 20. června 2002

Společnost GILROY LIMITED je zastupována osobou pana Branston Jay Haggerty bytem Praha, na Kocourkách 5/29,kde uvedená adresa bydliště je totožná sídlem společnosti Balfindor, a.s.

### Důkazy:
- výpis společnosti GILROY Limited – nutno použít právní pomoc. V příloze je zpráva od Správce společností na Kypru Rena Davis, která uvedené informace získala z rejstříku centrální banky na Kypru.
- Výpis z Obchodního rejstříku společnosti Balfindor, a.s.

V souvislosti s výše uvedenými vyvolá pan Weiss prostřednictvím pana Hoffmanna jednání a to 2.8. 2004, 12.8.2004, 16.8. 2004, 24. 8. 2004. Na těchto jednáních prezentoval požadavek pana prof. Weisse na úhradu částky 137 mil. Za akcie Kotvy, a.s., které vlastní prostřednictvím fondu pan prof. Weiss a za stažení žalob společností GIROY LIMITED a Balfindor, a.s.

### Důkazy:
- videonahrávky z jednání mezi panem Bendou a panem Hoffmannem
- svědci, kteří byly u jejich pořízení

Na základě výše uvedených skutečností je zřejmé, že osoba pana Weise pod pohrůžkou újmy, která je dána znemožněním podnikatelských aktivit firem Kotva holding způsobených účelovými žalobami spřízněných společností, požaduje odkup akcií společnosti KOTVA za částku 4.000.000,- USD, které jsou ve vlastnictví Brookdale Global Oporotunity Fund. Tímto svým jednání naplnil skutkovou podstatu trestného činu **Porušování závazných pravidel v hospodářském styku** ve smyslu ustanovení § 127 odst. 1, 2 trestního zákona, **Zneužívání informací v obchodním styku** dle ustanovení § 127 odst. 1, 2 trestního zákona a trestného činu **Podvodu** dle ustanovení § 250 odst. 1, 4 trestního zákona ve fázi pokusu dle § 8 odst. 1 trestního zákona.

a) **Porušování závazných pravidel v hospodářském styku** ve smyslu ustanovení § 127 odst. 1, 2 trestního zákona – pan prof. Weiss prostřednictvím třetích osob (advokáti a spřízněné firmy) v úmyslu opatřit sobě ve značném rozsahu neoprávněnou výhodu ve formě plnění za akcie KOTVA, a.s. porušil závažným způsobem pravidla hospodářského styku stanovená obecně závaznými předpisy a to zejména tím, že pod pohrůžkou poškození oznamovatele podal smyšlené žaloby s vědomím, že i když se jedná o smyšlené podání bude ve svém důsledku omezovat společnost KOTVA a to

K5088

zejména blokací na katastru nemovitostí jejího majetku, což realizoval jak výše uvedeno.

b) **Zneužívání informací v obchodním styku** dle ustanovení § 127 odst. 1, 2 trestního zákona – pan prof. Weiss prostřednictvím třetích osob z titulu akcionáře vlastnícího 1 akcii KOTVA, a.s. zneužil informace získané z pozice akcionáře na VH o nutnosti přefinancování společnosti a současně hledání strategického partnera a tyto dosud nikoli veřejné informace využil ke svému prospěchu kdy podáním šikanózní žaloby znemožnil společnosti KOTVA realizovat uvedené podnikatelské projekty a tím jí výrazně poškozuje.

c) **Podvodu** dle ustanovení § 250 odst. 1, 4 trestního zákona ve fázi pokusu dle § 8 odst. 1 trestního zákona – pan prof. Weiss na základě využití omylu katastru nemovitostí v relevanci probíhajícího soudního řízení o určení vlastnictví k nemovitostem KOTVA

**KOTVA, a.s.**

# Nystrom Beckman & Paris LLP

March 30, 2006

**Via First Class Mail and Email**
Edward P. Leibensperger, Esquire
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109-17775

Re:  Kotva a.s. v. Andrew Weiss and Weiss Asset Management, LLC
     C.A. No. 05-10679-PBS (D. Mass.)

Dear Ned:

In further response to our discovery conferences, enclosed please find an additional document Bates No. K 5674.  Please contact me if you have any questions.

Sincerely,

Joel G. Beckman

Enclosure



Někdy počátkem května prostřednictvím pana Ing. Vladimíra Hoffmanna bylo představenstvo společnosti KOTVA, a.s. osloveno s požadavkem na osobní jednání s panem prof. Weissem a to mimo OD KOTVA. Schůzka se uskutečnila formou oběda dne 12.5. 2004 ve Francouzské restauraci Obecního domu v Praze okolo 14 hodiny.

Na místě byly přítomni pan prof. Weiss pan Vladimír Hoffmann a za společnost KOTVA, a.s Pan Martin Benda a Richard Harazim členové představenstva. Po úvodní společenské konverzaci nap prof. Weiss navedl diskuzi na téma společnosti KOTVA, a.s.

V samotném úvodu se prezentoval jako zástupce akcionáře vlastnícího kolem 12% akciového podílu na společnosti KOTVA, a.s. (od roku 2000), kde uved, že tyto jsou v majetku společnosti Brookdale, kterou spravuje Zmíněnou společnost, dle jeho vyjádření získal od pana Hauvarda Goldna (byl v minulosti členem představenstva KOTVA, a.s.) v rámci soudního sporu, který s tímto vedl. Po tomto pan prof. Weiss požadoval Informace týkající se obchodní činnosti KOTVY, a.s.

Na výše uvedená tvrzení přítomní zástupci KOTVY, a.s. reagovali s tím, že prezentace pana prof. Weisse jako majitele 12% podílu na akciích je zcela novou informací a tato tvrzení nebyla doložena. Pokud jde o obchodní činnost a zejména pak smlouvy s obchodními partnery tyto podléhají obchodnímu tajemství a členové představenstva nejsou oprávněni také informace sdělovat mimo valnou hromadu jednotlivým akcionářům a tím tyto zvýhodňovat ve vztahu k ostatním.

Po tomto pan prof. Weiss navázal na výše uvedené s tím, že hodlá ukončit činnost společnosti vlastnící zmíněný akciový podíl a požaduje, abychom tento podíl odkoupily a to za cca 4,000.000,- USD.

Na tento požadavek bylo panu prof. Weissovi sděleno, že pro představenstvo, resp. společnost KOTVA, a.s. je tento obchod nepřijatelný a to hned ze dvou důvodů. Prvním je, že není možno aby společnost dlouhodobě vlastnila svoje vlastní akcie. Druhým důvodem je naprosto neopodstatněná cena, která je několikanásobně vyšší než reálná tržní cena na trhu s cennými papíry.

Na uvedené pan prof. Weiss uvedl, že pokud od něj tyto akcie za uvedených podmínek nekoupím, tak na představenstvo podá trestní oznámení s tím, že si již nějaký důvod najde a bude toto výrazně mediálně prezentovat, což bude pro zástupce společnosti velice nepříjemné, a že by bylo podstatně rozumnější se dohodnout.

Přítomní zástupci společnosti KOTVA, a.s. zkonstatovali, že pokud jako osoba ví o trestně právním deliktu je jejím právem a současně povinností toto oznámit orgánům činným v trestním řízení, ale je krajně neetické pod hrozbou smyšleného oznámení požadovat odkup akciového podílu a to i s ohledem na skutečnost, že uzavření právě takového obchodu by bylo bezesporu kvalifikováno jako trestně právní delikt, který by poškozoval společnost a to jak výší ceny tak samotným nabytím vlastních akcií.

V této fázi rozhovoru se pan prof. Weiss vzdálil cca na 20 min. od stolu.

Po návratu nám sdělil „že když to nepůjde po dobrém tak to půjde po zlém". Vycházel z předpokladu, že na jeho návrh statutární zástupci hned nepřistoupí a proto si jak uvedl najal vysoce kvalifikovanou a mediálně známou advokátní kancelář Peterka a spol. z Prahy. Jak je mu známo z dostupných (ze zjištěných) informací bude společnost v druhé polovině roku potřebovat přefinancování v souvislosti se stávajícím úvěrem popřípadě bude chtít realizovat některou z nabídek na prodej nemovitostí společnosti KOTVA, a.s. Po konzultaci s panem Mgr. Peterkou dojde

K 5674



Benjamin
Goldberger/BST/MWE
03/30/2006 04:14 PM

To  "Joel Beckman" <jbeckman@nbparis com>
cc  ELeibensperger@mwe com
bcc
Subject  Re: Kotva

Joel,

This font appears to be different than the font on K5085. Is there a complete copy of this document, preferably signed?

