UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| KOTVA a.s. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 05-10679-RCL |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW WEISS and WEISS ASSET | ) | |
| MANAGEMENT, LLC | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**KOTVA'S OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS**

**INTRODUCTION**

The defendants' refusal to accept Kotva's well-pled allegations as true, proves that their 12(c) motion is futile. As this Court has stated: "[f]or purposes of these [Rule 12(c)] motions, I must treat all well-pleaded facts, and all reasonable inferences therefrom, as true." Castucci v. United States, 311 F.Supp. 2d 184, 186 (2004) (Lindsay, J.). Yet, time and time again, the defendants mischaracterize or omit altogether Kotva's facts, and instead from the first page spin their own tale. (See, e.g., Memo at 1 "the Forminster Group brought this lawsuit in the name of the Kotva corporate shell . . .") As further examples:

| The defendants contend … | but the Complaint states and the law is that … |
|---|---|
| "Kotva was not to receive a dime from the sale of the Shopping Centre" (Memo at 6) | Kotva was the seller of the Shopping Centre and, under the express terms of the Share Purchase Agreement, may exercise rights to the sale proceeds |

| The defendants contend … | but the Complaint states and the law is that … |
|---|---|
| "All of the damages Kotva alleges relates to it not receiving the proceeds of the Shopping Centre sale" (Memo at 6) | Kotva's damages include attorneys' fees defending KT and Gilroy lawsuits, diminution in the value of its subsidiaries, lost business opportunities, attorneys' fees in this action, statutory damages, and exemplary damages, and Kotva satisfies the notice pleading requirements of Rule 8. |
| Kotva did not allege that it purchased or sold securities (Memo at 8) | Kotva sold SPV KN securities to Markland (Complaint ¶25, 37) |
| "Kotva has not, nor cannot plead, with particularity, reliance to its detriment." (Memo at 9) | No reliance is needed for fraudulent schemes under 10b-5 or for fraud by conduct |
| "the threat of litigation or the filing of a litigation cannot serve as a RICO predicate act." (Memo at 10) | Controlling authority from the First Circuit and District of Massachusetts holds otherwise. See, e.g., Gonazalez-Morales v. Hernandez-Asencibia, 221 F.3d 45, 51-52 (1st Cir. 2002); Lemelson v. Wang Labortories, 874 F.Supp. 430, 432 (D. Mass 1994). |

In short, Kotva has properly pled with specificity each element necessary to assert violations of the Federal Securities (Count I) and Racketeering (Counts II and III) statutes. And while Kotva recognizes that it may not recover on both claims, it is certainly entitled under Fed. R. Civ. P. 8(e)(2) to plead them in the alternative.

The defendants' challenge to Kotva's non-federal claims is limited. With respect to 93A (Count IV), defendants argue that this Court's decision to dismiss the defendants' 93A claim means that Kotva has no claim itself. But these two claims were not mirror images. While the defendants' 93A claim was a private dispute based on the transfer of the Shopping Centre to Kotva's subsidiary, Kotva's claim encompasses a far broader range of parties and interests, and

must survive a motion to dismiss.  Grand Pacific Finance Corp. v. Bramer, 57 Mass. App. Ct. 407, 416 n.7 (2003) (reversing dismissal of c.93A claim because "private dispute" exemption does not apply when there are "multiple corporate entities and business people involved in the extra enterprise dealings. . ."). Finally, the defendants seek dismissal of Kotva's state law claim for abuse of process (Count V), common law fraud (Count VI) and tortious inference (Count VII) solely on the grounds that Kotva purportedly suffered no damages.  But Kotva's Complaint references multiple categories of damages caused by the defendants' interference with the sale of the Shopping Centre to Markland, including lost business opportunities, diminution in value of its subsidiaries, attorneys' fees, and exemplary damages.  The fact that the sale was effectuated through a Kotva wholly owned subsidiary is of no legal consequence, under §2.5 of the SPA, Kotva is entitled to the sale proceeds.  In short, the defendants last minute "motion to dismiss" lacks merit, and must be denied.

## FACTS

Plaintiff Kotva a.s. ("Kotva" or the "Company") is a public company traded on the Czech securities market.  (Complaint ¶4)  Until March 4, 2005, Kotva, through its wholly owned subsidiaries, owned and operated the famous downtown Prague department store named Kotva (the "Shopping Centre").  (Complaint ¶7)  Defendant Andrew Weiss ("Weiss"), through his Boston-based investment firm Weiss Asset Management, LLC ("WAM"), is the investment manager of the Brookdale Global Opportunity Fund ("Brookdale"), which owns nearly 12% of Kotva's shares (Weiss and WAM are collectively referred to as the "defendants").  (Complaint ¶¶ 9-10)

When the defendants learned that Kotva planned to sell the Shopping Centre to an Irish investment group ("Markland"), they hatched a scheme to extort Kotva.  (Complaint ¶¶ 19-21)

