UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s., )<br><br>Plaintiff, )<br><br>v. )<br><br>ANDREW WEISS and WEISS ASSET )<br>MANAGEMENT, LLC, )<br><br>Defendants. )<br>_____ )<br>ANDREW WEISS, WEISS ASSET )<br>MANAGEMENT LLC, K T, INC. and CVF )<br>INVESTMENTS, LTD., )<br><br>Counterclaim-plaintiffs, )<br><br>v. )<br><br>KOTVA a.s., MARTIN BENDA, RICHARD )<br>HARAZIM, FORMINSTER ENTERPRISES, )<br>LTD., SPV CO and JOHN DOES 1–5, )<br><br>Counterclaim-defendants. )<br>_____ ) | C.A. No. 05-10679-RCL |

**COUNTERCLAIM-PLAINTIFFS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL
MEMORANDUM IN OPPOSITION TO FORMINSTER'S MOTION TO DISMISS**

Pursuant to Local Rule 7.1(b)(3), counterclaim-plaintiffs Andrew Weiss, Weiss Asset

Management LLC, K T, Inc. and CVF Investments Ltd. (collectively, the "Weiss Parties"),  by

and through their attorneys, hereby move for leave to file a supplemental memorandum in

opposition to Forminster Enterprises Ltd.'s Motion to Dismiss.  In further support of their

Motion, the Weiss Parties state:

1.      On November 14, 2005, Forminster Enterprises Ltd. ("Forminster") filed a motion to dismiss for lack of personal jurisdiction.  This motion was accompanied by the affidavit of Rena David, a nominee director of Forminster who appears to have no independent decision-making capacity.

2.      On December 1, 2005, the Court set a hearing on Forminster's Motion to Dismiss for January 23, 2006.

3.      On December 20, 2006, the Weiss Parties filed a motion seeking jurisdictional discovery from Forminster, among others.  On January 7, 2006, the Special Master denied the Weiss Parties' motion, in part because the motion was "untimely in light of the currently scheduled hearing on the motions to dismiss for lack of jurisdiction and no good cause for the delay has been demonstrated."

4.      On .January 12, 2006, the Court postponed the hearing on Forminster's Motion to Dismiss indefinitely.  On April 25, 2006, the Court rescheduled that hearing for June 19, 2006.

5.      On March 21, 2006, shortly after receiving the transcript of Richard Harazim's deposition, the Weiss Parties filed a motion for leave to file additional materials in opposition to the three pending motions to dismiss for lack of personal jurisdiction.

6.      On April 19, 2006, after exhausting the Rule 37.1 process, the Weiss Parties filed a motion to compel seeking, among other things, an order requiring Kotva to answer an interrogatory and reveal the individuals who stand behind its majority shareholder, Forminster. The interrogatory at issue asks Kotva to "[p]lease identify the legal and beneficial owners of an interest, including shares of stock or a partnership interest, in [Forminster Enterprises Ltd.], for the period from January 1, 2000 until to present."  Kotva's response was: "Unknown."

7.    Kotva claims not to know who owns and controls Forminster, despite describing Forminster in its Annual Report as the "controlling person" of Kotva which exercises "decisive influence" over the management of Kotva.   Martin Benda and Michal Vlach, members of Kotva's governing boards, are former Forminster directors.  Kotva's CEO, Richard Harazim, is a former director of Forminster who also worked for Forminster before becoming one of its directors.  As described in more detail in the accompanying memorandum, Mr. Harazim claims, however, that neither he nor anyone else at Kotva knows who the true owners of Forminster are.

8.    On May 26, 2006, in ruling on the Weiss Parties' Motion to Compel, the Special Master wrote:

> With respect to the motion to compel Kotva to identify the beneficial owners of Forminster, Kotva has answered under oath that it does not know who the beneficial owners are. Similarly, Mr. Harazim, a director of Forminster from November 30, 1999, to October 30, 2002, has testified under oath that he does not know who the beneficial owners are. The corporate veil between Forminster and Kotva has not been pierced, and Forminster's motion to dismiss for want of jurisdiction is still pending. **Arguments asserting the incredibility of Kotva's and Mr. Harazim's responses to date are more properly directed to the Court in connection with the motion to dismiss Forminster.** That said, Kotva is obligated to exercise due diligence to ascertain whether its employees, officers, directors, or agents know the requested information or possess the requested documents. Kotva is hereby ordered to describe the steps it took to respond to interrogatory no. 1 with respect to Forminster, and the individuals whose knowledge is reflected in the response. If the response does not reflect the knowledge of all Kotva employees, officers, directors, and agents, Kotva shall supplement the response forthwith. If someone who happens to be a Kotva agent came by the requested information in some other capacity, and if divulging that information would violate fiduciary or contractual obligations to such other principal, then the information need not be disclosed.

May 26, 2006 Order of Special Master at 13(emphasis added)

9.    In accordance with the Special Master's suggestion, the attached Memorandum brings to the Court's attention the portions of Mr. Harazim's deposition and other discovery that are directly relevant to Forminster's motion to dismiss for lack of personal jurisdiction.

.

Respectfully Submitted,

ANDREW WEISS, WEISS ASSET
MANAGEMENT LLC, K T, INC. and CVF
INVESTMENTS LTD.

By their attorneys,


/s/ Benjamin A. Goldberger
Edward P. Leibensperger (BBO# 292620)
Benjamin A. Goldberger (BBO# 654357)
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts  02109-1775
(617) 535-4000

Dated: June 6, 2006


## CERTIFICATE OF CONSULTATION PURSUANT TO LOCAL RULE 7.1

I hereby certify that counsel for the Weiss Parties conferred with counsel for Forminster Enterprises Ltd. and attempted in good faith to resolve or narrow the issues presented by this Motion, but was unsuccessful.

/s/ Benjamin A. Goldberger
Benjamin A. Goldberger


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 6, 2006.

/s/ Benjamin A. Goldberger
Benjamin A. Goldberger


BST99 1504981-2.072198.0012

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s., | ) |
| Plaintiff, | ) |
| v. | ) |
| ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC, | ) |
| Defendants. | ) |
| | ) C.A. No. 05-10679-RCL |
| ANDREW WEISS, WEISS ASSET MANAGEMENT LLC, K T, INC. and CVF INVESTMENTS, LTD., | ) |
| Counterclaim-plaintiffs, | ) |
| v. | ) |
| KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM, FORMINSTER ENTERPRISES, LTD., SPV CO and JOHN DOES 1–5, | ) |
| Counterclaim-defendants. | ) |

## COUNTERCLAIM-PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO FORMINSTER'S MOTION TO DISMISS

The plaintiff's CEO, Richard Harazim, worked for Forminster in one capacity or another from approximately 1998 to 2002 and served as one of Forminster's directors from 1999 to 2002. Mr. Harazim claims that he no longer represents Forminster. He further claims that neither he nor anyone else at Kotva knows who owns and controls Forminster, despite the fact that Forminster is Kotva's controlling shareholder. As described in more detail below, these assertions are simply not credible. Applying the prima facie standard for purposes of

Forminster's Motion to Dismiss, the Court should draw the inference that Forminster representatives including Mr. Harazim were the driving force in the decision to initiate this lawsuit in Massachusetts, thereby subjecting Forminster to the jurisdiction of this Court.

## I.    RICHARD HARAZIM'S CONNECTION TO FORMINSTER

Mr. Harazim testified that he worked for Forminster for three years, including two as a director, from approximately 1998 until he resigned in 2002.  Harazim Dep., 29:2–21 (attached hereto as Exhibit A).  The only people at Forminster with whom Mr. Harazim ever spoke were lawyers from a single law firm and Martin Benda.  *Id.* 30:9–30:24, 112:21–114:2.  Mr. Benda, like Mr. Harazim, was a director of Forminster who was installed as a member of Kotva's governing board.  *See* Exhibit B.  In 2002, all four of Forminster's directors, including Messrs. Benda and Harazim, as well as Michal Vlach, who was the chairman of Kotva's board of directors when the main events described in Kotva's complaint took place, resigned.  *Id.*  They were replaced by nominee directors operating out of a law firm in Nicosia, Cyprus.[1]  These nominee directors, including the director who submitted an affidavit in support of Forminster's Motion to Dismiss, appear to be nothing more than marionettes.  The individuals holding the

---

[1] When Messrs. Benda and Harazim first became directors of Forminster, Forminster's Secretary was Indilaw Secretarial Limited, which lists its address as 4 Diagorou Street, Kermia House, 6th Floor, Flat 601, 1097 Nicosia, Cyprus.  Indilaw Secretarial Limited has remained Forminster's Secretary at least through July 2005, and remains at the same address.  All four of Forminster's replacement directors—Doxa Pericleous, Rena David, Anthony Indianos and Andreas Papasiantis—also list their "residential addresses" as 4 Diagorou Street, Kermia House, 6th Floor, Flat 601, 1097 Nicosia, Cyprus.  *See* Exhibit B.  Anthony Indianos is a Cypriot lawyer, who heads the law firm Costas Indianos & Co.  *See* Exhibit C.  The address of the Costas Indianos firm is also 4 Diagorou Street, Kermia House, 6th Floor, Flat 601, 1097 Nicosia, Cyprus.  *Id.* at 1.  This firm appears to be in the business of providing nominee directors and a Cypriot mailing address to those who wish to control a company anonymously.  Using Google to search for the Costas Indianos firm's address, one can find multiple companies claiming to be located at this address.  Notably, the company listed in Kotva's 2002 annual report as the next largest Kotva shareholder behind Forminster can also be found at the Costas Indianos law firm.  *See* 2002 Annual Report at 4 (attached hereto as Exhibit D).

strings for Forminster are most likely in the Czech Republic, but their identities remain a mystery.

The individuals who control Forminster—and through Forminster, Kotva—may have good reason to hide their identities. Ever since Forminster became involved with Kotva and installed Messrs. Benda and Harazim as officers and directors of Kotva, Kotva has been at the center of a number of suspicious events. Vladimir Hoffmann—a Czech who was working with some of the Weiss Parties from 2003 to 2004—summarized these events in an October 2004 memorandum, listing the following as "unusual events" in Forminster's history:

> 13 6 1998 - CEO of Kotva Jindrich Zeleznik suddenly died at the age of 52
> 25 10 1998 - Chalet of Martin Benda exploded
> 27 10 1998 - Car of Bronislav Becka (CIH) exploded
> 1998 - Flow East representatives claimed they were threatened and spied
> 30 8 1999 - Explosion in the sixth floor of Kotva near the office of the board
> Aug 2000 - Investigator Blahoslav Kavka committed suicide
> March 2001 - Prosecutor Vladislav Kusala resigned
> 2002 - Martin Razim, bankruptcy trustee of Trend resigned, privately claimed that he was threatened

Exhibit E.

At the time Forminster began to assert control over Kotva, it appears that two rival boards—one associated with Forminster and one associated with another company called Czech Investment Holding ("CIH")—were battling for control over Kotva. Mr. Harazim had the following to say with respect to Mr. Bečka,:

> Q.   Who is that?
>
> A.   Mr. Bechka is a businessman, who attracts bad luck. He was shot in the head. He had a crash in a helicopter.
>
>          * * * *
>
> Q.   And what connection did he have with

Kotva?

A.   He was somehow involved with Czech investment holding, and he served on the board of Kotva for some time.

* * * *

Q.   And you said it was a famous story about him being shot in the head?

A.   Well, he wasn't shot in the head.  That was the famous about it, because he was shot in the back, but he was shot from a very light weapon, so there were all sorts of discussions, where there was a lover or it was commercial or it was this or that.

* * * *

Q.   And were there claims in the press that he was shot in connection with a business transaction?

A.   There were wide speculations about from all possible angles.

Q.   And did the speculation include the controversy over whether Forminster rightly held Kotva shares?

MR. BECKMAN:  Objection.

A.   The speculations were that this might have been because of his commercial disputes.  Kotva was named.  Chik [phonetic] was named.  Other companies were named.

Harazim Dep., 386:15–388:21.[2]

It is indisputable that Kotva is controlled by Forminster. Forminster controls a majority of Kotva's shares; Richard Harazim and Martin Benda, the CEO and Chairman of K-T-V's Supervisory Board, were directors of Forminster when they were installed at Kotva; and Michal Vlach, the Chairman of Kotva's Board of Directors, is a former Forminster director who continues to hold a power of attorney to act on behalf of Forminster.[3] Should there be any doubt, Kotva's annual report admits in plain language that Forminster is the "controlling person" of Kotva and, in that capacity, exercises "decisive influence" over the management of Kotva.[4] Mr. Harazim's claim that no director, officer, supervisory board member or employee of Kotva knows who owns and speaks for Kotva's controlling shareholder is simply not believable.

## II.    FORMINSTER'S EFFORTS TO PURCHASE THE BGO SHARES

Since 2001, Forminster—through Richard Harazim—has been in negotiations to purchase the shares in Kotva owned by CVF Investments Ltd. (the "BGO Shares"). These

---

[2] With respect to the bomb that exploded at Kotva, Mr. Harazim states:

```
        Q.    At some time, did a bomb explode in
Mr. Benda's office?
        A.    Sometime before 2000, as well, yes.
                        * * * *
        Q.    Did you ever talk with Mr. Benda about
that?
        A.    Yes.
                        * * * *
        Q.    Did Mr. Benda tell you who he thought had
caused the explosion?
        A.    No.
```

Harazim Dep., 389:6–390:3.

[3] Harazim Dep., 349:2–16; Exhibit F (translation of relevant portion of Kotva 2004 Annual Report).

[4] Harazim Dep., 352:9–354:24.

negotiations are at the core of this case.  Although Mr. Harazim acknowledges his role on behalf of Forminster in the past, he contends that he was representing Kotva rather than Forminster in 2003 and 2004 when negotiating with Andrew Weiss and Vladimir Hoffmann.  As explained below, this claim is simply not believable.  Messrs. Weiss and Hoffmann always understood that Mr. Harazim was representing Forminster, as evidenced by emails authored well before any litigation was filed.  Moreover, Mr. Harazim admits that Kotva cannot, as a matter of Czech law, purchase the BGO shares.  Thus, Mr. Harazim must have been representing some third party in the negotiations for the plaintiff's allegations of blackmail to make any sense.

In 2001, while Mr. Harazim was a director of Forminster, he negotiated a deal in which Forminster would purchase the BGO Shares—the shares at the heart of Kotva's claim and CVF Investments' counterclaim.  Mr. Harazim testified as follows:

> Q.   All right.  This morning you testified about a period of time when Mr. Golden was on the board of Kotva?
>
> A.   Yes.
>
> Q.   And it was during that period of time you were on the board of both Kotva and Forminster, correct?
>
> A.   Correct.
>
> Q.   Did you talk with Mr. Golden then about the possibility of Forminster buying the BGO shares?
>
> A.   Yes.
>
> Q.   What did you say and what did he say about that possibility?

A.    Once again, I can't remember what exactly
was said, but the principle was that Forminster would
buy shares of BGO, and if I remember correctly, there
was some option for the shares of Trend on the
question.  The business terms were agreed in principle,
but for some reason, later on the transaction just
didn't come through.

Q.    Can you place this in time, to the best of
your memory?

A.    2001.

Q.    And what were the business terms that you
had agreed upon?

A.    I don't remember correctly.  Very roughly,
I would say that Forminster offered like 50 million,
and I don't know if it was for the whole thing or if it
was just for the shares of Kotva.

Q.    50 million Czech crowns?

A.    Czech crowns.

Q.    That's a number that sticks in your head?

A.    (Witness nodded.)  That's a number that I
have in my head, yes.

Harazim Dep. 136:18–138:3.[5]

---

[5] Looking at average currency conversion rates in 2001, fifty million Czech crowns was the
equivalent of approximately $1.3 million.

Two years later, in the fall of 2001, Mr. Harazim and Mr. Hoffmann resumed negotiations over the purchase of the BGO Shares. On September 2, 2003, Mr. Hoffmann wrote:

> I have been contacted yesterday by Richard Harazim - CEO of Kotva, who would like to talk. **I believe, that we could be able to negotiate some sort of a deal with him (Forminster).** I think, that the Irish guy has told Forminster to settle with us or otherwise he would withdraw from the transaction or reduce the price.

Exhibit G (emphasis added).

Although Mr. Harazim recalls that he had a discussion with Vladimir Hoffmann about the potential purchase of the BGO Shares, Mr. Harazim testified that:

> . . . In Autumn, 2003, I didn't represent Forminster. I represented Kotva, and it's not allowed -- excuse me. It's not allowed by Czech law for a company to buy its own shares, and of course I didn't have any interest in buying shares from anybody. So, no, I didn't show any interest in the shares.

Harazim Dep. 151:20–152:24. Instead, Mr. Harazim claims that he told Mr. Hoffmann that Mr. Harazim and Mr. Benda would "look around" to see if there was someone who was willing to buy the BGO Shares. *Id.*

On November 28, 2003, Mr. Hoffmann reported to Mr. Weiss that:

> Harazim called me today and told me they will make the firm bid for our Kotva shares on [December 1, 2003]. They will fax it to you and deliver the original to me. The price will be USD 1 million and it will be valid for one week.

Exhibit H.[6] On December 2, 2003, J&T Securities faxed an offer on behalf of an unnamed "client" to Weiss Asset Management, seeking to purchase Kotva shares for "USD 1 million," and holding the offer "valid for a period of 7 calendar days." Exhibit I. Mr. Harazim testified that he

---

[6] Mr. Harazim claims that he has no memory of this conversation, but allows for the possibility that he spoke to Mr. Hoffmann about a forthcoming offer from a third party. Harazim Dep. 153:17–154:8.

and Mr. Benda contacted J&T Bank "to look for a potential buyer of the shares," but claims that he has no idea who J&T's unnamed client was. Harazim Dep. 154:9–19, 155:6–8.[7]

This denial is not credible. Mr. Harazim admits that he knew that J&T was going to make the offer and, had the offer been accepted, J&T's client would have become the owner of over 10% of Kotva. Harazim's claim that he was "not really" interested in knowing who that client was does not make sense. Harazim Dep. 155:6–8, 157:12–158:7. Moreover, it appears that either Mr. Benda or Mr. Harazim identified the unnamed client as Forminster. On December 8, 2003, Mr. Hoffmann reported to Mr. Weiss by email that he "informed Forminster today that we decline their offer." Exhibit M.

According to Mr. Harazim, neither he nor Mr. Benda was acting on behalf of Forminster in negotiating with Messrs. Weiss and Hoffmann. Instead, Mr. Harazim claims that Mr. Weiss demanded that *Kotva*—rather than Forminster—purchase the BGO shares at an exorbitant price. *See, e.g.*, Complaint at 1, 2, ¶¶ 21, 22, 48. Mr. Harazim continues to advance this claim, despite acknowledging that, under Czech law, Kotva was forbidden to purchase the BGO Shares *at any price*. Harazim Dep. 152:6–7 ("It's not allowed by Czech law for a company to buy its own shares."); 248:5–6 ("It is illegal for Kotva to buy those shares."). Thus, according to Kotva, Mr.

---

[7] To quote the representative of the Irish investors who purchased the Department Store, "the name of the J&T Banka appears regularly in the information we have been given regarding past transactions that are allegedly suspect and fraudulent. This Bank has had a part to play in the past dealings of the Kotva / Trend / FEL / Suringham issues . . . ." Exhibit J. Similarly, when Kotva, Forminster and others reached an agreement under which James Woolf, Deutsche Bank and others agreed not to pursue any claims against Kotva, J&T Bank participated in the transaction on behalf of an unnamed client. *See* Harazim Dep. 80:17–85:13; Exhibit K (Deed of Indemnity); Exhibit L (Letter from Richard Harazim to Andrew Dixon-Smith (March 29, 2005)) ("We consulted JT Bank about their attitude and we were informed that JT Bank is still willing to buy the claims of DB and Flow for their client . . . .").

Weiss demanded the impossible—that Mr. Harazim, on behalf of Kotva, purchase the BGO Shares.

This, of course, makes no sense.  Even under the plaintiff's version of events, Messrs. Harazim and Benda must have been representing Forminster or some company other than Kotva for the alleged "blackmail scheme" to have any chance of success.  Indeed, contemporaneous communications created throughout the period of negotiations confirm that Mr. Weiss and Mr. Hoffmann believed that Messrs. Benda and Harazim were acting on behalf of Forminster.  Two examples of such emails are attached as Exhibits G and N, and summarized in the table below, with emphasis added:

| Vladimir Hoffmann to Eitan Milgram on September 2, 2003 | **I have been contacted yesterday by Richard Harazim - CEO of Kotva, who would like to talk.  I believe, that we could be able to negotiate some sort of a deal with him (Forminster).**  I think, that the Irish guy has told Forminster to settle with us or otherwise he would withdraw from the transaction or reduce the price. |
|---|---|
| Vladimir Hoffmann to Georgiy Nikitin on May 6, 2004 | The plan of **meetings for 12th of May** is as follows:<br><br>10.00AM: James Woolf<br>12.00: Mgr. Svobodova (Lunch)<br>**2.00PM: Harazim, Benda (Forminster)**<br>5.00PM: Pavelka, Dostal - PR Agency ExMise |

Thus, the evidence indicates that, from the very beginning of their negotiations with Messrs. Weiss and Hoffmann all the way through the critical May 12, 2004 meeting, Messrs. Harazim and Benda were acting on behalf of Forminster.  Mr. Harazim admits that, at the May 12, 2004 meeting, he did nothing to disabuse Messrs. Weiss and Hoffmann of the idea that he continued to represent Forminster.  Harazim Dep. 247:9–22.

For purposes of Forminster's Motion to Dismiss, the Court must take these emails at face value and conclude that Messrs. Harazim and Benda were acting as representatives of Forminster.  As this Court has acknowledged, the Court "must view the evidence . . . under the prima facie standard, in the light most favorable to the party opposing the motion to dismiss for lack of personal jurisdiction."  *Moldflow Corp. v. Simcon, Inc.*, 296 F. Supp. 2d 34, 45 (D. Mass. 2003).   Thus, the Court cannot credit Mr. Harazim's denials in view of the contravening evidence and the Court should deny Forminster's Motion to Dismiss.

.                                              Respectfully Submitted,

                                               ANDREW WEISS, WEISS ASSET
                                               MANAGEMENT LLC, K T, INC. and CVF
                                               INVESTMENTS LTD.

                                               By their attorneys,


                                               /s/ Benjamin A. Goldberger
                                               Edward P. Leibensperger (BBO# 292620)
                                               Benjamin A. Goldberger (BBO# 654357)
                                               McDermott Will & Emery LLP
                                               28 State Street
                                               Boston, Massachusetts  02109-1775
                                               (617) 535-4000
Dated: June 6, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 6, 2006.

