UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
KOTVA a.s.                              )
                                        )
            Plaintiff,                  )        Case No. 05-10679-RCL
                                        )
            v.                          )
                                        )
ANDREW WEISS and WEISS ASSET            )
MANAGEMENT, LLC                         )
                                        )
            Defendants.                 )
_____ )

### KOTVA'S MOTION TO COMPEL AND REQUEST FOR SANCTIONS PURSUANT TO THE SPECIAL MASTER'S PRIOR ORDER

### INTRODUCTION

This is now the <u>second</u> time Kotva requests the Court's intervention to pry a complete privilege log from the Weiss Defendants.  Most recently, on April 3, 2006, Kotva a.s. filed its motion to compel directing Defendants to supplement their log.  Among the many defects highlighted in Kotva's motion were: the failure to identify attorneys; the failure to specify which individuals were represented by which attorneys; and the use of descriptions so general that it was impossible to determine what role, if any, attorneys played in purported attorney-client communications and/or the creation of alleged work product.  The Special Master granted Kotva's motion and ordered the Weiss Defendants to supplement and amend their privilege log to provide both missing entries and missing information:

> The [privilege] logs must identity the author(s) and recipient(s); the person or entity whom the attorney represents; the date the communication was created or transmitted, as applicable; the nature of the communication, and the basis for the claim of privilege or protection.  The log should not

> contain or reveal privileged communications. To the extent the logs
> prepared by the parties to date do not comply with this directive, the
> parties shall amend their logs so that they provide all the foregoing
> information.

May 26, 2006 Order ("Order") at 2. The Order also provided that "continued failure to

produce documents, witnesses, <u>and the privilege log already ordered produced</u> will result

in the imposition of sanctions." Order at 15 (emphasis added).

　　　　As demonstrated below, the revised privilege log produced by Weiss on July 10,

2006 fails to comply with the Special Master's Order. (A copy of the log is attached

hereto as Exhibit A). Defendants once again have asserted the attorney/client privilege

for hundreds of entries that do not even list any attorney as an author or recipient. The

revised privilege log again does not identify the person or entity whom the attorney

purportedly represents.[1] Compounding this problem, Weiss has made no effort to amend

the hundreds of vague document descriptions from the original log, and the log entries

still fail to provide sufficient information to ascertain why the privilege is being asserted

and whether it applies.

　　　　In accordance with the Order, the Weiss Defendants should be sanctioned for

their continuing failure to provide a complete log. Indeed, the Special Master's prior

Order of <u>January 6, 2006</u> required Weiss to identify and log documents withheld on the

basis of privilege. Seven months later, with discovery about to close, Weiss is still

resisting adequately logging these documents. Could it be that, like the Woolf

---

[1] During the Rule 37.1 conferences, Kotva advised Weiss' counsel of the deficiencies that still exist in the revised log. Weiss proposed providing an additional "column" identifying the attorneys involved. This is very revealing: if the document is truly an attorney/client communication, the attorney should appear as an author or recipient, or be identified in the description of the document. Thus, the offer of a new column was rejected. Although Kotva requested a sample, Weiss' counsel advised that the "corrected" log could not be produced before August 7, 2006. Kotva also advised Weiss that the appendix to the revised log was not sufficient to identify whom attorneys represented or the scope of such representations. Weiss agreed to supplement the appendix to provide additional information to identify which attorneys represented which clients and when, where necessary. Per the Order, this should have been done by July 10th.

documents, such assertions of privilege are improper?  Could it be that Weiss is engaging in dilatory tactics to stifle Kotva's right to challenge their privilege assertions, including challenges based on the crime/fraud exception?  The Weiss Defendants should be sanctioned for disregarding the Court's Order, including ordering Defendants to show cause why documents listed on the privilege log should not be disclosed or, alternatively, reviewed in camera.  Kotva also respectfully requests that the Weiss Defendants be ordered to pay Kotva's reasonable attorneys' fees incurred in connection with reviewing the log (for the second time) and filing this motion (for the second time).

### ARGUMENT

A party that withholds documents on the basis of privilege must state the claim expressly and provide a log that enables other parties to assess the applicability of the claimed privilege or protection.  Fed. R. Civ. P. 26(b)(5).  Moreover, the party resisting production on the basis of privilege has the burden of establishing the existence of the asserted privilege and the burden to show that the privilege has not been waived.  In re Raytheon Sec. Litig., 218 F.R.D. 354, 357 (D. Mass. 2003) citing United States v. Wilson, 798 F.2d 509, 512-513 (1st Cir. 1986); In re Lernout & Hauspie Sec. Litig., 222 F.R.D. 29, 36 (D. Mass. 2004).  Weiss' privilege log again fails the test.

Despite the Order, Weiss refuses to provide enough information for Kotva to assess the applicability of numerous privilege assertions.  The log is rife with vague descriptions of unidentified legal proceedings, assertions of attorney-client communications with no attorney identified, and assertions of work product that do not specify who created it, when it was created, or what litigation it was created for.  Weiss also continues to make overbroad assertions of privilege on behalf of non-parties.

I.    **Weiss Should Be Ordered to Provide Additional Information About
Individuals and Litigation Referenced in the Privilege Log**

   A.    **To Assert the Attorney-Client Privilege, Weiss
Must at Least Identify the Attorney Involved**

Kotva identified more than 200 assertions of attorney-client privilege in Weiss'
original privilege log that did not list any attorney as an author or recipient, and Weiss
engages in the same tactics with the revised log.[2]   In opposing Kotva's original motion to
compel, Weiss previously argued that "communications among Hoffman, Weiss, and
other employees of Weiss Capital LLC (or some subset of this group) relaying and
discussing legal advice" are privileged.  (See Weiss opposition to motion to compel at 5).
Even assuming this to be true, the Order required Weiss to supplement and amend the log
to identify attorneys and "the person or entity whom the attorney represents."  At a
minimum, therefore, Weiss was required to identify either (1) how a withheld
communication contains legal advice that originated from an attorney, or (2) how the
communication was sent to an attorney seeking legal advice.  Otherwise, there is no
attorney-client communication to be protected.

Notwithstanding the explicit terms of the Order, there are still hundreds of entries
that claim attorney-client privilege with no attorney identified as an author or recipient.

---

[2]  For example, the following entries have no reference to any attorney whatsoever, yet are withheld
purportedly on the basis of the attorney/client privilege: 17-26, 41, 42, 44-46, 48, 50-53, 62, 67, 75, 83-84,
87-88, 103-108, 113, 120-127, 150, 152, 153, 162-167, 170, 175-178, 180-181, 182-194, 197, 198, 201-
202, 211-212, 214-215, 217-218, 223-231, 235-239, 241-245, 247-248, 250-271, 274-275, 277-283, 296-
297, 299, 309, 311, 313-314, 316-317, 319-320, 323-324, 327-330, 332, 337, 339-340, 346-347, 349-357,
363-364, 369, 371, 389, 396, 404, 410-411, 430-431, 438, 476, 478, 489-492, 513, 516, 520-524, 532-534,
537, 548, 565, 567-568, 596, 607, 610, 618, 621-624, 628, 635-644, 672, 676, 681, 692, 696, 700, 711-712,
716-718, 722, 725-726, 728, 740-741, 754, 759, 768-774, 776, 788-790, 800-803, 825, 849-850, 865, 871-
878, 929, 942, 951-954, 962-963, 971, 999-1000, 1006, 1015-1019, 1029-1030, 1040, 1071, 1101, 1107,
1141, 1155, 1161-1162, 1199-1200, 1206, 1212, 1213, 1230, 1303, 1317-1319, 1322, 1327, 1359, 1371,
1376, 1380-1399, 1411, 1433-1435, 1440.

For example, in the absence of any identified attorney-client relationship, Weiss asserts

attorney-client privilege for things such as:

- Internal e-mails or e-mails with Hoffman described as "Correspondence relating to KT corporate documents" (517, 521) or "Correspondence regarding Delaware corporations" (537) in July 2004;

- An internal e-mail in November 2004 "regarding Irish company[3] purchasing real estate in Prague" (1101); and

- E-mails exchanged with Vladimir Hoffman and internally from November 2003 that describe only "potential legal proceedings" (entries 67-75).

In addition, between the May 12, 2004 meeting at which Weiss threatened that "he could

make serious problems for Kotva" (Compl. ¶ 20) and the June 4, 2004 retention of

Attorney Peterka, there are numerous attorney-client assertions that fail to identify any

specific attorneys:

- May 18, 2004 e-mail from Hoffman to Weiss "regarding request for legal opinion from Czech counsel" that does not identify the Czech counsel (224);

- May 20, 2004 e-mails "regarding upcoming legal proceedings and retention of consultant for legal proceedings" that do not identify the consultant (235-238);

- May 30-31, 2004 e-mails "summarizing meetings with counsel" without identifying the counsel (259-263; 267-269).

These entries suggest that Weiss attempted to retain various counsel before hiring

Attorney Peterka, which may be relevant to assessing the crime/fraud exception.  (i.e.

Weiss approached other counsel with his scheme to extort Kotva by filing sham lawsuits,

but was turned down, until he retained Peterka) (see Section III, infra addressing the

---

[3] Communications with Markland, the Irish company that purchased the Kotva department store, are particularly relevant to Kotva's blackmail and interference with contractual relation claims.  Documents already produced reveal Weiss and his counsel contacted Markland in an effort to disrupt the sale.  All such documents listed on the deficient log concerning communications with Markland should be produced because Weiss had his chance to satisfy his burden that such communications are privileged, and he failed. Moreover, such documents may be discoverable as non-privileged business negotiations and/or qualify for the crime/fraud exception.  (See Section III, infra).

crime/fraud exception). The lack of information in the log, however, forces Kotva to engage in an exercise of unnecessary speculation.

Moreover, the fact that a communication references litigation or may even be based on legal advice does not make the document privileged. The Order expressly provided that "directives from management to employees that are based upon legal advice, but that do not refer specifically to attorney-client communications, are not privileged." Order at 7; see also, State of Maine, 298 F.3d at 69 (the "mere relation of documents to litigation does not automatically endow those documents with privileged status.").

 When there are actual communications to or from counsel, Weiss also must identify who the attorney represents so that Kotva can determine whether the asserted privilege has been waived. In many cases, however, it is not evident who is even asserting the privilege (see 1373-1415), or whether it still applies (see 1357, 1359-61). To the extent that any of the alleged attorney-client communications were disclosed to parties outside of the particular attorney-client relationship, the privilege has been waived and the documents must be produced. United States v. M.I.T., 129 F.3d at 684-685; see Order at 7.

> **B.** **The Weiss Log Fails to Provide Sufficient Information to Assess Whether the Privilege Applies to "Multi-Capacity" Individuals like Vladimir Hoffman and Howard Golden**
>
> **1.** **Communications with Vladimir Hoffman**.

The Order expressly provided that, "Business communications between Weiss and Hoffman, e.g., for the purpose of selling Weiss's holdings in Kotva and Trend…are not privileged." Order at 6. Indeed, only those Hoffman communications that were

made for the purpose of obtaining legal advice, <u>where Hoffman was acting as Weiss' representative</u>, are privileged.[4] <u>Id</u>.

Because Hoffman was acting in multiple capacities--sometimes as Weiss' representative for business purposes, sometimes purportedly as Weiss' representative for legal purposes, and sometimes as his own representative--the privilege log should provide sufficient detail so that those different roles can be discerned.[5]  It does not.  For example, the privilege log contains entries that appear to include Hoffman's business functions:

- memoranda from Hoffman to the BGO Board in 2003 described as "analyzing potential and ongoing legal actions, <u>among other issues</u>."  (17 to 25) (emphasis added);[6]

- correspondence between Weiss and Hoffman in July 2004 regarding "purchase of Trend claim" (520, 522-24, 528, 530);[7]

- communications in October 2004 vaguely described as "regarding principles governing future activities" (942); and

- correspondence with Hoffman regarding his termination of the contract with BGO (1214-1215, 1217).

---

[4] To the extent that Hoffman was represented by an attorney that did not represent Weiss--as appears to be the case with Attorney Wenzl--disclosure of those communications to Weiss effects a waiver of the privilege and the document should be produced.  (See e.g. #179 and Appendix (listing only Hoffman as Wenzl's client)).

[5]  Weiss retained Hoffman in September 2003 to facilitate the sale of BGO's Kotva and Trend shares.  As part of his duties, Hoffman was required to provide the BGO board with written updates and to be available for regular telephone conversations on any developments regarding his efforts.  (<u>Id</u>, at W0002065).  Because those updates and communications would have been created in the same form irrespective of litigation, they are not entitled to work product protection.  <u>In re Lernout & Hauspie Sec. Litig.</u>, 222 F.R.D. at 36-37.

The parties could not reach agreement under Rule 37.1 as to whether Weiss would supplement the descriptions of Hoffman entries to provide this detail.

