UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KOTVA a.s., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW WEISS and WEISS ASSET | ) | |
| MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendants. | ) | C.A. No. 05-10679-RCL |
| | ) | |
| | ) | |
| ANDREW WEISS, WEISS ASSET | ) | |
| MANAGEMENT LLC, K T, INC. and CVF | ) | |
| INVESTMENTS, LTD., | ) | |
| | ) | |
| Counterclaim-plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KOTVA a.s., MARTIN BENDA, RICHARD | ) | |
| HARAZIM, FORMINSTER ENTERPRISES, | ) | |
| LTD., SPV CO and JOHN DOES 1-5, | ) | |
| | ) | |
| Counterclaim-defendants | ) | |
| | ) | |
| | ) | |

## MOTION FOR APPROVAL OF APPLICATION FOR LETTERS ROGATORY

Andrew Weiss and Weiss Asset Management LLC (the "Defendants") hereby move that

the Discovery Master approve the attached application for letters rogatory (the "Application")

and refer the Application to the district judge for approval and signature.  In support of this

Motion, the Defendants state:

1.      For the reasons stated in the Application, the Application is meritorious.

2.      In order to be in proper form, the Letters Rogatory must be signed by a judicial

officer.  However, the Application is arguably a discovery motion within the scope of the Court's

December 13, 2005 Order Appointing Discovery Master.  Accordingly, the Defendants seek approval from the Discovery Master and a referral to the Court to approve the Application and execute the Letters Rogatory.

3.      Once the Court signs the letters rogatory and affixes its seal, the Defendants ask that the Court return the original, signed and sealed copy to the Defendants, who will forward it to the appropriate authorities.

4.      The Defendants filed a similar Motion for Approval of Application for Letters Rogatory on June 30, 2006.  On July 19, 2006, after consultation with counsel for Mr. Mulryan, the Defendants withdrew that Motion.

5.      In November 2006, the Defendants again raised the issue of deposing Mr. Mulryan.  Benjamin Goldberger, representing the Defendants, discussed this issue with Michael Kealey of William Fry Solicitors, representing Mr. Mulryan, during a telephone call that lasted from approximately 8:50 a.m. to 9:05 a.m. (Eastern Time) on November 9, 2006.  Mr. Kealey indicated that it was unlikely that Mr. Mulryan would change his position: that he would not be deposed voluntarily.  On November 13, 2006, Mr. Kealey confirmed this in a letter, stating that "any application to oblige him to be deposed will be resisted," and providing contact information for local counsel for Mr. Mulryan, John Blessington of Kirkpatrick & Lockhart.  A copy of this Motion is being served on both Mr. Kealey and Mr. Blessington.  On November 21, 2006, Mr. Goldberger spoke by telephone with Daniel Pasquarello and Dana Zakarian representing Kotva a.s. and Richard Harazim, from approximately 10:30 a.m. to 11:30 a.m.  During this conversation, counsel discussed this Motion for less than five minutes.  Counsel for Kotva a.s. and Richard Harazim stated that they take no position on whether the Court should grant the attached application, and do not intend to file an Opposition.

Respectfully Submitted,

ANDREW WEISS and WEISS ASSET
MANAGEMENT LLC

By their attorneys,

/s/ Benjamin A. Goldberger
Edward P. Leibensperger (BBO# 292620)
Benjamin A. Goldberger (BBO# 654357)
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts  02109-1775
(617) 535-4000

Dated: November 22, 2006

## CERTIFICATE OF CONSULTATION PURSUANT TO LOCAL RULES 7.1 AND 37.1

I hereby certify that counsel for Weiss and WAM conferred with counsel for Kotva a.s. and Richard Harazim as described above and have attempted in good faith to resolve or narrow the issues presented by this Motion and have complied with the provisions of Local Rule 37.1.

/s/ Benjamin A. Goldberger
Benjamin A. Goldberger

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 22, 2006.  I further certify that this document and all attachments will be sent, on November 21, 2006, by electronic mail and regular mail to Michael Kealey of William Fry Solicitors and John Blessington of Kirkpatrick & Lockhart

/s/ Benjamin A. Goldberger
Benjamin A. Goldberger

BST99 1508541-2.072198.0012

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s.,              ) | |
|              ) | |
|      Plaintiff,      ) | |
|              ) | |
|      v.           ) | |
|              ) | |
| ANDREW WEISS and WEISS ASSET   ) | |
| MANAGEMENT, LLC,     ) | |
|              ) | |
|      Defendants.     ) | C.A. No. 05-10679-RCL |
|              ) | |
|              ) | |
| ANDREW WEISS, WEISS ASSET    ) | |
| MANAGEMENT LLC, K T, INC. and CVF  ) | |
| INVESTMENTS, LTD.,     ) | |
|              ) | |
|      Counterclaim-plaintiffs,   ) | |
|              ) | |
|      v.           ) | |
|              ) | |
| KOTVA a.s., MARTIN BENDA, RICHARD  ) | |
| HARAZIM, FORMINSTER ENTERPRISES,  ) | |
| LTD., SPV CO and JOHN DOES 1-5,   ) | |
|              ) | |
|      Counterclaim-defendants   ) | |
|              ) | |

## APPLICATION FOR LETTERS ROGATORY

Andrew Weiss and Weiss Asset Management LLC (the "Defendants") hereby apply to the Court pursuant to Rule 28(b) of the Federal Rules of Civil Procedure for the issuance of a Letters Rogatory, in the form attached hereto, directed to the High Court of the Republic of Ireland, requesting the examination of and production of documents from Sean Mulryan, Chairman and Managing Director of Ballymore Properties Limited, an Irish registered company of Fonthill House, Old Lucan Road, Palmerstown, Dublin 20, Ireland, that may be used in civil proceedings before this court in the above captioned matter.

## GROUNDS FOR APPLICATION

As grounds for this application, Defendants state as follows:

1.      Kotva a.s., ("Kotva") filed this action against Weiss and Weiss Asset Management alleging violations of the Securities and Exchange Act of 1934, RICO, M.G.L. c. 93A and common law claims of abuse of process, fraud, and tortious interference with advantageous business relations. In its Complaint, Kotva alleges that Defendants interfered with the sale by Kotva of its major asset, a department store building in Prague (the "real estate"), and caused damage to Kotva arising out of the ultimate sale of the real estate to "an Irish investment group." Complaint, ¶¶ 17, 37-39. The Irish investment group is Markland Holdings Limited ("Markland"). Kotva alleges further that when the sale of the real estate finally closed, Markland held back $24.3 million from the purchase price (the "escrow") until lawsuits allegedly instituted by Defendants in the Czech courts are resolved. Complaint, ¶ 37.

2.      Counsel for Mr. Mulryan has taken the position that Mr. Mulryan does not have any relevant evidence regarding the matters at issue in this case. Plainly, this is not the case. Mr. Mulryan is one of two "shareholders" of Markland, who own Markland through a number of companies, including Ballymore. Aidan Scully, Managing Director of Markland, has testified that Mr. Mulryan was present at meetings at which Markland's purchase of the real estate, as well as the impact of lawsuits that Kotva attributes to the Defendants and others on that purchase, were discussed. *See generally* Exhibit A. Thus, Mr. Mulryan has knowledge relevant to this action.

3.      Mr. Scully's memory of those meetings was incomplete, and Mr. Mulryan's testimony is necessary to fill in the significant gaps left by Mr. Scully's testimony. In particular, the meeting at which Mr. Mulryan, Mr. Kelly (Markland's other shareholder), Mr. Scully and others decided whether or not to proceed with the Kotva purchase is at the heart of Kotva's claim

that the Defendants' actions interfered with the sale of the Department Store and damaged Kotva.  *See* Exhibit A (describing the subject of the meeting as a "deci[sion] whether we were going to proceed or not and the decision was made [by the shareholders] to proceed.  That was D-day.").

4.      In addition to the Kotva purchase, effected through Markland, Mr. Mulryan has been involved in a number of other real estate transactions in Prague.  As described in the attached press articles and testimony before The Tribunal of Inquiry into Certain Planning Matters & Payments (also known as the Mahon Tribunal or the Flood Tribunal), Mr. Mulryan has a long-standing interest and involvement in Prague real estate.  *See* Exhibit B (Article from Shopping Centre Magazine); Exhibit C (Article from The Irish Independent); Exhibit D (Testimony from the Tribunal).  Thus, Mr. Mulryan's involvement in Markland's negotiations for and purchase of the Kotva real estate is not merely that of a passive investor, but rather that of an active participant who is "the kind of person who likes to go through the snag lists himself to make sure that everything is as it should be."  Exhibit B at 3.

5.      Kotva has deposed Lars Bader of QVT, a beneficial owner of the Kotva and Trend shares managed by Professor Weiss.  Mr. Bader had no involvement in the underlying Czech litigation or real estate transaction.  This Court has also granted Kotva's request for letters rogatory to secure the deposition of Howard Golden, a former director of CVF with only second-hand knowledge of the facts described in Kotva's Complaint.  Mr. Mulryan has more direct knowledge of relevant information than either of these individuals, and the Court should grant the Application in order to allow his deposition to proceed.

6.      If the Application is granted, the Defendants will, through Irish counsel, make an application to the High Court of the Republic of Ireland for an order effecting the assistance requested in this Application for letters rogatory/commission rogatoire.

ANDREW WEISS and WEISS ASSET
MANAGEMENT LLC

By their attorneys,

/s/ Benjamin A. Goldberger
Edward P. Leibensperger (BBO# 292620)
Benjamin A. Goldberger (BBO# 654357)
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts  02109-1775
(617) 535-4000

Dated: November 22, 2006

BST99 1508545-3.072198.0012

IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856

AND IN THE MATTER OF CIVIL PROCEEDINGS NOW PENDING BEFORE

THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF

MASSACHUSETTS (CIVIL ACTION NO. 05-10679-RCL)

| | |
|---|---|
| BETWEEN/ | )Plaintiff |
| | ) |
| KOTVA a.s. | ) |
| | ) |
| ANDREW WEISS and WEISS ASSET | ) |
| MANAGEMENT | )Defendant |

| | |
|---|---|
| ANDREW WEISS, WEISS ASSET | ) |
| MANAGEMENT LLC, KT, INC. AND CVF | ) |
| INVESTMENTS LIMITED | )Counterclaim-plaintiffs |
| | ) |
| KOTVA a.s, MARTIN BENDA, | ) |
| RICHARD HARAZIM, FORMINSTER | ) |
| ENTERPRISES LTD., SPV CO | ) |
| AND JOHN DOES 1-5 | )Counterclaim-defendants |

Deposition under oral examination

OF

AIDAN SCULLY

taken at 10.00 am

on

May 26, 2006

Examiner:                         MR. PHILIPP RAHN BL

Counsel for Weiss & Weiss
Asset Management, LLC:            MR. BENJAMIN A. GOLDBERGER
McDermott Will & Emery LLP       28 State Street, Boston,
                                 Massachusetts 02109-1775
                                 bgoldberger@mwe.com
                                 Tel. 617.535.4483


Mason Hayes+Curran               MS. SUSAN FRISBY
                                 South Bank House,
                                 Barrow Street, Dublin 4,
                                 Ireland
                                 sfrisby@mhc.ie
                                 +353 1 614 5272


Counsel for Kotva:               MR. JOEL BECKMAN
Nystrom Beckman & Paris LLP      10 St. James Avenue
                                 16th Floor, Boston
                                 Massachusetts 02116
                                 jbeckman@nbparis.com


Counsel for Markland
Holdings Ltd                     MR. MICHAEL KEALEY
Linklaters                       MR. BRYAN WILSON

Court Reporter: Marea J O'Toole

Gwen Malone Stenography Services Ltd

Law Library

PO Box 5939

145-151 Church Street, Dublin 7, Ireland


Videographer:   Dagan O'Donaghue

Pearl Audio Visual

191 Lower Kimmage Road, Dublin 6 West

Ireland

INDEX

DEPOSITION HEARING OF AIDAN SCULLY:

PAGE:

Direct examination by Mr  Goldberger    007-120

Cross-examination by Mr  Beckman        121-151

Re-direct by Mr  Goldberger             151-154

```
1   22  Q.   What are your duties as its managing director now?
2       A.   The main duties would be to manage and direct the
3            company, to grow and to acquire assets, to add value to
4            the company --
5   23  Q.   Who do you -- I'm sorry.
6       A.   -- to your property.
7   24  Q.   I am sorry.  Who do you report to?
8       A.   I report to two shareholders who own the company. They
9            are not ...(INTERJECTION).
10  25  Q.   Do you have any -- I am sorry.
11      A.   They are not, they don't work in the office there. They
12           are the shareholders.
13  26  Q.   Are you yourself also a shareholder or are there only
14           two shareholders?
15      A.   There is quite a large number of companies in the
16           group.  The majority of them would be owned by those
17           two shareholders.
18  27  Q.   I see, so there are two -- are these individuals?
19      A.   Yes.
20  28  Q.   Okay, so there are two individuals who own the majority
21           of Markland shares?
22      A.   Yes, they have their own companies.
23  29  Q.   And then there are a number of other companies that may
24           own a minority stake?
25      A.   For the purpose of your question, those two people own
26           100% of Markland.
27  30  Q.   I understand, but through a variety of companies?
28      A.   Yes, yeah.
29  31  Q.   Understood. So you are in charge of the day-to-day
```

10

1     A.   I would say so.  Yeah, I'd say so because they joined
2          the EU.
3   41  Q.   Hmm-hmm.
4     A.   And progress was being made there and it did very well,
5          yeah.
6   42  Q.   So real estate in Prague generally appreciated --
7     A.   Hmm-hmm.
8   43  Q.   -- over that time?
9     A.   Hmm-hmm.
10  44  Q.   And from 2005 to the present --
11    A.   Yes.
12  45  Q.   -- has that continued?
13    A.   Yes, definitely.
14  46  Q.   When did -- tell me about when Markland first found out
15         if the Kotva building might be for sale?
16    A.   We first found out about the building when one of our
17         shareholders was passed a brochure from an
18         international real estate agents, Jones Lang LaSalle,
19         who have offices here in Dublin.  I know people in
20         Dublin here in those offices  and I looked at what was
21         on offer in the memorandum.  It is quite a big booklet,
22         very well produced.  Certainly it struck me as a super
23         opportunity to get a large chunk of city centre
24         property in one go rather than spending two years
25         trying to acquire five smaller deals.
26  47  Q.   Who was the person who handed you the brochure?
27    A.   Henry Prestage.
28  48  Q.   And is he one of the shareholders?
29    A.   No, he's not. He's, he was working for me at the time.

12

```
1   49  Q.   He is an employee of Markland?

2       A.   He's an employee of Markland, yeah.

3   50  Q.   You said that one of the ...(INTERJECTION).

4       A.   Sorry, there was a meeting held with shareholders,

5            myself and Henry Prestage --

6   51  Q.   I see.

7       A.   -- and the brochure was being passed around, you know,

8            so ...

9   52  Q.   Okay, I see.  So the attendees at this meeting were

10           you, Henry Prestage, your two shareholders and one or

11           more representatives from Jones Lang LaSalle?

12      A.   No, there was no representatives from Jones Lang.

13  53  Q.   Okay, who -- which one of the shareholders was

14           approached by Jones Lang LaSalle originally?

15      A.   I don't know, I don't know.

16  54  Q.   Okay.

17      A.   I don't think they were approached, it was just somehow

18           the brochure would have come into their offices.

19  55  Q.   Does Markland have other investments in the.

20           Czech Republic other than the Kotva store?

21      A.   Yes, it does.

22  56  Q.   And what are they?

23      A.   We acquired Revolucni one and three, which are two

24           significant office and retail buildings next door to

25           Kotva.  We acquired a six building office park on about

26           seven acres in Prague town called Klimacentrum office

27           development, that also includes a 2,000 square meter

28           supermarket. We acquired recently the Sieman's

29           headquarters, also in Prague town, on a sale and lease
```

13

1          in late October/early November 2004 to have a
2          discussion on the current state of the deal?
3     A.   I don't recall that particular meeting. I recall
4          requesting a meeting with our shareholders with Frank
5          and Henry and Bryan Wilson from Linklaters in Dublin to
6          basically put on the table the state of the deal as we
7          saw it and then -- if that is what that meeting is
8          referring to.
9  372 Q.  Mr. Prestage here referred to the Gilroy case and
10         "others all threatening", do you know what the "others"
11         were, beyond Mr. Woolf?
12         MR  BECKMAN:                Objection, lack of
13                                     foundation, assuming facts
14         not in evidence.
15         EXAMINER:                   Again in relation to that I
16                                     would ask you to answer the
17         question in any event. I am not in a position to
18         express a specific opinion on that, which is all that I
19         can d.o, so I would ask you to answer the question.
20    A.   "With the Gilroy case filed and others all threatening"
21         it is just a generic kind of term really, isn't it. No,
22         specifically, no.
23  373 Q.  MR. GOLDBERGER:            I'm afraid that the record
24                                     might be a bit muddled
25         there. So I am just going to ask the form of the
26         question again.
27    A.   All right. I presume it is e-mailed to Woolf or
28         somebody as well, whoever else was in the
29         ...(INTERJECTION).

74

```
 1                    After the Gilroy lawsuit was filed and after Linklaters
 2                    reviewed the Gilroy lawsuit, were you satisfied that
 3                    Markland could proceed with the sale?
 4             MR. GOLDBERGER:                Same objection.
 5       A.   Well, ultimately there was a shareholders decision.  So
 6                    what we did at that stage was we arranged a meeting in
 7                    Dublin where we all got together, the two shareholders,
 8                    Bryan Wilson from Linklaters, Czech Republic,
 9                    Frank Walker who was then working in Markland,
10                    Henry Prestage who was then working in Ballymore.  And
11                    we discussed the deal and we discussed the risks,
12                    explained the situation.  And we had to decide whether
13                    we were going to proceed or not and the decision was
14                    made to proceed.  That was D-day.
15   743 Q.   MR. BECKMAN:                You previously testified
16                                         about the Irish police
17                    questioning you within the last six months or so.  Were
18                    the Irish police asking about Andrew Weiss?
19       A.   I think they were looking for a general, just for a
20                    general background to the deal, the transaction. It may
21                    have been triggered by something that Weiss had, it may
22                    have been Weiss's connections that got this, that got
23                    these police to call.  I don't know.  I am trying to
24                    remember exactly under whose authority they were
25                    ...(INTERJECTION).
26   744 Q.   Did they ask about Weiss's blackmail?
27             MR. GOLDBERGER:               I move to strike the
28                                           portion of the last answer
29                    that begins with "and it may have been".
```

147

**Shopping-centre.cc**

**Mulryan of many talents**
**Ballymore chairman Sean Mulryan is a developer who knows his business from the bottom up, writes Hugh Oram**
Published: 16 May, 2006

*Page 10*

Sean Mulryan, 51, the chairman of Ballymore Properties, was one of the driving forces behind the recently opened Whitewater Shopping Centre in Newbridge, Co Kildare. He's one of the biggest property developers in Ireland and Britain and he now also has massive interests in central and eastern Europe. Currently, Ballymore is involved in about 30 projects in Ireland, Britain and central and eastern Europe with an estimated gross development value of E22bn. Mulryan and his family are estimated to be worth E344m, according to The Sunday Times Rich List 2006.

His origins are humble, though.Mulryan comes from the small village of Oran in Co Roscommon in the west of Ireland. It's still a very underdeveloped part of Ireland, far from the bright lights and myriad cranes of Dublin but Mulryan has always maintained his family connections with the area, dropping in to see his mother by helicopter.

Both his parents were farmers. When the young Sean left school at the age of 17, he started work as a stonemason, quickly winning a construction scholarship with the state training agency for apprentices, then known as AnCO, now called Fas.

The young Mulryan worked in Galway for four years, then for a further two years in Athlone, before moving to Dublin. He set up his first firm in 1982, a small house building and development concern, in a small village in west Co Wicklow, not far from Dublin. The village is called Ballymore Eustace and that's why his property company is called Ballymore.

Today Mulryan, his wife Bernadine and their five children live in the same area, but on the 93ha Ardenode Stud. They are keen racegoers and owners.

Mulryan soon got into the big time with house building schemes in Ireland and currently, Ballymore Properties has four massive schemes on the go in Ireland, with two more major ones coming up soon. He often works on joint deals with other developers, such as Castlethorn.

He's also expanded substantially into Britain, beginning with apartment development in central London in 1992. Since then, his London interest has been characterised by large scale apartment blocks in Westminster and the Docklands.

Following London, he began developing in the regions. Outside London, his company has bought a number of former Railtrack sites in, and close to, main line rail stations, such as Snow Hill in Birmingham and Temple Meads in Bristol. What he aims to do is regenerate inner city sites that have good transport links.

He's also moved strongly in central and eastern Europe, opening his first office in Prague five years ago, followed by offices in Bratislava and Budapest in 2003. In Wenceslas Square in Prague, Ballymore is currently developing its largest scheme in the Czech Republic - 60,000 sq m of offices, retail and homes. Bratislava has Ballymore's flagship scheme in central Europe, the Eurovea international trade centre, which includes Slovakia's first super-regional 55,000 sq m shopping destination. He's working on a similar-sized mixed-use development in the centre of Budapest, close to the main railway station. He's also started an involvement with property development in Romania.

Here in Ireland, the Whitewater shopping centre scheme in Newbridge was Mulryan's first big involvement in such a retail development. Mulryan conducted the E400m development on a 50:50 basis with Sean Dunne of Mountbrook Homes, another major house builder in Ireland.

Records in the Companies Registration Office, Dublin, show that Ballymore Developments sold its 50 per cent stake in Newbridge Investments, the developer of Whitewater, in April 2004. That stake went for E725,000 - to Sean Mulryan's wife Bernadine.

With its imaginative design, as a projct Whitewater showed off Mulryan's meticulous love of detail. Business colleagues say that this is Mulryan's strongest business attribute. He is said to want everything done properly, or not done at all. He also spends a lot of time pre-planning developments, which is what happened with Whitewater.

Shoppingcentre

The overall design of Whitewater was the brief of Dublin architectural practice Henry J Lyons, while the interior design was the responsibility of renowned London-based specialist, Benoy. The end result, now that the centre is open, is described by Larry Brennan of Hamilton Osborne King, Dublin, a joint letting agent for the centre: "Whitewater beats Grafton Street any day." Mulryan himself says that since Whitewater is so fashion focused, it gives the people of the Midlands region a real alternative to shopping in Dublin.

The Ballymore Properties group today has headquarter offices in Dublin and London as well local office in the Czech Republic, the Slovak Republic and Hungary. The group turns over about E240m and makes post-tax profits of over E8m, employing about 150 people directly.

Yet despite the vast scale of his developments, he's the kind of person who likes to go through the snag lists himself to make sure that everything is as it should be. That's what he does with all his housing developments and that's precisely what he did with Whitewater when it was under construction. Coming from a building background, he's rare among developers and it also means that he knows the trade inside out, from a practical perspective.

Last autumn, Mulryan, who controls his property empire himself, appointed Dr Michael Smurfit to the board of Ballymore Properties. But despite this appointment, Ballymore Properties has strongly denied that this means that the group is going to go public.

Outside his property development interests, horse racing and golf (he also has a house on the K Club in Co Kildare, where the 2006 Ryder Cup will be staged,) he's also keenly interested in Gaelic sports and sponsors his county's main GAA team, rarely missing a match.

He does a lot of un-publicised work for charity. A very generous man, he's often described as a businessman with a conscience. He's also described as a quiet man, much liked in the industry for his professional approach. Mulyran may have famously tousled hair, but he's always immaculately dressed in the most expensive suits.

He's also a strong supporter of the Fianna Fail political party, which has been in government for much of the past 75 years. He's a regular visitor to the party's tent at the Galway races every summer, which is a stomping ground for construction and property development magnates close to the party.

Apart from all his current developments, he's very much involved in a new private hospital development in Ireland, the Heritage medical clinic, which is due to open later this summer on land owned by Mulryan in Lucan, close to

Ballymore's headquarters.

But he also has another big tussle on the retailing front in Ireland coming up. He is the lead developer in the consortium that wants to complete the Florentine centre in Bray, Co Wicklow, a major commuter town just south of Dublin. Work started on the centre in 2004 but was stopped when the consortium bought more land that significantly increased the size of the site.

Bray Town Council is about to announce its verdict on the new look Florentine Centre, which is right in the centre of Bray. But if the plans do get the go-ahead, they face strong opposition from the plans of the Pizzaro consortium, which wants to build a E2bn scheme, with much retail, just up the road from the Florentine Centre. This scheme is also going through planning now, so it looks as the next few months is going to see Sean Mulryan back in the news for his latest Irish retailing scheme.

# Irish Independent 🏵

## 'Finder's fee' for Lawlor described as loan

### Friday September 19th 2003

LIAM Lawlor hoped to get a stg£2m "finder's fee" for his involvement in the sale of a prime six-storey building in the centre of Prague to an Irish developer three years ago, the Mahon Tribunal heard yesterday.

But the building eventually sold for half initial asking price of more than Stg£8m and instead of the stg£2m profit he sought, the former TD - who did not own the building - got around Stg£835,000 from the deal. Proceeds from the sale went into Mr Lawlor's Czech company Zatecka and an agreement was drawn up to describe the funds as a loan.

However, London solicitor Tony Seddon, whose law firm was involved in drawing up documents for the sale, was criticised by the tribunal for drafting a document that described the payments as a loan.

Tribunal chairman Judge Alan Mahon suggested that such an arrangement should have caused the lawyer a "professional difficulty".

The tribunal, which was continuing its questioning of Mr Seddon's role in Mr Lawlor's business dealings, was told how Mr Lawlor contacted Irish businessman Sean Mulryan with a view to him purchasing the building in central Prague for a suggested sale price of stg£8,110,300.

The Hybernska building came to light after an English-owned estate agency in Prague, Aspen, "introduced" the property to Mr Lawlor.

Towards the end of 1999, he approached Sean Mulryan of Ballymore Properties as a potential purchaser and Mr Ryan travelled to Prague in January 2000 along with his architectural adviser Ambrose Kelly. However, the tribunal has heard how Mr Mulryan quickly established that the initially requested price was far in excess of his opinion of the property's market value and subsequently had its value assessed at stg£4m.

Mr Seddon, who was involved in drafting documents on the proposed sale, told the tribunal the initial asking price was like an "advertising puff" and that the figures had been puffed up by Mr Lawlor.

He could only assume Mr Lawlor wanted to make as much money as possible on the sale.

Judge Mahon said Mr Lawlor stood to make a finder's fee of close to stg£2m on the transaction - an "enormous profit".

The chairman asked whether it caused Mr Seddon professional difficulty describing the payment as a loan.

Mr Seddon said he did not know at the time there was no such loan. Tribunal member Judge Gerald Keys asked why he did not consult the owner before drawing up the loan agreement.

Judge Keys asked whether Mr Seddon received instructions from Mr Lawlor to treat the payment as a loan. "I really don't recollect whether I advised Mr Lawlor to treat it as a loan," he replied.

**Fergus Black**

© *Irish Independent*
*http://www.unison.ie/irish_independent/ & http://www.unison.ie/*

1

1    THE TRIBUNAL RESUMED AS FOLLOWS ON THURSDAY,

2    18TH SEPTEMBER, 2003 AT 10 AM:

3

4    CHAIRMAN:  Morning, Mr. O'Neill.

5

6    MR. O'NEILL:  Morning, Mr. Chairman.  Mr. Seddon, please.

7

8    ANTHONY SEDDON RETURNS TO THE WITNESS BOX AND CONTINUES

9    TO BE EXAMINED BY MR. O'NEILL AS FOLLOWS:

10

11   Q.1  Good morning, Mr. Seddon.

12   A.   Morning.

13   Q.2  At the conclusion of yesterday afternoon's evidence, we were dealing with the

14        instructions which you received from Mr. Lawlor on the 30th of December 1999,

15        and I think it would be fair to say that in that instruction you were dealing

16        with the possible acquisition of two separate properties, one at Hybernska and

17        one at Zatecka, is that right?

18   A.   Sorry, the date?

19   Q.3  The 30th of December, you see it at page 232 in your hard copy.

20   A.   Yes, at that time there were two very specific matters under consideration.

21        One was Zatecka 14 property and the other one was the Hybernska 12 property.

22   Q.4  And as between those two properties, I think at that point in time the Zatecka

23        14 was probably more advanced in the plans for acquisition rather than

24        Hybernska although Hybernska was slated as being the --

25   A.   Not exactly because at that stage there was a binding contract for the

26        Hybernska property, so that was a transaction which was very much in progress.

27   Q.5  But the binding contract for Hybernska was a contract with Aspen and RIF rather

28        than any vehicle?

29   A.   It was question but a situation that was agreed and had to be completed.  So

30        whereas the Zatecka property had not been, terms had not been negotiated.

2

 1  Q.6  I see.  Are you saying that the Aspen to Zatecka or Aspen to Lawlor aspect of

 2       the acquisition of Hybernska had been agreed prior to this date?

