UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

————————————————————
                                                  )
KOTVA a.s.                                        )
                                                  )
            Plaintiff,                            )        Case No. 05-10679-RCL
                                                  )
            v.                                    )
                                                  )
ANDREW WEISS and WEISS ASSET                      )
MANAGEMENT, LLC                                   )
                                                  )
            Defendants.                           )
————————————————————)

**PLAINTIFF'S OBJECTION TO THE SPECIAL MASTER'S
JANUARY 26, 2007 ORDER AND REQUEST FOR PROTECTIVE ORDER**

**INTRODUCTION**

On November 14, 2006, pursuant to Fed. R. Civ. P. 26(c) and the Special Master's

previous Orders, Plaintiff Kotva a.s. ("Kotva") moved for an extremely narrow protective order

to protect the identity of three business partners on the grounds of business confidentiality and

relevance.  [Docket # 160, 161]  The Special Master denied Kotva's request to protect the

identity of its business partners on January 26, 2007 ("Order").[1]  Identifying its partners in the

two remaining investments at issue has nothing to do with accounting for the proceeds from the

sale of the Kotva Department Store, the pretext under which Defendants claim the information is

relevant.  In addition, Kotva's contracts with these two business partners contain very broad

confidentiality/non-disclosure provisions that call for significant penalties if violated.  Kotva

---

[1]  Kotva's motion also sought to protect the identity of a third business partner in a restaurant investment solely on the grounds of relevance.  As discussed herein, none of the business partner information Weiss demands is relevant. Nevertheless, Kotva is not pressing an objection regarding the restaurant investment and is producing the relevant unredacted documents to Defendants.

respectfully requests that the Court enter a protective order to protect the identity of Kotva's

business partners.

From the outset of this case, the Weiss Defendants alleged that the so-called "Forminster

Group" had looted the proceeds from the sale of the Kotva Department Store. *See e.g.* First

Amended Counterclaim at ¶¶ 74, 76. To support this theory, they demanded documents from

Kotva concerning the receipt, holding, and disbursement of the Department Store sale proceeds.

The bank statements, escrow statements, contracts, investment documents, and year-end audited

financials that Kotva has produced to the Defendants, however, fully account for all sale

proceeds through December 31, 2006. There was no "looting." There has been no "looting."

And there is no "looting."

The Court's Orders of June 14, 2006 and November 28, 2006, moreover, dismissed all

the "looting" claims. In the wake of the Court's Orders dismissing their claims, Defendants now

cast their "looting" allegations as forward-looking, arguing they are somehow relevant to the

"dueling abuse of process" claims that were alleged in 2005:

> If the Forminster Group is looting Kotva's assets, it is less likely that Professor
> Weiss abused process and more likely that Mr. Harazim, through the Kotva
> corporate shell, abused process.

Opposition at 5. But Defendants cannot explain how Kotva's business transactions in 2007

make it more or less likely that any party abused process in 2004 or 2005. Kotva's current

business, of course, has no bearing on the abuse of process claims, or on any part of the

Defendants' case.

In 2006, as part of its ongoing business, Kotva made a real estate investment and

purchased a claim. Kotva produced redacted versions of the contracts and investment

instruments to the Defendants, and advised them that both investments were due to be repaid

with interest.[2]  On December 28, 2006, the real estate investment was repaid; the claim is

expected to be repaid by March 2007.  As part of its ongoing business Kotva also intends to

make future investments with its real estate partner.

     As described below, Weiss has interfered with Kotva's other business relationships

including, for example, filing a lawsuit against the purchaser of the Department Store and

threatening the bank providing the purchaser's financing.  Weiss also has made reckless and

baseless accusations about Kotva.[3]  Understandably, Kotva is concerned that Weiss will employ

the same desperate and malicious tactics to interfere with its ongoing business relationships.  In

short, (1) because the information is not relevant; (2) because of contractual confidentiality

provisions, and (3) because of the Weiss Defendants' history of interfering with Kotva's business

and business relationships, Kotva seeks to maintain the confidentiality of its business partners

with respect to these investments.

---

[2]  Copies of the translated contracts and relevant investment documents with proposed redactions are attached as
Exs. 3 and 4.  (Kotva is separately submitting unredacted copies of these documents for *in camera* review.)

Kotva invested 220,000,000 czk (in installments of 170,000,000 czk and 50,000,000 czk) in the real estate
investment.  As the promissory notes indicate, the entire investment with interest was due to be repaid before
December 31, 2006.  *See* Ex 3.  On December 28, 2006, Kotva was repaid 247,632,561.10 czk (194,103,794 czk
plus 53,528,767.10 czk) in accordance with the investment instruments.  *See* Ex. 5.

Kotva invested 60,270,000 czk in a claim and 70,000,000 czk is scheduled to be repaid by the end of March 2007.
Until the investment is repaid, Kotva also seeks to protect the identity of the company against which the claim
stands to prevent interference from the Defendants, through litigation or otherwise.  *See* Declaration of Richard
Harazim ("Harazim Decl.") at ¶¶ 6-7, attached as Ex. 2.

[3]  Specifically, Weiss has conveyed to the press (including the Wall Street Journal and New York Times) and to
members of the U.S. Government (including Senators Kerry and Kennedy) that a Kotva executive bragged about
killing a Czech police officer.  Weiss has also alleged that Kotva is connected to the "Russian mafia."  Apparently,
Weiss bases these allegations primarily on the contention that someone affiliated with *Forminster* - - not Kotva - -
speaks Russian.  *See* § II.B infra.

## ARGUMENT

### Standard of Review

The Special Master's conclusions of law and findings of fact are subject to *de novo* review by the Court.  Fed. R. Civ. P. 53(g); December 13, 2005 Order, ¶ 6.  A copy of the Order is attached as Ex. 1.

### Legal Standard

Rule 26(c) specifically authorizes this Court to protect confidential commercial information by ordering that it not be revealed at all or that it be revealed only in a designated way.  Fed. R. Civ. P. 26(c)(7) (Court may issue order that confidential "commercial information not be revealed or be revealed only in a designated way"); Poliquin v. Garden Way, Inc., 989 F.2d 527, 532 (1st Cir. 1993).  Here, the disclosure of Kotva's business partner information will potentially harm Kotva's investments, Kotva's business relationships with these parties, and Kotva's prospects for beneficial future investment opportunities, and could result in substantial contractual penalties.  *See* Declaration of Richard Harazim.[4]

Kotva satisfies the Rule 26 good cause requirement, and a protective order is warranted because:  (1) the information sought to be protected is not relevant to any claim or defense in this case; (2) if relevant, the identity of Kotva's current business partners constitutes confidential information; (3) the Weiss Defendants cannot "present a need for the discovery sufficiently compelling to warrant overriding  [Kotva and its business partners'] reasonable expectation of privacy or compromising [Kotva's] business relationship with [its partners]" (*see* Special

---

[4]  *See also*, Anderson v. Cryovac, Inc., 805 F.2d 1, 7 (1st Cir. 1986) (finding of good cause must be based on a particular factual demonstration of potential harm); Gill v. Gulfstream Park Racing Association, 399 F.3d 391, 402 (1st Cir. 2005) ("good cause" standard in Rule 26(c) is "a flexible one that requires an individualized balancing of the many interests that may be present in a particular case.") quoting United States v. Microsoft Corp., 165 F.3d 952, 959-60 (D.C. Cir. 1999).

Master's September 29, 2006 Order at 24); and (4) the relief sought is extremely narrow in scope.

**I.      The Identity of Kotva's  Current Business Partners**
**          Is Not Relevant To Any Claims in This Case_____**

The looting claims have been dismissed.  Documents relating to the continued holding and investment of the sale proceeds in 2007 to demonstrate alleged looting, therefore, are no longer relevant.  Even if the looting claims had not been dismissed, however, documents concerning Kotva's <u>ongoing</u> business and <u>current</u> investment strategy would still be irrelevant. The counterclaims alleged that Kotva <u>had been looted</u> in June 2005--past tense.  *See e.g.* First Amended Counterclaim at ¶¶ 74, 76 (Forminster Group had "unlawfully seized control," had "deprived" Kotva's shareholders, and had "unjustly enriched" themselves).  Defendants' recent argument that the "dueling abuse of process claims" somehow makes these documents relevant is both unexplained and unsupported.

The identity of two business partners on investments--one of which has already been repaid and the other of which is due shortly--is neither relevant to any issue in this case nor relevant to the Weiss Defendants' stated reason for the discovery.  Weiss conceded during the discovery conference that he only wants the information to confirm that the sale proceeds have not been looted.  Kotva has accounted for the sale proceeds through December 31, 2006, however, and has already demonstrated the falsity of the looting allegations.  Kotva has provided its bank statements.  Kotva has provided its escrow statements.  Kotva has provided its relevant contracts and investment instruments.  Kotva has provided year-end audited financial statements.

The Defendants have sufficient information to confirm that the proceeds have not been looted--they need only review the bank statements and investment documents.  Kotva, moreover, has no interest in concealing the whereabouts of the sale proceeds, as demonstrated by its

substantial production of financial information to the Defendants.  But Kotva is also an ongoing

business that has a legitimate interest in preserving its valuable business relationships--

relationships that will lead to future investments.  Simply put, Kotva does not want the

Defendants to interfere with those relationships or to further interfere with its business.

II.     **The Identity of Kotva's Current Business Partners
        Is Confidential Commercial Information**

        A.      **The Identity of Kotva's Partners is Covered by
                Contractual Confidentiality Provisions and Kotva Treats
                the Information as Confidential**

        The contracts with both of Kotva's business partners contain broad confidentiality and

non-disclosure provisions.  For the claim investment, the contract provides that, "Each party

undertakes to keep confidential all facts relating to this Contract or concerning the other party."

*See* Ex. 4 at ¶ 5.5.  The contract for the real estate investment provides that, "the contractual

parties understand confidential information to mean all information disclosed by the other party

in relation to this contract, which is not the subject of trade secrecy."  *See* Ex. 3 at ¶ III.5.  These

are very broad confidentiality provisions.  The Special Master, however, ascribes a very limited

interpretation to the very broad language in these provisions.  For example:

> I do not see why the parties' agreement to keep confidential 'all facts' concerning
> the agreement or the parties should be construed to extend to the identity of the
> parties to the contract.

