UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ANDREW WEISS and WEISS ASSET ) | |
| MANAGEMENT, LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | C.A. No. 05-10679-RCL |
| ) | |
| ANDREW WEISS, WEISS ASSET ) | |
| MANAGEMENT LLC, ) | |
| ) | |
| Counterclaim-plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| KOTVA a.s., RICHARD HARAZIM and ) | |
| MARTIN BENDA, ) | |
| ) | |
| Counterclaim-defendants. ) | |
| ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S
OBJECTION TO DISCOVERY MASTER'S JANUARY 26, 2007 ORDER**

Defendants Andrew Weiss ("Weiss") and Weiss Asset Management LLC ("WAM")
(collectively, the "Defendants" or the "Weiss Parties"), hereby respond to the Objection of
plaintiff Kotva a.s. ("Kotva") to the Discovery Master's January 26, 2007 Order:

In this, Kotva's fourth objection to an Order of the Discovery Master, Kotva once again
fails to acknowledge and apply the correct legal standard. Kotva objects to two aspects of the
January 26, 2007 Order. First, Kotva objects to disclosing unredacted copies of contracts with
third parties. However, Kotva has failed to show the good cause required by Federal Rule of

Civil Procedure 26(c)(7).  Second, Kotva objects to the Discovery Master's routine order that, pursuant to Federal Rule of Civil Procedure 37(a)(4)(B), Kotva demonstrate why the Discovery Master should not order recovery of the expenses and fees that are presumptively awarded when a Court denies a discovery motion.

## I.    PROCEDURAL HISTORY

On August 1, 2005, the Weiss Parties served written discovery on Kotva.  In direct contravention of the Federal Rules of Civil Procedure, counsel for Kotva refused to produce any documents—even documents for which there was no good faith claim of confidentiality—unless the Weiss Parties agreed to a confidentiality order.  The Weiss Parties moved to compel, and filed two other discovery motions.

On December 13, 2005, the Court appointed Jeanne Kempthorne as the Discovery Master in this case.  In the Order Appointing Discovery Master (Docket No. 43), the Court provided that:

> In order to facilitate the prompt and efficient disposition of this case, the court makes the following orders.  . . . .  The Discovery Master also shall have the authority to impose upon any party a non-contempt sanction provided by Rule 37 or 45, and may recommend contempt sanctions against a party and sanctions against a nonparty.  . . . .  Unless the Discovery Master otherwise orders, on the basis of the conduct of a party with respect to a particular matter in dispute, the fees and expenses of the Discovery Master shall be borne equally by the parties involved in the particular matter referred to the Discovery Master.

Dec. 13, 2005 Order, at 1–3.

After a hearing on January 6, 2006, the Discovery Master granted the Weiss Parties' Motions to Compel in large part and ordered Kotva to produce documents by January 17, 2006 (Docket No. 55).  The Discovery Master did not engage in any cost or fee shifting associated with the Weiss Parties' motions.

On January 17, 2006, Kotva filed a motion for a protective order (Docket No. 59), and on January 31, 2006, the Weiss Parties filed an emergency motion for a protective order (Docket No. 67). On February 13, 2006, the Discovery Master issued an Order deciding these motions (Docket No. 73), but the Discovery Master did not engage in any cost or fee shifting.

In April 2006, the parties filed cross-motions to compel (Docket Nos. 90, 92, 100, 102) and Andrew Weiss filed a motion for a protective order (Docket Nos. 97, 98). On May 26, 2006, the Discovery Master entered an Order deciding these motions (Docket No. 113). The Discovery Master did not engage in any cost or fee shifting in connection with the May 26, 2006 Order.

In the May 26, 2006 Order, the Discovery Master ordered Kotva to "produce forthwith all documents that concern or evidence the receipt and holding of the proceeds of the sale of the Kotva Department Store." May 26, 2006 Order at 12. The Weiss Parties had requested these documents in August 2005 and the Court had ordered these documents produced in January 2006. On June 2, 2006, Kotva sent a letter requesting "clarification" of this portion of the May 26, 2006 Order. "While Kotva frame[d] its request as seeking clarification, Kotva apparently s[ought] to have the requirement deleted from the Order." June 12, 2006 Order at 1. The Special Master rejected this request, writing:

> The documents, <u>which are plainly relevant, indeed central to the allegations in this case, were ordered produced in January 2006, five months ago.</u> At this juncture, it is disingenuous of Kotva to claim it has not had sufficient process with respect to this issue. . . . . Indeed, there has been more than enough process about the production of these documents which were requested ten months ago.

June 12, 2006 Order at 1–2 (emphasis added).

On the same day that the Special Master issued the June 12, 2006 Order, Kotva filed an objection to the May 26, 2006 Order. On June 26, 2006, the Weiss Parties filed a response to that Objection. On June 28, 2006, Kotva filed a motion for leave to file a reply in support of its Objection. In that reply memorandum, Kotva raised the same arguments about relevance that it

presses in its present Objection, dedicating an entire section of its brief to the argument that

"THE JUNE 14, 2006 ORDER RENDERS THE REQUEST FOR DISBURSEMENT

DOCUMENTS IRRELEVANT."  Kotva argued:

> [O]n June 14, 2006, the Court dismissed Forminster, SPV CO, Martin Benda, and
> all claims but one (Count I - abuse of process) against Richard Harazim
> ("Order"). Documents relating to "disbursements" of $65 million in sale proceeds
> were only relevant to the Defendants' allegation that the "Forminster Group"—
> which does not include Kotva—had conspired to loot Kotva's assets. By
> dismissing the alleged "Forminster Group," the looting claim has been eliminated.
> Accordingly, Kotva respectfully submits that it should not be required to produce
> irrelevant documents and that the Discovery Master's May 26, 2006 Order should
> be modified.

Kotva's Proposed Supp. to Its Obj. to the Special Master's Discovery Order in View of the

Court's Order Granting Motions to Dismiss at 1–4 (emphasis added) (Document No. 121).

Later that day, the Court denied Kotva's Objection, entering an Order reading "Electronic

ORDER finding as moot [117] Objections filed by Kotva a.s., to Discovery Master's order of

May 26, 2006 regarding motions to compel."  In late July 2006, the Court issued a second Order

with respect to Kotva's Objection to the May 26, 2006 Order.  That Order reads: "Electronic

ORDER entered. Over Ruling [117] Objection filed by Kotva a.s., as to the Discovery Master's

May 26, 2006 Order Regarding Motions to Compel."

In August 2006, Kotva filed two motions to compel (Docket Nos. 128, 129) and the

Weiss Parties filed a motion to compel discovery from counterclaim-defendant Richard Harazim

(Docket No. 136).  On September 29, 2006 the Discovery Master issued a detailed, thirty-two

page Order, deciding all pending discovery motions (Docket No. 142).  In the September 29,

2006 Order, the Discovery Master ordered the parties to submit various materials for her review,

including affidavits and briefing regarding sanctions and apportionment of costs.  Kotva did not

object to the September 29, 2006 Order.  Instead, Kotva and the Weiss Parties submitted the

materials to the Discovery Master as requested.  On November 6 and 7, 2006, the Discovery

Master issued two Orders relating to those materials (Docket Nos. 153, 156). On November 17, 2006, the Discovery Master issued an Order deciding the pending requests for sanctions and apportionment of costs (Docket No. 166). The Discovery Master ordered Kotva to pay the Weiss Parties a total of $11,800. Kotva objected to this Order, and that Objection is pending before this Court.

On November 7, 2006, the Weiss Parties filed a second motion to compel discovery from Richard Harazim. The Discovery Master decided that Motion on January 27, 2007 (Docket No. 190), and awarded $5,000 in sanctions, cost and fee shifting against Mr. Harazim and in favor of the Weiss Parties. Mr. Harazim did not object to that Order.

On November 14, 2006, Kotva filed the Motion for a Protective Order (Docket No. 160) that is the subject of this latest Objection. The Weiss Parties filed an opposition on November 29, 2006 (Docket No. 174). In this motion, Kotva sought to withhold the identity of the counter-parties to a number of agreements, as well as other allegedly related information that Kotva considered confidential. These agreements reflect the disposition of a portion of the proceeds of the sale of the Department Store

On January 26, 2006, the Discovery Master issued an Order denying Kotva's motion, ordering Kotva to produce unredacted copies of the documents at issue, and ordering Kotva to show cause why the Discovery Master should not engage in the sort of expense and fee shifting under Rule 37 that is the default treatment for discovery disputes that result in motion practice.

On February 9, 2007, Kotva filed an Objection to the January 26, 2006 Order.

## II.    THE INFORMATION AT ISSUE IS RELEVANT TO THREE CENTRAL ISSUES IN THIS CASE

As illustrated above, Kotva has already argued, both to the Discovery Master and to the Court, that the disposition of the Department Store sale proceeds is irrelevant to this litigation in

view of the dismissal, on jurisdictional grounds, of the looting claims brought against Forminster and others. The Discovery Master and the Court both rejected this argument. Nothing has changed. The disposition of the Department Store sales proceeds is relevant to: (1) Kotva's abuse of process claim against the Defendants; (2) the Defendants' abuse of process counterclaim against Kotva and Richard Harazim; (3) Kotva's theory of damages.

All of Kotva's claims stem from Kotva's allegation that the Defendants caused two lawsuits to be filed in the Czech Republic that delayed the sale of the Kotva Department Store and caused the purchaser to withhold part of the purchase price in an escrow account pending resolution of the lawsuits. The alleged delay in receipt of Department Store sale proceeds is the primary component of damages that Kotva claims against the Defendants.

Kotva contends that the filing of the two Czech lawsuits was an abuse of Czech civil process in order to "blackmail" Kotva. Professor Weiss counters that he authorized the filing of litigation in order to prevent the looting of Kotva's assets and their transfer to entities and individuals affiliated with Kotva's controlling shareholder, Forminster, (collectively, the "Forminster Group"), to the detriment of Kotva's minority shareholders.

In their counterclaims, the Defendants contend that Kotva and Richard Harazim abused Czech criminal process and U.S. civil process by initiating criminal proceedings and this case in order to obtain an unfair advantage over Professor Weiss in their efforts to coerce Weiss to abandon his investors' claims in the Czech courts so that the Forminster Group could loot Kotva's assets in relative peace. Kotva and Mr. Harazim counter that they took the steps they did in response to Professor Weiss's filing of lawsuits that allegedly damaged Kotva.

Thus, the identities of the individuals and entities to whom the Department Store sales proceeds are being transferred is directly relevant to the central issues in this case. If the

Forminster Group is looting Kotva's assets, it is less probable that Professor Weiss abused process and more probable that Mr. Harazim, through the Kotva corporate shell, abused process. *See* FED. R. EVID. 401 (defining relevant evidence as "evidence having *any tendency* to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") (emphasis added). Although not as relevant as direct evidence of the parties' motives when lawsuits were authorized, the disposition of the Department Store sales proceeds and whether looting is taking place or about to take place still has relevance. For example, evidence of ongoing looting makes it more likely that, at the time he caused this lawsuit to be filed, Richard Harazim had as his motive looting of the Department Store sale proceeds. As the information meets the relevancy test for admission at trial, it meets the even broader relevancy test for discovery.

The fact that proceeds have been disbursed in the form of loans or other "investments" does not diminish the relevance of the recipients of the proceeds. Making "unfortunate" investments or extending loans that are never repaid are classic methods of tunneling assets away from a company, leaving the shareholders with nothing. *See generally* Andrew Weiss & Georgiy Nikitin, *Effects of Ownership by Investment Funds on the Performance of Czech Firms*, *in* DESIGNING FINANCIAL SYSTEMS IN TRANSITION ECONOMIES 187 (Anna Meyendorff & Anjan V. Thakor eds. 2002) (citing, among others, Jan Veverka, *Current Aspects of the Czech Capital Market*, (Ministry of Finance of the Czech Republic Working Paper 1997)).

