UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s.,<br><br>       Plaintiff,<br><br>  v.<br><br>ANDREW WEISS and WEISS ASSET<br>MANAGEMENT, LLC,<br><br>       Defendants.<br><br>ANDREW WEISS and WEISS ASSET<br>MANAGEMENT LLC,<br><br>     Counterclaim-plaintiffs,<br><br>  v.<br><br>KOTVA a.s. and RICHARD HARAZIM,<br><br>     Counterclaim-defendants. | C.A. No. 05-10679-RCL |

## **DEFENDANTS' MOTION TO ADD EXPERT WITNESS**

Defendants Andrew Weiss and Weiss Asset Management LLC move that this Honorable Court exercise its discretion to allow the identification of and disclosure from an expert witness, Stephen Ross, Ph.D. Dr. Ross will testify on issues where expert testimony will greatly assist the trier of fact and, as described below, no unfair prejudice will result to plaintiff. A memorandum is submitted herewith to explain the circumstances that have led to the filing of this motion.

Professor Ross is a chaired Professor of Finance and Economics at the Sloan School of Management of the Massachusetts Institute of Technology. He also has a wealth of practical experience relevant to the complex matters involved in the case. A copy of Professor Ross's

curriculum vitae is provided as Attachment A to his expert report, which is attached hereto as Exhibit A.

Defendants are accused of trying to coerce Kotva, a Czech company, to buy back Kotva shares held by CVF Investments, Ltd., a company related to defendants. Central to this allegation is the issue of how much the shares actually were worth and whether the price at which the shares were offered was in fact "extortionate" as Kotva contends or entirely reasonable as defendants contend. If the jury does not receive expert testimony, the trier of fact will be left at sea with respect to the valuation of the shares. The complexity of the valuation, which includes an evaluation of yet another company, Trend, which had a claim to ownership of Kotva shares, requires an expert to explain how the value of the Kotva and Trend shares may be determined. This issue has become increasingly clear over the last six weeks as discovery has been completed.

Granting this motion will result in no prejudice to Kotva. Defendants will make Professor Ross available for deposition, and have no objection to Kotva designating its own expert on the subjects addressed by Professor Ross. Overall, the expert testimony will greatly assist the jury and enhance the fair and just consideration of the issues presented at trial.

## CONCLUSION

For the foregoing reasons and those stated in the Memorandum submitted with this motion, defendants urge the Court to allow the motion.

Respectfully Submitted,

ANDREW WEISS and WEISS ASSET
MANAGEMENT LLC

By their attorneys,


/s/ Edward T. Dangel, III
Edward T. Dangel, III (BBO#113580)
Dangel & Mattchen, LLP
10 Derne Street
Boston, MA 02114
(617) 557-4800



/s/ Benjamin A. Goldberger
Edward P. Leibensperger (BBO# 292620)
Benjamin A. Goldberger (BBO# 654357)
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts  02109-1775
(617) 535-4000

Dated: March 13, 2007

## CERTIFICATE OF CONSULTATION

I hereby certify that counsel for the Defendants has conferred with counsel for Kotva a.s. and Richard Harazim and attempted in good faith to narrow or resolve this issue.  Counsel for Kotva a.s. and Richard Harazim opposes this Motion.

/s/ Edward T. Dangel, III          /s/ Benjamin
Edward T. Dangel, III             Benjamin A.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 13, 2007.

<u>/s/ Edward T. Dangel, III</u>
Edward T. Dangel, III

BST99 1534451-4.072198.0012

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA,a.s. <br><br> Plaintiff, <br><br> v. <br><br> ANDREW WEISS AND <br> WEISS ASSET MANAGEMENT, LLC. <br><br> Defendants. | ) <br> ) <br> ) <br> )   CIVIL ACTION <br> )   NO. 05-10679-RCL <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

### EXPERT REPORT OF STEPHEN A ROSS
### FRANCO MODIGLIANI PROFESSOR OF FINANCIAL ECONOMICS,
### SLOAN SCHOOL, MIT
### PURSUANT TO F.R.CIV.P. 26(a)(2)(B)

### Introduction

1. I have been asked by counsel for the defendants to render
an opinion in two areas in order to assist the Court and jury in
their evaluation of the case. Because I am acquainted with Mr.
Weiss, I have declined compensation, although I consider myself
the equivalent of a retained expert asked to provide an unbiased
and independent evaluation of the issues and to testify and
withstand cross-examination in the two areas in which I have been
asked to opine. I am also an investor in one of his funds. A
copy of my CV, including publications is attached hereto as

Exhibit A; a list of cases in which I have testified as an expert

at trial or in deposition in the last four years is attached as

Exhibit B; a list of data and materials I considered in rendering

my opinions is attached as Exhibit C. In addition to serving as

a chaired professor in financial economics at MIT at which I

teach a course covering valuation and financial markets, I am the

president of Compensation Valuation Inc., a firm specializing in

option valuation, a former principal of a hedge fund, and a

consultant and advisor to investment banks and hedge funds. I

was also the cofounder and cochairman of Roll and Ross Asset

Management Corporation, an equity management firm that at one

time managed several billions of dollars. I am currently a

trustee of Caltech where I chair the investment committee, I

chair the investment committee of IV Capital, Ltd., a fund of

funds, and I serve as investment advisor to several wealthy

individuals who invest in funds like those operated by Weiss

Asset Management. I have a very high regard personally and

professionally for Mr. Weiss and I know that he is well-regarded

in the economics profession and in the investment advisory field

as a gifted economist, an astute investor and as a man of

straightforward honesty. I have no difficulty recommending Weiss

Asset Management to those I advise - and have done so - except as

described in Section II below where I consider the effect of

Civil RICO, Abuse of Civil RICO, Abuse of Process, and other such

charges made in the litigation in this case. The two areas where

I have been asked to render an opinion are: (1) the
reasonableness of the offers Mr. Weiss made for CVF's shares in
Kotva and in Trend (the valuation opinion), and (2) the likely
effects on Weiss Asset Management's ability to raise new
investment when charges of the type described above are leveled
against it.  I have reviewed the relevant documents as listed in
Appendix C, and I have utilized knowledge I have acquired from my
experience with investments, my experience as the cofounder and
chairman of an investment advisory business, my experiences as a
principal of a hedge fund and as an advisor to hedge funds and
investment banks, and the knowledge I have gained in my academic
career to form my opinions in this matter.

## I. VALUATION

2. In order to determine the reasonableness of the offers
Mr. Weiss made to sell CVF's shares in Kotva and Trend I examined
the materials in Appendix C.  On the basis of my analysis of this
material I have concluded that:

a.    The methodology employed by Weiss to obtain a value for
the CVF holdings in Trend and Kotva was reasonable and
appropriate.

b.    It would be inappropriate to use the share price
information on Kotva obtained from market trades as the benchmark
to value for the shares.

3. In his November 23, 2004 letter ("letter") to Martin Benda and Richard Harazim, Andrew Weiss made an offer to sell the CVF position of 82,782 shares of Kotva and 1,098,617 shares of Trend, which were, respectively, percentage holdings of 11.92% and 39.73% of the outstanding shares. Weiss presented two methodologies - labeled as Scenario 1 and Scenario 2 - for valuing these positions and then averaged them to obtain a single estimate of the value on which the offer was based.

