UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s. and SPV Co, )<br><br>Plaintiffs, )<br><br>v. )<br><br>ANDREW WEISS and WEISS ASSET )<br>MANAGEMENT, LLC, )<br><br>Defendants. )<br>)<br>)<br>ANDREW WEISS, WEISS ASSET )<br>MANAGEMENT LLC and CVF )<br>INVESTMENTS, LTD., )<br><br>Counterclaim-plaintiffs, )<br><br>v. )<br><br>KOTVA a.s., RICHARD HARAZIM,  SPV )<br>CO and JOHN DOES 1–5, )<br><br>Counterclaim-defendants. )<br>) | C.A. No. 05-10679-WGY |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
## MOTION TO INCLUDE EXPERT WITNESS CONCERNING VALUATION AND LOSS
## OF BUSINESS

Defendants Andrew Weiss and Weiss Asset Management LLC request permission from

the Court to include Stephen Ross, Ph.D, as an expert witness on two issues: whether the prices

Andrew Weiss requested for CVF's Kotva and Trend shares at issue were reasonable and what

effect charges lodged by the plaintiff have had on Defendants' ability to obtain new investment

in their funds.  The first question goes to the heart of the allegations plaintiff has made against

the defendants; the second goes to the heart of the Defendants' counterclaims.

Rule 26(a)(2)(C) provides that expert disclosures are due ninety days before trial. That Rule also provides discretion in the Court to alter the scheduling of expert discovery. In this case, the Court has endorsed the parties' plan to identify experts on June 22—more than 90 days from the trial date—and for expert rebuttal to be provided on August 10, 2007.

Ordinarily, there would be no need for a motion to include an expert in the June 22 exchange of reports. However, this Court previously denied defendants' motion to include Professor Ross as an expert witness in March: the motion denied sought to add Professor Ross late, in light of the April trial date. As both parties recalled in their separate submissions concerning the recent scheduling order, the Court declined to rule at the April status conference that Professor Ross could be included without presentation of a proper motion. By this, the parties understood that a motion was needed even though subsequent to the conference a new expert disclosure date was set in the Scheduling Order.

The plaintiffs no longer have any argument that they are prejudiced by inclusion of Professor Ross as an expert. They have been in possession of his report and full Rule 26 disclosures since March 13. Further, there can be no serious argument that valuation and loss of business cannot be areas of expert testimony in this case. The parties have conferred pursuant to Local Rule 7, but defendants have been unable to obtain plaintiffs' assent as of the filing of this motion. While plaintiffs have not said no, it is necessary to file this motion now, to allow sufficient time to obtain a Court ruling before the June 22 deadline for expert disclosures.

In determining whether to allow the motion, defendants ask the Court to recognize that the plaintiffs have plenty of time to choose experts on valuation and loss of business either to serve as primary experts or in rebuttal. Further, there can be no dispute whether Professor Ross is qualified to testify in the areas covered by his report. See Exhibits 1 and 2 to defendants' motion

to include Professor Ross as an expert on valuation and loss of business. Professor Ross is a chaired Professor of Financial Economics at the Sloan School of Management of the Massachusetts Institute of Technology and also has a wealth of practical experience with real estate and investment transactions here and abroad.

Finally, defendants ask the Court to recognize the importance of these areas to the jury's consideration of this case. Plaintiffs claim that this case arose because defendants were demanding an allegedly extortionate price for their interests in Kotva—basing their claim that the price demanded was unreasonably high because it exceeded the share price for certain trades of as few as two shares of Kotva stock on the stock market in Prague over an extended period of time. Defendants need to show the jury that the Kotva stock was so thinly traded that the few shares publicly traded are irrelevant and that proper valuation methods require that the assets' underlying value, the size of the block being traded, and other financial considerations be taken into account. Defendants claim, for instance, that the sale of Kotva's assets to an Irish property company in the relevant time period at a value quite consistent with their valuation is important. The plaintiffs disagree. A review of the Chronology of Events relied upon by Professor Ross demonstrates just how daunting the task of understanding the relevant transactions is and how complex the valuation question is in this case. Exhibit A to this memorandum. Also please see the representative pages from the rough draft of the second day of Howard Golden's recent deposition attached as Exhibit B hereto, which demonstrate that, though they protest otherwise, plaintiffs recognize that their simplistic view of valuation is problematic. While it is true that Professor Weiss is one of the world's experts in share valuation, it is inappropriate to limit his defense to only his own words. An independent expert will assuredly assist the trier of fact.

