UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s. and SPV Co, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| ANDREW WEISS and WEISS ASSET ) | |
| MANAGEMENT, LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | C.A. No. 05-10679-WGY |
| ) | |
| ANDREW WEISS, WEISS ASSET ) | |
| MANAGEMENT LLC and CVF ) | |
| INVESTMENTS, LTD., ) | |
| ) | |
| Counterclaim-plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| KOTVA a.s., RICHARD HARAZIM,  SPV ) | |
| CO and JOHN DOES 1–5, ) | |
| ) | |
| Counterclaim-defendants. ) | |

## DEFENDANTS' ANSWER TO PLAINTIFFS' FIRST AMENDED COMPLAINT AND RE-STATED COUNTERCLAIMS FOR THE FIRST AND SECOND TRIALS

### SUMMARY

In 1991, the United States and the Czech and Slovak Federal Republic, recently freed from the bonds of Communism, entered into a Bilateral Investment Treaty. This Treaty guarantees investors certain legal protections, including fair and equal treatment of their investments and effective means for asserting claims and enforcing rights within each other's sovereign territory. A copy of the Treaty is attached as Exhibit 1 hereto.

At approximately the same time, pursuant to legislation in the Czech Republic intended to promote share ownership among its citizens and foreign investors in newly privatized business and property companies, a private investment fund called Trend was created which issued its shares to many Czech nationals and a few foreign investment funds. In the early 1990s, Trend purchased a significant interest in the largest department store in the Czech Republic's capital, Prague. That department store, Kotva, located in the heart of Prague, occupies a city block on one of Prague's most valuable commercial streets.

In the mid-1990s, a Cyprus investment company, CVF Investments, Ltd., ("CVF" hereinafter), purchased a 40% interest in Trend. In 1997, CVF purchased directly approximately 12% of Kotva's shares.

The managers of Trend began to loot Trend by transferring its shares in Kotva to themselves and their friends at ridiculously low prices—one of the well-known and notorious means in the Czech Republic for undermining shareholder rights known as "tunneling." The Trend Tunneling was described in the Czech press and recognized by the Czech Government which placed Trend into "forced administration." By the time the Trend Tunneling was recognized, however, Trend's shares—the majority interest in Kotva—had "fallen" into the hands of Forminster Enterprises Ltd. (hereinafter "Forminster").

Forminster is a shadowy Cyprus company, whose ownership is a closely guarded secret, but, upon information and belief, is said to contain directly or indirectly the former top management of Kotva, former high level Czech government officials, members of police and prosecutorial departments in Prague, and criminal elements, known to have existed under Communist regimes and now more prominently seen in Czech and other post-Communist countries. The claim that Forminster legally owns the majority interest in Kotva has, however,

been the subject of criminal investigation, and Forminster's right to transfer the Kotva shares it holds was and is frozen as a result of the actions of a Czech prosecutor.

In 2002, Weiss Capital LLC assumed management responsibilities for CVF's parent company, the Brookdale Global Opportunity Fund ("BGO" hereinafter).  Andrew Weiss is the principal owner of Weiss Capital.  He is Professor Emeritus of Economics at Boston University, and is widely known to have a special ability to pick and value underappreciated investment opportunities, including funds, properties and stocks in what is sometimes referred to as emerging economies. Weiss and Weiss Capital "inherited" CVF's holdings in Trend and Kotva, as a result of taking over management of BGO.

Since at least 2001, representatives of Forminster, Richard Harazim and Martin Benda, had been negotiating with the previous management of BGO in an effort to purchase CVF's holdings in Kotva.  Forminster also installed Harazim and Benda as directors and officers of Kotva, a.s., the corporation in which the department store and real estate were owned.  However, since this corporation was unable to purchase its own shares under Czech law, it was understood that Harazim and Benda were negotiating on behalf of the Forminster/Kotva group generally— meaning the group which owned the majority of Kotva's shares, to wit, Forminster.

In late 2003, Weiss signed a contract with Vladimir Hoffman under which Hoffmann was to assist in realizing the value of CVF's holdings in the Czech Republic, including the Kotva and Trend shares.  Ultimately, this proved to be an unsatisfactory arrangement and the contract was terminated in the fall of 2004

In May, 2004, Weiss and Hoffmann met with Harazim and Benda while Weiss was on a business trip to Europe. The meeting occurred at a restaurant in Prague, and, as the parties' pleadings demonstrate, the participants in the meeting at the restaurant have a very different view

of what was said. Specifically, the defendants deny that they made any threats and allege that Harazim and Benda threatened to tunnel Kotva's only valuable assets to Kotva's majority shareholder and reduce the minority shareholders' interests to nothing.

In response to Harazim's and Benda's threat, Weiss hired lawyers in Prague. By the end of June 2004, Weiss had authorized those lawyers to file good faith lawsuits to protect the rights of the minority shareholders in Kotva and Trend. In order to bring the lawsuits it was necessary to demonstrate standing under Czech law. This could be accomplished only by having corporations registered with the Czech Securities Center as owners of shares in Kotva and Trend shares bring the lawsuits. CVF was unable to register immediately. Thus, lawsuits were initially instituted by two other corporations, one Cypriot—Gilroy—and one American, K T. Later, once CVF succeeded in registering as an owner of shares, it sought to join the existing lawsuits and participated as a plaintiff in additional litigation. \

It is the lawsuits brought by these corporations, K T and Gilroy, all of which were brought in the *Czech Republic* by *Czech* lawyers, which the plaintiffs now claim were an abuse of process under *American* law and which violate *Massachusetts General Laws* Chapter 93A. The defendant states here and in detail below, that plaintiffs' claims are false, that they are pre-textual, and that they have been prosecuted maliciously.

After the meeting at the restaurant, and after further negotiation demonstrated that Forminster/Kotva, having no intention of paying a fair price for the shares, was unable to scare Weiss into a fire sale of the CVF's Kotva holdings, Benda and Harazim, upon information and belief, used Forminster/Kotva's influence over Czech law enforcement to instigate a criminal prosecution of Weiss on sham charges of blackmail. Seeking to apply additional pressure, the plaintiffs, purposely and intentionally, then abused U.S. civil process by filing this lawsuit,

alleging that Weiss was a racketeer who had engaged in securities fraud.  Among other things, the plaintiffs sent copies of the complaint to Congressmen, issued subpoenas to Weiss's investors falsely claiming that Weiss had been "indicted" and sought to use the media as part of their campaign against Weiss.

As is shown below, many of the fears which Weiss had as a result of the restaurant meeting—namely, that the property would be sold out from under the minority shareholders in a form of tunneling—have been realized.  Ironically, the sale price of the assets, after reflecting the payoff of Kotva's liabilities, was almost identical to the sale price that Weiss had offered to sell Brookdale's Kotva holdings.

Kotva is presently a corporate shell and alter ego to Forminster and its affiliates and has been merged into a company called CIS, which is controlled by Forminster. The plaintiffs (counterclaim defendants) have taken complicated steps, described below, to play with the proceeds of the sale of Kotva's assets to Markland in an effort to dilute the minority interests of Kotva's shareholders, including taking a portion of the proceeds of the Markland sale, holding them back in escrow, valuing the escrow at zero, and then merging Kotva into another Forminster company, CIS, at an unfavorable valuation.

As a result of the prosecution of this lawsuit and instigation of criminal process, the counterclaim defendants have taken what should have been a normal commercial negotiation and turned it into a personal nightmare for Professor Weiss and Weiss Asset Management all in an effort to render CVF's shares in Kotva valueless, just as Benda and Harazim threatened at the meeting in Prague in May 2004.

## **ANSWER**

Defendants Weiss and Weiss Asset Management LLC ("WAM") (collectively, the "Defendants") answer the Complaint of Plaintiffs Kotva a.s. and SPV Co.:

## INTRODUCTION

The Introduction contains no averments within the meaning of Federal Rules of Civil Procedure 8 and 10 and requires no response. To the extent a response is required, the Defendants deny the factual allegations in the Introduction. What is most noticeable about the allegations in the introduction, aside from their falsity, are the lengths the plaintiffs have gone through to avoid admitting that the prices requested for the sale of their holdings in Kotva were in line with the sale price actually achieved in the sale of the department store and real property to Markland and that the only meeting of the parties—the one the plaintiffs rely on to falsely claim a breach of Chapter 93A and abuse of process—occurred in the Czech Republic, not Massachusetts.

## JURISDICTION

1.      Paragraph 1 states a conclusion of law to which no response is required.

2.      Paragraph 2 states a conclusion of law to which no response is required.

3.      Paragraph 3 states a conclusion of law to which no response is required.

## PARTIES

4.      Admitted as to the plaintiffs. However, since KN is mentioned in Paragraph 4 but not defined, defendants are lack sufficient information to respond to any allegations regarding it.

5.      Admitted, except that Weiss does not own 100% of Weiss Asset Management: he owns a majority of Weiss Asset Management.

6.      Admitted.

## FACTS

7.    Defendants are without knowledge or information sufficient to form a belief as to the truth of paragraph 7, except that it is admitted that Kotva is the largest department store in the Czech Republic.

8.    Admitted that Kotva was publicly listed. However, Kotva's shares were not actively traded publicly and had no public market value based on trading activity.

9.    Defendants admit the first sentence of paragraph 9.  Defendants deny the second sentence of paragraph 9.

10.    Defendants admit the first sentence of paragraph 10.  Defendants deny the second sentence of paragraph 10.

11.    Denied.

12.    Defendants admit the first sentence of paragraph 12.  Defendants deny the remainder of paragraph 12.

13.    Defendants admit that the Forminster Group installed new management at Kotva and called this a management change.  On information and belief, Defendants deny that the purpose of installing new management was to effectuate a turnaround of Kotva's business.  By way of further answering, Defendants believe that the purpose of installing new management was to loot Kotva a.s. of its real estate.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the remainder of paragraph 13.

14.    Defendants are without knowledge or information sufficient to form a belief as to the truth of paragraph 14.

15.    Defendants are without knowledge or information sufficient to form a belief as to the truth of paragraph 15.

16.     Defendants are without knowledge or information sufficient to form a belief as to the truth of paragraph 16.

17.     Defendants are without knowledge or information sufficient to form a belief as to the truth of paragraph 17.

18.     Defendants admit that the Shopping Centre was purportedly transferred from Kotva Nemovitosti k.s. to SPV KN.  By way of further answering, however, Defendants believe that the purpose of the alleged transfer was to divert the proceeds from the sale of the Shopping Centre.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the remainder of paragraph 18.

19.     Defendants admit that during May 2004, the press reported a pending sale of the Shopping Centre to Irish investors.  Defendants deny the remainder of paragraph 19.

20.     Defendants admit that, on May 12, 2004, Weiss and Hoffmann met with Harazim and Benda. Plaintiffs, however, are being less than forthright by failing to plead that the meeting occurred in Prague, Czech Republic.  Defendants admit that Harazim and Benda were, respectively, the CEO and chairman of the board of Kotva at that time, but deny that Benda and Harazim held themselves out as representatives of Kotva during the May 12, 2004 meeting. Defendants deny the remainder of paragraph 20.

21.     Denied.

22.     Defendants admit that Gilroy commenced a lawsuit claiming that SPV KN is not the legal owner of the Shopping Centre and that Kotva is the legal owner of the Shopping Centre. Defendant Andrew Weiss further admits that he communicated with Hoffman and Ondrej Peterka from Boston and that Hoffman sent bills to Brookdale in Boston.  Defendant Weiss

Asset Management denies that it communicated with Hoffman and Peterka from Boston. Defendants deny the remainder of paragraph 22.

23.     Defendants admit that Gilroy opened an account at the Securities Centre on June 23, 2004. Defendants further admit that Gilroy purchased one share of Kotva for 430 CZK on June 24, 2004 and 134 shares of Kotva for 430 CZK per share on June 29, 2004 to confer legal standing to commence litigation for the purpose of trying to prevent the plaintiffs from rendering valueless all minority interests in Kotva. Defendants deny the remainder of paragraph 23.

24.     Defendants admit that, on June 30, 2004, Gilroy filed a civil lawsuit against Kotva, KN and SPV KN in Prague seeking a declaration that Kotva owns the Shopping Centre. Defendants deny the remainder of paragraph 24.

25.     Defendants admit the first sentence of paragraph 25, except in so far as the plaintiffs claim that the notice requested was framed in any manner other than the actual language used within the notice. Defendants deny the remainder of paragraph 25.

26.     Defendants are without knowledge or information sufficient to form a belief as to the truth of paragraph 26.

27.     Defendants admit that, on August 17, 2004, Weiss sent the letter attached to the Complaint as Exhibit A to Martin Benda, who held himself out as a representative of Forminster as well as the plaintiffs. Defendants deny the remainder of paragraph 27.

28.     Defendants admit that an e-mail was sent on August 17, 2004 with Richard Harazim listed as the sender and that e-mail speaks for itself. Defendants deny the remainder of paragraph 28.

29.     Defendants admit that, on August 23, 2004, Weiss sent the letter attached to the Complaint as Exhibit B to Martin Benda and Richard Harazim, who held themselves out as

representatives of Forminster and the plaintiffs. That document speaks for itself.  Defendants
deny the remainder of paragraph 29.

30.     Defendants admit that, on November 23, 2004, Weiss sent the letter attached to
the Complaint as Exhibit C to Martin Benda and Richard Harazim, who held themselves out as
representatives of Forminster and the plaintiffs.  Defendants deny the remainder of paragraph 30.

31.     Denied.

32.     Admitted, except that Defendants deny that Weiss is the sole director of K T Inc.

33.     Defendants admit that, on December 23, 2004, Peterka sent a letter to Bryan
David Paul Wilson, of Linklaters Prague, and that the letter contained the block quote in
paragraph 33.  Defendants deny the remainder of paragraph 33.

34.     Defendants admit the second sentence of paragraph 34, except that Defendants
deny that Weiss's e-mail was in response to a communication from Kotva.  Defendants deny the
remainder of paragraph 34.

35.     Denied.

36.     Denied.

37.     Defendants deny the first sentence of paragraph 37.  Defendants are without
knowledge or information sufficient to form a belief as to truth of the remainder of paragraph 37.

38.     Defendants deny the first two sentences of paragraph 38.  Defendants neither
admit nor deny the remainder of paragraph 38, but instead state that they reference material
protected by the attorney-client privilege and which the plaintiff has obtained improperly.

39.     Denied.

40.     Denied, except that the plaintiffs commenced criminal process against Weiss.

41.    Defendants admit that Weiss held a video press conference in Boston on March 15, 2005.  Defendants further admit that Exhibit E contains a true and accurate copy of Weiss's written statement in English. Defendants are without knowledge or information sufficient to form a belief as to whether the portion of Exhibit E written in Czech is a completely accurate translation of Weiss's written statement. Defendants deny the remainder of paragraph 41.

42.    Denied.

43.    Defendants are without knowledge or information sufficient to form a belief as to whether internal documents were disclosed as a result of any charges.  Defendants deny the remainder of paragraph 43.

44.    Defendants neither admit nor deny the allegations in paragraph 44, but instead state that they reference material protected by the attorney-client privilege and which the plaintiff has obtained improperly.

45.    Denied.

46.    Defendants admit that, on October 25, 2004, Hoffman sent Weiss an email that includes the text quoted in paragraph 46.  Defendants deny the remainder of paragraph 46.

47.    Defendants admit that, on November 25, 2004, Weiss sent Hoffman the document attached to the Complaint as Exhibit G.  Defendants deny the remainder of paragraph 47.

