UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
KOTVA a.s. and SPV Co.,                             )
                                                    )
                    Plaintiffs,                     )        Case No. 05-10679-WGY
                                                    )
         v.                                         )
                                                    )
ANDREW WEISS and WEISS ASSET                        )
MANAGEMENT, LLC                                     )
                                                    )
                    Defendants and                  )
                    Counterclaimants,               )
                                                    )
         v.                                         )
                                                    )
KOTVA a.s., SPV Co., and RICHARD HARAZIM            )
                                                    )
                    Counterclaim-Defendants         )
                                                    )
                                                    )
_____)

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF ITS
MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

**INTRODUCTION**

On November 17, 2006, the Court granted Kotva's request for letters rogatory to take the

deposition of Defendants' Czech attorney Ondrej Peterka regarding non-privileged matters, *i.e.*

his communications with third parties.  (Mr. Peterka was retained by the Weiss Defendants to

file lawsuits against Kotva in the Czech Republic; he attended at least one meeting with Kotva

representatives at which the lawsuits were discussed and Weiss' pay-off for Kotva shares was

demanded).  Kotva did not intend to question Mr. Peterka about privileged areas.  At the

deposition of Mr. Peterka, however, Defendants expanded the scope of the questioning and

elicited testimony regarding privileged matters, including communications with Defendants,

research he performed, and opinions regarding the "purpose and function" of the Czech lawsuits, including whether they were filed for an improper purpose.

By calling Attorney Peterka as a witness and electing to place at issue otherwise privileged subject matters, Defendants have waived the privilege and work product protection on all matters that attorney Peterka has testified about, or that he intends to testify about at trial. Defendants deny there has been a waiver and refuse to produce the documents Plaintiffs have requested.[1]  They have, however, confirmed that they intend to use Attorney Peterka's testimony at trial.

Mr. Peterka's deposition was suspended on April 18, 2007.  Before the completion of Attorney Peterka's deposition, Defendants should be compelled to produce the documents and materials relevant to the subject matters on which there has been a waiver, and Plaintiffs should

---

[1]  The documents sought in this motion were requested in the following document discovery served upon defendants:

**Plaintiffs First Set of Document Requests:**

18. All documents concerning the authorization given to "lawyers in the Czech Republic to file lawsuits to protect the rights of the minority shareholders" of Kotva as set forth in the "summary" to the Counterclaim.

19. All documents concerning communications between or among Weiss, Hoffmann, and Ondrej Peterka, including those communications referenced in Paragraph 22 of the Answer.

28. All documents concerning Weiss' video press conference in Boston on March 15, 2005 referenced in Paragraph 41 of the Complaint, including, without limitation, all documents concerning Weiss' instructions to lawyers in the Czech Republic referred to in the press conference.

40. All documents concerning and communications with (1) Ondrej Peterka; (2) Branston Haggerty; (3) Eitan Milgram; and (4) Georgiy Nitikin, relating to Trend, Kotva, this Action, the Czech Lawsuits, and/or the BGO Shares.

**Plaintiffs' Second Set of Document Requests:**

2. All documents concerning Weiss' purpose, motive and intent in filing the Gilroy and/or KT lawsuits in the Czech Republic.

3. All documents concerning business discussions between Weiss and anyone else about whether to bring litigation in order to recover the value of the Kotva or Trend shares.

(The relevant pages from Defendant's responses are attached hereto as Exhibit 1).

be allowed to cross-examine Attorney Peterka about the bases for the "opinions" he has offered and the subject matters he intends to testify about at trial.

## BACKGROUND

Plaintiff Kotva a.s. owned and operated a famous department store in downtown Prague, Czech Republic. Defendant Andrew Weiss ("Weiss"), through his Boston-based hedge fund investment firm Weiss Asset Management, LLC ("WAM"), is the investment manager of the Brookdale Global Opportunity Fund ("BGO"), which owns approximately 12% of Kotva's shares.

In May 2004, after learning of press reports about a potential sale of the department store, Weiss launched a scheme from Boston to blackmail Kotva, ultimately demanding that Kotva purchase BGO's Kotva shares and shares in another Czech fund called "Trend" for over $12 million (even though the shares had been valued by Defendants at only $1.5 million). Weiss threatened to stop the sale of the department store unless he received a "pay-off." When Kotva refused, Weiss followed through on his threats: he arranged for shell companies to purchase token shares of Kotva and retained Attorney Peterka to file sham lawsuits challenging the title to and transfer of the department store building to a Kotva subsidiary - - a transfer that had occurred four years earlier. These lawsuits had absolutely nothing to do with the purchase or sale of BGO's shares, but were designed to pressure Kotva into buying BGO's shares, even though Kotva was under no obligation to do so. Peterka also contacted Markland, the purchaser of the department store and its lender, to interfere with and stop the sale. Weiss conditioned the withdrawal of his interference with the department store sale upon meeting his price demands.

Mr. Peterka was deposed on April 18, 2007. When Mr. Peterka was questioned about the scope of the deposition, Defendants' counsel responded as follows:

Q.          Are you permitted, Mr. Peterka, to testify about legal, your thoughts or mental impressions concerning the lawsuits you filed on behalf of your client?

Mr. Dangel:  That depends.  That depends on the particular question that is asked.

Q.          Are you permitted, Mr. Peterka, to testify about the basis of your legal opinions?

Mr. Dangel:  He is permitted to testify about the basis of his legal opinions in so far as the basis are from facts he has learned and law that he knows.

Q.          Mr. Peterka, are you permitted to testify about any legal research you did?

Mr. Dangel: That also depends because that is covered, by, it could be covered by either the work product doctrine or the attorney client privilege.  And I think that the easiest thing to say is that he is permitted to testify about the results of legal research that he conducted but not necessarily the reason why he conducted the particular research.

Q.          Mr. Peterka, are you able to testify about communications that you had with your clients before you filed the lawsuits?

Mr. Dangel:  No.

(Deposition of Ondrej Peterka ("Peterka Dep."), April 18, 2007, at pp. 30-31, relevant pages

attached hereto as Ex. 2.)

Thereafter, Defendant's counsel took the position that the Plaintiffs were limited to

questioning about matters in the letters rogatory, but Defendants were not so limited:

Mr. Beckman: Do you want me to be limited to the subject matters in the letter [rogatory]?

Mr. Dangel:    **You are, I am not.**

Mr. Beckman: Okay.  Is that your position?

Mr. Dangel:    Not only is it my position, that's the law.

Mr. Beckman: Okay.

Mr. Dangel:    You are limited to those areas, sir, and you knew it and you have known it for five hours and I am [going to] take that to Judge Young. . . .You have zero respect for being a lawyer.  And you have zero respect for the process that was issued in this case.  Now what is your next question, only on

4

these five area[s] [in the letters rogatory]. . . .  My statement does not get read to the jury.  Your God dammed questions do.  Pardon my French.

(Peterka Dep. p. 113).

## ARGUMENT

### I.  Calling an Attorney as a Witness Waives the Privilege for the Subject Matters of the Attorney's Testimony

It is well established that a litigant may waive the attorney-client privilege by "injecting certain claims or defenses into a case."  *Darius v. City of Boston*, 433 Mass. 274, 277-278 (2001); *see also Savoy v. Richard A. Carrier Trucking, Inc.*, 178 F.R.D. 346, 350 (D. Mass. 1998) ("the advice or conduct of a party's lawyer may become the subject of litigation--and thereby impliedly waived--when that lawyer's advice or conduct is explicitly or implicitly made the basis of an offense or defense.").  The First Circuit has similarly held:

> Particularly in a civil case, a privileged party cannot fairly be permitted to disclose as much as he pleases and then to withhold the remainder to the detriment of the defendant . . .  In a civil damages action . . . fairness requires that the privilege holder surrender the privilege to the extent that it will weaken, in a meaningful way, the defendant's ability to defend.  That is the privilege ends at the point where the defendant can show that the plaintiff's civil claim and the probable defenses thereto, are enmeshed in important evidence that will be unavailable to the defendant if the privilege prevails.

*Greater Newburyport Clamshell Alliance v. Public Service Co. of New Hampshire*, 838 F.2d 13, 20 (1st Cir. 1988) (citation omitted).  Access to privileged materials is especially important where a party attempts to insert an attorney's opinion into the dispute.  *See Herrick Co., Inc. v. Vetta Sports, Inc.*, No. 94 CIV. 0905 (RPP), 1998 WL 637468, *1 (S.D.N.Y. Sept. 17, 1998) ("it is well established that a party waives the attorney-client and work product privileges whenever it puts an attorney's opinion into issue, by calling the attorney as an expert witness or otherwise.").

Calling one's attorney as a witness places at issue whatever the attorney intends to testify about and waives the privilege on those topics.  *See United States v. Titchell*, 261 F.3d 348, 351-

352 (3d Cir. 2001) ("calling one's attorney as a fact witness in a prior proceeding constitutes a waiver of the attorney-client privilege, at least regarding the subject of the testimony adduced in the prior proceeding."). In *Rutgard v. Haynes*, 185 F.R.D. 596, 601 (S.D. Cal. 1999), the Court held that plaintiff had waived the attorney-client privilege by "indicating the intent to use [the attorney] as a witness." The *Haynes* court could not see how the attorney would be able to testify about the malicious prosecution case at issue without relying in some measure on privileged information from his files. *Id.* To conduct an effective cross-examination, moreover, the court ruled that the defendant needed to know the information upon which the attorney's opinions and conclusions were based. *Id.*

Based on the Rule 37.1 conference and the letters exchanged by counsel regarding the waiver issue,[2] Plaintiffs expect that Defendants will argue that there has been no waiver because Attorney Peterka did not testify about any "communications" or the "substance" of any communications with his clients. *See Montgomery v. Pickering*, 116 Mass. 227, 231 (1874); *Blount v. Kimpton*, 155 Mass. 378, 380 (1892); *Commonwealth v. Goldman*, 395 Mass. 495, 500 (1985). First, as described below, this is factually inaccurate. Second, unlike the cases in the *Montgomery* line*,* Defendants have not designated Attorney Peterka as a witness to testify about "transactions" or "events." Rather, they have identified him as a "fact" witness to provide quasi-expert testimony about why the sham lawsuits in the Czech Republic were filed. As demonstrated below, Defendants have placed at issue Attorney Peterka's opinions, his communications with the Defendants, and his work product on various subjects. By doing so, Defendants have waived the privilege, and documents concerning these subject matters should be produced. *See Darius*, 433 Mass. at 277-278.

---

[2] Plaintiffs' May 4, 2007 letter and Defendants' June 6, 2007 reply are attached hereto as Exhibits 3 and 4.

## II.    Defendants Have Placed Otherwise Privileged Matters At Issue by Eliciting Testimony From Mr. Peterka

### A. Defendants Have Placed Attorney Peterka's Opinions at Issue and, as a Consequence, Documents Concerning Such Opinions Must Be Disclosed

Defendants intend to call Mr. Peterka as a witness at trial and to offer his testimony to justify the filing of lawsuits against Kotva in the Czech Republic.  (Those lawsuits comprise part of the scheme Defendants used in an attempt to blackmail Kotva into "repurchasing" a 12% block of shares in the company).  As described in detail below, in response to questioning by the Defendants' counsel at his deposition, Attorney Peterka testified about <u>communications</u> he had with Defendants, <u>research</u> he performed, and <u>opinions</u> he held regarding the "<u>purpose and function</u>" of the lawsuits he filed, including whether they were filed for any improper purpose. *See* Ex. 2 at 118-136.  Specifically, Defendants intend to introduce Attorney Peterka's opinions regarding, among other things, the core issue in the case:

> Q.    Sir, you see the term "blackmail" in the middle of [the] second line, to blackmail Kotva.  Let me just say it the way we would say it in front of a jury, to <u>blackmail</u>.  Horrible thing.  Right.  **Are you aware of any effort to blackmail Kotva?**

> Mr. Beckman:  Objection.

> A.    I consider this word to be, this word to be used here absurd.  **According to my opinion, nothing like that ever happened.  The lawsuits were filed in order to protect the investment.**

Peterka Dep. at 133 (underlined emphasis in original; bold emphasis added).  Attorney Peterka's awareness of any efforts to blackmail must necessarily include his communications with Defendants, his knowledge of the Defendants' conduct, and his own conduct on behalf of the Defendants.  As in the *Haynes* case, Attorney Peterka could not have responded to questions about his "awareness" of any effort to blackmail without relying in part on privileged information.

Defendants' counsel also asked Attorney Peterka to testify about the "purpose" of the lawsuits that he filed on behalf of the Defendants:

> Q.    Mr. Peterka, you and your law firm filed various lawsuits for what I will call the KT plaintiffs, correct?
>
> A.    Yes.
>
> Q.    Were any of the lawsuits filed for the purpose of getting a higher price for any shares of stock in Kotva or any other entity?
>
> A.    No, never.  The only purpose of these lawsuits was to protect the American investment and was to preserve the status quo.  In other words, to prevent, to prevent for this 12% block that was held directly by our clients and the 32% block that, in our view, belongs to Trend, and our client holds 40% in Trend, to prevent for the value of these shares to decline or drop.

*Id.* at 118-119.

By eliciting testimony from Attorney Peterka about what he thinks the purpose of the lawsuits was, and whether, in his opinion, they amounted to an "effort to blackmail Kotva," Defendants waived whatever attorney-client privilege and work product protection may have applied to those subjects.  In short, Defendants cannot use the privilege as both a sword and shield to prevent full disclosure of documents - - and full cross-examination - - on subjects into which they voluntarily inquired.

### B. Attorney Peterka's Testimony Concerning His Investigation and Client Communications Opens Up Such Matters to Discovery

In addition to the basis for Attorney Peterka's opinion testimony, Defendants also waived the privilege and work product protection with respect to the research and investigation that Attorney Peterka conducted and communications he had with Defendants:

> Q.    Sir, as part of what you did when you were hired, did you gather certain facts before any lawsuits were filed?
>
> A.    As far as it was possible, we were trying to gather information from open sources, public sources.

…

Q.      So were [Professor Weiss and Dr. Nikitin] a source of actual facts used in filing
        the case?

Mr. Beckman: Objection

A.      **I will say that they knew** the general facts about their investment, that is they had
        12% in Kotva directly and 40% in Trend, whereby Trend hold 32% in Kotva.
        Other than that, **they were not familiar with** the Czech system and with the
        workings of the system in this country and **they were not aware of** the methods
        that are used to devalue their investment.

Q.      **Were they aware of**--there has been references to tunneling of Kotva shares and
        various other things.  **Were they aware of**, did they provide those facts or did you
        gather those facts on your own?

Mr. Beckman: Objection, that is three questions.

Mr. Dangel:    Okay.

Q.      Did you gather those facts yourself or were they the source of those facts?

Mr. Beckman: Objection.

A.      They had a general understanding of the fact that Trend was tunneled but that is
        common knowledge, everybody knows that.  And then we used open sources,
        public sources to gather additional information and it was also from the media
        that we learned that a plan to sell the department store is under way or in the
        making.

Peterka Dep. at 125-126 (emphasis added).  Communications with his clients, verbal or

otherwise, can be the only source of Attorney Peterka's knowledge of their awareness,

familiarity, and knowledge of the subjects at issue.  By eliciting such testimony, Defendants have

opened the door to discovery concerning communications about the Weiss Defendants'

awareness of the facts alleged in the Czech lawsuits.  Simply put, Defendants have waived the

privilege with respect to these subjects.

        Defendants also have waived the privilege with regard to Mr. Peterka's initial advice he

provided to obtain permission for filing the actions:

> Q.    Did you provide, without telling me what the advice was, **before the lawsuits were filed, did you provide advice to Professor Weiss and Mr. Nikitin and other interested parties**?
>
> Mr. Beckman: Objection.
>
> A.    Yes, I did.
>
> Q.    Did you do that after you had gathered the facts and researched the law?
>
> A.    Yes.
>
> Mr. Beckman: Objection.
>
> Q.    **After giving that advice, did they give you permission to proceed with the lawsuits**?
>
> Mr. Beckman: Objection.
>
> A.    That's correct.

Peterka Dep. at 126-127 (emphasis added).  In short, Defendants are attempting to assert an advice of counsel defense without accepting the consequences--waiver of the previously privileged subjects.  Nevertheless, by asking Attorney Peterka to testify about the research that was gathered and conveyed to the Defendants as part of his advice and the substance of communications that he had with the Defendants about proceeding with the lawsuit, Defendants have waived the privilege.  As a result, Plaintiffs are entitled to full disclosure.

### C. The Purpose of the Czech Lawsuits was to Interfere with the Sale of Kotva's Department Store, Not to Protect Weiss's Investment

Contrary to Attorney Peterka's testimony, the sole purpose of the Czech lawsuits was to block the sale of Kotva's department store and pressure Kotva to relent to Weiss's "pay-off" demands.  Indeed, discovery to date confirms that the lawsuits were filed to "block the deal," not to "protect the investment."  For example, Andrew Weiss admitted in an email that he wanted to "stop the deal" with the Irish investors, Markland.  (Ex. 5).  Further, emails from Vladimir Hoffmann, Weiss' agent in Prague, reveal that Weiss sought advice from the Czech lawyers to

"block any potential transfer of Kotva building" and "discourage potential buyers of Kotva from the purchase." (Ex. 6). In connection with Weiss' initial client conference with Mr. Peterka, moreover, Mr. Hoffman's own handwritten notes state: "1) Block the deal with the Irish." (Ex. 7). Revealingly, Peterka himself prepared a memorandum in which he advised filing another lawsuit "[i]n order to increase our pressure on Kotva, a.s." (Ex. 8 at K 8047, ¶ 2).

