UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s. and SPV Co, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| ANDREW WEISS and WEISS ASSET ) | |
| MANAGEMENT, LLC, ) | |
| ) | |
| Defendants. ) | C.A. No. 05-10679-WGY |
| ) | |
| ANDREW WEISS, WEISS ASSET ) | |
| MANAGEMENT LLC and CVF ) | |
| INVESTMENTS, LTD., ) | |
| ) | |
| Counterclaim-plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| KOTVA a.s., RICHARD HARAZIM,  SPV ) | |
| CO and JOHN DOES 1–5, ) | |
| ) | |
| Counterclaim-defendants. ) | |
| ) | |

DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF PRIVILEGED DOCUMENTS

        In Darius v. City of Boston, 433 Mass. 274 (2001), Chief Justice Marshall set out the standards that govern the instant motion.  Andrew Weiss and Weiss Asset Management LLC (hereinafter "the Weiss Parties" or "the defendants") cited Darius in their June 7 letter to counsel for Kotva and SPV CO (hereinafter "the Kotva Parties" or "the plaintiffs").   The Kotva Parties also cited Darius in passing in their moving papers, but ignore its teaching.  Neither the factual nor legal pre-conditions for an "at issue" waiver—what the Darius court refers to as the "premises"—have been met.  There has been no waiver of the attorney-client privilege.

As counsel for the Kotva Parties has argued to this Court under different circumstances, "waiver of the attorney-client privilege is a nuclear sanction that is reserved only for the most extreme and outrageous circumstances." Harazim's Opp. to Weiss Parties' Mot. for Sanctions and to Compel at 2. The Kotva Parties seek the discovery at issue not for use in this litigation, but rather to place additional pressure on Mr. Peterka. Mr. Peterka, the lead partner in a 40 lawyer firm based in Prague, is vital to the pending criminal and civil litigation involving the Weiss Parties and others in the Czech Republic. The Kotva Parties first surfaced this tactic of attacking counsel in 2004 when they *filed a criminal complaint* against Mr. Peterka based on his filing litigation on behalf of his clients, continued their efforts by having an allied company file a complaint with the Czech Bar Association against Mr. Peterka, and showed no signs of letting up during the deposition of Mr. Peterka in which they asked a number of questions designed to harass and embarrass Mr. Peterka rather than obtain testimony for use in this case.

The Kotva Parties make no effort to limit the additional discovery they seek. Mr. Peterka has had thousands of communications with the Weiss Parties relating to over half a dozen cases pending in the Czech courts, the Czech criminal proceedings and this litigation. In addition to obtaining all of these documents, the Kotva Parties have stated that they seek to re-open Mr. Peterka's deposition, as well as the depositions of *every other witness affiliated with Weiss Capital* who has already testified at deposition.

There are several reasons why the Court should deny the Kotva Parties' motion, each of them stated below. Further, defendants respond to the allegation that the Kotva Parties were mistreated during the Peterka deposition. Indeed, the opposite is true. The Kotva Parties tried to "hometown" the defendants in Prague. Indeed, much of this litigation is a manifestation of the

problem of favoritism.  Absent the Kotva Parties' knowledge that Czech authorities are willing to extend themselves for them, this litigation would be a garden variety commercial dispute.

1.    <u>Designating Mr. Peterka as a Potential Witness Does Not Effect a Waiver</u>

The Kotva Parties, not the defendants, sought Mr. Peterka's deposition.  In their May 4 letter, the Kotva Parties claimed, nevertheless, that by merely listing Mr. Peterka as a potential trial witness and asking any questions at the deposition, the Weiss Parties waived the attorney-client privilege. However, as defendants responded, it has never been Massachusetts law that a party who questions its attorney on matters of fact or law waives the attorney-client privilege. <u>Kendall v. Atkins</u>, 374  Mass. 320 (1978); Young et al., <u>Massachusetts Evidence</u>, 19 MASS. PRACTICE SERIES § 518.1, at 324–30.

In apparent recognition that their initial position was less than sound, plaintiffs have shifted course and advance an even more ludicrous idea in their moving papers: because defendants listed Mr. Peterka as a "fact witness" and not as a witness merely as to "transactions and events" the privilege should be deemed waived. Pls.' Mem. at 6.  Not only is there no such category under the federal rules, "fact witness" is *exactly* how the Kotva Parties designated their own witnesses for trial.  <u>See</u> Corrected Joint Pretrial Mem. at 15.  At the risk of stating the overly-obvious, the plaintiffs have no point.

2.    <u>There is No "At Issue" Waiver</u>

A.    <u>The Weiss Parties Have Not Placed Communications With Mr. Peterka at Issue</u>

The <u>Darius</u> court stated that "a litigant may implicitly waive the attorney-client privilege at least partly, by injecting certain claims or defenses into a case.  That is the basic premise underlying the concept of 'at issue'" waiver."  <u>Id.</u> at 277–78.  There are three instances in which courts have declared an "at issue" waiver: where attorney-client communications part of a claim,

when attorney-client communications are enmeshed in a defense, and where either party relies on advice of counsel to block the other party's claims. None of these are present in this case.

First, the alleged violation of attorney-client privilege is not the basis for any of the Weiss Parties' claims. While the Kotva Parties did wear a wire into a negotiation session with Mr. Peterka, and while they have apparently benefited from the police's seizure of documents protected by the attorney-client privilege, none of the counterclaims depend upon proof that the plaintiffs learned privileged information from these police activities.

Thus, this case is not like Greater Newburyport Clamshell Alliance v. Public Service Co. of New Hampshire; 838 F.2d 13 (1st Cir. 1988). In that case, the very basis of the plaintiffs' suit was a claim that the defendants had violated their rights by sending an undercover informant to listen in on private, attorney-client communications in a criminal case. Imposing a very narrow reading on the district court's order for discovery, the First Circuit found a very limited waiver with respect to only those particular conversations that were the subject of the plaintiffs' § 1983 claim and *to which the discovering party already had access* by virtue of sending the undercover informant to attorney-client meetings. Id. at 21–22.[1]

---

[1] Likewise, Rutgard v. Haynes, 185 F.R.D. 596 (S.D. Cal. 1999) is not on point. In Rutgard, the plaintiff sued his former attorney, Haynes. The plaintiff alleged that Haynes' negligence in representing Rutgard in connection with an antitrust suit caused two categories of damages. First, Rutgard had to pay another attorney, Royce, to represent Rutgard when he was sued for malicious prosecution for filing the antitrust suit. Second, Rutgard had to pay money to settle the malicious prosecution case. Haynes argued that by seeking these damages and designating Royce as a witness, Rutgard waived the attorney-client privilege as to his communications with Royce. "Had [Rutgard]'s claims for damages been limited only to recovery of attorney's fees incurred . . ., this Court would likely find that [Rutgard] had not waived the attorney-client privilege." Id. at 599. However, by seeking to recovery not only expenditures for fees, but also the amount paid to settle the malicious prosecution case, Rutgard put Royce's conduct of the malicious prosecution litigation and the decision to settle "at issue" and the court determined that Royce could not testify that Haynes' actions—as opposed to some mistake made by Royce—was the proximate cause of the need to settle the case without relying on privileged information. The

4

Second, the claims raised by the Kotva Parties involve the Weiss Parties' motives and the actions taken in Czech courts by their counsel, not the advice that the Weiss Parties sought or that Mr. Peterka rendered. Mr. Weiss has already testified about his motives. As the <u>Darius</u> court held, it is only where counsel's knowledge of the thought processes of his clients is *directly* at issue that the privilege is deemed waived. <u>Darius</u>, <u>supra</u>, at 278–79. The only possible use to which the Kotva Parties could put the discovery they seek is to mine communications with counsel in an effort to find prior inconsistent statements with which to attack Mr. Weiss's testimony. This is exactly what <u>Darius</u> forbids. Where the waiver is sought for the purpose of testing the veracity of the party's testimony, or, as the <u>Darius</u> court stated, to pit the parties' counsel against them, the "at issue" waiver is unavailable. *Id*. at 280.

Third, the Weiss Parties have explicitly stated that they do not intend to rely on advice of counsel as a defense at trial. Put simply, neither the defendants nor Mr. Peterka will testify that the decision to sue Kotva, nor the motivations behind the decision, were made because their counsel told them to do it. <u>Cf</u>. <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1291–94, <u>cert. denied</u> 502 U.S. 813 (1991) (a defendant who testified that he committed the alleged securities violations on advice of counsel waived the privilege). In the case at bar, the defendants did not testify that they were motivated to sue Kotva based on counsel's representations, nor did they plead advice of counsel as a defense.

In <u>Darius</u>, one issue was the defendants' statute of limitations defense. The required presentment letter was sent by plaintiffs on January 15, 1998, so, as the Court ruled, the operative date for determining the question was January 15, 1996, two years earlier. Plaintiffs claimed that they first learned that they had a cause of action during the course of attorney-client

---

Weiss Parties have not placed Mr. Peterka's conduct of the Czech litigation at issue in their claims for damages.

communications in the *spring* of 1996.  Defendant claimed that reliance on the communication

waived the attorney-client privilege as to the statute of limitations issue.  Therefore, plaintiffs'

reliance on a later conversation with their counsel in 1996 was *relevant* to support their claim

that they lacked knowledge in January, but not *determinative*.  The Supreme Judicial Court ruled

that the spring conversation was not "at issue" and held that there was no waiver:

> The only reason we can see for the city's attempting to obtain that information
> from present counsel is to test the credibility of the plaintiffs – in other words, to
> see whether the plaintiffs confided in their counsel anything that contradicted
> their assertion that they did not know of a causal connection before being
> informed of it by counsel.  We shall not allow the city to pit counsel against their
> clients in that fashion.  To permit that kind of inquiry would pry open the
> attorney-client relationship and strike at the very core of the privilege.

*Id* at 280.

In their memorandum, plaintiffs state the gravamen of their case, as follows: defendants

allegedly threatened them during a May, 2004 meeting in Prague, demanding that Kotva

purchase their shares, ("a payoff"), or face lawsuits.  When the demand was not met, the Weiss

Parties filed "sham" lawsuits, and sent notice of the cases to a potential purchaser of Kotva's real

estate.  Plaintiffs allege that defendants had ulterior motives for filing lawsuits, and that the

lawsuits filed in the Czech Republic violated G.L.C. 93A, were an abuse of process and

interfered with their business relationship with Markland—despite the fact that Markland

actually did purchase the real estate for the same price on which they had agreed before Mr.

Weiss had taken any action.  Discovery on Kotva's claims closed months ago.  Summary

judgment motions are due on July 27.

At Mr. Peterka's deposition neither party asked questions concerning the Weiss Parties'

motives nor about the effects on Markland (the purchaser of the property) of filing the lawsuits.

Nor did either party ask questions relating to opinions Mr. Peterka held about the merits of the

cases at the time they were filed.  Very simply, Mr. Peterka's testimony was relevant but did not

go directly to the plaintiffs' claims. Nor, as stated above, did defendants set up as advice of counsel defense. As such, there was no "at issue" waiver.

### B. The Kotva Parties Have Failed to Show Prejudice

Even if the Weiss Parties had placed attorney-client communications at issue, the Court should still not permit discovery, because maintaining the privilege does not prejudice the Kotva Parties. Indeed, at pages 10–11 of their memorandum, plaintiffs have shown that they were *not* prejudiced by non-disclosure. Further, without conceding admissibility, plaintiffs' Exhibits 5–9 demonstrate that they feel they have the facts they need, without any additional discovery. Moreover, as the Discovery Master has pointed out, "[i]f extortion was intended, one would expect that there would be non-privileged communications, *e.g.*, extortionate demands made to Kotva, demonstrating such intent. And, indeed, the complaint alleges such demands. It is difficult to see what the attorney-client communications and work product would materially add to this evidence that is not piling on." May 26, 2006 Order at 5.

As the <u>Darius</u> Court noted, no waiver should be found unless it can be shown that the proof is unavailable from any other source. Plaintiffs themselves have shown the Court that they have other sources and that the interests of justice do not require waiver.

### 3. Neither Mr. Peterka's Prospective Testimony Nor the Questions Put to Mr. Peterka at His Deposition Effect a Waiver

### A. Mr. Peterka's Prospective Testimony

If the Weiss Parties call Mr. Peterka at trial, his testimony will be quite limited. The Kotva Parties allege that Mr. Peterka filed lawsuits on behalf of the defendants and that filing those lawsuits was, among other things, an abuse of process. Mr. Peterka would testify about what lawsuits he filed, what the allegations in those lawsuits are, what the purpose of those lawsuits are (what relief is sought), and whether lawsuits seeking that relief are "process" under

the Czech legal system.  None of this testimony implicates *confidential* attorney-client

communications: the basis for the testimony is found in the very *public* documents filed with the

Czech courts.[2]

Mr. Peterka will not be asked about opinions he held at the time of commencement of the

litigation.  He will not be asked to provide the substance of research or private investigation.  He

will not be asked about his thought process as he prepared the lawsuits.  His testimony will be

limited to facts about litigation that has been filed and certain technical aspects of the litigation.

He will not be asked to disclose any of his communications with the Weiss Parties.

The Massachusetts law of attorney-client privilege has been well-settled, for the most

part, for several decades.  It suits the modern world, in which lawyers are often an integral part

of transactions (and, therefore, witnesses).  The privilege is limited to advice giving and

receiving.  That is, a client may provide information to or receive it from a lawyer without

implicating the privilege; on the other hand, facts provided might be an integral part of the giving

of advice and would be protected.  "Testimony about an event should not be construed as a

waiver of the privilege, merely because the subject matter of the testimony may also have been

discussed in the privileged communication."  Commonwealth v. Goldman, 395 Mass. 495, 500

(1985), citing People v. Lynch, 23 N.Y. 2d 262, 271, 244 N.E. 2d 29 (1968).  In Goldman, the

Court ruled that there has been no waiver unless the witness (former client) takes the stand,

testifies to the facts covered by his conversations with counsel and about the specifics of his

conversation.  This case follows from Blount v. Kimpton, 155 Mass 378 (1892), in which the

---

[2] Thus, United States v. Titchell, 261 F.3d 348, 351–52 (3d Cir. 2001) is inapposite.  In that case
the Third Circuit rejected an ineffective assistance of counsel claim, noting in passing the
unremarkable proposition that the trial court was correct to permit questioning regarding
attorney-client communications when the defendant-client had elicited testimony from the
attorney about those very same communications at a prior proceeding.

Supreme Judicial Court ruled that where the client testified to "what was done, not to what was said," the privilege is not waived.

It is not only comforting to Massachusetts lawyers to have the law in this area well-established, it is a valuable aid to practice. Under Massachusetts law, fewer communications are protected perhaps, but courts must looks to the privilege holder's intent and are hesitant to find a waiver. Kendall v. Atkins, 374 Mass. 320 (1978); Commonwealth v. Birks, 435 Mass 782, 788 (2002); Commonwealth v. Sullivan, 435 Mass 722, 729 (2002). In view of the testimony Mr. Peterka will give at trial, there is simply no waiver under Massachusetts law. Nor did any of the questions put to Mr. Peterka at his deposition effect a waiver.

> B.    Alleged Waiver Resulting from Questions Regarding Mr. Peterka's "Opinion"

At page 7 of their memorandum plaintiffs claim a waiver based on the following question and answer:

> Q.    Sir, you see the term "blackmail" in the middle of [the] second line, to blackmail Kotva. Let me just say it the way we would say it in front of a jury, to blackmail. Horrible thing. Right. Are you aware of any effort to blackmail Kotva?

> A:    I consider this word to be, this word to be used here absurd. According to my opinion, nothing like that ever happened. The lawsuits were filed in order to protect the investment.

The Kotva Parties provide no context for this question and answer. This question came near the end of the deposition and was intended to demonstrate that there was no reason to extend the deposition. See Peterka Dep. Tr. at 129-135 (Exhibit 1). The letters rogatory indicated that plaintiffs intended to inquire whether Mr. Peterka had knowledge from third parties of a scheme to blackmail Kotva. See Exhibits 2 (application for letters rogatory) and 3 (letters rogatory). Plaintiffs' counsel had already questioned Mr. Peterka in this area. Peterka Dep. Tr. at 108-109. In order to demonstrate this to the Court, and to show that there was no

need to continue the deposition on this basis, counsel asked Mr. Peterka to take the letters rogatory into his hands and read with him the question—which was clearly limited to knowledge from third parties—and answer it. Counsel had no intention of reading this to a jury. Realizing as he read that plaintiffs' counsel might unfairly try to read the question to a jury, counsel stopped and asked whether Mr. Peterka was aware of any efforts to blackmail Kotva. Mr. Peterka embellished his answer, but basically he said he was not.

Plaintiffs have bolded the second point of his answer beginning with "In my opinion." Mr. Peterka stated that no blackmail happened, in his opinion, and the lawsuits were filed to protect the investment.[3] Not only is there no reference to an attorney-client conversation, there is no showing that the answer is necessarily derived from anything other than the face of the complaints. When a witness says he is not aware of information, he is not saying that he has specific knowledge derived from the client or his work product. He is saying the opposite. Further, his statement that the purpose of the lawsuit was to protect the Weiss Parties' investment —more explicitly asked and answered earlier in the deposition does not derive from knowledge of the clients' motives, it comes from the face of the lawsuit filed by Mr. Peterka in Prague.

The plaintiffs had questioned Mr. Peterka extensively about the relief sought in the lawsuits. He had provided such lengthy answers—indicating that the relief sought, not damages or a stock price or to disrupt the sale of the Kotva property, but to protect the Weiss Parties' investments. Defendants were satisfied with the answers, but plaintiffs indicated that they were too long and unresponsive, and that they were probably going to move to strike them. As such, defendants asked the same question in a form easier for the jurors to understand, after virtually

---

[3] Contrary to the plaintiffs' suggestion on page 11 of their Memorandum, there was no blackmail, and Howard Golden's deposition confirms that fact. See Golden Deposition Tr. at __ (Exhibit 4).

begging Mr. Peterka to keep his answers short.  Plaintiffs argue that the word "purpose" was meant to mean something other than "relief," but not only is purpose an easier word for a lay person to understand, the *purpose* of a lawsuit derives from the *relief sought*.  Mr. Peterka was not asked to go beyond the allegations in the petitions filed in the Czech courts.  Plaintiffs are grasping for a violation by claiming that the answer had to have been derived from client communications.  It is simply untrue.

Thus, this case is not at all like Herrick Co., Inc. v. Vetta Sports, Inc., No. 94-civ-0905 (RFP), 1998 U.S. Dist. LEXIS 14544 (S.D.N.Y. Sept. 17, 1998) in which a party designated an attorney as an expert witness on legal ethics.  Relying heavily on the rules governing expert testimony, the court ordered a limited production, subject to a confidentiality order, of documents relating to advice previously given to the party by the attorney on similar matters.  Mr. Peterka is testifying as a fact witness, as described above.  Moreover, in citing the September 17, 1998 Order, the Kotva Parties failed to mention that the district court in Herrick did not have jurisdiction to decide the dispute between the parties to the discovery dispute, and subsequently dismissed one of the parties to that discovery dispute, nunc pro tunc as of the date the lawsuit was commenced.  See Herrick Co., Inc. v. Vetta Sports, Inc., No. 94-civ-0905 (RFP), 2002 U.S. Dist. LEXIS 3617 (S.D.N.Y. March 5, 2002).  Even if Herrick were on point, it has effectively been vacated and this Court should not rely on it.

### C.    Alleged Waiver Resulting from Questions Regarding Research

At page 8, plaintiffs argue that the questions asked—which were intended to be answered simply "yes" or "no"—called for details of the research and investigation Mr. Peterka conducted. The question and answer were as follows:

Q.    Sir, as part of what you did when you were hired, did you gather certain facts before any lawsuits were filed?

A.      As far as it was possible, we were trying to gather information from open sources, public sources.

It is hardly startling that in a case where abuse of process has been alleged, a lawyer is asked whether he gathered facts before a lawsuit was filed.  This is particularly so given the plaintiffs' allegation that the commencement of the suits occurred by some unusual means.  The defendants wanted to counteract that by demonstrating that the lawyer did his homework, gave advice, and received permission before the lawsuits were commenced.  The substance of the advice, and permission given were never inquired about.  This question does not ask for the details of the fact gathering process.  Mr. Peterka volunteered that "we were gathering facts for public sources."  This, again, does not get into the substance of what was learned, but the source.  Since the source was "public," it cannot be said that Mr. Peterka was divulging private information.  Young et al., <u>Massachusetts Evidence</u>, 19 MASS. PRACTICE SERIES §503.5, at 289.

Having established that the facts were *public*, counsel asked follow-up questions:

Q.      So were [Professor Weiss and Dr. Nikitin] a source of actual facts used in filing the case?

Mr. Beckman: Objection

A.      I will say that they knew the general facts about their investment, that is they had 12% in Kotva directly and 40% in Trend, whereby Trend hold 32% in Kotva.  Other than that, they were not familiar with the Czech system and with the workings of the system in this country and they were not aware of the methods that are used to devalue their investment.

Q.      Did you gather those facts yourself or were they the source of those facts?

A.      They had a general understanding of the fact that Trend was tunneled but that is common knowledge, everybody knows that.  And then we used open sources, public sources to gather additional information and it was also from the media that we learned that a plan to sell the department store is under way or in the making.

Here, again, no disclosure of private information was called for.  All of the facts mentioned in Mr. Peterka's answer were public knowledge: the Weiss Parties' (actually CVF's)

ownership of 12% of Kotva and of 40% in Trend, and the Trend tunneling scheme, which was, as the evidence shows, the subject of intense, detailed press coverage.

Since the information was factual—not to mention, public—and since there is no showing that it was learned as part of the process of rendering advice, there is no waiver under existing Massachusetts law.  The information concerned only publicly known transactions. Blount v. Kimpton, 155 Mass 378 (1892).  However, plaintiffs and the Court should be aware that there is no harm in any event—the defendants do not intend to read the questions and answers quoted immediately above to the jury.

> D.    Alleged Waiver Resulting from Questions Regarding Timing and Fact of Advice

At page 10 of their memorandum, plaintiffs take issue with the following questions and answers:

> Q.    Did you provide, without telling me what the advice was, before the lawsuits were filed, did you provide advice to Professor Weiss and Mr. Nikitin and other interested parties?
>
> A.    Yes, I did.
>
> Q.    Did you do that after you had gathered the facts and researched the law?
>
> A.    Yes.
>
> Q.    After giving that advice, did they give you permission to proceed with the lawsuits?
>
> A.    That's correct.

There was no disclosure of the substance of any attorney-client communications in the questions or answers.  As stated above, defendants do not rely on advice of counsel as a defense. Nor, unlike United States v. Bilzerian, 927 F.2d 1285, 1291–94 (2d Cir. 1991), cert. denied, 502 U.S. 813 (1991), was the substance of advice utilized as a defense.  Very simply, evidence that there was advice given, facts exchanged, and permission granted—without disclosure of the

substance of the communications—does not create a waiver.  Like the situation where a plea

bargain is discussed among counsel and her client before it is accepted, and later there is

testimony that this occurred, there is no waiver unless the substance of the conversations is

disclosed.  Commonwealth v. Birks, 435 Mass. 782, 788 (2002); see also Commonwealth v.

Sullivan, 435 Mass. 722, 729 (2002).  If the Kotva Parties' position were the law, nearly every

defendant who pleads guilty after the "standard" plea colloquy outlined in the FJC's Benchbook

for U.S. District Court Judges would have waived the attorney-client privilege with respect to the

entire representation by defense counsel.  *See* BENCHBOOK FOR U.S. DISTRICT COURT JUDGES

§ 2.01, at 69, 72 (4th ed. March 2000) (instructing court to ask defendant "[h]ave you received a

copy of the indictment (information) pending against you—that is, the written charges made

against you in this case—and have you fully discussed those charges, and the case in general,

with Mr./Ms. _____ as your counsel?" and "[h]ave you and your attorney talked about

how the sentencing guidelines might apply to your case?").

       4.    Other Independent Reasons Preclude a Finding of Waiver

     Mr. Peterka represents multiple clients jointly, and some of those clients were not parties

to this litigation at the time of Mr. Peterka's deposition and did not waive their privilege.  As the

Kotva Parties argued (successfully) when the shoe was on the other foot, litigation conduct by

one party to a joint representation does not destroy the privilege as to other parties to that

representation.  See Harazim's Opp. to Weiss Parties' Mot. for Sanctions and to Compel at 6–8.

Accordingly,  there can be no waiver.

     Moreover, Mr. Peterka has been actively involved in the conduct of litigation for some

time now.  Thus, the Kotva Parties must show not only a waiver of the attorney-client privilege,

but also a waiver of the work product protection that attaches to most, if not all, of the documents

14

that they seek.  The Kotva Parties' failure to do so provides an independent ground why the Court should deny their motion to compel.

    5.    <u>The Discovery Sought is Ridiculously Overbroad</u>

Based on conversations among counsel and what can be gleamed from plaintiffs' memorandum, and on a review of the defendants' 235 page privilege log, it appears that plaintiffs seek hundreds if not thousands of documents, plus to re-open four depositions.  The <u>Darius</u> Court faced a similarly broad request and denied it, because, as the Court said and is appropriate to the case at bar, "Conceivably (the request for relief) required production of any document reflecting anything the plaintiffs communicated to counsel regarding *any* aspect of the case . . . ." <u>Darius</u>, 433 Mass. at 283.

Here, plaintiffs have not indicated to the Court which of the documents on defendants' extensive and carefully prepared privilege log they seek.[4]  It would be unfair to defendants to permit plaintiffs to ambush by reply brief on this issue: rule 37.1 demands that plaintiffs narrow this issue before moving to compel, not after defendants have opposed their motion.  Moreover, the special master ordered that attorney-client communications after December 23, 2004 need not be logged.  Accordingly, this mountain of privileged material to which the Kotva Parties now seek access has not even been catalogued yet.

Further, plaintiffs argue that they should be allowed to cross-examine Mr. Peterka "about the basis for the 'opinions' he has offered and the subject matters he intends to testify about at trial."  After six hours of insulting, repetitive, jury pandering questions, they seek another day with Mr. Peterka (at whose expense?), and they have informed defense counsel that they also

---

[4] At page two of their memorandum, plaintiffs have simply cited to their document requests, including, for instance, "All documents concerning and communications with (1) Ondrej Peterka; (2) Branston Haggerty; (3) Eitan Milgram; and (4) Georgiy Nikitin, relating to Trend, Kotva,  this Action, the Czech Lawsuits, and/or the BGO Shares."

seek to re-open the Weiss, Nikitin, and Milgram depositions after they receive the 1,000 pages of attorney-client documents they request.

The broad statement in plaintiffs' motion serves as a reminder of the truth within the Supreme Judicial Court's decision in <u>Darius</u>.  The all-too-easy claim of a waiver of privilege, subjecting counsel to inspection of his files and to pitting him against his clients creates an unwarranted tactical advantage which, at a minimum, is meant to convince the counsel that he should not have ever gotten himself involved in the case.  The defendants in this case need Ondrej Peterka.  The plaintiffs have sought a criminal complaint against him; they have— through an allied company—filed a complaint against him with the Czech Bar Association, they have secretly taped him during a negotiation session, and they have subjected him to questioning meant to demean him at his deposition in Prague before young, impressionable judges and court personnel.  Enough is enough.

6.    <u>The Conduct of the Deposition Demonstrates that No Further Questioning Is Warranted</u>

For some unknown reason—there are only oblique references in their memorandum—the plaintiffs have chosen to attach pages from the transcript which contain dialogue among counsel in an effort to suggest that they did not get a full and fair deposition of Mr. Peterka.  The exact opposite is true.  The Weiss Parties have attached a full transcript.  <u>See</u> Exhibit 1.  In attaching this exhibit, the Weiss Parties are not suggesting that the Court need (or should) review the entire transcript in deciding the Kotva Parties' motion.  However, when the excerpts selected by the Kotva Parties are examined in the context of the rest of the deposition and this dispute as a whole, an entirely different picture emerges.

Plaintiffs treated the proceeding in the same way Ronald Reagan treated a debate in 1979, when he told a New Hampshire audience, "I paid for this microphone," and famously refused to

yield it.  They knew the defendants had important questions to ask Mr. Peterka about whether or not the lawsuits he had brought on the Weiss parties were started in some peculiar fashion and whether the lawsuits or the notice filed in the Real Estate Cadastre constituted "process" under Czech law.  Yet, from the commencement of the deposition and throughout it, plaintiffs' counsel claimed that he was entitled to a full seven hours, and refused to allow defendants any time to ask their questions.   After the interpreter and judge indicated that they would not stay after 4:30 and it became clear that plaintiffs' counsel was unwilling or unable to schedule a continuation on the next day, defense counsel begged for 45 minutes to ask questions, and struck a bargain which would allow plaintiffs' counsel to question thereafter.

At the beginning of the 45 minutes, the judge apparently did not understand what was happening, and, even after she did, she called a recess, which cut into the defendants' 45 minutes.  Therefore, the questions had to be compressed, and in a less than artful form, the Weiss Parties proved that, since the lawsuits were simply declaratory in nature, that no injunction, money damages, attachments or other deprivation of property was requested—there was no process.  Then, seeing that his time was running short, defense counsel took Mr. Peterka through the topics listed in plaintiffs' request for letters rogatory to demonstrate that the witness had no additional information about the topics listed in the letters rogatory.

The colloquy between counsel about closure/continuation of the deposition was the colloquy and just that.  Since the closing of the deposition, plaintiffs have not indicated to defense counsel that they have any further questions to ask except to inquire into attorney-client matters if the instant motion is granted.

In their memorandum, plaintiffs have argued that counsel shut-off or prevented them from inquiry into other areas.  That is untrue.  At page 4 of their memorandum, plaintiffs have

quoted from pages 30–31 of the deposition and then from page 113, almost 100 pages later. What happened in between is instructive. First, at page 30 plaintiffs were in the midst of a two hour inquiry into exactly what they said they would not do in that request for letters rogatory: namely, a series of questions designed to test the limits of confidentiality and to provide themselves with "probing questions" which, if the witness refused to reply, give the impression that the witness was hiding something. <u>See</u> Exhibit 2 at 3 (application for letters rogatory). Finally, at page 55, plaintiffs left this area and delved into Mr. Peterka's knowledge of third party conversations in which he participated as did representatives of Markland, Kotva and others. This was what the deposition was supposed to be about.

At page 110, plaintiffs started to question Mr. Peterka about the complaint and proceeding they have trumped up against him in the Czech Bar Association. This has nothing to do with the case at bar, and it is bogus. They were accusatory, and they were designed to demean Mr. Peterka to give the American jury and the Czech judge the fake impression that he is an unethical lawyer. The questions, the tone of voice, and the lack of respect for Mr. Peterka, a respected member of the Czech bar, were offensive, and concerned a matter outside the scope of this case. Unfortunately, it has become commonplace to take the "private attorney general" arguments in law review articles written by Professor Coffee and others for high counsel fees in intentional tort cases too far. Delving into the sad facts that the plaintiffs have sought criminal complaints against Mr. Peterka, have surreptitiously recorded him, and have found a way to take him to the bar association was more than irrelevant. It was disgraceful. When undersigned counsel stepped in, late in the afternoon, he went too far. No excuse is offered for the use of profanity. I am embarrassed and I apologize. It was wrong. The questions, however, were

profane to any lawyer who respects other lawyers.  They were insincere questions on a sensitive and immaterial topic.

