UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s. and SPV Co, )<br><br>Plaintiffs, )<br><br>v. )<br><br>ANDREW WEISS and WEISS ASSET<br>MANAGEMENT, LLC, )<br><br>Defendants. )<br>———————————————— )<br>ANDREW WEISS and WEISS ASSET<br>MANAGEMENT LLC, )<br><br>Counterclaim-plaintiffs, )<br><br>v. )<br><br>KOTVA a.s., RICHARD HARAZIM and<br>SPV Co, )<br><br>Counterclaim-defendants. )<br>———————————————— ) | C.A. No. 05-10679-WGY |

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
PURSUANT TO LOCAL RULE 56.1**

Pursuant to Local Rule 56.1, Andrew Weiss and Weiss Asset Management LLC hereby

submit this statement of undisputed facts.  These facts are, for purposes of the defendants'

motion for summary judgment and for no other purpose, not the subject of any genuine dispute.

1.      During 2004 and 2005, Kotva a.s. was a Czech joint stock company with its

incorporation and primary place of business in the Czech Republic.  *See* Am. Compl. ¶¶ 4, 7.

2.      The lawsuits that are the subject of the Amended Complaint were filed in courts

in the Czech Republic.  *See* Exhibit 1, Am. Compl. ¶¶ 24, 32.

3.      On June 30, 2004, Gilroy, Ltd., a Cyprus company controlled by Vladimir Hoffman, who was affiliated at the time with the defendants as an independent contractor, brought a declaratory rights lawsuit against Kotva a.s. and other Kotva entities in a Court seated in Prague.  In October, 2004, Gilroy brought additional lawsuits seeking that a Czech court declare that shares voted by Forminster, Kotva's controlling shareholder, were actually owned, not by Forminster, but by a Czech investment fund called Trend. In December, 2004 and February, 2005, K T, Inc., a Delaware corporation, controlled allegedly by the defendants, brought nearly identical lawsuits in the Czech courts against the same parties seeking the same relief.  No money damages, attachments, or injunctions were sought.  *See* Exhibit 1, Am. Compl. ¶¶ 24, 32.

4.      In connection with the dismissal of the Gilroy lawsuit, the Czech courts awarded approximately $750 to the defendants, including Kotva a.s. under a Tariff procedure which includes any costs, fees, and damages for litigation improperly commenced.  *See* Exhibit 7, at 109–10.

5.      The purchase price for the Kotva Department Store did not change in amount from June, 2004 to the closing.  *See* Exhibit 3A, at 183–85.

6.      By October 2004 the parties (Kotva and Markland) had worked out modifications to the original escrow agreement, allowing a portion of the sale proceeds to be set aside pending resolution of the dissident shareholders' lawsuits. The agreement provided that any investment use of the escrow money flowed to Markland, not Kotva.  *See* Exhibit 6, Exhibit 8 at p. 4, ¶ 5.

7.      Yet, through no fault of the defendants, the purchase of the Kotva Department Store did not close until March 2005.  *See* Am. Compl. ¶ 35.

8.    The purchase price for the Kotva Department Store in March 2005 was higher than it would be today. The defendants did not cause the plaintiffs any compensable damages. Exhibit 3, at 112–13.

Respectfully submitted,

ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC

By their counsel,

Dated: August 3, 2007    /s/ Edward T. Dangel, III
Edward T. Dangel, III (BBO#113580)
Dangel & Mattchen, LLP
10 Derne Street
Boston, MA 02114
617-557-4800

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 3, 2007.

/s/ Edward T. Dangel, III
Edward T. Dangel, III

PETERKA & PARTNERS
Law Office

Praha 1 District Court
Ovocny trh 14
110 00 Praha 1

Prague, 30 June 2004

[impression of stamp:]   Praha 1 District Court
Praha 1, Ovocny trh 14
Received: 30 June 2004
Four copies, bound volume

Plaintiff:
GILROY LIMITED
registered office: Pikioni, 4, Limassol, Republic of Cyprus
representative: Ondrej Peterka, Attorney-at-Law registered by the Czech Bar Chamber under
Reg. No 4245, practising law as an associate of PETERKA & PARTNERS v.o.s., registered
office: Na Prikope 15, 110 00 Praha 1 (power of attorney of the legal representative attached)

Defendant 1:
KOTVA a.s.
Registered office: Praha 1, Namesti Republiky 8
Company registration number: 60193808
Incorporated by entry in the Commercial Register kept by the Municipal Court in Prague,
Section B, Entry 2370
(hereinafter referred to as 'Kotva' or 'Defendant 1')

Defendant 2:
KOTVA NEMOVITOSTI, k.s.
Registered office: 602 00 Brno, Prikop 4
Company registration number: 26229048
Incorporated by entry in the Commercial Register kept by the Regional Court in Brno, Section
A, Entry 16586
(hereinafter referred to as 'Kotva Nemovitosti' or 'Defendant 2')

Defendant 3:
SPV KN, a.s.
Registered office: 602 00 Brno, Prikop 4
Company registration number: 26910705
Incorporated by entry in the Commercial Register kept by the Regional Court in Brno, Section
A, Entry 4043
(hereinafter referred to as 'SPV KN' or 'Defendant 3')

Action to determine the ownership of real property
Four copies
Court fee of CZK 3,000 paid in the form of fee stamps
Delivered in person at the court registry
Attachments:
See the list of attachments on the final page of the action

K 0250

1. SPECIFICATION OF PARTIES, SUBJECT OF PROCEEDINGS, JURISDICTION OF THE COURT

1.1. Specification of parties

Plaintiff is a shareholder of Defendant 1.

Defendant 1 is a commercial company registered in the property register as the sole owner of the real property specified below in paragraph 1.2 until 2002. As ensues from that is described below, Defendant 1 is still the sole owner.

Defendant 2 is a commercial company registered in the property register as the sole owner of the real property specified below in paragraph 1.2, such being pursuant to a statement[1] on an immobile investment made by Defendant 1 in 2000. It arose by transformation of KOTVA NEMOVITOSTI, a.s[2]

Defendant 3 is a commercial company, the sole shareholder of which is Defendant 2. At present Defendant 3 is entered in the property register as the owner of real property specified below in paragraph 1.2.

1.2. Subject of proceedings

Under this action, Plaintiff seeks a court decision, further to Section 80(c) of Act No 99/1963, the Code of Civil Procedure ('CCP'), determining that Defendant 1 is the owner of the following real property:

- Building with land registry reference number 656 (civic amenities), belonging to part of the Stare Mesto municipality, located on building plot number 680;
- Building with no land registry reference number or street number (civic amenities), belonging to part of the Stare Mesto municipality, located on building plot number 1018/2;
- Land Parcel No 680 (developed area and courtyard) with an area of 4,385 m2;
- Land Parcel No 683/1 (other land) with an area of 851 m2;
- Land Parcel No 683/2 (other land) with an area of 2,963 m2;
- Land Parcel No 683/3 (other land) with an area of 2 m2;
- Land Parcel No 690/2 (other land) with an area of 25 m2;
- Land Parcel No 690/3 (other land) with an area of 49 m2;
- Land Parcel No 690/4 (other land) with an area of 9 m2;
- Land Parcel No 1018/2 (developed area and courtyard) with an area of 1 m2;

all the above-mentioned real property is registered by the Land Registry for the City of Prague on Title Deed No 265, maintained for the municipality of Praha, Cadastral District: Stare Mesto (this real property is hereinafter referred to jointly as 'KOTVA department store').

---

[1] In accordance with Section 60(1) of Act No 513/1991, the Commercial Code.
[2] KOTVA NEMOVITOSTI, a.s. changed its legal form from a public limited company to a limited partnership. This change in legal form was made in accordance with a decision of the General Meeting held on 20 May 2003; the decision of the registration court to register the change entered into legal force on 15 August 2003.

1.3. Jurisdiction

The material jurisdiction of the district court is determined on the basis of Section 9(1) of the CCP, because there is no indication under Section 9(2) or (3) of the CCP, or under other provisions, that jurisdiction pertains to a regional court in the first instance.

With regard to local jurisdiction, Plaintiff refers to Section 88(g) of the CCP, under which the competent court is the court in whose circuit the real property is located, provided that the legal proceedings relate to this property. KOTVA department store, as a set of real property units, is located in the circuit of the Praha 1 District Court.

Evidence:
- Statement from the Securities Centre
- Certificates of Incorporation of the Defendants
- proof of the existence of Plaintiff
- statement from the Property Register (Title Deed No 265 for the Stare Mesto Cadastral District)
- annual reports of Defendant 1 for 2000, 2001, and 2003
- with the reservation of further evidence

## 2. EXISTENCE OF PLAINTIFF'S EXIGENT LEGAL INTEREST IN DETERMINING OWNERSHIP AS SOUGHT IN THESE PROCEEDINGS

The Supreme Court the Czech Republic, in Decision No 3 Cdo 1338/96[3] of 27 March 1997, took the legal view that there is room for a declaratory action under Section 80(c) of the CCP in cases where:
- this action can help eliminate a threat to a right or uncertainty in a legal relationship and the corresponding remedy cannot be achieved by other means, and
- it is more effective than other legal means in detailing the content and nature of the relevant legal relationship, and it can be used to achieve an adjustment forming a certain legal framework, which functions as a guarantee that there will be no future disputes between the parties.

In accordance with this judicial decision, it is possible to file a declaratory action aimed at ensuring that information about the ownership of real property contained in the property register complies with the actual legal situation[4]. This sort of action is usually filed by an entity who considers itself to be the owner of real property in question. However, current decision-making practices at the Supreme Court indicate that a declaratory action may also be filed by a person who is a member/shareholder of such an entity.

In this respect, in the proceedings maintained under File No 29 Odo 767/2002, the Supreme Court inferred that a shareholder has an exigent legal interest in filing a declaratory action whereby the shareholder seeks the nullity of a contract under which a public limited company

---

[3] Published in the periodical Soudni judikatura (civilni) No 3/1997 on page 58, and subsequently under number Jc 21/1997.

[4] Based on a decision on a declaratory action, the relevant entry can be inserted into the property register in accordance with Section 7(1) of Act No 265/1992, on records of proprietary and other material rights attached to real property.

transfers its enterprise, or part thereof, to another entity in accordance with Section 476 of the Commercial Code. The Supreme Court stipulated inter alia that 'the conclusion of a contract on the sale of part of an enterprise could have a significant influence on the legal relations of the company of which he is a shareholder, and therefore indirectly on his legal relations, e.g. on the share in the liquidation balance (in relation to the content of the contract).'

Analogically, it is necessary to deduce the authorization of a shareholder to file an action to determine ownership of a set of real property representing the main asset item in the business activities of a company (here KOTVA department store[5] with a value of at least CZK 1.39 billion).

The significance of the ownership of such a principal asset item and its impact on the legal relations of the shareholder can best be explained by comparing the position of a shareholder in a situation where the company owns such an asset item with a situation where it does not own such an asset.

In a situation where the company owns such an asset item:

- the sale of the asset in a given accounting period can generate a substantial profit, whereby the practical exercise of the shareholder's right specified in Section 155(1) of the Commercial Code is achieved, i.e. the shareholder shares in the company profit;
- if the company is liquidated, the acquired sale price of such an asset item would undoubtedly be reflected positively in the shareholder's share in the liquidation balance (again with reference to Section 155(1) of the Commercial Code);
- the shareholder has the opportunity of making decisions on the business activities of Defendant 1 at the General Meeting; this opportunity is determined by the ownership and use of the asset item, setting the practical content of the shareholder's authorization to share in the management of the company (again with reference to Section 155(1) of the Commercial Code).

If the company were not the owner of the principal asset item, the above-mentioned entitlements of the shareholder would be completely different, because in connection with ownership (and any future transfer) of this asset item the company would be unable to realize any income from which we could derive the shareholder's right to a share in the profit or a share in the liquidation balance.

In this specific case, Plaintiff also refers to the fact that the opportunity of the effective exercise of his shareholder rights (and therefore the significance of the decision in this action for the shareholder's legal relations) is consolidated by the fact that he is also a shareholder in TREND-VIF, which Plaintiff believes is the owner of the main stake in Defendant 1.

For the sake of completeness, Plaintiff considers it necessary to add that the Supreme Court expressed exactly the same legal opinion as in the Verdict under File No 29 Odo 767/2002 in

---

[5] In the case of KOTVA department store, we can also consider whether such a dominant and relatively independent part of an enterprise meets the description of 'part of an enterprise' (i.e. a separate organizational component), bearing in mind that it can only be disposed of in accordance with the pertinent peremptory provisions of the Commercial Code (i.e. the sale or lease of part of the enterprise). It will certainly be possible to find enough factual information for such a conclusion in the documents used by Defendant 1 in its formal justification for the transfer of KOTVA department store to another entity.

K 0253

a previous verdict of 5 November 2002 under File No 29 Odo 535/2001, and from the aspect of the way this legal issue is handled we can consider court decisions to be constant.

Evidence:
- statement from the Securities Centre
- Expert Opinion valuing KOTVA department store
- with the reservation of further evidence

## 3  REASONS WHY DEFENDANT 1 NEVER LOST OWNERSHIP OF KOTVA DEPARTMENT STORE AND THEREFORE IS STILL THE OWNER OF THIS PROPERTY

### 3.1. Competence of persons connected with Miroslav Halek in TREND VIF and IF MERCIA

The beginning of the current problematic relations, in respect of which the verdict issued in these proceedings should help to resolve (and in particular avert other future disputes in accordance with the above-mentioned Supreme Court Decision 3 Cdo 1338/96), relates to TREND VIF[6] and to the investment fund MERCIA, a s.[7] in the period from 1995 to 1997.

In the scope of voucher privatization, TREND VIF was very successful (exploiting the celebrities Michael Kovab and Martin Kratochvil), and its portfolio contained the shares of top Czech enterprises, the value of which was well above a billion crowns, including the shares in Defendant 1.

In 1995, a group of persons connected with Kralovehradecka brokerska, a s.[8], represented in particular by Miroslav Halek, took over managerial control of TREND VIF.

At the time of this takeover, TREND VIF had equity of approximately CZK 1.45 billion.

This takeover was followed by a number of transactions, the purpose of which was to transfer these assets, including shares in Defendant 1, to entities from the group of Miroslav Halek unlawfully and to the detriment of TREND VIF. The method used to strip the assets of TREND VIF was legal transactions which are described in detail, for example, in the Report of the Compulsory Administrator of TREND VIF of 22 February 1007, in Report No 102/9017697 of the Ministry of Finance of 21 January 1998, concerning an investigation into trading in securities from the TREND VIF portfolio, and in the indictment of the deputy regional public prosecutor Vladislav Kusala brought against Mr Halek et al. of 30 September 1998. Also, this indictment gives the most detailed description of the personnel relations of all entities contributing to these transactions (p. 25 et seq.).

As a result of these transactions, the equity of TREND VIF fell to CZK 116 million as at 31 December 1996, i.e. by more than 90%.

---

[6] TREND – vseobecny investicni fond a.s , registered office: 500 02 Hradec Kralove, Skroupova 441, company registration number: 45 24 51 77 (hereinafter referred to as 'TREND VIF').

[7] Investicni fond MERCIA, a.s., registered office: Praha 2, Londynska 53, company registration number: 15 05 41 01.

[8] KRALOVEHRADECKA BROKERSKA, a.s. (now Brnenska obchodni, a.s., v konkurzu), company registration number: 60 91 41 22, former registered office: Hradec Kralove, Skroupova 9, current registered office: Brno, Lipova 27

The participation of Kralovehradecka brokerska, a.s. in the financial management of Investicni fond Mercia, a.s. followed exactly the same course.

3.2. Demonstrative list of significant unlawful activities of entities connected with Miroslav Halek and directly or indirectly concerning shares in Defendant 1.

Individual transactions aimed at the unlawful enrichment of representatives are described in both the above-mentioned reports and in the indictment. Given the extensiveness of this conduct, Plaintiff refers to these documents and makes their content, in the parts directly or indirectly[9] concerning the shares in Defendant 1, part of the claims in this action. Therefore, in this action Plaintiff only mentions several cases of the most serious conduct that damaged TREND VIF and that, according to the indictment, can be qualified as a crime[10].

Plaintiff specifies the two groups of principal unlawful transactions perpetrated by entities connected with Mr Halek. In terms of their type, these transactions are characterized on page 24 of the indictment.

The first group (see paragraph 3.2.1 of this action) comprises transactions whereby shares in Defendant 1 were unlawfully transferred from the assets of TREND VIF.

The second group (see paragraph 3.2.2) comprises transactions whereby finances were transferred from TREND VIF (and from IF Mercia) and were used by entities connected with Mr Halek to pay the purchase price of shares in Defendant 1 which were bought from third parties.

Naturally, all the transactions described below, considering that – according to the indictment – they can be qualified as crimes and therefore were an infringement of the law, have civil law implications, most commonly resting in the fact that such transactions are null and void from the outset[11].

As regards an evaluation of the conduct described in the two reports as crimes, Plaintiff refers to the indictment against the accused Miroslav Halek et al., submitted by the Regional Public Prosecutor's Office in Hradec Kralove on 30 September 1998 under File No KZv 323/97.

3.2.1. Transfer of shares in Defendant 1 from the assets of TREND VIF

3.2.1.1. Disadvantageous trading in shares in Defendant 1

---

[9] E.g. the transfer of financial resources from TREND VIF so that other parties involved could use these funds to purchase shares in Defendant 1 (see paragraph 3.2.2)

[10] As regards the qualification of crimes committed, according to the indictment, by entities connected with Mr Halek (often as members of a criminal conspiracy), Plaintiff refers to the relevant passages of the indictment, in particular to pages 7, 8, 11, 12, 13, 14, 16, 19, and 20.

[11] For the sake of completeness, Plaintiff also states that in most transactions with shares in Defendant 1 Section 17(3) of Act No 248/1992, on investment companies and investment funds, in the wording in force until 30 June 1996, stipulating that an investment fund is obliged to sell a security only at the highest price for which it is possible to sell the security while taking due professional care, was breached (or, in relation to the preceding manipulation of the share price, was circumvented).

The compulsory administrator's report states on page 21 that 'On 28 May 1996, the investment fund sold 152,935 shares in KOTVA, a.s. to KHB via the SCP for a price of CZK 400. On the same day, the investment fund repurchased 152,935 shares in KOTVA, a.s. from KHB, but for a price of CZK 952 per share, and subsequently the investment fund sold these shares to IFM, a.s., again for CZK 400. See the documents attached to paragraph 14.11 of this report. This transaction resulted in a loss of CZK 168,840,240 on the part of the investment fund.'

3.2.1.2. Backdating of contracts intended to ensure that, in connection with provisions on contractual penalties, shares in Defendant 1 were transferred from the assets of TREND VIF without any counter-consideration

The indictment states the following on page 24: 'The conclusion of the backdated contracts was essentially merely an instrument to carry out other transactions, as mentioned above. Contracts were probably concluded in this way that were secured, to the detriment of the fund, with high contractual penalties. However, it has only been possible to prove the backdating of the contract of 10 January 1996 with IFM, a.s. This procedure resulted in damage to the fund at a time when the Ministry of Finance of the Czech Republic had suspended trading in securities from the fund's portfolio.'

The essence of the backdated contract labelled with the date 10 January 1996 is described by the compulsory administrator's report on page 12 et seq., by the indictment (e.g. on page 27), and in brief on page 2 of the report of the Ministry of Finance as follows: '10 January 1996 – IFM, a.s. signed a contract for the transfer of 200,000 shares in Kotva from the fund's portfolio for a total price of CZK 360,000,000. Based on this contract, IFM, a.s. acquired 60,000 shares in Kotva in the form of a contractual penalty, without any counter-consideration.'

3.2.1.3. Non-observance of the preliminary measure concerning the shares in Defendant 1

The indictment states on page 31 that 'On 24 January 1997, Miroslav Halek, as the Chairman of the Board of Directors and Chief Executive Officer of IFM a.s., decided to transfer 361,375 shares in Sokolovska uhelna a.s. and 30,000 shares in Kotva a.s. from IFM account number 100200879133 at the Prague Securities Centre to the account of Kralovehradecka brokerska a.s. (KHB) even though an order had been placed on IMF a.s. to refrain from handling the above-mentioned shares under Resolution of the Hradec Kralove Regional Court No Nc 542/96 of 21 January 1997, delivered to IFM, a.s. on 23 January 1997. This resolution was delivered to IFM, a.s. on 23 January 1997 and on the same day Mr Halek was acquainted with it through Karel Kavalir, on whom he had conferred power of attorney to study the document. Although he knew of the court's preliminary measure, he decided to transfer the above-mentioned shares to KHB a.s., which then transferred the shares to the account of the foreign company Forminster Enterprises Ltd.'

3.2.2. Use of the financial resources of TREND VIF and IF MERCIA so that companies around KHB, a.s. could purchase shares in Defendant 1 on their own account.

3.2.2.1. Misuse of financial resources of investment funds to the benefit of entities connected with KHB, a.s.

The compulsory administrator's report states the following in paragraph 8.9: 'It is proven by the investment fund's statement of account for account number 103745574, held at IPB, a.s., dated 7 September 1995, and in particular by a payment order of the same day, that the management of the investment fund transferred CZK 112,000,000 to the bank account of KHB, which used this sum to purchase 70,077 shares in KOTVA, a.s. for a price of CZK 1,800 per share from Brno Broker Group, a.s., as evidenced by the confirmation of the conclusion of a contract of 4 September 1995. Confirmation on the conclusion of the business transaction of 4 September 1995 is attached to this report under paragraph 14.15. These shares were purchased by KHB in its own name and to its own account and were ultimately transferred, according to information obtained from the compulsory administration, to one of the companies controlled by the management of the investment fund.'

Page 3 of the Finance Ministry report adds that on 25 September 1995 KHB purchased a further 28,033 shares in Defendant 1 for CZK 49,057,750 in its own name and to its own account, and in relation to the description of the transaction with Brno Broker Group, a.s., the following conclusion is drawn: 'KHB purchased securities to its own account with the funds of another party (CZK 175,196,350)

3.2.2.2. Acquisition of the financial resources if investment funds via provisions on contractual penalties

On page 10, the report of the Ministry of Finance states[12] that 'The method for contractual penalties was based on the conclusion of contracts which formed contractual obligations for the investment fund that the investment fund subsequently failed to discharge; the contract penalized this with unusually high contractual penalties. Given the form of the contracts, a legal analysis thereof, and the unusual amount of the contractual penalties, there is a strong suspicion, backed up by the evidence that has been collected, that the actual object of these contracts was not the transfer of shares, but the artificial creation of a liability of the investment fund and the transfer of the assets of the investment fund

As a result of this method, the following assets disappeared from the investment fund:

a) The sum of CZK 126,000,000, which was acquired by IFM, a.s. in accordance with a contract of 10 January 1996. This contractual penalty was paid in the form of the transfer of 60,000 shares in KOTVA with a value of 108,000,000.
b) The sum of CZK 45,617,000, which was acquired by Moravska Zemska, a.s. in accordance with a contract of 10 July 1996.
c) The sum of CZK 44,896,666, which was acquired by Lidova obchodni spolecnost, s.r.o. in accordance with a contract of 17 July 1996.
d) The sum of CZK 73,718,000, which was acquired by Moravska Zemska, a.s. in accordance with a contract of 22 July 1996. See the document attached in paragraph 14.8 of this report.
e) The sum of CZK 70,526,475, which was acquired by Sokolovsky investicni fond, a.s. in accordance with a contract of 24 July 1996.'

3.2.2.3. Non-payment of purchase prices for shares and the thirty-year maturity period for payment of the purchase price

[12] The compulsory administrator's report agrees with this on page 12 et seq.; this method of transferring assets is also described on many pages of the indictment

These two methods are described by the compulsory administrator's report on pages 13-15 as follows. As regards the method of defaulting on the payment of the purchase prices of shares, the report states that 'This very simple method was based on the conclusion of contracts with companies which subsequently failed to pay the purchase price for the purchase of shares from the investment fund portfolio. These transferred assets were then transferred to companies controlled by the management of the investment fund.' This is followed by a list of these contracts; the loss incurred by TREND VIF from these transactions is more than CZK 350 million.

The method of a thirty-year maturity period is described by the compulsory administrator as follows: 'The method described in this paragraph is based on the conclusion of contracts under which the investment fund sold shares from the investment fund portfolio to companies controlled by the management of the investment fund for a price, the payment of which was set in monthly instalments and distributed over a period of thirty years.' Contracts worth CZK 336,841,700 were concluded in this way.

3.3. Transfer of assets from TREND VIF and IF MERCIA to Forminster[13], a company connected with Mr Halek

The parties involved managed, especially by means of the above-mentioned methods, to realize practically all the assets transferred from TREND VIF in the form of securities and to gain enrichment from the subsequent sale of these assets. They also planned to follow this procedure with the shares in Defendant 1. After compulsory administration was introduced, they implemented a series of transfers, described by the compulsory administrator on pages 21 and 22 of his report; the only aim of these transfers was to avoid the effects of the legal measures taken by the compulsory administrator aimed at returning the shares in Defendant 1 to the assets of TREND VIF.

In this respect, the shares in Defendant 1 were eventually transferred to Forminster. As regards the personnel connection between Forminster and Mr Halek, and the purpose of the transfer of shares in Defendant 1 to Forminster, Plaintiff refers to the following passages of the indictment (page 25):

'The trading in and transfers of shares in Kotva, a.s. were the most significant interest of the accused. In the period before 4 August 1995, shares in Kotva were among the fund's key investments. The aim of the investment fund's then management was and still is – to transfer shares in Kotva to companies controlled by Mr Halek et al., and to gain a majority stake in Kotva by means of further purchases, in respect of which they have used the fund's resources.

