UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s. and SPV Co.,<br><br>  Plaintiffs,<br><br>   v.<br><br>ANDREW WEISS and WEISS ASSET<br>MANAGEMENT, LLC<br><br>  Defendants and Counterclaimants. | )<br>)<br>)<br>) Case No. 05-10679-WGY<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

This case was set for trial in April 2007. The original deadline for summary judgment motions expired in October 2006, without any motion filed by the Defendants. At the April 4, 2007 final pretrial conference, the Court allowed SPV Co. to enter the case as a Plaintiff and allowed the Defendants to assert or reassert counterclaims against SPV Co. Although SPV Co. joined the action as an additional damaged party, the factual allegations remained virtually identical. In conjunction with the April 2007 ruling, the Court also set a new case management schedule for limited additional discovery and filing summary judgment motions regarding SPV Co.'s entry into the case and any new or reasserted counterclaims against SPV Co. As confirmed by the Court's recent Order granting Kotva's motion to dismiss the "restated" counterclaims, there are no "new" claims in this case.

In the absence of new claims, it follows that there are no "new" issues that warrant the filing of a motion for summary judgment at this late date. Indeed, Defendants argue that "[a]ll of plaintiffs' claims in the Czech criminal complaint[1] and in the complaint in this case stem from

---

[1] In February 2005, following an investigation by the Czech Police (including seized documents and Court approved wire taps) Defendant Weiss and his agent in Prague, Vladimir Hoffman, were criminally charged with extortion. (Ex. U). In January 2006, at Weiss' own request, the High State prosecutor in Prague conducted reviewed the

the allegation that the Weiss Parties abused Czech civil process." Memo at 4. The abuse of process count, however, is not even asserted by SPV Co. (Am. Compl. at ¶ 77, Count V). Simply put, Defendants' summary judgment arguments are not linked in any way to the new case management schedule. The motion should have been filed, if at all, more than ten months ago. There is good reason why no summary judgment motion was filed by Defendants' prior counsel, however. As demonstrated below, this case, involving allegations of blackmail and contractual interference, is so rife with disputes of material fact that summary judgment is impossible. The case should proceed to trial, and the Defendants' motion should be denied.

## MATERIAL FACTS IN DISPUTE[2]

### The May 12th 2004 Meeting and Defendants' Blackmail Threats

On May 12, 2004, after rumors of a potential sale of the Kotva department store surfaced in the press, Andrew Weiss, and Vladimir Hoffman[3] met with Kotva executives, Richard Harazim and Martin Benda, in Prague. (Weiss Dep. 1/25/07 pp. 184-185). At the May 12th meeting. Weiss demanded to know the status of the sale. (Harazim Dep. 2/22/06 pp. 212-214). Messrs. Harazim and Benda refused to confirm or deny the press reports, explaining that they could not divulge such confidential insider information unless it was disclosed to all Kotva shareholders. (Harazim Dep. 1/24/07 pp. 448-449; Harazim Dep. 2/23/07 p. 248). Weiss then

---

charges and concluded that "the unlawfulness of [Weiss'] does not consist in the mere filing of said civil lawsuits but on the fact that these lawsuits were intended to serve as an instrument of pressure with the intention to gain unlawful benefits from the sale of securities. . ." (Ex. LL).

[2] In support of this opposition, Plaintiffs rely upon the deposition testimony of Andrew Weiss ("Weiss Dep."), Richard Harazim ("Harazim Dep."), Aidan Scully ("Scully Dep."), Martin Benda ("Benda Dep."), Georgiy Nikitin ("Nikitin Dep."), and Howard Golden ("Golden Dep.") and certain documentary evidence. The relevant deposition transcripts and corresponding deposition exhibits are attached as Exhibits A-R, respectively, to the Transmittal Declaration in Support of Plaintiffs' Opposition to Motion for Summary Judgment. The documentary evidence attached to the Transmittal Declaration shall be cited herein as "Ex. __."

[3] Weiss had entered into a contract with Vladimir Hoffman, a former director of BGO living in Prague, to assist in negotiating the sale of BGO's shares in Kotva and Trend. (Weiss Dep. pp. 146-147; Nikitin Dep. Ex. 2). Weiss also appointed Hoffman to act as his agent in connection with the negotiation of the Kotva shares. (Weiss Dep. p. 148; Nikitin Dep. Ex. 3).

demanded that Kotva purchase BGO's Kotva shares or he would use "every means" to "stop the sale"[1] of the department store. (Harazim Dep. 2/22/06 pp. 123-124; Harazim Dep.2/22/06 p. 213) ("if you don't buy my shares, I will block the sale of the building"); (Benda Dep. 1/22/07 p. 88) (Weiss threatened to "block sale of real estate. . .")

Even Mr. Weiss now <u>admits</u> that he demanded a "<u>pay off</u>" for his Kotva shares at the May 12th meeting.[5] Weiss also threatened to file lawsuits against Kotva. (Harazim Dep. 1/24/07 p. 450). Weiss threatened to stop the sale by discrediting Kotva's trustworthiness so that no potential buyers would consider purchasing the department store. (Harazim Dep. 2/22/06 pp. 123-124; Harazim Dep. 2/22/06 pp. 216-217). In addition, Weiss threatened to file criminal charges and report the charges in the media. (Benda Dep. 1/22/07 p. 88; Harazim Dep. 2/22/06 p. 224). Weiss also stated that a payoff of $4 million was not enough and, as time went by, his price demands would increase. (Harazim Dep. 2/22/06 p. 22).

