UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s. and SPV Co., ) | |
| ) | |
| Plaintiffs, ) | Case No. 05-10679-WGY |
| ) | |
| v. ) | |
| ) | |
| ANDREW WEISS and WEISS ASSET ) | |
| MANAGEMENT, LLC ) | |
| ) | |
| Defendants and ) | |
| Counterclaimants, ) | |
| ) | |
| v. ) | |
| ) | |
| KOTVA a.s., SPV Co., and RICHARD HARAZIM ) | |
| ) | |
| Counterclaim-Defendants ) | |
| ) | |
| ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT
## OF UNDSPUTED FACTS PURSUANT TO LOCAL RULE 56.1

Plaintiffs hereby respond to the Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1:

1.    During 2004 and 2005, Kotva a.s. was a Czech joint stock company with its incorporation and primary place of business in the Czech Republic. *See* Am. Compl. ¶¶ 4, 7.

**Plaintiffs' Response:** Admitted

2.    The lawsuits that are the subject of the Amended Complaint were filed in courts in the Czech Republic. *See* Exhibit 1, Am. Compl. ¶¶ 24, 32.

**Plaintiffs' Response:** Admitted

3.    On June 30, 2004, Gilroy, Ltd., a Cyprus company controlled by Vladimir Hoffman, who was affiliated at the time with the defendants as an independent contractor, brought a declaratory rights lawsuit against Kotva a.s. and other Kotva entities in a Court seated in Prague. In October, 2004, Gilroy brought additional lawsuits seeking that a Czech court declare the shares voted by Forminster, Kotva's controlling shareholder, were actually owned, not by Forminster, but by a Czech investment fund called Trend. In December, 2004 and February, 2005, KT, Inc., a Delaware corporation, controlled allegedly by the defendants, brought nearly identical lawsuits in the Czech courts against the same parties seeking the same relief. No money damages, attachments, or injunctions were sought. *See* Exhibit 1, Am. Compl. ¶¶ 24, 32.

Plaintiffs' Response: Disputed. Weiss had entered into a contract with Vladimir Hoffman, a former director of BGO living in Prague, to assist in negotiating the sale of BGO's shares in Kotva and Trend. (Weiss Dep. pp. 146-147; Nikitin Dep. Ex. 2). Weiss also appointed Hoffman to act as his agent in connection with the negotiation of the Kotva shares. (Weiss Dep. p. 148; Nikitin Dep. Ex. 3). Gilroy was controlled by Weiss, not Hoffmann. (Ex. NN). The lawsuits that were filed against Kotva sought to nullify the transfer of Kotva's department store from Kotva to its wholly-owned subsidiary-- which had occurred four years earlier--and to declare that Kotva was the record owner of the property. The effect of those lawsuits would be to unravel the sale of the department store and force a return of the purchase price. (Harazim Dep. 6/27/07 pp. 67, 89; Ex. HH). The suit that Gilroy brought against Forminster is not part of the Complaint and not relevant to this dispute.

2

4.    In connection with the dismissal of the Gilroy lawsuit, the Czech courts awarded approximately $750 to the defendants, including Kotva a.s. under a Tariff procedure which includes any costs, fees, and damages for litigation improperly commenced. *See* Exhibit 7, at 109-10.

> **Plaintiffs' Response:** Disputed.  The award that was made under the Czech tariff
> system did not encompass "damages" that were suffered.  As the order dismissing
> the Gilroy action makes plain, the tariff award includes "costs" not damages.
> (September 20, 2005 Order dismissing Gilroy action).

5.    The purchase price for the Kotva Department Store did not change in amount from June, 2004 to the closing. *See* Exhibit 3A, at 183-85.

> **Plaintiffs' Response:**  Admitted.

6.    By October 2004 the parties (Kotva and Markland) had worked out modifications to the original escrow agreement, allowing a portion of the sale proceeds to be set aside pending resolution of the dissident shareholders' lawsuits.  The agreement provided that any investment use of the escrow money flowed to Markland, not Kotva. *See* Exhibit 6, Exhibit 8 at p. 4, ¶ 5.

