UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KOTVA a.s. and SPV Co., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 05-10679-WGY |
| v. | ) | |
| | ) | |
| ANDREW WEISS and WEISS ASSET | ) | |
| MANAGEMENT, LLC | ) | |
| | ) | |
| Defendants and | ) | |
| Counterclaimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KOTVA a.s., SPV Co., and RICHARD HARAZIM | ) | |
| | ) | |
| Counterclaim-Defendants. | ) | |

## TRANSMITTAL DECLARATION OF COUNSEL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

I, Daniel J. Pasquarello, hereby depose as follows:

1.    I am counsel to plaintiffs Kotva a.s. and SPV Co. in this matter.  I submit this affidavit in support of Plaintiffs' Opposition to Motion for Summary Judgment.

2.    Attached hereto as Exhibit A is a true and accurate copy of the relevant pages from the deposition transcripts of Richard Harazim dated February 22 and 23, 2006.

3.    Attached hereto as Exhibit B is a true and accurate copy of the relevant pages from the deposition transcripts of Richard Harazim dated January 23 and 24, 2007.

4.    Attached hereto as Exhibit C is a true and accurate copy of the relevant pages from the deposition transcript of Richard Harazim dated June 27, 2007.

5.    Attached hereto as Exhibit D is a true and accurate copy of Exhibit 21 to Mr. Harazim's deposition (labeled by plaintiffs as KC1-1958-KC1-1971).

6.    Attached hereto as Exhibit E is a true and accurate copy of the relevant pages from the deposition transcripts of Andrew Weiss dated January 26 and 26, 2007.

7.    Attached hereto as Exhibit F is a true and accurate copy of Exhibit 11 to Mr. Weiss' deposition (labeled by defendants as W0011547-W0011553).

8.    Attached hereto as Exhibit G is a true and accurate copy of Exhibit 14 to Mr. Weiss' deposition (labeled by defendants WP0000411-WP0000413).

9.    Attached hereto as Exhibit H is a true and accurate copy of the relevant pages from the deposition transcript of Aidan Scully dated May 26, 2006.

10.    Attached hereto as Exhibit I is a true and accurate copy of the relevant pages from the deposition of Georgiy Nikitin dated November 16, 2006.

11.    Attached hereto as Exhibit J is a true and accurate copy of Exhibit 2 to Mr. Nikitin's deposition (labeled by defendants as WP0004292-WP0004294).

12.    Attached hereto as Exhibit K is a true and accurate copy of Exhibit 3 to Mr. Nikitin's deposition (labeled by defendants as WP0006204).

13.    Attached hereto as Exhibit L is a true and accurate copy of Exhibit 11 to Mr. Nikitin's deposition (labeled by defendants as W0001209-W0001210).

14.    Attached hereto as Exhibit M is a true and accurate copy of Exhibit 13 to Mr. Nikitin's deposition (labeled by plaintiffs as K5548-K5549 and K5560-K5561).

15.    Attached hereto as Exhibit N is a true and accurate copy of Exhibit 14 to Mr. Nikitin's deposition (labeled by defendants as WP0002337-WP0002338).

16.    Attached hereto as Exhibit O is a true and accurate copy of Exhibit 35 to Mr. Nikitin's deposition (labeled by defendants as WP0013980-WP0013981).

17.    Attached hereto as Exhibit P is a true and accurate copy of Exhibit 44 to Mr. Nikitin's deposition (labeled by defendants as WP0010188).

18.    Attached hereto as Exhibit Q is a true and accurate copy of the relevant pages from the deposition of Martin Benda dated January 22, 2007.

19.    Attached hereto as Exhibit R is a true and accurate copy of the relevant pages from the deposition of Howard Golden dated April 17, 2007.

20.    Attached hereto as Exhibit S is a true and accurate copy of the Objections and Responses of Plaintiff to Defendants Andrew Weiss, Weiss Asset Management, LLC, KT, Inc., and CVF Investments, Ltd.'s Second Set of Interrogatories to the Plaintiff dated September 6, 2005.

21.    Attached hereto as Exhibit T is a true and accurate copy of Andrew Weiss's Second Supplemental Response to Kotva's First Set of Interrogatories dated October 20, 2006.

22.    Attached hereto as Exhibit U is a true and accurate copy of the Extortion Charge dated February 3, 2005 (labeled by plaintiffs as K0041-K0046).

23.    Attached hereto as Exhibit V is a true and accurate copy of the Gilroy Complaint dated June 30, 2004 (labeled by plaintiffs as K0250-K0265).

24.    Attached hereto as Exhibit W is a true and accurate copy of the Gilroy Decision dated September 20, 2005.

25.    Attached hereto as Exhibit X is a true and accurate copy of the relevant pages of the translated Czech Civil Code, 2005 edition.

26.    Attached hereto as Exhibit Y is a true and accurate copy of the various emails regarding blackmail offers dated August 17, 2004 through January 7, 2005 (labeled by defendants as W0004223-W0004242, WP0000664-WP0000662 and WP0003060-WP0003061).

27.    Attached hereto as Exhibit Z is a true and accurate copy of the email from Andrew Weiss to Vladomir Hoffmann dated December 4, 2003 (labeled by defendants as WP0000133).

28.    Attached hereto as Exhibit AA is a true and accurate copy of the handwritten notes of Vladomir Hoffmann dated June 7, 2004 (labeled by plaintiffs as K8059-K8061).

29.    Attached hereto as Exhibit BB is a true and accurate copy of the letter from Ondrej Peterka on behalf of Gilroy, Ltd. to Henry Prestage dated July 2, 2004 (labeled by plaintiffs as M0066-M0081).

30.    Attached hereto as Exhibit CC is a true and accurate copy of the email from Andrew Weiss to Richard Harazim dated January 6, 2005 (labeled by defendants W0004242).

31.    Attached hereto as Exhibit DD is a true and accurate copy of the email from Henry Prestage to Richard Harazim dated July 30, 2004 (labeled by plaintiffs as K1921-K1923).

32.    Attached hereto as Exhibit EE is a true and accurate copy of the email from Aidan Scully to Frank Walker dated August 11, 2004 (labeled by plaintiffs as M0091-M0092).

33.    Attached hereto as Exhibit FF is a true and accurate copy of the email from Ondrej Peterka to Vladomir Hoffmann dated August 31, 2004 (labeled by plaintiffs as K8051-K8053).

34.    Attached hereto as Exhibit GG is a true and accurate copy of the Memorandum from Bryan Wilson to Markland Holdings Ltd. dated September 16, 2004 (labeled by plaintiffs as M0018-M0021).

35.    Attached hereto as Exhibit HH is a true and accurate copy of the email from Henry Prestage to Richard Harazim dated September 20, 2004 (labeled by plaintiffs as K2197-K2200).

36.    Attached hereto as Exhibit II is a true and accurate copy of the email from Henry Prestage to Richard Harazim dated November 8, 2004 (labeled by plaintiffs as K2293-K2294).

37.    Attached hereto as Exhibit JJ is a true and accurate copy of the email from Andrew Weiss to Richard Harazim dated January 7, 2005 (labeled by defendants as WP0003060-WP0003061).

38.    Attached hereto as Exhibit KK is a true and accurate copy of the Escrow Agreement dated January 26, 2005 (labeled by plaintiffs as KC1-1937-KC1-1957).

39.    Attached hereto as Exhibit LL is a true and accurate copy of the letter from the High State Prosecutor in Prague dated January 31, 2006 (labeled by defendants as WP0013770-WP0013771).

40.    Attached hereto as Exhibit MM is a true and accurate copy of the email from Henry Prestage to Richard Harazim dated September 13, 2004 (labeled by plaintiffs as K2171).

41.    Attached hereto as Exhibit NN is a true and accurate copy of the letter from Andrew Weiss to Boston Private Bank & Trust Company dated July 8, 2004 (labeled by defendants as WP0009192-WP0009194).

42.    Attached hereto as Exhibit OO is a true and accurate copy of Share Purchase Agreement dated December 20, 2004 (labeled by plaintiffs as KC1-2641-KC1-2689).


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 24TH DAY OF AUGUST 2007.

Daniel J. Pasquarello

5

## CERTIFICATE OF SERVICE

I hereby certify that a caused a copy of the above referenced document to be served by hand delivery upon Terry Dangel, Esquire this 24th day of August, 2007 at 11 Chestnut Street, Boston, MA 02108.

_____
Daniel J. Pasquarello

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 27th day of August, 2007.

/s/ Joel G. Beckman

**A**

Page 1

1                               VOLUME 1, PAGES 1 - 234

2                               EXHIBITS 1 - 22

3            IN THE UNITED STATES DISTRICT COURT

4            FOR THE DISTRICT OF MASSACHUSETTS

5                               No. 05-10679-RCL

6    - - - - - - - - - - - - - - - - - - - - - - - -

7    KOTVA a.s.,

8                     Plaintiffs

9            vs.

10   ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,

11                   Defendants

12   _____

13   ANDREW WEISS, WEISS ASSET MANAGEMENT LLC,

14   KT, INC. and CVF INVESTMENTS, LTD.,

15                       Counterclaim-Plaintiffs,

16          v.

17   KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM,

18   FORMINSTER ENTERPRISES, LTC., SPV CO. and

19   JOHN DOES 1-5,

20                       Counterclaim-Defendants.

21   - - - - - - - - - - - - - - - - - - - - - - - -

22      VIDEOTAPED RULE 30(b)(6) DEPOSITION OF KOTVA a.s.

23            BY AND THROUGH RICHARD HARAZIM

24        Tuesday, February 22, 2006 10:02 a.m

Richard Harazim                                                    02/22/2006

Page 18

1   Forminster for your work with respect to the
2   Forminster/Trend settlement?
3        A.   Yes.  I was paid.  I was hired as I had
4   the power to work for them.
5        Q.   Who paid you?
6        A.   The law firm paid me.
7        Q.   With a law firm check?
8        A.   Toman Devaty and Partners.
9        Q.   Did the money come from the law firm's
10  checking account?
11       A.   We are talking about 1998, and I do not
12  remember from which account the money -- I don't
13  remember whose account it was from which I was paid.
14       Q.   Why did a prosecutor block the Forminster
15  shares of Kotva?
16       MR. BECKMAN:  I'm going to again object.
17  This doesn't fall into any of the subject matters of
18  inquiry, and Mr. Harazim as the corporate designee is
19  not prepared to testify with respect to this subject
20  matter.
21       MR. LEIBENSPERGER:  Well, I disagree,
22  Joel.
23       MR. BECKMAN:  Well, point to me where it
24  is, this line of questioning.  It's not, it's not

Page 19

1   covered.
2        MR. LEIBENSPERGER:  Paragraph 8 and
3   Paragraph 10.
4        MR. BECKMAN:  You certainly can inquire
5   about Kotva's relationship with Forminster.  You
6   certainly can inquire about Mr. Harazim's conversations
7   with the press.  But, that's not the line of inquiry.
8        MR. LEIBENSPERGER:  Again, Joel, I don't
9   want to fill the record, but I do need to say this on
10  the record.  If you try to limit the deposition, it
11  will cause Mr. Harazim to have to come back to Boston,
12  and I think that's very disruptive and expensive, and
13  we would seek costs.
14       Furthermore, it makes no sense to even
15  insist on this being only a 30(b)(6) deposition, for
16  two reasons.  First, the 30(b)(6) notice, I believe, is
17  broad enough to cover what we're going to ask, and,
18  second, Mr. Harazim is clearly a principal witness
19  listed by you, and subject to deposition also.  So,
20  enough for the record.
21       MR. BECKMAN:  Well, let me just say
22  Mr. Harazim diligently prepared to testify with respect
23  to the 30(b)(6) notice.  There is no individual notice.
24  And those are the subject matters he will testify, as

Page 20

1   prepared to testify.
2        Q.   My question, sir:  Why did the prosecutor
3   block the shares held by Forminster of Kotva?
4        A.   I can start to speculate, but I was
5   preparing to reply to questions that concerned Kotva,
6   as corporation.  It's quite irrelevant for Kotva -- it
7   was irrelevant for Kotva to know by what means and for
8   what reasons were these shares blocked.
9        Q.   I press my question.  To your knowledge,
10  why did the prosecutor block the Forminster shares?
11       MR. BECKMAN:  Objection, but you may
12  answer, if you know.
13       A.   I do not know exact legal formulation or
14  specification why this was, and I do not know why this
15  would be important.
16       MR. LEIBENSPERGER:  Would you mark this as
17  the next exhibit.
18       (English translation of Document
19  beginning with Bates No. W6430
20  marked Exhibit 2.)
21       MR. LEIBENSPERGER:  I'm sorry, Joel, I'll
22  have to get you a copy.  You can take a look before he
23  does.
24       MR. BECKMAN:  That's okay.  I have a

Page 21

1   question.  There is no Bates number on this.  Was this
2   produced?
3        MR. LEIBENSPERGER:  I don't know for sure.
4        MR. BECKMAN:  Just for the record, I've
5   never seen this document.  I don't think it was
6   produced in this litigation.
7        MR. LEIBENSPERGER:  I believe it's a
8   translation of this document, which I will mark the
9   next exhibit.
10       (Document Bates stamped W6430
11  through W6432 marked Exhibit 3.)
12       MR. LEIBENSPERGER:  I'm sorry.  I did have
13  that.  So, Exhibit 3 is a Czech document starting with
14  Bates No. W6430 that has been produced.
15       Q.   Looking at Exhibit 3, Mr. Harazim, can you
16  identify what that is?
17       THE INTERPRETER:  This is three.
18       MR. LEIBENSPERGER:  Yes.
19       A.   My quick looking at it, I see that one
20  order is being cancelled here.  There was another
21  decision made that limits, that limits disposition of
22  other securities.
23       Q.   Sir, you've seen this order before,
24  correct?

6 (Pages 18 to 21)

Page 22

1    A.  I'm not sure whether I can confirm that I
2  saw exactly this document.
3    Q.  You've seen an order that blocks
4  Forminster's shares in Kotva?
5    A.  I would say it this way:  I know about
6  such an order.  Maybe I have seen it, but it was not
7  important for my work.
8    Q.  I did not ask you whether it was important
9  for your work.
10    MR. BECKMAN:  Just answer the question
11  that he asks.
12    Q.  If you would please go to the last page,
13  which is W6432 --
14    A.  W6432.
15    Q.  -- the last sentence of the -- I direct
16  you -- excuse me.  I direct you to the last sentence of
17  the paragraph at the top of the page, 6432.  Would you
18  please read that sentence outloud?
19    A.  Czech?
20    Q.  Yes.
21    THE INTERPRETER:  I'm sorry.  I lost --
22  which one is that?
23    Q.  Please show the interpreter what sentence
24  you're reading.

Page 23

1    THE INTERPRETER:  This one (indicating)?
2    MR. LEIBENSPERGER:  Yes.
3    Q.  And please read it slowly so the
4  interpreter can interpret it to English.
5    A.  It was, therefore, decided that was -- the
6  order of the center for valuable papers in Prague that
7  cancelled from the day of 11th of March, 1997, and it
8  was decided or a new decision was issued that limits
9  the dealing where they exactly specified securities,
10  which until currently available evidence have a
11  substantial relationship to the pursuit of criminal
12  activities.
13    Q.  Finished?
14    A.  Yes.
15    MR. BECKMAN:  Can we go off the record for
16  a moment here?
17    MR. LEIBENSPERGER:  Yes.
18    MR. BECKMAN:  I want to talk to the
19  witness about an interpretive issue.
20    THE VIDEOGRAPHER:  Going off?  Is that
21  okay?
22    MR. LEIBENSPERGER:  Yes.
23    THE VIDEOGRAPHER:  Going off the record.
24  The time is 10:39 a.m.

Page 24

1    (A recess was taken.)
2    THE VIDEOGRAPHER:  Going back on the
3  record.  The time is 10:42 a.m.
4  BY MR. LEIBENSPERGER:
5    Q.  Referring to Exhibit 3 again, what is the
6  date of this document?
7    A.  It's not very clear, but it's -- it
8  appears that this is 12th of May, 1997.
9    Q.  And does this document concern the
10  prosecution of Mr. Hůlek?
11    MR. BECKMAN:  Objection.  You may answer.
12  If you know.
13    A.  Yes.  It's written down.
14    Q.  The answer is yes?
15    A.  I read from this paper.  Yes, it is a
16  matter of prosecution of Mr. Halek, yes.
17    Q.  Does this document impose an injunction on
18  the Forminster shares -- I'm sorry, the shares that
19  Forminster holds of Kotva?
20    MR. BECKMAN:  Objection.  Calls for a
21  legal conclusion, and object to the form of the
22  question, as well.  There is no foundation.  I don't
23  think Mr. Harazim was -- he might have been in graduate
24  school at the time.

Page 25

1    MR. LEIBENSPERGER:  Please.  No coaching.
2    MR. BECKMAN:  I'm not coaching.  It
3  actually raises an issue we haven't covered.  Do we
4  have the usual stipulations in place or are we, are all
5  objections on the record?  Are you stipulating to?  You
6  didn't mention it at the outset of the deposition.
7    MR. LEIBENSPERGER:  Because the rules
8  apply, but if you want, I don't believe you need to --
9  well, let's put it this way:  I'm happy to stipulate
10  that all objections, except as to form of the question,
11  are reserved.
12    MR. BECKMAN:  Fine.  You had not said so.
13  You had not said so, so fair enough.
14    MR. LEIBENSPERGER:  Good.
15    Q.  Sir, this document imposes an order on
16  Forminster's shares in Kotva, correct?
17    A.  It's -- it's not purchase.  What was
18  the -- restriction on?
19    Q.  I asked you to read the paragraph that
20  imposed an injunction.  With respect to the paragraph
21  that you read into the record, does that apply to
22  Forminster's shares in Kotva?
23    A.  I understand basically the question, even
24  if it was not translated accurately.  From what I see,

Richard Harazim                                                                                          02/22/2006

Page 90

1          MR. LEIBENSPERGER: So, let me show you --
2 let me have this document marked.
3          (E-mail dated October 20, 2004
4 marked Exhibit 10.)
5          MR. LEIBENSPERGER: That's Exhibit 10.
6          COURT REPORTER: Ten.
7 BY MR. LEIBENSPERGER:
8          Q.  Exhibit 10 is an e-mail to you,
9 Mr. Harazim, from Bryan Wilson who is the lawyer for
10 Markland, correct?
11         A.  Yes.
12         Q.  It's dated October 20, 2004. And I direct
13 you to Paragraph 3.
14         A.  Yes.
15         Q.  At this point in time, October 20, 2004,
16 Markland was asking for an indemnity from Kotva parties
17 against any further litigation from Gilroy, Balfinger
18 or James Woolf and DB, which -- is that Deutsche Bank?
19         A.  Yes.
20         Q.  And any related parties, correct?
21         A.  Yes.
22         Q.  And it said, "Such indemnity be satisfied
23 from the money held in escrow and to be held into the
24 outcome" of the litigation of -- "of litigation is

Page 91

1 finalized" --
2          A.  Yes.
3          Q.  -- "as per Gilroy, in the event that
4 litigation is commenced within that 12-month period,"
5 right? Did I read that correctly?
6          A.  Yes.
7          Q.  Okay. So, at this point in time on
8 October 20, 2004, there had been no agreement with
9 Mr. Woolf?
10         A.  Yes. Probably not. Correct.
11         Q.  And at this point in time on October 20,
12 2004, Markland wanted any potential Woolf claim to be
13 dealt with the same way the Gilroy claim was being
14 dealt with in the deal documents?
15         MR. BECKMAN: Objection. You may answer.
16         A.  Well, I think there is a difference. The
17 Gilroy's lawsuit meant that we started to speak about
18 escrow. The initial drafts of the SPA, there was
19 nothing about escrow. There was nothing about
20 litigations. There was nothing about this. Gilroy
21 filed its lawsuit in June, and we started lengthy
22 discussions about what does it mean, how much money in
23 escrow, do we terminate the deal at all? All of this
24 took a lot of time.

Page 92

1          Somewhere in this time, the
2 complication with Deutsche Bank and James Woolf
3 surfaced, and we're talking here only about the cost of
4 litigations. The escrow, as such, was established by
5 the existence of Gilroy.
6          Q.  My question was: At the time of this
7 e-mail, Exhibit 10, Markland was requesting that the
8 claims by Mr. Woolf be treated in the deal documents
9 the same way as Gilroy?
10         MR. BECKMAN: Objection.
11         A.  And I don't think so. There are two
12 issues. One is escrow, as such, and the other is
13 indemnity, okay, and legal costs taken from the escrow,
14 but escrow came first because of Gilroy.
15         MR. LEIBENSPERGER: Let me mark this
16 exhibit as the next one, six days later.
17         (E-mail October 26, 2004
18 marked Exhibit 11.)
19 BY MR. LEIBENSPERGER:
20         Q.  So, Exhibit 11 is an e-mail from
21 Mr. Prestage to you, Mr. Harazim, dated October 26,
22 2004, 6 days later, and in the third paragraph he says,
23 "Bryan has told me that Kotva will not include James
24 Woolf or Deutsche Bank in the indemnity covered by the

Page 93

1 retained escrow money, so our comeback on the Kotva
2 group is nonexistent if these claims are successful.
3 Can you reconsider your position? Can you give us any
4 more comfort that we can consider in an effort to
5 reassure ourselves and our shareholders that our
6 position is reasonably secure?" Did I read that
7 correctly?
8          A.  Yes.
9          Q.  So, Markland was concerned about the Woolf
10 and Deutsche Bank claim. They wanted some assurance
11 with respect to it, correct?
12         A.  Yes.
13         Q.  And you did not want to include the Woolf
14 and the Deutsche Bank claim as part of the escrow?
15         A.  Correct.
16         Q.  Why not?
17         A.  Because there was no claim. There were
18 only threats about a claim. That's Issue No. 1. And,
19 Issue No. 2, the -- there is a tremendous difference
20 between Gilroy and Deutsche Bank and James Woolf.
21 Deutsche Bank and James Woolf existed exactly in the
22 same situation since we ever started to talk to
23 Markland. So, our position was that Markland knew
24 about James Woolf and Deutsche Bank, even as they

24 (Pages 90 to 93)

Richard Harazim                                                                02/22/2006

Page 118

1  will sue?"
2      A.  Right.
3      Q.  Did you say that?  Is that an accurate --
4  well, did you say that to The Prague Post?
5      A.  Yes.  It's here.  Yes.
6      Q.  All right.  And that was an accurate
7  statement?
8      A.  That was an accurate statement, yes.
9      Q.  And then DB ultimately signed an indemnity
10  agreement, taking no money from either you or Markland?
11  Is that your testimony?
12      A.  That's my testimony.
13      Q.  But, instead, they took money from JT
14  Bank?
15          MR. BECKMAN:  Objection.
16      Q.  Can you answer that?
17      A.  As far as I know, they bought assets.  JT
18  Bank bought assets from James Woolf --
19      Q.  And they bought the claim of -- JT Bank
20  bought the claim of Woolf and DB; is that right?
21      A.  JT bought the claim of James Woolf against
22  Trend, yes.
23      Q.  And the claim of DB that had been
24  threatened against you and Markland?

Page 119

1      A.  No.  Wrong.  That claim was never
2  formalized.  There was never an official claim stating
3  because of this and that, we request money.  There was
4  only the letter part.
5      Q.  I didn't ask you whether it was
6  formalized.  I referenced in your Prague Post interview
7  that the claim had been asserted orally to you, and my
8  question is:  Isn't it true that when JT Bank settled
9  with DB and Woolf, they bought off the assertions by DB
10  against Kotva and Markland?
11          MR. BECKMAN:  Objection.  You may answer.
12      Q.  Isn't that true?
13      A.  No.  That's not true.  As far as I know,
14  JT bought the claim against Trend, based on London
15  arbitration, and shares of James Woolf and nothing
16  else.  This claim didn't exist (indicating).
17      Q.  How do you know that's not true if you
18  don't have the settlement agreement between JT?
19      A.  I said as far as I know.
20      Q.  And DB --
21      A.  As far as I know, this is what was sold.
22  And I know that Deutsche Bank never presented any claim
23  against Kotva.  Never.
24      Q.  When you say "presented," you mean

Page 120

1  formally?
2          MR. BECKMAN:  Objection.
3      A.  Yes.
4      Q.  You say in this interview that they made a
5  claim against Kotva, right?
6      A.  Yes.  That's what was so outrageous.
7      Q.  In this Prague Post article, at Page 2,
8  which is W2313, do you see the question by The Prague
9  Post:  "Why do you think these rumors are flying
10  about?"
11      A.  Yes.
12      Q.  Do you see that question?
13      A.  Yes.
14      Q.  Then in the third paragraph of your
15  response, there is a sentence that begins, "The group
16  has been headed by Andrew Weiss, a professor at Boston
17  University."  Do you see where I read that?
18      A.  Yes.
19      Q.  Let me refer you back, actually, to the
20  paragraph before that, referenced as "a group of people
21  who tried to take advantage of our effort to find a
22  suitable investor.  They are a small group -- I'm
23  sorry.  They are a group of small shareholders who we
24  believe are trying to blackmail us.  In our opinion

Page 121

1  they filed a case relating to the legal title of the
2  building just to have leverage enabling them to ask for
3  money in order to get rid of the lawsuits."
4      A.  Yes.
5      Q.  Who are you referring to in that
6  paragraph?
7      A.  I was referring to Mr. Weiss,
8  Mr. Hoffmann, Mr. Strieberg.
9      Q.  And what lawsuits were you referring to?
10      A.  A lawsuit filed by entity named Gilroy.
11      Q.  Were you also referring to lawsuits filed
12  by KT?
13      A.  KT.  It depends on the date.  Yes.
14  February.  Yes.  Gilroy and KT.
15      Q.  Did you believe that Mr. Weiss was the
16  controlling person behind Gilroy, KT?
17      A.  Yes.
18      Q.  At all times you believed that Mr. Weiss
19  was the controlling person behind?
20      A.  Not until --
21          MR. BECKMAN:  Objection.
22      Q.  Let me just finish my question.
23      A.  Not --
24      Q.  That he was the controlling person by

31 (Pages 118 to 121)

Richard Harazim                                                                02/22/2006

Page 122

1  Gilroy and KT?
2          MR. BECKMAN:  Objection.  You may answer.
3          A.  Not until we were told so.  Gilroy filed
4  its lawsuit in June, the 13th.
5          Q.  Mm-hmm.
6          A.  And the identity of the person controlling
7  Gilroy was revealed to us only in August, I would say,
8  during meetings in August, when Mr. Hoffmann revealed
9  that Gilroy is controlled by him on the instructions of
10 Mr. Weiss.
11         Q.  In August, 2004?
12         A.  Yes.
13         Q.  So, from that point on you knew that
14 Mr. Weiss controlled Gilroy?
15         A.  Well, we had the information, but no one
16 could ever prove it, and Mr. Hoffmann told us that
17 there is no way we could prove it, and even the
18 correspondence that we had with Mr. Weiss was to the
19 effect that he doesn't control these two entities.  So,
20 yes, we knew that it was Mr. Weiss.  But, there was no
21 way to prove this.
22         Q.  You believed it was Mr. Weiss?
23         A.  We believed, starting August.
24         Q.  Right.  Then in the next paragraph that I

Page 123

1  began to direct you to about this group has been headed
2  by Andrew Weiss, there is a sentence there that says,
3  "Mr. Weiss met us in spring last year and requested
4  that Kotva buy his shares.  Otherwise, he would prevent
5  us from talking to potential investors."  Do you see
6  where I read that?
7          A.  Yes.
8          Q.  Is that an accurate statement of what you
9  said to the reporter?
10         A.  Yes.
11         Q.  Did you tell the reporter anything else
12 about what happened when you met with Mr. Weiss in the
13 spring?
14         A.  I don't recall.  I think this is pretty
15 much precise.
16         Q.  Precise?
17         A.  As to what I said.
18         Q.  As to what you said.  Well, what did you
19 mean when you said, "Otherwise, he would prevent us
20 from talking to potential investors?"
21         A.  Well, I was relating to the threats that
22 were said at the meeting that if you don't buy shares
23 of BGO, Mr. Weiss would use every means how to stop the
24 sale of the building.

Page 124

1          Q.  But, how does that refer to preventing you
2  from talking to potential investors?
3          MR. BECKMAN:  Objection.
4          Q.  That is my question.
5          MR. BECKMAN:  You may answer if you
6  understand.
7          A.  If you can't sell the building, then there
8  is no need and no use in talking to investors, and also
9  he also referred to discrediting our trustworthiness so
10 that we wouldn't be able to talk to anybody, who would
11 be serious.
12         Q.  There is nothing Mr. Weiss could do that
13 would stop you from talking to investors, right?
14         MR. BECKMAN:  Objection.  You may answer.
15         A.  Well, I think that the results speak for
16 itself.
17         Q.  Well, the results -- well, just first
18 answer my question.
19         A.  Okay.
20         Q.  When the -- the quote is that he would --
21         A.  Stop us.
22         Q.  -- "prevent you from talking."  That's
23 something he couldn't do, right?  You could talk to
24 anybody?

Page 125

1          A.  Okay.
2          MR. BECKMAN:  Objection.
3          Q.  Right?
4          A.  Not if your trustworthiness is discredited
5  to the degree that the investors don't talk to you.
6          Q.  And -- all right.  And when you reference
7  "potential investors," who did you have in mind?
8          A.  I didn't want to reveal how far in the
9  negotiations we were and what exactly is the state, but
10 I meant Markland, first of all.
11         Q.  Okay.  And did you mean anyone else, any
12 other potential investor?
13         A.  There were other interested parties, but
14 this is late -- actually, this is the beginning of
15 2005.  So, we were a few weeks before the closing of
16 the deal with Markland.
17         Q.  All right.
18         (Discussion off the record.)
19         MR. LEIBENSPERGER:  Let's mark this as the
20 next exhibit.
21         (
22              marked Exhibit    .)
23         MR. LEIBENSPERGER:  This is Exhibit what,
24 please?

LegaLink Boston, a Merrill Company
(617) 542-0039

Richard Harazim                                                                    02/22/2006

Page 130

1    A.   I think that it was Mr. Peterka.
2    Q.   Do you know that?
3    A.   I don't know that.
4    Q.   Did anybody tell you that?
5    A.   I don't think that the police tells you
6   who initiated the criminal charge.
7    Q.   My question is more simple.  Did anyone
8   tell you that?
9    A.   I don't recall, no.  I don't think so.
10   Q.   Do you have any evidence that Mr. Peterka
11  caused that criminal investigation to occur?
12   A.   I know documents sent to Supreme State
13  Prosecutor's office, and I presume elsewhere, too,
14  where the criminal charges are raised, yes.
15   Q.   Do you have any evidence that Mr. Peterka
16  caused the particular criminal investigation that was
17  the basis for interviewing you to take place?
18   A.   I don't have evidence, no.  That's just my
19  guess.  I don't have evidence.
20   Q.   Do you know the name of the person, who
21  interviewed you?
22   A.   No.
23   Q.   I asked you about a criminal investigation
24  by the Illegal Proceeds and Tax Crimes of the Bureau of

Page 131

1   Criminal Police and Investigation of the Police of the
2   Czech Republic Cheske Budejovice office.  Does that
3   ring a bell to you?
4    A.   I've never testified in Cheske Budejovice.
5    Q.   Is Cheske Budejovice a location?
6    A.   That is a city.  That is a city a hundred
7   kilometers away from Prague.
8    Q.   And you've never testified in that?
9    A.   No.
10   Q.   Are you aware of an investigation going on
11  there regarding Kotva's sale of -- Kotva's sale of
12  shares to Markland and the movement of the real estate?
13       MR. BECKMAN:  Objection.
14   A.   First of all, there was no sale of Kotva
15  shares to Markland.
16   Q.   Sir, I'm talking in generalities.
17       MR. BECKMAN:  That's -- don't talk in
18  generalities.  That was a compound question.  You need
19  to rephrase your question.
20       MR. LEIBENSPERGER:  All right.  I'll
21  rephrase it.
22   Q.   We'll come back to the deal structure.  I
23  understand who sold shares to whom, but in
24  connection -- are you testifying that you're unaware of

Page 132

1   an investigation in Cheske Budejovice about the
2   transaction where Markland ended up owning the real
3   estate?
4    A.   I can testify I don't know what is the
5   origin of the criminal investigation in frames of which
6   I was interviewed.  I don't know if it originates in
7   Cheske Budejovice or if it originates in Brno, at the
8   Supreme State Prosecutor's office.  I don't know.  I
9   know that I was interviewed in relation to transfer of
10  the building.
11   Q.   All right.  Who else was interviewed in
12  relation to transfer of the building?
13   A.   I don't know for sure.  I think Martin
14  Benda was interviewed, too.
15   Q.   You think he was?
16   A.   I think he was, but I'm not sure.
17   Q.   Other than being interviewed, have you
18  received any other notices or information about that
19  investigation?
20   A.   No.
21   Q.   So, you, since that day you went to be
22  interviewed, have you heard anything else about that
23  investigation?
24   A.   Actually, we received --

Page 133

1        THE INTERPRETER:  It was a decision or
2   resolution.
3    A.   Resolution about terminating one of the
4   criminal charges.  Now, I'm not sure if it was this
5   one.  The one where I was interviewed was terminated,
6   was finished, rejected.
7    Q.   Do you have a copy of the statement you
8   gave to the police in that investigation?
9        MR. BECKMAN:  Objection.  Object to the
10  form of the question.
11   A.   Yes, I do.
12   Q.   Do you have a copy of any notice of
13  termination or resolution?
14   A.   The resolution.  Yes, I do.
15       MR. LEIBENSPERGER:  We request copies of
16  both of those documents.
17       MR. BECKMAN:  Did you ask for them?
18       MR. LEIBENSPERGER:  I now ask for them.
19  Probably the scope of our requests will cover them.
20  But, in any event, I now ask for them.
21       MR. BECKMAN:  Well, we need a document
22  request.
23       MR. LEIBENSPERGER:  No, you don't, under
24  Rule 34, but we'll do it.

LegaLink Boston, a Merrill Company
(617) 542-0039

Richard Harazim                                                                    02/22/2006

Page 134

1  BY MR. LEIBENSPERGER:
2       Q.   You just said you know that one of the
3  criminal investigations was terminated, so what
4  criminal investigations do you know of?
5       A.   I know about just one. I'm a little bit
6  confused. You speak about Cheske Budejovice. Cheske
7  Budejovice is a different region. I know that there
8  was criminal charges brought against me by Mr. Peterka.
9  That is what I know, and I know that I was at the
10 police, and I know that it was terminated.
11       If there's something else, then I'm not
12 aware of it. I've never been contacted. I received no
13 papers. That's all.
14       Q.   I have to go back to your statement that
15 there was a criminal prosecution initiated by
16 Mr. Peterka. I thought we covered that, that you don't
17 know whether it was?
18       A.   That's true. I don't know if this is the
19 criminal proceedings, yes.
20       Q.   Do you know of any criminal proceedings
21 initiated by Mr. Peterka against you?
22       A.   I know about criminal charges brought
23 against me. Here are the facts: I know that
24 Mr. Peterka wrote to this Supreme State Prosecutor. I

Page 135

1  know I was interviewed by police, and I know that there
2  was a resolution saying nothing happened.
3       I don't know how to fit inside or fit
4  in it the Cheske Budejovice issue. I don't know if I
5  was interviewed in relation to Mr. Peterka's charges or
6  in relation to Cheske Budejovice charges.
7       Q.   All right. Back to the Wall Street
8  Journal article, Exhibit 14 --
9       A.   Yes.
10       MR. BECKMAN: July 18th?
11       MR. LEIBENSPERGER: July 18th. Exhibit 14
12 I think is what I said.
13       Q.   -- the very last paragraph of the article
14 states, "Mr. Harazim defends the sale of Kotva to
15 Markland despite the court order freezing Forminster's
16 shares. The frozen 'shares were not sold,' he says,
17 'merely the assets.'" Did you say that to Mr. Carey?
18       A.   Yes. That, I may have said that, yes.
19 That's what I would say again, yes.
20       Q.   In the paragraph right above that, it
21 says, "Mr. Harazim acknowledged that the transaction
22 leading from Trend to Forminster 'might not be entirely
23 legal when examined all together.' He added, 'Under
24 Czech law ownership is defined by possession.

Page 136

1  Forminster possesses the shares.'" Did you say that to
2  Mr. Carey?
3       A.   I don't know. I have no trust in
4  Mr. Carey, so I don't know. I didn't -- I didn't have
5  tape records of what I said to Mr. Carey. I don't
6  know.
7       Q.   Is it you don't remember whether you said
8  that?
9       A.   It was three hours telephone discussion
10 with Mr. Carey, so I don't know if I said this
11 particular sentence or if I said something else, and if
12 you put it like this, I can only repeat that I have no
13 trust in Mr. Carey.
14       Q.   But, you might have said these quotes to
15 Mr. Carey?
16       MR. BECKMAN: Objection.
17       A.   I might have said. Might have said.
18       Q.   All right. This morning you testified
19 about a period of time when Mr. Golden was on the board
20 of Kotva?
21       A.   Yes.
22       Q.   And it was during that period of time you
23 were on the board of both Kotva and Forminster,
24 correct?

Page 137

1       A.   Correct.
2       Q.   Did you talk with Mr. Golden then about
3  the possibility of Forminster buying the BGO shares?
4       A.   Yes.
5       Q.   What did you say and what did he say about
6  that possibility?
7       A.   Once again, I can't remember what exactly
8  was said, but the principle was that Forminster would
9  buy shares of BGO, and if I remember correctly, there
10 was some option for the shares of Trend on the
11 question. The business terms were agreed in principle,
12 but for some reason, later on the transaction just
13 didn't come through.
14       Q.   Can you place this in time, to the best of
15 your memory?
16       A.   2001.
17       Q.   And what were the business terms that you
18 had agreed upon?
19       A.   I don't remember correctly. Very roughly,
20 I would say that Forminster offered like 50 million,
21 and I don't know if it was for the whole thing or if it
22 was just for the shares of Kotva.
23       Q.   50 million Czech crowns?
24       A.   Czech crowns.

Richard Harazim                                                    02/22/2006

---

**Page 162**

1  A. I asked around, people who were dealing in
2  shares.
3  Q. Like who?
4  A. Well, JT Bank. There is another dealer in
5  securities, Fideja. I asked -- who did I ask? I think
6  that's about it. I asked the people from Fideja,
7  Martin asked them there, maybe asked somewhere else. I
8  don't know.
9  Q. Is Fideja a brokerage company?
10  A. People from Fideja are dealers in
11  securities, yes. I mean I don't know if officially,
12  but the people simply live on dealing with, in
13  securities.
14  Q. Did you know Fideja as being a company
15  associated with Mr. Hßlek?
16  A. No.
17  Q. Did Fideja also have a business
18  relationship with Kotva?
19  A. Business relationship, no.
20  Q. Did they -- strike that. Did they loan
21  money to Kotva?
22  A. There was a transaction that might have
23  happened, but didn't happen. Fideja was basically
24  interested in shares of Kotva since maybe 2002,

---

**Page 163**

1  something like that.
2  Q. They had made that known to you?
3  A. Not on an official basis, no. I just
4  know, because I know people, who know them.
5  Q. But, just to be clear, did Fideja have any
6  financial arrangement with Kotva, either as a lender or
7  in any respect?
8  A. Contemplated.
9  MR. BECKMAN: Objection.
10  A. Contemplated, but something that didn't
11  happen.
12  Q. In December of 2003, did Petr Toman know
13  of the deal with Markland?
14  A. December, 2003. They knew that we were
15  starting to work on SPA, but they knew it I think
16  beginning of summer, when I asked them to provide a
17  draft of SPA, but after they replaced lawyers, so by
18  December of 2003, I don't believe that they were
19  involved in any way.
20  Q. All right. So, Toman and his firm were
21  lawyers for Kotva up to a particular time?
22  A. No. We used them. No.
23  Q. You said that they were involved and then
24  you replaced lawyers. So, what did you mean by that?

---

**Page 164**

1  A. I asked them to provide the first draft of
2  the SPA when it looked like we were principally in
3  agreement with Markland, and we started -- we thought
4  about starting drafting some contracts. I asked
5  Toman's office to provide a draft.
6  Q. And that would be in the Summer of 2003?
7  A. It was in the e-mails. I don't recall the
8  correct. I don't recall precisely the date. But, it
9  could be.
10  Q. Well, if I tell you that the deal to make
11  a deal was October of 2003, does that refresh your
12  recollection of when you were using Toman?
13  A. Well, I know that we started to negotiate
14  with Markland at the beginning of 2003, so I'm weighing
15  how long could we have negotiated without thinking
16  about drafting the first draft, and I think that the
17  negotiations might have been like two, three, four
18  months before we started.
19  Q. In October, 2003, there was a contract
20  entered into with Markland with a draft SPA attached to
21  it. Do you remember that?
22  A. Yes.
23  Q. Do you remember that Toman is the person
24  indicated in that draft to receive notices on behalf of

---

**Page 165**

1  Kotva?
2  A. I don't.
3  Q. Does that refresh your memory that you
4  used Toman up to and through the October, 2003, deal to
5  make a deal?
6  A. No. Toman was replaced much earlier on.
7  We started with the draft from Toman, but from there
8  on, the lawyers working on the contract was Zdenek
9  Kubica and Phillips Mayer. It's different law firms.
10  Q. Why did you change?
11  A. Toman's office?
12  Q. Yes.
13  A. The other guys were cheaper and better.
14  Q. So, Mr. Toman would have been aware by
15  October of 2003 from this work that there was going to
16  be an offer from Markland in roughly 48 million Euro?
17  A. The price was set fairly early. Maybe.
18  Q. To the best of your recollection, would
19  you say he would have known that from the progress of
20  the deal?
21  MR. BECKMAN: Objection. You may answer.
22  A. I'm not sure. I would have to look when,
23  when they finished with their participation in the SPA,
24  but it is possible.

Richard Harazim                                                    02/22/2006

Page 166

1    Q.   All right.
2         (Discussion off the record.)
3         MR. LEIBENSPERGER:  Would you mark this as
4    the next exhibit.
5         (Report from Ernst & Young dated
6    November 23, 2000 marked Exhibit 18.)
7         MR. LEIBENSPERGER:  This is Exhibit?
8         COURT REPORTER:  Eighteen.
9         MR. LEIBENSPERGER:  Eighteen.
10        Q.   Exhibit 18 is a report from Ernst & Young
11   dated November 23, 2000, and it's addressed to you,
12   Mr. Harazim; is that correct?
13        A.   That's correct.
14        Q.   And did the board of Kotva decide to
15   follow the advice that Ernst & Young gave in this
16   report?
17        A.   Yes.
18        Q.   Was there in fact a vote by shareholders
19   to follow the advice given by Ernst & Young?
20        A.   Definitely, I can't tell you the exact
21   date of the general meeting, but there were general
22   meetings when this strategy was approved.
23        Q.   All right.  Let me direct you to the third
24   bullet point on the first page --

Page 167

1        A.   On the first page.
2        Q.   -- where it is said, "It is the intention
3    of the main shareholders to maximize the value of Kotva
4    and to realize the value by distribution thereof to the
5    shareholders within the next two years."  Do you see
6    where I read that?
7        A.   Yes.
8        Q.   When it says "the intention of the main
9    shareholders," does that mean Forminster?
10       A.   Yes.  That means Forminster and BGO.
11       Q.   And how did you become aware of the
12   intention of the main shareholder, Forminster?
13       A.   This is the year 2000.  It's shortly after
14   the settlement agreement, and I said already that the
15   settlement agreement was just a technical measure of
16   how to achieve the sale of the shares of Kotva of all
17   of the shareholders.  Now, because we learned that that
18   was impossible, this should have been a reserve
19   strategy.
20       MR. BECKMAN:  Exhibit 18.
21       A.   Exhibit 18.
22       Q.   When you said "this," you meant
23   Exhibit 18?
24       A.   I'm sorry.  Yes.

Page 168

1        Q.   Did you tell Ernst & Young that the shares
2    of Forminster were blocked?
3        A.   Yes.
4        Q.   So, did Ernst & Young put any -- strike
5    that.  Did that affect the Ernst & Young advice in any
6    way?
7        MR. BECKMAN:  Objection.
8        Q.   To your knowledge?
9        A.   I don't remember.  I don't remember.  Here
10   it says sale of Kotva as a going concern.  I believe
11   that they must have come here to the conclusion that it
12   would be difficult.
13       Q.   Let me -- on Page 2, there is a second
14   bullet point on Page 2 that says, "Value of the land
15   and building together determined by a certified valuer
16   is approximately Czech 2.22 billion."
17       A.   Yes.
18       Q.   What certified valuer does that refer to?
19       A.   That comes from a valuation performed
20   according to administer -- well, there are various
21   norms according to which the value can be established,
22   and I believe that this is -- I believe that this
23   relates to so-called administrative value of the
24   building, which is just an output from using tables and

Page 169

1    norms and then a formalized -- then a formalized
2    procedure.
3        Q.   Who was the certified valuer?
4        A.   I don't remember.  I don't recall.
5        Q.   You don't recall who gave you a valuation
6    of $2.2 billion?
7        A.   Crowns.
8        Q.   I'm sorry, crowns?
9        A.   I don't, because this number is completely
10   irrelevant.  It's an administrative number.
11       Q.   It says, "The value of the land and
12   building together determined by a certified valuer is
13   approximately 2.22 billion crowns," correct?
14       A.   That is correct.
15       Q.   Did you receive any offers from a
16   potential buyer of the land and buildings, other than,
17   other than Markland?
18       A.   I did.
19       Q.   What other offers did you receive?
20       A.   There were many.  None of them even close
21   to what Markland offered.
22       Q.   And was Markland aware of the certified
23   valuer's 2.22 billion Czech crown valuation when it
24   made its offer?

43 (Pages 166 to 169)

Richard Harazim                                                              02/22/2006

Page 170

1    A.   I believe so.  I believe so, because this
2  expert valuation served as a basis for creation of KN,
3  for establishing the basic capital of KN, so in the
4  process of due diligence they must have come across the
5  fact KN had the basic capital of 2.2 billion, and they
6  must have seen the expert valuation, but it has nothing
7  to do with market value.
8    Q.   You would agree -- well, Markland's offer
9  was for approximately 1.5 billion Czech crowns?
10    A.   Correct.
11    Q.   Which you would agree would reflect market
12  value?
13    A.   Yes.
14    Q.   Do you know why the offer by Markland at
15  1.5 billion was 700 million Czech crowns less than the
16  certified valuer's valuation?
17    MR. BECKMAN:  Objection.
18    A.   Well, I think I can explain this, because
19  there were various valuations of the building, and
20  there is even -- it caused us a lot of accounting
21  problems, so I was interested to know how this came
22  into being, and the valuator explained to me that this
23  number is administrative number.  The norms in 2000
24  were different than in 2005, because we did have

Page 171

1  accounting issues when we created SPV KN in 2004 or 5,
2  probably 2004, and the market value of the building was
3  put at 1.3 billion, so it was our question how come,
4  where is the 900 million, and the response was this is
5  administrative valuation.  The other one, the other one
6  was market valuation.  This is according to the norms
7  from 2000.  That was according to the regulations from
8  2004, so this is not even called the market valuation.
9    Q.   Ernst & Young recommended that Kotva
10  contribute real estate to a subsidiary, correct?
11    A.   Correct.
12    Q.   And it recommended that the contribution
13  go to a subsidiary 100 percent owned by Kotva, correct?
14    A.   Right.
15    Q.   Instead of doing that, Kotva contributed
16  to KN, Kotva Nemovitosti, which was not owned
17  100 percent by Kotva a.s., correct?
18    A.   Wrong.
19    Q.   Was it Kotva a.s. only one of the owners
20  of KN, we'll call it?
21    A.   Wrong.
22    Q.   KN changed to become a partnership, as
23  opposed to --
24    A.   That was later on, yes.

Page 172

1    Q.   So, when you say "wrong," initially when
2  the property was transferred to KN, it was 100 percent
3  owned by Kotva a.s.?
4    A.   Yes.
5    Q.   But, the ownership of KN changed, right?
6    A.   The legal structure of KN changed.
7    Q.   Right.  So, Kotva a.s. gave up 100 percent
8  ownership of KN, correct?
9    MR. BECKMAN:  Objection.
10    A.   I don't know how to explain this.
11    MR. BECKMAN:  Yes or no.
12    A.   Well, strictly speaking, yes.  99.8 or
13  something like that, and the rest was owned by entities
14  fully controlled by Kotva.
15    Q.   When KN became a partnership, it was a
16  limited partnership?
17    A.   Comandi cuspolognist [phonetic].
18    COURT REPORTER:  I didn't hear you.
19    A.   That was in Czech.  The same thing CPF
20  used to be with BGO.  That means I think that it's
21  limited partners and unlimited partners.  But, I'm not
22  sure about terminology here.
23    MR. LEIBENSPERGER:  That's all right.
24  Let's go on.

Page 173

1    Q.   When Kotva became a partnership -- strike
2  that.  When KN became a partnership of some sort, there
3  were several entities that had ownership interests; is
4  that right?
5    A.   That's right.
6    Q.   They were all Kotva-related entities?
7    A.   They were all Kotva-owned entities.
8    Q.   Kotva a.s. owned entities?
9    A.   All of them.
10    Q.   Why did the ownership of KN get --
11    THE INTERPRETER:  I have the term if you
12  wish.
13    MR. LEIBENSPERGER:  Please.
14    Q.   Why did the ownership of Kotva KN get
15  separated out into other Kotva owned entities?
16    A.   Because this was the most effective way of
17  how to run the business.  We were faced with the first
18  step was to create two subsidiaries, KN and KO.  KN
19  owned the real estate.  KO was the retail operator.
20  And we were faced with the fact that KN had high income
21  and low expenses, low costs.  On the other hand side,
22  KO, the retail operator, was losing money.  They were
23  in a loss, and the limited partnership enables to
24  transfer part of the profits to the unlimited partner,

44 (Pages 170 to 173)

Richard Harazim                                                    02/22/2006

Page 174

1  which in our case was KO, and, thus, optimize the
2  performance of the company from the point of view of
3  taxes. It's a standard organization.
4         I have to point out that CP have used
5  the same organization structure. I have to say that
6  every major operator in Czech Republic, including
7  Arhol, Globals, use this structure.
8      Q.  You stated a few moments ago that there
9  was a small percentage of ownership of KN that went
10 outside of Kotva?
11     A.  No.
12     Q.  No?
13     A.  No. I just said that Kotva directly had a
14 stake close to 100 percent, and the rest was owned
15 through the remaining subsidiaries of Kotva.
16     Q.  Mm-hmm.
17     A.  Kotva transferred one share to KO, one
18 share to KP, one share to KS. But, this way
19 100 percent owned subsidiaries of Kotva.
20     Q.  All right.
21     A.  And that's why I say that the stake of
22 Kotva was not 100 percent. The remaining two to three
23 shares were owned through 100 percent subsidiaries of
24 Kotva.

Page 175

1      Q.  All right. Let me direct your attention
2  in the Ernst & Young report to Page 5, going onto
3  Page 6?
4         MR. BECKMAN: How are you doing?
5         THE WITNESS: I'm fine.
6      Q.  And I want to direct your attention to
7  Steps 7, 8 and 9 --
8      A.  Right.
9      Q.  -- of its recommendations. Do you want to
10 read those to yourself?
11     A.  No. 7, the closing?
12     Q.  Just read them to yourself to refresh your
13 memory.
14     A.  Yes.
15     Q.  Okay?
16     A.  Yes.
17         MR. BECKMAN: I haven't even read them
18 yet.
19         MR. LEIBENSPERGER: Okay. I'm sorry.
20         MR. BECKMAN: He wants you to read 7, 8
21 and 9.
22     A.  I'm sorry. I read just 7. I don't have
23 to wait. Yes.
24         MR. BECKMAN: Take your time.

Page 176

1         THE WITNESS: Okay.
2      Q.  The Ernst & Young report and its
3  Recommendations 1 through 9 involved a series of
4  transactions that would end with the shareholders of
5  Kotva a.s. getting a distribution for all the proceeds
6  of the sale of the real estate, correct?
7      A.  Yes. Correct.
8      Q.  All right. And it was that plan that the
9  Board of Directors approved, correct?
10     A.  That is correct.
11     Q.  And was it that plan that was presented to
12 the shareholders of Kotva a.s. at a general meeting?
13        MR. BECKMAN: Objection.
14     A.  I don't think that this particular report
15 was presented to shareholders.
16     Q.  I didn't ask whether the report was. Was
17 the plan that the sale of the real estate would result
18 in a distribution of the proceeds to all of the
19 shareholders presented at the general meeting?
20     A.  No. I'm not aware of any such document.
21     Q.  Again, I asked you whether that was what
22 was presented, not a document?
23     A.  I'm not aware that this would have been
24 presented to the shareholders.

Page 177

1      Q.  Even though that was the Ernst & Young
2  recommendation?
3      A.  (Witness nodded.)
4      Q.  You're not aware that it was presented to
5  shareholders?
6      A.  I'm not aware of such a situation.
7      Q.  Now, as we sit here today, the transaction
8  has occurred with Markland, correct?
9      A.  Correct.
10     Q.  And except for the escrow, which we'll
11 talk about, the proceeds have come into Kotva?
12     A.  The proceeds have come to SPV Co., which
13 is a Cypriot subsidiary of Kotva, of Kotva Nemovitosti,
14 I'm sorry.
15     Q.  Is SPV Co. owned 100 percent by Kotva?
16     A.  Yes.
17     Q.  Where, in what company's account are the
18 proceeds held?
19     A.  SPV Co.
20     Q.  And is the money actually held in a bank
21 account by SPV Co.?
22     A.  That's correct.
23     Q.  Has any of it been distributed throughout
24 the rest of Kotva?

45 (Pages 174 to 177)

Page 178

1    A.   No.
2    Q.   Is that -- is there a plan to distribute
3 it to shareholders as recommended by Ernst & Young?
4         MR. BECKMAN:  Objection.  You may answer.
5    A.   The plan, I'll say it in a different
6 manner.  In summer, 2005, a general meeting of Kotva
7 was held, and one of the points on the agenda was a
8 decision about liquidation of Kotva and distributing
9 proceeds to the shareholders.  That's a decision that
10 cannot be done by the management of the company.  This
11 is a decision that the shareholders must do.  Everyone
12 at the meeting, including BGO, voted against.
13   Q.   Who voted on behalf of BGO?
14   A.   I don't know.
15   Q.   How do you know BGO voted?
16   A.   Because I checked.
17   Q.   What did you see?
18   A.   They voted against.
19   Q.   No.  What did you see by way of a
20 document?
21   A.   The voting, what is it?
22        THE INTERPRETER:  Ballot.
23   A.   I'll put it in a different manner.  I
24 asked our lawyers what was the vote of BGO in the

Page 179

1 general meeting, where we proposed to liquidate the
2 company and distribute the proceeds to the
3 shareholders.  The answer was they voted against, and I
4 didn't check personally how they came to it.
5    Q.   So, you, personally, didn't either see a
6 document in that regard or --
7    A.   No.
8    Q.   -- or see a person make that vote?
9    A.   I asked lawyers.
10   Q.   All right.  Did Forminster, how did
11 Forminster vote with respect to that?
12        MR. BECKMAN:  Objection.
13   A.   Forminster didn't vote.
14        MR. BECKMAN:  You may answer.
15   A.   Forminster didn't vote, because it doesn't
16 execute its voting rights.
17   Q.   Because what?
18   A.   It doesn't execute voting rights to the
19 shares.
20        MR. BECKMAN:  Execute.
21        THE WITNESS:  Execute.  I'm sorry.
22   Q.   Why doesn't it execute voting rights?
23   A.   Because the shares were incorporated into
24 the bankruptcy estate of Sprint.

Page 180

1    Q.   Did Sprint vote the Forminster shares?
2    A.   Sprint, as far as I know, voted against.
3    Q.   Voted against liquidation?
4    A.   (Witness nodded.)
5    Q.   And, again, is it --
6         MR. BECKMAN:  You have to answer yes or
7 no.
8    Q.   Your answer to that is yes?
9         THE WITNESS:  I'm sorry?
10        MR. BECKMAN:  You have to answer yes or
11 no.
12   A.   They voted against, so I don't know what
13 the answer -- what the question was.
14   Q.   All right.  Sprint voted against
15 liquidation, correct?
16   A.   That is correct.
17   Q.   All right.  And you know that by the fact
18 that the lawyers told you that?
19   A.   Yes.
20   Q.   So, what is the current plan for Kotva if
21 it's not going to liquidate?
22   A.   The general meeting voted in favor of
23 defining a new business plan for the company and
24 continuing its enterprise.

Page 181

1    Q.   In what business?
2    A.   That's up to the Board of Directors to
3 present, because the company went through an abrupt
4 change.  The company was used to hold the department
5 store.  Now, it sits in a bank account.  So, it's in a
6 completely new situation, and it's up to the Board of
7 Directors to formulate a new way forward.
8    Q.   And the proceeds from the sale sit in a
9 bank account of SPV Co.?
10   A.   Yes.  Correct.
11   Q.   In Cyprus?
12        MR. BECKMAN:  Objection.  You don't have
13 to answer that.
14        MR. LEIBENSPERGER:  Well, you do have to
15 answer that.
16        MR. BECKMAN:  No.
17   Q.   Does it sit in a bank account in Cyprus?
18        MR. BECKMAN:  I'm instructing you not to
19 answer that question.  This is the subject for the
20 motion for protective order which we are taking up to
21 Judge Lindsay.
22        MR. LEIBENSPERGER:  The discovery master
23 has ruled that you should answer it, so you can follow
24 the instructions of your lawyer or not, but I'm asking

46 (Pages 178 to 181)

Richard Harazim                                                          02/22/2006

Page 186

1    Q.   So, from the time of the agreement on a
2  future agreement, was it contemplated this deal would
3  close by not later than December 31, 2004?
4    A.   That was the plan.
5    Q.   And was it the estimate that it would take
6  until about December 31, 2004 to close?
7    A.   No.  That was the last possible date for
8  both sides.  The estimate was it would take much less.
9    Q.   There were numerous issues and
10  complications that caused it to be extended; is that
11  right?
12        MR. BECKMAN:  Objection.
13    A.   Well, I wouldn't agree.  No.  There was
14  just one major complication.
15    Q.   You inserted the word "major."  First of
16  all, I ask you what one major complication are you
17  referring to?
18    A.   Gilroy.  Gilroy's lawsuit.
19    Q.   You're not suggesting that it was the
20  Gilroy lawsuit that caused all the time to go by until
21  past December 31, 2004, are you?
22        MR. BECKMAN:  Objection.  You may answer.
23    A.   Well, not all, but the vast majority of
24  the time was lost due to Gilroy.

Page 187

1    Q.   What was the estimated time of closing
2  before the Gilroy lawsuit?
3    A.   This one must be missing here from -- this
4  is December.
5    Q.   Yes.  There is a January '04 document?
6    A.   There is a January '04.
7        MR. LEIBENSPERGER:  We can mark that,
8  also.
9    A.   No, no.  I'm just trying to come to the
10  timeline here.  We were basically ready in, by summer.
11  We were basically ready, and there was just one major
12  thing we would have to resolve without Gilroy, and that
13  was that the Irish requested a change in the structure.
14        That was one thing we would have to
15  resolve, and considered that we had all the business
16  terms, basically everything was agreed on, it was just
17  a question of rewriting who receives the money and
18  this.
19        So, apart from this, I can't recall
20  that any serious, any important objection.
21    Q.   You didn't know about the Gilroy lawsuit
22  until, what, July of 2004?
23    A.   No.
24    Q.   June?

Page 188

1    A.   No.  Gilroy was filed on the 13th of June.
2  Immediately, the day after, Mr. Peterka wrote both to
3  the investors and to us and informed us that there is a
4  lawsuit, questioning the title to the property.  So, we
5  knew the day after.
6    Q.   All right.  So, June.  Mid June, 2004?
7    A.   No.  June.  Gilroy was filed 13th of June,
8  so the first if it's not Saturday or Sunday, the day
9  after in July we knew.
10        MR. BECKMAN:  You said July.
11    Q.   You said July.  You mean June?
12    A.   I'm sorry.  The 13th of June, that is date
13  of filing of Gilroy.
14    Q.   And before the, you learned of the filing
15  of Gilroy, was there a closing date scheduled?
16    A.   I don't think that we set a definite date.
17  But, if you go through the e-mails, you will see that
18  we aimed at something in the summer.
19    Q.   Your best memory of a -- of the date you
20  were aiming at is what?
21    A.   We didn't have any set date.  We didn't.
22    Q.   And you still had outstanding issues with
23  Mr. Woolf and Deutsche Bank, correct?
24    A.   That happened to come, I believe so.  Do

Page 189

1  we have that e-mail from Bryan, when Mr. -- when
2  Deutsche Bank called him?  I believe that it was after.
3  It was after Gilroy.  And Gilroy triggered the whole
4  discussion about lawsuits and then potential claims and
5  then escrow and legal costs and then there is nothing
6  like that in the January, 2000, contract.  So, this is
7  July the 18th -- No, that's 2003.  I mean the e-mail
8  from Bryan.  This is it (indicating).  It's the one
9  where he speaks about the person from Deutsche Bank
10  calling him.
11    Q.   Right.  That was September, I believe?
12    A.   That was September.
13    Q.   '04?
14    A.   Okay.  So, that was after Gilroy was
15  filed.
16    Q.   Right.  So, in the summer of '04, you
17  still had issues, other than Gilroy, to resolve before
18  you could close?
19        MR. BECKMAN:  Objection.
20    A.   Just one.
21    Q.   The structure of the deal?
22    A.   To change the structure of the deal so
23  that we don't sell the Cypriot entity and receive money
24  to KN, but, rather, K -- rather sell the shares of SPV

48 (Pages 186 to 189)

Richard Harazim                                                                02/22/2006

Page 190

1  KN from SPV Co. and receive the money into the Cypriot
2  entity. The SPA from January of 2004 was constructed
3  so that KN was selling the shares of the Cypriot entity
4  in which the shares of SPV KN were included, so the
5  money should have come to KN. Because of reasons on
6  the side of the Irish, purportedly something with their
7  bankers not wanting to buy a Cypriot entity, insisting
8  on having to buy a Czech entity. We had to change the
9  structure, but I wouldn't call that an obstacle.
10      Q.  But, the deal that reflects the change of
11 structure from the January, 2004, document is the Share
12 Purchase Agreement of December 20, 2004, correct?
13      A.  Correct.
14      Q.  And it replaced in total the January deal?
15      A.  It replaced the January deal.
16      Q.  Right. And that, this document wasn't
17 drafted until December, 2004, correct?
18          MR. BECKMAN:  Objection.
19      A.  It wasn't drafted until we figured out how
20 to go on with a lawsuit questioning the title.
21      Q.  I accept that you had to deal with the
22 Gilroy case, but the drafting of the restructuring of
23 the deal didn't occur until December, 2004?
24      A.  No. Because for a moment it looked like

Page 191

1  there is no deal at all.
2      Q.  If you would look at Exhibit 20. Let's go
3  to the Section 5.64, which is the escrow section.
4      A.  5.64. 5.64. Yes.
5      Q.  Is this the provision that relates to the
6  retention amount?
7      A.  Yes.
8      Q.  And this is the setting up of the escrow
9  of 576,450,000 Czech crowns?
10      A.  Yes.
11      Q.  This escrow was set up for more than the
12 contingency of the Gilroy case, correct?
13      A.  No. I'm sorry. I'm not sure if I
14 understood it correctly.
15      Q.  It contemplates other possible
16 contingencies to, before the escrow could be paid
17 out --
18          MR. BECKMAN:  Objection.
19      Q.  -- than just Gilroy?
20          MR. BECKMAN:  Objection.
21      A.  I don't think so. Gilroy and KT.
22      Q.  Well, at this point in time it's just
23 Gilroy in December of 2004?
24      A.  All right. And there was Amendment No. 1,

Page 192

1  right, which included KT under the same definition of
2  Gilroy. Well, no, it says here that if Gilroy is gone,
3  and nothing else happens in between, we receive all the
4  money.
5      Q.  If nothing else happens after nine months,
6  correct?
7      A.  If nothing else happens within nine
8  months.
9      Q.  Right.
10      A.  Right.
11      Q.  So that if Gilroy had been gone the next
12 day, you still wouldn't have received this escrow
13 amount for a period of nine months?
14          MR. BECKMAN:  Objection.
15      A.  We would have received everything with the
16 exception of 6 million Euros. 189 million.
17      Q.  Well, we were talking in Czech crowns.
18      A.  Yes.
19      Q.  So, we have to -- if under this provision
20 the Gilroy case had gone away the next day, there would
21 still be 189 million Czech crowns held in escrow for
22 nine months, correct?
23      A.  That's correct.
24      Q.  The retention also references the possible

Page 193

1  payment to, for lawyers representing Markland in any
2  future proceeding, correct?
3      A.  Yes.
4      Q.  Do you know whether there has been any
5  payments to lawyers representing Markland?
6      A.  No. Because the nine months test passed
7  on the 4th of December, and nobody initiated any
8  action.
9      Q.  So, Markland hasn't incurred any legal
10 expenses?
11      A.  No.
12      Q.  To apply to the escrow?
13      A.  No, no.
14      Q.  And has there been any deductions at all
15 from the escrow since it was set up at the closing?
16      A.  No.
17      Q.  Turn to Page 20.
18          (Witness complies.)
19      Q.  And I want to direct you to Section 6.1
20 (iii) on Page 20.
21      A.  Are you talking about 20? The SPA from
22 December?
23      Q.  Yes. Exhibit 20. Page 20?
24      A.  Page 20.

49 (Pages 190 to 193)

Richard Harazim                                                                02/22/2006

Page 198

1   the record. The time is 4:35 p.m.
2       Q. Mr. Harazim, I'm still talking to you
3   about Exhibit 20, and Page 20, Section 6.13 --
4       A. Yes.
5       Q. -- where reps and warranties are made,
6   correct?
7       A. Correct.
8       Q. All right. Now, it references that there
9   are no proceedings, it says except for the Gilroy case
10  and the Balfindor litigation. Why were those two
11  litigations disclosed in this paragraph?
12      A. Because these were the only ones that
13  threatened the deal as such. Gilroy claimed title to
14  the property that was being sold, and Balfindor
15  questioned the authority of the Board of Directors of
16  Kotva, who participated in the deal.
17      Q. Now, if there had been a criminal threat
18  against you or Kotva, as it relates to the ownership of
19  the Kotva shares, that would have to be disclosed,
20  correct?
21          MR. BECKMAN: Objection, hypothetical,
22  compound.
23      Q. You can answer.
24      A. Well, I don't know if it would have to be

Page 199

1   disclosed, but regardless of that, we were not aware of
2   any criminal proceedings against us at that time.
3       Q. Were you aware of any threat of a criminal
4   proceeding against you at this time in December, 2004?
5       A. There is always threat of criminal
6   proceedings.
7       Q. No. The definition of "Threatened" was
8   somebody orally or in writing saying that there was --
9       A. No.
10      Q. All right. So, let me just make that
11  clear. In December, 2004, you were not aware of any
12  person threatening any criminal complaint against you
13  or Kotva; is that correct?
14      A. Not such that would make this agreement
15  invalid, void or voidable, and in addition, I was not
16  aware of any.
17      Q. So, the answer is you're not aware of any?
18          MR. BECKMAN: Objection. He answered the
19  question. Stick to your answer.
20          MR. LEIBENSPERGER: He answered it with a
21  double --
22          MR. BECKMAN: He gave a complete answer.
23  That is his answer.
24      Q. So, the answer is you were not aware of

Page 200

1   any such criminal threat; is that right?
2       A. Yes. Yes. I wasn't aware.
3           MR. LEIBENSPERGER: So, let's mark the
4   next document, which is Amendment No. 1 to the SPA.
5           MR. GOLDBERGER: She's already marked it.
6           MR. LEIBENSPERGER: Great. What exhibit
7   is it?
8           THE WITNESS: Twenty-one.
9           MR. LEIBENSPERGER: Thank you.
10      Q. Why was there an Amendment No. 1 to the
11  Share Purchase Agreement?
12      A. Because in December, 2004, another lawsuit
13  was filed from BGO under the name of KT, and it was
14  exactly the same wording as Gilroy, so it was only
15  logical that the same things applied to KT as to
16  Gilroy.
17      Q. So, if you look at KC1-1960 of Exhibit 21,
18  KT is included in the paragraph regarding the retention
19  or escrow?
20      A. Yes.
21      Q. And if you look at the next page, there is
22  an amendment to the reps and warranties, Section 6.13,
23  where the KT claim is added in, correct?
24      A. You speak about .2.1, the first paragraph

Page 201

1   of Clause 5.6.4 shall be amended to read, right?
2       Q. I was actually, the last question was
3   Section 3.1 of this amendment --
4       A. Okay.
5       Q. -- which amended Section 6.13 --
6       A. Yes.
7       Q. -- of the SPA --
8       A. Yes.
9       Q. -- where you added KT, correct?
10      A. Yes.
11      Q. The addition of the KT claim to the
12  retention paragraph did not change the amount that
13  would be retained in escrow, correct?
14      A. Yes. Exactly.
15          MR. LEIBENSPERGER: Okay. And then is the
16  March 4 Share Purchase Agreement marked, Ben?
17          THE WITNESS: March 4 --
18          MR. BECKMAN: Let them do it.
19          MR. GOLDBERGER: No. It is not.
20          MR. LEIBENSPERGER: Do you have that?
21          MR. GOLDBERGER: I don't think I do. You
22  mean the closing document? No. I don't have
23  March 4th.
24          MR. LEIBENSPERGER: Let me mark as an

51 (Pages 198 to 201)

Richard Harazim                                                          02/22/2006

Page 210

1    A.  I think the position is, has been the
2  same.  If there was a willing buyer, and if BGO wanted
3  to sell, we'd be only glad.
4    Q.  And you'd be willing to find a buyer?
5    MR. BECKMAN:  Objection.
6    A.  We're not finding a buyer, but we're
7  willing to do what was in the possibilities to ask
8  people.
9    Q.  And had you told Mr. Hoffmann that you'd
10  have this meeting, and, depending on what was said, you
11  might be willing to try to find a potential buyer?
12    MR. BECKMAN:  Objection.
13    A.  I don't recall that that was discussed,
14  but I think that based on the previous experience it
15  was kind of understood.
16    Q.  And it was understood that Kotva, itself,
17  could not be the buyer?
18    A.  Yes.
19    Q.  So that Mr. Hoffmann was looking to you
20  and Mr. Benda to assist in finding a buyer?
21    MR. BECKMAN:  Objection.
22    A.  I don't know what his plans were.
23    Q.  You understood that that was the message
24  you had sent to Mr. Hoffmann, that the most you could

Page 211

1  do would be to help find a buyer for the BGO shares?
2    MR. BECKMAN:  Objection.  You've got to
3  break that one down.
4    A.  Frankly speaking, I thought that we were
5  helping to establish Mr. Hoffmann's position.  We
6  thought that we were helping him to show that he can
7  invite us to -- we kind of understood that he -- that
8  this betters his position.
9    Q.  Why were you interested in bettering
10  Mr. Hoffmann's position?
11    A.  It had several issues at the same time.
12  We would hear what the plans of BGO are.  It couldn't
13  harm anything.  On the contrary.  If we rejected to go
14  to the meeting, we'd be worse off.  I think it's always
15  better to know.
16    Q.  Did you expect that the topic of the sale
17  of the BGO shares would come up at this meeting?
18    MR. BECKMAN:  Objection.
19    A.  It was a possibility.
20    Q.  So, you did expect that as a possibility?
21    A.  I didn't have any expectations.  It was a
22  possibility.
23    Q.  All right.  So, where did this meeting
24  take place?

Page 212

1    A.  In the French restaurant of Obec Nidum.
2  O-B-E-C.
3    THE INTERPRETER:  D-U-M.  Shall I spell it
4  again? O-B-C-E N-I-D-U-M.
5    A.  That is not E.  O-B-E-C-N-I --
6    THE INTERPRETER:  N-I-D-U-M.
7    A.  D-U-M.
8    Q.  Did you arrive at the restaurant before
9  Mr. Hoffmann and Mr. Weiss?
10    A.  Well, first remember correctly, we met, we
11  came together with Martin, and I believe that we met
12  Mr. Hoffmann alone and that Mr. Weiss arrived later,
13  but I may -- well, I'm not sure about that.
14    Q.  Did you and Mr. Benda go to the restaurant
15  together?
16    A.  Yes.
17    Q.  And you don't have a recollection of
18  whether you got there first or whether Mr. Hoffmann and
19  Weiss got there first, one way or the other; is that
20  right?
21    A.  I don't have a recollection.
22    Q.  All right.  When all four of you arrived,
23  what do you recall was said first?
24    A.  The first thing was asking the formalities

Page 213

1  if there were any inquiry from Mr. Weiss as to how does
2  the sale proceed.  It was something like I hear you're
3  selling the building, so what is the status?  We
4  refused to comment on this, because, once again, it's
5  impossible for one shareholder to be informed and the
6  rest of the shareholders not, and I think was the
7  first point of friction, because Mr. Weiss got quite
8  upset.
9    After a short discussion about why we
10  can't and then where, how a shareholder can find out
11  about this, he got upset and left the meeting for a
12  minute.  I think he went to bar, and when he returned,
13  when he returned we got into the discussion of -- well,
14  of course, I don't remember it sentence by sentence,
15  but principally that the meaning of the discussion was
16  you have to buy my shares, and if you don't buy my
17  shares, I will block the sale of the building.  There
18  is no decent buyer in this world that will touch the
19  building.  Kotva is just a small fraction of the assets
20  that I manage, and I don't care if it goes bankrupt.  I
21  don't care about consequences.  I'm concerned about my
22  reputation, and if we start to fight, I have to finish
23  the fight until the end.  I've been in these situations
24  before.  If you think that I'm scared because of

54 (Pages 210 to 213)

Richard Harazim                                                    02/22/2006

Page 214

1  eastern Europe and these kind of things, I'm not.
2          There was a situation in Kazakstan. I
3  remember Kazakstan being mentioned specifically, where
4  they tried to play games with me, too, specifically,
5  and the guy begged me in the end to stop.
6          This was, in general, the meaning of
7  the discussion, to which we reacted, well, you don't
8  have rights to sell your shares. If you want to sell
9  it, sell it in the market. There is no way Kotva will
10 buy the shares. There is no way anybody is forced to
11 buy those shares. That about is the meaning of the
12 meeting and that then we split, yes.
13         Q.  In your testimony, you sounded like you
14 were quoting some things you remember from Mr. Weiss?
15         A.  Yes. I'm trying to recite as closely as I
16 can what was said from the side of Mr. Weiss, yes.
17         Q.  And have you testified to everything you
18 remember that Mr. Weiss said?
19         A.  No.
20         Q.  What else do you recall?
21         A.  This the meaning. Of course, there might
22 have been other sentences spoken here and there. I
23 don't recall every sentence. I recall the meaning of
24 the meeting.

Page 215

1          Q.  Okay. But, do you recall any other
2  particular sentences or phrases that Mr. Weiss said?
3          A.  I just recall one particular situation,
4  and that was quite at the end of the meeting when we
5  were leaving the restaurant, and Mr. Hoffmann forgot
6  his glasses on the table, and he returned, and I was
7  there. And as we were walking out of the restaurant, I
8  told him, Mr. Hoffmann, please stay away from this.
9  What we just heard is illegal. There's no way you can
10 force anyone to buy your shares. Stay away from this.
11 And he said like, Okay, you don't take it seriously.
12 We have a saying in Czech. A barking dog doesn't bite.
13 Something like that.
14         Q.  That last conversation with Mr. Hoffmann
15 took place just between you and Mr. Hoffmann?
16         A.  Yes.
17         Q.  What did you think was illegal?
18         A.  What was illegal?
19         Q.  Yes.
20         A.  It is illegal to force anyone to buy his
21 or her shares. If I don't want to buy your shares,
22 there's no way you can force me. That's illegal.
23         Q.  What was the force? Was there any threat
24 of physical force?

Page 216

1          MR. BECKMAN:  Objection.
2          MR. LEIBENSPERGER:  I am asking the
3  question.
4          A.  Of course, there was a threat.
5          Q.  No, no. My question was:  Was there a
6  threat of physical force?
7          A.  From Mr. Weiss?
8          Q.  Yes.
9          A.  To me?
10         Q.  Yes.
11         A.  No.
12         Q.  All right. What was there? What was the
13 force that was being applied?
14         MR. BECKMAN:  Objection.
15         A.  The force was --
16         MR. BECKMAN:  Other than what he just
17 testified to?
18         A.  The force --
19         Q.  Answer the question.
20         A.  The force was that the transaction that
21 was vital for the company would be blocked. That was
22 the force. That's the threat.
23         Q.  And anything else? Was that it?
24         MR. BECKMAN:  Objection.

Page 217

1          A.  Well --
2          MR. BECKMAN:  Anything else that was said?
3  What are you asking?
4  BY MR. LEIBENSPERGER:
5          Q.  The question previously, what was the
6  force that was being stated, and you said it was
7  blocking of the transaction. I said:  Was there any
8  other?
9          A.  To use all methods to block the sale, to
10 discredit us so that the building will be not touched
11 by anyone. It's not only about the transaction, as
12 such. It's about, I'm a big guy. I have money. I
13 have lawyers. I'll start such a hell nobody ever talks
14 to you. This is the force.
15         Q.  When you just answered that, were you
16 describing your impression, or were those words said?
17         A.  This is 90 percent precise, 80 percent
18 precise, and the rest is impression.
19         Q.  Do you remember any other words Mr. Weiss
20 used in that meeting?
21         A.  I remembered the -- that he mentioned the
22 Kazakstan people. He mentioned the small fraction that
23 Kotva represents under his management. I especially
24 remember the focus and the stress that he was put on

55 (Pages 214 to 217)

Richard Harazim                                                          02/22/2006

Page 222

1  buy it, now, okay, we can't buy it, but you had an
2  offer, now what value do you think that your shares
3  have, and I remember specifically that there was a
4  figure, but it was in the context of now even if you
5  said Mr. Weiss -- even if you said $4 million, I
6  wouldn't accept it now. Just make me an offer. Offer
7  money for my shares. Do your best.
8        I said, well, this is a bizarre
9  discussion. You speak about selling shares, and you
10 don't put any value to that. I remember that the $4
11 million were mentioned in the context of "and that's
12 not enough, and as the time goes it will be more."
13       Q.  Did you mention any value of the shares?
14       A.  I didn't mention any value.
15       Q.  Did you ever say to Mr. Weiss in this
16 meeting that what you're doing here is criminal?
17       A.  I said it to Mr. Hoffmann. I'm not sure I
18 said it to Mr. Weiss.
19       Q.  You testified earlier what you
20 said to Mr. Hoffmann leaving the restaurant?
21       A.  (Witness nodded.)
22       Q.  Correct?
23       A.  That's it.
24       Q.  And that is what you're referring to about

Page 223

1  whatever you said?
2        A.  Yes, yes, yes.
3        Q.  And you don't remember saying anything
4  like that to Mr. Weiss?
5        A.  Like these identical words, I don't
6  recall. But, it's true that we were making very clear
7  hints that this is just not acceptable.
8        Q.  Did you take Mr. Weiss's statements that
9  you have said he said -- let me start over again. With
10 respect to the testimony you've given about what
11 Mr. Weiss said, did you take it seriously?
12       A.  We thought that he would do nothing,
13 because we knew there was nothing wrong in what we were
14 doing and that any step Mr. Weiss would have taken
15 would have created liabilities on his side. And we
16 didn't, we just didn't believe that he would want to
17 drag BGO into this mess. So, we didn't think anything
18 would happen, because we knew that if anything should
19 happen, it would be illegal, and we just didn't, we
20 just counted on the fact that he wouldn't do it.
21       Q.  So, at the meeting, you didn't feel
22 threatened that he would actually do anything; is that
23 correct?
24       MR. BECKMAN: Objection.

Page 224

1        A.  I felt threatened, but I just didn't
2  believe that it would happen.
3        Q.  Did Mr. Weiss ever say anything that
4  suggested a criminal prosecution of you or Kotva?
5        A.  I think it was part of the overall
6  threatening.
7        Q.  Well, what, do you remember any words?
8        A.  No. I would be -- No. I don't remember
9  any specific sentence. But I would -- yes. I think
10 it's highly -- yes. Most likely in the context of
11 making the threats, even this was said. Apart from the
12 other things that I remember clearly and specifically,
13 I don't remember this clearly and specifically.
14       Q.  Your best memory is that he said he would
15 take all actions? Is that right?
16       MR. BECKMAN: Objection. Asked and
17 answered. It's not what he said.
18       A.  As far as the criminal -- well, you know,
19 a lot of things were said. My general impression was
20 that even the criminal factor was incorporated, but I
21 don't want to say this sounded like -- so I think that,
22 yes, but I can't produce the exact sentence.
23       Q.  All right. But, to be clear, you can't
24 testify today under oath as to any sentence that

Page 225

1  Mr. Weiss said --
2        A.  I can't repeat any sentence.
3        MR. BECKMAN: Let him finish the sentence,
4  the question.
5        Q.  -- that Mr. Weiss said threatening any
6  criminal complaint against you or Kotva, correct?
7        A.  I can't testify what exactly sentence he
8  said, but I can testify that I think that the threat
9  was there, too.
10       Q.  I'm hearing two different answers there.
11       MR. BECKMAN: Objection.
12       Q.  You don't recall anything he said, where
13 he used the word criminal complaint. Isn't that fair
14 to say? Isn't that correct to say?
15       A.  I don't recall any specific sentence, but
16 I think that the criminal charges were brought up, too,
17 yes.
18       Q.  Well, I have --
19       A.  Threat of the criminal charges.
20       Q.  What do you recall about the "threat of
21 criminal charges" being brought up?
22       A.  When the discussion was about using all
23 means so that you are -- well, I mean that nobody ever
24 takes anything from you. You just won't be able to

57 (Pages 222 to 225)

LegaLink Boston, a Merrill Company
(617) 542-0039

Page 235

1                          VOLUME 2, PAGES 235 - 403

2                              EXHIBITS 23 - 40

3               IN THE UNITED STATES DISTRICT COURT

4               FOR THE DISTRICT OF MASSACHUSETTS

5                              No. 05-10679-RCL

6    - - - - - - - - - - - - - - - - - - - - - - - - -

7    KOTVA a.s.,

8                          Plaintiffs

9              vs.

10   ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,

11                         Defendants

12   _____

13   ANDREW WEISS, WEISS ASSET MANAGEMENT LLC,

14   KT, INC. and CVF INVESTMENTS, LTD.,

15                          Counterclaim-Plaintiffs,

16             v.

17   KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM,

18   FORMINSTER ENTERPRISES, LTC., SPV CO. and

19   JOHN DOES 1-5,

20                          Counterclaim-Defendants.

21   - - - - - - - - - - - - - - - - - - - - - - - - -

22       CONTINUED VIDEOTAPED DEPOSITION OF KOTVA a.s.

23              BY AND THROUGH RICHARD HARAZIM

24          Wednesday, February 23, 2006 9:44 a.m

Richard Harazim, Vol. 2                                                2/23/2006

Page 244

1    A.  This wasn't Mr. Hoffmann.  The main person
2  was Howard Golden.
3    Q.  But, Mr. Hoffmann was also involved in
4  those discussions, correct?
5        MR. BECKMAN:  Objection.
6    A.  It is possible.  I conclude that I know
7  him from the time.  But, his active participation
8  during those negotiations, I don't recall.
9    Q.  Is it fair to say you knew that
10  Mr. Hoffmann knew about the prior negotiations between
11  Forminster and Howard Golden?
12        MR. BECKMAN:  Objection.
13    A.  It is possible.
14    Q.  Do you know?
15        MR. BECKMAN:  Objection.
16    A.  I don't know.
17    Q.  Do you deny that you told Mr. Hoffmann
18  that Forminster would consider buying shares of Kotva
19  in September of 2003?
20    A.  Yes.
21    Q.  Have you -- strike that.  Did you tell
22  Mr. Hoffmann in September, 2003, that you were no
23  longer a representative of Forminster?
24    A.  I am not sure about that.  As I already

Page 245

1  said yesterday, that discussion was very general.
2    Q.  So, you don't recall whether you told him?
3    A.  No.
4    Q.  Did Mr. Hoffmann say anything to indicate
5  that he believed you were representing Forminster?
6        THE INTERPRETER:  That he believed that
7  you represent?
8    A.  I don't remember.  I don't recall.
9    Q.  At the May 12, 2004 meeting, did you say
10  that Kotva could not legally buy the shares of BGO?
11        MR. BECKMAN:  Objection.  You may answer.
12    A.  I believe that this argument was said,
13  said at the time.
14    Q.  It was said by you?
15    A.  Yes.
16    Q.  And it wasn't an argument.  It was your
17  belief, correct?
18    A.  At that meeting?
19    Q.  Yes.
20    A.  Yes.  That was my belief.
21    Q.  And you were confident that Kotva was
22  legally correct that it could not buy the BGO shares?
23        THE INTERPRETER:  Kotva?  Could you repeat
24  it one more time, please.

Page 246

1    Q.  And you were confident that Kotva was
2  legally correct that it could not buy the BGO shares?
3    A.  The discussion wasn't as much specific as
4  that.  I stated my opinion at that meeting that Kotva
5  is not interested and, as well, cannot or it is not
6  possible for Kotva to buy its own shares.
7    Q.  But, according to your testimony,
8  Mr. Weiss asked for a purchase of the shares?
9        MR. BECKMAN:  Objection.
10    A.  He insisted on the sale of the shares.
11    Q.  Did it occur to you that he was asking for
12  the purchase of the shares by someone, other than
13  Kotva?
14        THE INTERPRETER:  Can I clarify?  Was it
15  the sale of the shares was by Kotva or for Kotva?  In
16  order for me to translate correctly.
17    Q.  Did it occur to you that he was asking for
18  the purchase of the shares by someone other than Kotva?
19    A.  I didn't, didn't think about thought
20  process of Mr. Weiss.  I didn't explore his thinking.
21    Q.  Did it occur to you that Mr. Weiss
22  believed you and Mr. Benda were there as
23  representatives of Forminster?
24        MR. BECKMAN:  Objection.

Page 247

1    A.  We gave him our business cards, our Kotva
2  business cards, and it really didn't occur to me that
3  he would consider us to be somebody else, or
4  representatives of somebody else.
5    Q.  Previously, you were both an officer of
6  Kotva and a director of Forminster, correct?
7        MR. BECKMAN:  Objection.
8    A.  Yes.  Two years back.
9    Q.  So, my question is:  Did it occur to you
10  that Mr. Weiss believed you still were a representative
11  of both Kotva and Forminster?
12        MR. BECKMAN:  Objection.  Asked and
13  answered.
14    A.  This really did not occur to me.
15    Q.  All right.  And you never clarified to
16  Mr. Weiss in that meeting that you did not -- strike
17  that, that you were not there in any capacity for
18  Forminster?
19        MR. BECKMAN:  Objection.
20    A.  No.  After I introduced myself as a
21  director of Kotva, it really didn't occur to me to
22  explain which other companies I do not represent.
23    Q.  Did you say on May 12th that Kotva would
24  pay nothing for the BGO shares?

4 (Pages 244 to 247)

Page 248

1    MR. BECKMAN: Objection. You may answer.
2    A.  I don't recall saying exactly this
3  sentence.  I may only repeat -- I can only repeat that
4  I stated that the Kotva doesn't have reason, doesn't
5  have interest, and it is illegal for Kotva to buy those
6  shares.
7    Q.  Did Mr. Weiss bring up the newspaper
8  article regarding the sale of the building?
9    A.  Yes.
10    Q.  And the price mentioned in the newspaper
11  article?
12    A.  Yes.
13    Q.  Did you deny there was a deal for the sale
14  of the building?
15    A.  We didn't comment on the process of the
16  sale of the building.
17    Q.  Did you agree that there was a deal?
18    A.  We didn't confirm anything like that.  We
19  did not confirm anything like that.
20    Q.  So, you denied there was a deal?
21    MR. BECKMAN: Objection.
22    A.  We, we didn't comment on it.  We neither
23  confirm it or deny it.  We didn't comment on it.
24    Q.  Did you tell Mr. Weiss that as a minority

Page 249

1  shareholder, BGO would get nothing for the sale of the
2  building?
3    MR. BECKMAN: Objection.
4    A.  I don't recall such sentence.
5    Q.  Do you deny that you said that?
6    MR. BECKMAN: Objection.
7    A.  I don't recall such sentence.
8    Q.  Is it fair to say that you were confident
9  that there was nothing Mr. Weiss could do to force
10  Kotva to buy the BGO shares?
11    MR. BECKMAN: Objection.
12    A.  I believed that there was no way or
13  procedure which will not --
14    THE INTERPRETER: I don't understand what
15  he wants to say, so I will ask him to clarify.
16    A.  I'll try in English.  I didn't believe
17  there was such a procedure Mr. Weiss might use that
18  wouldn't create liabilities on his part.
19    Q.  And you didn't believe there was any
20  procedure that could successfully force Kotva to buy
21  the shares?
22    A.  It -- not a legal one.
23    MR. BECKMAN: What did he, how did he
24  transcribe that?

Page 250

1    (Answer read by the reporter as
2  requested.)
3    MR. BECKMAN: Not a legal one.  Okay.
4  Thank you.
5    Q.  Did you believe there was an illegal
6  procedure Mr. Weiss could use to force Kotva to buy the
7  shares?
8    MR. BECKMAN: Just objection or
9  clarification.  At the time of the meeting?
10    MR. LEIBENSPERGER: Yes.
11    MR. BECKMAN: Okay.
12    A.  I didn't believe that Mr. Weiss would use
13  illegal procedures or methods.
14    Q.  After the May 12th, is it correct that the
15  next communication from Mr. Weiss or Mr. Hoffmann was
16  the filing of the Gilroy lawsuit?
17    A.  Gilroy.  I believe so.
18    Q.  Did you believe that was an illegal
19  procedure by -- strike that.  Did you believe that was
20  an illegal procedure?
21    THE INTERPRETER: At the time when, when
22  this court case was brought up or submitted, nobody did
23  know, anybody didn't know --
24    A.  Nobody knew.

Page 251

1    THE INTERPRETER: Nobody knew that
2  Mr. Weiss is behind Gilroy case.
3    Q.  My question was different.  When you
4  learned of the Gilroy lawsuit, did you think that
5  lawsuit was an illegal procedure?
6    A.  Yes.  I believed that the real purpose of
7  this, this lawsuit is different than the face one, the
8  face value of it.
9    THE INTERPRETER: Thank you.
10    Q.  Did you believe that the filing of the
11  Gilroy lawsuit was a criminal act?
12    MR. BECKMAN: Objection.  Calls for a
13  legal conclusion.  How is he supposed to answer that?
14  You can answer, though.  Go ahead.
15    THE INTERPRETER: Just filing the lawsuit,
16  no.  But, when you -- when the money were asked for
17  pulling --
18    A.  Extorting, extorting money in order to
19  drop the lawsuit, yes.  That is a criminal act.
20    Q.  So, your view of a criminal act was the
21  request to have the shares purchased after the lawsuit
22  was filed?
23    MR. BECKMAN: Objection.
24    A.  I understand this situation as follows:

5 (Pages 248 to 251)

Richard Harazim, Vol. 2                                                                 2/23/2006

Page 256

1    THE INTERPRETER: And our lawyers.
2    MR. BECKMAN: If it involves lawyers --
3    THE INTERPRETER: Board of Directors, yes,
4  because Board of Directors is the big one. People from
5  the Board of Directors.
6    MR. BECKMAN: I need to instruct the
7  witness if you had communications with your lawyer,
8  that is privileged, and you can't disclose that.
9    Q.  Who was there from the Board of Directors?
10    THE INTERPRETER: I, I am not able to say
11  the names now. It was more people. There were the
12  people from the Board of Directors.
13    A.  And there were more discussions. It was
14  not one, single discussion. We discussed the process
15  on an ongoing basis.
16    Q.  The process, meaning to tape record?
17    MR. BECKMAN: If this involves counsel,
18  communications with counsel, I'm instructing the
19  witness not to answer. That's -- you need to cut off
20  this line of questioning.
21    MR. LEIBENSPERGER: I do not need to cut
22  off this line of questioning.
23    MR. BECKMAN: If it's privileged
24  communications with counsel, you established who was

Page 257

1  there and who was present. You can't ask about the
2  substance of communications with counsel. You know
3  that.
4    Q.  Was it your idea to tape record the
5  meeting?
6    A.  I already answered, it was -- I believe it
7  was a collective decision, and I am not able to name
8  one person, who made the decision.
9    Q.  Was Mr. Benda involved in the decision to
10  tape record?
11    A.  He was present at those discussions.
12    Q.  The only -- is it correct that the only
13  persons present were members of the Board of Directors
14  and lawyers?
15    A.  And Benda and me were also present. I
16  repeat one more time. And I repeat one more time, it
17  was not only one meeting. It was a number of
18  discussions, which we had about that situation.
19    Q.  When did those discussions start?
20    A.  After Mr. Hoffmann asked for the meeting,
21  where he was supposed to tell us very important
22  information about Gilroy.
23    Q.  Who did Mr. Hoffmann contact to ask for a
24  meeting?

Page 258

1    A.  I believe that he contacted Mr. Benda.
2    Q.  I asked you about the tape, and you said
3  it's in a safe at your lawyer's office?
4    A.  Yes.
5    Q.  Did you ever listen to it?
6    A.  Yes.
7    Q.  Could you hear the conversation?
8    A.  I believe that this specific meeting or
9  negotiation was recorded, but, but the recording
10  somehow totally malfunctioned, so I believe the first
11  contact with Mr. Hoffmann is not recorded at all. But,
12  we tried to record it.
13    Q.  And the first contact is the one on
14  August 2?
15    THE INTERPRETER: Can I look at the court
16  papers?
17    A.  The criminal complaint we filed. It says
18  how many.
19    MR. BECKMAN: It's not in there. You
20  can't answer it without, just say I can't answer it.
21    THE INTERPRETER: I don't remember the
22  dates exactly. But from the context, it's clear that
23  this was the first meeting.
24    Q.  Did you ever see a transcript of the tape

Page 259

1  of the August 2 meeting?
2    MR. BECKMAN: Objection. Asked and
3  answered.
4    A.  There is no transcript of that meeting.
5    Q.  Did Kotva go to the police at some date?
6    A.  Yes.
7    Q.  What date?
8    A.  I believe that the submission of the
9  criminal complaint is August 27.
10    Q.  Is it correct that before August 27, there
11  was no communication from Kotva to the police?
12    A.  Yes. That's correct.
13    MR. LEIBENSPERGER: Could I have this
14  W1211.
15    Q.  What do you recall -- strike that. What
16  is your best memory of what was said between Mr. Benda
17  and Mr. Hoffmann at the first meeting?
18    THE INTERPRETER: Between Mr. Benda and
19  Mr.?
20    A.  Hoffmann.
21    MR. LEIBENSPERGER: Hoffmann.
22    A.  I remember that Mr. Benda told me that
23  Gilroy is controlled by Hoffmann and that Hoffmann
24  activities are directed by Mr. Weiss, and if we want

7 (Pages 256 to 259)

Page 260

1  for this court case to be dropped, we have to buy their
2  shares.
3       Q.   Do you remember anything else about that
4  first meeting?
5       A.   No.
6       Q.   Did Mr. Benda tell Mr. Hoffmann the
7  meeting was being tape recorded?
8       A.   No.
9            MR. LEIBENSPERGER:  Would you mark this as
10 the next exhibit.
11           (E-mail dated August 9, 2004
12 marked Exhibit 25.)
13           (Discussion off the record.)
14           (Witness conferred with counsel.)
15           MR. LEIBENSPERGER:  Mark this, please, as
16 the next one.
17           (Offer document
18 marked Exhibit 26.)
19           MR. LEIBENSPERGER:  This as the next one.
20           (Offer document
21 marked Exhibit 27.)
22       Q.   Exhibit 25 is an e-mail from Mr. Hoffmann
23 to Mr. Weiss, dated August 9, 2004.  It says, "Please
24 find the enclosed offer that Harazim says to have sent

Page 261

1  you by fax on Friday.  He also said that he has
2  E-mailed it to me on Friday, but I have only received
3  it this morning."  And below on this document,
4  Exhibit 25, there is an e-mail from you to Mr. Hoffmann
5  in Czech.  Could I ask, I'm going to ask the
6  interpreter to read what the Czech says.
7       A.   Sir, I sent it today this way.  Sincerely
8  Richard Harazim.
9       Q.   Is that a correct interpretation,
10 Mr. Harazim?
11      A.   I'm sorry.  I didn't listen to the
12 English.
13           THE INTERPRETER:  Sir, this is the way how
14 I send it today.  Sincerely, Richard Harazim.
15      A.   Mm-hmm.
16      Q.   Yes?
17      A.   Yes.
18      Q.   Did you send to Mr. Hoffmann an offer?
19      A.   Yes.
20      Q.   If you look at Exhibits 26 and 27, do you
21 recognize either of those documents as the offer that
22 you sent?
23      A.   This is already version which was, which
24 was changed or adjusted by Mr. Hoffmann.

Page 262

1       Q.   Which document were you referring to?
2       A.   I am talking about both.
3       Q.   Well --
4       A.   Twenty-six and twenty-seven.
5            THE INTERPRETER:  I have only one.  Can I
6  have the second one?  Okay.  Thank you.
7            MR. BECKMAN:  Share with me.
8       Q.   Exhibits 26 and 27 appear to you to be
9  Hoffmann's versions?
10           THE INTERPRETER:  Yes.  I sent my version
11 to Mr. Hoffmann, who reviewed that version in such a
12 way that it will be acceptable to Mr. Weiss --
13      A.   Modified.
14           THE INTERPRETER:  Modified, yes.  Because,
15 because a written offer to Mr. Weiss was requested by
16 Hoffmann so that we can even start talking about them
17 dropping the lawsuit.
18      Q.   I'm going to show you another document
19 that was produced to us yesterday by Mr. Beckman.  We
20 don't have photocopies.  And I'll ask you whether this
21 is the document that was attached to your e-mail?
22      A.   This is my original proposal of the offer
23 which was requested, which I sent to Mr. Hoffmann.
24           MR. LEIBENSPERGER:  I want to mark that as

Page 263

1  Exhibit 28.
2            MR. BECKMAN:  Twenty-eight.
3            (Original offer document
4  marked Exhibit 28.)
5  BY MR. LEIBENSPERGER:
6       Q.   When you compare Exhibit 28 to Exhibit 26,
7  what are the significant differences, if any?
8       A.   I, in my own proposal, I was trying to
9  stress that this offer exists solely or exclusively
10 for, only because of the lawsuits were brought by
11 Gilroy.  The version modified by Mr. Hoffmann is in
12 this regard softer.
13      Q.   In what way?
14      A.   In phrasing.
15           THE INTERPRETER:  In phrasing.
16      Q.   Can you point to any particular phrase?
17           THE INTERPRETER:  I will read it in
18 English, and you can --
19           MR. LEIBENSPERGER:  What are you reading,
20 sir?
21           THE INTERPRETER:  I am reading --
22           MR. LEIBENSPERGER:  What exhibit number?
23           MR. BECKMAN:  Twenty-eight.
24           THE INTERPRETER:  It's Exhibit 28.

8 (Pages 260 to 263)

Page 264

1     MR. LEIBENSPERGER: Thank you.
2          THE INTERPRETER: The second paragraph.
3     Because of the fact that the lawsuits brought by the
4     companies, which are under the influence of BGO,
5     Gilroy, Balfindor and to certain extent complicate the
6     position of the Kotva company during negotiations with
7     strategy partners, there is interest of the Kotva
8     company to solve, to resolving the situation proposed
9     by Mr. Weiss, which was interpreted to us by, by
10    Mr. Hoffmann, which is based on the buying of the
11    shares under the condition of pulling, of dropping
12    those stated court cases, and it will be done under
13    fulfillment of following conditions. And there are the
14    four conditions.
15         Q.  Did you offer 75 million Czech for the BGO
16    shares?
17         A.  This in reality is not an offer. This is
18    from our side the way how to obtain proofs or evidence
19    that Mr. Weiss is connected with the Gilroy lawsuits.
20         Q.  So, you did not intend this to be a real
21    offer?
22         A.  No.
23         Q.  So, this was a false statement to
24    Mr. Weiss?

Page 265

1          MR. BECKMAN: Objection.
2          THE INTERPRETER: This was --
3     A.  Extorted.
4          THE INTERPRETER: This statement was
5     enforced or extorted from us in order for us to be able
6     to close the sale of the real estate.
7          Q.  Is it your testimony that you did not in
8     good faith want to buy these shares pursuant to this
9     offer?
10         MR. BECKMAN: Objection. Argumentative.
11    You can answer.
12    A.  Kotva could not buy those shares, so this
13    was not a serious offer from our side.
14         Q.  All right. It was intended to deceive
15    Mr. Weiss to continue the negotiations, correct?
16         MR. BECKMAN: Objection. Argumentative.
17    A.  No. It was intended to obtain proofs or
18    evidence that the things which Mr. Hoffmann was saying
19    were based on the truth.
20         Q.  Are you familiar with the English word
21    sting?
22         MR. BECKMAN: Objection.
23         THE INTERPRETER: I translated sting the
24    way how it was translated in the very famous Czech

Page 266

1     movie, which everybody knows, so this is the word for
2     it.
3          MR. LEIBENSPERGER: The Paul Newman movie?
4          THE INTERPRETER: Yes.
5     Q.  Are you familiar with that?
6          THE INTERPRETER: No. I don't know.
7     A.  I didn't. Now, I know.
8     Q.  Now, you know?
9     A.  (Witness nodded.)
10    Q.  Were you setting up Mr. Weiss for a sting
11    by this offer --
12         MR. BECKMAN: Objection.
13    Q.  -- of 75 million?
14         MR. BECKMAN: You don't have to answer
15    that.
16         MR. LEIBENSPERGER: You do have to answer
17    that, and, Joel, you can object. That's it. The word
18    objection. You end it at that point. You can't keep
19    adding additional words. Answer the question, please.
20         MR. BECKMAN: That is very argumentative.
21    I can state my objection. You need to rephrase your
22    question.
23         MR. LEIBENSPERGER: No, I don't. Please
24    answer the question.

Page 267

1          THE INTERPRETER: Can you repeat the
2     question one more time so that I can translate it
3     exactly. Thank you.
4     BY MR. LEIBENSPERGER:
5     Q.  Were you setting up Mr. Weiss for a sting
6     by this offer of 75 million?
7          THE INTERPRETER: Could you repeat it one
8     more time, the question. This is difficult to
9     translate it exactly as you mean it.
10    A.  I understood it. I understood.
11         MR. BECKMAN: Objection. You may answer.
12    Q.  What is your answer?
13    A.  This was not a sting.
14    Q.  It was not a sincere offer, correct?
15         MR. BECKMAN: Objection.
16    A.  This was defense against criminal act.
17    Q.  Answer my question, please. It was not a
18    sincere offer; is that correct?
19         MR. BECKMAN: That's his answer.
20         MR. LEIBENSPERGER: Stop.
21    A.  It was defense against criminal act.
22    Q.  Can you answer the question of whether
23    this was a sincere offer?
24         MR. BECKMAN: Objection.

9 (Pages 264 to 267)

Page 268

1    A.   I already answered that.
2    Q.   That is your best answer?
3         MR. BECKMAN: Objection.
4         MR. LEIBENSPERGER: Well, I'm entitled to
5    know whether this was a sincere offer or not.  Can you
6    answer that yes or no?
7         MR. BECKMAN: Objection.
8    A.   I already answered, it was defense against
9    criminal act.
10   Q.   So, you cannot answer my question yes or
11   no?  Is that right?
12   A.   I believe that your questions are
13   misleading.
14   Q.   Very simple question.  Was the offer
15   sincere?
16        MR. BECKMAN: Objection.
17   A.   Can I talk to my lawyer for a minute?
18        MR. LEIBENSPERGER: No.
19        MR. BECKMAN: Asked and answered.
20   A.   I don't understand -- what was the
21   question again, please?
22   Q.   Very simple question.
23        MR. BECKMAN: Ned, you're getting very
24   argumentative.  Very argumentative.  You need to tone

Page 269

1    it down a bit.
2         MR. LEIBENSPERGER: I'm cross-examining
3    the witness.
4         MR. BECKMAN: Be respectable.  In a very
5    argumentative fashion.
6         MR. LEIBENSPERGER: Joel, I am going to go
7    to the court if you keep interrupting.
8         MR. BECKMAN: That's fine, but you need to
9    calm down and ask --
10        MR. LEIBENSPERGER: Stop.
11        MR. BECKMAN: -- you have to ask the
12   questions respectfully.  You're losing your temper.
13        MR. LEIBENSPERGER: I'm not losing my
14   temper.  Give me a break.  I want an answer to a very
15   simple question.
16   BY MR. LEIBENSPERGER:
17   Q.   Was this offer sincere?
18        MR. BECKMAN: He's answered it several
19   times.
20   A.   We didn't consider buying the shares of
21   Mr. Weiss.
22   Q.   And you agree the offer says that you are
23   considering to buy the shares?
24   A.   It's in the offer is said that there is an

Page 270

1    interest to solve it.
2    Q.   And an offer of --
3         THE INTERPRETER: For solution.
4    Q.   And an offer of 75 million crowns is made?
5         THE INTERPRETER: I would state that the
6    offer was enforced.
7    A.   Extorted from us.  The offer was extorted.
8    Q.   What threat was made against you to cause
9    you to make that offer?
10   A.   The threat was that the, that the lawsuit
11   will not be dropped.
12   Q.   After August 9, 2004, what was the next
13   communication with Mr. Hoffmann?
14   A.   With Mr. Hoffmann?
15   Q.   Yes.
16   A.   We got response from United States, and
17   then there was communication.
18        MR. LEIBENSPERGER: Why don't we take a
19   break, and I can get those documents.
20        THE VIDEOGRAPHER: Going off the record.
21   The time is 10:51 a.m.
22        (A recess was taken.)
23        THE VIDEOGRAPHER: Going back on the
24   record.  The time is 11:01 a.m.

Page 271

1    BY MR. LEIBENSPERGER:
2    Q.   Mr. Harazim, referring again to
3    Exhibit 28, that's the offer transmitted to Mr. Weiss,
4    correct?
5         THE INTERPRETER: This is the offer which
6    was requested by Mr. Weiss.
7    A.   Demanded.
8         THE INTERPRETER: Demanded by Mr. Weiss.
9    Q.   It was sent by you to Mr. Weiss, correct?
10        THE INTERPRETER: No.  I sent this offer
11   to Mr. Hoffmann.  He modified that offer and sent it
12   back to me, and he requested that I send it to
13   Mr. Weiss.
14   A.   Demanded.
15        THE INTERPRETER: He demanded that I will
16   send it to Mr. Weiss.
17   Q.   Were you in fear of your physical being if
18   you did not do it?
19        MR. BECKMAN: Objection.
20   A.   No.
21   Q.   How did you come up with 75 million
22   crowns?
23   A.   This came up from the remarks which
24   Mr. Weiss made during our negotiations on May 12th,

Page 376

1        MR. BECKMAN:  He jumped in.  He's on
2  Paragraph 2, and he's further in, I think.
3        A.  Oh, I'm sorry.  "Since we do not..."  All
4  right.
5        Q.  Paragraph 2, it says, "Since we do not
6  exert control over Gilroy and Balfindor or petitions
7  submitted by them, we could not guarantee a withdrawal
8  of the complaint."  Do you see where I read that?
9        THE INTERPRETER:  This is the second
10  sentence in the paragraph.  Yes.  I couldn't find it,
11  either.  Okay, but yes.
12        Q.  You knew in November of 2004 that
13  Mr. Weiss did exert control over Gilroy and Balfindor;
14  is that correct?
15        MR. BECKMAN:  Objection.
16        A.  In November, 2004, we had information from
17  Mr. Hoffmann that Mr. Weiss is lying about that at that
18  time.
19        (Discussion off the record.)
20        Q.  If you turn to Page 11 of Exhibit 37,
21  Paragraph 32, it states that, "On December 21, 2004 KT,
22  Inc., a Delaware corporation -- do you need this to be
23  translated, Mr. Harazim?
24        A.  No.

Page 377

1        Q.  It will be a little faster.  Paragraph 32
2  says, "On December 21, 2004, KT, Inc. (KT), a Delaware
3  corporation, of which Andrew Weiss is the director,
4  purchased 1000 shares of Kotva for 425 Czech per share.
5  On December 23, 2004, KT filed a lawsuit against Kotva
6  with virtually identical allegations as the Gilroy
7  action.  The KT action was filed by Andre Peterka, who
8  also served as Gilroy's attorney."
9        My question is:  Did you know when you
10  received the KT lawsuit that Mr. Weiss was a director
11  of KT?
12        A.  At the time, probably not.
13        Q.  By January 4, 2005, if you look at
14  Paragraph 34, you asked Mr. Weiss whether the KT
15  lawsuit would be included as part of a settlement?
16        THE INTERPRETER:  In the interest of time,
17  if you want to, I can -- just point on me when you need
18  me, and I will jump in.
19        MR. BECKMAN:  Are you tired?
20        THE INTERPRETER:  No.  I'm not tired, but
21  I'm doing a job, and I'm keeping all you behind.
22        MR. LEIBENSPERGER:  Let's start over,
23  because now I'm not sure what question might be
24  pending.

Page 378

1  BY MR. LEIBENSPERGER:
2        Q.  Let me ask it this way:  At some point in
3  time, you learned that Mr. Weiss was a director of KT,
4  correct?
5        A.  I would say that this is at some point in
6  time, we learned that Mr. Weiss is behind KT.
7        Q.  Right.
8        A.  Whether he's director or owner or
9  whatever.  He controlled KT.
10        Q.  When did you learn that?
11        A.  We knew from Hoffmann that another entity
12  called KT is preparing another lawsuit identical to
13  Gilroy.
14        Q.  Mr. Hoffmann told you that?
15        A.  Yes.
16        Q.  And who did he say was behind KT?
17        A.  Weiss.
18        Q.  When did he tell you that?
19        A.  I can't tell you the exact date.  I
20  understood it was a lengthy process.
21        Q.  Was it, did he tell you that before you
22  received the KT lawsuit?
23        A.  Oh, yes.
24        Q.  So, when you received the lawsuit, after

Page 379

1  December 23, 2004, you already knew from Mr. Hoffmann
2  that Mr. Weiss was behind KT?
3        MR. BECKMAN:  Objection.
4        Q.  Is that correct?
5        MR. BECKMAN:  I object to the form of that
6  question.
7        A.  Yes.
8        Q.  All right.  In Paragraph 34, you reference
9  an e-mail from Mr. Weiss, in which you "question KT is
10  not controlled by Weiss Asset Management; however, if a
11  satisfactory resolution of all matters can be achieved,
12  I will try to persuade KT to settle its lawsuits, and I
13  am highly confident that I would be successful in that
14  endeavor."
15        Did you believe that statement from
16  Mr. Weiss when you received it in the January 4 e-mail?
17        A.  We did not believe that KT is not
18  controlled by Weiss Asset Management.  That is the part
19  we did not believe.  We did believe that he could -- he
20  could control KT to the effect that it drops its
21  lawsuit.
22        Q.  Yesterday, you testified that the proceeds
23  from the deal with Markland, other than the escrow,
24  were being held in a bank account.  Do you remember

Richard Harazim, Vol. 2                                                    2/23/2006

Page 380

1  that?
2      A.  I do.
3      Q.  What is the rate of return on that bank
4  account?
5      A.  3 percent, plus, minus.
6      Q.  Is it tied to any index?
7      A.  No.  It's not connected to any index.
8      Q.  Yesterday you testified that you had given
9  a statement in a criminal proceeding -- strike that.
10  Let me start over again.  You referenced that you were
11  aware of a criminal investigation concerning Kotva and
12  the deal with Markland; is that right?
13          MR. BECKMAN:  Objection.
14      A.  Yes.
15      Q.  And you gave a statement to someone with
16  respect to that?
17      A.  Yes.
18      Q.  Was it to the police or was it to a
19  prosecutor or to whom?
20      A.  To the police, I believe.
21      Q.  And I believe you testified that you gave
22  that statement in Prague?
23      A.  Yes.
24      Q.  Then you said you received a resolution or

Page 381

1  a termination of that criminal proceeding?
2      A.  That's correct.
3      Q.  What do you recall that that document
4  said?
5          MR. BECKMAN:  Objection.
6      Q.  Well, as you know, we requested to get a
7  copy of the document, but we don't have it.  So, I'm
8  just asking you for your best memory.
9          THE INTERPRETER:  It is a standardized
10  police procedure, where the police is announcing that
11  they investigated those and those suspicions.
12      A.  Charges.
13          THE INTERPRETER:  Charges.  And after
14  investigating all of the circumstances, they set the
15  investigation aside.
16      A.  Which means they terminated.
17      Q.  You said they investigated those and those
18  charges?  Is that what your answer was?
19      A.  Yes, sir.
20      Q.  What did you mean by that?
21      A.  Charges specified in the criminal
22  complaint that initiated the investigation in the
23  beginning.
24      Q.  Do you know who initiated that criminal

Page 382

1  complaint?
2          MR. BECKMAN:  Objection.  Asked and
3  answered.  You can answer again.
4      A.  I believe that Mr. Peterka started this
5  investigation.  He filed the complaint.
6      Q.  I did ask you about that yesterday, and I
7  asked you what your evidence was that Mr. Peterka had
8  filed the complaint.  Do you recall that?
9      A.  I do.
10      Q.  And did you have any evidence that
11  Mr. Peterka the complaint?
12          MR. BECKMAN:  Objection.  Asked and
13  answered.
14      A.  Then 18-pages document, the material you
15  were talking about, about the origin was unknown, that
16  document was claiming some serious charges, and I
17  expected or I believed that the police investigation
18  was based on that document.
19      Q.  Do you know the date -- when you say "that
20  document," you're talking about the 18-page document
21  written by Mr. Peterka; is that correct?
22      A.  Yes.
23      Q.  And do you know the date of that document,
24  the 18-page document?

Page 383

1      A.  I think it was sometime since Summer,
2  2005.
3      Q.  And do you know whether this criminal
4  complaint that caused you to go in and give a statement
5  was dated before or after the 18-page document?
6          MR. BECKMAN:  Objection.
7          THE INTERPRETER:  One more time, I don't
8  know the connections, charges, investigation, and
9  setting the investigation aside or basically conclusion
10  of that investigation, I don't know the connection.
11  Those are my guesses or estimates.
12      A.  Deductions.
13          THE INTERPRETER:  Deductions.  I believe
14  that the investigation of me or of my person was
15  connected with Mr. Peterka.
16      A.  But it doesn't have to be that case.
17      Q.  When did you give a statement to the
18  police?
19          MR. BECKMAN:  Objection.  Asked and
20  answered.
21      A.  That's what I don't remember.
22      Q.  Can you put it, was it in 2005?
23          MR. BECKMAN:  Oh, Ned, you've asked these
24  questions over and over and over again.

38 (Pages 380 to 383)

Richard Harazim, Vol. 2                                                     2/23/2006

Page 396

1      Q.  When you were a member of the Board of
2  Directors of Forminster, did it have any business
3  transactions with JT Bank?
4      A.  In my time in Forminster?
5      Q.  Yes.
6      A.  I don't recall any.
7      Q.  And let me expand that to say with respect
8  to your time both working for Forminster and as a
9  member of the Board of Directors of Forminster, do you
10  recall any transactions between Forminster and JT Bank?
11     A.  I don't recall any transactions.
12     Q.  Do you know whether the owners of JT
13  Bank -- first of all, do you know who the owners of JT
14  Bank are?
15     A.  The J and T are the letters for the
16  owners, but I don't know them.  The names started with
17  J, and the other with T.  I don't know the persons.  If
18  I tried, I would remember the names.
19     Q.  To the best of your memory, the J and the
20  T are individual names, as opposed to corporate names?
21     A.  Yes.  These are two names, two sir names.
22     Q.  And you said you don't recall the sir
23  names?
24     A.  Jakaba, something like that, and the other

Page 397

1  one is Takac.
2      Q.  Do you know either one of those
3  individuals?
4      A.  I've never seen them.
5      Q.  Do you know anybody, do you personally
6  know anybody, who works at JT Bank?
7      A.  Personally, who works in JT Bank, I know
8  some people, so that I know who they are.  I don't know
9  them to be on the first names terms.
10     Q.  In what connection do you know them in any
11  respect?
12     A.  JT was providing a loan to Kotva.
13     Q.  When did they provide a loan to Kotva?
14     A.  They provided a loan, it's my guess
15  again --
16         MR. BECKMAN:  Don't guess.
17     A.  -- I think 2003.
18     Q.  Your best estimate?
19     A.  My best estimate is 2003, after the
20  financing bank, Union Bank went into bankruptcy.
21     Q.  And how long were they a lender to Kotva?
22     A.  The loan was due at the end of 2004, but
23  we were able to repay the loan only in March, 2005.
24     Q.  So, at the time of the closing with

Page 398

1  Markland, you paid off the loan to JT Bank?
2      A.  That's right.
3      Q.  And how -- do you recall how much that
4  loan was?
5      A.  I recall a number of 196 million.
6      Q.  Crowns?
7      A.  Crowns.
8      Q.  Who was the loan officer responsible at JT
9  Bank?
10         MR. BECKMAN:  Objection.
11     Q.  For your account?
12     A.  I'm sorry.  I'm not following.
13         MR. BECKMAN:  Objection.
14     A.  I'm not following.
15     Q.  Who was the loan officer at JT for your
16  account?
17         MR. BECKMAN:  Kotva.
18     Q.  For Kotva's account?
19     A.  I don't know.  This was handled by the
20  financial department.
21     Q.  In this case, do you claim that there were
22  damages suffered by Kotva as a result of Mr. Weiss's
23  conduct?
24     A.  I do.

Page 399

1      Q.  What are those damages?
2      A.  Well, damage, I see damages in the fact
3  that the sale or the whole process of the sale was
4  prolonged considerably because of the lawsuit by Gilroy
5  and KT.  There were even threats that Kotva could have
6  lost the building, because the loan of JT was due at
7  the end of 2004, and we just couldn't finish the
8  contract, because of Gilroy and KT.  And, further, I
9  see the damage in the fact that as time goes, we start
10  to identify projects that might be advantageous to
11  Kotva, and because it will take a long time in the
12  Czech Republic before the lawsuits are resolved, it is
13  clear that the company won't be able to use all its
14  potential for coming two to three, maybe even more
15  years.
16     Q.  What is your estimate of the time delay of
17  the closing of the transaction as a result of the
18  Gilroy lawsuit?
19     A.  With the knowledge of the process, I think
20  that we were able to close the transaction in Summer,
21  2004.  And that the appearance of the Gilroy's lawsuit
22  postponed the whole thing by the nine months that it
23  actually took us to finish, to complete the
24  transaction.

Richard Harazim, Vol. 2                                                      2/23/2006

Page 400

1      Q.   And the filing of the KT lawsuit didn't
2  prolong it any more.  Is that accurate?
3      A.   KT --
4          MR. BECKMAN:  Objection.  You may answer.
5      A.   KT is the same thing as Gilroy.  It's the
6  same, same reasoning.  The difference between -- I mean
7  where KT damages Kotva in addition to what Gilroy has
8  done is that it's two lawsuits, two independent courts,
9  and it's, therefore, the time.  It may happen as it
10  happened that Gilroy has been resolved, but KT's
11  lawsuit is pending, and it may be pending, I don't
12  know, we haven't even received a copy of the lawsuit
13  from the Court.  It could be years.
14      Q.   With respect to the proceeds from the
15  sale, other than the escrow amount, you've not used
16  those for any independent projects of Kotva, correct?
17      A.   Not yet.
18      Q.   In any other way, does Kotva claim it's
19  been damaged by the actions of Mr. Weiss?
20      A.   I'm not a lawyer, so once again, there may
21  be other damages, costs, expense, damages to
22  reputation.  I don't know what.  From the business
23  point of view, I see these two main actions, damages.
24          MR. BECKMAN:  That is your best answer.

Page 401

1  It's not a subject matter of inquiry, so you can give
2  your best answer.
3      Q.   Is -- does Kotva have to pay Mr. Beckman's
4  law firm in connection with this lawsuit?
5      A.   Yes.  That's damage.  I was about to ask
6  if --
7          MR. BECKMAN:  Don't.  There is no question
8  pending.
9          THE WITNESS:  It's 4:00.
10          MR. LEIBENSPERGER:  Well, we will suspend
11  the deposition at your request, because you have a
12  plane to catch.  And we'll probably have to have a
13  battle with Mr. Beckman about whether we will complete
14  the deposition after we get all the documents and the
15  other information we need.  So, we'll suspend.
16          THE VIDEOGRAPHER:  This concludes the
17  February 23rd deposition of Richard Harazim.  The
18  number of tapes used today was three.  Total number of
19  tapes used in the deposition is seven.  Going off the
20  record.  The time is 4:02 p.m.
21          (Deposition suspended.)
22
23
24

Page 402

1              E R R A T A   S H E E T
2          I, RICHARD HARAZIM, do hereby certify that I
3  have read the foregoing transcript of my testimony, and
4  further certify that it is a true and accurate record
5  of my testimony (with the exception of the corrections
6  listed below).
7  PAGE  LINE            CORRECTION
8      ____  ____  _____
9      ____  ____  _____
10     ____  ____  _____
11     ____  ____  _____
12     ____  ____  _____
13     ____  ____  _____
14     ____  ____  _____
15     ____  ____  _____
16     ____  ____  _____
17     ____  ____  _____
18     ____  ____  _____
19     ____  ____  _____
20  Signed under the pains and penalties this _____
21  day of _____, 2006.
22
23          _____
24              RICHARD HARAZIM

Page 403

1              C E R T I F I C A T E
2  COMMONWEALTH OF MASSACHUSETTS
3  SUFFOLK, SS.
4          I, Janet M. Konarski, a Registered Merit
5  Reporter and a Notary Public within and for the
6  Commonwealth of Massachusetts do hereby certify:
7          THAT RICHARD HARAZIM, the witness whose
8  testimony is hereinbefore set forth, was duly sworn by
9  me and that such testimony is a true and accurate
10  record of my stenotype notes taken in the foregoing
11  matter, to the best of my knowledge, skill and ability.
12          IN WITNESS WHEREOF, I have hereunto set my hand
13  this 6th day of March, 2006.
14
15
16          _____
16          JANET M. KONARSKI
17          Notary Public
17
18  My Commission Expires:
19  July 19, 2007
20
21
22
23
24

                                              43 (Pages 400 to 403)

**B**

VOLUME 1, PAGES 1 - 152

EXHIBITS: 1 - 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

No. 05-10679-RCL

- - - - - - - - - - - - - - - - - - - - - - - - -

KOTVA a.s.,

Plaintiffs

vs.

ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,

Defendants

(Full Caption on Page 2)

_____

VIDEOTAPED DEPOSITION OF RICHARD HARAZIM

Tuesday, January 23, 2007, 9:40 a.m.

McDermott, Will & Emery

28 State Street, 34th Floor

Boston, Massachusetts 02109

Reporter: Dana Welch, CSR, RPR

Certified LiveNote Trainer

Richard Harazim                                          01/23/2007

| Page 46 |
|---|
| 11:26:38 1 even such nonsense complaint can cause the company |
| 11:26:46 2 Koiva a.s. huge negative – huge financial losses |
| 11:26:55 3 or huge economic impacts, and I would like to ask |
| 11:27:02 4 for you to take a tactical approach to this case. |
| 11:27:08 5      If you subpoena Mr. Hoffmann and Mr. Weiss |
| 11:27:14 6 too early, it may – the result may be that you may |
| 11:27:18 7 never be able to prove their participation in the |
| 11:27:25 8 complaint filed by Gilroy Limited, and the |
| 11:27:33 9 complaint will remain filed at the court. |
| 11:27:44 10      Q. Is that an accurate statement of what you |
| 11:27:47 11 said to the police? |
| 11:27:55 12      MR. BECKMAN: Ned, accurate – translation |
| 11:27:57 13 accurate or what's in the document? |
| 11:28:03 14      Q. Do you have any disagreement with the |
| 11:28:06 15 translation, with the interpretation that was just |
| 11:28:10 16 stated in English? |
| 11:28:16 17      A. Just some little things which do not doubt |
| 11:28:25 18 the basic meaning. |
| 11:28:28 19      Q. And that is what you said to the police on |
| 11:28:33 20 September 9, 2004? |
| 11:28:37 21      A. Yes. |
| 11:28:40 22      Q. When you requested that the police take a |
| 11:28:48 23 tactical approach, what did you mean? |
| 11:29:00 24      MR. BECKMAN: Objection. You may answer. |

| Page 47 |
|---|
| 11:29:03 1 I thought the translation was technical. |
| 11:29:07 2      THE INTERPRETER: No, I said tactical. |
| 11:29:10 3      MR. BECKMAN: I apologize. |
| 11:29:29 4      A. I meant what I said here. What I believed |
| 11:29:32 5 was that to rushing in to some too fast steps may, |
| 11:29:39 6 quote, scare the thief. |
| 11:29:48 7      Q. What do you mean rushing in to too fast of |
| 11:29:52 8 steps? |
| 11:29:55 9      A. I -- can I give an analogical example? |
| 11:30:10 10      Q. Well, but my question is, did you ask the |
| 11:30:13 11 police to not rush in to take steps too fast? |
| 11:30:22 12      MR. BECKMAN: Objection. You may answer. |
| 11:30:23 13      A. I did not ask the police not to take |
| 11:30:35 14 speedy steps. I asked the police to refrain from |
| 11:30:48 15 steps that would, as a result, prevent them from |
| 11:30:54 16 obtaining proof, evidence. |
| 11:30:59 17      Q. So you asked the police to refrain from |
| 11:31:03 18 taking steps until you could develop more evidence? |
| 11:31:15 19      MR. BECKMAN: Objection. You may answer. |
| 11:31:17 20      A. No. |
| 11:31:18 21      Q. You wanted the police to delay notifying |
| 11:31:22 22 the defendants so that you could continue to |
| 11:31:27 23 negotiate with the defendants, correct? |
| 11:31:41 24      MR. BECKMAN: Objection. You may answer. |

| Page 48 |
|---|
| 11:31:43 1      A. This is not about us. It is about police. |
| 11:32:06 2 We asked the police to realize the fact that this |
| 11:32:10 3 is not a case in which demonstrating the force |
| 11:32:14 4 would lead to results. |
| 11:32:21 5      Q. So did you tell the police you would be |
| 11:32:27 6 willing to continue to negotiate with the Weiss |
| 11:32:32 7 parties in order to develop more evidence? |
| 11:32:37 8      MR. BECKMAN: Objection – apologize. |
| 11:32:48 9 Objection. You may answer. |
| 11:32:51 10      A. No. The thought behind this sentence is |
| 11:33:10 11 asking police to select such methods when producing |
| 11:33:25 12 evidence that would not scare Weiss and Hoffmann. |
| 11:33:29 13      Q. And when you say not scare Weiss and |
| 11:33:31 14 Hoffmann, you mean not let them know that there was |
| 11:33:35 15 any police investigation? |
| 11:33:44 16      MR. BECKMAN: Objection. You may answer. |
| 11:34:13 17      THE INTERPRETER: Excuse me. I need to |
| 11:34:15 18 ask for a clarification, I did not hear. |
| 11:34:30 19      A. We wanted to make sure that Weiss and |
| 11:34:35 20 Hoffmann -- |
| 11:34:38 21      THE INTERPRETER: Sorry. Because of the |
| 11:34:39 22 explanation, I lost the whole sentence. Could |
| 11:34:41 23 you please repeat the whole sentence? |
| 11:34:49 24      A. Could you please repeat that question? |

| Page 49 |
|---|
| 11:34:53 1      MR. LEIBENSPERGER: I have to ask the |
| 11:34:55 2 court reporter. |
| 11:35:09 3      THE REPORTER: "Question: 'And when you |
| 11:35:09 4 say not scare Weiss and Hoffmann, you mean not |
| 11:35:09 5 let them know that there was any police |
| 11:35:18 6 investigation?'" |
| 11:35:18 7      A. Our point was for the police to take such |
| 11:35:40 8 steps that would not mean that the engagement of |
| 11:35:47 9 Weiss and Hoffmann with Gilroy would remain secret. |
| 11:36:25 10      I would like to add one more thing: If |
| 11:36:29 11 police concluded that the best way how to obtain |
| 11:36:34 12 proof that – how to obtain – obtain evidence that |
| 11:36:36 13 Weiss and Gilroy in fact -- Weiss and Hoffmann in |
| 11:36:41 14 fact is Gilroy, then, yes, you can notify them, |
| 11:36:44 15 But if police concludes that the best way how to |
| 11:36:48 16 obtain this evidence would be to monitor them, then |
| 11:36:52 17 we would prefer monitoring. The point is that our |
| 11:36:57 18 decisive goal was to obtain evidence that Weiss and |
| 11:37:01 19 Hoffmann are in fact Gilroy. |
| 11:37:15 20      And I would also like to state that in any |
| 11:37:18 21 communication that was available to us, Weiss and |
| 11:37:20 22 Hoffmann denied any connection with Gilroy. |
| 11:37:27 23      Q. In the period from August to |
| 11:37:34 24 September 9th, 2004, Mr. Benda had met with |

13 (Pages 46 to 49)

Richard Harazim                                    01/23/2007

## Page 50

11:37:38 1   Mr. Hoffmann at least three times, correct?

11:37:55 2       A. I don't know exactly the dates, but in

11:38:05 3   summer of that year, Mr. Benda met Vladimir

11:38:10 4   Hoffmann at least three or four times, as far as I

11:38:13 5   know.

11:38:13 6       Q. And you were aware of -- strike that.

11:38:18 7   Mr. Benda told you what happened in those meetings,

11:38:22 8   right?

11:38:25 9       A. Yes.

11:38:26 10      Q. And in those meetings in the summer of

11:38:32 11  2004, Mr. Hoffmann told Mr. Benda that he owned

11:38:37 12  Gilroy -- he, Mr. Hoffmann owned Gilroy -- and that

11:38:40 13  he was acting at the direction of Mr. Weiss; isn't

11:38:43 14  that true?

11:38:53 15      MR. BECKMAN: Objection. You may answer.

11:38:55 16      A. I don't think it was exactly that way.

11:39:02 17      Q. Well, isn't it correct that you understood

11:39:08 18  on September 9, 2004, that Hoffmann had said to

11:39:14 19  Mr. Benda that he owned Gilroy and that Mr. Weiss

11:39:18 20  was directing his actions?

11:39:38 21      MR. BECKMAN: Objection. You may answer.

11:39:41 22      A. That was not exactly my understanding of

11:40:00 23  the situation. My understanding was that Mr. Weiss

11:40:06 24  was behind any actions of Gilroy, and Mr. Hoffmann

## Page 51

11:40:13 1   was helping him.

11:40:16 2       Q. And that's what you believed in -- on

11:40:20 3   September 9, 2004?

11:40:24 4       A. Yes, that's what I believed on

11:40:31 5   September 9th.

11:40:31 6       Q. All right. Did you discuss with the

11:40:33 7   police what the next steps would be in the

11:40:39 8   investigation?

11:40:46 9       A. It is, of course, up to the police.

11:40:51 10      Q. That was not my question. Did you discuss

11:40:55 11  with them what next steps would occur?

11:41:02 12      MR. BECKMAN: Objection. You may answer.

11:41:04 13      A. No, I did not.

11:41:06 14      Q. You became aware that the police and --

11:41:13 15  strike that.

11:41:14 16  You became aware that Mr. Benda wore recording

11:41:22 17  equipment provided by the police after September 9,

11:41:27 18  2004, right?

11:41:37 19      MR. BECKMAN: Objection. You may answer.

11:41:40 20      A. Yes.

11:41:48 21      Q. You -- you knew that Mr. Benda was meeting

11:41:53 22  with Mr. Hoffmann wearing recording equipment after

11:41:58 23  September 9?

11:42:06 24      A. I do not understand the significance of

## Page 52

11:42:12 1   September 9th.

11:42:14 2       Q. Just using that as the date that you gave

11:42:17 3   your statement to the police,

11:42:21 4       A. I knew that after we filed criminal

11:42:35 5   complaint, the meetings were monitored.

11:42:39 6       Q. All right. Filing the criminal complaint

11:42:43 7   was on August 27, 2004. Does that sound right?

11:42:53 8       A. Yes.

11:42:53 9       Q. All right. So after that date, you knew

11:42:56 10  that the police were conducting an investigation

11:43:00 11  through Mr. Benda wearing recording equipment?

11:43:05 12      A. I knew that the police was monitoring the

11:43:23 13  meetings.

11:43:24 14      Q. All right. And by what method were the

11:43:28 15  police monitoring meetings?

11:43:32 16      A. Except for cases when police informed us,

11:43:49 17  I do not know anything more than that.

11:43:53 18      Q. My question was, so based on whatever you

11:43:58 19  know, by what methods were the police monitoring

11:44:00 20  meetings?

11:44:10 21      MR. BECKMAN: Objection. You may answer.

11:44:11 22      A. I believe that the meetings were monitored

11:44:30 23  using equipment on Mr. Benda -- attached to

11:44:34 24  Mr. Benda. And also using recording technology, at

## Page 53

11:44:59 1   least in one case, it was in my office.

11:45:05 2       Q. All right. Let me go back to Exhibit 1 in

11:45:08 3   front of you, that statement. Did you retain a

11:45:17 4   copy of that statement?

11:45:19 5       A. I don't know. And I think copies are not

11:45:29 6   provided in our country.

11:45:31 7       Q. Did -- did you obtain a copy from the

11:45:34 8   police file?

11:45:35 9       A. No.

11:45:38 10      Q. All right. Did you give any other written

11:45:43 11  statement to the police besides Exhibit 1,

11:45:47 12  September 9, 2004?

11:45:49 13      A. Already in my first deposition, I

11:46:17 14  testified that I could not remember the -- I cannot

11:46:20 15  comment on that because I don't know.

11:46:23 16      Q. So your testimony today is that you don't

11:46:25 17  remember whether you gave any other statement to

11:46:27 18  the police besides the September 9, 2004 statement?

11:46:42 19      A. That's correct. I do not remember.

11:46:46 20      Q. After the complaint on August 27, 2004,

11:46:55 21  did you ever wear recording equipment on your body

11:47:01 22  in connection with the investigation?

11:47:13 23      A. Yes.

11:47:15 24      Q. When?

14   (Pages 50 to 53)

Richard Harazim                                           01/23/2007

---

**Page 98**

```
02:43:40  1   previously what the purpose of the meeting was.
02:43:42  2   Were there discussions before that meeting between
02:43:47  3   Markland and Mr. Peterka about the possible sale of
02:43:55  4   shares owned of Kotva to Markland?
02:44:20  5       THE INTERPRETER: I'm -- I'm sorry.
02:44:21  6   Before that meeting, from that point, could
02:44:23  7   you read it to me again? I'm sorry.
02:44:27  8       MR. LEIBENSPERGER: Between Markland and
02:44:28  9   Mr. Peterka.
02:44:38 10       MR. PASQUARELLO: Objection.
02:44:41 11       MR. LEIBENSPERGER: I'm going to withdraw
02:44:43 12   that question. It came out -- it didn't come
02:44:44 13   out very well looking at it. So let me start
02:44:47 14   over.
02:44:52 15       Q. Before the meeting on October 18, 2004,
02:44:56 16   are you aware of any discussions between Markland
02:44:58 17   and Mr. Peterka?
02:45:09 18       A. I don't.
02:45:11 19       Q. At the meeting on October 18, 2004, did it
02:45:19 20   come up that Markland might purchase the shares
02:45:28 21   owned by BGO?
02:45:41 22       MR. PASQUARELLO: Objection.
02:45:42 23       Q. And I mean shares of Kotva.
02:45:45 24       MR. PASQUARELLO: Objection.
```

**Page 99**

```
02:45:46  1       A. I would like to provide an explanation
02:45:54  2   here because I stated something inaccurately. The
02:46:05  3   final effect of the transaction would be as if
02:46:09  4   Markland would purchase shares from BGO. But the
02:46:24  5   whole technique was different. It was based on the
02:46:26  6   following: Hoffmann wanted that Kotva purchase --
02:46:40  7   purchase Kotva shares from BGO, which would make
02:46:53  8   liability on the side of Kotva towards BGO; in
02:46:57  9   other words, that there would be a receivable from
02:47:00 10   BGO to Kotva. Maybe it's better to use the word
02:47:07 11   claim, not receivable. And on the other hand,
02:47:22 12   Markland was purchasing real estate from Kotva, and
02:47:28 13   that means that Kotva had claim from Markland. And
02:47:44 14   the whole structure of the transaction would be
02:47:46 15   that Kotva would pay part of its liability towards
02:47:51 16   BGO with its receivable or claim from Markland,
02:48:03 17   which means that the net result of this transaction
02:48:05 18   would be that Markland would actually pay to -- pay
02:48:22 19   to Kotva by an X-amount of money less for the
02:48:29 20   purchase of the building of the department store,
02:48:41 21   and the number X would -- would then Markland send
02:48:46 22   to BGO for Kotva shares which would then end up
02:48:49 23   being in Kotva.
02:48:54 24       Q. The Kotva shares would end up being in
```

**Page 100**

```
02:49:02  1   Kotva?
02:49:06  2       A. Yes.
02:49:27  3       (Off-the-record discussion held.)
02:49:27  4       MR. PASQUARELLO: Can we read back the
02:49:29  5   question.
02:49:29  6   BY MR. LEIBENSPERGER:
02:49:29  7       Q. My question was, did you -- my question
02:49:44  8   was, did you say that the Kotva shares would end up
02:49:47  9   being in Kotva?
02:49:54 10       A. Yes. This has been obvious for quite some
02:50:14 11   time that during this hypothetical transaction
02:50:18 12   where a party would purchase Kotva's share, that
02:50:22 13   this a party would have to be BGO.
02:50:46 14       (Interruption by the reporter.)
02:50:46 15       Q. Who proposed this arrangement that you
02:50:51 16   just testified to?
02:50:56 17       A. Mr. Hoffmann, Mr. Hoffmann together with
02:51:01 18   Mr. Peterka.
02:51:09 19       Q. Why did Mr. Hoffmann care whether the BGO
02:51:14 20   shares were purchased by Kotva or by Markland?
02:51:24 21       MR. PASQUARELLO: Objection.
02:51:25 22       A. It is the -- the other way. Markland had
02:51:37 23   no interest whatsoever to purchase Kotva shares
02:51:40 24   from BGO. Markland only wanted to purchase the
```

**Page 101**

```
02:51:47  1   real estate.
02:52:00  2       Q. Do you remember anything that Mr. Peterka
02:52:02  3   said in this meeting?
02:52:07  4       A. Yes. He surprised me by two statements.
02:52:35  5   The first statement was that he represents Gilroy,
02:52:39  6   not BGO. And the second one was -- the second one,
02:53:07  7   which I cannot remember exactly, but in general, he
02:53:10  8   was kind of making a statement that this
02:53:18  9   arrangement, in fact, equals stealing from share --
02:53:24 10   shareholders of Kotva.
02:53:35 11       We were arguing that this scheme would in
02:53:38 12   fact mean stealing from shareholders of Kotva, and
02:53:42 13   he was kind of making it sound not so serious.
02:54:00 14       Q. Do you remember anything else that
02:54:01 15   Mr. Peterka said in that meeting?
02:54:05 16       A. Regarding the lawsuits, he said that if an
02:54:44 17   agreement and transaction is done between Kotva and
02:54:48 18   BGO, then he as representative of Gilroy would
02:54:54 19   withdraw the lawsuits, which were in the way of the
02:54:58 20   transactions.
02:55:05 21       Q. Do you remember anything else that
02:55:07 22   Mr. Peterka said in that meeting?
02:55:22 23       A. I don't remember anything else.
02:55:25 24       Q. What do you remember that Mr. Hoffmann
```

26 (Pages 98 to 101)

Richard Harazim                                           01/23/2007

## Page 102

02:55:28 1  said in that meeting at Mr. Peterka's office?

02:55:39 2      A. Mr. Hoffmann introduced and explained the

02:55:46 3  technical part of the transaction.

02:55:55 4      Q. Do you remember anything else that

02:55:57 5  Mr. Hoffmann said?

02:56:02 6      A. I don't remember anything else.

02:56:06 7      Q. Was there discussion about the Gilroy

02:56:15 8  lawsuit?

02:56:16 9      A. As far as I remember, only in the sense

02:56:46 10  that that lawsuit is in the way of completing the

02:56:51 11  transaction between Markland and Kotva and that

02:57:06 12  this was the basis of Mr. Hoffmann's scenario,

02:57:10 13  because if this scenario would have been

02:57:14 14  implemented, then the lawsuit would have been

02:57:19 15  withdrawn.

02:57:23 16      Q. When you were talking with Mr. Peterka and

02:57:28 17  Mr. Hoffmann at this meeting in Mr. Peterka's

02:57:31 18  office, you had no intent to enter into any

02:57:40 19  agreement with Mr. Hoffmann and Mr. Peterka; is

02:57:43 20  that correct?

02:57:48 21      MR. PASQUARELLO: Objection.

02:57:51 22      A. Yes.

02:57:57 23      Q. You were just gathering evidence?

02:58:05 24      MR. PASQUARELLO: Objection.

## Page 103

02:58:06 1      A. Yes.

02:58:08 2      Q. Do you know Mr. Foukal?

02:58:19 3      MR. LEIBENSPERGER: Foukal, F-O-U-K-A-L.

02:58:31 4      A. Can you identify more specific?

02:58:34 5      Q. A Mr. Foukal who either is or represents a

02:58:39 6  shareholder of Kotva?

02:58:46 7      A. I don't know Mr. Foukal, a shareholder of

02:58:51 8  Kotva.

02:58:51 9      Q. Have you ever met with a Mr. Foukal?

02:59:04 10      A. Do you know his first name?

02:59:12 11      Q. I do not.

02:59:13 12      MR. GOLDBERGER: Begins with a B.

02:59:19 13      A. Last name Foukal is very frequent name in

02:59:23 14  the Czech Republic.

02:59:25 15      Q. Do you remember Mr. Foukal asking for a

02:59:29 16  change of the agenda at the annual meeting of

02:59:33 17  Kotva?

02:59:40 18      MR. PASQUARELLO: Objection.

02:59:40 19      A. No.

02:59:41 20      Q. Do you recall that the Gilroy lawsuit was

03:00:09 21  filed in approximately July 2004?

03:00:22 22      A. June.

03:00:24 23      Q. June.

03:00:30 24      The Gilroy lawsuit sought a declaration

## Page 104

03:00:34 1  from the court as to the ownership of the Kotva

03:00:38 2  Real Estate; is that correct?

03:00:52 3      A. That lawsuit sought a declaration of the

03:01:00 4  court that the real estate is part of -- is in the

03:01:05 5  assets of Kotva rather than its subsidiary.

03:01:09 6      Q. All right. Now, do you recall that there

03:01:12 7  was a lawsuit filed by KT, Inc. in December 2004?

03:01:23 8      A. Yes.

03:01:24 9      Q. Do you recall that the -- that lawsuit

03:01:30 10  sought a declaration that the ownership of the real

03:01:33 11  estate belonged to Kotva a.s. and not its

03:01:38 12  subsidiary?

03:01:48 13      A. Yes.

03:01:49 14      Q. With respect to the lawsuit brought by KT,

03:02:07 15  Inc., are you aware that CVF Investments Limited

03:02:15 16  has joined that lawsuit as a plaintiff with KT?

03:02:31 17      A. Yes.

03:02:32 18      Q. Do you understand that CVF Investments

03:02:38 19  Limited is the entity that holds the BGO shares?

03:02:47 20      MR. PASQUARELLO: Objection.

03:02:50 21      A. Shares of BGO?

03:02:56 22      Q. Yes.

03:02:58 23      A. I'm not aware of that.

03:03:01 24      Q. All right. You're aware that CVF

## Page 105

03:03:03 1  Investments Limited is the shareholder of record

03:03:09 2  for the Kotva shares that are beneficially owned by

03:03:16 3  BGO?

03:03:30 4      MR. PASQUARELLO: Objection. If you

03:03:31 5  understand, you can answer.

03:03:33 6      A. I saw documents that were provided by the

03:03:57 7  counter-party in the discovery showing that CVF

03:04:01 8  became shareholder sometime in spring 2006, maybe

03:04:06 9  in January.

03:04:08 10      Q. Became shareholder of Kotva?

03:04:11 11      A. Yes.

03:04:12 12      Q. And by that, do you mean they became the

03:04:17 13  shareholder of record in the center -- security

03:04:21 14  center in Prague?

03:04:26 15      A. Yes.

03:04:27 16      Q. All right. Are you aware of whether the

03:04:33 17  shareholder of record at the security center holds

03:04:39 18  shares for another shareholder who has beneficial

03:04:42 19  ownership?

03:04:55 20      MR. PASQUARELLO: Objection.

03:04:56 21      A. Yes, such structure is possible.

03:05:00 22      Q. All right. Is it common?

03:05:03 23      MR. PASQUARELLO: Objection.

03:05:04 24      A. I think banks provide this service.

27 (Pages 102 to 105)

Richard Harazim                                                01/23/2007

---

**Page 134**

04:38:50 1    deposition of Richard Harazim. Going off the
04:38:53 2    record. The time is 4:39.
04:38:53 3         (Proceedings interrupted at 4:39 p.m. and
04:39:01 4    reconvened at 4:40 p.m.)
04:39:01 5         THE VIDEOGRAPHER: Back on the record.
04:40:12 6    Here marks the beginning of tape number four
04:40:14 7    in the deposition of Richard Harazim. The
04:40:17 8    time is 4:40.
04:40:22 9         MR. LEIBENSPERGER: Would you mark this
04:40:23 10   document as the next exhibit, please.
04:40:37 11        (Exhibit No. 6, Supplement to Kotva's
04:40:37 12   Initial Disclosures, marked for
04:40:38 13   identification.)
04:40:45 14   BY MR. LEIBENSPERGER:
04:40:45 15        Q. Exhibit 6 is a document filed in this
04:40:47 16   lawsuit entitled Supplement to Kotva's Initial
04:40:50 17   Disclosures Pursuant to Fed.R.Civ.P 2691 regarding
04:40:56 18   damages.
04:41:16 19        Mr. Harazim, have you seen this document
04:41:19 20   before?
04:41:38 21        A. Yes.
04:41:39 22        Q. Did you approve this computation of
04:41:47 23   damages that's on this document?
04:41:54 24        MR. PASQUARELLO: Objection.

---

**Page 135**

04:41:56 1    A. Yes.
04:41:58 2    Q. If you look at page 2, it references a --
04:42:11 3    $24 million of the purchase price that has been
04:42:13 4    held in the escrow account. Do you see that
04:42:16 5    reference?
04:42:21 6    A. Yes.
04:42:28 7    Q. It states that Kotva has been damaged in
04:42:32 8    the amount of the lost investment opportunity on
04:42:35 9    the $24 million since March 2005, correct?
04:42:54 10   A. Yes.
04:42:55 11   Q. All right. The document then references a
04:42:58 12   10 percent rate of return. My question is, what's
04:43:03 13   the basis for the -- the 10 percent rate of return?
04:43:14 14        MR. PASQUARELLO: Objection. You can
04:43:16 15   answer.
04:43:18 16        A. It is based on our business experience, on
04:43:53 17   some academic assumptions and on some practical
04:43:56 18   assumptions for in the period after the closing.
04:44:05 19   Q. What are the assumptions that Kotva makes
04:44:08 20   for a 10 percent rate of return?
04:44:16 21        MR. PASQUARELLO: Objection.
04:44:21 22        A. I just -- I just named those
04:44:28 23   assumptions -- assumptions a short while ago.
04:44:31 24   Q. Specifically, what assumptions do you make

---

**Page 136**

04:44:35 1    about how Kotva could obtain a 10 percent rate of
04:44:42 2    return?
04:44:54 3         MR. PASQUARELLO: Objection.
04:44:59 4    A. It is a whole bundle of things. Some of
04:45:42 5    them are the situation in the Czech capital market.
04:45:47 6    Then also the usual rate of return of companies
04:45:50 7    dealing in the same area as we are; it means on --
04:45:54 8    real estate. And also usual rate of return on --
04:45:58 9    of companies in the financial market. And from the
04:46:02 10   mix of all these assumptions, we made a
04:46:06 11   conservative estimate. And the other reason is
04:46:16 12   business transactions that we have already
04:46:18 13   realized.
04:46:22 14        Q. Did Kotva prepare any written analysis of
04:46:27 15   investments to determine the 10 percent rate of
04:46:36 16   return assumption?
04:46:43 17        MR. PASQUARELLO: Objection. Calls for
04:46:45 18   work product, but you can answer.
04:46:57 20        A. I don't think any analysis like that
04:46:57 20   exists.
04:46:58 21        Q. With respect to assumptions regarding
04:47:07 22   investment rates of return, did Kotva rely on any
04:47:12 23   particular kind of investment that would return 10
04:47:16 24   percent?

---

**Page 137**

04:47:30 1         MR. PASQUARELLO: Objection.
04:47:31 2         A. Yes. Our real estate projects that we
04:47:50 3    have already executed and that we are -- that are
04:47:52 4    still pending, we are part of it.
04:47:56 5    Q. What real estate projects does Kotva have
04:47:59 6    that have earned a 10 percent rate of return or
04:48:03 7    better?
04:48:08 8         MR. PASQUARELLO: Objection to the extent
04:48:11 9    this calls for revelation of a subject that's
04:48:14 10   part of a pending motion for protective order.
04:48:18 11   Other than that, you can answer.
04:48:21 12        Q. You can answer the question. I disagree
04:48:24 13   with Mr. Pasquarello.
04:48:26 14        MR. LEIBENSPERGER: You've put the real
04:48:27 15   estate projects at issue. I want to know
04:48:30 16   about them.
04:48:39 17        MR. PASQUARELLO: You can answer, subject
04:48:40 18   to my instruction.
04:48:44 19        A. Rate of return of this project is at least
04:48:55 20   16 percent.
04:48:55 21        Q. Rate of return of what project?
04:48:58 22        MR. PASQUARELLO: Again, same objection,
04:49:00 23   same instruction.
04:49:02 24        A. Real estate projects.

35 (Pages 134 to 137)

3cdf5077-a976-42fb-854b-2c595b390941

Richard Harazim                                      01/23/2007

---

**Page 138**

04:49:05 1   Q. Describe the real estate project. First,
04:49:11 2 describe it without revealing the name of the
04:49:13 3 partner, which is the basis of Mr. Pasquarello's
04:49:17 4 objection.
04:49:25 5   A. My colleague described it here yesterday.
04:49:49 6 This is investment into certain pieces of land that
04:49:54 7 are developed and then sold to developers.
04:50:03 8   Q. And how did Kotva earn a 16 percent rate
04:50:06 9 of return on that investment?
04:50:12 10   MR. PASQUARELLO: Objection.
04:50:14 11   A. This is the price at which Kotva finances
04:50:29 12 these projects.
04:50:33 13   Q. What do you mean by this is the price by
04:50:41 14 which Kotva finances these transactions?
04:50:52 15   A. To get a better idea, I cannot name its
04:51:03 16 interest.
04:51:04 17   Q. All right. So it's your testimony that
04:51:07 18 Kotva loaned money to a real estate project, and it
04:51:14 19 returned 16 percent interest on the loan?
04:51:22 20   A. Technically, it's not exactly like that,
04:51:39 21 but practically, for an — for an idea, it can be
04:51:44 22 put that way.
04:51:46 23   Q. All right. Are there documents that
04:51:49 24 reflect Kotva earning 16 percent for its investment

**Page 139**

04:51:58 1 in this real estate project?
04:52:08 2   MR. PASQUARELLO: Objection.
04:52:11 3   A. Yes, there are accounting documents
04:52:17 4 supporting that.
04:52:23 5   MR. LEIBENSPERGER: And this is a project
04:52:24 6 that you're going to instruct him not to
04:52:28 7 answer who the partner is; is that correct?
04:52:30 8   MR. PASQUARELLO: My objection to the last
04:52:32 9 question when you said this project, are
04:52:34 10 you're referring to the same project?
04:52:36 11   MR. LEIBENSPERGER: He's only identified
04:52:37 12 one project.
04:52:38 13   MR. PASQUARELLO: Okay. Then I think the
04:52:39 14 answer is we've already produced documents
04:52:41 15 about that investment, and you already have
04:52:43 16 them.
04:52:43 17   MR. LEIBENSPERGER: That's not my
04:52:45 18 question. I'm asking you now whether you're
04:52:47 19 instructing him not to answer with respect to
04:52:49 20 the —
04:52:49 21   MR. PASQUARELLO: The only thing —
04:52:50 22   MR. LEIBENSPERGER: -- who the partner is.
04:52:51 23   MR. PASQUARELLO: Just the identity until
04:52:53 24 we get a determination from the discovery

**Page 140**

04:52:57 1 master.
04:52:58 2   MR. LEIBENSPERGER: All right.
04:53:05 3   Q. How much money did Kotva invest in this
04:53:11 4 particular real estate project?
04:53:20 5   A. Approximately 220 million.
04:53:23 6   Q. Korunas?
04:53:24 7   A. Yes.
04:53:26 8   Q. Was this Kotva who invested 220 million or
04:53:31 9 was it SPV CO?
04:53:43 10   MR. PASQUARELLO: Objection. You can
04:53:48 11 answer.
04:53:48 12   A. Technically SPV CO, but we — for us, all
04:53:55 13 these entities are interconnected.
04:54:01 14   Q. Was there an opportunity to invest more
04:54:04 15 than 220 million korunas in this real estate
04:54:08 16 project?
04:54:15 17   A. Much more than that —
04:54:15 18   THE WITNESS: Many times.
04:54:20 19   A. -- many times more than that — many times
04:54:26 20 there was an opportunity to invest.
04:54:30 21   Q. In this particular real estate project,
04:54:33 22 was there more opportunity to develop — strike
04:54:35 23 that.
04:54:36 24   In this particular real estate project, was there an

**Page 141**

04:54:39 1 opportunity to invest more than 220 million korunas?
04:54:48 2   A. Yes. We could have -- we could have
04:55:05 3 become general developer of the project, but we
04:55:08 4 could not afford to do that, first of all, with
04:55:13 5 respect to risk diversification and also due to --
04:55:17 6 to the blocked funds.
04:55:29 7   Q. Your -- this document, Exhibit 6, also
04:55:44 8 references that Kotva lost the use of and was
04:55:49 9 deprived of the investment opportunity on the
04:55:52 10 $65 million in department store proceeds. Do you
04:55:56 11 see that reference?
04:56:15 12   A. Yes.
04:56:16 13   Q. All right. How was Kotva deprived of the
04:56:20 14 investment opportunity on the $65 million of sale
04:56:25 15 proceeds?
04:56:26 16   A. At the time of the Gilroy lawsuit, there
04:57:18 17 were no more things to solve with Markland except
04:57:22 18 for a change in structure because everything else
04:57:24 19 was done. This was -- would only require changes
04:57:28 20 in the contract.
04:58:02 21   In my -- in my estimate, the contract
04:58:04 22 could have been concluded sometime in June or July,
04:58:08 23 which means we could have had the money
04:58:11 24 approximately nine months earlier, and our prudent

36 (Pages 138 to 141)

3cdf5077-a976-42fb-854b-2c595b390941

Richard Harazim                                      01/23/2007

---

### Page 142

04:58:27 1   estimate is that six months is very reasonable.
04:58:35 2      Q. All right. What's the basis -- strike
04:58:39 3   that.
04:58:40 4      What was the total amount of the purchase price by
04:58:48 5   Markland of the department store real estate and
04:58:54 6   trademarks?
04:58:57 7      THE INTERPRETER: Department store, real
04:58:59 8   estate --
04:59:01 9      MR. LEIBENSPERGER: And trademark.
04:59:03 10    THE INTERPRETER: And trademark.
04:59:09 11    MR. PASQUARELLO: Objection. You can
04:59:13 12   answer.
04:59:13 13    A. I don't know exactly, but it was somewhere
04:59:20 14   around 1,520,000,000.
04:59:26 15    Q. All right. So on page 2 of Exhibit 6,
04:59:34 16   does this $65 million constitute the exchange rate
04:59:39 17   conversion of the 1.5 billion Czech korunas?
05:00:00 18    A. I think that from that amount of 1.52
05:00:20 19   billion korunas, we would have to deduct a loan
05:00:23 20   that we would have to pay anyway, and then the
05:00:27 21   resulting amount would be translated using a
05:00:31 22   different exchange rate which is more beneficial
05:00:34 23   for us today because the koruna appreciated.
05:00:41 24    Q. And is that -- is that how you got to the

### Page 143

05:00:43 1   $65 million that's in Exhibit 6?
05:00:54 2    A. Yes.
05:00:57 3    Q. All right. Exhibit 6 also references
05:01:22 4   towards the bottom of page 2 that Kotva has
05:01:25 5   incurred substantial legal fees in both the Czech
05:01:29 6   Republic and United States as a result of Weiss's
05:01:34 7   conduct exceeding $750,000 to date. Do you see
05:01:37 8   where that is in the document?
05:01:56 9    A. Yes.
05:01:57 10    Q. What's your best estimate, sitting here
05:02:00 11   today, January 23, 2007, of the legal fees in both
05:02:05 12   the Czech Republic and the United States that Kotva
05:02:10 13   has incurred?
05:02:24 14    MR. PASQUARELLO: Objection. You can
05:02:26 15   answer.
05:02:26 16    A. Very roughly estimated, $1 million.
05:02:33 17    Q. Okay. Of that $1 million, how much was
05:02:39 18   paid to Mr. Beckman's firm?
05:02:43 19    THE INTERPRETER: I couldn't hear. I'm
05:02:43 20   sorry.
05:02:46 21    MR. LEIBENSPERGER: Sorry.
05:02:46 22    Q. Of the $1 million, how much was paid to
05:02:48 23   Mr. Beckman's firm?
05:02:55 24    MR. PASQUARELLO: Objection. You can

### Page 144

05:02:58 1   answer, if you know.
05:03:00 2    A. I don't know.
05:03:01 3    Q. What's your best estimate of how much of
05:03:05 4   that total $1 million was paid to Mr. Beckman's
05:03:05 5   firm?
05:03:16 6    A. $700,000.
05:03:25 7    Q. All right. And is it your best
05:03:30 8   estimate -- strike that.
05:03:33 9    What amounts paid to lawyers in the Czech Republic
05:03:38 10   are you including in the $1 million legal fee claim?
05:03:53 11    MR. PASQUARELLO: Objection.
05:03:56 12    A. Legal -- cost of legal representation
05:04:16 13   incurred in connection with lawsuits filed against
05:04:20 14   Kotva, plus any work in connection with the case in
05:04:26 15   Boston.
05:04:28 16    Q. All right. Putting aside what you've paid
05:04:31 17   to Mr. Beckman's firm, how much have you paid to
05:04:36 18   lawyers in the Czech Republic in connection with
05:04:40 19   the Gilroy lawsuit?
05:04:53 20    A. I am -- I don't know exact number. I am
05:05:02 21   just estimating aggregate numbers.
05:05:05 22    Q. The aggregate number is $300,000 to the
05:05:09 23   Czech lawyers; is that correct?
05:05:15 24    MR. PASQUARELLO: Objection.

### Page 145

05:05:17 1    A. Very roughly.
05:05:19 2    Q. All right. How much have you paid in
05:05:25 3   connection with the KT lawsuit?
05:05:35 4    MR. PASQUARELLO: Objection.
05:05:36 5    A. It is the same answer. I am unable to
05:05:45 6   give you exact numbers.
05:05:46 7    Q. I'm asking for your best estimate.
05:05:51 8    MR. PASQUARELLO: Objection.
05:05:52 9    A. I cannot break it down like that.
05:06:01 10    Q. Are you including in your estimate of
05:06:10 11   $300,000 any amounts paid for matters other than
05:06:18 12   the KT lawsuit and the Gilroy lawsuit?
05:06:29 13    MR. PASQUARELLO: Objection.
05:06:31 14    A. I include legal work in connection with
05:06:47 15   the -- the suit in the United States.
05:06:50 16    Q. Legal work by Czech lawyers regarding the
05:06:55 17   suit in the United States?
05:07:02 18    A. Yes.
05:07:02 19    Q. All right. What's your best estimate of
05:07:06 20   the amount paid to Czech lawyers in connection with
05:07:11 21   this lawsuit in the United States?
05:07:19 22    MR. PASQUARELLO: Objection.
05:07:20 23    A. That's exactly what I cannot categorize.
05:07:28 24    Q. Is there any way that you can categorize

37 (Pages 142 to 145)

Richard Harazim                                          01/23/2007

---

**Page 146**

05:07:36 1  that if you went back to your office?
05:07:48 2      A. Of course, lawyers must submit breakdown
05:07:59 3  of their work.
05:08:03 4      Q. So is it your testimony that you would
05:08:07 5  have records that would allow you to break down how
05:08:11 6  much the Czech lawyers were paid for Gilroy, for
05:08:15 7  KT, for Boston?
05:08:30 8      MR. PASQUARELLO: Objection.
05:08:34 9      A. I suppose that it would have to -- it
05:08:43 10 would -- it has to be possible to find these
05:08:45 11 numbers. It would be possible to find those
05:08:48 12 numbers.
05:08:50 13     Q. My question is a little different. Do you
05:08:53 14 have records to do that breakdown?
05:09:01 15     MR. PASQUARELLO: Objection.
05:09:04 16     A. I do not work in the accounting
05:09:14 17 department, but I suppose that each bill -- each
05:09:19 18 invoice submitted by the lawyers must have a
05:09:22 19 breakdown of hours spent.
05:09:31 20     Q. Do you approve the lawyers' bills for
05:09:35 21 payment before you send them to the accounting
05:09:38 22 department?
05:09:39 23     A. I approve the -- the bills of American
05:09:48 24 lawyers.

**Page 147**

05:09:50 1      Q. And by that, though, does that mean you do
05:09:53 2  not approve the bills of the Czech lawyers?
05:10:02 3      MR. PASQUARELLO: Objection.
05:10:04 4      A. No.
05:10:05 5      Q. Do you approve the bills of the Czech
05:10:09 6  lawyers before you submit them for payment?
05:10:17 7      A. I don't.
05:10:18 8      Q. Who does?
05:10:21 9      A. To be honest, in today's structure, I
05:10:33 10 don't know.
05:10:31 11     Q. So -- so you don't know whether the Czech
05:10:36 12 lawyers' bills break down the time spent on the
05:10:40 13 Gilroy lawsuit versus the KT lawsuit, for example?
05:10:52 14     MR. PASQUARELLO: Objection.
05:10:55 15     A. I don't know that. I suppose that.
05:11:05 16     Q. Still on Exhibit 6, page 2 references that
05:11:10 17 Koiva also incurred interest and banking penalties
05:11:16 18 on its J&T Bank loan because of the delay in
05:11:20 19 closing the transaction estimated to be in excess
05:11:23 20 of $250,000. Do you see that on the document?
05:11:50 21     A. Yes.
05:11:51 22     Q. All right. Does Koiva have documents that
05:11:58 23 support the calculation of $250,000 of damages?
05:12:08 24     A. Definitely.

**Page 148**

05:12:13 1      Q. All right. What banking penalties did
05:12:18 2  Koiva suffer?
05:12:23 3      A. I do not remember details, but I know that
05:12:37 4  Koiva took a loan from J&T Bank which was due,
05:12:42 5  payable at the end of 2004. Before the Gilroy --
05:13:13 6  Gilroy lawsuit was filed, it was clear that in
05:13:16 7  summer 2004, the Koiva/Markland transaction
05:13:22 8  could -- could have been executed and even if
05:13:27 9  anything else happened, Koiva could have refinanced
05:13:29 10 itself. But because Gilroy filed lawsuit bringing
05:13:44 11 into doubt the ownership of real -- of real estate
05:13:54 12 and on the same date, Gilroy filed an application
05:14:00 13 with the land deed register requesting to make a
05:14:06 14 note on the -- in the ownership certificate, the
05:14:17 15 result was that, the same day, Koiva could not be
05:14:22 16 financed in the Czech Republic. No bank in the
05:14:36 17 Czech Republic will loan money to an entity that
05:14:40 18 provides collateral in the form of real estate
05:14:50 19 where the ownership is in doubt.
05:15:05 20     So since at the end of 2004, we were
05:15:10 21 unable to pay off the loan from the money that we
05:15:16 22 would generate from the sale of the department
05:15:19 23 store and we were unable to refinance under
05:15:30 24 standard conditions, we became -- we became delayed

**Page 149**

05:15:44 1  on payments on that -- that loan that was due at
05:15:47 2  the end of 2004, delinquent. And as it is usual
05:16:06 3  anywhere in the world, in such case, bank
05:16:10 4  applies -- increases the interest and applies
05:16:13 5  sanctions and other instruments.
05:16:31 6      And I would also like to state that there
05:16:34 7  was even a much greater risk, because in fact the
05:16:38 8  bank had the right to seize the -- the real estate.
05:16:53 9      Q. Do you have a written analysis of the
05:16:57 10 estimate of $250,000 of damages in relation to the
05:17:11 11 J&T Bank -- the J&T Bank loan?
05:17:15 12     MR. PASQUARELLO: Objection.
05:17:16 13     A. I think this amount was derived from the
05:17:28 14 accounting.
05:17:30 15     Q. Was there a -- a written analysis?
05:17:36 16     MR. PASQUARELLO: Same objection.
05:17:37 17     A. I don't know.
05:17:39 18     Q. How much of the estimated $250,000 is
05:17:44 19 interest?
05:17:49 20     A. I cannot provide any details about how
05:17:56 21 this number was calculated by -- on the top of my
05:18:02 22 head -- off the top of my head.
05:18:05 23     Q. How much of the $250,000 is penalties?
05:18:10 24     A. Off the top of my head, I cannot give you

38 (Pages 146 to 149)

3cdf5077-a976-42fb-854b-2c595b390941

Richard Harazim                                    01/23/2007

---

Page 150

05:18:20  1   a breakdown of that number.
05:20:03  2       MR. LEIBENSPERGER: Why don't we end here
05:20:05  3   for the day.
05:20:07  4       THE VIDEOGRAPHER: Here marks the end of
05:20:09  5   videotape number four in the deposition of
05:20:12  6   Richard Harazim. The original videotapes will
05:20:15  7   be retained by Merrill Legal Solutions. Going
05:20:18  8   off the record. The time is 5:20.
05:20:24  9       (Whereupon, this deposition was concluded
05:20:26 10   at 5:20 p.m.)
05:20:26 11
         12
         13
         14
         15
         16
         17
         18
         19
         20
         21
         22
         23
         24

---

Page 152

 1            CERTIFICATE
 2   Commonwealth of Massachusetts
 3   Suffolk, ss.
 4
 5       I, Dana Welch, Registered Professional
 6   Reporter and Notary Public in and for the
 7   Commonwealth of Massachusetts, do hereby certify
 8   that RICHARD HARAZIM, the witness whose deposition
 9   is hereinbefore set forth, was duly sworn by me and
10   that such deposition is a true record of the
11   testimony given by the witness.
12       I further certify that I am neither related
13   to nor employed by any of the parties in or counsel
14   to this action, nor am I financially interested in
15   the outcome of this action.
16       In witness whereof, I have hereunto set my
17   hand and seal this 5th day of February, 2007.
18
19                        _____
                          Dana Welch
20                        Notary Public
                          My commission expires:
21                        October 22, 2010
22
23
24

---

Page 151

 1            CERTIFICATE
 2
 3       I, RICHARD HARAZIM, do hereby certify that I
 4   have read the foregoing transcript of my testimony,
 5   and further certify that it is a true and accurate
 6   record of my testimony (with the exception of the
 7   corrections listed below):
 8   Page Line      Correction
 9
10
11
12
13
14
15
16
17
18
19       Signed under the pains and penalties of
20   perjury this ____ day of _____, 2007.
21
22            _____
              RICHARD HARAZIM
23
24

---

39 (Pages 150 to 152)

3cdf5077-a976-42fb-8S4b-2c595b390941

30 (B) (6)

VOLUME 3, PAGES 404 - 488

EXHIBITS: 41 - 50

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

No. 05-10679-RCL

- - - - - - - - - - - - - - - - - - - - - - - -

KOTVA a.s.,

               Plaintiffs

          vs.

ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,

               Defendants

(Full Caption on Page 2)

---

CONTINUATION OF

VIDEOTAPED RULE 30(b)(6) DEPOSITION OF KOTVA a.s.

BY ITS DESIGNEE RICHARD HARAZIM

Wednesday, January 24, 2007, 9:36 a.m.

McDermott, Will & Emery

28 State Street, 34th Floor

Boston, Massachusetts 02109

Reporter:  Dana Welch, CSR, RPR

Certified LiveNote Trainer

Richard Harazim, Vol. 3                                01/24/2007

30 (B) (6)

| Page 445 | Page 447 |
|---|---|
| 11:28:15 1  A. Yes. | 11:31:53 1  break? |
| 11:28:16 2  Q. Okay. Do you remember it was dated in | 11:31:54 2  MR. LEIBENSPERGER: If you want to take a |
| 11:28:19 3  early 2002? | 11:31:55 3  break. |
| 11:28:23 4  A. I don't remember the date. | 11:31:56 4  THE VIDEOGRAPHER. Going off the record. |
| 11:28:29 5  Q. Well, do you remember that it was dated | 11:31:55 5  The time is 11:32. |
| 11:28:35 6  prior to your meeting with Mr. Weiss in May of | 11:32:07 6  (Proceedings interrupted at 11:32 a.m. and |
| 11:28:41 7  2002? | 11:32:59 7  reconvened at 11:33 a.m.) |
| 11:28:48 8  MR. PASQUARELLO: Objection. | 11:32:59 8  MR. PASQUARELLO: All set |
| 11:28:50 9  A. Probably, yes. | 11:32:59 9  THE VIDEOGRAPHER: Back on the record. |
| 11:28:53 10  Q. Do you remember that the arbitrator in | 11:32:59 10  The time is 11:33. |
| 11:28:56 11  that London arbitration found it to be highly | 11:33:59 11  (Off-the-record discussion held.) |
| 11:29:01 12  probable that a court would award Trend 32 percent | 11:33:05 12  BY MR. LEIBENSPERGER: |
| 11:29:06 13  of Kotva shares? | 11:33:14 13  Q. Do you recall that in the communications |
| 11:29:20 14  MR. PASQUARELLO: Objection. | 11:33:16 14  with Mr. Weiss in the second half of 2004 that |
| 11:29:33 15  A. There was a consideration like that, yes. | 11:33:20 15  Mr. Weiss sought a lawyer for the Trend shares held |
| 11:29:26 16  Q. All right. And do you re-- recall that | 11:33:47 16  by BGO? |
| 11:29:37 17  the arbitration award actually awarded damages | 11:33:44 17  MR. PASQUARELLO: Objection |
| 11:29:42 18  based on the probability that Trend would own | 11:34:01 18  A. In one of his e-mails, Mr. Weiss |
| 11:29:50 19  32 percent of the shares of Kotva? | 11:34:10 19  conditioned the -- the withdrawal of the lawsuit by |
| 11:30:04 20  MR. PASQUARELLO: Objection. | 11:34:15 20  the purchase of shares of Trend. I responded that |
| 11:30:07 21  A. I do not remember that. | 11:34:19 21  we were never interested in the shares of Trend. |
| 11:30:10 22  Q. Do you remember that the high probability | 11:34:25 22  Q. You understood at that time in 2004 that |
| 11:30:13 23  of Trend owning 32 percent of the shares of Kotva | 11:34:32 23  the shares of Trend had some value? |
| 11:30:18 24  was at 80 percent, according to the arbitrator? | 11:34:40 24  MR. PASQUARELLO: Objection |

| Page 446 | Page 448 |
|---|---|
| 11:30:33 1  MR. PASQUARELLO: Objection. | 11:34:43 1  A. We were never interested in shares of |
| 11:30:34 2  A. Yes, I remember there was some kind of | 11:34:45 2  Trend. |
| 11:30:40 3  high probability in that arbitration award. | 11:34:50 3  Q. Can you answer my question? |
| 11:30:46 4  Q. You knew about that award and that | 11:34:56 4  A. I was not -- it did not concern me. I was |
| 11:30:50 5  probability when Mr. Weiss was negotiating with you | 11:35:02 5  not interested in the value of shares of Trend. |
| 11:30:54 6  to buy the BGO shares of Trend, correct? | 11:35:11 6  Q. Still, my question was, did you understand |
| 11:31:10 7  MR. PASQUARELLO: Objection. You can | 11:35:14 7  that the shares of Trend, based on your reading the |
| 11:31:13 8  answer. | 11:35:20 8  London arbitration decision, did have some value? |
| 11:31:13 9  A. We never negotiated the purchase of shares | 11:35:26 9  MR. PASQUARELLO: Objection. |
| 11:31:15 10  of Trend. | 11:35:27 10  A. I was not considering any -- in my head |
| 11:31:19 11  Q. Well, do you recall in the -- in the | 11:35:47 11  any considerations of value of shares, value of |
| 11:31:23 12  communications starting in August 2004 and going to | 11:35:51 12  shares of Trend |
| 11:31:31 13  the end of 2004 -- do you want to change your last | 11:35:55 13  Q. So is your answer that you don't know |
| 11:31:34 14  answer? | 11:35:58 14  whether the shares in Trend had value? |
| 11:31:35 15  MR. PASQUARELLO: There's no question | 11:35:57 15  MR. PASQUARELLO: Objection |
| 11:31:38 16  pending right now. | 11:36:08 16  A. I don't know whether they had any value. |
| 11:31:39 17  MR. LEIBENSPERGER: It -- it seemed like | 11:36:25 17  considering the fact that Trend -- Trend was in |
| 11:31:40 18  he wanted to -- | 11:36:30 18  bankruptcy. If there was any value, it must have |
| 11:31:41 19  MR. PASQUARELLO: I don't know -- I don't | 11:36:34 19  been very low. But I never was losing any time |
| 11:31:42 20  know if he was actually trying to get -- | 11:36:39 20  thinking about it. |
| 11:31:44 21  THE WITNESS: I'm having trouble with | 11:36:44 21  Q. At the meeting with Mr. Weiss in the |
| 11:31:48 22  concentration when Mr. Weiss smiles at me all | 11:36:44 22  restaurant on May 12, 2004, did you tell Mr. Weiss |
| 11:31:50 23  the time like that. | 11:36:48 23  that there was not an agreement between Kotva -- or |
| 11:31:51 24  MR. PASQUARELLO: Can we take a two-minute | 11:36:54 24  there was not an agreement for Kotva to sell the |

12 (Pages 445 to 448)

Richard Harazim, Vol. 3                                    01/24/2007

30 (B) (6)

Page 449

11:37:01 1   real estate?
11:37:14 2       MR. PASQUARELLO: Objection. If you
11:37:18 3   understand.
11:37:21 4       A. We told Mr. Weiss that we were unable to
11:37:29 5   comment on this issue because we cannot provide to
11:37:43 6   one of the share -- shareholders information
11:37:45 7   different from what information we provide to the
11:37:48 8   rest of the shareholders. So we never officially
11:38:01 9   admitted publicly that we were dealing with
11:38:05 10  Markland. That's why we were unable to say it --
11:38:13 11  to give this information to one of the
11:38:15 12  shareholders.
11:38:19 13      Q. It had been reported in the media before
11:38:21 14  the meeting on May 12, 2004 that Kotva had reached
11:38:25 15  an agreement to sell the building for 1.5 billion
11:38:29 16  Czech korunas; is that correct?
11:38:43 17      A. I think the price estimates in media were
11:38:53 18  inaccurate.
11:38:54 19      Q. What -- what were the price estimates in
11:39:00 20  the media?
11:39:28 21      A. The English press reported that, complete
11:39:32 22  nonsense, that 50 percent of shares of Kotva are
11:39:35 23  sold for 50 million pounds. And the Czech press
11:39:40 24  published different speculations, which one of them

Page 450

11:39:45 1   I remember was in Mlada Fronta newspaper that the
11:39:51 2   price is 1.7 billion.
11:39:54 3       Q. Did you tell Mr. Weiss that the press
11:39:57 4   reports regarding a deal to sell the building were
11:40:00 5   wrong?
11:40:16 6       A. We -- our behavior towards Mr. Weiss was
11:40:26 7   exactly the same as our behavior towards media. We
11:40:31 8   have not even confirmed that such negotiation
11:40:23 9   existed.
11:40:35 10      Q. My question was different. Did you tell
11:40:37 11  Mr. Weiss that the reports in the media were wrong?
11:40:51 12      MR. PASQUARELLO: Objection.
11:40:50 13      A. I think I did.
11:40:58 14      Q. Okay. At the meeting, do you recall
11:41:05 15  that -- well, strike that.
11:41:05 16      You testified previously that Mr. Weiss,
11:41:09 17  at this meeting on May 12, said that he would bring
11:41:13 18  lawsuits against Kotva; is that your memory?
11:41:16 19      MR. PASQUARELLO: Objection.
11:41:31 20      A. Yes.
11:41:32 21      Q. At that meeting on May 12, 2004, did he
11:41:37 22  mention the name of the lawyer that would assist
11:41:43 23  him in bringing lawsuits?
11:41:48 24      A. I'm not aware of that.

Page 451

11:41:51 1       Q. At that meeting on May 12, 2004, did he
11:41:56 2   mention the name Ondrej Peterka?
11:42:19 3       A. I don't remember he would say anything
11:42:14 4   like that.
11:42:45 5       Q. With respect to Mr. Laznicka's client, who
11:42:53 6   bought Gilroy, did that same client also buy
11:42:58 7   Balfindor?
11:43:02 8       MR. PASQUARELLO: Objection.
11:43:07 9       A. I don't know anything like that.
11:43:10 10      Q. All right. Are you aware of whether
11:43:15 11  Balfindor, the corporation, was sold? Stop there.
11:43:12 12  was sold.
11:43:13 13      MR. PASQUARELLO: Objection. Ned, is this
11:43:22 14  one of the subject matters of inquiry in the
11:43:25 15  30(b)(6) notice?
11:43:28 16      MR. LEIBENSPERGER: Yes. It connects with
11:43:31 17  the notice with respect to the lawsuits of
11:43:36 18  Gilroy.
11:43:39 19      MR. PASQUARELLO: Balfindor?
11:43:43 20      MR. LEIBENSPERGER: Yes. It will connect
11:43:46 21  up, please. I may only -- let me --
11:43:48 22      MR. PASQUARELLO: Well, I'd just like to
11:43:55 23  know now because Mr. Harazim is only prepared
11:43:55 24  for certain subject matters as a 30(b)(6)

Page 452

11:43:59 1   witness.
11:43:55 2       MR. LEIBENSPERGER: My question is
11:43:55 3   pending.
11:43:55 4       Q. Do you know anything about the sale of
11:44:00 5   Balfindor?
11:44:04 6       A. No.
11:44:05 7       Q. When you testified about Mr. Laznicka's
11:44:13 8   client buying Gilroy, did you say it was for 4
11:44:15 9   million korunas or $4 million or 4 million Euros?
11:44:23 10      MR. PASQUARELLO: Objection. You mean
11:44:27 11  when he testified yesterday?
11:44:32 12      MR. LEIBENSPERGER: Yes.
11:44:32 13      A. I said 4 million korunas.
11:44:40 14      Q. And you testified yesterday that you don't
11:44:43 15  know who Mr. Laznicka's client was?
11:44:50 16      A. I did not testify that.
11:44:57 17      Q. Do you know who Mr. Laznicka's client was
11:45:06 18  that bought Gilroy?
11:45:09 19      A. I said it is a foreign company whose name
11:45:12 20  I cannot remember.
11:45:17 21      Q. All right. Isn't it true that as part of
11:45:27 22  that transaction, Mr. Laznicka's client agreed to
11:45:43 23  not pursue the Gilroy lawsuit against Kotva?
11:45:13 24      MR. PASQUARELLO: Objection

Merrill Legal Solutions
(617) 542-0039

Richard Harazim, Vol. 3                                01/24/2007

30 (B) (6)

Page 457

11:53:41 1    MR. LEIBENSPERGER: No, we're not. This
11:53:47 2    is directly within the 30(b)(6). And I'm
11:53:45 3    going to add time to my three hours --
11:53:47 4        MR. PASQUARELLO: You can have another two
11:53:49 5    minutes, Ned.
21:53:49 6        MR. LEIBENSPERGER: Please.
11:53:51 7        MR. PASQUARELLO: Same objection.
11:53:53 8    A. I don't have that e-mail.
11:53:54 9    Q. All right. And you don't -- you don't
11:53:56 10   have that e-mail with its attachment any longer; is
11:54:00 11   that correct?
11:54:07 12   A. I don't have the e-mail with the
11:54:09 13   attachment.
11:54:10 14   Q. And did -- did you ask Mr. Nekuta whether
11:54:15 15   he had this e-mail that he sent to you with the
11:54:18 16   attachment?
11:54:24 17       MR. PASQUARELLO: Objection. You can
11:54:26 18   answer.
11:54:26 19   A. I did ask.
11:54:27 20   Q. And he also no longer has that e-mail with
11:54:30 21   the attachment; isn't that correct?
11:54:24 22       MR. PASQUARELLO: Objection.
11:54:35 23   A. That's correct.
11:54:51 24   Q. Other than the meeting at Mr. Peterka's

Page 458

11:54:54 1    office where Mr. Prestage was present, are you
11:54:57 2    aware of any other meeting with Mr. Hoffmann where
11:55:59 3    a representative of Markland was present?
11:55:15 4        MR. PASQUARELLO: Could you read that
11:55:17 5    back?
11:55:31 6        THE REPORTER: "Question: Other than the
11:55:31 7    meeting at Mr. Peterka's office where
11:55:31 8    Mr. Prestage was present, are you aware of any
11:55:33 9    other meeting with Mr. Hoffmann where a
11:55:42 10   representative of Markland was present?"
11:55:42 11       MR. PASQUARELLO: Objection. You can
11:55:48 12   answer.
11:55:48 13   A. I'm not aware of any meeting like that.
11:55:16 14   Q. Are you aware of any telephone
11:55:52 15   conversation that Mr. Hoffmann was on where also a
11:55:57 16   representative of Markland was on?
11:58:11 17   A. I was told by Mr. Prestage and I think
11:58:15 18   also by Mr. Hoffmann that Mr. Hoffmann called
11:58:16 19   Mr. Prestage
11:58:16 20   Q. What are you recalling with respect to the
11:58:16 21   timing of that conversation between Mr. Prestage
11:58:16 22   and Mr. Hoffmann?
11:58:44 23   A. I am unable to specify the timing.
11:58:51 24   Q. You were told that this happened by

Page 459

11:56:54 1    Mr. Prestage?
11:56:59 2        MR. PASQUARELLO: Objection.
11:57:00 3    A. Yes.
11:57:00 4    Q. All right. Was it before the meeting at
11:57:03 5    Mr. Peterka's office on October 18, 2004?
11:57:07 6    A. I am guessing, but I believe it was -- I
11:57:22 7    think it was before that meeting.
11:57:24 8    Q. What did Mr. Prestage tell you about that
11:57:39 9    conversation?
11:57:48 10   A. As far as I remember, Henry told me that
11:58:04 11   Mr. Hoffmann wanted to know some details, and Henry
11:58:09 12   refused to confirm or deny it and referred
11:58:13 13   Mr. Hoffmann to me.
11:58:15 14   Q. What did Mr. Prestage tell you about what
11:58:19 15   details Mr. Hoffmann wanted to know about?
11:58:24 16   A. I don't think he gave me any more specific
11:58:31 17   information about it.
11:58:47 18   Q. Other than that one telephone conversation
11:58:47 19   and the meeting at Mr. Peterka's office, are you
11:58:55 20   aware of any other communications between
11:59:03 21   Mr. Hoffmann and anyone at Markland?
11:59:03 22       MR. PASQUARELLO: Objection.
11:59:03 23   A. I am not aware of any.
11:59:13 24   Q. All right. You were aware that Mr. Benda

Page 460

11:59:24 1    was video recording meetings with Mr. Hoffmann in
11:59:27 2    the period of August 2004; is that correct?
11:59:43 3        MR. PASQUARELLO: Objection.
11:59:43 4    A. Yes.
11:59:49 5    Q. Did -- did you approve of Mr. Benda doing
11:59:52 6    that?
11:59:55 7        MR. PASQUARELLO: Objection.
11:59:58 8    A. Yes.
12:00:11 9    Q. The purpose of Mr. Benda doing those video
12:00:13 10   recordings was to gather evidence to use against
12:00:13 11   Mr. Weiss; is that correct?
12:00:13 12       MR. PASQUARELLO: Objection. You can
12:00:19 13   answer.
12:00:20 14   A. Yes.
12:00:33 15   Q. All right. Are you aware that in 2006,
12:00:18 16   the prosecutor in the Halek prosecution renewed the
12:00:27 17   freeze on the transfer of Forminster shares in
12:00:38 18   Kotva?
12:01:19 19       MR. PASQUARELLO: Objection.
12:01:20 20   A. No.
12:01:21 21   Q. Is it your understanding that the
12:01:27 22   Forminster shares of Kotva -- strike that.
12:01:27 23   Is it your understanding that the shares
12:01:34 24   of Kotva that Forminster holds are still frozen

15 (Pages 457 to 460)

C

SPV, Co. by Richard Harazim

Page 1

1                                    Volume:   I

2                                    Pages:  1-124

3                                    Exhibits:  1-6

4

5              UNITED STATES DISTRICT COURT

6              DISTRICT OF MASSACHUSETTS

7    Civil Action No. 05-10679-WGY

8    - - - - - - - - - - - - - - - - - - - - - - - x

9    KOTVA, a.s.,

10                Plaintiff,

11        v.

12   ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,

13                Defendants.

14   - - - - - - - - - - - - - - - - - - - - - - - x

15

16   VIDEOTAPED INTERPRETED RULE 30(b)(6) DEPOSITION OF

17      SPV Co., By Its Designee, RICHARD HARAZIM

18              Wednesday, June 27, 2007

19              2:30 p.m. to 6:31 p.m.

20              McDERMOTT, WILL & EMERY

21                28 State Street

22              Boston, Massachusetts

23

24      Reporter:  Marianne R. Wharram, CSR/RPR

SPV, Co. by Richard Harazim

Page 6

1    MR. BECKMAN: Joel Beckman representing
2  the plaintiffs.
3    RICHARD HARAZIM,
4  a witness called on behalf of the Defendants,
5  having first been satisfactorily identified by the
6  production of his Czech Republic passport and duly
7  sworn by the Notary Public,
8  was examined and testified as follows:
9    DIRECT EXAMINATION
10   Q. (BY MR. DANGEL) And you understand,
11  Mr. Harazim, that taking an oath in the United
12  States means that if it's found that you've given
13  perjurious testimony, you could be prosecuted
14  criminally in the United States for that?
15   MR. BECKMAN: Objection.
16   A. Yes.
17   Q. (BY MR. DANGEL) Sir, I'm going to -- this
18  is your third day -- oh, that's right. This is an
19  SPV Co. deposition.
20   MR. BECKMAN: Yeah, just so the record
21  is clear --
22   Q. (BY MR. DANGEL) But this is your third day
23  of deposition. I understand.
24   MR. BECKMAN: Just so the record is

Page 7

1  clear, as you know, we've objected to the subject
2  matters in the 30(b)(6) notice, but without waiving
3  these designee objections, we have designated, or
4  SPV Co. has designated Mr. Harazim to testify with
5  respect to subject matters one, two, three, four,
6  five, six, nine, ten, 11, 13, 15, 16, 17, 18, 19,
7  20 and 21. Also, given our exchange in the prior
8  deposition, Mr. Dangel, we'll designate Mr. Harazim
9  with respect to subject matter number 14, and given
10  Mr. David's testimony regarding Mr. Harazim's
11  involvement in Deveplan, you certainly will be
12  permitted to testify or to ask questions of
13  Mr. Harazim with respect to that, and we'll
14  designate him with respect to subject matter number
15  seven as well.
16   MR. DANGEL: Okay.
17   Q. (BY MR. DANGEL) Mr. Harazim, I take it
18  that in your role at CI-- at CIS, you keep your eye
19  on the investments that are made in the name of SPV
20  Co. Limited, both the monies that were received and
21  are free from the sale of the Kotva property and
22  also the escrow agreement; is that correct?
23   MR. BECKMAN: Objection.
24   A. That is a complex question or sentence for

Page 8

1  the beginning, so I will say -- answer not -- not
2  exactly that way.
3   Q. (BY MR. DANGEL) Okay. Do you keep your
4  eye on the investments made on the money that was
5  held back or put into escrow?
6   A. Neither I nor any entity has control over
7  the escrow account money on the part of Kotva.
8   Q. I only asked whether you keep your eye on
9  the investments that are made. Do you?
10   MR. BECKMAN: Objection.
11   A. There are no investments, and that's why I
12  cannot keep an eye -- keep an eye over them.
13   Q. (BY MR. DANGEL) So you don't consider
14  putting money into a bond or into a money market
15  investment or any interest returning instrument to
16  be an investment?
17   MR. BECKMAN: Objection.
18   A. The money in the escrow is held with the
19  condition that in order to invest the money, there
20  must be joint instruction issued by Kotva and
21  Markland.
22   Q. (BY MR. DANGEL) Who on the Kotva side
23  negotiated the escrow agreement?
24   A. I did the work, and of course, the approval

Page 9

1  and the acceptance of the -- of the conditions is
2  up to the board.
3   Q. And --
4   MR. BECKMAN: Terry, same stipulations?
5  I'm sorry to interrupt. I forgot to say that.
6   MR. DANGEL: I was on a roll.
7   MR. BECKMAN: Same stips?
8   MR. BECKMAN: Of course.
9   MR. BECKMAN: Thanks.
10   MR. DANGEL: All we're doing is
11  stipulating that the federal rules apply.
12   MR. BECKMAN: Well, all objections
13  except as to the form of the question or privilege
14  are reserved until trial.
15   MR. DANGEL: Okay. That's exactly what
16  it says.
17   Q. (BY MR. DANGEL) You're a graduate of
18  business school, are you not, sir?
19   A. Yes.
20   Q. In fact, you have an advanced degree? You
21  have a Master's of Business Administration from the
22  University of Pittsburgh, do you not?
23   A. Yes.
24   MR. BECKMAN: Objection. Asked and

3 (Pages 6 to 9)

Q. Now, at the time you did this negotiation, who were the members of the board of directors of KN and of SPV Co.?

MR. BECKMAN: Objection. This has been covered, but you can certainly answer.

**A. People stated in this document. Do you want me to read them?**

Q. (BY MR. DANGEL) No. Now, KN was a partnership, right?

**A. Yes. Yes.**

Q. And KO, which I'm sorry I can't pronounce the name of, but that company was a general partner, or as they call it, an unlimited partner of KN, correct?

MR. BECKMAN: Objection.

**A. Yes.**

Q. (BY MR. DANGEL) All of the people who voted to approve the deal and who signed the deal from the seller's side were grown men and women with experience in business, correct?

MR. BECKMAN: Objection.

**A. Yes.**

Q. (BY MR. DANGEL) And presumably, they knew -- understood -- knew and understood the document

they were signing, correct?

**A. Yes.**

Q. And you knew and understood it, correct?

**A. Yes.**

Q. Sir, can you show me where in the escrow agreement or the amendment there's any limitation stated as to what the money that was being put into escrow could be invested in or used for?

**A. After two years, of course, I do not recall accurately, but if you want me to read the contract, I can do it.**

Q. I want you to read through the contract and I want you to refer me to any section in which you claim there is any limitation placed on what the money placed into escrow can be invested in or used for.

**A. On 51, in connection with appendix number six.**

Q. This is the section that begins the escrow amount shall be invested according to the joint instructions; is that correct?

**A. Since I only have scanned through the contract and I did not read it thoroughly, after two years, I would think that this is the sentence**

**that meets the conditions.**

Q. You needn't take it from me, but I'll represent to you that that's the only section that I found that could possibly cover this.

MR. BECKMAN: Is that a question?

MR. DANGEL: No. I'm just making him rest easy, and then I'll move on.

MR. BECKMAN: Just ignore that.

Q. (BY MR. DANGEL) Looking, then, at that section, do you see any language in there that requires that the escrow amount be invested in low yield bonds, Money Market instruments, or other low yield investments?

**A. No, but what I see is that there is a need for a joint instruction -- joint instruction from Markland, and it was not the interest of Markland to invest the money with any risk at all, and as we ordinarily know, the least risky investments brings the lowest yield. On top of that, Markland insisted that the amount invested in the escrow account be very liquid, and it was very difficult to convince Markland at all that the money needs to be invested in any manner. Their original idea was to keep the money in a current account.**

Q. Thank you for the completeness of the answer, but I will reserve my rights, as we have, to strike everything after the word yes. Nevertheless, we will in short order be covering much of what came after the word yes, and so let me go on with that by asking you this. Is there anything in writing in this section which defines how the money must be or shall be invested?

MR. BECKMAN: Objection. In addition to what he already testified to? He identified two things, and I'm not going to say any more --

MR. DANGEL: Please don't.

MR. BECKMAN: -- but he identified two things.

Q. (BY MR. DANGEL) I'm looking for a definition of how money is to be invested; not the manner, but the type of investment that is required under the escrow agreement.

**A. Risking that you will strike me again, I will answer that it must meet the requirements of both parties.**

MR. BECKMAN: Don't -- I have to instruct the witness. Ignore the motions to strike. You give your answer to a complete answer.

SPV, Co. by Richard Harazim

Page 18

1  Don't be coached by him saying he's going to strike
2  your answer. You answer the question as you feel
3  --
4       MR. DANGEL: Oh, Mr. Harazim, do you
5  need that translated?
6       INTERPRETER: What was the question?
7       MR. DANGEL: It's quite all right.
8  Don't worry.
9    Q. (BY MR. DANGEL) Now I'm going to try to
10  ask a very precise question just to make my point
11  and then we'll move on. I am correct, am I not,
12  that there is nothing in Section 5.1 which defines
13  how -- that defines what type of investments must
14  be made of the escrow amount --
15       MR. BECKMAN: Objection.
16    Q. (BY MR. DANGEL) -- the type of
17  investment --
18       MR. BECKMAN: Objection.
19    Q. (BY MR. DANGEL) -- am I not?
20    A. I don't think you are right.
21    Q. Tell me where in this language in 5.1 it
22  says that the money must be, for instance, invested
23  in a low yield investment or a no risk investment?
24    A. We are running in circles. I think that

Page 19

1  the meaning of joint instruction is in the fact
2  that it must be an investment that is accepted
3  before Markland.
4    Q. Did Markland tell you in advance of signing
5  this agreement that it would only agree to low
6  yield investments?
7    A. Yes, Markland wanted the money to remain in
8  the form of current account.
9    Q. Who at Markland told you that?
10    A. I -- after so much time, I will not be able
11  to identify the person with accuracy, but the main
12  person I was dealing with was Andrew Prestage.
13    A. (By the Witness) Henry.
14    A. (Through the Interpreter) Henry Prestage.
15    Q. Are you testifying that Henry Prestage told
16  you that Markland would only agree to cash
17  equivalent or low risk -- strike that -- to low
18  risk, low yield investments of the escrow money?
19       MR. BECKMAN: Objection. Asked and
20  answered.
21    A. What I'm saying is that someone from
22  Markland, and after so much time I cannot identify
23  who it was, told me that Markland will only agree
24  with low risk investment and very liquid

Page 20

1  investment.
2    Q. (BY MR. DANGEL) Did you report that to the
3  board of KN and SPV Co. prior to their execution of
4  the escrow agreement?
5    A. Of course.
6    Q. Do you have freedom of contract in your
7  country?
8       MR. BECKMAN: Objection.
9    A. I don't know the term. What does it mean?
10    Q. (BY MR. DANGEL) Were you forced, was the
11  board of directors forced by the government or any
12  other organization to sign this agreement in the
13  form that it is in?
14       MR. BECKMAN: Objection.
15    A. I must explain this. The contract, the way
16  we signed it, despite the way you are directing
17  your questions, was a big victory for Kotva.
18    Q. (BY MR. DANGEL) Excuse me, but I -- I'm
19  going to move to strike that answer, okay? I'm
20  just going to ask my question again. I'm going to
21  ask my question again. First of all --
22       MR. BECKMAN: He's not done with his
23  answer. You cannot interrupt. You cannot
24  interrupt. He wasn't finished with his answer.

Page 21

1       MR. DANGEL: I'm just not going to have
2  political speeches and use my seven hours that way.
3  I'm sorry, but --
4    A. I do not want to say political speeches. I
5  would like to explain a financial matter to you.
6    Q. (BY MR. DANGEL) Let me ask you this. Did
7  Andrew Weiss force you to sign this contract in
8  this form?
9       MR. BECKMAN: Objection.
10    A. Economic necessity forced me to sign the
11  contract in this form.
12    Q. (BY MR. DANGEL) You didn't want to sign
13  it, though it was a big victory for Kotva?
14       MR. BECKMAN: Objection.
15    A. I did not like the situation that forced
16  Kotva to sign this contract.
17    Q. (BY MR. DANGEL) I'm talking about the form
18  of the contract and the language that's in S 5.1.
19  Did anybody force you -- did Andrew Weiss force
20  you; did the government of the Czech Republic force
21  you -- did anyone force you to sign the contract
22  with that language?
23       MR. BECKMAN: Objection. That's four
24  questions.

6 (Pages 18 to 21)

SPV, Co. by Richard Harazim

## Page 22

1    A. We didn't -- there was no need to force us.
2 We were happy to sign the contract. Despite the
3 fact that due to circumstances that occurred as a
4 result of Mr. Weiss' lawsuit, that was the
5 solution, the best solution for Kotva to do that.
6    Q. (BY MR. DANGEL) As a result of signing
7 this agreement, did Kotva, did the -- sorry; strike
8 that -- did the seller sign away its right to the
9 proceeds of the investments and interest earned
10 during the escrow period to anyone?
11    MR. BECKMAN: Objection.
12    A. We believe not, but somewhere in the
13 contract is a sentence that Markland is basing its
14 claim on interest accrued on escrow.
15    Q. (BY MR. DANGEL) And what sentence is that?
16    A. Somewhere in this contract is a sentence
17 that interest on escrow belongs to the buyer, but
18 how we understood the contract, it's only the money
19 accrued on the escrow account before Markland got
20 the shares. After -- once Markland received the
21 shares, we insist that the interest belongs to us,
22 so any interest accrued on the escrow belongs to
23 us --
24    A. (By the Witness) That the escrow belongs

## Page 23

1 to us.
2    A. (Through the Interpreter) -- that the
3 escrow belongs to us.
4    Q. Can you show me the sentence?
5    A. Meaning the sentence that Markland is
6 basing --
7    Q. That Markland is relying on. Don't go very
8 far. Just take a look at 5.3.
9    MR. BECKMAN: So you're withdrawing
10 that question?
11    MR. DANGEL: No, I'm helping him find
12 it.
13    A. Yes, that would be the sentence.
14    Q. (BY MR. DANGEL) Now, you read English
15 quite well, don't you, sir?
16    MR. BECKMAN: Objection.
17    A. Yes, I can read.
18    Q. (BY MR. DANGEL) And you had a lawyer,
19 Kotva and -- the Kotva parties had a lawyer or
20 lawyers, did they not?
21    A. Of course.
22    Q. And who was your lawyer?
23    A. Filip Smeja. It was Valdauf & Dolezal Law
24 Office, but Filip Smeja did this particular

## Page 24

1 translation.
2    Q. I'm going to read the language into the
3 record. Accrued interest, if any, shall be paid to
4 the buyer upon the first release of the whole or
5 part of the escrow amount and thereafter at such
6 intervals as the buyer shall request in writing,
7 except the interest earned from the investment of
8 the securities sum, which shall be credited to the
9 seller upon first release of the whole or part of
10 the escrow amount and thereafter at such intervals
11 as the seller shall request in writing. I read
12 that correctly, did I not?
13    INTERPRETER: If it's for translation,
14 I would need the text, please.
15    Q. (BY MR. DANGEL) Do you understand what I
16 read?
17    A. Mm-hmm.
18    Q. What's unclear about that language?
19    MR. BECKMAN: Objection.
20    MR. DANGEL: You can give it to her in
21 Czech if he needs it. We just provided a copy in
22 Czech to the translator.
23    MR. GOLDBERGER: No, it's in English.
24    INTERPRETER: It's in English, but

## Page 25

1 that's all right. It helps.
2    MR. DANGEL: Oh, in English. Oh, I'm
3 sorry. So you have it. Yes, I'm sorry.
4    Q. (BY MR. DANGEL) What's unclear about that
5 language?
6    A. The sentence does not exactly reflect the
7 business agreement we had with Markland. The first
8 draft of the escrow agreement was prepared before
9 any lawsuits of Gilroy and KT were existing.
10    Q. Right.
11    MR. BECKMAN: Let him finish his
12 answer.
13    Q. (BY MR. DANGEL) Go ahead.
14    MR. DANGEL: Joel, calm down. This
15 isn't that upsetting. Go ahead, please.
16    A. This — this sentence related to the
17 situation when Markland puts the money into the
18 escrow account and waits for the transfers of
19 shares. After the Gilroy lawsuit came around,
20 there were many things that we had to consider and
21 discuss, whether the transaction ended or under
22 what conditions it would end, and unfortunately,
23 this sentence was not amended to reflect that
24 situation. There were -- there were new facts like

7 (Pages 22 to 25)

SPV, Co. by Richard Harazim

**Page 26**

1  another amount and securities sum, and --
2      A. (By the Witness) Then security sum, then
3  escrow amount, that there would be the money kept
4  in the escrow after the transaction was closed.
5      Q. (BY MR. DANGEL) I understand. All of
6  Section 5, in fact, came from the original escrow
7  agreement; isn't that correct?
8      A. (Through the Interpreter) Most likely.
9      Q. And therefore, Section 5.1 was taken right
10  from the old escrow account -- escrow agreement,
11  and plugged into this new agreement, correct?
12      MR. BECKMAN: Objection.
13      A. I think that Markland had better lawyers
14  than we did, because .51 related to the money in
15  the escrow. It was very beneficial for them. They
16  liked it.
17      Q. (BY MR. DANGEL) Right. And that came from
18  the original escrow account -- agreement? That's
19  what I meant.
20      MR. BECKMAN: Objection.
21      A. Yes, but it reflected their interest in the
22  new situation.
23      Q. (BY MR. DANGEL) Right, but you really
24  can't blame the Gilroy lawsuit for causing the

**Page 27**

1  language of 5.1 if it was in the original escrow
2  agreement before the Gilroy lawsuit, can you?
3      MR. BECKMAN: Objection.
4      A. If it were not for Gilroy, there would not
5  be any securities sum.
6      Q. (By the Witness) Money in the escrow.
7      A. (Through the Interpreter) Oh, money in the
8  escrow.
9      Q. (BY MR. DANGEL) Well, there was an escrow
10  agreement before, I mean, as you've testified,
11  before the -- oh, I see what you're saying. There
12  would have been no money in it, but the agreement
13  would have been the same, correct?
14      MR. BECKMAN: Objection.
15      Q. (BY MR. DANGEL) But the agreement was --
16  strike that. There may have been no money in it,
17  or money for a very short period, but the language
18  is the same?
19      MR. BECKMAN: Objection.
20      Q. (BY MR. DANGEL) Correct?
21      MR. BECKMAN: Objection.
22      A. There is a confusion in terminology here,
23  because there are two types of amounts that we call
24  escrow. The money that is now in the escrowed

**Page 28**

1  account we probably should call tied up money. And
2  what I'm saying, if it were not for Gilroy, there
3  would be no tied up money.
4      Q. (BY MR. DANGEL) I understand your answer
5  to that, but I -- my question was specific to the
6  language of 5.1 and the investment -- whether or
7  not there is an investment limitation stated in
8  5.1. And you understand that that was my question,
9  correct? It related to language?
10      MR. BECKMAN: Objection.
11      A. Now I don't understand your question.
12      Q. (BY MR. DANGEL) The language of 5.1 is the
13  language that you pointed to earlier this afternoon
14  as the language that does or doesn't provide any
15  limitation on the investment of the escrowed
16  proceeds, correct?
17      MR. BECKMAN: Objection.
18      A. In the big escrow and tied up money.
19      Q. (BY MR. DANGEL) And 5.3 is also a
20  provision that was in the escrow agreement prior to
21  the Gilroy lawsuit, correct?
22      MR. BECKMAN: Objection.
23      A. I have to trust you. I don't have the
24  previous drafts. I don't know.

**Page 29**

1      Q. (BY MR. DANGEL) Well, assuming the
2  previous drafts say that -- and certainly, at the
3  appropriate time, those will be raised -- you
4  cannot blame on Gilroy the language of an agreement
5  if the language was negotiated prior to the Gilroy
6  lawsuit, can you?
7      MR. BECKMAN: Objection. Asked and
8  answered.
9      A. I think this is an academic debate. What I
10  would like to say is I can blame Gilroy for the
11  fact that language that is in the escrow which was
12  construed for different conditions is now, after
13  Gilroy lawsuit, in this agreement.
14      Q. (BY MR. DANGEL) Well, I don't agree it's
15  academic, and let me ask a few more questions. Had
16  the Gilroy lawsuit not occurred, would he have been
17  happy with the lang-- would you have been happy
18  with the language of 5.1, 5.2 and 5.3?
19      MR. BECKMAN: Objection. Incomplete
20  hypothetical.
21      MR. DANGEL: I'm going to withdraw the
22  question. He made a good point.
23      Q. (BY MR. DANGEL) Before the Gilroy lawsuit,
24  were you happy with the language of 5.1, 5.2 and

8 (Pages 26 to 29)

SPV, Co. by Richard Harazim

Page 34

1  correct?
2       MR. BECKMAN: Objection.
3       A. James Woolf threatened with a lawsuit to
4  whom?
5       Q. (BY MR. DANGEL) Kotva?
6       A. No.
7       Q. Forminster?
8       A. I don't know.
9       Q. It related to the ownership of the
10  building, though, right?
11       MR. BECKMAN: Objection.
12       A. I am not aware of the fact that James Woolf
13  would be threatening litigation against Kotva.
14       Q. (BY MR. DANGEL) Well, you have testified
15  at great length, and I don't need to repeat it, but
16  it's true, is it not, that the threatened
17  litigation by Mr. Woolf was not disclosed by Kotva
18  to Markland originally, but later, that they, when
19  they found out about it, they wrote you, upset that
20  you hadn't disclosed it, insisted that it be
21  disclosed, and then they became aware of the
22  threatened litigation, right?
23       MR. BECKMAN: Objection.
24       Q. (BY MR. DANGEL) And I said this very

Page 35

1  quickly in order to try to get through it.
2       MR. BECKMAN: Objection.
3       A. No. That's absolutely wrong.
4       Q. (BY MR. DANGEL) Who did Woolf threaten to
5  sue?
6       MR. BECKMAN: Objection. That's
7  already been covered.
8       A. I have heard that Woolf threatened
9  Markland.
10       Q. (BY MR. DANGEL) And that was prior to the
11  negotiation of the escrow agreement, correct --
12  original escrow agreement, correct?
13       A. That is very possible. James Woolf
14  threatened from the very beginning of Markland's
15  involvement, and I disagree with the statement that
16  Markland did not know about a threat. They knew
17  that from day one.
18       Q. Okay. So just reading the language of the
19  agreement, is there anything in that that tells me
20  that Markland did not have in mind the threatened
21  litigation from Woolf at the time that 5.1, 5.2 and
22  5.3 were negotiated?
23       MR. BECKMAN: Objection. This has all
24  been covered in four days of prior deposition.

Page 36

1       MR. DANGEL: I'm sorry, but I didn't
2  read anything about this.
3       A. I would answer like that Markland knew
4  about threats of James Woolf, but if you look at
5  the older versions of SPA and escrow, there was
6  nothing about tied up money. Tied up money came up
7  only after Gilroy suit.
8       Q. (BY MR. DANGEL) Is there anything here
9  that references tied up money in explicit language?
10       MR. BECKMAN: Objection.
11       A. No, because the agreement was that money
12  can be used only based on joint instruction, so
13  what administers the money in the account is a
14  business agreement between us and Markland, and
15  that was in SPA.
16       Q. (BY MR. DANGEL) Now, sir, as to these
17  provisions and your last statement as to joint
18  instructions, that means that Markland instructs
19  and your side instructs as to what the money is to
20  be used for, correct?
21       A. Yes, Markland and we have to reach an
22  agreement and sign a joint instruction.
23       Q. Now, who on your side -- that is, the
24  SPV/Kotva side -- is involved with those

Page 37

1  instructions? What individual --
2       MR. BECKMAN: Objection.
3       Q. (BY MR. DANGEL) -- or individuals?
4       MR. BECKMAN: Objection.
5       A. It has been a while since we have used the
6  money in escrow, so I cannot recall, but I suppose
7  there must be some signature specimen in this or
8  something like that. Maybe appendix four.
9       Q. (BY MR. DANGEL) When you say used the
10  money, you mean invested the money?
11       A. I am talking about March 2005 when money
12  from the escrow was sent to different places based
13  on joint instructions.
14       Q. Okay. Now we're talking about something --
15  I understand what you meant. I meant to go
16  someplace else. As to the money that remained in
17  escrow, who talks with whom about what bonds to
18  buy, what interest, what CD's, what negotiated
19  instruments or other investments will be made with
20  that escrow money?
21       MR. BECKMAN: Does he have the full
22  document that you gave me?
23       MR. DANGEL: If it -- I'm utterly
24  confused myself, so --

SPV, Co. by Richard Harazim

Page 38

1    MR. BECKMAN: Because you're asking
2  questions --
3    MR. GOLDBERGER: It should end at 1963.
4    MR. BECKMAN: Because I have a 1957,
5  KC1-1957.
6    MR. GOLDBERGER: That's the last --
7    MR. DANGEL: That's the last page? Oh,
8  I don't have -- well, first of all --
9    MR. GOLDBERGER: It should go beyond
10  that. There's a 58 through 63. I'm sorry. I
11  wasn't paying attention.
12    MR. BECKMAN: Is there an answer to
13  that question?
14    MR. DANGEL: Yeah.
15    MR. BECKMAN: Okay.
16    MR. DANGEL: Okay. What is it?
17    MR. BECKMAN: It's in 1957.
18    MR. DANGEL: If you'd like to show him
19  a page to make it easier, go ahead.
20    MR. BECKMAN: Just to move it along.
21    MR. DANGEL: Yeah, sure.
22    A. (By the Witness) What is it? 57?
23    MR. BECKMAN: I just want to make sure
24  he has what I have.

Page 39

1    A. (By the Witness) Joint investment
2  instruction.
3    MR. DANGEL: No, no. I'm looking for
4  the individual.
5    MR. BECKMAN: Okay. I don't want to --
6    Q. (BY MR. DANGEL) So taking your counsel's
7  cue here, there's a joint -- there's a page, 1957,
8  that has a joint investment instruction. It is
9  dated March 4th, 19-- 2005, and there are some
10  signatures for Kotva Nemovitosti and SPV Co. Do
11  you see that? And that's your signature and Martin
12  Benda's signature; is that right?
13    A. (Through the Interpreter) Yes.
14    Q. Has there been any instruction since
15  March 4th, 2005?
16    A. No.
17    Q. Have you ever asked Markland -- that is,
18  you or Martin Benda or any other individual on
19  behalf of SPV Co. or KN -- ever asked Markland to
20  change the joint instruction?
21    A. To be honest, no, because the discussion
22  about the investing of money in the escrow was
23  before Markland agreed that they will invest with
24  us at least this way, jointly, and they made it

Page 40

1  very clear that this is the maximum that they
2  wanted to go to and that it makes no sense to try
3  anything on top of that.
4    Q. Well, again, I reserve my right to move to
5  strike, but we'll try to get to some of these
6  points. After the word no, I reserve my right to
7  strike, but let me ask this question. In business,
8  has it been your experience that English-speaking
9  people never change their mind?
10    MR. BECKMAN: Objection.
11    A. My experience is that English-speaking
12  people can be very hard-headed.
13    Q. (BY MR. DANGEL) And the Czech people are
14  easy to deal with, right?
15    A. Easier than with many English-speaking.
16    Q. (By the Witness) Some English-speaking.
17    Q. So it's fair to say that you've made no
18  attempt to get a higher yield from the escrow
19  agreement since March 4th, 2005; isn't that right?
20    MR. BECKMAN: Objection.
21    A. (Through the Interpreter) We have not --
22  we did not do anything officially. In discussions
23  with Frank Walker, I suggested it several times,
24  but it was an ice cold response.

Page 41

1    Q. (BY MR. DANGEL) Is there any -- -- did you
2  as much as send an e-mail on the subject?
3    A. I do not recall any specific situation, but
4  I know that over the phone, I made several
5  suggestions, but that the reaction was refusal.
6    Q. From time to time, you tape telephone
7  calls, don't you?
8    MR. BECKMAN: Objection.
9    A. I don't. The police does.
10    Q. (BY MR. DANGEL) Well, you taped a bunch of
11  conversations. Martin Benda, at least, taped a
12  bunch of conversations in March of 2004 that the
13  police didn't authorize; is that correct?
14    A. That is -- that is absolutely incorrect.
15  We have never taped any phone conversations.
16    MR. BECKMAN: And again, this is
17  covered exhaustively in the four prior days of
18  deposition.
19    MR. DANGEL: I have a right to ask the
20  question. The man has the right to answer under
21  oath as he wants to. I'm afraid that — that's a
22  very problematic answer, may I say. You don't need
23  to translate that. I'll go on to the next
24  question. I'm astounded by that answer, but

JONES REPORTING COMPANY
617-451-8900

SPV, Co. by Richard Harazim

Page 42

1  anyway, let's go on to the next question.
2      Q. (BY MR. DANGEL) Did you tape any of your
3  conversations which you allegedly had with
4  Mr. Walker about changing the investment?
5          MR. BECKMAN: Objection.
6      A. Of course not.
7      Q. (BY MR. DANGEL) From time to time, you or
8  Mr. Benda videotape your conversations with people;
9  isn't that right?
10         MR. BECKMAN: Objection. Already
11 covered.
12     A. Yes, when we were subject of criminal
13 activity.
14     Q. (BY MR. DANGEL) Well, I wonder if the
15 videos show any criminal activity, but we'll move
16 on from that and just ask did you video any of your
17 conversations, meetings with Mr. Walker where
18 allegedly you asked for a change of investment?
19         MR. BECKMAN: Objection.
20     A. I said that I do not know and do not
21 remember any specific situation where I would be
22 pushing on changing escrow conditions. What I said
23 is that in some conversations I touched this topic.
24     Q. (BY MR. DANGEL) What were the dates of the

Page 43

1  conversations?
2      A. I just said I did not remember, so I cannot
3  say a date of something that I do not remember.
4      Q. How many times?
5      A. I do not recall. Once, twice, maybe.
6      Q. What were the exact words you said to him?
7      A. I do not recall, of course.
8      Q. Well, sir, at the time you had those
9  conversations, weren't you familiar with the fact
10 that Markland was claiming that it had the right to
11 the interest?
12     A. I do not know when it was the first time
13 when Markland came with the idea that it had the
14 right to the interest, but after this question was
15 raised, it is true that I do not recall that we
16 would be discussing new conditions of escrow.
17         MR. BECKMAN: Terry, are we at a break
18 that we could take a two-minute bathroom break?
19         MR. DANGEL: No.
20         MR. BECKMAN: If you need to finish,
21 that's fine.
22         MR. DANGEL: I'm only kidding. Where
23 are we on the tape?
24         VIDEOGRAPHER: An hour and 15 minutes.

Page 44

1          MR. DANGEL: All right. So let's take
2  a break.
3          VIDEOGRAPHER: The time is 3:45. We're
4  off record.
5          (Off the record.)
6          (Recess taken.)
7          VIDEOGRAPHER: The time is 3:52. We're
8  back on.
9      Q. (BY MR. DANGEL) So is it fair to say that
10 you have a disagreement with Markland, you
11 representing the Kotva side and the SPV side, have
12 a disagreement with Markland as to what the money
13 is invested in and where the money will go when the
14 escrow agreement ends; that is, whether to Markland
15 or to Kotva?
16         MR. BECKMAN: Objection.
17     A. I don't think we have a disagreement as to
18 whether into what -- into what to invest the money
19 because we accept the logic, their logic at the
20 beginning, so there is not a disagreement in this,
21 and there is also not a conflict in the fact where
22 the money will go after the escrow is ended,
23 because it is also very clear that the money
24 belongs to us once it is not in escrow.

Page 45

1          Where the conflict is is where -- who
2  owns the money from the interest on the escrow, and
3  I don't think the conflict is so serious and I am
4  sure we'll reach some agreement.
5      Q. (BY MR. DANGEL) And none of the defendants
6  in this case have taken a stand, a position on
7  where the interest money should go; isn't that
8  correct?
9          MR. BECKMAN: Objection.
10     Q. (BY MR. DANGEL) Weiss and Weiss Asset
11 Management.
12     A. Would you please repeat that question?
13     Q. Neither Weiss Asset Management or Professor
14 Andrew Weiss have taken any position on Markland's
15 side or your side as to where that interest money
16 should go; isn't that correct?
17         MR. BECKMAN: Objection.
18     A. I do not know anything of any position like
19 that, and I am even not sure if they should take a
20 position, because this is a relationship between
21 Markland and Kotva.
22     Q. (BY MR. DANGEL) Does Kotva, a.s. exist
23 today?
24         MR. BECKMAN: Objection. Asked and

12 (Pages 42 to 45)

SPV, Co. by Richard Harazim

**Page 46**

1 answered. Covered in prior depositions.
2    A. Kotva does not exist.
3    Q. (BY MR. DANGEL) And it is now succeeded by
4 CIS; is that correct?
5    A. Yes, that's how I understand it.
6       MR. DANGEL: Well, it seems to me,
7 Joel, if you're going to continue this litigation,
8 you need to file an amendment to substitute CIS in.
9 Otherwise, the case gets dismissed because the
10 corporation doesn't exist.
11       MR. BECKMAN: I think you should read
12 Rule 25 before you take that position and what you
13 need to do with respect to Rule 25.
14       MR. DANGEL: All right. It's always
15 great that the Rules of Civil Procedure got
16 invented, I guess, after I went through law school
17 and read them. Anyway, onward.
18    Q. (BY MR. DANGEL) So do I have it correct,
19 sir, that SPV Co. and Kotva claim that their
20 business was interfered with by the defendants --
21 that is, Andrew Weiss and Weiss Asset Management --
22 by filing the lawsuits -- is that correct -- that
23 they filed in the Czech Republic?
24       MR. BECKMAN: Objection.

**Page 47**

1    A. Yes, because the purpose of the lawsuit was
2 to — to stop the finalization of the sale, because
3 other steps were connected with the lawsuit like,
4 for example, immediate notification to the
5 investors and immediate notification to the land
6 deed office.
7    Q. (BY MR. DANGEL) Well, the investors -- the
8 notification to the investors didn't impact on the
9 sale of the property, did it?
10       MR. BECKMAN: Objection.
11    A. In my opinion, only a person who has not
12 read all the e-mail exchanges between Markland and
13 us could make this statement. The transaction was
14 close to a collapse and it took us six months
15 before we were able to find new leverage. We have
16 not received 30 to 40 percent of the purchase price
17 and the money that we have not received are still
18 invested under absurdly low yield.
19    Q. (BY MR. DANGEL) Okay. Now, maybe you
20 misunderstood my question; maybe it didn't
21 translate correctly. Are you saying that it is
22 notification to investors which caused interference
23 with your business with Markland?
24       MR. BECKMAN: Objection.

**Page 48**

1    A. It is only one little piece of the whole
2 scheme.
3    Q. (BY MR. DANGEL) Which investors do you
4 mean?
5    A. Markland.
6    Q. Markland is an investor?
7    A. Yes, because they were buying the property.
8    Q. Okay. Is there any other investor other
9 than Markland you meant when you provided your
10 answer?
11    A. I was answering to your original question
12 whether the lawsuit was interfering with our
13 business. Yes, because the lawsuit was filed just
14 at the time when we were finishing the transaction
15 with Markland and I mentioned the investors just as
16 a little bitty piece of the whole scheme to prove
17 that that was the case.
18    Q. Okay, but is it the filing of the lawsuits
19 or is it the notification that you say caused the
20 interference with your business?
21       MR. BECKMAN: Objection.
22    A. Of course, filing the lawsuit is the most
23 decisive part.
24    Q. (BY MR. DANGEL) The notification that was

**Page 49**

1 filed in the Cadastre did not put an encumbrance or
2 lien on the property; isn't that correct?
3       MR. BECKMAN: Objection.
4    A. That is not correct, because notification
5 of the Cadastre results in a note being made on the
6 ownership -- ownership sheet, meaning there is a
7 note that affects the title to the real estate, so
8 there is no -- no one will buy the property because
9 the title is uncertain.
10    Q. (BY MR. DANGEL) Well, you were present
11 when Mr. Peterka testified that there are two types
12 of notification to the Cada-- that the Cadastre can
13 put on property, were you not?
14       MR. BECKMAN: Objection.
15    A. I was -- I was present.
16    Q. (BY MR. DANGEL) Was his testimony wrong?
17       MR. BECKMAN: Objection.
18    A. I do not recall the exact legal argument
19 there, but from the practical point of view, if
20 anyone files a lawsuit that results into a note and
21 -- on the title to the property, then the property
22 is not salable and it cannot be financed. No one
23 will provide financing, because no lien --
24    A. (By the Witness) It cannot be pledged.

13 (Pages 46 to 49)

SPV, Co. by Richard Harazim

Page 50

1   A. (Through the Interpreter) The building
2   cannot be pledged.
3   Q. (BY MR. DANGEL) Sorry. Yeah, I heard it.
4   It's okay. Sir, are you saying that when the
5   lawsuit was filed, you were about to close on the
6   transaction with Markland?
7   A. There was only one thing open, and that was
8   the change of structure. Both contracts that were
9   concluded before, one in October 2003 and one in
10  January 2004, were about Markland purchasing SPV
11  Co. shares and paying to KN. For reasons on the
12  Markland side, they came with a new request to
13  change the structure and that was the only
14  remaining task. And the task basically consisted
15  only of some not very complex changes in the
16  contract, so the answer is yes, we were just before
17  the closing of the transaction.
18  Q. Had you notified all of the shareholders of
19  Kotva of the possibility of the sale as of the
20  filing of the lawsuit?
21  A. During the whole period of negotiations
22  about the sale, whether with Markland or some other
23  entities before Markland, we did not inform
24  shareholders of Kotva of those negotiations. We

Page 51

1   informed the securities commission and we requested
2   that the publication of this information be put on
3   hold because we were afraid of what really did
4   happen later, that what really happened, and that
5   being the fact that some shareholders took
6   advantage of their right to — to threaten the
7   finalization of the transaction.
8   Q. Sir, the change you're talking about in
9   structure that Markland asked for was a -- well,
10  why don't you describe to me what the change was
11  that they asked for in the structure.
12  A. When we signed the contract originally,
13  Kotva Nemovitosti, as the owner of the real estate,
14  was supposed to invest the property into --
15  A. (By the Witness) Contribute the property.
16  A. (Through the Interpreter) -- into -- into
17  the Czech Investment company.
18  Q. SPV KN?
19  A. (By the Witness) SPV KN.
20  A. (Through the Interpreter) And the shares
21  of SPV KN were supposed to be invested or
22  contributed --
23  A. (By the Witness) Contributed.
24  A. (Through the Interpreter) -- into the --

Page 52

1   into its subsidiary SPV Co. --
2   A. (By the Witness) The subsidiary of KN,
3   another subsidiary of KN.
4   Q. A Czech subsidiary?
5   A. (By the Witness) Cypriot. Cypriot.
6   Q. That was the original transaction?
7   A. (By the Witness) That was how it was
8   foreseen.
9   Q. Okay.
10  A. (By the Witness) Maybe I'll explain this
11  in English. This is important.
12  Q. Yeah, because I do need to understand it.
13  A. (By the Witness) The original plan was for
14  KN as the owner of the building to create another
15  Czech company, a daughter of KN, that would be
16  called SPV KN. The building would be contributed;
17  thus, KN would obtain shares of SPV KN in return
18  for the building.
19  Q. Yes.
20  A. (By the Witness) This sh-- these shares of
21  SPV KN would then be contributed to a Cypriot
22  daughter of KN, SPV, Co., and SPV Co. would be sold
23  through the market.
24  Q. Yes.

Page 53

1   A. (By the Witness) Thus, the end result is
2   KN getting rid of SPV Co., where SPV KN was
3   deposited.
4   Q. Okay.
5   A. (By the Witness) Thus, the money would
6   come to a Czech entity.
7       Later on -- and that was shortly before
8   -- before the Gilroy lawsuit was filed. Because of
9   concerns of some sort reported by the financing
10  bank, with AIB, who had reservations about buying a
11  Cypriot company, the structure was changed into
12  what was described in the December 2004 contract,
13  and then, the structure was basically the same,
14  with the exception that SPV Co., the Cypriot
15  entity, sold the shares of SPV KN, and thus, the
16  money ended up in SPV Co. We did not mind the
17  change, because it's fairly easy to dilute a
18  Cypriot company and distribute the proceeds back to
19  KN, and that was the original plan. And because of
20  the lawsuit, nowadays the money is being tied up in
21  escrow. We just can't proceed.
22  Q. The company which purchased Markland's
23  company was CRQ, right?
24  A. (Through the Interpreter) CRQ purchased

14 (Pages 50 to 53)

SPV, Co. by Richard Harazim

Page 54

1  the shares of SPV KN, yes.
2     Q. Right. Was there a tax advantage involved
3  in structuring the deal this way?
4     A. There were two benefits or aspects.
5  Markland -- Markland insisted that this is the way
6  they do the business when there are existing
7  companies and they are buying their real estate,
8  because they were afraid to buy a company that had
9  the corporate history, and of course, the next
10  aspect was taxes.
11     Q. Okay. And what was the tax benefit and to
12  whom?
13     A. The tax benefit was on the Kotva side.
14     Q. And what was the benefit?
15     A. (By the Witness) Could we mark this
16  confidential again?
17     Q. Yes.
18     MR. DANGEL: You don't mind, do you, if
19  the tax benefit is explained in a confidential --
20  we just want to understand it, so I don't have any
21  particular use for it. And we are Kotva
22  shareholders, so I think it can be done
23  confidentially.
24     MR. BECKMAN: Mark it confidential.

Page 55

1     A. (Through the Interpreter) The problem is
2  the building holding the property of Kotva that
3  Markland was interested in was built in 1975, which
4  is 15 years prior to the revolution, and of course,
5  the prices then were completely different than
6  25 years later. Nevertheless, the value was
7  recorded in the company's accounting, in the
8  accounting of Kotva, in the amounts from 1975.
9  Therefore, the tax value of the property was
10  somewhere around 400 million.
11     Q. We call that the basis. Same thing?
12     A. So if we sold the property from Kotva
13  Nemovitosti, so the tax would be calculated from
14  the sales price, minus tax paid, and of course, the
15  sales price was 1.5 billion and the tax base was
16  400. You see how much we would be X liable for.
17     Q. 1.1.
18     A. (By the Witness) That would be the tax
19  base, and --
20     Q. And what's the tax rate?
21     A. (Through the Interpreter) At that time, it
22  was around 30 percent.
23     Q. So how did you avoid the -- so how did this
24  transaction avoid the tax?

Page 56

1     A. For some reason which I cannot recall, by
2  double contributing the shares, the tax base of the
3  property increased, the tax base -- the tax base
4  for the transaction; not of the property, but of
5  the shares. So in the end, what we were tax liable
6  on was the difference between the sales price, 1.5
7  billion, and the value of the shares of SPV KN,
8  which were contributed, and it was again 1.5
9  billion.
10     Q. And what was the value of the shares?
11     A. We divided -- we broke down the transaction
12  into two parts, the property and the trademarks,
13  and the value of shares of SPV KN was approximately
14  1.480 billion, nearly 1.5, and I am just recalling
15  three-year old information, so it might not be
16  accurate.
17     Q. But these are shares, value of shares,
18  right?
19     A. Yes, but the value of shares included the
20  value of the property and trademarks.
21     Q. Got it. Who owned the shares?
22     A. SPV Co., 97 percent; KN owned three
23  percent.
24     Q. Right. And SPV Co. owned --

Page 57

1     A. (By the Witness) 97.
2     Q. -- 97 percent. And who owned three percent
3  of KN? Who owned KN?
4     A. (Through the Interpreter) Kotva.
5     Q. And who owned SPV Co.?
6     A. (By the Witness) KN.
7     Q. What I'm trying to get to is at the point
8  that this became a share transaction, weren't the
9  shares in Kotva owned by all the shareholders equal
10  to at least 1.48 billion Czech crowns?
11     MR. BECKMAN: Objection.
12     A. (Through the Interpreter) I don't think
13  so.
14     Q. (BY MR. DANGEL) Well, the shares of Kotva
15  reflect -- the only assets of Kotva were these
16  shares, correct?
17     MR. BECKMAN: Objection. Shares of --
18     Q. (BY MR. DANGEL) The only assets of Kotva
19  at this point were the shares, correct?
20     MR. BECKMAN: Shares of what?
21     Q. (BY MR. DANGEL) Of -- the shares of KN, I
22  suppose.
23     MR. BECKMAN: Objection.
24     A. So what Kotva owned at that point of time

15 (Pages 54 to 57)

SPV, Co. by Richard Harazim

Page 62

1  record.
2          MR. BECKMAN: I'm instructing the
3  witness not to disclose any attorney/client
4  communications or work product. He can't answer
5  that question if it's going to involve disclosing
6  privileged communications or work product.
7      Q. (BY MR. DANGEL) Did the lawyers for Kotva
8  disclose their opinion about the cases to the
9  lawyers for Markland or Markland?
10     A. I don't know.
11     Q. At the time that the -- that the Kotva
12 entities were merged into CIS, the valuation of
13 Kotva did not include any money from the escrow
14 account, correct?
15         MR. BECKMAN: Objection.
16     A. Whatever I will answer now can be very
17 inaccurate, because I did not prepare for this --
18 for this question. I was preparing for the
19 questions that I was designated.
20     Q. (BY MR. DANGEL) Well, this is important
21 and I think it does relate to SPV Co., as you will
22 see, so please give me your best answer.
23     A. So how was the question?
24     Q. At the time of the merger of the Kotva

Page 63

1  entities into CIS, none -- no asset -- no assets in
2  the escrow account were included in the value of
3  Kotva; isn't that correct?
4      A. As far as I recall, that's correct.
5      Q. First question, then, would be that
6  somebody or some people determined that the
7  lawsuits were so valuable that they were likely to
8  eat up the entire escrow fund, correct?
9          MR. BECKMAN: Objection.
10     A. How could a lawsuit eat up money in escrow
11 for law fees?
12     Q. (BY MR. DANGEL) Damages?
13     A. (By the Witness) Damages to Markland?
14     Q. No, damages to — paid by Markland or paid
15 by Kotva --
16         MR. BECKMAN: Objection.
17     Q. (BY MR. DANGEL) -- to either Weiss or
18 Woolf.
19         MR. BECKMAN: Objection.
20     A. (Through the Interpreter) The only reason
21 for the existence is -- of the escrow account is --
22 of the tied up money is the effort of Markland to
23 cover any costs connected with this litigation and
24 to force Kotva to actively defend itself and to try

Page 64

1  to close -- finalize this litigation as soon as
2  possible. If Markland had admitted -- if Markland
3  admitted that the lawsuits filed by Gil-- that the
4  lawsuits filed could be successful, then they would
5  have never completed the transaction, so therefore,
6  the money is really -- has nothing to do with
7  damages payable to Mr. Weiss or anyone else. They
8  were put aside specifically for the purpose that I
9  described.
10     Q. (BY MR. DANGEL) But if a zero value is put
11 on the escrow fund at the time of the merger, that
12 means that there's a zero chance of getting the
13 money; isn't that correct?
14         MR. BECKMAN: Objection.
15     A. In my previous deposition, I have already
16 stated that I disagreed with the auditor's approach
17 to this --
18     A. (By the Witness) I don't disagree. I
19 don't fully support.
20     A. (Through the Interpreter) -- but the true
21 -- but the fact is that auditors follow their
22 procedures and those procedures are more
23 conservative than the approach of the management,
24 so this is what the auditor did.

Page 65

1      Q. (BY MR. DANGEL) Oh, Lord. Okay.
2          MR. BECKMAN: Let him finish his
3  answer, please.
4      A. When I was thinking about reasons which may
5  lead to that, no lawyer will tell a specific
6  opinion about it to an auditor, a binding specific
7  opinion. They only provide vague answers and the
8  auditor must rely on his instinct. In this case,
9  even though the likelihood of success of KT and
10 Gilroy is very small, the possible consequences are
11 so huge that I do understand it.
12     Q. (BY MR. DANGEL) Okay. There is one other
13 — there are two other possibilities, are there
14 not, sir? One possibility is that the merger
15 occurred with a zero valuation on the escrow fund
16 and that the escrow fund no longer belongs to what
17 was Kotva and is now CIS; isn't that correct? That
18 is a possibility?
19         MR. BECKMAN: Objection.
20     A. I do not understand this construction.
21     Q. (BY MR. DANGEL) Does the escrow fund
22 belong to SPV or Kotva or now CIS?
23         MR. BECKMAN: Objection.
24     A. Money in the escrow were and will be the --

17 (Pages 62 to 65)

SPV, Co. by Richard Harazim

Page 66

1  owned by SPV Co.
2      Q. (BY MR. DANGEL) And when the money comes
3  out of, whenever it does, money comes out of
4  escrow, it will go into where?
5          MR. BECKMAN: Objection. Asked and
6  answered.
7      A. SPV Co.
8      Q. (BY MR. DANGEL) And how will the
9  shareholders of Kotva benefit from that?
10         MR. BECKMAN: Objection.
11     A. They will have a subsidiary that has more
12 money.
13     Q. (BY MR. DANGEL) However, their shares were
14 merged into this entity at a lower value because
15 the escrow account was not taken into account,
16 right?
17         MR. BECKMAN: Objection.
18     A. That is true.
19     Q. (BY MR. DANGEL) And therefore, the owners
20 of CIS will get a greater benefit than the owners
21 of Kot-- than the prior owners of Kotva, correct?
22         MR. BECKMAN: Objection.
23     A. What you said is based on the same
24 presumption that the management of Kotva did,

Page 67

1  meaning that the lawsuits of Gilroy will be lost --
2      A. (By the Witness) And KT.
3      A. (Through the Interpreter) -- And KT. If
4  you for a minute think of the very unlikely success
5  of those lawsuits, then the CIS shareholders would
6  lose -- would lose.
7      Q. (BY MR. DANGEL) Right.
8      A. (By the Witness) Because they would pay
9  tremendous damages to Markland.
10     A. (Through the Interpreter) Because they
11 would pay tremendous damages to Markland.
12     Q. What would those damages be?
13     A. I don't know. I don't want even to think
14 about it. The whole purchase price would have to
15 be returned. Tremendous fines would have to be
16 paid. That would be catastrophic for the company.
17     Q. But you would get the property back?
18     A. Yes, but it still would be catastrophic,
19 thinking of the fines and all that.
20     Q. Well, wait a minute. The property is worth
21 a hundred percent more than you paid for it -- than
22 they bought it for in 2004, right?
23         MR. BECKMAN: Objection. Objection.
24     A. I absolutely disagree.

Page 68

1      Q. (BY MR. DANGEL) How much more? I mean, we
2  have valuations in the record, but how much? What
3  would you say?
4          MR. BECKMAN: Objection.
5      A. I categorically state that if we were to
6  sell the property today, we would not even reach
7  the amount that we had in 2005. I know the
8  situation with the tenants. I know how -- how it
9  looks like there.
10         MR. BECKMAN: Are you done with your
11 answer?
12         MR. HARAZIM: I'm done.
13     Q. (BY MR. DANGEL) Okay. The -- did the
14 auditors receive any opinion from Kotva's lawyers
15 that the likelihood of success of the KT lawsuit
16 was small?
17         MR. BECKMAN: Objection. Don't --
18 don't disclose conversations with counsel.
19         MR. BECKMAN: Excuse me. That would
20 have to be in a financial statement.
21         MR. BECKMAN: All right. I apologize.
22         MR. DANGEL: Give me a break.
23         MR. BECKMAN: I apologize. You can
24 answer if -- that question.

Page 69

1          MR. DANGEL: You already know the
2  answer.
3      A. I do not know, but as I know lawyers, I
4  would be very surprised if they said anything that
5  specific.
6      Q. (BY MR. DANGEL) Is there anything in a
7  financial statement that indicates that -- strike
8  that. The financial statements of CIS -- Kotva
9  before -- are audited, correct?
10     A. Yes.
11     Q. And certified by the auditors?
12     A. Yes.
13     Q. Is there in any financial statement of
14 Kotva or CIS a statement that it is the view of
15 legal counsel to the corporation that the
16 likelihood of success of the lawsuits is small?
17     A. It is possible and it is likely, but I do
18 not know exactly where and how it is formulated.
19     Q. Well, I'm asking you that you produce the
20 financial statements for CIS for -- the
21 consolidated, anyway, I have a right to see them --
22 for 2005/2006.
23         MR. BECKMAN: Don't answer that.
24         MR. DANGEL: Well, come on. Are you

18 (Pages 66 to 69)

SPV, Co, by Richard Harazim

Page 82

1  lawsuit meant anything, whether Weiss was behind
2  the lawsuit, whether anything should be done in
3  terms of papers, the -- an escrow of money and so
4  forth throughout that summertime period, right --
5       MR. BECKMAN: Objection.
6       Q. (BY MR. DANGEL) -- of July, August and
7  into early September, right?
8       MR. BECKMAN: Objection.
9       A. Yes.
10      Q. (BY MR. DANGEL) And when was it that you
11  knew that the Gilroy lawsuit -- that in your mind,
12  Weiss was behind the Gilroy lawsuit?
13      MR. BECKMAN: Objection.
14      A. There are two points here. First point is
15  when verbally we were notified by Mr. Hoffman at a
16  meeting, but I cannot tell you what the date of the
17  meeting was, and then secondly, when we were able
18  to verify that the information provided by
19  Mr. Hoffman was true was a fax confirmation from
20  America -- was a reaction to our fax sent to
21  America.
22      A. (By the Witness) Sent to the States, yes.
23      Q. (BY MR. DANGEL) Okay. At what point did
24  you inform Markland that you believed Weiss was

Page 83

1  behind the Gilroy lawsuit?
2       A. (Through the Interpreter) I do not recall.
3  I cannot tell you.
4       Q. Were you at this point trying to convince
5  -- whenever that was that you notified them, were
6  you trying to convince them that they should go
7  ahead with the closing and that the Gilroy lawsuit
8  didn't pose a problem, or much of a problem?
9       MR. BECKMAN: Objection. This is all
10  covered in a prior deposition.
11      MR. DANGEL: Oh, yes, and we're going
12  to fly through this because it has been to get to
13  the point I want to make.
14      MR. BECKMAN: You keep saying that, and
15  it's beyond the scope, but you keep asking the same
16  questions.
17      A. Yes.
18      Q. (BY MR. DANGEL) Did Markland agree with
19  you at any time that the Gilroy lawsuit did not
20  need to be taken into account?
21      A. I think their position was developing. At
22  first, I thought they did not put much weight on
23  the information, because we were continuing
24  discussion on several other topics, but later on,

Page 84

1  it did not look -- it looked like they were willing
2  to cancel the transaction, because I believe they
3  realized what impacts -- what impacts it could be.
4       Q. What were the other points that were in
5  discussion at first, as you say?
6       A. Because we were changing the structure,
7  meaning that the Cypress company was selling shares
8  of a Czech company, we needed representation of a
9  company like SPV Co. that it was properly founded,
10  that it has the -- it has not performed any
11  corporate delicts and all these things --
12      INTERPRETER: And I need to ask for the
13  end once again. Sorry. I missed it.
14      A. (By the Witness) And needed to be -- such
15  a declaration was to be produced by someone having
16  PI insurance. Professional indemnity, I guess.
17      A. (Through the Interpreter) And it showed to
18  be an impossible task, because we were unable to
19  find a company that would have this type of
20  insurance in Cypress. However, we were continuing
21  this small thing, and at the same time, we were
22  talking about the main issue, whether we will
23  complete the transaction or cancel the transaction.
24      Q. (BY MR. DANGEL) When was this conversation

Page 85

1  concerning the change in structure and the
2  professional -- the PI insurance and so forth, when
3  was that going on?
4       MR. BECKMAN: Objection.
5       A. You can find the most accurate answer in
6  e-mails that we produced, but just roughly, it was
7  sometime in summer, around the time when Gilroy
8  filed his lawsuit.
9       Q. (BY MR. DANGEL) Did that -- well, you said
10  at first it didn't seem to be much because you were
11  concerned with that and then the Gilroy matter took
12  over. That's what your testimony was, so what I'm
13  trying to find out, was the conversation concerning
14  the professional insurance, the assurance that was
15  needed, did that occur in July and August?
16      MR. BECKMAN: Objection. Asked and
17  answered, covered in prior depositions, and beyond
18  the scope of this deposition.
19      A. I really cannot answer. I cannot give you
20  the exact date, but this was really a small thing.
21  We would have settled it somehow, and we in fact
22  did, so we would have done it the way we did, but
23  since there was the principal, the main issue
24  unsolved, therefore, it lasted for so long a time.

22 (Pages 82 to 85)

SPV, Co. by Richard Harazim

Page 86

1    Q. (BY MR. DANGEL) When did it settle, that
2  issue settle?
3    A. I cannot give you the date. I don't
4  recall.
5    Q. Was it October?
6        MR. BECKMAN: Objection.
7    A. I doubt that it would last that long.
8    Q. (BY MR. DANGEL) Okay. But e-mails would
9  tell me?
10    A. Yes, the declaration itself is -- exists.
11    Q. Now, but at some point, you knew that the
12  -- you determined that the Gilroy lawsuit was a
13  real obstacle to closing the deal, right?
14        MR. BECKMAN: Objection.
15    A. Yes, at a certain point, it looked like the
16  transaction will collapse -- would collapse.
17    Q. (BY MR. DANGEL) And when was that?
18    A. I don't know. I would have to look into
19  the e-mails.
20    Q. How many days was it before you went to the
21  police for the first time to lodge a -- not you
22  personally, but your company went to the police to
23  lodge the complaint, criminal complaint, was it
24  that you had made the determination that this was a

Page 87

1  real obstacle, the Gilroy case?
2        MR. BECKMAN: Objection, beyond the
3  scope.
4    Q. (BY MR. DANGEL) Was it within a week?
5        MR. BECKMAN: Already covered.
6  Objection.
7    A. This cannot be specified or clearly
8  answered like that. That was not one day, or let's
9  say it would be Monday and we would reach agreement
10  on Tuesday. It was a process and there were ups
11  and downs in the process.
12    Q. (BY MR. DANGEL) What process? The process
13  of filing a complaint?
14    A. (By the Witness) The process of
15  negotiating with Markland --
16    Q. I see.
17    A. (By the Witness) -- about the consequences
18  of the lawsuit.
19    Q. I see. Well, I asked you when you decided
20  it was a real obstacle and something you really
21  needed to negotiate.
22        MR. BECKMAN: Objection.
23    Q. (BY MR. DANGEL) Can you place that in
24  time?

Page 88

1        MR. BECKMAN: Objection. That's not
2  what he testified to.
3    A. (Through the Interpreter) As I said, it
4  was an ongoing process that lasted until we signed
5  SPA. It was a long process.
6    Q. (BY MR. DANGEL) Okay, but when he first
7  decided that it was a real possibility that it
8  could upset the deal, had he already gone to the
9  police at that time, or did he go subsequently?
10        MR. BECKMAN: Objection.
11    Q. (BY MR. DANGEL) That is, the company.
12        MR. BECKMAN: Objection. Beyond the
13  scope of this deposition.
14        MR. DANGEL: Not at all.
15        MR. BECKMAN: This has already been
16  testified to for days.
17    A. I personally saw Gilroy lawsuit as a very
18  serious problem on the first day when I received
19  it. Of course, I put on a calm face.
20    Q. (BY MR. DANGEL) I understand.
21    A. And of course, I tried to convince Markland
22  that it was not serious, but I was afraid of
23  consequences of the lawsuit immediately after it
24  was filed.

Page 89

1    Q. So that occurred -- immediately after it
2  was filed means when you found out about it in the
3  beginning of July, you were concerned that it could
4  upset the deal?
5        MR. BECKMAN: Objection.
6    A. We were selling property and this lawsuit
7  was putting in doubt our right to sell the
8  property, so of course, I was afraid of
9  consequences of the lawsuit.
10    Q. (BY MR. DANGEL) And within a month of you
11  learning about the lawsuit, you had been involved
12  with, or Mr. Benda, your associate, had been
13  involved with videotaping Mr. Hoffman in
14  conversation, and that videotape was done for the
15  purpose of taking it to the police, correct?
16        MR. BECKMAN: Objection.
17        INTERPRETER: So what was in fact the
18  question? You and Mr. Benda videotaping
19  Mr. Hoffman and --
20    Q. (BY MR. DANGEL) About a month after you
21  first learned of the Gilroy lawsuit and were
22  concerned it could upset the sale to Markland,
23  correct?
24    A. Yes.

JONES REPORTING COMPANY
617-451-8900

SPV, Co. by Richard Harazim

**Page 90**

1    Q. And then you took those videotapes -- not
2    you personally, but they were taken by your company
3    to the police a few weeks after the taping, right?
4    A. I think the main reason why we contacted
5    the police were not those videotapes.
6    Q. Okay, but you contacted them in August,
7    right?
8          MR. BECKMAN: Let him finish his
9    answer, please.
10   A. The decisive fact was that e-mail that we
11   received from Mr. Weiss confirmed facts that were
12   presented to us by Mr. Hoffman.
13   Q. (BY MR. DANGEL) But at the time that you
14   went to the police, you were concerned that his
15   actions might upset the sale of the property to
16   Markland, correct?
17         MR. BECKMAN: Objection.
18   A. Yes.
19   Q. (BY MR. DANGEL) And so your purpose for
20   going to the police was to try to back Weiss off of
21   the lawsuits so that the transaction could go
22   through free and clear, correct?
23         MR. BECKMAN: Objection.
24   A. That's not the case.

**Page 91**

1    Q. (BY MR. DANGEL) Sir, isn't it true that
2    you believe in the use of criminal process to try
3    to effect a business end?
4          MR. BECKMAN: Objection. No need to
5    raise your voice, Mr. Dangel, and let me just say,
6    we've given you incredibly wide latitude in asking
7    Mr. Harazim questions when he's designated as to be
8    deposed on behalf of SPV Co. with respect to the
9    notices and the subject matters.
10         MR. DANGEL: I promise you --
11         MR. BECKMAN: You keep promising, but
12   all of this was covered in prior depositions of him
13   individually and of Kotva.
14         MR. DANGEL: I believe you just made
15   that objection to try to obfuscate my question.
16         MR. BECKMAN: I did not.
17         MR. DANGEL: You gave him a lot of time
18   to think about what I thought was a pretty simple
19   question.
20   Q. (BY MR. DANGEL) Do you remember the
21   question?
22         MR. BECKMAN: Please answer the
23   question fully, Mr. Harazim.
24   A. Your projection is based on a completely

**Page 92**

1    incorrect logic. If you were right, then we would
2    expect after contacting police that police would
3    approach Mr. Weiss and tell him don't do that. We
4    did not assume that and we did not want that,
5    because at that time, we did not know that
6    Mr. Weiss controls Gilroy, because if he was
7    pressured, he would of course not continue the
8    negotiation and that way he would not provide the
9    proof that he is behind Gilroy, because any
10   documentation that we had was re-- was denying that
11   Mr. Weiss was behind Gilroy. So the purpose of our
12   criminal complaint was not to back off Mr. Weiss of
13   his action, but to make sure that he carried the
14   consequences of his action.
15   Q. (BY MR. DANGEL) And what -- then what
16   you're concerned about is that the deal -- as you
17   indicated, you were concerned the deal might fall
18   apart and you would have to explain to the people
19   at Kotva why the deal fell apart and you'd have to
20   blame Mr. Weiss, correct?
21         MR. BECKMAN: Objection.
22   A. At that time, no one knew it was Mr. Weiss.
23   At that time, we would blame some nameless
24   offshore.

**Page 93**

1    A. (By the Witness) With no assets, no
2    liabilities, nothing.
3    Q. (BY MR. DANGEL) Right, but then what
4    you're looking for is someone to blame for the
5    transaction not going through, right, whoever that
6    is?
7          MR. BECKMAN: Objection. Objection.
8    A. (Through the Interpreter) We were looking
9    for someone who we can blame for actually
10   collapsing the transaction.
11   A. (By the Witness) It's not blame, but it's
12   making responsible for actually cancelling the
13   transaction.
14   Q. (BY MR. DANGEL) Okay. But that's why you
15   went to the police, right?
16         MR. BECKMAN: Objection.
17   A. (Through the Interpreter) We -- we went to
18   the police for them to find out who is it who is
19   interfering with the transaction. And if they can
20   prove that it was criminal activity, we wanted the
21   person to be punished.
22         (Exhibit 6 marked for identification.)
23   Q. (BY MR. DANGEL) Okay. Now, sir, the
24   question I asked you before, though, was whether

24 (Pages 90 to 93)

**D**



Dated      14th   February 2005

SPV CO Limited

and

CRO Czech a.s.

# AMENDMENT NO. 1 TO SHARE PURCHASE AGREEMENT

relating to the purchase of shares in SPV KN a.s.

Linklaters

Palác Myslbek
Na Příkopě 19
117 19 Prague 1



EXHIBIT
HARAZIM
21
2/22/06

Telephone  (420) 221 622 111
Fax       (420) 221 622 199

Ref. BDXW/L-033253

KC 1-1958



Amendment No.1 to the Share Purchase Agreement

**Between:**

(1)    **SPV CO Limited,** with its registered office at Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus, company registration no HE 148845, registered in Cyprus (the "Seller"), represented by Martin Benda, member of the Board of Directors.

(2)    **CRQ Czech a.s.,** with its registered office Prague 1, Národní 1435/6, Post Code 11000, Identification no. 27159256,registered in the Companies Register by the Regional Court in Prague, in Part B, File 9394 (the "Buyer"), and represented by Frank Walker and Aidan Scully, members of the Board of Directors

(3)    **SPV KN a.s.,** with its registered office in Brno, Příkop 4, Post Code 602 00, Identification no. 26910705, registered in the Companies Register by the Regional Court in Brno, in Part B, File 4043 ("SPV KN"), represented by Ing. Richard Harazim, sole member of the Board of Directors.

(4)    **KOTVA NEMOVITOSTI, k.s.,** with its registered office at Příkop 4 Brno Post Code 602 00 Identification no. 26229048, registered in the Companies Register by the Regional Court in Brno, in Part A, File 16586 ("Kotva"), and represented by KOTVA OBCHODNI, a.s., represented by Ing. Michal Vlach, Chairman of the Board of Directors, Ing. Jiří Brada, member of the Board of Directors, and Ing. Pavel Richter, member of the Board of Directors

(5)    **MARKLAND HOLDINGS Limited,** with its registered office at 19 Upper Fitzwilliam Street, Dublin 2, company registration no. 291167 registered under the laws of the Republic of Ireland ("Markland"), and represented by Frank Walker and Aidan Scully, directors.

(6)    **KOTVA a.s.,** with its registered office at Náměstí Republiky 8, Praha 1, Identification no. 60193808, registered in the Companies Register by the Municipal Court in Prague, in Part B, File 2370 ("KAS"), and represented by Marek Kolibal, Chairman of the Board of Directors. A copy of a resolution of the Board of Director made on 22 December 2004 by which Marek Kolibal has been appointed to the function and the petition on registration of him in the Commercial Register as the Chairman of the Board of Directors is annexed hereto at Schedule 1G; and

(7)    **KOTVA OBCHODNÍ, a.s.,** with its registered office at Příkop 4, Brno, Postal Code 602 00, Identification no. 26231735, registered in the Companies Register by the Regional Court in Brno, in Part B, File 3484 ("KO"), represented by Messrs Ing. Michal Vlach, Chairman of the Board of Directors, Ing. Jiří Brada and Ing. Pavel Richter, members of the Board of Directors.

(jointly referred to as the "Parties").

Terms and expressions capitalised and not otherwise defined in this amendment shall bear the same meaning as assigned to them in the Share Purchase Agreement dated 20 December 2004 entered into between the Parties (the "SPA").

**The Parties hereby agree to the following amendment of the SPA (the "Amendment")**

1

KC 1-1959

1    Amendment of clause 1.2 – Definition:

1.1    A new definition of the terms 'KT", "KT Claim" and "KT Settlement" shall be incorporated into clause 1.2 of the SPA in alphabetical order as follows:

"KT"    means KT, Inc., whose registered seat is at 2711 Centerville Road, Suite 400, City of Wilmington, County of Newcastle, Delaware, USA.

"KT Claim"    means the claim that KT lodged on 23 December 2004 with the District Court for Prague 1 under reference number 22 C 239/2004 a copyof which is attached at Schedule 9

"KT Settlement"    means the obtaining of a definitive and final ruling in respect of the KT Claim; for purposes of this Agreement such definitive and final ruling is deemed to be also a final settlement between the parties to the KT Claim, approved by the court or the withdrawal by KT of the KT Claim

2    Amendment of clause 5.6.4 of the SPA:

2.1    The first paragraph of the clause 5.6.4 shall be amended to read:

"The balance of the Share Purchase Price, being the Retention, amounting to CZK 576,450,000 (five hundred and seventy six million four hundred and fifty thousand Czech Crowns), shall be retained by the Escrow Agent until such time as there has been Gilroy Settlement and KT Settlement. However, if there has been Gilroy Settlement and KT Settlement but either 9 months from the Closing Date have not elapsed or there are Proceedings pursuant to Clause 5.6.4.(i) below, the Escrow Agent shall release the Retention to the Seller less the sum of CZK 189,000,000 (one hundred and eighty nine million Czech Crowns), which shall be retained in the Escrow Account until such time as the Buyer obtains a definitive and final ruling in respect of such Proceedings or the period of 9 months from the Closing Date has elapsed and there are no Proceedings which ever is the later. For the avoidance of doubt, a court decision made on the basis of a valid withdrawal is considered to be a definitive and final ruling."

2.2    The clause 5.6.4 (ii) shall be amended to read:

"On each regular quarter day, being 1 January, 1 April, 1 July and 1 October, such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending SPV KN under the Gilroy Claim and/or the KT Claim; the request of the Buyer for such sums from the Retention must evidenced by a duly issued invoice from the Buyer's lawyers for the time being. Any payments under this Clause 5.6.4(ii) () will be considered to be Share Purchase Price adjustments."

2

2.3    The first paragraph of the clause 5.6.4 (III) shall be amended to read:

"In the event that, under any tax regulations applicable up to the date of Closing, Kotva or SPV KN are assessed with Tax (in particular real estate transfer tax or VAT) in relation to the contribution of the Property, to SPV KN and Kotva, SPV KN or the Seller is liable to pay such Tax to the Financial Authorities, Kotva and the Seller undertakes to compensate SPV KN for such Tax and any corresponding penalty, interest or any other financial payment imposed by the Financial Authorities on SPV KN and such amount of Tax shall be retained in the Escrow Account by the Escrow Agent and shall only be released to the Seller following Gilroy Settlement _and KT Settlement_ upon receipt of the following:"

Whilst the rest of the clause 5.6.4 (iii) stays the same

3    Amendment of clause 6.1 of the SPA:

3.1    The first paragraph of the clause 6.1 (iii) shall be amended to read:

"There is no Proceeding in progress, pending or Threatened against or relating to Kotva, SPV KN or the Seller or KAS except for the Gilroy _Claim, KT Claim_ and the 'Bailinder litigation' and there is no circumstance, matter or thing which might give rise to any such Proceeding by Kotva or SPV KN or the Seller or KAS or any shareholder thereof or any third party or to any governmental investigation relative to it, nor is there outstanding against Kotva or SPV KN or Seller or KAS any regulation, judgement, decree, injunction, rule or Order of any court, Governmental Body or arbitrator which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable."

4    Amendment of Schedule 9 to the SPA

4.1    Schedule 9 to the SPA shall be amended to include the KT Claim annexed hereto at Schedule 1.

4    Counterparts

This Amendment will be executed in four counterparts, each of which will be deemed to be an original copy of this Amendment. The Amendment is executed in the English (2 counterparts) and Czech (two counterparts) languages, and the Czech language version shall prevail.

The Parties have executed this Amendment as of the date indicated in the first sentence of this Amendment.

By:

Seller:

SPV CO Limited

KC 1-1961

Name:       MARTIN BENDA

Title:        DIRECTOR

By:

**KOTVA NEMOVITOSTI k. s. ( KOTVA OBCHODNÍ, a.s )**

Name:   MICHAL VLACH            JIŘÍ BRADA              PAVEL RICHTER

Title: CHAIRMAN OF THE BoD     MEMBER OF THE BoD     MEMBER OF THE BoD

By:

**KOTVA a.s.**

Name:    MAREK KOLIBAL

Title:      CHAIRMAN OF THE BoD

By:

**KOTVA OBCHODNÍ, a.s.**

Name: MICHAL VLACH               JIŘÍ BRADA             PAVEL RICHTER

Title: CHAIRMAN OF THE BoD     MEMBER OF THE BoD     MEMBER OF THE BoD

By:

**Buyer:**

**CRO Czech a.s.**

4

KC 1-1962

*F. Walter*

Name:

Title:

By:

**Markland Holdings Limited**

*F. Walter*

Name:

Title:

by :

SPV KN a.s

Name:   RICHARD HARAZIM
Title:   MEMBER OF THE BoD

5

KC 1-1963

Dne 14 února 2005

SPV CO Limited

a

CRQ Czech a.s.

# DODATEK Č. 1 KE SMLOUVĚ O KOUPI AKCIÍ

týkající se odkupu akcií společnosti SPV KN a.s.

Linklaters

Palác Myslbek
Na Příkopě 19
117 19 Praha 1

Telefon    (420) 221 522 111
Fax        (420) 221 522 199

Č.j. BDXW/L-033253

KC 1-1964

### Dodatek č. 1 ke Smlouvě o koupi akcií

**Smluvní strany:**

(1) **SPV CO Limited**, se sídlem Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus, společnost zapsaná pod číslem HE 146845, registrovaná na Kypru (dále jen „Prodávající"), kterou zastupuje pan Martin Benda, člen představenstva;

(2) **CRQ Czech a.s.**, se sídlem Národní 1435/6, 110 00 Praha 1, IČ 27159256, zapsaná v obchodním rejstříku vedeném Městským soudem v Praze, oddíl B, složka 9394 (dále jen „Kupující"), kterou zastupují pan Frank Walker a pan Aidan Scully, členové představenstva;

(3) **SPV KN a.s.**, se sídlem Příkop 4, 602 00 Brno, IČ 26910705, zapsaná v obchodním rejstříku vedeném Krajským soudem v Brně, oddíl B, složka 4043 (dále jen „SPV KN"), kterou zastupuje Ing. Richard Harazim, jediný člen představenstva;

(4) **KOTVA NEMOVITOSTI, k.s.**, se sídlem Příkop 4, 602 00 Brno, IČ 26229048, zapsaná v obchodním rejstříku vedeném Krajským soudem v Brně, oddíl A, složka 16586 (dále jen „Kotva"), společnost zastupovaná společností KOTVA OBCHODNÍ, a.s., jejímž jménem jednají Ing. Michal Vlach, předseda představenstva, Ing. Jiří Brada, člen představenstva, a Ing. Pavel Richter, člen představenstva.

(5) **MARKLAND HOLDINGS Limited**, se sídlem 19 Upper Fitzwilliam Street, Dublin 2, společnost zapsaná pod číslem 291167 a registrovaná podle zákonů Irské republiky (dále jen „Markland"), kterou zastupují pan Frank Walker a pan Aidan Scully, ředitelé.

(6) **KOTVA a.s.**, se sídlem Náměstí Republiky 8, Praha 1, IČ 60193808, zapsaná v obchodním rejstříku vedeném Městským soudem v Praze, oddíl B, složka 2370 (dále jen „KAS"), kterou zastupuje pan Marek Kolibal, předseda představenstva. Kopie rozhodnutí představenstva ze dne 22. prosince 2004, kterým byl pan Marek Kolibal jmenován do funkce, a návrh na zápis pana Marka Kolibala do obchodního rejstříku jako předsedy představenstva jsou připojeny k tomuto dokumentu jako Příloha 1G; a

(7) **KOTVA OBCHODNÍ, a.s.**, se sídlem Příkop 4, 602 00 Brno, IČ 26231735, zapsaná v obchodním rejstříku vedeném Krajským soudem v Brně, oddíl B, složka 3484 (dále jen „KO"), kterou zastupují pánové Ing. Michal Vlach, předseda představenstva, Ing. Jiří Brada a Ing. Pavel Richter, členové představenstva.

(společně nazývané „Smluvní strany")


Termíny a výrazy psané s velkým počátečním písmenem, které v tomto dodatku nejsou definovány jinak, budou mít týž význam, který je jim připisován ve Smlouvě o koupi akcií ze dne 20. prosince 2004 uzavřené mezi Smluvními stranami (dále jen „SPA").

Smluvní strany se tímto dohodly na následujícím dodatku k SPA (dále jen „Dodatek"):

KC 1-1965

1    **Dodatek ke článku 1.2 - Definice:**

1.1    Nová definice termínů „KT", „Žaloba KT" a „Vypořádání KT" budou do článku 1.2 SPA zařazeny v abecedním pořádku takto:

„KT" znamená KT, Inc., společnost se sídlem 2711 Centerville Road, Suite 400, City of Wilmington, County of Newcastle, Delaware, USA.

„Žaloba KT" znamená žalobu, kterou společnost KT k 23. prosinci 2004 podala u Obvodního soudu pro Prahu 1 pod číslem jednacím 22 C 239/2004, jejíž kopie je připojena v příloze 9.

„Vypořádání KT" znamená získání definitivního a konečného rozhodnutí týkajícího se Žaloby KT; pro účely této Smlouvy má být za takové definitivní a konečné rozhodnutí považován také smír mezi stranami Žaloby KT schválený soudem, nebo zpětvzetí Žaloby KT společností KT.

2    **Dodatek ke článku 5.6.4 SPA:**

2.1    První odstavec článku 5.6.4 bude pozměněn takto:

1.1.1    Zbytek Kupní ceny za Akcie, tj. Zádržné, ve výši 576 450 000 Kč (pět set sedmdesát šest miliónů čtyři sta padesát tisíc korun českých) bude zadrženo Správcem vázaného účtu do té doby, než dojde k Vypořádání Gilroy a Vypořádání KT. Pokud dojde k Vypořádání Gilroy a k Vypořádání KT, avšak dosud neuběhla lhůta 9 měsíců od Data uzavření nebo probíhají Řízení uvedená v odstavci 5.6.4.(i), je Správce vázaného účtu povinen uvolnit Prodávajícímu Zádržné snížené o částku 189 000 000 Kč (jedno sto osmdesát devět miliónů korun českých), kterou musí dále zadržovat na Vázaném účtu do té doby, než bude vydáno konečné a pravomocné rozhodnutí ohledně těchto Řízení, nebo pokud taková Řízení nejsou, dokud neuběhne lhůta 9 měsíců od Data uzavření, podle toho, k čemu dojde později. Pro vyloučení pochybností se stanoví, že konečným rozhodnutím se rozumí rovněž rozhodnutí soudu o zastavení řízení vydané na základě zpětvzetí žaloby.

2.2    Bod 5.6.4 (ii) bude pozměněn takto:

„Vždy prvního dne každého čtvrtletí, tj. 1. ledna, 1. dubna, 1. července a 1. října, takové částky ze Zádržného, jaké jsou nezbytné pro plnou náhradu nákladů a výdajů na právní zástupce Kupujícího vynaložených na obranu SPV KN v Řízení o Žalobě Gilroy a/nebo Žaloby KT; požadavek Kupujícího na uvolnění takovýchto částek ze Zádržného musejí být doloženy fakturou řádně vystavenou právními zástupci Kupujícího. Veškeré částky vyplacené podle tohoto ustanovení 5.6.4.(ii) budou považovány za úpravu Kupní ceny za Akcie."



2.3     První odstavec bodu 5.6.4 (iii) bude pozměněn takto:

*"V případě, že na základě jakéhokoliv Daňového Právního předpisu platného v období do dne Uzavření, vznikne společnosti Kotva nebo SPV KN Daňová povinnost (zejména Daň z převodu nemovitostí nebo DPH) v souvislosti s vkladem Majetku do SPV KN a společnosti Kotva, a SPV KN nebo Prodávající tak bude povinen zaplatit tuto Daň finančním úřadům, Kotva a Prodávající se zavazují nahradit SPV KN tuto Daň a veškeré odpovídající pokuty, úroky nebo jakékoli jiné finanční platby uložené finančními úřady SPV KN a částka odpovídající uvedené Daní bude zadržena na Vázaném účtu Správcem vázaného účtu a bude uvolněna Prodávajícímu pouze po Vypořádání Gilroy a Vypořádání KT na základě předložení těchto dokumentů:"*

Zatímco zbývající část bodu 5.6.4 (iii) zůstává nezměněna.

3     **Dodatek k bodu 6.1 SPA:**

3.1     První odstavec bodu 6.1 (iii) bude pozměněn takto:

*"Neexistuje žádné probíhající, zahajované nebo Hrozící Řízení vůči nebo ve vztahu ke společnostem Kotva, SPV KN nebo Prodávajícímu nebo KAS vyjma Žaloby Gilroy, Žaloby KT a Žaloby Balfindor, neexistuje žádná okolnost, záležitost nebo věc, která by mohla vyvolat ze strany společností Kotva nebo SPV KN nebo Prodávajícího nebo KAS nebo jejích akcionářů nebo třetí osoby takové Řízení anebo související šetření státních orgánů, a nebyl ani vůči společnostem Kotva nebo SPV KN nebo Prodávajícímu nebo KAS vydán příkaz, rozsudek, výnos, zákaz, rozhodnutí nebo Nařízení žádného soudu, Orgánu nebo rozhodce, které by způsobily, že tato Smlouva nebo v ní Zamýšlená transakce bude prohlášena za neplatnou, neúčinnou nebo relativně neplatnou."*

4     **Dodatek k Příloze 9 k SPA**

4.1     Příloha 9 k SPA bude pozměněna tak, aby zahrnovala Žalobu KT připojenou k tomuto dokumentu v Příloze 1.

4     **Exempláře**

Tento Dodatek bude vyhotoven ve čtyřech exemplářích, přičemž každý z nich bude považován za originál tohoto Dodatku. Dodatek je vyhotoven v angličtině (2 exempláře) a v češtině (dva exempláře), přičemž rozhodné znění bude v českém jazyce.

Smluvní strany podepsaly tento Dodatek k datu uvedenému v první větě tohoto Dodatku.

Za:

Prodávající:

SPV CO Limited

Jméno:      MARTIN BENDA

Funkce:      DIRECTOR

Za:

KOTVA NEMOVITOSTI k. s. ( KOTVA OBCHODNÍ, a.s.)

Jméno:  MICHAL VLACH          JIŘÍ BRADA          PAVEL RICHTER

Funkce: PŘEDSEDA PŘEDSTAVENSTVA      ČLEN PŘEDSTAVENSTVA      ČLEN PŘEDSTAVENSTVA

Za:

KOTVA a.s.

Jméno:      MAREK KOLÍBAL

Funkce:      PŘEDSEDA PŘEDSTAVENSTVA

Za:

KOTVA OBCHODNÍ, a.s.

Jméno:  MICHAL VLACH          JIŘÍ BRADA          PAVEL RICHTER

Funkce: PŘEDSEDA PŘEDSTAVENSTVA      ČLEN PŘEDSTAVENSTVA      ČLEN PŘEDSTAVENSTVA

KC 1-1968

Za

Kupující:

CRQ Czech a.s.

Jméno: FRANK WALKER

Funkce: DIRECTOR

AIDAN SCULLY

DIRECTOR

Za:

Markland Holdings Limited

Jméno: FRANK WALKER

Funkce: DIRECTOR

AIDAN SCULLY

DIRECTOR

Za:

SPV KN a.s.

Jméno:    RICHARD HARAZIM

Funkce:    ČLEN PŘEDSTAVENSTVA

KC 1-1969



Příloha č.1
(doplnění přílohy 9 SPA)

Žaloba KT

KC 1-1970



Příloha č.2

(příloha 1G SPA)

Rozhodnutí dozorčí rady KAS

Zápis ze zasedání představenstva KAS

Návrh na zápis změn do OR (zápis předsedy představenstva KAS)

KC 1-1971

**E**

Kotva
vs.
Weiss, et al.

# Weiss Asset Management by Andrew Weiss

Volume 1

January 25, 2007
pp 1-334



Two Oliver Street, Suite 804
Boston, MA 02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Weiss Asset Management by Andrew Weiss

Page 58

1  Q. Are those answers accurate?
2  A. I believe so.
3  Q. Are those answers complete?
4  A. I believe so.
5      MR. GOLDBERGER: Joel, I need a bathroom
6  break. Would now be a good time?
7      MR. BECKMAN: Let me just finish one
8  thing up.
9      MR. GOLDBERGER: Sure.
10     MR. BECKMAN: Can you give me two
11 minutes?
12     MR. GOLDBERGER: Yes.
13     MR. BECKMAN: All right, go ahead. We
14 can go off the record now.
15     VIDEOGRAPHER: Time is 10:32. We're off
16 the record.
17     (Whereupon, a recess was taken)
18     (Exhibit 2 marked for identification)
19     VIDEOGRAPHER: Time is 10:41. We're
20 back on the record.
21 Q. Who is Nick Carey, Mr. Weiss?
22 A. He was a reporter for Dow Jones.
23 Q. Did Mr. Carey or was an article published in
24 the Wall Street Journal authored by Mr. Carey?

Page 59

1  A. Yes.
2  Q. Did you communicate with Mr. Carey about
3  that article?
4  A. Yes.
5  Q. I hand to you an e-mail that's been produced
6  from your files and marked as Exhibit Number 2.
7      (Document exhibited to witness)
8  Q. Now, the bottom of the e-mail is from Ben
9  Goldberger to individuals in your office, and you're
10 cc'd on that. Do you see that?
11 A. Where it says hi, Benjamin?
12 Q. No, I'm going to the bottom of it. From B.
13 Goldberger to MWE, but in the middle of the first
14 page?
15 A. Oh, where it says "attached," the sentence
16 that begins with the word "attached"?
17 Q. Yes, yes. Mr. Goldberger writes, "Attached
18 is a company report on SPV Co. I will amend
19 paragraph 11 of the counterclaim to state that Benda
20 is a director of SPV Co." Do you see that?
21 A. Yes.
22 Q. Is that Martin Benda?
23 A. I would assume so.
24 Q. Now, did you forward this e-mail that you

Page 60

1  received from Mr. Goldberger to Nick Carey at the
2  Wall Street Journal?
3  A. I don't recall.
4  Q. Well, look at the top. Does that indicate
5  that you forwarded this e-mail to Mr. Carey?
6  A. No, that doesn't indicate that.
7  Q. All right, let's focus on what -- let's go
8  to the top e-mail from Andrew Weiss to Nick Carey,
9  SPV Co. Do you see that?
10 A. Yes.
11 Q. Do you recall sending this e-mail to Mr.
12 Carey?
13 A. No.
14 Q. Well, you generated this e-mail, correct?
15 A. Yes.
16 Q. Right. In the e-mail you write, "I thought
17 you might be interested to see that the person who
18 is bragging about killing the police investigator is
19 also a director of SPV Co., which is the company
20 that ended up owning the department store the Irish
21 investors bought, SPV Co.," and then your initials
22 AW. Do you see that?
23 A. Yes, I do.
24 Q. Did you forward this to Nick Carey before

Page 61

1  the Wall Street Journal article was published?
2      MR. GOLDBERGER: Objection.
3  A. You use the word "forwarded." Do you mean
4  to say did I send the e-mail?
5  Q. Yes, did you send this e-mail to Mr. Carey?
6  A. It says that I did it. So I assume I did
7  it. It says that, yeah, like I said, I don't have
8  any recollection.
9  Q. Do you believe that Mr. Benda was bragging
10 about killing the police investigator?
11 A. Yes, I do believe that.
12 Q. Describe all facts supporting your
13 contention that Mr. Benda bragged about killing a
14 police investigator.
15 A. That's pretty much a direct -- it's a
16 paraphrase of a report that I got from police
17 investigator in which -- not a police investigator,
18 private -- excuse me, Mr. Topinka hired -- my
19 attorneys in the Czech Republic hired a police
20 investigator to do background checks on what was
21 going on in this matter. The report that they sent
22 me said that Benda has in -- I believe is what it
23 said is often and in various places has bragged
24 about, quote, doing in the, and then they gave the

16 (Pages 58 to 61)

Weiss Asset Management by Andrew Weiss

Page 62

1  name of the police investigator who committed
2  suicide under what his supervisor described as very
3  unusual circumstances. It was the subject of
4  several newspaper reports talking about how
5  suspicious the suicide was. There's also been
6  newspaper reports in the Czech Republic about the
7  frequency in which police investigators, quote,
8  commit suicide.
9     Q. Do you believe that Mr. Benda killed the
10 police investigator?
11    A. I think it's -- I don't believe that -- I
12 guess the word believe in the context in that
13 sentence is a difficult one for me to think about.
14 You know, it's easier for me to think in terms of
15 probabilities. I think there's a -- given that the
16 police -- that the investigator said that he bragged
17 about doing in the police investigator, I think that
18 there is some probability that he did. That those
19 boasts are correct. I never --
20    Q. Have you brought this information to the
21 attention of the Czech authorities?
22    A. No. Not that I know of. I don't know if --
23 I did not personally.
24    Q. Did anyone on your behalf bring this

Page 63

1  information to the --
2     A. Not that I know of.
3     Q. Did you take efforts to insure that this
4  information was provided to the Czech authorities?
5     A. I did not.
6     Q. So you think you know the person who killed
7  another person, and you don't think it's important
8  to convey that to the Czech authorities?
9        . MR. GOLDBERGER: Objection.
10    A. I didn't say that. That's not true.
11    Q. Well, do you believe that Mr. Benda killed a
12 police investigator?
13    A. I think that -- I think that there's some
14 probability that he did, but I don't think it's a
15 certainty. I don't think that there's evidence
16 to -- that would be close to sufficient to convict
17 anybody of it or prove beyond a reasonable doubt.
18 Whether I believe it or not -- I don't -- the notion
19 of believe in the context of that question is really
20 probabilistic. It's really probabilistic. It's
21 not --
22    Q. But you thought you had enough information
23 to convey it to the Wall Street Journal; is that
24 correct?

Page 64

1     A. I didn't convey that he killed him. I said
2  I conveyed to the Wall Street Journal that the
3  person who bragged about doing it. I did not say
4  that he did it.
5     Q. Identify the police officer that you believe
6  in some probability that Mr. Benda killed.
7     A. There's a possibility. It's the police
8  investigator was the person who was in charge of
9  investigating the tunneling of Trend.
10    Q. What's the name of the police officer?
11    A. It's one of these Czech names that I have so
12 much trouble remembering. It's in the files.
13    Q. When did he die?
14    A. He died in the early part of -- around — I
15 don't remember. I don't recall.
16    Q. Do you have a best estimate as to when this
17 police officer died?
18    A. It was before I started getting involved in
19 this case.
20    Q. Okay, when did you first get involved in
21 this case?
22    A. In 2003. The second half of 2003.
23    Q. Did you repeat this accusation to others?
24    A. That's not an accusation.

Page 65

1     Q. Did you convey to others that Mr. Benda
2  bragged about killing a police investigator?
3     A. I may have.
4     Q. Who else?
5     A. My wife.
6     Q. Did you convey this information to the New
7  York Times?
8     A. That a police investigator -- that my
9  private -- which information?
10    Q. Did you convey to the New York Times that
11 you had information Mr. Benda was bragging about
12 killing a police investigator?
13    A. I may have.
14    Q. Did you convey that information to members
15 of the U.S. Government?
16    A. I don't recall.
17    Q. Did you convey that information to Senator
18 Kerry's office?
19    A. I don't recall.
20    Q. Other than -- let me back up.
21       What's the basis for the investigator's
22 conclusion, the private investigator's conclusion
23 that Mr. Benda bragged about killing a police
24 officer?

17 (Pages 62 to 65)

Weiss Asset Management by Andrew Weiss

Page 66

1    A. He said that often and in various places,
2  Mr. Benda has said that he did in, and then he gave
3  the name of the police investigator.
4    Q. Now, before you conveyed this information to
5  the Wall Street Journal, did you ask the private
6  investigator who and when Mr. Benda allegedly made
7  these statements?
8    A. No, I did not.
9        (Exhibit 3 marked for identification)
10    Q. I'm handing to you what's been marked as
11  Exhibit Number 3.
12        (Document exhibited to witness)
13    Q. Which is an e-mail produced by defendants in
14  this case. The top e-mail being from you to Lars
15  Bader dated February 9, 2005. Who's Lars Bader?
16    A. Lars Bader is an executive with QVT.
17    Q. And QVT is one of the largest investors in
18  the ring-fenced assets, correct?
19    A. Yes.
20    Q. Is your answer yes?
21    A. Yes.
22    Q. Now, I want to direct your attention to
23  beginning with the second sentence of this e-mail in
24  which you write, "I spoke with McKnight at State

Page 67

1  Department. She just gave me the number of the
2  person at the embassy who didn't seem to be able to
3  do anything. He said the Czech legal system was
4  bullshit and this the bribe could well have been
5  given to either the justice minister or the prime
6  minister. Also, he said the judges are bribed at
7  fairly low prices. He did not say that he
8  thought -- he did say that he thought the key point
9  would be able to find out if the money behind
10  Forminster was Russian money. I'm hiring an
11  investigator to research that." Did someone at the
12  U.S. Embassy in Prague representing the U.S.
13  Government tell you that the Czech legal system was
14  bullshit and a bribe could well have been given?
15        MR. GOLDBERGER: Objection.
16    A. Yes.
17    Q. Who at the U.S. Embassy made the statement?
18    A. The commercial attache.
19    Q. What's the name of the person?
20    A. I don't recall.
21    Q. When was that information allegedly conveyed
22  to you?
23    A. I don't recall. But -- I don't recall the
24  date.

Page 68

1    Q. But you can't give me a name of the person;
2  is that right?
3    A. No, I can't. It was whoever was the
4  commercial attache, roughly at this time it's
5  probably a matter of public record. You can get on
6  the internet.
7    Q. Did this person say to you that he thought
8  the key point would be to find out if the money
9  behind Forminster was Russian money?
10    A. Yes.
11    Q. What do you mean by Russian money?
12    A. Organized -- Russian organized crime.
13    Q. What exactly did he say to you about that
14  issue?
15    A. I don't know. I can't recall exactly what
16  he said.
17    Q. What's your best recollection of what he
18  told you about saying that he thought the key point
19  would be to find out if the money behind Forminster
20  was Russian money?
21    A. He said that the pattern of violence
22  associated with this case suggested that it was most
23  likely to be Russian organized crime.
24    Q. Oh, so he told you that it was most likely

Page 69

1  Russian organized crime was involved in this case?
2    A. Yes.
3    Q. Oh, he didn't say that you should -- that
4  the key point would be to find out?
5    A. He said it was most likely that -- it
6  sounded to him, what he said -- this is a long time
7  ago. So I'm trying to -- not saying exactly what he
8  said, but my best recollection is he said it sounded
9  to him the way, given the violence associated with
10  this case, there's a very well known case, by the
11  way, is that it sounded to him like it was -- it
12  sounded to him like Russian organized crime.
13    Q. Did he tell you that the key point would be
14  to find out if Russian money was involved?
15    A. I don't recall, but given that it's in the
16  e-mail, it seems like that's plausible.
17    Q. Is it your testimony that he told you
18  Russian money was involved -- Russian mob was
19  involved or did he tell you whether to investigate
20  it?
21        MR. GOLDBERGER: Objection.
22    A. Let me just repeat what I said before.
23    Q. Please.
24    A. Which is what I believe he said was given

18 (Pages 66 to 69)

Weiss Asset Management by Andrew Weiss

Page 70

1  the amount of violence involved in this case, that
2  it sounded to him like Russian organized crime was
3  involved.
4      Q. Did you have your private investigator look
5  into whether there was a link with Russian mob?
6      A. I didn't communicate with the private
7  investigator.
8      Q. Well, do you know whether your private
9  investigator researched whether Russian mob was
10 involved?
11     A. I don't know.
12     Q. Were you ever provided any information
13 regarding whether Russian mob was involved, other
14 than what the State Department or the U.S. Embassy
15 told you?
16         MR. GOLDBERGER: And other than what
17 your lawyers told you.
18     A. No. Wait, can you rephrase that question
19 again, please?
20     Q. Were you provided any information -- were
21 you provided any other information supporting the
22 allegation that Russian mob was involved?
23     A. Yes.
24     Q. Describe that information.

Page 71

1      A. It's quite tangential, but we eventually,
2  because Forminster has been involved in so many
3  criminal processes, we were able to find out that
4  the beneficial owners of Forminster is Bonalbo
5  Group. If you trace it down, Forminster is owned by
6  Bonalbo Fiduciaries UK who report having no assets,
7  because it's a UK company, was owned by Bonalbo
8  Group UK who report having just liabilities, which
9  is owned by Bonalbo Group Cyprus. When we call
10 Bonalbo Group Cyprus, they say on their website that
11 they're in the business of on-line gaming, on-line
12 licensed and unlicensed gaming. And that they are
13 fluent Russian speakers. And when we called Bonalbo
14 Group, we get people who speak Russian. Georgiy
15 Nikitin, who is Russian speaking, calls them. And
16 there's a long history of the Russian organized
17 crime making use of entities in Cyprus. So that
18 would be the connection, the only other connection I
19 might know about.
20     Q. So anyone who speaks Russian may be part of
21 the Russian mob?
22         MR. GOLDBERGER: Objection.
23     A. No. Oh, maybe. You mean anybody who speaks
24 Russian? Sure, anybody may be part of the Russian

Page 72

1  mob. You may be. I mean anybody might be.
2      Q. I might be part of the Russian mob?
3      A. Anybody may be part of the Russian mob.
4  That's like saying anybody -- I mean anybody may.
5  You know, anyone in the world may be part -- you
6  can't like refute that. That's a philosophical
7  statement.
8      Q. Do you think it's responsible to report to
9  third parties that there may be links to the Russian
10 mob because a person speaks Russian?
11         MR. GOLDBERGER: Objection.
12     A. I never did that.
13     Q. Oh, you didn't?
14     A. No.
15     Q. Okay. Let's mark this as the next exhibit.
16         (Exhibit 4 marked for identification)
17     Q. Who's Nancy Stetson?
18     A. I don't know.
19     Q. You don't know? Do you know whether she
20 works for Senator Kerry?
21     A. No, I don't know.
22     Q. What about in the U.S. Government, you never
23 heard that name?
24     A. Nancy Stetson.

Page 73

1      Q. Yes.
2      A. Well, I don't recall.
3          (Document exhibited to witness)
4      Q. Let me hand to you what's been marked as
5  Exhibit Number 4, which is an e-mail produced by
6  defendants in this case from Georgiy Nikitin on
7  behalf on Andrew Weiss sent to Nancy Stetson at
8  foreign dot Senate dot gov. Did you review this
9  e-mail before it was sent out?
10     A. Probably. I don't recall, but it seems
11 likely that I did.
12     Q. Now, the subject line is phone call and
13 meeting. In the first line is, "I was having dinner
14 with Cam Kerry last night," and this e-mail is --
15 purports to be from you. Do you remember having
16 dinner with -- let me ask a foundational question.
17 Does this e-mail refresh your recollection as to who
18 Ms. Stetson is?
19         MR. GOLDBERGER: Objection.
20     A. No. I mean, from the e-mail, it doesn't
21 refresh my recollection, but it gives me information
22 about who she is.
23     Q. Who is she? What information does it give
24 you?

19 (Pages 70 to 73)

Weiss Asset Management by Andrew Weiss

Page 74

1       MR. GOLDBERGER: Objection.
2       A. It gives me information that she has a gov,
3  a Senate dot gov e-mail address, which presumably
4  means that she has some position with the U.S.
5  Senate. Given the context of the e-mail, it sounds
6  as though she probably is on Senator Kerry's staff.
7       Q. Let me direct your attention to the second
8  full paragraph, which provides, "We have learned
9  that Forminster Enterprises, the firm instigating
10  trumped-up charges against me, is secretly owned by
11  a Cyprus company which gives as its business
12  unlicensed on-line gaming operations and says it is
13  fluent in Russian. I've been told that this
14  information combined with the pattern of violence,
15  including questionable suicides of police officials,
16  strongly indicates the involvement of Russian
17  Mafia." So, Mr. Weiss, you conveyed to Senator
18  Kerry's office allegations concerning connections to
19  the Russian Mafia, correct?
20       MR. GOLDBERGER: Objection.
21       A. I conveyed what this sentence says.
22       Q. Right.
23       A. I did what -- I wrote what the sentence
24  says.

Page 75

1       Q. Now, you said, "I've been told that this
2  information." What information were you told and by
3  whom?
4       MR. GOLDBERGER: Objection.
5       A. That was given by advice of counsel. That
6  information came from counsel.
7       Q. Well, describe all facts asserting --
8  supporting your allegation that the pattern of
9  violence, including questionable suicides, strongly
10  indicates the involvement of Russian Mafia.
11       MR. GOLDBERGER: Objection.
12       A. You're asking me for all information --
13       Q. Supporting that statement.
14       A. I don't understand the question. I mean --
15       Q. What -- go ahead, I'm sorry.
16       A. I don't understand the question.
17       Q. What facts are you aware of that support the
18  statement that you sent to Senator Kerry's office
19  about a pattern of violence including questionable
20  suicides of police officials indicates the
21  involvement of Russian Mafia?
22       MR. GOLDBERGER: Objection.
23       A. Well, there was a newspaper story that I
24  read which gave a list of all the suicides of Czech

Page 76

1  police investigators, a fairly long list of them all
2  committing suicide. There was a newspaper story in
3  which several people questioned the suicide of the
4  police investigator that I talked about. There was
5  the communication I got from the commercial attache
6  about the indication of the Russian Mafia. And
7  subsequent to this, there was actually a report by
8  the Czech security officials talking about the
9  strong involvement of Russian organized crime and
10  its corrupting influence inside the Czech legal
11  system.
12       Q. Does that report have any connection to your
13  case, this Czech security report?
14       A. Does it have any connection to my case?
15  It's talking about the question you asked, about
16  involvement of Russian organized crime.
17       Q. Do you believe today that Russian organized
18  crime is involved in this case?
19       A. I have no idea.
20       Q. When you --
21       A. I don't know.
22       Q. You don't know. Do you believe it?
23       A. Do I believe that organized crime -- again,
24  this is a probabilistic statement. I don't know. I

Page 77

1  don't know that it is or is not.
2       Q. Describe all facts that support your belief
3  that Russian organized crime is involved.
4       MR. GOLDBERGER: Objection.
5       A. These are just the things I said already.
6       Q. You're not aware of any other facts that
7  support your belief; is that correct?
8       MR. GOLDBERGER: Objection.
9       A. I believe there has been some additional
10  newspaper articles talking about Russian organized
11  crime having increased influence in Eastern and
12  Central Europe.
13       Q. Are you aware of any facts supporting an
14  allegation that Russian Mafia is involved in the
15  Czech criminal action against you?
16       A. Repeat the question.
17       Q. Sure. Are you aware of any facts supporting
18  an allegation that Russian Mafia is involved in the
19  Czech criminal action against you?
20       A. Just the facts that I've told you about.
21       Q. Now, direct your attention to the last
22  paragraph of your e-mail. The second sentence, you
23  write, "This matter is of the utmost importance to
24  me, since it could endanger the physical safety of

20 (Pages 74 to 77)

Weiss Asset Management by Andrew Weiss

Page 142

1    Q. Now, do you have an understanding of the KT
2  action that was filed against Kotva, KN and SPV KN
3  in December of 2004?
4    A. Can you repeat the question?
5    Q. Sure. Do you have an understanding of what
6  relief was being requested in the KT action filed in
7  the Czech Republic in December of 2004 against
8  Kotva, KN and SPV KN?
9    A. Yes.
10    Q. What's your understanding?
11    A. My understanding is that they were -- that
12  with filing -- I had asked Mr. Peterka in --
13    MR. GOLDBERGER: Don't get into what you
14  said to Mr. Peterka. Answer the question what your
15  understanding of the relief requested is.
16    A. My understanding is that at least one of the
17  lawsuits, I believe this is the lawsuit that had
18  this relief was to un -- to simplify the structure
19  of Kotva back to the way it was originally or at
20  least the way Ernst & Young suggested it be
21  structured, rather than having this very convoluted
22  set of interlocking subsidiaries and cross holdings
23  that -- for a single piece of property. It didn't
24  make any sense.

Page 143

1    Q. Is it your understanding that the KT action
2  sought to undo the property transfers?
3    MR. GOLDBERGER: Objection.
4    A. It's my understanding that the KT lawsuits
5  sought to simplify the structure back so that the
6  property would belong to Kotva, a.s. as it
7  originally did.
8    Q. Did you believe that Forminster was behind
9  the transfers of the property from Kotva, a.s. to
10  subsidiaries?
11    A. Yes.
12    Q. And did you believe that Forminster -- that
13  Richard Harazim and Martin Benda were behind those
14  property transfers?
15    A. I have no idea.
16    Q. Well, you believe that Forminster was
17  involved, correct?
18    A. Yes, I do believe that.
19    Q. In May of -- between May and December of
20  2004, you believe that Richard Harazim and Martin
21  Benda were representing Forminster, correct?
22    A. Say it again.
23    Q. Is it your position that between May and
24  December of 2004, you believe that Richard and

Page 144

1  Martin were representing Forminster?
2    A. Yes, I do.
3    Q. And you offered -- is it your testimony that
4  BGO offered to sell its shares to Forminster?
5    MR. GOLDBERGER: Objection.
6    A. Again, it's not BGO. You mean Czech value
7  CVF investment?
8    Q. Fine, is it your testimony that CVF offered
9  to sell its shares to Forminster between May and
10  December of 2004?
11    MR. GOLDBERGER: Objection.
12    A. It's my understanding that we were offering
13  to sell it to whichever -- to -- that Mr. Hoffmann
14  was negotiating a sale of that to some entity. It
15  might have been Forminster or an entity controlled
16  by Forminster, some subsidiary that Forminster could
17  have set up, some dummy company.
18    Q. And you believe that the property transfers
19  that Forminster had orchestrated were illegal,
20  correct?
21    A. I didn't -- this was by advice of counsel.
22    Q. If you believe that Forminster, what
23  Forminster was doing was illegal, why did you offer
24  to sell CVF its shares to Forminster?

Page 145

1    MR. GOLDBERGER: Objection.
2    A. I answered that question before.
3    Q. Well, please answer it again.
4    A. I have a fiduciary duty to the investors.
5  This isn't my money. They have shares. I have an
6  obligation to sell it to whoever is going to pay a
7  fair price for the shares.
8    Q. If the KT action was successful in reversing
9  the property transfers and putting the transfer --
10  putting the department store back to Kotva, could
11  Kotva have sold the department store to Markland?
12    MR. GOLDBERGER: Objection.
13    A. I believe so. I don't see why not.
14    Q. Let's go back to the Hoffmann contract. I'm
15  handing to you what's been previously marked as
16  Nikitin Exhibit Number 2.
17    MR. BECKMAN: I don't have a copy of
18  this one, Ben. I apologize.
19    (Document exhibited to witness)
20    Q. Do you recognize this as the agreement BGO
21  entered into with Vladimir Hoffmann in the fall of
22  2003?
23    A. I really can't read this. It's so smudged,
24  it's going to take me a long time to read it. Can

37 (Pages 142 to 145)

Weiss Asset Management by Andrew Weiss

Page 146

1  we get a better copy?
2      Q. No, this is the one that you produced
3  actually, Mr. Weiss. Go to the second page. Do you
4  recognize your signature on this?
5      A. That looks like my signature, yes.
6      Q. And let me just make this -- make sure we're
7  on the same page. This agreement was between BGO
8  and Vladimir Hoffmann, correct?
9      A. I'd have to read it. Let me try reading it.
10     Q. Read the first paragraph, Mr. Weiss.
11         MR. GOLDBERGER: Could you put it over
12  here so I can read it.
13     Q. Let me move this along. The very first
14  paragraph provides this agreement --
15         MR. GOLDBERGER: Let him read the
16  document. Let me read the document.
17         MR. BECKMAN: You've seen the document.
18  Let me ask the question.
19     Q. "This letter agreement refers to the Kotva
20  Trend shares held by Brookdale Global Opportunity
21  Fund. BGO currently owns 82,782 Kotva shares and
22  1,141,794 Trend shares. You agree to provide BGO
23  with such services as may be reasonably required by
24  BGO to facilitate the sale of the shares, including

Page 147

1  but not limited to identifying and communicating
2  with prospective purchasers." Do you understand
3  that the agreement that has been put in front of you
4  was an agreement between BGO and Vladimir Hoffmann?
5         MR. GOLDBERGER: Objection to the form.
6      A. I agree with what you read.
7      Q. Okay. Did you negotiate this agreement on
8  behalf of BGO?
9      A. Yes.
10     Q. And Mr. Hoffmann agreed to provide services
11  to BGO to facilitate the sale of the Kotva/Trend
12  shares, correct?
13     A. Yes.
14     Q. And those services included identifying and
15  communicating with prospective purchasers, correct?
16     A. Yes.
17         MR. GOLDBERGER: Andrew, if you could
18  just slide more back towards the middle of the table
19  so we can keep the waters out of the screen. Have
20  you finished reading this?
21         THE WITNESS: No.
22         MR. BECKMAN: I don't have anymore
23  questions on it.
24     Q. I'm handing to you what's been previously

Page 148

1  marked as Nikitin Exhibit Number 3.
2         (Document exhibited to witness)
3      Q. Do you recognize your signature on Exhibit
4  Number 3?
5      A. Yes.
6      Q. Is your answer yes?
7      A. Yes. Excuse me, let me take a drink of
8  water.
9      Q. Certainly. Do you recognize this as a
10  mandate agreement BGO provided to Vladimir Hoffmann
11  in connection with facilitating the sale of the
12  shares?
13     A. This is a mandate agreement between --
14  there's an authorization from BGO authorizing
15  Vladimir Hoffmann to act as its agent.
16     Q. So BGO appointed Mr. Hoffmann to act as its
17  agent in connection with the negotiation of the
18  Kotva shares, correct?
19     A. It gave them the authority.
20         MR. GOLDBERGER: Objection.
21     Q. I'm handing to you what's been marked as
22  Exhibit Number 7.
23         (Exhibit 7 marked for identification)
24         (Document exhibited to witness)

Page 149

1      Q. Which is a document that the defendants
2  produced in this case. Did you ever sign a version
3  of this document?
4      A. I don't recall.
5      Q. Did you ever or did KT ever guarantee to
6  Vladimir Hoffmann to pay its legal expenses or
7  damages resulting from his representation of the
8  interest of KT?
9         MR. GOLDBERGER: Objection.
10     A. I don't recall.
11     Q. Whose idea was it to negotiate over a
12  guarantee to pay Mr. Hoffmann legal expenses in
13  connection with representing the interests of KT?
14         MR. GOLDBERGER: If you can answer that
15  question without going into communications with
16  counsel, answer it.
17     A. I don't recall.
18     Q. Are you paying the legal expenses of
19  Vladimir Hoffmann in connection with the criminal
20  prosecution against him?
21     A. No.
22     Q. Did you ever?
23     A. No.
24     Q. Do you recall discussing with Vladimir

38 (Pages 146 to 149)

Weiss Asset Management by Andrew Weiss

Page 182

1  requested the meeting?
2      A. No. I shouldn't say that. I don't recall.
3  I don't remember asking him. But I think in the
4  context of those e-mails, I think that's -- after
5  reviewing them, this happened a long time ago, it's
6  my impression from reviewing the e-mails that those
7  meetings were requested by the Forminster
8  representatives.
9      Q. When you say "Forminster representatives,"
10 who are you referring to?
11     A. I don't know who. This was in the e-mail.
12 I'm assuming these were probably Mr. Harazim and
13 Mr. Benda, but it was always discussed in terms of
14 the Forminster representatives.
15     Q. So your testimony is based on exchanges of
16 e-mails; is that correct?
17     A. Yes.
18     Q. And you have no independent recollection
19 today as to who called the meeting; is that correct?
20     A. No.
21     Q. It isn't correct?
22     A. No, it is correct. I'm sorry, the English
23 language is a problem there. It's correct that I
24 have no independent recollection of who called the

Page 183

1  meeting, except for the fact that I'm fairly certain
2  that I did not call the meeting. That I was not the
3  person who requested the meeting. I had never
4  spoken with Mr. Harazim or Mr. Benda, as far as I'm
5  aware, prior to that meeting. I wouldn't even know
6  how to call the meeting.
7      Q. Where did it take place?
8      A. At a restaurant.
9      Q. What's the name of the restaurant?
10     A. I can't pronounce it. It begins with an O,
11 I think.
12     Q. Where is it located? In Prague?
13     A. It's located in Prague, yes.
14     Q. What time of day was the meeting?
15     A. Midday.
16     Q. How long did it last?
17     A. About two hours.
18     Q. Did you eat lunch?
19     A. Yes.
20     Q. Did everyone eat lunch?
21     A. I believe so. I don't recall exactly.
22     Q. Who picked up the check?
23     A. I don't remember.
24     Q. Did you pick up the check?

Page 184

1      A. I don't remember any better than the last
2  time you asked me.
3      Q. Who talked first at the meeting?
4      A. Mr. Benda -- well, I don't know exactly who
5  talked first, who was the first person to say words.
6      Q. How did the meeting start?
7      A. I think we introduced one another,
8  ourselves.
9      Q. After that, were you given business cards?
10     A. I don't recall.
11     Q. You don't recall, do you?
12     A. No, I don't recall.
13     Q. Did you provide any business cards to
14 anyone?
15     A. I don't recall.
16     Q. At the beginning of the meeting, did you ask
17 whether the Kotva department store was being sold?
18     A. No.
19     Q. Did you ask at any point during the meeting
20 whether the Kotva department store was being sold?
21     A. I referred during the meeting -- did I ask
22 whether it was being sold? I'm not sure if it was
23 posed as a question, whether I used those words,
24 whether I said is the Kotva department store being

Page 185

1  sold. I don't -- I did try to -- I referred to the
2  newspaper article that I had seen -- that I had been
3  told about. And the information I'd been told about
4  earlier that day by Mr. Woolf, that the department
5  store was being sold. And conveyed that information
6  to Mr. Harazim and Mr. Benda.
7      Q. What did you convey? What did you say?
8      A. I said well, I understand that the Kotva,
9  that the department -- I don't know exactly what I
10 said. The substance of what I said, to paraphrase,
11 was to the best of my recollection, is that I said
12 something along the lines of I -- it's my
13 understanding, I understand from the newspapers that
14 the department store's being sold.
15     Q. Is that your best recollection as to what
16 you said about the department store being sold?
17     A. The substance of what I said, yeah.
18     Q. What else did you say about the department
19 store being sold?
20     A. I think I might have mentioned the price
21 that was mentioned in the newspapers.
22     Q. What was the price?
23     A. I don't remember. I think one and a half
24 billion Czech crowns, something like that. One

47 (Pages 182 to 185)

Weiss Asset Management by Andrew Weiss

Page 186

1  point something like that.
2      Q. So prior to the meeting you had reviewed a
3  newspaper article about the sale; is that your
4  testimony now?
5      A. No, it's not my testimony. I did not say
6  that. That's not my testimony.
7      Q. Did you or did you not review a newspaper
8  article --
9      A. I did not.
10     Q. -- about the sale?
11     A. I did not review a newspaper article about
12  the sale.
13     Q. Did you hear about a newspaper article?
14     A. Yes, I did.
15     Q. Who did you hear that from?
16     A. Vladimir Hoffmann.
17     Q. What did he tell you about that article?
18     A. He told me that there was an article in the
19  newspapers, I think he said in the London newspaper,
20  that he had just seen. He told me the evening
21  before the meeting, that there was an article in a
22  London newspaper saying that the Kotva department
23  store was being sold, and he gave -- and they gave a
24  price for it.

Page 187

1      Q. What else did he say about the article?
2      A. I don't recall what else he said. He must
3  have said other things about the article, but I just
4  don't remember. This is four, three years ago.
5      Q. So have I exhausted your recollection as to
6  what Mr. Hoffmann said about that newspaper article?
7      A. If you let me think for a second, maybe I
8  can try and remember more.
9          (Pause)
10     A. I think that's pretty much what he said.
11  That there was a -- that the department store was
12  being sold, and he mentioned a price which was I
13  believe somewhere in the region of one and a half
14  billion Czech crowns, maybe one point seven billion
15  Czech crowns, something like that.
16     Q. How well do you remember the meeting of May
17  12th?
18     A. I remember, I mean, I don't know how to
19  answer that question. What do you mean how well?
20  One foot, two foot, three feet? How do you -- I
21  have no idea how to answer that question.
22     Q. How well do you remember being at the
23  meeting?
24     A. I don't know what you mean to say how well

Page 188

1  do you remember something.
2      Q. Do you remember specifically --
3      A. I don't know how to quantify a question like
4  that.
5      Q. Do you remember specific details about the
6  meeting?
7      A. I remember some details.
8      Q. You do. What details do you remember?
9      A. I remember where everybody was sitting.
10     Q. What else --
11     A. For example.
12     Q. What other specific details do you remember
13  about the meeting?
14     A. I remember leaving the meeting and walking
15  down in sort of after Benda gave -- well, shortly
16  after Benda gave his monologue, Mr. Benda gave his
17  monologue. I remember leaving the meeting and
18  walking down the steps to the bar and having a drink
19  and then returning to the meeting. I remember very
20  distinctly what Mr. Harazim said at the conclusion
21  of the meeting. That was quite shocking to me. I
22  remember those words quite clearly. That very
23  clearly. I remember several of the statements that
24  were made during the meeting, because some of them

Page 189

1  were quite shocking.
2      Q. What other specific details do you remember
3  about the meeting?
4      A. I remember that Mr. Benda left in the
5  middle, which was quite surprising to me. I
6  remember that Mr. Benda didn't speak English, and
7  everything he said was being translated by
8  Mr. Harazim.
9      Q. What other specific details do you remember
10  about the meeting?
11     A. I remember that it was -- that we were
12  sitting in a window seat in a table for four people.
13  Where the table was abutting the window wall. I
14  remember that Mr. Hoffmann was sitting next to a
15  window, Mr. Benda was sitting next to a window, and
16  that I was sitting directly across from Mr. Harazim.
17  That Mr. Harazim and Mr. Benda were sitting closest
18  to the door in which we entered the restaurant.
19  Mr. Hoffmann and I were sitting on the other side.
20  I remember it was a rectangular tablecloth. I
21  remember that it had a white tablecloth and white
22  napkins. I remember that the chairs were -- had
23  fairly straight backs. That the stairs, going down
24  the stairs had a bend in them, that you walked -- as

48 (Pages 186 to 189)

Weiss Asset Management by Andrew Weiss

Page 262

1  to uninformed people. Again, this is with the
2  caveat that I don't know what the insider trading
3  laws are in the Czech Republic. And also on the
4  caveat that I was getting information that was not
5  public information. So it would have to be
6  information other than what was in the newspapers.
7      Q. Let's go back to the May 12th meeting. Did
8  Richard Harazim or Martin Benda tell you that they
9  wanted to discuss the terms under what Kotva shares
10 that were held by BGO would be purchased?
11     MR. GOLDBERGER: Objection.
12     A. Can I use the bathroom break soon?
13     Q.. Sure. Go ahead.
14     VIDEOGRAPHER: Time is 4:26. This is
15 the end of cassette number three. We're off the
16 record.
17     (Whereupon, a recess was taken)
18     VIDEOGRAPHER: Time is 4:33. This is
19 the beginning of cassette number four in the
20 deposition of Andrew Weiss. We're back on the
21 record.
22     Q. Mr. Weiss, at the May 12th meeting, did the
23 issue of the payoff of the BGO shares come up?
24     MR. GOLDBERGER: Objection.

Page 263

1      A. What do you mean by the term "payoff"?
2      Q. Was the payoff of BGO shares discussed at
3  the May 12th meeting?
4      MR. GOLDBERGER: Objection.
5      A. Payoff is like the payola bribes. Payoffs
6  sounds like something illegal.
7      Q. Did you say at the May 12th meeting that the
8  shares owned by minority shareholders of Kotva
9  should get the same payoff as Forminster shares?
10     A. I don't recall using those words.
11     Q. Do you recall using the words payoff in any
12 respect?
13     A. I don't think I would use the word payoff.
14     Q. At the May 12th meeting, did you discuss --
15     A. That's not a word I would use.
16     Q. In any words receiving the same for your
17 shares as the Forminster shares?
18     A. I might have said something like I think all
19 shareholders should be treated equally.
20     Q. But you didn't discuss that minority
21 shareholders of Kotva should receive the same payoff
22 as Forminster shares; is that your testimony?
23     MR. GOLDBERGER: Objection.
24     A. I never would use the word payoff.

Page 264

1      Q. Okay.
2      (Exhibit 11 marked for identification)
3      (Document exhibited to witness)
4      Q. Handing to you what's been marked as Exhibit
5  Number 11, which is an e-mail addressed to Lars
6  Bader or from Lars Bader to you. And at the bottom
7  or a little closer to the bottom, actually it's from
8  you to Lars Bader dated February 8, 2005. Do you
9  see that, Mr. Weiss? Do you see the date on the
10 first page?
11     A. February 8, 2005, yes.
12     Q. Right. Let me direct your attention to the
13 second page of this exhibit. About six lines from
14 the top.
15     A. Second page six lines down from the top?
16     Q. Exactly. There's a sentence that starts
17 with "about nine months ago." Do you see that?
18     A. Yes.
19     Q. You write, "About nine months ago The London
20 Times reported that Forminster was in the process of
21 selling Kotva to Markland." Do you see that?
22     A. Yes.
23     Q. "And Vladimir Hoffmann arranged for me to
24 meet with Richard Harazim and Martin Benda." Do you

Page 265

1  see that?
2      A. Yes.
3      Q. So is that an accurate statement?
4      A. Well, I don't know who initiated it. Which
5  statement? I mean there's two statements here. The
6  London Times reported it, there's several
7  statements. Which part of it?
8      Q. I'll tell you what we're going to focus on,
9  Mr. Weiss. Is the statement that Vladimir Hoffmann
10 arranged for you to meet with Richard Harazim and
11 Martin Benda, is that an accurate statement?
12     MR. GOLDBERGER: Objection.
13     A. Yeah, I would think that's accurate. I'm
14 not sure who initiated that proposal for the
15 meeting, but he arranged that meeting.
16     Q. Let's go about ten lines further down. That
17 same paragraph.
18     A. Yeah.
19     Q. There's a sentence, just so you can find
20 where we are, "I left the table and went to a bar to
21 cool off." Do you see that?
22     A. Yes, I do.
23     Q. Now, I want to focus on the second sentence.
24     A. Where it says I said?

67 (Pages 262 to 265)

Weiss Asset Management by Andrew Weiss

Page 266

1    Q. "I said that the shares owned by minority
2  shareholders of Kotva should get the same payoff as
3  Forminster." Do you see that?
4    A. Oh, okay. I guess if -- that's -- I guess
5  in writing I use things that I wouldn't normally use
6  as in language. I didn't recall having said that
7  during the meeting. If I said it here, this is my
8  recollection. What was the date on this? February
9  8th, two years ago. I guess I had a better
10  recollection when it was six months later than when
11  it's two and a half, you know, how many years later.
12    Q. So you did use the word "payoff," didn't
13  you?
14    A. I don't recall. I don't recall using it.
15    Q. Is that an accurate statement, Mr. Weiss?
16    MR. GOLDBERGER: Objection. Is what an
17  accurate statement?
18    MR. BECKMAN: All right, Ben, please.
19    Q. Is the statement that, "I said that the
20  shares owned by the minority shareholders of Kotva
21  should get the same payoff as Forminster," is that
22  an accurate statement?
23    A. I don't recall having said that. Given that
24  it's in this e-mail, it's likely that if I put it in

Page 267

1  the e-mail, especially then, it's likely that I did
2  say it. But I had no recollection of having said
3  it. Now that you show it to me that it's in the
4  e-mail, it's likely that I said it. You're asking
5  me about things I said three years ago.
6    Q. You reported this to Mr. Bader, didn't you?
7    MR. GOLDBERGER: Objection.
8    Q. And he was a large shareholder of the
9  ring-fenced assets, correct?
10    A. No, he's not a large shareholder of the
11  ring-fenced assets.
12    Q. Or QVT is, correct?
13    A. Yes.
14    Q. Can you be sure today of anything you said
15  at the May 12th meeting, without reviewing a
16  document?
17    MR. GOLDBERGER: Objection.
18    A. Can I be sure of anything I said without
19  reviewing a document? I can't be sure that I'm
20  alive. I can't be sure that the world is not an
21  illusion. I can't be sure of anything.
22    Q. So your answer is no?
23    A. No, my answer is that there are some things
24  that are more vivid in my mind than others. When I

Page 268

1  say -- when there's something I said I said, I'm
2  much more sure of it than when there's something
3  that I think I didn't say. Because there's a lot of
4  things -- it's very hard to remember all the things
5  you didn't say. It's much easier to remember the
6  things that you did say. It's much harder to
7  remember the things you didn't hear than the things
8  you did hear. So claims about things I didn't say
9  or didn't hear, I just don't remember.
10    Q. You write just a few lines down, "I said
11  that was fine because I wouldn't take five million
12  dollars." Did you say that at the May 12th meeting?
13    A. There's a typo here. It says "find." I
14  said that was "fine," because I wouldn't take --
15  that sounds -- I recall saying that, but not with
16  the D, with an E. That was a typo.
17    Q. In this memo, just a few more lines down
18  kind of at the back, it says, "I said I would think
19  of something." Did you show that at the meeting?
20    A. Excuse me, can you show where we were
21  talking about?
22    Q. Sure. Three lines down from where we were
23  just reading.
24    A. Can you show me -- what sentence -- which

Page 269

1  line does — what's the first word in the line?
2    Q. That's a good way of doing it. "Said."
3    A. Word said, okay.
4    Q. Now go to the back. It says, "I said I
5  would think of something." Is that accurate?
6    A. Something like that. I said -- I probably
7  said I would think of something, something likely.
8  That sounds like something I would have said. Yeah,
9  that sounds accurate.
10    Q. Was it your understanding that Forminster
11  was receiving a payoff for its shares in Kotva?
12    MR. GOLDBERGER: Objection.
13    A. Can you --
14    Q. Sure.
15    A. You mean --
16    Q. Absolutely, I'll go back to the sentence.
17  You write, "I said that the shares owned by the
18  minority shareholders of Kotva should get the same
19  payoff as Forminster." Was it your understanding
20  that Forminster was getting a payoff for its Kotva
21  shares?
22    MR. GOLDBERGER: Objection.
23    A. It was my understanding is that Forminster
24  would end up with a certain amount of money from

68 (Pages 266 to 269)

Weiss Asset Management by Andrew Weiss

Page 286

1  based on its percentage of ownership in Kotva
2  shares?
3         MR. GOLDBERGER: Objection.
4     A. Very hard to do hypothetical about any,
5  because I'm sure somebody out there can, you know,
6  who's sophisticated enough could come up with some
7  scenario perhaps that I can't think of. So I would
8  guess if you gave me enough time, I could come up
9  with some kind of, you know, I don't know, maybe
10  somebody could come up with that. That's really
11  hard hypothetical to come up with.
12     Q. Let's cut to the May 12th meeting. We've
13  been talking about this for hours. Prior to the
14  meeting you learned about the potential sale, and
15  there was a price reported in the newspaper,
16  correct?
17         MR. GOLDBERGER: Objection.
18     A. I learned that — prior to the meeting, I
19  learned that there had been a newspaper report of an
20  agreement to sell with a price attached to that
21  agreement.
22     Q. And at the May 12th meeting, you were
23  looking for a payoff of your shares based on the
24  percentage value of the Kotva shares held by CVF,

Page 287

1  correct?
2         MR. GOLDBERGER: Objection.
3     A. You asked me that question before. I'll
4  just give the same answer again. You asked me
5  exactly that question. Why don't we just read back
6  the answer.
7     Q. What's your answer to that question?
8     A. Can you please give me my answer the last
9  time he asked that question?
10     Q. I'll ask it again.
11         MR. BECKMAN: Could you read back the
12  question, please?
13     A. Read back the last time he asked the
14  question previously.
15     Q. Mr. Weiss, if your lawyer wants to instruct
16  you not to answer, that's one thing. But you're
17  going to answer my question.
18         MR. BECKMAN: Would you read the
19  question.
20     A. You keep asking me the same question. Don't
21  we have more important — okay.
22     Q. You don't think this is important?
23     A. Yes, I think it's extremely important.
24     Q. It's very important.

Page 288

1     A. So why don't you ask me different questions
2  so we can learn something? Why do you keep asking
3  me the same question again and again if it's
4  important?
5     Q. It's critical, Mr. Weiss. I need an answer
6  to the question.
7     A. You've got an answer. You've already asked
8  it to me twice.
9         MR. GOLDBERGER: Andrew, let --
10         THE WITNESS: Okay.
11         MR. BECKMAN: Please read the question
12  to him.
13         (Question read back: And at the May
14  12th meeting, you were looking for a payoff of your
15  shares based on the percentage value of the Kotva
16  shares held by CVF, correct?)
17     A. I was not looking for a payoff. I'm sorry I
18  used that word. At the May 12th meeting, I went
19  into that meeting not looking for anything. We were
20  going into that meeting to -- there was no agenda in
21  the meeting. We were going into the meeting to have
22  discussions.
23     Q. At the May 12th meeting, were you willing to
24  accept a percentage of the sale proceeds if it was

Page 289

1  based on net asset value? Let me rephrase that.
2         At the May 12th meeting, were you
3  willing to accept as a purchase price for the CVF
4  shares a percentage of the net asset value based on
5  the price reported in the press?
6         MR. GOLDBERGER: Objection. Go ahead.
7     A. At all times, at any and all times I would
8  have been -- accepted a proportional share payoff of
9  the cash in — the net cash in Kotva represented by
10  the 11 point nine percent interest of CVF. That's
11  not just -- that's before, after, during the May
12  12th meeting at any time. That would have been
13  clearly a fair payoff -- payment.
14         MR. GOLDBERGER: I need a break.
15     Q. Let's go to the Glen Hubbard letter.
16         MR. GOLDBERGER: Joel --
17         MR. BECKMAN: One more question.
18     Q. The fourth paragraph, the sentence that
19  starts with "find something." Do you see "find
20  something"?
21     A. Oh, yeah, the last line in the paragraph
22  yes.
23     Q. Actually I apologize. I want to start the
24  line before. "About it," do you see that?

73 (Pages 286 to 289)

Weiss Asset Management by Andrew Weiss

Page 290

1  A. Yes, yes, I do.
2  Q. You write to Mr. Hubbard, "I replied that I
3  thought there was surely something I could do and
4  would speak with lawyers to find something I could
5  do to protect my investors. Subsequently I filed
6  lawsuits." Now, the statement "subsequently I filed
7  lawsuits," is that an accurate statement?
8        MR. GOLDBERGER: Objection.
9  A. I mean, not really. I mean, what
10 happened -- subsequently Mr. Peterka filed lawsuits
11 on behalf of CVF and/or on behalf of Gilroy and CVF
12 and Balfindor. I mean, I would say it conveys what
13 happened, but it could have been more precise.
14 Q. So that sentence subsequently I filed
15 lawsuits is inaccurate?
16       MR. GOLDBERGER: Objection.
17 A. I answered, I mean what it is, is
18 subsequently -- I don't know if it's inaccurate or
19 not. What I probably should have said is
20 subsequently Mr. Peterka and -- Mr. Peterka, Ondrej
21 Peterka filed civil lawsuits on behalf of Gilroy
22 and -- I don't know what the date of this is. But
23 on behalf of Gilroy and other entities, depends on
24 when the date is.

Page 291

1        MR. GOLDBERGER: All right, we're going
2  to take a break.
3        MR. BECKMAN: Hold on. I'm almost done
4  with this line of questioning.
5        MR. GOLDBERGER: Joel, you said one more
6  question. I asked you for a break.
7        MR. BECKMAN: Sorry, Ben. This is a
8  line of questioning. We're not going to interrupt
9  this.
10 Q. What civil lawsuits are you referring to
11 here?
12 A. The civil lawsuits in the Czech Republic.
13 Q. Is that the Gilroy lawsuit?
14 A. I don't know the date of this memo. So it's
15 hard for me to know which ones I was referring to.
16 What's the date of this? This is January 10, 2006?
17 Is this memo here attached to this -- you know, is
18 page 12218 a continuation --
19 Q. It's your document, Mr. Weiss.
20 A. Okay, I'm trying to understand --
21 Q. Let me withdraw that, and I'll ask you this.
22       After the May 12th meeting, you filed
23 the Gilroy action. That was the first action that
24 was filed, correct?

Page 292

1  A. Mr. Peterka filed that action, I believe.
2  Q. And you hired Mr. Peterka, correct?
3  A. I think Mr. Hoffmann hired Mr. Peterka.
4  Q. Did you --
5  A. I've never actually met Mr. Peterka.
6  Q. Did you retain Mr. Peterka?
7  A. I believe Mr. Hoffmann retained Mr. Peterka
8  on behalf of Gilroy. I mean, Mr. Peterka has never
9  been retained by me personally. I believe he's been
10 retained by various entities that are shareholders
11 of some of the ring-fenced assets of shareholders of
12 Kotva and Trend.
13 Q. So is it your testimony sitting here today
14 that you personally did not retain Mr. Peterka?
15       MR. GOLDBERGER: Objection.
16 A. I don't know what the words "retained" mean,
17 Mr. --
18 Q. Did you hire Mr. Peterka?
19       MR. GOLDBERGER: Joel, we're on a
20 totally different line of questioning. I'm taking a
21 break now.
22       MR. BECKMAN: I'm not taking a break.
23 If you want to leave the room, you can.
24 Q. Did you personally hire Mr. Peterka?

Page 293

1        MR. BECKMAN: You're leaving the room
2  with a question pending?
3        MR. GOLDBERGER: Joel, you promised
4  me --
5  Q. Answer that last question.
6        MR. GOLDBERGER: Is this going to be
7  your last question? I asked you for a break awhile
8  ago. You said one question. You've now asked
9  several.
10 Q. Did you personally hire Mr. Peterka?
11       MR. GOLDBERGER: Objection.
12 A. Mr. Hoffmann -- I asked Mr. Hoffmann --
13 Q. It's a yes or no, did you hire --
14 A. I mean, I can't -- I don't really understand
15 the question in terms of whether I hired
16 Mr. Peterka. I can give you an answer. You know, I
17 can't give a yes or no answer to that question.
18 Q. Okay.
19 A. Okay, the question is Mr. Hoffmann found
20 Mr. Peterka. He said, you know, that Mr. Peterka
21 would be really, you know, would be a good person to
22 work on this case. Mr. Peterka was then retained to
23 work on this case. He was not retained to be by me
24 personally as Andrew Weiss. He's not paid by Andrew

Weiss Asset Management by Andrew Weiss

Page 294

1  Weiss. So now Andrew Weiss is very much involved
2  with the shareholders of CVF, the beneficial
3  shareholders, and he does represent the beneficial
4  shareholders of CVF. So whether or not -- you know,
5  I really don't know, and I do approve the bills that
6  get paid to Mr. Peterka. I've never actually met
7  Mr. Peterka. So when you say did I retain him, I'm
8  not -- I'm trying to answer your question the best I
9  can.
10      MR. GOLDBERGER: Okay. We're on break.
11      VIDEOGRAPHER: Time is 5:12. We're off
12  the record.
13      (Whereupon, a recess was taken)
14      (Exhibit 13 marked for identification)
15      VIDEOGRAPHER: Time is 5:23. We're back
16  on the record.
17      Q. Sir, I'm handing to you what's been marked
18  as Exhibit Number 13, which is entitled Andrew
19  Weiss's second supplemental response to Kotva's
20  first set of interrogatories. I direct your
21  attention to the very last page. Did you sign these
22  interrogatories under the pains -- under the penalty
23  of perjury that the foregoing is true and correct?
24      A. Yes, I did.

Page 295

1      Q. And you reviewed these answers before you
2  signed them?
3      A. Yes, I did.
4      Q. I direct your attention to the second page
5  of this document. The interrogatory number three.
6  Interrogatory number three asks you to or reads as
7  follows, "Identify who owned or controlled Gilroy in
8  June 2004 when Gilroy filed its suit against Kotva
9  KN, SPV Co. in the Czech Republic. State whether
10  Weiss owned or controlled Gilroy at the time the
11  Gilroy lawsuit was filed. Identify who retained
12  Peterka, Ondrej Peterka to represent Gilroy in the
13  lawsuit, identify the parties to any engagement
14  letter to contract with Mr. Peterka, identify who
15  made the decision to file the Gilroy lawsuit,
16  identify who paid Mr. Peterka's legal bills and the
17  amount of such bills." That's the interrogatory,
18  Mr. Weiss. Turn to page three, please. The
19  supplemental interrogatory. The paragraph that
20  starts "in June of 2004." Do you see that,
21  Mr. Weiss?
22      A. Yes.
23      Q. Please follow with me.
24      MR. GOLDBERGER: I object to you reading

Page 296

1  parts of the interrogatory without reading the full
2  response.
3      MR. BECKMAN: You can direct that on
4  your cross, if you want, Mr. Goldberger.
5      MR. GOLDBERGER: I'm just registering my
6  objection, Joel.
7      Q. "In June of 2004, Andrew Weiss retained
8  Peterka and Partners to provide legal services in
9  the Czech Republic, including representation in
10  connection with the litigation."
11      A. Uh-hum.
12      Q. Is that accurate, Mr. Weiss?
13      A. Yeah.
14      Q. So you did retain Mr. Peterka, didn't you?
15      MR. GOLDBERGER: Objection.
16      A. The -- I think these responses were written
17  by counsel, and the notion of retaining a law firm
18  is not what I -- not a concept I'm necessarily
19  familiar with, with that language would be. I'd
20  like to say what happened is Mr. -- I'm just going
21  to repeat what actually happened. Mr. Gil -- I'm
22  losing it now. Vladimir Hoffmann found Peterka, and
23  the bills are being paid by some of the other
24  entities. But in a sense that I have some

Page 297

1  authority, I made some of these decisions to retain
2  them, for Peterka to provide these legal services.
3      Q. Did you retain Peterka and Partners to
4  provide legal services in the Czech Republic in June
5  of 2004?
6      MR. GOLDBERGER: Objection.
7      A. I'm not -- again, you know, I guess I'm not
8  quite sure what's meant by "retained." I think, you
9  know, loosely speaking, I guess that -- I'm not
10  quite sure what is the technical meaning to retain.
11  But I agreed to having Peterka and Partners
12  providing the legal service. I agreed to that.
13      Q. Well the --
14      A. So the -- I think this is an accurate
15  sentence, about retained him. But, you know, if I
16  was writing it myself, I probably would have -- I'm
17  not sure I would have used this word, this language.
18      Q. Well, retained is your word, right? These
19  are your answers to interrogatories?
20      MR. GOLDBERGER: Objection.
21      A. I think this might have been written by my
22  lawyers, the actual responses. You know, the text I
23  think I approved it, and like you said, I reviewed
24  it, but I'm not sure I wrote it.

75 (Pages 294 to 297)

Weiss Asset Management by Andrew Weiss

Page 298

1    Q. - Is this a mistake of your lawyers,
2  McDermott, Will & Emery?
3        MR. GOLDBERGER: Objection.
4    A. No, they would know what retained means more
5  clearly than I would as a legal term. So if they
6  wrote it, it's probably -- I would guess it's
7  correct.
8    Q. So do you sign anything that MWE gives to
9  you without reviewing it?
10       MR. GOLDBERGER: Objection.
11   A. No, but if it's a legal term like retaining
12 a law firm and since they know exactly what
13 happened, I would assume the language they used
14 would be correct.
15   Q. So MWE knew better than you as to whether
16 you retained Peterka and Partners, correct?
17       MR. GOLDBERGER: Objection.
18   A. They would have been --
19       MR. GOLDBERGER: Wait for --
20       THE WITNESS: I'm sorry.
21       MR. GOLDBERGER: Could you repeat the
22 question?
23   A. Repeat the question.
24   Q. Sure. MWE knew better than you whether or

Page 299

1  not you had retained Peterka and partners in June of
2  2004; is that correct?
3        MR. GOLDBERGER: Objection. Go ahead
4  and answer.
5    A. MWE would have a better notion of what the
6  word -- what's meant by the phrase Andrew Weiss
7  retained Peterka and Partners than I would have.
8  They would have a better understanding of that
9  terminology than I would have, about the
10 implications of it.
11   Q. Who made the decision to file the Gilroy
12 lawsuit that was filed in June of 2004?
13   A. I think that decision was made jointly by
14 consultations between myself, Ondrej Peterka and
15 Vladimir Hoffmann.
16   Q. What did Mr. Hoffmann tell you with respect
17 to your statement that Mr. Peterka would be good for
18 this case, as you previously testified?
19       MR. GOLDBERGER: Just to caution you
20 here, answer what Mr. Hoffmann told you, not what
21 Mr. Peterka told you.
22   A. Could you repeat the question again? I'm
23 sorry, I'm getting a little tired.
24   Q. What did Mr. Hoffmann tell you with respect

Page 300

1  to that Mr. Peterka would be good for this case, the
2  Gilroy case?
3    A. I think he told me that Peterka and Partners
4  was one of the most highly regarded, ethical law
5  firms in the Czech Republic. That they were really
6  excellent. I think he said something like among all
7  the domestic law firms, if you leave out the
8  international firms, this was the one with the best
9  reputation.
10   Q. So he used the word ethical when he
11 described Peterka and Partners?
12   A. He may have. I don't remember exactly the
13 words that he gave.
14   Q. Is it your belief that Peterka and Partners
15 is an ethical law firm?
16   A. Yes.
17   Q. Are you -- have you still retained Peterka
18 and Partners?
19       MR. GOLDBERGER: Objection.
20   A. My relationship with Peterka and Partners
21 persists, is continuing.
22   Q. To this day?
23   A. Yes, it is.
24   Q. What is Peterka and Partners representing

Page 301

1  you in connection with?
2    A. Me personally?
3    Q. Let's start with that.
4    A. Well, in terms of me personally, they give
5  some advice -- they're advising me --
6        MR. GOLDBERGER: Without getting into
7  the content of it. We understand just describing
8  the subject matter, we agreed there's no waiver.
9        MR. BECKMAN: Sure.
10   Q. You can answer.
11       MR. GOLDBERGER: Just the broad subject
12 matter of what they're advising you about without
13 getting into what they advised.
14   A. They advised me to some extent about the way
15 the Czech legal system works, what the -- what would
16 be the effects of the -- what my legal rights are,
17 I'm sorry. What the legal rights of KT and CVF are,
18 securities. The way the security register works in
19 terms of civil versus, you know, in terms of who the
20 registered shareholder is versus the beneficial
21 shareholder. They advised me about how best, what
22 the best strategy is to make sure that the
23 shareholders of CVF Investments Limited are treated
24 fairly and get fair treatment. They advised me

76 (Pages 298 to 301)

Weiss Asset Management by Andrew Weiss

Page 334

1  didn't use force, what did you use?
2          MR. GOLDBERGER: Objection.
3      A. I brought lawsuits that were designed to
4  undo the three things that had happened. The
5  complicated -- the complicated convoluted share
6  structuring.
7      Q. Are you referring to the Gilroy actions?
8      A. Yes, I am.
9          MR. GOLDBERGER: Let him finish his
10  answer.
11     Q. Are you also referring to the KT action?
12     A. Yes. So I brought lawsuits that were
13  intended to force the money that Forminster ended up
14  getting, the defrauding of Trend, which ended up
15  giving Forminster control of Kotva by giving them
16  all these Trend shares that the arbitration tribunal
17  says belonged to Trend to get the shares back in the
18  hands of Trend. And I brought some lawsuits to stop
19  Kotva from being controlled by Forminster so that
20  the other shareholders where the courts had frozen
21  Forminster shares, but still allowed Forminster to
22  control them. So we've been able to get them -- all
23  the money taken out. So that's what I was trying to
24  do, to protect the minority shareholders of both

Page 335

1  Forminster — excuse me, little tired, the minority
2  shareholders of both Kotva and the shareholders of
3  Trend.
4      Q. Let's focus on the Gilroy and KT actions.
5  Did the Gilroy lawsuit seek damages from Forminster?
6          MR. GOLDBERGER: Objection.
7      A. Not that I'm aware of.
8      Q. Did the KT lawsuit seek damages from
9  Forminster?
10         MR. GOLDBERGER: Objection.
11     A. Not that I'm aware of.
12     Q. And the Gilroy — did you file the Gilroy
13  lawsuit to recover damages from Forminster? Let me
14  rephrase that.
15         Was the Gilroy lawsuit filed to recover
16  damages from Forminster?
17     A. The Gilroy lawsuit was filed I believe to
18  undo the convoluted structure that would have
19  enabled Forminster to tunnel the assets of Kotva.
20  We were not asking for damages in the U.S. legal
21  sense. It would have resulted in more value I
22  believe going to the shareholders of Kotva, to the
23  minority shareholders of Kotva, the other
24  shareholders of Kotva, and less going to the people

Page 336

1  planning to steal the money out of Kotva.
2          MR. BECKMAN: Let's go off the record
3  for two seconds.
4          VIDEOGRAPHER: Time is 6:27. We're off
5  the record.
6          (Whereupon, a recess was taken)
7          VIDEOGRAPHER: Time is 6:32. We're back
8  on the record.
9      Q. Mr. Weiss, if you did not file the Gilroy
10  action to stop the deal, why did Gilroy notify
11  Markland the same -- notify Markland of the Gilroy
12  action the same day the lawsuit was filed?
13         MR. GOLDBERGER: Objection.
14     A. I don't know.
15     Q. You don't know?
16     A. No, I don't know why they notified Markland
17  the same day. Let me think for a second. Why would
18  they have notified -- Gilroy notified Markland that
19  they were filing the lawsuit -- I don't know. I
20  guess I would think -- this is just conjecturing,
21  but I would guess if I was a company seeking to
22  acquire another company, seeking to acquire like the
23  third level subsidiary of some other company, fourth
24  or fifth level, I forget what level it is of

Page 337

1  subsidiaries of subsidiaries. So Markland was doing
2  some transaction through all these subsidiaries. I
3  would hope that if somebody was suing to undo the
4  whole Rube Goldberg scheme of interlocking
5  subsidiaries, I would hope that they would tell me
6  about it before so that I could -- would know and so
7  that if the deal gets unraveled, you know, you'd
8  want to know. I would think that would just be
9  common decency to tell the buyer that all the
10  subsidiaries he's dealing with are going to be
11  unraveled. Also, if you're going to unravel it, you
12  want them to sort of be set up to buy it from the
13  parent company. I think you'd want to know. I
14  would want to be notified if I was in their
15  position.
16     Q. So Gilroy was acting ethically in notifying
17  Markland of the lawsuit the same day they filed the
18  lawsuit?
19         MR. GOLDBERGER: Objection.
20     Q. Is that your testimony?
21     A. I would think that would be very ethical,
22  yes. It would be pretty sneaky not to.
23     Q. What is the state of the Constitutional
24  Court petition that was filed on your behalf?

85 (Pages 334 to 337)

Weiss Asset Management by Andrew Weiss

Page 338

1  A. As far as I know, the Constitutional Court
2  said that because I was not -- I had not been
3  charged, the Constitutional Court did not have
4  standing. The verdict, as far as I can recall, said
5  that the petition had quite a lot of merit, but that
6  they were not going to rule on it, because I didn't
7  have standing. And Mr. Topinka, who brought it, did
8  not have standing to bring it, because it was not
9  ripe for decision.
10  Q. Did the Constitutional Court reject your
11  petition?
12  A. They said it was not -- they said they were
13  not going to reconsider it, because I did not have
14  standing.
15  Q. Do you think the Constitutional Court in the
16  Czech Republic is controlled by Forminster?
17  A. No, I do not. Well, I have no way of
18  knowing. I absolutely have no opinion about that.
19  Q. So they may be, in your view?
20  A. I have no idea. I have no idea. I doubt
21  it. I would doubt that.
22  Q. Have you had your private investigators
23  check out whether the Constitutional Court is
24  controlled by Forminster?

Page 339

1  A. I didn't direct the private investigators as
2  to what to do. I said they would do everything. I
3  would say in terms of that point, that the -- when I
4  talked with the Czech, the U.S. attache, he thought
5  that the corruption in the Czech level reached quite
6  high levels.
7  Q. Did that include the Czech Constitutional
8  Court?
9  A. No, he did not say the Czech Constitutional
10  Court, but he did describe quite high levels of
11  corruption. I do not believe the Czech
12  constitutional is corrupt; because for one thing,
13  they're one of the parties that's been most vocal in
14  complaining about the corruption.
15  Q. Did Gilroy want to slow down the deal with
16  Markland so the transfers could be unraveled?
17        MR. GOLDBERGER: Objection.
18  A. I don't -- that didn't occur to me. I don't
19  know if it occurred to Vladimir Hoffmann or
20  Mr. Peterka. It didn't occur to me.
21  Q. Well, you testified that you still wanted
22  Markland to purchase the department store, correct?
23        MR. GOLDBERGER: Objection.
24  A. Yes.

Page 340

1  Q. But you didn't want Markland to purchase the
2  department store from the subsidiary that held the
3  title --
4        MR. GOLDBERGER: Objection.
5  Q. -- at the time that the deal was going
6  forward; is that correct?
7  A. I don't even know which subsidiary held the
8  title, it was so complicated. I wanted Markland to
9  purchase the department store in a way that the
10  money would end up in the hands -- that the value
11  would end up with all -- being shared fairly among
12  all the shareholders.
13  Q. So did you view -- was it your understanding
14  that all shareholders had a direct right to the sale
15  proceeds upon the closing of the sale of the
16  department store?
17  A. Did -- can you repeat the question?
18  Q. Was it your understanding that all
19  shareholders had a direct right to the sale proceeds
20  upon the closing of the sale of the department store
21  with Markland?
22        MR. GOLDBERGER: Objection.
23  A. It was my understanding that with a
24  legitimate share structure, all the shareholders

Page 341

1  would be entitled to their proportionate share of
2  the value of the company. Since the company would
3  have all cash implicitly, they would have that
4  entitlement. They would have the -- the shares
5  would be worth their proportional share of the cash
6  that was received. Whether or not -- how it came
7  back, through an extraordinary dividend, through
8  share repurchase agreements, through tenders,
9  there's lots of ways that happens in reverse rights
10  offerings. There's tons of ways companies tend to
11  let the people get their proportional share when
12  they have cash.
13        MR. GOLDBERGER: Joel, since we're at
14  seven hours of on the record time and it's 6:40 at
15  night, I think we should stop.
16        MR. BECKMAN: I've got one more
17  question.
18  Q. Couldn't the shareholders determine to
19  invest the cash from the sale proceeds in something
20  else?
21  A. That's --
22        MR. GOLDBERGER: Could you repeat that
23  question? I'm sorry.
24  Q. Couldn't the shareholders determine to

86 (Pages 338 to 341)

Kotva
vs.
Weiss, et al.

Andrew Weiss

Volume 2

January 26, 2007
pp 345-618

**Jones Reporting**
*COMPANY*

Two Oliver Street, Suite 804
Boston, MA 02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Andrew Weiss

Page 358

1    Q. So sitting here today, you have no
2    understanding, you can't testify one way or another
3    as to whether under Czech law, the shareholders of a
4    Czech publicly traded company make the decision or
5    the management of the company make the decision to
6    liquidate; is that your testimony?
7        MR. GOLDBERGER: Objection.
8    A. I have no personal knowledge of Czech law or
9    ~~what the Czech law is governing who makes the~~
10   decision on liquidation of companies.
11   Q. Did you ever ask anyone about that issue?
12       MR. GOLDBERGER: Are you asking, does
13   that include whether he's asked lawyers, Czech
14   lawyers?
15       MR. BECKMAN: Sure, whether he asked or
16   not I think is fine. I don't want the
17   communication. I just want to know whether he
18   asked.
19       MR. GOLDBERGER: Do you understand that?
20       THE WITNESS: Yeah, whether I asked --
21       MR. GOLDBERGER: It's a yes or not
22   question.
23   A. My understanding of the question is whether
24   or not I ever asked anybody whether there's a Czech

Page 359

1    law that determines whether the management of a
2    company determines whether it should be liquidated
3    or whether the shareholders determine whether it was
4    liquidated. My answer is no, I've never asked that
5    question of anybody.
6    Q. Mr. Weiss, have you published and lectured
7    on the importance of improved corporate governance
8    in the Czech Republic?
9    A. Yes.
10   Q. You published on that subject matter and
11   you've lectured on that subject matter, correct?
12   A. I don't believe the titles of the articles
13   or the lectures were necessarily on corporate
14   governance. But I believe that some of the material
15   in the lectures and in the papers covered corporate
16   governance.
17   Q. Now, with respect to Kotva, do you
18   understand that the decision whether to liquidate
19   the company was put to a shareholder vote?
20   A. Do you mind if we get some more water? I'm
21   going to need more water. Can you ask somebody to
22   do that?
23   Q. Do you want to go off the record now and do
24   that?

Page 360

1    A. Just hope you can get somebody to get it.
2    Q. That's fine. I have to go off the record to
3    do it. I know you want to take a break.
4    A. No, we won't have to go off the record. We
5    won't have to go off the record.
6    Q. You want to keep going?
7    A. Oh, definitely. We'll just keep going. I
8    just want to remind you if somebody comes by.
9    ~~Q. I don't want to talk about water during the~~
10   deposition. I want to keep going with the
11   questions. We'll go off the record next time for
12   this.
13   A. I understand.
14   Q. Do you understand that the question of
15   whether to liquidate Kotva was put to a shareholder
16   vote in the summer of 2005?
17   A. Again, I really wish you would clarify what
18   you mean by "understand." Do you mean do I have
19   knowledge of that fact, is that the question?
20   Q. Yes, do you know?
21   A. So is the question do I know if the subject
22   of liquidation was put to a shareholder vote. I
23   believe that's correct. I believe it was. That's
24   my best guess.

Page 361

1    Q. And in the Czech Republic with respect to
2    publicly traded companies, shareholders decide
3    whether or not to liquidate the company; is that
4    correct?
5        MR. GOLDBERGER: Objection.
6    A. I'm not an expert on Czech law. I don't
7    know Czech law, and I don't know if that's true. My
8    experience in other countries has been whether or
9    not the shareholders vote to liquidate or not versus
10   management is governed by the charter of the
11   companies and -- the company's charter and the
12   articles of association.
13   Q. Between June and December of 2004, were you
14   asking that there be a distribution of the sale
15   proceeds from the department store based on the net
16   asset value?
17       MR. GOLDBERGER: Objection.
18   A. Asking to whom?
19   Q. Anyone.
20   A. Yes.
21   Q. Between May and December of 2004, did you
22   believe that BGO had a right to a proportionate
23   share of the department store sale proceeds based on
24   net asset value?

5 (Pages 358 to 361)

Andrew Weiss

**Page 362**

1        MR. GOLDBERGER: Objection.
2        A. No, not BGO.
3        Q. CVF? Let me ask the question. Between May
4    and December of 2004, did you believe that CVF had a
5    right to a proportionate share of the department
6    store proceeds based on net asset value?
7        A. I believe that, that would be the normal
8    action of an ethically run company. When its sold
9    its own major asset, it would give all the investors
10    an opportunity to get their proportional share of
11    the cash proceeds. That's been my experience in
12    numerous liquidations, numerous other events in
13    which were far less clearcut in which they sold
14    major assets from a company, and they gave the
15    shareholders rights for distributions. In this
16    case, where it was such a large sale, I would -- all
17    my experience in capital markets would have lead me
18    to believe that all the shareholders would have been
19    given an opportunity to get their proportional share
20    of the cash.
21        Q. Do you know whether the shareholders were
22    given an opportunity to get their proportional share
23    of the cash?
24        A. I don't know that. During what period?

**Page 363**

1        Q. After the sale.
2        A. I don't have any knowledge of that.
3        Q. Were the shareholders in Kotva allowed to
4    vote on whether to liquidate the company and receive
5    a proportionate share of the cash in the summer of
6    2005?
7        MR. GOLDBERGER: Objection. Sorry, go
8    ahead.
9        A. It's my understanding that the shareholders
10    were allowed to vote as to whether or not there
11    would be a liquidation of the company, but I don't
12    believe they were allowed to vote as to whether or
13    not individual shareholders would have the
14    opportunity to tender their shares back to the
15    company for cash or whether the company would make a
16    tender offer or reverse rights offering or any of
17    the other normal corporate actions that my
18    experience has been done which give the individual
19    shareholders the right to get the cash to make that
20    decision and not be forced to do what the
21    controlling shareholder chooses.
22        Q. What's the basis of your belief that the
23    individual shareholders were not given the
24    opportunity to tender their shares to the company to

**Page 364**

1    secure a distribution of the cash proceeds from the
2    sale?
3        MR. GOLDBERGER: Objection.
4        A. I was never notified of any such
5    opportunity. As a shareholder in every other case,
6    in numerous cases, scores of cases, perhaps
7    hundreds, I've been a shareholder and been notified
8    of those opportunities. In this case, I wasn't. We
9    monitor postings.
10        Q. Were you requesting a distribution based on
11    the proportionate -- let me back up.
12        Were you requesting a distribution of
13    the sale proceeds before the sale was closed and
14    cash was received?
15        A. Requesting from whom?
16        Q. Anyone.
17        A. Yes.
18        Q. Who did you make that request to?
19        A. I believe I made that request to Vladimir
20    Hoffmann.
21        Q. What did you request from Mr. Hoffmann on
22    that issue?
23        A. I requested that I thought it would be fair
24    and customary that if cash payments were made for

**Page 365**

1    the department store, that such payments be -- that
2    the shareholders be given the opportunity to receive
3    their proportionate share of the assets of Kotva,
4    since it would be completely liquid money.
5        Q. Did you consult a lawyer in the Czech
6    Republic as to whether shareholders have a right to
7    be given the opportunity to receive cash for their
8    proportionate share?
9        MR. GOLDBERGER: Before you answer that
10    question, you're not asking the content of his
11    communications, you're just asking whether this was
12    the subject matter of some inquiry to a lawyer?
13        MR. BECKMAN: That's right.
14        MR. GOLDBERGER: And there's no waiver?
15        MR. BECKMAN: That's right.
16        MR. GOLDBERGER: Go ahead and answer
17    that.
18        A. I don't believe so. I don't recall making
19    such a question. I might have, but I don't have any
20    recollection of asking that question.
21        Q. So your view was based on what you thought
22    was fair and customary in other countries; is that
23    correct?
24        A. Yes, that was correct.

6 (Pages 362 to 365)

Andrew Weiss

Page 378

1   A. Yes.
2   Q. What did you do?
3   A. I reread her article. And prior to writing
4   to her and speaking with her, I had been -- received
5   many e-mails, which I had read when I got them.
6   Q. Were you reckless when you made that
7   statement, Mr. Weiss?
8       MR. GOLDBERGER: Objection.
9   A. I don't understand the question.
10  Q. You don't understand the term "reckless"?
11      MR. GOLDBERGER: Joel, you know that's a
12  legal term. Objection.
13  A. In a legal context, I don't know what
14  reckless means. You know, I'm not a lawyer.
15  Q. Why did you create KT?
16      MR. GOLDBERGER: Objection.
17  A. Because we were having considerable
18  difficulty getting CVF registered with the
19  Securities Commission because of the problem with
20  Bank of Bermuda no longer being a legal entity, and
21  HSPC having taken it over.
22  Q. Did you create KT for the purpose of filing
23  lawsuits?
24      MR. GOLDBERGER: Objection.

Page 379

1   A. We created KT for the purpose of having an
2   entity that was registered with the Securities
3   Commission.
4   Q. Was BGO registered with the Securities
5   Commission as opposed to CVF prior to June of 2004?
6   A. It's my impression, to the best of my
7   knowledge, neither of them were registered with the
8   Securities Commission.
9   Q. What has KT done, other than file lawsuits?
10      MR. GOLDBERGER: Objection.
11  A. I'm not quite sure what the question is.
12  What do you mean by "has done"?
13  Q. What is the business of KT?
14  A. It holds shares, I believe, of Kotva and of
15  Trend.
16  Q. Does KT stand for Kotva Trend?
17  A. KT stands for KT. It stands for the name of
18  the company.
19  Q. Who came up with the name KT?
20  A. It was a product of conversation, I believe,
21  between myself and Georgiy Nikitin.
22  Q. What corporate actions has KT done, other
23  than file lawsuits?
24      MR. GOLDBERGER: Objection.

Page 380

1   A. I would imagine it's filed all kinds of
2   registration documents. It may have paid taxes.
3   I'm not -- I really don't get that involved in the
4   particulars of what KT is doing. That's delegated
5   to people who work for me.
6   Q. How many employees does KT have?
7   A. I don't know.
8   Q. It doesn't have any employees, does it?
9   A. I don't know. I don't have any direct
10  knowledge of that. I don't know.
11  Q. How much income has KT generated since it
12  was formed in June of 2004?
13  A. I don't know.
14  Q. It hasn't generated any income, has it?
15      MR. GOLDBERGER: Objection.
16  A. I don't know.
17  Q. What's the business of KT? How would you
18  describe what business it is engaged in?
19      MR. GOLDBERGER: Objection.
20  A. I think its only business, as far as I'm
21  aware, is to hold shares of Kotva and Trend.
22  Currently, its only current business is to hold
23  shares of Kotva and Trend.
24  Q. How many shares of Kotva is it holding?

Page 381

1   A. To the best of my knowledge, it holds one
2   thousand shares of Kotva. Excuse me, I don't -- I
3   don't think Kotva exists anymore. I think it became
4   KTV or CIS. So I'm not quite sure if it holds
5   shares of Kotva or the merged company. I'm really
6   not sure what it holds shares of currently.
7   Q. If its only assets are holding Kotva and
8   Trend shares, then you know it hasn't generated any
9   income, correct?
10      MR. GOLDBERGER: Objection.
11  A. It might also have cash. I'm not sure. It
12  might be the case that there were dividends that I'm
13  not aware of that might have been paid by this new
14  company, Kotva that was merged. I just wanted to be
15  careful.
16  Q. Are you giving truthful answers about your
17  knowledge of KT?
18  A. Yes.
19  Q. How many Trend shares does it hold?
20  A. I believe it holds one thousand shares of
21  Trend.
22  Q. Have the Trend shares paid any dividends?
23  A. To the best of my knowledge, they've not. I
24  have no knowledge of any dividends being paid by the

10 (Pages 378 to 381)

Andrew Weiss

Page 382

1   Trend shares.
2      Q. Do you have any knowledge of the Kotva
3   shares paying any dividends?
4      A. I have no knowledge of Kotva shares paying
5   any dividends.
6      Q. Now, to this day you're still a director of
7   KT, correct?
8      A. Is that a question, please?
9      Q. Yes, it is. What do you not understand?
10     A. Could you please repeat the question?
11     Q. To this day, are you still a director of KT?
12     MR. GOLDBERGER: Joel, I think if you
13  let the witness explain what he doesn't understand
14  about the question, you'll be able to ask a better
15  one.
16     A. As far as I'm aware, I am still a director
17  of KT.
18     Q. Now, did you ever try — let me back up.
19        When did you register the shares of
20  Kotva and Trend that were held by KT with the Czech
21  security center?
22     A. I personally did not do that registration.
23     Q. When was that accomplished?
24     A. I believe toward the -- to the best of my

Page 383

1   knowledge, they were registered in the last half of
2   2004. But I'm not sure how long it took to become
3   registered.
4      Q. Now, prior to the last half of 2004, did you
5   try to register the Kotva shares with CVF or BGO
6   with the Czech security center?
7      MR. GOLDBERGER: Objection.
8      A. I don't understand the question. You say
9   the Kotva shares with CVF? I don't understand what
10  that means.
11     Q. You've repeatedly testified that CVF Limited
12  holds the Kotva shares, not BGO, correct?
13     MR. GOLDBERGER: Objection.
14     A. Yes.
15     Q. Now, prior to the last part of 2004, did you
16  try to register the Kotva shares held by CVF with
17  the Czech security center?
18     A. Vladimir Hoffmann tried to do that on my
19  behalf.
20     Q. When?
21     A. I believe in the time I hired him, shortly
22  after the time I signed a contract with him quite
23  continuously he tried to do that. From the moment
24  we hired him, that was an on-going project.

Page 384

1      Q. What documents do you have or are you aware
2   of that support your testimony that Mr. Hoffmann
3   tried to register the securities that were held by
4   CVF with the Czech security center prior to December
5   of 2004?
6      MR. GOLDBERGER: Objection.
7      A. Numerous e-mails between myself and
8   Mr. Hoffmann. The other information would probably
9   be advice -- would be attorney/client privilege,
10  covered by --
11     Q. Did you produce the e-mails — I'm sorry.
12     A. The other documents are probably covered by
13  attorney/client privilege.
14     Q. Did you produce the e-mails that you
15  exchanged with Vladimir Hoffmann in this case?
16     MR. GOLDBERGER: Objection.
17     A. Excuse me, it's very disconcerting for me to
18  try to answer a question while you people are
19  talking. Could you please, it's hard -- can you
20  repeat the question?
21     Q. Could you repeat the question?
22     A. It would really be best if you guys didn't
23  speak while I was trying to think of my answer.
24     Q. I'm sorry, Mr. Weiss. We sat through three

Page 385

1   days of depositions with Mr. Goldberger and
2   Mr. Leibensperger, and that's how depositions are
3   done. We'll try to keep it down.
4      A. Excuse me, Mr. Beckman, I was there present
5   at those depositions and I didn't notice
6   Mr. Goldberger and Mr. Leibensperger --
7      MR. GOLDBERGER: What happened --
8      Q. You weren't at all the depositions.
9      MR. BECKMAN: Let's go off the record.
10  Let's go off the record.
11     MR. GOLDBERGER: Stop arguing with the
12  witness. No, let's continue. Let's not go off the
13  record.
14     MR. BECKMAN: I'm going to go off the
15  record so he cools down.
16     MR. GOLDBERGER: The witness --
17     A. I'm not cool. I'm not heated up.
18     MR. GOLDBERGER: You guys are having the
19  problem.
20     A. I'm not heated up.
21     VIDEOGRAPHER: I need an agreement by
22  counsel to go off the record.
23     A. I'm not --
24     MR. GOLDBERGER: Wait until a question,

11 (Pages 382 to 385)

Andrew Weiss

Page 430

1  discourage potential buyers from purchasing the
2  department store?
3         MR. GOLDBERGER: Objection.
4     A. I have no recollection of any such
5  discussions.
6     Q. Did you ask Mr. Hoffmann to retain Czech
7  counsel in the fall of 2003?
8     A. I asked Mr. Hoffmann to find us some Czech
9  lawyers.
10    Q. In that time period, correct?
11    A. In the fall of 2003 are you saying?
12 Probably. It might have been winter of 2000 -- it
13 might have been in the winter, but that seems right.
14 I wouldn't -- I wouldn't be actually positive about
15 the date, whether it was fall or summer or winter.
16 It's possible it was winter 2003/4.
17        (Exhibit 17 marked for identification)
18    Q. Handing to you what's been marked as Exhibit
19 Number 17.
20        (Document exhibited to witness)
21    Q. I want to direct your attention to the
22 second e-mail appearing on the first page, which is
23 an e-mail from Vladimir Hoffmann dated November 19,
24 2003 addressed to you, among others.

Page 431

1     A. Yes.
2     Q. I want to direct your attention to the last
3  paragraph on the first page of Mr. Hoffmann's e-mail
4  to you in which he writes, "This afternoon, I also
5  met the lawyers that I want to hire to work for
6  us" --
7     A. Wait, I'm sorry. Oh, third paragraph?
8     Q. Yes, thank you. "This afternoon I also met
9  the lawyers that I want to hire to work for us in
10 Kotva Trend situation."
11    A. Uh-hum.
12    Q. "Their name is Andel and Svabodva. They
13 will send you the contract in English tomorrow." Do
14 you see that?
15    A. Yes, I do.
16    Q. Now I want you to follow down to the last
17 sentence on that page. "They agreed to start
18 working immediately, but please process their
19 contract." Go to the next page, "and invoice
20 without delay. I asked them to look at how we
21 could," you read number three, "block" --
22        MR. GOLDBERGER: Don't read number
23 three.
24    Q. I want to direct your attention to number

Page 432

1  three. "Block any potential transfer of Kotva
2  building and block the sale of KN shares." And then
3  number eight, "discourage potential buyers of Kotva
4  from the purchase." Did you discuss with Vladimir
5  Hoffmann retaining lawyers to look into how you
6  could block any potential transfer of the Kotva
7  building?
8         MR. GOLDBERGER: Objection.
9     A. I have no recollection of such a
10 conversation.
11    Q. Did you discuss blocking the potential
12 transfer of the building with anyone?
13    A. I have no recollection of such a trans -- of
14 conversations.
15    Q. Did you ever discuss with anyone, prior to
16 this lawsuit being filed, the subject of blocking
17 any potential transfer of the Kotva building?
18        MR. GOLDBERGER: Objection.
19    A. Which lawsuit are we talking about now?
20    Q. This case that you're sitting here today.
21    A. Oh, this lawsuit? Can you repeat the
22 question, please?
23    Q. Did you ever discuss with anyone, other than
24 your counsel, the blocking of any potential

Page 433

1  transfer -- let me rephrase that.
2        Prior to the filing of this lawsuit,
3  have you ever discussed with anyone the subject of
4  blocking a potential transfer of the Kotva building?
5     A. I may have discussed with Vladimir Hoffmann
6  whether the lawsuits might have that tangential -- I
7  might have discussed with somebody whether the
8  lawsuits might have had that tangential effect.
9  Prior -- can you -- these law -- wait, let me
10 just -- I'm trying to remember the date. I'm just
11 trying to remember the date this lawsuit was filed.
12    Q. This lawsuit was filed in April of 2005.
13    A. Okay, thank you. I may have discussed with
14 Vladimir Hoffmann and/or Georgiy Nikitin whether or
15 not these lawsuits would interfere or have the
16 tangential effect of making it more or less likely
17 that the transaction with Markland or the
18 transaction we had heard about would be finalized.
19    Q. Are you referring to -- when you say
20 "lawsuits," are you referring to the Gilroy lawsuit?
21    A. I'm referring to the entire package of --
22 well, you know, all -- any or all of the lawsuits
23 that Mr. Peterka was engaged in that they might have
24 some effect on the transactions.

23 (Pages 430 to 433)

Andrew Weiss

Page 434

1    Q. So that would include the Gilroy lawsuit?
2    A. I'm not sure we sort of -- I don't think
3  there was any conversation about the effect of the
4  Gilroy lawsuit. I don't recall any conversation on
5  the effect of the Gilroy lawsuit in particular about
6  the transfer, about its effect on the transfer.
7    Q. So you did have communications at some point
8  prior to this lawsuit that the entire package of
9  lawsuits that were filed could interfere with the
10  sale to Markland?
11    A. Yes.
12        MR. GOLDBERGER: Objection.
13    Q. Who did you have those communications with?
14  Mr. Nikitin and Mr. Hoffmann, is that what you said?
15        MR. GOLDBERGER: Objection.
16    A. I might have had those communications with
17  Mr. Hoffmann. And its -- we bounce ideas back and
18  forth in my firm. So it's possible that I could
19  have discussed it with anybody in my firm.
20    Q. Did you discuss --
21    A. I don't recall.
22    Q. -- the advantages of --
23    A. Excuse me?
24    Q. Did you discuss the advantages of the

Page 435

1  lawsuits having the effect of interfering with the
2  sale to Markland?
3        MR. GOLDBERGER: Objection.
4    A. Advantages to whom?
5    Q. To you, BGO or CVF.
6    A. I think we would have discussed that if the
7  sale was going to have the effect of defrauding
8  minority shareholders, it would be advantageous if a
9  sale that was going to defraud the minority
10  shareholders did not happen. And that it would be
11  better if it was stopped, and a sale that would not
12  defraud the minority shareholders would happen.
13  That would be a likely conversation.
14    Q. Did you have those discussions between
15  August and December of 2004 when the Czech police
16  were recording telephone conversations?
17        MR. GOLDBERGER: Objection.
18    A. What were the dates again, please?
19    Q. August and December of 2004.
20    A. It's possible. I'm not sure I even had the
21  conversations, but that seems like the most likely
22  time those conversations would have happened.
23    Q. And those conversations --
24    A. But probably not December with Mr. Hoffmann.

Page 436

1  They would be -- wouldn't have been after the time
2  that I terminated my relationship. So it would have
3  been prior to December. It would not have been in
4  December of '04.
5    Q. Did you ever discuss with Mr. Peterka the
6  subject of the package of lawsuits interfering with
7  the sale of the department store to Markland?
8        MR. GOLDBERGER: Hold on a second.
9        MR. BECKMAN: Just the subject matter.
10        MR. GOLDBERGER: You already know --
11        MR. BECKMAN: I don't want to know about
12  communications specific. I just want to know if the
13  subject matter was raised with Mr. Peterka.
14        MR. GOLDBERGER: Now you're kind of
15  getting into content here I think. You already know
16  that Mr. Peterka was counsel in the Gilroy lawsuit
17  and the KT lawsuit. So whatever discussions they
18  had about the impact of those lawsuits I'm not going
19  to allow you to inquire into.
20        MR. BECKMAN: Are you instructing him
21  not to answer that question?
22        MR. GOLDBERGER: I am. Excuse me, don't
23  answer that question.
24    Q. So between June of 2004 and December of

Page 437

1  2004, did you understand that the package of
2  lawsuits that you had filed might interfere with the
3  department store sale to Markland?
4        MR. GOLDBERGER: Objection.
5    A. I understood that if the point of the sale
6  was to defraud the minority shareholders and had --
7  the point of the sale had some nefarious content,
8  then stopping the defrauding of the minority
9  shareholders might have lead the people who wanted
10  to defraud the minority shareholders to not do the
11  contract if it wasn't going to have the effect they
12  wanted. That might have been a tangential result of
13  the lawsuits, but it was not the purpose of the
14  lawsuits.
15    Q. Between August and December of 2004, you
16  were exchanging counter offers and offers with
17  Richard Harazim and Mr. Benda for the sale of the
18  Kotva shares held by the ring-fenced asset holders,
19  correct?
20        MR. GOLDBERGER: Objection.
21    A. I'm not sure if I was exchanging the offers
22  directly with Mr. Benda and directly with
23  Mr. Harazim. I might have -- I don't recall whether
24  they were going directly with both of them or

24 (Pages 434 to 437)

Andrew Weiss

Page 438

1  whether they were going via Mr. Hoffmann. I believe
2  that there was -- my best recollection is that there
3  was one exchange, at least one exchange with
4  Mr. Harazim.
5      Q. Well, between August and December of 2004,
6  offers were exchanged between Mr. Benda or
7  Mr. Harazim, and you either directly or through
8  Mr. Hoffmann, correct?
9          MR. GOLDBERGER: Objection.
10     A. I believe that's correct.
11     Q. And there are several letters or e-mails
12 exchanged between you or Mr. Hoffmann on one side
13 and Mr. Benda or Mr. Harazim on the other side,
14 correct?
15         MR. GOLDBERGER: Objection.
16     A. Yes, I believe that's correct.
17     Q. Now, in any of those e-mails or -- in any of
18 those offers, did you raise the issue that the
19 transfer of the shares might harm the minority
20 shareholders?
21         MR. GOLDBERGER: Objection.
22     A. I have no recollection whether --
23     Q. You're done?
24     A. Yeah.

Page 439

1      Q. In any of the offers exchanged between
2  August and December of 2004, did you raise the issue
3  of the transfer of the department store to
4  subsidiaries would harm the minority shareholders?
5          MR. GOLDBERGER: Objection.
6      A. I don't recall, but it's possible that in --
7  I just don't recall. It's possible that there were
8  e-mails with Mr. Hoffmann that also, that combined
9  more than one point.
10     Q. Did you or Mr. Hoffmann ever send any
11 written communication to Mr. Benda or Mr. Harazim
12 demanding that the department store be returned to
13 Kotva, a.s.?
14         MR. GOLDBERGER: Objection.
15     A. I can't answer what all the e-mails that
16 Mr. Hoffmann might have sent to Mr. Benda or
17 Mr. Harazim. I would have no knowledge of that.
18     Q. Well, you've spent 20 hours a week on this
19 case. Have you seen any e-mails that have been
20 produced in this case from Mr. Hoffmann that he sent
21 and demanded that the department store be returned
22 to Kotva, a.s.?
23         MR. GOLDBERGER: Objection.
24     A. I don't know if the -- since he submitted

Page 440

1  the lawsuits from Gilroy and since the lawsuits made
2  that demand, and since the lawsuits presumably were
3  delivered to Mr. Hoffmann and Mr. Benda, I would
4  assume that, that would constitute a communication,
5  but --
6      Q. Between August and December of 2004 when you
7  were exchanging offers with Mr. Benda --
8      A. August and --
9      Q. Between August and December of 2004 when you
10 were exchanging offers and counter offers with
11 Mr. Benda or Mr. Harazim, did you ever demand that
12 the department store be returned to Kotva in any of
13 those written communications?
14         MR. GOLDBERGER: Question done?
15 Objection.
16     A. I don't recall.
17     Q. If there was a written communication to that
18 effect, you would have produced it, correct?
19         MR. GOLDBERGER: Objection.
20     A. I told Mr. Nikitin to produce all
21 communications relevant to this case.
22     Q. Going back to the last exhibit that's been
23 marked that's in front of you, page two. The sub
24 point eight where Mr. Hoffmann reports to you that

Page 441

1  he has asked Svabodva to look into point number
2  eight, discourage -- how we could discourage
3  potential buyers of Kotva from the purchase.
4          MR. GOLDBERGER: Hold on a second,
5  because this is --
6          MR. BECKMAN: You can state an
7  objection. Please don't lead the witness.
8          MR. GOLDBERGER: I'm not going to lead
9  the witness other than to say I am going to state an
10 objection. So please wait until the question is
11 finished.
12     Q. Did you discuss with Mr. -- let me rephrase
13 that.
14         Prior to this lawsuit being filed in
15 April of 2005, did you discuss with anyone how
16 potential buyers of the department store could be
17 discouraged from purchasing the department store?
18         MR. GOLDBERGER: Objection. Go ahead
19 and answer.
20     A. I don't recall having a discussion with
21 anyone about how potential buyers could be
22 discouraged. I might have had discussions with
23 people about the tangential effects of the lawsuits
24 on discouraging potential buyers, in particular

25 (Pages 438 to 441)

Andrew Weiss

Page 442

1  buyers who would be entering into transactions that
2  would have had the effect of defrauding minority
3  shareholders or the fact that they might be --
4  because of the lawsuits, that they might be aware
5  that there was a potential for money laundering
6  liability for them. I might have had discussions
7  that included those kinds of points perhaps.
8      Q. Who did you have those discussions with?
9      A. My answer was that I might have had them. I
10  don't recall whether I actually had them or not.
11     Q. If you did, who would --
12     A. I'm conjecturing.
13     Q. If you did, who would you have had them
14  with?
15        MR. GOLDBERGER: Objection.
16     A. In this answer, I'm omitting lawyers, right?
17     Q. No, the subject matter is fine. You may
18  answer.
19     A. I can say if I might have had them with
20  lawyers?
21     Q. Yes.
22        MR. GOLDBERGER: Do not discuss the
23  content of your communication with lawyers.
24     A. But this is -- I'm sorry.

Page 443

1      Q. Just the subject matter. Do you understand
2  the difference?
3      A. No, I don't understand the difference
4  between the subject matter and the content.
5      Q. What exactly the lawyer said to you, we
6  don't want to know.
7        MR. GOLDBERGER: And exactly what you
8  said to the lawyer.
9      Q. We don't want to know. The question is did
10  you discuss the subject of potential buyers being
11  discouraged? Did you discuss that with anyone?
12        MR. GOLDBERGER: Wait a second, are we
13  talking about this generally or in connection with
14  particular pieces of litigation for which you
15  already know that he was represented?
16        MR. BECKMAN: We're talking about it
17  generally.
18        MR. GOLDBERGER: Okay, go ahead.
19     A. Repeat the question, please. I'm sorry.
20        (Question read back: The question is
21  did you discuss the subject of potential buyers
22  being discouraged? Did you discuss that with
23  anyone?)
24     A. So there's two questions, did I discuss the

Page 444

1  subject of potential buyers --
2      Q. With anyone.
3        MR. GOLDBERGER: I thought the question
4  was if you had discussed it, who would that have
5  been with.
6        MR. BECKMAN: We're going to go with
7  this one.
8        MR. GOLDBERGER: I think that was the
9  most recent question, but I'm sorry.
10     A. What's the question I'm supposed to be --
11  I'm getting all mixed up.
12     Q. Did you discuss with anyone prior to this
13  lawsuit being filed in April of 2005 the subject of
14  discouraging potential buyers from purchasing the
15  department store?
16     A. I may have discussed with people whether or
17  not the lawsuits would have the effect of
18  discouraging potential buyers from completing this
19  transaction.
20     Q. With whom?
21     A. If I had the discussion, there's numerous
22  people I might have had it with potentially. I
23  might have had it with Georgiy Nikitin. I might
24  have had it with any of my lawyers at MWE. I might

Page 445

1  have had it with the lawyers with Mr. Peterka. I
2  might have had it with Mr. Hoffmann. I might have
3  had it with my wife, my children. Who else might I
4  have had it with? Possible I might have had it
5  with -- even before the lawsuits. This is -- any
6  time before -- this could even be before the
7  lawsuits were filed; is that right? So it's
8  possible, it's possible I had it with James Woolf,
9  some conversations like this. Possible that I could
10  have had it -- it's hard to list all the people, you
11  know, when you say possible. Quite possibly could
12  have talked to about -- it's hard to sort of make a
13  list of everybody. You know, any of my friends, I
14  guess.
15     Q. Prior to the Gilroy lawsuit being filed, did
16  you discuss the subject of discouraging potential
17  buyers of purchasing the department store?
18     A. I might have discussed whether or not the
19  filing of lawsuits would have the effect of
20  discouraging -- the effect of how it would affect
21  whether or not particular transactions on the
22  transfer of the department store would be completed.
23     Q. Did you understand that one of the
24  consequences of the Gilroy lawsuit might be to

26 (Pages 442 to 445)

Andrew Weiss

Page 478

1  financial statements for the year ended December of
2  2005 prepared by KPMG.
3      A. Yes.
4      Q. Why are these financial statements prepared?
5          MR. GOLDBERGER: Objection.
6      A. I don't know.
7      Q. You have no idea why financial statements
8  are prepared for one of the companies you're
9  affiliated with?
10         MR. GOLDBERGER: Objection.
11     A. That's not part of what I get involved with.
12  I delegate those decisions.
13     Q. Are these financial statements given to
14  investors?
15         MR. GOLDBERGER: Objection.
16     A. This -- are you referring to this particular
17  financial statement?
18     Q. Well, let's start with that, sure.
19     A. With this one? I don't know.
20     Q. You don't know whether investors in CVF
21  Investments Limited are given copies of financial
22  statements?
23     A. We don't know who the investors are in CVF
24  Investments Limited.

Page 479

1      Q. Well, do you give these reports and
2  financial statements to anyone?
3      A. I don't know.
4      Q. Do you give them to the custodians that are
5  acting on behalf of your investors?
6      A. I don't know. That's not part of what I
7  take care of. Everyone in my firm is instructed to
8  follow the rules and regulations that govern
9  whatever investments we have and whatever the
10  investors do. I don't get involved in that. It's
11  back office. Actually, let me modify that. I'm not
12  sure that's done by the people, those decisions are
13  made by my employees. They might be made by the
14  administrator, whether the distribution of this
15  report might be made by the secretary -- the company
16  secretary or Arlene Nahlkian, who is the director.
17  I don't even know who makes that -- my guess is -- I
18  wouldn't want to venture a guess on this as to who
19  decides whether this is distributed.
20     Q. If you could turn to the page marked 12996.
21     A. 12996, yes.
22     Q. The very first paragraph says, "Quoted
23  Investments are valued at the last traded price on
24  the principal stock exchange, other regulated market

Page 480

1  or over-the-counter market. Unquoted investments
2  are valued either at cost or substantiated
3  director's valuation." Do you see that?
4      A. Yes, I do.
5      Q. So there's an effort to substantiate a
6  director's valuation of holdings of CVF when they're
7  included in the financial reports, correct?
8          MR. GOLDBERGER: Objection.
9      Q. Financial statements?
10     A. Could you repeat the question? I'm not sure
11  I understood it.
12     Q. What's your understanding of the sentence
13  "unquoted investments are valued either at cost or
14  substantiated director's valuation"?
15     A. If you have an investment where there's no
16  real market price, the director tries to get a
17  valuation. In this case, it would be Ms. Arlene
18  Nahlkian. My understanding would be that she would
19  try and call some brokers to get a value -- I'm not
20  sure how she would do that, actually. That would be
21  something that would probably be governed under
22  Cyprus law how she would -- what her -- what she
23  should do.
24     Q. What's your understanding of the term

Page 481

1  "director's valuation"?
2          MR. GOLDBERGER: Objection.
3      A. My understanding would be that, that is what
4  the director -- I think that's a technical term that
5  I really don't understand. It's an accounting term.
6      Q. What does the CVF Investments Limited report
7  and financial statements year ended December 31,
8  2005 prepared by KPMG give for the value of the
9  Kotva shares?
10         MR. GOLDBERGER: Objection.
11     A. Director's valuation seems to be 932 U.S.
12  dollars?
13     Q. 932,136 dollars?
14     A. I don't know if those are in thousands or --
15  oh, yeah, I guess it's 932,136 dollars, yes.
16     Q. What are the Trend shares valued at as of
17  December 31, 2005?
18         MR. GOLDBERGER: Objection.
19     A. 535,168.
20     Q. Mr. Weiss, let's go back to the August to
21  December 2004 time frame. Would you have --
22     A. Are we finished with this document?
23     Q. Yes. Would you have withdrawn the KT
24  lawsuit if CVF had received the price it requested

35 (Pages 478 to 481)

Andrew Weiss

Page 482

1  for the Kotva shares?
2        MR. GOLDBERGER: Objection. That's a
3  totally unfair question.
4    **A. Say it again.**
5    Q. Would you have withdrawn the KT lawsuit if
6  CVF had received the price it requested for the
7  Kotva shares?
8        MR. GOLDBERGER: In what time period,
9  Joel?
10        MR. BECKMAN: I already told you the
11  time period.
12        MR. GOLDBERGER: You can't --
13    **A. Wait, wait, wait a second.**
14        MR. GOLDBERGER: Hold on a second.
15        MR. BECKMAN: Don't -- do not lead the
16  witness. I'll withdraw the question and rephrase
17  it. Do not lead the witness right now, Ben. I'll
18  withdraw it.
19        MR. GOLDBERGER: Thank you. Give him a
20  fair question.
21    Q. Would you have withdrawn the KT lawsuit if
22  CVF had received the price it requested for the
23  Kotva shares?
24        MR. GOLDBERGER: Objection. Go ahead

Page 483

1  and answer.
2    A. I believe I would have. Let me think about
3  this for a second longer, okay? Let me continue on
4  the answer. I would have -- it sort of goes the
5  opposite way. If I had sold the -- if CVF had sold
6  its KT shares, then I would have withdrawn the
7  lawsuits, because I would have a fiduciary duty to
8  the investors. And if there were no longer
9  shareholders in KT, there would be no reason -- it
10  would be a violation of my fiduciary duties to
11  continue the lawsuits. So the sequencing is the
12  opposite. In other words, if the shares had been
13  sold, then I would have -- then it would have been
14  irresponsible of me to continue lawsuits regarding a
15  company in which we didn't -- in which the investors
16  were not invested. Now, I might have continued them
17  on behalf of Trend. So I'm not positive whether I
18  would have continued the lawsuits. I would have had
19  to see whether Trend's interests in a lawsuit
20  justified continuing the lawsuits if I just sold the
21  Kotva shares. If I sold the Kotva and Trend shares,
22  then I definitely would have discontinued all the
23  lawsuits.
24    Q. After the Gilroy lawsuit was filed in June

Page 484

1  of 2004, did you ask Vladimir Hoffmann to contact
2  Richard Harazim or Martin Benda?
3        MR. GOLDBERGER: Objection.
4    A. After the lawsuits were filed --
5    Q. No, no, no, after the Gilroy action was
6  filed against Kotva, KN and SPV KN in June of 2004,
7  did you ask Vladimir Hoffmann to contact Richard
8  Harazim or Martin Benda?
9        MR. GOLDBERGER: Objection.
10    A. I would have to review my records to see
11  whether I ever asked him, when and if I ever asked
12  him to contact those people or whether that was
13  something he suggested or did on his own initiative.
14  I just don't recall. There was many
15  correspondence -- many e-mails back and forth
16  between Mr. Hoffmann and myself, and I don't know --
17  I just don't recall.
18    Q. Do you understand that Vladimir Hoffmann
19  called Martin Benda after the Gilroy action was
20  filed?
21        MR. GOLDBERGER: Objection.
22    A. I understand that he was in communication
23  with Mr. Benda and/or Mr. Harazim. I don't know if
24  he made phone calls to them or if he made the phone

Page 485

1  call to Mr. Harazim who connected. I don't know or
2  whether he met with them personally or via phone
3  calls. I don't know how the communications were
4  conducted or whether it was with Benda or Harazim or
5  both.
6    Q. As you previously testified, Vladimir
7  Hoffmann was hired to facilitate the sale of the
8  Kotva and Trend shares, correct?
9        MR. GOLDBERGER: Objection.
10    A. Yes, he was.
11    Q. And after the Gilroy action, was filed, did
12  you ask Mr. Hoffmann to contact Richard Benda or
13  Mr. Harazim?
14        MR. GOLDBERGER: Objection.
15    A. I don't recall if I asked him. I was aware
16  that he was in contact with them. But I don't know
17  if that was -- I don't recall if that was on my
18  initiative or on his initiative.
19    Q. Okay. So you know a Mr. Hoffmann was in
20  contact with Mr. Benda or Mr. Harazim after the
21  Gilroy action was filed; is that correct?
22        MR. GOLDBERGER: Objection.
23    A. Yes, that is correct.
24    Q. Did Mr. Hoffmann explain or tell you about

36 (Pages 482 to 485)

Andrew Weiss

Page 486

1  his communication that he had with Mr. Benda in
2  August of 2004?
3       MR. GOLDBERGER: Objection.
4     A. I'm not quite sure I understand the
5  question. Are you asking me if in August of 2004,
6  he told me about communications that he had with
7  Mr. Harazim or Mr. Benda or are you asking me
8  whether he told me about communications that he had
9  in August of 2004? Which is the August of 2004
10 referred to?
11    Q. Are you aware of Mr. Hoffmann contacting
12 Mr. Benda in August of 2004?
13      MR. GOLDBERGER: Objection.
14    A. I don't know. I can't testify to that, that
15 I know -- I'm using the word aware as in do I know
16 that it happened.
17    Q. Do you have any knowledge as to whether
18 Mr. Hoffmann contacted Mr. Benda in August of 2004?
19      MR. GOLDBERGER: Objection.
20    A. I don't recall. I don't recall the dates.
21    Q. Did Mr. Hoffmann tell you that he called
22 Mr. Benda and told him about the Gilroy action?
23    A. I don't recall that.
24    Q. Did you ever agree to sell CVF's shares —

Page 487

1  let me rephrase it.
2       Did you ever agree to condition the sale
3  of CVF's shares in Kotva upon the withdrawal of the
4  Gilroy and KT actions?
5       MR. GOLDBERGER: Objection.
6     A. Can you repeat the question, please? I'm
7  sorry.
8     Q. Did you ever agree to condition the sale of
9  CVF's shares in Kotva upon the withdrawal of the
10 Gilroy and KT actions?
11    A. I believe I agreed to say that if the shares
12 of KT -- the shares of Kotva, excuse me. I'm
13 getting a little tired. Of Kotva. If the shares of
14 Kotva and Trend owned by CVF and KT were purchased,
15 then the lawsuits would be withdrawn. I would have
16 an obligation to do that.
17    Q. After the Gilroy --
18    A. Or I would attempt to. Let me finish the
19 answer to the question.
20    Q. Your answer is not done?
21    A. No, it's not done.
22    Q. Go ahead.
23    A. I would attempt to do, I would try to
24 influence the withdrawal of those lawsuits but that

Page 488

1  I would not necessarily be able -- I didn't control
2  those entities. So I said I would try to influence
3  withdrawal of the lawsuits.
4     Q. After the Gilroy action was filed, did you
5  ask that Vladimir Hoffmann request a written offer
6  from Richard Harazim or Martin Benda?
7       MR. GOLDBERGER: Objection.
8     A. I think that there were on-going
9  negotiations at that point and after those lawsuits
10 were filed. And I asked if there were such
11 negotiations going on with offers, they should be
12 put in writing. I believe I said that.
13    Q. So you did ask that Mr. Hoffmann request a
14 written offer from Mr. Benda and Mr. Harazim; is
15 that correct?
16    A. What I asked is if they were making oral
17 offers to buy the shares, he should say instead of
18 relying, getting second hand, if oral offerings were
19 being made, they should be put in writing.
20    Q. And you made that request for a written
21 offer -- let me rephrase that.
22      Did you make your request for written
23 offers after the Gilroy action was filed?
24      MR. GOLDBERGER: Objection.

Page 489

1     A. I made -- I believe I made requests — I
2  don't know the date on which I made requests that if
3  an oral offer was made, he should ask for it in
4  writing. I don't know the exact date I made it. It
5  might very well have been after the Gilroy lawsuits
6  were filed, but I don't recall the dates.
7     Q. Why did you want a written offer?
8     A. They're communicating in Czech, and you
9  would get everything -- there might be garblement.
10 I wasn't talking with Mr. Harazim and Mr. Benda
11 and/or Mr. Benda. Mr. Hoffmann was. I wanted to
12 make sure that I was getting an accurate account.
13 None of those people have as their first language
14 English, and I wanted to make sure that everybody
15 was on the same page with what was actually going
16 on.
17    Q. Handing to you what's been previously marked
18 as Nikitin Exhibit Number 15.
19      (Document exhibited to witness)
20      MR. GOLDBERGER: Thank you.
21    A. Thank you.
22    Q. You know what, I don't need to ask questions
23 about that one. I apologize. I'll take that back.
24      MR. BECKMAN: Let's go off the record

37 (Pages 486 to 489)

Andrew Weiss

**Page 494**

1  Q. Well, you used encrypted or encoded e-mails
2  through 2003 as well, didn't you?
3      A. I don't recall.
4          MR. GOLDBERGER: Objection.
5      Q. Go to the second page. Vlado writes to you,
6  "I met Benda today and have informed him about our
7  offer to sell Kotva shares for Czech 131 million
8  without any further conditions, withdrawal of
9  lawsuits." Was this your first offer, 131 million
10  Czech crowns for the Kotva shares?
11          MR. GOLDBERGER: Objection.
12      A. It's the first offer that I believe was made
13  by Mr. Hoffmann on our behalf.
14      Q. And you asked him to convey the offer of 131
15  million Czech crowns?
16      A. That's my best recollection.
17          (Exhibit 20 marked for identification)
18      Q. Handing to you what's been marked as Exhibit
19  Number 20.
20          (Document exhibited to witness)
21      Q. Direct your attention to the second page.
22  Do you recognize your signature on this page?
23      A. No.
24      Q. That's not your signature?

**Page 495**

1      A. I don't recognize it. I'm not saying it's
2  not my signature. The Weiss part looks like my
3  signature, but the Andrew part doesn't. I'm not
4  saying it's not my signature. It just doesn't look
5  like it.
6      Q. Do you remember sending this written offer
7  to Martin Benda for the sale of BGO's shares in
8  Kotva for 131 million Czech crowns?
9      A. Yes, I do.
10      Q. How did you arrive at the 131 million Czech
11  crown figure?
12      A. I don't recall exactly, but I can give you a
13  rough idea. I think it was based on what we had
14  heard was the price that was sold -- that the
15  property sold for net of the liabilities that
16  Mr. Hoffmann thought were attached to the company.
17  Our best estimate of the net value of the company
18  and our proportionate share of that net value, that
19  would be a fair value, what we thought the fair
20  value was given the information available to me at
21  that time. It might have also been influenced --
22  might have also been influenced by the UK
23  arbitration court tribunal's decision on Kotva's
24  valuation.

**Page 496**

1      Q. I'm handing to you what's been marked as
2  Nikitin Exhibit Number 21.
3      A. Are we finished with this document?
4      Q. We are, Mr. Weiss.
5      A. Thank you.
6          (Document exhibited to witness)
7      Q. This is an e-mail from Mr. Harazim dated
8  August 17, 2004 to you. You're indicated as
9  receiving a copy. And it's also sent to Nikitin and
10  Vladimir Hoffmann.
11      A. This is the one that Nikitin wrote -- sent?
12      Q. It's the very top e-mail, Mr. Weiss.
13      A. Top one, okay.
14      Q. Mr. Harazim writes to you and Nikitin and
15  Hoffmann, "Thank you for your offer. Unfortunately
16  your offer doesn't seem to deal with the lawsuits
17  brought by Balfindor and Gilroy against our company.
18  Without resolving these and other potential lawsuits
19  against our company raised by BGO or by BGO
20  controlled entities, we won't be able to conclude
21  any deal at all." Did you understand -- let me --
22  did you understand that Mr. Harazim was not
23  interested in purchasing BGO's shares unless the
24  Gilroy and Balfindor actions were withdrawn?

**Page 497**

1          MR. GOLDBERGER: Objection.
2      A. It's probable that I didn't get this e-mail,
3  because if it was just cc'd to me and went directly
4  to Georgiy, and he screens my e-mails, there's a
5  good chance I didn't see this e-mail at all. So
6  that's what I was just focusing on. So could you
7  repeat the rest of your question, please? It's
8  conditional on the fact that I might not have seen
9  it. It's likely I didn't see the e-mail. Can you
10  give me the rest of the question?
11      Q. Did you understand that Mr. Harazim was not
12  interested in the purchase of BGO's shares unless
13  the Gilroy and Balfindor actions were withdrawn?
14          MR. GOLDBERGER: Objection.
15      A. It sounds as though from this, it's hard to
16  know. My understanding from this is that he was
17  saying that. Whether that was a negotiating ploy or
18  something else is hard to know. I'm not even sure
19  actually at this point whether these e-mails were
20  really, had any substance at all or were just part
21  of a sting operation.
22      Q. As of August of 2004, the only actions filed
23  in the Czech Republic were the Balfindor and Gilroy
24  actions, correct?

39 (Pages 494 to 497)

Andrew Weiss

Page 498

1    A. I believe so.
2    Q. And as of August 2004, you or any of your
3  companies had not filed lawsuits against Forminster;
4  is that correct?
5    A. As of --
6    Q. As of August of 2004.
7    A. I believe that's correct, to the best of my
8  knowledge.
9    Q. Did you consider whether or not to accept
10  Mr. Harazim's condition of the purchase of the BGO
11  shares -- let me withdraw that.
12      (Exhibit 21 marked for identification)
13    Q. I'm handing to you what's been marked as
14  Exhibit Number 21.
15      (Document exhibited to witness)
16    Q. Which appears to be an e-mail from Vlado to
17  Georgly. Is this what the e-mails looked like when
18  they were encrypted?
19      MR. GOLDBERGER: Objection.
20    Q. After you printed them out -- after they
21  were decoded, is this what the e-mails looked like?
22      MR. GOLDBERGER: Objection.
23    A. I don't know. When the e-mails are encoded,
24  I go to the decrypt button, and I read them off the

Page 499

1  screen. So I don't know what they look like when
2  you print it.
3    Q. The e-mail provides, "I have just talked to
4  Andrew, though very briefly. He's very busy with
5  some guests at his summer house. He said he will
6  not be able to talk with anyone until Monday now,
7  but he also indicated that he may be willing to send
8  a counter offer to Benda and Harazim to sell our
9  shares in Kotva for 131 and drop the lawsuits for
10  the ownership of Kotva property." Were you
11  considering in August of 2004 selling the BGO shares
12  for 131 million Czech crowns and dropping the
13  lawsuit for the ownership of the Kotva property?
14      MR. GOLDBERGER: Objection.
15    A. Can I ask, on what makes -- why -- is there
16  anything that makes -- that indicates this was sent
17  in August of 2004?
18    Q. I'm asking the questions here, Mr. Weiss.
19    A. Okay, so then --
20    Q. Did you consider after Mr. Harazim -- let me
21  rephrase it -- let me phrase it this way.
22      Do you recall considering whether to
23  send a counter offer to Benda and Harazim to sell
24  BGO's's shares for 131 million Czech crowns and drop

Page 500

1  the lawsuit for the ownership of the Kotva property?
2    A. Oh, yes. Like I said before, once we sold
3  the shares in Kotva, we would not -- it would be a
4  violation of my fiduciary duties leaving aside the
5  Trend shares. If we sold all the shares, the Kotva
6  and Trend shares, it would be a violation of my few
7  fiduciary duty to pursue lawsuits, to spend people's
8  money pursuing lawsuits if they had no economic
9  interests in the companies. I'd almost be compelled
10  to drop the lawsuits.
11      (Exhibit 22 marked for identification)
12    Q. If you were compelled to drop the lawsuits,
13  then why didn't you state that in your offers?
14      MR. GOLDBERGER: Objection.
15    A. There's no reason for me to state it.
16    Q. Is that your answer?
17    A. I don't -- why would -- yeah, there's no
18  reason for me -- I don't see any point to state it.
19  I wouldn't see any point of stating it. It's pretty
20  obvious to me that if you don't have shares in a
21  company, you would not pursue lawsuits against that
22  company.
23    Q. Then --
24    A. Against the management of the company, you

Page 501

1  had no economic interest. And as a fiduciary, you
2  just wouldn't do it. It would seem obvious to
3  anybody.
4    Q. I'm handing to you what's been marked as
5  Exhibit Number 22.
6      (Document exhibited to witness)
7    Q. I direct your attention to the second page
8  of this exhibit. Did you authorize Mr. Nikitin to
9  send an offer to Martin Benda and Richard Harazim
10  offering to sell the BGO's Kotva shares for 131
11  million Czech crowns?
12      MR. GOLDBERGER: Objection.
13    Q. Did you authorize Mr. Nikitin to send this
14  offer that's been marked as an exhibit in front of
15  you?
16    A. Let me read the exhibit. I believe I
17  authorized -- best of my recollection is that I
18  authorized him to send this on my behalf.
19    Q. Did you come up with any of the language
20  included in this offer?
21    A. To the best of my recollection, I did.
22    Q. What language did you come up with?
23    A. I don't remember which specific language. I
24  can tell you the language I probably did not come up

40 (Pages 498 to 501)

Andrew Weiss

Page 530

1    VIDEOGRAPHER: Time is 3:43. We're back
2  on the record.
3          MR. GOLDBERGER: Joel, before you begin.
4  When we went off the record, I asked you for the
5  purpose of the break, and you didn't respond.
6  Instead you went to your office, which I can see
7  from this conference room, and I observed, among
8  other things, Mr. Nystrom, Mr. Harazim, who have not
9  returned to the deposition, playing catch with a
10 football. It is Friday afternoon. It's 3:45. As I
11 said this morning, I don't want to be here past
12 6 o'clock. Please keep the breaks to a minimum.
13        MR. BECKMAN: Ben, we will be done by
14 6 o'clock. For you to mention what's going on
15 behind closed doors in an office is really
16 offensive. And trying to create a record. This has
17 been a long day for all of us. We need to take
18 breaks for the court reporter. You'll learn after
19 you do this a few more years that, that's most
20 important. For the court reporter, we take breaks
21 for the court reporter. We take breaks for the
22 witness. We were very, very accommodating to you
23 and Mr. Leibensperger. So I appreciate if you
24 refrain from cluttering the record about tossing a

Page 531

1  football. That's offensive. Let's go on.
2          MR. GOLDBERGER: I have to desire to
3  offend you.
4      Q. I am handing you Exhibit Number 9 at
5  Mr. Nikitin's deposition.
6          (Document exhibited to witness)
7      Q. Have you seen a translation of the KT
8  complaint filed in the Czech Republic against Kotva,
9  KN and SPV KN?
10         MR. GOLDBERGER: Joel, before he answers
11 that question, may I have a copy of the exhibit?
12         (Document exhibited to Mr. Goldberger)
13         MR. GOLDBERGER: Thank you.
14     A. I'm sorry, I got interrupted.
15     Q. Have you seen an English translation of the
16 KT action filed against Kotva, KN and SPV KN?
17         MR. GOLDBERGER: Objection.
18     A. I don't recall.
19     Q. Why don't you take a look at Exhibit Number
20 9, particularly the first page. Do you understand
21 in connection with the KT lawsuit, KT Inc. was the
22 plaintiff. And you see — first page, Mr. Weiss,
23 defendant one is Kotva, a.s.
24     A. Okay, I'm sorry.

Page 532

1      Q. Do you see that?
2      A. Yes.
3      Q. And defendant two is Kotva Nemovitosti, and
4  defendant three is SPV KN?
5          MR. GOLDBERGER: Objection.
6      Q. Do you see that?
7      A. Yes, I do.
8      Q. If you could go to the third page. The
9  paragraph of the — the third paragraph that starts
10 with defendant two, do you see that, Mr. Weiss?
11     A. Yes, I do.
12     Q. Provides, "Defendant two is a trading
13 company registered in the property register as the
14 sole owner of the real property specified below in
15 paragraph one point two. Such based on a statement
16 on an immovable investment made by defendant one in
17 2000. It was established by transformation of Kotva
18 Nemovitosti." Now, did you understand that the
19 department store had been transferred to KN in 2000?
20         MR. GOLDBERGER: Objection.
21     A. This is the -- I have — this is the first
22 time that I recall seeing this document. Is that an
23 answer?
24     Q. Did you understand that the department store

Page 533

1  was transferred to KN in 2000?
2      A. Did I understand --
3          MR. GOLDBERGER: Objection.
4      A. Did I know that the department store was
5  transferred in 2000? No, I did not.
6      Q. That's not what I asked, Mr. Weiss. In
7  connection with the filing of the KT lawsuit, you
8  were challenging the transfers of the department
9  store, correct?
10         MR. GOLDBERGER: Objection.
11     A. Yes, I was.
12     Q. And you were transferring the — you were
13 transferring the department store — you were
14 challenging the department store transfer from Kotva
15 to KN, correct?
16     A. I'm not a lawyer, and this is the first time
17 I've seen this. I should review the document more
18 carefully. My impression was that the lawsuits were
19 designed to challenge the entire change in the whole
20 structure of Kotva, a.s. That there was a
21 combination of not one piece of it, but the entire
22 change of structure.
23     Q. And part of the change in structure that you
24 were challenging in the KT lawsuit was the transfer

Andrew Weiss

**Page 534**

1  of the department store from Kotva to KN, correct?
2  A. That's what this document says.
3  Q. Well, did you understand —
4  A. Although I don't know what the word -- by
5  establish by transformation of Kotva Nemovitosti. I
6  don't really understand what that words mean.
7  Q. Well, you authorized the filing of the KT
8  action, correct?
9      MR. GOLDBERGER: Objection.
10  A. Mr. Peterka informed me that he was filing
11  the KT actions. I relied on his judgment.
12      MR. GOLDBERGER: Don't talk about
13  reliance on what Mr. Peterka communicated to you.
14  A. Okay.
15  Q. Did you direct Mr. Peterka to file the KT
16  lawsuit?
17  A. My best recollection is that I approved
18  every lawsuit that he suggested being filed.
19  Q. And that included the KT lawsuit?
20  A. Presumably, yes.
21  Q. Before the KT lawsuit was filed, did you
22  understand that part of the relief being requested
23  was to transfer the department store back to Kotva?
24  A. My understanding was that part of the relief

**Page 535**

1  was to undo all the complicated interlocking
2  directorships, you know, interlocking holdings, the
3  whole mess, was to undo the whole mess.
4  Q. Did KT own shares of Kotva in 2000?
5  A. I don't believe KT existed in 2000.
6  Q. So it didn't own any shares, correct?
7  A. That is correct.
8  Q. How could KT challenge a transfer of the
9  department store property if it occurred before it
10  owned the shares?
11      MR. GOLDBERGER: Objection.
12  A. That's a legal question that I'm not
13  qualified to answer.
14  Q. Do you have any opinion on that?
15  A. I would rather not give legal advice,
16  especially about Czech law.
17  Q. I'm not asking for legal advice. I'm asking
18  you, do you have an understanding as to whether a
19  shareholder can challenge a property transfer of a
20  corporation if it didn't — doesn't own shares at
21  the time of the transfer?
22      MR. GOLDBERGER: Objection.
23  A. I have tremendous respect for Mr. Peterka.
24  He's an extremely prominent Czech lawyer. I would

**Page 536**

1  assume that the lawsuits that he was filing, that he
2  thought of all these considerations. And I trust
3  his judgment. He's perhaps the most highly
4  respected civil lawyer in Prague.
5  Q. Do you still have that opinion of him to
6  this day?
7  A. I have a high opinion of Mr. Peterka.
8  Q. Do you understand that the Gilroy lawsuit
9  was dismissed by the Czech court?
10  A. I've heard that.
11  Q. Do you know why it was dismissed?
12      MR. GOLDBERGER: Objection.
13  A. No.
14  Q. After the Gilroy action was filed, did you
15  or anyone acting on your behalf contact Kotva to
16  demand that they transfer the building back to
17  Kotva, a.s.?
18      MR. GOLDBERGER: Objection.
19  A. I don't know what demands Mr. Hoffmann might
20  have made or Mr. Peterka. I did not make those
21  demands, and I'm not aware of any such demands that
22  were made.
23  Q. After the KT action was filed, did you or
24  anyone acting on your behalf contact Kotva to demand

**Page 537**

1  that the department store be transferred back to
2  Kotva, a.s.?
3  A. I'm not aware of anybody making such
4  demands, not to my knowledge.
5  Q. Do you understand —
6  A. I have no direct knowledge of that.
7  Q. Do you understand that the Czech court
8  dismissed the Gilroy suit because Gilroy did not own
9  shares at the time of the transfers that were
10  challenged?
11      MR. GOLDBERGER: Objection.
12  A. As I said to the previous question, I did
13  not know the reason why the Gilroy lawsuit was
14  dismissed. And I still don't know the reason.
15  Q. Well, do you understand that on January
16  29th — let me rephrase it. Do you admit that on
17  January 29th, Gilroy purchased shares in Kotva and
18  then on January 30th --
19  A. Can you give the -- I'm sorry.
20  Q. Please let me finish the question.
21  A. Okay, I'm sorry.
22  Q. Do you admit that on January 29, 2004 Gilroy
23  acquired shares in Kotva, and the next day it filed
24  a lawsuit against Kotva?

49 (Pages 534 to 537)

**F**

Lucy Chen

**From:**       Lars Bader [lars.bader@qvi.com]
**Sent:**       Tuesday, February 08, 2005 1:30 PM
**To:**          Andrew Weiss
**Subject:**    RE: Czech criminals call others criminals

what is the password to open the story?

**From:** Andrew Weiss [mailto:AWeiss@WeissAsset.com]
**Sent:** Tuesday, February 08, 2005 1:16 PM
**To:** Lars Bader
**Subject:** Czech criminals call others criminals

Dear Lars,
Some background on the new story. Please read the attached story. I also have a paragraph at the end for what you could say. The person at the Czech desk at the state departement is Alexandra "Alex" McKnight 202 647 1457. Pls let me know what she says. aw

Harazim was appointed by the Forminster people as chairman of KOTVA. Harazim represents Forminster in these negotiations. To remind you of the story it' s as follows:
BGO was formerly called the Czech Value Fund, and was managed by Regent Kingpin. Brookdale took over the management of CVF through a proxy fight and ring fenced the KOTVA and Trend shares in the portfolio since we couldn't fairly value them. They are held in a special purpose vehicle and I will try to find out what share of that vehicle you own. At the time Weiss Asset Management took over the management of BGO (previously known as Czech Value Fund) the fund owned around 11% of the shares of KOTVA and around 40% of the shares of Trend IF, which had been the largest shareholder of KOTVA a.s. before Trend was tunneled. The previous managers of Czech Value Fund had attempted to take over Trend Fund, but before the takeover could be completed the assets disappeared – to a large extent the embezzlement took the form of selling and buying shares of KOTVA a.s. to various companies associated with Halek who was the manager of Trend and who was allied with Forminster at the time. The crooks were really shameless for instance we have the ticket printouts: on May 28, 1996 at 7:58:23 Trend sold 152,935 shares of KOTVA for CZK 400, at 8:46:53 they bouth 139,000 shares at CZK 952 and one minute and 37 seconds later they sold the same shares for  CZK 400. After all these machinations were over the Halek affiliated companies that had participated in the stealing of the KOTVA shares and other assets from Trend that they used to buy KOTVA shares sold their shares to KHB (another Halek affiliated company) on January 28 1997 for an average price of around CZK 540, on January 30, KHB resold those shares to Forminster for CZK 215 (on 20 March 1996 KOTVA had traded for 1860 CZK).  Because of all these machinations the Forminster shares in KOTVA were frozen by the Czech court.  Thus Forminster spent CZK 82,766,765 for 384,971 shares of KOTVA. We understand that if the Forminster group is not prevented from disenfranchising the minority shareholders of KOTVA and all shareholders of Trend, we calculate that they will net CZK 1,400,000,000  from the sale of KOTVA to the Irish investors, while the other shareholders will get nothing. (the CZK is now 23.5 to the dollar).  Although the ownership of the KOTVA shares bought by Forminster was contested and the shares themselves were blocked by the Czech courts, a different court allowed Forminster to take control of the board of Kotva a.s. they were allowed to vote 55% of the shares and used those shares to elect Harazim as the Chairman and CEO, they appointed the rest of the board as well. There is no difference between the management of KOTVA and Forminster - Harazim has always made it clear that he is negotiating on behalf of Forminster.  It is clear that a legitimate court would take the KOTVA shares away from Forminster and would award them to Trend. (On  27 February 2002 a U.K. arbitration panel ruled that with 80% probability, a Czech court will eventually rule that at least 32% of the KOTVA a.s. shares that were being voted by Forminster actually belong to TREND and that those shares will be returned to TREND – we have a copy of that arbitration decision). BGO owns 11+% directly and 40% of Trend which owns 32% of Trend with 80% probability so altogether BGO should get around 22% of the CZK 1,400,000 or around CZK 300, this is around $12.8 million. We think QVT owns around 20% of the ring fenced assets so your stake in this is around $2.5 million.

After taking the assets, Forminster and Halek claim to have had a falling out, Benda' s car was blown up, a bomb went off in the board room of KOTVA, the police investigator committed suicide -- Hoffman provided me with other

11/16/2005

W0011547

lurid details. Recently Forminster decided to sell the property that KOTVA a.s. owns. To do this they set up a succession of dummy corporations and transferred the land to those companies. The latest of the companies was a special purpose vehicle, thus all the assets that they wanted to sell were removed from KOTVA a.s. and these other companies could sell the assets pocket the money and the shareholders of KOTVA a.s. would be left with nothing. Once I had separated from Golden I started researching this matter and hired Vladimir Hoffman who I had met around 10 years ago through Howard to represent us. About 9 months ago the London Times reported that Forminster was in the process of selling KOTVA to Markland (an Irish property company), and Vladimir Hoffman arranged for me to meet with Richard Harazim and Martin Benda who said they represented Forminster and wished to discuss terms under which the shares of KOTVA owned by BGO would also be sold - they said taht there was no way they would pay as much as $5 million, I said that that was find because I wouldln't take $5 million. Benda didn't speak English and gave a speech at the beginning in which he basically said that we had been defrauded and should accept that fact - I left the table and went to a bar to cool off. I said that the shares owned by the minority shareholders of KOTVA should get the same payoff as Forminster, and that TREND shareholders are entitled to being repaid for the shares that was embezzled from them. In response Richard Harazim told me in the presence of Vladimir Hoffman that minority shares of KOTVA were worthless. Harazim said there was nothing Weiss could do to rectify the embezzlement of the assets of Trend. I said I would think of something. Subsequently, I hired Ondrej Peterka and we filed court petitions on behalf of companies that were owned by Hoffman and to which we sold some shares. These petitions were filed to reverse the transactions that moved all of the valuable assets of KOTVA a.s. into the companies controlled by Forminster. I sent Harazim an email in which I computed the value of the KOTVA and Trend shares held by BGO. In response In December 2004 Harazim asked for a second direct meeting that was supposed to last a week in Prague to discuss the terms under which the BGO shares of KOTVA could be purchased. I said I didn't see any point in the meeting without settling the numbers. Peterka now says that he believes that the purpose of the meeting was to get me arrested.

Apparently Forminster is trying to induce the police to charge Weiss with extortion because they believe Weiss is behind the lawsuits that are intended to stop Forminster from stealing all the assets of KOTVA, and because Weiss is trying to get BGO's shares of KOTVA to receive the same payment as the KOTVA shares that Forminster is selling, and because he does not believe the shareholders of Trend should be left out of any settlement.

I think the points you should make to the State Dept. is that you are a large shareholder of a company that owns shares in KOTVA a.s. (a publicly traded Czech company which owns valuable property in Prague). KOTVA is controlled by Forminster because it is voting shares that it stole from TREND (another company in which you have a large stake) - an English court ruled that a Czech court would find that the shares actually belong to TREND and the Czech courts have blocked the shares of KOTVA that Forminster claims to own. Thus Forminster can't sell their shares in KOTVA a.s. to the Irish investors in any rate in a legitimate sale they would only get a fraction of the money paid equal to their proportionate ownership of the shares of KOTVA a.s. INstead they used their control of KOTVA a.s. to move the assets into companies that they own and then those companies will sell the assets to the Irish investors. We don't know the details of the movement to several companies the last called SPV of which is completely non transparent but presumably they transferred the property from KOTVA a.s. in exchange for unsecured debt or shares in SPV, SPV will then simply become a slush fund for the Forminster people. Some entities owned by Hoffman sued to reverse these transactions, a company that I set up also sued in December. These lawsuits apparently discouraged the Irish investors from buying the property and that is why the Forminster people are using the Public Prosecutor to try to intimidate me and get me to drop the lawsuits so that they can complete their theft of all the assets of KOTVA.

Fax 617 778 7781
Mobile 617 548 0580

---

From: Georgiy Nikitin
Sent: Tuesday, February 08, 2005 10:27 AM
To: Andrew Weiss
Subject: should I send this to Lars with an explanation?

We wish to hire a public relations firm to respond to an article that appeared in Czech newspapers. In particular,

11/16/2005

W0011548

the newspaper reports that police suspect Andrew Weiss of extortion. We have attached a copy of the article that was distributed on Friday at http://www.ceskenoviny.cz/index_view.php?id=113962 and a translation of another related article that appeared in today's issue of "Lidové noviny".

We believe the charges are attempts by Forminster to frighten Weiss and to defame him so that they can complete their theft of the assets of KOTVA. The public prosecutor's office is working with the thieves to help them make sure that minority shareholders do not get anything from the sale of KOTVA, and that justice is subverted with respect to the tunneling of Trend. Andrew Weiss's background is available at http://www.weissasset.com/aweiss

Andrew Weiss is the President of Weiss Asset Management which manages Brookdale Global Opportunity Fund ("BGO"). BGO was formerly called the Czech Value Fund, and was managed by Regent Kingpin. At the time Weiss Asset Management took over the management of BGO (previously known as Czech Value Fund) the fund owned around 11% of the shares of KOTVA and around 40% of the shares of Trend IF, which had been the largest shareholder of KOTVA a.s. before Trend was tunneled. The previous managers of Czech Value Fund had attempted to take over Trend Fund, but before the takeover could be completed the assets disappeared -- to a large extent the embezzlement took the form of selling and buying shares of KOTVA a.s. to various companies associated with Halek at very different prices. The final step of the embezzlement of Trend's shares of Kotva occurred on 30 January 1997 when Forminster Enterprises paid 215 CZK per shares for KOTVA shares that on 20 March 1998 had traded for 1880 CZK. They spent CZK 82,768,765 for 384,971 shares of KOTVA. We understand that if the Forminster group is not prevented from disenfranchising the minority shareholders of KOTVA and all shareholders of Trend, they plan to get CZK 1,400,000,000 from the sale of KOTVA to the Irish investors, while the other shareholders will get nothing. Although the ownership of the KOTVA shares bought by Forminster was contested and the shares themselves were blocked by the Czech courts, a different court allowed Forminster to take control of the board of Kotva a.s. (On 27 February 2002 a U.K. arbitration panel ruled that with 80% probability, a Czech court will eventually rule that at least 32% of the KOTVA a.s. shares that were being voted by Forminster actually belong to TREND and that those shares will be returned to TREND -- we have a copy of that arbitration decision).

Through several questionable deals Forminster moved the assets of Kotva into companies that Forminster or its associates owned. These transfers were done in order to sell the KOTVA property to foreign investors without the minority shareholders of KOTVA, or the shareholders of TREND, getting any benefit from the sale, and to get around the court order blocking Forminster's shares in KOTVA. After the London Times reported that Forminster was in the process of selling KOTVA to Markland (an Irish property company), Weiss met with Richard Harazim and Martin Benda who said they represented Forminster and wished to discuss terms under which the shares of KOTVA owned by BGO and its shares of TREND would also be sold. Weiss said that the shares owned by the minority shareholders of KOTVA should get the same payoff as Forminster, and that TREND shareholders are entitled to being repaid for the shares that was embezzled from them. In response Richard Harazim told Prof. Weiss in the presence of Vladimir Hoffman that minority shares of KOTVA were worthless. Harazim said there was nothing Weiss could do to rectify the embezzlement of the assets of Trend, and asked how Weiss intended to help the minority shareholders of KOTVA, and the shareholders of Trend. Weiss answered that he would think of something. Subsequently, court petitions were filed to reverse the transactions that moved the assets of KOTVA out of KOTVA a.s. and into the companies controlled by Forminster. In December 2004 Harazim asked for a second direct meeting with Weiss to discuss the terms under which shares of KOTVA could be purchased.

Apparently Forminster has been able to induce the police to charge Weiss with extortion because they believe Weiss is behind the lawsuits that are intended to stop Forminster from stealing all the assets of KOTVA, and because Weiss is trying to get BGO's shares of KOTVA to receive the same payment as the KOTVA shares that Forminster is selling, and because he does not believe the shareholders of Trend should be left out of any settlement.

Please let us know whether you would be interested in representing Andrew Weiss, and Weiss Asset Management in this matter. Please let me know what rates you would charge and how you would proceed. We can get you in touch with the attorney in Prague who has all the details of this situation. I will be looking forward to hearing from you.
Sincerely yours,

Georgiy Nikitin

Policie obvinila minoritní akcionáře Kotvy z vydírání

PRAHA - Policie podezírá minoritního akcionáře společnosti Kotva Andrewa Weisse a jeho dva spolupracovníky z vydírání. Weissovi spolupracovníky policie již obvinila. "Stíhání bylo zahájeno ve čtvrtek," řekl dnes ČTK mluvčí státního zastupitelství Martin Omelka. Nechtěl sdělit žádné další podrobnosti, ani to, zda žalobce navrhuje vazbu. Společnost Kotva provozuje v Praze stejnojmenný obchodní dům.

Obviněni byli podle informací ČTK Edita Šimková a Vladimír Hoffman. Stíhání údajně čeká i Weisse, který žije v Bostonu ve Spojených státech. Jeho společnost Weiss Asset Management kontroluje firmu BGO, která drží v a.s. Kotva zhruba desetiprocentní podíl.

Generální ředitel společnosti Kotva Richard Harazim dnes ČTK řekl, že Weiss se loni Kotvu snažil vydírat prostřednictvím dvojice nastrčených firem se sídlem na Kypru a v Delawaru. Společnost Kotva proto loni na Weisse podala trestní oznámení.

"Loni na jaře nás (Weiss) kontaktoval s tím, že se dozvěděl o našich podnikatelských plánech. Požadoval po Kotvě odkup jeho akciového podílu a vyhrožoval, že jinak tyto plány pomocí různých žalob překazí. Chtěl tehdy částku, která byla o více než 100 milionů korun vyšší než aktuální cena akcií na burze, a cenové požadavky stále stupňoval," uvedl Harazim.

Poté následovaly dvě žaloby na společnost Kotva. "První žaloba byla podána loni v červnu a druhá v prosinci. Obě žaloby byly totožné a pocházely od dvojice společností, za kterými Weiss stojí. Počínání pana Weisse nám způsobilo značné škody, které budeme soudně vymáhat," podotkl Harazim.

Kvůli akciím Kotvy je stíhán za podvod také bývalý šéf vytunelovaného investičního fondu Trend Miroslav Hálek a další čtyři podnikatelé z Hradce Králové. Hálek a spol. chtěli podle policie pomocí zfalšovaných dokumentů získat akcie Kotvy, které již dříve prodali.

Od roku 1996 je Hálek s deseti svými kolegy stíhán také za to, že připravil akcionáře fondu o více než miliardu korun. V případu již mělo být nařízeno hlavní líčení, ale soud případ loni v lednu vrátil policii k doplnění.

Majetek fondu Trend podle dřívějšího obvinění Hálek a další podezřelí nezákonně převedli na kyperskou firmu Forminster Enterprises. Součástí majetku byly i akcie obchodního domu Kotva.

Pětice podezřelých však předloni na podzim předložila smlouvy, ze kterých vyplývá, že akcie Kotvy byly údajně kyperské společnosti jen dočasně zapůjčeny a nyní mají být vráceny firmám blízkým Hálkovi.

11/16/2005

W0011550

"Forminster neuznává platnost smlouvy o půjčce. Prohlašuje, že je falešná. Tak se jí nehodlá ani řídit. Domnívá se, že na jeho účet se někdo dopustil podvodu, chtěl se na něm obohatit, a proto Forminster podal trestní oznámení," řekl před časem České televizi právník společnosti Petr Toman. Hálek obvinění označil za účelové. Pokud soud obviněným prokáže, že smlouvu opravdu zfalšovali, mohou jít až na osm let do vězení.

Kvůli složitým sporům ohledně investičního fondu Trend, který akcie Kotvy vlastnil, je majetek společnosti Kotva stále zablokován policií a soudy. Šestapadesátiprocentní podíl na majetku Kotvy nadále leží na blokovaném účtu kyperské firmy Forminster Entreprises Limited (FEL), uvedly nedávno Lidové noviny.

Autor: ČTK;

*"Police suspect a minority shareholder of KOTVA of extortion*

*Prague, February 4, 2005 (CTK) - Police suspect a minority shareholder of KOTVA, Mr. Andrew Weiss and two of his associates of extortion. Police have already charged two associates of Mr. Weiss. "The prosecution was initiated on Thursday", Mr. Martin Omelka, spokesman of the public prosecutor, told today to CTK. However, he refused to give any other details, not even whether the prosecutor proposes taking them into custody. The company Kotva runs a department store of the same name in Prague.*

*According to information from CTK, the charged persons are Ms. Edita Šimková and Mr. Vladimír Hoffman. Mr. Andrew Weiss, domiciled in Boston, USA, will be, supposedly, also prosecuted. His company Weiss Asset Management controls the company BGO, which holds a 10% interest in the company Kotva, a.s.*

*The CEO of the company Kotva, Mr. Richard Harazim, said today to CTK that Mr. Weiss sought last year to extort the company Kotva through two companies with registered offices in Cyprus and Delaware. Consequently, the company Kotva lodged last year a charge against Mr. Weiss.*

*"Mr. Weiss contacted us last spring and told us that he had learned about our business plans. He required us to purchase his shares and threatened that otherwise he will blight our plans with a number of petitions. He required an amount exceeding by more than CZK 100 million the actual price of the shares on the stock exchange and continued in gradation of his demands", said Harazim.*

*Subsequently, two petitions against the company Kotva have been filed. "The first petition was filed in June and the second in December last year. Both petitions were identical and were filed by two companies linked to Mr. Weiss. We have suffered considerable damages as a result of the activity of Mr.*

11/16/2005

W0011551

*Weiss, whose recovery we will claim in court," remarked Mr. Harazim.*

*In connection with shares in Kotva a former director of the tunneled investment fund Trend, Mr. Miroslav Hálek, and four other entrepreneurs from Hradec Kralove are being prosecuted for fraud. Halek and Co. according to the police, sought to acquire, by means of forged documents, shares in Kotva that they had sold before.*

*Since 1996, Mr. Halek, together with his ten associates, has also been prosecuted for depriving the shareholders of the investment fund of more than one billion Czech crowns. The trial should have been started last year, but the court returned the case to the police for a further investigation last year in January.*

*Halek and the other suspects have illegally transferred, according to previous charges, the assets of Trend to a Cyprus company Forminster Enterprises. The shares of Kotva department store were part of these assets. The five suspects submitted, however, in the autumn of the year before last, contracts from which it results that the shares in Kotva were only lent to the Cyprus company and they should be returned to companies linked to Mr. Halek.*

*"Forminster does not acknowledge the validity of the loan contract. It declares that it is false. Consequently, it does not intend to respect it. It considers that someone intended to commit fraud against it, intended to enrich itself at the expense of Forminster and this is why Forminster has lodged a charge", said the lawyer of the company Mr. Petr Toman, to Czech television. Mr. Halek considers this accusation as untrustworthy. Should the court find the accused persons guilty, they may be sent to prison for up to eight years.*

*Because of the complicated disputes concerning the investment fund Trend that owned the shares in Kotva, the assets of Kotva are still blocked by the police and courts. Lidové noviny have recently reported that a 56% interest on the assets of the company Kotva is still frozen on an account of the company Forminster Enterprises Limited (FEL).*

*Štěpánka Kučerová, Petr Běhal (CTK)"*

---

This email is confidential and is intended solely for the addressee(s). If you are not an addressee, you must not disclose, copy, circulate or in any other way use or rely on the information contained in this email. If received in error, please notify the sender immediately and then delete this email. Any disclosure, copying, distribution or use of this communication is prohibited and may be unlawful.

11/16/2005

Any views or opinions expressed do not necessarily represent those of Weiss Asset Management or any affiliated companies. Please note that the content of this e-mail may be intercepted, monitored or recorded for compliance purposes. Sensitive personal data should not normally be transmitted by e-mail.

Weiss Asset Management or any affiliated companies shall not be liable to the recipient or any third party for any loss or damage howsoever arising from this e-mail and/or its content, including loss or damage caused by virus. It is the responsibility of the recipient to ensure that the opening or use of this message and any attachments shall not adversely affect systems or data.

**Weiss Asset Management**
**29 Commonwealth Avenue**
**Boston, MA 02116**
**TEL: (617) 778-7780**
**FAX: (617) 778-7781**
**www.weissasset.com**

11/16/2005

W0011553

**G**

## Lucy Chen

**From:**    Andrew Weiss
**Sent:**    Sunday, May 30, 2004 10:32 PM
**To:**    svejnar@umich.edu
**Subject:** FW: Kotva

Dear Jan, these are the Irish investors that are going to pay the crooks for that they end op owning KOTVA if we don't stop the deal. Linkaters is a London based international law firm. It is very reputable. I got your email of Saturday, was the longer email I sent you sufficiently informative. andy

    ----Original Message----
**From:** Vladimir Hoffmann [mailto:vlado1@volny.cz]
**Sent:** Sun 5/30/2004 3:21 PM
**To:** Andrew Weiss
**Cc:** Dave Johnson; Eitan Milgraun
**Subject:** RE: Kotva

Dear Andy,

Please find below the contacts to the Irish investors:

Henry Prestage
Markland Holdings
19 Upper Fitzwilliam Street
Dublin 2
Ireland

tel: 01 676 2023
fax: 01 676 2000
mob: 087 948 1742
e-mail: hprestage@markland.ie

Markland's lawyer in Prague:

Brian Wilson
Linklaters
Palác Myslbek Na Příkopě 19
Prague 1
117 19 Czech Republic

tel: (420) 221 622 111
fax: (420) 221 622 199

Regards,

Vlado.

    ----Original Message----
**From:** Andrew Weiss [mailto:AWeiss@WeissAsset.com]
**Sent:** Saturday, May 29, 2004 1:44 PM
**To:** Vladimir Hoffmann
**Subject:** RE: Kotva

what is happening with the new company? Did you get my email. Who are the Irish investors I need to send their identities to my contact wit hthe Czech finance minister. Also when did KHB go bankrupt? andy



WP0000411

RE: Kotva

-----Original Message-----
From: Vladimr Hoffmann [mailto:vlado1@volny.cz]
Sent: Thu 5/20/2004 6:58 AM
To: Andrew Weiss
Cc: Dave Johnson; Georgiy Nikitin; Eitan Milgram
Subject: Kotva

Dear Andy,

I am aware that you do not want to send the letter to Markland, but I am sending you the text of the draft letter in English for your information. As we agreed yesterday this letter will be sent by the new company as soon as we have it (which is a matter of few days).

Best regards,

Vlado.

---
Odchoz zprva neobsahuje viry.
Zkontrolov no antivirovm syst mem AVG (http://www.grisoft.cz).
Verze: 6.0.683 / Virov b ze: 445 - datum vydn : 12.5.2004

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

This email is confidential and is intended solely for the addressee(s). If you are not an addressee, you must not disclose, copy, circulate or in any other way use or rely on the information contained in this email. If received in error, please notify the sender immediately and then delete this email. Any disclosure, copying, distribution or use of this communication is prohibited and may be unlawful.

Any views or opinions expressed do not necessarily represent those of Weiss Asset Management or any affiliated companies. Please note that the content of this e-mail may be intercepted, monitored or recorded for compliance purposes. Sensitive personal data should not normally be transmitted by e-mail.

Weiss Asset Management or any affiliated companies shall not be liable to the recipient or any third party for any loss or damage howsoever arising from this e-mail and/or its content, including loss or damage caused by virus. It is the responsibility of the recipient to ensure that the opening or use of this message and any attachments shall not adversely affect systems or data.

Weiss Asset Management
29 Commonwealth Avenue
Boston, MA 02116
TEL: (617) 778-7780
FAX: (617) 778-7781
www.weissasset.com

---
P choz zpr va neobsaluje viry.
Zkontrolovno antivirov m systmem AVG (http://www.grisoft.cz).
Verze: 6.0.691 / Virov bze: 452 - datum vyd n: 26.5.2004

---
Odchozí zpráva neobsahuje viry.
Zkontrolováno antivirovým systémem AVG (http://www.grisoft.cz).
Verze: 6.0.691 / Virová báze: 452 - datum vydání: 26.5.2004

8/30/2005

RE: Kotva

8/30/2005

WP0000413

**H**

THE HIGH COURT

Record No. 2006/ 1 FTE


IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856
AND IN THE MATTER OF CIVIL PROCEEDINGS NOW PENDING BEFORE
THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS (CIVIL ACTION NO. 05-10679-RCL)


| | |
|---|---|
| BETWEEN/ | )Plaintiff |
| | ) |
| KOTVA a.s. | ) |
| | ) |
| ANDREW WEISS and WEISS ASSET | ) |
| MANAGEMENT | )Defendant |

---

| | |
|---|---|
| ANDREW WEISS, WEISS ASSET | ) |
| MANAGEMENT LLC, KT, INC. AND CVF | ) |
| INVESTMENTS LIMITED | )Counterclaim-plaintiffs |
| | ) |
| KOTVA a.s,  MARTIN BENDA, | ) |
| RICHARD HARAZIM, FORMINSTER | ) |
| ENTERPRISES LTD., SPV CO | ) |
| AND JOHN DOES 1-5 | )Counterclaim-defendants |

---

Deposition under oral examination

OF

AIDAN SCULLY


taken at 10.00 am

on

May 26, 2006

```
 1              something that needs to be looked up, if we can just
 2              park the issues then, it is just I don't want to get
 3              into discussion on matters ...(INTERJECTION).
 4              MR. WILSON:              In which case that is a
 5                                       matter of public record in
 6              the Czech Republic, all the information he is asking.
 7     420  Q.  MR. GOLDBERGER:          Are you a director?
 8          A.  Well, I have already said to you that any company that
 9              has been set up in relation to purchasing properties in
10              the Czech Republic as far as I'm aware I am a director
11              of them all for signing purposes and for whatever.
12     421  Q.  Okay. Do you know of any other reasons for the merger
13              other than tax reasons?
14          A.  No, but I might just, actually you asked me to let you
15              know -- now that you mention Kotva, what was the
16              company, the merged company, Kotva?
17     422  Q.  Markland Kotva a.s..
18          A.  Yes, yeah, that now kind of rings a bell.
19     423  Q.  As being the merged company?
20          A.  As the company, yeah.
21     424  Q.  Thank you.
22          A.  I should know which companies I am director of, of
23              course, but I mean the list is as long as my arm.
24     425  Q.  How did Markland first learn about the filing of the
25              Gilroy lawsuit?
26          A.  I don't know but Henry told me at some stage.
27     426  Q.  What did Henry tell you specifically?
28          A.  I can't remember specifically.
29     427  Q.  Can you remember generally?
```

83

```
 1    A.   That somebody had filed a lawsuit in the Czech
 2         Republic. They couldn't find out who was behind the
 3         company for some reason. It was, where was the company
 4         based? I can't remember where it was from, but this
 5         company had filed a lawsuit in a bid to stop the
 6         transaction happening.
 7   428  Q.   And this is all information that Mr. Prestage told you?
 8    A.   That is information that I would have received from
 9         Henry or a combination of sources, but I mean I am
10         guessing Henry predominantly, there may be e-mails.
11   429  Q.   Did Kotva present this lawsuit as a serious problem, a
12         frivolous lawsuit, what was their view of it?
13         MR. BECKMAN:              Objection, that is three
14                                   questions.
15         EXAMINER:                 Just for the purpose of
16                                   ease of giving the
17         evidence, you might rephrase similarly.
18   430  Q.   MR. GOLDBERGER:           How did Kotva present this
19                                   lawsuit?
20    A.   I don't know.
21   431  Q.   Did you ever have any communications with Mr. Harazim
22         about this lawsuit?
23    A.   Yes.
24   432  Q.   What did you say to Mr. Harazim and what did he say to
25         you?
26    A.   Well, I was in a room where communications were taking
27         place in relation to this lawsuit amongst other
28         matters.
29   433  Q.   What did he say about the lawsuit, Mr. Scully?
```

84

```
 1      A.   Mainly he would address Henry in relation to this deal,
 2           I would be taking a back seat, as it were.
 3   434  Q.   Do you recall when this was?
 4      A.   When?
 5   435  Q.   This meeting, you were in a room with Mr. Prestage and
 6           Mr. Harazim.
 7      A.   Generally speaking, which I am sure you will get onto
 8           later, I have met Richard Harazim on a number of
 9           occasions, predominantly with Henry Prestage and the
10           issue of Gilroy would have been brought up, because any
11           issue relating to the delay in us acquiring the
12           property was obviously top of the agenda. If that
13           answers your question.
14   436  Q.   Well, it begins to. About how many times would you say
15           you have met Mr. Harazim?
16      A.   Ever?
17   437  Q.   Ever.
18      A.   Total.  I would guess to date maybe six, six-ish times.
19   438  Q.   Give or take?
20      A.   Yeah, it could be eight, it could be -- no, it's more
21           than four but it's definitely six times.
22   439  Q.   Probably less than ten?
23      A.   Probably less than ten, yeah, definitely less than ten,
24           I'd say.
25   440  Q.   Did you ever meet him before Markland became interested
26           in purchasing Kotva?
27      A.   No.
28   441  Q.   When was the first time you met him?
29      A.   I was trying to think of that yesterday. I was
```

85

```
 1              MR. GOLDBERGER:              Objection.
 2       A.     Yes.
 3  689  Q.     MR. BECKMAN:                 Now, did the Gilroy lawsuit
 4                                           delay the closing?
 5       A.     Clearly.  Clearly, yeah.
 6  690  Q.     How long did it delay the sale, the purchase and sale?
 7              MR. GOLDBERGER:              Objection.
 8       A.     God, I would have to go back and get, I would have to
 9              really consult with Frank on this, but, you know, it
10              was considerable time.
11  691  Q.     MR. BECKMAN:                 Did you understand that the
12                                           Gilroy lawsuit was
13              questioning the title to the building?
14              MR. GOLDBERGER:              Objection.
15              MR. BECKMAN:                 Could you ask him to state
16                                           the basis of his objection.
17              MR. GOLDBERGER:              The basis of this
18                                           objection is relevance,
19              hearsay, lack of personal knowledge and calls for an
20              expert opinion.
21              MR. BECKMAN:                 Let me ask the question
22                                           again.
23  692  Q.     Was your personal understanding of the Gilroy lawsuit
24              that it was questioning the title to the building?
25              MR. GOLDBERGER:              Same objection.
26       A.     It was laying a claim to the building.
27  693  Q.     MR. BECKMAN:                 Okay.
28       A.     I don't know whether it was actually a title claim or
29              shares in a previous company claim, or whatever claim,
```

134

Gwen Malone Stenography Services Ltd.

```
 1            it was a claim to the building that was delaying them,
 2            that was...(INTERJECTION).
 3  694  Q.  Okay, I am going to use your language then.  Did the
 4            lawyers representing Gilroy send copies of the lawsuit
 5            to Anglo Irish Bank?
 6            MR. GOLDBERGER:              Objection.
 7            EXAMINER:                    Again if you might just
 8                                         outline the basis of your
 9            objections.
10            MR. GOLDBERGER:              Lack of personal knowledge.
11            MR. BECKMAN:                 How do we know if he hasn't
12                                         answered the question?  We
13            need to pose the question and then if he doesn't know
14            he will say he doesn't know.  But unless he answers the
15            question it is not the proper basis to say "lack of
16            personal knowledge".
17            EXAMINER:                    Again for what it's worth,
18                                         and this is all I can do is
19            give my opinion, I think the question in my opinion is
20            a proper question. Again it is my opinion only.
21            Mr. Goldberger's objection has been noted.  If the
22            witness might answer the question at this juncture.
23            MR. BECKMAN:                 Thank you. Let me ask the
24                                         question again. Let me ask
25            the question again so the record is clear.
26  695  Q.  Did the Gilroy lawyers send copies of the lawsuit to
27            the Anglo Irish Bank?
28       A.  Correspondence was received by Anglo Irish Bank and the
29            exact format of that I am not certain as we sit here.
```

135

```
 1              Some correspondence outlining litigation, maybe not the
 2              full details of the court case, I don't know, but
 3              something was sent to the chief executive of
 4              Anglo Irish Bank.
 5   696  Q.    Is Anglo Irish Bank, is that a large bank in Dublin?
 6        A.    It would be a significant, they would do major
 7              commercial transactions, they would be the ones to be
 8              using.
 9   697  Q.    And your understanding is that some correspondence was
10              sent to the chief executive of Anglo Irish from Gilroy?
11              MR. GOLDBERGER:            Objection, as to the
12                                         characterisation of the
13              testimony and as to his personal knowledge.
14              EXAMINER:                  If you might just answer
15                                         the question.
16        A.    Sorry, can you repeat that?
17   698  Q.    MR. BECKMAN:               Certainly. Your
18                                         understanding is that the
19              Gilroy lawyers sent some correspondence to the chief
20              executive at Anglo Irish bank regarding the Gilroy
21              lawsuit?
22        A.    I can't recall whether it was the Gilroy lawyers or
23              something to do with Professor Weiss in the States, but
24              some part of that camp, or whatever, communicated with
25              the top man in Anglo Irish Bank.  I think it may have
26              been cc'd to myself and Frank and some junior in the
27              office for some reason who has never been to the
28              Czech Republic on business.
29   699  Q.    Did this cause any problems to Markland, it's
```

136

```
 1              relationship with Anglo Irish Bank?
 2      A.      It was embarrassing, yeah, embarrassing, because the
 3              shareholders, certainly one of the shareholders would
 4              have a 20 year plus history with Anglo and would have
 5              major, major business with that bank. So for that to
 6              land on his desk to be percolated down to whoever is
 7              going to deal with it, yeah, it was certainly
 8              embarrassing, it put the deal at risk actually.
 9  700 Q.      It did put the deal at risk?
10      A.      Hmm.
11              MR. GOLDBERGER:           Objection.
12              EXAMINER:                 What is the basis of your
13                                        objection?
14              MR. GOLDBERGER:           Sorry, I am just thinking
15                                        about the earlier question.
16              I withdraw the objection.
17  701 Q.      MR. BECKMAN:              You have to answer orally,
18                                        you nodded your head to
19              that.
20      A.      Well, it did put the deal at risk because the top
21              person was saying, you know, was questioning, I
22              suppose, the lower levels decisions to be lending this
23              large sums of money into Eastern Europe, so ...
24  702 Q.      After the Gilroy lawsuit was filed did Markland cancel
25              the deal?
26      A.      Markland didn't cancel the deal, but I guess it was
27              always taking stock of the situation as it presented
28              itself on the day, but we didn't cancel the deal, no.
29  703 Q.      Did Markland's lawyers review the impact of the Gilroy
```

137

```
 1          litigation of the purchase of the department store?
 2          MR. GOLDBERGER:              Objection, hearsay.
 3    A.    Yes, that's what they were there for.
 4  704 Q.  MR. BECKMAN:                 Now, based on -- was this
 5                                        Linklaters that reviewed
 6          it?
 7          MR. GOLDBERGER:              Same objection.
 8    A.    With a combination of the three lawyers who I am sure
 9          would have had an involvement there.
10  705 Q.  MR. BECKMAN:                 So Linklaters reviewed the
11                                        impact. Let me restate the
12          question.  Did Linklaters review the impact of the
13          Gilroy lawsuit on the sale?
14    A.    They would have.
15  706 Q.  Yes, and did the bank's lawyers review the impact of
16          the Gilroy lawsuit on the deal?
17          MR. GOLDBERGER:              Same objection.
18    A.    I would be amazed if they didn't, you know.
19  707 Q.  MR. BECKMAN:                 Now, did you -- were you
20                                        advised not to proceed with
21          the sale by Linklaters because of the Gilroy lawsuit?
22    A.    I would have to check with Henry if at any stage
23          Linklaters advised us not to proceed with the deal.
24          They may have outlined the commercial risks associated
25          with the deal, but I don't know whether they actually
26          advised us: "Do not proceed with this deal".
27  708 Q.  After the Gilroy lawsuit was filed did the purchase
28          price change in any respect?
29    A.    I am not certain about that, although knowing Henry he
```

138

```
 1    A.   Well, I suppose the litigation delayed the sale, but on
 2         an on-going basis, I suppose, it's a bit technical, but
 3         again it's similar to what I described this morning.
 4         Our debt ratio is suffering because we can't get a
 5         proper title in Kotva. Our margins over euro bar and
 6         margins over the base, the base lending rate are
 7         considerably higher than they might be had we got
 8         proper title to this property and that's on a daily
 9         basis.
10
11         Had we got, or if we do get proper title we would be
12         looking for the bank to reduce that margin and
13         obviously save us an amount annually.
14
15         Besides that it is probably hampering our ability to
16         regear on the increased value of Kotva to buy in, buy
17         other properties and buy in other locations.  So it is
18         having a slightly suffocating effect on the portfolio,
19         notwithstanding, it has gone up in value.
20  720 Q. MR. BECKMAN:              Are you aware of the Gilroy
21                                   lawsuit being dismissed by
22         the Czech Court?
23    A.   Yes, I mean.
24  721 Q. Let me restate that question, I apologise.  Are you
25         aware of the Czech Court issuing a decision dismissing
26         the Gilroy lawsuit?
27    A.   I am now.  I'm not sure if I fully recollected that
28         earlier, but...(INTERJECTION).
29  722 Q. You didn't recall that when Mr. Goldberger was
```

141

```
 1           questioning you?
 2      A.   At the meeting I think I said it either had been, had
 3           been or was about to be dismissed.  I think when he
 4           asked me initially I may have said that I wasn't aware
 5           if it had been dismissed or not.
 6  723 Q.   Are you aware of the Czech Court issuing a decision
 7           stating that Gilroy had no standing to challenge the
 8           building?
 9      A.   I am not aware of the asset details.
10           MR. GOLDBERGER:              Objection.
11           EXAMINER:                    Again, Mr. Goldberger, if
12                                        you might explain the basis
13           of your objection.
14           MR. GOLDBERGER:              It's as to form, it is a
15                                        confusing question of legal
16           terms.
17      A.   I'm not aware of exactly what was said in relation to
18           or what was decided.  Again I was just concerned that
19           it was one less perceived headache eradicated, you
20           know, so ...
21  724 Q.   MR. BECKMAN:                 Are you aware of the, that
22                                        the KT lawsuit is still
23           pending?
24      A.   Yes.
25  725 Q.   And because that KT lawsuit is pending it is causing
26           what you describe as suffocating damages to Markland?
27           MR. GOLDBERGER:              Objection.
28  726 Q.   MR. BECKMAN:                 Is that correct?
29      A.   Yes, it's the same position, we still can't get a
```

142

```
 1           mortgage on the property.
 2   727  Q.  MR. BECKMAN:                Just so the record is
 3                                        clear, is the KT's lawsuit
 4           preventing Markland from getting a mortgage on the
 5           property.
 6           MR. GOLDBERGER:              Objection.
 7           EXAMINER:                    Basis, Mr. Goldberger.
 8           MR. GOLDBERGER:              Relevancy, form, asked
 9                                        and answered.
10      A.   Again it's a technical question and I am probably not
11           the person to, who would answer it in its fullest, but
12           I believe it is to be the case, yeah.
13   728  Q.  MR. BECKMAN:                If I can direct your
14                                        attention, Mr. Scully, to
15           exhibit number 7 which is the Post article (same
16           handed).
17      A.   Thank you.
18   729  Q.  And particularly page two of this article.
19           EXAMINER:                    If I might just intervene
20                                        for one moment. Purely for
21           housekeeping.  Mr. Beckman, are you finished with
22           exhibit 14?
23           MR. BECKMAN:                 Yes.
24           EXAMINER:                    Just that I'm, just so that
25                                        can be marked and formerly
26           entered as an exhibit at this juncture. (Exhibit 14 was
27           then marked for identification and handed to the
28           Examiner).
29           MR. BECKMAN:                 Certainly, thank you very
```

143

```
 1                                                much.
 2  730  Q.   If I can direct your attention to the second page at
 3            the very top the article provides:
 4
 5                 "Weiss is a professor of economics at
 6                 Boston University and president and
                   chief investment officer of Weiss Asset
 7                 Management.
 8                 According to his website, he is an
                   advisor to the World Bank and
 9                 previously taught at New York
                   University and Columbia University.
10                 He said last week he was considering
11                 hiring Irish counsel to take action
                   against Markland in the Irish
12                 courts..."
13            Do you see that?
14       A.   Hmm-hmm.
15  731  Q.   Now, if you just skip down to where your name appears,
16            it provides:
17
18                 "Aidan Scully, managing director of
                   Markland, said that the company was
19                 satisfied that there was no legal basis
                   for any such claims."
20
21            Did Mr. Weiss ever threaten action against Markland?
22            MR. GOLDBERGER:              Objection as to form.
23       A.   Clearly that's threatening action.
24  732  Q.   MR. BECKMAN:                 Did Mr. Weiss ever file a
25                                         lawsuit against Markland?
26       A.   Mr. Weiss himself or a company?
27  733  Q.   Or any of the entities, yeah.
28       A.   I think we are co-joined or something -- I mean is
29            Mr. Weiss KT? Am I getting that as fact today?  I mean
```

144

I

Page 1

Vol. 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
C.A. NO. 05-10679-RCL

KOTVA a.s.,
                Plaintiff,

           vs.

ANDREW WEISS and WEISS ASSET
MANAGEMENT, LLC,
                Defendants.

           **************
ANDREW WEISS, WEISS ASSET
MANAGEMENT LLC, K T, INC., and
CVF INVESTMENTS, LTD.,
                Counterclaim-plaintiffs,

           vs.

KOTVA a.s., MARTIN BENDA, RICHARD
HARAZIM, FORMINSTER ENTERPRISES,
LTD, SPV CO and JOHN DOES 1-5,
                Counterclaim-defendants.

VIDEOTAPE DEPOSITION OF GEORGIY A. NIKITIN, taken

pursuant to Notice under the applicable provisions

of the Federal Rules of Civil Procedure on behalf

of the Plaintiff and Counterclaim-Defendants,

before Simonne J. Elwood, R.P.R. and a Notary

Public in and for the Commonwealth of Massachusetts,

at the office of Nystrom Beckman & Paris LLP,
10 St. James Avenue, 16th Floor, Boston,

Massachusetts, commencing on Thursday, November

16, 2006 at 10:11 a.m.

       NEAL A. SALLOWAY - COURT REPORTERS
             FIVE CARDIGAN ROAD
           WEST PEABODY, MA 01960
   781-581-3993 - 978-535-0313 - FAX 978-536-3142

G. NIKITIN

Page 82

| | | |
|---|---|---|
| 1 | | negotiations for the sale of 82,000 shares of |
| 2 | | Kotva? |
| 3 | A | Approximately. |
| 4 | Q | Right. |
| 5 | A | Yes. |
| 6 | Q | And that 82,000 shares, between May and |
| 7 | | December 2004, that included the K T shares, |
| 8 | | correct? |
| 9 | | MR. GOLDBERGER: Objection. |
| 10 | A | I believe so. |
| 11 | Q | Right. So Mr. Weiss was representing K T in |
| 12 | | connection with the sale of those shares? |
| 13 | | MR. GOLDBERGER: Objection. |
| 14 | Q | Correct? |
| 15 | A | That's -- Again, this is a legal conclusion. |
| 16 | | I don't know how to make it. |
| 17 | Q | Well, he -- he was offering to sell the K T |
| 18 | | shares, correct? |
| 19 | A | I believe K T shares were a part of those |
| 20 | | 82,000 shares, approximately 82,000 shares. |
| 21 | Q | Now, do you understand that after Weiss' |
| 22 | | meeting in Prague with Richard Harazim and |
| 23 | | Martin Benda, a company called Gilroy filed a |

Page 83

| | | |
|---|---|---|
| 1 | | lawsuit against Kotva, KN and SPV KN? |
| 2 | A | I understand that this is a correct timeline. |
| 3 | Q | All right. So your answer is yes? |
| 4 | A | Yes. |
| 5 | Q | And this was a civil proceeding lodged |
| 6 | | against Kotva, correct? |
| 7 | A | You're phrasing it in such a way that it |
| 8 | | sounds as if this proceedings was lodged |
| 9 | | against Kotva shareholders. |
| 10 | Q | I'm not saying that. The complaint |
| 11 | | identifies the company, Kotva, as a |
| 12 | | defendant, correct? |
| 13 | A | Yes. |
| 14 | Q | Okay. Now, subsequently, in December of |
| 15 | | 2004, a company called K T filed a lawsuit |
| 16 | | against Kotva, correct? |
| 17 | A | I believe so. |
| 18 | Q | Okay. And did you, personally, along with |
| 19 | | Andrew Weiss, make the decision to file that |
| 20 | | K T lawsuit? |
| 21 | | MR. GOLDBERGER: Objection. Compound. |
| 22 | Q | You may answer. |
| 23 | A | Andrew Weiss and I discussed the filing of |

Page 84

| | | |
|---|---|---|
| 1 | | this lawsuit; and we, together, made the |
| 2 | | decision to file this lawsuit. |
| 3 | Q | So -- Just so the record is clear, you and |
| 4 | | Mr. Weiss made the decision to file the K T |
| 5 | | lawsuit against Kotva in December of 2004, |
| 6 | | correct? |
| 7 | A | I believe so. |
| 8 | Q | Now, were these lawsuits designed to force |
| 9 | | Forminster to pay compensation to Weiss for |
| 10 | | his Kotva shares? |
| 11 | | MR. GOLDBERGER: Objection. |
| 12 | A | No. |
| 13 | Q | Were these -- Was the K T lawsuit designed to |
| 14 | | pressure Forminster to purchase BGO's Kotva |
| 15 | | shares? |
| 16 | A | No. |
| 17 | Q | Let's go back to Mr. Topinka's filing, |
| 18 | | Exhibit No. 5, Page 4, again, at the bottom, |
| 19 | | where it states, "It is common knowledge that |
| 20 | | Kotva a.s. had its assets stripped, resulting |
| 21 | | in a fundamental fall in the value of the |
| 22 | | Plaintiff's investment, which had not been |
| 23 | | protected by the Czech State." |

Page 85

| | | |
|---|---|---|
| 1 | | MR. GOLDBERGER: Objection. |
| 2 | Q | Do you see that? |
| 3 | A | I see the sentence. |
| 4 | Q | Do you agree with that statement? |
| 5 | A | I don't understand the last part of this |
| 6 | | sentence, "which had not been protected by |
| 7 | | the Czech State." |
| 8 | Q | I don't either. Let's -- Let's -- Let's |
| 9 | | start with -- Let's just -- The first clause. |
| 10 | | "It is common knowledge Kotva a.s. had its |
| 11 | | assets stripped, resulting in a fundamental |
| 12 | | fall in the value of the Plaintiff's |
| 13 | | investment, --." Do you agree with that |
| 14 | | statement. |
| 15 | A | I will generally agree with the statement |
| 16 | | except for definition of common knowledge. I |
| 17 | | don't know what is meant by that. I don't |
| 18 | | think some people in other countries would |
| 19 | | know or care about this. |
| 20 | Q | Now, let's go down to the second sentence. |
| 21 | | "In the opinion of the Plaintiff, --," now, |
| 22 | | plaintiff, you understand, refers to Andrew |
| 23 | | Weiss? |

## G. NIKITIN

| Page 106 |
| --- |

1  A    He may have mentioned something like that,
2      but I don't remember the details.
3  Q    Now, after you learned about these press
4      reports about the potential sale to Markland,
5      do you recall discussing with Mr. Weiss, at
6      any time, the subject of stopping the sale?
7  A    I recall discussing with him the subject
8      that if the sale occurs, the cash that Kotva
9      would receive -- that the subsidiary of Kotva
10     would receive could very well be tunneled out
11     of Kotva and that this would definitely
12     circumvent the freezing order for sale of
13     Kotva shares issued by the Czech Court.
14  Q    So --
15  A    And -- Sorry. I haven't finished the
16     question.
17  Q    Go ahead.
18  A    And that the shareholders of Kotva a.s. are
19     likely to see no benefit from the sale and,
20     specifically, Professor Weiss referred to the
21     document -- to May 12th meeting and the
22     document that he and Vladimir Hoffmann signed
23     after they left the meeting which evidenced

| Page 107 |
| --- |

1     the words of Mr. Harazim that the minority
2     shareholder is absolutely worthless, and no
3     minority shareholders will receive any money
4     from Kotva.
5  Q    Let's talk about the time period before the
6     May meeting. Do you recall discussing Mr.
7     Weiss -- with Mr. Weiss his concern about
8     tunneling the cash received from the sale of
9     the department store?
10  A    No.
11  Q    You don't recall discussing that?
12  A    I --
13     MR. GOLDBERGER: Are you asking him
14     about before the May meeting?
15  Q    Let's --
16  A    Before May 12?
17  Q    After you learned about the press reports --
18  A    What I learned?
19  Q    -- about the potential sale, you said you
20     learned about them in the fall of 2003 and
21     through into the spring, correct?
22     MR. GOLDBERGER: Objection.
23  A    I don't remember. Did I -- Is that -- I

| Page 108 |
| --- |

1     don't think that's what I said.
2  Q    That's my recollection. Do you -- Well, let
3     me just ask you this: Do you remember
4     learning through the press about a potential
5     sale in the fall of 2003?
6  A    No.
7  Q    Okay. When was the first time you learned
8     about the potential sale?
9  A    I believe that happened after -- after May
10     12th.
11  Q    So you didn't know about the sale before May
12     12th?
13  A    I don't believe so. The potential sale of
14     Kotva Department Store, you mean?
15  Q    Yes.
16  A    I don't believe I knew about that before May
17     12th --
18  Q    Okay.
19  A    -- of 2004.
20  Q    All right. After -- After May -- Well, do
21     you still have copies of those newspaper
22     articles that you read?
23  A    I may have them.

| Page 109 |
| --- |

1  Q    Okay. And you don't recall the dates of
2     those?
3  A    I recall that there was one article published
4     before May 12 which I read after May 12 --
5  Q    Okay.
6  A    -- and that I recall there were several
7     articles published after May 12.
8  Q    So after May 12, --
9  A    You dropped your mike.
10  Q    After May 12, you -- you did discuss with Mr.
11     Weiss his concern that the cash from the sale
12     of the department store might be tunneled?
13  A    I did. I believe I discussed this topic with
14     him.
15  Q    Okay. Did you discuss with Mr. Weiss what
16     would you -- what to do with respect to that
17     concern?
18  A    I believe we had such discussions.
19  Q    Did you discuss the option of stopping the
20     sale?
21  A    We may have discussed this.
22  Q    What do you recall about that, those
23     discussions?

# G. NIKITIN

## Page 110

1  A   I recall that we spoke about the fact that if
2      there is a sale, the minority shareholders
3      will see no money. All the money will go to
4      the controlling shareholder.
5  Q   So what options did you consider based on
6      that concern?
7  A   We considered options of filing lawsuits to
8      return the assets from the subsidiaries to
9      the -- to Kotva a.s. so that it would be
10     Kotva a.s. that would receive the money.
11         We may have mentioned -- I think we
12     spoke about the fact that if he files these
13     lawsuits, it's likely to affect the sale.
14         VIDEOGRAPHER: Excuse me. We need to
15     change the tape.
16         MR. BECKMAN: Okay.
17         VIDEOGRAPHER: The time is 12:16 p.m.
18     This is the end of Cassette No. 1. We're off
19     the record.
20         (Break takes place at 12:16 p.m.)
21         VIDEOGRAPHER: The time is 12:24 p.m.
22     This is the beginning of Cassette No. 2 in
23     the deposition of Georgiy Nikitin. We're on

## Page 111

1      the record.
2          (Back on the record at 12:24 p.m.)
3  Q   After the press report reported a potential
4      sale of the department store to Markland, did
5      you discuss with Weiss the option of blocking
6      the sale?
7  A   I don't think the name of Markland was in the
8      report, so that's --
9  Q   Okay.
10 A   -- one thing, and I don't think we were
11     speaking about blocking of sale. The answer
12     would be no.
13 Q   After the press reports about a potential
14     sale of the department store building, did
15     you discuss the option of stopping the sale?
16 A   The answer is still no. We discussed, rather
17     than filing the lawsuits, to return the asset
18     back to Kotva a.s.; and as a part of what we
19     discussed, the possible consequences of this.
20 Q   What's the last part of that?
21 A   We discussed possible consequences.
22 Q   What do you mean possible consequences?
23 A   That as a result of learning about this

## Page 112

1      attempt to strip the assets from the
2      shareholders and learning about the title of
3      this -- that sale may be postponed if the
4      buyer finds that there is this problem.
5  Q   So one of the possible consequences you
6      discussed was that the sale may be postponed?
7  A   Or cancelled.
8  Q   Postponed or cancelled, is that correct?
9  A   The thought of the possibility.
10 Q   Okay. You've written many e-mails that have
11     been produced in this case and letters
12     describing the May 12th meeting. Did Mr.
13     Weiss tell you what was said at that meeting?
14         MR. GOLDBERGER: Objection to form.
15 Q   You may answer.
16 A   He did tell me about some of the parts of
17     this meeting.
18 Q   When did he -- When did he tell you about the
19     meeting, the parts of the meeting?
20 A   On multiple occasions.
21 Q   When was the first time he told you?
22 A   I think it happened sometime in -- I'm trying
23     to use my best memory. I think it must have

## Page 113

1      happened sometime in June 2004.
2  Q   Okay. What did he tell you with respect to
3      what he said in the meeting?
4  A   I don't remember his exact words that he
5      used, but my general understanding was that
6      he said -- I will try to remember some
7      examples. I don't remember everything he
8      said about this. One example would be --
9  Q   Let's focus on what he said?
10 A   What he said. What he said.
11         After -- Well, I would have to give
12     what he was told in order to put it into
13     context?
14 Q   Just try to tell me what he said first.
15 A   Okay.
16 Q   And then we'll get through what other people
17     said at the meeting.
18 A   Uh-huh. I think --
19         MR. GOLDBERGER: Did you get the end
20     of his answer there, "in order to put it into
21     context"?
22         THE COURT REPORTER: Yes, I did.
23 A   I think he said like, "Don't worry. We

G. NIKITIN

| Page 142 | Page 144 |
|---|---|
| 1  Q   Did K T -- Did you authorize the filing of | 1   returned to Kotva? |
| 2       the K T lawsuit to -- so the sale of the | 2   A   The cash proceeds that are held by SPV CO be |
| 3       department store to Markland could be | 3       returned to the shareholders of Kotva or to |
| 4       stopped? | 4       Kotva. |
| 5  A   No. | 5   Q   No.  Does -- Do shareholders have a right -- |
| 6       MR. GOLDBERGER:  Objection. | 6       a direct right to the cash proceeds? |
| 7  Q   Did you file the lawsuit so that sale of the | 7   A   I don't believe -- I'm not an expert in the |
| 8       department store could be postponed? | 8       Czech law.  I don't believe that this is |
| 9       MR. GOLDBERGER:  Objection. | 9       correct. |
| 10 A   No, it was not the purpose of the lawsuit. | 10  Q   The Kotva shareholders don't have a direct |
| 11 Q   Now, sitting here today, do you understand | 11      right to the cash proceeds from the sale, |
| 12      that the department store has been sold to | 12      correct? |
| 13      Markland? | 13      MR. GOLDBERGER:  Objection. |
| 14      MR. GOLDBERGER:  Objection. | 14  A   That's a question asking to make a judgment |
| 15 A   I've seen copy of the press conference made | 15      about the legal system, but my understanding |
| 16      by on paper -- issued by subsidiary of | 16      is such. |
| 17      Markland and saying that they purchased the | 17  Q   That is your -- Is it your understanding that |
| 18      Kotva Department Store. | 18      Kotva shareholders don't have a direct right |
| 19 Q   Now, the K T lawsuit is still going forward, | 19      to the cash proceeds of the sale? |
| 20      correct? | 20      MR. GOLDBERGER:  Objection. |
| 21 A   I believe so. | 21  A   Not to receive the right -- the cash from the |
| 22 Q   Right.  Is K -- Is K T seeking to reverse | 22      proceeds, you're right; but to be entitled to |
| 23      the -- the sale to Markland? | 23      have this property rather than a subsidiary |

| Page 143 | Page 145 |
|---|---|
| 1       MR. GOLDBERGER:  Objection. | 1   down the chain which Kotva doesn't own fully. |
| 2  A   I don't know what would be the best legal way | 2   Q   Is it your understanding that Kotva doesn't |
| 3       to restore the value to the shareholders of | 3       own SPV CO? |
| 4       Kotva.  It's up to the lawyers in the Czech | 4   A   That's my understanding that Kotva doesn't |
| 5       Republic to determine what would be the best | 5       own even the majority of shares of SPV CO. |
| 6       procedure to do that. | 6   Q   Who owns the majority of the shares then? |
| 7  Q   Well, the K T lawsuit is seeking to have the | 7   A   Some other subsidiaries of Kotva or some |
| 8       department store turned back over to Kotva? | 8       other companies controlled by Kotva. |
| 9  A   That's correct. | 9   Q   And does Kotva control those subsidiaries? |
| 10 Q   Right?  That's what you testified to. | 10  A   It may.  I don't know.  It would be a legal |
| 11 A   Yes. | 11      judgment. |
| 12 Q   Is -- And that case is still pending, right? | 12  Q   Did you authorize the filing of the K T |
| 13 A   I believe so. | 13      lawsuit to force the purchase of BGO's Kotva |
| 14 Q   Is Ko -- K T seeking to get the department | 14      shares? |
| 15      store back from Markland? | 15      MR. GOLDBERGER:  Objection. |
| 16      MR. GOLDBERGER:  Objection. | 16  A   No. |
| 17 A   As I said, I don't know what would be the | 17  Q   Did you file the K T lawsuit to pressure |
| 18      best approach, whether to take the department | 18      Richard Harazim and Martin Benda to buy BGO's |
| 19      store back to Kotva or to make sure that the | 19      Kotva shares? |
| 20      proceeds are moved to Kotva.  It's up to the | 20  A   No. |
| 21      lawyers to decide what would be the best | 21  Q   As the President, CEO, Treasurer, Secretary |
| 22      procedure. | 22      of K T, describe for me the business of K T? |
| 23 Q   What do you mean the cash proceeds be | 23  A   Investments. |

G. NIKITIN

| Page 146 | Page 148 |
|---|---|
| 1  Q   What investments does it own? | 1  Q   Yes.  What's your understanding of what K T |
| 2  A   It owns investments in Kotva and Trend. | 2        stands for? |
| 3  Q   Does it own any other investments? | 3  A   I don't have any specific understanding.  I |
| 4  A   I don't believe so. | 4        could make a guess. |
| 5  Q   How many employees does K T have? | 5  Q   What's your general understanding of what K T |
| 6  A   It does not have employees. | 6        stands for? |
| 7  Q   Does it file tax returns? | 7  A   K T are the letters of the alphabet, K and T. |
| 8  A   Yes. | 8  Q   So you're testifying under oath that you have |
| 9  Q   Okay.  Does it generate any income? | 9        no understanding that K T refers to Kotva |
| 10 A   It has not generated any income so far. | 10       Trend? |
| 11 Q   And it was formed in June of 2004, correct? | 11        MR. GOLDBERGER:  Objection. |
| 12 A   Around that time.  I don't remember the exact | 12 A   I asked if you wanted me to guess.  I can |
| 13       month.  Probably. | 13       guess. |
| 14 Q   When K T was formed, Andrew Weiss was the | 14 Q   Yeah.  What's your guess? |
| 15       sole director, correct? | 15 A   If you want me to guess -- |
| 16 A   After K T was formed, Andrew Weiss was the | 16 Q   Sure. |
| 17       sole director. | 17 A   -- that Kotva and Trend could be -- K T could |
| 18 Q   And before you were appointed President, | 18       stand for Kotva and Trend because Kotva |
| 19       Treasurer and Secretary, Andrew Weiss was the | 19       starts with the Letter K, and Trend starts |
| 20       President, Treasurer and Secretary, correct? | 20       with Letter T. |
| 21 A   I don't think so. | 21 Q   What's the basis of your guess? |
| 22 Q   Who was? | 22 A   The knowledge of the spelling of names, Kotva |
| 23 A   I don't how -- I don't think anybody was an | 23       and Trend. |

| Page 147 | Page 149 |
|---|---|
| 1        officer of the company. | 1  Q   Did anyone ever tell you that K T stood for |
| 2  Q   Describe any liabilities of K T? | 2        Kotva Trend? |
| 3        MR. GOLDBERGER:  Objection. | 3  A   I think I may have had such discussions, and |
| 4  A   Just -- I don't think K T has any liabilities | 4        maybe people could have made similar guesses. |
| 5        at this moment. | 5  Q   Who -- Who did you have discussions with? |
| 6  Q   So the only assets it owns are Kotva shares | 6  A   Could be Andrew Weiss. |
| 7        and Trend shares, is that correct? | 7  Q   Did Andrew Weiss tell you that K T stood for |
| 8  A   I believe so. | 8        Kotva Trend? |
| 9  Q   Okay.  How many Kotva shares does it own? | 9  A   I don't believe he used this language. |
| 10 A   About 1,000. | 10 Q   What language did he use? |
| 11 Q   How many? | 11        MR. GOLDBERGER:  Objection. |
| 12 A   Approximately 1,000. | 12 A   I don't recall the exact language he used. |
| 13 Q   And how many Trend shares does it own? | 13 Q   What general language did he use that led you |
| 14 A   Approximately -- Approximately 1,000. | 14       to believe that K T stood for Kotva Trend |
| 15 Q   All right.  And K T stands for Kotva Trend, | 15       from Andrew Weiss? |
| 16       doesn't it? | 16        MR. GOLDBERGER:  Objection. |
| 17 A   I don't know. | 17 A   He did not -- Again, I'm just repeating what |
| 18 Q   You don't?  Are you sure? | 18       I -- what I said.  He did not -- I don't |
| 19        MR. GOLDBERGER:  Is he sure what? | 19       believe he told me that K T stands for Kotva |
| 20 Q   Let me rephrase the question. | 20       Trend, but we may have exchanged guesses.  I |
| 21 A   Okay. | 21       may have told him.  I may have guessed that |
| 22 Q   Does K T stand for Kotva Trend? | 22       K T could be an abbreviation of Kotva Trend |
| 23 A   Do you want me to guess? | 23       just like you suggested, and I don't remember |

G. NIKITIN

<table>
<tr><td colspan="2">

Page 322

1   it seemed that Forminster found a way to
2   circumvent that freezing order by tunneling
3   the Kotva Department Store down the chain of
4   subsidiaries in the company called Kotva a.s.
5   controlled by Forminster which could allow
6   them later to realize cash for the assets
7   and --
8  Q   Could allow them?
9  A   Could allow them.
10 Q   Did -- Did -- Is it your understanding that
11     Forminster tunneled the cash proceeds of the
12     department store?
13 A   I don't know if it has already happened or
14     not.
15 Q   What facts support your statement that the
16     public prosecutor is working with the
17     thieves?
18 A   The fact that -- I learned about many of --
19     some of the facts later.
20 Q   No. As of February --
21 A   As of that date, --
22 Q   When you wrote this, what are you basing that
23     statement on?

</td><td colspan="2">

Page 324

1   disenfranchising the minority shareholders of
2   KOTVA and all shareholders of Trend, they
3   plan to get 1.7 billion CZK from the sale of
4   KOTVA to the Irish investors, while the other
5   shareholders will get nothing.
6      Do you see that?
7  A   Yes.
8  Q   What is the basis for your statement?
9  A   My basis -- The basis for the statement is
10     the words of Mr. Harazim to Andrew Weiss and
11     Hoffmann documented by the statement of --
12     What's it called?  Statement of -- The
13     document that they -- Vladimir Hoffmann and
14     Andrew Weiss signed on May 12 where Harazim
15     said that minority shareholders of Kotva will
16     get nothing.
17 Q   So your statement is based on the report of
18     conduct, is that your testimony?
19 A   Among other things, yes.
20 Q   What else?
21 A   The -- There's a known history of how
22     Forminster received the stolen assets.  That
23     is documented in the criminal file regarding

</td></tr>
<tr><td colspan="2">

Page 323

1  A   When I wrote this, I was basing the statement
2      on the newspaper article that you read that
3      Andrew Weiss, Vladimir Hoffmann and Edita
4      Simkova are accused of extortion by the Czech
5      Police, and I also based it on the general
6      knowledge of the facts, personal general
7      knowledge of the facts and my opinion that
8      Andrew Weiss did not extort anything from
9      anyone.
10 Q   Now, as you previously testified,
11     shareholders are not entitled to the proceeds
12     of the sale of a corporate asset, correct?
13     MR. GOLDBERGER:  Objection.
14 A   This is probably not exactly what I said, but
15     my general belief is that under most
16     jurisdictions, the shareholders are, in
17     general, not entitled to receive cash from
18     the sale of assets.
19 Q   I direct your attention to the second page of
20     your letter, about ten lines from the bottom
21     of that first paragraph, and take your time
22     finding it.  You write:  We understand that
23     if the Forminster group is not prevented from

</td><td colspan="2">

Page 325

1   the Trend investigation.
2      Well, maybe, in addition, the order by
3   Czech courts freezing the -- freezing the
4   shares of Kotva that Forminster held.  Maybe
5   something else.
6  Q   Now, I direct your attention to the second
7      paragraph on Page 2 of your letter, say ten
8      or so lines down, where you write, "Weiss met
9      with Richard Harazim and Martin Benda who
10     said they represented Forminster and wished
11     to discuss terms under which the shares of
12     KOTVA owned by BGO and its shares of Trend
13     would also be sold."
14        Were the shares of Trend discussed at
15     that May meeting?
16 A   I don't know.  I believe Andrew -- I believe
17     Andrew told me that they discussed the sale
18     of shares of Trend, and he received a
19     response that Trend assets were stolen, and
20     there is nothing that can be done about this.
21 Q   Now, you further write, "Weiss said that the
22     shares owned by the minority shareholders of
23     KOTVA a.s. should get a payment equal to

</td></tr>
</table>

17c50f4a-9fdc-40d0-be4e-29c05a091f41

**J**

*Brookdale Global Opportunity Fund*

September 15, 2003

Mr. Vladimir Hoffmann
Medinská 825
190 14 Praha 9 – Klánovice
Czech Republic

EXHIBIT
Nikitan
2
11/16/06  J. E.

<u>Re: Success Fee Regarding the Sale of Ring Fenced Assets</u>

Dear Mr. Hoffmann:

This letter agreement refers to the Kotva and Trend shares held by Brookdale Global Opportunity Fund ("BGO"). BGO currently owns 52,782 Kotva shares and 1,161,794 Trend shares ("The Shares").

You agree to provide BGO with such services as may be reasonably requested by BGO to facilitate the sale of the Shares, including, but not limited to, identifying and communicating with prospective purchasers. You further agree that in providing such services he will not offer the Shares for sale to any person or entity living or headquartered in the United States.

BGO agrees to front the payment of expense incurred directly for the purpose of selling Kotva and/or Trend shares owned by BGO, or to enter into any other arrangements or contracts that will improve the expected return on those securities for BGO. Any single expenditure in excess of $1,000, or cumulative monthly expenses in excess of $5,000 must be approved in advance by either Andrew Weiss or Eitan Milgram. Expenditures related to your normal business activities such as rent, secretarial help, would not be included. In other words BGO will not be paying a share of Vladimir Hoffmann's normal overhead and operating costs. BGO would only be paying costs that would not otherwise have been incurred by V. Hoffmann or the associated entity. Itemized bills will be submitted as the expenses are incurred. In addition to expense reimbursements, BGO will pay Vladimir Hoffmann a monthly retainer of $2,000 per month.

In addition to the payments set forth in the preceding paragraph, BGO agrees to pay Vladimir Hoffmann a Success Fee in the amount of 30% of the proceeds paid to BGO for the sale or other disposition of the Kotva and/or Trend shares minus the cumulative expenses and retainer fee that had been paid by BGO in relationship to this contract. In other words if the Kotva shares were sold for $1,000,000 in December 30, 2003; and suppose that between now and Dec. 30, 2003, we had paid legal fees and other expenses of $35,000 and had paid Vladimir Hoffmann $4,000; then Hoffmann would receive $261,000 from the Kotva transaction. If one month later BGO received $2,000,000 for its' interest in Trend, and if during that month an additional $61,000 has been paid in expenses Hoffmann had been paid an additional $2,000, then Hoffmann's net success fee on the Trend transaction would be $537,000: i.e. 30% of the $2,000,000 equals $600,000 deducting all the new expenses whose cost BGO advanced, we come up with $539,000 and then subtracting the additional retainer paid we end up with a payment to Hoffmann of $537,000. Hoffmann's total payment under these circumstances would be $798,000. The Success Fee will be paid within 20 business days following the sale of shares

WP0004293

of Kotva or Trend and the receipt of the proceeds of such sales by BGO . The payment of the
Success Fee for the sale of Kotva shares is not conditional upon sale of Trend shares and vice
versa.

The price and terms for the sale of the BGO shares in Trend and Kotva are subject to the
approval of the board of directors of BGO in their sole discretion.

Vladimir Hoffmann will provide the Board of BGO with written updates on any
developments relating to the sale of the Shares. Those updates will be provided on an ongoing
basis, but if there has been no written communication in any month then an update will be mailed
at the end of that month. These written communications can be via email. Vladimir Hoffmann
will also be available for regular telephone conversations with members of the board of
Brookdale Global Opportunities Fund. It is anticipated that such telephone conversations will
occur at least once a week.

This contract expires January 31, 2004, unless it is renewed before that date by mutual
written agreement of the parties. Upon expiration of this contract, Hoffmann shall be entitled to
reimbursement of all unpaid expenses incurred prior to such expiration and any portion of the
monthly retainer accrued but unpaid prior to such expiration. Renewals will be for three month
periods and can be terminated by either party at the end of the applicable three month period.

We very much look forward to working with you and to achieving success for BGO, and
in doing so, for you.

Sincerely yours,

Andrew Weiss

Agreed to:

Vladimir Hoffmann

WP0004294

| Attention: | **Briana Dubrow** | Date: | 31.10.2003 |
|---|---|---|---|
| Company: | Brookdale Group; The | Number of Pages: | 3 |
| Fax Number: | 001 617 778 7781 | | |
| Voice Number: | 001 617 778 7710 | | |

| From: | **Vladimir Hoffmann** |
|---|---|
| Company: | |
| Fax Number: | +420 281 961 580 |
| Voice Number: | |

Subject:    Contract

**Comments:**

WP0004292

**K**



## Mandate Agreement

This Mandate is between Brookdale Global Opportunity Fund ("BGO") with its registered office at 29 Commonwealth Ave., Boston, MA 02116 and Vladimír Hoffmann, an individual person with the address Medinska 825, 190 14 Praha 9 – Klanovice, The Czech Republic, birth number 651030/6990, concerning the sale, disposition, negotiations regarding 82,782 Kotva shares, (the "Kotva Shares") and 1,141,794 Trend shares (the "Trend Shares") (collectively, the Trend Shares and the Kotva Shares are called "The Shares").

BGO hereby authorizes Vladimír Hoffmann to act as its agent, in its place and stead, to negotiate for the sale, transfer or other disposition of the Kotva Shares and The Trend Shares.

Signed in Boston,

This 31st of October, 2003

By _____
Andrew Weiss, Chairman of the Board

L

| | |
|---|---|
| **From:** | Vladimir Hoffmann [vlado1@volny.cz] |
| **Sent:** | Wednesday, August 04, 2004 11:00 AM |
| **To:** | Georgly Nikitin |
| **Cc:** | Andrew Weiss |
| **Subject:** | RE: Kotva / Trend situation |



Dear Georgyi,

I have requested a written offer from Benda and he told me that they woud prepare it in English by tomorrow (Thursday).

On the newspaper issue of course I do perform a search on internet for relevant news at least once a week and I follow the main Czech newspapers.
However I do not share your idea that its easy to do the monitoring on the net. In contrary, it is time consuming and unreliable. Not all articles that appear in the press are also published in the internet versions of respective newspapers. Also, some newspapers provide access to their articles database only for registered users - for a fee. I am refering to my e-mail conversation with Andy on the monitoring of press issue. We have obtained a quote from Newton for the daily monitoring of press and other media provided on the weekly basis for a price of CZK 8115 per month (about USD 300). I have also asked company Internet Securities Inc. to provide a quote. They have a service called e-mail allert and their price is USD 100 per month if they monitor just Czech media, 500 USD if they monitor a Region - Central and Eastern Europe and 850 USD for the whole world. I suggest that we order professional monitoring from one of these companies. This would ensure that we will obtain all relevant information - also fro Radio and TV, business gasette etc. - which as you certainly agree is not possible to follow for me 24 hours a day every day. Please discuss with Andy and let me know your decision.

Company CMQ Czech paid CZK 496m for the buildings. The initial minimum price was set at CZK 447m.

Best regards,

Vlado.

-----Original Message-----
From: Georgiy Nikitin [mailto:georgiy@weissasset.com]
Sent: Tuesday, August 03, 2004 8:54 PM
To: Vladimir Hoffmann
Cc: Andrew Weiss; Eitan Milgram
Subject: RE: Kotva / Trend situation


Dear Vlado,

How are you? Have you had a chance to request the written offer for our shares of Kotva? We would like to ask you to look through Czech and International newspapers on a daily basis to see if there is any information about Kotva, Trend, Forminster, or any other companies involved in the lawsuits or might be in any way relevant. You may be able to relatively easily do it on Internet at such sites as Google.cz, Alenka.cz, etc. On this issue, what do you know about the company that bought the buildings next to Kotva store? Do you know how much they paid for the buildings relative to the starting price of the auction?
Another important project may be to communicate with the journalists who write about the lawsuits involving Kotva and Trend to see if they have more information that they disclose. They might also have incorrect information, which would need to be corrected and updated. Do you think you would be able to do that?
Please, feel free to contact me if you have any questions.
Best regards,
Georgiy

Georgiy Nikitin, Ph.D.

1

W0001209

Weiss Asset Management
tel. + 1 (617) 778-7725
fax + 1 (617) 778-7781

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

This email is confidential and is intended solely for the addressee(s). If you are not an
addressee, you must not disclose, copy, circulate or in any other way use or rely on the
information contained in this email.  If received in error, please notify the sender
immediately and then delete this email.  Any disclosure, copying, distribution or use of
this communication is prohibited and may be unlawful.

Any views or opinions expressed do not necessarily represent those of Weiss Asset
Management or any affiliated companies.  Please note that the content of this e-mail may
be intercepted, monitored or recorded for compliance purposes.  Sensitive personal data
should not normally be transmitted by e-mail.

Weiss Asset Management or any affiliated companies shall not be liable to the recipient or
any third party for any loss or damage howsoever arising from this e-mail and/or its
content, including loss or damage caused by virus.  It is the responsibility of the
recipient to ensure that the opening or use of this message and any attachments shall not
adversely affect systems or data.

Weiss Asset Management
29 Commonwealth Avenue
Boston, MA 02116
TEL: (617) 778-7780
FAX: (617) 778-7781
www.weissasset.com

2

W0001210

M

Original Message-----
From: Vladimír Hoffmann [mailto:vlado1@volny.cz]
Sent: Wednesday, August 04, 2004 4:20 PM
To: Richard Harazim
Subject: RE: kotva

Vážený pane Harazime,

posílám Vám upravený text nabídky. Jsem připraven prodiskutovat s Vámi
definitivní verzi.

S pozdravem,

Vladimír Hoffmann


-----Original Message-----
From: Richard Harazim [mailto:richard.harazim@od-kotva.cz]
Sent: Wednesday, August 04, 2004 2:09 PM
To: vlado1@volny.cz
Subject: kotva

Vážený pane Hoffmanne

posílám shrnutí Vaší schůzky s Martinem. Až se k tomu vyjádříte, předěláme
to do angličtiny pošleme prof. Weissovi. Asi budu na něho potřebovat nějaké
kontakty.


S pozdravem

Richard Harazim

EXHIBIT
Nikitan
13
11/16/06  S.E.

Na základě našeho jednání posílám shrnutí jeho výsledků s přihlédnutím k současným možnostem Kotvy:

Vzhledem ke skutečnosti, že žaloby podané společnostmi ve vlivu BGO (Gilroy, Balfindor) do určité míry komplikují pozici společnosti Kotva při jednání se strategickými partnery, existuje zájem společnosti Kotvy na řešení navrhovaném panem A. Weissem (tlumočený ing. Hoffmannem), které spočívá v odkupu akcií za podmínky stažení uvedených žalob, a to za splnění následujících podmínek:

1. dojde k odkupu akcií Kotvy, které jsou v držení BGO, avšak musí dojít ke sblížení představ obou stran o kupní ceně, přičemž spol. Kotva není ochotna uhradit více než 75 mil. Kč,
2. úhrada kupní ceny musí být podmíněna stažením všech žalob podaných společnostmi Gilroy a Balfindor a dále i případných dalších žalob podaných právnickými osobami či fyzickými osobami spřízněnými s BGO,
3. BGO poskytne Kotvě dostatečnou záruku, že ze strany BGO či dalších s ní spřízněných subjektů (fyzických i právnických osob) v budoucnu nedojde k dalšímu účelovému napadání platnosti převodů obchodního domu Kotva, resp. podávání žalob či jakýchkoliv oznámení namířených proti Kotvě či osob ze skupiny Kotva,
4. vzhledem k současné finanční situaci Kotvy bude nutné rozložit její finanční plnění vůči BGO do více kroků (2 až 3 kroky).

Dovoluji si BGO požádat o rozpracování výše uvedených principů do konkrétního návrhu technické realizace tak, abychom se k němu mohli vyjádřit.

Martin Benda

Prof. Andrew Weiss
Fax: 001 617 778 7781

Prague 6.8.04

Dear Mr. Weiss

Based on my meeting with Mr. Hoffmann and based on your request we herewith submit our offer to buy the shares of Kotva held by Brookdale Opportunity Fund (BGO).

Conditions of the offer:

1. We offer to buy the approximately 12 % of the shares of Kotva held by BGO for a purchase price of 75 million CZK
2. The purchase price will be paid against withdrawal of all the lawsuits filed by Gilroy and Balfindor and potential further lawsuits filed by legal or physical entities associated with BGO.
3. BGO will provide a sufficient guarantee that both BGO and other legal or physical entities associated with BGO will not in the future initiate further deliberate attacks against the validity of the transfer of the department store Kotva as well as file any lawsuits or any actions aimed against Kotva or any entity from the Kotva group.

I take the liberty to ask a reaction from BGO to this offer.

With best regards

Martin Benda

K5560

Based on our discussions, I am sending a summary of the results that takes Kotva's current options into consideration:

Because the lawsuits filed by companies under BGO control (Gilroy, Balfindor) have complicated Kotva's position in talks with strategic partners to a certain degree, Kotva is interested in pursuing the solution proposed by Mr. A. Weiss (presented by Ing. Hoffmann) consisting of the purchase of Kotva shares provided that these lawsuits are withdrawn and the following conditions are met:

1. the purchase of Kotva shares held by BGO will be carried out provided that both sides can reach an agreement on the purchase price; Kotva is not willing to pay more than CZK 75 million,
2. the payment of the purchase price will depend on the withdrawal of all lawsuits filed by Gilroy and Balfindor and any other lawsuits filed by legal or physical entities affiliated with BGO,
3. BGO will provide Kotva with a sufficient guarantee that there will be no further challenges to the validity of the transfer of the Kotva Department Store by BGO or subjects (physical or legal entity) affiliated with it, nor any lawsuits or notices filed against Kotva or subjects of the Kotva Group,
4. because of Kotva's current financial situation, the payment of the purchase price to BGO will have to be spread over several steps (2 to 3 steps).

I would like to ask BGO to factor the above points into a concrete proposal for carrying out this solution, so that we have the opportunity to comment on specific aspects.

Martin Benda

K 5561

**N**

From:           Georgiy Nikitin
Sent:           Friday, August 06, 2004 10:57 AM
To:             'Vladimir Hoffmann'
Cc:             Andrew Weiss
Subject:        RE: Kotva / Trend situation

EXHIBIT
Nikitin
14
11/16/06   J.E.

Dear Vlado,

Thank you for your message.
It is really great that you could get a trial account to monitor media. Please, let us
know in the beginning on the next week what you think of it: whether you find the e-mail
alerts useful.
You are right: the trades in Trend shares should be in the CVF books, but, unfortunately,
since CVF was taken over by Brookdale, we do not have older accounts. The earliest annual
report we have is for 1997. I was able to get some information from the Bank of Bermuda,
but they had information only about some trades:

Date  Number of Shares
October 30, 1995  923
November 27, 1995 3,018
January 30, 1996  907
February 13, 1996 11,141
February 16, 1996 8,423
February 21, 1996 5,993

Apparently, there were more trades, since CVF had over 1 million shares of Trend by the
end of 1997. Do you happen to have any thoughts on how we can find out the dates and
volume of other trades?
Best regards,
Georgiy

Georgiy Nikitin, Ph.D.

Weiss Asset Management
tel. + 1 (617) 778-7725
fax + 1 (617) 778-7781


-----Original Message-----
From: Vladimir Hoffmann [mailto:vladol@volny.cz]
Sent: Friday, August 06, 2004 5:31 AM
To: Georgiy Nikitin
Cc: Andrew Weiss
Subject: RE: Kotva / Trend situation


Dear Georgyi,

1. Benda told me yesterday that he was out of the country and that he would send some
written offer today. He asked me for fax number of WAM which I have provided. 2. I
received a password from Internet Securities yesterday and I should receive e-mails
containing the key words which I will be able to open using the password. This is for
limited trial period of one week. I have not received any e-mail yet. After the trial
period we will see the frequency and relevance of the e-mail alerts and we should also be
able to fine-tune the key words. Of course I will be able to read the messages and will
inform you if there is anything interesting. 3. In a separate e-mail I was asked by Andy
to find out when exactly CVF bought its Trend shares. I am afraid that I am unable to get
this info and this information should be in CVF = BGO accounting - years 1995, 1996. 4.
Andy also asked me to contact Trend shareholder who might join us in the lawsuit. I will
discuss it with Streitberg who allegedly owns 2 % of Trend.

1

WP0002337

Best regards,

Vlado.

-----Original Message-----
From: Georgiy Nikitin [mailto:georgiy@weissasset.com]
Sent: Thursday, August 05, 2004 8:30 PM
To: Vladimir Hoffmann
Subject: RE: Kotva / Trend situation


Dear Vlado,

Have you heard from Benda regarding his written offer?
On the issue of media monitoring, the e-mail alerts by Internet Securities seem
interesting. Do you know what kind of electronic filters they have for the Czech Republic?
Would the price of $100 per month allow to search a sufficient amount of key words? It
does not make any sense for us to receive the summary e-mail messages since we do not
understand Czech. Would you be able to read the reports from Internet Securities daily and
then inform us if there is something interesting? Best regards, Georgiy

Georgiy Nikitin, Ph.D.

Weiss Asset Management
tel. + 1 (617) 778-7725
fax + 1 (617) 778-7781


-----Original Message-----
From: Vladimir Hoffmann [mailto:vlado1@volny.cz]
Sent: Wednesday, August 04, 2004 11:00 AM
To: Georgiy Nikitin
Cc: Andrew Weiss
Subject: RE: Kotva / Trend situation


Dear Georgyi,

I have requested a written offer from Benda and he told me that they woud prepare it in
English by tomorrow (Thursday).

On the newspaper issue of course I do perform a search on internet for relevant news at
least once a week and I follow the main Czech newspapers. However I do not share your idea
that its easy to do the monitoring on the net. In contrary, it is time consuming and
unreliable. Not all articles that appear in the press are also published in the internet
versions of respective newspapers. Also, some newspapers provide access to their articles
database only for registered users - for a fee. I am refering to my e-mail conversation
with Andy on the monitoring of press issue. We have obtained a quote from Newton for the
daily monitoring of press and other media provided on the weekly basis for a price of CZK
8115 per month (about USD 300). I have also asked company Internet Securities Inc. to
provide a quote. They have a service called e-mail allert and their price is USD 100 per
month if they monitor just Czech media, 500 USD if they monitor a Region - Central and
Eastern Europe and 850 USD for the whole world. I suggest that we order professional
monitoring from one of these companies. This would ensure that we will obtain all relevant
information - also fro Radio and TV, business gasette etc. - which as you certainly agree
is not possible to follow for me 24 hours a day every day. Please discuss with Andy and
let me know your decision.

Company CMQ Czech paid CZK 496m for the buildings. The initial minimum price was set at
CZK 447m.

Best regards,

Vlado.

2

WP0002338

O



**PETERKA & PARTNERS** v.o.s.



E-mail of October 18, 2004

From: Ondrej Peterka                    peterka@cesbinzt.cz

To:    Andrew Weiss                     A.Weiss@WeissAsset.com

Cc:    Georgiy Nikitin                  georgiy@rolzecarat.com

        Elton Milgrom                   elton@wylecorpet.com

        Ing. Vladimir Hoffmann          vlado1@svolny.cz

Re:    KOTVA / TREND

Dear Andrew,

Today I had together with Mr. Hoffmann a meeting with Messrs Benda and Horazim of KOTVA and Mr. Prestage representing the prospective Irish buyers of KOTVA Department Store. I would like to inform you in brief about the basic points we discussed.

At the beginning the representatives of KOTVA confirmed that they are willing to purchase the whole of BGO's stake in KOTVA for CZK 131 million. We responded that the offer of BGO for the sale of these shares contained in your letter of August 23, 2004 expired on August 31, 2004. We told them that we will get in touch with you in order to receive your instructions.

The representatives of KOTVA further stated that their condition for purchasing the shares is the withdrawal of certain initiated lawsuits. They did not specify in detail what lawsuits they want to be withdrawn. We may assume that the representatives of KOTVA were today still unaware of the new lawsuits initiated by Gilroy last Friday that concerned the shares in KOTVA held by Forminsterbankruptcy trustee of SPRINT.

Messrs Benda and Horazim then stated that the buyer of the shares is to be KOTVA, a.s. and Mr. Prestage declared that the Irish investors are prepared to finance this acquisition. As we have already stated in our e-mail of August 31, 2004 we consider it as being risky to sell shares to KOTVA, a.s. or to any of its subsidiaries.

The representatives of KOTVA further stated that a bank providing operational financing to KOTVA (a loan in the amount approx. CZK 200 million due at the end of this year) is

WP0013980

PETERKA & PARTNERS v.o.s.

...ncerned about the pending lawsuit on the declaration of ownership to the KOTVA Department Store and is reluctant to extend this loan. In our opinion they seemed to derive ...bility of Gilroy for damages suffered by KOTVA as a consequence of the lawsuit.

We suggest setting up a conference call tomorrow and discussing these issues in detail.

Best regards,

Ondrej

WP0013981

P



PETERKA & PARTNERS



Linklaters, v.o.s.
Mr. Bryan David Paul Wilson

Na Příkopě 19
110 00  P r a h a  1

Prague, December 23rd, 2004

Dear Mr. Wilson,

Announcement of lawsuit initiation

On behalf of the company K T. Inc., a company established under the laws of Delaware, with its registered office at 2711 Centerville Road, Suite 400, City of Wilmington, County of New Castle, Delaware, USA, I am writing to inform you about the following facts.

We have been informed that your law firm represents a group of Irish investors that intend to buy the KOTVA Department Store in Prague, Czech Republic.

Today the company K T. Inc. (as a shareholder of the company KOTVA, a.s.) has submitted a petition for declaration of ownership to real estate. In this petition the plaintiff requests the court to declare that the company KOTVA, a.s. is the real and true owner of the real estate – KOTVA Department Store, including the land on which the department store is located.

The reasons why K T. Inc. is of the opinion that KOTVA, a.s. is still the owner of the real estate are described in detail in the enclosed copy of the petition.

With respect to the gravity of the whole matter and the value of the real estate that is the subject matter of the petition. I consider it appropriate to inform you immediately about the submission of the petition.

I would appreciate if you could send me your comments on this issue.

Yours sincerely

K T. Inc.
Ondrej Peterka
acting under a power of attorney

Enclosure:    - copy of the petition

Linklaters, v.o.s.
Palác Myslbek
Na Příkopě 19
117 19 Praha 1

28 12 2004

PETERKA & PARTNERS v.o.s.

Na Příkopě 15/583
11 000 00  Praha 1
tel +420 246 085 300
fax +420 246 085 301
www.raluno.cz
obhajce.nepokoreneni.cz
info@raluno.cz
i n f o . c z

PRAHA - BRATISLAVA

**Q**

VOLUME 1, PAGES 1 - 174

EXHIBITS:  1 - 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

No. 05-10679-RCL

- - - - - - - - - - - - - - - - - - - - - - - - - -

KOTVA a.s.,

              Plaintiffs

        vs.

ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,

              Defendants

(Full Caption on Page 2)

---------------------------------------

VIDEOTAPED DEPOSITION OF MARTIN BENDA

Monday, January 22, 2007, 9:14 a.m.

McDermott, Will & Emery

28 State Street, 34th Floor

Boston, Massachusetts 02109

Reporter:  Dana Welch, CSR, RPR

      Certified LiveNote Trainer

Martin Benda                                                01/22/2007

## Page 86

the next exhibit, please.

(Exhibit No. 1, May 15, 2004 statement, marked for identification.)

MR. LEIBENSPERGER: For the record, Exhibit 1 is a document in Czech.

Q. Take your time, Mr. Benda, to peruse the document, and then I'm going to ask you what it is.

A. Do you want me to read the document or just scan through it?

Q. All right. You can read it if you feel you need to. My first question is, can you describe what this document is?

A. This is a document of my testimony for the Czech police that I made on September 15, 2004.

Q. And does this document describe what you say occurred at the meeting on May 12, 2004?

MR. BECKMAN: Can you ask him to read the document for me, please?

A. The second page is poorly legible on the top.

Yes. I have read the document except for the page that I have mentioned which is illegible on the top.

Q. All right. This document is a statement

## Page 87

by you to the police of what happened at the meeting on May 12, 2004; is that correct?

MR. BECKMAN: Objection. You may answer.

A. Yes. And not only that, there are some additional circumstances.

Q. Right.

When you made this statement, did you understand it was important to be truthful?

A. Of course.

Q. Is that your signature on the bottom of — of several of the pages?

A. I cannot tell for sure from a copy, but most likely, yes.

Q. Let's start at page 5, the last page. Is that your signature under the words "Martin Benda"?

A. I think it is. It looks like it.

Q. When you gave this statement to the police, were you under oath?

MR. BECKMAN: Objection. You may answer.

A. I am not sure if we call it that way, but the first few paragraphs on the document is instruction for witness, which basically represents the same.

Q. All right. Did you tell the police on

## Page 88

September 15, 2004 in your statement that Mr. Weiss mentioned that he had hired a legal representative, Dr. Peterka?

A. Yes.

Q. And did you tell the police on September 15, 2004 that in the meeting on May 12, 2004, Mr. Weiss told you that Dr. Peterka had devised a plan which you should listen to so that you would not make any rash decisions?

A. Not exactly like that. What I said was that Mr. Weiss presented to me that he and Mr. Peterka had a plan.

Q. And that you should listen to it before you made any decisions?

A. Yes.

Q. And it was Mr. Weiss' reference to Dr. Peterka and his plan that you took as a threat at the meeting?

A. No. I did not understand that as a threat. What I did understand as a threat was his statement that he would file criminal charges against us and present the case in the media. And another threat was that he said that he would block the real estate so that no one can purchase it and we would

## Page 89

not be able to refinance.

Q. And your testimony is that he referenced Dr. Peterka as the lawyer who would assist him in doing these things, correct?

MR. BECKMAN: Objection. You may answer.

A. Yes. What he presented was that Mr. Peterka is the lawyer who will work on the case.

Q. In this statement, after you described the May 12, 2004 meeting, did you propose to the criminal law authorities to place devices to tap phone calls?

A. Yes. I suggested to the police to monitor these negotiations and thus obtain proof for criminal prosecution.

Q. And when you suggested to the police to monitor the negotiations, you meant to surreptitiously monitor conversations?

THE INTERPRETER: Sir, may I ask for a different word instead of surreptitiously? I may try to find it if you --

Q. So when -- when you asked the police to monitor conversations, did you ask them to monitor them secretly?

Martin Benda                                                    01/22/2007

Page 142

```
04:43:02 1    The time is 4:43.
04:43:04 2       (Proceedings interrupted at 4:43 p.m. and
04:43:60 3    reconvened at 4:55 p.m.)
04:53:51 4       THE VIDEOGRAPHER: Back on the record.
04:54:46 5    The time is 4:55.
04:54:45 6    BY MR. LEIBENSPERGER:
04:54:44 7       Q. Mr. Benda, after the May 12, 2004 meeting
04:54:48 8    with Mr. Weiss and Mr. Hoffmann, did you do
04:54:58 9    anything to record what happened at the meeting?
04:55:1810      MR. BECKMAN: Objection. You may answer.
04:55:2611      A. I am not exactly sure about the question
04:55:3215    because the question was after the meeting. So
04:55:3615    whether he did something for recording at that
04:55:4314    meeting.
04:55:4215      Q. Let's break it down.
04:55:4716      At the meeting itself, were you recording
04:55:4917    the meeting by audiotape?
04:55:5818      A. On the 12th?
04:55:5819      Q. Yes, on May 12th, 2004.
04:56:0320      A. That is the meeting in Obecni Dum?
04:56:1121      Q. Yes.
04:56:1122      A. No, I did not.
04:56:1323      Q. After the meeting, did you write down what
04:56:1824    happened at the meeting?
```

Page 143

```
04:56:27 1    A. No.
04:56:28 2    Q. Did you talk to someone else to ask them
04:56:31 3    to write down what happened at the meeting?
04:56:38 4    A. I do not recall.
04:56:40 5    Q. Have you ever seen any memoranda prepared
04:56:49 6    by anyone regarding what happened at the meeting on
04:56:56 7    May 12, 2004?
04:57:07 8    MR. BECKMAN: Objection. You may answer.
04:57:08 9    A. No, I have not.
04:57:1210    Q. Did you talk with anybody after you left
04:57:2013    the meeting on May 12, 2004 about what happened at
04:57:2412    the meeting?
04:57:2313    A. Definitely.
04:57:3614    Q. Who did you talk to?
04:57:4015    A. With my colleagues. With my colleagues in
04:57:4816    the supervisory board, on the -- the board of
04:57:5117    directors and with lawyers because a situation like
04:57:5818    that does not happen every day. In fact, I must
04:58:0119    say, this was first time it has ever happened to
04:58:0420    me. Because I was expecting to see a pleasant
04:58:1521    person and a professor, but I met a person who was
04:58:3522    behaving in a heinous manner.
04:58:3723    Q. When you prepared the videotapes -- strike
04:58:4024    that.
```

Page 144

```
04:58:41 1    When you conducted the videotapes of the
04:58:46 2    meetings with Mr. Hoffmann before you went to the
04:59:13 3    police, did you do that to gather evidence for a
04:59:16 4    lawsuit against Mr. Hoffmann and Mr. Weiss?
04:59:14 5    A. Yes.
04:59:15 6    Q. Were you contemplating at that time,
04:59:30 7    before September 2004, that you would file a civil
04:59:37 8    lawsuit against Mr. Weiss in the United States?
04:59:56 9    MR. BECKMAN: I'll let the witness answer,
05:00:0010    but I don't want it to be construed as any
05:00:0311    waiver of any privilege.
05:00:0612    A. I do not recall.
05:00:1013    Q. Were you a member of the board of
05:00:1314    directors of SPV CO?
05:00:3115    A. I don't think so.
05:00:3716    Q. Did you have any responsibility for what
05:00:4217    SPV CO was doing?
05:00:4518    A. When?
05:00:5319    A. At any time.
05:00:5620    A. Yes.
05:01:0721    Q. What was your responsibility?
05:01:1022    A. Responsibility to whom?
05:01:1123    Q. To SPV CO.
05:01:1524    A. Could you please elaborate what you mean
```

Page 145

```
05:01:30 1    by responsibility?
05:01:31 2    Q. What was your job for SPV CO?
05:01:41 3    A. I do not recall exactly. I think I had
05:02:01 4    the signature authorization for the bank, and I
05:02:10 5    think I was also on the board for SPV, but I am not
05:02:17 6    any more.
05:02:19 7    Q. Why are you no longer on the board of SPV
05:02:31 8    CO?
05:02:31 9    A. Because I do other jobs.
05:02:3610    Q. Did SPV CO invest the money it received
05:02:5111    from Markland?
05:02:5112    A. When?
05:02:5313    Q. After it received the money from Markland
05:02:5614    at the closing of the deal.
05:03:1515    A. Part of the money originating from this
05:03:1916    transaction was blocked in the account of the
05:03:2217    depository bank due to these law suits that we are
05:03:2518    talking about, it means Gilroy and KT. Based on
05:03:3419    the decision of the general meeting, another part
05:03:4220    of the funds was invested into very prudent
05:03:5121    securities with -- at least with the rating of at
05:04:1022    least AAA.
05:04:1323    And we were waiting for the general
05:04:1824    meeting at which was supposed to decide whether the
```

37 (Pages 142 to 145)

Martin Benda                                                         01/22/2007

---

Page 146

05:04:27 1 company will be liquidated and then its estate
05:04:31 2 would be divided up between the shareholders or
05:04:38 3 whether the company will adopt a new business
05:04:43 4 strategy and continue its activities. This general
05:04:53 5 meeting decided that they did not want liquidation.
05:05:03 6 And one of the things that I do not understand is
05:05:06 7 that Professor Weiss also voted against
05:05:09 8 liquidation, despite the fact that this would be
05:05:17 9 the simplest way how to cash in his share.
05:05:39 10 And then the -- the business activities
05:05:42 11 started from the merger with CIS. This merger was
05:05:51 12 approved by the following subsequent general
05:05:14 13 meeting. And today, after the merger, the legal
05:05:09 14 successor of the company is CIS.
05:06:13 15 Q. What was the date of the merger with CIS?
05:06:14 16 A. It was in the middle of last year
05:06:25 17 sometime, around July. I do not remember the exact
05:06:36 18 date.
05:06:39 19 Q. After the merger with CIS, are the assets
05:06:44 20 of SPV CO invested in projects of CIS?
05:06:51 21 MR. BECKMAN: Objection. You may answer.
05:07:04 22 A. Yes.
05:07:05 23 Q. What are the projects?
05:07:13 24 MR. BECKMAN: Just so the record is clear,

Page 147

05:07:18 1 we have filed a motion for protective order,
05:07:19 2 as you know, just to protect the identity of
05:07:22 3 certain ongoing business relationships. You
05:07:25 4 can ask all the questions you want, I think
05:07:29 5 it's two or three names that we're seeking
05:07:30 6 protection. If the court in the discovery
05:07:35 7 master rule against us, we'll provide by
05:07:39 8 affidavit or otherwise the exact names. But
05:07:41 9 you can exhaustively ask all questions on
05:07:45 10 that, but we just want to make sure that those
05:07:48 11 names are protected.
05:07:54 12 THE INTERPRETER: Do you want me to
05:07:52 13 interpret this?
05:07:53 14 MR. LEIBENSPERGER: No. Unless you want
05:07:56 15 him to hear it.
05:07:58 16 MR. BECKMAN: Well, I -- I just don't want
05:08:00 17 him to disclose the names. That's all.
05:08:02 18 MR. LEIBENSPERGER: By my not responding,
05:08:09 19 I don't want that to be construed as in any
05:08:10 20 way agreeing with you that these names are
05:08:12 21 something that legitimately should be
05:08:13 22 protected, but we'll just deal with it a
05:08:15 23 question at a time.
05:08:19 24 MR. BECKMAN: Okay. That's fine.

Page 148

05:08:18 1 THE INTERPRETER: He would like me to
05:09:19 2 interpret what was discussed.
05:09:34 3 MR. LEIBENSPERGER: Okay.
05:08:37 4 THE INTERPRETER: Then I will have to ask
05:08:39 5 you to go once again.
05:08:31 6 MR. BECKMAN: Okay. With respect to three
05:08:33 7 ongoing investments, we have filed a motion
05:08:40 8 with the court not to disclose identities of
05:08:43 9 those people. But, Mr. Benda, you should
05:09:01 10 answer all questions that Mr. Leibensperger
05:09:07 11 asks you except for the identity of those
05:09:09 12 three limited investments that are still
05:09:13 13 ongoing.
05:09:14 14 MR. LEIBENSPERGER: And the record should
05:09:15 15 reflect that I object to Mr. Beckman's
05:09:30 16 instruction to the witness, and that would be
05:09:34 17 a ground, among others, why Mr. Benda would
05:09:38 18 have to come back for deposition.
05:09:55 19 MR. BECKMAN: We're not agreeing to that,
05:10:01 20 But let's move on.
05:10:05 21 Q. What is the nature of the projects that
05:10:22 22 the SPV CO assets are now being invested in?
05:10:38 23 A. Real estate, investment in securities,
05:10:38 24 And that's it. And I'm only mentioning the big

Page 149

05:10:56 1 projects because as a member of the supervisory
05:10:58 2 board. I don't have available all details about all
05:11:05 3 projects.
05:11:05 4 Q. Is SPV CO involved in these projects under
05:11:10 5 the name SPV CO or is it under a different name?
05:11:22 6 A. Under the name SPV.
05:11:27 7 Q. Okay. Is SPV CO involved in a real estate
05:11:32 8 project to build a building in Prague for use by
05:11:39 9 the municipal offices in Prague?
05:11:55 10 A. I don't know about that.
05:11:57 11 Q. Do you know about a project in Prague, a
05:12:04 12 real estate project in Prague that SPV CO is
05:12:09 13 involved with?
05:12:13 14 A. Yes.
05:12:14 15 Q. Describe the nature of that project.
05:12:22 16 A. It is a real estate project where land is
05:12:33 17 purchased and zoning plans are created for that
05:12:45 18 land and the utility networks are being built. And
05:13:01 19 then the land is offered to big developers and
05:13:03 20 companies.
05:13:07 21 Q. Is this a project where the municipal
05:13:14 22 offices of the City of Prague would have offices
05:13:16 23 eventually?
05:13:17 24 A. No.

Merrill Legal Solutions
(617) 542-0039

R

IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856
AND IN THE MATTER OF CIVIL PROCEEDINGS NOW PENDING
BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF MASSACHUSETTS (CIVIL ACTION NO. 05-10679-RCL)

```
--------------------------------
                               )
                               )
                               )
KOTVA a.s.                     )
                               )
             Plaintiff         )
                               )
                               )
             v.                )
                               )
                               )
ANDREW WEISS and WEISS ASSET   )
MANAGEMENT, LLC                )
                               )
                               )
             Defendants        )
--------------------------------)
```

Deposition of:

Mr. Howard Golden

Taken at:
Courtroom No 126
District Court for Prague 1,
Ovocny trh 14

On:  April 17th, 2007
Commencing at 9.00 am

*Gwen Malone Stenography Services Ltd.*

```
 1   gave me four tapes and said:  Whose voice is this?
 2   I couldn't say this is Georgiy.  Really my relationship
 3   with him is mostly by e-mail and I only spoke to him on
 4   maybe a couple of times.
 5              MR BECKMAN:
 6      Q.  Did you understand in the fall of 2004 time frame
 7   that Mr Hoffmann was having a difficult time getting
 8   a decision from Mr Weiss as to what to do?
 9              MR DANGEL:  Objection.
10      A.  I do recall some discussions where he said, he
11   couldn't get a decision.
12              MR BECKMAN:
13      Q.  What do you recall about those discussions,
14   Mr Golden?
15              MR DANGEL:  Object.
16      A.  Basically, that he was frustrated that he
17   couldn't get an answer from Andy about going forward and
18   accepting an offer.
19              MR BECKMAN:
20      Q.  Accepting an offer for what?
21              MR DANGEL:  Objection.
22      A.  I recall he was buying the shares of Kotva.
23              MR BECKMAN:
24      Q.  Did you understand that the Irish were interested
25   in purchasing the adjoining buildings to Kotva?
26              MR DANGEL:  Objection.
27      A.  No, I wasn't familiar with that situation.
28              MR BECKMAN:
29      Q.  I want to play --
```

3

*Gwen Malone Stenography Services Ltd.*

1    A.   This is probably one of the first times, I don't

2    recall that being a discussion either with me or Vlado

3    or in the papers.  I just don't recall such a thing.

4    Q.   Okay.  Let me play another clip of this November

5    2nd, 2004 telephone call between Mr Nikitin and

6    Mr Hoffmann.

7            MR DANGEL:   I object to it on several

8    grounds including incompleteness.  It seems you should

9    play the whole tape first, but that is neither here nor

10   there.  Object.

11   Q.   *"... is to provide you with information to*

12   *discuss with the other party and I simply -- that's,*

13   *that is what I believe.  I mean if price is the NAV or*

14   *very close to NAV, maybe the NAV is 120, maybe the NAV*

15   *is 140, it is not that much different, but it is*

16   *terribly difficult.  I think we cannot go and say we*

17   *want, you know, full NAV plus we want even more for*

18   *that, you know, that is blackmail.*

19   *Mr Nikitin:   Yes"*.

20           Mr Golden, do you recognise the voice on

21   this clip as Mr Hoffmann?

22           MR DANGEL:   Objection.

23   A.   Well I must say it is a little bit scratchy, as

24   you know, but from what I heard it appeared to be the

25   voice of Mr Hoffmann.

26           MR BECKMAN:

27   Q.   Mr Hoffmann uses the term blackmail.  What is

28   your understanding of the term blackmail?

29           MR DANGEL:   Objection.

4

1    A.   It is an interesting question.  You use the word,
2  you hear it, you never think of how to define the word.
3  It is how to get a definition of the word blackmail.
4  Trying to extract money or other benefits from someone
5  by threat of usually it was information when you say:
6  I will tell you wife or something, information or some
7  other action which you didn't have a legal right to do
8  it.
9    Q.   Did you have any understanding that Andrew Weiss
10  was seeking more than NAV, net asset value of the
11  department store for the Kotva shares?
12    A.   No, sir, no.
13    Q.   All right.
14    A.   It is the first time I have heard this.
15    Q.   Is it your understanding that Vladimir Hoffmann
16  was concerned that Andrew Weiss was threatening
17  blackmail?
18         MR DANGEL:   Objection.
19    A.   No.   I must say that in my discussions with
20  Vladimir I think his concern was that he felt that the,
21  either the Irish or the Forminster people claimed it was
22  blackmail, not that he was concerned it was blackmail.
23  It was the appearance or the argument on the other side
24  that he said it was.
25    Q.   Who is "they"?
26    A.   The Forminster and the Irish, it was just they
27  were presenting it as that and he didn't like their
28  presentation.  I don't think, he didn't present to me,
29  let's say.  This is the first time I have heard him

5

S

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s., <br><br> Plaintiff, <br><br> v. <br><br> ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC, <br><br> Defendants. <br><hr> ANDREW WEISS, WEISS ASSET MANAGEMENT LLC, KT, INC. and CVF INVESTMENTS, LTD., <br><br> Counterclaim-plaintiffs, <br><br> v. <br><br> KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM, FORMINSTER ENTERPRISES, LTD., SPV CO AND JOHN DOES 1-5, <br><br> Counterclaim-defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> CA No. 05-10679-RCL |

**OBJECTIONS AND RESPONSES OF PLAINTIFF TO DEFENDANTS ANDREW
WEISS, WEISS ASSET MANAGEMENT, LLC, KT, INC., AND
CVF INVESTMENTS, LTD.'S SECOND SET OF
INTERROGATORIES TO THE PLAINTIFF**

Pursuant to Fed. R. Civ. P. 33 and Local Rule 33.1, plaintiff, Kotva, a.s.

("Kotva") hereby responds to the Second Set of Interrogatories of defendants, Andrew

Weiss, Weiss Asset Management, LLC, KT, Inc., and CVF Investments, Ltd.

(collectively the "Counterclaim plaintiffs').

1

## GENERAL OBJECTIONS

I.      Kotva objects to each interrogatory to the extent it seeks information that is beyond the scope of Rules 26 or 33 of the Federal Rules of Civil Procedure, is beyond the proper scope of discovery because of the attorney client relationship, prepared in anticipation of litigation or trial or constitutes attorney work product, or is otherwise immune from discovery.

II.     In providing answers to these interrogatories, Kotva does not in any way waive or intend to waive but rather intends to preserve the following:

        a.      All objections as to competency, relevancy, materiality and admissibility;

        b.      All rights to object on any ground to the use of any of the Answers herein, including the trial of this or any other action;

        c.      All objections as to vagueness or ambiguity; and

        d.      All rights to object on any ground to any further interrogatories or other discovery requests involving or related to any of the interrogatories in the Counterclaim plaintiffs' Second Set of Interrogatories.

III.    Privileged information responsive to any interrogatory below is not being provided. Kotva does not waive, and intends to preserve and is preserving the attorney client privilege, the work product doctrine, and every other privilege with respect to each and every answer, document or other repository of information protected by such a privilege.

IV.     Kotva objects to the Instructions and/or Definitions contained in the Interrogatories to the extent that they attempt to impose obligations on Kotva that are

2

inconsistent with and/or in addition to those required under the Federal Rules of Civil

Procedure and the Local Rules.

      V.    Kotva objects to the Interrogatories to the extent each interrogatory

contains several subparts and therefore exceeds the number of interrogatories permitted

under Fed. R. Civ. P. 33(a).

      VI.    Kotva objects to the Interrogatories to the extent that they demand

production of any information containing any confidential, proprietary and/or trade secret

information.

      VII.    Kotva's answers to the Interrogatories are qualified by the General

Objections. Failure to restate any General Objection in response to a particular

interrogatory does not constitute a waiver of such General Objection. By responding to

these Interrogatories, Kotva does not waive any asserted objection.

INTERROGATORY NO. 1:

Please identify all persons which have a direct or indirect ownership interest in Kotva a.s.
and all persons in which Kotva a.s. has a direct or indirect ownership interest, and for
each such person which is not a natural person, state the date of that entity's formation
and describe the reasons the entity was created.

    Response:

    Kotva objects to this interrogatory to the extent it is overly broad, unreasonable,

unduly burdensome, seeks irrelevant information, and is not reasonably calculated to lead

to the discovery of admissible evidence. Notwithstanding these objections and subject to

the foregoing General Objections, Kotva responds as follows: Kotva's shares are

publicly traded on the Czech securities market, and there are currently approximately

7,700 shareholders. Given that Kotva's shares are publicly traded, Kotva's ownership

changes regularly.  Shareholders currently owning more than 10% of Kotva's outstanding

shares are:

| | | |
|---|---|---|
| Forminster Enterprises Limited | 385,038 shares | 55.74% |
| Ardmore Risk Management Limited | 97,753 shares | 14.08% |
| HSBC Bank plc | 81,082 shares | 11.92% |

Kotva cannot identify those persons who have an "indirect ownership interest" in Kotva's

shares.

Kotva owns 100% of Kotva Nemovitosti ("KN"), and Kotva Obchodni.  These

entities were created for the following reasons:  In 2000, Kotva found itself on the brink

of bankruptcy.  Kotva sought to restructure its business operations to alleviate this threat

and to optimize its structure for a potential strategic financial sale.  Ernst & Young

opined that Kotva could unlock the value of its assets by separating the property

ownership and the department store operations.  Ernst & Young, therefore, suggested the

transfer of the Shopping Centre real estate from Kotva to a wholly owned subsidiary.  To

this end, in late 2000, Kotva established two separate wholly owned subsidiaries:  Kotva

Nemovitosti ("KN") and Kotva Obchondi.  The shopping centre was transferred from

Kotva to KN in November 2000.

SPV KN as and SPV CO. Ltd. were created to effectuate the sale of the shopping

center to Markland Holdings, Ltd.  KN transferred the shopping center to SPV KN,

which was 100% owned by KN.  Pursuant to the Share Purchase Agreement with

Markland, Markland purchased the shares of SPV KN and paid the purchase price to SPV

CO.  SPV CO., is and always has been 100% owned by KN, which is 100% owned by

Kotva.  In further answering, pursuant to Fed. R. Civ. P. 33(c) the answer to this

interrogatory may be derived or ascertained by the Share Purchase Agreement and Ernst & Young report, which will be provided upon the entry of a Confidentiality Order.

INTERROGATORY NO. 2:

Please identify all persons, including Kotva, its employees, officers, directors, agents, owners, attorneys and affiliates and the Irish Investors, their employees, officers, directors, agents, owners, attorneys and affiliates, who have knowledge regarding the purported sale of the Department Store to the Irish Investors, including the negotiations leading up to that sale and the disposition of the proceeds of that sale.

Response:

Kotva objects to this interrogatory to the extent it is overly broad, unduly burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, Kotva responds that the following persons have had the most knowledge concerning the sale of the Department Store:

Richard Harazim, Kotva

Martin Benda, Kotva

Michael Vlach, Kotva

Jiři Brada, Kotva

Pavel Richtr, Kotva

Jaromír David, Kotva

Henry Prestage, Irish Investors

Frank Walker, Irish Investors

Aidan Scully, Irish Investors

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS ___ DAY

OF SEPTEMBER, 2005.

_____
Richard Harazim

As to objections:

_____
Joel G. Beckman (BBO #657086)
William C. Nystrom (BBO#559656)
Dana A. Zakarian (BBO#641058)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: September 6, 2005

6

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2005 I caused a copy of the foregoing document to be served by Facsimile and First Class Mail upon all defendants.

_____
Joel G. Beckman

T

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s.,<br><br>       Plaintiff,<br><br>   v.<br><br>ANDREW WEISS and WEISS ASSET<br>MANAGEMENT, LLC,<br><br>       Defendants.<br><br>ANDREW WEISS, WEISS ASSET<br>MANAGEMENT LLC, K T, INC. and CVF<br>INVESTMENTS, LTD.,<br><br>       Counterclaim-plaintiffs,<br><br>   v.<br><br>KOTVA a.s., MARTIN BENDA, RICHARD<br>HARAZIM, FORMINSTER ENTERPRISES,<br>LTD., SPV CO and JOHN DOES 1–5,<br><br>       Counterclaim-defendants. | C.A. No. 05-10679-RCL |

### ANDREW WEISS'S SECOND SUPPLEMENTAL RESPONSE
### TO KOTVA'S FIRST SET OF INTERROGATORIES

### GENERAL OBJECTIONS

Weiss incorporates by reference all general objections set forth in his response to Kotva's

First and Second Set of Interrogatories as if set forth fully herein.

## RESPONSES TO FIRST SET OF INTERROGATORIES

### Interrogatory No. 3

Identify who owned or controlled Gilroy in June 2004 when Gilroy filed its lawsuit against Kotva, KN and SPV Co. in the Czech Republic, state whether Weiss owned or controlled Gilroy at the time the Gilroy lawsuit was filed, identify who retained Ondrej Peterka to represent Gilroy in the lawsuit, identify the parties to any engagement letter to contract with Mr. Peterka, identify who made the decision to file the Gilroy lawsuit, identify who paid Mr. Peterka's legal bills, and the amount of such legal bills.

### Initial Response to Interrogatory No. 3:

Weiss objects to this interrogatory to the extent that it calls for information protected by the attorney client privilege or work product doctrine, to the extent that it calls for information not reasonably calculated to lead to the discovery of admissible evidence and to the extent that it calls for information that the parties agreed would not be the subject of discovery at this phase of the litigation. Subject to these Objections and the General Objections above, Weiss answers as follows:

Weiss does not have direct knowledge of who owned Gilroy in June 2004. Georgiy Nikitin told Weiss that Nikitin had a conversation with Vladimir Hoffmann in the fall of 2004, when Hoffmann told Nikitin that Gilroy was owned by a nominee shareholder or shareholders and formally controlled by a nominee director or directors, but that Hoffmann provided orders to that nominee director or directors and controlled Gilroy *de facto*.

Neither Weiss nor Weiss Asset Management owned or controlled Gilroy at the time that the Gilroy lawsuit was filed.

The decision to file the Gilroy lawsuit was made collectively in a conference call among Andrew Weiss, Ondrej Peterka, and Vladimir Hoffmann.

Bills from Peterka & Partners were paid by K T and then later by CVF Investments Ltd. The total amount paid up to 30 April 2006 has been EUR 781,138.15.

2

**Supplemental Response to Interrogatory No. 3:**

Weiss incorporates by reference his objections and responses to this Interrogatory as set forth in his Response to Kotva's First and Second Set of Interrogatories as if set forth fully herein. Subject to these objections, Weiss further answers as follows:

In June 2004, Andrew Weiss retained Peterka & Partners to provide legal services in the Czech Republic, including representation in connection with litigation. Weiss is unaware of any engagement letter, as such. However, entries 367 and 368 on the privilege log do contain a summary of legal steps to be carried out and an expression of thanks for retaining Peterka and Partners and entry 657 on the privilege log is an "[e]xecuted agreement on the provision of legal services." This contract is between K T, Inc. and Peterka & Partners v.o.s.

The Gilroy lawsuit was initiated in connection with this retention of Peterka & Partners by Weiss. Gilroy authorized Ondrej Peterka to represent Gilroy in the lawsuit Gilroy filed. As previously explained, the only information Weiss has regarding ownership or control of Gilroy is from Vladimir Hoffmann.

**Interrogatory No. 4**

Identify who owned or controlled K T in December 2004 when K T filed its lawsuit against Kotva, KN and SPV Co. in the Czech Republic, state whether Weiss owned or controlled K T at the time the K T lawsuit was filed, identify who retained Ondrej Peterka to represent K T in the lawsuit, identify the parties to any engagement letter or contract with Mr. Peterka, identify who made the decision to file the K T lawsuit, identify who paid Mr. Peterka's legal bills, and the amount of such legal bills.

**Initial Response to Interrogatory No. 4:**

Weiss objects to this interrogatory to the extent that it calls for information protected by the attorney client privilege or work product doctrine and to the extent that it calls for information that the parties agreed would not be the subject of discovery at this phase of the

litigation. Subject to these Objections and the General Objections above, Weiss answers as follows:

In December 2004, K T was owned by CVF Investments Ltd. Weiss Asset Management did not own or control K T. Georgiy Nikitin and Andrew Weiss were the sole directors of K T at the time; Georgiy Nikitin and Andrew Weiss made the decision to file the K T lawsuit in consultation with Czech counsel.

K T retained Peterka & Partners to represent K T in the lawsuits. Peterka & Partners' bills were paid by K T and then later by CVF Investments Ltd. The total amount of Peterka & Partners' bills up to 30 April 2006 has been EUR 781,138.15..

**Supplemental Response to Interrogatory No. 4:**

Weiss incorporates by reference his objections and responses to this Interrogatory as set forth in his Response to Kotva's First and Second Set of Interrogatories as if set forth fully herein. Subject to these objections, Weiss further answers as follows:

In June 2004, Andrew Weiss retained Peterka & Partners to provide legal services in the Czech Republic, including representation in connection with litigation. Weiss is unaware of any engagement letter, as such. However, entries 367 and 368 on the privilege log do contain a summary of legal steps to be carried out and an expression of thanks for retaining Peterka and Partners and entry 657 on the privilege log is an "[e]xecuted agreement on the provision of legal services." This contract is between K T, Inc. and Peterka & Partners v.o.s.

Georgiy Nikitin and Andrew Weiss made the decision to file the K T lawsuit in consultation with Peterka & Partners, Czech counsel.

**Interrogatory No. 7**

Identify all legal or beneficial owners of BGO and BIP that have interests in the "ring fenced assets," and describe in detail why the Kotva shares were "ring fenced" for 373 Czech crowns per share, how such a price was determined and by whom, and explain whether Weiss

4

and/or BGO will personally benefit (by receiving a success fee or other bonus) if the Kotva shares are sold at a price above the ring fenced price of 373 Czech crowns.

**Initial Response to Interrogatory No. 7:**

Weiss objects to this interrogatory on the grounds that it is vague, seeks confidential business information, and assumes facts that are in dispute. Subject to these Objections and the General Objections above, Weiss answers as follows:

The shareholders of the BGO ring-fenced assets are identified in document WP0004930–WP0004931.

The shares of Kotva and Trend (as well as some of the other assets of Czech Value Fund) were ring-fenced because they could not be valued with the precision required under the Fund's new structure. While Czech Value Fund was a closed-end fund and, as such, a precise valuation was not material, BGO was accepting and redeeming shares at NAV which required a precise valuation to be able to treat all the investors fairly. A more complete explanation of the reasons for segregating the assets was provided in WP0008893.

Paragraph (g) of Schedule A of the BGO Investment Management Agreement (WP004150), describes the success fee Weiss Capital LLC, as the manager of the ring-fenced assets, might earn depending on the ultimate realized value of the ring-fenced assets.

**Supplemental Response to Interrogatory No. 7:**

Weiss incorporates by reference his objections and responses to this Interrogatory as set forth in his Response to Kotva's First and Second Set of Interrogatories as if set forth fully herein. Subject to these objections, Weiss further answers as follows:

The price of CZK 373 was recommended by Howard Golden in his capacity as President of Czech Value Fund and unanimously approved by the Board of Directors. A more detailed explanation of the reasons for segregating the assets are provided in WP0003903, WP0005923,

WP0006151, WP0008893, WP0016968, WP0017031, WP0017037, WP0017040 and WP0017054.

Paragraph (g) of Schedule A of the BGO Investment Management Agreement (WP004150), describes the success fee Weiss Capital LLC, as the manager of the ring-fenced assets, might earn depending on the ultimate realized value of the ring-fenced assets. Andrew Weiss owns Weiss Capital LLC.

**Interrogatory No. 10**

State the basis for your contention in Paragraph 53 of the Counterclaim that the "Forminster Group caused Kotva to transfer the Department Store through a series of shell companies. These transfers have no legitimate business purpose but are instead designed to allow the Forminster Group to take more easily the proceeds of the sale of the Department Store. Ultimately, the Department Store was sold to an Irish company called Markland for approximately $65 million." Please identify in your answer the person with the most knowledge of the facts concerning your answer to this interrogatory and identify any documents concerning your answer to this interrogatory.

**Initial Response to Interrogatory No. 10:**

Weiss objects to this interrogatory on the grounds that Kotva has claimed that paragraph 53 of the counterclaim "contains allegations that are not directed to Kotva" and, therefore, has waived any right it may have had to seek discovery on this topic. Subject to this Objection and the General Objections above, Weiss answers as follows:

Kotva admits that it has transferred the Department Store through a series of shell companies. Kotva also admits that one of those shell companies sold another shell company to a subsidiary of Markland.

Weiss contends that the transfers have no legitimate business purpose but are instead designed to allow Forminster and/or persons and companies associated with Forminster to take more easily the proceeds of the sale of the Department Store because: (1) Mr. Harazim told Weiss that a minority shareholding in Kotva was worthless; (2) Kotva has never explained what

legitimate purpose the structuring of the shell companies and transfer of the Department Store achieved; and (3) the transfers and structure do not correspond to the recommendation of Ernst & Young (K0145).  In addition, in view of Forminster's history and reputation, the fact that the Department Store was moved to a Cypriot company that is not directly owned by Kotva's shareholders—or even Kotva a.s. itself—appears to be a step in tunneling Kotva's assets. Moreover, documents produced in this case reveal that portions of the sales proceeds have been distributed to other companies related to Kotva and other unknown entities.

Weiss does not know who has the most knowledge of the facts concerning this interrogatory.

**Supplemental Response to Interrogatory No. 10:**

Weiss incorporates by reference his objections and responses to this Interrogatory as set forth in his Response to Kotva's First and Second Set of Interrogatories as if set forth fully herein.  Subject to these objections, Weiss further answers as follows:

Documents concerning the answer to this interrogatory identified to date are the documents that begin with the following bates numbers: WP0009514, WP0010548, WP0010550, WP0010579, WP0010589, WP0010601, WP0010602, WP0010622, WP0010633, WP0010640, WP0010647, WP0010665, WP0010674, WP0010693, WP0010703, WP0010717, WP0010726, WP0010732, WP0010743, WP0010757, WP0010787, WP0010802, WP0010815, WP0010832, WP0010834, WP0010837, WP0010839, WP0010860, WP0010864, WP0010868, WP0010875, WP0010876, WP0010919, WP0010921, WP0010924, WP0010931, WP0010951, WP0010966, WP0010972, WP0010989, WP0010992, WP0010994, WP0010997, WP0011159, WP0011348, WP0011361, WP0011381, WP0011404, WP0011427, WP0011430, WP0011458, WP0011462, WP0011473, WP0011478, WP0011499, WP0011518, WP0011524, WP0011531, WP0011545, WP0011552, WP0011562, WP0011570, WP0011578, WP0011585, WP0011601, WP0011613,

WP0011626, WP0011633, WP0011667, WP0011669, WP0011683, WP0011684, WP0011685,

WP0011687, WP0011690, WP0011698, WP0017624, WP0017642, WP0017658, WP0017668,

WP0019289, WP0019345, KC1-002641

## Interrogatory No. 16

Identify any litigation, threatened litigation, arbitration, mediation, or other judicial proceeding concerning the Weiss Funds and any of their investments. Your answer should include without limitation:

a)    the parties to the dispute;

b)    the nature of the dispute, and whether it involved litigation or arbitration;

c)    Weiss' involvement in the dispute and/or settlement thereof;

d)    settlement demands made by the Weiss Funds to settle the dispute;

e)    the terms of the settlement reached to resolve the dispute.

## Initial Response to Interrogatory No. 16:

Weiss objects to this interrogatory as vague, unduly burdensome, overbroad and not reasonably calculated to lead to the discovery of admissible evidence. The Weiss Funds have investments in hundreds of companies. Many of these companies are undoubtedly involved in litigation or arbitration of which Weiss is not aware. Weiss has previously answered that he has no personal knowledge of the arbitration referred to in interrogatory number 12.

## Supplemental Response to Interrogatory No. 16:

Weiss incorporates by reference his objections and responses to this Interrogatory as set forth in his Response to Kotva's First and Second Set of Interrogatories as if set forth fully herein. Weiss further objects to Kotva's interrogatory to the extent that it seeks information related to the potential settlement of this case and/or related proceedings in the Czech Republic. Subject to these objections, Weiss further answers as follows:

The Weiss Funds have investments in hundreds of companies. Many of these companies

are undoubtedly involved in litigation or arbitration of which Weiss is not aware. In addition to

this case, parallel cases in the Czech Republic and the litigation referenced by Kotva in its

interrogatories 12–14, Weiss is aware of the following litigation:

| Parties | Dates | Nature | Weiss's involvement | Settlement proposals | Settlement reached |
|---|---|---|---|---|---|
| Brookdale Equity Partners, Brookdale International Partners, Brookdale Global Opportunity Fund vs. Aberdeen Asset Managers Jersey | 2005–present | Misrepresentation made by the employees of the defendant that resulted in investment decisions based on incorrect information for the plaintiffs | Investment advisor to plaintiffs | None made to date | No |
| JSC Central Asia Cement vs. Kazakhstan Investment Fund Ltd. -- arbitration under UNCITRAL Arbitration Rules | 2000–2002 or 2003 | Dispute over the termination fee payable to the old manager of KIF | Weiss funds owned shares in KIF at time of dispute | Unknown | Yes |
| Kazakhstan Investment Fund Ltd. vs. Gerry Manolovici (former director of KIF) | 2004–2005 | The plaintiff accused its former director in a breach of fiduciary duty | Weiss funds owned shares in KIF at time of dispute | Unknown | Yes |

9

| Parties | Dates | Nature | Weiss's involvement | Settlement proposals | Settlement reached |
|---------|-------|--------|---------------------|---------------------|-------------------|
| Kazakhstan Asset Management Limited and OJSC Central Asia Cement vs. Kazakhstan Investment Fund Ltd., Cement Engineering Consultancy Ltd, VISOR Investment Solutions LLP, Howard I. Golden, John D. Chapman | 2004–2005 | The plaintiffs claimed that they had "a right-of-first refusal" for the sale of shares of OJSC Central Asia Cement to KIF, which was not satisfied | Weiss funds owned shares in KIF at time of dispute | Unknown | Yes |

**Interrogatory No. 17**

　　　State the basis of Weiss' representations in his letter to investors of May 2005 (attached hereto as Bates No. Fitz 0095) that "Investors in the segregated assets could be awarded damages of as much as $25 million," and "[t]here is nominal risk to BIP investors from these legal problems, and an opportunity for significant gains."

**Initial Response to Interrogatory No. 17:**

　　　Weiss objects to this interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Subject to this Objection and the General Objections above, Weiss answers as follows:

　　　At the time Weiss sent the May 2005 communication, he believed, based on the valuations of Kotva, that investors in the segregated assets could be awarded damages of as much as $25 million. Weiss regarded this figure as a significant gain. The only risk for BIP investors of which Weiss was aware at the time was that it might cost the ring-fenced assets more in legal fees than what would ultimately be realized from liquidating the assets. Weiss regarded this risk as nominal from the perspective of a BIP investor.

**Supplemental Response to Interrogatory No. 17:**

Weiss objects to this interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Subject to this Objection and the General Objections above, Weiss answers as follows:

The valuations of Kotva referred to in Weiss's initial response to this interrogatory are the valuations outlined in documents K0016 and WP0000684.

**Interrogatory No. 18**

Identify any and all damages that Defendants and Counterclaim Plaintiffs are claiming in this action and state the basis for each category of damages. If your claimed damages include recovery of legal fees paid to McDermott Will & Emery LLP, legal fees paid to Czech counsel, and/or fees paid to Madeline Albright and/or The Albright Group, state whether those fees have been paid or funded by BGO investors or BIP investors, and whether Weiss has informed BGO investors or BIP investors that they are paying or funding such fees.

**Initial Response to Interrogator No. 18:**

Weiss objects to this interrogatory on the grounds that it is vague, seeks information that the parties agreed would not be the subject of discovery at this phase in the litigation, is not reasonably calculated to lead to the discovery of admissible evidence, and to the extent it calls for information protected by the attorney-client privilege or work product doctrine. Subject to these Objections and the General Objections above, Weiss answers as follows:

Weiss's damages include the following categories: legal fees and other fees incurred defending against this case; legal fees and other fees incurred in connection with the Czech criminal investigation, lost business opportunities, damage to reputation, and lost time.

After legal proceedings had already commenced, BIP and QVT have advanced loans to CVF Investments. CVF Investments has paid legal fees on behalf of the Counterclaim-Plaintiffs. The amount of BIP's loan is, in the opinion of its auditor, not material and has not been disclosed.

11

**First Supplemental Response to Interrogatory No. 18:**

Weiss incorporates by reference his objections and responses to this Interrogatory as set forth in his Response to Kotva's First and Second Set of Interrogatories as if set forth fully herein. Subject to these objections, Weiss further answers as follows:

Weiss's initial answer to this interrogatory included the following statement:

> After legal proceedings had already commenced, BIP and QVT have advanced loans to CVF Investments. CVF Investments has paid legal fees on behalf of the Counterclaim-Plaintiffs. The amount of BIP's loan is, in the opinion of its auditor, not material and has not been disclosed.

At the time Weiss answered the interrogatory, Weiss believed these statements to be true. However, the final sentence is inaccurate. In fact, footnote 6 of the December 31, 2005 BIP audited financial statements issued by KPMG describes BIP's loan to CVF Investments. *See* WP0017151.

**Second Supplemental Response to Interrogator No. 18:**

Weiss incorporates by reference his objections and responses to this Interrogatory as set forth in his Response to Kotva's First and Second Set of Interrogatories as if set forth fully herein. Subject to these objections, Weiss further answers as follows:

Andrew Weiss and Weiss Asset Management have been damaged in that Kotva and Richard Harazim have unjustly forced them to incur attorneys' fees and associated costs in the amount of approximately $2.2 million as of the end of August 2006. This figure does not include fees paid to Peterka & Partners because, at this stage of the litigation, Peterka & Partners has not segregated time spent in defense of the civil and criminal litigation initiated by Kotva from time spent by Peterka & Partners on other matters. These damages continue to grow.

Andrew Weiss and Weiss Asset Management have suffered damage to their respective reputations as a result of Kotva's and Harazim's conduct. Andrew Weiss and Weiss Asset

12

Management have also been damaged through the loss of time of Andrew Weiss. As a result of injury to reputation and disruption of business, Weiss believes that some investors have chosen not to invest with Weiss. *See, e.g.*, WP0018334–WP0018336. These damages have two components. For each million dollars not invested, Weiss and Weiss Asset Management have lost approximately $19,000 in management fees and approximately $95,000 in performance fees for the period from February 2005 to date. These damages continue to grow and would continue to grow indefinitely. Accordingly, Weiss claims the net present value of the lost revenue stream as of the date of judgment.

Andrew Weiss and Weiss Asset Management have been damaged through the loss of time of Georgiy Nikitin for which the Weiss Parties claim damages of a pro rata share of his annual compensation, which is approximately $155,000. A conservative estimate of the amount of time spent by Mr. Nikitin as a result of the counterclaim-defendants' conduct is twenty-five hours per week.

Andrew Weiss has been damaged through the loss of his time, for which he claims damages based on the fair market value of his time, such value to be determined by the jury. A conservative estimate of the amount of time spent by Professor Weiss as a result of the counterclaim-defendants' conduct is twenty hours per week.

The basis for these damages calculations will be established through the testimony of Andrew Weiss and Georgiy Nikitin. Weiss specifically reserves the right to supplement this interrogatory as additional information is gathered and additional costs are incurred.

**Interrogatory No. 19**

With respect to the August 23, 2004 letter to Martin Benda and Richard Harazim (attached thereto) please state in complete detail (1) why you are willing to "attempt to influence Gilroy" to withdraw its complaint in exchange for sale of Kotva shares for 131 million CZK; and (2) state the basis of the representation that "we do not exert control over Gilroy (and Balfindor) or petitions submitted by them."

**Initial Response to Interrogatory No. 19:**

Weiss objects to this interrogatory on the grounds that it is vague and assumes facts that are in dispute. Weiss further objects to this interrogatory in that it takes individual parts of a communication out of context. Subject to these Objections and the General Objections above, Weiss answers as follows:

Weiss believed that CZK 131 million was a fair (albeit low) price for the 82,781 shares of Kotva (at approximately CZK 1582.5 per share). If the shares were sold, then there was no economic justification for continuing to fund a lawsuit brought to protect the minority shareholders.

The basis for the statement that "we do not exert control over Gilroy (and Balfindor) or petitions submitted by them" is that it is true. Weiss is not a shareholder or director or officer of either company.

**Supplemental Response to Interrogatory No. 19:**

Weiss incorporates by reference his objections and responses to this Interrogatory as set forth in his Response to Kotva's First and Second Set of Interrogatories as if set forth fully herein. Subject to these objections, Weiss further answers as follows:

The basis for the statement that "we do not exert control over Gilroy (and Balfindor) or petitions submitted by them" is that it is true. Weiss has personal knowledge that neither he nor any other Weiss Capital employee is a shareholder or director or officer of either Gilroy or Balfindor. As explained in response to Interrogatory Number 3, the information regarding control of Gilroy that Weiss has originates with Vladimir Hoffmann. Vladimir Hoffmann provided Georgiy Nikitin with similar information about the directors of Balfindor.

14

I declare under penalty of perjury that the
foregoing is true and correct.

_____
ANDREW WEISS

As to objections,

_____
Edward P. Leibensperger (BBO# 292620)
Benjamin A. Goldberger (BBO# 654357)
McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts  02109-1775
(617) 535-4000

*Counsel for Andrew Weiss*

Dated: October 20, 2006

Dated: October 20, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document is being served by regular mail and electronic mail on counsel for Kotva a.s. and Richard Harazim on October 20, 2006.

Benjamin A. Goldberger

BST99 1520296-1.072198.0012

15

U

Stamp:
POLICE OF THE CZECH REPUBLIC
ADMINISTRATION OF THE CITY OF PRAGUE
*Criminal Police and Investigation Service*
Economic Crime Section
140 21 PRAGUE 4, Kongresová 2

Criminal Prosecution No.: PSP-4035/OHK-3-2004

At Prague on 3 February 2005

DECISION

Pursuant to Section 160(1) of the Criminal Procedure Code, I hereby initiate criminal prosecution of the accused:

1) Ing. Vladimír Hoffmann,
nationality: Czech Republic
born on 30 October 1965 in Bratislava I, Slovak Republic
birth index no. 651030/6990
permanent resident at Medinská 825,
Klánovice, Prague 9, 190 14
owner of the company Balfindor a.s., Company ID No. 27107892
with its seat at Na Kocourkách 2915, Prague 6
owner of the company Gilroy Limited, Company ID No. 0090061682
with its seat at Pikioni, 4, Limassol, Republic of Cyprus

2) Edita Šimková
nationality: Czech Republic
born on 27 July 1968 in the Slovak Republic
birth index no. 685727/6140
permanent resident at Na Folimance 2153/19,
Vinohrady, Prague 2, 120 00
chairperson of the board of directors of Balfindor a.s., Company ID No. 27107892
with its seat at Na Kocourkách 2915, Prague 6

3) Andrew Weiss,
nationality: United States of America
born on 2 January 1947, passport no. Z7528881
resident at 46 Abbottsford Road, 2 Brookline, Massachusetts, 2446 USA
owner of the company Weiss Asset Management,
company address 29 Commonwealth Avenue, Boston, Massachusetts 02116,
which manages the company Brookdale Global Opportunity Fund,
company address      P.O. Box 1748, GT 27 Hospital Road, George Town
Grand Cayman, Cayman Islands
and controls the company KT, Inc.
with its seat at 2711 Centerville Road, Suite 400, City of Wilmington, County of Newcastle, Delaware, USA,

K 0041

for the criminal offence of

extortion pursuant to Section 235(1) and (3) of the Criminal Code, committed as accomplices pursuant to Section 9(2) of the Criminal Code,

because it has been sufficiently substantiated by the facts ascertained until now that

the accused Andrew Weiss and the accused Ing. Vladimír Hoffmann met on 12 May 2004 at 2:00 p.m. in the French restaurant of Obecní dům (Municipal House) in Prague 1, náměstí Republiky 1090/5, with the management of Kotva a.s., ID No. 60193808, with its seat at Prague 1, náměstí Republiky 8, represented by Richard Harazim, general manager of Kotva a.s., born on 10 March 1965, permanent resident at Přezletice, U bažantnice 305, district of Prague-East, and Martin Benda, chairman of the supervisory board of Kotva a.s., born on 8 September 1971, permanent resident at Borač 46, district of Žďár nad Sázavou, and requested from them redemption of 11.9% shares of the registered capital of Kotva a.s., i.e. 82,782 shares, which are held by Brookdale Global Opportunity Fund, P.O. BOX 1748, GT 27 Hospital Road, George Town, Grand Cayman, Cayman Islands (where these shares are administered by the accused Weiss Andrew through his company Weiss Asset Management, 29 Commonwealth Avenue, Boston, Massachusetts 02116), for an amount of 4,000,000 US dollars, stating that if these shares were not so redeemed, the accused Weiss would arrange for blocking the real estate of Obchodní dům Kotva (Kotva Department Store), located at náměstí Republiky 8, Prague 1, in the real estate cadastre by filing fabricated and self-serving lawsuits against Kotva a.s., by which he would substantially disturb negotiations of Kotva Holding with potential strategic partners and financial institutions about the financing of operations and sales of Obchodní dům Kotva, and would restrict the disposal of this property for several years, because he knew that Kotva a.s. had concluded a contract for sale of the above Obchodní dům Kotva from which it could not withdraw and that Kotva a.s. was under a time pressure and had financial problems, and if Kotva a.s. did not purchase his shares, the next offer would be substantially higher, and if Kotva a.s. refused to purchase these shares from him, he would file criminal charges against the board of directors of Kotva a.s. By this way, the accused blackmailed Kotva a.s. and its board of directors by the threat of causing large-scale damage, physical violence or other major detriment, forcing Kotva a.s. and its board of directors to perform, omit or suffer an act, although the above representatives of

Kotva a.s. refused to redeem the above shares, stating that the asked price for the shares of Kotva a.s. is excessively high and that Kotva a.s. is not allowed to redeem its own shares.

Subsequently, the accused Weiss and the accused Hoffmann informed through Gilroy Limited and Balfindor a.s. Mr. Henry Prestige, the strategic partner of Kotva a.s., and financial institutions financing the operations of Kotva a.s. about actions filed against Kotva a.s. (as noted below), by which they hindered business operations of Kotva a.s. Such notification of the strategic partner and the financial institutions was meant to prevent the sale of the real property of Kotva a.s. to the strategic partner.

Subsequently, the accused Hoffmann, being the owner of Balfindor a.s., the accused Šimková as the chairperson of the board of director of Balfindor a.s., and the accused Weiss (who instructed the accused Hoffman and the accused Šimková to file the action referred to below), represented by Mgr. Ondřej Peterka, attorney-a-law, registered in the attorneys register kept by the Czech Bar Association under no, 4245, filed with the Municipal Court in Prague on 8 June 2004 on behalf of Balfindor a.s., Company ID No. 27107892, with its seat at Prague 6, Na Kocourkách 29/5 (which purchased on 8 June 2004, specifically for such purpose, one share of Kotva a.s. from the accused Hoffmann), an action for determination of invalidity of the general meeting of Kotva a.s., Company ID No. 60193808. On the same day, i.e. 8 June 2004, they submitted the statement of claim regarding the above action to the Cadastral Office of the City of Prague to attach in the real estate cadastre a seal to the lands and properties of Kotva a.s.

Subsequently, the accused Hoffmann, being the owner of Gilroy Limited, and the accused Weiss (who instructed the accused Hoffmann to file the action referred to below), represented by Mgr. Ondřej Peterka, attorney-at-law, filed with the Municipal Court in Prague on 30 June 2004 on behalf of Gilroy Limited, Company ID No. 0090061682, with its seat at Pikioni, 4, Limassol, Republic of Cyprus, which holds a part of shares of Kotva a.s., an action for determination of title to real estate of Kotva a.s., Company ID No. 60193808, Kotva nemovitosti k.s. with its seat at Příkopy 4, Brno, Company ID No. 26229048, and SPV KN a.s., with its seat at Příkopy 4, Brmo. At the same time (on 2 July 2004), they submitted the statement of claim regarding the above action to the Cadastral Office of the City of Prague to attach in the real estate cadastre a seal to the lands and properties of Kotva a.s., Kotva nemovitosti k.s. and SPV KN a.s.

Subsequently, the accused Ing. Vladimír Hoffmann, born on 30 October 1965, birth index number 651030/6990, permanent resident at Prague 9, Medinská 825, as the holder of a part of shares of Kotva a.s., acting jointly with JUDr. Petr Streiberg, permanent resident at Prague 6, Na Kuthance 16/1218, born on 18 October 1955, who holds a part of shares of Kotva a.s., and with the accused Weiss, being the owner of Weiss Asset Management, company address 29 Commonwealth Avenue, Boston, Massachusetts 02116, which manages Brookdale Global Opportunity Fund, with its seat at P.O. BOX 1748, GT 27 Hospital Road, George Town, Grand Cayman, Cayman Islands, which owns a part of shares of Kotva, a.s., all of them represented by Mgr. Jiří Černý, attorney-at-law, substituted by Mgr. Ondřej Peterka, filed with the Municipal Court in Prague on 15 July 2004, on behalf of Brookdale Global Opportunity Fund and on behalf of Ing. Vladimír Hoffman and JUDr. Petr Streitberg as individuals, an action for declaration of invalidity of the general meeting of Kotva a.s. At the same time, they submitted the statement of claim regarding the above action to the Cadastral Office of the City of Prague to attach in the real estate cadastre a seal to the lands and properties of Kotva a.s.

Subsequently, the accused Weiss, who controls KT, Inc., with its seat at 2711 Centerville Road, Suite 400, City of Wilmington, County of Newcastle, Delaware, USA, which holds a part of shares of Kotva a.s. through Brookdale Global Opportunity Fund (which also holds a part of shares of Kotva a.s.), represented by Mgr. Ondřej Peterka, attorney-at-law, filed individually with the Municipal Court in Prague on 23 December 2004 on behalf of KT, Inc. an action for determination of title to real estate. At the same time, he submitted the statement of claim regarding the above action to the Cadastral Office of the City of Prague to attach in the real estate cadastre a seal to the lands and properties of Kotva a.s.

Subsequently, the three accused have requested Kotva a.s. repeatedly by extortion, from 12 May 2004 to date, to redeem of 11.9% of shares of Kotva a.s. and to purchase 39.73% (i.e. 11,098,617 shares) of Trend – všeobecný investiční fond a.s., with its seat at Hradec Králové, Škroupova 9/441, Company ID No. 45245177. They increased the requested redemption price up to 295,000,000 CZK, otherwise they would not withdraw their lawsuits against Kotva a.s., Kotva nemovitosti k.s. and SPV KN a.s., thus causing high financial losses to these companies. The extortion itself was represented by filing the above actions, by personal

contacts of the accused with representatives of Kotva a.s., and by a telephone call, by fax and e-mail messages sent to these representatives.

Subsequently, the accused Hoffmann has demanded individually from Kotva a.s. by extortion, from November 2004 to date, payment of 45,000,000 CZK as compensation for withdrawal of claims against Kotva a.s. filed by his companies, i.e. Gilroy Limited and Balfindor a.s. He forced Kotva a.s. to conclude with him a preliminary agreement on compensation for withdrawal of the above claims filed by his companies. The extortion itself was represented by filing the above actions by the companies owned by Hoffman, and by a telephone call, by fax and e-mail messages sent to the representatives of Kotva a.s.

By the foregoing conduct, the accused committed the above criminal offence to the detriment of the following injured parties:

Kotva a.s.

Kotva nemovitosti k.s.

SPV KN a.s.

Martin Benda, born on 8 September 1971

Richard Harazim, born on 10 March 1965.

### Statement of reasons

Kotva a.s. filed on 27 August 2004 to the Police of the Czech Republic, Administration of the Capital City of Prague, Criminal Police and Investigation Service, Kongresová 2, Prague 4, criminal charges against the accused Weiss and the accused Hoffmann regarding the criminal offence described above. Subsequently, an explanatory interrogation with the injured parties Harazim and Benda was carried out. The police seized documents evidencing extortion. Furthermore, having obtained court permission, the police tapped telephone calls in this matter. These calls and seized documents, the criminal charges and explanatory interrogation sufficiently documented this offence. It was ascertained that there are sufficient grounds, pursuant to Section 160(1) of the Criminal Procedure Code, to start criminal prosecution of specific persons who committed such offence. Therefore, the criminal prosecution of the above accused was started.

**Instruction:**

Pursuant to Section 36(3) of the Criminal Procedure Code, you, as the accused, must have a legal counsel to defend you at the pre-trial proceeding, because you have committed an offence that is punishable under the law by a prison sentence with the upper limit of more than 5 years. If you fail to choose a counsel by yourself or if the counsel is not selected by the persons listed in Section 37 of the Criminal Procedure Code within two hours of the service of this Decision, the defence counsel shall be appointed for you in accordance with Section 38(1) of the Criminal Procedure Code.

I further instruct you that every accused must have his own defence counsel, because the interests of individual accused at this criminal suit are conflicting.

I further instruct you that the following persons will be heard among the witnesses in this criminal matter: Mgr. Ondřej Peterka, Mgr. Jiří Černý and Mgr. Ladislav Chundela of the law offices of Peterka & Partners v.o.s., and JUDr. Ing. Petr Šrámek, listed in the attorneys register of the Czech Bar Association under no. 5076; therefore, you cannot choose these persons as your defence counsels pursuant to Section 37 of the Criminal Procedure Code.

A complaint against this decision may be filed by an accused within three days of the service hereof with the police authority that has prepared this decision. Such complaint has no suspensory effect.

Ing. Pavel Brož

Police Commissioner: *[Signature]*

Accepted by the accused Ing. Vladimír Hoffman on 3 February 2005 at 2:00 p.m. *[Initial]*
Accepted by the accused Andrew Weiss            on
Accepted by the accused Edita Šimková           on 3 February 2005 at 11.20 a.m.
*[Signature]*

K 0046

V

PETERKA & PARTNERS
Law Office

Praha 1 District Court
Ovocny trh 14
110 00 Praha 1

Prague, 30 June 2004

[impression of stamp:]    Praha 1 District Court
Praha 1, Ovocny trh 14
Received: 30 June 2004
Four copies, bound volume

Plaintiff:
GILROY LIMITED
registered office: Pikioni, 4, Limassol, Republic of Cyprus
representative: Ondrej Peterka, Attorney-at-Law registered by the Czech Bar Chamber under
Reg. No 4245, practising law as an associate of PETERKA & PARTNERS v.o.s., registered
office: Na Prikope 15, 110 00 Praha 1 (power of attorney of the legal representative attached)

Defendant 1:
KOTVA a.s.
Registered office: Praha 1, Namesti Republiky 8
Company registration number: 60193808
Incorporated by entry in the Commercial Register kept by the Municipal Court in Prague,
Section B, Entry 2370
(hereinafter referred to as 'Kotva' or 'Defendant 1')

Defendant 2:
KOTVA NEMOVITOSTI, k.s
Registered office: 602 00 Brno, Prikop 4
Company registration number: 26229048
Incorporated by entry in the Commercial Register kept by the Regional Court in Brno, Section
A, Entry 16586
(hereinafter referred to as 'Kotva Nemovitosti' or 'Defendant 2')

Defendant 3:
SPV KN, a.s.
Registered office: 602 00 Brno, Prikop 4
Company registration number: 26910705
Incorporated by entry in the Commercial Register kept by the Regional Court in Brno, Section
A, Entry 4043
(hereinafter referred to as 'SPV KN' or 'Defendant 3')

Action to determine the ownership of real property
Four copies
Court fee of CZK 3,000 paid in the form of fee stamps
Delivered in person at the court registry
Attachments:
See the list of attachments on the final page of the action

K 0250

# 1 SPECIFICATION OF PARTIES, SUBJECT OF PROCEEDINGS, JURISDICTION OF THE COURT

## 1.1 Specification of parties

Plaintiff is a shareholder of Defendant 1

Defendant 1 is a commercial company registered in the property register as the sole owner of the real property specified below in paragraph 1.2 until 2002. As ensues from that is described below, Defendant 1 is still the sole owner.

Defendant 2 is a commercial company registered in the property register as the sole owner of the real property specified below in paragraph 1.2, such being pursuant to a statement[1] on an immobile investment made by Defendant 1 in 2000. It arose by transformation of KOTVA NEMOVITOSTI, a.s[2]

Defendant 3 is a commercial company, the sole shareholder of which is Defendant 2. At present Defendant 3 is entered in the property register as the owner of real property specified below in paragraph 1.2.

## 1.2. Subject of proceedings

Under this action, Plaintiff seeks a court decision, further to Section 80(c) of Act No 99/1963, the Code of Civil Procedure ('CCP'), determining that Defendant 1 is the owner of the following real property:

- Building with land registry reference number 656 (civic amenities), belonging to part of the Stare Mesto municipality, located on building plot number 680;
- Building with no land registry reference number or street number (civic amenities), belonging to part of the Stare Mesto municipality, located on building plot number 1018/2;
- Land Parcel No 680 (developed area and courtyard) with an area of 4,385 m2;
- Land Parcel No 683/1 (other land) with an area of 851 m2;
- Land Parcel No 683/2 (other land) with an area of 2,963 m2;
- Land Parcel No 683/3 (other land) with an area of 2 m2;
- Land Parcel No 690/2 (other land) with an area of 25 m2;
- Land Parcel No 690/3 (other land) with an area of 49 m2;
- Land Parcel No 690/4 (other land) with an area of 9 m2;
- Land Parcel No 1018/2 (developed area and courtyard) with an area of 1 m2;

all the above-mentioned real property is registered by the Land Registry for the City of Prague on Title Deed No 265, maintained for the municipality of Praha, Cadastral District: Stare Mesto (this real property is hereinafter referred to jointly as 'KOTVA department store').

---

[1] In accordance with Section 60(1) of Act No 513/1991, the Commercial Code.
[2] KOTVA NEMOVITOSTI, a.s. changed its legal form from a public limited company to a limited partnership. This change in legal form was made in accordance with a decision of the General Meeting held on 20 May 2003; the decision of the registration court to register the change entered into legal force on 15 August 2003

K 0251

1.3. Jurisdiction

The material jurisdiction of the district court is determined on the basis of Section 9(1) of the CCP, because there is no indication under Section 9(2) or (3) of the CCP, or under other provisions, that jurisdiction pertains to a regional court in the first instance

With regard to local jurisdiction, Plaintiff refers to Section 88(g) of the CCP, under which the competent court is the court in whose circuit the real property is located, provided that the legal proceedings relate to this property KOTVA department store, as a set of real property units, is located in the circuit of the Praha 1 District Court

Evidence:
- Statement from the Securities Centre
- Certificates of Incorporation of the Defendants
- proof of the existence of Plaintiff
- statement from the Property Register (Title Deed No 265 for the Stare Mesto Cadastral District)
- annual reports of Defendant 1 for 2000, 2001, and 2003
- with the reservation of further evidence

## 2. EXISTENCE OF PLAINTIFF'S EXIGENT LEGAL INTEREST IN DETERMINING OWNERSHIP AS SOUGHT IN THESE PROCEEDINGS

The Supreme Court the Czech Republic, in Decision No 3 Cdo 1338/96[3] of 27 March 1997, took the legal view that there is room for a declaratory action under Section 80(c) of the CCP in cases where:
- this action can help eliminate a threat to a right or uncertainty in a legal relationship and the corresponding remedy cannot be achieved by other means, and
- it is more effective than other legal means in detailing the content and nature of the relevant legal relationship, and it can be used to achieve an adjustment forming a certain legal framework, which functions as a guarantee that there will be no future disputes between the parties.

In accordance with this judicial decision, it is possible to file a declaratory action aimed at ensuring that information about the ownership of real property contained in the property register complies with the actual legal situation[4]. This sort of action is usually filed by an entity who considers itself to be the owner of real property in question. However, current decision-making practices at the Supreme Court indicate that a declaratory action may also be filed by a person who is a member/shareholder of such an entity.

In this respect, in the proceedings maintained under File No 29 Odo 767/2002, the Supreme Court inferred that a shareholder has an exigent legal interest in filing a declaratory action whereby the shareholder seeks the nullity of a contract under which a public limited company

---

[3] Published in the periodical Soudni Judikatura (civilni) No 3/1997 on page 58, and subsequently under number Jc 21/1997.
[4] Based on a decision on a declaratory action, the relevant entry can be inserted into the property register in accordance with Section 7(1) of Act No 265/1992, on records of proprietary and other material rights attached to real property.

K 0252

transfers its enterprise, or part thereof, to another entity in accordance with Section 476 of the Commercial Code. The Supreme Court stipulated inter alia that 'the conclusion of a contract on the sale of part of an enterprise could have a significant influence on the legal relations of the company of which he is a shareholder, and therefore indirectly on his legal relations, e.g on the share in the liquidation balance (in relation to the content of the contract) '

Analogically, it is necessary to deduce the authorization of a shareholder to file an action to determine ownership of a set of real property representing the main asset item in the business activities of a company (here KOTVA department store[5] with a value of at least CZK 1.39 billion).

The significance of the ownership of such a principal asset item and its impact on the legal relations of the shareholder can best be explained by comparing the position of a shareholder in a situation where the company owns such an asset item with a situation where it does not own such an asset

In a situation where the company owns such an asset item:

- the sale of the asset in a given accounting period can generate a substantial profit, whereby the practical exercise of the shareholder's right specified in Section 155(1) of the Commercial Code is achieved, i.e. the shareholder shares in the company profit;
- if the company is liquidated, the acquired sale price of such an asset item would undoubtedly be reflected positively in the shareholder's share in the liquidation balance (again with reference to Section 155(1) of the Commercial Code);
- the shareholder has the opportunity of making decisions on the business activities of Defendant 1 at the General Meeting; this opportunity is determined by the ownership and use of the asset item, setting the practical content of the shareholder's authorization to share in the management of the company (again with reference to Section 155(1) of the Commercial Code).

If the company were not the owner of the principal asset item, the above-mentioned entitlements of the shareholder would be completely different, because in connection with ownership (and any future transfer) of this asset item the company would be unable to realize any income from which we could derive the shareholder's right to a share in the profit or a share in the liquidation balance.

In this specific case, Plaintiff also refers to the fact that the opportunity of the effective exercise of his shareholder rights (and therefore the significance of the decision in this action for the shareholder's legal relations) is consolidated by the fact that he is also a shareholder in TREND-VIF, which Plaintiff believes is the owner of the main stake in Defendant 1.

For the sake of completeness, Plaintiff considers it necessary to add that the Supreme Court expressed exactly the same legal opinion as in the Verdict under File No 29 Odo 767/2002 in

---

[5] In the case of KOTVA department store, we can also consider whether such a dominant and relatively independent part of an enterprise meets the description of 'part of an enterprise' (i.e. a separate organizational component), bearing in mind that it can only be disposed of in accordance with the pertinent peremptory provisions of the Commercial Code (i.e. the sale or lease of part of the enterprise). It will certainly be possible to find enough factual information for such a conclusion in the documents used by Defendant 1 in its formal justification for the transfer of KOTVA department store to another entity.

K 0253

a previous verdict of 5 November 2002 under File No 29 Odo 535/2001, and from the aspect of the way this legal issue is handled we can consider court decisions to be constant.

Evidence:
- statement from the Securities Centre
- Expert Opinion valuing KOTVA department store
- with the reservation of further evidence

## 3  REASONS WHY DEFENDANT 1 NEVER LOST OWNERSHIP OF KOTVA DEPARTMENT STORE AND THEREFORE IS STILL THE OWNER OF THIS PROPERTY

3.1. Competence of persons connected with Miroslav Halek in TREND VIF and IF MERCIA

The beginning of the current problematic relations, in respect of which the verdict issued in these proceedings should help to resolve (and in particular avert other future disputes in accordance with the above-mentioned Supreme Court Decision 3 Cdo 1338/96), relates to TREND VIF[6] and to the investment fund MERCIA, a.s.[7] in the period from 1995 to 1997.

In the scope of voucher privatization, TREND VIF was very successful (exploiting the celebrities Michael Kovab and Martin Kratochvil), and its portfolio contained the shares of top Czech enterprises, the value of which was well above a billion crowns, including the shares in Defendant 1.

In 1995, a group of persons connected with Kralovehradecka brokerska, a.s.[8], represented in particular by Miroslav Halek, took over managerial control of TREND VIF.

At the time of this takeover, TREND VIF had equity of approximately CZK 1.45 billion.

This takeover was followed by a number of transactions, the purpose of which was to transfer these assets, including shares in Defendant 1, to entities from the group of Miroslav Halek unlawfully and to the detriment of TREND VIF. The method used to strip the assets of TREND VIF was legal transactions which are described in detail, for example, in the Report of the Compulsory Administrator of TREND VIF of 22 February 1007, in Report No 102/9017697 of the Ministry of Finance of 21 January 1998, concerning an investigation into trading in securities from the TREND VIF portfolio, and in the indictment of the deputy regional public prosecutor Vladislav Kusala brought against Mr Halek et al. of 30 September 1998. Also, this indictment gives the most detailed description of the personnel relations of all entities contributing to these transactions (p. 25 et seq.).

As a result of these transactions, the equity of TREND VIF fell to CZK 116 million as at 31 December 1996, i.e. by more than 90%.

---

[6] TREND – vseobecny investicni fond a.s , registered office: 500 02 Hradec Kralove, Skroupova 441, company registration number: 45 24 51 77 (hereinafter referred to as 'TREND VIF').
[7] Investicni fond MERCIA, a.s., registered office: Praha 2, Londynska 53, company registration number: 15 05 41 01.
[8] KRALOVEHRADECKA BROKERSKA, a.s. (now Brnenska obchodni, a.s., v konkurzu), company registration number: 60 91 41 22, former registered office: Hradec Kralove, Skroupova 9, current registered office: Brno, Lipova 27

K 0254

The participation of Kralovehradecka brokerska, a.s. in the financial management of Investicni fond Mercia, a.s. followed exactly the same course

3.2. Demonstrative list of significant unlawful activities of entities connected with Miroslav Halek and directly or indirectly concerning shares in Defendant 1.

Individual transactions aimed at the unlawful enrichment of representatives are described in both the above-mentioned reports and in the indictment. Given the extensiveness of this conduct, Plaintiff refers to these documents and makes their content, in the parts directly or indirectly[9] concerning the shares in Defendant 1, part of the claims in this action. Therefore, in this action Plaintiff only mentions several cases of the most serious conduct that damaged TREND VIF and that, according to the indictment, can be qualified as a crime[10].

Plaintiff specifies the two groups of principal unlawful transactions perpetrated by entities connected with Mr Halek In terms of their type, these transactions are characterized on page 24 of the indictment

The first group (see paragraph 3.2.1 of this action) comprises transactions whereby shares in Defendant 1 were unlawfully transferred from the assets of TREND VIF.

The second group (see paragraph 3.2.2) comprises transactions whereby finances were transferred from TREND VIF (and from IF Mercia) and were used by entities connected with Mr Halek to pay the purchase price of shares in Defendant 1 which were bought from third parties

Naturally, all the transactions described below, considering that — according to the indictment — they can be qualified as crimes and therefore were an infringement of the law, have civil law implications, most commonly resting in the fact that such transactions are null and void from the outset[11].

As regards an evaluation of the conduct described in the two reports as crimes, Plaintiff refers to the indictment against the accused Miroslav Halek et al., submitted by the Regional Public Prosecutor's Office in Hradec Kralove on 30 September 1998 under File No KZv 323/97.

3.2.1. Transfer of shares in Defendant 1 from the assets of TREND VIF

3.2.1.1. Disadvantageous trading in shares in Defendant 1

---

[9] E g. the transfer of financial resources from TREND VIF so that other parties involved could use these funds to purchase shares in Defendant 1 (see paragraph 3 2 2)
[10] As regards the qualification of crimes committed, according to the indictment, by entities connected with Mr Halek (often as members of a criminal conspiracy), Plaintiff refers to the relevant passages of the indictment, in particular to pages 7, 8, 11, 12, 13, 14, 16, 19, and 20.
[11] For the sake of completeness, Plaintiff also states that in most transactions with shares in Defendant 1 Section 17(3) of Act No 248/1992, on investment companies and investment funds, in the wording in force until 30 June 1996, stipulating that an investment fund is obliged to sell a security only at the highest price for which it is possible to sell the security while taking due professional care, was breached (or, in relation to the preceding manipulation of the share price, was circumvented).

The compulsory administrator's report states on page 21 that 'On 28 May 1996, the investment fund sold 152,935 shares in KOTVA, a.s. to KHB via the SCP for a price of CZK 400. On the same day, the investment fund repurchased 152,935 shares in KOTVA, a.s. from KHB, but for a price of CZK 952 per share. and subsequently the investment fund sold these shares to IFM, n.s , again for CZK 400. See the documents attached to paragraph 14 11 of this report. This transaction resulted in a loss of CZK 168,840,240 on the part of the investment fund '

3.2.1.2. Backdating of contracts intended to ensure that, in connection with provisions on contractual penalties, shares in Defendant 1 were transferred from the assets of TREND VIF without any counter-consideration

The indictment states the following on page 24: 'The conclusion of the backdated contracts was essentially merely an instrument to carry out other transactions, as mentioned above Contracts were probably concluded in this way that were secured, to the detriment of the fund, with high contractual penalties. However, it has only been possible to prove the backdating of the contract of 10 January 1996 with IFM, a s. This procedure resulted in damage to the fund at a time when the Ministry of Finance of the Czech Republic had suspended trading in securities from the fund's portfolio '

The essence of the backdated contract labelled with the date 10 January 1996 is described by the compulsory administrator's report on page 12 et seq , by the indictment (e.g. on page 27), and in brief on page 2 of the report of the Ministry of Finance as follows: '10 January 1996 – IFM, a.s. signed a contract for the transfer of 200,000 shares in Kotva from the fund's portfolio for a total price of CZK 360,000,000 Based on this contract, IFM, a s. acquired 60,000 shares in Kotva in the form of a contractual penalty, without any counter-consideration '

3.2.1.3. Non-observance of the preliminary measure concerning the shares in Defendant 1

The indictment states on page 31 that 'On 24 January 1997, Miroslav Halek, as the Chairman of the Board of Directors and Chief Executive Officer of IFM a.s., decided to transfer 361,375 shares in Sokolovska uhelna a.s and 30,000 shares in Kotva a.s. from IFM account number 100200879133 at the Prague Securities Centre to the account of Kralovehradecka brokerska a.s. (KHB) even though an order had been placed on IMF a.s. to refrain from handling the above-mentioned shares under Resolution of the Hradec Kralove Regional Court No Nc 542/96 of 21 January 1997, delivered to IFM, a.s. on 23 January 1997. This resolution was delivered to IFM, a.s. on 23 January 1997 and on the same day Mr Halek was acquainted with it through Karel Kavalir, on whom he had conferred power of attorney to study the document. Although he knew of the court's preliminary measure, he decided to transfer the above-mentioned shares to KHB a.s., which then transferred the shares to the account of the foreign company Forminster Enterprises Ltd. '

3.2.2. Use of the financial resources of TREND VIF and IF MERCIA so that companies around KHB, a.s. could purchase shares in Defendant 1 on their own account.

3 2.2.1. Misuse of financial resources of investment funds to the benefit of entities connected with KHB, n.s.

K 0256

The compulsory administrator's report states the following in paragraph 8.9: 'It is proven by the investment fund's statement of account for account number 103745574, held at IPB, a.s., dated 7 September 1995, and in particular by a payment order of the same day, that the management of the investment fund transferred CZK 112,000,000 to the bank account of KHB, which used this sum to purchase 70,077 shares in KOTVA, a.s. for a price of CZK 1,800 per share from Brno Broker Group, n.s., as evidenced by the confirmation of the conclusion of a contract of 4 September 1995 Confirmation on the conclusion of the business transaction of 4 September 1995 is attached to this report under paragraph 14.15. These shares were purchased by KHB in its own name and to its own account and were ultimately transferred, according to information obtained from the compulsory administration, to one of the companies controlled by the management of the investment fund.'

Page 3 of the Finance Ministry report adds that on 25 September 1995 KHB purchased a further 28,033 shares in Defendant I for CZK 49,057,750 in its own name and to its own account, and in relation to the description of the transaction with Brno Broker Group, a.s, the following conclusion is drawn: 'KHB purchased securities to its own account with the funds of another party (CZK 175,196,350)

3 2.2.2. Acquisition of the financial resources if investment funds via provisions on contractual penalties

On page 10, the report of the Ministry of Finance states[12] that 'The method for contractual penalties was based on the conclusion of contracts which formed contractual obligations for the investment fund that the investment fund subsequently failed to discharge; the contract penalized this with unusually high contractual penalties. Given the form of the contracts, a legal analysis thereof, and the unusual amount of the contractual penalties, there is a strong suspicion, backed up by the evidence that has been collected, that the actual object of these contracts was not the transfer of shares, but the artificial creation of a liability of the investment fund and the transfer of the assets of the investment fund

As a result of this method, the following assets disappeared from the investment fund:

a) The sum of CZK 126,000,000, which was acquired by IFM, a.s. in accordance with a contract of 10 January 1996. This contractual penalty was paid in the form of the transfer of 60,000 shares in KOTVA with a value of 108,000,000.
b) The sum of CZK 45,617,000, which was acquired by Moravska Zemska, a.s. in accordance with a contract of 10 July 1996.
c) The sum of CZK 44,896,666, which was acquired by Lidova obchodni spolecnost, s.r.o. in accordance with a contract of 17 July 1996.
d) The sum of CZK 73,718,000, which was acquired by Moravska Zemska, a.s. in accordance with a contract of 22 July 1996. See the document attached in paragraph 14.8 of this report.
e) The sum of CZK 70,526,475, which was acquired by Sokolovsky investicni fond, a.s. in accordance with a contract of 24 July 1996.'

3.2.2.3. Non-payment of purchase prices for shares and the thirty-year maturity period for payment of the purchase price

---

[12] The compulsory administrator's report agrees with this on page 12 et seq.; this method of transferring assets is also described on many pages of the indictment

These two methods are described by the compulsory administrator's report on pages 13-15 as follows  As regards the method of defaulting on the payment of the purchase prices of shares, the report states that 'This very simple method was based on the conclusion of contracts with companies which subsequently failed to pay the purchase price for the purchase of shares from the investment fund portfolio  These transferred assets were then transferred to companies controlled by the management of the investment fund.' This is followed by a list of these contracts; the loss incurred by TREND VIF from these transactions is more than CZK 350 million.

The method of a thirty-year maturity period is described by the compulsory administrator as follows: 'The method described in this paragraph is based on the conclusion of contracts under which the investment fund sold shares from the investment fund portfolio to companies controlled by the management of the investment fund for a price, the payment of which was set in monthly instalments and distributed over a period of thirty years.' Contracts worth CZK 336,841,700 were concluded in this way.

3.3. Transfer of assets from TREND VIF and IF MERCIA to Forminster[13], a company connected with Mr Halek

The parties involved managed, especially by means of the above-mentioned methods, to realize practically all the assets transferred from TREND VIF in the form of securities and to gain enrichment from the subsequent sale of these assets. They also planned to follow this procedure with the shares in Defendant 1. After compulsory administration was introduced, they implemented a series of transfers, described by the compulsory administrator on pages 21 and 22 of his report; the only aim of these transfers was to avoid the effects of the legal measures taken by the compulsory administrator aimed at returning the shares in Defendant 1 to the assets of TREND VIF

In this respect, the shares in Defendant 1 were eventually transferred to Forminster. As regards the personnel connection between Forminster and Mr Halek, and the purpose of the transfer of shares in Defendant 1 to Forminster, Plaintiff refers to the following passages of the indictment (page 25):

'The trading in and transfers of shares in Kotva, a.s. were the most significant interest of the accused. In the period before 4 August 1995, shares in Kotva were among the fund's key investments. The aim of the investment fund's then management was and still is – to transfer shares in Kotva to companies controlled by Mr Halek et al., and to gain a majority stake in Kotva by means of further purchases, in respect of which they have used the fund's resources.

The shares in Kotva are currently at the centre of interest of companies connected with Mr Halek et al. Even in the course of compulsory administration, several transfers of shares in Kotva have taken place between entities and companies; Jiri Mares, a fellow pupil of Mr Halek, is evidently a significant person – it was through him that shares in Kotva were transferred back to companies controlled by Mr Halek. At a time when the Regional Court in Hradec Kralove had reached a decision (which had not yet entered into force) to prohibit the handling of shares in Kotva by Kralovehradecka brokerska, at the instruction of KHB shares

---

[13] Forminster Enterprises Limited, registered office: 20 Queen Frederica Street, El Greco House, Nicosia, Cyprus (hereinafter referred to as 'Forminster').

K 0258

in Kotva were transferred to Forminster Enterprises Ltd., based in Cyprus, in respect of whose financial accounts Mr Halek had specific entitlements...

The activities of Mr Halek's group were not even stopped by a decision on compulsory administration; latest findings indicate that their attempts to take control of Kotva and the assets of Trend remain today, and that neither criminal proceedings nor custody are an obstacle <u>Before criminal proceedings began, some of the shares in Kotva were transferred to Forminster Enterprises Ltd. domiciled in Cyprus, and then this company was sold to Kralovehradecka spolecnost a.s. and Bonit kapital, a.s., Brno; KHB, renamed Brnenska obchodni, a.s. is currently in a situation where a bankruptcy petition has been filed against it.</u> According to latest information, even when Mr Halek was in remand prison he signed important documents connected with the accounts of Forminster Enterprises Ltd held at LGT Bank in Vaduz, Liechtenstein '

A connection between Forminster, Mr Halek, and other entities is also evident from the fact that, in a similar manner to the trading in the shares of Defendant 1, trading in the shares of Sokolovska uhelna, a.s also took place (for a description, see page 7 of the Finance Ministry report, which indicates that after the shares in Sokolovska uhelna, a.s. had been transferred from KHB to Forminster, these shares were immediately sold by Forminster with a profit of CZK 135 million). In this respect, Plaintiff also refers to page 9 of this report, in which the personnel connection with Forminster is also described.

All the above-mentioned circumstances are of fundamental importance in assessing the activities related to KOTVA department store, because these actions were taken by members of the statutory body who had been elected by Forminster, in respect of which the indictment refers to the connection with Mr Halek <u>All the annual reports of Defendant 1 since 2000 state that Forminster is the entity controlling Defendant 1</u> [14].

3.4. Measures taken by the Public Prosecutor – blocking of shares in Defendant 1

Under a measure of the Public Prosecutor, however, shares in Defendant 1 were blocked in the asset account of Forminster at the SCP in 1997. Therefore it is evident that no income from criminal activity can be gained from these shares, at least in the foreseeable future.

Nevertheless, the shares represent a majority stake in a company owning a building and land worth approximately one and a half billion crowns. Forminster has not yet been prevented by any measure imposed by a court or public authority from exercising voting rights and therefore it has the opportunity of making a profit from criminal activity, or it has the opportunity of legalizing proceeds from criminal activities.

Plaintiff describes below that steps are currently in place to circumvent the measure of the Public Prosecutor blocking the handling of Defendant 1's shares

3.4 1  Specification of the above-mentioned unlawful conduct as the legalization of income from criminal activities in the decisions of the competent authorities

---

[14] The annual reports for 2001 and 2003 state this on page 3; the annual report for 2000 states this on page 2.

In this respect, Plaintiff believes it would be expedient to recall the definition given in Section 1a(1) of Act No 61/1996, on certain measures against the legalization of proceeds from criminal activities and on an amendment to related laws:

'For the purposes of this Act, the legalization of proceeds from criminal activities (hereinafter referred to as 'legalization of proceeds') shall mean conduct aimed at concealing the illegal origin of proceeds from such activities with the intention of giving the impression that these proceeds are income acquired in accordance with the law. It is irrelevant whether such conduct occurs fully or partly in the Czech Republic. This conduct includes, but is not limited to
a) the transformation or transfer of assets in the knowledge that they come from criminal activities in order to conceal them or disguise their origin, or in order to assist a person who takes part in the perpetration of such activity to evade the legal consequences of such conduct;
b) the concealment or disguise of the real nature, source, location, or movement of assets and the handling thereof, or changes in the rights related to assets in the knowledge that such assets come from criminal activities;
c) the acquisition, possession, or use of assets or the handling thereof in the knowledge that such assets come from criminal activities;
d) the criminal conspiracy of persons or another form of cooperation for the purposes of the conduct stipulated under subparagraphs (a), (b), or (c).'

As regards an assessment of the above-mentioned conduct as activity aimed at legalizing proceeds from criminal activities, Plaintiff refers to the fact that the indictment specifies the following on page 30:

'Part of the proceeds from the above-mentioned criminal activity were subsequently transferred, in the amount of CZK 151,237,425, on 31 January 1997 from the account of KHB, a.s. held at IPB, account number 100200878/5100, on the instruction of Libor Pav to the account of Forminster Enterprises Limited (FEL), account number, 0123414AA, held at LGT Bank in Liechtenstein, which Mr Halek, in accordance with a general power of attorney from FEL, opened on 26 November 1996. A sum of USD 5,422,251, corresponding to the aforementioned amount in CZK when translated, was deposited in the account at LGT Bank in Liechtenstein on 5 February 1997. Of this amount, on 14 February 1997 USD 2 million was cleared to the account of Presley Industries at the same bank, account number 0123415AA, which Mr Halek also opened on 26 November 1996 pursuant to a general power of attorney from the said company. On the same day, i.e. 14 February 1997, an amount of USD 2,964,287.21, corresponding to a sum of CZK 82,768,765, was cleared back to the account of KHB, a.s. In return, on 30 January 1997 KHB transferred 384,971 shares in Kotva, acquired by criminal means from the portfolio of the investment funds Trend and Mercia, to the FEL account opened at the SCP at the request of Mr Vlastnik and Mr Pav.'

In a preliminary measure issued by the Provincial Court of the Liechtenstein Principality on 4 November 1997, blocking the funds in the bank account of Forminster, after the description of the above-mentioned transfers of finances to and from the Forminster bank account, it is stated that 'The above-mentioned investigations give rise to the suspicion of money laundering under Section 165 of the Criminal Code. It is necessary to work on the basis that unknown perpetrators have tried, by means of transferring fraudulently obtained money to accounts in Liechtenstein, with a subsequent transfer, to conceal from Trend VIF a.s. the place where the profits from the sale of securities, and other transactions, have been deposited, and in particular to prevent the flow of money from being monitored.'

K 0260

In a notification of the General Public Prosecutor's Office in Prague, addressed 29 August 2002 in the matter of the Accused, Miroslav Halek, whereby the Provincial Court of the Liechtenstein Principality was requested to release the money for the return thereof to the accounts of TREND VIF and MERCIA, it is stated that 'With reference to Article 1(1) of the European Convention on Mutual Assistance in Criminal Matters, and with reference to the Convention on Laundering, Search, Seizure, and Confiscation of the Proceeds from Crime of 18 December 1995... On 27 November 2001 the Supreme General Public Prosecutor's Office of the Czech Republic, under File No 2 NZt 749/2001, took over the criminal proceedings conducted in the Liechtenstein Principality against Miroslav Halek, such being at the request of the Attorney General of the Principality of Liechtenstein. In Liechtenstein, criminal proceedings were conducted against Miroslav Halek for the crimes of money laundering, criminal conspiracy, and other crimes pursuant to the relevant criminal-law provisions of the Liechtenstein Criminal Code '

In conclusion, Plaintiff refers to the fact that the Report of the Ministry of Finance of the Czech Republic also contains, on page 4, a passage titled 'Suspicion of the possible legalization of proceeds from crime'. The report also discusses this suspicion on pages 6 and 7 (with regard to shares in Sokolovska uhelna, a.s.). At the end (page 9), the report states that 'In the case of persons incorporated into this group, there is reason to suspect that their activities are financed by means of assets from the portfolios of funds. Another group of persons cooperates with these entities to legalize the proceeds from the criminal activities of the first group, such being by means of traditional activities in money laundering, i.e. the organization of seeming intercompany transactions, the implementation of banking transactions in third states, artificial increases in the profits of otherwise legally operating companies.

The following companies should be included in this group:
-   Forminster Enterprises Limited
-   Burzovni spolecnost Egretta, a.s.
-   Atlanta Safe, a.s.
-   Severni brokerska, a.s.
-   DYNAMIC PARTNERS, a.s.
-   Sokolovsky IF, a.s.
-   the natural persons Anatolij Solamatin, Jiri Mares'

3.4.2. Circumventing the purpose of the measure imposed by the Public Prosecutor

From what is mentioned above, it is clear that the Public Prosecutor's measure to block shares in Defendant 1, which are currently in the account of Forminster, should have a very obvious purpose, i.e. to prevent – at least until the end of the police investigation – proceeds from criminal activities, which according to the above-mentioned relevant decisions and according to the indictment comprise the shares in Defendant 1 (numbering 384, 971 shares), from being handled in any manner and to prevent Forminster and any entities related to it from achieving any undue enrichment in connection with ownership of the shares in Defendant 1.

Undoubtedly, the purpose of the Public Prosecutor's measure is to prevent the assets of Defendant 1, which are controlled by Forminster as the majority shareholder as a result of conduct labelled a crime by the indictment, from being transferred from the assets of Defendant 1.

K 0261

It ensues from the Public Prosecutor's measure in particular (even considering the above-mentioned ban on legalizing proceeds from crime) that no actions may be taken which are aimed at diminishing the assets of Defendant 1 and that the assets must not be transformed in a manner that would give rise (even only theoretically) to a risk that Defendant 1 will not have direct control over such transformed assets. Because of the above-mentioned actions of the competent authorities of several states, based on the suspicion of money laundering, it is quite evident that none of the actions of Forminster in the exercise of shareholder rights and none of the actions of members of statutory bodies de facto appointed by Forminster as the controlling entity are allowed to give rise to any doubt.

However, in the case at hand, not only has the main asset value, i.e KOTVA department store, been transferred from the assets of Defendant 1, but other activities have also been carried out leading to a situation where Defendant 1 has lost control of this asset completely.

So far, the following activities have been carried out:

1. Defendant 1 invested KOTVA department store into its subsidiary, which at the time in question was Defendant 2  At the time of the investment, Defendant 1 was the sole shareholder in Defendant 2;

2. Defendant 1 decided, as the sole shareholder in Defendant 2, to transform Defendant 2 into a limited partnership, which had the following consequences:

a) there was a fundamental reduction in the share of Defendant 1 in the profits of Defendant 2 and its liquidation balance (at present, Defendant 1 has a share in the profits of just under 50%, and a share in the liquidation balance of 40%, even though its contribution represents 98.6% of all contributions into the company –Defendant 2),

b) because Defendant 1 became the limited partner of Defendant 2, it does not contribute to the business management of the defendant, i.e. by making the transformation Defendant 1 de facto surrendered the opportunity of influencing the financial management of Defendant 2).

3. Defendant 2, acting in the capacity of the General Meeting of Defendant 3 (as the sole shareholder in Defendant 3), decided to increase the registered capital by CZK 1,390,000,000, i.e. from the current CZK 2,000,000 to a new amount of registered capital standing at CZK 1,392,000,000. The increase in registered capital was made by means of a new share subscription; all shares were offered to the sole shareholder – Defendant 2 – for subscription. The new shares were paid by means of a non-monetary contribution – KOTVA department store. Therefore Defendant 3 became the owner of KOTVA department store.

As has been mentioned above, the Public Prosecutor's measure to block the shares in Defendant 1 naturally relates to the assets of Defendant 1, which is represented by the blocked shares in the broader sense of the word.

By means of the steps that have been taken, Forminster and the statutory bodies of Defendant 1, who were appointed by Forminster as the main shareholder, have managed to separate the ownership of the shares in Defendant 1 from the main asset value which was held by

Defendant 1 at the time the Public Prosecutor's measure was imposed, i.e from KOTVA department store, and transfer this asset value to an entity in whose registered capital Defendant 1 does not share at all

Therefore, the practical result of these steps is that there is now practically no sense in the Public Prosecutor's measure.

In this respect, it is also significant that Defendant 3 holds bearer shares. This means that if these shares are transferred no one (including the police) will find out that such a transfer has occurred. It will not be possible to look up the terms and conditions of the transfer (in particular the person of the buyer, the purchase price, whether security was provided, whether the purchase price has been paid). Therefore there is a risk that these shares will be transferred outside the group of KOTVA companies without the payment of the purchase price and that the buyer will transfer the shares to another entity, and as such the income from the sale of the shares will be realized completely outside the KOTVA group of companies. Considering the above-mentioned description of transactions executed by the group connected with Mr Halek, it is quite understandable that Plaintiff is concerned in this respect.

3.4.3. Consequences of circumventing the Public Prosecutor's measure

Naturally, as a shareholder in Defendant 1, Plaintiff is not interested in a risk existing in this manner and to Plaintiff's detriment whereby the process that various authorities (see the quotations above) have labelled as the legalization of proceeds from crime will be completed, and therefore Plaintiff files this action.

There can be no doubt that the circumstances mentioned above, although primarily a criminal law matter, are, in their consequences, also a civil-law issue. Undoubtedly, it is a general truth that all legal activities aimed at legalizing proceeds from crime are unlawful as set forth in Section 39 of the Civil Code (a conflict with the law). Because, for this reason, all the above-mentioned legal transactions, the subject of which was the handling of KOTVA department store, are null and void, Defendant 1 remains the owner of KOTVA department store[15].

---

[15] Plaintiff does not consider it necessary to discuss, at this point, the invalidity of legal transactions concerning the shares in Defendant 1, because its legal status is affected by the transactions related to KOTVA department store. In this respect, Plaintiff also states that Plaintiff is aware that, between the persons who represented TREND VIF and Forminster, an agreement was concluded in 1999 whereby, in the future, TREND VIF was to refrain from casting doubt on Forminster's ownership of the shares in Defendant 1. Nevertheless, considering that the legal transactions, which are not only null and void because they are an infringement of the law, but which were also executed to perpetrate crime, cannot be subsequently legitimized by the conclusion of a settlement agreement, Plaintiff does not believe it is necessary to discuss this agreement in greater detail here.

To conclude, Plaintiff refers to the fact that in the above-mentioned context preventative nature of this action comes to the fore, because the decision on this action is capable of preventing the emergence of judicial disputes, evidently with an international element (see the above-mentioned Decision of the Supreme Court of the Czech Republic, File No 3 Cdo 1338/96, on the existence of an exigent legal interest in determining the existence of a legal relationship).

K 0263

Evidence:

- Report of the compulsory administrator of TREND-VIF of 22 February 1997 (including the documents specified in its appendix)
- Report of the Ministry of Finance of 21 January 1998, Ref No 102/90 17697
- Indictment against the Accused, Miroslav Halek et al, submitted by the Regional Public Prosecutor's Office in Hradec Kralove on 30 September 1998, File No KZv 323/97
- Complete Certificate of Incorporation of TREND VIF
- Report of the Securities Centre on the transfer of shares in Defendant 1 from TREND VIF to Forminster (may be requested by the court)
- Contributor's Statement of 10 October 2000, on the transfer of KOTVA department store from Defendant 1 to Defendant 2
- Complete Certificate of Incorporation of Defendant 2

- Notarial Deed of Vaclav Halbich of 20 May 2003, No NZ 235/203, N 317/2003 (contains a decision on a change in the legal form of Defendant 2, including the new wording of the Articles of Association, evidences the reduction in the share in profits, the settlement share, and the share in the liquidation balance)
- Statement from the Property Register (Title Deed No 265 for the Stare Mesto cadastral District)
- Annual Reports of Defendant 1 for 2000, 2001, and 2003
- Decision of the Liechtenstein Provincial Court in Vaduz, Liechtenstein, on the freezing of assets in the accounts of Forminster and Presley Industries
- Application of the General Prosecutor's Office of 29 August 2002, File No VI VZv 3/2002 – 1597, for legal assistance – request of the Provincial Court in Vaduz, Liechtenstein, of 29 August 2002
- Public Prosecutor's Measure to block transfers of shares issued by Defendant 1 (may be requested by the court)
- Expert opinion valuing KOTVA department store
- with the reservation of further evidence

## 4. CONCLUSION, PLAINTIFF'S DEMAND

Above, Plaintiff has described the reasons why the transfers of KOTVA department Store from Defendant 1 to Defendant 2 and from Defendant 2 to Defendant 3 are null and void and why Defendant 1 remains the owner of the property. Plaintiff has also evidenced its exigent legal interest in having the ownership of KOTVA department store determined by a court.

For the above-mentioned reasons, Plaintiff proposes that, after discussing the matter, the court issue the following:

### VERDICT

1. It has been determined that Defendant 1 is the sole owner of the following properties:

K 0264

- Building with land registry reference number 656 (civic amenities), belonging to part of the Stare Mesto municipality, located on building plot number 680;
- Building with no land registry reference number or street number (civic amenities), belonging to part of the Stare Mesto municipality, located on building plot number 1018/2;
- Land Parcel No 680 (developed area and courtyard) with an area of 4,385 m2;
- Land Parcel No 683/1 (other land) with an area of 851 m2;
- Land Parcel No 683/2 (other land) with an area of 2,963 m2;
- Land Parcel No 683/3 (other land) with an area of 2 m2;
- Land Parcel No 690/2 (other land) with an area of 25 m2;
- Land Parcel No 690/3 (other land) with an area of 49 m2;
- Land Parcel No 690/4 (other land) with an area of 9 m2;
- Land Parcel No 1018/2 (developed area and courtyard) with an area of 1 m2;

all in the Stare Mesto Cadastral District and municipality of Prague.


II. The Defendants are obliged to reimburse the costs of proceedings jointly and severally to Plaintiff within three days of the date that this Verdict enters into force


[signature]
GILROY LIMITED
Ondrej Peterka
Attorney-at-Law, pursuant to power of attorney


Appendices:
- Statement from the Securities Centre
- Certificates of Incorporation of the Defendants
- Proof of the existence of Plaintiff
- Statement from the Property Register (Title Deed No 265 for the Stare Mesto Cadastral District)
- annual reports of Defendant 1 for 2000, 2001, and 2003
- Expert Opinion valuing KOTVA department store
- Report of the compulsory administrator of TREND-VIF of 22 February 1997 (including the documents specified in its appendix)
- Report of the Ministry of Finance of 21 January 1998, Ref. No 102/90 17697
- Indictment against the Accused, Miroslav Halek et al., submitted by the Regional Public Prosecutor's Office in Hradec Kralove on 30 September 1998, File No KZv 323/97
- Complete Certificate of Incorporation of TREND VIF
- Contributor's Statement of 10 October 2000, on the transfer of KOTVA department store from Defendant 1 to Defendant 2
- Notarial Deed of Vaclav Halbich of 20 May 2003, No NZ 235/203, N 317/2003
- Decision of the Liechtenstein Provincial Court in Vaduz, Liechtenstein, on the freezing of assets in the accounts of Forminster and Presley Industries
- Application of the General Prosecutor's Office of 29 August 2002, File No VI VZv 3/2002 – 1597, for legal assistance – request of the Provincial Court in Vaduz, Liechtenstein, of 29 August 2002

K 0265



13 C131/2004-63

**CZECH REPUBLIC**

**JUDGEMENT**

District Court for Prague 1 held, by the judge JUDr. Libuše Fritzová, in the legal matter of the Plaintiff: GILROY LIMITED, with its registered seat Pikioni 4, Limassol, the Republic of Cyprus, represented by JUDr. Tomáš Láznička, barrister and solicitor at the law office with its registered seat in Prague 4, Jindřicha Plachty 28, against the Defendants: 1) KOTVA, a.s., ID no.: 60193808, with its registered seat Náměstí Republiky 8, 113 88 Prague 1; 2) KOTVA NEMOVITOSTI, k.s., ID NO. 26229048, with its registered seat Příkop 4, 602 00 Brno; and 3) SPV KN, a.s., ID no.: 26910705, with its registered seat Příkop 4, 602 00 Brno, all represented by JUDr. Petr Toman, barrister and solicitor at the law office with its registered seat in Prague 2, Trojanova 12

Concerning the determination of the ownership of real property

as follows:

I. The application for determination that Kotva a.s. is the exclusive owner of the real property mentioned below is being r e j e c t e d:

1) building no. 656 in the municipal part of the Old Town, located on the building lot no. 680;
2) building without a number, in the municipal part of the Old Town, located on the building lot no. 1018/2;
3) lot parcel no. 680;
4) lot parcel no. 683/1;
5) lot parcel no. 683/2;
6) lot parcel no. 683/3;
7) lot parcel no. 690/2;
8) lot parcel no. 690/3;
9) lot parcel no. 690/4;
10) lot parcel no. 1018/2.

all of the above-mentioned real property is inscribed by the Land Registry office for the City of Prague in the deed of ownership no. 265 for the City of Prague, Cadastral District of Staré Město (Old Town).

II. The Plaintiff s h a l l compensate the Defendants for the costs of the procedure, in the total amount of CZK 12,450, to the account of the representative of the Defendants, JUDr. Petr Toman, within 3 days of the legal effects of this judgement.

**Rationale:**

According to the claims brought forward in the application, the Plaintiff is a shareholder of the 1st Defendant. The first Defendant was, in 2000, inscribed in the Land Registry as the sole owner of the real property specified in the holding. In 2000, the first Defendant made a declaration about a contribution in the form of a real property, on the basis of which the second Defendant was inscribed in the real property registry as the sole owner. Currently, the third Defendant is registered as the owner. The third Defendant is a company whose only partner is the second Defendant. The Plaintiff is convinced that the first Defendant still owns the above-mentioned real property, and that all legal acts on the basis of which the second and then the third Defendant were registered as owners, are invalid due to their opposition to the law. The first Defendant, as the sole shareholder of the second Defendant, decided to transform the second Defendant into a limited partnership, by which act he significantly cut down the share of the first Defendant in the profits of the second Defendant. The first Defendant, as the limited partner, cannot participate in the business management of the second Defendant, and has therefore factually given up the possibility of having impact on its financial management. The trading and transfers of the shares of Kotva, a.s., were to cover up legalisation of the proceeds of crime of other entities. The investigations of the criminal activity related to the trading with the shares of the first Defendant is not complete yet. The Plaintiff, as the shareholder, is entitled to sue for the determination of the ownership to a set of real property which represents an aspect of the assets used in the conduct of business of a joint-stock company. By such an application for determination, the situation of a right being threatened, or of uncertainty in a legal relation in a situation when an adequate remedy cannot be reached otherwise, and the application for determination may lead to an arrangement which will constitute a legal framework that will guarantee that future disputes will be avoided. The Plaintiffs urgent interest in such a determination is fully established.

The application was filed with the District Court for Prague 1 on 30 June 2004, the power of attorney of the former legal representative of the Plaintiff, Mgr. Ondřej Peterka, was signed by the Plaintiff on 25 June 2004, which was a power of attorney for representation in the above-mentioned law suit for the determination of the ownership of the real property specified in the holding.

The third Defendant argued that the application should be rejected, as there is no urgent legal interest on the part of the Plaintiff in the determination of the right of ownership to the above-mentioned real property.

All of the Defendants argued that the application should be rejected, as there is no urgent legal interest on the part of the Plaintiff in the requested determination of the right of ownership to the real property. The Plaintiff is not authorised to sue in this procedure, as it is not a party to any rights or legal relations concerned by the procedure, and those rights or legal relations in no way touch upon his legal sphere. The Plaintiff is not a party to legal relations to the first Plaintiff, nor claims as much. At the time of the transfer of ownership from the first Defendant to the second Defendant and subsequently to the third Defendant, the Plaintiff was not the shareholder of the first Defendant, and those transfers could not have had an impact on its situation. The Plaintiff was able to ascertain the said facts, and undoubtedly ascertained them, from public resources, such as the Land Registry or the Commercial Registry.

A determination of a right or a legal relation through an application for determination is only possible in a situation when the legal position of a party to a legal relation has become uncertain, or if its position was threatened. This is not the case. The Plaintiff only has a relation to the first Defendant based on the ownership of one share, which represents a small share in the registered capital of that Defendant. The Defendants are therefore of the opinion that the application could be rejected due to insufficient urgent legal interest, without the court studying the substantive aspects of the ownership to the real property specified in the holding. The Defendants are convinced, however, that all of the property transfers mentioned above were in line with the law.

From the statement of account of the Plaintiff, as the owner of securities, the Court has ascertained that as of 24 June 2004, the Plaintiff was the owner of one share of the first Defendant. On 29 June 2004, the Plaintiff obtained another 134 shares into its ownership. The Plaintiff therefore gave its former legal representative Mgr. Ondřej Peterka an authorisation to file an application one day after it became the owner of one share of the first Defendant.

By an application for determination, a plaintiff may claim the determination of a right or a legal relationship, provided he has an urgent interest in such a determination, within the meaning of Sec. 80 (c) of the Civil Procedures Act. An application for determination is relevant in cases when there is a threat that the rights of a party will be breached; in that case, it is of a preventive nature. Also in cases, when an application for performance could be filed, an application for determination can be filed in cases when an arrangement constituting the legal framework of the relationship of the parties may be reached, which would prevent future disputes. The Plaintiff however, has no legal relation to the real property the determination of whose ownership he had sought. Undoubtedly, the Plaintiff had information about the changes in the registry of legal relations in the Land Registry prior to having bought any share in the company Kotva, a.s. The relation between the Plaintiff and the first Defendant is based on the Plaintiff owns the shares of the first Defendant. The position of the Plaintiff as a shareholder is not threatened in any way. The Plaintiff purchased the shares of the first Defendant at a time when the first Defendant was not registered in the Land Registry as the owner of the real property specified in the application. The Plaintiff has no direct relation to the disputed real property, and the Plaintiff does not claim that the changes in legal relations to the real property occurred after it had bought the said shares. In this situation, the Plaintiff is not entitled to sue under an application for determination concerning the said real property. The Plaintiff does not have any urgent legal interest in the requested determination, within the meaning of Sec. 80 (c) of the Civil Procedures Act. The Court has therefore rejected the application.

The Defendants were successful in the matter, and are therefore entitled to a compensation of costs under Sec. 142 (1) of the Civil Procedures Act. The Defendants' costs arose due to its legal representations, where the rate is CZK 10,000, increased by 20% for representing multiple persons, plus 6 flat fees at CZK 75.

Notice:      This judgement may be appealed within 15 days of the delivery of the written form of the judgement, at the Municipal Court in Prague, through this Court.

In Prague, 20 September 2005                    JUDr. Libuše Fritzová
                                                Judge

Responsible for the correct rendering:
Jarmila Macáková

**X**

# CZECH REPUBLIC



## CIVIL CODE
### "Občanský zákoník"

#### 2005 edition

*TradeLinks*

Civil Code

§ 174 - § 177

the pledge (the thing subject to lien) instead of the lien creditor (sublience).

(3) The provisions on lien shall apply as appropriate to sublien.

## Division 2
## Right of Retention (Possessory Lien)

### Section 175

(1) A person who is obliged to hand over another person's movable thing held by him may retain it for the purpose of securing a receivable due to him from the person to whom he would otherwise be obliged to hand over the thing.

(2) A right of retention (possessory lien) also arises in the case of a receivable which is not yet due (mature) provided that a bankruptcy petition has been filed against the debtor.

### Section 176

(1) A right to retain a thing shall not arise if the person in whose favour such right might arise holds the thing unlawfully, in particular if the person acquired the thing in an unlawful manner or by means of a trick.

(2) A right to retain a thing shall not pertain to a person who was ordered, when a thing was passed on to him, to handle it in a manner which is incompatible with proper exercise of the right of retention; this shall not apply if a bankruptcy petition has been filed against the debtor.

### Section 177

(1) A right of retention (possessory lien) arises when an entitled person expresses his will (unilateral act) to retain (withhold) a certain thing.

(2) An entitled person is obliged to inform the debtor of this retention of the thing and the reasons for this without delay; if the contract under which such thing is with the debtor was made in writing, the person must also notify the debtor in writing.

128

Civil Code

§ 178 - § 415

### Section 178

Regarding the care of a retained thing and reimbursement of the related expenses, the person who retains the thing has the same status as a lien creditor has in relation to a thing delivered in pledge.

### Section 179

Based on his right of retention, the creditor is entitled to preferential satisfaction from the proceeds of the retained thing when the judicial ruling is executed, his entitlement being satisfied before the other creditors' claims, even before the claim of the lien creditor.

### Section 180

(1) A right of retention extinguishes when the secured receivable is discharged, or when the retained thing ceases to exist, or when it is handed over to the debtor.

(2) A right of retention also extinguishes if the debtor provides the entitled person, subject to his consent, with another securement.

## PARTS THREE, FOUR AND FIVE
## (Sections 181 to 414)
## Repealed

## PART SIX
## LIABILITY FOR DAMAGE AND UNJUST ENRICHMENT

## CHAPTER I
## PREVENTION OF IMPENDING DAMAGE

### Section 415

Everybody is obliged to behave in such a way that no damage (injury) to health, property, nature and the environment occurs.

129

Civil Code     § 415 - § 417

*Relating provisions of the Civil Code:*
*– sections 3, 6, 13, 43, 420, 420a, 421, 441, 451*
*Some relating provisions of other Acts:*
*– sections 170, 171, 175 of the Labour Code;*
*– Act on Railways;*
*– sections 86f(2), 88(1) of the Building Code*

*Commentary on section 415:*
*The provision of section 415 contains one of the fundamental principles of the Civil Code. Liability for damage is regulated in sections 420 to 450 and liability for unjust enrichment in sections 451 to 459. Liability for defects is regulated individually (with regard to specific types) and liability for delay (default) is subject to sections 517 to 523.*

### Section 416
Repealed

### Section 417
(1) Anyone who is threatened with damage must take measures to avert its occurrence. In a manner appropriate to the circumstances of the threat.
(2) If the threat is serious, the person threatened has the right to demand at a court that it order suitable and commensurate precautions to avert the impending damage.

*Relating provisions of the Civil Code:*
*– sections 6, 127, 418, 419, 441*
*Some other relating provisions:*
*– section 384 of the Commercial Code*

*Commentary on section 417:*
*A person who is threatened with damage may be either an individual or a legal entity. Such person is obliged to take measures to avert the impending damage. Non-performance of this duty may be sanctioned under section 441.*

130

§ 418 - § 419     Civil Code

### Section 418
(1) Anyone who has caused damage in an effort to avert a directly impending danger, which he has not himself brought about, shall not be liable for such damage, unless, in the given circumstances, the danger could have been averted in a different manner or unless the consequences of his conduct are obviously equally serious or even more serious than the consequences of the danger which he threatened.
(2) Likewise, a person is not liable for damage caused by acts that are necessary to his defence against an impending or persisting attack. However, a defence which is obviously disproportionate to the nature and danger of the attack shall not be deemed as necessary.

*Some relating provisions of other Acts:*
*– sections 13, 14 of the Criminal Code;*
*– section 13 of the Labour Code*

*Commentary on section 418:*
*The regulation in section 418 corresponds to the provisions of the Criminal Code. A person who has caused damage when averting a directly impending danger which he has not brought about, or when acting in necessary defence against an impending or persisting attack, is excluded from liability for such damage.*

### Section 419
Any person who averted impending damage has the right to reimbursement for expenses which he reasonably incurred, as well as to compensation for damage which he thereby suffered, and he has this right also against the party in whose interest he acted. However, such compensation shall not exceed the total sum of the averted damage.

*Relating provisions of the Civil Code:*
*– sections 417, 418, 443 to 450*
*Some other relating provisions:*
*– sections 192, 205 of the Labour Code.*

131

Commentary on section 419:

Damages and reimbursements of expenses are due to a person who acted in accordance with the provisions of sections 417 and 418. Damages can be provided up to the amount of the damage averted.

# CHAPTER II
# LIABILITY FOR DAMAGE

## Division 1
## General Liability

### Section 420

(1) Any person is liable for damage which he caused by breaching a legal obligation (duty).

(2) Damage is deemed to have been caused by a legal entity or an individual if it was caused within the scope of performance of activity by persons whom the legal entity or individual assigned to perform such activity (or certain tasks within the framework of such activity). These persons are not themselves liable under this Code for the damage thus caused; their liability under labour provisions is not thereby affected.

(3) A person (an entity or an individual) shall be relieved of his liability if he proves that he did not cause the damage.

Relating provisions of the Civil Code:
- sections 7 to 10, 18 to 21, 420a to 423, 424, 432, 433, 442 to 450

Some relating provisions of other Acts:
- section 135(2) of the Civil Procedure Code;
- sections 172 to 186, 205c(1) of the Labour Code;
- sections 4, 5 of the Criminal Code;
- sections 43(2), 228 of the Criminal Procedure Code;
- section 78(2) and (3) of the Act on People's Health Care;
- sections 373 to 386 of the Commercial Code

Commentary on section 420:

The prerequisites for liability for damage are:
- a breach of a legal obligation (duty);
- damage caused (detriment);
- a connection between a breach of duty and the damage caused;
- bringing about such damage, or objective liability for such damage.

### Section 420a

(1) Any person shall be liable for damage which he causes to another person while operating a business (an enterprise).

(2) Damage is considered to have been caused while operating a business (an enterprise) if it was caused:

(a) by an activity performed in the operation of a business, or by a thing used in such activity;

(b) by the physical, chemical, or biological effects of an operation on its surroundings;

(c) by the lawful performance, or the making of arrangements for such performance, of those kinds of work which cause damage to someone else's real estate, or which substantially impede or make impossible the use of some else's real estate.

(3) A person (entity or individual) shall only be relieved from liability for damage caused upon proving that such damage was caused either by an unavoidable event not arising from the operation of a certain business (an enterprise), or by own conduct of the person injured.

Relating provisions of the Civil Code:
- sections 420, 421

Some relating provisions of other Acts:
- sections 261(1)(a), 273 to 386 of the Commercial Code;
- sections 187 to 205c of the Labour Code;
- Act on Roads

Civil Code                                                              § 422 - § 424

– a minor or a person suffering from a mental disorder is liable for damage;
– a person exercising supervision over another person is liable for damage (because the duty to supervise has been neglected);
– a minor or a person suffering from a mental disease and the supervising person are liable for damage;
– nobody is liable.

## Section 423

Any person who is guilty of having brought himself into a condition (sic) in which he is incapable of controlling his conduct or estimating (sic) its consequences must provide compensation for the damage he causes while he is in such condition; persons who have intentionally put him into such condition shall be liable jointly and severally with him.

*Relating provisions of the Civil Code:*
– sections 420, 420a, 442, 809(2), 820, 826
*Some relating provisions of other Acts:*
– section 12(2) of the Criminal Code;
– section 186 of the Labour Code

*Commentary on section 423:*
This section applies to liability for damage when caused by an intoxicated person.

## Liability for Damages Caused by an Intentional Contravention of Morality
## Section 424

Any person who causes damage by an intentional contravention of morality (good morals) shall be liable for the damage.

*Relating provisions of the Civil Code:*
– sections 3, 39, 415
*Some other relating provisions:*
– section 187(1) of the Labour Code

136

§ 424 - § 428                                                              Civil Code

*Commentary on section 424:*
The term "morality" ("good morals") is not defined. Whether damage has been caused by an intentional contravention of morality is determined by the judge.

## Section 425
Repealed

## Section 426
Repealed

## Liability for Damage Caused by the Operation of Means of Transport
## Section 427

(1) Individuals and legal entities operating means of transport as their business shall be liable for any damage caused by the special nature of those operations.
(2) The same liability shall be borne by any other operator of a motor vehicle or a motor vessel, or an aircraft.

*Relating provisions of the Civil Code:*
– sections 7 to 10, 18 to 21, 420, 420a, 450, 764(1), 769(3), 773
*Some relating provisions of other Acts:*
– section 15 of the Act on Private International Law;
– Act on Railways;
– Act on Civil Aviation;
– Inland Water Transport Act;
– Act on Ocean Transport (Shipping)

*Commentary on section 427:*
Liability under section 427 is general (objective) liability.

## Section 428

The operator cannot exonerate himself from liability if the damage was caused by circumstances which originated from his operations.

137

**Y**

**Georgiy Nikitin**

| | |
|---|---|
| From: | Georgiy Nikitin |
| Sent: | Tuesday, August 17, 2004 10:09 AM |
| To: | 'Vladimir Hoffmann'; 'richard.harazim@od-kotva.cz' |
| Cc: | Andrew Weiss |
| Subject: | RE: Kotva |



KotvaOffer
ug17-2004.pdf (26 ...

Dear Mr. Harazim,

Attached, please, find the offer from Weiss Asset Management to sell the EGO's shares of Kotva.
We will be looking forward to your response.
Best regards,

Georgiy Nikitin, Ph.D.

Weiss Asset Management
tel. + 1 (617) 778-7725
fax + 1 (617) 778-7781



EXHIBIT
HARAZIM
27 8-16
2/23/66

W0004223



# WEISS ASSET MANAGEMENT

**PRIVATE AND CONFIDENTIAL**

August 16th, 2004

To: Martin Benda
From: Andrew Weiss,
Weiss Asset Management

August 17, 2004

Dear Mr. Benda

Based on our previous correspondence and based on your request we herewith submit our counter-offer to sell you the shares of Kotva held by Brookdale Opportunity Fund (BGO).

Conditions of the offer:

1. We offer to sell the 82,781 shares of Kotva held by BGO for a purchase price of 131 million CZK, no additional obligations or restrictions are placed on either the buyer or seller.
2. This offer expires on August 31, 2004.

Sincerely yours,

Andrew Weiss

---

29 Commonwealth Avenue • Boston • Massachusetts • 02116
Phone: (617) 778-7780 • Fax: (617) 778-7781 • E-mail: info@weissasset.com

Received  Aug-17-04  12:00am    From-5082278781        To-Weiss Asset Management    Page 002

W0004224

**Georgiy Nikitin**

| | |
|---|---|
| From: | Richard Harazim (richard.harazim@od-kotva.cz) |
| Sent: | Tuesday, August 17, 2004 11:51 AM |
| To: | Georgiy Nikitin; Vladimir Hoffmann |
| Cc: | Andrew Weiss |
| Subject: | RE: Kotva |

Dear Mr. Nikitin

Thank you for your offer.

Unfortunately, your offer doesn't seem to deal with the lawsuits brought about by
Balfindor and Gilroy against our company. Without resolving these and any other potential
lawsuits against our company raised by BGO or by BGO controlled entities we won't be able
to conclude any deal at all.

Should you reconsider your position we can return to the discussion about the purchase
price for Kotva shares held by BGO.


Best regards


Richard Harazim

W0004225

**Georgiy Nikitin**

| | |
|---|---|
| From: | Georgiy Nikitin |
| Sent: | Wednesday, August 18, 2004 11:07 AM |
| To: | 'Richard Harazim'; Vladimir Hoffmann |
| Cc: | Andrew Weiss |
| Subject: | RE: Kotva |

Dear Mr. Harazim,

We are preparing another counter-offer, which would deal with the lawsuits brought regarding the ownership of Kotva, a.s. property. Andrew Weiss is currently on vacation. He will be back in the beginning of the next week and we will try to have the written offer ready then.
Best regards,
Georgiy

Georgiy Nikitin, Ph.D.

Weiss Asset Management
tel. + 1 (617) 778-7725
fax + 1 (617) 778-7781

W0004226

**Georgiy Nikitin**

From:       vlado1@volny.cz
Sent:       Monday, August 23, 2004 2:16 PM
To:         richard.harazim@od-kotva.cz
Cc:         Georgiy Nikitin
Subject:    Nabídka



Kotva+Offer+23-A
ug-04.pdf (76 ...

          Vážený pane Harazíme,

dle instrukcí pana Nikitina - zástupce prof. Weisse Vám přeposílám nabídku na prodej akcií
Kotva, a.s.

S pozdravem,

Vladimír Hoffmann.

--          ✔
Zrychlete si až 7x načítání www stránek a obrázků přes vytáčené připojení pomocí VOLNÝ
internet akcelerátoru. Stažení a používání je ZDARMA. http://akcelerator.volny.cz

1

W0004227



**PRIVATE AND CONFIDENTIAL**
Without Prejudice

August 23rd, 2004

To: Martin Benda, Richard Harazim
From: Andrew Weiss, Weiss Asset Management

Dear Mr. Benda and Mr. Harazim,

Based on our previous correspondence and based on your request we herewith submit our counter-offer to sell you 82,771 shares of Kotva, a.s.

Conditions of the offer:

1. We offer to sell you 82,771 shares of Kotva for a total consideration of 131 million CZK.
2. We will attempt to influence Gilroy to withdraw the complaint questioning ownership of assets by Kotva, a.s. Since we do not exert control over Gilroy and Balfindor or petitions submitted by them, we cannot guarantee a withdrawal of the complaint. The sale agreement shall be conditional on withdrawal of the existing lawsuit where Gilroy is the plaintiff.
3. We provide a guarantee that no legal or physical entities controlled by us will initiate attacks against the ownership or transfer of KOTVA Department Store.
4. This offer expires on August 31st.

Please, note that this is a non-binding offer, which will be subject to contract.
We will be looking forward to your reply.

Sincerely yours,
Andrew Weiss


Signed by Georgiy Nikitin on behalf of Andrew Weiss:


Georgiy Nikitin

---

29 Commonwealth Avenue • Boston • Massachusetts • 02116
Phone: (617) 778-7780 • Fax: (617) 778-7781 • E-mail: info@weissasset.com

W0004228

**Georgly Nikitin**

| | |
|---|---|
| From: | Richard Harazim [richard.harazim@od-kotva.cz] |
| Sent: | Friday, August 27, 2004 7:51 AM |
| To: | Georgly Nikitin |
| Subject: | Kotva shares |

Dear Mr. Nikitin

Thank you for your offer from 23.8.04. While we appreciate your offer and we are basically interested in buying the shares of Kotva from BGO we feel the following areas are problematic for us:

1. The purchase contract must be tied to lawsuits filed by Gilroy AND Balfindor, not only to Gilroy.

2. The purchase price is too high from several points of view. First of all, it is too high in general. It is much higher than the price on Stock exchange. Secondly, even if we disregarded this, we certainly wouldn't be able to sell the shares to another investor at the same price, which means we would have to decrease the share capital of Kotva. If it showed in the process of capital decrease that NAV is lower than the purchase price (the deal created a loss) - which is a certainty at the level suggested by you - we as a board would face risks that are not acceptable.

3. The process of acquiring more than 10 % of our own shares poses accounting and legal complications that must be consulted with our auditors and lawyers.

4. Due to the above we can't react as quickly as requested from us.

5. Mr. Benda who is in charge of this particular deal is leaving for a holiday and will not be back before Monday 13, September.

Therefore we suggest to prolong the negotiating period till the end of September.

Best regards

Richard Harazim

1

W0004229

**Lucy Chen**

| | |
|---|---|
| **From:** | Vladimír Hoffmann [vlado1@volny.cz] |
| **Sent:** | Monday, October 04, 2004 4:17 PM |
| **To:** | Andrew Weiss |
| **Subject:** | Kotva/Trend |



E-mail Andy Oct 4,
2004.doc (19...

EXHIBIT
Kuketar
31
11/16/06  S.E.

       Dear Andy,

Please find enclosed document.

Best regards,

Vlado.
---
Odchozí zpráva neobsahuje viry.
Zkontrolováno antivirovým systémem AVG (http://www.grisoft.cz).
Verze: 6.0.762 / Virová báze: 510 - datum vydání: 13.9.2004

1

WP0000664

E-mail Georgiy, Oct. 4, 2004

Dear Georgiy,

I have one bad news and 2 good news.

1. Bad news:
SCP did not transfer the Kotva and Trend shares to KT. The reason is that SCP now requires that company documents are not older than 3 months (it used to be 6 months). Unfortunately the KT certificate of Incorporation that I have was verified by the Secretary of State on June 17, 2004. Therefore the documents were good only until Sep.16, 2004. We will have to produce the new set of documents. Let's discuss by phone what exactly is needed.

Since it will take a while to produce new KT documents and we need to file the petition seeking the withdrawal of shares from the bankrupt's assets I suggest that Gilroy files it. Gilroy will need new documents either but it might take shorter to get them from Cyprus. Alternatively we can order documents for both companies and file the petition by whichever has the documents first. Please let me know what you think about this idea and whether I should order new documents for Gilroy.

2. Good news 1:
I checked the SCP's public records and they list the following shareholders of Kotva who own more than 10 % (as at Sep. 30, 2004 – latest available):
Forminster Enterprises Limited: 55,46 %
Fidea Consulting, a.s.: 14,08 %
Bank of Bermuda / Guernsey / Limited: 11,92 %

It means that the bankruptcy trustee of Sprint has not yet sold the Kotva shares.

3. Good news 2:
Benda told me that he was able to convince Henry Prestage (representative of the Irish investors) to join our meeting with Benda – preliminary scheduled for this Thursday. Up to now Prestage refused to get involved in any way. My idea would be to convince Prestage that if we can agree with Benda on the purchase price of BGO's Kotva shares, Prestage would pay part of the purchase price for the property (which would equal the purchase price of BGO's shares) directly to us. This would solve the issue of Kotva buying its own shares as well as Benda's counterparty risk.

Benda told me that Prestage required that I show him some document proving that I represent BGO in Kotva/Trend matter. Could you please issue a simple letter signed by Andy confirming that and e-mail me the PDF copy ? I do not want to show him my contract, since it contains also financial and other details.

Let's discuss the affore mentioned issues by phone later today.

Best regards,

Vlado.

**Georgiy Nikitin**

| | |
|---|---|
| **From:** | Andrew Weiss |
| **Sent:** | Tuesday, November 23, 2004 12:24 PM |
| **To:** | 'Richard Harazim' |
| **Cc:** | Andrew Weiss |
| **Subject:** | RE: Kotva |

Counter-offer
11-23-04.pdf (10...

                    Dear Mr. Harazim,

Attached please find our counter offer to sell shares in Kotva and Trend.

Andrew Weiss

1

W0004230



# WEISS ASSET MANAGEMENT

**PRIVATE AND CONFIDENTIAL**
Without Prejudice

November 23, 2004

To: Martin Benda, Richard Harazim
From: Andrew Weiss, Weiss Asset Management

Dear Mr. Benda and Mr. Harazim,

Based on our previous correspondence and based on your request we herewith submit our counter-offer to sell you all our holdings in Kotva, a.s. (82,782 shares or 11.92%) and Trend VIF (1,098,617 shares or 39.73%)

Conditions of the offer:

1. We offer to sell you 82,782 shares of Kotva and 1,098,617 shares of Trend for a total consideration of 295.75 million CZK (our computations are detailed in Appendix A).
2. We will attempt to influence Gilroy and Balfindor to withdraw the complaint questioning ownership of assets by Kotva, a.s. Since we do not exert control over Gilroy and Balfindor or petitions submitted by them, we cannot guarantee a withdrawal of the complaint. The sale agreement shall be conditional on withdrawal of the existing lawsuits where Gilroy and Balfindor are the plaintiffs.
3. We provide a guarantee that no legal or physical entities controlled by us will initiate litigation against the ownership or transfer of Kotva, a.s. shares, KOTVA Department Store, or Kotva subsidiaries.
4. This offer expires on December 10, 2004.

Please, note that this is a non-binding offer, which will be subject to contract.
I am looking forward to your reply. Please contact me directly.

Sincerely yours,

Andrew Weiss

W0004231

## Appendix A. Valuation of BGO holdings of Kotva and Trend

BGO holdings: 1,098,617 shares of Trend (39.73%) and 82,782 shares of Kotva (11.92%).

**Estimated value of Kotva:**
<u>Assets</u> = CZK 1.7 billion (value of the Kotva Department Store building)
<u>Estimated Liabilities</u> = CZK 0.3 billion
Net Asset Value of Kotva = CZK 1.4 billion
**BGO's share of Kotva's NAV** = CZK 167 million

**Estimated value of Trend:**
**Scenario 1:**
<u>Assets:</u>
Kotva shares held in Forminster and Melodia to be sold to Mr. Woolf: 277,036 shares (as per Paragraph 101 of London Court of International Arbitration Case No. 0250 decision that those shares legally belong to Trend) at CZK 1,350 per share (the option strike price from the agreement with Mr. Woolf) = CZK 373,998,600; receivable with 80% probability: CZK 283,198,880.
Other assets, including undisputed shares of Kotva and claim for 327 237 shares in Sokolovska Uhelna = CZK 35 million
<u>Estimated Liabilities</u> = CZK 45 million
Net Asset Value of Trend = CZK 273,198,880
**BGO's share of Trend's NAV** = CZK 108.5 million


**Scenario 2:**
<u>Assets:</u>
Penalty payable under Moffitt-Forminster agreement = CZK 350 million plus interest (10% per annum) = CZK 559 million.
Other assets, including undisputed shares of Kotva and claim for 327 237 shares in Sokolovska Uhelna = CZK 35 million
Total Assets = CZK 594 million
<u>Estimated Liabilities</u> = CZK 110 million (CZK 45 million as above plus CZK 65 million for Moffitt's claim) plus the CZK 109 million awarded by the London Court of International Arbitration Case No. 0250 decision.
Total Estimated Liabilities = CZK 219 million.
Net Asset Value of Trend = CZK 375 million
**BGO's share of Trend's NAV** = CZK 149 million


The total price for the assets is the value of Kotva shares plus the average of the Trend value under the two valuation scenarios = CZK 295.75 million

29 Commonwealth Avenue · Boston · Massachusetts · 02116
Phone: (617) 778-7780 · Fax: (617) 778-7781 · E-mail: info@weissasset.com

W0004232

**Georgiy Nikitin**

| | |
|---|---|
| **From:** | Richard Harazim [richard.harazim@od-kotva.cz] |
| **Sent:** | Wednesday, December 01, 2004 10:32 AM |
| **To:** | Andrew Weiss |
| **Subject:** | RE: Kotva |

Dear Mr Weiss

Thank you for your email from 23.11.04.

We have studied your offer carefully. Unfortunately, we feel there are many factors that come into our decision making process and we need to discuss them with someone authorized to make decision on you part. The lack of such a person makes it impossible for us to assign a value to various scenarios and therefore we can't provide a clear answer to you offer.

We plan a week of very important negotiations with our Irish partners. These negotiations should establish the final frameworks of our relations. The exact dates are just under discussions. Would it be feasible for someone from your side to take part in these negotiations? The person we would have on mind, though, would need to be someone more than a messenger. In ideal case it would be yourself as we will need to consider various alternatives and we are sure there will be a necessity to make qualified decisions on the spot. This is a unique chance to put all relevant parties at one table and suggest a final scheme which would satisfy everybody.

Tentatively, we speak about next week as the week when we should meet. If you were interested and this proved to be of a too short notice for you to arrange your travel plans we can postpone the meeting by one week and meet during the week starting 13th of December as neither us nor the Irish have time preference when considering these two weeks. All we know is that we have to meet in order to make some important decisions and both our parties wish to make those decisions before the end of the year.

Please let me know as soon as possible whether you'd be interested in coming and if so what dates would be most convenient to you. It is our believe that it would help move things ahead if you decided to come.

Best regards

Richard Harazim

W0004233

Message                                                                          Page 1 of 1

## Georgiy Nikitin

| From: | Andrew Weiss |
|---|---|
| Sent: | Wednesday, December 01, 2004 7:48 PM |
| To: | 'richard.harazim@od-kotva.cz' |
| Cc: | 'Ondrej Peterka'; Georgiy Nikitin; Eitan Milgram |

Subject: Kotva/Trend

Dear Mr. Harazim,

It would be impractical for me personally to spend more than a few hours negotiating this matter. I found the last meeting at which I was present to have been unproductive. I don't understand why my physical presence would affect the value you would assign to various alternatives. My view is that valuations are a mathematical exercise, and I would need to do the arithmetic regardless of whether an authorized representative were present or not. The terms of the final agreement are a legal matter, and I would not agree to any terms without taking legal advice. My legal advisors and quantitative analysts would need to have time to evaluate any alternatives your group would present. You have seen our evaluation methodology. If you find flaws with our methodology please explain those flaws. If you wish to propose alternatives that would be mutually beneficial please set them out in writing. I would then have time to respond. Once we had agreed upon the numbers involved in a settlement I would be willing to give Mr. Peterka authority to represent our organization in meeting during which the final legal details were worked out, but I would expect that you would tell us who is representing Forminster and the Irish investors at the meeting and would show me what authority they have to represent the various parties. Of course Mr. Ondrej Peterka's attendance would be conditional on his availability, and I would have to approve any final agreement.

I will be traveling from December 9 through December 13, other members of my team will be available at that time.

I will be vacationing with my family starting December 19 and may not be available at that time - the end of December could be a difficult time to reach other members of our firm.

Sincerely yours,

Andrew Weiss,

President and CIO

Weiss Asset Management

Office 617 778 7780

Mobile 617 548 0580

2/7/2005

W0004234

Message

**Georgly Nikitin**

| | |
|---|---|
| **From:** | Richard Harazim [richard.harazim@od-kotva.cz] |
| **Sent:** | Friday, December 03, 2004 6:04 AM |
| **To:** | Andrew Weiss |
| **Subject:** | RE: Kotva/Trend |

Dear Mr Weiss

It is a pity you will not be able to come. We don't think that we face mere mathematical computations. The whole situation comprises of many other factors than just purely technical and we hoped we would have a chance to discuss them. As it stands, we understand that we will not utilise the unique opportunity of having all relevant parties at one table.

Under these circumstances and without clear answers to some of the questions we have and we wanted to discuss in person we won't be in a position to accept your offer by the 10th of December. As to further development we will wait for the meeting with Markland and its outcome. Only then we will be able to define our further steps.

Best regards

Richard Harazim

W0004235

Message

**Georgly Nikitin**

| | |
|---|---|
| **From:** | Andrew Weiss |
| **Sent:** | Friday, December 03, 2004 1:27 PM |
| **To:** | 'Richard Harazim' |
| **Cc:** | Georgly Nikitin |
| **Subject:** | RE: Kotva/Trend |

Dear Mr. Harazim,
As I said without telling me the other issues in advance it would not be fruitful for me to participate in a meeting. I will be tavellag December 9-13.

Andrew Weiss
Office 617 778 7780

Mobile 617 548 0580

W0004236

Message

## Georgiy Nikitin

**From:** Georgiy Nikitin

**Sent:** Tuesday, December 07, 2004 7:07 PM

**To:** 'Richard Harazim'; Andrew Weiss

**Subject:** RE: Kotva/Trend

Dear Mr. Harazim,

I saw the message that you wrote to Mr. Weiss and was quite surprised by your statement that our valuation of Kotva property is wrong. Would it be possible for you to provide documentation showing this?
I would appreciate your reply.
Best regards,
Georgiy

Georgiy Nikitin, Ph.D.

Weiss Asset Management
tel. + 1 (617) 778-7725
fax + 1 (617) 778-7761

W0004237

Message                                                        Page 1 of 4

## Georgly Nikitin

**From:**           Richard Harazim [richard.harazim@od-kolva.cz]
**Sent:**           Wednesday, December 08, 2004 1:57 AM
**To:**             Georgly Nikitin
**Subject:**        RE: Kolva/Trend
**Follow Up Flag:** Follow up
**Flag Status:**    Completed

Dear Mr. Nikitin

Of course we couldn't and that is the reason we can't resolve this over the email. We can't provide you with specific data because

1. This information is under confidentiality agreement
2. You as a shareholder would obtain an insider information which might bear its consequences for both our parties.


regards

Richard Harazim

W0004238

Message                                                                                    Page 1 of:

**Georgiy Nikitin**

| | |
|---|---|
| **From:** | Georgiy Nikitin |
| **Sent:** | Wednesday, December 08, 2004 6:58 PM |
| **To:** | 'Richard Harazim' |
| **Cc:** | Andrew Weiss |
| **Subject:** | RE: Kotva/Trend |

Dear Mr. Harazim,

Andrew Weiss has left for the conference and will not be accessible until middle of the next week. I understand your concerns, but neither of the problems you cite seem to be crucial. We are ready to sign a side confidentiality agreement if you need. Also, we would not need any information that you would not disclose in a personal meeting.
The second issue is not crucial for us: we do not mind to be insiders. What kind of consequences do you think it might have for you? In order to move on this matter, I would like to suggest that you come back to us with your corrections to our valuation of Kotva and Trend shares. If you do that by the beginning of the next week, Professor Weiss should be able to analyze your response as soon as ne comes back and we will try to respond to you by the middle of the next week.

Sincerely yours,
Georgiy

Georgiy Nikitin, Ph.D.

Weiss Asset Management
tel. + 1 (617) 778-7725
fax + 1 (617) 778-7781

W0004239

Message

## Georgiy Nikitin

**From:** Richard Harazim [richard.harazim@od-kotva.cz]
**Sent:** Wednesday, December 15, 2004 8:31 AM
**To:** Georgiy Nikitin
**Subject:** RE: Kotva/Trend

Dear Mr. Nikitin

I am afraid I can't be more specific about the value of the building and about your assumptions used in the valuation in general. I expressed our concerns already and we still view them as serious. Also, as I stated before, we are not interested in the Trend stake you hold and therefore any discussions about your valuations of this stake are not beneficial.

Having all these constrainst on mind we repeatedly suggest that the only way forward is to meet in person and discuss these and other aspects so that layout to a final solution can be found during the meeting. Please let us know whether this is possible. We do not insist, of course, but it is true that we do not see how else we can find a solution. In other words, unless we manage to find some solution during the talks we will not be able to accept your offer.

We would appreciate your final position ASAP becasue we need to organize the dates for more parties and that can be sometimes difficult.

Best regards

Richard

W0004240

Message                                                                      Page 1 of 6

**Georgiy Nikitin**

From:      Georgiy Nikitin
Sent:      Wednesday, December 15, 2004 7:48 PM
To:        'Richard Harazim'
Cc:        Ondrej Peterka; Andrew Weiss
Subject:   RE: Kotva/Trend

Dear Mr. Harazim,

Andrew Weiss is leaving for vacation this Friday and much of the staff will be gone from Christmas until after the New Year. He told me to advise you that if you cannot give a written response to our latest offer or communicate a verbal response to Mr. Peterka, then further negotiations will have to wait until the New Year.

Sincerely yours,

Georgiy

Georgiy Nikitin, Ph.D.

Weiss Asset Management
tel. + 1 (617) 778-7725
fax + 1 (617) 778-7781

W0004241

## Lucy Chen

| | |
|---|---|
| **From:** | Andrew Weiss |
| **Sent:** | Friday, January 07, 2005 2:05 PM |
| **To:** | 'Richard Harazim' |
| **Subject:** | RE: KT |

Dear Mr. Harazim,

Yes your understanding of the conditions is correct. We are looking forward to reviewing your offer.

Sincerely,
Andrew Weiss

---

**From:** Richard Harazim [mailto:richard.harazim@od-kotva.cz]
**Sent:** Friday, January 07, 2005 4:28 AM
**To:** Andrew Weiss
**Subject:** RE: KT

Dear Mr. Weiss

Thank you for the information.

Nevertheless, as withdrawals of all the lawsuits are important for us and we would not normally consider buying any shares from you without knowing that we were getting rid of the lawsuits at the same time I'd like to be perfectly clear on what exactly the conditions are. Please confirm my understanding that conditions of your last offer from 23. November 04 prevail, i.e. if we buy the assets there specified for consideration there shown you will use your best endeavours to persuade Gilroy, Balfindor and now also KT to withdraw their respective lawsuits. Any potential purchase contract for the shares from BGO is to be conditional upon withdrawals of these lawsuits.

Once we have the terms confirmed from your side we will be able to tell you our final position re your offer.

Best regards

Richard Harazim

-----Original Message-----
**From:** Andrew Weiss [mailto:AWeiss@WeissAsset.com]
**Sent:** Thursday, January 06, 2005 5:12 PM
**To:** Richard Harazim
**Subject:** RE: KT

Dear Mr. Harazim,

8/22/2005

WP00O3060

KT is not controlled by Weiss Asset Management; however, if a satisfactory resolution of all other matters can be achieved, I would try to persuade KT to settle its lawsuits and I am highly confident that I would be successful in that endeavor. Thus, I do not expect that the KT lawsuit will impair the ability of the parties to achieve a successful agreement.

Andrew Weiss

---

**From:** Richard Harazim [mailto:richard.harazim@od-kotva.cz]
**Sent:** Tuesday, January 04, 2005 8:08 AM
**To:** Andrew Weiss
**Cc:** Georgiy Nikitin
**Subject:** KT

Dear Mr. Weiss

I was informed by Linklaters Prague today that they received a letter from Mr. Peterka putting them on notice that a new lawsuit was filed. As it uses exactly the same format, phrases and logic in general as the previous lawsuit filed on behalf of Gilroy we assume that KT belongs to your group, as well.

Please confirm whether or not KT's lawsuit is part of the deal offered by you on November 23, 04. As this is a completely new issue we would like to know what exactly each of the various factors represent.

Best regards

Richard Harazim

---

This email is confidential and is intended solely for the addressee(s). If you are not an addressee, you must not disclose, copy, circulate or in any other way use or rely on the information contained in this email. If received in error, please notify the sender immediately and then delete this email. Any disclosure, copying, distribution or use of this communication is prohibited and may be unlawful.

Any views or opinions expressed do not necessarily represent those of Weiss Asset Management or any affiliated companies. Please note that the content of this e-mail may be intercepted, monitored or recorded for compliance purposes. Sensitive personal data should not normally be transmitted by e-mail.

Weiss Asset Management or any affiliated companies shall not be liable to the recipient or any third party for any loss or damage howsoever arising from this e-mail and/or its content, including loss or damage caused by virus. It is the responsibility of the recipient to ensure that the opening or use of this message and any attachments shall not adversely affect systems or data.

Weiss Asset Management
29 Commonwealth Avenue
Boston, MA 02116
TEL: (617) 778-7780
FAX: (617) 778-7781
www.weissasset.com

8/22/2005

Z

From:           Andrew Weiss
Sent:           Thursday, December 04, 2003 5:55 PM
To:             'Vladimír Hoffmann'
Subject:        RE: Kotva maybe forward to Ms. Svabodova

Dear Vlado, I haven't had time to communicate with Ms. Svabodova yet, I hope we can do
something to put sand in the works and slow things down with regards to the Fidea
Consulting contracts and others. Let's speak tomorrow, please give me a time. andy

-----Original Message-----
From: Vladimír Hoffmann [mailto:vladol@volny.cz]
Sent: Thursday, December 04, 2003 10:35 AM
To: Dave Johnson
Cc: Eitan Milgram; Andrew Weiss
Subject: Kotva

Dear Dave,

I should receive a comprehensive analysis of the Kotva situation from our lawyers tonight.
I will have it translated and I believe that I will be able to send it to you tomorrow
morning (your time). I will also include my comments and analysis. May I therefore suggest
that we have a conference call tomorrow (Friday)when everybody is available ?

Vlado.

P.S. I am enclosing the "Kotva chart" that I have produced and that shows the complicated
ownership structure and liens that FEL has created.

EXHIBIT
9
Weiss
M6 1/25/07

1

WP0000133

**AA**

Mgr Petrika, 7.6.04

Zaposlenci pověděn dohoda o narovnání

→ Gudová na řešení ot pí oni

☑ ✗ WLK WOOLF – Memorandum JP Jones, Long, Lockllr

Řízení by měli prošli na Petrika, Holubová
prodat spisy – úplně řiedmo

☑ ✗ 15% 7.00 half hour S Weisser

TNT                    Liege – Belgie    shipped from
GD 852 175 888 WW                       Larnaca on Mon
                                        7th 18:58

                    Logoton Limited
                    4 Pilious street
Branston Heggerty   (Limassol) Cyprus

1) Block the deal with the Irish
2) Legal actions    jeopardize & question ownership of the building
3) Trend is shareholder of Kotva – ask court to declare   no
   statutes of limitation, later settlement agreement
   We have direct legal interest
4) issam – question validity of shareholders meeting of Kotva
   to say that Trend is shareholder of Kotva

9) Notify Markland? ? that – copy of our legal actions ?
   property already transferred to SPV KN          → damages ?
   against Iglon, KN and SPV KN
5) declare that Kotva is still owner
6) request to have access to the bankruptcy file
7) take over board of Trend
8) move Trend out of bankruptcy ?

                    Coordinate w the Delaware Longs.

K8059

14.6 2004    Peterka, Černý, Andol, Svoboda - předávání
              dokladů

✓ ✳ Iniciovat konf. hovor        16:00 CET

Lubica        777766 737
              237

Conf. Call

Petition → Kotva as. still owns the property
Only then inform Irish investors
Entity — transfer shares        Cyprus Vlado + Cyprus Andy
                                              Delaware

✓ ✳ Trend — zjistit prevoditelnost akcií

TYM — Cyprus or Delaware ?

BGO buys shares of TYM
TYM buys shares of Kotva & Trend

✓ ✳ kúpiť jednu akciu Kotvy na VH
    ✳ zriať kúpovať akcie Kotvy na BF — zjistit žalobu ?

K8060

JUDr. Přemysl Kraus – SKP VS
221 803 400   Vágnerová
sl. Řeháková – asistentka

Grenna – Bělehradská 18, 14000 Praha 4

Poslat doklady Diventree
Plná moc Gilroy pro Peterka
Převod akcí Kotvy a Trendu   (Seifertovi, Streitberg)

PoA nemusí být ověřeno
Kopie certifikátu tě GR

NAXOS   257 314 251
        Švanová    777 707 301
www.naxos.cz

Streitberg, BHS OVA – Petr Ševčík

Horal   266 113030
        horal_jan@hotelduo.cz

Fakturace BGO – doklady překladů a SCP, nákup akcií – Kotva

1) BHS překlad stanovy Kotva, Trend, dokumenty Gilroy    30 256,-
2) SCP  23.6.04    644,—
3) Presto překlad doklady — Havraná výplata a Trustu    23 400,-
                                                        +15% 4478
                                                        27 846,-
4) Společnost Online – Insomnia    5000 + 15% 350 – 5 350 —
5) SCP  8.6.04    560,-

K8061

**BB**



PETERKA & PARTNERS

Markland Holdings Ltd.
Mr. Henry Prestage

19 Upper Fitzwilliam Street
Dublin 2
I R E L A N D

Prague, July 2, 2004

Announcement about initiation of an lawsuit

Dear Mr. Prestage,

On behalf of the company GILROY LIMITED, with its registered seat at Pikioni, 4, Limassol, Cyprus, I am writing to you to inform you about the following facts.

We have been informed that your firm intends to buy KOTVA Department Store in Prague, Czech Republic.

On June 30th, 2004 the company GILROY LIMITED (an shareholder of the company KOTVA, a.s.) submitted a petition for declaration of ownership to real estates. In this petition the plaintiff proposes the court to declare, that the company KOTVA, a.s., is the real and true owner of real estates – KOTVA Department Store, inclusive the land on which the department store is located.

The reasons, why GILROY LIMITED is of the opinion, that KOTVA, a.s., is still the owner of the real estates, are in detail described in the enclosed copy of the petition.

With respect to the gravity of the whole matter and to the value of the real estates, that are subject matter of the petition, I considered appropriate to inform you immediately about submission of the petition.

I would appreciate getting your comments on this issue.

Yours sincerely

GILROY LIMITED
Ondrej Peterka
under a power of attorney

PETERKA & PARTNERS v.o s.

Na Příkopě  15/583
CZ - 110 00   Praha 1
tel  +420 272 141 400
fax  +420 272 141 470
www.cabinet.cz

PRAHA - BRATISLAVA

M 0066

## PP

**PETERKA & PARTNERS**
Advokátní kancelář, Law Offices, Cabinet d'avocats

Obvodní soud pro Prahu 1
Ovocný trh 14
110 00 Praha 1

V Praze dne 30. června 2004

| Žalobce: | **GILROY LIMITED** |
|---|---|

se sídlem Pikioni, 4, Limassol, Kyperská republika
zastoupený Mgr. Ondřejem Peterkou, advokátem zapsaným ČAK pod reg.
č. 4245, vykonávajícím advokacii jako společník kanceláře PETERKA &
PARTNERS v.o.s. se sídlem Na Příkopě 15, 110 00 Praha 1 (plná moc
právního zástupce přiložena)

---

**Žalovaný č. 1:** **KOTVA a.s.**
se sídlem Praha 1, Náměstí Republiky 8
IČ: 60 19 38 08
zapsaná v obchodním rejstříku vedeném Městským soudem v Praze
v oddíle B., vložka 2370
(dále jen „Kotva" nebo „žalovaný č. 1")

**Žalovaný č. 2:** **KOTVA NEMOVITOSTI, k.s.**
se sídlem 602 00 Brno, Příkop 4
IČ: 26 22 90 48
zapsaná v obchodním rejstříku vedeném Krajským soudem v Brně v oddíle
A., vložka 16 586
(dále jen „Kotva Nemovitosti" nebo „žalovaný č. 2")

**Žalovaný č. 3:** **SPV KN, a.s.**
se sídlem 602 00 Brno, Příkop 4
IČ: 26 91 07 05
zapsaná v obchodním rejstříku vedeném Krajským soudem v Brně v oddíle
B., vložka 4043
(dále jen „SPV KN" nebo „žalovaný č. 3")

---

## Žaloba na určení vlastnického práva k nemovitostem

Čtyřikrát
Soudní poplatek ve výši 3 000 Kč zaplacen kolky
Doručeno osobně na podatelnu soudu

Přílohy:
Dle seznamu příloh na poslední straně žaloby

PETERKA & PARTNERS v.o.s.

Na Příkopě 15/583
CZ - 110 00   Praha 1
tel : +420 272 143 400
fax : +420 272 143 470
www.cabinet.cz
obchodní rejstřík, Městský soud v Praze
oddíl A, vložka 42541
IČ: 26 16 92 20

PRAHA · BRATISLAVA

M 0067

1.    SPECIFIKACE ÚČASTNÍKŮ, PŘEDMĚT ŘÍZENÍ, PŘÍSLUŠNOST SOUDU

### 1.1.    Specifikace účastníků

Žalobce je akcionářem žalovaného č. 1.

Žalovaný č. 1 je obchodní společností, která byla do roku 2000 zapsána v katastru nemovitostí jako výlučný vlastník nemovitostí specifikovaných níže v bodě 1.2. Jak vyplývá z dále uvedeného, je žalovaný č. 1 takovýmto výlučným vlastníkem dosud.

Žalovaný č. 2 je obchodní společností, která byla v katastru nemovitostí evidována jako výlučný vlastník nemovitostí specifikovaných níže v bodě 1.2, a to na základě prohlášení[1] o nemovitém vkladu učiněného žalovaným č. 1 v roce 2000. Vznikl přeměnou společnosti KOTVA NEMOVITOSTI, a.s.[2]

Žalovaný č. 3 je obchodní společností, jejímž jediným společníkem je žalovaný č. 2. V současné době je žalovaný č. 3 v katastru nemovitostí evidován jako vlastník nemovitostí specifikovaných níže v bodě 1.2.

### 1.2.    Předmět řízení

Žalobce se touto žalobou domáhá, aby soud svým rozhodnutím ve smyslu ustanovení § 80 písm. c) zákona č. 99/1963 Sb., občanského soudního řádu (dále jen OSŘ), určil, že žalovaný č. 1 je vlastníkem těchto nemovitostí:

- budova č.p. 656 (obč. vyb.) příslušná k části obce Staré Město, nacházející se na stavební parcele parc. č. 680;
- budova bez č.p./č.ev. (obč. vyb.) příslušná k části obce Staré Město, nacházející se na stavební parcele parc. č. 1018/2;
- pozemek parc. č. 680 (zastavěná plocha a nádvoří) o výměře 4385 m$^2$;
- pozemek parc. č. 683/1 (ostatní plocha) o výměře 851 m$^2$;
- pozemek parc. č. 683/2 (ostatní plocha) o výměře 2963 m$^2$;
- pozemek parc. č. 683/3 (ostatní plocha) o výměře 2 m$^2$;
- pozemek parc. č. 690/2 (ostatní plocha) o výměře 25 m$^2$;
- pozemek parc. č. 690/3 (ostatní plocha) o výměře 49 m$^2$;
- pozemek parc. č. 690/4 (ostatní plocha) o výměře 9 m$^2$;
- pozemek parc. č. 1018/2 (zastavěná plocha a nádvoří) o výměře 1 m$^2$;

všechny uvedené nemovitosti jsou zapsány Katastrálním úřadem pro hlavní město Prahu na listu vlastnictví č. 265 vedeném pro obec Praha, katastrální území Staré Město (dále tyto nemovitosti souhrnně označovány: "Obchodní dům KOTVA").

---

[1] Na základě ustanovení § 60 odst. 1 zákona č. 513/1991 Sb., obchodní zákoník (dále jen "ObchZ").

[2] Společnost KOTVA NEMOVITOSTI, a.s. změnila svoji právní formu z akciové společnosti na společnost komanditní. Ke změně právní formy došlo rozhodnutím valné hromady ze dne 20. května 2003; rozhodnutí rejstříkového soudu o zápisu přeměny nabylo právní moci ke dni 15. srpna 2003.

M 0068

1.3.  Příslušnost soudu

Věcná příslušnost okresního (obvodního) soudu je dána na základě ustanovení § 9 odst. 1 OSŘ, neboť z ustanovení § 9 odst. 2 a 3 OSŘ a ani z jiných ustanovení nevyplývá, že by byla v prvním stupni dána příslušnost soudu krajského.

K příslušnosti místní žalobce odkazuje na ustanovení § 88 písm. g) OSŘ, dle kterého je příslušným soud, v jehož obvodu je nemovitost, týká-li se řízení práva k ní. Obchodní dům KOTVA jakožto soubor nemovitostí je umístěn v obvodu Obvodního soudu pro Prahu 1.

K důkazu:

- výpis ze Střediska cenných papírů,
- výpisy z obchodního rejstříku ohledně žalovaných,
- doklady o existenci žalobce,
- výpis z katastru nemovitostí (LV č. 265 pro k.ú. Staré Město),
- výroční zprávy žalovaného č. 1 za roky 2000, 2001 a 2003,
- s výhradou důkazů dalších.

## 2.  EXISTENCE NALÉHAVÉHO PRÁVNÍHO ZÁJMU ŽALOBCE NA URČENÍ, JEHOŽ SE DOMÁHÁ V TOMTO ŘÍZENÍ

Nejvyšší soud České republiky ve svém rozhodnutí sp. zn. 3 Cdo 1338/96[3] ze dne 27. března 1997) zaujal právní názor, dle kterého určovací žaloba podle § 80 písm. c) OSŘ má místo v případech, kdy:

- lze její pomocí eliminovat stav ohrožení práva či nejistoty v právním vztahu a k odpovídající nápravě nelze dospět jinak a

- účinněji než jiné právní prostředky vystihuje obsah a povahu příslušného právního vztahu a jejím prostřednictvím lze dosáhnout úpravy tvořící určitý právní rámec, který je zárukou odvrácení budoucích sporů účastníků.

V intencích tohoto judikátu je přípustné podání určovací žaloby směřující k tomu, aby údaj o vlastnictví nemovitosti uvedený v katastru nemovitostí odpovídal skutečnému právnímu stavu[4]. Takovou žalobu obvykle podává subjekt, který se považuje za vlastníka předmětné nemovitosti. Z aktuální rozhodovací praxe Nejvyššího soudu však lze dovodit, že určovací žalobu může podat rovněž osoba, která je společníkem, resp. akcionářem takového subjektu.

Takto v řízení pod sp. 29 Odo 767/2002 Nejvyšší soud dospěl k závěru, že akcionář má naléhavý právní zájem na podání určovací žaloby, jíž se domáhá vyslovení neplatnosti smlouvy, kterou akciová společnost převádí ve smyslu § 476 obchodního zákoníku svůj podnik, resp. jeho část, na jiný subjekt. Mimo jiné Nejvyšší soud uvedl: „... *uzavření smlouvy o prodeji části podniku může mít významný vliv na právní poměry společnosti, jejímž je akcionářem, a tedy zprostředkovaně i na jeho právní poměry, např. právě (ve vazbě na obsah smlouvy) na výši jejího podílu na likvidačním zůstatku.*"

---

[3] Publikováno v časopise Soudní judikatura (civilní) č. 3/1997 na str. 58 a násl. pod číslem Jc 21/1997.

[4] Na základě rozhodnutí o určovací žalobě lze provést příslušný záznam do katastru nemovitostí ve smyslu ustanovení § 7 odst. 1 zák. č. 265/1992 Sb., o zápisech vlastnických a jiných věcných práv k nemovitostem.

3

Analogicky je nutno dovodit oprávnění akcionáře žalovat na určení vlastnického práva k souboru nemovitostí, který představuje hlavní majetkovou složkou podnikání akciové společnosti (zde Obchodní dům KOTVA[5] v hodnotě přinejmenším 1,39 miliardy korun).

Význam vlastnictví takovéto hlavní majetkové složky a jeho dopad do právních poměrů akcionáře lze nejlépe vysvětlit na porovnání postavení akcionáře v situaci, kdy akciová společnost je vlastníkem takové majetkové složky, se situací, kdy takový majetek nevlastní.

V situaci, kdy akciová společnost je vlastníkem takovéto majetkové složky:

- může jejím prodejem v daném účetním období dosáhnout výrazného zisku, čímž dojde k praktickému naplnění práva akcionáře uvedeného v ustanovení § 155 odst. 1 ObchZ, dle kterého se akcionář podílí na zisku společnosti;

- došlo-li by k likvidaci akciové společnosti, nepochybně by se v podílu akcionáře na likvidačním zůstatku příznivě promítnula získaná kupní cena za takovouto majetkovou složku (opět ustanovení § 155 odst. 1 ObchZ);

- akcionář má možnost na valné hromadě rozhodovat o podnikatelské činnosti žalovaného č. 1, která je determinována právě vlastnictvím a užíváním takovéto majetkové složky; čímž je dán praktický obsah oprávnění akcionáře podílet se na řízení společnosti (opět ustanovení § 155 odst. 1 ObchZ).

Pokud by akciová společnost vlastníkem této hlavní majetkové složky nebyla, shora uvedená oprávnění akcionáře by měla zcela jiný obsah, neboť společnost by zejména v souvislosti s vlastnictvím (a případným budoucím převodem) této majetkové složky nemohla realizovat žádné příjmy, od nichž by se odvíjelo naplnění práva akcionáře na podíl na zisku, resp. na podíl na likvidačním zůstatku.

V tomto konkrétním případě žalobce ještě poukazuje na to, že možnost efektivního výkonu jeho akcionářských práv (a tedy i význam rozhodnutí dle této žaloby pro jeho právní poměry) je umocněna tím, že je rovněž akcionářem TREND VIF, který dle žalobcova přesvědčení je vlastníkem hlavního akciového podílu v žalovaném č. 1.

Pro úplnost považuje žalobce za nutné dodat, že zcela shodný právní názor jako v rozsudku pod sp. zn. 29 Odo 767/2002 vyslovil Nejvyšší soud i v dřívějším rozsudku ze dne 5. listopádu 2002 pod sp. zn. 2 Odo 535/2001 a z hlediska řešení této právní otázky je možno již považovat soudní judikaturu za konstantní.

K důkazu:

- výpis ze Střediska cenných papírů,
- znalecký posudek oceňující hodnotu Obchodního domu KOTVA,
- s výhradou důkazů dalších.

---

[5] V případě Obchodního domu KOTVA lze navíc uvažovat o tom, zda takto dominantní a relativně samostatná součást podniku nenaplňuje znaky části podniku (tj. samostatné organizační složky) s tím, že s ní nelze disponovat jinak než podle příslušných kogentních ustanovení obchodního zákoníku (prodej nebo nájem části podniku). Jistě z dokumentů, kterými žalovaný č. 1 formálně odůvodňoval vyvedení Obchodního domu KOTVA na jiný subjekt, bude možné dohledat dostatek faktických údajů pro takovýto závěr.

4

3.    DŮVODY, PRO KTERÉ ŽALOVANÝ Č. 1 NIKDY NEPOZBYL VLASTNICKÉ
PRÁVO K OBCHODNÍMU DOMU KOTVA A JE TEDY NADÁLE JEHO
VLASTNÍKEM

### 3.1.    Působení osob spojených s Ing. Miroslavem Hálkem v TREND VIF a IF MERCIA

Počátek stávajících zásadně problematických vztahů, k jejichž řešení (a zejména k odvrácení
dalších budoucích sporů ve smyslu shora citovaného rozhodnutí Nejvyššího soudu 3 Cdo
1338/96) má přispět rozsudek vydaný v tomto řízení, se váže k TREND VIF[6] a k investičnímu
fondu MERCIA, a.s.[7] v období let 1995 až 1997.

V rámci kupónové privatizace byl TREND VIF velmi úspěšný (mediální tváře Michael Kocáb a
Martin Kratochvíl) a v jeho portfoliu byly akcie významných českých podniků, jejichž hodnota
výrazně přesahovala miliardu korun, včetně akcií žalovaného č. 1.

V roce 1995 manažerskou kontrolu TREND VIF převzala skupina osob okolo společnosti
Královéhradecká brokerská, a.s.[8], reprezentovaná zejména Ing. Miroslavem Hálkem.

V době tohoto převzetí měl TREND VIF vlastní jmění ve výši cca 1,45 mld. korun.

Následovala řada transakcí, jejímž účelem bylo tento majetek, včetně akcií žalovaného č. 1,
protiprávně a ke škodě TREND VIF vyvést na osoby ze skupiny Ing. Miroslava Hálka. Nástrojem
tunelování TREND VIF byly právní úkony, které jsou podrobně popsány např. ve Zprávě
nuceného správce TREND VIF ze dne 22. února 1997, ve zprávě Ministerstva financí ze dne 21.
1. 1998, č.j. 102/90 17649, týkající se šetření obchodů s cennými papíry z portfolia TREND VIF a
v obžalobě náměstka krajského státního zástupce JUDr. Vladislava Kusaly proti Ing. Hálkovi a
spol. ze dne 30. září 1998. Zejména v obžalobě je rovněž nejdetailněji popsáno personální
propojení všech osob podílejících se na těchto transakcích (str. 25 a násl.).

V důsledku těchto transakcí poklesla hodnota vlastního jmění TREND VIF k 31. 12. 1996 na 116
mil. korun, tedy více než o 90 %.

Zcela obdobný průběh měla i účast Královéhradecké brokerské, a.s. na hospodaření investičního
fondu MERCIA, a.s.

### 3.2.    Demonstrativní výčet podstatných protiprávních úkonů subjektů spojených s Ing. Miroslavem Hálkem a týkajících se přímo či nepřímo akcií žalovaného č. 1

Jednotlivé úkony směřující k obohacení protiprávně jednajících osob jsou popsány v obou shora
uvedených zprávách a v obžalobě. Vzhledem k rozsáhlosti jednání žalobce na tyto dokumenty
odkazuje a činí jejich obsah v částech týkajících se přímo i nepřímo[9] akcií žalovaného č. 1
součástí žalobních tvrzení. V této žalobě žalobce tedy uvádí pouze několik případů

---

[6] TREND – všeobecný investiční fond a.s., se sídlem 500 02 Hradec Králové, Škroupova 441, IČO: 45 24 51 77
(dále jen „TREND VIF").

[7] Investiční fond MERCIA, a.s., se sídlem Praha 2, Londýnská 53, IČO: 15 05 41 01.

[8] Společnost KRÁLOVÉHRADECKÁ BROKERSKÁ, a.s. (nyní Brněnská obchodní, a.s., v konkurzu), IČO: 60
91 41 22, dříve se sídlem Hradec Králové, Škroupova 9, nyní se sídlem Brno, Lipová 27.

[9] Tj. například vyváděním finančních prostředků z TREND VIF tak, aby za tyto prostředky jiné zúčastněné
subjekty mohly nakupovat akcie žalovaného č. 1 (viz bod 3.2.2.).

5

nejzávažnějšího jednání, kterým byl TREND VIF poškozen, a které dle obžaloby naplňují skutkovou podstatu trestného činu[10].

Žalobce uvádí dvě skupiny hlavních protiprávních úkonů subjektů spojených s Ing. Hálkem. Typově jsou tyto úkony charakterizovány na str. 24. obžaloby.

První skupinu (viz čl. 3.2.1. této žaloby) představují úkony, kterými byly protiprávně vyváděny akcie žalovaného č. 1 z majetku TREND VIF.

Druhou skupinu (viz čl. 3.2.2.) představují úkony, kterými byly vyváděny finanční prostředky z TREND VIF (a rovněž z IF Mercia), za které subjekty spojené s Ing. Hálkem hradily kupní cenu akcií žalovaného č. 1 kupovaných od třetích osob.

Samozřejmě všechny níže popsané úkony mají vzhledem k tomu, že jimi dle obžaloby byla naplněna skutková podstata trestného činu a tedy byly v rozporu se zákonem, i své občanskoprávní implikace, spočívající nejčastěji v tom, že takové úkony jsou bez dalšího neplatné[11].

Pokud jde o hodnocení jednání popsaného v obou uvedených zprávách jakožto trestných činů, odkazuje žalobce na obžalobu proti obviněným Ing. Miroslavu Hálkovi a spol. podanou Krajským státním zastupitelstvím v Hradci Králové dne 30. září 1998, sp. zn. KZv 323/97.

### 3.2.1.    Vyvádění akcií žalovaného č. 1 z majetku TREND VIF

#### 3.2.1.1. Nevýhodné obchody s akciemi žalovaného č. 1

Zpráva nuceného správce uvádí na str. 21: „Dne 28.5.1996 prodal investiční fond prostřednictvím SCP společnosti KHB 152 935 kusů akcií společnosti KOTVA, a.s. za cenu 400,-- Kč. Téhož dne investiční fond koupil od KHB 152 935 ks akcií společnosti KOTVA, a.s. zpět avšak za cenu 952,- Kč za jeden kus a následně je investiční fond prodal společnosti IFM, a.s. opět za cenu 400,- Kč. Viz dokumenty přiložené k článku 14.11. této zprávy. Tato transakce způsobila investičnímu fondu ztrátu 168 840 240,-Kč."

#### 3.2.1.2.    Antedatování smluv směřující k tomu, aby ve spojení s ujednáním o smluvních pokutách bez jakéhokoliv protiplnění byly z majetku TREND VIF vyvedeny akcie žalovaného č. 1

Obžaloba na str. 24 uvádí následující: „Uzavírání antedatovaných smluv bylo v podstatě jen nástrojem k provedení jiných, výše popsaných transakcí. Takto byly pravděpodobně uzavřeny smlouvy, které byly v neprospěch fondu zajištěny vysokými smluvními pokutami. Prokázat se však podařilo jen antidataci smlouvy ze dne 10.1.1996 s IFM, a.s. Tímto postupem docházelo k poškozování fondu v době, kdy Ministerstvo financí ČR pozastavilo obchodování s cennými papíry z portfolia fondu."

---

[10] Ohledně kvalifikace trestných činů, kterých se dle obžaloby osoby okolo Ing. Hálka dopustily (často jako členové zločinného spolčení), odkazuje žalobce na příslušné pasáže obžaloby, zejm. str. 7, 8, 11, 12, 13, 14, 16, 19 a 20.

[11] Pro úplnost žalobce rovněž uvádí, že při většině obchodů s akciemi žalovaného č. 1 bylo porušeno (nebo v návaznosti na předchozí manipulaci kursem akcií obcházeno) ustanovení § 17 odst. 3 zákona č. 248/1992 Sb., o investičních společnostech a investičních fondech, ve znění do 30. června 1996 (dále jen „ZISF") stanovící, že investiční fond je povinen cenný papír prodat jen za nejvyšší cenu, za kterou jej bylo možné při vynaložení odborné péče prodat.

M 0072

Podstatu antedatované smlouvy označené datem 10. ledna 1996 popisuje zpráva nuceného správce na str. 12 a násl., obžaloba např. na str. 27 a dále ve stručnosti na str. 2 zpráva Ministerstva financí takto: „10.1.1996 – IFM, a.s. podepsala smlouvu o převodu 200.000 ks akcií Kotvy z portfolia fondu za celkovou sumu 360.000.000,- Kč. Na základě této smlouvy získala IFM, a.s. ve formě smluvní pokuty 60.000 ks Kotvy bez jakékoliv protihodnoty."

### 3.2.1.3. Nerespektování předběžného opatření týkajícího se akcií žalovaného č. 1

Obžaloba uvádí na str. 31: „Dne 24.1.1997 Ing. Miroslav Hálek jako předseda představenstva a generální ředitel IFM a.s. rozhodl o převodu 361 375 ks akcií Sokolovské uhelné a.s. a 30 000 ks akcií Kotvy a.s. z účtu IFM č. 100200879133 ve Středisku cenných papírů Praha na účet Královéhradecké brokerské a.s. (KHB) přesto, že bylo IFM a.s. Usnesením Krajského soudu Hradec Králové č.j. : Nc 542/96 ze dne 21.1.1997, doručeným IFM, a.s. dne 23.1.1997, uloženo zdržet se nakládání výše uvedenými akciemi. Usnesení bylo IFM a.s. doručeno dne 23.1.1997 a téhož dne se s ním Ing. Hálek seznámil prostřednictvím JUDr. Karla Kavalíra, kterému udělil plnou moc k prostudování spisu. Přesto, že věděl o předběžném opatření soudu, rozhodl o převodu výše uvedených akcií na společnost KHB a.s., která akcie následně převedla na účet zahraniční firmy Forminster Enterprises Ltd...."

### 3.2.2.          Užití finančních prostředků TREND VIF a IF MERCIA k tomu, aby společnosti okolo KHB, a.s. nakupovaly akcie žalovaného č. 1 na svůj účet

### 3.2.2.1.          Zneužití peněžních prostředků investičních fondů ve prospěch osob okolo KHB, a.s.

Zpráva nuceného správce v čl. 8.9. uvádí následující: „Jak dokazuje výpis z bankovního účtu investičního fondu u IPB, a.s. č.ú.103745574 ze dne 7.9.1995 a zejména pak příkaz k úhradě z téhož dne, management-investičního fondu převedl částku ve výši 112 000 000,- Kč na bankovní účet společnosti KHB, která ji použila ke koupi 70 077 kusů akcií společnosti KOTVA, a.s. za cenu 1 800,- Kč za kus od společnosti Brno Broker Group, a.s., jak dokazuje potvrzení o uzavření smlouvy ze dne 4.9.1995. Potvrzení o uzavřeném obchodu ze dne 4.9.1995 je přiloženo k této zprávě pod článkem 14.15. Tyto akcie koupila KHB svým jménem a na svůj účet, a byly posléze převedeny, dle informací, které nucená zpráva získala, na jednu ze společností ovládanou managementem investičního fondu.

K tomuto je na str. 3 zprávy Ministerstva financí doplněno, že dne 25.9.1995 KHB koupila dalších 28 033 ks akcií žalovaného č. 1 za 49.057.750,-- Kč svým jménem a na svůj účet a v návaznosti na popis obchodů s Brno Broker Group, a.s. je vysloven závěr: „KHB za cizí peněžní prostředky (175 196 350,- Kč) koupila cenné papíry na vlastní účet."

### 3.2.2.2.          Získávání finančních prostředků investičních fondů prostřednictvím ujednání o smluvních pokutách

Zpráva Ministerstva financí na str. 10 uvádí[12]: „Metoda smluvních pokut spočívala v uzavírání smluv, které vytvářely smluvní závazky pro investiční fond, které následně investiční fond nesplnil, a které smlouva penalizovala neobvykle vysokými smluvními pokutami. Vzhledem k formě smluv, jejich právnímu rozboru a ojediněle výši smluvních pokut je podezření, podpořené i o získané

---

[12] Shodně Zpráva nuceného správce na str. 12 a násl., tato metoda vyvádění majetku je rovněž popsána na mnoha stranách obžaloby.

7

M 0073

*důkazy, že skutečným předmětem těchto smluv nebyl převod akcií, ale umělé vytvoření závazku investičního fondu a vybrání majetkových hodnot investičního fondu.*

*Touto metodou zmizely z investičního fondu následující částky:*

a) *Částka 126 000 000,- Kč, kterou získala společnost IFM, a.s. na základě smlouvy ze dne 10.1.1996. Tato smluvní pokuta byla uhrazena ve formě převodu 60 000 kusů akcií KOTVY v hodnotě 108 000 000,- Kč.*

b) *Částka 45 617 000,- Kč, kterou získala společnost Moravská Zemská, a.s. na základě smlouvy ze dne 10.7.1996.*

c) *Částka 44 896 666,- Kč, kterou získala společnost Lidová obchodní společnost, s.r.o. na základě smlouvy ze dne 17.7.1996*

d) *Částka 73 718 000,- Kč, kterou získala společnost Moravská zemská, a.s. na základě smlouvy ze dne 22. 7. 1996. Viz dokument přiložený v čl. 14. 8. této zprávy.*

e) *Částka 70 526 475,- Kč, kterou získala společnost Sokolovský investiční fond, a.s. na základě smlouvy ze dne 24. 7. 1996."*

### 3.2.2.3. Neplacení kupních cen za akcie a 30-letá splatnost kupní ceny

Tyto dvě metody popisuje zpráva nuceného správce na str. 13-15 následovně. K metodě neplacení kupních cen za akcie uvádí: *„Tato velmi prostá metoda spočívala v uzavírání smluv se společnostmi, které následně nesplatily kupní cenu za koupi akcií z portfolia investičního fondu. Takto převedený majetek byl následně převeden na společnosti ovládané managementem investičního fondu."* Následuje výčet takto uzavřených smluv, přičemž ztráta TREND VIF z těchto obchodů přesahuje 350 milionů korun.

Metodu 30-leté splatnosti popisuje nucený správce takto: *„Metoda popsaná v tomto článku spočívala v uzavírání smluv, na základě kterých investiční fond prodával akcie z portfolia investičního fondu společnostem ovládaným managementem investičního fondu, za cenu, jejíž splatnost byla stanovena v měsíčních splátkách a rozložena na dobu 30-ti let"* Takto byly uzavřeny smlouvy v hodnotě 336.841.700,- Kč.

### 3.3.    Vyvedení majetku z TREND VIF a IF MERCIA na společnost Forminster[13] spojenou s Ing. Hálkem

Zúčastněným osobám se zejména shora popsanými způsoby podařilo prakticky veškerý majetek ve formě cenných papírů vyvedený z TREND VIF zpeněžit a jeho následným prodejem se obohatit. Toto zamýšlely učinit i ohledně akcií žalovaného č. 1. Po zavedení nucené správy realizovaly sérii převodů, kterou nucený správce popisuje na str. 21 a 22 své zprávy, přičemž jediným cílem těchto převodů bylo vyhnout se účinkům právních kroků nuceného správce směřujících ke vrácení akcií žalovaného č. 1 do majetku TREND VIF.

Takto byly akcie žalovaného č. 1 převedeny až na společnost Forminster. Ohledně personálního propojení společnosti Forminster s Ing. Hálkem a účelu převodu akcií žalovaného č. 1 na Forminster žalobce poukazuje na následující pasáže obžaloby (str. 25).

*„Obchodování a převody akcií Kotvy, a.s. byly nejvýznamnějším zájmem obviněných. Akcie Kotvy patřily v době před 4.8.1995 ke klíčovým investičním fondu. Cílem tehdejšího managementu investičního fondu bylo a stále je je převést akcie Kotvy na společnosti ovládané Ing. Hálkem a spol. a dalšími nákupy, k nimž používali i prostředky fondu, dosáhnout v Kotvě majoritního podílu.*

---

[13] Forminster Enterprises Limited, se sídlem 20 Queen Frederica Street, El Greco House, Nicosia, Kypr (dále jen „Forminster").

8

*Akcie Kotvy jsou i v současnosti v centru zájmu společností kolem Ing. Hálka a spol. I v průběhu nucené správy se uskutečnilo několik převodů akcií Kotvy mezi osobami a společnostmi a významnou osobou bude zřejmě Jiří Mareš, spolužák Ing. Hálka, přes kterého byly převáděny akcie Kotvy zpět na společnosti ovládané Ing. Hálkem. V době, kdy bylo Krajským soudem v Hradci Králové rozhodnuto nepravomocně o zákazu nakládání akciemi Kotvy Královéhradeckou brokerskou, došlo na pokyn KHB k převodu akcií Kotvy na společnost Forminster Enterprises, ltd., se sídlem na Kypru, k jejímž peněžním účtům má Ing. Hálek konkrétní oprávnění. ...*

*Aktivity skupiny Ing. Hálka nezastavilo ani rozhodnutí o nucené správě a z posledních zjištění je zřejmé, že jejich snaha ovládnout Kotvu a majetek Trendu trvá do dnešního dne a ani trestní řízení a umístění ve vazbě není překážkou. Ještě před zahájením trestního stíhání došlo k převodu části akcií Kotvy na Forminster Enterprises, Ltd. Se sídlem na Kypru, z níž vyplývá, že po převodu akcií Sokolovské uhelné a.s. a společnosti Bonit kapital, a.s., Brno, a KHB, přejmenovaná na Brněnskou obchodní, a.s. je v současnosti ve stavu po podání návrhu na prohlášení konkursu. Podle posledních zjištění i v průběhu vazby Ing. Hálka byly jim podepisovány důležité listiny v souvislosti s účty společnosti Forminster Enterprises Ltd. u LGT bank ve Vaduzu v Lichtenštejnsku."*

Dále je propojení společnosti Forminster s Ing. Hálkem a dalšími osobami zřejmé z toho, že podobně jako obchod s akciemi žalovaného č. 1 byl realizován obchod s akciemi společnosti Sokolovská uhelná, a.s. (jeho popis viz str. 7 zprávy Ministerstva financí, z níž vyplývá, že po převodu akcií Sokolovské uhelné, a.s. z KHB na Forminster obratem byly tyto akcie společnosti Forminster dále prodány, a to se ziskem ve výši 135 milionů korun). V této souvislosti žalobce odkazuje rovněž na str. 9 této zprávy, v níž je rovněž personální propojení se společností Forminster popsáno.

Všechny právě uvedené skutečnosti jsou zcela zásadní při posuzování úkonů týkajících se Obchodního domu KOTVA, neboť tyto úkony činili členové statutárního orgánu, kteří byli zvoleni právě společností Forminster, ohledně které obžaloba poukazuje na spojení s Ing. Hálkem. <u>Všechny výroční zprávy žalovaného č. 1 od roku 2000 uvádí, že Forminster je jeho ovládající osobou</u>[14].

3.4.    Opatření státního zástupce – blokace akcií žalovaného č. 1

Opatřením státního zástupce však akcie žalovaného č. 1 byly v roce 1997 zablokovány na majetkovém účtu společnosti Forminster v SCP. Tedy je zřejmé, že ze samotných akcií žádný výnos z trestné činnosti realizovat přinejmenším v dohledné době nelze. Nicméně akcie představují majoritní podíl na společnosti vlastnící budovy a pozemky v hodnotě dosahující přibližně jeden a půl miliardy korun. Společnosti Forminster není dosud žádným opatřením soudu či státního orgánu zakázán výkon hlasovacích práv a tedy má možnost docílit i v tomto směru prospěchu z trestného činu, resp. má možnost legalizovat výnos z trestné činnosti.

Žalobce níže popíše, že v současné době probíhají kroky směřující k tomu, aby bylo obcházeno opatření státního zástupce, kterým je blokováno nakládání s akciemi žalovaného č. 1.

---

[14] Výroční zpráva za rok 2001 a za rok 2003 toto uvádí na str. 3, výroční zpráva za rok 2000 toto uvádí na str. 2

M 0075

3.4.1. *Označení shora popsaného protiprávního jednání jakožto legalizace výnosů z trestné činnosti v rozhodnutích příslušných orgánů*

V této souvislosti žalobce považuje za vhodné připomenout definici uvedenou v ustanovení § 1a odst. 1 zákona č. 61/1996 Sb., o některých opatřeních proti legalizaci výnosů z trestné činnosti a o změně a doplnění souvisejících zákonů:

*„Legalizací výnosů z trestné činnosti (dále jen „legalizace výnosů") se pro účely tohoto zákona rozumí jednání sledující zakrytí nezákonného původu výnosu z této činnosti s cílem vzbudit zdání, že jde o příjem nabytý v souladu se zákonem. Není přitom rozhodující, zda k takovému jednání došlo zcela nebo zčásti na území České republiky. Uvedené jednání spočívá zejména*
*a) v přeměně nebo převodu majetku s vědomím, že pochází z trestné činnosti, za účelem jeho utajení nebo zastření jeho původu nebo za účelem napomáhání osobě, která se účastní páchání takové činnosti, aby unikla právním důsledkům svého jednání,*
*b) v utajení nebo zastření skutečné povahy, zdroje, umístění, pohybu majetku a nakládání s ním nebo změny práv vztahujících se k majetku s vědomím, že tento majetek pochází z trestné činnosti,*
*c) v nabytí, držbě, použití majetku nebo nakládání s ním s vědomím, že pochází z trestné činnosti,*
*d) ve zločinném spolčení osob nebo jiné formě součinnosti za účelem jednání uvedeného pod písmeny a), b) nebo c)."*

Pokud jde o hodnocení shora popsaného jednání jako úkonů směřujících k legalizaci výnosů z trestné činnosti, poukazuje žalobce na to, že obžaloba na str. 30 uvádí následující:

*„Část výtěžku z uvedené trestné činnosti byla následně v částce 151,237.425,-Kč převedena dne 31.1.1997 z účtu KHB, a.s. u IPB č. 100200878/5100 na pokyn Libora Páva na účet firmy Forminster Enterprises Limited (FEL) č. 0123414AA u LGT Bank v Lichtenštejnsku, který Ing. Hálek na základě generální plné moci od firmy FEL dne 26.11.1996 založil. V přepočtu pak byla na účet u LGT Bank v Lichtenštejnsku dne 5.2.1997 uložena částka ve výši 5,422.251 USD, odpovídající výše uvedené částce v Kč. Z této částky byly dne 14.2.1997 poukázány 2 miliony USD na účet firmy Presley Industries u stejné banky č. 0123415AA, který Ing. Hálek rovněž založil dne 26.11.1996 na základě generální plné moci od uvedené firmy. Ve stejný den, tj. 14.2.1997 pak byla poukázána částka ve výši 2.964.287,21 USD, odpovídající částce 82,768.765,-Kč zpět na účet KHB, a.s. Za tuto částku KHB převedla dne 30.1.1997 na účet firmy FEL v SCP založený na žádost Ing. Vlasnika a Páva 384.971 ks akcií Kotvy, získaných trestnou činností z portfolii investičních fondů Trend a Mercia."*

Dále v předběžném opatření vydaném Zemským soudem Lichtenštejnského knížectví dne 4. listopadu 1997, kterým byly zablokovány finanční prostředky na bankovním účtě společnosti Forminster, se po popisu právě uvedeného převádění finančních prostředků na bankovní účet a z bankovního účtu Forminster uvádí: *„Z výše zmíněných vyšetřování vyplývá podezření na praní peněz podle § 165 trestního zákoníku. Je třeba vycházet ze skutečnosti, že neznámí pachatelé se pokusili prostřednictvím převodu podvodně získaných peněz na konta v Lichtenštejnsku s eventuálním následným převodem zatajit společnosti Trend VIF a.s. místo uložení zisku z prodeje cenných papírů, popřípadě z dalších obchodů, a obzvláště znemožnit sledování toku peněz."*

Rovněž v přípisu Vrchního státního zastupitelství v Praze adresovaného dne 29.8.2002 ve věci Obviněného Ing. Miroslava Hálka, kterým byl Zemský soud Lichtenštejnského knížectví požádáno o uvolnění peněz za účelem jejich zaslání na účet společnosti TREND VIF a MERCIA, se uvádí: *„S odvoláním na článek 1 odstavec 1 Evropské úmluvy o vzájemné pomoci ve věcech trestních ze dne 20. dubna 1959, dále s odkazem na Úmluvu o praní, vyhledávání, zadržování a konfiskaci výnosů ze zločinů ze dne 18.12.1995...Dne 27.11.2001 Nejvyšší státní zastupitelství*

10

M 0076

*České republiky pod sp. zn. 2 NZt 749/2001 převzalo, k žádosti Knížecího Lichtenštejnského státního zastupitelství, trestní řízení vedené v Lichtenštejnském knížectví proti Miroslavu Hálkovi. V Lichtenštejnském knížectví bylo vedeno trestní řízení proti Miroslavu Hálkovi pro trestné činy praní špinavých peněz, zločinné spolčení a další podle příslušných trestněprávních ustanovení lichtenštejnského trestního zákona."*

Konečně, žalobce poukazuje na to, že rovněž Zpráva Ministerstva financí ČR obsahuje na str. 4 pasáž nadepsanou Podezření na možné legalizování výnosů z trestné činnosti. O tomto podezření zpráva pojednává rovněž na str. 6 a 7 (ohledně akcií společnosti Sokolovská uhelná, a.s.). V závěru (str. 9) zpráva uvádí: *„ U osob začleněných do této skupiny vzniká důvodné podezření, že jejich aktivity jsou financovány pomocí majetkových hodnot z portfolií fondů. S touto skupinou spolupracuje další skupina osob, která legalizuje výnosy trestné činnosti první skupiny, a to pomocí tradičních aktivit při praní špinavých peněz, tj. organizování zdánlivých mezifiremních obchodů, provádění bankovních operací ve třetích státech, umělé zvyšování zisků jinak legálně fungujících firem.*

*Do této skupiny osob je nutné zařadit společnosti:*
- *Forminster Enterprises Limited*
- *Burzovní společnost Egretta, a.s.*
- *Atlanta Safe, a.s.*
- *Severní brokerská, a.s.*
- *DYNAMIC PARTNERS, a.s.*
- *Sokolovský IF, a.s.*
- *Fyzické osoby Anatolij Salamatin, Jiří Mareš."*

### 3.4.2.  Obcházení účelu opatření státního zástupce

Z práve uvedeného jasně vyplývá, že opatření státního zástupce spočívající v blokaci akcií žalovaného č. 1, které jsou nyní na účtě společnosti Forminster, mělo zcela jasný účel, a to přinejmenším do doby skončení policejního šetření zamezit tomu, aby s výnosem z trestné činnosti, který dle shora citovaných relevantních rozhodnutí, resp. dle obžaloby představují akcie žalovaného č. 1 (v počtu 384 971 kusů) představují, nebylo možné jakkoliv nakládat a aby společnost Forminster a s ní spjaté subjekty nemohla v souvislosti s vlastnictvím akcií žalovaného č. 1 realizovat jakýkoliv neoprávněný majetkový prospěch.

Nepochybně účelem opatření státního zástupce je, aby majetek žalovaného č. 1, který jakožto jeho majoritní akcionář ovládá Forminster v důsledku důsledku jednání označeného obžalobou jako trestný čin, nebyl z majetku žalovaného č. 1 nijak převáděn.

Zejména z účelu opatření státního zástupce (i s přihlédnutím na shora zmíněný zákaz legalizace výnosů z trestné činnosti) vyplývá, že nesmějí být činěny žádné úkony, které směřují k tomu, aby se majetek žalovaného č. 1 zmenšil nebo aby byla prováděna jakákoliv jeho transformace způsobem, kdy by (byť i jen teoreticky) vznikalo riziko, že nad takovýmto transformovaným majetkem žalovaný č. 1 nebude mít přímou kontrolu. Vzhledem ke shora popsaným úkonům příslušných orgánů několika států vycházejících z podezření na praní peněz, je zcela zřejmé, že žádný z úkonů společnosti Forminster při výkonu akcionářských práv a žádný z úkonů členů statutárních orgánů jmenovaných de facto společností Forminster jakožto ovládající osobou, nesmí v tomto ohledu vyvolávat jakékoliv pochybnosti.

V daném případě však nejenže hlavní majetková hodnota, tj. Obchodní dům KOTVA, byla vyvedena z majetku žalovaného č. 1, ale jsou činěny další úkony, které vedou k tomu, že žalovaný č. 1 zcela ztratil nad touto majetkovou hodnotou kontrolu.

M 0077

Dosud byly provedeny tyto úkony:

1. Žalovaný č. 1 vložil Obchodní dům KOTVA do své dceřinné společnosti, kterou v danou dobu byl žalovaný č. 2 V době vkladu byl žalovaný č. 1 jediným akcionářem žalovaného č. 2;

2. Žalovaný č. 1 rozhodl jako jediný akcionář žalovaného č. 2 o transformaci žalovaného č. 2 na komanditní společnost, čímž došlo k tomu, že:

a) zásadním způsobem se snížil podíl žalovaného č. 1 na zisku žalovaného č. 2 a na jeho likvidačním zůstatku (v současnosti má žalovaný č. 1 podíl na zisku ve výši necelých 50 %, podíl na likvidačním zůstatku 40%, ačkoliv jeho vklad představuje 98,6 % všech vkladů do společnosti – žalovaného č. 2 ),

b) vzhledem k tomu, že žalovaný č. 1 se stal komanditistou žalovaného č. 2, nepodílí se na obchodním vedení žalovaného, tedy se transformací žalovaný č. 1 fakticky vzdal možnosti ovlivňovat hospodaření žalovaného č. 2.

3. Žalovaný č. 2 vykonávající jako jediný akcionář žalovaného č. 3 působnost jeho valné hromady přijal rozhodnutí o zvýšení základního kapitálu o 1.390.000.000 Kč, tj. ze stávající výše 2.000.000 Kč na novou výši základního kapitálu 1.392.000.000 Kč. Ke zvýšení základního kapitálu došlo upsáním nových akcií s tím, že všechny akcie byly nabídnuty k upsání jedinému akcionáři – žalovanému č. 2. Nové akcie byly splaceny nepeněžitým vkladem – Obchodním domem KOTVA. Takto se žalovaný č. 3 stal vlastníkem Obchodního domu KOTVA.

Jak již bylo uvedeno shora, opatření státního zástupce spočívající v blokaci akcií žalovaného č. 1 se samozřejmě vztahuje na majetek žalovaného č. 1, který je blokovanými akciemi v širším slova smyslu reprezentován.

Již učiněnými kroky se podařilo společnostmi Forminster a statutárním orgánům žalovaného č. 1, které Forminster jako hlavní akcionář jmenoval, oddělit vlastnictví akcií žalovaného č. 1 od hlavní majetkové hodnoty, kterou v době uvalení opatření státního zástupce žalovaný č. 1 měl, tj. od Obchodního domu KOTVA, a tuto majetkovou hodnotu převést na subjekt, na jehož základním kapitálu se žalovaný č. 1 vůbec nijak nepodílí.

Praktický důsledek již učiněných kroků je tedy takový, že opatření státního zástupce prakticky pozbývá smysl.

V této souvislosti je rovněž podstatné, že žalovaný č. 3 má akcie na majitele. Tedy při případném převodu těchto akcií se nikdo nedozví (a to dokonce ani orgány Policie), že k takovémuto převodu došlo. Nebude možné dohledat podmínky převodu (zejm. osobu kupujícího, výši kupní ceny, zda bylo poskytnuto její zajištění, zda kupní cena byla uhrazena). Takto nelze zcela vyloučit riziko, že tyto akcie budou vyvedeny mimo skupinu společností skupiny KOTVA bez zaplacení kupní ceny a že takový kupující převede akcie na další subjekt, čímž příjem z prodeje akcií bude realizován zcela mimo společnosti skupiny KOTVA. Vzhledem ke shora uvedenému popisu obchodů realizovaných skupinou okolo Ing. Hálka je patrně pochopitelné, že žalobce pojímá tuto obavu.

12

### 3.4.3.  Důsledky obcházení opatření státního zástupce

Samozřejmě žalobce jako akcionář žalovaného č. 1 nemá zájem na tom, aby takovýmto způsobem a k jeho újmě přetrvávalo riziko, že bude fakticky dokončen proces, který různé orgány (viz citace shora) označily jako legalizaci výnosů z trestné činnosti dokončen, a proto podává tuto žalobu.

Jistě nelze pochybovat o tom, že shora uvedené, ačkoliv primárně se jedná o záležitost práva trestního, má rovněž své důsledky občanskoprávní. Nepochybně obecně všechny právní úkony, které směřují k legalizaci výnosů z trestné činnosti, jsou protiprávní ve smyslu ustanovení § 39 občanského zákoníku (rozpor se zákonem). Vzhledem k tomu, že z tohoto důvodu jsou neplatné všechny shora vyjmenované právní úkony, jejichž předmětem bylo nakládání s Obchodním domem KOTVA, je žalovaný č. 1 i nadále jeho vlastníkem[15].

Zcela závěrem žalobce poukazuje na to, že ve shora popsaném kontextu vzniká preventivní charakter této žaloby, neboť rozhodnutí o ní je způsobilé zabránit vzniku dalších soudních sporů, zřejmě i s mezinárodním prvkem (viz shora citované rozhodnutí Nejvyššího soudu ČR sp. zn. 3 Cdo 1338/96 týkající se existence naléhavého právního zájmu na určení existence právního vztahu).

K důkazu:

- zpráva nuceného správce TREND VIF ze dne 22. února 1997 včetně dokumentů uvedených v její příloze,
- zpráva Ministerstva financí ze dne 21. 1. 1998, č.j. 102/90 17697,
- obžaloba proti obviněným Ing. Miroslavu Hálkovi a spol. podaná Krajským státním zastupitelstvím v Hradci Králové dne 30. září 1998, sp. zn. KZv 323/97,
- úplný výpis z obchodního rejstříku TREND VIF,
- zpráva Střediska cenných papírů ohledně převodu akcií žalovaného č. 1 z TREND VIF na Forminster (nechť vyžádá soud),
- prohlášení vkladatele ze dne 10. října 2000 ohledně převodu Obchodního domu KOTVA z žalovaného č. 1 na žalovaného č. 2,
- úplný výpis z obchodního rejstříku ohledně žalovaného č. 2,
- notářský zápis JUDr. Václava Halbicha ze dne 20. 5. 2003 č. NZ 235/203, N 317/2003 (obsahuje rozhodnutí o změně právní formy žalovaného č. 2, včetně nového znění společenské smlouvy, dokládá pokles podílu na zisku, vypořádacího podílu a podílu na likvidačním zůstatku),
- výpis z katastru nemovitostí (LV č. 265 pro k.ú. Staré Město),
- výroční zprávy žalovaného č. 1 za rok 2000, 2001 a 2003,
- rozhodnutí Knížecího zemského soudu ve Vaduzu, Lichtenštejnské knížectví o zmrazení peněžních prostředků na účtech Forminsteru a Presley Industries,
- žádost Vrchního státní zastupitelství ze dne 29. 8. 2002 pod č.j. VI VZv 3/2002 – 1597 o právní pomoc – dožádání Knížecího zemského soudu ve Vaduzu, Lichtenštejnské knížectví, ze dne 29. 8. 2002,

---

[15] Žalobce nepovažuje za nutné zabývat se na tomto místě neplatností právních úkonů týkajících se akcií žalovaného č. 1, neboť jeho právní postavení ovlivňují úkony týkající se Obchodního domu KOTVA. Žalobce v této souvislosti rovněž uvádí, že je mu známo, že mezi osobami, které zastupovaly TREND VIF a Forminster, byla v roce 1999 uzavřena dohoda, na jejímž základě se měl TREND VIF v budoucnu zdržet zpochybňování vlastnického práva Forminsteru k akciím žalovaného č. 1. Nicméně vzhledem k tomu, že právní úkony, které nejenže jsou absolutně neplatné pro rozpor se zákonem, ale kterými byly dokonce spáchány trestné činy, nemohou být následně legalizovány uzavřením dohody o narovnání, nepovažuje žalobce za potřebné se zde podrobněji touto dohodou zabývat.

13

- opatření státního zástupce o zablokování převodů akcií emitovaných žalovaným č. 1 (nechť vyžádá soud),
- znalecký posudek oceňující hodnotu Obchodního domu KOTVA,
- s výhradou dalších důkazů.

## 4.    ZÁVĚR, ŽALOBNÍ PETIT

Žalobce shora popsal důvody, pro které jsou převody Obchodního domu Kotva ze žalovaného č. 1 na žalovaného č. 2 a ze žalovaného č. 2 na žalovaného č. 3 neplatné a pro které zůstává majitelem nemovitostí i nadále žalovaný č. 1. Rovněž tak žalobce doložil svůj naléhavý právní zájem na určení vlastnického práva k Obchodnímu domu KOTVA soudem.

Z důvodů shora uvedených žalobce navrhuje, aby soud po projednání věci vydal tento

## R O Z S U D E K :

I.    Určuje se, že žalovaný č. 1 je výlučným vlastníkem těchto nemovitostí:

- budovy č.p. 656 (obč. vyb.) příslušná k části obce Staré Město, nacházející se na stavební parcele parc. č. 680;
- budovy bez č.p./č.ev. (obč. vyb.) příslušná k části obce Staré Město, nacházející se na stavební parcele parc. č. 1018/2;
- pozemku parc. č. 680 (zastavěná plocha a nádvoří) o výměře 4385 m²;
- pozemku parc. č. 683/1 (ostatní plocha) o výměře 851 m²;
- pozemku parc. č. 683/2 (ostatní plocha) o výměře 2963 m²;
- pozemku parc. č. 683/3 (ostatní plocha) o výměře 2 m²;
- pozemku parc. č. 690/2 (ostatní plocha) o výměře 25 m²;
- pozemku parc. č. 690/3 (ostatní plocha) o výměře 49 m²;
- pozemku parc. č. 690/4 (ostatní plocha) o výměře 9 m²;
- pozemku parc. č. 1018/2 (zastavěná plocha a nádvoří) o výměře 1 m²;

vše v katastrálním území Staré Město a obci Praha.

II.    Žalovaní jsou povinni společně a nerozdílně nahradit žalobci náklady řízení do 3 dnů od právní moci tohoto rozsudku.

GILROY LIMITED
Mgr. Ondřej Peterka
Advokát v plné moci

14

M 0080

Přílohy:

- výpis ze Střediska cenných papírů,
- výpisy z obchodního rejstříku ohledně žalovaných,
- doklady o existenci žalobce,
- výpis z katastru nemovitostí (LV č. 265 pro k.ú. Staré Město),
- výroční zprávy žalovaného č. 1 za roky 2000, 2001 a 2003,
- znalecký posudek oceňující hodnotu Obchodního domu KOTVA,
- zpráva nuceného správce TREND VIF ze dne 22. února 1997 včetně dokumentů uvedených v její příloze,
- zpráva Ministerstva financí ze dne 21. 1. 1998, č.j. 102/90 17697,
- obžaloba proti obviněným Ing. Miroslavu Hálkovi a spol. podaná Krajským státním zastupitelstvím v Hradci Králové dne 30. září 1998, sp. zn. KZv 323/97,
- úplný výpis z obchodního rejstříku TREND VIF,
- prohlášení vkladatele ze dne 10. října 2000 ohledně převodu Obchodního domu KOTVA z žalovaného č. 1 na žalovaného č. 2,
- notářský zápis JUDr. Václava Halbicha ze dne 20. 5. 2003 č. NZ 235/203, N 317/2003,
- rozhodnutí Knížecího zemského soudu ve Vaduzu, Lichtenštejnské knížectví o zmrazení peněžních prostředků na účtech Forminsteru a Presley Industries,
- žádost Vrchního státní zastupitelství ze dne 29. 8. 2002 pod č.j. VI VZv 3/2002 – 1597 o právní pomoc – dožádání Knížecího zemského soudu ve Vaduzu, Lichtenštejnské knížectví, ze dne 29. 8. 2002.

15

M 0081

**CC**

Message                                                                    Page 1 of 1

## Georgiy Nikitin

**From:** Andrew Weiss
**Sent:** Thursday, January 06, 2005 11:12 AM
**To:** 'Richard Harazim'
**Subject:** RE: KT

Dear Mr. Harazim,

KT is not controlled by Weiss Asset Management; however, if a satisfactory resolution of all other matters can be achieved, I would try to persuade KT to settle its lawsuits and I am highly confident that I would be successful in that endeavor. Thus, I do not expect that the KT lawsuit will impair the ability of the parties to achieve a successful agreement.

Andrew Weiss

**From:** Richard Harazim [mailto:richard.harazim@od-kotva.cz]
**Sent:** Tuesday, January 04, 2005 8:08 AM
**To:** Andrew Weiss
**Cc:** Georgiy Nikitin
**Subject:** KT

Dear Mr. Weiss

I was informed by Linklaters Prague today that they received a letter from Mr. Petarka putting them on notice that a new lawsuit was filed. As it uses exactly the same format, phrases and logic in general as the previous lawsuit filed on behalf of Gilroy we assume that KT belongs to your group, as well.

Please confirm whether or not KT's lawsuit is part of the deal offered by you on November 23, 04. As this is a completely new issue we would like to know what exactly each of the various factors represent.

Best regards

Richard Harazim

2/7/2005

W0004242

**DD**

| | |
|---|---|
| From: | Henry Prestage [hprestage@ballymoreproperties.ie] |
| Sent: | Friday, July 30, 2004 10:14 AM |
| To: | Richard Harazim |
| Subject: | RE: Kotva |

Thanks Richard

Rest assured my weekend is not ruined.

A few points that need to be made:

- there is and will not be any hostility from our side

- we agree there can be no room for blackmailers.  To sort this out it needs to go through the courts and be defeated.  Any pay-off sets a bad precedent that will make our life difficult.

- we don't want to turn this in to a legal battle where we all end up with nothing and the lawyers get rich.

- there remains plenty of good faith but still our position must be protected.  Once the deal is done you walk away while we will have to live with the consequences of any actions made now.

- the issue of walking away and the penalty would be a last resort however we believe that we are entitled to it in the current circumstances.

The simplest way forward is to close now, retain the money in escrow and for you to defeat the court case asap which you said you were hopeful of doing within a number of months. The funds could then be released as the claim is gone and there is no precedent set for further spurious claims.  Is this an option for you?

Henry

-----Original Message-----
From: Richard Harazim [mailto:richard.harazim@od-kotva.cz]
Sent: 30 July 2004 15:09
To: Henry Prestage
Subject: RE: Kotva


Dear Henry

It is good that we make our positions quite clear. I too can confirm that we are fully committed to the deal and we did a lot of costly steps that otherwise would make no sense. As the case must be we view the current situation differently:

1. We don't agree we breached the SPA and there should be a penalty. The SPA says there has to be a proceeding that would make the SPA voidable in order for us to breach the contract. Only court can show if this particular proceeding would make the SPA voidable. We don't think so. The court will decide this is a nonsense and the SPA goes on. Otherwise ANY lawsuit you would make us pay the penalty and open the door to your exit. Please go through the SPA, we think it is quite clear.

2. We can't take responsibility for blackmailers. You are right that anyone may try to file a lawsuit against you after you have acquired the company and try to seek compensation to get rid of the lawsuit. This is a criminal act and we can't be hold responsible for someone acting criminally. You are basically saying we should remove the risk of enterprising from you. This may happen in Ireland or here. We don't think one should not enterprise just because there is someone filing lawsuits that have no merits. This is a fact of life and you either live with it or you can do nothing.

**K1921**

We totally disagree with any changes to the SPA as you propose. We will never agree to any monies staying in the Escrow as a result of someone filing crazy lawsuits. This would be an incentive for people to file them, in fact. If they knew we are dependent on having NO lawsuits in order to get our money they could file just whatever just because of this, if they had the guts. I stress once again - it is a criminal act and we shouldn't yield to it.

It would be a very sad ending to all the effort and good faith both our parties showed if we had to go back to the SPA and start to read it in a hostile manner this time. And all of that because of one lawsuit from an offshore holder of 1 share claiming something totally unclaimable. Right, there is some risk, but there is always a risk. (There is a risk for you and for us even in trying to walk away from the deal. You and us can go to the arbitration and claim serious money. There is some risk in every move you take). The risk associated with Gilroy is so small that we would think it is a shame to run away from this deal because of it. As for the notion of us hedging you against potential future blackmailers - if this a fixed standpoint then we have to seriously consider the alternative we have no deal. We will not accept this.

All of this is just to describe how we view things. We don't want to turn this into a battle of lawyers. If you feel you are not up to risks of Gilroys and their like we'd better start finding ways of how to end this painlessly. We won't accept a penalty without a fight and we won't accept money being tied to lunatics (or criminals) and their lawsuits.

I hope I am not ruining your weekend. I know this deal is important to you as it is to us. We spent too much on it. We can handle Gilroy. If you can handle life with risks associated to life then we can go on and enjoy the glass of champagne soon.


Best regards


Richard


-----Original Message-----
From: Henry Prestage [mailto:hprestage@ballymoreproperties.ie]
Sent: Friday, July 30, 2004 2:21 PM
To: Richard Harazim (E-mail)
Subject: Kotva


Richard

Prior to your meeting with the Gilroy people next week I think we need to make the Markland position very clear.  The first point to stress is that after 18 months of hard work we remain fully committed to the deal and want to get it over the line - I know we are both working toward that outcome.

Whilst you have stated that the Gilroy claim is more of a nuisance than a serious legal issue we must (and are) take it very seriously.  As I see the position there are two courses of action from here:

- based on the Gilroy litigation and under the terms of the SPA, Markland are entitled to walk away from this deal now and claim the EUR500,000 penalty from Kotva held in escrow. This is not our preferred course of action and I am sure that the Kotva Board do not wish to forfeit the escrow money and lose the deal having worked hard on the deal for so long and put in place the new corporate structuring.  You would need to find another buyer and then face the same legal issues all over again.

- even if the Gilroy legal case "goes away" we are left in a very difficult situation as clearly they will only withdraw the legal challenge if they receive some form of compensation.  In our view this sets a precedent and could open the floodgates to similar spurious legal actions that would be both costly and time consuming to deal with, and if ultimately successful could result in the building having to go back to Kotva a.s.  Our preferred course of action is to proceed now with the closing and to pay off the outstanding Bank debts, etc.  The remaining funds are to remain in escrow until the Gilroy

K1922

claim is withdrawn. At that time we will reduce the amount held in Escrow to EUR25M for the following 6 months to guard against other legal challenges. If after this time there are no legal challenges we will further reduce the Escrow amount to EUR10M for a further 18 months and at that time all Escrow monies (other than those governed by the SPA) will be released. If there are ongoing legal challenges at any time during this time frame then the Escrow monies will not be released until all cases have received full and final settlement. We will be entitled to draw against the Escrow monies for legal costs and claims.

Please discuss this with your Board over the next day or two and let me know how you wish to proceed.

When we get through this it will be a well deserved glass of champagne on the KOTVA terrace for all!

Regards

Henry

K1923

**EE**

# hbulejkova

| | |
|---|---|
| **From:** | Aidan Scully [ascully@markland.ie] |
| **Sent:** | 11 August 2004 13:57 |
| **To:** | 'Frank Walker' |
| **Cc:** | hbulejkova@markland.ie |
| **Subject:** | FW: Kotva |

For file

Hana please print and file.

**From:** Henry Prestage [mailto:hprestage@ballymoreproperties.ie]
**Sent:** 11 August 2004 13:13
**To:** Aidan Scully
**Subject:** RE: Kotva

Aidan

[illegible text]

He claimed to represent a number of minority shareholders in Kotva and
[illegible lines of faded text]
how much we were paying [illegible] making as he had seen Shull reported in the paper
[illegible] of $100m

[illegible] said he had a strict confidentiality agreement and could not disclose anything. I told him to
[illegible] agreement as Kotva are also bound to the same confidentiality, [illegible]
[illegible]

[illegible] Richard and told him. Richard confirmed that this is the guy he met at Gilroy. He said they
[illegible] was discussing possibilities. He told me not to disclose anything as they
would and. I told him to make sure he had our agreement re the planned course of action on Gilroy before
they acted and he agreed to talk next week prior to acting

Henry

-----Original Message-----
**From:** Aidan Scully [mailto:ascully@markland.ie]
**Sent:** 11 August 2004 13:06
**To:** 'Henry Prestage'
**Subject:** Kotva

Henry,

Can you summarize that call you got from Gilroys yesterday?

Ta

Aidan

---------------------------------------------------
Aidan Scully
Managing Director
Markland Holdings Ltd
19 Upr Fitzwilliam Street
Dublin 2

11/08/04

M 0091

Ph      00353-1-6762023
Fax     00353-1-6762500
Email   scully@markland.ie
Web     www.markland.ie

--
This email has passed through an IE Internet MailWall gateway
and has been screened for known viruses, potential viruses and
malicious code.

IE Internet.com MailWall (http://ieinternet.com/mailwall/)
--

11/08/04

M 0092

**FF**

# PETERKA & PARTNERS v.o.s.

Commercial Register, Municipal Court in Prague
Section A, Enclosure 42051

Business Identification Number 26 ...

Law Offices
Na Příkopě 15/583, 110 00 PRAHA 1
Tel:    (420) 272 143 400, 246 085 300
Fax:   (420) 272 143 470, 246 085 370

*www....cz*

E-mail of August 31, 2004

| | | |
|---|---|---|
| From: | Ondrej Peterka | peterka@cabinet.cz |
| To: | Ing. Vladimir Hoffmann | vladof@volny.cz |
| Cc: | Andrew Weiss | AWeiss@Weiss-Asset.com |
| | Georgyi Nikitin | georgiy@weissasset.com |
| | Eitan Milgram | eitan@weissasset.com |
| Re: | KOTVA - TREND | |

Dear Mr. Hoffmann,

On the basis of your telephone call of Friday August 27, 2004 we have analyzed the legal requirements as regards the acquisition of shares of KOTVA, a.s. by KOTVA Group (i.e. KOTVA, a.s. and its subsidiaries). Please find below a short summary. Our analysis is based on information contained in the last annual accounts of KOTVA, a.s., the consolidated accounts of the whole KOTVA Group for 2003 and accounts of KOTVA, a.s. as of July 30, 2004.

## 1. Legal requirements for acquisition of its own shares

According to the provisions of the Commercial Code, KOTVA, a.s. and any of its subsidiaries may acquire shares of KOTVA, a.s. under the following circumstances:

(a) the acquisition of shares is approved by the general meeting of the company;

(b) the face value of all the acquired shares cumulatively may not exceed 10% of the company's registered capital;

(c) the company has enough available resources to be able to create a special reserve fund in the amount of the purchase price of the acquired shares.

Sub (a) With respect to votes exercised currently by Forminster (if we accept that Forminster is entitled to vote) it is quite probable that general meeting of KOTVA, a.s. is able to approve the acquisition of shares. But a broad public will be informed about it and some minority

2.                                         PETERKA & PARTNERS v.o.s.

shareholders may submit a petition questioning validity of the adopted resolution. Before court decides on submitted petition, it is risky to conclude an agreement on sale of shares. With respect to this fact it would be more appropriate if the shares were bought by a subsidiary of KOTVA a.s. since only the approval of general meeting of the subsidiary is required.

Sub (b): This limitation applies to the whole KOTVA Group. Since KOTVA, a.s. has already acquired 0.5% of its own shares, it is now unable to purchase more than 9.5%, i.e. KOTVA is not allowed to purchase the whole stockholding of BGO which is about 11.9%. This obstacle can, however, be easily avoided if BGO's block of shares is split into two parts and the rest of the shares are acquired by an entity not falling within the KOTVA Group.

Sub (c): We find a much stricter rule set out in point 56 as per section on the creation of a special reserve fund – please see point 4 and 5 above. This special reserve fund may be created almost exclusively out of previous profit. Since KOTVA, a.s. has suffered in the past huge losses amounting CZK 178 million, it will be unable to create this special reserve fund. Although we do not have the annual accounts of all the subsidiaries of KOTVA, a.s. it follows from the consolidated annual accounts of the whole KOTVA Group that similar conclusions most likely apply to all the companies of KOTVA Group since the accumulated previous losses of the whole KOTVA Group amount to approx. CZK 489 million.

Any contract on the purchase of shares contradicting these rules is null and void unless the seller is able to prove that he/she acted in good faith, i.e. that they did not know and also were unable to ascertain that the contract violates the above mentioned provisions. The violations of the provisions of Commercial Code on the acquisition of own shares may under certain circumstances be a criminal offence.

## 2. Financing of acquisition of shares

The most important question is whether KOTVA, a.s. or any company of the KOTVA Group has enough funds to pay the purchase price for the shares to BGO. From the annual accounts of KOTVA, a.s. for 2003 it is apparent that KOTVA, a.s. has only approx. CZK 0.5 million in cash or in its bank account (as of June 30, 2004 CZK 1 million in cash or in the bank accounts). Companies of the whole KOTVA Group have together approx. CZK 66 million in bank accounts or in cash (as of December 31, 2003). Since the amount of the short term receivables of KOTVA Group is approx. CZK 116 million (as of December 31, 2004) KOTVA Group may be able to gain a little more cash, but probably not for a long period of time.

According to section 161e of the Commercial Code a KOTVA, a.s. is not allowed to secure financing of acquisition of its own shares. The same applies to other companies of KOTVA Group.

## 3. Conclusions

The proposal of Mr. Benda that KOTVA, a.s. (or maybe another company falling within the KOTVA Group) buys shares of KOTVA, a.s. which are held by BGO makes sense only if the companies of KOTVA Group are able to finance the acquisition out of their own proceeds. From the available accounts of KOTVA Group however, it follows that this situation is not given. If the acquisition of shares is to be financed by credits from third parties, it has no

K8052

3.                                                                        PETERKA & PARTNERS v.o.s.

sense to conclude the contract on sale with KOTVA, a.s. or any other company of KOTVA Group.

Please note that legitimacy of the current board of directors of KOTVA, a.s. may be questioned and any shareholder of KOTVA, a.s. may try to invalidate contract on sale of shares using these arguments. This is another reason why we do not recommend concluding any contract on sale of shares with KOTVA, a.s.

Two possibilities exist as to how to interpret the current situation.

a) the management of KOTVA, a.s. is not aware of the legal requirements as regards the acquisition of its own shares - in such a case a new structure has to be discussed;

b) the management of KOTVA, a.s. is aware of the legal requirements as the regards acquisition of its own shares and they do not, in fact, want to conclude a settlement or play a waiting game.

We remain at your entire disposal for any further information.

Best regards

Ondrej Peterka

K8053

**GG**

# Linklaters

## Memorandum

16 September 2004

| | |
|---|---|
| To | Markland Holdings Limited |
| From | Bryan Wilson |
| Direct Line | (420) 221 622 177 |
| Client | Markland Holdings Limited |
| Matter | L-075479 |

### GILROY's claim

You have asked us to provide Markland Holdings Limited ("Markland") with an analysis of a claim filed by GILROY LIMITED ("GILROY") against KOTVA a.s. ("KOTVA") KOTVA NEMOVITOSTI, k.s. ("KOTVA NEMOVITOSTI") and SPV KN, a.s. ("SPV KN").

**1    Substance of the claim**

By a petition dated 30 June 2004 filed at the District Court for Prague 1, GILROY wants the court to declare that building no. 656 located on the plot of land no. 680 in the registration area of Staré Město, an unnumbered building located on the plot of land no. 1018/2, and plots of land no. 680, 683/1, 683/2, 683,3, 690/2, 690/3, 690/4, 1018/2, belong to KOTVA (the "Property").

GILROY argues that KOTVA has never ceased to be the Property's owner because all transfers of the Property, beginning with the non-monetary investment contribution to KOTVA NEMOVITOSTI, and subsequently to SPV KN, are invalid. It is claimed that the transfers are invalid as they allegedly circumvented the measure of the state prosecutor made in 1997, which blocked KOTVA's shares (the "Measure").

The Measure is a specific legal act issued within the criminal proceedings, however, it does not have the legal force of law. Even if breached, which we do not believe to be the case, it could not lead to invalidity of the Property's transfers.

The petition describes in detail several transactions relating to KOTVA's shares, which are and have been the subject of pending criminal and civil proceedings for many years. The principal defendant in these proceedings is Miroslav Hálek and is being prosecuted for the tunnelling of TREND - všeobecný investiční fond a.s. ("TREND")[1], and another investment fund MERCIA, a.s. ("MERCIA"), through KRÁLOVÉHRADECKÁ BROKERSKÁ, a.s. ("KHB"). GILROY cites, *inter alia*, the following as examples of how TREND was tunnelled:

---

[1]    TREND is an investment fund owning a portfolio of shares in important Czech companies including KOTVA, the value of which was CZK 1.45 Bln in 1995. In January 2000, TREND was declared bankrupt and its trustee is collecting assets back to the estate.

A04662831/0.0/24 Feb 2005

1

M 0018

  1.1   Disadvantageous sales of KOTVA shares

On 28 May 1996 TREND sold 152,935 KOTVA shares for CZK 420 per share to KHB. The same day TREND bought them back for CZK 952 per share and subsequently sold them to MERCIA for CZK 400 per share. This transaction resulted in a loss of CZK 168,840,240 to TREND

  1.2   Use by KHB of TREND's and MERCIA's funds to buy KOTVA shares

On 7 September 1995 TREND transferred CZK 112,000,000 to KHB's bank account and KHB used this to buy 70,077 KOTVA shares from Brno Broker Group, a.s.

  1.3   Breach of the preliminary injunction over KOTVA's shares

On 24 November 1997 Miroslav Hálek as chairman of MERCIA's board of directors decided to transfer 30,000 KOTVA shares from MERCIA's account to KHB's account although MERCIA had been ordered, pursuant to a court injunction, to refrain from any disposal of KOTVA shares.

The petition further states that Miroslav Hálek and KHB have transferred KOTVA shares to Forminster Enterprises Limited ("FORMINSTER"), a company which is and has been, according to KOTVA's annual reports, the controlling entity of KOTVA since 2000. The petition also points out that all transfers of the Property were done by the statutory body of KOTVA that was appointed by Forminster.

## 2   Plaintiff

GILROY is a company incorporated in Cyprus and holds one share in KOTVA with a nominal value of CZK 1,000. KOTVA's basic capital is CZK 694,209,000. As stated in the petition, GILROY is also a shareholder in TREND. We are not aware of any link between GILROY and James Wolf.

## 3   Litigation

GILROY's petition is a declaratory petition under which a special condition has to be met in order for the court to handle the petition in full, namely the plaintiff must have an urgent legal interest for such a declaratory decision to be made. If the court concludes that GILROY has an urgent legal interest, a full hearing with evidence will commence. It usually takes the court of first instance from one to two years to decide the matter. An appellate procedure takes approximately one year.

If the court of first instance concludes that GILROY does not have an urgent legal interest, it will dismiss the case without going through an evidential procedure. However, in relation to time, there is no major difference whether an evidential procedure is undertaken or not. Hence, it may also take from one to three years to dismiss the petition (including any appellate procedure).

An extraordinary appeal can be lodged with the Supreme Court. It usually takes one year to obtain a ruling.

Subsequently, a constitutional complaint to the Constitutional Court can be filed. It takes another year before the dispute is finally resolved by Czech courts.

Ultimately, there is an option to take the claim to the European Court of Human Rights in Strasbourg.

M 0019

## 4 Arguments against the claim

The following arguments can be raised against the claim:

### 4.1 GILROY does not have an urgent legal interest

Current case law stipulates that a declaratory petition has a preventive character and so is admissible only where the claimant's right is threatened or uncertain An example of such a situation is where two persons claim to be the owner of a building. Without a court ruling their position is unclear and so they need to obtain a court ruling, in order to be registered as the rightful owner.

GILROY's position is neither threatened nor uncertain. It has been, and still is, a KOTVA shareholder no matter what transfers of the Property have been undertaken.

The case law further stipulates that if the claimant's right has already been breached, the declaratory petition is not allowed.

The transfers of the Property either had, or did not have, a detrimental effect on KOTVA's shareholders. If they had a detrimental effect on KOTVA's shareholders, then a declaratory petition would not be allowed. Instead GILROY could claim for damages against KOTVA's statutory body. However, such a claim has to be filed with a different court, different arguments would have to be raised and GILROY would have to prove that it has suffered damage as a result of KOTVA's statutory body acting without due managerial care.

Currently, we do not see any legal reason for GILROY's statement that, as a result of the transfers of the Property, KOTVA has lost its control over the Property. SPV KN shareholders' structure ensures that KOTVA is a controlling entity in relation to all partners in KOTVA NEMOVITOSTI.

In the litigation, GILROY cites a Supreme Court ruling on a petition of a shareholder which requests the court to declare that a sale of the enterprise was not valid. GILROY's interpretation of this ruling is that the Supreme court ruled that a shareholder has the requisite urgent legal interest to file a declaratory petition.

Our interpretation of the same Supreme Court ruling is different. In the ruling the Supreme Court stated that a contract for the sale of the enterprise could have an important influence on the legal relationship of the company and, therefore, could have an impact on the legal status of its shareholder. However, the Supreme Court did not say expressly that the shareholder had an urgent legal interest. Since the lower courts did not examine this legal issue properly, the Supreme Court cancelled previous rulings and ordered the lower courts to re-examine whether a shareholder has an urgent legal interest in such circumstances. The legal issue of whether a shareholder has an urgent legal interest for declaratory petition has not yet been finally resolved by the Supreme Court.

### 4.2 The Measure did not cover the transfers of the Property

GILROY's main argument is that the transfers of the Property breached the Measure and as such are invalid. This argument is incorrect. As stated in the petition, the Measure blocked transfers of KOTVA's shares. It did not relate to the Property. We see no legal ground for GILROY's interpretation.

---

A0488263 1/0.0/24 Feb 2005

M 0020

The only legal tool which could have prevented KOTVA and KOTVA NEMOVITOSTI from transferring the Property is a preliminary injunction or a court ruling issued by court against KOTVA and KOTVA NEMOVITOSTI. We are not aware any such preliminary injunction or ruling has been issued.

4.3    KOTVA NEMOVITOSTI's transformation from a joint stock company to a general partnership has been registered by the Commercial Register

GILROY's position as a KOTVA shareholder is governed principally by the Czech Commercial Code. Among other rights, a shareholder has a right to file a petition to court to nullify a resolution of the general meeting if such resolution is contrary to statutory provisions or the deed of association. However, it is forbidden by Czech law to nullify a resolution if a transformation of a company has been registered in the Commercial Register. An analogous argument can be used in the current litigation. Although GILROY does not, and cannot, challenge the resolution of KOTVA's general meeting but instead the actual transfer of the Property, KOTVA and other defendants can argue that KOTVA's non-monetary contribution to KOTVA NEMOVITOSTI can no longer be disputed as it has already been registered in the Commercial Register.

4.4    To date no criminal ruling against Miroslav Hálek has been pronounced

Even if Miroslav Hálek was found guilty of a crime in connection with the transfers of KOTVA shares, it would not automatically lead to invalidity of the transfers of the Property. In each case the court would have to pronounce to what extent Miroslav Hálek's unlawful or criminal activity could have influenced civil acts.

5    Implications if the claim is successful

If the court ruled after Closing that the Property belongs to KOTVA, then Markland would be in an exposed position because such a situation is not covered in the SPA. In order to have a claim against the sellers, we recommend amending the SPA and inserting a clause so that, if GILROY's, or any other shareholder's, claim is successful, Markland would have a right to terminate the SPA.

6    Risks

We do not find GILROY's petition justified for the reasons set out above. It seems unlikely that the court would declare that the Property belongs to KOTVA.

A04882031/0.0/24 Feb 2005

4

M 0021

**HH**

| From: | Henry Prestage [hprestage@ballymoreproperties.ie] |
|---|---|
| Sent: | Monday, September 20, 2004 7:33 AM |
| To: | Richard Harazim |
| Subject: | RE: Gilroy |

Good morning Richard

This position is extremely awkward.  I can see from your e-mail that you too are starting to get fed up with the situation and the continued delay.

To respond to your points of view:

1. It is understandable that this is your view.  If we were selling something subject to a legal claim we would be saying the same thing.
Linklaters have advised us that they believe that the claim has little chance of success but it does have a chance and the consequences are massive.  Surely you can understand this.  We are trying to be proactive and work with you to find a solution.

2. I appreciate that you are considering all options.  We are also doing this.  We do have the option of walking away from the SPA today and taking the EUR500,000 penalty.  We do not want to do this as we have both come a long way in the process and I believe that you are acting in good faith and genuinely want to do the deal.  This penalty would barely cover our costs to date.

3. I must reassure you that we are acting in good faith.  This is not a tactic to achieve a price reduction.  None of this situation (Gilroy or the Indemnity) was caused by any actions of Markland so I am not sure how we can be accused of trying to manipulate a situation for our gain.  We would have liked to close this deal in March with no hassles!  As mentioned above there are small risks but serious consequences so releasing further funds from the escrow carries incremental risk for our shareholders that should be rewarded with a price reduction.  We would be prepared to reduce the formula to releasing EUR15M now for a EUR1M price reduction.

4. We have offered an option of extending the contract for another year whilst you get the court action resolved.  Clearly we do not want to do this but we are trying to be flexible.  We would prefer to move forward and close the deal now.

Your "bottom line" position cannot be acceptable to us.  We cannot release EUR30M from Escrow and then face the possibility of being ordered by the courts to hand the building back to Kotva a.s.  With all due respect I suspect the EUR23M funds will be long gone from your offshore company leaving us to suffer a massive loss.  The Bank will not carry any of this risk so all losses will fall directly on to our shareholders.

Trying to look at the deal objectively, if the deal falls over now:

- Markland walk away with EUR500,000 from Kotva which barely covers our costs for the past 2 years work. At least there is no damage done, no ongoing risk and it has not cost anything.
- Markland misses out on the opportunity to redevelop Kotva over the next 5 years
- Kotva walk away with a lot of wasted time, energy and money
- Kotva now have the building in a new SPV unnecessarily
- the court case will not immediately disappear so the building / SPV sale will effectively be unsaleable
- when the building finally gets in a clear legal position for sale (say 18 months) it is highly unlikely that the market will look at the deal as it is now very tarnished.  If a buyer is found I would suggest it is likely to be well below the current level. Certainly no Investment Fund or risk averse buyer will contemplate a purchase.

If we proceed with a deal at say EUR15M escrow release with a EUR1M price reduction then:

- Markland secure the building and can begin to implement its management plan now
- Kotva immediately have access to EUR15M which you can use to fund other deals to at

K2197

least start the reinvestment program you have been planning
- the EUR1M discount represents 2% of the deal value.  This is minute when compared to the
risks associated with our shareholders having to sign personal g'tees for EUR22M (EUR15M
to Kotva + EUR7M to J&T).
- Kotva have a large "carrot" to swiftly deal with this case via the courts to facilitate
the release of the remaining funds.
- there is no further negotiation required.  We simply pragmatically get on with this and
close the deal.
- we can share the credit interest generated from the escrow account during the life of
the court case.  This will at least provide a small supplementary income.

Richard, as mentioned many times we are trying to work with you to get this deal done.
Surely it is clear that the Gilroy case puts all risk on Markland - we are prepared to
live with this within reason hence our willingness to try to find a solution.

If you really are at a "bottom line" position then we have a major problem.
Please come back to me asap so that we may consider the next steps.

I trust you can make your Board members understand our position and remain committed to
working this one through with you to a successful conclusion.

Regards

Henry


-----Original Message-----
From: Richard Harazim [mailto:richard.harazim@od-kotva.cz]
Sent: 16 September 2004 12:08
To: Henry Prestage
Subject: RE: Gilroy

Dear Henry

Sorry for the delay, it took us a while to figure out how exactly should we respond to
your last email. The advantage is we had time to go through the whole situation again and
contemplate it from all possible angles. Our view is as follows:

1. As stated many times we don't believe Gilroy poses a real risk and we don't believe
Kotva should be punished for one of its minority shareholders filing malicious lawsuit
without a substance. The fact itself that we are willing to keep part of the money in
Escrow till the final resolution is viewed here as an utmost gesture of good will as there
is really no reason for the deposit in our minds. In other words - we agree to keep some
money in Escrow only because we try to understand your position and we try to show we mean
to finish the deal. But we feel it is not fair and we can't go behind a certain line. Then
our good will gesture would become a damage to our company and we can't afford that.

2. By selling the building we pursue the best economical interests of our company. We
genuinely believe that the deal as structured in the SPA  is better for the company than
looking for another investor and better than having to refurbish the company on our own.
The space between the deal we have and other options we have is not inexhaustible and by
adding a few unfavourable aspects to our deal we might fall back into a territory where we
do not do the best for our company. We can't allow other aspects let to convert the deal
into something that is bad for the company - and that is exactly what is happening.

3. With all due respect we question the motives on your end and we wonder whether the
situation is really as serious as put forward to us. In fact, there are only two solutions
to this aspect, and both of them are not in our
favour: either the situation is somewhat exaggerated on your side and you try to squeeze
last minute additional benefits for your side and that is understandable, but jeopardizing
our deal as we are "in the corner" and can't yield any more space, or the situation is as
grave with your financing as described which doesn't provide much comfort to us either as
we view Gilroy as zero real life risk and yet the structure seems to be falling apart. The
question in our mind is - what happens next when confronted with another, zero real life
risk situation?

K2198

The whole point here is the more sensitive for us as it is clear that the Gilroy lawsuit was initiated thanks to the unfortunate leak in the Irish press. If it hadn't been for the imprecise and exaggerated numbers and the information about the sale itself we would not have been blackmailed in this manner by BGO.

4. The situation we find ourselves in must come to an end. We feel as being in a vacuum. The deal has been dragging for too long from both sides and we still do not see clearly where it is going. We need decisions quickly. We will accept whatever the solution to your situation and our situation is but we need to know the solution. Anything that prolongs this state of ambiguity harms our potential to steer the company in the best direction.

Coming from the four points above I hope you will understand we just cannot accept any of the options listed in you email. We can't accept 10 + 7 ME and keep the rest (31.3 ME) in the Escrow as it simply doesn't make any economical sense. Nor can we accept 20 + 7 ME and a discount of 2 ME which leaves the remaining 19.3 ME in the Escrow as once again this solution loses the appeal of the best economical solution for us.

We have established the bottom line that makes sense for us to be on 23 ME as funds we use immediately plus 7 ME for JT. This still leaves stunning 18.3 ME in the Escrow we can't use. Under normal conditions we would declare this solution as unacceptable for us as the funds in the Escrow serve as a hedge against a non-existing risk and the size of the funds we can't use renders the economical calculations we did at the beginning totally useless.
We want to show, nevertheless, that we do act in a good faith and that we are capable of making steps forward.

It may be the case, though, that even this huge step forward to meet your needs doesn't entirely cure your issues with the bank. In this unlucky scenario we wouldn't favour further prolonging of this agony, especially when realizing your banks reported shyness towards real life risks. We would rather return back and evaluate the options that are left for us. We don't view the situation as pessimistically as described in your email. There were other parties trying to approach us that we didn't deal with because of the SPA. They may be serious and may be not, may show more resistance against risks of Gilroy's magnitude and may show not. We would have to explore this if we were forced. Even the unpreferred option of having to refurbish the building seems unfortunately more attractive than accepting further concessions.

Henry, you know that we want to finish the deal. We really do. But not at all costs. We have stretched ourselves to our limits and I think that is a good news. Please let me know if it is good enough. Because we can't stretch any more and that is the bad news.

Best regards

Richard

-----Original Message-----
From: Henry Prestage [mailto:hprestage@ballymoreproperties.ie]
Sent: Monday, September 13, 2004 4:27 PM
To: Richard Harazim (E-mail)
Subject: Gilroy

Richard

I have considered the current position re the Gilroy issue. I acknowledge that you believe it is a non issue and I am sure that you can understand that to our Bankers and Lawyers any pending lawsuit must be taken seriously and steps taken to ensure that themselves and their client (i.e. Markland) are not exposed to significant losses. There is a genuine intent on both sides to get this deal done so I hope we can find a solution.

K2199

After looking at all possibilities I can see three possible options:

- We proceed with the deal on the current terms, releasing EUR10M from escrow pending the successful outcome of the lawsuit. (already rejected by Kotva but maybe accepted when measured against other options below). As I explained our Bankers will carry none of the risk so our shareholders are having to sign additional personal guarantees of EUR10M - something that they would never normally do.

- we proceed with the deal, releasing EUR20M from escrow pending the successful outcome of the lawsuit. In compensation for the increased cash risk the price of the overall deal is to be reduced by EUR2M. This figure is not negotiable given the increased cash exposure of EUR20M that my shareholders will have to sign with the Bank.

- We amend the contract date out until the end of 2005 giving Kotva the opportunity to defeat this case. The closing will be 30 days after the successful conclusion of the court proceedings. I believe that neither party wants this however it may be the only option if your Board are not prepared to be flexible with regard to the escrow money.

The options above are of course subject to the satisfactory resolution of the indemnity issue. We strongly believe that Kotva SPV should be signing a stand alone indemnity with all parties and have no link to the overall Kotva Group indemnity.

I believe that the Kotva Board should seriously consider the above and must also consider their position should this deal fail to complete. The market will quickly learn that the deal has fallen over and I am sure that no other party will come near the deal on the basis that after two years of Due Diligence and negotiation we were unable to proceed. This will have a serious impact on the value of your building and could possibly render it "unsaleable". As discussed you will then have to undertake a refurbishment program yourselves which will require a lot of intensive management and further funding. You also have the "opportunity cost" of not getting the funds from this deal as you state that there are many other interesting projects for you to work on in the market at present. If the deal does collapse we will be claiming the EUR500k penalty from the Escrow as the Gilroy case is in clear breach of the SPA terms.

Clearly the current position is not ideal for either side and neither of us want the deal to fail. Whilst your Board claim that the Gilroy case is trivial I trust they can understand the seriousness of the issue for us and the implications for Kotva of not proceeding with one of the above options.
There will be no winner here if they fail to agree a compromise to get the deal closed and the court case defeated.

I believe the above options show great flexibility and generosity on our behalf to try and advance the deal to a conclusion. I trust you can agree to proceed with one of the options above.

Regards

Henry Prestage
Markland Holdings Ltd

**II**

**From:**    Henry Prestage [hprestage@ballymoreproperties.ie]
**Sent:**    Monday, November 08, 2004 11:02 AM
**To:**    richard.harazim@od-kotva.cz
**Subject:** shareholders meeting

Richard

**We have a serious problem.** Whilst the legal challenge (s) are in place and noted on the cadastral register Markland cannot either take a mortgage over the building or sell it. This poses two issues:

1. We are not free to trade the asset which seriously effects its value
2. We cannot take out a mortgage loan against the property which effectively means that <u>no one would buy the property</u> as all buyers use leverage (a 100% cash purchase doesn't make any sense for any real estate investment).

Our Bankers have told us that despite the above they would allow us to proceed on the basis that our shareholders provided a <u>100% personal g'tee</u> for the deal - this is crazy stuff and would not be offered if it were not the case that our shareholders are among the wealthiest men in Ireland and have a long track record with Anglo. Our shareholders should not have to personally carry all the risk for dealing with Kotva's past - no one would do this!

Clearly we cannot now pay what we believe is a full market price for the asset as we are not getting it on usual open market terms. **Believe me there is no other party in Europe that would now do this deal so Kotva have a major decision to make.**

Your Board needs to now take a view and decide upon one of the following:

1 - do nothing and allow Markland to walk away with the €500k penalty as the Gilroy case breaches the SPA. Clearly you will then need to invest in Kotva however with the legal challenge on the Cadastral register I am not sure how you could possibly raise the cash to complete a renovation. You to are severely restricted by this court action.

2 - Underwrite the potential James Wolf and DB claims if received within 12 months of closing within the €17M escrow facility, plus offer some token price discount of €1M-€2M

3 - Offer a large discount below the current deal price (10%-15%), maintain the Gilroy Escrow monies but let us fight Wolf and DB when they file their suits.

We had to work very hard to even bring these options back to the table as you must understand we are facing one known piece of litigation, 2 other declared intentions to sue, any number of unknown variables plus we cannot borrow even €1 against the building!! **In effect your building is currently un-saleable.** Please note that none of the above is of our making - we are attempting to facilitate the Kotva Group to negotiate some of it's colourful history. Your Board must acknowledge this and realise that these issues do have massive value implications. While you will have €23M to spend as you wish until the conclusion of the court case we will have no way of releasing funds against the building so will effectively have a €50M asset locked up for an indefinite period! Ask yourself would you do this deal if in our shoes - I doubt it!

Richard the time for your Board to play hardball has passed. Please seriously consider the above and come back to me with your agreed course of action.

I am doing my best to get this over the line.

Regards

K2293

Henry

K2294

**JJ**

## Lucy Chen

**From:** Andrew Weiss

**Sent:** Friday, January 07, 2005 2:05 PM

**To:** 'Richard Harazim'

**Subject:** RE: KT

Dear Mr. Harazim,

Yes your understanding of the conditions is correct. We are looking forward to reviewing your offer.

Sincerely,
Andrew Weiss

**From:** Richard Harazim [mailto:richard.harazim@od-kotva.cz]
**Sent:** Friday, January 07, 2005 4:28 AM
**To:** Andrew Weiss
**Subject:** RE: KT

Dear Mr. Weiss

Thank you for the information.

Nevertheless, as withdrawals of all the lawsuits are important for us and we would not normally consider buying any shares from you without knowing that we were getting rid of the lawsuits at the same time I'd like to be perfectly clear on what exactly the conditions are. Please confirm my understanding that conditions of your last offer from 23. November 04 prevail. i.e. if we buy the assets there specified for consideration there shown you will use your best endeavours to persuade Gilroy, Balfindor and now also KT to withdraw their respective lawsuits. Any potential purchase contract for the shares from BGO is to be conditional upon withdrawals of these lawsuits.

Once we have the terms confirmed from your side we will be able to tell you our final position re your offer.

Best regards

Richard Harazim

-----Original Message-----
**From:** Andrew Weiss [mailto:AWeiss@WeissAsset.com]
**Sent:** Thursday, January 06, 2005 5:12 PM
**To:** Richard Harazim
**Subject:** RE: KT

Dear Mr. Harazim,

8/22/2005

WP00O3060

KT is not controlled by Weiss Asset Management; however, if a satisfactory resolution of all other matters can be achieved, I would try to persuade KT to settle its lawsuits and I am highly confident that I would be successful in that endeavor. Thus, I do not expect that the KT lawsuit will impair the ability of the parties to achieve a successful agreement.

Andrew Weiss

**From:** Richard Harazim [mailto:richard.harazim@od-kotva.cz]
**Sent:** Tuesday, January 04, 2005 8:08 AM
**To:** Andrew Weiss
**Cc:** Georgiy Nikitin
**Subject:** KT

Dear Mr. Weiss

I was informed by Linklaters Prague today that they received a letter from Mr. Peterka putting them on notice that a new lawsuit was filed. As it uses exactly the same format, phrases and logic in general as the previous lawsuit filed on behalf of Gilroy we assume that KT belongs to your group, as well.

Please confirm whether or not KT's lawsuit is part of the deal offered by you on November 23, 04. As this is a completely new issue we would like to know what exactly each of the various factors represent.

Best regards

Richard Harazim

This email is confidential and is intended solely for the addressee(s). If you are not an addressee, you must not disclose, copy, circulate or in any other way use or rely on the information contained in this email. If received in error, please notify the sender immediately and then delete this email. Any disclosure, copying, distribution or use of this communication is prohibited and may be unlawful.

Any views or opinions expressed do not necessarily represent those of Weiss Asset Management or any affiliated companies. Please note that the content of this e-mail may be intercepted, monitored or recorded for compliance purposes. Sensitive personal data should not normally be transmitted by e-mail.

Weiss Asset Management or any affiliated companies shall not be liable to the recipient or any third party for any loss or damage howsoever arising from this e-mail and/or its content, including loss or damage caused by virus. It is the responsibility of the recipient to ensure that the opening or use of this message and any attachments shall not adversely affect systems or data.

Weiss Asset Management
29 Commonwealth Avenue
Boston, MA 02116
TEL: (617) 778-7780
FAX: (617) 778-7781
www.weissasset.com

8/22/2005

WP0003061

**KK**


# Escrow Agreement

## The Parties

**(1)**    **MARKLAND HOLDINGS Limited**, with its registered office at 19 Upper Fitzwilliam Street, Dublin 2, company registration no. 291167 registered under the laws of the Republic of Ireland (" **MH**"), represented by Frank Walker and Aidan Scully, Directors of Markland Holdings Limited;

**(2)**    **KOTVA NEMOVITOSTI, k.s.**, with its registered office at Příkop 4, Brno, Post Code 602 00, Identification no. 26229048, registered in the Companies Register by the Regional Court in Brno, in Part A, File 16586 (" **KN**"), represented by KOTVA OBCHODNÍ a.s., represented by Ing. Michal Vlach, Chairman of the Board of Directors, Ing. Jiří Brada, member of the Board of Directors, and Ing. Pavel Richter, member of the Board of Directors;

**(3)**    **UBS AG** with its registered office in Zurich, Bahnhofstrasse 45, CH-8098 Zurich and in Basle, Aeschenplatz 6, CH-4051 Basle (the "Escrow Agent") represented by Mr. Pavel Berka and/or Mr. Stefan Staub.

**(4)**    **SPV CO Limited**, with its registered office at Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus, company registration no HE 148845, registered in Cyprus, represented by Martin Benda, Director (the "**Seller**");

**(5)**    **CRQ Czech a.s.**, with its registered office Prague 1, Národní 1435/6, Post Code 11000, Identification no. 27159256, registered in the Companies Register by the Regional Court in Prague, in Part B, File 9394, and represented by Aidan Scully and Frank Walker (the "**Buyer**");

(MH, KN, the Buyer, the Seller and the Escrow Agent also jointly referred to as the "**Parties**")

MH, KN, jointly referred to as the "**Principals**".

## Whereas:

**(A)**    On 20 January 2004, MH and KN concluded the Share Purchase Agreement I by which KN intended to sell the Shares to MH.

**(B)**    Consequently the parties to the Share Purchase Agreement I have agreed to amend the Share Purchase Agreement I. On 20 December 2004 the parties to the Share Purchase Agreement I together with the Seller, the Buyer and SPV KN concluded the Share Purchase Agreement II that has substituted the Share Purchase Agreement I in its entirety.

**(C)**    The Seller (being 100% owned by KN) shall sell the Shares I and the Kotva Trademarks to the Buyer. KN shall sell the Shares II to the Buyer. The Buyer shall pay the purchase price for the Shares I and the Shares II

**(D)**    The parties to the Share Purchase Agreement II have agreed that KOTVA Trademarks shall be transferred from KN to the Buyer or SPV KN under an Agreement on Transfer

.

KC 1-1937

of the Trademarks and the price for transfer shall be paid by the Buyer on behalf of SPV KN or in Buyer's own name

(E)     The parties to the Share Purchase Agreement II have agreed the total of the monies to pay the purchase price for the (i) Shares I, (ii) the Shares II and (iii) the KOTVA Trademarks shall be in accordance with the Share Purchase Agreement II and the Call Option Agreement **CZK 1,521,450,000** (one billion five hundred and twenty one million four hundred and fifty thousand Czech crowns) which amount shall be deposited in escrow with the Escrow Agent.

**The Parties hereby agree as follows:**

**1.**     **Definitions**

| | |
|---|---|
| **Agreement on Deposit of Securities** | means the contract to be concluded between KN, the Buyer and the Depositor upon which the Depositor undertakes to take over Shares II from KN to the Deposit and release them to the Buyer/or back to KN in accordance to the terms and conditions as specified in Call Option Agreement. |
| **Business Day** | means any day on which banks are open for the conduct of business in Zurich and Vienna, Prague and the Republic of Ireland; |
| **Call Option Agreement** | means the agreement concluded between KN and the Buyer on 20 December 2004 in which the Buyer may call for KN to sell the Shares II and transfers the ownership right to them and the Buyer may purchase the Shares II from KN for the purchase price stipulated being CZK **20,000,000** (twenty million Czech Crowns). The purchase price shall be settled through the Escrow Agent. |
| **Clause** | means a paragraph of this Escrow Agreement; |
| **Closing** | means the hand-over of the Shares I by the Seller to the Buyer through the Escrow Agent upon terms stipulated herein; |
| **Closing Date** | means the day when the Closing takes place; |
| **Deposit** | means the sum of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech crowns) delivered to the Escrow Agent by the Buyer in accordance with Clause 3.4 of this Escrow Agreement; |
| **Depositor** | means the law firm Linklaters, v.o.s, having its register seat at Palác Myslbek, Na Příkopě 19, 117 19, Prague 1, the Czech Republic, acting as depositor in accordance with the terms and conditions of the Agreement on Deposit of Securities |

KC 1-1938

**Escrow Account** — the Escrow Agent's bank account no. **804057** with UBS (Luxembourg) SA, Vienna Branch, Vienna, Austria opened and maintained by the Escrow Agent solely for the purpose of holding the Escrow Amount until the Escrow Amount is to be distributed in accordance with the terms and conditions of this Escrow Agreement.

**Escrow Agreement** — means this Escrow Agreement together with any attachments, schedules, appendixes or supplements;

**Escrow Amount** — means the cash amount being placed into the Escrow Account, in accordance with Clause 3 below including interest, if any, accrued thereon;

**Escrow Documents** — means any and all documents, issued or not issued as securities, that are placed with the Escrow Agent;

**Gilroy** — means Gilroy Limited whose registered office is at 4 Pikioni Street Limassol, Cyprus;

**Gilroy Claim** — means the claim that Gilroy lodged on 30 June 2004 with the District Court for Prague 1 a copy of which is attached to the Share Purchase Agreement II at its Schedule 9;

**Gilroy Settlement** — means the obtaining of a definitive and final ruling in respect of the Gilroy Claim; for purposes of this Agreement such definitive and final ruling is deemed to be also a final settlement between the parties to the Gilroy Claim, approved by the court or the withdrawal by Gilroy of the Gilroy Claim.

**Security Sum** — means the sum of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech crowns) payable into the Escrow Account by the Seller in accordance with Clause 3.2 of this Escrow Agreement;

**Share Purchase Agreement I** — means the agreement between KN and MH dated 20 January 2004 according to which KN wished to sell and MH wished to buy the Shares I.;

**Share Purchase Agreement II** — means the agreement between the KN, MH, SPV KN, SPV CO Limited, CRQ Czech a.s., KOTVA a.s. and KOTVA OBCHODNÍ dated 20 December 2004 a copy of which is annexed hereto at Appendix 1

**Shares I** — means the ordinary certificated bearer shares owned by the Seller and issued by SPV KN, the nominal value of which represents 97 per cent of the capital stock of SPV KN.

**Shares II** — means the ordinary bearer shares owned by KN and issued by SPV KN the nominal value of which represents 3 per cent of the capital stock of SPV KN

| **SPV KN** | means SPV KN a.s. with its registered office at Příkop 4, Brno, Post Code 602 00, ID No. 269 10 705, registered with the Commercial Register of the Regional Court in Brno, section B, file 4043 |
| **KOTVA Trademark I** | means the collection of trademarks consisting of: word-device trademark KOTVA, registration no. 167478, registered in the Patent and Trademark Office of the Czech Republic, and word-device trademark KOTVA, registration no. 167478 registered in the Patent and Trademark Office of the Slovak Republic; |
| **KOTVA Trademark II** | means the collection of trademarks consisting of: word-device and word only trademark KOTVA having been used by Kotva but not yet registered Kotva´s name in the Patent and Trademark Office of the Czech Republic for which registration Kotva has applied by the applications no. 355 884 and 355 885 both filed with the Patent and Trademark Office of the Czech Republic on 1st of July 2004, with the pre-emptive right date of 1st of July, 2004. |
| **KOTVA Trademarks** | means collectively KOTVA Trademark I and KOTVA Trademark II |

## 2    Accession to the Agreement and substitution to the existing Agreement

2.1    MH, KN and Escrow Agent hereby agree that their mutual obligations arising out of the escrow agreement concluded on 1st January 2004 (hereinafter referred to as the **"Existing Escrow Agreement"**) between MH, KN and the Escrow Agent is replaced in their entirety by the obligations contained in this Escrow Agreement.

2.2    For avoidance of any doubt it is agreed that the Existing Escrow Agreement terminates in its whole scope i.e. including all attachments, schedules, appendixes or supplements in their entirety once this Escrow Agreement comes into force

2.3    The Buyer, the Seller and the Principals hereby agree to accession of the Seller and the Buyer to this Agreement and the Seller and the Buyer confirm by signing this Agreement they have acceded to this Agreement.

2.4.    For avoidance of any doubt it is agreed that the termination of the Existing Escrow Agreement and its substitution by this Escrow Agreement as stipulated herein shall not give a rise to claim for the return of any performance that has already been provided pursuant to the Existing Escrow Agreement.

## 3    Escrow Appointment

3.1    The Seller, the Buyer and the Principals herewith jointly mandate the Escrow Agent to serve as their escrow agent and to hold the Escrow Amount hereunder, and the Escrow Agent herewith accepts the appointment to hold

and distribute the Escrow Amount, upon the terms and conditions hereinafter set forth.

**3.2.** The relationship between the Agent on the one hand and the Seller, the Buyer and the Principals on the other hand shall solely and exclusively be governed by this Escrow Agreement. Neither the Seller nor the Buyer nor the Principals can assert any claims whatsoever against the Escrow Agent arising from the Share Purchase Agreement II.

**3.3.** Nothing contained in this Escrow Agreement shall jeopardise the rights and obligations between Seller and the Buyer in any other agreement.

## 4    Deposit of Escrow Amount and Shares

**4.1** Prior to the signing of this Escrow Agreement and in accordance with the Existing Escrow Agreement, the Escrow Agent opened the Escrow Account in the name of the Escrow Agent under the designation „Escrow **MARKLAND HOLDINGS/KOTVA NEMOVITOSTI** „ bearing the number 804057.

**4.2** The Escrow Agent hereby acknowledges receipt from the Seller of the Security Sum to the Escrow Account where it shall be held by the Escrow Agent on the terms of this Escrow Agreement.

**4.3** The Escrow Agent hereby acknowledges receipt from the Buyer of the Deposit to the Escrow Account where it shall be held by the Escrow Agent in accordance with the terms of this Escrow Agreement.

**4.4** Pursuant to clause 5.3.2 of the Share Purchase Agreement II at the time and in the manner stated therein, the Buyer shall transfer the amount of CZK 1,363,950,000 (one billion three hundred and sixty three million nine hundred and fifty thousand Czech crowns) to the Escrow Account, representing the purchase price under the Share Purchase Agreement II less the Deposit.

**4.5** Within two days of the sums referred to in Clause 4.4 above being credited to the Escrow Account the Escrow Agent shall send written notification of such credit to both the Buyer and the Seller. The Escrow Agent shall have no duty whatsoever to take any measures for the collection of the Funds other than to inform the Principals should such funds not have been paid into the Escrow Account in accordance with the provisions of this Escrow Agreement.

**4.6** The amounts credited to the Escrow Account shall remain on deposit in the Escrow Account with the Escrow Agent until a release of all or part thereof takes place in accordance with the terms of this Escrow Agreement.

**4.7** Pursuant to clause 5.6.2 of the Share Purchase Agreement II the Seller shall remit to the Escrow Agent the Shares I and other documents as specified in clause 5.6.1 items b) and c) of the Share Purchase Agreement II . However the Escrow Agent shall not have to check the authenticity of the remitted Shares I and those other documents according to Art. 8.6 below. The Escrow Agent shall have no duty whatsoever to take any measures for the collection of the Shares I and other documents other than to inform the Principals should the Shares I and other documents not be remitted into the Escrow Account in accordance with the provisions of this Escrow Agreement.

KC 1-1941

**5. Investment of the Escrow Amount**

**5.1**    The Escrow Amount shall be invested according to the joint instructions of the Principals as per Appendix 6 given to and agreed by UBS (Luxembourg) SA, Vienna Branch. Withholding tax, if any, shall be deducted from the accrued interest by UBS (Luxembourg) SA, Vienna Branch at source.

All payment out of the Escrow Account shall take into consideration the repayment dates of the investments effected according to Art.4.1 or 4.2, and the value date for payment to be made by the Escrow Agent shall be postponed to coincide with the maturity of the said investment, except if the parties agree to bear the breakage costs due to any early repayment.

**5.2.**    The Escrow Agent shall have the right to liquidate any investments held in the Escrow Account in order to provide funds necessary to make required payments under this Agreement. The Escrow Agent shall not have any liability for any loss sustained as a result of any investment made pursuant to the instructions of the Principals or as a result of any liquidation of such investments prior to their maturity in order to provide funds necessary to make required payments hereunder or for the failure of the Principals to give the Escrow Agent instructions in accordance with the provisions under Clause 6 below.

**5.3.**    Accrued interest, if any, shall be paid to the Buyer upon the first release of the whole or part of the Escrow Amount and, thereafter, at such intervals as the Buyer shall request in writing (but not more than once every month) except the interest earned from the investment of the Security Sum which shall be credited to the Seller upon the first release of the whole or part of the Escrow Amount and, thereafter, at such intervals as the Seller shall request in writing (but not more than once every month).

**6**    **Release of the Escrow Amount and the Shares**

**6.1**    The Escrow Agent will under no circumstances be obliged to pay out any amount exceeding the Escrow Amount deposited at the time of such payment or to release any Escrow Documents not being in possession of the Escrow Agent at the time of such release.

**6.2**    The Escrow Agent shall release monies from the Escrow Account at any time in accordance with:

**6.2.1**    joint written instructions given by the Principals in substantially the same form as attached in Appendix 2; or

**6.2.2**    an authenticated, legal and apostilled copy of a final and enforceable judgment or arbitral award issued in proceedings held in connection with this Escrow Agreement or the Share Purchase Agreement II, together with a legalised confirmation by Linklaters Prague or a reputable international law firm reasonably acceptable to the Escrow Agent according to which such judgement or award is final, stating to whom any such part or all of the Escrow Amount shall be distributed.

**6.3**    The Escrow Agent shall release the Shares I from the Escrow Account at any time in accordance with:

KC 1-1942

6.3.1. joint written instructions given by the Principals in substantially the same wording as attached in Appendix 3, or

6.3.2 an authenticated, legal and apostilled copy of a final and enforceable judgment or arbitral award issued in proceedings held in connection with this Escrow Agreement or the Share Purchase Agreement II, together with a legalised confirmation by Linklaters Prague or a reputable international law firm reasonably acceptable to the Agent according to which such judgment or award is final, stating to whom the Shares I shall be distributed.

6.4.   The balance of the purchase price amounting to CZK **576,450,000** (five hundred and seventy six million four hundred and fifty thousand Czech Crowns) (the "**Retention**"), shall be retained by the Escrow Agent until such time as the facts specified in Clauses 6.4.1, 6.4.2 and 6.4.3 hereunder have occurred. The Escrow Agent shall release any sum from the Retention upon:

6.4.1   Following the Closing Date the Escrow Agent shall throughout the period of holding the Retention release to the Buyer upon the sole request of the Buyer such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending the Buyer, SPV KN or MH in any Proceedings pursuant to clauses 5.6.4 (i) and (ii) of the Share Purchase Agreement II. The request of the Buyer for such sums from the Retention must be evidenced by a duly issued invoice from the Buyer's lawyers for the time being. For purposes of this agreement it is agreed that Linklaters v.o.s., Prague are entitled to issue such invoice. The Principals, the Buyer and the Seller agree that the Escrow Agent shall have to check neither the correctness of invoices nor their authenticity, and instruct the Escrow Agent to pay any so invoiced amount.

6.4.2   The purchase price for the Shares II amounting to CZK **20,000,000** (twenty million Czech Crowns) under the Call Option Agreement shall be released by the Escrow Agent to KN upon the sole request of KN provided either (i) the Shares II have been handed over to the Depositor in accordance with the Agreement on Deposit of Securities as confirmed by the Depositor to the Escrow Agent; **or** (ii) the period of 5 (five) years from the 14th day of April 2004 has elapsed.

6.4.3   joint written instructions given by the Principals in substantially the same form as attached in Appendix 2.

6.6   In the event that the Buyer fails to credit the Escrow Account pursuant to clause 4.4 hereof by 31 March 2005, then the Seller shall be entitled to alone recover all the documents having been deposited by the Seller and/or KN to the Escrow Agent.

7.   **Fees**

The Seller has paid to the Escrow Agent EUR 40,000 (Euro forty thousand), for the services that the Escrow Agent provides under this Escrow Agreement and the Escrow Agent has delivered to the Seller a valid invoice for the same.

KC 1-1943

**8 ·    Indemnity and Limitations**

8.1    The Principals jointly and severally undertake to indemnify and hold harmless the Escrow Agent for all and any losses, costs, expenses, liabilities, claims, actions or demands including court and legal costs which the Escrow Agent may incur or which may be made against the Escrow Agent as a result of or in connection with this Escrow Agreement except with respect to any losses, costs, expenses, liabilities, claims, actions or demands including court and legal costs based upon the gross negligence or wilful misconduct of the Escrow Agent, the Escrow Agent's nominees and its agents. The indemnifications of the Escrow Agent provided in this Clause 7 shall survive termination of this Escrow Agreement, and any resignation or removal of the Escrow Agent Escrow Agreement.

8.2.    The Principals acknowledge and agree that any measures taken by any court or authority having jurisdiction over the Escrow Agent which might result in preventing the Escrow Agent from executing its obligations under this Escrow Agreement shall have to be taken into consideration and be a valid excuse for the Escrow Agent for not being able to perform its duties in due time so long as such measures are in effect.

8.3.    The Escrow Agent shall not be required to perform any acts that may violate any law or applicable rules of any governmental agency applicable to the Parties.

8.4.    The Escrow Agent shall be protected in acting upon any written notice, request, demand, waiver, consent, receipt or other paper or document furnished to the Escrow Agent, not only as to its due execution and the validity and effectiveness of its provisions but also as to the truth and acceptability of any information therein contained. The Escrow Agent shall be entitled fully to rely without need for any enquiry on its part on any written notice or certification or other written instructions given to it in accordance with this Escrow Agreement without reference to any party save as specifically provided herein. The Escrow Agent shall also be entitled to assume, without further inquiry, that the information contained in any notification is true and accurate in all respects.

8.5.    If more than one notification is received by the Escrow Agent in respect of the same subject matter, the Escrow Agent shall, to the extent that any notification received later than the first notification in respect of that subject matter contradicts the first notification, be entitled to refrain from acting; however, the Escrow Agent shall inform the Principals of such fact without undue delay. Furthermore, the Escrow Agent shall be entitled to refuse to act on any notification that is unclear or ambiguous until such time as it is able to clarify such notification.

8.6.    The Escrow Agent is not responsible for or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of any Escrow Amount, documents or other materials deposited with it.

8.7.    The Escrow Agent shall be under no obligation to institute, appear in or defend any action, suit or legal or arbitration proceeding in connection with this Escrow Agreement or to take any other action likely to involve it in liability, cost or expense, unless first indemnified to its satisfaction.

KC 1-1944

8.8.    The Escrow Agent shall have a first lien on the Escrow Amount as security for the reimbursement or payment of any liabilities, losses, fees, costs and expenses related to this Escrow Agreement.

8.9    The Escrow Agent shall not be liable for any error of judgement, or for any act done or step taken or omitted by it in good faith, or for any mistake of fact or law, or for anything, which it may do or refrain from doing in connection herewith except for its own gross negligence or wilful misconduct or for the negligence or wilful misconduct of the Escrow Agent's nominees or its agents.

## 9    Duties of the Escrow Agent

9.1    The Escrow Agent shall be responsible only for the performance of the duties and obligations expressly imposed upon it herein.

9.2    The Principals may jointly at any time terminate the mandate of the Escrow Agent by giving to the Escrow Agent at least twenty (20) Business Days prior written notice to that effect signed by the Principals. If at any time the Escrow Agent shall be adjudged bankrupt or insolvent, or shall file a voluntary petition in bankruptcy or make an assignment for the benefit of its creditors or consent to the appointment of a receiver of all or any substantial part of its property, or if a receiver of it or of all or any substantial part of its property shall be appointed, or if any public officer shall take charge or control of the Escrow Agent or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, or a resolution is passed or an order made for the winding-up of the Escrow Agent, the Principals may jointly terminate the appointment of the Escrow Agent forthwith upon giving written notice.  The termination of the appointment of the Escrow Agent hereunder shall not entitle it to any amount by way of compensation but shall be without prejudice to any amount then accrued due.

9.3    The Escrow Agent may resign its mandate hereunder at any time by giving to each of the Principals, at least forty (40) Business Days written notice to that effect provided that no such resignation shall take effect until a new Escrow Agent shall have been appointed to exercise the powers and undertake the duties hereby conferred and imposed upon the Escrow Agent.

9.4    The Principals agree that if, by the day falling ten (10) Business Days before the expiry of any notice under Clause 9.2 above, they have not appointed a successor to the Escrow Agent, to which such notice relates, the Escrow Agent shall be entitled, on behalf of the Principals, to appoint a successor.

9.5    Upon its resignation or removal becoming effective, the Escrow Agent shall deliver or procure the delivery of all the Escrow Amount in the Escrow Account (and any interest accrued thereon) to its successor and any Escrow Documents.

9.6    Upon any successor to the Escrow Agent appointed hereunder executing, acknowledging and delivering to each of the Principals an instrument accepting such appointment hereunder, it shall, without any further act, agreement or conveyance, become vested with all authority, rights, powers, trusts, indemnities, duties and obligations of the Escrow Agent hereunder.

**10     Warranties**

Each of the Parties to this Escrow Agreement warrants and represents that it has full power, authority and legal right to incur the obligations, to execute and deliver, and to perform and observe the terms and provisions of this Escrow Agreement and that this Escrow Agreement constitutes its legally binding and valid obligations enforceable in accordance with its terms and does not conflict with any law, regulation or instrument binding on or relating to it and that this Escrow Agreement is within its powers and has been duly authorized by it, that all necessary actions have been taken and all consents and approvals have been granted to authorize the execution, delivery and performance of this Escrow Agreement and that the person or persons signing this Escrow Agreement on behalf of each of them is authorized to do so.

**11     Assignment**

No Party may assign its rights or obligations under this Escrow Agreement without the prior written consent of all other Parties.

**12     Communications between the Parties**

Each communication under this Escrow Agreement shall be made in writing and delivered personally, sent by registered mail or by courier, except for duly signed investment instructions sent by the Principals to the Escrow Agent as specified in Appendix 7 attached hereto, which may be sent by fax. Each communication or document to be delivered to a Party under this Escrow Agreement shall be sent to it at the address, and marked for the attention of the person from time to time designated by it to the other Party for the purpose of this Escrow Agreement. The initial and address and marking (if any) so designated by each Party are set out as below:

To the Escrow Agent:

**UBS AG.**
Address: Talacker 21, P.O. Box 8098 Zurich/Switzerland
Attention: Mehdi Zaouia
Fax no: +41 1 234 42 46
Tel. no: +41 1 234 59 73

with a copy to

UBS (Luxembourg) SA, Vienna Branch,
Address: Waechtergasse 1, 1010 Vienna/Austria
Attention: Stefan Staub and/or Pavel Berka
Fax no: +43-1-25398 14 10
Tel no: +43 1 25398 1410

To the KN:

**KOTVA NEMOVITOSTI, k.s.**
Address: Namesti Republiky 8, 113 88 Praha 1

KC 1-1946

Attention: Richard Harazim
Fax no: +420 224 801 230
Tel. no: +420 224 801 401

To the MH:

**Markland Holdings Limited**

Address: 19 Upper Fitzwilliam Street, Dublin 2, Republic of Ireland
Attention: Henry Prestage/Frank Walker/Aidan Scully
Fax no: 00353 167 620 00
Tel. no: 00353 167 620 23

with a copy to

**Linklaters v.o.s**
Address: Palac Myslbek, Na Prikope 19, 117 19 Prague 1
Attention: Bryan Wilson
Fax no: +420 221 622 199
Tel. no: +420 221 622 177

## 13    Signatories

Any and all notices or other instructions or papers issued by any of the Principals and intended for the Escrow Agent shall be delivered personally and signed by the person(s) mentioned in the respective signature cards (Appendix [4]: Signature card of the Seller KN; Appendix [5]: Signature card of the Buyer and MH) on the premises of UBS (Luxembourg) SA, Vienna Branch in the presence of the Escrow Agent's representative. The Escrow Agent is, nevertheless, obliged to accept signatures of other persons authorized to represent the respective Party or Parties.

For the purpose of a physical identification, each person mentioned in the signature cards as per Appendix 4 and Appendix 5 shall call personally at UBS (Luxembourg) SA, Vienna Branch in order to carry out any instruction given to the Escrow Agent with his valid passport or identity card and the original of the power of attorney and/or any corporate document such as the minutes of the general meeting of the directors, appointing him as an authorized signatory.

## 14    Severability

Should any provision of this Escrow Agreement be prohibited or ineffective or otherwise unenforceable in whole or in part for whatever reason, such provision shall cease to have effect without prejudicing the validity of the other provisions hereunder. The Parties hereto or the court having jurisdiction hereupon will replace such provision by another provision so that, to the extent possible, the economic balance of this Escrow Agreement will be preserved.

## 15    Closing Provisions

**15.1**  This Escrow Agreement has been made in five originals in the English language of which each Party shall retain one.

KC 1-1947

**15.2** The terms of this Escrow Agreement may only be amended by the Parties in writing.

**15.3** The Escrow Agreement and any rights and obligations resulting therefrom shall be governed by Swiss law. Swiss law shall also apply for assessing the validity of the agreed place of performance and place of jurisdiction.

**15.4** Place of performance and exclusive place of jurisdiction for any dispute in connection with the Escrow Agreement shall be Zurich, Switzerland. The Escrow Agent reserves the right, however, to take legal action against any other party before the authority of the party's domicile or before any other competent authority, in which event exclusively Swiss law shall remain applicable

## 16    Counterparts

The Escrow Agreement shall be established and signed in five separate counterparts, each of which shall be deemed to be an original but which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Escrow Agreement has been duly executed by the parties hereto or their respective duly authorized officers in the place and as of the date written below.

Place and Date:
In Prague on 26 January 2005

_____
Seller

Place and Date:
PRAGUE 9 February 2005

_____
Buyer

Place and Date

_____
Escrow Agent

Place and date
Prague 9 February 2005

_____
MH

Place and date: In Prague 26 January 2005

_____
KOTVA OBCHODNI, a.s., unlimited partner
on behalf of **KN**

KC 1-1948

**Appendix 1**
Share Purchase Agreement II

KC 1-1949

**Appendix 2**

**Joint instruction as per Art.6.2.1 of the Escrow Agreement**

[Letterhead of KN and MH]

## addressed to:UBS AG.

Address: Talacker 21, P.O. Box 8098 Zurich/Switzerland
Attention: Mehdi Zaouia

and

UBS (Luxembourgh)SA, Vienna Branch
Address: Waechtergasse 1, 1010, Vienna/Austria
Attention: Stefan Staub and/or Pavel Berka

[Date]

Dear Sirs,
Reference is made to the Escrow Agreement dated [date], between KN, MH, Seller, Buyer and the Escrow Agent.

Terms used here shall have the meaning given to them in the Escrow Agreement and the Share Purchase Agreement II. The mention of certain Share Purchase Agreement's articles is made for the Principals' reference only and shall not be binding on the Escrow Agent.

This confirmation is being provided to you in accordance with Clause 6.2.1 and/or 6.4.3 of the Escrow Agreement.

We, the Principals, herewith confirm and instruct you as the Escrow Agent to release the following sums as follows:

[●]

With best regards,

_____    _____

[Signature of KN] [Signature ofMH]

KC 1-1950

**Appendix 3**

**Joint instruction as per Art.6.3 of the Escrow Agreement**

[Letterhead ofKN and MH]

addressed to:

**UBS AG.**
Address: Talacker 21, P.O. Box 8098 Zurich/Switzerland
Attention: Mehdi Zaouia

and

UBS (Luxembourgh)SA, Vienna Branch
Address: Waechtergasse 1, 1010, Vienna/Austria
Attention: Stefan Staub and/or Pavel Berka

[Date]

Dear Sirs,

Reference is made to the Escrow Agreement dated [date], between KN, MH, Seller, Buyer and the Escrow Agent.

Terms used here shall have the meaning given to them in the Escrow Agreement and the Share Purchase Agreement II. The mention of certain Share Purchase Agreement's articles is made for the Principals' reference only and shall not be binding on the Escrow Agent. This confirmation is being provided to you in accordance with Clause 6.3 of the Escrow Agreement. We, the Principals, herewith confirm that the monies specified in joint instruction as per Appendix 2 of the Escrow Agreement have been debited from the Escrow Account, and instruct you as the Escrow Agent to deliver the Shares I having been held by you to the Buyer.

With best regards,

_____   _____
[Signature of KN] [Signature of MH]

KC 1-1951

**Appendix 4**

## Signature Card of KN and the Seller

KOTVA NEMOVITOSTI, k.s.
Príkop 4, Brno, Post Code 602 00,

SPV Co Limited
Aigou Pavlou, Ledra House, Agios Andreas Nicosia,
Cyprus

We hereby advise you the following persons with authority to sign (without right of substitution) and to carry out any legal acts in connection with the Escrow Agreement signed between MARKLAND HOLDINGS Limited, KOTVA NEMOVITOSTI, k.s., SPV CO Limited, CRQ Czech a.s. and UBS AG This authority is limited to the said Escrow Agreement and the relative Escrow Account.:

KOTVA NEMOVITOSTI, k.s.

| Last name / First name | Nationality / Date of Birth | Form of signature (individually, jointly by two) | Specimen signature |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

SPV CO Limited

| Last name / First name | Nationality / Date of Birth | Form of signature (individually, jointly by two) | Specimen signature |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

The undersigned authenticates the signatures above as well as the form of signature and representation.

KC 1-1952

Place and Date

For the Seller

_____

_____

Escrow Agent

For KN

_____

KC 1-1953

**Appendix 5**

**Signature Card of Markland and the Buyer**

MARKLAND HOLDINGS Limited                CRQ Czech a.s.
19 Upper Fitzwilliam Street, Dublin 2        Národní 1435/6 Post Code
Republic of Ireland                                      Prague

We hereby advise you the following persons with authority to sign (without right of substitution) and to carry out any legal acts in connection with the Escrow Agreement signed between MARKLAND HOLDINGS Limited, KOTVA NEMOVITOSTI, k.s., SPV CO Limited, CRQ Czech a.s. and UBS AG This authority is limited to the said Escrow Agreement and the relative Escrow Account.:

MARKLAND HOLDINGS LIMITED

| Last name / First name | Nationality / Date of Birth | Form of signature (individually, jointly by two) | Specimen signature |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

CRQ CZECH a.s.

| Last name / First name | Nationality / Date of Birth | Form of signature (individually, jointly by two) | Specimen signature |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

The undersigned authenticates the signatures above as well as the form of signature and representation.

Place and Date                                          For the Buyer

_____            _____

KC 1-1954

Escrow Agent

For MH

KC 1-1955

## APPENDIX -6-

## Joint Investment Instructions by fax



**Agreed**

**Interest Rate:** the rate per annum equal to the monthly Prague Interbank Bid Rate (i.e. PRIBID) as published on Telerate page 16005 at or about 11:00 am (Czech Republic time) less the Margin of 0.25% per annum.

**PRIBID as per:** (date should coincide with a day when the Central Bank of the Czeck Republik is open)

It is understood that UBS (Luxembourg) SA, Vienna Branch shall carry out these instructions as soon as possible. The Principals allow, however, 2 Business days to UBS (Luxembourg) SA, Vienna Branch to invest the amount as mentioned above.

The terms in Capital shall have the meanings given to them in the Escrow Agreement Place/Date:

For KOTVA NEMOVITOSTI, k.s.

_____    _____
..............................(name) ...........................(name)

For Markland Holdings Limited

_____    _____
..............................(name) .............................(name)

KC 1-1956

# JOINT INVESTMENT INSTRUCTION

FROM:    KOTVA NEMOVITOSTI, k.s.
Příkop 4, 602 00 Brno, Czech Republic

SPV CO Limited ("Seller")
Agiou Pavlou 15, Ledra House, P.C. 1105, Nicosia, Cyprus

Markland Holdings Limited
19 Upper Fitzwilliam Street, Dublin 2, Republic of Ireland

CRQ Czech a.s. ("Buyer")
Národní 1435/6, 110 00 Praha 1, Czech Republic

TO:    UBS (Luxembourg) SA, Vienna Branch,
Waechtergasse 1, 1010 Vienna/Austria

CC:    UBS AG Zurich
Attn.: Mehdi Zaouia, Fax no. +41 1 234 42 46

In accordance with Articles 4.1 and 4.2 of the Escrow Agreement between Markland Holdings Limited, Kotva Nemovitosti, k.s., SPV Co Limited, CRQ Czech a.s. and UBS AG as Escrow Agent, we kindly ask you to invest the Escrow Amount as follows:

Amount:    CZK 567 000 000,-

From:    March 4th, 2005

To:    Up to withdrawal

Interest Rate:  the rate per annum equal to the monthly Prague Interbank Bid Rate (i.e. PRIBID) as published on Telerate page 16005 at or about 11.00 am (Czech Republic time) less the Margin of 0,1875 % per annum.

PPRIBID as per: (date)

It is understood that UBS (Luxembourg) SA, Vienna Branch shall carry out these instructions as soon as possible. The Principals allow, however, 2 Business days to UBS (Luxembourg) SA, Vienna Branch to invest the amount as mentioned above.

The terms in Capital shall have the meanings given to them in the Escrow Agreement

Vienna, March 4th, 2005

For KOTVA NEMOVITOSTI, k.s.

............................
(name)

For Markland Holdings Limited

............................
(name)

FRAN SOUL         FRAN WALLER

For SPV CO Limited

............................
(name)

For CRQ Czech a.s.

............................
(name)

FRAN SOUL         FRAN WALLER

KC 1-1957

**LL**

UNOFFICIAL TRANSLATION

Heading: High State Prosecutor in Prague, Criminal Division, address

Date: In Prague, January 31, 2006

Address of Mr. Topinka

Dear Sir:

On the basis of your motion of October 24 and 25, 2005, Motion to Conduct Supervision of the Conduct of Municipal Prosecutor, the High State Prosecution Department conducted supervision of the conduct of the Municipal State Prosecution Department in Prague of the criminal case against Andrew Weiss and others registered under File No. 1 KZV 38/2005.

It was established on the basis of the review of the documents for the files to the necessary extent that the State Prosecutor's conduct on these criminal proceedings was in accordance with the law.

The resolution of the police division dated Feb. 3, 2005, CTS: PSP-4035/OHK-3-2004 is in accordance with the legal requirements and the background material supporting this resolution supports the suspicion that the accused persons committed acts which would constitute the crimes specified in the resolution. Therefore, there was no reason under the law for the State Prosecutor conducting supervision over the pretrial proceedings to suspend the decision of the police investigator.

For the sake of completeness, we point out that the unlawful conduct of the accused persons was to lie in the fact that they demanded of the representatives of the company the purchase of securities were inappropriately high priced under the threat of filing civil lawsuits which should have negative impact on the running and business intentions of this company. Therefore, the unlawfulness of their conduct does not consist in the mere filing of said civil lawsuits but on the fact that these lawsuits were intended to serve as an instrument of pressure with the intention to gain unlawful benefits from the sale of securities for inappropriately high price. Of course, the aim of further investigation will be to ascertain with the help of evidence gained procedurally whether the present suspicion expressed in the resolution for initiation of criminal proceedings will be confirmed or rejected.

As to your objection consisting of the claim that the accused persons were to demand certain acts of conduct upon a legal person and that the alleged threats of causing other serious harm was directed also towards a legal person, the protected interest of the crime of blackmail couldn't have been violated, we do not share your view.

Our laws do not expressly define the concept of a legal person, but they are based on the fact that legal persons are subjects under the law, different from natural persons, they are artificially created by law and vested with the capability to have rights and obligations with the capability to perform legal and illegal acts and with the responsibilities in legal relations. A legal person may perform legal acts only through its bodies or the acts may be performed by its representative. As far as the decision-making of a legal person is concerned, it is done by its statutory bodies, usually consisting of natural persons.

US199 1491525-1 072198 0011

WP0013770

UNOFFICIAL TRANSLATION

Therefore, we may infer that in case such natural persons will be acting on behalf of a legal person, meaning especially its statutory bodies, they are acting as the legal person. Therefore, this is a certain legal construct which is based on the concept of the very act of legal persons in legal relations. Otherwise, we would not speak of legal or illegal acts of legal persons at all because these acts are expressions of will and a legal person as such does not have any will and cannot express it.

From the above, we may conclude that it is possible to force a legal person to make a certain decision; for example, by forcing natural persons authorized to act in the name of the legal person to make decisions as its statutory bodies. We may not exclude the possibility that natural persons acting on behalf of the legal person will be forced by unlawful means, for example, physical force, threat of physical force, or threat of other serious harm to act to the detriment of this legal person or in violation of its interests which they are obliged to represent and defend. The threat may then objectively be directed against towards legal person, but at the same time it has a practical impact on persons who are forced to act on behalf of legal persons in violation of interests. Therefore, we cannot exclude the possibility of perpetrators at the above-mentioned act pursuant to the legal provisions concerning the crime of blackmail.

As to your procedural objections, we declare that the municipal state prosecutor in Prague made no mistake when they did not make a decision on your motion of September 22, 2005, as a complaint of an accused person against the resolution of the police on initiation of criminal proceedings. In the present phase of criminal proceedings, when the resolution on initiation of criminal proceedings has not been delivered to Andrew Weiss yet, the said person is not in the procedural position of an accused and therefore he doesn't have the right of an accused person.

Therefore, we may conclude from the above that a legal representative of a person who is to become an accused may not be vested with the right of a defense counsel pursuant to Article 41 of the Criminal Procedure Code. Thus, no flaws or errors were detected in the conduct of the Municipal State Prosecution Department in Prague. Your motion for review is hereby rejected as unjustified. At the same time, I'm obliged to inform you pursuant to Article 1, section 4, chapter 23/1994, concerning your motion, that further motions of identical content will not be reviewed and the Petitioner will not be informed of their delivery.

Signed "High State Prosecutor's Office".
JUDr. Vladimir Vanicek

Secretary signed because the original is in the "file", and Topinka received only a copy.

DS799 1491535-1 072198 0011

WP0013771

**MM**

From:           Henry Prestage [hprestage@ballymoreproperties.le]
Sent:           Monday, September 13, 2004 10:27 AM
To:             Richard Harazim (E-mail)
Subject:        Gilroy

Richard

I have considered the current position re the Gilroy issue.  I acknowledge that you believe it is a non issue and I am sure that you can understand that to our Bankers and Lawyers any pending lawsuit must be taken seriously and steps taken to ensure that themselves and their client (i.e. Markland) are not exposed to significant losses.  There is a genuine intent on both sides to get this deal done so I hope we can find a solution.

After looking at all possibilities I can see three possible options:

- we proceed with the deal on the current terms, releasing EUR10M from escrow pending the successful outcome of the lawsuit. (already rejected by Kotva but maybe accepted when measured against other options below). As I explained our Bankers will carry none of the risk so our shareholders are having to sign additional personal guarantees of EUR10M - something that they would never normally do.

- we proceed with the deal, releasing EUR20M from escrow pending the successful outcome of the lawsuit.  In compensation for the increased cash risk the price of the overall deal is to be reduced by EUR2M.  This figure is not negotiable given the increased cash exposure of EUR20M that my shareholders will have to sign with the Bank.

- We amend the contract date out until the end of 2005 giving Kotva the opportunity to defeat this case.  The closing will be 30 days after the successful conclusion of the court proceedings. I believe that neither party wants this however it may be the only option if your Board are not prepared to be flexible with regard to the escrow money.

The options above are of course subject to the satisfactory resolution of the indemnity issue.  We strongly believe that Kotva SPV should be signing a stand alone indemnity with all parties and have no link to the overall Kotva Group indemnity.

I believe that the Kotva Board should seriously consider the above and must also consider their position should this deal fail to complete.  The market will quickly learn that the deal has fallen over and I am sure that no other party will come near the deal on the basis that after two years of Due Diligence and negotiation we were unable to proceed. This will have a serious impact on the value of your building and could possibly render it "unsaleable".  As discussed you will then have to undertake a refurbishment program yourselves which will require a lot of intensive management and further funding.  You also have the "opportunity cost" of not getting the funds from this deal as you state that there are many other interesting projects for you to work on in the market at present.  If the deal does collapse we will be claiming the EUR500k penalty from the Escrow as the Gilroy case is in clear breach of the SPA terms.

Clearly the current position is not ideal for either side and neither of us want the deal to fail. Whilst your Board claim that the Gilroy case is trivial I trust they can understand the seriousness of the issue for us and the implications for Kotva of not proceeding with one of the above options.
There will be no winner here if they fail to agree a compromise to get the deal closed and the court case defeated.

I believe the above options show great flexibility and generosity on our behalf to try and advance the deal to a conclusion.  I trust you can agree to proceed with one of the options above.

Regards

Henry Prestage
Markland Holdings Ltd

K2171

**NN**



# WEISS ASSET MANAGEMENT

July 8, 2004

<u>FACSIMILE TRANSMITTAL</u>
Fax: (617) 912-4509

Boston Private Bank and Trust Company
500 Boylston Street
Boston, MA 02116

<u>Re:  Wire Transfer</u>

Please transfer $6,230.00 from our account number 403-9541, Weiss Capital LLC – Fund
Expenses, to the following account:

Komercni banka, a.s., Praha
SWIFT:  KOMB CZ PP
Account Number: ████████0100
Account Name:  Vladimir Hoffmann

If you have any questions, please contact Briana Dubrow at 617-778-7710.

Thank you,

Andrew Weiss


Internal Reference:

Payment of Invoice No. 0704 from Vladimir Hoffman – Translation Fees and Purchase of
Kotva and Trend Shares, etc.

Payment of Invoice No. 0804 from Vladimir Hoffman – services rendered in June 2004

---

29 Commonwealth Avenue • Boston • Massachusetts • 02116
Phone: (617) 778-7780 • Fax: (617) 778-7781 • E-mail: info@weissasset.com

Vladimir Hoffmann, Medinska 825, 190 14 Praha 9 - Klanovice. The Czech Republic

Brookdale Global Opportunity Fund
P.O.Box 852
Gt-UBS House, Elgin Avn., George Town, Grand Cayman Islands

Cc:
Weiss Asset Management
29 Commonwealth Avenue, Suite 1005
Boston, MA 02116

June 28th, 2004

Sirs,

## INVOICE No. 0704

We bill you for the cost incurred in connection with the Ring Fenced Assets[1]:

| | | |
|---|---|---|
| 1) Translation of Kotva and Trend articles | US $ | 1,164 |
| 2) Official Translation of the documents for the payment from Harvard Trust | US $ | 1,071 |
| 3) Purchase and sale of Insomnia, s.r.o[2] | US $ | 229 |
| 4) Purchase of Kotva and Trend shares | US $ | 118 |
| 5) Fees to the Centre of Securities (SCP) | US $ | 46 |
| 6) Notarisation of documents | US $ | 77 |
| **Total Due** | US $ | **2,705.00** |

Please wire transfer by SWIFT to the following USD account:
Vladimir Hoffmann
Acc. No.: ████████0100
Bank: Komercni banka, a.s., Praha
SWIFT: KOMB CZ PP

---

[1] All items are translated from CZK to USD at the rate of 26.00 CZK/USD
[2] Company that we wanted to use to file a petition against Kotva, Kotva nemovitosti and SPV KN

WP0009194

Vladimir Hoffmann, Medinska 825, 190 14 Praha 9 – Klanovice, The Czech Republic

Brookdale Global Opportunity Fund
P.O.Box 852
Gt-UBS House, Elgin Avn., George Town, Grand Cayman Islands

Cc:
Weiss Asset Management
29 Commonwealth Avenue, Suite 1005
Boston, MA 02116

July 1st, 2004

Sirs.

TO:                                                          __INVOICE No. 0804__

1) We bill you for the advisory services on Kotva and Trend for the month June 2004
(retainer fee USD 2200 per month)

Retainer Fee ................................................................. US $  2,200.00

2) We bill you for the advisory services on Harvard Holding for the month June 2004
(USD 75 per hour)

4 hours ......................................................................... US $    300.00

3) We bill you for the advisory services on Manhattan IF for the month June 2004
(USD 75 per hour)

11 hours ....................................................................... US $    825.00

4) Costs incurred, including telephone, translation, fax, transportation,
postage, notarisation of documents, etc. .......................... US $    200.00


                                    Total Due            US $  3,525.00


**Please wire transfer by SWIFT to the following USD account:**
**Vladimir Hoffmann**
**Acc. No.:** ▮▮▮▮▮▮0100
**Bank: Komercni banka, a.s., Praha**
**SWIFT: KOMB CZ PP**

OO

Dated 20 December 2004

SPV CO Limited

and

CRQ Czech a.s.

SHARE PURCHASE AGREEMENT

relating to the purchase of shares in SPV KN a.s.

Linklaters

Palác Myslbek
Na Příkopě 19
117 19 Prague 1

Telephone  (420) 221 622 111
Fax        (420) 221 622 199

Ref. BDXW/L-033253



KC 1-2641

KC1-2641

**This Share Purchase Agreement (the "Agreement") is made on 20 December 2004**

**Between:**

(1)  **SPV CO Limited,** with its registered office at Agiou Pavlou 15, Ledra House, Agios Andreas, P.C. 1105, Nicosia, Cyprus, company registration no HE 148845, registered in Cyprus (the "Seller"), represented by Martin Benda, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1A;

(2)  **CRQ Czech a.s.,** with its registered office Prague 1, Národní 1435/6, Post Code 11000, Identification no. 27159256, registered in the Companies Register by the Regional Court in Prague, in Part B, File 9394 (the "Buyer"), and represented by Frank Walker, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1B;

(3)  **SPV KN a.s.,** with its registered office in Brno, Příkop 4, Post Code 602 00, Identification no. 26910705, registered in the Companies Register by the Regional Court in Brno, in Part B, File 4043 ("SPV KN"), represented by Ing. Richard Harazim, sole member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1C;

(4)  **KOTVA NEMOVITOSTI, k.s.,** with its registered office at Příkop 4, Brno, Post Code 602 00, Identification no. 26229048, registered in the Companies Register by the Regional Court in Brno, in Part A, File 16586 ("Kotva"), and represented by KOTVA OBCHODNÍ, a.s., represented by Ing. Michal Vlach, Chairman of the Board of Directors, Ing. Jiří Brada, member of the Board of Directors, and Ing. Pavel Richter, member of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1D;

(5)  **MARKLAND HOLDINGS Limited,** with its registered office at 19 Upper Fitzwilliam Street, Dublin 2, company registration no. 291167 registered under the laws of the Republic of Ireland ("Markland"), and represented by Frank Walker, a proxy. A copy of an extract from Companies House Ireland is annexed hereto at Schedule 2;

(6)  **KOTVA a.s.,** with its registered office at Náměstí Republiky 8, Praha 1, Identification no. 60193808, registered in the Companies Register by the Municipal Court in Prague, in Part B, File 2370 ("KAS"), and represented by Ing. Michal Vlach, Chairman of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1E; and

(7)  **KOTVA OBCHODNÍ, a.s.,** with its registered office at Příkop 4, Brno, Postal Code 602 00, Identification no. 26231735, registered in the Companies Register by the Regional Court in Brno, in Part B, File 3484 ("KO"), represented by Messrs Ing. Michal Vlach, Chairman of the Board of Directors, Ing. Jiří Brada and Ing. Pavel Richter, members of the Board of Directors. A copy of an extract from the Commercial Register is annexed hereto at Schedule 1F;

(jointly referred to as the "Parties").

**Whereas:**

(A)  The Seller is a company validly established under the laws of Cyprus and is part of the KAS Group.

---

A04677559/1.4/22 Dec 2004

KC 1-2642

KC1-2642

(B)     SPV KN is the registered owner of the Property and is part of the KAS Group.

(C)     The Seller is undertaking steps to acquire 97% of the shares in SPV KN.

(D)     KAS is a holding company established under the laws of the Czech Republic and is the controlling person in relation to the Seller, SPV KN and to KO.

(E)     The Seller wishes to sell and the Buyer wishes to buy the Shares, and the KOTVA Trademarks under the terms and subject to the conditions set out herein.

**The Parties hereby agree as follows:**

1       **Interpretation**

        1.1     Construction

                Any reference in this Agreement to an "Article", "Clause" or "Section" refers to the corresponding Article, Clause or Section of this Agreement, unless the context indicates otherwise. The headings of Articles, Clauses and Sections are provided for convenience only and should not affect the construction or interpretation of this Agreement. All words used in this Agreement should be construed to be of such gender or number as the circumstances require. The terms "include" or "including" indicate examples of a foregoing general statement and not a limitation on that general statement. Any reference to a statute refers to the statute, any amendments or successor legislation, and all regulations promulgated under or implementing the statute, as in effect at the relevant time. Any reference to a contract or other document as of a given date means the contract or other document as amended, supplemented and modified from time to time. Any reference to an amount in a given currency shall mean a similar amount in any other currency converted at the then applicable exchange rate.

        1.2     Definitions

                For the purposes of this Agreement, the following terms and variations on them have the meanings specified in this Clause 1.2:

"Adverse Consequence"    means any Liability, loss, damage (including incidental and consequential damages), claim, cost, deficiency, diminution of value, or expense (including the reasonable costs of investigation and defence, penalties, and reasonable legal fees and costs), whether or not involving a third-party claim;

"Building"               means building no. 656, located in the registration area of Staré Město, municipality section Staré Město, on plot no. 680, and further building registered therein without descriptive number or evidence number present on plot no. 1018/2. Both buildings are registered at the Real Estate Register hl. m. Praha, title no. 265, for Prague city, cadastral area Staré Město. A copy of an extract from the Real Estate Register is annexed hereto at Schedule 5;

"Business"               means the business of leasing non-residential premises in the Building or leasing the Contributed Property to third persons as tenants and providing related services;

KC1-2643

| | |
|---|---|
| "Business Day" | means any day other than a public holiday as defined under Czech law or Austrian law or Irish law or a day that the Escrow Agent or the Buyer's bank is closed for business; |
| "Change of Control" | means: (a) KAS or Kotva ceasing to directly or indirectly control the Seller; or (b) KAS ceasing to control SPV KN or Kotva or KO, prior to the Closing Date; |
| "Closing" | means the hand-over of the Shares by the Seller to the Buyer through the Escrow Agent upon terms stipulated herein; |
| "Closing Date" | means the day on which the Closing takes place; |
| "Consent" | means any approval, consent, ratification, waiver or other expiration of a right to deny consent or other authorisation, provided either by a Governmental Body or other Person; |
| "Contemplated Transactions" | means all of the transactions to be carried out in accordance with this Agreement, including the purchase and sale of the Shares and the performance by the Parties of their obligations under this Agreement; |
| "Contract" | means any contract, agreement, commitment, understanding, lease, licence, franchise, warranty, guarantee, mortgage, note, bond, or other instrument or consensual obligation (whether written or oral and whether express or implied) that is legally binding; |
| "Commercial Code" | means the Czech Commercial Code, Act no. 513/1991 Coll., as amended; |
| "Companies Register" | means the register of company information, maintained by the regional courts in the Czech Republic; |
| "CZK" | means Czech Crowns, the official currency of the Czech Republic; |
| "Deposit" | means the sum of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) which has already been delivered to the Escrow Agent by Markland on behalf of the Buyer; |
| "Due Diligence" | means a process, during which the Kotva and the KAS Group provided Markland with requested data and information and provided the Buyer with all co-operation necessary to enable it to ascertain the legal status and condition of the Property and of Kotva and KAS, SPV KN and SPV CO; |
| "Encumbrance" | means any charge, claim, mortgage, easement, right of way, community or other material property interest, covenant, equitable interest, lien, option, pledge, security interest, preference, priority, right of first refusal, or other similar right of a third party of restriction; |
| "Escrow Account" | means the escrow account opened to facilitate the transaction envisaged hereunder; |
| "Escrow Agent" | ████████████████████████████████████ |
| "Escrow Agreement" | means the contract concluded between the Seller, the Buyer, Kotva and Markland and the Escrow Agent, as amended; |

"EUR"                     means Euro, the official currency of the European Union;

"Financial Statements"    means the audited financial statements of SPV KN as at the Closing
                          Date;

"Fixtures & Fittings"     means the list of fixtures an fittings annexed hereto at Schedule 11;

"Force Majeure"           means an event occurring out of the control of the Parties which
                          results in breach of the obligations under the Agreement by one of the
                          Parties, if the Party breaching the Agreement could not have avoided
                          such event or breach of the Agreement despite having exercised
                          maximum effort and care which may reasonably be required from
                          such Party.

                          The Force Majeure shall mean in particular:

                          (a)   natural disaster;

                          (b)   war, war footing, invasion, mobilization or embargo;

                          (c)   uprising, revolution, rebellion, military regime or civil war;

                          (d)   radioactivity contamination from a nuclear facility or any other
                                dangerous part of an explosive nuclear facility or a part of such
                                facility;

                          (e)   discovery of archaeological findings, fossils, coins, precious
                                objects and antiques, etc.;

                          (f)   terrorist attack; and

                          (g)   any act by a municipality or registered authority which delays,
                                beyond the control of Kotva, the transfer/contribution of the
                                Shares and the Kotva Trademarks to the Seller.

                          Force Majeure shall not include:

                          (a)   unfavourable weather conditions;

                          (b)   events that were known to Kotva or the Seller or to Markland or
                                the Buyer prior to the signing hereof;

                          (c)   any changes of statutory regulations and technical standards;

                          (d)   any new statutory regulations or technical standards.

"Gilroy"                  means Gilroy Limited whose registered office is at 4 Pikioni Street
                          Limassol, Cyprus;

"Gilroy Claim"            means the claim that Gilroy lodged on 30 June 2004 with the District
                          Court for Prague 1 a copy of which is attached hereto at Schedule 9;

"Gilroy Settlement"       means the obtaining of a definitive and final ruling in respect of the
                          Gilroy Claim; for purposes of this Agreement such definitive and final
                          ruling is deemed to be also a final settlement between the parties to
                          the Gilroy Claim, approved by the court or the withdrawl by Gilroy of
                          the Gilroy Claim.

"Governmental             means any consent, licence, permit or registration issued, granted, or

---

A04677559/1.4/22 Dec 2004

4

| | |
|---|---|
| **Authorisation"** | otherwise made available by or under the authority of any Governmental Body or pursuant to any law, including decisions of a court or other body on incorporation of a legal person and decisions of the Real Estate Register Office on registration at the Real Estate Register; |
| **"Governmental Body"** | means any of the following: |

(a)  the executive ruling body of any state, region, city, village, or other jurisdiction;

(b)  federal, state, local, municipal, foreign or other government or self-government;

(c)  a budgetary or contributory governmental authority of any nature (including any governmental agency, branch, department, or other entity and any court or other tribunal);

(d)  a multinational organisation incorporated pursuant to international law;

(e)  a body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, policy, regulatory, or tax authority; or

(f)  an official of any of the foregoing.

| | |
|---|---|
| **"Indemnified Person"** | means a Person entitled to an Share Purchase Price adjustment or damages under Clause 8.2 or Clause 8.3; |
| **"Indemnifying Person"** | means a Person obliged to pay a Share Purchase Price adjustment or damages to an Indemnified Person; |
| **"J&T banka Mortgage"** | means at the date of this Agreement a mortgage over the Property registered in favour of J & T banka, a.s. Identification no. 47115378, with its registered office Pobřežní 297/14, 186 00 Praha 8 (hereinafter referred to as "J&T banka"). |
| **"KAS Group"** | means KAS and trade companies, all of them together or each one individually, under the centralised power and control of KAS, pursuant to §66a Art. 7 of of the Commercial Code; |
| **"Knowledge"** | means knowledge of information relevant for this Agreement about any matter, fact or Person, being known to a Person; |
| **"KO Lease"** | means the lease to be entered into between SPV KN and KO on the Closing Date the text of which is annexed hereto at Schedule 5; |
| **"Kotva's Indemnities"** | is defined in Clause 8.3; |
| **"Kotva Správcovská a.s."** | means Kotva Správcovská a.s., with its registered office in Brno, Příkop 4, PSČ 60200, ID no. 26510081; |
| **"KOTVA Trademark I"** | means the collection of trademarks consisting of: word-device trademark KOTVA, registration no. 167478, registered in the Patent and Trademark Office of the Czech Republic and word-device trademark KOTVA, registration no. 167478 registered in the Patent and Trademark Office of the Slovak Republic; |

KC1-2646

| "KOTVA Trademark II" | means the collection of trademarks consisting of: word-device and word only trademark KOTVA having been used by Kotva but not yet registered in Kotva's name in the Patent and Trademark Office of the Czech Republic for which registration Kotva has applied by the applications no. 355 884 and 355 885 both filed with the Patent and Trademark Office of the Czech Republic on 1st of July 2004, with the priority right date of July the 1st 2004. The KOTVA Trademark II is further specified in an expert opinion dated 10 July 2004 annexed hereto as the Schedule 10; |
|---|---|
| "KOTVA Trademarks" | means collectively KOTVA Trademark I and KOTVA Trademark II |
| "Land" | means the collection of plots of land registered at the Real Estate Register hl. m. Praha, ownership deed no. 265, for Prague city, cadastral area of Staré Město, consisting of: plot no. 680 – built-up area and yard, plot no. 683/1 – other area, plot no. 683/2 – other area, plot no. 683/3 other area, plot no. 690/2 – other area, plot no. 690/3 – other area, plot no. 690/4 – other area, and plot no. 1018/2 – built-up area and yard. A copy of an extract from the Real Estate Register is annexed hereto at Schedule 4; |
| "Legal Requirement" | any valid legal regulation of any Governmental Body; |
| "Liabilities" | includes liabilities or obligations of any nature, whether known or unknown, whether obsolete, accrued, contingent or other, whether due or to become due or prescribed, and whether or not required to be reflected on a financial statement and "Liability" shall be construed accordingly; |
| "Markland's Indemnities" | is defined in Clause 8.2; |
| "Order" | any published and publicly available order, injunction, judgement, assessment, decree, ruling, or arbitration award of any Governmental Body or arbitrator; |
| "Ordinary Course of Business" | actions taken in the course of normal Business operation by SPV KN and/or by Kotva or the Seller or KO as the respective owner or manager of the Property, consistent with past practice of Kotva; |
| "Organisational Documents | any deed, bylaws, regulations, certificate, statement, statute, or similar document adopted, filed or registered in connection with the creation, formation, or organisation of an entity, and any Contract among equity holders, partners or members of an entity; |
| "Person" | an individual or an entity, including a corporation, share company, limited liability company, partnership, trust, association, or any other body with legal personality separate from its equity holders or members; |
| "Proceeding" | any action, arbitration, audit, examination, investigation, hearing, litigation, or suit (whether civil, criminal, administrative, judicial or investigative, informal, public or private) commenced, brought, conducted, heard by or before, or otherwise involving, any |

KC1-2647

Governmental Body or arbitrator;

"Property"               means the Building and the Land;

"Proprietary         is defined in Clause 9.1;
Information"

"Purchase Price"    means the total purchase price for the Shares and the KOTVA Trademarks in the sum of the Czech Crown equalling CZK 1,501,450,000 (one billion five hundred and one million four hundred and fifty thousand Czech Crowns) calculated as follows:

    (i)     purchase price for the Shares CZK 1,366,450,000 (one billion three hundred and sixty six million four hundred and fifty thousand Czech Crowns) ("Share Purchase Price"),

    (ii)    purchase price for the Kotva Trademarks CZK 135,000,000 (one hundred and thirty five million Czech Crowns) ("Trademarks Purchase Price");

"Related Person"    with respect to a particular Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person and, with respect to an individual, any other individual that is a member of the individual's family (by blood, marriage or adoption), a member of the individual's household, an entity in which the individual participates in management or an employee or employer of the individual. For the purposes of this definition, "control" means where a Person (or Persons acting in concert) acquires or agrees to acquire or has options over direct or indirect control: (a) of the affairs of that Person; or (b) more than 50 per cent of the total voting rights conferred by all the issued shares in the capital of that Person which are ordinarily exercisable in general meeting; or (c) of the composition of the main board of directors of a Person. For these purposes "Persons acting in concert", are Persons which actively co-operate, pursuant to an agreement or understanding (whether formal or informal), with a view to obtaining or consolidating or exercising control of that Person;

"Rent Roll"        means the up to date rent roll as at the date of this Agreement which truly and accurately records the existing lease relations concerning non-residential premises in the Building, a copy of which is annexed at Schedule 6;

"Representative"    with respect to a particular Person, any director, appointed officer, employee, consultant, agent, advisor, legal counsel, accountant, or other representative of that Person;

"Retention"       means the money retained in the Escrow Account following Closing in accordance with Clause 5.6.4.;

"Security"        means the amount of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) that has been paid by Kotva on behalf of the Seller into the Escrow Account prior to the date hereof in order to secure a possible claim or claims of the Buyer against the Seller together with any interest thereon;

---

KC 1-2648

KC1-2648

| | |
|---|---|
| "Shares" | means the following ordinary bearer shares in certified form issued by SPV KN: |

(a)     10 shares of nominal value CZK 200,000 each with Nos. 1-10 issued on 10 November 2003; and

(b)     13 shares of nominal value CZK 100,000,000 each with Nos. 11-23 issued on 9 April 2004; and

(c)     2 shares of nominal value CZK 20,000,000 each with Nos. 24 and 25 issued on 9 April 2004; and

(d)     8 shares of nominal value CZK 1,000,000 each with Nos. 28-35 issued on 9 April 2004; and

(e)     2 shares of nominal value CZK 100,000 each with Nos. 37 and 38 issued on 9 April 2004; and

(f)     4 shares of nominal value CZK 10,000 each with Nos. 46-49 issued on 9 April 2004;

the nominal value of which represents 97 per cent of the capital stock of SPV KN;

| | |
|---|---|
| "SPV Conclusion" | the satisfaction of the conditions in Clause 3.1; |
| "Tax" or "Taxes" | means without limitation and whatever means by which it is levied all forms of taxation, statutory, governmental, state, local, foreign and municipal impositions, duties, contributions and levies including any tax imposed on any income, withholding tax, value added tax ("VAT"), road tax, real estate tax, real estate transfer tax, gift tax, inheritance tax, excise duties, customs or other duty, employment related levies, including social security contributions and contributions to complementary welfare and health insurance including both principal and potential related interest and penalties; |
| "Threatened" | an action or matter would be considered to have been "Threatened" if a demand or statement has been made (whether orally or in writing) or a notice has been given (whether orally or in writing), or any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such action or matter is likely to be asserted, commenced, taken or otherwise pursued in the future; and |
| "Transfer Deed" | means a Share Purchase Agreement to be concluded between the Seller and the Buyer effecting the transfer of the title to the Shares to the Buyer. |

**2      Agreement on replacement of present obligations between several Parties by new obligations between all Parties**

2.1     The Parties hereby agree pursuant to section 570 of the Act. No. 40/1964 Coll., the Civil Code, as amended, that their mutual obligations arising out of the Share Purchase Agreement concluded on 20 January 2004 (hereinafter referred to as the "Present SPA") between Kotva and Markland is replaced in their entirely by the obligations contained in the Agreement.

KC1-2649

**2.2**  For avoidance of any doubt it is agreed that the Present SPA terminates in its whole scope on the moment when this Agreement comes into being so that this Agreement substitutes the Present SPA in the whole scope.

**2.3**  The Parties hereby agree to accession of the Seller, SPV KN, KAS, KO and the Buyer to this Agreement and the Seller, SPV KN, KAS, KO and the Buyer confirm by signing this Agreement they have acceded to the Agreement.

**2.4**  For avoidance of any doubt it is agreed that the termination of the Present SPA and its substitution by this Agreement as stipulated herein shall not give a rise to claim for return of any performance that has been already provided pursuant to the Present SPA.

**2.5**  If the nature of rights and obligations under this Agreement enables so, the Seller's rights and obligations under this Agreement may be fulfilled and exercised by Kotva and the Buyer's rights and obligations under this Agreement may be fulfilled and exercised by Markland.

**2.6**  The Seller and Kotva are jointly and severally liable for the fulfilment of the obligations of either of them arising out of this Agreement. Kotva, KAS and KO jointly and severally guarantee the fulfilment of the Seller's and Kotva's obligations arising out of this Agreement. The Buyer and Markland are jointly and severally liable for the fulfilment of the obligations of either of them arising out of this Agreement.

**2.7**  The Seller and the Buyer and Kotva and Markland shall use their best endeavours to execute an amendment to the Escrow Agreement within 20 Business Days of the date of this Agreement to enable the Escrow Agent to perform its duties in accordance with the terms and conditions of this Agreement.

**3    Initial Obligations**

The Initial Obligations are as follows:

**3.1**  Seller's Obligation - procuring of SPV Conclusion

**3.1.1**  The Seller is obliged to procure the valid and legal and effective transfer or contribution of the Shares and the KOTVA Trademarks to the Seller through a non-monetary investment contribution to the Seller by Kotva which is satisfactory to the Buyer, acting reasonably, which in the circumstances will mean the requirement of the Seller to procure a valid and clear legal opinion confirming the valid and legal and effective transfer or contribution of the Shares and the KOTVA Trademarks to the Seller through a non-monetary investment contribution to the Seller by Kotva. Such legal opinion will also include confirmation that the Seller is fully and effectually entitled to sell the Shares and the KOTVA Trademarks to the Buyer pursuant to the terms of this Agreement; and

**3.1.2**  The Seller is obliged to procure the application for registration in the Patent and Trademark Office of the Czech Republic and Slovak Republic respectively of the contribution of the KOTVA Trademarks to the Seller, in a form acceptable to the Buyer, acting reasonably.

**3.2**  Buyer's Obligation - Legal Opinion

KC1-2650

3.2.1   The Buyer will procure as soon as possible after the date hereof, but no later than 31 January 2005, that its lawyers agree with the Buyer's bank's lawyers a legal opinion in respect of the ownership of the Property by SPV KN and the Shares by SPV CO to enable the Buyer's bank to confirm that it is prepared to finance the transactions contemplated hereunder.

3.3   Satisfaction of Initial Obligations

3.3.1   Within five Business Days of the satisfaction of any of the obligations referred to in Clauses 3.1 or 3.2, the party satisfying such condition shall serve notice of satisfaction on the other party.

3.4   Failure to satisfy the conditions precedent

3.4.1   In the event that Kotva fails to satisfy the obligations under this Clause 3.1 by 31 January 2005, the Buyer and Markland may withdraw from this Agreement by either one of them serving five Business Days written notice on Kotva and the Seller. Markland shall be entitled to the immediate refund of the Deposit together with any interest thereon and a contractual penalty payable by Kotva in the sum of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied firstly from the Security.

3.4.2   In the event that the Buyer fails to satisfy the obligations under Clause 3.2.1 by 31 January 2005, the Seller or Kotva may withdraw from this Agreement by either one of them serving five Business Days written notice on the Buyer and Markland. The Seller shall be entitled to a contractual penalty payable by the Buyer in the sum of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied from the Deposit and te balance of such Deposit shall be retuned to the Buyer.

4   SPV KN from its founding until Closing

4.1   Board of Directors of SPV KN

4.1.1   Kotva may only appoint a new member of SPV KN's Board of Directors or remove any of the existing members only with the prior written approval of the Buyer.

4.1.2   Kotva further undertakes that the members of the Board of Directors or other managers of SPV KN will not act outside of the Ordinary Course of Business and shall obtain prior written approval from the Buyer before making any non-operational decision or series of related decisions of a value in excess of CZK 157,500 (one hundred and fifty seven thousand five hundred Czech Crowns) except where this Agreement states to the contrary.

4.1.3   Kotva and/or the Seller, once it becomes majority shareholder of SPV KN, shall procure that the Board of Directors of SPV KN will observe and perform the obligations and undertakings as set out in Clause 6 and for the avoidance of doubt, any breach of such obligations and undertakings by the Board of Directors of SPV KN, if able to cause an Adverse Consequence to SPV KN and/or the Buyer and/or Markland of a sum in

KC1-2651

excess of CZK 31,500 (thirty one thousand five hundred Czech Crowns), shall be regarded as a material breach of this Agreement which shall entitle the Buyer and Markland to withdraw pursuant to Clause 10 respecting the time period in Clause 8.5.

**4.2** Supervisory Board of SPV KN

4.2.1    Kotva may only appoint a new member of SPV KN's Supervisory Board or remove an existing one only with the prior written approval of the Buyer.

**5    Sale and Transfer of Shares and KOTVA Trademarks; Closing**

**5.1** Transfer of Shares

5.1.1    Subject to the terms and conditions of this Agreement the Seller and the Buyer undertake, within five (5) Business Days of the Purchase Price being paid into the Escrow Account in accordance with Clause 5.3, to conclude the Transfer Deed, and the Seller undertakes to sell the Shares and to transfer the title to the Shares to the Buyer, the Seller and the Buyer undertake to instruct the Escrow Agent to immediately release the Shares to the Buyer and the Buyer undertakes to buy the Shares from the Seller and to pay for the Shares the Share Purchase Price.

5.1.2    The terms and conditions of this Agreement not repeated in the Transfer Deed will apply to the transfer of the Shares under the Transfer Deed as if they were explicitly stipulated in the Transfer Deed.

**5.2** Transfer of the KOTVA Trademarks

5.2.1    Subject of the terms and conditions of this Agreement the Seller undertakes, within five (5) Business Days of the Purchase Price is paid into the Escrow Account in accordance with Clause 5.3, to conclude with SPV KN or the Buyer (such decision to be at the discretion of the Buyer provided that it shall not cause any material adverse effect to the Seller) the Kotva Trademarks transfer agreement in a form to be agreed by the Buyer, acting reasonably, and the Seller undertakes to sell and transfer the KOTVA Trademarks to SPV KN or the Buyer and the Buyer undertakes to:

(i)    ensure that SPV KN or the Buyer will buy the KOTVA Trademarks; and

(ii)    pay on behalf of SPV KN or in its own name for the KOTVA Trademarks the Trademark Purchase Price.

5.2.2    SPV KN hereby agrees to sign all such documents as are required to effect the Kotva Trademarks transfer agreements referred to in Clause 5.2.1 above.

5.2.3    The terms and conditions of this Agreement not repeated in the KOTVA Trademarks transfer agreements will apply to the transfer of the KOTVA Trademarks under the the KOTVA Trademarks transfer agreements as if they were explicitly stipulated in the KOTVA Trademarks transfer agreements.

---

A04677559/1.4/22 Dec 2004

11

5.2.4   In the event that the Buyer decides about the transfer of the KOTVA Trademarks to SPV KN under Clause 5.2.1 and as a result of this decision any provision of this Agreement is directly or indirectly breached, neither Markland nor the Buyer may claim any right that it would otherwise have as a result of such breach.

5.3   Deposit and Purchase Price

5.3.1   The Deposit credited to the Escrow Account shall form part of the Purchase Price.

5.3.2   Within 20 Business Days of receipt or service by the Buyer of the notice of satisfaction of the last of the initial obligations, the Buyer shall credit to the Escrow Account the amount of CZK 1,363,950,000 (one billion three hundred and sixty three million nine hundred and fifty thousand Czech Crowns) representing the balance of the Purchase Price. In the event that on the date of payment of the balance of the Purchase Price, the Deposit or its part has been used to settle a Seller's claim according to this Agreement (other than the claim to receive the Purchase Price), the Buyer is obliged to balance the Purchase Price so that the total sum deposited by the Buyer (including the Deposit) represents the Purchase Price.

5.3.3   In the event that the Buyer fails to credit the Escrow Account as specified in Clause 5.3.2 the Buyer shall pay to the Seller a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) by way of forfeit of the Deposit which shall be released to the Seller within five (5) Business Days from the breach of this obligation. Upon settlement of this contractual penalty in favour of the Seller this Agreement immediately terminates.

5.3.4   Following Closing, if:

(i)    a breach of any of the Seller's or Kotva's obligations or representations or warranties is discovered which occurred prior to Closing; and

(ii)   the nature of that breach is such that it entitles the Buyer to compensation (by way of Share Purchase Price reduction or damages) in accordance with the terms of this Agreement,

then the parties shall apply to Arbitration pursuant to Clause 11.12 of this Agreement to ascertain that conditions (i) and (ii) of this Clause 5.3.4 have been satisfied and, if so determined in the arbitration award, then the Buyer shall be entitled to have recourse to the Escrow Account for the amount corresponding to the Adverse Consequence so discovered. The Seller shall be obliged to replenish the Escrow Account with the amount withdrawn on account of the breach within 20 Business Days of its removal by the Buyer until such time as all the monies standing to the credit of the Escrow Account have been released in accordance with the terms of the Escrow Agreement.

5.4   Action pending Closing

KC1-2653

5.4.1   Kotva and the Seller shall collaborate fully with Markland and the Buyer, such collaboration to include but not be limited to Markland's and/or the Buyer's right to:

(i)   receive, after a request made by each of them, all information distributed to the directors of SPV KN and the Seller;

(ii)   attend, but not vote at, the meetings of the directors of SPV KN and the Seller; and

(iii)   have full access to all those books, records and other documentation of SPV KN and the Seller to which a director normally has access in relation to all matters concerning the operation of SPV KN and the Seller between the date of this Agreement and the Closing Date.

5.4.2   During such period Kotva and/or the Seller shall procure that neither SPV KN nor the Seller shall without the prior written consent of Markland:

(i)   incur or enter into any agreement or commitment involving any capital expenditure in excess of CZK 157,500 (one hundred and fifty seven thousand five hundred Czech Crowns) per annum which is not in the Ordinary Course of Business;

(ii)   enter into or amend any contract or commitment which is not in the Ordinary Course of Business or which involves or may involve a total annual expenditure or income in excess of CZK 500,000 (five hundred thousand Czech Crowns);

(iii)   incur any additional borrowings or incur any other indebtedness;

(iv)   save as required by law, make any amendment to the terms and conditions of employment (including, without limitation, remuneration and other benefits) of any employee, provide or agree to provide any gratuitous payment or benefit to any such person or any of their dependants, dismiss any employee or engage or appoint any additional employee;

(v)   acquire or agree to acquire or dispose of or agree to dispose of any material asset or material stocks or enter into or amend any material Contract or arrangement;

(vi)   take steps to procure the payment or settlement of any Liability generally in advance of the date on which book and other Liabilities are usually payable in accordance with the standard terms of the Seller's business or to extend the period to any particular debtor in which to make payment;

(vii)   delay making payment to any trade creditors generally beyond the date on which payment of the relevant trade debt should be paid in accordance with a credit period as authorised by the relevant creditors or (if different) the period extended by such creditors in which to make payment;

(viii)  amend, to any material extent, any of the terms on which goods, facilities or services are supplied, such supplies being material in the context of the Business, except where required to do so in order to comply with any Legal Requirement;

(ix)  enter into any guarantee, indemnity or other agreement to secure any obligation of a third party or create any encumbrance over any of its assets or undertaking;

(x)  allot, issue, redeem or repurchase any share capital of SPV KN and/or the Seller;

(xi)  enter into any contract reducing or depreciating the assets of SPV KN and/or the Seller;

(xii)  acquire or agree to acquire any share, shares or other interest in any Person;

(xiii)  declare, make or pay any dividend or other distribution to shareholders;

(xiv)  make any change to the practices or policies of SPV KN and/or the Seller;

(xv)  amend the Organisational Documents of SPV KN or the Seller; or

(xvi)  enter into any Contract or arrangement with a Related Person other than in the Ordinary Course of Business.

5.4.3  Kotva and the Seller further undertake and undertake to procure that pending Closing each of them will:

(i)  continue those business activities which affect the Property, SPV KN or the Seller, only in the Ordinary Course of Business, save insofar as agreed in writing by the Buyer;

(ii)  take all reasonable steps to preserve its assets and Governmental Authorisations; and

(iii)  take all reasonable steps to preserve the validity of all Contracts to which they are a party which have an effect on the Property, SPV KN or the Seller.

## 5.5  Closing

5.5.1  The Closing shall occur within five (5) Business Days after receipt of the Purchase Price by the Escrow Agent.

5.5.2  The Seller shall, through the Escrow Agent, hand-over the Shares and shall hand-over the other documents referred to in Clause 5.6.1 and upon receipt of such Shares and other documents by the Buyer, the Closing of this transaction shall be deemed to occur. The title to the Shares including shareholder's rights shall pass to the Buyer upon Closing. The Purchase Price shall be settled by the Escrow Agent via the Escrow Account.

## 5.6  Closing deliveries

---

A04677559/1.4/22 Dec 2004

14

5.6.1   At Closing Date, the Seller shall deliver to the Buyer through the Escrow Agent the items listed in sub-clause (a), (b) and (c) below and personally in respect of the remainder of the items listed below):

(a)   the Shares;

(b)   the Transfer Deed;

(c)   a hand-over protocol confirming the hand-over of the Shares;

(d)   an extract of SPV KN from the Commercial Register dated the Closing Date (fax copy is deemed to be a sufficient form);

(e)   written resignations of each member of the Board of Directors and the Supervisory Board of SPV KN and a resolution of the sole shareholder (or the Supervisory Board, as appropriate) of SPV KN taking note of the resignations in a form reasonably acceptable to the Buyer, to provide the resignations to take effect on the Closing Date;

(f)   resolution of the sole shareholder (or Supervisory Board, as appropriate) appointing new members of the Board of Directors and the Supervisory Board of SPV KN designated by the Buyer and advised to the Seller at least (5) Business Days prior to Closing in a form reasonably acceptable to the Buyer, to provide the appointments to take effect on the day immediately following the Closing Date;

(g)   the Powers of Attorney signed by each member of the Board of Directors of SPV KN to enable the Buyer to make the necessary post-Closing registration (or deletions) at the Commercial Register;

(h)   all SPV KN's Organisational Documents, including, but not limited to, the founding deed, articles of association and all applications regarding SPV KN's registration in the Commercial Register and all resolutions of the registration court;

(i)   all lease agreements in respect of the Property;

(j)   all title deeds and documents in respect of the Property;

(k)   all the financial and accounting books and records and returns of SPV KN completed up to Closing;

(l)   all other documents regarding SPV KN;

(m)   a certificate executed by the Seller and Kotva dated as of the Closing Date stating that: (i) all representations, warranties, obligations and undertakings as set forth under Clause 6 are fulfilled and are true and correct in all material respects as the Closing Date; and (ii) all actions required to be taken by Kotva, SPV KN and the Seller to effect Closing have been properly taken;

(n)   the KO Lease duly executed by KO;

(o)   certificates executed by the Seller and Kotva and their accountants, so far as they are authorised to do in accordance with Czech Law

KC 1-2656

KC1-2656

confirming: (i) the successful payment and liquidation of any and all long-term debts or Liabilities, financial or otherwise, of SPV KN, the Seller and Kotva not arising in the Ordinary Course of Business which would affect SPV KN, the Seller or the Property; and (ii) that the Liabilities and debts, financial or otherwise of Kotva and the Seller arising in the Ordinary Course of Business which would affect SPV KN, the Seller or the Property amount to less than CZK 500,000 (five hundred thousand Czech Crowns);

(p)    a certificate executed by the accountants of SPV KN confirming what debts and Liabilities, financial or otherwise SPV KN has and that, save for day to day debts or Liabilities, financial or otherwise, that SPV KN has no other such debts or Liabilities, financial or otherwise;

(q)    a confirmation of discharge of the liability secured by the J&T banka Mortgage, signed by J&T banka in a form reasonably acceptable to the Buyer to enable the Buyer to remove the registration of such mortgage from the real estate register;

(r)    the list of tenant's security deposits as evidenced in the accounting of SPV KN, which list in detail the amounts provided by the individual tenants as security deposits;

(s)    evidence that the Seller has relinquished all authority and all rights to make any transactions on the SPV KN bank accounts (or that such accounts are frozen pending the Buyer completing the necessary bank mandates) and all banking records and account details and new mandate forms for the Buyer to complete and to give all assistance as required by the banks in this respect to ensure the proper transmission of the accounts;

(t)    applications for the registration of the transfer of the KOTVA Trademarks from Kotva to the Seller stamped by the Industrial Property Offices in the Czech Republic and Slovak Republic, as applicable; and

(u)    the Kotva Trademarks transfer agreements.

5.6.2    The documents listed in Clause 5.6.1 above shall be delivered by the Seller and Kotva to the Escrow Agent within ten (10) Business Days of the date of the written notice evidencing to the Buyer SPV Conclusion delivered in accordance with Clause 5.3.2 and following this, the Seller and the Buyer shall execute such confirmatory document as is required by the Escrow Agent and if either of them shall fail to execute such document as required by the Escrow Agent (save in the event of a dispute as to the actual delivery of the documentation) then a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) shall be payable to the other party.

5.6.3    the Escrow Agent shall release the following sums from the Escrow Account upon Closing:

KC1-2657

(i)     to the Buyer, the sum of CZK 10,837,800 (ten million eight hundred and thirty seven thousand eight hundred Czech Crowns) in respect of three months rent and service charge as defined in the KO Lease as a security deposit thereunder;

(ii)    provided that the debt secured by the J&T banka Mortgage has not been discharged and the Seller has supplied evidence thereof to the Buyer which is reasonably acceptable to the Buyer, to J&T banka an amount equal to the amount required to discharge in full and final settlement all amounts secured by the J&T banka Mortgage, provided that the Escrow Agent received a letter from J&T banka confirming that such amount will be in full and final settlement of the debt secured by the J&T banka Mortgage and any and all claims;

(iii)   to the Seller the Trademark Purchase Price;

(iv)    to the Seller, the sum of CZK 925,000,000 (nine hundred and twenty five million Czech Crowns), less the amounts paid to the Buyer pursuant to Clauses 5.6.3(i) above and to J&T banka pursuant to Clause 5.6.3(ii) above and to the Seller pursuant to Clause 5.6.3(iii) above.

5.6.4   The balance of the Share Purchase Price, being the Retention, amounting to CZK 576,450,000 (five hundred and seventy six million four hundred and fifty thousand Czech Crowns), shall be retained by the Escrow Agent until such time as there has been Gilroy Settlement. However, if there has been Gilroy Settlement but either 9 months from the Closing Date have not elapsed or there are Proceedings pursuant to Clause 5.6.4(i) below, the Escrow Agent shall release the Retention to the Seller less the sum of CZK 189,000,000 (one hundred and eighty nine million Czech Crowns), which shall be retained in the Escrow Account until such time as the Buyer obtains a definitive and final ruling in respect of such Proceedings or the period of 9 months from the Closing Date elapsed and there are no Proceedings which ever is the later. For the avoidance of doubt, a court decision made on basis of a valid withdrawal is considered to be a definitive and final ruling

The Escrow Agent shall throughout the period of holding the Retention release to the Buyer upon the sole request of the Buyer the following sums:

(i)     In the event that anyone initiates any legal Proceedings the subject matter of which is a declaration of invalidity of legal acts based on which the Property has been transferred or contributed to Kotva and/or to the Seller, within nine months of the Closing Date, then the Buyer shall be entitled to unilaterally withdraw on each regular quarter day, being 1 January, 1 April, 1 July and 1 October, such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending the Buyer, SPV KN or Markland in any such Proceedings. Such amounts will be considered to be the Share Purchase Price adjustments. In the event that compensation of such costs are awarded by the court to

the Buyer in such Proceedings, then the Buyer shall return such sums as it recovers to the Seller once it has received them from the obliged person, such amounts again will be considered the Share Purchase Price adjustments.

(ii)     On each regular quarter day, being 1 January, 1 April, 1 July and 1 October, such sums from the Retention as are necessary to fully pay the fees and costs of the Buyer's lawyers spent on defending SPV KN under the Gilroy Claim; the request of the Buyer for such sums from the Retention must evidenced by a duly issued invoice from the Buyer's lawyers for the time being. Any payments under this Clause 5.6.4(ii) will be considered to be Share Purchase Price adjustments.

(iii)     In the event that, under any tax regulations applicable up to the date of Closing, Kotva or SPV KN are assessed with Tax (in particular real estate transfer tax or VAT) in relation to the contribution of the Property, to SPV KN and Kotva, SPV KN or the Seller is liable to pay such Tax to the Financial Authorities, Kotva and the Seller undertakes to compensate SPV KN for such Tax and any corresponding penalty, interest or any other financial payment imposed by the Financial Authorities on SPV KN and such amount of Tax shall be retained in the Escrow Account by the Escrow Agent and shall only be released to the Seller following Gilroy Settlement upon receipt of the following:

(a)     an original or an authenticated copy of the extract from the Real Estate Register showing the SPV KN as the exclusive owner of the Property which are free of any Encumbrances; it does not relate to any Encumbrances, which arise after the Closing has taken place or which are created by the Buyer;

(b)     an original or an authenticated copy of the Tax return relating to the real estate transfer tax resulting from the contribution of the Property to SPV KN and a copy of an expert's valuation, both bearing a stamp of the Tax Collection Authority confirming that the Tax return, including the expert's valuation, have been duly submitted to the Tax Collection Authority; and

(c)     original confirmation, issued by the appropriate Financial Authority, proving that neither Kotva nor the Seller or SPV KN have any tax liabilities in respect of any Tax and in particular real estate transfer tax resulting from the contribution of the Property to SPV KN.

Any payments under this Clause 5.6.4(ii) will be considered to be Share Purchase Price adjustments.

(iv)     In the event that the Retention falls below the amount of CZK 31,500,000 (thirty one million five hundred thousand Czech Crowns) then the Seller and/or Kotva and/or KAS shall, within twenty (20) Business Days of the level falling below CZK

KC1-2659

31,500,000 (thirty one million five hundred thousand Czech Crowns), ensure that sufficient funds are paid in to the Escrow Account to bring the level back up to at least CZK 31,500,000 (thirty one million five hundred thousand Czech Crowns).

(v) The Seller and Buyer will agree to adjust the Share Purchase Price by deducting from the Share Purchase Price payable to the Seller and release to the Buyer one half of the difference between CZK 177,250,000 (one hundred and seventy seven million two hundred and fifty thousand Czech Crowns ) and the actual annual income due in accordance with the true and accurate Rent Roll as existing at the Closing Date in respect of the Property, excluding the Service charge, as agreed between the Seller and the Buyer not more than 2 Business Days prior to the Closing Date.

(vi) For the avoidance of doubt, the sums referred to in this Clause 5.6.4 of this Agreement may be released to the Buyer upon the Buyer's sole request and shall be deposited in such account as the Buyer shall, in its own discretion, determine.

5.6.5    If the conditions under this Agreement or under the Escrow Agreement for releasing any funds from the Escrow Account to either of the Seller or the Buyer have been validly satisfied, save in respect of any monies to be released pursuant to Clause 5.6.4, the other party shall, upon a written invitation by the other party, countersign a joint instruction or any other document contemplated by the Escrow Agreement and deliver it to the other party within five days of the invitation being delivered. If the appropriate party does not satisfy the aforementioned obligation in a due and timely manner, it shall pay to the other party a contractual penalty of CZK 157,500,000 (one hundred and fifty-seven million five hundred thousand Czech Crowns).

5.6.6    Kotva and the Seller hereby confirm that the Fixtures & Fittings will remain at the Building following Closing and will become, if not already, the property of SPV KN.

6    Representations, Warranties and Obligations and Undertakings of KAS, Kotva and the Seller

KAS, Kotva and the Seller represent and warrant that the following representations and warranties contained in this Section 6 are true, correct and complete as at the date of signing this Agreement and Kotva, the Seller and KAS undertake to maintain them true, correct and complete during the entire term of effectiveness of this Agreement and to comply with all the obligations and undertakings contained in this Section 6 during the entire term of effectivness of this Agreement until Closing and in respect of those obligations and undertakings specified in Clause 6.5, for five years following the Closing Date:

6.1    General

(i) Kotva, SPV KN, the Seller and KAS have been duly established and incorporated under the respective laws, being Czech, Czech, Cypriot and

Czech, and the share capital has been fully paid up in respect of each of them.

(ii) None of Kotva, SPV KN, the Seller or KAS has been declared bankrupt nor, and to the best their Knowledge, has any person delivered a petition for bankruptcy.

(iii) There is no Proceeding in progress, pending or Threatened against or relating to Kotva, SPV KN or the Seller or KAS except for the Gilroy Case and the 'Balfinder litigation' and there is no circumstance, matter or thing which might give rise to any such Proceeding by Kotva or SPV KN or the Seller or KAS or any shareholder thereof or any third party or to any governmental investigation relative to it, nor is there outstanding against Kotva or SPV KN or Seller or KAS any regulation, judgement, decree, injunction, rule or Order of any court, Governmental Body or arbitrator which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable.

(iv) None of Kotva, SPV KN, or the Seller nor KAS nor any of their directors and managers have committed any offence or failed to comply with any applicable Law which might give rise to any fine, penalty, default or commencement of Proceeding or any other liability which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable.

(v) None of Kotva, SPV KN, or the Seller nor KAS is in default or breach of Organisational Documents or any licence, Governmental Authorisation, Contract or other instrument to which it is a party or by which it may be bound and there exists no state of facts which after notice or lapse of time, or both, would constitute such a default or breach, and all such licences, Governmental Authorisations, Contracts and documents are in good standing and Kotva, SPV KN or the Seller or KAS, as the case may be, are entitled to all benefits there under and none of Kotva, SPV KN, or the Seller or KAS have Knowledge of any of the above which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable.

(vi) Kotva and SPV KN and KAS are Tax resident only in the Czech Republic and will remain so (whilst under the control of the KAS Group) until at least five years from the Closing Date and neither Kotva nor SPV KN nor KAS has any Tax Liabilities whether actual or contingent in jurisdictions other than in the Czech Republic.

(vii) The Seller is tax resident of Cyprus.

(viii) The corporate records supplied to Markland during Due Diligence contain complete and accurate records of all minutes of meetings held and all resolutions adopted by Kotva and in general meetings since SPV KN's incorporation and neither Kotva nor KAS have any Knowledge of any defects in the above or breaches thereof, or in the corporate governance of KAS, which would make this Agreement or the transactions contemplated in this Agreement invalid, void or voidable.

(lx)    Kotva and the Seller have supplied the Buyer and/or Markland with all complete and accurate records of all minutes of meetings held and all resolutions adopted by SPV KN since its incorporation.

(x)    The books and records of Kotva and SPV KN fairly and correctly set out and disclose in all material respects the financial position of the Business of Kotva and all material financial transactions relating to the Business have been accurately recorded in such books and records since its incorporation and Kotva has no Knowledge of a breach of any of the above.

(xi)    None of Kotva, SPV KN, or the Seller or KAS is a party to any valid written or verbal Contract or any other document under the terms and conditions of which the performance by the Seller of this Agreement would result in the breach of an obligation, or might provide a reason for the termination or invalidity of this Agreement or the transactions contemplated in this Agreement, or which might preclude Kotva, SPV KN or the Seller or KAS from performing their obligations hereunder.

(xii)    With respect to the Property, SPV KN will not execute any new lease without the prior written consent of the Buyer, such consent not to be unreasonably withheld or delayed. If a response to such a request is not given by the Buyer within 10 Business Days of its delivery, this will be deemed consent to the execution of the new lease.

(xiii)    The Seller, SPV KN, Kotva shall not extend or agree to extend any existing lease without the prior written Consent of the Buyer, such consent not to be unreasonably withheld or delayed. If a response to such a request is not given by the Buyer within 10 Business Days of its delivery, this will be deemed consent to the extension of the existing lease.

(xiv)    All Consents necessary to fulfil the obligations of Kotva, SPV KN, the Seller or KAS to complete the SPV Conclusion and the consummation of the transactions contemplated by this Agreement shall be provided by the Seller, SPV KN or by Kotva to the Buyer as soon as practicable after they are available.

(xv)    Kotva and/or SPV KN shall permit any Person nominated by Markland or the Buyer to oversee the day-to-day management of the Property which, for the avoidance of doubt, shall mean the internal management of the Kotva shopping centre by the on-site retail manager. Kotva and/or SPV KN undertake to provide assistance, advice and all information necessary to enable such Person to effectively learn the current management structure of the Property.

(xvi)    That in relation to those persons currently employed by Kotva or by the Seller there are no written Contracts of employment, mandate, consultancy or similar agreements with any employee, director or consultant of Kotva or of the Seller which are to be transferred to the Buyer or SPV KN on Closing either by operation of law or by virtue of any provision contained within any such employment agreements. Kotva and the Seller shall remain fully liable for all claims of redundancy payments or protective awards and for any liability, direct or indirect, resulting from the unfair or wrongful dismissal of any employee and shall fully and effectually indemnify, and continue to

KC1-2662

keep indemnified, the Buyer in respect of any costs or expenses which may arise in connection therewith.

(xvii)   The Seller and Kotva undertakes to ensure that, in relation to SPV KN, the entry into or completion of this Agreement will not directly or indirectly cause or contribute to the disallowance or non-availability of any Tax benefit or relief (whether by way of deduction, reduction, set-off, exemption, allowance or otherwise) from, against or in respect of which any Tax could or may be effectively reduced withdrawn, postponed, restricted or waived as a result of entry into or completion of this Agreement.

(xviii)  As at the Closing Date neither SPV KN nor the Seller will have any joint or several liability in respect of any Tax incurred by or due from any other Person, as a transferee or successor, by contract, or otherwise.

(xix)    Concerning SPV KN and/or the Seller, full liability has been accounted for or full provision or reserve has been made in the Financial Statements for all Taxes liable to be assessed or for which SPV KN is or may become accountable. Proper provision, reserve or liability for deferred Tax has been made in the Financial Statements.

(xx)     No income or revenue in relation to SPV KN (as computed for Tax purposes) will arise or accrue in consequence of cancellation of provisions or reserves which have been claimed as deductions or charges for Tax purposes in computing profits (tax base) or loss carry-forwards (as computed for Tax purposes), other than income against which corresponding expense allowable as deductions or charges for Tax purposes in computing profit (tax base) or loss carry-forwards (as computed for Tax purposes), (e.g. write-off of a receivable or expenses incurred on repairs of tangible assets) can be set-off.

(xxi)    Kotva shall procure that as at the Closing Date all of the accounts, books and records of SPV KN will be fully, properly and accurately up-to-date from the incorporation of each entity respectively, and will be maintained at a place and in a form that complies with the Commercial Code and all applicable Laws of the Czech Republic. All accounts, documents, reports and returns required by Law to be delivered or made to any Governmental Body will have been duly and correctly delivered or made by representatives of SPV KN and the Seller and will be delivered to the Buyer.

(xxii)   Kotva shall procure that as at the Closing Date neither SPV KN nor the Seller will have any outstanding or undisclosed Taxes that were incurred on or before the Closing Date. SPV KN and the Seller have complied with all applicable Laws, rules and regulations relating to the payment and withholding of all Taxes. If the above mentioned declarations of the Seller prove to be incorrect the Seller shall immediately rectify this situation or shall immediately settle the tax for SPV KN or the Seller.

(xxiii)  Enforceability; No Conflict

         (a)      Kotva, SPV KN, KAS and the Seller have the absolute and unrestricted right, power, and authority to execute and deliver this

---

KC1-2663

Agreement and to perform their obligations under this Agreement, which actions have been duly authorised and approved by all necessary corporate actions of Kotva and the Seller and KAS, where relevant. This Agreement constitutes the legal, valid, and binding obligation of Kotva, KAS and the Seller, and is enforceable against Kotva, KAS and the Seller in accordance with its terms.

(b)    Neither the execution nor the delivery of this Agreement by Kotva, KAS and the Seller, nor the consummation or performance of any of the contemplated Transactions by Kotva, KAS or by the Seller where relevant, will directly or indirectly (with or without notice or lapse of time), contravene any Contract to which Kotva, KAS or the Seller is a party or by which Kotva, KAS or the Seller may be bound, any Governmental Authorisation, Legal Requirement, or Order to which the Seller may be subject, any provision of Kotva's, KAS' or the Seller's Organisational Documents, or any resolution adopted by the board of directors or the shareholders of Kotva, KAS or the Seller, which was not disclosed to the Buyer during Due Diligence.

(xxiv)    The Seller or Kotva (whoever is legally responsible) undertakes to enter into any and all documents and agreements, within 20 Business Days of the request of the Buyer, following the Closing to:

(a)    permit the merger of SPV KN with the Buyer under the Laws of the Czech Republic;

(b)    sign and/or issue any document as requested by the Buyer or Markland which can speed up the process of the merger referred to in (a) above (e.g. waiver of right to receive various reports on merger);

(c)    waive any rights to any increased shareholding in the merged company or to any compensation payments upon the merger by reason of the dilution of shares or for any other reason; and

(d)    ensure the continued operation of SPV KN or the merged company including any shareholders agreements.

(xxv)    Kotva will advise Markland and the Buyer of any adverse or potential adverse economic situation of Kotva or KAS.

6.2    Kotva and/or the Seller (once it becomes the owner of the Shares) are obliged or undertake to procure that:

(i)    The Board of Directors of SPV KN will obtain the prior written approval of Markland, such approval not to be unreasonably withheld, before carrying out anything not in the Ordinary Course of Business.

(ii)    The following activities shall not be carried out without the prior written approval of Markland:

(a)    amendment, modification or supplementation of the Organisational Documents of Kotva, the Seller or SPV KN;

KC1-2664

    (b)    the liquidation, dissolution or winding-up of Kotva, KAS or SPV KN;

    (c)    the merger, consolidation, transformation or division of SPV KN; or

    (d)    the change or agreement to change of the share capital of SPV KN (whether by consolidation, sub-division, purchase, redemption, cancellation, allotment or issuance of any shares), the grant of any option over, or issuance of any instrument carrying rights of conversion into, any of its shares.

6.3    Kotva and the Seller (once it becomes owner of the Shares) are obliged or undertake to procure that SPV KN does not without the prior written approval of Markland:

    (i)    dispose of or transfer control of or interest in all or any material part of its business, property or assets, whether by a single transaction or series of related transactions, or acquire any business, property or assets which would, following such acquisition, constitute a material part of its Business, property or assets (for these purposes, any business, property or asset accounting to CZK 31,500 (thirty one thousand five hundred Czech Crowns) or any business, property or asset with a fair market value of CZK 31,500 (thirty one thousand five hundred Czech Crowns) or more shall be deemed material);

    (ii)    change or agree to change its share capital (whether by consolidating, subdividing, purchasing, redeeming, cancelling, allotting or issuing any shares), or grant any option over, or issue any instrument carrying rights of conversion into, any of its shares;

    (iii)    commence any new business not being reasonably ancillary or incidental to the Business;

    (iv)    replace its auditors;

    (v)    enter into, modify or terminate any Contract or make any payment that: (a) involves or will involve obligations or potential obligations that, because of their nature or significance, are or will be deemed to be unusual or extraordinary for companies engaging in activities similar to the Business; (b) is or will be otherwise than at arms length and on the best terms reasonably obtainable; or (c) is in excess of CZK 31,500 (thirty one thousand five hundred Czech Crowns);

    (vi)    give any guarantee or indemnity, other than in the normal course of business in relation to the supply of goods or services, which is in excess of CZK 31,500 (thirty one thousand five hundred Czech Crowns);

    (vii)    make any loan, or create any borrowings or other indebtedness in the nature of borrowings;

    (viii)    acquire or incorporate any subsidiary or acquire or dispose of shares (except the Shares in accordance with this agreement), equity interests or loan stock in any Person or enter into any joint venture, partnership or consortium arrangement;

---

A04677559/1 4/22 Dec 2004

24

KC 1-2665

KC1-2665

(ix)    permit its interest in any Person to be diluted (whether by a disposal of shares held by it or by a new issue of shares);

(x)    declare any dividend or make any other distribution in respect of its shares, whether in cash or otherwise; nor

(xi)    determine the compensation payable by SPV KN to any officer or Director.

### 6.4    Monthly Reports

Kotva and/or the Seller shall procure that the Directors of SPV KN provide to Markland, no later than the fifteenth (15th) day of each calendar month, a report detailing the activities of SPV KN.

### 6.5    Transfers

Kotva and the Seller, once it becomes a shareholder of SPV KN, shall procure that from the date of this Agreement until five years following the Closing Date, no shares in SPV KN owned by Kotva or the Seller are transferred (including by way of sale of enterprise, merger or winding-up) to a third party and no Encumbrance may be created over those shares except in accordance with and subject to the provisions of this Agreement. For the duration of this Agreement SPV KN must not, without the prior written consent of the Buyer, suffer a Change of Control.

## 7    Representations, warranties and Obligations and Undertakings of the Buyer and of Markland

The Buyer and Markland represents and warrants that the following representations and warranties are true, correct and complete as at the date of signing this Agreement and the Buyer and Markland undertake to maintain them true, correct and complete during the effectiveness of this Agreement up to Closing:

### 7.1    Organisation

The Buyer and Markland are duly established and incorporated and their share capitals have been fully paid up.

### 7.2    Enforceability; No Conflict

7.2.1    The Buyer and Markland have the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and to perform their obligations under this Agreement, which obligations have been duly authorised and approved by all necessary corporate actions of the Buyer and Markland. This Agreement constitutes the legal, valid, and binding obligation of the Buyer and Markland, and is enforceable against the Buyer and Markland in accordance with its terms.

7.2.2    Neither the execution nor the delivery of this Agreement by the Buyer and by Markland nor the consummation or performance of any of the Contemplated Transactions by the Buyer or Markland will directly or indirectly (with or without notice or lapse of time), contravene any Contract to which the Buyer and/or Markland is a party or by which the Buyer and/or Markland may be bound, any Governmental Authorisation, Legal Requirement, or Order to which the Buyer and/or Markland may be subject,

any provision of their Organisational Documents, or any resolution adopted by the board of directors or the shareholders of the Buyer and/or Markland.

7.2.3   General

(i)   The Buyer and Markland have not been declared bankrupt nor, to the best Knowledge of the Buyer and Markland, has any person delivered a petition for bankruptcy in relation to it.

(ii)   There is no Proceeding in progress, pending or Threatened against or relating to the Buyer and Markland and there is no circumstance, matter or thing to the Knowledge of the Buyer and Markland which might give rise to any such Proceeding by a third Person or any shareholder thereof, nor to any governmental Investigation relative to it, nor is there outstanding against the Buyer and Markland any regulation, judgement, decree, injunction, rule or order of any court, Governmental Body or arbitrator.

(iii)   The Buyer and Markland are not in default or breach of their Organisational Documents or any Contract to which they are a party or by which they may be bound and there exists no state of facts which after notice or lapse of time, or both, would constitute such a default or breach, and all such documents and Contracts are in good standing and the Buyer and Markland are entitled to all benefits thereunder.

(iv)   Markland is tax resident in the Republic of Ireland and the Buyer is tax resident in the Czech Republic.

(v)   The corporate records of the Buyer and Markland contain complete and accurate records of all minutes of meetings held and all resolutions adopted by the Buyer and/or Markland in general meetings since their incorporation and the Buyer and/or Markland have no knowledge of any of the above that might make this Agreement invalid, void or voidable.

(vi)   The books and records of the Buyer and Markland fairly and correctly set out and disclose in all material respects the financial position of the business of the Buyer and Markland and all material financial transactions relating to the business have been accurately recorded in such books and records since their incorporation and the Buyer and/or Markland have no Knowledge of a breach of any of the above.

(vii)   The Buyer and Markland are not a party to any valid written or verbal Contracts or any other document under the terms and conditions of which the performance by the Buyer and/or Markland of this Agreement would result in the breach of an obligation, or might provide a reason for the termination or invalidity of this Agreement, or which might preclude the Buyer and/or Markland from performing their obligations hereunder.

(viii)   All Consents and other co-operations necessary to fulfil this Agreement by the Buyer and Markland shall be provided by the

A04677559/1.4/22 Dec 2004

26

KC 1-2667

KC1-2667

Buyer and Markland to the Seller and to the KAS Group upon their written request thereof.

(ix)    The Buyer is obliged to conclude a Transfer Deed and trademark transfer agreements in accordance with Clause 5.1 and 5.2 and take over the Shares in accordance with Clause 5.5.

**7.3    Due Diligence**

Markland represents that during Due Diligence it had an option to ask for and did ask for information concerning the Property, Kotva and other members of the KAS Group and that the documents provided were and still are represented by Kotva and KAS to be satisfactory and of a standard to enable Markland and the Buyer to enter into this Agreement including their willingness to pay the Purchase Price subject to such retentions as are made hereunder. The Buyer and Markland agree that, on the basis of the information provided to them by the Sellers, the Purchase Price is reasonable and corresponds to the value of the Shares and the Kotva Trademark.

**8    Share Purchase Price Adjustment and Remedies**

**8.1    Survival; Right to Share Purchase Price Adjustment; Waiver**

All obligations and undertakings and Share Purchase Price adjustment obligations in this Agreement and its Schedules, and any other certificate or document delivered pursuant to this Agreement will survive the Closing until the expiration of the relevant limitation period, i.e. preclusion or statutory limitations. Any claim by a Party based on a breach of any undertakings, representation or warranty made pursuant to this Clause 8.1 must be submitted to the breaching party prior to the expiration of the applicable limitation period. The right to Share Purchase Price adjustment, payment of damages or other remedy based on a breach such representations, warranties, covenants, and obligations will not be affected by any investigation conducted with respect to, or any Knowledge acquired (or capable of having been acquired) about, the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to Share Purchase Price adjustment, payment of damages, or other remedy based on such representation, warranty, covenant, or obligation.

**8.2    Share Purchase Price adjustment and Payment of Damages by Kotva**

Kotva and the Seller shall jointly and severally reimburse and hold harmless Markland and the Buyer and the members of their Boards of Directors (collectively, the "Markland's Indemnities"), and shall pay (by way of deducting from the Share Purchase Price payable by the Buyer) to the relevant Markland's Indemnities the monetary value of any Adverse Consequence arising directly or indirectly, from or in connection with:

(a)    any breach of any representation, warranty covenant, obligation or undertaking made by Kotva and/or the Seller and /or KAS in this Agreement, or any other certificate or document delivered by Kotva and/or KAS and/or by the Seller pursuant to this Agreement;

---

A04677559/1.4/22 Dec 2004

27

KC 1-2668

KC1-2668

(b)   any Liabilities of SPV KN existing at or arising out of a state of facts existing at or before the Closing Date, to the extent that such Liabilities are not reflected or reserved against in the Financial Statements;

(c)   any claim by any Person for brokerage or finder's fees or commissions or similar payments from the Seller, SPV KN or SPV CO in connection with any of the Contemplated Transactions; and

(d)   any and all Threatened or Implemented Proceedings, demands or assessments incidental to any of the matters set forth in this Clause 8.2(a) to (c).

8.3   Share Purchase adjustment and Payment of Damages by Markland

The Buyer and Markland shall jointly and severally reimburse and hold harmless Kotva, the Seller, KAS Group, SPV KN and the members of the boards of directors of the aforementioned companies (the "Kotva's Indemnities"), and shall pay (by way of increasing the Share Purchase Price payable by the Buyer) to Kotva's Indemnities the monetary value of any Adverse Consequence arising directly or indirectly, from or in connection with:

(a)   any breach of any representation, warranty covenant, obligation or undertaking made by Markland or by the Buyer in this Agreement or in any certificate delivered by Markland or by the Buyer pursuant to this Agreement; and

(b)   any and all Threatened or Implemented Proceedings, demands or assessments incidental to any of the matters set forth in Clause 8.3(a) above.

8.4   Procedure for Share Purchase Price adjustment

(a)   Immediately after: (i) receipt by an Indemnified Person of notice of the assertion of a third-party claim against it; or (ii) the Indemnified Person becoming aware that it has suffered an Adverse Consequence entitling it to a Share Purchase Price adjustment, the Indemnified Person will, if a claim is made against such Indemnified Person, give notice to the Indemnifying Person of the assertion of such claim or the Adverse Consequence as the case may be. An Indemnified Person's failure to notify an Indemnifying Person will not relieve the Indemnifying Person of any Liability that it may have to the Indemnified Person.

(b)   A claim for Share Purchase Price adjustment originates by the expiration of the protection time limit according to Clause 8.5, at which moment the sum payable under the Share Purchase Price adjustment shall be paid promptly by the Indemnifying Person to the Indemnified Person.

8.5   If any of the Parties discovers a Threatened Adverse Consequence to it for a reason which would entitle the another Party to Share Purchase Price adjustment or to withdraw from this Agreement, that Party shall notify the others accordingly. The Party who would but for the terms of this Clause 8.5 be the Indemnifying Party then has a protection time limit lasting 25 (twenty five) Business Days from the date of the delivery of the notification to remove the fact causing falsehood of the representation or remedy the breach of its obligation. If such Party does not do so, it is obliged to

KC1-2669

pay to the other Party upon expiration of the protection time limit sufficient and full compensation for the Threatened or newly discovered Adverse Consequence. If later the Adverse Consequence does not materialise the Party receiving the compensation is obliged to return it.

8.6    In the event that an Adverse Consequence is discovered, Kotva or the Seller shall remedy such situation as soon as possible following the discovery but in any event shall do so prior to Closing. If at Closing the Adverse Consequence still exists, the Buyer shall be entitled to deduct the amount of the Adverse Consequence from the Share Purchase Price.

8.7    Any payments made under this Clause 8 hereof shall be treated as an adjustment to the Share Purchase Price paid by the Buyer for the Shares under the terms of the Agreement, with the exception of any contractual penalty payable hereunder.

8.8    All sums payable by the Seller to the Buyer under this Agreement shall be paid free and clear of all deductions, withholdings, set-offs or counterclaims whatsoever save only as may be required by Law. If any deductions or withholdings are required by Law the Seller shall be obliged to pay to the Buyer such sum as will after such deduction or withholding has been made leave the Buyer with the same amount as it would have been entitled to receive in the absence of any such requirement to make a deduction or withholding.

8.9    If any Tax authority charges to Tax any sum paid to the Buyer under this Agreement then the amount so payable shall be grossed up by such amount as will ensure that after payment of the Tax so charged, or which would have been so charged if any relief available to the Buyer were ignored, there shall remain a sum equal to the amount that would otherwise be payable under this Agreement.

9    **Post - Closing Confidentiality Duty**

9.1    For the purpose of this Agreement, confidential or proprietary information ("**Proprietary Information**") shall mean the information created, transferred, recorded or employed as part of, or otherwise resulting from the activities undertaken pursuant to this Agreement or the Schedules hereto which constitutes the confidential, proprietary or trade secret information of the disclosing Party. Proprietary Information of Kotva shall also include Proprietary Information of SPV KN and/or the Seller. Such information may be of, but not limited to, a business, organisational, technical or financial nature. The Parties understand and agree that all Proprietary Information of a disclosing Party shall be treated as confidential by the receiving Party. Each receiving Party shall use the same degree of care as it uses with regard to its own Proprietary Information to prevent disclosure, use or publication of the disclosing Party's Proprietary Information.

9.2    Proprietary Information of the disclosing Party shall be held by the receiving Party as described in Clause 9.1 unless it is or has been:

(i)    obtained legally and freely from a third Person without restriction;

(ii)    independently developed by the receiving Party at a prior time or in a separate and distinct manner without benefit of any of the Proprietary Information of the disclosing Party and documented to be as such;

---

KC 1-2670

KC1-2670

(iii)   made available by the disclosing Party for general release;

(iv)   made public as required by Law, applicable regulations or Order or stock exchange requirements; and

(v)    within the public domain or later becomes part of the public domain as a result of acts by someone other than the receiving Party and through no fault or wrongful act of the receiving Party.

9.3    A receiving Party may disclose Proprietary Information of a disclosing Party to directors, officers, and employees of the receiving Party or agents of the receiving Party including their respective brokers, lenders, insurance carriers or prospective purchasers who have specifically agreed in writing to nondisclosure of the terms and conditions hereof. Any disclosure hereof required by legal process pursuant to Clause 9.2(v) shall only be made after providing the disclosing Party with notice thereof in order to permit the disclosing Party to seek an appropriate protective order or exemption.

9.4    The provision of this Clause 9 shall be effective for a period of two years following the Closing Date.

9.5    If a court of competent jurisdiction determines that the length of time or any other restriction or portion thereof set forth in this Clause 9 is unduly restrictive and thereby unenforceable, such restriction shall be interpreted and applied to include as much of the restriction as will render the covenants in this Clause 9 valid and enforceable to the fullest extent permitted by applicable Law, and as so interpreted and applied such covenants shall remain in full force and effect. The Parties further agree that if a court of competent jurisdiction determines that any provision of this Clause 9 is invalid or against public policy, the remaining provisions of this Clause 9 shall not be affected thereby, and shall remain in full force and effect.

## 10    Termination

10.1   Markland and/or the Buyer shall be entitled to withdraw by written notice to Kotva or to the Seller from this Agreement only if: (i) there is a breach of the Kotva's or Seller's representations, warranties, obligations or undertakings in accordance with Clause 6 and the protection time limit in accordance with Clause 8.5 of this Agreement expires, or in other cases of a breach of the Kotva's or Seller's representations, warranties or obligations where this Agreement entitles Markland or the Buyer to withdraw from the contract; (ii) if either SPV Conclusion has not taken place by 31 January 2005, save in the event of Force Majeure, including inactivity of a relevant Governmental Body or through the fault of a third party that is not either directly or indirectly controlled by the Seller; or (iii) if Closing has not occurred by 31 March 2005 provided that no breach of this Agreement by the Buyer or Markland will have occurred by then.

10.2   If Markland and/or the Buyer withdraw from this Agreement pursuant to Clause 10.1 the Buyer shall be entitled (in addition to and without prejudice to all other rights or remedies available to it including the right to claim damages) to:

10.2.1   the return of the Deposit and, if appropriate the Purchase Price in accordance with the terms of the Escrow Agreement; and

---

A04677559/1.4/22 Dec 2004

KC 1-2671

KC1-2671

10.2.2    a contractual penalty amounting to CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns) to be satisfied firstly from the Security and then from other funds of the Seller as necessary.

10.3    Failure to exercise this right in accordance with Clause 10.2 shall not constitute a waiver of any other right of Markland and/or the Buyer arising out of any breach of the obligations and undertakings of Kotva and/or the Seller.

10.4    Kotva and/or the Seller are entitled to withdraw from this Agreement by serving written notice on Markland and the Buyer if it shall be found that any of the representations and warranties of Markland and/or the Buyer in accordance with Clause 7 was untrue at the date of execution of this Agreement or by the Closing Date, and the protection time limit according to Clause 8.5 of this Agreement expires or in other cases of breach of Markland's or Buyer's obligations where the Seller is entitled to withdraw from this Agreement.

10.5    In the event of failure by Kotva and/or the Seller to satisfy the SPV Conclusion by 31 January 2005, Markland and/or the Buyer may withdraw from this Agreement by serving five Business Days notice on the Seller and Kotva and the Buyer shall be entitled to a contractual penalty of CZK 15,750,000 (fifteen million seven hundred and fifty thousand Czech Crowns), to be satisfied firstly from the Security and then from other funds of Kotva and/or of the Seller as necessary.

10.6    If Kotva and/or the Seller withdraws from this Agreement pursuant to Clause 10.4 the Seller will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty in accordance with the relevant term of this Agreement of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) in case this Agreement does not set other contractual penalty to be satisfied firstly from the Deposit and then from other funds of Markland as necessary.

10.7    Failure to exercise this right in accordance with Clause 10.6 shall not constitute a waiver of any other right of Kotva and/or the Seller arising out of any breach of the obligations and undertakings of Kotva and/or the Buyer, however, settling the agreed contractual penalty causes the right to Share Purchase Price adjustment and possible other right to indemnification or damages against Markland and/or the Buyer to cease.

10.8    If Closing does not occur within the time limits envisaged in this Agreement (other than due to the fault of the Buyer or Markland), then the Buyer will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) to be satisfied firstly from the Security and then from other funds of Kotva, SPV KN and/or the Seller as necessary.

10.9    If Closing does not occur within the time limits envisaged in this Agreement (other than due to the fault of the Seller or Kotva), then the Seller will be entitled (in addition to and without prejudice to all other right or remedies available to it including the right to claim damages) to a contractual penalty of CZK 157,500,000 (one hundred and fifty seven million five hundred thousand Czech Crowns) to be satisfied firstly from the Deposit and then from other funds of Markland as necessary.

---

KC1-2672

**10.10** The Parties are not entitled to the contractual penalties as above, if the other party does not comply with this Agreement due to the event of Force Majeure, including inactivity of a relevant Governmental Body or through the fault of a third party that is not either directly or indirectly controlled by Kotva, the Seller or the Buyer.

**10.11** In the event (i) that the breach of obligations of the Seller or of Kotva does not cause an Adverse Consequence or (ii) if the Seller or Kotva fully indemnifies the Buyer or Markland during the protection time limit stated in Clause 8.5, then Markland and/or the Buyer shall not be entitled to withdraw from this Agreement or claim a contractual penalty.

## 11    General Provisions

### 11.1    Expenses

Except as otherwise expressly provided in this Agreement, each Party will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of its Representatives.

### 11.2    Public Announcements

Any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued at such time and in such manner as the Parties mutually determine. None of the Parties will make any disclosure of the Purchase Price or other terms of the Contemplated Transactions to any Person, except with the prior written consent of the other Parties or as required by Legal Requirements or by law. The Parties will consult with each other concerning the means by which the Kotva's employees, customers and others having dealings with Kotva or the Seller will be informed of the Contemplated Transactions, and the Parties will have the right to be present for any such communication, if possible.

### 11.3    Notices

All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed given to a Party when: (a) delivered to the appropriate address by hand or by nationally recognised overnight courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment (subsequently delivered in written form within five days); or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested; in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number, e-mail address or individual as a Party may designate by notice to the other Parties):

**Kotva, KAS, KO and the Seller:**

Kotva NEMOVITOSTI, k.s.
Address:      Příkop 4, Brno, Post Code 602 00
Fax:          +420 224 801 230
Tel:          +420 224 801 401
Attention:    Martin Benda

copy to

KC1-2673

Toman, Deváty and Partneři
Address:    Trojanova 12, 120 00 Prague 2
Fax:    +420 224 920 468
Tel:    +420 224 918 490
Attention:    Petr Toman

and

**Markland and the Buyer:**

Markland Holdings Limited
Address:    19 Upper Fitzwilliam Street, Dublin 2, Republic of Ireland
Fax:    00353 167 620 00
Tel:    00353 167 620 23
Attention:    Henry Prestage/Frank Walker/Aidan Scully

copy to

Linklaters v.o.s.
Address:    Palác Myslbek, Na Příkopě 19, 117 19 Praha
Fax:    +420 221 622 199
Tel:    +420 221 622 111
Attention:    Bryan Wilson

**11.4    Further Assurances**

The Parties agree:

11.4.1    to furnish, upon request, each other with such further information as requested;

11.4.2    to execute and deliver to each other such other documents; and

11.4.3    to do all such other acts, as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Contemplated Transactions.

**11.5    Incorporation of Schedules**

The Schedules identified in this Agreement are incorporated herein by reference and made a part of this Agreement.

**11.6    Entire Agreement and Modification**

This Agreement supersedes all prior agreements among the Parties with respect to its subject matter and constitutes (along with the documents delivered pursuant to this Agreement) a complete and exclusive statement of the terms of the agreement between the Parties regarding its subject matter. In the case of any inconsistency between the terms of this Agreement and the terms of the Transfer Deed or the KOTVA Trademarks transfer agreement, the terms of this Agreement shall prevail. This Agreement may not be amended, supplemented or otherwise modified except by a written agreement executed by all the Parties.

**11.7    Acknowledgement**

Markland and the Buyer acknowledge that they have not been induced to enter into this Agreement by any representation, warranty or undertaking not expressly

---

A04677559/1.4/22 Dec 2004

33

KC 1-2674

KC1-2674

incorporated into it. Parties to this Agreement confirm that they have received independent legal advice relating to all the matters provided for in this Agreement, including the provisions of this Clause 11.7, and agrees, having considered the terms of this Clause 11.7 and the Agreement as a whole, that the provisions of this Clause 11.7 are fair and reasonable.

**11.8**    Time of the Essence

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**11.9**    Severability

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable. However, the transfer of the Shares and the transfer of KOTVA Trademarks are mutually dependant transactions pursuant to Section 275 (2) of the Commercial Code.

**11.10**    Assignments, Successors, and No Third Party Rights

No Party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Parties, such consent not to be unreasonably withheld, except that Markland may assign without the other Parties' consent any of its rights and delegate any of its obligations under this Agreement to any Related Person or any subsidiary of Markland or to any subsequent acquirer of the Shares or of all or substantially all of the business of the Buyer or any Related Person. This Agreement will apply to, be binding in all respects upon, and inure to the benefit of each of the Kotva's and/ or Seller's successors and permitted assigns and Markland's and/or the Buyer's successors and permitted assigns (whether by merger, consolidation, purchase of all or substantially all of its assets or otherwise). The Buyer will indemnify and hold harmless the Seller and KAS, and will pay to the Seller's Indemnities the monetary value of any Adverse Consequence arising, directly or indirectly, from or in connection with any breach of such a Buyer's successor. Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the Parties, any right, remedy, or claim under or with respect to this Agreement or any its provision except the rights as shall inure to a successor or assignee pursuant to this Clause 11.10.

**11.11**    Waiver

The rights and remedies of the Parties are cumulative and not alternative. Neither any failure nor any delay by any Party in exercising of any right, power, or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable Law, (a) no claim or right arising out of this Agreement or any of the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Party, and (b) no waiver that

KC I-2675

KC1-2675

may be given by a Party will be applicable except in the specific instance for which it is given.

**11.12  Arbitration**

This provision shall apply to all and any dispute or difference that may arise in connection with or the interpretation, performance or termination of this Agreement between the Parties, as well as the validity or settlement of this Agreement and of the relationship established by this Agreement (the "Dispute"). The Parties shall make every effort to resolve any Dispute out of court, if possible. If they are unable to reach an out-of-court settlement, any of the Parties shall have the right to file a petition for the Dispute to be resolved before the Court of Arbitration attached to the Economic Chamber of the Czech Republic and the Agrarian Chamber of the Czech Republic in accordance with Acts nos. 216/1994 Coll., as amended, and 223/1994 Coll., as amended, under said Court's Rules of Arbitration, by three arbitrators. The language of the proceedings shall be Czech and the venue of the proceedings shall be Prague. The chairman of the arbitration tribunal shall be authorised to decide on procedural issues at his own discretion. If the disputing Parties reach conciliation before the above Court as part of the arbitration proceedings, no justification needs to be attached to the arbitral award that will endorse the conciliation between the disputing Parties. The Party that is defeated in such a Dispute shall reimburse the other Party for all of its legal expenses in addition to the costs of the arbitration proceedings adjudicated to it by the arbitration tribunal. In proceedings before the above Court of Arbitration, the Parties shall take an active attitude and shall be helpful to the Court in the resolution of the Dispute, especially as regards giving explanations, furnishing evidence and documents, etc., and shall acknowledge its arbitral award without any reservations, and shall carry out the arbitral award voluntarily. If a Party refuses to carry out the arbitral award referred to in the preceding sentence, the other Party has the right to file a petition for the execution of the decision with the court of law having jurisdiction over the place and merit of the dispute.

**11.13  Governing Law**

This Agreement will be governed by and construed under the laws of the Czech Republic without regard to its conflicts of law principles, in particular the Czech Commercial Code.

**11.14  Counterparts**

This Agreement will be executed in four counterparts, each of which will be deemed to be an original copy of this Agreement and which, when taken together, will be deemed to constitute one and the same document. The Agreement is executed in the English (2 counterparts) and Czech (two counterparts) languages, and the Czech language version shall prevail.

The Parties have executed this Agreement as of the date indicated in the first sentence of this Agreement.

By:

Seller:

A04677559/1.4/22 Dec 2004

35

KC 1-2676

KC1-2676

**SPV CO Limited**

**Name:**

**Title:**


By:

**KOTVA NEMOVITOSTI k. s.**


**Name:**

**Title:**


By:

**KOTVA a.s.**

**Name:**

**Title:**


By:

**KOTVA OBCHODNÍ, a.s.**


**Name:**

**Title:**


By:

KC1-2677

Buyer:

CRQ Czech a.s.

Name:

Title:

By:

Markland Holdings Limited

Name:

Title:

KC1-2678

**Schedule 1**
**Extracts from Commercial Register**

KC I-2679

KC1-2679

**Schedule 2**
**Extract from Companies House**

KC 1-2680

KC1-2680

**Schedule 3**
**INTENTIONALLY DELETED**

KC1-2681

**Schedule 4**
**Extract from Real Estate Register**

KC1-2682

**Schedule 5**
**KO Lease**

KC1-2683

**Schedule 6**
**Rent Roll**

KC 1-2684

KC1-2684

**Schedule 7**
**INTENTIONALLY DELETED**

KC 1-2685

**Schedule 8**
**INTENTIONALLY DELETED**

45

KC 1-2686

KC1-2686

**Schedule 9**

**Gilroy Claim**

KC I-2687

KC1-2687

**Schedule 10**

**Expert Opinion**

KC !-2688

KC1-2688

**Schedule 11**

**List of Fixtures & Fittings**

KC 1-2689

KC1-2689