UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s. and SPV Co, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| ANDREW WEISS and WEISS ASSET ) | |
| MANAGEMENT, LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | C.A. No. 05-10679-WGY |
| ) | |
| ANDREW WEISS and WEISS ASSET ) | |
| MANAGEMENT LLC, ) | |
| ) | |
| Counterclaim-plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| KOTVA a.s., RICHARD HARAZIM and ) | |
| SPV Co, ) | |
| ) | |
| Counterclaim-defendants. ) | |
| ) | |

## DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE TAPE RECORDINGS

In late March 2007, just before the Pretrial Conference held by this Court, the Czech police released a number of audio tapes of conversations recorded by the police. Some of the tapes came from a wiretap placed on the telephone of Vladimir Hoffman, the Weiss parties' broker. Other tapes stemmed from the wearing of a wire by Martin Benda to record his in-person settlement negotiation with Mr. Hoffman and with Ondrej Peterka, the Weiss party's lawyer at Dr. Peterka's office in Prague. The tapes of that conversation and several others are in Czech language. The tapes were supposedly made in the fall of 2004 after Kotva had gone to the police claiming extortion but before any charges were made. None of the tapes have been

authenticated, nor has there been any proof of chain of custody. The notion that any of the conversations were in furtherance of a conspiracy strains credibility. For one thing, the plaintiffs allege that the alleged threats made in May and the filing of the Gilroy suit in June were the crimes. In August, the plaintiffs made their complaint. The tapes did not begin until September. Plaintiffs have admitted that nothing they said on the tapes was for real—it was all for the purpose of trying to get evidence to prove the accused's intent.

Defendants Andrew Weiss and Weiss Asset Management, LLC, hereby move *in limine* that the Court exclude their tapes from evidence. As of now, the plaintiffs have not indicated which tapes they intend to use at trial, the manner by which they intend to meet the requirements of Rule 901 of the Federal Rules of Evidence, why they believe the tapes to be anything but hearsay, why  they believe that those tapes which concern settlement are not barred by Rule 408, why they believe that the relative lack of probity of the conversations outweighs the huge prejudice involved in playing the tapes, and how they plan to get around those portions in which it seems patently clear that the tapes have been tampered with. The tapes are the subject of a meritorious motion for "Police Provocation" now pending in the Czech Republic. Exhibit 1. While it is understood that exclusion in a criminal case does not *de facto* require exclusion in a civil case,  the choice of law issue—that is the choice to override Czech public policy of exclusion in favor of use of the tapes in an American civil proceeding where the proponent has cooperated with indeed promoted the taping for its own purposes, has not been squarely presented to an American court previously to defendants' knowledge. The relief requested, given the state of the record, is that the Court hear the tapes and rule on their admissibility before trial, if possible, and at least before they are played, and, further, that both parties be precluded from mentioning the tapes before a ruling is made. *U.S. v. Camuti,* 78 F.3d. 738 (1st Cir. 1996).

The deposition of Howard Golden is the only example available presently upon which to present the facts to consider the instant motion. In Mr. Golden's deposition, the plaintiffs played portions of tapes purportedly made on conversations in English between Mr. Golden and Mr. Hoffman. While Mr. Golden was able to recognize his and Mr. Hoffman's voice on some of the conversations, he was unable to authenticate the tapes, indicate whether they fairly represented the conversations, or indicate anything other than shock that any recordings had been made without his knowledge or consent. It cannot be said that these conversations were in furtherance of any conspiracy. Mr. Golden is Mr. Weiss's former brother-in-law and associate. He has been estranged from Mr. Weiss and his firm since 2002—he is neither a friend nor anyone who could have helped Mr. Hoffman overcome his frustrations about his inability to bring Professor Weiss to the bargaining table, which is what most of the conversations (to the extent they were faithfully recorded and kept) seem to have been about. Indeed, there are only two portions of the tapes played at Mr. Golden's deposition could conceivably help the plaintiffs: in the first, Mr. Golden says that he thinks Andrew Weiss is crazy and does things for reasons no one can understand. This is in answer to Mr. Hoffman's complaint that Mr. Weiss will not respond to Mr. Hoffman's entreaties that he come up with a counter offer to sell CVF's shares in Kotva. Mr. Golden says in essence, after defaming his former brother-in-law in like manner for several minutes, *He's crazy. What can I tell you?* Exhibit 2.  In the second portion a voice appears over Mr. Golden's voice as he is speaking in English and claims to blurt out that he is afraid that the Irish property owner's representative, who was to attend the October 18 meeting at which Mr. Benda wore a wire, would misunderstand the counter offers as "vydirani". Mr. Golden pointed out in his deposition that the entire conversation occurred in English, because his Czech was not too good and Mr. Hoffman spoke good English, and that he (Golden) did not know the word.  He

also testified that he did not hear Mr. Hoffman use the word, and he doubted Mr. Hoffman had. The tape itself sounds like  this line was superimposed  According to the Czech interpreter at the deposition, the word means *Blackmail.* The kind of pall the phrase monetarily over all of the Czech people in attendance at the deposition is apparently the effect the plaintiffs seek by playing the tape—and translating "vydirani" to the jury. Exhibit 3.

It is worth noting that the Civil RICO claim has been dismissed. At the very least, plaintiffs should be barred from making reference to these taped conversations in their opening. Broad exclusion is warranted for the following reasons:

1) <u>The Tapes Cannot Pass Muster Under Rule 901.</u>

Rule 901 of the Federal Rules of Evidence requires the plaintiffs to authenticate the tapes and prove chain of custody. In the absence of evidence from the Czech police about how the tapes were made (not just recorded, but the tapes made), how they were protected from tampering, whether they are complete (not that they are whole recordings, but that the portions presented do not have deletions or instances where, for instance, Mr. Benda turned off the wire and then turned it back on, that the chain of custody of the tapes is sufficient. The tapes Mr. Harazim made of certain portions of the police tapes are what the plaintiffs played to Mr. Golden. How do we know whether the plaintiffs faithfully recorded what is on those tapes, that they did not cut and paste and superimpose voices on the tapes? Plaintiffs only response to date has been that  1) the defendants should be required to obtain tapes from the police themselves and turn them over and 2) Mr. Golden recognized his voice and Mr. Hoffman's voice on some of the tapes. This does not begin to satisfy Rule 901. It is likely that the Czech police have failed to respond to the parties' joint request for depositions and to this Court's order for Letters Rogatory issues in July because the police know that the tapes do not pass scrutiny.

2) <u>The Tapes Violate Rule 408.</u>

All of the tapes, including especially those from the wire worn into Ondrej Peterka's office, concerned the settlement of the pending Czech civil lawsuits through the purchase of CVF's Kotva and Trend shares. The plaintiffs see these negotiations—which they instituted on their own—to be part of an extortion scheme or the "legitimate" gathering of evidence to prove one existed, which is bizarre and foolish. But, in seeking to admit the tapes, they are missing the important international implications of what they seek. If businessmen around the globe can tape settlement negotiations with other businessmen and lawyers and then use those negotiations in American courts, there are going to be few settlement conferences. This case is a sterling example of the problem. Not only has the Weiss's civil Czech lawyer refused to participate in settlement conferences—quite legitimately, given what the plaintiffs (and their lawyers) have put him through--  the Weiss parties have seen their first efforts to begin discussions, through the good offices of Madeline Albright's representatives in the Czech Republic reported by Martin Benda to the police in 2006 as a continued extortion threat. The plaintiffs made a veiled reference to defense counsel's effort last month to settle the matter through intervention of the Irish purchaser of Kotva's real estate at page 3 of the joint pre-trial memorandum as a continued interference with Kotva's advantageous relations. Nothing could be further from the truth. The only contacts with the Irish purchaser have been McDermott, Will's letter to the them in April 2005, after the closing, and defense counsel's casual conversation over a  pint of Guinness in Dublin last month. Kotva's point is simple: unless you do it our way and agree to our terms, we report you. Using the patina of police protection, they seek to disclose and use settlement negotiations at the trial; of this case. This Court should not accept the defense counsel's failure to

state that plaintiffs' representation of the status of settlement negotiations last Thursday was incorrect was anything but fear of reprisal form Kotva.