Benjamin A  Goldberger
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109
t.  +1 617 535 4483
f.  +1 617 535 3800
e.  bgoldberger@mwe com
"Joel Beckman" <jbeckman@nbparis com>



"Joel Beckman"
<jbeckman@nbparis.com>
03/30/2006 03:17 PM

To  <ELeibensperger@mwe com>
cc  <BGoldberger@mwe com>
Subject  Kotva

 Nystrom Beckman & Paris LLP

**Joel G. Beckman**
**10 St. James Avenue, 16ᵗʰ Floor**
**Boston, MA  02116**

**Phone:**  **(617) 778-9100**
**Direct:**  **(617) 778-9126**
**Fax:**      **(617) 778-9110**
**Email:**    **jbeckman@nbparis.com**
            **www.nbparis.com**

  

3 30 06 LTR Leibensperger pdf   K5674 pdf

*************************************************************************************************************

IRS Circular 230 Disclosure:  To comply with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained herein (including any attachments), unless specifically stated otherwise, is not intended or written to be used, and cannot be used, for the purposes of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter herein.

_____

This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited.  Please notify the sender of the delivery error by replying to this message, and then delete it from your system.  Thank you.
*************************************************************************************************************

Please visit http://www.mwe.com/ for more information about our Firm.



ΚΥΠΡΙΑΚΗ    ΔΗΜΟΚΡΑΤΙΑ
REPUBLIC    OF CYPRUS

C.C.2

No.: 78962

**MINISTRY OF COMMERCE, INDUSTRY & TOURISM
DEPARTMENT OF REGISTRAR OF COMPANIES
AND OFFICIAL RECEIVER
NICOSIA**

30 June 2005

CERTIFICATE

FORMINSTER ENTERPRISES LIMITED

It is hereby certified that in accordance with the records kept by this Department the following were the Directors and Secretary of the above company as at 30 11 1999:

| Directors | Nationality | Residential Address |
|---|---|---|
| RICHARD HARAZIM | Czech Republic | 174 Skorkovskeho<br>636 00 Brno<br>Czech Republic |
| MARTIN BENDA | Czech Republic | 46 Borac C<br>Czech Republic |
| JOHN MOFFITT | American | 14 Bilkova<br>Prague 1<br>Czech Republic |
| MICHAEL BLUHM | American | 4 U Nikolajky<br>Prague 5<br>Czech Republic |

| Secretary | Residential Address |
|---|---|
| INDILAW SECRETARIAL LIMITED | 4 Diagorou Street<br>Kermia House, Office 601<br>Nicosia |

M. MARKIDOU

For Actg Registrar of Companies

/LH



ΚΥΠΡΙΑΚΗ     ΔΗΜΟΚΡΑΤΙΑ
REPUBLIC      OF CYPRUS

C.C.2

No.: 78962

**MINISTRY OF COMMERCE, INDUSTRY & TOURISM
DEPARTMENT OF REGISTRAR OF COMPANIES
AND OFFICIAL RECEIVER
NICOSIA**

30 June 2005

### CERTIFICATE

### FORMINSTER ENTERPRISES LIMITED

It is hereby certified that in accordance with the records kept by this Department the following were the Directors and Secretary of the above company as at 6.5.2002:

| Directors | Nationality | Residential Address |
|---|---|---|
| RICHARD HARAZIM | Czech Republic | 174 Skorkovskeho 636 00 Brno Czech Republic |
| MARTIN BENDA | Czech Republic | 46 Borne C Czech Republic |
| JOHN MOFFITT | American | 14 Bilkova Prague 1 Czech Republic |
| MICHAEL VLACH | Czech Republic | 10 Gulanduuerova Brno Czech Republic |

| Secretary | Residential Address |
|---|---|
| INDILAW SECRETARIAL LIMITED | 4 Dingorou Street Kermia House, Office 601 Nicosia |

M. MARKIDOU
For Actg Registrar of Companies

Л.Н



KYΠPIAKH **REPUBLIC**     ΔHMOKPATIA **OF CYPRUS**

C.C.2

No.: 78962

**MINISTRY OF COMMERCE, INDUSTRY & TOURISM**
**DEPARTMENT OF REGISTRAR OF COMPANIES**
**AND OFFICIAL RECEIVER**
**NICOSIA**

30 June 2005

**CERTIFICATE**

**FORMINSTER ENTERPRISES LIMITED**

It is hereby certified that in accordance with the records kept by this Department the following were the Directors and Secretary of the above company as at 31 10 2002:

| Directors | Nationality | Residential Address |
|---|---|---|
| DOXA PERICLEOUS | Cypriot | 4 Diagorou Street<br>Kermia House<br>6th Floor, Flat 601<br>1097 Nicosia |
| RENA DAVID | Cypriot | 4 Diagorou Street<br>Kermia House<br>6th Floor, Flat 601<br>1097 Nicosia |
| ANTHONY INDIANOS | Cypriot | 4 Diagorou Street<br>Kermia House<br>6th Floor, Flat 601<br>1097 Nicosia |
| ANDREAS PAPASIANTIS | Cypriot | 4 Diagorou Street<br>Kermia House<br>6th Floor, Flat 601<br>1097 Nicosia |

| Secretary | Residential Address |
|---|---|
| INDILAW SECRETARIAL LIMITED | 4 Diagorou Street<br>Kermia House, 6th Floor, Flat 601<br>1097 Nicosia |

M. MARKIDOU

For Actg Registrar of Companies

/LH

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s. | ) <br> ) <br> ) |
|       Plaintiff, | )     Case No. 05-10679-RCL <br> ) |
|       v. | ) <br> ) |
| ANDREW WEISS and WEISS ASSET <br> MANAGEMENT, LLC | ) <br> ) <br> ) |
|       Defendants. | ) <br> ) |

**KOTVA'S RESPONSE TO SECOND SET OF REQUESTS FOR PRODUCTION
OF DOCUMENTS OF ANDREW WEISS, WEISS ASSET MANAGEMENT LLC,
KT INC. AND CVF INVESTMENTS LTD.**

The plaintiff, Kotva a.s. ("Kotva"), hereby responds to Counterclaim-plaintiffs

Andrew Weiss, Weiss Asset Management LLC, K T Inc , and CVF Investments, Ltd.'s

(collectively "Counterclaim-plaintiffs") Second Request for Production of Documents

("Second Request") as follows:

## GENERAL OBJECTIONS

The following general objections apply to and are incorporated by reference into

each of Kotva's specific responses to the document production requests contained herein.

I.     Kotva is providing this response to the Second Request, and is producing

documents pursuant thereto, without waiver of or prejudice to their rights, at any later

time, to raise objections to:

(a)     the relevance, materiality or admissibility of:

A.     the Second Request or any part thereof;

            B.     statements made in this response to the Second Request or any part thereof; or

            C.     any document produced pursuant to this response; or

    (b)    any further demand for discovery involving or relating to the matters raised in the Second Request.

    II.    The specific responses set forth below and Kotva's production pursuant thereto are based upon information currently available after diligently searching within the time available of the documents in Kotva's possession, custody or control. Kotva may, in the future, obtain or locate additional documents responsive to the Second Request and may identify or determine additional information relevant to its specific responses to the Second Request. Kotva objects to the Second Request to the extent it purports to demand production of documents not in Kotva's possession, custody or control or to require a search of files that do not reasonably relate to one or more of the specific document production requests contained in the Second Request. Kotva reserves the right at any time to revise, correct, add to, supplement, modify or clarify the specific responses set forth below or the production made pursuant thereto.

    III.    Kotva objects to the Second Request to the extent it demands production of any document covered by the attorney-client privilege, the work product doctrine or any other applicable privilege. In the event Kotva produces any privileged document, its production is inadvertent and does not constitute a waiver of privilege.