3

Their extortion scheme entailed interfering with the sale of the Shopping Centre and using that interference as a lever to force Kotva to pay them millions of dollars for their shares of Kotva as well as their shares of Trend (another Czech Company).  (Complaint ¶¶ 22-36)  Specifically, defendants utilized a shell company based in Cyprus named Gilroy Limited ("Gilroy"), and later a Delaware shell company named KT, Inc. ("KT"), to purchase nominal shares of Kotva's stock and file "sham lawsuits" in the Czech Republic solely for the improper purpose of interfering with the Shopping Centre's sale.  (Complaint ¶¶ 23-25, 32-33)  They then made ever increasing price demands on Kotva to purchase their shares (eventually seeking almost eight times the publicly traded market value) with the carrot that he would "attempt to influence" Gilroy and KT to drop the suits.  (Complaint ¶¶ 22-36)  As a result of the "strike suits," Kotva's sale of the Shopping Centre was severely impaired and the Company lost millions of dollars.  (Complaint ¶¶ 37-38, 54, 68, 76, 83, 87)

Weiss' own written communications to Kotva exposed his fraudulent scheme. (Complaint ¶¶ 29-32, 35, 43-48)  Shortly after filing the Gilroy action, in an August 23, 2004 letter to Kotva, Weiss stated he would sell Brookdale's stock for 131 million Czech crowns ("CZK") ($5.6 million USD) and would "attempt to influence Gilroy to withdraw the complaint questioning the ownership of assets by Kotva."  (Complaint ¶29)  Weiss in fact conditioned the sale "on withdrawal of the existing lawsuit where Gilroy is present."  (Id.)  In November 2004, Weiss raised his demand to 295.75 million CZK ($12.7 million USD).  (Complaint ¶30)  When Kotva balked, Weiss directed a second shell company, KT, to file a second action against Kotva which mirrored the Gilroy action.  (Complaint ¶¶ 31-32)  In all his communications to Kotva, Weiss denied any connection with Gilroy or KT, but stated that he would "influence" the companies if Brookdale's shares were purchased for $12.7 million.  (Complaint ¶¶ 29, 30, 35)

In February 2005, Weiss was criminally charged by the Czech government for his role in the blackmailing scheme against Kotva.  (Complaint ¶40)  In a feeble "damage control" effort, Weiss broadcasted a video press conference from Boston on March 15, 2005, abruptly changing his story regarding his control of Gilroy and KT, and now admitting:  "I had no choice but to instruct my lawyers to take appropriate legal actions."  (Complaint ¶41)  Denying that he was out simply to enrich himself at the expense of Kotva, Weiss now claims that "the main goals of the petitions that my lawyers filed in the Czech courts are very simple - to return the assets of Kotva and Trend that were transferred to other entities…"  (Id.)  Multiple written communications, however, prove otherwise.  (Complaint ¶¶ 43-48)

Defendants' extortion scheme has had a cataclysmic effect on Kotva.  The sale of the Shopping Centre was delayed over 8 months, costing Kotva the use of $65.3 million, enormous legal fees, and lost business opportunities.  (Complaint ¶ 37)  When the sale finally closed, the buyer held back $24.3 million (37 % of the sale price), which will not be released until both the Gilroy and KT lawsuits are finally and conclusively resolved by the Czech courts.  (Id.)  In this action, Kotva alleges violations of the Federal Securities and Exchange Act of 1934 (Count I), RICO (Counts II and III), M.G.L. ch. 93A (Count IV), and common law claims of abuse of process (Count V), fraud (Count VI), and tortious interference with advantageous business relations (Count VII).

## ARGUMENT

### I.    The Standard

The Court must accept all of Kotva's factual averments as true and afford Kotva all favorable inferences in deciding a motion for judgment on the pleadings.  See Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir.1988); Castucci v. United States, 311 F.Supp. 2d 184, 186 (2004).  This standard requires denial "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Rivera-Gomez, 843 F.2d at 635.

### II.    Kotva Properly Plead Damages Caused By The Weiss Defendants' Blackmail Scheme

Kotva is not required to specify its damages at this early stage of the litigation.  See Fed. R. Civ. P. 8, 54(c); Falk v. Levine, 60 F.Supp. 660, 663 (D. Mass. 1945) (denying motion to dismiss); Bontkowski v. Smith, 305 F.3d 757, 762 (7th Cir. 2002) (under Rules 8(a)(3) and 54(c), plaintiff is only required to allege that it suffered damages as a result of defendants' conduct).  Rather, Kotva is merely required to plead that it has suffered damages as a result of the Weiss Defendants' misconduct, which it has done.  See e.g. (Complaint ¶¶ 54, 68, 76, 83, 87).  Indeed, Kotva has surpassed the notice pleading required and alleged specific categories of damages, including the loss of use of the sale proceeds; attorneys' fees in defending the Gilroy and KT actions; lost business opportunities; attorneys' fees in this action; statutory damages; exemplary damages; and pre and post judgment interest. (e.g., Complaint ¶¶ 37-38, p. 20)

Undaunted, the defendants contend that Kotva's Complaint must be dismissed because the Shopping Centre was ultimately sold by SPV Co (a subsidiary holding company), and baldly assert the following:

6

> It is indisputable that Kotva's sole role under the contract for the sale of the Shopping Centre was to guarantee certain obligations. Kotva was not to receive a dime from the sale of the Shopping Centre.