                                               /s/ Benjamin A. Goldberger
                                               Benjamin A. Goldberger

BST99 1504985-3.072198.0012

11

```
 1                          VOLUME 1, PAGES 1 - 234

 2                          EXHIBITS 1 - 22

 3           IN THE UNITED STATES DISTRICT COURT

 4           FOR THE DISTRICT OF MASSACHUSETTS

 5                          No. 05-10679-RCL

 6  - - - - - - - - - - - - - - - - - - - - - - - -

 7  KOTVA a.s.,

 8                    Plaintiffs

 9           vs.

10  ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,

11                    Defendants

12  _____

13  ANDREW WEISS, WEISS ASSET MANAGEMENT LLC,

14  KT, INC. and CVF INVESTMENTS, LTD.,

15                    Counterclaim-Plaintiffs,

16           v.

17  KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM,

18  FORMINSTER ENTERPRISES, LTC., SPV CO. and

19  JOHN DOES 1-5,

20                    Counterclaim-Defendants.

21  - - - - - - - - - - - - - - - - - - - - - - - -

22    VIDEOTAPED RULE 30(b)(6) DEPOSITION OF KOTVA a.s.

23           BY AND THROUGH RICHARD HARAZIM

24           Tuesday, February 22, 2006 10:02 a.m
```

```
 1                McDermott, Will & Emery

 2            28 State Street, Boston, MA 02109

 3           Reporter:  Janet M. Konarski, RMR, CRR

 4                    LegaLink Boston

 5            320 Congress Street, Boston, MA 02210

 6                      (617)542-0039

 7      APPEARANCES:

 8

 9      MCDERMOTT, WILL & EMERY

10      (By Edward P. Leibensperger, Esquire,

11      Benjamin A. Goldberger, Esquire, and

12      Sylvia Kratky, Esquire)

13      28 State Street

14      Boston, Massachusetts 02109

15      (617)535-4000

16      Counsel for the Defendants/Counterclaim-Plaintiffs

17

18      NYSTROM, BECKMAN & PARIS LLP

19      (By Joel G. Beckman, Esquire)

20      10 St. James Avenue

21      Boston, Massachusetts 02116

22      (617)778-9100

23      Counsel for the Plaintiff/Counterclaim-Defendant

24      - Continued -
```

```
 1    APPEARANCES (Continued):

 2

 3

 4    ALSO PRESENT:

 5    Wesley Hicks, Videographer

 6    Andrew Weiss, Afternoon Only

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1  Well, we'll deal with that.

2  BY MR. LEIBENSPERGER:

3       Q.   Now, what is the date of this settlement

4  agreement?

5       A.   I don't see it here.  I believe that it

6  was signed in December of 1999.

7       Q.   All right.

8       A.   But, here the date is not there.

9       Q.   At the time of this settlement agreement,

10  you worked for Forminster, correct?

11       A.   Yes.

12       Q.   How long did you work for Forminster?

13       A.   You mean how long was the work on this

14  particular agreement?  Was this the question?

15       Q.   No.  How long total did you work?

16       A.   It was one year on this project, and two

17  years as a director, and in total it's three years.

18       Q.   When did you first start doing any work

19  for Forminster?

20       A.   I'm not really sure, but we could say that

21  it could have been 1998.

22       Q.   Did you have a written employment

23  agreement with Forminster?

24       A.   No.  It was not about employment, no.

 1         Q.   Was there anyone else engaged by

 2   Forminster to negotiate this agreement?

 3         A.   Besides the lawyers, I was working also

 4   with Mr. Martin Benda.

 5         Q.   Was Mr. Benda at this time, 1988 to 1999,

 6   engaged by Forminster?

 7         A.   I believe, yes, because we were working on

 8   this project together.

 9         Q.   All right.  In connection with this

10   settlement agreement, who did you talk to at

11   Forminster?

12         A.   These were lawyers, and a law firm Toman,

13   which I mentioned, and Martin.

14         Q.   Anyone else?

15         A.   No.  I'm not aware of anyone else.

16         Q.   From whom did you receive instructions

17   about Forminster's position on the agreement?

18         A.   All the details, I was discussing with

19   these people that I mentioned.

20         Q.   Mr. Benda and Mr. Toman?

21         A.   And Mr. Toman, yes.

22         Q.   No one else?

23         A.   There were some other lawyers from the law

24   firm of Toman.

1  person said?  It must have been some threat of some
2  kind.

3       Q.   A Deutsche Bank person making a threat to
4  Bryan Wilson?

5       A.   Not to go ahead with the sale.

6       Q.   And was the threat about who the rightful
7  owner of the real estate was?

8       A.   It was something along the lines, as James
9  used to say, that means that he is the rightful owner
10 of the building, something like that.  And after that,
11 when it got out of the level of Mr. Woolf just saying
12 unpleasant things about us, when it got to the level of
13 Deutsche Bank intervening on his behalf, we felt that
14 it was the time to react, and that's when we started
15 to -- well, I wouldn't call it negotiate, because -- or
16 having discussions.

17      Q.   Ultimately those discussions resulted in a
18 settlement with Mr. Woolf and Deutsche Bank?

19           MR. BECKMAN:  Objection.

20      Q.   Is that right?

21           MR. BECKMAN:  You may answer.

22      A.   The discussions resulted in a contract
23 that provided mutual obligation not to attack anymore.

24      Q.   And the contract -- well, let's take that

1  a step at a time.  What is the date of that contract?

2          A.   I'm guessing now, but I think it's the end

3  of 2004.

4          Q.   All right.  And it's a document, it's a

5  written contract?

6          A.   It's not a contract.  It's -- I would call

7  it a mutual indemnification.

8          Q.   Mutual what?

9          A.   Indemnification.  Indemnity.

10         Q.   Indemnification?

11         A.   Yes.

12         Q.   But, it's a document, right?

13         A.   It's a document.

14         Q.   And what was in the document, other than

15  agreeing not to attack each other anymore?

16         A.   That was it.

17         Q.   Who was indemnifying whom?

18              MR. BECKMAN:  Objection to the term

19  "indemnifying."  To the extent you understand, but you

20  may answer.

21         Q.   You called it an indemnification, correct?

22         A.   Yes.  Well, I don't want to go into the

23  legalities of it.

24         Q.   Go into whatever you recall about it.

1      A.   I don't want to be imprecise; therefore, I

2  don't want to go it.  The principle of the document was

3  that parties on one side, which was Deutsche Bank,

4  James Woolf and all the other entities --

5      Q.   Keep going.

6      A.   -- will not attack the entities on the

7  other side, which was Kotva and then on the other

8  entities, and the entities on the side of Kotva will

9  not attack Deutsche Bank and James Woolf.  It was a

10 mutual, mutual obligation not to attack.

11     Q.   Did the document also release Woolf's

12 claim for any interest in the real estates?

13          MR. BECKMAN:  Objection.  If you

14 understand.

15     A.   I don't know.  Can you rephrase, please.

16 I'd rather have it rephrased, please.

17          MR. LEIBENSPERGER:  Sorry.

18     A.   I'd rather have it rephrased, the

19 question, please.

20     Q.   In this, we'll call it an indemnity

21 agreement --

22     A.   Let's call it indemnity agreement, yes.

23     Q.   In this indemnity agreement, did Woolf

24 give up any claim to a right to the real estate?

1        A.    No.   That wasn't the content of the

2  document.  The content was he will no more attack Kotva

3  or other entities, and Kotva will no more attack him.

4        Q.    What was the consideration for Mr. Woolf

5  to not attack anyone?

6              MR. BECKMAN:  Objection.

7        A.    There was no consideration.

8              MR. BECKMAN:  Objection.  You may answer.

9        A.    There was no consideration.  What happened

10  was Deutsche Bank intervening on behalf of James Woolf

11  was taken as a very serious step on our side, then we

12  prepared a lawsuit against Deutsche Bank, so in the end

13  it was mutual giving up of any hostile steps against

14  each other.  There was no consideration paid to James

15  Woolf.

16        Q.    Were the shares that James Woolf held in

17  Kotva acquired in this agreement?

18        A.    Not in this agreement.  No.

19        Q.    All right.  Have the shares of James Woolf

20  and Kotva been acquired?

21        A.    Shares of James Woolf were bought by a

22  third entity, not related to Kotva, but because it's

23  true that the business transaction was a trigger for

24  the settlement talks, James Woolf was selling his

1  claims against Trend, not against Kotva, against Trend,

2  and his shares in Kotva to a third party, and because

3  he was giving up the basis on which he was in my view

4  wrongly formulating claims against Kotva, he wanted to

5  be sure that with this gone, he's not open to our

6  attacks.

7           So, as a followup to the business

8  transaction by which James Woolf sold the instruments

9  that provided in his mind the leverage against the

10  building, he requested indemnity, and so did we,

11  because it eased our position with the Irish buyers.

12     Q.   So, a follow-up question on that.  To whom

13  did Woolf sell his claim in his shares in Kotva?

14     A.   I think was JT Bank.

15     Q.   Was JT Bank acting on behalf of someone

16  else?

17     A.   I have no idea.

18     Q.   Is it your testimony that JT Bank was not

19  acting on behalf of Kotva?

20     A.   It was not acting on behalf of Kotva.

21     Q.   Was JT Bank acting on behalf of you,

22  personally?

23     A.   No.

24     Q.   Was JT Bank acting on behalf of

 1  Forminster?

 2         A.   This is 2005.  I don't know what

 3  Forminster was doing, but not to my knowledge.

 4         Q.   So, you don't know whether JT Bank was --

 5         A.   I don't know.

 6         Q.   --  was acting on behalf of Forminster?

 7         A.   Not to my knowledge.  I don't know.

 8         Q.   All right.  Who is the record shareholder

 9  of the shares previously owned by Woolf?

10         A.   I don't know.

11         Q.   And do you know who the beneficial owner

12  of the shares previously held by Woolf?

13         A.   No.

14         Q.   Have you ever seen a document

15  memorializing the sale by Woolf of his shares and claim

16  to JT Bank?

17         A.   If I saw the documents?

18         Q.   Did you see those documents?

19         A.   I think I did.

20         Q.   Do you recall what they were called?  I

21  mean what was the title of the documents?

22         A.   I think it was instrument of transfer or

23  something like that.

24         Q.   Do you have copies of those documents?

1          A.   Of my then, on behalf of the company where

2    I was employed at that time and on behalf of his

3    company where he was employed at that time.

4          Q.   Was Forminster also an investor --

5          A.   No, no.

6          Q.   -- in that?

7          A.   No.

8          Q.   How did you know that Mr. Benda was

9    authorized by Forminster to ask you to be on the board

10   of Kotva?

11         A.   I didn't know.

12         Q.   He told you that he was?

13         A.   He told me if I would like or if I was

14   willing to be a member of the Board of Directors of

15   Kotva.

16         Q.   And that Forminster would elect you to

17   that?

18              MR. BECKMAN:  Objection.

19         A.   I don't recall how exactly it was.  This

20   is the principle of the agreement.

21         Q.   From that very first time in 1997 to

22   today, who have you communicated with, who is from

23   Forminster?

24              MR. BECKMAN:  Objection.  I think you went

1    through all this this morning.

2         Q.   You can answer.

3         A.   Well, we spoke -- I spoke to lawyers, and

4    in the time of the settlement, Martin Benda and the

5    lawyers and me.  That was the team.

6         Q.   I just want to get a complete list from

7    your testimony as to everyone you have ever

8    communicated with, who purports to be acting on behalf

9    of Forminster?

10             MR. BECKMAN:  Objection.  Asked and

11   answered.

12        Q.   You can answer.

13             MR. BECKMAN:  He's answered and answered

14   and answered that question all morning.

15             MR. LEIBENSPERGER:  Please, please, Joel.

16        Q.   You can answer.

17        A.   The lawyers, Toman's office.

18        Q.   Toman's office, and some lawyers within

19   Toman's office, correct?

20        A.   Yes.

21        Q.   And Benda, Mr. Benda?  Right?

22        A.   Benda, I knew that was working me on the

23   settlement.  I didn't know, and I don't know what his

24   relation to Forminster is or was.

1        Q.    Anyone else?

2        A.    No.  I don't recall anyone.

3        Q.    Did you ever ask to see Mr. Toman's power

4   of attorney?

5              MR. BECKMAN:  Objection.  You asked that

6   exact same question this morning.

7              MR. LEIBENSPERGER:  Okay.  Fine.

8              MR. BECKMAN:  You don't have to answer

9   that again.

10       A.    Yes, I did.

11       Q.    Do you have a copy of it?

12       A.    No.

13       Q.    Have you ever spoken to Mr. Hßlek?

14       A.    No.

15       Q.    Did you have any knowledge of him before

16  you ever got involved in this -- strike that.  That is

17  too broad.  Have you ever met him in any context?

18       A.    I think that he was in -- he was

19  participating on one of the general meetings.  That's

20  where I saw him.

21       Q.    One of the general meetings of Kotva?

22       A.    Of Kotva, yes.

23       Q.    And in what year do you recall that to be?

24       A.    No.  I don't know.  I don't know.  I just

1  Forminster possesses the shares.'"  Did you say that to

2  Mr. Carey?

3         A.   I don't know.  I have no trust in

4  Mr. Carey, so I don't know.  I didn't -- I didn't have

5  tape records of what I said to Mr. Carey.  I don't

6  know.

7         Q.   Is it you don't remember whether you said

8  that?

9         A.   It was three hours telephone discussion

10  with Mr. Carey, so I don't know if I said this

11  particular sentence or if I said something else, and if

12  you put it like this, I can only repeat that I have no

13  trust in Mr. Carey.

14         Q.   But, you might have said these quotes to

15  Mr. Carey?

16              MR. BECKMAN:  Objection.

17         A.   I might have said.  Might have said.

18         Q.   All right.  This morning you testified

19  about a period of time when Mr. Golden was on the board

20  of Kotva?

21         A.   Yes.

22         Q.   And it was during that period of time you

23  were on the board of both Kotva and Forminster,

24  correct?

1        A.    Correct.

2        Q.    Did you talk with Mr. Golden then about

3    the possibility of Forminster buying the BGO shares?

4        A.    Yes.

5        Q.    What did you say and what did he say about

6    that possibility?

7        A.    Once again, I can't remember what exactly

8    was said, but the principle was that Forminster would

9    buy shares of BGO, and if I remember correctly, there

10   was some option for the shares of Trend on the

11   question.  The business terms were agreed in principle,

12   but for some reason, later on the transaction just

13   didn't come through.

14       Q.    Can you place this in time, to the best of

15   your memory?

16       A.    2001.

17       Q.    And what were the business terms that you

18   had agreed upon?

19       A.    I don't remember correctly.  Very roughly,

20   I would say that Forminster offered like 50 million,

21   and I don't know if it was for the whole thing or if it

22   was just for the shares of Kotva.

23       Q.    50 million Czech crowns?

24       A.    Czech crowns.

138

1        Q.    That's a number that sticks in your head?

2        A.    (Witness nodded.)  That's a number that I

3    have in my head, yes.

4        Q.    And to the best of your memory, was that

5    the total for both BGO and the Trend shares or the --

6    sorry.  Let me start over.  Is that the total for both

7    the BGO shares in Kotva and Trend shares in Kotva?

8        A.    I don't recall.

9        Q.    Had that, did you come to the 50 million

10   as a result of a negotiation?

11       A.    Yes.

12       Q.    For example, did Mr. Golden want more than

13   that, and he came down?

14       A.    Of course, he wanted more, yes, yes.

15       Q.    And you had offered less, and you came up?

16       A.    Presumably.  This is just the -- yes.

17   That is normally when two parties try to strike a deal,

18   I just remember the structure; that is, that there was

19   discussion about the shares, and the shares of -- I

20   mean the shares of Kotva and the shares of Trend, and

21   as far as the Trend shares are concerned, the

22   discussion was not, was not about direct sale, but

23   about an option.

24       Q.    All right.  Now, in 2001, there had been a

1  understand what vocal?

2           THE WITNESS:  I'd rather rephrase it,

3  please.

4      Q.  Did he tell you that Mr. Weiss would be a

5  person, who was active and interested in how Kotva

6  would be operated and run?

7           MR. BECKMAN:  Objection.

8           MR. LEIBENSPERGER:  You can answer that.

9           MR. BECKMAN:  I object to the form of that

10 question.  It's a compound question.

11     A.  First of all, it's important to understand

12 that Mr. Hoffmann didn't know if he represented any

13 interests of BGO, so we didn't go to any great length

14 about the situation.  He just said that there is a

15 change and then the change is for worse for us, for

16 this and this reasons, as I just explained.

17          We didn't go into how exactly what

18 would happen and stuff, because it was very uncertain

19 whether Mr. Hoffmann was involved at all.

20     Q.  Did you express to Mr. Hoffmann that, yes,

21 you would be interested in buying the BGO shares,

22 perhaps?

23     A.  No way.  I did confirm that I also think

24 that it would be best if BGO sold their shares.

1       Q.   Right.  But, did you express that there be

2   an interest in buying those shares?

3              MR. BECKMAN:  Objection.

4       A.   No.  In Autumn, 2003, I didn't represent

5   Forminster.  I represented Kotva, and it's not

6   allowed -- excuse me.  It's not allowed by Czech law

7   for a company to buy its own shares, and of course I

8   didn't have any interest in buying shares from anybody.

9   So, no, I didn't show any interest in the shares.

10      Q.   Did you say to Mr. Hoffmann that you could

11  talk with Forminster about a possible interest there in

12  buying shares of Mr. -- of BGO?

13             MR. BECKMAN:  Objection.  You may answer.

14      A.   No.  When we were parting, we agreed that

15  Mr. Hoffmann will try to find out if he does represent

16  interests of BGO or he doesn't, and we will look around

17  if there was somebody, who would be willing to buy the

18  shares of BGO.

19      Q.   So that -- let me follow up on that.  You

20  did say to Mr. Hoffmann that you would be willing to

21  look around if there is someone interested in buying

22  the shares?

23      A.   We will look around, if there was somebody

24  willing to buy the shares, yes.

1          Q.   All right.

2               (Discussion off the record.)

3              (Witness conferred with counsel.)

4               MR. BECKMAN:   Can we take a two-minute

5   break?

6               MR. LEIBENSPERGER:   Yes.   That's fine.

7               THE VIDEOGRAPHER:   Going off the record.

8   The time is 3:25 p.m.

9                    (A recess was taken.)

10                    (E-mail dated November 28, 2003

11        marked Exhibit 16.)

12                    (Letter dated December 2, 2003

13        marked Exhibit 17.)

14              THE VIDEOGRAPHER:   Going back on the

15   record.   The time is 3:32 p.m.

16   BY MR. LEIBENSPERGER:

17          Q.   I have handed you what has been marked as

18   Exhibits 16 and 17.   The first is an e-mail from

19   Mr. Hoffmann to Dave Johnson, Andrew Weiss, Eiton

20   Nobrahim [phonetic] dated November 28, 2003, and the

21   second is a letter dated December 2, 2003.

22   Mr. Harazim, with respect to the Exhibit 16, it says

23   that "Harazim called me today and told me that they

24   will make the firm bid for our Kotva shares on Monday."

1 Do you see where I read that?

2        A.    Yes.

3        Q.    Did you call Mr. Hoffmann and indicate

4 that there would be a bid for the Kotva shares of BGO?

5        A.    I don't recall that particular situation,

6 but it's true that JT Bank acknowledged to us that they

7 had a client who would be willing to buy the shares,

8 and I probably informed Mr. Hoffmann about that, yes.

9        Q.    Did, had you contacted JT Bank to look for

10 a potential buyer of the shares?

11        A.    Yes, we did.

12        Q.    All right.  Who at JT Bank had you

13 contacted?

14        A.    Who at JT Bank?

15        Q.    Yes.

16        A.    This is something that was done by my

17 colleague, Martin Benda, and I believe he spoke to the

18 person signed here, but I didn't contact personally

19 anyone.

20        Q.    To the best of your knowledge, Mr. Benda

21 contacted JT Bank?

22        A.    Yes.

23        Q.    To find a potential buyer of the BGO

24 shares?

1        A.   I would say he just asked if there was

2   anybody interested in those shares.

3        Q.   And did you say that you believe he

4   contacted Mr. Semotan?

5        A.   I think so.

6        Q.   Who was the client of JT Bank, who made

7   the offer for the shares?

8        A.   I have no idea.

9        Q.   So, your testimony is you have no idea who

10  the -- well, I just said that.  Let me go back.

11  Exhibit 17 is a letter from JT Bank to Weiss Asset

12  offering to buy the Kotva shares held by BGO on behalf

13  of a client, correct?

14       A.   Correct.

15       Q.   And the offer is for 1 million U.S.

16  dollars?

17       A.   Yes.

18       Q.   How did you learn that JT Bank was going

19  to make this offer?

20       A.   Mr. Benda told me.

21       Q.   What did Mr. Benda tell you?

22       A.   That apparently JT would make an offer

23  either on behalf of its client or maybe for themselves,

24  and that's it.  Let's see if BGO accepts.

1      Q.   Was -- how did JT Bank know any amount to

2  make the offer for?

3      A.   JT Bank is a dealer in securities.  They

4  had relation to Kotva, because they provided a loan,

5  financing loan, operating loan to Kotva, and, moreover,

6  they showed interest in the building.  Therefore, I

7  believe that they had the means of how to establish the

8  value for themselves.

9      Q.   Did Mr. Benda tell you the name of the

10  client of JT Bank?

11     A.   No.

12     Q.   Do you believe that Mr. Benda knows the

13  client of JT Bank?

14          MR. BECKMAN:  Objection.  You can answer.

15     A.   I don't know.

16     Q.   From any way?  You don't know one way or

17  the other?

18     A.   No.

19     Q.   Did you ever learn the client of JT Bank

20  that made this offer?

21     A.   No.  The deal didn't come through.

22     Q.   No -- my question is --

23     A.   No.

24     Q.   -- did you ever learn the client?

157

1       A.   No.  No, I didn't.

2       Q.   Did you learn that the client of JT Bank

3   making the offer might have been Forminster?

4       A.   I don't know.

5       Q.   You don't know that it wasn't Forminster,

6   right?

7       A.   I don't know who the client was.

8       Q.   So, it could have been Forminster?  You

9   wouldn't know one way or the other?

10           MR. BECKMAN:  Objection.

11      A.   I wouldn't know.

12      Q.   Weren't you interested to know who would

13  become the shareholder replacing BGO?

14      A.   Not really.  That's enough.  No, not.

15      Q.   So, BGO was roughly 12 percent shareholder

16  of Kotva, correct?

17      A.   Yes.

18      Q.   And you testified you had an interest in

19  BGO being purchased, their shares being purchased,

20  correct?

21           MR. BECKMAN:  Objection.

22      A.   I agreed that such a situation would be

23  better, yes.

24      Q.   Right.  So, wouldn't you want to know

1   whether the buyer of the BGO shares could be someone,

2   who would be very problematic to Kotva?

3           MR. BECKMAN:  Objection.

4       A.   I didn't believe so.  I didn't believe so.

5       Q.   You didn't believe so about what?

6       A.   I didn't believe that there could be a

7   shareholder that would be more troublesome, no.

8       Q.   Now, in -- let me take a step back.

9   Exhibit 16 references that you called Hoffmann and told

10  him that the bid was coming, right?

11          MR. BECKMAN:  Objection.

12      A.   That's what it says.  I don't recall that

13  particular event.

14      Q.   What -- you don't recall the particular

15  event, but is it your best memory that you did let him

16  know that was happening, going to be happening?

17          MR. BECKMAN:  Objection.

18      A.   To my best memory, either me or Martin

19  must have called him and said the deal could come

20  through.

21      Q.   The deal could come through?

22      A.   Meaning there might be a buyer, yes.

23      Q.   Did you tell Mr. Hoffmann in November of

24  2003 that you had a deal with Markland for the

1                    VOLUME 2, PAGES 235 - 403

2                       EXHIBITS 23 - 40

3            IN THE UNITED STATES DISTRICT COURT

4             FOR THE DISTRICT OF MASSACHUSETTS

5                          No. 05-10679-RCL

6   - - - - - - - - - - - - - - - - - - - - - - -

7   KOTVA a.s.,

8                       Plaintiffs

9              vs.

10  ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,

11                      Defendants

12  _____

13  ANDREW WEISS, WEISS ASSET MANAGEMENT LLC,

14  KT, INC. and CVF INVESTMENTS, LTD.,

15                      Counterclaim-Plaintiffs,

16          v.

17  KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM,

18  FORMINSTER ENTERPRISES, LTC., SPV CO. and

19  JOHN DOES 1-5,

20                      Counterclaim-Defendants.

21  - - - - - - - - - - - - - - - - - - - - - - -

22     CONTINUED VIDEOTAPED DEPOSITION OF KOTVA a.s.

23            BY AND THROUGH RICHARD HARAZIM

24          Wednesday, February 23, 2006 9:44 a.m

```
 1                    McDermott, Will & Emery

 2             28 State Street, Boston, MA 02109

 3           Reporter:  Janet M. Konarski, RMR, CRR

 4                       LegaLink Boston

 5            320 Congress Street, Boston, MA 02210

 6                        (617)542-0039

 7

 8    APPEARANCES:

 9    MCDERMOTT, WILL & EMERY

10    (By Edward P. Leibensperger, Esquire,

11    Benjamin A. Goldberger, Esquire, and

12    Sylvia Kratky, Esquire)

13    28 State Street

14    Boston, Massachusetts 02109

15    (617)535-4000

16    Counsel for the Defendants/Counterclaim-Plaintiffs

17

18    NYSTROM, BECKMAN & PARIS LLP

19    (By Joel G. Beckman, Esquire)