[6] The description itself indicates that only a portion of these documents--at best--could be privileged.  Moreover, Weiss has produced in discovery similar memoranda addressed to the BGO board.  In short, the Hoffman Board documents are non-privileged business communications and should be produced.  "Business communications between Weiss and Hoffman, e.g., for the purpose of selling Weiss's holdings in Kotva and Trend…are not privileged."  Order at 6.

Returning to the May 2004 time period, even before retaining an attorney, Weiss asserts the attorney-client privilege for a number of e-mail exchanges with Vladimir Hoffman which he describes as: "Document describing action items and status for legal proceedings and other activities by lawyers;" "Email regarding legal proceedings and other activities by lawyers;" and "Correspondence regarding potential legal proceedings." (See entries 182-189). From these descriptions, there is no way to tell whether these documents refer specifically to attorney-client communications or include more general business strategy discussions. Given Weiss' failure to sustain his burden of demonstrating that the documents in question are privileged, the critical nature of the time period, and the wrongful privilege assertions previously advanced by Weiss, Kotva requests that Weiss be ordered to produce the Hoffman communications or, alternatively, that the documents be reviewed in camera to assess whether they are privileged or unprotected business communications.

### 2.    Communications with Howard Golden.

With respect to Howard Golden, Weiss asserts both attorney-client privilege and work product protection.[8] Although Howard Golden is identified as an attorney, he is also a former director of BGO's predecessor and has extensive involvement in these issues in a business capacity. To the extent that Weiss asserts privilege for communications with Golden, Weiss must demonstrate that Golden was acting as an attorney and providing legal advice to Weiss in the capacity of a legal adviser—and not acting in some other capacity. Weiss has an obligation to provide sufficient information about the legal representations at issue for Kotva to assess the alleged privilege and to

---

[8] See log entries 14-15, 1316, 1324-25, 1329, 1344, 1350, 1355, 1360-64, 1368, 1370. 1438-39.

challenge it where appropriate.[9]  Therefore, the Golden documents should be either

produced forthwith (because Weiss has failed to satisfy his burden) or be reviewed <u>in</u>

<u>camera</u> like the James Woolf documents.

## II.    Weiss Continues to Make Overbroad Assertions of Work Product Protection

### A.    Without Alleging or Attempting to Substantiate a "Common Interest" Weiss Cannot Withhold Work Product on Behalf of Other Parties

Weiss made improperly broad assertions of privilege in the original privilege log,

and was ordered to produce alleged "work product" that he disseminated to the press and

to the State Department.  Order at 5-6.  Weiss also wrongfully withheld many documents

exchanged with non-parties like James Woolf on the grounds of an unasserted "common

interest" privilege.  Weiss, however, has produced in discovery emails revealing that in

November 2003, Woolf refused to cooperate with Weiss, that he had no deal with Weiss,

and that Weiss and Woolf "should both go our own way."  (See Exhibit B attached

hereto).  Thus, there can be no "common interest" privilege after November 2003, and

any documents exchanged after that date with Woolf should be produced.

The Order also specifically required Weiss to state when any alleged common

interest arose, its scope, and when it terminated.  Order at 7-8; see <u>United States v. Bay</u>

<u>State Ambulance & Hosp. Rental Serv., Inc.,</u> 874 F.2d 20, 28 (1st Cir. 1989).  Despite the

Order, nowhere in the revised privilege log does Weiss assert common interest protection

or identify the scope and duration of any such relationship.  Moreover, Weiss continues

---

[9]  During the Rule 37.1 conference Weiss' counsel asserted that all Howard Golden attorney-client assertions related to Mr. Golden's role as an attorney, but the parties could not reach agreement as to whether Weiss would provide additional information in the descriptions for these entries.

to assert work product protection on behalf of non-parties in the revised privilege log, including the following: [10]

- Jason Leroux:  1317, 1320-21, 1323, 1326, 1433;[11]

- Lars Bader:  1416-1420; 1422-1432.

Weiss has now taken the position that it will produce "some" Bader documents and "some" LaRoux documents if Kotva agrees that such disclosure does not operate as a subject matter waiver.  Weiss misses the point: if he disclosed documents to third parties, with no showing of a common interest, the documents are not privileged and should be produced.

### B.    Weiss Has Provided Inadequate Descriptions of Work Product

Weiss has continued to provide vague and inadequate descriptions of work product.  Kotva is left to speculate throughout the log about vague descriptions of work product that do not identify specific legal proceedings, like:

- "Email attaching materials prepared by V. Hoffman relating to ongoing legal proceedings" from October 23, 2003 without identifying the proceedings (45-46);

- "Email discussing pending legal proceeding in Czech Republic" from November 2003 without identifying the proceedings (54-57);

- "Attachment to Hoffman memorandum" in December 2003 (87);

- "Correspondence regarding potential litigation" in January 2004 without identifying the litigation (119);

---

[10]  Weiss' counsel identified Jason Leroux as being affiliated with HSBC.  Lars Bader is an investor affiliated with QVT Financial, L.P.  Weiss' counsel agreed to produce "some" Bader and "some" Leroux documents contingent upon Kotva surrendering any waiver claims based on the "withdrawal" of privilege. On the contrary, such documents are either not privileged or the privilege has been destroyed.  Kotva also identified several entries involving Jan Svejnar, a University of Michigan Professor.  Weiss' counsel has agreed to produce all documents concerning Svejnar.

[11]  Attorney-client privilege is asserted for the following communications sent to or from Leroux: 1303, 1318-19, 1322, 1359, 1366, 1373-77, 1381-94, 1400-1401.  Many of these privilege claims do not identify any attorney.  See, e.g., 1317-19, 1322 ("Email relating to pending legal proceeding in Czech Republic against Bank of Bermuda.")

- "Email regarding ongoing legal proceeding and potential participation" in February 2004 (123);

- "Email discussing potential litigation" from February and March 2004 (130-132; 138-139);

- "Email regarding participation in pending proceeding" (170-171) and "Email discussing potential legal proceeding" (177-178) in April 2004;

- "Correspondence regarding potential contract with third party company to assist in litigation efforts" (281; 284; 290; 292-293) in June 2004;

- "Document describing selected facts that may serve as basis for legal actions" sent by "Multiple Weiss Capital Employees" without identifying the employees (306);

- "Email relating to potential resources for resolving Kotva/Trend issues" sent by non-party Jan Svejnar in June 2004 (307);

- "Loose translation of document containing comments and analysis" without identifying whose comments or analysis (313-314; 316-317; 319-320; 323-324);

- "Email relating to filing of lawsuit" (349-352).

This is only a sample.

There are multiple litigations involving multiple parties that have a bearing on this case. Without identifying the lawsuits, it is impossible to match the attorney with the litigation to determine if any privilege has been waived. Weiss, however, has made no effort to identify which litigations are at issue in any of the privilege log entries. These documents should be produced forthwith.

### III. Certain Privilege Log Entries Should be Reviewed In Camera to Assess Whether the Crime/Fraud Exception Applies

In ruling on Kotva's last motion to compel, the Special Master denied without prejudice Kotva's request for an in camera inspection of documents on the basis of the crime/fraud exception. The Special Master ruled that "[i]f the amended privilege log or other discovery . . . gives rise to a reasonable inference that particular, identifiable communications or categories of communications between Weiss and Hoffman or others

11

were intended to foster and promote an extortion scheme as opposed to advantageous business litigation, the issue of in camera inspection will be revisted."  Order at 5.  As demonstrated below, given that (1) Weiss' privilege log is once again woefully deficient, (2) the discovery period is drawing to a close, and (3) the Weiss Defendants are still withholding documents under bald assertions of privilege, the documents included on the privilege log and generated between May and December 2004 should be reviewed in camera now as they will likely reveal evidence of Weiss' plan to extort Kotva.  See Order at 4.

A. **Weiss' hiring of Vladimir Hoffman and efforts to call a shareholders' meeting and take over the Kotva Board**

In the fall of 2003, BGO hired Vladimir Hoffman "to provide BGO with such services as may be reasonably requested by BGO to facilitate the sale of [BGO's Kotva and Trend] shares, including, but not limited to, identifying and communicating with prospective purchasers."  (See BGO's contract with Vladimir Hoffman, dated September 15, 2003, attached hereto as Exhibit C) (emphasis added).[12]  Weiss directed Hoffman "to start moving toward hiring a law firm and calling an extraordinary meeting to replace the board of directors of Kotva and to ask that the frozen shares cannot be voted." (See email from Weiss to Hoffman, dated September 16, 2003, attached as Exhibit F).  To this end, Hoffman engaged the law firm of Andel & Svobodova, and the firm took steps to implement Weiss' plan to call an extraordinary shareholders meeting of Kotva. (There is

---

[12] Vladimir Hoffman, a Czech citizen, had a prior business relationship with BGO and/or its predecessor, including apparently a similar contractual relationship in 2001 (see Exhibit D hereto) as well as being asked by "the chairman of the Board of BGO to join the board of BGO in order to unlock the value of the Kotva and Trend shares…" (See Exhibit E hereto). These business activities are not protected by any privilege.

no claim in this case that the actions of Mr. Weiss to exercise such shareholder rights in this fashion are improper).

In February 2004, Hoffman reported to Weiss that the Board of Kotva had "refused to include an agenda to the shareholders' meeting."  (See email from Hoffman to Weiss attached hereto as Exhibit G).  As set forth in this email produced in discovery, Hoffman reported to Weiss the legal advice of Svobodova:

> We could sue them, but it is quite likely the Court would accept their interpretation of the law.  Moreover, according to Svobodova the only sanction would be that we could seek damages compensation from the Board.  In this case it would be difficult to prove that we suffered damage just because they did not include our agenda to the shareholders' meeting.

(Exhibit G). (emphasis added).[13]  Another email produced in discovery reveals that Hoffman advised Weiss:

> I still believe that what he should do is call the extraordinary shareholders meeting of Kotva with the unpleasant questions (that we originally wanted to include to the last meeting) on the agenda.

(See email from Hoffman to Weiss dated April 1, 2004, attached as Exhibit H).[14]  As described bellow, having failed to push his agenda onto the shareholders meeting, Weiss resorted to a nefarious extortion scheme to sell BGO's Kotva shares.

**B.     Weiss Hiring of Ondrej Peterka and Filing of
the Gilroy and KT lawsuits**

After the May 12, 2004 meeting between Kotva representatives and Messrs. Weiss and Hoffman, at which Weiss launched his extortion plan, Weiss apparently fired the Svobodova law firm, and hired Ondrej Peterka.  On June 23 and June 29, 2004,

---

[13] As discussed in Section IV, infra, the disclosure of the advice of Svobodova operates as a subject matter waiver of the privilege.  Therefore, all such documents concerning this subject matter should be produced.

[14] This email also discloses the legal advice of Svobodova, thus warranting a subject matter waiver of any privilege.

Gilroy Ltd. purchased 135 shares in Kotva.  On June 30, 2004, Peterka filed a lawsuit on behalf of Gilroy Ltd. in the Czech courts against Kotva and its subsidiaries disputing the title to the department store real estate.  The Gilroy lawsuit asserted that Kotva should be declared the owner of the department store rather than the wholly owned subsidiary that was selling it.  (Kotva had transferred the department store to a subsidiary four years earlier in a publicly disclosed transaction, and prior to Gilroy even becoming a shareholder).[15]  Simply put, the only relief Gilroy sought in its complaint was a declaration that Kotva, as opposed to its subsidiary, be declared the owner of the department store, the lawsuit had nothing to do with Weiss' Kotva or Trend Shares.

### C.    Weiss' Extortionate Scheme and Peterka's Involvement

Weiss did not approach Kotva seeking to settle the Gilroy lawsuit.  Instead, Weiss denied any involvement with the Gilroy suit, demanded that Kotva purchase BGO's Kotva and Trend shares and, in exchange, Weiss would "attempt to influence" Gilroy to drop the suit.  Thereafter, Weiss made ever increasing written demands on Kotva to purchase BGO's shares (seeking almost eight times more than the publicly traded market price).  In other words, Weiss was willing to have the sale of the department store go through so long as he was given a cut of the sale proceeds.  Indeed, Weiss' position is completely contradictory and exposes his true motives: Weiss could not demand a cut of the sale proceeds from Markland and at the same time pursue a lawsuit disputing the real estate title to the department store, which would undo the Markland sale.

---

[15] The Gilroy lawsuit was dismissed by the Czech courts on the grounds that, because Gilroy did not own shares at the time the department store was transferred, it lacked standing to bring the suit.  In December 2004, Weiss' shell company, KT, Inc. filed an action against Kotva alleging word for word the same claim as Gilroy.