 3  A.   No, no.

 4  Q.7  In December?

 5  A.   No, I was talking more about the stage at which the property purchase was at,

 6       the fact that Hybernska was already subject to a binding contract, albeit it

 7       had nothing to do with Mr. Lawlor or Zatecka.  But at that time no terms had

 8       been discussed, as far as I am aware, between Mr. Lawlor and the owner of

 9       Zatecka.

10  Q.8  So that equally Mr. Lawlor had nothing at that point in time to sell on to his

11       own investors?

12  A.   He had an idea.

13  Q.9  An idea.  There were ideas to acquire two properties, one of them was Hybernska

14       one was them was Zatecka?

15  A.   These two very specific ones at the time, there were ideas, there were numerous

16       other properties that had been looked at over the, around this time, but these

17       were the ones on which he was then focusing.

18  Q.10 As at the 30th of December 1999, do you know whether Mr. Lawlor had seen any or

19       inspected any of these buildings himself or was that to take place in January

20       for the first time?

21  A.   No, I believe he had already seen, he had seen Zatecka because he knew that

22       building, he liked it very much.  But when he saw the Hybernska building and

23       knew the contractual situation there, he became very, very interested indeed

24       and quite excited by that particular prospect because he had an opportunity, he

25       thought, to engineer a deal, to make a deal with it, to find finance in a

26       situation where the person buying it had revealed to him that he had a contract

27       and didn't have the, his financial backer had dropped out and he didn't have

28       the money to complete it.  So that was a possibility to do a good property

29       deal, he thought.  That's my understanding.

30  Q.11 And would it appear from your instructions on the 30th of December that the

3

1     person who Mr. Lawlor was going to reach agreement with to provide the finance

2     for this was Mr. Sean Mulryan, who's noted in your attendance here as Mr. Sean

3     O'Ryan?

4  A.  I understand, my recollection of my note is that he had met Mr. Mulryan at that

5     time and had interested him in the, in one of the properties.  I am not sure, I

6     am not sure which of them that it would have been because although I have

7     headed the note "Zatecka", I might have done that when he came on the

8     telephone, not thinking that that would be the matter that he would discuss,

9     then he might have gone on to something else.

10 Q.12 Your note may help us in interpreting that, because about four lines from the

11     bottom of it there, you note that he is, he indicated to you that he is also

12     looking at the Hybernska?

13 A.  Yes, that may --

14 Q.13 Which would appear to suggest that the information prior to that is dealing

15     with Zatecka?

16 A.  It may have been, but my recollection had been that he had been more, yes that

17     may be right -- the timing of one what was said -- it's difficult to remember

18     which day back in 1999.  So he would have certainly have mentioned Zatecka as

19     one of the properties because it was a particularly nice investment property.

20 Q.14 Yes.  But it was one of the properties that he was advancing to Mr. Sean

21     Mulryan as an attractive proposition to purchase?

22 A.  Yes indeed.

23 Q.15 And he presented to you on the 30th of December that he thinks that he will buy

24     and, will buy and sell to him, which seems to indicate that Mr. Lawlor's

25     intention at that time was to acquire the Zatecka himself, to sell it on to

26     Mr. Mulryan?

27 A.  Indeed.  His intention was to make a profit, certainly.

28 Q.16 Yes.  And that Mr. Martin Philips was to be the solicitor, I think Mr. Philips

29     is a solicitor in the firm of Howard Kennedy which carries on practice in

30     London and carries on the conveyancing or some of the conveyancing aspects of

4

1    Mr. Mulryan's activities, is that right?

2 A.    Yes, as I later learned that company represents Ballymore in London.

3 Q.17 Yes and was --

4 A.    I didn't know that at the time, but that is indeed the case.

5 Q.18 His name appears on this attendance on the 30th so that insofar as Mr. Mulryan

6      was going to be involved, his solicitor was identified?

7 A.    That was information for Mr. Lawlor.

8 Q.19 So Mr. Lawlor was aware of the solicitor who would be carrying on the business

9      for Mr. Mulryan at that time?

10 A.    That, yes, well he certainly mentioned his name.

11 Q.20 Now, if we move forward then into the early part of the next year, there

12      obviously is the intervention of the Christmas, but by the 4th of January you

13      are again in discussion and correspondence with Mr. Lawlor as we see on page

14      235 where you write to him on the 4th of January in regard to Zatecka 14.

15      "Further to our conversation of last week, I'd wait hearing further as to how

16      and when I should make contact with the investor's solicitor.

17

18      In the meantime, we are looking at means of registering the company for you as

19      quickly as possible.  There is no other company registered if Prague under the

20      name of Zatecka Properties which should (I'm afraid it is not possible to be

21      absolutely positive about this) mean that the name is available for use for

22      this purpose.

23

24      When we last spoke, you said that you had arranged for the transfer of funds in

25      connection with the company incorporation.  This is not yet received by our

26      bank.  It was actually September."

27

28      You note on the next page, 236, a manuscript attendance on Mr. Lawlor by

29      yourself under the heading "Prague property" dated the 4th of January, I think

30      you have Liam perhaps.

5

1  A.    Yes that's -- there is a translation on the next page.

2  Q.21 Translation on page 237 reads, "O'Ryan may go for the bigger property.  May be

3      helpful if can refer to the valuation of the fund of 3 hundred million koruna.

4      Now if we just look to the words may be helpful and look to the manuscript

5      copy, could I suggest that a more accurate translation is may help them, rather

6      than may be helpful?

7  A.    Yes, that is probably right.

8  Q.22 So it should read "May help them if can refer to the valuation of the fund of 3

9      hundred million CZK."  Now firstly, obviously Mr. Lawlor had had some

10     discussion with Mr. Mulryan about both properties and Mr. Lawlor was expressing

11     the view that he may go for the bigger property, was the Hybernska the bigger

12     physical property?

13 A.    Yes --

14 Q.23 As between the two?

15 A.    Yes, I am sure that was the meaning of that.

16 Q.24 Right.  So that whilst the intention initially seemed to be directed towards

17     the acquisition of Zatecka, the direction was now moving towards Hybernska?

18 A.    Indeed.

19 Q.25 The words "May help them if can refer to the valuation of the fund of 3 hundred

20     million koruna."  Can you interpret that for us, what was the relevance of

21     that?  In what way was it going to help them?

22 A.    I really don't know.  I think it was in terms of describing the -- describing

23     the property that was the subject of the interest.

24 Q.26 Yes.

25 A.    I presume it would, maybe -- obviously if Mr. Lawlor was trying to interest an

26     investor in a property he would want to say --

27 Q.27 There was a valuation of 3 hundred million?

28 A.    As many good things about it as possible.

29 Q.28 Sure.

30 A.    And a valuation would be a relevant point.

6

1  Q.29 Right.  Whilst that may help Mr. Lawlor to be able to use the valuation, how

2       would it help the purchaser who was going to put up the money to accept the

3       valuation of 3 hundred million for this property?

4  A.   I have absolutely no idea and I really wouldn't read anything into that

5       scribble in that way.

6  Q.30 You were aware that the property was capable of being acquired and was in fact

7       contracted to be acquired by Aspen for --

8  A.   That was my understanding, yes.

9  Q.31 -- for 162 million?

10 A.   Yes, I think there was some confusion at that time as to whether that was the

11      price or it was a slightly higher price, but approximately that, yes.

12 Q.32 Well the contract document apparently show 162 million as the contract price,

13      in other words the State property company was prepared to sell this property

14      for 162 million?

15 A.   They had --

16 Q.33 Or they had contracted under a tender process to do so, though apparently there

17      was some internal valuation of theirs which valued it at 3 hundred million?

18 A.   Yes I think that was how it was set out in the initial official brochure or

19      tender with because that is what normally happens, they put an estimate of the

20      figure.

21 Q.34 So you don't know why it was that Mr. Lawlor mentioned to you that it would

22      suit them, i.e. the intending ultimate purchasers, to have a valuation of 3

23      hundred million for the property?

24 A.   I don't know if the "them" would refer to anybody other than Mr. Lawlor.

25 Q.35 Well he was dealing in this instance as an individual to this point, no company

26      had been incorporated; the company which was to be incorporated, Zatecka, was

27      going to be his exclusive company as far as you are aware.  I am just wondering

28      why you note "them" rather than "him."  You don't --

29 A.   I really can't comment.

30 Q.36 Okay.  We see from the next documents then as page 239 and 240 that Barbora

7

1    Stankevova advises you that the company is going to be set up under the name of

2    Zatecka 14 S.R.O.  At page 239, at the top of the page.

3  A.    Mm-hmm.

4  Q.37 And the subject is Mr. Lawlor and Zatecka 14 S.R.O.?

5  A.    Yes.

6  Q.38 At this point in time I think she was inviting you to provide the Power of

7        Attorney to set up the company and have your signature notarised, which perhaps

8        envisaged that you were going to be the original director of the company, is

9        that so?

10 A.    That is so certainly possible.  I was and am in a number -- there is a

11       restriction on the number of companies that one can do this for.  It may have

12       been that or a matter of convenience as to who finally became the founder of

13       the company, within the office.  It was a matter of some urgency as I

14       understood it then to have a company incorporated and this was the Christmas

15       period and it may simply have been that we decided to use somebody locally in

16       order to deal with the signature.

17 Q.39 Right.  Not only to deal with the signatures but to be the actual shareholder

18       and director?

19 A.    Yes, to be nominee for the client.

20 Q.40 And we see that on the next document, page 240, Sarka Therova opened the

21       company account at the Erste Bank Sparkassen?

22 A.    Yes, I was obviously still in London then.

23 Q.41 Were any formal documents completed to record the legal relationship between

24       Mr. Liam Lawlor and this company which was intended to be formed and whose

25       account had been opened on this particular day?

26 A.    I don't think there was any formal documentation.

27 Q.42 Is that the usual practice in your firm when you set up companies in the Czech

28       Republic, which you have already explained to us is a necessity if a foreigner

29       is to own property in the Czech Republic, is it normal that you don't structure

30       that relationship in some legal document within the firm?

8

1  A.  It's not always regarded as necessary because it is clear as between us and the

2      client that we have formed something for him, for them and hold it for them, so

3      there isn't a requirement to be any documentation to cover it.  It is a matter

4      of practice, it is always clear, that this is being done for the client.

5  Q.43 But in the event, let's say you set up a company for a Mr. John Smith and the

6      company documentation indicates that you are the director and sole shareholder

7      of the company, what would happen in the event that Mr. Smith unfortunately

8      passed away, there would be no available record to establish that he in fact

9      was the owner of the company, isn't that so -- in the absence of there being

10     other documentation?

11 A.  Well there would be our file of, our file of papers --

12 Q.44 Your file of papers would say what in particular?

13 A.  It would confirm, it would show that the client had caused a company to be

14     incorporated for them.

15 Q.45 Yes?

16 A.  So that if in the instance that you put forward, then we would hold the company

17     for the personal representatives of the client.

18 Q.46 And the evidence of that would be the attendances on your file between yourself

19     and the deceased rather than any formal document?

20 A.  Yes, there are circumstances where it is appropriate or where you would wish to

21     clarify it, that does certainly happen on occasion, especially if there is more

22     than one person involved.

23 Q.47 Yes?

24 A.  Which --

25 Q.48 You would have to record their respective rights?

26 A.  Well if there is a formal agreement made between joint venturers, for example,

27     then we certainly have something to record, the nature of the agreement.

28 Q.49 Did you discuss with Mr. Lawlor when you set up the company at his behest

29     whether he required you to execute any formal documentation acknowledging that

30     your secretary, Sarka Therova, was holding her shareholding as, in effect, a

9

1    trustee for Mr. Lawlor?

2  A.   No, he didn't require anything formal because he knew that that was the

3       position.

4  Q.50 But my question is whether you asked him whether or not he required that or

5       waived that?

6  A.   I don't remember if I asked him that question.

7  Q.51 By the following day then, the 5th of January of 2000, there is a lengthy

8       attendance which you took in manuscript, about three-pages, it's at page 241

9       and the translation is on page 242.

10      This memorandum, I suggest, deals again both with the Hybernska and with the

11      Zatecka buildings.

12 A.   Yes.

13 Q.52 Under the heading "Liam Lawlor, Zatecka" you have query translation -- but I

14      think that should be translator, that he was seeking a translator to be

15      available and had communicated that request to you a little earlier?

16 A.   Yes, I was, I had prepared this on Monday for the Tribunal solicitor from a fax

17      copy which is rather less clear than this one, so I would agree translator.

18 Q.53 I think he required a translator to be available for the inspection of the

19      building, deals with Mr. Kavalek?

20 A.   It doesn't say that but I assume that that is very likely the position.

21 Q.54 "Translator, trying to line up.  Kavalek was going to assemble the paperwork on

22      Hybernska.  Offer document -- Ron is translating through the office."

23

24      I think that was Ron Smith going to provide you with a translation of the

25      contract document between RIF and Aspen under which the property would be

26      available at 162 million koruna, isn't that so?

27 A.   Yes, which Aspen had contracted to buy, yes.

28 Q.55 There then is a line on your original note and beneath that "Coming on Monday

29      evening.  Hoping to see Maron Monday evening."

30 A.   Yes.

10

1   Q.56 Whereas the entries above the line deal with Hybernska, these entries deal with

2        the other property Zatecka; isn't that right?

3   A.   Yes.

4   Q.57 Mr. Maron is the vendor of the Zatecka property on behalf of his company?

5   A.   The company that owned it, yes.

6   Q.58 They want a detailed offer for building in Prague, 4 to 6.8 million?

7   A.   In fact that would be the address, Prague 4 is a District.

8   Q.59 Zatecka isn't in Prague 1?

9   A.   Zatecka is in Prague 1.

10  Q.60 Right.  Well then, is it not more likely that the reference would be to

11       building in Prague --

12  A.   No, this is obviously a completely different building because it says on the

13       line below "Shell is in it, bank on the ground floor", which is obviously an

14       office block in Prague 4.

15  Q.61 Is there not offices beneath the Zatecka building, at street level?

16  A.   No, there are shops.

17  Q.62 And it is neither of these two, it is not a bank?

18  A.   No.

19  Q.63 "O'Ryan in on the 17th or 18th of January."

20  A.   Yes.

21  Q.64 The next document then is page 243 and its translation is page 244.

22

23       "Needs a couple of meetings to get organised.  He will need to be ready.

24       Trying to achieve the following.  1.  Wants best start up in Hybernska."  What

25       does that, how do you interpret that?

26  A.   I am not sure, I think those would have been the words used by Mr. Lawlor when

27       he was talking to me.

28  Q.65 Putting them in context of possible acquisition --

29  A.   I imagine that he meant he wanted to give the best possible appearance for this

30       particular building if he was going to try and do a deal with it.

11

1  Q.66 Right.  Then goes on to say, "Valued by restitution fund at 3 hundred million."

2       That I take it is the vendor, the State property company RIF, valuation of 3

3       hundred million CZK?

4  A.   Yes.

5  Q.67 Then "Mulryan 6.6 million - 3 hundred."

6  A.   The line above says "Look at it fitted out."  I think that means look at,

7       assess what it would be like if it was fitted out.

8  Q.68 "Mulryan 6.6 million, 3 hundred million Czech crowns" does that mean that at

9       that time 6.6 million sterling was approximately --

10 A.   It's difficult to say exactly what I meant by that comment there but I would

11      guess that he would be thinking in terms of offering it at that price.

12 Q.69 Right.  On the basis that Mr. Mulryan would pay 3 hundred million for it?

13 A.   Yes, that's -- that's perhaps I think what it would mean.

14 Q.70 "Doesn't want Kavalek talking to Ambrose or Mulryan."  That's Mr. Ambrose Kelly

15      who, I think, was the architect?

16 A.   Yes.

17 Q.71 An associate of both Mr. Lawlor and Mr. Mulryan?

18 A.   So he clearly, that indicates he doesn't want the owner to use the intermediary

19      and he didn't want direct conversations with the person owning the contract.

20 Q.72 So Dr. Kavalek was the lawyer acting for Mr. Smith who held the contract for

21      Aspen?

22 A.   Yes.

23 Q.73 "Could be a terrific rent roll.

24      Ambrose will look at it and the spend needed to fit it out.

25      Property finance to be arranged by Ballymore Group.

26      LL keep equity in development.

27      2.  Bank of Bohemia want to check the availability of the other one."

28 A.   There was -- are you inviting me to comment?

29 Q.74 Yes, on the last entries.

30 A.   The comment about keeping equity, I think had been in his mind that he might be

12

1      able to do some sort of deal which allowed him to keep a share in the building.

2

3      Then bank of Bohemia, there was a building which adjoined the site at the rear

4      of the Hybernska building, a very large courtyard, considerably bigger than

5      this room, which backed on to form a premises of Bank Of Bohemia, if one was

6      thinking of site development it would be extremely advantageous building to

7      acquire, that was the thought at the time

8   Q.75 The next pages then are 245 and 246, the translation on 246.

9

10     "No problem in paying RS if goes ahead on that"  That's Ron Smith.  He was

11     going to get paid.

12     "More local finance that can be raised, the more can spend.

13     O'Ryan doesn't mind if there is a turn on the building.

14     S priority is to put -- " I suggest the word is spin -- "on upside.

15     Take look at contract.

16     Can sort out assignment fees.  No problem"

17

18     We'll start at the beginning.

19     "No problem in paying RS if goes ahead on that." Ron Smith is the vendor for

20     Aspen, isn't that right?

21  A.   Yes.

22  Q.76 What was he to be paid if the deal went ahead?

23  A.   I don't think anything had been said about that at the time and probably as

24     little as possible.

25  Q.77 But was this envisaged to be a premium over and above the contract price of --

26  A.   Certainly, that he would be paid to pass on his interest in the contract,

27     certainly.

28  Q.78 Yes.  "The more local finance that can be raised, the more they can spend"?

29  A.   I would presume that's on the, in terms of how easy it would be to raise money

30     on spending on fitting out of the building.

13

1  Q.79 Right.  "O'Ryan doesn't mind if there is a turn on the building", does that

2       mean that he would be happy to sell it on at the right price?

3  A.   I think I would have, I may have asked the question or he may have volunteered

4       the information before I asked -- I certainly did ask and I know that one point

5       is to whether he would know that, that he would be taking a profit out of doing

6       this and he said yes of course, he knew that he wouldn't be doing it for

7       nothing.

8  Q.80 In other words, that Mr. Lawlor would benefit in some way out of this

9       transaction?

10 A.   Yes, it was understood, he said it would be normal that somebody doing this

11      would earn a turn on the building, on the transaction.

12 Q.81 Right.  A week later on the 12th of January we see at page 249 that there is a

13      copy of a fax to you where Mr. Lawlor, I suggest, is saying that he is

14      confirming a telephone discussion from Prague this morning, he gives your

15      London and Prague office addresses and numbers.  It says that you are the

16      senior partner in the above firm.  You were at the London number.  He has been

17      told that you have been told to expect a call from Mr. Martin Philips this

18      afternoon and he would confirm to Mr. Seddon of your intentions to travel to

19      Prague on the 27th and 28th of January and that it is your intention to

20      purchase the Hybernska building from the National Property Fund, subject to you

21      inspecting the building and being satisfied about its potential.

22

23      So that as of that date it would appear that there is an agreement in

24      principle, subject to inspection and satisfaction on the part of Mr. Mulryan,

25      that this building would be purchased?

26 A.   No, I don't think so that's quite the case.  An expression of interest wouldn't

27      be -- I subsequently met Mr. Mulryan and I know that he may well say yes, I

28      would like to buy that or yes, I am interested in that, but that certainly

29      couldn't be taken as an agreement to purchase and at this stage he didn't have

30      the details and I know that he wouldn't have made an agreement to buy blind.

14

1   Q.82 Whilst there mightn't have been any legally binding commitment, there was

2       clearly stated intention on his part to acquire it according to Mr. Lawlor's

3       memorandum here; isn't that right?

4   A.   This is, this is a way that Mr. Lawlor would express things rather than -- and

5       he would put a, I think he would put a -- if somebody said that they might like

6       to buy it, then he might well say I confirm your intention to buy it.  I don't

7       think I could read any more into it than that.

8   Q.83 As far as you are concerned, this is the information that you were being given?

9   A.   Yes, I took that as confirmation that somebody was coming who was interested in

10      this particular property, but it is inaccurate in saying to purchase it from

11      the fund because that wasn't actually the situation either, because it would be

12      to take it on from Aspen who held the contract.

13  Q.84 We see that on the same date, there is an attendance of yours in manuscript at

14      page 250, again an attendance on Liam Lawlor on Prague properties.

15

16      "Faxing Sean Mulryan, he will speak to Martin Philips this afternoon.  Believes

17      that Hybernska is superb."  Then he gives the name of the chairman of the fund,

18      that is the vendor's fund; isn't that right?

19  A.   Yes.

20  Q.85 Dr. Kalfus says "Has board meeting next Thursday."

21  A.   Tuesday, I think.

22  Q.86 Tuesday.

23  A.   Yes.

24  Q.87 Between that date and the 24th of January, you obviously had further

25      discussions with Mr. Lawlor with a view to establishing how he had progressed

26      his prospective relationship with Mr. Mulryan, isn't that so?

27  A.   I think Mr. Mulryan still hadn't seen the property at this stage.

28  Q.88 Yes, that's so.

29  A.   And -- but Mr. Lawlor was working out the, in his own mind what sort of deal to

30      put forward.

15

1  Q.89 Yes.

2  A.    To make the most of what he saw as this opportunity.

3  Q.90 And we see that you prepared a draft letter on the 25th of January 2002 which

4        you subsequently amended?

5  A.    Yes.

6  Q.91 You can see that at page 253 where we see the draft.

7        It has the 25th of January 2000 with the 25th struck out and 26th substituted

8        for it.  Beneath that Sean Mulryan, which is struck out, and you have Sean

9        Mulryan, esquire.  London address is struck out and the Ballymore Group, Pointe

10       North, No. 3 Greenwich View Place is substituted.

11       The word draft is struck out.

12       If we turn to the text, it concerns Hybernska 12, Prague 1.

13

14       "Following the instructions I have received from Liam Lawlor" and the words I

15       have received from Liam Lawlor are struck out and substituted with the words

16       "from my client".  Is that your writing?

17 A.    Yes.

18 Q.92 "I am writing to set out the current position on the action needed to conclude

19       the purchase of the above building."

20       Now firstly, can we take it that the amendments which there are to this letter

21       are amendments which were made at the request of Mr. Lawlor to you when you

22       acquainted him with this draft?

23 A.    Yes, this would have been discussed, discussed with him and I can't say for

24       sure whether they had been his changes, my changes or after a discussion about

25       the matter, but certainly after discussion with him.

26 Q.93 Well, can you indicate why it was that Mr. Lawlor wanted any reference to him

27       being deleted from this letter?

28 A.    Well it may possibly have been me.  If I was saying that it was going to be the

29       company that was going to be selling rather than him, but certainly if there

30       was a change, it would have been him that was approving it.

16

Q.94 Yes.  You obviously would have gone through the original draft and in response
     to his direction would have made such amendments as you saw fit to make
     following upon them?

A.   Yes, certainly.

Q.95 So can we take it that one of the directions given to you by Mr. Lawlor was
     that his name should not appear in this document?

A.   Well it would have been -- that's very possible, I can't say for sure if that
     was his direction.

Q.96 Obviously you can't have taken instruction from a company at this point in time
     because there was no company in being, isn't that right?

A.   Well the company was --

Q.97 15th of February?

A.   At the time it was in a sort of limbo existence of having had the, I think the
     company was opened the notarial deed was signed and the papers were with the
     Companies Court, so it was in existence for some very limited purposes, it
     couldn't actually trade but it was in the state of incorporation, before being
     registered.

Q.98 But the letter was being written personally to, well certainly to Mr. Sean
     Mulryan esquire rather than to a company.  There is no reason why one shouldn't
     name the individual concerned in this also?

A.   It was sent to Ballymore.

Q.99 It was sent to Sean Mulryan esquire at Ballymore.

A.   At Ballymore.  I don't know if anything can be read into that, he was the
     person at the company that Mr. Lawlor was dealing with, I understand.

Q.100But in writing to somebody personally in the firm from another company, it
     would be normal or not unusual to name the individual in the company who was
     writing the letter equally, isn't that right?  That's why you used Liam Lawlor
     in the first instance, you named him because you were writing the letter to
     Sean Mulryan.

A.   It would be perfectly normal for me to refer to Liam Lawlor as my client as he

17

1     was my client.

2  Q.101 Yes.  And would require a conscious effort and reason to delete the reference

3       to Mr. Liam Lawlor from the ultimate letter that was sent?

4  A.   Well it was deleted certainly.

5  Q.102 Yes.  The letter reads "The building was owned by one of the Czech government

6       State property funds which had been disposed of properties in Czech Republic in

7       recent years to raise funds for the government.

8       The Hybernska property is located in Prague 1, which is the central part of the

9       city and regarded as a prime area.

10

11      The fund requested tender bids in September 1999.  Aspen Properties S.R.O.

12      (Aspen) of address, which is an estate agency and small mortgage developer, bid

13      for the building and after numerous meetings and contacts were awarded the

14      building competition against numerous serious bidders.

15

16      The preliminary contract was to issue late October 1999, to be returned the

17      first week of December 1999 signed with 5 per cent deposit to be paid which

18      would be forfeited if the contract was not closed and the property purchased.

19

20      I understand that Aspen raised a number of queries on the contract regarding

21      potential technical problems in relation to the leases of the current tenants

22      on the 4, 5th and 6th floors of the building.  This gained some time in their

23      negotiations with the State fund.

24

25      In the third week of December, negotiations were opened by Liam Lawlor with

26      Aspen for his new company Zatecka 14 S.R.O. (Zatecka) to purchase the building.

27

28      Here there were further amendment of deletion of 'Liam Lawlor' and substitution

29      of 'my client' and 'his' new company by the substitution of a word 'a' new

30      company to purchase the building.

18

1

2      Again have you a recollection specifically of why it was that Mr. Lawlor wanted

3      the connection between himself and the new company Zatecka struck out of this

4      letter?

5  A.   I really can't say, but it would be consistent with the first sentence,

6      whatever was the reason for the first sentence would be the reason for that

7      one.

8  Q.103 Yes.  The factual position was as you stated in your original draft and the

9      decision was to delete the reference to Mr. Lawlor, though you are not aware in

10     this point in time as to why Mr. Lawlor gave you that particular instruction,

11     is that right?

12 A.   That's right.

13 Q.104 Various negotiations and building inspections have taken place in the meantime.

14     Further meetings have taken place with a chairman and senior executives of the

15     State Property Fund.  Other unsuccessful bidders have been pursuing the fund

16     regarding the building as a result of Aspen not closing the contract.

17

18     However the board of the fund announced last week at a meeting at which I can

19     present that Aspen may sign the closing contract next Tuesday, February 1st

20     2000.  As a prerequisite of closing, evidence from a bank is needed and a legal

21     undertaking that the funds to close the contract are available and in an

22     appropriate account.

23

24     If the transfer of ownership of the building is to be definitely secured, then

25     the appropriate financial instruments must be in place by close of business on

26     Monday next, 31st January 2000.

27

28     A further meeting with the State fund's lawyer took place last Friday when we

29     were left in no doubt that the appropriate signing and ability to close must be

30     forthcoming in advance of next Tuesday when I, as legal advisor to Zatecka,

19

1    must be put in a position to conclude a contract with Aspen and to make the

2    necessary arrangements regarding funds.

3

4    The actual closing of the contract that is the registration of title into the

5    purchaser's name is likely to take one month and maximum of two.  When a clean

6    title is provided from the Land Registry Office, this acts as the trigger to

7    pay over the purchase price to the vendor and take possession of the building.

8

9    During this registration period, a purchase price is normally held in a blocked

10   escrow account and only released when an unencumbered title is registered.  An

11   alternative is to provide a letter of credit which will provide for a bank to

12   pay funds to the vendor on the completion of process.  A bank in the Czech

13   Republic would not issue such a letter of credit without holding either cash or

14   security for its value.

15

16   Because real estate in the Czech Republic can only be owned by a Czech

17   individual or Czech corporation, a new purpose made company is needed for this

18   transaction.

19

20   Zatecka is a Czech registered company with a Czech director.  This company has

21   been set up by my office for the sole reason to buy the Hybernska building and

22   the UK purchaser will purchase the company.  Any UK purchaser cannot avoid

23   using a Czech registered company to own real estate in Prague.  I have set up

24   all the necessary legal formalities to allow the UK purchaser to acquire the

25   newly registered company.

26

27   Current use of the building:  In the contract to purchase, it is specified that

28   the specialist medical practitioners occupying the 4th and 5th floors have the

29   right to remain in their tenancy to 1st February 200305.  The 6th floor is

30   occupied by a legal practice and the same tenancy arrangements apply.

20

1

2    The current rent roll and annual is there.  From these tenancy is 7,424,000

3    CZK,  in either event it is 135,000 sterling.

4

5    There are possibilities that some of the tenants may vacate the building before

6    the 2005 date.

7

8    The remaining floors -- and that's substituted by ground floor, can't decipher

9    the next word -- sorry, ground floor retail, first floor retail/offices, second

10   floor offices and the large courtyard at the rear of the building are available

11   for 'redevelopment and letting' is deleted and substituted 'for car parking'.

12

13   My understanding of the contractual and finalised agreement is as follows

14

15   Property sales tax 5 per cent, 360,000 koruna, sterling, I beg your pardon.

16   360 sterling.