Order at 3.  First, the plain meaning of the language extends that far:  the identity of the parties is

certainly "a fact" that relates to the contract <u>and</u> concerns the other party.  Second, the Special

Master can only reach this conclusion by ignoring the declaration testimony that was submitted,

which, without explanation, she apparently does.  Mr. Harazim's Declaration states that Kotva

interprets both of these confidentiality provisions to extend to the identity of its business

partners.  Harazim Decl. at ¶ 5 ("Under the terms of this agreement, Kotva considers the name of

its investment partner to be confidential"); and ¶ 6 ("Kotva considers both identities to be confidential…").  Moreover, Kotva "treats this information as confidential, and takes appropriate measures to safeguard [its] confidentiality."  *Id.*

Both contracts also contain penalty clauses for violation of the confidentiality provisions. Kotva could be subject to contractual penalties of 10,000,000 czk or 1,000,000 czk for breaching its confidentiality obligations (using a 5% conversion rate as a rough estimate, the penalties for violations would be $500,000 and $50,000, respectively).  *See* Exs. 3 and 4 at ¶ IV.2 and ¶ 5.5, respectively.  The penalty provisions alone satisfy Kotva's burden to make a particular demonstration of potential harm in moving for a protective order.

> **B.    Kotva's Relationships Will Be Harmed by Disclosure
> and Kotva Reasonably Fears that Defendants Will Further
> Interfere with Its Business**

Disclosing the identity of Kotva's business partners also would damage Kotva's relationships with them.  Harazim Decl. at ¶ 7 ("Disclosure of confidential in violation of Kotva's contracts with these partners would also cause embarrassment to Kotva and immediately damage the relationships."); *see generally Id.* at ¶¶ 5-7.  As a result, Kotva's prospects for future beneficial investment opportunities with these partners would be jeopardized and could be lost. *Id.* at ¶ 7.  Moreover, disclosure of this information to the Weiss Defendants could potentially harm Kotva's outstanding investment.  In particular, Kotva has serious concerns that the Weiss Defendants will misuse this information to harass Kotva's business partners and further interfere with Kotva's business by, among other things, filing groundless litigation in the Czech Republic or disparaging Kotva.[5]  *Id.* at ¶ 7.  Indeed, the instant litigation was filed because of the Weiss

---

[5]  The Weiss Defendants admit that they seek this information for use in the Czech Republic.  Opposition at 8.  The Special Master commented that she cannot "conceive why" disclosing the identity of the company against which the claim stands may jeopardize Kotva's ability to recover.  The potential harm, however, must be viewed in the context of the instant litigation and with the benefit of Mr. Harazim's Declaration stating that Kotva fears that Weiss will try

Defendants' tortious interference with Kotva's business and attempts to blackmail Kotva through sham litigation. The Weiss Defendants have a history of employing such tactics.

Weiss also has filed suit against Markland, the Irish purchaser of the Department Store. *Id*. at ¶ 7. It goes beyond just filing lawsuits, however, including threats and baseless accusations. For example, Weiss sent correspondence threatening Anglo Irish Bank, Markland's lender, when he learned of Markland's intention to purchase the Department Store. *Id*. The Weiss Defendants have accused Kotva executives of belonging to the Russian mob, presumably because someone allegedly affiliated with *Forminster* speaks Russian. *See* Dep. Tr. of Andrew Weiss at 66-71, attached as Ex. 6; and Dep. Tr. of Georgiy Nikitin at 340-342, Ex. 7. When asked under oath whether he believes the Russian mob is involved in this case, however, Weiss testified: "I have no idea." *Id*. at 76. During his deposition, Weiss even suggested that undersigned counsel could be part of the mob, presumably because of involvement in this case. Weiss Dep. Tr. at 71-72, Ex. 6. Further, the Weiss Defendants have made reckless allegations to the press and U.S. Government that a Kotva executive bragged about murdering a Czech police officer. Weiss Dep. at 60-66; 74-75. This is not rational behavior. Kotva has no reason to believe that the zebra will suddenly change its stripes and <u>not</u> try to interfere with its business and business partners.

### C. The Special Master Has Accorded Confidential Treatment to Weiss's Investor Information to Protect Business Relationships

The Weiss Defendants have twice requested confidential treatment for the identity of their "investors." And twice, the Special Master has deemed the information to be confidential, relying on declaration testimony from the Weiss Defendants. In protecting the identity of

---

to interfere with its ongoing business. A lawsuit seeking to enjoin repayment to Kotva is certainly a "conceivable" threat.

Weiss's investors, the Special Master acknowledged the harm that can result from compromised

business relationships:

> The identity of current BGO investors, which is confidential business information…is likely to injure Weiss's business relationships with the current BGO investors with little, if any, concomitant benefit to Kotva.

May 26, 2006 Order at 9.

> The identity of investors is confidential business information and Kotva does not present a need for the discovery sufficiently compelling to warrant overriding the investors' reasonable expectation of privacy or compromising Weiss's business relationship with the investors.

September 29, 2006 Order at 24.  That is precisely the situation here with Kotva's business

relationships.  Kotva has demonstrated that the information is confidential.  Kotva has

demonstrated that it will be harmed by disclosure.  And Kotva has demonstrated that the

information is irrelevant and that Weiss has no need for it.  In other words, since Kotva has

demonstrated "good cause" to keep its business partner information confidential, Weiss bears the

burden to prove that the confidential information is relevant and that the need for the information

outweighs the harm that will result from disclosure.[6]  As discussed above, Weiss cannot make

that showing.

## III.    The Show-Cause Portion of the Order Should be Overruled

Despite the Court's dismissal of all "looting" claims, Kotva's previous production of

voluminous financial information to the Defendants, and the extremely narrow relief sought by

Kotva, the Special Master denied Kotva's motion *and ordered Kotva to show cause why it*

*should not be sanctioned* for seeking a protective order.  The Special Master alleged there was a

---

[6]  Pansy v. Borough of Stroudsburg, 23 F.3d 772, 787 (3d Cir. 1994) (determining whether to issue a protective order involves a balancing process that weighs the need for the information against the harm that might result from disclosure), citing Arthur R. Miller CONFIDENTIALITY, PROTECTIVE ORDERS, AND PUBLIC ACCESS TO THE COURTS, 105 Harv. L. Rev. 427, 433-35 (1991); *see also,* Duracell Inc. v. SW Consultants, Inc., 126 F.R.D. 576, 578 (N.D. Ga. 1989) (discussing three part balancing test); 8 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2043 (West 2005).

"mischaracterization" of the parties with whom Kotva did business as "partners" and "investors."

Order at 5. Nowhere in its motion did Kotva describe the entities it seeks to protect as

"investors." But Kotva's motion and Mr. Harazim's Declaration do <u>properly</u> describe the two

parties as business "partners." Kotva uses that term to describe the two entities with which it has

business relationships. Kotva's motion plainly identified the relationships and left no doubt

about the identity of the entities and the relationships Kotva seeks to protect. Kotva's

characterization is also supported by the contracts and investment documents.

The Special Master's misunderstanding of <u>proposed</u> redactions--for information that

would indirectly lead to the identification Kotva's business partners--appears to be the only

explanation for her allegations.[7] That type of misunderstanding, however, does not justify

denying Kotva's well-supported motion, accusing Kotva of making arguments in bad faith, and

threatening sanctions.

At the outset of the case, the Special Master established a procedure for protecting

confidential business information:

> In order to expedite the resolution of issues with respects [*sic*.] to claims of
> business confidentiality, the producing party must submit a copy of documents
> which are claimed to contain confidential information to the Special Master for in
> camera review, along with a motion for a protective order under Rule 26(c).

January 7, 2006 Order at 2. Kotva abided by the Special Master's procedures for seeking to

protect information it deemed confidential by filing a motion for a protective order. Defendants,

on the other hand, have repeatedly ignored these procedures. Instead of submitting materials and

moving for a protective order, Defendants simply withheld information and then requested

---

[7] For example, it takes little effort to identify a party Kotva seeks to protect if Kotva is forced to identify the sole trustee who facilitated the deal or the issuer of the securities. With respect to the claim investment, moreover, Mr. Harazim's Declaration expressly states that Kotva's proposes to redact the name of the company against whom the claim stands on a <u>temporary</u> basis. Harazim Decl. at ¶ 6 ("Kotva will reveal the identity of the company against whom the claim stands, however, once it receives back its investment.").

confidential treatment for materials in the context of opposition briefing.  *See* April 26, 2006

Opposition at 18-19 [Docket 106] and August 28, 2006 Opposition at 11-12 [Docket 132].

Rather than sanctions or threatened sanctions, the Special Master rewarded the Weiss Defendants

with the confidential treatment they requested.  *See* May 26, 2006 Order at 9; September 29,

2006 Order at 24.

     The Special Master's inclination to impose sanctions in this case--apparently only against

Kotva--and repeated demands for additional briefing, with its concomitant expenses and

additional compensation to the Special Master, needs to be addressed.  In 19 years of practice,

undersigned counsel has never been sanctioned.  During the course of discovery in this case

alone, however, the Special Master has imposed sanctions <u>four</u> <u>times</u> and threatened sanctions on

two other occasions, including the instant motion for a protective order.  Sanctions, or the threat

of sanctions, should not be the default position for every ruling by a Special Master.

     Kotva is entitled to a level playing field for discovery matters--no more, no less.  In the

face of this evidence, to conclude that Kotva's arguments with respect to confidentiality were not

made in good faith is inappropriate and unjustified.  As demonstrated in the preceding sections,

Kotva satisfied the good cause standard under Fed. R. Civ. P. 26(c), and its motion should be

granted.

## CONCLUSION

For the foregoing reasons, Kotva requests a protective order specifying that the Weiss Defendants should not have discovery regarding (1) the identity of Kotva's business partners in the investments identified herein, and that (2) Kotva has satisfied its obligations to produce "disbursement" discovery in this case. Kotva further requests that the Court obviate the need for Kotva to show cause to the Special Master why sanctions are not appropriate.

Respectfully submitted,

KOTVA A.S.

By its attorneys,

/s/ Joel G. Beckman
Joel G. Beckman (BBO# 553086)
Daniel J. Pasquarello (BB0# 647379)
NYSTROM BECKMAN & PARIS LLP
10 St. James Ave., 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: February 9, 2006

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), Kotva believes that oral argument may assist the Court and requests the opportunity to be heard.

## **LOCAL RULE 37.1/7.1 CERTIFICATION**

The issues in this motion have been the subject of a meet and confer process and hearing before the Special Master, as well as a separate meet and confer process that took place on February 8, 2007.

/s/ Joel G. Beckman
Joel G. Beckman (BB0# 553086)

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 9th day of February, 2007.