Counsel for Kotva sought to allay any concerns over these disbursements by providing an affidavit that the counterparties to the contracts at issue are not affiliated with Kotva's controlling shareholder, Forminster  Mr. Harazim stated, under oath:

> None of the [counterparties] described above is Forminster Enterprises Ltd. ("FEL"). As I previously testified, I do not know the identity of the "beneficial

owners" of FEL.   None of the [counterparties] described above, however, is owned by, controlled by, or affiliated with FEL.

Harazim Decl. ¶ 8.

As the Discovery Master wrote, "Mr. Harazim represents that none of the investors are owned by, controlled by, or affiliated with Forminster, although since he does not know who the beneficial owners of Forminster are, it is difficult to see how he can make such a representation under oath." Jan. 26, 2007 Order at 2.  Mr. Harazim has repeatedly disavowed all knowledge of Forminster's present-day owners and claims to no longer be a representative of the company. Mr. Harazim was a director of Forminster until the directors were replaced with nominee directors, all claiming the same address of a Cypriot law firm.   Either Mr. Harazim has misled the Court with respect to his knowledge about Forminster, or his statement that the counterparties who have received Department Store sales proceeds are not affiliated with Forminster lacks foundation.

Finally, in response to the Weiss Defendants' Motion for Judgment on the Pleadings, which is pending before the Court, Kotva claimed that it should recover damages resulting from the diminution in value of its partnership interest in a Czech partnership.  Kotva made this argument because the contract governing the sale of the Department Store provides that Kotva was never going to receive *any* of the Department Store sales proceeds.  Rather, the department store sale proceeds were to go to a Cypriot company called SPV CO.  Kotva is a partner in a Czech partnership that owned SPV CO at the time of the sale, and allegedly still owns SPV CO today.   Kotva argues that it has been damaged because SPV CO suffered damage, thus diminishing its value, causing the Czech partnership to lose value, to the detriment of Kotva and the other partners.  The other partners are not parties to this case.

Controlling First Circuit precedent holds that this daisy-chain theory of damages is not available to Kotva. Kotva lacks standing to claim damages suffered by another company even if that results in a diminution in value of Kotva's investment. *See Diva's Inc. v. City of Bangor*, 411 F.3d 30, 42 (1st Cir. 2005). Resolution of this issue in the context of the Weiss Parties' Motion for Judgment on the Pleadings should eliminate all of Kotva's claims. Nevertheless, so long as Kotva clings to this damages theory, the Weiss Defendants are entitled to discovery establishing exactly how and why the value of SPV CO as a company has been diminished, through disbursements of Department Store sales proceeds or otherwise.

Moreover, to the extent that Kotva is suggesting that these contracts are evidence of what rate of return Kotva would have earned on investing the Department Store sales proceeds, the counter-parties are relevant to determining the risk associated with the investments. The realized rate of return is meaningless unless one takes into account the associated risk. It is almost always the case that the higher the realized return on an investment is, the greater the risk of a loss is. For example, lending money to a sub-prime borrower pays relatively high interest rates; generally the loan is repaid, but not infrequently the borrower defaults. However, people who make sub-prime loans are not necessarily better than the average investor and one should not infer from one or two successful investments that their overall returns will be higher. Only with complete discovery about these investments can the Defendants challenge any claims that Kotva may seek to make about the foregone returns that they allegedly lost because they could not invest the money held in the escrow account.

## III.    KOTVA HAS FAILED TO SHOW GOOD CAUSE TO JUSTIFY WITHHOLDING RELEVANT DISCOVERY

Having failed to show that the information sought is irrelevant, Kotva next argues that the Court should exempt the information from discovery because it is confidential commercial

information. However, Kotva cannot meet *its* burden of demonstrating the "good cause" required for this sort of protective order. In *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786–87 (3d Cir. 1994), the Third Circuit wrote:

> Good cause is established on a showing that disclosure will work <u>a clearly defined and serious injury</u> to the party seeking closure. <u>The injury must be shown with specificity.</u> Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning do not support a good cause showing. <u>The burden</u> of justifying the confidentiality of each and every document sought to be covered by a protective order <u>remains on the party seeking the order.</u>

*Id.* at 786–87 & n.17 (internal quotation marks and citations omitted; emphasis added).

Kotva makes two arguments in an effort to establish "good cause." First, Kotva argues that good cause is shown because the contracts contain confidentiality clauses requiring the parties to "keep confidential all facts relating to this Contract" or a similarly "very broad confidentiality provision[]." Kotva's Obj. at 6. Kotva's argument proves too much. If Kotva were really concerned about these contractual provisions, it would have withheld the contracts in their entirety. Neither contract provides any special protection for the identity of the parties. Disclosure of the parties to the contract is no more a disclosure of a "fact[] relating to th[e] Contract" than disclosure of any of the other contractual terms. Thus, as the Special Master concluded, the additional disclosure the Weiss Parties seek will not cause Kotva to violate its confidentiality obligations.

These counter-parties and other information Kotva are not, as Kotva repeatedly claimed, its business partners (Kotva's Motion at 1, 2, 5–9) or the equivalent to Professor Weiss's investors (Kotva's Motion at 2, 7). Rather, they are as, the Discovery Master wrote, "persons and entities with whom Kotva did business," that Kotva sought to mischaracterize as the equivalent of a business partner or an investor in a fund managed by a company affiliated with

10

Professor Weiss.  Jan. 26, 2007 Order at 5.  Kotva cannot evade its discovery obligations by contracting out of them with third parties.

Second, Kotva argues that if it reveals the identities of the counter-parties to the contracts, the Defendants may seek to interfere with Kotva's relationship with those entities. This sort of speculative harm, which requires the logical leap that the Defendants would violate some legal duty, is not the sort of foundation on which the Court may enter a protective order. *See Pansy*, *supra*; *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 7 (1st Cir. 1986); *Doe v. Dist. of Columbia*, 230 F.R.D. 47, 50 (D.D.C. 2005) ("[Kotva] must articulate specific facts to support its request and cannot rely on speculative or conclusory statements."); *Alexander v. FBI*, 186 F.R.D. 71, 75 (D.D.C. 1998) ("[Kotva] must make a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one.").

Finally, the Court should reject Kotva's efforts to litigate its case through this motion. Kotva must wait until trial to attempt to prove that Professor Weiss abused process.  In any event, the "proof" Kotva offers in its Objection is insufficient.  Kotva claims that Professor Weiss "sent correspondence threatening Anglo Irish Bank," but it fails to attach the allegedly threatening letter.  Kotva's Obj. at 8.  This allegation is incorrect.  A copy of the correspondence is attached hereto as Exhibit A.[1]  As the Court can see, the letter does not threaten Anglo Irish Bank.  Kotva's claim that Markland, the purchaser of the Department Store, is a party to some of the lawsuits in the Czech Republic is correct.  It is also meaningless.  Those lawsuits, which are still pending, raise valid claims regarding the transfer of Kotva's corporate assets.

---

[1] Counsel for Kotva advises that he believes that there may be other correspondence, but this is the only correspondence with Anglo Irish Bank that undersigned counsel is able to locate.

Kotva's argument that Professor Weiss has "made reckless and baseless accusations about Kotva" twists the truth. Kotva's Obj. at 3. Rather, Professor Weiss has accurately stated that a private investigator hired in the Czech Republic reported that Martin Benda often and in a variety of places bragged about "doing in" a Czech police investigator. Repeating an investigator's findings is far from the "reckless[ness]" Kotva alleges.

Professor Weiss and others, including a U.S. government employee, have suggested the possibility of Russian mafia involvement in Forminster, the secretive company that is Kotva's controlling shareholder. The facts underlying this suspicion are not, as Kotva suggests, limited to the fact that certain individuals speak Russian. Indeed, Mr. Weiss specifically disavowed the notion that everyone who speaks Russian is a part of the Russian mafia or that speaking Russian is a prerequisite for being part of the Russian mafia. Kotva's claim that Mr. Weiss suggested that Mr. Beckman could be part of the Russian mafia, "presumably because of involvement in this case" is without support in the record. Rather, when Mr. Beckman posed the question, Mr. Weiss responded that anyone in the world, including non-Russian speakers such as Mr. Beckman, could conceivably be part of the Russian mafia.[2]

---

[2] The transcript reads as follows:

   Q. So anyone who speaks Russian may be part of the Russian mob?

       MR. GOLDBERGER: Objection.

   A. No. Oh, maybe. You mean anybody who speaks Russian? Sure, anybody may be part of the Russian mob. You may be. I mean anybody might be.

   Q. I might be part of the Russian mob?

   A. Anybody may be part of the Russian mob. That's like saying anybody -- I mean anybody may. You know, anyone in the world may be part -- you can't like refute that. That's a philosophical statement.

Tr. 71:20–72:7.

There is no question that organized crime, including Russian-speaking organized crime syndicates, has achieved significant penetration into various parts of the Czech government. The Czech Security Information Service (the "BIS") released a report in October 2006, which includes the following excerpts:

- BIS's own findings obtained during 2005 show that in the recent years organized crime groups have been stepping up their effort to infiltrate the state structures and local government.

- BIS has confirmed continuing penetration by organized crime into the judiciary.

- Also, BIS has information about manifestations of corruption at various levels of court proceedings. Especially at district courts, prisoners or other "clients" are granted unjustified reliefs as a result of financial payments to judges. Implicated in this corruption behaviour are also some lawyers and public prosecutors.

- The creation of a corrupt environment in investigative, prosecuting and adjudicating bodies endangers the functioning of the state in the law enforcement area.

Exhibit B, Annual Report of the Security Information Service (BIS) for 2005 § 2.6, at 17.

In view of Kotva's relationship with the Czech police, Forminster's Herculean efforts to conceal the identities of its owners, Martin Benda's reported statements and the overall climate in the Czech Republic, the likelihood of involvement by organized crime is significant.

## IV.    KOTVA'S OBJECTION TO THE ORDER TO SHOW CAUSE FLIES IN THE FACE OF THE PROCEDURE ESTABLISHED BY RULE 37

Kotva objects to the Discovery Master's Order that "pursuant to Fed. R. Civ. P. 37(a)(4)(B), I order Kotva to show cause why I should not award the Weiss defendants their reasonable expenses incurred in opposing the motion." Jan. 26, 2007 Order at 5. In refusing to show cause, Kotva argues:

The Special Master's inclination to impose sanctions in this case--apparently only against Kotva--and repeated demands for additional briefing, with its concomitant expenses and additional compensation to the Special Master, needs to be addressed. In 19 years of practice, undersigned counsel has never been sanctioned. During the course of discovery in this case alone, however, the

Special Master has imposed sanctions four times and threatened sanctions on two other occasions, including the instant motion for a protective order. <u>Sanctions, or the threat of sanctions, should not be the default position for every ruling by a Special Master.</u>

Kotva's Obj. at 11 (emphasis added).

Kotva's argument is wrong on the law, and wrong on the facts.

First, the shifting of fees and expenses *is the default* in discovery motions. Federal Rule of Civil Procedure 37(a)(4) establishes a presumption in favor of expense shifting that can be overcome only if: (1) the losing party's position was "substantially justified;" or (2) other circumstances make expense shifting unjust. *See* FED. R. CIV. P. 37(a)(4)(A), 37(a)(4)(B) ("If the motion is denied, the court . . . ***shall*** . . . require the moving party or the attorney filing the motion or both of them to pay to the party or deponent who opposed the motion the reasonable expenses incurred in opposing the motion, including attorney's fees, unless . . . .") (emphasis added); *Notice v. Dubois*, 187 F.R.D. 19, 20 (D. Mass. 1999) ("Absent the finding that the opposing party's position was 'substantially justified,' an award is mandatory.").