4. In both scenarios the value of the CVF direct Kotva holding was obtained by using a value of 1.7 billion CZK for Kotva on a gross basis. From this figure the estimated liabilities of 0.3 billion CZK were then deducted to obtain a net value of 1.4 billion CZK for Kotva.[1] The CVF holding was then valued as 11.92% of 1.4 billion CZK resulting in a value of 167 million CZK. The value of 1.7 billion CZK was the price reported in the press as having been paid for Kotva by the firm Markland owned by the Irish real estate investors, Sean Mulryan and Paddy Kelly. It was not clear whether or not and to what extent Markland assumed the liabilities of Kotva. If they did not, and the price was for the assets net of the liabilities then the above computation would be a correct estimate of the value to the owners of Kotva who would then pay the liabilities. The Share Purchase Agreement 20041220 refers to a price being paid of 1.501

---

[1] I have not formed an independent assessment of the value of the liabilities

billion CZK for the company net of its liabilities. Applying the CVF stake of 11.92% would result in a value for CVF of 179 million CZK although the extent to which this would be decremented by any liabilities was not clear. If 0.3 billion CZK were to be deducted, the value of the CVF stake would be 143 million CZK.

5. An alternative independent estimate for the value of Kotva is presented in the London Arbitration Court Decision 27 February 2002 ("LACD"). This, in turn was based on a valuation undertaken by CA IB. The CA IB valuation offered two methodologies, one valued Kotva as an ongoing retail enterprise and the other as prime real estate. Since the value as prime real estate significantly exceeded that as a retail enterprise, it is clear that the real estate valuation is for the best use of the property and is appropriate. Using a capitalization rate of 9-10% and an estimated rental of $4.5 million per year the value of the property was estimated to range between $45 and $50 million which, in turn, using the appropriate exchange rate, produced an adjusted book value of the shares at between 2,102 CZK and 2,356 CZK. The methodology described is standard and the capitalization rate used is within the bounds of what would be reasonable industry practice.[2] Applying the lower of these to

---

2    I have not made an independent assessment of the CA IB valuation and assumptions beyond what is reported in the LACD

the 82,782 shares held by CVF produces a value of 174 million
CZK.  Applying the higher share price produces a value of 195
million CZK.  The LACD settled on a figure of 1,950 CZK per share
which produces a value for the CVF holdings of 161 million CZK.
The following table summarizes these results.

| Methodology | Value (million CZK) |
|---|---|
| Weiss | 167 |
| Share Purchase Agreement | 179 |
| Share Purchase Agreement (low) | 143 |
| LACD low estimate | 174 |
| LACD high estimate | 195 |
| LACD final figure | 161 |

6. As can be seen, the Weiss valuation is near the middle of
the range of estimates.  In conclusion, then, and based on the
above information, the Weiss valuation of the CVF direct holding
of Kotva was both reasonable and appropriate.


7. Weiss presented two scenarios for valuing the CVF holding
in Trend.  Under both scenarios Weiss valued Trend by computing
the value of the shares it held in Kotva, added that to the value
of other Trend holdings and subtracted the liabilities.  Under
Scenario 1, to compute the value of the Trend shares of Kotva,
Weiss used the figure of 277,036 shares reported in paragraph 101
of the LACD.  Quoting that paragraph, "The Tribunal is satisfied,
given the assessments from both parties, that Trend had a real

and substantial chance of recovering the 277,036 Shares (as outlined above at paragraph 96). Given the robust legal opinions and actions, and the successful settlement agreement in the event, the Tribunal finds that Trend had an 80% prospect of succeeding in its proceeding against Forminster for 221,036 shares and Melodia for 56,000 shares."

8. From the LACD it appears, relying on the agreement between Woolf (Flow) and Forminster and Melodia, that Flow had agreed to purchase the shares Forminster and Melodia held in Kotva for 1,350 CZK per share. Applying that to the 277,036 shares produces a value of 373,998,600 CZK. Weiss then adjusted that figure by the 80% probability of recovery estimated in the LACD to arrive at a final value of 283,198,880 CZK.[3] Adding in the other shares of Kotva held by Trend and, quoting from the letter, Trend's "claim for 327,237 shares in Sokolovska Uhelna" raised the value by 35 million CZK. The letter asserts that liabilities were 45 million CZK, hence the net effect of the additional assets and the liabilities was to deduct 10 million CZK from the value of the shares Trend would recover from Forminster and Melodia, producing a value for Trend of 273,198,880 million CZK.[4] Applying CVF's 39.73% stake in Trend,

---

3    The actual computation requires a deduction of 20,000,000 CZK prior to applying the 80% multiplier. Upon inquiry of counsel I was informed that this was a deduction made to account for projected administrative and legal costs.

4    I have no independent information and can offer no opinion on the estimate made by Weiss of the additional assets or the liabilities of Trend.

results in a value of 108.5 million CZK for its Trend holding.

9. The above estimate of the value of the Kotva shares that
would be recovered by Trend from Forminster and Melodia is
appropriate. On the assumption that there was an 80% chance of
recovery and that, if recovered, the shares would then be sold to
Woolf at the purchase price of 1,350 CZK, the analysis of their
value to Trend is correct. In fact, though, it would seem to be
conservative in the light of the higher valuations estimated for
the Kotva shares above.

10. Scenario 2 of the Weiss letter estimated the value of
the Trend holdings in Kotva by utilizing the figure for, to quote
from the letter, "Penalty payable under Moffitt-Forminster
agreement…" This is a reference to the Settlement Agreement
between Trend, whose chairman was John Moffitt, and Forminster.
The dispute between Trend and Forminster was over the ownership
of 384,971 shares of Kotva held by Forminster and claimed by
Trend. Under the terms of the Settlement Agreement, Trend agreed
to drop its claim to these shares in return for Forminster's
agreement to pay Trend 350 million CZK (see paragraph 1, Article
8 of the Settlement Agreement). The Settlement Agreement thus
established a value for the Trend holding of Kotva shares claimed
by Forminster. Since this agreement was signed in December,
1999, and the letter was written in November, 2004, interest

would be applied to the settlement amount to arrive at the correct figure for the later time. Using the interest rate of 10%/year and compounding this for the 4 years and 11 months from December, 1999 to November, 2004 raised the settlement figure from 350 million CZK to 559 million CZK. The interest rate of 10% is reasonable given that it is the same rate referred to in the valuation cited in the LACD and, in my experience, for an investment of this risk level this is a conservative rate. By way of comparison with previous estimates, the computed value is equivalent to a Kotva share value of 1,453 CZK per share. Adding the additional assets of 35 million CZK as in Scenario 1 raises the value to 594 million CZK.

11. From this figure Weiss deducted 45 million CZK as in Scenario 1. In addition, for the claim that Moffitt had against Trend, he deducted an additional 65 million CZK. Lastly, Weiss deducted the 109 million CZK awarded to Flow from Trend under the LACD. The total of these deductions came to 219 million CZK and subtracting that from the 594 million CZK computed from the settlement results in a value for Trend of 375 million CZK. CVF's 39.73% stake in Trend is thus worth 149 million CZK. I find this a reasonable approach to valuing the Trend shares. The Settlement Agreement was apparently arrived at by two contending parties as a way of settling their dispute and it assigned a value to the shares in the range of the previous estimates of

value, if somewhat on the low side.  The deductions are also
appropriate.  Furthermore, had the settlement been paid to Trend
it is appropriate to deduct the LACD award to Flow.  I have no
opinion on the appropriateness of the deduction of 65 million CZK
for Moffitt's claim, but insofar as it is a legitimate obligation
of Trend, it is appropriate to deduct it as well.