The same is true as to the defendants' loss of business. While it is possible to present a loss of business damages case by showing the jury forms which the defendants must fill out to seek the kind of institutional clients who invest in the type of investment funds the defendants operate and listing clients who have stayed away, the effect of having to disclose the existence of Civil RICO, securities fraud, and other alleged wrongs to potential investors is more subtle and more chilling than what might be understood without independent expert testimony. As such, Professor Ross, quite demonstrably an expert on the subject, should be allowed to testify concerning the defendants' loss of business.

## CONCLUSION

For the foregoing reasons, the Defendants' motion should be allowed.

Respectfully Submitted,

ANDREW WEISS and WEISS ASSET
MANAGEMENT LLC

By their attorneys,


/s/ Edward T. Dangel
Edward T. Dangel, III (BBO#113580)
Dangel & Mattchen, LLP
10 Derne Street
Boston, MA 02114
(617) 557-4800


Edward P. Leibensperger (BBO# 292620)
Benjamin A. Goldberger (BBO# 654357)
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts  02109-1775
(617) 535-4000

Dated: May 14, 2007

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 14, 2007.

/s/ Edward T. Dangel
Edward T. Dangel, IIII

BST99 1540843-2.072198.0012

# CHRONOLOGY OF EVENTS
*All USD prices are at exchange rate as of July 28 2006*

4 August 1995 – Persons with links to Kralovehradecka brokerska, a.s. ("KHB") bought the management contract of Trend VIF ("Trend") for CZK 318 million (USD 14.25 million) (annual gross revenue from management contract was CZK 20 million (USD 896,000)). At the same time, they assumed control of Trend—a private Czech investment fund established in the CR as a result of a statute enacted to encourage such funds to allow Czech citizens and others to invest in Czech owned businesses.

November 1995 – November 1996 – Czech Value Fund ("CVF" – predecessor of Brookdale Global Opportunity Fund ("BGO")) purchased through a subsidiary (CVF Investments Ltd.) over 1 million shares of Trend (about 40% of Trend) at an average price of approximately CZK 45 (USD 2) per share

1995-1996 – KHB in collusion with Forminster used its management of Trend and Mercia embezzled significantly more than CZK 1 billion (USD 44.8 million) by a series of related party transactions.

Table 1. Transactions with shares of Kotva, a.s. on 28 May 1996

| Time | Seller | Buyer | Quantity | Price | Total Amount |
|---|---|---|---|---|---|
| 7:58:23 | Trend | KHB | 152,935 | 400 | CZK 61,174,000 USD 2,741,999 |
| 8:01:22 | KHB | Mercia | 152,000 | 952 | CZK 144,704,000 USD 6,486,060 |
| 8:03:03 | Mercia | IFM | 82,000 | 400 | CZK 32,800,000 USD 1,470,193 |
| 8:44:22 | Mercia | KHB | 138,406 | 400 | CZK 55,362,400 USD 2,481,506 |
| 8:46:53 | KHB | Trend | 139,000 | 952 | CZK 132,328,000 USD 5,931,331 |
| 8:48:30 | Trend | IFM | 139,000 | 400 | CZK 55,600,000 USD 2,492,156 |

By these related party transactions, KHB acquired approximately 56% of shares in Kotva, the largest department store in Prague and the owner of the land and buildings in which the store operated.

31 October 1996 – As a result of KHB's poor management and shenanigans, Trend was placed in forced administration – a type of government receivership. It had lost more than CZK 1 billion (USD 44.82 million). The NAV of Trend was CZK 40.5 million (USD 1.82 million)

30 January, 1997 KHB sold 384,971 shares of KOTVA a.s. (55.45%) to Forminster Enterprises Limited ("Forminster") for CZK 215 (USD 9.63)/share or CZK 82,768,765

(USD 3,709,940). The transactions were not arm's length purchases and sales, and KHB went bankrupt shortly after those trades were completed.