48.    Denied.

## Counts I, II, and III

Paragraphs 49–70 contained within Counts I–III were dismissed by the court or would have been had the plaintiffs not waived them before a court ruling was obtained. The paragraphs and claims having been dismissed and "intentionally omitted" from the Plaintiffs' First Amended complaint, no response is necessary.

## Count IV

71.     Defendants incorporate by reference their responses to the allegations contained in the preceding paragraphs.

72.     Paragraph 72 states a conclusion of law as to which no response is required.  To the extent a response is required, denied.  By way of further answering, Defendants state that the Court has already ruled that the relationship among the Plaintiffs and the Weiss Defendants was such that the parties were not involved in trade or commerce within the meaning of M.G.L. Chapter 93A.

73.     Denied.

74.     Denied.

75.     Denied.

76.     Denied.

## Count V

77.     Defendants incorporate by reference their responses to the allegations contained in the preceding paragraphs.

78.     Paragraph 78 states a conclusion of law as to which no response is required.

79.     Denied.

80.     Denied.

## Count VI

Defendants note that plaintiffs have withdrawn Count VI and the paragraphs contained within it, 81–83, and, therefore, no response is necessary.

## Count VII

84.     Defendants incorporate by reference their responses to the allegations contained in the preceding paragraphs.

85.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the remainder of paragraph 85.

86.     Denied.

87.     Denied.

## REQUESTS FOR RELIEF

The Plaintiffs' Requests for Relief are not averments within the meaning of Federal Rules of Civil Procedure 8 and 10 and require no response. To the extent a response is required, Defendants request that the Court deny all of the Plaintiffs' Requests for Relief.

## AFFIRMATIVE DEFENSES AND OTHER MATTERS

1.     The Plaintiffs' claims are barred by the doctrine of unclean hands.

2.     The Plaintiff has failed to state a claim on which relief can be granted.

3.     The Plaintiffs' claims are barred by estoppel.

4.     The Plaintiffs' claims are barred, at least in part, by res judicata.

5.     At least some of the Plaintiffs' claims, to the extent that they are based on lawsuits filed by American and/or Cypriot investors, are barred by the Bilateral Investment Treaties in force in the Czech Republic, Cyprus and the United States.

6.      At least some of the Plaintiffs' claims, to the extent that they are based on lawsuits filed in the Czech Republic, are barred by the Charter of Fundamental Rights and Basic Freedoms of the Czech Republic.

## COUNTERCLAIMS

Counterclaim-plaintiffs Andrew Weiss ("Weiss"), Weiss Asset Management LLC ("WAM") and CVF Investments Ltd. for their Counterclaim against counterclaim-defendants Kotva a.s., Richard Harazim, SPV CO and John Does 1–5 state:

### Jurisdiction and Venue

1.      The Court has subject matter jurisdiction over the Counterclaim under 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

2.      The Court has personal jurisdiction over the counterclaim-defendants because they have committed tortious acts in Massachusetts and have availed themselves of the jurisdiction of this Court.

3.      Venue is proper in the District of Massachusetts under 28 U.S.C. §§ 1391(a) and 1391(c).

### Parties

4.      Defendant and counterclaim-plaintiff Andrew Weiss is an individual residing in Brookline, Massachusetts.

5.      Defendant and counterclaim-plaintiff Weiss Asset Management LLC is a Delaware limited liability company with its principal place of business in Boston, Massachusetts.

6.      Counterclaim-plaintiff CVF Investments Ltd. is a Cyprus corporation with its principal place of business in Nicosia, Cyprus.  It owns shares of Kotva a.s. and shares of Trend. CVF Investments Ltd. is a wholly owned subsidiary of Brookdale Global Opportunity Fund

("BGO"). The interests of CVF Investments Ltd. in Kotva a.s. and Trend is referred to herein generally and interchangeably as "CVF Investments' shares" or "BGO's shares."

7.    Counterclaim-defendant Kotva a.s. is a company organized under the laws of the Czech Republic with its principal place of business in Prague, Czech Republic. It is the defendants' position that the plaintiff and counterclaim-defendant, Kotva a.s., should be removed and substituted with Česká investiční a správcovská a.s. ("CIS"). Kotva a.s. changed its name to K-T-V Invest a.s. and subsequently merged with CIS Kotva a.s. / K-T-V Invest a.s. has been deleted from the Commercial Register in the Czech Republic. Article XVIII of Kotva's Articles of Association provides that the company disappears upon its deletion from the Commercial Register. The merger is being challenged in the Czech courts. The Defendants are convinced that the Czech courts will declare the merger null and void and it will be apparent that Kotva did not cease to exist. In such a case it will be necessary to substitute CIS with Kotva a.s. / K-T-V invest a.s. again. Until the Czech courts invalidate the merger, however, CIS rather than Kotva should be the party in this case.

8.    Forminster Enterprises Ltd. ("Forminster") is a company organized under the laws of Cyprus. On information and belief, Forminster's principal place of business is outside the United States. The identity of its owners is a closely-kept secret

9.    Counterclaim-defendant Richard Harazim ("Harazim") is an individual residing in the Czech Republic. Harazim was until recently Kotva's general manager or chief executive officer. Harazim was a member of the board of Kotva a.s. for part or all of the period from May 29, 1997 to March 8, 2004. From March 8, 2004 to the present, Harazim has been a member of the Supervisory Board of Kotva a.s. Forminster nominated Harazim to Kotva's board and used

its control over a majority of Kotva's shares to secure his election. Harazim also is or was a member of the board of Forminster and an agent of Forminster.

10.    Counterclaim-defendant SPV CO is a company organized under the laws of Cyprus. On information and belief, SPV CO's principal place of business is outside the United States.

11.    Martin Benda ("Benda") is an individual residing in the Czech Republic. Benda was a member of the board of Kotva a.s. for part or all of the period from May 21, 1999 to March 8, 2004. From as early as March 8, 2004, Benda had been the Chairman of the Supervisory Board of Kotva a.s. Forminster nominated Benda to Kotva's board and used its control over a majority of Kotva's shares to secure his election. Benda also is or was a member of the board of Forminster and an agent of Forminster. Finally, Benda was a director of SPV CO.

12.    The counterclaim-defendants are individuals and corporations residing in the Czech Republic and elsewhere who are members of a conspiracy among Kotva a.s., Forminster Enterprise Limited, SPV CO, Benda, Harazim and others (collectively, the "Forminster Conspiracy"). The Forminster Conspiracy is a combination of individuals and entities formed for the purpose of gaining sole control of Kotva and its assets through various unlawful means such as the "tunneling" of shares and assets, corporate maneuvering to deny shareholders the benefits of their shares, intimidation, use of meritless litigation, and use of police, governmental, and prosecution contacts to threaten and commence meritless criminal charges.

*Factual Allegations*

12.    One object of the Forminster Conspiracy is to strip Kotva a.s. of its real estate and other assets, sell the real estate and distribute the proceeds among members of the conspiracy

13.     Weiss Capital LLC ("Weiss Capital") is a Delaware limited liability company. Andrew Weiss is the principal owner of Weiss Capital.

14.     In 2002, Weiss Capital took over the management of Brookdale Global Opportunity Fund ("BGO"). BGO is an investment fund. Its subsidiary, CVF Investments Ltd., owns shares in Trend, a Czech investment fund, and shares in Kotva a.s.

15.     CVF Investments Ltd. has owned shares in Trend since 1996 and in Kotva a.s. since 1997.

16.     Trend's most valuable asset is a significant stake in Kotva a.s. However, as described in more detail in paragraphs 36–52 below, these shares were embezzled in the mid-1990s and came into the possession of the Forminster Conspiracy.

17.     CVF Investments Ltd. has both a direct interest in Kotva a.s. as a shareholder and an indirect interest in Kotva as a shareholder in Trend, which is the rightful owner of at least 32% of the shares of Kotva a.s.

18.     In September 2003, Weiss Capital entered into an agreement with Vladimir Hoffmann under which Hoffmann would assist BGO in liquidating CVF Investments' shares in Trend and Kotva a.s. Hoffmann's agreement with Weiss Capital ended in the fall of 2004.

19.     In September 2003, Harazim approached Hoffmann and suggested that Forminster might be interested in purchasing BGO's shares in Kotva. A Forminster Conspiracy affiliate then offered to purchase BGO's Kotva shares for 20,000,000 CZK. Weiss rejected this offer.

20.     While attempting to purchase BGO's shares in Kotva, the Forminster Conspiracy was also attempting to sell Kotva's only valuable asset, a department store in downtown Prague (the "Department Store").

21.     On May 12, 2004, Weiss, Hoffmann, Benda and Harazim met in Prague.  At the meeting, Harazim told Weiss and Hoffmann that CVF Investments' shares in Kotva were worth *nothing*. Harazim said that because CVF Investments is a minority shareholder of Kotva a.s. its shares in Kotva have no value.  Harazim further said that Kotva will never make any distributions to its shareholders and, therefore, Kotva's shareholders would not receive any of the proceeds of the sale of the Department Store. Harazim offered his opinion that there was nothing that Weiss could do about this, or the previous theft of Trend's assets.

22.     In June 2004, two of Kotva's shareholders, Balfindor and Gilroy, filed lawsuits in the Czech courts challenging actions taken by the Forminster Conspiracy.  Balfindor challenged actions taken at a Kotva general meeting.  Gilroy challenged the Forminster Conspiracy's efforts to move the Department Store from Kotva a.s. to other companies.

23.     In August 2004, Benda and Harazim approached Hoffmann and offered to purchase BGO's Kotva shares for 75,000,000 CZK.  Neither Benda nor Harazim specified what company would purchase those shares.  Weiss rejected this offer and made a counter-offer to sell BGO's Kotva shares for 131,000,000 CZK.

24.     On August 17, 2004, Harazim responded to the counter-offer by sending an email to a Weiss Capital employee in Boston, Massachusetts, stating:

> Unfortunately, your offer doesn't seem to deal with the lawsuits brought about by Balfindor and Gilroy against our company. Without resolving these and any other potential lawsuits against our company raised by BGO or by BGO controlled entities we won't be able to conclude any deal at all.

> Should you reconsider your position we can return to the discussion about the purchase price for Kotva shares held by BGO.

25.     Based on Harazim's email, Weiss amended his offer to sell BGO's shares for 131,000,000 CZK by including a promise not to initiate any legal challenges relating to the

ownership of the Department Store and a promise to attempt to persuade Gilroy to withdraw its lawsuit challenging the transfer of the Department Store.

26.    On August 27, 2004, Harazim responded by email to a Weiss Capital employee in Boston, Massachusetts and demanded that any purchase of Kotva shares was conditioned on the withdrawal of "lawsuits filed by Gilroy AND Balfindor, not only Gilroy." Around the same date, Benda told Hoffmann that any purchase of Kotva shares was conditioned on the release of all claims that BGO had against the Forminster Group, including claims that Forminster's shares in Kotva really belong to Trend.

27.    The release of claims that Trend is the rightful owner of the Forminster Conspiracy's shares in Kotva would effectively strip BGO's Trend shares of their value. A share in Trend is valuable primarily because Trend is the rightful owner of at least 32% of Kotva and Kotva is the rightful owner of a valuable piece of real estate or the proceeds from the sale of that real estate. Moreover, the shareholders of Trend have a claim against Forminster for the other assets that were tunneled from Trend. This tunneling provided the capital that Forminster used to buy additional shares in Kotva. Weiss could not agree to surrender these claims for nothing in return.

28.    Thus, in order to meet Harazim's and Benda's demands, Weiss amended his offer so that it (a) referenced Balfindor's lawsuit; (b) included BGO's shares in Trend in addition to BGO's shares in Kotva; and (c) increased the purchase price to reflect the value of BGO's Trend shares. Weiss enclosed with the new offer a detailed calculation supporting the valuation of BGO's holdings in both Kotva and Trend.

29.    Unwilling to pay CVF Investments the fair value of its shares, as reflected by the value of the Department Store, Harazim rejected this offer. Harazim repeatedly refused to

respond to requests to explain why the purchase price Weiss suggested was too high or why the calculations Weiss presented were incorrect or inaccurate..

30.    Instead the Forminster Conspiracy responded by using its influence over Czech law enforcement to cause a contrived criminal charge of blackmail to be brought against Weiss. Harazim is quoted in the Czech press as having "filed a criminal complaint" against Weiss. This charge has no merit—Weiss has committed no crime. He has, at all relevant times, been genuinely concerned that the Forminster Conspiracy—meaning Harazim, Benda, Kotva a.s., SPV Co, Forminster and others—were going to strip Kotva's assets and dilute the value of Kotva's shares if they were not prevented from doing so by legal action.   On information and belief, the essence of the Forminster Conspiracy's allegation is that Weiss threatened to bring lawsuits challenging the embezzlement of Trend's shares in Kotva and the transfers of the Department Store unless his investors received their fair share of the proceeds of the sale of the Department Store.  Even if this sort of conduct were criminal—it is not—it was Harazim and Benda rather than Weiss who demanded that any purchase of stock be linked to the withdrawal of lawsuits.

31.    Harazim and Benda were not negotiating in good faith with Weiss.  Instead, the Forminster Conspiracy had decided to use the Czech and U.S. legal systems as weapons against the defendants.  They secretly recorded business meetings with Hoffmann.  They made offers that they had no intention of honoring.  Instead, they sought to "entrap" the counterclaim-plaintiffs. The counterclaim-defendants bad faith motive was to intimidate and obtain an additional unfair advantage over the plaintiffs.

32.     The Forminster Conspiracy's motive in causing Czech law enforcement to bring the criminal charge was to further the goals of the Forminster Conspiracy by obtaining an unfair advantage over Weiss and with knowledge that Weiss had committed no crimes.

33.     From August 2004 until January 2005, Harazim sent at least nine e-mails to Weiss and at least one other person in Massachusetts as part of the Forminster Conspiracy's efforts to pressure Weiss to sell BGO's shares in Kotva and its Trend shares at pennies on the dollar. The Forminster Conspiracy, including the counterclaim-defendants, have never been willing to pay a fair price for the shares. Instead, they have always portrayed themselves as being so powerful and in control that they do not have to pay minority shareholders a fair price. The abuse of criminal process and filing of the instant lawsuits are the most recent attempts to intimidate Weiss.

34.     The instant lawsuit filed by the counterclaim-defendants is entirely without merit and meant to harass and threaten the counterclaim plaintiffs. In an attempt to ruin the counterclaims-plaintiffs financially, the counterclaim-defendants have made wholly meritless claims that the counterclaim plaintiffs are Racketeers who have committed Securities Fraud, the counterclaim-defendants have issued subpoenas to the counterclaims-plaintiffs' investors falsely claiming that Weiss had been indicted, publicized the complaint, and have maliciously prosecuted the suit, knowing full well that these steps would have a chilling effect on the counterclaim-plaintiffs' investment management businesses and reputations.

35.     Weiss and WAM have incurred and continue to incur damages in Massachusetts, including damage to reputation, disruption of their business, loss of new business, lost time and attorneys' fees, as a result of the counterclaim-defendants decision to try to gain an unfair

advantage in a business negotiation through civil and criminal litigation for the Forminster
Conspiracy.