After Peterka filed the lawsuits, Mr. Hoffman was recorded in a telephone conversation with Georgi Nikitin, Weiss' associate, expressing concern for demanding too much for the Kotva shares:

> I think we cannot go and say that we want, you know, full NAV [net asset value of Kotva] plus we want even more for that, we know, that is blackmail.

(Deposition of Howard Golden, dated April 17, 2007 at 4, attached hereto as Exhibit 9).[3] Directly contradicting Mr. Peterka's testimony, Mr. Hoffman discussed with Georgi Nikitin that they "organize a conference call with Andy [Weiss] with Peterka, with myself, we can, we can discuss it so we can discuss how we can present it, what arguments can we give, <u>what basically we are allowed to say so that, you know, it is not blackmail.</u>" (Golden Dep. at 9) (emphasis added).

---

[3]  In February 2005, Andrew Weiss, Vladimir Hoffman, and Edita Simkova were criminally charged with extortion. (A copy of the criminal charge is attached hereto as Ex. 10). With Czech court approval, the Czech police utilized wire taps to record conversations during their investigation of Weiss and his associates. *See* Ex. 10 at K 0045. Tape recordings of the conversations obtained by the Czech police have been made available to both Mr. Weiss and Kotva as part of the Czech criminal file. In the Czech Republic, both the harmed party (Kotva) and the accused (Weiss) are entitled to access the materials in the criminal file. Kotva has obtained copies of the recorded telephone conversations and produced those materials to the Defendants in March 2007 in response to their discovery requests.

Kotva issued similar discovery demands to the Defendants for the production of materials that the Defendants obtained from the criminal file. In September 2006, the Special Master ordered Defendants to produce portions of the criminal file if such materials fell within the purview of other discoverable requests. Despite this Order, Defendants continue to refuse to produce copies of the recordings available to them from the criminal file. When Plaintiffs used portions of the recordings at the deposition of Howard Golden, Defendants' counsel implied that the tapes had been tampered with. To eliminate such issues, Plaintiffs have requested that Defendants either produce the version of the recordings they have obtained from the Czech criminal file or stipulate that the recordings they have obtained are the same as the recordings Kotva produced to them in March 2007. Plaintiffs request that the defendants be ordered to comply with the Court's September Order and produce the tapes.

11

## <u>CONCLUSION</u>

In sum, Plaintiffs expect that the communications and documents for which the

Defendants have waived the privilege will provide further evidence of the Defendants' blackmail

and tortious conduct.  For the foregoing reasons, Plaintiffs respectfully request that their motion

to compel be granted.

Respectfully submitted,


KOTVA, A.S., SPV CO.


By their attorneys,



/s/ Joel G. Beckman_____
Joel G. Beckman BBO#553086
William C. Nystrom BBO#559656
Daniel J. Pasquarello BBO# 647379
Nystrom Beckman & Paris LLP
10 St. James Ave., 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: July 2, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non registered participants on this 2nd day of
July, 2007.

/s/ Daniel J. Pasquarello_____

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s., <br><br> Plaintiff, <br><br> v. <br><br> ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC, <br><br> Defendants. <br><br> ANDREW WEISS, WEISS ASSET MANAGEMENT LLC, K T, INC. and CVF INVESTMENTS, LTD., <br><br> Counterclaim-plaintiffs, <br><br> v. <br><br> KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM, FORMINSTER ENTERPRISES, LTD., SPV CO and JOHN DOES 1–5, <br><br> Counterclaim-defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  C.A. No. 05-10679-RCL |

## OBJECTIONS AND RESPONSES OF ANDREW WEISS AND WEISS ASSET MANAGEMENT LLC TO SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS OF KOTVA A.S.

## GENERAL OBJECTIONS

1.     The Defendants object to Kotva's failure to describe each item or category of documents requested with "reasonable particularity."  FED. R. CIV. P. 34(b).

2.     The Defendants object to Kotva's failure to "specify a reasonable time, place, and manner of making the inspection and performing the related acts."  FED. R. CIV. P. 34(b).

18.     All documents concerning the authorization given to "lawyers in the Czech Republic to file lawsuits to protect the rights of the minority shareholders" of Kotva as set forth in the "summary" to the Counterclaim.

**RESPONSE:**

The Defendants object to this Request to the extent that it calls for the production of documents protected by the attorney-client privilege and work product doctrine. Subject to these Objections and the General Objections above, the Defendants will produce non-privileged responsive documents.

19.     All documents concerning communications between or among Weiss, Hoffmann, and Ondrej Peterka, including those communications referenced in Paragraph 22 of the Answer.

**RESPONSE:**

The Defendants object to this Request to the extent that it calls for the production of documents protected by the attorney-client privilege and work product doctrine. Subject to these Objections and the General Objections above, the Defendants will produce non-privileged responsive documents.

20.     All documents concerning and communications with Hoffmann, including but not limited to all contracts with Hoffmann and all bills and invoices from Hoffmann.

**RESPONSE:**

The Defendants object to this Request to the extent that it calls for the production of documents protected by the attorney-client privilege and work product doctrine. Subject to these Objections and the General Objections above, the Defendants will produce non-privileged responsive documents.

21.     The agreement with Hoffmann referenced in Paragraph 20 of the Counterclaim.

11

**RESPONSE:**

The Defendants object to this Request on the grounds that it is vague, unduly burdensome, overly broad and not reasonably calculated to lead to the discovery of admissible evidence. Subject to these Objections and the General Objections above, the Defendants will produce non-privileged responsive documents.

28.    All documents concerning Weiss' video press conference in Boston on March 15, 2005 referenced in Paragraph 41 of the Complaint, including, without limitation, all documents concerning Weiss' instructions to lawyers in the Czech Republic referred to in the press conference.

**RESPONSE:**

The Defendants object to this Request on the grounds that it is unduly burdensome, overly broad and not reasonably calculated to lead to the discovery of admissible evidence and to the extent it calls for the production of documents that are protected by the attorney-client privilege and work product doctrine. Subject to these Objections and the General Objections above, the Defendants will produce non-privileged responsive documents.

29.    All documents concerning any communications with the press involving Kotva.

**RESPONSE:**

The Defendants object to this Request the extent it calls for the production of documents that are protected by the attorney-client privilege and work product doctrine. Subject to the General Objections above, the Defendants will produce non-privileged responsive documents.

30.    All documents concerning CVF LLC's ownership of shares in Kotva and Trend as referenced in Paragraphs 16 and 17 of the Counterclaim.

**RESPONSE:**

14

**RESPONSE:**

The Defendants object to this Request on the grounds that it is vague, unduly burdensome, overly broad and not reasonably calculated to lead to the discovery of admissible evidence and to the extent that it calls for documents protected by the attorney-client privilege and work product doctrine. Defendants further object to the use of the phrase "Weiss' criminal indictment." This phrase refers to the inaccurate, scurrilous allegation in the Complaint that there has been an "indictment" of Weiss in the Czech Republic where, to Defendants' knowledge, there has been an investigation as a result of an abusive criminal complaint filed by the counterclaim-defendants. No indictment has occurred. Plaintiff's continued use of the phrase is further evidence of its abuse of process. The Defendants further object to this request to the extent that it has the purpose or effect of interfering with or prejudicing the ongoing defense of a pending criminal investigation. Subject to these Objections and the General Objections above, the Defendants will produce non-privileged responsive documents.

39.    All documents concerning and communications with Kotva.

**RESPONSE:**

The Defendants object to this Request on the grounds that it is vague, unduly burdensome and overly broad and to the extent that it calls for documents protected by the attorney-client privilege and work product doctrine. Subject to these Objections and the General Objections above, the Defendants will produce non-privileged responsive documents.

40.    All documents concerning and communications with (1) Ondrej Peterka; (2) Branston Haggerty; (3) Etian Milgram; and (4) Georgiy Nitikin, relating to Trend, Kotva, this Action, the Czech Lawsuits, and/or the BGO Shares.

**RESPONSE:**

The Defendants object to this Request on the grounds that it is vague, unduly burdensome and overly broad and to the extent that it calls for documents not within the Defendants' custody, possession or control and documents protected by the attorney-client privilege and work product doctrine. Subject to these Objections and the General Objections above, the Defendants will produce non-privileged responsive documents.

41.   All documents concerning and communications with David Paul Wilson.

**RESPONSE:**

Subject to the General Objections above, the Defendants will produce non-privileged responsive documents.

42.   All documents concerning a potential or contemplated transfer of BGO's shares in Trend and/or Kotva to KT.

**RESPONSE:**

The Defendants object to this request on the grounds that it is vague and assumes that BGO has shares in Trend and/or Kotva. Subject to this Objection and the General Objections above, the Defendants will produce non-privileged responsive documents.

43.   All documents concerning the lawsuit filed by Balfindor as referenced in Paragraph 25 of the Counterclaim.

**RESPONSE:**

The Defendants object to this Request on the grounds that it is repetitive, unduly burdensome, overly broad, not reasonably calculated to lead to the discovery of admissible evidence and to the extent it calls for the production of documents outside of the Defendants' possession, custody or control or protected by the attorney-client privilege and work product doctrine. Subject to these Objections and the General Objections above, the Defendants will

responsive documents.

ANDREW WEISS and WEISS ASSET
MANAGEMENT LLC

By their attorneys,

Edward P. Leibensperger (BBO# 292620)
Benjamin A. Goldberger (BBO# 654257)
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts  02109-1775
(617) 535-4000

Dated: January 27, 2006

## CERTIFICATE OF SERVICE

I, Benjamin A. Goldberger, hereby certify that on the 27th day of January, 2006, a true and correct copy of the foregoing document was served by first class mail and electronic mail on counsel for each other party.

Benjamin A. Goldberger

BST99 1486458-2.072198.0012

27

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ANDREW WEISS and WEISS ASSET | ) |
| MANAGEMENT, LLC, | )     C.A. No. 05-10679-RCL |
| | ) |
| Defendants. | ) |
| | ) |
| ANDREW WEISS, WEISS ASSET | ) |
| MANAGEMENT LLC, K T, INC. and CVF | ) |
| INVESTMENTS, LTD., | ) |
| | ) |
| Counterclaim-plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| KOTVA a.s., MARTIN BENDA, RICHARD | ) |
| HARAZIM, FORMINSTER ENTERPRISES, | ) |
| LTD., SPV CO and JOHN DOES 1–5, | ) |
| | ) |
| Counterclaim-defendants. | ) |
| | ) |

## OBJECTIONS AND RESPONSES OF
## ANDREW WEISS AND WEISS ASSET MANAGEMENT LLC TO
## SET OF DOCUMENT REQUESTS SERVED ON JUNE 22, 2004

### GENERAL OBJECTIONS

1.    The Defendants object to Kotva's failure to describe each item or category of documents requested with "reasonable particularity." FED. R. CIV. P. 34(b).

2.    The Defendants object to Kotva's failure to "specify a reasonable time, place, and manner of making the inspection and performing the related acts." FED. R. CIV. P. 34(b).

and the General Objections above, the Defendants will produce non-privileged responsive documents to the extent that they have not produced such documents already.

2.     All documents concerning Weiss' purpose, motive and intent in filing the Gilroy and/or KT lawsuits in the Czech Republic.

**RESPONSE:**

The Defendants object to this Request on the grounds that it is vague, unduly burdensome, and overly broad. The Defendants further object to this Request to the extent that it assumes facts that are in dispute and to the extent that it seeks documents protected by the attorney-client privilege and work product doctrine. Subject to these Objections and the General Objections above, the Defendants will produce non-privileged responsive documents to the extent that they have not produced such documents already.

3.     All documents concerning business discussions between Weiss and anyone else about whether to bring litigation in order to recover the value of the Kotva or Trend shares.

**RESPONSE:**

The Defendants object to this Request on the grounds that it is vague, unduly burdensome, and overly broad. The Defendants further object to this Request to the extent that it assumes facts that are in dispute and to the extent that it seeks documents protected by the attorney-client privilege and work product doctrine. Subject to these Objections and the General Objections above, the Defendants will produce non-privileged responsive documents to the extent that they have not produced such documents already and to the extent that the Defendants have such documents in their possession, custody or control.

4

The Defendants object to this Request on the grounds that it is vague, unduly burdensome, overly broad and not reasonably calculated to lead to the discovery of admissible evidence and to the extent it seeks confidential business information.

43.    All communications and agreements with Starlight Investments Limited concerning the company Investec European Growth & Income Trust Ltd. "IEO" including, without limitation, communications and agreements concerning IEO shares, the voting rights to IEO shares and the proceeds from the winding up of IEO.

**RESPONSE:**

The Defendants object to this Request on the grounds that it is vague, unduly burdensome, overly broad and not reasonably calculated to lead to the discovery of admissible evidence and to the extent it seeks confidential business information.

Respectfully Submitted,

ANDREW WEISS and WEISS ASSET
MANAGEMENT LLC

By their attorneys,

Edward P. Leibensperger (BBO# 292620)
Benjamin A. Goldberger (BBO# 654257)
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts  02109-1775
(617) 535-4000

Dated: July 24, 2006

21

## <u>CERTIFICATE OF SERVICE</u>

I, Benjamin A. Goldberger, hereby certify that on the 24th day of July, 2006, a true and correct copy of the foregoing document was served by ~~first class mail and electronic mail~~ on counsel for each other party.

Benjamin A. Goldberger

BST99 1510365-2.072198.0012

IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856

AND IN THE MATTER OF CIVIL PROCEEDINGS NOW PENDING BEFORE

THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF

MASSACHUSETTS (CIVIL ACTION NO. 05-10679-RCL)

KOTVA a.s.

       Plaintiff

       v.

ANDREW WEISS and WEISS ASSET
MANAGEMENT, LLC

       Defendants

Deposition of:

Mr. Ondrej Peterka

Taken at:
Courtroom No 126
District Court for Prague 1,
Ovocny trh 14

On:  April 18th, 2007
Commencing at 9.00 am

1    court, what he said in court.  He is able to testify
2    about general sources of information he has, that have
3    borne on the subject of the lawsuits and that was the
4    purpose, and because we thought that those were the
5    subjects that Mr Beckman and his clients would be most
6    concerned with, we provided a full waiver as to those
7    subjects.

8                MR BECKMAN:  Is there anything else?

9                MR DANGEL:  You can ask Mr Peterka is there
10   anything else.

11               MR BECKMAN:  Okay.

12       Q.  Mr Peterka, are you permitted to testify about
13   your legal opinions?

14               MR DANGEL:  Legal opinions rendered to any
15   of these clients or representatives -- others he has
16   represented in these matters, obviously he is not able
17   to give those legal opinions.  But if you ask him
18   a question of Czech law or if you ask him about
19   something in the complaint that he can testify to as
20   a Czech lawyer.

21               THE INTERPRETER:  The complaints, you mean
22   the lawsuits?

23               MR DANGEL:  Yes, the lawsuits.  Yes, he can
24   testify about any opinions he has.  What he cannot
25   testify about are legal opinions he has given his
26   clients and others he has represented.

27               MR BECKMAN:  So, are you making
28   a distinction between legal opinions he has given his
29   clients and legal opinions he has generally?

29

*Gwen Malone Stenography Services Ltd.*

1          MR DANGEL:  Yes.  Except that if he formed
2     a particular legal opinion as part of his
3     representation, those are obviously covered by attorney
4     work product.  The attorney work product doctrine, and
5     as you know, the attorney work product doctrine works
6     slightly differently than the attorney client privilege.
7          MR BECKMAN:
8     Q.  Mr Peterka, are you permitted to testify about
9     your thoughts or mental impressions?
10          MR DANGEL:  As you know, those are the
11    covered by the attorney work product doctrine, and the
12    work product doctrine is slightly different than the
13    attorney client privilege.  Because the privilege is an
14    absolute bar and the work product doctrine can be lifted
15    when there is a particularized need, when there is
16    a special need.
17          MR BECKMAN:
18    Q.  Are you permitted, Mr Peterka, to testify about
19    legal, your thoughts or mental impressions concerning
20    the lawsuits you filed on behalf of your client?
21          MR DANGEL:  That depends.  That depends on
22    the particular question that is asked.
23          MR BECKMAN:
24    Q.  Are you permitted, Mr Peterka, to testify about
25    the basis for your legal opinions?
26          MR DANGEL:  He is permitted to testify about
27    the basis of his legal opinions insofar as the bases are
28    from facts he has learned and law that he knows.
29

30

*Gwen Malone Stenography Services Ltd.*

1          MR BECKMAN:

53    2     Q.  Mr Peterka, are you permitted to testify about

3    any legal research you did?

4          MR DANGEL:  That also depends because that

5    is covered by, it could be covered by either the work

6    product doctrine or the attorney client privilege.  And

7    I think the easiest thing to say is he is permitted to

8    testify about the results of legal research that he

9    conducted but not necessarily the reason why he

10   conducted the particular research.