It was as if the plaintiffs, who, in spite of their reputation in Prague, are well-connected politically and in police circles, feel they have an inherent right to use the rules to their advantage and circumvent them when they choose.  It was not enough that they were in a hometown court. They let the judge, the interpreter, and the court reporter know who was paying the costs of the proceeding.  So complete was their cooperation with plaintiffs that they claimed, at first, that they had no time for the defendants' questions.  The judge has been asked to give an official running time, but has never done so.  In spite of the fact that defense counsel signed the order form for a transcript, the court reporter did not provide it until, six weeks later, she received permission from the plaintiffs to do so.

As the attached transcript demonstrates, the plaintiffs were granted significant leeway at the Peterka deposition, and they abused it.  E.g., Peterka Deposition Tr. at 15, 16, 21-33; id. at 49-51; id. at 74; 107-112..  Mr. Peterka's knowledge of the areas listed in the letters rogatory has been exhausted.  Id. at  108–09, 129–35.  No further opportunity should be given plaintiffs' counsel to berate Mr. Peterka.  His deposition should be deemed closed.

CONCLUSION

For all of the above-stated reasons and exhibits, the Court should deny the plaintiffs'

motion to compel.

Respectfully submitted,

ANDREW WEISS and WEISS ASSET
MANAGEMENT LLC

By their counsel,


Dated: July 16, 2007                    /s/ Edward T. Dangel, III
                                        Edward T. Dangel, III (BBO#113580)
                                        Dangel & Mattchen, LLP
                                        10 Derne Street
                                        Boston, MA 02114
                                        617-557-4800

                                        Edward P. Leibensperger (BBO# 292620)
                                        Benjamin A. Goldberger (BBO# 654357)
                                        McDermott Will & Emery LLP
                                        28 State Street
                                        Boston, MA 02109-1775
                                        617-535-4000

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system and all attachments will
be sent electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non-registered participants on July 16,
2007.

                                        /s/ Edward T. Dangel, III
                                        Edward T. Dangel, III

BST99 1547078-6.072198.0012

IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856

AND IN THE MATTER OF CIVIL PROCEEDINGS NOW PENDING BEFORE

THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF

MASSACHUSETTS (CIVIL ACTION NO. 05-10679-RCL)


)                )
)
KOTVA a.s.                )
)
          Plaintiff       )
)
          v.              )
)                )
)
ANDREW WEISS and WEISS ASSET )
MANAGEMENT, LLC              )                )
)
          Defendants       )
)


          Deposition of:

     Mr. Ondrej Peterka

     Taken at:
     Courtroom No 126
     District Court for Prague 1,
     Ovocny trh 14

     On:  April 18th, 2007
     Commencing at 9.00 am

```
 1                    A P P E A R A N C E S

 2
        Examiner:                 Mgr Kamil Tojner
 3

 4
        Counsel for Kotva:        Joel G Beckman, Esq
 5
                                  Nystrom Beckman & Paris LLP
 6
                                  10 St James Avenue
 7                                16th Floor, Boston,
                                  Massachusetts 02116
 8
                                  jbeckman@nbparis.com
 9                                Tel. 617.778.9126

10

11      Counsel for Weiss,
        Weiss Asset
12      Management LLC:           Edw. Terry Dangel, Esq

13                                Dangel and Mattchen LLP

14                                10 Derne Street
                                  Boston, MA 02114
15
                                  tdangel@danmatllp.com
16                                Tel. 617.557.4800

17
        Other persons present:
18

19                                Daniel Malis, JD, LLM

20                                Longin Business Center
                                  Na Rybnicku 5
21                                120 00 Prague 2

22
                                  Hynek Perroutka, Esq
23
                                  Peterka & Partners
24                                Na Prikope 15/583
                                  CZ - 110 00 Praha 1
25

26

27

28

29
```

2

*Gwen Malone Stenography Services Ltd.*

| 1 | **Interpreter:** | Dr Dominika Winterova |
| 2 | | |
| 3 | | Sinkulova 42/1121, 140 00 Praha 4 Czech Republic |
| 4 | | |
| 5 | **Court Reporter:** | Mrs JoAnne McAlister |
| 6 | **On behalf of:** | Gwen Malone Stenography Services Ltd |
| 7 | | Law Library PO Box 5939 |
| 8 | | 145-151 Church Street, Dublin 7, Ireland |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |
| 29 | | |

3

1                        *INDEX*

2

3      EXHIBIT            DESCRIPTION                      PAGE

4
       1         Letter dated March 12, 2007              10
5
       1A        Letter dated April 12, 2007              19
6
       2         Letter from Andrew Weiss                 12
7                on behalf of Weiss Asset Management

8      3         E-mail dated October 18, 2004            83

9      4         Request for International Judicial      103
                 Assistance
10
       5         Letter from Gilroy Ltd                  106
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

4

*Gwen Malone Stenography Services Ltd.*

1    THE DEPOSITION OF ONDREJ PETERKA COMMENCED ON 18th APRIL

2    2007 AS FOLLOWS:

3              THE INTERPRETER:  The witness has been

4    explained his rights that he has under the Czech law and

5    he is now being asked whether he is willing to take the

6    oath under the American system.  He needs to understand

7    from you whether this is required.

8              MR BECKMAN:  It is.

9              **ONDREJ PETERKA, having been duly sworn,**

10             **gave testimony as follows:**

11             **Examined by MR BECKMAN:**

12             THE INTERPRETER:  The witness will speak in

13   Czech and he will require the questions to be translated

14   as well.

15             MR BECKMAN:  I would like to raise an issue

16   with respect to that.  I will do it in the questions,

17   I will do that.

18   Q.  Mr Peterka, your website states that you are

19   fluent in English; is that correct?

20   A.  It is correct that I do speak English.

21   Nonetheless, because this is such a serious matter and

22   it is a deposition for a particular purpose, I would

23   prefer that everything is translated to me into my

24   mother tongue; the reason being that I am not certain

25   whether I can understand all the subtle nuances of the

26   English language.

27   Q.  Are you fluent in English, Mr Peterka?

28             MR DANGEL:  Objection, asked and answered.

29   He responds anyway.

5

```
 1      A.   I have already answered and I refer to my
 2   previous answer.
 3            MR BECKMAN:
 4      Q.   Please state your name?
 5      A.   My name is Ondrej Peterka.
 6      Q.   Are you a lawyer permitted to practice in the
 7   Czech Republic?
 8      A.   That's correct.
 9      Q.   For how long have you worked at Peterka &
10   Partners?
11      A.   I am the founding partner of that law firm and
12   I founded the firm in March 2000 and ever since then
13   I have been a partner in that office and I practice law
14   in that capacity.
15      Q.   For how long have you been a member of the Czech
16   Bar?
17      A.   I believe since 1996 but I am not 100% sure of
18   that.
19      Q.   For how long did you work at the Codere Brothers
20   law firm?
21            THE INTERPRETER:  Can you repeat the name?
22            MR BECKMAN:  Codere Brothers.
23      A.   If I recall correctly but I am not sure because
24   this is a way back, I worked there since 1992 until 1994
25   and it was in the Paris office of this law firm.
26      Q.   Is Codere Brothers an American law firm?
27            MR DANGEL:  Objection.
28      A.   When I worked for them I worked with French
29   attorneys in a division that dealt with litigations
```

6

1    before French courts.  As far as I can tell whether this

2    was an American or a French firm, there had been

3    a number of discussions or disputes within the firm at

4    that time.  These discussions continued even after

5    Codere Brothers as a global company ended its

6    activities, and that was last year.

7         Q.  Were you an associate attorney at the Codere

8    Brothers law firm?

9         A.  I am not sure what "associate attorney" is

10   understood in that.

11        Q.  Were you a partner?  Were you ever promoted to

12   being a partner at Codere brothers?

13             MR DANGEL:  Objection to the form.

14        A.  I have never been a partner in that firm.  And if

15   I recall correctly, when I worked for them in Paris, my

16   situation was a form of internship.

17             MR BECKMAN:

18        Q.  What do you mean by an internship?

19             MR DANGEL:  Goodness gracious.

20        A.  That is what they called it.  I wasn't sure why

21   they were calling it that or what it meant, but I worked

22   full-time within that title.

23             MR BECKMAN:

24        Q.  Why did you leave Codere Brothers?

25        A.  I left because, as I have already indicated,

26   I worked mainly with French lawyers who were, who

27   specialised in litigations and they decided to establish

28   their own firm and they wanted me to join them in this

29   new law firm.  And, as I recall at that time, Codere did

7

1  not offer me a position with him.  I was quite, very

2  young at that time; 22, 23 years old.  I have to correct

3  myself, I was about 25 years old.  And basically

4  I didn't have much of a choice to make so I was

5  appreciative of the fact that they, my colleagues

6  offered me to join them in the other law firm.  Okay, to

7  be precise, I was happy that the other law firm offered

8  me a job.

9       Q.  Were you terminated by Codere Brothers?

10           MR DANGEL:   Objection.

11      A.  No, my contract was not terminated by Codere

12  Brothers because legally the situation involved really

13  a split into two law firms and people were not laid off

14  or terminated, they were automatically leaving with the

15  other part of the company.

16           MR BECKMAN:

17      Q.  What was the name of the new firm that you

18  joined?

19      A.  It is Sokolovw, S-o-k-o-l-o-v, w at the end,

20  Dunaud, which spells D-u-n-a-u-d, Mercadier.

21           MR DANGEL:   M-e-r-c-a-d-i-e-r.

22      A.  And Carreras, which is spelt C-a-r-r-e-r-a-s.

23           MR BECKMAN:

24      Q.  May we refer to that as the Sokolovw firm?

25      A.  Yes, sir.

26      Q.  What was your position with the Sokolovw firm?

27      A.  About two or three months after this law firm was

28  established, I was admitted to the French Bar, Paris Bar

29  and at that point I received what I could call

8

1    a substitution contract.  I was given a contract by this

2    law firm which was called collaboration and that is

3    a standard procedure whereby the law firm signs these

4    contacts with the attorneys who work for the law firm

5    for a lump sum of money.

6            MR BECKMAN:  I just realised, your Honour,

7    because we are using an interpreter with Mr Peterka, we

8    actually need to swear in the interpreter.

9            **DOMINIQUE WINTEROVA WAS DULY SWORN**

10           MR DANGEL:  I would just like to say on the

11   record I have many questions for the interpreter.  I am

12   only kidding.

13           MR BECKMAN:

14       Q.  When you worked at the Codere Brothers law firm,

15   were you not admitted to the Paris Bar?

16       A.  That is correct, I was not.  I was admitted in

17   January 1995.

18       Q.  Were you ever promoted to the position of

19   a partner with the Sokolovw law firm?

20           MR DANGEL:  Objection to the form.

21       A.  No.

22           MR BECKMAN:

23       Q.  For how long did you work at the Sokolovw firm?

24       A.  Roughly speaking since October '94 until February

25   or March 1996.

26       Q.  Why did you leave the Sokolovw firm?

27       A.  There were several reasons.  The main reason,

28   however, was a personal reason.  At that time I had

29   spent about seven years in France or had lived in France

9

*Gwen Malone Stenography Services Ltd.*

1    for about seven years.  My girlfriend, who is now my

2    wife, she is not French either, she is Danish, and we

3    felt we didn't want to continue living in France.  At

4    the same time I was receiving various offers from

5    various firms, not only law firms, for jobs and

6    positions in the Czech Republic.  These offers were

7    quite interesting.  So in spite of the fact I had

8    previously thought it would be very difficult for me to

9    return to the Czech Republic, I came to realise that it

10   would be viable even financially and that there would be

11   a possibility for us, for myself and my then girlfriend

12   to live in a country that is a home land to one of us.

13       Q.   Where did you work next?

14       A.   Could you repeat the question I was just

15   answering, please, because I am not sure if I fully

16   answered?

17       Q.   No, we are going move on.

18            MR DANGEL:   Excuse me, he has a right to

19   fully answer.

20            MR BECKMAN:   I asked him why he left the law

21   firm.

22       A.   One of those offers came from a French law firm

23   by the name Gide, G-i-d-e, Loirette, L-o-i-r-e-t-t-e,

24   Nouel N-o-u-e-l, and the offer stated that I could first

25   work for this law firm in France and then later in

26   Prague.

27       Q.   What is the first name of the law firm, how do

28   you pronounce it?

29            MR DANGEL:   The lead partner is Dominic

10

*Gwen Malone Stenography Services Ltd.*

1    Gide.

2              MR BECKMAN:  Are you testifying, Mr Dangel?

3              MR DANGEL:  He is an old friend of mine,

4    that's all.  Go ahead.

5              MR BECKMAN:

6    Q.  For how long did you work at the Gide law firm?

7    A.  I cannot simply say how long I worked for them

8    because the forms of corporation changed over time.

9    Initially, which was since April '96 until the end of

10   1997, I worked for them on a similar basis; that is on

11   the basis of a contract like with the previous firm, and

12   I received a lump payment or monthly payment for my

13   services.  Since May 1996, physically I was already in

14   Prague, I worked out of Prague or in Prague.

15   Q.  I will withdraw the question and move on.

16   A.  But I would like to finish answering.

17   Q.  That is okay.

18             MR DANGEL:  Excuse me, he has the right.

19   Excuse me, he will finish his answer.  Please finish.

20             MR BECKMAN:  I will withdraw the question

21   and ask another question.

22             MR DANGEL:  Excuse me.  Excuse me, I am

23   going to make a statement just very briefly.  This is

24   a very distinguished member of the Czech Republic Bar.

25   He deserves, he deserves to be treated with respect, not

26   only because of who he is, having founded a 40 lawyer

27   firm in this city, but also because he is representing

28   a party in this litigation and a deposition should not

29   be used as an effort to intimidate one side's lawyer or

11

1  another.  If Mr Beckman starts down the road to

2  determine his credentials he has a right to continue

3  until he has completed.  I can only say that any lack of

4  respect shown to Mr Peterka will be treated by me as an

5  embarrassment to my Bar and I will take that to the

6  appropriate authorities if it continues.

7          MR BECKMAN:  I will simply say we only have

8  seven hours of questioning today.

9          MR DANGEL:  Truthfully it is not necessary.

10         MR BECKMAN:  I am answering the Judge's

11  question.  We only have seven hours of questioning,

12  I was trying to get a little bit of his employment

13  background.  I would like to move on.

14         THE INTERPRETER:  The witness says he has

15  the right to complete his answer because he believes

16  that the intention of this question is to discredit him

17  professionally or diminish his professional credibility

18  and therefore he feels it is his right and it is

19  necessary that he answers fully the question to

20  establish his professional credentials.

21         MGR PESLOVA:  According to the Czech law the

22  Defendant's party can also ask the same question if it

23  is necessary for the record.

24         MR DANGEL:  Okay.

25         MGR PESLOVA:  So please continue.

26         MR DANGEL:  Excuse me, your Honour.  The

27  American -- sorry.  The American rule, the American rule

28  is the witness gets to complete his answer and I would

29  like to follow the American rule.

12

*Gwen Malone Stenography Services Ltd.*

1          MR BECKMAN:  Mr Dangel, you are interrupting
2     the Judge who is going to speak.  You have to let the
3     Judge and the interpreter interpret for the Judge.
4          MR DANGEL:  Excuse me, if you don't let the
5     witness speak, then why do I have to let anyone speak?
6          MGR PESLOVA:  Mr Beckman, is that correct
7     that the witness has a right under American procedure to
8     complete his answer once the question is asked?
9          MR BECKMAN:  That is correct, but I have
10    withdrawn the question.
11         MR DANGEL:  You cannot withdraw a question
12    in the middle of an answer.
13         MGR PESLOVA:  Is it possible to withdrew
14    a question in the middle of an answer?
15         MR BECKMAN:  To move this along I will let
16    the witness complete his answer.  But I would ask,
17    respectfully, if he could he move it along, because we
18    have a lot of issues to cover today.
19    A.   So, I will continue.  And we were talking about
20    the end of 1997.  After that the former corporation
21    changed quite principally and the roles actually
22    reversed, at least in the Czech Republic, because we
23    entered into a franchise contract, a certain form of
24    a franchise contract in name whereby all legal services
25    to the client in the Czech Republic were provided by
26    myself as an individual and by lawyers who were my
27    employees or by cooperating or collaborating attorneys.
28    These services were provided under the business name or
29    the company's name Gide.  All payments from clients went

13

1    to me and I was paying to Gide law firm fees for

2    administrative services and rent.  And I was also paying

3    them for work hours of attorney's, French attorneys

4    working for Gide for work hours and French lawyers

5    working for Gide spent on my client or on my cases.  The

6    collaboration continued until the end of 1999 in this

7    form.  And then at the end of '99, beginning of 2000,

8    there were certain disagreements between myself and the

9    Gide law firm which ultimately led to our splitting at

10   the end of March 2000, which corresponds with the time

11   when I established Peterka & Partners.  And just to be

12   precise when established the law firm, it was called

13   Peterka Leuchtrova, L-e-u-c-h-t-r-o-v-a.  But it still

14   is the same entity even though it had a different name.

15           MR BECKMAN:

16       Q.  Are you finished with the answer to the question

17   I asked?

18       A.  Yes, I am.

19           MR BECKMAN:   Your Honour may I show the

20   witness a document?

21   **(Exhibit 1 marked by Mr Beckman)**

22       Q.  Mr Peterka --

23           MR DANGEL:   There are several levels on

24   which a lawyer can be dishonest, this is one of them.

25   This, for the record, is a letter that I wrote in which,

26   which was preliminary on this matter.  After this letter

27   there was a conversation with Mr Beckman and his partner

28   concerning the scope of the waiver of privilege.

29   I handed Mr Beckman today the letter which is the final

14

1    letter approved by the client as to the level of waiver.

2    My letter suggested a complete waiver.  I do not

3    understand --

4            MR BECKMAN:  It isn't that letter, I didn't

5    mark that letter.  This is your subsequent letter.

6    I wouldn't do that to you.

7            MR DANGEL:  Okay, sorry.  I withdraw what

8    I said.  I mistook which letter it was and I apologise

9    to Mr Beckman.

10           MR BECKMAN:  And Terry --

11           MR DANGEL:  Please excuse me.

12           MR BECKMAN:  -- I would really appreciate

13   that you keep your comments pursuant to the rules only

14   to stating an objection.

15           MR DANGEL:  Okay, I will do so.

16           MR BECKMAN:  Because we do not have much

17   time.

18           MR DANGEL:  Right, right, go ahead.

19           MR BECKMAN:  And I would ask you to

20   translate that for the Judge.

29  21   Q.  Mr, Peterka, this is a letter that I received

22   from Mr Dangel dated April 12th, 2007.  I believe --

23   I want to direct your attention to the first sentence in

24   the letter which Mr Dangel writes:

25           *"This is in brief response to your phone call*

26   *this afternoon concerning the scope of waiver which*

27   *Mr Weiss, CVF and KT are willing to give Mr Peterka, and*

28   *the impact that waiver has on the need for additional*

29   *document production.  As I said, the purpose of the*

15

1   *waiver is to put Mr Peterka in the same position an*

2   *American lawyer would be in a deposition where*

3   *the privilege was not waived in America".*

4        A.   What is the question?

5        Q.   Is it your understanding that Mr Weiss, CVF and

6   KT are waiving the attorney client privilege so you are

7   in the same position where the privilege is not waived

8   in the United States?

9        A.   This is somewhat complicated, sir.

10            MR DANGEL:   May I recommend that we mark

11   this also as an exhibit, Mr Beckman, would that be all

12   right?

13            MR BECKMAN:   I didn't have a copy, an extra

14   copy.  You just gave it to me before we were starting

15   the deposition.

16   **(Exhibit 2 marked by Mr Beckman)**

17            MR DANGEL:   Okay.  Give this to Mr Peterka.

18   Just wait there for a minute, please.

19            MR BECKMAN:   Just so the record is clear,

20   I have marked as Ex No 2 a letter from Peterka &

21   Partners:  Re: Partial release of Attorney-at-law from

22   the Duty to Maintain Confidentiality.  It appears to

23   have a April 17th 2006 - 7 date.  May I give this to the

24   witness?

25        A.   From my point of view it is not important or

26   essential.  That was communicated between the lawyers in

27   the US and is not important from my point of view as

28   regards the waiver of confidentiality.  What

29   is important to me is the extent to which my client

16

1  lifts the confidentiality or to which the client waives

2  confidentiality privilege, that is the clients rather

3  than the client.  Client and/or clients.

4      Q.  What is your understanding of the scope --

5      A.  Let me finish.  I haven't finished.

6      Q.  There is no question pending.  He said it didn't

7  matter what the American lawyer said so now he is

8  reading from a document.

9      A.  The question was to what extent or how

10  I understand to what extent my confidential, the

11  confidentiality was waived.

12          MR BECKMAN:  That is not the question, let

13  me restate the question.

14      Q.  What is your understanding of the scope of the

15  waiver provided to you by your clients?

16      A.  I understand that waiver to involve several

17  limitations.

18      Q.  The question is the scope of the waiver, not the

19  limitations.  The question is: what is the scope of the

20  waiver?  What are you permitted to testify about?

21      A.  According to the Czech law, the attorney client

22  privilege covers everything and anything, all the facts

23  that the attorney learns in connection with provision of

24  legal services.  And that is the underlining principle,

25  everything is covered by the privilege.  And if the

26  privilege is lifted or waived, then it has to be clearly

27  said to what extent it is waived and I understand that

28  as follows.  The waiver is only for the purpose of

29  today's deposition.  That's one.  Under no

17

*Gwen Malone Stenography Services Ltd.*

1    circumstances, in no case the waiver covers those facts

2    and circumstances that would be covered by the US

3    attorney client privilege.  Please, gentlemen, if it is

4    not clear tell me.  And since I am not an American

5    lawyer and therefore I do not know the exact scope of

6    the privilege in the US, the exact scope of this notion.

7              MR DANGEL:  So would it be okay if I helped

8    here?

9              MR BECKMAN:  No, let him answer the

10   question.  It is important for the witness to answer the

11   question what his understanding is of the scope of the

12   waiver.

13   A.  And because I am not an American lawyer and I am

14   not sure of the scope of this US provision, therefore

15   Mr Dangel is here, who was asked by my client and/or

16   clients to instruct me with each and every question

17   whether it falls under the scope of the waiver.

18             Further, I need to say that our law firm provided

19   services based on a contract on provision of legal

20   services between our law firm and the KT company.  This

21   is the basic framework.  If, based on this contracts on

22   provision of legal services we also represented other

23   entities, then even in that case, then even in that case

24   it is essential to me, it is essential to me to

25   understand to what extent I received a waiver by KT.  It

26   is essential for me to what extent I received a waiver

27   by KT.  So even if another, another entity provided

28   a waiver of a greater extent, then on the basis of

29   a cumulative principle, for me it is the extent of the

18

*Gwen Malone Stenography Services Ltd.*

1   waiver provided by KT that is decisive.

2        Further, I need to state that there are persons

3   -- and I use the term "persons" without specifying

4   whether these are individuals or legal entities -- which

5   or who gave no waiver to me.  And further, according to

6   the Czech case law even if there is a waiver of the

7   privilege according to the Czech law, the attorney

8   himself or herself can judge whether it is appropriate

9   to speak publicly about certain facts or information.

10  So this is the framework of the waiver.

11       MR BECKMAN:

12  Q.  Are you finished?  What other entities did you

13  represent under the contract between your firm and KT?

14       And just so the witness is aware, if you are

15  reviewing a document we are going to mark it as an

16  exhibit.  You waive the privilege.  I just want to make

17  sure you are aware of that because you are not familiar

18  with the privilege.

19  A.  There are several of those entities that we

20  represent and I can only speak about those where I was,

21  where I was provided the waiver of the privilege.  And

22  it is the company KT Inc -- can you specify the

23  question?  Was it a question who we represent or was it

24  a question entities that we represent or entities that

25  we provide legal counsel?

26  Q.  As I understood your prior answer, you said you

27  represented other entities under the contract between KT

28  and your firm.  My question is: could you please

29  identify the other entities you are referring to that

19

1    you provided legal services to between the contract,

2    between your firm and KT?

3        A.   That is correct, because we did provide legal

4    services and only a subset of those legal services is

5    actual representation of some entities.  So, in other

6    words, we provided legal services to some of those

7    entities and we represented some of them and we did both

8    in connection with some other ones.

9        Q.   Then with that, please identify the entities you

10   represented, do that first?

11       A.   It is KT Inc, then it is CVF Investments Limited,

12   CVF, then it is CVF Investments LLC, then Gilroy.  As

13   for the rest or if there are any other entities then

14   I would have to consult my files because there are many

15   litigations that involve other entities which I may not

16   recall at this time but these are the main ones.

17       Q.   What entities did you provide legal services to?

18       A.   Representation, legal representation is a form of

19   legal service, so it does represent.  In addition to

20   that, there are other companies that we most likely

21   provided legal services to as well of counseling,

22   consultants in nature, and these included Weiss Asset

23   Management LLC, Weiss Capital LLC, Global Opportunity

24   Fund and also possibly its subsidy areas.  That is, to

25   my best knowledge, all of them.  But it needs to be

26   noted that the files are very extensive.  We have a team

27   of several lawyers that work on that and I certainly

28   cannot on the spot recall all the details.

29       Q.   Can you identify any other entities that you

20

1    provided legal services to or represented under the

2    contract with your firm Peterka & Partners and KT?

3        A.   As I have indicated, some entities, whether

4    individuals or legal entities, did not waive the

5    confidentiality and I cannot speak about them at all.

6    Other than that, however, in my previous answer

7    I believe I named them all.  I named them all with the

8    caveat that other cases, the client is very extensive or

9    the case is very extensive and then there may be some

10   that I forgot.

11       Q.   Is it your testimony that under the Czech law of

12   attorney client privilege, you cannot identify by name

13   entities that have not waived the privilege?

14       A.   That is my legal opinion and that is what

15   I believe the Czech law stipulates.

16       Q.   What is the difference between providing legal

17   services and representing a client?

18       A.   As I have already indicated, our company had

19   a contract with KT, which is our principal client.

20   Based on this contract, we represented also other

21   entities.  However, the contract with KT, from our point

22   of view, is superior or encompasses all the other

23   relations with these other entities.

24           Generally speaking, and this is not speaking

25   about this particular case, it is certainly possible to

26   represent an entity, to represent an entity and to

27   advise about that representation to another entity.

28       Q.   Did you represent KT, CVF Investments Limited,

29   CVF Investments LLC and Gilroy in connection with

21

*Gwen Malone Stenography Services Ltd.*

1    communications with third parties?

2                    MR DANGEL:   Objection to the form.

3        A.   What exactly do you mean when you say

4    "communication with third parties"?

5                    THE TRANSLATOR:   I tried to translate that.

6                    MR BECKMAN:

7        Q.   Did you represent KT, the CVF entities and Gilroy

8    in connection with meeting representatives of Kotva?

9        A.   Once again those entities were KT, CVF and

10   Gilroy?

11       Q.   Correct.

12       A.   I need to recheck the statement that I would ever

13   speak on behalf of those entities with representatives

14   of Kotva.   And I consider that the question to be

15   misleading.   If I recall correctly, I did take part in

16   a single meeting that took place on October 18, 2004,

17   and at that meeting Mr Harazim was present, Mr Benda,

18   Mr Prestage and Mr Hoffmann.   I took part in this

19   meeting as a legal representative of entities which

20   filed lawsuits and my mandate in this meeting was only

21   limited to this one aspect.   It was not in any way

22   a part of my mandate or authorisation to negotiate about

23   the sale or purchase of Kotva shares.   If I recall,

24   because this is away back, I spoke at that meeting about

25   some technicalities of the Czech law.

26            Nonetheless, I want to state that my

27   understanding was that Mr Benda and Mr Harazim did not,

28   from the formal legalistic point of view, did not

29   represent or did not act as representatives of Kotva

22

*Gwen Malone Stenography Services Ltd.*

1  there, but they are there simply as individuals who are

2  simply members of a group which, in fact, controls

3  Forminster group and, Forminster and Kotva group.  And

4  that group, which does not have any particular legal

5  form, wishes to purchase or negotiate that representing,

6  or a group which wishes to purchase or negotiate

7  a purchase of a shares which were held by CVF Limited,

8  indirectly held by CVF, that these people are simply

9  interested in purchasing about 12% packet of shares of

10  Kotva.

11         MR DANGEL:  A block of shares?

12         THE INTERPRETER:  That was the word I was

13  searching for.  Yes, block of shares.

14         MR DANGEL:  That's okay.

15    A.  At the same time though, they condition this,

16  they condition this transaction on, on a withdrawal of

17  some of the lawsuits that were filed, whereas as these

18  lawsuits did not only concern Kotva as such, but also

19  concerned shareholders or the ownership structure of

20  Kotva, which reconfirmed for me that it is just an

21  informal group of people, that is just an informal group

22  of people that controls Forminster and Kotva rather than

23  any specific legal entity, and certainly not Kotva

24  itself or Kotva company itself.

25         The other point is that that meeting was very

26  odd.  And, frankly speaking, I did not quite understand

27  it.  During the whole meeting Mr Benda, in particular,

28  and also, to some extent, Mr Harazim, kept repeating

29  that only Kotva company or Kotva can purchase those

23

1    shares.  The reason being that only Kotva has the kind
2    of money or that they have some internal reason for
3    which they simply want Kotva to be the buyer.
4    Mr Hoffmann, in particular, but myself also, responded
5    to that quite spontaneously that we did not understand
6    and that from the point of view of the seller we really
7    didn't care who the buyer was.  That from our
8    perspective, it plays, it does not matter who the buyer
9    is; that the issue is the technical arrangement or
10   technical solution.  But that first a business deal or
11   business negotiation may, a part of that being what is
12   being sold and what for what price.  And during that
13   meeting, at least as far as I can recall, it turned out
14   that that part is not very clear.  Because, on the one
15   hand, there were discussions about the sale and purchase
16   of the block of 12% of shares but as far as, as far as
17   I recall, on the part of Mr Benda and Mr Harazim there
18   were repeated requests that this needs to be linked to
19   our withdrawing the lawsuit --excuse me, of all
20   lawsuits; including those that regard the ownership
21   structure of Kotva which, in effect, would mean, which
22   in effect would mean that the subject matter of the
23   transaction is not only the 12% block of shares, but
24   also the fact that in the '90s -- and this was one of
25   the biggest tunneling scandals in the recent Czech
26   history -- an interest of at least 32% was diverted from
27   the Trend Fund and, through a series of transaction,
28   this 32% interest landed with Forminster, a company with
29   no credibility.  And if a transaction is to involve

24

*Gwen Malone Stenography Services Ltd.*

1    a withdrawal of lawsuits that concern ownership
2    structure of Kotva, then it is not a 12% block of shares
3    that would be the subject of the deposition but a 40%
4    share.  And at least how I understood that in that
5    meeting, this was not clear.  There was no clarity about
6    price, but just repeatedly on and on Mr Benda or the
7    gentleman kept saying that only Kotva can purchase those
8    shares.  That was a new piece of information to me and
9    I most likely spontaneously responded at that meeting
10   that there are certain technicalities that need to be
11   completed or met in order for own shares to be purchased
12   and those technicalities need to be first checked and
13   verified.  But, if I recall, Mr Hoffmann stated then
14   that this was not the point, this was not an essential
15   point because what is important is the item that is
16   being sold and the price.  And only later when I learned
17   that this all was a police entrapment then I understood
18   why it was that Mr Benda kept telling us that only Kotva
19   could purchase those shares.  And why it was that he was
20   not interested in matter of fact discussion or realistic
21   discussion about what is the actual item that is the
22   subject of the, or object of the transaction and for
23   what price.
24        We can sum up this as follows, and that is that
25   Mr Benda and Mr Harazim were speaking for the purposes
26   of police interceptions and certainly were not talking
27   to the benefit of the other party.  And it was only
28   looking back then that I came to realise why that
29   meeting was so odd and so difficult for me to

25

*Gwen Malone Stenography Services Ltd.*

1    understand.  Only now I understand that the only purpose
2    of that meeting was to, by people around the Forminster
3    and Kotva, was to construct these absurd allegations by
4    the people surrounding Kotva and Forminster that there
5    is an attempt to extort Kotva.  So this is, in fact, the
6    only meeting in which I took part that would also
7    involve people surrounding Kotva and Forminster or from
8    Kotva and Forminster.  When I was representing those
9    entities which filed lawsuits, but in that context my
10   authorisation was not to negotiate the sale of shares.
11        So far I have answered your question as to when
12   I had anything to do with people from Kotva or
13   Forminster in connection with my representation of these
14   four entities.  If there are other third parties, then
15   please specify what third parties you have in mind,
16   because otherwise the question would be too broad.
17   Q.  I am reserving my right to strike the answer as
18   non responsive.
19             MR DANGEL:  I'd like to say it was
20   exceedingly responsive and correct.  The only problem
21   being that apparently, it dealt -- well, strike it.
22             MR BECKMAN:  Mr Dangel again, Rule 30(d)
23   really.
24             MR DANGEL:  Listen, if a person reserves his
25   right, the other counsel has the right to give his
26   statement for his side, that is all.
27             MR BECKMAN:  Are you finished?
28             MR DANGEL:  Very much so.
29

26

*Gwen Malone Stenography Services Ltd.*

1          MR BECKMAN:

2      Q.  Is it your understanding, Mr Peterka, that the

3  waiver you have been provided only applies for today's

4  deposition?