The shares in Kotva are currently at the centre of interest of companies connected with Mr Halek et al. Even in the course of compulsory administration, several transfers of shares in Kotva have taken place between entities and companies; Jiri Mares, a fellow pupil of Mr Halek, is evidently a significant person – it was through him that shares in Kotva were transferred back to companies controlled by Mr Halek. At a time when the Regional Court in Hradec Kralove had reached a decision (which had not yet entered into force) to prohibit the handling of shares in Kotva by Kralovehradecka brokerska, at the instruction of KHB shares

---

[13] Forminster Enterprises Limited, registered office: 20 Queen Frederica Street, El Greco House, Nicosia, Cyprus (hereinafter referred to as 'Forminster').

in Kotva were transferred to Forminster Enterprises Ltd., based in Cyprus, in respect of whose financial accounts Mr Halek had specific entitlements...

The activities of Mr Halek's group were not even stopped by a decision on compulsory administration; latest findings indicate that their attempts to take control of Kotva and the assets of Trend remain today, and that neither criminal proceedings nor custody are an obstacle  Before criminal proceedings began, some of the shares in Kotva were transferred to Forminster Enterprises Ltd, domiciled in Cyprus, and then this company was sold to Kralovehradecka spolecnost a.s. and Bonit kapital, a.s., Brno; KHB, renamed Brnenska obchodni, a.s. is currently in a situation where a bankruptcy petition has been filed against it. According to latest information, even when Mr Halek was in remand prison he signed important documents connected with the accounts of Forminster Enterprises Ltd held at LGT Bank in Vaduz, Liechtenstein '

A connection between Forminster, Mr Halek, and other entities is also evident from the fact that, in a similar manner to the trading in the shares of Defendant 1, trading in the shares of Sokolovska uhelna, a.s also took place (for a description, see page 7 of the Finance Ministry report, which indicates that after the shares in Sokolovska uhelna, a.s. had been transferred from KHB to Forminster, these shares were immediately sold by Forminster with a profit of CZK 135 million). In this respect, Plaintiff also refers to page 9 of this report, in which the personnel connection with Forminster is also described.

All the above-mentioned circumstances are of fundamental importance in assessing the activities related to KOTVA department store, because these actions were taken by members of the statutory body who had been elected by Forminster, in respect of which the indictment refers to the connection with Mr Halek  All the annual reports of Defendant 1 since 2000 state that Forminster is the entity controlling Defendant 1[14].

3.4. Measures taken by the Public Prosecutor – blocking of shares in Defendant 1

Under a measure of the Public Prosecutor, however, shares in Defendant 1 were blocked in the asset account of Forminster at the SCP in 1997. Therefore it is evident that no income from criminal activity can be gained from these shares, at least in the foreseeable future.

Nevertheless, the shares represent a majority stake in a company owning a building and land worth approximately one and a half billion crowns. Forminster has not yet been prevented by any measure imposed by a court or public authority from exercising voting rights and therefore it has the opportunity of making a profit from criminal activity, or it has the opportunity of legalizing proceeds from criminal activities.

Plaintiff describes below that steps are currently in place to circumvent the measure of the Public Prosecutor blocking the handling of Defendant 1's shares

3.4 1  Specification of the above-mentioned unlawful conduct as the legalization of income from criminal activities in the decisions of the competent authorities

---

[14] The annual reports for 2001 and 2003 state this on page 3; the annual report for 2000 states this on page 2.

In this respect, Plaintiff believes it would be expedient to recall the definition given in Section 1a(1) of Act No 61/1996, on certain measures against the legalization of proceeds from criminal activities and on an amendment to related laws:

'For the purposes of this Act, the legalization of proceeds from criminal activities (hereinafter referred to as 'legalization of proceeds') shall mean conduct aimed at concealing the illegal origin of proceeds from such activities with the intention of giving the impression that these proceeds are income acquired in accordance with the law. It is irrelevant whether such conduct occurs fully or partly in the Czech Republic. This conduct includes, but is not limited to

a) the transformation or transfer of assets in the knowledge that they come from criminal activities in order to conceal them or disguise their origin, or in order to assist a person who takes part in the perpetration of such activity to evade the legal consequences of such conduct;
b) the concealment or disguise of the real nature, source, location, or movement of assets and the handling thereof, or changes in the rights related to assets in the knowledge that such assets come from criminal activities;
c) the acquisition, possession, or use of assets or the handling thereof in the knowledge that such assets come from criminal activities;
d) the criminal conspiracy of persons or another form of cooperation for the purposes of the conduct stipulated under subparagraphs (a), (b), or (c).'

As regards an assessment of the above-mentioned conduct as activity aimed at legalizing proceeds from criminal activities, Plaintiff refers to the fact that the indictment specifies the following on page 30:

'Part of the proceeds from the above-mentioned criminal activity were subsequently transferred, in the amount of CZK 151,237,425, on 31 January 1997 from the account of KHB, a.s. held at IPB, account number 100200878/5100, on the instruction of Libor Pav to the account of Forminster Enterprises Limited (FEL),account number, 0123414AA, held at LGT Bank in Liechtenstein, which Mr Halek, in accordance with a general power of attorney from FEL, opened on 26 November 1996. A sum of USD 5,422,251, corresponding to the aforementioned amount in CZK when translated, was deposited in the account at LGT Bank in Liechtenstein on 5 February 1997. Of this amount, on 14 February 1997 USD 2 million was cleared to the account of Presley Industries at the same bank, account number 0123415AA, which Mr Halek also opened on 26 November 1996 pursuant to a general power of attorney from the said company. On the same day, i.e. 14 February 1997, an amount of USD 2,964,287.21, corresponding to a sum of CZK 82,768,765, was cleared back to the account of KHB, a.s. In return, on 30 January 1997 KHB transferred 384,971 shares in Kotva, acquired by criminal means from the portfolio of the investment funds Trend and Mercia, to the FEL account opened at the SCP at the request of Mr Vlastnik and Mr Pav.'

In a preliminary measure issued by the Provincial Court of the Liechtenstein Principality on 4 November 1997, blocking the funds in the bank account of Forminster, after the description of the above-mentioned transfers of finances to and from the Forminster bank account, it is stated that 'The above-mentioned investigations give rise to the suspicion of money laundering under Section 165 of the Criminal Code. It is necessary to work on the basis that unknown perpetrators have tried, by means of transferring fraudulently obtained money to accounts in Liechtenstein, with a subsequent transfer, to conceal from Trend VIF a.s. the place where the profits from the sale of securities, and other transactions, have been deposited, and in particular to prevent the flow of money from being monitored.'

In a notification of the General Public Prosecutor's Office in Prague, addressed 29 August 2002 in the matter of the Accused, Miroslav Halek, whereby the Provincial Court of the Liechtenstein Principality was requested to release the money for the return thereof to the accounts of TREND VIF and MERCIA, it is stated that 'With reference to Article 1(1) of the European Convention on Mutual Assistance in Criminal Matters, and with reference to the Convention on Laundering, Search, Seizure, and Confiscation of the Proceeds from Crime of 18 December 1995... On 27 November 2001 the Supreme General Public Prosecutor's Office of the Czech Republic, under File No 2 NZt 749/2001, took over the criminal proceedings conducted in the Liechtenstein Principality against Miroslav Halek, such being at the request of the Attorney General of the Principality of Liechtenstein. In Liechtenstein, criminal proceedings were conducted against Miroslav Halek for the crimes of money laundering, criminal conspiracy, and other crimes pursuant to the relevant criminal-law provisions of the Liechtenstein Criminal Code.'

In conclusion, Plaintiff refers to the fact that the Report of the Ministry of Finance of the Czech Republic also contains, on page 4, a passage titled 'Suspicion of the possible legalization of proceeds from crime'. The report also discusses this suspicion on pages 6 and 7 (with regard to shares in Sokolovska uhelna, a s.). At the end (page 9), the report states that 'In the case of persons incorporated into this group, there is reason to suspect that their activities are financed by means of assets from the portfolios of funds. Another group of persons cooperates with these entities to legalize the proceeds from the criminal activities of the first group, such being by means of traditional activities in money laundering, i.e. the organization of seeming intercompany transactions, the implementation of banking transactions in third states, artificial increases in the profits of otherwise legally operating companies.

The following companies should be included in this group:
- Forminster Enterprises Limited
- Burzovni spolecnost Egretta, a.s.
- Atlanta Safe, a.s.
- Severni brokerska, a.s.
- DYNAMIC PARTNERS, a.s.
- Sokolovsky IF, a.s.
- the natural persons Anatolij Salamatin, Jiri Mares'

3.4.2. Circumventing the purpose of the measure imposed by the Public Prosecutor

From what is mentioned above, it is clear that the Public Prosecutor's measure to block shares in Defendant 1, which are currently in the account of Forminster, should have a very obvious purpose, i.e. to prevent – at least until the end of the police investigation – proceeds from criminal activities, which according to the above-mentioned relevant decisions and according to the indictment comprise the shares in Defendant 1 (numbering 384, 971 shares), from being handled in any manner and to prevent Forminster and any entities related to it from achieving any undue enrichment in connection with ownership of the shares in Defendant 1.

Undoubtedly, the purpose of the Public Prosecutor's measure is to prevent the assets of Defendant 1, which are controlled by Forminster as the majority shareholder as a result of conduct labelled a crime by the indictment, from being transferred from the assets of Defendant 1.

It ensues from the Public Prosecutor's measure in particular (even considering the above-mentioned ban on legalizing proceeds from crime) that no actions may be taken which are aimed at diminishing the assets of Defendant 1 and that the assets must not be transformed in a manner that would give rise (even only theoretically) to a risk that Defendant 1 will not have direct control over such transformed assets. Because of the above-mentioned actions of the competent authorities of several states, based on the suspicion of money laundering, it is quite evident that none of the actions of Forminster in the exercise of shareholder rights and none of the actions of members of statutory bodies de facto appointed by Forminster as the controlling entity are allowed to give rise to any doubt.

However, in the case at hand, not only has the main asset value, i.e. KOTVA department store, been transferred from the assets of Defendant 1, but other activities have also been carried out leading to a situation where Defendant 1 has lost control of this asset completely.

So far, the following activities have been carried out:

1. Defendant 1 invested KOTVA department store into its subsidiary, which at the time in question was Defendant 2. At the time of the investment, Defendant 1 was the sole shareholder in Defendant 2;

2. Defendant 1 decided, as the sole shareholder in Defendant 2, to transform Defendant 2 into a limited partnership, which had the following consequences:

a) there was a fundamental reduction in the share of Defendant 1 in the profits of Defendant 2 and its liquidation balance (at present, Defendant 1 has a share in the profits of just under 50%, and a share in the liquidation balance of 40%, even though its contribution represents 98.6% of all contributions into the company –Defendant 2),

b) because Defendant 1 became the limited partner of Defendant 2, it does not contribute to the business management of the defendant, i.e. by making the transformation Defendant 1 de facto surrendered the opportunity of influencing the financial management of Defendant 2).

3. Defendant 2, acting in the capacity of the General Meeting of Defendant 3 (as the sole shareholder in Defendant 3), decided to increase the registered capital by CZK 1,390,000,000, i.e. from the current CZK 2,000,000 to a new amount of registered capital standing at CZK 1,392,000,000. The increase in registered capital was made by means of a new share subscription; all shares were offered to the sole shareholder – Defendant 2 – for subscription. The new shares were paid by means of a non-monetary contribution – KOTVA department store. Therefore Defendant 3 became the owner of KOTVA department store.

As has been mentioned above, the Public Prosecutor's measure to block the shares in Defendant 1 naturally relates to the assets of Defendant 1, which is represented by the blocked shares in the broader sense of the word.

By means of the steps that have been taken, Forminster and the statutory bodies of Defendant 1, who were appointed by Forminster as the main shareholder, have managed to separate the ownership of the shares in Defendant 1 from the main asset value which was held by

Defendant 1 at the time the Public Prosecutor's measure was imposed, i.e from KOTVA department store, and transfer this asset value to an entity in whose registered capital Defendant 1 does not share at all

Therefore, the practical result of these steps is that there is now practically no sense in the Public Prosecutor's measure.

In this respect, it is also significant that Defendant 3 holds bearer shares. This means that if these shares are transferred no one (including the police) will find out that such a transfer has occurred. It will not be possible to look up the terms and conditions of the transfer (in particular the person of the buyer, the purchase price, whether security was provided, whether the purchase price has been paid). Therefore there is a risk that these shares will be transferred outside the group of KOTVA companies without the payment of the purchase price and that the buyer will transfer the shares to another entity, and as such the income from the sale of the shares will be realized completely outside the KOTVA group of companies. Considering the above-mentioned description of transactions executed by the group connected with Mr Halek, it is quite understandable that Plaintiff is concerned in this respect.

3.4.3. Consequences of circumventing the Public Prosecutor's measure

Naturally, as a shareholder in Defendant 1, Plaintiff is not interested in a risk existing in this manner and to Plaintiff's detriment whereby the process that various authorities (see the quotations above) have labelled as the legalization of proceeds from crime will be completed, and therefore Plaintiff files this action.

There can be no doubt that the circumstances mentioned above, although primarily a criminal law matter, are, in their consequences, also a civil-law issue. Undoubtedly, it is a general truth that all legal activities aimed at legalizing proceeds from crime are unlawful as set forth in Section 39 of the Civil Code (a conflict with the law). Because, for this reason, all the above-mentioned legal transactions, the subject of which was the handling of KOTVA department store, are null and void, Defendant 1 remains the owner of KOTVA department store[15].

[15] Plaintiff does not consider it necessary to discuss, at this point, the invalidity of legal transactions concerning the shares in Defendant 1, because its legal status is affected by the transactions related to KOTVA department store. In this respect, Plaintiff also states that Plaintiff is aware that, between the persons who represented TREND VIF and Forminster, an agreement was concluded in 1999 whereby, in the future, TREND VIF was to refrain from casting doubt on Forminster's ownership of the shares in Defendant 1. Nevertheless, considering that the legal transactions, which are not only null and void because they are an infringement of the law, but which were also executed to perpetrate crime, cannot be subsequently legitimized by the conclusion of a settlement agreement, Plaintiff does not believe it is necessary to discuss this agreement in greater detail here.

To conclude, Plaintiff refers to the fact that in the above-mentioned context preventative nature of this action comes to the fore, because the decision on this action is capable of preventing the emergence of judicial disputes, evidently with an international element (see the above-mentioned Decision of the Supreme Court of the Czech Republic, File No 3 Cdo 1338/96, on the existence of an exigent legal interest in determining the existence of a legal relationship).

Evidence:

- Report of the compulsory administrator of TREND-VIF of 22 February 1997 (including the documents specified in its appendix)
- Report of the Ministry of Finance of 21 January 1998, Ref. No 102/90 17697
- Indictment against the Accused, Miroslav Halek et al., submitted by the Regional Public Prosecutor's Office in Hradec Kralove on 30 September 1998, File No KZv 323/97
- Complete Certificate of Incorporation of TREND VIF
- Report of the Securities Centre on the transfer of shares in Defendant 1 from TREND VIF to Forminster (may be requested by the court)
- Contributor's Statement of 10 October 2000, on the transfer of KOTVA department store from Defendant 1 to Defendant 2
- Complete Certificate of Incorporation of Defendant 2

- Notarial Deed of Vaclav Halbich of 20 May 2003, No NZ 235/203, N 317/2003 (contains a decision on a change in the legal form of Defendant 2, including the new wording of the Articles of Association, evidences the reduction in the share in profits, the settlement share, and the share in the liquidation balance)
- Statement from the Property Register (Title Deed No 265 for the Stare Mesto cadastral District)
- Annual Reports of Defendant 1 for 2000, 2001, and 2003
- Decision of the Liechtenstein Provincial Court in Vaduz, Liechtenstein, on the freezing of assets in the accounts of Forminster and Presley Industries
- Application of the General Prosecutor's Office of 29 August 2002, File No VI VZv 3/2002 – 1597, for legal assistance – request of the Provincial Court in Vaduz, Liechtenstein, of 29 August 2002
- Public Prosecutor's Measure to block transfers of shares issued by Defendant 1 (may be requested by the court)
- Expert opinion valuing KOTVA department store
- with the reservation of further evidence

## 4. CONCLUSION, PLAINTIFF'S DEMAND

Above, Plaintiff has described the reasons why the transfers of KOTVA department Store from Defendant 1 to Defendant 2 and from Defendant 2 to Defendant 3 are null and void and why Defendant 1 remains the owner of the property. Plaintiff has also evidenced its exigent legal interest in having the ownership of KOTVA department store determined by a court.

For the above-mentioned reasons, Plaintiff proposes that, after discussing the matter, the court issue the following:

## VERDICT

1. It has been determined that Defendant 1 is the sole owner of the following properties:

- Building with land registry reference number 656 (civic amenities), belonging to part of the Stare Mesto municipality, located on building plot number 680;
- Building with no land registry reference number or street number (civic amenities), belonging to part of the Stare Mesto municipality, located on building plot number 1018/2;
- Land Parcel No 680 (developed area and courtyard) with an area of 4,385 m2;
- Land Parcel No 683/1 (other land) with an area of 851 m2;
- Land Parcel No 683/2 (other land) with an area of 2,963 m2;
- Land Parcel No 683/3 (other land) with an area of 2 m2;
- Land Parcel No 690/2 (other land) with an area of 25 m2;
- Land Parcel No 690/3 (other land) with an area of 49 m2;
- Land Parcel No 690/4 (other land) with an area of 9 m2;
- Land Parcel No 1018/2 (developed area and courtyard) with an area of 1 m2;

all in the Stare Mesto Cadastral District and municipality of Prague.

II. The Defendants are obliged to reimburse the costs of proceedings jointly and severally to Plaintiff within three days of the date that this Verdict enters into force.

[signature]
GILROY LIMITED
Ondrej Peterka
Attorney-at-Law, pursuant to power of attorney

Appendices:
- Statement from the Securities Centre
- Certificates of Incorporation of the Defendants
- Proof of the existence of Plaintiff
- Statement from the Property Register (Title Deed No 265 for the Stare Mesto Cadastral District)
- annual reports of Defendant 1 for 2000, 2001, and 2003
- Expert Opinion valuing KOTVA department store
- Report of the compulsory administrator of TREND-VIF of 22 February 1997 (including the documents specified in its appendix)
- Report of the Ministry of Finance of 21 January 1998, Ref. No 102/90 17697
- Indictment against the Accused, Miroslav Halek et al., submitted by the Regional Public Prosecutor's Office in Hradec Kralove on 30 September 1998, File No KZv 323/97
- Complete Certificate of Incorporation of TREND VIF
- Contributor's Statement of 10 October 2000, on the transfer of KOTVA department store from Defendant 1 to Defendant 2
- Notarial Deed of Vaclav Halbich of 20 May 2003, No NZ 235/203, N 317/2003
- Decision of the Liechtenstein Provincial Court in Vaduz, Liechtenstein, on the freezing of assets in the accounts of Forminster and Presley Industries
- Application of the General Prosecutor's Office of 29 August 2002, File No VI VZv 3/2002 – 1597, for legal assistance – request of the Provincial Court in Vaduz, Liechtenstein, of 29 August 2002

K 0265

## Record of the meeting between companies in the KOTVA concern

Present:

1)    for KOTVA a.s., Ing. Richard Harazim, CEO
2)    for KOTVA NEMOVITOSTI, k.s., Ing. Richard Harazim
3)    for SPV CO. Limited. Martin Benda, CEO

The reason for today's meeting between the representatives is to tackle the results of the conduct of Andrew Weisse and co. The actual conduct of Andrew Weisse is well known to those present and, according to all current knowledge, appears to be criminal. For this reason, a criminal information was filed against Andrew Weisse and Ing. Vladimir Hoffmann in August on suspicion that they have committed the crimes of breaching the compulsory rules of business transactions, of misusing information obtained from business transactions, and the crime of fraud

All dealings with Andrew Weisse and Ing. Vladimir Hoffmann have taken place in the presence of the representatives of KOTVA a.s. i.e. Ing. Richard Harazim and Martin Benda. Also, all requests made by Andrew Weisse or his representative have been directed towards KOTVA a.s. For this reason, the criminal information relating to these persons was filed by KOTVA a.s.

From the point of view of criminal law, the injured party in the initiated criminal proceedings is KOTVA a.s. itself, in spite of the fact that the nature of the behaviour of Andrew Weisse and co. also affects the other companies in the KOTVA concern. For example, as a consequence of the action to declare the proprietary rights filed by GILROY LIMITED, KOTVA NEMOVITOSTI, k.s is a direct participant in the proceedings. However, SPV CO. Limited and KOTVA OBCHODNI, a.s. are also indirectly affected

The participants have agreed that, in accordance with the criminal proceedings, **the interests of the concern will be represented by the parent company KOTVA a.s.** The same will apply in the event of the exercise of any legal claims against GILROY LIMITED or any other responsible persons

In the event that in the future, in connection with the above, there will be the need for any acts to be carried out, both SPV CO. Limited and KOTVA NEMOVITOSTI, k.s agree to carry them out. Both these companies hereby expressly authorise KOTVA a.s to take all essential steps

Regarding potential costs, the participants have agreed that they will be borne by that company in the KOTVA concern for which it will be the most advantageous for whatever reason. After the final and conclusive end of the proceedings in question, the costs will be fairly settled between the companies in the concern. The same will apply for the recovery of any damages or their parts

Prague, 4 October 2004

[illegible signature]

for KOTVA a.s., for KOTVA NEMOVITOSTI, k.s.,

[illegible signature]

for SPV CO. Limited

K8087

**Zápis ze schůzky společností koncernu KOTVA**

Přítomni:

1/   za KOTVA a.s., Ing. Richard Harazim, ředitel

2/   za KOTVA-NEMOVITOSTI, k.s., Ing. Richard Harazim

3/   za SPV CO. Limited, Martin Benda, ředitel

Důvodem dnešní schůzky zástupců je řešení důsledků jednání Andrew Weisse a spol. Vlastní jednání Andrew Weisse je přítomným podrobně známo s tím, že toto dle všech dosavadních poznatků naplňuje znaky jednání trestního. Z uvedeného důvodu bylo podáno na Andrew Weisse a Ing. Vladimíra Hoffmanna v měsíci srpnu trestní oznámení pro podezření ze spáchání trestných činů Porušování závazných pravidel v hospodářském styku, zneužívání informací v obchodním styku a trestného činu podvodu.

Veškerá jednání s Andrew Weissem, resp. s Ing. Vladimírem Hoffmannem se uskutečnila za přítomnosti zástupců KOTVA a.s., a to Ing. Richarda Harazima, Martina Bendy. Rovněž veškeré požadavky vznesené Andrew Weissem, resp. jeho zástupcem, směřovaly vůči společnosti KOTVA a.s. Z uvedeného důvodu bylo i trestní oznámení na výše uvedené osoby podáváno společností KOTVA a.s.

Z hlediska trestního práva je osobou poškozenou v iniciovaném trestním řízení právě společnost KOTVA a.s., a to přestože podstata jednání Andrew Weisse a spol. se dotýká významně i ostatních společností koncernu KOTVA. Např. v důsledku společností GILROY LIMITED podané žaloby o určení vlastnického práva, je účastníkem řízení přímo i KOTVA NEMOVITOSTI, k.s. Nepřímo jsou pak zasaženy i SPV CO. LIMITED a KOTVA OBCHODNÍ, a.s.

Účastníci se shodli na tom, že nadále, shodně jako v trestním řízení, **bude zájmy koncernu zastupovat mateřská společnost KOTVA a.s.** Stejně bude postupováno i v případě uplatnění jakýchkoli soudních nároků proti společnosti GILROY LIMITED, případně dalším odpovědným osobám.

Pro případ, že bude v budoucnu v souvislosti s výše uvedeným zapotřebí jakýchkoli úkonů, zavazují se společnosti SPV CO. Limited i KOTVA NEMOVITOSTI, k.s. tyto učinit. Obě společnosti pak výslovně zmocňují KOTVA a.s. k podniknutí veškerých nezbytných kroků.

Ohledně případných nákladů se účastníci dohodli tak, že tyto ponese ta ze společností koncernu KOTVA, pro kterou to bude z jakéhokoli důvodu výhodnější. Po pravomocném skončení příslušného řízení bude úhrada nákladů mezi společnostmi koncernu spravedlivě vypořádána. Totéž platí i v případě vymožení vzniklých škod nebo jejich části.

V Praze dne 4./ října 2004

_____                          _____

za KOTVA a.s., za KOTVA NEMOVITOSTI, k.s.         za SPV CO. Limited

K8088

1

1    Volume:  I

2    Pages:  1-124

3    Exhibits:  1-6

4

5         UNITED STATES DISTRICT COURT

6         DISTRICT OF MASSACHUSETTS

7    Civil Action No. 05-10679-WGY

8    - - - - - - - - - - - - - - - - - - - - - - - x

9    KOTVA, a.s.,

10         Plaintiff,

11    v.

12    ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,

13         Defendants.

14    - - - - - - - - - - - - - - - - - - - - - - - x

15

16    VIDEOTAPED INTERPRETED RULE 30(b)(6) DEPOSITION OF

17    SPV Co., By Its Designee, RICHARD HARAZIM

18         Wednesday, June 27, 2007

19         2:30 p.m. to 6:31 p.m.

20         MCDERMOTT, WILL & EMERY

21         28 State Street

22         Boston, Massachusetts

23

24    Reporter:  Marianne R. Wharram, CSR/RPR

8

1    the beginning, so I will say -- answer not -- not

2    exactly that way.

3        Q.  (BY MR. DANGEL)  Okay.  Do you keep your

4    eye on the investments made on the money that was

5    held back or put into escrow?