In response to Weiss's threats, Mr. Harazim explained at the May 12th meeting that Kotva had no interest in purchasing BGO's shares and, in fact, it was not permissible under Czech law for Kotva to buy back its own shares. (Harazim Dep. 2/23/06 pp. 245-248). Mr. Harazim also advised at the May 12th meeting that such threats to force Kotva to pay off Weiss were illegal. (Harazim Dep. 2/22/06 p. 215). As described below, when Kotva did not capitulate to Weiss' demands, he followed through with each and every one of his blackmail threats.[6]

---

[4] Weiss also admitted in an email (dated May 20, 2004) that he wanted to "stop the deal" with Markland. (Weiss Dep. Ex. 14).

[5] Mr. Weiss first testified under oath that he would "never would use the word payoff." (Weiss Dep. 1/25/07 p. 263) When shown an email that he had sent to an investor in which he described demanding a pay off, Weiss changed his testimony and admitted that he demanded a "pay off" at the May 12th meeting. (Weiss Dep. p. 266-267, Weiss Dep. Ex. 11).

[6] In addition to filing civil lawsuits, Weiss had his Czech lawyer file a criminal complaint against Richard Harazim; this complaint was investigated and terminated. (Harazim Dep. 2/22/06 pp. 134-135). Weiss also contacted the Wall Street Journal, New York Times, and members of the U.S. government to discredit Kotva's executives, including making outrageous and defamatory allegations that Mr. Benda had bragged about killing a Czech police officer, and that Kotva's executives were members of the Russian mob. (Weiss Dep. 1/25/07 pp. 60-61; 65; 73-74).

**Defendants Follow Through on Their Blackmail Threats to Stop the Sale**

After the May 12th meeting, in June 2004, Weiss retained Ondrej Peterka, a Czech attorney.[7] (Weiss Dep. p. 296; Andrew Weiss Second Supplemental Response to Kotva's First Set of Interrogatories No. 3 dated October 20, 2006). On June 23-24, Gilroy, Ltd. a Cyprus shell company, purchased 135 nominal shares of Kotva. (Answer, ¶23). Messrs. Weiss, Hoffman and Peterka made the decision to file a complaint challenging the title to the Kotva Department Store on behalf of Gilroy. (Weiss Dep. 1/25/07 p. 299).

On June 30th, the Gilroy lawsuit, styled as an "action to determine the ownership of real property" was filed against Kotva and its wholly owned subsidiaries (Kotva Nemovitosti ("KN") and SPV KN), claiming that Kotva was the owner of the department store rather than Kotva's wholly owned subsidiary (which was planning to sell the building to Markland). (Gilroy Complaint, K0250; Ex. V). The Gilroy lawsuit sought to declare the transfer of the department store from Kotva to its subsidiary "null and void," and that Kotva (the parent) was the sole owner of the property, not its subsidiary. (Gilroy Complaint, K0264; Ex. V).[8] In addition, on the very day of the filing of the lawsuit, Gilroy filed an application with the Cadastre (deed registry) requesting that a note be made on the title for the department store, thus clouding the title, and making it impossible to mortgage the property. (Harazim Dep. 1/23/07 p. 148).

---

[7] Weiss first testified under oath that "Peterka has never been retained by me personally." (Weiss Dep. 1/25/07 p. 292). When confronted with his answers to interrogatories, he changed his testimony, again. (Id. at 296). In connection with Weiss' initial client conference with Peterka, Mr. Hoffman's own handwritten notes state: "1) Block the deal with the Irish." (Ex. AA) (emphasis added).

[8] Kotva, however, had transferred the department store to the subsidiary four years earlier (in November 2000) in a publicly disclosed and shareholder approved transaction, and pursuant to the recommendations of Ernst & Young. (Plaintiff's Answers to Defendants' Second Set of Interrogatories, No. 1, dated September 5, 2005; Harazim Dep. 2/22/06 p. 166, 171-174). In other words, the transfer was accomplished four years before Gilroy became a shareholder of Kotva. On September 20, 2005, the Czech court dismissed the lawsuit because Gilroy did not own the shares at the time of the transfer and thus had no standing to sue. (Ex. W).

As Richard Harazim testified, the Gilroy lawsuit was designed to pressure Kotva into purchasing BGO's shares.[9] (Harazim Dep. 2/23/06 p. 251). As Kotva's executives had explained from the outset at the May 12th meeting, Kotva was not interested in purchasing the shares, had no obligation to purchase the shares, and was not permitted by law to purchase more than 10% of its own shares. (Harazim Dep. 2/23/06 pp. 247-248; (Ex. FF). In response, Weiss tortiously interfered with the department store sale to create leverage and force a "pay off." Weiss admitted in his deposition that, prior to the lawsuits being filed, he discussed with Mr. Hoffman the advantages of interfering with the sale to Markland. (Weiss Dep. pp. 434-435; 441). Similarly, Georgi Nikitin, Weiss' associate, and a director, and officer of KT, Inc., (the Delaware shell company that subsequently filed an identical lawsuit against Kotva), discussed with Mr. Weiss the option of stopping the sale of the department store:

> A.  . . . I think we spoke about the fact that if he filed these lawsuits, its likely to affect the sale.
>
> ***
>
> Q.  So one of the possible consequences you discussed was that the sale may be postponed?
> A.  Or cancelled.

(Nikitin Dep. pp. 108-112) (emphasis added).

## Defendants Contact Markland Directly to Intimidate and Interfere with the Sale

Not satisfied with clouding the title by filing the sham Gilroy lawsuit, Weiss and his cohorts increased the pressure and directly contacted Markland to interfere with the sale. On the very day that the Gilroy lawsuit was filed, Weiss's counsel, sent a copy of the Gilroy complaint to Markland's business lawyer working on the sale, and to Markland's senior person handling the negotiations. (Nikitin Dep. Ex. 44; Harazim Dep. 1/24/07, p. 459). Vladimir Hoffman also called Markland raising questions about the sale. (Ex. EE; Harazim Dep. 1/24/07 p. 459). In

---

[9] The scenario is akin to someone demanding that you buy a car from them for $200,000, even though you do not want to buy the car or have any obligation to do so. After you refuse to buy the car, the "seller" finds out you are in the process of selling your house and files a sham lawsuit challenging the title to your home, which he knows will interfere with your ability to sell the house. The "seller" then continues to pressure you to buy the car in exchange for dropping the sham lawsuit.

addition, Weiss sent correspondence to Markland's lender on the department store deal, Anglo Irish Bank. (Scully Dep. 5/26/06 pp. 136-137). As Markland's senior director testified, contacting the lender put the entire deal at risk (Scully Dep. 5/26/06 p. 137) and, as described below, blew up the sale agreed upon between the parties.