> **Plaintiffs' Response:**  Disputed.  The Escrow Agreement was not signed until
> February 2005.  As of November 2004, Henry Prestage of Markland was still
> negotiating with Kotva to address the problems raised by the Defendants' lawsuit.
> In a November 8, 2004 email to Richard Harazim, Prestage summarized the
> fallout from the Gilroy suit:
>
> > **We have a serious problem.**  Whilst the legal challenge (s) are in place and
> > noted on the cadastral register Markland cannot either take a mortgage over the
> > building or sell it....**Believe me there is no other party in Europe that would
> > now do this deal so Kotva have a major decision to make....**[W]ith the legal
> > challenge on the Cadastral register I am not sure how you could possibly raise the
> > cash to complete a renovation.  You to[o] are severely restricted by this court
> > action. . . .**In effect, your building is currently un-saleable**.

(emphasis in original).

7.      Yet, through no fault of the defendants, the purchase of the Kotva Department Store did not close until March 2005. *See* Am. Compl. ¶ 35.

> **Plaintiffs' Response:** Disputed. It is exactly because of the Defendants that the transaction had to be renegotiated and that no deal was reached until March 2005. *See generally*, Plaintiffs' brief in opposition at 8-10.

8.      The purchase price for the Kotva Department Store in March 2005 was higher than it would be today. The defendants did not cause the plaintiffs any compensable damages Exhibit 3, at 112-13.

> **Plaintiffs' Response:** Disputed. Defendants' interference has caused Plaintiffs' to suffer more than $9,000,000 in damages to date. *See generally*, Plaintiffs' brief in opposition at 12-13.

## DISPUTED FACTS IN BRIEF

9.      Among the important matters left to be worked out [in June 2004] was the exact form of the transaction, including who the seller would be, and the tax consequences. Memo. at 3.

> **Plaintiffs' Response:** Disputed. In June 2004, only one open issue remained concerning an uncomplicated change to the structure of the purchase that Markland had requested. (Harazim Dep. 2/22/06 pp. 189-191; 1/23/07 pp. 141-142; 6/27/07 p. 50).

10.    Another was that a separate shareholder, James Woolf, a substantial property holder in Prague and a bitter minority shareholder of Kotva had commenced a series of case and an international arbitration involving many of the same facts as those alleged in the Gilroy case. Memo. at 3.

> **Plaintiffs' Response:** Disputed. James Woolf made a threat but never filed any case, claim, or civil charge against Kotva. (Richard Harazim Dep. 2/22/06 pp. 88-93).

11.    In September, 2004, with the form of the transaction still not finalized, Markland informed Kotva's management that it was concerned enough about the lawsuits to consider withdrawing from the proposed transaction. Thereafter, Kotva's management swore out a criminal complaint against Andrew Weiss and Vladimir Hoffman. Memo. at 4.

> **Plaintiffs' Response:** Disputed. The criminal complaint was filed by Kotva on August 27, 2004. (Harazim Dep. 2/23/06 p. 259). Kotva's management did not swear out the criminal complaint; the Board of Directors made that decision. (Id. at 277, 293-295).

12.    Shortly thereafter, Kotva, SPV Co and the in-between partnership, Kotva Nemovitosti - - all under the control of Richard Harazim and Martin Benda - - met in contemplation of this case and decided that the "spoils," as it were, from proceeding against the defendants should be divided as they chose later. Thus, it had apparently resolved as of that time to bring the lawsuit as a hedge if the Markland deal fell apart or to seek damages from an alleged shortfall from the escrow agreement if the deal proceeded. Memo. at 4.

**Plaintiffs' Response:** Disputed. The October 2004 assignment document speaks

for itself. That document actually says:

> Regarding potential costs, the participants have agreed that they will be
> borne by that company in the Kotva concern for which will be the most
> advantageous for whatever reason. After the final and conclusive end of
> the proceedings in question, the costs will be fairly settled between the
> companies in the concern. The same will apply for the recovery of any
> damages or their parts.

(October 4, 2004 Record of Meeting attached as Ex. 2 to Defendants' Rule 56.1
Statement).

13.    The Amended Complaint purports to assert seven counts against Defendants.

However counts I to III and VI have been "omitted," left as placeholders for counts dismissed

from Kotva's original complaint. Memo. at 5.

> **Plaintiffs' Response:** Disputed. The only counts asserted by Plaintiffs that have
>
> been "dismissed" were Counts II and III. On the eve of trial earlier this year,
>
> Plaintiffs unilaterally decided not to pursue Counts III and VI and therefore did
>
> not include them in the Amended Complaint.