Rule 408 would not allow this kind of playing around in settlement negotiations. It would also not countenance the playing of tapes. It provides, in pertinent part, that no evidence is admissible to prove liability or invalidity of a claim or defense which involves offers to settle, the conduct or statements made during compromise negotiations, and acts undertaken in efforts to compromise parties' positions relative to pending lawsuits. There are no exceptions to 408 which apply, except if the Court wishes to limit 408 to American cases and not to those pending overseas, which it would be disastrous to do.

In *US v. Janis*, 428 US 433 (1976), the Supreme Court held that a determination of whether the exclusionary rule should apply in a civil case involves weighing the deterrent effect of application of the rule against the societal costs of exclusion. That was in the context of searches and seizures under the Fourth Amendment. The First Circuit has observed that tapes should be excluded where carved out two exceptions to this general rule: (1) where foreign police conduct shocks the judicial conscience, and (2) where American agents participated in the wrongful conduct. *United States v. Mitro*, 880 F.2d 1480, 1482 (1st Cir. 1989).

Here, the situation is different and far more compelling than *Mitro*. In this case, the party who instigated the police procedures in order to try to lure the defendants into making offers to settle under claims of extortion seeks to use the tapes of the settlement negotiations and steps taken (such as to set up meetings) to further their civil case that the Weiss parties were involved in abusive conduct. It should shock the judicial conscience, the defendants respectfully submit.

The Weiss Parties have brought the equivalent of a motion to suppression in the Czech Republic. Under Czech law, the request for suspension must first be filed with the prosecution.

If the prosecutor does not agree to suppression, the request then is addressed to the court.  A copy of the request, translated into English, is Exhibit 1 hereto.

Moreover, there are particular facts surrounding the manner in which electronic inventory was done in this case that further warrants suppression.  The Plaintiffs and the Czech Police obviously were aware that there was little likelihood that Andrew Weiss would voluntarily submit to the authority of a legal system in which individual rights are so significantly restricted as compared to American criminal jurisprudence.  The Czech Police assisted the Plaintiffs in obtaining evidence that they knew the plaintiffs would seek to use in the United States.

That the Czech police have been leery of being dragged into the plaintiffs' trap, their faked negotiations, speaks volumes. This Court should not admit any tapes which concern settlement of the Czech litigation as part of a purchase of CVF's stock interests at all.

3) <u>The Recordings Include Attorney-Client Privileged Communications</u>

Among the taped phone calls were conversations between Vladimir Hoffman and Howard Golden referred to above  Mr. Golden is an attorney, and he testified that the conversations tape include legal advice he was providing to Mr. Hoffman.  *See* Deposition of Howard Golden, pp. 153-54, provided at Attachment 4 hereto.

4) <u>The Tapes Should Be Excluded Pursuant to Rule 403.</u>

The tapes include language that would be unfairly prejudicial and would have little or no probative value.  The goal of the Plaintiffs is to introduce words like "blackmail" or "extortion" without regard to their use, context or lack of relevance.

For example, the phone call between Mr. Hoffman and Mr. Golden, Mr. Hoffman purportedly asks Mr. Golden if he has any thoughts about how to approach Henry Prestage—the Irish purchaser's representative-- and explain to him how this is not "vydirani". Mr. Golden

testified that he never heard Mr. Hoffman use the word and that he did not know what the word meant.  There was no subsequent conversation following up on the question posed by Mr. Hoffman.  So, at most, this statement suggests that Mr. Hoffman was concerned that Mr. Prestage could interpret the conduct of Mr. Weiss as being akin to blackmail and that he wanted suggestions from Mr. Golden, a lawyer, as to how he should explain that it was not. Mr. Goilden did not respond, making it likely he was telling the truth at his deposition that he never heard the word and doubted it had been uttered.   It is confusing and tangential to any issue in this case. Whether or not Mr. Prestage thought that the actions of the Weiss parties seemed like blackmail is not relevant.  Whether Mr. Hoffman was concerned that Mr. Prestage might have such thoughts also is not relevant.  The significance of the remark is that Mr. Hoffman was concerned about how the actions of Weiss could be perceived.  Against this the Court must weigh the unfair prejudice that would not stem simply from the jury hearing the word "blackmail."

Similarly, Mr. Golden's off-handed statements that Mr. Weiss is crazy have no place in this trial. There is no insanity defense. It is doubtful that Mr. Weiss, whose funds have recorded profits exceeding 20% for the last 17 consecutive quarters is ready for McLean's. at any rate, such suggestions from his estranged brother-in-law have no place in this trial.

The mention of these items in an opening will severely prejudice the trial. Admission of such evidence should not be allowed. F.R.Evid 403. The Court should not permit it.

8

## CONCLUSION

For the foregoing reasons, the Court should exclude all tape recordings from evidence.


Respectfully submitted,

ANDREW WEISS and WEISS ASSET
MANAGEMENT, LLC
By their counsel,

Dated:October 15, 2007        ___/s/ Edward T.Dangel III_____
Edward T. Dangel III, (BBO#113580)
Dangel & Mattchen, LLP
10 Derne St.
Boston, MA 02114
(617) 557-4800


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on Septemeber 15, 2007.

___/s/ Edward T.Dangel III_____
Edward T. Dangel, III


BST99 1547757-7.072198.0012

9

[Translation from Czech]

**Municipal Prosecution Office in Prague**
Náměstí 14. října 2188/9
<u>150 00  Prague 5</u>

**Attention to: JUDr. Dagmar Máchová, Prosecutor**

ČTS: PSP-4035/OHK-3-2004

In Prague on 30 July 2007

Accused:           **1. Ing. Vladimír Hoffmann**, born on 30 October 1965,
                        residing at Medinská 825, Klánovice, Prague 9, 190 14

                **2. Edita Šimková**, born on 27 July 1968,
                        residing at Na Folimance 2153/19, Vinohrady, Prague 2, 120 00

                **3. Prof. Andrew Weiss**, born on 2 January 1947,
                        residing at 46 Abbottsford Road, 2 Brookline, Massachusetts, 2446 USA

                **Represented by the defence counsel JUDr. Petr Topinka**, attorney-at-law
                        Registered office Národní 11, 110 00 Prague 1

Re:           Criminal prosecution of the accused Prof. Andrew Weiss et al. for extortion
            pursuant to Section 235(1) and (3) of the Criminal Code as accomplices
            pursuant to Section 9(2) of the Criminal Code

**Application for review of the procedure used by the police authority of the Police of the
Czech Republic, Administration of the Capital City of Prague, Criminal Police and
Investigation Service of the Economic Crime Section, Kongresová 2, 140 21 Prague 4**

I, as the defence counsel of the accused Prof. Andrew Weiss in the above matter, present
hereby, pursuant to Section 157a of the Criminal Procedure Code, the following

**application for review of the procedure used by the above police authority**

The power of attorney is attached to the file

**I.**

On 3 February 2005, the police commissioner of the Police of the Czech Republic, Administration of the Capital City of Prague, Criminal Police and Investigation Service of the Economic Crime Section, decided on the initiation of criminal prosecution of the accused Prof. Andrew Weiss et al. (hereinafter also the "accused") based on suspicion of extortion pursuant to Section 235(1) and (3) of the Criminal Code as an accomplice pursuant to Section 9(2) of the Criminal Code.