    IV.    Kotva objects to producing any requested documents to the extent that the production of said documents will be oppressive, unduly burdensome, unreasonably expensive or will require an unreasonable investigation.

    V.    Kotva objects to the Instructions and/or Definitions contained in the Second Request to the extent that they attempt to impose obligations upon Kotva that are

inconsistent with and/or in addition to those required under the Federal Rules of Civil Procedure.

VI.    Kotva objects to the Second Request to the extent it demands production of any document containing any confidential, proprietary and/or trade secret information.

VII.    Kotva objects to the production of any document falling within one of the General Objections set forth above or the specific objections set forth below. In the event any document falling within such an objection is or may be produced by Kotva, its production is inadvertent and does not constitute a waiver of the objection with respect to the produced document or any other document. Moreover, a statement by Kotva that it will produce documents responsive to a particular request or falling within a particular description means that Kotva will produce all documents within its possession, custody or control that: (a) are responsive to the particular request or fall within the particular description in question; (b) have been located by Kotva after a diligent search; and (c) do not fall within one of the General Objections set forth above or within any of the objections contained in the specific responses set forth below. Furthermore, such a statement is not an acknowledgement or an admission that any document responsive to the particular request or falling within the particular description in question currently exists or has ever existed.

## SPECIFIC OBJECTIONS AND RESPONSES

Request No. 1:

All documents concerning Kotva's ability or inability to access the criminal file of the investigation of Andrew Weiss, including any documents in the criminal file accessible by Kotva and any communications transmitting such documents or translations thereof to counsel for Kotva on or after January 1, 2006.

Response:

Kotva objects to this request to the extent it calls for documents protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving its objections, Kotva has previously produced copies of the criminal file that are accessible by Kotva.

Request No. 2:

All documents concerning communications between Kotva, including those of Richard Harazim, Martin Benda or any attorney for Harazim, Benda or Kotva, and any third party, including members of the press, the Irish Investors or their attorneys or agents, Petr Toman or Czech law enforcement, concerning Andrew Weiss, Weiss Asset Management LLC, Weiss Capital LLC, Vladimir Hoffmann, Ondrej Peterka, the Czech Lawsuits or this lawsuit.

Response:

Kotva objects to this request to the extent it calls for documents protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving its objections, Kotva will produce non-privileged documents that are responsive to this request to the extent they exist.

Request No. 3:

All documents concerning any Threat of Litigation, including any documents concerning any settlement of any claim associated with any Threat of Litigation.

Response:

Kotva objects to this request to the extent it calls for documents protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving its objections, Kotva will produce non-privileged documents that are responsive to this

request to the extent they exist. Further answering, Kotva states that it has no non-privileged responsive documents where there was no lawsuit filed against it.

<u>Request No. 4:</u>

The mutual indemnification agreements involving one or more Woolf Companies identified by Richard Harazim in his deposition, including any drafts.

<u>Response:</u>

Kotva objects to this request to the extent it calls for documents protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving its objections, Kotva will produce non-privileged documents that are responsive to this request to the extent they exist.

<u>Request No. 5:</u>

All documents concerning the documents responsive to Request No. 4, including but not limited to documents concerning the agreement between Woolf and J&T Bank.

<u>Response:</u>

Kotva objects to this request to the extent it calls for documents protected by the attorney-client privilege and/or work product doctrine. Kotva further objects on the ground that this request is vague and unintelligible. Subject to and without waiving its objections, Kotva will produce non-privileged documents that are responsive to this request to the extent they exist. Further answering, Kotva has no documents concerning any agreement between Woolf and J&T Bank.

<u>Request No. 6:</u>

An executed copy of the settlement agreement marked as Exhibit 4 during the deposition of Richard Harazim.

Response:

Subject to and without waiving its objections, Kotva will produce an executed

copy of the settlement agreement marked as Exhibit 4 during the deposition of Richard

Harazim if one can be located.

Request No. 7:

All documents, including copies of any witness statements/interviews, resolutions
or termination notices, relating to the criminal investigation referred to by Richard
Harazim during his deposition in which Mr. Harazim was interviewed by Czech
authorities in 2005 and for which Mr. Harazim claimed that the investigation has since
been terminated.

Response:

Subject to and without waiving its objections, Kotva will produce non-privileged

documents that are responsive to this request to the extent they exist.

Request No. 8:

All documents concerning any actual or prospective agreement between
Forminster and BGO or any other entity represented by Howard Golden to sell or
purchase shares in Kotva and/or Trend or to sell or purchase options to sell or purchase
shares in Kotva and/or Trend.

Response:

Kotva objects to this request as not properly directed to Kotva. Kotva further

objects to this request as vague and unintelligible to the extent that the phrase "any other

entity represented by Howard Golden" is undefined. Subject to and without waiving its

objections, Kotva states that it has no such documents.

Request No. 9:

All documents concerning communications between Kotva, including those of
Richard Harazim, Martin Benda or any attorney for Harazim, Benda or Kotva, and J&T

Bank regarding the purchase or potential purchase of Kotva shares from one or more of the Woolf companies, BGO, Vladimir Hoffmann, Andrew Weiss or any affiliated entity.

Response:

Kotva objects to this request to the extent it calls for documents protected by the attorney-client privilege and/or work product doctrine. Kotva further objects to this request as vague and unintelligible to the extent that the phrases "one or more of the Woolf companies" and "any affiliated entity" are undefined. Subject to and without waiving its objections, Kotva states that it has no such documents.

Request No. 10:

Copies of any communications between Kotva, including those of Richard Harazim, Martin Benda or any attorney for Harazim, Benda or Kotva, and any member of Czech law enforcement regarding Andrew Weiss, Vladimir Hoffmann and/or the sale of the Department Store.

Response:

Kotva objects to this request to the extent it is duplicative of request No. 2. Kotva further objects to the extent this request calls for documents protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving its objections, Kotva will produce non-privileged documents that are responsive to this request to the extent they exist.

Request No. 11:

All documents concerning communications with Deutsche Bank and/or Dominic Redfern and/or James Woolf regarding any claim by Deutsche Bank and/or Dominic Redfern and/or James Woolf relating to the Department Store or ownership thereof, including any draft legal complaints.

Response:

Kotva objects to this request to the extent it calls for documents protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving its objections, Kotva will produce non-privileged documents that are responsive to this request to the extent they exist.

Request No. 12:

Any documents concerning the purchase or offer to purchase, by Richard Harazim, Martin Benda, J&T Banka, J&T Securities, Forminster, or Kotva, of shares in Kotva a.s. from a minority shareholder from the period September 1, 2003 to the present.

Response:

Kotva objects to this request as not properly directed to Kotva. Subject to and without waiving its objections, Kotva states that it has no such documents.

Request No. 13:

All documents concerning any actual or contemplated complaint to law enforcement authorities relating to Threats of Litigation or statements made concerning the sale of the Department Store, including but not limited to any complaint against Andrew Weiss, Ondrej Peterka, Vladimir Hoffmann or Hana Lesenarova.

Response:

Kotva objects to this request to the extent it calls for documents protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving its objections, Kotva will produce non-privileged documents that are responsive to this request to the extent they exist

Request No. 14:

All documents concerning the conversion of Kotva Nemovitosti a.s. into a limited partnership.

Response:

Subject to and without waiving its objections, Kotva states that it has already

produced any documents responsive to this request.

Request No. 15:

All documents on which Kotva relied in accepting a profit share in Kotva
Nemovitosti k.s. of less than 100%.

Response:

Kotva objects to this request to the extent it mischaracterizes the history and

corporate form of KN. Kotva further objects to this request on the ground that it

mischaracterizes Kotva's "profit share" and assumes facts that have not been established.

Subject to and without waiving its objections, Kotva states that it has no such documents.

Request No. 16:

All documents concerning Gilroy's lawsuit against Kotva and other persons,
including any documents concerning the resolution of the lawsuit, including any hearing
transcripts.

Response:

Kotva objects to the use of the term "resolution;" the Gilroy lawsuit was

dismissed. Kotva further objects to this request to the extent it calls for documents

protected by the attorney-client privilege and/or work product doctrine, and as overbroad

and unduly burdensome. Subject to and without waiving its objections, Kotva will

produce a translated copy of the order dismissing the lawsuit.