(Memo at 6). In making this statement, the defendants simply ignore the express terms of the Share Purchase Agreement ("SPA"), which obligates Kotva to perform all obligations under the Agreement,[1] and permits Kotva to exercise rights to the sale proceeds:

> If the nature of rights and obligations under this Agreement enables so, [SPV Co.'s] rights and obligations under this Agreement may be fulfilled and exercised by Kotva and the Buyer's rights and obligations under this Agreement may be fulfilled and exercised by Markland.
>
> [SPV Co.] and Kotva are jointly and severally liable for the fulfillment of the obligations of either of them arising out of this Agreement. Kotva, KAS and KOP jointly and severally guarantee the fulfillment of [SPV Co.'s] and Kotva's obligations arising out of this Agreement. The buyer and Markland are jointly and severally liable for the fulfillment of the obligations of either of them arising out of this Agreement.[2]

SPA §§ 2.5, 2.6. (emphasis added).

In short, by the Share Purchase Agreement's very terms, Kotva is the real party in interest and may assert claims for loss of the sale proceeds. Furthermore, it is black letter law that a parent company may sue for the lost profits and/or diminished value of its subsidiary. See, e.g., Foster-Miller, Inc. v. Babcock & Wilcox Canada, 210 F.3d 1, 16 (1st Cir. 2000) (discussing these two damages models); Eateries, Inc. v. J.R. Simplot Co., 346 F.3d 1225, 1229 (10th Cir. 2003) (affirming diminution in value damages suffered by parent as a result of harm to wholly owned subsidiary).

---

[1] As alleged in the Complaint, Kotva was the ultimate seller of the Shopping Centre. (Complaint ¶¶ 16-18) Indeed, Kotva bears the primary obligations under the SPA. Kotva must transfer the shares of KN (as well as its two trademarks) to SPV Co. as a condition precedent to the sale. See SPA §3.1.1. Kotva also must make nearly forty 40 separate representations and covenants, the breach of any of which are grounds for termination. Id. §§ 6, 10.1.

[2] As such, the defendants contention that Kotva's "sole role under the contract for the sale of the Shopping Centre was to guarantee certain obligations of SPV Co" is in a word nonsense. (Memo at 6)

### III.     Kotva Has Properly Asserted A § 10(b) Claim

The defendants seek dismissal of Kotva's securities claim (Count I) on the theory that

Kotva purportedly failed to allege that it relied upon a knowingly false statement.   (Memo at 9).

The protection of §10(b) of the Exchange Act of 1934, however, is not limited to fraudulent

statements or omissions made during the sale of a security.  The statutory language itself

prohibits not only misrepresentations and omissions, but also any "device, scheme or artifice to

defraud" and any other "act, practice, or course of three distinct primary violations" that

"operates … as a fraud or deceit."  15. U.S.C. §78j.  This Court discussed these separate

violations in In Re Lernout & Hauspie Securities Litigation, 230 F.Supp. 2d 152 (D. Mass 2002):

> It is true that 10b-5 primary liability encompasses more than material
> misstatements.  Central Bank itself references all three subsections of the statute,
> and describes "employ[ment of] a manipulative device" and "commit [ting] a manipulative or
> deceptive act," as primary violations.  511 U.S. at 191, 114 S.Ct. 1439.  SEC v. Zandford, a more
> recent case, underscores the principle that "the statute should be construed not technically and
> restrictively, but flexibly to effectuate its remedial purposes."  535 U.S. 813, 122 S.Ct. 1899,
> 1903, 153 L.Ed.2d 1 (2002) (internal quotations omitted).  "Neither the SEC nor [the Supreme]
> Court has ever held that there must be a misrepresentation about the value of a particular security
> in order to run afoul of the Act …. Congress meant to bar deceptive devices and contrivances in
> the purchase or sale of securities whether conducted in the organized markets or face to face.

Id. at 174.  See also, A.T. Brod & Co. v. Perlow, 375 F.2d 393, 396-97 (2d Cir. 1967) ("We

believe that §10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the

purchase or sale of securities, whether the artifices employed involve a garden type variety of

fraud, or present a unique form of deception.  Novel or atypical methods should not provide

immunity from the securities laws.")

Here, the Complaint specifically alleges that the primary violations of 15 U.S.C. §78j are

under subsections (1) and (3), and not subsection (2) relating to misrepresentations or omissions.