20    10 St. James Avenue

21    Boston, Massachusetts 02116

22    (617)778-9100

23    Counsel for the Plaintiff/Counterclaim-Defendant

24    - Continued -
```

1    ALSO PRESENT:

2    Wesley Hicks, Videographer

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1      A.   We gave him our business cards, our Kotva

2  business cards, and it really didn't occur to me that

3  he would consider us to be somebody else, or

4  representatives of somebody else.

5      Q.   Previously, you were both an officer of

6  Kotva and a director of Forminster, correct?

7           MR. BECKMAN:  Objection.

8      A.   Yes.  Two years back.

9      Q.   So, my question is:  Did it occur to you

10  that Mr. Weiss believed you still were a representative

11  of both Kotva and Forminster?

12           MR. BECKMAN:  Objection.  Asked and

13  answered.

14      A.   This really did not occur to me.

15      Q.   All right.  And you never clarified to

16  Mr. Weiss in that meeting that you did not -- strike

17  that, that you were not there in any capacity for

18  Forminster?

19           MR. BECKMAN:  Objection.

20      A.   No.  After I introduced myself as a

21  director of Kotva, it really didn't occur to me to

22  explain which other companies I do not represent.

23      Q.   Did you say on May 12th that Kotva would

24  pay nothing for the BGO shares?

1            MR. BECKMAN:  Objection.  You may answer.

2        A.   I don't recall saying exactly this

3   sentence.  I may only repeat -- I can only repeat that

4   I stated that the Kotva doesn't have reason, doesn't

5   have interest, and it is illegal for Kotva to buy those

6   shares.

7        Q.   Did Mr. Weiss bring up the newspaper

8   article regarding the sale of the building?

9        A.   Yes.

10       Q.   And the price mentioned in the newspaper

11  article?

12       A.   Yes.

13       Q.   Did you deny there was a deal for the sale

14  of the building?

15       A.   We didn't comment on the process of the

16  sale of the building.

17       Q.   Did you agree that there was a deal?

18       A.   We didn't confirm anything like that.  We

19  did not confirm anything like that.

20       Q.   So, you denied there was a deal?

21            MR. BECKMAN:  Objection.

22       A.   We, we didn't comment on it.  We neither

23  confirm it or deny it.  We didn't comment on it.

24       Q.   Did you tell Mr. Weiss that as a minority

1  question one more time.

2       Q.   After Mr. Benda left the Board of

3  Forminster, it is your testimony that the only person

4  you knew to act on behalf of Forminster was Mr. Toman?

5            MR. BECKMAN:  Objection.

6       A.   I know that in certain, specific

7  administrative matters, I know that Mr. Vlach was

8  helping them, as well, but -- to represent Forminster,

9  but, as far as I know, only Petr Toman was representing

10 Forminster.

11      Q.   What matters are you referring to where

12 Mr. Vlach did something on behalf of Forminster?

13      A.   He had some sort of power of attorney to

14 submit some official documents or something like that.

15      Q.   When?

16      A.   When?  I think he still has it.

17      Q.   Have you seen that power of attorney?

18      A.   I did not see it.  It was described to me.

19      Q.   Who described it to you?

20      A.   Mr. Vlach.

21      Q.   Do you know who signed the power of

22 attorney on behalf of Forminster?

23      A.   I don't know.

24      Q.   What did Mr. Vlach tell you he was doing

1      Q.   And when you say "relatively young," did
2  he have the power of attorney for Forminster in 2004,
3  2005?

4      A.   This is the way I think so.

5      Q.   Do you have the exhibit which is the Kotva
6  annual report in the stack?

7           MR. GOLDBERGER:   I believe that is six or
8  so.

9      Q.   And if you would turn -- actually, may I
10  have the exhibit, and I'll try to find the page.  I'm
11  directing you to Page 3, which is K5475, and there is a
12  heading under the letter "D".  Does that say
13  description of the structure of the parent company?

14      A.   No.

15      Q.   What does it say?

16      A.   The corporation concern.  The description
17  of the structure of the concern and concern is the big,
18  big corporation.

19      Q.   Okay.  If I could have the exhibit again,
20  please.  I want to ask the translator to read, to
21  translate the paragraphs under that subsection.

22           THE INTERPRETER:   The description of the
23  structure of the concern.  The company Kotva
24  Shareholding Company is in the sense of the

1   Paragraph 66A of the trade law of the companies with

2   majority ownership shareholder and is Vladimir Sosoba

3   [phonetic].

4           A.   Control person.

5                THE INTERPRETER:  Control person, yes.

6           Q.   Is a control person?

7                THE INTERPRETER:  Is being controlled by

8   somebody.  Being controlled by somebody.  The

9   controlling person, the person -- next paragraph.  The

10  controlling person, the person which in the sense of

11  the stated paragraph of the trade law in fact or

12  legally exercised directly or indirectly decisive

13  influence on running or operation of the company of the

14  other person.  The person being controlled; that is,

15  company's mother company, is company Forminster

16  Enterprises, Ltd., located at 20 Queen Frederica

17  Street, El Greco House, Nicosia Kypr.

18          Q.   Kypr is Cyprus?

19               THE INTERPRETER:  Cyprus.  Thank you.

20          Q.   Did the interpreter read that paragraph

21  correctly?

22          A.   More or less.

23          Q.   Is there anything that you different with?

24          A.   No.  I think it's all right.

1        Q.   If you'd turn to Page -- I'm sorry.  May I

2   have that exhibit back, sir, and I will find the page

3   for you?

4            MR. LEIBENSPERGER:  I think I can find it.

5   It's missing.

6        Q.   All right, the exhibit -- hmm, Exhibit 6,

7   which is the copy of the Kotva annual report, produced

8   by Kotva, appears to be missing Page 15.  It goes from

9   Page 14 to 16.  Do you see that?

10       A.   I do.

11       Q.   And the --

12           THE INTERPRETER:  Yes, I do.

13       Q.   The numbering from Kotva is consecutive?

14           MR. BECKMAN:  We'll look for that.

15       Q.   Okay?  I'm going to show you -- I'm going

16   to show you a copy of the annual report that we pulled

17   off the web, which has the Page 15, and if you could

18   describe what that page is?

19       A.   The data of people responsible for the

20   annual report.

21       Q.   And then does it have a statement that you

22   swear to on Page 15?

23       A.   Could you repeat that?

24       Q.   On Page 15, is there a statement where you

1  "Woolf claims that Mr. Benda, Mr. Vlach and yourself

2  are all criminals and will be dealt with by the

3  police."  Do you see that?

4          A.   I see that.

5          Q.   And immediately before that, he says that

6  "Mr. Woolf had said that seven people have already gone

7  to jail over the Kotva dealings to date and that one

8  man was shot in the head."  Do you see that?

9          A.   I do see that.

10          Q.   Do you have any idea of what he was

11  referring to when he said "one man was shot in the

12  head?"

13          A.   I think he was relating to Mr. Bechka.

14  That was a famous case.

15          Q.   Who is that?

16          A.   Mr. Bechka is a businessman, who attracts

17  bad luck.  He was shot in the head.  He had a crash in

18  a helicopter.

19          Q.   Were those separate incidents?

20          A.   Yes.

21              MR. BECKMAN:  I hope so.

22          Q.   And what connection did he have with

23  Kotva?

24          A.   He was somehow involved with Czech

1  investment holding, and he served on the board of Kotva

2  for some time.

3          Q.   What time period?

4          A.   '97, '9, I don't know, before 2000, that

5  is.

6          Q.   Did you serve on the board with him at

7  some time?

8          A.   No.

9               MR. LEIBENSPERGER:  Did you get the

10  answer?

11              COURT REPORTER:  Yes.

12              THE WITNESS:  No.  I said no.

13         Q.   You said that he served on the board until

14  maybe 2000?

15         A.   No.  I said before 2000.

16         Q.   Oh.  When did you -- you start on the

17  board at Kotva in 1999; isn't that right?

18         A.   In 2000.

19         Q.   Did you know this person?

20         A.   I met him.

21         Q.   And you said it was a famous story about

22  him being shot in the head?

23         A.   Well, he wasn't shot in the head.  That

24  was the famous about it, because he was shot in the

1  back, but he was shot from a very light weapon, so

2  there were all sorts of discussions, where there was a

3  lover or it was commercial or it was this or that.

4       Q.   When did that event happen?

5       A.   I'm very poor on dates.  I really don't

6  know.

7       Q.   You had read stories in the press about

8  that?

9       A.   Yes.

10      Q.   And were there claims in the press that he

11  was shot in connection with a business transaction?

12      A.   There were wide speculations about from

13  all possible angles.

14      Q.   And did the speculation include the

15  controversy over whether Forminster rightly held Kotva

16  shares?

17           MR. BECKMAN:  Objection.

18      A.   The speculations were that this might have

19  been because of his commercial disputes.  Kotva was

20  named.  Chik [phonetic] was named.  Other companies

21  were named.

22      Q.   And when Kotva was named in this

23  speculation, what was said?

24      A.   I don't remember exactly the nature of the

1  speculation, but it was, like I said, very wild

2  speculations.

3           MR. BECKMAN:  Don't speculate.

4           MR. LEIBENSPERGER:  I'm asking him what he

5  recalls about what he read.

6      Q.  At some time, did a bomb explode in

7  Mr. Benda's office?

8      A.  Sometime before 2000, as well, yes.

9      Q.  Was there an investigation of that?

10     A.  I don't have much knowledge about this.

11     Q.  Can you be more specific about when it

12  occurred?  What year?

13     A.  That's what I can't.  I don't know the

14  year.

15     Q.  Did it occur before you were engaged by

16  Forminster?

17     A.  Yes.  That was before my time, yes.

18     Q.  Did you ever talk with Mr. Benda about

19  that?

20     A.  Yes.

21     Q.  Was he injured in the explosion?

22     A.  No.  He wasn't injured.

23     Q.  Was he there?

24     A.  I think he just happened to escape it.

1          Q.   Did Mr. Benda tell you who he thought had

2   caused the explosion?

3          A.   No.

4          Q.   If you turn the page of Exhibit 39 --

5          A.   I'm sorry.  Thirty-nine.

6          Q.   -- and I'm now referring to the portion of

7   this e-mail, which is a letter from Mr. Woolf to

8   Mr. Prestage.  There is a paragraph that reads, "We

9   have prepared a statement to the National Criminal

10  Intelligence Service Economic Crime Unit of the UK that

11  is being filed regarding some of the associated

12  companies of the alleged sellers."

13         Are you aware of any investigation at the

14  National Criminal Intelligence Service in the UK?

15         A.   I don't know if that institution exists.

16         Q.   Well, do I take it by that answer that

17  you're not aware of any --

18         A.   No.

19         Q.   -- investigation?

20         A.   No.

21         Q.   Are you aware of any investigation by any

22  entity in the UK?

23         A.   No.

24         Q.   Then in the second to the last Paragraph,



ΚΥΠΡΙΑΚΗ
REPUBLIC
ΔΗΜΟΚΡΑΤΙΑ
OF CYPRUS

C.C.2

No.: 78962

## MINISTRY OF COMMERCE, INDUSTRY & TOURISM
### DEPARTMENT OF REGISTRAR OF COMPANIES
### AND OFFICIAL RECEIVER
### NICOSIA

**30 June 2005**

## CERTIFICATE

## FORMINSTER ENTERPRISES LIMITED

It is hereby certified that in accordance with the records kept by this Department the following were the Directors and Secretary of the above company as at 30 11 1999:

| Directors | Nationality | Residential Address |
|---|---|---|
| RICHARD HARAZIM | Czech Republic | 174 Skorkovskeho 636 00 Brno Czech Republic |
| MARTIN BENDA | Czech Republic | 46 Borac C Czech Republic |
| JOHN MOFFITT | American | 14 Bilkova Prague 1 Czech Republic |
| MICHAEL BLUHM | American | 4 U. Nikolajky Prague 5 Czech Republic |

| Secretary | Residential Address |
|---|---|
| INDILAW SECRETARIAL LIMITED | 4 Diagorou Street Kermia House, Office 601 Nicosia |

M. MARKIDOU

For Actg Registrar of Companies

/LH



КҮПΡΙΑΚΗ   ΔΗΜΟΚΡΑΤΙΑ
REPUBLIC   OF CYPRUS

C.C.2

No.: 78962

MINISTRY OF COMMERCE, INDUSTRY & TOURISM
DEPARTMENT OF REGISTRAR OF COMPANIES
AND OFFICIAL RECEIVER
NICOSIA

30 June 2005

### CERTIFICATE

### FORMINSTER ENTERPRISES LIMITED

It is hereby certified that in accordance with the records kept by this Department the following were the Directors and Secretary of the above company as at 6.5.2002:

| Directors | Nationality | Residential Address |
|---|---|---|
| RICHARD HARAZIM | Czech Republic | 174 Skorkovskeho 636 00 Brno Czech Republic |
| MARTIN BENDA | Czech Republic | 46 Borac C Czech Republic |
| JOHN MOFFITT | American | 14 Bilkova Prague 1 Czech Republic |
| MICHAEL VLACH | Czech Republic | 10 Galandauerova Brno Czech Republic |

| Secretary | Residential Address |
|---|---|
| INDILAW SECRETARIAL LIMITED | 4 Diagorou Street Kermia House, Office 601 Nicosia |

M. MARKIDOU
For Actg Registrar of Companies

/LH



ΚΥΠΡΙΑΚΗ    ΔΗΜΟΚΡΑΤΙΑ
REPUBLIC     OF CYPRUS

C.C.2

No.: 78962

**MINISTRY OF COMMERCE, INDUSTRY & TOURISM
DEPARTMENT OF REGISTRAR OF COMPANIES
AND OFFICIAL RECEIVER
NICOSIA**

**30 June 2005**

**CERTIFICATE**

**FORMINSTER ENTERPRISES LIMITED**

It is hereby certified that in accordance with the records kept by this Department the following were the Directors and Secretary of the above company as at 31 10 2002:

| Directors | Nationality | Residential Address |
|---|---|---|
| DOXA PERICLEOUS | Cypriot | 4 Diagorou Street Kermia House 6th Floor, Flat 601 1097 Nicosia |
| RENA DAVID | Cypriot | 4 Diagorou Street Kermia House 6th Floor, Flat 601 1097 Nicosia |
| ANTHONY INDIANOS | Cypriot | 4 Diagorou Street Kermia House 6th Floor, Flat 601 1097 Nicosia |
| ANDREAS PAPASIANTIS | Cypriot | 4 Diagorou Street Kermia House 6th Floor, Flat 601 1097 Nicosia |

| Secretary | Residential Address |
|---|---|
| INDILAW SECRETARIAL LIMITED | 4 Diagorou Street Kermia House, 6th Floor, Flat 601 1097 Nicosia |

M. MARKIDOU

For Actg Registrar of Companies

/LH



## COSTAS INDIANOS & CO

## ADVOCATES & LEGAL CONSULTANTS

### ESTABLISHED 1924

# Specialized in Corporate & Business Law and Shipping Law



### ENTER

# CONTACT

# Costas Indianos & Co - Advocates & Legal Consultants

4, Diagoras street, Kermia House, 6th floor, flat 601
P.O.Box 21574, CY 1510 Nicosia, CYPRUS
Telephone: +357-22 67 52 31 / Fax: +357-22 66 96 78
e-mail: indianos@indianos.com.cy



## COSTAS INDIANOS & CO - Advocates & Legal Consultants

## THE FIRM:  COSTAS INDIANOS & CO - ADVOCATES & LEGAL CONSULTANTS

     

Antonis.C. Indianos (1899-1968)      Costas. A. Indianos (1942-2001)

The Law Firm, one of the oldest in Cyprus, was founded by the late **Antonis C. Indianos**, M.A. (Oxon), Barrister-at-Law, in 1924, in the town of Limassol and was known then as A. C. Indianos - Advocate.The late A.C. Indianos was the Criminal Lawyer par excellence in the island and in later years when he moved his office to Nicosia (1942), the firm's business expanded to encompass commercial, insurance and corporate activities.

**Costas A. Indianos** joined the firm in 1965 after studying in Oxford M.A. (Oxon).After the passing away in 1968 of the late A.C. Indianos the firm's name was changed to **Costas Indianos & Co, Advocates & Legal Consultants.** Between 1977-1983 he served as a member of the International Secretariat of the Council of Europe in Strasbourg, France, in the Department of Economic and Social Activities. Costas Indianos was a practising lawyer with wide experience and specialization in shipping & martime, commercial, business and corporate law. His brother Antonis Emiliou Indianos (University of Athens) joined the firm in 1975. He served on the bench as a Judge of most of the District Courts of Cyprus until 2001. He is now a practising lawyer in Larnaca and an expert in criminal law.

Anthony Indianos (University of Aix-Marseilles / Maastricht), lawyer and son of Costas Indianos joined the firm in 1999. He is currently heading the Law Firm and is fluent in English, French and Greek. The main office is situated in Nicosia with an office in Larnaca. It includes five lawyers, shipping and corporate consultants and one internal accountant. It has a solid local and international client base and possesses an extensive

international network of business contacts.



**AREAS OF PRACTICE**    **CLIENT BASE**    **CYPRUS**    **OFFICES**
**BACK**

# Výroční zpráva
# KOTVA a.s.
# za rok 2002

**I.  TEXTOVÁ ČÁST**                                                      str.

  1  Základní údaje ............................................................... 2
  2  Struktura koncernu, údaje o základním kapitálu a cenných papírech    3
  3  Údaje o činnosti a finanční situaci .................................... 7
  4  Údaje o statutárních a dozorčích orgánech, vedení
     společnosti a soudních sporech. ...................................... 13
  5. Očekávaná hospodářská a finanční situace a vývoj činnosti
     v roce 2003 .............................................................. 18


**II.  ZPRÁVA  PŘEDSTAVENSTVA  O  PODNIKATELSKÉ  ČINNOSTI
     A STAVU MAJETKU SPOLEČNOSTI.** ..................................... 19

**III.  ÚČETNÍ ZÁVĚRKA V NEZKRÁCENÉM ROZSAHU** ................... 22
      **PŘÍLOHA K ÚČETNÍ ZÁVĚRCE.** ................................... 29

**IV.  KONSOLIDOVANÁ ÚČETNÍ ZÁVĚRKA** ............................... 54
      **PŘÍLOHA KE KONSOLIDOVANÉ ÚČETNÍ ZÁVĚRCE** ............ 56
      **ZPRÁVA AUDITORA KE KONSOLIDOVANÉ ÚČETNÍ ZÁVĚRCE** 65

**V.  ZPRÁVA O VZTAZÍCH MEZI OVLÁDAJÍCÍ A OVLÁDANOU OSOBOU
     A O VZTAZÍCH MEZI OVLÁDANOU OSOBOU A OSTATNÍMI OSOBAMI
     OVLÁDANÝMI STEJNOU OVLÁDAJÍCÍ OSOBOU** .................. 66

**VI.  VÝROK AUDITORA** ................................................... 69

**VII. OSOBY ODPOVĚDNÉ ZA VÝROČNÍ ZPRÁVU A OVĚŘENÍ ÚČETNÍ
      ZÁVĚRKY** ................................................................. 71

# I. Textová část

## 1. Základní údaje

| | |
|---|---|
| Obchodní firma (Název): | KOTVA a.s. |
| Sídlo: | nám. Republiky 8, Praha 1 |
| PSČ: | 113 88 |
| | |
| IČ: | 60193808 |
| DIČ: | 001-60193808 |
| | |
| Datum založení: | 22.12.1993 |
| Právní forma: | akciová společnost |
| Období: | doba neurčitá |

Rejstříkový soud oprávněný
k vedení obchodního rejstříku:    Městský soud v Praze

Číslo pod kterým je
společnost zapsána:    odd. B, vložka 2370

Předmět podnikání:    dle čl. IV stanov:

koupě zboží za účelem dalšího prodeje a prodej, hostinská činnost, výroba a prodej nenahraných nosičů zvukových nebo zvukově obrazových záznamů a prodej a půjčování nahraných zvukových a zvukově obrazových záznamů, pronájem motorových vozidel, silniční motorová doprava, provozování nestátního zdravotnického zařízení s druhem a rozsahem poskytované péče všeobecného lékařství, provozování parkovišť, garáží a odstavných ploch, praktický výcvik učňů, rozvod elektřiny

KOTVA a.s. byla založena dle právního řádu České republiky jako akciová společnost podle § 172 zákona č 513/91 Sb a byla zapsána do Obchodního rejstříku k 1 1 1994 Jediným zakladatelem společnosti je Fond národního majetku ČR, se sídlem v Praze 2, Rašínovo nábřeží 42, na který přešla část majetku státního podniku PRIOR-KOTVA, obchodní dům se sídlem Praha 1, náměstí Republiky 8, zapsaného v obchodním rejstříku vedeném u Obvodního soudu pro Prahu 1, oddíl Ps, vložka 140, podle § 11 odst 2 zákona č 92/91 Sb o podmínkách převodu majetku státu na jiné osoby, ve znění zákona č 210/93 Sb

# 2. Struktura koncernu, údaje o základním kapitálu a cenných papírech

- ## Popis struktury koncernu

   Společnost ve smyslu ust. § 66a obchodního zákoníku je společností s většinovým společníkem (akcionářem) a je osobou ovládanou. Ovládající osobou je potom osoba (firma: FORMINSTER ENTERPRISES LIMITED, sídlo: 20 Queen Frederica Street, El Greco House, Nicosia, Kypr). Společnost s touto ovládající osobou tvoří koncern

   <u>Údaje o koncernu:</u>

   **A/ Společnost ovládající:**
   Obchodní firma (název): FORMINSTER ENTERPRISES LIMITED
   Sídlo: 20 Queen Frederica Street, El Greco House, Nicosia, Kypr
   Další údaje o ovládající společnosti nejsou společnosti známy
   Výše podílu, který opravňuje k hlasování na valné hromadě emitenta:   55,74%

   **B/ Společnost ovládaná:**
   Obchodní firma : KOTVA a s
   Sídlo:            Praha 1, nám Republiky 8
   IČ:               60193808

   Mezi společnosti ovládající a ovládanou není uzavřena tzv. ovládací smlouva

   Definice dalších ovládaných osob:
   1  KOTVA a s  byla v roce 2002 vlastník 100% akcií KOTVA NEMOVITOSTI, a s, IČ: 26229048, se sídlem Brno, Příkop 4, zapsané v obchodním rejstříku Krajského soudu v Brně, oddíl B, vložka 3426
   2  KOTVA a s  byla v roce 2002 vlastník 100% akcií KOTVA OBCHODNÍ, a s, IČ: 26231735, se sídlem Brno, Příkop 4, zapsané v obchodním rejstříku Krajského soudu v Brně, oddíl B, vložka 3484
   3  KOTVA a s  byla v roce 2002 jediný společník obchodní společnosti Značková konfekcia s r o, IČ: 35689641, se sídlem Mickiewiczova 6, Bratislava, zapsané v obchodním registru Okresného súdu v Bratislave 1, oddíl Sro, vložka: 10928/B
   4  KOTVA a s  byla v roce 2002 jediným společníkem KOTVA-středisko praktického vyučování, s r o, IČ: 26123193, se sídlem Praha 1, nám. Republiky 8, zapsané v obchodním rejstříku Městského soudu v Praze, oddíl C, vložka 72148