Mr. Peterka was front and center when the extortion scheme unfolded between June and December 2004. On October 18, 2004, Peterka met with Kotva representatives Richard Harazim and Martin Benda and a representative of Markland, the buyer of the department store. Weiss has produced in discovery a memorandum prepared by Peterka and addressed to Weiss summarizing this meeting. (See Exhibit H hereto). In the memorandum, Mr. Peterka explains to Weiss:

> Today I had together with Mr. Hoffman a meeting with Messrs Benda and Harazim of KOTVA and Mr. Prestage representing the prospective Irish buyers of KOTVA Department Store.
>
> ***
>
> The representatives of KOTVA further stated that their condition for purchasing the shares is the withdrawal of certain initiated lawsuits. They did not specify in detail what lawsuits they want to be withdrawn. We may assume that the representatives of KOTVA were today still unaware of the new lawsuits initiated by Gilroy last Friday that concerned the shares in KOTVA held by Forminster/bankruptcy trustee of SPRINT.
>
> ***
>
> The representatives of KOTVA further stated that a bank providing operational financing to KOTVA (a loan in the amount approx CZK 200 million due at the end of this year) is concerned about the pending lawsuit on the declaration of ownership to the KOTVA Department Store and is reluctant to extend this loan. In our opinion they seemed to derive liability of Gilory for damages suffered by KOTVA as a consequence of the lawsuit.
>
> We suggest setting up a conference call tomorrow and discussing these issues in detail.

(Exhibit I). In addition, Weiss produced in discovery a memorandum prepared by Peteraka questioning the prospects of success in filing lawsuits on behalf of Gilroy and KT:

> Today we have finalized the petition for the withdrawal of 384 971
> shares in KOTVA held by Forminster from the bankrupt's assets of
> SPRINT a.s.
>
>       \*\*\*
>
> As Agreed the petition will be submitted on behalf of GILROY and
> later KT Inc. will join GILROY as another plaintiff.  <u>As we already
> informed you before that the standing of both GILROY and KT Inc.
> is very problematic since they derive it from the fact that they are
> shareholders of TREND.  The previous court rulings have so far
> acknowledged only the standing of a previous owner to submit such a
> petition.</u>
>
>       \*\*\*
>
> <u>This restriction on the transferability of the shares is valid as long as the
> court has not finally decided about the petition, which may take several
> years.</u>

(See Memorandum from Peterka to Weiss dated October 18, 2004, attached hereto as

Exhibit J) (emphasis added).  The Czech police also seized documents from Mr.

Peterka's office, including emails exchanged between WAM and Hoffman, in which

WAM conveys to Hoffman:

> We can show that if [Kotva] do not settle with us, their cost of financing
> will be very high;…<u>If they do not settle, they will be able to realize the
> value of the property only in several years…</u>

(See email dated October 21, 2004 from Georgie Nikitin of WAM to Hoffman, attached

hereto as Exhibit K) (emphasis added).

     In short, the Peterka and Hoffman communications expose that the Weiss

Defendants filed the KT and Gilroy lawsuits as part of its plan to "foster and promote an

extortion scheme" - - not for the stated purpose of seeking a declaration that Kotva was

the true owner of the department store.  (<u>See</u> Order at p. 5)  These documents reveal that

Weiss was advised that his prospects for success were "very problematic," that his

lawsuits were negatively impacting Kotva's financing, and if Kotva does "not settle, they

will be able to realize the value of the property only in several years." The documents
produced by Weiss reveal that he made multiple extortionate demands for BGO's Kotva
and Trend shares between May and December 2004. Kotva submits that the documents
withheld by Weiss and identified on the log dated between May and December 2004,
have nothing to do with discussing "litigation strategy" about the Gilroy and KT lawsuits,
but have everything to do with the Weiss Defendants' scheme to force Kotva to purchase
their shares.[16] See Order at 4.

Simply put, Kotva has satisfied the good faith standard warranting in camera
review. In view of Weiss' deficient log, Kotva requests that Weiss be ordered to disclose
these documents forthwith or, alternatively, submit the documents dated between May
and December 2004 for in camera inspection. Such a review should focus on, among
other things, the following:

- Whether the communications are addressing the KT and Gilroy's litigation strategy challenging title to the department store; or

- Whether the communications are actually addressing Weiss' efforts to leverage the Czech lawsuits to pressure Kotva to purchase BGO's shares; and

- Whether Weiss was advised that filing the Czech lawsuits was improper, but decided to proceed anyway.

---

[16] The Court in Lemelson v. Wang Laboratories, 874 F.Supp. 30 (D. Mass. 1994) recognized that a RICO
claim may arise from extorting monies through a pattern of litigation. See also Hall American Center
Association v. Dieh, 726 F.Supp. 1083, 1097, (E.D. Mich. 1989) (the filing of a lawsuit as part of a scheme
to extort property may constitute a predicate act under RICO.

**IV.    By Disclosing Privileged Documents, Weiss has Waived the**
**Privilege on all Documents Concerning the Same Subject Matter**

Disclosure of an attorney-client communication waives the privilege with respect to the subject matter of those communications.  See AMCA International Corp. v. Phipard, 107 F.R.D. 39, 44 (D. Mass. 1985), see also Texaco Pureto Rico, Inc. v. Dept. of Consumer Affairs, 60 F.3d 867, 883-884 (1st Cir. 1995).  ("In general, "a waiver premised on inadvertent disclosure will be deemed to encompass all other such communications on the same subject.")  As described below, the Weiss Defendants have produced multiple documents revealing communications with their counsel, Svobodova, and successor counsel, Ondrej Peterka.  Therefore, all documents concerning the same subject matter should be produced.

For example, Weiss produced a memorandum from Mr. Peterka (Exhibit J hereto), discussing problems in filing of additional lawsuits by Gilroy and KT.  (This memorandum appears to match entry 967 on Weiss' privilege log).  Therefore, all such documents concerning the same subject matter should be produced, including the emails and memoranda referenced therein.[17]  Similarly, Weiss has disclosed a memorandum summarizing Peterka's meeting with Kotva and Markland during the critical period between May and December 2004 when Weiss was engaging in his extortion scheme

---

[17] This memorandum also discusses a position that Weiss has taken in this litigation (i.e. the fact that Forminster did not pay the settlement amount under the Forminster/Trend settlement agreement renders the agreement void).  Peterka advised:

> Under Czech law the fact that Forminster did not pay the settlement amount does not make the settlement agreement void.  The same applies even if Forminster intended from the beginning not to pay the settlement amount.  Under the circumstances this fact may entitle Trend to withdraw from the settlement agreement.  This is, however, possible only within a certain statutory limit that has already passed.

(Exhibit J) (emphasis added)  Weiss' advancement of this theory in the Czech lawsuits further exposes his extortion scheme (and favoring a review in camera of Weiss' documents).  In any event, all communications concerning this subject matter should be disclosed.

18

(Exhibit I) (This memorandum appears to be entry 1007 on the log with a description as "email enclosing communication from counsel regarding meeting with Benda and Harazim including advice of counsel").  Given Weiss' disclosure of this memorandum, all such communications concerning the subject matter (i.e. the meeting) should be produced.  Weiss also produced two memoranda from Mr. Peterka (attached hereto as Exhibits L and M) concerning efforts to research the ownership of SPV Co., (Kotva's subsidiary) and Forminster (Kotva's shareholder), and drafts of motions to be filed with the Czech prosecutor.  In addition to the Peterka communications, Weiss also produced multiple documents disclosing the advice of his prior counsel, Svobodova (See Exhibits G and H)  Again, all documents concerning these subject matters should be produced) as any privilege has been waived.

## <u>CONCLUSION</u>

For the foregoing reasons, Weiss should be sanctioned for disregarding the Court's Order, including ordering Defendants to show cause why the documents listed on the privilege log should not be disclosed or, alternatively, reviewed <u>in camera</u>.  Kotva also respectfully requests that the Weiss Defendants be ordered to pay Kotva's reasonable attorneys' fees incurred in connection with reviewing the log and filing this motion.

Respectfully submitted,

KOTVA, A.S.

By its attorneys,


/s/ Daniel J. Pasquarello
Joel G. Beckman (BBO# 553086)
William C. Nystrom (BBO# 559656)
Daniel J. Pasquarello (BB0# 647379)
NYSTROM BECKMAN & PARIS LLP
10 St. James Ave., 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)
jbeckman@nbparis.com
wnystrom@nbparis.com
dpasquarello@nbparis.com

Dated: August 2, 2006


## REQUEST FOR HEARING

Kotva believes that an oral argument may assist the Court and requests a hearing on this motion pursuant to Local Rule 7.1(D)

/s/ Daniel Pasquarello


## LOCAL RULE 7.1(A)(2) and 37.1(B) CERTIFICATION

In accordance with Local Rule 7.1(A)(2), I certify that I have conferred with opposing counsel and have attempted in good faith to resolve or narrow the issue addressed in this motion and complied with the provisions of Local Rule 37.1.

On July 25, 2006, I spoke with Benjamin Goldberger, Esq., counsel to the Weiss Defendants, by telephone for approximately 30 minutes beginning at 2:05 p.m. Sarah Brine was also on the call with Mr. Goldberger but did not participate. On July 26, 2006, I spoke with Mr. Goldberger by telephone for approximately 10 minutes beginning at 3:28 p.m. David Jaffe was also on the call with Mr. Goldberger but did not participate. The conference continued with two telephone calls on July 28, 2006, from approximately 3:50 p.m. to 4:20 p.m. and from 5:00 p.m. to 5:10 p.m. Mr. Jaffe was on the first call on

20

July 28, 2006 but not the second.  Mr. Goldberger asked to continue the conference on the following Monday morning.  On the morning of July 31, 2006, I sent Mr. Goldberger an e-mail in response to an e-mail he sent on Friday, July 28, 2006 regarding the discovery conference.  Mr. Goldberger replied by e-mail and letter late in the afternoon on July 31, 2006.  I replied by e-mail at approximately 1:00 p.m. on August 2, 2006.

/s/ Daniel Pasquarello

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 2nd day of August, 2006.

/s/ Daniel Pasquarello

# EXHIBIT A

## APPENDIX TO REVISED PRIVILEGE LOG

List of Attorneys (with client(s) or prospective clients(s) in parentheses)

*Andel & Svobodova* (Vladimir Hoffmann, Andrew Weiss)
Roman Andel
Gabriella Svobodova

*Appleby Law Firm* (BGO, Weiss Capital LLC)
Sarah Bolton

*Cahill Gordon & Reindel LLP* (Andrew Weiss)
Bart Friedman

*Howard Golden* (Andrew Weiss)

*Hrazdira, Doudera, Wenzl* (Vladimir Hoffmann)
Pavel Wenzl

*Iva Istvankova, Josef Monsport, Ivo Mraz* (memorandum provided by Vladimir Hoffmann,
attorneys unnamed shareholder of Trend and Kotva)

*McDermott Will & Emery LLP* (Andrew Weiss, Weiss Asset Management LLC, Weiss Capital
LLC, K T, Inc. and CVF Investments Ltd.)
Edward P. Leibensperger
John Reynolds

*Newman & Newman PC* (Weiss Capital LLC)
Jeff Karp
Marshall Newman

*Nutter, McClennan & Fish* (Weiss Capital LLC)
Derek Davis
Richard Goldman
Steve Gould

*Peterka & Partner* (Andrew Weiss, K T, Inc., Weiss Capital LLC, Vladimir Hoffmann, Gilroy,
Balfindor, CVF Investments Ltd.)
Jiri Cerny
Ladislav Chundela
Lenka Opatova
Hynek Peroutka
Ondrej Peterka

*Salans* (Andrew Weiss, Vladimir Hoffmann)
Olga Humlova

*Jiri Spousta* (Bank of Bermuda)

Revised Privilege Log for the Weiss Parties
C.A. 05-10679-RCL

| No. | Date | Sender | Receiver | Cc: | Doc Type | PRIV | Description |
|-----|------|--------|----------|-----|----------|------|-------------|
| 1 | 2/27/2002 | London Court of International Arbitration | | | Document | WP | Final Award of London Court of International Arbitration Case No. 0250 between Flow Corporation v. Mgr. Matin Razim, Bankruptcy Trustee of Trend, Trend and Forminster Enterprises (with handwritten notes) |
| 2 | 2/27/2002 | London Court of International Arbitration | | | Document | WP | Final Award of London Court of International Arbitration Case No. 0250 between Flow Corporation v. Mgr. Matin Razim, Bankruptcy Trustee of Trend, Trend and Forminster Enterprises (with handwritten notes) |
| 3 | 2/27/2002 | London Court of International Arbitration | | | Document | WP | Final Award of London Court of International Arbitration Case No. 0250 between Flow Corporation v. Mgr. Matin Razim, Bankruptcy Trustee of Trend, Trend and Forminster Enterprises (with handwritten notes) |
| 4 | 2/27/2002 | London Court of International Arbitration | | | Document | WP | Final Award of London Court of International Arbitration Case No. 0250 between Flow Corporation v. Mgr. Matin Razim, Bankruptcy Trustee of Trend, Trend and Forminster Enterprises (with handwritten notes) |
| 5 | 2/27/2002 | London Court of International Arbitration | | | Document | WP | Final Award of London Court of International Arbitration Case No. 0250 between Flow Corporation v. Mgr. Matin Razim, Bankruptcy Trustee of Trend, Trend and Forminster Enterprises (with handwritten notes) |
| 6 | 2/27/2002 | London Court of International Arbitration | | | Document | WP | Final Award of London Court of International Arbitration Case No. 0250 between Flow Corporation v. Mgr. Matin Razim, Bankruptcy Trustee of Trend, Trend and Forminster Enterprises (with handwritten notes) |

# EXHIBIT B

**Lucy Chen**

| | |
|---|---|
| **From:** | Vladimír Hoffmann [vlado@anezska10.cz] |
| **Sent:** | Tuesday, November 11, 2003 8:09 AM |
| **To:** | Andrew Weiss |

**Subject:** RE: TREND

Thanks,
Vlado.