17

18   Aspen Properties S.R.O. assignment agreement, 250,000 pounds sterling.

19

20   Legal fees for Aspen Properties S.R.O. and Zatecka Properties S.R.O, not sure

21   if that's 158 thousand or 108 amended to read 168,000 pounds sterling.

22

23   Contract price to purchase the building (as instructed), 7.2 million pounds.

24

25   Consultancy payment.  125,000 pounds.

26

27   Total 8,033,000 pounds sterling.

28

29   For the above figures -- I can't decipher that.

30 A.  'I had been assuming.'

21

1  Q.105 Yes, sorry, "I had been assuming an exchange rate of one pounds sterling to 55
2        CZK but --
3  A.    The pound has strengthened.
4  Q.106 -- strengthened recently and is now closer to 1 to 60 CZK.
5
6        We were able to negotiation extensions of time but next Tuesday, February 1st,
7        2000 is the deadline by which the purchasing companies must be forthcoming to
8        confirm the ability to close the contract.  When title is registered, this
9        effectively means tying up the sale price at that date.
10
11       I look forward to meeting you in Prague on Thursday 27th of January and will
12       have the appropriate documentation available."
13
14       Now this draft is amended and ultimately sent to Mr. Mulryan in the form that
15       appears in pages 257, sorry 257, 258, 259 and 260.  There are additional
16       figures inserted, as we'll see on page 259.
17
18       In substitution of what had been provided for in the original draft as the
19       understanding of the contractual and financial agreement we now see that there
20       is inserted the words "basic contract price".  Basic contract price 300 million
21       CZK and its sterling equivalent is put in at 5.5 million.
22
23       Instructed contract price for sell on, 396 million CZK or 7.2 million.
24
25       Can you tell me what explanation you were given by Mr. Lawlor for the figures
26       that are described here as the basic contract price, namely 3 hundred million
27       CZK?
28 A.    I assume that that is the price that he was putting forward as the price that
29       he would be having to pay Aspen to buy the contract, as opposed to the price
30       that he was proposing for selling on the contract.

22

1   Q.107  Well --

2   A.    Which is the figures below the line and the figures if you add it up and that

3         is not part of the addition.

4   Q.108  The figures above the line are then supposed to represent the buy in price of

5         the property to Zatecka, is that right?

6   A.    Yes, I think the figures here are figures which have been puffed up by

7         Mr. Lawlor to make the, to increase the figures.

8   Q.109  Well, can we examine firstly what the basic contract price is as between RIF

9         and Aspen.  It's 162 million pounds, isn't that right?

10  A.    That was the figure that was paid, yes.

11  Q.110  In fact it was the basic price.  We'll see further down in the split of

12        additional figure that Aspen's assignment agreement is quantified at a quarter

13        of a million pounds sterling, that was their supposed up take on their sell on

14        to Zatecka, is that right?

15  A.    Supposedly so, yes.

16  Q.111  So the price we have as the basic contract price of 5.5 million sterling or 3

17        hundred million CZK is represented here as being the price at which Aspen was

18        acquiring property, is that right?

19  A.    That was the impression which he wished to give, yes.

20  Q.112  But that is the impression that you conveyed through this letter to

21        Mr. Mulryan?

22  A.    That's -- that was the -- yes, that was what I was instructed to do, to give

23        that impression.

24  Q.113  But whilst you were instructed to do that, you knew it to be untrue and I am

25        curious as to why it is that you should be a party to creating a false

26        impression in your contractual, in your correspondence on behalf of Mr. Lawlor?

27  A.    Well the relevance of that line, which I really don't know why it was put in in

28        that way, and I see that it doesn't appear in the original draft.

29  Q.114  But it's expressed by you in terms "My understanding of the contractual and

30        financial agreement is as follows", so you are expressing your understanding of

23

1      what the arrangement was and that understanding is that the basic contract

2      price was 3 hundred million koruna, now that happens to be the figure that is

3      mentioned in two earlier handwritten attendances which we see on page 224 and

4      page 237, in one instance in which it is stated it would suit them to have the

5      figure of 300 million, did it suit this particular transaction as expressed

6      here?

7  A.   Well the basic contract price was the price that was inserted at the beginning

8      in the tender documents.  I think this was intended no more than to say this

9      was, this is what was originally intended as a contract price by the people

10     selling on, by the fund who were selling it.  This was to reinforce the

11     impression given by Mr. Lawlor that this was a very valuable property, and as a

12     basis for the increased price which he wanted to sell it on for.

13 Q.115 The increased price at which it would be sold on here, contract price, would be

14     7.2 million, which would show a difference between what was supposedly paid for

15     in the property to satisfy the RIF requirement 5.5 million?

16 A.   No.  That's not part of the equation, part of the equation, that's not in

17     the --

18 Q.116 Well basic contract price can only mean the basic price at which property was

19     purchased?

20 A.   No, I think --

21 Q.117 At 300 million?

22 A.   That's not part of the addition, that was intended as a description and as a --

23     as you might say, as a, almost like an advertising puff, but it's not part of

24     that addition.  If you see the figures that are added up, it's not part of

25     the -- it's not part of the equation of the request or the suggested agreement.

26 Q.118 Well the suggested agreement if we look to the bottom line is that there would

27     be a total contract price to purchase Zatecka 14 S.R.O. as owner of Hybernska

28     Prague building of 8.11 --

29 A.   Indeed that was his opening shot.

30 Q.119 Well what you are recording that as being your understanding of the contractual

24

1      and financial agreement?

2  A.   The, again that would have, that is is -- at that stage there was no agreement.

3      That is -- this is what Mr. Lawlor would have told me is what he was hoping to

4      be agreed, but to say that it was, is the agreement wouldn't actually be

5      accurate, if it wasn't yet agreed.

6  Q.120 Why then did you express it as being your understanding of the financial

7      agreement if you knew that there was no such agreement?

8  A.   My understanding is that's what he, that these are the figures which he had

9      told him.

10 Q.121 But what you express in your letter to the recipient, Mr. Mulryan, is that your

11     understanding is that this is the contractual and financial agreement, you now

12     say that that was not the agreement, it was the aspiration of Mr. Lawlor?

13 A.   Yes indeed.

14 Q.122 But you chose to write it in terms that expressed it as being the agreement.  I

15     want to know why you did that and why you didn't say it is my client's

16     understanding that there will be an agreement in these terms; instead you

17     indicate that this is an agreement which has been concluded?

18 A.   Yes, but it wasn't.  In that case, it wasn't well expressed.

19 Q.123 Well it was --

20 A.   There certainly wasn't an agreement at that stage.

21

22     CHAIRMAN:   Mr. Seddon, if you look at the next page of that letter, which was

23     written to Mr. Mulryan, you were warning him that by next Tuesday was the

24     deadline.

25 A.   Yes, that was indeed the situation as far as the original owner was concerned,

26     that was when Aspen were due to complete.

27

28     CHAIRMAN:   But you have -- you appear to have set out on the previous page in

29     those figures what you understand the agreement to be to enable Mr. Mulryan to

30     purchase the company which would itself be purchasing the building --

25

1 A.   Yes, that was Mr. Lawlor's offer, his proposal, that was setting out what he

2      had proposed to him by the situation.

3

4      CHAIRMAN:   So where was the difference arising between the -- you were saying

5      it -- it seems fairly clear to anyone reading that letter that what you were

6      saying to Mr. Mulryan was, although the building is only going to cost 5 and a

7      half million, you are going to have to pay Mr. Lawlor 7.2 million for it.

8 A.   Yes.

9

10     CHAIRMAN:   And it's couched in terms, I have to suggest to you, that this is

11     your letter, it's couched in terms which would suggest that this had been

12     agreed and you were simply putting into writing what you understood to be

13     agreed between Mr. Mulryan and Mr. Lawlor.  What other interpretation --

14 A.  On the way that sentence -- my understanding of the agreement would indicate

15     that that is what he had told me had been agreed.  I later discovered that that

16     hadn't been agreed.

17

18     CHAIRMAN:   But would you agree, would you agree that the way the letter is

19     written would suggest that Mr. Lawlor understood there to be an agreement?

20 A.  Yes, that -- certainly.

21

22     CHAIRMAN:   That while the property would be purchased for 5 and a half

23     million, that in fact Mr. Mulryan would be paying Mr. Lawlor 7.2 million?

24 A.  The --

25

26     CHAIRMAN:   Plus the other additional --

27 A.  Yes, certainly be read in that way.

28

29     CHAIRMAN:   And did you have any idea when you were writing that letter as to

30     why there was this huge difference between the two figures?

26

1   A.   Because I could only assume that Mr. Lawlor wanted to make as much money

2        possible.

3

4   CHAIRMAN:   On what basis?  As a sort of finder's fee?

5   A.   On the basis that if he thought that he had found a unique opportunity of a

6        building which was worth very much more than would be required to buy it, so

7        that there was in the field a big opportunity for profit, which was why he was

8        very excited by the transaction.

9

10  CHAIRMAN:   But this is a finder's fee of close to 2 million sterling.

11  A.   It wouldn't be a finder's fee that would be a develop -- property dealer's

12       turn, yes.

13

14  CHAIRMAN:   Sorry?

15  A.   However you -- it would be a turn.  A profit on selling on one, from one person

16       to the next.

17

18  CHAIRMAN:   And would you not see that as an enormous profit in the

19  circumstances?

20  A.   I would regard it as a very large profit, such profits are certainly not

21       unknown in the world of property dealing though.

22

23  CHAIRMAN:   Did you ever remark on that in your discussions with Mr. Lawlor?

24  A.   I am sure that I did.  I would have little doubt that I would have commented

25       that that was over egging the pudding.

26

27  CHAIRMAN:   Can we agree then, Mr. Seddon, that it was your understanding that

28       this was to be a profit to Mr. Lawlor, this is the difference between the two?

29  A.   Certainly.  Certainly.

30

27

1    JUDGE FAHERTY:   Mr. Seddon, can I just ask you one question, when you wrote

2    this letter, who did you understand to be the parties to the basic contract

3    price which was given as 5.5 million sterling?

4  A.  The -- I wasn't intending that to mean the, that there were any parties to that

5    price.  That was expressed to indicate what had been the basic option price,

6    the stated, the requested price when the matter originally started and that was

7    to give the, I assume that was Mr. Lawlor's intention that the -- to put

8    forward the building being as valuable as he believed it to be.

9

10   JUDGE FAHERTY:   Because as I understood it from previous evidence, there was a

11   reference in the various attendances to 300 million CZK which is 5 and a half

12   million sterling as being the valuation of the building, isn't that correct?

13 A.  That was the original --

14

15   JUDGE FAHERTY:   Somebody valued it, yes --

16 A.  No, no, that was a different figure.

17

18   JUDGE FAHERTY:   I understood Mr. Smith from Aspen to have contracted with the

19   restoration fund for 1.6 million CZK.

20 A.  Yes, that was the final, that was the eventual --

21

22   JUDGE FAHERTY:   So that's what the vendors of the building were selling to

23   Aspen, isn't that correct?  And I think that would be roughly, my maths aren't

24   great but if 300 million is 5 and a half sterling, 160 million would be 2.7

25   plus or thereabouts sterling.

26 A.  Considerably less.

27

28   JUDGE FAHERTY:   So ultimately what started off when the tender document in

29   October --

30 A.  What started off from 300 came down to 162.

28

```
1
2      JUDGE FAHERTY:   Yes, yes but what I am saying is what was agreed sometime in
3      October or November to, the fund to sell this building for 2.7 sterling
4      roughly, and then we come to January 26th there is a sell on price for 8.1
5      million sterling, that's actually a difference of about 5 and a half million
6      pounds?
7   A. It's a huge difference.
8
9      JUDGE FAHERTY:   So not just the two million from what was actually agreed,
10     yes.
11  A. It would be a huge difference.  I mean this, as no doubt you will see, this was
12     as I said before, an opening shot, so to speak, from Mr. Lawlor, which was a
13     kite which was shot down fairly quickly.
14
15     JUDGE FAHERTY:   Were you concerned at all that perhaps when Mr. Mulryan,
16     perhaps he did, I don't know, would receive this letter, that he would have
17     some sort of dealings, I understood the previous memo to suggest that
18     Mr. Mulryan's agents, I think Mr. Kelly and some other gentleman, weren't to
19     have any really dealings with Mr. Smith; is that correct?
20  A. Certainly that was because Mr. Smith was the --
21
22     JUDGE FAHERTY:   He was Aspen and he was the person that had contracted.
23  A. And Mr. Lawlor would, if one party was talking to the other party, they would
24     know how much money he was hoping to make and that have affected his
25     negotiation.
26
27     JUDGE FAHERTY:   And Mr. Ambrose Kelly would have found out it was 1.6 million
28     CZK?
29  A. If they had that sort of discussion, very possibly.
30
```

29

1   JUDGE FAHERTY:   Could I suggest, were you satisfied that had they wouldn't

2       have known because --

3  A.   Well, in fact --

4

5   JUDGE FAHERTY:   -- there was an instruction given that nobody would speak to

6       Mr. Kelly?

7  A.   In fact, I probably would have said that this is, in terms of what was actually

8       paid, would come out because it would be a matter of record what was paid and

9       it's one thing to get somebody's interest by referring to high figures and high

10      valuations, it's quite another thing when you negotiate, especially in the

11      knowledge that inevitably you are going to see the actual document which has

12      the real figures in it.

13

14  JUDGE FAHERTY:   Yes.  Thanks, Mr. Seddon.

15

16  Q.124MR. O'NEILL:   In the figures we see on page 259, Mr. Seddon, if the

17      transaction had proceeded on the basis of those figures, the results of that

18      would have been that a price of 7.2 million pounds would have been paid for the

19      building itself; isn't that right?

20  A.   Correct.

21  Q.125To Zatecka?

22  A.   Correct.

23  Q.126The other items then, if we just run down through those and identify what they

24      are, the property sales tax is 5 per cent fee which has to be paid by the

25      seller?

26  A.   Stamp duty.

27  Q.127Yes, and would depend on the ultimate price, isn't that right?

28  A.   Correct.

29  Q.128The 360,000 calculated is 5 per cent of 7.2.  The Aspen assignment agreement

30      was for 250,000 pounds.  Legal fees for Aspen's lawyers 45,000.  Zatecka's

30

1    formation share capital 5,000.  Zatecka property legal fees, which presumably

2    go to you, 108,000.  Aspen consultancy fees 125,000 and the telephone exchange

3    contract, which we know to be part of the tender process, undisputed figure to

4    be 17,300.

5

6    Can I deal firstly with the Aspen assignment agreement and Aspen consultancy

7    fees, how were they distinguished?  What was the difference to be between these

8    two figures, as far as you were instructed by Mr. Lawlor?  We know that Aspen

9    was to get the benefit for the fact it was passing on the contract.

10 A.    This was at this stage simply a proposal of Mr. Lawlor, I don't know if it was

11    ever, in these terms, elaborated, because the fact that this didn't proceed on

12    this basis means that those figures, those ideas used to be irrelevant.

13 Q.129 Equally, I take it, you never received 108,000 pounds for legal fees?

14 A.    I wish.

15 Q.130 The difference between the 5.5 million sterling and 7.2 is 1.7 million which is

16    approximately 2 million Irish pounds at the time.  If this documentation was

17    reflective of a transaction which had taken place between the parties, it would

18    have resulted in Mr. Lawlor obtaining 2 million pounds Irish on this

19    transaction as part of an agreement?

20 A.    As a profit.

21 Q.131 Yes, as part of an agreement?

22 A.    As part of this agreement, sure.

23 Q.132 Is that the 2 million that was referred to in the earlier documents, when you

24    took your instructions?

25 A.    I can't imagine it was because none of this was known earlier.

26 Q.133 Well, the stated intention of the transaction at an early stage was that there

27    would be an uplift of 2 million, is this the uplift of 2 million?

28 A.    That I can't say.  Whether 2 million is, was his target for the sort of profit

29    that he wanted to make, maybe, I don't think, there was certainly no secret

30    that he wanted to make it a profitable exercise.

31

1  Q.134  But can I suggest to you that your earlier attendances would record an uplift

2       of 2 million, in other words it was not as much profit as he could get out of

3       the deal, but rather that he was to get 2 million through whatever property

4       transaction was involved?

5  A.   I am sure that whatever property transaction was involved that he would be

6       looking for as much profit as he could obtain.  If 2 million was his target --

7       I can't really say what was in his mind.  If he mentioned a figure of 2 million

8       as being a target, then that's what he was clearly trying to achieve.

9  Q.135  Well if we look, if we reflect on yesterday's evidence when the letter to whom

10      it concerns was discussed at length, the net effect of that was that there

11      would be a 2 million equity if that transaction had progressed; isn't that

12      right?

13 A.   That didn't progress, I don't know if it was ever sent out, that letter.  And

14      certainly didn't make sense to me although in the way that we talked about it

15      yesterday, because it was clearly incomplete.  I don't know who that letter was

16      given to, how many people he was proposing to give it to, or whether he gave it

17      to anybody, possibly he didn't.  From the point that it was drafted I never

18      heard any more about it and never gave it another thought.

19 Q.136  But I am putting to you that one of the consequences or the consequence of that

20      agreement, had it been implemented, would have been that Mr. Lawlor's company

21      would have got 2 million from the English company which was putting up the

22      3,694,000 pounds?

23 A.   That wasn't an agreement.

24 Q.137  I am not saying it was an agreement, but if what was envisaged in this document

25      was implemented -- if it had been and I am not saying necessarily it had been,

26      it merely is a document which reflects an arrangement which was possibly to be

27      come to between these two entities -- the effect of it would have been, if

28      there is no side agreement to it, that the company Zatecka would have --

29 A.   It was clearly an incomplete --

30

32

1     MR. LAWLOR:  Chairman, can I  ask you what letter number?

2

3     CHAIRMAN:   Mr. Lawlor, you will be given an opportunity.

4

5     MR. O'NEILL:   It's page 229..

6

7     CHAIRMAN:   Perhaps it might be an opportune time to rise for about ten

8     minutes.

9

10    THE TRIBUNAL THEN ADJOURNED FOR A SHORT BREAK

11    AND RESUMED AGAIN AS FOLLOWS:

12

13  Q.138 MR. O'NEILL:   Mr. Seddon, in addition to the instructions which you took from

14    Mr. Lawlor, as a result of, in the preparation of the letter of the 26th of

15    January, which you furnished to Mr. Lawlor, did you also draft a form of draft

16    agreement for him to implement some of the terms of that arrangement as noted

17    in your letter of the 26th, you will find them on page --

18  A.   I believe a preliminary draft was created.

19  Q.139 If we look to page 263?

20  A.   Yes.

21  Q.140 This is a draft agreement expressed to be between Liam Lawlor of the one part

22    and, known as the vendor and (Ballymore Group, the purchaser)?

23  A.   Yes.

24  Q.141 The recital are "The vendor acquired a freehold property in Prague Czech

25    Republic situated at Hybernska 12, B, because it is necessary under the law of

26    the Czech Republic for real property to be owned by a Czech legal person, the

27    vendor caused a Czech limited liability company to be incorporated for the

28    purposes named Zatecka 14 S.R.O. The company agreed to acquire the property

29    from Aspen Properties S.R.O. hereinafter called Aspen.

30    The purchaser agreed with the vendor to purchase the company on the terms set

33

1    out herein.

2

3    It is agreed as follows:

4

5    1: The vendor shall arrange for the transfer of the company to the vendor and

6    the purchase price."

7

8    I think that probably should be to the purchaser, in any event.

9

10    "For the purchase price for the company hereafter, after called the price, in

11    the sum of 8,100,000, which equates to the sum in the draft letter you provide.

12

13    2:  Included in the price are the following items which are provisional figures

14    as date of this contract.

15    Property transfer tax to be incurred by the company on the transfer of the

16    property. 360,000 pounds.  Telephone exchange contract, 17,300 pounds.

17

18    The parties agree that in so far as the actual sum expended by the vendor in

19    connection with such are less than the stated figure, the difference should be

20    refunded to the purchaser.

21

22    3:  The parties acknowledge that the basis of the calculation of the purchase

23    price has been fully disclosed by the vendor to the purchaser and the purchaser

24    as an experienced investor specifically acknowledges that no warranty of market

25    value is given by the vendor.

26

27    4.  The purchase price shall be paid by the purchaser to the vendor on the

28    completion date referred to in clause 5 below, by bank transfer to the vendor's

29    solicitor Seddons of Portman Square, London, to their account at National

30    Westminster Bank to be complete to the Seddon account.

34

1

2     The completion date of the transaction shall be      2000 being the closing

3     date and the property to be acquired by Aspen provide that, if such acquisition

4     is delayed, the vendor shall notify the purchaser and the completion date shall

5     be the revised acquisition date by Aspen provided a minimum of one workday's

6     notice is given by the vendor to the purchaser.

7

8     The vendor warrants that the purchaser shall acquire the unencumbered ownership

9     of the company and the company shall become the registered owner of the

10    property free from mortgage debt or similar encumbrances, although subject to

11    same contractual rights including leases relating to the property currently in

12    existence.

13

14    This agreement is subject to English law thereof, etcetera."

15

16    So can you tell me what instructions you were given in relation to this

17    Mr. Seddon, because it certainly would appear that Mr. Lawlor had moved forward

18    somewhat from merely having an intention to deal on this basis to actually

19    drawing up a draft agreement which would take place between himself and the

20    Ballymore Group?

21 A.  I really cannot remember any specific instructions about this other than I

22    would have -- I would have thought that bearing in mind the very short space of

23    time that was available, that it would be useful to have a basic draft ready to

24    be used if this was to go ahead on this basis, in the event of course it

25    didn't, so this was never used.

26 Q.142 One of the specific recitals in this agreement is at clause 3, where the

27    question of the basis of calculation of the price is expressly dealt with.

28    The parties acknowledge that the basis of calculation of the purchase price has

29    been fully disclosed by the vendor to the purchaser.  What was that intended to

30    reflect?  Obviously a purchase price in a contract is a purchase price, one

35

1      doesn't give warranties one way or the other as to market value in the sale of

2      property, isn't that the general  situation?

3   A.   Well contracts may contain all sorts of warranties and in particular it was

4      probably thought appropriate that if it was to proceed on this basis, that

5      there should be specifically no warranty of market value.  Maybe I included

6      that because if the price was 8 million, then in my mind that would be more

7      than the market value.

8   Q.143But this in effect was requiring the purchaser of the property to acknowledge

9      that what he was buying was something which he was buying which was other than

10     market value, isn't that the reality of this clause?

11  A.   No.  It would be acknowledging that whatever might have been said couldn't be

12     taken as a warranty of market value.

13  Q.144But in the relationship of vendor and purchaser in a contractor property, there

14     isn't a warranty as to market value ever given or ever implied, it is a willing

15     seller and willing purchaser?

16  A.   There wasn't one given here either, nor was this document ever used.  It was a

17     draft as prepared in the, at the time in the circumstances, if something had

18     gone ahead according to an original proposal, it would be useful to have

19     something in place ready.

20  Q.145Could I suggest to you, Mr. Seddon, that if you were the solicitor acting on

21     behalf of a company who was being offered a contract on these terms it would

22     immediately alert you to the fact that the property was in fact being sold at a

23     value which bore no relationship to the market value ?

24  A.   Well, I wasn't the person, I didn't think of it in those terms and it would not

25     be, it would be abnormal to, for a purchaser to give acknowledgements regarding

26     warranties or lack of them from a vendor, but this was a draft which did not

27     proceed.

28  Q.146Yes.  Because we know that the arrangement between the vendors and purchasers

29     was carried out on terms other than are contained within these documents we are

30     considering at present, nonetheless these were documents which were prepared at

36

```
1     the behest of Mr. Lawlor, and we must assume that it was his intention that
2     they would be implemented, they weren't being prepared for the purpose of
3     wasting paper; isn't that right?
4  A.  It was obviously prepared for a purpose, in the event of the matter going ahead
5     on this basis.  It didn't go ahead on this basis so it didn't become a document
6     of discussion.
7  Q.147 Did Mr. Lawlor ever indicate to you what the result of his presentation of
8     these documents were by the intended purchaser?
9  A.  I really cannot recollect if Mr. Lawlor ever saw this document and I certainly
10    have no recollection of it going to anybody else.
11 Q.148 Well, you certainly know that the letter of the 26th went to Mr. Lawlor with
12    the expressed purpose that it would be furnished to Mr. Mulryan; isn't that
13    right?
14 A.  The, sorry -- the letter went to Mr. Mulryan at the instruction of Mr. Lawlor.
15 Q.149 Yes.  I think in fact you furnished the letter to Mr. Lawlor for onwards
16    transmission by him, if I just check that that is accurate?
17 A.  I don't recollect.  It was certainly addressed to Mr. Mulryan.
18 Q.150 Page 252, you are dealing with a letter which you faxed to Dr. Kavalek, it is a
19    letter of the 26 of January,  "Also enclosed is a received letter for Sean
20    Mulryan with the figures you gave me today" so you certainly provided him well
21    a copy?
22 A.  That may have been.  Is that the draft which is attached in the next 253?
23 Q.151 No.  I think the draft was dated the 25th and it was then deleted, 26th, and we
24    see that the letter to Mr. Mulryan is dated 26th?
25 A.  Well, I would certainly have copied that to Mr. Lawlor, whether or not he
26    actually had the original to deliver, I really don't know.
27 Q.152 Well, I was asking you whether he ever came back to you to say what had become
28    of the proposition contained in this letter, namely that he would buy or
29    Mr. Mulryan would buy for 3 million, he didn't though, what was the response of
30    Mr. Lawlor?
```

37

1  A.    My understanding was that it all awaited on his making an inspection of the

2        building and as to whether, and assessing the deal which at that time he had

3        not done.

4  Q.153  Yes.

5  A.    And the -- I can't recollect the exact days, but I understand after that

6        inspection he informed Mr. Lawlor that the building wasn't worth what he had

7        requested and he wasn't prepared to pay that price.

8  Q.154  We'll see a handwritten manuscript note of yours of the 31st of January 2000,

9        which reflects a valuation which was hoped to be obtained from Colliers who are

10        property valuers, it's at page 265.

11  A.    Yes.

12  Q.155  You say "Lawlor, Hybernska 12.  Liam Lawlor, Sean Mulryan will speak."

13  A.    To Colliers "He is hoping to have --

14  Q.156  "He is hoping to have Colliers man confirm that 180 million CZks to - " I'm not

15        sure of that.

16  A.    "To try to do H" which, H presumably is, maybe it's to try to do it, I would

17        guess meaning the deal.  My understanding of what happened was that he said

18        that if he was -- he would get a separate valuation, his own valuation and that

19        would be the basis of his, any agreement that he might enter into for the

20        property.

21  Q.157  The next line then is, "Will also look at, also look to move forward."

22  A.    To move forward, yes.

23  Q.158  And then you have a note then of the calculation of the sum of 180.  There is

24        162 which is obviously the price RIF were to be paid.  There is 5 million after

25        that I am not sure what that is then 1 million for RK, Richard Kavalek, 2

26        million for Seddons is it, 2 million for Ron Smith and I am not sure what the

27        final figure is there?

28  A.    I really don't know what the significance of those particular jottings would be

29        or whether that was something he had said to me, or I was trying to work

30        something out for myself.

38

1  Q.159 Certainly as of this date then, it would appear that figures such as 396

2       million CZKs which were proposed in the purchase price of Mr. Lawlor's letter

3       of the 26th from not going to be obtainable?

4  A.   Certainly.

5  Q.160 But Mr. Mulryan continued to deal with Mr. Lawlor, and moved on to acquire this

6       property?

7  A.   I understand that Mr. Mulryan is well able to negotiate in a sensible way for

8       property.

9  Q.161 And did Mr. Lawlor indicate to you what his reward was going to be, given that

10      Mr. Mulryan's company ultimately bought the Hybernska building?

11 A.   Not specifically that --

12 Q.162 At any time did he produce to you or ask you to draw an agreement which would

13      reflect his entitlement under the new figures which were being proposed for

14      sale?

15 A.   I don't believe it happened with a formal agreement in the end.

16 Q.163 Well, what did you understand the informal agreement to be?  How much was

17      Mr. Lawlor to receive for his involvement in the deal between Aspen S.R.O. and

18      Mr. Mulryan's company, which ultimately purchased the property?

19 A.   I'm afraid I can't remember the, how the exact figures worked out, but I -- I

20      know that Ballymore made a budget for the deal and assessed what they thought

21      should be paid and paid it and it was, I have in mind something in the region

22      of 4 million pounds but you are asking me for detailed figures that I can't

23      bring up.

24 Q.164 Irrespective of the figures, how did you understand that Mr. Lawlor was to

25      receive his take, or his uplift on this particular transaction?  You to this

26      point are acting on behalf of Mr. Lawlor?

27 A.   Yes.  That it would be whatever was left over would be the profit of him or his

28      company.

29 Q.165 Well, we know that Ballymore paid a sum of 1 million deutschmarks and a sum of

30      500 thousand deutschmarks and allowed the funds which were standing Erste Bank

39

1    account on the 17th to be paid?

2  A.   So, whatever the total of those figures less the amount paid out, would be less

3       all the expenses, would be in effect, Mr. Lawlor's profit.