/s/ Joel G. Beckman
Joel G. Beckman (BB0# 553086)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KOTVA A.S., )
)
) Civil Action No. 05-10679-RCL
v. )
)
WEISS, ET AL. )

ORDER OF SPECIAL MASTER ON PLAINTIFF'S
MOTION FOR PROTECTIVE ORDER
(January 26, 2007)

On November 14, 2006, Kotva a.s. moved for a protective order (Document 160) to shield the identity of certain of its business partners in ongoing investments. In its motion, Kotva asserts that the identity of these partners is confidential business information and is irrelevant. Weiss opposes the motion.

On December 1, 2006, Kotva moved for leave to file a reply memorandum in further support of its motion for a protective order (Document 177). Leave is hereby granted.

In support of its motion, Kotva submitted a memorandum, the Declaration of Richard Harazim and, for *in camera* review, three exhibits, consisting of contracts related to a claim investment (Exhibit A), a real estate investment (Exhibit B); and a restaurant investment (Exhibit C). In his cover letter, Mr. Pasquarello, counsel to Kotva, represents that Kotva seeks to protect the first two agreements on the grounds of irrelevance and confidentiality, and the third agreement on the ground of irrelevance.

Kotva represents that it has invested 220 million czk in a real estate investment and 60 million czk in a "claim." Kotva represents that it has already produced bank account statements, escrow account statements, and year-end audited financial statements for 2004 and 2005, and that

1

these documents conclusively demonstrate that there has been no looting.

Kotva recites as good cause for a protective order (1) that it has promised its partners not to reveal their identity; and (2) the partners might seek liquidated damages and cease doing business with Kotva if Kotva reveals their identity, thereby depriving Kotva of investment opportunities it might otherwise enjoy in the future. Mr. Harazim represents that none of the investors are owned by, controlled by, or affiliated with Forminster, although since he does not know who the beneficial owners of Forminster are, it is difficult to see how he can make such a representation under oath.

With respect to its challenge to the relevance of the investment information, Kotva relies on the fact that the counterclaim as it pertains to looting has been dismissed and that because Weiss had alleged that looting occurred in 2005, current investments and investors have no bearing on whether looting occurred in 2005.

Kotva submitted the investment agreements with proposed redactions in Czech and translated to English. Upon review of Exhibit A and the proposed redactions, it is apparent that Kotva proposes to redact not the name of its business partners as it represents in its motion, but the name and address of the assignor of the "claim" for which Kotva paid 60 million czk, the name and address of the obligor of the receivable which is the subject of the assignment, and the name and address of the company whose shares are the subject of the underlying obligation. None of these parties can conceivably be called a "business partner" of Kotva's. The assignor is not an investor or business partner of Kotva's but an arm's-length party to a commercial transaction, and the other entities have no apparent relationship whatsoever, much less a fiduciary relationship, to Kotva. Thus, I do not credit Kotva's representation at page 2 of its Motion that

2

"Only information that would identify Kotva's business partners has been redacted." [emphasis in original].

      The confidentiality clause in Exhibit A provides that "Each party undertakes to keep confidential all facts relating to this Contract or concerning the other party." Agreement, ¶ 5.5. This clause does not by its terms extend to the obligor or the company which is the subject of the debt.  Moreover, I do not see why the parties' agreement to keep confidential "all facts" concerning the agreement or the parties should be construed to extend to the identity of the parties to the contract.  Finally, there seems to be no legitimate business reason why an assignment of a debt from one entity to another, a routine business deal,  should be kept confidential, nor can I conceive why "[d]isclosure of the identity of the company against which the claim stands may jeopardize Kotva's ability to recover on its current investment."  Harazim Declaration, ¶ 3.  Indeed, the agreement provides that the assignor would have to inform the obligor of the assignment.

      Exhibit B is a contract of collaboration and nondisclosure concerning real estate investment opportunities.  Nothing in it suggests that the identity of the parties to the contract is or was intended to be treated as confidential information. The nondisclosure clause relates only to information relating to investment opportunities and trade secrets.  It does not extend to the identity of the contractual parties.  Nothing in the contract remotely suggests that mere disclosure of the agreement itself or the identity of the parties to it would give rise to a claim pursuant to the liquidated damages provision.

      Accordingly, I conclude that Kotva has not sustained its burden to demonstrate the confidentiality of the information contained in Exhibits A and B and therefore has not

demonstrated good cause for issuance of a protective order with respect to those documents or the information contained therein.

Exhibit C is a contract for the transfer of securities. Kotva proposes to redact not only the name of the contracting transferor, but also the trustee who is the custodian of the securities and the issuer of the securities, neither of whom is a party to the contract. I do not see how any of these persons or entities can conceivably be construed as a "business partner" of Kotva or an "investor" in Kotva or Kotva's business ventures. The contract appears to be an arm's length business transaction, not one giving rise to fiduciary duties or to the duty to maintain the identity of the transferor or the issuing entity confidential. Finally, the contract definition of the term "confidential information" does not include the names of the parties, the trustee or the issuer of the subject securities.

Mr Pasquarello's letter disavows any claim that Exhibit C contains confidential business information. Instead, it claims that the identity of the parties to the agreement is irrelevant. I disagree. The standard of relevance is very broad indeed, and while the so-called "looting" issue may no longer be the subject of a counterclaim against the co-called Forrminster Group, it is still relevant to Weiss's defenses. So, I do not see how it is that the "looting" issue is no longer n the case. The identity of the recipients of large "investments" as well as the identity of the underlying obligor and issuer of the stock is certainly relevant to the issues raised by the defense. I weigh, of course, the relevance of the requested discovery against the burden to produce it. The balance is weighted toward production because the burden of production is minimal: the documents are already identified and the volume appears to be minimal.

Accordingly, the motion for a protective order is DENIED. I order Kotva to produce the

4

documents without redactions.  I do not consider the redactions or the motion to have been supported by good cause and I conclude that the arguments with respect to confidentiality advanced in the memorandum of law are not made in good faith.  In particular, I am troubled by the repeated mischaracterization of the persons and entities with whom Kotva did business as "partners" and "investors," when they are neither.  Accordingly, pursuant to Fed. R. Civ. P. 37(a)(4)(B), I order Kotva to show cause why I should not award the Weiss defendants their reasonable expenses incurred in opposing the motion.  I invite the Weiss defendants to submit an affidavit or affidavits establishing their costs and expenses.  Submissions shall be made within two weeks of issuance of this Order.

So ordered this 26th day of January, 2007.


_____/s/ Jeanne M.Kempthorne_____
Special Master

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KOTVA a.s.                              )
                                        )
                                        )
                Plaintiff,              )        Case No. 05-10679-RCL
                                        )
            v.                          )
                                        )
ANDREW WEISS and WEISS ASSET            )
MANAGEMENT, LLC                         )
                                        )
                Defendants.             )
                                        )

## DECLARATION OF RICHARD HARAZIM
## IN SUPPORT OF PLAINTIFF'S MOTION FOR PROTECTIVE ORDER

I, Richard Harazim, declare as follows:

1.      I am a senior consultant of K-T-V Finance, k.s.  I served as Chief Executive

Officer of Kotva, a.s. ("Kotva") beginning in the summer of 2000.   Effective September 13,

2005, Kotva changed its name to K-T-V Invest, a.s.  This name change was precipitated by

the sale of the "Kotva" trade name along with the Kotva Department Store.  In the summer of

2006, K-T-V Invest and a Czech company merged to form C.I.S.  Kotva, a.s., K-T-V Invest,

a.s., and C.I.S. are collectively referred to hereafter as "Kotva."

2.      In 2005, Kotva sold its Department Store for approximately $65,000,000.  As a

result of litigation instigated by the Weiss Defendants, $24,000,000 of the purchase price has

been held back in escrow and continues to be held in escrow.

3.      Earlier this year, Kotva produced bank account statements, escrow account

statements, year-end audited financial statements, and various documents concerning the sale

of the Department Store that accounted for the whereabouts of the Department Store sale

proceeds through the end of 2005. Kotva has recently produced additional bank account statements, escrow account statements, and investment related documents that account for the sale proceeds through the end of October 2006. Kotva also has previously agreed to provide a year-end audited financial statement prepared by an international accounting firm for 2006 when completed.

4.    In 2006, Kotva moved the majority of the proceeds from the sale of its Department Store to a different financial institution to receive better returns. This year, Kotva also made a number of investments as part of its ongoing business. Kotva has produced documents to the defendants to account for the whereabouts of these proceeds. Several investments made by Kotva are ongoing, however, and are confidential in nature. As described in the following paragraphs, Kotva will be harmed if it is forced to disclose certain confidential information regarding these ongoing investments.

5.    Kotva is currently involved in a real estate investment with another company. The contract with this company contains strict confidentiality and non-disclosure agreements that carry a 10,000,000 czk penalty for violations. Under the terms of this agreement, Kotva considers the name of its investment partner to be confidential. Kotva treats this information as confidential, and takes appropriate measures to safeguard the confidentiality of the information. Kotva has already produced the contract with this business partner to the defendants in redacted form to protect only the identity of the business partner. Kotva also has already disclosed to the defendants that it has made two investments with this business partner this year in the amounts of 170,000,000 and 50,000,000 czk. Further, Kotva has produced documents to the defendants disclosing that these investments are to be repaid to Kotva with interest (in the amounts of 194,103,794 and 53,528,767 czk) by the end of this

year.  In addition to incurring a significant contractual penalty, Kotva's ongoing investment, its relationship with this business partner, and its prospects for future beneficial investment opportunities will be harmed if Kotva is forced to disclose the identity of its business partner.

6.  Kotva is also currently involved in a claim investment.  Earlier this year, Kotva purchased a claim for 60,270,000 czk and will receive back 70,000,000 by the end of March 2007.  Kotva has produced the contract to the defendants in redacted form to protect the identity of its business partner and the company against which the claim stands.  Kotva considers both identities to be confidential business information, treats this information as confidential, and takes appropriate measures to safeguard the confidentiality of this information.  Disclosure of the identity of the company against which the claim stands may jeopardize Kotva's ability to recover on its current investment.  Kotva will reveal the identity of the company against whom the claim stands, however, once it receives back its investment.  On the other hand, disclosure of the identity of Kotva's business partner will jeopardize Kotva's ability to conduct future business with this entity and therefore could deprive Kotva of valuable investment opportunities in the future.  The contract with this business partner also contains a confidentiality provision and nondisclosure agreement that carries a 1,000,000 czk penalty for violations.