Second, Rule 37 not only creates a default rule of shifting expenses and costs, it also *requires* the Court (or in this case, the Discovery Master) to "afford[] [Kotva] an opportunity to be heard" before requiring Kotva to pay the Weiss Parties' expenses and fees. Thus, the Discovery Master's order to show cause is not, as Kotva suggests, a demand for unnecessary "additional briefing" to line the Discovery Master's pockets with the "additional compensation to the Special Master" that comes with the review of additional filings. Rather, the Discovery Master's order to show cause is part of the procedure required by the Rules.

Third, the procedural history of this case demonstrates that the Discovery Master has not imposed sanctions or shifted expenses and fees with every decision she issued. Rather, the Discovery Master first ordered the parties (including the Weiss Parties) to show cause why

expenses and fees should not be shifted only after deciding, by undersigned counsel's count, ten contested discovery motions.  By September 2006, the Discovery Master had apparently decided that enough was enough with respect to the discovery motion practice in this case, a theme that the Court echoed at the December 4, 2006 conference.  Kotva's position that it should be immune—not from an order to pay money—but from an order *to show cause* why it should not be ordered to pay money denies the reality that the Discovery Master and the Court need a means of providing incentives to dissuade parties from pressing unnecessary discovery disputes to the point where they need to be litigated.

The amendments to Rule 37 were designed to "press[] the court to address itself to abusive practices." Notes of Advisory Committee on 1970 Amendments to Rules. The notes to Rule 37 further explain:

> [T]he rules should deter the abuse implicit in carrying or forcing a discovery dispute to court when no genuine dispute exists. And the potential or actual imposition of expenses is virtually the sole formal sanction in the rules to deter a party from pressing to a court hearing frivolous requests for or objections to discovery.

*Id.*

Kotva's request that the Court overrule the Discovery Master's order that Kotva show cause why expenses and fees should not be shifted—as the very text of Rule 37 provides—strikes at the very heart of the Discovery Master's ability to control discovery by removing what the drafters of the Rules described as "virtually the sole formal sanction in the rules to deter a party from pressing" frivolous discovery disputes.  Sanctions in the form of shifting expenses and fees to Kotva are not only appropriate; they are exactly what the drafters of the Rules had in mind for a litigant that has engaged in the course of conduct that Kotva has in this case.

In keeping with the spirit of Rule 37, the Court should not only overrule Kotva's Objection, but also order Kotva to show cause why it should not pay the Defendants' their

expenses and fees associated with responding to Kotva's Objection. Although the Defendants have prevailed on the majority of discovery disputes, not every discovery dispute in this case has been decided in the Defendants' favor. However, the Defendants have not filed any objections to the Discovery Master's orders in view of the Court's admonition in its December 13, 2005 Order to minimize objections. Kotva's repeated objections have served to delay the Weiss Parties' discovery and increase their expenses. Accordingly, expense and fee shifting associated with Kotva's Objections is appropriate.

## V.    CONCLUSION

For the above reasons, the Court should overrule Kotva's Objection to the Discovery Master's January 26, 2007 Order.

.                                       Respectfully Submitted,

                                        ANDREW WEISS and WEISS ASSET
                                        MANAGEMENT LLC

                                        By their attorneys,


                                        /s/ Benjamin A. Goldberger
                                        Edward P. Leibensperger (BBO# 292620)
                                        Benjamin A. Goldberger (BBO# 654357)
                                        McDermott Will & Emery LLP
                                        28 State Street
                                        Boston, Massachusetts  02109-1775
                                        (617) 535-4000

Dated: February 23, 2007

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system and any attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 23, 2007.

                                        /s/ Benjamin A. Goldberger
                                        Benjamin A. Goldberger

BST99 1532789-3.072198.0012

12:54 FAX 017   5353800    . .  ─ 　🏴002

# McDermott
# Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Milan
Munich New York Orange County Rome San Diego Silicon Valley Washington, D C

Michael Kendall
Attorney at Law
mkendall@mwe.com
617 535 4065

March 15, 2005

BY ELECTRONIC MAIL — Daviddrumm@angloirishbank.ie AND FACSIMILE — 353 1 616 2488

David Drumm
Chief Executive
Anglo Irish Bank
Stephen Court
18/21 St Stephen's Green
Dublin 2, Ireland

Re:    Markland Holding Limited's Acquisition of Kotva Department Store in Prague, Czech
Republic

Dear Mr. Drumm:

I represent Weiss Asset Management, LLC, an American asset management company. I
understand that AIB has or will soon complete the financing of Markland Holding Limited's
acquisition of Kotva Department Store in Prague, Czech Republic. I also understand that James
Woolf of Flow East has told the participants in this acquisition in writing that the ostensible
sellers acquired their interest in the property through improper means, and do not have a valid
title to convey. Among the persons he has informed are Bryan Wilson of Linklaters, Messrs
Prestage, Scully and Sheehan of Markland, and Ben Bannatyne of Jones Lang LaSalle. Have
these gentlemen informed AIB of Mr. Woolf's concerns?

Weiss Asset Management serves as the investment adviser to an investment fund that has direct
and indirect interests equaling 22% of Kotva, a.s., the rightful owner of the real property. It
appears the sale could be designed to deprive minority shareholders, such as the investment fund
Weiss Asset Management advises, from benefiting from the sale.

If AIB has not yet financed the transaction, I ask that you take steps to verify the issues raised
concerning the title before financing the sale. If AIB has financed the transaction, I ask that you
take immediate steps to protect the rights of minority shareholders in Kotva, a.s.

U.S. practice conducted through McDermott Will & Emery LLP.
28 State Street  Boston, Massachusetts  02109-1775  Telephone: 617.535.4000  Facsimile: 617.535.3800  www.mwe.com

K 0002

04 FAX 617    5353800
12:55 FAX 617    5353800                                    ☎003

Mr David Drumm
March 15, 2005
Page 2

We have substantial information that may be of assistance to you. If you would like this
information or to discuss this further, please contact me by telephone at 617.535.4085 or
617 905.8206.

Sincerely,

Michael Kendall

cc:    Padraig Murray (by electronic mail -- Padraigmurray@angloirishbank.ie)
       Bryan Wilson (by facsimile 420 221 622 199)
       Henry Prestage (by facsimile 353 1 676 20 00)
       Ben Bannatyne (by facsimile 420 221 622 199)

MK/pmf

DST99 1449857-2 072198.0011

K 0003

# Annual Report of the Security Information Service (BIS) for 2005

# 1. Word of Introduction by BIS Director

Dear Madam, dear Sir,

after the regular approximately twelve-month interval, I have the third opportunity to extend cordial greetings and welcome you to the text by which we introduce the work of the Security Information Service to the public every year. It is up to you to make a picture of it. And so allow me to use this meeting with you as representatives of the public for reflection about a widespread and persistent idea about our Service.

Irrespective of numerous assurances that the Service is not aimed against citizens, does not enter the lives of people who have nothing in common with the threats endangering the security and interests of our country – and any fear of its activities are thus unnecessary – voices to the contrary are heard over and again. Serious mention is being made of our almighty, omniscient and all-embracing role. In case of need, the Service allegedly sees that one entrepreneur or another goes out of business. The service knows about everything what happens anywhere but does not admit it. And whenever it likes – or is instructed "from above" – it searches the "dark corners" and finds anything about each of us. Of course, nothing of this is true or a fraction of truth.

With my personal responsibility for the work of the Security Information Service I assure you that in all its activities the Service is loyal to democratic values, the Constitution and the law, consistently respects human rights and freedoms, and when it must infringe on them it does so for serious reasons and only in accordance with the precise and strict rules stipulated by the law. It may seem paradoxical, but the bounds of the Service activities are much more restricted than the limits of the free media. For example, nobody and nothing can prevent journalists from delving into the private affairs of a new person in public life and publish the seamy sides they find. The Security Information Service can never do anything of the sort.

The Annual Report informs about the legal scope the Service has for its activities in eight chapters, beginning with terrorism and ending with the security information systems. Not even in these areas can we operate arbitrarily. Every intelligence operation must be preceded by a reliably verified serious suspicion, the infringement on human privacy is decided by a judge, the surveillance of an automobile or person at public places is approved by me or a staff member I authorize. Equally inconceivable would be our work to order of a politician, minister, or somebody "above". The Service can be entrusted with a particular task only by the Government and with its knowledge by the President of the Czech Republic. But each such order must and does relate to areas in which the law allows the Service to operate. Everything else we must regard as taboo.

WP0021539

Dear madam, dear sir, thank you for your interest in the Annual Report and your attention
to my reflection. If our imaginary meeting makes at least a little contribution to an
informed, realistic and unbiased view of the Security Information Service, I shall be glad
and pleased.

**Jiří Lang**
Director of the Security Information Service

# 2. Intelligence Activities and Findings

## 2.1. TERRORISM

In the struggle against international terrorism in 2005, the Security Information Service
was mainly concerned with Islamic radicalism and extremism. It monitored the
occurrence of activities the nature of which could allow support to or spreading of radical
Islamic ideas. But it found no facts testifying to the radicalization of persons present in
the Czech Republic. The Muslim community in the Czech Republic has around 8 000
members, and so it is not numerous, not isolated from the majority population, and as a
whole has moderate views.

In view of the global character of the terrorist threat, which goes beyond the borders of
countries and continents, its elimination requires extensive international co-operation.
This also determines the character of BIS activities. Within the framework of contacts
with foreign partners BIS examined last year the activities and connections of persons
suspected of support to extremism and terrorism inspired by Islam. It focused on their
possible links with the radical environment. An important role way played by domestic
inter-departmental co-operation. Dozens of suggestions and warnings BIS received from
private persons were not negligible.

In 2005, BIS participated in the clarification of the activities of a certain Algerian who
was – according to available information – allegedly planning a terrorist attack on
unspecified targets in our territory. The acquired findings mentioned his role in the
organization of criminal activities. But he had no contacts with radical Islamists or people
suspected of links with a terrorist organization, although he probably used to meet them
in the past. In December 2005, this Algerian was arrested and under the control of Czech
security bodies deported with a prohibition of residence in our territory.

Last year, BIS devoted attention to the case of Egyptians suspected of a share in the
preparation of a terrorist attack on a civilian aircraft. The three men tried to break into the
cockpit of a Czech Airlines plane during the OK 447 flight from Oslo to Prague. The
suspicion that it was a test of the safety measures in Czech aircraft was neither confirmed
nor refuted. When the plane landed at Prague Ruzyně airport, the foreigners were
detained and escorted to Egypt.