12. Under Scenario 1, there is an 80% chance that Trend
would recover the Kotva shares held by Forminster and Melodia.
Scenario 1 then assumes that Flow would purchase those shares
from Trend for the same price as it was willing to pay Forminster
and Melodia.  Scenario 2 assumes, instead, that the Settlement
Agreement between Trend and Forminster is in effect and used to
value the holdings.  In this case, according to the LACD, Trend
is obligated to pay damages to Flow.  Not taking a stand on
whether Trend would settle with Flow and turn the shares over to
them according to the Purchase Agreement or whether it would
instead keep with the Settlement Agreement and pay the damages to
Flow, Weiss averaged the two valuations from the two scenarios.
Adding the 167 million CZK value for the direct holdings in Kotva
in both scenarios, and the Scenario 1 valuation is 275.5 million
CZK and the Scenario 2 valuation is 316 million CZK, for an
average of 295.75 million CZK, which was the Weiss offer.

13. I find the computations presented by Weiss to be appropriate and conservative. Indeed, I can think of little that I could do to improve upon them. They are conservative because under both scenarios the value assigned to the shares of Kotva is lower than that used by the tribunal in the LACD, lower then that placed on the value of the shares by the CA IB valuation, and lower than that actually paid for the shares by Markland. Using any of these other valuations for the Kotva shares would have been justifiable and would have produced a substantially higher valuation.

14. It has been suggested that it would be appropriate to use the traded share price of Kotva to estimate its value as opposed to the methodologies employed above. For a trade price to be taken as a reasonable estimate of value the stock must trade in a liquid market. Typically this requires that trades are frequent and of sufficient volume so that both sides of the market are adequately represented. In such a market the price record is nearly continuous and the market evidences obvious depth, i.e., large share orders can be traded with minor impact on price.

15. None of these conditions are satisfied by the Kotva trades. Indeed, trading on the stock is so sparse as to make it ludicrous to assert that the price is a reasonable estimate of

the value.  Using data from Bloomberg, a relatively large volume
of stock was traded in September, 1997 - 185,345 shares.  From
January, 1998 through October, 2005, the total volume of trade
over that roughly eight year period was 2207 shares or about 280
shares per year.  Furthermore, from 1999 through October, 2005
the volume dropped from 2207 to 332 shares.  The following table
displays the annual trading volume.

| Year | Annual Volume (shares) | Monthly Volume (shares) | Number of no trade months | |
|------|------------------------|-------------------------|---------------------------|---|
| 2005 | 12      | 1      | 10 | (out of 10) |
| 2004 | 10      | 1      | 11 | |
| 2003 | 26      | 2      | 10 | |
| 2002 | 4       | 0      | 10 | |
| 2001 | 72      | 6      | 4  | |
| 2000 | 208     | 17     | 9  | |
| 1999 | 0       | 0      | 12 | |
| 1998 | 1,875   | 156    | 1  | |
| 1997 | 205,804 | 17,150 | 0  | |

16. According to the LACD, which also rejected the use of
the share price, during the period there were various freezing
orders which would have contributed to the low volume.
Irrespective of the cause, as can be seen from the table volume
was essentially non existent and the market could not serve as a
price discovery mechanism.  The data set I have does not have the
block trade of 97,573 shares in 2001 reported in the LACD, but,
interestingly the reported price of that trade was 1,964 CZK
which is within the range used by Weiss in his valuations.

17. Given the almost complete absence of any trades, it is
sophistry to argue that the market trading value is a valid
measure of the value of Kotva shares; in effect there is no
market so there can be no market trading value.  I can summarize
this issue no more lucidly than was done in the LACD, "…the
current trading value is irrelevant and should be disregarded:"

18. Based on the above analyses I have reached the following
conclusions.  First, the analysis of value on which Weiss based
his offer in the letter of November 23, 2004 was appropriate and
reasonable.  Second, the use of the trading price as a measure of
value is without any validity.

## II. THE EFFECT ON WEISS ASSET MANAGEMENT OF THE CHARGES MADE IN THIS CASE ON THE LIKELIHOOD ON OBTAINING NEW INVESTMENT

19. As I stated above I have personal experience in the area of investment management.  I was the cofounder and cochairman of Roll & Ross Asset Management Corporation which at one time was a multi billion dollar firm that managed equity accounts in global markets for wealthy individuals, institutions such as university endowments and foundations, and for major corporate pension funds and a principal in a IV Capital Ltd., a fund of funds.  I can say with great conviction that the likelihood of obtaining new investors in our funds would have been greatly diminished had the charges made in this case been leveled at me.

20. Currently I advise several wealthy individuals.  For one such individual I have refrained from recommending Weiss' funds, because of the current litigation and that despite my high regard for Weiss as an individual and an investor.  I also am a trustee of Caltech and chair the Investment Committee there, and in that capacity I have not been able to recommend Weiss Asset Management as a potential investment while the current charges and litigation is pending.

I personally prepared and signed this report.

_____Stephen A. Ross, PH.D.

MARCH 12, 2007

Exhibit A

Attached is a copy of my curriculum vitae.

## VITAE

STEPHEN A. ROSS
(March, 2007)

| | | |
|---|---|---|
| Address: | (Home) | 160 East Rock Road<br>New Haven, CT 06511<br>(203) 624-9423 |
| | (Office) | Sloan School of Management<br>Massachusetts Institute of Technology<br>50 Memorial Drive<br>Cambridge, MA 02142-1347<br>(617) 258 8371<br>(sross@mit.edu) |
| | | 33 Whitney Avenue<br>New Haven, CT 06510<br>(203) 772 0225<br>Cell: (203) 243 2323<br>fax: (203) 772 1365 |

Date and Place
 of Birth:          February 3, 1944; Boston, Massachusetts

Marital Status:     Married. Wife's name: Carol. Two children: Kate and Jon, one grandchild:
                    Lucy

Education:          Ph.D. Harvard University, 1969 (Economics)
                    B.S. California Institute of Technology, 1965
                    (Physics-Honors)

Current
Employment:         Franco Modigliani Professor Finance and Economics
                    Sloan School, MIT, July 1998-present

                    President
                    CVI
                    33 Whitney Avenue
                    New Haven, CT 06510
                    (203) 562 9500, fax: (203) 562 9512

Directorships:      Trustee, California Institute of Technology (1993-present)

Trustee, Hopkins School (1991-1997)

Director, General Reinsurance Corporation (1993-1998)

Director, CREF (1981-2004)

Director, Algorithmics, Inc. (1998-2004)

Director, Freddie Mac (1998-present)

Director, IV Capital, Ltd.

Positions Held:      Fischer Black Visiting Professor of Finance
Sloan School, MIT, 1997-1998

Sterling Professor of Economics and Finance, 1985-1998

Adrian C. Israel Prof. of International Trade and Finance, Yale University, 1984-1985

Edwin J. Beinecke Professor of Economics and Finance, Yale University, 1979 - 1983

Professor of Organization, Management and Economics, Yale University, 1977 - 1979.

Professor of Economics, Finance and Public Policy, Wharton School, University of Pennsylvania, 1975 - 1977.

Associate Professor of Economics, University of Pennsylvania, 1972 - 1974.

Assistant Professor of Economics, University of Pennsylvania, 1970 - 1972.