**Table 2. Transactions with shares of Kotva, a.s. in January 1997**

| Date | Seller | Buyer | Quantity | % of Kotva | Price | Total Amount |
|------|--------|-------|----------|------------|-------|--------------|
| 24-Jan-97 | IFM | KHB | 30,000 | 4.32% | 490 | CZK 14,700,000 USD 658,897.4 |
| 28-Jan-97 | MAREŠ | KHB | 20,487 | 2.95% | 650 | CZK 13,316,550 USD 596,887 |
| 28-Jan-97 | MAREŠ | KHB | 75,000 | 10.80% | 525 | CZK 39,375,000 USD 1,764,904 |
| 28-Jan-97 | MAREŠ | KHB | 237,190 | 34.17% | 538 | CZK127,608,220 USD 5,719,777 |
| 30-Jan-97 | KHB | Forminster | 384,971 | 55.45% | 215 | CZK 82,768,765 USD 3,709,940 |

12 May 1997 – The Public Prosecutor issued an injunction and froze all the Kotva shares in Forminster's custody account with Czech Securities Center.

September 1997 – CVF (predecessor of BGO) purchased through its subsidiary CVF Investments Ltd. 80,708 shares of Kotva (about 11%) at CZK 1,000 per share.

06 April 1998 – Czech News Agency *CTK* informed that the High Court in Prague suspended Forminster's voting rights in Kotva *[Also published in Mlada fronta Dnes daily]*

21 December 1999 – An agreement was signed whereby Trend dropped its claim against Forminster in return for CZK 350 million (USD 15.70 million). Only CZK 5 million (USD 224,215) was paid up front, and the rest was never paid. Less than a month later, a Czech court declared bankruptcy over the assets of Trend due to fictional liabilities towards persons connected to former management of Trend (Mr. Hálek & Co.). These claims were rejected by the bankruptcy trustee and court dismissed petitions that attempted to uphold them.

November 2001 – Kotva, under the control of Forminster, set up a subsidiary called Kotva Nemovitosti.

27 February 2002 –A U.K. arbitration panel ruled in an arbitration dispute that in all probability (80%) a Czech court will eventually rule that at least 32% of the Kotva shares in the hands of Forminster actually belong to Trend and will order that the shares be returned to Trend. The Tribunal also stated that the stock market price of Kotva (which was around CZK 500 (USD 22.42) at that time) was "irrelevant and should be disregarded". The Tribunal estimated the value of Kotva shares to be CZK 1,950 (USD 87.44) per share.

20 June 2002 - Kotva transfered its only asset, Kotva Department Store, to its subsidiary Kotva Nemovitosti a.s. This decision of Kotva's General Meeting was immediately disputed in a petition filed by BGO and Vladimir Hoffmann on 20 September 2002.

28 November 2003 – Vladimir Hoffmann wrote in an e-mail to David Johnson and Andrew Weiss: "Harazim called me today and told me that they will make the firm bid for our Kotva shares on Monday. They will fax it to you and deliver the original to me The price will be USD 1 million and it will be valid for one week until Monday, Dec 8th "

2 December 2003 – J&T Securities made from "an unidentified client" to purchase 82,782 shares of Kotva for USD 1 million. This was rejected by Mr. Weiss

3 February 2004 - KOTVA NEMOVITOSTI acquired 100% of the shares of SPV KN a.s. (then referred to as UNI LIGHTING a s ).

27 February 2004 – Kotva Nemovitosti transferred the Kotva Department Store by way of a non-monetary contribution to SPV KN in return for bearer shares in SPV KN In my opinion this was probably done to circumvent the 1997 injunction of the public prosecutor of May 12, 1997

27 May 2004 – A Cyprus-based company SPV CO LIMITED was established by KOTVA NEMOVITOST. SPV issued bearer shares, so further tracking of ownership became impossible

30 June 2004 – A petition was filed by Ondrej Peterka (a lawyer working for BGO and its subsidiary CVF Investments Ltd) to declare that Kotva, a s. to be the true owner of the Kotva Department Store and to declare the transfers of Kotva Department Store invalid

6 August 2004 – Mr Hoffmann was approached by Messrs. Benda and Harazim, the directors of Forminster, who offered to purchase BGO's shares in Kotva for CZK 75 million (USD 3 36 million). Mr. Benda and Mr. Harazim now claim that the offer was not "real", but was part of an operation to try to entrap Mr Weiss and Mr. Hoffman

17 August 2004 – Andrew Weiss, thinking the offer to be in good faith, responded with a counteroffer to sell the 82,781 shares of Kotva for CZK 131 million (USD 5.87 million).

27 August 2004 – Richard Harazim responded that the offer must be conditioned on dropping all the lawsuits, including the lawsuits contesting the thievery of the assets from Trend.