*Initial Corporate Maneuvering: The Tunneling of the Assets of the Trend Fund*

36.    In 1995 and 1996, Trend's management embezzled Trend's assets, including
Trend's shares in Kotva.  The embezzlement of Trend's assets has been documented extensively
in several Czech government reports and is commonly referred to as the "Trend Scandal" or
"Trend Tunneling."  The media has also reported extensively on the Trend Scandal[1] as well as
several unusual events surrounding the investigation of the Trend Scandal.  On information and
belief, multiple law enforcement personnel involved in the investigation of the Trend Scandal
have either resigned or committed suicide under suspicious circumstances.

37.    Miroslav Hálek, who exerted managerial control over Trend at the time of the
embezzlement, also possessed a general power of attorney to act on behalf of Forminster during
the same time period.

38.    Hálek's connections to Forminster and personal involvement in the embezzling of
Trend's assets are documented in detail in several reports authored by Czech prosecutors.  For
example, the Deputy Regional Public Prosecutor wrote:

> Dealings and transfers of shares of Kotva, a.s., represented the most significant
> object of interest for the defendants [Miroslav Hálek & Co.]. Kotva shares
> belonged among essential investments of the fund within the period before
> August 4, 1995. The aim of the previous management was, and still is, to transfer
> the shares of Kotva to companies controlled by Mr. Hálek and Co., and to gain
> majority shareholding in Kotva through other purchases, whereto they also used
> the resources of the fund. The Kotva shares are still in the focus of interest of Ing.
> Hálek's and Co. surrounding companies. Even within the period of the forced
> administration, several transfers of Kotva shares were accomplished, namely
> between persons and companies and Jiří Mareš, classmate of Mr. Hálek, through
> whom Kotva shares were transferred back to the companies controlled by Ing.
> Hálek, and who is, with a high probability, a significant person. At the time of

---

[1] Attached hereto as Exhibit 2 are some press articles about the Trend Scandal, with English translations.

adoption of a non-effective resolution by the Regional Court in Hradec Králové to prohibit any disposal with the shares of Kotva by Královehradecká brokerská, the transfer of Kotva shares to the company **Forminster Enterprises, Ltd.**, with the registered office at Cyprus, to whose financial accounts Ing. Hálek holds particular rights, was effectuated by an order of KHB.

The activities of Mr. Hálek's group have not been stopped even by the decision about the forced administration [of Trend], and as it results from recent findings, their effort to take the control of Kotva and the assets of Trend continues up to the present and neither the criminal proceedings nor their placement in detention constitute any obstacle to it. Even before the commencement of criminal proceedings, the transfer of part of shares of Kotva to **Forminster Enterprises, Ltd.**, with its registered office at Cyprus, was effectuated and after that the company Královehradecká (brokerská) a.s. was sold to the company Bonit kapital, a.s., Brno. KHB, renamed to Brněnská obchodní, a.s., is now facing a petition for declaration of bankruptcy against it. According to recent findings, even within the period of his detention, Ing. Hálek signed important documents concerning the accounts of the **Forminster Enterprises, Ltd.** Company with LGT Bank in Vaduz in Liechtenstein.

September 30, 1998 Report of the Hradec Králové Deputy Regional Public Prosecutor (emphasis added).

39.    After a complicated series of transactions, members of the Forminster Conspiracy gained possession of the Kotva shares embezzled from Trend and, with those shares, control over Kotva.  The Forminster Conspiracy paid significantly less for Trend's Kotva shares than the shares were worth.

40.    The Forminster Conspiracy also used other assets embezzled from Trend to purchase shares in Kotva.  The Kotva shares Forminster obtained from Trend and the Kotva shares Forminster purchased with Trend's assets total more than 55% of Kotva's shares.

41.    As part of an investigation of the Trend Tunneling, in 1997 a public prosecutor in the Czech Republic froze the Kotva shares held by the Forminster Group, preventing Forminster from selling them.  In 2004, the Czech Constitutional Court affirmed the actions of the prosecutor, writing:

In the opinion of the then Supervising Public Prosecutor of the Regional Public Prosecutor's Office in Hradec Kralove, the said securities were the subject of a crime or as the case may be, the proceeds of crime, and were totally and materially related to the commitment of a grievous crime against property. The issuance of the injunction was meant to preclude the completion of the chain of illegal securities' transfers.

Czech Constitutional Court, Decision No. II US 267/03 (April 15, 2004). Similarly, "[i]n the opinion of the High Public Prosecutor, [Forminster's shares in Kotva] are the proceeds of a crime committed by Ing. M. H[alek] and Co., which had been transformed into documentary securities and placed in the account of F[orminster] E[nterprises] Limited in the Prague Security Exchange Center." Id.

42.     The Hradec Králové Public Prosecutor described the freeze of Forminster's Kotva shares as a narrow one, "specify[ing] exactly those securities that have been the subject matter of crime, or the effects thereof," and not applying to securities "hav[ing] no connection to crime whatsoever, or where such a connection, if assumed, cannot be deduced conclusively on the basis of the evidence produced." May 13, 1997 Injunction of the Hradec Králové Public Prosecutor, No. KZv 323/97.

43.     Around the same time, the High Court in Liechtenstein froze Forminster's accounts at the LGT Bank in Vaduz, Liechtenstein on suspicion of money laundering and conspiracy, among other crimes.

44.     Despite the Czech prosecutor's order freezing the Kotva shares held by the Forminster Group, members of the Forminster Group were still able to vote those shares. The Forminster Group controls at least 55% of the shares of Kotva. As majority shareholders, the Forminster Group elects the board of Kotva and controls its management.

45.     Nevertheless, the freeze inconvenienced the Forminster Group. They could not convert their Kotva shares into cash. Thus, they had to devise a scheme to separate the assets of

Kotva a.s. from the frozen shares of Kotva a.s., liquidate those assets, and appropriate the cash proceeds for their own benefit.

46.     Since at least 1999, after electing board members of Kotva a.s., the Forminster Group has, through its front-men, Benda and Harazim, exerted full control over Kotva a.s. and actively directed all of its activities, including the bringing of this lawsuit.  The Forminster Group uses its pervasive control over Kotva a.s. to act in a selfish way, disregarding the interests of Kotva a.s.'s minority shareholders.  They use Kotva a.s. to serve the Forminster Conspiracy's interests and defraud the minority shareholders.

47.     The counterclaim-defendants caused Kotva a.s. to transfer the Department Store through a series of shell companies.   These transfers are instead designed to further the interests of the Forminster Conspiracy.

48.     More specifically, Kotva a.s. first transferred the Department Store to a company it created called Kotva Nemovitosti.  On information and belief, Benda was the chairman of the board of Kotva Nemovitosti at the time.  The Forminster Conspiracy then caused Kotva a.s. to convert Kotva Nemovitosti ("KN") from a wholly owned child corporation into a limited partnership in which Kotva a.s. had a right to less than half of the profits and liquidation surplus.  Next it caused KN to transfer the store and real estate further away from Kotva's shareholders by transferring the assets to a newly formed Cyprus company, SPV KN, which had untraceable bearer shares. Ultimately, the Department Store and Real Estate were sold for approximately $65 million, but the counterclaim-defendants continued to tell plaintiffs that their 12% interest was worth less than $1 million.

49.     On information and belief, when SPV KN first received the Department Store from KN, KN held all of the bearer shares evidencing the ownership of SPV KN.  However,

according to Kotva's 2004 annual report, the Forminster Conspiracy moved the Department Store even further away from Kotva's shareholders by causing Kotva Nemovitosti to transfer 97% of the shares of SPV KN to a Cyprus company called SPV CO.

50.     SPV CO is part of the Forminster Conspiracy.  SPV CO has as its registered seat the address: Ledra House, Agiou Pavlou 15, Agio Andreas, 1105 Nicosia, Cyprus.  This address is also the registered seat of the law offices of Chistodoulos G. Vassiliades & Co., the law firm that established Forminster Enterprises Limited in 1996.

51.     According to Kotva's 2004 annual report, Forminster Enterprises Limited effected the sale of the Department Store to CRQ Czech, a Czech company controlled by Markland, by transferring the bearer shares of SPV KN from SPV CO to CRQ Czech.

52.     Thus, the proceeds from the sale of the Department Store were not paid to Kotva or even another Czech company.  The purchase price for the SPV KN shares was paid to SPV CO or another Forminster-controlled entity that will distribute the proceeds of the sale among the Forminster Group rather than among Kotva's shareholders.

53.     In fact, as Exhibit 3 demonstrates, the Forminster Conspiracy has kept its options open as to where the funds will eventually end up.  According to this document, in October 2004, several Kotva entities, including Kotva a.s. and SPV CO, agreed to reallocate expenses and proceeds of the conspiracy as they see fit at some point in the future.

*Further Corporate Maneuvering: The Kotva Merger*

54.     In 2006, the Forminster Conspiracy sought to merge Kotva with another company within its sphere of control, Česká investiční a správcovská a.s. ("CIS").

55.     One stated purpose of the merger with CIS is that Kotva was incapable of investing funds itself.

56.     The Forminster Conspiracy caused SPV CO to assign zero value to the portion of the Department Store purchase price withheld in escrow.  Thus, this asset—approximately $24,000,000—disappeared from SPV CO's balance sheet entirely.

57.     As a result of this machination, Kotva shareholders who opposed the merger were given the opportunity to redeem shares for only 921 CZK per share rather than over 1,700 CZK per share, which would have been the value of Kotva a.s. shares had the escrow account not disappeared from SPV CO's books.

## First Trial

### Count I
### (Abuse of Civil Process)

58.     Paragraphs 1–57 are incorporated by reference as if set forth fully herein.

59.     The counterclaim-defendants abused civil process by filing an untrue and purposely inflammatory complaint which alleged that the counterclaim plaintiffs were engaged in racketeering activities and securities fraud, and then issuing subpoenas in the name of the U.S. Courts to the plaintiffs' investment clients seeking their depositions and records and publicizing the complaint, all for the purpose of intimidating the counterclaim plaintiffs and obtaining BGO's shares at an unreasonably low value.

60.     This action had an ulterior and illegitimate purpose as described above.

61.     Counterclaim-plaintiffs Weiss and Weiss Asset Management were damaged by this abuse of process as described above and are entitled to damages in this case.

### Count II
### (Conspiracy to Abuse Civil Process)

62.      Paragraphs 1–61 are incorporated by reference as if set forth fully herein.

63.    The members of the Forminster Conspiracy, including the counterclaim-defendants, agreed to work together to abuse U.S. civil process, and intimidate the counterclaim-plaintiffs.

64.    Counterclaim-defendants Kotva, Harazim and SPV Co., as well as Benda, Forminster, and the John Does have conspired to damage counterclaim-plaintiffs Weiss and Weiss Asset Management as described above. The counterclaim-plaintiffs have been damaged thereby and are, therefore, entitled to damages in this case.

## Second Trial

## Count III
### (Conspiracy)

65.    Paragraphs 1–64 are incorporated by reference as if set forth fully herein.

66.    The members of the Forminster Conspiracy, including the counterclaim-defendants, agreed to work together to loot Kotva's assets, abuse Czech criminal process, and intimidate the counterclaim-plaintiffs so as to unjustly enrich the Forminster Conspiracy at the expense of the counterclaim-plaintiffs.

67.    The members of the Forminster Conspiracy have a peculiar power of coercion in that, as a group, they have access to and influence over at least one member of the Czech government, including the ability to cause Czech law enforcement to bring criminal charges to provide them with leverage in their commercial disputes.

68.    The members of the Forminster Conspiracy have taken action against the counterclaim-plaintiffs in a variety of ways.  CVF Investments Ltd. has been harmed by the efforts to loot Kotva's assets.  When Weiss sought relief in the Czech courts to stop that looting, the Forminster Conspiracy turned its attention to Weiss and WAM, and launched a campaign of abusive civil and criminal litigation against them rather than fight the Czech lawsuits on their

merits. Through these coordinated activities against the counterclaim-plaintiffs, the Forminster Conspiracy seeks to complete its tunneling in relative peace, undisturbed by minority shareholders or their representatives.

69.     Counterclaim-defendants Kotva, Harazim and SPV Co., as well as Benda, Forminster, and the John Does have conspired to damage each of the counterclaim-plaintiffs as described above. Each of the counterclaim-plaintiffs have been damaged thereby and are, therefore, entitled to damages in this case.

## Count IV
### (Constructive Trust)

70.     Paragraphs 1–69 are incorporated by reference as if set forth fully herein.

71.     The Department Store, the bearer shares in SPV KN and/or the proceeds of the sale of the SPV KN bearer shares are subject to a constructive trust for the benefit of Kotva's shareholders, including counterclaim-plaintiff CVF Investments Ltd

## Count V
### (Declaratory Judgment)

72.     Paragraphs 1–71 are incorporated by reference as if set forth fully herein.

73.     There is a genuine controversy between counterclaim-plaintiff CVF Investments Ltd. on the one hand and Harazim, Kotva, SPV CO and John Does 1–5 on the other hand as to who should receive the proceeds of the sale of the Department Store.

74.     The Forminster Conspiracy, including the counterclaim-defendants, have obtained possession of the sale proceeds through unlawful means. Accordingly, they have no right to those proceeds.

75.     The sale proceeds belong instead to Kotva a.s. and its shareholders.

## Count VI
### (Abuse of Criminal Process)

76.    Paragraphs 1–75 are incorporated by reference as if set forth fully herein.

77.    The Forminster Conspiracy, including the counterclaim-defendants, used criminal process, knowing that no crime had been committed by the counterclaim plaintiffs, solely for the purposes of intimidating and damaging them in order to obtain BGO's shares at an unfair and unreasonable price.

78.    This action had an ulterior and illegitimate purpose, as described above.

79.    Andrew Weiss has been damaged by this abuse of process and is, therefore, entitled to damages.

## Count VII
### (Malicious Prosecution)

80.    Paragraphs 1–79 are incorporated by reference as if set forth fully herein.

81.    The instant civil case was brought by the counterclaim-defendants without probable cause and for the ulterior and malicious purposes of intimidating the counterclaim plaintiffs, causing them to require BGO's shares to be surrendered at an unfair and unreasonable price, and to harm the plaintiffs in the business and personal lives

82.    The original Complaint in this case alleged that the Defendants committed fraud and securities fraud.

83.    The original Complaint in this case did not include any allegation that Kotva reasonably relied on any statement of the Defendants to its detriment and, in fact, Kotva did not reasonably rely on any statement of the Defendants to its detriment.

84.    Counterclaim-defendants knew or should have known that an essential element of an action for common law fraud is reasonable reliance to the plaintiff's detriment.

85.    Counterclaim-defendants knew or should have known that an essential element of an action for securities fraud is reasonable reliance to the plaintiff's detriment.

86.    Counterclaim-defendants knew or should have known that the claims made in the Complaint, including those under the Racketeer Influenced and Corrupt Organizations Act and Massachusetts General Laws Chapter 93A, were without merit.

87.    The counterclaim-plaintiffs have already been exonerated of three of the charges against them and will be exonerated from the rest.

88.    The civil case brought by the counterclaim-defendants in the United States District Court has severely harmed Andrew Weiss and Weiss Asset Management LLC, and they are entitled to damages.