11         MR BECKMAN:

54   12    Q.  Mr Peterka, are you able to testify about

13   communications you had with your clients before you

14   filed the lawsuits?

15         MR DANGEL:  No.

16         MR BECKMAN:

55   17    Q.  Mr Peterka, are you able to testify about any

18   investigations you undertook in connection with filing

19   the lawsuits?

20         MR DANGEL:  Perhaps, yes.  It depends on the

21   particular area of investigation and whether it

22   concerned public records which clearly he can testify

23   to.  Private communications with clients, which clearly

24   he cannot testify to.  And the many areas that fall in

25   between, I will have to hear your questions before I can

26   say anything more.  So why don't we proceed with

27   questions and see where the problems arise.  My view

28   point is that I would like you to have as much discovery

29   as you can have without violating the work product

31

1    doctrine and the attorney client privilege.  Mr Peterka

2    is here to answer questions.

3                MR BECKMAN:

4        Q.  Mr Peterka, if you could go back to Mr Dangel's

5    letter.  About four lines from the bottom of the first

6    paragraph, Mr Dangel writes:

7              *"Our idea is that with a proper waiver from all*

8    *of the necessary parties, Mr Peterka could testify about*

9    *the matters stated above and still preserve Mr Weiss's,*

10   *CVF's and KT's privilege as it exists under American*

11   *law"*.

12             You have to let me finish the sentence.  Is that

13   your understanding?

14       A.  I can't see that line that you are quoting from,

15   says Mr Peterka.  Can we check it is the same document?

16   I can't see that sentence you quoted.

17               MR BECKMAN:

18       Q.  It is the fourth line from the bottom, the word

19   "our".

20       A.  No.

21               MR DANGEL:  With the permission of the

22   Court.

23             Wait a minute, you gave him a different

24   letter.  Wait a minute, I want the record to reflect

25   this.  Hold on.  The letter that he gave Mr Peterka is

26   different than the letter he gave me as the example.

27   Excuse me, but I am going to mark the letter he gave me

28   as 1A, please.  It may have been a simple mistake or you

29   may have been trying to fool me.

                                32

1   parties regarding the Weiss Defendants efforts to sell
2   their shares.  His representations to third parties
3   including the Irish investors who intended to purchase
4   the department store, the Kotva department store.  His
5   representations to third parties regarding the Weiss
6   alleged Defendant's efforts to use litigation to force
7   Kotva to purchase shares.  His meetings with Kotva on
8   behalf of the Weiss defendants.  His representation to
9   and meetings with third parties about the Weiss
10  Defendants scheme to blackmail Kotva and interfere with
11  the sale of the department store.  Further there was
12  a representation --
13          MR BECKMAN:  You don't need to read the
14  whole thing.
15          MR DANGEL:  Excuse me.  Kotva does not
16  intend to question Mr Peterka about privileged matters.
17  To finish reading the fifth area.  Alleged scheme to
18  blackmail Kotva, his representation to and meetings with
19  third parties -- not the general subject, his
20  representations and meetings with third parties about
21  the Weiss Defendants alleged scheme to blackmail Kotva
22  and interfere with the sale of the department store by,
23  among other things, filing litigation on behalf of the
24  Weiss Defendants, Gilroy, Balfindor, KT, CV and/or
25  Hoffmann.
26          In other words, asking this man if there has
27  been a Bar Association complaint or asking him if
28  anything that is outside of these areas has been and
29  continues to be entirely improper and I can't believe

                              112


                *Gwen Malone Stenography Services Ltd.*

1     that this Court has allowed it.

2               MR BECKMAN:  Do you want me to be limited to

3     the subject matters in this letter?

4               MR DANGEL:  You are, I am not.

5               MR BECKMAN:  Okay.  Is that your position?

6               MR DANGEL:  Not only my position, that's the

7     law, yes.

8               MR BECKMAN:  Okay.

9               MR DANGEL:  You are limited to those areas,

10    sir, and you knew it and you have known it for five

11    hours and I am taking that to Judge Young.  What is your

12    next point, sir?  Do you want to ask more questions

13    about whether a Bar Association has been filed by

14    a bunch of thieves against this man who has a 40 lawyer

15    firm?  You have zero respect for being a lawyer.  And

16    you have zero respect for the process that was issued in

17    this case.  Now what is your next question, only in

18    these five areas.

19              MR BECKMAN:  Mr Dangel, when I was asking

20    background questions of Mr Peterka and I tried to cut

21    him off to move this along, you said:  No, this is a man

22    who is an esteemed member of the Bar, let him answer his

23    questions, let him answer the question fully.

24              MR DANGEL:  My statement does not get read

25    to the jury.  Your God dammed questions do.  Pardon my

26    French.

27              MR BECKMAN:  So if you are putting at issue

28    and you want him to testify, as you say:  I am not

29    limited -- I am limited and you are not, and I think

113

1    this background is at issue, do you only want him to

2    talk about his background?

3            MR DANGEL:  You have ten more minutes, sir.

4            MR BECKMAN:  You are saying.

5            MR DANGEL:  You have ten more minutes,

6    I have made my point, now go ahead.  Excuse me, I have

7    a bad back that is why I have got up.

8            MR BECKMAN:

232    9    Q.  Did you ever file or caused to be file criminal

10    complaints against Richard Harazim or Martin Benda with

11    the Czech Police?

12            MR DANGEL:  Objection, it is outside the

13    scope.

14            MR BECKMAN:  Are you instructing him not to

15    answer?

16            MR DANGEL:  No.

17            MR BECKMAN:  Okay.

18            MR DANGEL:  I am giving you your ten

19    minutes.

20    A.  We did provide many items of information to

21    various authorities in the Czech Republic.  None of

22    these pieces of information, as far as I recall, was

23    a formal criminal complaint.  And I can give you a list

24    of those notifications that we filed.  I have a list

25    that I can give to you.

26            MR DANGEL:  It is outside the scope.

27            MR BECKMAN:  It is concerning meetings with

28    third parties about Weiss Defendants alleged scheme to

29    blackmail.

114

*Gwen Malone Stenography Services Ltd.*

243
1    Q.   Who is it addressed to, so we know what these

2    are?  Can we mark those as exhibits?

3              MR DANGEL:  It is attorney work product.  Of

4    course.  Object on the grounds it is attorney work

5    products.

6              MR BECKMAN:  Letters to third parties?

7              MR DANGEL:  Insofar as it his file, it is

8    work product.

9              MR BECKMAN:  There might be notes if that's

10   what you mean.

11             MR DANGEL:  Yes.

12             MR BECKMAN:  I don't need that.

13   A.   I can give you dates, you wanted dates.

14             MR DANGEL:  He wanted dates, we can read the

15   dates.

16   A.   June 3rd 2005; August 27, 2005; September 1st,

17   2005; and March 2nd, 2006.

244
18   Q.   Who are those letters addressed to?

19   A.   Supreme Prosecutor.

245
20   Q.   Is there a name, a particular name?

21   A.   There were two different names because there was

22   a change in that position, a new person was appointed.

23   The first three letters went to Mrs Benecova when she

24   was the Supreme Prosecutor and the last one to

25   Mrs Vesecka.

246
26   Q.   How much have you been paid in fees from Mr Weiss

27   or KT?

28             MR DANGEL:  Object to the form of the

29   question, but please answer.

117

*Gwen Malone Stenography Services Ltd.*

1    A.   We bill based on hours spent or time spent on
2    client's case.  Our hourly rate ranges from 80 to 280
3    Euros.  We do monthly billing, but I will have to go to
4    my accountant to find out what was the total that we
5    billed to this client in this case.
247    6    Q.   Have you been paid at least US$1.3 million from
7    the Weiss Defendants?
8    A.   I am not able to make that estimation right now,
9    but what is important is to know is that we bill based
10   on hours spent and we do not charge any success fee.
248    11   Q.   Are you billing for your time today?
12   A.   I haven't thought about that yet.
249    13   Q.   Right.  Well I am going reserve our rights to
14   bring Mr Peterka back.  I'll probably be insisting that
15   he come to the United States, but I am going give the
16   courtesy to Mr Dangel.  He said he needed 45 minutes.
17   It is now 3.45.
18        MR DANGEL:  I appreciate the courtesy but.
19        MGR PESLOVA:  Before we start we will have
20   a three minute break.
21        (Off the record - 3.45 pm)
22        (On the record - 3.52 pm)
23        MR DANGEL:  Have you no sympathy to the fact
24   that there are two sides to this case, your Honour.  Can
25   we please get going, please?
26        **Questioned by MR DANGEL:**
250    27   Q.   Mr Peterka, you and your law firm filed various
28   lawsuits for what I will call the KT Plaintiffs;
29   correct.

118

*Gwen Malone Stenography Services Ltd.*

1      A.   Yes.

251    2      Q.   Were any of those lawsuits filed for the purpose

3      of getting a higher price for any shares of stock in

4      Kotva or any other entity?

5      A.   No, never.   The only purpose of these lawsuits

6      was to protect the American investment and was to

7      preserve the status quo.   In other words, to prevent, to

8      prevent for this 12% block that was held directly by our

9      clients and the 32% block that, in our view, belongs to

10     Trend, and our client holds 40% in Trend, to prevent for

11     the value of these shares to decline or drop.

252    12     Q.   Were any of the lawsuits filed -- strike that.

13     As to any of the lawsuits filed, were they processed, as

14     that term is understood under Czech law?

15           MR BECKMAN:   Objection.

16     A.   Can you explain what you mean by process,

17     exactly?

18           MR DANGEL:

253    19     Q.   Did they tie up, cause an injunction, cause the

20     transfer of a property, of property or a property right

21     in any way?

22           MR BECKMAN:   Objection.

23     A.   By, only by filing those lawsuits no asset

24     transfers could occur.

25           MR DANGEL:

254    26     Q.   Could any assets be tied up that is enjoined?

27           MR BECKMAN:   Objection.

28           MR DANGEL:

255    29     Q.   Other than status quo, keeping the things the

119

*Gwen Malone Stenography Services Ltd.*

1    same, could there be any injunction of any kind?

2              MR BECKMAN:  Objection.

3        A.  We did not, we did not demand an injunction on

4    assets in these litigations.  I just, I am not sure if

5    I understand that correctly, but I believe I do.  So,

6    you know, you say tied up or if there was an injunction,

7    I understand the injunction is a preliminary ruling that

8    will stop people from doing something.

256    9        Q.  Correct.

10             MR BECKMAN:  Objection.  Go ahead.

11       A.  We did not seek any injunction even though we

12    could have and I can imagine, I imagine it as possible

13    that we would have, we would have asked for an

14    injunction to freeze the assets of Kotva but we didn't

15    do that.

16             MR DANGEL:

257    17       Q.  Did you ask for the transfer of shares or

18    money --

19             MR BECKMAN:  Objection.

20             MR DANGEL:

258    21       Q.  -- as part of the lawsuits?

22             MR BECKMAN:  Objection.

23       A.  We did not seek a transfer of money as regards

24    shares.  It wouldn't be a transfer.  It would simply be

25    a confirmation, it would simply be a confirmation that

26    the transfers from the tunneled Trend to Forminster were

27    invalid.

28             MR DANGEL:

259    29       Q.  Was a notice filed in any registry concerning the

120

*Gwen Malone Stenography Services Ltd.*

1    lawsuits?

2              MR BECKMAN:   Objection.

3              MR DANGEL:

260   4    Q.   Or in something called a Cadastre ?

5              MR BECKMAN:   Objection.

6    A.   The Czech law has it that if there is a lawsuit

7    filed to determine ownership rights regarding real

8    estate, a notice about such lawsuits to determine

9    ownership or a note is recorded in the Land Registry in

10   order for all third parties to be aware of such

11   a pending lawsuit.

12             MR DANGEL:

261   13   Q.   Does the filing of that notice prevent the

14   transfer of real estate under Czech law?

15             MR BECKMAN:   Objection.

16   A.   This is a relatively complicated legal issue that

17   we did not give much thought to.   But, according to my

18   understanding, it is to the discretion of the Land

19   Registry and then it is the discretion of the Land

20   Registry which may suspend the registration of a new

21   title or new owner until the pending lawsuit is resolved

22   or ruled upon.   In our case though --

23             MR DANGEL:

262   24   Q.   That is my next question, may I ask it?   Did that

25   occur in this case?

26             MR BECKMAN:   Objection.   Now when you are

27   asking the questions, you are going to let him stop the

28   answer.

29             MR DANGEL:   I just don't want to have

121

*Gwen Malone Stenography Services Ltd.*

1    a situation where it is beyond the scope of my question.

2              MR BECKMAN:  As I did, but you can interrupt

3    and stop him, but I can't.  Is that what you are doing?

4              MR DANGEL:  And you can speak on the record

5    and I can't.  It is funny how when the shoe on the other

6    foot how different it feels.

263    7      Q.  But would you just please answer my question.

8    What occurred in this case?

9      A.  In this case this did not happen because the real

10    estate at that time was already registered with this

11    subsidiary number 51, that is a stipulation or in

12    parentheses so no proceedings regarding a registration

13    of the title were in progress at the time.  So,

14    according to my best knowledge, there was no proceeding

15    that could have been suspended by the Land Registry.

264    16      Q.  So no process issued as a result of that filing

17    of the notice; correct?

18              MR BECKMAN:  Objection.

19              MR DANGEL:  Strike that.

265    20      Q.  Did any process issue as a result of the filing

21    of the notice?

22              MR BECKMAN:  Objection.

23      A.  As I know the case, I believe no.

24              MR DANGEL:

266    25      Q.  Now, sir, at the end of lawsuits in the Czech

26    Republic is there a process by which one party can

27    recover its costs and legal fees if it feels it is

28    justified or that there has been some abuse in the

29    litigation?

1                MR BECKMAN:  Objection.

2     A.  Yes.  Yes, it may.  This is all dealt with in the

3  Code of Civil Procedure.

4                MR DANGEL:

267    5     Q.  Now in this particular instance, the Gilroy case

6  was dismissed after a transfer of the Gilroy stock from

7  one party to a party you believe and you testified

8  as close to Forminster.  Is that -- the lawsuit

9  terminated after that; is that correct?

10                MR BECKMAN:  Objection.

11     A.  That is correct, it was terminated then.

12                MR DANGEL:

268   13     Q.  And did the Defendant in that case seek

14  tariffication, that is did they seek costs and fees?

15                MR BECKMAN:  Objection.

16     A.  I will check.  According to the ruling from

17  September 20th, 2005 the Defendants, being Kotva AS,

18  Kotva NVKS, and SPVK,AS, the Defendants are entitled to

19  the cost incurred in relation to the proceedings and in

20  keeping with Section 142(1) of the Code of Civil

21  Procedure.

22                MR DANGEL:

269   23     Q.  And can you tell me the amount that they received

24  in US Dollars?

25     A.  My understanding that it was 12,000 Crowns and

26  six times 75 Crowns.  This is how I read the ruling.

270   27     Q.  So 12,500 Crowns roughly is how much in US

28  Dollars, sir?

29                MR BECKMAN:  Objection.

123

*Gwen Malone Stenography Services Ltd.*

1       A.   About 20 Crowns, 20.75 into a Dollar.

2            MR DANGEL:

271     3       Q.   So roughly 20 into 1500 is roughly 700, $750,

4    more or less?

5       A.   Yes, something like that.

272     6       Q.   And that was awarded by a judge here?

7            MR BECKMAN:  Objection.

8       A.   Yes, that's correct.

9            MR DANGEL:

273    10       Q.   And that is the final judgment?

11       A.   Yes.

274    12       Q.   Now you have already testified, and I don't want

13    to go back, to your being hired in this case and I want

14    to ask you a few questions about what you did in

15    connection with that in 2004.  Sir, first of all, how

16    big is your law firm?

17       A.   We have about 70 lawyers.

275    18       Q.   And how many cities do you practice?

19       A.   Prague, Bratislava and Kiev.

276    20       Q.   And did Mr -- strike that.  Were you asked

21    questions before you were hired about your professional

22    standing and who you were and where you went to law

23    school, that sort of question?

24            MR BECKMAN:  Objection.

25       A.   During our first conference call with Mr Weiss he

26    did ask me questions about myself and where I was coming

27    from.  He was interested in this and it was important to

28    him in terms of his case.

29            MR DANGEL:

124

*Gwen Malone Stenography Services Ltd.*

277
1      Q.  Sir, as part of what you did when you were hired,

2   did you gather certain facts before any lawsuits were

3   filed?

4      A.  As far as it was possible, we were trying to

5   gather information from open sources, public sources.

278
6      Q.  Now Mr Weiss and Mr Nikitin or actually Professor

7   Weiss and Dr Nikitin resided in the United States;

8   correct?

9      A.  Yes.

279
10      Q.  So were they a source of actual facts used in

11   filing the case?

12          MR BECKMAN:  Objection.

13      A.  I will say that they knew the general facts about

14   their investment, that is they had 12% in Kotva directly

15   and 40% in Trend, whereby Trend hold 32% in Kotva.

16   Other than that, they were not familiar with the Czech

17   system and with the workings of the system in this

18   country and they were not aware of the methods that are

19   used to devalue their investment.