5      A.  I have to check in this document if that is

6  correct.

7          MR DANGEL:  May I just register an objection

8  to the question, please.

9          MR BECKMAN:

10     Q.  Do you previously testify, Mr Peterka, that your

11 understanding of the waiver is that it only applies to

12 today's deposition; is that what you testified to?

13         MR DANGEL:  Excuse me, but I am here on

14 behalf of the Defendants and Plaintiffs in the

15 counterclaim and I have my right on behalf of those

16 parties to state the extent of the waiver.  I do not

17 wish to have a witness applying the attorney client

18 privilege waiver.  If you have questions, Mr Beckman,

19 about the scope of the waiver, my suggestion is first

20 you ask your questions, and secondly I would be happy,

21 as I have offered before, to inform you about the extent

22 of the waiver.  Rather than having, rather than legal

23 fencing why don't we just take this question by

24 question?

25     A.  May I say something?  I am not a specialist in

26 American, in US law, and I have only explained how

27 I understand the scope of the waiver or its limitations.

28 But, once again, Mr Dangel is here to determine during

29 the course of the deposition the precise scope or

27

*Gwen Malone Stenography Services Ltd.*

1    precise limitations of the waiver.

2            MR DANGEL:  And it is my understanding that

3    there is no such thing as a waiver for a single day or

4    for a deposition of the attorney client privilege.  It

5    is either waived completely by statements made or not

6    waived at all.

7        A.    Then, of course, I join in with Mr Dangel, it is

8    my understanding too.

9            MR DANGEL:  So please ask your next

10   question.

11           MR BECKMAN:

12       Q.    Are you permitted to testify about anything

13   beyond communications with third parties?

14           MR DANGEL:  The answer under American law,

15   and that is what we are following, is: yes, he is able

16   to testify about some other matters.

17           MR BECKMAN:  What other matters?

18           MR DANGEL:  He is able to testify about the

19   substance of lawsuits that he has filled.  He is able to

20   testify about court procedures.  He is able to testify

21   about when he was hired, the nature of the billing that

22   he has rendered for services.  He is able to testify

23   about documents he has received from third parties.  He

24   is able to testify -- by the way he is not able to

25   testify about actual negotiations in settlement of

26   litigations, not only because the attorney client

27   privilege but because of his settlement, litigation

28   settlement rights and privileges.  But he is able to

29   testify, he is able to testify about what he was told in

28

*Gwen Malone Stenography Services Ltd.*

1    court, what he said in court.  He is able to testify

2    about general sources of information he has, that have

3    borne on the subject of the lawsuits and that was the

4    purpose, and because we thought that those were the

5    subjects that Mr Beckman and his clients would be most

6    concerned with, we provided a full waiver as to those

7    subjects.

8              MR BECKMAN:  Is there anything else?

9              MR DANGEL:  You can ask Mr Peterka is there

10   anything else.

11             MR BECKMAN:  Okay.

12   Q.  Mr Peterka, are you permitted to testify about

13   your legal opinions?

14             MR DANGEL:  Legal opinions rendered to any

15   of these clients or representatives -- others he has

16   represented in these matters, obviously he is not able

17   to give those legal opinions.  But if you ask him

18   a question of Czech law or if you ask him about

19   something in the complaint that he can testify to as

20   a Czech lawyer.

21             THE INTERPRETER:  The complaints, you mean

22   the lawsuits?

23             MR DANGEL:  Yes, the lawsuits.  Yes, he can

24   testify about any opinions he has.  What he cannot

25   testify about are legal opinions he has given his

26   clients and others he has represented.

27             MR BECKMAN:  So, are you making

28   a distinction between legal opinions he has given his

29   clients and legal opinions he has generally?

29

*Gwen Malone Stenography Services Ltd.*

1          MR DANGEL:   Yes.   Except that if he formed

2     a particular legal opinion as part of his

3     representation, those are obviously covered by attorney

4     work product.   The attorney work product doctrine, and

5     as you know, the attorney work product doctrine works

6     slightly differently than the attorney client privilege.

7                    MR BECKMAN:

8        Q.   Mr Peterka, are you permitted to testify about

9     your thoughts or mental impressions?

10                   MR DANGEL:   As you know, those are the

11    covered by the attorney work product doctrine, and the

12    work product doctrine is slightly different than the

13    attorney client privilege.   Because the privilege is an

14    absolute bar and the work product doctrine can be lifted

15    when there is a particularized need, when there is

16    a special need.

17                   MR BECKMAN:

18       Q.   Are you permitted, Mr Peterka, to testify about

19    legal, your thoughts or mental impressions concerning

20    the lawsuits you filed on behalf of your client?

21                   MR DANGEL:   That depends.   That depends on

22    the particular question that is asked.

23                   MR BECKMAN:

24       Q.   Are you permitted, Mr Peterka, to testify about

25    the basis for your legal opinions?

26                   MR DANGEL:   He is permitted to testify about

27    the basis of his legal opinions insofar as the bases are

28    from facts he has learned and law that he knows.

29


                                30


              *Gwen Malone Stenography Services Ltd.*

1          MR BECKMAN:

53    2     Q.  Mr Peterka, are you permitted to testify about

3     any legal research you did?

4          MR DANGEL:  That also depends because that

5     is covered by, it could be covered by either the work

6     product doctrine or the attorney client privilege.  And

7     I think the easiest thing to say is he is permitted to

8     testify about the results of legal research that he

9     conducted but not necessarily the reason why he

10    conducted the particular research.

11         MR BECKMAN:

54    12    Q.  Mr Peterka, are you able to testify about

13    communications you had with your clients before you

14    filed the lawsuits?

15         MR DANGEL:  No.

16         MR BECKMAN:

55    17    Q.  Mr Peterka, are you able to testify about any

18    investigations you undertook in connection with filing

19    the lawsuits?

20         MR DANGEL: Perhaps, yes.  It depends on the

21    particular area of investigation and whether it

22    concerned public records which clearly he can testify

23    to.  Private communications with clients, which clearly

24    he cannot testify to.  And the many areas that fall in

25    between, I will have to hear your questions before I can

26    say anything more.  So why don't we proceed with

27    questions and see where the problems arise.  My view

28    point is that I would like you to have as much discovery

29    as you can have without violating the work product

31

1  doctrine and the attorney client privilege.  Mr Peterka

2  is here to answer questions.

3           MR BECKMAN:

4       Q.  Mr Peterka, if you could go back to Mr Dangel's

5  letter.  About four lines from the bottom of the first

6  paragraph, Mr Dangel writes:

7           "Our idea is that with a proper waiver from all

8  of the necessary parties, Mr Peterka could testify about

9  the matters stated above and still preserve Mr Weiss's,

10  CVF's and KT's privilege as it exists under American

11  law".

12          You have to let me finish the sentence.  Is that

13  your understanding?

14      A.  I can't see that line that you are quoting from,

15  says Mr Peterka.  Can we check it is the same document?

16  I can't see that sentence you quoted.

17           MR BECKMAN:

18      Q.  It is the fourth line from the bottom, the word

19  "our".

20      A.  No.

21           MR DANGEL:  With the permission of the

22  Court.

23          Wait a minute, you gave him a different

24  letter.  Wait a minute, I want the record to reflect

25  this.  Hold on.  The letter that he gave Mr Peterka is

26  different than the letter he gave me as the example.

27  Excuse me, but I am going to mark the letter he gave me

28  as 1A, please.  It may have been a simple mistake or you

29  may have been trying to fool me.

32

1          MR BECKMAN:  It was a simple mistake, Terry,
2    I have the same one you have.  It was copied wrong, that
3    is all it was.
4          MR DANGEL:  Please mark mine as Ex 1A.  This
5    is most irregular.
6          MR BECKMAN:  Come over here, Terry, and
7    I will mark it.  You don't have to show him that one.
8    **(Exhibit 1A marked by Mr Beckman)**
9          MR BECKMAN:  Okay, now we are working of the
10   same letter at least.  Thank you.  No wonder you didn't
11   see the word "our".  Don't say anything.
12       A.  I need to clarify for the record that I already
13   answered questions concerning this document and I was
14   answering those questions based on a different document.
15          MR DANGEL:  Okay.
16          Mistakes happen in depositions all the time.
17   We are both tired.  We are six hours in time away from
18   home, and mistakes will happen.  And a little mistake
19   happened, and I take Mr Beckman at his word that he
20   wasn't trying to do anything wrong.  Okay.  So now you
21   have a letter properly dated April 12th, not the letter
22   of March 12th.  And now in there, there is a sentence
23   that says "our idea".  Let me give you back Ex 1.
24   Sorry.  Well I am not sorry but I am sure you are.
25          MR BECKMAN:
26       Q.  So the record is clear, I want to focus your
27   attention on the sentence which provides:
28   *"Our idea is that with a proper waiver from all the*
29   *necessary parties, Mr Peterka can testify about the*

33

*Gwen Malone Stenography Services Ltd.*

1    *matters stated above and still preserve Mr Weiss's,*

2    *CVF's and KT's privilege as it exists under American*

3    *law".*

4    Is that your understanding of the scope of the waiver

5    that you have been provided, Mr Peterka?

6    A.  I just want to read the document.  In principle

7    this is how I understand it.  But, as I said at the

8    onset of the deposition, there are other limitations on

9    the waiver such as that some entities or some persons

10   did not waive the privilege, and that it concerns other

11   entities, not only those three that are mentioned in

12   that letter.  But I wish not to go back to my

13   understanding of the limitations of the waiver that

14   I had described here earlier because this is still

15   invalid.

59   16   Q.  Under Czech law have proper waivers been provided

17   by all necessary parties?

18   A.  I believe it is just the same or it is

19   a duplication of the previous question.

60   20   Q.  No, it is a different question.  Let me ask it

21   again.

22              MR DANGEL:  Well my objection is this.

23              MR BECKMAN:  I didn't ask it.

24              MR DANGEL:  My objection is this.  There may

25   be questions that only involves the entities where

26   a waiver has been obtained.  There may be other

27   questions where some other entities rights are

28   implicated.  We don't know until we hear the questions.

29   So please let's get on with the questions.

34

*Gwen Malone Stenography Services Ltd.*

1          MR BECKMAN:

2     Q.   As a Czech lawyer, are you comfortable giving

3     testimony today --

4          MR DANGEL:   Objection.

5          MR BECKMAN:

6     Q.   -- that the parties necessary for you to give

7     testimony has given waivers to you?

8     A.   I am comfortable with it to the extent

9     I described at the beginning with those limits.   That is

10    the same question, third time.

11    Q.   Now you mentioned an October 18 meeting.   Where

12    did that meeting take place?   I ask you to answer just

13    the question that was asked.   Where did the meeting take

14    place?

15    A.   It took place in my law firm, in our law firm.

16    Q.   Who called the meeting?

17    A.   Can I answer that, Mr Dangel?

18         MR DANGEL:   Called the meeting.   To me, if

19    I understand the question correctly, the answer is yes.

20    In other words, if it was Mr Benda or Mr Harazim or

21    Mr Hoffmann or you, the answer is yes.   If it was

22    somebody else, such as --

23    A.   Let me answer, it was not me undoubtedly who

24    called the meeting.

25         MR DANGEL:   The answer is yes.

26    A.   Beyond that I will provide information I received

27    from the client in my answer.

28         MR DANGEL:   Then he can't answer that.

29

35

*Gwen Malone Stenography Services Ltd.*

```
 1              MR BECKMAN:

 2      Q.  You can't answer that question who called the

 3   meeting?

 4              MR DANGEL:  We have to raise the attorney

 5   client privilege.

 6      A.  I can tell you that it was not me who called the

 7   meeting.

 8              MR BECKMAN:

 9      Q.  Did Vladimir Hoffmann call the meeting?

10              MR DANGEL:  Yes, you can answer that.

11      A.  No, it was a piece of information that I received

12   from a client.

13              MR DANGEL:  Yes, he can answer that.

14      A.  I do not recall precisely.  Most likely it was at

15   some point myself or someone from my, one of my people

16   received a call from Mr Hoffmann, either he received

17   a call from either Mr Hoffmann or from our client

18   informing us about the meeting having been set up in our

19   office.  That's all I know.

20              MR BECKMAN:

21      Q.  When you refer to "client", who do you mean?

22              MR DANGEL:  You can answer that.

23              THE INTERPRETER:  He said clients.

24              MR DANGEL:  In other words who was the

25   client that you are referring to when you say "our

26   clients", that is what he says.

27              MR BECKMAN:

28      Q.  Client?

29      A.  It is most likely that in this specific case we
```

36

1   communicated with either Mr Weiss or Mr Nikitin, either

2   Mr Nikitin or Mr Weiss.  On behalf which entity they

3   spoke I am not sure.  I just simply do not remember

4   exactly because I didn't think it would be important.

5           MR DANGEL:  Do not say what was said but

6   identify the person or entity.

7       A.   But it just didn't, I never considered it to be

8   important who was calling what meeting.

9           MR DANGEL:  Fine, just stop.

10      A.   But what was more important to me what was going

11  to be the subject matter of that meeting.  That's it.

12  That's all.

13          MR BECKMAN:

14      Q.   Did you -- have you listened to the police

15  recordings of this meeting?

16      A.   Our office --

17      Q.   Have you listened to the police recordings; yes

18  or no?  Have you listened to the police recording?

19          MR DANGEL:  You mean of that meeting?

20          MR BECKMAN:  Of that meeting.

21          MR DANGEL:  Well I object.  I object to any

22  reference to police recordings.  I certainly object to

23  the notion that somebody, apparently Mr Benda wore what

24  is referred to as a wire into a law firm.

25          MR BECKMAN:  Terry, again you cannot coach

26  the witness.

27          MR DANGEL:  And I object to the use of

28  anything that was gained from that activity.

29


37


*Gwen Malone Stenography Services Ltd.*

1          MR BECKMAN:

2     Q.   Have you listened to the police recording of the

3     October 18th meeting; yes or no?

4          MR DANGEL:  Well that, that would be covered

5     by the attorney client privilege.  You can't answer

6     that.

7          MR BECKMAN:  You are instructing him not to

8     answer.

9          MR DANGEL:  I am instructing him not to

10    answer whether he has heard such recordings.  I mean he

11    is always able to answer "no", and then, of course, it

12    is not attorney client privilege.  He can answer he

13    doesn't know or whatever.  But that is -- if he listened

14    to a recording in his law firm as a part of his

15    engagement on behalf of a company or entity or

16    individual, of course that is covered by the attorney

17    client privilege.

18         MR BECKMAN:  Well, of course, it is actually

19    not a fax or documents are provided to --

20         MR DANGEL:  No, no, but.

21         MR BECKMAN:  You are interrupting me again.

22         MR DANGEL:  Excuse me, that is right because

23    you didn't ask during the course of the meeting or

24    a tape were the following words said.  That is a fact.

25    Asking somebody whether he listened to a recording as

26    part of his representation is part of attorney client

27    privilege, that is exactly where the line is drawn.  And

28    what I am trying to get you to do is stay with the facts

29    and not with matters of attorney client privilege,

38

*Gwen Malone Stenography Services Ltd.*

1   please.

2             MR BECKMAN:  That is fine, Mr Dangel.  But

3   if you are going to instruct the witness not to answer,

4   that is fine.  But then don't go on and try to coach him

5   and say, you can say "I don't know" or "no".  If you are

6   going to have him answer the question, that is fine or

7   assert the privilege^.

8             MR DANGEL:  You are right in that sense and

9   so I instruct him not to answer that question, since he

10  could only have heard it in his capacity as an attorney

11  for somebody who he is representing in this case.  So,

12  the answer is I do instruct him not to answer.  I hope

13  he will follow my instruction.

14            MR BECKMAN:

15      Q.  Prior to the meeting did you understand that

16  Vladimir Hoffmann had been hired by BGO to facilitate

17  the sale of the Kotva and Trend shares?

18            MR DANGEL:  There are two ways an individual

19  can learn facts in a case.  One is through his client

20  and one is through other sources.  So when a lawyer asks

21  "do you understand", he is playing a game.  Okay.

22  Because he knows that the form of question "do you

23  understand" could call for a waiver or might not.  So

24  what he is trying to do is get a waiver and not a fact.

25  If he will ask the questions properly, such as:  Did you

26  learn other than through your clients that A, B, C are

27  facts; then clearly he can testify.  If you do not make

28  that clarification, then clearly you have asked such

29  a general question that the only answer can be to waive,

                            39

1    is to either waive the privilege or keep the privilege.
2    So please ask the questions properly.  In the form that
3    question was asked, he has to, and I instruct him to
4    obtain the privilege.  Please rephrase the question.
5              MR BECKMAN:  Just so the record is clear and
6    we are not going waste the time with a back and forth
7    with Mr Dangel, but I just want to state for the record
8    that if facts are conveyed to an attorney for purposes
9    of securing a legal advice, then those facts are
10   privileged, that communication is privileged.  But if
11   the facts conveyed to an attorney are not for the
12   purposes of securing a legal opinion, they are not
13   privileged.  And Mr Peterka, in his answer about the
14   October 18th meeting, said he wasn't retained in
15   connection with negotiating the sale of Kotva or Trend.
16             MR DANGEL:  But that does not mean he is not
17   there as a legal representative of a company, in other
18   words, as a lawyer.  Come on, Joel, you know better than
19   this.
20             MR BECKMAN:  So we move on based on your
21   instruction not to answer.
22             MR DANGEL:  I've suggested a way you could
23   rephrase the question and you get an answer, if he can
24   answer it that way.  But anyway, go ahead, it is your
25   deposition.
26             MR BECKMAN:  What are you suggesting,
27   Mr Dangel?
28             MR DANGEL:  I am suggesting you ask him
29   that: other than through facts learned as part of your

40

1    representation and the providing of legal advice to the

2    client, did you learn A, B, C. He can answer that

3    question obviously.

4           MR BECKMAN:

5    Q.  Other than providing, other than in

6    communications with your clients in which they were

7    seeking legal advice from you, are you aware of

8    a contract between -- or prior to the October 18th

9    meeting, are you aware of a contract between Vladimir

10   Hoffmann and BGO in which Mr Hoffmann was retained to

11   facilitate the sale of the BGO's Kotva and Trend shares?

12          MR DANGEL:  The seeking of legal advice does

13   not meant at that second.  It means if you learn facts

14   as part of a process of providing advice and opinions to

15   a client, then that is covered by the privilege.

16   A.  But the question is asked in a manner that I will

17   disclose because if I say -- (through Interpreter) In my

18   opinion the question is asked in a manner that if

19   I answer that question I will still indirectly violate

20   the confidentiality.

21          MR DANGEL:  Okay, then don't answer it.

22          MR BECKMAN:

23   Q.  The Czech law of confidentiality.

24   A.  No, the US.

25          MR BECKMAN:  Mr Dangel, you are not

26   comfortable with the way I attempted to rephrase the

27   question as you asked?

28          MR DANGEL:  I am, but I didn't know -- if he

29   knows of this contract, you see, I wouldn't know of how

41

1   he learned of it.  He would know of how he learned of

2   it.  If he learned of it as part of his legal

3   representation in giving advice then he knows that and

4   he knows that he can't answer it.  I mean I don't know

5   how -- if he learnt it I don't know how he learned it,

6   I am not...

7            MR BECKMAN:  Perhaps if I could suggest we

8   take a short break and Mr Dangel can confer with

9   Mr Peterka as how to answer a question.

10           MR DANGEL:  I want to talk to you for a

11   minute because I think I can give you a form of

12   question.

13           MGR PESLOVA:  How long a break do you want?

14           MR BECKMAN:  Whatever, I think it is really

15   up to everybody.

16           MGR PESLOVA:  Half an hour?

17           MR DANGEL:  Oh, no, ten minutes.

18           **(Off the record - 11.21 am)**

19           **(On the record - 11.32 pm)**

20           MR BECKMAN:

75    21   Q.  Prior to the October 18 meeting, were you aware

22   that Vladimir Hoffmann entered into a contract with BGO

23   to facilitate the sale of the Kotva Trend shares?

24           MR DANGEL:  Other than through your client.

25   A.  I did not know about that from sources other than

26   from the client, but that is not to say what I knew from

27   the client.

28           MR DANGEL:  Just answer no or yes, please.

29

42

*Gwen Malone Stenography Services Ltd.*

1          MR BECKMAN:

2      Q.  Prior to the October 18th meeting were you aware

3   that the Vladimir Hoffmann had entered into a contract

4   with BGO; yes or no?

5          MR DANGEL:  No, other than through -- well

6   he has to take, he has to take the preliminary attorney

7   client privilege and then I have to ask you, please, to

8   ask that without reference to what he may have heard

9   from this client.  So, other than -- assuming that he

10  took the attorney client privilege as the question was

11  asked and that the question was re-asked, asking other

12  than through clients did you know.

13     A.  Can I answer that?

14         MR DANGEL:  You can answer that.

15     A.  No.

16         MR BECKMAN:

17     Q.  So in this deposition you are able to understand

18  Mr Dangel when he speaks English but you are not able to

19  understand me; is that correct?

20         MR DANGEL:  Can I just say, this is an awful

21  waste of time.  Mr Harazim, who studied in the United

22  States and speaks wonderful English preferred to use an

23  interpreter.  There is nothing wrong with that because

24  it is, he is not trying to be difficult.  He

25  understands, as Mr Harazim understood, that these are

26  technical matters and when you get involved in very

27  precise things, sometimes your second language is not

28  quite good enough.  Now please do not berate the witness

29  over that.

43

*Gwen Malone Stenography Services Ltd.*

```
1              MR BECKMAN:  Let me state for the record
2   that when the issue of an interpreter came up for
3   Mr Harazim's deposition, NWE provided an interpreter and
4   asked for the seven hours to be continued for 14 hours.
5   Until today, no-one has ever mentioned that Mr Peterka
6   would need an interpreter for today's deposition.
7              MR DANGEL:  Well let me put this way --
8              MR BECKMAN:  Please let me finish.  Please
9   let me finish.  So now we are confronted with travelling
10  from the United States to take this deposition during
11  a seven hour time frame, which will be very, very
12  difficult to do, and there was no request for an
13  interpreter.  We, as an accommodation to the Court, had
14  provided an interpreter for the Judge.  So, of course,
15  Mr Peterka can take advantage of that, but this process
16  is being very, very prolonged because of this and that
17  is much different than Mr Harazim's situation.
18             MR DANGEL:  I have to say I didn't know
19  Mr Peterka was going to require an interpreter here
20  today, but he is a free human being, I don't control
21  him.  He isn't my client.  Mr Harazim is your client.
22  I would expect you to know what your client prefers.
23  But as to Mr Peterka, he has his own standing as
24  a lawyer in the Czech community.  He can determine his
25  own level of comfort.  I don't see a problem here,
26  except for one thing, that it is taking more time and so
27  let's do our best to move on.
28  A.  I just want to say that my intention is not to
29  cut into the time of the deposition, I am available for
```

44

*Gwen Malone Stenography Services Ltd.*

1   as much time as you will need, including tomorrow, so
2   I don't understand what the problem is.
3           MR DANGEL:  Well I am not available all day
4   tomorrow.  I have a plane out of here at four o'clock in
5   the afternoon.  So please let's go ahead.
6           MR BECKMAN:
7   Q.  What is the date of the contract between KT and
8   your law firm?
9   A.  There are two things.  There is a written
10  contract but also an oral contract, an oral agreement.
11  As I recall, we began to provide legal services so that
12  we are first time approached in this matter around June
13  3rd.  The written contract, for just practical reasons,
14  was entered into somewhat later, and I think it was
15  somewhere towards the end of July, beginning of August.
16  Q.  Who approached you on or about June 3rd, 2004?
17          MR DANGEL:  No, you answer that.
18  A.  Mr Hoffmann.  Shortly after that there was
19  a conference call with Mr Weiss, if I recall correctly.
20          MR BECKMAN:
21  Q.  Who was Mr Hoffmann representing when he
22  approached you on or about June 3rd?
23          MR DANGEL:  You can answer that.
24  A.  It wasn't formally stated, nonetheless implicitly
25  it was understood there were American investors who had
26  12% block of shares in Kotva and 40% in Trend.  That was
27  the gist of the message and specified --
28          MR DANGEL:  Excuse me.  Yes, go ahead.
29          MR BECKMAN:  The record needs to reflect

45

*Gwen Malone Stenography Services Ltd.*

1  that the witness is looking at Mr Dangel and Mr Dangel

2  is either making sounds or gesticulating and I am not

3  sure how we can do that, but the record needs to reflect

4  that is happening.

5          MR DANGEL:  Here is what the record needs to

6  reflect.  The witness needs to know that he is not to

7  give communications, the substance of communications

8  between a client and a client's representative and

9  counsel.  So when the next question is asked that can be

10  answered yes or no, it would be much better if he

11  answered it yes or no, because then we don't get in the

12  substance of communications.  So, yes, I made a grimace

13  not in the direction of Mr Peterka, a general grimace

14  and I am grimacing still.

15          MR BECKMAN:

81  16  Q.  The question was: who did Mr Hoffmann represent

17  when he approached you on or about June 3rd?

18          MR DANGEL:  And I believe he said it was

19  implicit.

20          MR BECKMAN:  I am asking the --

21          MR DANGEL:  But that is not an answer to

22  your question.

23          MR BECKMAN:

82  24  Q.  The question is who?

25  A.  It was implicit from his communication that he

26  represents American investors who have 40% in Trend and

27  12% in Kotva without, it was not specified which actual

28  company's legal entities he represents.

83  29  Q.  Who did you enter into the oral contract with

46

*Gwen Malone Stenography Services Ltd.*

1   that you mentioned?

2       A.   It was a mutual understanding.  As far as I can

3   recall, and I do not recall very precisely, that the

4   other part of that oral agreement was KT Inc and that

5   was also implied when I signed the contract in writing

6   and also all the billing was done to KT.

84    7       Q.   Approximately when did you enter into the oral

8   contract.

9                MR DANGEL:   It has already asked and

10  answered.

11               MR BECKMAN:   Not the oral contract.

12               MR DANGEL:   Yes, he did.

13      A.   Around June 3rd.

14               MR BECKMAN:

85    15      Q.   June 3rd.  So on the day --

16      A.   When we started to provide legal services.

86    17      Q.   -- that Mr Hoffmann met with you, you entered

18  into an oral agreement?

19      A.   No, it was on the day when we had a conference

20  call with Mr Weiss, which I am not sure whether it was

21  on the 3rd, 4th or 5th.

87    22      Q.   Okay.  And I don't want to know what you

23  discussed in the conference call.  I want to know, based

24  on what you have just said, did you enter into an oral

25  agreement on June, 3rd, 4th or 5th of 2004?

26               MR DANGEL:   It is okay.

27      A.   I recall that, based on that conference call with

28  Mr Weiss, we began to provide legal services.  I don't

29  know precisely on what day it was, but it was after June

47

*Gwen Malone Stenography Services Ltd.*

1    3rd.

2                    MR BECKMAN:

88    3    Q.  And it was -- did you enter into an oral

4    agreement on the date of the conference call?

5                    MR DANGEL:  Objection.

6    A.  I certainly do not remember precisely.  I do not

7    remember precisely.  I do not consider it important

8    because later on we entered into a written contract.

9                    MR DANGEL:  Correct.

10                    MR BECKMAN:  Mr Dangel, you can't testify.

11                    MR DANGEL:  I am not testifying.  I am just

12    amazed by your questions.  Now please go ahead.

13                    MR BECKMAN:

89    14    Q.  Is it your testimony that you entered into an

15    oral contract with KT, your firm and KT?

16                    MR DANGEL:  Objection.

17    A.  I said already that I do not recall it precisely,

18    but my impression from that time is that it was KT

19    because all the billing was done to KT from the very

20    beginning.  This is what I recall but that is a long

21    time ago and what was important to me that there was

22    a written contract that followed, so I didn't worry

23    about it any more.  But I have said that, I can repeat

24    that fourth time if you want.

25                    MR BECKMAN:

90    26    Q.  Did Mr Hoffmann tell you that he represented

27    Gilroy when he first approached you?

28                    MR DANGEL:  That would be an instruction not

29    to answer.

48

*Gwen Malone Stenography Services Ltd.*

```
 1              MR BECKMAN:
 2      Q.  Did Mr Hoffmann tell you that he was asking you
 3  to represent him personally when he first approached you
 4  on or about June 3rd of 2004?
 5      A.  I cannot answer, that would be a violation of
 6  confidentiality.
 7      Q.  The attorney client privilege under the Czech
 8  Republic; is that what you are saying?
 9              MR DANGEL:  What he is saying is that --
10              MR BECKMAN:  I would like an answer from
11  Mr Peterka if this is a question of Czech law.
12              MR DANGEL:  Yes, it is a question of Czech
13  law.
14      A.  Yes, under Czech law.
15              MR BECKMAN:
16      Q.  When did you begin representing Gilroy?
17              MR DANGEL:  Could I ask that the question be
18  rephrased?  When did you start providing legal services
19  to Gilroy.
20              MR BECKMAN:  No.
21              MR DANGEL:  Okay.  Then I object to the form
22  of the question.  Please go ahead.
23      A.  I have already explained our legal services were
24  provided to KT Inc.  As regards Gilroy, we were
25  instructed or advised that it is a legal entity --
26  Gilroy is a legal entity which will be filing one of the
27  lawsuits.  But the communication about that lawsuit was
28  with KT.  So, the representation of Gilroy, it can be
29  said, started when a lawsuit was filed on behalf of
```

91

92

93

49

*Gwen Malone Stenography Services Ltd.*

1    Gilroy.  Precisely when that occurred I would have to

2    look into the file to get the date.  I believe it was

3    early July, but I do not know the date.