6        A.  Neither I nor any entity has control over

7    the escrow account money on the part of Kotva.

8        Q.  I only asked whether you keep your eye on

9    the investments that are made.  Do you?

10               MR. BECKMAN:  Objection.

11       A.  There are no investments, and that's why I

12   cannot keep an eye -- keep an eye over them.

13       Q.  (BY MR. DANGEL)  So you don't consider

14   putting money into a bond or into a money market

15   investment or any interest returning instrument to

16   be an investment?

17               MR. BECKMAN:  Objection.

18       A.  The money in the escrow is held with the

19   condition that in order to invest the money, there

20   must be joint instruction issued by Kotva and

21   Markland.

22       Q.  (BY MR. DANGEL)  Who on the Kotva side

23   negotiated the escrow agreement?

24       A.  I did the work, and of course, the approval

SPV, Co. by Richard Harazim

9

1    and the acceptance of the -- of the conditions is

2    up to the board.

3        Q.   And --

4            MR. BECKMAN:  Terry, same stipulations?

5    I'm sorry to interrupt.  I forgot to say that.

6            MR. DANGEL:  I was on a roll.

7            MR. BECKMAN:  Same stips?

8            MR. DANGEL:  Of course.

9            MR. BECKMAN:  Thanks.

10            MR. DANGEL:  All we're doing is

11    stipulating that the federal rules apply.

12            MR. BECKMAN:  Well, all objections

13    except as to the form of the question or privilege

14    are reserved until trial.

15            MR. DANGEL:  Okay.  That's exactly what

16    it says.

17        Q.   (BY MR. DANGEL)  You're a graduate of

18    business school, are you not, sir?

19        A.   Yes.

20        Q.   In fact, you have an advanced degree?  You

21    have a Master's of Business Administration from the

22    University of Pittsburgh, do you not?

23        A.   Yes.

24            MR. BECKMAN:  Objection.  Asked and

SPV, Co. by Richard Harazim

11

1    reading page one?

2        A.   And what was the wording of the question?

3        Q.   The two parties from the seller's side were

4    KN and SPV Co. Limited, right?

5        A.   Yes.

6        Q.   And the parties from the buyer's side were

7    Markland and CRQ Czech, correct?

8        A.   Yes.

9        Q.   And you negotiated with the purchaser on

10   behalf of the seller and the seller's principal,

11   correct?

12              MR. BECKMAN:   Objection.

13       A.   Yes.

14       Q.   (BY MR. DANGEL)   How old are you, sir?

15       A.   42.

16       Q.   So you'd been in the business world for

17   quite some time when this was negotiated in early

18   2005, correct?

19              MR. BECKMAN:   Objection.

20       A.   Yes.

21       Q.   (BY MR. DANGEL)   And looking at the last

22   page of the document, you see your name and title,

23   do you not?

24       A.   Yes.

SPV, Co. by Richard Harazim

14

1    Q.  Now, at the time you did this negotiation,

2  who were the members of the board of directors of

3  KN and of SPV Co.?

4            MR. BECKMAN:  Objection.  This has been

5  covered, but you can certainly answer.

6    A.  People stated in this document.  Do you

7  want me to read them?

8    Q.  (BY MR. DANGEL)  No.  Now, KN was a

9  partnership, right?

10    A.  Yes.  Yes.

11    Q.  And KO, which I'm sorry I can't pronounce

12  the name of, but that company was a general

13  partner, or as they call it, an unlimited partner

14  of KN, correct?

15            MR. BECKMAN:  Objection.

16    A.  Yes.

17    Q.  (BY MR. DANGEL)  All of the people who

18  voted to approve the deal and who signed the deal

19  from the seller's side were grown men and women

20  with experience in business, correct?

21            MR. BECKMAN:  Objection.

22    A.  Yes.

23    Q.  (BY MR. DANGEL)  And presumably, they knew

24  -- understood -- knew and understood the document

SPV, Co. by Richard Harazim

15

1    they were signing, correct?

2        A.   Yes.

3        Q.   And you knew and understood it, correct?

4        A.   Yes.

5        Q.   Sir, can you show me where in the escrow

6    agreement or the amendment there's any limitation

7    stated as to what the money that was being put into

8    escrow could be invested in or used for?

9        A.   After two years, of course, I do not recall

10   accurately, but if you want me to read the

11   contract, I can do it.

12       Q.   I want you to read through the contract and

13   I want you to refer me to any section in which you

14   claim there is any limitation placed on what the

15   money placed into escrow can be invested in or used

16   for.

17       A.   On 51, in connection with appendix number

18   six.

19       Q.   This is the section that begins the escrow

20   amount shall be invested according to the joint

21   instructions; is that correct?

22       A.   Since I only have scanned through the

23   contract and I did not read it thoroughly, after

24   two years, I would think that this is the sentence

SPV, Co. by Richard Harazim

16

1    that meets the conditions.

2        Q.   You needn't take it from me, but I'll

3    represent to you that that's the only section that

4    I found that could possibly cover this.

5                MR. BECKMAN:  Is that a question?

6                MR. DANGEL:  No.  I'm just making him

7    rest easy, and then I'll move on.

8                MR. BECKMAN:  Just ignore that.

9        Q.   (BY MR. DANGEL)  Looking, then, at that

10   section, do you see any language in there that

11   requires that the escrow amount be invested in low

12   yield bonds, Money Market instruments, or other low

13   yield investments?

14       A.   No, but what I see is that there is a need

15   for a joint instruction -- joint instruction from

16   Markland, and it was not the interest of Markland

17   to invest the money with any risk at all, and as we

18   ordinarily know, the least risky investments brings

19   the lowest yield.  On top of that, Markland

20   insisted that the amount invested in the escrow

21   account be very liquid, and it was very difficult

22   to convince Markland at all that the money needs to

23   be invested in any manner.  Their original idea was

24   to keep the money in a current account.

SPV, Co. by Richard Harazim

17

1       Q.   Thank you for the completeness of the

2   answer, but I will reserve my rights, as we have,

3   to strike everything after the word yes.

4   Nevertheless, we will in short order be covering

5   much of what came after the word yes, and so let me

6   go on with that by asking you this.   Is there

7   anything in writing in this section which defines

8   how the money must be or shall be invested?

9               MR. BECKMAN:   Objection.   In addition

10   to what he already testified to?  He identified two

11   things, and I'm not going to say any more --

12               MR. DANGEL:   Please don't.

13               MR. BECKMAN:   -- but he identified two

14   things.

15       Q.   (BY MR. DANGEL)   I'm looking for a

16   definition of how money is to be invested; not the

17   manner, but the type of investment that is required

18   under the escrow agreement.

19       A.   Risking that you will strike me again, I

20   will answer that it must meet the requirements of

21   both parties.

22               MR. BECKMAN:   Don't -- I have to

23   instruct the witness.   Ignore the motions to

24   strike.   You give your answer to a complete answer.

SPV, Co. by Richard Harazim

19

1    the meaning of joint instruction is in the fact

2    that it must be an investment that is accepted

3    before Markland.

4        Q.  Did Markland tell you in advance of signing

5    this agreement that it would only agree to low

6    yield investments?

7        A.  Yes, Markland wanted the money to remain in

8    the form of current account.

9        Q.  Who at Markland told you that?

10       A.  I -- after so much time, I will not be able

11   to identify the person with accuracy, but the main

12   person I was dealing with was Andrew Prestage.

13       A.  (By the Witness)  Henry.

14       A.  (Through the Interpreter)  Henry Prestage.

15       Q.  Are you testifying that Henry Prestage told

16   you that Markland would only agree to cash

17   equivalent or low risk -- strike that -- to low

18   risk, low yield investments of the escrow money?

19              MR. BECKMAN:  Objection.  Asked and

20   answered.

21       A.  What I'm saying is that someone from

22   Markland, and after so much time I cannot identify

23   who it was, told me that Markland will only agree

24   with low risk investment and very liquid

SPV, Co. by Richard Harazim

20

1    investment.

2        Q.  (BY MR. DANGEL)  Did you report that to the

3    board of KN and SPV Co. prior to their execution of

4    the escrow agreement?

5        A.  Of course.

6        Q.  Do you have freedom of contract in your

7    country?

8                MR. BECKMAN:  Objection.

9        A.  I don't know the term.  What does it mean?

10       Q.  (BY MR. DANGEL)  Were you forced, was the

11   board of directors forced by the government or any

12   other organization to sign this agreement in the

13   form that it is in?

14               MR. BECKMAN:  Objection.

15       A.  I must explain this.  The contract, the way

16   we signed it, despite the way you are directing

17   your questions, was a big victory for Kotva.

18       Q.  (BY MR. DANGEL)  Excuse me, but I -- I'm

19   going to move to strike that answer, okay?  I'm

20   just going to ask my question again.  I'm going to

21   ask my question again.  First of all --

22               MR. BECKMAN:  He's not done with his

23   answer.  You cannot interrupt.  You cannot

24   interrupt.  He wasn't finished with his answer.

SPV, Co. by Richard Harazim

22

1      A.   We didn't -- there was no need to force us.

2   We were happy to sign the contract.  Despite the

3   fact that due to circumstances that occurred as a

4   result of Mr. Weiss' lawsuit, that was the

5   solution, the best solution for Kotva to do that.

6      Q.   (BY MR. DANGEL)  As a result of signing

7   this agreement, did Kotva, did the -- sorry; strike

8   that -- did the seller sign away its right to the

9   proceeds of the investments and interest earned

10  during the escrow period to anyone?

11              MR. BECKMAN:  Objection.

12     A.   We believe not, but somewhere in the

13  contract is a sentence that Markland is basing its

14  claim on interest accrued on escrow.

15     Q.   (BY MR. DANGEL)  And what sentence is that?

16     A.   Somewhere in this contract is a sentence

17  that interest on escrow belongs to the buyer, but

18  how we understood the contract, it's only the money

19  accrued on the escrow account before Markland got

20  the shares.  After -- once Markland received the

21  shares, we insist that the interest belongs to us,

22  so any interest accrued on the escrow belongs to

23  us --

24     A.   (By the Witness)  That the escrow belongs

SPV, Co. by Richard Harazim

23

1   to us.

2       A.   (Through the Interpreter)  -- that the

3   escrow belongs to us.

4       Q.   Can you show me the sentence?

5       A.   Meaning the sentence that Markland is

6   basing --

7       Q.   That Markland is relying on.  Don't go very

8   far.  Just take a look at 5.3.

9           MR. BECKMAN:  So you're withdrawing

10  that question?

11          MR. DANGEL:  No, I'm helping him find

12  it.

13      A.   Yes, that would be the sentence.

14      Q.   (BY MR. DANGEL)  Now, you read English

15  quite well, don't you, sir?

16          MR. BECKMAN:  Objection.

17      A.   Yes, I can read.

18      Q.   (BY MR. DANGEL)  And you had a lawyer,

19  Kotva and -- the Kotva parties had a lawyer or

20  lawyers, did they not?

21      A.   Of course.

22      Q.   And who was your lawyer?

23      A.   Filip Smeja.  It was Valdauf & Dolezal Law

24  Office, but Filip Smeja did this particular

SPV, Co. by Richard Harazim

25

1   that's all right.  It helps.

2            MR. DANGEL:  Oh, in English.  Oh, I'm

3   sorry.  So you have it.  Yes, I'm sorry.

4     Q.  (BY MR. DANGEL)  What's unclear about that

5   language?

6     A.  The sentence does not exactly reflect the

7   business agreement we had with Markland.  The first

8   draft of the escrow agreement was prepared before

9   any lawsuits of Gilroy and KT were existing.

10    Q.  Right.

11           MR. BECKMAN:  Let him finish his

12  answer.

13    Q.  (BY MR. DANGEL)  Go ahead.

14           MR. DANGEL:  Joel, calm down.  This

15  isn't that upsetting.  Go ahead, please.

16    A.  This -- this sentence related to the

17  situation when Markland puts the money into the

18  escrow account and waits for the transfers of

19  shares.  After the Gilroy lawsuit came around,

20  there were many things that we had to consider and

21  discuss, whether the transaction ended or under

22  what conditions it would end, and unfortunately,

23  this sentence was not amended to reflect that

24  situation.  There were -- there were new facts like

SPV, Co. by Richard Harazim

26

1    another amount and securities sum, and --

2        A.  (By the Witness)  Then security sum, then

3    escrow amount, that there would be the money kept

4    in the escrow after the transaction was closed.

5        Q.  (BY MR. DANGEL)  I understand.  All of

6    Section 5, in fact, came from the original escrow

7    agreement; isn't that correct?

8        A.  (Through the Interpreter)  Most likely.

9        Q.  And therefore, Section 5.1 was taken right

10   from the old escrow account -- escrow agreement,

11   and plugged into this new agreement, correct?

12            MR. BECKMAN:  Objection.

13       A.  I think that Markland had better lawyers

14   than we did, because .51 related to the money in

15   the escrow.  It was very beneficial for them.  They

16   liked it.

17       Q.  (BY MR. DANGEL)  Right.  And that came from

18   the original escrow account -- agreement?  That's

19   what I meant.

20            MR. BECKMAN:  Objection.

21       A.  Yes, but it reflected their interest in the

22   new situation.

23       Q.  (BY MR. DANGEL)  Right, but you really

24   can't blame the Gilroy lawsuit for causing the

SPV, Co. by Richard Harazim

29

1    Q.  (BY MR. DANGEL)  Well, assuming the
2    previous drafts say that -- and certainly, at the
3    appropriate time, those will be raised -- you
4    cannot blame on Gilroy the language of an agreement
5    if the language was negotiated prior to the Gilroy
6    lawsuit, can you?
7              MR. BECKMAN:  Objection.  Asked and
8    answered.
9    A.  I think this is an academic debate.  What I
10   would like to say is I can blame Gilroy for the
11   fact that language that is in the escrow which was
12   construed for different conditions is now, after
13   Gilroy lawsuit, in this agreement.
14   Q.  (BY MR. DANGEL)  Well, I don't agree it's
15   academic, and let me ask a few more questions.  Had
16   the Gilroy lawsuit not occurred, would he have been
17   happy with the lang-- would you have been happy
18   with the language of 5.1, 5.2 and 5.3?
19             MR. BECKMAN:  Objection.  Incomplete
20   hypothetical.
21             MR. DANGEL:  I'm going to withdraw the
22   question.  He made a good point.
23   Q.  (BY MR. DANGEL)  Before the Gilroy lawsuit,
24   were you happy with the language of 5.1, 5.2 and

SPV, Co. by Richard Harazim

32

1    actions had been taken, but I'm also --

2                MR. BECKMAN:  Such as arbitration?

3                MR. DANGEL:  Excuse me.  I'm entitled

4    to know whether he has threatened Markland.

5    Anything that's been communicated to a third party

6    in any form whatsoever, I'm entitled to.

7                MR. BECKMAN:  I agree.

8                MR. DANGEL:  So I'm not restricting my

9    question as you suggest.

10               MR. BECKMAN:  If that was your

11   question, I wasn't restricting it.

12       Q.   (BY MR. DANGEL)  My question right now is

13   arbitration or litigation.

14       A.   We did not start any proceedings, legal

15   proceedings like that, but what we did, we

16   explained Markland the situation and we referred

17   them to the spirit of gentlemen's agreement,

18   because they did know what was the agreement, and

19   as a proof of what I am saying is that they did not

20   touch the interest.

21       A.   (By the Witness)  So far.

22       A.   (Through the Interpreter)  So far.

23       Q.   Is there a tolling agreement on litigation

24   or any agreement not to litigate for some period of

SPV, Co. by Richard Harazim

33

1     time?

2                MR. BECKMAN:  Objection.

3        A.  No.

4        Q.  (BY MR. DANGEL)  Did you go to the police

5     to complain that they were stealing your money?

6                MR. BECKMAN:  Objection.

7        A.  A, they did not use the money yet, and B,

8     if necessary, we can start arbitration.

9        Q.  (BY MR. DANGEL)  Now, prior to May of --

10    strike that.  Prior to the first negotiation --

11    strike that.  Prior to the first negotiation of

12    paragraphs 5.1 through 5.3 -- in other words, the

13    original escrow agreement provisions -- James Woolf

14    had been threatening litigation, had he not?

15               MR. BECKMAN:  Objection.  This is all

16    covered in prior depositions.

17               MR. DANGEL:  This relates to SPV.

18               MR. BECKMAN:  That was covered.

19       A.  We can talk about it, but maybe it would be

20    faster if you read my previous deposition, because

21    it's on tens of pages in there.

22       Q.  (BY MR. DANGEL)  Right.  And the short form

23    answer is he had threatened litigation prior to the

24    negotiation of the original escrow agreement,

SPV, Co. by Richard Harazim

34

1    correct?

2              MR. BECKMAN:  Objection.

3       A.   James Woolf threatened with a lawsuit to

4    whom?

5       Q.   (BY MR. DANGEL)  Kotva?

6       A.   No.

7       Q.   Forminster?

8       A.   I don't know.

9       Q.   It related to the ownership of the

10   building, though, right?

11             MR. BECKMAN:  Objection.

12      A.   I am not aware of the fact that James Woolf

13   would be threatening litigation against Kotva.

14      Q.   (BY MR. DANGEL)  Well, you have testified

15   at great length, and I don't need to repeat it, but

16   it's true, is it not, that the threatened

17   litigation by Mr. Woolf was not disclosed by Kotva

18   to Markland originally, but later, that they, when

19   they found out about it, they wrote you, upset that

20   you hadn't disclosed it, insisted that it be

21   disclosed, and then they became aware of the

22   threatened litigation, right?

23             MR. BECKMAN:  Objection.

24      Q.   (BY MR. DANGEL)  And I said this very

SPV, Co. by Richard Harazim

35

1    quickly in order to try to get through it.

2              MR. BECKMAN:  Objection.

3         A.   No.   That's absolutely wrong.

4         Q.   (BY MR. DANGEL)  Who did Woolf threaten to

5    sue?

6              MR. BECKMAN:  Objection.  That's

7    already been covered.

8         A.   I have heard that Woolf threatened

9    Markland.

10        Q.   (BY MR. DANGEL)  And that was prior to the

11   negotiation of the escrow agreement, correct --

12   original escrow agreement, correct?

13        A.   That is very possible.  James Woolf

14   threatened from the very beginning of Markland's

15   involvement, and I disagree with the statement that

16   Markland did not know about a threat.  They knew

17   that from day one.

18        Q.   Okay.  So just reading the language of the

19   agreement, is there anything in that that tells me

20   that Markland did not have in mind the threatened

21   litigation from Woolf at the time that 5.1, 5.2 and

22   5.3 were negotiated?

23             MR. BECKMAN:  Objection.  This has all

24   been covered in four days of prior deposition.

SPV, Co. by Richard Harazim

36

1          MR. DANGEL:  I'm sorry, but I didn't

2     read anything about this.

3        A.   I would answer like that Markland knew

4     about threats of James Woolf, but if you look at

5     the older versions of SPA and escrow, there was

6     nothing about tied up money.  Tied up money came up

7     only after Gilroy suit.

8        Q.  (BY MR. DANGEL)  Is there anything here

9     that references tied up money in explicit language?

10          MR. BECKMAN:  Objection.

11       A.   No, because the agreement was that money

12    can be used only based on joint instruction, so

13    what administers the money in the account is a

14    business agreement between us and Markland, and

15    that was in SPA.

16       Q.  (BY MR. DANGEL)  Now, sir, as to these

17    provisions and your last statement as to joint

18    instructions, that means that Markland instructs

19    and your side instructs as to what the money is to

20    be used for, correct?

21       A.   Yes, Markland and we have to reach an

22    agreement and sign a joint instruction.

23       Q.   Now, who on your side -- that is, the

24    SPV/Kotva side -- is involved with those

SPV, Co. by Richard Harazim

39

1    A.  (By the Witness)  Joint investment

2  instruction.

3         MR. DANGEL:  No, no.  I'm looking for

4  the individual.

5         MR. BECKMAN:  Okay.  I don't want to --

6    Q.  (BY MR. DANGEL)  So taking your counsel's

7  cue here, there's a joint -- there's a page, 1957,

8  that has a joint investment instruction.  It is

9  dated March 4th, 19-- 2005, and there are some

10  signatures for Kotva Nemovitosti and SPV Co.  Do

11  you see that?  And that's your signature and Martin

12  Benda's signature; is that right?

13    A.  (Through the Interpreter)  Yes.

14    Q.  Has there been any instruction since

15  March 4th, 2005?

16    A.  No.

17    Q.  Have you ever asked Markland -- that is,

18  you or Martin Benda or any other individual on

19  behalf of SPV Co. or KN -- ever asked Markland to

20  change the joint instruction?

21    A.  To be honest, no, because the discussion

22  about the investing of money in the escrow was

23  before Markland agreed that they will invest with

24  us at least this way, jointly, and they made it

SPV, Co. by Richard Harazim

44

1      MR. DANGEL:  All right.  So let's take

2  a break.

3      VIDEOGRAPHER:  The time is 3:45.  We're

4  off record.

5      (Off the record.)

6      (Recess taken.)

7      VIDEOGRAPHER:  The time is 3:52.  We're

8  back on.

9    Q.  (BY MR. DANGEL)  So is it fair to say that

10  you have a disagreement with Markland, you

11  representing the Kotva side and the SPV side, have

12  a disagreement with Markland as to what the money

13  is invested in and where the money will go when the

14  escrow agreement ends; that is, whether to Markland

15  or to Kotva?

16      MR. BECKMAN:  Objection.

17    A.  I don't think we have a disagreement as to

18  whether into what -- into what to invest the money

19  because we accept the logic, their logic at the

20  beginning, so there is not a disagreement in this,

21  and there is also not a conflict in the fact where

22  the money will go after the escrow is ended,

23  because it is also very clear that the money

24  belongs to us once it is not in escrow.

SPV, Co. by Richard Harazim

45

1          Where the conflict is is where -- who

2    owns the money from the interest on the escrow, and

3    I don't think the conflict is so serious and I am

4    sure we'll reach some agreement.

5        Q.   (BY MR. DANGEL)  And none of the defendants

6    in this case have taken a stand, a position on

7    where the interest money should go; isn't that

8    correct?

9             MR. BECKMAN:  Objection.

10       Q.   (BY MR. DANGEL)  Weiss and Weiss Asset

11   Management.

12       A.   Would you please repeat that question?

13       Q.   Neither Weiss Asset Management or Professor

14   Andrew Weiss have taken any position on Markland's

15   side or your side as to where that interest money

16   should go; isn't that correct?

17            MR. BECKMAN:  Objection.

18       A.   I do not know anything of any position like

19   that, and I am even not sure if they should take a

20   position, because this is a relationship between

21   Markland and Kotva.

22       Q.   (BY MR. DANGEL)  Does Kotva, a.s. exist

23   today?

24            MR. BECKMAN:  Objection.  Asked and

SPV, Co. by Richard Harazim

50

1    A.    (Through the Interpreter)    The building

2    cannot be pledged.

3    Q.    (BY MR. DANGEL)    Sorry.    Yeah, I heard it.

4    It's okay.    Sir, are you saying that when the

5    lawsuit was filed, you were about to close on the

6    transaction with Markland?

7    A.    There was only one thing open, and that was

8    the change of structure.    Both contracts that were

9    concluded before, one in October 2003 and one in

10   January 2004, were about Markland purchasing SPV

11   Co. shares and paying to KN.    For reasons on the

12   Markland side, they came with a new request to

13   change the structure and that was the only

14   remaining task.    And the task basically consisted

15   only of some not very complex changes in the

16   contract, so the answer is yes, we were just before

17   the closing of the transaction.

18   Q.    Had you notified all of the shareholders of

19   Kotva of the possibility of the sale as of the

20   filing of the lawsuit?

21   A.    During the whole period of negotiations

22   about the sale, whether with Markland or some other

23   entities before Markland, we did not inform

24   shareholders of Kotva of those negotiations.    We

SPV, Co. by Richard Harazim

51

1    informed the securities commission and we requested

2    that the publication of this information be put on

3    hold because we were afraid of what really did

4    happen later, that what really happened, and that

5    being the fact that some shareholders took

6    advantage of their right to -- to threaten the

7    finalization of the transaction.

8        Q.  Sir, the change you're talking about in

9    structure that Markland asked for was a -- well,

10   why don't you describe to me what the change was

11   that they asked for in the structure.

12       A.  When we signed the contract originally,

13   Kotva Nemovitosti, as the owner of the real estate,

14   was supposed to invest the property into --

15       A.  (By the Witness)  Contribute the property.

16       A.  (Through the Interpreter)  -- into -- into

17   the Czech Investment company.

18       Q.  SPV KN?

19       A.  (By the Witness)  SPV KN.

20       A.  (Through the Interpreter)  And the shares

21   of SPV KN were supposed to be invested or

22   contributed --

23       A.  (By the Witness)  Contributed.

24       A.  (Through the Interpreter)  -- into the --

SPV, Co. by Richard Harazim

52

1    into its subsidiary SPV Co. --

2        A.   (By the Witness)  The subsidiary of KN,

3    another subsidiary of KN.

4        Q.   A Czech subsidiary?

5        A.   (By the Witness)  Cypriot.  Cypriot.

6        Q.   That was the original transaction?

7        A.   (By the Witness)  That was how it was

8    foreseen.

9        Q.   Okay.

10       A.   (By the Witness)  Maybe I'll explain this

11   in English.  This is important.

12       Q.   Yeah, because I do need to understand it.

13       A.   (By the Witness)  The original plan was for

14   KN as the owner of the building to create another

15   Czech company, a daughter of KN, that would be

16   called SPV KN.  The building would be contributed;

17   thus, KN would obtain shares of SPV KN in return

18   for the building.