## Defendants Ever Increasing Blackmail demands

In August 2004, with the Gilroy lawsuit in place, Weiss directed Hoffman, his agent in Prague, to demand a written offer from Kotva to purchase BGO's Kotva shares. (Nikitin Dep. Exs. 11 and 13). Pursuant to Weiss's request, at a meeting in August 2004, Mr. Hoffman demanded that Kotva purchase BGO's Kotva's shares in exchange for withdrawing the Gilroy lawsuit. (Harazim Dep. 2/23/06 pp. 259-260; 267). Between August and December 2004, Andrew Weiss made ever increasing price demands upon Kotva to purchase BGO's Kotva shares in exchange for dropping the Gilroy lawsuit, while all along denying that he exerted control over Gilroy or the Gilroy lawsuit. (Ex. Y; Defendants' Answer to Complaint, 6/15/05 ¶¶27-30; Harazim Dep. 1/23/07 p. 49; Harazim Dep. 2/22/06 pp. 121-122). Indeed, in August 2004, Weiss demanded 131 million CZK for BGO's Kotva shares. (Id., Weiss Dep. 494-495). By November 2004, Weiss was demanding almost 295 million CZK ($12 million USD) from Kotva in exchange for purchasing its shares in Kotva, and another Czech investment fund called Trend. (Id.). (Revealingly, BGO had internally valued the shares in Kotva and Trend at only $1.5 million, yet was demanding $12 million from Kotva). (Weiss Dep. 1/26/07 p. 481). Mr. Hoffman was recorded in a telephone conversation with Georgi Nikitin, Weiss's associate, expressing concern for demanding too much for the Kotva shares:

> I think we cannot go and say that we want, you know, full NAV [net asset value of Kotva] plus we want even more for that, you know, that is blackmail.

(Howard Golden Dep. dated 4/17/07 at p. 4) (emphasis added).

**Weiss's Attempt to Divert the Department Store**
**Sale Proceeds in Exchange for Dropping the Litigation**

In October 2004, Vladimir Hoffman and Ondrej Peterka on behalf of Weiss asked that a portion of the sale proceeds for the department store be paid directly to BGO for its Kotva shares (Nikitin Dep. Exs. 31 and 35; Harazim Dep. 1/23/07 pp. 100-101). On October 18, 2004, Hoffman and Peterka met with Kotva executives and Markland's representative, Henry Prestage. (Nikitin Dep. Ex. 35). At the October 18th meeting, both Peterka and Hoffman stated that if a deal could be reached regarding the purchase of BGO's Kotva shares, Gilroy would drop its lawsuits. (Harazim Dep. 1/23/07 pp. 100-102). Similarly, Mr. Weiss admitted in his deposition that he was always willing to accept "a proportional share payoff of the cash" from the department store sale. (Weiss Dep. 1/25/07 pp. 288-289). Moreover, Weiss admitted that if he had received the payoff, he would have dropped the lawsuits. (Weiss Dep. pp. 487-488; 499-500).[10]

**The Filing of the KT Lawsuit**

In December 2004, KT, Inc. filed a lawsuit against Kotva and its subsidiaries identical to the Gilroy lawsuits. Weiss denied any connection to KT. (Ex. CC). Mr. Weiss was lying. In fact, he had set up KT as a Delaware shell corporation; he was a director of KT and he had authorized and approved of the filing of the lawsuit on behalf of KT (Harazim Dep. 2/23/07 p. 379; Weiss Dep. 1/26/07 p. 382 and 534; Nikitin Dep. 1/16/06 p. 84). Not surprisingly, KT was a mere shell company with no assets or employees. (Weiss Dep. 1/26/07 pp. 379-381; Nikitin

---

[10] A shareholder in a publicly traded company is not entitled to a percentage of the proceeds from the sale of a corporate asset. (Nikitin Dep. p. 323) (e.g. If IBM sells one of its office buildings, an IBM shareholder has no legitimate basis to demand a cut of the sale proceeds). Rather, as in the case of Kotva, if Kotva's shareholders voted to liquidate the company and distribute the department store proceeds, then Kotva's shareholders would receive a proportionate distribution of cash. In the summer of 2005, however, Kotva's shareholders voted against liquidating the company and distributing the sale proceeds. (Harazim Dep. 2/22/06 p. 178; Benda Dep. 1/22/07 pp. 145-146). Moreover, BGO, Weiss' fund also voted against the liquidation and distribution. (Harazim Dep. 2/22/06 p. 178). In short, Weiss had no legitimate basis to interfere with the sale to Markland and demand a "pay off" from the department store proceeds.

Dep. 11/16/06 pp. 145-146). Simply put, if the litigation is legitimate, why deny your involvement?

## Impact on the Sale to Markland

After negotiating for almost eighteen months, Kotva and Markland were ready to close the deal for the sale of the department store in the summer of 2004. (Harazim Dep. 1/23/07 pp. 141-142; Harazim Dep. 6/27/07 p. 50; Ex. DD). Due diligence had been completed, and only one open issue remained concerning an uncomplicated change to the structure of the purchase that Markland had requested. (Id.; Harazim Dep. 2/22/06 pp. 189-191). On the eve of closing, however, Defendants filed the Gilroy lawsuit to stop the transaction. (See Gilroy Complaint; Scully Dep. 5/26/06 at 84. The original deal, under which Kotva was to receive more than 1.5 billion Czech korunas ($65,000,000 USD) at the closing was dead. The parties now faced six to nine months of renegotiations and delay. (Harazim Dep. 6/27/07 p. 47-48).