14.    In an effort to bolster the criminal charges against Andrew Weiss and Vladimir

Hoffman, Martin Benda taped conversations he participated in with Vladimir Hoffman and

Ondrej Peterka, the Weiss Parties' lawyer in the Czech Republic.

> **Plaintiffs' Response:** Disputed. After the criminal complaint was filed in
>
> August 2004, the Czech police conducted an investigation of Andrew Weiss and
>
> his associates. The investigation included court-approved wire taps and other
>
> surveillance. (Ex. U). As part of that investigation, Mr. Benda was asked to wear
>
> a wire to certain meetings with the Defendants' associates. (Benda Dep. 1/22/07
>
> pp. 111-114).

15.    The lawsuits did not seek damages or a higher price for stock, an injunction, an asset transfer, or an asset freeze. What was sought was a declaration that the transfer of the Kotva shares to Forminster, creating a majority interest in Kotva, were not legal and, [Peterka] testified this is not process. Memo. at 8-9.

> **Plaintiffs' Response:** Disputed. The Gilroy lawsuit sought to nullify the transfer of Kotva's department store and declare that Kotva was the record owner. The effect of this relief would be to unravel the deal. (Harazim Dep. 6/27/07 pp. 67, 89). The lawsuits at issue have nothing to do with Forminster.

## PLAINTIFFS' STATEMENT OF DISPUTED FACTS

## MATERIAL FACTS IN DISPUTE[1]

### The May 12th 2004 Meeting and Defendants' Blackmail Threats

On May 12, 2004, after rumors of a potential sale of the Kotva department store surfaced in the press, Andrew Weiss, and Vladimir Hoffman[2] met with Kotva executives, Richard Harazim and Martin Benda, in Prague. (Weiss Dep. 1/25/07 pp. 184-185). At the May 12th meeting, Weiss demanded to know the status of the sale. (Harazim Dep. 2/22/06 pp. 212-214). Messrs. Harazim and Benda refused to confirm or deny the press reports, explaining that they could not divulge such confidential insider information unless it was disclosed to all Kotva shareholders. (Harazim Dep. 1/24/07 pp. 448-449; Harazim Dep. 2/23/07 p. 248). Weiss then

---

[1] In support of this opposition, Plaintiffs rely upon the deposition testimony of Andrew Weiss ("Weiss Dep."), Richard Harazim ("Harazim Dep."), Aidan Scully ("Scully Dep."), Martin Benda ("Benda Dep."), Georgiy Nikitin ("Nikitin Dep."), and Howard Golden ("Golden Dep.") and certain documentary evidence. The relevant deposition transcripts and corresponding deposition exhibits are attached as Exhibits A-R, respectively, to the Transmittal Declaration in Support of Plaintiffs' Opposition to Motion for Summary Judgment. The documentary evidence attached to the Transmittal Declaration shall be cited herein as "Ex. __."

[2] Weiss had entered into a contract with Vladimir Hoffman, a former director of BGO living in Prague, to assist in negotiating the sale of BGO's shares in Kotva and Trend. (Weiss Dep. pp. 146-147; Nikitin Dep. Ex. 2). Weiss also appointed Hoffman to act as his agent in connection with the negotiation of the Kotva shares. (Weiss Dep. p. 148; Nikitin Dep. Ex. 3).

demanded that Kotva purchase BGO's Kotva shares or he would use "every means" to "stop the sale"[3] of the department store. (Harazim Dep. 2/22/06 pp. 123-124; Harazim Dep.2/22/06 p. 213) ("if you don't buy my shares, I will block the sale of the building"); (Benda Dep. 1/22/07 p. 88) (Weiss threatened to "block sale of real estate. . .")

Even Mr. Weiss now <u>admits</u> that he demanded a "<u>pay off</u>" for his Kotva shares at the May 12th meeting.[4] Weiss also threatened to file lawsuits against Kotva. (Harazim Dep. 1/24/07 p. 450). Weiss threatened to stop the sale by discrediting Kotva's trustworthiness so that no potential buyers would consider purchasing the department store. (Harazim Dep. 2/22/06 pp. 123-124; Harazim Dep. 2/22/06 pp. 216-217). In addition, Weiss threatened to file criminal charges and report the charges in the media. (Benda Dep. 1/22/07 p. 88; Harazim Dep. 2/22/06 p. 224). Weiss also stated that a payoff of $4 million was not enough and, as time went by, his price demands would increase. (Harazim Dep. 2/22/06 p. 22).