The act which was allegedly committed by the accused under the decision on the initiation of criminal proceedings is described as follows: "that, on 12 May 2004 at 2 pm, in the French restaurant in the Municipal House in Prague 1, Náměstí Republiky 1090/5, the accused Andrew Weiss and the accused Ing. Vladimír Hoffmann demanded from the management of Kotva a.s., Identification No.: 60193808, registered office Prague 1, Náměstí Republiky 8, represented by the general manager of Kotva a.s., Richard Harazim, born 10 March 1965, permanent residence Přezletice, U bažantnice 305, Prague-East District, and by Martin Benda, chairman of the supervisory board of Kotva a.s., born 8 September 1971, permanent residence Borač 46, Žďár nad Sázavou District, the purchase of 11.9% of shares of the registered capital of Kotva a.s., i.e. 82,782.00 shares, held by Brookdale Global Opportunity Fund, P. O. BOX 1748, GT 27 Hospital Road, George Town, Grand Cayman, Cayman Islands, where these shares are managed by the accused Weiss Andrew through his company Weiss Asset Management, 29 Commonwealth Avenue, Boston, Massachusetts 02116, for US$ 4,000,000.00, threatening that if these shares are not purchased the accused Weiss will arrange for attaching a seal to the real estate of Kotva Department Store, located at the address Náměstí Republiky 8, Prague 1, at the real estate cadastre by filing fabricated self-serving lawsuits against Kotva a.s. with a court, thus hindering substantially the negotiations of the Kotva Holding with potential strategic partners and financial institutions concerning the operation and sale of Kotva Department Store and restricting the disposal of these assets for several years, because he knew that Kotva a.s. had concluded a contract for the sale of the said Kotva Department Store which it could not rescind, and that it was in a time and financial pressure and that if Kotva a.s. did not immediately purchase his shares, the next offer would be substantially higher, and if Kotva a.s. refused to purchase these shares from him, he would, on top of that, file criminal charges against the board of directors of Kotva a.s." According to the decision on initiation of criminal proceedings: "the accused persons extorted both the said company Kotva a.s. and the Kotva a.s. board of directors itself by causing large-scale damage, threat of violence or other serious distress by forcing Kotva a.s. and its board of directors to do, to desist from or to tolerate something, despite the fact that the said representatives of Kotva refused to perform the said purchase of shares referring to the fact that the asked price for the shares of the company Kotva was excessively high and, moreover, Kotva was not allowed to buy its own shares". Thereafter, according to the description of the facts of the case cited in the decision on initiation of criminal proceedings, the accused Weiss and Hoffmann, wishing allegedly to frustrate the sale of the real property of Kotva a.s., informed the strategic partner of Kotva a.s. and financial institutions about lawsuits filed against Kotva a.s., whereby they allegedly complicated the business activities of Kotva a.s. Subsequently, the accused indeed filed several lawsuits against Kotva a.s., as further described in the decision on initiation of criminal proceedings.

The accused Prof. Weiss entirely denies these accusations raised in the decision on the initiation of criminal proceedings of 3 February 2005; the description of the facts of the case in the said decision, which is clearly based on the notification of crime filed by Kotva a.s., is

false and misleading in many aspects and the application of the said provisions of the Criminal Code to the conduct of all of the accused persons is misplaced and incorrect. The accused Prof. Weiss has highlighted those false allegations and incorrect application of the Criminal Code many times both in his previous written motions filed with the competent law enforcement authorities and in his testimony of 9 March 2007, and he has specified in great detail what, in his opinion, the incorrect description of the facts of the case and the incorrect application of the law consists in. Therefore, the accused Prof. Weiss only generally states again herein his fundamental disagreement with the accusations raised against him, referring, as regards details, to his previous written motions and his oral testimony in the respective criminal case.

During the investigation, the accused exercised, in accordance with Sections 33 and 65 of the Criminal Procedure Code, his right to inspect the criminal file maintained in the above case and to familiarize himself with its contents. On this occasion, he found out that the evidence which is to document his alleged guilt includes records of tapping of his phone calls and personal meetings (hereinafter the "records"). These materials contain records of calls of more than one person, but always include persons close to the accused, particularly the accused Ing. Vladimír Hoffmann.

## II.

**The accused disagrees with the inclusion of the above evidence in the criminal file** due to the method by which these records were made. It is evident that the law enforcement authorities obtained these records through one of the accused's business partners, Mr. Martin Benda, who acted under an agreement with the Police of the Czech Republic. Mr. Martin Benda made repeated contacts with the accused Ing. Hoffmann and knew that all his phone contacts and personal meetings with the accused Ing. Hoffmann were monitored and recorded. At the same time, he tried (at least with the knowledge of the police authority) to induce the accused Ing. Hoffmann to make statements incriminating himself and the accused Prof. Weiss.

The above records and the circumstances of the case clearly indicate that:

1. during the investigation of the offence committed allegedly by the accused, **the law enforcement authorities used all operative search means** pursuant to Section 158b et seq. of the Criminal Procedure Code (particularly Mr. Benda as an "agent" pursuant to Section 158e of the Criminal Procedure Code), although the **legal conditions** for such procedure stipulated in the Criminal Procedure Code **were not met.**

Pursuant to Section 158b(1) of the Criminal Procedure Code, unless the law stipulates otherwise, the police authority is entitled to use operative search means in the course of proceedings concerning an intentional criminal offence; the operative search means shall consist in: a) fictitious transfer, b) monitoring of persons and items, c) use of an agent. Pursuant to paragraph 2 of this Section, the application of the operative search means may not follow any interest other than collecting facts necessary for the criminal proceedings. Those means may be applied only if the intended purpose cannot be attained otherwise or if its attainment would otherwise be substantially impeded. Rights and freedoms of persons may be restricted only to the necessary extent.

As follows from the cited provisions of the Criminal Procedure Code, the police authority is entitled to apply operative search means under the stipulated conditions, but strictly in order to collect facts important for the conducted criminal proceedings and only if the intended

3

purpose cannot be attained otherwise or if its attainment would otherwise be substantially impeded.