Request No. 17:

All documents concerning any power of attorney from Kotva or any of its
subsidiaries or Forminster to one or more of the following persons: Michal Vlach,
Richard Harazim, Martin Benda or Petr Toman.

Response:

Kotva objects to this request to the extent it is not properly directed to Kotva.

Kotva further objects to the extent this request calls for documents protected by the

attorney-client privilege and/or work product doctrine. Subject to and without waiving

its objections, Kotva states that it has already produced all powers of attorney in its

possession.

Request No. 18:

All documents, including checks, reflecting a financial transaction between
Richard Harazim and/or Martin Benda on the one hand and Forminster on the other hand.

Response:

Kotva objects to this request as not properly directed to Kotva. Kotva further

objects to this request as vague and ambiguous to the extent that the term "financial

transaction" is not defined. Subject to and without waiving its objections, Kotva states

that it has no such documents.

Request No. 19:

All documents concerning any agreement between Forminster and one or more of
the following persons: Richard Harazim, Martin Benda, Petr Toman, Michael Vlach.

Response:

Kotva objects to this request as not properly directed to Kotva. Subject to and

without waiving its objections, Kotva states that it has no such documents.

Request No. 20:

All documents concerning the person or persons who owned or controlled Gilroy
at the time the Gilroy lawsuit was resolved.

Response:

Kotva objects to the use of the term "resolved;" the Gilroy lawsuit was dismissed.

Kotva further objects to this interrogatory as vague. Subject to and without waiving its

objections, Kotva states that it has no such documents.

Request No. 21:

All documents created on or after May 12, 2004 concerning any negotiations or
agreements between, on the one side, Vladimir Hoffmann, Gilroy and/or Balfindor and,
on the other side, Forminster, Toman Devaty & Partners, including Petr Toman, J&T
Securities, J&T Banka or Kotva, including Messrs. Harazim or Benda or any attorney for
Kotva.


Response:

Kotva objects to this request as not properly directed to Kotva. Kotva further

objects to the extent this request calls for documents protected by the attorney-client

privilege and/or work product doctrine. Subject to and without waiving its objections,

Kotva states that it has no such documents.

Request No. 22:

All documents concerning the insurance policy referenced in document K2030.

Response:

Kotva objects to this request as not properly directed to Kotva. Subject to and

without waiving its objections, Kotva will produce non-privileged documents responsive

to this request to the extent they can be located.

Request No. 23:

All documents concerning financial transactions between Kotva, including those
of Richard Harazim, Martin Benda or any attorney for Harazim, Benda or Kotva, and any
person working for Czech law enforcement, including Pavel Broz and/or Dagmar
Machova or any person with an oversight role in the Trend bankruptcy proceedings.

<u>Response:</u>

Kotva objects to this request as vague and ambiguous to the extent that the term

"financial transaction" is not defined. Subject to and without waiving its objections,

Kotva states that it has no such documents.

<u>Request No. 24:</u>

Such documents as are sufficient to determine the votes of all Kotva shareholders at the summer 2005 general meeting at which one of the points on the agenda, as described by Richard Harazim during his deposition, was a decision about liquidation of Kotva and/or distribution of proceeds or dividends to shareholders.

<u>Response:</u>

Subject to and without waiving its objections, Kotva will produce non-privileged

documents responsive to this request to the extent they exist.

<u>Request No. 25:</u>

Martin Benda's business cards.

<u>Response:</u>

Kotva objects to this request as vague and ambiguous and unlimited in time and

scope. Kotva further objects that this request is not properly directed to Kotva to the

extent it seeks "business cards" that are unrelated to Kotva. Subject to and without

waiving its objections, Kotva will produce business cards related to Kotva.

<u>Request No. 26:</u>

Richard Harazim's business cards.

<u>Response:</u>

Kotva objects to this request as vague and ambiguous and unlimited in time and

scope. Kotva further objects that this request is not properly directed to Kotva to the

extent it seeks "business cards" that are unrelated to Kotva. Subject to and without

waiving its objections, Kotva will produce business cards related to Kotva.

Request No. 27

All documents concerning the methods Kotva used to identify David Waxman,
QVT LLC and/or Kochis Fitzhugh as past or present investors in BGO.

Response:

Kotva objects to this request on the ground that it calls for information protected

by the attorney-client privilege and/or work product doctrine. Subject to and without

waiving its objections, Kotva states that it has no such documents.

Request No. 28:

All documents concerning any change in status in the relationship among Kotva,
Richard Harazim and Martin Benda from May 12, 2004 to the present, including any
resignation of any position Messrs. Harazim or Benda held with Kotva.

Response:

Kotva objects to this request to the extent it is vague and ambiguous and

incorporates undefined terms. Subject to and without waiving its objections, Kotva will

produce non-privileged documents responsive to this request to the extent they exist.

Request No. 29:

All documents concerning the authority to vote Forminster's shares in Kotva,
including documents relating to SPRINT.

Response:

Subject to and without waiving its objections, Kotva will produce non-privileged

documents responsive to this request to the extent they exist.

Respectfully submitted,

KOTVA a.s.

By its attorneys,

_____

Joel G. Beckman (BBO #553086)
William C. Nystrom (BBO#559656)
Daniel J. Pasquarello (BBO#647379)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: April 7, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2006 I caused a copy of the foregoing document to be served by facsimile and First Class Mail upon all defendants.

_____

Joel G. Beckman

| From: | Vladimír Hoffmann [vlado1@volny cz] |
|---|---|
| Sent: | Friday, November 28, 2003 6:39 AM |
| To: | Dave Johnson |
| Cc: | Andrew Weiss; Eitan Milgram |
| Subject: | Kotva |

Dear Dave,

Harazim called me today and told me that they will make the firm bid for our Kotva shares on Monday. They will fax it to you and deliver the original to me. The price will be USD 1 million and it will be valid for one week until Monday, Dec.8th.

You can reach me on my mobile phone +420 605 282 464 this afternoon to discuss this.

Best wishes,

Vlado.

1

WP0000125

Mr. Dave Johnson
Weiss Asset Management
Fax: 001 617 778 7781

Brookdale Global Opportunity Fund
With it`s investment manager`s office at
29 Commonwealth Ave. Boston, MA 02116

POBREZNÍ 14  186 00 PRAHA 8
ČESKÁ REPUBLIKA

TEL : +420 221 710 111
FAX: +420 221 710 133
E-MAIL: SECURITIES@JTBANK.CZ
HTTP://WWW.JTBANK.CZ

IC: 25087532
DIČ: 009-25067532

ZAPSÁNA V OR VEDENÉM
MS V PRAZE ODDÍL B
VLOŽKA 7398

Praha, 2/12/2003

Dear Sirs,

We have the pleasure to inform you that based on an instruction from
our client we make now the following bid:

We offer to buy all of your shares in KOTVA a.s., Náměstí republiky 8,
Praha 1, Czech Republic, ISIN CZ0009048955, minimum number of
shares being 82,782 (eightytwo thousands sevenhundreds and eighty
two) for the total purchase price of USD 1 million (one million USD),

This offer is valid for a period of 7 calendar days, after which it expires
in vain. Should you decide to accept this offer send please your
consent in writing to following address:

J&T SECURITIES (CZECH REPUBLIC), a.s.
Attn. Michal Semotan
Pobřežní 14
186 00 Praha 8
Czech Republic

We declare we are in a position to settle the deal within 14 days
following the day we receive your written consent to our offer.

Best regards

Michal Semotan
Head of trading

| | |
|---|---|
| **From:** | Vladimír Hoffmann [vlado1@volny cz] |
| **Sent:** | Monday, December 08, 2003 9:25 AM |
| **To:** | Andrew Weiss |
| **Cc:** | Eitan Milgram; Dave Johnson |
| **Subject:** | Kotva |

I informed Forminster today that we decline their offer. I told them that our offer would be USD 4m. They rejected it.
Regards,
Vlado.

1

WP0000137

**From:**    Henry Prestage [hprestage@markland.ie]
**Sent:**    Wednesday, August 20, 2003 4:01 AM
**To:**    richard.harazim@od-kotva.cz
**Subject:** Escrow

Good morning Richard

I am afraid that we cannot consent to J&T Banka acting as Escrow agent.