(Complaint ¶50).  In short, this is yet another example of the defendants setting up, and then

knocking down, a straw man.

The defendants also argue that Kotva lacks standing to assert a securities fraud claim because it "did not buy or sell securities." (Memo at 8). But, the defendants again rely on an overly restrictive view of both the law and Kotva's Complaint. The United States Supreme Court has recently confirmed that:

> Under our precedents, it is enough that the fraud alleged "coincide" with a securities transaction - - whether by the plaintiff or by someone else. See <u>O'Hagan,</u> 521 U.S., at 651, 117 S.Ct. 2199. The requisite showing, in other words, is "deception 'in connection with the purchase or sale of any security,' not deception of an identifiable purchaser or seller." <u>Id.,</u> at 658, 117 S.Ct. 2199. Notably, this broader interpretation of the statutory language comports with the longstanding views of the SEC. See <u>Zandford,</u> 535 U.S., at 819-820, 122 S.Ct. 1899.

<u>Merrill Lynch, Pierce, Fenner & Smith v. Dabit</u>, 126 S.Ct. 1503, 1513 (March 21, 2006).

For purposes of Rule 10b-5, moreover, the terms "buy" and "purchase" each include "any contract to buy, purchase or otherwise acquire." 15 U.S.C. §78c(a). <u>See</u> <u>also</u>, <u>The Wharf (Holdings) Limited v. United International Holdings, Inc.</u>, 532 U.S. 588, 595 (2001) (affirming 10(b)(5) judgment for breach of an oral contract to sell securities, noting "[t]he [Securities] Act itself says that it applies to "any contract' for the purchase or sale of a security").

Here, the defendants' fraudulent scheme was "in connection with" Kotva's contract to sell SPV KN shares to Markland. (Complaint ¶ 25).[3] Indeed, the defendants' own attachment to its motion - - the Share Purchase Agreement - - demonstrates that Kotva (through its subsidiary), sold 97% of the shares in SPV KN to Markland. This contract to sell securities gives Kotva

---

[3] The private nature of the transaction affords no immunity from the anti-fraud provisions of the securities laws is well established." <u>Collins v. Rukin</u>, 342 F.Supp. 1282, 1287 (D. Mass. 1972); <u>Sulkow v. Crosstown Apparel, Inc.</u>, 807 F.2d 33 (2d Cir. 1986) (vacating motion to dismiss securities fraud claim involving purchase of stock, with limitations on negotiability and pledgibility, in closely held company with three shareholders); <u>Bronstein v. Bronstein</u>, 407 F.Supp. 925, 931 (E.D. Pa. 1976) ("it is well-settled that section 10(b) applies face to face transactions between private individuals and outside the organized securities markets.")

standing to assert securities violations against defendants, and the motion to dismiss Count I

fails. <u>Wharf</u>, 532 U.S. at 595.[4]

### IV.    Kotva Has Plead Fraud With Particularity

Common law fraud is broader than mere false representations as defendants contend

(Memo at 9-10).  "[F]raud may be defined to be any artifice whereby he who practises it gains,

or attempts to gain, some undue advantage to himself, or to work some wrong or do some injury

to another, by means of a representation which he knows to be false, <u>or of an act which he knows

to be against right or in violation of some positive duty</u>. <u>Commonwealth v. O'Brien</u>, 305 Mass.

393, 398-399 (1940) (emphasis added; quotation omitted).  Further, it is well settled that "[f]raud

may be proved by the acts and conduct of a party quite as effectively as from their declarations."

<u>Price v. Rosenberg</u>, 200 Mass. 36, 43 (1908); <u>see</u> <u>also</u> <u>Margaret Hall Foundation, Inc. v. Atlantic

Fin. Mgmt., Inc.</u>, 572 F.Supp. 1475, 1480-1481 (D. Mass 1983) (allowing claims based on

fraudulent activity in addition to fraudulent representations/omissions and noting "informational

fraud" and "fraudulent activity" as separate bases for claims fraud.)  Here, defendants' scheme to

blackmail Kotva to accede to his improper demands, including the "act" of filing sham lawsuits,

amounts to fraud.  Thus, the motion to dismiss Count VI fails.

### V.    Kotva Has Properly Plead Its RICO Claims

To state a civil RICO claim, Kotva need only allege (1) an injury to its business or

property (2) caused by the defendant's involvement in an enterprise (3) engaged in a pattern of

racketeering activity or the collection of an unlawful debt.  <u>Lemelson v. Wang Laboratories</u>, 874

---

[4] Kotva also alleged that "[a]n essential act of the Weiss Defendants' stock fraud scheme was the purchase of nominal shares of Kotva by Gilroy and KT."  (Complaint ¶51).  Contrary to defendant's argument, Kotva does <u>not</u> contend that these purchases "confer standing on Kotva."  (Memo at 9 n6).  Rather, Kotva was demonstrating that the defendants are legally culpable "control persons" of KT and Gilroy - - which the defendants have all but conceded.  (Opposition to Kotva's Motion to Compel at 2-4, 11 n.27).