   5  KOTVA NEMOVITOSTI, a s  vlastní od roku 2002  99% akcií společnosti KOTVA INTERNATIONAL LIMITED, č. 522767 se sídlem Geneva Place, Waterfront Drive, P O. Box 3469, Road Town, Tortola, British Virgin Islands
   6  KOTVA a s  byla v roce 2002 jediným společníkem společnosti SANDERSON s r o, IČ: 25666797 se sídlem Praha 3, Táboritská 1000/23, zapsané v obchodním rejstříku MěS v Praze, oddíl C, vložka 59498

3

- Společnost, tj emitent ani osoba, na které má emitent přímý či nepřímý podíl přesahující 50% základního kapitálu nebo hlasovacích práv nedrží vlastní účastnické cenné papíry s výjimkou 3 471 ks akcií, které byly vráceny zaměstnanci v souladu se stanovami společnosti a které byly valnou hromadou společnosti, konanou 6 8 2001 změněny ze zaměstnaneckých na kmenové, takto zapsány soudem na základě usnesení Městského soudu v Praze čj F 86816/2001 ze dne 15 11 2001 a které budou po zákonném postupu společností zcizeny

- Jmenovitá hodnota povoleného nebo podmíněného zvýšení základního kapitálu a případná lhůta pro jeho zvýšení, okruh osob s právem na výměnu cenných papírů, přednostní upisování akcií a podmínky a postup při vydávání nových akcií se řídí platnými stanovami a obchodním zákoníkem

- Společnost nevlastní akcie, které nezakládají podíl na základním kapitálu

- Podmínky pro změny výše základního kapitálu a práv vyplývajících z jednotlivých druhů akcií ve stanovách společnosti nejsou přísnější než podmínky stanovené zákonem

- ## Osoby s podílem 5 % na hlasovacích právech emitenta:

  Uvádíme osoby dle údajů z výpisů z registru emitenta ze SCP v průběhu roku 2002, které má emitent k dispozici; nejedná se o data, ke kterým došlo ke změně vlastnictví akcií:

  | Specifikace osoby | Počet akcií | Podíl na hlasovacích právech |
  |---|---|---|
  | FORMINSTER ENTERPRISES LIMITED, 20 Queen Frederica Street El Greco House | 385 038 | 55,74% |
  | ARBEGE HOLDING LIMITED, Dingorou St.Fl.601, CY-1010 Nicosia | 97 854 | 14,10% |
  | Bank of Bermuda /Guernsey/ Limited, St.Julians Avenue,St.Peter Port. Guernsey | 82 023 | 11.68% |
  | Melodia, spol s r o , Na hrázce 241, Hradec Králové | 56 000 | 8,10 % |

- ## Základní kapitál

  Výše upsaného základního kapitálu činí 694 209 000,- Kč a je zcela splacen  Základní kapitál je rozložen na 694 209 ks akcií  o jmenovité hodnotě po 1 000,- Kč  Všechny akcie znějí na majitele, jsou vydány v zaknihované podobě a jsou registrované

  Společnost nevydala žádné cenné papíry, které opravňují k uplatnění práva na výměnu za jiné účastnické cenné papíry nebo na přednostní úpis jiných účastnických cenných papírů

  V letech 1993-2002 nedošlo k žádným změnám ve výši základního kapitálu  Základní kapitál společnosti je 100% splacen

4

Pohyby vlastního jmění

| (tis. Kč) | 2000 | 2001 | 2002 |
|---|---|---|---|
| Vlastní jmění k 1. 1. | 518.347 | 454.992 | 465.707 |
| Výplata zaměstnaneckých akcií | -30 | -59 | |
| Platby na vrub sociálního fondu | -313 | | |
| Ztráta (zisk) běžného roku | -63.012 | 10 774 | 19.809 |
| Oceňovací rozdíly z přecenění majetku a závazků | | | -41 |
| Nerozdělený zisk minulých let | | | -36 |
| Vlastní jmění k 31. 12. | 454.992 | 465.707 | 485.439 |

- **Cenné papíry**

| | |
|---|---|
| Druh | kmenové |
| Forma | na majitele |
| Podoba | zaknihovaná |
| Počet kusů | 694 209 ks |
| Připojené kupóny | ne |
| ISIN | CZ 0009048955 |
| Celkový objem emise | 694 209 000,- Kč |
| Jmenovitá hodnota akcie | 1 000,-Kč |

Valná hromada konaná dne 6.8. 2001 rozhodla o změně zaměstnaneckých akcií na kmenové akcie na majitele. Společnost vykupuje zaměstnanecké akcie od odcházejících pracovníků. Usnesením Městského soudu v Praze ze dne 15. 11. 2001 byly vymazány akcie na majitele v počtu 3 471 ks a přeměněny na kmenové akcie na majitele. Prodej nebyl dosud realizován, neboť společnosti nebyl přidělen ISIN.

- **Způsob převodu cenných papírů:**

  K převodu kmenových akcií dochází registrací převodu v zákonem stanovené evidenci na základě příkazu k registraci převodu (§ 21 z č. 591/1992 Sb., o cenných papírech v platném znění). Převoditelnost akcií není omezena.

- Výnos z akcie je zdaňován podle zákona ČNR č. 586/1992 Sb., o daních z příjmu ve znění pozdějších předpisů. Daň se vybírá srážkou při výplatě dividendy.

- Emise cenných papírů byla přijata k obchodování na veřejných trzích:
  a) Burza cenných papírů Praha, a.s
  b) RM - SYSTÉM, a.s

- Akcie jsou evidovány ve Středisku cenných papírů

- Společnost nemá uzavřenu smlouvu s bankou nebo jinou k tomu oprávněnou osobu, jejímž prostřednictvím mohou majitelé akcií zdarma uplatňovat svá majetková práva spojená s těmito cennými papíry (výplata dividend)

5

- **Popis práv vyplývajících z akcií:**

  a) akcionář je oprávněn účastnit se valné hromady, hlasovat na ní, má právo požadovat a dostat na ní vysvětlení záležitostí týkajících se společnosti, je-li takové vysvětlení potřebné pro posouzení předmětu jednání valné hromady a uplatňovat návrhy a protinávrhy S každou akcií o jmenovité hodnotě 1 000,- Kč je spojen jeden hlas Dle stanov společnosti se nejprve hlasuje o návrhu svolavatele valné hromady Společnost nevydala prioritní akcie s prioritními právy.

  b) akcionář má právo na podíl na zisku společnosti (dividendu), který valná hromada podle hospodářského výsledku schválila k rozdělení Tento podíl se určuje poměrem jmenovité hodnoty jeho akcií k jmenovité hodnotě akcií všech akcionářů,

  c) akcionář má právo na podíl na likvidačním zůstatku Likvidační zůstatek se dělí mezi akcionáře v poměru jmenovitých hodnot jejich akcií,

  d) dividenda je splatná do tří (3) měsíců ode dne, kdy valná hromada přijala usnesení o rozdělení zisku Dividendy, jež nebylo možno vyplatit či doručit jejich adresátovi, budou uloženy na zvláštním bankovním účtu společnosti, přičemž oprávněné osoby si je po dobu čtyř (4) let ode dne splatnosti mohou vyzvednout v sídle společnosti po předložení příslušných dokladů Právo na dividendu v případě neuplatnění akcionářem přechází na zákonného právního nástupce ve smyslu ustanovení občanského a obchodního zákoníku V případě promlčení se uplatňuje obecná čtyřletá promlčecí lhůta podle § 397 obchodního zákoníku

  Další akcionářská práva vyplývají z obchodního zákoníku a stanov společnosti Skutečnosti důležité pro uplatňování akcionářských práv společnost dle svých stanov uveřejňuje v celostátně distribuovaném deníku Lidové Noviny nebo týdeníku Obchodní Věstník

- Právo na přednostní úpis dosavadních akcionářů a omezení nebo vyloučení tohoto práva je v souladu s platným zákonem, dle současných platných stanov není upraveno

- Mezi veřejnost je umístěno 29 340 ks akcií, na které připadá 29 340 000,- Kč základního kapitálu, tj 4,25 % z celkového základního kapitálu společnosti

- V roce 2002 ani v účetním roce předcházejícím nebyla učiněna veřejná nabídka převzetí akcií emitenta, činěná třetími osobami, ani veřejná nabídka převzetí akcií jiných společností činěná emitentem

6

# 3. Údaje o činnosti a finanční situaci

Textová část viz odd II Zpráva představenstva o podnikatelské činnosti a stavu majetku společnosti

| ROK | 2000 | 2001 | 2002 |
|---|---|---|---|
| Hospodářský výsledek za účetní období k 31.12. v t. Kč | -63 012 | 10 774 | 19 809 |
| Hospodářský výsledek/1 ks akcie v Kč | -90,77 | 15,52 | 28,54 |
| Dividendy | 0 | 0 | |
| Konsolidovaný hospodářský výsledek za účetní období k 31.12. v t. Kč | 247 702 | 238 473 | 60 410 |
| Konsolidovaný hospodářský výsledek/1 ks akcie v Kč | 356,82 | 343,52 | 87,02 |

<u>Údaje o tržbách:</u>

a) Vývoj tržeb za prodané vlastní výrobky, služby a zboží v t. Kč

| ROK | 2000 | 2001 | 2002 |
|---|---|---|---|
| Tržby za vlastní výrobky | 2 430 | 0 | 0 |
| Tržby za služby | 123 157 | 99 093 | 56 972 |
| Tržby za zboží | 511 641 | 0 | 0 |

b) Rozlišení tržeb dle druhů činnosti v %:

| % tržeb | 2000 | 2001 | 2002 |
|---|---|---|---|
| Vlastní výrobky | 0,38 | 0 | 0 |
| Služby – nájemné,pronájmy zařízení | 10,77 | 0,15 | 2,50 |
| - ostatní služby | 8,55 | 99,85 | 97,50 |
| Tržby za zboží | 80,30 | 0 | 0 |

<u>Hlavní činnost dle druhu v t. Kč:</u>

| | |
|---|---|
| Pronájmy zařízení, nájemné | 1.421 |
| Lékařské výkony od zdravotních pojišťoven | 786 |
| Služby právní,účetní, bezpečnostní | 25.232 |
| Ochranná známka-licence | 29.533 |
| CELKEM | 56.972 |

<u>Průměrný přepočtený počet zaměstnanců, řídících pracovníků a osobní náklady:</u>

| | 2000 | | 2001 | | 2002 | |
|---|---|---|---|---|---|---|
| | počet pracovníků | osobní náklady (t.Kč) | počet pracovníků | osobní náklady (t.Kč) | počet pracovníků | osobní náklady (t.Kč) |
| řídící pracovníci | 4,91 | 7 769 | 3,5 | 3 717 | 0,75 | 817 |
| ostatní pracovníci | 455 | 134 188 | 97,5 | 30 935 | 10,25 | 4 687 |
| celkem | 460 | 141 957 | 101,0 | 34 652 | 11 | 5 504 |

7

- **Investiční činnost:**
- investice uskutečněné v tuzemsku v letech 1999 až 2002:

| Období | Název investice | Pořizovací cena v tis. Kč | Způsob financování |
|--------|-----------------|---------------------------|--------------------|
| 1999 | Eskalátory *) | 46.700 | leasing |
| | Telefon.ústředna | 2.100 | vlastní zdroje |
| | Informační systémy | 1.500 | vlastní zdroje |
| | Modernizace prodejních odd. | 2.000 | vlastní zdroje |
| 2000 | Výtahy *) | 4.500 | leasing |
| | Rekonstrukce rozvodů vody -VZT | 2.650 | vlastní zdroje |
| | Rekonstrukce patrových rozvaděčů | 1.200 | vlastní zdroje |
| 2001 | Osobní automobil Mercedes | 102 | leasing, vlastní zdroje |
| 2002 | 0 | 0 | |

*) U leasingových smluv na eskalátory a výtahy byl v roce 2001 uskutečněn převod na nového nájemce KOTVA NEMOVITOSTI, a s

- finanční investice

| 2000 | 2001 | 2002 |
|------|------|------|
| 535 995 | 539 149 | 577 237 |

Počet a nominální hodnota podílových a ostatních cenných papírů a vkladů v tuzemsku a v zahraničí k 31 12  2002:

| Název společnosti | Podíl | Nominál. hodnota (Kč) | Cena pořízení (tis. Kč) | Opravná položka (tis. Kč) | Forma |
|-------------------|-------|-----------------------|-------------------------|---------------------------|-------|
| Artia, a. s. v likvidaci | 30 ks | 10.000 | 300 | 300 | listinná |
| Motokov, a. s. | 500 ks | 1.000 | 500 | 500 | zápis v SCP |
| Značková konfekcia s. r. o. | 100 % | | 150 | 150 | |
| KOTVA SPV s. r. o. | 100 % | | 100 | 0 | |
| KOTVA NEMOVITOSTI, n.s. | 100 % | 10 mil. | 536.383 | 0 | listinná |
| KOTVA OBCHODNÍ, a. s. | 100 % | 100.000 | 39.000 | 16.000 | listinná |
| SANDERSON, s.r.o. | 100 % | | 100 | 0 | |
| Kotva International Limited | 1% | 1 USD | 30 | 0 | |
| Celkem | | | 576.563 | 16.950 | |

8

- **Majetkové účasti:**

KOTVA a.s. byla v roce 2002 jediný akcionář vlastník 100% akcií:

**1) Obchodní firma:**      **KOTVA NEMOVITOSTI, a.s.**
Právní forma:      akciová společnost
Sídlo:      Brno, Příkop 4
IČO:      26229048
Datum založení:      16 11 2000
Hlavní předmět podnikání:      pronájem nemovitostí, bytů a nebytových prostor spočívající v poskytování základních služeb zajišťujících jejich řádný provoz, koupě zboží za účelem jeho dalšího prodeje a prodej, správa majetkových účastí, vyjma činností uvedených v § 3 zák č. 455/1991 Sb

Výše upsaného zákl kapitálu:      2 200 000 tis Kč
Výše a druhy rezerv:      53 268 tis Kč – zákonná rezerva
     14 775 tis Kč - odložený daňový závazek
         (pohledávka)

Výše zisku nebo ztráty:      - 99 962 tis Kč

**2) Obchodní firma:**      **KOTVA OBCHODNÍ, a.s.**
Právní forma:      akciová společnost
Sídlo:      Brno, Příkop 4
IČO:      26231735
Datum založení:      7 12 2000
Hlavní předmět podnikání:      koupě zboží za účelem jeho dalšího prodeje a prodej

Výše upsaného zákl kapitálu:      39 000.000,-Kč
Výše a druhy rezerv:      93 t Kč – odložený daňový závazek
         (pohledávka)

Výše zisku nebo ztráty:      -21.493 t Kč

KOTVA a.s. byla v roce 2002 jediný společník:

**1) Obchodní firma:**      **Značková konfekcia s.r.o.**
Právní forma:      společnost s ručením omezeným
Sídlo:      Bratislava, Micklewiczova 6, Slovenská republika
IČO:      35689641
Datum založení:      26 4 1996
Hlavní předmět podnikání:      koupě zboží za účelem jeho dalšího prodeje a prodej

Výše upsaného zákl kapitálu:      200 000,-Sk
Výše a druhy rezerv:      3 664 t Sk – rezerva na kursové ztráty
Hospodářský výsledek za uč období: 287 t Sk

9

**2) Obchodní firma:**                   KOTVA-středisko praktického vyučování,
                                        s r.o.
   Právní forma:                        společnost s ručením omezeným
   Sídlo:                               Praha 1, nám Republiky 8
   IČO:                                 26123193
   Datum založení:                      25 10 1999
   Hlavní předmět podnikání:            poskytování praktické výuky studijních oborů
                                        koupě zboží za účelem jeho dalšího prodeje
                                        a prodej
   Výše upsaného zákl kapitálu:         100 000,-Kč
   Výše a druhy rezerv:                 1 tis Kč – zákonný rezervní fond
   Výše zisku nebo ztráty po zdaněnl:   0,--Kč


**3) Obchodní firma:**                   SANDERSON s.r.o.
   Právní forma:                        společnost s ručením omezeným
   Sídlo:                               Praha 3, Táboritská 1000/23
   IČO:                                 25666797
   Datum založení:                      13 5 1998
   Hlavní předmět podnikání:            koupě zboží za účelem jeho dalšího prodeje
                                        a prodej
   Výše upsaného zákl kapitálu:         100 000,-Kč


**Další majetkové účasti:**

**1) Obchodní firma:**                   KOTVA INTERNATIONAL LIMITED
   Sídlo:                               RN 522767, Geneva Place, Waterfront Drive,
                                        P.O.Box 3469, Road Town, Tortola, British
                                        Virgin Islands
   Majetkový podíl:                     1% (1 000 ks akcií, nominální hodnota 1,-USD)
   Výše upsaného zákl kapitálu:         1 001 000,--USD
   Výše zisku nebo ztráty po zdaněnl:   0,--USD


**2) Obchodní firma:**                   MOTOKOV, a.s.
   Majetkový podíl:                     500 ks akcií v nominální hodnotě 1 000,-Kč


**3) Obchodní firma:**                   Artia, a.s. (v likvidaci)
   Majetkový podíl:                     30 ks akcií v nominální hodnotě 10 000,-Kč


- KOTVA a s je majitelem ochranné známky kombinované „KOTVA" pod reg č  167 478
  a na základě Licenční smlouvy o ochranné známce ze dne 28.2 2001 je KOTVA
  NEMOVITOSTI, a s IČO: 26229048 oprávněna k výkonu práv z průmyslového vlastnictví,
  užívat ochrannou známku Dále je majitelem ochranné známky slovní KOTVA
  pod reg č  173 919

10

**Výkaz zisků a ztrát v zkráceném rozsahu 2000-2002**

|     |                                                                                                    | 2000    | 2001    | 2002    |
|-----|----------------------------------------------------------------------------------------------------|---------|---------|---------|
| 1.  | PROVOZNÍ VÝNOSY                                                                                     | 850 434 | 140 663 | 199 015 |
|     | Tržby za prodej zboží                                                                               | 511 641 |         |         |
|     | Výkony                                                                                              | 128 106 | 99 093  | 56 972  |
|     | Tržby z prodeje majetku                                                                             | 1 988   | 19 972  | 323     |
|     | Ostatní provozní výnosy                                                                             | 208 699 | 21 598  | 141 720 |
| 2.  | PROVOZNÍ NÁKLADY                                                                                    | 894 119 | 103 983 | 154 103 |
|     | Náklady na prodané zboží                                                                            | 383 625 |         |         |
|     | Spotřeba materiálu a energie                                                                        | 31 860  | 3 472   | 795     |
|     | Služby                                                                                              | 66 679  | 20 157  | 7 174   |
|     | Osobní náklady                                                                                      | 141 957 | 36 632  | 6 404   |
|     | Daně a poplatky                                                                                     | 363     | 139     | 77      |
|     | Odpisy investičního majetku včetně zůstatkové ceny prodaného investičního majetku                  | 59 423  | 19 718  | 157     |
|     | Ostatní provozní náklady                                                                            | 210 212 | 23 865  | 139 496 |
| A.  | PROVOZNÍ HOSPODÁŘSKÝ VÝSLEDEK                                                                       | -43 685 | 36 680  | 44 912  |
| 3.  | FINANČNÍ VÝNOSY                                                                                     | 245     | 2 088   | 675     |
| 4.  | FINANČNÍ NÁKLADY                                                                                    | 31 473  | 24 957  | 26 091  |
| B.  | HOSP. VÝSLEDEK Z FINANČNÍCH OPERACÍ                                                                 | -31 228 | -22 869 | -25 416 |
| 5.  | MIMOŘÁDNÉ VÝNOSY                                                                                    | 3 725   | 1 513   | 584     |
| 6.  | MIMOŘÁDNÉ NÁKLADY                                                                                   | -9 029  | 4 550   | 429     |
| C.  | MIMOŘÁDNÝ HOSPODÁŘSKÝ VÝSLEDEK                                                                      | 12 754  | -3 037  | 155     |
| D.  | HOSPODÁŘSKÝ VÝSLEDEK PŘED ZDANĚNÍM                                                                  | -62 159 | 10 774  | 19 651  |
|     | DAŇ Z PŘÍJMU ZA BĚŽNOU ČINNOST SPLATNÁ                                                              | 853     |         |         |
| E.  | HOSPODÁŘSKÝ VÝSLEDEK ZA ÚČETNÍ OBDOBÍ                                                               | -63 012 | 10 774  | 19 809  |

**Rozvaha v zkráceném rozsahu 2000-2002**

| | k 31.12.2000 | k 31.12.2001 | k 31.12.2002 |
|---|---|---|---|
| AKTIVA CELKEM | 783 386 | 778 498 | 589 458 |
| 1. Stálá aktiva | 573 981 | 560 744 | 582 689 |
| □ dlouhodobý nehmotný majetek | 2 702 | 70 | 3 |
| □ dlouhodobý hmotný majetek | 36 950 | 23 191 | 23 073 |
| pozemky | 23 000 | 23 000 | 23 000 |
| budovy, haly, stavby | | | 10 |
| samostatné movité věci | 9 637 | 55 | 63 |
| jiný hmotný investiční majetek | 1 884 | 136 | |
| nedokončené hmotné investice | 2 429 | | |
| □ finanční dlouhodobý majetek | 534 329 | 537 483 | 559 613 |
| 2. Oběžná aktiva | 200 589 | 215 672 | 6 755 |
| □ zásoby | 2 826 | | 0 |
| materiál | 2 826 | | |
| zboží | | | |
| □ dlouhodobé pohledávky | | | |
| □ krátkodobé pohledávky | 153 390 | 214 553 | 6 317 |
| pohledávky z obchodního styku | 151 835 | 178 973 | 931 |
| stát-daňové pohledávky | | 15 | 1 |
| pohledávky v podnicích s rozh.vlivem | 1 300 | 35 510 | 5 371 |
| jiné pohledávky | 255 | 55 | 14 |
| □ finanční majetek | 44 373 | 1 119 | 438 |
| 3. Ostatní aktiva | 8 816 | 2 082 | 14 |
| □ časové rozlišení | 8 726 | 2 069 | 1 |
| □ dohadné účty aktivní | 90 | 13 | 13 |
| PASIVA CELKEM | 783 386 | 778 498 | 589 458 |
| 1. Vlastní jmění | -454 992 | -465 707 | -485 439 |
| □ základní jmění celkem | 690 803 | 690 744 | 690 744 |
| základní jmění | 694 209 | 694 209 | 694 209 |
| vlastní akcie | -3 406 | -3 465 | -3 465 |
| □ kapitálové fondy | 34 | 34 | -7 |
| □ fondy ze zisku | 71 560 | 71 560 | 72 099 |
| zákonný rezervní fond | 71 560 | 71 560 | 72 099 |
| statutární a ostatní fondy | | | |
| □ hospodářský výsledek minulých let | -244 393 | -307 405 | -297 206 |
| □ hospodářský výsledek běžného období | -63 012 | 10 774 | 19 809 |
| 2. Cizí zdroje | 326 822 | 312 670 | 103 951 |
| □ rezervy | 10 000 | 10 000 | -122 |
| □ dlouhodobé závazky | 109 436 | 108 348 | 64 978 |
| □ krátkodobé závazky | 169 786 | 180 122 | 29 479 |
| z obchodního styku | 134 151 | 129 635 | 947 |
| k zaměstnancům | 6 970 | 1 670 | 278 |
| ze sociálního zabezpečení | 3 676 | 993 | 133 |
| vůči státu | 6 937 | 1 911 | 243 |
| závazky k podnikům s rozhodujícím vlivem | | 45 067 | 27 883 |
| jiné | 18 052 | 846 | 5 |
| □ bankovní úvěry | 37 600 | 14 200 | 9 616 |
| dlouhodobé | | 11 800 | 4216 |
| běžné | 16 600 | 2 400 | 5 400 |
| krátkodobé finanční výpomoci | 21 000 | | |
| 3. Ostatní | 1 572 | 121 | 68 |
| □ časové rozlišení | 1 531 | | 36 |
| □ dohadné účty pasivní | 41 | 121 | 32 |

# 4. Údaje o statutárních a dozorčích orgánech, vedení společnosti a soudních sporech

1. **Statutární a dozorčí orgány, vedení společnosti:**

   **Představenstvo:**
   - Martin Benda, r č 710908/3795, bytem Borač 46, okr Žďár nad Sázavou – předseda představenstva
   - John Moffitt, nar 16 července 1964, bytem Praha 1, Bílkova 14 – místopředseda, zánik funkce:12.11 2002
   - Ing Richard Harazim, r č 650310/1363, bytem Brno, Skorkovského 174, člen
   - Ing Irena Šmejcová, r č. 735406/0285, bytem Praha 4, U Nových domů II 532/11, člen, zánik funkce 11 11 2002
   - Ing Michal Vlach, r č 660411/0183, bytem Brno, Galandauerova 10, člen, den vzniku funkce: 11 11 2002
   - Ing Jaromír David, r č 420511/429, bytem Brno, V Lužích 1, člen, den vzniku funkce: 12 11 2002

   **Dozorčí rada:**
   - JUDr Luděk Krajhanzl, r č 540512/3405, bytem Praha 6, V udolí 493, člen, zánik funkce 17 1 2003
   - Radim Polame, r č 520617/044, bytem Praha 4, Mnichovická 719/4, člen dozorčí rady zvolený zaměstnanci společnosti KOTVA a s
   - Mgr. Martin Razim, r č 570514/0914, bytem Hradec Králové, P Hanuše 252, člen, zánik funkce 14 2 2003
   - Ing Pavel Richter, r č 480524/409, bytem Brno, Rolnická č 7, člen, den vzniku funkce:14 2 2003

   **Vedoucí zaměstnanci společnosti:**
   - generální ředitel – Ing Richard Harazim
   - ekonomický manažer – Ing Jaromír David, CSc

   Zaměstnanci nemají možnost učastnit se na základním kapitálu emitenta a řízení společnosti