-----Original Message-----
**From:** Andrew Weiss [mailto:AWeiss@WeissAsset.com]
**Sent:** Monday, November 10, 2003 2:28 PM
**To:** Vladimír Hoffmann
**Subject:** RE: TREND

We will cover Mr. Veverka's travel and hone costs; please send the bill to Brookdale Global Opportunity Fund (it is the entity that owns the relevant shares). andy

-----Original Message-----
**From:** Vladimír Hoffmann [mailto:vlado@anezska10.cz]
**Sent:** Monday, November 10, 2003 4:39 AM
**To:** Andrew Weiss
**Cc:** Eitan Milgram; Dave Johnson
**Subject:** RE: TREND

Dear Andy,

Mr. Kulvait is a minority shareholder of Trend. I spoke with him over the phone last week and we discussed the Kotva/Trend situation with him. I asked him to send me whatever info he has that he finds relevant. The attachment of his mail is a set of press realeases and newspaper articles which I have already seen. I don't know if it would be efficient for you to read all that stuff. Some articles are a bit confusing without further comments and explanation.

I also spoke last week with Mr. Stanek - president of the small shareholders group and I met another minority shareholder of Trend and Kotva - Dr. Streitberg. He told me, that Halek claims to have a Contract with Forminster proving that he has only "lent" the Kotva shares to Forminster. Streitberg suggested that we speak to Halek and ask him to get the shares back from Forminster and "hand them over" to Trend. I think that it's a bad idea and that we would compromise ourselves by negotiating with Halek who is the real "Mega Crook".

I had a brief telephone conversation with James Woolf. He said that he has no deal with you and that "we should both go our own way". However tomorrow I am meeting Ms. Marta Gutova - his right hand to discuss the situation with her.

I also met Mr. Maras - representative of Fidea Consulting - company that owns 14% of Kotva. He offered CZK 20m for our Kotva shares - the same number that Harazim, CEO of Kotva and Forminster's director has indicated. Maras told me that Fidea has investor for Kotva and that the purchase of Kotva shares is one step to come closer to the purchase of the property. He said that Fidea is not part of Forminster, but that they have some sort of agreement. Harazim and Benda - FEL's directors are in South Africa until 20th of November. The Kotva shareholders meeting is on 22nd of November - Saturday. Please ask you custodian to issue a Power of Attorney for our representative at the shareholders meeting.

Today I am meeting a law firm to discuss if and under what terms they would represent us in

W0001073

Kotva/Trend case.

As I already told you in one of the previous mail I have hired Mr. Veverka to help me handle this. I agreed that I will share the success fee with him and he asked me if you would cover his travel and phone costs - which should be only few thousands of Czech Crowns. Please let me know your point of view on this.

I will keep informing you on the progress of this case.

Best wishes,

Vlado.


-----Original Message-----
**From:** Andrew Weiss [mailto:AWeiss@WeissAsset.com]
**Sent:** Monday, November 10, 2003 12:13 AM
**To:** Vladimír Hoffmann
**Subject:** FW: TREND

Should I have this translated? andy

-----Original Message-----
**From:** Kulvait [mailto:kulvait@volny.cz]
**Sent:** Thursday, November 06, 2003 4:50 PM
**To:** vlado1@volny.cz
**Cc:** pstreitberg@seznam.cz; Andrew Weiss
**Subject:** TREND


Vážený pan
Vladímír Hoffmann
zástupce pana Andrew Weisse
WEISS ASSET MANAGEMENT

Vážený pane Hoffmanne,

v návaznosti na náš dnešní telefonický rozhovor Vám zasílám v přílohách některé informace Ochranného sdružení malých akcionářů-OSMA, které se týkají kauzy TREND a byly mj. předsedou OSMA panem Karlem Staňkem již předány Komisi pro cenné papíry , policii a státnímu zastupitelství. Domnívám se, že obdobným způsobem jako minoritní akcionáři by měl postupovat při ochraně svých majetkových práv také majoritní akcionář fondu TREND (např. podání podnětů státnímu zástupci a policii a podání žalob soudu na úhradu škody ), který má také nyní možnost svolat valnou hromadu fondu TREND za účelem např. odvolání současného zkorumpovaného představenstva a provedení auditu ve fondu ap., tak, aby se zabránilo definitivně pokusům o dotunelování majetku akcionářů fondu TREND v konkursním řízení a aby došlo k zajištění výplaty likvidačního zůstatku akcionářům fondu v adekvátní výši.(tj. minimálně 100 Kč na akcii, tak jak by vyplývalo s Dohody o mimosoudním narovnání z roku 1999)


Mgr. Petr Kulvait

P.S.
Pro dokreslení celkové situace ještě přikládám  některé již publikované informace z médií. Sdělte mi prosím ještě Vaše faxové číslo, na které Vám mohu zaslat další kopie  sdělení VSZ v Praze a NSZ v Brně.
Brně.

8/30/2005

W0001074

Pozn: V souvislosti s připravovaným navýšením ZJ KOTVY ve výši   500 milionů Kč mj. i z finančních  zdrojů společnosti Forminster Enterprises Limited (dále FEL), se nabízí podnět pro policii ve věci praní špinavých peněz společnosti FEL, která nezaplatila fondu TREND 350 milionů (z Dohody o mimosoudním narovnání za 56% akcií KOTVA+2 mil USD), ale je přitom schopna stejnou částku získat  pro navýšení ZJ KOTVY. Další otázka se nabízí pro podnět a žalobu ve věci neoprávněného prodeje zajištěné pohledávky fondu TREND ve výši 350 mil. Kč v dražbě pouze za třetinovou cenu (část pohledávky tj. balík 56% akcií KOTVA v souvislosti s upisováním akcií KOTVY za 1000 Kč má hodnotu téměř 400 milionů Kč  a nikoliv  jen 50 milionů Kč, za které byla tato část zajištěné pohledávky fondu TREND de facto z fondu vyvedena zpět na společnost FEL)

8/30/2005

W0001075

Dave Johnson
Thursday, November 20, 2003 11:23 AM
'Vladimir Hoffmann'
RE: Kotva update

Vlado-
We'll call you at 3pm today. I have not received an engagement letter yet from Andel &
Svobodova. When would they like it signed by? I guess I have a few questions to be
answered.
1) How detrimental is the London Arbitration to our shares of Trend? Is it worth it to
not fight the arbitration and partner with Woolf or is there any value in fighting for our
Trend shares?
2) Have we tried to go back and talk to Fidea Consulting? I still believe 20 million is
unreasonable, but given the circumstances, 25-30 million might not be a bad option and
then continue the fight on Trend.
3) Have we looked into hiring the PR firm yet? If they are worried about us making them
look bad in the press, perhaps we should make them a little nervous by pursuing that route
4) Under bankruptcy, would we receive anything? Is there any way to prevent bankruptcy or
buy some debt of Kotva as well to hedge ourselves?
5)Wouldn't bankruptcy negate the capital increase? I'm unsure of how bankruptcy works in
the Czech Republic, but in the US equity holders usually get nothing and the debt holders
take control. How much debt of Kotva does Forminster have? Will Forminster write up a
lot of receivables and what is the likelihood we could invalidate these claims?
6)What is our best and worst case scenarios? The more I learn about this, the more I feel
as though we're powerless in this situation and that we need settle or we'll lose
everything.

Looking forward to our conversation.

Regards,
Dave

-----Original Message-----
From: Vladimir Hoffmann [mailto:vladol@volny.cz]
Sent: Wednesday, November 19, 2003 3:39 PM
To: Dave Johnson; Eitan Milgram; Andrew Weiss
Subject: Kotva update

Dear Andy,

I spoke today with Marta Gutova, James Woolf's assistant. She told me that James refuses
to cooperate with us because we do not respect the results of the London Arbitration. Not
only they rejected the proposed swap of our Trend shares for their claim, they also
rejected our offer to share the legal costs to fight the capital increase of Kotva. She
also told me that they think that our Trend shares are worth zero.

From the Real Estate Register I learned that they have registered a pledge against Kotva
for Fidea Consulting's claim of CZK 700 million and a right of first refusal !!! Fidea
Consulting is the company that owns 14 % of Kotva and that offered CZK 20 million for our
Kotva shares. Now I understand why Harazim told me that Kotva's shares have no value and
that they offered 20 million just to get rid of us - to avoid potential lawsuits or bad
publicity that we could create ! I also understand Maras's of Fidea notes that our
valuation of Kotva shares might not reflect "potential" claims that were not yet in the
accounting ...

This afternoon I also met the lawyers that I want to hire to work for us in Kotva/Trend
situation. Their name is Andel & Svobodova. They will send you the contract in English
tomorrow. They charge CZK 2000 per hour (about USD
75) and they will ask for a prepayment of CZK 30000 (about USD 1100) since we are a new
client. They agreed to start working immediately but please process their contract and

1

W0010600

invoice without delay.

I asked them to look how we could:

1) Block the capital increase of Kotva
2) Block Forminster from voting their shares
3) Block any potential transfer of Kotva building and block the sale of Kotva Nemovitosti shares
3) Learn more about the Fidea's claim against Kotva
4) Learn more about Barbican's claim against Kotva
5) Find out who the small creditors of Trend are
6) Invalidate the auction of Trend's receivable
7) Map all the lawsuits, both criminal and business that are under way
8) Discourage potential buyers of Kotva from the purchase

We also discussed the situation generally and I fear that maybe Forminster's master plan could be the bankruptcy of Kotva. The bankruptcy would be even more detrimental to the value of our shares than the capital increase.
Morover the bankruptcy would "clean" the building from any liens and thus would make it better sellable.

I should get the documents about Fidea's lien from the Real Estate Register tomorrow and we will se if they have any real ground.

I am enclosing a new spreadsheet with Kotva NAV reflecting these "new" claims. If Fidea's claim is approved, the NAV of our stake in Kotva goes down to CZK 17 million.

Please call me tomorrow (Thursday) at about 3.00PM your time to discuss this.

Regards,

Vladimir.
---
Odchozí zpráva neobsahuje viry.
Zkontrolováno antivirovým systémem AVG (http://www.grisoft.cz).
Verze: 6.0.538 / Virová báze: 333 - datum vydání: 10.11.2003

2

W0010601

# EXHIBIT C

31. October 2003 9:46     Vladimir Hoffmann +420 281 961 660     p.02

*Brookdale Global Opportunity Fund*

September 15, 2003

Mr. Vladimir Hoffmann
Medinská 825
190 14 Praha 9 – Klánovice
Czech Republic

Re: Success Fee Regarding the Sale of Ring Fenced Assets

Dear Mr. Hoffmann:

This letter agreement refers to the Kotva and Trend shares held by Brookdale Global Opportunity Fund ("BGO"). BGO currently owns 82,782 Kotva shares and 1,141,794 Trend shares ("The Shares").

You agree to provide BGO with such services as may be reasonably requested by BGO to facilitate the sale of the Shares, including, but not limited to, identifying and communicating with prospective purchasers. You further agree that in providing such services he will not offer the Shares for sale to any person or entity living or headquartered in the United States.

BGO agrees to front the payment of expense incurred directly for the purpose of selling Kotva and/or Trend shares owned by BGO, or to enter into any other arrangements or contracts that will improve the expected return on those securities for BGO. Any single expenditures in excess of $1,000, or cumulative monthly expenses in excess of $5,000 must be approved in advance by either Andrew Weiss or Eitan Milgram. Expenditures related to your normal business activities such as rent, secretarial help, would not be included. In other words BGO will not be paying a share of Vladimir Hoffmann's normal overhead and operating costs. BGO would only be paying costs that would not otherwise have been incurred by V, Hoffmann or the associated entity. Itemized bills will be submitted as the expenses are incurred, In addition to expense reimbursements, BGO will pay Vladimir Hoffmann a monthly retainer of $2,000 per month.