4  Q.166 Right.

5  A.   So that, thank you for reminding me of those figures, so that would have been

6       180 million CZks which were paid at the time of completion.

7  Q.167 Less 162 which went to RIF, I mean his take was 17?

8  A.   Yes.  That was the amount paid.  The first payment of 1 million deutschmarks

9       and then there was a second payment of 5 -- which my recollection was that that

10      was following a demand or request by Mr. Lawlor for expenses which he sent.

11

12      MR. LAWLOR:  The exchange rate at the time, Mr. Chairman, was --

13

14      CHAIRMAN:   Mr. Lawlor, you will get your opportunity.

15      I wonder, Mr. O'Neill, could we have the sterling equivalents approximate

16      sterling equivalents of those sums?

17

18      MR. O'NEILL:   Yes.  I can give you those figures, the total paid for the

19      property is 3,573,748 pounds sterling.  That's represented by approximately 198

20      million CZk and between the breakdown of the other figures -- the million

21      deutschmarks at the rate of 2.5 deutschmarks to the Irish pound, which is

22      believed to be, the rate at the time is, 400,000 Irish pounds.  Correspondingly

23      the 500,000 deutschmarks is 200,000 Irish pounds.

24      The 17 million -- I only had a sterling figure for that, for the 17,094,000 CZk

25      at approximately 310,000 pounds sterling.

26

27      CHAIRMAN:   We can sort out the exchange rate later, these are the total

28      figures which were given to Mr. Lawlor.

29

30      MR. O'NEILL:   Yes, or to Zatecka.

40

1

2      JUDGE FAHERTY: To Zatecka.

3

4      CHAIRMAN:   And what was paid out then, out of those, do we know?

5

6      MR. O'NEILL:   We do.  There is a table on which, which was put on screen

7      yesterday indicating the various withdrawals from these funds, page number --

8      page 121.

9

10     On page 121 you will see that the funds came into two separate accounts both

11     held in the name of Zatecka 14 S.R.O. at the Erste Bank.  Subsequently the name

12     changed,  one of these accounts was an account in CZKs, thats the top column,

13     the second is in deutschmarks and we went through these yesterday.

14     The 17,092 thousand CZk was received from Aspen Properties S.R.O.  Now, I think

15     that you are aware, Mr. Seddon, that a document was subsequently prepared by

16     you showing this to be a loan from Aspen to Ballymore; isn't that right?

17     Sorry, from Ballymore to Zatecka -- sorry, I stand corrected on that.  There is

18     a loan agreement between Aspen and Zatecka for that sum.

19  A.   I think there could well have been when we were, when we were trying -- when we

20     were preparing accounts for the company but that was, it was another allocated

21     item which we had, we needed to cover, because we hadn't got an invoice from

22     him.

23  Q.168But it went over, in fact, a loan from one to the other, it was accounted for

24     subsequently in the accounts of the company?

25  A.   I think, it was subsequently covered as an invoice but we hadn't got an invoice

26     at the time because it was an expense of -- it was a payment.  The payment

27     to -- sorry which company --

28  Q.169This is the Aspen Properties.  There is 180 million on deposit, when it came to

29     closing the contract that deposit was a guarantee against the liability to

30     perform the RIF/Aspen contract, isn't that right?

41

1   A.   Yes.

2   Q.170The guarantee was performed by the payment of the 162 which left a surplus --

3   A.   That left a surplus which was paid into the --

4   Q.171There was some dispute as to what was to happen to the surplus because the bank

5        was saying that we have 180 million in the guarantee, to pay out the 180

6        million, that's what he intend to do, whereas they were informed through

7        yourself, I believe, that the contract price was 162, that that was the Limit

8        of their obligation, and they should hold the balance of 18 million for

9        Zatecka, and ultimately at the direction of Mr. Lawlor that money went to

10       Zatecka's account, isn't that right?

11  A.   Yes.  I think it actually went to Aspen Properties' account who were the

12       contracting party, and from that account I think it went to the Zatecka

13       account, I think that was the actual routing.

14  Q.172Yes.  I am just finding the appropriate agreement that we are referring to

15       Mr. Seddon, it's a document which is in draft form, Ballymore Properties to

16       Aspen, and I am just seeing if we have it in the brief of documents before you.

17       I will put it on screen.

18  A.   What you have given me is something which doesn't have a signature on it.  But

19       I believe that this was, I think there was a completed document.

20  Q.173Yes.  This relates to the original 180?

21  A.   And there was also a mortgage agreement which --

22  Q.174And a deed of trust, I think from Sarka Therova in relation to --

23  A.   Not in relation to this, this was, this related to the money which was actually

24       provided by Ballymore to enable Aspen to complete the purchase and I prepared a

25       mortgage contract at the time the documents were lodged which, to secure the

26       money that had been provided for the purpose.

27

28       We have, I know it's in my brief statement that we started yesterday with, but

29       the narrative history of the matter was that around this time when completion

30       was supposed to be taking place, when it was thought that the property would be

42

1     sold into the name of Zatecka and RIF refused to do that, I admit that the

2     property ended up in the legal ownership of Aspen, which for a company

3     providing the money, would have been very uncomfortable if they weren't

4     properly secured.  So I prepared a loan agreement and a mortgage agreement and

5     also for the purpose of providing further protection, a Deed of Trust, which

6     specifically stated that that property would be owned beneficially for

7     Ballymore, who had provided the money.

8  Q.175The agreement that you had before you there was in relation to the 180 million

9     CZk.  We know that 162 million of that found itself ultimately with RIF, the

10    balance translated as 17,042,000 CZk, was subject of the  draft loan agreement

11    you see on page 156 of the hard copy before you.  It's Aspen Properties S.R.O.

12    and Zatecka, and in it the creditor undertakes to provide to the debtor, that

13    is Aspen provides to Zatecka, 14 million CZk; sorry 17 million CZk to be used

14    for the purchase of property to be owned by the debtor.  Now, we can firstly

15    establish whether or not there was such a loan at the time that the monies came

16    to, from the account to which they had been lodged, and found themselves with

17    Zatecka?

18    This money is treated as --

19  A.   Right, yes.

20  Q.176-- as a loan, but in fact --

21  A.   This was, I think, at the time I didn't know how else to treat this particular

22    money, because it came from the Aspen account to the account of Zatecka without

23    any contract relating to it, so it was simply money paid from one company to

24    another.

25  Q.177Yes?

26  A.   And it was the balance of the money which had been provided by Ballymore for

27    the completion.

28  Q.178Yes.  And it is money which you say in your statement to the Tribunal,

29    represents the benefit which Mr. Lawlor was to get for his involvement in the

30    transaction between Aspen and --

43

1  A.   It became part of the balance -- that particular money I think was not, I

2       hadn't understood myself at the time, that that was going to be part of his

3       entitlement.  He believed that it would be, and in fact that is how it turned

4       out.

5  Q.179Yes.  But that is how you deal with it in your statement to the Tribunal.  You

6       say that this money was the money which was paid to Mr. Lawlor in respect of

7       the fees?

8  A.   Yes, yes.  Indeed that was paid through his vehicle, the company.

9  Q.180Yes.  It can't be both a payment to Zatecka for it's services, be it a finder's

10      fee or otherwise, and at the same time be a loan; isn't that right?  They are

11      mutually incompatible explanations for these funds.  Either they are earnings

12      of Zatecka's which are earned because of their involvement in this transaction,

13      in which case they are the property of Zatecka, or else they are the property

14      of Aspen which are lent to Zatecka on terms; isn't that right?

15 A.   The money was the balance of the money that was left in the hands of Aspen and

16      to which Aspen had no claim.  It was, at Mr. Lawlor's request, transferred to

17      his company.  From my point of view, and from an accounting point of view,

18      there had to be a reason for a payment being made from that company to the

19      other company.

20 Q.181And could that reason have been as commission for it's effort, that is

21      Zatecka's effort in securing a purchaser for a property which Aspen was

22      transferring?

23 A.   That was the effect, that was the reality.

24 Q.182That was the reality?

25 A.   Of what had happened from --

26 Q.183Why was that reality not reflected in the accounts of Zatecka, because what

27      happened in Zatecka, in accounting for this receipt by Zatecka, was that a loan

28      agreement was drawn up which appears to indicate not that Aspen had paid the

29      money, but rather that it lent the money?

30 A.   But it did pay the money.  It went from that bank account to the other bank

44

1       account.

2   Q.184   True, but not by way of a loan.  Aspen never lent the money to Mr. Lawlor or to

3       Aspen -- or to Zatecka, sorry, I should say, isn't that the reality that you

4       just mentioned to us a moment ago?  The reality was that Zatecka earned the 17

5       million as a result of its introduction of Ballymore to Aspen, it received

6       three payments for that service.  A million deutschmarks, half a million

7       deutschmarks and 17 million koruna?

8   A.  Yes.

9   Q.185   That's the reality?

10  A.  Yes.

11  Q.186   Now, that reality is not reflected in the accounts of the company.  If this

12      loan agreement was entered into by Aspen and Zatecka, because this loan

13      agreement says that Aspen has lent 17 million korunas to Zatecka, as a

14      consequence of that Zatecka must return 17 million to Aspen and it is not the

15      property of Zatecka; isn't that right?

16  A.  That is correct.  And I should say that I don't think that this was a document

17      which Mr. Lawlor would be possibly even aware of and it would have been

18      prepared at the request of the accountants as to what the correct documentation

19      would be for accounting purposes there to show why one payment came from

20      another company without any other explanation.

21  Q.187   Mr. Seddon, the correct accounting document for this should be that there is an

22      acknowledgement in the accounts of Zatecka that it earned 17 million korunas

23      that year, instead in the event that had that happened, obviously it would have

24      to pay tax on that amount?

25  A.  I'm afraid I can't tell you whether or not that would be the correct -- I am

26      not an accountant.

27  Q.188   If Zatecka is the company which claims to have received this money from

28      Ballymore on the basis of its services provided in introducing Aspen to

29      Ballymore, they are earnings of that company and they have to be treated as

30      earnings.  You can't treat your earnings as a loan.

45

1  A.   I am not a Czech accountant and I don't think you are either.

2  Q.189You don't have to be a Czech accountant, even an Irish accountant, even the

3       simplest of accountants?

4  A.   I'm afraid the system is very different.

5

6  CHAIRMAN:   Mr. Seddon who -- it was you who drew up the loan agreement or

7       caused it to be drawn up?

8  A.   It would have been drawn up by my firm but I really don't recollect it myself.

9

10  CHAIRMAN:   But it would have been on your instruction?

11  A.   Not necessarily.

12

13  CHAIRMAN:   Well somebody --

14  A.   I didn't deal with the preparation of the accounts and the dealings with the

15      auditors.

16

17  CHAIRMAN:   Yes.  But the actual agreement is drawn up by a lawyer, I take it?

18       This is the loan agreement.

19  A.   Yes, I mean it followed a standard form, I would think.  I can't tell from this

20      immediately but I would think that it had been prepared in my office.

21

22  CHAIRMAN:   Yes and presumably -- are you saying it was prepared on the

23      instruction of Mr. Lawlor?

24  A.   No, I am saying he probably is unaware of it.  I wouldn't have been, he

25      wouldn't have been asked about all accounting and audited technical details.

26

27  CHAIRMAN:   But somebody, presumably in your office, either yourself or one of

28      your staff, sat down and prepared a loan agreement with quite a lot of detail

29      about this 17-odd million korunas and it's signed by, I don't know who it is

30      signed by, it is signed by the creditor, do you recognise the signature?

46

1  A.  Which page?

2

3      CHAIRMAN:   199 -- sorry, sorry 157.

4  A.  That's signed by Mr -- that's Mr. Smith, yes, and whether it was signed on

5      behalf of the company and completed I do not know.

6

7      CHAIRMAN:   The loan agreement you say was prepared in order to explain the

8      receipt of 17 million into the account of Zatecka?

9  A.  Yes.

10

11     CHAIRMAN:   And it was prepared for the accountants in order to conclude an

12     audit of the company?

13 A.  Yes.

14

15     CHAIRMAN:   It was prepared by you or by someone in your office?

16 A.  Yes.

17

18     CHAIRMAN:   Presumably on your advice or on the advice of someone in your

19     office?

20 A.  I would, I think all the documentation regarding the company in terms of

21     matters like loan agreements were on the advice of the auditor.

22

23     CHAIRMAN:   But the auditor wouldn't -- the auditor surely would say to you or

24     to Mr. Lawlor that 17 million is in this Zatecka account, can you explain where

25     it came from?  The auditor surely doesn't --

26 A.  Yes, he would have seen exactly where it came from.  I can't say what he

27     thought or --

28

29     CHAIRMAN:   But who decides to call it a loan?  Because we know it is not a

30     loan.

47

1  A.  Well I think that at that time we may not have known what else to call it.

2

3    CHAIRMAN:   Who didn't know what else to call it?

4  A.  I am speculating.

5

6    CHAIRMAN:   No but who, when you say --

7  A.  I don't know what was said, I don't know what was discussed so I'm --

8

9    CHAIRMAN:   But does it not cause you a professional difficulty where you or

10    your office is party to an arrangement where a loan agreement is drafted and

11    prepared in compliance with, as we see in the heading to the loan agreement,

12    with the Civil Code of the Czech Republic, where no one knows the precise

13    detail or at least nobody is certain or even, no one has any knowledge about

14    the loan and why it is being called a loan?  Is there not a difficulty for you

15    as a solicitor, being party to that type of arrangement?  Where --

16  A.  Certainly not, if this was advised to be the correct way from an accounting

17    point of dealing with the payment that came from another company and was

18    technically due back to that company.

19

20    CHAIRMAN:   But you or whoever dealt with it in your office knew that it wasn't

21    a loan.

22  A.  I didn't know.  I didn't know that.  The fact that the company received and had

23    the use of the money is not to say that it wasn't technically a loan.

24

25    CHAIRMAN:   And is there no instruction or memo drawn up before your office

26    would prepare a document of this type indicating where the instruction had come

27    from or the, giving the detail as to what was to go into the loan agreement?

28  A.  Are you talking in general terms or in this specific?

29

30    CHAIRMAN:   Well in general terms and specifically in relation to this

48

1   particular agreement.  Somebody had to prepare the detail that went into the
2   loan agreement.
3   A.  Certainly, I mean there is not a great deal of detail, it's a standard form
4       document, but it would be the matter of discussion with accountants as to what
5       was required.
6
7   MR. O'NEILL:  It may prove helpful, Sir, if we were to address the
8       correspondence from the auditors which appears in the brief before that.
9
10  CHAIRMAN:  All right.
11
12  MR. O'NEILL:  I might ask you, Mr. Seddon, to consider the information on page
13      102.  This is a letter of the 1st of June 2001 and it's a translation I think
14      of information which is provided by Primaska Consult, which I think is a firm
15      of accountants and auditors who were the auditors and accountants to Zatecka 14
16      S.R.O; is that correct?
17  A.  Indeed.
18  Q.190  And do they have statutory obligations under the Czech code in relation to the
19      returns that they file or is their obligation due only to the client company?
20  A.  I can't tell you precisely, but they were certainly have obligations but I have
21      no reason to believe they are other than completely professional.
22  Q.191  They write to Sarka Therova on that date, saying "Dear Madam, with regard to
23      the fact that our company prepares the draft of the 2000 corporate income tax
24      return of the company Zatecka 14 S.R.O, hereinafter the company, together with
25      processing the accounting, we are addressing you with description of the
26      situation and with demand for its settlement.
27
28      We consider important to specify purposes of the payments given in the attached
29      table for complete and correct accounting operations of the company for 2000.
30      We were provided with information on some payments during the meeting of

49

1    Mr. Bohumil Vozenilek  and Mr. Anthony Seddon on the 19th February 2001."

2

3    Have you a recollection of that meeting and of being the source of the

4    information which we'll now see further on in the agreement?

5  A.   I can't say that I can recollect.

6  Q.192No, but presumably you don't dispute that the information on these payments was

7    information given by you to him at a meeting on the 19th of February 2001?

8  A.   He says I gave him some information, I am sure I did.

9  Q.193Right.

10

11    "Item not having been specified.

12    A.   The company received the amount at the value of 1 and a half million

13    deutschmarks from the company Ballymore Properties Limited, some of the lines

14    number 5 and 14."

15    I think this relates to the table we already used.  That's 121.  The numbers

16    are on the left hand column.  So numbers 5 and 14 are identified as the one and

17    a half million deutschmarks they are identified in the text of the table as

18    payments from Ballymore.

19

20    "According to the oral information, the amount represents a loan."  Now is that

21    factually correct, Mr. Seddon, that the one and a half million represented a

22    loan from Ballymore to Zatecka?

23  A.   According to, I think according to the way they viewed it as a payment without

24    other reason regarded it as a loan, the circumstances of it were that Ballymore

25    would not have, I don't think, have regarded it as a loan although I think it

26    still at this point in time the exact way that the matter should be treated I

27    don't think had been completely understood.  I can't recollect from the timing

28    whether we had still dealt with the transfer of the land at this stage.

29

30    JUDGE FAHERTY:  Mr. Seddon, who gave the oral information to the accountants as

50

1      reflected on the letter?

2  A.   I couldn't tell you.  I don't know.

3  Q.194The only person named as having provided information on payments during the

4      meeting of the 19th of February 2001 was you?

5  A.   Then it goes on to say items not having been specified I presume would be

6      matters which hadn't been discussed at the earlier meeting.

7  Q.195Is that how you interpret it or do you understand it --

8  A.   I am really not sure.

9  Q.196It doesn't help that the writer of the letter is not a native English speaker

10     and the use of language here is somewhat strange.  But I suggest to you that --

11 A.   That is true.  One of the reasons why I wouldn't be giving all the information

12     myself.

13 Q.197But what is certain, would you agree, Mr. Seddon, is that the accountants would

14     not have been reporting on oral information given from themselves but rather

15     oral information given to them by the company Zatecka or its agent, isn't that

16     right?

17 A.   They would certainly be commenting on the information they have been given.

18 Q.198Right.  According to the oral information, the amount represents a loan, that

19     can only mean that some person orally spoke to them and said these amounts

20     represent a loan.  I suggest there is no possible other alternative

21     explanation.

22 A.   That's what they say.

23 Q.199Yes.  "We were not provided with any contract or other agreement as a basis for

24     accounting of the amount as a loan.  Therefore it is necessary to prove the

25     accounting by the contract with the company Ballymore Properties where also

26     interest rates and due date of loan should be treated."

27

28     So what they are saying is that if it was a loan, there is going to have to be

29     a loan document produced and dated, recording the fact that this was in fact a

30     loan.

51

1   A.   Yes.

2   Q.200 Do you interpret that as a direction from the accountants that you should draw

3        up a loan agreement for this amount when in fact it wasn't a loan?

4   A.   I think at this time there was some uncertainty as to how the money should be

5        treated.  I think a loan agreement was drafted.

6   Q.201 Yes, there is no doubt that it is, you have a plain copy of that loan

7        agreement, sorry, I beg your pardon that's in relation to the next item.  You

8        think there was also a loan agreement for the one and a half million

9        deutschmarks that Ballymore provided to --

10  A.   I think there may have been one prepared, yes, and the -- and I think it was a

11       matter of subsequent discussion.

12  Q.202 Well, if there was such a document prepared, it clearly was not a valid

13       document because there had been no valid loan.  One can't ex post facto make a

14       payment on account, a loan from one company to the other, when in fact it was a

15       payment for services.

16  A.   There was, nor was there an agreement specifically about payment for services.

17       I think we were to some extent in the dark as to exactly how it should be

18       treated.

19  Q.203 Well, was the bottom line that you were prepared to treat it in any way that

20       possibly ensured that there would be no tax liability irrespective of whether

21       there was any reality in that agreement or otherwise?

22  A.   Well, that wasn't the intention I am sure.

23  Q.204 What was the intention if any agreement would do?

24  A.   The intention was to prepare proper accounts according to the rules that apply.

25  Q.205 They could only be proper if they reflect the actual transactions that took

26       place in an honest manner; isn't that right?  Isn't that so?

27  A.   The way in which Czech accounts fare is very much according to the form of what

28       happens and where payments are made and I am not familiar with all the

29       accounting rules but as I understand it, the accountants ask for paper work in

30       respect of transactions --

52

1

2      JUDGE FAHERTY:   Mr. Seddon, they were simply looking for proof of a loan of

3      which they had been informed orally by somebody, either some principal of

4      Zatecka, isn't that correct?  They were -- that request was no different --

5  A.  If there is, if there isn't contract for the receipt of the money.

6

7      JUDGE FAHERTY:   My point is this --

8  A.  Then it is money that is technically maybe repayable to the person that has

9      paid it.

10

11     JUDGE FAHERTY:   They were told that it was a loan.  And they were simply, as

12     an accountant would, an auditor, look for proof of that for accounting

13     purposes.  That request was a fairly valid request, given they were orally told

14     it was a loan amount.

15 A.  Yes.  That's correct.

16

17     JUDGE FAHERTY:   But who ultimately instructed you that it was a loan?  You say

18     there was an agreement, which I don't think we have seen, drawn up in respect

19     of the 1.5 million deutschmarks?

20 A.  The --

21

22     JUDGE FAHERTY:   Surely there were only three people could have, three

23     principal players around this whole Zatecka, which was Sarka Therova, who was

24     the registered share holder, isn't that correct, and the director.  The only

25     person to make any --

26 A.  Yes, and would have had most of the --

27

28     JUDGE FAHERTY:   Mr. Lawlor, who owned, effectively controlled the company, and

29     yourself as solicitor for the company.

30 A.  Yes.

53

1

2    JUDGE FAHERTY:   I mean, was there any person that could --

3  A.  There would have been other people in the office that had dealings with the

4    transactions but would have probably been present in instructing the

5    accountants in dealings generally with the accountants.

6

7    JUDGE FAHERTY:   See I understood you earlier this morning to say that when the

8    1.or the 18 million CZk was paid  or the or 180 million CZk was paid for the

9    building, 162 went to the restoration fund, isn't that correct, and there was

10    some dispute about the balance?  But you said that Mr. Lawlor was to get that

11    ultimately and in fact there was some dispute with Erste Bank but they acceded

12    to that ultimately.  You didn't seem to have any problem then this morning

13    conceding that ultimately in relation to that amount, Mr. Lawlor became the

14    beneficiary?

15  A.  That amount, he received it certainly.

16

17    JUDGE FAHERTY:   And that was the amount in fact in the first schedule that

18    would be the 17 million CZk that went in from Aspen Properties, isn't that

19    correct?

20  A.  There is no dispute but they received that amount of money.

21

22    JUDGE FAHERTY:   But that also was treated as a loan, isn't that correct?  So I

23    can't understand you were quite happy to say this morning Mr. Lawlor became the

24    beneficiary of that

25  A.  Well he was the beneficiary to the extent he had the money and the use of that

26    money certainly.

27

28    MR. MARRY:   Members of the Tribunal, can I just point out in relation to that

29    document 156, which gave rise to Mr. O'Neill's examination, that that document

30    is actually signed by Mr. Ron Smith of Aspen.

54

1

2      CHAIRMAN:    Which document?

3

4      MR. MARRY:   156 and 157.  It is headed "Loan agreement" signed by Mr. Ron

5      Smith of Aspen, would indicate that Mr. Smith, Aspen, was treating the money as

6      a loan to Zatecka.

7

8      CHAIRMAN:   Yes, but we are interested in finding out whether in fact it was a

9      loan, the basis on which Mr. Seddon or someone in his office took instructions

10     to the effect that it was a loan and should be dealt with as a loan.

11

12     MR. MARRY:   Yes, well I think that Mr. Seddon indicated that he was instructed

13     to draw up the loan agreement on the basis that it was a loan from Aspen to

14     Zatecka being the parties to the loan agreement.  Now it seems to me that if

15     further questions in relation to that matter are to be put to Mr. Seddon, they

16     should be on the basis of information obtained first from Mr. Smith as to

17     whether or not that's in fact the case.

18

19     CHAIRMAN:   Well, Mr. Seddon has been asked by me, as well as others, are there

20     any instructions which led to the drawing up of the loan agreement and he said,

21     well as I understand his reply, there are no instructions, so we don't know,

22     other than this letter from the accountant, so we don't know what led to the

23     drawing up of the loan agreement other than the letter from the accountant and

24     the fact that it was drawn up.

25

26     MR. MARRY:   Just one other observation Mr. Chairman, the letter at page 102

27     from the accountants, I think it is even allowing for the strange translation

28     that might occur in such circumstances, does clearly indicate that with regard

29     to the items appearing in sub paragraphs A to N that there were oral

30     explanations, that the oral explanations given were given to the accountants,

55

1    it would appear by someone other than the parties that attended at the meeting

2    that's referred to on September, or February 19th, 2001.

3

4    CHAIRMAN:   Well, in the second paragraph the letter says "We were provided by

5    information on some payments during the meeting of Mr. Vozenilek  and

6    Mr. Anthony Seddon on February 19th, 2001" and then it goes on, "Items not

7    having been specified."   Then there is a reference to "According to the oral

8    information" which may or may not refer to information received from

9    Mr. Seddon, but he has been questioned as to whether he gave any of this, or

10   who did.

11

12   MR. MARRY:   I appreciate that.  But I am simply indicating that so far as

13   Mr. Seddon has been pressed on the issue that he knew it wasn't a loan and it

14   was monies that were received by Mr. Lawlor in some other capacity or for some

15   other purpose, the actual document on foot of which the questions are being put

16   is a document signed by Aspen, indicating and confirming that the person giving

17   the money was treating the money as a loan.

18

19   MR. O'NEILL:   If I might deal with what My Friend seems to be making as a

20   submission in the course of the interposition of the taking of the witness in

21   direct evidence, it's firstly inappropriate in my view to make such a

22   submission at this point in time, but I am concerned as to whether my friend

23   has a factual basis for advancing this submission.

24

25   He seems to be putting forward his interpretation of the document and I am

26   curious as to whether or not he is doing so on the basis of any instruction

27   which he has received from his clients, Mr. Seddon, to the effect that the loan

28   agreements were drawn up at the insistence of Mr. Ron Smith.

29

30   Now, if he doesn't have those instructions from his client, it seems to me this

56

1    is an entirely inappropriate submission to make.  I suspect my friend cannot

2    have those instructions.  I am not blaming him for this, but if he reads the

3    entire of the volume of documentation which is contained in the five volumes of

4    Seddons files which were provided to us by Mr. Lawlor and which we in turn have

5    provided to him, he will find that Mr. Smith's involvement in this loan

6    agreement stems from correspondence which starts on the 8th of August of 2001

7    and it's in the brief at page 118.

8

9    And you will see there that the loan agreements were given to Mr. Smith by

10    Sarka Therova, I think Barbora is another employee of Seddons, she gave him

11    four agreements relating to Zatecka for his signature.  He had signed them, he

12    was to then deliver them to the office.

13

14    Now that would indicate firstly that although the agreement is signed by

15    Mr. Smith and dated the 31st of March 2000, he could not have signed it on that

16    date because he didn't receive it until October.  And secondly, that the draft

17    agreement came from Seddons, as is obvious from the computer track at the

18    bottom of the document which shows at the bottom of page 157 -- I don't find

19    Mr. Marry's interjection helpful because it is speculative firstly and I don't

20    believe that it concords with any instruction given to him by Mr. Seddon on

21    this issue and I just want you to confirm, Mr. Seddon, that the fact of the

22    matter is you did not receive instructions from Mr. Ron Smith that he had lent

23    money to Zatecka and that you should draw up a loan agreement reflecting that

24    fact, isn't that so?

25    A.    He was not the client.

26    Q.206Yes.  So he did not inform you that he had lent money to Zatecka, namely 17

27    thousand -- 17 million?

28    A.    No, he confirmed the situation.

29    Q.207No.  He signed the draft agreement which was prepared in your office and sent

30    to him for signature?

57

1  A.   Yes.

2

3       JUDGE KEYS:   Mr. Seddon, could I just ask you one question?  Did you receive

4       any instructions from anybody to treat these sums as loans?

5  A.   I really can't recollect.

6

7       JUDGE KEYS:   You can't recollect?

8  A.   I really can't recollect any such instructions.

9

10      JUDGE KEYS:   Did you advise anybody or Zatecka to treat them as loans?

11 A.   I think that I was more concerned with what would be the correct accounting

12      treatment of the payments.

13

14      JUDGE KEYS:   Well when do you say you first realised they weren't loans?

15 A.   It was, I think, some considerable time later when the, it was I think, I think

16      I am right in saying there was a discussion with Ballymore as to why the loan

17      agreement had not been completed and then said well it wasn't a, it wasn't

18      treated as being a loan.  It was by them, treated as part of the purchase

19      price.

20

21      JUDGE KEYS:   Did you take any steps then to advise Zatecka that they should

22      correct the description of them as loans and should now be treated as something

23      else?

24 A.   I don't think that they are now in the accounts as that because it was never

25      completed.

26

27      JUDGE KEYS:   Yes, but did you not at that stage decide it prudent to advise

28      Zatecka that the description of the payments was wrong and should be corrected

29      to reflect what they really represented?