7.  Specifically, Kotva is concerned that its business partners will refuse to conduct business with Kotva in the future.  As a result, Kotva will be deprived of investment opportunities it otherwise would have.  Disclosure of confidential information in violation of Kotva's contracts with these partners would also cause embarrassment to Kotva and immediately damage the relationships.  With respect to the current investments, Kotva is very concerned that its confidential information will be misused to interfere with Kotva's

3

expected receipt of those investments.  In particular, the Weiss Defendants have initiated a number of lawsuits to disrupt Kotva's business relationships.  For example, the Weiss Defendants have filed suit against Markland, the purchaser of Kotva's Department Store, and sent correspondence threatening A.I.B., Markland's bank.  It is very easy to file lawsuits in the Czech Republic.  The targeted party must pay the expense of defending the case, which may drag on for years, whether or not the claims have merit.

8.      None of the entities described above is Forminster Enterprises Ltd. ("FEL").  As I previously testified, I do not know the identity of the "beneficial owners" of FEL.  None of the entities described above, however, is owned by, controlled by, or affiliated with FEL.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY OF THE LAWS OF THE
UNITED STATES OF AMERICA ON THIS 14th DAY OF NOVEMBER, 2006.

Richard Harazim.

5

On this day, month and year, the following contractual parties:

1. **SPV CO. LIMITED**
   A company established in accordance with Cypriot law, reg. no. HE 148845
   Registered offices: Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus
   Represented by Marek Kolibal, Managing Director

   (hereinafter "**SPV**") on the one side

   and

2. ▮▮▮▮▮▮▮▮▮▮
   Identification no.: ▮▮▮▮▮▮
   Registered offices: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   Entered in the Commercial Register kept by the ▮▮▮▮▮▮▮▮▮▮▮ section ▮
   record no. ▮
   Represented by ▮▮▮▮▮▮▮▮▮ Chairman of the Board of Directors, together
   with ▮▮▮▮▮▮▮, Vice Chairman of the Board and ▮▮▮▮▮▮▮ member
   of the Board

   (hereinafter ▮▮▮▮▮▮▮) on the other

did hereby conclude this:

### CONTRACT OF NONDISCLOSURE AND BASIC TERMS OF COLLABORATION

in accordance with §269, paragraph 2 of
Act no. 513/1991 Coll., the Commercial Code, as amended (hereinafter the
"**Commercial Code**")

### I.
### Introductory provisions

1. ▮▮▮▮▮▮ is a Czech corporate body doing business in, among other things, real estate and development. It has sufficient personnel and technical facilities, as well as essential know how to pursue this activity.

2. SPV is a foreign corporate body with available funds at its disposal in sufficient volumes to allow collaboration between the contractual parties in the area of real estate and development.

3. Both contractual parties declare that they are interested in mutual collaboration; ▮▮▮▮▮▮ with the aim of further developing its business activities and making profit and SPV with the aim of better valorising temporarily available funds, all with the maximum possible elimination of potential risks.

K7951

## II.
## Collaboration between the contractual parties

1. Collaboration between the contractual parties will take place in accordance with this contract and agreements concluded between the contractual parties in relation thereto, as part of individually realised projects.

2. ▮▮▮▮▮ will seek and identify investment opportunities suitable for collaboration between the contractual parties according to this contract and inform SPV thereof.

3. On receiving identification of an investment opportunity from ▮▮▮▮▮, SPV will assess the suitability of this investment opportunity for SPV in as short a time as possible and inform ▮▮▮▮▮ of the results of this assessment without delay. In the event of a positive assessment of the investment opportunity, the contractual parties' representatives will arrange a meeting at which they will agree on the details of collaboration, especially the manner in which funds will be provided by SPV, together with guarantees and security provided by ▮▮▮▮▮ and other business terms and conditions.

## III.
## Nondisclosure

1. Both contractual parties declare that they been acquainted with information in the course of their mutual collaboration and intend to be acquainted with information in the future that is considered as trade secrecy in the sense of § 17 of the Commercial Code, as well as other information that both contractual parties consider confidential, in that its disclosure to third parties can result in damages to one or both contractual parties. In this context, ▮▮▮▮▮ declares that, in view of the extent of competition in the field of real estate and development, it primarily considers information on investment opportunities found by ▮▮▮▮▮ to be subject to increased nondisclosure requirements, given that unauthorised access to this information by third parties could mean the use of this information by the competition at ▮▮▮▮▮ expense.

2. Both contractual parties have an interest in ensuring the above information is not disclosed to third parties and in maintaining the nature of this information – trade secrets and confidential information. Both contractual parties therefore undertake to keep all information disclosed by the other contractual party in the strictest of confidence. Information of the above nature can only be disclosed or made available to third parties with the written consent of the contractual party with sole disposition rights to the trade secret or confidential information, or the consent of both contractual parties, if this right belongs to both parties.

3. SPV undertakes not to use any information on investment opportunities provided by ▮▮▮▮▮ for its own benefit or the benefit of a third party and is not authorised to make such information available to third parties without ▮▮▮▮▮ prior written consent.

4. For the purposes of this contract, the contractual parties understand trade secrecy, in the sense of § 17 of the Commercial Code, to mean all information of a

commercial, production or technical nature relating to the business activities of either contractual party, which has a real, or at least potential, material or intangible value and is not available in the relevant business circles. All information on investment opportunities disclosed to SPV by ███████ has the nature of a trade secret.

5.   For the purposes of this contract, the contractual parties understand confidential information to mean all information disclosed by the other contractual party in relation to this contract, which is not the subject of trade secrecy.

6.   If, in the execution of its obligations under this contract, either of the contractual parties collaborates with a third party, the relevant contractual party undertakes to impose a duty of nondisclosure on this party to the extent corresponding to this contract, if this third party is not already bound by a duty of nondisclosure by law. The contractual party that initiates collaboration with a third party is liable for any breach of nondisclosure by this third party, as if it was responsible for this breach itself.

7.   The duty of nondisclosure imposed by this contract remains in effect for both contractual parties without time limitation, even after the end of collaboration between the contractual parties or the expiry or termination of this contract.


## IV.
## Breach of nondisclosure and sanctions

1.   In the event of a breach of any of the obligations imposed by this contract by one of the contractual parties, the other contractual party becomes entitled to the payment of a contractual fine from the contractual party that breached the duty of nondisclosure or was liable for such a breach.

2.   The contractual fine for each individual case of a breach of nondisclosure is **CZK 10,000,000** (in words: **ten million Czech crowns**). The payment of the contractual fine does not affect the right to seek compensation for damages in full. The obligation to pay damages applies to all damages, including costs required to exercise these claims.


## V.
## Arbitration clause

The contractual parties agree that all disputes arising in relation to the execution of this contract will be definitely decided by the Arbitration Court of the Chamber of Economics CZ and the Agrarian Chamber CZ. The arbitration senate will consist of three arbitrators, wherein the contractual parties will appoint one arbitrator each, and these two arbitrators will elect a third arbitrator to preside over the arbitration senate from the list of arbitrators. The seat of the Arbitration Court is in Prague.

K7953

## VI.
## Final provisions

1.  This contract becomes valid and effective on the day it is signed by both contractual parties.

2.  This contract will be drawn up in duplicate and in Czech, of which both copies have the validity of the original. The contractual parties will receive one copy of the contract each.

3.  If any of the provisions of this contract is, or becomes invalid or unenforceable, whether this relates to individual provisions or the entire contract, the contractual parties undertake to make all possible effort that can be reasonably expected, to replace the invalid or unenforceable contract (or its invalid or unenforceable parts) or invalid or unenforceable provisions with valid and enforceable provisions whose content and intent is as close as possible to the affected provisions of the original contract and the intent the contractual parties wished to achieve in concluding the original contract.

4.  Changes or additions to this contract are only possible in the form of written, numbered addenda to the contract, which must be signed by both contractual parties.

5.  The contractual parties' rights and obligations not specifically addressed by this contract are governed by the relevant legislation of the Czech Republic.


In Prague, _____(date)_____




_____                    _____

**SPV CO. LIMITED**                            ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄




K7954

# Promissory Note

**Prague, March 20, 2006**

------------------------------------------------

Location and Date of Issue

**CZK 194,103,794**

------------------------------------------------

Amount

**December 31, 2006**

------------------------------------------------

Payable by

For this promissory **note**, I shall pay to **SPV CO. LIMITED** (registration number: HE 148845; address: Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus) the amount of **one hundred and ninety-four million, one hundred and three thousand, seven hundred and ninety four Czech crowns.**

**Prague 1**

------------------------------------------------

Payable in

**WITHOUT PROTEST**



K7955

# Promissory Note

**Prague, July 24, 2006**

------------------------------------------------

Location and Date of Issue

**CZK 53,528,767.10**

------------------------------------------------

Amount

**December 31, 2006**

------------------------------------------------

Payable by

For this promissory **note, I** shall pay to **SPV CO. LIMITED** (registration number: HE 148845; address: Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus) the amount of **fifty-three million, five hundred and twenty-eight thousand, seven hundred and sixty-seven and 10/100's Czech crowns.**

**Prague 1**

------------------------------------------------

Payable in

**WITHOUT PROTEST**



K7956

Parties:

1.   

as the "**Assignor**" of the one part

and

2.   **SPV CO Limited**
     Reg. no. HE 148845
     Registered office Agiou Pavlou 15, Ledra House, Agios Andreas, P. C. 1105, Nicosia, Cyprus
     Represented by Marek Kollbal, director

     as the "**Assignee**" of the other part

entered on the day, month and year set forth below, pursuant to Section 524 et seq. of Act No. 40/1964 Coll., the Civil Code, as amended (hereinafter the "**Civil Code**") into this

### Contract on Transfer of a Receivable for Consideration

#### I.

#### Subject of the Contract

1.1   The subject of this Contract is the Assignor's obligation to assign to the Assignee a receivable specified in Article II par. 2.1. hereof as the relevant receivable and to transfer to the Assignee all creditor rights relating to this receivable, and the Assignee's obligation to pay to the Assignor the consideration specified in Article IV of this Contract, all of the foregoing subject to the terms set forth herein.

#### II.

#### Object of Assignment

2.1   The Assignor represents that he has a receivable from  with its registered office at (hereinafter the "**Debtor**") in the total amount of **70,000,000 CZK** (In words: **seventy million Czech crowns**), representing the purchase price of the Shares of with its registered office at registered in the Commercial Register maintained by the

K7947

Section █, Insert█ arising under a contract on sale of securities dated 14 March 2006, which was not paid by the Debtor. Under the contract on transfer of securities, this receivable is due twelve months after the signature of the contract at the latest.