WP0021540

## Buildings and Facilities in the Czech Republic Threatened with a Possible Terrorist Attack

A permanent task of the Service is the assessment of the risk of a possible terrorist attack on buildings and facilities in our territory  The potentially most threatened places include the "soft targets", i e  buildings and localities where large numbers of people tend to concentrate and which cannot be sufficiently protected for a variety of objective reasons These are especially railways, metro stations, shopping malls, sports stadiums and venues of sport and cultural events  The targets of possible attacks include civilian aircraft, airports, and the buildings and staff of the embassies of countries engaged in the international anti-terrorist coalition  In 2005, BIS received no relevant and confirmed information about a direct immediate threat to the mentioned buildings

The building of Radio Free Eurrope/Radio Liberty (RFE/RL) and its staff continued to rank among potential targets of possible attacks  BIS regarded the location of the RFE/RL building in the very centre of Prague as inappropriate and had a large share in the decision to move it  The main security risks included possible interest of Islamic extremists – possibly intelligence services of countries which support terrorism – to infiltrate into the radio station staff, or prepare and conduct a specific attack

BIS regards as extremely threatened the activities of Radio Farda, a joint venture of the Voice of America and RFE/RL which broadcasts in Persian to Iran  The programmes prepared by the Persian section of RFE/RL are constantly criticized by Iran  And so there is a risk that Radio Farda – a RFE/RL station – draws interest of Iranian secret services The Security Information Service has noted that photographs of the station building were taken by different people and – in an effort to exclude a possible connection with preparations for a terrorist operation – examined particular cases in co-operation with foreign partners

## Risk of Possible Use of Czech Territory as a Logistic Base of Terrorist Groups

A certain risk exists that some terrorists could regard our territory as a suitable locality for support to financial, transit, and logistic operations  This cannot be underestimated although it does not involve a direct or secondary threat  We can mention for example the case of February 2005 when a group of persons suspected of affiliation to the Continuity Irish Republican Army, an Irish terrorist organization, moved around Prague  They behaved very cautiously and thoroughly checked if they were shadowed  BIS found no immediate threat in their movement and conduct

In December 2005, Oussama Abdallah Kassir, wanted by Interpol for suspicion that he had links with an international terrorist network, was detained at Ruzyně airport  This citizen of Sweden and Lebanon was travelling from Stockholm to Beirut  Interpol detained him on the basis of a search launched by the court of the Southern District of New York

WP0021541

The fight against terrorism includes the identification of the forms and ways of its financing. Frequently mentioned in this connection is the extra-bank transfer of money, the so-called hawala system. In contrast to the past, hawala transfers of money to terrorists are on the decline, but their use in our country cannot be excluded. BIS did not register hawala transfers in the Czech Republic last year.

In 2005, the Security Information Service dealt with indications that our territory was involved by the activities of the Islamic missionary organization Tablighi Jama'at, which operates almost throughout the world. Although this organization has not been directly connected with terrorist activities, it could be misused for support to terrorism, and its activities thus pose a certain risk. So far, intelligence examination has neither proved nor refuted the suspicion that the organization is gaining new followers of its teaching among persons living in our country.

Tablighji Jama'at is an Islamic fundamentalist organization striving to spread Islam throughout the world in its pure form as it was practised in the day of Muhammad. It is now very active and small groups of its members are going on missions to spread their own fundamentalist concept of Islam especially among Muslim and other youth.

## Activity in the Czech Republic of Intelligence Services of Countries Supporting Terrorism

In the entire mentioned area, the Security Information Service also concentrates on risks connected with the operations of the intelligence services of countries which support terrorism. Last year, BIS received no relevant information which would confirm that the intelligence services of these countries developed in our territory activities that could immediately threaten the economic and security interests of the Czech Republic. But the general degree of risk connected with their activity showed no noticeable change. Information provided by foreign partner services makes it evident that the countries supporting terrorism remain hostile to the surrounding world and the activity of their intelligence services continues to pose a major security risk.

A permanent threat to the security of the Western world is, for instance, the intelligence services of Iran. The security situation in the Middle East worsened in 2005 in connection with the political development in Iran. The new Iranian President Mahmoud Ahmadinejad of the hard conservative wing was elected in the middle of 2005. Iran supports various foreign terrorist movements and clearly strives for the status of the regional power. This objective is also confirmed by the Iranian nuclear programme including uranium enrichment.

Historical experience dictates the need to continue devoting attention to the intelligence services of Libya. In 2005, Libya made big progress in co-operation in the struggle against terrorism. The country gave up its development of weapons of mass destruction and President Muammar Qadaffi is continuing his endeavour to improve relations with the USA and the countries of West Europe. But by end of 2005, the US Administration

had not erased Libya from the list of countries supporting terrorism and Libyan intelligence services are still regarded as posing a certain danger

Risks include the activities of the Syrian intelligence services. Last year, Syria was accused of involvement in the assassination of the former Lebanese Premier Rafiq Hariri. The head of the UN investigating commission confirmed Syria's share in the assassination. Syria is still on the list of countries supporting world terrorism and direct engagement of Syrian intelligence services is reported. Illegal supplies of weapons and foreign fighters are going to Iraq from Syrian territory. Syria's failure to change fundamentally its attitude to support to terrorism in the foreseeable future could have an adverse impact on the security situation in the Middle East and the general political climate in the world

## 2.2. PROTECTION OF IMPORTANT ECONOMIC INTERESTS OF THE STATE

The protection of the economic interests of the state ranked among the priorities also in 2005 and BIS devoted due attention to it

BIS was again focused on the management of state-owned property to expose shortcomings in the activity of institutions entrusted with the management of assets owned by the state, and possibly to expose non-standard activity of their staff. In many cases, proper management of state-owned property was impaired by business and financial groups which asserted their economic interests to the detriment of the state. Findings indicate that these groups influence state administration employees by methods which go beyond the usual forms of lobbying. They also use clientelism and disloyalty of some representatives of state bodies which leads up to the dysfunction of state administration. Such groups penetrate state institutions where they establish goal-directed contacts especially with officials who have decision-making powers

BIS continued to monitor cases when incompetent decisions or intentional conduct of responsible persons and bodies posed the risk of state-owned property being depreciated. BIS informed authorized entities about cases in which disloyal state officials resorted to clientelism, leaked internal sensitive and strategic information from state institutions, and altered official documents to benefit third entities at their request

An example of the assertion of business interests to the detriment of the state by the mentioned methods and procedures are the activities of a group of persons, known from the media, around the entrepreneur Tomáš Pitr who control the Setuza company through the Český olej company. The activities of this group have for long been heading towards getting control of Setuza and ridding it of debts at the cost of the state. For this purpose, the persons around T. Pitr have been establishing contacts with state officials

Tomáš Pitr's group made use of the slip of former representatives of the Farming and Forestry Support and Guarantee Fund (Czech acronym PGRLF), attached to the Ministry

WP0021543

of Agriculture, to conclude an option contract on the sale of Setuza stock  PGRLF had to sell Setuza stock to Český olej in 2005

Due to the activities of the mentioned group, the state, which had been a significant shareholder and also the biggest creditor of Setuza, lost a certain extent of its influence on this important company

The development around Setuza exposed the special status of PGRLF  Although it is a company controlled by the Ministry of Agriculture, which participates in support to Czech farmers and accepts subsidies from public funds, it is a regular commercial company from the view of the Commercial Code  Owing to this ambiguousness, PGRLF partly detached itself from state control and in some cases its representatives emphasised PGRLF subordination to the Ministry of Agriculture and its operation within the framework of support to the agricultural sector, and, on the contrary, in other cases pointed to the PGRLF legal subjectivity of a regular commercial company

Timely information to competent bodies about the activities of the group around Setuza and suggestion of possible measures at least attenuated the unfavourable situation of the state  By passing findings to authorized addressees, BIS, for instance, prevented the Government from making decisions on the basis of manipulated documents

In 2005, BIS continued to monitor the privatization of strategic companies with a significant share of the state (Český Telecom, Severočeské doly, Vítkovice steel, Unipetrol)  Its particular objective was to acquire information about negative phenomena threatening the amount of revenue from the current privatization tenders, and provide authorized addressees with sufficient relevant information allowing qualified decisions  BIS devoted particular attention to the seriousness, transparency, stability, capability and intentions of potential buyers of the privatized shares  Facts having influence on the management of privatized companies and possible attempts to have negative influence on it were other areas of BIS interest  The management of privatized companies is closely connected with the bid and consequently with state budget revenue

BIS passed to statutory recipients findings about economic damage inflicted on state-owned companies before their sale to private entities, and findings about risk factors connected with the bidders for privatized shares

The findings indicated the continuation in 2005 of the use of third (mediating) entities to assert the interests of the actual prospective buyer of the privatized shares  This was to conceal the real identity, objectives and intentions of the potential buyer

Another phenomenon was co-operation of some business and financial groups to arouse competition and thus manipulate the course of the privatization  The final outcome of these activities could be lower state budget revenues

BIS also acquired findings about disputes between different business groups  In consequence of such disputes a purpose-built campaign was unleashed around the

WP0021544

completed privatization of Unipetrol which was sold to the Polish PKN Orlen concern One of the objectives of this wide campaign was to reverse the result of the completed privatization to the benefit of private entities

In the broader context, some business groups fought for the control of lucrative state-subsidized manufacture of biofuels, or rather the manufacture of biocompounds a certain amount of which is added to petroleum-based fuels Specifically, it is the manufacture of bioethanol which is added to petrol, and the manufacture of methyl ester of rape oil used to dilute Diesel oil Support to the renewable sources of energy, to which the Czech Republic has committed itself, is part of the EU strategy to boost energy self-sufficiency, reduce the emission of greenhouse gases, and indirectly support to agriculture

In connection with support to the manufacture of biofuels, BIS acquired, assessed and passed on findings about efforts of some business groups operating in chemical industry and agriculture to influence the wording of strategic documents concerning the future manufacture and distribution of biofuels in the Czech Republic and the following changes in legislation On the basis of the acquired information, BIS drew the attention of authorized entities to the risk of the misuse of the suggested system of support to biofuel production to the benefit of such groups

BIS gathered findings about efforts of different business and financial groups to influence the process of legislation to their benefit While monitoring the activities of these groups BIS found that for this purpose they frequently engage lobbyists and PR agencies In some cases, their activities went beyond the framework of normal lobbying and showed signs of corruption and non-standard influencing of officials of legislative and administrative bodies

Findings showed that some business and financial groups also engage lobbyists and PR agencies to acquire information about the private lives of officials who have decision-making powers Certain business and financial formations engage PR agencies to conduct purpose-built campaigns to influence public opinion to their benefit The aim purpose of these campaigns is to create a situation which suits the particular business or financial group, but is often disadvantageous to the state BIS informed authorized entities about the activities of business and financial groups which went beyond normal lobbying

In 2005, BIS gave attention to risks in the system of drawing money from EU resources, the Structural Funds in particular BIS acquired information about private entities who tried to influence the selection of projects for their illegitimate gains The participation of persons who are responsible for the management of state-owned property cannot be excluded in some cases

Findings acquired by BIS in 2005 show that the public administration is exposed to pressure from different business groups This also applies to officials who have decision-making powers and legislators The purpose is the fulfilment of the business objectives of certain groups by non-standard methods

WP0021545

Resistance to this pressure places high demands on the public administration and the quality of the legislative environment, as well as on the security apparatus which protects state interests. BIS has information that some state officials succumb to this pressure, and it cannot be excluded that some of them even ask for bribes.

The endeavour of some entities to gain illegitimate advantage at the cost of the economic interests of the state dictates the need for continued protection of the important economic interests of the Czech Republic.

## 2.3. COUNTER-INTELLIGENCE ACTIVITY

### Intelligence services of the Russian Federation

The main Russian intelligence services operating in the Czech Republic are the military GRU and the civilian SVR. Most of their members are officially declared as diplomats or staff of the Embassy of the Russian Federation in Prague. SVR members also operate at the Consulates General in Karlovy Vary and Brno.

At the end of 2005, Russia had in the Czech Republic 60 diplomats and 93 members of the administrative and technical staff with families. The share of intelligence officers in the diplomatic staff of the Embassy ranged between 40 and 50% as it did in 2004.

Within the scope of their political and intelligence work, the members of the mission at the Embassy of the Russian Federation in Prague monitor the quality of Russian-Czech relations, assess Czech political representatives and the foreign relations of the Czech Republic, and draw up recommendations for the future development of bilateral contacts between Russian and Czech officials.

The Russian mission in the Czech Republic develops activities directly connected with the endeavour of Russia to create its positive image. For this purpose, the Russian Centre of Science and Culture arranges events which are to attract the attention of Czech citizens and influence their views and attitudes to the benefit of Russian interests, or to search among them for potential sources of intelligence information. Russian media are purposefully used for this publicity of Russia in the Czech Republic. Russian intelligence services have a share in the endeavour and misuse it for their purposes.