Cochairman and cofounder, Roll & Ross Asset Management Corp., 1986-2004

Principal and Cofounder, IV Capital, Ltd., 1997-2004, Chairman of Investment Committee 2004-present

Awards and
Grants:

Co-winner Smith Breeden Prize – Best Paper, JF 2006

CME-MSRI Prize, 2006

Nomura Lecture, Oxford University - 2006

Kuwait Lecture, Cambridge University - 2006

Karl Borch Lecture, Norwegian School of Economics, Bergen - 2006

Honorary Doctorate, University of Lugano – 2006

Finance Research Letters establishes the 'Ross Best Paper Award' to honor the best paper published that year - 2005

Honorary Doctorate, De Paul University – June 2002

2001 AIMR Nicholas Molodovsky Award

1997 Eastern Finance Association Distinguished Scholar

1997 Midwest Finance Association, AAII Distinguished Lecture

Financial Engineer of the Year, 1996

Honorary Doctorate, Universitate Karlsruhe - July 1995

Honorary Doctorate, Erasmus University, Rotterdam - November 1993.

Distinguished Alumnus Award, May 1993. California Institute of Technology.

Co-winner 1992 Review of Financial Studies Award for best paper "Survivorship Bias in Performance Studies", with William Goetzmann, Roger Ibbotson and Stephen Brown.
Elected Fellow of the American Academy of Arts and Sciences, May 1987.

Graham and Dodd Award, 1984 for excellence in financial writing, given by Financial Analysis Journal.

Leo Melamed Prize for best research by a business school professor (1978-

Awards and
Grants:

Co-winner Smith Breeden Prize – Best Paper, JF 2006

CME-MSRI Prize, 2006

Nomura Lecture, Oxford University - 2006

Kuwait Lecture, Cambridge University - 2006

Karl Borch Lecture, Norwegian School of Economics, Bergen - 2006

Honorary Doctorate, University of Lugano – 2006

Finance Research Letters establishes the 'Ross Best Paper Award' to
honor the best paper published that year - 2005

Honorary Doctorate, De Paul University – June 2002

2001 AIMR Nicholas Molodovsky Award

1997 Eastern Finance Association Distinguished Scholar

1997 Midwest Finance Association, AAII Distinguished Lecture

Financial Engineer of the Year, 1996

Honorary Doctorate, Universitate Karlsruhe - July 1995

Honorary Doctorate, Erasmus University, Rotterdam - November 1993.

Distinguished Alumnus Award, May 1993. California Institute of
Technology.

Co-winner 1992 Review of Financial Studies Award for best paper
"Survivorship Bias in Performance Studies", with William Goetzmann,
Roger Ibbotson and Stephen Brown.
Elected Fellow of the American Academy of Arts and Sciences, May
1987.

Graham and Dodd Award, 1984 for excellence in financial writing, given
by Financial Analysis Journal.

Leo Melamed Prize for best research by a business school professor (1978-

3

1979), given by the Graduate School of Business, University of Chicago.

Elected Fellow of the Econometric Society, 1979.

Pomerance Prize for Excellence in the Area of Options Research by the Chicago Board Options Exchange, 1978.

Guggenheim Fellowship, 1975 - 1976.

University Lindback Award Nominee for Distinguished Teaching, 1972-1973, 1973-1974, 1974-1975.

National Science Foundation Grant with Larry L. Weiss, 1978-1983.

National Science Foundation Grant with M. Wachter, 1972-1977.

National Science Foundation Grant with R. Pollack and E. Burmeister, 1970-1972.

NDEA Prize Fellowship, 1965-1969.

| | |
|---|---|
| Professional Activities: | Advisory Editor, <u>The Review of Derivatives Research</u>, February 1994. |

Adviser, Japan Financial Economics Association, 1994.

Advisory Board, Weiss Center for International Financial Research, The Wharton School of the University of Pennsylvania, 1990.

Board of Overseers, Boettner Research Institute, 1990.

President, American Finance Association, 1988.

President-elect, American Finance Association, 1987.

Vice President, American Finance Association, 1986.

Social Science Advisory Committee, California Institute of Technology, 1986

Director, American Finance Association, 1983-1986.

University of Rochester Trustee Visiting Committee of the Graduate School of Management, 1985 - 1987.

Editorial Board, <u>The Journal of Real Estate Finance and Economics</u>, 1987 – 1996.

Associate Editor, <u>Journal of Finance</u>, 1984 - present.

Associate Editor, <u>Econometrics</u>, 1978 - 1984.

Associate Editor, <u>Journal of Economic Theory</u>, 1975- present.

Associate Editor, <u>Journal of Financial Economics</u>, 1974- 1983.

Associate Editor, <u>Management Science</u>, 1976 - 1978.

Member, National Science Foundation Review Panel, 1976 - 1978.

Program Chairman for Financial Economics, American Economic Association Meetings, 1975.

Secretary, Faculty Senate University of Pennsylvania, 1973 - 1974.

Publications:

"A Fisherian Approach to Trade, Capital Movements, and Tariffs," with Michael Connolly, <u>American Economic Review</u> 60, No. 3, June 1970, 478-484.

"International Capital Movements and Long Run Diversification," with Wilfred Ethier, <u>Journal of International Economics</u> 1, No. 3, 1971, 301-314.

"The 'Saddlepoint Property' and the Structure of Dynamic Heterogeneous Capital Good Models," with Edwin Burmeister, Christopher Caton and Rodney Dobell, <u>Econometrics</u> 41, No. 1, January 1973, 134-139.

"The Economic Theory of Agency: The Principal's Problem," <u>American Economic Review</u> 63, No. 2, May 1973, 134-139, reprinted in *Readings in Applied Microeconomic Theory: Market Forces and Solutions,* ed. Richard Kuenne, Blackwell Publishers, reprinted in *The Principal Agent Model: The Economic Theory of Incentives*, ed. Jean-Jacques Laffont, Edward Elgar Publishing, reprinted in *Personal Economics*, ed. Edward Lazear, Edward Elgar Publishing.

"Wage Determination, Inflation, and the Industrial Structure," with Michael L. Wachter, <u>American Economic Review</u> 63, No. 4, September 1973, 675-692.

"Return, Risk and Arbitrage," Wharton Discussion Paper, 1973, published in I. Friend and J. Bicksler, eds., <u>Risk and Return in Finance</u>. (Cambridge: Ballinger), 1976, 189-217.

"On the Economic Theory of Agency and the Principal of Similarity," in <u>Essays on Economic Behavior Under Uncertainty</u>, Chapter 8, (Amsterdam: North-Holland Publishing Co.), 1974, 215-240.

Comment on "Consumption and Portfolio Choices with Transaction Costs," by R. Multherjee and E. Zabel, in <u>Essays on Economic Behavior Under Uncertainty</u>, (Amsterdam: North-Holland Publishing Co.), 1974.

Comment on "Market Equilibrium and Uncertainty," by Roy Radner, in Frontiers of Quantitative Economics, Vol. II, (Amsterdam: North-Holland Publishing Co ), 1974.

"Portfolio Turnpike Theorems for Constant Policies", <u>Journal of Financial Economics</u> 1, 1974, 171-198.

"Uncertainty and the Heterogeneous Capital Good Model," <u>Review of Economic Studies</u> 42, No. 1, January 1975. 133-146.

"Pricing and Timing Decisions in Oligopoly Industries," with Michael L. Wachter, <u>Quarterly Journal of Economics</u> 89, February 1975, 115-137.

"Wage Determination, Inflation, and the Industrial Structure: Reply," with Michael L. Wachter, American Economic Review 65, No. 3, June 1975, 507-509.