1 October 2004 – BGO lawyers received a written statement from the attorneys of Kotva, a.s., asserting that Forminster is no longer in control of the 384,971 shares in Kotva and that the shares had been transferred to SPRINT, a bankrupt company, although a Czech Court had enjoined Forminster from disposing of its shares in Kotva.

15 October 2004 – A petition was filed by Ondrej Peterka (BGO's lawyer) for the withdrawal of 384,971 shares in Kotva held by Forminster from the bankrupt assets of SPRINT, a.s., and asked for a declaration that Trend, instead of Forminster, is the real and true owner of 212,935 shares in Kotva.

23 November 2004 – Andrew Weiss sent a counteroffer to Martin Benda and Richard Harazim, the BGO's shares in Kotva and its shares in Trend (as the rightful owner of shares of Kotva). The total asking price for the 39.73% of Trend and 11.92% of Kotva was CZK 295.75 million (USD 13.25 million).

20 December 2004 – SPV and KOTVA NEMOVITOSTI, k.s., KOTVA a.s. and KOTVA OBCHODNÍ, a.s. entered into an Agreement to sell their shares in the company SPV KN—100% owner for CZK to Markland Holdings, an Irish company, for 1.5 billion (USD 67.2 million).

March 2005 – Transfer of SPV KN bearer shares from SPV CO LIMITED to still another company formed by Forminster/Kotva, CRQ Czech a.s., was finalized. Markland and the sellers agreed to put one-third of the contract price in escrow until the lawsuits in regards to the Kotva Department Store are settled. At present the amount in escrow is approximately $24 million.

April 2006 – SPV CO issued its annual reports for 2004 and 2005. Its business activity is described as an investment company but it does not report having any income from investments.

26 May 2006 – Aidan Scully, the CEO of Markland Holdings Limited testified that 1) Kotva Department Store building was valued around April 2006 and the value was "assuming clear and clean title, is in the order of 80,000,000" Euros.

27 February 2007 – Sean Mulryan, a 50% shareholder of Markland, and one of the richest and most sophisticated real estate investors in Ireland, with several holdings in the Czech Republic, testified that the market price of the stock is often not important in valuing a company in the CR and that there is not necessarily a direct relationship between the market price of a company's stock in the CR and the value of the company. He testified that the purchase price was reasonable, maybe a little on the high side. The tax benefits are unknown, as is the question of the amount of Kotva debt assumed by Markland.

H Golden 17 April 07.txt

6

1   the swcratchy tape. And when we discussed with me, we

2   were discussing numbers that were below NAV, so I don't

3   recall his him expressing a view that getting less than

4   NAV was blackmail. And there was a discussion or a word

5   and I can still remember from yesterday's discussion on

6   the tape and I still don't remember in Czech about

7   blackmail, I just recall ever hearing that word, and

8   I had difficulty yesterday. But any discussion that

9   would touched upon his concerns was more the attitude

10   that he was getting from the Forminster people who

11   always resisted it, saying: It was too much you are not

12   entitled or.

13        MR BECKMAN:

14   Q. Was it Mr -- well, would you agree that getting

15   more than NAV would be blackmail?

16        MR DANGEL:  Objection.

17   A. You are asking my professional opinion?

18        MR BECKMAN:

19   Q. Yes.

20   A. No. I couldn't say. It depends entirely on the

Page 8

H Golden 17 April 07.txt

21  circumstances, sir, because there was a number of years

22  that this had been hanging out there. I know it was

23  from '98 or so, there is a lot of circumstances behind

24  this particular one. The best way I can explain that to

25  you is when I was doing the takeover of the Czech Value

26  Fund, the old manager Rejen (?) offered more than NAV to

27  some of the shareholders in order to get enough shares

28  so he could vote against me in the shareholders meeting.

29  And when I say me at the time it was the Brookdale group

7

1  who was doing the shareholder takeover at the time. My

2  understanding is the shareholders refused to sell even

3  at above NAV. All right. And in this term the

4  legitimate use of NAV that is the fund. In Vlado's

5  discussion in this tape NAV really means book value or

6  something, not quite. NAV means net asset value it is

7  usually referred to an investment fund. I don't think

8  that either Rejen, which is the manager that I was

9  fighting against, felt he was being blackmailed when

10  I offered more than NAV and I don't think that the

11  shareholders who had been offered it felt it was

Page 9

H Golden 17 April 07.txt

12  blackmail. I could also envision circumstances where it

13  could be considered not blackmail, certainly remail or

14  some type of attempt to get more money, but I can't make

15  a blanket statement that in every circumstances or even

16  in most circumstances asking or receiving more than NAV

17  would be either improper or using the word we are using

18  today, blackmail.