## PRAYER FOR RELIEF

WHEREFORE, counterclaim-plaintiffs Andrew Weiss, Weiss Asset Management LLC and CVF Investments Ltd. respectfully request that this Court:

(a)    Enter judgment for the counterclaim-plaintiffs and against the counterclaim-defendants on all counts of the Counterclaim;

(b)    Impose a constructive trust on the proceeds of the sale of the Department Store;

(c)    Declare that the shareholders of Kotva a.s. are the owners of the proceeds of the sale of the Department Store;

(d)    Enter an Order requiring SPV CO to disgorge the proceeds of the sale of the Department Store and transfer them to the shareholders of Kotva, a.s.;

(e)    Award damages on Counts I–III, VI and VII;

(f)    Award the counterclaim-plaintiffs their costs;

(g)     Enter an Order requiring SPV CO turn over to the counterclaim-plaintiffs SPV

CO's rights to the escrow account to the extent a judgment is obtained against

it or Kotva; and

(h)     Grant such other relief as the Court deems just and proper.

## JURY DEMAND

DEFENDANTS AND COUNTERCLAIM-PLAINTIFFS DEMAND TRIAL BY JURY

ON ALL ISSUES SO TRIABLE.

.                                       Respectfully submitted,

ANDREW WEISS, WEISS ASSET
MANAGEMENT LLC and CVF
INVESTMENTS LTD.

By their attorneys,


/s/ Benjamin A. Goldberger
Edward P. Leibensperger (BBO# 292620)
Benjamin A. Goldberger (BBO# 654257)
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts 02109-1775
(617) 535-4000

Edward T. Dangel, III (BBO#113580)
Dangel & Mattchen, LLP
10 Derne Street
Boston, MA 02114
(617) 557-4800

Dated: May 14, 2007

## CERTIFICATE OF SERVICE

      I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 14, 2007.

/s/ Benjamin A. Goldberger
Benjamin A. Goldberger

# Czech Republic Bilateral Investment Treaty

After the breakup of Czechoslovakia in 1993, this treaty continued in effect for the successor states, the Czech Republic and Slovakia.

Signed October 22, 1991; Entered into Force December 19, 1992; Amended May 1, 2004

Prior to the accession of the Czech Republic to the European Union, this treaty was amended to reduce the possibility of conflict with the laws of the European Union.[View Amending Protocol]

2nd Session

TREATY WITH THE CZECH AND SLOVAK FEDERAL REPUBLIC
CONCERNING THE RECIPROCAL ENCOURAGEMENT
AND PROTECTION OF INVESTMENT

MESSAGE FROM

THE PRESIDENT OF THE UNITED STATES

Transmitting

THE TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE CZECH AND SLOVAK FEDERAL REPUBLIC CONCERNING THE RECIPROCAL ENCOURAGEMENT AND PROTECTION OF INVESTMENTS, WITH PROTOCOL AND THREE RELATED EXCHANGES OF LETTERS, SIGNED AT WASHINGTON ON OCTOBER 22 ,1991

June 2, 1992.-Treaty was read the first time and, together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1992

LETTER OF TRANSMITTAL

THE WHITE HOUSE, June 2, 1992.

To the Senate of the United States:

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty Between the United States of America and the Czech and Slovak Federal Republic Concerning the Encouragement and Reciprocal Protection of Investment, with Protocol and three related exchanges of letters, signed at Washington on October 22. 1991. I transmit also, for the information of the Senate, the report of the Department of State with respect to this Treaty.

The Treaty is an integral part my initiative to strengthen economic relations with Central and East European countries. The treaty is designed to aid the growth of the private sector in the Czech and Slovak Federal Republic by protecting and thereby encouraging U.S. private investment. The treaty is also fully consistent with U.S. policy toward international investment. A specific tenet, reflected in this treaty, is that U.S. direct investment abroad and foreign investment in the United States should receive fair, equitable, and non-discriminatory treatment. Under this treaty, the parties also agree to international law standards for expropriation and compensation; free transfers of funds associated with investments and the option of the investor to resolve disputes with the host government through international arbitration.

I recommend that the Senate consider this Treaty as soon as possible, and give its advice and consent to ratification of the Treaty, with Protocol and related exchange of letters, at an early date.

GEORGE BUSH.


LETTER OF SUBMITTAL


DEPARTMENT OF STATE,
Washington, DC, May 12, 1992.
The PRESIDENT, The White House.


THE PRESIDENT: I have the honor to submit to you the Treaty Between the United States of America and the Czech and Slovak Federal Republic Concerning the Encouragement and Reciprocal Protection of Investment, with Protocol and three related exchange of letters, signed at Washington on October 22, 1991. I recommend that this Treaty with Protocol, and exchange of letters, be transmitted to the Senate for its advice and consent to ratification.

This is the second U.S. treaty containing investment protections with a former Communist country of Central or East Europe, following the U.S.-Poland treaty concerning business and economic relations signed March 21, 1990. This Treaty will assist the Czech and Slovak Federal Republic (CSFR) in its transition to a market economy by creating favorable conditions for U.S. private investment, helping to attract such investment and, thus, strengthening the development of the private sector.

The Bilateral Investment Treaty (BIT) helps to encourage U.S. investment in the economies of its BIT partners. It is U.S. policy, however, to advise potential treaty partners during BIT negotiations that conclusion of a BIT does not necessarily result in immediate increases in private U.S. investment flows.

A number of West European countries, including Switzerland and Germany, have entered into BITs with the CSFR. The U.S. treaty, however, is more comprehensive than the European BITs.

The United States has also signed BITs with Argentina, Bangladesh, Cameroon, the Congo, Egypt, Grenada, Haiti, Morocco, Panama, Senegal, Sri Lanka, Tunisia, Turkey, and Zaire; and a treaty containing the BIT elements with Poland. The Office of the United States Trade Representative and the Department of State jointly lead BIT negotiations, with assistance from the Departments of Commerce and Treasury.

THE U.S.-CSFR TREATY

The CSFR Treaty satisfies the main BIT objectives, which are:

-Investments of nationals and companies of either Party in the territory of the other Party (Investments) receive the better of national treatment or most-favored-nation (MFN) treatment both on establishment and thereafter;

-Investments are guaranteed freedom from performance requirements, including requirements to use local products or to export local goods;

-Expropriation can occur only in accordance with international law standards; for a public purpose; in a nondiscriminatory manner; under due process of law; and upon payment of prompt, adequate, and effective compensation; Investments are guaranteed the unrestricted transfer of funds in a freely usable currency; and

-Nationals and companies of either Party, in investment disputes with the host government, have access to binding international arbitration, without first resorting to domestic courts.

As does the model BIT, the treaty with the CSFR allows sectoral exceptions to national and most-favored-nation (MFN) treatment, as set forth in the annex and a related exchange of letters to the treaty. The U.S. exceptions are designed to protect state regulatory interests and to accommodate the derogations from national treatment and, in some cases, MFN treatment in existing state or federal law. The U.S. exceptions from national treatment include among other sectors, air transportation; ocean and coastal shipping; banking; insurance; government-grants; government insurance and loan programs; energy and power production; custom house brokers; ownership of real property; ownership and operation of broadcast or common carrier radio and television stations; ownership of shares in the Communications Satellite Corporation; the provision of common carrier telephone and telegraph services; the provision of submarine cable services; use of land and natural resources; mining on the public domain; maritime services and maritime-related services. Except for ownership of property, MFN exceptions are based on reciprocity provisions in government laws and regulations.

The CSFR sectoral exceptions to national treatment are ownership of real property and insurance. The CSFR does not reserve any sectors from the obligation to accord MFN treatment to U.S. investment.

The CSFR is privatizing many of its state-owned companies and decided that it could not ensure national treatment with respect to the privatization process. Therefore, in a related exchange of letters to the treaty, the CSFR states that prior approvals may be required when (i) U.S. nationals or companies acquire majority ownership of state companies, or (ii) U.S. nationals or companies acquire the equity interest of the CSFR in companies. The CSFR further undertakes to apply the approval process in a way not discourage or prohibit U.S. investment, to accord U.S. investment MFN treatment in this process, and to consult with the U.S. within two years of the treaty's entry into force with a view to phasing out this approval requirement.

This treaty, consistent with the model BIT, does not oblige a Party to extend to the other Party's investments the advantages accorded to third country investments by virtue of binding obligations that derive from full membership in a free trade area or customs union. The Protocol confirms that

such investment-related obligations may arise from economic relationships that include free trade areas and customs unions, notwithstanding that these relationships include trade obligations as well.

The BIT with the CSFR provides that an investment dispute between a Party and a national or company, including a dispute involving an investment authorization or the interpretation of an investment agreement, may be submitted to international arbitration six months after the dispute arose. Exhaustion of local remedies is not required. The treaty identifies several procedures for arbitration, at the investor's option: the International Centre for the Settlement of Investment Disputes ("ICSID"), upon CSFR adherence to the ICSID Convention; the ICSID Additional Facility: or ad hoc arbitration under the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL).

The BIT with the CSFR, as does the U.S.-Poland treaty, contains several provisions designed to resolve problems that U.S. business traditionally has faced in the centrally-controlled, non-market economies of Central and East Europe, and which may continue to impede U.S. investments during the transition to a market economy.

One such provision is a guarantee that nationals and companies of either Party receive non-discriminatory treatment with respect to an expanded and detailed list of activities associated with their investments. These include: access to registrations, licenses, and permits; access to financial institutions and credit markets; access to their funds held in financial institutions; the importation and installation of business equipment; advertising and the conduct of market studies; the appointment of commercial representatives; direct marketing; access to public utilities; and access to raw materials. The right to non-discriminatory treatment in these activities requires that the CSFR grant U.S. nationals and companies treatment no less favorable than that granted to enterprises that remain under state ownership or control.

The treaty also provides, in a related exchange of letters, that the CSFR will designate an entity to assist U.S. nationals and companies overcome problems relating to bureaucracy and lack of knowledge. The entity's tasks will include providing up-to-date information on business and investment regulations, collecting and disseminating information regarding investment projects and financing, and coordinating with the CSFR agencies, at all levels, to facilitate U.S. investment.

The other Government agencies which negotiated the treaty join with me in recommending that it be transmitted to the Senate at an early date.

Respectfully submitted.


JAMES A. BAKER III.


TREATY WITH THE CZECH AND SLOVAK FEDERAL REPUBLIC
CONCERNING THE RECIPROCAL ENCOURAGEMENT
AND PROTECTION OF INVESTMENT


The United States of America and the Czech and Slovak Federal Republic (hereinafter the "Parties");

Desiring to promote greater economic cooperation between them, with respect to investment by nationals and companies of one Party in the territory of the other Party;

Recognizing that agreement upon the treatment to be accorded such investment will stimulate the flow of private capital and the economic development of the Parties;

Agreeing that fair and equitable treatment of investment is desirable in order to maintain a stable framework for investment and maximum effective utilization of economic resources;

Reaffirming their desire to develop economic cooperation in accordance with the principles and provisions of the Final Act signed in Helsinki on the lst of August 1975, and other documents of the Conference on Security and Cooperation in Europe;

Convinced that private enterprise operating within free and open markets offers the best opportunities for raising living standards and the quality of life for the inhabitants of the Parties, improving the well-being of workers, and promoting overall respect for internationally recognized worker rights; and

Having resolved to conclude a Treaty concerning the encouragement and reciprocal protection of investment;

Have agreed as follows:

ARTICLE I

1. For the purposes of this Treaty,

(a) "investment" means every kind of investment in the territory of one Party owned or controlled directly or indirectly by nationals or companies of the other Party, such as equity, debt, and service and investment contracts; and includes:

(i) tangible and intangible property, including movable and immovable property, as well as rights, such as mortgages, liens and pledges;

(ii) a company or shares of stock or other interests in a company or interests in the assets thereof;

(iii) a claim to money or a claim to performance having economic value, and associated with an investment;

(iv) intellectual property which includes, inter alia, rights relating to: literary and artistic works, including sound recordings, inventions in all fields of human endeavor, industrial designs, semiconductor mask works, trade secrets, know-how, and confidential business information, and trademarks, service marks, and trade names; and

(v) any right conferred by law or contract, and any licenses and permits pursuant to law;

(b) "company of a Party" means any kind of corporation, company, association, enterprise, partnership, or other organization, legally constituted under the laws and regulations of a Party or a political subdivision thereof whether or not organized for pecuniary gain, or privately or governmentally owned;

(c) "national, of a Party means a natural person who is a national of a Party under its applicable law;

(d) "return" means an amount derived from or associated with an investment, including profit; dividend; interest; capital gain; royalty payment; management, technical assistance or other fee;

or returns in kind;

(e) "associated activities" include the organization, control, operation, maintenance and disposition of companies, branches, agencies, offices, factories or other facilities for the conduct of business; the making, performance and enforcement of contracts; the acquisition, use, protection and disposition of property of all kinds including intellectual property rights; the borrowing of funds; the purchase, issuance, and sale of equity shares and other securities; and the purchase of foreign exchange for imports;

(f) "nondiscriminatory" means treatment that is at least as favorable as the better of national treatment or most-favored nation treatment;

(g) "national treatment" means treatment that is at least as favorable as the most favorable treatment accorded by a Party to companies or nationals of third Parties in like circumstances; and

(h) "most favored nation treatment" means treatment that is at least as favorable as that accorded by a Party to companies and nationals of third Parties in like circumstances.

2. Each Party reserves the right to deny to any company the advantages of this Treaty if nationals of any third country control such company and, in the case of a company of the other Party, that company has no substantial business activities in the territory of the other Party or is controlled by nationals of a third country with which the denying Party does not maintain normal economic relations.

3. Any alteration of the form in which assets are invested or reinvested shall not affect their character as investment.

ARTICLE II

1. Each Party shall permit and treat investment, and activities associated therewith, on a basis no less favorable than that accorded in like situations to investment or associated activities of its own nationals or companies, or of nationals or companies of any third country, whichever is the most favorable, subject to the right of each Party to make or maintain exceptions falling within one of the sectors or matters listed in the Annex to this Treaty. Each Party agrees to notify the other Party before or on the date of entry into force of this Treaty of all such laws and regulations of which it is aware concerning the sectors or matters listed in the Annex. Moreover, each Party agrees to notify the other of any future exception with respect to the sectors or matters listed in the Annex, and to limit such exceptions to a minimum. Any future exception by either Party shall not apply to investment existing in that sector or matter at the time the exception becomes effective. The treatment accorded pursuant to any exceptions shall, unless specified otherwise in the Annex, be not less favorable than that accorded in like situations to investments and associated activities of nationals or companies of any third country.

2. (a) Investment shall at all times be accorded fair and equitable treatment, shall enjoy full protection and security and shall in no case be accorded treatment less than that required by international law.

(b) Neither Party shall in any way impair by arbitrary or discriminatory measures the management, operation, maintenance, use, enjoyment, acquisition, expansion, or disposal of investments. For purposes of dispute resolution under Article 3 VI and VII, a measure may be arbitrary or discriminatory notwithstanding the fact that a Party has had or has exercised the opportunity to review such measure in the courts or administrative tribunals of a Party.

(c) Each Party shall observe any obligation it may have entered into with regard to investments.

3. Subject to the laws relating to the entry and sojourn of aliens, nationals of either Party shall be permitted to enter and to remain in the territory of the other Party for the purpose of establishing, developing, administering or advising on the operation of an investment to which they, or a company of the first Party that, employs them, have committed or are in the process of committing a substantial amount of capital or other resources.

4. Companies which are legally constituted under the applicable laws or regulations of one Party, and which are investments, shall be permitted to engage top managerial personnel of their choice, regardless of nationality.

5. Neither Party shall impose performance requirements as condition of, establishment, expansion or maintenance of investments, which require or enforce commitments to export goods produced, or which specify that goods or services must purchased locally, or which impose any other similar requirements.

6. Each Party shall provide effective means of asserting claims and enforcing rights with respect to investment, investment agreements, and investment authorizations.