20          MR DANGEL:

280
21      Q.  Were they aware of -- there has been references

22   to tunneling of Kotva shares and various other things.

23   Were they aware of, did they provide those facts or did

24   you gather those facts on your own?

25          MR BECKMAN:  Objection, that is three

26   questions.

27          MR DANGEL:  Okay.

281
28      Q.  Did you gather those facts yourself or were they

29   the source of those facts?

125

*Gwen Malone Stenography Services Ltd.*

```
  1                 MR BECKMAN:  Objection.
  2      A.  They had a general understanding of the fact that
  3   Trend was tunneled but that is common knowledge,
  4   everybody knows that.  And then we used open sources,
  5   public sources to gather additional information and it
  6   was also from the media that we learned that a plan to
  7   sell the department store is under way or in the making.
  8                 MR DANGEL:
  9      Q.  Was that information gathered here in the Czech
 10   Republic?
 11                 MR BECKMAN:  Objection.
 12      A.  Yes, that's correct.
 13                 MR DANGEL:
 14      Q.  Was it gathered by your law firm?
 15                 MR BECKMAN:  Objection.
 16      A.  Correct.
 17                 MR DANGEL:
 18      Q.  Now did Professor Weiss or Dr Nikitin have any
 19   knowledge or expertise in Czech law and Czech procedure,
 20   civil procedure and other procedure?
 21                 MR BECKMAN:  Objection.
 22      A.  No, they do not.
 23                 MR DANGEL:
 24      Q.  But that is something that you are an expert in;
 25   correct?
 26                 MR BECKMAN:  Objection.
 27      A.  That's correct.
 28                 MR DANGEL:
 29      Q.  Did you provide, without telling me what the
```

282
283
284
285
286

126

1   advice was, before the lawsuits were filed, did you

2   provide advice to Professor Weiss and Mr Nikitin and

3   other interested parties?

4          MR BECKMAN:  Objection.

5   A.  Yes, I did.

6          MR DANGEL:

7   Q.  Did you do that after you had gathered the facts

8   and researched the law?

9   A.  Yes.

10          MR BECKMAN:  Objection.

11          MR DANGEL:

12   Q.  After giving that advice, did they give you

13   permission to proceed with the lawsuits?

14          MR BECKMAN:  Objection.

15   A.  That's correct.

16          MR DANGEL:

17   Q.  Was it possible to know every fact about what had

18   happened with the Kotva shares and with the sale of the

19   real estate and so forth before you filed any lawsuits?

20          MR BECKMAN:  Objection.

21   A.  Certainly not.  Even today we learn new items of

22   information that we were not familiar with two and

23   a half years ago.  Simply because the methods of

24   tunneling of then and the methods of removing the assets

25   from the proximity of shareholders are sophisticated

26   methods and rely on the assumption that Czech

27   authorities will not be able to view the case in its

28   entirety and that these authorities --

29          THE INTERPRETER:  I am sorry, I beg your

127

*Gwen Malone Stenography Services Ltd.*

1   pardon.

2   A.   -- and these methods always rely or are billed on

3   legal formalism.

4           MR DANGEL:

290

5   Q.   Okay.  Now I wanted to get to that.  I have only

6   two more areas for you.  You filed how many lawsuits

7   here roughly?

8           MR BECKMAN:   Objection.

9   A.   About twenty lawsuits.

10           MR DANGEL:

291

11   Q.   Now was it necessary to file --

12           MR BECKMAN:   Mr Dangel, please.

13           MR DANGEL:

292

14   Q.   Was it necessary to file that many lawsuits?

15           MR BECKMAN:   Objection.

16   A.   It was necessary to file all these lawsuits

17   because the Czech law does not recognise the possibility

18   of one action against tunneling.  The Czech law operates

19   on the principle that these cases are seen as individual

20   cases, and even though we do state in each of these

21   lawsuits that it is a part of a larger whole, it is very

22   difficult to convince Czech judicial authorities to view

23   the case as one.  And it is completely impossible to

24   address this in one single lawsuit.

25           MR DANGEL:

293

26   Q.   So do I have this right?  Each separate issue

27   that might arise in the litigation is a different point

28   and each point requires, under Czech law, its own

29   lawsuit; is that understanding correct?

128

*Gwen Malone Stenography Services Ltd.*

1                MR BECKMAN:   Objection.

2        A.   That is correct.

3                MR DANGEL:

294    4        Q.   Now, sir, you were asked today, over a period of

5    many hours, about a conversation that you took part in

6    on October 18th at your law office.  I am sure you

7    remember those questions, sir?

8        A.   Yes, I do.

295    9        Q.   Now I am going to ask you this: other than that

10    meeting, other than that meeting, did you make any

11    representations to third parties, that is other than the

12    discussions with Weiss or those parties -- here in order

13    to do this, look at Ex 4, take Ex 4.  This is what they

14    asked the permission to come ask you questions about.

15    And as to each of these areas I am going ask you whether

16    you told us everything you know.  Okay.

17                So, first area:  Mr Peterka's representations to

18    third parties regarding Weiss Defendant's efforts to

19    sell shares in Kotva by BGO.  Did I read that correctly,

20    sir?

21                MR BECKMAN:   Objection.

22                MR DANGEL:

296    23        Q.   Did I read it correctly?

24        A.   Yes.

297    25        Q.   Okay.  Is there anything more than you know that

26    you have already testified to about that area?

27                MR BECKMAN:   Objection.

28        A.   The only representations I made to third parties

29    are those representations that are part of the lawsuits

129

1   or that are part of our notifications to various

2   authorities in the Czech Republic.

3           MR DANGEL:

298   4    Q.   Sir, taking the next area, did you make any

5   representations, and if so, have you told us about all

6   of them or are there more?

7           MR BECKMAN:  Objection.

8           MR DANGEL:

299   9    Q.   Including to the Irish investors who purchased

10   the Kotva department store about the sale of Kotva's

11   department store?  So, to summarise that, were there any

12   other representations made to third parties about the

13   sale of Kotva's department store that have not been

14   testified to so far?

15           MR BECKMAN:  Objection.

16    A.   Aside from those representations that I

17   mentioned, that is those included in lawsuits and/or

18   notifications or motions to authorities, we also

19   notified, notified the Defendants about some of these

20   lawsuits and I have a list of these notifications which

21   were letters telling that we filed a lawsuit.

22           MR DANGEL:

300   23    Q.   It doesn't count because they are not third

24   parties.  Just third parties?

25           MR BECKMAN:  They are third parties.  They

26   are absolutely third parties.  Just let him answer.

27           MR DANGEL:  Okay, there is a list of

28   notifications provided.

29           MR BECKMAN:  Objection.


130


*Gwen Malone Stenography Services Ltd.*

301

302

303

1        MR DANGEL:

2    Q.  Third item, did you make any representations to

3    third parties regarding Weiss defendant's alleged

4    efforts to use litigation to force Kotva to purchase BGO

5    shares?

6    A.  We never made such representations.  To the

7    contrary, we always stressed that these litigations

8    aimed at preserving the status quo so that the shares

9    would not be devalued by assets being manipulated and

10   diverted.  And we always emphasised that any

11   negotiations about the sale of the shares, these

12   negotiations were unrelated to those lawsuits because

13   the objectives of those lawsuits was to preserve the

14   status quo.  If they were not filed, the entire

15   investment would be lost and there would be no interest

16   in the purchasing shares of Kotva or Trend from anyone,

17   from anybody.

18   Q.  Is what you have just told me about the purpose

19   of the filing of the lawsuits and their function, that

20   is what you have just testified to; was that the truth?

21       MR BECKMAN:  Objection.

22   A.  Yes, it was the truth.

23       MR DANGEL:

24   Q.  The next item you have testified today about

25   a meeting with Kotva, using that term generally, not

26   just Kotva AS, in fact that is the way it is used in the

27   document?

28       MR BECKMAN:  Objection.

29       MR DANGEL:  Well there is Kotva Real Estate,

131

*Gwen Malone Stenography Services Ltd.*

1    there is Kotva Operations and there is Kotva this and

2    Kotva that, so they used the term Kotva generally and so

3    did you, so I am pointing that out.

4              MR BECKMAN:  Objection.

5        A.  Yes.  As I explained for us, Kotva was very, even

6    more general term in the sense it the referred to the

7    group of people rounding Kotva and Forminster.

8              MR DANGEL:

304    9        Q.  Now, sir, you described a meeting of October 18,

10    2004, right?

11        A.  Mm-hmm.

305    12        Q.  Is that correct?

13        A.  Yes.

306    14        Q.  You have to speak to the record and say yes or

15    no?

16        A.  Can you repeat the question?

307    17        Q.  The question is you talked today, you told us the

18    testimony about your recollections of the October 18th,

19    2004 meeting; correct?

20        A.  Yes.

308    21        Q.  Were there any other meetings that come to mind,

22    as you sit here, with Kotva, using that term generally,

23    on behalf of "the Weiss Defendants" "to negotiate the

24    sale of BGO shares", if in fact you ever did that?

25              MR BECKMAN:  Objection.

26              MR DANGEL:

309    27        Q.  Were there any other meetings?

28              MR BECKMAN:  Objection.

29        A.  There was no such other meetings in which I would

132

*Gwen Malone Stenography Services Ltd.*

1    have taken part.

2            MR DANGEL:

310    3    Q.  Okay.  Now look at the fifth item?

4            MR BECKMAN:  Can you read it so the record

5    is complete?

6            MR DANGEL:  I will read it in a moment.  Are

7    you -- you already read it half, I will read it all.

8    I will do what you are supposed to do as a lawyer, yes.

311    9    Q.  Sir, you see the term "blackmail" in the middle

10    of second line, to blackmail Kotva.  Let me just say it

11    the way we would say in a US court in front of a jury,

12    to blackmail.  Horrible thing.  Right.  Are you aware of

13    any effort to blackmail Kotva?

14            MR BECKMAN:  Objection.

15    A.  I consider this word to be, this word to be used

16    here absurd.  According to my opinion, nothing like that

17    ever happened.  The lawsuits were filed in order to

18    protect the investment.

19            MR DANGEL:

312    20    Q.  Now having said that, let me read into the record

21    the following.  Are you aware of any representations you

22    made to and meetings you had with third parties about

23    the Weiss Defendants alleged scheme to blackmail Kotva

24    and interfere with the sale of the department store by,

25    among other things, filing litigation on behalf of the

26    Weiss Defendants, Gilroy, Balfindor, KT, CVF and/or

27    Vladimir Hoffmann?

28    A.  Certainly not and it is all absurd.

29            MR DANGEL:  Your Honour, those are the five

133

1    matters that were sent to you to have hearings on.

2    I consider --

3              MR BECKMAN:  Hearings?

4              MR DANGEL:  This deposition on.  I consider

5    that all of those five areas have been fully covered.

6    If Mr Beckman has other questions that have not been

7    covered in these five areas, he should state them now

8    for the record or the record should be closed.  Thank

9    you very much for your time, your Honour.  I am

10    finished.

11              State, please, any other questions in these

12    five areas that you have in mind?

13              MR BECKMAN:  I can't.

14              MR DANGEL:  I can have the witness step out

15    so he doesn't hear them.  But either tell us what those

16    questions are now or the record, I say, is closed.

17              MR BECKMAN:  Okay.  That is your position.

18    We had an agreement on the record that I was giving you

19    the courtesy of going until 3.45 --

20              MR DANGEL:  What time is it now?

21              MR BECKMAN:  -- until 4.30.  And as it is

22    4.30, am I about right?

23              MGR PESLOVA:  Yes.

24              MR DANGEL:  But if you have other questions.

25              MR BECKMAN:  She can't take us both down,

26    Mr Dangel.

27              MR DANGEL:  True.

28              MR BECKMAN:  So we have more than stated our

29    positions on the record.  We are suspending this

134

1    deposition at this time and reserving our rights to

2    bring Mr Peterka back.

3              MR DANGEL:  In my opinion this deposition is

4    closed.  But we will talk about in the United States.

5              MR BECKMAN:  Before we close, I am sorry,

6    are you going back on your agreement to have Mr Peterka

7    be deposed by telephone?

8              MR DANGEL:  I am going back on it to the

9    extent that you have been unable to state a single

10   question that you would ask in the five areas.  And

11   until you do that, and you demonstrate to me and to the

12   Court that in good faith you have real questions to ask

13   in those areas, yes, I am telling you I am not going

14   along with anything.  But if you show me that you do

15   have real questions in it, of course I will consider

16   a telephone deposition as a courtesy to my opposing

17   counsel in the case at a time convenient to Mr Peterka,

18   who has a law firm who run.  Thank you.  So you will

19   receive every courtesy, Joel.  All I want to know is you

20   really have questions and this is not really part of

21   a strategy to run up time against the Weiss Defendants.

22             MR BECKMAN:  Thank you very much for your

23   time.

24             MR DANGEL:  Thank you.  Your Honour, please,

25   there is one more matter we should do before we finish.

26   We should get an official time count on how much time

27   each side used and enter that in the record because that

28   is important.

29             THE INTERPRETER:  The Judge says she will

135

*Gwen Malone Stenography Services Ltd.*

1    put together a short transcript or short memo where the

2    exact time will be recorded.

3              MR DANGEL:  Thank you so much, your Honour.

4    Thank you for your time.

5    (The deposition adjourned at 4.30 pm)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

136

*Gwen Malone Stenography Services Ltd.*



Nystrom Beckman & Paris LLP

May 4, 2007

**By Email and First Class Mail**

Edward T. Dangel, III, Esquire
Dangel & Mattchen, LLP
10 Derne Street
Boston, MA 02114

    Re:  <u>Kotva a.s. v. Andrew Weiss and Weiss Asset Management, LLC</u>
         C.A. No. 05-10679-RCL (D. Mass.)

Dear Terry:

    I have reviewed the draft transcript of Mr. Peterka's April 18, 2007 deposition in Prague. In view of the testimony, your clients have made broad waivers of the attorney-client privilege and work product protection. A party who designates its attorney as a witness in a lawsuit and solicits testimony from that attorney does so at its own peril. Indeed, once a party injects its counsel into a matter as a witness, the privilege no longer applies to the subject matters about which the attorney-witness provides testimony. The waiver also applies to documents relevant to the subject matters placed in issue.

    As demonstrated by your designation of Mr. Peterka as a witness and your *voluntary* examination of him, the Defendants have crossed the waiver bridge here. Specifically, the Defendants have waived the privilege and work-product protection with respect to issues including, but not limited to, the following:

- All communications and documents regarding the purpose and function of the lawsuits filed by Peterka for the "KT plaintiffs" (Rough Dep. Tr., hereinafter "Dep.", at 111-112, 124);

- All communications and documents regarding whether to ask for the transfer of shares or money damages in the lawsuits (Dep. at 113);

- All communications and documents regarding the filing of notices with the land registry office (Dep. at 113-114);

- All communications with Defendants, and documents related thereto, concerning Mr. Peterka's professional background, as discussed during the outset of Mr. Peterka's relationship with the Defendants (Dep. at 117);

- All communications and documents regarding facts provided by Defendants to Peterka regarding Kotva and Trend share ownership (Dep. at 118);



Edward T. Dangel, III, Esq.
May 4, 2007
Page 2

- All communications and documents regarding the facts and research gathered before proceeding with the lawsuits and conveyed to Defendants to obtain permission for filing the lawsuits (Dep. at 119-120);

- All communications and documents regarding the "necessity" of filing separate lawsuits to achieve the contemplated purpose of the "KT plaintiffs" (Dep. at 121);

- All communications and documents regarding the alleged distinction made by Peterka and Defendants between Kotva entities and the "group of people rounding Kotva and Forminster" (Dep. at 124);

- All communications and documents regarding the basis of Mr. Peterka's opinion that the lawsuits were not meant as an effort to blackmail Kotva (Dep. at 126); and

- All communications and documents regarding Mr. Peterka's opinion that the lawsuits were filed in order to "protect the investment."

Please confirm that you will be producing all of these materials forthwith.

In light of this waiver, Defendants are under an obligation to review the assertions of privilege that are currently listed on the their privilege log. We believe that many of the documents listed on the log will need to be produced. As you know, we are entitled to cross-examine Mr. Peterka thoroughly about the matters he testified to during *your* examination of him, and we are entitled to the relevant documents before doing so.

If you deny there has been a waiver as described herein and refuse to produce the requested materials, please consider this a formal request for a Rule 37.1 conference and advise us of your availability for a conference next week.

Finally, as general matter, the record reflects that your conduct during Mr. Peterka's deposition was troubling. *Rebuking the Judge*, repeated speaking objections in violation of Rule 30(d), coaching the witness (through speeches and gestures), and *cursing on the record*, among other transgressions, demonstrate an overall lack of decorum. We request--and expect—that you will abide by the Rules and comport yourself in a more professional manner in the future.

Kindly provide a response to this letter by the end of the business day on Tuesday, May 8, 2007.