4               MR BECKMAN:

5       Q.  Is it your testimony that you did not represent

6    Gilroy before the filing of the Gilroy petition?

7               MR DANGEL:  Objection.  Objection.

8       A.  I have already answered.

9               MR BECKMAN:

10      Q.  When did you first begin representing Gilroy?

11              MR DANGEL:  That has been asked and

12   answered.

13      A.  I said it three times and I am going to answer

14   the same question?

15              MR BECKMAN:

16      Q.  When is the approximate date when you first began

17   representing Gilroy?

18      A.  I am not going to answer it a fourth time.  That

19   is the same question.

20      Q.  Why are you not answering the question as to when

21   you first began --

22              MR DANGEL:  Excuse me, but that is an

23   improper question and not only do I object --

24              MR BECKMAN:  I want to know if there is

25   a privilege issue.

26              MR DANGEL:  No, no, no.  He told you that he

27   began his representation upon the filing of the lawsuit

28   and he doesn't know the precise date.  He has a file he

29   could look to, but it was somewhere around July 3rd or

50

1   July 4th.  He said it.  He said it.  He said it.  Okay.

2   And he is not going to change his answer, I don't

3   believe, no matter how many times you ask the question.

4              MR BECKMAN:

98   5   Q.  Did you do any work for Gilroy before the filing

6   of Gilroy petition?

7              MR DANGEL:  It is the same question.

8   Objection.

9   A.  I have already answered that.  That is the same

10  question.

11             MR BECKMAN:

99   12  Q.  Who told you that Gilroy would be one of the

13  entities filing the lawsuit?

14             MR DANGEL:  Yikes.  I think the foundation

15  question is: did anybody inform you that Gilroy would be

16  filing a lawsuit?  Then the next question would be, if

17  the answer to that is yes, the next question would be:

18  did anyone other than your client inform you?  And

19  I think those questions he could answer but in the form

20  you have done it I think he has to take the attorney

21  client privilege.

22             MR BECKMAN:  He previously testified,

23  Mr Dangel, that he was told that Gilroy would be filing

24  one of the lawsuits.

25             MR DANGEL:  Okay.  Now we have to find out

26  was he told by somebody other than the client.  And then

27  we have to ask if the answer to that is yes, so he can

28  answer, then you would have to ask the question: who?

29  It has to be the right foundation to do it.  Other than

51

1    that, you fall squarely within the attorney client

2    privilege, unless you parcel it out.  Please.  Certainly

3    I am not trying to be difficult and I don't think

4    Mr Peterka is either, we are just asking that the right

5    form be followed.

6            MR BECKMAN:  Well the record will reflect

7    how this is unfolding.

100    8    Q.  Who were you talking to, who is representing KT

9    when you first began, when you had the conference call

10    -- let me withdraw.  I will ask a better question.  Who

11    was representing KT; Mr Weiss, Mr Nikitin?

12            MR DANGEL:  Object to the form, but please

13    answer.

14    A.  I can say generally what flows actually from our

15    written contract that was signed later and which

16    reflects our understanding of the mutual arrangement,

17    probably reflects the mutual understanding of the

18    arrangement that existed even prior to the signing.  And

19    according to that agreement, the instructions are to be

20    received from either Mr Weiss or Mr Hoffmann.  I believe

21    both of them are named, I would have to double check to

22    make sure 100%.

23            MR BECKMAN:

101    24    Q.  Who was on the conference call when you first

25    began the representation?  And I don't know what was

26    said, I just want to know who you talked to?

27    A.  Mr Weiss certainly, and I am not certain whether

28    there was also Mr Hoffmann.

102    29    Q.  Let's go back to the October 18th meeting,

52

*Gwen Malone Stenography Services Ltd.*

1    Mr Peterka.  Did you represent yourself as the attorney

2    representing Gilroy and Balfindor at the meeting?

3            MR DANGEL:  Okay, wait a minute.  He has

4    already asked and answered that.  He has already

5    indicated that he attended the meeting and had no

6    authority or mandate to negotiate for the entities, but

7    he was present as the person handling the lawsuits for

8    those.  He couldn't have been more precise, it seemed to

9    me, and I may have not been as precise as he was, but

10   that is more than asked and answered.

11           MR BECKMAN:  You are again coaching the

12   witness.

13           MR DANGEL:  I am not.

14           MR BECKMAN:

15   Q.  I will ask it this way: did you say at the

16   October 18th meeting that you were representing Gilroy

17   and Balfindor?

18   A.  I believe I stated at that meeting that

19   I represent those companies that filed lawsuits and I do

20   not recall which were those companies that had pending

21   lawsuits or lawsuits filed and pending at that time.  It

22   is likely that I said that on behalf of Gilroy.  As

23   regards the other company you mentioned, I cannot answer

24   that because of the privilege.

25   Q.  I just want the record to be clear.  I just need,

26   so the court reporter has this, and if you are going to

27   answer no I understand.  Did you say at the October 18th

28   meeting that you were the attorney representing

29   Balfindor in the lawsuit that was filed by Balfindor, or

53

*Gwen Malone Stenography Services Ltd.*

1    words to that effect?

2      A.  Again I have to repeat that regarding this entity

3    that you mentioned, I cannot say anything because of the

4    privilege.

5      Q.  And when you say "privilege", just so the record

6    is clear, if you are going to assert the privilege based

7    on the Czech privilege, could you please say so?

8      A.  Every and all privilege I have or the

9    confidentiality obligation is under the Czech law,

10    generally speaking.  Even there where the -- the US law

11    would interfere only to the extent that some of those

12    entities, some of the entities lifted, waived the

13    privilege only to the extent that is defined by American

14    law.  But that is still all under the Czech concept

15    according to the Czech law of confidentiality

16    obligations.

17            MR BECKMAN:

18      Q.  I understand because we have a court reporter

19    here and we are going to have a record of it.  Mr Dangel

20    is zealously protecting and understands, as I understand

21    from the waiver that I have just received this morning,

22    you don't understand US privilege issues and

23    I completely understand that.  Mr Dangel will be

24    asserting the American privilege.  If you are concerned

25    that it will, that you cannot answer privilege and you

26    are asserting the Czech privilege, I need to you say:

27    I can't answer that based on the Czech privilege.

28            MR DANGEL:  Well.

29            MR BECKMAN:  Because you are going to

54

*Gwen Malone Stenography Services Ltd.*

1    instruct him not to answer and we are not going to know
2    whether it is Czech privilege or American privilege.
3            MR DANGEL:  You didn't hear me raise
4    a privilege objection, so obviously he is raising it
5    under the Czech privilege.  And obviously, since you
6    mentioned Balfindor and obviously since there is no
7    waiver in this court room or anywhere that I know as of
8    Balfindor, he was protecting himself as a Czech lawyer,
9    and as a Czech lawyer he is not even allowed to whisper
10   anything that he did on behalf of Balfindor.  So it is
11   more than obvious, and I say this politely, that I can
12   consider it a waste of time.  But Mr Peterka, to the
13   extent that you can remember when you assert a privilege
14   of Czech law, to say: this is under Czech law, and help
15   Mr Beckman's efforts to build a record here on that,
16   please do so.  Okay.
17       A.  Okay.
18           MR BECKMAN:
107  19       Q.  Are you aware that the Czech police recorded the
20   October 18th meeting?
21       A.  Can you repeat that?
108  22       Q.  Are you aware that the Czech police recorded the
23   October 18th meeting?
24           MR DANGEL:  Objection.  You can answer.
25       A.  I did want, I wanted to say with my previous
26   answer and I forgot, I did learn about it.  I did learn
27   about it from the media, and the press stated that all
28   these meetings and negotiations were intercepted by the
29   police and supervised by the police.  This is how

55

1    I learned it.  But when I took part in that meeting, it

2    wouldn't have occurred to me at all, and I have had

3    never had had previous experience of that nature in my

4    professional practice, that anyone -- not the police,

5    I am not speaking about the police -- in my law office

6    would record a business meeting where two parties

7    negotiate a business deal.  That is it.  I have already

8    said that.

9            MR BECKMAN:

10       Q.  You mentioned the Gilroy lawsuit and the Gilroy

11    lawsuit was filed approximately in early July 2004;

12    correct?

13       A.  Yes, I did.

14       Q.  What was the relief requested in the Gilroy

15    lawsuit?

16       A.  I am glad to hear that question because that is

17    the first time we are speaking about the actual merits

18    of the matter.  But that will require a detailed

19    explanation.  That lawsuit was one of many measures and

20    legal steps.

21       Q.  I am talking about the Gilroy lawsuit and your

22    answer though.  I asked for the relief requested in the

23    Gilroy lawsuit, let's talk about the Gilroy lawsuit.

24       A.  May I finish the answer, please?  It was one of

25    many measures and legal steps that we took and we

26    continued to do to protect the American investment in

27    the Czech Republic in this particular case.  And

28    I understand that it is your objective to --

29       Q.  I have no objective, I just want to know what you

56

1    requested?

2              MR DANGEL:  Excuse me, but please do not

3    interrupt him again.  He will give his answer and you

4    can ask follow up questions.  Please do not do that.

5    Please continue with your answer, sir.

6              MGR PESLOVA:  I just would like to ask the

7    witness to answer the questions and go to the point of

8    the question.

9       A.  Anyway he was saying that the objective to chop

10   up the whole case into these partial cases or partial

11   litigations which will not appear, will not be

12   understood by anyone in this manner in the US.  We

13   cannot separate here what we were seeking through this

14   lawsuit from other steps that were taken.  So let me

15   briefly describe those steps we took and what were the

16   objectives of those steps.

17             MR BECKMAN:  Your Honour, if I may, I think

18   you have raised a very good point.  I was simply asking

19   what the relief requested in the Gilroy was and if you

20   could ask the witness --

21             MR DANGEL:  Excuse me, but the Judge has no

22   authority to do that.  I am sorry, but under American

23   law the witness is given the opportunity to give his

24   answer.  Mr Beckman can move to strike if he wants to

25   protect the record and he can break down the answer into

26   multiple questions.  But there is no basis for asking

27   a Judge to intervene in an American deposition to do

28   what you just asked.  So I am sorry, but I have to say

29   with the greatest respect that the Court does not have

                        57


                *Gwen Malone Stenography Services Ltd.*

1    the authority to instruct the witness on that.

2                MGR PESLOVA:  To what extent, according to

3    the US law, is the witness obliged to stick to the

4    question or to what extent he or she may talk about it?

5                MR DANGEL:  In court the witness is obliged,

6    in a deposition a witness is not obliged.

7                MR BECKMAN:  I absolutely disagree.  And we

8    will be here for three weeks if we let the witness give

9    long speeches when I simply ask what the relief was

10   requested in a Czech lawsuit.

11               MR DANGEL:  But you need to understand the

12   difference between court and deposition.  In

13   a deposition there is no protection for a witness.  We

14   would need to adjourn this proceeding and call the

15   American Judge to discuss this.  And so therefore what

16   happens is the deposition proceeds as it proceeds and

17   the Judge rules afterwards on whether or not the

18   question is responsive.  The witness needs to protect

19   himself from unfair questioning unless you are going to

20   start to say and we are going to argue every point as to

21   whether that was an unfair question.  But my objections

22   are only supposed to be as matters of form.  And,

23   therefore, unless we are going to change the rules,

24   change the Federal Rules, you have to let this proceed

25   as it is proceeding.

26               MGR PESLOVA:  So should I as the Court go

27   and try to establish what the rules are because there

28   doesn't seem to be agreement between the two of you, or

29   are you going to find an agreement on the procedure?

                          58

         *Gwen Malone Stenography Services Ltd.*

1          MR DANGEL:  We are not going to find an

2     agreement if he says this witness is not free to answer

3     the questions as he pleases.  But let me say, the rules

4     concerning admissibility of testimony are not the same

5     in a deposition as in the actual court proceeding.  And

6     the witness is allowed to defend himself as he sees fit.

7          MGR PESLOVA:  Mr Beckman, do you agree with

8     that or do I have to adjourn and seek advice on that

9     aspect?

10          MR BECKMAN:  Perhaps my Czech counsel can

11     say something.

12     (There then followed a conversation between Mr Malis and

13     the Judge in Czech which was not translated)

14          MR DANGEL:  I need a translation as he is

15     talking.  What was that?  What did he say?

16          THE COURT REPORTER:  Sorry, I can't get that

17     for the record, if you want it on the record.

18          THE INTERPRETER:  I am happy to translate

19     that.

20          MR DANGEL:  Just show me the article, but

21     please do translate it so it is on the record that this

22     lawyer said a certain thing.  Please translate it.

23          THE INTERPRETER:  It is referred to Article

24     9.

25          MR DANGEL:  Yes, but this is not as to

26     method or procedure.  This is to the substance.  It is

27     to substance.  The question is when he answers it is to

28     the substance.  We went through this yesterday and the

29     Judge ruled that he could tell me, for instance, to sit

59

1   down or stand up, or what language to speak in even, but

2   he can't do the questions and answers.  That is an

3   incredibly stupid interpretation.  Frankly, that is

4   unbelievably stupid.

5          THE INTERPRETER:  Mr Dangel, the Judge says

6   that in this regard we proceed in keeping with the Czech

7   law and it is up to the Judge to allow to proceed under

8   US law, if that is not in contradiction or in conflict

9   with Czech law.  That is why the Court, the Judge is

10  trying to establish what is the US procedure in that

11  regard.

12         MR DANGEL:  Okay.  The US procedure is the

13  question is asked, the witness gives whatever answer he

14  gives, without interruption.  Okay.  All objections

15  except as to form, and all motions to strike an answer

16  for any reason, including whether the answer was

17  responsive, are reserved until the time of trial

18  pursuant to Rule 30 of the Federal Rules of procedure of

19  the United States.  There can be no interpretation which

20  would permit a lawyer to interrupt an answer or refuse

21  to allow a witness to answer, because expressly all

22  objections and all motions to strike are reserved to the

23  time of trial.  They are not to be made during

24  a deposition.  There is simply no question about that.

25         MGR PESLOVA:  Is that correct, Mr Beckman,

26  or do you want the Court to establish for my own need

27  what is the US procedure?

28         MR BECKMAN:  He is correctly stating what

29  the law is.  You don't need to get involved.  What I am

60

*Gwen Malone Stenography Services Ltd.*

1  suggesting is this, as yesterday's deposition and the
2  day before was done, and the Court took a role in terms
3  of proceedings.  It would be a very long deposition if
4  the witness does not answer the question that is asked.
5  I will try this again and I will try not to have to
6  involve your Honour.
7          MR DANGEL:  In other words, he is admitting
8  I was right.
9          MR BECKMAN:  I am not admitting anything,
10  Mr Dangel.  What I am suggesting is, as you know, there
11  are practicalities we are dealing with here.  You said
12  you not -- don't interrupt Mr Dangel, I am talking.
13          MGR PESLOVA:  Can we proceed, please?
14          MR DANGEL:  I agree that there are
15  practicalities.  I want the witness to keep the answers
16  short.
17          MGR PESLOVA:  Mr Dangel, please we go on,
18  okay.
19    A.  I think we have already wasted three hours on non
20  essential things.  This is now coming to the point.  So,
21  I don't understand why the most principal question that
22  there is in this issue, there should be a discussion
23  whether I am given one or two or three minutes.
24          MR BECKMAN:
25    Q.  Let's make the record clear.  The question is,
26  because there was a long interruption, what was the
27  relief requested in the lawsuit filed by Gilroy in June
28  of 2004?
29          MR DANGEL:  And he was in the process.  Just

113

                              61


                Gwen Malone Stenography Services Ltd.

1   leave it that way.  Go ahead.

2      A.   There have been several legal steps taken in

3   order to protect the American investment.  The first

4   area of measures or steps concerned the question who are

5   shareholders of the Kotva company.  In our opinion,

6   Forminster unlawfully hold 56% of shares in Kotva

7   because this is an asset that was through illegal

8   transactions or unlawful transactions diverted from the

9   Trend Investment Fund.  So, the first series of steps

10  aims to confirm that the lawful owner of at least 32% of

11  the shares in Kotva is the Trend Investment Fund and, at

12  the same time, to confirm that Forminster is not

13  a shareholder at all.

14        The second series of steps it would not make any

15  sense to return shares of Kotva into the Trend Fund if

16  in the meantime Kotva company, if in the mean time Kotva

17  company would be tunneled.  Because then the first

18  series of steps or the first steps would not make any

19  sense.  This brings me in this context to the lawsuit

20  filed on behalf of Gilroy.  From public sources we

21  established in June 2004 that the only substantial

22  material asset of Kotva was diverted, and continues to

23  be diverted, from Kotva through a series or a number or

24  a complex net of subsidiaries, was diverted to another

25  entity that was three tiers away from Kotva.

26        There was no rational financial business

27  explanation for these transactions other than the point

28  here is too, for the management of Kotva, for the

29  management of Kotva to be able to dispose of or to be

62

1    able to handle, dispose of the department store without

2    having the obligation to ask the general meeting whether

3    such transactions may be done.

4         At the same time, we learned from the media that

5    a sale of the department store Kotva is being negotiated

6    but the management of Kotva kept denying this

7    information at general meetings.  In particular, at

8    a general meeting that was held towards the end of June

9    2004 the only thing the management was admitting to was

10   an investment by a financial investor -- joining, an

11   entry of a financial investor into the Kotva group, but

12   not the sale, they were not admitting to the sale.

13        At the same time it needs to be said that

14   Forminster was forbidden, based on an order by the

15   Prosecutor, to dispose of these shares in Kotva in any

16   manner whatsoever.  The reason for this order or measure

17   by the prosecutor was to prevent for the loss, was to

18   prevent a loss, was to prevent the loss of assets which

19   were diverted from the Trend Fund.  According to our

20   opinion, it was obvious from these facts that the

21   tangled structure of subsidiaries that were established

22   by Kotva has the objective to enable the management of

23   Kotva, the management that was planted there by

24   Forminster or appointed by Forminster, to separate the

25   assets of the department store from those shares, from

26   those shares of which they didn't, they couldn't dispose

27   of otherwise.

28        So, in our opinion, those transfers of assets

29   within the Kotva group, from Kotva down to the third

63

*Gwen Malone Stenography Services Ltd.*

1   tier subsidiary were done to avoid or circumvent the

2   purpose of the Prosecutor's order whereby Forminster was

3   prohibited from, prohibited from disposing of the Kotva

4   shares.  So one of the principal arguments in that

5   lawsuit --

6              MR BECKMAN:

7      Q.  The Gilroy lawsuit?

8      A.  Gilroy.

9      Q.  Okay.  That is the question of relief requested.

10     A.  No.  I am not asking about what we were asking

11  the kind of relief, I am talking about the argument we

12  are making.

13     Q.  I know.  The question is what was the relief.

14             MR DANGEL:  Hold on.

15     A.  I will come to that.

16             MR DANGEL:  If his answer is leading to the

17  answer as to what the relief is, he has a right to give

18  the explanation of what the relief was, that is all.

19             MGR PESLOVA:  I just want to remind you and

20  the witness that if the witness should speak about

21  things that are unrelated to the questions or are

22  totally about something different, then he will be

23  proceeding, then he will be in violation of the Czech

24  law and with this protraction we are going to be here

25  for three more days.  The witness is here and I am

26  reminding him to the speak about the facts and

27  circumstances that he learnt and not to give legal

28  analysis.

29             MR DANGEL:  Here is the problem, here is the

64

1   problem.  Under American law, the Judge decides the

2   matters as to whether the answer is responsive or not,

3   not with blinders on but with broad discretion of the

4   purpose.  For the Court to interfere with that here is

5   to interfere with the authority and the discretion of

6   America's Federal judicial system.  I would beg the

7   Judge not to interfere with that.

8            MGR PESLOVA:  I understand that.

9   Nonetheless I still would like to ask the witness to

10  speak to the point and answer the questions that he was

11  asked and not to raise any objections.  That is not his

12  right.

13           MR DANGEL:  And me too.  And I would like to

14  tell the witness that I'm allowed to ask questions after

15  Mr Beckman has finished, and if there are other points

16  I can bring them out.  Me too.  But I am not going to

17  interrupt a witness in the middle of an answer.  So, let

18  me ask this.

19           Mr Peterka, having given this general

20  background, can you explain, please, what the specific

21  relief was in this particular case?

22      A.   This particular lawsuit seeks that these

23  transfers that are done, that were done within the

24  group, that these transfers be called null and void and

25  that it seeks a confirmation that the real estate is

26  still in the ownership of the Kotva company.

27           MR DANGEL:  So was it anything more than

28  that?

29           MR BECKMAN:  It is my deposition.

65

*Gwen Malone Stenography Services Ltd.*

1          MR DANGEL:  So ask him was it declaratory
2     relief.  Please go ahead.  Mr Beckman, go ahead.
3          MR BECKMAN:
4     Q.  I am sorry, did you want to say something?
5     A.  I have not finished.  That ruling if made by the
6     court, would only in a declaratory manner, confirm
7     a status quo, confirm a condition, a status quo, a sort
8     of condition.  So there would not be, no change in legal
9     relations could be a result of this litigation, it would
10    be just a confirmation of the existing situation, of the
11    original situation as at a certain date.  That ruling
12    would be a court declaration that these transfers that
13    were done with the objective to circumvent the order by
14    the prosecutor are invalid.
15    Q.  Are you finished with your answer?
16    A.  Yes.
17    Q.  I want to record to reflect that that answer took
18    almost 20 minutes to that one question.
19         MR DANGEL:  I would like the record to
20    reflect that by giving that long answer he has given
21    a tremendous background and understanding as to what
22    relief was that a jury could actually understand and
23    I credit him for that.  But please let's not fence,
24    let's just ask questions.
25         MR BECKMAN:
26    Q.  Let's go back to the October 18th meeting,
27    Mr Peterka.  Did you tell Richard Harazim or Martin
28    Benda that you wanted the Kotva department store
29    transfer to be declared null and void and that the

66

*Gwen Malone Stenography Services Ltd.*

1    department should be returned to Kotva AS?

2              MR DANGEL:  I would like to state an

3    objection.

4              MR BECKMAN:  To the form?

5              MR DANGEL:  To the form of that question.

6              MR BECKMAN:  Don't lead the witness,

7    Mr Dangel, that is all you can say.

8              MR DANGEL:  Believe me, he is a lot smarter

9    than I am but I really think you are wasting time by

10   asking a question like that.  But anyway, go ahead and

11   answer.

12             MR BECKMAN:  I am wasting time now.

13             MR DANGEL:  You are.

14             MR BECKMAN:  That is interesting.

15        A.  I did already say what I remember from that

16   meeting.

17        Q.  Yes or no?

18        A.  Since it is two and a half years ago I do not

19   recall every detail of that conversation, and I do not

20   recall us going into details of those lawsuits.

21   What I recall is that Mr Benda kept repeating that

22   shares can be only purchased by Kotva and I didn't

23   understand that statement and found it odd.

24        Q.  Let's focus on what you said at the meeting of

25   October 18th, Mr Peterka.  Did you tell Richard Harazim

26   or Martin Benda that the transfers of the department

27   store were done, as described in the Gilroy lawsuit,

28   were done to circumvent the Prosecutor's order freezing

29   the assets?  Yes or no, did you tell them that?

67

*Gwen Malone Stenography Services Ltd.*

```
         1              MR DANGEL:  Objection.
         2              MR BECKMAN:
123      3      Q.  It is a yes or no question.
         4      A.  I have already answered so I will repeat.  As
         5  I recall the purpose of the meeting was not --
124      6      Q.  The question is what you said, Mr Peterka?
         7      A.  -- to discuss the content of the lawsuits, and
         8  I do not recall that I would be giving an explanation of
         9  the contents of these lawsuits and I do not recall
        10  I would have been asked to do so by anyone.
125     11      Q.  Did you discuss the Gilroy lawsuit in any respect
        12  at the October 18th meeting?
        13              MR DANGEL:  Objection.  In a slightly
        14  different form he has already answered.  It seems that
        15  you are berating him on this, but please answer as best
        16  you can and briefly, please.
        17              MR BECKMAN:
126     18      Q.  Yes or no, did you discuss the Gilroy lawsuit?
        19              MR DANGEL:  No, briefly.  It can be yes, no,
        20  or I don't remember, right, Mr Beckman.
        21              MR BECKMAN:  Of course.
        22              MR DANGEL:  Then don't instruct him it has
        23  to be yes or no.
        24      A.  I have an impression that Mr Benda or Mr Harazim
        25  asked me whether if they agree on a sale of shares
        26  whether in that case the lawsuits would be withdrawn.
        27  To which I replied that this was not my decision, that
        28  it was the client's decision and it depended on the
        29  transaction and all the aspects of the transaction and
```

68

1   that simply, and I think that is all we said about those
2   lawsuits.
3              MR BECKMAN:
4       Q.  At the meeting of October 18th did you understand
5   that Martin Benda was a representative of Kotva?
6              MR DANGEL:  That has already been asked and
7   answered.
8              MR BECKMAN:  I just need an answer to that
9   question.
10             MR DANGEL:  Objection, objection.
11      A.  I did answer that and I will answer it again.
12  For me Mr Benda was not a representative of Kotva but
13  simply one person of a group of people who control
14  Forminster and Kotva and who are interested in buying
15  a block of shares of 12% from our client.  It was not
16  said specifically which legal entity would be the buyer,
17  and from our knowledge of the case there were dozens of
18  companies that were used by these people.  So it was
19  not, the issue was not which specific company, but the
20  issue was whether they can reach an agreement with our
21  client on the purchase of the shares and for what price.
22  At that meeting my understanding was that they want to
23  buy the shares, that it was their interest to buy the
24  shares, that is what they want.  But again I did not
25  understand why they keep telling us that it has to be
26  Kotva only or exclusively.  Because Mr Hoffmann stressed
27  to them that from the point of view of the seller this
28  makes no difference who is the buyer, aside from
29  technical terms that need to be respected.

69

*Gwen Malone Stenography Services Ltd.*

128     1    Q.  Mr Peterka, I am going to again caution you, just

2    to keep this moving, to listen to the question and only

3    answer the question that is asked.

4         MR DANGEL:  Gee, that couldn't have been

5    more responsive.  You just are looking for, you are not

6    looking to say that because a man speaks into a wire

7    with microphone on, I am here for Kotva, I am here for

8    Kotva, or only Kotva can buy, that that is who he really

9    represents.  He is allowed to be more sophisticated than

10    that, sir.  Now come on, just ask your questions.  If

11    you don't like the answers, just ask another question.

12         MR BECKMAN:

129    13    Q.  At the meeting of October 18th did you understand

14    that Richard Harazim was a representative of Kotva?

15         MR DANGEL:  Objection.

16    A.  The answer would be identical and analogical to

17    that one concerning Mr Benda.  The only difference was

18    that Mr Harazim did not repeat that so many times as

19    Mr Benda, the fact that Kotva has to be the buyer.

20         MR BECKMAN:

130    21    Q.  Did you or Mr Hoffmann represent BGO at the

22    October 18th meeting?

23         MR DANGEL:  Objection, it is compound.

24         MR BECKMAN:  Okay.

131    25    Q.  Did you represent BGO at the meeting on October

26    18th?

27    A.  I have already said three times I only

28    represented those companies that filed lawsuits at that

29    meeting, this was how my mandate was strictly defined

70

*Gwen Malone Stenography Services Ltd.*

1   and limited.

132  2      Q.   Is that mandate in writing?

3      A.   No.

133  4      Q.   Did Mr Hoffmann represent BGO at the October 18th

5   meeting?

6            MR DANGEL:   I can't conceive of why you

7   can't answer that.   In other words, you don't have to

8   say who you represented you just have to answer the

9   specific question.   You don't have to go into a long

10  answer.   Okay.   But I am not going to raise the attorney

11  client privilege.

12     A.   My understanding of that was that Mr Hoffmann was

13  representing and I am not sure which entity precisely or

14  exactly, but he was representing or his role was to

15  facilitate the negotiations of the sale of the shares.

16           MR BECKMAN:

134  17     Q.   Did Mr Hoffmann say at the October 18th meeting

18  that he represented BGO; yes, no or I don't recall?

19     A.   I don't recall.   It is likely but I don't recall.

20  For me my understanding of what was important to me was

21  that Mr Hoffmann was responsible for negotiating the

22  deal of the sale of the shares.

23           MR BECKMAN:   I hate to ask, can you read

24  that last part back?   I missed it.

25  **(Previous answer read back by the Court Reporter)**

135  26     Q.   Did Richard Harazim or Martin Benda say at the

27  October 18th meeting that they were willing to purchase

28  BGO's Kotva shares for 131 million Czech Crowns?

29           MR DANGEL:   Objection.

71

*Gwen Malone Stenography Services Ltd.*

1    A.   I do not remember this, in this matter.  I said

2  earlier my impression is that there were no talks about

3  price, that there was no agreement, the decision on,

4  that there was no agreement, that there was no agreement

5  or clarity about the price or about the object of the

6  transaction.

7              MR BECKMAN:

8    Q.   I understand there was no agreement.  My question

9  is: did Mr Harazim or Mr Benda say that Kotva was

10  willing to purchase BGO's shares for 131 million Czech

11  Crowns?

12              MR DANGEL:  Objection.  Objection.

13    A.   That amount, I do not recall if they said that

14  amount, but I recall they said that it has to be Kotva

15  making the purchase.  But amounts were not what I was

16  concerned with because that was not my responsibility.

17              MR BECKMAN:

18    Q.   You were at the meeting, we have established

19  that.  Did Richard or Martin say that Kotva was willing

20  to purchase BGO's share for 131 million Czech Crowns --

21              MR DANGEL:  Objection.

22              MR BECKMAN:   -- if lawsuits were withdrawn?

23              MR DANGEL:  Objection.  I believe that has

24  been...

25    A.   I did answer that and I will repeat it again.

26  They were asking whether these lawsuits could be

27  withdrawn.

28

29

72

*Gwen Malone Stenography Services Ltd.*

1          MR BECKMAN:

138   2      Q.   What particular lawsuits do you recall were filed

3      as of October 18, 2004?

4      A.   To be 100% sure I would have to consult my files.

5      Certainly there was the lawsuit on behalf of Gilroy

6      regarding real estate.  And if there were any other

7      lawsuits filed at that time then I cannot speak about

8      them because of the privilege based on Czech law.  If

9      there were -- the other ones that I recall are under the

10     privilege, there may still be some other ones that I do

11     not recall.

12         MR DANGEL:  No, no.  If KT had been filed

13     that certainly is not under the privilege.  Do you have

14     a list of lawsuits that were done?

15         MR BECKMAN:  Let's just keep going.  Let's

16     just keep going.

17         MR DANGEL:  Wait a minute, hold on a minute,

18     I don't want to prevent or, I don't want to come back

19     a second time because of -- is there something in

20     English?  Okay, sorry.  Joel, perhaps could you refer to

21     specific lawsuits.  I don't know the dates of lawsuits

22     so I am somewhat at sea here.  Hang on, I may have one.

23     But go ahead and move on if you want but if you want to

24     come back to that.

25         MR BECKMAN:

139   26     Q.   Was the Balfindor lawsuit filed before October

27     18th 2004?

28     A.   I cannot answer, privileged, under Czech

29     privilege.

73

*Gwen Malone Stenography Services Ltd.*

140

1       Q.  Did Richard Harazim or Martin Benda tell you they

2   were willing to purchase BGO's Kotva shares for 131

3   Czech Crowns if the Gilroy and Balfindor lawsuits were

4   withdrawn?