19       Q.   Yes.

20       A.   (By the Witness)  This sh-- these shares of

21   SPV KN would then be contributed to a Cypriot

22   daughter of KN, SPV Co., and SPV Co. would be sold

23   through the market.

24       Q.   Yes.

SPV, Co. by Richard Harazim

53

1          A.   (By the Witness)  Thus, the end result is
2     KN getting rid of SPV Co., where SPV KN was
3     deposited.

4          Q.   Okay.

5          A.   (By the Witness)  Thus, the money would
6     come to a Czech entity.

7                    Later on -- and that was shortly before
8     -- before the Gilroy lawsuit was filed.  Because of
9     concerns of some sort reported by the financing
10    bank, with AIB, who had reservations about buying a
11    Cypriot company, the structure was changed into
12    what was described in the December 2004 contract,
13    and then, the structure was basically the same,
14    with the exception that SPV Co., the Cypriot
15    entity, sold the shares of SPV KN, and thus, the
16    money ended up in SPV Co.  We did not mind the
17    change, because it's fairly easy to dilute a
18    Cypriot company and distribute the proceeds back to
19    KN, and that was the original plan.  And because of
20    the lawsuit, nowadays the money is being tied up in
21    escrow.  We just can't proceed.

22         Q.   The company which purchased Markland's
23    company was CRQ, right?

24         A.   (Through the Interpreter)  CRQ purchased

SPV, Co. by Richard Harazim

54

1    the shares of SPV KN, yes.

2        Q.  Right.  Was there a tax advantage involved

3    in structuring the deal this way?

4        A.  There were two benefits or aspects.

5    Markland -- Markland insisted that this is the way

6    they do the business when there are existing

7    companies and they are buying their real estate,

8    because they were afraid to buy a company that had

9    the corporate history, and of course, the next

10   aspect was taxes.

11       Q.  Okay.  And what was the tax benefit and to

12   whom?

13       A.  The tax benefit was on the Kotva side.

14       Q.  And what was the benefit?

15       A.  (By the Witness)  Could we mark this

16   confidential again?

17       Q.  Yes.

18           MR. DANGEL:  You don't mind, do you, if

19   the tax benefit is explained in a confidential --

20   we just want to understand it, so I don't have any

21   particular use for it.  And we are Kotva

22   shareholders, so I think it can be done

23   confidentially.

24           MR. BECKMAN:  Mark it confidential.

SPV, Co. by Richard Harazim

55

1

2

3

4

5

6

7

8

9

10

11

12

13          **REDACTED**

14

15

16

17

18

19

20

21

22

23

24

SPV, Co. by Richard Harazim

56

1

2

3

4

5

6

7

8

9

10

11

12                          **REDACTED**

13

14

15

16

17

18

19

20

21

22

23

24

SPV, Co. by Richard Harazim

80

1    police as of that time?

2              MR. BECKMAN:  Objection.

3        A.  As far as I know, Michael Vlock signed the

4    criminal report, so it really depends what you mean

5    by contacting the police.

6        Q.  (BY MR. DANGEL)  Well, let's now take --

7    now that I've given you the document that I've

8    marked as Harazim 5 in Czech and we recognize it

9    was -- the one in Czech is in Harazim 1 --

10             MR. BECKMAN:  This was marked at a

11   previous deposition?

12             MR. DANGEL:  Yes, right, at a previous

13   Haraz-- at the earliest deposition.

14       Q.  (BY MR. DANGEL)  Mr. Harazim, you see your

15   name on the upper left-hand corner there.  Do you

16   know why your name appears there?

17       A.  I don't know what it is.  This is some

18   translation of something.  I have never seen this

19   translation.  I don't know who did it.  I don't

20   know whether it's translated correctly.  I don't

21   know why it is in English.

22       Q.  Okay.  Sir, the Gilroy case was filed,

23   what, June 30th?

24       A.  June 30th, 2004.

SPV, Co. by Richard Harazim

82

1    lawsuit meant anything, whether Weiss was behind

2    the lawsuit, whether anything should be done in

3    terms of papers, the -- an escrow of money and so

4    forth throughout that summertime period, right --

5                 MR. BECKMAN:   Objection.

6        Q.  (BY MR. DANGEL)  -- of July, August and

7    into early September, right?

8                 MR. BECKMAN:   Objection.

9        A.   Yes.

10       Q.  (BY MR. DANGEL)  And when was it that you

11   knew that the Gilroy lawsuit -- that in your mind,

12   Weiss was behind the Gilroy lawsuit?

13                MR. BECKMAN:   Objection.

14       A.   There are two points here.  First point is

15   when verbally we were notified by Mr. Hoffman at a

16   meeting, but I cannot tell you what the date of the

17   meeting was, and then secondly, when we were able

18   to verify that the information provided by

19   Mr. Hoffman was true was a fax confirmation from

20   America -- was a reaction to our fax sent to

21   America.

22       A.   (By the Witness)  Sent to the States, yes.

23       Q.  (BY MR. DANGEL)  Okay.  At what point did

24   you inform Markland that you believed Weiss was

SPV, Co. by Richard Harazim

83

1    behind the Gilroy lawsuit?

2        A.   (Through the Interpreter)  I do not recall.

3    I cannot tell you.

4        Q.  Were you at this point trying to convince

5    -- whenever that was that you notified them, were

6    you trying to convince them that they should go

7    ahead with the closing and that the Gilroy lawsuit

8    didn't pose a problem, or much of a problem?

9                MR. BECKMAN:  Objection.  This is all

10   covered in a prior deposition.

11               MR. DANGEL:  Oh, yes, and we're going

12   to fly through this because it has been to get to

13   the point I want to make.

14               MR. BECKMAN:  You keep saying that, and

15   it's beyond the scope, but you keep asking the same

16   questions.

17       A.  Yes.

18       Q.  (BY MR. DANGEL)  Did Markland agree with

19   you at any time that the Gilroy lawsuit did not

20   need to be taken into account?

21       A.  I think their position was developing.  At

22   first, I thought they did not put much weight on

23   the information, because we were continuing

24   discussion on several other topics, but later on,

SPV, Co. by Richard Harazim

86

1     Q.  (BY MR. DANGEL)  When did it settle, that

2  issue settle?

3     A.  I cannot give you the date.  I don't

4  recall.

5     Q.  Was it October?

6          MR. BECKMAN:  Objection.

7     A.  I doubt that it would last that long.

8     Q.  (BY MR. DANGEL)  Okay.  But e-mails would

9  tell me?

10     A.  Yes, the declaration itself is -- exists.

11     Q.  Now, but at some point, you knew that the

12  -- you determined that the Gilroy lawsuit was a

13  real obstacle to closing the deal, right?

14          MR. BECKMAN:  Objection.

15     A.  Yes, at a certain point, it looked like the

16  transaction will collapse -- would collapse.

17     Q.  (BY MR. DANGEL)  And when was that?

18     A.  I don't know.  I would have to look into

19  the e-mails.

20     Q.  How many days was it before you went to the

21  police for the first time to lodge a -- not you

22  personally, but your company went to the police to

23  lodge the complaint, criminal complaint, was it

24  that you had made the determination that this was a

SPV, Co. by Richard Harazim

90

1    Q.  And then you took those videotapes -- not

2  you personally, but they were taken by your company

3  to the police a few weeks after the taping, right?

4    A.  I think the main reason why we contacted

5  the police were not those videotapes.

6    Q.  Okay, but you contacted them in August,

7  right?

8          MR. BECKMAN:  Let him finish his

9  answer, please.

10    A.  The decisive fact was that e-mail that we

11  received from Mr. Weiss confirmed facts that were

12  presented to us by Mr. Hoffman.

13    Q.  (BY MR. DANGEL)  But at the time that you

14  went to the police, you were concerned that his

15  actions might upset the sale of the property to

16  Markland, correct?

17          MR. BECKMAN:  Objection.

18    A.  Yes.

19    Q.  (BY MR. DANGEL)  And so your purpose for

20  going to the police was to try to back Weiss off of

21  the lawsuits so that the transaction could go

22  through free and clear, correct?

23          MR. BECKMAN:  Objection.

24    A.  That's not the case.

92

1    incorrect logic.  If you were right, then we would
2    expect after contacting police that police would
3    approach Mr. Weiss and tell him don't do that.  We
4    did not assume that and we did not want that,
5    because at that time, we did not know that
6    Mr. Weiss controls Gilroy, because if he was
7    pressured, he would of course not continue the
8    negotiation and that way he would not provide the
9    proof that he is behind Gilroy, because any
10   documentation that we had was re-- was denying that
11   Mr. Weiss was behind Gilroy.  So the purpose of our
12   criminal complaint was not to back off Mr. Weiss of
13   his action, but to make sure that he carried the
14   consequences of his action.
15       Q.  (BY MR. DANGEL)  And what -- then what
16   you're concerned about is that the deal -- as you
17   indicated, you were concerned the deal might fall
18   apart and you would have to explain to the people
19   at Kotva why the deal fell apart and you'd have to
20   blame Mr. Weiss, correct?
21             MR. BECKMAN:  Objection.
22       A.  At that time, no one knew it was Mr. Weiss.
23   At that time, we would blame some nameless
24   offshore.

SPV, Co. by Richard Harazim

93

1      A.   (By the Witness)  With no assets, no

2  liabilities, nothing.

3      Q.   (BY MR. DANGEL)  Right, but then what

4  you're looking for is someone to blame for the

5  transaction not going through, right, whoever that

6  is?

7           MR. BECKMAN:  Objection.  Objection.

8      A.   (Through the Interpreter)  We were looking

9  for someone who we can blame for actually

10  collapsing the transaction.

11      A.   (By the Witness)  It's not blame, but it's

12  making responsible for actually cancelling the

13  transaction.

14      Q.   (BY MR. DANGEL)  Okay.  But that's why you

15  went to the police, right?

16           MR. BECKMAN:  Objection.

17      A.   (Through the Interpreter)  We -- we went to

18  the police for them to find out who is it who is

19  interfering with the transaction.  And if they can

20  prove that it was criminal activity, we wanted the

21  person to be punished.

22           (Exhibit 6 marked for identification.)

23      Q.   (BY MR. DANGEL)  Okay.  Now, sir, the

24  question I asked you before, though, was whether

SPV, Co. by Richard Harazim

102

1       A.   As I described the structure at the

2   beginning, this was the special purpose vehicle.

3   They were selling Kotva's property.

4              MR. DANGEL:  Okay.  Why don't we take a

5   break.

6              VIDEOGRAPHER:  The time is 5:47.  We're

7   off the record.

8              (Off the record.)

9              VIDEOGRAPHER:  The time is 5:53.  We're

10  back on the record.

11      Q.   (BY MR. DANGEL)  Sir, does SPV Co. have

12  meetings of the board of directors?

13      A.   In very exceptional cases.

14      Q.   Okay.  Are you a director of SPV Co.?

15      A.   No.

16      Q.   Are you a director of CIS?

17      A.   No.

18      Q.   Who controls SPV Co.'s activities?

19      A.   SPV Co. is generally a wallet or bank

20  account of CIS, so it is the management and the

21  board of directors of CIS.

22      Q.   Who as a practical matter determines -- I

23  don't mean -- below the board level determines to

24  bring to the board investments that should be made

106

1    I may need to go through this in some detail.  When

2    Mr. David testified this morning, he said there

3    were 780 million, roughly, in assets of SPV Co.,

4    and he described certain investments and he

5    described a $21 million -- 21 million crowns bond,

6    I believe, a three percent bond, but there was

7    about 180 million -- 80 million crowns, so big

8    difference there, that wasn't accounted for, and

9    this -- and also, he mentioned that there's a lot

10   of cash in the J&T account.  I don't remember the

11   actual numbers, and we're trying to find -- Andy

12   made notes of them, but I'm trying to find them.

13   Not all of the money, though, by any means, of SPV

14   Co. is invested in these high yield loans, correct?

15          MR. BECKMAN:  Objection.  You may

16   answer.

17      A.  Yes.

18      Q.  (BY MR. DANGEL)  About 172 million crowns

19   are in the bank, in the J&T Bank?

20      A.  Yes.

21      Q.  Is that a pretty steady amount?  I mean, in

22   other words, is there usually that kind of money in

23   the account?

24      A.  This is the way how we see business.  A

SPV, Co. by Richard Harazim

109

1    ▓▓▓▓ paid, and if we pledged the land at a

2    time when ▓▓▓▓ purchased them, it would extend

3    the translation by at least two or three months,

4    because the Cadastre, or land deed offices, in the

5    Czech Republic are very slow.  So what our solution

6    is, we always have one person who, so to say, keeps

7    the thumb on the money, because -- and so far, we

8    were very successful.

9        Q.  Okay.  Does CIS own 50 percent of ▓▓▓▓

10       A.  No.

11       Q.  Does it own any?

12       A.  According to my knowledge, not.

13       Q.  ▓▓▓▓, what is the connection of ▓▓▓▓

14   to CIS or ▓▓▓▓

15              MR. BECKMAN:  Objection.  You may

16   answer.

17       A.  I do not know accurate details.  I only

18   know the principal relations, and I know that the

19   principle is secured by more than -- that the

20   receivable is secured by more than is the

21   principle.

22       A.  (By the Witness)  And by more than adequate

23   security.

24       Q.  By more adequate collateral?

SPV, Co. by Richard Harazim

112

1    go for a period of time.  I'm not agreeing to half

2    an hour, but we'll -- you certainly continue on

3    subject matter seven.

4            MR. DANGEL:  I will.

5        Q.  (BY MR. DANGEL)  The -- I need to know --

6    okay.  Let me get myself together a little bit.

7    Was 2005 a better year than 2004, let's say?

8        A.  It cannot be specified that clearly.  There

9    were no changes that would be so clear.

10       A.  (By the Witness)  No abrupt changes in the

11   climate.  It's basically the same thing.

12       Q.  Because I notice that the negotiation here

13   when it began -- that is, to sell the property to

14   Kotva -- there was an agreement reached to reach an

15   agreement in 2003 that had the same purchase price

16   on it as the property was sold for in early 2005,

17   and I'm wondering, are you saying that the property

18   didn't go up in value during that time?

19       A.  (Through the Interpreter)  You have to

20   realize the situation of Kotva.  It is a

21   30-year-old property that's standing across from

22   the biggest development in Prague and that will

23   open in the fall.  Today, when I go to the Kotva

24   garage, two-thirds of the places are empty, and

SPV, Co. by Richard Harazim

113

1    that's before Fall 2007 when another 29 -- 920

2    places will be available.  As far as the price of

3    properties, that also has stabilized.  There is no

4    reason why the price of Kotva should go up.  To the

5    contrary.

6        Q.  Okay.  Just on the directors issue, is

7    Martin Benda a director of any of the CIS

8    companies, or of CIS itself?

9        A.  I think he is not, but you can look this up

10   on the Internet.

11       Q.  What do you mean I can look it up on the

12   Internet?  Aren't you in contact with Martin Benda?

13               MR. BECKMAN:  Objection.

14       A.  I am, but it does not mean that I know all

15   details about his life.

16       Q.  (BY MR. DANGEL)  Is he a consultant to or

17   in any way employed by any of the CIS companies?

18       A.  I think he sits on a supervisory board and

19   that he is a consultant at some level.

20       Q.  But do you know which company or companies?

21       A.  No, because the common practice is to find

22   this information online, so I don't try to remember

23   them.

24   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

SPV, Co. by Richard Harazim

116

1          MR. DANGEL:  -- to talk to my people?

2          MR. BECKMAN:  Of course.  Yes.

3          VIDEOGRAPHER:  The time is 6:18.  We're

4  off the record.

5                (Off the record.)

6                (Recess taken.)

7          VIDEOGRAPHER:  The time is 6:21.  We're

8  back on.

9     Q.  (BY MR. DANGEL)  Mr. Harazim, other than

10  what we heard from Mr. David this morning and from

11  you, that there's 172 million in ▇▇▇▇ 98 -- oh,

12  84 million receivable from ▇▇▇▇ 12 million for

13  ▇▇▇ 116 million ▇▇▇▇▇▇, 60

14  million receivable from ▇▇▇, 28 million from

15  ▇▇▇ 21 million ▇▇▇, four million

16  ▇▇, which comes to about 590 million crowns

17  --

18          MR. BECKMAN:  You're missing some.

19     A.  (By the Witness)  You must be missing some.

20          MR. BECKMAN:  You're missing some that

21  he identified.

22          MR. DANGEL:  He identified 98 million

23  in notes, generally --

24          MR. BECKMAN:  ▇▇▇▇

SPV, Co. by Richard Harazim

117

1    A.  (By the Witness)  ▌▌▌▌▌  It's 170

2  cash, 96 in --

3    Q.  (BY MR. DANGEL)  Notes, okay.  So that's

4  260?

5    A.  (By the Witness)  205, ▌▌▌▌, 60 --

6    Q.  Yeah, then 84.  That's about --

7    A.  (By the Witness)  84, ▌▌▌▌▌

8    Q.  That's about 340, 12 is, let's say, 350,

9  116 is 465, 60 makes it 525, 28 makes it roughly

10 550, 21 makes it roughly 575, four makes it 589, so

11 let's say 590 out of 788.  What's the other 190

12 million?  I mean, what's that invested in, or if

13 it's not invested, is it in an account or a bond or

14 what?

15    MR. BECKMAN:  He identified -- he

16 accounted for all 788.  You're taking it from notes

17 of Mr. Weiss.  We can go back to the transcript,

18 but --

19    MR. DANGEL:  So you're saying he

20 accounted for the whole thing?

21    MR. BECKMAN:  I'm pretty sure he did.

22    Q.  (BY MR. DANGEL)  Okay.  There's nothing

23 else that you know of?

24    MR. BECKMAN:  That's a better question.

```
 1                      VOLUME 1, PAGES 1 - 234

 2                      EXHIBITS 1 - 22

 3           IN THE UNITED STATES DISTRICT COURT

 4           FOR THE DISTRICT OF MASSACHUSETTS

 5                      No. 05-10679-RCL

 6   - - - - - - - - - - - - - - - - - - - - - - - -

 7   KOTVA a.s.,

 8               Plaintiffs

 9         vs.

10   ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,

11               Defendants

12   _____

13   ANDREW WEISS, WEISS ASSET MANAGEMENT LLC,

14   KT, INC. and CVF INVESTMENTS, LTD.,

15               Counterclaim-Plaintiffs,

16         v.

17   KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM,

18   FORMINSTER ENTERPRISES, LTC., SPV CO. and

19   JOHN DOES 1-5,

20               Counterclaim-Defendants.

21   - - - - - - - - - - - - - - - - - - - - - - - -

22     VIDEOTAPED RULE 30(b)(6) DEPOSITION OF KOTVA a.s.

23            BY AND THROUGH RICHARD HARAZIM

24         Tuesday, February 22, 2006 10:02 a.m
```

```
 1                    (Agreement dated October 16,

 2          2003 marked Exhibit 19.)

 3                    (December Share Purchase

 4          Agreement marked Exhibit 20.)

 5                    MR. LEIBENSPERGER:  This is Exhibit what?

 6                    COURT REPORTER:  20 and 21 -- I'm sorry,

 7  19 and 20.

 8                    MR. LEIBENSPERGER:  Can I see what is 19

 9  and 20, so I have it?

10          A.   This is the future, and this is the SPA

11  from December.

12                    MR. LEIBENSPERGER:  That is 19.  Thank

13  you, and the December one was -- did you hand me that?

14                    MR. GOLDBERGER:  The December one, you

15  should have.  No, I did not.

16                    MR. LEIBENSPERGER:  Thank you.

17          Q.   All right.  As I said, it may get

18  cumbersome, but I'll try to make it simpler.  The

19  agreement on a future agreement --

20          A.   Okay.

21          Q.   -- on share purchase, Exhibit 19, is dated

22  October 16, 2003.  Is that correct?

23          A.   Yes.

24          Q.   And the purchase price referenced in this
```

1  deal is 48,300,000 Euros; is that right?

2        A.    That is right.

3        Q.    Is it correct to say that the purchase

4  price never changed all the way to the closing of the

5  deal?

6        A.    I think it changed a little bit, and I'm

7  trying to think why.  This is the final one

8  (indicating).  Oh, no, it didn't.  It didn't.

9        Q.    So, the purchase price stayed the same all

10  the way to the end?

11        A.    Yes.  Yes.  Right.  There were adjustments

12  to the purchase price, but that was on the closing

13  date, and it was in relation to the various, to the

14  various stipulations of this contract.

15        Q.    Okay.

16        A.    So, the purchase price, as defined, as a

17  definition, stayed the same.

18        Q.    So, it is correct to say that the Gilroy

19  and KT lawsuits had no effect on the purchase price

20  that you received from Markland?

21        A.    Had no effect on the purchase price, on

22  the nominal value of purchase price.  It had effect on

23  how much money Kotva received.

24        Q.    You're talking about the escrow?

1          A.    I'm relating to the escrow.

2          Q.    So, let me just ask my question and make

3   it clear again.   Other than the escrow, which we'll

4   talk about, the Gilroy and KT lawsuits had no effect on

5   the purchase price Kotva received from Markland; is

6   that correct?

7                MR. BECKMAN:   Objection.   You may answer.

8          A.    That is correct.

9          Q.    All right -- on Exhibit 19 --

10         A.    Nineteen.

11         Q.    -- turn to Page 12 of the draft SPA.

12         A.    The SPA?

13         Q.    Yes.

14         A.    Page 12.   Yes.

15         Q.    And Section 4 is entitled "Sale and

16   Transfer of Shares Closing"?   Do you see that?

17         A.    Yes.

18         Q.    And in Section 4.1 it talks about the

19   transfer of shares?

20         A.    Right.

21         Q.    Do you see that?   It indicates that the

22   transfers of shares is to occur not later than 31

23   December, 2004?

24         A.    Right.

| From: | Henry Prestage [hprestage@markland.ie] |
|---|---|
| Sent: | Friday, July 18, 2003 9:45 AM |
| To: | harazim@sky.cz |
| Subject: | FW: KOTVA |
| Importance: | High |

Good afternoon Richard

I hope the holiday is going well. We got a letter from Mr James Wolf which I am forwarding to you below. I met him and was accused of aiding fraud and money laundering. I was also told that 7 people have already gone to jail over the KOTVA dealings to date and that one man was shot in the head. He claims that Mr Benda, Mr Vlach and yourself are all criminals and will be dealt with by the police.

I have forwarded his letter to Linklaters to deal with. I am a little concerned that he claims that an arbitration has been held in the UK which they won and that an award was made against KOTVA - none of this was disclosed to Linklaters by you during the due diligence process.

Rather than respond to you on the issues we discussed on Wednesday I think it best to see what Linklaters uncover first as this may have a further impact on the sale price or other conditions. I would obviously like to hear your side of the story. You can call me today on my usual number or from Monday on 0036305055518.

Regards

Henry

-----Original Message-----
**From:** James Woolf [mailto:james.woolf@demac.cz]
**Sent:** 16 July 2003 18:27
**To:** Henry prestage
**Cc:** Legal; Schweigelová Dana; Zimmerman Jonathan; Industrial1
**Subject:** KOTVA
**Importance:** High




Henry Prestage
Markland Holdings
19 Upper Fitzwilliam Street
Dublin 2
Ireland


16 July 2003


Dear Mr Prestage,                                                    **K62B**

Re Kotva building, Prague, Czech Republic

We understand that you or an associated company are in negotiations to purchase this building.

On behalf of F E Reality a.s., Flow Corporation Ltd and Morgan Grenfell Ltd [Deutsche Bank] we hereby put you on notice that the transactions through which the alleged sellers of this building have acquired the property are not transparent and are doubtful and are being challenged.

We have prepared a statement to the National Criminal Intelligence Service, Economic Crime Unit, of the UK that is being filed regarding some of the associated companies of the alleged sellers. Criminal investigations are also ongoing in the Czech Republic.

We have obtained an arbitration award and several injunctions against companies associated with the alleged sellers and are pursuing our claims. In conjunction with these actions and a bankruptcy proceeding in which we are a principal creditor a lien was placed in the property.

We put you on notice that our claim is against the owner of the property known as Kotva. Should you or your company become the registered owner of the property we will pursue you as knowing, willful accomplices to the various allegedly fraudulent transactions surrounding the Kotva property.

This letter constitutes notice that you cannot henceforth allege that you are a bona fide third party. You are hereby put on notice that the circumstances surrounding the ownership of the Kotva property are unclear and are being challenged in the courts of law of the Czech Republic; legal actions are also under way in England and Wales.

**K629**

Jones Lang Lasalle are and have been aware of the legal disputes regarding this property.

I am able to discuss this with you at any time. Please contact me on 00 420 602 320710 or the telephone number above.

Yours sincerely,

James Woolf

Cc Ben Bannatyne

--
This message has been screened for all known viruses by IE Internet.com and is believed to be free of infection.
--
--
This message has been screened for all known viruses by IE Internet.com and is believed to be free of infection.
--

K630

*[Translation from Czech]*

**Municipal Prosecution Office in Prague**
Náměstí 14. října 2188/9
<u>150 00  Prague 5</u>

**Attention to: JUDr. Dagmar Máchová, Prosecutor**

ČTS: PSP-4035/OHK-3-2004

In Prague on        .2007

Accused:      1. **Ing. Vladimír Hoffmann**, born on 30 October 1965,
               residing at Medinská 825, Klánovice, Prague 9, 190 14

          2. **Edita Šimková**, born on 27 July 1968,
               residing at Na Folimance 2153/19, Vinohrady, Prague 2, 120 00

          3. **Prof. Andrew Weiss**, born on 2 January 1947,
               residing at 46 Abbottsford Road, 2 Brookline, Massachusetts, 2446 USA

          **Represented by the defence counsel JUDr. Petr Topinka**, attorney-at-law
               Registered office Národní 11, 110 00 Prague 1

Re:           Criminal prosecution of the accused Prof. Andrew Weiss et al. for extortion
             pursuant to Section 235(1) and (3) of the Criminal Code as accomplices
             pursuant to Section 9(2) of the Criminal Code

**Application for review of the procedure used by the police authority of the Police of the
Czech Republic, Administration of the Capital City of Prague, Criminal Police and
Investigation Service of the Economic Crime Section, Kongresová 2, 140 21 Prague 4**

I, as the defence counsel of the accused Prof. Andrew Weiss in the above matter, present
hereby, pursuant to Section 157a of the Criminal Procedure Code, the following

      **application for review of the procedure used by the above police authority**

The power of attorney is attached to the file

I.