As a result of the Gilroy lawsuit and the filings made on the title at the Cadastre (land registry) the department store could not be pledged and no buyer could obtain financing to purchase the store. (Harazim Dep. 2/22/06 p. 91; Harazim Dep. 6/27/07 p. 49; Scully Dep. 5/27/07 pp. 142-143). In a November 8, 2004 email to Richard Harazim, Henry Prestage of Markland summarized the fallout from the Gilroy suit:

> **We have a serious problem.** Whilst the legal challenge (s) are in place and noted on the cadastral register Markland cannot either take a mortgage over the building or sell it....**Believe me there is no other party in Europe that would now do this deal so Kotva have a major decision to make....**[W]ith the legal challenge on the Cadastral register I am not sure how you could possibly raise the cash to complete a renovation. You to[o] are severely restricted by this court action. . . .**In effect, your building is currently un-saleable.**

(emphasis in original) (Ex. II). Indeed, Markland's lender refused to provide financing unless Markland's shareholders provided personal guarantees. (Ex. MM). Markland's position was clear and unwavering: "there can be no room for blackmailers. To sort [the Gilroy lawsuit] out it needs to go through the courts and be defeated." (Ex. DD ). To further complicate matters,

after five months of renegotiations caused by the Gilroy suit, Defendants then caused the KT suit to be filed in December 2004, resulting in yet more delays and negotiations. (Harazim Dep. 2/22/06 p. 200; Harazim Dep. Ex. 21). At several points during the renegotiations, the deal almost collapsed. (Harazim Dep. 6/27/07 pp. 83-84, 86-87; Scully Dep. 5/26/06 at 135-137). Markland initially demanded that the entire purchase price be held in escrow until the Gilroy case was resolved.[11] Ultimately, Markland and Kotva struck a new deal whereby Kotva would receive only two-thirds of the purchase price ($41 million USD) at closing, and one-third ($24 million USD) would be held in escrow until the final disposition or withdrawal of the Gilroy (and later KT) lawsuits. (Harazim Dep. 6/27/07 p. 27). As noted above, the original deal called for Kotva to receive all of the sale proceeds at closing. (Id.). While Kotva succeeded in negotiating a reduced escrow, Markland insisted and prevailed upon a substantial escrow amount, payment of its litigation costs from the escrow, and only low-risk investment vehicles for the escrowed funds that are easily accessible. (Ex. KK; Harazim Dep. 6/27/07 pp. 16, 18, 36, 39-41, 63-64). The amount and terms of the escrow was changing by the catastrophic effect the Gilroy and KT lawsuits would have if successful--the unraveling of the deal and return of the purchase price). (Harazim Dep. 6/27/07 pp. 67, 89; Ex. HH).

   In the wake of the filing of the KT and Gilroy lawsuits, Markland's lawyers in Prague and Dublin (as well as its lenders' counsel) scrutinized the lawsuit allegations, and ultimately advised Markland that the lawsuit allegations were without merit, and Markland agreed to proceed with the transaction, but only if the escrow benefiting Markland was in place. (Exs. GG and HH). The new deal between Kotva and Markland was not consummated until March 2005, nine months after the parties expected to close. (Harazim Dep. 1/23/07 pp. 141-142; Scully Dep.

---

[11] "The simplest way forward is to close now, retain the money in escrow and for you to defeat the court case asap....The funds could then be released as the claim is gone and there is no precedent set for further spurious claims."). (7/30/04 email from Henry Prestage) (Ex. DD).

5/26/06 p. 134). In short, this delay was the direct result of Defendants' blackmail and interference with the sale. (Id.).

## ARGUMENT

Defendants reassert a number of choice of law arguments in their summary judgment motion and claim that it would be unfair for the Court to hear any claims governed by Czech law.[12] Plaintiffs' choice of forum, however, is entitled to great deference, and Plaintiffs are entitled to have their claims resolved where they can enforce a judgment against the Defendants. Unlike Defendants, Plaintiffs have no other forum where they can obtain relief because Defendants refuse to subject themselves to jurisdiction in the Czech Republic. There is no adequate alternative forum for Plaintiffs' claims; there is no basis for abstention; there is no conflict of law; and there is no reason to summarily dismiss any of Plaintiffs' claims.

**I.    Defendants Tortiously Interfered with Plaintiffs' Relationship with Markland and Material Issues of Fact Preclude Summary Judgment on this Claim**

Defendants make two arguments against Plaintiffs' claim for tortious interference: (1) that the transaction "succeeded" so there could not be any interference, and (2) that Plaintiffs' damages are "pie in the sky." Because both arguments hinge upon and are intertwined with disputed issues of material fact, summary judgment should be denied.

**A. Defendants' "Successful Transaction" Argument Raises Disputed Issues of Material Fact And, In Any Event, is Not Applicable**

*1. Whether the Deal "Succeeded" is a Material Issue in Dispute*

Defendants contend that their conduct had no effect on the transaction to sell the department store and that the transaction succeeded because Kotva was able to sell the department store to Markland. Whether or not the transaction to sell the department store

---

[12] In support, Defendants incorrectly state that the Court has determined it will not decide claims governed by Czech law. Memo. at 10-11. To the contrary, the Court informed the parties at the April 4, 2007 conference that it would hear Plaintiffs' claims even if they were governed by Czech law. Defendants' choice of law arguments are addressed in Section IV below.