In response to Weiss's threats, Mr. Harazim explained at the May 12th meeting that Kotva had no interest in purchasing BGO's shares and, in fact, it was not permissible under Czech law for Kotva to buy back its own shares. (Harazim Dep. 2/23/06 pp. 245-248). Mr. Harazim also advised at the May 12th meeting that such threats to force Kotva to pay off Weiss were illegal. (Harazim Dep. 2/22/06 p. 215). As described below, when Kotva did not capitulate to Weiss' demands, he followed through with each and every one of his blackmail threats.[5]

---

[3] Weiss also admitted in an email (dated May 20, 2004) that he wanted to "stop the deal" with Markland. (Weiss Dep. Ex. 14).

[4] Mr. Weiss first testified under oath that he would "never would use the word payoff." (Weiss Dep. 1/25/07 p. 263) When shown an email that he had sent to an investor in which he described demanding a pay off, Weiss changed his testimony and admitted that he demanded a "pay off" at the May 12th meeting. (Weiss Dep. p. 266-267, Weiss Dep. Ex. 11).

[5] In addition to filing civil lawsuits, Weiss had his Czech lawyer file a criminal complaint against Richard Harazim; this complaint was investigated and terminated. (Harazim Dep. 2/22/06 pp. 134-135). Weiss also contacted the Wall Street Journal, New York Times, and members of the U.S. government to discredit Kotva's executives,

**Defendants Follow Through on Their Blackmail Threats to Stop the Sale**

After the May 12th meeting, in June 2004, Weiss retained Ondrej Peterka, a Czech attorney.[6] (Weiss Dep. p. 296; Andrew Weiss Second Supplemental Response to Kotva's First Set of Interrogatories No. 3 dated October 20, 2006). On June 23-24, Gilroy, Ltd. a Cyprus shell company, purchased 135 nominal shares of Kotva. (Answer, ¶23). Messrs. Weiss, Hoffman and Peterka made the decision to file a complaint challenging the title to the Kotva Department Store on behalf of Gilroy. (Weiss Dep. 1/25/07 p. 299).

On June 30th, the Gilroy lawsuit, styled as an "action to determine the ownership of real property" was filed against Kotva and its wholly owned subsidiaries (Kotva Nemovitosti ("KN") and SPV KN), claiming that Kotva was the owner of the department store rather than Kotva's wholly owned subsidiary (which was planning to sell the building to Markland). (Gilroy Complaint, K0250; Ex. V). The Gilroy lawsuit sought to declare the transfer of the department store from Kotva to its subsidiary "null and void," and that Kotva (the parent) was the sole owner of the property, not its subsidiary. (Gilroy Complaint, K0264; Ex. V).[7] In addition, on the very day of the filing of the lawsuit, Gilroy filed an application with the Cadastre (deed registry) requesting that a note be made on the title for the department store, thus clouding the title, and making it impossible to mortgage the property. (Harazim Dep. 1/23/07 p. 148).

---

including making outrageous and defamatory allegations that Mr. Benda had bragged about killing a Czech police officer, and that Kotva's executives were members of the Russian mob. (Weiss Dep. 1/25/07 pp. 60-61; 65; 73-74).

[6] Weiss first testified under oath that "Peterka has never been retained by me personally." (Weiss Dep. 1/25/07 p. 292). When confronted with his answers to interrogatories, he changed his testimony, again. (Id. at 296). In connection with Weiss' initial client conference with Peterka, Mr. Hoffman's own handwritten notes state: "1) Block the deal with the Irish." (Ex. AA) (emphasis added).

[7] Kotva, however, had transferred the department store to the subsidiary four years earlier (in November 2000) in a publicly disclosed and shareholder approved transaction, and pursuant to the recommendations of Ernst & Young. (Plaintiff's Answers to Defendants' Second Set of Interrogatories, No. 1, dated September 5, 2005; Harazim Dep. 2/22/06 p. 166, 171-174). In other words, the transfer was accomplished four years before Gilroy became a shareholder of Kotva. On September 20, 2005, the Czech court dismissed the lawsuit because Gilroy did not own the shares at the time of the transfer and thus had no standing to sue. (Ex. W).