With regard to Mr. Benda's active participation it is clear that the **purpose of this procedure was not finding facts relevant to the criminal proceedings pursuant to Section 158b(2) of the Criminal Procedure Code**, but actually an effort to create an interpretation of facts which had already occurred to fit the purposes of the criminal proceedings. This fact was confirmed by Martin Benda himself in his explanation presented on 15 September 2004, where he stated that the business negotiations with the accused Ing. Hoffmann were not conducted to conclude a trade but **with the aim of attaining evidence against the accused** Prof. Weiss and Ing. Hoffmann. This fundamental fact was further confirmed by Richard Harazím, the second person attending, together with M. Benda, some of the monitored meetings and actively dealing with the accused Ing. Hoffmann, in his testimony of 23 February 2006 in the proceedings conducted in the United States of America between Kotva a.s. and persons related to this company on one side and the accused Prof. Weiss and persons related to him on the other side. R. Harazím expressly says that the offer he had made on behalf of Kotva a.s. to the accused in the respective case, or rather to the companies represented by the accused, had not been really a genuine, seriously-meant offer made in the course of business negotiations, but a way of obtaining evidence confirming that the accused Prof. Weiss is behind Gilroy's lawsuits.[1]

In the light of these circumstances it is therefore justified to believe that the purpose of conducting the monitored "business" negotiations between M. Benda and R. Harazím on the one side and the accused Ing. Hoffmann on the other side was not an impartial, objective finding of facts constituting the facts of the case which had already occurred and which the police authority suspected to constitute the grounds of an intentional criminal offence, as envisaged by the Criminal Procedure Code. Under the given circumstances, the tapping of these telephone conversations and meetings, actively controlled and managed especially by M. Benda, raises , an impression that it was actually led by the effort to influence the interpretation of the business meetings which had already taken place and at the same time to manipulate the conduct of the accused Ing. Hoffmann so as to make it correspond to the allegations contained in the notification of crime filed by Kotva a.s. and to make it possible to accuse Ing. Hoffmann and Prof. Weiss of a criminal activity, as described in detail below.

This is evident from the fact that the purpose specified in Section 158b of the Criminal Procedure Code could simply have been achieved otherwise and without any serious difficulties through testimonies of witnesses and of the accused, by documentary evidence seized during house searches, etc.

2. Mr. Benda himself contacted the accused Ing. Hoffman a number of times on his own or probably at the initiative of the law enforcement agencies, while Ing. Hoffman was rather passive at the negotiations – it was Mr. Benda who proposed meetings, which means that the contacts were not initiated by the accused Ing. Hoffmann, let alone the accused Prof. Weiss (see e.g. the thirteen telephone contacts of the accused Ing. Hoffmann by Mr. Benda, Benda's proposal for joint lunch with the accused Ing. Hoffmann on 14 December 2004, etc.). It is evident that it was **Mr. Benda who played an active role in the negotiations with the accused Ing. Hoffmann**; Mr. Benda presented various further steps in the negotiations in order to acquire recordings of telephone calls and meetings.

---

[1] See the deposition testimony of Richard Harazím of 23 February 2007 in the proceedings file no. 05-10679RCL conducted at the US District Court for the District of Massachusetts, page 26 of the original transcript of the deposition testimony.

4

3. In order to obtain the required information, Mr. Benda did not hesitate to modify data, changed repeatedly his allegations, stated facts in conflict with reality (see the misinterpretation of facts as to which one of the business partners presented a specific offer during negotiations etc.), sought to obtain from the accused Ing. Hoffmann information and non-existent documents which were to incriminate the accused Prof. Weiss and Ing. Hoffmann and asked confusing and leading questions to obtain confessions of guilt by the accused Ing. Hoffmann.

These circumstances indicate that **the law enforcement agencies which participated in the obtaining of the records proceeded in conflict with the law and with constitutional principles of the Czech Republic.**

### III.

Through Mr. Benda, the law enforcement agencies influenced the whole development of relations and circumstances relating to the alleged criminal activities of the accused and got involved into an action whose course and results were to be used subsequently to the detriment of the accused. Thus, the law enforcement agencies acted in a way which is commonly called "police provocation". The term "police provocation" usually means a secret procedure used by the police, which results in an act committed by another person, who will or should become the subject of subsequent criminal prosecution.

In this respect, the accused reminds that this matter has become the subject of a number of dicussions, professional journals, of the case law of the Constitutional Court of the Czech Republic and also of the European Court for Human Rights, to which the accused refers below; the police provocation has been found illegal and in conflict with the constitution and the evidence obtained thereby is inadmissible in criminal proceedings.

1. First of all, there is the **finding of the Constitutional Court of 22 June 2000, file no. III. ÚS 597/99**. In this case, the Police of the Czech Republic interfered into the course of criminal activity through a person in the position of witness to obtain grounds for arresting the suspect. The Constitutional Court underlines that Czech law does not regulate and does not recognize such course of actions of the police authority due to the fact that **an indicated activity of the police must not exist** in a democratic society and under the rule of law **and if the police proceeds in such manner, such activity must be considered not only illegal but also unconstitutional.**

In this respect, the Constitutional Court remembered that the basic procedural law which regulates criminal proceedings is the Criminal Procedure Code (Act No. 141/1961 Coll., as amended). Section 2 of this act clearly stipulates that **nobody may be prosecuted as indicated otherwise than for legal reasons and in the manner stipulated herein**. This provision reflects Article 8(2) of the Charter of Fundamental Rights and Freedoms, which states that "No one may be prosecuted or deprived of her liberty except on the grounds and in the manner specified by law." The court stated clearly that the above action of the police does not correspond to these basic legal and constitutional prerequisites.

If there was a suspicion that the accused acted more or less in manner by which he commited extortion under Section 235 of the Criminal Code and such suspicion was relevant, it would be appropriate to apply a procedure complying with the Criminal Procedure Code, i.e. to notify the accused of the relevant charges relating to the relevant offence, its preparation of

5

attempt. However, this did not occur and the **state power represented by the police created at a certain moment certain conditions and invoked a certain situation by its conduct and course of action in an evident attempt to commit and complete the crime (if any). Such course of action exceeds distinctively the limits of the criminal proceedings, including the limits set out by constitutional law**. The accused believes that the course of action taken by the police is not and cannot be regulated by procedural rules applying to the course of criminal proceedings. **Thus, the conduct of the law enforcement authorities in this case is extra lege in this matter and the evidence so obtained is illegal from the very outset and therefore inadmissible in criminal proceedings.**

The court also deemed it necessary to remind and emphasise that only the law may designate the acts of individuals which constitute a crime (see Article 39 of the Charter of Fundamental Rights and Freedoms and Article 7(1) of the Convention of Protection of Human Rights and Fundamental Freedoms). The prerequisites for culpability are defined by the grounds of criminal liability, which include unlawful conduct, the causal chain and culpability. **It is an impermissible breach of Article 39 of the Charter and Article 7(1) of the Convention on Protection of Human Rights and Fundamental Freedoms** (hereinafter the "Convention"), **if the state (i.e. of the Police of Czech Republic) becomes, through its acts, a party to the action, to the entire sequence of acts constituting the criminal offence** (e.g. provoking or initiating the offence, its completion, etc.). In another words, such state involvement in an action that comprises, in its entirety, a crime, or such state participation in the conduct of a person which results in the qualification of such conduct as an offence, is impermissible.

2. A similar opinion was pronounced by the Constitutional Court in its **finding of 25 June 2003, file no. II ÚS 710/01**. In this case, disguised members of the Police of the Czech Republic contacted certain persons who were later accused and based on their instigation, such individuals committed their offences. The Constitutional Court inferred from the facts of the case that, the police officers did not use the operative technical means for a mere passive review but exercised such influence upon the accused that led them to the commitment of the offence for which they were sentenced. According to the Constitutional Court, nothing indicated that the accused would have committed such crime without the police interference.