There are two main reasons for this:

- our Bank is not comfortable using a small Czech Bank
- the name of the J&T Banka appears regularly in the information we have been given regarding past transactions that are allegedly suspect and fraudulent.  This Bank has had a part ot play in the past dealings of the Kotva / Trend / FEL / Suringham issues so we do not want them involved going forward.

From your point of view I cannot see how having the Escrow account with J&T would do you any good as these funds cannot be used and must only be paid out upon certain events.  You will have a very large cash deposit with them which should provide all of the credibility you need.

In my opinion Linlakers are the safest (and cheapest) option.  Their Escrow accounts are run from their London office and are vigorously policed to ensure funds are only released in accordance with the Escrow agreement - any breach of this and they can be sued.  I would rather sue Linklaters than any Czech Bank.

If you still cannot accept Linklaters then we will need to agree upon another large Bank, or possibly we could use an Irish Bank (as we are using Euros) if this meets with you approval.

Regards

Henry

--
This message has been screened for all known viruses by IE Internet.com
and is believed to be free of infection.
--

**K557**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| KOTVA a.s., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW WEISS and WEISS ASSET | ) | |
| MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | C.A. No. 05-10679-RCL |
| | ) | |
| ANDREW WEISS, WEISS ASSET | ) | |
| MANAGEMENT LLC, K T, INC. and CVF | ) | |
| INVESTMENTS, LTD., | ) | |
| | ) | |
| Counterclaim-plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KOTVA a.s., MARTIN BENDA, RICHARD | ) | |
| HARAZIM, FORMINSTER ENTERPRISES, | ) | |
| LTD., SPV CO and JOHN DOES 1–5, | ) | |
| | ) | |
| Counterclaim-defendants. | ) | |

## COUNTERCLAIM-PLAINTIFFS' OPPOSITION TO
## FORMINSTER ENTERPRISES LTD.'S MOTION TO DISMISS COUNTERCLAIM
## FOR LACK OF PERSONAL JURISDICTION

Counterclaim-plaintiffs Andrew Weiss ("Weiss"), Weiss Asset Management LLC

("WAM"), K T, Inc. ("K T") and CVF Investments Ltd. ("CVF") (collectively, the "Weiss

Parties") hereby submit their Opposition to the Motion to Dismiss of Forminster Enterprises Ltd.

("Forminster"). As described below, Forminster has submitted itself to this Court's jurisdiction

by planning, initiating and directing the commencement and prosecution of this lawsuit through

the plaintiff Kotva, and its CEO and Chairman of the Supervisory Board, Richard Harazim and

Martin Benda. The act of filing this lawsuit in Boston, Massachusetts constitutes a tortious abuse of process. This abuse of process was part and parcel of a larger scheme by which Forminster, Harazim and Benda have utilized their control over the Kotva corporate shell to divert assets to themselves and others in their group.

## I.   FRAMEWORK FOR DECIDING JURISDICTIONAL MOTIONS

The Weiss Parties suggest that the Court first decide Harazim's and Benda's Motion to Dismiss before turning to Forminster's Motion to Dismiss. In their Opposition to Harazim's and Benda's Motion to Dismiss, the Weiss Parties explain why the filing of this lawsuit in Boston, and the pre-suit contacts and e-mails to Boston, are sufficient contacts with Massachusetts for the Court to exercise jurisdiction over Richard Harazim and Martin Benda, who Harazim described as "in charge of this particular deal." As described more fully below, the Court should attribute the lawsuit-related contacts with Massachusetts of Kotva, Harazim and Benda to Forminster and exercise jurisdiction over Forminster on the basis of those contacts.

## II.   FACTUAL BACKGROUND RELATING TO FORMINSTER

This lawsuit is part of the ongoing efforts of Richard Harazim, Martin Benda and others to use the proceeds of illegal activity to convert the assets of Kotva a.s. for their own benefit and to the detriment of Kotva's minority shareholders. As described in more detail below, Harazim and Benda are the representatives of Forminster Enterprises, Ltd. ("Forminster"). Harazim and Benda are also, respectively, the Chief Executive Officer and Chairman of the Supervisory Board of Kotva, and direct its affairs. Forminster controls Kotva through its representatives, Benda and Harazim, and its control over a majority of Kotva's shares. However, Forminster secured its control of these shares—and Kotva—as a result of the massive embezzlement of a Czech investment fund called Trend.

## A.   Forminster Seizes Control of Kotva as a Result of Criminal Activity

As described in more detail in the counterclaim and attached press articles, the Czech government has frozen Forminster's shares in Kotva on the grounds that they are the proceeds of a crime—the "tunneling" of assets from Trend.   *See* Counterclaim ¶ 47 (quoting Czech Constitutional Court, Decision No. II US 267/03 (April 15, 2004)).   As one of the press articles attached to the counterclaim explains:

> **The tunnel ends in Cyprus**
>
> The most valuable asset of TREND was represented by the majority block of the shares in KOTVA.   These shares also disappeared.   However, the court finally succeeded in freezing these shares in the account of the Cyprus company Forminster Enterprises Limited.

"Trend Case — everybody knows what happened but the assets will hardly be restored," SLOVO DAILY, Counterclaim Ex. 2 at 7 (translation at 9).

Miroslav Hálek, who exerted managerial control over Trend at the time of the embezzlement, also possessed a general power of attorney to act on behalf of Forminster during the same time period.   Hálek's connections to Forminster and personal involvement in the embezzling of Trend's assets are documented in detail in several reports authored by the Czech authorities.[1]

Even Richard Harazim acknowledged in an interview "that the transactions leading from Trend to Forminster 'might not be entirely legal when examined all together.'"   Nick Carey, "Prague's Free Market Pain," WALL ST. J., July 18, 2005, at A10 (attached hereto as Ex. A).   Mr. Harazim followed this admission with an explanation of his might-makes-right theory of Czech law, adding "Under Czech law, ownership is defined by possession.   Forminster possesses the shares." *Id.*

---

[1] Paragraph 44 of the Counterclaim contains an excerpt from one such report.

3

**B.    Benda and Harazim Represent Forminster's Interests in the Czech Republic**

From November 30, 1999 to October 30, 2002, Richard Harazim and Martin Benda were directors of Forminster.  *See* Certificates of Cypriot Ministry of Commerce, Industry & Tourism (attached hereto as Ex. B).  It was during this time that Forminster installed Harazim and Benda as directors and officers of Kotva.

Perhaps realizing that their dual roles created too much evidence of a link between Forminster and the company it was in the process of looting, Benda, Harazim and the two other directors resigned.[2]  What little is known about their replacements is telling.

When Benda and Harazim first became directors of Forminster, Forminster's Secretary was Indilaw Secretarial Limited, which lists its address as 4 Diagorou Street, Kermia House, 6th Floor, Flat 601,[3] 1097 Nicosia, Cyprus.  Indilaw Secretarial Limited has remained Forminster's Secretary at least through July 2005, and remains at the same address.

All four of Forminster's replacement directors—Doxa Pericleous, Rena David, Anthony Indianos and Andreas Papasiantis—also list their "residential addresses" as 4 Diagorou Street, Kermia House, 6th Floor, Flat 601, 1097 Nicosia, Cyprus.  Anthony Indianos is a Cypriot lawyer, who heads the law firm Costas Indianos & Co.  *See* Costas Indianos & Co. Website at 2 (attached hereto as Ex. C).  The address of the Costas Indianos firm is also 4 Diagorou Street, Kermia House, 6th Floor, Flat 601, 1097 Nicosia, Cyprus.  *Id.* at 1.

This firm appears to be in the business of providing nominee directors and a Cypriot mailing address to those who wish to control a company anonymously.  Using Google to search for the Costas Indianos firm's address, one can find multiple companies claiming to be located at

---

[2] One of these directors, Michael Vlach, is currently affiliated with Kotva.  *Compare* Ex. B at 2 *with* Kotva's Interrogatory Response, *infra* at note 7.

[3] Sometimes, this portion of the address is listed as "Office 601."

this address. Notably, the company listed in Kotva's 2002 annual report as the next largest Kotva shareholder behind Forminster can also be found at the Costas Indianos law firm. *See* 2002 Annual Report at 4 (attached hereto as Ex. D).