F.Supp. 430, 432 (D.Mass 1994) (denying motion to dismiss RICO claim).  RICO defines

"racketeering activity" as any act or threat involving specified state law-crimes, any act

indictable under specified federal statutes, and certain federal offenses, including extortion, mail

fraud and wire fraud.  18 U.S.C. §1961(1).  The statute further defines a "pattern of racketeering"

as "at least two acts of racketeering activity" within a ten year period.  18 U.S.C. §1961(5).

Thus, to plead a "pattern of racketeering" plaintiff must merely allege "at least two racketeering

predicates that are related and that amount to, or threaten the likelihood of continued criminal

activity."  H.J., Inc. v. Northwestern Bell Telephone, 492 U.S. 229 (1989) (reversing dismissal of

RICO claim).

 Predicate acts are related if they have the "same or similar purposes, results, participants,

victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics

and are not isolated events."  Id., at 240.  Accordingly, pleading relatedness merely requires "[a]

fact-specific allegation of a single common scheme."  M&I Heat Transfer Products, LTD. v.

Wilke, 131 F.Supp.2d 256, 261 (D. Mass. 2001) quoting Feinstein v. Resolution Trust Corp., 942

F.2d 34, 44-45 (1st Cir. 1991).  Predicate acts amount to or threaten the likelihood of continued

criminal activity when they are "part of the regular way of doing business for an ongoing entity

such as a criminal association or legitimate business" or "they are a regular way of conducting or

participating in an ongoing RICO enterprise."  H.J., Inc., 492 U.S. at 230.

 As detailed below, Kotva has properly alleged each element of a civil RICO claim.

(Complaint ¶¶ 55-68)  Specifically, Kotva has alleged several predicate acts (including filing of

the Gilroy suit, filing of the KT suit, extortion in violation of the Hobbs Act and M.G.L. ch. 265

§25, mail fraud, and wire fraud).  These predicate acts are related to the common scheme of

using "strike suits" to block corporate transactions as a lever for extortion.  (Complaint ¶¶ 20-25,

27-40, 55-68)  Kotva has further alleged that there is a likelihood of continued criminal activity because the defendants have used this exact scheme to extort other targets.  (Complaint ¶¶ 20, 67).

> <u>Litigation Can Constitute Wrongful Means For Purposes Of RICO Extortion</u>

The defendants initial blunder is claiming that "the threat of litigation or the filing of litigation cannot serve as the basis for a charge of extortion under the Hobbs Act or as a RICO predicate act."  (Memo at 10)  The First Circuit and the District of Massachusetts have held that the filing of litigation can constitute "wrongful means" for purposes of RICO extortion. <u>Gonzalez-Morales v. Hernandez-Arencibia</u>, 221 F.3d 45, 51-52 (1st Cir. 2000) (recognizing that filing of suits may constitute RICO extortion in some instances) <u>citing</u> <u>Lemelson</u>, 874 F.Supp. at 433-34 (denying motion to dismiss where counterclaim plaintiff alleged that litigation was part of extortionate scheme that was furthered by enterprises repeated use of mail and wires).[5]  In <u>Lemelson</u>, Judge Sterns recognized the filing of vexatious litigation as an integral part of those racketeering scheme:

> DG contends that the plaintiff has extorted millions of dollars in settlement monies through a pattern of litigation involving infringement claims based on fraudulently obtained patents.  DG alleges that the predicate acts are the enterprises' repeated and continuing use of the United States mails and the interstate use of the telephone wires to further this extortionate scheme.  DG's RICO counterclaim meets the threshold requirements of Fed. R. Civ. P. 12(b)(6) and the plaintiff's motion to dismiss will be DENIED.

<u>Id.</u> at 434.  Judge Sterns further noted that the cost of defending against the litigation is properly recoverable as a RICO injury:

---

[5] <u>See</u> <u>also</u>, <u>Hall American Center Associates Limited Partnership v. Dick</u>, 726 F.Supp. 1083, 1096 (E.D. Mich. 1989) ("The implicit threat was that, should the plaintiff refuse to sell the Property, the Property would be tied up in litigation, the Joint Venture would collapse, the mortgage would be foreclosed, the high interest payments would continue to be owed, and the Property would be lost completely.  Viewing the allegations in the complaint as true, the court cannot say that the plaintiffs have failed to allege a predicate act under the Hobbs Act.").  Indeed, <u>Hall</u> cites the First Circuit's decision in <u>U.S. v. Sturm</u>, 870 F.2d 769, 774 (1st Cir. 1989) for the proposition that "[t]he implicit thrust of <u>Sturm</u>, albeit dicta, is that a threat to sue may constitute extortion under the Hobbs Act."