   Členové představenstva a dozorčí rady nevlastní akcie společnosti

   Členům představenstva ani dozorčí rady neposkytla společnost žádné úvěry nebo půjčky, nepřevzala žádné záruky ani jištění za úvěry

- Plnění poskytnuté statutárním orgánům nebo jejich členům a členům dozorčích orgánů emitenta (v tis Kč) :

| v Kč | Peněžité příjmy | Z toho tantiémy | Naturální příjmy |
|---|---|---|---|
| Představenstvo | 720 | 0 | 0 |
| Dozorčí rada | 180 | 0 | 0 |
| Vedení společnosti | 649 | 0 | 0 |

- Plnění statutárním orgánům nebo jejich členům a členům dozorčí rady poskytnuté osobami v celém koncernu v rámci České republiky (včetně plnění od emitenta):

| v Kč | Peněžité příjmy | Tantiémy | Věcná plnění |
|---|---|---|---|
| Představenstvo | 2 160 | 0 | 0 |
| Dozorčí rada | 900 | 0 | 0 |

2. **Údaje o soudních, správních nebo rozhodčích řízeních společnosti vedených v běžném účetním období a dvou předcházejících účetních obdobích:**

Na základě rozhodnutí Komise pro cenné papíry čj : 31/837/2000 ze dne 2 6 2000 bylo zrušeno předběžné opatření o pozastavení obchodování s veřejně obchodovatelnými akciemi vydanými společností KOTVA a s v zaknihované podobě v celkovém objemu 690 738 000,-Kč a zároveň bylo zastaveno správní řízení v této věci

Na základě pravomocného usnesení Krajského obchodního soudu v Praze č j.: 47 Cm 261/97-443 ze dne 22 5 2000, podle kterého se zastavuje řízení ve věci nároku, došlo k zániku předběžného opatření podle usnesení Krajského obchodního soudu v Praze čj : 261/97 (47 Cm 261/97-219), kterým bylo omezeno nakládání nemovitostmi ve vlastnictví společnosti

**Ostatní údaje o soudních, správních nebo rozhodčích řízeních:**

**I. Pohledávky v konkursním řízení:**
- A-B-Comp  a s – Kč 21 251,50 – dosud neukončeno
- AD reklamní agentura – Kč 400 000 - . 12 2 1999  konkurs zrušen – majetek úpadce nepostačuje k úhradě nákladů konkursu
- AGU International  s r o - Kč 3 910,- - skončeno - 30 60 Kč
- ALSIA TRADING, s.r.o. – Kč 5 787 60 – zrušen pro nedostatek majetku 1 8 2000
- BLONDIE s r o – Kč 1 500,- - zrušeno 14 11 2000 pro nedostatek majetku
- B-BREMEX s r o – Kč 58 876.- konkursní řízení neukončeno
- Císařská huť  a s – Kč 3 917.- ukončeno bude poukázáno Kč 4.50
- CALEX Zlaté Moravce, a s – Sk 74 877.- dosud neukončeno
- Caster-o Kč 5 500,-Kč, konk říz. skončeno-podíl 0 00328%%
- Centrotex. a s  - 39 988,- dosud neukončeno
- Classic restaurant – Kč 17 500.- - konkurs zrušen  majetek nepostačuje k úhradě nákladů
- Exico, a s – Kč 64 084,30 – dosud neukončeno
- East West Travel – Kč 60 895.- 21 2 2001 zrušen pro nedostatek majetku
- FIREX, a.s. – Kč 458 620.- dosud neukončeno
- Gen řed AGRAS – Kč 55 267.- - dosud neukončeno
- IBEX s r o – Kč 7 826.30 – dosud neukončeno

14

- J R Villmek. s r o. – Kč 848 903,- - dosud neukončeno
- Itec Motro n.s – 49 500.-Kč a 16.500,-Kč – přihláška do k ř
- IMPEX. a s Bratislava – Sk 1 155 126 24 – dosud neukončeno
- JEVIsport. s r o – Kč 16 470.- dosud neukončeno.
- Kastner. s r o – Kč 7 500,- – zrušen 25 9 2000 pro nedostatek majetku
- NADA. s r o – Kč 59 107,90 – dosud neukončeno
- Melodia, s r o – Kč 16 195 50 – dosud neukončeno
- Neapol Moda  s r o – Kč 2 968 996.20 – 16 2 2001 zrušen pro nedostatek majetku. likvidace  výmaz 3 12 2002
- Meopta  20 035 -Kč přihláška do k ř.
- Pronto Plus. a s – Kč 35 783.- dosud neukončeno
- SAS + KIA, s r o – Kč 507 400.- – popřena Kč 73 2000 správcem konk podstaty  dosud neukončeno
- Slušovice JZD- 2x 490 200,-Kč , přihláška, dosud neskončeno
- SPRINT. a s  Brno – Kč 50 380,50 – dosud neukončeno
- SPRINT a s . IČ: 63079755, přihláška pohledávky 240 250 -Kč
- TIP TOP, s r o – Kč 145 640,- - dosud neukončeno
- TOSTA A87 355,- dosud neukončeno
- Tvrský Mirko – Kč 30 0000,- - 20.12 2000 zrušen pro úmrtí úpadce
- Universum . s r o – Kč 424 764,80 – ukončeno – přiznáno 2 138%
- Veselý Radovan – Kč 6 100,- - dosud neukončeno
- Velkoobchod Kilian – Kč 30 460.90 – dosud neukončeno
- Zádruha  dr  – Kč 7 120.- 28 2 2001 zrušen pro nedostatek majetku

## II. Pohledávky v soudním řízení
- AG Kult. fa Kčs 2491,50. 5517 - žaloba. pravomocný rozsudek. žádost o pomoc soudu dle § 26O o s ř
- Alsia Trading s r o  o Kčs 5 287 60  přihláška pohledávky do konkurzního řízení. konkurz zrušen  přiznáno v rozsudku MS v Praze
- Agrostroj Prostějov o Kčs 2 950 - žaloba  pravomocný rozsudek. výkon rozhodnutí-exekuce
- Alpha s r o  o Kč 21 060,- žaloba. pravomocný rozsudek. žádost o pomoc soudu při exekuci. neúspěšné
- A-B-Comp n s  o Kč 6 150 --žaloba. pravomocný platební rozkaz. žádost o pomoc soudu dle § 26O o s ř  – zrušen konkurs
- A-B-Comp a s. o 15 101,50 Kč. žaloba. platební rozkaz. zrušen konkurs
- Assenov - škoda Kč 2 150.- - trestní příkaz 17 2.1996
- AD rekl agentura s r o. o 400 000 --Kč. žaloba konkursní řízení zrušeno, rozsudek
- Balog A  o Kčs 27 950.-, žaloba. pravomocný rozsudek, výkon rozhodnutí -exekuce
- Balog E  o Kčs 4 631,-. žaloba . pravomocný rozsudek. výkon rozhodnutí- exekuce
- Balog J  o Kčs 9 855,- žaloba. rozsudek. exekuce
- Balog R. o Kčs 3 455,-. žaloba  2 x výkon rozhodnutí-exekuce. zastaveno
- Brabec R  o Kčs 1 540 - pravomocný rozsudek, výkon rozhodnutí- exekuce
- Bimbo - rekl 152. 153, 173, o 9 300,--Kč žaloby. pravomocný rozsudek
- Banda Ernest o 112 22O,--Kč, žaloba  pravomocný rozsudek. soudní výkon rozhodnutí -exekuce
- Bona r  114/K/075/93 Kč 11 915 - žaloba. pravomocný rozsudek
- K Březinová  Motorest Kristinka o 8 769 --Kč, žaloba. pravomocný rozsudek. výkon rozhodnutí bezúspěšně proveden
- Bílak – o Kč 45 410,- dosud neobdržen rozsudek MS v Praze
- Brožík -Eastern Prof models o 7 500,--Kč . žaloba. neprovedená exekuce
- Blondie s r o  o l 500.--Kč  žaloba. platební rozkaz, přihláška do konkursu
- Bytoservis s r o. o 66 822,--Kč, platební rozkaz, § 260 o s ř
- Centrotex, rekl.č  9a/084/91 o Kčs 49 500.-žaloba. rozsudek. odvolání KOTVA n s  probíhá soudní řízení. konkurs
- ČSAD o Kčs 23 430.- žaloba. platební rozkaz doposud pravomocně nerozhodnuto
- Compact Techn  o Kčs 9 343 - žaloba Červenka. pravomocný rozsudek, soudní výkon rozhodnutí-exekuce neprovedena
- Cest kanc  GEO o Kčs 14 000.-Kč žaloba  pravomocný rozsudek. návrh na soudní výkon rozhodnutí-exekuce. soupis proveden
- Class Praha dobropisy Kč 63 182 50 , žaloba. rozsudek. § 260 o s ř
- Calex - dobropis o 74 877,-žaloba, pravomocný rozsudek. soudní výkon rozhodnutí-exekuce. konkurs
- Classic restaurant o 20 000,--Kč  žaloba  konkurs zrušen malý majetek
- Colorlak s.p. fa Kč 15 178,20 –rozsudek. žádost 260 o s ř
- Dómová. žaloba o Kčs 26 922 - žaloba  pravomocný rozsudek. soudní výkon rozhodnutí-exekuce  nemá žádný majetek. neprovedena
- Družstvo Uno Břeclav o Kčs 19 925 - rozsudek  v likvidaci. konkurs zrušen
- Drevoindustria Žilina o Kč 82 400,-žaloba. platební rozkaz. žádost o exekuci. nemají finance na účtu
- Duffi s r o  238 937,--Kč.ručitelský závazek  odvolání
- Euro-komex – náhrada škody Kč 15 880 žaloba. rozsudek. odvolání. vráceno MS v Praze
- Etic s r o o Kč 66 240 - žaloba. rozsudek. §260 o s ř – společníci cizinci
- Festi s r o  o Kčs 30 100 - žaloba . pravomocný rozsudek - výkon rozhodnutí-exekuce. § 260 o s ř

- Frič s.r o Žilina. o Kč 15 619 - a 3 675 -žaloba. platební rozkaz. žádost o vyznačení právní moci. uhrazeno v exekuci částečně
- Ficena o 5 618,--Kč. žaloba. návrh na výkon rozhodnutí-exekuce. jsme v pořadí. propuštěn z VTOS
- Flieger o Kč 43 000.- pátrání po osobě v exekučním řízení
- Gen řed Agras v likvidaci o 55 267 --Kč. žaloba. pravomocný rozsudek. přihláška pohledávky - likvidační řízení
- Humanity Society o 102 713.50 Kč. trestní činnost, rozsudek, nutno právní moc a exekuci
- Hangurbadžo o 20 730.--Kč. žaloba. pravomocný rozsudek  výkon rozhodnutí-exekuce zastavena. neznáme jiné místo. kde jsou věci povinného
- Hrdý o 680.--Kčs. žaloba. rozsudek. exekuce únor 2003
- Hrubý /servisní služba / o 64 584,--Kč. žaloba. platební rozkaz. exekuce neprovedena. na adrese nebydlí
- Hefmánek Ing. o 21 500 --Kč. žaloba. pravomocný rozsudek. 2 x výkon rozhodnutí -exekuce
- Hadžala o 366,--Kč . 451,40 Kč - rozsudek.
- Hradecký, parking o 13 830.--Kč žaloba. exekuce  má jen vrtačku
- Holíková o 9 366.--Kč. platební rozkaz.
- Hajný - Šeky - trestní příkaz.
- Hejbalík Daniel, škoda Kč 1 845,- trestní příkaz vést exekuci
- ing. HEIP Tran Van  fa Kč 34870 -  22 722 - zavražděn
- Hejč Vladislav - škoda Kč 314 -  rozsudek
- Churvát - Topinka - neuhrazené faktury 21 520 --Kč. Kč 53 800 - - rozsudky. exekuce
- Impex s r o. 5003/88 o 12 649,60 Kčs. žaloba. pravomocný rozsudek. přihláška pohledávky do konkurzního řízení
- Impex- r 4032/90 o 121654.--Kčs žaloba.pravomocný rozsudek. přihláška pohledávky do konkurzního řízení
- Impex o 154 922,76 Kčs. žaloba. pravomocný rozsudek  přihláška pohledávky do konkurzního řízení
- Interiér o 73 340.--Kčs. neuhr dobropisy, žaloba. pravomocný rozsudek. žádost soudu o pomoc -při exekuci. konkurs
- Impex. neuhr dobropisy Kč 822 685.13 Kč žaloba. soudní smír. přihláška pohledávky do konkurzního řízení
- IBC s.r o  Jínočany Kč 42 797.- - rozsudek.
- Jaroš V .náhrada škody 2 100 --Kč rozsudek  návrh na soudní výkon rozhodnutí-exekuce
- JZD Velke Výklepy o 9 500 --Kčs. žaloba. pravomocný rozsudek. z r 1995. likvidace družstva
- Jícha - škoda 1 650.--Kč výkon rozhodnutí-exekuce. na adrese neznámý
- Jet-Set, dobropis 3/94 o 48 070,--Kč . žaloba  rozsudek  jednatel zemřel
- Kopečný, fa Kčs 3 089.- a 4 752 - trestná činnost. pravomocný rozsudek. žádost na vězeňskou službu ČR. kde se vykonává výkon trestu,exekuce zastavena zemřel žádný majetek
- Král fa č  970713 Kčs 5 215.. žaloba. pravomocný rozsudek  dva návrhy na výkon rozhodnutí-exekuce  jsme v pořadí
- Kúblech fa Kčs 30 700.- žaloba. pravomocný rozsudek  návrh na soudní výkon rozhodnutí-exekuce
- Krákora fa Kčs 1 231,20, žaloba, rozsudek. výkon rozhodnutí
- Krákora Jindřich - nájemné 72 000,-Kč. žaloba. pravomocný rozsudek. návrh na soudní výkon rozhodnutí. část inv důchod
- Kotlář Pavel o Kč 9 650,-, rozsudek. exekuce. zastavení žádný majetek  část inv důchod
- Koldová neuhrazené fa Kč 32 840 - žaloba  pravomocný platební rozkaz. exekuce
- Knotek o 31 160,--Kč.žaloba.pravomocný rozsudek. návrh na soudní výkon rozhodnutí-exekuce. marná exekuce
- Kůřčka Petr – Kč 15 000,-  rozsudek  exekuce
- Kastner s r o  o 2 500.--Kč. žaloba. konkurs zrušen  pokračovat v exekuci
- KORAL s r.o – Kč 14 157.94. rozsudek. exekuce
- Kučera – náhrada škody Kč 57 175.-, rozsudek. exekuce
- Lebanoramma. r  29/084/91 Kčs 21 600 --žaloba. nepravomocný rozsudek. nemožnost doručení účastníku. nový pokus o doložku pr moci
- Ing Lapikáš Lučenec - dbp  Kč 46 985 -žaloba  rozsudek, žádost o doložku právní moci. exekuce zastavena pro nepatrný majetek
- Lacko-trest činnost o 9 994.--Kč pravomocný rozsudek. návrh-dožádání vězeňské služby ČR.evidence vězňů neznámý pobyt
- Lněníčka Tomáš náhrada škody Kč 3 616 - splácí
- Mirga. fa Kčs 13 970,- žaloba. pravomocný rozsudek. návrh na výkon rozhodnutí-exekuce
- My a svět. fa Kčs 14 650 - žaloba. rozsudek  družstvo v likvidaci
- Magnet Pardubice, neopr maj prospěch 662 400,-žaloba., rozsudek, exekuce
- Meopta fa Kčs 20 035,- žaloba.přihláška pohledávky do konkurzního řízení
- Mink fa Kč 4 020,- žaloba. rozsudek
- Merlin s.r.o  o 5 057,--Kč, žaloba. rozsudek. odvolání Merlinu  potvrzený rozsudek
- Macek Tomáš o 19 500.--Kč. rozsudek
- März Radek o 6 800,--Kč. trest příkaz
- Maxa Fr  o 6 300.--Kč. žaloba  IČ. pravomocný rozsudek. exekuce
- May Day Grup s r o  o 18 983 --Kč, platební rozkaz
- Nogol neuhrazené faktury Kč 6 830,- a Kč 9 854 -rozsudek, exekuce
- Nivela Trading s r o  o 3 200,--Kč, dobropis. rozsudek. neúčinná exekuce
- Neradová Miroslava škoda Kč 1 390 -. rozsudek  podat exekuci
- Ocela Jan. 199 470.-Kč podvod, rozsudek
- OTF dobropisy Kč 220 526,-. 12 980 - žaloba, platební rozkaz. žádost o doložku právní moci, exekuce
- Opticentrum - škoda Kč 1550 099 - žaloba,pravomocný platební rozkaz. žádost o pomoc soudu § 260 o s ř
- Q-Ton -nezaplacené faktury. pl rozkaz. žádost dle § 260 neúčinná. nelze nalézt sídlo
- Ocílko o Kč 68 113.75 žaloba. rozsudek  exekuce neúčinná žádný majetek

- Průša / Lakona / o 6 820.--Kč žaloba. rozsudek: výkon rozhodnutí neúčinný. neznámý pobyt. bez data narození nelze zjistit
- Pospíšil náhrada škody Kčs 6 501.- žaloba. rozsudek. návrh na výkon rozhodnutí-exekuce nebyly nalezeny postižitelné věci
- Poskočil VI Kč 7 620.-. rozsudek. exekuce neúčinná. na nám známé adrese nebydlí. data narození neznámá
- Pavlík fa Kčs 4 838.-rozsudek. exekuce neúčinná
- Pragorest neuhrazené fa Kčs 14 415,- žaloby. platební rozkaz. rozsudek
- Průcha - škoda Kč 750,- výkon rozhodnutí-exekuce
- Pratex s.p Čadca o 2448.--Sk a 622 43 Sk.dobropisy.žaloba. pravomocný platební rozkaz
- Pozdíšek /KB ,ozn. FČ/  uznání závazku o 333 900,--Kč. žaloba. přiznáno. jeho odvolání
- Polínec o Kč 76 805.-, uznání dluhu z r.1997. splácí
- Rekonstrukce Praha fa Kčs 1 542.50 žaloba. pravomocný platební rozkaz. delimitace  neznámý subjekt
- Rus s.r o  o 3897.97 Kč,žaloba, rozsudek, podat exekuci
- Roubíčková FKSP 7 000.- (Veselá ručitel) srážky z platu KOTVA
- Stíx 1  trestná činnost Kč 9.300.-, rozsudek. výkon - rozhodnutí srážkami ze mzdy /exekuce/ - jsme v pořadí
- Š a Š fa Kčs 16 730,- a 6 835,- /Šoulová/ rozsudek 96
- Sadup - Škorpík fa Kčs 5 285 - rozsudek. exekuce
- Slušovice - o 2 X 490 200, žaloba. pravomocný rozsudek. návrh na soudní výkon rozhodnutí-exekuce.(přerušeno konkursem)
- Schyvil - fa Kč 4 760,- žaloba  pravomocný rozsudek. dva návrhy na soudní výkon rozhodnutí-exekuce.
- Sainer - škoda Kč 2200,--Kč, rozsudek, exekuce, nezjištěná osoba
- Spektrum - dbp Kč 9 728.- . žaloba, dotaz dle 260 o s f
- Šumavan Unibras dobropisy 35 037.--Kč žaloba  platební rozkaz. konkurs v roce 1997 vyhlášen  dozvěděli jsme se až v roce 1999.
- Šmíd Martin o 1.985,50 Kč. žaloba  pravomocný rozsudek  návrh na soudní výkon rozhodnutí-exekuce.
- Svit Zlín 214 952 70 Kč /dobropisy /. žaloba  pravomocný rozsudek. žádost - pomoc soudu pro exekuci.konkurs přihláška. zrušení konkursu Vrchním soudem. na KS v Brně
- Slánsky o  80 000.--Kč. omylem 2 x poukázána platba .žaloba. splácí
- Štumper o 4363.--Kč. žaloba, pravomocný rozsudek
- Sdružení přátel div.umění o 70 000.--Kč. rozsudek. není k nalezení. exekuce
- Šmídová E  Kč 1 902.-  rozsudek. exekuce
- Shilland and Co  O Kč 6405,-, platební rozkaz
- TEWA Comeritz neuhrazené faktury Kč 22 755.- žaloba - pravomocný rozsudek. /v likvidaci/
- Tenkl - fa č. 1091 Kčs 54000.-, žaloba. rozsudek  návrh na soudní výkon rozhodnutí
- TJ Rozvoj  o Kč 13 400,- rozsudek.
- I vrdský - dobropis Kč 30 000.-žaloba. pravomocný rozsudek - návrh na soudní výkon rozhodnutí-exekuce. konkurs. zemřel
- Trendex - reklamace 33 130,--Kč žaloba. rozsudek
- Tenders Group, o 5 040.-, rozsudek
- Wavrisch o 18 000.--Kč, FKSP. žaloba, návrh na soudní výkon rozhodnutí-exekuce
- Valenta, Sedláček 31 159.--Kč, splácí dluh
- Volák. Fliegr. Švngerko o 52 790.--Kč.trestná činnost, rozsudek. exekuce  návrh Voláka uhradit ve 3 splátkách
- Žaloudek o Kč 8 780.-  pokračovat v exekuci  částečně uhrazeno
- Železná H  Kč 9 087.- rozsudek
- Yond Dynamic Promotion o 3500.--Kč. rozsudek

# 5. Očekávaná hospodářská a finanční situace a vývoj činnosti v roce 2003

Počátkem roku 2003 vedení společnosti vyhodnotilo dosavadní postup realizace záměru na zvýšení základního kapitálu ve společnosti KOTVA OBCHODNÍ, a s a k zásadnímu kapitálovému posílení této společnosti rozhodlo ve smyslu §59 odst 2 Obchodního zákoníku zastavit přechod majetkového práva k předmětu nepeněžitého vkladu V tomto smyslu byl podán dne 20 1 2003 návrh na zpětvzetí návrhu na zahájení řízení ze dne 3 9 2002 Rozhodnutím Katastrálního úřadu Praha-město bylo předmětné řízení zastaveno a nabylo právní moci dne 25 2 2003

S vědomím povinnosti zaplatit hodnotu nepeněžitého vkladu v penězích ve smyslu § 59 odst 2 Obchodního zákoníku byl stanoven postup zajištění potřebných finančních prostředků odprodejem části aktiv společnosti KOTVA a s uvnitř společenství podniků KOTVA a získané finanční prostředky použít jako peněžitý vklad do základního kapitálu společnosti KOTVA OBCHODNÍ, a s ve výši 23 000 000,-Kč

Za tímto účelem byly předmětné pozemky v k ú Ruzyně odprodány V současné době je podán Návrh na vklad práva vlastnického na Katastrální úřad Praha-město

Na mateřské společnosti zůstávají zachovány činnosti vedení holdingu, finanční, správní a administrativní činnosti včetně správy majetkových podílů, mzdová účtárna a personální záležitosti a výkon zdravotního střediska

Hlavním předmětem podnikatelské činnosti je i nadále poskytování ekonomických služeb pro dceřině společnosti v omezeném rozsahu a realizace příjmů z pronájmu licenčních práv

Očekávaná hospodářská a finanční situace v roce 2003 v t.Kč:

| | |
|---|---:|
| Tržby za prodej vl. výrobků a služeb | 43.720 |
| Přidaná hodnota | 40.535 |
| Provozní hospodářský výsledek | 34.875 |
| Hospodářský výsledek z finančních operací | -4.975 |
| Hospodářský výsledek za účetní období | 20.631 |

18

# II. Zpráva představenstva o podnikatelské činnosti a stavu majetku společnosti

V návaznosti na realizované změny vyplývající z majetkové restrukturalizace aktiv společnosti v letech 2000-2001 a následné organizační změny převodu rozhodujících aktivit souvisejících s řízením provozu obchodního domu KOTVA, spočívající v zajištění technického provozu objektu a řízení agendy pronájmu nebytových prostor na společnost KOTVA NEMOVITOSTI, a s , plnila společnost KOTVA a s pouze správní funkce především v rámci vnitrokoncernových služeb zajišťující podnikové účetnictví včetně mzdového, plánovací funkce, finanční servis včetně bankovních operací, personální agenda, vedení podnikových archívů a lékařská péče

V koncernovém majetkovém uspořádání bylo v roce 2002 hlavním předmětem činnosti kromě poskytování uvedených služeb především správa akciových účastí v dceřiných společnostech

Hlavními zdroji příjmů byly příjmy za poskytované služby a příjmy z pronájmu licenčních práv  Celková finanční bilance společnosti v průběhu roku 2002 byla vyrovnaná a společnost dosáhla positivního hospodářského výsledku - zisku ve výši 19 809 tis  Kč, což představuje nárůst oproti předchozímu roku téměř dvojnásobný

V oblasti výsledkových účtů kromě výnosů z běžné činnosti a k tomu zúčtovaných přiměřených nákladů byla realizována transakce související s pohledávkou společnosti vůči společnosti SPRINT, a s  Na základě Smlouvy o postoupení pohledávky uzavřené mezi společnostmi KOTVA a s  a EUREX CONSULTANTS LIMITED byla na tuto společnost postoupena část pohledávky KOTVA a s vůči SPRINT, a s  ve výši 122 mil Kč  Na základě dohody obou stran pak následně se úplata za postoupenou pohledávku započetla proti pohledávce ve stejné výši, kterou měla společnost EUREX CONSULTANTS LIMITED vůči KOTVA a s  Tímto započtením dohodou tyto vzájemné pohledávky zanikly

Uvedené operace se promítly v položkách ostatních provozních výnosů a nákladů v následujícím rozsahu:

| | | |
|---|---|---|
| výnosy: | 122 000 tis  Kč | postoupení pohledávky ke SPRINT, a s  na EUREX |
| | 10 000 tis  Kč | rozpuštění rezervy za SPRINT, a s |
| | 660 tis  Kč | postoupení pohledávky na KOTVA NEMOVITOSTI, a s |
| | 497 tis  Kč | odpis nákladů KOTVA PARKING, s r o |
| náklady: | 135 000 tis  Kč | zúčtování postoupení pohledávky na EUREX za SPRINT, a s opravné položky |
| | 660 tis  Kč | zúčtování postoupené pohledávky na KOTVA NEMOVITOSTI, a s |
| | 497 tis  Kč | odpis nákladů KOTVA PARKING, s r o |
| | 733 tis  Kč | odpis nedobytných pohledávek z provozu garáží |

V uplynulém období se realizoval prodej cenných papírů ve výši 200 tis  Kč  V souladu s podnikatelským záměrem stavebního rozšíření parkovacích stání v podzemních garážích KOTVA a dosažení vyššího využití parkovacích míst, založila společnost KOTVA a s obchodní společnost KOTVA PARKING, s r o, k datu 13 3 2002 se základním kapitálem 200 tis  Kč, která měla provozovat podzemní garáže  S ohledem na přetrvávající právní spory s předchozím nájemcem parkingu, byl obchodní podíl v této společnosti odprodán za účetní hodnotu

19

V oblasti majetkových účtů je společnost KOTVA a s držitelem podílu akcií a obchodních podílů v celkové účetní hodnotě k 31 12 2002 – 577 237 tis Kč – dlouhodobý finanční majetek, v následujících společnostech:

| | |
|---|---|
| 536 383 000,-Kč | KOTVA NEMOVITOSTI, a s |
| 39 000 000,-Kč | KOTVA OBCHODNÍ, a s |
| 150 000,-Kč | Značková konfekcia s.r o. |
| 100 000,-Kč | KOTVA-Středisko praktického vyučování, s r o |
| 300 000,-Kč | Artia a s |
| 500 000,-Kč | MOTOKOV, a s |
| 100 000,-Kč | Sanderson, s r o |
| 30 000,-Kč | KOTVA INTERNATIONAL Ltd |
| 674 000,-Kč | Značková konfekcia s r o – půjčka |

Rozhodnutím jediného akcionáře KOTVA a s ze dne 9 3 2001 a rozhodnutím Krajského soudu v Brně ze dne 18 10 2001 a ze dne 19 6 2002 o zápis změn do obchodního rejstříku byly vytvořeny základní předpoklady k provedení zvýšení základního kapitálu KOTVA OBCHODNÍ, a s upisováním akcií o částku  38 000 000,-Kč v počtu 380 kusů, jmenovitá hodnota 100 000,-Kč, druh kmenové, forma na jméno, podoba listinná  Splacení emisního kursu bylo provedeno peněžitým vkladem ve výši 15 000 000,-Kč započtením peněžité pohledávky vůči společnosti KOTVA OBCHODNÍ, a s , kterou měla společnost KOTVA a s na základě Smlouvy o půjčce ze dne 18 1 2001 a upisováním akcií nepeněžitým vkladem, jehož předmětem jsou pozemky zapsané na listu vlastnictví 1130 pro katastrální území Ruzyně ve výši 23 000 000,-Kč

Z uvedeného důvodu podala společnost KOTVA a s  návrh na zahájení řízení o povolení vkladu do katastru nemovitostí ze dne 3 9 2002 vedeným pod č j  V-32304/02

Nahlédnutím do evidence nemovitostí u Katastrálního úřadu Praha-město společnost KOTVA a s  zjistila, že v době po splacení základního kapitálu formou Prohlášení vkladatele o vložení nemovitostí do základního kapitálu obchodní společnosti ze dne 26 3 2002 bylo u předmětné nemovitostí části dokumentovaných pozemků provedeno oddělení – bez vědomí vlastníka -- některých pozemků