In addition to the payments set forth in the preceding paragraph, BGO agrees to pay Vladimir Hoffmann a Success Fee in the amount of 30% of the proceeds paid to BGO for the sale or other disposition of the Kotva and/or Trend shares minus the cumulative expenses and retainer fee that had been paid by BGO in relationship to this contract. In other words if the Kotva shares were sold for $1,000,000 in December 30, 2003; and suppose that between now and Dec.. 30, 2003, we had paid legal fees and other expenses of $35,000 and had paid Vladimir Hoffmann $4,000; then Hoffmann would receive $261,000 from the Kotva transaction. If one month later BGO received $2,000,000 for its' interest in Trend, and if during that month an additional $61,000 has been paid in expenses Hoffmann had been paid an additional $2,000, then Hoffmann's net success fee on the Trend transaction would be $537,000: i.e. 30% of the $2,000,000 equals $600,000 deducting all the new expenses whose cost BGO advanced, we come up with $539,000 and then subtracting the additional retainer paid we end up with a payment to Hoffmann of $537,000. Hoffmann's total payment under those circumstances would be $798,000. The Success Fee will be paid within 20 business days following the sale of shares

W0002064

of Kotva or Trend and the receipt of the proceeds of such sales by BGO . The payment of the Success Fee for the sale of Kotva shares is not conditional upon sale of Trend shares and vice versa.

The price and terms for the sale of the BGO shares in Trend and Kotva are subject to the approval of the board of directors of BGO in their sole discretion.

Vladimir Hoffmann will provide the Board of BGO with written updates on any developments relating to the sale of the Shares. These updates will be provided on an ongoing basis, but if there has been no written communication in any month then an update will be mailed at the end of that month. These written communications can be via email. Vladimir Hoffmann will also be available for regular telephone conversations with members of the board of Brookdale Global Opportunities Fund. It is anticipated that such telephone conversations will occur at least once a week.

This contract expires January 31, 2004, unless it is renewed before that date by mutual written agreement of the parties. Upon expiration of this contract, Hoffmann shall be entitled to reimbursement of all unpaid expenses incurred prior to such expiration and any portion of the monthly retainer accrued but unpaid prior to such expiration. Renewals will be for three month periods and can be terminated by either party at the end of the applicable three month period.

We very much look forward to working with you and to achieving success for BGO, and in doing so, for you.

Sincerely yours,

Andrew Weiss

Agreed to:

Vladimir Hoffmann

W0002065

# Mandate Agreement

This Mandate is between Brookdale Global Opportunity Fund ("BGO") with its registered office at 29 Commonwealth Ave., Boston, MA 02116 and Vladimír Hoffmann, an individual person with the address Medinska 825, 190 14 Praha 9 – Klanovice, The Czech Republic, birth number 651030/6990, concerning the sale, disposition, negotiations regarding 82,782 Kotva shares, (the "Kotva Shares") and 1,141,794 Trend shares (the "Trend Shares") (collectively, the Trend Shares and the Kotva Shares are called "The Shares").

BGO hereby authorizes Vladimír Hoffmann to act as its agent, in its place and stead, to negotiate for the sale, transfer or other disposition of the Kotva Shares and The Trend Shares.

Signed in Boston,

This 31st of October, 2003

By _____
Andrew Weiss, Chairman of the Board

W0008918

# EXHIBIT D



# THE BROOKDALE GROUP, LLC

### Specialists in          Emerging Markets

November 27, 2001

Mr. Vladimir Hoffman

### Re:  Sharing a Success Fee Regarding the Sale of Ring Fenced Assets

Dear Vlado:

This refers to the agreement that the Brookdale Group, LLC ("Brookdale") has with the Brookdale Global Opportunity Fund ("BGO") concerning a success fee for obtaining a solution to the Kotva and Trend situations. I refer specifically to the Kotva and Trend shares held by Brookdale Global Opportunity Fund. BGO currently values the Kotva shares at 373 CZK per share and the Trend shares at 15 CZK per share. Brookdale is entitled to a success fee of 25% of the amount in excess of 373 CZK that BGO receives for the sale of the 82,782 Kotva shares, and 25% of the amount in excess of 15 CZK that BGO receives for the 1,141,794 Trend shares (the "Success Fee").

Recently an offer of 100 million CZK was made to purchase all the Kotva and Trend shares. Yesterday, we received yet another offer for 50 million CZK. If we assume a reasonable mid point of these offers would be 75 million CZK, I believe that this is the settlement we can achieve without any outside help.

Brookdale agrees to pay to such entity as you direct, and in such manner as you so direct, 20% of the Success Fee that it receives from BGO in regard to the ultimate sale of the Kotva and Trend shares that exceeds 75 million CZK in return for your devoting the time and effort necessary to bring these matters to a successful conclusion. The money will be paid promptly upon Brookdale's receipt of the Success Fee and will be calculated as the net success fee in regard to the sale of the two shareholdings above 75 million CZK. We also agree to pay your incidental expenses for traveling and/or entertainment i.e. meals, etc. directly connected to your attempts to resolve these situations to the benefit of the Brookdale Global Opportunity Fund.

■ 305 Madison Avenue, 46th Floor, New York, NY 10165 ■ Phone (212) 682-2300 ■ Fax (212) 922-1353 ■
E-Mail: brookdale@brookdalefunds.com

W0001506

Vladimir Hoffman
November 27, 2001
Re:  Sharing a Success Fee
Pg. 2

The incidental fees will be paid either from the Ring Fenced Asset pool of BGO, or by Brookdale directly, as is appropriate upon receipt of proper documentation.

We both agree that any incidental expenses are expected be in the hundreds, not thousands, of dollars and if any substantial expenses need to be incurred, you will confer with us prior to undertaking such expenses.  We, as managers of BGO, expect to receive periodic written updates on your progress on these matters so that the Board and the shareholders can be kept informed.

Please confirm that the above is your understanding of our agreement and timely indicate same by signing a copy of this letter below.

We very much look forward to working with you and to achieving success for BGO, and in doing so, for ourselves.

Sincerely yours,

_____
Howard I. Golden
President

_____
Andrew Weiss
Investment Advisor

Agreed to:

_____
Vladimir Hoffman

HIG/sc

\\Jay\months 01\Nov-BG\HoffmanSuccessFeeKotva.doc

# EXHIBIT E

/c

**Opinion on the Value of Ring Fenced Assets as of Sep.30, 2002**          PBC

From: Vladimir Hoffmann

To: The Board of Directors of the Brookdale Global Opportunity Fund (BGO)

Prague, March 24th, 2003

**Introduction**

I was asked by the Chairman of the Board of BGO to join the board of BGO in order to help
to unlock the value of Kotva and Trend shares owned by BGO in November 2001. During the
last 18 months or so I have accumulated substantial knowledge of the Kotva abd Trend
situation and therefore I believe that I can provide my professional oppinion on the value of
Kotva and Trend shares.

However I have not been responsible for Harvard shares and therefore I have only general
knowledge of the Harvard situation. I am not able to provide a professional oppinion on the
value of Harvard shares based on the limited amount of information that is available to me.

**Trend Valuation:**

The last available price from the Prague Stock Exchange is from Feb.21, 2000 and is CZK
46.36 (fortysix crowns and thirtysix hellers) and the last price from the OTC market RM-
System is from Feb.2, 2000 and is CZK 56.70 (fiftysix crowns and seventy hellers). I find
these prices neither relevant nor meaningful, since they are old, created by minimal volumes
and do not reflect the current NAV and legal situation. In my opinion, in the best case
the NAV of Trend would be CZK 67 and in the worst case it would be 0.

/a

Therefore I believe that the **valuation estimate of CZK 15** per share as the Trend shares were
originally valued when RFA were separated from other BGO's assets would be more
appropriate (See Czech Value Fund Annual Report 1999, page 7).

**Kotva Valuation:**

The weighted average price at the Prague Stock Exchange between Oct.1, 2001-Sep.30,2002
was CZK 294.98. The liquidity was very low and only 44 shares were traded during this
period.

According to my estimate the NAV per share of Kotva could be about CZK 1,176. We are in
the position of minority shareholders and the majority shareholder – Forminster Enterprises
Ltd. (FEL) is non-transparent Cyprus shell company. Forminster has no obligation to
distribute the proceeds from the ultimate sale of the Kotva building. It is very likely, that after
the sale of the property Kotva will turn into an "industrial holding" and the minority
shareholders will have very little information and control over its business. I believe that it
would be appropriate to use the discount to NAV of 65 % for this type of company which
makes the value of CZK 411.60.

I suggest to use the average of the weighted average market price and the discounted NAV
value which would result in the **valuation estimate of CZK 353.29** per share.

/a

(A)

# EXHIBIT F

## Lucy Chen

| | |
|---|---|
| **From:** | Vladimír Hoffmann [vlado@anezska10.cz] |
| **Sent:** | Friday, September 19, 2003 4:54 PM |
| **To:** | Andrew Weiss |
| **Subject:** | RE: Trend/Kotva |

Dear Andy,

The law firm that I mentioned to you in one of my my previous e-mails will most likely not be able to represent us in Trend/Kotva case due to conflict of interest. One of the partners worked years ago for a law firm that was subcontracted by Toman who represents Forminster. I will have to speak to some other law firm. It's not a big issue, we will sort it out soon, I am sure.

On a diferrent note - I incidentally ran into Richard Harazim - CEO of Kotva today in a restaurant. We had a brief discussion and I told him the story about the "crazy professor" in charge instead of Howard. He indicated, that maybe they (=Forminster) would consider buying our shares of Kotva. We agreed, that we would meet the week starting 29th of September. I think, that in the meantime we should discuss the price acceptable for us.

I will be travelling next week and will not be able to access my e-mails. If there is an emergency, the best way to contact me is to send an SMS to my mobile +420 605 282 464. I will try to retrieve my SMS every morning and evening and will call you back.

Did your lawyers already had a look at the Letter Contract and Mandate ? I would appreciate if you could have them signed and faxed to me before I go to negotiate with Harazim.

Best wishes,

Vlado.


-----Original Message-----
**From:** Andrew Weiss [mailto:AWeiss@WeissAsset.com]
**Sent:** Tuesday, September 16, 2003 6:18 PM
**To:** Vladimír Hoffmann
**Subject:** Trend/Kotva

Dear Vlado,
I'm worried about statute of limitations expiring with regard to this mess. I realize that it is odd for me to worry about this now, since I've been so inactive in the past; I'll spare you the excuses. At any rate I we are in agreement on the substance of the contract and I would like you to start moving toward hiring a law firm and calling an extraordinary meeting to replace the board of directors of Kotva and to ask that the frozen shares cannot be voted. Also to replace the board of Trend and to initiate a shareholders suit against Moffitt and (possibly) Bluhm. For the new board members of both Trend and Kotva I would nominate you, Yossi Barath (a person who is taking care of our affairs in Eastern Europe); and Veverka (if he was willing to serve). I would get directors insurance for all parties. Andy

We have the cash to do those things. I believe that those steps will get the attention of the relevant people. If you have any other ideas please let me know. andy



EXHIBIT
HARAZIM
23

2/23/06

8/30/2005

W0001026

# EXHIBIT G

**Jack Hsiao**

| | |
|---|---|
| **From:** | Vladimír Hoffmann [vlado1@volny.cz] |
| **Sent:** | Thursday, February 26, 2004 11:41 AM |
| **To:** | Andrew Weiss |
| **Cc:** | Robert Woo; Eitan Milgram; Dave Johnson |
| **Subject:** | Kotva |

Dear Andy,

We have received a letter from the Board of Kotva. They have refused to include our agenda to the shareholders meeting. They are quoting § 156 art.7 of the Business Code: "Shareholders rights connected with the dematerialised bearer shares are performend by the person registered in the evidence of the dematerialised securities in accordance with the special law."

We could sue them, but it is quite likely that the court would accept their formal interpretation of the law. Morover, according to Svobodova the only sanction would be that we could seek the damages compansation from the Board. In this case it would be difficult to prove that we suffered damage just because they did not include our agenda to the shareholders meeting.

Therefore I am trying to contact the custody department of CSOB. I believe that they have the POA from the Bank of Bermuda (that is registered as shareholder in the Central Securities Registry (SCP)) and we should ask them to sign a new letter requesting the Kotva board to call an extraordinary shareholders meeting with our agenda. If you could find out from the Bank of Bermuda who is responsible for BGO's account in CSOB it would be great.

I am looking forward to your comments.

Best wishes,

Vlado.

1

# EXHIBIT H

**Jack Hsiao**

| | |
|---|---|
| **From:** | Dave Johnson |
| **Sent:** | Thursday, April 01, 2004 6:09 PM |
| **To:** | 'Vladimir Hoffmann' |
| **Subject:** | RE: Kotva/Trend update |

Vlado-
We're going to need a local custodian to set up the transfer of Kotva/Trend/Manhattan shares, we could probably just use CSOB. Since we've decided to go ahead and transfer administration to Ergoserve, we need to facilitate the transfer of shares, i.e. set up a custodian locally for CVF Investments Ltd. Let's speak tomorrow, perhaps with Geoffrey so we cover all the bases for how we move forward. I will be available from 9am EST onward.