30 A.   I think we may well have done that.

58

1

2      JUDGE KEYS:   And did you take a memo of that and do you have it on a file?

3   A.   I have really no idea.

4

5      JUDGE KEYS:   I take you have gone through all your files before you decided to

6         come across and give evidence here?

7   A.   No.

8

9      JUDGE KEYS:   You haven't?  But I thought that when you didn't arrive on the

10        first date, appointment, one of the reasons was that you weren't prepared and

11        wanted some time to consider your documents?

12   A.   Indeed I did.

13

14      JUDGE KEYS:   I presume these are all --

15   A.   It would have been very helpful if I had been told what the areas of

16        information the Tribunal would be interested in knowing about, and I would have

17        been very happy to prepare on whatever narrow or wide areas may have been

18        wished.  I received for the first time this bundle on Tuesday evening and that

19        wasn't a great deal of time to prepare at half past seven in the evening before

20        I was in the Tribunal, the day before I received five lever arch files of about

21        2,000 pages without any indication of what I was supposed to look at, but was

22        requested that day to provide transcriptions of a number of handwritten items,

23        which I, despite everything else I was doing, I did do, but it did mean that I

24        didn't have the chance to read 2,000 pages, nor was I given any indication of

25        what in particular I was supposed to look at and consider.

26

27      JUDGE KEYS:   Are you saying that if you are given time now to check a file,

28        you might find a memo stating that you had advised Zatecka that this was a

29        misdescription of monies which had come into your account which should be

30        corrected, are you saying that or --

59

1   A.   You are asking me if there was a memo on a file and I said I didn't know.

2

3        JUDGE KEYS:   No, I asked you you did you give any advice to Zatecka on

4        discovering that the description of the monies was a misdescription because it

5        had been ascribed as a loan when it obviously wasn't a loan, had you gone then

6        further to describe them that it should be corrected?  You said you probably

7        did.  Then I asked did you have a memo on the file.  You said you don't know, I

8        have asked you now, do you think if you were given time you might find the memo

9        on the file?

10  A.   If there was a memo on the file and I had time then I would find it, I am sure.

11

12       MR. O'NEILL:   Mr. Seddon you seem critical of the Tribunal's approach in its

13       inquiry of you regarding Zatecka, I just want to remind you that you received,

14       through your solicitor, on the 1st of August of this year, a letter from the

15       Tribunal asking you to produce a separate narrative statement regarding your

16       dealings with Zatecka 14 S.R.O. including but not limited to the setting up of

17       the company, all bank accounts opened in the name of the company or for the

18       benefit of the company and all work carried out by your firm on behalf of

19       Zatecka, including details of instructions received from persons on behalf of

20       the company.

21

22       Now, had you chosen to provide that statement in detail, it would have been

23       necessary for you to consider the files in question, which were the five

24       bundles of files which Mr. Lawlor delivered to the Tribunal in the very recent

25       past, but which comprise apparently your files on this issue.

26

27       What we have been putting to you is that any consideration of the files

28       necessary to deal with the queries raised by Tribunal would, of necessity,

29       drawn you to the accounts of the company, the tabular list of payments in and

30       payments out which we have seen on screen here, and would and should have

60

1    allowed you to be in a position to deal with these individual transactions and

2    as far as I know, you are able to deal with these individual transactions

3    because the descriptions which are contained within that schedule are

4    sufficient to identify them to you; isn't that right?

5  A.    I am not sure where the question started, but if you are saying I shouldn't be

6        aware of all matters relating to this company, then I'm afraid that I can't say

7        I am.

8  Q.208 Not all matters, but the banking transactions which are set out in the document

9        in question which is a review of the financial dealings of this company.  It

10       had a limited number of dealings, we see them effectively set out in the

11       accountants tabular form here as a total of 40 items in relation to two

12       separate accounts, that is the key to what became of the monies that came in,

13       which are three simple amounts of 17 million, 9 million koruna and 1 million

14       deutschmarks and then the various withdrawals from them.

15

16       That would allow you to put yourself in a position to understand what were the

17       incoming funds into these accounts.  There are only three transactions, but you

18       are being asked about now is whether or not the 17 million was a loan or not a

19       loan.  It is one of only three accretions of funds to the accounts of Zatecka

20       since its origin, even a basic consideration of your files would have allowed

21       you to address that question, isn't that so?

22 A.    Yes, and had I been given notice of the question, it certainly would have

23       helped.

24 Q.209 But the question remains the same.  Was this money received by the company as a

25       loan or was it not a loan?  And if it was a loan, what is the basis of the loan

26       and if it was not a loan, why did you instruct your firm to draw up a loan

27       agreement to reflect a transaction which was not a loan?  You can answer that

28       without the necessity of going through in detail any one of the 5,000 pages

29       that there may be in the files that were considered by the Tribunal as being

30       your files.

61

1   A.   But my answer then simply, if you want specific answer, is I would say that if

2        it was done in that way, it is because we thought that there was the correct

3        way of dealing with it.

4

5        JUDGE KEYS:   Mr. Seddon, who is 'we' when you say we?  Do you mean Mr. Lawlor,

6        do you mean your firm?

7   A.   No, I don't mean Mr. Lawlor.  I mean my firm and the accountants.

8

9        JUDGE KEYS:   Would you not discuss that with Mr. Lawlor before you come to a

10       final conclusion before considering how you are going to treat it, considering

11       Zatecka --

12  A.   I don't think we did discuss, from my recollection I don't think we discussed

13       the matter of audit details with Mr. Lawlor.

14

15       JUDGE KEYS:   Do I take it then you would take decisions on how to treat funds

16       coming into a company, which isn't your company, you are just the legal, you

17       are just a lawyer who is been employed by a company itself, which is

18       Mr. Lawlor, that you would take it upon yourself to put into an operation

19       documentation which would treat a payment which had obviously misdescribed, as

20       we now know, without consulting with the owner of the company, is that what you

21       are saying?

22  A.   Well that's what I have said, yes.

23

24       JUDGE KEYS:   And do you think that's correct procedure for a solicitor's

25       office to act in that way?

26  A.   Well this was, these were regarded, I think, as technical points where it was

27       quite likely that the client wasn't --

28

29       JUDGE KEYS:   Would that be in accordance with the standards of the British Law

30       Society?  That you would take it upon yourself to make a decision in relation

62

1    to monies coming into a company's account without consulting with the owner of

2    the company?

3  A.  Well, I can't say that that's a question, a matter of anything to do with

4    professional rules.  It was a matter of day to day work where technical details

5    were dealt with by accountants and the client wasn't --

6

7    JUDGE KEYS:   I can understand that.  But until -- but surely you must consult

8    with the director of the company or the owner of the company before you

9    conclude, before you come to a conclusion how you are going to treat it, treat

10   the payment?  I can understand that it is day to day work, but the final

11   decision to be made must be done in consultation surely with the owner of the

12   company?

13 A.  Very possibly, I can't say for sure whether there was discussion or not but

14   these were technical meetings which took place without, as far as I am aware,

15   without the involvement of anyone else, other than the lawyers and accountants.

16

17   JUDGE KEYS:   I will ask you once again if I may, Mr. Seddon, did you receive

18   instructions from Mr. Lawlor to treat this as a loan?

19 A.  I don't recollect any specific instructions.

20

21   JUDGE KEYS:   Did you advise Mr. Lawlor to treat it as a loan?

22 A.  I really don't recollect.

23

24   JUDGE KEYS:   I see.  Thank you.

25

26   JUDGE FAHERTY:   Just one aspect of that, Mr. Seddon.  As Zatecka's lawyer and

27   legal advisers, were you not concerned that by, if it was at your instigation

28   that loan agreements be drawn up, that you would be subjecting your client to

29   possible legal action in the future about something which they didn't own, if

30   Ballymore or the other entity were to come back seeking this money?  If you had

63

1    chosen to treat something that wasn't a loan as a loan, weren't you opening up
2    a possible avenue of litigation by third parties against Zatecka?
3  A.  Well --
4
5    JUDGE FAHERTY:   As a solicitor, did you consider that?
6  A.  If it was, if a loan agreement had been completed, then it would have been
7    clearly understood by everybody what the position was.
8
9    JUDGE FAHERTY:   But I don't understand that answer in light of what you said
10    to Judge Keys, that you didn't in fact consult Mr. Lawlor.  To the best of your
11    recollection, in drawing up the -- it is just an observation I am making,
12    Mr. Seddon.
13  A.  I am sorry if I am not appearing to be helpful but when I don't remember the
14    exact sequence of what happened.  Certainly there would have been general
15    discussions with Mr. Lawlor regarding the company and the accounts.  Certainly
16    there would have been discussion about the liability for potential taxes,
17    certainly there would have been discussions about the monies that he was taking
18    out which were being categorised as loans to him.  There would have been
19    ongoing discussion about these financial matters, certainly.
20
21    JUDGE FAHERTY:   So you are saying there were discussions then with Mr. Lawlor
22    about how monies would be treated in the company accounts?
23  A.  In terms of how they were treated in the accounts, I can't be sure, because how
24    they were treated in the accounts was to an extent outside my field.  It's
25    possible that the -- that the way that they were treated there would be
26    different from the way they would be treated in the UK, I don't know.  I know
27    from experience that certainly there is a very different way of treating
28    accounting entries in that jurisdiction but I wasn't qualified to say what was
29    or was not the right way of recording them.
30

64

1  Q.210 MR. O'NEILL:   Mr. Seddon, it is the case, is it not, that Mr. Lawlor used the

2       mechanism of loans to take down monies which, in any event, he could have

3       accessed as being the owner of the company Zatecka, isn't that correct?

4  A.   That is correct and --

5  Q.211 So they were not taken out as a dividend or as income from the company, but

6       rather through the mechanism of loan agreements, is that right?

7  A.   Well no, not quite, because what Mr. Lawlor would do would simply take the

8       money or ask to be paid the money.

9  Q.212 Mm-hmm?

10 A.   We would have to follow up on that afterwards for accounting purposes, say you

11      have had the money, we have not made a distribution, it has to have a name to

12      it, what is it?  Therefore the only alternative is to call it a loan from his

13      company to himself.

14

15     CHAIRMAN:   Mr. Seddon, if you read, and you can do it over the lunch break, if

16      you read the brief from about 148 onwards, you will see numerous requests from

17      Mr. Lawlor to your office, Sarka Therova in your office, seeking to borrow

18      money from Zatecka, and one --

19 A.   I don't think he didn't usually, I don't think he said borrow money.

20

21     CHAIRMAN:   Borrow money.

22 A.   I think he said transfer.

23

24     CHAIRMAN:   No, no, there is a number of instances, one which I am just looking

25      at at the moment, page 151 which is from Mr. Lawlor to Sarka Therova in your

26      office.

27 A.   Yes, you are correct.

28

29     CHAIRMAN:   It says "Sarka, I would like to ask your company" bear in mind he

30      is in effect writing to his own company "I would like to ask your company

65

1    Zatecka 14 S.R.O. to provide me with an advance of two and a half million CZk.

2

3    This is to be delivered to Dr. Kavalek.  Kindly add this to the loan provided

4    to me by the company and increase same by the said amount of two and a half

5    million".  And there are a number of other instances, page 153 a letter, a fax

6    from Mr. Lawlor to your office saying, "I request Zatecka 14 to provide an

7    advance of 10,000 sterling.  I will arrange collection of the loan with

8    Mr. Anthony Seddon." I can go on, there are other instances.  This was clearly

9    a practice engaged in.

10  A.  I am sure there were other instances where the request was made and was

11     followed up subsequently with the loan documentation.  But -- which in terms of

12     accounting practice there was a normal, a correct way of dealing with it, from

13     a tax point of view in certainly in the UK, I can't speak for Ireland, if those

14     had been monies which had been collected and remitted, they would be certainly

15     taxable income, no matter what it was called.

16

17     CHAIRMAN:   But they weren't loans.  They were transfers which were being

18     called loans.

19  A.  This were loans, technically he would owe the money back to the company,

20     certainly.

21

22     CHAIRMAN:   I think we'll break for lunch now.  If we say around two o'clock.

23     Two o'clock.

24

25     THE TRIBUNAL THEN ADJOURNED FOR LUNCH..

26

27

28

29

30

66

```
1     THE TRIBUNAL RESUMED AS FOLLOWS AFTER LUNCH:

2

3     MR. O'NEILL:  Before the luncheon break, Mr. Seddon, we were dealing with

4         certain loan arrangements, loan agreements, and draft loan agreements which

5         were prepared by your firm in relation to the affairs of Zatecka; and if we

6         look to the information which is contained in the schedule prepared by the

7         auditors, of the withdrawals from the Czech account and the deutschmark account

8         in the Zatecka bank account at Erste Bank, which we see on page 121, I think

9         you can confirm to me that other than those items where there are specific

10        references to individuals, such as Richard Kavalek, Aspen Properties and

11        yourselves as solicitors, that all of the other withdrawals from those accounts

12        were withdrawals which came to Mr. Liam Lawlor, isn't that so?

13  A     I didn't get all the names you mentioned; Hannibal, for example, is nothing to

14        do with Mr. Lawlor, Westaway is the not Mr. Lawlor, it's the Morgan company

15        that paid some invoices.

16  Q 213 Yes, it paid the invoice to Dr. Kavalek, to its offshore account at Sinclair.

17  A     The, I think I'm right in saying the 950,000 koruna was in respect of the, in

18        respect of the contract that --

19  Q 214 Sorry, if you could give us the number?

20  A     Number 18.

21  Q 215 Number 18, withdrawal cheque, 950 thousand or 52,000?

22  A     My memory is that was the amount of money paid for the telephone exchange in

23        the building.  But otherwise, yes, everything else is Mr. Lawlor.

24  Q 216 And I take it that you can confirm from your knowledge of Zatecka to date, in

25        so far as Mr. Lawlor entered loans with these entities, he has not repaid

26        monies to the Zatecka account on foot of any such loans?

27  A     That's correct.

28  Q 217 And in respect of most of those withdrawals, could I suggest to you that they

29        took place in the year 2000?  All those particular withdrawals took place in

30        the year 2000.
```

67

1  A   This is a statement of the year 2000, I think.  So it would inevitably be.

2  Q 218And that new loan agreements --

3  A   Subsequent payments were, subsequent withdrawals were made by Mr. Lawlor.

4  Q 219And Mr. Lawlor signed a new set of loan agreements for Sarka Therova, he

5     returned to her on the 15th May 2003, if we look to page 142.

6  A   There were certainly a number of subsequent withdrawals.

7  Q 220And I think you have confirmed earlier that you see nothing usual in having

8     loan agreements drawn up after the event, isn't that correct?

9  A   To record the, to record a loan that had been notified.  What wouldn't be

10    possible would be to complete a loan account after the; you couldn't reopen the

11    accounts to say that something had happened in a year previous.

12 Q 221Is it the case that in April of the year 2000, that loan agreements as we have

13    already seen, were being sent out to Mr. Lawlor, in particular the loan

14    agreement for the 170 --

15 A   That's only in respect of loans that had been notified in the documentation,

16    recording -- the documentation recording them would follow later.

17 Q 222Could I suggest to you there was no documentation in the year 2000, that

18    evidenced there being a loan agreement to Mr. Lawlor of 117,500 pounds sterling

19    because that money did not come to Mr. Lawlor until after the second --

20 A   I think you are speaking now about the draft loan agreement you referred to

21    yesterday.

22 Q 223Yes.

23 A   And again, this is a matter which, had I had some prior notice of what was

24    going to be asked, I could have dealt with it rather better than I did when you

25    asked me yesterday.

26 Q 224Feel free to elaborate.

27 A   So I took the opportunity to make an inquiry regarding that particular document

28    and established that it was never completed and that the accounting treatment

29    of it was such that it was decided that it could not possibly be treated as

30    income of the company because it was Mr. Lawlor's income, and therefore it was

68

```
 1      appropriate to -- inappropriate to record a loan which hadn't existed, because
 2      the money had not been the company's.  If it had not been the company's,
 3      therefore it could not have been loaned back to him, so the document was not
 4      completed and the receipt was not included in the accounts of the company
 5      because it was not belonging to the company.
 6  Q 225So equally the instruction which you had given to Sarka in the handwritten
 7      memorandum was an instruction which could never have been complied with
 8      legitimately by her, page 41?
 9  A   The request had been made to me to prepare a loan agreement was not in fact
10      complied with because we looked at it and it wasn't correct and we didn't
11      complete it.
12  Q 226Well, can I suggest firstly that the instruction was complied with in that one
13      of the assistants did prepare --
14  A   The instruction was complied with to the extent that a draft was prepared.
15  Q 227And it was sent by fax to Mr. Lawlor and sent by Mr. Lawlor, who signed the
16      document.
17  A   Who signed the document.
18  Q 228And September it, back in the year 2002, though it was dealing, if it was a
19      legitimate payment, it was dealing with a payment which had been, which had
20      taken place in the financial year 2000 and was being prepared two years after
21      the event, in breach of your procedures, you have already mentioned to me.
22  A   It was not continued, it was not.  Because it was looked at and it was
23      understood that it couldn't be entered as a correct procedure.
24  Q 229But the intention was to enter into it and the intention could never have
25      been --
26  A   Presumably from the instruction that had been the intention of Mr. Lawlor,
27      which is why I gave the instruction, but it wasn't and it couldn't be complied
28      with.
29  Q 230But it couldn't be -- it could be complied with, but if it was complied with,
30      it could not be legitimately complied with, is that the appropriate --
```

69

1  A    But it wasn't, it wasn't followed because to do so wouldn't have been correct.

2  Q 231Well, it was followed from Mr. Lawlor's point of view, it was followed to the

3      point that we do not have a signature from Zatecka at the end of the agreement

4      but we have Mr. Lawlor's signature, isn't that right?

5  A    Yes?

6  Q 232And as the lawyer to Zatecka --

7  A    Yes?

8  Q 233You were writing to Mr. Lawlor, who you knew to be the principal behind that

9      company, asking him to enter into this?

10 A    I didn't ask him to -- he was stating that this is, this was a position which

11     is how he wished to conduct his particular business.  To the extent that he had

12     that instruction, we started to comply with it, looked at it and didn't

13     continue with it further.

14 Q 234Are you saying this was as a result of a conscious decision taken by Zatecka

15     not to enter into this agreement because it did not comply with your

16     appropriate regulation?

17 A    Correct.  It was a conscious decision that it was not correct.

18 Q 235By whom?  By you?

19 A    By us.  Yes.

20 Q 236Who is us?  Is it Mr. Lawlor?

21 A    Sorry, by the people who were advising the company, namely my firm and the

22     accounting firm.

23 Q 237And where is there advice that says that this legal agreement should not be

24     completed on behalf of the company? I suggest to you in the files provided by

25     Mr. Lawlor there is no such record of any decision of the company.

26 A    The fact is that is what happened and I can't help you further in that regard.

27 Q 238Are you saying because it was not completed, it must follow that the company

28     made a decision not to sign it?  Or are you saying that there was a positive

29     decision taken by the company, after consideration of the merits of the

30     situation, where it decided not to?  Which is it?

70

1    A    I am sorry, I couldn't differentiate between your two questions but let me just

2         tell you that it was prepared on Mr. Lawlor's instructions and we did not

3         comply with it because it was decided that it was not appropriate to do so.

4    Q 239 In many respects this particular agreement merely mirrors similar types of

5         agreements, loan agreements entered into, or supposedly entered into by the

6         company with Mr. Lawlor which had not, in fact, been entered into but were

7         prepared ex post facto in April of 2002?

8    A    Not at all, it was completely different.

9    Q 240 Why was it different?

10   A    Because it referred to other monies which were not held by the company.

11   Q 241 Though some of those monies found themselves in the accounts, as we have

12        already seen, 57,000 of the 100,000 ends up in Zatecka's account?

13   A    But not in the accounts of the company, it was in the client account ledger.

14        That was the money that was then paid to Mr. Lawlor.

15   Q 242 And can you confirm to me, as I asked you to before, whether or not the

16        contents of the Zatecka client account in London were ever made available to

17        the auditors in the Czech Republic and noted as being transfers involving the

18        company's financial affairs in the year 2000 in your accounts?

19   A    I believe so, but I understand that it was decided that it could not properly

20        be treated as the income of the company.

21   Q 243 I want to turn now briefly, Mr. Seddon, to the dealings in respect of the

22        property Zatecka.  We have been dealing with Hybernska which moved to the point

23        that it was acquired by Ballymore, but I want to deal with the other company

24        which was under consideration at that particular time.  Namely Zatecka 14.

25        We'll see at page 183 of the hard copy documentation that you wrote to the

26        agent who represented the vendor, Mr. Mark Batt at Identity Limited in Prague

27        on the 16th February, saying "I understand yesterday's term were agreed for the

28        sale by your client and purchase by mine of the above property for a price of

29        11,050,000 deutschmarks.

30   A    Yes indeed.

71

1  Q 244 So it received instructions from your client, Mr. Lawlor, that included a deal

2      in that amount?

3  A    Yes.

4  Q 245 Were you told by Mr. Lawlor at that time how he intended to finance this?

5  A    He said it was out of his own funds and that he was intending raising a loan,

6      probably with Erste Bank, to make up the balance.

7  Q 246 Did he indicate to you where the funds that he had were on deposit or --

8  A    No, he didn't.

9  Q 247 Did you enquire from him as to whether the funds were available immediately for

10     the payment of deposits etc?

11 A    No, I didn't.  There wasn't in fact a requirement at that stage to -- in fact

12     there did never become a requirement to pay a deposit so it wouldn't have been

13     something I would have discussed.

14 Q 248 That consideration would translate into about 4.75 million Irish pounds at the

15     time, isn't that right?

16 A    11 million deutschmarks.

17 Q 249 The next document I'd like you to look at is page 184, and this is a document

18     on letterheading of Zatecka 14 S.R.O.  Can I deal first with the letterheading,

19     was that documentation that you had generated on behalf of the company in

20     Prague?

21 A    No, it wasn't.

22 Q 250 Did you have any of this documentation in your office in Prague?

23 A    No, I didn't.

24 Q 251 If we look to page 273 of the hard copy, we will see an invoice from a company

25     in north or West Dublin called Griffeen Graphics, to Liam Lawlor for 500 letter

26     heads?

27 A    Sorry, what page is it.

28 Q 252 Page 273.  Griffeen Graphics, Lucan Heights, Dublin, to Liam Lawlor, 500

29     letters heads, Zatecka Properties printed in lieu, 114 odd.  Have you any

30     recollection of Zatecka having to meet this bill or discharge its liability?

72

1  A    I have no recollection, I couldn't tell you if that is in one of the files of

2       invoices; but it wasn't, it was something clearly ordered by Mr. Lawlor and any

3       letter heads would have been held by him and not by me.  I don't know if I have

4       ever seen any -- I don't recollect seeing a letter with that letterhead, they

5       were usually as in the form of the next letter in the bundle which appears to

6       be computer generated.

7  Q 253This particular document certainly seems to indicate that it was copied to Mark

8       Batt, to yourself, Tony Seddon and Ron Smith.

9  A    Yes.

10 Q 254This is the letter of page 184, which is on the Zatecka letterheading that

11      suggests it was probably prepared in Ireland.

12 A    Any letter coming through a fax, you wouldn't be able to tell if that had been

13      a printed letterhead.

14 Q 255Unless --

15 A    I don't know what, there's no difference between a printed letterhead and a

16      generated letterhead.

17 Q 256Right.  This is discovered to the Tribunal by Mr. Lawlor as being your file, so

18      I must assume that --

19 A    I really --

20 Q 257Sorry, not the invoice, I am talking about the letter.

21 A    This copy fax is --

22 Q 258So you were aware that Mr. Lawlor is conducting the day to day business, if I

23      can describe it as that as opposed to the accounting business of Zatecka, on

24      letterheading that he has prepared in Ireland.

25 A    Yes, he would conduct business using the Zatecka name, certainly.

26 Q 259Right; and the registered address there being your own registered address at

27      Seddons in Prague?

28 A    Which is the correct address.

29 Q 260Correct.  In this particular letter on page 184, it's expressed to be from

30      Zatecka but if we read the text of it, we'll see that Mr. Lawlor is addressing

73

```
1      Mr. Maron, who is the principal of Simotex, the vendor of the building, saying:
2      "Following my last meeting with you when we shook hands and agreed I would
3      purchase the building from you, I was of the opinion at the time that I was
4      purchasing the building, not Simotex S.R.O", etc etc, So it was a very
5      important input in this correspondence from the purchaser, Zatecka, to the
6      vendor, Mr. Maron, isn't that right?
7  A   Yes, they were the two principals, the two effective owners of the two
8      companies.  At least I assumed Mr. Maron was, that is how he conducted himself.
9  Q 261And that is how Mr. Lawlor in turn conducted himself as the principal behind
10     this company and his dealings with it?
11 A   Oh yes, which was the case of course.
12 Q 262Right.  That letter was written on March 28th, we will see from the earlier
13     letter that the terms had been agreed in February, matters seemed to be
14     progressing rather slowly, isn't that right?
15 A   Indeed, yes.
16 Q 263And this continues for some time, Mr. Lawlor is in touch with you in April --
17 A   Well yes, the position is touched on here as a matter of history of where he
18     refers to, he thought he was buying a building and it turned out that Simotex,
19     which was the company that owned that building, had not only that building but
20     a number of other buildings as well, other various financial dealings and
21     obligations.  It was a much more complicated story than had been first
22     understood when the agent had more simplistically said "that is the price, this
23     is the building."
24 Q 264By the 28th April, we see on page 186, you are writing to Mr. Lawlor in
25     connection with Zatecka, in the body of which you say:
26     "I understood you would do the deal of Erste Bank and they had been prepared to
27     lend 4 million deutschmarks on the original deal when the price was 11,050,000
28     deutschmarks".  So that on that, it would appear that there was to be an equity
29     of about 4 million deutschmarks to be put up by Mr. Lawlor in this acquisition?
30 A   Yes.
```

74

1  Q 265 At page 189, you see an attendance on Mr. Lawlor in relation to Prague

2      properties, Zatecka 14, manuscript document and translation is page 190.

3      "LL will be talking about it to BF and SM next week, will then decide on

4      whether or not to proceed".  You might just confirm to me the identity of BF

5      and SM?

6  A    I imagine that that, those would be SM would be Sean Mulryan and BF would be

7      his finance director.

8  Q 266 Now, we move to June on page 191, where on the 27th June in relation to

9      Zatecka, you are writing:

10     "Dear Liam, I had a call from Maron yesterday, he was asking about your

11     intentions for the property", etc, in the following paragraph you say "I

12     understand you intend to pass Zatecka 14 S.R.O. on to a third party.  Would it

13     be your intention to buy that property as well or is that not on the agenda".

14     Obviously there was the intention, the property, the Zatecka was going to be

15     passed.  To whom was it going to be passed on, for what consideration?

16 A    I really don't remember and certainly nothing came out of it.

17 Q 267 Yes.  Three days later we see on page 192 a letter from you of the 30th June to

18     Mr. Lawlor at his home, headed Zatecka 14 S.R.O. in which you say:

19     "I see that your connection with two Czech companies was put on the front page

20     of the Irish Times yesterday.  I read the articles and the extract of the

21     business interests of TDs.  I do not know the rules that you have to follow,

22     but please note that you are not and never have been any kind of director of

23     Zatecka 14 S.R.O.."

24

25     Firstly, can I ask you, are you a subscriber to the Irish Times on a daily

26     basis?

27 A    No, somebody sent it to me.

28 Q 268 Who was it that sent it to you?

29 A    I can't remember.  It was brought to my attention anyway.  I think in fact at

30     the time I had an article clerk in the office seconded from Matheson Ormsby

75

1      Prentice who showed it to me.

2  Q 269There's reference also to an extract of the business interests of TDs?

3  A    Yes.

4  Q 270Have you a recollection of considering such an extract and --

5  A    Yes, I remember seeing it because it was in the newspaper and I thought it

6       appropriate to comment on it.

7  Q 271You again said, made reference, you referred to an Irish Times article which

8       was published on that date, which we see on page 193, I wonder if that's the

9       article that you read, it's headed "Lawlor claims no income apart from TD

10      salary." That is from the Irish Times of the 29th June, 2000.

11

12      "Dublin West TD, Liam Lawlor, claimed in his latest declaration of TD's

13      interest he earned no occupational income apart from his TDs salary, in the

14      updated register of interests of TDs and Senators, he is shown to be a director

15      of a Czech based property development company.  This is apart from the one he

16      was questioned about by the Fianna Fail Payments to Politicians Inquiry team.

17      He is shown to be a non-executive director of a company called Zatecka 14

18      S.R.O. based in Prague.  When questioned by the inquiry team, he was asked

19      about the Irish Consortium S.R.O. also based in Prague.  The latest declaration

20      is due to be published tomorrow for the year ending January 31st, 2000.

21      Mr. Lawlor in the new register said he had a position as technical consultant

22      with Rotary M&E Services in Fairview."

23      Do you think that was the article?

24  A    I don't think so.

25  Q 272In any event --

26  A    It said it was an article that was stating very specifically names and the

27       interests that were, I can't be sure, it may be that I was shown the Irish

28       Times of that day on the Internet.  I'm certain -- but there was definitely a

29       specific reference saying these are listing directorships.