(hereinafter the "**Relevant Receivable**")

2.2    The Relevant Receivable is secured by a pledge attached to the above 151 ordinary bearer shares of ███████████, Identification No.███████ with its registered office at ████ ████████████████████ registered in the Commercial Register maintained by the ████████████ Section █, Insert ███ with the nominal value of ███████ per one share, marked by serial numbers ████████████ (hereinafter the "**Shares**"). By their signatures, the parties acknowledge that, before the execution of this Contract, the Assignor handed over the Shares to the Assignee with attached endorsement indicating the pledge.

2.3    The Assignor represents that the Relevant Receivable fulfils all legal conditions required for its being assigned to the Assignee in accordance with this Contract, particularly the conditions set forth in Section 525 of the Civil Code.

2.4    The Assignor further represents that he is entitled to dispose of the Relevant Receivable in accordance with his obligations relating thereto.

III.

**Assignment of the Receivable**

3.1    The Assignor hereby assigns to the Assignee the Relevant Receivable from the Debtor and the Assignee hereby accepts the Relevant Receivable and becomes its creditor.

3.2    Together with the assigned Relevant Receivable, the Assignor also transfers to the Assignee the accessories and all rights relating to the assigned Relevant Receivable, including the pledge specified in Article 2.2 hereof.

3.3    If the transfer or exercise of these rights requires making any representations or taking legal acts by the Assignor, the Assignor undertakes to issue such representations and take such acts upon the Assignee's request.

K7948

2

## IV.
## Consideration and Payment Terms

4.1     The Assignee undertakes to pay to the Assignor for the assignment of the Relevant Receivable specified in Article II par. 2.1 a consideration in the amount of **60,270,000 CZK** (in words: **sixty million two hundred and seventy thousand Czech crowns**).

4.2     The Assignee undertakes to pay the consideration to the Assignor within 30 days after the signature of this Contract by transfer on the bank account communicated by the Assignor to the Assignee in writing.

## V.
## Other Rights and Obligations of the Parties

5.1     The Assignor undertakes to notify the Debtor of the assignment of the Relevant Receivable to the Assignee without undue delay after the execution of this Contract.

5.2     The Assignor undertakes to hand over to the Assignee all documents evidencing the existence of the Relevant Receivable, its amount and other important facts relating to the Relevant Receivable, provided that he has them in his possession or is able to acquire them through efforts that can be reasonably required from him.

5.4     The Assignor and the Assignee undertake to inform one another without undue delay about all material facts relating to the subject of this Contract.

5.5     Each party undertakes to keep confidential all facts relating to this Contract or concerning the other party. If any part breaches this duty, it undertakes to pay to the other party a contract penalty in the amount of 1,000,000 CZK (in words: one million Czech crowns). This shall not affect or restrict any claim for damages.

## VI.
## Final Provisions

6.1     This Contract is made in two original counterparts, one for each of the parties.

6.2     The nullity, invalidity or unenforceability of one or more provisions of this Contract shall not affect the validity of this Contract as a whole. In lieu of such null, invalid or unenforceable provision, the parties undertake to agree on such provision that shall be as close as possible to the purpose of the existing provision.

K7949

6.3     Both parties represent that they have read this Contract prior to its signature and that it has been executed after mutual negotiations as a manifestation of their free and solemn intent, and that it was not concluded under duress or under conspicuously unfavourable conditions. IN WITNESS WHEREOF, the parties attach their signatures below.

███████████████████

SPV CO Limited

K7950



**VÝPIS Z ÚČTU/**
**ACCOUNT STATEMENT**

| | | | | |
|---|---|---|---|---|
| Výpis č.: | 14 | | | |
| Datum: | 31.12.2006 | | | |
| Strana č.. | 1 | | | |
| Účet: | ████████618███████████ | | | |
| IBAN: | ██████████████████████618 | | | |
| Název: | SPV CO. LIMITED | | | |
| Typ: | Klientské běžné účty | | | |

*SPV CO. LIMITED*

K-T-V finance, k.s.

Revoluční 3

110 00   Praha 1

| | | |
|---|---|---|
| Počáteční zůstatek | 30.11.2006 | 17 120 401,61 CR |
| Obrat debet | | 3 619 124,10 |
| Obrat kredit | | 247 709 717,61 |
| Nový zůstatek | 31.12.2006 | 261 210 995,12 CR |

| Datum: | Popis | Valuta | Debet | Kredit |
|---|---|---|---|---|
| 01.12.2006 | Vypořádání úroku BÚ - DT+CR | 01.12.2006 | | 25 308,56 |
| | Daň z úroků BÚ | 01.12.2006 | 2 530,00 | |
| 01.12.2006 | Poplatek BÚ - perioda A | | | |
| | Výpisy z ustavené schůzky 02/01/2726 - 01/12/2006 | | | |
| | výpisy z účtu - poplatek | 01.12.2006 | 20,00 | |
| 01.12.2006 | Poplatek BÚ - perioda A | | | |
| | Poplatek za vedení účtu 01/11/2006 - 01/12/2006 | | | |
| | Popl: Vedení běžného účtu | 01.12.2006 | 100,00 | |
| 04.12.2006 | Vypořádání úroku TV - DT+CR ██████850 | 04.12.2006 | | 12 : 49,32 |
| | Daň z úroků TV | 04.12.2006 | 1 214,00 | |
| 05.12.2006 | Enter general ledger | | | |
| | ███████335 | | | |
| | Doúčtovaný popl. OUR k vrácení ze zahr. - zahr. platba | | | |
| | Popl: OUR | 05.12.2006 | - 726,60 | |
| 11.12.2006 | Vypořádání úroku TV - DT+CR ██████850 | 11.12.2006 | | 12 082,19 |
| | Daň z úroků TV | 11.12.2006 | 1 208,00 | |
| 14.12.2006 | Zahraniční platba klienta ████████████355 | 14.12.2006 | 14 162,00 | |
| | VASILIADES CHRISTODOULOS 15 AGIOU PAVLOU STREET,LEDRA HOU | | | |
| | ███████206H | | | |
| | Zahraniční platba klientu Proprovedené Komerční Bankou | | | |
| | Popl: odchozí zahraniční platba | 14.12.2006 | 250,00 | |
| 18.12.2006 | Vypořádání úroku TV - DT+CR ██████850 | 18.12.2006 | | 12 082,19 |
| | Daň z úroků TV | 18.12.2006 | 1 208,00 | |
| | | | 21 418,60 | 61 622,26 |

K7980

J&T BANKA ████ PORUČŽÍČ 14/2007 ████ CC PRAHA ████ ČESKÁ REPUBLIKA  TEL. ████ 591 719 111   TEL.████ 591 719 111  SI



Výpis č.:   14
Datum:      31.12.2006
Strana č.:  2
Účet:       ███████618██████████
IBAN:       ████████████████████518
Název:      SPV CO. LIMITED
Typ:        Klientské běžné účty

| Datum: | Popis | | Valuta | Debet | Kredit |
|---|---|---|---|---|---|
| | | | | 3 619 124,10 | 247 709 717,61 |
| 18.12.2006 | Příkaz k úhradě | ████████00 | 18.12.2006 | 3 595 450,00 | |
| | | ████51 | | | |
| | Popl: odchozí hotelní platba | | 19.12.2006 | 10,00 | |
| 19.12.2006 | Enter general ledger | | | | |
| | ████████335 | | | | |
| | ███████████████████████████████ | | | | |
| | Popl: OUR | | 19.12.2006 | 554,00 | |
| 19.12.2006 | Enter general ledger | | | | |
| | ████████335 | | | | |
| | ██████████████████████████████ | | | | |
| | Popl: OUR | | 19.12.2006 | 138,50 | |
| 27.12.2006 | Vypořádání úroku TV - DT+CR ████████390 | | 27.12.2006 | | 15 534,25 |
| | Daň z úroků TV | | 27.12.2006 | 1 553,00 | |
| 28.12.2006 | Příchozí platba | ███████700 | 28.12.2006 | | 194 103 794,00 |
| | ███████████ | | | | |
| | ██████ | | | | |
| 28.12.2006 | Příchozí platba | ███████700 | 28.12.2006 | | 53 528 767,10 |
| | ███████████ | | | | |
| | ██████ | | | | |

K7981

Kotva
vs.
Weiss, et al.

# Weiss Asset Management by Andrew Weiss

Volume 1

January 25, 2007
pp 1-334

**Jones Reporting**
COMPANY

Two Oliver Street, Suite 804
Boston, MA 02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Weiss Asset Management by Andrew Weiss

Page 1

1                              Volume:   I

2                              Pages:   1 - 334

3           UNITED STATES DISTRICT COURT

4             DISTRICT OF MASSACHUSETTS

5                      C.A. No. 05-10679-RCL

6

7    KOTVA, a.s.,

8              Plaintiff,

9       v.

10   ANDREW WEISS and WEISS ASSET

11   MANAGEMENT, LLC,

12             Defendants.

13

14

15                  *********

16   30(b)(6) DEPOSITION OF WEISS ASSET MANAGEMENT

17              BY ANDREW WEISS

18         Thursday, January 25, 2007

19        Nystrom, Beckman & Paris, LLP

20           10 St. James Avenue

21          Boston, Massachusetts

22          9:30 a.m. to 3:44 p.m.

23        Reporter:  Linda M. Grieco

24

Weiss Asset Management by Andrew Weiss

Page 58

1    Q. Are those answers accurate?
2    A. I believe so.
3    Q. Are those answers complete?
4    A. I believe so.
5         MR. GOLDBERGER: Joel, I need a bathroom
6    break. Would now be a good time?
7         MR. BECKMAN: Let me just finish one
8    thing up.
9         MR. GOLDBERGER: Sure.
10        MR. BECKMAN: Can you give me two
11   minutes?
12        MR. GOLDBERGER: Yes.
13        MR. BECKMAN: All right, go ahead. We
14   can go off the record now.
15        VIDEOGRAPHER: Time is 10:32. We're off
16   the record.
17        (Whereupon, a recess was taken)
18        (Exhibit 2 marked for identification)
19        VIDEOGRAPHER: Time is 10:41. We're
20   back on the record.
21   Q. Who is Nick Carey, Mr. Weiss?
22   A. He was a reporter for Dow Jones.
23   Q. Did Mr. Carey or was an article published in
24   the Wall Street Journal authored by Mr. Carey?