The activity of the Embassy of the Russian Federation is focused on the mapping and development of Russian-Czech economic relations. For this purpose, the Embassy set up an Economic Council comprised of members of the Russian diplomatic mission in the Czech Republic including intelligence officers under diplomatic coverage, and representatives of strategic Russian firms which have agencies in the Czech Republic (for example of the power industry and aviation), banks, and business chambers. The Council holds regular meetings and serves as a source of economic information which is passed to the Russian administration.

WP0021546

This fully corresponds with the fact that Russia strives to use economic instruments for influence on the Czech Republic. In 2005, members of Russian intelligence services dispersed in the economic sections of Russian Embassy were strongly involved in negotiations of an Agreement on Economic, Industrial and Scientific-technical Co-operation between the Russian Federation and the Czech Republic. Within this initiative, the Russian side made an abortive attempt to keep the Commercial Representation of the Russian Federation in the Czech Republic independent of the Embassy so that it would not fall under the Vienna Convention on Diplomatic Relations.

The activity of the present and former Russian intelligence officers in the economic area is apparent at all levels, from trade to interstate affairs.

The operations of intelligence officers in the economic field threaten the interests of the Czech Republic. They provide the Russian Embassy with direct access to strategic information and classified facts, and can influence the managers of important economic sectors in the Czech Republic. The activities of the Embassy and the two Consulates General of the Russian Federation in the assertion of Russian national economic interests in the Czech Republic are co-ordinated by the mentioned Economic Council.

The importance attached to economic affairs in the Russian foreign policy is illustrated by Russian acquisitions in the Czech Republic: Vítkovice steel (Evraz Group), and three factories of Škoda Plzeň (OMZ holding controlled by the state-owned Gazprom). Russia demonstrated the effectiveness of economic levers in practice in the case of Ukraine at the end of 2005. The possibility cannot be excluded that the Russian Federation could also try to boost its positions in the Czech energy industry.

The threat to the interests of the Czech Republic posed by operations of Russian intelligence services is redoubled by the repeated detection in 2005 of contacts maintained by officers or persons acting to the benefit of Russian intelligence services with persons from Russian-speaking groups of organized crime in our territory. Specifically, it is the risk of the corruption, finances and influence of this organized crime being used by the intelligence services of the Russian Federation.

## Intelligence services of North Korea

In 2005, the endeavour of the Democratic People's Republic of Korea to improve the quality and standard of relations with the Czech Republic, particularly in the economy, education and culture, and to promote diplomatic relations with the Czech Republic, was accompanied by efforts of the North Korean intelligence services to spread their country's ideological propaganda in the Czech Republic.

BIS also detected in the Czech Republic efforts of North Koreans to trade in commodities and technologies which could be used in the North Korean armament industry, and efforts to acquire strategic information of political, social and economic character.

The permanent tasks of North Korea intelligence services further include the provision of information to state and trade delegations visiting the Czech Republic, and monitoring the activities and behaviour of the North Korean nationals staying in the Czech Republic Besides the diplomatic staff, they include workers employed in several manufacturing companies, and holders of grants from the Czech Government studying at Czech universities within the framework of the development aid programme

## 2.4. EXTREMISM

In 2005, the Security Information Service did not register any signal of an increased security risk ensuing from the existence or activity of Czech right-wing or left-wing extremist organizations, or indications of the radicalization of these groups, or their links with terrorist organizations  BIS also found no noticeable change in the activity of the exponents of extreme political opinions, but detected several less important qualitative changes

### Right-wing extremism

Two basic streams can be distinguished in the Czech right-wing extremist environment The first is represented by supporters of extreme nationalism with a certain admixture of conservative Catholicism  The second includes persons who are not officially organized and to a varying extent incline to national socialism, neo-Nazism, and the "White Power" doctrine (hereafter referred to as the neo-Nazi movement), mainly adherents to the skinhead movement

The main extremely nationalist groups active in 2005 were registered civic associations or political parties and movements which had in the previous years scaled down the most radical activities to be more acceptable by the public  Despite abortive attempts to do well in local elections and elections to the European Parliament, these entities follow the example of right-wing extremists abroad and are gradually establishing themselves on the Czech political scene  These entities were devoting utmost attention to preparations for the 2006 parliamentary elections and arranged an increased number of demonstrations, public assemblies, ceremonies and lectures

Although they tried they were unable to keep co-operation free of conflicts, and following attempts to form a united nationalist entity the extreme nationalists were again divided due to opinion disputes and personal aversions  Two main platforms of extreme nationalists were active at end of 2005

One of their major themes is refusal to recognize some fundamental human rights and freedoms of a certain group of people  When propagating and defending their political programmes, the members and sympathizers of extreme nationalism show to varying extent xenophobia, racism, anti-Semitism, aversion to liberalism, and sympathies with totalitarian ideologies

WP0021548

Although extreme nationalist entities generally declared detachment from nationalist and Fascist ideas, BIS acquired in 2005 information which confirmed that the entire extreme right wing was linked by some common themes and personal contacts The common themes include anti-Semitism closely connected with revisionism; BIS noted its revival in the Czech Republic at the end of 2005 Revisionist activities included, for example, a demonstration in support of the prosecuted revisionists Ernst Zündel and David Irving, which was attended besides nationalists by sympathizers with the extreme nationalist scene At the same time, several schools received a pamphlet entitled "Auschwitz – Facts versus Fiction", which cast doubt on the Holocaust, and the so-called National Education Institute launched websites that propagated revisionism and the neo-Nazi ideology

The other part of the extreme right-wing scene in the Czech Republic includes supporters of the neo-Nazi movement mostly in informally organized autonomous regional groups In 2005, BIS did not register the existence and operations of official Czech branches of international neo-Nazi organizations2

The number of public events with political implications arranged or attended by supporters of the neo-Nazi movement in increased in 2005 compared with 2004, but there was no signal of neo-Nazi efforts to create a political entity and enter the political scene For the sake of a "good image" and conduct in accordance with the law, competent local authorities were properly notified of all public neo-Nazi events in advance Their participants were disciplined and there were no major disturbances

The most visible neo-Nazi activities were again right-wing extremist events accompanied by music performances, but their number was slightly lower in 2005 than in 2004 There were only two large concerts with an audience of some five hundred right-wing extremists, and other 2005 events were small The number of participants was reduced by the fact that several events took place concurrently in consequence of rivalry between individuals or groups which arranged them for profit Towards the end of 2005, BIS found that in response to more consistent steps of the police the organization of concerts was increasingly conspiratorial, disinformation was spread intentionally, and several planned events did not take place in consequence

As in the previous years, BIS registered in 2005 appeals for armed struggle, but these went without response Attacks against anti-Fascist left-wing extremists continued, but BIS did not register any violent activities indicating growth in radicalism of the neo-Nazi movement in the Czech Republic

2 A concert organized, according to published invitations, by the Czech branch of the Blood & Honour organization was held in Jablonné v Podještědí on 26 March 2005, but no activities of this organization were noted in the Czech Republic in recent years The organizers of the concert only used the "well sounding" name known abroad to attract more paying participants

WP0021549

## Left-wing extremism

Two basic streams are evident on the Czech left-wing extremist scene, but in contrast to the right-wing extremists they are not co-operating due to persisting ideological differences One stream includes supporters of the anarcho-autonomist movement, and the other is comprised of Marxist-Leninist groups

The ideas of the anarcho-autonomist movement have been appealing to a negligible number of persons in the Czech Republic in recent years Moreover, the activists are rather passive and incapable of speaking to the young generation which would increase membership and the capacity of action of anarchist organizations The movement has been restrained for several years, but was not totally inactive in 2005

BIS noted a slight activation and radicalization of the anarcho-autonomists in connection with the fight against ideological opponents from the extreme right-wing spectrum Monitoring of the extreme right-wing scene and fight against its activists gave a boost to co-operation of adherents of the different streams of the anarcho-autonomist movement in the planning and arrangement of public events The anarcho-autonomists regarded this as important enough to refrain from organizing their traditional May Day celebrations and tried, unsuccessfully, to disrupt a demonstration of right-wing extremists in Brno.

Besides several other protests against right-wing extremists, anarchists organized in the second half of 2005 a demonstration against the EU and USA Days They protested especially against the presence of prominent foreign politicians who are known for their support to the military operations in Iraq With the exception of isolated excesses, the demonstration was peaceful and did not threaten the conference or the guests In the second half of the year, adherents of the anarcho-autonomist movement took part in several demonstrations against the action of the Police of the Czech Republic at the 2005 CzechTek

BIS registered several so-called Antifa Benefit concerts of the international campaign entitled Good Night White Pride, which is focused in the Czech Republic on support for imprisoned or prosecuted left-wing activists Co-operation of the anarcho-autonomists with similarly oriented foreign entities was at the minimum in 2005

In 2005, BIS noted no substantial changes in the activity of radical Marxist-Leninist groups Groups of this part of the extremist left-wing spectrum strive to replace the present arrangement of society with the socialist or communist system Most of their members reject parliamentary democracy and assert revolution

In 2005, the members and sympathizers of Marxist-Leninist groups continued their traditional activities – propagation of left-wing extremist ideas by lectures, their own journals, websites, and public events In the second half of the year, BIS noted the presence of members of some groups at demonstrations held to express disagreement with the police operation against participants in CzechTek 2005

In October 2005, representatives of several extreme left-wing organizations arranged the second national social forum under the title Revolt Forum which followed the first Czech Social Forum (CSF) in 2004  The Revolt Forum was less successful than CSF as the changed name of the event, which indicated strong influence of the Trotskist group, probably discouraged many representatives of social movements from attendance. The Revolt Forum confirmed a bigger participation of left-wing extremists in social forums in the Czech Republic than in other countries where non-extremist sectors of the social movement prevail. In contrast to social forums abroad, which emphasize human rights and social aspects, the Revolt Forum had a concrete political dimension and thus lost the non-party character typical of social forums

In 2005, some Marxist-Leninist groups continued to promote co-operation with similar foreign groups

## 2.5. PROLIFERATION AND TRADE IN MILITARY MATERIAL

### Handling of weapons, military material, explosives and dual-use items

In 2005, the Security Information Service dealt with the non-proliferation of weapons of mass destruction (WMD) and their carriers, and devoted attention to cases of the breach or circumvention of duties ensuing from inter-state agreements and international control regimes for dual-use items and conventional weapons. In keeping with the long-term requirements of the international community, the Czech Republic strives to prevent WMD proliferation and illicit handling of dual-use items and conventional weapons. Risks of the misuse of such materials, technologies or know-how by groups of organized crime or terrorism rank among BIS priorities

### Proliferation of WMD and their carriers including dual-use items and technologies

WMD non-proliferation applies to nuclear, chemical and biological (bacteriological and toxin) weapons and their carriers which can be misused in military programmes and terrorist attacks. In 2005, potentially most risky were chemical and biological substances the production of which is not demanding in financial and technical terms.

BIS registered interest in trade in chemical substances which belong to controlled items. BIS co-operation with the Ministry of Industry and Trade, the Ministry of Foreign Affairs and the State Authority for Nuclear Safety prevented undesirable exports.