"Options and Efficiency," Quarterly Journal of Economics, 90, February 1976, 75-89, reprinted in Options Markets, ed G.M.Constantinides and A.G. Malliaris, Edward Elgar Publishing, 1999.

"A Survey of Some New Results in Financial Option Pricing Theory," with John C.Cox, Journal of Finance 31, No. 1, May 1976, 383-402; reprinted in Options Markets, ed. Constantinedes, Edward Elgar Publishing 2000.

"The Valuation of Options for Alternative Stochastic Processes" with John C. Cox, Journal of Financial Economics, 3, 1976, 145-166, reprinted in Options: Classic Approaches to Pricing and Modelling, ed. Lane Hughston, RISK Books, London, 1999; Options Markets, ed. Constantinedes, Edward Elgar Publishing 2000.

"The Arbitrage Theory of Capital Asset Pricing," Journal of Economic Theory 13, No. 3, December 1976, 341-360.

"The Capital Asset Pricing Model (CAPM), Short-Sale Restrictions and Related Issues," Journal of Finance 32, No. 1, March 1977, 177-183.

Discussion "Informational Asymmetries, Financial Structure, and Financial Intermediation," by Hayne E. Leland and David H. Pyle and "On Value Maximization and Alternative Objectives of the Firm," by S.J. Grossman and J.E. Stiglitz, Journal of Finance 32, No. 2, May 1977, 412-415.

"The Determination of Financial Structure: The Incentive-Signalling Approach," Bell Journal of Economics 8, No. 1, Spring 1977, 23-40, reprinted in The History of Management Thought eds., Dimson, Elroy and Massoud Mussavain, Ashgate Publishing, Ltd., Hampshire, England, 1998.

"The Evaluation of Simple and Optimal Decision Rules with Misspecified Welfare Functions," with Edwin Burmeister and J. Jackson, in J.D. Pitchford, S.J. Turnovsky, eds., Applications of Control Theory to Economic Analysis. (Amsterdam: North-Holland Publishing Co.), 1977, 155-171.

"Comments on Qualitative Results for Investment Proportions," with Richard Roll, Journal of Financial Economics 5, 1977, 265-268.

Abstract: "A Theory of the Term Structure of Interest Rates and the Valuation of Interest-Dependent Claims," with John C. Cox and Jonathan E. Ingersoll, Jr., Journal of Financial and Quantitative Analysis, November 1977.

"Mutual Fund Separation in Financial Theory -- The Separating Distributions," Journal of Economic Theory 17, No. 2, April 1978, 254-286. Reprinted in Frontiers of Modern Financial Theory, S. Bhattacharya and G.M. Constantinides, eds., (Tottowa, NJ: Littlefield Adams), 1987, and in Theory of Valuation, Rowman & Littlefield Publishers, Inc., 1989, 309-341.

"Some Notes on Financial Incentive-Signalling Models, Activity Choice and Risk Preferences," Journal of Finance 33, No. 3, June 1978, 777-794.

"The Current Status of the Capital Asset Pricing Model (CAPM)," Journal of Finance 33, No. 3, June 1978, 885-901.

"A Simple Approach to the Valuation of Risky Streams," Journal of Business 51, No. 3, July 1978, 453-475.

"Comments: Capital Asset Pricing in a General Equilibrium Framework," Journal of Financial and Quantitative Analysis, Proceedings Issue, November 1978.

"Duration and the Measurement of Basis Risk," with John C. Cox and Jonathan E. Ingersoll, Jr., Journal of Business 52, No. 1, January 1979, 51-61.

"Disclosure Regulation in Financial Markets: Implications of Modern Finance Theory and Signalling Theory," in F.R. Edwards, ed., Issues in Financial Regulation, Chapter 4, (New York: McGraw-Hill, Inc.), 1979, 177-202.

"An Economic Theory of Altruism," in K. Krippendorff, ed., Communication and Control in Society. (New York: Gordon and Breach Science Publishers, Inc.), 1979, 181-197.

"Equilibrium and Agency - Inadmissible Agents in the Public Agency Problem," American Economic Review 69, No. 2, May 1979, 308-312.

"Option Pricing: A Simplified Approach," with John C. Cox and Mark Rubinstein, Journal of Financial Economics 7, 1979, 229-263, reprinted in The Handbook of Financial Engineering, Harper Business Publishers, 1990.

"An Analysis of Variable Rate Loan Contracts," with John C. Cox and Jonathan E. Ingersoll, Jr., Journal of Finance, 35, No. 2, May 1980, 389-403.

"Present Values and Internal Rates of Return," with Chester S. Spatt and Philip H. Dybvig, Journal of Economic Theory 23, No. 1, August 1980, 66-81.

"An Empirical Investigation of the Arbitrage Pricing Theory," with Richard Roll, Journal of Finance 35, No. 5, December 1980.

"Tobin's q Ratio and Industrial Organization," with Eric B. Lindenberg, Journal of Business 54, No. 1, January 1981, 1-32.

"Some Stronger Measures of Risk Aversion in the Small and the Large with Applications," Econometrica 49, No. 3, May 1981, 621-638.

"Learning by Observing and the Distribution of Wages," with Paul J.E. Taubman and Michael L. Wachter, <u>Studies in Labor Markets</u>, Sherwin Rosen, ed., University of Chicago Press, 1981, 359-386.

"A Reexamination of Traditional Hypotheses About the Term Structure of Interest Rates," with John C. Cox and Jonathan E. Ingersoll, Jr., <u>Journal of Finance</u> 36, No. 4, September 1981, 769-799. Reprinted in "Speculation and Financial Markets" edited by Dr Liam A. Gallagher and Mark P. Taylor, THE INTERNATIONAL LIBRARY OF CRITICAL WRITINGS IN ECONOMICS – Series Editor: Mark Blaug, Edward Elgar Publishing Ltd.

"The Relation Between Forward and Future Prices," with John C. Cox and Jonathan E. Ingersoll, Jr., <u>Journal of Financial Economics</u> 9, No. 4, December 1981, 321-346.

"The General Validity of the Mean-Variance Approach in Large Markets," <u>Financial Economics Essays in Honor of Paul Cootner</u> (Prentice-Hall, Inc.), 1982.

"The Determination of Fair Profits for the Property-Liability Insurance Firm," with Alan Kraus, <u>Journal of Finance</u> 37, No. 4, September 1982, 1015-1028.

"Portfolio Efficient Sets," with Philip H. Dybvig, <u>Econometrica</u> 50, No. 6, November 1982, 1525-1546

"Accounting and Economics," <u>Accounting Review</u> 58, No. 2, April 1983, 375-380.

"A Simple Approach to the Pricing of Risky Assets with Uncertain Exchange Rates," with Michael M. Walsh in the <u>Research in International Business and Finance</u>, R.G. Hawkins, R.M. Levich, Clas G. Wihlborg, eds., (Greenwich: JAI Press Inc.) Vol. 3, 1983, 39-54.

"Regulation, the Capital Asset Pricing Model, and The Arbitrage Pricing Theory," with Richard Roll, <u>Public Utilities Fortnightly</u> 3, No. 11, May 1983, 22-28.

"Portfolio Turnpike Theorems, Risk Aversion, and Regularly Varying Utility Functions," with Gur Huberman, <u>Econometrica</u> 51, No. 5, September 1983, 1345-1361.