19      MR BECKMAN:

20   Q. When you were doing the takeover the Czech Value

21  Fund the Trend tunneling scandal was already public?

22   A. Yes, sir.

23   Q. Did you discount the value of Trend shares in the

24  Czech Value Fund because of the Trend scandal?

25   A. Well, I am going try and be precise with the

26  answer. We had difficulty -- I was on the board -- in

27  giving a value to the Trend shares. Whether it was

28  discount or premium is a different, I don't know how to

29  answer that question. The real issue is how do you

8

1  value it.

2   Q. That is a better question, I apologies. How did

Page 10

H Golden 17 April 07.txt

3  you value when you now that the Trend tunneling scandal

4  was out?

5        MR DANGEL:  I object and I would like to

6  state for the record that we sought to bring in expert

7  witnesses and it was opposed by the opposing counsel.

8  I assume he will withdrew his opposition based on the

9  fact that he was asking this lay witness brought in for

10  valuation, valuation and valuation methods and

11  valuations techniques.

12        MR BECKMAN:  You are taking up more of my

13  time.

14    Q.  Go ahead and answer Mr Golden.  Go ahead.

15    A.  The scandal wasn't the issue in valuing the

16  shares.  The issue was what assets really were in the

17  Trend fund at that time.  And since the hard asset like

18  the Kotva shares, cash, shares of other companies that

19  it had, were gone from the portfolio and the reality

20  what it had was a claim against the manager who had

21  converted assets or the recipients of those assets.  It

22  is really hard to value a lawsuit or a claim against

23  third parties.  So that it is clear, it wasn't the

24  scandal that was the issue in making it a discount or

Page 11

H Golden 17 April 07.txt

25  a question of valuation, it was trying to determine what

26  actual assets we could value in the fund so that we

27  could give it a net asset value.  Normally, you would

28  discount an overvalued company.  So if a fund owned

29  shares in a company and we felt that the market price

9

1  was too high or was not liquid, you would discount that.

2  We didn't have that issue of discounting.  I hope that

3  answer is clear.

4    Q.  I am going play for you, Mr Golden, another clip

5  of the November 2nd telephone conversation between

6  Mr Nikitin and Mr Hoffmann.

7  ... organise a conference call with Andy, Peterka with

8  myself, we can discuss this so we can discuss how we can

9  present it, what arguments can we give, what basically

10  we are allowed to say so that, you know, it is not

11  blackmail.

12  Did Mr Hoffmann ever discuss with you that he was

13  seeking to organise a conference call with Andrew Weiss

14  and Mr Peterka to discuss how to present the offer so it

15  was not# viewed as blackmail

H Golden 17 April 07.txt

7       MR DANGEL: Do abuse the process, sir.

8       MR BECKMAN:

9    Q. Let's focus on the 2004 time frame. Did, in the

10   2004 time frame did Mr Hoffmann tell you that Forminster

11   had raised the issue of blackmail?

12          MR DANGEL: Objection.

13      A. I don't recall that it was ever raised in the

14   2004 time frame. In that period my activities were

15   pretty much limited to helping, as we heard in these

16   tapes, write the papers or to how to present to Andy

17   that he should accept an offer. No, I think he, he was

18   concentrating -- almost all the discussions were

19   concentrating on Andy's side, trying to get Andy to get

20   the offers and it wasn't on defence or argument used by

21   the Forminster people. That, that was a negotiation

22   that he was doing an I don't think so. No, sir.

23   Q. In the 2004 time frame, did anyone tell you that

24   Forminster had raised the issue of blackmail?

25          MR DANGEL: Objection.

26      A. My recollection of the only time that was raised

27   was in a newspaper article or somewhere I read it,

28   I don't know if it was in 2004, but I recall at some

29   point that there was public discussion where Forminster,

Page 14

H Golden 17 April 07.txt

11

1  that is my recollection at this time that somebody said:

2  Oh, this is really blackmail, something of that nature,

3  it is the defence.  But nobody that I can recall told

4  me, told me, if that is the question, that hey, this is

5  blackmail.