7. Each Party shall make public all laws, regulations, administrative practices and procedures, and adjudicatory decisions that pertain to or affect investments.

8. The treatment accorded by the United States of America to investments and associated activities of nationals and companies of the Republic of CSFR under the provisions of this Article shall in any State, Territory or possession of the United States of America be no less favorable than the treatment accorded therein to investments and associated activities of nationals of the United States of America resident in, and companies legally constituted under the laws and regulations of other States, Territories or possessions of the United States of America.

9. The nondiscrimination and most favored nation provisions of this Treaty shall not apply to advantages accorded by either Party to nationals or companies of any third country by virtue of:

(a) that Party's binding obligations that derive from full membership in a free trade area or customs union; or

(b) that Party's binding obligations under any multilateral international agreement under the framework of the General Agreement on Tariffs and Trade that enters into force subsequent to the signature of this Treaty.

10. The Parties acknowledge and agree that "associated" activities, include without limitation, such activities as:

(a) the granting of franchises or rights under licenses;

(b) access to registrations, licenses, permits and other approvals (which shall in any event be issued expeditiously);

(c) access to financial institutions and credit markets;

(d) access to their funds held in financial institutions;

(e) the importation and installation of equipment necessary for the normal conduct of business affairs, including but not limited to, office equipment and automobiles, and the export of any

equipment and automobiles so imported;

(f) the dissemination of commercial information;

(g) the conduct of market studies;

(h) the appointment of commercial representatives, including agents, consultants and distributors and their participation in trade fairs and promotion events;

(i) the marketing of goods and services, including through internal distribution and marketing systems, as well as by advertising and direct contact with individuals and companies;

(j) access to public utilities, public services and commercial rental space at nondiscriminatory prices, if the prices are set or controlled by the government; and

(k) access to raw materials, inputs-and services of all types at nondiscriminatory prices, if the prices are set or controlled by the government.

ARTICLE III

1. Investments shall not be expropriated or nationalized either directly or indirectly through measures tantamount to expropriation or nationalization ("expropriation") except: for public purpose; in a nondiscriminatory manner; upon payment of prompt, adequate and effective compensation; and in accordance with due process of law and the general principles of treatment provided for in Article II(2). Compensation shall be equivalent to the fair market value of the expropriated investment immediately before the expropriatory action was taken or became known, whichever is earlier; be calculated in a freely usable currency on the basis of the prevailing market rate of exchange at that time; be paid without delay; include interest at a commercially reasonable rate from the date of expropriation; be fully realizable; and be freely transferable.

2. A national, or company of either Party that asserts that all or part of its investment has been expropriated shall have a right to prompt review by the appropriate judicial or administrative authorities of the other Party to determine whether any such expropriation has occurred and, if so, whether such expropriation, and any associated compensation, conforms to the principles of international law.

ARTICLE IV

Nationals or companies of either Party whose investments suffer losses in the territory of the other Party owing to war or other armed conflict, revolution, state of national emergency, insurrection, civil disturbance or other similar events shall be accorded treatment by such other Party no less favorable than that accorded to its own nationals or companies or to nationals or companies of any third country, whichever is the most favorable treatment, as regards any measures it adopts in relation to such losses.

ARTICLE V

1. Each Party shall permit all transfers related to an investment to be made freely and without delay into and out of its territory. Such transfers include: (a) returns; (b) compensation pursuant to Article III; (c) payments arising out of an investment dispute; (d) payments made under a contract, including amortization of principal and accrued interest payments made pursuant to a loan agreement; (e) proceeds from the sale or liquidation of all or any part of an investment; and (f) additional contributions to capital for the maintenance or development of an investment.

2. Except as provided in Article III, paragraph 1, transfers shall be made in a freely usable currency at the prevailing market rate of exchange on the date of transfer with respect to spot transactions in the currency to be transferred.

3. Notwithstanding the provisions of paragraphs 1 and 2, either Party may maintain laws and regulations (a) requiring reports of currency transfer; and (b) imposing income taxes by such means as a withholding tax applicable to dividends or other transfers. Furthermore, either Party may protect the rights of creditors, or ensure the satisfaction of judgments in adjudicatory proceedings, through the equitable, nondiscriminatory and good faith application of its law.

ARTICLE VI

1. For purposes of this Article, an investment dispute is a dispute between a Party and a national or company of the other Party arising out of or relating to (a) an investment agreement between that Party and such national or company; (b) an investment authorization granted by that Party's foreign investment authority to such national or company; or (c) an alleged breach of any right conferred or created by this Treaty with respect to an investment.

2. In the event of an investment dispute between a Party and a national or company of the other Party, the parties to the dispute shall initially seek to resolve the dispute by consultation and negotiation, which may include the use of non-binding, third party procedures. Subject to paragraph 3 of this Article, if the dispute cannot be resolved through consultation and negotiation, the dispute shall be submitted for settlement in accordance with previously agreed, applicable dispute-settlement procedures; any dispute-settlement procedures, including those relating to expropriation, specified in the investment agreement shall remain binding and shall be enforceable in accordance with the terms of the investment agreement, relevant provisions of domestic laws and applicable international agreements regarding enforcement of arbitral awards.

3. (a) At any time after six months from the date on which the dispute arose, the national or company concerned may choose to consent in writing to the submission of the dispute for settlement by conciliation or binding arbitration to the International Centre for the Settlement of Investment Disputes ("Centre") or to the Additional Facility of the Centre of pursuant to the Arbitration Rules of the United Nationals Commission on International Trade Law ("UNICTRAL") or pursuant to the arbitration rules of any arbitral institution mutually agreed between the parties to the dispute. Once the national or company concerned has so consented, either party to the dispute may institute such proceeding provided:

(i) the dispute has not bee submitted by the national or company for resolution in accordance with any applicable previously agreed dispute-settlement procedures; and

(ii) the national or company concerned has not brought the dispute before the courts of justice or administrative tribunals or agencies of competent jurisdiction of the Party that is a party to the dispute. If the parties disagree over whether conciliation or binding arbitration is the more appropriate procedure to be employed, the opinion of the naitonal or company concerned shall prevail.

(b) Each Party hereby consents to the submission of an investment dispute for settlement by conciliation or binding arbitration.

(i) to the Centre, in the event that the Government of the Czech and Slovak Federal Republic becomes a party to the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States done at Washington, March 18, 1965 ("Convention") and the Regulations and Rules of the Centre, and to the Additional Facility of the Centre, and

(ii) to an arbitral tribunal established under the UNCITRAL Rules, as those Rules may be

modified by mutual agreement of the parties to the dispute (the Appointing Authority referenced therein to be the Secretary-General of the Centre).

(c) Conciliation or arbitration of disputes under (b)(i) shall be done applying the provisions of the Convention and the Regulations and Rules of the Centre, or of the Additional Facility as the case may be.

(d) The place of any arbitration conducted under this Article shall be a country which is a party to the 1958 United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards signed at New York in 1958.

(e) Each Party undertakes to carry out without delay the provisions of any award resulting from an arbitration held in accordance with this Article VI. Further, each Party shall provide for the enforcement in its territory of such arbitral awards. 4. In any proceeding involving an investment dispute, a Party shall not assert, as defense, counter-claim or otherwise, that the naitonal or company concerned has received or will receive, pursuant to an insurance of guarantee contract, indemnification or other compensation for all or part of its alleged damages. 5. In the event of an arbitration, for the purposes of this Article any company legally constituted under the applicable laws and regulations of either Party of a political subdivision thereof but that, immediately before the occurance of the event or events giving rise to the dispute, was an investment of nationals or companies of the other Party, shall be treated as a national or company of such other Party (in accordance with Article 25 (20)(b) of the Convention).

ARTICLE VII

1. Any dispute between the Parties concerning the interpretation or application of the Treaty which is not resolved through consultations or other diplomatic channels, shall be submitted, upon the request of either Party, to an arbitral tribunal for binding decision in accordance with the applicable rules of international law. In the absence of an agreement by the Parties to the contrary, the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL), except to the extent modified by the Parties or by the arbitrators, shall govern.

2. Within two months of receipt of a request, each Party shall appoint an arbitrator. The two arbitrators shall select a third arbitrator as Chairman, who is a national of a third State. The UNCITRAL Rules for appointing members of three member panels shall apply mutatis mutandis to the appointment of the arbitral panel except that the appointing authority referenced in those rules shall be the Secretary General of the Center.

3. Unless otherwise agreed, all submissions shall be made and all hearings shall be completed within six months of the date of selection of the third arbitrator, and the Tribunal shall render its decisions within two months of the date of the final submissions or the date of the closing of the hearings, whichever is later.

4. (a) Each Party shall bear the costs of its own representation in the arbitral proceedings.

(b) Expenses incurred by the Chairman, the other arbitrators, and other costs of the proceedings shall be paid for equally by the Parties. The Tribunal may, however, at its discretion, direct that a higher proportion of the costs be paid by one of the Parties.

ARTICLE VIII

The provisions of Article VI and VII shall not apply to a dispute arising:

(a) under the export credit, guarantee or insurance programs of the Export-Import Bank of the

United States

(b) under other official credit, guarantee or insurance arrangements pursuant to which the Parties have agreed to other means of settling disputes.

ARTICLE IX

This Treaty shall not derogate from:

(a) laws and regulations, administrative practices or procedures, or administrative or adjudicatory decisions of either Party;

(b) international legal obligations; or

(c) obligations assumed by either Party, including those contained in an investment agreement or an investment authorization, that entitle investments or associated activities to treatment more favorable than that accorded by this Treaty in like situations.

ARTICLE X

1. This Treaty shall not preclude the application by either Party of measures necessary for the maintenance of public order, the fulfillment of its obligations with respect to the maintenance or restoration of international peace or security, or the protection of its own essential security interests.

2. This Treaty shall not preclude either Party from prescribing special formalities in connection with the establishment of investments, but such formalities shall not impair the substance of any of the rights set forth in this Treaty.

ARTICLE XI

1. With respect to its tax policies, each Party should strive to accord fairness and equity in the treatment of investment of nationals and companies of the other Party.

2. Nevertheless, the provisions of this Treaty, and in particular Article VI and VII, shall apply to matters of taxation only with respect to the following:

(a) expropriation, pursuant to Article III;

(b) transfers, pursuant to Article IV; or

(c) the observance and enforcement of terms of an investment agreement or authorization as referred to in Article VI (1) (a) or (b), to the extent they are not subject to the dispute settlement provisions of a Convention for the avoidance of double taxation between the two Parties, or have been raised under such settlement provisions and are not resolved within a reasonable period of time.

ARTICLE XII

The Parties agree to consult promptly, on the request of either, to resolve any disputes in connection with the Treaty, or to discuss any matter relating to the interpretation or application of the Treaty.

ARTICLE XIII

This Treaty shall apply to the political subdivisions of the Parties.

ARTICLE XIV

1. This Treaty shall enter into force thirty days after the date of exchange of instruments of ratification. It shall remain in force for a period of ten years and shall continue in force unless terminated in accordance with paragraph 2 of this Article. It shall apply to investments existing at the time of entry into force as well as to investments made or acquired thereafter.

2. Either Party may, by giving one year's written notice to the other Party, terminate this Treaty at the end of the initial ten year period or at any time thereafter.

3. With respect to investments made or acquired prior to the date of termination of this Treaty and to which this Treaty otherwise applies, the provisions of all of the other Articles of this Treaty shall thereafter continue to be effective for a further period of ten years from such date of termination.

4. The Annex, Protocol, and Side Letters shall form an integral part of the Treaty.

IN WITNESS WHEREOF, the respective plenipotentiaries have signed this Treaty.

DONE in duplicate at Washington, this twenty-second day of October, 1991 in the English anc Czech languages, both texts being equally authentic.

FOR THE UNITED STATES OF AMERICA:

FOR THE CZECH AND SLOVAK FEDERAL REPUBLIC:

ANNEX

1. Consistent with Article II Paragraph 1 the United States reserves the right to make or maintain limited exceptions to national treatment in the sectors or matters it has indicated below: air transportation; ocean and coastal shipping; banking; insurance; government-grants; government insurance and loan programs; energy and power production; custom house brokers; ownership of real property; ownership and operation of broadcast or common carrier radio and television stations; ownership of shares in the Communications Satellite Corporation; the provision of common carrier telephone and telegraph services; the provision of submarine cable services; use of land and natural resources; mining on the public domain; maritime services and maritime-related services.

2. Consistent with Article II paragraph 1, the United States reserves the right to make or maintain limited exceptions to most favored nation treatment in the sectors or matters it has indicated below:

ownership of real property; mining on the public domain; maritime services and maritime-related services; and primary dealership in United States government securities.

3. Consistent with Article II paragraph 1, the Czech and Slovak Federal Republic reserves the right to make or maintain limited exceptions to national treatment in the sectors or matters it has indicated below: ownership of real property; and insurance.

4. The Annex shall form an integral part of the Treaty.


PROTOCOL

1. The Parties agree that nothing in this Treaty shall be construed as pertaining to entities which are accredited as part of a diplomatic mission or consular post of a Party.

2. The Parties interpret the term "political subdivision" in Article I, paragraph (1)(b), Article VI, paragraph 5, and Article XIII of the Treaty to include: in respect of the Czech and Slovak Federal Republic, the Czech Republic and the Slovak Republic; and in respect of the United States of America, the states of the United States of America. 3. The Parties acknowledge that the terms of Article II, paragraph (9)(a) are satisfied if an economic relationship between a Party and a third country includes a free trade area or customs union.

4. The Protocol shall forma an integral part of the Treaty.


DEPUTY UNITED STATES TRADE REPRESENTATIVE EXECUTIVE OFFICE OF THE PRESIDENT WASHINGTON, DC 20506

October 22, 1991

His Excellency Vaclav Klaus Deputy Prime Minister and Minister of Finance Czech and Slovak Federal Republic

Dear Mr. Deputy Prime Minister:

In connection with the signing this day of the Treaty between the United States of America and the Czech and Slovak Federal Republic ("CSFR") concerning the Reciprocal Encouragement and Protection of Investment (the "Treaty"), I have the honor to confirm the following understanding reached by our governments relating to the Annex of the Treaty:

With respect to paragraphs 1 and 2 of the Annex to the Treaty, the United States confirms that the extent to exceptions to national treatment or most-favored nation treatment in each sector or matter listed is reflected in U.S. federal or state laws and regulations. Any exceptions to national treatment or by such laws and regulations as may now or hereafter be in force. Any future exceptions shall be limited to those sectors or matters listed in the annex and shall not apply to investments existing a the time the exception becomes effective.

With respect to paragraph 2 of the Annex, the United States confirms that exceptions to most-favored nation treatment in the following sectors result from the use of reciprocity criteria in governing laws and regulations: mining on the public domain; primary dealership in United States government securities; and maritime-related services.

I have the honor to confirm that this understanding shall be treated as an integral part of this Treaty.

Sincerely


Julius L. Katz

[TRANSLATION]

Deputy Prime Minister and Minister of Finance of the CSFR Vaclav Klaus


Washington, October 22, 1991

Dear Ms. Ambassador,

I have the honor to confirm receipt of your letter of October 22, 1991 which reads as follows:

[See text of Ambassador Katz's letter immediately preceding.]

I have the honor to confirm that the Government of the Czech and Slovak Federal Republic agrees that this understanding be considered an integral part of the Treaty.