Very truly yours,

Daniel J. Pasquarello

cc:    Ned Leibensperger, Esq. (via Email)
       Benjamin Goldberger, Esq. (via Email)



10 St. James Avenue    16th Floor    Boston    Massachusetts 02116    Tel 617.778.9100    Fax 617.778.9110    www.nbparis.com

# DANGEL & MATTCHEN, LLP

### ATTORNEYS AT LAW

10 DERNE STREET
BOSTON, MASSACHUSETTS 02114-4203

BEACON HILL
TEL: (617) 557-4800
FAX: (617) 557-4827

June 6, 2007

BY FACSIMILE AND FIRST CLASS MAIL

Joel Beckman and Daniel Pasquarello, Esqs.
Nystrom Beckman and Paris LLP
10 St. James Avenue, 16th Floor
Boston, MA 02116

Re: Kotva a.s. v. Andrew Weiss et al., C.A. No. 05-10679-WGY

Dear Joel and Dan:

This responds to your recent letter claiming that, as counsel to the Weiss defendants, I waived the attorney-client privilege by asking questions of Ondrej Peterka at his deposition on April 18 in Prague. As you are aware, the deposition occurred as a result of Letters Rogatory issued by the Federal court at your request. You sought the deposition of the Weiss parties' Czech attorney, but indicated that you did not "intend to question Mr. Peterka about privileged matters." Nevertheless, at the deposition you asked several questions relating to the lawsuits which Mr. Peterka commenced and about his personal knowledge of meetings between Mr. Hoffman, representatives of the plaintiffs in this case, and a representative of Markland. The Letters Rogatory listed five specific areas of inquiry relating to Mr. Peterka's knowledge and actions he has taken on behalf of the Weiss parties with "third parties." As with all other depositions the Weiss parties' counsel was invited to cross-examine. In advance of the deposition we discussed, specifically, attorney client privilege issues and the nature of the questions I intended to ask.

Because the Czech law of attorney-client privilege is broader than American law, there was a question of whether Mr. Peterka could testify at all – even could mention the nature of the allegations and the status of the pending Czech litigation – as a witness in this case. It turns out that limited waivers are permitted under Czech law and so, trying to be as forthcoming as we could, Mr. Peterka and the Weiss parties, at my request, executed a letter agreement under which Mr. Peterka could testify as to matters privileged under Czech law but not under American law. The net effect was intended to be that the attorney-client privilege as recognized in America would be maintained, but Mr. Peterka could testify to third party meetings and discussions and the nature and progress of the lawsuits – the discovery you sought.

In responding to your claim that the privilege was waived, I am assuming that you are not trying to apply Czech law, and that you are not claiming that the questions you asked about the October 18, 2004 memo from Peterka to Weiss which you obtained through the seizure of Vladimir

Hoffman's computer created a waiver. I note that in your examination based on that letter you examined only as to his recollection of the negotiation meeting he attended with Hoffman, Benda, Harazim, and Prestige. Those recollections are matters of fact and, are not protected even when the facts are reported later by the attorney to the client for information purposes only.

The threshold question is whether you are claiming waiver under Federal or State law. Massachusetts law applies because as of April 18 there were no pending federal claims. While Massachusetts courts from time to time use federal precedent in this area, Massachusetts law is quite different in certain privilege matters. I am unable to find any case to justify your position that the mere fact that a lawyer answers questions asked of him by any side in a case represents a waiver, and in fact, Massachusetts law is to the contrary. See, Young et al., Massachusetts Evidence, Vol. 1, Section 518.1. Further, it is legitimate to ask a lawyer whether he indeed represented a client's interest, that he gave advice, that he received permission before filing a case, and that he did his homework. This isn't a sword/shield issue – it would look ridiculous in front of a jury not to establish that, and the failure to do it would create unwarranted negative inferences. As I told you, the defendants do not rely on advice of counsel as a defense.

We've had a number of Local Rule 7 discussions on this subject, and you asked that I provide a letter with citations explaining why the questions I asked did not create a waiver. I appreciate your giving me enough time to do that, given my schedule and the fact that we only today received the official transcript of the Peterka Depostion.

My response is, as follows:

1. "All communications and documents regarding the purpose and function of the lawsuits filed by Peterka for the "KT plaintiffs" (Dep., at 118-120)

As you are no doubt aware, the attorney-client privilege is limited to communications between clients and their counsel in which advice is sought, implicitly or directly. Even in those situations, the disclosure of "Public facts" does not create a waiver. Young, et al, Section 503.4. There is simply nothing in the questions or answers at pages 118-120 which requires a disclosure of any attorney/client communication, unless you try to make more out of the words "purpose" and "function" of the lawsuits publicly filed than was intended in the question or included in Mr. Peterka's answers. The purpose of lawsuits is usually evident from the lawsuits themselves. You had asked about that at pp. 55-66 of the deposition and Mr. Peterka gave answers which you thought were overly long and too inclusive. I thought the answers were okay, and the inquiry was proper, because the answer could be and were derived without reference to private attorney/client communications. I wanted to make sure that it was clear that none of the lawsuits requested a higher price for the shares, nor did they request that any of the assets of Kotva be tied up. Very simply the questions did not ask for, nor did the answers provide, the substance of confidential communications between an attorney or client. Even under your view that "purpose" means the intent of the parties in the lawsuit, which I think is flat wrong, there would no waiver under Massachusetts law, where disclosure of the substance of communications was not called for or provided. See, Commonwealth v. Birks, 435 Mass. 782, 788. Further, you have tried to parse

DANGEL & MATTCHEN, LLP

2

the questions found at pages 118-120 without including all of them. A reading of all of the questions on this subject demonstrates that the questions and responses concern whether process, as that term is known in the Czech Republic, was used in the filing of the lawsuits. That is, the questions relating to whether damages were sought or a higher price or an injunction concerned whether given the purposes stated in the lawsuits (i.e., what the lawsuits were looking for) represents process. At page 119, lines 12-14, the court reporter got the question a little bit wrong – instead of "processed" the word should read "process". The lawyer is not being used as a sword or shield. He was asked to testify as to the nature of the lawsuits by both of us, my purpose being to establish that under Czech law, the suits did not implicate process.

2. "All communications and documents regarding whether to ask for the transfer of shares or money damages in the lawsuits":

The answer that I have given above covers this subject. However, there is more that can be said. The question asked was whether he, as counsel for the Weiss parties, asked for the transfer of shares as part of the lawsuits he filed. His answer was that he did not ask for the transfer of shares or a transfer of money as regards to shares. This negative answer cannot be taken as an affirmative statement, and therefore cannot be any kind of a waiver. Even if I had asked, which I clearly did not-- did you discuss the transfer of shares with Andrew Weiss?-- there has been no waiver, if the answer is –no, I *did not* discuss it.

3. "All communication and documents regarding the filing of notices with the land registry office":

The filing of a public notice and reference to statements mad within the notice are public facts not covered by privilege. See, Young et al. Section 503.5; Liacos et al., Section 13.4. ("The privilege protects only those communications from the client made for the purpose of obtaining legal advice" and not the substance of "public facts").

4. "All communications with Defendants, and documents related thereto, concerning Mr. Peterka's professional background, as discussed during the outset of Mr. Peterka's relationship with the Defendants":

Because counsel for the Weiss parties were very concerned that they might make an "easy slip" under the First Circuit understanding of the privilege, they considered even this matter to be too dangerous to disclose. I do not believe that such communications are privileged, and therefore, I have asked Ben Goldberger to provide the few communications on that subject matter to you. Ben is in Philadelphia for most of the week, and I am sure he will send them along to you shortly.

DANGEL & MATTCHEN, LLP

3

5. "All communications and documents regarding facts provided by Defendants to Peterka regarding Kotva and Trend share ownership" (Dep. at 125-126);

Starting at line 6 of 125 I asked a series of questions, intended to be answered yes or no, and Mr. Peterka apparently not being aware or willing to answer questions appropriately under American law, did not answer the questions yes or no. Therefore, I have looked at the questions and answers separately. Here is what I asked:

Q. Now Mr. Weiss and Mr. Nikitin or actually Professor Weiss and Dr Nikitin resided in the United States; correct?

Q. So were they a source of actual facts used in filing the case?

Q. Were they aware are of, there has been reference to tunneling of Kotva shares and various other things. Were they aware of, did they provide those facts or did you gather those facts on your own?

Q. Did you gather those facts yourself or were they the source of those facts?

Q. Was that information gathered here in the Czech Republic?

Q. Was it gathered by your law firm?

None of these questions, standing alone or together, asked the witness to disclose the substance of communications. Even if they were, the questions, like those Joel asked on this subject, concerned matters pleaded by a party in litigation are certainly public. Further, the responses given disclose only that the Weiss parties were aware of publicly known facts, namely, that they owned 12% of Kotva, 40% of Trend, and the common knowledge – he even used that term – that the Trend shares had been subject to tunneling allegations and litigation in the 1990s. Mr. Peterka testified that his law firm used "public sources" available in the Czech Republic to gather the information used in the lawsuits. While it was not my intention to inquire into any substance, I was simply seeking yes or no answers, Mr. Peterka did extend beyond the questions, and it is my intention to move to strike his answers, except his reference to public sources. Even so, the references to the shares owned by the Weiss parties and the Trend tunneling were clearly publicly known facts, and the disclosure of such facts by a client to a lawyer does not create a waiver unless they are given for the purpose of asking for advice – such as, given these facts, do I have a valid case? Neither the questions I asked nor the answers – nor the documents I'm aware of – go there.

6. "All communications and documents regarding the facts and research gathered before proceeding with the lawsuits and conveyed to Defendants to obtain permission for filing the lawsuits":

DANGEL & MATTCHEN, LLP

There were no questions asked which required Mr. Peterka to disclose any communications about the specific facts pleaded in the complaint, nor did he disclose any communications other than they were aware of their share ownership and the prior tunneling lawsuits.

Further, the fact that Mr. Peterka gave advice to the Weiss parties and that they granted permission to file the lawsuits are classic examples of the type of matters which the Supreme Judicial Court has ruled does not waive the privilege in instances where, for instance, a defendant in a criminal case and his counsel discuss a plea bargain before a plea is entered. The fact of having discussed the bargain and of the defendants' agreement to enter the plea does not provide the right to inquire into the *substance* of what was discussed. See, the Birks case cited above and Commonwealth v. Sullivan, 435 Mass 722, 729. See also Darius v. City of Boston, 433 Mass 274.

7. "All communications and documents regarding the 'necessity' of filing separate lawsuits to achieve the contemplated purpose of the 'KT plaintiffs'":

I'm not aware of any such documents, but even if I were, there were no questions asked that related to any communications on the subject. The only question I am aware of related to Mr. Peterka's understanding of Czech law and procedure. For the life of me, I can't see why any experienced lawyer would think that asking another lawyer familiar with foreign law a question about that country's legal procedure represents a waiver.

8. "All communications and documents regarding the alleged distinction made by Peterka and Defendants between Kotva entities and the 'group of people rounding Kotva and Forminster'":

I am aware of only one such document, namely, the October 18 memo, which you marked in evidence and asked a zillion questions about. I asked in this general area related to reading to the witness your subject matter areas stated in the Letters Rogatory, Exh. 4, which you marked in the deposition, and which relate to third party communications – not attorney-client communications. Mr. Peterka's answers made it abundantly clear that he had provided all the information that he had and that this information, because it related to the third party negotiation with your clients and Markland, was not privileged. My reference at page 132 was as follows: "Were there any other meetings that come to mind, as you sit here, with Kotva, using that term generally, on behalf of 'the Weiss Defendants' 'to negotiate the sale of BGO shares,' if in fact you ever did that?"

The question concerns meetings with third parties, not meetings of attorneys with their clients and cannot possibly raise an attorney-client issue. The question came directly from the Letters Rogatory, a copy of which is attached hereto as Exhibit 1. The reference to "Kotva generally" stems from Mr. Peterka's answers to Joel's questions at pp. 89-92.

DANGEL & MATTCHEN, LLP

9. "All communications and documents regarding the basis of Mr. Peterka's opinion that the lawsuits were not meant as an effort to blackmail Kotva":

The question I asked related to your subject matter questions in the Letters Rogatory and specifically asked about information learned from third parties. It did not ask for, nor did Mr. Peterka give, any information, which involved an attorney-client communication.

10. "All communications and documents regarding the basis of Mr. Peterka's opinion that the lawsuits were filed in order to 'protect the investment.'"

Quite clearly an opinion held by Mr. Peterka on the day of his deposition does not implicate any attorney-client communications, nor does it require him to do anything other than read the complaints on file. How you can claim an attorney-client waiver or work product waiver based on that is beyond my comprehension.

I have spent a lot of time researching and reviewing this matter since you first alleged an attorney-client privilege waiver. It is an extremely serious allegation. I looked into the matter thoroughly with a view to determining whether there had been a waiver or not. As I am sure you are aware, the waiver of privilege under Massachusetts law must be made voluntarily by the client. I did not so intend, nor did Andy, as the privilege letter which was marked as Exhibit 2 (copy provided herewith) makes clear. Having reviewed the matter in detail, I am quite clear that I did not do so. While the clients and I resent having had to expend the resources to make this investigation, I can only hope that the time was not spent in vain and that when you get down to brass tacks and not generalities, you will take your Rule 7 obligations seriously and recognize that there may be smoke, but there is no fire.

Sincerely yours,

Edward T. Dangel III

Enclosures (2)

ETD/kk
cc: Ben Goldberger, Esq.

DANGEL & MATTCHEN, LLP

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KOTVA a.s.                          )
                                    )
            Plaintiff,              )          Case No. 05-10679-RCL
                                    )
      v.                            )
                                    )
ANDREW WEISS and WEISS ASSET        )
MANAGEMENT, LLC                     )
                                    )
            Defendants.             )
                                    )

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
## (LETTERS ROGATORY/COMMISSION ROGATOIRE)

To:    The Appropriate Judicial Authorities of the Czech Republic

       Ministerstvo Spravedlnosti Ceske Republicky
       (The Ministry of Justice of the Czech Republic)
       128 10 Praha 2
       Vysehradska 16
       Prague, Czech Republic

Dear Honorable Justices:

       The United States District Court for the District of Massachusetts presents its

compliments, and requests international judicial assistance to obtain evidence to be used

in a civil proceeding before this court in the above captioned matter,

       This court requests the assistance described herein as necessary in the interests of

justice.  The assistance requested is that the appropriate judicial authority of the Czech

Republic, pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil

or Commercial Matters, require the examination of Mr. Ondrej Peterka, a resident of the

Czech Republic and attorney at Peterka & Partners hired by Defendant Andrew Weiss

and Weiss Capital LLC. Mr. Peterka has also represented counterclaim-plaintiffs KT,
Inc. and CVF Investments Ltd. as well as CVF Investments, LLC, Gilroy, Balfindor, and
Vladimir Hoffmann in litigation filed against Kotva in the Czech Republic. As an
individual with personal knowledge of the topics described, Kotva has requested that Mr.
Peterka be required to provide testimony and give evidence that may be used in civil
proceedings before this Court.

## BACKGROUND

The plaintiff, Kotva a.s. ("Kotva"), filed a civil suit against the defendants,
Andrew Weiss and Weiss Asset Management, LLC ("Weiss defendants"), in federal
court in Massachusetts in 2005. The description of the case is based on allegations in
Kotva's Complaint.

According to Kotva's Complaint, defendant Andrew Weiss attempted to
blackmail the Czech company Kotva a.s. in an effort to extort millions of dollars in return
for dropping certain sham lawsuits initiated by Weiss. Beginning in 2004, Weiss
allegedly blackmailed Kotva after he learned that Kotva planned to sell its shopping
center. When Kotva refused Weiss' demand that it "repurchase" BGO's shares in Kotva,
Kotva claims that Gilroy Limited ("Gilroy") and KT, Inc. ("KT") purchased nominal
shares of Kotva's stock and filed lawsuits in the Czech Republic to challenge the transfer
of the Department Store from Kotva to its subsidiary—which had occurred three years
earlier—solely to interfere with the sale. Thereafter, Weiss allegedly made ever
increasing demands on Kotva to purchase BGO's shares, and promised that he would
"attempt to influence" Gilroy and KT to drop the suits if his price demands were met.
According to Kotva, Weiss initially denied any connection with Gilroy or KT in his

2

communications with Kotva, but later admitted that he caused both Gilroy and KT to file
the suits against Kotva.

Defendant Andrew Weiss and Weiss Capital LLC hired attorney Ondrej Peterka
of Peterka & Partners on or about June 4, 2004 and that firm continues to represent them.
According to the Weiss Defendants and counterclaim-plaintiffs' August 10, 2006
Appendix to their revised privilege log:

> Peterka & Partners began representing KT, Inc. in July 2004 and continues
> to represent it. Peterka & Partners began representing CVF Investments
> LLC in December 2005 and continues to represent it. Peterka & Partners
> began representing CVF Investments Ltd. on May 26, 2005 and continues
> to represent it. Peterka & Partners also represented Balfindor with respect
> to a particular piece of litigation from June 8, 2004 to December 10, 2004.
> Peterka & Partners also represented Gilroy with respect to a particular
> piece of litigation from mid-June 2004 until December 13, 2004. Peterka
> & Partners also represented Mr. Hoffmann with respect to a particular
> piece of litigation from June 2004 to November 25, 2004.

Mr. Hoffmann was Weiss's associate in the Czech Republic.