5               MR DANGEL:  Excuse me, Joel.  Well that is

6   an obvious ploy to get a privilege raised when no

7   privilege is really needed by throwing the name

8   Balfindor in.  He has already indicated that -- he has

9   already spoken in great detail about this.  It has been

10  asked and answered a number of times.  And I must ask

11  you, please, don't try to play privilege games here,

12  that is just not productive.

13              MR BECKMAN:

141

14      Q.  Are you unable to answer the question?

15              MR DANGEL:  He is unable to answer it under

16  Czech law because you mentioned the word Balfindor.  We

17  all know that.

18      A.  Either the question was already answered as part

19  of my previous answers or I cannot answer it because of

20  the Czech privilege.

21              MR BECKMAN:

142

22      Q.  Did Richard Harazim or Martin Benda say that

23  Kotva was willing to purchase BGO's Kotva shares for 131

24  million Czech Crowns if the Gilroy lawsuit was

25  withdrawn?

26      A.  I have already addressed that four times.  It is

27  still the same question.

28              MR DANGEL:  He has already said he doesn't

29  remember an amount because he was not focussed on that.

74

1    He has already said --

2             MR BECKMAN:  Please, please, please, you

3    cannot.

4             MR DANGEL:  You can.

5             MR BECKMAN:  You are mischaracterizing him.

6    If you have an objection.  If it is asked and answered,

7    please stop.  Now you are mischaracterizing his

8    testimony.

9             MR DANGEL:  Okay.  Asked and answered

10   several times, so object on that basis.  Please answer

11   even though it has been objected to.

12            MGR PESLOVA:  Take a break for lunch.

13            MR DANGEL:  Do you want to go for a few more

14   minutes, Joel, or do you want to go now?

15            MR BECKMAN:  It is up to the Judge.

16            THE INTERPRETER:  Half an hour is okay to

17   her.

18            MR BECKMAN:  Okay.

19            MR DANGEL:  Half an hour.

20            **(Off the record - 1.02 pm)**

21            **(Lunch adjournment)**

22            **(On the record - 1.46 pm)**

23            THE INTERPRETER:  We will begin the Judge

24   says.  But before you do so.

25            Now what I have just said for your

26   understanding and for the record.  I was not, I was

27   hired by Mr Beckman and his client to do informative

28   interpreting for the Judge, which is something I can do

29   just being by myself here.  But normally it is two

75

*Gwen Malone Stenography Services Ltd.*

1    people who take turns interpreting if it is for the

2    record, if it is a very technical and difficult legal

3    subject, like this one.  So, I cannot continue working

4    like this, just being here by myself, or I can continue

5    for a limited period of time and either there will be

6    a need to bring in a different interpreter or, I don't

7    know, maybe the gentleman will speak English.  But, in

8    any case, I can only go a maximum of seven and a half

9    hours, which will be about 4.30 or so.  And I wanted to

10   state it for the record.

11          MR DANGEL:  Well the problem is that I have

12   some questions to ask and I need an opportunity to do

13   that.

14          THE INTERPRETER:  So let's continue today,

15   the Judge proposes, based on what I have indicated and

16   what you have responded and we will go until 4.30 and

17   then if there is still time, more time needed there will

18   be, there will have to be somebody called in tomorrow to

19   interpret.

20          MR DANGEL:  Can we make that, can we do that

21   today to make sure there is an interpreter tomorrow?

22          MR BECKMAN:  Mr Dangel, you said earlier

23   that you couldn't do tomorrow and I can't do tomorrow.

24          MR DANGEL:  I can do in the morning.

25          MR BECKMAN:  I cannot.

26          MR DANGEL:  But you have to give me some

27   opportunity to ask questions.  I have to have some

28   opportunity.  I mean I can ask my questions right now

29   and be done in a half hour.

76

*Gwen Malone Stenography Services Ltd.*

1          MR BECKMAN:  I will do my best, Mr Dangel,
2   but I am saying --
3          MR DANGEL:  That is not fair.
4          MR BECKMAN:  Well you can raise it with
5   Judge Young, but I can't do this tomorrow.
6          MR DANGEL:  No, no, wait a minute.  Can we
7   agree that at a quarter to four I will be given a half
8   hour opportunity?
9          MR BECKMAN:  That is, that is actually
10  a substantive issue, a procedural issue that is dealt
11  with by the court.  Under the rules I am entitled to a
12  seven hour examination.
13         MR DANGEL:  But there is nothing --
14         MR BECKMAN:  You can't interrupt, Mr Dangel,
15  because the court reporter has to take us both down and
16  I'd really appreciate if you let me finish what I was
17  going to say.  Under the rule we noticed this deposition
18  and we are entitled to take this deposition for seven
19  hours.  I am trying to move this along as fast as
20  possible.
21         MR DANGEL:  Now wait a minute.  Under the
22  rules I have the right, if I attend, to ask also seven
23  hours of questions.
24         MR BECKMAN:  Yes, you do.
25         MR DANGEL:  I have that right as well and
26  I am saying I can ask my questions in a half hour.  So
27  I am asking for an accommodation.  There is no rule that
28  says he gets seven hours without any interruption.  The
29  court can decide to break it up however the court wants.

77

*Gwen Malone Stenography Services Ltd.*

1          MR BECKMAN:  Okay, Mr Dangel, this is what
2    I propose to do.
3          MR DANGEL:  Okay, let's go.
4          MR BECKMAN:  I don't think we are going to
5    be able to continue tomorrow.  What I will do, is go as
6    long as I can until a quarter to four and I will let
7    Mr Dangel then ask his questions.
8          MR DANGEL:  Thank you.
9          MGR PESLOVA:  I need to ask Mr Dangel to
10   just say objection, if there is an objection or to say
11   yes or no regarding privilege to the client, but to
12   otherwise refrain from any other interventions.
13         MR DANGEL:  Sure.
14         MR BECKMAN:  There is only one other issue
15   that I think that we need to state for the record.  Yes,
16   we did notice this deposition and Mr Peterka, for the
17   record, is advising Mr Weiss with respect to the Czech
18   lawsuits as well as the Czech criminal charges.  He was
19   going to participate by telephone in a deposition or
20   listen in on a deposition last year.  In other words,
21   this witness is actually under the control of Mr Weiss
22   and if we are going to have to go back another, for
23   another session I would ask that the Defendants have
24   Mr Peterka flown to the United States to finish this
25   deposition.
26         MR DANGEL:  Let's see --
27         MR BECKMAN:  Can I just -- let me please
28   finish, let me please finish.  The delay -- seven hours
29   should have been more than enough even to give adequate

78

*Gwen Malone Stenography Services Ltd.*

1    cross-examination for Mr Dangel.  And we, we imposed
2    upon the court to have this deposition here today.  The
3    problem that I see in going forward is it's, it's,
4    because of the interpreter issue that we were not given
5    any notice of whatsoever, that has slowed things down.
6    We, with respect to other depositions that needed
7    a translator it was raised well in advance and there
8    were things that were done and a translator, an
9    interpreter was provided.  This was sprung on us.
10   I think also the way the witness is answering questions
11   is very much delaying this process.  So again I would
12   ask for the Defendants to consider flying Mr Peterka to
13   complete this deposition.  If you agree to that, I will
14   be happy to give you a half an hour of time.
15            MR DANGEL:  I would agree that if we do not
16   finish the deposition that the remainder of your time,
17   if you need it, could be used by a telephone deposition
18   in which the Defendant would pay for the telephone call.
19   But I don't know about the interpreter, how you would
20   handle the interpreter.  But we can talk about that
21   another time.  Let's see how we go.
22            MR BECKMAN:  So you are agreeing to
23   a telephone deposition?
24            MR DANGEL:  I'm agreeing that if I have to,
25   if I ask my questions today and you can't finish as
26   a result of that, and I start a quarter to four and you
27   can't finish, that you could do the rest by telephone.
28   I would agree to that.
29            MR BECKMAN:  Well I am going to, I am going

79

*Gwen Malone Stenography Services Ltd.*

1    to get --

2                MR DANGEL:  Come on, Joel.

3                MR BECKMAN:  Let me just finish this.  I am

4    going to give you your time, but I am going to ask that

5    the Defendants fly Mr Peterka to Boston.

6                MR DANGEL:  No, no.  Telephone.

7                MR BECKMAN:  I can ask, I am asking them to

8    do it and I am going to raise it with the court in the

9    United States because of the interpreter issue and

10   because of the way in which Mr Peterka is answering

11   questions.  So we'll get started.

12               MR DANGEL:  Can I say something, Joel?  We

13   are going to have to come back here anyway or do things

14   in the United States, because the Judge has reopened

15   discovery and I am going to have to have Mr Benda and

16   Mr Harazim on the new issues.

17               MR BECKMAN:  You agree to take those

18   depositions in the Czech Republic?

19               MR DANGEL:  We can -- I agree to discuss it

20   with you.  I like being in Prague, put it that way.

21               MR BECKMAN:  We are ready to begin.

22   I apologise for that.

23               MR DANGEL:  But not having it in front of

24   a court again.  Anyway, go ahead.

25               MR BECKMAN:

143   26    Q.   Was Gilroy one of the entities that was covered

27   under the contract between your law firm and KT?

28    A.   Yes.

144   29    Q.   Now I will represent to you, Mr Peterka, just to

80

*Gwen Malone Stenography Services Ltd.*

1    move this along, that the Gilroy lawsuit was filed on

2    June 30th of 2004. As of June 30th, 2004, who did you

3    receive your instructions from on behalf of Gilroy?

4        A.  As of, right. As of?

145  5        Q.  So there is no problem with the translation.

6    Starting from January, June 30th, 2004 going forward?

7        A.  I don't know for a fact when the suit was filed,

8    but it was Mr Weiss and Mr Hoffmann who instructed me.

146  9        Q.  Who controlled Gilroy?

10               MR DANGEL:  I think that is covered by

11   the attorney client privilege.

12               MR BECKMAN:  You are instructing him not to

13   answer.

14               MR DANGEL:  Well unless it is a matter of

15   public record. If it is a matter of public record he

16   should answer. If it is not a matter of public record

17   he should not answer, so I don't know.

18       A.  Privileged.

19               MR BECKMAN:

147  20       Q.  Okay. Do you know who controlled Gilroy?

21   I don't want you to disclose, but do you know who did

22   control Gilroy?

23               MR DANGEL:  You can answer whether you had

24   knowledge. You either did or did not have knowledge.

25       A.  I have never had specific or precise information

26   about who controlled Gilroy.

27               MR BECKMAN:

148  28       Q.  Who owned the 12% of the Kotva shares? Let's

29   start with that. Who owned the 12% of the Kotva shares

81

*Gwen Malone Stenography Services Ltd.*

1    that you referred to in your earlier answer that were

2    owned by American investors?

3            MR DANGEL:  Objection to the form.

4        A.  I believe it was CVF Investments Limited,

5    a beneficiary owner -- CVF Investments Limited being

6    a beneficiary owner of, of that block.  That is my best

7    recollection.

8            MR BECKMAN:

149    9        Q.  Who was the real owner of the shares as opposed

10    to beneficial owner?

11            MR DANGEL:  Objection.  There is no such

12    phrase in America.

13            MR BECKMAN:  Other witnesses have answered

14    that.

15        A.  According to my knowledge of that, there was

16    formal owners, such as a bank or another entity that

17    provided the service of safekeeping the shares for the

18    benefit of the beneficial owner.

150    19        Q.  At the October 18th meeting, did you tell Richard

20    Harazim, Martin Bender or Mr Peterka that the Gilroy

21    lawsuit was filed to protect the interest of the 12%

22    shareholders in Kotva?

23            MR DANGEL:  Objection.

24        A.  Mr Beckman, did you say did I say it to

25    Mr Peterka?

26            MR BECKMAN:  Did I say that?  I am sorry.

27    To Mr Prestage.  If I did I apologise, you didn't say it

28    to yourself.

29        A.  Again my impression is that we did not go into

82

*Gwen Malone Stenography Services Ltd.*

1    that specific detail, specifically discuss that.

151    2    Q.  Did Mr Hoffmann say at the October 18th meeting

3    that the lawsuits were filed by minority shareholders

4    other than BGO?

5         MR DANGEL:  Object.

6    A.  I do not recall that precisely and my overall

7    impression is that we did not discuss those lawsuits

8    specifically.  Specifically and in detail.

152    9    Q.  Did you say at the meeting, at the October 18th

10    meeting that it was risky to sell the shares to Kotva or

11    any of its subsidiaries?

12         MR DANGEL:  Objection.  Please answer.

13    A.  As I said the idea to, the idea that the shares

14    should be sold to Kotva was Mr Benda's idea that he kept

15    repeating at that meeting, and that idea was new to me

16    at that time.  And as far as I recall, I merely stated

17    that there are certain legal requirements for such

18    a transaction to happen under Czech law.

19         MR BECKMAN:

153    20    Q.  Let's focus --

21    A.  But I do not recall the precise wording of what

22    I said.

154    23    Q.  But you do recall -- strike that.  Did

24    Mr Prestage say that the Irish were willing to finance

25    Kotva's acquisition of the shares?

26         MR DANGEL:  You mean at the October 18th

27    meeting?

28         MR BECKMAN:  Yes.

29    A.  I do not recall.

83

1         MR BECKMAN:

2         Q.  Did Mr Benda or Mr Harazim say at the October

3    18th meeting that Kotva's bank, that the bank providing

4    Kotva's financing was concerned about the pending

5    lawsuits challenging the declaration of the ownership of

6    the Kotva department store?

7         A.  I do not recall this specifically in this matter.

8    What I recall is that they were saying there was time to

9    negotiate until the end of the year, there was space for

10   negotiations until the end of the year.

11        Q.  Do you recall any discussions at the October 18th

12   meeting that concerned or that raised the issue of

13   Kotva's bank being concerned about the pending lawsuit

14   challenging the declaration of the ownership of the

15   department store?

16        A.  The only thing I recall, as I indicated in my

17   previous answer, is that it was said there was only

18   space in the negotiations until the end of the year and

19   my impression was that it was somehow linked to third

20   party's banks.  But, from my point of view, this

21   continuous monologue with Mr Benda where he kept saying

22   who was going to be the buyer and how it would be

23   financed and we felt that this was not important for us.

24   And I believe it was Mr Hoffmann who said several times

25   that it was not that essential or important for us to

26   hear that, so I didn't listen carefully any more.

27        Q.  What did you view as the important point?

28        A.  I believed that, I believed that the discussion

29   was going to centre on whether there is a willingness to

84

1    buy and sell some shares and that the discussion would

2    be between Mr Harazim, Benda and Hoffmann.  And if there

3    is an agreement that there is that willingness, then

4    what are the other terms of such transaction, what is

5    the price, what are those lawsuits that possibly should

6    be withdrawn, because should these be also lawsuits that

7    pertain to the ownership structure of Kotva, then we

8    wouldn't be speaking about a 12% block de facto but

9    a 40% block de facto.  And this was what I expected that

10   the discussion between Mr Benda and Mr Harazim and

11   Mr Hoffmann would centre on.  And what we instead

12   witnessed was this somewhat bizarre monologue on the

13   part of Mr Benda and Mr Harazim that was designed for

14   the microphones and the police.

158   15       Q.   To your understanding was Kotva obligated to

16   purchase -- to your understanding was Kotva obligated to

17   purchase the 12% shares?

18       A.   Certainly I didn't have this information but they

19   still kept telling us that it is Kotva who has to, which

20   has to buy their shares.

159   21       Q.   To your understanding was Forminster obligated to

22   buy the 12% shares of Kotva?

23       A.   There was no such obligation with Forminster or

24   anybody else.

160   25       Q.   Mr Peterka, what is the last numbered exhibit

26   that you have in front of you, the ones that have been

27   marked?

28             THE INTERPRETER:  These are my notes, he

29   says.

85

*Gwen Malone Stenography Services Ltd.*

1      A.   I take them.

2           MR DANGEL:   While he is doing that, I just

3    want to record something, while he is pooling that

4    together.   Mr Beckman indicated that he has seven hours,

5    he was entitled to seven hours, and he wasn't going to

6    allow for a second day here.   Just to let the record

7    know, and I want the court to know too, please, that

8    I sent a letter to Mr Beckman saying that I needed three

9    and a half hours and if it was only going to be one day

10   he was going to examine in three and a half hours.   He

11   never sent me a letter saying I couldn't do it.   So the

12   idea that I am going to have a half hour and he is going

13   to have five hours and a half and he is complaining he

14   needs more time, seems a little, let's say, unfair in

15   the slightest.

16           MR BECKMAN:   Is that what your letter said,

17   Mr Dangel?

18           MR DANGEL:   That's right, I needed at least

19   a half a day.

20           MR BECKMAN:   That is what the letter said.

21           MR DANGEL:   Yes, sir.

22           MR BECKMAN:   It said three and a half hours

23   or did it say half a day?

24           MR DANGEL:   Half a day.

25           MR BECKMAN:   And you said, you said that you

26   needed that time?

27           MR DANGEL:   That's right.

28           MR BECKMAN:   Okay.

29           MR DANGEL:   I did.

86

*Gwen Malone Stenography Services Ltd.*

```
 1            MR BECKMAN:  Good.  I am glad that is on the
 2   record.
```

161
```
 3       Q.  What is the last number?
 4       A.  Two.
 5            MR BECKMAN:  Your Honour, may I give the
 6   witness another document?  Thank you.
 7   (Exhibit 3 marked by Mr Beckman)
```

162
```
 8       Q.  You have to leave these here, don't take these
 9   with you.
10            MR DANGEL:  What is the number please?  3?
11            MR BECKMAN:  Yes.
```

163
```
12       Q.  What I am handing to you has been marked as Ex No
13   3, which is an e-mail from you to Mr Weiss with a copy
14   to Mr Nikitin, Mr Milgram and Mr Hoffmann.  Have you
15   seen this e-mail?  Let me withdrew that.  Did you send
16   this e-mail to Mr Weiss?
17       A.  May I read through this first?
```

164
```
18       Q.  Certainly.
19       A.  Okay.
```

165
```
20       Q.  So did you send this e-mail to Mr Weiss?
21       A.  I would have to check against the file to see
22   that it is the actual e-mail to Mr Weiss.
```

166
```
23       Q.  Do you have any reason to believe you didn't send
24   this e-mail?
25       A.  Apparently no, I do not have a reason to believe
26   that.
```

167
```
27       Q.  And did you prepare this e-mail the day of the
28   October 18th meeting?
29       A.  I do not remember that.
```

*Gwen Malone Stenography Services Ltd.*

168    1    Q.   What is the date of the e-mail, Mr Peterka?

       2    A.   It says the 18th but I am not sure if it was sent

       3    on the 19th or so.

169    4    Q.   Did you prepare this e-mail, did you prepare this

       5    e-mail on October 18th, 2004, the very day of the

       6    meeting?

       7         MR DANGEL:   Objection, asked and answered.

       8    A.   Probably I did, I am not sure if it was on that

       9    day or the next day.

      10         MR BECKMAN:

170   11    Q.   Does this e-mail accurately reflect what was said

      12    at the October 18th, 2004 meeting?

      13         MR DANGEL:   Objection.   Objection.

      14         MR BECKMAN:   Form?

      15         MR DANGEL:   Objection as to form, as to

      16    breadth.

      17    A.   I am not able to say if it accurately reflects

      18    what happened at that meeting, that meeting took one

      19    hour, one hour and a half and this is just very brief

      20    information about that meeting.

      21         MR BECKMAN:

171   22    Q.   Is there anything in this e-mail that you sent to

      23    your clients that is inaccurate?   Strike that.   Strike

      24    that.   I withdrew that question.

      25         When you send communications to your client, do

      26    you attempt to be accurate in conveying the information?

      27    A.   Yes.

172   28    Q.   Do you have any reason to believe that this

      29    e-mail is inaccurate?

88

*Gwen Malone Stenography Services Ltd.*

1     A.   No.

173   2     Q.   I direct your attention to the first paragraph of

3     your e-mail to Mr Weiss in which you write:   "*Today*

4     *I had together with Mr Hoffmann a meeting with Messrs*

5     *Benda and Harazim of Kotva and Mr Prestage representing*

6     *the perspective Irish buyers of the Kotva department*

7     *store*".

8     Did you understand that Messrs Benda and Harazim were

9     with Kotva when you prepared this e-mail?

10    A.   We were using the word Kotva referring generally

11    and it was our understanding to the group of people

12    around Forminster and Kotva and the legal form of that

13    entity was not what was important.

174   14    Q.   Is that first sentence an accurate statement?

15    A.   I would like to finish.  This is, this is in

16    keeping and it explains too why in the fourth paragraph

17    I specifically say that both gentlemen Mr Benda and

18    Mr Harazim indicated it should be Kotva AS the buyer.

19    If I understood that they would only represent Kotva AS,

20    then it would be implicit and understood in itself that

21    the buyer is Kotva AS if I felt they were representing

22    simply this entity.  When we spoke about the specific

23    legal entity Kotva AS, we use this AS.  Whereas when we

24    speak about Mr Harazim and Mr Benda, then we just use

25    the general term Kotva.

175   26    Q.   Let's go to paragraph two of your e-mail,

27    Mr Peterka, in which you write:

28         "*At the beginning the representatives of Kotva*

29    *confirm that they are willing to purchase the whole of*

89

1   *BGO's stake in Kotva for CZK 131 million".*

2   Is that accurate?

3      A.   If I send this e-mail, if it is indeed my e-mail

4   then I believe it is accurate.

176

5      Q.   Let's go to the last sentence of that same

6   paragraph, paragraph number two.

7         *"We told them that we will get in touch with you*

8   *in order to receive your instructions".*

9   Is that an accurate statement?

10            MR DANGEL:   Excuse me, but objection.   And

11   counsel just did something improper.

12            MR BECKMAN:   I am sorry, did I misread it?

13            MR DANGEL:   No.   You need to read the whole

14   of the paragraph.   You can't just do that.   You have to

15   put the whole thing in there.

16            MR BECKMAN:   Mr Dangel, you know as well as

17   I do that is not accurate.

18            MR DANGEL:   You are not giving me enough

19   time.

20            MR BECKMAN:   Let me finish.   You can read

21   the whole paragraph in cross.

22            MR DANGEL:   Right, I have half hour to do

23   cross and now I have to undo every bit of cheating that

24   you do.   So please don't cheat.

25            MR BECKMAN:   Don't waste time, Mr Dangel, or

26   I will take back your half hour.

27            MR DANGEL:   You will.   Let that put on the

28   record.

29

90

*Gwen Malone Stenography Services Ltd.*

1          MR BECKMAN:

2      Q.  Is that an accurate statement?

3      A.  I would like to go back to my previous answer,

4  which I did not finish, I was interrupted.  In the

5  second paragraph there is a key word, in my opinion, the

6  word "they", "they want to buy".  Again we understood it

7  as this group of people want to buy that group, and that

8  is why we say "they".  And next question now, please?

9      Q.  Paragraph number three, first sentence:

10         "*The representatives of Kotva further stated that*

11  *their condition for purchasing the shares is the*

12  *withdrawal of certain initiated lawsuits*".

13  Is that an accurate statement?

14     A.  Yes, it is accurate but I said previously that

15  what was not clear was the object of the desired

16  transaction because if we were to withdrew actions or

17  lawsuits filed in connection with the ownership

18  structure of Kotva, then the object would be de facto

19  a 40% block rather than a 12% block.

20     Q.  Well read the last sentence in that paragraph Mr

21  Peterka, in which you write:

22         "*You may assume that the representatives of Kotva*

23  *were today still unaware of the new lawsuits initiated*

24  *by Gilroy last Friday that concern the shares in Kotva*

25  *held by Forminster/bankruptcy trustee of Sprint*".

26  Prior to the October 18th meeting, you had not provided

27  notice of those lawsuits to Kotva, had you?

28     A.  I can say in general terms that prior to this

29  meeting there were other lawsuits filed that pertained

91

1   to the ownership structure about which Mr Benda, Harazim

2   and others were informed, but I cannot speak about those

3   more in view of the privilege under Czech law.

180     4   Q.  Can you identify for me the certain initiated

5   lawsuits that you are referring to in the first sentence

6   in paragraph three of your e-mail?

7   A.  I cannot because it was not made clear by

8   Mr Benda or Harazim.

181     9   Q.  Well as of October 18th, what lawsuits had been

10   filed by Gilroy?

11   A.  I would have to go back to my files, but I recall

12   that the lawsuit regarding the real estate had been

13   filed by that time.  But there were, as I said already,

14   there were other lawsuits that were filed that pertained

15   to the ownership structure of Kotva of which I cannot

16   speak due to privilege and this is about the fifth time

17   I am repeating this.

182    18   Q.  If you go down to the fourth paragraph in which

19   you write:

20      "*Messrs Benda and Harazim then stated that the*

21   *buyer of the shares is to be Kotva AS and Mr Prestage*

22   *declared that the Irish investors are prepared to*

23   *finance this acquisition*".

24   Did Mr Prestage -- is that an accurate statement?

25       MR DANGEL:  Object.

26       MR BECKMAN:  It is accurate, but I have to

27   add to that.  As I said, Mr Benda and Mr Harazim kept

28   repeating that the buyer had to be Kotva AS, so it was

29   not certainly only once that this was said.  And as

92

*Gwen Malone Stenography Services Ltd.*

1    regards Mr Prestage, I recall that it was said that he

2    was willing, on behalf the Irish investors, to seek

3    a solution or a manner in which they could be

4    financially vested or involved in this transaction.

183    5    Q.  Did Mr --

6    A.  I haven't finished.  Essentially it was just an

7    exchange of ideas or brain storming in which different

8    ideas were thrown out as to how this could be done

9    without it being clear what would be the actual core or

10    the business core of that transaction or that matter.

11    Now looking back again, I understand that this was just

12    simply a monologue for the microphones in order for the

13    people around Forminster to be able to allege at some

14    point or claim, to claim that, to claim that we somehow

15    wanted to take advantage of this situation and get the

16    Irish investors involved, which was not the case because

17    this was something that was put on the table by Mr Benda

18    and Mr Harazim.  This was not important from our point

19    of view.  What was important, as I said many times, was

20    the object of the transaction, the price of the

21    transaction and the terms.  And I don't recall that

22    there would be any agreement regarding any of these

23    three items.

184    24    Q.  What do you mean by "the object of the

25    transaction"?

26    A.  I have already said that the object of the

27    transaction may either be the sale of the 12% block of

28    shares and in that case it would be understandable that

29    we would contemplate withdrawal of those lawsuits that

93

1    pertained to Kotva only.  However, if the other party

2    was demanding a withdrawal of those lawsuits that

3    pertained to the ownership structure of Kotva, whereas

4    these lawsuits were there to protect the 32% block in

5    Kotva held by Trend, if such a requirement is made, then

6    from the economic point of view this would only make

7    sense if -- from the economic point of view I would

8    understand it, then I would understand it that the

9    object of the transaction is the 40% block.

185    10    Q.  Who were the Defendants in the lawsuits

11    challenging the ownership structure?

12    A.  I would have to look.  It is here in the files.

186    13    Q.  Maybe I can move this along.  If you have to look

14    at the file we can do that, but was Kotva a Defendant in

15    the lawsuits challenging the ownership structure?

16    A.  I would have, I would have to look at it.  Just

17    a second.

187    18    Q.  Okay.

19    A.  The Defendants were Kotva AS and SPVKN, AS.

188    20    Q.  In that the -- the Plaintiff is Gilroy; is that

21    correct?

22    A.  Gilroy, that's correct.

189    23    Q.  And that is filed June 30th, 2004; correct?

24    A.  I am looking at the document.  I do see now it

25    was June 30th.

190    26    Q.  Who were the Defendants in the lawsuits

27    challenging the shareholder structure?

28    A.  As at what date?

191    29    Q.  October 18th, 2004?

94

*Gwen Malone Stenography Services Ltd.*

1    A.  As I said, I cannot speak about those lawsuits

2    because these are subject to legal privilege.

192   3    Q.  When were the lawsuits filed against Forminster

4    and/or the bankruptcy trustees of Sprint referred to in

5    your e-mail of October 18th, 2004.

6    A.  That you referred to in the --

193   7    Q.  I am sorry.

8         THE INTERPRETER:  Did you say e-mail.

9         MR BECKMAN:

194   10   Q.  Yes.  If you go back to your e-mail, M Peterka,

11   dated October 18th, 2004, you write in the third

12   paragraph:

13        *"We may assume that the representative of Kotva*

14   *were today still unaware of the new lawsuits initiated*

15   *by Gilroy last Friday that concern the shares in Kotva*

16   *held by Forminster/bankruptcy trustee of Sprint"*?

17   A.  Mm-hmm.

195   18   Q.  When were those lawsuits filed?

19   A.  Do you want me to check?

196   20   Q.  I would.

21        MR DANGEL:  This is just an unbelievable

22   waste of time.  These things have matters of record for

23   years.  A colossal waste of time.  You are just trying

24   avoid having me have a fair time.  You know, if you only

25   schedule one seven hour day, you have got to give the

26   other side half time.  You have to.  You are just

27   cheating and I am going take it right to Judge Young.

28   A.  There were two lawsuits which were filed on

29   October 15 on behalf of Gilroy.

95

*Gwen Malone Stenography Services Ltd.*

197

```
 1            MR BECKMAN:
 2      Q.  Just to move this along, maybe this will help.
 3   If you could identify the two lawsuits, you have the
 4   dates they're filed, identify the Plaintiffs and the
 5   Defendants that you are referring to in your e-mail?
 6      A.   The one, in one the Plaintiff was Gilroy, the
 7   Defendant in one, the Defendants in one of those
 8   lawsuits were Forminster, Mr Halik as the receiver,
 9   as the receiver or the trustee in bankruptcy of Trend,
10   and Trend as the general investment fund in bankruptcy.
11   And there was the other lawsuit, Gilroy being the
12   Plaintiff and the Defendants being Mr Baklav as the
13   trustee in bankruptcy of Sprint.  The purpose of these
14   lawsuits --
15            MR BECKMAN:  There is no question.  I was
16   just asking, I was asking for dates.
17            MR DANGEL:  Excuse me, he cannot interrupt
18   the witness.
19            MR BECKMAN:  So the record is clear, the
20   question was:  Who were the Plaintiffs and Defendants
21   and the dates.  I didn't ask about the purpose.
22            MR DANGEL:  Continue your answer.
23      A.   I will complete my answer.  The purpose of these
24   actions with the first one the purpose was to declare
25   that the actual owner of the shares in Kotva is that, is
26   the Trend Fund that had been tunneled and not
27   Forminster.  The purpose of the letter was to ensure, to
28   ensure that the shares of Kotva that were formally in
29   the name of Forminster but were included in the
```

96

1    bankruptcy assets of Sprint, which, in our opinion, was

2    a way in which these shares would be set aside, would be

3    set aside in that way and the Prosecutor's order to

4    freeze would then be circumvented.

5            The purpose of the second action was to exclude

6    these shares from the bankruptcy as bankruptcy assets

7    and we believed that these shares were included in the

8    bankruptcy assets completely artificially.  That's all

9    to that question.

10            MR BECKMAN:

198    11    Q.  Now the fourth paragraph of your e-mail to

12    Mr Weiss, I asked you about the first sentence in which

13    you wrote:  *"Messrs Benda and Harazim then stated that*

14    *the buyer of the shares to be Kotva AS and Mr Prestage*

15    *declared that the Irish investors are prepared to*

16    *finance this acquisition"*.

17    When I asked you about that, you said other ideas were

18    thrown out that could be done.  What other ideas were

19    thrown out at the October 18th meeting?