On 3 February 2005, the police commissioner of the Police of the Czech Republic, Administration of the Capital City of Prague, Criminal Police and Investigation Service of the Economic Crime Section, decided on the initiation of criminal prosecution of the accused Prof. Andrew Weiss et al. (hereinafter also the "accused") based on suspicion of extortion pursuant to Section 235(1) and (3) of the Criminal Code as an accomplice pursuant to Section 9(2) of the Criminal Code.

The act which was allegedly committed by the accused under the decision on the initiation of criminal proceedings consists in demanding from the management of Kotva a.s., Identification No.: 60193808, registered office Prague 1, Náměstí Republiky 1090/5, represented by the general manager Richard Harazim and by Martin Benda, chairman of the supervisory board, at a meeting on 12 May 2004, the purchase of 11.9% of shares of the registered capital of Kotva a.s. held by Brookdale Global Opportunity Fund, where these shares are managed by the accused Prof. Andrew Weiss through his company Weiss Asset Management, for US$ 4,000,000, threatening that if these shares were not purchased, the accused Weiss would arrange for attaching a seal to the real estate of Kotva Department Store at the real estate cadastre by filing fabricated self-serving lawsuits against Kotva a.s., thus hindering substantially the negotiations of the Kotva Holding with potential strategic partners and financial institutions concerning the operation and sale of Kotva Department Store and restricting the disposal of its assets for several years, because he knew that Kotva a.s. is in time and financial pressure with regard to its contractual obligations; if Kotva a.s. did not purchase his shares, the next offer would be substantially higher. If Kotva a.s. refused to purchase these shares from him, the accused Weiss and Hoffmann would allegedly file criminal charges against the board of directors of Kotva a.s. According to the decision on initiation of the criminal charges, the accused Weiss and Hoffmann allegedly extorted both Kotva a.s. and its board of directors by causing large-scale damage, threat of violence or other serious distress by forcing Kotva a.s. and its board of directors to do, to desist from or to tolerate something. Thereafter, the accused Weiss and Hoffmann, wishing allegedly to frustrate the sale of properties of Kotva a.s., informed the strategic partner of Kotva a.s. and financial institutions about lawsuits filed against Kotva a.s., thus causing problems to Kotva a.s., and actually filed subsequently several lawsuits against spol. Kotva a.s.

During the investigation, the accused exercised, in accordance with Sections 33 and 65 of the Criminal Procedure Code, his right to inspect the criminal file maintained in the above case and to familiarize himself with its contents. On this occasion, he found out that the evidence which is to document his alleged guilt includes records of tapping of his phone calls and personal meetings (hereinafter the "records"). These materials contain records of calls of more than one person, but always include persons close to the accused, particularly the accused Ing. Vladimír Hoffmann.

II.

**The accused disagrees with the inclusion of the above evidence in the criminal file** due to the method by which these records were made. It is evident that the law enforcement authorities obtained these records through one of the accused's business partners, Mr. Martin Benda, who acted under an agreement with the Police of the Czech Republic. Mr. Martin Benda made repeated contacts with the accused Ing. Hoffmann and knew that all his phone

contacts and personal meetings with the accused Ing. Hoffmann were monitored and recorded. At the same time, he tried (at least with the knowledge of the police authority) to induce the accused Ing. Hoffmann to make statements incriminating himself and the accused Prof. Weiss.

The above records and the circumstances of the case clearly indicate that:

1. during the investigation of the offence committed allegedly by the accused, **the law enforcement authorities used all operative search means** pursuant to Section 158b et seq of the Criminal Procedure Code (particularly Mr. Benda as an "agent" pursuant to Section 158e of the Criminal Procedure Code), although the **legal conditions** for such procedure stipulated in the Criminal Procedure Code **were not met**.

Moreover, Mr. Benda's active participation indicates that the **purpose of this procedure was not finding facts relevant to the criminal proceedings pursuant to Section 158b(2) of the Criminal Procedure Code**, but an attempt to interpret in a specific way the facts that had already occurred, which would be useful for the criminal proceedings. This fact was confirmed by Martin Benda himself in his explanation presented on 15 September 2004, where he stated that the business negotiations with the accused Ing. Hoffmann were not conducted to conclude a trade but **with the aim of attaining evidence against the accused** Prof. Weiss and Ing. Hoffmann. Moreover, the purpose specified in Section 158b of the Criminal Procedure Code could have been achieved otherwise and without any serious difficulties through testimonies of witnesses and the accused, by documentary evidence seized during house searches, etc.

2. Mr. Benda himself contacted the accused Ing. Hoffman a number of times on his own or probably at the initiative of the law enforcement agencies, while Ing. Hoffman was rather passive at the negotiations – it was Mr. Benda who proposed meetings, which means that the contacts were not initiated by the accused Ing. Hoffmann, let alone the accused Prof. Weiss (see e.g. the thirteen telephone contacts of the accused Ing. Hoffmann by Mr. Benda, Benda's proposal for joint lunch with the accused Ing. Hoffmann on 14 December 2004, etc.). It is evident that it was **Mr. Benda who played an active role in the negotiations with the accused Ing. Hoffmann**; Mr. Benda presented various further steps in the negotiations in order to acquire recordings of telephone calls and meetings.

3. In order to obtain the required information, Mr. Benda did not hesitate to modify data, changed repeatedly his allegations, stated facts in conflict with reality (see the misinterpretation of facts as to which one of the business partners presented a specific offer during negotiations etc.), sought to obtain from the accused Ing. Hoffmann information and non-existent documents which were to incriminate the accused Prof. Weiss and Ing. Hoffmann and asked confusing and leading questions to obtain confessions of guilt by the accused Ing. Hoffmann.

These circumstances indicate that **the law enforcement agencies which participated in the obtaining of the records proceeded in conflict with the law and with constitutional principles of the Czech Republic**.

### III.

Through Mr. Benda, the law enforcement agencies influenced the whole development of relations and circumstances relating to the alleged criminal activities of the accused and got involved into an action whose course and results were to be used subsequently to the detriment of the accused. Thus, the law enforcement agencies acted in a way which is commonly called "police provocation". The term "police provocation" usually means a secret procedure used by the police, which results in an act committed by another person, who will or should become the subject of subsequent criminal prosecution.

In this respect, the accused reminds that this matter has become the subject of a number of dicussions, professional journals, of the case law of the Constitutional Court of the Czech Republic and also of the European Court for Human Rights, to which the accused refers below; the police provocation has been found illegal and in conflict with the constitution and the evidence obtained thereby is inadmissible in criminal proceedings.

1. First of all, there is the **finding of the Constitutional Court of 22 June 2000, file no. III. ÚS 597/99.** In this case, the Police of the Czech Republic interfered into the course of criminal activity through a person in the position of witness to obtain grounds for arresting the suspect. The Constitutional Court underlines that Czech law does not regulate and does not recognize such course of actions of the police authority due to the fact that **an indicated activity of the police must not exist** in a democratic society and under the rule of law **and if the police proceeds in such manner, such activity must be considered not only illegal but also unconstitutional.**

In this respect, the Constitutional Court remembered that the basic procedural law which regulates criminal proceedings is the Criminal Procedure Code (Act No. 141/1961 Coll., as amended). Section 2 of this act clearly stipulates that **nobody may be prosecuted as indicated otherwise than for legal reasons and in the manner stipulated herein.** This provision reflects Article 8(2) of the Charter of Fundamental Rights and Freedoms, which states that "No one may be prosecuted or deprived of her liberty except on the grounds and in the manner specified by law." The court stated clearly that the above action of the police does not correspond to these basic legal and constitutional prerequisites.

If there was a suspicion that the accused acted more or less in manner by which he commited extortion under Section 235 of the Criminal Code and such suspicion was relevant, it would be appropriate to apply a procedure complying with the Criminal Procedure Code, i.e. to notify the accused of the relevant charges relating to the relevant offence, its preparation of attempt. However, this did not occur and the **state power represented by the police created at a certain moment certain conditions and invoked a certain situation by its conduct and course of action in an evident attempt to commit and complete the crime (if any). Such course of action exceeds distinctively the limits of the criminal proceedings, including the limits set out by constitutional law.** The accused believes that the course of action taken by the police is not and cannot be regulated by procedural rules applying to the course of criminal proceedings. **Thus, the conduct of the law enforcement authorities in this case is extra lege in this matter and the evidence so obtained is illegal from the very outset and therefore inadmissible in criminal proceedings.**

The court also deemed it necessary to remind and emphasise that only the law may designate the acts of individuals which constitute a crime (see Article 39 of the Charter of Fundamental

Rights and Freedoms and Article 7(1) of the Convention of Protection of Human Rights and Fundamental Freedoms). The prerequisites for culpability are defined by the grounds of criminal liability, which include unlawful conduct, the causal chain and culpability. **It is an impermissible breach of Article 39 of the Charter and Article 7(1) of the Convention on Protection of Human Rights and Fundamental Freedoms** (hereinafter the "Convention"), **if the state (i.e. the Police of Czech Republic) becomes, through its acts, a party to the action, to the entire sequence of acts constituting the criminal offence** (e.g. provoking or initiating the offence, its completion, etc.) In another words, such state involvement in an action that comprises, in its entirety, a crime, or such state participation in the conduct of a person which results in the qualification of such conduct as an offence, is impermissible.

2. A similar opinion was pronounced by the Constitutional Court in its **finding of 25 June 2003, file no. II ÚS 710/01**. In this case, disguised members of the Police of the Czech Republic contacted certain persons who were later accused and based on their instigation, such individuals committed their offences. The Constitutional Court inferred from the facts of the case that, the police officers did not use the operative technical means for a mere passive review but exercised such influence upon the accused that led them to the commitment of the offence for which they were sentenced. According to the Constitutional Court, nothing indicated that the accused would have committed such crime without the police interference.

In its assessment of the case, the Constitutional Court relied mainly on the case of the European Court for Human Rights (hereinafter "ECHR") in Teixeira et al. v. Portugal. In this case, the ECHR reviewed a case when the plain-clothes policemen asked a man suspected of drug abuse for procurement of purchase of heroin with the aim of identifying dealers. This man contacted the applicant, who procured the drug. When it was handed over, the police officers disclosed their identity and arrested the applicant. ECHR concluded that the police intervention and its use in the criminal proceedings deprived the applicant irreparably of the right to fair trial, because **the use of evidence obtained by a police provocation may not be justified even by public interest.** In the above judgment, ECHR reviewed whether the activity of the police had exceeded the limits of the activity of infiltrated agents. It concluded that it is not evident that the relevant authorities had serious reasons to suspect Mr. Teixeira of the participation in the criminal activity in question and there were not grounds to believe that he inclined to this type of crime. The police contacted him through a third party. Under such circumstances, ECHR inferred that the police officers did not confine themselves to investigating the applicant's criminal activity in an essentially passive manner, but exercised an influence such as to incite the commission of the offence. In this respect, ECHR concluded that the police activities exceeded the scope of activities of infiltrated agents and incited the criminal offence. As stated by ECHR in this judgment, **such police officers' actions went beyond the limits within which a lawful and fair trial** guaranteed by Article 6(1) of the Convention is to take place. The Constitutional Court shared this conclusion in the case under review, when it added that the principle under which the authorized police body may use operative search means only in accordance with the law and only if the suspicion that a crime is being or has been committed is sufficiently justified must be complied with at all times. **The police authority must not incite criminal activities by use of such means or must not otherwise actively participate in the formation of the facts of the case to instigate or to direct the perpetrator's intention to commit the relevant offence which has been non-existent to date.** It is inadmissible that police authorities, as state authorities, incite another person to commit a criminal offence, support his intent to commit an offence or assist him in the commitment of such offence, even indirectly through cooperation with a third party.

3. Both of the above findings of the Constitutional Court (i.e. the finding of the Constitutional Court file No. II ÚS 710/01 and the finding of the Constitutional Court file No. III. ÚS 597/99) inspired subsequently the Supreme Court of the Czech Republic in its **ruling file no. 7 Tdo 295/2005 dated 7 June 2005.**

4. In connection with the activities of Mr Benda, who cooperated knowingly with the law enforcement authorities in obtaining the records, the accused also refers to the **finding of the Constitutional Court dated 1 April 2004 file no. II ÚS 797/02 and the finding dated 13 January 2005, file no. III. ÚS 323/04,** in which the Constitutional Court considered as **one of the decisive facts for the assessment of legitimacy** of a similar conduct of the police **the fact whether the activity, the incentive to commit the crime, originated from the law enforcement authority or from the accused**

In Mr Benda's case, the decisive activity originated undoubtedly from his part, or from the part of the law enforcement agencies. The records indicate that the absolute majority of contacts between Mr Benda and the accused Ing. Hoffmann was initiated by Mr Benda, who not only established contacts with the the accused Ing Hoffmann by telephone calls, but also invited him to meetings, lunches, etc. With regard to ECHR's judgment in the case Allan v. United Kingdom referred to below, it is also important to mention the relatively close business contact which existed between both the accused, particularly Ing Hoffman of the one part and Mr Benda of the other part at the time when the records were made This fact is mentioned by ECHR as one of the essential aspects which have to be considered in assessing the trial as fair

5. For the sake of completeness, it is necessary to remind **ECHR's decision in the case of Allan v. United Kingdom dated 5 November 2002.** In this case, the applicant suspected of murder was taken in custody. In order to obtain evidence of the applicant's guilt, the police used its informer, who was placed in the same cell as the applicant, pretended that he was, like the applicant, an accused in custody asked the applicant questions about his alleged crime. Their discussions were recorded by the police with the informer's knowledge and such recorded were then included by the police in the evidence in the proceedings against the applicant.

ECHR considered the conduct of the police as **breach of Article 6(1) of the Convention,** which stipulates that "everyone is entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal established by law, which shall decide on the legitimacy of any criminal charges against him." First, ECHR stated that it is **essential whether the criminal proceedings as a whole, including the way in which the evidence was obtained, were fair.** In that context, regard must also be had to whether the **rights of the defence have been respected,** in particular whether the applicant was given the opportunity of challenging the authenticity of the evidence and of opposing its use, as well as the opportunity of examining any relevant witnesses; **whether the admissions made by the applicant during the conversations were made voluntarily, there being no entrapment and the applicant being under no inducement to make such admission; and to the quality of the evidence, including whether the circumstances in which it was obtained cast doubts on its reliability or accuracy.**

ECHR also referred to the related right to silence and the privilege against self-incrimination, stating that it is aim of Article 6 of the Convention to provide an accused person with protection against improper compulsion by the authorities and thus to avoid miscarriages of

justice. The scope of these rights is not confined to cases where duress has been brought to bear on the accused or where the will of the accused has been directly overborne in some way. **The right to silence is at the heart of the notion of a fair procedure, serves in principle to protect the freedom of a suspected person** to choose whether to speak or to remain silent when questioned by the police. **Such freedom of choice is effectively undermined in a case in which, the suspect having elected to remain silent during questioning, the authorities use subterfuge to elicit, from the suspect, confessions or other statements of an incriminatory nature, which they were unable to obtain during such questioning and where the confessions or statements thereby obtained are adduced in evidence at trial.**

In its assessment, ECHR also referred to the judgments of the Supreme Court of Canada (R v. Hebert [1990] and R v. Broyles [1991]), when it stated that the **right to silence will only be infringed where the informer was acting as an agent of the State at the time the accused made the statement and where it was the informer who caused the accused to make the statement** Whether an informer was to be regarded as a State agent depended on whether the exchange between the accused and the informer would have taken place, and in the form and manner in which it did, but for the intervention of the authorities Whether the evidence in question was to be regarded as having been elicited by the informer depended on whether the conversation between him and the accused was the functional equivalent of an interrogation, as well as on the nature of the relationship between the informer and the accused

The admissions allegedly made by the applicant to the informer, and which formed the main or decisive evidence against him at trial, were not spontaneous and unprompted statements volunteered by the applicant, but were induced by the persistent questioning of the informer, who, at the instance of the police, channeled their conversations into discussions of the murder in circumstances which can be regarded as the functional equivalent of interrogation, **without any of the safeguards which would attach to a formal police interview, including the attendance of a solicitor and the issuing of the usual caution** In those circumstances, the information gained by the use of the informer in this way may be regarded as having been obtained in defiance of the will of the applicant and **its use at trial impinged on the applicant's right to silence and privilege against self-incrimination.**

In this respect, the accused refers to the identical substance of the case of Allan v. United Kingdom (hereinafter "Allan") and the case of the accused Prof. Andrew Weiss and Ing. Vladimir Hoffmann:

First, like the case of Allan, a person cooperating knowingly with the police authority (the "informer") was used in this investigation and received instructions directly from such police authority:

a) the informer pretended, in relation to the accused or the person against whom the criminal proceedings had not yet been initiated, a completely different interest than he actually had While in the Allan case, it should have been a mere "friendly" talk between two men in custody, in the accused's case, it was represented by pretended business negotiations during which the informer tried to solicit the required information;

b) in both cases, it was the informer or the police authority who initiated the contacts between the parties and who tried to make the other party disclose the fact which had

not been available to the police authority and by which the relevant person would have incriminated himself;

c) in both cases, the informer sought facts which could be used in criminal proceedings and which the police authorities had not been able to obtain from the accused or by another legal procedure

Here, however, lies the difference between the two cases. The accused Mr. Allan expressly refused to testify when asked to do so by the police authority. Thus, he had been offered an opportunity to clarify the case from his own viewpoint in accordance with the procedure foreseen by the law. On the other hand, the accused Prof. Weiss or the accused Ing. Hoffmann did not have a chance to decide whether or not to testify, let alone deciding that their testimony would be provided for in accordance with the relevant provisions of the Criminal Procedure Code. This difference is due, in particular, to the fact that the accused Allan had already been the subject of criminal proceedings for completed offence and he had been aware of it. On the contrary, no criminal prosecution had been initiated against the accused Prof. Weiss and Ing. Hoffmann and the law enforcement authorities procrastinated for a long time with its initiation and the accused had thus no opportunity to convey their opinion to the police authority. Thus, their procedural rights were wholly excluded.

The foregoing indicates that the rights of the accused Andrew Weiss and of the accused Ing. Hoffmann were breached even more seriously, since Ing. Hoffmann was actually interrogated without his knowledge and without being aware that he could be interrogated.

It has to be pointed out in this respect that no legal and constitutional guarantees regarding the conduct of the investigation and the interrogation were complied with during this actual interrogation, which was directed by the police authority and carried out through the informer. The accused Ing. Hoffmann was asked inadmissible leading questions (i.e. such questions whereby he was presented with facts that were to be ascertained through his answers and he was given hints how to answer) and frivolous questions (i.e. questions presenting false, misleading facts or anticipating facts which had not yet been confirmed by the accused, which led the accused at the same time to testify in accordance with the "interrogator's" wishes). At the same time, misleading and untrue circumstances were alleged (see above). Therefore, it is evident that the "interrogation" of the accused Ing. Hoffmann was conducted in direct conflict with Section 92 of the Criminal Code. Such course of action of the law enforcement authorities circumvented the applicable laws and particularly the Criminal Procedure Code, which regulates taking individual kinds of evidence, including interrogation

e) Finally, the obtained records were used in both cases in criminal proceedings, where they were to play a decisive role to the detriment of the accused persons.

Since the facts of both cases are identical and the case of the accused Andrew Weiss and the accused Ing. Hoffmann represents, for the foregoing reasons, an even more serious violation of regulations concerning the conduct of criminal proceedings, the course of action taken by the law enforcement authorities has to be viewed in the same way as stated by ECHR in its judgment in the Allan case, where **it decided that the investigation methods used by the police were inadmissible, illegal and violating the provisions of Article 6(1) of the**

Convention. If the evidence obtained by such method were used in the criminal proceedings against the accused Prof. Weiss and the accused Ing. Hoffmann, such procedure would have to be clearly considered as a violation of the right of the accused not to testify and not to incriminate himself.

6.  As noted above, the issue of police provocation is also dealt with in legal literature. It is appropriate here to refer, in particular, to the article of plk doc JUDr Jan Chmelik, Ph D., published in the journal Čtvrtletník kriminalistiky (Criminal Science Quarterly) No 1/2006. The author of this article expresses a definitely negative standpoint to the police provocation and states the following: "All concealed police procedures inciting a specific person to commit a criminal offence are illegal . Police initiation or incitement of an offence is contrary to the law and in conflict with the Charter of Fundamental Rights and Freedoms and with the Convention on Human Rights and Fundamental Freedoms. It denies the right to fair trial. Evidence of guilt procured by a police provocation is unusable "

7.  While respecting the legality and officiality principle, it is necessary to insist of the duty of the law enforcement authorities (both the police and the prosecutor) to initiate criminal prosecution in all cases where the identified facts indicate that an act which has all characteristics of a certain criminal offence has been committed and there are reasons to suspect that it has been committed by a specific person. **The importance of the requirement for timely initiation of criminal prosecution lies in the fact that any delay in this respect restricts the rights of the suspected,** because he may defend himself, in principle, only after he has been accused and the police investigation in his case has become evident.

The accused believes that **the right to defence was definitely restricted** due to the late start of the criminal prosecution. The criminal prosecution was started only half a year after the notification of crime, even though the law enforcement authorities had obtained thereby sufficient information about the facts of the case, documentary evidence, correspondence, etc., and there was thus no reason – if the act in question actually were a criminal offence – for procrastination with the start of the criminal prosecution. **Only then, the law enforcement authorities were to seek by investigation,** i.e. by the subsequent procedure described in Section 161 et seq. of the Criminal Procedure Code, **the evidence** necessary to clarify the basic facts necessary for impartial assessment of the case, **and not to create them secretly against the accused**

8.  Furthermore, it has to be underlines that even though this specified case is qualified as an offence specified in Section 235 of the Criminal Code, it is, by its nature, an act resulting from economic relations; thus, the methods comprised of the so-called police provocation are evidently inappropriate here. Since the illegality of similar police methods has been also ascertained in cases of serious organized crime, e.g. in drug crime (see above), the course of action taken by the Police of the Czech Republic in this case cannot be described otherwise but as **inadmissible criminalization of business relations.**

9.  Finally, it has to be noted that even if the prosecutor did not consider the conduct of the law enforcement authorities which is described above as impermissible and illegal police provocation, it would still be **at least the misuse of operative search means,** which were to replace the usual investigation procedures, particularly the interrogation of the accused Ing. Hoffmann. While obtaining information for the law enforcement authorities, Mr. Benda used all kinds of inadmissible interrogations methods (see Article II(3)). If the law enforcement authorities wished to obtain testimony of the Ing. Hoffmann concerning the facts of the case

9

which took place, the circumvented by using Mr. Benda the provisions relation to the interrogation of the accused and also the prohibition of self-incrimination (see above)

## IV.

With regard to the foregoing facts and taking into account the assessment of the content of the records, the accused applies to the prosecutor of the Municipal Prosecution Office in Prague to review the course of action taken by the police authorities in this case. The accused believes that their activity, which was used in obtaining audio records of telephone calls and meetings of various persons, may be called a police provocation, which is an illegal police procedure.

At the same time, the accused requests that these records are excluded from the criminal file and are not further used in the criminal proceedings in any way, since this evidence has been procured in conflict with the law and with procedural principles and is thus wholly unusable as evidence of the alleged criminal activities of the accused.

For and on behalf of the accused Prof. Andrew Weiss
JUDr. Petr Topinka, Attorney-at-law

| | |
|---|---|
| **From:** | Wilson, Bryan [bryan.wilson@linklaters.com] |
| **Sent:** | Wednesday, October 20, 2004 4:01 AM |
| **To:** | Richard Harazim (E-mail) |
| **Subject:** | KOTVA |

Dear Richard

Further to our meeting yesterday I am writing to confirm my clients requirements and our agreement:

1    that the SPA will include a representation and warranty by Kotva a.s. to the effect that it guarantees all contributions of the property have been legally and validly carried out and are not liable to cancellation, reversal or challenge.

2    the SPA will provide that Kotva a.s. and Kotva Nemovitosti k.s. should allow CRQ/Markland to terminate or withdraw from the agreement and the whole transaction if any claim is successful and that Kotva a.s. and Kotva Nemovitosti should provide a guarantee to CRQ and Markland covering return of the whole purchase price by SPV CO.

3    that for a period of one year following closing there is an indemnity from all Kotva parties against any further litigation from Gilroy, Balfinger, James Woolf and DB and any related parties, such indemnity to be satisfeid from the money held in escrow and to be held until the outcome of litigation is finalised (as per Gilroy) in the event that litigation is commenced within that 12 month period.

4    the holdback in the escrow account will only be released upon the joint instruction of the parties

5    the purchase price for the trademarks is to be CZK 135,000,000. In this respect I await confirmation of all trademarks held and applied for please.