"succeeded" is not just a material fact in dispute, it is a critical material fact in dispute. In fact, as described above, Defendants' conduct drastically altered the course of negotiations between the parties and the ultimate deal. In reality, Defendants' interference blew up the original deal, and resulted in a sale that was far less advantageous to Plaintiffs. This factual dispute over the "success" of the sale renders summary judgment inappropriate.

## 2. *Defendants' Restatement Argument Is Incorrect*

Defendants' contention that the Restatement, and Massachusetts law, require that the third party "*actually break off the relationship* with the plaintiffs as a result of the defendant's interference in order to be actionable" is wrong. As in this case, the third party in <u>Ary Jewelers, LLC v. IBJTC Business Credit Corp.</u>, 414 F. Supp. 2d 90, 93 (D. Mass. 2006) revoked the original proposal and offered less favorable financing terms, but did not break off the relationship entirely. The <u>Ary</u> court held that factual issues precluded summary judgment. Similarly, in <u>McNamee v. Jenkins</u>, 52 Mass. App. Ct. 503 (2001), the plaintiff police sergeant was harmed by the loss of a more favorable shift, not the loss of his employment. In neither case did the third party "actually break off the relationship."

The <u>McNamee</u> court further held that summary judgment was inappropriate because the plaintiff had a reasonable expectation of proving all four elements of tortious interference. <u>Id.</u>, 754 N.E.2d 740, 745. The same is true in this case: (1) Plaintiffs had a business relationship for economic benefit with Markland; (2) the Weiss Defendants knew about that relationship; (3) the Weiss Defendants interfered with that relationship by trying to stop the sale through both improper motive and improper means; and (4) as a result of Defendants' conduct, Plaintiffs lost the benefit of the original deal, suffered substantial delays, and continue to incur massive damages. See <u>Id.</u>

Rather than address the elements of the tort, however, Defendants parse the Restatement to confuse the issue.[13] The absurdity of Defendants' position is demonstrated by the fact that they want to punish Plaintiffs and Markland for <u>not</u> completely breaking off their relationship. In effect, Defendants complain that Plaintiffs and Markland exerted herculean efforts to mitigate the damages <u>that the Defendants themselves caused.</u> This makes no sense.

### B. The Extent of Plaintiffs' Damages Presents a Disputed Issue of Material Fact That Is Not Appropriate for Resolution on Summary Judgment

Plaintiffs' damages are straightforward.[14] The deal between Kotva and Markland was ready to close by the summer of 2004. (Harazim Dep. 2/23/06 p. 399). The filing of the Gilroy action, however, spun the parties off into months of renegotiations, changed the terms of the agreement, and delayed the consummation of any deal between the parties for nine months. (<u>Id</u>. at 91, 399-400). The initial Share Purchase Agreement agreed upon by the parties said nothing about an escrow account to withhold proceeds post closing pending the resolution of a lawsuit. (Id. at 91). Defendants' interference caused Plaintiffs the following damages:

1.  delayed receipt of the full sale proceeds ($65,000,000 USD) from summer 2004 to March 2005;[15]

2.  hold back of more than 1/3 of the purchase price in escrow and lost investment opportunities on those proceeds since March 2005;

3.  costs associated with the continued existence of a special purpose vehicle company that would have been dissolved years ago;[16]

---

[13] Since the Defendants interfered with both the Plaintiffs' performance and Markland's performance of the contemplated sales transaction, however, Plaintiffs' tortious interference claim satisfies any of the Restatement sections cited by the Defendants.

[14] To defeat a motion for summary judgment, Plaintiffs need only present evidence that they were harmed. <u>G.S. Enterprises, Inc. v. Falmouth Marine, Inc.</u>, 410 Mass. 2662, 276 (1991) (vacating grant of summary judgment based on damages); <u>Davidson Pipe Supply Co., Inc. v. Johnson</u>, 14 Mass. App. Ct. 518,520 (1982) (same); <u>see Smith v. Massimiano</u>, 414 Mass. 81, 86 (1993). By offering evidence of lost interest, lost investment opportunities, and other damages, Plaintiffs have more than met that minimal burden. Defendants, however, dispute the amount, nature, and origin of Plaintiffs' damages. Memo. at 15-18. Such disputes over damages cannot be resolved on summary judgment and Defendants' motion should be denied.

[15] Plaintiffs have conservatively estimated the delay as six months (Harazim Dep. 1/23/07 pp. 141-142). Assuming a 10% rate of return, the damages from the delay amount to $3.25 million . (Id. at 135-140).

4.    banking penalties;[17] and

5.    various legal expenses in both the Czech Republic and United States.[18]
(Harazim Dep. 1/23/07 pp. 135-149).

When the sale proceeds were received, approximately $24 million was diverted to a new escrow account. Plaintiffs have lost the use of that money since March 2005. Unlike the proceeds they did receive, Plaintiffs have been unable to realize <u>any</u> return on the escrowed funds. First, Markland insisted that the escrow funds be invested only in low-risk, low-yield investments. (Harazim Dep. 6/27/07 pp. 8, 16, 18, 39-41). Second, Markland asserts that it is entitled to whatever interest the escrowed funds earn. (<u>Id.</u> at 22). Thus, Plaintiffs receive absolutely no benefit from the funds tied up in escrow. Again, assuming a 10% rate of return--which is conservative given the returns Plaintiffs have been able to achieve on the non-escrowed funds--Plaintiffs have lost since March 2005 more than $5,000,000 for this component of their damages. (Harazim Dep. 1/23/07 pp. 135-140).

In sum, had the original transaction not been blown up by Defendants' conduct, Plaintiffs would have received the full purchase price and could have put the proceeds to use as they saw fit. Contrary to the Defendants' assertions, the effect the delayed closing had on Plaintiffs' business, the details of the post-Gilroy-lawsuit renegotiations with Markland, the investment alternatives that would have been available to the Plaintiffs (including risk tolerances and rates of return), and which Czech companies are affiliated with whom, are <u>all</u> disputed issues of material fact that preclude entry of summary judgment.