As Richard Harazim testified, the Gilroy lawsuit was designed to pressure Kotva into purchasing BGO's shares.[8] (Harazim Dep. 2/23/06 p. 251). As Kotva's executives had explained from the outset at the May 12th meeting, Kotva was not interested in purchasing the shares, had no obligation to purchase the shares, and was not permitted by law to purchase more than 10% of its own shares. (Harazim Dep. 2/23/06 pp. 247-248; (Ex. FF). In response, Weiss tortiously interfered with the department store sale to create leverage and force a "pay off." Weiss <u>admitted</u> in his deposition that, prior to the lawsuits being filed, he discussed with Mr. Hoffman the advantages of interfering with the sale to Markland. (Weiss Dep. pp. 434-435; 441). Similarly, Georgi Nikitin, Weiss' associate, and a director, and officer of KT, Inc., (the Delaware shell company that subsequently filed an identical lawsuit against Kotva), discussed with Mr. Weiss the option of stopping the sale of the department store:

> A.  . . . <u>I think we spoke about the fact that if he filed these lawsuits, its likely to affect the sale</u>.
> ***
> Q.  So one of the possible consequences you discussed was that the sale may be postponed?
> A.  Or cancelled.

(Nikitin Dep. pp. 108-112) (emphasis added).

## Defendants Contact Markland Directly to Intimidate and Interfere with the Sale

Not satisfied with clouding the title by filing the sham Gilroy lawsuit, Weiss and his cohorts increased the pressure and directly contacted Markland to interfere with the sale. On the very day that the Gilroy lawsuit was filed, Weiss's counsel, sent a copy of the Gilroy complaint to Markland's business lawyer working on the sale, and to Markland's senior person handling the negotiations. (Nikitin Dep. Ex. 44; Harazim Dep. 1/24/07, p. 459). Vladimir Hoffman also

---

[8] The scenario is akin to someone demanding that you buy a car from them for $200,000, even though you do not want to buy the car or have any obligation to do so. After you refuse to buy the car, the "seller" finds out you are in the process of selling your house and files a sham lawsuit challenging the title to your home, which he knows will interfere with your ability to sell the house. The "seller" then continues to pressure you to buy the car in exchange for dropping the sham lawsuit.

called Markland raising questions about the sale. (Ex. EE; Harazim Dep. 1/24/07 p. 459). In addition, Weiss sent correspondence to Markland's lender on the department store deal, Anglo Irish Bank. (Scully Dep. 5/26/06 pp. 136-137). As Markland's senior director testified, contacting the lender put the entire deal at risk (Scully Dep. 5/26/06 p. 137) and, as described below, blew up the sale agreed upon between the parties.

## Defendants Ever Increasing Blackmail demands

In August 2004, with the Gilroy lawsuit in place, Weiss directed Hoffman, his agent in Prague, to demand a written offer from Kotva to purchase BGO's Kotva shares. (Nikitin Dep. Exs. 11 and 13). Pursuant to Weiss's request, at a meeting in August 2004, Mr. Hoffman demanded that Kotva purchase BGO's Kotva's shares in exchange for withdrawing the Gilroy lawsuit. (Harazim Dep. 2/23/06 pp. 259-260; 267). Between August and December 2004, Andrew Weiss made ever increasing price demands upon Kotva to purchase BGO's Kotva shares in exchange for dropping the Gilroy lawsuit, while all along denying that he exerted control over Gilroy or the Gilroy lawsuit. (Ex. Y; Defendants' Answer to Complaint, 6/15/05 ¶¶27-30; Harazim Dep. 1/23/07 p. 49; Harazim Dep. 2/22/06 pp. 121-122). Indeed, in August 2004, Weiss demanded 131 million CZK for BGO's Kotva shares. (Id., Weiss Dep. 494-495). By November 2004, Weiss was demanding almost 295 million CZK ($12 million USD) from Kotva in exchange for purchasing its shares in Kotva, and another Czech investment fund called Trend. (Id.). (Revealingly, BGO had internally valued the shares in Kotva and Trend at only $1.5 million, yet was demanding $12 million from Kotva). (Weiss Dep. 1/26/07 p. 481). Mr. Hoffman was recorded in a telephone conversation with Georgi Nikitin, Weiss's associate, expressing concern for demanding too much for the Kotva shares:

> I think we cannot go and say that we want, you know, full NAV [net asset value of Kotva] plus we want even more for that, you know, that is blackmail.