In its assessment of the case, the Constitutional Court relied mainly on the case of the European Court for Human Rights (hereinafter "ECHR") in Teixeira et al. v. Portugal. In this case, the ECHR reviewed a case when the plain-clothes policemen asked a man suspected of drug abuse for procurement of purchase of heroin with the aim of identifying dealers. This man contacted the applicant, who procured the drug. When it was handed over, the police officers disclosed their identity and arrested the applicant. ECHR concluded that the police intervention and its use in the criminal proceedings deprived the applicant irreparably of the right to fair trial, because **the use of evidence obtained by a police provocation may not be justified even by public interest.** In the above judgment, ECHR reviewed whether the activity of the police had exceeded the limits of the activity of infiltrated agents. It concluded that it is not evident that the relevant authorities had serious reasons to suspect Mr. Teixeira of the participation in the criminal activity in question and there were not grounds to believe that he inclined to this type of crime. The police contacted him through a third party. Under such circumstances, ECHR inferred that the police officers did not confine themselves to investigating the applicant's criminal activity in an essentially passive manner, but exercised an influence such as to incite the commission of the offence. In this respect, ECHR concluded that the police activities exceeded the scope of activities of infiltrated agents and incited the criminal offence. As stated by ECHR in this judgment, **such police officers' actions went**

**beyond the limits within which a lawful and fair trial** guaranteed by Article 6(1) of the Convention is to take place. The Constitutional Court shared this conclusion in the case under review, when it added that the principle under which the authorized police body may use operative search means only in accordance with the law and only if the suspicion that a crime is being or has been committed is sufficiently justified must be complied with at all times. **The police authority must not incite criminal activities by use of such means or must not otherwise actively participate in the formation of the facts of the case to instigate or to direct the perpetrator's intention to commit the relevant offence which has been non-existent to date.** It is inadmissible that police authorities, as state authorities, incite another person to commit a criminal offence, support his intent to commit an offence or assist him in the commitment of such offence, even indirectly through cooperation with a third party.

3. Both of the above findings of the Constitutional Court (i.e. the finding of the Constitutional Court file No. II ÚS 710/01 and the finding of the Constitutional Court file No. III. ÚS 597/99) inspired subsequently the Supreme Court of the Czech Republic in its **ruling file no. 7 Tdo 295/2005 dated 7 June 2005.**

4. In connection with the activities of Mr. Benda, who cooperated knowingly with the law enforcement authorities in obtaining the records, the accused also refers to the **finding of the Constitutional Court dated 1 April 2004 file no. II ÚS 797/02 and the finding dated 13 January 2005, file no. III. ÚS 323/04,** in which the Constitutional Court considered as **one of the decisive facts for the assessment of legitimacy** of a similar conduct of the police **the fact whether the activity, the incentive to commit the crime, originated from the law enforcement authority or from the accused.**

In Mr. Benda's case, the decisive activity originated undoubtedly from his part, or from the part of the law enforcement agencies. The records indicate that the absolute majority of contacts between Mr. Benda and the accused Ing. Hoffmann was initiated by Mr. Benda, who not only established contacts with the the accused Ing. Hoffmann by telephone calls, but also invited him to meetings, lunches, etc. With regard to ECHR's judgment in the case Allan v. United Kingdom referred to below, it is also important to mention the relatively close business contact which existed between both the accused, particularly Ing. Hoffman of the one part and Mr. Benda of the other part at the time when the records were made. This fact is mentioned by ECHR as one of the essential aspects which have to be considered in assessing the trial as fair.

5. For the sake of completeness, it is necessary to remind **ECHR's decision in the case of Allan v. United Kingdom dated 5 November 2002.** In this case, the applicant suspected of murder was taken into custody. In order to obtain evidence of the applicant's guilt, the police used its informer, who was placed in the same cell as the applicant, pretended that he was, like the applicant, an accused in custody asked the applicant questions about his alleged crime. Their discussions were recorded by the police with the informer's knowledge and such recorded were then included by the police in the evidence in the proceedings against the applicant.

ECHR considered the conduct of the police as **breach of Article 6(1) of the Convention,** which stipulates that "everyone is entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal established by law, which shall decide on … the legitimacy of any criminal charges against him." First, ECHR stated that it is **essential whether the criminal proceedings as a whole, including the way in which the evidence**

7

was obtained, were fair. In that context, regard must also be had to whether **the rights of the defence have been respected**, in particular whether the applicant was given the opportunity of challenging the authenticity of the evidence and of opposing its use, as well as the opportunity of examining any relevant witnesses; **whether the admissions made by the applicant during the conversations were made voluntarily, there being no entrapment and the applicant being under no inducement to make such admission; and to the quality of the evidence, including whether the circumstances in which it was obtained cast doubts on its reliability or accuracy.**

ECHR also referred to the related right to silence and the privilege against self-incrimination, stating that it is aim of Article 6 of the Convention to provide an accused person with protection against improper compulsion by the authorities and thus to avoid miscarriages of justice. The scope of these rights is not confined to cases where duress has been brought to bear on the accused or where the will of the accused has been directly overborne in some way. **The right to silence is at the heart of the notion of a fair procedure, serves in principle to protect the freedom of a suspected person** to choose whether to speak or to remain silent when questioned by the police. **Such freedom of choice is effectively undermined in a case in which, the suspect having elected to remain silent during questioning, the authorities use subterfuge to elicit, from the suspect, confessions or other statements of an incriminatory nature, which they were unable to obtain during such questioning and where the confessions or statements thereby obtained are adduced in evidence at trial.**

In its assessment, ECHR also referred to the judgments of the Supreme Court of Canada (R. v. Hebert [1990] and R. v. Broyles [1991]), when it stated that the **right to silence will only be infringed where the informer was acting as an agent of the State at the time the accused made the statement and where it was the informer who caused the accused to make the statement.** Whether an informer was to be regarded as a State agent depended on whether the exchange between the accused and the informer would have taken place, and in the form and manner in which it did, but for the intervention of the authorities. Whether the evidence in question was to be regarded as having been elicited by the informer depended on whether the conversation between him and the accused was the functional equivalent of an interrogation, as well as on the nature of the relationship between the informer and the accused.

The admissions allegedly made by the applicant to the informer, and which formed the main or decisive evidence against him at trial, were not spontaneous and unprompted statements volunteered by the applicant, but were induced by the persistent questioning of the informer, who, at the instance of the police, channeled their conversations into discussions of the murder in circumstances which can be regarded as the functional equivalent of interrogation, **without any of the safeguards which would attach to a formal police interview, including the attendance of a solicitor and the issuing of the usual caution.** In those circumstances, the information gained by the use of the informer in this way may be regarded as having been obtained in defiance of the will of the applicant and **its use at trial impinged on the applicant's right to silence and privilege against self-incrimination..**

In this respect, the accused refers to the identical substance of the case of Allan v. United Kingdom (hereinafter "Allan") and the case of the accused Prof. Andrew Weiss and Ing. Vladimir Hoffmann:

8

First, like the case of Allan, a person cooperating knowingly with the police authority (the "informer") was used in this investigation and received instructions directly from such police authority;

a) the informer pretended, in relation to the accused or the person against whom the criminal proceedings had not yet been initiated, a completely different interest than he actually had. While in the Allan case, it should have been a mere "friendly" talk between two men in custody, in the accused's case, it was represented by pretended business negotiations during which the informer tried to solicit the required information;

b) in both cases, it was the informer or the police authority who initiated the contacts between the parties and who tried to make the other party disclose the fact which had not been available to the police authority and by which the relevant person would have incriminated himself;

c) in both cases, the informer sought facts which could be used in criminal proceedings and which the police authorities had not been able to obtain from the accused or by another legal procedure.