Forminster's shareholders have, as early as September 1998, also been nominees selected to conceal the identity of who truly owns and operates Forminster. *See* Certificates of Cypriot Ministry of Commerce, Industry & Tourism at 1 (attached hereto as Ex. E) (listing Ledra Nominees Ltd. and Ledra Trustees Ltd. as shareholders). From November 30, 1999—the date Harazim and Benda became directors of Forminster—to May 24, 2005, Forminster's two shareholders were both nominees claiming the Costas Indianos law firm as their address. *Id.* at 2. On May 25, 2005, all of Forminster's shares were consolidated under a single nominee at the Costas Indianos firm, Indvecta (Nominees) Ltd., 4 Diagorou Street, Kermia House, 6th Floor, Office 601, 1097 Nicosia, Cyprus. *Id.* at 3. The beneficial owners of Forminster appear to be further concealed behind a web of companies affiliated with the Bonalbo Group.[4]

Thus, the current "directors" of Forminster appear to be directors in name only. The logical inference is that Benda and Harazim continue to represent Forminster's interests and act on its behalf as de facto directors and officers. Those familiar with Kotva, Forminster and Trend acknowledge this reality of how Forminster is run. The Wall Street Journal has identified Richard Harazim as "the Forminster-appointed chief executive of Kotva" and accurately

---

[4] Bonalbo Fiduciaries is reportedly listed with the Cypriot authorities as the "beneficial" owner of Forminster. Bonalbo Fiduciaries is owned by the Bonalbo Group UK, which is owned by the Bonalbo Group Ltd. Other affiliated companies include the Bonalbo Group Cyprus and Bonalbo Management. Like the Costas Indianos firm, the Bonalbo Group is in the business of providing cover for those who wish to run a company anonymously. *See* Ex. F (According to the Bonalbo Group website, Bonalbo is "an international network of professionals specialising in the formation and administration of companies and trusts" providing services including "professional directors, nominee shareholders and company secretaries.").

characterizes this current dispute as one between Forminster and the Weiss Parties. WALL ST. J., Ex. A at 4. Communications created contemporaneously during the negotiations among Weiss, Harazim and Benda over the value of the Weiss Parties' stake in Kotva confirm that Weiss—as well as Vladimir Hoffmann, the Czech resident with whom Weiss was working—also understood Benda and Harazim to be representatives of Forminster.[5]

These facts raise serious questions about the "affidavit" submitted by Rena David.[6] The Court should not consider this document to the extent that it controverts the Weiss Parties' proffer under the "prima facie" test for personal jurisdiction. However, the Court should note the following: (1) Ms. David states that her residential address is the same as that of Forminster, Indilaw Secretarial Limited and Costas Indianos & Co. (¶ 1); and (2) Ms. David states that Forminster has no other offices or places of business aside from the Costas Indianos law firm (¶ 5).

Nominating lawyers to stand in as directors of a company cannot serve to insulate the company from the activities of the individuals who continue to run the company's affairs. In view of the suspicious nature of David's installation as a director of Forminster, the document Forminster submitted does not set forth sufficient facts to indicate that David has personal knowledge of the company's affairs and is competent to testify as to the extent of Forminster's involvement in the affairs of Kotva, including the filing of this lawsuit.

---

[5] *See* Ex. G (referring to "the latest offer from Forminster") and Ex. H (predicting that "Forminster will withdraw its offer").

[6] This document does not appear to have been sworn before an officer authorized to take oaths and, assuming that its was executed in Cyprus, is not in proper form under 28 U.S.C. § 1746(1). This statute requires unsworn declarations that are executed outside of the United States submitted in lieu of affidavits include language in which the declarant submits to the jurisdiction of the United States courts for purposes of prosecution for making a false statement. *Compare* *id.* *with* 18 U.S.C. § 1623.

The conclusion that the nominee directors are isolated from the realities of Forminster's business is further supported by Kotva's interrogatory responses. The sale of the Department Store transformed Kotva from a department store company to a company with a new name (K-T-V Invest, a.s.) and unknown business. Common sense dictates that Forminster, the majority shareholder of Kotva, would be intimately involved in this sea change in the business of Kotva. Yet, when asked to identify "all persons, including Kotva, [and] its . . . owners . . . who have knowledge regarding the purported sale of the Department Store to the Irish Investors, including the negotiations leading up to that sale and the disposition of the proceeds of that sale," Kotva identified Richard Harazim, Martin Benda and others affiliated with Kotva, but not one person formally affiliated with Forminster.[7] This response indicates that either *no one* from Forminster had a great deal of knowledge about the sale of the Department Store—which is

---

[7] The full response to the interrogatory is as follows:

INTERROGATORY NO. 2:

Please identify all persons, including Kotva, its employees, officers, directors, agents, owners, attorneys and affiliates and the Irish Investors, their employees officers, directors, agents, owners, attorneys and affiliates, who have knowledge regarding the purported sale of the Department Store to the Irish Investors, including the negotiations leading up to that sale and the disposition of the proceeds of that sale.

Response:

Kotva objects to this interrogatory to the extent it is overly broad, unduly burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Kotva responds that the following persons have had the most knowledge concerning the sale of the Department Store: Richard Harazim, Kotva; Martin Benda, Kotva; Michael Vlach, Kotva; Jiři Brada, Kotva; Pavel Richtr, Kotva; Jaromir David, Kotva; Henry Prestage, Irish Investors; Frank Walker, Irish Investors; Aidan Scully, Irish Investors.

difficult to believe—or that *no one else* from Forminster needed much knowledge because Benda and Harazim—Forminster's de facto directors—were intimately involved in the deal.

**C.    "Kotva" Files this Lawsuit in Massachusetts**

The plaintiff in this case is Kotva.  However, Kotva is a corporation.  It cannot act but through its directors, officers and employees.  As explained in more detail on page 8 of the Weiss Parties' Opposition to Harazim's and Benda's Motion to Dismiss, Kotva's CEO, Richard Harazim, is prosecuting this lawsuit in Kotva's name.

In response to Kotva's complaint, the Weiss Parties asserted counterclaims against Forminster and other counterclaim-defendants.  Pages 5–6 of the Weiss Parties' Opposition to Harazim's and Benda's Motion to Dismiss contains a brief summary of the counterclaims. Forminster claims, inaccurately, that "the Counterclaim contains only four allegations of specific acts by FEL."  Forminster's Mot. to Dismiss at 7.  However, in paragraphs 13 and 14, the counterclaim lists Forminster as a member of a conspiracy referred to throughout the counterclaim as the "Forminster Group."  The counterclaim goes on to allege, among other acts by the Forminster Group, that Harazim sent emails to Massachusetts "as part of the Forminster Group's efforts to pressure Weiss to abandon his investors' claims in the Czech litigation" and that "[t]he Forminster Group [] filed this civil case against Weiss" with a bad faith motive, making the filing of this case a tortious abuse of process.  Counterclaim ¶¶ 35, 38–45.

Forminster refused to accept service of process when notified of the counterclaims in May 2005.  Consequently, the Weiss Parties were forced to resort to the costly and time-consuming method of service under the Hague Convention.  After being formally served on September 9, 2005, Forminster filed a motion to dismiss on November 14, 2005, arguing that this Court lacks personal jurisdiction over it.

## III.   ARGUMENT

### A.   The Legal Standards

"When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing . . . the 'prima facie' standard governs its determination." *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618–19 (1st Cir. 2001). "[I]n evaluating whether the prima facie standard has been satisfied, 'the district court is not acting as a factfinder; rather, it accepts properly supported proffers of evidence by a plaintiff as true and makes its ruling as a matter of law.'" *Id.* at 619 (citations omitted).

Although Forminster spends some space in its memorandum discussing the Massachusetts long-arm statute, the Court "may sidestep the statutory inquiry and proceed directly to the constitutional analysis, however, because the Supreme Judicial Court of Massachusetts has interpreted the state's long-arm statute 'as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States.'" *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 52 (1st Cir. 2002) (quoting *"Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp.*, 361 Mass. 441, 280 N.E.2d 423, 424 (1972)).