> DG alleges that the taxing of victims with the prospects of vexatious
> litigation is an integral component of the racketeering scheme.  Where,
> as here, the institution of a lawsuit is alleged to be an instrument of
> racketeering activity, I hold that the costs incurred in investigating and
> defending that litigation are a sufficient RICO injury to satisfy the
> indulgent pleading requirement of Rule 12(b)(6).

Id. at 433.

Here, like in Lemelson, the KT and Gilroy litigation were an integral part of the extortion scheme and, thus, constitute predicate acts under RICO.  The Complaint alleges that "[t]he sole purpose of the lawsuit was to block the property's sale and give the defendants leverage against Kotva."  (Compl. ¶20)  The defendants challenged the transfer after they learned of the potential sale to Markland and Kotva refused to buyback their shares at a grossly inflated price. (Complaint ¶¶ 15, 20, 21-24, 42)  The defendants, moreover, admitted that the litigation was part of their strategy to squeeze Kotva:

> We can show that if they [Kotva] do not settle with us, their cost of
> financing will be very high; and they will pay most of this increased cost
> since we have only 11% of the shares…**If they [Kotva] do not settle,
> they will be able to realize the value of the property only in several
> years**, which will be diminished by the discount rate and discounted
> probability of winning the lawsuits.

(Complaint ¶ 45 quoting an October 20, 2004 email from WAM to Hoffman) (emphasis added). The use of the Gilroy and KT lawsuits to extort Kotva is the same "wrongful means" that was used in Lemelson and found to constitute a RICO predicate act by Judge Sterns.  Lemelson, 874 F.Supp. at 433.  Accordingly, Kotva has properly pled extortion as a predicate act, and the defendants' motion must be denied.[6]

---

[6]  The cases cited by defendants are inapposite.  For instance, in Di Giambattisa v. McGovern, 1992 WL 214444 *1, *4 (1st Cir. 1992), the plaintiff was the trustee of a revocable trust and of the settlor's estate.  After his siblings successfully petitioned Probate Court to remove him as trustee, he sued both the Probate Judges and his siblings for violating RICO.  Again, the Court properly dismissed his claims.  Similarly, in Dias v. Bogins, 1998 WL 13089 *1 (1st Cir. 1998) the plaintiff was harassing the defendant with frivolous litigation.  The defendant obtained an injunction, and the plaintiff then sued her for violating RICO.  The Court dismissed his claim, noting that he had not alleged anything close to commercial extortion.

The basis of Kotva's RICO claim, moreover, extends beyond the "threat of litigation" and includes the defendant's threat to "cause severe economic harm to Kotva's business" unless Kotva purchased their Trend and Kotva shares at a grossly inflated price.  (Complaint ¶¶ 20, 63, 64)  The threatened economic harm included interfering with Kotva's financing, interfering with the sale of the Shopping Centre, and tying up the proceeds from the sale of the Shopping Centre.  (Complaint ¶¶ 45, 63, 64)  This is classic case of extortion, in violation of both the Hobbs Act (the federal extortion statute) and the M.G.L. ch. 265 §25 (the Massachusetts extortion statute).[7]  As such, Weiss' conduct constitutes a predicate act under RICO.

<u>Kotva Has Properly Alleged Mail and Wire Fraud</u>

The defendants next contend that "Kotva has not alleged mail or wire fraud with the requisite specificity required by Rule 9(b)."  (Memo at 12).  But the use of the mail and wires <u>in furtherance of an extortionate scheme</u> constitutes predicate acts under RICO.  <u>Lemelson</u>, 874 F.Supp. at 434 (sufficient to plead that "the predicate acts are the enterprise's repeated and continuing use of the United States mails and the interstate use of telephone wires to further this extortionate scheme.").  In this context, Kotva is only required to allege the general extortion scheme and that the Weiss Defendants used the mail and wires to further that scheme, which it has done.  (Complaint ¶¶ 65-66)  <u>New England Data</u>, 829 F.2d at 291 (reversing dismissal for failure to plead RICO mail fraud with particularity).  Indeed, the Court in <u>New England Data</u> reasoned as follows:

---

[7] Extortion is the use of wrongful means to obtain a wrongful objective.  <u>United States v. Clemente</u>, 640 F.2d 1069, 1076 (2d Cir.1981) <u>citing</u> <u>United States v. Enmons</u>, 410 U.S. 396, 93 S.Ct. 1007 (1973)).  Extortion often involves the threat of economic injury to obtain property to which one has no lawful claim.  <u>Enmons</u>, 410 U.S. at 400; <u>Viacom International, Inc. v. Baruch</u>, 747 F.Supp. 205, 210 (S.D. N.Y. 1990).  The wrongful means, however, need not be illegal in an of itself.  Rather, activities that would otherwise be lawful may constitute "wrongful means" when they are used to obtain an "improper objective" as part of an extortionate scheme.  <u>Id</u>. at 211-12 (under the Hobbs Act, activities that are not inherently unlawful can constitute wrongful means of obtaining property…What converts otherwise lawful business activity into "wrongful means" is the use of that activity to obtain property to which defendants have no lawful claim.)