S ohledem na výše uvedené a z opatrnosti pro případ odlišného posouzení Prohlášení vkladatele o vložení nemovitostí do základního kapitálu do obchodní společnosti ze dne 26 3 2002, učinila společnost KOTVA a s  dne 4 11 2002  Prohlášení vkladatele o vložení nemovitostí do základního kapitálu obchodní společnosti ve formě dodatku  V návaznosti na to byl podán Doplňující návrh na zahájení řízení o povolení vkladu do katastru č j  V-32304/02  Na výzvu Katastrálního úřadu byly dne 13 11 2002 uhrazeny poplatky za správní řízení

Na základě posouzení hospodářské a finanční situace společnosti KOTVA OBCHODNÍ, a s , která je součástí společenství podniků koncernu KOTVA ve 100% vlastnictví KOTVA a s , bylo vzájemnou dohodou rozhodnuto o kapitálovém posílení této společnosti a navýšení základního kapitálu ze strany KOTVA NEMOVITOSTI, a s  peněžitým vkladem ve výši 61 000 tis Kč. Tímto postupem se 100% podíl držení akcií ze strany KOTVA a s  sníží na 39% a 61% je v držení KOTVA NEMOVITOSTI, a s  Tímto postupem však nebyla narušena holdingová vlastnická struktura, neboť 100% vlastníkem akcií KOTVA NEMOVITOSTI, a s  je nadále společnost KOTVA a s

V oblasti závazků došlo oproti předchozímu období k významnému poklesu  Objem dlouhodobých a krátkodobých závazků činí 92 861 tis  Kč, z toho nejvýznamnější představují

15 400 tis  Kč     zůstatek z půjčky 20 000 tis  Kč poskytnuté společností
                                KOTVA OBCHODNÍ, a s

52 978 tis  Kč     zůstatek ze závazku vůči firmě SPRINT, a s  v původní
                                výši 135 000 tis  Kč převzatého společností KOTVA
                                NEMOVITOSTI, a s

V položce bankovních úvěrů zůstává ke splacení běžný bankovní úvěr GE-Capital bank ve výši 9 616 tis  Kč

Společnost řádně splácí veškeré splatné závazky

Na základě iniciativy společnosti KOTVA a s  a KOTVA NEMOVITOSTI, a s  byl podán návrh na zahájení Rozhodčího řízení ve věci pohledávek ke společnosti SPRINT, a s  Podle rozhodčího nálezu vydaného dne  16 10 2002 bylo rozhodnuto o povinnosti společnosti SPRINT, a s  zaplatit ve prospěch KOTVA a s  částku 135 000 tis  Kč a příslušné úroky k datu splacení dlužných částek

Na základě prohlášení konkurzu na společnost SPRINT, a s ze dne 6 11 2002 uplatnila společnost svoje pohledávky vůči této společnosti ve výši potvrzené rozhodčím nálezem  Uvedená pohledávka byla postoupena na společnost EUREX CONSULTANTS LIMITED.

Dne  14.1 2002 odkoupila KOTVA a s  od společnosti SPRINT, a s  100% podíl ve společnosti SANDERSON s r o  ve výši 100 tis  Kč

V listopadu r  2002 byla provedena realizace dalších postupových kroků s cílem nalézt strategického partnera pro společnost  Jednotlivé transakce jsou realizovány ve smyslu doporučení podle projektu „Strukturální transakce KOTVA a s " zpracovaného renomovanou poradenskou firmou ERNST and YOUNG, s r o  v listopadu r  2000  Podle analýzy doposud provedených opatření byla provedena restrukturalizace aktiv společnosti založením dceřiných společností KOTVA NEMOVITOSTI, a s  a KOTVA OBCHODNÍ, a s  Dalším postupným krokem strukturální transakce bylo založení nové dceřiné společnosti v zahraničním teritoriu KOTVA INTERNATIONAL, Ltd  Základní kapitál činí  1 000 USD s nominální hodnotou 1USD/1 akcie

Na základě posouzení stavu výběrového řízení zaměřeného na vyhledání strategického/finančního partnera, bylo vyhověno požadavku zájemců, aby v tranzitní společnosti (zahraniční společnost ve vlastnictví KOTVA a s ) měla přiměřenou kapitálovou účast společnost vlastníka nemovitého majetku OD KOTVA, tj  KOTVA NEMOVITOSTI, a s  V této souvislosti byl vysloven souhlas s navýšením základního kapitálu společnosti KOTVA INTERNATIONAL, Ltd  o 1 mil  USD  Tímto postupem není narušen majetkový vztah v koncernu KOTVA, kdy KOTVA a s  vlastní 100% kapitálu ve společnosti KOTVA NEMOVITOSTI, a s

V roce 2002 společnost neuvedla na trh žádné nové významné výrobky, ani nerozvíjela nové významné činnosti

# V. Zpráva představenstva KOTVA a.s. o vztazích mezi ovládající a ovládanou osobou a mezi ovládanou osobou a ostatními osobami ovládanými stejnou ovládající osobou za účetní období roku 2002

Společnost ve smyslu ust § 66a obch zák je společností s většinovým společníkem (akcionářem) a je osobou ovládanou. Ovládající osobou je potom osoba (firma: FORMINSTER ENTERPRISES LIMITED, sídlo: 20 Queen Frederica Street, El Greco House, Nicosia, Kypr)

Společnost s touto ovládající osobou tvoří koncern

Mezi KOTVA a s a ovládající společností nebyla uzavřena žádná smlouva, ovládanou osobou nebylo poskytnuto ovládající osobě žádné plnění ani od ní přijato, a ovládaná osoba nepřijala a neuskutečnila žádné opatření v zájmu nebo na popud ovládající osoby

Mezi výše uvedenou ovládající společností a ovládanou společností KOTVA NEMOVITOSTI, a s byla uzavřena dne 25 6 2001 Dohoda podle § 269 odst 2 zákona č 513/1991 Sb, kterou se upravují práva smluvních stran v souvislosti s uzavřením Smlouvy o zřízení zástavního práva k nemovitostem se svolením k vykonatelnosti notářského zápisu, uzavřené mezi TREND-všeobecný investiční fond a s a KOTVA NEMOVITOSTI, a s dne 25 6.2001 ve formě notářského zápisu čj NZ 377/2001, N 406/2001 Touto smlouvou je ze strany KOTVA NEMOVITOSTI, a s zajištěna zřízením zástavního práva k nemovitostem KOTVA NEMOVITOSTI, a s, zapsaným na listu vlastnictví č 265 pro kat území Staré Město, obec Praha pohledávka společnosti TREND-všeobecný investiční fond a s vůči společnosti FORMINSTER ENTERPRISES LIMITED, sídlo: 20 Queen Frederica Street, El Greco House, Nicosia, Kypr) na zaplacení částky 350 000 000,-Kč (z titulu Dohody o narovnání uzavřené mezi FEL a TREND VIF z 21 12 1999)

Mezi ovládanou a ovládající společností nebyla uzavřena žádná jiná smlouva, ovládanou osobou nebylo poskytnuto ovládající osobě žádné plnění ani od ní přijato, a ovládaná osoba nepřijala a neuskutečnila žádné opatření v zájmu nebo na popud ovládající osoby

## I. DEFINICE DALŠÍCH OVLÁDANÝCH OSOB

1  KOTVA a.s. byla v roce 2002 vlastník 100% akcií **KOTVA NEMOVITOSTI, a.s.**, IČ: 26229048, se sídlem Brno, Příkop 4, zapsané v obchodním rejstříku Krajského soudu v Brně, oddíl B, vložka 3426

2  KOTVA a.s. byla v roce 2002 vlastník 100% akcií **KOTVA OBCHODNÍ, a.s.**, IČ: 26231735, se sídlem Brno, Příkop 4, zapsané v obchodním rejstříku Krajského soudu v Brně, oddíl B, vložka 3484

3  KOTVA a.s. byla v roce 2002 jediný společník obchodní společnosti **Značková konfekcia s.r.o.**, IČ: 35689641, se sídlem Mickiewiczova 6, Bratislava, zapsané v obchodním registru Okresného súdu v Bratislave 1, oddíl Sro, vložka: 10928/B

4  KOTVA a.s. byla v roce 2002 jediným společníkem **KOTVA-středisko praktického vyučování, s.r.o.**, IČ: 26123193, se sídlem Praha 1, nám Republiky 8, zapsané v obchodním rejstříku Městského soudu v Praze, oddíl C, vložka 72148

22

5. **KOTVA NEMOVITOSTI, a.s.** vlastní od roku 2002 99% akcií společnosti **KOTVA INTERNATIONAL LIMITED**, č 522767 se sídlem, Geneva Place, Waterfront Drive, P O Box 3469, Road Town, Tortola, British Virgin Islands

6  **KOTVA a.s** je jediným společníkem společnosti **SANDERSON s.r.o.**, IČ: 25666797 se sídlem Praha 3, Táboritská 1000/23, zapsané v obchodním rejstříku MěS v Praze, oddíl C, vložka 59498

## II. SMLOUVY UZAVŘENÉ MEZI OVLÁDAJÍCÍ A OVLÁDANOU OSOBOU KOTVA a.s. NEBO MEZI OVLÁDANOU OSOBOU KOTVA A.S. A OSTATNÍMI OSOBAMI OVLÁDANÝMI STEJNOU OVLÁDAJÍCÍ OSOBOU V ROCE 2002:

1. KOTVA a s  uzavřela jako pronajímatel dne 31 12 2001 s KOTVA NEMOVITOSTI, a s jako nájemcem Smlouvu o pronájmu osobního automobilu s platností od 1 1.2002, podle které pronajímatel pronajímá nájemci osobní automobil MERCEDES-BENZ, typ C 32 AMG, za cenu nájemného 85 750,-Kč+DPH měsíčně

2. KOTVA a s  uzavřela jako pronajímatel dne 31 12 2001 s KOTVA NEMOVITOSTI,a s jako nájemcem Smlouvu o pronájmu osobního automobilu s platností od 1 1 2002, podle které pronajímatel pronajímá nájemci osobní automobil TOYOTA, typ Carina 1,6 BEMDKW, za cenu nájemného 10 930,-Kč+DPH měsíčně

3. KOTVA a s uzavřela jako prodávající dne 31 12 2001 s KOTVA NEMOVITOSTI, a s jako kupujícím Kupní smlouvu na prodej vybraného hmotného majetku popsaného a oceněného v Posudku č 11-151-2001 znalcem KOPPREA-ZNALECKÝ ÚSTAV, spol s r o  Praha za cenu 4 246 808,-Kč+DPH

4. KOTVA a s  jako nájemce uzavřela dne 8.2 2002 s KOTVA NEMOVITOSTI, a s  jako pronajímatelem Smlouvu o nájmu nebytových prostor, podle které nájemce najímá od pronajímatele 11 303 m2 nebytových prostor v 1 -9  podzemním podlaží OD Kotva za sjednané nájemné ve výši 800 000,-Kč+DPH měsíčně a touto smlouvou se zároveň sjednává rozsah služeb poskytovaných pronajímatelem nájemci v souvislosti s nájmem nebytových prostor za sjednanou cenu ve výši 400 000,-Kč+DPH měsíčně.

5. KOTVA a s  jako objednatel uzavřela dne 25 2 2002 s KOTVA NEMOVITOSTI, a s  jako zhotovitelem Smlouvu o poskytnutí služeb, podle které zhotovitel poskytuje objednateli služby nutné k zabezpečení provozu parkingu za sjednanou cenu 125 000,-Kč měsíčně

6. KOTVA a s  uzavřela jako pronajímatel (nájemce) dne 31 12 2001 s KOTVA NEMOVITOSTI, a s jako podnájemcem Smlouvu o podnájmu osobního automobilu s platností od 1 1 2002, podle které pronajímá této společnosti osobní automobil MERCEDES-BENZ, typ C 32 AMG, za cenu nájemného 85 750,-Kč+DPH měsíčně  Tato smlouva nahrazuje smlouvu uvedenou pod č  1 této zprávy

7. KOTVA a s. uzavřela jako prodávající dne 11 6.2002 s KOTVA NEMOVITOSTI, a s jako kupujícím Kupní smlouvu, podle které prodávající prodává kupujícímu osobní automobil TOYOTA, typ Carina 1,6 BEMDKW za sjednanou kupní cenu 150 000,-Kč

8. KOTVA a s uzavřela jako prodávající dne 18 6 2002 s KOTVA NEMOVITOSTI, a s jako s kupujícím Kupní smlouvu na prodej vybraného hmotného majetku popsaného v soupisu k této smlouvě za sjednanou cenu 18 040,-Kč+DPH

9. KOTVA a s  jako postupitel uzavřela dne 2 10 2002 s KOTVA NEMOVITOSTI, a s  jako postupníkem Smlouvu o postoupení pohledávky, podle které postupitel postupuje postupníku pohledávky uvedené v této smlouvě postupníku za sjednanou celkovou cenu ve výši 659 500,02 Kč

10. KOTVA a s uzavřela jako prodávající dne 14 10 2002 s KOTVA NEMOVITOSTI,a s jako kupujícím Kupní smlouvu, podle které prodávající prodává kupujícímu osobní automobil ŠKODA FELICIA EFF 41za sjednanou kupní cenu 44 500,-Kč

11. KOTVA a s jako postupitel uzavřela dne 27 11 2002 s KOTVA NEMOVITOSTI, a s jako postupníkem Smlouvu o postoupení pohledávky, podle které postupitel postupuje postupníku pohledávku za společnosti KOTVA PARKING s r o ve výši 497 222,50 Kč za sjednanou celkovou cenu ve výši 497 222,50 Kč

12. KOTVA a s jako nájemce uzavřela dne 12 8 2002 s KOTVA NEMOVITOSTI, a s jako pronajímatelem Dodatek č 3 ke Smlouvě o pronájmu nebytových prostor z 22 12 2000, podle kterého se cena nájemného mění a nově sjednává na částku 55,-Kč+DPH měsíčně s platností od 1 9 2002

13. KOTVA a s uzavřela dne 28 6 2002 s KOTVA NEMOVITOSTI, a s Dohodu o vzájemných zápočtech, podle které se smluvní strany dohodly, že budou vzájemně započítávat nesplatné pohledávky

14. KOTVA a s uzavřela dne 21 12 2002 s KOTVA NEMOVITOSTI,a s a s KOTVA OBCHODNÍ,a s Dodatek č 2 k Dohodě o poskytování služeb, podle kterého se pro období roku 2003 sjednává poskytování ekonomických služeb společností KOTVA a s pro KOTVA NEMOVITOSTI,a s za roční paušální cenu 11 020 000,-Kč a pro KOTVA OBCHODNÍ,a s za roční paušální cenu 720 000,-Kč

15. KOTVA a s jako prodávající uzavřela dne 27 2 2002 s KOTVA OBCHODNÍ,a s jako kupujícím Kupní smlouvu, podle které prodávající prodává kupujícímu zařízení pro výpočetní středisko za sjednanou cenu 41 200,-Kč

16. KOTVA a s jako prodávající uzavřela dne 25 7 2002 s KOTVA OBCHODNÍ, a s jako kupujícím Kupní smlouvu, podle které prodávající prodává kupujícímu server Dell 6300 za sjednanou cenu 70 000,-Kč+DPH

17. KOTVA a s uzavřela jako prodávající dne 31 12 2001 s KOTVA OBCHODNÍ, a s jako kupujícím Kupní smlouvu na prodej vybraného movitého a nehmotného majetku popsaného a oceněného v Posudku č 11-150-2001 znalcem KOPPREA-ZNALECKÝ ÚSTAV, spol s r o Praha za cenu 1 243 848,-Kč+DPH

18. KOTVA a s uzavřela dne 21 3 2002 s KOTVA OBCHODNÍ,a s Smlouvu o upsání akcií, podle které KOTVA a s upisuje jako jediný akcionář akcie společnosti KOTVA OBCHODNÍ, a s v nominální hodnotě 38 000 000,-Kč

19. KOTVA a s na základě Prohlášení vkladatele o vložení nemovitosti do základního kapitálu ze dne 26.3 2002 splatila jako jediný akcionář emisní kurs upsaných akcií KOTVA OBCHODNÍ, a s nepeněžitým vkladem ve výši 23 000 000,-Kč vložením nemovitosti

20. KOTVA a s uzavřela dne 26 3 2002 s KOTVA OBCHODNÍ,a s Dohodu o započtení pohledávek, podle které splatila jako jediný akcionář KOTVA OBCHODNÍ,a s započtením své peněžité pohledávky ve výši 15 000 000,-Kč vůči KOTVA OBCHODNÍ, a s svůj peněžitý vklad ve výši 15 000 000,-Kč

III. ŽÁDNÉ JINÉ SMLOUVY MEZI KOTVA a.s. a PROPOJENÝMI OSOBAMI, PRÁVNÍ ÚKONY, UČINĚNÉ V ZÁJMU PROPOJENÝCH OSOB A OSTATNÍ OPATŘENÍ V ZÁJMU NEBO NA POPUD TĚCHTO OSOB PŘIJATÁ NEBO USKUTEČNĚNÁ OVLÁDANOU OSOBOU V ROCE 2002 NEBYLY USKUTEČNĚNY.

# VII. Údaje o osobách odpovědných za výroční zprávu a ověření účetní závěrky

Audit společnosti:

2000:    **Ernst and Young Audit, spol. s r.o.**
Praha 2, Mánesova 28
Auditorská licence KA ČR č 137
Ing Eva Dekastellová, dekret č 759

2001:    **BDO CS, spol. s r.o.**
Olbrachtova 5, Praha 4
Auditorská licence KA ČR č 18
Ing Radomír Kosina, CSc , dekret č 119
Ing Růžena Trnková, dekret č 373

2002:    **BDO CS, spol. s r.o.**
Olbrachtova 5, Praha 4
Auditorská licence KA ČR č 18
Ing Radomír Kosina, CSc , dekret č 119
Ing Růžena Trnková, dekret č 373

Prohlašuji, že údaje uvedené ve Výroční zprávě odpovídají skutečnosti a žádné podstatné okolnosti, které by mohly ovlivnit přesné a správné posouzení emitenta cenných papírů, nebyly vynechány

Veškeré dokumenty a materiály uváděné ve Výroční zprávě jsou k nahlédnutí v sídle společnosti

V Praze dne 28 4 2003

Ing Richard Harazim, generální ředitel KOTVA a s

25

Confidential Memorandum to the board of the Brookdale Global Opportunity Fund
Prepared by: Vladimir Hoffmann
Prague, October 21, 2004

Dear Andy,

The purpose of this Memorandum is to summarize the latest developments in Kotva & Trend case to enable the Board of BGO to make informed decision

Negotiations, Price offers & Lawsuits

In the fall of 2003 I was approached by Mr Harazim, CEO of Kotva who offered CZK 20m for BGO's Kotva shares We declined this offer as too low and we received an increased and firm offer from I&T Banka who acted as a broker for Kotva with the price of USD 1m (about CZK 26m) We declined this offer at the end of 2003

In May 2004 you visited Prague and during our meeting with Messrs Benda and Harazim we were told by Mr Harazim that BGO's Kotva shares have no value, since they represent a minority interest and Kotva would never pay dividends or make any other distribution Following this we have hired Peterka & Partners and initiated several lawsuits questioning the ownership of Kotva property and Kotva shares

In August 2004 Mr Benda offered CZK 75m for BGO's Kotva shares The offer was conditional upon the withdrawal of all lawsuits filed by Gilroy and Balfindor We have responded by offering BGO's Kotva shares for CZK 131m and to withdraw Gilroy's lawsuit (lawsuit against ownership of Kotva property) Mr Benda responded rather vaguely that the price was too high and that they insist on withdrawal of all lawsuits, not only Gilroy's lawsuit He also asked for more time since he was leaving for holiday and since he asked his lawyers to provide their legal opinion on Kotva buying its own shares

During our meeting on Oct 18, 2004 Mr Benda said in the presence of Mr Peterka and myself that he would accept the price of CZK 131m provided that all lawsuits are withdrawn I have emphasized that our offer was conditional only upon the withdrawal of Gilroy's lawsuit and that it has expired at the end of August 2004 anyway Later, Messrs Prestage – representative of the Irish investors and Harazim joined the meeting Mr Prestage said, that it should not be a problem for him to pay part of the money intended for the Kotva property directly to us for Kotva's shares

Valuation of Kotva property

We were informed by Mr Woolf that the price of the property that the Irish investors agreed to pay was approx CZK 1,5 billion. This was confirmed to me also by another party who is involved in the Czech real-estate market The latest article published in Sunday Times on Oct 4th, 2004 has the price at EUR 54m, or approx CZK 1,7 billion This price was quoted also in the latest article published in the Czech Business Weekly on Oct. 11th, 2004

K 0075

Page 1 of 4

The same group of Irish investors has bought two neighbouring buildings to Kotva at Revolucni 1 and 3 for CZK 496m in public auction  The comparative valuation is in the following table:

| Property | Built up area | Additional Ground | Total Serviceability | Overground Floors | Underground Floors | Price (CZK '000) | Price per Total Serviceability (CZK/sqm) |
|---|---|---|---|---|---|---|---|
| Kotva[1] | 4,385 | 3,900 | 39,575 sqm[2] | 7 | 3 | 1,700m | 42,956 |
| | | | | | | 1,500m | 37,902 |
| Revolucni 1+3[3] | 2,800 | ? | 20,500 sqm | 8 | 3 | 496m | 24,195 |

The comparison shows that even at CZK 1,5 billion Kotva is valued relatively expensive (by 50%) compared to the neighbouring Revolucni 1 and 3

Valuation of Kotva shares

We have estimated Kotva's liabilities, costs and taxes associated with the sale of the property at CZK 400m  The following table shows the NAV of BGO's 11,9% stake for the property price of CZK 1,5 and 1,7 billion

| Price of the property (CZK '000) | Liabilities (CZK '000) | Total NAV (CZK '000) | NAV of BGO's stake of 11,9 % (CZK '000) |
|---|---|---|---|
| 1,500,000 | 400,000 | 1,100,000 | 130,900 |
| 1,700,000 | 400,000 | 1,300,000 | 154,700 |

The alternative to the sale of Kotva shares is the pursuing of the lawsuits until the end  In the best case scenario Trend would end up with 212,935 shares of Kotva – which represents 30,7%  The following table shows the "pursuing of the lawsuits scenario" under the following assumptions:

1. Lawsuits will take 5 years
2. We will win all the lawsuits
3. The associated legal and other costs will be CZK 5m per year
4. Trend with BGO and other shareholders will take over Kotva and pursue the sale of property which will take 1 year (sale and distribution)
5. The price of the property less costs and taxes will be CZK 1,5 billion and the NAV of Kotva will be 1,1 billion
6. The appropriate discount rate of this project is 35% due to its very high risk

---

[1] Source: Jones Lang Lasalle
[2] Does not include 368 underground parking places
[3] Source: Naxos

K 0076

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Costs (CZK '000) | -5 000 | -5 000 | -5 000 | -5 000 | -5 000 | -5 000 |
| Sale of Kotva for CZK 1,5bln, NAV 1,1bln | | | | | | 1 100 000 |
| Distribution to BGO from Kotva | | | | | | 130 900 |
| Distribution to Trend from Kotva | | | | | | 337 700 |
| Distribution from Trend to BGO | | | | | | 139 470 |
| Total Cash Flow BGO | -5 000 | -5 000 | -5 000 | -5 000 | -5 000 | 265 370 |

| NPV @ 35% (CZK '000) | 32 738 |
|---|---|

Due to the costs, time involved and high risk the NPV of "pursuing lawsuits" is very low at CZK 32,738m.

Risks

*Irish withdraw*
The first risk is that the Irish investors withdraw from the contract with Kotva. It is very unlikely that Kotva would be able to find another investor who would pay CZK 1,5-1,7 bln given the legal status of the property. That would mean that Forminster will not be able and willing to purchase BGO's shares

*Bankruptcy*
The only posibility to "clean" the property completely is to put it into bankruptcy. Forminster has used this method already at least on two ocasions: bankruptcy of Trend and bankruptcy of Sprint. In both cases Forminster was able to install bankruptcy administrator friendly to them. Forminster has also demonstrated the ability to create huge artificial receivables in the past and they would very likely be by far the largest creditor of Kotva. High receivables in combination with the sale of the Property, or Kotva Nemovitosti at depressed price would mean zero or very low distribution to the shareholders

*Damages*
During our last meeting Mr Benda said that Kotva has financing secured from banks only until the end of 2004. He said that the banks would not extend the credit if there is still lien on the property resulting from the lawsuits. That would cause damage to Kotva. It is possible that Forminster will try to sue us for damages resulting from this. Forminster might also secure financing from its own sources, siphon profits from Kotva through high interest and at the same time create the high receivable it needs to put Kotva to bankruptcy

*Violence*
Up to now Forminster used only legal methods in negotiations. However it was not always the case. The list of "unusual events" is quite extensive:

*13 6 1998 – CEO of Kotva Jindrich Zeleznik suddenly died at the age of 52*
*25 10 1998 – Chalet of Martin Benda exploded*
*27 10 1998 – Car of Bronislav Becka (CIH) exploded*
*1998 – Flow East representatives claimed they were threatened and spied*
*30 8 1999 – Explosion in the sixth floor of Kotva near the office of the board*
*Aug 2000 – Investigator Blahoslav Kavka committed suicide*

K 0077

*March 2001 – Prosecutor Vladislav Kusala resigned*
*2002 - Martin Razim, bankruptcy trustee of Trend resigned, privately claimed that he was*
*threatened*

Considering how much money is at stake for Forminster it is difficult to assess how they react
if pushed to the corner

Conclusion

Since the beginning of the negotiations Forminster has increased its offer from **CZK 20m** to
**CZK 131m, or by 555%.** The price of CZK 131m represents zero, or near to zero discount to
the NAV of Kotva. This is very extraordinary for this kind of non-transparent companies. The
NPV of continuing the lawsuits is very low at approx **CZK 33m**. The risks involved are
substantial

Even if we drop the lawsuits against Kotva we would still be able to work on Trend case and
we could initiate lawsuits for other property than Kotva – e.g. Sokolovska Uhelna. We might
also sue former Trend directors for damages. Depending on the outcome of Flow East's and