Regards,
Dave

-----Original Message-----
From: Vladimir Hoffmann [mailto:vladol@volny.cz]
Sent: Thursday, April 01, 2004 5:56 AM
To: Andrew Weiss
Cc: Robert Woo; Eitan Milgram; Dave Johnson
Subject: Kotva/Trend update

Dear Andy,

I spoke today to Mr. Petr Streitberg, minority shareholder of Kotva. He was very active at the shareholders meeting and he told me that he plans to sue the shareholders meeting, specifically the approval of the consolidated financial statements, because the board was unable to explain the existance or non-existence of the CZK 700 m Kotva Nemovitosti debt and also because they said that the financial result of Kotva BVI (the offshore they have created) was 0, which is practically impossible. I told him that we would like to join him in his action. He said that he would discuss it with his lawyer and we will talk again next week.

I received from Svobodova the copy of the letter to the Hradec Kralove court in which we ask to become participants of the lawsuit against the validity of the Trend receivable auction. She points out that we will need to prove the ownership of Trend shares to the court and also, because the POA is signed by you we will also need to prove your capacity to sign on behalf of BGO. Otherwise our request could be denied because of formal reasons. I know that its frustrating that we have this formal issues all the time, but thats the way it works here. If we are to be active and if we are to communicate to the courts and other authorities we need to be able to prove the ownership of shares. Therefore I can only repeat that I am very much in favor of creating an SPV in Cyprus and to transfer the shares of Kotva and Trend there. It is cheap and efficient solution. I believe that to establish such company would cost about USD 3000-4000 and to maintain it about USD 2000 a year. I provided contact details in Cyprus to Dave.

I still believe that what we should do is to call the extraordinary shareholders meeting of Kotva with the unpleasent questions, (that we originally wanted to include to the last meeting) on the agenda. Of course in order to be able to do it we need to fulfill the formalities described above.

On Monday next week I have a meeting with one PR guy who used to work for me before. I would like to discuss with him how we could support our effort in Kotva/Trend case using PR. It could be a good idea, given the hesitation of the Kotva's board to provide any information and because of the formal issues preventing us in really hurt our counterparts through legal actions.
I will also ask him to give indication of the price of his services. Please let me know what you think about using PR.

Since it's been a while since we spoke last time I would appreciate if you could call me. I am available on my mobile practically all the time, except when I have a meeting or if I

1

sleep (after 7.00 PM your time).

I am looking forward to hearing from you soon.

Best regards,

Vlado.

2

W0010424

# EXHIBIT I



**PETERKA & PARTNERS v.o.s.**

Financial Register: Municipal Court in Prague                    Law Offices
A Enclosure 42591                                    Na Příkopě 15/583  110 00 PRAHA 1
Business Identification Number: 26 16 97 26          TEL :  (420) 272 143 400  246 085 300
                                                     FAX :  (420) 272 143 470  246 085 370

                                                              www.cabinet.cz

E-mail of October 18, 2004

From:  Ondrej Peterka                    peterka@cabinet.cz

To:    Andrew Weiss                      AWeiss@WeissAsset.com

Cc:    Georgiy Nikitin                   georgiy@weissasset.com

       Eitan Milgram                     eitan@weissasset.com

       Ing Vladimir Hoffmann             vlado1@volny.cz

Re:    KOTVA / TREND

Dear Andrew,

Today I had together with Mr Hoffmann a meeting with Messrs Benda and Harazim of KOTVA and Mr Prestage representing the prospective Irish buyers of KOTVA Department Store I would like to inform you in brief about the basic points we discussed

At the beginning the representatives of KOTVA confirmed that they are willing to purchase the whole of BGO's stake in KOTVA for CZK 131 million We responded that the offer of BGO for the sale of these shares contained in your letter of August 23, 2004 expired on August 31, 2004 We told them that we will get in touch with you in order to receive your instructions

The representatives of KOTVA further stated that their condition for purchasing the shares is the withdrawal of certain initiated lawsuits They did not specify in detail what lawsuits they want to be withdrawn We may assume that the representatives of KOTVA were today still unaware of the new lawsuits initiated by Gilroy last Friday that concerned the shares in KOTVA held by Forminster/bankruptcy trustee of SPRINT

Messrs Benda and Harazim then stated that the buyer of the shares is to be KOTVA, a s and Mr Prestage declared that the Irish investors are prepared to finance this acquisition As we have already stated in our e-mail of August 31, 2004 we consider it as being risky to sell shares to KOTVA, a s, or to any of its subsidiaries

The representatives of KOTVA further stated that a bank providing operational financing to KOTVA (a loan in the amount approx CZK 200 million due at the end of this year) is

WP0013980

PETERKA & PARTNERS v.o.s.

...cerned about the pending lawsuit on the declaration of ownership to the KOTVA Department Store and is reluctant to extend this loan. In our opinion they seemed to derive liability of Gilroy for damages suffered by KOTVA as a consequence of the lawsuit

We suggest setting up a conference call tomorrow and discussing these issues in detail

Best regards,

Ondrej

WP0013981

# EXHIBIT J

**PETERKA & PARTNERS** v.o.s.

Law Offices
Na Příkopě 15/583, 110 00 PRAHA 1
TEL. :    (420) 272 143 400, 246 085 300
FAX :    (420) 272 143 470, 246 085 370

www.cabinet.cz

Commercial Register: Municipal Court in Prague
Section A, Enclosure 42561

Business Identification Number: 26 16 97 20

E-mail of October 12, 2004

From: Ondrej Peterka

To:    Andrew Weiss

Cc:    Georgiy Nikitin

         Eitan Milgram

         Ing. Vladimir Hoffmann

Re:    KOTVA / TREND

peterka@cabinet.cz

AWeiss@WeissAsset.com

georgiy@weissasset.com

eitan@weissasset.com

vlado1@volny.cz

Dear Andrew,

Today we have finalized the petition for the withdrawal of 384 971 shares in KOTVA held by Forminster from the bankrupt's assets of SPRINT, a.s. The arguments we are using in this petition are similar to the arguments we have already used in the petition for a declaration that the owner of 212 935 shares in KOTVA is TREND (a translation of this petition we have already sent to you).

As agreed the petition will be submitted on behalf of GILROY and later KT Inc. will join GILROY as another plaintiff. As we already informed you before that the standing of both GILROY and KT Inc. is very problematic since they derive it from the fact that they are shareholders of TREND. The previous court rulings have so far acknowledged only the standing of a previous owner to submit such a petition

We have broadened the subject matter of the petition to include all shares in KOTVA held by Forminster even if they were not previously in the ownership of TREND Please note that with respect to the above mentioned rulings the prospect of success as regards the difference between the total number of shares of Forminster in KOTVA (384 971) and the number of shares previously in the ownership of TREND (212 935) is only limited one. The immediate effect of this petition is that it prevents the bankruptcy trustee from further transferring shares This restriction on the transferability of the shares is valid as long as the court has not finally decided about the petition, which may take several years In the meantime it is necessary that BGO assumes control over TREND and TREND joins the petition or submits a new petition in its own name

WP0013983

We announce the submission of the petition to the bankruptcy trustee. At the same time we will ask the court to enable us to access the court file kept in the bankruptcy proceedings of SPRINT. We hope we will in this way acquire information about the bankruptcy trustee seized the shares held by Forminster, which we can only guess at.

At the same time we will submit the petition for a declaration that TREND is the owner of 212 935 shares in KOTVA. In this context we would like to respond to the suggestions contained in the e-mail of Mr. Nikitin of September 20, 2004 as regards paragraph 4 6 of the petition. Under Czech law the fact that Forminster did not pay the settlement amount does not make the settlement agreement void. The same applies even if Forminster intended from the beginning not to pay the settlement amount. Under the circumstances this fact may entitle Trend to withdraw from the settlement agreement. This is, however, possible only within a certain statutory limit that has already elapsed.

Please confirm to us that you agree with these steps.

As regards the envisaged settlement between the companies of Mr. Woolf, the bankruptcy trustee of TREND and Suringham Enterprises Ltd we will provide you with our opinion tomorrow after we visit the court in Prague and inspect the files on the disputed claims of Mr. Woolf towards TREND.

Best regards,

Ondrej Peterka

WP0013984

# EXHIBIT K

| | |
|---|---|
| **Od:** | "Georgiy Nikitin" <georgiy@weissasset.com> |
| **Komu:** | "Vladimir Hoffmann" <vlado1@volny.cz>; "Andrew Weiss" <AWeiss@WeissAsset.com> |
| **Kopie:** | "Hynek Peroutka" <peroutka@cabinet.cz>; "Jiri Cerny" <cerny@cabinet.cz>; "Ladislav Chundela" <chundela@cabinet.cz>; "Ondrej Peterka" <peterka@cabinet.cz> |
| **Odesláno:** | 21. fijna 2004 23:09 |
| **Připojit:** | E-mail Vlado Oct 21 2004.doc |
| **Předmět:** | RE: Kotva/Trend |

My letter is attached.
Best regards,
Georgiy

Georgiy Nikitin, Ph.D.

Weiss Asset Management
tel. + 1 (617) 778-7725
fax + 1 (617) 778-7781

-----Original Message-----
From: Vladimir Hoffmann [mailto:vlado1@volny.cz]
Sent: Thursday, October 21, 2004 12:29 PM
To: Andrew Weiss
Cc: Georgiy Nikitin; Hynek Peroutka; Jiri Cerny; Ladislav Chundela; Ondrej Peterka
Subject: Kotva/Trend

Dear Andy,

Please find enclosed the Memorandum.

Best regards,

Vlado.

::::::::::::::::::::::::::::::::::::::::::::::::::::::::

This email is confidential and is intended solely for the addressee(s). If you are not an addressee, you must not disclose, copy, circulate or in any other way use or rely on the information contained in this email. If received in error, please notify the sender immediately and then delete this email. Any disclosure, copying, distribution or use of this communication is prohibited and may be unlawful.

Any views or opinions expressed do not necessarily represent those of Weiss Asset Management or any affiliated companies. Please note that the content of this e-mail may be intercepted, monitored or recorded for compliance purposes. Sensitive personal data should not normally be transmitted by e-mail.

Weiss Asset Management or any affiliated companies shall not be liable to the recipient or any third party for any loss or damage howsoever arising from this e-mail and/or its content, including loss or damage caused by virus. It is the responsibility of the recipient to ensure that the opening or use of this message and any attachments shall not adversely affect systems or data.

Weiss Asset Management
29 Commonwealth Avenue
Boston, MA 02116
TEL: (617) 778-7780
FAX: (617) 778-7781

To Vlado – 21 October 2004

Dear Vlado,

Thank you for the memo you wrote. Do you think you could write a similar letter to Kotva people: use the same assumptions and the same discount rates, just calculate how much they will spend on the lawsuits and how much they can get? You can consider different scenarios: settlement now, us winning, them winning, or some combination. We should give them such calculations for their consideration. We can show that if they do not settle with us, their cost of financing will be very high; and they will pay most of this increased cost since we have only 11% of the shares. Also, the total serviceability of Kotva store in the table you produced does not include the parking garage, which by itself has a large value in the downtown Prague. If they do not settle, they will be able to realize the value of the property only in several years, which will be diminished by the discount rate and discounted probability of winning the lawsuits.

It is my understanding that Andrew does not want to settle all the lawsuits if all we get for our shares in Kotva is CZK 131 million. However, he has not given me any directions regarding how to reply to Benda and Harazim. I will try to speak with him about this.

Vlado, the facts about violence that you provided are very impressive. I really hope it does not get to the point when we get personally threatened. Do you have contact information for Vladislav Kusala and Martin Razim? It would be very interesting and possibly useful to talk to them about the reasons of their resignations and their views of the situation.

Please, keep me updated on the status of KT registration with the Securities Center.

Best regards,
Georgiy

# EXHIBIT L

# PETERKA & PARTNERS v.o.s.

Commercial Register: Municipal Court in Prague
Section A, Enclosure 42561

Business Identification Number: 26 16 97 20

Law Offices
Na Příkopě 15/583, 110 00 PRAHA 1
TEL. : (420) 246 085 300
FAX : (420) 246 085 370

www.cabinet.cz

E-mail of July 12, 2005

| | | |
|---|---|---|
| From: | Ondrej Peterka | peterka@cabinet.cz |
| To: | Andrew Weiss | AWeiss@WeissAsset.com |
| Cc: | Georgiy Nikitin | georgiy@weissasset.com |
| | Marta Sluborska | marta@weissasset.com |
| | Petr Topinka | topinka@hkstd.cz |
| Re: | KOTVA / TREND | |

Dear Mr. Weiss,

In the first place we would like to inform you that we have succeeded in obtaining official access to the criminal file kept in the case of the criminal proceedings against the accused Mr. Hálek and co. and that we have found out and obtained the copies of the very important documents providing us with new information about the background of the tunnelling of TREND (for more details see point 3 hereunder).

Further, we would like to inform you about the following:

**1. New general meeting of Kotva a.s.**

We would like to inform you that Kotva, a.s. has published a notice convening a new general meeting. This new general meeting is scheduled for Saturday, August 6, 2005. As agreed, we will participate at this general meeting.