30  Q 273Now, you were advising him here that whilst you didn't know the rules you had

76

1       to follow, he should note that he was not and never had been any kind of

2       director of Zatecka 14 SRO.

3   A   I was simply, he had declared that he was a director and I was pointing out

4       that he was incorrect.

5   Q 274The declaration was one which indicated the beneficial ownership of that

6       company, or Mr. Lawlor's beneficial interest in it, isn't that so?

7   A   That I don't remember, there's no comment made about that.  I don't remember if

8       that was declaring that he had an interest in that company.

9   Q 275Did you consider that the fact that this had been disclosed publicly might

10      affect any other business interests that Zatecka would be conducting in Prague,

11      or elsewhere, at that time?

12  A   I don't think so.  He was, he made no secret of his status, in fact that was

13      something which, myself included, was swayed by the fact that somebody is a

14      member of a respected institution, people doing business with them feel

15      entitled to believe what they are told.

16  Q 276Are you talking about his membership of Dail Eireann?

17  A   Sorry, what is that?

18  Q 277The parliament, the Irish parliament.

19  A   Sorry, yes, yes.  I'm not sure because he seemed to be described as different

20      things, whether it was MP, which may be a literal translation, I am not sure

21      but he sometimes called himself MP, sometimes was -- may have been Member of

22      Parliament, but it was not something that he kept to himself.

23  Q 278Yes.  We can see his description in those terms on page 181.  Where in writing

24      to Mr. Batt, who was agent to the vendor of the Zatecka property, this missive,

25      which comes from the desk of Liam L Lawlor, MP.

26  A   I don't know if that was his normal way of translating TD to a non-Irish

27      person.

28  Q 279If we look to page 194 we see a letter you wrote to Mr. Lawlor on the 10th July

29      2000, some 10 days or so after the reference to the Irish Times article.

30      "As you know, Elard Maron is coming on Tuesday afternoon.  What will I be able

77

1    to tell him?  Are you still proposing to come to Prague this week?  Shall be

2    here until the 19th July.  As I understand Ron Smith, he is getting agitated

3    for the reason of nonpayment of his fee. I do not know the reason for holding

4    back in this respect as everything has been done in accordance with your

5    agreement."

6

7    I think there was a specific agreement between Mr. Lawlor and Mr. Smith

8    regarding payment to Mr. Smith in the eventuality of the Hybernska building

9    being acquired; and also in the event of the Zatecka being either acquired or

10   not acquired he was to get varying rates of benefit, depending on whether the

11   property was or was not acquired, isn't that so?

12 A   I apologise, I was trying to read it and listen at the same time.  I didn't

13   catch the question.

14 Q 280If we move to page 268 you will see there's an agreement signed by Mr. Lawlor

15   and Mr. Ron Smith on the 7th February 2000, which is one which provides for

16   certain payments to be made.

17 A   Sorry, page?

18 Q 281Page 268.  We will see it's signed at the bottom by both, dated 7th February

19   and it provides for certain payments in the eventuality of, firstly, the

20   Hybernska building being purchased; secondly, the Zatecka building being

21   purchased; and thirdly, what's to happen in the event that it is not purchased,

22   isn't that so?

23 A   Yes.

24 Q 282In either event, these are payments which will come to Mr. Smith from

25   Mr. Lawlor.  It's noteworthy that these were not agreements between Zatecka

26   S.R.O. and Mr. Smith, as it was presumably Zatecka that was going to benefit.

27 A   Well on the 7th February the company hadn't actually been incorporated, so that

28   would have been the sort of, that sort of contract couldn't have been effective

29   before the date of incorporation -- before the date of registration.

30 Q 283Well in fact it could be effective from the date of its signing, and unless

78

```
 1    there had been a specific reference to the liability of Mr. Lawlor being taken

 2    over by the company Zatecka on its incorporation, Mr. Lawlor would remain bound

 3    by these terms, notwithstanding the subsequent incorporation of Zatecka, isn't

 4    that right?

 5  A  At the time this was done, Zatecka didn't exist.

 6  Q 284But if it was intended that this was to be an agreement which would be

 7    performed at the end of the day by Zatecka, a company in the course of

 8    formation, that specifically would have been mentioned here.

 9  A  This was -- such person is to transfer the property as Liam Lawlor shall

10    direct.

11  Q 285Well that would be Ballymore Properties or some other properties.

12  A  Whoever.

13  Q 286But Mr. Smith obviously wanted to be paid by a real person and not by a company

14    which may or may not have assets.

15  A  Well apart from the fact that it wasn't a company with any assets at that time,

16    it wouldn't have been possible to have a binding agreement made, and this was a

17    personal obligation that Mr. Lawlor had made.

18  Q 287Yes.  I'm putting to you that it remained a personal obligation of Mr. Lawlor's

19    and had been a personal obligation from the time the agreement was reached.  It

20    was not superseded by any agreement after the incorporation of Zatecka.

21  A  It was superseded to the extent that because, in the event the company Zatecka

22    did the actual deal, the company Zatecka also paid the amount of the first fee,

23    but as a company Zatecka had no, in the event, had no connection with the

24    property Zatecka and didn't, did not pay the other fee because the other fee

25    didn't become payable.

26  Q 288In your letter of the --

27  A  Sorry, the -- this is, there are two other fees.  The other fee that is

28    referred to should have become payable because it was agreed that Mr. Lawlor

29    would pay an additional fee if he didn't go ahead with the Zatecka purchase

30    because that would have meant that Mr. Smith would have lost a fee and he was
```

79

1       probably -- I am not sure -- agreeing the package deal, so to speak.

2   Q 289Do you know if he was paid that second 10,000 fee for non-completion of

3       Zatecka?

4   A    It does -- it didn't proceed.  The additional fee of 25,000.

5   Q 290Shall be 10, sorry; if it does proceed, he will be paid 10, he will be paid 25

6       if it doesn't proceed.  Was he paid 25?

7   A    I don't think that he was.  I think that it was -- I can't be sure, but I know

8       that at one point, it was a matter of contention between the two people.

9   Q 291In this letter in July 2000, you state Mr. Ron Smith's position as follows "you

10      say his future cooperation is needed in the connection of transfer of the

11      freehold from Aspen into the new Ballymore Company" that's in respect of

12      Hybernska, is that right?

13  A    Yes, that's right, he was very much involved with that property and I was

14      pointing out that there was an obligation.

15  Q 292Well, it was vague, to the extent that there wasn't a time limit as to by which

16      time the property Zatecka should have been completed, but as it was becoming

17      clear, that he was not going to be able to deal with the acquisition, then it

18      seemed correct that he ought to honour the agreement to pay.

19  A    I was simply pointing it out and pointing out the fact that the man's

20      cooperation was needed because of the complications regarding the transfer of

21      the property interest.

22  Q 293You go on to say "his position is that the Zatecka purchaser not going ahead

23      (is this correct) is your inquiry" and therefore he is entitled to the higher

24      fee specified in your agreement, that's the 25,000?

25  A    Yes.

26  Q 294He said "the next step if the matter is not dealt with early next week is to

27      ask Brian Fagan for payment.  He is the accountant for Ballymore.  He said he

28      has given you due warning".  Now, can you explain what possible interest

29      Mr. Fagan would have in the affairs of Zatecka if they are not concerned with

30      the acquisition of that building?  Why would he be concerned with the absence

80

1    of payment of any agreement?

2  A  Well because he was aware that Ballymore had been the purchaser of the

3     Hybernska property.  His fee was in respect of that transaction and he was

4     aggrieved that he hadn't had it and therefore felt he was entitled to go over

5     Mr. Lawlor's head, so to speak, even though there was no obligation of

6     Ballymore to Mr. Smith in that regard.

7  Q 295You go on in your letter to say: "I have not heard anything further from

8     Richard Kavalek, I thought we had reached agreement with him on procedure for

9     settling his fees.  I would have expected to hear something if Zatecka 14

10    S.R.O. is expected to make payment.  With regard to the company I understood

11    from Brian that it was proposed that they take it over lock, stock and barrel",

12    I think that's meant to be, but it may have changed since the notification of

13    the company in the list of members' interest.  The list of members' interest

14    that you refer to there, is that the Dail declaration of Mr. Lawlor's

15    beneficial interests?

16 A  Yes, I'm sure that was.

17 Q 296And were you suggesting here that by reason of the fact that this had found

18    itself listed in the interests of Mr. Lawlor that it might not be an attractive

19    proposition for Ballymore to take over the property, and if so, why?

20 A  I think that by this time, I think I understand that Mr. Lawlor had become a

21    figure of some controversy and there had been a discussion because Ballymore

22    were, by this time, beginning to become involved in the business of managing,

23    developing property in this country; that an existing company might be of use

24    to them.  I think that was -- and I think that there had been a proposal made

25    by Mr. Lawlor at one point that he might have simply sold on the shell of what

26    was left Zatecka and I think it was no more than a proposal, and I was making a

27    comment that that may no longer be a matter of attraction.

28 Q 297Of course you knew at that time that Ballymore Properties Czech Republic S.R.O,

29    had been registered on the 12th June, a month before this and there was no

30    requirement for Ballymore to acquire any further Czech company past that date,

81

1    isn't that right?

2  A    No, they -- well, they had another completely separate reason as to why they

3        would want some Czech property vehicles which had nothing to do with

4        Mr. Lawlor.

5  Q 298But there was no reason for them, that you could see, that you say for them to

6        be acquiring Zatecka 14 S.R.O. in July to satisfy that requirement?

7  A    There was -- I think there was no specific requirement but I think it was

8        something that might have been useful, it was something that was there.

9  Q 299On the day following this, you take an attendance of Mr. Lawlor on page 196 in

10       relation to Zatecka where you record things "will have to tell Maron can't

11       proceed, doesn't think he can do anything."  Effectively it seemed to be an end

12       of the pursuit by Zatecka 14 S.R.O. of the Zatecka 14 building, is that right?

13 A    Yes.

14 Q 300Did Mr. Lawlor give you specific reason on that date as to why it was that this

15       was not going to be acquired?

16 A    Why it was not going to be acquired, I assume from that it was meaning that the

17       money was not available for the transaction.

18 Q 301Well did he tell you that?

19 A    Apart from the jotting I made I can't tell you the precise words that were

20       used, but I was aware that he was always very keen on being able to acquire it

21       and it was simply the inability to raise the money to do it.

22 Q 302Well I want to know how you had the understanding that he did not have the

23       available funds to do it, given that some months before, you had been told by

24       him that he had funds.

25 A    Some months before he had said that he could raise the funds, yes, and then he

26       said he couldn't.

27 Q 303So we see that on the 25th August at page 200, you are responding to Nicholas

28       Morgan and his fax of the 18th August, which is a fax we dealt with yesterday,

29       which is one where Mr. Morgan was indicating that the outstanding funds in the

30       credit of the company Zatecka were to be transferred to Liechtenstein, and to

82

1     Switzerland, to two numbered accounts.

2  A    Yes.

3  Q 304Do you know what had triggered the desire on Mr. Lawlor's part to wind up the

4     affairs of the Zatecka company and remove the funds from the Czech Republic

5     certainly by August and probably July of that year, 2000?

6  A    Why was he?

7  Q 305Yes.

8  A    I don't know, I presume he simply wanted the money, he wanted the money to be

9     paid away.

10 Q 306Was it because the Zatecka company could no longer be used by him to acquire

11    properties unless this was going to be disclosed publicly?

12 A    No, that certainly wasn't a point that I ever had.

13 Q 307You didn't address that issue in any way?

14 A    That didn't cross my mind, no.  He had declared he owned it, there was no

15    reason why he shouldn't use it to buy investments.

16 Q 308At the time he declared he owned it, it had no assets that you were aware of,

17    but was intending to acquire the Zatecka 14 S.R.O. building?

18 A    It was the assets it had, the money in the bank and the loan notes it had from

19    Mr. Lawlor.

20 Q 309And those assets were intended, a month later, to be taken out of the company,

21    transferred to a company under the administration of Mr. Nicholas Morgan in

22    Switzerland and in Liechtenstein?

23 A    That's what they proposed, yes.

24 Q 310Would it follow from that there would be no further interest in the building,

25    Zatecka 14, given that the company that was interested in buying it was

26    effectively going to be wound up?

27 A    Well if the company was wound up, any interests that he had in it couldn't be

28    adopted through the company, certainly, if that's what was going to happen.

29 Q 311But he could set up, presumably, another company to continue on the

30    negotiations that he was having for its acquisition?

83

1  A    In fact as we have seen before, the discussions had moved on and were in

2       relation to the acquisition of a different company, which wouldn't have

3       required another intermediary company because you would have been able to buy

4       that property owning company and hold it directly.

5  Q 312This was if he had purchased Simotex rather than purchasing the company?

6  A    Yes.

7  Q 313We see that by the 30th August, on page 202, Ron Smith, I believe it is, is

8       raising a query with you, page 202.  The query "whether can put the connection

9       with Batt as it is a different deal.  PT had said that he would buy if the deal

10      falls through."  Now, was there a separate deal, a new deal cut with somebody

11      other than Mr. Batt who had been the official agent for Mr. Maron in the

12      transaction between Zatecka and --

13 A    Yes, I think what he was asking, he had -- this was nothing in fact -- in fact

14      nothing to do with Mr. Lawlor, but Mr. Smith was asking if he took a completely

15      different deal to the owner, whether the commission to Batt would be cut.  I

16      think that's the nature of his inquiry.

17 Q 314But he would have no obligation to pay Batt a commission?

18 A    He would be inquiring because if somebody else was buying, had an obligation to

19      pay Mr. Batt, if there was some form of exclusive arrangement, then it may be

20      relevant for his discussions with third parties.

21 Q 315But you record this in connection with Mr. Lawlor, Zatecka.

22 A    Yes.  That was the only file I had relating to Zatecka, so --

23 Q 316Was it to cover an eventuality that another entity of Mr. Lawlor's other

24      than --

25 A    Definitely not.

26 Q 317-- Zatecka might acquire this property?

27 A    This was nothing to do with Mr. Lawlor.

28 Q 318I see.  If we move to September then, page 204, you fax Mr. Lawlor on that date

29      in relation to Zatecka 14.  "I hope the rest of your sporting week went well, I

30      am in London for the whole of this week, I would like if possible to make

84

1    progress with regard to this project.  Following the meeting with Elard Maron,

2    we promised to let him have a detailed proposal regarding the transaction."

3    Do you remember having a meeting with Elard Maron after the decision to --

4  A    Yes, I think there was another meeting and originally Mr. Maron had been under

5    some pressure to complete quickly, but he said that he didn't actually have the

6    same pressure any more.  He wasn't in any rush.  And I think if I have the

7    sequence, the timing right, I think Mr. Lawlor -- who did particularly like the

8    building -- said he would see if he could find another means of financing it.

9  Q 319And could I suggest possibly another means of acquiring it rather than through

10    Zatecka?

11  A    Yeah, I think the vehicle to be used wasn't, I think it was a matter of

12    discussion then.

13  Q 320We see on page 205 where Mr. Batt contacts you by fax of the 12th September

14    saying "I have recently returned from holidays, I understand that Mr. Liam

15    Lawlor's purchase of Zatecka 14, Prague, has been reagreed with Mr. Maron of

16    Simotex.?"

17  A    Yes.

18  Q 321Does that act accurately reflect the position?

19  A    Yes, he was going to try again.

20  Q 322It doesn't say trying again here, "it has been reagreed2.

21  A    He didn't sign a contract.  He said he was going to buy it.

22  Q 323On what terms was he going to buy it?  And who was going to do the buying?

23    What terms had he agreed with Mr. Maron in the new arrangement?

24  A    I really don't recollect what those terms were now.

25  Q 324Did you record them or were you given them by Mr. Lawlor at any time?

26  A    I am sure it was on my file, whatever was said about that.

27  Q 325You may take it that these are your files, Mr. Seddon.

28  A    This is a small extract from it.

29  Q 326I'm putting to you that there is no record of the details of a new transaction

30    under which Mr. Lawlor had agreed to acquire the property from Mr. Maron, or

85

```
1       from his company, Simotex, other than these documents.
2   A   Perhaps -- I really don't recollect, perhaps we didn't get to forming it,
3       preparing or receiving from the vendor, as would be normal for the person
4       selling to prepare the contract.
5   Q 327  I think in this instance, Mr. Maron was always insistent on the contract being
6       prepared by you and that you would act for both himself and for Mr. Lawlor,
7       isn't that so?
8   A   I don't remember that being so.
9   Q 328  In November of the same year, Mr. Batt is getting back to you at page 206
10      saying that he had spoken to Mr. Maron today, that is the 10th November 2000,
11      and "I understand that he confirmed in writing with Mr. Lawlor approximately
12      ten days ago the new sale price of Zatecka 14 as discussed during the last
13      personal meeting that Mr. Lawlor had with Mr. Maron about two months ago.
14      Mr. Maron is now waiting on news from Mr. Lawlor and confirmation of finance
15      etc. and is keen to conclude the acquisition as soon as possible. I appreciate
16      you may already be aware of the above, but I want to keep you informed".
17
18      You follow that up with a fax of page 206 of the 13th November.
19      "Dear Liam, on Friday I had a call from Mark Batt which he follows up with a
20      fax, copy attached herewith. I gather that Elard Maron had been in touch with
21      you direct and you have made a new agreement as to the price etc.  Mark also
22      says that Mr. Maron told him that he understood that you had asked me to
23      prepare a new contract.  I look forward to hearing from you.  In fact there
24      have been some further developments.  Kind regards.  Yours sincerely."
25  Q 329  Does that bring back to mind what role you were to play with regard to the
26      implementation of the new agreement between Mr. Maron and Mr. Lawlor, it was
27      probably concluded in November?
28  A   If that's, if the matter had proceeded then I would have followed the
29      instructions and prepared a contract as requested.
30  Q 330  But did Mr. Lawlor give you an explanation as to whether he was going to
```

86

```
1      proceed with the new agreement, or not proceed, or whether it was going to

2      proceed through other company or another solicitor or another firm?

3  A   I certainly don't remember him saying to me that he was going to proceed with

4      another lawyer.

5  Q 331Well did he formally tell you that he was no longer interested in this property

6      and that he was not going to acquire it, either personally or through the

7      vehicle in this form, or otherwise.

8  A   I don't remember how he told me or didn't tell me, or whether simply nothing

9      happened.  All I do know is that there was no deal and there was no contract

10     and so, it's difficult to remember terms of something that didn't happen.

11 Q 332Well it was something that had taken up a fair amount of your time throughout

12     that year, you had been working on it since probably the beginning of January?

13 A   It did indeed, it took a very considerable amount of my time, but --

14 Q 333Can you not recollect exactly how it came to a conclusion?

15 A   No, I can't, all I know is it didn't come to a conclusion in a normal sense of

16     being completed.  It just didn't happen.  It came to an end.  It stopped.  And

17     I think there is in the bundle, a letter where I have referred to the fact that

18     it's not going anywhere or it's not going to be bought for the agreed fee for

19     the time that was used in the abortive negotiations.

20 Q 334Do you know whether or not Mr. Lawlor did in fact acquire this property?

21 A   I'm pretty sure that he didn't.

22 Q 335If he did, he didn't do it through you, effectively you are saying?

23 A   Yes.  Yes.  But I'm fairly sure because I have come across Mr. Maron in other

24     circumstances and I would have heard if he had sold it, I have no doubt.

25 Q 336Has the building, or the company, been sold since?

26 A   I believe not.

27 Q 337I want to turn finally, Mr. Seddon, to the invoice which is apparently an

28     invoice on your companies notepaper, but which you indicate was not prepared by

29     your firm; and we see a copy of it at page 40 of the brief.  This is a document

30     we know --
```

87

1  A    We are now going back to the first part of the --

2  Q 338Exactly.  This document which you see before you is a photocopy of a document,

3       and it is your evidence that this document is not generated in the firm of

4       Seddons, is that so?

5  A    It is indeed my evidence.  It's apparent from the face of the document that it

6       is not our document.

7  Q 339And why do you say that?  It has all the appearances of being a Seddons

8       document, perhaps you can indicate what particular items on it indicate it's

9       not a Seddons document?

10 A    If somebody wrote an invoice with "O' Neill" on the top, that wouldn't make it

11      an O' Neill invoice, would it?

12 Q 340We are looking here at what --

13 A    I took care to have a report made and for you to be supplied with a copy of the

14      exact style of invoice that was used by this firm at this particular time in

15      January 2001, and I think it is clear to anybody that the way that had been

16      prepared is not the same.

17 Q 341You make an assumption that the document which is at page 40, that is the

18      invoice 117,500 pounds was prepared in January of 2001, merely because it has a

19      date of January 2001?

20 A    I make a comparison, yes, that is the case.  I don't know, I wasn't here when

21      the evidence was given, but I understand that evidence was given and this

22      document was produced by the company that had asked for it.

23 Q 342It was --

24 A    And that --

25 Q 343-- it was produced by the company which had asked for it and they paid a

26      further 17,500 pounds on that basis and that payment was made on the 24th

27      September, 2001.

28 A    Yes.  That is in the -- so what you -- well yes, so --

29 Q 344So the fact that invoice --

30 A    It was clearly there they had it in their books before that -- before

88

1    September, but I don't know, I have no idea when it was produced, there's no

2    reason why I should have any idea when it was produced.

3  Q 345But you are making the point in your evidence that it is clearly not a Seddons

4    invoice.  I have some difficulty in --

5  A   If you were to look at it you will see that it is similar to, but not the same

6    as.

7  Q 346Not identical to.

8  A   And to be one of our invoices, it would have to be on our stationery, and our

9    stationery is all the same.

10 Q 347Well, could I suggest that your stationery isn't all the same, that it varies

11    according to the number of partners who are in the firm at a particular time?

12 A   Certainly.

13 Q 348Who the associates are at a particular time?

14 A   Certainly would, but on our invoices, they are not set out in this fashion.

15 Q 349If we look to page 39 now, which is a blank document, this is a document which

16    appears in Seddons files and was discovered to the Tribunal by Mr. Lawlor; and

17    it is a blank document.

18 A   Yes.  Yes.

19 Q 350Now --

20 A   It's not clear to me where this document came from.

21 Q 351It's on your file.

22 A   Yes, I am not clear where it came to you from.

23 Q 352It came to us from Mr. Lawlor from the file of Seddons Solicitors which he

24    discovered to the Tribunal in the past two weeks.

25 A   This is the -- this is certainly the form of the firm's bill paper.

26 Q 353So it is a genuine document, it is a blank document and it is a fee invoice,

27    isn't that so?

28 A   It appears to be so.

29 Q 354Now, if we compare that with the fee invoice for the 117,500 pounds, what

30    distinctions do you see in that other than the fact that the partners are not

89

1     the same partners in the firm, and that the positioning of the associates is

2     also different.

3   A   The lay out at the bottom of the paper is completely different.  For some

4     reason there is, some additional characters have been added to the VAT

5     registration number.  There is no -- there are no printed lines above the name

6     of Seddons.  There is not on our account any words to the effect -- sorry,

7     on --

8   Q 355 You should have two documents before you, Mr. Seddon, firstly the document you

9     say is not a Seddons invoice and could not be a Seddons invoice and the other

10    document is page 39 which you are prepared to accept is a Seddons invoice?

11  A   Is a photocopy of it --

12  Q 356 A photocopy, yes, of a blank Seddons invoice.

13  A   Yes.

14  Q 357 Now, that photocopy of a blank Seddons invoice does not correspond with the

15    sample Seddons invoice which you sent to the Tribunal with your statement,

16    which is at page 33.

17  A   Yes.

18  Q 358 If we look to that.

19  A   Yes.

20  Q 359 So two genuine Seddons invoices have distinctions between them, isn't that so?

21  A   Yes.

22  Q 360 So even in your genuine invoices, there are going to be distinctions and those

23    distinctions --

24  A   Sorry, which distinctions are you talking about now?

25  Q 361 You told me there are distinctions between you.  I point them out to you,

26    amongst other things there are a different number of associates on the invoice

27    which is on page 33, you will see the associates are Nicholas Davis, Simon

28    Seaton and Rebecca Thomas, whereas on the document on page 39 which is also a

29    genuine document, the associate is Nicholas Davis.

30

90

1

2  A    Yes, that would be -- as at January 2001 the position would be as on the

3       invoice which is next to my statement.

4  Q 362The date on which the blank invoice 39 was printed, that was the correct

5       invoice because that represented the firm and the details of the firm at that

6       point in time?

7  A    At a point in time.

8  Q 363At a point in time, yes.

9  A    The names certainly wouldn't enable one to date, within a time fame when that,

10      when this particular piece of stationery was printed.

11 Q 364Well I'm suggesting to you that there could be series of different forms of

12      invoice dependent upon the composite partnership and structuring of the firm

13      over the years of its existence.  They wouldn't all necessarily be the same,

14      isn't that right?

15 A    Of course.

16 Q 365Is there any information on the document which is for 117,000 pounds which is

17      untrue, in other words is not accurate?  You make reference to the VAT

18      registration?

19 A    You have turned the page again.

20 Q 366Sorry, it's page 40.

21 A    The lines on the, immediately below "professional services relating to", you

22      see that, immediately following that, it says 117 Picadilly, London W1.  On one

23      of our invoices those words would be put there but in the space below, but that

24      is a question of style, preparation.  Immediately below that line, Picadilly,

25      you will see that there's a solid continuous dotted line, immediately below

26      that, there is another below the figure costs and disbursements, which is also

27      a continuously dotted line, which on our stationery is not so.

28 Q 367Are you saying somebody then forged this document so as to represent a Seddons

29      invoice?

30 A    All I can say is that somebody other than us, and I don't know if it appeared

91

1        in the evidence, I did try to find it but couldn't, whether there was produced

2        to the Tribunal the document that was said to have been received by Lunar Sea.

3        I don't know if you have that document.

4   Q 368No.  As much as the Tribunal had produced to us was a copy document which is a

5        print, a photoprint and the witness who received it indicated that as far as he

6        could recall he had received it in that format also.  Had not received it in --

7   A    So he haven't got a copy where the "S" of Seddon would be in a blue printed

8        field.  And I presume, also, that whatever they had would at least have had the

9        name correctly and the "S" on the end of Seddons, as in ours.

10  Q 369Yes.

11  A    I can't tell if that's simply as a result of a photocopy but certainly the

12       omission of the full spelling of the name would be different.  Anyway, I was

13       talking about lines with the gaps between the dots and you see the same feature

14       applies down below and --

15  Q 370So it is, as far as you are concerned, Mr. Seddon, it is a forged document?

16  A    I think that any document, which on the face of it purports to be something

17       that it isn't, I think that's a definition of a forgery.

18  Q 371And Mr. Lawlor has apologised to you in writing for having produced this

19       document as being a genuine document of your firm, isn't that so?

20  A    I am not -- I can't recollect if his apology went so far as to say he had

21       produced it.  There is certainly an apology.

22  Q 372For it's production, whether he was the architect of it or not, he is silent on

23       it?

24  A    Indeed, he said to me he was sorry and it was produced at the request of

25       somebody else.

26  Q 373Produced for somebody else, but --

27  A    For somebody else at their request is how he put it, I think.

28  Q 374I see.

29  A    And I think that you can imagine that while an apology was appreciated, that

30       there are some things you don't easily forgive.

92

1  Q 375You would appear, however, to have continued to act as Mr. Lawlor's solicitor,

2       notwithstanding his unauthorised use and forgery of documents of your firm,

3       isn't that so?

4  A    That is not quite the case.  This was something that was notified in --

5  Q 376July?

6  A    -- in July of this year, and I immediately told Mr. Lawlor that he had to

7       realise that that made rather a difference to our professional relationship.

8  Q 377Nonetheless, I note from your correspondence to Mr. Lawlor of late,

9       particularly when you were copying and enclosing files to him, that you

10      conclude your letter with "kind regards, yours sincerely" or is that on auto

11      print?

12 A    That is maybe on auto print with the secretary, but I would not necessarily

13      change the style of letter.  But the matters which were being carried out from

14      that point on were under rather a different relationship.

15 Q 378I see.  Has Mr. Lawlor discussed the evidence which you are to give to this

16      Tribunal with you?  Either prior to or during the course of your evidence here?

17 A    Mr. Lawlor has spoken to me, but not about the evidence that I might give.

18 Q 379Or have given?

19 A    Or have given.

20 Q 380I see.  Thank you Mr. Seddon.  Would you answer any questions which might be

21      put to you by Mr. Lawlor, and then your own counsel will have the opportunity

22      of questioning you.

23

24      CHAIRMAN:  Mr. Lawlor, do you want to come up to one of the desks.

25

26      Mr. Lawlor, you are entitled to cross-examine Mr. Seddon, and I suggest that

27      it's important that -- you are not legally advised --  I am suggesting to you

28      that it's important that you question him in relation, particularly to anything

29      that Mr. Seddon has said in evidence and that you disagree with or take issue

30      with.