Page 59

1    A. Yes.
2    Q. Did you communicate with Mr. Carey about
3    that article?
4    A. Yes.
5    Q. I hand to you an e-mail that's been produced
6    from your files and marked as Exhibit Number 2.
7         (Document exhibited to witness)
8    Q. Now, the bottom of the e-mail is from Ben
9    Goldberger to individuals in your office, and you're
10   cc'd on that. Do you see that?
11   A. Where it says hi, Benjamin?
12   Q. No, I'm going to the bottom of it. From B.
13   Goldberger to MWE, but in the middle of the first
14   page?
15   A. Oh, where it says "attached," the sentence
16   that begins with the word "attached"?
17   Q. Yes, yes. Mr. Goldberger writes, "Attached
18   is a company report on SPV Co. I will amend
19   paragraph 11 of the counterclaim to state that Benda
20   is a director of SPV Co." Do you see that?
21   A. Yes.
22   Q. Is that Martin Benda?
23   A. I would assume so.
24   Q. Now, did you forward this e-mail that you

Page 60

1    received from Mr. Goldberger to Nick Carey at the
2    Wall Street Journal?
3    A. I don't recall.
4    Q. Well, look at the top. Does that indicate
5    that you forwarded this e-mail to Mr. Carey?
6    A. No, that doesn't indicate that.
7    Q. All right, let's focus on what -- let's go
8    to the top e-mail from Andrew Weiss to Nick Carey,
9    SPV Co. Do you see that?
10   A. Yes.
11   Q. Do you recall sending this e-mail to Mr.
12   Carey?
13   A. No.
14   Q. Well, you generated this e-mail, correct?
15   A. Yes.
16   Q. Right. In the e-mail you write, "I thought
17   you might be interested to see that the person who
18   is bragging about killing the police investigator is
19   also a director of SPV Co., which is the company
20   that ended up owning the department store the Irish
21   investors bought, SPV Co.," and then your initials
22   AW. Do you see that?
23   A. Yes, I do.
24   Q. Did you forward this to Nick Carey before

Page 61

1    the Wall Street Journal article was published?
2         MR. GOLDBERGER: Objection.
3    A. You use the word "forwarded." Do you mean
4    to say did I send the e-mail?
5    Q. Yes, did you send this e-mail to Mr. Carey?
6    A. It says that I did it. So I assume I did
7    it. It says that, yeah, like I said, I don't have
8    any recollection.
9    Q. Do you believe that Mr. Benda was bragging
10   about killing the police investigator?
11   A. Yes, I do believe that.
12   Q. Describe all facts supporting your
13   contention that Mr. Benda bragged about killing a
14   police investigator.
15   A. That's pretty much a direct -- it's a
16   paraphrase of a report that I got from police
17   investigator in which -- not a police investigator,
18   private — excuse me, Mr. Topinka hired -- my
19   attorneys in the Czech Republic hired a police
20   investigator to do background checks on what was
21   going on in this matter. The report that they sent
22   me said that Benda has in -- I believe is what it
23   said is often and in various places has bragged
24   about, quote, doing in the, and then they gave the

16 (Pages 58 to 61)

Weiss Asset Management by Andrew Weiss

Page 62

1 name of the police investigator who committed
2 suicide under what his supervisor described as very
3 unusual circumstances. It was the subject of
4 several newspaper reports talking about how
5 suspicious the suicide was. There's also been
6 newspaper reports in the Czech Republic about the
7 frequency in which police investigators, quote,
8 commit suicide.
9    Q. Do you believe that Mr. Benda killed the
10 police investigator?
11    A. I think it's -- I don't believe that -- I
12 guess the word believe in the context in that
13 sentence is a difficult one for me to think about.
14 You know, it's easier for me to think in terms of
15 probabilities. I think there's a -- given that the
16 police -- that the investigator said that he bragged
17 about doing in the police investigator, I think that
18 there is some probability that he did. That those
19 boasts are correct. I never --
20    Q. Have you brought this information to the
21 attention of the Czech authorities?
22    A. No. Not that I know of. I don't know if --
23 I did not personally.
24    Q. Did anyone on your behalf bring this

Page 63

1 information to the --
2    A. Not that I know of.
3    Q. Did you take efforts to insure that this
4 information was provided to the Czech authorities?
5    A. I did not.
6    Q. So you think you know the person who killed
7 another person, and you don't think it's important
8 to convey that to the Czech authorities?
9     ·.  MR. GOLDBERGER: Objection.
10    A. I didn't say that. That's not true.
11    Q. Well, do you believe that Mr. Benda killed a
12 police investigator?
13    A. I think that -- I think that there's some
14 probability that he did, but I don't think it's a
15 certainty. I don't think that there's evidence
16 to -- that would be close to sufficient to convict
17 anybody of it or prove beyond a reasonable doubt.
18 Whether I believe it or not -- I don't -- the notion
19 of believe in the context of that question is really
20 probabilistic. It's really probabilistic. It's
21 not --
22    Q. But you thought you had enough information
23 to convey it to the Wall Street Journal; is that
24 correct?

Page 64

1    A. I didn't convey that he killed him. I said
2 I conveyed to the Wall Street Journal that the
3 person who bragged about doing it. I did not say
4 that he did it.
5    Q. Identify the police officer that you believe
6 in some probability that Mr. Benda killed.
7    A. There's a possibility. It's the police
8 investigator was the person who was in charge of
9 investigating the tunneling of Trend.
10    Q. What's the name of the police officer?
11    A. It's one of these Czech names that I have so
12 much trouble remembering. It's in the files.
13    Q. When did he die?
14    A. He died in the early part of -- around -- I
15 don't remember. I don't recall.
16    Q. Do you have a best estimate as to when this
17 police officer died?
18    A. It was before I started getting involved in
19 this case.
20    Q. Okay, when did you first get involved in
21 this case?
22    A. In 2003. The second half of 2003.
23    Q. Did you repeat this accusation to others?
24    A. That's not an accusation.

Page 65

1    Q. Did you convey to others that Mr. Benda
2 bragged about killing a police investigator?
3    A. I may have.
4    Q. Who else?
5    A. My wife.
6    Q. Did you convey this information to the New
7 York Times?
8    A. That a police investigator -- that my
9 private -- which information?
10    Q. Did you convey to the New York Times that
11 you had information Mr. Benda was bragging about
12 killing a police investigator?
13    A. I may have.
14    Q. Did you convey that information to members
15 of the U.S. Government?
16    A. I don't recall.
17    Q. Did you convey that information to Senator
18 Kerry's office?
19    A. I don't recall.
20    Q. Other than -- let me back up.
21     What's the basis for the investigator's
22 conclusion, the private investigator's conclusion
23 that Mr. Benda bragged about killing a police
24 officer?

17 (Pages 62 to 65)

Weiss Asset Management by Andrew Weiss

Page 66

1  A. He said that often and in various places,
2 Mr. Benda has said that he did in, and then he gave
3 the name of the police investigator.
4  Q. Now, before you conveyed this information to
5 the Wall Street Journal, did you ask the private
6 investigator who and when Mr. Benda allegedly made
7 these statements?
8  A. No, I did not.
9  (Exhibit 3 marked for identification)
10  Q. I'm handing to you what's been marked as
11 Exhibit Number 3.
12  (Document exhibited to witness)
13  Q. Which is an e-mail produced by defendants in
14 this case. The top e-mail being from you to Lars
15 Bader dated February 9, 2005. Who's Lars Bader?
16  A. Lars Bader is an executive with QVT.
17  Q. And QVT is one of the largest investors in
18 the ring-fenced assets, correct?
19  A. Yes.
20  Q. Is your answer yes?
21  A. Yes.
22  Q. Now, I want to direct your attention to
23 beginning with the second sentence of this e-mail in
24 which you write, "I spoke with McKnight at State

Page 67

1 Department. She just gave me the number of the
2 person at the embassy who didn't seem to be able to
3 do anything. He said the Czech legal system was
4 bullshit and this the bribe could well have been
5 given to either the justice minister or the prime
6 minister. Also, he said the judges are bribed at
7 fairly low prices. He did not say that he
8 thought -- he did say that he thought the key point
9 would be able to find out if the money behind
10 Forminster was Russian money. I'm hiring an
11 investigator to research that." Did someone at the
12 U.S. Embassy in Prague representing the U.S.
13 Government tell you that the Czech legal system was
14 bullshit and a bribe could well have been given?
15  MR. GOLDBERGER: Objection.
16  A. Yes.
17  Q. Who at the U.S. Embassy made the statement?
18  A. The commercial attache.
19  Q. What's the name of the person?
20  A. I don't recall.
21  Q. When was that information allegedly conveyed
22 to you?
23  A. I don't recall. But -- I don't recall the
24 date.

Page 68

1  Q. But you can't give me a name of the person;
2 is that right?
3  A. No, I can't. It was whoever was the
4 commercial attache, roughly at this time it's
5 probably a matter of public record. You can get on
6 the internet.
7  Q. Did this person say to you that he thought
8 the key point would be to find out if the money
9 behind Forminster was Russian money?
10  A. Yes.
11  Q. What do you mean by Russian money?
12  A. Organized -- Russian organized crime.
13  Q. What exactly did he say to you about that
14 issue?
15  A. I don't know. I can't recall exactly what
16 he said.
17  Q. What's your best recollection of what he
18 told you about saying that he thought the key point
19 would be to find out if the money behind Forminster
20 was Russian money?
21  A. He said that the pattern of violence
22 associated with this case suggested that it was most
23 likely to be Russian organized crime.
24  Q. Oh, so he told you that it was most likely

Page 69

1 Russian organized crime was involved in this case?
2  A. Yes.
3  Q. Oh, he didn't say that you should -- that
4 the key point would be to find out?
5  A. He said it was most likely that -- it
6 sounded to him, what he said -- this is a long time
7 ago. So I'm trying to -- not saying exactly what he
8 said, but my best recollection is he said it sounded
9 to him the way, given the violence associated with
10 this case, there's a very well known case, by the
11 way, is that it sounded to him like it was -- it
12 sounded to him like Russian organized crime.
13  Q. Did he tell you that the key point would be
14 to find out if Russian money was involved?
15  A. I don't recall, but given that it's in the
16 e-mail, it seems like that's plausible.
17  Q. Is it your testimony that he told you
18 Russian money was involved -- Russian mob was
19 involved or did he tell you whether to investigate
20 it?
21  MR. GOLDBERGER: Objection.
22  A. Let me just repeat what I said before.
23  Q. Please.
24  A. Which is what I believe he said was given

18 (Pages 66 to 69)

Weiss Asset Management by Andrew Weiss

Page 70

1 the amount of violence involved in this case, that
2 it sounded to him like Russian organized crime was
3 involved.
4 Q. Did you have your private investigator look
5 into whether there was a link with Russian mob?
6 A. I didn't communicate with the private
7 investigator.
8 Q. Well, do you know whether your private
9 investigator researched whether Russian mob was
10 involved?
11 A. I don't know.
12 Q. Were you ever provided any information
13 regarding whether Russian mob was involved, other
14 than what the State Department or the U.S. Embassy
15 told you?
16 MR. GOLDBERGER: And other than what
17 your lawyers told you.
18 A. No. Wait, can you rephrase that question
19 again, please?
20 Q. Were you provided any information -- were
21 you provided any other information supporting the
22 allegation that Russian mob was involved?
23 A. Yes.
24 Q. Describe that information.