An important area of BIS interest was the application of mechanisms controlling duel-use items and technologies export to risk countries, which were especially Iran, Syria and North Korea last year  These countries continued to develop their missile and WMD programmes, used cover companies for trade in dual-use commodities, and declared civilian use of the required commodities

The Czech Republic was visited in 2005 by representatives of companies and official institutions of Iran, Syria and North Korea reasonably assumed to be linked with entities involved in programmes of WMD research and development BIS reacted to concrete interest in control units or very precise machining equipment

BIS also paid attention to the misuse of second-hand equipment and the assessment of risks connected with new technologies. The application of mechanisms controlling the handling of duel-use items, technologies and know-how also concerned joint ventures with Czech involvement based outside the territory of the Czech Republic For example, BIS dealt with the involvement of Russian capital in several Czech engineering companies

Rapid exchange of findings between competent institutions prevented several other non-transparent deals in controlled items, and no obligations ensuing from international control regimes and Czech laws were broken

## Conventional weapons, military material, ammunition and explosives

The BIS priorities in 2005 included the gathering and assessment of information about the observance of obligations of the Czech Republic in control of the handling of conventional weapons, military material and explosives The main instrument of the national control regime in this area was Act no 38/1994 Coll , on foreign trade in military materials as amended; BIS participated in its amendment

Outstanding legislative measures in foreign trade in military material, handling of military materials in the territory of the Czech Republic, and the handling of civilian (industrial) explosives led to some non-transparent deals There was the risk that some imports or exports declared as civilian could in fact be trade in military material BIS noted efforts of some exporters to circumvent control regimes, but co-operation of competent state institutions prevented exports which would break obligations ensuing from international control regimes and harm the good name of the Czech Republic

BIS regularly participated in proceedings of licensing foreign trade in military material within the relevant provisions of Act no 38/1994 Coll In 2005, licences for foreign trade in military material were held by 113 corporate bodies BIS generalized some purposeful steps of applicants for a licence when amendments to the mentioned act were discussed

In 2005, BIS participated in licence proceedings concerning concrete deals in military material, and through the Ministry of the Interior made comments on some applications for export licences BIS drew attention to risks of possible re-export of military material to countries which do not provide guarantees of unauthorized handling of conventional weapons and explosives

In 2005, the international community applied to a number of countries arms embargo or other sanctions pursuant to resolutions of the UN Security Council, EU, OSCE, or the West African ECOWAS Besides North Korea, Syria and Iran, military material,

weapons and ammunition supplies were risky in 2005 to Belarus, the Dniester River area, Caucasus, countries of South-East Asia and several African countries. Possible re-exports also concerned China to which the EU continued to apply the embargo on arms export in 2005.

BIS recommended that a licence for these exports to Iraq should not be awarded as the main buyer of the Iraqi army Ziad Tareq Cattan participated in non-transparent deals in military material.

Neither did BIS recommend exports of military material to the Republic of Congo, and export of the passive radar VERA to Vietnam.

In view of the planned privatization, BIS examined the situation in the Aero Vodochody joint-stock company. The reason of BIS attention was the future of the privatized company and supplies of the subsonic fighters L 159 Alca to the Army of the Czech Republic, and possible consequences for co-operating companies including Technometra Radotín, a s, Jihlavan, a s, Letov simulátory, a s, Mesit přístroje, spol s r o, and last but not least the state enterprise LOM Praha, s p.

In 2005, environmentally friendly disposal of redundant army ammunition continued in the Czech Republic. A substantial amount of ammunition of all calibres was liquidated for the Czech Ministry of Defence on a contractual basis by companies led by Poličské strojírny (engineering works), a s. BIS noted no breach of legal measures.

## 2.6. ORGANIZED CRIME

### Organized groups from the area of the Caucasus

BIS obtained information about the activities of an organized crime group from the Caucasus area, which seeks to be integrated into the social structures of the state, to gain control of part of social and political activities, and to legalize profits from criminal activity by means of public or corporate budget funds.

When uncovering the group's contacts BIS found its close links with criminal structures in the Moravian-Silesian and Zlin Regions, and with individuals of the Balkan, or more precisely Albanian, community involved in drug trade.

The group maintains its position in the debts market, taking advantage of contacts reaching to the highest political and social circles. A new activity of the group consists in using its contacts in the banking sector to obtain credits for debtors to pay their liabilities.

Furthermore, the group has political and social contacts that are used to implement its interests (e g in getting information on indebted companies). The group also maintains contacts, and at the same time establishes new ones, in the area of the judiciary, their chief purpose being to provide assistance to selected persons prosecuted or convicted for criminal activity in favour of the group. On the basis of information obtained, BIS has

WP0021553

confirmed the findings about the access of an Armenian group to administrative and police records by means of associates from the ranks of Czech police and employees of local government

There are also other criminal organizations of Caucasian origin which operate in the Czech Republic. These groups cooperate with Russians, Ukrainians, Kosovo Albanians, etc. They are involved in various illegal activities, such as racketeering and other forms of extortion, participate in the organization of illegal migration, legalization of residential stays, drug trafficking, etc.

## Activities of other Russian-speaking groups of organized crime

According to information available to BIS, the activities of Russian and Ukrainian organized crime groups in the territory of our republic mostly have the nature of violent and property-related criminality. In mapping the manifestations of these criminal associations, sometimes called brigades (identified as Irshava, Kiev, Uzhgorod, Crimea, Luhan), and of their representatives it was discovered that they specialize in the collection of "tithes" from foreign workers, in the extortion of debts and protection money, in providing protection, securing residence permits, etc., and allegedly also in drugs and arms trade

Most information obtained about the above mentioned Russian-speaking groups does not fall into the target areas that are the focus of attention for BIS. BIS has no findings that the activities of these groups go beyond the framework of violent crime. Their activities are mainly directed at debt and protection money extortion, providing protection, securing residence permits, etc., and fall within the competence of the Police of the Czech Republic

## Organized crime of Albanians and Turkish Kurds

BIS has obtained findings about a group of Turkish citizens who had in the past operated in the import and sale of narcotics and psychotropic substances from Turkey to the Czech Republic, Germany and the Netherlands

Within this trade part of the goods was to be exchanged for explosives (semtex) for the former Kurdish Workers' Party (PKK). In October 2004 a part of the group were detained by the police, but according to information available to BIS several persons remained at large and may be carrying on the above mentioned trade

Because of the possible links with the Kurdish radical movement BIS is paying permanent attention both to illegal migration of Turkish citizens to the Czech Republic generally, and the related suspicious activities and links of some persons

According to BIS findings, Kosovo Albanian organized groups focus on drugs trade. Often these groups legalize the proceeds from drugs trade in casinos, gambling rooms and night clubs operated by them. According to the acquired information some of the

WP0021554

casinos are co-owned by persons of the Russian-speaking organized crime, which testifies to co-operation between Balkan and Russian-speaking groups in the area of drug-related crime Information of this kind obtained is passed by BIS to the Czech Republic bodies with the relevant jurisdiction

## Infiltration of organized crime into state structures and local government

BIS's own findings obtained during 2005 show that in the recent years organized crime groups have been stepping up their effort to infiltrate the state structures and local government.

Working together with investigative, prosecuting and adjudicating bodies, BIS has confirmed continuing penetration by organized crime into the judiciary An analysis of the available information shows that several models exist for discrediting, compromising and intimidating public prosecutors during criminal proceedings, by which the defendants and their "teams" seek to compel a public prosecutor to mitigate the charges or to withdraw from the case

Also, BIS has information about manifestations of corruption at various levels of court proceedings Especially at district courts, prisoners or other "clients" are granted unjustified reliefs as a result of financial payments to judges Implicated in this corruption behaviour are also some lawyers and public prosecutors

The creation of a corrupt environment in investigative, prosecuting and adjudicating bodies endangers the functioning of the state in the law enforcement area Attempts to influence court decisions in favour of indicted representatives of organized crime impede the work of the police and public prosecutors' offices, and in some cases even cast doubt on its meaning

The attempts of groups of interlinked persons working in local government, lawyers' offices, education and elsewhere, and using their legal knowledge, contacts and influence in the legislative process area, are also highly serious These groups (one example are persons around judge Berka) try to build networks of special purpose relationships in the judiciary, police and politics by applying corruption and creating a system of mutual commitments

## 2.7. ILLEGAL MIGRATION

In accordance with its competences set out by Act no 153/1994 Coll., on the intelligence services of the Czech Republic, BIS deals with migration as one of the manifestations of organized crime

WP0021555

## Chechen migration

The escalation of violence in the Caucasus during 2005 has been causing lasting migration from this area  Large numbers of refugees continue to transit our territory to West European countries  By analyzing data on asylum procedures in countries which are the Czech Republic's neighbours, and considering the direction of the main migration routes of refugees, BIS has concluded that 3 500 to 4 000 citizens of the Russian Federation, mostly Chechens, successfully crossed our territory in 2005, which is six times more than the data given by statistics

During 2005 police detained several groups of people smugglers which focused on migrants from the area of the Caucasus  For example, there were two groups of organizers of illegal migration that used their contacts with asylum centres in Poland and the Czech Republic, from which they smuggled persons to Austria, France, Germany, the Netherlands and Belgium  BIS participated with information support in the successful police operations Geno, Charon and Vacek, in which more than 20 members of these groups were captured in June 2005 and charged with criminal conspiracy

According to BIS, the main risk of the migration from the Caucasus is the potential presence of persons suspected of involvement in militant, terrorist and radical religious groupings or in organized crime groups  At the end of the year, BIS obtained information about the links of one of the organizers of illegal migration with a person who attempted to model a terrorist attack in Prague  BIS prevented the continuation of possible preparations for such attack by its timely operative measure

## Chinese and Vietnamese illegal migration

From the viewpoint of Chinese migration the Czech Republic has so far been only a transit country  The growing influence of Chinese business entities in the Czech Republic, the interest of Chinese investors in the country, as well as the existence of numerous Chinese communities in Hungary and some Balkan countries indicate that the Czech Republic is becoming an interesting territory for the citizens of China

In 2005, Chinese nationals crossed our territory mainly by overland routes  They used passenger cars and vans driven by Czech citizens or foreign nationals, mostly in the direction from Slovakia to Germany  To enter the Czech Republic Chinese nationals also used the Prague–Ruzyně airport  Detained persons often show false or forged documents to prove their identity, making use of the physical likeness of Asians  It is becoming obvious that - with regard to the high degree of organization, and to "independence" from the integration development in Europe - Chinese illegal migration ranks among permanent problems of the Czech Republic as well as a number of other states

Vietnamese illegal migration is of quite a different nature. The Vietnamese community, officially numbering about 35 000 persons in this country, is concentrated around businessmen operating large open air markets, networks of markets, and/or sale in their own stands (an now ever more often sale in shops)  The existence of this numerous

WP0021556

community facilitates illegal stays of migrating persons in Czech territory, and the subsequent crossing of the state border especially in the direction to Germany.

In co-operation with the Police of the Czech Republic and partner foreign services, BIS participates in operations conducted against networks of Chinese and Vietnamese people smugglers. During 2005 several operations were carried out resulting in the detention of gangs which illegally smuggled migrants from Russia, Kazakhstan, India, China and other countries across the Czech border. About 2 000 persons (especially Chinese, Vietnamese and Indians) were taken to neighbouring countries in the smuggling actions.

One of the major successes of BIS in its struggle against illegal Chinese migration was the result of co-operation with a partner service, thanks to which several offenders from the group of the Chinese forger of identification documents and organizer of illegal migration Wu Han Liang and his companion Chu Wen Ping were detained.

## Ukrainian migration

The numbers of migrants who head to the Czech Republic as their destination continue to be dominated by the citizens of Ukraine. At the moment more than 82 000 Ukrainian nationals are staying officially in our territory. Ukrainians formed the largest group of foreigners among applicants for asylum in the Czech Republic, with almost a thousand applications in the year (25 % of all applications submitted in the Czech Republic). Statistics also show that Ukrainians accounted for almost 70 % of foreigners who in 2005 violated the conditions of legal stay in our territory. However, in the opinion of BIS, neither the legal nor illegal migration of Ukrainians represents a major security risk for the Czech Republic from the intelligence viewpoint. Ukrainians mostly represent a sought-after labour force and their stay in this territory is connected with standard crime.

## Illegal migration via Prague – Ruzyně airport

As the number of handled passengers is going up each year, so is the number of illegal migrants detained at Prague – Ruzyně airport.