"The Arbitrage Pricing Theory Approach to Strategic Portfolio Planning," with Richard Roll <u>Financial Analysts Journal</u>, May/June 1984, 14-26. Reprinted in the <u>Financial Analyst's Handbook</u>, (Dow Jones-Irwin), 1987, reprinted in <u>Readings in Investments</u>, 1994, 25-38, reprinted in <u>International</u> <u>Securities,</u> ed. Philippatos, G..

"A Critical Reexamination of the Empirical Evidence on the Arbitrage Pricing Theory: A Reply," <u>Journal of Finance</u> 39, No. 2, June 1984, 347-350.

"Reply to Dhrymes: APT Is Empirically Relevant," <u>The Journal of Portfolio Management</u> 11, No. 1, Fall 1984, 54-56.

"Measuring Investment Performance in a Rational Expectations Equilibrium Model," with Anat R. Admati, Journal of Business 58, No. 1, January 1985, 1-26.

"An Intertemporal General Equilibrium Model of Asset Prices," with John C. Cox and Jonathan E. Ingersoll, Jr., Econometrica 53, No. 2, March 1985, 363-384, reprinted in Continuous Time Finance, ed. S. Schaefer.

"A Theory of the Term Structure of Interest Rates," with John C. Cox and Jonathan E. Ingersoll, Jr., Econometrica 53, No. 2, March 1985, 385-407, reprinted in Theory of Valuation, Rowman & Littlefield Publishers, Inc., 1989, 129-151, and Continuous Time Finance, ed. S. Schaefer, and The International Library of Critical Writings in Economics, ed., L. Gallagher and M. Taylor, Edward Elgar Publishers, 2001.

"Differential Information and Performance Measurement Using a Security Market Line," with Philip H. Dybvig. Journal of Finance 40, No. 2, June 1985, 383-399.

"The Analytics of Performance Measurement Using a Security Market Line," with Philip V. Dybvig, Journal of Finance 40, No. 2, June 1985, 401-416.

"Debt and Taxes and Uncertainty," Journal of Finance, 40, No. 3, July 1985, 637-657.

"Yes, The APT is Testable," with Philip H. Dybvig, Journal of Finance 40, September, 1985, 1173-1167.

"Market Power in a Securities Market with Endogenous Information," with Mark Grinblatt, The Quarterly Journal of Economics, No. 403, November 1985, 1143-1167.

"Tax Clienteles and Asset Pricing," with Philip H. Dybvig, Journal of Finance 41, No. 3, July 1986, 751-763.

"On Timing and Selectivity," with Anat R. Admati, Sudipto Bhattacharya and Paul Pfleiderer, Journal of Finance 41, No. 3, July 1986, 715-730.

"Economic Forces and the Stock Market:  Testing the APT and Alternative Asset Pricing Theories," with Nai-fu Chen and Richard Roll, Journal of Business 59, No. 3, July 1986, 383-403. Reprinted in Asset Pricing Theory and Tests, ed. Robert Grauer, Edward Elgar Publishing, Ltd. 2002.

"Arbitrage and Martingales with Taxation," Journal of Political Economy 95, No. 2, April 1987, 371-393.

"The Interrelations of Finance and Economics:  Theoretical Perspectives," American Economic Review 77, No. 2, May 1987, 29-34.

"Intertemporal Asset Pricing Models: A Discussion," <u>Frontiers in Modern Financial Theory</u>, S. Bhattacharya and G.M. Constantinides, eds., (Totowa, NJ: Littlefield Adams). 1987.

"Finance," in J. Eatwell, M. Milgate and P. Newman, eds., <u>New Palgrave. A Dictionary of Economics</u>, (London: The MacMillan Press, Ltd.), 1987, 1.

"Arbitrage," with Philip H. Dybvig in J. Eatwell M. Milgate and P. Newman, eds., <u>New Palgrave, A Dictionary of Economics</u>, (London: The MacMillan Press, Ltd.). 1, 1987, 100-106.

"Stock and Bond Market Volatility and Real Estate's Allocation," with Randall C. Zisler, <u>Goldman Sachs Real Estate Research Publication</u>, November 16, 1987.

"Managing Real Estate Portfolios" with Paul B. Firstenberg and Randall C. Zisler, <u>Goldman Sachs Real Estate Research Publication</u>, November 16, 1987.

"Managing Real Estate Portfolios. Part 2: Risk and Return in Real Estate," with Randall C. Zisler, <u>Goldman Sachs Real Estate Research Publication</u>, November 16, 1987.

"Real Estate: The Whole Story," with Paul M. Firstenberg and Randall C. Zisler, <u>The Journal of Portfolio Management</u>, Spring 1988, 22-34.

Comment on Robert C. Merton's "On the Application of the Continuous-Time Theory of Financial to Financial Intermediation and Insurance". Discussion at the Second International Conference in Finance of the Centre HEC-ISA, Paris, June 1988.

"Comment on the Modigliani-Miller Propositions," <u>Journal of Economic Perspectives</u> 2, No. 4, Fall 1988, 127-133.

"Information and Volatility: The No-Arbitrage-Martingale Approach to Timing and Resolution Irrelevancy," <u>The Journal of Finance</u> 44, No. 1, March 1989, 1-17.

"A Test of the Efficiency of a Given Portfolio," with Michael R. Gibbons and Jay Shanken, <u>Econometrica</u>, Basil Blackwell Publishers, Volume 57, No. 5, September, 1989, reprinted in Asset Pricing Tests, ed. Robert Grauer, Financial Economics, ed. Andy Lo.

"Discussion: Intertemporal Asset Pricing," in, Bhattacharya, Constantinides, eds., <u>Theory of Valuation</u>, Rowman & Littlefield Publishers, Inc., 1989, 85-96.

"Institutional Markets, Financial Marketing and Financial Innovation," American Finance Association Annual Meeting, Presidential Address, New York, <u>The Journal of Finance</u>, 44, No. 3, July 1989.

Comment on "Using Tax Policy to Curb Speculative Short-Term Trading, prepared for the Conference on Regulatory Reform of Stock and Futures Markets, Columbia University, New York, May 1989, Journal of Financial Services Research, No. 3, Kluwer Academic Publishers, 1989.

"Spanning, Valuation and Options," with Donald J. Brown, Economic Theory, Vol. 1, No. 1, January 1991.

"Waiting to Invest: Investment and Uncertainty," with Jonathan Ingersoll, The Journal of Business, Vol. 65, No. 1. January 1992.

"Survivorship Bias in Performance Studies", with Stephen J. Brown, William Goetzmann, Roger G. Ibbotson and Stephen A. Ross, Review of Financial Studies, Vol. 5, No. 4, 1992, 553-580.

"Is Beta Useful?". The CAPM Controversy: Policy and Strategy Implications for Investment Management. October 15, 1993, published by the Association for Investment Management and Research, Charlottesville, VA.

"Topics in Finance", by S.A. Ross, 6th Symposium on Money, Finance and Insurance, Universitat Karlsruhe, December 1993.

"A Practitioner's Guide to Arbitrage Pricing Theory" with Edwin Burmeister and Richard Roll, in "A Practitioner's Guide to Factor Models, March 1994.

"On the Cross-Sectional Relation Between Expected Returns and Betas ", with Richard Roll, The Journal of Finance, Vol. 49, No. 1, March 1994.

"Survival " with Stephen J. Brown, William N. Goetzmann, The Journal of Finance, Vol. 1, No. 3. July 1995.