6     Q.  In 2004 time frame did anyone from Markland?

7     A.  What is the name of the company?

8     Q.  Markland?

9     A.  That is the Irish?

10    Q.  I am sorry, let's use the Irish.  Let me withdrew

11  that.  In the 2004 time frame did anyone representing

12  the Irish raise with you the issue of blackmail?

13    A.  My recollection is I only had one chance

14  encounter with anyone from that organisation, that was

15  at the airport that we discussed yesterday, and the

16  discussion centered as to whether or not he would get

17  legal title and I think the only response was that he

18  had letter saying that he could go ahead with it, his

19  law firm were examining this and said he could go ahead

20  with this sale.  I can't remember the entire

Page 15

H Golden 17 April 07.txt

21  conversation but I think if he had used the word

22  blackmail I would properly remember it. So I would have

23  to say no to that question.

24     Q. What is the basis for your testimony that

25  Vladimir Hoffmann was -- when discussing blackmail, was

26  raising an argument that either Forminster or the Irish

27  had raised the issue of blackmail?

28        MR DANGEL: Objection.

29     A. My basis would be that I had encountered that in

12

1  my discussions. I may have repeated it there because

2  when I was trying to negotiate the sale years earlier

3  they were saying, I seem to recall, this is blackmail or

4  remail, I don't know what term they used. I didn't

5  think that things had changed there. I think the other

6  basis with the conversation I heard yesterday was where

7  he said: How do I present it to the Irish without it

8  appearing to be, or without it being and he used that

9  word in Czech, Yydirani I think it was, which I still

10  contend I didn't hear in the phone conversation and

11  I didn't hear it the first time yesterday. So that from

Page 16

H Golden 17 April 07.txt

7  know why Andrew Weiss and Mr Hoffmann terminated the

8  contract for the success fee in the negotiation for the

9  sale of the shares?

10      MR DANGEL:  Object to the form.

11   A.  My recollection from the discussion with

12  Mr Hoffmann was that Mr Weiss felt that he could move

13  forward and do the discussions himself and didn't need

14  further assistance from Mr Hoffmann.  But I never spoke

15  to Andy about that.  I have no personal knowledge of

16  what have Andy told to Mr Hoffmann and again I think the

17  contract of this particular date or period of time and

18  I think it just wasn't renewed and that is my best

19  recollection today.  And the reason that I understood

20  was that Mr Weiss was going to continue himself.

21   Q.  Yesterday we talked about the Kazakhstan

22  investment fund in the cement plant.  Did Andrew Weiss

23  value the cement plant based on the net asset value

24  calculation?

25   A.  No, sir.

26   Q.  How did the value the cement plant?

27   A.  I think we went into that.  He did an analysis.

28  I am pretty sure he had someone in his office.  I recall

29  a statement that I've a report and it is unlikely that

Page 21

H Golden 17 April 07 txt

16

1   Mr Weiss actually went through the economic reports, but

2   he did a report as to the potential growth of

3   Kazakhstan, the growth in neighbouring countries where

4   they could export cement to, the valuation of cement

5   plants in other, nearby other countries across the

6   region, the likelihood of the need fore cement in the

7   area and the fact that it was located near the new

8   capital Kazakhstan, the President came from a town in

9   the north and they were building that town to be the new

10  capital instead of all MA tee ## and those were all

11  economic factors. The NAV of the plant in this case, it

12  was an irrelevancy because it had to do with the

13  factory, how much it would cost to replace the factory.

14  There was an issue because replacement value was very

15  high because the -- shall I continue. You want to talk?

16  Okay. The replacement# value, which would be NAV, was

17  very high. But my recollection of what he based the

18  value of this was the potential for the profit for the

19  cement plant based on all these economic factors.

20      Q. Now here one of his entities was a majority

Page 22

H Golden 17 April 07.txt

21  always commanded a premium.  This was the whole this was

22  part of the method of tunneling a company and

23  transferring value.  If you want me to explain it,

24  I will go into it, but.

25      MR DANGEL:  I will ask you questions.

26    A.  This is why people would always sell, that was

27  one of issue in RIF, that they owned shares of numerous

28  companies and they are blocks.  So a block of shares,

29  sir, would be worth more in an illiquid company.

62

1   Q.  Yes.  May I ask a question?

2       MR BECKMAN:  Please don't cut the witness

3  off from his answer.