Respectfully, [s] Vaclav Klaus


Ms. Carla Hills Ambassador and Trade Representative of the United States of America


[TRANSLATION]

Deputy Prime Minister and Minister of Finance of the CSFR Vaclav Klaus

Washington, October 22, 1991

Dear Ms. Ambassador,

In connection with the signing this day of the Treaty between the United States of America and the Czech and Slovak Federal Republic ("CSFR") concerning the Reciprocal Encouragement and Protection of Investment (the "Treaty"), I have the honor to confirm the following understanding reached by our governments relating to Article II, paragraph 1, of the Treaty with respect to the entry of investments:

[The text of the understanding is contained in Ambassador Katz's letter which follows.]

I would be grateful if you could confirm that your government agrees with this understanding.


Respectfully, [s] Vaclav Klaus


Ms. Carla Hills Ambassador and Trade Representative of the United States of America

DEPUTY UNITED STATES TRADE REPRESENTATIVE EXECUTIVE OFFICE OF THE PRESIDENT WASHINGTON, DC 20506

October 22, 1991

His Excellency Vaclav Klaus Deputy Prime Minister and Minister of Finance Czech and Slovak Federal Republic

Dear Mr. Deputy Prime Minister:

In connection with the signing this day of the Treaty between the United States of America and the Czech and Slovak Federal Republic ("CSFR") concerning the Reciprocal Encouragement and Protection of Investment (the "Treaty"), I have the honor to confirm the following understanding reached by our governments relating to Article II, paragraph 1, of the Treaty with respect to the entry of investments:

1. In the implementation of the provisions of Article II, paragraph 1, relating to the entry of investments, the CSFR may require approval for (a) investments of nationals or companies of the United States in or with companies the majority of the assets or ownership interests of which are owned by the CSFR, and (b) investments of nationals or companies of the United States through which such nationals or companies acquire, directly or indirectly, the equity interests of the CSFR in companies.

2. Any requisite approvals under paragraph 1 shall not be denied for the purpose of with the effect of limiting competition or discouraging or prohibiting investment by nationals or companies of the United States in particular sectors (except as set forth in the Annex). Further, the CSFR shall accord no less than most favored nation treatment to nationals and companies of the United States in determining whether to grant or deny such approval.

3. Within two years of the entry into force of the Treaty, the Parties shall consult with a view to narrowing the scope of investments subject to paragraph 1 and subsequently phasing out the requirement for such approval.

The CSFR will initiate ratification of this treaty immediately after a new commercial code, which is consistent with the provisions of this letter regarding the liberalization of government approval procedures, has been approved by parliament.

I have the honor to confirm that this understanding shall be treated as integral part of the Treaty.

Sincerely


Julius L. Katz.


DEPUTY UNITED STATES TRADE REPRESENTATIVE EXECUTIVE OFFICE OF THE PRESIDENT WASHINGTON, DC 20506

October 22, 1991

His Excellency Vaclav Klaus Deputy Prime Minister and Minister of Finance Czech and Slovak Federal Republic

Dear Mr. Deputy Prime Minister:

During the course of negotiations of the Treaty between the United States of America and the Czech and Slovak Federal Republic ("CSFR") concerning the Reciprocal Encouragement and Protection of Investment (the "Treaty"), the delegations took note of the economic transformations in the CSFR. In view of these rapid changes, we discussed the desirability of ensuring that nationals and companies of the United States receive timely information on these changes and other assistance so that they may derive the full benefits of the Treaty with respect to their investments and associated activities.

In this connection, the Government of the CSFR intends to accomplish this objective by designating an entity which would:

- provide up to date information regarding current national and local business and investment regulations, including authorization and registration procedures, taxation, labor regulation, accounting standards and access to credit;

- provide up to date and readily available information regarding proposed changes in the laws and regulations concerning investors;

- coordinate with CSFR government agencies on the national, regional and local levels to facilitate investment;

- assist investors who experience difficulties with registration, authorization, access to public services, regulatory and other matters which concern establishment and operation of investments; and

- collect and disseminate information regarding investment projects and sources of their financing. I have the honor to confirm that this understanding shall be treated as an integral part of this Treaty.

Sincerely,

Julius L. Katz

Lichtenštejnské důkazy o vytunelování Trendu

# Heslo: PIANO ČERNÝ

*Rekonstruujeme modelový příklad, jak vytunelovat investiční fond. TÝDEN získal dokumenty, které nasvědčují tomu, že tzv. prodej obchodního domu Kotva do zahraničí byl jen trikem.*

Kauza OD Kotva (tržní hodnota činí asi 2,885 miliardy korun) je bitvou v Čechách nevídaného rozměru. Je operprena několika vězněnými osobami, desítkami žalob, kampaněním známých mediálních agentur i nebývalou koncentrací nejprestižnějších českých advokátů. Dříve než zrekonstruujeme případ na základě nejnovějších poznatků TÝDNE, shrňme jeho podstatu: firma Královéhradecká brokerská, a s (KHB), se podle dokumentů, které máme k dispozici, pokusila majoritní podíl Kotvy převést z investičního fondu Trend prostřednictvím zahraniční společnosti ve prospěch dosud nespecifikovatelných subjektů či osob. Případ je jedním z nejkomplikovanějších v moderní historii komerčního práva u nás

## Rekonstrukce kauzy Trend & Kotva

Fond Trend (založený Bankou Skala a Montovanými stavbami) využil politického zázemí Michaela Kocába a podnikatelských schopností Martina Kratochvíla k důvěryhodnému úspěchu v kuponové privatizaci Prvním nebezpečím pro „otce zakladatele" fondu Trend byla aktivita spojená se sdružováním menších akcionářů a skupováním akcií Trend se pokusil zabránit vzniku silné minoritní skupiny akcionářů, která by mohla vyměnit statutární orgány složené z „otců zakladatelů" Rozhodl se pro výplatu velmi slušného dividend (s předpokladem, že původní akcionáři fondu namísání dividendou, akcie neprodají) To však zjevně nestačilo a po několika měsících díkové opět skupovali akcie fondu investorovi, který je shromažďoval (šlo o firmu

Czech Value Fund, která v případu bude hrát podstatnou roli)

V únoru 1995 byla založena nová investiční společnost Trend, a s., se základním jměním 1 000 000 Kč, mezi jejímiž akcionáři byli i Michael Kocáb a Martin Kratochvíl Tato společnost pak fond Trend spravovala Její založení a existence se však zdají silně účelové Akcie správcovské společnosti Trend, a s., byly totiž 2 srpna 1995 prodány firmě Královéhradecká brokerská, a. s. za 318,365 milionu korun. Jejím hlavním akcionářem byl Miroslav Hálek (nyní ve vazbě) Z tohoto obchodu měl Kocáb zisk 36,142 milionu Kč Že se jednalo o první a zásadní faul na akcionáře fondu Trend, je zřejmé z Kocábova prohlášení

v listopadu 1997: „V případě, že minoritním akcionářům fondu Trend nebude najevo k navrácení, tuto sumu nebudu chtít a použiji ji na nějaký dobročinný ale kontrolovatelný účel"

## Tunel hned na počátku

Noví správci z Královéhradecké brokerské uskutečnili první podivný obchod s akciemi již tři týdny poté, co majoritní akcionářskou firmu koupili Ve třech smlouvách prodali lukrativní akcie z Trendu (Telecom, Chemopetrol a Synthesia) společnosti Consul Invest (jejíž šéf je nyní ve vazbě) za 487 milionů korun Kupec zaplatil jen první splátku (135 milionů), zbytek zůstal dlužen dodnes, čímž Trend ztratil 352 milionů korun Akcie držel pár dnů a obratem je prodal firmě spřízněné s Královéhradeckou brokerskou

Porovnání čísel vede logicky k podezření, že šlo o pokrytí investic KHB za koupi

správcovské investiční společnosti Trend, a s., včetně desetiprocentní provize Je tu ba investic že v této době již šlo zůstávali v představenstvu fondu Trend Michael Kocáb a Martin Kratochvíl, avšak oba tvrdí, že v období, kdy fond prodával lukrativní akcie byli na dovolené v zahraničí

## Na řadu přišla Kotva

Koncem roku 1995 vlastnil Trend přibližně 20 procent akcií Kotvy Hálkovi, který byl tehdy už u ní jen majitelem správcovské společnosti, ale i předsedou představenstva samotného fondu Trend, se postupně podařilo shromáždit v rozličných firmách různým způsobem celkem 65 % akcií Kotvy

O tento obchodní dům měla zájem právě již zmíněná společnost Czech Value Fund (CVF) Během roku 1996 proto koupila na kapitálovém trhu 37 procent akcií fondu Trend za zhruba 10 milionů dolarů a 1 listopadu byli zvoleni její zástupci - John Moffat a Michael Blum - do představenstva fondu O týden později, když oba zjistili, že fond již byl vytunelován, byla na jejich nátlak ministerstvem



Ve vazbě. Miroslav Hálek (v popředí), bývalý předseda představenstva IF Trend obviněný vyšetřovatelem z trestného činu podvodu. (6. března 1997 na chodbě Krajského úřadu vyšetřování v Hradci Králové.)

financí uvalena na fond Trend
nucená správa. Londýnský
ředitel společnosti vlastnící
CVF pan Kingsnorth svého
času prohlásil, že odpověd-
nost za špatné hospodaření
s půl Trend nese spolu s Hál-
kem a jeho představenstvem
i představenstvo předcházejí-
cí, tedy Michael Kocáb a jeho
společníci.

## Zablokování účtu

John Moffit, šéf CVF, však
začátkem roku 1997 přechází
za pomoci Michaela Kocába
a advokátní kanceláře Váňa,
Pergl a partneři (AK VPP) do
tvrdého útoku. Účty Trendu
byly rozhodnutím soudu
zablokovány, ale rozhodnutí
soudu se dostalo do Středis-
ka cenných papírů pozdě. Hálek
i spol. proto stihli prodat
svým spřízněným firmám kon-
cem ledna 1997 z již zablokova-
ných účtů Trendu asi
14 procent akcií Kotvy. Kro-
mě toho stahovali další akcie
a nakonec 30. ledna 1997
Hálek a spol. balík o velikosti
56 % akcií Kotvy prodali za
80 milionů Kč kyperské firmě
Forminster Enterprises Limi-
ted (FEL) Začátkem března
se ocitli ve vazbě a 65 % akcií
Kotvy státní úředníci zablo-
kovali Tak propukl naplno nevi-
daný právní spor mezi FEL
a Czech Value Fund

## Bitva advokátů

Advokáti z advokátní kance-
láře Váňa, Pergl a partneři ve
službách minoritního akcioná-
ře Czech Value Fund vstupují
do orgánů fondu Trend
v dubnu již jako statutární
zástupci, ale zároveň Mgr.
Pergl a Mgr. Radek
Jirchá z AK VPP na valných
hromadách Kotvy vystupují za
Trend v roli právníků a podaří
se jim v přímém souboji zvít-
ězit nad zástupci FEL Advokát
Pergl prohlašuje v Právu
(22. 10. 1997): ... a teď jsme
udali a nes sebe, jejich před-
sedu ... On to po hodině
udělal. Nepřijal to nervově.
Tak se snaží dvě představen-
stva Trend – tedy Pergl vystavu-
je ..... plnou moc

V roce 1997 pověřuje
nový statutár 56 procent Kot-
vy, které má kyperský FEL,
zastupováním advokátní kan-
celář Brzobohatý Tomán

1/98 TÝDEN

a partneři Do obchodního rej-
stříku však bylo 4 srpna
zapsáno představenstvo mino-
ritního vlastníka – tedy Czech
Value Fund

V srpnu 1997 je podepsána
další zvláštní smlouva: koncipi-
ent JUDr. Tomana bývalý
ředitel Bezpečnostní infor-
mační služby Stanislav Devátý
od starého hálkovského
představenstva koupil za
2,885 miliardy korun Kotvu
jako nemovitost (Stalo se tak
za registrováním na katastrál-
ním úřadě v Praze, součástí
operace bylo deklarované
zpětvzetí ) Smyslem této ope-
race byla snaha kyperské fir-
my FEL, kterou Tomanova
kancelář zastupovala, zabránit
jakémukoliv nakládání
s majetkem Kotvy V listopadu
1997 pak došlo ke zrušení
této smlouvy, protože údajné
nebezpečí neoprávněného
nakládání s nemovitostmi
pominulo

## Bankovní dokumenty

Vraťme se však k zásadní otáz-
ce, otázce právoplatnosti důle-
žitých rozhodnutí a k otázce,
oč usilovala firma FEL.

V prosinci 1997 zrušil Vrch-
ní soud v Praze zápis minorit-
ního představenstva a na
bojovné prosincové valné hro-
madě Kotvy, kterou vedl
JUDr. Tomáš Sokol (pověřen
většinovým vlastníkem Tren-
du, tedy kyperskou společnos-
tí FEL), došlo ke zvolení nové-
ho představenstva. V něm se
z ničeho nic objevili zástupci
Českého investičního holdingu
(ČIH). Ten zastupovala další
přední advokátní kancelář
Kříž, Bělina & spol. Jak se
však mohl český investiční
holding objevit v této hře?
Holding ČIH koupil od kyper-
ského FEL opci na akcie Kot-
vy. (Této valné hromadě byl
přítomen mimo JUDr. Toman
a i JUDr. Josef Lžičař - taková

koncentrace nejrenomovaněj-
ších českých právníků nastala
v našich novodobých dějinách
poprvé )

ČIH se ryze český investor,
pro nějož je investice do akcií
Kotvy obchodem s únosnou
mírou rizika. Jeho zástupci
budou v orgánech Kotvy při-
nejmenším do té doby, než
soud rozhodne, komu zabloko-
vané akcie vlastně patří Role
ČIH se zdá v případě operací
týkajících se Kotvy spíše
náhodná

## „PIANO ČERNÝ"

Prosincová valná hromada
Kotvy tedy nedopadla pro
Czech Value Fund dobře a jen
několik dnů poté se objevuje
prohlášení advokátky
JUDr. Jirkové z advokátní kan-
celáře Váňa, Pergl a partneři
v LN (12 12 1997), že mají
důkazy o tom, že kyperská fir-
ma FEL byla pouze Hálkovou
schránkou TÝDNU se podařilo
část těchto dokumentů získat.
Pokud by se potvrdila jejich
pravost, podařilo by se advoká-
tům husarský kousek (vzpo-
meňme si, že stejní právníci
vnesli jasno i do kauzy tunelo-
vání CS Fondů, když popsali
přesné toky peněz)

V případě Trendu by totiž
prolomili bankovní tajemství
lichtenštejnské banky LGT
Bank in Liechtenstein, kde
kyperská firma FEL měla svůj
účet Hálek si totiž měl „prona-
jmout" firmu FEL se svým
obchodním, což má dokazovat
plná moc od kyperského FEL
pro nakládání s jeho kontem
ve prospěch Hálka a heslo pro
telefonické příkazy: „PIANO
ČERNÝ" Je nepravděpodob-
né, že by kyperský občan zvolil
heslo v češtině

Tento průlom však určitě
povede k objasnění celého pří-
padu. Hálek a spol. s největší
pravděpodobností využili spo-
lečnosti FEL k převodu majet-
ku z fondu Trend na akcie
Trendu Angličanům
z Czech Value Fund, který za
akcie Trendu zaplatil zhruba
10 milionů dolarů, a dalším
investorům se pak snad vrátí
peníze vložené do akcií fondu.
Případ neskončil. podle zasvě-
cených právníků může být
ještě vzneseno až padesát
žalob.