## QUESTIONS

Kotva seeks to examine Mr. Peterka under oath because of his personal
knowledge of and personal participation in the Weiss defendants' alleged efforts to
blackmail Kotva. Specifically, Kotva seeks to question Mr. Peterka about:

- his representations to third parties regarding the Weiss defendants' efforts
  to sell shares held in Kotva by BGO;

- his representations to third parties, including the Irish investors who
  purchased the Kotva Department Store, about the sale of Kotva's
  Department Store;

- his representations to third parties regarding the Weiss defendants' alleged
  efforts to use litigation to force Kotva to purchase BGO's shares;

3

- his meetings with Kotva on behalf of the Weiss defendants to negotiate the sale of the BGO shares;

- his representation to and meetings with third parties about the Weiss Defendants' alleged scheme to blackmail Kotva and interfere with the sale of the Department store by, among other things, filing litigation on behalf of the Weiss Defendants, Gilroy, Balfindor, KT, CVF and/or Vladimir Hoffmann.

Kotva does not intend to question Mr. Peterka about privileged matters.

## REQUEST

The undersigned honorable Judge Reginald C. Lindsay, Judge of the United States District Court for the District of Massachusetts, therefore respectfully requests the Appropriate Judicial Authorities of the Czech Republic to cause Mr. Ondrej Peterka to be summoned to attend, at such place and time as the Court shall appoint, before such person who, according to the procedure of your Honorable Court, is competent to preside over the examination of witnesses under oath, and that you permit such witness to be examined orally by Joel G. Beckman, or William C. Nystrom or Daniel J. Pasquarello of Nystrom, Beckman & Paris LLP, attorneys for Kotva; and Edward P. Leibensperger, or Benjamin A. Goldberger, or Sylvia K. Kratky of McDermott, Will & Emery LLP, attorneys for the Weiss defendants. The specific topics of inquiry proposed for the examination of Mr. Peterka are outlined above. It is further requested that:

a. The testimony of Mr. Peterka be recorded on videotape and transcribed by a stenographer in accordance with the rules applicable to the jurisdiction of your Honorable Court and there be authentication of Mr. Peterka's testimony by the

4

seal of your Honorable Court or in such other way as prescribed by the procedure

of your Honorable Court.

b. The testimony of Mr. Peterka on video, the transcripts of Mr. Peterka's testimony

as well as any documents, copies or extracts from documents be transmitted to

this Court in a sealed envelope addressed to the Clerk of the United States District

Court for the United States District of Massachusetts at:

> Clerk of Court
> United States District Court of Massachusetts
> 1 Courthouse Way
> Boston, Massachusetts 02210
> Attention: Mr. Don Stanhope
> CA #05-10679-RCL

c. Your Honorable Court cause to be sent to Joel Beckman, Nystrom, Beckman &

Paris LLP, 10 St. James Ave., 16th Floor, Boston, MA 02216, a note of the

charges and expenses payable in respect of the execution of this request.

## RECIPROCITY

It is the understanding of this Court that the granting of assistance of the type

herein requested is authorized by the laws of the Czech Republic. The courts of the

United States are authorized by statute, Section 1782, title 28 of the United States Code,

to extend similar assistance to the tribunals of the Czech Republic.

5

## REIMBURSEMENT OF COSTS

Kotva has assured this Court that they are prepared to reimburse your Court for all reasonable costs incurred in executing this request.

Reginald C. Lindsay, U.S. District Judge
United States District Court for the District of Massachusetts
Boston, Massachusetts, United States of America

November ___, 2006

(SEAL OF COURT)



6

PETERKA & PARTNERS v.o.s.
Na Příkopě 15, Praha 1
110 00 Prague 1
Czech Republic
Fax N° (+420) 246 085 370

Mgr. Ondřej Peterka, Attorney-at-law
Na Příkopě 15, Praha 1
110 00 Prague 1
Czech Republic
Fax N° (+420) 246 085 370


Re:    Partial Release of Attorney-at-law from the Duty to Maintain Confidentiality


K T, Inc., with its registered office at 2711 Centerville Road, Suite 400, City of Wilmington,
County of Newcastle, Delaware, USA,

for the below purpose and within the below scope hereby partially releases the law firm
PETERKA & PARTNERS v.o.s. with its registered office at Na Příkopě 15, Prague 1,
110 00, Business Identification Number: 26169720 and Ondřej Peterka, attorney-at-law,
Czech Bar Association Licence No. 4245, exercising as a partner in PETERKA & PARTNERS
v.o.s., from their duty to maintain confidentiality within the meaning of ss21(1) and (2) of the
Czech Act No. 85/1996 Coll., on the Legal Profession.

(a)    Purpose of the partial release from the duty to maintain confidentiality:

PETERKA & PARTNERS v.o.s. and Ondřej Peterka are released from the duty to keep
confidential certain facts which were disclosed to them in relation to legal services rendered
to K T, Inc. only for the purposes of the testimony of Mgr. Ondřej Peterka in the proceedings
held before the United States District Court for the district of Massachusetts, C.A. No. 05-
10679-RCL, concerning the action of KOTVA a.s. as plaintiff against Professor Andrew
Weiss and WEISS ASSET MANAGEMENT, LLC, as defendants, and the counterclaim of
Professor Andrew Weiss and WEISS ASSET MANAGEMENT LLC, K T, INC. and CVF
INVESTMENTS, LTD., against KOTVA a.s., Martin Benda, Richard Harazim,
FORMINSTER ENTERPRISES, LTD., SPV CO and JOHN DOES 1–5, as counterclaim-
defendants.

(b)    Scope of the partial release from the duty to maintain confidentiality:

PETERKA & PARTNERS v.o.s. and Ondřej Peterka are released from the duty to keep
confidential facts disclosed to them in connection with their legal services rendered to K T,
Inc., however, with the limitation that the release from the duty to maintain confidentiality
does not relate to information which is subject to protection under the attorney-client privilege
applicable in the US. PETERKA & PARTNERS v.o.s. and Ondřej Peterka are thus not
authorised to disclose information covered by the attorney-client privilege applicable in the
US.


Page 1 (of 3)

As PETERKA & PARTNERS v.o.s. and Ondřej Peterka do not have sufficient knowledge of the regulations governing the attorney-client privilege in the US, the testimony of Ondřej Peterka will be provided in the presence of Mr. Edward T. Dangel III, of the law firm Dangel und Mattchen, LLP, with its registered office at Ten Derne Street, PO Box 9505, Boston, MA 02114-9505, who will determine which queries Ondřej Peterka may answer and the scope of his responses.

In Boston on *Apr. 17, 2007*

On behalf of K T, Inc.

Signature: *(signature)*
Name: *GEORGIY NIKITIN*
Position *PRESIDENT*


As within the legal services rendered to K T, Inc. PETERKA & PARTNERS v.o.s. and Ondřej Peterka also acquired personal information regarding Professor Andrew Weiss, residing at 46 Abbottsford Road, 2 Brookline, Massachusetts 2446 USA, information on BROOKDALE GLOBAL OPORTUNITY FUND with its registered seat at P.O.BOX 1748, GT 27 Hospital Road, George Town, Grand Cayman, Cayman Islands, and its subsidiaries, mainly CVF Investments LLC, with its registered seat at 29 Commonwealth Avenue, Suite 1005, Boston, MA 02116, USA and CVF Investments Limited, with its registered seat at 27 Pindarou Street, Alpha Business Centre, 2nd floor, 1060 Nicosia, Cyprus, plus information on WEISS ASSET MANAGEMENT LLC with its registered seat at 29 Commonwealth Ave. (10th Floor), Boston, MA 02116, USA, and WEISS CAPITAL LLC with its registered seat at 30 Old Rudnick Lane, 19901 Dover, Delaware, USA, to exclude any potential doubts regarding the scope of the release from the duty to maintain confidentiality, these entities release PETERKA & PARTNERS v.o.s. and Ondřej Peterka from the duty to maintain confidentiality of information only in the scope necessary for the purpose for which they were released from the duty to maintain confidentiality by K T, Inc., above.

In Boston on *April 17, 2007*

Signature: *(signature)*
Name: Prof. Andrew Weiss


In Boston on *April 17, 2007*

On behalf of WEISS ASSET MANAGEMENT LLC

Signature: *(signature)*
Name: ~~Andrew Weiss~~
Position ~~CIO & President of Weiss Asset Management LLC~~

Page 2 (of 3)

In Boston on April 17, 2007

On behalf of WEISS CAPITAL LLC

Signature:
Name: Andrew Weiss
Position President of Weiss Capital LLC

In Boston on April 17, 2007

On behalf of BROOKDALE GLOBAL OPPORTUNITY FUND and its subsidiaries

Signature:
Name: Andrew Weiss
Position Director, Brookdale Global Opportunity Fun.

In Boston on April 17, 2007

On behalf of CVF Investments Limited

Signature:
Name: Andrew Weiss
Position Based on power of attorney

In Boston on Apr. 17, 2007

On behalf of CVF Investments LLC

Signature:
Name: GEORGIY NIKITIN
Position MANAGER

Page 3 (of 3)

## POWER OF ATTORNEY

The company CVF Investments Limited, with its registered seat at 27 Arch. Makarios III Avenue, 4th floor, 1065 Nicosia, Cyprus, represented by Ms. Arlene Nahikian, director (hereinafter the "Client"),

hereby grants this power of attorney to Mr. **Andrew Weiss**, with his office at 29 Commonwealth Avenue, 10th floor, Boston, MA 02116, USA,

to represent the Client in all legal matters on the territory of the United States of America, especially in courts, in negotiation with criminal proceedings entities, in dealings with other public authorities and in negotiations with natural and legal persons. Weiss is entitled to take all necessary legal steps, in particular to sustain every motion, accept all delivered documents, submit appeals and other settlements as well as to renounce them.

In Nicosia, 29. July 2005



SIGNED by Arlene Nahikian
duly authorized on behalf of
CVF Investments Limited

_____
_____
For and on behalf of
CYPRANGLO SERVICES LIMITED

I accept this power of attorney

In Boston 29, July 2005

_____
Andrew Weiss

RE: Kotva

**Lucy Chen**

| | |
|---|---|
| **From:** | Andrew Weiss |
| **Sent:** | Sunday, May 30, 2004 10:32 PM |
| **To:** | svejnar@umich.edu |
| **Subject:** | FW: Kotva |

Dear Jan, these are the Irish investors that are going to pay the crooks for that they end op owning KOTVA if we don't stop the deal. Linkaters is a London based international law firm. It is very reputable. I got your email of Saturday, was the longer email I sent you sufficiently informative. andy

    ——-Original Message——-
    **From:** Vladimir Hoffmann [mailto:vlado1@volny.cz]
    **Sent:** Sun 5/30/2004 3:21 PM
    **To:** Andrew Weiss
    **Cc:** Dave Johnson; Eitan Milgram
    **Subject:** RE: Kotva

    Dear Andy,

    Please find below the contacts to the Irish investors:

    Henry Prestage
    Markland Holdings
    19 Upper Fitzwilliam Street
    Dublin 2
    Ireland

    tel: 01 676 2023
    fax: 01 676 2000
    mob: 087 948 1742
    e-mail: hprestage@markland.ie

    Markland's lawyer in Prague:

    Brian Wilson
    Linklaters
    Palác Myslbek Na Příkopě 19
    Prague 1
    117 19 Czech Republic

    tel: (420) 221 622 111
    fax: (420) 221 622 199

    Regards,

    Vlado.

    ——-Original Message——-
    **From:** Andrew Weiss [mailto:AWeiss@WeissAsset.com]
    **Sent:** Saturday, May 29, 2004 1:44 PM
    **To:** Vladimir Hoffmann
    **Subject:** RE: Kotva



what is happening with the new company? Did you get my email. Who are the Irish investors I need to send their identities to my contact wit hthe Czech finance minister. Also when did KHB go bankrupt? andy

8/30/2005

WP0000411

-----Original Message-----
From: Vladimr Hoffmann [mailto:vlado1@volny.cz]
Sent: Thu 5/20/2004 6:58 AM
To: Andrew Weiss
Cc: Dave Johnson; Georgiy Nikitin; Eitan Milgram
Subject: Kotva

Dear Andy,

I am aware that you do not want to send the letter to Markland, but I am
sending you the text of the draft letter in English for your information. As
we agreed yesterday this letter will be sent by the new company as soon as
we have it (which is a matter of few days).

Best regards,

Vlado.

—
Odchoz zprva neobsahuje viry.
Zkontrolov no antivirovm syst mem AVG (http://www.grisoft.cz).
Verze: 6.0.683 / Virov b ze: 445 - datum vydn : 12.5.2004

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

This email is confidential and is intended solely for the addressee(s). If you are not an addressee, you must not
disclose, copy, circulate or in any other way use or rely on the information contained in this email. If received in
error, please notify the sender immediately and then delete this email. Any disclosure, copying, distribution or use of
this communication is prohibited and may be unlawful.

Any views or opinions expressed do not necessarily represent those of Weiss Asset Management or any affiliated
companies. Please note that the content of this e-mail may be intercepted, monitored or recorded for compliance
purposes. Sensitive personal data should not normally be transmitted by e-mail.

Weiss Asset Management or any affiliated companies shall not be liable to the recipient or any third party for any loss
or damage howsoever arising from this e-mail and/or its content, including loss or damage caused by virus. It is the
responsibility of the recipient to ensure that the opening or use of this message and any attachments shall not
adversely affect systems or data.

Weiss Asset Management
29 Commonwealth Avenue
Boston, MA 02116
TEL: (617) 778-7780
FAX: (617) 778-7781
www.weissasset.com

—
P choz zpr va neobsahuje viry.
Zkontrolovno antivirov m systmem AVG (http://www.grisoft.cz).
Verze: 6.0.691 / Virov bze: 452 - datum vyd n: 26.5.2004

—
Odchozi zpráva neobsahuje viry.
Zkontrolováno antivirovým systémem AVG (http://www.grisoft.cz).
Verze: 6.0.691 / Virová báze: 452 - datum vydání: 26.5.2004

8/30/2005

RE: Kotva

8/30/2005

WP0000413

Dave Johnson
Thursday, November 20, 2003 11:23 AM
'Vladimir Hoffmann'
RE: Kotva update

Vlado~
We'll call you at 3pm today. I have not received an engagement letter yet from Andel & Svobodova. When would they like it signed by? I guess I have a few questions to be answered.
1) How detrimental is the London Arbitration to our shares of Trend? Is it worth it to not fight the arbitration and partner with Woolf or is there any value in fighting for our Trend shares?
2) Have we tried to go back and talk to Fidea Consulting? I still believe 20 million is unreasonable, but given the circumstances, 25-30 million might not be a bad option and then continue the fight on Trend.
3) Have we looked into hiring the PR firm yet? If they are worried about us making them look bad in the press, perhaps we should make them a little nervous by pursuing that route
4) Under bankruptcy, would we receive anything? Is there any way to prevent bankruptcy or buy some debt of Kotva as well to hedge ourselves?
5) Wouldn't bankruptcy negate the capital increase? I'm unsure of how bankruptcy works in the Czech Republic, but in the US equity holders usually get nothing and the debt holders take control. How much debt of Kotva does Forminster have? Will Forminster write up a lot of receivables and what is the likelihood we could invalidate these claims?
6) What is our best and worst case scenarios? The more I learn about this, the more I feel as though we're powerless in this situation and that we need settle or we'll lose everything.

Looking forward to our conversation.

Regards,
Dave

-----Original Message-----
From: Vladimir Hoffmann (mailto:vladol@volny.cz)
Sent: Wednesday, November 19, 2003 3:39 PM
To: Dave Johnson; Eitan Milgram; Andrew Weiss
Subject: Kotva update



Dear Andy,

I spoke today with Marta Gutova, James Woolf's assistant. She told me that James refuses to cooperate with us because we do not respect the results of the London Arbitration. Not only they rejected the proposed swap of our Trend shares for their claim, they also rejected our offer to share the legal costs to fight the capital increase of Kotva. She also told me that they think that our Trend shares are worth zero.

From the Real Estate Register I learned that they have registered a pledge against Kotva for Fidea Consulting's claim of CZK 700 million and a right of first refusal !!! Fidea Consulting is the company that owns 14 % of Kotva and that offered CZK 20 million for our Kotva shares. Now I understand why Harazim told me that Kotva's shares have no value and that they offered 20 million just to get rid of us - to avoid potential lawsuits or bad publicity that we could create ! I also understand Maras's of Fidea notes that our valuation of Kotva shares might not reflect "potential" claims that were not yet in the accounting ...

This afternoon I also met the lawyers that I want to hire to work for us in Kotva/Trend situation. Their name is Andel & Svobodova. They will send you the contract in English tomorrow. They charge CZK 2000 per hour (about USD 75) and they will ask for a prepayment of CZK 30000 (about USD 1100) since we are a new client. They agreed to start working immediately but please process their contract and

invoice without delay.

I asked them to look how we could:

1) Block the capital increase of Kotva
2) Block Forminster from voting their shares
3) Block any potential transfer of Kotva building and block the sale of Kotva Nemovitosti shares
3) Learn more about the Fidea's claim against Kotva
4) Learn more about Barbican's claim against Kotva
5) Find out who the small creditors of Trend are
6) Invalidate the auction of Trend's receivable
7) Map all the lawsuits, both criminal and business that are under way
8) Discourage potential buyers of Kotva from the purchase

We also discussed the situation generally and I fear that maybe Forminster's master plan could be the bankruptcy of Kotva. The bankruptcy would be even more detrimental to the value of our shares than the capital increase. Morover the bankruptcy would "clean" the building from any liens and thus would make it better sellable.