20    A.  These were just technicalities as to how this

21    could be executed.  For example, I recall I myself said

22    something about the fact that it would be necessary to

23    divide profits, to distribute profits and, but I didn't

24    consider it important because these were just ideas that

25    were talked about without the core of the matter

26    missing -- without any agreement being on the table.

199    27    Q.  Distribute whose profits?

28    A.  Profits of Kotva AS, but I don't recall it

29    precisely.  And I believe it wasn't important.

97

*Gwen Malone Stenography Services Ltd.*

200   1      Q.  I am not asking whether you believe it is

      2   important, I am just asking what you said?

      3           MR DANGEL:  Excuse me, you have no right to

      4   say that, sir, just ask the question.

      5           MR BECKMAN:

201   6      Q.  What did you say about the distribution of

      7   profits?

      8      A.  I do not recall.  I do not recall it because it

      9   was all very vague and we were not, we did not

     10   understand or we didn't know what was the purpose of the

     11   involvement or how the involvement should be set up of

     12   these Irish investors.  So it was all very, very vague.

202  13      Q.  Let's go to the last paragraph of your e-mail to

     14   Mr Weiss, starting on the first page, in which you

     15   write:

     16           *"The representatives of Kotva further stated that*

     17   *a bank providing operational financing to Kotva (a loan*

     18   *in the amount of approximately CZK 200 million due at*

     19   *the end of this year) is"* -- and then it is obliterated

     20   -- *"concern about the pending lawsuit on the declaration*

     21   *to the Kotva department store and is reluctant to extend*

     22   *this loan"*.

     23   Is that an accurate statement?

     24           MR DANGEL:  You mean is it accurate that it

     25   was said or is it accurate that it was true?  I mean

     26   your question encompasses both so object to the form.

     27   I don't know what you want.

     28           MR BECKMAN:

203  29      Q.  Does that accurately reflect what was said at the

                              98

1    October 18th meeting?

2        A.  Most likely this is how it was said if this is

3    what I wrote.  Once again, however, if there is

4    a lawsuit filed for the declaration of the real estate,

5    declaration of ownership of real estate, which is based

6    on our opinion that the Kotva management was

7    circumventing measures imposed by the Prosecutor, and

8    for other reasons as well, and it is likely that it will

9    be declared that the owner of the interest is not, is

10   not the subsidiary number 51, but it is Kotva itself,

11   then any consequences this may bring about, the

12   consequences are not consequences of the fact that

13   a lawsuit was filed, the consequences are consequences

14   of the fact that the actual legal status is different as

15   a result of the fact that the management of Kotva was

16   going around to avoid these measures.

17        THE TRANSLATOR:  He wants to repeat the sentence

18   because it was not clearly translated.

19        A.  The consequences are the consequences, or are

20   a product of the fact that the transfers within the

21   group were simply invalid.  A consequence of a lawsuit

22   having been filed, a lawsuit, the lawsuit simply serves

23   as, works as if you open a book and it seeks

24   a confirmation of the fact that the real legal status or

25   situation is different from that that was recorded in

26   the Land Registry.

27        And one more thing, I never understood why a bank

28   should be concerned about the fact that within one

29   group, within one group the main asset is with either

99

1    a subsidiary or the parent company, because from the

2    economic or financial point of view the assets, the

3    asset is still with that group, within that group.  It

4    is a different thing when it comes to the legal

5    perspective on that issue because the shareholders'

6    rights, the shareholders are affected to the extent that

7    if the asset is not held by the parent company, then the

8    general meeting cannot make decisions on those assets.

9    That's all.

10            MR BECKMAN:  Mr Dangel, would it helpful to

11    maybe take a two minute break to give the interpreter

12    a break.  I think you would like a break.

13            MR DANGEL:  Wait a minute.

14            MR BECKMAN:  Can I just finish what I was

15    going to propose?  Could you talk, could you maybe talk

16    to Mr Peterka about trying to move this along because

17    I don't think that was responsive.

18            MR DANGEL:  That was probably the most

19    important thing that has been said today.  Okay.  The

20    fundamental reason why we are here is to examine whether

21    this man filed lawsuits that were in good faith, honest

22    and correct lawsuits and whether they represent or do

23    not represent process under Czech law.  Now, his answers

24    that he has given go to those issues.  You came here

25    with your, let's say, to slide around those issues, not

26    that that is bad lawyering.  But I can't agree that that

27    is not responsive and I can't agree that it is not

28    appropriate.  And here is my problem, I may not have

29    time to examine these things fully.  So it is critical

100

*Gwen Malone Stenography Services Ltd.*

1   to me they get on the record now.  Now if the

2   interpreter is tired and the court reporter is tired,

3   I respect that.  But I have got to have my chance to

4   prove that my client did not file any false lawsuits.

5           It is really up to you, Madam.  By the way,

6   you are doing a brilliant job, seriously.

7           THE INTERPRETER:  I can take few minutes,

8   that is fine.

9           MGR PESLOVA:  Let's say five minutes.

10          **(Off record - 2.55 pm)**

11          **(On the record - 3.04 pm)**

12          MR BECKMAN:

204    13   Q.  Mr Peterka, tell me everything you recall

14   Mr Prestage saying at the meeting on October 18th?

15   A.  I do not recall.  What I recall is that he

16   arrived towards the end of the meeting.  He says he, he

17   said he didn't want to have anything to do with that

18   past history of the tunneling in Trend and then he was

19   saying something to that effect that the Irish investors

20   could in some form participate in that transaction.  But

21   this, but this were the general talk I recall, I don't

22   recall anything else.

205    23   Q.  I don't want to exhaust your recollection, do you

24   remember Mr Peterka saying anything else - Mr Prestage?

25   A.  I do not recall anything else about what he said.

206    26   Q.  What did you say to Mr Prestage?

27   A.  I don't recall.

207    28   Q.  Do you recall anything you said to Mr Prestage?

29   A.  I probably told him something, but in addition or

101

```
 1   aside from those general things that I had said there
 2   and that I already mentioned I do not recall telling him
 3   anything else.
 4      Q.  You testified that Mr --
 5      A.  I do not recall if I told him anything else or
 6   whatever that was if I did.  It is two and a half years
 7   ago.
 8      Q.  You testified that Mr Prestage arrived at the end
 9   of the meeting.  Did he arrive at the meeting alone?
10      A.  I am not certain now if Mr Harazim arrived with
11   Mr Prestage or whether Mr Harazim was there from the
12   beginning with Mr Benda.  I do not recall that.
13      Q.  How long was the meeting?
14      A.  About an hour and a half.
15      Q.  Did anyone from your law firm attend?
16      A.  Just myself.
17      Q.  Tell me everything that Mr Hoffmann said at the
18   meeting?
19      A.  I've said that several times.  He responded to
20   the monologue by Mr Benda or Mr Harazim and said that it
21   was not important who was going to be the buyer of the
22   shares.  This is the main point I recall, the main thing
23   I recall he said.
24      Q.  Do you recall Mr Hoffmann saying anything else?
25      A.  I do not recall what else he was saying aside
26   from that being in those general lines of thoughts that
27   I have already described.
28      Q.  Now, you said that Mr Hoffmann said it was not
29   important who buys the shares.  What shares are you
```

208
209
210
211
212
213
214

102

*Gwen Malone Stenography Services Ltd.*

1  talking about?  Are you talking about the 12% of the

2  Kotva shares?

3      A.  This is a misleading question again.  You are

4  trying to push me to say that it was only the 12% of

5  shares that we were talking about.  And I have

6  repeatedly or several times explained that the object of

7  the transactions was not clear, was not clearly defined

8  because it was dependent on, the object of the

9  transaction depends on what lawsuits should be withdrawn

10  according to the requests or demands made by the people

11  around Forminster.  If these lawsuits are also lawsuits

12  concerning the ownership structure of Kotva and because

13  these lawsuits protect the 32% share of Trend in Kotva,

14  if these lawsuits should be withdrawn then we are no

15  longer talking about a 12% share but a 40% block.  But

16  this is about the fifth time I have said that.

215

17      Q.  Was Kotva defended in the ownership structure of

18  shares regarding the 32%?

19          MR DANGEL:  This is the third time.

20          MR BECKMAN:  Referring to his answer here,

21  I want to make sure it is clear.

22      A.  Can you repeat the question?

23          MR BECKMAN:  Of course.

24      A.  You said was Kotva a defendant.

25          MR BECKMAN:

216

26      Q.  In the lawsuits concerning the 32% of the shares?

27      A.  It was not certainly or understandably, that is

28  a lawsuit against Forminster who formally holds these

29  shares but there are many other lawsuits in which a, as

103

*Gwen Malone Stenography Services Ltd.*

1    a preliminary issue has to be resolved, in which it has

2    to be resolved as a preliminary issue whether Forminster

3    is a shareholder or not or whether it is Trend instead

4    of Forminster.  There are many such lawsuits and these

5    are mainly the lawsuits that call for general meetings

6    to be called null and void.  These are lawsuits for

7    invalidity of general meetings.

8         MR DANGEL:  To invalidate.

9         THE INTERPRETER:  Sorry.

10         MR BECKMAN:  Mr Dangel, do you speak Czech?

11         THE INTERPRETER:  No, I understand.  I mean

12    it is difficult to do it word for word like this.

13    A.  Invalidity of general meetings.

14         These are the lawsuits that seek a declaration

15    that some of the general meetings were invalid, some of

16    the general meetings of Kotva AS, and here, as

17    a preliminary issue, it needs to be resolved who is the

18    shareholder.  Because if these were general meetings in

19    which Forminster voted and we believe Forminster is not

20    a shareholder, then such a general meeting is invalid.

21         There is, in other words, to your question, there

22    are several lawsuits that pertain to the shareholder

23    structure of Kotva, some of them see the invalidation as

24    their main concern in that lawsuit and some of them this

25    is a matter of preliminary issue.  And from that stems

26    or from that evolves who is the Defendant.  It is not

27    always Forminster who is the Defendant in these actions.

28    That's all.

29         MR BECKMAN:

104

*Gwen Malone Stenography Services Ltd.*

217    1    Q.  Tell me everything Mr Harazim said at the October

2    18th meeting?

3    A.  You have already asked me that several times.

218    4    Q.  I have not asked you specifically what Mr Harazim

5    said at the meeting.

6         MR DANGEL:  Oh, yes, he has.  Just put on

7    record that usually when you ask somebody about

8    a meeting it takes about twenty minutes to ask the

9    questions about who said what.  We have been at this now

10   for six hours.  You have definitely asked what

11   Mr Harazim has said.  You also, may I say, have elicited

12   testimony in which he said what Mr Harazim said.

13        MR BECKMAN:

219    14   Q.  Other than what you previously testified, tell me

15   everything you recall Mr Harazim saying at the October

16   18th meeting?

17        MR DANGEL:  That requires him to remember

18   everything he has already testified to about it.  The

19   record stands as it is.

20   A.  In addition to what I have already testified

21   about this, about what he had said, I do not recall

22   anything else of what he had said.

23        MR BECKMAN:

220    24   Q.  You have testified repeatedly what Mr Benda said.

25   Sitting here now do you remember anything else he said

26   at that meeting?

27        MR DANGEL:  Objection.

28   A.  No, I do not recall anything else that he had

29   said.

105

*Gwen Malone Stenography Services Ltd.*

1           MR DANGEL:  Do you want me to go for a half
2     hour now?
3           MR BECKMAN:
221   4     Q.  Did Mr Weiss tell you that he controlled Gilroy?
5           MR DANGEL:  Obviously that is within the
6     attorney client privilege if he said such a thing.  So
7     I am going instruct him not to answer one way or the
8     other.
9           MR BECKMAN:
222   10    Q.  Did you treat Gilroy as a separate client or did
11    you understand it was part of KT, the KT contract that
12    you had with the firm?
13          MR DANGEL:  Excuse me, but you asked him
14    that.  That was the very first question when we came
15    back from lunch.  That was almost the exact, word for
16    word, the same question.
17              Let's put on the record the following.
18    I had conversation with Mr Beckman last week in which
19    I said, in which his partner asked me were there certain
20    important things I had to put on record about Mr --
21          MR BECKMAN:  That never happened, that never
22    happened.  You are just, you are wasting time here.
23    Let's do the deposition.
24          MR DANGEL:  Excuse me, I am going to dispute
25    that.  In which I said it was very important to me that
26    I establish that the lawsuits were brought in good faith
27    and so on and so forth.  There was then a long
28    discussion about attorney client privilege and it was
29    made very clear to me that they were very unhappy to

106

1    give me an opportunity to use this, take this time, this

2    one opportunity to make this crucial matter a matter of

3    record.  I am now speaking to Judge Young, I am telling

4    Judge Young that the same questions have been asked

5    again and again and I believe the situation here is the

6    time is being wasted to prevent me from having the

7    opportunity to ask the questions I need to ask.

8             And I want you to know, Mr Beckman, that

9    I will seek to have my airfare paid and my time paid to

10   return if I do not get my opportunity to ask my

11   questions in the next fifteen minutes.

12             MR BECKMAN:  You want to start now?

13             MR DANGEL:  Yes.

14             MR BECKMAN:  You want to start now?

15             MR DANGEL:  Yes, and I will finish it.

16             MR BECKMAN:  I thought we had an agreement

17   that you were going to start at a quarter to four.

18             MR DANGEL:  I am willing to wait to

19   a quarter to four, I am just afraid you are not going to

20   honour it.  Because what I am hearing is --

21             MR BECKMAN:  I will honour it at a quarter

22   to four.  Let's move this along.

23             MR DANGEL:  Okay.

24             MR BECKMAN:  May I show the witness

25   a document please?

26   **(Ex 4 marked by Mr Beckman)**

27             MGR PESLOVA:  Okay.

28             MR BECKMAN:

29     Q.  I am handing to you what has been marked as Ex No

223

107

1    4, which is a request for international judicial

2    assistance issued by the court in the United States to

3    the Ministry of Justice of the Czech Republic.  Was this

4    served upon you, Mr Peterka?

5        A.  The only document I received is the subpoena from

6    this Court.

7        Q.  Okay.

8        A.  I did not receive anything else.

9        Q.  If I could direct your attention then to page 3

10   and this will make it much quicker if you have received

11   this.  The first full paragraph appearing on page 3

12   provides:

13       *"Defendant Andrew Weiss and Weiss Capital LLC*

14   *hired attorney Ondrej Peterka of Peterka & Partners on*

15   *or about June 4, 2004 and that firm continues to*

16   *represent them"*?

17   And that is an accurate statement?

18           MR DANGEL:  Wait a minute.  Objection.

19       A.  I have already spoken to what entities

20   I represent and under what legal framework.

21           MR BECKMAN:

22       Q.  Okay, let me move down, we will do this -- let's

23   do it a little more efficiently then.  The second

24   sentence:

25       *"According to the Weiss Defendants and*

26   *Counterclaim-plaintiffs' August 10, 2006, Appendix to*

27   *their revised privilege log:*

28       *"Peterka & Partners began representing KT Inc in*

29   *July 2004 and continues to represent it"*.

*Gwen Malone Stenography Services Ltd.*

1   That is a correct statement; correct?

2       A.  This is not an accurate statement because as

3   I indicated our first contact with the client was around

4   June 3rd.

227

5       Q.  Okay.  The next sentence:

6           "*Peterka & Partners began representing CVF*

7   *Investments LLC in December 2005 and continues to*

8   *represent it*".

9   Is that an accurate statement?

10      A.  I am not able to answer that because I would have

11  to consult the file to make sure that I get the exact

12  date of the filing of a lawsuit on behalf of which

13  entity.

228

14      Q.  Does that sound about the approximate correct

15  date; December 2005?

16      A.  I cannot say that, sir, because there are too,

17  there are many legal entities that are involved here and

18  I am just not able to say precisely when exactly we

19  started representing whom by filing of lawsuits and

20  I would have to look into the file.

229

21      Q.  Okay, skip to the next one then:

22          "*Peterka & Partners also represented Gilroy with*

23  *respect to a particular piece of litigation from*

24  *mid-June 2004 until December 13, 2004*".

25  Is that an accurate statement?

26      A.  We did represent Gilroy in several proceedings.

27  Then our representation ended towards the end of 2004,

28  beginning 2005, I do not know the precise date.  I want

29  to emphasise here that there was a certain suspicion on

109

1  our part that arose that Gilroy was in some manner taken
2  under control by people around Forminster.  And I have
3  what I believe to be a good piece of evidence to prove
4  that, which is a motion filed by Mr Laznicka on behalf
5  of Gilroy dated February 15, 2007 and the motion is in
6  connection with that lawsuit that should determine that
7  Forminster is not the legal owner of shares.  Kotva is
8  not the defendant in that lawsuit.  But Mr -- and
9  Mr Laznicka states here in his motion that this lawsuit
10  was filed in order to blackmail or extort Kotva.
11        MR DANGEL:  No, I don't want him to do this,
12  but I am --
13     A.  I will be finished in one second.
14        MR DANGEL:  Okay.
15     A.  That the lawsuit was filed in order to extort
16  Kotva and that is the reason why it needs to be
17  withdrawn.  What I do not understand is how Kotva could
18  be extorted by filing a lawsuit that pertains or that
19  concerns only Kotva's shareholders which is the case at
20  hand.  So, I am convinced --
21        MR BECKMAN:  We need to mark this as an
22  exhibit.  But you keep going with your answer.  We have
23  to mark that.
24        MR DANGEL:  Sure.  Keep going with your
25  answer, sir, please do.
26        MR BECKMAN:  Take it out.
27  **(Exhibit 5 marked by Mr Beckman)**
28        MR DANGEL:  Ondrej, had you finished your
29  answer?

110

*Gwen Malone Stenography Services Ltd.*

1      A.   Could you maybe just read the last few words.

2   **(From second sentence in previous answer read back by**

3   **the Court Reporter)**

4      A.   So I am convinced that today Gilroy is controlled

5   by people from, by people from around Forminster,

6   surrounding Forminster because that is the only

7   explanation of this motion dated February 15th, 2007.

8           MR BECKMAN:

9      Q.   When did these suspicions you have described

10  first arise?

11     A.   It was when Mr Laznicka last year filed

12  a complaint about conduct against me with the Bar.  I do

13  not have any information to indicate that that complaint

14  was honoured by the Bar.

15     Q.   You have no knowledge as to what, if anything,

16  the Czech Bar did with respect to the complaint?

17          MR DANGEL:  Excuse me, your Honour, there is

18  something I have to state that is very, very important,

19  because this relates to Mr Peterka.

20          MR BECKMAN:  The question that I just asked?

21          MR DANGEL:  Yes.

22          MR BECKMAN:  Okay.

23          MR DANGEL:  When Mr Beckman applied and

24  obtained the right to take this deposition, he limited

25  the areas that he would enquire into, into five specific

26  areas.  This and many of the other areas that he has

27  inquired into is outside of the scope of permission for

28  this deposition.  The five areas were: his

29  representations, Mr Peterka's representations to third

230 (left margin, line 9)
231 (left margin, line 15)

111

*Gwen Malone Stenography Services Ltd.*

```
 1   parties regarding the Weiss Defendants efforts to sell
 2   their shares.  His representations to third parties
 3   including the Irish investors who intended to purchase
 4   the department store, the Kotva department store.  His
 5   representations to third parties regarding the Weiss
 6   alleged Defendant's efforts to use litigation to force
 7   Kotva to purchase shares.  His meetings with Kotva on
 8   behalf of the Weiss defendants.  His representation to
 9   and meetings with third parties about the Weiss
10   Defendants scheme to blackmail Kotva and interfere with
11   the sale of the department store.  Further there was
12   a representation --
13            MR BECKMAN:  You don't need to read the
14   whole thing.
15            MR DANGEL:  Excuse me.  Kotva does not
16   intend to question Mr Peterka about privileged matters.
17   To finish reading the fifth area.  Alleged scheme to
18   blackmail Kotva, his representation to and meetings with
19   third parties -- not the general subject, his
20   representations and meetings with third parties about
21   the Weiss Defendants alleged scheme to blackmail Kotva
22   and interfere with the sale of the department store by,
23   among other things, filing litigation on behalf of the
24   Weiss Defendants, Gilroy, Balfindor, KT, CV and/or
25   Hoffmann.
26            In other words, asking this man if there has
27   been a Bar Association complaint or asking him if
28   anything that is outside of these areas has been and
29   continues to be entirely improper and I can't believe
```

112

*Gwen Malone Stenography Services Ltd.*

1   that this Court has allowed it.

2           MR BECKMAN:  Do you want me to be limited to

3   the subject matters in this letter?

4           MR DANGEL:  You are, I am not.

5           MR BECKMAN:  Okay.  Is that your position?

6           MR DANGEL:  Not only my position, that's the

7   law, yes.

8           MR BECKMAN:  Okay.

9           MR DANGEL:  You are limited to those areas,

10  sir, and you knew it and you have known it for five

11  hours and I am taking that to Judge Young.  What is your

12  next point, sir?  Do you want to ask more questions

13  about whether a Bar Association has been filed by

14  a bunch of thieves against this man who has a 40 lawyer

15  firm?  You have zero respect for being a lawyer.  And

16  you have zero respect for the process that was issued in

17  this case.  Now what is your next question, only in

18  these five areas.

19          MR BECKMAN:  Mr Dangel, when I was asking

20  background questions of Mr Peterka and I tried to cut

21  him off to move this along, you said:  No, this is a man

22  who is an esteemed member of the Bar, let him answer his

23  questions, let him answer the question fully.

24          MR DANGEL:  My statement does not get read

25  to the jury.  Your God dammed questions do.  Pardon my

26  French.

27          MR BECKMAN:  So if you are putting at issue

28  and you want him to testify, as you say:  I am not

29  limited -- I am limited and you are not, and I think

113

*Gwen Malone Stenography Services Ltd.*

1    this background is at issue, do you only want him to

2    talk about his background?

3              MR DANGEL:  You have ten more minutes, sir.

4              MR BECKMAN:  You are saying.

5              MR DANGEL:  You have ten more minutes,

6    I have made my point, now go ahead.  Excuse me, I have

7    a bad back that is why I have got up.

8              MR BECKMAN:

9        Q.  Did you ever file or caused to be file criminal

10   complaints against Richard Harazim or Martin Benda with

11   the Czech Police?

12             MR DANGEL:  Objection, it is outside the

13   scope.

14             MR BECKMAN:  Are you instructing him not to

15   answer?

16             MR DANGEL:  No.

17             MR BECKMAN:  Okay.

18             MR DANGEL:  I am giving you your ten

19   minutes.

20       A.  We did provide many items of information to

21   various authorities in the Czech Republic.  None of

22   these pieces of information, as far as I recall, was

23   a formal criminal complaint.  And I can give you a list

24   of those notifications that we filed.  I have a list

25   that I can give to you.

26             MR DANGEL:  It is outside the scope.

27             MR BECKMAN:  It is concerning meetings with

28   third parties about Weiss Defendants alleged scheme to

29   blackmail.

114

*Gwen Malone Stenography Services Ltd.*

1          MR DANGEL:  Are you asking whether he met
2    with police authorities?  I didn't hear you ask that.
3          MR BECKMAN:  I asked:  Did you ever file or
4    cause to be filed.
5          MR DANGEL:  Objection.  Well he has already
6    given you his answer but anyway, go ahead.
7          MR BECKMAN:
233    8    Q.  Have you had any communication with the US State
9    Department concerning Kotva?
10    A.  No.
234    11    Q.  Have you had any communications with the Czech
12    Ambassador concerning Kotva, Richard Harazim or Martin
13    Benda or Forminster?
14    A.  No.
235    15    Q.  Have you had any communications with the Ministry
16    of Justice concerning Kotva, Richard Harazim or Martin
17    Benda?
18    A.  Which Minister of Justice, please?
236    19    Q.  Identify the ministries of justice that you are
20    thinking of?
21    A.  Czech or?
237    22    Q.  Czech?
23    A.  I would have to go to all those submissions or
24    information that I have just referred to and check
25    whether any of them was also addressed to the Minister
26    of Justice.  I am not sure.
238    27    Q.  Did you have any communications with any other
28    branch of the Czech government concerning Kotva, Richard
29    Harazim or Martin Benda?

115

1    A.  Same answer as regarding the Minister of Justice.

239    2    Q.  You have to review files.  What files would you

3    have to review?

4    A.  I have them here.

240    5    Q.  So we can't do that in the next five minutes, can

6    we?

7    A.  We can do it.

8        MR BECKMAN:  Okay.  Let's try and identify

9    those communications.

10    A.  This is the folder of these letters.  So it is

11    not going to take five minutes, we will have to go

12    through these letters and see which, which authorities

13    these were addressed to.

14        MR DANGEL:  I may have a solution.  Go

15    ahead.  Joel, ask your next question.  I will take

16    a look at these.  Oh, they are all in Czech.  I thought

17    I could be helpful.

18        MR BECKMAN:

241    19    Q.  Did you have any communications with the state --

20    Czech Prosecutors concerning Kotva and Richard Harazim

21    and Martin Benda?

22    A.  My answer is the same as before, that I would

23    have to review the file.  But I can expand on that by

24    saying that the entire case of tunneling of Trend and

25    its complexity, that case was described to the supreme,

26    in several letters addressed to the Supreme Prosecutor.

242    27    Q.  What are the approximate dates of those letters,

28    if you know?  I am just trying to move this along.

29    A.  June 3rd, 2005.

116

*Gwen Malone Stenography Services Ltd.*

243
1      Q.   Who is it addressed to, so we know what these

2   are?  Can we mark those as exhibits?

3           MR DANGEL:  It is attorney work product.  Of

4   course.  Object on the grounds it is attorney work

5   products.

6           MR BECKMAN:  Letters to third parties?

7           MR DANGEL:  Insofar as it his file, it is

8   work product.

9           MR BECKMAN:  There might be notes if that's

10  what you mean.

11          MR DANGEL:  Yes.

12          MR BECKMAN:  I don't need that.

13     A.   I can give you dates, you wanted dates.

14          MR DANGEL:  He wanted dates, we can read the

15  dates.

16     A.   June 3rd 2005; August 27, 2005; September 1st,

17  2005; and March 2nd, 2006.

244
18     Q.   Who are those letters addressed to?

19     A.   Supreme Prosecutor.

245
20     Q.   Is there a name, a particular name?

21     A.   There were two different names because there was

22  a change in that position, a new person was appointed.

23  The first three letters went to Mrs Benecova when she

24  was the Supreme Prosecutor and the last one to

25  Mrs Vesecka.

246
26     Q.   How much have you been paid in fees from Mr Weiss

27  or KT?

28          MR DANGEL:  Object to the form of the

29  question, but please answer.

117

*Gwen Malone Stenography Services Ltd.*

1    A.  We bill based on hours spent or time spent on

2    client's case.  Our hourly rate ranges from 80 to 280

3    Euros.  We do monthly billing, but I will have to go to

4    my accountant to find out what was the total that we

5    billed to this client in this case.

247    6    Q.  Have you been paid at least US$1.3 million from

7    the Weiss Defendants?

8    A.  I am not able to make that estimation right now,

9    but what is important is to know is that we bill based

10    on hours spent and we do not charge any success fee.

248    11    Q.  Are you billing for your time today?

12    A.  I haven't thought about that yet.

249    13    Q.  Right.  Well I am going reserve our rights to

14    bring Mr Peterka back.  I'll probably be insisting that

15    he come to the United States, but I am going give the

16    courtesy to Mr Dangel.  He said he needed 45 minutes.

17    It is now 3.45.

18        MR DANGEL:  I appreciate the courtesy but.

19        MGR PESLOVA:  Before we start we will have

20    a three minute break.

21        (Off the record - 3.45 pm)

22        (On the record - 3.52 pm)

23        MR DANGEL:  Have you no sympathy to the fact

24    that there are two sides to this case, your Honour.  Can

25    we please get going, please?

26        Questioned by MR DANGEL:

250    27    Q.  Mr Peterka, you and your law firm filed various

28    lawsuits for what I will call the KT Plaintiffs;

29    correct.

118

1    A.  Yes.

251    2    Q.  Were any of those lawsuits filed for the purpose

3    of getting a higher price for any shares of stock in

4    Kotva or any other entity?

5    A.  No, never.  The only purpose of these lawsuits

6    was to protect the American investment and was to

7    preserve the status quo.  In other words, to prevent, to

8    prevent for this 12% block that was held directly by our

9    clients and the 32% block that, in our view, belongs to

10    Trend, and our client holds 40% in Trend, to prevent for

11    the value of these shares to decline or drop.

252    12    Q.  Were any of the lawsuits filed -- strike that.

13    As to any of the lawsuits filed, were they processed, as

14    that term is understood under Czech law?

15    MR BECKMAN:  Objection.

16    A.  Can you explain what you mean by process,

17    exactly?

18    MR DANGEL:

253    19    Q.  Did they tie up, cause an injunction, cause the

20    transfer of a property, of property or a property right

21    in any way?

22    MR BECKMAN:  Objection.

23    A.  By, only by filing those lawsuits no asset

24    transfers could occur.

25    MR DANGEL:

254    26    Q.  Could any assets be tied up that is enjoined?

27    MR BECKMAN:  Objection.

28    MR DANGEL:

255    29    Q.  Other than status quo, keeping the things the

119

*Gwen Malone Stenography Services Ltd.*

1   same, could there be any injunction of any kind?

2          MR BECKMAN:  Objection.

3   A.  We did not, we did not demand an injunction on

4   assets in these litigations.  I just, I am not sure if

5   I understand that correctly, but I believe I do.  So,

6   you know, you say tied up or if there was an injunction,

7   I understand the injunction is a preliminary ruling that

8   will stop people from doing something.

256     9   Q.  Correct.

10          MR BECKMAN:  Objection.  Go ahead.

11  A.  We did not seek any injunction even though we

12  could have and I can imagine, I imagine it as possible

13  that we would have, we would have asked for an

14  injunction to freeze the assets of Kotva but we didn't

15  do that.

16          MR DANGEL:

257    17   Q.  Did you ask for the transfer of shares or

18  money --

19          MR BECKMAN:  Objection.

20          MR DANGEL:

258    21   Q.  -- as part of the lawsuits?

22          MR BECKMAN:  Objection.

23  A.  We did not seek a transfer of money as regards

24  shares.  It wouldn't be a transfer.  It would simply be

25  a confirmation, it would simply be a confirmation that

26  the transfers from the tunneled Trend to Forminster were

27  invalid.

28          MR DANGEL:

259    29   Q.  Was a notice filed in any registry concerning the

120

1    lawsuits?

2                    MR BECKMAN:   Objection.

3                    MR DANGEL:

260    4    Q.   Or in something called a Cadastre ?

5                    MR BECKMAN:   Objection.

6    A.   The Czech law has it that if there is a lawsuit

7    filed to determine ownership rights regarding real

8    estate, a notice about such lawsuits to determine

9    ownership or a note is recorded in the Land Registry in

10    order for all third parties to be aware of such

11    a pending lawsuit.

12                    MR DANGEL:

261    13    Q.   Does the filing of that notice prevent the

14    transfer of real estate under Czech law?

15                    MR BECKMAN:   Objection.

16    A.   This is a relatively complicated legal issue that

17    we did not give much thought to.  But, according to my

18    understanding, it is to the discretion of the Land

19    Registry and then it is the discretion of the Land

20    Registry which may suspend the registration of a new

21    title or new owner until the pending lawsuit is resolved

22    or ruled upon.  In our case though --

23                    MR DANGEL:

262    24    Q.   That is my next question, may I ask it?  Did that

25    occur in this case?