6    we await the Barbican documents

7    we await the Cyprus lawyers comments on the legal opinion

Many thanks

Bryan Wilson
Solicitor (England and Wales)
Registered Foreign Lawyer
Linklaters, Prague

Tel:(420) 221 622 177
Fax:(420) 221 622 199

bryan.wilson@linklaters.com
http//:www.linklaters.com

This message is confidential. It may also be privileged or otherwise protected by work product immunity or other legal rules. If you have received it by mistake please let us know by reply and then delete it from your system; you should not copy it or disclose its contents to anyone. All messages sent to and from Linklaters may be monitored to ensure compliance with internal policies and to protect our business. Emails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, lost or destroyed, or contain viruses. Anyone who communicates with us by email is taken to accept these risks.

**K2259**

The contents of any email addressed to our clients are subject to our usual terms of business; anything which does not relate to the official business of the firm is neither given nor endorsed by it.

The registered address of the UK partnership of Linklaters is One Silk Street, London, EC2Y 8HQ. Please refer to http://www.linklaters.com/regulation for important information on the regulatory position of the firm.

K2260

IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856
AND IN THE MATTER OF CIVIL PROCEEDINGS NOW PENDING BEFORE
THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS (CIVIL ACTION NO. 05-10679-RCL)

KOTVA a.s.

        Plaintiff

        v.

ANDREW WEISS and WEISS ASSET
MANAGEMENT, LLC

        Defendants

Deposition of:

Mr. Ondrej Peterka

Taken at:
Courtroom No 126
District Court for Prague 1,
Ovocny trh 14

On:  April 18th, 2007
Commencing at 9.00 am

1    That is a correct statement; correct?

2        A.  This is not an accurate statement because as

3    I indicated our first contact with the client was around

4    June 3rd.

5        Q.  Okay.  The next sentence:

6            "Peterka & Partners began representing CVF

7    Investments LLC in December 2005 and continues to

8    represent it".

9    Is that an accurate statement?

10       A.  I am not able to answer that because I would have

11   to consult the file to make sure that I get the exact

12   date of the filing of a lawsuit on behalf of which

13   entity.

14       Q.  Does that sound about the approximate correct

15   date; December 2005?

16       A.  I cannot say that, sir, because there are too,

17   there are many legal entities that are involved here and

18   I am just not able to say precisely when exactly we

19   started representing whom by filing of lawsuits and

20   I would have to look into the file.

21       Q.  Okay, skip to the next one then:

22           "Peterka & Partners also represented Gilroy with

23   respect to a particular piece of litigation from

24   mid-June 2004 until December 13, 2004".

25   Is that an accurate statement?

26       A.  We did represent Gilroy in several proceedings.

27   Then our representation ended towards the end of 2004,

28   beginning 2005, I do not know the precise date.  I want

29   to emphasise here that there was a certain suspicion on

227

228

229

1    our part that arose that Gilroy was in some manner taken
2    under control by people around Forminster.  And I have
3    what I believe to be a good piece of evidence to prove
4    that, which is a motion filed by Mr Laznicka on behalf
5    of Gilroy dated February 15, 2007 and the motion is in
6    connection with that lawsuit that should determine that
7    Forminster is not the legal owner of shares.  Kotva is
8    not the defendant in that lawsuit.  But Mr -- and
9    Mr Laznicka states here in his motion that this lawsuit
10   was filed in order to blackmail or extort Kotva.
11            MR DANGEL:  No, I don't want him to do this,
12   but I am --
13   A.   I will be finished in one second.
14            MR DANGEL:  Okay.
15   A.   That the lawsuit was filed in order to extort
16   Kotva and that is the reason why it needs to be
17   withdrawn.  What I do not understand is how Kotva could
18   be extorted by filing a lawsuit that pertains or that
19   concerns only Kotva's shareholders which is the case at
20   hand.  So, I am convinced --
21            MR BECKMAN:  We need to mark this as an
22   exhibit.  But you keep going with your answer.  We have
23   to mark that.
24            MR DANGEL:  Sure.  Keep going with your
25   answer, sir, please do.
26            MR BECKMAN:  Take it out.
27   (**Exhibit 5 marked by Mr Beckman**)
28            MR DANGEL:  Ondrej, had you finished your
29   answer?

110

1     A.   Yes.

251    2     Q.   Were any of those lawsuits filed for the purpose
3     of getting a higher price for any shares of stock in
4     Kotva or any other entity?

5     A.   No, never.  The only purpose of these lawsuits
6     was to protect the American investment and was to
7     preserve the status quo.  In other words, to prevent, to
8     prevent for this 12% block that was held directly by our
9     clients and the 32% block that, in our view, belongs to
10    Trend, and our client holds 40% in Trend, to prevent for
11    the value of these shares to decline or drop.

252    12    Q.   Were any of the lawsuits filed -- strike that.
13    As to any of the lawsuits filed, were they processed, as
14    that term is understood under Czech law?

15              MR BECKMAN:  Objection.

16    A.   Can you explain what you mean by process,
17    exactly?

18              MR DANGEL:

253    19    Q.   Did they tie up, cause an injunction, cause the
20    transfer of a property, of property or a property right
21    in any way?

22              MR BECKMAN:  Objection.

23    A.   By, only by filing those lawsuits no asset
24    transfers could occur.

25              MR DANGEL:

254    26    Q.   Could any assets be tied up that is enjoined?

27              MR BECKMAN:  Objection.

28              MR DANGEL:

255    29    Q.   Other than status quo, keeping the things the

119

1    same, could there be any injunction of any kind?

2            MR BECKMAN:  Objection.

3    A.  We did not, we did not demand an injunction on

4    assets in these litigations.  I just, I am not sure if

5    I understand that correctly, but I believe I do.  So,

6    you know, you say tied up or if there was an injunction,

7    I understand the injunction is a preliminary ruling that

8    will stop people from doing something.

256    9    Q.  Correct.

10            MR BECKMAN:  Objection.  Go ahead.

11    A.  We did not seek any injunction even though we

12    could have and I can imagine, I imagine it as possible

13    that we would have, we would have asked for an

14    injunction to freeze the assets of Kotva but we didn't

15    do that.

16            MR DANGEL:

257    17    Q.  Did you ask for the transfer of shares or

18    money --

19            MR BECKMAN:  Objection.

20            MR DANGEL:

258    21    Q.  -- as part of the lawsuits?

22            MR BECKMAN:  Objection.

23    A.  We did not seek a transfer of money as regards

24    shares.  It wouldn't be a transfer.  It would simply be

25    a confirmation, it would simply be a confirmation that

26    the transfers from the tunneled Trend to Forminster were

27    invalid.

28            MR DANGEL:

259    29    Q.  Was a notice filed in any registry concerning the

1    lawsuits?

2              MR BECKMAN:  Objection.

3              MR DANGEL:

260    4    Q.  Or in something called a Cadastre ?

5              MR BECKMAN:  Objection.

6    A.  The Czech law has it that if there is a lawsuit

7    filed to determine ownership rights regarding real

8    estate, a notice about such lawsuits to determine

9    ownership or a note is recorded in the Land Registry in

10   order for all third parties to be aware of such

11   a pending lawsuit.

12             MR DANGEL:

261   13   Q.  Does the filing of that notice prevent the

14   transfer of real estate under Czech law?

15             MR BECKMAN:  Objection.

16   A.  This is a relatively complicated legal issue that

17   we did not give much thought to.  But, according to my

18   understanding, it is to the discretion of the Land

19   Registry and then it is the discretion of the Land

20   Registry which may suspend the registration of a new

21   title or new owner until the pending lawsuit is resolved

22   or ruled upon.  In our case though --

23             MR DANGEL:

262   24   Q.  That is my next question, may I ask it?  Did that

25   occur in this case?

26             MR BECKMAN:  Objection.  Now when you are

27   asking the questions, you are going to let him stop the

28   answer.

29             MR DANGEL:  I just don't want to have

121

1   a situation where it is beyond the scope of my question.

2          MR BECKMAN:  As I did, but you can interrupt

3   and stop him, but I can't.  Is that what you are doing?

4          MR DANGEL:  And you can speak on the record

5   and I can't.  It is funny how when the shoe on the other

6   foot how different it feels.

7     Q.  But would you just please answer my question.

8   What occurred in this case?

9     A.  In this case this did not happen because the real

10  estate at that time was already registered with this

11  subsidiary number 51, that is a stipulation or in

12  parentheses so no proceedings regarding a registration

13  of the title were in progress at the time.  So,

14  according to my best knowledge, there was no proceeding

15  that could have been suspended by the Land Registry.

16    Q.  So no process issued as a result of that filing

17  of the notice; correct?

18          MR BECKMAN:  Objection.

19          MR DANGEL:  Strike that.

20    Q.  Did any process issue as a result of the filing

21  of the notice?

22          MR BECKMAN:  Objection.

23    A.  As I know the case, I believe no.

24          MR DANGEL:

25    Q.  Now, sir, at the end of lawsuits in the Czech

26  Republic is there a process by which one party can

27  recover its costs and legal fees if it feels it is

28  justified or that there has been some abuse in the

29  litigation?

122

1              MR BECKMAN:  Objection.

2      A.   Yes.  Yes, it may.  This is all dealt with in the

3  Code of Civil Procedure.

4              MR DANGEL:

267    5      Q.   Now in this particular instance, the Gilroy case

6  was dismissed after a transfer of the Gilroy stock from

7  one party to a party you believe and you testified

8  as close to Forminster.  Is that -- the lawsuit

9  terminated after that; is that correct?

10             MR BECKMAN:  Objection.

11     A.   That is correct, it was terminated then.

12             MR DANGEL:

268    13     Q.   And did the Defendant in that case seek

14  tariffication, that is did they seek costs and fees?

15             MR BECKMAN:  Objection.

16     A.   I will check.  According to the ruling from

17  September 20th, 2005 the Defendants, being Kotva AS,

18  Kotva NVKS, and SPVK,AS, the Defendants are entitled to

19  the cost incurred in relation to the proceedings and in

20  keeping with Section 142(1) of the Code of Civil

21  Procedure.

22             MR DANGEL:

269    23     Q.   And can you tell me the amount that they received

24  in US Dollars?

25     A.   My understanding that it was 12,000 Crowns and

26  six times 75 Crowns.  This is how I read the ruling.

270    27     Q.   So 12,500 Crowns roughly is how much in US

28  Dollars, sir?

29             MR BECKMAN:  Objection.

1    A.   About 20 Crowns, 20.75 into a Dollar.

2         MR DANGEL:

271    3    Q.   So roughly 20 into 1500 is roughly 700, $750,

4    more or less?

5    A.   Yes, something like that.

272    6    Q.   And that was awarded by a judge here?

7         MR BECKMAN:   Objection.

8    A.   Yes, that's correct.

9         MR DANGEL:

273    10   Q.   And that is the final judgment?

11   A.   Yes.

274    12   Q.   Now you have already testified, and I don't want

13   to go back, to your being hired in this case and I want

14   to ask you a few questions about what you did in

15   connection with that in 2004.  Sir, first of all, how

16   big is your law firm?

17   A.   We have about 70 lawyers.

275    18   Q.   And how many cities do you practice?

19   A.   Prague, Bratislava and Kiev.

276    20   Q.   And did Mr -- strike that.  Were you asked

21   questions before you were hired about your professional

22   standing and who you were and where you went to law

23   school, that sort of question?

24        MR BECKMAN:   Objection.

25   A.   During our first conference call with Mr Weiss he

26   did ask me questions about myself and where I was coming

27   from.  He was interested in this and it was important to

28   him in terms of his case.

29        MR DANGEL:

124

277    1    Q.  Sir, as part of what you did when you were hired,
       2    did you gather certain facts before any lawsuits were
       3    filed?
       4    A.  As far as it was possible, we were trying to
       5    gather information from open sources, public sources.
278    6    Q.  Now Mr Weiss and Mr Nikitin or actually Professor
       7    Weiss and Dr Nikitin resided in the United States;
       8    correct?
       9    A.  Yes.
279   10    Q.  So were they a source of actual facts used in
      11    filing the case?
      12         MR BECKMAN:  Objection.
      13    A.  I will say that they knew the general facts about
      14    their investment, that is they had 12% in Kotva directly
      15    and 40% in Trend, whereby Trend hold 32% in Kotva.
      16    Other than that, they were not familiar with the Czech
      17    system and with the workings of the system in this
      18    country and they were not aware of the methods that are
      19    used to devalue their investment.
      20         MR DANGEL:
280   21    Q.  Were they aware of -- there has been references
      22    to tunneling of Kotva shares and various other things.
      23    Were they aware of, did they provide those facts or did
      24    you gather those facts on your own?
      25         MR BECKMAN:  Objection, that is three
      26    questions.
      27         MR DANGEL:  Okay.
281   28    Q.  Did you gather those facts yourself or were they
      29    the source of those facts?

125



# Escrow Agreement

## The Parties

(1)  **MARKLAND HOLDINGS Limited**, with its registered office at 19 Upper Fitzwilliam Street, Dublin 2, company registration no. 291167 registered under the laws of the Republic of Ireland (" **MH**"), represented by Frank Walker and Aidan Scully, Directors of Markland Holdings Limited;

(2)  **KOTVA NEMOVITOSTI, k.s.**, with its registered office at Příkop 4, Brno, Post Code 602 00, Identification no. 26229048, registered in the Companies Register by the Regional Court in Brno, in Part A, File 16586 ( " **KN**"), represented by KOTVA OBCHODNÍ a.s., represented by Ing. Michal Vlach, Chairman of the Board of Directors, Ing. Jiří Brada, member of the Board of Directors, and Ing. Pavel Richter, member of the Board of Directors;

(3)  ████████████████████████████(the "Escrow Agent")█████████████

(4)  **SPV CO Limited**, with its registered office at Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus, company registration no HE 148845, registered in Cyprus, represented by Martin Benda, Director (the "**Seller**");

(5)  **CRQ Czech a.s.**, with its registered office Prague 1, Národní 1435/6, Post Code 11000, Identification no. 27159256, registered in the Companies Register by the Regional Court in Prague, in Part B, File 9394, and represented by Aidan Scully and Frank Walker (the "**Buyer**");

(MH, KN, the Buyer, the Seller and the Escrow Agent also jointly referred to as the "**Parties**")

MH, KN, jointly referred to as the "**Principals**".

## Whereas:

(A)  On 20 January 2004, MH and KN concluded the Share Purchase Agreement I by which KN intended to sell the Shares to MH.

(B)  Consequently the parties to the Share Purchase Agreement I have agreed to amend the Share Purchase Agreement I. On 20 December 2004 the parties to the Share Purchase Agreement I together with the Seller, the Buyer and SPV KN concluded the Share Purchase Agreement II that has substituted the Share Purchase Agreement I in its entirety.

(C)  The Seller (being 100% owned by KN) shall sell the Shares I and the Kotva Trademarks to the Buyer. KN shall sell the Shares II to the Buyer. The Buyer shall pay the purchase price for the Shares I and the Shares II

(D)  The parties to the Share Purchase Agreement II have agreed that KOTVA Trademarks shall be transferred from KN to the Buyer or SPV KN under an Agreement on Transfer

KG 1-1937

of the Trademarks and the price for transfer shall be paid by the Buyer on behalf of SPV KN or in Buyer's own name

(E)    The parties to the Share Purchase Agreement II have agreed the total of the monies to pay the purchase price for the (i) Shares I, (ii) the Shares II and (iii) the KOTVA Trademarks shall be in accordance with the Share Purchase Agreement II and the Call Option Agreement **CZK 1,521,450,000** (one billion five hundred and twenty one million four hundred and fifty thousand Czech crowns) which amount shall be deposited in escrow with the Escrow Agent.

**The Parties hereby agree as follows:**

**1.    Definitions**

| | |
|---|---|
| **Agreement on Deposit of Securities** | means the contract to be concluded between KN, the Buyer and the Depositor upon which the Depositor undertakes to take over Shares II from KN to the Deposit and release them to the Buyer/or back to KN in accordance to the terms and conditions as specified in Call Option Agreement. |
| **Business Day** | means any day on which banks are open for the conduct of business in ▉▉▉▉▉▉ Prague and the Republic of Ireland; |
| **Call Option Agreement** | means the agreement concluded between KN and the Buyer on 20 December 2004 in which the Buyer may call for KN to sell the Shares II and transfers the ownership right to them and the Buyer may purchase the Shares II from KN for the purchase price stipulated being CZK **20,000,000** (twenty million Czech Crowns). The purchase price shall be settled through the Escrow Agent. |
| **Clause** | means a paragraph of this Escrow Agreement; |
| **Closing** | means the hand-over of the Shares I by the Seller to the Buyer through the Escrow Agent upon terms stipulated herein; |
| **Closing Date** | means the day when the Closing takes place; |
| **Deposit** | means the sum of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech crowns) delivered to the Escrow Agent by the Buyer in accordance with Clause 3.4 of this Escrow Agreement; |
| **Depositor** | means the law firm Linklaters, v.o.s, having its register seat at Palác Myslbek, Na Příkopě 19, 117 19, Prague 1, the Czech Republic, acting as depositor in accordance with the terms and conditions of the Agreement on Deposit of Securities |

**Escrow Account**

the Escrow Agent's bank account no. ██████████ ████████ opened and maintained by the Escrow Agent solely for the purpose of holding the Escrow Amount until the Escrow Amount is to be distributed in accordance with the terms and conditions of this Escrow Agreement.

**Escrow Agreement**

means this Escrow Agreement together with any attachments, schedules, appendixes or supplements;

**Escrow Amount**

means the cash amount being placed into the Escrow Account, in accordance with Clause 3 below including interest, if any, accrued thereon;

**Escrow Documents**

means any and all documents, issued or not issued as securities, that are placed with the Escrow Agent;

**Gilroy**

means Gilroy Limited whose registered office is at 4 Pikioni Street Limassol, Cyprus;

**Gilroy Claim**

means the claim that Gilroy lodged on 30 June 2004 with the District Court for Prague 1 a copy of which is attached to the Share Purchase Agreement II at its Schedule 9;

**Gilroy Settlement**

means the obtaining of a definitive and final ruling in respect of the Gilroy Claim; for purposes of this Agreement such definitive and final ruling is deemed to be also a final settlement between the parties to the Gilroy Claim, approved by the court or the withdrawal by Gilroy of the Gilroy Claim.

**Security Sum**

means the sum of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech crowns) payable into the Escrow Account by the Seller in accordance with Clause 3.2 of this Escrow Agreement;

**Share Purchase Agreement I**

means the agreement between KN and MH dated 20 January 2004 according to which KN wished to sell and MH wished to buy the Shares I.;

**Share Purchase Agreement II**

means the agreement between the KN, MH, SPV KN, SPV CO Limited, CRQ Czech a.s., KOTVA a.s. and KOTVA OBCHODNÍ dated 20 December 2004 a copy of which is annexed hereto at Appendix 1

**Shares I**

means the ordinary certificated bearer shares owned by the Seller and issued by SPV KN, the nominal value of which represents 97 per cent of the capital stock of SPV KN.

**Shares II**

means the ordinary bearer shares owned by KN and issued by SPV KN the nominal value of which represents 3 per cent of the capital stock of SPV KN

| | |
|---|---|
| **SPV KN** | means SPV KN a.s. with its registered office at Příkop 4, Brno, Post Code 602 00, ID No. 269 10 705, registered with the Commercial Register of the Regional Court in Brno, section B, file 4043 |
| **KOTVA Trademark I** | means the collection of trademarks consisting of: word-device trademark KOTVA, registration no. 167478, registered in the Patent and Trademark Office of the Czech Republic, and word-device trademark KOTVA, registration no. 167478 registered in the Patent and Trademark Office of the Slovak Republic; |
| **KOTVA Trademark II** | means the collection of trademarks consisting of: word-device and word only trademark KOTVA having been used by Kotva but not yet registered Kotva's name in the Patent and Trademark Office of the Czech Republic for which registration Kotva has applied by the applications no. 355 884 and 355 885 both filed with the Patent and Trademark Office of the Czech Republic on 1st of July 2004, with the pre-emptive right date of 1st of July, 2004. |
| **KOTVA Trademarks** | means collectively KOTVA Trademark I and KOTVA Trademark II |

## 2    Accession to the Agreement and substitution to the existing Agreement

2.1    MH, KN and Escrow Agent hereby agree that their mutual obligations arising out of the escrow agreement concluded on 1st January 2004 (hereinafter referred to as the "**Existing Escrow Agreement**") between MH, KN and the Escrow Agent is replaced in their entirety by the obligations contained in this Escrow Agreement.

2.2    For avoidance of any doubt it is agreed that the Existing Escrow Agreement terminates in its whole scope i.e. including all attachments, schedules, appendixes or supplements in their entirety once this Escrow Agreement comes into force

2.3    The Buyer, the Seller and the Principals hereby agree to accession of the Seller and the Buyer to this Agreement and the Seller and the Buyer confirm by signing this Agreement they have acceded to this Agreement.

2.4.    For avoidance of any doubt it is agreed that the termination of the Existing Escrow Agreement and its substitution by this Escrow Agreement as stipulated herein shall not give a rise to claim for the return of any performance that has already been provided pursuant to the Existing Escrow Agreement.

## 3    Escrow Appointment

3.1    The Seller, the Buyer and the Principals herewith jointly mandate the Escrow Agent to serve as their escrow agent and to hold the Escrow Amount hereunder, and the Escrow Agent herewith accepts the appointment to hold



and distribute the Escrow Amount, upon the terms and conditions hereinafter set forth.

**3.2.** The relationship between the Agent on the one hand and the Seller, the Buyer and the Principals on the other hand shall solely and exclusively be governed by this Escrow Agreement. Neither the Seller nor the Buyer nor the Principals can assert any claims whatsoever against the Escrow Agent arising from the Share Purchase Agreement II.

**3.3.** Nothing contained in this Escrow Agreement shall jeopardise the rights and obligations between Seller and the Buyer in any other agreement.

## 4    Deposit of Escrow Amount and Shares

**4.1** Prior to the signing of this Escrow Agreement and in accordance with the Existing Escrow Agreement, the Escrow Agent opened the Escrow Account in the name of the Escrow Agent under the designation „██████████

**4.2** The Escrow Agent hereby acknowledges receipt from the Seller of the Security Sum to the Escrow Account where it shall be held by the Escrow Agent on the terms of this Escrow Agreement.

**4.3** The Escrow Agent hereby acknowledges receipt from the Buyer of the Deposit to the Escrow Account where it shall be held by the Escrow Agent in accordance with the terms of this Escrow Agreement.

**4.4** Pursuant to clause 5.3.2 of the Share Purchase Agreement II at the time and in the manner stated therein, the Buyer shall transfer the amount of CZK 1,363,950,000 (one billion three hundred and sixty three million nine hundred and fifty thousand Czech crowns) to the Escrow Account, representing the purchase price under the Share Purchase Agreement II less the Deposit.

**4.5** Within two days of the sums referred to in Clause 4.4 above being credited to the Escrow Account the Escrow Agent shall send written notification of such credit to both the Buyer and the Seller. The Escrow Agent shall have no duty whatsoever to take any measures for the collection of the Funds other than to inform the Principals should such funds not have been paid into the Escrow Account in accordance with the provisions of this Escrow Agreement.

**4.6** The amounts credited to the Escrow Account shall remain on deposit in the Escrow Account with the Escrow Agent until a release of all or part thereof takes place in accordance with the terms of this Escrow Agreement.

**4.7** Pursuant to clause 5.6.2 of the Share Purchase Agreement II the Seller shall remit to the Escrow Agent the Shares I and other documents as specified in clause 5.6.1 items b) and c) of the Share Purchase Agreement II . However the Escrow Agent shall not have to check the authenticity of the remitted Shares I and those other documents according to Art. 8.6 below. The Escrow Agent shall have no duty whatsoever to take any measures for the collection of the Shares I and other documents other than to inform the Principals should the Shares I and other documents not be remitted into the Escrow Account in accordance with the provisions of this Escrow Agreement.

## 5. Investment of the Escrow Amount

5.1    The Escrow Amount shall be invested according to the joint instructions of the Principals as per Appendix 6 given to and agreed by ▉▉▉▉▉▉▉▉▉ Withholding tax, if any, shall be deducted from the accrued interest ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ at source.

All payment out of the Escrow Account shall take into consideration the repayment dates of the investments effected according to Art.4.1 or 4.2, and the value date for payment to be made by the Escrow Agent shall be postponed to coincide with the maturity of the said investment, except if the parties agree to bear the breakage costs due to any early repayment.

5.2.    The Escrow Agent shall have the right to liquidate any investments held in the Escrow Account in order to provide funds necessary to make required payments under this Agreement. The Escrow Agent shall not have any liability for any loss sustained as a result of any investment made pursuant to the instructions of the Principals or as a result of any liquidation of such investments prior to their maturity in order to provide funds necessary to make required payments hereunder or for the failure of the Principals to give the Escrow Agent instructions in accordance with the provisions under Clause 6 below.

5.3.    Accrued interest, if any, shall be paid to the Buyer upon the first release of the whole or part of the Escrow Amount and, thereafter, at such intervals as the Buyer shall request in writing (but not more than once every month) except the interest earned from the investment of the Security Sum which shall be credited to the Seller upon the first release of the whole or part of the Escrow Amount and, thereafter, at such intervals as the Seller shall request in writing (but not more than once every month).

## 6    Release of the Escrow Amount and the Shares

6.1    The Escrow Agent will under no circumstances be obliged to pay out any amount exceeding the Escrow Amount deposited at the time of such payment or to release any Escrow Documents not being in possession of the Escrow Agent at the time of such release.

6.2    The Escrow Agent shall release monies from the Escrow Account at any time in accordance with:

6.2.1 joint written instructions given by the Principals in substantially the same form as attached in Appendix 2; or

6.2.2 an authenticated, legal and apostilled copy of a final and enforceable judgment or arbitral award issued in proceedings held in connection with this Escrow Agreement or the Share Purchase Agreement II, together with a legalised confirmation by Linklaters Prague or a reputable international law firm reasonably acceptable to the Escrow Agent according to which such judgement or award is final, stating to whom any such part or all of the Escrow Amount shall be distributed.