---

[16] Had the Gilroy and KT suits not been filed, SPV Co. would have been dissolved long ago. Instead, Plaintiffs have incurred damages for the continued operation of this Cyprus entity. (Harazim Dep. 6/27/07 p. 53).

[17] Plaintiffs suffered more than $250,000 in banking penalties. (Harazim Dep. 1/23/07 at 147).

[18] With respect to the various litigations that Plaintiffs have been forced to defend and prosecute, damages exceeded $750,000 as of January of this year. (Harazim Dep. 1/23/07 pp. 143-147).

II.    **The Lawsuits Instigated by Defendants are Textbook Abuse of Process**

A.    **Plaintiffs Have Stated a Valid Claim for Abuse of Process**

Defendants argue that "under Massachusetts law there is considerable doubt that the declaratory rights actions taken by Gilroy and KT would be actionable," and claim that the blocking lawsuits filed in the Czech Republic are "classic petitioning activity" protected by the Massachusetts Anti-SLAPP statute. Memo. at 9-10. Contrary to defendants' assertions, Kotva's abuse of process claim is not based solely on the filing of lawsuits in the Czech Republic. (Id). Rather, the filing of the sham lawsuits was only the first step in Defendants' scheme. As described above, Plaintiffs' claims arise out of defendants' **misuse of that process** to extort Kotva. Accordingly, the Anti-SLAPP statute does not apply.[19]    Adams v. Whitman, 62 Mass. App. Ct. 850 (2005) (anti-SLAPP statutes does not apply to abuse of process claims involving subsequent misuse of process).

The stated relief in the lawsuits, to nullify the transaction and transfer the shopping center back to Kotva, was entirely pretextual. The Defendants' ulterior motive was to force Kotva to buy BGO's shares in Kotva and Trend. Indeed, Defendants never once demanded that Kotva provide the actual relief that the lawsuits requested in exchange for dropping the suits (i.e. return the department store back to Kotva) (Weiss Dep. 1/26/07 p. 440). This is a classic example of abuse of process.[20] Simply put, Defendants used the blocking lawsuits as a "threat or a club to

---

[19] In stark contrast, Defendants' counterclaim for abuse of process is based solely on Plaintiffs' filing this lawsuit. Accordingly - - under Defendants' own argument - - the abuse of process counterclaims should be dismissed under the Massachusetts anti-SLAPP statute. See Motion at 10 ( "The mere filing of a civil lawsuit alone did not provide a basis for claiming abuse of process, even if there was an ulterior motive" ). At the Court's direction, Plaintiffs will file a special motion to dismiss those counterclaims pursuant to M.G.L ch. 231 §59H. The anti-SLAPP statute also does not apply to Kotva's claim for abuse of process because Defendants were not engaged in "petitioning activity" as defined by the statute. Specifically, M.G.L. ch. 231 §59H only protects a "party's exercise of its rights of petition under the constitution of the United States or of the commonwealth." Those constitutional rights do not apply in the Czech Republic where the blocking lawsuits were filed.

[20] See Gouin v. Gouin, 249 F.Supp.2d 62, 70 (D. Mass. 2003) ("A typically cited example of abuse of process is extortion, but any process used 'to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it . . .' may qualify.") citing Stromberg v. Costello, 456 F.Supp. 848, 850 (D. Mass. 1978); Restatement (Second) of Torts §682 com. b).

coerce or extort some collateral advantage not properly involved in the proceeding" - - namely, the purchase of the Kotva and Trend shares for $12 million. See Broadway Mgmt. Services, Ltd. v. Cullinet Software, Inc., 652 F.Supp. 1501, 1503 (D. Mass. 1987); Cohen v. Hurley, 20 Mass.App. 439, 442 (1985). In view of the evidence presented by Kotva and defendants' own admissions, summary judgment should be denied.

## B. Defendants Cannot Use Ondrej Peterka as an "Expert" on Czech Law

Defendants' attempt to use Ondrej Peterka as a quasi-expert witness on Czech law is both impermissible and unavailing.[21] According to Peterka, Defendants allege that the Gilroy lawsuit only sought a declaration and, therefore, did not constitute "process" under Czech law. In fact, the Gilroy suit sought to "nullify" the transfer of Kotva's Department Store from Kotva to its subsidiary--which had occurred years earlier--and to declare that Kotva was the record owner. The *effect* of this relief would have unraveled the deal with Markland (Harazim Dep. 6/27/07 p. 67; Weiss Dep. 1/26/07 pp. 336-337) and demonstrates that the suit was exactly what the Defendants claim it was not--an asset transfer and injunction. (Harazim Dep. 6/27/07 pp. 48-50).

Just how "vigorously prosecuted" (Memo. at 2) the Gilroy and KT suits have been is also an issue in dispute between the parties. The Gilroy lawsuit was dismissed on standing grounds in May 2005. Since that time, Defendants' counsel Peterka has engaged procedural wrangling against defendants to avoid the same fate for the KT lawsuit. Indeed, the Defendants have no incentive to prosecute the suits vigorously since it is the *pendency* of the actions that clouds the title and keeps the funds away from Kotva and in the escrow.