(Howard Golden Dep. dated 4/17/07 at p. 4) (emphasis added).

## Weiss's Attempt to Divert the Department Store
## Sale Proceeds in Exchange for Dropping the Litigation

In October 2004, Vladimir Hoffman and Ondrej Peterka on behalf of Weiss asked that a

portion of the sale proceeds for the department store be paid <u>directly</u> to BGO for its Kotva shares

(Nikitin Dep. Exs. 31 and 35; Harazim Dep. 1/23/07 pp. 100-101). On October 18, 2004,

Hoffman and Peterka met with Kotva executives and Markland's representative, Henry Prestage.

(Nikitin Dep. Ex. 35). At the October 18th meeting, both Peterka and Hoffman stated that if a

deal could be reached regarding the purchase of BGO's Kotva shares, Gilroy would drop its

lawsuits. (Harazim Dep. 1/23/07 pp. 100-102). Similarly, Mr. Weiss admitted in his deposition

that he was always willing to accept "a proportional share payoff of the cash" from the

department store sale. (Weiss Dep. 1/25/07 pp. 288-289). Moreover, Weiss admitted that if he

had received the payoff, he would have dropped the lawsuits. (Weiss Dep. pp. 487-488; 499-

500).[9]

## The Filing of the KT Lawsuit

In December 2004, KT, Inc. filed a lawsuit against Kotva and its subsidiaries identical to

the Gilroy lawsuits. Weiss denied any connection to KT. (Ex. CC). Mr. Weiss was lying. In

fact, he had set up KT as a Delaware shell corporation; he was a director of KT and he had

authorized and approved of the filing of the lawsuit on behalf of KT (Harazim Dep. 2/23/07 p.

---

[9] A shareholder in a publicly traded company is not entitled to a percentage of the proceeds from the sale of a
corporate asset. (Nikitin Dep. p. 323) (e.g. If IBM sells one of its office buildings, an IBM shareholder has no
legitimate basis to demand a cut of the sale proceeds). Rather, as in the case of Kotva, if Kotva's shareholders voted
to liquidate the company and distribute the department store proceeds, then Kotva's shareholders would receive a
proportional distribution of cash. In the summer of 2005, however, Kotva's shareholders voted <u>against</u> liquidating
the company and distributing the sale proceeds. (Harazim Dep. 2/22/06 p. 178; Benda Dep. 1/22/07 pp. 145-146).
Moreover, BGO, Weiss' fund also voted <u>against</u> the liquidation and distribution. (Harazim Dep. 2/22/06 p. 178). In
short, Weiss had no legitimate basis to interfere with the sale to Markland and demand a "pay off" from the
department store proceeds.

12

379; Weiss Dep. 1/26/07 p. 382 and 534; Nikitin Dep. 1/16/06 p. 84). Not surprisingly, KT was a mere shell company with no assets or employees. (Weiss Dep. 1/26/07 pp. 379-381; Nikitin Dep. 11/16/06 pp. 145-146). Simply put, if the litigation is legitimate, why deny your involvement?

## Impact on the Sale to Markland

After negotiating for almost eighteen months, Kotva and Markland were ready to close the deal for the sale of the department store in the summer of 2004. (Harazim Dep. 1/23/07 pp. 141-142; Harazim Dep. 6/27/07 p. 50; Ex. DD). Due diligence had been completed, and only one open issue remained concerning an uncomplicated change to the structure of the purchase that Markland had requested. (Id.; Harazim Dep. 2/22/06 pp. 189-191). On the eve of closing, however, Defendants filed the Gilroy lawsuit to stop the transaction. (See Gilroy Complaint; Scully Dep. 5/26/06 at 84. The original deal, under which Kotva was to receive more than 1.5 billion Czech korunas ($65,000,000 USD) at the closing was dead. The parties now faced six to nine months of renegotiations and delay. (Harazim Dep. 6/27/07 p. 47-48).