Here, however, lies the difference between the two cases. The accused Mr. Allan expressly refused to testify when asked to do so by the police authority. Thus, he had been offered an opportunity to clarify the case from his own viewpoint in accordance with the procedure foreseen by the law. On the other hand, the accused Prof. Weiss or the accused Ing Hoffmann did not have a chance to decide whether or not to testify, let alone deciding that their testimony would be provided for in accordance with the relevant provisions of the Criminal Procedure Code! This difference is due, in particular, to the fact that the accused Allan had already been the subject of criminal proceedings for completed offence and he had been aware of it. On the contrary, no criminal prosecution had been initiated against the accused Prof. Weiss and Ing. Hoffmann and the law enforcement authorities procrastinated for a long time with its initiation and the accused had thus no opportunity to convey their opinion to the police authority. Thus, their procedural rights were wholly excluded.

The foregoing indicates that the rights of the accused Andrew Weiss and of the accused Ing. Hoffmann were breached even more seriously, since Ing. Hoffmann was actually interrogated without his knowledge and without being aware that he could be interrogated.

It has to be pointed out in this respect that no legal and constitutional guarantees regarding the conduct of the investigation and the interrogation were complied with during this actual interrogation, which was directed by the police authority and carried out through the informer. The accused Ing. Hoffmann was asked inadmissible leading questions (i.e. such questions whereby he was presented with facts that were to be ascertained through his answers and he was given hints how to answer) and frivolous questions (i.e. questions presenting false, misleading facts or anticipating facts which had not yet been confirmed by the accused, which led the accused at the same time to testify in accordance with the "interrogator's" wishes). At the same time, misleading and untrue circumstances were alleged (see above). Therefore, it is evident that the "interrogation" of the accused Ing. Hoffmann was conducted in direct conflict with

9

Section 92 of the Criminal Code. Such course of action of the law enforcement authorities circumvented the applicable laws and particularly the Criminal Procedure Code, which regulates taking individual kinds of evidence, including interrogation.

e) Finally, the obtained records were used in both cases in criminal proceedings, where they were to play a decisive role to the detriment of the accused persons.

Since the facts of both cases are identical and the case of the accused Andrew Weiss and the accused Ing. Hoffmann represents, for the foregoing reasons, an even more serious violation of regulations concerning the conduct of criminal proceedings, the course of action taken by the law enforcement authorities has to be viewed in the same way as stated by ECHR in its judgment in the Allan case, where **it decided that the investigation methods used by the police were inadmissible, illegal and violating the provisions of Article 6(1) of the Convention. If the evidence obtained by such method were used in the criminal proceedings against the accused Prof. Weiss and the accused Ing. Hoffmann, such procedure would have to be clearly considered as a violation of the right of the accused not to testify and not to incriminate himself.**

6. As noted above, the issue of police provocation is also dealt with in legal literature. It is appropriate here to refer, in particular, to the article of plk.doc. JUDr. Jan Chmelík, Ph.D., published in the journal Čtvrtletník kriminalistiky (Criminal Science Quarterly) No. 1/2006. The author of this article expresses a definitely negative standpoint to the police provocation and states the following: "All concealed police procedures inciting a specific person to commit a criminal offence are illegal ... Police initiation or incitement of an offence is contrary to the law and in conflict with the Charter of Fundamental Rights and Freedoms and with the Convention on Human Rights and Fundamental Freedoms. It denies the right to fair trial. Evidence of guilt procured by a police provocation is unusable."

7. While respecting the legality and officiality principle, it is necessary to insist on the duty of the law enforcement authorities (both the police and the prosecutor) to initiate criminal prosecution in all cases where the identified facts indicate that an act which has all characteristics of a certain criminal offence has been committed and there are reasons to suspect that it has been committed by a specific person. **The importance of the requirement for timely initiation of criminal prosecution lies in the fact that any delay in this respect restricts the rights of the suspected,** because he may defend himself, in principle, only after he has been accused and the police investigation in his case has become evident.

The accused believes that **the right to defence was definitely restricted** due to the late start of the criminal prosecution. The criminal prosecution was started only half a year after the notification of crime, even though the accusations contained in the decision on initiation of criminal prosecution are based almost entirely on the contents of this notification of crime, the decision cites the facts of the case described in the notification of crime and refers to documents delivered to the police authority together with this notification. From the point of view of the law enforcement authorities there was thus no reason – if they considered the act in question on the basis of this information as a criminal offence, which they apparently did – for procrastination with the start of the criminal prosecution. **Then, the law enforcement authorities were to seek by investigation,** i.e. by the subsequent procedure described in Section 161 et seq. of the Criminal Procedure Code, **by methods prescribed by the Criminal Procedure Code, the evidence** necessary to clarify the basic facts necessary for an impartial assessment of the case, mainly by interrogations of the persons involved, **and not to**

collect information from the suspects, specifically from the accused Hoffmann, in a manner circumventing the provisions on collecting evidence, i.e. predominantly by secret tapping of telephone conversations and meetings of the accused Ing. Hoffmann, which were clearly manipulated by M. Benda. Such conduct of the police authority appears to be purposefully directed against the accused and abusing the operative search means available to the police authorities in the course of investigation. Such procedure clearly violates the fundamental conditions of use of the operative search means stipulated in Section 158b(2) of the Criminal Procedure Code, in consequence of which such application of the operative search means cannot be evaluated otherwise than as unlawful and the evidence collected by such method as inadmissible in the criminal proceedings.

8. Furthermore, it has to be underlines that even though this specified case is qualified as an offence specified in Section 235 of the Criminal Code, it is, by its nature, an act resulting from economic relations; thus, the methods comprised of the so-called police provocation are evidently inappropriate here. Since the illegality of similar police methods has been also ascertained in cases of serious organized crime, e.g. in drug crime (see above), the course of action taken by the Police of the Czech Republic in this case cannot be described otherwise but as **inadmissible criminalization of business relations.**

9. Finally, it has to be noted that even if the prosecutor did not consider the conduct of the law enforcement authorities which is described above as impermissible and illegal police provocation, it would still be **at least the misuse of operative search means**, which were to replace the usual investigation procedures, particularly the interrogation of the accused Ing. Hoffmann. While obtaining information for the law enforcement authorities, Mr. Benda used all kinds of inadmissible interrogations methods (see Article II(3)). If the law enforcement authorities wished to obtain testimony of the Ing. Hoffmann concerning the facts of the case which took place, the circumvented by using Mr. Benda the provisions relation to the interrogation of the accused and also the prohibition of self-incrimination (see above).

### IV.

**With regard to the foregoing facts and taking into account the assessment of the content of the records, the accused applies to the prosecutor of the Municipal Prosecution Office in Prague to review the course of action taken by the police authorities in this case. The accused believes that their activity, which was used in obtaining audio records of telephone calls and meetings of various persons, may be called a police provocation, which is an illegal police procedure.**

**At the same time, the accused requests that these records are excluded from the criminal file and are not further used in the criminal proceedings in any way, since this evidence has been procured in conflict with the law and with procedural principles and is thus wholly unusable as evidence of the alleged criminal activities of the accused.**

For and on behalf of the accused Prof. Andrew Weiss
JUDr. Petr Topinka, Defence Counsel

11

1

1   16th April 2007

2

3        THE JUDGE:  You are going to be heard as

4   a witness and it is your obligation to tell the truth

5   and nothing but the truth and if you should withhold

6   something you may be committing the crime of perjury.

7   Do you understand this instruction and are you going to

8   tell the truth?