Thus, the Court must filter the counterclaim-plaintiffs' jurisdictional allegations through the three-prong test for establishing specific jurisdiction.[8]  The three-prong test for specific jurisdiction requires that the counterclaim-plaintiffs show that: (1) Forminster's actions in the forum relate to the asserted cause of action; and (2) that Forminster purposefully availed itself of the forum. *Ticketmaster-New York v. Alioto*, 26 F.3d 201, 206 (1st Cir. 1994) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) and *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  If the counterclaim-plaintiffs have met their burden under

---

[8] The Weiss Parties do not suggest that Forminster is subject to general jurisdiction in Massachusetts.

9

the first two prongs, then "[t]he defendant may nonetheless avoid having to defend in a strange place if it can establish that allowing the suit to go forward would be inconsistent with 'fair play and substantial justice.'" *Ticketmaster-New York*, 26 F.3d at 206.

Under this third and final prong, Forminster has the opportunity to show the Court that, despite its contacts with and purposeful availment of the forum, it would be unreasonable to subject it to personal jurisdiction. In order to prevail, however, Forminster "must present *a compelling case* that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477 (1985) (emphasis added). Forminster must address the so-called "gestalt factors": "These gestalt factors include: the defendant's burden of appearing; the forum State's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief; the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and the shared interest of the several States in furthering fundamental substantive social policies." *N. Laminate Sales, Inc. v. Davis*, 403 F.3d 14, 26 (1st Cir. 2005) (citing *Burger King Corp.*, 471 U.S. at 477).

If the Weiss Parties make a prima facie showing of any one of the following, the Court should attribute the filing of this lawsuit to Forminster and, therefore, exercise jurisdiction over it: (a) Harazim was an agent of Forminster; (b) Forminster was part of a conspiracy with either Kotva or Harazim and the filing of this lawsuit was an act in furtherance of that conspiracy; or (c) Kotva is an alter ego of Forminster.

As explained in more detail in their Opposition to Harazim's and Benda's Motion to Dismiss, the filing of this lawsuit in Massachusetts is sufficient to confer jurisdiction over the individuals and corporations responsible for planning, initiation and directing the filing and prosecution of this lawsuit. *See* Opp. to Harzim's and Benda's Mot. to Dismiss § III.B, at 8–11;

*Mobil Oil Corp. v. Advanced Environmental Recycling Technologies, Inc.*, 833 F. Supp. 437 (D. Del. 1993). In these circumstances, if the filing of this lawsuit is a contact attributable to Forminster, then the Weiss Parties have met their burden under the first two prongs of the test for specific jurisdiction and Forminster cannot meet its burden under the third prong.

**B.      The Court Should Attribute the Filing of this Lawsuit to Forminster as a Contact with Massachusetts Because Richard Harazim is Forminster's Agent**

"[I]t is clearly established that under basic principles of agency law, forum-related contacts made by an agent acting within the scope of an agency relationship are attributable to the principal." *In re Lernout & Hauspie Sec. Litig.*, 337 F. Supp. 2d 298, 314 (D. Mass. 2004) (citations omitted).

As detailed above, the evidence the Weiss Parties have been able to marshal at this point indicates that Richard Harazim continues to act as Forminster's agent. Harazim caused this lawsuit to be filed to benefit Forminster, among others, as part of the Forminster Group's efforts to freeze out Kotva's minority shareholders. Since the filing of this lawsuit is a forum-related contact of one of Forminster's agents, arising within the scope of the agency relationship, the Court should attribute the filing of this lawsuit to Forminster for purposes of establishing personal jurisdiction. As explained in more detail in their Opposition to Harazim's and Benda's Motion to Dismiss, the filing of this lawsuit is, alone, a sufficient forum-related contact to justify this Court's exercise of personal jurisdiction.

**C.      In the Alternative, the Court Should Attribute Harazim's and Kotva's Filing of this Lawsuit to Forminster Because They Are Co-Conspirators and Pursuing This Lawsuit is an Act in Furtherance of the Conspiracy**

Forminster appears to concede that forum-related contacts of other individuals may be attributed to it under an agency theory or alter ego theory if an appropriate showing is made. However, in its Opposition to the Weiss Parties' Motion for Jurisdictional Discovery, Forminster

argues that there can never, under any circumstances, be personal jurisdiction over out-of-state defendants based solely on their conspiring with defendants who have contacts with the forum in furtherance of the conspiracy. Forminster's Opp. to Mot. for Jurisdictional Discovery at 13–14 (quoting *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 307 F. Supp. 2d 145, 157–58 (D. Me. 2004)). Forminster is wrong.

At its core, the co-conspirator theory of personal jurisdiction is a logical outgrowth of the well established—and uncontested—rule that an agent's contacts with a forum are attributable to the principal. Co-conspirators are effectively each others' principals and agents. While it is true that there is no First Circuit case in which the co-conspirator theory of jurisdiction was adopted, the First Circuit has also never rejected this theory. Nor would it. Several other courts have recognized this theory. *E.g.*, *Crompton Corp. v. Clariant Corp.*, 221 F. Supp. 2d 683 (M.D. La. 2002); *Dooley v. United Techs. Corp.*, 786 F. Supp. 65 (D.D.C. 1992); *Gemini Enterprises, Inc. v. WFMY Television Corp.*, 470 F. Supp. 559 (M.D.N.C. 1979); *Socialist Workers Party v. Att'y Gen. of the United States*, 375 F. Supp. 318 (S.D.N.Y. 1974).

Exercising jurisdiction over co-conspirators based on their membership in the conspiracy does not violate Due Process. Courts routinely impose consequences far more serious than personal jurisdiction in a civil case based on membership in a conspiracy. For example, in criminal cases, courts routinely admit statements that would otherwise be hearsay, increase sentences or even impose criminal liability when there otherwise would be none based on the defendant's membership in a conspiracy. *See United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977) (hearsay); U.S.S.G. § 1B1.3(a)(1)(B) (sentencing); *Pinkerton v. United States*, 328 U.S. 640 (1946) (criminal liability). There can be no serious suggestion that in so doing the courts have routinely denied criminal defendants Due Process. Moreover, rejecting a theory of personal

12

jurisdiction over co-conspirators in civil cases on Due Process grounds would be inconsistent with the exercise of jurisdiction over out-of-state co-conspirators in criminal cases under the as strict or stricter constraints of the Sixth Amendment's venue provisions. *Cf. United States v. Uribe*, 890 F.2d 554 (1st Cir. 1989) (holding that venue for all co-conspirators is proper in a district in which any co-conspirator committed an overt act in furtherance of the charged conspiracy, even if a particular co-conspirator was not physically present in that district).

Accordingly, even if the Court were to find that Harazim is no longer an agent of Forminster, so long as Harazim's and Kotva's forum-related contacts were in furtherance of the Forminster Group's efforts to freeze out Kotva's minority shareholders, this Court has personal jurisdiction over all members of the conspiracy, including Forminster.

**D.    In the Alternative, Kotva's Filing of This Lawsuit is Attributable to Forminster Because Kotva is Forminster's Alter Ego**

As this Court noted in *Giuliano v. Nations Title, Inc.*, 938 F. Supp. 78, 81 (D. Mass. 1996), the leading Massachusetts case for determining whether to pierce the corporate veil and exercise jurisdiction over a parent corporation for the acts of its subsidiary is *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614 (1968). Forminster appears to agree that this is the appropriate standard, citing *Giuliano* and quoting extensively from *My Bread*. *See* Forminster's Mot. to Dismiss at 13. *My Bread* established two alternate methods for piercing the corporate veil:

> (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, **or** (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, **or** serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

*My Bread*, 353 Mass. at 619 (emphasis added).