> Where there are multiple defendants, as here, and where the plaintiff was not directly involved in the alleged transaction, the burden on the plaintiff to know exactly when the defendants called each other or corresponded with each other, and the contents thereof, is not realistic. **Plaintiff here provided an outline of the general scheme to defraud and established an inference that the mail or wires was used to transact this scheme**; requiring plaintiff to plead the time, place and contents of communications between the defendants, without allowing some discovery, in addition to interrogatories, seems unreasonable.

Id.  In fact, Kotva's Complaint identifies several specific letters and emails sent by the defendants in carrying out their scheme, (e.g., Complaint ¶¶ 21, 27-31, 33-34), which they admit sending (e.g., Answer ¶¶ 27-30, 33-34).  Defendants also admit to communicating from Boston with their agents in the Czech Republic (including Vladimir Hoffman) via email.  (Answer ¶22; Memorandum in Opposition to Kotva's Motion to Compel at 3 ("various present and former employees of Weiss Capital LLC, including Andrew Weiss, David Johnson, and Georgiy Nikitin and others, communicated with Hoffman by email."))[8]  In sum, Kotva has properly alleged mail and wire fraud as predicate acts under RICO.  New England Data, 829 F.2d at 291; Lemelson, 874 F.Supp. at 434.

<u>Kotva Has Properly Alleged A Pattern Of Racketeering Activity</u>

Kotva's RICO allegations do <u>not</u> "stem from a single alleged blackmail scheme" and, contrary to defendants' bald assertions, Kotva has properly alleged a "pattern" of racketeering activity.  (Memo at 14)  To establish a pattern, Kotva need only show that the predicate acts are part of the regular way of conducting or participating in the defendants' ongoing RICO enterprise.  H.J., Inc., 492 U.S. at 230.  Here, the Complaint specifically states that Weiss told Kotva that he had extorted other companies, including an investment in Kazakhstan where his

---

[8] Additionally, Kotva is entitled to the reasonable inference that the defendants also communicated with their agents in the Czech Republic via the mail and wires.  See New England Data Services, Inc. v. Becher, 829 F.2d 286, 291 (1987) ("defendant Monarch Investments is incorporated in a different state than that resided in by the other defendants.  In this day and age, it is difficult to perceive how the defendants would have communicated without the use of the mail or interstate wires.")

target "begged him to stop." (Complaint ¶20) This allegation and the reasonable inferences therefrom, satisfy Kotva's pleading requirements. H.J., Inc., 492 U.S. at 230.

In discovery, Kotva has sought information about defendants' other targets, including IPB/Domenana (another Czech company), where he employed a virtually identical extortion scheme.[9] The defendants' blackmail of IPB/Domenana , which is detailed in Kotva's Civil RICO case statement, also involved the use of litigation to block a corporate transaction. Just as they did with Kotva, the defendants used the litigation as a lever to force a buy back of their shares at a price significantly higher than market. In short, Kotva was not the defendants' first victim, and it probably will not be their last.

<u>Kotva's RICO Claim Is Not Barred By the Securities Litigation Reform Act</u>

Finally, Kotva's RICO claims are not barred by the Private Securities Litigation Reform Act at this stage of the litigation, as defendants contend. (Memo at 15). It is well settled that a plaintiff may plead potentially inconsistent theories of recovery. See Fed. R. Civ. P. 8(e)(2); Gens v. Resolution Trust Corp., 112 F.3d 569, 573 & n.4 (1st Cir. 1997); Q Division Records, LLC v. Q Record and QVC, Inc., 2000 WL 29847 *7 (D. Mass. Feb. 11, 2000). That the success of one claim may preempt another is no grounds for a dismissal. Q Division, 2000 WL 29847 *7 (denying motion to dismiss alternative state law dilution of trademark claim that would be preempted if federal trademark infringement claim prevailed). Indeed, in Q Division Judge

---

[9] Not surprisingly, defendants have resisted this discovery—and even claimed that their motion for judgment on the pleadings must be decided first. (Opposition to Kotva's Motion to Compel at 15-16) This discovery, however, relates directly to defendants' predicate acts as well as the threat of their continued criminal activity. Libertad v. Welch, 53 F.3d 428, 438 n.5 (1st Cir. 1995) ("nowhere in either the text of RICO or the case law is there any suggestion that *each victim* of an alleged pattern of racketeering activity must have suffered at least two predicate acts at the hands of the defendant. In fact, adopting such a requirement would conflict with the statute's purpose and seriously curtail the statute's intended breadth. Under the Appellees' proposed scheme, a defendant could avoid RICO liability simply by continually choosing new targets for his unlawful activities, a result that Congress could not have intended.") Given that this information is solely in the possession of the defendants, it is unfair for them to withhold the information while at the same time seeking a dismissal based on a failure to allege the requisite predicate acts and the particulars of that identical scheme. At a minimum, the Court should permit the discovery and allow Kotva an opportunity to amend. See New England Data, 829 F.2d at 291.