John Moffit's claims we might expect bankruptcy proceeds from Trend in the amount of **USD
1-2m** (even if Trend does not recover any additional assets) on top of the money received for
Kotva shares

Given the facts I recommend you to agree with Forminster on the price of CZK 131m or
close

I believe that if we do not bring this round of negotiations to the successful end we will not
get another chance in forseeable future. To <u>put my money where my mouth is</u> I am willing to
reduce my success fee by 30% - which would leave BGO with more money. This „voluntary
reduction" is valid until the end of October 2004


Best regards,

Vladimir Hoffmann


K 0078

# Annual Report for KOTVA a.s for year 2004

**1. The textual Part**
A  Information about the business results, financial situation for the last fiscal year in terms of information disclosed in the second fiscal plan for this year

    I  Information about the emitent     2
    II  Information about the activities and business goals of the emitent     5
    III  Information about the financial status of the emitent     13
    IV  Information about the people responsible for this report     15
B  Information about facts that happened after the day of balancing day     16
C  Information about the expected development of the accounting unit.     16
D  Information about the activities in research and development     17
E  Information about the environmental issues and relations with our employees     17
F  Information on the foreign parts of accounting unit     17
G  Information about all the monetary and natural income that was accepted by the board of directors and other leading figures in the company from the emitent and people controlled by the emitent.     17
H  Information about the number of shares issued by the emitent,which are owned by the statutory organs and other leading figures of the emitent and about contracts of possession and dealings of mentioned persons with the emitent     18
I  Principles of rewarding the leading persons of the emitent and the board     19
J  Information about the costs of the audit     19
**2. Report about the relations between controlling and controlled person and about relationship between the controlled person and other persons that are controlled by the same person**     **20**

**3. Report of the board about the business activities and their financial state.** 24

**4. Report of the auditors towards the consolidated statement of balances including the statement of balances and its attachments.**     **27**

**5. Statement of balances for year 2004**     **46**

**6. Report of the auditor statement of balances for year 2004**     **49**

Page 20

**2. Report about the relationship between controlling and controlled person and about the relations of the controlled person and other controlled persons.**

Emitent is in the sense of § 66a trade law a shareholding company with a majority shareholder and controlling person  Controlling person, is such that in the sense of the law it, directly or indirectly, de jure or practically, exercises a decisive influence over management of the emitent, is FORMINSTER ENERPRISES LIMITED, with headquarters in 20 Queen Frederica Street, El Greco House, Nicosia, Cyprus
Emitent does not know any other person or company controlled by the controlling person (FORMINSTER ENTERPRISES LIMITED)
There is no controlling agreement between FORMINSTER ENERPRISES LIMITED and the emitent

**I. Between Controlled person and Controlling person.**

**a) Agreements**

There was no agreement between the emitent and FORMINSTER ENTERPRISES LIMITED in the last fiscal period  Also there were no actions in this field

**b) Other legal actions made in interest of this person**

There were no other legal actions made in the interest of this person

**c) Other actions made in the interest or by the desire of this person**

There were no such actions

**II. Between emitent and connected persons (persons controlled by the same person)**
Emitent is with other persons under collective management exercised by the controlling person FORMINSTER

| From: | Eitan Milgram |
|---|---|
| Sent: | Tuesday, September 02, 2003 1:07 PM |
| To: | 'Yossi Barath'; Briana Dubrow |
| Cc: | Andrew Weiss |
| Subject: | FW: Kotva-urgent ! |

| Importance: | High |
|---|---|

Please read below

-----Original Message-----
From: Vladimir Hoffmann [mailto:vlado@anezska10.cz]
Sent: Tuesday, September 02, 2003 12:37 PM
To: Eitan Milgram
Subject: Kotva-urgent !
Importance: High

Dear Eitan,

I have learned through my contacts that the sale of Kotva is being negotiated and could be closed very soon. The buyer is an Irish real-estate firm and I met their representative earlier this year in Prague. During this meeting I have explained to this person, that if he buys Kotva he could face several lawsuits from us (at that time I was member of BGO's board). I have been contacted yesterday by Richard Harazim - CEO of Kotva, who would like to talk. I believe, that we could be able to negotiate some sort of a deal with him (Forminster). I think, that the Irish guy has told Forminster to settle with us or otherwise he would withdraw from the transaction or reduce the price. However, he indicated that he might choose to go ahead with this transaction even without having Forminster settled with us.

Once the transaction is closed, Kotva will turn into an untransparent industrial holding and very likely it will lose all its money in "unfortunate" deals over next few years. BGO's 12 % stake would most likely be worth zero. The only chance would be to sue Kotva, Forminster or the Investor which will be costly, lengthy and with low probability of success.

I would like to use my knowledge of the situation as well as the main players involved to try and negotiate a deal for BGO. The best solution would be to sell BGO's shares of Kotva before the property is sold. I think that we would have to accept a discount to the price paid to Forminster due to BGO's minority position. If I have a mandate from BGO I will work as hard as I can to achieve the best possible solution. To do that I need 2 things:

1) Mandate to represent BGO, since I am not a board member anymore;
2) Contract defining my success fee, which I propose to be 30 % of whatever proceeds. I am ready to work 100 % on contingency basis and I will not ask for any retainer or costs compensation.

The matter is urgent and I need an answer from you soon. If I do not hear from you by Monday, Sept.8th I will assume that you did not accept my proposal.

I am looking forward to hearing from you soon.

Best wishes,

Vladimír Hoffmann

Anežská 10
110 00 Praha 1
tel: +420 221 892 350
fax: +420 221 892 360
mob: +420 605 282 464
e-mail: vlado@anezska10.cz

1

WP0000005

| | |
|---|---|
| **From:** | Vladimír Hoffmann [vlado1@volny cz] |
| **Sent:** | Friday, November 28, 2003 6:39 AM |
| **To:** | Dave Johnson |
| **Cc:** | Andrew Weiss; Eitan Milgram |
| **Subject:** | Kotva |

Dear Dave,

Harazim called me today and told me that they will make the firm bid for our Kotva shares on Monday. They will fax it to you and deliver the original to me. The price will be USD 1 million and it will be valid for one week until Monday, Dec.8th.

You can reach me on my mobile phone +420 605 282 464 this afternoon to discuss this.

Best wishes,

Vlado.

1

WP0000125

Mr. Dave Johnson
Weiss Asset Management
Fax: 001 617 778 7781

Brookdale Global Opportunity Fund
With it`s investment manager`s office at
29 Commonwealth Ave. Boston, MA 02116

POBREŽNÍ 14  186 00 PRAHA 8
ČESKÁ REPUBLIKA

TEL : +420 221 710 111
FAX: +420 221 710 133
E-MAIL: SECURITIES@JTBANK.CZ
HTTP://WWW.JTBANK.CZ

IC: 25067532
DIČ: 009-25067532

ZAPSÁNA V OR VEDENÉM
MS V PRAZE ODDÍL B
VLOŽKA 7398

Praha, 2/12/2003

Dear Sirs,

We have the pleasure to inform you that based on an instruction from
our client we make now the following bid:

We offer to buy all of your shares in KOTVA a.s., Náměstí republiky 8,
Praha 1, Czech Republic, ISIN CZ0009048955, minimum number of
shares being 82,782 (eightytwo thousands sevenhundreds and eighty
two) for the total purchase price of USD 1 million (one million USD),

This offer is valid for a period of 7 calendar days, after which it expires
in vain. Should you decide to accept this offer send please your
consent in writing to following address:

J&T SECURITIES (CZECH REPUBLIC), a.s.
Attn. Michal Semotan
Pobřežní 14
186 00 Praha 8
Czech Republic

We declare we are in a position to settle the deal within 14 days
following the day we receive your written consent to our offer.

Best regards

Michal Semotan
Head of trading

J&T SECURITIES
(CZECH REPUBLIC), a. s.
POBŘEŽNÍ 14
186 00 PRAHA 8
ČESKÁ REPUBLIKA
IČO: 25067532
DIČ: 009-25067532

**From:**     Henry Prestage [hprestage@markland.ie]
**Sent:**     Wednesday, August 20, 2003 4:01 AM
**To:**       richard.harazim@od-kotva.cz
**Subject:** Escrow

Good morning Richard

I am afraid that we cannot consent to J&T Banka acting as Escrow agent.

There are two main reasons for this:

- our Bank is not comfortable using a small Czech Bank
- the name of the J&T Banka appears regularly in the information we have been given regarding past transactions that are allegedly suspect and fraudulent.  This Bank has had a part ot play in the past dealings of the Kotva / Trend / FEL / Suringham issues so we do not want them involved going forward.

From your point of view I cannot see how having the Escrow account with J&T would do you any good as these funds cannot be used and must only be paid out upon certain events.  You will have a very large cash deposit with them which should provide all of the credibility you need.

In my opinion Linlakers are the safest (and cheapest) option.  Their Escrow accounts are run from their London office and are vigorously policed to ensure funds are only released in accordance with the Escrow agreement - any breach of this and they can be sued.  I would rather sue Linklaters than any Czech Bank.

If you still cannot accept Linklaters then we will need to agree upon another large Bank, or possibly we could use an Irish Bank (as we are using Euros) if this meets with you approval.

Regards

Henry

--
This message has been screened for all known viruses by IE Internet.com
and is believed to be free of infection.
--

**K557**

*K ZURKAYH MUT MAIT KUBICY*

Indemnity Deed
Kotva Settlement

THIS DEED OF INDEMNITY is made the ___ day of _____ 2004 (the "Agreement")

BETWEEN:

1. FLOW CORPORATION, Ltd., with its registered office at 25 Harley Street, London W1N 2BR ("Flow"),

2. DB UK Bank Limited, with its registered office at 23 Great Winchester Street, London EC2 P2 AX ("DBUKBL"),

3. F E Reality a.s., with its registered office at Mostecká 12/49, 118 00 Praha 1. Company ID: 47672943 ("FE Reality"),

4. Realty IX s.r.o., with its registered office at Mostecká 12/49, Praha 1, 118 00, Company ID: 25129295 ("Realty IX"),

5. Marta Guthová, Birth ID: 725505/0319, resident at Praha 1, U Obecního dvora 794/4, PSČ 11000 („Marta Guthová"),

6. James Lewis Woolf, born on July 27, 1964, resident at Praha 2, Mánesova 47 („James Woolf"), and

7. The other parties named and, if relevant, defined on the signature pages (the "Indemnifying Parties")

(Flow, DBUKBL, FE Reality and Realty IX shall together be referred to as the "Sellers".)

WHEREAS

(A) On the date hereof J&T Banka a.s., Pobřežní 297/14, Praha 8, 186 00, IČ: 47115378 ("JT Banka") has entered (i) with Flow into an agreement on assignment of receivables against TREND – všeobecný investiční fond a.s., with its registered office at Hradec Králové, Škroupova 441, PSČ 500 02. Company ID No 45245177 ("TREND") arising from a share purchase agreement for shares in KOTVA a.s., Náměstí republiky 8, Praha 1, PSČ 113 88, IČ 60193808 ("Kotva") (the "Flow Assignment Agreement"), (ii) with DBUKBL into an agreement on assignment of receivables against TREND arising from a loan agreement (the "DBUKBL Assignment Agreement"), (iii) with FE Reality into a share purchase agreement for the purchase of FE Reality's shares in Kotva and (iv) with Realty IX into a share purchase agreement for the purchase of Realty IX's shares in Kotva (the "Transaction Agreements" respectively).

(B) The Sellers in their respective capacities as creditors of TREND and/or shareholders of Kotva have taken certain steps and actions to protect their interests, including civil law actions, criminal and other investigations against TREND, the bankruptcy

K 6221

administrator of TREND, the management of TREND, namely Mr. Moffitt and Mr. Bluhm, SURINGHAM ENTERPRISE LIMITED, with its registered seat at Lawford House, Albert Place, London N3 1QA, UK (hereinafter "SEL"), and certain other parties, including the Indemnifying Parties, in connection with disputes and controversies related to Kotva property, shares in Kotva, TREND and the bankruptcy proceedings of TREND (all such actions, steps, disputes and controversies together, the "Kotva Case").

(C)    The Indemnifying Parties have been materially involved in the Kotva Case in different capacities, including as management of Kotva and Kotva group companies, as management of Forminster Enterprises Limited, with its registered seat at 4 Diagorou street, Kermia Building, Office 601, Nicosia, Cyprus (hereinafter "FEL"), against the Sellers. The Kotva Case has been continuing for several years and significant costs have been incurred by the Sellers as well as by the Indemnifying Parties. Therefore, the Indemnifying Parties have a material interest in the Sellers concluding the Transaction Agreements with JT Banka, whereby the Sellers will cease to be parties to the Kotva Case. The Sellers acknowledge that JT Banka, as counterparty to the Sellers under the Transaction Agreements, is acting as financial intermediary in the interest of the Indemnifying Parties. It is therefore a condition precedent to the Sellers entering into the Transaction Agreements that the Indemnifying Parties provide the Sellers with certain comfort regarding the finality of the settlement of the Kotva Case effected in the Transaction Agreements.

NOW THIS DEED WITNESSES THAT:

1.    No further Actions

1.1    Each of the Indemnifying Parties confirms and undertakes that it shall not from the date of execution of this Agreement and at any time in the future bring any action, suit, proceedings (including any governmental or regulatory investigation or criminal proceedings), allegation, claim, petition or demand ("Action"), including any steps for the appointment of a liquidator, receiver, executor or similar officer, in any jurisdiction against or in any way affecting any of the Indemnified Persons (as defined in Clause 2.1) relating to the Transaction Agreements, excluding Art. II Sec. 1) and Art. VI Sec. 1) of the DBUKBL Assignment Agreement, and excluding Art. II Sec. 1) and Art. VI Sec. 1) of Flow Assignment Agreement (hereinafter referred as "Excluded provisions"), the Kotva Case, or any other matters connected or ancillary thereto or to this Agreement and that it shall not take any step (including granting instructions, assigning any claim, receivables or rights, etc.) for the purpose of or which may have the effect of a third party taking any Action against any of the Indemnified Persons.

1.2    Subject to (i) the fulfilment of all the conditions precedent in the Transaction Documents Agreements including for the avoidance of doubt the DBUKBL Assignment Agreement and the Flow Assignment Agreement and (ii) the DBUKBL Assignment Agreement and the Flow Assignment Agreement having taken effect pursuant to their respective terms

K 6222

(a)    each of the Sellers confirms and undertakes that it shall not and shall procure that any member of such Seller's Group shall not from the date of execution of this Agreement and at any time in the future bring any Action in any jurisdiction against or in any way affecting any of the Indemnifying Persons relating to the Kotva Case, or any other matters connected or ancillary thereto or to this Agreement and that it shall not take any step for the purpose of or which may have the effect of a third party taking any Action against any of the Indemnified Persons, and

(b)    Marta Guthová and James Woolf jointly and severally confirm and undertake that they and each of them shall not and shall procure that any member of any of the Seller's Groups shall not from the date of execution of this Agreement and at any time in the future bring any Action in any jurisdiction against or in any way affecting any of the Indemnifying Persons relating to the Kotva Case, or any other matters connected or ancillary thereto or to this Agreement and that it shall not take any step for the purpose of or which may have the effect of a third party taking any Action against any of the Indemnified Persons.

"**Seller's Group**" means, at any time, in respect of each of DBUKBL, Flow, FE Reality and Realty IX, such Seller and/or any person directly or indirectly controlled by such Seller and/or any person directly or indirectly controlling such Seller, and/or directors and/or agents of such Seller and/or any such controlling or controlled person, and/or any person acting in concert with and/or upon the instruction of such Seller, and/or any assignee (legal or beneficial) of any of such Seller's assets, Claims and/or Actions, and/or any legal successor of such Seller. For the avoidance of doubt Seller's Group shall not include JT Banka or any other party or beneficiary in relation to the assignment or transfer of assets, Claims or Actions under the Transaction Agreements.

1.3    For the avoidance of doubt the confirmations and undertakings given in Clauses 1.1 and 1.2 do not affect good faith performance of genuine public duties and obligations stipulated by law related to the subject matter of this Agreement.

2.    Indemnity

a)    Subject to Clause 2.4, SEL undertakes as a continuing indemnity that it will indemnify and keep indemnified and hold harmless each and every Seller, its directors, officers, employees and agents and each person controlling it, Marta Guthová and James Woolf (each Seller and such other person, an "**Indemnified Person**") from and against any and all losses, liabilities, costs, claims, damages, expenses or demands ("**Claims**") or Actions in respect thereof which any of them may incur or which may be made against any of them, *in so far as* such Claims or Actions are asserted or taken by any member of the SEL Group *and* arise out of, in relation to or in connection with the Kotva Case, including any Action related thereto taken by any Indemnified Person, whether such Claims or Actions commenced or occurred before or after the date of this Agreement and will reimburse each of the Indemnified Persons for all costs, charges and expenses which it may pay or incur in

- 3 -

K 6223

connection with investigating, disputing or defending any such Claims or Actions.

"SEL Group" means, at any time, SEL and/or any person directly or indirectly controlled by SEL and/or directors, officers, employees, agents of SEL and/or any such controlled person, and/or any assignee (legal or beneficial) of any of SEL's assets, Claims and/or Actions, and/or any legal successor of SEL.

2.1  b)  Subject to Clause 2.5 FEL undertakes as a continuing indemnity that it will indemnify and keep indemnified and hold harmless each and every Indemnified Person from and against any and all Claims or Actions in respect thereof which any of them may incur or which may be made against any of them, *in so far as* such Claims or Actions are asserted or taken by any member of FEL Group and/or any member of SEL Group *and* arise out of, in relation to or in connection with the Kotva Case and/or the Transaction Agreements except Excluded Provisions, including any Action related thereto taken by any Indemnified Person; whether such Claims or Actions commenced or occurred before or after the date of this Agreement and will reimburse each of the Indemnified Persons for all costs, charges and expenses which it may pay or incur in connection with investigating, disputing or defending any such Claims or Actions.

"FEL Group" means, at any time, FEL and/or any person directly or indirectly indirectly controlled by FEL and/or any person directly or indirectly controlling FEL and/or directors and/or agents of FEL and/or any person acting in concert with and/or upon instruction of FEL and/or any assignee (legal or beneficial) of any of FEL's assets, Claims and/or Action, and/or any legal successor of FEL.

2.1  c)  Subject to Clause 2.6 Martin Benda and Richard Harazim jointly and severally and as a continuing indemnity undertake that they and each of them will indemnify and keep indemnified and hold harmless each and every Indemnified Person from and against any and all Claims or Actions in respect thereof which any of them may incur or which may be made against any of them, *in so far as* such Claims or Actions are asserted or taken by any Indemnifying Party and/or any member of SEL Group and/or FEL Group and/or any member of any Other Indemnifying Party Group, as defined in Clause 2.1d) and/or by any other person linked with any of them (whether personally, by way of ownership or otherwise) at any time, *and* arise out of, in relation to or in connection with the Kotva Case and/or the Transaction Agreements except Excluded Provisions, including any Action related thereto taken by any Indemnified Person, whether such Claims or Actions commenced or occurred before or after the date of this Agreement, and will reimburse each of the Indemnified Persons for all costs, charges and expenses which it may pay or incur in connection with investigating, disputing or defending any such Claims or Actions

d)  Subject to Clause 2.7 each Indemnifying Party other than SEL, FEL, Martin Benda and Richard Harazim (the "Other Indemnifying Parties") as a

- 4 -

K 6224