We have already prepared a verified translation of documents regarding the companies K T, Inc. and CVF Investments LLC that will enable our participation at the general meeting. Until now we have, however, not received any response from HSBC (Bank of Bermuda). Please give your instruction to the responsible person in HSBC, so that we receive the necessary documents in time.

**2. Corporate documents regarding FEL**

With the help of a cooperating law firm based in Cyprus we have received a complete set of corporate documents showing the current as well as former shareholders and directors of FEL. According to the corporate documents FEL was registered with the Registrar of Companies in Cyprus on May 15, 1996, with its registered address at 4 Diagoras Street, KERMIA HOUSE,

WP0014250

office 601, 1097 Nicosia, Cyprus and with its registered capital of CYP 1,000 divided into 1,000 shares of CYP 1 each.

*2.1 Shareholders of FEL*

Please see below the development of the shareholders' structure of FEL.

(i)    <u>As of May 15, 1996</u>
       LEDRA NOMINEES LIMITED, holds 50% of the shares
       LEDRA TRUSTEES LIMITED, holds 50% of the shares

(ii)   <u>As of May 5, 1997</u>
       JEAN-PIERRE COUTARD, holds 99.9% of the shares
       *- acquired 49.9% from LEDRA NOMINEES LIMITED and 50% from LEDRA TRUSTEES LIMITED*
       LEDRA NOMINEES LIMITED, holds 0.1% of the shares

(iii)  <u>First transfer of September 3, 1998</u>
       MANAGEMENT & DEVELOPMENT (LUXEMBOURG) S.A., holds 99.9% of the shares[1]
       *- acquired 99.9% from JEAN-PIERRE COUTARD*
       LEDRA NOMINEES LIMITED, holds 0.1% of the shares

(iv)   <u>Second transfer of September 3, 1998</u>
       LEDRA NOMINEES LIMITED, holds 50% of the shares
       *- acquired 49.9% from MANAGEMENT & DEVELOPMENT (LUXEMBOURG) S.A.*
       LEDRA TRUSTEES LIMITED, holds 50% of the shares
       *- acquired 50% from MANAGEMENT & DEVELOPMENT (LUXEMBOURG) S.A.*

(v)    <u>As of November 30, 1999</u>
       INDVECTA (NOMINEES) LIMITED, holds 50% of the shares
       *- acquired 50% from LEDRA NOMINEES LIMITED*
       CYRENA (NOMINEE) LIMITED, holds 50% of the shares
       *- acquired 50% from LEDRA TRUSTEES LIMITED*

(vi)   <u>As of May 25, 2004</u>
       INDVECTA (NOMINEES) LIMITED, holds 100% of the shares
       *- acquired 50% from CYRENA (NOMINEE) LIMITED*

Therefore, at the present date INDVECTA (NOMINEES) LIMITED holds 100% of the issued shares capital of FEL (i.e. 1,000 shares).

*2.2 Directors of FEL*

Please see below the development of the directors' structure of FEL.

---

[1] Please note that immediately after the transfer of shares to MANAGEMENT & DEVELOPMENT (LUXEMBOURG) S.A. another transfer of shares ensued and therefore the former transfer is not shown on the English certificate of shareholders but only on the certificate in the Greek language. The transfer of shares to MANAGEMENT & DEVELOPMENT (LUXEMBOURG) S.A. seems, however, very important, since Mr. Benda represented this company.

WP0014251

**3.**                                                          **PETERKA & PARTNERS v.o.s.**

(i)   As of incorporation, of May 15, 1996
      CHRISTODOULOS G. VASSILIADES
      LOUISA CHR. MASONIDOU
      *(Both these perssons are lawyers who have incorporated FEL as an off-the-shelf company.)*

(ii)  As of May 5, 1997
      CHRISTODOULOS G. VASSILIADES
      JEAN-PIERRE COUTARD – appointed as an additional director
      ALAIN BAUDIN - appointed as an additional director

      *(LOUISA CHR. MASONIDOU – resigned)*

(iii) As of September 3, 1998
      ALASTAIR MATTHEW CUNNINGHAM - appointed as a new director
      WILLIAMS PAUL JOSEPH - appointed as a new director

      *(CHRISTODOULOS G. VASSILIADES - resigned*
      *JEAN-PIERRE COUTARD - resigned*
      *ALAIN BAUDIN – resigned)*

(iv)  As of March 23, 1999
      HASTINGS RONALDO DANIEL - appointed as a new director
      JAMES WINGROVE NATHANIEL - appointed as a new director

      *(ALASTAIR MATTHEW CUNNINGHAM- resigned*
      *WILLIAMS PAUL JOSEPH– resigned)*

(v)   As of November 30, 1999
      RICHARD HARAZIM - appointed as a new director
      MARTIN BENDA - appointed as a new director
      JOHN MOFFITT - appointed as a new director
      MICHAEL BLUHM - appointed as a new director

      *(HASTINGS RONALDO DANIEL - resigned*
      *JAMES WINGROVE NATHANIEL– resigned)*

(vi)  As of May 6, 2002
      RICHARD HARAZIM
      MARTIN BENDA
      JOHN MOFFITT
      MICHAL VLACH – appointed as an additional director

      *(MICHAEL BLUHM – resigned)*

(vii) As of October 31, 2002

      RENA DAVID - appointed as an additional director
      DOXA PERICLEOUS - appointed as an additional director
      ANTONIS INDIANOS - appointed as an additional director
      ANDREAS PAPASHANTHIS - appointed as an additional director

      *(RICHARD HARAZIM - resigned*

**4.**                                                      PETERKA & PARTNERS v.o.s.

*MARTIN BENDA - resigned*
*JOHN MOFFITT- resigned*
*MICHAL VLACH – resigned)*

Therefore, at present, the composition of FEL's board of directors is as follows:

ANTONIS INDIANOS
RENA DAVID
DOXA PERICLEOUS
ANDREAS PAPASHANTHIS

Please find enclosed a scanned copy of all certificates regarding the current and past shareholders and directors of FEL. In case you need originals of these documents for the U.S. lawsuit, please let us know.

### 3. Beneficial shareholders of FEL

The shareholders shown in the certificates issued by the Registrar of Companies in Cyprus are, however, only nominees. The beneficial shareholders ought to be disclosed to Cyprus National Bank.

As we have already mentioned above, last week we succeeded in getting access, on the basis of the demand filed on behalf of the company K T, Inc., to the police file on the investigation of TREND case (prosecution of Mr. Hálek and co.). In this file we have found copies of notifications of FEL's attorneys to Cyprus National Bank in which the beneficial shareholders are specified. Please find a list of them below:

1. October 10, 1996 – May 5, 1997:       EUROALARM, s.r.o.[2]

2. May 5, 1997 – September 30, 1998:      DUNA S.A.[3]

3. September 30, 1998 – January 19, 2000: MANAGEMENT AND DEVELOPMENT
                                          (LUXEMBOURG) S.A.[4]

4. as of January 20, 2000 on:             BONALBO FIDUCIARIES LTD.[5]

We do not have information as to whether any subsequent transfers of the shares in FEL occurred.

---

[2] EUROALARM is a Czech company. From further documents contained in the police file it seems that Mr. Železník (a former director of KOTVA, a.s.) was behind this company.

[3] DUNA is a French company. According to the testimonies of their representatives to the police DUNA held the shares for Mr. Železník.

[4] A representative of MANAGEMENT AND DEVELOPMENT (LUXEMBOURG) S.A. acting in connection with the acquisition of the shares was Mr. Benda. Mr. Železník died (allegedly of a heart-attack) 10 days after the transfer of shares occurred, at the age of 52.

[5] Bonalbo Fiduciaires Ltd. is a U.K. company, with its registered seat at Brushfield Street, London E1, United Kingdom.

WP0014253

Now we are analyzing some further documents from the police file, which seem to be very important for the clarification of the role of some persons involved in the TREND case, in particular the fact that the persons standing behind FEL were Mr. Železník and later Mr. Benda. We will provide you with a summary of them very soon.

We will try to get more information on the persons behind MANAGEMENT AND DEVELOPMENT (LUXEMBOURG) S.A. and Bonalbo Fiduciaries. We intend to ask our partner law firm of the TerraLex network in London and Luxembourg to provide us with the further information about these companies and to obtain their corporate documents from commercial registers.

### 4. Corporate documents regarding SPV CO.

The company SPV CO. LIMITED was registered with the Registrar of Companies on May 25, 2004, under registration number 148845, with the registered capital of CZK 1,480,000,000 and its registered address at 15 Ayios Pavlos Street, LEDRA HOUSE, Ayios Andreas, 1105 Nicosia, Cyprus.

*3.1 Shareholders of SPV CO. LIMITED*

The sole shareholder of the company SPV CO. LIMITED is currently:

KOTVA NEMOVITOSTI, k.s., holding 100% of the shares

*3.2 Directors of SPV CO. LIMITED*

The directors of the company SPV CO. LIMITED are currently:

EVANGELLOS GREGORIOU
PARASKEVAS ZACHAROULLIS
MARTIN BENDA

### 5. Motions to Public Prosecutor's Offices

We have not yet received your reaction to the drafts of the motions to the Public Prosecutor's Offices we sent you enclosed with our e-mail of June 22, 2005.

We sent you drafts of the following motions:

a) a motion to the Municipal Public Prosecutor's Office in Prague, which is supervising the criminal proceedings against the bankruptcy trustee of TREND, Mr. Vítězslav Hálek,

b) a motion to the Regional Public Prosecutor's Office in Hradec Králové, which is supervising the criminal proceedings against the directors of KOTVA, Messrs. Benda and Harazim,

c) a motion to the High Prosecutor's Office in Prague, which is supervising the criminal proceedings against the accused, Mr. Miroslav Hálek and co.

With regard to the fact that we consider the submission of these motions as quite important we would like to ask you to inform us whether you agree with the (very similar) text of these motions at your first convenience.

WP0014254

6.                                                                    **PETERKA** & **PARTNERS v.o.s.**

**6.  Claims for damages in the Czech Republic**

We have not yet received either your reaction to our analyses concerning the possibility to sue for damages Messrs. Benda and Harazim and FEL (see our e-mail of June 7, 2005) and the company CRQ (see our e-mail of June 15, 2005) in the Czech Republic.

Please inform us about your instruction in this matter.

*     *     *

We remain at your disposal for any further assistance you may require.

Best regards,


Ondrej Peterka

WP0014255

# EXHIBIT M

# PETERKA & PARTNERS v.o.s.

| | |
|---|---|
| Commercial Register: Municipal Court in Prague<br>Section A, Enclosure 42561<br><br>Business Identification Number: 26 16 97 20 | Law Offices<br>Na Příkopě 15/583, 110 00 PRAHA 1<br>TEL. : (420) 246 085 300<br>FAX : (420) 246 085 370 |

www.cabinet.cz

E-mail of July 14, 2005

From:   Ondrej Peterka                         peterka@cabinet.cz

To:      Andrew Weiss                           AWeiss@WeissAsset.com

Cc:      Georgiy Nikitin                          georgiy@weissasset.com

           Marta Sluborska                       marta@weissasset.com

           Petr Topinka                            topinka@hkstd.cz

Re:      KOTVA / TREND

---

Dear Mr. Weiss,

As we have already informed you, we succeeded in getting access, on behalf of the company K T, Inc., to the police file kept on the case of the criminal proceedings against the accused Mr. Hálek and co.

Last week, we obtained from this file some documents, which were previously unavailable, (in particular contracts and records of witness examination), which seem to be crucial for the whole TREND/KOTVA case.

On the basis of this information and these documents we may put the already ascertained facts concerning the chronology of the TREND/KOTVA case and the relationships of the persons involved therein in more precise terms.

We are summarising hereunder the content of the acquired documents as well as the possible conclusions resulting therefrom. However, please note that the authenticity of these documents (and consequently the correctness of the below-mentioned conclusions) cannot be, in the majority of cases, confirmed with absolute certainty, as we do not have at our disposal anything other than the copies of the documents.

1. **Within the period between 1996 and 1998, FEL was allegedly controlled by Mr. Jindřich Železník, the director general of the company KOTVA, a.s., while Mr. Miroslav Hálek was only an intermediary for the purchase of the shares in Kotva, a.s. by FEL**

We have obtained from the file a copy of the contract on the intermediation of the purchase of securities between Mr. Jindřich Železník as an interested party and Mr. Miroslav Hálek as an

WP0014257

intermediary. The execution of this contract is dated August 23, 1996. However, the file contains only a copy of this contract without any signatures.

It results from the terms of the above-mentioned contract that Mr. Miroslav Hálek did not act on his proper account when taking the shares in Kotva a.s. out from the property of TREND, within the period from the second half of 1996 up to January 1997, but he collected the shares in Kotva for Mr. Jindřich Železník, who exercised at that time the function of the director general of Kotva a.s.

Mr. Železník declares in this contract that he owns FEL and that he is interested in the purchase of the majority block of shares in Kotva a.s. by FEL.