93

1       MR. SEDDON WAS CROSS EXAMINED AS FOLLOWS BY MR. LIAM LAWLOR:

2

3       MR. LAWLOR:  I just received this booklet at the commencement of Mr. Seddon's

4       evidence yesterday morning and I received a transcript this morning of

5       yesterday's evidence, so it's a little bit difficult to deal with all the

6       issues I would like.  But I would like to commence by just saying, asking

7       Mr. Seddon, would he agree with me when the Tribunal was set up, when I first

8       communicated with him, both by letter and by meetings and telephone calls, that

9       at all times I requested that he would give the fullest cooperation from his

10      London and Prague offices to the Tribunal.

11   A   I certainly remember having various discussions with Mr. Lawlor about the

12      requests and the need to cooperate and I responded as, and when, I was asked to

13      do so.

14

15      CHAIRMAN:  But Mr. Lawlor specifically put it to you, Mr. Seddon, that he had

16      asked you to cooperate fully with the Tribunal.  Do you want to answer that

17      question?

18   A   Well my cooperation was to him, I wasn't in any direct communication with the

19      Tribunal, but yes, there were, I think the majority of discussions with, any

20      discussions I did have with Mr. Lawlor were in relation to requests for

21      information by the Tribunal.

22

23   Q 381MR. LAWLOR:  Sorry, I just repeat, the fullest cooperation.  I never put any

24      parameters or limitations on what the cooperation should be.  Would you agree

25      with that?

26   A   I would agree that I would follow your instructions, if they were, whatever

27      they would be.

28   Q 382Do you recall that that was my instruction?

29   A   I don't remember the specific times but I wouldn't disagree that you said that

30      you wanted to cooperate fully.

94

1  Q 383Thank you.

2      Would you also recollect, Mr. Seddon, that you were forwarded with whatever

3      correspondence I got that impinged on your London or Prague offices from the

4      Tribunal and copies of whatever orders, so that you could be fully aware of

5      requirements of the Tribunal by receipt of the papers circulated by the

6      Tribunal to me at the time.

7  A    Yes, you would -- I can't say for sure whether I received everything, but I

8      certainly received a good number of communications which were copied by you to

9      my office.

10 Q 384And would you recall requesting a copy of the Terms of Reference of the

11     Tribunal?

12 A    I don't recall, but I think I remember speaking to you about it, because I was

13     puzzled by the questions in relation to what the title of the inquiry was.

14 Q 385Yes.  And I think you went on to discuss your perplexity as to how it related

15     to Prague, Breno-Pilsenan Czech related property produce?

16 A    I hadn't understood why it was a matter of inquiry, that is true.

17 Q 386If we could just go on to your own statement and the fact that, would you agree

18     that there's a very glaring omission in it, in that there's no reference

19     whatsoever to the Putney Hill Project?

20 A    I was not asked to make a statement about the Putney Hill Project, but I'm

21     quite happy to confirm that you were involved in trying to acquire a

22     development site in London.

23 Q 387Would you agree that there was a request to transfer funds from Zatecka 14

24     S.R.O. as part of a purchase of an apartment at the Putney Hill complex?

25 A    Yes, that was --

26 Q 388And did you actually --

27 A    I believe that those instructions were followed.

28 Q 389Sure.  And that we jointly, with Prominent Town Planning Consultancy in

29     Wandsworth made a presentation to the 18 residents of the complex with a view

30     to acquisition?

95

1  A    Yes, that was a project which I knew you were heavily involved in.

2  Q 390OK.  Could I just ask about, go back to the formation of Zatecka 14 S.R.O. and

3       just get it on the record, if you would, because it appears that there's a

4       trend coming through from Mr. O'Neill that there's some instances, supposedly

5       attempts to hide my involvement in the company.  I mean, would you agree

6       there's never been an attempt from my  part to view, other than publicly

7       disclose my partition and involvement as a consultant to that company?

8  A    There was no, there was certainly no secret you were very public in all

9       meetings and discussions that you were dealing with this company.

10 Q 391If I could just ask you to turn to a letter that was referred to at great

11       length this morning by Mr. O'Neill, concerning your draft letter where you were

12       changing from Liam Lawlor, the client -- if I can just lay hands on the number

13       now -- where you change --

14

15       MR. O'NEILL:  Page 253.

16

17       MR. LAWLOR:  You changed the letter Mr. O'Neill.  Whether it was at my

18       suggestion, you took out my name and put in client.  Could I put it to you,

19       Mr. Seddon --

20

21       CHAIRMAN:  That is page 253.

22

23       MR. O'NEILL:  I wonder if Mr. Lawlor could press the button on the microphone

24       so he can be recorded?

25

26       MR. LAWLOR:  OK.

27 Q 392Could I suggest that was your changes, Tony, I had no problem if my name was

28       there and it wasn't my request or instruction to give credence to that; go to

29       263, where in a draft agreement you drew up there was no problem in including

30       my name in the agreement that was proposed to be signed between myself and the

96

1      Ballymore Group, so it was more a drafting on a solicitor/legalistic point of
2      view that it was changed from "I have received from Liam Lawlor" and putting in
3      "from my client".
4    A  I think that I said that I couldn't be absolutely sure as to why the change was
5      made but that I had thought that it was a document that I would have discussed
6      with you and agreed with you.
7    Q 393 Yeah, I have no problem with you discussing it with me.  I had no input in
8      changing from the draft in that context, maybe the substance of the finance and
9      so forth, which was the only thing that would have been of detailed interest;
10     but in the drafting I would respectfully suggest, and confirm, that by going on
11     to really 263 agreement, there was no request for you to "our client herein
12     called the vendor" that my name, there was no problem whatsoever with it.  I
13     just make that point because it was raised at some length this morning?
14   A  I think I did say I couldn't really recollect whether it was my initiative or
15     on your instructions.
16   Q 394 Now, I just wanted to clarify, because I appreciate when giving evidence you
17     referred in your statement to the fact that it was your recollection that Ron
18     Smith of Aspen had introduced the Hybernska building, and then that was a very
19     lengthy passage in yesterday's evidence in questions about the first timing of
20     my knowledge and involvement with the building.
21
22     If I could put it to you that -- and I only remember it so clearly for one
23     reason, specific reason, and it wasn't as was outlined yesterday, date wise,
24     that my first knowledge of the Hybernska building was on the 19th December and
25     it was brought to my attention by Dr. Richard Kavalek, which is not what you
26     have stated in your statement.  I am not making any issue out of it, I just
27     want to put it on the record, that's exactly my first introduction to the
28     building.
29   A  I wouldn't argue with that.  It was -- I had thought that it was Mr. Smith had
30     introduced it to you, but it may have been his lawyer.

97

1   Q 395 The only reason I recall, I called in to see Dr. Kavalek on that morning en

2         route to the airport, and I was under some time constraint, and he raised the

3         building with me and I said "if I can view it on the way to the airport,

4         otherwise I have a time constraint to catch a flight, if you can come with me",

5         I had a car and driver outside, it was only five minutes from the office and

6         we were able to view the building virtually from the outside and then we were

7         able to proceed to the airport.

8   A    I wouldn't argue with that as a recollection, it was Mr. Smith's lawyer rather

9         than Mr. Smith himself who made that introduction.

10  Q 396 Sure.  Now I, as you will be aware, returned to Prague immediately after

11        Christmas because in the very short discussion I had with Dr. Kavalek, he had

12        explained to me whatever process had gone on was now going to default if there

13        wasn't urgent attention, and I returned to Prague very early after the

14        Christmas break and commenced with yourself, Dr. Kavalek, Mr. Smith, and

15        possibly others, negotiations directly with RIF.  Now in that discussion, this

16        company was an urgent necessity based on the concept, on the way we were

17        proposing to proceed, is that correct?

18  A    We thought we were going to need a different company to take the property.

19  Q 397 Yes.

20  A    But in the event, we couldn't do it that way.

21  Q 398 Sure.  It would change, but that was the urgent aspect of Zatecka.  Now we had

22        taken the name from the previous discussions about a very fine well renovated

23        building which was a major attraction, which has been again the basis of

24        lengthy evidence here, the Zatecka building itself, and that's where we took

25        the name from.  There was a great deal of play made yesterday and again maybe

26        Mr. O'Neill can help me on the letter that went, it was "to whom it concerned"

27        regarding the valuation on the building and the numbers that were referred to

28        in your letter "to whom it concerned".  I am not sure of the number now.  The

29        detail of that letter was the figures were discussed at length and the

30        difference between the 1.6 million and the 3-odd million, the laying of the

98

1     balance and so forth; can I put it to you, Tony, that that was not taking into

2     account in that letter; A, the potential revaluation upwards, the very

3     excellent rent roll and the possibility that there was rent reviews, and I

4     think there was a couple of vacant apartments or units in the building, and I

5     think that those numbers had the ability, would be substantially adjusted

6     upwards; coupled with the second building and coupled with the sale and

7     acquisition of the company which didn't really reflect in that letter regarding

8     those figures?

9  A  Well as I said before, the letter only made sense to me in the context of other

10    values being available to the investor, and whether that was by revaluation, by

11    equity share or whatever, that was something that was in addition; but when I

12    was asked about it, I had no recollection of that particular letter, I'm sorry,

13    it's difficult for me to remember all the details of transactions that took

14    place without remembering things about ones that didn't take place.

15 Q 399  I just wanted to put on the record, the situation was that there were extra

16    curricular financial aspects that weren't reflected in the letter.  I wanted to

17    make that point to you.  The valuation of what was intended is greater than

18    what was reflected in the letter, and Mr. O'Neill went to great lengths to try

19    and get an understanding yesterday.

20 A  Yes, I would agree that I said in my evidence that the letter I regarded as

21    incomplete, is an expression of a, not a proposal for a deal.

22 Q 400  Regarding Zatecka 14 S.R.O.'s formation, its methods of operation; because of

23    the changing circumstances and not using it in the acquisition of the Hybernska

24    building, that has been well and truly researched.  Would you agree that it was

25    always the intent that the beneficial owner; A, it was held in your office, I

26    never asked for, or requested, to have a controlling interest or to control it,

27    it was always the intention that Mr. Nicholas Morgan's company would hold the

28    ownership of the company; but in evidence yesterday, it seemed to get very

29    convoluted to me, that this wasn't clearly understood.

30 A  That is perhaps correct, that it wasn't clearly understood.  My understanding

99

```
 1        is that the references to Mr. Morgan came later.  There certainly were
 2        references to Mr. Morgan and the fact that Mr. Morgan was to have an interest
 3        in the company.  I have no recollection though that they were the instructions
 4        at the time the company was incorporated.
 5   Q 401Yes.  But I appreciate that, but if it was going to be used for the purpose you
 6        were setting it up, it wouldn't have been available for Mr. Morgan's company to
 7        have control.
 8   A    As understand it, it was intended when it was first set up, for a completely
 9        different purpose, and that purpose in fact never materialised.
10   Q 402But then to give effect to the agreement I had with Mr. Morgan, it was said to
11        you, and instructions issued, it was to be held by Mr. Morgan; and the
12        necessary introductions were made and there's no reference in your statement
13        that Mr. Morgan visited Prague and updated himself on the procedures and
14        properties, I think probably during 2000, and at meetings in your office and so
15        forth.  Do you recall that?
16   A    I confirm my recollection -- I recollect Mr. Morgan coming on at least one
17        occasion to Prague and meeting with me.  This would have been after all the
18        Hybernska transactions took place.
19   Q 403Sure.  Yes.  That's fine.  I just wanted to get it on record that you did --
20
21        CHAIRMAN:  Sorry, just a moment, Mr. Lawlor.  Do I understand you to say,
22        Mr. Seddon, that from the start you understood that Mr. Morgan was the
23        effective controller of the company?
24   A    No, no, I didn't say that.
25
26        CHAIRMAN:  Is it still your evidence that you believed Mr. Lawlor to be in
27        control of the company?
28   A    At the time the company was set up, it was set up for the purpose of buying a
29        particular building and it was not, as far as I was aware, ever the intention
30        that that would have been a Morgan company or investment.
```

100

1

2        CHAIRMAN:  Sorry, Mr. Lawlor.

3

4    Q 404MR. LAWLOR:  There was a little grey area there I want to get it cleared now.

5          Because the company that was set up was to acquire the building and sell the

6          company on at that juncture, it wasn't to be a Mr. Morgan company.  As soon as

7          there was a need for that purchase it was always your instructions, and my

8          understanding, that it would be a Mr. Nicholas Morgan company, is that right?

9    A    I don't think that's entirely correct.  You did say at a later stage that there

10         was an agreement between you and Mr. Morgan, that you would have a joint

11         venture, that you would share your profits and use a percentage of those

12         profits to repay a loan to him.  I think that I must admit to be confused as to

13         who had the 25 percent and who had the 75 percent, but I believe that you had

14         agreed, you told me that you had agreed that Mr. Morgan would receive 75

15         percent of the profits to be generated by this company.

16   Q 405On page 8 --

17   A    -- and he would receive those because there was some loan, of which I had no

18         details.

19   Q 406Just on page 8 on your statement, Mr. Seddon, you address the matter in the

20         correct format.  Now that may be with the benefit of hindsight.

21         "As far as I can recollect, it was after completion, which is probably just put

22         to you to become ... taking instructions" and so forth -- so, I had no problem

23         in taking or having control if that's what was intended, it was never the

24         intention, but also it was always understood that I was a consultant advisor to

25         the company, granted with a 100 per cent of the activities at my direction in

26         the Czech Republic because there was no other consultant or officer, other than

27         for legalistic purposes in your own office, but you were always of the opinion,

28         to the best of my knowledge, that I was never other than consultant to the

29         company?

30   A    No, because you couldn't be a director, you were a consultant for want of any

101

1     other word.  If I can make a parallel, and I don't know if it's the same in

2     Ireland, but in England you would probably have been deemed a shadow director.

3  Q 407But I mean I wasn't even in that category and never sought to be and never

4     requested or instructed I should be in that category.  I was a consultant

5     advising the company, managing its day to day affairs, but certainly wasn't the

6     beneficial owner of the company; because that's just the way Mr. Morgan and

7     myself wanted it set up.  There was nothing untoward about it or no attempt to

8     conceal anything, that was it, and the Head Bills I got prepared by a printer

9     out in Dublin, but at all times never have I signed myself as an executive,

10    other than advising the company, isn't that correct?

11 A   I can't speak as to your intentions.  You did --

12 Q 408My actions --

13 A   -- you did sign letters on behalf of the company that you generated.

14 Q 409Sure, yeah.

15 A   I don't think you ever called yourself a director though.

16 Q 410Well I mean you rightly pointed out, because of the misunderstanding in the

17    Irish Times, you took it on yourself to do so.

18

19    Could I just move on to the Hybernska documentation, vis-a-vis the valuation

20    and correspondence, and the letter that was referred to at great length this

21    morning, associated with the first letter that was drafted.  I don't know

22    whether it did issue to Ballymore Properties in London.  I think as you said,

23    you were awaiting the -- yeah, I think it's on page 266 of the actual --

24 A   I think the one you mean is 257.

25 Q 411Sorry.  266 I think was the eventual letter following the inspection of the

26    building.

27 A   Yes.

28 Q 412That was the actual letter following the visit of the executives from Ballymore

29    that set out the exact situation.

30

102

1       Now, going on to the previous draft letter which there was some great length,

2       257, the figures in that letter I think are suggested were provided by

3       Dr. Kavalek, is that right?

4   A   Certainly I would have obtained some information from Dr. Kavalek.

5   Q 413There is a letter somewhere referring to conversation with him --

6   A   Who would have had all information about the property which I didn't have.

7   Q 414Now, I found it difficult to pin down with Mr. Smith and Dr. Kavalek as to what

8       exactly, what the terms of their bid process had been with the Restitution

9       Fund; and would you agree that it was both our understanding, on page 259, the

10      300 million Czk figure, that was provided based on the valuation that RIF had

11      on the building at the time.

12  A   My understanding is that that figure came from the original valuation and the

13      original target figure of the vendor, RIF.

14  Q 415Now again what didn't reflect here, which you may recall, without you being

15      involved in the detail of it, was that I would have had extensive discussions

16      at the time regarding the potential for full rent roll based on vacant

17      possession, which wasn't immediately available, and the projections that were

18      done accordingly.  You are aware of that?

19  A   I was aware that you were spending a lot of time on investigating the position

20      and the property and the details; and following your investigations, you were

21      instructing me to do what I did.

22  Q 416Yes.  And to secure the information from others and so forth.  Now, there was

23      also a brief reference, and lest it be misunderstood, I know you did clarify it

24      this morning, also into that equation came consideration regarding the vacant

25      bank of Bohemia building at the back of the Hybernska building?

26  A   Yes, there was another adjoining building.

27  Q 417And there was also discussions you might record with Skanska regarding the

28      adjoining building to Hybernska which was also in a state of dereliction and

29      available for purchase?

30  A   The adjoining building to Hybernska was a hotel which was vacant, indeed

103

1      derelict, and available for sale and development.

2  Q 418 Now, the eventual letter of the 2nd February, that really set out what had been

3      agreed following the inspection of the building by myself and the Ballymore

4      team, and that's what was reflected as the valuation put on by that company's

5      experts, and that was the way the deal progressed.  Isn't that correct?

6  A    The letter?

7  Q 419 Letter 266.  That reflected the purchase price was 180 million CZk, the actual

8      agreement as I recall it, and I think it was calculated upwards --

9  A    No, I don't think, I think this is saying what was required to enable Aspen to

10      complete its obligations with RIF.

11  Q 420 But RIF were only discharging 162 million CZk?

12  A    I think there had been some confusion on that figure that, because I know for

13      some time I thought that 162 was the 180 less a 10 percent deposit.

14  Q 421 I don't think there was ever a deposit paid, was there?

15  A    As I later found out, no, there wasn't.

16  Q 422 Right.  Well I know the conclusion of my discussions was that the upwards total

17      valuation on the agreed figure negotiated was 4 million Irish and whatever that

18      calculates back to.  And from all those times I always operated on the 44 CZk

19      to the Irish pound, but I know the upper limit of the bid that Ballymore were

20      prepared to pay for the building was 4 million Irish, and I think that might

21      equate, maybe it would equate to 200 million, but that was the conclusion.

22

23      On the second page, 267, as you have given in your evidence already, we were in

24      touch with Ronan Kachler of Colliers, they gave the valuation probably in the

25      region of the 300 million CZk and we both agree that that can be exaggerated.

26      Prices in Prague, they don't always come to reality on acquisition.  Do you

27      agree that the 300 valuation was top end of the market and you were inheriting

28      the building with tenants and so forth?

29  A    That would have been my opinion then, it may well be worth that now, yes.  But

30      that's the nature of the property business.

104

1  Q 423 Could you just turn to the Morgan entity, Sinclair and so forth; and can I ask

2       you to comment on the fact that it was the intention to transfer the funds, as

3       set out by Mr. Morgan in his letter, I think referred to at pages 79 and 80.

4       Now I got the impression, Mr. Seddon, that there was something never acted

5       upon, the request for transfers; it was something in the order of that, based

6       on the replies you gave to Mr. O'Neill yesterday.  Could I quote from the

7       letter, I think it's on the page, page 8 but I wrote anyway.  Mr. Morgan's

8       letter, "after making any due provisions for local fees and expenses"  Would

9       you confirm that Mr. Nicholas Morgan never requested that anything, incorrect

10       or inappropriate, be taken regarding any of these dealings?

11  A    I can't say that I ever had any dealings, discussion, with Mr. Morgan when he

12       suggested that anything incorrect should be done.

13  Q 424 You gave the impression yesterday in your evidence that you gave a view that

14       was accepted and therefore these actions never were given effect to?

15  A    I think I said that because the effect of the instruction would have been to

16       have dispossessed the company of all its assets, and in the circumstances that

17       wasn't appropriate.

18  Q 425 But the point of making any due provisions wasn't achievable and couldn't be

19       dealt with in the way it was requested?

20  A    The request refers to local fees and expenses, if that could be read as meaning

21       all other liabilities, then that would be perfectly correct.

22  Q 426 Would you further agree, Mr. Seddon, that since I introduced the level of

23       negotiations in Ballymore, Ballymore successfully concluded purchase of

24       Hybernska, that company has now set up a permanent staff and presence in

25       Prague.

26  A    Yes, it has.

27  Q 427 And gone on to buy a very substantial city site in Bratislava?

28  A    I think it's a matter of public knowledge that they have a big development site

29       in the Slovak Republic.

30  Q 428 This was as a result of my introducing them in the first instance to Prague?

105

1   A     Indirectly, I imagine that is the case and that if they had not been there,

2         they wouldn't have had the reason to do business in that part of the world.

3   Q 429 If we just turn to the 100,000 pounds payment that has been debated,

4         substantial debate and discussion and media coverage and so forth, and based on

5         my request overnight to you, at your Prague office, where you provided a

6         handwritten breakdown of the dispersal of the 100,000 pounds, where it was

7         identified that 57, 58 thousand pounds came back to my consultancy in Dublin

8         and there was a payment made to my accountant in Dublin; would you disagree

9         with Mr. O'Neill's assertion that there was some attempt to shelter this

10        account?  Because he is suggesting that both you and I were doing something

11        regarding, and there was headlines in yesterday's evening papers and media

12        reports, that we were supposed to be sheltering this money; and I bring you

13        back to the jurisdiction and have it traceable and provide the information to

14        my accountants, etc.

15  A     I think it was being suggested that you were trying to hide it, is that your

16        question?

17  Q 430 Well would you agree that I would hardly bring it back into my account in the

18        Dublin bank and pay my accountant's fees if I was trying to shelter it in some

19        form?

20  A     It didn't seem to me at the time that it was being hidden.  There were payments

21        made direct to your trading account and payments were made back to Ireland to

22        your banks.  Now, it was a matter for you, not a matter for me as to what you

23        were disclosing in your tax returns.

24  Q 431 I don't think you would concur with me if you thought I was trying to shelter

25        the funds or facilitate or agreed to it, or whatever?

26  A     Certainly that was never part of any discussion you had with me.

27  Q 432 No, it wasn't my intent either, I want to get it on the record because there

28        was a headline grabbing line used by Mr. O'Neill yesterday, which was quite

29        incredible.  If we go on to page 93 and 94 where we dealt with the 100,000

30        pounds invoice to Zatecka and there was much play made yesterday again by Mr.

106

1    O'Neill of the 58,000 sterling, the balance of the 25,000 and so forth.  Would

2    it strike you, Mr. Seddon, that that might be just giving effect to the profit

3    sharing agreement, and that the sterling equivalent would be 75 Irish, give or

4    take, and that the retention of the 25,000 was part of what had been agreed

5    with Mr. Morgan?

6  A    Could you --

7  Q 433  Yeah, there was an invoice, you recall, on page 93 and 94 --

8  A    I don't have that on 93.

9  Q 434  And on the second page, a company received from Mr. Lawlor an invoice of --

10  A    This is the letter from Delahunt?

11  Q 435  Yes.  I just want to make the point to you that as suggested in the second last

12    paragraph of your letter, it was a slightly different figure, 57 or something

13    thousand, sterling.

14  A    Yes, the 60,000 as was made clear yesterday was the total balance, and from

15    that was, there is a sum of 3 thousand-odd was deducted for an invoice.

16  Q 436  It didn't occur to Mr. O'Neill or yourself in his questioning yesterday was

17    that the balance, the retention of the profit sharing arrangement, I just

18    wanted to -- there was an invoice raised and it seemed to go on forever here

19    yesterday trying to find an answer and everything discussed was well wide of

20    the mark.  I just put it to you that an invoice was received for 100,000?

21  A    We certainly, you certainly raised an invoice for 100,000 and I don't think it

22    had occurred to anyone here in the, when we were debating that it was anything

23    to do with the division between --

24  Q 437  Yes, that's exactly, that explains what it was?

25  A    But of course the, I don't know what happened to it afterwards.  The whole of

26    the money was, in effect, paid in its entirety to your accounts or to your

27    direction.

28  Q 438  I think is there something in the region of 30,000 in Zatecka 14 S.R.O.?

29  A    Was it paid?

30  Q 439  Now.  Now.

107

1  A    Something, possibly something in that region.  This is the remains of a rather

2       larger sum.

3  Q 440Yes.  Could I just go to page 30 please?  There's your letter of the 29th

4       December 2000, would that give one to believe that as is quoted in the second

5       paragraph, "I will be sending a note to Nicholas Morgan on the background to

6       the Zatecka 14 S.R.O. and I am awaiting his instructions" and do you want to

7       see the copy reflecting the fact that he, in effect, was the controlling holder

8       of the company in the legalistic format of holding shares, because they were

9       held in your office to be assigned, and I think you raised it with me and that

10      was the advice and instruction given?

11 A    I think I gave evidence to the effect that I had understood that you had made

12      some former arrangement with Mr. Morgan and he was to have a share of the

13      company and it was to be a profit sharing agreement.

14 Q 441Sorry, could I distinguish, would you distinguish between a profit sharing

15      agreement and him having control.

16 A    The profit sharing, as I had thought you had explained to me, was that the

17      profits which you were going to hopefully generate would be paid back to him to

18      reduce the loan, that they would be your share, but paid to him.

19 Q 442Yeah.  That was the discussion that took place at the time; and would you agree

20      that it was always the instruction and intent that he held control of the

21      company and whatever profits were generated would be shared in whatever format

22      be it 75-25; but it was your office's intent and instructions, and is it the

23      case that today Sinclair Holdings controls, or has some legalistic arrangement

24      with your office in Zatecka 14; which is my understanding that that's the

25      situation.

26 A    We referred in evidence yesterday to the letter from Mr. Morgan saying that he

27      was to hold the shares, and we have not followed that up; and if I have

28      misunderstood the instructions, I am sorry, but I have continued to regard you

29      as the person from whom I would have taken instructions, until recently.

30 Q 443But those instructions, going back as far as those times, why would you be

108

1   writing saying you were going to send a note to Nick Morgan, etc. and await his

2   instructions, if I haven't instructed and requested that that should take

3   place?

4  A   I think that I was going to write a note to him because you had asked me to do

5      so, and awaiting his instructions, would be awaiting his comments as to what

6      was to happen next.  I wouldn't dispute, I wouldn't deny that you had every

7      right and entitlement to pass on the entirety of whatever share of the company

8      you wished to Mr. Morgan.

9  Q 444But if we can go to page 79 and 80.  The second paragraph, "shares in his

10      company should be issued to or held for Sinclair Holdings, I would be grateful

11      if you could forward to me, in due course, the relevant books and papers

12      relating to this company together with any relevant information you should hold

13      in relation to its affairs."

14      I mean that letter arose because of discussions I would have had with

15      Mr. Nicholas Morgan and I don't think it can be clearer.  Now maybe it wasn't

16      actioned, I wasn't so aware that wasn't actioned but that has always been the

17      intent.

18  A   That may well have been your intention and I wouldn't dispute that.

19  Q 445Sure, OK.

20  A   But, and if you had written to me saying "please transfer all the company to

21      Mr. Morgan", then I would have understood and would have followed that

22      instruction.  I would not necessarily follow the rest of the instruction if to

23      do so would not have been appropriate.

24  Q 446I appreciate that, but I genuinely was of the opinion as of today that you had

25      assigned or had discussions with Mr. Nicholas Morgan and that the matter had

26      been finalised.  But if it hasn't, it can be attended to.

27

28      Could I just deal with the question of my supposedly having a Dublin solicitor

29      write to you, Mr. Seddon, in Prague and requesting you to write back to the

30      Tribunal, and the suggestion or indication of Mr. O'Neill's questioning that I

109

1    was holding your hand in responding to requests for information from the

2    Tribunal.

3

4    Would you totally desist from that position and suggest that whatever you

5    thought was legally appropriate was what you would provide me with, recognising

6    there were third parties and approvals needed, etc.

7  A    With regard to letter to Mr. Delahunt, I would have written that letter on the

8    basis that I received your instructions to do so.  What I said in the letter

9    would have been what I would have thought was appropriate and that I think I

10    discussed it with you, and asked if what I said -- and discussed the sort of

11    things that were needed, the sort of information that you wanted and had to

12    disclose.

13

14    I myself was not aware of the total nature of the Tribunal, I was not aware of

15    the way that it worked and nor of the -- I am not sure of the extent of the

16    requirements of that particular date and I subsequently came to learn that they

17    are rather more extensive than I was originally understanding.  But the letter

18    which I wrote was intended to provide the information which you requested me to

19    provide.

20  Q 447    But you know, would you dispel any myth that I, in any way, ever requested that

21    you not disclose something; and could I further put it to you that you would

22    have outlined to me what you saw as the limitations of what you could provide

23    as a legal representative to entities, that I had to accept that as your legal

24    advice on these matters.

25  A    I was providing what, in my understanding, was relevant and I would agree that

26    I have no memory at all of you having said to me "don't disclose this or don't

27    disclose that".  It was more a positive instruction for me to disclose certain

28    matters which were of relevance to the Tribunal, and that is what I did.

29  Q 448    Sorry, well just to follow the question, I would just like you to dispel

30    totally there was ever the slightest intention I would withhold or request you,

110

1      and I know what you have just said, I just want to put it on the record that I

2      was proactive in urging, to the extent that I recall you pointing out as

3      regards the Irish Consortium, with Zatecka the same, that I wasn't the

4      principal and I didn't have a right to certain documents; and if third parties

5      didn't give approval, you felt as legal advisor to the entity, that I didn't

6      have the right to procure those documents.

7   A   That's absolutely correct, you didn't.  You weren't the client and had no

8      entitlement to give any instructions regarding those papers.  That was clear.