Page 71

1 A. It's quite tangential, but we eventually,
2 because Forminster has been involved in so many
3 criminal processes, we were able to find out that
4 the beneficial owners of Forminster is Bonalbo
5 Group. If you trace it down, Forminster is owned by
6 Bonalbo Fiduciaries UK who report having no assets,
7 because it's a UK company, was owned by Bonalbo
8 Group UK who report having just liabilities, which
9 is owned by Bonalbo Group Cyprus. When we call
10 Bonalbo Group Cyprus, they say on their website that
11 they're in the business of on-line gaming, on-line
12 licensed and unlicensed gaming. And that they are
13 fluent Russian speakers. And when we called Bonalbo
14 Group, we get people who speak Russian. Georgiy
15 Nikitin, who is Russian speaking, calls them. And
16 there's a long history of the Russian organized
17 crime making use of entities in Cyprus. So that
18 would be the connection, the only other connection I
19 might know about.
20 Q. So anyone who speaks Russian may be part of
21 the Russian mob?
22 MR. GOLDBERGER: Objection.
23 A. No. Oh, maybe. You mean anybody who speaks
24 Russian? Sure, anybody may be part of the Russian

Page 72

1 mob. You may be. I mean anybody might be.
2 Q. I might be part of the Russian mob?
3 A. Anybody may be part of the Russian mob.
4 That's like saying anybody -- I mean anybody may.
5 You know, anyone in the world may be part -- you
6 can't like refute that. That's a philosophical
7 statement.
8 Q. Do you think it's responsible to report to
9 third parties that there may be links to the Russian
10 mob because a person speaks Russian?
11 MR. GOLDBERGER: Objection.
12 A. I never did that.
13 Q. Oh, you didn't?
14 A. No.
15 Q. Okay. Let's mark this as the next exhibit.
16 (Exhibit 4 marked for identification)
17 Q. Who's Nancy Stetson?
18 A. I don't know.
19 Q. You don't know? Do you know whether she
20 works for Senator Kerry?
21 A. No, I don't know.
22 Q. What about in the U.S. Government, you never
23 heard that name?
24 A. Nancy Stetson?

Page 73

1 Q. Yes.
2 A. Well, I don't recall.
3 (Document exhibited to witness)
4 Q. Let me hand to you what's been marked as
5 Exhibit Number 4, which is an e-mail produced by
6 defendants in this case from Georgiy Nikitin on
7 behalf on Andrew Weiss sent to Nancy Stetson at
8 foreign dot Senate dot gov. Did you review this
9 e-mail before it was sent out?
10 A. Probably. I don't recall, but it seems
11 likely that I did.
12 Q. Now, the subject line is phone call and
13 meeting. In the first line is, "I was having dinner
14 with Cam Kerry last night," and this e-mail is --
15 purports to be from you. Do you remember having
16 dinner with -- let me ask a foundational question.
17 Does this e-mail refresh your recollection as to who
18 Ms. Stetson is?
19 MR. GOLDBERGER: Objection.
20 A. No. I mean, from the e-mail, it doesn't
21 refresh my recollection, but it gives me information
22 about who she is.
23 Q. Who is she? What information does it give
24 you?

19 (Pages 70 to 73)

Weiss Asset Management by Andrew Weiss

Page 74

1    MR. GOLDBERGER: Objection.
2    A. It gives me information that she has a gov,
3  a Senate dot gov e-mail address, which presumably
4  means that she has some position with the U.S.
5  Senate. Given the context of the e-mail, it sounds
6  as though she probably is on Senator Kerry's staff.
7    Q. Let me direct your attention to the second
8  full paragraph, which provides, "We have learned
9  that Forminster Enterprises, the firm instigating
10 trumped-up charges against me, is secretly owned by
11 a Cyprus company which gives as its business
12 unlicensed on-line gaming operations and says it is
13 fluent in Russian. I've been told that this
14 information combined with the pattern of violence,
15 including questionable suicides of police officials,
16 strongly indicates the involvement of Russian
17 Mafia." So, Mr. Weiss, you conveyed to Senator
18 Kerry's office allegations concerning connections to
19 the Russian Mafia, correct?
20    MR. GOLDBERGER: Objection.
21    A. I conveyed what this sentence says.
22    Q. Right.
23    A. I did what -- I wrote what the sentence
24 says.

Page 75

1    Q. Now, you said, "I've been told that this
2  information." What information were you told and by
3  whom?
4    MR. GOLDBERGER: Objection.
5    A. That was given by advice of counsel. That
6  information came from counsel.
7    Q. Well, describe all facts asserting --
8  supporting your allegation that the pattern of
9  violence, including questionable suicides, strongly
10 indicates the involvement of Russian Mafia.
11    MR. GOLDBERGER: Objection.
12    A. You're asking me for all information --
13    Q. Supporting that statement.
14    A. I don't understand the question. I mean --
15    Q. What -- go ahead, I'm sorry.
16    A. I don't understand the question.
17    Q. What facts are you aware of that support the
18 statement that you sent to Senator Kerry's office
19 about a pattern of violence including questionable
20 suicides of police officials indicates the
21 involvement of Russian Mafia?
22    MR. GOLDBERGER: Objection.
23    A. Well, there was a newspaper story that I
24 read which gave a list of all the suicides of Czech

Page 76

1  police investigators, a fairly long list of them all
2  committing suicide. There was a newspaper story in
3  which several people questioned the suicide of the
4  police investigator that I talked about. There was
5  the communication I got from the commercial attache
6  about the indication of the Russian Mafia. And
7  subsequent to this, there was actually a report by
8  the Czech security officials talking about the
9  strong involvement of Russian organized crime and
10 its corrupting influence inside the Czech legal
11 system.
12    Q. Does that report have any connection to your
13 case, this Czech security report?
14    A. Does it have any connection to my case?
15 It's talking about the question you asked, about
16 involvement of Russian organized crime.
17    Q. Do you believe today that Russian organized
18 crime is involved in this case?
19    A. I have no idea.
20    Q. When you --
21    A. I don't know.
22    Q. You don't know. Do you believe it?
23    A. Do I believe that organized crime -- again,
24 this is a probabilistic statement. I don't know. I

Page 77

1  don't know that it is or is not.
2    Q. Describe all facts that support your belief
3  that Russian organized crime is involved.
4    MR. GOLDBERGER: Objection.
5    A. These are just the things I said already.
6    Q. You're not aware of any other facts that
7  support your belief; is that correct?
8    MR. GOLDBERGER: Objection.
9    A. I believe there has been some additional
10 newspaper articles talking about Russian organized
11 crime having increased influence in Eastern and
12 Central Europe.
13    Q. Are you aware of any facts supporting an
14 allegation that Russian Mafia is involved in the
15 Czech criminal action against you?
16    A. Repeat the question.
17    Q. Sure. Are you aware of any facts supporting
18 an allegation that Russian Mafia is involved in the
19 Czech criminal action against you?
20    A. Just the facts that I've told you about.
21    Q. Now, direct your attention to the last
22 paragraph of your e-mail. The second sentence, you
23 write, "This matter is of the utmost importance to
24 me, since it could endanger the physical safety of

20 (Pages 74 to 77)

Vol. 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
C.A. NO. 05-10679-RCL

KOTVA a.s.,
                  Plaintiff,

            vs.

ANDREW WEISS and WEISS ASSET
MANAGEMENT, LLC,
                  Defendants.

            **************
ANDREW WEISS, WEISS ASSET
MANAGEMENT LLC, K T, INC., and
CVF INVESTMENTS, LTD.,
                  Counterclaim-plaintiffs,

            vs.

KOTVA a.s., MARTIN BENDA, RICHARD
HARAZIM, FORMINSTER ENTERPRISES,
LTD, SPV CO and JOHN DOES 1-5,
                  Counterclaim-defendants.

VIDEOTAPE DEPOSITION OF GEORGIY A. NIKITIN, taken

pursuant to Notice under the applicable provisions

of the Federal Rules of Civil Procedure on behalf

of the Plaintiff and Counterclaim-Defendants,

before Simonne J. Elwood, R.P.R. and a Notary

Public in and for the Commonwealth of Massachusetts,

at the office of Nystrom Beckman & Paris LLP,
10 St. James Avenue, 16th Floor, Boston,

Massachusetts, commencing on Thursday, November

16, 2006 at 10:11 a.m.


      NEAL A. SALLOWAY - COURT REPORTERS
            FIVE CARDIGAN ROAD
          WEST PEABODY, MA 01960
  781-581-3993 - 978-535-0313 - FAX 978-536-3142

Page 2

Vol. 1


APPEARANCES:


JOEL E. BECKMAN, ESQ.
NYSTROM BECKMAN & PARIS LLP
10 ST. JAMES AVENUE - 16TH FLOOR
BOSTON, MA  02116
  REPRESENTS THE PLAINTIFF AND
  COUNTERCLAIM-DEFENDANTS


BENJAMIN A. GOLDBERGER, ESQ.
EDWARD P. LEIBENSPERGER, ESQ.
McDERMOTT WILL & EMERY LLP
28 STATE STREET
BOSTON, MA  02109-1885
  REPRESENTS THE DEFENDANTS AND
  COUNTERCLAIM-DEFENDANTS



VIDEOGRAPHER:  GEORGE P. LIBBARES
         NATIONAL VIDEO REPORTERS, INC.
         58 BATTERYMARCH STREET - SUITE 243
         BOSTON, MA  02110
         800-551-2440

Page 4

CONTINUED
EXHIBIT NO.    DESCRIPTION    PAGE NO.