Besides persons who use irregular travel documents, the migrants include foreigners without travel documents who apply for asylum in the Czech Republic after arriving at Ruzyně airport. The most frequent applicants were especially Indian nationals, who did so mainly between August and December 2005. They were mostly people with a lower level of education, but the groups always included one person who spoke English and, after placement in a reception facility, ensured communication with contact phone numbers in Germany, France or Italy. These were countries where the migrants attempted to travel after being moved to long-term asylum facilities.

The above-mentioned development necessitated appropriate visa measures. An amendment to Decree no. 86/2000 Coll. of the Czech Ministry of the Interior, introducing the duty of airport visa for Indian nationals, came into effect on 24 November 2005.

WP0021557

Owing to its application Indian migration via Ruzyně airport fell substantially already in December

A similar manner to travel to the Czech Republic in 2005 as Indians was used by Nigerian nationals. They took advantage mainly of the CSA (Czech Airlines) flights from Cairo and invitations to visit the Czech Republic made out by some Czech companies

The third risk group of migrants, who come to this country by air, is represented by some Turkish nationals. From the beginning of 2005, several cases of illegal migration by Turks across the Czech Republic to Germany were recorded almost every month. The Turks usually arrived on an Istanbul – Prague flight with genuine travel documents and valid entry visas (usually issued by the Czech Republic's diplomatic mission in Ankara) After arrival they did not apply for asylum but continued in the direction of the German state border and crossed it illegally. Some of them were detained in Germany and returned to the Czech Republic in accordance with the readmission agreement

### Further activities connected with illegal migration

Over the longer term, a negative phenomenon has been the illegal migrants' abuse of the asylum procedure. By applying for asylum in this country they legalize their stay for a certain period of time, avoid being placed in a detention facility for foreigners, and gain time to prepare their journey to the next country. In 2005, BIS registered cases suggesting the interest of some entities (persons, lawyers' offices, civic associations) to be able to influence the course of the asylum procedure

To an ever greater extent illegal migration is combined with the abuse of irregular travel documents. BIS obtained a number of findings about concrete examples of their misuse (e.g. French and Spanish passports). These cases are dealt with in co-operation with the partner intelligence services. Together with the relevant competent bodies of public administration and the Police of the Czech Republic, BIS also deals with issues concerning persons or groups of forgers operating in Czech territory

## *2.8. SECURITY OF INFORMATION AND COMMUNICATION SYSTEMS*

The rapid development of information and communication technologies and their interlinking brings many changes in the functioning of society

Criminal penetration of data networks, information struggle, cyber terrorism, cyber espionage, and other similar activities are becoming reality and may decisively influence the security, defence capability, economic stability and political systems of democratic states. The massive use of information and telecommunication technologies also opens the scope for electronic attacks targeted at the strategic economic interests of states. The virtual world is moreover an object of, and scope - and a very fertile one - for commercial and industrial espionage that can be freely accessed by the professional intelligence services of all countries

WP0021558

The activities of the Security Information Service in the above mentioned wide area of electronic communication derived from tasks stemming from the document "The National Strategy for Information Security", which was approved by the Czech Government in 2005. The basic objective for BIS is to reduce the vulnerability of electronic communication systems and to forestall possible incidents by exposing potential attackers - including their motives - and uncovering the methods and forms of electronic crime. In the past year BIS also monitored the global development of information and communication technologies, and from the angle of the possible emergence of further new threats, new security risks and vulnerable spots mapped in advance, and analyzed, their trends and anticipated applications

# 3. Protection of classified information and security screening

In the area of protection of classified information BIS fulfilled tasks defined in Act no. 148/1998 Coll., on the protection of classified information and on the amendment of some related acts of law

In conducting the security screening of natural persons and organizations and in verifying the security clearance of natural persons, BIS closely cooperates with the National Security Authority (Czech acronym NBÚ), with the other Czech intelligence services, government authorities and organizations. In this area it also closely cooperates with its counterparts abroad, in compliance with a government resolution which gives approval for BIS's international co-operation

In 2005 BIS dealt mainly with the so-called repeated security screening of natural persons, supplementary applications and investigations of data changes to existing valid security screening of organizations, and with the verification of the security clearance of natural persons especially where sensitive activities in foreign trade in military material were involved

During 2005 BIS received from NBÚ 293 requests for 3rd and 4th degree security screening of persons, and completed screening in 249 such cases. As concerns the security screening of organizations, BIS received 308 requests from NBÚ and completed screening in 335 cases. Regarding screening for security clearance of persons NBÚ made 1001 requests and BIS completed the screening of 793 persons. Within the framework of security screening at NBÚ requests BIS, at the same time, conducted surveys in its records concerning 14 837 persons and 271 organizations.

# 4. Reporting and tasking

BIS is tasked in compliance with § 8 of Act no. 153/1994 Coll. The tasks with which BIS is charged by the Government and President are in compliance with the priorities set for

WP0021559

the activities of the Service. Most tasks concerned the areas of terrorism, protection of important economic interests, extremism, and operations of organized crime groups.

Apart from direct assignments BIS fulfils on an ongoing basis tasks defined by law (see the chapter on intelligence activities). If it makes findings on matters which allow no delay, BIS passes the necessary information to the respective bodies or institutions which have the authority to take a decision or action.

In the period under review BIS passed a series of information to the President of the Republic and to individual members of the Government. The Ministry of the Interior was provided by BIS with background information for government discussions (such as migration and internal security) - in all 556 documents. Further information was sent by BIS e.g. to the State Authority for Nuclear Safety and the Czech Mining Office. Some information of intelligence value was passed directly to the Czech Police, the Office for Foreign Relations and Information, and the Military Intelligence Service (a total of 245 documents). Information concerning "the intelligence situation in the territory of the Czech Republic" was discussed by the Committee for Intelligence Activities, a working body of the Security Council of the State.

At the request of the respective authorities, BIS comments on applications for Czech citizenship, for diplomatic entry visas, permanent residence status in Czech territory or on applications for refugee status. Last year BIS prepared more than 4 500 such commentaries. In connection with licensing procedures for foreign trade in military material BIS processed last year more than 1 600 applications.

In collaboration with the Directorate of Aliens' Registration Service and Border Police, and other Czech intelligence services, BIS is involved in the visa granting process (under a government resolution, BIS is the guarantor acting on behalf of all intelligence services). A total of 574 101 commentaries on visa applications were produced in 2005.

# 5. Co-operation with other Czech intelligence services and government bodies

In 2005 BIS continued its close co-operation with other intelligence services of the Czech Republic and with the Czech Police.

The 2005 co-operation, too, was focused mainly on fight against international terrorism, with the Permanent Intelligence Group carrying on as the basic co-ordinating unit in this area. By its Resolution no. 54 of 6 June 2005 the Security Council of the State established the Joint Intelligence Group as a permanent working body of the Committee for Intelligence Activities. Just as in previous years, the activities of the Joint Intelligence Group consisted especially of comparing and assessing information and proposing further

measures to efficiently eliminate security risks stemming from the Czech Republic's active participation in actions of NATO allies.

Further lines of co-operation include exchange of information concerning operations of the intelligence services of foreign powers in Czech territory, extremism, organized crime, illegal migration, and protection of the Czech Republic's important economic interests.

Within the framework of "Optimization of the Existing Security System of the Czech Republic", approved by the Government in Resolution no. 1214 of 21 September 2005, BIS actively participated in the implementation of a pilot project for the coordination of the activities of the Czech Republic's intelligence services.

# 6. Co-operation with intelligence services of foreign powers

The co-operation of BIS with intelligence services of foreign powers is regulated by § 10 of Act no. 153/1994 Coll. Last year BIS maintained contacts with 86 services of 54 countries.

Most active was co-operation with the services of neighbouring states and the services of NATO member countries. As concerns the Czech Republic's neighbours the reason is the logical need for effective co-operation, and in the case of other countries the impulses are struggle against terrorism, EU membership, or effort to be incorporated in international structures.

The principal topics of the broad international contacts included, besides terrorism, proliferation of weapons of mass destruction, trade in military technologies and conventional weapons, counter-intelligence and illegal migration. In the context of this co-operation BIS provided its foreign partners with 2 351 reports, received 4 738 communications, and its representatives participated in 416 personal discussions.

In general it can be stated that co-operation with the intelligence services of foreign powers has been constantly expanding and deepening. The growth in the volume of BIS reports for foreign services is particularly significant.

## MULTILATERAL CO-OPERATION

Since the Czech Republic's entry into NATO, BIS has been taking an active part in the activities of the NATO Special Committee, which is an advisory body to the North Atlantic Council on matters of civilian security threats. The Committee is composed mainly of civilian counter-intelligence services, BIS represents in it the whole intelligence community of the Czech Republic.

In 2005, the main tasks of the NATO Special Committee were improving communication with the North Atlantic Council and the Secretary General, achieving better co-operation among the committees, and preparing a greater involvement of external civilian services

A permanent analytical body, comprised of the civilian and military pillars, prepares mainly short-term tactical evaluations of the situation. BIS regularly participates in its activities in co-operation with the other Czech services, and their standpoints are incorporated into a joint national position of which BIS is the guarantor

**During the year BIS received 948 reports from NATO and dispatched 105 contributions.**

Following 11 September 2001, the security structures of EU countries set up a special body to combat terrorism, the so-called Counter-terrorist Group – CTG. It deals mainly with co-operation among the services, and with other EU bodies

BIS continued its active participation in all the CGT expert discussions and sent its background materials for all the standing projects and joint analytical reports

BIS sent 64 contributions to the CTG and received 588 communications. The CTG agenda registered a manifold expansion over the previous year.

BIS also participates in the work of other international structures, such as the Middle Europe Conference, which coordinate joint activities of the security and intelligence services of democratic states

# 7. Internal security

As part of personnel security measures, BIS ensured and carried out repeated security screening of BIS officers and staff prior to the expiration of validity of their security clearance, and security screening of applicants for service or employment contracts with BIS

As regards the security of facilities and technical security, the priority was safeguarding the development and operation of the systems of technical protection of facilities, in compliance with the valid legislation. These activities were considerably influenced by the need to ensure protection of classified information, in connection with the reorganization and relocation of some BIS workplaces that was carried out

In the information system, BIS made further progress and adopted new information and communication technologies. This change not only contributed to more effective data processing, but also upgraded the security of the information system.

WP0021562

In the cryptographic protection of classified information, a new communication system was put into operation using certified cryptographic means, which ensure the protection of transmitted voice and fax reports

An inspection in the area of administrative security was focused mainly on the completeness of BIS classified documents, their essential elements, the accuracy of record keeping in the administrative files  Most shortcomings have already been eliminated, attention was drawn to repeated or major shortcomings, and the findings were passed to the security director to decide about further steps

# 8. Oversight, audit and inspection

## 8.1. EXTERNAL OVERSIGHT

Pursuant to Act no  153/1994 Coll , the activities of the intelligence services, i e including BIS, are subject to oversight by the Government and Parliament of the Czech Republic  The Government also oversees the fulfilment of tasks assigned to BIS  The BIS Director is accountable to the Government

Government oversight covers all the areas of BIS activities  The Government supervises the activities of BIS in terms of their substance (subject matter) on an ongoing basis, by means of the outputs received from and tasks fulfilled by the Service  The operational aspects of BIS activities are audited by the competent government authorities

Parliamentary oversight of BIS is regulated by Act no  154/1994 Coll , on the Security Information Service, which in §§ 18 to 21 defines the supervisory role of the Chamber of Deputies (lower house) of Czech Parliament performed through a supervision body set up specifically for this purpose (the Standing Committee for Oversight of the Activities of the Security Information Service)  The law specifies the scope of jurisdiction of this oversight body and the duties of the BIS Director in relation to it

Oversight regarding the management of the funding allocated to BIS from the state budget, and the property at its disposal, is based on Act no  320/2001 Coll , on financial audit in public administration and on the amendment of some related laws, as amended by later regulations and Ministry of Finance Decree no  416/2004 Coll , the statutory instrument

Observance of work safety, fire protection and hygienic regulations is supervised by staff of the Ministry of the Interior, on the basis of a coordination agreement  A total of six inspections were made in 2005, and no gross defects or breaches of regulations were found

WP0021563

## *8.2. INTERNAL AUDIT*

### Internal audit activities

Internal financial audit is the responsibility of the BIS Internal Audit Department. Its jurisdiction is defined in the BIS Rules of Internal Governance and an internal regulation of the Service Director. From the legal point of view, it is regulated by Act no. 320/2001 Coll., on financial audit in public administration and on the amendment of some related laws, and by Decree no. 416/2004 Coll. implementing it. Some acts of internal audit are carried out by specialist BIS units.