"Capital Structure and the Cost of Capital ", Stephen A. Ross, Yale Working Paper, August 1995.

"Uses and Abuses of Net-Present Value Analysis ", Journal of Financial Management, Vol. 24, No. 3, Autumn 1995, pgs. 96-102.

"Long Forward and Zero-Coupon Rates Can Never Fall ", by Jonathan Ingersoll, Phillip H. Dyvbig and Stephen A. Ross. The Journal of Business,  January 1996.

"Rejoinder: The J-Shape of  Performance Persistence Given Survivorship Bias ", with Stephen Brown, William Goetzmann, and Roger Ibbotson, The Review of Economics and Statistics, May, 1997.

"Hedging Long Run Commitments: Exercises in Incomplete Market Pricing," <u>Economic Notes</u>, no.2, 1997, 385-420, reprinted in Corporate Hedging in Theory and Practice, Lessons from Metallgesellschaft, ed. Christopher L. Culp and Merton H. Miller, RISK Books, London, 1999.

"The Mathematics of Finance: Pricing Derivatives,"<u>Quarterly of Applied Mathematics</u>, vol. LVI, no. 4, December, 1998, pp. 695-706.

"Adding Risks: Samuelson's Fallacy of Large Numbers Revisited", <u>Journal of Financial and Quantitative Analysis</u>, vol. 34, no.3, September, 1999, reprinted in <u>Behavioral Finance</u>, ed. Harold M. Shefrin, Edward Elgar Publishing, UK

"How Proper are Proper Utility Functions?" unpublished manuscript, October, 1998.

"The Absence of Arbitrage: Some New Results," with Gyutaeg Oh and Jay Shanken, unpublished manuscript, January 1998.

Comment on "Financial Engineering and Social Security Reform," by Zvi Bodie, NBER Conference on Risk Aspects of Investment Based Social Security Reform, eds., Campbell, John Y., and Feldstein, Martin, University of Chicago Press, 2001.1999

"Forensic Finance," Risk Magazine, 1999.

"Rebels, Conformists, Contrarians and Momentum Traders," with Evan Gatev, Working paper, February, 2000.

"Financial Regulation in the New Millennium," <u>The Geneva Papers on Risk and Insurance</u>, Vol. 26, No.1, January 2001, p. 1-9.

"Neoclassical Finance, Alternative Finance and the Closed End Fund Puzzle," Keynote Address, <u>European Financial Management</u>, Vol. 8, No. 2, 2002, 129-138.

"Forensic Finance: Enron and Others," Fourth Angelo Costa Lecture, <u>Rivista Di Politica Economica,</u> Vol. 92, No. 11-12, 2002, 9-27.

"High-Water Marks and Hedge Fund Management Contracts", with William Goetzmann and Jonathan Ingersoll, Jr., <u>Journal of Finance</u>, vol. 58, no. 4, August 2003, pp. 1685-1717.

"Compensation, Incentives, and the Duality of Risk Aversion and Riskiness," <u>Journal of Finance,</u> <u>Vol. 59, 1, 2004. Nominated for the Journal of Finance 2004 Brattle Prize</u>

"Review of *The New Financial Order* by Robert J. Shiller," <u>Journal of Economic Literature</u>, Vol. XLII (December 2004), 1098-1101.

"Markets for Agents: Fund Management," The Legacy of Fischer Black, ed. by Bruce N. Lehman, Oxford University Press, 2005.

"Capital Structure and the Cost of Capital," Journal of Applied Finance, Spring/Summer 2005, p. 7-25.

"The Price Impact and Survival of Irrational Traders, with Leonid Kogan, Andrew Lo, and JIang Wang, Journal of Finance ,Vol. 61, No.1, February 2006, p. 195-229. Winner of the 2004 FAME Prize, winner of 2006 Smith-Breeden Prize for Best Paper in the Journal of Finance.

"Dividend Irrelevance and Siamese Twins," working paper, revised 2006.

Books:

"Corporate Finance", with Randolph W. Westerfield and Jeffrey F. Jaffe, 8th ed., Irwin McGraw-Hill, 2006.

"Fundamentals of Corporate Finance," with Randolph W. Westerfield and Bradford D. Jordan, 7th ed., Irwin McGraw-Hill, 2006.

"Essentials of Corporate Finance," with Randolph W. Westerfield and Bradford D. Jordan, 6th ed., Irwin McGraw-Hill, 2006

"The Debt Market," Elgar Publishing, August 2000.

"Neoclassical Finance," Princeton University Press, Princeton, NJ, 2005

## Exhibit B

In the past four years I have not testified in any cases as an expert at trial or in deposition.

Exhibit C

The following is a list of the materials I have relied upon in rendering my opinion:


Chronology of Events

London Arbitration Court Decision 27 Feb 2002

Czech Business Weekly October 11-17, 2004 LAST WORD article,

(p. 30)

Settlement Agreement Trend-FEL

Share Purchase Agreement 20041220

Share Purchase Agreement II 20050304

Amendment 1 to Share Purchase Agreement 20050214

Trades with SU

Draft Share Purchase Agreement

SDOC7828 (the "letter")

Kotva trading volume Bloomberg

# CHRONOLOGY OF EVENTS
*All USD prices are at exchange rate as of July 28 2006*

4 August 1995 – Persons with links to Kralovehradecka brokerska, a.s. ("KHB") bought the management contract of Trend VIF ("Trend") for CZK 318 million (USD 14.25 million) (annual gross revenue from management contract was CZK 20 million (USD 896,000)). At the same time, they assumed control of Trend—a private Czech investment fund established in the CR as a result of a statute enacted to encourage such funds to allow Czech citizens and others to invest in Czech owned businesses.

November 1995 – November 1996 – Czech Value Fund ("CVF" – predecessor of Brookdale Global Opportunity Fund ("BGO")) purchased through a subsidiary (CVF Investments Ltd.) over 1 million shares of Trend (about 40% of Trend) at an average price of approximately CZK 45 (USD 2) per share.

1995-1996 – KHB in collusion with Forminster used its management of Trend and Mercia embezzled significantly more than CZK 1 billion (USD 44.8 million) by a series of related party transactions.

**Table 1. Transactions with shares of Kotva, a.s. on 28 May 1996**

| Time | Seller | Buyer | Quantity | Price | Total Amount |
|------|--------|-------|----------|-------|--------------|
| 7:58:23 | Trend | KHB | 152,935 | 400 | CZK 61,174,000 USD 2,741,999 |
| 8:01:22 | KHB | Mercia | 152,000 | 952 | CZK 144,704,000 USD 6,486,060 |
| 8:03:03 | Mercia | IFM | 82,000 | 400 | CZK 32,800,000 USD 1,470,193 |
| 8:44:22 | Mercia | KHB | 138,406 | 400 | CZK 55,362,400 USD 2,481,506 |
| 8:46:53 | KHB | Trend | 139,000 | 952 | CZK 132,328,000 USD 5,931,331 |
| 8:48:30 | Trend | IFM | 139,000 | 400 | CZK 55,600,000 USD 2,492,156 |

By these related party transactions, KHB acquired approximately 56% of shares in Kotva, the largest department store in Prague and the owner of the land and buildings in which the store operated.

31 October 1996 – As a result of KHB's poor management and shenanigans, Trend was placed in forced administration – a type of government receivership. It had lost more than CZK 1 billion (USD 44.82 million). The NAV of Trend was CZK 40.5 million (USD 1.82 million).