4       MR DANGEL:

5   Q.  You mentioned something called a premium?

6    A.  Yes, sir.

7   Q.  Okay.  And I think you indicated that a block of

8  shares like this in this type of situation would sell at

9  a premium?

10   A.  Yes, sir.

11   Q.  What did you mean by that?

H Golden 17 April 07.txt

12   A.  What I meant was there were, in a normal liquid

13  company, I mean in the United States, but in a normal

14  liquid company there is a market price for shares

15  because you have willing buyer, willing sellers in

16  a stock exchange that was functional and the shares were

17  available.  Under those circumstances where there were

18  small quantities being sold and the price was ten on the

19  market, a buyer who could obtain a large block of those

20  shares would be willing to pay a premium to the market

21  price of those shares because of the fact that there

22  were a number of shares in a block being sold at the

23  time.

24   Q.  Now, you said a buyer would be willing to pay.

25  The buyer you were assuming was a fair market buyer, not

26  a buyer who had, let's say, the government and

27  everything else in his hip pocket, right?

28      MR BECKMAN:  Objection.

29   A.  What I was referring to was a normal buyer that

63

1  would pay the premium for a block of shares in a normal

2  situation.  When I discussed a minute ago why I felt the

Page 87

H Golden 17 April 07.txt

3  price was not a reasonable price offered by Forminster,

4  clearly one of the factors was that the market price did

5  not properly reflect the value of the shares. So, in

6  any event, if there was a market price, we would be

7  entitled to a premium, that is why.

8      MR DANGEL:

9   Q. Go ahead?

10   A. And secondly that the value to this particular

11  buyer would be much higher than to any other buyer

12  whether or not they had the government in their pocket

13  or not, which is a fair characterization, but they had

14  particular issues with the other shares they owned and

15  the ability to vote and this solved some of the problems

16  for them so that it should have a higher value to them

17  than any other buyer in the market.

18   Q. Who who were you discussing this sale and

19  purchase with on the Forminster side?

20      MR BECKMAN: Objection.

21   A. Mr Benda and Mr Harazim.

22      MR DANGEL:

23   Q. Did you consider them -- strike that. Did you,

24  as you negotiated with them learn that they are

Page 88

H Golden 17 April 07.txt

25  sophisticated men, they were people that understood

26  business and economics?

27      MR BECKMAN:  Objection.

28    A.  I would characterise them both as being very

29  sharp negotiator who would make cogent arguments and

64

1  came to meetings generally prepared.  On the other hand,

2  I would also say that it seemed when we got to a point

3  they always had to adjourn and talk to someone else in

4  order to obtain a permission to make any deals, so they

5  were, so they presented they were not the deal makers

6  which could be a very astute bargaining position if they

7  were the principals or if they were not the principals,

8  I can't testify as to what it was.

9      MR DANGEL:

10    Q.  Did you ever learn that there was somebody above

11  them?

12    A.  I didn't.

13      MR BECKMAN:  Objection.

14    A.  I didn't learn that, because I don't know who the

15  owners of Forminster are, but they always indicated to

H Golden 17 April 07.txt

16        MR BECKMAN:  Objection.

17    A.  I seem to recall that there was some article

18  years ago where he said some nice words about Andy.

19  I can't at this particular setting testify that he said

20  that Andy was the most brilliant person, I don't recall

21  that.  I do remember he said to nice things about Andy.

22        MR DANGEL:

23    Q.  Well let's get back to the negotiations with the

24  Forminster people.

25        MR BECKMAN:  Can we have a time frame on

26  this?

27        MR DANGEL:  We are going to.

28    Q.  Bringing your attention to the year before you

29  left, in orther words from let's say September 2001 to

70

1  September 2002, did you receive any offers that you

2  considered to be reasonable, fair market offers for the

3  Kotva shares owned by Brookdale?

4        MR BECKMAN:  Objection.

5    A.  No, sir.

6        MR DANGEL:

Page 97

H Golden 17 April 07.txt

7    Q.  Did there come a time that I recommended that an

8   offer be taken by Brookdale?

9    A.  Yes, sir.

10    Q.  And what was the offer that was made by

11   Forminster that you recommended?

12       MR BECKMAN:  Objection.

13    A.  My recollection is it was in the area of about

14   two million Dollars.  I am not sure of the -- I think it

15   was about 50 million crowns, if I recall correctly.

16       MR DANGEL:

17    Q.  What were the reasons that you recommended taking

18   the offer?