JAROMÍR PISKOŘ
*(Autor je volný reportér)*



„PIANO ČERNÝ". Tak zní heslo umožňující operovat s kontem společ-
nosti kyperské firmy Forminster Enterprises Limited u LGT Bank in
Liechtenstein. Z dalšího dokumentu jsou patrné podpisové vzory ben-
a Forminster Enterprises Limited u LGT Bank in Liechtenstein. Jde
o důkaz o tom, že Hálek a spol. mohli s kontem volně disponovat.

LIECHTENSTEIN EVIDENCE ON THE TUNNELING OF TREND

# Password: PIANO BLACK

Reconstruction of a model case of how to tunnel an investment fund: TYDEN has evidence supporting the suspicion that the so-called "sale" of Kotva Department Store to abroad was a mere fraudulent trick.

TÝDEN MAGAZINE 04/1998

The case of Kotva DS (with the market value of about 2,885 billion Czech Crowns) is a battle of unseen dimensions in the Czech Republic. It is spiced up with people turned in jail, dozens of court claims, campaigns of well-known PR agencies as well as an unusual concentration of the most prestigious Czech lawyers. Before we present to you our reconstruction of the case on the basis of the newest findings by TYDEN, let's focus on its fundamental aspects: the company Kralovehradecka brokerska, a.s., (KHB), has attempted, as the documents we have acquired show, to take the majority share in Kotva out of Trend and transfer it via a foreign company to the benefit of not yet specifiable persons or entities. The case is one of the most complicated ones in the modern history of commercial law in our country.

**Reconstruction of the case of Trend & Kotva**

The mutual investment fund Trend (founded by Skala Bank and the company Montovane stavby) took the advantage of the political background of Michael Kocab in combination with the business talents of Martin Kratochvil and won a credible success in the voucher privatization. The first activities perceived as a threat by the "founding fathers" of the fund were the activities concerning the grouping of small shareholders and the purchase and concentration of shares. Trend made an attempt to prevent a strong minority shareholders' group that would have the power of replacing the statutory bodies of the fund composed of the "founding fathers" from coming into existence by having made an offer of very good dividends (assuming that the original shareholders, satiated by such dividends, shall not get rid of their shares). However, this tactic did not prove effective enough and in a few short months, the investment vouchers holders (shareholders) started selling off their shares to the investor accumulating them again (the company Czech Value Fund, which shall turn out to play a significant role in the case later).

In February 1995, the new investment company Trend, a.s., was founded having the registered capital of CZK 1,000,000, amongst whose shareholders were also Michael Kocab and Martin Kratochvil. This company undertook the administration of Trend. Its foundation and existence alone, however, seem to be very purpose-sown, since the shares of the administrating company Trend, a.s., were, on 2 August 1995, sold to Kralovehradecka brokerska, a.s., for the price of CZK 318,365,000, whose major shareholder was Miroslav Halek (held in custody now). Kocab's profit from this deal came to be CZK 36,142,000. The fact that this transfer was the first and principal foul against Trend's shareholders is borne out in Kocab's public announcement of November 1997: "In the case that the assets of the minority shareholders are not returned to them, I will not accept this sum of money but give it up to some charitable purpose under good control."

## Tunnel from the beginning

The new administrators of Trend from Kralovehradecka brokerska realized their first fishy deal with the shares already three weeks after their takeover of the administrating company. Under three contracts they sold the lucrative shares of Trend (Telecom, Chemopetrol and Synthesia) to the company Consult Invest (whose boss is in custody now) for 487 million Czech Crowns. The purchaser only paid up the first installment (135 million) owing the rest until today – and having Trend lose 352 million in result. Moreover, it only held the shares purchased for a couple of days and then resold it to a company tied to Kralovehradecka brokerska.

The simple comparison of the figures logically and immediately leads to a suspicion that this transaction served to cover the investment of KHB for the purchase of the administrating investment company Trend, a.s., including a 10% provision. We need to add at that time, Michael Kocab and Martin Kratochvil were still sitting on Trend's Board of Directors but both of them assert they were on holiday abroad and out of touch when the fund was selling the lucrative shares.

## Eyes on Kotva

By the end of 1995, Trend owned about 20% of shares in Kotva. Halek, who was then not only the owner of the administrating company but already sat in the chair of the Chairman of the Board of Trend itself, gradually succeeded in gathering up 65% of shares in Kotva within all sorts of various companies.

The already mentioned Czech Value Fund (CVF) was interested in the Department Store and during 1996, it bought 37% of the shares in Trend on the capital market for about $ 10 million: on 1 November, the representatives of CVF, John Moffit and Michael Blum, were elected in the Board of Directors of the Fund. A week later, when they found out that the fund had already been tunneled out, the Ministry of Finance under their pressure imposed forced administration on Trend. The London executive of the company controlling CVF, Mr. Kingsnorth, once commented that it is not only the Board of Directors headed by Halek, who should be held responsible for the poor management of the fund, but also the previous Board of Directors, i.e. Kocab and his associates.

## Account Freezing

John Moffit, the head of CVF, turns to fight back hard with the help of Michael Kocab and the law firm Vana, Pergl and Partners (AK VPP) in 1997. The accounts of Trend are frozen but the freezing order arrives at the Prague Security Center too late, which gives enough room to Halek and Co. to use their time and resell about 14% of the shares in Kotva from the frozen account to their crony companies by the end of January 1997. Besides that, they kept on removing other shares until they finally managed, on January 30, 1997, to sell the bulk of 56% shares in Kotva to the Cyprus company Forminster Enterprises Limited (FEL) for CZK 80 million. At the beginning of March, they were eventually put in custody and the governmental officials managed to freeze 65% of the shares in Kotva. This kicked off an unprecedented legal dispute between FEL and Czech Value Fund with violence.

**The battle of lawyers**

The lawyers from AK VPP hired by the minority shareholder, Czech Value Fund, enter the statutory bodies of Trend. They become the statutory representatives in April but at the same time Mgr. Robert Pergl and Mgr. Radek Blaha of AK VPP act in the role of Trend's attorneys at the general meetings of Kotva and they succeed in beating the reps of FEL in a head-on combat. As the attorney Pergl says in an interview for Pravo (newspaper) on October 27, 1997:"...and now we spoke over each others voices, me and their Chairman. And he gave it up in an hour – didn't have the nerves for it." In result, two Boards of Directors of Kotva emerge. Pergl draws up a power of attorney for himself.

In June 1997, the new owner of the 56% shares in Kotva, FEL from Cyprus, appoints as its attorney the law firm JUDr. Petr Toman and Partners. However, the Board of Directors nominated by the minority shareholder, i.e. Czech Value Fund, was already registered in the Commercial Register on August 4.

In August 1997, another fishy contract is signed: the junior lawyer of JUDr. Toman, the ex-head of the Security and Information Agency of the Czech Republic Stanislav Devaty buys Kotva as a real estate from the old Halek's Board of Directors for 2,885 billion Czech Cronws (it was achieved by the registration at the Land Registry of Prague, and the part of the transaction was the declared retraction of the contract after the fulfillment of certain conditions). The purpose of this transaction was the effort of the Cyprus company, being represented by Toman's law firm, to prevent any possible manipulation with the property of Kotva. In November 1997, this contract was cancelled since the danger of illegal disposition allegedly ceased to exist.

**Bank Documents**

But lets get back to the principal question of legality of the crucial decisions that were made and also to the one of what was FEL really after?

In December 1997, the Supreme Court in Prague abolished the registration of the minority Board of Directors and the new Board of Directors was elected at the inflammatory general meeting headed by JUDr. Tomas Sokol (appointed by the majority owner of Trend, the Cyprus company FEL). The new Board of Directors was partly made up of the reps of Czech Investment Holding (CIH). Out of the blue. CIH was represented by another leading law firm, Kriz, Belina & Co. But how did CIH get in the game? CIH bought an option for the shares in Kotva from Cyprus FEL. (By the way, personas like JUDr. Toman and JUDr. Lzicar were to be found at this general meeting – creating a concentration of the most renowned Czech lawyers per meter square unseen in our modern Czech history.)

CIH is a purely Czech investor for whom the investment in the shares in Kotva represents a transaction with a bearable risk. Its representatives shall remain in the statutory bodies of Kotva at least until the decision is finally made as to who is the owner of the frozen shares in Kotva. The role of CIH in the transactions around Kotva seems to be rather a coincidence than anything else.

**"PIANO BLACK"**

The December general meeting of Kotva didn't work out too well then for Czech Value Fund; a few days later, a statement by JUDr. Jirkova of the law firm Vana, Pergl and Partners appears in the press (LN, December 12, 1997) saying that they possess evidence that Cyprus FEL was nothing but Halek's money chest. TYDEN managed to get a hold of a part of these documents of evidence. If their authenticity is proved, the lawyers would have managed a quire an impressive feat (let us remember that it was the same law firm that brought the light into the case of the tunneled out CS Funds, having disclosed and described the exact money flows used).

In the case of Trend it would mean that they were able to break through the bank secret of LGT Bank in Liechtenstein where the Cyprian FEL held its account. By their allegations, Halek was supposed to "hire" FEL for his own business, a fact that should be evidenced by FEL's power of attorney for Halek to handle its account, including the phone-banking password 'PIANO BLACK'. It is rather unlikely that a Cyprus citizen would have selected a password in the Czech language.

However, it seems certain that this breakthrough will lead to the clarification of the whole case. Halek and Co. have most likely used FEL to transfer the assets from Trend to the benefit of the various companies owed by them. Hopefully, the Britons of Czech Value Fund, having paid about 10 million Czech Crowns for the shares in Trend, as well as the other investors have finally began to see the chance of recovering their investments put into the shares of the fund. Although the story is not over with yet and the lawyers initiated in the case claim that about 50 more court claims may still be brought and tried.

JAROMIR PISKOR
*(an independent journalist)*

# Případ Trend: Co se dělo, všichni vědí, ale majetek se vrátí jen stěží

Jako pruhlíšky kámen v cause vytunelovaných investičních fondů působí případ Trend. Na první pohled vzbuzuje optimismus - hlavní aktéři podvodu, spjatí s Královéhradeckou brokerskou jsou ve vazbě, dříve setkání vytunelovaného majetku je zmrazena na účtech ve Středních cenných papírů a minerálních účtů kolem Trendu ovšědi obcholetálním Kotva. Jenž patří mezi ...zi jeho hlavní majitele. Ac se ale zdá jasné a dušlaji se původní vlastníci návratu svého majetku?

Trend, z něhož jeho správci ...syší jeden a čtvrt miliardy korun byl prvním fondem, na nějž byla uvalena nucená správa. Přišlo tak proti fondech provéděla Královéhradecká brokerská, nebylo u nás zdaleka ojedinělé. „Do té doby takové obchody běžně fungovaly. Desítky dalších .u nedělily jich se, kdyby to bylo stavy - proto bylo posvěleníé,“ potvrzuje ba,zovní analytik Michal Konečný z Komera.

## S jídlem roste chuť

Trend byl jedním z nejúspěšnějších fondů kuponové privatizace. Své body do něj v obou koletch vložilo přes sto tisíc lidí a jeho majetek nucené správa. Přitom to, co ve fondech prováděla Královéhradecká brokerská, nebylo u nás zdaleka ojedinělé...

## Rozhýbat stát

„Podíleti by se nezmohli na nic Možná by ministerstvo zavedlo nucenou správu, ale to by byla všechno,“ říká Robert Pergl z advokátní kanceláře Váha, Pergl & partneři, která se zastupovní Czech Value Fundu a vytunelovaného Trendu ujala. „Případ Trend je plným vešla jasný. Bylo to naprosté fašerství nyní si již tunelář dávají mnohem větší pozor,“ tvrdí Pergl

„Největší práce byla rozhýbat stát a všechny ostatní instituce, jako například dozor nad kapitálovým trhem, aby se těmto případem vůbec zabály,“ říká Pergl. „Zpočátku byly stální orgány bezradné, vůbec neveděly co dělat. Situace se ale lepy otočila,“ dodává.

Výsledkem snah podílníků Trendu bylo, že začátkem letošní rok...

### Jak získal Forminster peníze na nákup Kotvy



24. ledna rozhodl Krajský obchodní soud v Hradci Králové o zablokování akcií na účtu IFM. Toto rozhodnutí však soudkyně zpřísnila dovolit Středoku cenných papírů, takže Hálek a spol. byli však varováni a akcie stačili ještě převést.

TREND → akcie → IFM
24. 1. 1997
357 000 akcií po 320 Kč
smlouva z 22. 1. 1997 o prodeji
KHB ← 357 000 akcií po 700 Kč → ATLANTA SAFE
24. 1. 1997
357 000 akcií po 320 Kč → FORMINSTER
27. 1. 1997
357 000 akcií po 700 Kč

Zisk za tuto jedinou finanční operaci 135,6 milionu korun

koupili Miroslav Hálek a jeho Královéhradecká brokerská ve vlek majetek fondu velice rychle zmizel na druhotina. I to by však jeho správcům v té době nijak zvlášť neuškodil...

## Vývoj situace okolo Trendu

## Kocáb: Za to, jak fond skončil, cítím odpovědnost



zakladatel Trendu
Michael Kocáb

Investiční fond Trend si díky osobám Michaela Kocába a Martina Kratochvila získal důvěru více než sta tisíc lidí. Mužům však v k. V. Konečně nebyl hlavním iniciátorem vzniku fondu...

### Tunel stihl tunel

Jen oznaceni dni ze koupi Trendu však docházi k prvnímu neochvějnému obchodu. Nový správce fondu prodalí akcie Kolek Chemapol tonu, Telecomu a Synthesie za 487 milionů korun společnosti Corsair v k. V. Konečně...



### Jeden ze způsobů, jak Trend přišel o majetek

28. května 1996 (viz tabulka)
152 935 akcií Kotvy po 400 Kč
TREND → celkem 61,174 mil Kč → KHB

28. května 1996 - 8. srpna 1996
139 100 akcií Kotvy po 952 Kč
TREND → celkem 132,328 mil Kč → KHB

28. května 1996 - 8. srpna 1996
139 000 akcií Kotvy po 400 Kč
TREND → celkem 55,600 mil Kč → KHB

## TREND case – everybody knows what happened but the assets will hardly be restored

Slovo daily - September 18, 1997 - Prague

The TREND case seems to be the touchstone with regards to tunnelled investment funds. At first appearance, this case seems to arouse optimism, as the main participants in the fraud connected to Královéhradecká Brokerská are in custody, the majority of the embezzled assets is frozen in the accounts kept with the Securities Centre and the majority shareholders of TREND assumed control over Kotva department store, which represented Trend's main asset. However, is everything as clear as this and will the former owners get their property back?

TREND, from which its managers "drained" CZK 1.25 billion, was the first investment fund to be placed under forced administration. However, the steps undertaken in the investment funds by Královéhradecká brokerská were far from isolated in the Czech Republic. *"Such deals were by then commonly undertaken Dozens of other similar deals – and I would not be surprised if there were hundreds – were undertaken even without being noticed"*, confirms the Stock Exchange analyst Michal Konečný from Komero.

### The taste grows with food

TREND was one of the most successful investment funds in coupon privatisation. Within both waves of the privatisation, more than 100.000 "DIKS" (designation of the holders of the investment coupons – remark of translator) put their points to this fund and its assets amounted to CZK 1.3 billion. However, very soon after the purchase of TREND from Michael Kocáb by Miroslav Hálek and his company Královéhradecká brokerská, the assets of the fund decreased to one twentieth. The managers of the fund could probably have effectuated even this step without difficulties. The whole group around Královéhradecká brokerská may thank its greed for more than half a year of custody.