I should get the documents about Fidea's lien from the Real Estate Register tomorrow and we will se if they have any real ground.

I am enclosing a new spreadsheet with Kotva NAV reflecting these "new" claims. If Fidea's claim is approved, the NAV of our stake in Kotva goes down to CZK 17 million.

Please call me tomorrow (Thursday) at about 3.00PM your time to discuss this.

Regards,

Vladimir.
---
Odchozí zpráva neobsahuje viry.
Zkontrolováno antivirovým systémem AVG (http://www.grisoft.cz).
Verze: 6.0.538 / Virová báze: 333 - datum vydání: 10.11.2003

W0010601

Mar Pefkila, 7 6 04

Republic A powder deliver in warrant in

→ Gutani no return at once

x Wolf Woolf – Memorandum for June, long health

Risk by mel. project no Pefkila, includes
prod.A spying – uphin issue

√ x    15 % AOO half hour S Weissen

TNT                        Liege – Belgu     shipped from
GD 852 175 888 WW                  Larnaca on Mon
                                                    7th  12:38

Branston Haggerty                 Logotou Limited
                                  4 Pikioui street
                                  Limassol  Cyprus

1) Block the deal with the Irish
2) Legal actions, jeopardize & question ownership of the building
3) Trend is shareholder of Kotva – ask court to declare   no
   statutes of limitation, later settlement agreement
   We have direct legal interest
4) Saario – question validity of shareholders meeting of Kotva
   to say that Trend is shareholder of Kotva

9) Notify  Maitland ?  that, – copy of our legal actions ?
   property already transferred to SPV kN         → damages ?
   against  Kotva, kN and SPV kN
5) declare that Kotva is still owner
6) request to have access to the bankruptcy file
7) take over board of Trend
8) move Trend out of bankruptcy ?

              Coordinate & the Delaware Congo

14 6 2004 + Peterka, Černý, Andol, Sobotova - piedávání dullude

✓ ※ Incicont kof. hovor     16:00  CET

Lubic          777766-737
                    237

Conf. Call

Petition → Kotva ps. still owns the property
Only then inform Irish investors
Entity — transfer shares     Cyprus Vlado, Cyprus Andy,
                                        Delaware
✓ ※ Trend — zistit prevoditelnost akcí

TYM — Cyprus or Delaware ?

BGO buys shares of TYM
TYM buys shares of Kotva & Trend

✓ ※ kúpit jednu akciu Kotvy na VH
  ※ Začat kupovat akcie Kotvy na BF - zistit John ]

      proolédání    ...  abdo brani

JUDr Přemysl Klaus – SKP VS
221 803 400 Vágnerová
sl. Řeháková = asistentka

Grennn – Bělehradská 18, 14000 Praha 4

Poslat doklady Directree
✓ Plná moc Gilroy pro Peterku
✓ Převod akcií Kotva a Trend (Seifertová, Streitberg)

✓ PoA nemusí být ověřená
✓ Kopie certifikátů pro GŘ

✓ NAXOS   257 314 251
              Švanová    777 707 301

         www naxos.cz

✓ Streitberg, BHS OVA – Petr Ševčík

✓ Horal 266 713 030
         horal_jan@hotelduo.cz

Fakturace BGO – náklady překladů a SCP, nákup akcií Kotva
1) BHS překlad Stanovy Kotva, Trend dokumenty Gilroy   30 256,
2) SCP  23.6.04          644,—
3) Persto překlad doklady — Horvord výplata + Trustu   23 400 +
                                                        +15%  4446
                                                        _____
                                                        27 846,—

4) Společnost Online – Insomnia     5000 + 15% 350 = 5 950 —
5) SCP  8.6.04          560,—
6) Nál. 11. akcie Kotva Hoffmann    430,—

                                            K8061

With regard to

## 1. Meeting with Mr. Benda of KOTVA, a.s.

Mr. Hoffmann has informed us that he had a meeting with Mr. Benda of KOTVA, a.s., and Mr. Benda offered him compensation totalling 75 million CZK if BGO sells its shares in KOTVA, a.s. and withdraws all lawsuits against KOTVA, a.s. and affiliated companies. Mr. Hoffmann has asked us to prepare an analysis of the prospects of initiated lawsuits as well as whether the conclusion of a settlement agreement would influence the prospects of getting compensation from the Czech Republic under the treaty on protection of foreign investments. We will send this analysis to you as soon as it is ready. In order to evaluate the possible claim against the Czech Republic we will need to know when BGO (Czech Value Securities) acquired its shares of TREND. Please give us this information.

*The CVF was set up in 1995 to invest in Czech securities and started investing in Trend, among other funds. We have a record from Bank of Bermuda that CVF made the following purchases of Trend VIF:*

| Date | Number of Shares |
|------|------------------|
| *October 30, 1995* | *923* |
| *November 27, 1995* | *5,018* |
| *January 30, 1996* | *907* |
| *February 13, 1996* | *11,111* |
| *February 16, 1996* | *8,423* |
| *February 21, 1996* | *5,993* |

*There were some other trades, but we do not currently have evidence of them. The total holding of Trend shares by CVF on 30 September 1997 was 1,002,209 shares – this information is from the earliest annual report of CVF that we have available.*

## 2. Petition concerning shares in KOTVA, a.s., currently held by Forminster

In order to increase our pressure on KOTVA, a.s. (Forminster) we consider it appropriate to submit a petition for a declaration that the owner of shares in KOTVA, a.s., currently held by Forminster is, at least in part, TREND. We will prepare a draft of this petition. As agreed, we are awaiting information from you with regards to who will be the plaintiff in this case (please see point 8 bellow).

*The problem with having KT as a plaintiff is U.S. capital gains tax – KT inc. is Delaware Corporation and as such is subject to U.S. capital gains tax. The way we could avoid this is to have a swap transaction with KT inc. where BGO would pay KT inc. for shares in KT Inc. they would pay enough money for KT Inc. to pay legal bills and other expenses associated with these matters. Some of these shares would be distributed to some of the holders of the ring fenced assets others would be held by BGO as nominee for the owners of the ring fenced assets. KT and BGO would either enter into a total return swap transaction, in which KT would become the owner of the shares of Trend and Kotva, and*

K8047

*BGO would receive the gains and losses from the sale of the Trend and Kotva shares, that differ from the current market price; or else KT inc. would sell to BGO a call option on the Trend and Kotva shares, and would use the money it obtained from the sale of the call option to buy BGO's shares of Trend and Kotva. The charter of KT inc. would be set up such that the shares are not transferable without the consent of 90% of all shareholders. We need to get some local legal advice as to whether to do the total return swap or the option contract. Would there be any issues under Czech law?*

*Under Delaware law I do not believe the shareholders could obstruct any settlement agreement; Delaware law gives considerable power to the directors of a company.*

## 3. Gaining control over TREND

We are preparing a detailed list of the steps necessary to acquire control over TREND.

## 4. Prosecution of Mr. Halek and others

In order to get access to the police file it is necessary to find a shareholder of TREND who sustained damages as a consequence of fraudulent transactions organised by Mr. Halek. This means that this shareholder had to acquire his shares or at least a part of them in the period between September 1995 and May 1996 when the transactions occurred and his shares consequently decreased in value. It would be very difficult to construct the claim for damages in any other way. This shareholder has to be prepared to grant us a power of attorney.

In this case a great number of persons suffered damages as a consequence of an offence being committed. In such a case the court is entitled to decide, that instead of injured persons representatives elected by the injured persons or appointed by the court are entitled to act. Therefore, it would be useful if we will be able to represent a significant shareholder.

Please send us your instructions.

*Please ask Vladimír Hoffman to find a significant shareholder that could join the lawsuit. We are also researching to see if Czech Value Fund was a shareholder during that period; I included (above) a table of some buy transactions in Trend shares that we have on record with the Bank of Bermuda. How important are exact dates? It seems that most of the trades in Kotva shares by Trend took place in the second half of 1996. Clearly there were other trades since CVF ended up with over 1,000,000 shares of Trend.*

## 5. Bankruptcy proceeding TREND

The company Internet Securities, Inc., assigned to the company Balfindor, a.s. (a company controlled by Mr. Hoffmann) a claim towards TREND. Last week we received a motion of the company Internet Securities, Inc., to the court to swap the previous creditor for the new one. As soon as we receive a power of attorney from the company

K8048

Baltindor, a.s., we will file the appropriate documents to the court so that it can decide on the swap of participants in the proceedings. After this decision is valid and effective for Baltindor, a.s., we will be entitled to exert the rights of bankruptcy creditor of TREND, especially to access the bankruptcy file

### 6. Files of Mr. Woolf's lawyers

On July 8th, 2004 Ms. Marta Guthova sent us an e-mail in which she promised to inform us within a week or two about the possibilities to access files held by Mr. Woolf's external lawyers Glatzova and Co. Since then we have not received any information from her. We think that this is a clear sign that they are not ready to cooperate with us. Please inform us whether we should contact her again

*I agree, apparently Woolf's lawyers have persuaded him not to cooperate with us, that cooperation could generate legal issues, they seem to have told him that we might get sued and that cooperating with us would drag him into the lawsuit*

Mr. Hoffmann has informed us that Mr. Benda allegedly received information from Mr. Woolf that we are able to withdraw our lawsuits against KOTVA, a.s., only with the consent of Mr. Woolf. Mr. Woolf allegedly said that he has an interest in the plaintiffs because of a non specified joint-venture in which he participates. We are not able to evaluate if this was really said by Mr. Woolf, but if a settlement with KOTVA, a.s. (Forminster), is to be concluded in the future, we have to be very careful about sharing information with Mr. Woolf due to a possible conflict of interests.

*I have not made any such agreement with Woolf, although we both think our interests are aligned*

### 7. Properties acquired by CMQ

As regards buildings acquired by the company CMQ Czech (a member of Markland group) a little misunderstanding occurred, since this company did not acquire the KOTVA Department Store or any part of it but two adjacent buildings which were not in the ownership of KOTVA, a.s., or any affiliated company. We informed you about this fact because Mr. Hoffmann told us that the Markland Group may be interested in buying KOTVA Department Store and the acquisition of neighbouring buildings may be a prelude to it. Due to these facts it is impossible to take any legal steps against the purchaser of both buildings.

Today we have again verified with the land registry that the owner of KOTVA Department Store is still SPV KN, a.s. (a subsidiary of KOTVA, a.s.). There are no changes apparent in the commercial register as regards the shareholder structure of SPV KN, a.s. either. (We must, however, take into account that entries in the commercial register are not up-to-date).

K8049

*The price that was paid for those properties could help us determine a (minimum) valuation for the KOTVA department store. Apparently those properties were sold by a liquidator so the price was probably artificially low. Vlado thinks the price was 496million, our translator saw a price of 448,750 million. We might want to compare the sale price with the assessed value, to get a similar ratio. Vlado has an independent source saying that Markland is paying 1.5 billion CZK, do you have any independent information.'*

## 8. Ownership of KOTVA and TREND shares

After we receive your information on whether the owner of shares in KOTVA and TREND is BGO or Czech Value Securities, we will discuss with you further steps.

With regards to your notice contained in your e-mail of July 22nd, 2004 that you consider distributing the shares of Czech Value Securities to original shareholders of BGO we would only like to point out that we have to stay flexible in the future. If new shareholders were not under the control of BGO it would be very difficult to withdraw the lawsuits and conclude a settlement in the future. That is why we do not recommend to distribute the shares in this phase.

*Re: My response to point 2 - If we transfer the shares to KT Inc., I don't think this problem would arise.*

Because of the above mentioned facts it is uncertain whether it is still necessary to open an account of KT, Inc., with the Czech Securities Center. We have nevertheless prepared an official translation of new corporate documents of KT, Inc., which we received from Ms. Dubrow and passed on to BH Securities, which is empowered by you to act on your behalf with the Czech Securities Center.

## 9. Contract on provision of legal services

On July 16th, 2004 we sent you a revised draft of the contract on provision of legal services between Peterka and Partners and the KT, Inc., and of the guarantee of BGO for liabilities of KT, Inc., arising in connection with the contract. We have not received any comments from you as regards this matter. Please let me know if the contract has already been signed by you or if there are some obstacles in the way of concluding it.

*I'm sorry we dropped the ball on this. I had thought the agreement had been signed and returned. The signatory will be the director of KT, probably Georgiy Nikitin. We also need to transfer the money into KT to pay your bill. I think the bill was paid on Monday but I'll also check on that. As soon as we get money transferred into KT inc. we will immediately send it to you. Could you give us wire instructions; that will speed up the transfer of funds to you. I'm sorry for the delay. I was not at work on Monday or Tuesday and thought it had been taken care of.*

IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856
AND IN THE MATTER OF CIVIL PROCEEDINGS NOW PENDING
BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF MASSACHUSETTS (CIVIL ACTION NO. 05-10679-RCL)


—————————————————————————
                                                    )
                                                    )
                                                    )
KOTVA a.s.                                          )
                                                    )
            Plaintiff                               )
                                                    )
                                                    )
            v.                                      )
                                                    )
                                                    )
ANDREW WEISS and WEISS ASSET                        )
MANAGEMENT, LLC                                     )
                                                    )
                                                    )
            Defendants                              )
—————————————————————————)

                        Deposition of:

                        Mr. Howard Golden

                        Taken at:
                        Courtroom No 126
                        District Court for Prague 1,
                        Ovocny trh 14

                        On:  April 17th, 2007
                        Commencing at 9.00 am


*Gwen Malone Stenography Services Ltd.*

1    gave me four tapes and said:  Whose voice is this?

2    I couldn't say this is Georgiy.  Really my relationship

3    with him is mostly by e-mail and I only spoke to him on

4    maybe a couple of times.

5            MR BECKMAN:

6        Q.  Did you understand in the fall of 2004 time frame

7    that Mr Hoffmann was having a difficult time getting

8    a decision from Mr Weiss as to what to do?

9            MR DANGEL:  Objection.

10       A.  I do recall some discussions where he said, he

11   couldn't get a decision.

12           MR BECKMAN:

13       Q.  What do you recall about those discussions,

14   Mr Golden?

15           MR DANGEL:  Object.

16       A.  Basically, that he was frustrated that he

17   couldn't get an answer from Andy about going forward and

18   accepting an offer.

19           MR BECKMAN:

20       Q.  Accepting an offer for what?

21           MR DANGEL:  Objection.

22       A.  I recall he was buying the shares of Kotva.

23           MR BECKMAN:

24       Q.  Did you understand that the Irish were interested

25   in purchasing the adjoining buildings to Kotva?

26           MR DANGEL:  Objection.

27       A.  No, I wasn't familiar with that situation.

28           MR BECKMAN:

29       Q.  I want to play --

3

*Gwen Malone Stenography Services Ltd.*

1      A.  This is probably one of the first times, I don't

2   recall that being a discussion either with me or Vlado

3   or in the papers.  I just don't recall such a thing.

4      Q.  Okay.  Let me play another clip of this November

5   2nd, 2004 telephone call between Mr Nikitin and

6   Mr Hoffmann.

7             MR DANGEL:  I object to it on several

8   grounds including incompleteness.  It seems you should

9   play the whole tape first, but that is neither here nor

10  there.  Object.

11     Q.  *"... is to provide you with information to*

12  *discuss with the other party and I simply -- that's,*

13  *that is what I believe.  I mean if price is the NAV or*

14  *very close to NAV, maybe the NAV is 120, maybe the NAV*

15  *is 140, it is not that much different, but it is*

16  *terribly difficult.  I think we cannot go and say we*

17  *want, you know, full NAV plus we want even more for*

18  *that, you know, that is blackmail.*

19  *Mr Nikitin:  Yes".*

20            Mr Golden, do you recognise the voice on

21  this clip as Mr Hoffmann?

22            MR DANGEL:  Objection.

23     A.  Well I must say it is a little bit scratchy, as

24  you know, but from what I heard it appeared to be the

25  voice of Mr Hoffmann.

26            MR BECKMAN:

27     Q.  Mr Hoffmann uses the term blackmail.  What is

28  your understanding of the term blackmail?

29            MR DANGEL:  Objection.

4

*Gwen Malone Stenography Services Ltd.*

1     A.   It is an interesting question.  You use the word,
2     you hear it, you never think of how to define the word.
3     It is how to get a definition of the word blackmail.
4     Trying to extract money or other benefits from someone
5     by threat of usually it was information when you say:
6     I will tell you wife or something, information or some
7     other action which you didn't have a legal right to do
8     it.
9          Q.   Did you have any understanding that Andrew Weiss
10    was seeking more than NAV, net asset value of the
11    department store for the Kotva shares?
12         A.   No, sir, no.
13         Q.   All right.
14         A.   It is the first time I have heard this.
15         Q.   Is it your understanding that Vladimir Hoffmann
16    was concerned that Andrew Weiss was threatening
17    blackmail?
18              MR DANGEL:   Objection.
19         A.   No.  I must say that in my discussions with
20    Vladimir I think his concern was that he felt that the,
21    either the Irish or the Forminster people claimed it was
22    blackmail, not that he was concerned it was blackmail.
23    It was the appearance or the argument on the other side
24    that he said it was.
25         Q.   Who is "they"?
26         A.   The Forminster and the Irish, it was just they
27    were presenting it as that and he didn't like their
28    presentation.  I don't think, he didn't present to me,
29    let's say.  This is the first time I have heard him

5

*Gwen Malone Stenography Services Ltd.*

19      1      Q.  Did you discount the value of Trend shares in the

        2   Czech Value Fund because of the Trend scandal?

        3      A.  Well, I am going try and be precise with the

        4   answer.  We had difficulty -- I was on the board -- in

        5   giving a value to the Trend shares.  Whether it was

        6   discount or premium is a different -- I don't know how

        7   to answer that question.  The real issue is how do you

        8   value it.