26                    MR BECKMAN:   Objection.  Now when you are

27    asking the questions, you are going to let him stop the

28    answer.

29                    MR DANGEL:  I just don't want to have

121

*Gwen Malone Stenography Services Ltd.*

1    a situation where it is beyond the scope of my question.

2         MR BECKMAN:  As I did, but you can interrupt

3    and stop him, but I can't.  Is that what you are doing?

4         MR DANGEL:  And you can speak on the record

5    and I can't.  It is funny how when the shoe on the other

6    foot how different it feels.

263    7    Q.  But would you just please answer my question.

8    What occurred in this case?

9    A.  In this case this did not happen because the real

10   estate at that time was already registered with this

11   subsidiary number 51, that is a stipulation or in

12   parentheses so no proceedings regarding a registration

13   of the title were in progress at the time.  So,

14   according to my best knowledge, there was no proceeding

15   that could have been suspended by the Land Registry.

264   16   Q.  So no process issued as a result of that filing

17   of the notice; correct?

18        MR BECKMAN:  Objection.

19        MR DANGEL:  Strike that.

265   20   Q.  Did any process issue as a result of the filing

21   of the notice?

22        MR BECKMAN:  Objection.

23   A.  As I know the case, I believe no.

24        MR DANGEL:

266   25   Q.  Now, sir, at the end of lawsuits in the Czech

26   Republic is there a process by which one party can

27   recover its costs and legal fees if it feels it is

28   justified or that there has been some abuse in the

29   litigation?

122

*Gwen Malone Stenography Services Ltd.*

```
 1              MR BECKMAN:  Objection.
 2      A.  Yes.  Yes, it may.  This is all dealt with in the
 3   Code of Civil Procedure.
 4              MR DANGEL:
 5      Q.  Now in this particular instance, the Gilroy case
 6   was dismissed after a transfer of the Gilroy stock from
 7   one party to a party you believe and you testified
 8   as close to Forminster.  Is that -- the lawsuit
 9   terminated after that; is that correct?
10              MR BECKMAN:  Objection.
11      A.  That is correct, it was terminated then.
12              MR DANGEL:
13      Q.  And did the Defendant in that case seek
14   tariffication, that is did they seek costs and fees?
15              MR BECKMAN:  Objection.
16      A.  I will check.  According to the ruling from
17   September 20th, 2005 the Defendants, being Kotva AS,
18   Kotva NVKS, and SPVK,AS, the Defendants are entitled to
19   the cost incurred in relation to the proceedings and in
20   keeping with Section 142(1) of the Code of Civil
21   Procedure.
22              MR DANGEL:
23      Q.  And can you tell me the amount that they received
24   in US Dollars?
25      A.  My understanding that it was 12,000 Crowns and
26   six times 75 Crowns.  This is how I read the ruling.
27      Q.  So 12,500 Crowns roughly is how much in US
28   Dollars, sir?
29              MR BECKMAN:  Objection.
```

267
268
269
270

123

```
         1      A.   About 20 Crowns, 20.75 into a Dollar.
         2              MR DANGEL:
271      3      Q.   So roughly 20 into 1500 is roughly 700, $750,
         4    more or less?
         5      A.   Yes, something like that.
272      6      Q.   And that was awarded by a judge here?
         7              MR BECKMAN:  Objection.
         8      A.   Yes, that's correct.
         9              MR DANGEL:
273     10      Q.   And that is the final judgment?
        11      A.   Yes.
274     12      Q.   Now you have already testified, and I don't want
        13    to go back, to your being hired in this case and I want
        14    to ask you a few questions about what you did in
        15    connection with that in 2004.  Sir, first of all, how
        16    big is your law firm?
        17      A.   We have about 70 lawyers.
275     18      Q.   And how many cities do you practice?
        19      A.   Prague, Bratislava and Kiev.
276     20      Q.   And did Mr -- strike that.  Were you asked
        21    questions before you were hired about your professional
        22    standing and who you were and where you went to law
        23    school, that sort of question?
        24              MR BECKMAN:  Objection.
        25      A.   During our first conference call with Mr Weiss he
        26    did ask me questions about myself and where I was coming
        27    from.  He was interested in this and it was important to
        28    him in terms of his case.
        29              MR DANGEL:
```

124

277    1    Q.  Sir, as part of what you did when you were hired,
       2    did you gather certain facts before any lawsuits were
       3    filed?
       4    A.  As far as it was possible, we were trying to
       5    gather information from open sources, public sources.
278    6    Q.  Now Mr Weiss and Mr Nikitin or actually Professor
       7    Weiss and Dr Nikitin resided in the United States;
       8    correct?
       9    A.  Yes.
279   10    Q.  So were they a source of actual facts used in
      11    filing the case?
      12              MR BECKMAN:  Objection.
      13    A.  I will say that they knew the general facts about
      14    their investment, that is they had 12% in Kotva directly
      15    and 40% in Trend, whereby Trend hold 32% in Kotva.
      16    Other than that, they were not familiar with the Czech
      17    system and with the workings of the system in this
      18    country and they were not aware of the methods that are
      19    used to devalue their investment.
      20              MR DANGEL:
280   21    Q.  Were they aware of -- there has been references
      22    to tunneling of Kotva shares and various other things.
      23    Were they aware of, did they provide those facts or did
      24    you gather those facts on your own?
      25              MR BECKMAN:  Objection, that is three
      26    questions.
      27              MR DANGEL:  Okay.
281   28    Q.  Did you gather those facts yourself or were they
      29    the source of those facts?

                              125


                  *Gwen Malone Stenography Services Ltd.*

1            MR BECKMAN:  Objection.

2       A.  They had a general understanding of the fact that

3   Trend was tunneled but that is common knowledge,

4   everybody knows that.  And then we used open sources,

5   public sources to gather additional information and it

6   was also from the media that we learned that a plan to

7   sell the department store is under way or in the making.

8            MR DANGEL:

282    9       Q.  Was that information gathered here in the Czech

10  Republic?

11           MR BECKMAN:  Objection.

12      A.  Yes, that's correct.

13           MR DANGEL:

283    14      Q.  Was it gathered by your law firm?

15           MR BECKMAN:  Objection.

16      A.  Correct.

17           MR DANGEL:

284    18      Q.  Now did Professor Weiss or Dr Nikitin have any

19  knowledge or expertise in Czech law and Czech procedure,

20  civil procedure and other procedure?

21           MR BECKMAN:  Objection.

22      A.  No, they do not.

23           MR DANGEL:

285    24      Q.  But that is something that you are an expert in;

25  correct?

26           MR BECKMAN:  Objection.

27      A.  That's correct.

28           MR DANGEL:

286    29      Q.  Did you provide, without telling me what the

                            126

              *Gwen Malone Stenography Services Ltd.*

1  advice was, before the lawsuits were filed, did you

2  provide advice to Professor Weiss and Mr Nikitin and

3  other interested parties?

4           MR BECKMAN:  Objection.

5  A.  Yes, I did.

6           MR DANGEL:

287  7  Q.  Did you do that after you had gathered the facts

8  and researched the law?

9  A.  Yes.

10           MR BECKMAN:  Objection.

11           MR DANGEL:

288  12  Q.  After giving that advice, did they give you

13  permission to proceed with the lawsuits?

14           MR BECKMAN:  Objection.

15  A.  That's correct.

16           MR DANGEL:

289  17  Q.  Was it possible to know every fact about what had

18  happened with the Kotva shares and with the sale of the

19  real estate and so forth before you filed any lawsuits?

20           MR BECKMAN:  Objection.

21  A.  Certainly not.  Even today we learn new items of

22  information that we were not familiar with two and

23  a half years ago.  Simply because the methods of

24  tunneling of then and the methods of removing the assets

25  from the proximity of shareholders are sophisticated

26  methods and rely on the assumption that Czech

27  authorities will not be able to view the case in its

28  entirety and that these authorities --

29           THE INTERPRETER:  I am sorry, I beg your

127

*Gwen Malone Stenography Services Ltd.*

1   pardon.

2      A.   -- and these methods always rely or are billed on

3   legal formalism.

4            MR DANGEL:

290

5      Q.   Okay.  Now I wanted to get to that.  I have only

6   two more areas for you.  You filed how many lawsuits

7   here roughly?

8            MR BECKMAN:  Objection.

9      A.   About twenty lawsuits.

10           MR DANGEL:

291

11     Q.   Now was it necessary to file --

12           MR BECKMAN:  Mr Dangel, please.

13           MR DANGEL:

292

14     Q.   Was it necessary to file that many lawsuits?

15           MR BECKMAN:   Objection.

16     A.   It was necessary to file all these lawsuits

17   because the Czech law does not recognise the possibility

18   of one action against tunneling.  The Czech law operates

19   on the principle that these cases are seen as individual

20   cases, and even though we do state in each of these

21   lawsuits that it is a part of a larger whole, it is very

22   difficult to convince Czech judicial authorities to view

23   the case as one.  And it is completely impossible to

24   address this in one single lawsuit.

25           MR DANGEL:

293

26     Q.   So do I have this right?  Each separate issue

27   that might arise in the litigation is a different point

28   and each point requires, under Czech law, its own

29   lawsuit; is that understanding correct?


                          128


           *Gwen Malone Stenography Services Ltd.*

1           MR BECKMAN:   Objection.

2      A.   That is correct.

3           MR DANGEL:

294    4      Q.   Now, sir, you were asked today, over a period of

5      many hours, about a conversation that you took part in

6      on October 18th at your law office.  I am sure you

7      remember those questions, sir?

8      A.   Yes, I do.

295    9      Q.   Now I am going to ask you this: other than that

10     meeting, other than that meeting, did you make any

11     representations to third parties, that is other than the

12     discussions with Weiss or those parties -- here in order

13     to do this, look at Ex 4, take Ex 4.  This is what they

14     asked the permission to come ask you questions about.

15     And as to each of these areas I am going ask you whether

16     you told us everything you know.  Okay.

17          So, first area:  Mr Peterka's representations to

18     third parties regarding Weiss Defendant's efforts to

19     sell shares in Kotva by BGO.  Did I read that correctly,

20     sir?

21          MR BECKMAN:   Objection.

22          MR DANGEL:

296    23     Q.   Did I read it correctly?

24     A.   Yes.

297    25     Q.   Okay.  Is there anything more than you know that

26     you have already testified to about that area?

27          MR BECKMAN:   Objection.

28     A.   The only representations I made to third parties

29     are those representations that are part of the lawsuits

129

1   or that are part of our notifications to various
2   authorities in the Czech Republic.
3           MR DANGEL:
298  4   Q.  Sir, taking the next area, did you make any
5   representations, and if so, have you told us about all
6   of them or are there more?
7           MR BECKMAN:  Objection.
8           MR DANGEL:
299  9   Q.  Including to the Irish investors who purchased
10  the Kotva department store about the sale of Kotva's
11  department store?  So, to summarise that, were there any
12  other representations made to third parties about the
13  sale of Kotva's department store that have not been
14  testified to so far?
15          MR BECKMAN:  Objection.
16  A.  Aside from those representations that I
17  mentioned, that is those included in lawsuits and/or
18  notifications or motions to authorities, we also
19  notified, notified the Defendants about some of these
20  lawsuits and I have a list of these notifications which
21  were letters telling that we filed a lawsuit.
22          MR DANGEL:
300  23  Q.  It doesn't count because they are not third
24  parties.  Just third parties?
25          MR BECKMAN:  They are third parties.  They
26  are absolutely third parties.  Just let him answer.
27          MR DANGEL:  Okay, there is a list of
28  notifications provided.
29          MR BECKMAN:  Objection.


130


*Gwen Malone Stenography Services Ltd.*

1          MR DANGEL:

2     Q.   Third item, did you make any representations to

3     third parties regarding Weiss defendant's alleged

4     efforts to use litigation to force Kotva to purchase BGO

5     shares?

6     A.   We never made such representations.  To the

7     contrary, we always stressed that these litigations

8     aimed at preserving the status quo so that the shares

9     would not be devalued by assets being manipulated and

10    diverted.  And we always emphasised that any

11    negotiations about the sale of the shares, these

12    negotiations were unrelated to those lawsuits because

13    the objectives of those lawsuits was to preserve the

14    status quo.  If they were not filed, the entire

15    investment would be lost and there would be no interest

16    in the purchasing shares of Kotva or Trend from anyone,

17    from anybody.

18    Q.   Is what you have just told me about the purpose

19    of the filing of the lawsuits and their function, that

20    is what you have just testified to; was that the truth?

21         MR BECKMAN:  Objection.

22    A.   Yes, it was the truth.

23         MR DANGEL:

24    Q.   The next item you have testified today about

25    a meeting with Kotva, using that term generally, not

26    just Kotva AS, in fact that is the way it is used in the

27    document?

28         MR BECKMAN:  Objection.

29         MR DANGEL:  Well there is Kotva Real Estate,

131

*Gwen Malone Stenography Services Ltd.*

1    there is Kotva Operations and there is Kotva this and

2    Kotva that, so they used the term Kotva generally and so

3    did you, so I am pointing that out.

4           MR BECKMAN:  Objection.

5    A.   Yes.  As I explained for us, Kotva was very, even

6    more general term in the sense it the referred to the

7    group of people rounding Kotva and Forminster.

8           MR DANGEL:

304    9    Q.   Now, sir, you described a meeting of October 18,

10    2004, right?

11    A.   Mm-hmm.

305    12    Q.   Is that correct?

13    A.   Yes.

306    14    Q.   You have to speak to the record and say yes or

15    no?

16    A.   Can you repeat the question?

307    17    Q.   The question is you talked today, you told us the

18    testimony about your recollections of the October 18th,

19    2004 meeting; correct?

20    A.   Yes.

308    21    Q.   Were there any other meetings that come to mind,

22    as you sit here, with Kotva, using that term generally,

23    on behalf of "the Weiss Defendants" "to negotiate the

24    sale of BGO shares", if in fact you ever did that?

25           MR BECKMAN:  Objection.

26           MR DANGEL:

309    27    Q.   Were there any other meetings?

28           MR BECKMAN:  Objection.

29    A.   There was no such other meetings in which I would

132

*Gwen Malone Stenography Services Ltd.*

1    have taken part.

2            MR DANGEL:

3    Q.   Okay.  Now look at the fifth item?

4            MR BECKMAN:  Can you read it so the record

5    is complete?

6            MR DANGEL:  I will read it in a moment.  Are

7    you -- you already read it half, I will read it all.

8    I will do what you are supposed to do as a lawyer, yes.

9    Q.   Sir, you see the term "blackmail" in the middle

10   of second line, to blackmail Kotva.  Let me just say it

11   the way we would say in a US court in front of a jury,

12   to blackmail.  Horrible thing.  Right.  Are you aware of

13   any effort to blackmail Kotva?

14           MR BECKMAN:  Objection.

15   A.   I consider this word to be, this word to be used

16   here absurd.  According to my opinion, nothing like that

17   ever happened.  The lawsuits were filed in order to

18   protect the investment.

19           MR DANGEL:

20   Q.   Now having said that, let me read into the record

21   the following.  Are you aware of any representations you

22   made to and meetings you had with third parties about

23   the Weiss Defendants alleged scheme to blackmail Kotva

24   and interfere with the sale of the department store by,

25   among other things, filing litigation on behalf of the

26   Weiss Defendants, Gilroy, Balfindor, KT, CVF and/or

27   Vladimir Hoffmann?

28   A.   Certainly not and it is all absurd.

29           MR DANGEL:  Your Honour, those are the five

133

*Gwen Malone Stenography Services Ltd.*

1  matters that were sent to you to have hearings on.
2  I consider --
3           MR BECKMAN:  Hearings?
4           MR DANGEL:  This deposition on.  I consider
5  that all of those five areas have been fully covered.
6  If Mr Beckman has other questions that have not been
7  covered in these five areas, he should state them now
8  for the record or the record should be closed.  Thank
9  you very much for your time, your Honour.  I am
10  finished.
11           State, please, any other questions in these
12  five areas that you have in mind?
13           MR BECKMAN:  I can't.
14           MR DANGEL:  I can have the witness step out
15  so he doesn't hear them.  But either tell us what those
16  questions are now or the record, I say, is closed.
17           MR BECKMAN:  Okay.  That is your position.
18  We had an agreement on the record that I was giving you
19  the courtesy of going until 3.45 --
20           MR DANGEL:  What time is it now?
21           MR BECKMAN:  -- until 4.30.  And as it is
22  4.30, am I about right?
23           MGR PESLOVA:  Yes.
24           MR DANGEL:  But if you have other questions.
25           MR BECKMAN:  She can't take us both down,
26  Mr Dangel.
27           MR DANGEL:  True.
28           MR BECKMAN:  So we have more than stated our
29  positions on the record.  We are suspending this

                          134

1    deposition at this time and reserving our rights to

2    bring Mr Peterka back.

3            MR DANGEL:  In my opinion this deposition is

4    closed.  But we will talk about in the United States.

5            MR BECKMAN:  Before we close, I am sorry,

6    are you going back on your agreement to have Mr Peterka

7    be deposed by telephone?

8            MR DANGEL:  I am going back on it to the

9    extent that you have been unable to state a single

10   question that you would ask in the five areas.  And

11   until you do that, and you demonstrate to me and to the

12   Court that in good faith you have real questions to ask

13   in those areas, yes, I am telling you I am not going

14   along with anything.  But if you show me that you do

15   have real questions in it, of course I will consider

16   a telephone deposition as a courtesy to my opposing

17   counsel in the case at a time convenient to Mr Peterka,

18   who has a law firm who run.  Thank you.  So you will

19   receive every courtesy, Joel.  All I want to know is you

20   really have questions and this is not really part of

21   a strategy to run up time against the Weiss Defendants.

22           MR BECKMAN:  Thank you very much for your

23   time.

24           MR DANGEL:  Thank you.  Your Honour, please,

25   there is one more matter we should do before we finish.

26   We should get an official time count on how much time

27   each side used and enter that in the record because that

28   is important.

29           THE INTERPRETER:  The Judge says she will

135

*Gwen Malone Stenography Services Ltd.*

1    put together a short transcript or short memo where the
2    exact time will be recorded.
3              MR DANGEL:  Thank you so much, your Honour.
4    Thank you for your time.
5    **(The deposition adjourned at 4.30 pm)**
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

*Gwen Malone Stenography Services Ltd.*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s.<br><br>                Plaintiff,<br><br>                v.<br><br>ANDREW WEISS and WEISS ASSET<br>MANAGEMENT, LLC<br><br>                Defendants. | )<br>)<br>)<br>)    Case No. 05-10679-RCL<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## APPLICATION FOR LETTER OF REQUEST
## FOR INTERNATIONAL JUDICIAL ASSISTANCE

Kotva a.s. hereby applies to this Court pursuant to Rule 28(b) of the Federal Rules of Civil Procedure and the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention") for the issuance of a Letter of Request, in the form attached hereto, directed to the Appropriate Judicial Authorities of the Czech Republic. Kotva is seeking the examination of Mr. Ondrej Peterka, attorney at Peterka & Partners (hired by defendant Andrew Weiss and Weiss Capital Partners LLC on or about June 4, 2004), that may be used in civil proceedings before this court in the above captioned matter.

## GROUNDS FOR APPLICATION

As grounds for this application, Kotva states as follows:

1.     At the heart of this matter is an attempt by the defendant Andrew Weiss to blackmail the Czech company Kotva a.s. in an effort to extort millions of dollars in return for dropping certain sham lawsuits initiated by Weiss. In short, beginning in 2004, Weiss

blackmailed Kotva after he learned that Kotva planned to sell its shopping center. When Kotva refused Weiss' demand that it "repurchase" the shares in Kotva held by BGO (a Weiss managed fund), Gilroy Limited ("Gilroy") and KT, Inc. ("KT") purchased nominal shares of Kotva's stock and filed lawsuits in the Czech Republic, challenging the transfer of the Department Store from Kotva to its subsidiary—which had occurred three years earlier—solely to interfere with the sale. Weiss thereafter made ever increasing demands on Kotva to purchase BGO's shares, and promised that he would "attempt to influence" Gilroy and KT to drop the suits if his price demands were met. In all of his communications to Kotva, however, Weiss denied any connection with Gilroy or KT. Nevertheless, Weiss subsequently admitted that he caused both Gilroy and KT to file the suits against Kotva.

2.    Defendant Andrew Weiss and Weiss Capital LLC hired attorney Ondrej Peterka of Peterka & Partners on June 4, 2004 and that firm continues to represent them. According to the Defendants and counterclaim-plaintiffs' August 10, 2006 Appendix to their revised privilege log:

> Peterka & Partners began representing KT, Inc. in July 2004 and continues to represent it. Peterka & Partners began representing CVF Investments LLC in December 2005 and continues to represent it. Peterka & Partners began representing CVF Investments Ltd. on May 26, 2005 and continues to represent it. Peterka & Partners also represented Balfindor with respect to a particular piece of litigation from June 8, 2004 to December 10, 2004. Peterka & Partners also represented Gilroy with respect to a particular piece of litigation from mid-June 2004 until December 13, 2004. Peterka & Partners also represented Mr. Hoffmann with respect to a particular piece of litigation from June 2004 to November 25, 2004.

Mr. Hoffmann was Weiss's associate in the Czech Republic.

3.    Mr. Peterka, therefore, played an instrumental role in carrying out the Weiss Defendants' blackmail scheme against Kotva through the use of sham litigation.

2

Indeed, Mr. Peterka's firm, Peterka & Partners, appears to have filed all of the sham lawsuits against Kotva in the Czech Republic. Mr. Peterka also personally participated in meetings and conversations with Kotva regarding the Weiss Defendants' blackmail scheme.

4.      Kotva seeks to question Mr. Peterka about the conversations and meetings with third parties, including Kotva, which he participated in or was aware of that are relevant to the Weiss Defendants' scheme to blackmail Kotva and interfere with the sale of Kotva's Department store. Kotva does not seek to invade the attorney-client privilege and does not intend to question Mr. Peterka about privileged matters.

5.      Kotva has submitted herewith a Letter of Request to the Appropriate Judicial Authorities of the Czech Republic for an order effecting the assistance requested in this application. Pursuant to the Hague Convention, the Letter of Request should be transmitted in duplicate directly from the Court to the Czech central authority designated in the Letter of Request. If necessary, Kotva will provide a certified translation of the Letter of Request.

Respectfully submitted,

KOTVA, A.S.

By its attorneys,


/s/ Joel G. Beckman
Joel G. Beckman (BBO# 553086)
William C. Nystrom (BBO# 559656)
Daniel J. Pasquarello (BB0# 647379)
NYSTROM BECKMAN & PARIS LLP
10 St. James Ave., 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)
jbeckman@nbparis.com
wnystrom@nbparis.com
dpasquarello@nbparis.com

Dated: November 6, 2006


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 6th day of November, 2006.


/s/ Joel G. Beckman

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ANDREW WEISS and WEISS ASSET | ) |
| MANAGEMENT, LLC | ) |
| | ) |
| Defendants. | ) |

Case No. 05-10679-RCL

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
## (LETTERS ROGATORY/COMMISSION ROGATOIRE)

To:    The Appropriate Judicial Authorities of the Czech Republic

Ministerstvo Spravedlnosti Ceske Republicky
(The Ministry of Justice of the Czech Republic)
128 10 Praha 2
Vysehradska 16
Prague, Czech Republic

Dear Honorable Justices:

The United States District Court for the District of Massachusetts presents its

compliments, and requests international judicial assistance to obtain evidence to be used

in a civil proceeding before this court in the above captioned matter.

This court requests the assistance described herein as necessary in the interests of

justice.  The assistance requested is that the appropriate judicial authority of the Czech

Republic, pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil

or Commercial Matters, require the examination of Mr. Ondrej Peterka, a resident of the

Czech Republic and attorney at Peterka & Partners hired by Defendant Andrew Weiss

and Weiss Capital LLC.  Mr. Peterka has also represented counterclaim-plaintiffs KT, Inc. and CVF Investments Ltd. as well as CVF Investments, LLC, Gilroy, Balfindor, and Vladimir Hoffmann in litigation filed against Kotva in the Czech Republic.  As an individual with personal knowledge of the topics described, Kotva has requested that Mr. Peterka be required to provide testimony and give evidence that may be used in civil proceedings before this Court.

## BACKGROUND

The plaintiff, Kotva a.s. ("Kotva"), filed a civil suit against the defendants, Andrew Weiss and Weiss Asset Management, LLC ("Weiss defendants"), in federal court in Massachusetts in 2005.  The description of the case is based on allegations in Kotva's Complaint.

According to Kotva's Complaint, defendant Andrew Weiss attempted to blackmail the Czech company Kotva a.s. in an effort to extort millions of dollars in return for dropping certain sham lawsuits initiated by Weiss.  Beginning in 2004, Weiss allegedly blackmailed Kotva after he learned that Kotva planned to sell its shopping center.  When Kotva refused Weiss' demand that it "repurchase" BGO's shares in Kotva, Kotva claims that Gilroy Limited ("Gilroy") and KT, Inc. ("KT") purchased nominal shares of Kotva's stock and filed lawsuits in the Czech Republic to challenge the transfer of the Department Store from Kotva to its subsidiary—which had occurred three years earlier—solely to interfere with the sale.  Thereafter, Weiss allegedly made ever increasing demands on Kotva to purchase BGO's shares, and promised that he would "attempt to influence" Gilroy and KT to drop the suits if his price demands were met. According to Kotva, Weiss initially denied any connection with Gilroy or KT in his

communications with Kotva, but later admitted that he caused both Gilroy and KT to file the suits against Kotva.

Defendant Andrew Weiss and Weiss Capital LLC hired attorney Ondrej Peterka of Peterka & Partners on or about June 4, 2004 and that firm continues to represent them. According to the Weiss Defendants and counterclaim-plaintiffs' August 10, 2006 Appendix to their revised privilege log:

> Peterka & Partners began representing KT, Inc. in July 2004 and continues to represent it. Peterka & Partners began representing CVF Investments LLC in December 2005 and continues to represent it. Peterka & Partners began representing CVF Investments Ltd. on May 26, 2005 and continues to represent it. Peterka & Partners also represented Balfindor with respect to a particular piece of litigation from June 8, 2004 to December 10, 2004. Peterka & Partners also represented Gilroy with respect to a particular piece of litigation from mid-June 2004 until December 13, 2004. Peterka & Partners also represented Mr. Hoffmann with respect to a particular piece of litigation from June 2004 to November 25, 2004.

Mr. Hoffmann was Weiss's associate in the Czech Republic.

## QUESTIONS

Kotva seeks to examine Mr. Peterka under oath because of his personal knowledge of and personal participation in the Weiss defendants' alleged efforts to blackmail Kotva. Specifically, Kotva seeks to question Mr. Peterka about:

- his representations to third parties regarding the Weiss defendants' efforts to sell shares held in Kotva by BGO;

- his representations to third parties, including the Irish investors who purchased the Kotva Department Store, about the sale of Kotva's Department Store;

- his representations to third parties regarding the Weiss defendants' alleged efforts to use litigation to force Kotva to purchase BGO's shares;

3

- his meetings with Kotva on behalf of the Weiss defendants to negotiate the sale of the BGO shares;

- his representation to and meetings with third parties about the Weiss Defendants' alleged scheme to blackmail Kotva and interfere with the sale of the Department store by, among other things, filing litigation on behalf of the Weiss Defendants, Gilroy, Balfindor, KT, CVF and/or Vladimir Hoffmann.

Kotva does not intend to question Mr. Peterka about privileged matters.

## **REQUEST**

The undersigned honorable Judge Reginald C. Lindsay, Judge of the United States District Court for the District of Massachusetts, therefore respectfully requests the Appropriate Judicial Authorities of the Czech Republic to cause Mr. Ondrej Peterka to be summoned to attend, at such place and time as the Court shall appoint, before such person who, according to the procedure of your Honorable Court, is competent to preside over the examination of witnesses under oath, and that you permit such witness to be examined orally by Joel G. Beckman, or William C. Nystrom or Daniel J. Pasquarello of Nystrom, Beckman & Paris LLP, attorneys for Kotva; and Edward P. Leibensperger, or Benjamin A. Goldberger, or Sylvia K. Kratky of McDermott, Will & Emery LLP, attorneys for the Weiss defendants. The specific topics of inquiry proposed for the examination of Mr. Peterka are outlined above. It is further requested that:

a. The testimony of Mr. Peterka be recorded on videotape and transcribed by a stenographer in accordance with the rules applicable to the jurisdiction of your Honorable Court and there be authentication of Mr. Peterka's testimony by the

4

seal of your Honorable Court or in such other way as prescribed by the procedure of your Honorable Court.

b.  The testimony of Mr. Peterka on video, the transcripts of Mr. Peterka's testimony as well as any documents, copies or extracts from documents be transmitted to this Court in a sealed envelope addressed to the Clerk of the United States District Court for the United States District of Massachusetts at:

> Clerk of Court
> United States District Court of Massachusetts
> 1 Courthouse Way
> Boston, Massachusetts 02210
> Attention: Mr. Don Stanhope
> CA #05-10679-RCL

c.  Your Honorable Court cause to be sent to Joel Beckman, Nystrom, Beckman & Paris LLP, 10 St. James Ave., 16th Floor, Boston, MA 02216, a note of the charges and expenses payable in respect of the execution of this request.

## **RECIPROCITY**

It is the understanding of this Court that the granting of assistance of the type herein requested is authorized by the laws of the Czech Republic.  The courts of the United States are authorized by statute, Section 1782, title 28 of the United States Code, to extend similar assistance to the tribunals of the Czech Republic.

## <u>REIMBURSEMENT OF COSTS</u>

Kotva has assured this Court that they are prepared to reimburse your Court for all reasonable costs incurred in executing this request.

_____
Reginald C. Lindsay, U.S. District Judge
United States District Court for the District of Massachusetts
Boston, Massachusetts, United States of America

November __, 2006

(SEAL OF COURT)

6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s. | ) |
| | ) |
| Plaintiff, | ) Case No. 05-10679-RCL |
| | ) |
| v. | ) |
| | ) |
| ANDREW WEISS and WEISS ASSET | ) |
| MANAGEMENT, LLC | ) |
| | ) |
| Defendants. | ) |

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
## (LETTERS ROGATORY/COMMISSION ROGATOIRE)

To:    The Appropriate Judicial Authorities of the Czech Republic

Ministerstvo Spravedlnosti Ceske Republicky
(The Ministry of Justice of the Czech Republic)
128 10 Praha 2
Vysehradska 16
Prague, Czech Republic

Dear Honorable Justices:

The United States District Court for the District of Massachusetts presents its

compliments, and requests international judicial assistance to obtain evidence to be used

in a civil proceeding before this court in the above captioned matter.

This court requests the assistance described herein as necessary in the interests of

justice. The assistance requested is that the appropriate judicial authority of the Czech

Republic, pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil

or Commercial Matters, require the examination of Mr. Ondrej Peterka, a resident of the

Czech Republic and attorney at Peterka & Partners hired by Defendant Andrew Weiss

and Weiss Capital LLC. Mr. Peterka has also represented counterclaim-plaintiffs KT,

Inc. and CVF Investments Ltd. as well as CVF Investments, LLC, Gilroy, Balfindor, and

Vladimir Hoffmann in litigation filed against Kotva in the Czech Republic. As an

individual with personal knowledge of the topics described, Kotva has requested that Mr.

Peterka be required to provide testimony and give evidence that may be used in civil

proceedings before this Court.