6.3    The Escrow Agent shall release the Shares I from the Escrow Account at any time in accordance with:

**6.3.1.** joint written instructions given by the Principals in substantially the same wording as attached in Appendix 3, or

**6.3.2** an authenticated, legal and apostilled copy of a final and enforceable judgment or arbitral award issued in proceedings held in connection with this Escrow Agreement or the Share Purchase Agreement II, together with a legalised confirmation by Linklaters Prague or a reputable international law firm reasonably acceptable to the Agent according to which such judgment or award is final, stating to whom the Shares I shall be distributed.

**6.4.** The balance of the purchase price amounting to CZK **576,450,000** (five hundred and seventy six million four hundred and fifty thousand Czech Crowns) (the "**Retention**"), shall be retained by the Escrow Agent until such time as the facts specified in Clauses 6.4.1, 6.4.2 and 6.4.3 hereunder have occurred. The Escrow Agent shall release any sum from the Retention upon:

6.4.1   Following the Closing Date the Escrow Agent shall throughout the period of holding the Retention release to the Buyer upon the sole request of the Buyer such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending the Buyer, SPV KN or MH in any Proceedings pursuant to clauses 5.6.4 (i) and (ii) of the Share Purchase Agreement II. The request of the Buyer for such sums from the Retention must be evidenced by a duly issued invoice from the Buyer's lawyers for the time being. For purposes of this agreement it is agreed that Linklaters v.o.s., Prague are entitled to issue such invoice. The Principals, the Buyer and the Seller agree that the Escrow Agent shall have to check neither the correctness of invoices nor their authenticity, and instruct the Escrow Agent to pay any so invoiced amount.

6.4.2   The purchase price for the Shares II amounting to CZK **20,000,000** (twenty million Czech Crowns) under the Call Option Agreement shall be released by the Escrow Agent to KN upon the sole request of KN provided either (i) the Shares II have been handed over to the Depositor in accordance with the Agreement on Deposit of Securities as confirmed by the Depositor to the Escrow Agent; **or** (ii) the period of 5 (five) years from the 14th day of April 2004 has elapsed.

6.4.3   joint written instructions given by the Principals in substantially the same form as attached in Appendix 2.

**6.6**   In the event that the Buyer fails to credit the Escrow Account pursuant to clause 4.4 hereof by 31 March 2005, then the Seller shall be entitled to alone recover all the documents having been deposited by the Seller and/or KN to the Escrow Agent.

**7.   Fees**

The Seller has paid to the Escrow Agent EUR 40,000 (Euro forty thousand), for the services that the Escrow Agent provides under this Escrow Agreement and the Escrow Agent has delivered to the Seller a valid invoice for the same.

**8    Indemnity and Limitations**

8.1    The Principals jointly and severally undertake to indemnify and hold harmless the Escrow Agent for all and any losses, costs, expenses, liabilities, claims, actions or demands including court and legal costs which the Escrow Agent may incur or which may be made against the Escrow Agent as a result of or in connection with this Escrow Agreement except with respect to any losses, costs, expenses, liabilities, claims, actions or demands including court and legal costs based upon the gross negligence or wilful misconduct of the Escrow Agent, the Escrow Agent's nominees and its agents. The indemnifications of the Escrow Agent provided in this Clause 7 shall survive termination of this Escrow Agreement, and any resignation or removal of the Escrow Agent Escrow Agreement.

8.2.    The Principals acknowledge and agree that any measures taken by any court or authority having jurisdiction over the Escrow Agent which might result in preventing the Escrow Agent from executing its obligations under this Escrow Agreement shall have to be taken into consideration and be a valid excuse for the Escrow Agent for not being able to perform its duties in due time so long as such measures are in effect.

8.3.    The Escrow Agent shall not be required to perform any acts that may violate any law or applicable rules of any governmental agency applicable to the Parties.

8.4.    The Escrow Agent shall be protected in acting upon any written notice, request, demand, waiver, consent, receipt or other paper or document furnished to the Escrow Agent, not only as to its due execution and the validity and effectiveness of its provisions but also as to the truth and acceptability of any information therein contained. The Escrow Agent shall be entitled fully to rely without need for any enquiry on its part on any written notice or certification or other written instructions given to it in accordance with this Escrow Agreement without reference to any party save as specifically provided herein. The Escrow Agent shall also be entitled to assume, without further inquiry, that the information contained in any notification is true and accurate in all respects.

8.5.    If more than one notification is received by the Escrow Agent in respect of the same subject matter, the Escrow Agent shall, to the extent that any notification received later than the first notification in respect of that subject matter contradicts the first notification, be entitled to refrain from acting; however, the Escrow Agent shall inform the Principals of such fact without undue delay. Furthermore, the Escrow Agent shall be entitled to refuse to act on any notification that is unclear or ambiguous until such time as it is able to clarify such notification.

8.6.    The Escrow Agent is not responsible for or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of any Escrow Amount, documents or other materials deposited with it.

8.7.    The Escrow Agent shall be under no obligation to institute, appear in or defend any action, suit or legal or arbitration proceeding in connection with this Escrow Agreement or to take any other action likely to involve it in liability, cost or expense, unless first indemnified to its satisfaction.

8.8.   The Escrow Agent shall have a first lien on the Escrow Amount as security for the reimbursement or payment of any liabilities, losses, fees, costs and expenses related to this Escrow Agreement.

8.9   The Escrow Agent shall not be liable for any error of judgement, or for any act done or step taken or omitted by it in good faith, or for any mistake of fact or law, or for anything, which it may do or refrain from doing in connection herewith except for its own gross negligence or wilful misconduct or for the negligence or wilful misconduct of the Escrow Agent's nominees or its agents.

## 9    Duties of the Escrow Agent

9.1   The Escrow Agent shall be responsible only for the performance of the duties and obligations expressly imposed upon it herein.

9.2   The Principals may jointly at any time terminate the mandate of the Escrow Agent by giving to the Escrow Agent at least twenty (20) Business Days prior written notice to that effect signed by the Principals. If at any time the Escrow Agent shall be adjudged bankrupt or insolvent, or shall file a voluntary petition in bankruptcy or make an assignment for the benefit of its creditors or consent to the appointment of a receiver of all or any substantial part of its property, or if a receiver of it or of all or any substantial part of its property shall be appointed, or if any public officer shall take charge or control of the Escrow Agent or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, or a resolution is passed or an order made for the winding-up of the Escrow Agent, the Principals may jointly terminate the appointment of the Escrow Agent forthwith upon giving written notice. The termination of the appointment of the Escrow Agent hereunder shall not entitle it to any amount by way of compensation but shall be without prejudice to any amount then accrued due.

9.3   The Escrow Agent may resign its mandate hereunder at any time by giving to each of the Principals, at least forty (40) Business Days written notice to that effect provided that no such resignation shall take effect until a new Escrow Agent shall have been appointed to exercise the powers and undertake the duties hereby conferred and imposed upon the Escrow Agent.

9.4   The Principals agree that if, by the day falling ten (10) Business Days before the expiry of any notice under Clause 9.2 above, they have not appointed a successor to the Escrow Agent, to which such notice relates, the Escrow Agent shall be entitled, on behalf of the Principals, to appoint a successor.

9.5   Upon its resignation or removal becoming effective, the Escrow Agent shall deliver or procure the delivery of all the Escrow Amount in the Escrow Account (and any interest accrued thereon) to its successor and any Escrow Documents.

9.6   Upon any successor to the Escrow Agent appointed hereunder executing, acknowledging and delivering to each of the Principals an instrument accepting such appointment hereunder, it shall, without any further act, agreement or conveyance, become vested with all authority, rights, powers, trusts, indemnities, duties and obligations of the Escrow Agent hereunder.

KC 1-1945



**10      Warranties**

Each of the Parties to this Escrow Agreement warrants and represents that it has full power, authority and legal right to incur the obligations, to execute and deliver, and to perform and observe the terms and provisions of this Escrow Agreement and that this Escrow Agreement constitutes its legally binding and valid obligations enforceable in accordance with its terms and does not conflict with any law, regulation or instrument binding on or relating to it and that this Escrow Agreement is within its powers and has been duly authorized by it, that all necessary actions have been taken and all consents and approvals have been granted to authorize the execution, delivery and performance of this Escrow Agreement and that the person or persons signing this Escrow Agreement on behalf of each of them is authorized to do so.

**11      Assignment**

No Party may assign its rights or obligations under this Escrow Agreement without the prior written consent of all other Parties.

**12      Communications between the Parties**

Each communication under this Escrow Agreement shall be made in writing and delivered personally, sent by registered mail or by courier, except for duly signed investment instructions sent by the Principals to the Escrow Agent as specified in Appendix 7 attached hereto, which may be sent by fax. Each communication or document to be delivered to a Party under this Escrow Agreement shall be sent to it at the address, and marked for the attention of the person from time to time designated by it to the other Party for the purpose of this Escrow Agreement. The initial and address and marking (if any) so designated by each Party are set out as below:

To the Escrow Agent:



with a copy to

To the KN:

**KOTVA NEMOVITOSTI, k.s.**
Address: Namesti Republiky 8, 113 88 Praha 1

Attention: Richard Harazim
Fax no: +420 224 801 230
Tel. no: +420 224 801 401

To the MH:

**Markland Holdings Limited**

Address: 19 Upper Fitzwilliam Street, Dublin 2, Republic of Ireland
Attention: Henry Prestage/Frank Walker/Aidan Scully
Fax no: 00353 167 620 00
Tel. no: 00353 167 620 23

with a copy to

**Linklaters v.o.s**
Address: Palac Mysibek, Na Prikope 19, 117 19 Prague 1
Attention: Bryan Wilson
Fax no: +420 221 622 199
Tel. no: +420 221 622 177

**13    Signatories**

Any and all notices or other instructions or papers issued by any of the Principals and intended for the Escrow Agent shall be delivered personally and signed by the person(s) mentioned in the respective signature cards (Appendix [4]: Signature card of the Seller KN; Appendix [5]: Signature card of the Buyer and MH) on the premises of ▮▮▮▮▮▮▮▮▮▮▮▮▮ in the presence of the Escrow Agent's representative. The Escrow Agent is, nevertheless, obliged to accept signatures of other persons authorized to represent the respective Party or Parties.

For the purpose of a physical identification, each person mentioned in the signature cards as per Appendix 4 and Appendix 5 shall call personally at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ order to carry out any instruction given to the Escrow Agent with his valid passport or identity card and the original of the power of attorney and/or any corporate document such as the minutes of the general meeting of the directors, appointing him as an authorized signatory.

**14    Severability**

Should any provision of this Escrow Agreement be prohibited or ineffective or otherwise unenforceable in whole or in part for whatever reason, such provision shall cease to have effect without prejudicing the validity of the other provisions hereunder. The Parties hereto or the court having jurisdiction hereupon will replace such provision by another provision so that, to the extent possible, the economic balance of this Escrow Agreement will be preserved.

**15    Closing Provisions**

15.1    This Escrow Agreement has been made in five originals in the English language of which each Party shall retain one.

KC 1-1947

**15.2** The terms of this Escrow Agreement may only be amended by the Parties in writing.

**15.3** The Escrow Agreement and any rights and obligations resulting therefrom shall be governed by ▮▮▮▮▮ ▮▮▮▮▮ shall also apply for assessing the validity of the agreed place of performance and place of jurisdiction.

**15.4** Place of performance and exclusive place of jurisdiction for any dispute in connection with the Escrow Agreement shall be ▮▮▮▮▮ The Escrow Agent reserves the right, however, to take legal action against any other party before the authority of the party's domicile or before any other competent authority, in which event exclusively ▮▮▮▮▮ shall remain applicable

## 16    Counterparts

The Escrow Agreement shall be established and signed in five separate counterparts, each of which shall be deemed to be an original but which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Escrow Agreement has been duly executed by the parties hereto or their respective duly authorized officers in the place and as of the date written below.

Place and Date:
In Prague on 26 January 2005

_____

Seller

Place and Date
PRAGUE 9 February 2005

_____

Buyer

Place and Date

_____

Escrow Agent

Place and date
Prague 9 February 2005

_____
MH

Place and date: In Prague 26 January 2005

_____

KOTVA OBCHODNI, a s., unlimited partner
on behalf of **KN**



**Appendix 1**
Share Purchase Agreement II

KC 1-1949



**Appendix 2**

**Joint instruction as per Art.6.2.1 of the Escrow Agreement**

[Letterhead of KN and MH]



and

[Date]

Dear Sirs,
Reference is made to the Escrow Agreement dated [date], between KN, MH, Seller, Buyer and the Escrow Agent.

Terms used here shall have the meaning given to them in the Escrow Agreement and the Share Purchase Agreement II. The mention of certain Share Purchase Agreement's articles is made for the Principals' reference only and shall not be binding on the Escrow Agent.

This confirmation is being provided to you in accordance with Clause 6.2.1 and/or 6.4.3 of the Escrow Agreement.

We, the Principals, herewith confirm and instruct you as the Escrow Agent to release the following sums as follows:

[•]

With best regards,

_____    _____
[Signature of KN] [Signature ofMH]

KC 1-1950

**Appendix 3**

**Joint Instruction as per Art.6.3 of the Escrow Agreement**

[Letterhead of KN and MH]

addressed to:



and



[Date]

Dear Sirs,

Reference is made to the Escrow Agreement dated [date], between KN, MH, Seller, Buyer and the Escrow Agent.

Terms used here shall have the meaning given to them in the Escrow Agreement and the Share Purchase Agreement II. The mention of certain Share Purchase Agreement's articles is made for the Principals' reference only and shall not be binding on the Escrow Agent. This confirmation is being provided to you in accordance with Clause 6.3 of the Escrow Agreement. We, the Principals, herewith confirm that the monies specified in joint instruction as per Appendix 2 of the Escrow Agreement have been debited from the Escrow Account, and instruct you as the Escrow Agent to deliver the Shares I having been held by you to the Buyer.

With best regards,

_____   _____
[Signature of KN] [Signature of MH]



**Appendix 4**

**Signature Card of KN and the Seller**

KOTVA NEMOVITOSTI, k.s.                SPV Co Limited
Príkop 4, Brno, Post Code 602 00,      Aigou Pavlou, Ledra House, Agios Andreas Nicosia,
                                       Cyprus

We hereby advise you the following persons with authority to sign (without right of substitution) and to carry out any legal acts in connection with the Escrow Agreement signed between MARKLAND HOLDINGS Limited, KOTVA NEMOVITOSTI, k.s., SPV CO Limited, CRQ Czech a.s. and ████████ This authority is limited to the said Escrow Agreement and the relative Escrow Account.

KOTVA NEMOVITOSTI, k.s.

| Last name / First name | Nationality / Date of Birth | Form of signature (individually, jointly by two) | Specimen signature |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

SPV CO Limited

| Last name / First name | Nationality / Date of Birth | Form of signature (individually, jointly by two) | Specimen signature |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

The undersigned authenticates the signatures above as well as the form of signature and representation.

KC 1-1952

Place and Date

For the Seller

_____

Escrow Agent

_____

For KN

_____

KC 1-1953

**Appendix 5**

**Signature Card of Markland and the Buyer**

MARKLAND HOLDINGS Limited
19 Upper Fitzwilliam Street, Dublin 2
Republic of Ireland

CRQ Czech a.s.
Národní 1435/6 Post Code
Prague

We hereby advise you the following persons with authority to sign (without right of substitution) and to carry out any legal acts in connection with the Escrow Agreement signed between MARKLAND HOLDINGS Limited, KOTVA NEMOVITOSTI, k.s., SPV CO Limited, CRQ Czech a.s. and ▮▮▮▮▮▮▮This authority is limited to the said Escrow Agreement and the relative Escrow Account.:

MARKLAND HOLDINGS LIMITED

| Last name / First name | Nationality / Date of Birth | Form of signature (individually, jointly by two) | Specimen signature |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

CRQ CZECH a.s.

| Last name / First name | Nationality / Date of Birth | Form of signature (individually, jointly by two) | Specimen signature |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

The undersigned authenticates the signatures above as well as the form of signature and representation.

Place and Date

For the Buyer

_____

_____

KC 1~1954

Escrow Agent

For MH

_____

KC 1-1955



## APPENDIX -6-

## Joint Investment Instructions by fax



**Agreed**

**Interest Rate**: the rate per annum equal to the monthly Prague Interbank Bid Rate (i.e. PRIBID) as published on Telerate page 16005 at or about 11:00 am (Czech Republic time) less the Margin of 0.25% per annum.

**PRIBID as per**: (date should coincide with a day when the Central Bank of the Czech Republik is open)

It is understood that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ shall carry out these instructions as soon as possible. The Principals allow, however, 2 Business days to ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ to invest the amount as mentioned above

The terms in Capital shall have the meanings given to them in the Escrow Agreement
Place/Date:

For KOTVA NEMOVITOSTI, k.s.

_____   _____
. . . . . . . . . . (name) . . . .        (name)


For Markland Holdings Limited

_____   _____
. . . . . . . . . (name) . . .        . . (name)

## JOINT INVESTMENT INSTRUCTION

FROM:    KOTVA NEMOVITOSTI, k.s
         Příkop 4, 602 00 Brno, Czech Republic

         SPV CO Limited ("Seller")
         Agiou Pavlou 15, Ledra House, P.C. 1105, Nicosia, Cyprus

         Markland Holdings Limited
         19 Upper Fitzwilliam Street, Dublin 2, Republic of Ireland

         CRQ Czech a.s. ("Buyer")
         Národní 1435/6, 110 00 Praha 1, Czech Republic

TO:      ████████████████████████

CC:      ████████████████████████

In accordance with Articles 4.1 and 4.2 of the Escrow Agreement between Markland
Holdings Limited, Kotva Nemovitostí, k.s., SPV Co Limited, CRQ Czech a.s. and ████████
as Escrow Agent, we kindly ask you to invest the Escrow Amount as follows:

Amount:    CZK 567 000 000,-

From:      March 4th, 2005

To:        Up to withdrawal

Interest Rate:  the rate per annum equal to the monthly Prague Interbank Bid Rate (i.e.
PRIBID) as published on Telerate page 16005 at or about 11.00 am (Czech Republic time)
less the Margin of 0,1875 % per annum

PPRIBID as per: (date)

It is understood that ████████████████████ shall carry out these instructions
as soon as possible. The Principals allow, however, 2 Business days to ████████████
████████████ invest the amount as mentioned above.

The terms in Capital shall have the meanings given to them in the Escrow Agreement

Vienna, March 4th, 2005

For KOTVA NEMOVITOSTI, k.s.            For SPV CO Limited

.............................          .............................
(name)                                 (name)

For Markland Holdings Limited          For CRQ Czech a.s.

.............................          .............................
(name)                                 (name)

AIDAN SCULLY    FRANK WALKER           AIDAN SCULLY    FRANK WALKER

KC 1-1957



Dated   14th  February 2005

SPV CO Limited

and

CRQ Czech a.s.

# AMENDMENT NO. 1 TO SHARE PURCHASE AGREEMENT

relating to the purchase of shares in SPV KN a.s

Linklaters

Palác Myslbek
Na Příkopě 19
117 19 Prague 1

Telephone  (420) 221 622 111
Fax         (420) 221 622 199

Ref  BDXW/L-033253

KC 1-1958



## Amendment No.1 to the Share Purchase Agreement

**Between:**

(1)     **SPV CO Limited**, with its registered office at Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus, company registration no HE 148845, registered in Cyprus (the 'Seller'), represented by the Board of Directors.

(2)     **CRQ Czech a s.**, with its registered office Prague 1, Národní 1435/6, Post Code 11000. Identification no 27159256,registered in the Companies Register by the Regional Court in Prague, in Part B, File 9394 (the "**Buyer**"), and represented by Frank Walker and Aidan Scully, members of the Board of Directors

(3)     **SPV KN a.s.**, with its registered office in Brno, Příkop 4, Post Code 602 00. Identification no 26910705, registered in the Companies Register by the Regional Court in Brno, in Part B. File 4043 ("SPV KN"), represented by Ing. Richard Harazim. sole member of the Board of Directors.

(4)     **KOTVA NEMOVITOSTI, k.s.**. with its registered office at Příkop 4 Brno Post Code 602 00 Identification no 26229048, registered in the Companies Register by the Regional Court in Brno, in Part A, File 16586 ("**Kotva**"). and represented by KOTVA OBCHODNÍ. a s represented by Ing Michal Vlach. Chairman of the Board of Directors. Ing Jiří Brada member of the Board of Directors, and Ing. Pavel Richter, member of the Board of Directors

(5)     **MARKLAND HOLDINGS Limited**, with its registered office at 19 Upper Fitzwilliam Street, Dublin 2. company registration no 291167 registered under the laws of the Republic of Ireland ("**Markland**"), and represented by Frank Walker and Aidan Scully, directors

(6)     **KOTVA a.s.**, with its registered office at Náměstí Republiky 8, Praha 1, Identification no. 60193808, registered in the Companies Register by the Municipal Court in Prague, in Part B. File 2370 ("**KAS**"), and represented by Marek Kolíbal, Chairman of the Board of Directors A copy of a resolution of the Board of Director made on 22 December 2004 by which Marek Kolíbal has been appointed to the function and the petition on registration of him in the Commercial Register as the Chairman of the Board of Directors is annexed hereto at Schedule 1G; and

(7)     **KOTVA OBCHODNÍ, a.s.**, with its registered office at Příkop 4, Brno, Postal Code 602 00, Identification no 26231735, registered in the Companies Register by the Regional Court in Brno, in Part B, File 3484 ("**KO**"), represented by Messrs Ing Michal Vlach, Chairman of the Board of Directors, Ing Jiří Brada and Ing Pavel Richter members of the Board of Directors

(jointly referred to as the "**Parties**").

Terms and expressions capitalised and not otherwise defined in this amendment shall bear the same meaning as assigned to them in the Share Purchase Agreement dated 20 December 2004 entered into between the Parties (the "**SPA**").

**The Parties hereby agree to the following amendment of the SPA (the "Amendment")**

1

1    **Amendment of clause 1.2 – Definition:**

1.1    A new definition of the terms "KT" "KT Claim" and "KT Settlement" shall be incorporated into clause 1.2 of the SPA in alphabetical order as follows

"**KT**"    means KT, Inc., whose registered seat is at 2711 Centerville Road, Suite 400, City of Wilmington, County of Newcastle, Delaware, USA.

"**KT Claim**"    means the claim that KT lodged on 23 December 2004 with the District Court for Prague 1 under reference number 22 C 239/2004 a copyof which is attached at Schedule 9

"**KT Settlement**"    means the obtaining of a definitive and final ruling in respect of the KT Claim; for purposes of this Agreement such definitive and final ruling is deemed to be also a final settlement between the parties to the KT Claim, approved by the court or the withdrawal by KT of the KT Claim

2    **Amendment of clause 5.6.4 of the SPA:**

2.1    The first paragraph of the clause 5.6.4 shall be amended to read:

"The balance of the Share Purchase Price, being the Retention, amounting to CZK 576,450,000 (five hundred and seventy six million four hundred and fifty thousand Czech Crowns), shall be retained by the Escrow Agent until such time as there has been Gilroy Settlement **and KT Settlement**. However, if there **has** been Gilroy Settlement **and KT Settlement** but either 9 months from the Closing Date have not elapsed or there are Proceedings pursuant to Clause 5.6.4.(i) below, the Escrow Agent shall release the Retention to the Seller less the sum of CZK 189,000,000 (one hundred and eighty nine million Czech Crowns), which shall be retained in the Escrow Account until such time as the Buyer obtains a definitive and final ruling in respect of such Proceedings or the period of 9 months from the Closing Date has elapsed and there are no Proceedings which ever is the later. For the avoidance of doubt, a court decision made on the basis of a valid withdrawal is considered to be a definitive and final ruling."