Like the effect of the Gilroy suit, the effect of the notices filed with the Czech land registry is also in dispute. Defendants again try to use Mr. Peterka's testimony to establish that

---

[21] The Court already has ruled that Mr. Peterka may not testify about any matters for which the Defendants denied Plaintiffs' discovery requests. See Order dated July 17, 2007. As the Court may recall, the bases for Mr. Peterka's opinions was one of the areas for which Defendants refused to produce discovery. See Plaintiffs' Memorandum in Support of its Motion to Compel Production of Documents, filed July 2, 2007 [Docket # 250] at 7-8.

filing notices amounted to "notification only, not process." Memo. at 9. The filings, however, effectively clouded title, such that the original transaction with Markland was destroyed and had to be renegotiated. See p. 8 supra regarding impact of lawsuits. Further, Defendants mischaracterize the Czech "tariff system" as a procedure whereby "Damages" are awarded. Memo. at 9. The tariff system awards "costs," not "damages," as the Gilroy decision plainly states. The Gilroy case was dismissed for lack of standing. By no means does the $750 amount represent the "damages" Kotva has suffered from Defendants' abuse of process.

### III.    Plaintiffs' 93A Claim Is Not the Same as Defendants' Claim; Defendants' Claim was Based Entirely Upon Private Transactions

Plaintiffs' Chapter 93A claim is completely different than Defendants' claim, which was correctly dismissed.[22] See Quinton v. Gavin, 64 Mass. App. Ct. 792, 797-98 (2005) (whether a transaction is a private business venture and, therefore, not actionable under the statute, depends upon a careful analysis of the particular circumstances of each case). Defendants' 93A claim concerned alleged corporate looting - - a classic private intracompany dispute. In contrast, Plaintiffs' Chapter 93A claim concerns the Defendants' extra enterprise scheme to extort millions of dollars. That scheme was hatched by Weiss and WAM, and involved the participation of multiple other separate corporate entities including Gilroy, KT, CVF, and BGO. It also relied upon the reaction of third parties (e.g., Markland) to exert the necessary pressure on Kotva. And its goal was the forced purchase of BGO's shares in both Kotva and Trend (a different Czech company). Because the circumstances giving rise to Kotva's 93A claim fall outside the "private dispute" exemption to Chapter 93A §11, summary judgment should be denied. Grand Pacific Finance Corp. v. Bramer, 57 Mass. App. Ct. 407, 416 n.7 (2003) (reversing dismissal of c.93A claim because "private dispute" exemption does not apply when

---

[22] This Court has already heard and rejected Defendants' 93A argument (that Plaintiffs' claim must be dismissed because Defendants' claim was dismissed) in the course of denying Defendants' motion for judgment on the pleadings. See April 5, 2007 Clerk's Notes regarding April 4, 2007 Order.

there are "multiple corporate entities and business people involved in the extra enterprise dealings. . .").

## IV.   Defendants' Choice of Law Arguments Miss the Mark as There is no Conflict[23]

Defendants again ignore the First Circuit's actual test for conflicts of law. "An initial task of a choice-of-law-analysis is to determine whether there is an actual conflict between the substantive law of the interested jurisdictions." Levin v. Dalva Bros., Inc., 459 F.3d 68, 73 (1st Cir. 2006), citing Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 29 (1st Cir. 1997). "The usual first step in applying conflict of laws principles is to determine whether there is a conflict among the laws of the various states involved." Am. Mgmt. Servs., Inc. v. George S. May Int'l Co., 933 F. Supp. 64, 68 (D. Mass.1996), quoting Lambert v. Kysar, 983 F. 2d 1110, 1114 (1st Cir. 1993). When the controlling law in the two jurisdictions is the same, there is no conflict and there is no need to pursue the choice of law analysis. Id. Without citation, Defendants simply allege that there is a "clear conflict between Massachusetts law and Czech law" and then move on to a choice of law analysis. Memo. at 7.

From the outset of this case, Plaintiffs have asserted that Massachusetts law governs their claims. It is Defendants who have claimed that Czech law applies. See, e.g. July 25, 2005 Opposition to Kotva's Motion to Dismiss [Docket # 18]; March 24, 2006 Opp. at 18-19. As the party claiming that foreign law applies, it is the Defendants' burden to establish that there is an actual conflict. See RESTATEMENT (SECOND) CONFLICT OF LAWS § 136 cmt. f ("Frequently, the

---

[23] Defendants' so-called "summary judgment" motion rehashes the same arguments they made in a "motion in limine" filed on the eve of trial on February 27, 2007. That motion raised for the first time *forum non conveniens* arguments. Revealingly, only after their counterclaims were dismissed did the Defendants even contemplate raising *forum non conveniens*. In any event, Defendants' summary judgment argument suffers from a fatal flaw: they refuse to subject themselves to jurisdiction in any other forum (including the Czech Republic). Thus, Defendants cannot satisfy their burden of showing the requisite adequate, alternative forum. As with their twice-filed--and twice-denied--untimely motion to include an expert witness, and efforts to add previously dismissed counterclaims, Defendants are thwarting the Court's revised schedule by raising this argument again at this late date.

local law of the forum will provide that the party who claims that the foreign law is different

from the local law of the forum has the burden of establishing the content of the foreign law.").

By failing to demonstrate a conflict of law and failing to provide the requisite notice of

their intention to rely on foreign law, Defendants have no right to the application of any law but

the law of the forum. Carey v. Bahama Cruise Lines, 864 F.2d 201, 205-206 (1st Cir. 1988)

(where litigants fail to give proper notice of foreign law, deference to the forum law is

appropriate "provided that (a) the forum state bears a reasonable relationship to the dispute, and

(b) the litigants are not conspiring to avoid the policies of any other sovereign whose laws might

otherwise apply to the dispute.").[24] Thus, the Court does not need to determine any unsettled

questions of law because it can apply forum law.