As a result of the Gilroy lawsuit and the filings made on the title at the Cadastre (land registry) the department store could not be pledged and no buyer could obtain financing to purchase the store. (Harazim Dep. 2/22/06 p. 91; Harazim Dep. 6/27/07 p. 49; Scully Dep. 5/27/07 pp. 142-143). In a November 8, 2004 email to Richard Harazim, Henry Prestage of Markland summarized the fallout from the Gilroy suit:

> **We have a serious problem.** Whilst the legal challenge (s) are in place and noted on the cadastral register Markland cannot either take a mortgage over the building or sell it....**Believe me there is no other party in Europe that would now do this deal so Kotva have a major decision to make**....[W]ith the legal challenge on the Cadastral register I am not sure how you could possibly raise the cash to complete a renovation. You to[o] are severely restricted by this court action. . . .**In effect, your building is currently un-saleable.**

(emphasis in original) (Ex. II). Indeed, Markland's lender refused to provide financing unless Markland's shareholders provided personal guarantees. (Ex. MM). Markland's position was clear and unwavering: "there can be no room for blackmailers. To sort [the Gilroy lawsuit] out it needs to go through the courts and be defeated." (Ex. DD ). To further complicate matters, after five months of renegotiations caused by the Gilroy suit, Defendants then caused the KT suit to be filed in December 2004, resulting in yet more delays and negotiations. (Harazim Dep. 2/22/06 p. 200; Harazim Dep. Ex. 21). At several points during the renegotiations, the deal almost collapsed. (Harazim Dep. 6/27/07 pp. 83-84, 86-87; Scully Dep. 5/26/06 at 135-137). Markland initially demanded that the entire purchase price be held in escrow until the Gilroy case was resolved.[10] Ultimately, Markland and Kotva struck a new deal whereby Kotva would receive only two-thirds of the purchase price ($41 million USD) at closing, and one-third ($24 million USD) would be held in escrow until the final disposition or withdrawal of the Gilroy (and later KT) lawsuits. (Harazim Dep. 6/27/07 p. 27). As noted above, the original deal called for Kotva to receive all of the sale proceeds at closing. (Id.). While Kotva succeeded in negotiating a reduced escrow, Markland insisted and prevailed upon a substantial escrow amount, payment of its litigation costs from the escrow, and only low-risk investment vehicles for the escrowed funds that are easily accessible. (Ex. KK; Harazim Dep. 6/27/07 pp. 16, 18, 36, 39-41, 63-64). The amount and terms of the escrow was changing by the catastrophic effect the Gilroy and KT lawsuits would have if successful--the unraveling of the deal and return of the purchase price). (Harazim Dep. 6/27/07 pp. 67, 89; Ex. HH).

In the wake of the filing of the KT and Gilroy lawsuits, Markland's lawyers in Prague and Dublin (as well as its lenders' counsel) scrutinized the lawsuit allegations, and ultimately

---

[10] "The simplest way forward is to close now, retain the money in escrow and for you to defeat the court case asap....The funds could then be released as the claim is gone and there is no precedent set for further spurious claims."). (7/30/04 email from Henry Prestage) (Ex. DD).

advised Markland that the lawsuit allegations were without merit, and Markland agreed to proceed with the transaction, but only if the escrow benefiting Markland was in place. (Exs. GG and HH). The new deal between Kotva and Markland was not consummated until March 2005, nine months after the parties expected to close. (Harazim Dep. 1/23/07 pp. 141-142; Scully Dep. 5/26/06 p. 134). In short, this delay was the direct result of Defendants' blackmail and interference with the sale. (Id.).

Respectfully submitted,

KOTVA, A.S., SPV CO., AND RICHARD HARAZIM,

By their attorneys,

/s/ Joel G. Beckman
Joel G. Beckman BBO#553086
William C. Nystrom BBO#559656
Daniel J. Pasquarello BBO# 647379
Nystrom Beckman & Paris LLP
10 St. James Ave., 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
Dated: August 24, 2007           (617) 778-9110 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a caused a copy of the above referenced document to be served by hand delivery upon Terry Dangel, Esquire this 24th day of August, 2007 at 11 Chestnut Street, Boston, MA 02108.

Daniel J. Pasquarello

15

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 27th day of August, 2007.

/s/ Joel G. Beckman