9   A.  Yes, and yes.

10       THE JUDGE:  And now the parties can start

11  asking questions.

12       HOWARD GOLDEN, having been duly sworn,

13       gave testimony as follows:

14       Questioned by MR BECKMAN:

15  Q.  Could you please state your name?

16  A.  Yes, but prior to continuing, I'd like to make my

17  own statement.

18  Q.  You can't make a statement.

19       MR DANGEL:  Don't interrupt in the middle of

20  an answer, Joel.  Go ahead.

21  A.  It is the exactly the point.  I am not involved

22  in this case.  I don't want to be involved in this case

23  and I have sworn to tell the truth and I will tell the

24  truth.  But I also want you to know that there are

25  certain rights I understand I have under the

26  Constitution of the United States and not the least of

27  which is to avoid self incrimination.  In this

28  particular matter, I understand that Mr Professor Weiss

29  and Engineer Hoffmann have been accused of crimes for

87

1  but I came here.  It's a fortune of money.  I came here.

2  I'm meeting with the investors.

3  Mr Hoffmann:  Do your job.

4  Mr Golden:   This is a 37 million acquisition.  I'm in

5  the middle of a meeting.  That's why I didn't call you

6  because I've been doing this.

7  Mr Hoffmann:  Yes.  Of course.

8  Mr Golden:  I'm sorry.

9  Mr Hoffmann:  Sure.

10  Mr Golden:  I appreciate the heads up.  That's the only

11  thing I can think of.  You know my attitude on Andy.  I

12  think he is nuts.  I mean, I know he had a problem.  He

13  resigned from the university.  He's unstable.  It's

14  extremely difficult to work with him.  I will support

15  your decision anyway as far as that.  I'm not worried

16  about my money or whatever.  If he can do it, let him do

17  it.  It will never, ever, ever get done.  If he does it

18  -- if he takes anybody else, it will never get done

19  either.  The only issue is how to minimize damage to

20  Vladimir Hoffmann.  That's my only issue here because

21  I'm with you 100%.  Okay?

22  Mr. Hoffmann:  Okay.

23  Mr. Golden:   So don't worry.  If you think I care about

24  this 25, I didn't bank on it.  I didn't believe it was

25  going to happen anyway, and I knew how difficult it was

26  to work with him.  I appreciate how you're keeping me

27  involved.  I appreciate the work.  And I apologize for

28  getting you involved with this crazy person and having

29  to waste so much of your time and energy.  All right?

1

1   16th April 2007

2

3          THE JUDGE:  You are going to be heard as

4   a witness and it is your obligation to tell the truth

5   and nothing but the truth and if you should withhold

6   something you may be committing the crime of perjury.

7   Do you understand this instruction and are you going to

8   tell the truth?

9    A.  Yes, and yes.

10          THE JUDGE:  And now the parties can start

11   asking questions.

12          HOWARD GOLDEN, having been duly sworn,

13          gave testimony as follows:

14          Questioned by MR BECKMAN:

15    Q.  Could you please state your name?

16    A.  Yes, but prior to continuing, I'd like to make my

17   own statement.

18    Q.  You can't make a statement.

19          MR DANGEL:  Don't interrupt in the middle of

20   an answer, Joel.  Go ahead.

21    A.  It is the exactly the point.  I am not involved

22   in this case.  I don't want to be involved in this case

23   and I have sworn to tell the truth and I will tell the

24   truth.  But I also want you to know that there are

25   certain rights I understand I have under the

26   Constitution of the United States and not the least of

27   which is to avoid self incrimination.  In this

28   particular matter, I understand that Mr Professor Weiss

29   and Engineer Hoffmann have been accused of crimes for

79

1   asked me whether I believed Andy was crazy or said,

2   I can't remember what words you used, you note here, in

3   additions to sometimes saying he is crazy, I also

4   sometimes said he may be a genius.  So it depends on the

5   circumstances.

6      Q.  Did Mr Hoffmann tell you that he should have

7   a meeting with Prestige and Benda next week?

8      A.  In this, we are talking about this conversation,

9   correct, sir?

10     Q.  Yes.

11         MR DANGEL:  Objection to the form, but.

12     A.  It appears what I heard in this conversation that

13  is what Mr Hoffmann told me.  Has Mr Hoffmann heard

14  these tapes?

15         MR BECKMAN:

16     Q.  Hmm?

17     A.  Has Mr Hoffmann heard these tapes?

18     Q.  I don't know?

19     A.  Well if Weiss has them, why would Hoffmann.

20     Q.  I would think.

21         ... themselves.  So, basically, the point is that

22  we should have a meeting with Benda and Prestige next

23  Wednesday when Prestige is back from holiday.

24  Mr Golden:  God bless you.

25  Mr Hoffmann: So this is the news.

26  Mr Golden:  That certainly is news.  Terrific.

27  Mr Hoffmann:  All right.

28  Mr Golden:  Great news.  Good luck.  And If I can help

29  or you want me to be at a meeting, I come back in the

80

1   afternoon on Wednesday.

2   Mr Hoffmann:  Oh, no.  I believe that you can't be in

3   the meeting.  If something comes to your mind concerning

4   how to approach Prestige and how to explain to him that

5   this is not --

6   Did Vladimir Hoffmann ask you if something comes to mind

7   concerning how to approach Prestige and to explain to

8   hem this is not Vydirani?

9     A.  Could you replay that part, I don't remember

10   hearing that word, it is the first time I ever --

11         MR DANGEL:  Could somebody translate it for

12   me?

13         MR BECKMAN:  We will have the translator do

14   it when we are done.

15         Mr Golden:  That certainly is news.  Great

16   news.  Good luck.  And If I can help or you want me to

17   be at a meeting, I come back in the afternoon on

18   Wednesday.

19   Mr Hoffmann:  Oh, no.  I believe that you can't be in

20   the meeting.  If something comes to your mind concerning

21   how to approach Prestige and how to explain to him that

22   this is not, if it comes to mind --

23     A.  Even there I have trouble hearing because I

24   started talking.

25         MR BECKMAN:  Could you translate that word,

26   please?

27         MR DANGEL:  Objection, but please do.

28         THE INTERPRETER:  Yes, there is a word that

29   goes Vydirani and that means blackmail.

81

1        MR BECKMAN: Blackmail.

2        THE INTERPRETER: Yes, blackmail or

3    extortion.

4        MR BECKMAN:

5    Q.  Did Mr Hoffmann ask you if something comes to

6    mind concerning how to approach Prestige and to explain

7    to him how this is not blackmail?

8    A.  No.

9    Q.  Did he --

10    A.  I heard, I didn't hear that last word.  I heard

11    the first part of it,, even now when you repeat it a

12    third time on this tape, you will note that I was

13    talking over that last word and I didn't notice that

14    word.  What I heard then and now was if anything comes

15    to mind about how to explain this to Prestige that I

16    heard all the times.  But the word blackmail or

17    vydirani, even when I was listening to it now to be

18    quite frank with you, I didn't catch it and I am certain

19    I didn't catch it when you are on the phone because when

20    you start talking you are not listening to what the

21    other person said and so I just want on the record that

22    that word, and besides which I didn't know it in the

23    Czech, but I didn't hear it now and I didn't recall it

24    then.

25    Q.  Let's play it one more time.

26    Mr Golden:  Great news.  Good luck.  And If I can help

27    or you want me to be at a meeting, I come back in the

28    afternoon on Wednesday.