Forminster's relationship with Kotva meets either test. First, there is clearly active and direct participation by Forminster's representatives, Benda and Harazim, in the direction of Kotva's affairs. Harazim and Benda exercise "pervasive control" over Kotva through their positions as CEO and Chairman of the Supervisory Board, respectively. Kotva's minority shareholders have suffered injurious consequences as a result of this control, as Benda and Harazim are in the process of freezing out the minority shareholders to benefit Forminster. Weiss and WAM have suffered the further injurious consequences of being the subject of Kotva's abuse of process in this action. Second, the contemporaneous communications demonstrating that Weiss thought he was dealing with Benda and Harazim as representatives of Forminster and the Forminster Group's present insistence that Benda and Harazim no longer represent Forminster establish "a confused intermingling of activity of two or more corporations engaged in a common enterprise with . . . serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting." *Id.*

The belated replacement of Harazim and Benda as directors of Forminster with Cypriot lawyers is too little, too late to cure the fact that the two companies had—and as a practical matter continue to have—overlapping board members. This overlap, combined with Harazim's and Benda's complete control over Kotva—particularly with respect to this litigation—is sufficient for the Court to exercise personal jurisdiction over Forminster under an alter ego theory. *Cf. Sorenson v. H&R Block, Inc.*, No. 99-10268-DPW, 2002 U.S. Dist. LEXIS 18689, at *16–*19 (D. Mass. Aug. 27, 2002) (exercising personal jurisdiction under alter ego theory based on "pervasive control" over subsidiary, even under more stringent summary judgment standard).

Each of the cases Forminster cites in its papers is distinguishable from the case at hand. In *Giuliano*, this Court found that (1) the participation of the parent in the affairs of the

subsidiary did not enable or further any "fraudulent or injurious consequence;" and (2) the two

corporations were not engaged in a "common enterprise." *Giuliano*, 938 F. Supp at 81–82. In

*Andresen v. Diorio*, 349 F.3d 8 (1st Cir. 2003), the sole fact to distinguish the parent/subsidiary

relationship from the typical parent/subsidiary relationship was that the subsidiary "had

employed an interim president who formerly worked for" the parent: there were no overlapping

board members. *Id.* at 12. In *Alvarado-Morales v. Digital Equipment Corp.*, 843 F.2d 613 (1st

Cir. 1988), the First Circuit found that if the corporate veil were pierced, there would be

jurisdiction, but no liability, thus making the plaintiff's argument "self-defeating." *Id.* at 616.

Neither *United Electrical, Radio & Machine Workers of Am. v. 163 Pleasant Street Corp.*, 960

F.2d 1080 (1st Cir. 1992) nor *Northern Laminate Sales, Inc. v. Matthews*, 249 F. Supp. 2d 130

(D.N.H. 2003) applied the two alternative test established under Massachusetts state law. *See*

*United Elec.*, 960 F.2d at 1091 (applying a three-part federal common law test in ERISA case);

*N. Laminate*, 249 F. Supp. 2d at 140–43 (reviewing New York, Delaware and New Hampshire

law). Finally, it is true that in *McKesson HBOC, Inc. v. Green*, 339 F.3d 1087, 1094–95 (9th Cir.

2003), the Ninth Circuit indicated that piercing the veil of a publicly traded American company

may be unprecedented. However, the Ninth Circuit followed this pronouncement by writing:

> The shareholders of a public corporation can hardly be said, as a practical matter,
> to exercise control over the corporation. As a leading commentator noted,
> requiring control screens out piercing against the shareholders of a publicly traded
> corporation . . . . This provides a doctrinal underpinning to explain the fact that
> there never has been a case in which the court pierced to hold shareholders in a
> public corporation liable for the company's debts.

*Id.* (alteration in original; internal quotation marks and citations omitted). This "doctrinal

underpinning" is entirely inapplicable to Forminster's relationship to Kotva. Forminster controls

Kotva because it controls 55% of Kotva's shares and another company that appears to share the

same address with Forminster controls another 14% of Kotva's shares.

This case is more analogous to *Kleinerman v. Morse*, 26 Mass. App. Ct. 819 (1989), in which the Appeals Court found that there was personal jurisdiction over the out-of-state corporate parent under an alter ego theory. In *Kleinerman*, he parent corporation owned most, but not all, of the subsidiary's capital stock, just as Forminster owns most, but not all of Kotva's stock. *Id.* at 821–22. In *Kleinerman*, the president of the parent corporation became the president of the subsidiary, just as Forminster's directors became Kotva's CEO and Chairman of the Supervisory Board. *Id.* at 822. The parent in *Kleinerman*, like Forminster, also used its control over the subsidiary to wind up the subsidiary's operations. *Id.* at 822. In view of the "[s]ignificant exercise of control" by the parent over the subsidiary and "significant intermingling of officers and directors between parent and subsidiary," the *Kleinerman* court found that there was personal jurisdiction. *Id.* at 823. This Court should make a similar finding under the similar facts of this case.

### E.    Kotva's Failure to Comply with Its Discovery Obligations Has Prevented the Weiss Parties from Presenting Additional Evidence

The Weiss Parties submit that the facts presented in connection with this Opposition are sufficient to meet the prima facie standard for personal jurisdiction. However, the Weiss Parties would have had additional evidence had Kotva complied with its discovery obligations in a timely fashion.

In view of the Discovery Master's January 6, 2006 Order allowing the Weiss Parties' Motion to Compel, the Weiss Parties hope to receive additional discovery responses from Kotva on January 17, 2006. The Weiss Parties and will promptly review any information they receive and, if appropriate, supplement this submission. The Weiss Parties' anticipated access to this information was one of the grounds on which the Discovery Master relied in denying the Weiss Parties' Motion for Jurisdictional Discovery.

16

Additionally, on November 10, 2005—before Forminster filed its Motion to Dismiss—the Weiss Parties noticed a 30(b)(6) deposition of Kotva for December 16, 2005. Despite having over thirty days' notice of this deposition, counsel for Kotva stated that its designee—most likely Richard Harazim—would not attend due to counsel's schedule. The counterclaim-plaintiffs agreed to postpone the deposition, provided that it was rescheduled for no later than the first half of January. Counsel for the counterclaim-plaintiffs repeatedly asked for an alternate date. Weeks passed. Finally, on January 4, 2006—over *fifty days* after the deposition was noticed—counsel for Kotva suggested a single alternate date of February 6, 2006.[9] This strategy of delay is a transparent—and, to date, successful—effort to prevent the counterclaim-plaintiffs from accessing information about, among other things, "Kotva's decision to file [] this lawsuit," and "Kotva's relationship with Forminster"—facts directly relevant to Forminster's Motion to Dismiss. *See* Deposition Notice (attached hereto as Ex. I).

Finally, before the Discovery Master ruled on the Weiss Parties' Motion for Jurisdictional Discovery, counsel for Forminster suggested that the Discovery Master should consider "punt[ing]" the decision until the Court had an opportunity to determine: (1) if the Weiss Parties had made a "colorable case" for jurisdiction; and (2) what additional information, if any, would assist the Court in deciding Forminster's Motion to Dismiss. If the Court finds that the Weiss Parties have made a "colorable case," but not a "prima facie showing," the Weiss

---

[9] Counsel for the Weiss Parties is unavailable on that date and continues to press for a deposition in the first half of January, the condition for their agreement to postponing the December 16, 2005 deposition.

Parties ask that the Court order Forminster to respond to the discovery requests proposed by the Weiss Parties in their Motion for Jurisdictional Discovery.[10]

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Forminster's Motion to Dismiss. Should the Court have any doubts as to whether the counterclaim-plaintiffs have established personal jurisdiction, the counterclaim-plaintiffs again reiterate their request for jurisdictional discovery or, at a minimum, that the Court allow the counterclaim-plaintiffs an opportunity to further supplement the record after they have taken the 30(b)(6) deposition of Kotva originally noticed for December 16, 2005.

---

[10] In view of the Discovery Master's finding that "[t]he motion seeks discovery which is not narrowly tailored to jurisdictional issues," the Weiss Parties propose limiting their jurisdictional discovery from Forminster to the following: Document Requests Nos. 5, 8 and 9; and Interrogatories 4–5 and 10–12.

## REQUEST FOR ORAL ARGUMENT

The counterclaim-plaintiffs believe that oral argument may assist the Court and wish to be heard. Accordingly, pursuant to Local Rule 7.1(d), the counterclaim-plaintiffs hereby request oral argument.

Respectfully Submitted,

ANDREW WEISS, WEISS ASSET
MANAGEMENT LLC, K T, INC. and CVF
INVESTMENTS LTD.

By their attorneys,

/s/ Edward P. Leibensperger
Edward P. Leibensperger (BBO# 292620)
Benjamin A. Goldberger (BBO# 654357)
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts  02109-1775
(617) 535-4000

Dated: January 9, 2006

BST99 1486883-2 072198 0012

19