O'Toole reasoned:

> Q Division has also represented that its musical recordings are similar and directly competitive with those of Q Records that it intends to prove this in support of its trademark infringement claims, and that it has pled the state law dilution claims as a fallback position in case it is unsuccessful on this point. This is an acceptable example of pleading alternative and potentially inconsistent theories of recovery. The proof of the case may pan out in a direction that would support these claims. At this early state of the litigation it would not be prudent to void them.

Q Division, 2000 WL 29847 *7 (citations omitted).

Like the plaintiff in Q Division, Kotva has also pled alternative and potentially inconsistent theories of recovery. While Kotva may not be able to recover on both claims, it certainly is permitted to plead them in the alternative.

**VI.    Kotva's 93A Claim is Not Barred By Law of the Case Doctrine**

The defendants assert that Kotva's Chapter 93A claim must be dismissed under the "law of the case doctrine," because the Court dismissed their Chapter 93A claim. (Memo at 14). This argument, however, misconstrues the "law of the case doctrine" and ignores the fundamental differences between the two 93A claims.

"The 'law of the case' doctrine reflects the reluctance of a second judge to rule differently from the first judge on a case, issue, or question of fact or law once decided by final judgment or on appeal." Vittands v. Sudduth, 49 Mass. App. Ct. 401, 413 n.19 citing King v. Driscoll, 424 Mass. 1, 7-8 (1996). Application of the doctrine, moreover, is permissive and not mandatory. Potter v. John Bean Div. of Food Mach. & Chem. Corp., 344 Mass. 420, 427 (1962). Here, the issue of whether Kotva's Chapter 93A claim constitutes an intracompany dispute has never been decided by the Court and, thus, the doctrine is inapplicable.

Whether a transaction is a private business venture and, therefore, not actionable under the statute, depends upon a careful analysis of the particular circumstances of each case.

17

Quinton v. Gavin, 64 Mass. App. Ct. 792, 797-98 (2005). Here, the defendants challenged the transfer of Kotva's Shopping Centre to its subsidiaries, and alleged corporate looting. Those types of claims typify a private intracompany dispute. In sharp contrast, Kotva's 93A claim concerns the defendants' extra enterprise scheme to extort millions of dollars. That scheme was hatched by Weiss and WAM, neither of whom are shareholders in Kotva. It involved the participation of multiple corporate entities including Gilroy, KT, CVF, and BGO. It also relied upon the reaction of third parties (e.g., Markland and Kotva's financing agents) to exert the necessary pressure on Kotva. And its goal was the forced purchase of BGO's shares in both Kotva **and Trend** (a different Czech company). In short, the circumstances giving rise to Kotva's 93A claim fall outside the "private dispute" exemption to Chapter 93A §11. Grand Pacific Finance Corp. v. Bramer, 57 Mass. App. Ct. 407, 416 n.7 (2003) (reversing dismissal of c.93A claim because "private dispute" exemption does not apply when there are "multiple corporate entities and business people involved in the extra enterprise dealings. . ."). Accordingly, judgment on the pleadings must be denied.

### VII.    At A Minimum, Kotva is Entitled to Replead to Address Any Deficiencies

In the event that the Court determines that Kotva's Complaint is technically deficient in any respect, then it should grant Kotva leave to amend. See Fed. R. Civ. P. 15(a) (leave to amend shall be freely granted); Smith v. Mitre Corporation, 949 F.Supp. 943, 945 (D. Mass. 1997) (granting leave to amend). Indeed, this Court has repeatedly granted leave to amend where technical pleading deficiencies are curable. See, e.g., Chapin v. University of Massachusetts at Lowell, 977 F.Supp. 72, 82 (D.Mass. 1997) (Lindsay, J.); Chatman v. Gentle Dental Center of Waltham, 973 F.Supp. 228, 236 (D.Mass. 1997) (Lindsay, J.). Leave to amend, moreover, is particularly appropriate here because Kotva has yet to amend its Complaint, the

defendants have been given adequate notice of Kotva's claims, the case is still in discovery and

no trial date has been set, and any  amendments to cure technical deficiencies would not

prejudice the defendants.

## CONCLUSION

For these reasons, the Court should deny the defendants' motion for judgment on the

pleadings.

Respectfully submitted,

KOTVA A.S.

By its attorneys,

/s/ Dana A. Zakarian
Joel G. Beckman (BBO# 553086)
William C. Nystrom (BBO# 559656)
Dana A. Zakarian (BBO# 641058)
Daniel J. Pasquarello (BB0# 647379)
NYSTROM BECKMAN & PARIS LLP
10 St. James Ave., 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: May 23, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non registered participants on this 23rd day of
May, 2006.

/s/ Dana A. Zakarian