continuing indemnity undertakes that it will indemnify and keep indemnified and hold harmless each and every Indemnified Person from and against any and all Claims or Actions in respect thereof which any of them may incur or which may be made against any of them, *in so far as* such Claims or Actions are asserted or taken by any member of its Other Indemnifying Party Group, if any *and* arise out of, in relation to or in connection with the Kotva Case and/or the Transaction Agreements except Excluded Provisions, including any Action related thereto taken by or against any Indemnified Persons whether such Claims or Actions commenced or occurred before or after the date of this Agreement and will reimburse each of the Indemnified Persons for all costs, charges and expenses which it may pay or incur in connection with investigating, disputing or defending any Claim or Action.

"Other Indemnifying Party Group" means, at any time, in respect of each of Kotva, Kotva nemovitosti, Kotva obchodni, Kotva správcovská, Kotva garáže, Kotva parking and SPV KN (each, a "Corporate Other Indemnifying Party"), such Corporate Other Indemnifyng Party, any person directly or indirectly controlled by such Corporate Other Indemnifying Party and/or any person directly or indirectly controlling such Corporate Other Indemnifying Party and/or directors and/or agents of such Corporate Other Indemnifying Party and/or any person acting in concert with and/or upon instruction of such Corporate Other Indemnifying Party and/or any assignee (legal or beneficial) of any of such Corporate Other Indemnifying Party's assets and/or Claims and/or Actions, and/or any legal successor of such Corporate Other Indemnifying Party, but for the avoidance does not include the SEL Group and/or FEL Group.

2.2    If any Action is brought or asserted (whether prior to or after the date of this Agreement) against any Indemnified Person in respect of which indemnity may be sought pursuant to Clause 2.1, the Indemnified Person concerned shall notify the Indemnifying Parties in accordance with Clause 3. For the avoidance of doubt, the omission to so notify shall not relieve the Indemnifying Parties from any liability which they and each of them may have to any Indemnified Person under this Agreement.

2.3    If the Indemnifying Parties or any of them shall be required under this Agreement to indemnify any Indemnified Person, the Indemnifying Party shall be entitled to take over the conduct of the defence of the relevant Action, with legal representation to be approved by the Indemnified Person (such approval not to be unreasonably withheld or delayed), upon the delivery to the Indemnified Person of written notice of its election to do so.

2.4    Nothing in this Agreement shall be construed as implying (i) any SEL's liability or accountability for actions taken by any person other than a member of the SEL Group as specified in Clause 2.1a) (ii) SEL's consent or agreement to indemnify or keep indemnified or hold harmless any Indemnified Person for any Claim or Action *not* asserted or taken by a member of the SEL Group or for any Claim or Action of SEL's assignees (whether legal or beneficial) *not* directly derived from a Claim or Action assigned to them by SEL or (iii) undertaking by SEL to reimburse any of the Indemnified Persons for costs, charges and expenses in connection with Kotva Case

- 5 -

K 6225

that any of the Indemnified Persons actually incurred *before* the date of this Agreement.

2.5    Nothing in this Agreement shall be construed as implying (i) any FEL's liability or accountability for actions taken by any person other than a member of the SEL Group and/or of the FEL Group, as specified in Clause 2.1b) (ii) FEL's consent or agreement to indemnify or keep indemnified or hold harmless any Indemnified Person for any Claim or Action *not* asserted or taken by a member of the SEL Group and/or of the FEL Group or (iii) undertaking by SEL to reimburse any of the Indemnified Persons for costs, charges and expenses in connection with Kotva Case that any of the Indemnified Persons actually incurred *before* the date of this Agreement.

2.6    Nothing in this Agreement shall be construed as implying (i) any liability or accountability of Martin Benda and/or Richard Harazim for actions taken by any person other than as specified in Clause 2.1c) (ii) Martin Benda's and/or Richard Harazim's consent or agreement to indemnify or keep indemnified or hold harmless any Indemnified Person for any Claim or Action *not* asserted or taken by persons specified in Clause 2.1c) or (iii) undertaking by Martin Benda and/or Richard Harazim to reimburse any of the Indemnified Persons for costs, charges and expenses in connection with Kotva Case that any of the Indemnified Persons actually incurred *before* the date of this Agreement.

2.7    Nothing in this Agreement shall be construed as implying (i) any Other Indemnifying Party's liability or accountability for actions taken by any person other than a member of the relevant Indemnifying Party's Group, as specified in Clause 2.1d) (ii) any Other Indemnifying Party's consent or agreement to indemnify or keep indemnified or hold harmless any Indemnified Person for any Claim or Action *not* asserted or taken by a member of such Other Indemnifying Party Group or (iii) undertaking by any Other Indemnifying Party to reimburse any of the Indemnified Persons for costs, charges and expenses in connection with Kotva Case that any of the Indemnified Persons actually incurred *before* the date of this Agreement.

3.    Notices & Process Agent

3.1    a)    Aside from the service of process, any notice, demand, certificate or other communication (a "Notice") required to be given or sent to SEL in connection with this Agreement shall be given in writing or by fax to Mr. Daniel Mališ, Attorney-at-Law, at the address: Longin Business Center, Na Rybníčku 5, 120 00 Prague 2, fax (+420) 296 368 351 or to such other appointed representative of SEL at such other address (or fax number) as may be notified on behalf of SEL to each of the Sellers, Marta Guthová and James Woolf in writing or by fax at their addresses stated in the signature pages hereof from time to time for that purpose.

3.1    b)    Aside from the service of process, any Notice required to be given or sent to the Indemnifying Parties other than SEL in connection with this Agreement shall be given in writing or by fax to Mr Jaroslav Novák, attorney at law, at the address: Trojanova 12, 120 00 Praha 2, fax +420 224 918 490 or to such

- 6 -

K 6226

other appointed representative of the Indemnifying Parties at such other address (or fax number) as may be notified on behalf of the Indemnifying Parties to each of the Sellers, Marta Guthová and James Woolf in writing or by fax at their addresses stated in the signature pages hereof from time to time for that purpose.

3.1    c)    The Indemnifying Parties (other than SEL) hereby appoint the following as their agent for service of process in England and Wales:

Deutsche Bank AG London Branch
Winchester House
1 Great Winchester Street
London
EC2N 2DB

Attention: Head of Legal Department

3.2    A Notice given or sent to the Indemnifying Parties in accordance with Clause 3.1 shall be deemed to have been duly received by them, if left at such address as aforesaid, on the day it was so left, or if sent by post, five days after the time when the same was put in the post and in proving delivery it shall be sufficient to prove that the same was properly addressed and put in the post. A Notice sent by fax shall be deemed to have been duly given at the time of despatch.

4.    Payments

4.1    All payments falling due under this Agreement shall be made in Czech Crowns to a bank account or accounts indicated by the Indemnified Person(s) in the relevant Notice (the "Specified Account"). Where a Claim or Action is brought against any Indemnified Person(s) in a currency other than Czech Crowns the Indemnified Person(s) may select to receive the payments hereunder in the currency of such Claim or Action; failing such selection, the payments shall be made to the Specified Account in Czech Crowns, the exchange rate for such transfer to be made at the prevailing exchange rate as listed by the Czech National Bank as of the date of the Notice under Clause 3.

4.2    Every sum payable by the Indemnifying Parties under this Agreement shall be paid in full without set-off, counterclaim or condition and free and clear of and without deduction of or withholding for or on account of any taxes. If any Indemnifying Party shall be required by law to make any deduction or withholding from any payment to any Indemnified Person, it shall pay to such Indemnified Person such additional amount as will result in the receipt by that Indemnified Person of the full amount which would otherwise have been received by it hereunder had no such deduction or withholding been made.

- 7 -

K 6227

5.  **Remedies and Waivers**

No delay or omission on the part of any of the Indemnified Persons in exercising any right, power, privilege or remedy pursuant to this Agreement shall impair such rights or be construed as a waiver thereof nor shall any single or partial exercise of any such rights preclude any other or further exercise thereof or the exercise of any other right. The rights herein provided are cumulative and not exclusive of any rights provided by law.

6.  **Miscellaneous**

6.1  This Agreement shall be binding upon and enure for the benefit of each party hereto and its successors.

6.2  The parties hereto shall execute, acknowledge and deliver all such acts, documents or instruments or do such other things as may be reasonably necessary to give full effect to this Agreement.

6.3  This Agreement constitutes the entire agreement and understanding of the parties hereto and supersedes any previous agreement or understanding between the parties hereto relating to the subject matter of this Agreement.

6.4  If, at any time, any provision of this Agreement is or becomes invalid, ineffective or unenforceable in any respect, the validity, effectiveness and/or enforceability of the remaining provisions hereof shall not be in any way affected.

6.5  This Agreement may only be amended or supplemented by written amendments numbered in chronological order and signed by or on behalf of the parties hereto.

6.6  This Agreement shall be governed by and construed in accordance with the laws of England and Wales (excluding any English conflict of law rules which would refer any matter in issue between the parties hereto to be decided according to the laws of another jurisdiction).

6.7  Each party hereto irrevocably agrees to submit to the exclusive jurisdiction of the courts of England and Wales any claim, dispute or other issue arising under or in connection with this Agreement and waives any objection on the grounds of venue or inconvenient forum.

- 8 -

K 6228

6.8  This Agreement, including all undertakings, obligations and representations of the parties hereto shall automatically be cancelled and shall cease to exist in the event that any of Transaction Agreements does not take effect or ceases to be of any further effect due to non-occurrence of any of the conditions precedent or occurrence of any of the conditions subsequent therein.

SIGNED AND DELIVERED AS A DEED on the day above noted by

FLOW CORPORATION, Ltd.
Address:
25 Harley Street, London W1N 2BR

By: _____
Name:
Function: Director

By: _____
Name:
Function: Director / Company Secretary

DB UK BANK LIMITED
Address and fax:
23 Great Winchester Street, London EC2 P2 AX
+44 (0) 113 336 1143

By: _____
Name:
Function

By: _____
Name:
Function:

F E Reality a.s.
Address and fax:
Praha 1, Mostecká 12 č p. 49, PSČ: 11800
+44 296 518 112

By: _____
Name: James Lewis Woolf
Function: BoD member

K 6229

Mr. Andrew Dixon-Smith
Deutsche Bank A.G.
Legal Counsel
Fax: +44 113 336 1143

Prague, 29.3.05

Dear Mr. Dixon-Smith

Thank you for your letter from March 15, 2005, in which you expressed readiness of DB to execute various documents relating to the Assignment of Receivables & Deed of Indemnity among DB, Flow, Kotva and other parties.

We consulted JT Bank about their attitude and we were informed that JT Bank is still willing to buy the claims of DB and Flow for their client and that their consent was already communicated to your legal counsel, Mrs. Schweigelová.

After having received consent of JT Bank we also can confirm we are ready to conclude the deal as prescribed by the documents that were signed by your side already.

At the same time, though, we would like to inform you that we received information from Flow that seems to be contradictory to the deemed conclusion of the Settlement. Mr. Nováček informed us that the willingness of Flow to join the Settlement is conditioned by reaching an agreement with Markland by which DB and Flow would be entitled to additional money from Markland. As we were repeatedly told by Markland, there were attempts of Flow to enforce several million Euros from Markland, but there is reportedly no chance that Markland would pay anything.

It is a joint standpoint of Kotva and JT Bank that both parties are ready to conclude the pre-signed Settlement. None of the parties, though, are willing to take part in another round of negotiations and business maneuvering. We request a clear answer as to whether by DB presented offer to execute the old Settlement has taken all factors into consideration and whether it represents a fixed standpoint of DB. Due to our past experience of canceling the deal at the last second both parties request assurance that both the effort and expenses associated with deemed execution of the Settlement are this time not performed in vain.

Yours faithfully

Richard Harazim
CEO KOTVA a.s.
Email: richard.harazim@od-kotva.cz
Direct line: +420 224 801 230

K 6168

| | |
|---|---|
| **From:** | Vladimír Hoffmann [vlado1@volny cz] |
| **Sent:** | Monday, December 08, 2003 9:25 AM |
| **To:** | Andrew Weiss |
| **Cc:** | Eitan Milgram; Dave Johnson |
| **Subject:** | Kotva |

I informed Forminster today that we decline their offer. I told them that our offer would be USD 4m. They rejected it.
Regards,
Vlado.

1

WP0000137

| | |
|---|---|
| **From:** | Vladimír Hoffmann [vlado1@volny.cz] |
| **Sent:** | Thursday, May 06, 2004 4:45 PM |
| **To:** | Georgiy Nikitin |
| **Subject:** | Offer from PR agency ExMise |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Dear Georgiy,

The plan of meetings for 12th of May is as follows:

10.00AM: James Woolf
12.00: Mgr.Svobodova (Lunch)
2.00PM: Harazim, Benda (Forminster)
5.00PM: Pavelka, Dostal – PR Agency ExMise

I am trying to find a suitable hotel. I tried Hilton, but it is fully booked. Does Andy have any particular preference concerning standard, price, location ?

Vlado.

P.S. Please send me the mobile phone number that Andy will use while in Europe.

-----Original Message-----
From: Georgiy Nikitin [mailto:georgiy@weissasset.com]
Sent: Wednesday, May 05, 2004 4:14 PM
To: Vladimír Hoffmann
Subject: RE: Offer from PR agency ExMise


Dear Vlado,

Thank you for your message. Andrew's schedule is not finalized, but the plan now is that he is arriving at Prague at 9:10pm on May 11th. I will update you if there is any change. Andrew will need a hotel for two nights. Would you be able to do this, please? He will be leaving the office on Friday. Do you think you could, please, send us some information about his meetings in Prague before that? Best regards, Georgiy

Georgiy Nikitin, Ph.D.

Weiss Asset Management
tel. + 1 (617) 778-7725
fax + 1 (617) 778-7781


-----Original Message-----
From: Vladimír Hoffmann [mailto:vlado1@volny.cz]
Sent: Wednesday, May 05, 2004 6:01 AM
To: Georgiy Nikitin
Cc: Andrew Weiss
Subject: RE: Offer from PR agency ExMise


Dear Georgiy, I will organize meetings for Andy for Wednesday, May 12. What time is he

1

WP0001759

ariving ? I could pick him up at the airport on May 11th evening. Do you need help with hotel reservation or something ? Vlado.

-----Original Message-----
From: Andrew Weiss [mailto:AWeiss@WeissAsset.com]
Sent: Tuesday, May 04, 2004 9:22 PM
To: Vladimír Hoffmann
Subject: RE: Offer from PR agency ExMise


Dear Mr. Hoffmann,

I am trying to organize Andrew Weiss's trip to Europe next week and it looks like he should be able to go to Prague from the evening of May 11th to the morning of May 13th. Would you be able to organize the meetings for him during this period? I appreciate your help. Best regards, Georgiy

Georgiy Nikitin, Ph.D.

Weiss Asset Management
tel. + 1 (617) 778-7725
fax + 1 (617) 778-7781



-----Original Message-----
From: Vladimír Hoffmann [mailto:vlado1@volny.cz]
Sent: Thursday, April 29, 2004 5:20 AM
To: Andrew Weiss
Subject: RE: Offer from PR agency ExMise


It depends how much meetings would you like to have and how much time can you comit. I believe that 2 days would be optimal (e.g. if you came one day in the morning and leave next day in the evening). Please let me know soonest whom would you like to meet and when would you come so that I could arrange evrything.

Best wishes,

Vlado.

-----Original Message-----
From: Andrew Weiss [mailto:AWeiss@WeissAsset.com]
Sent: Wednesday, April 28, 2004 10:42 PM
To: Vladimír Hoffmann
Cc: Dave Johnson; Eitan Milgram
Subject: RE: Offer from PR agency ExMise


About how many much time would you suggest that I spend in Prague? andy

Office 617 778 7780
Mobile 617 548 0580



-----Original Message-----
From: Vladimír Hoffmann [mailto:vlado1@volny.cz]
Sent: Wednesday, April 28, 2004 6:05 AM

2

WP0001760

To: Andrew Weiss
Cc: Dave Johnson; Eitan Milgram
Subject: RE: Offer from PR agency ExMise


Dear Andy,

If you come to Prague, I would be able to organize meetings with the relevant people
involved in Kotva/Trend case (lawyers, PR people, Woolf, minority shareholders, Moffit,
Forminster, Halek ...) I believe that it would be a good opportunity to advance the
Kotva/Trend project. Also it would be my pleasure to see you in person after 8 years or
so.

As far as the web site is concerned I have people who could do it here for a good price
and very professionally. So we can decide that we would use just some services of ExMise.
Wee could meet them if  you come to Prague and make the decision then.

Tomorrow I am meeting Dr.Glatzova, Woolf's lawyer. James wants to sue Forminster for
damages and we will discuss tomorrow if we can join them in this lawsuit as plaintiffs.

Please let me know when would you like to come to Prague. I will be here from Monday the
10th of May until Thursday the May 13th. I will be travelling from 14-16th of May and I
will be back on Sunday 16th of May late in the evening. Then I will be here for the whole
next week starting 17th of May.

Best regards,

Vlado.


-----Original Message-----
From: Andrew Weiss [mailto:AWeiss@WeissAsset.com]
Sent: Tuesday, April 27, 2004 7:35 PM
To: Vladimír Hoffmann
Subject: RE: Offer from PR agency ExMise


If we were to hire these people (or not) would it make sense for me to go to Prague when
I'm in Europe during the week of May 10.  I plan to be in Warsaw toward the end of that
week and in London at the beginning of the week, I could also see media people at the
beginning of the next week. I'm not sure what we need (hope) to accomplish.  Given the
amount of money involved this may be a good expenditure but I need to think more about it.
We could set up the web site without them, I suspect we could do a better job of it
without going thrugh them, there are real experts around here, and we could hire one of
the students as a summer intern to set up the web site. What documents would you want, we
would need to hire a fluent Czech speaker but I have a friend who could do that for us.
andy

Office 617 778 7780
Mobile 617 548 0580


-----Original Message-----
From: Vladimír Hoffmann [mailto:vlado1@volny.cz]
Sent: Tuesday, April 27, 2004 6:04 AM
To: Andrew Weiss
Cc: Dave Johnson; Eitan Milgram
Subject: Offer from PR agency ExMise

3

WP0001761

Dear Andy,

Please find enclosed the offer from the PR agency ExMise. I believe that it would be useful to have the ability to present our opinions in media and to exercise certain pressure upon Forminster. I find especially useful the creation of an internet presentation where we could publish documents and evidence that we find relevant and also we could provide a platform for small shareholders to express there views and information.

Please let me know what you think about the offer. If we decide to go ahead I believe that we could negotiate the price.

Best wishes,

Vlado.

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

This email is confidential and is intended solely for the addressee(s). If you are not an addressee, you must not disclose, copy, circulate or in any other way use or rely on the information contained in this email. If received in error, please notify the sender immediately and then delete this email. Any disclosure, copying, distribution or use of this communication is prohibited and may be unlawful.

Any views or opinions expressed do not necessarily represent those of Weiss Asset Management or any affiliated companies. Please note that the content of this e-mail may be intercepted, monitored or recorded for compliance purposes. Sensitive personal data should not normally be transmitted by e-mail.

Weiss Asset Management or any affiliated companies shall not be liable to the recipient or any third party for any loss or damage howsoever arising from this e-mail and/or its content, including loss or damage caused by virus. It is the responsibility of the recipient to ensure that the opening or use of this message and any attachments shall not adversely affect systems or data.

Weiss Asset Management
29 Commonwealth Avenue
Boston, MA 02116
TEL: (617) 778-7780
FAX: (617) 778-7781
www.weissasset.com

---
Pøíchozí zpráva neobsahuje viry.
Zkontrolováno antivirovým systémem AVG (http://www.grisoft.cz).

4

WP0001762

Verze: 6.0.670 / Virová báze: 432 – datum vydání: 27.4.2004

---
Odchozí zpráva neobsahuje viry.
Zkontrolováno antivirovým systémem AVG (http://www.grisoft.cz).
Verze: 6.0.670 / Virová báze: 432 – datum vydání: 27.4.2004

5

WP0001763