As remuneration for the intermediation of this purchase there was agreed a sum amounting to CZK 40 million. However, the contract concluded between Mr. Hálek and Mr. Železník contained also an agreement for a future contract on intermediation between FEL as an interested party and the company Presley Industries, seated in Nassau, Bahamas, as an intermediary (it results from several terms of the contract that the company Presley Industries was also allegedly controlled by Mr. Železník).

On the basis of this further intermediation agreement between FEL and Presley Industries (a copy of which we do not have at our disposal), Presley Industries should have had a right to the same intermediation activity that Mr. Hálek was obliged to exercise for Mr. Železník, and this for a commission from FEL amounting to CZK 80 million.

This commission should have been deposited with the bank account of Presley Industries immediately (without the necessity of the duty of Presley Industries towards Forminster being fulfilled), and the contract did not specify the resources from which the commission should have been transferred to the account of Presley Industries. It results from the prosecution against Mr. Hálek and from the expert's opinion, elaborated during the investigation, that the financial means amounting to USD 2 million were transferred to the account of Presley Industries from the account of FEL, where they were transferred before by Královéhradecká brokerská and originated from the assets of TREND.

The shares of Presley Industries should have been, for the whole period of the duration of the contract on intermediation between Mr. Hálek and Mr. Železník, placed into safekeeping with an attorney at law (whose name was not mentioned in the contract) in order to guarantee Mr. Hálek's commission amounting to CZK 40 million and they should have been rendered to Mr. Železník after the payment of the commission to Mr. Hálek.

However, this stipulation casts significant doubt upon the supposition that Mr. Hálek acted only as independent intermediary for Mr. Železník, who was, among others, independent from the group around Mr. Hálek. This conclusion is reasoned by the fact that Mr. Železník would have acquired, through the restoration of the shares of Presley Industries, also a sum amounting to USD 2 million (corresponding to approximately CZK 80 million), which was, however, transferred to the account of Presley Industries by the company Královéhradecká brokerská (hereinafter "KHB"), through FEL, and so by Mr. Hálek's group, and this without any consideration from Mr. Železník. (It did not receive any consideration from Mr. Železník for this sum).

WP0014258

According to the letter of the investigator of January 12, 2005, addressed to the Superior Public Prosecutor's Office, a copy of which we have at our disposal, this contract was elaborated by Dr. Veleba (probably Igor). Igor Veleba, an attorney at law in Brno, was the liquidator of one Mr. Hálek's companies, namely IFM. To all appearances, there exists a connection between Mr. Igor Veleba and Mr. Martin Benda. For example, Mr. Igor Veleba was Chairman of the Board of Directors in the company MAS Trade s.r.o., within the period from November 27, 1998, to September 2, 2002, whereas Martin Benda was Vice-Chairman of the Supervisory Board of this company up until November 27, 1998. Alena Velebová, undoubtedly a relative of Igor Veleba, together with whom she is a member of the statutory bodies of several companies, was also involved in the company MAS Trade, in the statutory bodies whereof were persons connected to Mr. Martin Benda (for example Mr. Michal Vlach, who is also a member of the statutory bodies of the companies of the Kotva group), whose sole associate was for some time the company SPRINT. We have already informed you before about this company, for example in connection with the fact that the bankruptcy trustee of this company included the shares of FEL into the bankrupt's assets of this company.

*We are translating the copy of the intermediation contract between Mr. Železník and Mr. Hálek and we will provide you with this translation without delay.*

### 2. Contract on the sale of 384,971 shares in Kotva a.s., concluded between FEL and KHB on January 29, 1996

We have obtained a copy of this contract from the police file. This contract was executed in English and Czech versions (we are sending you enclosed herewith the English version designated as a "Contract of the fore-payment transfer of securities").

In this contract FEL declares its interest in acquiring 76% in total of the shares in Kotva a.s.

On the basis of this contract FEL immediately purchased from KHB 384,971 shares in Kotva a.s. and KHB undertook an engagement to transfer further shares to FEL, up to the total of 76% of the registered capital of Kotva and this until October 31, 1997, at the latest. Should KHB have failed to have transferred up to this date the shares in Kotva a.s., representing at least a 50% part of the registered capital of Kotva, it would have been obliged to pay for every non-transferred share up to this limit a contractual penalty of CZK 5000.

The purchase price for the block of 384,971 shares in Kotva a.s. was settled in the amount of CZK 215 per share. However, this price was not fixed and final. If KHB had transferred to FEL at least 50.1 % of the shares in Kotva a.s., the purchase price should have been increased to CZK 1,550 and if KHB had transferred to FEL more than 67% of the shares in Kotva, a.s., the purchase price would have equalled CZK 1,600 for each share over this limit.

The contract contained a stipulation in article VI., point 3, which proved clearly the intention of the parties to manipulate the price of the shares in Kotva a.s. on the public market: *„The purchase price mentioned in the art. III was settled, so that till the time of arising of the purchase price by the way described in this article, the Transferor could easier buy Kotva Shares from other shareholders. That's why the purchase price for one Kotva Share, including the price of 384.971 pcs of above specified securities arises to the amount of 1.550,- CZK for one piece of the above mentioned security (for one piece of Kotva Share), namely with the force from the 31st March 1997."* Although an express prohibition of manipulating the price of listed securities was not enacted in Czech law until April 1, 1998, it is possible to

WP0014259

**4.**                                                        **PETERKA & PARTNERS v.o.s.**

use this evidence to show a manipulation of the price as another reason for the non-validity of this contract.

### 3. Shareholders of FEL

#### 3.1  Holding of shares in FEL by the company DUNA S.A.; alleged verbal contract between Mr. Jindřich Železník and this company of April 20, 1997

From the police file, we have obtained copies of documents issued by the Central Bank of Cyprus containing a declaration/notification about the beneficiary shareholders of FEL, who are normally hidden, as far as the records of the commercial register are concerned, behind nominee shareholders. We sent you a chronological list containing the changes in the persons of the nominee and beneficial shareholders with our e-mail of July 12, 2005.

Beside these documents from the Central Bank of Cyprus, we have also obtained copies of the records of the examinations of witnesses, Messrs Alain Baudin and Jean-Pierre Coutard (French nationality) and Mrs. Pavla Aragonez de Faria, whose maiden name was Bocková (residing in France, originally from the Czech Republic). The attorney-at-law Jean-Pierre Coutard was, during the period from May 5, 1997, to September 3, 1998, the nominee shareholder as regards 99.9 % of the shares in Forminster and at the same time, they were, together with Mr. Alain Baudin, directors of FEL. The French company DUNA S.A., whose director general/CEO was Mrs. Pavla Aragonez de Faria, was at that time declared to the National Bank of Cyprus as a beneficial shareholder of FEL.

In particular, Mr. Jean-Pierre Coutard made a very detailed testimony and alleged that the company Euroalarm, together with the company DUNA S.A., concluded the contract on the sale of the shares in FEL for the purpose of their temporary detention ("portage"). According to Mr. Coutard, Mr. Jindřich Železník was allegedly behind the company Euroalarm and DUNA S.A. allegedly held the shares in FEL in reality for Mr. Železník, who wished to remain hidden. This transaction was negotiated, according to Mr. Coutard, by the attorney-at-law Mr. Veleba for Mr. Železník. The company DUNA S.A. was paid for the detention of the shares in FEL in the amount of FF 40,000 per month. The attorney-at-law Mr. Toman, according to Mr. Alain Baudin, paid this sum regularly.

Mr. Alain Baudin stated that the company DUNA S.A. was involved in this transaction on the basis of his meeting with a relative of Mrs. Aragonez de Faria in the Czech Republic (which must have taken place in April 1997 at the latest). Mrs. Pavla Aragonez de Faria stated that the relative concerned was her cousin removed, Martin David, residing in Brno, who was, at the time of the examination (i.e. November 15, 2001) about 32 years old. We believe that it is highly probable that this cousin was Mr. Martin David, birth number 680521/1633, residing at Brno, Dubová 645/21, ZIP: 637 00, who is a member of the statutory bodies of several companies together with the persons connected with Martin Benda. We have ascertained that Martin David was registered as of May 9, 2005, as the Chairman of the Board of Directors of the company KOTVA OBCHODNÍ, a.s., (which was renamed at the same date as BEN & CO a.s.). This company is an unlimited partner in the company KOTVA NEMOVITOSTI, k.s.

We have further obtained from the file a copy of the contract on the sale of the shares in FEL for the purpose of their temporary detention („portage"). However, it is necessary to point out that this copy is deemed to be only a transcript of the contract allegedly concluded verbally (and it is not consequently undersigned), which is deemed to be concluded by Mr. Igor

WP0014260

Veleba, on behalf of his client, with the company DUNA S.A., who allegedly confirmed the correctness of the transcript. This transcript of the alleged verbal contract is placed in the file only as an enclosure to the contract between Mr. Jindřich Železník and the Luxembourg company MANAGEMENT AND DEVELOPMENT S.A., which we describe in point 3.2 hereunder.

However, contrary to the allegation of Mr. Jean-Pierre Coutard, this contract designated as a transferor Mr. Jindřich Železník and not the company EUROALARM (which was at that time registered in Cyprus as the beneficial owner of the shares in FEL). It is declared in the contract that Mr. Železník purchased FEL from the company EUROALARM as an "empty shell".

This contract aimed in the main to hide the beneficial owner of the shares in FEL, and it was not the real sale (it was expressed among others by the fact that the price for the shares in FEL was USD 100 and DUNA S.A. should have had the right to a regular monthly remuneration of FF 40.000, for the period of the holding of shares.

The contract contains, inter alia, the following engagement of the company DUNA S.A.:" *Until the obtaining of the orders from the Seller by the Purchaser, concerning the determination to which person he should transfer the shares of the Enterprise or the shares in Kotva, the Purchaser is obliged to hold the shares in Enterprise, to act outwardly as their owner and through them also as an owner of all shares in Kotva.*" Furthermore, the company DUNA S.A. undertook an engagement in the contract to "*undertake all reasonable steps necessary in order to ensure that more than half of the members of the Board of Directors and of the Supervisory Board of the company Kotva are members who were proposed for these functions by the Enterprise (note: the term "Enterprise" was used for FEL in the contract) as well as steps to ensure that the shares in Kotva will be freely handled, and be especially freely transferable*".

We are preparing a translation of the Contract on the sale of the shares in FEL for the purpose of their temporary holding ("portage") and we will send it to you at our earliest convenience.

### 3.2  Contract on assignment of rights and takeover of duties and obligations between Mr. Železník and the company MANAGEMENT AND DEVELOPMENT S.A. of June 3, 1998

On June 3, 1998, the contract on assignment of rights and takeover of duties and obligations was concluded between Mr. Jindřich Železník and the company MANAGEMENT AND DEVELOPMENT S.A., seated at 23, rue Beaumont, L-1219 Luxembourg, on the basis of which all rights of Mr. Jindřich Železník resulting from the contract with the company DUNA S.A. were transferred. Consequently, the Luxembourg company MANAGEMENT AND DEVELOPMENT S.A. (hidden behind the outwardly acting company DUNA S.A.), on behalf of which the contract with Mr. Železník was signed by Martin Benda, became a beneficial owner of the shares in FEL. It is evident that MANAGEMENT AND DEVELOPMENT S.A., is another of the "covering" companies, a great number of which exist in connection with Kotva; the registered address of this company is the same as the registered address of the company International Corporate Activities S.A. (www.intercorp.lu), which provides services for the foundation and management of companies.

WP0014261

6.                                                    **PETERKA** & **PARTNERS v.o.s.**

This contract aimed to transfer the beneficial ownership of the shares in FEL (which were henceforth held by the company DUNA S.A.) from Mr. Jindřich Železník to the company MANAGEMENT AND DEVELOPMENT S.A. The contract settled the price for this transfer at CZK 15 million and Mr. Železník declared in this contract that he had already received this sum before the conclusion of the contract.

On the same day, June 3, 1998, Mr. Železník notified the company DUNA S.A. by letter of this transfer, a copy of which we also have at our disposal and which expressly designated Mr. Martin Benda as a representative of the company MANAGEMENT AND DEVELOPMENT S.A. and as a person who is entitled to communicate with the company DUNA S.A. regarding the shares in FEL.

On June 13, 1998, i.e. 10 days after the notification mentioned above, Mr. Jindřich Železník, aged 52, died, allegedly from heart failure.

The facts mentioned above in points 3.1 and 3.2 cast significant doubts on the allegations of the French attorney-at-law, Mr. Coutard, according to who, Mr. Železník was allegedly the beneficial owner of FEL. In all appearance, it is more probable that he was only one part of group to which Mr. Martin Benda, among others, also belongs, and should only have covered the real beneficial owners. It cannot be excluded that he played the role of a stooge or decoy.

*       *       *

We remain at your disposal for any further assistance you may require.

Best regards,

Ondrej Peterka

WP0014262