9      As far as those matters where you were able to give instructions, on matters

10     which you did control, I complied with your instructions and give and supplied

11     information to you to pass on, or to your Dublin solicitors, to pass on.

12  Q 449But moving on from that, Mr. Seddon, have you got, you know, effectively

13     provided me now with documents that, you know, could have been under that

14     heading of "not discoverable" but this Tribunal were of the opinion that all of

15     that was within my power and procurement and should have been discoverable, and

16     having a better understanding of the demands of the Tribunal, you have probably

17     provided me with privileged documentation relating to other parties in an

18     effort to bring finality to this discovery situation.

19  A   You were given, in July, following various orders, you were given absolutely

20     every single piece of paper that I had on any of my files, to the best of my

21     knowledge and belief, including; and I'm very sure from the sheer quantity of

22     it, that 99 percent of it can be of no interest to anybody.

23  Q 450But it mightn't be within my legal power or procurement but has been

24     discovered?

25  A   But that which is within your power has been discovered.  That was within my

26     control.  As far as I know, everything, every --

27  Q 451Would you agree that unless the likes of Mr. Nicholas Morgan instructed that

28     all bank documentation be provided from Zatecka 14 SRO, I didn't really have a

29     legal right to have that documentation.

30  A   If Mr. Nicholas Morgan was the owner of the company, but I think that he gave

111

1    his permission anyway because I am aware that he had discussions with you and

2    he had confirmed to me that was in order because of the uncertainty by this

3    point of who did own the beneficial interest. I did speak to him, and as there

4    was no problem from his point of view to making disclosure of my papers, I

5    arranged for everything to be copied and disclosed.

6  Q 452 Well in previous correspondence, Mr. Seddon, to the Tribunal, you said that

7    certain documentations were not within my power or procurement, but you would

8    facilitate the Tribunal in making the documentation available for their study

9    at your London office, and you have since provided me with that documentation,

10    which would appear to me to be documentation that you formed an opinion at a

11    certain stage it was documents I should not be capable of procuring.  But we

12    have now discovered that documentation, possibly exposing you to some dissent

13    from third party clients, associates of mine and clients of yours; and I just

14    want to get it across, if it's achievable, that what you have done in more

15    recent times was gone and discovered, or provided me with everything having had

16    a legal reluctance, that certain substantial documents weren't really in my

17    power or procurement but now have been provided by your office?

18  A   I think it's fair to say that various papers and files that have been referred

19    to require the consent of other people to be before they would be disclosed.  I

20    am not sufficiently au fait to the orders of the Tribunal or the obligations to

21    know what point you had certain obligations or wider obligations than you or I

22    had originally understood, but certainly in recent months there has been no

23    doubt there's been a need to produce everything that existed under your, on

24    your files, under your role; and it wasn't a question of deciding whether or

25    not something was relevant, it was simply to produce everything.  And that was

26    my, that was the recent understanding which I followed, having had your

27    instructions to disclose everything.

28  Q 453 They would have been my instructions from Day One, but because of the legal

29    interpretations -- I mean your letter regarding the Irish Consortium which I

30    don't have in front of me, it was that; well, there were third parties but

112

1    however, it was of assistance to the Tribunal, they could come and read the

2    files in London.  If there was anything specific they felt would be part of

3    their inquiries, they would be quite entitled to have access to it or whatever,

4    and we moved on from that and that was your advice.  In your hands, legally at

5    the time, that was the best you could provide to the Tribunal, but that wasn't

6    acceptable.

7

8    You refer to the limitations of the orders of the Tribunal, well I think I have

9    come to realise there is no such thing.

10

11    CHAIRMAN:  Mr. Lawlor, would you mind just putting questions to Mr. Seddon?

12

13  Q 454MR. LAWLOR:  The questions are about discovery.  I am just making a comment,

14    it's about discovery and the demands of the Tribunal, realistically or

15    otherwise.  And over the past two years, in discussing and pursuing and

16    visiting and meeting with Mr. Seddon, things have changed dramatically

17    regarding discovery in an effort to try and satisfy the Tribunal, and I think I

18    just want Mr. Seddon to put it on the record that from day one it was my intent

19    that everything would be provided. I had no problem with my activities in the

20    Czech Republic, going out to pioneer and achieve whatever has been --

21

22    CHAIRMAN:  Mr. Lawlor, have you had any further questions?

23

24  Q 455MR. LAWLOR:  I want you to confirm that you have discovered documents to me

25    which you have believed previously probably weren't within my power of

26    procurement?  That's a specific question.

27  A   When original requests were made, I believe that you didn't have the

28    entitlement to ask for everything that was being demanded.

29  Q 456So what changed?

30  A   What changed?  We ensured that we had permission of all relevant clients and we

113

```
 1      had your instructions to assist.
 2 Q 457It's my understanding, Mr. Seddon, that one of the clients didn't quite give
 3      full authority but we have, we seem to have overrode it now, or provided it
 4      even to the extent in recent discovery that we have discovered third party
 5      documentation regarding clients of your office, in an effort for your office to
 6      meet a deadline and my office to try and cooperate, that we have discovered to
 7      the Tribunal documents which are third party documents which I brought to your
 8      attention recently.
 9 A    Yes.  There were documents, because of the short notice of copying everything
10      and sending it in, there were some papers that had fallen into files which were
11      completely unrelated to the files which had anything to do with you, and that
12      has been, I believe, brought to the notice of the Tribunal's solicitor, with
13      request that those be removed.
14 Q 458Sure, finally, could I just ask you to comment, that regarding the company
15      Zatecka, it was always, it was my instructions never were that I was to hold
16      control or shares or under Czech law have the right, even if I had the right,
17      it was never my intent or my request to you that I would be other than a
18      consultant to the company, would you agree with that?
19 A    If you, to be other than a consultant and not the beneficial owner of the
20      company, you mean?
21 Q 459Well if I was to be other than the consultant, I would today hold, or you would
22      hold the signed shares of control, or whatever the legal mechanism is for, the
23      office of Seddons Solicitors in Prague today would hold control of that
24      company; and if it was to be my vehicle, my company, it wouldn't be in the
25      ownership of your office, it would have been allocated long ago to me?
26 A    I have never claimed to own that company.
27 Q 460I don't mean -- I know you do control it, or your office controls it, because
28      the transfer was never made to Sinclair Holdings.  Is that the correct
29      situation?
30 A    I am afraid that I have to say that if I had not believed that you were the
```

114

1      owner of the company, I would not have acted on your instructions to pay you

2      these sums of money that were paid to you.

3   Q 461But I mean the instructions were clear that the company was to be put in the

4      control of Sinclair Holdings, by correspondence from a firm of lawyers.

5   A   At a later date, yes.

6   Q 462So that was the situation with the company and remains, awaiting finalisation

7      then accordingly?

8   A   That's how it remains.

9   Q 463OK.  Thank you Chairman, thank you Mr. Seddon.

10

11     CHAIRMAN:  Thank you.

12     Mr. Marry, do you want to ask any questions?

13

14     MR. SEDDONS WAS FURTHER EXAMINED BY MR. MARRY AS FOLLOWS:

15

16  Q 464MR. MARRY:  Just perhaps one or two brief questions, Mr. Chairman.

17     If I could ask you, Mr. Seddon, to return again, I won't dwell very long on it,

18     but page 43, document number 43.  Which is the loan agreement between Zatecka

19     and Mr. Lawlor.  And which purports to refer to the 117,500 pounds sterling?

20  A   Yes.

21  Q 465Now, on discussing this matter yesterday, there was a confusion about dates and

22     other aspects of the document, but with the benefit of having considered the

23     document overnight, I think you clarified in the course of your evidence today,

24     that that loan agreement did not proceed, isn't that correct?

25  A   That is correct. I was able to make a telephone call this morning to check on

26     this and it's something that I had not had the opportunity to do before today.

27  Q 466And in that regard, and I think in fairness with respect to other documents

28     appearing in the brief of papers which were furnished by the Tribunal, you felt

29     you were under a certain significant disadvantage in terms of the time given to

30     you to consider the documentation and to be helpful to the Tribunal, isn't that

115

1    correct?

2  A    That is absolutely correct.  I had, despite some comments that have been made

3       to the contrary, I have been very willing to assist the Tribunal, to attend and

4       it's apparent, as has been made even clearer in the last two days, that it

5       would be very much easier to be of assistance to the Tribunal armed with the

6       documentation which was to be discussed.

7

8       I have not had the opportunity to look at the bundles which were produced.

9       They were rearranged six weeks ago that I would come yesterday and today, and I

10      know that my solicitors have been asking regularly for information about the

11      documents to be considered and the questions to be asked so that I could be of

12      assistance, and I regret the fact that, no disrespect to the important work the

13      Tribunal does, but the nature of the questioning put me at a considerable

14      disadvantage and did not enable me to be as helpful as I would have liked.

15  Q 467  Yes.  And I think your sense, your feeling of disadvantage or grievance in that

16        regard arises to some extent from your own professional assessment of the

17        period of time that one would require to consider documentation in the volume

18        and detail that you were presented with, is that correct?

19  A    Indeed.  If one wished to be ready to speak to any of 2,000 piece of paper, not

20       knowing which is to be examined in minute detail, as to nuances or meanings of

21       particular words even, that would have been a major, major task requiring a

22       considerable number of hours work.

23  Q 468  Thank you, Mr. Seddon.

24        Thank you.  Mr. Chairman.

25

26        CHAIRMAN:  I have just one short matter.  Control of the company; now, your

27        evidence has been that in your view, Mr. Lawlor was the effective controller of

28        the company and you were taking instructions from him.  Has that position

29        changed as we speak?

30  A    That position hasn't changed.  My understanding, if Mr. Lawlor is now saying

116

1    that he has granted all those rights to somebody else.  That's his privilege.

2

3    CHAIRMAN:  Well as far as you are concerned, up to today, your belief was that

4    Mr. Lawlor was controlling the company and was the person from whom you should

5    take instructions?

6  A  I may have been mistaken, but that was my understanding.

7

8    CHAIRMAN:  All right.

9

10    MR. LAWLOR:  Sorry Mr. Chairman, could I just, on that point, I mean what would

11    be the purpose of Nicholas Morgan being involved at all if it wasn't otherwise?

12    And it's my contention, Mr. Seddon, I discussed this matter with you and that

13    was, and if I was asked today in what control that company was, I would have

14    thought it was in Sinclair Holdings.  So that's my view on the matter.  And it

15    may have been a fact that you didn't act on a verbal instruction, and I should

16    probably put it in writing to you, but while advising and directing and driving

17    the company in Prague, it was for the control of another party.

18

19    JUDGE FAHERTY:  Mr. Seddon, I have a related question to that of the Chairman.

20    You have been quite adamant that as far as you were concerned, Mr. Lawlor

21    controlled the company Zatecka.

22  A  Sorry?

23

24    JUDGE FAHERTY:  He was in control of the company and the funds, isn't that

25    correct?

26  A  He was the person who gave the instructions.

27

28    JUDGE FAHERTY:  Yes.  And I think you said also today, and indeed yesterday to

29    Mr. O'Neill, that he was the instigator of the setting up of the company, isn't

30    that correct?

117

1  A    Yes, he was.

2

3       JUDGE FAHERTY:  He instructed you?

4  A    Yes, I don't think that's controversial.

5

6       JUDGE FAHERTY:  In light of that, I just want to ask you, last April of 2002,

7       you wrote a letter to Mr. Dermot Coyne.  Mr. Coyne was seeking, I think all

8       documentation regarding discovery to this Tribunal, and perhaps indeed the High

9       Court.  You recall getting communication either from Mr. Coyne or being passed

10      by Delahunt Solicitors, who were the previous solicitors?

11 A    I remember dealings.

12

13      JUDGE FAHERTY:  It's page 100 of the brief.  In the 4th paragraph he set out

14      quite categorically in fact Zatecka was set up at the instigation of

15      Mr. Morgan, and the company once established would be held as a member of his

16      group of companies and that he would hold the benefit.  They would be the

17      beneficial owner of Zatecka; and I just want to ask you, on those instructions

18      did you so write to Mr. Coyne as late as April 2002?

19 A    That was certainly a misunderstanding and a misstatement of what happened in

20      the time of the, at the time of the incorporation.  And when that letter was

21      written, the involvement of Mr. Morgan hadn't been made clear to me.

22

23      JUDGE FAHERTY:  You see, I understand that at some later point, and I think

24      from the evidence we have had heard, it was sometime in August of 2000, that

25      Mr. Morgan first made some sort of request to you as a solicitor for the

26      company, but you are here reciting historical facts as I can read, about the

27      setting up of the company.

28 A    I think that was true and I was writing to Mr. Coyne in explaining the history.

29

30      JUDGE FAHERTY:  Was that totally incorrect information given to Mr. Coyne in

118

1       2002?

2   A   That was incorrect, yes. I believe that was incorrect.

3

4       JUDGE FAHERTY:  Could I also suggest if you go on to deal with the letter, it

5       deals with a number of things, I am not going to go into them, page 101, when

6       you talk about Ballymore acquiring the Hybernska building.

7   A   Yes?

8

9       JUDGE FAHERTY:  You say the original purchase of the company was paid and

10      Zatecka 14 S.R.O. retained as its commission, the balance of the gross price

11      between Ballymore Properties, agreed by Ballymore Properties.  As I understand

12      it, that's a reference to the 18 million CZk, the difference between what was

13      paid to the Restoration Fund and the actual amount paid by Ballymore Homes.

14      Isn't that correct?

15  A   Which, in fact it was the other monies, that wasn't the price agreed by

16      Ballymore.  Ballymore agreed to pay the entirety of all the figures that we

17      spoke about earlier.

18

19      JUDGE FAHERTY:  But there was a surplus in any event

20  A   The whole amount less all the expenses was retained in the company.

21

22      JUDGE FAHERTY:  I think that was the 18 or the 17 CZk.

23  A   That was in addition to the hundred million deutschmarks.

24

25      JUDGE FAHERTY:  I understand that entirely.  The reason I'm asking you about

26      it, if you read that and you refer that back to the paragraph 4 where you talk

27      about the setting up of the company and the owner of the beneficial interest,

28      that would suggest to the reader of this letter that in fact the beneficial

29      interest in the commission ought to rest in Sinclair Holding because they owned

30      Zatecka.

119

 1  A      They would remain with the company if payments or dividends or whatever were to

 2         be paid out of the company, it would be payable to the owner.

 3

 4         JUDGE FAHERTY:  But in any event, you agree that the historical, your setting

 5         out of the historical facts was not the true position to Mr. Coyne?

 6  A      At the time of the writing of the letter, certainly I understood Mr. Morgan in

 7         Sinclair to have an interest, but it was mistaken to say that he was the

 8         person, as has been confirmed by Mr. Lawlor now.  It was after the transactions

 9         took place.

10

11         JUDGE FAHERTY:  But somebody must have instructed you to set out that,

12         Mr. Seddon, that's really why I'm asking you, who told you to set out in the

13         letter to Mr. Coyne that the company Zatecka was in the beneficial ownership of

14         a company controlled by Mr. Nicholas Morgan?

15  A      This --

16

17         JUDGE FAHERTY:  That was just last year.

18  A      Sorry, you are asking me --

19

20         JUDGE FAHERTY:  Who instructed you to write that on the 4th April of last year?

21  A      "I am writing further to the letter of the 26th March"?

22

23         JUDGE FAHERTY:  You refer to page 100, it's much the same tone, but talking

24         specifically about the letter to Mr. Coyne.

25  A      But I don't detract from anything that I said before, that my instructions came

26         from Mr. Lawlor, I regarded him as my client.

27

28         JUDGE FAHERTY:  Yes, so you said earlier to us.  In fact it wasn't so much you

29         have no memory of Mr. Lawlor saying "don't disclose", rather, positive

30         instructions to disclose certain matters of relevance.  That's how you

120

```
1     distinguished his instructions to you in answer to himself when he
2     cross-examined you?
3  A  Yes.
4
5     JUDGE FAHERTY:  Now it seems to me on the reading of that evidence that this
6     answer doesn't fall into either category.  Because there is disclosure and it
7     is of relevance because it wasn't in fact true, isn't that correct?  That
8     Mr. Morgan's company owned Zatecka.
9  A  At the outset he didn't.  Whatever interest he got, he got later.
10
11    JUDGE FAHERTY:  But from a Company Law point of view, either here or in the
12    Czech Republic, Zatecka is still a Czech company with Ms. Sarka Therova as
13    the named director, is that right?
14 A  Yes.
15
16    JUDGE FAHERTY:  I notice in your correspondence with Mr. Morgan, and indeed in
17    his to you, Mr. Seddon, that you refer to each other as Nick and Tony
18    respectively, is that correct?
19 A  Yes, I have met him in Prague, as I mentioned.
20
21    JUDGE FAHERTY:  Right, well did, was the, what was set out in that letter, was
22    that with the imprimatur of Mr. Morgan?
23 A  I don't recollect if that was after discussion with him, with discussion of
24    Mr. Lawlor or with both of them.
25
26    JUDGE FAHERTY:  Thank you.
27 A  Very likely with both of them.
28
29    MR. LAWLOR:  Could I be of assistance with a question?
30    Would you agree Mr. Seddon, when I asked you to form Zatecka 14 S.R.O, it
```

121

1       wasn't for the purpose of Mr. Morgan having any control whatsoever, it was in

2       the acquisition of the Hybernska building.

3   A   The start of incorporation of that company was in connection with a different

4       building.

5   Q 469Sorry, to buy the -- sorry, I correct myself, initially my interest was to form

6       a company to buy Zatecka 14 building and then we were deciding to use Zatecka

7       14 S.R.O. to acquire Hybernska, is that right?

8   A   Yes, that's correct.

9   Q 470Now, afterwards, Mr. Seddon, when it was not needed to use the Zatecka 14

10      building, which has been well researched today by questions, and was very

11      accurate, as I would suggest, within reason; it was after that then we still

12      had this company that was now making a profit out of the Hybernska building and

13      it was at that stage, probably mid 2000 that I had a verbal discussion with you

14      about the Nicholas Morgan situation and the correspondence commenced, and quite

15      honestly, I thought it had been regularised; and to this day and there's a

16      financial liability to Sinclair Holdings through Zatecka 14 from myself from

17      monies borrowed from Zatecka 14 S.R.O. and this situation prevails today and

18      this is confirmation of the intent, if not the actions that seemingly never

19      took place, but that was on my -- result of my requesting that that would be

20      the format back in the year 2000 when we didn't need Zatecka 14 for the

21      acquisition of a building.

22

23      CHAIRMAN:  All right.

24

25      JUDGE FAHERTY:  Just one other matter, in your client ledger accounts,

26      Mr. Seddon, in relation to just one in particular page 24, this is Mr. Lawlor's

27      client account in your ledger.  Just one thing that just slightly puzzles me.

28      In relation to the two 15,000 cash disbursements that were made, the words

29      "cash/cash declined" appears.

30  A   Yes.

122

1

2     JUDGE FAHERTY:  I want to know how is that paid to Mr. Lawlor?
3  A   In cash.

4

5     JUDGE FAHERTY:  In pure cash or by cheque?
6  A   I believe it was exactly what it says, cash.

7

8     JUDGE FAHERTY:  Would that be a normal thing for a solicitor's firm to do?
9  A   It certainly happens from time to time.  Clients often have a cash requirement
10     for a relatively, it's not regarded as an enormous amount.  Cash, cash dealings
11     are, we don't encourage them because they are inconvenient and have security
12     risks.

13

14    JUDGE FAHERTY:  Thanks very much, Mr. Seddon.

15

16    MR. O'NEILL:  I have no further questions of Mr. Seddon.

17

18    CHAIRMAN:  Thank you very much, Mr. Seddon, for coming over to give evidence.
19     If at some stage in the future, you feel you want to clarify anything that has
20     been said by you, you could contact the Tribunal either directly or through
21     your solicitor.  All right?
22     Thank you very much.

23

24    And Mr. Lawlor, I think we are half ten is it?  10.30 tomorrow.

25

26    MR. O'NEILL:  There is just one matter, Sir, if I raise it?  And that's in the
27     context of the documentation which was provided to the Tribunal by Mr. Lawlor
28     as emanating from Mr. Seddon.  I merely want to put on record that this
29     documentation, which we will call the Seddons File was only provided in full to
30     the Tribunal on the 5th September of this year so that the Tribunal had the

123

1    same difficulty perhaps as Mr. Seddon had in isolating the issues from a vast

2    volume of documentation.

3

4    CHAIRMAN:  I understand it's 10 o'clock tomorrow.

5

6    MR. O'NEILL:  As you wish.  If that suits.

7

8    CHAIRMAN:  Unless Mr. Lawlor --

9

10    MR. LAWLOR:  That's fine, nine o'clock if you --

11

12    CHAIRMAN:  No.  Ten.

13

14    THE TRIBUNAL THEN ADJOURNED UNTIL THE FOLLOWING DAY,

15    FRIDAY, 18TH SEPTEMBER 12 THOUSAND 3 AT 10.00 AM.

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s., ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ANDREW WEISS and WEISS ASSET ) | |
| MANAGEMENT, LLC, ) | |
| ) | |
|     Defendants. ) | C.A. No. 05-10679-RCL |
| ) | |
| ) | |
| ANDREW WEISS, WEISS ASSET ) | |
| MANAGEMENT LLC, K T, INC. and CVF ) | |
| INVESTMENTS, LTD., ) | |
| ) | |
|     Counterclaim-plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| KOTVA a.s., MARTIN BENDA, RICHARD ) | |
| HARAZIM, FORMINSTER ENTERPRISES, ) | |
| LTD., SPV CO and JOHN DOES 1-5, ) | |
| ) | |
|     Counterclaim-defendants ) | |
| ) | |
| ) | |

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE (LETTERS ROGATORY/COMMISSION ROGATOIRE)

To:    High Court of the Republic of Ireland

Dear Honorable Justices:

    The United States District Court for the District of Massachusetts presents its compliments to the appropriate judicial authority of Ireland, and requests international judicial assistance to obtain evidence to be used in a civil proceeding before this court in the above captioned matter.

This court requests the assistance described herein as necessary in the interests of justice. The assistance requested is that the appropriate judicial authority of Ireland, pursuant to the Irish Foreign Tribunals Evidence Act, 1856 and Order 9, rules 39-44 of the Irish Rules of the Superior Court 1986, require the examination of and production of documents for inspection and copying from Mr. Sean Mulryan, a resident of the Republic of Ireland and Chairman and Managing Director of Ballymore Properties Limited, an Irish registered company of Fonthill House, Old Lucan Road, Palmerstown, Dublin 20, Ireland, as an individual with personal knowledge of the topics described and give evidence that may be used in civil proceedings before this Court.

## **BACKGROUND**

Kotva a.s. ("Kotva"), a Czech company, filed suit against Weiss Asset Management, LLC, ("WAM") a Massachusetts-based investment firm, and Andrew Weiss, ("Weiss") its founder, President, and Chief Investment Officer. Weiss and WAM counterclaimed against Kotva and Martin Benda, Chairman of Kotva's supervisory board; Richard Harazim, Kotva's managing director; Forminster Enterprises, Ltd., the controlling shareholding of Kotva; and other defendants. K T, Inc. and CVF Investments, Ltd., companies that own shares in Kotva, were joined as counter-claim plaintiffs in this suit. Ballymore and Mr. Mulryan are not parties to the lawsuit. This court has since dismissed all claims against Mr. Benda and Forminster Enterprises Ltd. for lack of personal jurisdiction over them. For the same reason, this court dismissed, most, but not all, of the claims against Mr. Harazim.

The facts according to Kotva's Complaint are as follows. Until March 4, 2005, Kotva, through its wholly owned subsidiaries, owned and operated the Kotva Shopping Centre (the "real estate") in Prague, Czech Republic. WAM is owned and controlled by Weiss. WAM is allegedly the investment manager of Brookdale, a company owning nearly 12% of Kotva shares.

In 2004, the real estate was transferred to a wholly owned Kotva subsidiary SPV KN for the purpose of effectuating the sale of the real estate. Kotva alleges that when Weiss learned of the proposed sale he requested that Kotva repurchase his minority shares and threatened to interfere with the real estate deal when Kotva refused his request. As a result of Weiss' interference, Kotva asserts that the sale of real estate was delayed, causing it damages. In March, 2005, the real estate was sold to an Irish company, Markland through its Czech subsidiary. Kotva claims damages arising from the fact that Markland is withholding a portion of the purchase price until disputes with Weiss are resolved.

In April 2005, Kotva brought suit against Weiss and WAM in the United States District Court for the District of Massachusetts, alleging that, in violation of United States federal statutory law and Massachusetts state law, Weiss interfered with the real estate deal and attempted to force Kotva into purchasing his shares. Weiss and WAM deny all allegations of unlawful activity.

The defendants have represented to this Court that it is necessary for the purposes of justice and for the due determination of matters in dispute between the parties that Mr. Sean Mulryan should be examined as a witness under oath. The Court understands that Mr. Mulryan is one of two shareholders of Markland Holdings Limited and that Mr. Mulryan was involved in multiple meetings concerning Markland's purchase of the real estate and/or the impact on that purchase resulting from lawsuits that Kotva alleges that Weiss and WAM filed. Because Kotva claims that the purchase of the real estate was affected by conduct of defendants, causing harm to Kotva, Mr. Mulryan's testimony is crucial to the determination of this matter. The subject matter of the questions is described below.

## QUESTIONS

1.      Defendants seek to examine Mr. Mulryan under oath because of his personal knowledge of the matters below.  The lines of inquiry include the following:

      a.      How Markland chose to purchase the real estate;

      b.      How Markland valued the real estate;

      c.      The negotiations for the purchase of the real estate;

      d.      The effect, if any, of the lawsuits in the Czech Republic filed by minority shareholders of Kotva, on the purchase by Markland of the real estate;

      e.      The effect, if any, of other threatened legal actions or claims relating the real estate, on the purchase by Markland of the real estate; and

      f.      Any investigations into the real estate transaction, related legal actions or the assertion of claims related to the real estate transaction.

## DOCUMENTS

2.      Defendants request that Mr. Mulryan be compelled to produce documents, notes, memoranda or correspondence (including drafts in his possession, power or procurement) concerning the above-referenced topics, including:

      a.      any communications between Mr. Mulryan and Kotva a.s., Richard Harazim or other individuals affiliated with Kotva a.s. or its shareholders;

## REQUEST

3.      The undersigned Honorable Reginald C. Lindsay, Judge of the United States District Court for the District of Massachusetts, therefore respectfully requests the High Court of the Republic of Ireland to cause Mr. Mulryan to be summoned to attend, at such place and time as the Court shall appoint, before such person who, according to the procedure of your Honorable Court, is competent to preside over the examination of witnesses under oath, and that

you permit such witness to be examined orally by Edward P. Leibensperger or Benjamin A.

Goldberger of McDermott, Will & Emery LLP, attorneys for the Defendants; and Joel G.

Beckman, William Nystrom or Daniel J. Pasquarello of Nystrom, Beckman & Paris LLP,

attorneys for Kotva and Richard Harazim.  The specific topics of inquiry proposed for the

examination of Mr. Mulryan are outlined above.  It is also requested that the Court cause Mr.

Mulryan to have with him at his examination documents in his possession, custody or control

evidencing his employment by Markland, including those documents described above, for

inspection and/or copying by the Examiner.  It is further requested that:

     a.    the testimony of Mr. Mulryan be recorded  on videotape and transcribed

           by a stenographer in accordance with the rules applicable to the

           jurisdiction of your Honorable Court and there be authentication of Mr.

           Mulryan's testimony by the seal of your Honorable Court or in such other

           way as is prescribed by the procedure of your Honorable Court;

     b.    any documents produced by Mr. Mulryan on examination be marked for

           identification and that there be authentication of any such documents or

           certified copy of same or any extract therefrom by the seal of your

           Honorable Court or in such other way as is prescribed by the procedure of

           your Honorable Court;

     c.    the testimony of Mr. Mulryan on video, the transcripts of Mr. Mulryan's

           testimony as well as any documents, copies or extracts from documents be

           transmitted to this Court in a sealed envelope addressed to the Clerk of the

           United States District Court for the United States District of Massachusetts

           at:

Clerk of Court
United States District Court of Massachusetts
1 Courthouse Way
Boston, Massachusetts 02210
Attention: Mr. Don Stanhope
CA #05-10679-RCL

d.      your Honorable Court cause to be sent to Edward P. Leibensperger,

McDermott Will & Emery LLP, 28 State Street, 34th Floor, Boston, MA

02109, a note of the charges and expenses payable in respect of the

execution of this request.

## RECIPROCITY

It is the understanding of this Court that the granting of assistance of the type herein

requested is authorized by the laws of the Republic of Ireland. The courts of the United States

are authorized by statute, Section 1782, title 28 of the United States Code, to extend similar

assistance to the tribunals of Ireland.

## REIMBURSEMENT OF COSTS

Defendants have assured this Court that they are prepared to reimburse your Court for all

reasonable costs incurred in executing this request.

_____
Reginald C. Lindsay, U.S. District Judge
United States District Court for the District of Massachusetts
Boston, Massachusetts, United States of America

Dated: _____, 2006

(SEAL OF COURT)

BST99 1508550-2.072198.0012