9  Peterka & Partners - Prague    136
   Companies Register: Municipal
   Court in Prague - K0126 to
   K0144
10 E-Mail - 6/24/04 to Vladimir    152
   Hoffmann from Briana Dubrow
   with Attachments - WP0008532
   to WP0008541

11 E-Mail - 8/4/04 to Georgiy    166
   Nikitin from Vladimir
   Hoffmann with other E-Mails
   W0001209 to W0001210
12 E-Mail - 8/4/04 to vlado@    169
   volny.cz from Richard Harazim
   K5550
13 E-Mail - 8/4/04 to Richard    169
   Harazim from Vladimir Hoffmann
   with Attachments - WK5548,
   K5549 and K5561

14 E-Mail - 8/6/04 to Vladimir    182
   Hoffmann from Georgiy Nikitin
   with Other E-Mails - WP0002337
   to WP0002338
15 E-Mail - 8/9/04 to Georgiy    184
   Nikitin, Andrew Weiss from
   Vladimir Hoffmann with Other
   E-Mails - WP0002341 to
   WP0002343
16 E-Mail - 8/9/04 to Vladimir    189
   Hoffmann from Andrew Weiss
   with Other E-Mails - WP0016704
   to WP0016705

Page 3

          INDEX
DEPONENT          DIRECT EXAMINATION
GEORGIY A. NIKITIN

  By Mr. Beckman          11

       EXHIBITS
EXHIBIT NO    DESCRIPTION    PAGE NO.
1  Andrew Weiss's Second    31
   Supplemental Response to
   Kotva's First Set of
   Interrogatories

2  Brookdale Global Opportunity    43
   Fund - Letter - 9/15/03 to
   Vladimir Hoffmann from Andrew
   Weiss - WP0004292 to WP0004294
3  Mandate Agreement - WP0006204    50
4  Letter in Czech - WP0017080 to    62
   WP0017085

5  Constitutional Court of the    63
   Czech Republic - Prague
   December 21, 2005 - Appeal to
   the Constitutional Court
6  Peterka & Partners - Czech    72
   Document - WP0000519 to
   WP0000533
7  Peterka & Partners - Prague    72
   1 July 2004 - Notification of
   the filing of an action
   K0249 to K0265

8  Minutes of the Board of    133
   Directors Meeting of KT, Inc.
   August 5, 2004

Page 5

CONTINUED
EXHIBIT NO.    DESCRIPTION    PAGE NO.

17 E-Mail - 8/16/04 to Vladimir    189
   Hoffmann, Andrew Weiss from
   Georgiy Nikitin with
   Attachment - WP0002363 to
   WP0002364

18 E-Mail - 8/17/04 to Georgiy    201
   Nikitin from Vladimir Hoffmann
   with Other E-Mails - WP0005287
   to WP0005288
19 E-Mail - 8/17/04 to Vladimir    201
   Hoffmann from Georgiy Nikitin
   with Attachment - WP0002372
   to WP0002373

20 E-Mail - 8/16/04 to Andrew    205
   Weiss from Georgiy Nikitin
   with Attachment - WP0002365
   to WP0002366
21 E-Mail - 8/17/04 to Georgiy    209
   Nikitin from Richard Harazim
   with Other E-Mails - WP0002377
   to WP0002378

22 E-Mail - 8/17/04 from Vlado    216
   WP0000632
23 E-Mail - 8/18/04 to Vladimir    223
   Hoffmann from Georgiy Nikitin
   with Attachment - WP0002396 to
   WP0002397
24 E-Mail - 8/18/04 to Vladimir    228
   Hoffmann from Georgiy Nikitin
   with Attachment - WP0002401
   to WP0002402

17c50f4a-9fdc-40d0-be4e-29c05a091f41

## G. NIKITIN

| Page 338 |
|---|

1  A    I saw the statement in the translation of the
2       report by the private investigator.
3  Q    Okay. I'm handing to you what's been marked
4       as Exhibit No. 48. I direct your attention
5       to the second paragraph. (Indicating)
6            MR. GOLDBERGER: Hold on. Do you have
7       a copy for me?
8            MR. BECKMAN: I'm sorry.
9            MR. GOLDBERGER: That's okay. You're
10      entitled to one a day.
11           MR. BECKMAN: There you go.
12      (Indicating)
13 Q    Mr. Weiss writes, "After reading the
14      chronology of events some investors have
15      expressed concern for my personal safety."
16           Are you aware of any investors
17      expressing concern for Andrew Weiss' safety?
18 A    I do remember that some people were
19      expressing concerns. I don't remember who
20      exactly it was.
21 Q    Okay. "The Brookline police seem to be
22      taking it very seriously."
23           What did the Brookline Police do?

| Page 339 |
|---|

1  A    I know it only from conversations with Andrew
2       Weiss.
3  Q    What did he tell you?
4  A    He told me that he spoke -- I don't remember
5       the exact words he used, but my general
6       understanding was that he spoke to Brookline
7       Police, and they said that they would be
8       stopping by his house checking in on him
9       periodically.
10 Q    And did they do that?
11 A    I don't know.
12 Q    Did Mr. Weiss file anything with the
13      Brookline Police?
14 A    I don't know.
15 Q    I'm handing to you what's been marked as
16      Exhibit No. 49 which is an e-mail exchange
17      between you and Tim O'Brien and --
18      (Indicating)
19 A    Can you repeat that? Yes. Right.
20 Q    Now, Mr. O'Brien asks the question in his
21      e-mail, "If I remember correctly, I was told
22      by Mr. Weiss that some of those may be
23      Russian with possible organized crime ties.

| Page 340 |
|---|

1       Do you have names and contact information for
2       them in Prague?"
3            And you provided contact information
4       from Martin Benda and Richard Harazim,
5       correct?
6  A    Kotva number. Yes. Well, I provided them
7       with the e-mail address of Richard Harazim
8       that I knew and the general phone number for
9       Kotva Department Store which I found on Kotva
10      website.
11 Q    Were you inferring that Mr. Harazim has
12      possible organized crime ties?
13 A    No.
14 Q    What is the basis -- Do you have any
15      knowledge of facts supporting the statement
16      that some of those involved may be Russian
17      with possible organized crime ties?
18           MR. GOLDBERGER: Objection.
19 A    No, I don't have any -- I don't have any
20      documents that prove this.
21 Q    Do you have any -- Are you aware of any facts
22      supporting the allegation that those may be
23      Russian with possible organized crime ties?

| Page 341 |
|---|

1            MR. GOLDBERGER: Objection.
2  A    There are some -- Let me look up one word.
3       (Witness Reviewing Russian Dictionary)
4       Indirect. That's such an easy word.
5            There are some -- I think there may be
6       some indirect evidence that the -- one of the
7       many owners of Forminster, which is Bonalbo
8       Group, is partly Russian-speaking company.
9  Q    Do you have any facts -- Are you suggesting
10      that Bonalbo Group has ties to Russian
11      organized crime?
12 A    No.
13 Q    Okay. That they're Russian?
14 A    Somebody -- There are people at their company
15      speak in Russian.
16 Q    What facts are you -- What -- Who -- Do you
17      have any information as any individuals
18      involved in this case that have ties with
19      Russian organized crime?
20           MR. GOLDBERGER: Objection.
21 A    I don't know any -- I don't know of any
22      documents that show the ties to the --
23 Q    I'm not asking for documents. I'm asking any

G. NIKITIN

## Page 342

1 facts.
2 Are you aware of any facts supporting
3 the allegation that someone is tied to
4 Russian organized crime?
5 A No, I don't know any such facts.
6 Q And the only connection that you can make is
7 that people at Bonalbo speak Russian?
8 A That's the only fact I, personally, can
9 remember.
10 Q Okay. Did you tell members of the press that
11 people involved in the -- in this litigation
12 have ties to organized crime, Russian
13 organized crime?
14 A I don't think I phrased it this way. I said
15 that -- I may have said that this could have
16 been one of Andrew Weiss' suspicions.
17 Q It's a suspicion?
18 A That's my understanding.
19 Q Are you aware of any facts to back up that
20 suspicion?
21 MR. GOLDBERGER: Objection.
22 A I'm not aware of any other facts besides of
23 what I have already said.

## Page 344

Vol. 1

G. NIKITIN

C E R T I F I C A T E

I, GEORGIY A. NIKITIN, do hereby certify
that I have read the foregoing transcript of my
testimony and further certify that said
transcript is a true and accurate record of said
testimony and signed under the pains and
penalties of perjury.

Dated this        day of

2006.

GEORGIY A. NIKITIN

## Page 343

1 MR. BECKMAN: Well, we're going to
2 suspend this deposition at this time; and in
3 view of the defendant's late production of 35
4 boxes of documents, other documents produced
5 this week and in view of the pending issues
6 before the Special Master regarding
7 production — the possible production of
8 additional documents, as well as documents
9 that were identified in this deposition today
10 that may not have been produced, as well as
11 instructions as to -- instructions not to
12 answer questions, we're going to suspend.
13 MR. GOLDBERGER: All right.
14 MR. BECKMAN: Great. Off the record.
15 VIDEOGRAPHER: The time is 6:34 p.m.
16 We're off the record.
17 (Whereupon the videotape deposition of
18 Georgiy suspended at 6:34 p.m.)
19 (COURT REPORTER'S NOTE: The original
20 deposition transcripts were kept by Attorney
21 Beckman. The Court Reporter, on the
22 exhibits, incorrectly wrote "Nikitan" instead
23 of "Nikitin".)

## Page 345

Vol. 1

G. NIKITIN

C E R T I F I C A T E

I, Simonne J. Elwood, R.P.R. and a
Notary Public within and for the Commonwealth of
Massachusetts, duly commissioned, qualified and
authorized to administer oaths and to take and
certify depositions, do hereby certify that
heretofore, to wit, on the 16th day of November
2006, personally appeared before me Georgiy A.
Nikitin, at the office of Nystrom Beckman & Paris
LLP, 10 St. James Avenue, 16th Floor, Boston,
Massachusetts, in the aforecaptioned cause
pending in the United States District Court For
the District of Massachusetts; that the witness
was by me duly sworn to testify to the truth, the
whole truth and nothing but the truth; that
thereupon and while said witness was under oath,
the within videotape deposition was taken down by
me in shorthand at the time and place herein
named and was thereafter reduced to computer
transcription under my supervision. I further
certify that I am not interested in the event of
the action.

IN WITNESS WHEREOF, I have hereunto
subscribed my hand and affixed my seal of office
this     day of      , 2006.

Simonne J. Elwood
REGISTERED PROFESSIONAL REPORTER
My Commission Expires: February 14, 2008

17c50f4a-9fdc-40d0-be4e-29c05a091f41