A total of 64 internal financial audits were carried out in 2005. They concentrated on the observance of BIS internal regulations, regarding for instance periodical inventorying, allocation of funds earmarked for research and development, agreements on the liability of employees for damage caused by them, catering facilities for employees, management of special funding, accounting for pre-payments for goods and services, accounting practice and related documentation in BIS, use of service cars, etc.

Measures taken to remedy the identified shortcomings are monitored by the audit groups of the respective departments.

### Audit concerning protection of classified information

During 2005, selected buildings, facilities and workplaces were audited to check the observance of the principles applicable to the use of technical means, information and communication systems, and compliance with regulations on the protection of classified information. Checks were made of the methods classified information was dealt with, processed, transmitted and filed. Furthermore, inspections of the physical guarding of premises were performed and functioning of the technical protection systems was controlled and checked. In addition, an audit was conducted in the area of the management of material and technical supplies.

Working commissions were set up to ensure the protection of classified information in the 2005 destruction of documents procedure in those departments where destruction proposals signified shortcomings in document handling.

No major security shortcomings were found during repeated inspections of the observance of security rules in the area of the information system.

### Activities of the Inspection Department

The Inspection Department reports directly to BIS Director. In its auditing activities, it respects the basic principles formulated in Act no. 552/1991 Coll., on government audit

The Inspection Department proceeds in its work from the BIS Rules of Internal Governance and the management principles defined by an internal regulation. Its jurisdiction includes:

- acting as the BIS police body, pursuant to § 12 para 2 of Act no 141/1961 Coll , on the Rules of Criminal Proceedings, in cases when a BIS officer is suspected of having perpetrated a criminal offence;
- investigating cases of BIS officers being suspected of breach of discipline, including investigation of extraordinary events;
- investigating complaints and notifications made by BIS members as well as outside entities

## The frequency of these activities (comparing with previous years) is shown in the table below:

| Type of activity : | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|
| acting as BIS police body | 26 | 16 | 12 | 10 | 7 | 2 |
| investigating administrative infractions | 97 | 96 | 113 | 110 | 106 | 109 |
| investigating complaints and notifications | 118 | 115 | 79 | 88 | 69 | 49 |

## Inspection Department activity as the BIS police body

An overview of the Inspection Department activities in the capacity of the BIS police body in 2005, broken down according to the character of the cases and manner of their resolution, is provided by the following table:

| Criminal case file no | Legal qualification of offence | Resolution |
|---|---|---|
| 2 | embezzlement - § 248 para 1, 2) of Criminal Code | proposal to institute criminal proceedings |
| 3 | jeopardizing classified information - § 106, defamation - § 206, perjured testimony - § 174 of Act no 140/1961 Crim Code | discontinued - § 159a para 1 and 4 |

## Investigation of administrative infractions

This category includes mainly traffic accidents in which BIS members were involved, meritoriously investigated by Czech police bodies with the respective local jurisdiction The BIS Inspection Department provides input that the police cannot obtain themselves.

Furthermore, this category includes cases of extraordinary events in the sense of the valid internal norms, or other cases where there is a suspicion that BIS members have broken both generally binding and internal legal norms

Where the culpability of a BIS member is established, such case is referred for disciplinary proceedings, under §§ 51 – 59 of Act no 154/1994 Coll

In the course of 2005, the Inspection Department dealt with a total of 75 cases classified as extraordinary events Comparison with the previous years shows a slightly rising trend in the number of extraordinary events Most common in the sum of extraordinary events were traffic-related cases (a total of 50 - including those where BIS members were not found at fault), damage caused to parked cars, breaking into cars, and thefts of their accessories or transported objects

### Investigation of complaints and notifications

This type of investigation is conducted in keeping with Government Decree No 150/1958 Ú.l , on dealing with complaints, notifications and suggestions submitted by the working people (the Decree ceased to be effective as of the last day of 2005) The investigated cases include a variety of suggestions and submissions, by both BIS members and persons or institutions outside the Service Out of the total number of 49 submissions in 2005, 46 (i e 93 9 %) were notifications and three (i e 6 1 %) were complaints

In one of the complaints, BIS was not the competent authority and thus referred the case to the relevant body In the other two cases the complaints were assessed as unjustified

# 9. Conditions for BIS activities

## 9.1. THE LEGAL FRAMEWORK

The activities, status and jurisdiction of the Security Information Service, as an intelligence agency of a democratic state, are regulated by the following legislation. Act no 153/1994 Coll , on the intelligence services of the Czech Republic, as later amended, and by Act no 154/1994 Coll , on the Security Information Service, as later amended Further, BIS activities are governed by the Constitution of the Czech Republic, the Charter of Fundamental Rights and Freedoms, and other laws and legal regulations of the Czech Republic

## 9.2. THE BUDGET

The basic budgetary incomes and expenditures of State Budget Chapter 305 - the Security Information Service were approved by Act no 675/2004 Coll , on the 2005 State Budget of the Czech Republic Expenditures were set at CZK 1 177 143 000 and incomes at CZK 115 000 000

WP0021566

With regard to the development of the specific conditions for the management of budget resources the Ministry of Finance took essential budget measures in this period

On the basis of Czech Government Decree no 1237 of 8 December 2004, on a government regulation setting out a list of sensitive activities for civil aviation, the total expenditures of the budget chapter were raised by CZK 8 300 000

Due to the payment of services performed and provided in compliance with co-operation agreements with the Ministry of the Interior, expenditures of the chapter were reduced by CZK 4 753 000, which were transferred to the Interior Ministry chapter

Following Government Decree no 339 of 23 March 2005, CZK 43 400 000 of the chapter was earmarked for the implementation of Act no 361/2003 Coll , on the service relationship of members of the security corps Part of these resources, in the amount of CZK 18 350 000, was subsequently released by Government Decree no 1479 of 16 November 2005 to implement Act no 127/2005 Coll , on electronic communications

The approved budgetary income of CZK 115 000 000 was fulfilled with the amount of CZK 137 433 000 As previously, the decisive volume in this respect was accounted for by social security premiums and state employment policy contributions Compared to the previous year of 2004, the total income index in this area amounted to 113 36 %

After the changes, the amended BIS budget expenditure totalled CZK 1 180 690 000 CZK 1 109 913 000 was actually drawn, which is 94 01 % of the amended budget The amount drawn includes overall 2005 transfers of CZK 35 593 000 to the reserve fund

The incomplete drawing of current funds was decisively influenced mainly by the lower use of resources for salaries, including related expenditures - mainly compulsory insurance premiums - caused by two reasons A total of CZK 25 050 000 remained frozen in the BIS budget chapter on the basis of Government Decree no 339, and further the lower drawing of wage funds and related payments was due to the Service's understaffing

In compliance with Act no 218/2000 Coll., on budgetary rules, as later amended, there have been movements in the reserve fund Out of the resources transferred to the fund in the previous years, CZK 3 148 000 in capital expenditure and CZK 10 045 000 in current expenditure was used in 2005 On the other hand, CZK 3 005 000 and CZK 32 588 000 in capital expenditure and current expenditure respectively was subsequently transferred to the reserve fund

Budgetary resources under the Programme Financing Information System (ISPROFIN) were basically drawn totally, or transferred to the reserve fund. They were used for system allocations to programme 305 - Procurement and Technical Renewal of BIS capital assets, which was terminated in 2005, and programme 205 - Development and Renewal of the BIS material and technical basis The different projects under the

WP0021567

programme financing followed up investment projects of the last few years in upgrading the Service's property.

As shown by the above mentioned facts, the overall use of the BIS chapter budget funds, compared to the approved, or amended financial income and expenditure allocations, express a good attitude to the state budget and its improvement, without making further claims on it

To fulfil the main tasks, the intelligence service had to maintain its essential material and technical basis in an operational condition, and ensure its necessary development. All current operational requirements of the organization had to be secured and BIS also had to react to the higher security requirements, which impacted on most expenditure chapters

Just as in previous years, great attention continued to be paid to the essential needs resulting from the application of Act no. 148/1998 Coll., on the protection of classified information, as later amended. Expenditure in this area was allocated e g for safeguarding the material security of facilities, for securing the operation of the communication systems and means, with a view to further substantially increase information security and the technical means needed for the direct performance of the tasks of the Service. They include expenditure on the certification of the indispensable technical means. Expenditure in this area will continue to rise in the next few years, as a result of the new requirements under the new Act no. 412/2005 Coll., on the protection of classified information and security capacity

In the area of the material and technical basis the unfavourable trend was reversed in 2005. These expenditures had been falling in absolute figures since 1997, with the exception of the additional funding designated for increased expenditure on security in the chapter General Cash Administration in 2002, after the fall was partly halted in 2001. In 2004, expenditure in this area was the lowest of the last decade, and the reversal of the trend thus has to be regarded merely as a precondition of stabilization. The decline delayed reaction to some changes especially in communication and information technologies, and in their use. In quite a few areas the deficit of the previous years in necessary material and equipment continues as it is becoming physically and morally obsolete. The growth of expenditure on material provision in 2005 thus allowed a routine replacement for the moment

The trend started in 2005 must be maintained in the ensuing period also with regard to the Czech Republic's membership in NATO and the EU because activities of the intelligence agencies must also be brought close to European standards

In conclusion it can be stated that the management of the allocated funding from the state budget during 2005 was in compliance with the basic needs of the Security Information Service.

WP0021568

A detailed analysis of the budgetary incomes and expenditures, broken down by the different groups and sub-groups of items, is contained in the 2005 final account of the BIS chapter submitted as part of the chapter balance sheet for review to the Ministry of Finance and the Committee for Defence and Security of the Chamber of Deputies of Czech Parliament

## Implementation of BIS chapter budget in the years 2002 to 2005 (in thousand CZK)

|  | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| BIS chapter total income | 105 035 | 111 416 | 121 232 | 137 433 |
| BIS chapter total expenditure | 889 569 | 926 608 | 936 851 | 1 096 720 |
| of which . | | | | |
| Total capital expenditure | 119 722 | 141 005 | 122 359 | 149 330 |
| Total current expenditure | 769 847 | 785 603 | 814 492 | 947 390 |

Note. the current year incomes do not include resources drawn from the reserve fund in the given year, expenditures of the given year include resources transferred to the reserve fund in the given year and do not include resources drawn from the reserve fund in the given year

This part of the BIS Annual Report for 2005 (9 2 Budget) is also considered as "Annual Report" in the meaning of § 21 of Act no 218/2000 Coll , on budgetary rules, as later amended, and Decree no 323/2005 Coll , which defines the contents of the annual report.

The annual report is published only in this extent because a part of the information requested by legal regulations contains classified information in BIS jurisdiction pursuant to Act no 412/2005 Coll , on the protection of classified information and security capacity, in compliance with Government Regulation no 522/2005 Coll , which sets out the list of classified information This annual report has also been worked out in respect of the special methods of documenting the management of state budget funds in compliance with Czech Government Resolution no 435/T of 2 May 2001

All the required information is contained in the Report on BIS Activities and the Report on the Final Account of Chapter 305 – the Security Information Service for 2005. Both reports contain classified information in BIS jurisdiction and are submitted to authorized entities

WP0021569