30 January, 1997 KHB sold 384,971 shares of KOTVA a.s. (55.45%) to Forminster Enterprises Limited ("Forminster") for CZK 215 (USD 9.63)/share or CZK 82,768,765

(USD 3,709,940). The transactions were not arm's length purchases and sales, and KHB went bankrupt shortly after those trades were completed.

**Table 2. Transactions with shares of Kotva, a.s. in January 1997**

| Date | Seller | Buyer | Quantity | % of Kotva | Price | Total Amount |
|------|--------|-------|----------|------------|-------|--------------|
| 24-Jan-97 | IFM | KHB | 30,000 | 4.32% | 490 | CZK 14,700,000 USD 658,897.4 |
| 28-Jan-97 | MAREŠ | KHB | 20,487 | 2.95% | 650 | CZK 13,316,550 USD 596,887 |
| 28-Jan-97 | MAREŠ | KHB | 75,000 | 10.80% | 525 | CZK 39,375,000 USD 1,764,904 |
| 28-Jan-97 | MAREŠ | KHB | 237,190 | 34.17% | 538 | CZK127,608,220 USD 5,719,777 |
| 30-Jan-97 | KHB | Forminster | 384,971 | 55.45% | 215 | CZK 82,768,765 USD 3,709,940 |

12 May 1997 – The Public Prosecutor issued an injunction and froze all the Kotva shares in Forminster's custody account with Czech Securities Center.

September 1997 – CVF (predecessor of BGO) purchased through its subsidiary CVF Investments Ltd. 80,708 shares of Kotva (about 11%) at CZK 1,000 per share.

06 April 1998 – Czech News Agency *CTK* informed that the High Court in Prague suspended Forminster's voting rights in Kotva. *[Also published in Mlada fronta Dnes daily]*

21 December 1999 – An agreement was signed whereby Trend dropped its claim against Forminster in return for CZK 350 million (USD 15.70 million). Only CZK 5 million (USD 224,215) was paid up front, and the rest was never paid. Less than a month later, a Czech court declared bankruptcy over the assets of Trend due to fictional liabilities towards persons connected to former management of Trend (Mr. Hálek & Co.). These claims were rejected by the bankruptcy trustee and court dismissed petitions that attempted to uphold them.

November 2001 – Kotva, under the control of Forminster, set up a subsidiary called Kotva Nemovitosti.

27 February 2002 –A U.K. arbitration panel ruled in an arbitration dispute that in all probability (80%) a Czech court will eventually rule that at least 32% of the Kotva shares in the hands of Forminster actually belong to Trend and will order that the shares be returned to Trend. The Tribunal also stated that the stock market price of Kotva (which was around CZK 500 (USD 22.42) at that time) was "irrelevant and should be disregarded". The Tribunal estimated the value of Kotva shares to be CZK 1,950 (USD 87.44) per share.

20 June 2002 - Kotva transfered its only asset, Kotva Department Store, to its subsidiary Kotva Nemovitosti a.s. This decision of Kotva's General Meeting was immediately disputed in a petition filed by BGO and Vladimir Hoffmann on 20 September 2002.

28 November 2003 – Vladimir Hoffmann wrote in an e-mail to David Johnson and Andrew Weiss: "Harazim called me today and told me that they will make the firm bid for our Kotva shares on Monday. They will fax it to you and deliver the original to me. The price will be USD 1 million and it will be valid for one week until Monday, Dec 8th."

2 December 2003 – J&T Securities made from "an unidentified client" to purchase 82,782 shares of Kotva for USD 1 million. This was rejected by Mr. Weiss.

3 February 2004 - KOTVA NEMOVITOSTI. acquired 100% of the shares of SPV KN a.s. (then referred to as UNI LIGHTING a.s.).

27 February 2004 – Kotva Nemovitosti transferred the Kotva Department Store by way of a non-monetary contribution to SPV KN in return for bearer shares in SPV KN. In my opinion this was probably done to circumvent the 1997 injunction of the public prosecutor of May 12, 1997.

27 May 2004 – A Cyprus-based company SPV CO LIMITED was established by KOTVA NEMOVITOST. SPV issued bearer shares, so further tracking of ownership became impossible.

30 June 2004 – A petition was filed by Ondrej Peterka (a lawyer working for BGO and its subsidiary CVF Investments Ltd.) to declare that Kotva, a.s. to be the true owner of the Kotva Department Store and to declare the transfers of Kotva Department Store invalid.

6 August 2004 – Mr. Hoffmann was approached by Messrs. Benda and Harazim, the directors of Forminster, who offered to purchase BGO's shares in Kotva for CZK 75 million (USD 3.36 million). Mr. Benda and Mr. Harazim now claim that the offer was not "real", but was part of an operation to try to entrap Mr. Weiss and Mr. Hoffman.

17 August 2004 – Andrew Weiss, thinking the offer to be in good faith, responded with a counteroffer to sell the 82,781 shares of Kotva for CZK 131 million (USD 5.87 million).

27 August 2004 – Richard Harazim responded that the offer must be conditioned on dropping all the lawsuits, including the lawsuits contesting the thievery of the assets from Trend.

1 October 2004 – BGO lawyers received a written statement from the attorneys of Kotva, a.s., asserting that Forminster is no longer in control of the 384,971 shares in Kotva and that the shares had been transferred to SPRINT, a bankrupt company, although a Czech Court had enjoined Forminster from disposing of its shares in Kotva.

15 October 2004 – A petition was filed by Ondrej Peterka (BGO's lawyer) for the withdrawal of 384,971 shares in Kotva held by Forminster from the bankrupt assets of SPRINT, a.s., and asked for a declaration that Trend, instead of Forminster, is the real and true owner of 212,935 shares in Kotva.

23 November 2004 – Andrew Weiss sent a counteroffer to Martin Benda and Richard Harazim, the BGO's shares in Kotva and its shares in Trend (as the rightful owner of shares of Kotva). The total asking price for the 39.73% of Trend and 11.92% of Kotva was CZK 295.75 million (USD 13.25 million).

20 December 2004 – SPV and KOTVA NEMOVITOSTI, k.s., KOTVA a.s. and KOTVA OBCHODNÍ, a.s. entered into an Agreement to sell their shares in the company SPV KN—100% owner  for CZK to Markland Holdings, an Irish company, for 1.5 billion (USD 67.2 million).

March 2005 – Transfer of SPV KN bearer shares from SPV CO LIMITED to still another company formed by Forminster/Kotva, CRQ Czech a.s., was finalized. Markland and the sellers agreed to put one-third of the contract price in escrow until the lawsuits in regards to the Kotva Department Store are settled. At present the amount in escrow is approximately $24 million.

April 2006 – SPV CO issued its annual reports for 2004 and 2005. Its business activity is described as an investment company but it does not report having any income from investments.

26 May 2006 – Aidan Scully, the CEO of Markland Holdings Limited testified that 1) Kotva Department Store building was valued around April 2006 and the value was "assuming clear and clean title, is in the order of 80,000,000" Euros.

27 February 2007 – Sean Mulryan, a 50% shareholder of Markland, and one of the richest and most sophisticated real estate investors in Ireland, with several holdings in the Czech Republic, testified that the market price of the stock is often not important in valuing a company in the CR and that there is not necessarily a direct relationship between the market price of a company's stock in the CR and the value of the company. He testified that the purchase price was reasonable, maybe a little on the high side. The tax benefits are unknown, as is the question of the amount of Kotva debt assumed by Markland.