19       MR BECKMAN:  Objection.

20    A.  We have been involved in negotiations in the

21   debris of Czech value fund since 1998 or 9 when we had

22   taken it over.  We were doing, we meaning the Brookdale

23   group, Brookdale Global were making between 15 to 20 per

24   cent a year on our money.  As Andy had indicated in one

25   of these exhibits that we spoke earlier about the

26   Kazakhstan Investment Funds, money in the hands of the

27   manager being invested at a high rate was worth

28   substantially more than potential yet more money from

29   a failed investment.  I felt that the people at

Page 98

H Golden 17 April 07.txt

71

1  Forminster were very well connected, had a substantial

2  advantage over us, meaning Brookdale.  As far as dealing

3  in the Czech republic, they were locals, they knew

4  people, they knew how to deal with the system.  And that

5  there was a diminishing returns to continue the

6  negotiations with them since we had very little leverage

7  over them to force them to negotiate a higher term.

8    Q.  Was your recommendation based on any opinion that

9  you have that you should basically give up trying to get

10  a fair price out of Forminster?

11       MR BECKMAN:  Objection.

12       MR DANGEL:  Well let me withdraw the

13  question.

14    Q.  Can you explain in more detail what the basis for

15  your recommendation was?

16       MR BECKMAN:  Objection, asked and answered.

17       MR DANGEL:  Go ahead.

18    A.  I felt at the time that we had negotiated in good

19  faith with Forminster, that they were presenting to us

20  a pretty united front, they didn't want to give any more

Page 99

H Golden 17 April 07.txt

21  money than this, they wanted to buy these shares

22  cheaply.  Based on my experience dealing with other,

23  inverted commas, Czech businessmen it was not the custom

24  in the country to pay full value for shares or assets,

25  that was the basis of either tunneling or the building

26  of the Czech middle class that we were talking about

27  earlier, so that the idea that continued discussions

28  with them over giving a higher price were not going to

29  bear fruition; that there was no reasonable expectation

72

1  in my view that they would voluntarily pay somebody near

2  the market value or what I believe would be the market

3  value of the shares or the value that they should be to

4  them.  When you look at economic articles about

5  negotiating, you also take into account the other

6  party's knowledge and the other party's ability.  In

7  fact, that is, I think, is something that Mr Stiglett

8  won the Nobel Prize for.

9        MR DANGEL:  That is exactly right.

10        MR BECKMAN:  Objection.

11        MR DANGEL:  I withdraw the comment.  Go

H Golden 17 April 07.txt

12  ahead.

13    A.  In trying to utilise what I had spoken to from

14  Mr Stiglett and Professor Weiss, I felt that they knew

15  more, had the higher ground, as they say in the army,

16  they had more arrows in their quivver, however you want

17  to express it, than we did.  It was taking a lot of my

18  time and Professor Weiss's time and between the

19  diminishing returns, better knowledge and better ability

20  than the other side, I recommended to Professor Weiss

21  that we accept an offer that was lower than a fair

22  market value, in my view, but which would at least get

23  us money and get us out of the situation.

24    Q.  Did Professor Weiss accept the offer?

25    A.  No, sir.

26    Q.  Did you disagree?

27      MR BECKMAN:  Objection.

28    A.  Did I disagree with his refusal to accept the

29  offer?

73

1      MR DANGEL:  Yes.

2    A.  Intellectually I understood where he was coming

Page 101

H Golden 17 April 07.txt

3   from, so it was very difficult to disagree on one level.

4   On another level, meaning taking into account all the

5   factors I just gave you and my personal experience in

6   the country, I disagreed with his reading of the

7   situation as to our ability to obtain additional money

8   for the shares.

9        MR BECKMAN:  Can we have a time frame.

10        MR DANGEL:  We have been in the time frame,

11   September of 2001 to September 2002.

12     A.  That is the time frame you are talking about.

13   I thought you were talking about the time frame for

14   finishing the questions.  I am sorry, the time frame you

15   are asking me, I appreciate you bringing this to my

16   attention.  I have great difficulty, Mr Dangel, in

17   determining whether this was the year before or two

18   years ago before.

19     Q.  Okay.

20     A.  I am terribly sorry if that is the time frame you

21   are talking about I must amend my answers to say I can

22   is not definitively tell you it was in that one year

23   period but it was during the period I was doing the

24   negotiations with a Forminster people and I was unaware.

Page 102