As taste grows with food, Mr. Hálek tried to sell the empty shell of the investment fund to a foreign investor – the British Czech Value Fund belonging to a group of British Regents Funds. Before this the investment company Prag Invest had already started to buy up shares in TREND from the minority shareholders for this investor. Prag Invest warned the British investors about the bad state of TREND. The fund was, however, in far worse condition than the British investors anticipated, and consequently, they hired lawyers and started immediately to bombard the state authorities.

### To make the state move

*"The shareholders would not be able to do anything whatsoever. The Ministry would maybe put the fund under forced administration, but nothing more"* says Robert Pergl from the law office Váňa, Pergl and Partners, which took on the representation of Czech Value Fund and of the tunnelled TREND. *"The TREND case is completely clear. It was an absolute lack of professionalism and crooks are presently much more careful"* he alleges.

*"It was most difficult to make the state act and to compel it as well as all the other institutions, as for example the supervision over the capital market, to handle the case"*, he says. *"Initially, the state authorities were perplexed; they did not know what to do whatsoever. However, the situation soon made a turn"* he adds. The result of the efforts of the

shareholders was that, at the beginning of the May, the court took into the custody the first five participants in the fraud and one moth later, two other participants. The whole work of detecting the embezzled property was, however, several times incomprehensibly complicated by the court, which for example decided, at the end of the January, on the freezing of shares in Sokolovská uhelná and in Kotva in the accounts of the company IFM, but it delivered the freezing order only to the company IFM and failed to deliver it also to the Securities Centre. Consequently, the shares could have disappeared, on the same day, from the account. Within a further few days the court made a grave mistake for the second time, when it ordered, at the request of the Police, the freezing of all the accounts of KHB and of the companies linked to it, however, it confused the number of one of the accounts, in which there was deposited, by coincidence, all the money concerned – i.e. several hundred million Czech crowns. However, this failure contrived to be rectified.

**The tunnel ends in Cyprus**

The most valuable asset of TREND was represented by the majority block of the shares in KOTVA. These share also disappeared. However, the court finally succeeded in freezing these shares in the account of the Cyprus company Forminster Enterprises Limited.

The mode of acquisition by FEL of the money for the purchase of the shares in Kotva is particularly remarkable: FEL arranged the transfer of the shares in Sokolovská uhelná from KHB to Atlanta Safe and acquired by this sole business deal the unbelievable profit of CZK 135 million (see table). After the purchase of 55.73% of shares in Kotva for less than CZK 83 million, more than CZK 50 million remained with FEL. "*It is true that a profit of CZK 135 million from one business deal is unusual, but it is not prohibited by law. The Act on money laundering could however apply to this business deal and the person who undertook this deal should have reported it immediately to Ministry of Finance*", estimates the analyst Konečný.

The shares in KOTVA were probably intended to be further transferred, however, before this could be effectuated, the court had finally frozen the account of FEL. Nevertheless, FEL, which was meanwhile bought by the French company DUNA with total assets amounting to CZK 200,000, alleges that it acquired the shares via a legitimate purchase and that it has no connection with KHB, which tunnelled TREND.

However, the brokers have a different opinion. "*These business deals prove an evident connection between KHB and FEL*", alleges Mr. Pergl and he also points out that the majority block of shares was sold for half of the price for which the shares were sold at the time on the Stock Exchange. "*The bigger the block of shares is, the higher is the average price of one share. Not even a multiple of the price on the Stock exchange is exceptional*", agrees Konečný.

**Lobbing or civil duty?**

Meanwhile, the state authorities finally started to work faster, which is showed, inter alia, by more than a dozen of the frozen accounts with shares, which originated from TREND. However, the majority shareholders allege that this is all due to Michael Kocáb who exploited his good connections. "*The court succumbed after more than one year to consistent media pressure and to the one-sided description of the situation: that the heroes from Trend are saving the minority shareholders. In fact, they seek to assume control over KOTVA, which was legally purchased by FEL*", alleges Mr. Petr Toman. "*The courts undoubtedly did not act*

*in our favour and were committing a lot of mistakes.*" counters Mr. Pergl and refers to the two above-mentioned mistakes of the commercial court in Hradec Králové.

Michael Kocáb does not deny that he negotiated about TREND with Ministers Ruml and Parkanová and with the Supreme Public Prosecutor Mr. Hrbotický, however, he defends himself against the charge of misuse of his contacts. "*It was not lobbying but a civil duty. When someone sees a thief, he should come forward. It is not a pleasure for me to be engaged in this case, but we have to understand that when you make your bed you must lie in it*", says Kocáb and adding that if he did not do anything he would certainly be charged with idleness. "*We have always played fairly, we tried to give the property back to the robbed,*" he adds.

**Battle for KOTVA**

Meanwhile, the battle for TREND was definitively transformed into the battle for KOTVA. In spring, two general meetings of the department store took place within a short time period, at which two groups of shareholders refused to acknowledge one another and elected their own Boards of Directors. The minority shareholders allege that FEL did not announce, after the acquisition of the majority block of shares, that it was acting in concert with KHB and simultaneously failed to offer publicly the purchase of shares, which is why FEL lost all voting rights for a one-year period. However, FEL counters that in such a case it would lose only shares exceeding 50%. Total prevention from the possibility of exercising the rights of a shareholder is too hard a sanction. "*This case is a precedent, no other court has ever decided on such a case,*" alleges Mr. Tomáš Pelikán, who specialises in commercial law. According to him, the legal provisions are not completely clear in this case. Nevertheless, the court has not decided yet on the cancellation of the exercise of the rights of the shareholders of FEL and it refused requests from the minority shareholders regarding the delivery of the interlocutory injunction preventing FEL from the possibility of voting at yesterday's general meeting.

Both parties have filed several petitions against one another, which must be now treated by the court. The commercial register registered, on August 4, the Board of Directors elected by the minority shareholders around the Czech Value Fund. This registration was, however, immediately questioned by the majority shareholders. The attorneys of both the parties filed also a complaint with the Bar Association against their colleagues and charged them thereby with unethical behaviour.

**Law clerk and three billion**

The case has gathered steam approximately a month ago. Kotva was bought from FEL through a purchase agreement by the former chief of BIS and current law clerk of Mr. Toman's law office, Stanislav Devátý, who has immediately admitted that the agreement was fake and that he hasn't got any money. "*If someone does something like that, he is absolutely hopeless. Attorneys at law should advise their clients and not purchase department stores for them and even admit to this as being a fake,*" says Pergl.

"*We were afraid that transfer of the real estate of Kotva to third persons was being prepared. The only lawful way how to foil this transfer was to make a seal at the Land Registry. The purpose is nothing else but sealing possible transfers until the court issues a final and binding decision on the ownership of Kotva,*" explains Mr. Toman.

Subsequently, Devátý and Forminster granted together a power of attorney to Michael Kocáb, authorising him exclusively to remove the lead seal from the Land Registry. Before this removal could have been effectuated he must have already received a signed agreement on the cancellation of the purchase agreement, which now lies with the notary. "*We needed again a trustworthy person, and so we chose the representative of the other party*," says Toman.

Kocáb, however, strictly objects to the abuse of his name. "*If I had accepted that, I would have in fact legalized all their steps,*" he says indignantly. At the same time he refuses to accept Toman's interpretation of all these steps. "*By doing this acrobatic step in public, they intended to achieve that the view that it would not be considered as tunnelling. If some famous person pick pockets pedestrians on the Wenceslas square, grimacing and screaming. I am not stealing, would that also be in order?*" chafes Kocáb. Mr. Tomáš Pelikán thinks that all this is just a useless racket. "*The legal act, which has not been made seriously, even if made in writing, is invalid according to law,*" he asserts.

### The return of the property is uncertain

The thing that the shareholders of Trend, and of the other tunnelled funds, are principally interested in is, however, not the dispute of the two shareholders over the department store, but the question whether the state will finally begin to chase these cases fiercely and, principally, whether it will return the stolen property to them. Certain advances have been made, but there is no decisive campaign against the depravity on the Czech Capital market.

The stock market's analysts doubt that the entire property will return to the shareholders of Trend, although the vast majority of its original shares are frozen in the accounts of the Securities Centre. "*New owners must win the eventual court disputes. The shares are not numbered and it will be difficult to determine who was their original owner,*" says Michal Konečný from Komero. According to him, the purchaser will always, bar some exceptions, prove that he acted in good faith. But Pergl thinks the opposite. "*We have informed all of them in press. Whoever monitors the capital market must also know that KHB and the companies connected with it sold the stolen shares,*" he says. "*No one will prove to anyone that he knew about this media campaign,*" opposes Konečný. "*We are Trend's attorneys at law, and therefore we must assert that they knew, and they will evidently assert that they did not. It is up to the court to decide,*" concludes Pergl.

**Table:**
**How FEL acquired the money for the purchase of KOTVA**



The Regional Commercial Court in Hradec Králové decided, on January 24, on the freezing of the shares in the account of IFM. The judge, however, failed to deliver this decision to the Czech Securities Centre and consequently, Mr. Hálek and Co. were warned in time and managed to transfer the shares.

The profit of this sole financial operation amounts to CZK 135.6 million.

```
Titulek:        Trend:Předání  tunelářů  soudu  je  signálem  pro  zahraniční
investory
Datum vydání:   2.10.1998
Čas vydání:     15:53
Klíčová slova:  ČR; obchod; Trend; obžaloba
ID:             19981002F02034
Servis:         ece
Priorita:       4
Kategorie:      obo; zak; fin
```

Trend:Předání tunelářů soudu je signálem pro zahraniční investory

PRAHA 2.října (ČTK) - Předání tunelářů investičních fondů Trend a Mercia
soudu je očekávaným signálem pro zahraniční investory. ČTK to v reakci na
obžalobu sedmi osob stíhaných v případu vytunelování investičních fondů Trend
a Mercia řekl současný člen představenstva Trendu John Moffitt. Jak dodal,
případ je zlomovým pro celý český kapitálový trh.

Moffitt také připomněl, že tunelování Trendu je prvním případem v ČR, kde by
měly být stíhané osoby obžalovány z trestného činu zločinného spolčení.
Důkazy shromážděné v trestním řízení dokládají, že společnost Forminster
Enterprises Limited, na níž byly převedeny z Trendu akcie Kotvy, stále ovládá
Miroslav Hálek, který řídí boj proti Trendu dokonce i z vězení, dodal Moffitt

Na sedm osob stíhaných v případu vytunelování investičních fondů Trend a
Mercia podal ve čtvrtek královéhradecký krajský státní zástupce obžalobu k
tamnímu krajskému soudu. V současnosti je ve vazbě z obviněných pouze
Miroslav Hálek. Jeden z největších případů poškození investičních fondů v ČR,
kde škoda činí více než 1,3 miliardy korun, se tak dostává tímto
krokem do závěrečné fáze.

Státní zástupce obžalované viní ze spáchání trestných činů zneužití informací
v obchodním styku a zpronevěry spáchaných ve zločinném spolčení či pro účast
na tomto spolčení. Pokud budou soudem uznáni vinnými, hrozí jim až 15 let
vězení.

Marcela Prošková jw

---

**Title:** Trend: Handing over of tunnellers is signal for foreign investors
**Date of issue:** October 2, 1998
**Time of issue:** 15:53
**Key words:** Czech Republic; business; Trend; charges
**ID:** 19981002F02034
**Service:** ece
**Priority:** 4
**Category:** obo; zak; fin

Trend: Handing over of tunnellers is signal for foreign investors

PRAGUE, October 2, (Czech Press Agency) – The handing over of the tunnellers of the Trend and Mercia investment funds to the court is a long awaited signal for foreign investors, stated John Moffitt, a current member of the Board of Directors of Trend, to the Czech Press Agency, in reaction to the charges of seven people prosecuted in the case of the tunnelling of the Trend and Mercia investment funds. He added that this case represents a turning point for the whole Czech capital market.

Moffitt also mentioned that the tunnelling of the Trend fund is the first case in the Czech Republic where the persons are charged with the offence of criminal conspiracy.

The evidence collected in the criminal proceedings proves that the company Forminster Enterprises Limited, to which the shares in Kotva were transferred from Trend, is still controlled by Mr. Hálek, who is leading a battle against Trend even from prison, added Moffitt.

The Regional Public Prosecutor in Hradec Králové delivered to regional court, on Thursday, an indictment of seven people prosecuted in the case of the tunnelling of the Trend and Mercia investment funds. At the moment, from all the indicted persons, only Miroslav Hálek remains in custody. One of the greatest cases of causing damage to investment funds in the Czech Republic, where the damage amounts to almost CZK 1.3 billion, enters hereby into the final phase.

The Public Prosecutor indicted the accused persons with the criminal offences of insider dealing and embezzlement committed in a criminal conspiracy, or for participation in such a criminal conspiracy. Should the court find the accused guilty, they could be imprisoned for up to 15 years.

Marcela Prošková jw

## Record of the meeting between companies in the KOTVA concern

Present:

1) for KOTVA a.s., Ing. Richard Harazim, CEO
2) for KOTVA NEMOVITOSTI, k.s., Ing. Richard Harazim
3) for SPV CO. Limited, Martin Benda, CEO

The reason for today's meeting between the representatives is to tackle the results of the conduct of Andrew Weisse and co. The actual conduct of Andrew Weisse is well known to those present and, according to all current knowledge, appears to be criminal. For this reason, a criminal information was filed against Andrew Weisse and Ing. Vladimir Hoffmann in August on suspicion that they have committed the crimes of breaching the compulsory rules of business transactions, of misusing information obtained from business transactions, and the crime of fraud.

All dealings with Andrew Weisse and Ing. Vladimir Hoffmann have taken place in the presence of the representatives of KOTVA a.s., i.e. Ing. Richard Harazim and Martin Benda. Also, all requests made by Andrew Weisse or his representative have been directed towards KOTVA a.s. For this reason, the criminal information relating to these persons was filed by KOTVA a.s.

From the point of view of criminal law, the injured party in the initiated criminal proceedings is KOTVA a.s. itself, in spite of the fact that the nature of the behaviour of Andrew Weisse and co. also affects the other companies in the KOTVA concern. For example, as a consequence of the action to declare the proprietary rights filed by GILROY LIMITED, KOTVA NEMOVITOSTI, k.s. is a direct participant in the proceedings. However, SPV CO. Limited and KOTVA OBCHODNI, a.s. are also indirectly affected.

The participants have agreed that, in accordance with the criminal proceedings, **the interests of the concern will be represented by the parent company KOTVA a.s.** The same will apply in the event of the exercise of any legal claims against GILROY LIMITED or any other responsible persons.

In the event that in the future, in connection with the above, there will be the need for any acts to be carried out, both SPV CO. Limited and KOTVA NEMOVITOSTI, k.s. agree to carry them out. Both these companies hereby expressly authorise KOTVA a.s. to take all essential steps.

Regarding potential costs, the participants have agreed that they will be borne by that company in the KOTVA concern for which it will be the most advantageous for whatever reason. After the final and conclusive end of the proceedings in question, the costs will be fairly settled between the companies in the concern. The same will apply for the recovery of any damages or their parts.

Prague, 4 October 2004

[illegible signature]

_____
for KOTVA a.s., for KOTVA NEMOVITOSTI, k.s.,

[illegible signature]

_____
for SPV CO. Limited

K8087