20      9      Q.  That is a better question, I apologise.  How did

       10   you value when you now that the Trend tunneling scandal

       11   was out?

       12          MR DANGEL:  I object and I would like to

       13   state for the record that we sought to bring in expert

       14   witnesses and it was opposed by the opposing counsel.

       15   I assume he will withdrew his opposition based on the

       16   fact that he is asking this lay witness brought in for

       17   valuation, valuations and valuation methods and

       18   valuations techniques.

       19          MR BECKMAN:  You are taking up more of my

       20   time of the deposition so it is going to continue.

21     21      Q.  Go ahead and answer, Mr Golden.  Go ahead.

       22      A.  The scandal wasn't the issue in valuing the

       23   shares.  The issue was what assets really were in the

       24   Trend fund at that time.  And since the hard assets,

       25   like the Kotva shares, cash, shares of other companies

       26   that it had, were gone from the portfolio and the

       27   reality what it had was a claim against the manager who

       28   had converted assets or the recipients of those assets.

       29   It is really hard to value a lawsuit or a claim against

8

1    third parties.  So that it is clear, it wasn't the
2    scandal that was the issue in making it a discount or
3    a question of valuation, it was trying to determine what
4    actual assets we could value in the fund so that we
5    could give it a net asset value.  Normally, you would
6    discount an overvalued company.  So if a fund owned
7    shares in a company and we felt that the market price
8    was too high or was not liquid, you would discount that.
9    We didn't have that issue of discounting.  I hope that
10   answer is clear.

22   11   Q.  I am going play for you, Mr Golden, another clip
12   of the November 2nd telephone conversation between
13   Mr Nikitin and Mr Hoffmann.

14       "... *organise a conference call with Andy, with*
15   *Peterka, with myself, we can, we can discuss it so we*
16   *can discuss how we can present it, what arguments can we*
17   *give, what basically we are allowed to say so that, you*
18   *know, it is not blackmail*".

19       Did Mr Hoffmann ever discuss with you that he was
20   seeking to organise a conference call with Andrew Weiss
21   and Mr Peterka to discuss how to present the offer so it
22   was not viewed as blackmail?

23           MR DANGEL:  Objection.

24   A.  Again it is a compound question.  I don't recall
25   him discussing that with me at all.  No, I am sorry.  To
26   the best of my recollection, he never told me he was
27   having a meeting to discuss whether or not there was an
28   issue of blackmail.  In fact, I think this clip kind of
29   supports my earlier question that his concern was how it

9

1   was presented, not that it was blackmail.

2             MR BECKMAN:

23  3   Q.  You said Forminster argued that it was blackmail?

4             MR DANGEL:  Objection.

5   A.  My understanding in discussions with Vladimir and

6   I had discussions years earlier.

7             MR BECKMAN:

24  8   Q.  Let's focus on the 2004 time frame?

9             MR DANGEL:  Excuse me, I want it noted he

10  interrupted the witness in the middle of an answer and

11  I don't want that to happen again.

12            MR BECKMAN:

25  13  Q.  Let's focus on the 2004 time frame.

14            MR DANGEL:  Do abuse the process, sir.

15            MR BECKMAN:

26  16  Q.  Let's focus on the 2004 time frame.  Did, in the

17  2004 time frame did Mr Hoffmann tell you that Forminster

18  had raised the issue of blackmail?

19            MR DANGEL:  Objection.

20  A.  I don't recall that it was ever raised in the

21  2004 time frame.  In that period my activities were

22  pretty much limited to helping, as we heard in these

23  tapes, write the papers or to how to present to Andy

24  that he should accept an offer.  No, I think he, he was

25  concentrating -- almost all the discussions were

26  concentrating on Andy's side, trying to get Andy to get

27  the offers and it wasn't on defences or arguments used

28  by the Forminster people.  That was a negotiation that

29  he was doing and I don't think so.  No, sir.

10

*Gwen Malone Stenography Services Ltd.*

Stamp:
POLICE OF THE CZECH REPUBLIC
ADMINISTRATION OF THE CITY OF PRAGUE
*Criminal Police and Investigation Service*
Economic Crime Section
140 21 PRAGUE 4, Kongresová 2

Criminal Prosecution No.: PSP-4035/OHK-3-2004

At Prague on 3 February 2005

DECISION

Pursuant to Section 160(1) of the Criminal Procedure Code, I hereby initiate criminal prosecution of the accused:

1)    Ing. Vladimír Hoffmann,
       nationality: Czech Republic
       born on 30 October 1965 in Bratislava I, Slovak Republic
       birth index no. 651030/6990
       permanent resident at Medinská 825,
                                    Klánovice, Prague 9, 190 14
       owner of the company Balfindor a.s., Company ID No. 27107892
       with its seat at Na Kocourkách 2915, Prague 6
       owner of the company Gilroy Limited, Company ID No. 0090061682
       with its seat at Pikioni, 4, Limassol, Republic of Cyprus

2)    Edita Šimková
       nationality: Czech Republic
       born on 27 July 1968 in the Slovak Republic
       birth index no. 685727/6140
       permanent resident at Na Folimance 2153/19,
                                    Vinohrady, Prague 2, 120 00
       chairperson of the board of directors of Balfindor a.s., Company ID No. 27107892
       with its seat at Na Kocourkách 2915, Prague 6

3)    Andrew Weiss,
       nationality: United States of America
       born on 2 January 1947, passport no. Z7528881
       resident at 46 Abbottsford Road, 2 Brookline, Massachusetts, 2446 USA
       owner of the company Weiss Asset Management,
       company address 29 Commonwealth Avenue, Boston, Massachusetts 02116,
       which manages the company Brookdale Global Opportunity Fund,
       company address        P.O. Box 1748, GT 27 Hospital Road, George Town
                                    Grand Cayman, Cayman Islands
       and controls the company KT, Inc.
       with its seat at 2711 Centerville Road, Suite 400, City of Wilmington, County of
       Newcastle, Delaware, USA,

K 0041

for the criminal offence of

extortion pursuant to Section 235(1) and (3) of the Criminal Code, committed as accomplices pursuant to Section 9(2) of the Criminal Code,

because it has been sufficiently substantiated by the facts ascertained until now that

the accused Andrew Weiss and the accused Ing. Vladimír Hoffmann met on 12 May 2004 at 2:00 p.m. in the French restaurant of Obecní dům (Municipal House) in Prague 1, náměstí Republiky 1090/5, with the management of Kotva a.s., ID No. 60193808, with its seat at Prague 1, náměstí Republiky 8, represented by Richard Harazim, general manager of Kotva a.s., born on 10 March 1965, permanent resident at Přezletice, U bažantnice 305, district of Prague-East, and Martin Benda, chairman of the supervisory board of Kotva a.s., born on 8 September 1971, permanent resident at Borač 46, district of Žďár nad Sázavou, and requested from them redemption of 11.9% shares of the registered capital of Kotva a.s., i.e. 82,782 shares, which are held by Brookdale Global Opportunity Fund, P.O. BOX 1748, GT 27 Hospital Road, George Town, Grand Cayman, Cayman Islands (where these shares are administered by the accused Weiss Andrew through his company Weiss Asset Management, 29 Commonwealth Avenue, Boston, Massachusetts 02116), for an amount of 4,000,000 US dollars, stating that if these shares were not so redeemed, the accused Weiss would arrange for blocking the real estate of Obchodní dům Kotva (Kotva Department Store), located at náměstí Republiky 8, Prague 1, in the real estate cadastre by filing fabricated and self-serving lawsuits against Kotva a.s., by which he would substantially disturb negotiations of Kotva Holding with potential strategic partners and financial institutions about the financing of operations and sales of Obchodní dům Kotva, and would restrict the disposal of this property for several years, because he knew that Kotva a.s. had concluded a contract for sale of the above Obchodní dům Kotva from which it could not withdraw and that Kotva a.s. was under a time pressure and had financial problems, and if Kotva a.s. did not purchase his shares, the next offer would be substantially higher, and if Kotva a.s. refused to purchase these shares from him, he would file criminal charges against the board of directors of Kotva a.s. By this way, the accused blackmailed Kotva a.s. and its board of directors by the threat of causing large-scale damage, physical violence or other major detriment, forcing Kotva a.s. and its board of directors to perform, omit or suffer an act, although the above representatives of

Kotva a.s. refused to redeem the above shares, stating that the asked price for the shares of Kotva a.s. is excessively high and that Kotva a.s. is not allowed to redeem its own shares.

Subsequently, the accused Weiss and the accused Hoffmann informed through Gilroy Limited and Balfindor a.s. Mr. Henry Prestige, the strategic partner of Kotva a.s., and financial institutions financing the operations of Kotva a.s. about actions filed against Kotva a.s. (as noted below), by which they hindered business operations of Kotva a.s. Such notification of the strategic partner and the financial institutions was meant to prevent the sale of the real property of Kotva a.s. to the strategic partner.

Subsequently, the accused Hoffmann, being the owner of Balfindor a.s., the accused Šimková as the chairperson of the board of director of Balfindor a.s., and the accused Weiss (who instructed the accused Hoffman and the accused Šimková to file the action referred to below), represented by Mgr. Ondřej Peterka, attorney-a-law, registered in the attorneys register kept by the Czech Bar Association under no, 4245, filed with the Municipal Court in Prague on 8 June 2004 on behalf of Balfindor a.s., Company ID No. 27107892, with its seat at Prague 6, Na Kocourkách 29/5 (which purchased on 8 June 2004, specifically for such purpose, one share of Kotva a.s. from the accused Hoffmann), an action for determination of invalidity of the general meeting of Kotva a.s., Company ID No. 60193808. On the same day, i.e. 8 June 2004, they submitted the statement of claim regarding the above action to the Cadastral Office of the City of Prague to attach in the real estate cadastre a seal to the lands and properties of Kotva a.s.

Subsequently, the accused Hoffmann, being the owner of Gilroy Limited, and the accused Weiss (who instructed the accused Hoffmann to file the action referred to below), represented by Mgr. Ondřej Peterka, attorney-at-law, filed with the Municipal Court in Prague on 30 June 2004 on behalf of Gilroy Limited, Company ID No. 0090061682, with its seat at Pikioni, 4, Limassol, Republic of Cyprus, which holds a part of shares of Kotva a.s., an action for determination of title to real estate of Kotva a.s., Company ID No. 60193808, Kotva nemovitosti k.s. with its seat at Příkopy 4, Brno, Company ID No. 26229048, and SPV KN a.s., with its seat at Příkopy 4, Brno. At the same time (on 2 July 2004), they submitted the statement of claim regarding the above action to the Cadastral Office of the City of Prague to attach in the real estate cadastre a seal to the lands and properties of Kotva a.s., Kotva nemovitosti k.s. and SPV KN a.s.

K 0043

Subsequently, the accused Ing. Vladimír Hoffmann, born on 30 October 1965, birth index number 651030/6990, permanent resident at Prague 9, Medinská 825, as the holder of a part of shares of Kotva a.s., acting jointly with JUDr. Petr Streiberg, permanent resident at Prague 6, Na Kuthance 16/1218, born on 18 October 1955, who holds a part of shares of Kotva a.s., and with the accused Weiss, being the owner of Weiss Asset Management, company address 29 Commonwealth Avenue, Boston, Massachusetts 02116, which manages Brookdale Global Opportunity Fund, with its seat at P.O. BOX 1748, GT 27 Hospital Road, George Town, Grand Cayman, Cayman Islands, which owns a part of shares of Kotva, a.s., all of them represented by Mgr. Jiří Černý, attorney-at-law, substituted by Mgr. Ondřej Peterka, filed with the Municipal Court in Prague on 15 July 2004, on behalf of Brookdale Global Opportunity Fund and on behalf of Ing. Vladimír Hoffman and JUDr. Petr Streitberg as individuals, an action for declaration of invalidity of the general meeting of Kotva a.s. At the same time, they submitted the statement of claim regarding the above action to the Cadastral Office of the City of Prague to attach in the real estate cadastre a seal to the lands and properties of Kotva a.s.

Subsequently, the accused Weiss, who controls KT, Inc., with its seat at 2711 Centerville Road, Suite 400, City of Wilmington, County of Newcastle, Delaware, USA, which holds a part of shares of Kotva a.s. through Brookdale Global Opportunity Fund (which also holds a part of shares of Kotva a.s.), represented by Mgr. Ondřej Peterka, attorney-at-law, filed individually with the Municipal Court in Prague on 23 December 2004 on behalf of KT, Inc. an action for determination of title to real estate. At the same time, he submitted the statement of claim regarding the above action to the Cadastral Office of the City of Prague to attach in the real estate cadastre a seal to the lands and properties of Kotva a.s.

Subsequently, the three accused have requested Kotva a.s. repeatedly by extortion, from 12 May 2004 to date, to redeem of 11.9% of shares of Kotva a.s. and to purchase 39.73% (i.e. 11,098,617 shares) of Trend – všeobecný investiční fond a.s., with its seat at Hradec Králové, Škroupova 9/441, Company ID No. 45245177. They increased the requested redemption price up to 295,000,000 CZK, otherwise they would not withdraw their lawsuits against Kotva a.s., Kotva nemovitosti k.s. and SPV KN a.s., thus causing high financial losses to these companies. The extortion itself was represented by filing the above actions, by personal

contacts of the accused with representatives of Kotva a.s., and by a telephone call, by fax and e-mail messages sent to these representatives.

Subsequently, the accused Hoffmann has demanded individually from Kotva a.s. by extortion, from November 2004 to date, payment of 45,000,000 CZK as compensation for withdrawal of claims against Kotva a.s. filed by his companies, i.e. Gilroy Limited and Balfindor a.s. He forced Kotva a.s. to conclude with him a preliminary agreement on compensation for withdrawal of the above claims filed by his companies. The extortion itself was represented by filing the above actions by the companies owned by Hoffman, and by a telephone call, by fax and e-mail messages sent to the representatives of Kotva a.s.

By the foregoing conduct, the accused committed the above criminal offence to the detriment of the following injured parties:

Kotva a.s.

Kotva nemovitosti k.s.

SPV KN a.s.

Martin Benda, born on 8 September 1971

Richard Harazim, born on 10 March 1965.

## Statement of reasons

Kotva a.s. filed on 27 August 2004 to the Police of the Czech Republic, Administration of the Capital City of Prague, Criminal Police and Investigation Service, Kongresová 2, Prague 4, criminal charges against the accused Weiss and the accused Hoffmann regarding the criminal offence described above. Subsequently, an explanatory interrogation with the injured parties Harazim and Benda was carried out. The police seized documents evidencing extortion. Furthermore, having obtained court permission, the police tapped telephone calls in this matter. These calls and seized documents, the criminal charges and explanatory interrogation sufficiently documented this offence. It was ascertained that there are sufficient grounds, pursuant to Section 160(1) of the Criminal Procedure Code, to start criminal prosecution of specific persons who committed such offence. Therefore, the criminal prosecution of the above accused was started.

**Instruction:**

Pursuant to Section 36(3) of the Criminal Procedure Code, you, as the accused, must have a legal counsel to defend you at the pre-trial proceeding, because you have committed an offence that is punishable under the law by a prison sentence with the upper limit of more than 5 years. If you fail to choose a counsel by yourself or if the counsel is not selected by the persons listed in Section 37 of the Criminal Procedure Code within two hours of the service of this Decision, the defence counsel shall be appointed for you in accordance with Section 38(1) of the Criminal Procedure Code.

I further instruct you that every accused must have his own defence counsel, because the interests of individual accused at this criminal suit are conflicting.

I further instruct you that the following persons will be heard among the witnesses in this criminal matter: Mgr. Ondřej Peterka, Mgr. Jiří Černý and Mgr. Ladislav Chundela of the law offices of Peterka & Partners v.o.s., and JUDr. Ing. Petr Šrámek, listed in the attorneys register of the Czech Bar Association under no. 5076; therefore, you cannot choose these persons as your defence counsels pursuant to Section 37 of the Criminal Procedure Code.

A complaint against this decision may be filed by an accused within three days of the service hereof with the police authority that has prepared this decision. Such complaint has no suspensory effect.

Ing. Pavel Brož

Police Commissioner: *[Signature]*

Accepted by the accused Ing. Vladimír Hoffman on 3 February 2005 at 2:00 p.m. *[Initial]*

Accepted by the accused Andrew Weiss          on

Accepted by the accused Edita Šimková          on 3 February 2005 at 11.20 a.m.

*[Signature]*