## BACKGROUND

The plaintiff, Kotva a.s. ("Kotva"), filed a civil suit against the defendants,

Andrew Weiss and Weiss Asset Management, LLC ("Weiss defendants"), in federal

court in Massachusetts in 2005. The description of the case is based on allegations in

Kotva's Complaint.

According to Kotva's Complaint, defendant Andrew Weiss attempted to

blackmail the Czech company Kotva a.s. in an effort to extort millions of dollars in return

for dropping certain sham lawsuits initiated by Weiss. Beginning in 2004, Weiss

allegedly blackmailed Kotva after he learned that Kotva planned to sell its shopping

center. When Kotva refused Weiss' demand that it "repurchase" BGO's shares in Kotva,

Kotva claims that Gilroy Limited ("Gilroy") and KT, Inc. ("KT") purchased nominal

shares of Kotva's stock and filed lawsuits in the Czech Republic to challenge the transfer

of the Department Store from Kotva to its subsidiary—which had occurred three years

earlier—solely to interfere with the sale. Thereafter, Weiss allegedly made ever

increasing demands on Kotva to purchase BGO's shares, and promised that he would

"attempt to influence" Gilroy and KT to drop the suits if his price demands were met.

According to Kotva, Weiss initially denied any connection with Gilroy or KT in his

communications with Kotva, but later admitted that he caused both Gilroy and KT to file the suits against Kotva.

Defendant Andrew Weiss and Weiss Capital LLC hired attorney Ondrej Peterka of Peterka & Partners on or about June 4, 2004 and that firm continues to represent them. According to the Weiss Defendants and counterclaim-plaintiffs' August 10, 2006 Appendix to their revised privilege log:

> Peterka & Partners began representing KT, Inc. in July 2004 and continues to represent it.  Peterka & Partners began representing CVF Investments LLC in December 2005 and continues to represent it.  Peterka & Partners began representing CVF Investments Ltd. on May 26, 2005 and continues to represent it.  Peterka & Partners also represented Balfindor with respect to a particular piece of litigation from June 8, 2004 to December 10, 2004. Peterka & Partners also represented Gilroy with respect to a particular piece of litigation from mid-June 2004 until December 13, 2004.  Peterka & Partners also represented Mr. Hoffmann with respect to a particular piece of litigation from June 2004 to November 25, 2004.

Mr. Hoffmann was Weiss's associate in the Czech Republic.

## QUESTIONS

Kotva seeks to examine Mr. Peterka under oath because of his personal knowledge of and personal participation in the Weiss defendants' alleged efforts to blackmail Kotva.   Specifically, Kotva seeks to question Mr. Peterka about:

- his representations to third parties regarding the Weiss defendants' efforts to sell shares held in Kotva by BGO;

- his representations to third parties, including the Irish investors who purchased the Kotva Department Store, about the sale of Kotva's Department Store;

- his representations to third parties regarding the Weiss defendants' alleged efforts to use litigation to force Kotva to purchase BGO's shares;

3

- his meetings with Kotva on behalf of the Weiss defendants to negotiate the sale of the BGO shares;

- his representation to and meetings with third parties about the Weiss Defendants' alleged scheme to blackmail Kotva and interfere with the sale of the Department store by, among other things, filing litigation on behalf of the Weiss Defendants, Gilroy, Balfindor, KT, CVF and/or Vladimir Hoffmann.

Kotva does not intend to question Mr. Peterka about privileged matters.

## REQUEST

The undersigned honorable Judge Reginald C. Lindsay, Judge of the United States District Court for the District of Massachusetts, therefore respectfully requests the Appropriate Judicial Authorities of the Czech Republic to cause Mr. Ondrej Peterka to be summoned to attend, at such place and time as the Court shall appoint, before such person who, according to the procedure of your Honorable Court, is competent to preside over the examination of witnesses under oath, and that you permit such witness to be examined orally by Joel G. Beckman, or William C. Nystrom or Daniel J. Pasquarello of Nystrom, Beckman & Paris LLP, attorneys for Kotva; and Edward P. Leibensperger, or Benjamin A. Goldberger, or Sylvia K. Kratky of McDermott, Will & Emery LLP, attorneys for the Weiss defendants. The specific topics of inquiry proposed for the examination of Mr. Peterka are outlined above. It is further requested that:

a. The testimony of Mr. Peterka be recorded on videotape and transcribed by a stenographer in accordance with the rules applicable to the jurisdiction of your Honorable Court and there be authentication of Mr. Peterka's testimony by the

4

seal of your Honorable Court or in such other way as prescribed by the procedure of your Honorable Court.

b.  The testimony of Mr. Peterka on video, the transcripts of Mr. Peterka's testimony as well as any documents, copies or extracts from documents be transmitted to this Court in a sealed envelope addressed to the Clerk of the United States District Court for the United States District of Massachusetts at:

> Clerk of Court
> United States District Court of Massachusetts
> 1 Courthouse Way
> Boston, Massachusetts 02210
> Attention: Mr. Don Stanhope
> CA #05-10679-RCL

c.  Your Honorable Court cause to be sent to Joel Beckman, Nystrom, Beckman & Paris LLP, 10 St. James Ave., 16th Floor, Boston, MA 02216, a note of the charges and expenses payable in respect of the execution of this request.

## RECIPROCITY

It is the understanding of this Court that the granting of assistance of the type herein requested is authorized by the laws of the Czech Republic.  The courts of the United States are authorized by statute, Section 1782, title 28 of the United States Code, to extend similar assistance to the tribunals of the Czech Republic.

## REIMBURSEMENT OF COSTS

Kotva has assured this Court that they are prepared to reimburse your Court for all reasonable costs incurred in executing this request.

Reginald C. Lindsay, U.S. District Judge
United States District Court for the District of Massachusetts
Boston, Massachusetts, United States of America

November __, 2006

(SEAL OF COURT)

IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856

AND IN THE MATTER OF CIVIL PROCEEDINGS NOW PENDING

BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT

OF MASSACHUSETTS (CIVIL ACTION NO. 05-10679-RCL)

```
_____ )
                             )
                             )
KOTVA a.s.                   )
                             )
          Plaintiff          )
                             )
                             )
          v.                 )
                             )
                             )
ANDREW WEISS and WEISS ASSET )
MANAGEMENT, LLC              )
                             )
                             )
          Defendants         )
_____ )
```

Deposition of:

Mr. Howard Golden

Taken at:
Courtroom No 126
District Court for Prague 1,
Ovocny trh 14

On:   April 17th, 2007
Commencing at 9.00 am

1  was presented, not that it was blackmail.

2        MR BECKMAN:

23    3    Q.  You said Forminster argued that it was blackmail?

4        MR DANGEL:  Objection.

5    A.  My understanding in discussions with Vladimir and

6  I had discussions years earlier.

7        MR BECKMAN:

24    8    Q.  Let's focus on the 2004 time frame?

9        MR DANGEL:  Excuse me, I want it noted he

10  interrupted the witness in the middle of an answer and

11  I don't want that to happen again.

12        MR BECKMAN:

25   13    Q.  Let's focus on the 2004 time frame.

14        MR DANGEL:  Do abuse the process, sir.

15        MR BECKMAN:

26   16    Q.  Let's focus on the 2004 time frame.  Did, in the

17  2004 time frame did Mr Hoffmann tell you that Forminster

18  had raised the issue of blackmail?

19        MR DANGEL:  Objection.

20    A.  I don't recall that it was ever raised in the

21  2004 time frame.  In that period my activities were

22  pretty much limited to helping, as we heard in these

23  tapes, write the papers or to how to present to Andy

24  that he should accept an offer.  No, I think he, he was

25  concentrating -- almost all the discussions were

26  concentrating on Andy's side, trying to get Andy to get

27  the offers and it wasn't on defences or arguments used

28  by the Forminster people.  That was a negotiation that

29  he was doing and I don't think so.  No, sir.

10

27

1    Q.   In the 2004 time frame, did anyone tell you that

2    Forminster had raised the issue of blackmail?

3         MR DANGEL:   Objection.

4    A.   My recollection of the only time that was raised

5    was in a newspaper article or somewhere I read it,

6    I don't know if it was in 2004, but I recall at some

7    point that there was public discussion where Forminster,

8    that is my recollection at this time that somebody said:

9    Oh, this is really blackmail, something of that nature,

10   it is the defence.   But nobody that I can recall told

11   me, told me, if that is the question, that:   Hey, this

12   is blackmail.

28

13   Q.   In the 2004 time frame did anyone from Markland?

14   A.   What is the name of the company?

29

15   Q.   Markland?

16   A.   That is the Irish?

30

17   Q.   I am sorry, let's use the Irish.   Let me withdraw

18   that.   In the 2004 time frame did anyone representing

19   the Irish raise with you the issue of blackmail?

20   A.   My recollection is I only had one chance

21   encounter with anyone from that organisation, that was

22   at the airport that we discussed yesterday, and the

23   discussion centered as to whether or not he would get

24   legal title.   And I think the only response was that he

25   had a letter saying that he could go ahead with it, his

26   law firm were examining this and said he could go ahead

27   with this sale.   I can't remember the entire

28   conversation but I think if he had used the word

29   blackmail I would probably remember it.   So I would have

11

1    to say no to that question.

31

2        Q.   What is the basis for your testimony that

3    Vladimir Hoffmann was, when discussing blackmail, was

4    raising an argument that either Forminster or the Irish

5    had raised the issue of blackmail?

6            MR DANGEL:   Objection.

7        A.   My basis would be that I had encountered that in

8    my discussions.  I may have repeated it there because

9    when I was trying to negotiate the sale years earlier

10   they were saying, I seem to recall, this is blackmail or

11   re-mail, I don't know what term they used.  I didn't

12   think that things had changed there.  I think the other

13   basis with the conversation I heard yesterday was where

14   he said:  How do I present it to the Irish without it

15   appearing to be, or without it being and he used that

16   word in Czech, vydirani I think it was, which I still

17   contend I didn't hear in the phone conversation and

18   I didn't hear it the first time yesterday.  So from

19   that, my view would be his concern was how to present it

20   in a way that it wouldn't appear to the other people to

21   be improper.

32

22       Q.   But you --

23           MR DANGEL:   Excuse me.  I need to move to

24   strike the part of the answer that referred to the tape

25   yesterday.  Now go ahead.

26           MR BECKMAN:

33

27       Q.   Do you have any personal knowledge in the 2004

28   time frame anyone representing Kotva had raised the

29   issue of blackmail with Mr Hoffmann?

12

1      A.   Sitting here today, I cannot say I have any

2   personal knowledge.   The only --

3            MR DANGEL:   Objection beyond that.

4      A.   -- possible way that I could have information

5   like the Kotva people had a position would be through

6   Mr Hoffmann.   And unless Mr Hoffmann had told me, which

7   would then be hearsay, I had no personal knowledge even

8   when I played squash I wasn't talking to people, I don't

9   think I saw Mr Harazim or Mr Benda or anybody from

10  Forminster for a number of years.

11           MR BECKMAN:

12     Q.   Did Mr Hoffmann in the 2004 time frame raise with

13  you the issue that Kotva had asserted that the offers

14  were blackmail?

15           MR DANGEL:   Objection.

16     A.   Do I recall any conversation where he told me

17  that they said it was blackmail, that is basically?

18           MR BECKMAN:   Yes.

19           MR DANGEL:   In what time frame?   I am sorry.

20           MR BECKMAN:   2004.

21           MR DANGEL:   Object.

22     A.   I can't recall any specific conversation where he

23  said that.   You have tapes of all of that and if there

24  is one I will listen to it and I will discuss it.   But

25  I truthfully, as I sit here today, do not have

26  a recollection of he saying to me they said it is

27  blackmail.   I don't recall such a thing.

28           MR BECKMAN:

29     Q.   Did Vladimir Hoffmann tell you that Mr Weiss had

13

*Gwen Malone Stenography Services Ltd.*

1    accused him of not being aggressive enough in the

2    negotiating over --

3              MR DANGEL:  Objection.

4              MR BECKMAN:

5    Q.  -- over the sale of the Kotva shares?

6              MR DANGEL:  Objection to the form.

7    Objection to the question.

8    A.  I have a recollection in our discussions he

9    probably said something to the effect that Andy wanted

10   him to push and he was looking, Andy was looking for

11   more.  Something of the nature.  You're characterizing

12   that is aggressive and that is a characterization, with

13   all due respect.  I don't know that Hoffmann used the

14   word aggressive to me.  On the other hand, I believe

15   that in our discussions he would indicate that Andy

16   either wanted him to push or wanted more, something of

17   that nature.  If that could be characterised as being

18   more aggressive, then the answer would be yes to that

19   question.  It is a characterization of the terminology.

20   Q.  Did Mr Hoffmann --

21   A.  Excuse me.

22   Q.  Take your time.

23   A.  I still have a cold.

24   Q.  Did Mr Hoffmann tell that you Andrew Weiss wanted

25   him to push for more for the Kotva shares?

26             MR DANGEL:  Objection.  And objection.

27             MR BECKMAN:  You can answer.

28   A.  My recollection of our conversations were more

29   that he was having difficulty getting a response from

14

1    attitude towards the privatisation thefts.

140    2    Q.  During your time here in the 1990s, early 2000s,

3    did you have occasion, as you were doing your job in

4    gathering information, to learn that from time to time

5    business matters where there were disagreements, turned

6    violent?

7            MR BECKMAN:  Objection.

8    A.  Yes, sir.

9            MR DANGEL:

141    10    Q.  Did you report that to Professor Weiss from time

11    to time?

12            MR BECKMAN:  Objection.

13    A.  I don't know where you are going with this, sir,

14    but not only did Professor Weiss get those reports from

15    me, but he had his own sources and he, because at that

16    time we were not at odds, he insisted that I purchase

17    and wear a bullet proof vest in this country.  We had

18    a discussion as to whether I needed it and in the end

19    I gave in.  For a period of a few weeks or months I wore

20    it but I didn't feel it was to that degree that my life

21    was in danger.  But I can assure you that he understood

22    there was issues here and he was aware of it both from

23    my own reports and from his own intelligence gathering.

142    24    Q.  And he was concerned that business disagreements

25    that he was involved with could turn violent.  Was he

26    concerned about that, did he express concerns like that

27    to you?

28            MR BECKMAN:  Objection.

29    A.  I think I just told you.

46

1          MR BECKMAN:   That is four questions.

2          MR DANGEL:   Yes, there's four questions and

3    I will ask just one question.

143    4    Q.   Did he indicate to you that he was concerned that

5    business matters that Brookdale was concerned with could

6    turn violent?

7          MR BECKMAN:   Objection.

8    A.   Yes, sir.   I think that was the basis for his

9    insisting that I wear a bullet proof vest.   You must

10    also understand at that time in other communist

11    countries people were being killed; in Russia, Ukraine

12    and there is a lot of violence and the question was

13    whether the violence in the Czech Republic would rise to

14    that level and that was a concern that we discussed at

15    least on a few occasions.

16          MR DANGEL:

144    17    Q.   Are you familiar with a company called

18    Forminster?

19    A.   Yes, sir.

145    20    Q.   Have you attempted to find out who the

21    shareholders and the directors of Forminster are?

22          MR BECKMAN:   Objection.

23    A.   Yes, sir.

24          MR DANGEL:

146    25    Q.   Have you been able to find out and discover that?

26          MR BECKMAN:   Objection.

27    A.   No.

28          MR DANGEL:

147    29    Q.   You smiled in the direction of Mr Harazim.   What

47

1  is the reason why you smiled toward Mr Harazim when

2  I asked that question?

3          MR BECKMAN:  Objection.

4      A.  Yes, I wondered if he was going to look at me to

5  see if I'd found it so he'd maybe think yes, I found it

6  out.  But, no, I have been unable to discover who the

7  shareholders or real owners of Forminster are.

8      Q.  Do you have an indication that they, to some

9  extent, involve either present or former government

10  officials?

11          MR BECKMAN:  Objection.

12      A.  On the basis of enquiries I have made, and on the

13  basis of the events that have unfolded, I have reason to

14  believe that there are either government officials or

15  people closely connected with the government that have

16  an interest in Forminster.

17      Q.  What is the basis for that?

18      A.  I cannot imply that they own it or they are

19  shareholders.

20      Q.  What is the basis for that?

21      A.  In brief, there were substantial value

22  transferred of the Trend fund to Forminster.  No-one was

23  ever prosecuted in the Trend Fund and numerous suits

24  against Forminster always seemed to be resolved more

25  positively toward Forminster than I would expect from

26  an independent view point.  Before I got involved in

27  this White & Case, which is a prominent international

28  firm, spent substantial sums money with the Trend Fund

29  fighting to get their shares back and was surprisingly

148

149

150

48

1    unsuccessful.  Well, I tell you, I would rather not go

2    into each and every one of the pieces of information

3    which led me to that conclusion.  Not only do I think it

4    is not a good idea for my sources nor is it something

5    that is beneficial, but I would prefer to retain

6    confidentiality to my sources.  Let's just say I formed

7    an opinion that it was more than likely that highly

8    placed individuals, either in government or connected

9    with the government, had an interest in assisting

10   Forminster, whether it was by ownership or some other

11   method I cannot testify today that I have reached that

12   conclusion.

13            MR DANGEL:

151  14   Q.  The investigation and the determination and

15   opinion you have of the gathering of information and the

16   investigating you did that led you to this opinion, was

17   it relevant in some way to the consideration of the

18   Kotva shares and Trend shares?

19            MR BECKMAN:  Objection.

20   A.  Yes, sir.

21            MR DANGEL:

152  22   Q.  And what relevance did it have?

23   A.  I advised Professor Weiss that, in my opinion,

24   these were very highly connected people and as I was

25   arguing in the Kazakhstan fund that it makes it a good

26   idea to sell out at some point.  In poker you have, you

27   have got to know when to hold them and when to fold

28   them.  I utilised this information in an attempt to

29   convince Mr Weiss to accept some of the offers I was

49

1    given by Mr Benda and Mr Harazim to sell them earlier on
2    and not to continue to fight for NAV or a higher amount
3    because I thought that there were, it wouldn't benefit
4    us and it would be unlikely that we would receive it.
5        Q.   Now in describing that to Mr Professor Weiss, did
6    you describe I think what Mr Beckman called yesterday
7    certain extraordinary or unusual events that occurred in
8    connection with Kotva transactions?
9                MR BECKMAN:   Objection.
10       A.   Yes, sir.   I am almost certain I explained to him
11   some of the unusual events that occurred around Kotva.
12       Q.   And what event did you describe?
13               MR BECKMAN:   Objection.
14       A.   I am certain among the events that we discussed
15   the fact that one of the people who were investigating
16   the Trend Kotva issue, I don't -- it was an investigator
17   who was on the Trend case, which is, of course,
18   collaterally connected with Kotva, committed suicide by
19   putting a gun in his mouth; that there was a bomb that
20   had been placed in the Kotva offices.   He certainly was
21   told that Mr Woolf was roughed up at a Kotva shareholder
22   meeting.   I think he may have spoken to Mr Woolf himself
23   but I know that we discussed that.   I think we discussed
24   that some cars of someone related to Kotva or an
25   investigator of Kotva, I don't recall who it was, but
26   some cars were fire bombed.   Those are specific items
27   that I can think of that I know we discussed because
28   I can recall his reactions to that.   And I think there
29   were other instances but I can't recall right now.

50

155

1    Q.   Do you call that business as usual, sir?

2             MR BECKMAN:   Objection.

3             MR DANGEL:   I will withdraw that.

156

4    Q.   Let me ask you, you mentioned a Mr Benda,

5    B-e-n-d-a, correct?

6    A.   Yes, sir, that is my understanding of how he

7    spells his name.

157

8    Q.   Is Mr Benda connected to Forminster?

9             MR BECKMAN:   Objection.

10   A.   My understanding is he is either, he is the

11   chairman or their legal representative, I don't know

12   what the legal term is that he used.  But when I was

13   dealing with Forminster it was Mr Harazim and Mr Benda,

14   and Mr Harazim would speak because he English is

15   excellent and Mr Benda who always said he didn't speak

16   English.

158

17   Q.   Now Mr Harazim, was he connected in some way with

18   Forminster?

19            MR BECKMAN:   Objection.

20   A.   It is my information and belief he is, sir.

21            MR DANGEL:

159

22   Q.   You indicated you played squash with him from

23   time to time?

24   A.   I indicated I once played squash with Mr Harazim.

25   I didn't indicate it, it was opposing counsel who

26   brought up the fact that I had played squash with him.

27   I don't want to make this as Mr Harazim is my best

28   friend or my squash partner, but one time we played

29   squash.

51

1    A.   What I was referring to was a normal buyer that

2    would pay the premium for a block of shares in a normal

3    situation.   When I discussed a minute ago why I felt the

4    price was not a reasonable price offered by Forminster,

5    clearly one of the factors was that the market price did

6    not properly reflect the value of the shares.   So, in

7    any event, if there was a market price, we would be

8    entitled to a premium, that is why.

9              MR DANGEL:

208    10    Q.   Go ahead.

11    A.   And secondly that the value to this particular

12    buyer would be much higher than to any other buyer

13    whether or not they had the government in their pocket

14    or not, which is a fair characterization, but they had

15    particular issues with the other shares they owned and

16    the ability to vote and this solved some of the problems

17    for them so that it should have a higher value to them

18    than any other buyer in the market.

209    19    Q.   Who were you discussing this sale and purchase

20    with on the Forminster side?

21              MR BECKMAN:   Objection.

22    A.   Mr Benda and Mr Harazim.

23              MR DANGEL:

210    24    Q.   Did you consider them -- strike that.   Did you,

25    as you negotiated with them, learn that they are

26    sophisticated men, they were people that understood

27    business and economics?

28              MR BECKMAN:   Objection.

29    A.   I would characterise them both as being very

64

1    sharp negotiators who would make cogent arguments and

2    came to meetings generally prepared.  On the other hand,

3    I would also say that it seemed when we got to a point

4    they always had to adjourn and talk to someone else in

5    order to obtain a permission to make any deals.  So they

6    were, so they presented they were not the deal makers

7    which could be a very astute bargaining position if they

8    were the principals or if they were not the principals,

9    I can't testify as to what it was.

10                MR DANGEL:

11        Q.  Did you ever learn that there was somebody above

12    them?

13        A.  I didn't.

14                MR BECKMAN:  Objection.

15        A.  I didn't learn that, because I don't know who the

16    owners of Forminster are.  But they always indicated to

17    me that there was a principal that they had to consult

18    with before they could come back and respond to any

19    suggestion.

20                MR DANGEL:

21        Q.  Did you ever hear the name Toman?

22        A.  The name Toman is familiar to me because he is

23    a prominent attorney here.  As I sit here today, I seem

24    to recall that he either advised or was the lawyer for

25    Forminster.

26        Q.  For whom?

27        A.  For Forminster.  I think so, but I truthfully am

28    not 100% sure but I do recall the name Toman.

29        Q.  Did you find it difficult to negotiate with

211
212
213
214

65

1    Mr Harazim and Mr Benda?

2              MR BECKMAN:  Objection.

3              MR DANGEL:  Strike that.

215    4    Q.  Did you find it more difficult than the normal

5    transaction to negotiate with Mr Harazim and Mr Benda?

6              MR BECKMAN:  Objection.

7    A.  To be as fair as possible to them and to myself,

8    a normal transaction in a different country is

9    negotiated in a different way than normal transactions

10    in the Czech Republic.  And if we take it as a normal

11    transaction in the Czech Republic, it seems as though

12    there is always some issues in the background that

13    needed to be addressed in the transaction.  So, my first

14    answer to you is it is difficult to characterise any of

15    the negotiations in this country as normal from the

16    western point of view that I was used to in the twenty

17    years previously when I practiced law.  And the direct

18    answer is as to whether they were more or less difficult

19    than other people, that was a touchy issue, it was

20    a difficult negotiation, and they represented, they were

21    not the principal and could not make the decision.  So

22    that, in itself, for me made it more difficult because

23    I had been used to dealing with the principal who could

24    make the decision.  So certainly in that respect it was

25    more difficult than my normal transactions.

216    26    Q.  Did you report this back to Mr Professor Weiss?

27    A.  Yes, sir.

217    28    Q.  You had some time with Professor Weiss in terms

29    of his negotiating, have you not, negotiating deals?

66

1    Mr Beckman used the term blackmail and why don't we just

2    say it the way it should be said, _blackmail_, is what

3    Mr Beckman is accusing.  And you have heard him use the

4    word blackmail both in Czech, we have both learned that

5    term, and in English?

6        A.   Yes, sir.

264

7        Q.   Sir, are you familiar with the term blackmail as

8    it is used in business negotiations?

9             MR BECKMAN:   Objection.

10       A.   I would say yes.

11            MR DANGEL:

265

12       Q.   How is it used when one side or another uses that

13   phrase in a business negotiation?

14            MR BECKMAN:   Objection.

15       A.   In my personal experience, it is usually used in

16   the context that another guy has an advantage over the

17   other party.  When you say he is blackmailing me, it

18   means that you have to do it, you have to either give

19   money, take a position, vote a certain way in a

20   corporate action or whatever because the other party has

21   some advantage.  It could be he has knowledge or I owe

22   him a favour or I had some dealing with him.  There's

23   numerous reasons why the other person has an advantage

24   but it has usually meant in that circumstance that

25   I have got to do it, he is black mailing me, he is

26   forcing me because of this and that.  It is not anything

27   with a gun or I don't think usually has an illegally

28   constituted term in that sense.

29            MR DANGEL:

79

266
1      Q.   You are familiar and you have used the term
2   advantage.   Are you familiar with the term leverage?
3      A.   Yes, sir.
267
4      Q.   And how is that term used in business
5   negotiations?
6      A.   When one party has leverage over another it
7   usually means that, once again, they have advantage,
8   some other means of achieving the goal, some type of
9   a knowledge benefit, financial benefit.   Leverage has
10  various uses in business.   Leverage is used in the stock
11  market that you can borrow money on your stocks or you
12  get twice as much.   I am not sure what area of leverage.
268
13     Q.   As the term leverage --
14           MR BECKMAN:   Let him finish his answer.
15     A.   But if you are asking me in the negotiations.
16           MR DANGEL:
269
17     Q.   Okay, isn't that what I did?   But anyway, go
18  ahead please.
19     A.   Having leverage in negotiations usually means
20  that you have something the other guy wants more than
21  you are selling it to him.
270
22     Q.   Okay.   Is there leverage that is fair in the
23  business world in negotiations --
24           MR BECKMAN:   Objection.
25           MR DANGEL:
271
26     Q.   -- and leverage that is unfair?
27           MR BECKMAN:   Objection.
28           MR DANGEL:   Strike that.   Let's take it
29  back.

80

272

1    Q.   When one side has leverage is it common that the

2    other side tries to get leverage too?

3              MR BECKMAN:   Objection.

4    A.   Yes, sir.   The idea would be to counteract the

5    leverage by taking whatever action you have to do to,

6    the term usually used is to level the playing field

7    because one person has some advantage, i.e. leverage

8    over the other person and you want to do what you have

9    to to take out of the equation his leverage so now you

10   can deal on an equal plain.

11             MR DANGEL:

273

12   Q.   Did Forminster have leverage in the negotiation

13   of the sale of the Kotva shares during the time period

14   that you were involved?

15             MR BECKMAN:   When?

16             MR DANGEL:   I said 2000 to 2003.

17   A    Well you said the time frame I was involved so,

18   for the whole time period, for the whole period I was

19   involved, I would say all of the leverage was on the

20   side of Forminster.   They had maneuvered the settlement

21   with the Trend Fund.   One of the objections I had was

22   they put a mortgage on the Kotva building.   I had

23   discussed that with Mr Harazim what business does Kotva

24   have putting a mortgage on it to guarantee a settlement

25   with another party, et cetera.   They were locals.   They

26   knew the system.   They got into the position they were.

27   It was a Cyprus company so that I highly doubted that

28   there was a huge financial base in Forminster.   If this

29   had been a large Czech company and it acquired shares of

81

1    Kotva, it would be more transparent.  But by using
2    a foreign tax advantage location, generally such
3    companies are underfunded so the fact they would have
4    a foreign company that was relatively underfunded that
5    could accomplish all of this, it was clear that the
6    Forminster people were very powerful and had all the
7    leverage on their side.  That is the reason I kept
8    suggesting to Mr Professor Weiss why we should accept
9    their offer because they had all the leverage or
10   benefits or whatever the word you want to use on their
11   side, sir.

274
12       Q.  Did you get the impression in the negotiations
13   with Mr Harazim and Mr Benda that they knew they had
14   leverage?

15              MR BECKMAN:  Objection.

16       A.  Yes, sir.  It was quite clear that they felt and
17   knew that they were sitting in the high seat and I was
18   in the low seat and I was negotiating from
19   a disadvantage.

20              MR DANGEL:

275
21       Q.  From your experience in this and other
22   negotiations, is it your impression that Forminster ever
23   feels or felt, to your knowledge, that it did not have
24   all of the leverage in every negotiation they were
25   involved with, if you know?

26              MR BECKMAN:  Objection.

27       A.  The question is when I was involved?

28              MR DANGEL:  Yes.

29       A.  I think during the meeting that I was elected to

82

1    the board of Kotva, during those discussions I think

2    they felt they needed something from me because I think

3    I was asked by the opposing counsel earlier about that.

4    I'd say that would probably be the only situation that

5    comes to my mind where Forminster seemed to need me for

6    something so therefore their leverage would not have

7    been total, in response to your question.

8         MR DANGEL:

9    Q.   At that point in time did they negotiate in

10   a fair way with you?

11        MR BECKMAN:  Objection.

12   A.   I think that would be seem to be a fair solution,

13   I voted for them, they voted for me, they left me on the

14   board for a while, but the fact was I was quite soon

15   then removed by them from the board.  So whether or not

16   that was the intention at the beginning or it was

17   something that evolved, I can't testify to that.

18        MR DANGEL:

19   Q.   But so far as you were involved in the

20   negotiation of the purchase of -- strike that -- sale of

21   the Kotva interest owned by BGO and the Trend trust, did

22   they ever, did Mr Harazim or Mr Benda ever say anything

23   that indicated to you that they believed that Forminster

24   had anything other than all of the leverage on their

25   side?

26        MR BECKMAN:  Objection.

27   A.   Well ever is a long time.

28        MR DANGEL:  Correct.

29   A.   But to be fair to the answer, I don't recall

83

1    a situation in our discussions where it appeared to me

2    that Forminster didn't feel that it was in the driver's

3    seat, is the expression I would use in English, in the

4    negotiations.

5            MR DANGEL:  Now, sir --

6        A.  But to be fair, that said, we were still

7    negotiating.

8        Q.  When you say you were still negotiating, after

9    the 50 million Crown offer, were there further

10   negotiations?

11           MR BECKMAN:  Objection, asked and answered.

12   You may answer.

13       A.  There were breaks between the various

14   negotiations.  When I said that what I meant was they

15   could also have taken the position:  go to hell, we are

16   in the driver's seat.  So apparently they wanted shares

17   and so they were negotiating with me, but they wanted

18   shares only on their terms.  So, it is, it is not, you

19   know, so black and white.  They had leverage.  They were

20   in the driver's seat but they wanted the shares.

21   I can't tell you when the next negotiations were after

22   that.

23       Q.  I have just a few more questions.  Exhibits 1 and

24   2 --

25       A.  Yes, sir.

26       Q.  -- show low valuations of the Trend holding of

27   the Kotva shares?

28       A.  Yes, sir.

29           MR BECKMAN:  Objection.

84