2.2    The clause 5.6.4 (ii) shall be amended to read:

"On each regular quarter day, being 1 January, 1 April, 1 July and 1 October, such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending SPV KN under the Gilroy Claim **and/or the KT Claim**; the request of the Buyer for such sums from the Retention must evidenced by a duly issued invoice from the Buyer's lawyers for the time being. Any payments under this Clause 5.6.4(ii) 0 will be considered to be Share Purchase Price adjustments"

KC 1-1960

2.3    The first paragraph of the clause **5.6.4 (iii)** shall be amended to read:

"*In the event that, under any tax regulations applicable up to the date of Closing, Kotva or SPV KN are assessed with Tax (in particular real estate transfer tax or VAT) in relation to the contribution of the Property, to SPV KN and Kotva, SPV KN or the Seller is liable to pay such Tax to the Financial Authorities, Kotva and the Seller undertakes to compensate SPV KN for such Tax and any corresponding penalty, interest or any other financial payment imposed by the Financial Authorities on SPV KN and such amount of Tax shall be retained in the Escrow Account by the Escrow Agent and shall only be released to the Seller following Gilroy Settlement and KT Settlement upon receipt of the following*

Whilst the rest of the clause 5.6.4 (iii) stays the same

3    Amendment of clause 6.1 of the SPA:

3.1    The first paragraph of the clause **6.1 (iii)** shall be amended to read:

"*There is no Proceeding in progress, pending or Threatened against or relating to Kotva, SPV KN or the Seller or KAS except for the Gilroy Claim, KT Claim and the 'Balfinder litigation' and there is no circumstance, matter or thing which might give rise to any such Proceeding by Kotva or SPV KN or the Seller or KAS or any shareholder thereof or any third party or to any governmental investigation relative to it, nor is there outstanding against Kotva or SPV KN or Seller or KAS any regulation, judgement, decree, injunction, rule or Order of any court, Governmental Body or arbitrator which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable*"

4    Amendment of Schedule 9 to the SPA

4.1    Schedule 9 to the SPA shall be amended to include the KT Claim annexed hereto at Schedule 1.

4    Counterparts

This Amendment will be executed in four counterparts, each of which will be deemed to be an original copy of this Amendment. The Amendment is executed in the English (2 counterparts) and Czech (two counterparts) languages, and the Czech language version shall prevail

The Parties have executed this Amendment as of the date indicated in the first sentence of this Amendment

By:

**Seller:**

**SPV CO Limited**

3

KC 1-1961

Name:      MARTIN BENDA

Title:       DIRECTOR

By:

**KOTVA NEMOVITOSTI k. s.** ( KOTVA OBCHODNI, a.s )

Name:      MICHAL VLACH     JIRÍ BRADA     PAVEL RICHTER

Title:  CHAIRMAN OF THE BoD   MEMBER OF THE BoD   MEMBER OF THE BoD

By:

**KOTVA a.s.**

Name:      MAREK KOLIBAL

Title:      CHAIRMAN OF THE BoD

By:

**KOTVA OBCHODNÍ, a.s.**

Name:  MICHAL VLACH     JIRÍ BRADA     PAVEL RICHTER

Title:  CHAIRMAN OF THE BoD   MEMBER OF THE BoD   MEMBER OF THE BoD

By:

**Buyer:**

**CRQ Czech a.s.**

4

KC 1-1962

F. Walter

Name:

Title:


By:

**Markland Holdings Limited**

F. Walter

Name:

Title:


by :

SPV KN a s


Name:    RICHARD HARAZIM
Title:    MEMBER OF THE BoD

---

5

KC 1-1963

SPV, Co. by Jaromir David

1

1          Volume:  I

2          Pages:  1-109

3          Exhibits:  1-2, 2A,

4          3-5

5

6          UNITED STATES DISTRICT COURT

7          DISTRICT OF MASSACHUSETTS

8    Civil Action No. 05-10679-WGY

9    - - - - - - - - - - - - - - - - - - - - - - x

10   KOTVA, a.s.,

11          Plaintiff,

12       v.

13   ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,

14          Defendants.

15   - - - - - - - - - - - - - - - - - - - - - - x

16

17   VIDEOTAPED INTERPRETED RULE 30(b)(6) DEPOSITION OF

18       SPV CO. BY ITS DESIGNEE, JAROMIR DAVID

19          Wednesday, June 27, 2007

20          9:38 a.m. to 1:47 p.m.

21          MCDERMOTT, WILL & EMERY

22          28 State Street

23          Boston, Massachusetts

24   Reporter:  Marianne R. Wharram, CSR/RPR

SPV, Co. by Jaromir David

7

1  expected to have information concerning those

2  subjects, but as to any other subjects that I might

3  want to inquire into, the rules -- Rule 26

4  prevails.

5          MR. BECKMAN:  I disagree, but I'm not

6  going to clutter the record.  Go forward.

7          MR. DANGEL:  If you need case

8  citations, we'll get them for you.

9     Q.  (BY MR. DANGEL)  Sir, do you understand

10  what it means to be placed under oath in the United

11  States?

12     A.  Yes.

13     Q.  Do you understand that if you give any

14  testimony that is perjurious, you could be

15  prosecuted criminally in the United States?

16          MR. BECKMAN:  Objection.  You may

17  answer.

18     A.  Yes.

19     Q.  (BY MR. DANGEL)  How much money does SPV

20  Co. have as of today?

21     A.  On accounts of the Citibank, we have 172

22  million crowns.

23     Q.  What other assets does SPV Co. have as of

24  today?

SPV, Co. by Jaromir David

8

1     A.  In the Citibank, there are 98 million in

2   notes.

3          INTERPRETER:  I need to ask once again

4   about the name of the company as I did not

5   understand.

6     A.  ████████ 84 million in notes in the

7   company ████████

8          MR. BECKMAN:  Just so the record is

9   clear, I'm not going to interrupt, but we want to

10  mark this portion of the deposition as confidential

11  pursuant to the stipulation, because he's

12  identifying business partners.  He just did.

13         MR. DANGEL:  Okay, well any business

14  partner that's mentioned is confidential, the name;

15  that is, the name.

16         MR. BECKMAN:  Right.

17         MR. DANGEL:  But the whole deposition

18  --

19         MR. BECKMAN:  Right.

20         MR. DANGEL:  It is only the name within

21  that that is confidential.

22         MR. BECKMAN:  Right, and not --

23         MR. DANGEL:  Understood and agreed.

24         MR. BECKMAN:  Right.  Not to clutter

SPV, Co. by Jaromir David

9

1    it, I will just have that marked as confidential

2    now and I won't keep interrupting the deposition.

3            MR. DANGEL:  We'll explain to the

4    reporter at a break what that means.

5        Q.  (BY MR. DANGEL)  Go ahead.  Please

6    continue.

7        A.  And there is approximately 205 million of

8    receivable from the company          And the company

9    CIS, Czech Investment and Administration Company,

10   116 million.

11       Q.  I'm sorry.  I didn't catch what that was.

12       A.  116 million --

13       Q.  No, no, the Czech --

14       A.  Czech Investment and Administration

15   Company, CIS.

16       Q.  Cheese?

17       A.  C-I-S.

18       Q.  Ah, yes.

19       A.  (By the Witness)  CIS.

20       A.  (Through the Interpreter)  Approximately 60

21   million receivable from          and then some

22   smaller receivables, such as 28 million receivable

23   from KTV Finance, bonds, UBS, 21 million, and then

24   the last item that's worth mentioning is four

SPV, Co. by Jaromir David

10

1    million notes of the company ███████████.    I am not

2    exactly sure about the spelling.    So total assets

3    should be not the full 800 million; approximately

4    788 million.    These were the operating assets, so

5    said, and then we have assets in an escrow account.

6         Q.    What are those assets?

7         A.    And those we don't -- we cannot dispose

8    with, because they are in an escrow account, and

9    it's approximately 580 million.

10              MR. BECKMAN:    I'm going to mark that

11   answer as confidential because it identified names

12   of business partners, the earlier -- the earlier

13   answer, not the escrow account, and there was an

14   error in the translation of one.    It was Citibank.

15   I think it was JT Bank, just to help.

16              MR. DANGEL:    Ah.    That's a difference.

17              MR. BECKMAN:    Okay.    Thank you.

18              MR. DANGEL:    We'll in the record make

19   it JT Bank.    Here's what I have to ask you, though,

20   Joel.    I want to stay with the witness.

21              MR. BECKMAN:    Absolutely.

22              MR. DANGEL:    The confidentiality is

23   limited to partners, not to just people you've

24   loaned money to or to people in whose companies you

SPV, Co. by Jaromir David

12

1    A.   SPV Co. works with its own money, its own

2    assets, and no one invests in SPV Co.

3        Q.   (BY MR. DANGEL)  All right.  Does SPV Co.

4    have a partnership agreement with any of the

5    companies he mentioned?

6            MR. BECKMAN:  Objection.  You may

7    answer.

8        A.   I am sorry, but I am not sure what you mean

9    by partner -- the partnership agreement, because

10   either the company is owned by someone or the

11   company does business based on contracts, but the

12   partnership -- partnership contract is not clear to

13   me.

14       Q.   (BY MR. DANGEL)  Are any of the -- does SPV

15   Co. or CIS or KTV own shares in -- or other

16   ownership in any of the companies he mentioned?

17           MR. BECKMAN:  Objection.

18       A.   Kotva Finance owns SPV Co.  SPV Co. owns no

19   one, nobody.  As far as the ownership relations

20   between the other companies, I cannot answer,

21   because I do not know these relations.  The only

22   thing I can answer is that CIS is a holding company

23   and among those companies of the holding of the

24   group is KTV Finance.

SPV, Co. by Jaromir David

19

1    who were members of this group.  My position in

2    Kotva and later KTV Invest was financial manager.

3    I was involved in the business activities,

4    administration, the economics of sale of retail

5    goods, and the financial matters of the business

6    activity, rental of retail facilities.

7        Q.  (BY MR. DANGEL)  Please name all the

8    members of the Kotva holding group that he knows

9    the name of.

10                MR. BECKMAN:  Objection.

11       A.   You have already asked this question, and I

12   responded that I cannot list all the companies that

13   were part of the holding -- of the Kotva holding.

14       Q.  (BY MR. DANGEL)  I heard the answer.  The

15   question is list those companies whose names he

16   knows.

17                MR. BECKMAN:  Objection.

18       A.   Those that I know include Kotva Obchodni

19   and Kotva Nemovitosti.

20       Q.  (BY MR. DANGEL)  Was SPV Co. part of the

21   Kotva holding group?

22       A.   Not at that time.

23       Q.   Not as of 2005?

24                MR. BECKMAN:  Objection.

SPV, Co. by Jaromir David

23

1          MR. BECKMAN:  Objection.

2      A.  Could you please clarify the question for

3  me?  Do you mean whether the SPV Co. was -- had any

4  ownership relations, was connected with assets with

5  KTV Invest?

6      Q.  (BY MR. DANGEL)  There is a phrase in

7  paragraph one, the administration of ownership

8  interest in subsidiaries and intercompany services.

9      A.  SPV Co. was owned and still is owned by SPV

10  Finance.

11     Q.  Was it --

12          MR. BECKMAN:  I think that was

13  translated improperly.

14          MR. DANGEL:  By who?

15          INTERPRETER:  Can I ask for the answer

16  once again so I --

17          MR. DANGEL:  Yeah, ask for the answer.

18  Just ask him to repeat.

19     A.  SPV Co. was owned and is owned by SPV

20  Finance.

21     Q.  (BY MR. DANGEL)  And who owns SPV Finance?

22     A.  SPV Invest.  No, I take it back.  Sorry.

23  KTV Invest.

24     Q.  All right.  Now I'm a little confused.

SPV, Co. by Jaromir David

24

1       A.   (By the Witness)  I'm sorry.  My mistake.

2       Q.   Okay, yeah.  So what he's saying is that

3    SPV Co. is owned by KTV Invest, right, as of this

4    time?

5       A.   Yes.

6       Q.   Okay.  So is one of the companies that it

7    is expected -- that is, SPV Co., through KTV

8    Finance, is one of the companies that will be --

9    receive the benefit of administration of ownership

10   interest through the merger, correct?

11                MR. BECKMAN:  Objection.

12      A.   Could you please repeat the question?

13      Q.   (BY MR. DANGEL)  As a -- if the merger is

14   approved, then the investments of SPV Co. will be

15   managed by the new merged entity, correct?

16                MR. BECKMAN:  Objection.

17      A.   Yes.  The goal was always that SPV Co. be

18   administered by Kotva shareholders, who after the

19   merger became the ownership of Kotva -- of CIS.

20   I'm sorry; of CIS.

21      Q.   (BY MR. DANGEL)  Now look at the second

22   paragraph.  Read it to yourself, please.

23      A.   Yes.

24      Q.   You've read it?

SPV, Co. by Jaromir David

27

```
 1        A.   I cannot name any persons, but I would like
 2   to explain to you the position of SPV Co. in
 3   relation to CIS.  Because my area is finance and
 4   financial management, I cannot make any statements
 5   regarding business activities, investments and
 6   staffing which is here.  What I can say is that SPV
 7   Co. is one company of the -- of the CIS group and I
 8   would like to support this by legal and tax
 9   documents which are right now being discussed
10   during the approval of the financial results for
11   2006.  The company Ledra processes the accounting
12   records of --
13        Q.   I'm sorry?
14        A.   The company Ledra, L-E-D-R-A, is processing
15   the accounting records of SPV Co.  The company BDO
16   is the auditor and tax advisor.  That's why I
17   conclude -- that's why I believe that SPV Co.'s
18   financial statements will be audited and that this
19   is very important for the certainty about proper
20   financial management of the -- of the company.
21             The second point is -- the second point
22   is that CIS as a group, according to the laws of
23   the Czech Republic, must have -- must have
24   consolidated financial statements, which is also
```

SPV, Co. by Jaromir David

28

1    audited, and the audited financial statements of

2    SPV Co. are part of these consolidated financial

3    statements of CIS.  And I think that from my

4    financial point of view, this is the answer to the

5    question what is the position of SPV Co. in the CIS

6    group.

7        Q.  Okay.  Thank you.

8        A.  (By the Witness)  You're welcome.

9        Q.  Who invests SPV Co.'s money since the

10    merger?

11        A.  I do know the way how decisions on

12    financial transactions are made.  In terms of

13    strategic decisions, that is the responsibility of

14    the board of directors of CIS in cooperation with

15    the directors of SPV Co.  In terms of the

16    day-to-day work with finance banks, et cetera, so

17    this day-to-day work is performed by departments,

18    by the financial departments, accounting

19    departments, and planning departments, which I

20    manage.

21        Q.  So do you have responsibility day-to-day

22    for investing SPV Co.'s money?

23            MR. BECKMAN:  Objection.

24        A.  My responsibility is to implement the

SPV, Co. by Jaromir David

29

1    decisions of the board of directors which are

2    incorporated in contracts --

3        Q.  (BY MR. DANGEL)  By whom are you employed?

4        A.  -- and any operational spending is based on

5    the decisions of the financial council.  What I

6    mean by that is fees of legal advisors, accounting

7    company, rental fees for renting Cypress premises

8    for SPV Co. administration offices, travel expenses

9    of directors, et cetera.

10       Q.  By whom are you employed?

11       A.  SPV Finance.

12       Q.  Is he employed by anyone else?

13       A.  Within this group, my only employer is KTV

14   Finance, but I am on the supervisory board of

15   ▓▓▓▓▓▓ and I am the member of the executive

16   committee for retail management.

17            MR. BECKMAN:  I want to mark that

18   portion of the answer as confidential.  He just

19   testified --

20            MR. DANGEL:  The ▓▓▓▓▓▓ part?

21            MR. BECKMAN:  Yes.

22            MR. DANGEL:  Yeah.

23       Q.  (BY MR. DANGEL)  What is ▓▓▓▓▓▓

24       A.  It is one of significant cooperating

SPV, Co. by Jaromir David

30

1    companies in the area of developing, development.

2        Q.   Development of real estate?

3        A.   Yes.

4        Q.   Who owns ▆▆▆▆▆▆

5        A.   I do not know exactly the ownership

6    structure, but as far as I know, among the owners

7    are managers, ▆▆▆▆▆▆▆▆▆▆but I am not an

8    owner.

9        Q.   Who asked you to be on the supervisory

10   board of ▆▆▆▆▆▆

11       A.   There is some history to it.  Because

12   ▆▆▆▆ as an independent accounting unit is

13   involved also in retail sales after a merger that

14   happened in the past, and because I am a financial

15   management expert, I was requested -- I was asked

16   to become a supervisory board member. ▆▆▆▆▆ has

17   two independent business activities, develop --

18   real estate development and retail.  And other

19   supervisory board members are specialists for

20   development; I am specialist for retail, and our

21   role is to control the operations and the results.

22       Q.   Who asked him to become a member of the

23   supervisory board, the individual?

24       A.   There was not a specific individual.

SPV, Co. by Jaromir David

32

1      MR. BECKMAN:  Objection.  You may

2    answer again.

3      INTERPRETER:  Could you please state

4    the other name once again? ▪▪▪▪▪▪▪

5      Q.  (BY MR. DANGEL) ▪▪▪▪▪▪

6      A.  Oh, ▪▪▪▪▪▪  I will repeat what I stated

7    at the beginning, that currently, SPV Co. has a

8    receivable from ▪▪▪▪▪▪ totaling 84 million

9    crowns.

10      Q.  And what is the nature of the receivable?

11      A.  Notes, I believe.

12      Q.  When was the receivable created?

13      A.  I -- I am sorry, but I do not remember

14    exactly.  I cannot answer that question, but I

15    would like to state that receivables in ▪▪▪▪▪▪

16    are -- have high turn-around.  The total amount --

17      Q.  Sorry?

18      A.  Have high turn-around.  The total amount of

19    money that went through ▪▪▪▪▪ is now about 250

20    million crowns, and all of that was repaid,

21    including interest, so this I would call the next

22    round.  So I would like to state that the financing

23    of the development -- developing activity goes in

24    stages, so I really cannot answer the exact dates.

SPV, Co. by Jaromir David

51

1    Q.  As to the company ▓▓▓▓ you mentioned

2    there are loans or have been loans -- there are

3    loans today to a company called ▓▓▓▓▓

4          MR. BECKMAN:  I'm just going to mark

5    this part as confidential, ▓▓▓▓, and all the prior

6    testimony about ▓▓▓▓▓

7          MR. DANGEL:  Well, here's the problem

8    I'm having.  I haven't heard him say anything about

9    ▓▓▓▓▓ that makes them a partner, and so I don't

10   understand why it would be covered by the --

11         MR. BECKMAN:  ▓▓▓▓▓▓ is a business

12   partner and you have the investment contracts and

13   you know exactly what ▓▓▓▓▓ is, and that we're

14   treating as confidential, and your disclosure of

15   the name ▓▓▓▓▓ will be a breach of the ▓▓

16   stipulation.

17         MR. DANGEL:  All right.  Well, I will

18   go read the investment contracts to try to

19   understand that they are investors or SPV is

20   invested in and there's something more than just a

21   loan transaction.

22   Q.  (BY MR. DANGEL)  Let me ask, is there

23   something more than a loan transaction or loan

24   transactions that connect ▓▓▓▓▓ and SPV Co.?

SPV, Co. by Jaromir David

52

```
1        A.  I do not understand the question.

2        Q.  Is there something more than a

3   debtor/creditor relationship?

4        A.  Yes.  People.  I am on supervisory board

5   and Mr. Harazim is on the board of directors.

6        Q.  Of what?

7        A.  ███████████████

8        Q.  Was he on the board of directors in 2005,

9   if you know?

10              INTERPRETER:  He meaning?

11       Q.  (BY MR. DANGEL)  He meaning Harazim.

12       A.  No.

13       Q.  How does he know that?

14       A.  Because he was appointed to the board in

15   this year and the commercial register entry was

16   also made in this year.

17       Q.  Meaning 2007?

18       A.  Yes.

19       Q.  And your relationship with ███████████ did

20   that exist in 2005?

21              MR. BECKMAN:  Objection.

22       A.  It is possible, but I do not -- it is

23   possible.  I do not remember the exact dates,

24   because I do not have memory so good any more.
```

SPV, Co. by Jaromir David

69

```
 1   or loan with SPV Co. from any contract that he
 2   remembers, and if he does not remember any, he
 3   should just say he doesn't remember any.
 4              MR. BECKMAN:  Objection.  Other than to
 5   what he's already testified for three hours about
 6   and, at the beginning of the deposition,
 7   identifying all the contracts?
 8        Q.  (BY MR. DANGEL)  Please answer.
 9        A.   I just wanted to say that at the beginning,
10   I stated individual items of assets, and each of
11   those asset items represents one or more contracts,
12   so talking about ███████████ I saw a contract on the
13   purchase of notes.  We talked about other items.
14   For example, KTV Finance, there is a loan contract.
15   I saw this contract because I had to see the
16   contract in order to know what we are supposed to
17   do for KTV Finance and when KTV Finance has to
18   repay their loan.  I can tell you all the contracts
19   that I was talking about at the beginning.
20        Q.  Okay, good.  Okay.  As to KTV Finance, that
21   is owned -- that is part of the CIS group, correct?
22        A.  Yes.
23        Q.  What is the rate of interest, if there is
24   interest?
```

SPV, Co. by Jaromir David

70

1    A.  I don't know.  I do not recall.  There is

2  different rate of interest on each contract.

3    Q.  When was the first loan or investment made

4  by SPV Co. in KTV Finance?

5    A.  I do not recall whether -- whether -- when

6  and whether a loan was made to KTV Finance.  I am

7  talking about two loans that were -- that were

8  realized.  The first loan was 25 million.  I

9  remembered the first half of the loan has already

10  been paid by KTV Finance, and the second part is

11  payable after I come back.  The second loan, 23

12  million, it was made for one year, I think, but I

13  do not remember the interest rate.

14    Q.  Okay.  When was the 25 million loan made?

15  What year?

16        MR. BECKMAN:  I have to interject.  At

17  least a point of clarification here:  All these

18  contracts have been produced to you, as you well

19  know --

20        MR. DANGEL:  That's okay.

21        MR. BECKMAN:  -- and if this is a

22  memory test, so be it, but just so the record is

23  clear, the documents have been produced.  The

24  contracts have been produced.  He has been

SPV, Co. by Jaromir David

71

1    designated to testify about these contracts, and

2    you would certainly get full and complete testimony

3    if you would show him or mark the contracts as

4    exhibits, but you've failed to do so yet.

5        Q.    (BY MR. DANGEL)   What year?

6        A.    I do not recall.   It might have been in

7    2006, but I am not sure.   I do not know the dates

8    by heart.   I don't work with them.

9        Q.    Was KTV Finance formed before 2006?

10       A.    Yes.

11       Q.    When was it formed?

12       A.    I do not recall exactly the year, but there

13   was some development in the history.   Today, they

14   are -- I'm sorry.   I don't know the form of the

15   company in English.

16       Q.    Partnership?

17       A.    Partnership, yes.   Before, it had another

18   name, Kotva Nemovitosti, and she was found from

19   Kotva, a.s., same as Kotva Obchodni.

20       Q.    Now I understand.   What is the business --

21   what has been the business of KTV Finance in 2006

22   and 2007?

23               MR. BECKMAN:   Objection.   Asked and

24   answered.

SPV, Co. by Jaromir David

81

1  the business interests.

2       Q.  (BY MR. DANGEL)  Tell him I appreciate and

3  understand his answer.  As to ███████ who runs the

4  production company that he referred to that is part

5  of ███████  Oh, strike that.  Who runs ██████████

6            MR. BECKMAN:  Objection.

7       A.  The board of directors run ██████████

8       Q.  (BY MR. DANGEL)  Is his son the chairman?

9       A.  Yes.

10      Q.  And is ████████ already owned by -- strike

11  that.  Does ████████- does CIS own two-thirds of

12  ████████

13            MR. BECKMAN:  Objection.

14      A.  I thought another owner owned ██████████

15      Q.  (BY MR. DANGEL)  Is the other company that

16  you thought owned ████████ called ██████████████

17            MR. BECKMAN:  Objection.

18      A.  I don't know.

19      Q.  (BY MR. DANGEL)  Who does he think owns

20  Solodor?

21      A.  I thought it was ██████████   I thought it was

22  ██████████, because ████████ secured -- used ██████████

23  shares as security, so I am surprised.

24      Q.  So you don't know who owns ██████████████

SPV, Co. by Jaromir David

86

1      A.   It is a contract regarding JT Bank notes.

2      Q.   Okay.  What's the nature of the deal this

3  time with J&T Bank?

4      A.   I don't know.  That does not relate to my

5  position.

6      Q.   Does he know who --

7      A.   We received a contract which stated that we

8  are supposed to pay an advance payment, so we did.

9      Q.   Does he know -- do you know who controls

10  J&T?

11           MR. BECKMAN:  Objection.

12      A.   What do you mean by control?

13      Q.   (BY MR. DANGEL)  Who owns it?

14      A.   I don't know the owner.

15      Q.   So I gather that CIS purchased some notes

16  or other debt obligations of J&T, that the money

17  for that was advanced by SPV Co., and therefore,

18  the money is owed back from CIS; is that correct?

19           MR. BECKMAN:  Objection.

20      A.   Yes.

21      Q.   (BY MR. DANGEL)  Now we're going to move on

22  to a company called

23           MR. BECKMAN:  We're marking this as

24  confidential as well.

SPV, Co. by Jaromir David

99

1    the end.

2        A.   As far as I know from the auditors from

3    Cypress, there will be a provision for the escrow

4    account and that will significantly affect the

5    profit or loss, the result, which means that the

6    result will be a high loss.

7        Q.   (BY MR. DANGEL)  Let me ask you, taking a

8    look at page K 6403 --

9                INTERPRETER:  May I please get a copy?

10   I'm sorry.  That's all right.  I will just take a

11   look.

12       Q.   (BY MR. DANGEL)  Just take a look at the

13   page, please.

14       A.   Can you please repeat the name of the page?

15       Q.   Here, I'll give you the page.  6403.  Do

16   you see it?

17       A.   Yes, that is the provision.

18       Q.   I've read correctly that in 2004, SPV Co.

19   had a net loss, according to the audited report, of

20   1,705,826 crowns, correct?

21               MR. BECKMAN:  Objection.

22       A.   Where is the number?

23       Q.   (BY MR. DANGEL)  I thought you were an

24   accountant.  Far right corner, do you see it says

SPV, Co. by Jaromir David

105

1          VIDEOGRAPHER:  Okay.  The time is 1:31.

2  We're off the record.

3          (Off the record.)

4          (Recess taken.)

5          VIDEOGRAPHER:  The time is 1:43.  We're

6  back on the record.

7          RESUMED DIRECT EXAMINATION

8    Q.  (BY MR. DANGEL)  Home stretch here,

9  Mr. David.  You said this morning that the assets

10  of SPV Co., other than the escrow fund, are 788

11  million crowns; is that correct?

12    A.  Yes.

13    Q.  What were the assets of SPV Co. on the day

14  after the sale of the property to Markland other

15  than the escrow fund?

16    A.  I cannot tell you the exact -- the exact

17  amount, but in that period, it was somewhere around

18  720 million.

19         MR. DANGEL:  Thank you.  I have no

20  further questions.

21         MR. BECKMAN:  Just a couple real quick

22  questions.

23         CROSS-EXAMINATION

24    Q.  (BY MR. BECKMAN)  Prior to today's