In any event, Defendants have offered no proof of any "unsettled issues" of Czech law

that might be relevant to this case. Plaintiffs' common law claims are garden variety tort claims

encompassed by the Czech Civil Code. Indeed, Defendants have acknowledged that § 424 of the

Czech Civil Code provides liability for damages caused by intentional conduct against good

morals. This provision alone is broad enough to encompass all of Plaintiffs' common law

claims. Memo. at 15. Even in cases where foreign law does apply, moreover, the Court can

choose to apply the law of the forum rather than deal with unsettled issues of foreign law.[25]

---

[24] In Carey, the First Circuit found that the forum state had a reasonable relationship to the dispute because the plaintiffs were United States citizens and the defendant's principal place of business was in New York. Carey, 864 F.2d at 206. In this case, the Defendants' connections to the forum run far deeper. Mr. Weiss is a domiciliary of Massachusetts and his business, Weiss Asset Management, maintains a Boston office. Massachusetts was also the nerve-center from which Defendants hatched and executed their scheme to extort and interfere with Plaintiffs' business. The application of Massachusetts law, therefore, is in harmony with the First Circuit's Carey test.

[25] See Finance One Public Co. Ltd. v. Lehman Bros. Special Fin., 414 F.3d 325, 344 n.6 (2d Cir. 2005) (applying New York law to the question of exercising equitable discretion when neither party had presented evidence of Thai law); Anglo Am. Ins. Group, P.L.C. v. CalFed, Inc., 899 F. Supp. 1070, 1076-1077 ( S.D.N.Y. 1995) (forum state may presume similarity of foreign law in cases where foreign law is unsettled).

## A.   Czech Law Imposes General Liability for Tortious Conduct

Plaintiffs' claims for tortious interference and abuse of process claims are not complicated causes of action. These garden-variety torts are premised upon basic notions of liability and do not conflict with the general standards of liability and damages in the Czech Republic. Under the Czech Civil Code, a person is obliged to behave in such a way that no damage to health, property, nature, and the environment occurs (§ 415); and a person is liable for damage they cause by breaching that legal obligation (§ 420(1)). In addition to this general standard of liability, the Czech Civil Code also imposes liability for anyone who causes damage through the intentional contravention of good morals (§ 424). See relevant sections of Czech Civil Code (translated) attached as Ex. []. If anything, the Massachusetts law at issue may be more difficult to prove, but it is not in conflict with the principles of Czech law.

## B.   Even If Czech Law Applies to Plaintiffs' Common Law Claims, There is no Ground for Dismissal

The only reason Defendants suggest for dismissing Plaintiffs' claims on abstention or *forum non conveniens* grounds is that they might be governed by Czech law. Even if Czech law applied, however, Defendants' argument fails. Defendants' counsel has already represented to the Court that, "[t]he need to apply foreign law . . . . alone is not sufficient to warrant dismissal." March 24, 2006 Opp. at 18 quoting Piper Aircraft Co. v. Reyno, 454 U.S. 235, 260 n.29 (1968). Indeed, the Court informed the parties of as much during the April 4, 2007 pre-trial conference. In opposition to plaintiffs' *forum non conveniens*/international comity motion, Defendants' counsel argued that "abstention and forum non conveniens should be raised at the outset of a lawsuit, or not at all." March 24, 2006 Opp. at 4-5 (emphasis added). Thus, Defendants should be estopped from raising any *forum non conveniens* or abstention arguments on the eve of trial.[26]

---

[26] See Patriot Cinemas, Inc. v. Gen. Cinema Corp., 834 F.2d 208, 212 (1st Cir. 1987) (application of judicial estoppel warranted when "intentional self-contradiction" is being used to obtain unfair advantage) (citation omitted);

Defendants also argued that the federal courts have an "unflagging obligation" to exercise their jurisdiction and that abstention is extraordinary relief which is rarely appropriate.[27] They now ask the Court to abstain from hearing Plaintiffs' claims. On top of completely reversing their position, Defendants fail to acknowledge that there are no parallel proceedings pending between the parties. As for the doctrine of *forum non conveniens*, Defendants previously represented that "the adequacy of the alternate forum is not one of several considerations[,] ...it is a prerequisite to dismissal." March 24, 2006 Opp. at 18 citing Mercier v. Sheraton Int'l, Inc., 981 F.2d 1345, 1349 (1st Cir. 1992). Yet Defendants have refused to submit themselves to the jurisdiction of the Czech Republic. In other words, Plaintiffs have no adequate alternative forum. For that reason alone, dismissal under either *forum non conveniens* or abstention would be inappropriate.[28] Simply put, if Plaintiffs are not allowed to pursue their claims against Defendants here, in what forum are they supposed to seek relief?

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied in its entirety.

---

Elfman v. Glaser, 313 Mass. 370, 376-377 ("proposition that a litigant cannot assume inconsistent and contradictory positions is established by our decisions.").

[27] "Although "[f]ederal courts have the inherent power to stay an action based on the pendency of a related proceeding in a foreign jurisdiction," this power "must be balanced against the federal courts' 'strict duty to exercise the jurisdiction that is conferred upon them by Congress.'" Thus, only in "exceptional circumstances" will a court "decline jurisdiction in the face of this 'virtually unflagging obligation of the federal courts to exercise the jurisdiction given to them.'"

March 24, 2006 Opp. at 9-10 (emphasis added) (citations omitted).

[28] In further opposition to Defendants' motion, Plaintiffs incorporate herein their March 13, 2007 opposition to Defendants' motion in limine, which discusses the choice of law issues in greater detail.

Respectfully submitted,

KOTVA, A.S., SPV CO., AND RICHARD HARAZIM,

By their attorneys,

/s/ Joel G. Beckman
Joel G. Beckman BBO#553086
William C. Nystrom BBO#559656
Daniel J. Pasquarello BBO# 647379
Nystrom Beckman & Paris LLP
10 St. James Ave., 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: August 24, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a caused a copy of the above referenced document to be served by hand delivery upon Terry Dangel, Esquire this 24th day of August, 2007 at 14 Chestnut Street, Boston, MA 02108.

Daniel J. Pasquarello

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 27th day of August, 2007.

/s/ Joel G. Beckman