29    Mr Hoffmann:  Oh, no.  I believe that you can't be in

82

1  the meeting.  If something comes to your mind concerning

2  how to approach Prestige and how to explain to him that

3  this is not vydirani --

4  Mr Golden:  What comes to mind --

5  Let me ask you, Mr Golden, did Vladimir Hoffmann ask you

6  in this conversation if something comes to your mind how

7  to approach Prestige and how to explain to him that is

8  not vydirani?

9       MR DANGEL:  Objection.

10   A.  Is that your next question?

11       MR BECKMAN:

12   Q.  Yes.

13   A.  I thought I answered it a minute ago and I have

14  the same answer.  The first part of what you said I

15  heard now and I most likely heard at the time, which was

16  if something comes to mind as to how to approach

17  Mr Prestige and explain to him, my recollection as to

18  what I understood and what I understood while listening

19  to it had to do with how to do the transfer where money

20  would go partially to the Weiss people and partialy to

21  Kotva, that was the explanation I understood.  I, to

22  this day, don't know the word Vydirani, it wasn't part

23  of my vocabulary and I had, didn't even pay attention to

24  it this period, nor, I am certain that during the time I

25  made the conversation did I either understand the word

26  or hear it at the time.  So, therefore, if you are

27  asking me if he said it, listening to it today, and that

28  is your question, it appears from what I heard on the

29  tape that that is what he said,.

83

1    Q.  That he said vydirani?

2    A.  Whatever the word is that the translator called

3    blackmail.  Vydirani or vydani or whatever, that appears

4    to be on the tape, yes.

5        MR DANGEL:  I will move to strike.

6        MR BECKMAN:

7    Q.  Mr Golden, we are going to shift gears now.  Let

8    me play for you a recording of a conversation between

9    you and Mr Hoffmann dated October 5th, 2004 and we are

10   going to play the entire telephone conversation?

11   A.  You don't know how disturbing this is.

12        MR DANGEL:  Don't say anything until you are

13   asked a question.  It just makes it very confusing.

14   A.  Mr Dangel, you feel raped when your private

15   conversations are being taped.  I am sorry but I am

16   upset.

17        MR BECKMAN:  Here we go.

18   Mr Golden:  Yes?

19   Mr Hoffmann:  Hi.  Do you have a minute now?

20   Mr Golden:  No.  I'm in, doing a takeover here in

21   Cyprus.  Why don't you take one minute.  Did something

22   new happen with this, with Kotva or what?

23   Mr Hoffmann:  Well, basically, your former partner is

24   a real idiot, and I'm going to resign.  So I thought

25   that you would like to know, or that you should know,

26   actually.

27   Mr Golden:  I'll be there tomorrow night.  Maybe, if you

28   want, I can calm you down or chat with you or whatever

29   before you do it because you've invested so much time

1

1   16th April 2007

2

3        THE JUDGE:  You are going to be heard as

4   a witness and it is your obligation to tell the truth

5   and nothing but the truth and if you should withhold

6   something you may be committing the crime of perjury.

7   Do you understand this instruction and are you going to

8   tell the truth?

9     A.  Yes, and yes.

10        THE JUDGE:  And now the parties can start

11   asking questions.

12        HOWARD GOLDEN, having been duly sworn,

13        gave testimony as follows:

14        Questioned by MR BECKMAN:

15     Q.  Could you please state your name?

16     A.  Yes, but prior to continuing, I'd like to make my

17   own statement.

18     Q.  You can't make a statement.

19        MR DANGEL:  Don't interrupt in the middle of

20   an answer, Joel.  Go ahead.

21     A.  It is the exactly the point.  I am not involved

22   in this case.  I don't want to be involved in this case

23   and I have sworn to tell the truth and I will tell the

24   truth.  But I also want you to know that there are

25   certain rights I understand I have under the

26   Constitution of the United States and not the least of

27   which is to avoid self incrimination.  In this

28   particular matter, I understand that Mr Professor Weiss

29   and Engineer Hoffmann have been accused of crimes for

152

1       MR DANGEL:  You have to answer that

2   question, you must answer.

3       MR BECKMAN:  It is the Judge's

4   determination.

5       MR DANGEL:  Okay, it is the Judge's

6   determination.

7       THE JUDGE:  I consider this question

8   appropriate.

9   A.  It seemed to me that we were discussing legal

10   matters in that discussion.

11       MR BECKMAN:

12   Q.  So you were acting as a lawyer with respect to

13   Mr Hoffmann; is that correct?

14   A.  That is the question I don't want to answer.  We

15   discussed that already three times.  I don't want to be

16   put in the position to say that I was practising law.

17       THE JUDGE:  But the issue of legal privilege

18   is not an issue of whether a legal advice was provided

19   in accordance with law or was not.  But what is

20   protected here is the content of that advice, that

21   information that was passed on.  And, therefore, to

22   answer the question whether or not legal services were

23   thus provided does not fall under the privilege because

24   it is the content that falls under the privilege.  But

25   if as a witness you will refuse to answer that question,

26   then you waive the possibility to have that content

27   confidential or under privilege.

28       MR DANGEL:  And if I might just add, it is

29   not illegal for an American lawyer to advise a Czech

153

1  national on American law if he is a member of a Bar in

2  the United States, which Mr Golden is.  So I don't see

3  why he can't answer the question.  I don't think you are

4  thinking clearly is what I am saying.

5     A.  Could the Court tell me what penalty, if any,

6  there is in a country if someone is found to be

7  practising law here without a licence?

8        THE JUDGE: There is no such penalty.

9     A.  Thank you.  So let's move forward, that is the

10  important point I have been trying to get to, whether or

11  not I have a problem.

12        MR DANGEL:  So there is a pending question.

13     A.  What is the pending question?

14        MR BECKMAN:

15     Q.  Were you giving legal advice or business advice

16  to Mr Hoffmann?

17     A.  I would categorise this as legal advice.

18     Q.  Were you advising Mr Hoffmann on Czech law?

19     A.  Well there are aspects of Czech law in this memo.

20  I don't think that I discuss on Forminster line of

21  defence which talked about Czech law.  I think probably

22  did not discuss Czech law.

23     Q.  Would you agree you were also giving business

24  advice separate and apart from any purported legal

25  advice?

26     A.  I would agree that the legal advice had business

27  consequences to it and that I was discussing how best to

28  present a legal position to a board and that would, of

29  course, have business consequences to it.

154

1    Q.  Were you giving legal advice with respect to

2    American law?

3    A.  Certainly, there are certain -- yes.

4    Q.  New York law, Massachusetts law?

5        MR DANGEL:  Objection.

6        MR BECKMAN:

7    Q.  What do you mean by American law?

8    A.  General corporate law, which is very much the

9    same in most States.  There is a uniform code of

10   business, I have forgotten what is it called right now.

11   Q.  Mr Golden, not all communication with the client

12   are protected by the attorney client privilege under

13   American law; correct?

14       MR DANGEL:  Objection.

15       MR BECKMAN:

16   Q.  Let me rephrase that.  Not all communication with

17   a client are protected by attorney client privilege;

18   correct?

19       MR DANGEL:  Are you asking him for a legal

20   opinion now?

21       MR BECKMAN:  I am asking him for his

22   understanding.

23       MR DANGEL:  Objection.

24       MR BECKMAN:

25   Q.  You may answer?

26   A.  I don't agree with that.  I can't understand if I

27   have a client what would not be covered by attorney

28   client privilege.  If we had lunch and I am still his

29   lawyer and we had discussions about the case, even if we