UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
KOTVA a.s. and SPV Co.,                 )
                                        )
            Plaintiffs,                 )        Case No. 05-10679-WGY
                                        )
            v.                          )
                                        )
ANDREW WEISS and WEISS ASSET            )
MANAGEMENT, LLC                         )
                                        )
            Defendants and              )
            Counterclaimants,           )
                                        )
            v.                          )
                                        )
KOTVA a.s., SPV Co., and Richard Harazim )
                                        )
            Counterclaim-Defendants     )
                                        )
                                        )
_____)


**PLAINTIFFS' REQUEST FOR PRE-TRIAL RULING REGARDING THE
ADMISSIBILITY OF TAPE RECORDED TELEPHONE CONVERSATIONS OF
DEFENDANTS' EMPLOYEES AND AGENTS**

Pursuant to a Czech Court Order dated September 23, 2004, the Czech police wire tapped

the telephone lines of Vladimir Hoffman, one of defendants' agents.  From these wiretaps, the

Czech police recorded telephone conversations between Hoffman and Weiss, Georgiy Nikitin

(Weiss' employee), and Howard Golden (Weiss' former partner).  Both plaintiffs and defendants

obtained copies of these recordings from the Czech police in late March/April 2007, when the

recordings were unsealed from Weiss' criminal file.

Thereafter, plaintiffs deposed Howard Golden in Prague.  During the deposition,

plaintiffs played the recordings of five telephone conversations between Golden and Hoffman

(the "Golden calls").  <u>Golden identified his voice and Hoffman's voice on each of the five calls.</u>

<u>He further testified that he recalled the conversations and admitted what he and Hoffman said on</u>

<u>the recordings.</u>  Simply put, Golden authenticated the recordings of his conversations with

Hoffman.  At trial, plaintiffs seek to read in the portions of Golden's deposition in which he

identified the telephone conversations and admitted their contents.[1]  In doing so, plaintiffs seek

to play portions of the recorded telephone calls to the jury.[2]  A transcript of the portions of the

Golden calls that plaintiffs seek to play for the jury is attached as Ex. 1.  If it would assist the

Court, plaintiffs will also provide copies of the audio recordings.

Plaintiffs also seek to play for the jury recorded telephone conversations between

Georgiy Nikitin and Vladimir Hoffman (the "Nikitin calls").  Both Nikitin and Hoffman identify

themselves in these recordings, and Golden even identified Hoffman's voice on one of the

recordings.  Plaintiffs intend to call Nikitin as a witness at trial and examine him concerning his

recorded conversations with Hoffman.  Relevant portions of those calls are quoted <u>infra</u> at 9-10.

If it would assist the Court, plaintiffs will also provide copies of the recordings themselves.

Defendants have moved to exclude all recordings claiming that they: (1) are "not

authentic" and cannot pass Rule 901; (2) constitute settlement discussions barred by Rule 408;

(3) contain privileged communications; and (4) are barred by Rule 403.  As demonstrated below,

each of these arguments falls short and is without merit.  Indeed, the recordings are authentic

party admissions that bear directly on the core issues in this case.  Accordingly, the Court should

admit them into evidence.

---

[1] Mr. Golden resides in Prague and, accordingly, is beyond the subpoena power of this Court.  His deposition was conducted upon a Commission from this Court and in cooperation with the Ministry of Justice of the Czech Republic.

[2] While Plaintiffs are willing to play the recordings of the Golden calls in their entirety for the jury, they have selected only portions to address various issues raised by Defendants' in their Motion in Limine.  For example, plaintiffs are not seeking to play portions of the recordings in which Hoffman and Golden refer to Weiss as "crazy," "unstable," or "an idiot."

FACTUAL BACKGROUND

The Recorded Conversations

In accordance with Section 88 Paragraph 1 of the Czech Criminal Code and with Czech Court approval, the Czech police lawfully recorded telephone conversations and meetings involving Weiss and his agents.  See September 23, 2004 Court Order authorizing the police to wiretap several telephone numbers belonging to Vladimir Hoffman, attached as Ex. 2; Czech Criminal Charge at K0045, attached as Ex. 3; August 31, 2007 letter from Municipal State Prosecutor, attached as Ex. 4.  These recordings, which include telephone conversations between Weiss' agents and employees, were then placed in the Weiss criminal file.

In February 2005, Andrew Weiss and Vladimir Hoffman were criminally charged with extortion.  Pursuant to Czech criminal procedure, portions of Weiss' criminal file remained sealed until after Weiss was served with the Czech criminal charge and after he was interviewed by the Czech police (via the United States Department of Justice and MLAT procedure).  In March 2007, the Weiss criminal file (including the recordings) was made available to both parties.  In the Czech Republic, both the harmed party (Kotva) and the accused (Weiss) are entitled to access the materials in the criminal file.  Accordingly, Kotva inspected the criminal file and obtained from the Czech police true copies of the recorded conversations.  See Affidavit of Richard Harazim ("Harazim Aff.") ¶8, attached as Ex. 5.

Defendants Ignore the Court Order to Produce the Police Recordings

Because the criminal charge specifically referenced the recordings, both parties were aware of their existence long before they were able to obtain copies.  Accordingly, the parties issued document requests to each other calling for the production of the recordings.  After plaintiffs obtained copies of the recordings from the Czech police, they immediately produced

them to defendants.  Defendants, however, refused to produce their copies of the recordings to

plaintiffs.  On September 29, 2006, the Special Master <u>ordered</u> defendants to produce portions of

the criminal file if such materials fell within the purview of other discoverable requests:

> if otherwise unobjectionable requests call for the production of documents which,
> by happenstance, came from the criminal file (<u>e.g.</u> unprivileged witness
> statements, **tape recordings of witnesses**, relevant and unprivileged documents
> that had been in Weiss' possession but were seized by the Czech police), then
> **they must be produced**.

<u>See</u> Order dated September 29, 2006 at 22.  Despite this Order, defendants continue to refuse to

date to produce their copies of the recordings.

<u>The Czech Prosecutors' Office Rejects Weiss' Request to Suppress the Recordings</u>

On July 30, 2007, the Weiss' criminal defense counsel brought the equivalent of a motion

to suppress the recordings in the Czech Republic arguing that Weiss and his associates were

"entrapped."  <u>See</u> Defendants' Motion in Limine To Exclude Tape Recordings at 6-7.  Although

defendants refer this Court to their July 30, 2007 suppression request (Exhibit 1 to motion in

limine), <u>defendants fail to inform the Court that prosecutor's office rejected their request on</u>

<u>August 31, 2007.</u>  Indeed, the letter from he Municipal State Prosecutor's Office in Prague states

in relevant part:

> I have examined your request for an investigation into the procedure of the police
> body of 30 July 2007, which was delivered to the Municipal State Prosecutor's
> Office in Prague, and **have arrived at the conclusion that your complaint is
> unjustified.**
>
> Especially at the beginning of the investigation of the case intelligence means and
> devices were employed as described in Section 158b of the Criminal Code, *et.
> seq.*, though their use was undertaken in accordance with the Criminal Code. . . .
> the procedure outlined in Section 88 Paragraph 1 of the Criminal Code, namely
> **tapping of telephones** and emails, **was used with the permission of the
> appropriate court**. . .
>
> . . . The investigative, prosecuting and adjudicating bodies concerned themselves
> with information reported by the injured parties that a criminal act had been

committed, which has already been perpetrated, and only with the cooperation of the injured parties monitored the further steps of the accused.  I did not find any illegality in their procedure.

For this reason, **I regard your reservations as unjustified and the evidence which was gathered in accordance with the law will comprise an integral part of the investigation file.**

Id. (emphasis added).  Revealingly, defendants also failed to produce the Prosecutor's decision to plaintiffs, who were forced to obtain it directly from the Municipal State Prosecutor's Office in Prague.

<u>ARGUMENT</u>

I.     **The Recordings are Authentic**

The First Circuit has held that the foundation required to authenticate real evidence (such as audio recordings) is simply an evidentiary showing of whatever facts are necessary in the circumstances to prove that the item is what the proponent claims it to be.  <u>U.S. v. Doyon</u>, 194 F.3d 207, 212 (1st Cir. 1999) <u>citing</u> Fed. R. Evid. 901.  Generally, there are two ways to authenticate a recording: (1) showing how it was obtained and its chain of custody; or (2) through the testimony of a person who participated in or witnessed the conversation.  <u>U.S. v. Eberhart</u>, 467 F.3d at 659, 667 (7th Cir. 2006)  This Court has broad discretion in determining whether a sufficient foundation has been laid, and is not bound by a set "recipe" of elements. <u>Doyon</u>, 194 F.3d at 212.[3]

Once plaintiffs present sufficient foundation testimony, the burden shifts to the defendants to show why the recordings should be rejected as inauthentic.  <u>U.S. v. Rengifo</u>, 789 F.2d 975, 978, 979 (1st Cir. 1986); <u>U.S. v. Cortellesso</u>, 663 F.2d 361, 364 (1st Cir. 1981).  Such

---

[3] Although the First Circuit encourages courts to handle challenges to the authenticity of recordings at a pretrial hearing, it also empowers them to listen to them as they are played to the jury and rule upon objections when made. <u>U.S. v. Carbone</u>, 798 F.2d 21, 25 (1st Cir. 1986).

proof typically requires expert testimony. Id. at 364. Indeed, the First Circuit has held that "tapes are not inadmissible merely because one can conjure up hypothetical possibilities that tampering occurred." Rengifo, 789 F.2d at 978.

In this case, plaintiffs have satisfied their burden to authenticate the recorded conversations. To begin, the evidence shows that the recordings were lawfully obtained by the Czech police as part of their criminal investigation into Weiss' blackmail. See September 23, 2004 Court Order, Ex. 2; Czech Criminal Charge at K0045, Ex. 3; August 31, 2007 letter from Municipal State Prosecutor, Ex. 4; Harazim Aff. ¶¶ 2-8, Ex. 5. More importantly, plaintiffs have the testimony of defendants' own agents who participated in the conversations. Specifically, plaintiffs have the deposition testimony of Howard Gordon as well as the trial testimony of Georgiy Nikitin.

### 1.    Howard Golden Authenticated Each of the Golden Calls

The five Golden calls occurred on: (1) September 29, 2004; (2) October 5, 2004; (3) October 22, 2004; (4) October 25, 2004; and (5) October 27, 2004. During his deposition, Howard Golden authenticated each of these five recording.[4] First, as defendants concede on page 3 of their motion in limine, Golden identified his voice and the voice of Vladimir Hoffman on the recordings. See Transcript of Deposition of Howard Golden ("Golden Dep.") at 65-66 (first call), 88 (second call), 119 (third call), 156 (fourth call), and 182 (fifth call), attached as Ex. 6. It is black letter law that a speaker's identity can be authenticated by testimony from a witness recognizing the speaker's voice. See Fed. R. Evid. 901(b)(5):

> (5) *Voice Identification.* Identification of a voice, whether heard firsthand or
> through mechanical or electronic transmission or recording, [may be

---

[4] The recordings played during Golden's deposition were transcribed by the stenographer and appear in Golden's deposition transcript. The portions of the Golden calls that plaintiffs seek to play at trial are attached as Ex. 1, and transcripts of the entire conversations are included in Golden deposition transcript, attached as Ex. 6.

authenticated] by opinion based upon hearing the voice at any time under circumstances connection it with the alleged speaker.

Second, Golden admitted having each conversation with Hoffman.  See Golden Dep. at 68 (first call), 88 (second call), 119-123 (third call), 156 (fourth call), 182 (fifth call). Specifically, he admitted and Hoffman discussed the following:

**September 29th Call**

- Benda (a Kotva representative) said that "our lawsuit concerning the ownership of the property hit the right point" and it "concerns" Kotva.  Id. at 72.

- "there was a difficulty in buying back shares by the Kotva corporation."  Id. at 73.

- Kotva buying its own shares is not easy.  Id. at 74.

- Hoffman had the feeling that Kotva would even accept "the incredible price required by Andy" Weiss.  Id. at 75.

- it was difficult for Kotva to pay such an amount of money in such a way that it didn't create potential lawsuits from other minority shareholders.  Id. at 78.

- Hoffman was able to persuade Benda that the easiest way would be if the Irish guys would pay part of the purchase price directly to Weiss.  Id.

- Hoffman asked him how to approach Prestage (a representative of Markland, the buyer) and explain to him that this is not *vydirani*, which is Czech for blackmail.  Id. at 82-83.

**October 5th Call**

- Hoffman told him that he had a major breakthrough and that he had gotten Prestage to the table.  Id. at 102.

**October 22nd Call**

- Benda said that Kotva would pay 131 million Czech if the lawsuits were withdrawn. Id. at 124-125.

- Prestage said that Markland would pay a portion of the purchase price for the property directly to Weiss.  Id.

- Hoffman advised BGO to accept 131 million Czech.  Id. at 133

**October 25th Call**

- Prestage said that the lawsuits were interfering with the deal.  Id. at 158.

- Golden understood that the lawsuits were interfering with the deal.  Id. at 161.

**October 27th Call**

- Weiss has no oversight to third parties and is completely independent.  Id. at 183.

- Weiss' original idea was to get $4 million for the Kotva shares.  Id. at 186.

- Hoffman said that the $4 million price was ridiculous.  Id. at 187.

- Weiss always wants more than the last offer.  Id. at 187.

In short, Golden more than authenticated the recordings of each of the recorded Golden calls.

Because Golden resides in Prague and is "unavailable," plaintiffs seek to introduce

Golden's deposition testimony and the recorded conversations at trial.  See, e.g., KMS

Restaurant Corp. v. Wendy's International, Inc., 194 Fed. Appx. 591, 599 (11th Cir. 2006).

Indeed, in KMS, the trial court properly admitted recordings of taped conversations that were

authenticated by a witness during his deposition.  Specifically, the court ruled that the deponent's

identification of his own voice was sufficient authentication under Rule 901(a):

> the district court **allowed the jury to hear portions of the recordings as they
> were referenced in Nutter's deposition.**  Finding that **Nutter's identification of
> his own voice was sufficient authentication under Federal Rule of Evidence
> 901(a)**, the district court stated: "I will allow into evidence those portions of Mr.
> Nutter's deposition where the tapes were played for him and he was question
> under oath, as to whether it was his voice on the tapes, where the tapes reflected
> his statements and where he was subject to cross-examination on these topics.
> The district court further stated that "[t]he issue is essentially one of foundation"
> and concluded that it found "a sufficient evidentiary basis for the jury to hear
> certain of the tapes during the Nutter deposition in order to consider KMS' claim
> that Wendy's used improper means to interfere with its deal with Citicorp.

Id. at 599-600.

Here, as in KMS, Golden's deposition testimony sufficiently authenticates the recordings

of the Golden calls. Accordingly, plaintiffs should be permitted at trial to play the recordings of the Golden calls that were played to Golden during his deposition.[5]

### 2.    The Recordings of the Nikitin Calls are Authentic

The authenticity of the Nikitin calls is established in several ways. To begin, Nikitin and Hoffman identify themselves on the recordings. For example, the November 2, 2004 recording begins with "Hello Vladimir. This is Georgiy."[6] Such self identification is proper authentication. See Fed. R. Evid. 901(b)(5). There is, moreover, only one Georgiy involved with the defendants - - Georgiy Nikin - - and he speaks with a Russian accent and has a distinct voice. Some of the calls, moreover, are from Hoffman to Weiss' office. When the receptionist answers the telephone, Hoffman introduces himself and asks for Georgiy. These circumstances are sufficient to authenticate the voices on the recording. See Fed. R. Evid. 901(b)(6) (telephone conversations may be authenticated by the surrounding circumstances, including self-identification). Plaintiffs will further authenticate the recordings through Nikitin, who is being called as a witness at trial by both parties.

The Nikitin calls, moreover, speak to the heart of this case - - defendants' blackmail scheme. Indeed, Hoffman admits that what Weiss is doing is blackmail:

**October 25, 2004 Call:**

Mr. Hoffman: …Georgiy, but how am I suppose to go to them and tell them that we should receive more for the shares that they are actually worth? Or even, even worse, how should I get to them and tell them that we should get for the share

---

[5] Defendants incorrectly claim that Golden "was unable to authenticate the tapes, indicate whether they fairly represented the conversations, or indicate anything other than shock that any recording had been made without his knowledge or consent." (Motion in Limine at 3) Indeed, Golden testified that he recalled the conversation, but could not remember every single word that was said. See, e.g., Golden Dep. at 68, 88. This is quite understandable, given that the conversations occurred three years prior to his deposition. Regardless, Golden's identification of his and Hoffman's voices, the substance of the conversation, and the specific portions played to him by the plaintiffs satisfies Rule 901. See KMS, 194 Fed. Appx. At 599-600.

[6] Golden also identified the voice of Vladimir Hoffman on the recording of the November 2, 2004 call. See Golden Dep. Vol. 2 at 2.

even more than is the full NAV?

Mr. Nikitin:  Exactly.  That is what I am telling you.

Mr. Hoffmann:  I mean that they would probably - - I mean how would you react? I mean, this is blackmail. . .

**November 2, 2004 Call:**

Mr. Hoffman:  I understand that's my job to give you some advice to provide you with information to discuss with the other party and I simply, that's what I believe if the prize is the NAV or very close to NAV I don't know maybe the NAV is 120 maybe the NAV is 140, its not that much different, but its very difficult.  I simply cannot go and say we want you know full NAV plus we want even more for the lawsuits that's, you know, that's blackmail.

Mr. Nikitin:  Yeah, well the lawsuits probably cost more but anyway, I understand – I understand what you are saying and in some sense I share some of your points of view, but I just have to give you what Andrew asked me to give you and he asked me to tell you that we want to reject this offer but he also asked me to ask you to talk with them and to explain to them that we are still open for negotiations and we are expecting a better offer from them and we may come back with a counteroffer in the near future, but we are still expecting offer from them and we are still negotiating…

* * * *

Mr. Hoffman: . . . why don't we organize a conference call with Andy, with Peterka, with myself, we can, we can discuss it so we can discuss how we can present it, what arguments can we give, what basically we are allowed to say so that, you know, it is not blackmail.

In sum, plaintiffs have met their burden of showing that the recordings are what they purport to be.  Accordingly, the burden shifts to defendants to prove that the recordings are not authentic.  U.S. v. Rengifo, 789 F.2d 975, 978, 979 (1st Cir. 1986); U.S. v. Cortellesso, 663 F.2d 361, 364 (1st Cir. 1981).  Defendants cannot meet their burden.

B.    Defendants Cannot Prove that the Tapes are Not Authentic

As an initial matter, defendants' failure to produce its copies of the recordings - - despite being Ordered to do so - - waives any argument that Kotva has "tampered" with the recordings. See Defendants' Motion in Limine at 4.  Defendants ask "How do we know whether the

plaintiffs faithfully recorded what is on those tapes, that they did not cut and paste and superimpose voices on the tapes?"  Id.  The answer is simple – compare defendants' copies of the recordings to plaintiffs' copies of the recordings.  Defendants are well aware of this solution and, therefore, refused to produce their copies of the recordings in violation of the Court's Order. In doing so, however, they have waived any argument that plaintiffs "tampered" with the recordings.

Regardless, the First Circuit has held that defendants cannot satisfy their burden of showing that the recordings are not authentic with rank speculation and bald accusations. Rengifo, 789 F.2d at 978 ("tapes are not inadmissible merely because one can conjure up hypothetical possibilities that tampering occurred.")  Rather, defendants are required to present evidence, usually in the form of expert testimony.  See Cortellesso, 663 F.2d at 364.  Defendants have had these recordings for at least seven months and have not come forward with any expert reports or any other evidence to challenge the authenticity of the tapes.  The reason is simple - - they know that the recordings are authentic because they know what they did and said. Plaintiffs, moreover, has provided an affidavit stating that the recordings were not altered or tampered with.  See Harazim Aff. ¶8, Ex. 5.[7]  Defendants, in stark contrast, have offered no evidence to challenge the authenticity of the recordings.  Accordingly, defendants have failed to meet their burden and the Court should rule that the recordings satisfy Rule 901.

## II.    The Recorded Conversations Are Not Barred by Rule 408

Defendants argue that the recordings are barred by Rule 408 because they "concerned settlement of the pending Czech civil lawsuits through the purchase of CVF's Kotva and Trend shares."  See Motion in Limine at 4.  Internal discussion among defendants' agents as to how their blackmail scheme is playing out, however, are not covered by Rule 408.  Rather, Rule 408

---

[7] Indeed, the recordings are digitally protected from alteration.  See Harazim Aff. ¶8, Ex. 5.

prohibits parties from using the other side's *offers to compromise* for the forbidden purpose of establishing liability of a disputed claim. Here, the conversations are being used to prove defendants' tortious interference and abuse of process. Accordingly, Rule 408 is inapplicable.

Ironically, defendants' Rule 408 argument proves plaintiffs' case: the Czech civil lawsuits were filed by Gilroy and KT - - not defendants. Those lawsuits, moreover, sought to have the shopping centre "returned" to Kotva - - not a buyout of Weiss' shares. Defendants' used these lawsuits to block the sale to Markland and, thereby, force Kotva into buying their shares.

## III.    The Recordings Do Not Contain Privileged Communications

Defendants argue that the recordings should be excluded because they contain "privileged" communications. See Defendants' Motion in Limine at 7. But none of the conversations at issue concern legal advice - - rather they are all business discussions among Weiss' agents. Simply put, the recordings speak for themselves, and defendants' argument is without merit.

## IV.    The Tapes Are Not Barred By Rule 403

Defendants claim that the recordings of their agents' admissions should be excluded under Rule 403 because they "have little or no probative value." See Defendants' Motion in Limine at 7. Again, the recordings speak for themselves: Indeed, plaintiffs' claims concern defendants' efforts to blackmail them into buying their investor's shares. The recordings are admissions by the defendants' agents that this is precisely what they were doing. Specifically, the Golden calls lay out defendants' scheme to block the sale of the shopping centre in order to force Kotva to pay for Weiss' shares. The fact that these admissions prove plaintiffs' case is no reason to exclude them. Indeed, the First Circuit has stated "Relevant evidence [] always

prejudices the party against whom it is offered.  It can hardly be argued that accurate transcripts

of properly authenticated and relevant wiretap recordings are not relevant evidence."  See

Rengifo, 789 F.2d at 982.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court permit them to play the

portions of the recordings transcribed in Ex. 1 to the jury and/or the recordings of the

conversations in their entirety.


Respectfully submitted,

KOTVA A.S. and SPV CO.,

By their attorneys,

/s/ Dana A. Zakarian
Joel G. Beckman (BBO# 553086)
William C. Nystrom (BBO#559656)
Dana A. Zakarian (BB0# 641058)
NYSTROM BECKMAN & PARIS LLP
10 St. James Ave., 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: October 17, 2007


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non registered participants on this 17th day of
October, 2007.


/s/ Dana A. Zakarian

**1**

## EXHIBIT 1

### RECORDINGS OF THE GOLDEN CALLS
### THAT PLAINTFFS SEEK TO PLAY AT TRIAL

**1) September 29, 2004 (Golden Dep. 62:3 - 65:23)**

Mr. Hoffmann:  Hello?

Mr. Golden:  Hi, Buddy.  What's up?

Mr. Hoffmann:  Hi.  Well, I promised to call you with news concerning Kotva.  So I believe that I have some moderately good news.

Mr. Golden:  Okay.

Mr. Hoffmann:  I met Benda, actually -- when was it --Thursday or Friday of last week. No, no, no.  What am I saying?  No, I met him Monday.  I met him this Monday. I'm confused because yesterday was a holiday.  So I met him, in fact, on Monday, and he called me back today.  Basically, for the first time, he admitted that our lawsuit concerning the ownership of the property really, really --

Mr. Golden:  Concerns them.

Mr. Hoffmann:  -- concerns them, and that we hit the right point.  And basically, of course, we discussed, you know, some technicalities concerning if they can buy their own shares, if Kotva can buy its own shares, which is not that, not that easy.  And I have the feeling that they would even accept the incredible price required by Andy.

Mr. Golden:  Unbelievable that he's really -- maybe he's a genius.  Maybe I'm wrong.

Mr. Hoffmann:  Maybe he is a genius.  But just to remind you, it's 131 million.  Maybe he's a genius.  I don't know.  Before it's over we should judge it.  And Andy still can change his mind and increase the price.

Mr. Golden:  He may just be lucky.  I mean, maybe he's lucky, maybe he's a genius.  I don't know.  On the one hand, yeah, it would be interesting.  On the other hand, it creates a problem for me because I sold those shares at a very low price to them, and now Lars is asking where's my money, and all this other stuff.  So I don't know.  But, okay.  Whatever it is.  If you do it, and we get it over with, and you make money, I want the Vladimir Hoffmann Pension Fund to be very large.  And then maybe you'll invest 100,000 in my fund or something.  Who knows?

Mr. Hoffmann:  Well, I mean, the point is that it's really, basically, difficult for them to pay such an amount of money in such a way that they don't create potential lawsuits from other minority shareholders.  So I was able to persuade Benda that the easiest way would

be if the Irish guys would pay part of the purchase price right to us, directly to us. And then, you know, Kotva wouldn't have to, basically, seek any financing or do some --

Mr. Golden: Let them buy our shares. Let the Irish guys buy most of our shares so then they could get some of it back when they do a buy-in of all the money at a certain price.

Mr. Hoffmann: They wouldn't, they wouldn't buy our shares, but once they will be paying the purchase price for, for the property, they would pay part of the purchase directly to us, and we will give the shares -- transfer the shares to whoever they tell us. So, basically, the point is that we should have a meeting with Benda and Prestage next Wednesday when Prestage is back from holiday.

Mr. Golden: God bless you.

Mr. Hoffmann: So this is the news.

Mr. Golden: That certainly is news. Terrific.

Mr. Hoffmann: All right.

Mr. Golden: Great news. Good luck. And if I can help or you want me to be at a meeting, I come back in the afternoon on Wednesday.

Mr. Hoffmann: Oh, no. I believe that you can't be in the meeting. If something comes to your mind concerning how to approach Prestage and how to explain to him that this is not vydirani.

Mr. Golden: What comes to mind immediately is that they should do a buy-out offer at a relatively low price. We sell the shares to Prestage and his company at X. Then Kotva makes a public offer to buy in the shares at a much, much lower price so that there's a difference between what they can then submit the shares to, so that Kotva then says: Look, we had other shareholders give it. Look, James, Golden's people are, you know -- Weiss
sold his shares, and those 10% we bought in or whatever it is. That accomplishes two or three things. One, it gets part of the money back from Prestage so that the money that those guys get is, you know -- because you're asking him to divert some of the purchase money. In the contract -- what you have to understand, in the contract of sale, if anybody sees the contract of sale has to have -- let's say it's 100 million -- let's say it's 1 billion Crowns, whatever the price is. If they're saying it's 1 billion, pay me 900 and pay 100 to Weiss. That has to be in the contract. I'm suggesting –

Mr. Hoffmann: No, no, no, Howard. It doesn't have to be in the contract, and I'll tell you why. Because, basically, they will have a -- (Telephone interruption)

Mr. Golden: Just one second. Vlado, this is Cyprus. I'm going to have to take this.

Mr. Hoffmann: Okay.

Mr. Golden: I'll call you later on today, and we'll talk.

Mr. Hoffmann: Okay. Thank you. Bye.

Mr. Golden: Thank you so much. Bye.

**2) Oct. 5, 2004 (Golden Dep. 85:15-26)**

Mr. Golden: . . . What was the latest offer he refused?

Mr. Hoffman: Well, it's not the offer he refused. It's really the way, how he behaved. I mean, I believe that I was able to do a major breakthrough.

Mr. Golden: Brilliant job. You did a brilliant job.

Mr. Hoffman: But I mean, the latest development was that I was able to get Prestage to the table.

Mr. Golden: Yes, you were brilliant.

Mr. Hoffman: He has refused, up to now, all the time. Now he agrees that he would meet me and Benda on Thursday.

**3) Oct. 22, 2004 (Golden Dep. 114:8 – 116:7)**

Mr. Hoffmann: Hello.

Mr. Golden: Hello. So what's the current situation with the most smartest man in the world?

Mr. Hoffmann: Well, the situation is difficult as it usually is.

Mr. Golden: Come on. What's new with that? I said what's new. I didn't say what's old.

Mr. Hoffmann: Yes. Well, you know, the good news is that we met on Monday; we met Prestage and Benda. And Benda, Benda said that he would agree with 131 million for Kotva shares if we withdraw all lawsuits, and Prestage said that he would agree to send part of the money intended for the purchase of the building directly to us for the shares. So that's the good news. And the bad news is that basically Andy is unable to do any decision. He doesn't want to say anything. So I sent him, yesterday, a very comprehensive memorandum with all the numbers I have computed with the net present value of us pursuing the lawsuit which is some, you know, 32 million Crowns because it costs money and it's a lot of time, and it's risky. So the discount rate is very high. And I also pointed out all the risks still involved including the risk of violence and –

Mr. Golden:  Violence against who?

Mr. Hoffmann:  Well, I didn't specify against who. I just said that up to now they didn't use any violence and they were just using legal methods, but that was not always the case.  And I, you know, provided a list of all, what I call unusual events in this, in this case.  At the conclusion, I said that I, I simply advised the board to agree to accept 131 or something close, and that we could still get some additional money from Trend.  And that if we don't settle in this round of negotiations, then we, we want to be able to settle in the foreseeable future and even really could give some extra incentive to Andy.  I said that to put my money where my mouth is, I would, if he agrees to it, that then I would reduce my fee, which obviously is something that ultimately concerns you.  So I basically offered to reduce my fee by 30%.

Mr. Golden:  (Whistles) 30%?

Mr. Hoffmann:  Yeah.  But 30 out of 25, you know.  So that means --

Mr. Golden:  Seven and-a-half percent.

Mr. Hoffmann:  -- 75 would be 17.5% but, on the other hand, I --

Mr. Golden:  17.5% of what though; of the total amount received?

Mr. Hoffmann:  Of the total amount received.  Of course, less legal costs.  So let's say the amount would be 131 --

Mr. Golden:  So it's almost about 22 million.  It's over 22 million Crowns.

Mr. Hoffmann:  Yes.  I mean, I would be happy with that.  Really, I mean -- well, I simply believe that there, you know, that it's better to get something than to get nothing.  If this could, you know, be the last drop that persuades them, then I'm willing to do it.

### 4) October 25, 2004 (Golden Dep. 140:7-21)

Mr. Golden:  You should say: The lawsuits may have made it difficult or inconvenient for them to sell the property, but they and the Irish investor claim that they have legal opinions.  They can do it.  Whether they really held - - really block it or not, is unknown. I mean, but you don't want to say that it blocks the lawsuit.  You see the difference here.  Right?  So you want to put in both sides.  You want to say something to the effect that it either makes it inconvenient or causes them to put out money as guarantees, but the Irish investors said that they have a legal opinion that it doesn't stop the lawsuit.  We don't know which is true.  That's all.  But you don't want to play up that it does prevent the deal.  You see why now?  Right?

Mr. Hoffman:  Mm-hmm, yes.

**5) Oct. 27, 2004 (Golden Dep. 175:13-22)**

Mr. Hoffman: So, and anyway, he gets more than US$4 million and that was, basically, you know, his original idea that he should get four million. That even sounded, at that time, completely ridiculous. So he still would be very, very well off.

Mr. Golden: He's never well off until he gets more than the last offer was. Whatever the last offer is, he wants more. But then you know that. What can I tell you? All right. So what would you like from me? What would you like me to tell you or say to you?

**2**

*stupeň utajení zrušen*
*důvody utajení pominuly*
*dne 30. 9. 2007 kpt. Ing. Pavel NEVTŘIL*

*kpd.* ~~.....~~

**- 6 -**

**43 Nt 7235/2004**

## P ř í k a z

Soudkyně Obvodního soudu pro Prahu 1 rozhodla dne 23.9.2004 v Praze v trestní věci proti podezřelému Ing. Vladimíru Hoffmannovi nar.30.10.1965, pro podezření ze spáchání trestného činu podvodu podle § 250 odst.1,4 tr.zákona ve stadiu pokusu podle § 8 odst.1 tr.zák. a další trestné činy

t a k t o :

Podle § 88 odst.1,2 tr.řádu

se n a ř i z u j e

odposlech a záznam telekomunikačního provozu telefonních stanic číslo

.....605 2?2 464.....

.....737 459 610.....

.....217 961 570....., užívaných Ing. Vladimírem Hoffmannem, nar.30.10.1965,

a to od 23.9.2004 do 23.3.2005.

### O d ů v o d n ě n í:

Dne 23.9.2004 podala státní zástupkyně Městského státního zastupitelství v Praze pod sp.zn. V106-3/2004 (1 KZn 2273/2004) návrh na vydání příkazu odposlechu a záznamu telekomunikačního provozu ve smyslu ustanovení § 88 odst.1 tr.řádu.

Ze spisu bylo zjištěno, že policejní orgány PČR Správa hl.m. Prahy SKPV OHK Praha 4, Kongresová 2 provádějí ve smyslu ustanovení § 158 odst.3 tr.řádu pod ČTS:PSP-4035/2004 šetření ve věci podezření ze spáchání trestného činu podvodu podle § 250 odst.1,4) tr.zákona ve stadiu pokusu podle § 8 odst.1 tr.zák., trestného činu zneužívání informací v obchodním styku podle § 128 odst.1,2 tr. zákona a tr. činu porušování závazných pravidel hospodářského styku podle § 127 odst.1,2 tr.zák., z kterých jsou podezřelí Ing. Vladimír Hoffmann, nar.30.10.1965 a státní příslušník USA Andrew Weiss tím, že požadovali po vedení společnosti KOTVA, a.s. odkoupení 12% akcií základního jmění KOTVA, a.s. s tím, že pokud jim nevyhoví, zajistí zablokování nemovitostí OD KOTVA, dále využili informace dosud nikoli veřejné a podali na společnost Holding Kotva řadu vykonstruovaných žalob a dále na katastru nemovitostí na základě nepravdivých informací dosáhli zablokování nemovitostí KOTVA, a.s. K protiprávním jednáním dochází při ústních jednáních mezi Ing. Hoffmannem a Weisem, kteří se domlouvají na další trestné činnosti spočívající v zásazích do majetku OD KOTVA, a.s., k čemuž používají i výše uvedené telefonní stanice.

Soud přezkoumal návrh státního zástupce a došel k názoru po prostudování předloženého spisového materiálu, že jsou dány všechny podmínky podle § 88 odst.1,2 tr.řádu a proto bylo nařízeno jak je ve výrokové části tohoto rozhodnutí uvedeno. Přitom je nutno dodržet postup ve smyslu ustanovení § 88 odst.4 a 5 tr.řádu.

V Praze dne 23.září 2004



**JUDr.Eva B r á z d i l o v á**
soudkyně

**3**

1

Stamp:
POLICE OF THE CZECH REPUBLIC
ADMINISTRATION OF THE CITY OF PRAGUE
*Criminal Police and Investigation Service*
Economic Crime Section
140 21 PRAGUE 4, Kongresová 2


Criminal Prosecution No.: PSP-4035/OHK-3-2004

At Prague on 3 February 2005

DECISION


Pursuant to Section 160(1) of the Criminal Procedure Code, I hereby initiate criminal prosecution of the accused:

1)    Ing. Vladimír Hoffmann,
      nationality: Czech Republic
      born on 30 October 1965 in Bratislava I, Slovak Republic
      birth index no. 651030/6990
      permanent resident at Medinská 825,
                          Klánovice, Prague 9, 190 14
      owner of the company Balfindor a.s., Company ID No. 27107892
      with its seat at Na Kocourkách 2915, Prague 6
      owner of the company Gilroy Limited, Company ID No. 0090061682
      with its seat at Pikioni, 4, Limassol, Republic of Cyprus

2)    Edita Šimková
      nationality: Czech Republic
      born on 27 July 1968 in the Slovak Republic
      birth index no. 685727/6140
      permanent resident at Na Folimance 2153/19,
                          Vinohrady, Prague 2, 120 00
      chairperson of the board of directors of Balfindor a.s., Company ID No. 27107892
      with its seat at Na Kocourkách 2915, Prague 6

3)    Andrew Weiss,
      nationality: United States of America
      born on 2 January 1947, passport no. Z7528881
      resident at 46 Abbottsford Road, 2 Brookline, Massachusetts, 2446 USA
      owner of the company Weiss Asset Management,
      company address 29 Commonwealth Avenue, Boston, Massachusetts 02116,
      which manages the company Brookdale Global Opportunity Fund,
      company address        P.O. Box 1748, GT 27 Hospital Road, George Town
                             Grand Cayman, Cayman Islands
      and controls the company KT, Inc.
      with its seat at 2711 Centerville Road, Suite 400, City of Wilmington, County of
      Newcastle, Delaware, USA,

K 0041

2

for the criminal offence of

extortion pursuant to Section 235(1) and (3) of the Criminal Code, committed as accomplices pursuant to Section 9(2) of the Criminal Code,

because it has been sufficiently substantiated by the facts ascertained until now that

the accused Andrew Weiss and the accused Ing. Vladimír Hoffmann met on 12 May 2004 at 2:00 p.m. in the French restaurant of Obecní dům (Municipal House) in Prague 1, náměstí Republiky 1090/5, with the management of Kotva a.s., ID No. 60193808, with its seat at Prague 1, náměstí Republiky 8, represented by Richard Harazim, general manager of Kotva a.s., born on 10 March 1965, permanent resident at Přezletice, U bažantnice 305, district of Prague-East, and Martin Benda, chairman of the supervisory board of Kotva a.s., born on 8 September 1971, permanent resident at Borač 46, district of Žďár nad Sázavou, and requested from them redemption of 11.9% shares of the registered capital of Kotva a.s., i.e. 82,782 shares, which are held by Brookdale Global Opportunity Fund, P.O. BOX 1748, GT 27 Hospital Road, George Town, Grand Cayman, Cayman Islands (where these shares are administered by the accused Weiss Andrew through his company Weiss Asset Management, 29 Commonwealth Avenue, Boston, Massachusetts 02116), for an amount of 4,000,000 US dollars, stating that if these shares were not so redeemed, the accused Weiss would arrange for blocking the real estate of Obchodní dům Kotva (Kotva Department Store), located at náměstí Republiky 8, Prague 1, in the real estate cadastre by filing fabricated and self-serving lawsuits against Kotva a.s., by which he would substantially disturb negotiations of Kotva Holding with potential strategic partners and financial institutions about the financing of operations and sales of Obchodní dům Kotva, and would restrict the disposal of this property for several years, because he knew that Kotva a.s. had concluded a contract for sale of the above Obchodní dům Kotva from which it could not withdraw and that Kotva a.s. was under a time pressure and had financial problems, and if Kotva a.s. did not purchase his shares, the next offer would be substantially higher, and if Kotva a.s. refused to purchase these shares from him, he would file criminal charges against the board of directors of Kotva a.s. By this way, the accused blackmailed Kotva a.s. and its board of directors by the threat of causing large-scale damage, physical violence or other major detriment, forcing Kotva a.s. and its board of directors to perform, omit or suffer an act, although the above representatives of

3

Kotva a.s. refused to redeem the above shares, stating that the asked price for the shares of Kotva a.s. is excessively high and that Kotva a.s. is not allowed to redeem its own shares.

Subsequently, the accused Weiss and the accused Hoffmann informed through Gilroy Limited and Balfindor a.s. Mr. Henry Prestige, the strategic partner of Kotva a.s., and financial institutions financing the operations of Kotva a.s. about actions filed against Kotva a.s. (as noted below), by which they hindered business operations of Kotva a.s. Such notification of the strategic partner and the financial institutions was meant to prevent the sale of the real property of Kotva a.s. to the strategic partner.

Subsequently, the accused Hoffmann, being the owner of Balfindor a.s., the accused Šimková as the chairperson of the board of director of Balfindor a.s., and the accused Weiss (who instructed the accused Hoffman and the accused Šimková to file the action referred to below), represented by Mgr. Ondřej Peterka, attorney-a-law, registered in the attorneys register kept by the Czech Bar Association under no, 4245, filed with the Municipal Court in Prague on 8 June 2004 on behalf of Balfindor a.s., Company ID No. 27107892, with its seat at Prague 6, Na Kocourkách 29/5 (which purchased on 8 June 2004, specifically for such purpose, one share of Kotva a.s. from the accused Hoffmann), an action for determination of invalidity of the general meeting of Kotva a.s., Company ID No. 60193808. On the same day, i.e. 8 June 2004, they submitted the statement of claim regarding the above action to the Cadastral Office of the City of Prague to attach in the real estate cadastre a seal to the lands and properties of Kotva a.s.

Subsequently, the accused Hoffmann, being the owner of Gilroy Limited, and the accused Weiss (who instructed the accused Hoffmann to file the action referred to below), represented by Mgr. Ondřej Peterka, attorney-at-law, filed with the Municipal Court in Prague on 30 June 2004 on behalf of Gilroy Limited, Company ID No. 0090061682, with its seat at Pikioni, 4, Limassol, Republic of Cyprus, which holds a part of shares of Kotva a.s., an action for determination of title to real estate of Kotva a.s., Company ID No. 60193808, Kotva nemovitosti k.s. with its seat at Příkopy 4, Brno, Company ID No. 26229048, and SPV KN a.s., with its seat at Příkopy 4, Brno. At the same time (on 2 July 2004), they submitted the statement of claim regarding the above action to the Cadastral Office of the City of Prague to attach in the real estate cadastre a seal to the lands and properties of Kotva a.s., Kotva nemovitosti k.s. and SPV KN a.s.

Subsequently, the accused Ing. Vladimír Hoffmann, born on 30 October 1965, birth index number 651030/6990, permanent resident at Prague 9, Medinská 825, as the holder of a part of shares of Kotva a.s., acting jointly with JUDr. Petr Streiberg, permanent resident at Prague 6, Na Kuthance 16/1218, born on 18 October 1955, who holds a part of shares of Kotva a.s., and with the accused Weiss, being the owner of Weiss Asset Management, company address 29 Commonwealth Avenue, Boston, Massachusetts 02116, which manages Brookdale Global Opportunity Fund, with its seat at P.O. BOX 1748, GT 27 Hospital Road, George Town, Grand Cayman, Cayman Islands, which owns a part of shares of Kotva, a.s., all of them represented by Mgr. Jiří Černý, attorney-at-law, substituted by Mgr. Ondřej Peterka, filed with the Municipal Court in Prague on 15 July 2004, on behalf of Brookdale Global Opportunity Fund and on behalf of Ing. Vladimír Hoffman and JUDr. Petr Streitberg as individuals, an action for declaration of invalidity of the general meeting of Kotva a.s. At the same time, they submitted the statement of claim regarding the above action to the Cadastral Office of the City of Prague to attach in the real estate cadastre a seal to the lands and properties of Kotva a.s.

Subsequently, the accused Weiss, who controls KT, Inc., with its seat at 2711 Centerville Road, Suite 400, City of Wilmington, County of Newcastle, Delaware, USA, which holds a part of shares of Kotva a.s. through Brookdale Global Opportunity Fund (which also holds a part of shares of Kotva a.s.), represented by Mgr. Ondřej Peterka, attorney-at-law, filed individually with the Municipal Court in Prague on 23 December 2004 on behalf of KT, Inc. an action for determination of title to real estate. At the same time, he submitted the statement of claim regarding the above action to the Cadastral Office of the City of Prague to attach in the real estate cadastre a seal to the lands and properties of Kotva a.s.

Subsequently, the three accused have requested Kotva a.s. repeatedly by extortion, from 12 May 2004 to date, to redeem of 11.9% of shares of Kotva a.s. and to purchase 39.73% (i.e. 11,098,617 shares) of Trend – všeobecný investiční fond a.s., with its seat at Hradec Králové, Škroupova 9/441, Company ID No. 45245177. They increased the requested redemption price up to 295,000,000 CZK, otherwise they would not withdraw their lawsuits against Kotva a.s., Kotva nemovitosti k.s. and SPV KN a.s., thus causing high financial losses to these companies. The extortion itself was represented by filing the above actions, by personal

5

contacts of the accused with representatives of Kotva a.s., and by a telephone call, by fax and e-mail messages sent to these representatives.

Subsequently, the accused Hoffmann has demanded individually from Kotva a.s. by extortion, from November 2004 to date, payment of 45,000,000 CZK as compensation for withdrawal of claims against Kotva a.s. filed by his companies, i.e. Gilroy Limited and Balfindor a.s. He forced Kotva a.s. to conclude with him a preliminary agreement on compensation for withdrawal of the above claims filed by his companies. The extortion itself was represented by filing the above actions by the companies owned by Hoffman, and by a telephone call, by fax and e-mail messages sent to the representatives of Kotva a.s.

By the foregoing conduct, the accused committed the above criminal offence to the detriment of the following injured parties:

Kotva a.s.

Kotva nemovitosti k.s.

SPV KN a.s.

Martin Benda, born on 8 September 1971

Richard Harazim, born on 10 March 1965.

### Statement of reasons

Kotva a.s. filed on 27 August 2004 to the Police of the Czech Republic, Administration of the Capital City of Prague, Criminal Police and Investigation Service, Kongresová 2, Prague 4, criminal charges against the accused Weiss and the accused Hoffmann regarding the criminal offence described above. Subsequently, an explanatory interrogation with the injured parties Harazim and Benda was carried out. The police seized documents evidencing extortion. Furthermore, having obtained court permission, the police tapped telephone calls in this matter. These calls and seized documents, the criminal charges and explanatory interrogation sufficiently documented this offence. It was ascertained that there are sufficient grounds, pursuant to Section 160(1) of the Criminal Procedure Code, to start criminal prosecution of specific persons who committed such offence. Therefore, the criminal prosecution of the above accused was started.

K 0045

6

**Instruction:**

Pursuant to Section 36(3) of the Criminal Procedure Code, you, as the accused, must have a legal counsel to defend you at the pre-trial proceeding, because you have committed an offence that is punishable under the law by a prison sentence with the upper limit of more than 5 years. If you fail to choose a counsel by yourself or if the counsel is not selected by the persons listed in Section 37 of the Criminal Procedure Code within two hours of the service of this Decision, the defence counsel shall be appointed for you in accordance with Section 38(1) of the Criminal Procedure Code.

I further instruct you that every accused must have his own defence counsel, because the interests of individual accused at this criminal suit are conflicting.

I further instruct you that the following persons will be heard among the witnesses in this criminal matter: Mgr. Ondřej Peterka, Mgr. Jiří Černý and Mgr. Ladislav Chundela of the law offices of Peterka & Partners v.o.s., and JUDr. Ing. Petr Šrámek, listed in the attorneys register of the Czech Bar Association under no. 5076; therefore, you cannot choose these persons as your defence counsels pursuant to Section 37 of the Criminal Procedure Code.

A complaint against this decision may be filed by an accused within three days of the service hereof with the police authority that has prepared this decision. Such complaint has no suspensory effect.

Ing. Pavel Brož

Police Commissioner: *[Signature]*

Accepted by the accused Ing. Vladimír Hoffman on 3 February 2005 at 2:00 p.m. *[Initial]*

Accepted by the accused Andrew Weiss           on

Accepted by the accused Edita Šimková          on 3 February 2005 at 11.20 a.m.

*[Signature]*

K 0046

**4**

## Municipal State Prosecutor's Office in Prague

I KZV 38/2005                                              Prague, 31 August 2007

JUDr. Petr Topinka
AK Prague 1, Národní 11

*Re:* the accused Andrew Weiss – criminal proceedings

Dear Dr Topinka,

I have examined your request for an investigation into the procedure of the police body of 30 July 2007, which was delivered to the Municipal State Prosecutor's Office in Prague, and have arrived at the conclusion that your complaint is unjustified.

Especially at the beginning of the investigation of the case intelligence means and devices were employed as described in Section 158b of the Criminal Code, *et seq.*, though their use was undertaken in accordance with the Criminal Code. As far as following (tailing) persons is concerned, the provisions of Section 158d Paragraph 6 of the Criminal Code were used. In the case of the representatives of Kotva, a.s., monitoring technology can be used with the explicit consent of the subjects involved when it is directly located on their persons. These procedures are used by investigative, prosecuting and adjudicating bodies especially in cases of the criminal act of blackmail. The technology was also used, again with reference to the provisions cited above, in the buildings of the injured parties, who gave their consent to its deployment.

In other cases, the procedure outlined in Section 88 Paragraph 1 of the Criminal Code, namely tapping of telephones and emails, was used with the permission of the appropriate court.

Under no circumstances was the representative of the injured party, Martin Benda, used as an agent as set forth in Section 158e of the Criminal Code.

I have also not found proof in the file that the criminal activity was provoked by the injured parties with the cooperation of the Czech Police Force, and therefore it does not involve the case which you specify in your submission. The investigative, prosecuting and adjudicating bodies concerned themselves with information reported by the injured parties that a criminal act had been committed, which had already been perpetrated, and only with the cooperation of the injured parties monitored the further steps of the accused. I did not find any illegality in their procedure.

For this reason I regard your reservation as unjustified and the evidence which was gathered in accordance with the law will comprise an integral part of the investigation file.

JUDr. Dagmar Máchová
State Prosecutor
Municipal State Prosecutor's Office
in Prague





# Městské státní zastupitelství v Praze

nám. 14. října 9, Praha 5, 150 00; tel.: +420 257 111 611, fax : +420 257 111 682

1 KZV 38/2005

V Praze dne 31.8.2007

JUDr. Petr Topinka
AK Praha 1, Národní 11

Věc: obv. Andrew Weiss- trestní řízení

Pane doktore,

Zabývala jsem Vaší žádostí o přezkoumání postupu policejního orgánu ze dne 30.7.2007, která byla doručena na MSZ v Praze a dospěla jsem k závěru, že Vaše stížnost je nedůvodná.

Ve věci byly nasazeny zejména na počátku vyšetřování operativně pátrací prostředky dle § 158b tr. řádu a následující, nicméně jejich použití bylo provedeno v souladu s trestním řádem. Pokud jde o sledování osob, bylo použito ustanovení § 158d odst. 6 trestního řádu- v případě zástupců spol. tehd. Kotva,a.s.- těchto postupů, kdy je použita sledovací technika přímo umístěná na osobách, je možné použít s jejich výslovným souhlasem. Tyto postupy používají orgány činné v trestním řízení zejména u trestných činů vydírání. Dále byla za použití cit. ustanovení použita v objektech poškozených, kteří souhlasili s jejím nasazením.

V ostatních případech u postupu dle § 88 odst. 1 tr. řádu — odposlechy telefonů a emailů se tak stalo s povolením příslušného soudu.

V žádném případě nebyl zástupce pošk. Martin Benda nasazen jako agent za použití ustanovení § 158e tr. řádu.

Dále jsem ve spise neshledala důkaz o tom, že by trestná činnost byla vyprovokována poškozenými za spolupráce Policie ČR a nešlo tudíž o případ, který uvádíte ve svém podání. Orgány činné v trestním řízení se zabývaly

trestním oznámením poškozených o spáchaném trestném činu, ke kterému již předtím došlo a pouze za spolupráce poškozených dále monitorovali další kroky obviněných. Žádné nezákonnosti jsem v jejich postupu neshledala.

Proto považuji Vaši výhradu na neoprávněnou a důkazy, které byly provedeny v souladu se zákonem, budou tvořit nedílnou součást vyšetřovacího spisu.

JUDr. Dagmar Máchová
státní zástupkyně
Městského státního zastupitelství
v Praze

MĚSTSKÉ STÁTNÍ ZASTUPITELSTVÍ
V PRAZE
150 00 Praha 5, nám. 14. října 9

**5**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KOTVA a.s. and SPV Co., )<br><br>Plaintiffs, )<br><br>v. )<br><br>ANDREW WEISS and WEISS ASSET )<br>MANAGEMENT, LLC )<br><br>Defendants and )<br>Counterclaimants, )<br><br>v. )<br><br>KOTVA a.s., SPV Co., and Richard Harazim )<br><br>Counterclaim-Defendants )<br> ) | Case No. 05-10679-WGY |

**AFFIDAVIT OF RICHARD HARAZIM**

I, Richard Harazim, declare as follows:

1.      I am a senior consultant of K-T-V Finance, k.s. I served as Chief Executive
Officer of Kotva, a.s. ("Kotva") beginning in the summer of 2000.  Effective September 13,
2005, Kotva changed its name to K-T-V Invest, a.s.  This name change was precipitated by the
sale of the "Kotva" trade name along with the Kotva Department Store.  In the summer of 2006,
K-T-V Invest and a Czech company merged to form C.I.S.  Kotva, a.s., K-T-V Invest, a.s., and
C.I.S. are collectively referred to hereafter as "Kotva."

    2.      As part of its criminal investigation into Andrew Weiss and Vladimir Hoffman, the Czech police lawfully intercepted emails, and recorded telephone conversations and meetings involving Weiss and Hoffman.

    3.      Attached as Exhibit A is a true and accurate copy of the September 23, 2004 Court Order signed by Judge JUDr. Eva Brázdilová authorizing the police to wiretap several telephone numbers belonging to Vladimir Hoffman.

    4.      Attached as Exhibit B is a true and accurate copy of the September 29, 2004 Court Order signed by Judge JUDr. Michal Vacek authorizing the police to record email traffic to and from Vladimir Hoffman via the email addresses vlado1@volny.cz and on vlado@anezska.cz.

    5.      Attached as Exhibit C is a true and accurate copy of the September 23, 2004 measure signed by Municipal State Prosecutor JUDr. Dagmar Machova enabling the police to record meetings of Vladimir Hoffmann and Andrew Weiss.

    6.      Exhibits A, B, and C are in Czech. Kotva, however, is obtaining official English translations and will provide them to the Court.

    7.      In March 2007, the Czech police unsealed portions of the Weiss criminal file and permitted Kotva to inspect its contents, including recordings of telephone conversations between Weiss agents, including Howard Golden, Vladimir Hoffman, and Georgiy Nikitin.

    8.      Kotva obtained from the Czech police copies of these recordings. Kotva did not in any way, shape or form, alter or tamper with these recordings. Indeed, the Czech police have told us that the recordings contain a technology that digitally protects them from alteration.

OF THE UNITED STATES OF AMERICA ON THIS 17th DAY OF OCTOBER, 2007.

_____
Richard Harazim

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2007, I caused a copy of the foregoing document to be served by email and first class mail upon all defendants.

/s/ Joel G. Beckman
Joel G. Beckman



*stupeň utajení zrušen*
*důvody utajení pominuly*
*dne 30. 8. 2007 kpt. Ing. Pavel NEVTŘIL*

*-6-*

**43 Nt 7235/2004**

## P ř í k a z

Soudkyně Obvodního soudu pro Prahu 1 rozhodla dne 23.9.2004 v Praze v trestní věci proti podezřelému Ing. Vladimíru Hoffmannovi nar.30.10.1965, pro podezření ze spáchání trestného činu podvodu podle § 250 odst.1,4 tr.zákona ve stadiu pokusu podle § 8 odst.1 tr.zák. a další trestné činy

### t a k t o :

Podle § 88 odst.1,2 tr.řádu

### se  n a ř i z u j e

odposlech a záznam telekomunikačního provozu telefonních stanic číslo

*605 282 464*
*731 459 610*
*271 961 580*, užívaných Ing. Vladimírem Hoffmannem, nar.30.10.1965,

a to od 23.9.2004 do 23.3.2005.

### O d ů v o d n ě n í :

Dne 23.9.2004 podala státní zástupkyně Městského státního zastupitelství v Praze pod sp.zn. V106-3/2004 (1 KZn 2273/2004) návrh na vydání příkazu odposlechu a záznamu tele-komunikačního provozu ve smyslu ustanovení § 88 tr.řádu.

Ze spisu bylo zjištěno, že policejní orgány PČR Správa hl.m. Prahy SKPV OHK Praha 4, Kongresová 2 provádějí ve smyslu ustanovení § 158 odst.3 tr.řádu pod ČTS:PSP-4035/2004 šetření ve věci podezření ze spáchání trestného činu podvodu podle § 250 odst.1,4) tr.zákona ve stadiu pokusu podle § 8 odst.1 tr.zák., trestného činu zneužívání informací v obchodním styku podle § 128 odst.1,2 tr. zákona a tr. činu porušování závazných pravidel hospodářského styku podle § 127 odst.1,2 tr.zák., z kterých jsou podezřeli Ing. Vladimír Hoffmann, nar.30.10.1965 a státní příslušník USA Andrew Weiss tím, že požadovali po vedení společ-nosti KOTVA, a.s. odkoupení 12% akcií základního jmění KOTVA, a.s s tím, že pokud jim nevyhoví, zajistí zablokování nemovitostí OD KOTVA, dále využili informace dosud nikoli veřejné a podali na společnost Holding Kotva řadu vykonstruovaných žalob a dále na katastru nemovitostí na základě nepravdivých informací dosáhli zablokování nemovitostí KOTVA, a.s. K protiprávním jednáním dochází při ústních jednáních mezi Ing. Hoffmannem a Wei-sem, kteří se domlouvají na další trestné činnosti spočívající v zásazích do majetku OD KOTVA, a.s., k čemuž používají i výše uvedené telefonní stanice.

Soud přezkoumal návrh státního zástupce a došel k názoru po prostudování předloženého spisového materiálu, že jsou dány všechny podmínky podle § 88 odst.1,2 tr.řádu a proto bylo nařízeno jak ve výrokové části tohoto rozhodnutí uvedeno. Přitom je nutno dodržet postup ve smyslu ustanovení § 88 odst.4 a 5 tr.řádu.

V Praze dne 23.září 2004



JUDr.Eva  B r á z d i l o v á
soudkyně

B

*[handwritten annotations at top]*

Stupeň utajení zrušen
důvody utajení pominuly
30. 8. 2007 kpt. Ing. Pavel NEVTŘPIL
kpt. ...

43 Nt 7242/2004

## PŘÍKAZ K ODPOSLECHU A ZÁZNAMU TELEKOMUNIKAČNÍHO ZAŘÍZENÍ

Soudce Obvodního soudu pro Prahu 1 JUDr. Michal Vacek rozhodl dne 29. září 2004 v trestní věci podezřelých: 1. Ing. Vladimíra Hoffmanna, nar. 30.10.1965, bytem Praha 9, Medinská 825, a 2. Andrew Weisse, st. přísl. USA, bližší údaje dosud nezjištěny, podezřelých ze spáchání tr.činů porušování závazných pravidel hospodářského styku podle § 127 odst. 1 tr. zákona a pokusu trestného činu podvodu podle § 8 odst. 1 tr. zákona k § 250 odst. 1, 4 tr. zákona, o návrhu státního zástupce dle § 88 odst.1,2 tr.řádu, takto:

Podle § 88 odst.1, 2 tr.řádu se nařizuje záznam e-mailových zpráv uskutečněných na adresách: vlado1@volny.cz a vlado@anezska10.cz, pokud jejich provozovatelem je právnická osoba působící na území České republiky, a které užívá podezřelý Ing. Vladimír Hoffmann.

Doba záznamu se stanoví na šest měsíců, t.j. od 29.9.2004 do 29.3.2005.

Záznam telekomunikačního provozu provede příslušný policejní orgán ČR.

### Odůvodnění

Policejním orgánem v Praze byly dne 7.9.2004 pod sp. zn. ČTS: PSP-4035/2004 zahájeny úkony trestního řízení ve věci podezření ze spáchání tr.činů porušování závazných pravidel hospodářského styku podle § 127 odst. 1 tr. zákona a pokusu trestného činu podvodu podle § 8 odst. 1 tr. zákona k § 250 odst. 1, 4 tr. zákona, ze kterých jsou důvodně podezřelí Ing. Vladimír Hoffmann a Andrew Weisse.

V průběhu trestního šetření bylo zjištěno, že podezřelý Hoffman uskutečňuje komunikaci prostřednictvím svých výše uvedených e-mailových adres.

Na základě tohoto poznatku má proto státní zástupce za to, že záznamem těchto e-mailových adres budou sdělovány závažné informace týkající se probíhajícího šetření, a proto zdejší soud požádal o povolení záznamu těchto adres na dobu šesti měsíců.

Soudce přezkoumal podaný návrh a shledal, že je důvodný. V předmětné věci je vedeno trestní šetření proti výše uvedeným podezřelým pro shora uvedenou trestnou činnost a z dosud shromážděných poznatků, zejména z úředních záznamů o podání vysvětlení, vyplývá důvodné podezření, že takto mohou být sděleny skutečnosti významné pro probíhající trestní šetření. Proto bylo rozhodnuto tak, jak je shora uvedeno.

Poučení: proti tomuto příkazu není stížnost přípustná

V Praze dne 29. září 2004

JUDr. Michal Vacek
soudce

C

*Stupeň utajení zrušen*

*důvody utajení pominuly VYŘAZENO*

*dne 30.8.2007 kpt. ly Pavel NEVITPL*

# Městské státní zastupitelství v Praze

Legerova 13, 121 45  Praha 2; tel.: +420(2)24261188,  fax : +420(2)24261008

V106-4/2004                                          V Praze dne 23. 9. 2003
1KZn 2273/2004

Utajovat do zrušení stupně utajení
písemnosti Policie ČR č.j. V45/2004-PSP/OHK-3

# Opatření

Státní zástupkyně Městského státního zastupitelství v Praze ve věci podezření z trestných činů zneužívání informací v obchodním styku podle § 128/1,2 tr. zákona, pokusu k trestnému činu podvodu dle § 8/1 k § 250/1,4 tr. zákona a další rozhodla, t a k t o :

Podle § 158d) odstavce 2 trestního řádu **p o v o l u j i** sledování osob a to Andrew Weisse, státního příslušníka USA, majitele firmy Brookdale Global a ing. Vladimíra Hoffmanna, nar. 30. 10. 1965 bytem Praha 9, Medinská 825 a to na dobu **šesti měsíců.**

# Odůvodnění

Policejním orgánem Policie ČR pod ČTS:PSP-4035/2004 byly dne 7. 9. 2004 zahájeny procesní úkony podle § 158 odst. 3 tr. řádu ve věci podezření z pokusu trestného činu podvodu podle § 8/1 k § 250/1,4 tr. zákona, dále trestných činů zneužívání informací v obchodním styku dle § 128/1,2 tr. zákona a porušování závazných pravidel hospodářského styku dle § 127/1,2 tr. zákona, z kterých jsou podezřelí ing. Vladimír Hoffmann, nar. 30. 10. 1965 a státní příslušník USA Andrew Weiss tím, že požadovali po vedení společnosti KOTVA, a.s. odkoupení 12% akcií základního jmění KOTVA, a.s. s tím, že pokud jim nevyhoví, zajistí zablokování nemovitostí OD KOTVA, dále využili informace dosud nikoli veřejné a dále na katastru nemovitostí na základě nepravdivých informací dosáhli zablokování nemovitostí KOTVA, a.s.

Vzhledem k tomu, že k protiprávním jednáním dochází při ústních jednáních mezi ing. Hoffmannem a Weissem a zástupci KOTVA, a.s. většinou mezi dvěma osobami, je nutné zadokumentovat jejich jednání v plném rozsahu, zejména jejich vyhrůžky na adresu poškozených, rozhodla jsem o povolení operativně pátracích prostředků podle § 158d) odst. 2 tr. řádu, které budou použity jako důkaz v trestním řízení.

JUDr. Dagmar Máchová
státní zástupkyně
Městského státního zastupitelství
v Praze

**6**

IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856

AND IN THE MATTER OF CIVIL PROCEEDINGS NOW PENDING

BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT

OF MASSACHUSETTS (CIVIL ACTION NO. 05-10679-RCL)


```
--------------------------------
                                )
                                )
                                )
KOTVA a.s.                      )
                                )
          Plaintiff             )
                                )
                                )
          v.                    )
                                )
                                )
ANDREW WEISS and WEISS ASSET    )
MANAGEMENT, LLC                 )
                                )
                                )
          Defendants            )
--------------------------------)
```

                         Deposition of:

                         Mr. Howard Golden

                         Taken at:
                         Courtroom No 126
                         District Court for Prague 1,
                         Ovocny trh 14

                         On:  April 16th, 2007
                         Commencing at 9.30 am


*Gwen Malone Stenography Services Ltd.*

1        **(On the record - 11.39 am)**

2                MR BECKMAN:

260   3      Q.  Mr Golden, I am going to play for you a recording

4    of a telephone conversation between you and Mr Hoffmann,

5    dated September 29th, 2004.  I want you to listen to the

6    conversation first.

7                MR DANGEL:  Excuse me, but please note my

8    objection.  Please note my objection.

9                The record will reflect this is being played

10   from a computer that Mr Harazim has produced here.

261   11     Q.   *"Mr Hoffmann:  Hello?*

12   *Mr Golden:  Hi, Buddy.  What's up?*

13   *Mr Hoffmann:  Hi.  Well, I promised to call you with*

14   *news concerning Kotva.  So I believe that I have some*

15   *moderately good news.*

16   *Mr Golden:  Okay.*

17   *Mr Hoffmann:  I met Benda, actually -- when was it --*

18   *Thursday or Friday of last week.  No, no, no.  What am*

19   *I saying?  No, I met him Monday.  I met him this Monday.*

20   *I'm confused because yesterday was a holiday.  So I met*

21   *him, in fact, on Monday, and he called me back today.*

22   *Basically, for the first time, he admitted that our*

23   *lawsuit concerning the ownership of the property really,*

24   *really --*

25   *Mr Golden:  Concerns them.*

26   *Mr Hoffmann:  -- concerns them, and that we hit the*

27   *right point.  And basically, of course, we discussed,*

28   *you know, some technicalities concerning if they can buy*

29   *their own shares, if Kotva can buy its own shares, which*

62

1  is not that, not that easy.  And I have the feeling that
2  they would even accept the incredible price required by
3  Andy.
4  Mr Golden:  Unbelievable that he's really -- maybe he's
5  a genius.  Maybe I'm wrong.
6  Mr Hoffmann:  Maybe he is a genius.  But just to remind
7  you, it's 131 million.  Maybe he's a genius.  I don't
8  know.  Before it's over we should judge it.  And Andy
9  still can change his mind and increase the price.
10  Mr Golden:  He may just be lucky.  I mean, maybe he's
11  lucky, maybe he's a genius.  I don't know.  On the one
12  hand, yeah, it would be interesting.  On the other hand,
13  it creates a problem for me because I sold those shares
14  at a very low price to them, and now Lars is asking
15  where's my money, and all this other stuff.  So I don't
16  know.  But, okay.  Whatever it is.  If you do it, and we
17  get it over with, and you make money, I want the
18  Vladimir Hoffmann Pension Fund to be very large.  And
19  then maybe you'll invest 100,000 in my fund or
20  something.  Who knows?
21  Mr Hoffmann:  Well, I mean, the point is that it's
22  really, basically, difficult for them to pay such an
23  amount of money in such a way that they don't create
24  potential lawsuits from other minority shareholders.  So
25  I was able to persuade Benda that the easiest way would
26  be if the Irish guys would pay part of the purchase
27  price right to us, directly to us.  And then, you know,
28  Kotva wouldn't have to, basically, seek any financing or
29  do some --

63

1  *Mr Golden:  Let them buy our shares.  Let the Irish guys*
2  *buy most of our shares so then they could get some of it*
3  *back when they do a buy-in of all the money at a certain*
4  *price.*
5  *Mr Hoffmann:  They wouldn't, they wouldn't buy our*
6  *shares, but once they will be paying the purchase price*
7  *for, for the property, they would pay part of the*
8  *purchase directly to us, and we will give the shares --*
9  *transfer the shares to whoever they tell us.  So,*
10 *basically, the point is that we should have a meeting*
11 *with Benda and Prestage next Wednesday when Prestage is*
12 *back from holiday.*
13 *Mr Golden:  God bless you.*
14 *Mr Hoffmann:  So this is the news.*
15 *Mr Golden:  That certainly is news.  Terrific.*
16 *Mr Hoffmann:  All right.*
17 *Mr Golden:  Great news.  Good luck.  And if I can help*
18 *or you want me to be at a meeting, I come back in the*
19 *afternoon on Wednesday.*
20 *Mr Hoffmann:  Oh, no.  I believe that you can't be in*
21 *the meeting.  If something comes to your mind concerning*
22 *how to approach Prestage and how to explain to him that*
23 *this is not --*
24 *Mr Golden:  What comes to mind immediately is that they*
25 *should do a buy-out offer at a relatively low price.  We*
26 *sell the shares to Prestage and his company at X.  Then*
27 *Kotva makes a public offer to buy in the shares at a*
28 *much, much lower price so that there's a difference*
29 *between what they can then submit the shares to, so that*

64

1    *Kotva then says:  Look, we had other shareholders give*
2    *it.  Look, James, Golden's people are, you know -- Weiss*
3    *sold his shares, and those 10% we bought in or whatever*
4    *it is.  That accomplishes two or three things.  One, it*
5    *gets part of the money back from Prestage so that the*
6    *money that those guys get is, you know -- because you're*
7    *asking him to divert some of the purchase money.  In the*
8    *contract -- what you have to understand, in the contract*
9    *of sale, if anybody sees the contract of sale has to*
10   *have -- let's say it's 100 million -- let's say it's 1*
11   *billion Crowns, whatever the price is.  If they're*
12   *saying it's 1 billion, pay me 900 and pay 100 to Weiss.*
13   *That has to be in the contract.  I'm suggesting --*
14   *Mr Hoffmann:  No, no, no, Howard.  It doesn't have to be*
15   *in the contract, and I'll tell you why.  Because,*
16   *basically, they will have a -- (Telephone interruption)*
17   *Mr Golden:  Just one second.  Vlado, this is Cyprus.*
18   *I'm going to have to take this.*
19   *Mr Hoffmann:  Okay.*
20   *Mr Golden:  I'll call you later on today, and we'll*
21   *talk.*
22   *Mr Hoffmann:  Okay.  Thank you.  Bye.*
23   *Mr Golden:  Thank you so much.  Bye".*
24   MR DANGEL:  Move to strike.
25           MR BECKMAN:
262  26   Q.  Mr Golden, do you recognise your voice on this
27   recording?
28       A.  I did not consent to this recording.  I remember
29   at the beginning of this discussion that we discussed my

                          65

*Gwen Malone Stenography Services Ltd.*

1    rights to not testify about something that may
2    incriminate me in one way or the other.  I don't know
3    what involvement you had with, directly or indirectly
4    with surreptitiously taping my discussions with
5    a third-party and I want to put my objection on the
6    record that I did not consent to being taped.  This was
7    a private conversation and I don't know that I wish to
8    give any testimony whatsoever concerning a private
9    conversation that I had.  And now I know it was taped
10   and I am really upset, sir, I must tell you.  I hope,
11   I hope for your sake that you are not involved with this
12   either directly or indirectly in breaching my private
13   privacy.  But I hope you can understand how upsetting it
14   is to hear your voice like this.  And, yes, I recognise
15   my voice on that tape.
16          MR DANGEL:  Excuse me, but I need to know
17   a date and time of that conversation.
18          MR BECKMAN:  I said it at the beginning.
19   September 29th, 2004.
20   Q.  Mr Golden, let me represent to you that the
21   recording of this telephone conversation that you just
22   heard was taped by the Czech police.  Neither I nor my
23   client had anything to do with it.  And I also represent
24   to you that the Czech courts approved the Czech police,
25   as part of its investigation, to tape recordings which
26   is referred in the charge document against Mr Weiss.
27   A.  Let me represent to you that the Czech police
28   would only have done this if they received a formal
29   complaint.  And, therefore, your client did have

263

                          66

            *Gwen Malone Stenography Services Ltd.*

1  something to do with it because they filed a complaint
2  against either Weiss or Hoffmann, or somebody indicated
3  that illegal action had taken place.  Now the police get
4  thousands of such complaints and act on a relatively
5  limited number of those.  So to tell me that your client
6  had nothing to do with the tape is at best ingenuous
7  and, quite frankly, I believe it is not true.
8         MR DANGEL:  I need to say something else.
9  First of all, Mr Golden is an American national.  And,
10  secondly, this is being offered in a case involving an
11  American national, a civil case in the United States.
12  And I don't care whether the Czech police thought they
13  had a right to tape Vlado Hoffmann who may be a Czech
14  national operating the Czech Republic.  But this effects
15  an American company, American civil liberties, and you
16  know as well as I know that this is completely illegal,
17  and even using this in this case is illegal.
18         MR BECKMAN:  It is not illegal and I do not
19  want you to waste my time in the deposition.  It is my
20  time.
21         MR DANGEL:  Wait a minute.  I don't want to
22  argue.  I just want to know one thing.  Was this man
23  working for the company at the time that he was taped?
24  Is this something that effects my company or is this
25  something where he, who has now been, is no longer with
26  the company, and I think you need to and so therefore it
27  effects him personally and not the company and I think
28  you need to make a record on that.
29         MR BECKMAN:  This is a deposition and I am

*Gwen Malone Stenography Services Ltd.*

1    going to continue with the questions.

264    2    Q.   Do you recognise the voice of Vladimir Hoffmann?

3    MR DANGEL:  Objection.

4    A.   Without waiving my right not to testify based on

5    my Fifth Amendment right of the United States

6    Constitution I will answer that I do recognise the voice

7    of Vladimir Hoffmann on this tape.

8    MR BECKMAN:

265    9    Q.   Did you have this conversation with Mr Hoffmann?

10    MR DANGEL:  Object.

11    A.   I didn't remember this conversation prior to

12    hearing it on the tape but I believe that I had such

13    a conversation with Mr Hoffmann.

14    MR DANGEL:  Move to strike.

15    MR BECKMAN:

266    16    Q.   Do you believe that this is an accurate recording

17    of your telephone conversation with Mr Hoffmann?

18    MR DANGEL:  Objection.

19    A.   On that I have no recollection, it could have

20    been that I said more or less.  Some of the things that

21    I heard there I now recall saying, but to tell you this

22    is accurate, this is either the entire -- accurate

23    means, in my view, that it is the entire conversation,

24    that there is nothing added or subtracted, it wasn't

25    taken from other conversations or whatever, and that

26    I cannot represent to you, no.

27    MR BECKMAN:

267    28    Q.   Let me play you a portion of the conversation we

29    just heard.

68

*Gwen Malone Stenography Services Ltd.*

```
 1      A.   Sir, I am just wondering, if this was done by
 2   the Czech police and your representation is that this
 3   was done as part of a criminal investigation, then how
 4   come this is being played to me in a civil litigation by
 5   one, by one of the Plaintiffs of that civil litigation?
 6   Could you, if this is true, that is what you represented
 7   to me.   You said there was a Czech court that approved
 8   in a criminal investigation that a criminal examination
 9   be made and in that my tape was done.   Could you just
10   explain to me then how it is that the police are not
11   here to give me this tape and this is being given to me
12   or at least played to me by a Plaintiff in a civil case
13   in the United States?
14      Q.   Let me, I am not obligated to answer your
15   questions but I am going to.
16      A.   I know that.
17      Q.   But I am going to as a professional courtesy to
18   you and perhaps put you at ease a bit.   As the damaged
19   party, Kotva is entitled to access to the complete file,
20   as is Mr Weiss.   And, in fact, the court in the United
21   States of America in this case ordered the Plaintiffs,
22   I apologise, the Defendants to turn over any copies of
23   the tapes that they had secured from the witness file.
24   They have not done so.   These are the tapes that we
25   received directly from the Czech police.   But Mr Weiss,
26   Weiss Asset Management are obligated to turn over the
27   tapes.   They have not done so.   If they had turned over
28   their copies of the tapes I would be playing those for
29   you to today, Mr Golden.   But they have not done so
```

268

269

69

*Gwen Malone Stenography Services Ltd.*

1    last week.  So, they first surfaced when Mr Harazim
2    played them after lunch with a representative from Weiss
3    Asset Management a couple of weeks ago.  Other than
4    that, I don't think we had ever heard the tapes.  But it
5    doesn't matter who accessed the tapes, the question is
6    whether the Czech government can assist a civil
7    litigation by taping American nationals.  It is not only
8    illegal, in my opinion, it is a total, it is an absolute
9    disgrace and it discourages Americans from investing in
10   the Czech Republic and it is sad that it occurred.  But
11   you continue on, sir.
12         MR BECKMAN:  I am just going to caution you,
13   Mr Dangel.  Again there is an order of this Court not to
14   interrupt the deposition with long objections and
15   statements.  We will have a hearing before the court --
16   let me finish, I let you finish.  We will have a hearing
17   before the US Court on this issue, if you so desire.
18   But right now you are wasting my time to ask questions
19   of Mr Golden and to get him out of here.  So I'd really
20   appreciate if you would comply with Rule 30(d) and the
21   Court's order not to engage in speaking objections and
22   arguing.  Because you are, you are really going on very
23   thin ice.
24         MR DANGEL:  I agree not to do that.  I agree
25   not do that so long as you no longer make statements on
26   record and just ask questions.  I was responding to what
27   you said, sir.
28         MR BECKMAN:  I was asking -- answering the
29   witness's questions.  So we are going move on.

71

270    1    Q.  I am going to play you a clip of the conversation

2    we just heard, Mr Golden.

3        *"This is the first time the message about our*

4    *lawsuit concerning the ownership of the property really,*

5    *really concerns them and that we hit the right point,*

6    *and"* --

7    Did Vladimir Hoffman tell you that Mr Benda admitted

8    that our lawsuit concerning the ownership of the

9    property hit the right point?

10        MR DANGEL:  Objection.

11    A.  In the tape you played it appears to me that

12    that's the words that Mr Hoffmann used.

13        MR BECKMAN:

271    14    Q.  Did Mr Hoffmann tell you that Mr Benda admitted

15    that the lawsuit concerning the ownership of the

16    property concerns them?

17        MR DANGEL:  Objection.

18    A.  It appears from the tape you played to me that is

19    what Mr Hoffmann said to me.

20        MR BECKMAN:

272    21    Q.  We come to another claim.

22        *"You know, some technicalities concerning if they*

23    *can buy their own shares, if Kotva can buy its own*

24    *shares, which is not that easy.  And I have the feeling*

25    *that they would even accept the incredible price*

26    *required by Andy"*.

27        Did Mr Hoffmann tell you that if Kotva can buy

28    their own shares -- let me rephrase that.  Did

29    Mr Hoffmann tell you as to whether there was some

72

1    technicalities as to whether Kotva can buy their own

2    shares?

3              MR DANGEL:   Objection.

4    A.   When?

5              MR BECKMAN:

273  6    Q.   In this telephone conversation?

7    A.   Without waiving my rights to testify against

8    myself as we have discussed numerous times here, it

9    appears that Mr Hoffmann did say that, that there was

10   a difficulty in buying back shares by the Kotva

11   corporation.

274  12   Q.   Did Mr Hoffmann tell you that he discussed with

13   Mr Benda whether Kotva can buy their own shares?

14   A.   Without waiving any rights to my privilege under

15   the Fifth Amendment of the United States, it appears to

16   me that from what I heard in this conversation he did

17   discuss such a thing.

18             MR DANGEL:   Joel, I need to object to that.

19   Can I just have a continuing objection on this area?

20             MR BECKMAN:   Of course.

21             MR DANGEL:   Thanks.   That would save us

22   time.   Thank you.

23             MR BECKMAN:

275  24   Q.   And, Mr Golden, you can have a standing objection

25   as well, but if you want to say, if you feel more

26   comfortable, that is fine too?

27   A.   Well at some point I may not wish to answer

28   because this appears, the last thing I want to do is

29   have the Czech police come against me and telling me

73

1    that I am part of this conspiracy.

2                MR DANGEL:  Objection to that part of any

3    conspiracy, but anyway.

4                MR BECKMAN:

276    5    Q.  Did Vladimir Hoffmann tell you that Kotva, that

6    Kotva buying its own shares is not that easy?

7    A.  When?

277    8    Q.  In this telephone conversation that you have just

9    heard?

10    A.  Without waiving my rights under the Fifth

11    Amendment, I believe that what I heard from this

12    conversation to your question to answer affirmatively.

278    13    Q.  Do you know why it was not that easy for Kotva to

14    buy its own shares?

15    A.  If you are asking me an expert opinion as to how

16    Czech law works in repurchasing shares, my best answer

17    to you would be I may have an idea, but such testimony

18    would be as an expert witness because I have dealt in

19    corporate situations and not as a fact witness and my

20    understanding is that I am supposed to be here

21    testifying from the facts which I know rather than

22    either my legal knowledge or speculation.  So, that is

23    the best answer I could give to that question, sir.

279    24    Q.  Let me ask it this way.  I am not asking, you are

25    not being called as an expert witness, only a fact

26    witness and I am asking for your best understanding as

27    to whether, as to why it would not be that easy for

28    Kotva to buy its own shares?

29                MR DANGEL:  Wait a minute.  Objection.  Of

74

*Gwen Malone Stenography Services Ltd.*

1   course, if --

2           MR BECKMAN:  Mr Dangel, again we really need

3   to move this along.

4           MR DANGEL:  No, you are not allowed to --

5           MR BECKMAN:  Mr Dangel --

6           MR DANGEL:  -- to do anything that a lawyer

7   isn't allowed to do.  Now, come on.  You either want to

8   know what his opinion is based on his experience here or

9   you want to know whether something ask him about it.  If

10  you want to get beyond what somebody asked him about, if

11  you want his opinion, it is okay, I can object to him

12  giving his opinion if that is what you want.

13          MR BECKMAN:  You may answer, Mr Golden.

14  A.   Buy ins of shares of corporations in the Czech

15  Republic are very carefully monitored and you have to

16  have, I don't remember now if it is 51 or 75%, I think

17  that there is a question in the shareholders meeting of

18  how many people have to vote, what percentage would be

19  required for that.  I think that is what one of the

20  problems would be.  And I don't think at that time the

21  Forminster had the super majority required to do a buy

22  in.  That is one area that could be a problem.

23  Q.   Did Mr Hoffmann tell you in his telephone

24  conversation that he had the feeling that they would

25  even accept the incredible price required by Andy?

26          MR DANGEL:  Objection.

27  A.   Without waiving my rights under the Fifth

28  Amendment, it appears from the recording I just heard

29  that that is what Mr Hoffmann said.

280

75

*Gwen Malone Stenography Services Ltd.*

281     1      Q.  I will play you another clip of the same

        2      telephone conversation, it is a continuation of what we

        3      heard.

        4             MR DANGEL:  Just have the record reflect

        5      this too is being played off Mr Harazim's computer.

        6             MR BECKMAN:

282     7      Q.  *"I have the feeling that they would even accept*

        8      *the incredible price required by Andy.*

        9      *Mr Golden:  Unbelievable that he's really -- maybe he's*

        10     *a genius.  Maybe I'm wrong.*

        11     *Mr Hoffmann:  Maybe he is a genius.  But just to remind*

        12     *you, it's 131 million.  Maybe he's a genius.  I don't*

        13     *know.  Before it's over we should judge it and Andy*

        14     *still can change his mind and increase the price.*

        15     *Mr Golden:  He may just be lucky.  I mean, maybe he's*

        16     *lucky, maybe he's a genius.  I don't know.  On the one*

        17     *hand, yeah, it would be interesting.  On the other hand,*

        18     *it creates a problem for me because I sold those shares*

        19     *at a very low price to them, and now Lars"* --

        20     Did Vladimir Hoffmann tell you -- let me back up.  Did

        21     you tell Vladimir Hoffmann that it was unbelievable?

        22            MR DANGEL:  Objection.  I mean continuing

        23     objection to this form of examination.

        24     A.  Continuing objection to not waiving my rights it

        25     appears I used that term in this conversation.

        26            MR BECKMAN:  What was unbelievable to you?

        27     A.  My best recollection, without waiving my rights

        28     in regard to this whole line of questioning, would be

        29     that the offer would be raised by a factor of five or

                                    76


                *Gwen Malone Stenography Services Ltd.*

1   so.

283    2       Q.   Was the price of 131 million Czech Crowns

3   unbelievable to you?

4       A.   No, the price was low because it didn't represent

5   the value.  What was unbelievable was that the people in

6   a period of strength, meaning the Forminster group,

7   would be willing to pay something near the true value of

8   the shares because they were a very strong organisation.

9   They had succeeded in defending themselves over the

10   years.  They had excellent lawyers.  They had drawn this

11   thing out.  No-one had ever been prosecuted in the Trend

12   case for ten years.  As you asked me earlier, the Trend

13   theft occurred before I even got into this in 1996.  We

14   were talking in 2008, so for eight years no-one had been

15   prosecuted.  And my experience in the Czech Republic was

16   that people in that position of power usually did not

17   pay anything near the real value for what an asset was

18   worth because they had been used to getting away with

19   taking it for substantially less.  That is the part that

20   was unbelievable.  If I am answering your question

21   correctly, was the price unbelievable from the point of

22   view that it was more than the value or was the price

23   unbelievable for what other purpose, that is the answer

24   I am trying to give you.

284    25       Q.   Okay.  Who came up with 131 million; Andrew Weiss

26   or Vladimir Hoffmann, to your knowledge?

27       A.   I don't know.  From what I heard in the

28   conversation --

29           MR DANGEL:  No, no.  Object.

77

*Gwen Malone Stenography Services Ltd.*

1     A.   Okay, object.   I have no, I have no idea except

2     for what you heard in the conversation what Mr Hoffmann

3     said.

4          MR BECKMAN:

285   5     Q.   "... who knows?

6     *Mr Hoffmann:  Well, I mean, the point is that it's*

7     *really, basically, difficult for them to pay such an*

8     *amount of money in such a way that they don't create*

9     *potential lawsuits from other minority shareholders.   So*

10    *I was able to persuade Benda that the easiest way would*

11    *be if the Irish guys would pay part of the purchase*

12    *price right to us, directly to us.   And then"*

13    Mr Golden, did Vladimir Hoffmann tell you that it is

14    really basically difficult for them to pay such an

15    amount of money in such a way that they don't create

16    potential lawsuits from other minority shareholders?

17         MR DANGEL:  Well continuing objection.

18         MR BECKMAN:  You said that, Mr Dangel.

19    Please, we need to move this along.

20         MR DANGEL:  Oh, Lord.

21    A.   Well without waiving my rights, it appears, yes,

22    that is what Mr Hoffmann said.

23         MR BECKMAN:

286   24    Q.   Did Mr Hoffmann tell you that he was able to

25    persuade Benda that the easiest way would be if the

26    Irish guys would pay part of the purchase price directly

27    to us?

28    A.   Without waiving my rights and the continuing

29    objection as we discussed, from what I heard in this

78

1    tape, yes, that is what it appeared Vlado Hoffmann had

2    stated.

3        As a comment, sir, one of the things I said on

4    this tape reflects one of your prior questions when you

5    asked me whether I believed Andy was crazy or sick,

6    I can't remember what words you used.  You note here, in

7    addition to sometimes saying he is crazy, I also

8    sometimes said he may be a genius.  So it depends on the

9    circumstances.

287    10    Q.  Did Mr Hoffmann tell you that he should have

11    a meeting with Prestage and Benda next week?

12    A.  In this, we are talking about this conversation,

13    correct, sir?

288    14    Q.  Yes.

15        MR DANGEL:  Objection to the form, but...

16    A.  It appears what I heard in this conversation that

17    is what Mr Hoffmann told me.

18        Has Mr Hoffmann heard these tapes?

19        MR BECKMAN:

289    20    Q.  Hmm?

21    A.  Has Mr Hoffmann heard these tapes?

290    22    Q.  I don't know.

23    A.  Well if Weiss has them, why would Hoffmann.

291    24    Q.  I would think.

25        "... themselves.  So, basically, the point is

26    that we should have a meeting with Benda and Prestage

27    next Wednesday when Prestage is back from holiday.

28    Mr Golden:  God bless you.

29    Mr Hoffmann:  So this is the news.

79

1   *Mr Golden:  That certainly is news.  Terrific.*
2   *Mr Hoffmann:  All right.*
3   *Mr Golden:  Great news.  Good luck.  And If I can help*
4   *or you want me to be at a meeting, I come back in the*
5   *afternoon on Wednesday.*
6   *Mr Hoffmann:  Oh, no.  I believe that you can't be in*
7   *the meeting.  If something comes to your mind concerning*
8   *how to approach Prestage and how to explain to him that*
9   *this is not Vydirani"* --
10  Did Vladimir Hoffmann ask you if something comes to mind
11  concerning how to approach Prestage and to explain to
12  hem this is not vydirani?
13      A.   Could you replay that part, I don't remember
14  hearing that word, it is the first time I ever --
15              MR DANGEL:  Could somebody translate it for
16  me?
17              MR BECKMAN:  We will have the translator do
18  it when we are done.
19              *"Mr Golden:  That certainly is news.  Great*
20  *news.  Good luck.  And If I can help or you want me to*
21  *be at a meeting, I come back in the afternoon on*
22  *Wednesday.*
23  *Mr Hoffmann:  Oh, no.  I believe that you can't be in*
24  *the meeting.  If something comes to your mind concerning*
25  *how to approach Prestage and how to explain to him that*
26  *this is not vydirani, if it comes to mind"* --
27      A.   Even there I have trouble hearing because
28  I started talking.
29              MR BECKMAN:  Could you translate that word,

80

1    please?

2                 MR DANGEL:  Objection, but please do.

3                 THE INTERPRETER:  Yes, there is a word that

4    goes Vydirani and that means blackmail.

5                 MR BECKMAN:  Blackmail.

6                 THE INTERPRETER:  Yes, blackmail or

7    extortion.

8                 MR BECKMAN:

292    9    Q.  Did Mr Hoffmann ask you if something comes to

10    mind concerning how to approach Prestage and to explain

11    to him how this is not blackmail?

12    A.  No.

293    13    Q.  Did he --

14    A.  I heard, I didn't hear that last word.  I heard

15    the first part of it.  Even now when you repeated it

16    a third time on this tape, you will note that I was

17    talking over that last word and I didn't notice that

18    word.  What I heard then and now was if anything comes

19    to mind about how to explain this to Prestage, that

20    I heard all the times.  But the word blackmail or

21    vydirani, even when I was listening to it now, to be

22    quite frank with you, I didn't catch it and I am certain

23    I didn't catch it when we were on the phone because when

24    you start talking you are not listening to what the

25    other person said.  And so I just want on the record

26    that that word, and besides which I didn't know it in

27    Czech, but I didn't hear it now and I didn't recall it

28    then.

294    29    Q.  Let's play it one more time.

81

*Gwen Malone Stenography Services Ltd.*

1    "Mr Golden:  Great news.  Good luck.  And If I can help
2    or you want me to be at a meeting, I come back in the
3    afternoon on Wednesday.
4    Mr Hoffmann:  Oh, no.  I believe that you can't be in
5    the meeting.  If something comes to your mind concerning
6    how to approach Prestage and how to explain to him that
7    this is not vydirani --
8    Mr Golden:  What comes to mind" --
9    Let me ask you, Mr Golden, did Vladimir Hoffmann ask you
10   in this conversation if something comes to your mind
11   concerning how to approach Prestage and how to explain
12   to him that is not vydirani?
13              MR DANGEL:  Objection.
14       A.  Is that your next question?
15              MR BECKMAN:
16       Q.  Yes.
17       A.  I thought I answered it a minute ago and I have
18   the same answer.  The first part of what you said
19   I heard now and I most likely heard at the time, which
20   was if something comes to mind as to how to approach
21   Mr Prestage and explain to him, my recollection as to
22   what I understood and what I understood while listening
23   to it had to do with how to do the transfer where money
24   would go partially to the Weiss people and partially to
25   Kotva, that was the explanation I understood.  I, to
26   this day, don't know the word vydirani.  It wasn't part
27   of my vocabulary and I had, didn't even pay attention to
28   it this period, nor, I am certain that during the time
29   I made the conversation did I either understand the word

82

1    or hear it at the time.  So, therefore, if you are
2    asking me if he said it, listening to it today, and that
3    is your question, it appears from what I heard on the
4    tape that that is what he said.
5        Q.  That he said vydirani?
6        A.  Whatever the word is that the translator called
7    blackmail; vydirani or vydani or whatever, that appears
8    to be on the tape, yes.
9            MR DANGEL:  I will move to strike.
10           MR BECKMAN:
11       Q.  Mr Golden, we are going to shift gears now.  Let
12   me play for you a recording of a conversation between
13   you and Mr Hoffmann dated October 5th, 2004 and we are
14   going to play the entire telephone conversation?
15       A.  You don't know how disturbing this is.
16           MR DANGEL:  Don't say anything until you are
17   asked a question.  It just makes it very confusing.
18       A.  Mr Dangel, you feel raped when your private
19   conversations are being taped.  I am sorry but I am
20   upset.
21           MR BECKMAN:  Here we go.
22   "Mr Golden:  Yes?
23   Mr Hoffmann:  Hi.  Do you have a minute now?
24   Mr Golden:  No.  I'm in, doing a takeover here in
25   Cyprus.  Why don't you take one minute.  Did something
26   new happen with this, with Kotva or what?
27   Mr Hoffmann:  Well, basically, your former partner is
28   a real idiot and I'm going to resign.  So I thought that
29   you would like to know, or that you should know,

83

*Gwen Malone Stenography Services Ltd.*

1   *actually.*
2   *Mr Golden: I'll be there tomorrow night.  Maybe, if you*
3   *want, I can calm you down or chat with you or whatever*
4   *before you do it because you've invested so much time*
5   *and money here.  On the other hand, I came to that*
6   *conclusion --*
7              MR DANGEL:  Hold on.
8              MR BECKMAN:  No.
9              MR DANGEL:  The court reporter can't get it.
10  I want you to start again so she can record it now that
11  it is louder.  I am not trying to disrupt your
12  deposition, I am trying to help it.  I am not trying to
13  disrupt the deposition, I am trying to help it.  The
14  court reporter was unable to take the words down because
15  it was played too quietly.  If it could be replayed
16  louder so that we have a good record that would be the
17  right thing to do.
18             MR BECKMAN:  Your Honour, I have
19  a suggestion.  If we could perhaps take an early lunch
20  break, we will try to fix this technical difficulty to
21  move this along faster.
22             MR DANGEL:  Why don't we try one more time.
23  Try one more time?  Try one more time.
24             MR BECKMAN:
25  *"Mr Golden:  Yes?*
26  *Mr Hoffmann:  Hi.  Do you have a minute now?*
27  *Mr Golden:  No.  I'm in, doing a takeover here in*
28  *Cyprus.  Why don't you take one minute.  Did something*
29  *new happen with this -- with Kotva or what?*

84

1   *Mr Hoffmann:  Well, basically, your former partner is*
2   *a real idiot and I'm going to resign.  So I thought that*
3   *you would like to know, or that you should know,*
4   *actually.*
5   *Mr Golden:  I'll be there tomorrow night.  Maybe, if you*
6   *want, I can calm you down or chat with you or whatever*
7   *before you do it because you've invested so much time*
8   *and money here.  On the other hand, I came to that*
9   *conclusion about two years ago when I resigned and left*
10  *him myself.  And also, when we had lunch about this at*
11  *Credo the last time, I said to you, you really have to*
12  *think carefully if it's worth continuing to put an*
13  *effort into this because he seems to have a belief that*
14  *he knows more than you, despite you're the one who's*
15  *doing all the work.  What was the latest offer he*
16  *refused?*
17  *Mr Hoffmann:  Well, it's not the offer that he refused.*
18  *It's really the way, how he behaved.  I mean, I believe*
19  *that I was able to do a major breakthrough.*
20  *Mr Golden:  Brilliant job.  You did a brilliant job.*
21  *Mr Hoffmann:  But I mean, the latest development was*
22  *that I was able to get Prestage to the table.*
23  *Mr Golden:  Yes, you were brilliant.*
24  *Mr Hoffmann:  He has refused, up to now, all the time.*
25  *Now he agrees that he would meet me and Benda on*
26  *Thursday.*
27  *Mr Golden:  And if you just don't meet him?*
28  *Mr Hoffmann:  And Andy, you know, Andy asked questions*
29  *which were annoying and arrogant and not trusting as*

85

*Gwen Malone Stenography Services Ltd.*

1    *ever. I mean, he asked all kinds of nonsense instead*
2    *of, you know, getting to the point and blamed me, you*
3    *know. He's an idiot. And then Georgiy called me,*
4    *called me later yesterday at eight in the evening or so,*
5    *and he said: Vlado, could you postpone the meeting with*
6    *Prestage from this Thursday until next Thursday? And*
7    *I said: Why? What's the reason? And he said: I don't*
8    *know, that's what Andy wants. And I said: Does he want*
9    *to attend the meeting? Does it need to be the next*
10   *Thursday so that he can come? No, I don't think so.*
11   *Maybe he would join the negotiations at a later stage,*
12   *but he just wants you to try to postpone the meeting.*
13   *I mean, this was the last, really the last straw.*
14   *Mr Golden: I know.*
15   *Mr Hoffmann: I mean, he's an idiot.*
16   *Mr Golden: Okay. My advice to you is to say that you*
17   *have to resign under this thing. Then say: Andy,*
18   *I can't do it this way. You, either you realize that*
19   *the information I've given you, what I've done and how*
20   *I've accomplished it to this point, is that I'm moving*
21   *quickly. I'm doing it right, and I certainly involve*
22   *you in every step of the way and accept your advice.*
23   *You cannot micromanage when I have a meeting on this.*
24   *I can't work this way, and I'll have to resign. Then*
25   *you don't resign. You say, I have to do it this way.*
26   *If he says to you: Then resign. Then you resign. If*
27   *he says to you something, then at least you have a way*
28   *of going forward and you made your point. Does that*
29   *make sense to you?*

86

1  *Mr Hoffmann:  I don't know.  I mean, I don't want to --*
2  *Mr Golden:  Vlado, Vlado, I don't mean to be difficult,*
3  *but I came here, it's a fortune of money.  I came here.*
4  *I'm meeting with the investors.*
5  *Mr Hoffmann:  Do your job.*
6  *Mr Golden:  This is a 37 million acquisition.  I'm in*
7  *the middle of a meeting.  That's why I didn't call you*
8  *because I've been doing this.*
9  *Mr Hoffmann:  Yes, of course.*
10  *Mr Golden:  I'm sorry.*
11  *Mr Hoffmann:  Sure.*
12  *Mr Golden:  I appreciate the heads up.  That's the only*
13  *thing I can think of.  You know my attitude on Andy.*
14  *I think he is nuts.  I mean, I know he had a problem.*
15  *He resigned from the university.  He's unstable.  It's*
16  *extremely difficult to work with him.  I will support*
17  *your decision any way as far as that.  I'm not worried*
18  *about my money or whatever.  If he can do it, let him do*
19  *it.  It will never, ever, ever get done.  If he does it*
20  *-- if he takes anybody else, it will never get done*
21  *either.  The only issue is how to minimize damage to*
22  *Vladimir Hoffmann.  That's my only issue here because*
23  *I'm with you 100%.  Okay?*
24  *Mr Hoffmann:  Okay.*
25  *Mr Golden:  So don't worry.  If you think I care about*
26  *this 25, I didn't bank on it.  I didn't believe it was*
27  *going to happen anyway, and I knew how difficult it was*
28  *to work with him.  I appreciate how you're keeping me*
29  *involved.  I appreciate the work.  And I apologize for*

87

1   *getting you involved with this crazy person and having*
2   *to waste so much of your time and energy.   All right?*
3   *Mr Hoffmann:   Okay.   I suppose.*
4   *Mr Golden:   And I'll be there tomorrow night, and I'll*
5   *call you from the airport.*
6   *Mr Hoffmann:   Good.*
7   *Mr Golden:   I get in tomorrow night.*
8   *Mr Hoffmann:   Okay.   Thank you, sir.   Good luck.   Bye.*
9   *Mr Golden:   Bye".*
10          Mr Golden, do you recognise your voice on
11   this recording that we just played?
12          MR DANGEL:   Please note my objection to the
13   tape and to this line of examination.
14      A.   And note my objection to the request to waive any
15   rights I have under the Fifth Amendment which I am not
16   waiving.   And, yes, I recognise my voice.
17          MR BECKMAN:
298  18      Q.   Do you recognise the voice of Vladimir Hoffmann?
19      A.   Continuing objection.   Yes.
299  20      Q.   Did you have this conversation with Mr Hoffmann?
21      A.   This conversation --
22          MR DANGEL:   Objection, but please answer.
23      A.   This conversation, as I stated previously,
24   I recall many of the wording of this conversation now
25   that I hear it again.   But I cannot, at this time,
26   testify that every word I said in the conversation was
27   recorded or that this did not contain words from another
28   conversation.   So, in general, I do recall and an answer
29   to your question would be:   yes, but I am not going to

88

*Gwen Malone Stenography Services Ltd.*

1    state the veracity of the entire phone call from the
2    first minute to the end minute.
300    3        Q.  Do you have any reason to believe that this tape
4    recording is inaccurate?
5              MR DANGEL:  Objection.
6        A.  Yes.
7              MR BECKMAN:
301    8        Q.  Do you deny this is your voice on the recording
9    that we just played?
10       A.  No.
11             MR DANGEL:  Objection.
12             MR BECKMAN:
302    13       Q.  Do you deny this is Mr Hoffmann's voice on the
14   recording?
15             MR DANGEL:  Object.
16       A.  No.
17             MR BECKMAN:
303    18       Q.  We will play a clip for you, Mr Golden, from the
19   conversation we just heard.
20             MR DANGEL:  Is this part of the same?
21             MR BECKMAN:  I just said that.
22             "*Mr Golden:  Yes?*
23   *Mr Hoffmann:  Hi.  Do you have a minute now?*
24   *Mr Golden:  No. I'm in, doing a takeover here in Cyprus.*
25   *Why don't you take one minute.  Did something new happen*
26   *with this, with Kotva or what?*
27   *Mr Hoffmann:  Well, basically, your former partner is*
28   *a real idiot and I'm going to resign.  So I thought that*
29   *you would like to know, or that you should know,*

89

*Gwen Malone Stenography Services Ltd.*

330

1    Q.  I am going to play you another clip of the
2    recording that we just heard before we broke for lunch,
3    Mr Golden.
4    A.  And this is the recording of October 5th, 2004.

331

5    Q.  Yes.  We will start over so we can hear it.
6    *"... believe it is worth continuing to put time and*
7    *effort into this because he seems to have a belief that*
8    *he knows more than you, despite you're the one doing all*
9    *the work.  What was the latest offer he refused?*
10   *Mr Hoffmann:  Well, it's not the offer that he refused.*
11   *It's really the way, how he behaved.  I mean, I believe*
12   *that I was able to do a major breakthrough.*
13   *Mr Golden:  Brilliant job.  You did a brilliant job.*
14   *Mr Hoffmann:  But I mean the latest development was that*
15   *I was able to get Prestage to the table.*
16   *Mr Golden:  Yes.  You were brilliant.*
17   *Mr Hoffmann:  He has refused, up to now, all the time.*
18   *Now he agrees that he would meet me and Benda on*
19   *Thursday".*
20   Did Mr Hoffmann --
21            MR DANGEL:  Excuse me, but I am objecting to
22   the tape as I did before lunch on several grounds that
23   don't need to be stated unless Mr Beckman wants them
24   stated.  And I object to the question.
25            MR BECKMAN:  I have not asked a question
26   yet.  Mr Dangel, I will recognise your standing
27   objection to move this along.
28            MR DANGEL:  Okay.
29            MR BECKMAN:

101

*Gwen Malone Stenography Services Ltd.*

332    1    Q.  Did Mr Hoffmann tell you that he was able to do

2  a major break through?

3         MR DANGEL:  Objection.

4    A.  I assume this is referring to the tape we are

5  listening of October 5th, 2004 and in reference to that

6  tape, yes, it appears that Mr Hoffmann had told me he

7  was able to make a major break through.

8         MR BECKMAN:

333    9    Q.  Well, do you recall Mr Hoffmann telling you that

10  he believed that he was able to do a major break

11  through?

12         MR DANGEL:  Objection to the form of the

13  question.

14    A.  I had no independent recollection of hearing that

15  until I heard the tape today.  When I heard the tape

16  today and I am verifying that I do recognise that, yes.

17  The answer would be he told me something to the effect

18  that he had made a major break through, yes, sir.

334    19    Q.  Did you tell Vladimir Hoffmann that he did

20  a brilliant job?

21    A.  I believe I did.

335    22    Q.  Did Mr Hoffmann tell you that he was able to get

23  Prestage to the table?

24    A.  Did he tell me in that particular conversation we

25  are talking about again?  This question relates to

26  October 5th and the tape I just heard, assuming that is

27  the basis for the question, then the answer would be

28  I believe he did, yes.

336    29    Q.  Well, did Mr Hoffmann tell you that he was able

102

*Gwen Malone Stenography Services Ltd.*

```
          1    to get Mr Prestage to the table?
          2              MR DANGEL:  Objection.
          3        A.   Did he tell me at any time?
          4              MR BECKMAN:
337       5        Q.   At any time?
          6        A.   I believe he did.
338       7        Q.   Did Mr Hoffmann tell you that he would meet with
          8    Mr Prestage and Benda?
          9              MR DANGEL:  Objection.
         10        A.   Again based on what I heard today I believe that
         11    the answer to that question is yes.
339      12        Q.   Were you aware of Mr Hoffmann's efforts to
         13    arrange a meeting with Mr Benda and Prestage?
         14        A.   Prior to the conversation that --
340      15        Q.   No?
         16        A.   -- we heard today?
341      17        Q.   No.
         18        A.   No.
342      19        Q.   Let me strike that question.  That is a fair
         20    point.  Let me withdraw that.  Who was making the
         21    decisions with respect to meeting with Benda and
         22    Prestage; Vladimir Hoffmann or Andrew Weiss?
         23              MR DANGEL:  Objection.
         24        A.   I can only speculate based on this conversation,
         25    the other ones that I have heard there, but I have no
         26    independent information as to who made those decisions.
         27    Based on what I heard here it looked like Hoffmann made
         28    the decision and Weiss overruled it.  I wasn't involved
         29    in who made it.  I am sorry, I can't give you extra
```

                              103


                *Gwen Malone Stenography Services Ltd.*

360    1      Q.  Mr Weiss was on the board of BGO as well;
       2  correct?
       3      A.  You know I would be surprised.  I think so but
       4  I am surprised.  Because he generally didn't go on
       5  boards of companies.  He had policy not to go on boards
       6  of companies and I was the guy who went on the boards of
       7  companies.  So that was what I thought, or I thought
       8  I understand that Weiss went on the board of BGO.  But,
       9  once again, when I resigned, he wasn't -- I don't think
      10  -- was he on the board?  Hold on a minute, there is an
      11  exhibit here you gave me.  I have no current information
      12  he was on the board.  I think I heard he was, but my
      13  recollection is he did not go on boards so I have two
      14  opinions on that.
      15              MR DANGEL:  Move to strike.
      16              MR BECKMAN:
361   17      Q.  Did you say to Vladimir Hoffmann that you will
      18  support his decision?
      19      A.  His decision to resign, yes.
362   20      Q.  Did you say to Mr Hoffmann that you were not
      21  worried about your money?
      22      A.  I think I did, yes.
363   23      Q.  What did you mean by your reference to "my
      24  money"?
      25      A.  I indicated to you earlier he had promised me to,
      26  we had this whole discussion about attorney client
      27  privilege and he was going to give me part of his fee.
364   28      Q.  Success fee?
      29      A.  And if he resigned he would obviously get zero so

                                 113

                *Gwen Malone Stenography Services Ltd.*

1    I would get also zero and all the time I put in in

2    advising him would be for zero.

365    3        Q.    Let me play you a tape recording of a telephone

4    call between you and Vladimir Hoffmann dated December

5    22nd, I am sorry, October 22nd, 2004.    I will play the

6    entire call in its entirety?

7        A.    Yes.

366    8        Q.    "Mr Hoffmann:    Hello.

9    *Mr Golden:    Hello.    So what's the current situation with*

10   *the most smartest man in the world?*

11   *Mr Hoffmann:    Well, the situation is difficult as it*

12   *usually is.*

13   *Mr Golden:    Come on.    What's new with that?    I said*

14   *what's new.    I didn't say what's old.*

15   *Mr Hoffmann:    Yes.    Well, you know, the good news is*

16   *that we met on Monday; we met Prestage and Benda.    And*

17   *Benda, Benda said that he would agree with 131 million*

18   *for Kotva shares if we withdraw all lawsuits, and*

19   *Prestage said that he would agree to send part of the*

20   *money intended for the purchase of the building directly*

21   *to us for the shares.    So that's the good news.    And the*

22   *bad news is that basically Andy is unable to do any*

23   *decision.    He doesn't want to say anything.    So I sent*

24   *him, yesterday, a very comprehensive memorandum with all*

25   *the numbers I have computed with the net present value*

26   *of us pursuing the lawsuit which is some, you know, 32*

27   *million Crowns because it costs money and it's a lot of*

28   *time, and it's risky.    So the discount rate is very*

29   *high.    And I also pointed out all the risks still*

114

1  *involved including the risk of violence and --*
2  *Mr Golden:  Violence against who?*
3  *Mr Hoffmann:  Well, I didn't specify against who.*
4  *I just said that up to now they didn't use any violence*
5  *and they were just using legal methods, but that was not*
6  *always the case.  And I, you know, provided a list of*
7  *all, what I call unusual events in this, in this case.*
8  *At the conclusion, I said that I, I simply advised the*
9  *board to agree to accept 131 or something close, and*
10  *that we could still get some additional money from*
11  *Trend.  And that if we don't settle in this round of*
12  *negotiations, then we, we want to be able to settle in*
13  *the foreseeable future and even really could give some*
14  *extra incentive to Andy.  I said that to put my money*
15  *where my mouth is, I would, if he agrees to it, that*
16  *then I would reduce my fee, which obviously is something*
17  *that ultimately concerns you.  So I basically offered to*
18  *reduce my fee by 30%.*
19  *Mr Golden:  (Whistles) 30%?*
20  *Mr Hoffmann:  Yeah.  But 30 out of 25, you know.  So*
21  *that means --*
22  *Mr Golden:  Seven and-a-half percent.*
23  *Mr Hoffmann:  -- 75 would be 17.5% but, on the other*
24  *hand, I --*
25  *Mr Golden:  17.5% of what though; of the total amount*
26  *received?*
27  *Mr Hoffmann:  Of the total amount received.  Of course,*
28  *less legal costs.  So let's say the amount would be*
29  *131 --*

115

*Gwen Malone Stenography Services Ltd.*

1    *Mr Golden:  So it's almost about 22 million.  It's over*
2    *22 million Crowns.*
3    *Mr Hoffmann:  Yes.  I mean, I would be happy with that.*
4    *Really, I mean -- well, I simply believe that there, you*
5    *know, that it's better to get something than to get*
6    *nothing.  If this could, you know, be the last drop that*
7    *persuades them, then I'm willing to do it.  But anyway,*
8    *I mean, even though in this memorandum he didn't give*
9    *any answers, and I have, I thought -- my idea was that*
10   *we would, we haven't seen each other for a while, so we*
11   *would meet for lunch and I would explain to you*
12   *everything.  I would show you or I would give you,*
13   *actually, the memorandum that I sent.  I would give you*
14   *the answer from Georgiy which, as you know, stupid as*
15   *ever.*
16   *Mr Golden:  And he has a law degree?*
17   *Mr Hoffmann:  Sorry?*
18   *Mr Golden:  He has a law degree from a Russian*
19   *university.  He's telling me --*
20   *Mr Hoffmann:  I know.  You told me.*
21   *Mr Golden:  Because he wanted to go on our board, and we*
22   *said:  For what?  What are you going to do?  Yeah.*
23   *Okay.*
24   *Mr Hoffmann:  I mean, he's okay.  He's not stupid but,*
25   *really, the common sense is really missing.*
26   *Mr Golden:  Yes, that's it.  You're right.  The word is*
27   *not necessarily stupid, it's common sense, yes.*
28   *Mr Hoffmann:  So he -- and, obviously -- look.  He's*
29   *already the third within the year I worked for -- since*

116

1    *I've been working for Andy, he's already the third*
2    *assistant. So I just don't know how long he's going to*
3    *last.*
4    *Mr Golden: All right. So you want to meet Monday for*
5    *lunch?*
6    *Mr Hoffmann: If you have time, yes.*
7    *Mr Golden: See you Monday for lunch. What time; twelve*
8    *o'clock?*
9    *Mr Hoffmann: 12.00 or 12.30.*
10   *Mr Golden: Fine. Call when you're closer.*
11   *Mr Hoffmann: I have an appointment at 11.00, so I will*
12   *call you.*
13   *Mr Golden: So when you're downstairs or whatever, we'll*
14   *go down, and I'll be pleased to see you.*
15   *Mr Hoffmann: Okay.*
16   *Mr Golden: Thank you very much.*
17   *Mr Hoffmann: So the usual place?*
18   *Mr Golden: Yeah. Great. Thank you so much.*
19   *Mr Hoffmann: Okay. You have a nice weekend. Bye.*
20   *Mr Golden: Okay. Have a good weekend. Bye".*
21           MR DANGEL: Excuse me, may I ask: was all
22   of that testimony taken down in Czech, all of it?
23           MR BECKMAN: Nothing is being taken down in
24   Czech, it was all recorded.
25           MR DANGEL: Sorry, just a question.
26           MR BECKMAN: Your Honour, if I may ask this
27   in the most respectful way. I would ask you to talk to
28   Mr Dangel to not interrupt our questions or making
29   comments or laughing when the tape is going on. This is

117

1    a very serious matter and there has been so many
2    interruptions.  As we have a lot to cover, Mr Golden's
3    time is very important and we want to move this along.
4    But as we talked about at the outset, Mr Dangel is under
5    the obligation to only state objections and preserve the
6    record, and this is very disruptive.  We had a lot of
7    disruptions in the morning and I simply ask if you could
8    perhaps talk to Mr Dangel to keep this proceeding going
9    forward in the area, in an expeditious manner.
10          MR DANGEL:  I don't believe I have
11    interrupted a single tape.
12          MGR TOJNER:  Perhaps I will ask you then to
13    shorten your interventions if you have any and just not
14    to enter into any.
15          MR BECKMAN:
16    Q.  Mr Golden, just to go back to the tape recording
17    we just played of October 22nd, 2004.  Do you recognise
18    your voice on this recording?
19          MR DANGEL:  Objection to form.  An objection
20    to form.
21    A.  Continuing the objection about the fact that
22    I didn't ever consent to being taped and I think this is
23    an improper line, to be very honest with you, I didn't
24    realise my voice sounds like that, the words that I am
25    saying and expressions, sure it seems exactly like me,
26    but when you hear your voice on tape, maybe this time,
27    maybe others were different, but I can't say
28    I recognised my voice on the tape, that was the
29    question.  But, to be frank, it sounds like what I said,

367

118

1    if that is a sufficient answer.

2              MR BECKMAN:

368    3    Q.  Do you have any reason to believe that this is

4    not your voice on that recording?

5    A.  Well, without impuging your clients in any way,

6    I am sure they had plenty of reason to assume that they

7    were bombs in Kotva and the case this Trend fund was

8    mislaid and nobody has been prosecuted for twelve years.

9    There was a lot of strange things, as Mr Hoffmann said

10   on there, that have occurred in this matter in this

11   country.  So I have no reason to possibly believe it

12   could be changed.  Again I don't mean this personally

13   against Mr Harazim or anybody there, but the proper

14   answer to the question, I have a reason to believe but

15   from what I heard it sounded like that was what I was

16   saying.

369    17   Q.  Was that you on the tape?

18             MR DANGEL:  Objection.

19   A.  Based on what I heard it seemed to be me on the

20   tape, yes.

21             MR BECKMAN:

370    22   Q.  Did you recognise the voice of Vladimir Hoffmann?

23   A.  Hoffmann's voice I recognised, yes.

371    24   Q.  That was Mr Hoffmann; correct?

25   A.  Yes, it certainly sounded like Mr Hoffmann to me.

372    26   Q.  Now you mentioned bombs, Mr Golden.  Again you

27   are under oath.  Do you have any personal knowledge as

28   to who was involved in the bombs you are referring to?

29             MR DANGEL:  Objection.

119

*Gwen Malone Stenography Services Ltd.*

1     A.   Personally, no.   The bomb I was referring to,
2   there was a bomb in the Kotva building in the offices.
3   That occurred, I think, around 2000, something like
4   that.
5            MR BECKMAN:
6     Q.   2000?
7     A.   1999 or 2000 there was a bomb, I think.   I don't
8   remember now exactly what date, but there was
9   a destruction inside the Kotva building.   I have no idea
10   of who planted that, that is why I said I am not
11   impugning your client's reputation.   I said there was
12   strange things that occurred here, I didn't say your
13   clients had anything to do with this.
14     Q.   Did Mr Harazim have anything to do with that
15   bomb?
16            MR DANGEL:   Objection.
17     A.   I have just told you, I have no idea who was
18   responsible for that and I didn't suggest that
19   Mr Harazim or Mr Benda did.   All I am saying is that
20   occurred.   In fact, it occurred in those offices and, to
21   be frank with you, sir, it would be stupid for somebody
22   to plant a bomb in their own office but maybe they
23   would.   I didn't accuse them of that.   I just said one
24   of the events, one of the events that occurred in this
25   case that certainly gives me a belief that it is
26   possible anything can happen.
27            MR BECKMAN:
28     Q.   Have you played squash with Mr Harazim?
29     A.   Yes.

373
374
375

120

376

1     Q.   Would you play squash with someone if you
2     believed he was engaged in violent acts?
3     A.   If I believed he was going to take a violent act
4     against me, probably not.  On other hand; people tend
5     not to take violent acts against someone that you are
6     friendly with.

377

7     Q.   Mr Harazim was friendly with you?
8     A.   He has always been a friendly person, yes.

378

9     Q.   Good.  I want to play a portion of this tape for
10    you that we just heard.
11         *"The good news is that we met on Monday; we met*
12    *Prestage and Benda.  Benda said that he would agree with*
13    *131 million for Kotva shares if we withdraw all*
14    *lawsuits, and Prestage said that he would agree to send*
15    *part of the money intended for the purchase of the*
16    *building directly to us for the shares.  So that's the*
17    *good news.  And the bad news is that, basically, Andy is*
18    *unable to do any decision".*
19         Mr Golden, did Vladimir Hoffmann tell you that he
20    met with Mr Prestage and Mr Benda?
21         MR DANGEL:  Objection.
22    A.   In the tape of October 5th, 2004, I believe that
23    he did say that.
24         MR BECKMAN:

379

25    Q.   Did Mr Hoffmann tell you that Mr Benda said that
26    he would agree with 131 million for Kotva shares if all
27    lawsuits were withdrawn?
28         MR DANGEL:  Objection.
29    A.   I don't think that is the exact wording

121

*Gwen Malone Stenography Services Ltd.*

1    Mr Hoffmann used that I heard, I have a different note
2    than that wording.
3              MR BECKMAN:
4      Q.   What is your understanding of what Vladimir
5    Hoffmann told you in the telephone conversation of
6    October 5th, 2004?
7              MR DANGEL:  Objection.
8              MR BECKMAN:  You may answer.
9      A.   What I thought I heard on this tape, Benda would
10   agree with 131 million for Kotva shares if we withdrew
11   all lawsuits.   That is what I thought I heard.
12     Q.   Okay.  Did Vladimir Hoffmann tell you that
13   Prestage said that he would agree to send part of the
14   money intended for the purchase of the building directly
15   to us for the shares?
16             MR DANGEL:  Object.
17     A.   I believe that on the tape recording that you
18   played of October 5th, 2004 that those were the words he
19   used.
20             MR BECKMAN:
21     Q.   Do you recall Mr Hoffmann telling you that Benda
22   said that he would agree with 131 million for Kotva's
23   share if we withdrew all lawsuits?
24             MR DANGEL:  Objection.
25     A.   No.
26             MR BECKMAN:
27     Q.   You don't recall that?
28     A.   Well, if you want to repeat the question maybe
29   I could point out what I don't recall about that.

380  (line 4)
381  (line 12)
382  (line 21)
383  (line 27)

122

*Gwen Malone Stenography Services Ltd.*

1    I heard, have her repeat the question so not you, so you
2    will hear.
384    3    Q.  I am sorry?
4    A.  Would the court reporter repeat his question?
5    **(Second last question read back by the court reporter)**
385    6    Q.  Thank you.  Do you recall Mr Hoffmann telling you
7    that Mr Benda would agree with 131 million for Kotva
8    shares if we withdraw all lawsuits?
9            MR DANGEL:  Objection.
10    A.  I heard it on this tape, on the October 5th tape.
11            MR BECKMAN:
386    12    Q.  October 22nd tape, the one we just listened to?
13    A.  I had October 5th as the date.
387    14    Q.  No, it is October 22nd.
15    A.  I am sorry, you are right.  I am sorry, yes,
16    because I was referring to that.  Yes, I recall now
17    hearing on October 22nd tape that that is what
18    Mr Hoffmann told me.
388    19    Q.  Could you repeat that answer back, please.
20    **(Previous answer read back by the court reporter)**
21            I am trying to move it along, Mr Golden, if
22    you are confused at all we can do it.  I am simply
23    asking --
24    A.  Let me tell you the issue I have.  I recall when
25    I gave depositions that asking the witness if he has an
26    independent recollection.  Until I heard this tape, if
27    you had asked me without the tape, I couldn't honestly
28    tell you that I recall that part of the conversation.
29    If you are asking me do I recall hearing it today,

123

*Gwen Malone Stenography Services Ltd.*

1   clearly yes, it was a minute ago.  So you are using

2   a word, maybe that will help you or not, I don't know.

3   But I am trying to answer the question that is posed to

4   me, sir.

389    5   Q.  Does the tape refresh your recollection that

6   Mr Hoffmann told you that he would agree with 131

7   million Dollars for Kotva's shares if we withdraw all

8   lawsuits?

9           MR DANGEL:  Objection.

10   A.  No, I still, I didn't hear it.  I wouldn't have

11   recalled it independently so the answer to that question

12   is no.

13           MR BECKMAN:

390    14   Q.  Do you have any reason to believe that

15   Mr Hoffmann did not tell you that Mr Benda said that he

16   would agree with 131 million Dollars for Kotva shares if

17   we withdraw all lawsuits?

18   A.  No.

391    19   Q.  Did Mr Hoffmann tell you that Prestage said that

20   we agree to send part of the money intended for the

21   purchase of the building directly to us for the shares?

22           MR DANGEL:  Object.

23   A.  Based on what I heard today I believe that

24   Mr Hoffmann did tell me such a thing.

25           MR BECKMAN:

392    26   Q.  Did Mr Hoffmann tell that you that Andy is unable

27   to make any decision?

28   A.  Based on what I heard today, the October 22nd,

29   2004 tape I believe that Mr Hoffmann did say that.

124

*Gwen Malone Stenography Services Ltd.*

1    Q.   Did you view it as appropriate for Andrew

2   Weiss -- let me rephrase that.  Do you view it as

3   appropriate for BGO to receive a portion of the money

4   intended for the purchase of the building?

5    A.   I am going to have to, I just want to make sure.

6    Q.   I will say it again.

7    A.   Okay.

8    Q.   Do you view it as appropriate for BGO to receive

9   a portion of the money intended for the purchase of the

10  building?

11          MR DANGEL:  Object.

12   A.   Now you are asking for my view point on this

13  matter?

14          MR BECKMAN:

15   Q.   I am.

16   A.   Correct?

17   Q.   I am.  And not a legal opinion, just your view?

18          MR DANGEL:  Object.

19          MR BECKMAN:

20   Q.   What is your view on that?

21   A.   Well once again I am here, I thought, as a fact

22  witness telling you what I know.  But if there is an

23  objection in the record then and I am instructed to

24  answer that question, the end of your sentence should be

25  "for the purchase the Kotva shares" which you didn't say

26  that.  If we can add that to the question then I can

27  give you the proper answer.  And the answer is I view it

28  appropriate that BGO would receive the correct

29  compensation for their Kotva shares.  Now, whether it

125

1    came from the sale of the building or it came from

2    a different pocket, I don't think is so important here.

3    I think the problem in this particular case was that

4    Kotva itself was not generating sufficient funds to

5    purchase its own shares back and we heard prior tapes

6    saying there was some legal issues with them buying

7    their own shares.  So therefore one of the only real

8    sources to buy the shares back or to purchase the shares

9    would be from the money coming in from the sale of the

10   building.  Kotva itself only has two entities.  It has

11   real estate and it has income from the leasing of its

12   property, which you could also say it is real estate or

13   you could say it is a business concern.  Since that

14   second part was not generating a lot of funds, it seems

15   to me that it would be appropriate to accept money from

16   a different source that Kotva itself is going to get

17   from the sale of its shares.

399

18       Q.  Would it be appropriate to receive that money

19   directly from the Irish purchasers?

20            MR DANGEL:  Objection.  I believe that has

21   been asked and answered.

22       A.  I can't think of any legal impedative  to it, but

23   appropriate is a pretty broad word.  I don't think it is

24   inappropriate.  A simple answer would be yes, I think.

25            MR BECKMAN:

400

26       Q.  Do you view it as legal under Czech law for BGO

27   to receive part of the money intended for the purchase

28   of the building directly from the Irish buyers?

29            MR DANGEL:  Objection.  And I would like to

126

*Gwen Malone Stenography Services Ltd.*

1    company and the business entity.  I didn't remember the
2    name of whatever the subsidiary is, but I do recall
3    hearing something about that.
420    4        Q.   Have you Kotva Nemovitosti?
5        A.   Nemovitosti.
421    6        Q.   Thank you very much.
7        A.   That means Kotva real estate.
422    8        Q.   Right.  And are you aware of a separate entity
9    referred to as KO, Kotva Obchkodni, which means retail
10   as I understand it?
11       A.   It means business, but, no, that I don't recall.
12   I would have thought that they would have, Kotva would
13   be the business and they transferred the stuff into the
14   -- see Kotva was a hot button in this country and when
15   they held these meetings there was usually something in
16   the paper about it and I probably read it in the paper.
17   But I do remember that Kotva had a shareholders' meeting
18   where they transferred real estate into Kotva
19   Nemovitosti.  I don't have any recollection of Kotva
20   Obchkodni.
423    21       Q.   Do you recall that the Kotva department store was
22   transferred to KN to unlock the value of the real
23   estate?
24            MR DANGEL:  Object.
25       A.   (Shakes head) No.
26            MR BECKMAN:
424    27       Q.   We are going play another clip of the October
28   22nd record that we heard in its entirety?
29       A.   Sure.

132

*Gwen Malone Stenography Services Ltd.*

425     1          Q.    "*It could give some extra incentive to Andy.*
        2     *I said that to put my money where my mouth is, I would,*
        3     *if he agrees to go, then I would reduce my fee which,*
        4     *obviously, is something that ultimately concerns you.*
        5     *So I, basically, offered to reduce my fee by 30%.*
        6     *Mr Golden:  (Whistles)*".
        7     Were you surprised by Mr -- well let me ask the first
        8     question.  Did Mr Hoffmann tell you that he would reduce
        9     his fee by 30%?
        10               MR DANGEL:   Object.
        11         A.    Based on what I have heard two or three times now
        12    on the tape of October 22nd, 2004, I do believe that,
        13    yes, Mr Hoffmann told me he would reduce his fee by 30%.
        14               MR BECKMAN:
426     15         Q.    And just so we are on the same page, that fee is
        16    referring to the success fee he was to receive if the
        17    Kotva shares were sold; correct?
        18               MR DANGEL:   Object.
        19         A.    I would feel confident that both in the
        20    conversation and today my understanding would be that
        21    that fee had to do with his incentive fee, yes, sir.
427     22         Q.    Did Vladimir Hoffmann tell you that he advised
        23    the BGO board to agree to accept 131 or something close
        24    to it?
        25         A.    Based on what I heard today on the October 22nd,
        26    2004 tape, yes, Mr Hoffmann did tell me such a thing,
        27    which, I would like to point out to you, it ties into
        28    earlier questions as to who is going to decide because
        29    Mr Hoffmann is saying he is recommending to the board

                              133

                *Gwen Malone Stenography Services Ltd.*

1    and I explained to you that I wasn't sure if it was

2    Weiss or the board or Weiss Asset Management, I just

3    don't have the documents to answer that question, it

4    just clarifies my point.

428    5    Q.   Thank you.  Did you advise Mr Hoffmann to send

6    a memorandum to the BGO board because he was unable to

7    get a decision from Andy Weiss?

8                 MR DANGEL:   Object.

9    A.   Frankly it sounds like something I would most

10    likely recommend to him because, as we discussed all day

11    here, there is a board of directors who should make the

12    decision and if he couldn't get a decision from Weiss,

13    then tell the board.  It is the same advice I would give

14    today.  So I presume I would give the advice then too.

15    This is where we have this mixture of legal advice and

16    business advice here.  This is part of our issue with

17    the objection Mr Dangel raised earlier.

18                 MR BECKMAN:

429    19    Q.   Did you advise Mr Hoffmann to send the memorandum

20    to Yossi?

21                 MR DANGEL:   Object.

22    A.   If Yossi was on the Board of Directors, which

23    I think he was, I am certain that I would have suggested

24    to him to send it to Yossi, so that then I am pretty

25    sure.  Mr Barath was on the board of other companies so

26    he had a sense of corporate management decorum.

27                 MR BECKMAN:

430    28    Q.   Did Mr -- did you ask Mr Hoffmann if he wanted to

29    meet for lunch after you talked with him on October

134

1          MR BECKMAN:

437    2      Q.  Mr Golden, we are going to play for you a tape

3    recording of a conversation between you and Mr Hoffmann

4    in its entirety and the conversation occurred on October

5    25th, 2004.  We will play the entire recording.

6          "*Mr Hoffmann:  Hello.*

7    *Mr Golden:  Okay.  You got the memo to the board?*

8    *Mr Hoffmann:  Yes.*

9    *Mr Golden:  Okay.  In the third sentence, you have the*

10   *three explanation points.  Take that out.  He earns $250*

11   *million.  That's exactly the kind of thing that is going*

12   *to push his button because he'll say, yeah, I know*".

13   I apologise, Mr Golden, I am going to give you a copy of

14   the memo marked as an exhibit that is referred to here,

15   I think it will make a lot more sense.  If I may

16   approach.

17   This memorandum has been marked as Ex No 10.

18   I apologise, it is number 8.

19   **(Exhibit 8 marked by Mr Beckman)**

20        Before we play the tape, Mr Golden, just take

21   a moment and peruse this Exhibit number.

22     A.  Thank you, sir.  **(Pause)** Okay, let's continue.

23          MGR TOJNER:  There will be a short break

24   half an hour from now.

25          MR BECKMAN:  Thank you very much.

438  26    Q.  Mr Golden, this is a memorandum that was produced

27   by the Defendant in this case.  Do you recall this

28   memorandum?

29     A.  Parts of it I recall, but I must admit that Kotva

136

*Gwen Malone Stenography Services Ltd.*

1  KN I don't recall, I don't remember the name Balfindor,
2  that didn't.  And Gilroy I must admit that that didn't
3  stay with me very much.  But some of these points
4  I remember, yes.
5      Q.  Now, just so the record a clear, we are going to
6  play for you a recording of a telephone conversation
7  between you and Mr Hoffmann dated October 25, 2004 and
8  we will play that in its entirety?
9          MR DANGEL:  Please note my objection and
10  there is no waiver of attorney client privilege implied
11  but I'm allowing it to be played.
12          MR BECKMAN:
13          "Mr Hoffmann:  Hello.
14  Mr Golden:  Okay.  You got the memo to the board?
15  Mr Hoffmann:  Yes.
16  Mr Golden:  Okay.  In the third sentence, you have the
17  three explanation points.  Take that out.  He earns $250
18  million.  That's exactly the kind of thing that's going
19  to push his button because he'll say:  Yeah, I know.
20  Hoffmann thinks $5 million is big.  For me it's a trade,
21  and it's irrelevant.  You could say, though:  Currently,
22  about 5.25 million, period.  That's all.  No exclamation
23  marks because it's just for information.  It's not to
24  emphasize.  Hey.  It's a lot of money because he doesn't
25  give a shit, and it's not going to influence him.  Okay?
26  Mr Hoffmann:  Aha.  Okay.
27  Mr Golden:  Do you see my point?
28  Mr Hoffmann:  I see your point.  So in the letter?
29  Mr Golden:  In the letter to the board, on the third

137

*Gwen Malone Stenography Services Ltd.*

1  *line, just write:  Currently about, currently worth*
2  *about 5.25 million, period.  No exclamation marks.*
3  *That's fine.  The rest of it, I have --*
4  *Mr Hoffmann:  Currently --*
5  *Mr Golden:  Currently worth about.*
6  *Mr Hoffmann:  Worth about -- you said 5.25 million?*
7  *Mr Golden:  That's all.*
8  *Mr Hoffmann:  Without?*
9  *Mr Golden:  Without, yeah.  Don't emphasize that.*
10  *Mr Hoffmann:  Vykricnik.*
11  *Mr Golden:  What's the word?  What's it called?*
12  *Mr Hoffmann:  Vykricnik.  How do you say it in English?*
13  *Mr Golden:  Exclamation marks.*
14  *Mr Hoffmann:  Exclamation mark?*
15  *Mr Golden:  Yeah.*
16  *Mr Hoffmann:  Mm-hmm.  What about the memo?*
17  *Mr Golden:  That's fine.  Now, the memo.  The only*
18  *problems I have with the memo.  First of all, maybe it's*
19  *typographical, but on the fifth line -- first let me*
20  *start with the, you've repeated it twice.  You should*
21  *say:  First with the reconfiguration.  You have got it*
22  *twice.  Do you see it there?  It's underlined in red?*
23  *Mr Hoffmann:  Yes.*
24  *Mr Golden:  Okay.  Fine.  Now, Bought the things and*
25  *transferred the property to it.  No problem.  Now, in*
26  *Forminster's line of defense, you have 1, 2, 3, 4; and*
27  *then in the middle of that you have footnotes 1, 2, 3,*
28  *4.  It's confusing when you get down to the 4.  You*
29  *might want to do that A, B, C; you might want to do it*

138

1   *Roman numerals.  Just the 4, it's not clear if that was*
2   *a footnote, if it was part of it; but it threw me off*
3   *a little, and I had to go back.  You don't want him even*
4   *to waste a second on formatting.  You want that to be*
5   *very clear, you know.*
6   *Mr Hoffmann:  I know, yes.*
7   *Mr Golden:  So I would do it, I would do it in -- what*
8   *do you call it -- what's the word -- in Roman numerals*
9   *then.  Okay?*
10  *Mr Hoffmann:  Yes.*
11  *Mr Golden:  Okay.  Now, --*
12  *Mr Hoffmann:  I don't know if I'm able to do it.*
13  *Mr Golden:  No, no.  Just the points.  Instead of 1, 2,*
14  *3, you do A, B, C; or you do bullets then.  You don't*
15  *even need numbers.  Just do it as bullets.*
16  *Mr Hoffmann:  Yeah, yeah.  Sure.  Okay.  I will.*
17  *Mr Golden:  But just don't confuse him, that's all I'm*
18  *saying.*
19  *Mr Hoffmann:  Okay.*
20  *Mr Golden:  Now, the legal situation.  What you have*
21  *there is, As a result of lawsuits, has been unable.*
22  *I wouldn't put that in there.  You don't know that.*
23  *Mr Hoffmann:  Where, where?*
24  *Mr Golden:  Legal situation, the last sentence, As a*
25  *result of the lawsuit.  Okay.  I wouldn't say that*
26  *because he then thinks: Yeah, you see my lawsuits,*
27  *they're fucked, and they're not going to do it, and*
28  *blah, blah.  When I met with Prestage, he said:  We have*
29  *a gold plated letter from a law firm.  Remember I told*

139

1    *you that I met him at the airport.  And he told me that*
2    *they could go ahead with the deal and it's not a*
3    *problem.  All right?  Now, I would soften that because*
4    *you don't want him to think his position is so strong.*
5    *You're working against your interests.*
6    *Mr Hoffmann:  Mm-hmm.  So what should I say?*
7    *Mr Golden:  You should say:  The lawsuits may have made*
8    *it difficult or inconvenient for them to sell the*
9    *property, but they and the Irish investor claim that*
10   *they have legal opinions.  They can do it.  Whether they*
11   *really held -- really block it or not, is unknown.*
12   *I mean, but you don't want to say that it blocks the*
13   *lawsuit.  You see the difference here.  Right?  So you*
14   *want to put in both sides.  You want to say something to*
15   *the effect that it either makes it inconvenient or*
16   *causes them to put out money as guarantees, but the*
17   *Irish investors said that they have a legal opinion that*
18   *it doesn't stop the lawsuit.  We don't know which is*
19   *true.  That's all.  But you don't want to play up that*
20   *it does prevent the deal.  You see why now?  Right?*
21   *Mr Hoffmann:  Mm-hmm, yes.*
22   *Mr Golden:  Okay.  So fix that, and that's the thing.*
23   *Then the next one, Settlement:  Clean the property by*
24   *putting -- Putting is misspelled.  It's two --*
25   *Mr Hoffmann:  Two Ts.*
26   *Mr Golden:  Yeah.  Okay.  Now, with this:  Clean the*
27   *property.  You might want to put in an estimated cost*
28   *because you might say:  If it's cleaning the property,*
29   *the estimated cost of this option is less than 50*

140

*Gwen Malone Stenography Services Ltd.*

1    million, or 20 million or whatever it is.  So that, you
2    know, one of the things you left out here is what is
3    their cost; what is their expense as an alternative
4    means of doing it?  So, therefore, you want to say
5    something as to an estimated cost here as long as it's
6    a small cost to show Andy that they don't have huge
7    costs to take these other options up.  Okay?
8    Mr Hoffmann:  Well, but, you know, it would be such
9    a wild guess, that I --
10   Mr Golden:  Then say -- no, no.  Wait.  Then say,
11   estimated costs.  It's difficult to estimate the costs
12   of this option.  However, it doesn't appear to be more
13   than this and this, but the issue is more of time, and
14   it's hard to determine the time value of money to them.
15
16   Mr Hoffmann:  Mm-hmm.
17   Mr Golden:  Because, again, you don't want to -- you're
18   just leaving it out there.  Do they clean the property?
19   Andy then will say:  Yeah.  But it will cost them 100
20   million.  It's cheaper to do it with us.  You know?
21   It's not true.  It's really -- it may be cheaper to
22   clean the property, but there's an issue of timing, and
23   we don't know how to price the value of their timing in
24   getting it done earlier.  You see the point there?
25   Mr Hoffmann:  Mm-hmm.
26   Mr Golden:  So you put that in, too.  Use of illegal
27   methods, that's fine.  You put in here -- the only thing
28   is the last sentence and the last words, right
29   decisions; you need a space there, but that's fine.

141

*Gwen Malone Stenography Services Ltd.*

1    *Mr Hoffmann:  Sorry?*

2    *Mr Golden:  Use of illegal methods, number 3?*

3    *Mr Hoffmann:  Yes.*

4    *Mr Golden:  The last sentence in the last third*

5    *paragraph, you see you misspelling you have, right*

6    *decisions is run together.  You need a space between*

7    *right and decisions.*

8    *Mr Hoffmann:  I see, yes.*

9    *Mr Golden: That's what the red is.  I mean, you have it*

10   *there.  It's, like, I don't know if you purposely had*

11   *three dots after has not yet started.  That's fine*

12   *because it leaves it there.  That's good.  If you want*

13   *the three dots, I didn't have a problem with it, but*

14   *this one, right decisions, is wrong.  Okay?  Put the*

15   *sale on hold.  All right.  Now this -- I would put in,*

16   *Forminster can choose to put the sale on hold with*

17   *intent to operate.  Now, I think here you need to add*

18   *a sentence or two that it's hard to evaluate this since*

19   *we haven't determined whether Benda and what's his name*

20   *are working for someone and, therefore, thereby, it may*

21   *be in their personal interest, which is different than*

22   *the guy behind the scenes.  So you want to put in*

23   *something there, a sentence or an explanation that:*

24   *Hey, these guys are getting very big salaries.  They're*

25   *very important people.  They have very big positions.*

26   *They drive these fancy cars, and we don't know what*

27   *their reward is.  It may be the reason it took so long*

28   *was because they were making so much money off this*

29   *personally even though their boss -- they're not like*

142

*Gwen Malone Stenography Services Ltd.*

1    *Andy, you know.  Their interest may not be aligned with*
2    *their investors.  That's the term you want to use.  So*
3    *you want to put in here that this might be a real*
4    *valuation for Benda and for what's his name because it*
5    *might be -- in honesty, it might be better for them even*
6    *though it's bad for the investors, quote, unquote, in*
7    *this deal.*
8    *Mr Hoffmann:   Mm-hmm.*
9    *Mr Golden:  But you understand the concept, and you can*
10   *put in some wording there, but that's what I think*
11   *should go in there.  Something saying:  Put the sale on*
12   *hold.  You say:  The interest of Forminster and Benda*
13   *may be different from their investors.  Unlike in*
14   *investments on, like, BGO, where their interests are*
15   *aligned; these guys take out big salaries, they drive*
16   *big cars, they have all kinds of expenses, and they can*
17   *possibly tunnel this one or two million, you know, out*
18   *of there; some of it going to their pockets, some of it*
19   *going to Forminster's pockets.  We can't, we just can't*
20   *put an estimate on this because we just don't know*
21   *enough information.*
22   *Mr Hoffmann:   Yes.*
23   *Mr Golden:  So that's the way I would rephrase that*
24   *clause because that, again, gives him a more uncertainty*
25   *rather than a certainty because he would say:  No,*
26   *they're not going to delay it.  It's too much money.*
27   *It's worth blah, blah.  Look at how much, they're*
28   *millionaires, and look at what the time value of money*
29   *is.  The only way to explain it to a guy like Andy is*

143

*Gwen Malone Stenography Services Ltd.*

1   *the issue of the different interest between the*
2   *different parties, which I'm sure he wouldn't see that.*
3   *He wouldn't be aware of that.*
4   *Mr Hoffmann:  Right.*
5   *Mr Golden:  I don't think he would know that unless you,*
6   *specifically, lined it up.  So then you add that to the*
7   *conclusion that it's impossible to estimate the value*
8   *because, because there are different parties and, so*
9   *far, it appears that Harazim and Benda are different*
10  *parties than the owners and, therefore, there could even*
11  *be a real conflict here.  Then you put in your things*
12  *there because we have to -- and, in addition, it's not*
13  *clear what what's his name paid Trend for the years of*
14  *being free, but it would seem to me if these guys get*
15  *another five or seven years, the way the Dollar is*
16  *going, the way the economy is picking up in Czech, you*
17  *know, it may be that they'll find another buyer in five*
18  *years.  So now it's good for them to wait.  We think*
19  *not, and hope not.  That's why, if they're rational*
20  *investors, they want to give us this money now because*
21  *that's the value.  But I reiterate that it's highly*
22  *unlikely that they will give any more, and I feel that*
23  *it would be, you know, not useful to us to try that.*
24  *I would put those -- something like that in the end.*
25  *That's it.  And I've got to run to another meeting at*
26  *6.30.  So does this help you at all?*
27  *Mr Hoffmann: Yes, definitely.  Thank you for your*
28  *input, and I will send it to Andy and Georgiy.*
29  *Mr Golden:  Thanks so much.*

144

1    *Mr Hoffmann:  I will also include the old because*
2    *Georgiy has not received the old one.*
3    *Mr Golden:  That's right.*
4    *Mr Hoffmann:  I will include it.*
5    *Mr Golden:  No.  So give --*
6    *Mr Hoffmann:  The letter, old memorandum, new*
7    *memorandum.  That's it.*
8    *Mr Golden:  Exactly.*
9    *Mr Hoffmann:  The only problem is that Yossi doesn't*
10   *know the password.  So I will say the password is,*
11   *usually, -- Yossi, please refer to Georgiy or myself.*
12   *Mr Golden:  Well, if you're doing it that way, I mean, I*
13   *-- okay, fine.  Whatever you -- I don't know how else to*
14   *do it.  So, okay.*
15   *Mr Hoffmann:  Well, how should I do it?*
16   *Mr Golden:  To Yossi, I wouldn't -- I don't know.  Has*
17   *Andy told you to use a password?  Is that the idea?*
18   *Mr Hoffmann:  We agreed to use a password so it's our*
19   *normal modus operandi.*
20   *Mr Golden:  Okay, fine.  Then tell him:  We have this*
21   *password encoded.  You can either call me directly and*
22   *I'll give it to you, or call Georgiy or Andy so you can*
23   *read this.  These are important.  You have to do it*
24   *separate or something to tell Yossi that these are*
25   *important things he should look at.*
26   *Mr Hoffmann:  Good.  Okay.*
27   *Mr Golden:  Okay, pal.*
28   *Mr Hoffmann:  Thank you.            ]*
29   *Mr Golden:  Bye.*

145

*Gwen Malone Stenography Services Ltd.*

1    *Mr Hoffmann:  Bye, Howard"*.

2              MR DANGEL:  Okay.  Clearly that involves the

3    attorney client privilege.  However, as far as the Weiss

4    Asset interest are concerned, the parties I represent,

5    so long as everyone agrees that this witness can testify

6    without it being a waiver of attorney client privilege

7    as to anyone, including Hoffmann, I would not object to

8    his testifying.  But I need to know that it will not be

9    used as a waiver of an attorney client privilege.

10             MR BECKMAN:  This document was produced by

11   the Defendants that has been marked as Ex No 9.

12   **(Exhibit 9 marked by Mr Beckman)**

13             MR DANGEL:  Now you are asking --

14             MR BECKMAN:  Mr Dangel, you have to let me

15   finish.  You cannot interrupt when I am talking.

16   I don't interrupt you.  You have to show that respect

17   because the court reporter can't take -- you are doing

18   it again -- the court reporter can't take both of our

19   words down at the same time.  So please let me finish.

20             The document that was produced and marked as

21   Ex No 8 was produced by the Defendants.  There is no

22   privilege with respect to the contents of that document.

23   With respect to the recording, I am going to ask

24   foundational questions and I don't need the whole

25   privilege issues involved, with respect, and see how the

26   witness answers the questions with respect to whether

27   there is a privilege issue.

28             MR DANGEL:  But the privilege issue is not

29   the Weiss Asset issue, it is the Hoffmann issue and the

146

*Gwen Malone Stenography Services Ltd.*

1  problem is not the document, the problem is the tape.

2          MR BECKMAN:  I understand.

3          MR DANGEL:  What you just said makes no

4  sense.

5          MR BECKMAN:  Mr Dangel, I just said I was

6  going to ask foundational questions to see if the

7  witness was going to invoke attorney client privilege.

8          MR DANGEL:  Would you agree that that is

9  between this witness and Mr Hoffmann and if he answers

10  your question he is not waiving the attorney client

11  privilege?

12          MR BECKMAN:  I will say this, I want to find

13  out if there is an attorney client privilege first.

14          MR DANGEL:  It is so -- oh, my goodness.

15  Okay, go ahead.

16          MR BECKMAN:

17     Q.  Do you recognise your voice on this recording

18  that we just listened to on October 25th, 2004?

19          MR DANGEL:  Objection.  You just said you

20  were going to do the foundational questions and then you

21  didn't do it.  Objection.

22          MR BECKMAN:  I am going to find out.

23     Q.  Do you recognise your voice on this recording?

24     A.  Mr Judge, before I answer any questions

25  concerning this memorandum and that tape, I would

26  appreciate your view as to whether this detailed

27  discussion about a client preparing a memorandum was

28  part, not of a business deal but an attorney client

29  deal, which would create the attorney client

147

*Gwen Malone Stenography Services Ltd.*

1    case that Mr Peterka was providing business advice, that

2    is not privilege?

3                   MR DANGEL:  No, that is not correct.

4                   MR BECKMAN:  -- communications concerning --

5    you have to let me finish -- negotiations.  Business

6    negotiations are not privileged so, therefore, I suggest

7    that we --

8        A.  So the fact is you have to make a ruling if there

9    is an issue this is raised in the States.

10                  MR BECKMAN:  Regarding documents.

11                  MR DANGEL:  Excuse me.

12                  MR BECKMAN:  Mr Dangel was not involved in

13   the case at the time.

14                  MR DANGEL:  The order that the documents be

15   turned over was not the equivalent of an attorney client

16   waiver, for all purposes this is a very, very different

17   thing.  I let this document be produced.  I let this

18   document be put into this deposition on the

19   understanding of what the Discovery Master said, not as

20   an attorney client waiver for all purposes.  I am sorry,

21   but I was -- it is true, I was not a lawyer in this case

22   at that time, but I have a very definite understanding

23   of the way attorney client privilege law works and what

24   the ruling was.  And, sir, there are ways to ask the

25   questions you want to ask without getting into the

26   attorney client privilege.  I would ask you to ask those

27   questions.  If not, and you want me to do it the way it

28   is supposed to be done, I will do it.

29                  MR BECKMAN:  I think, your Honour, that we

                              155

1    just need to take it question by question, that is what
2    I would suggest.
3              MGR TOJNER:  And decide each question.
4              MR DANGEL:  No problem.
5    A.  Your Honour you have to know --
6              MGR TOJNER:  The privilege also does not
7    cover certain channel information regarding the case.
8    It only would pertain to say specific instructions
9    received from the client, that would be covered by
10    client, by the client attorney privilege.  The general
11    information about the case and individual pieces of
12    information, instructions and pieces of advice that
13    would be subject to privilege, but not the general
14    relationship between the client and the lawyer.
15              MR BECKMAN:  So again I am trying going to
16    try to take it question by question.
459    17    Q.  Mr Golden, with respect to the tape recording
18    that we played in October 25, 2004, do you recognise
19    your voice on this recording?
20    A.  Yes, sir.  I still retain my continuing
21    objection, so it is clear, just to move forward.
460    22    Q.  Do you recognise the voice of Mr Hoffmann?
23    A.  Yes, sir.
461    24    Q.  Did you have this conversation with Mr Hoffmann?
25              MR DANGEL:  Objection.
26    A.  I believe I did have such a conversation.
27    Whether or not this was the total conversation, whether
28    or not there was more or less added to it I can't give
29    you an opinion, but the sum substance of the

156

*Gwen Malone Stenography Services Ltd.*

1    conversation appeared to be what I said.

462    2    Q.   I will play a clip of the recording for you, of

3    the October 25th, 2004?

4           MR DANGEL:   I object because it is

5    the substance of an attorney client conversation.   So

6    long as people know I am not waiving rights in order to

7    make this thing go quicker, I will let it happen.

8           MR BECKMAN:   Thank you.

9           *"As a result of lawsuits, has been unable...*

10   *I wouldn't put that in there.   You don't know that.   You*

11   *might say --*

12   *Mr Hoffmann:  Where?  Where?*

13   *Mr Golden:  Legal situation, the last sentence, As a*

14   *result of the lawsuit... Okay?  I wouldn't say that*

15   *because he then thinks:  Yeah.  You see my lawsuits,*

16   *they're fucked, and they're not going to do it, and*

17   *blah, blah.  When I met with Prestage, he said:  We have*

18   *a gold plated letter from a law firm.  Remember I told*

19   *you that when I met him at the airport, and he told me*

20   *that they could go ahead with the deal, and it's not a*

21   *problem?  All right".*

22   A.   I submit that that perfectly legal advice is what

23   I am giving.

24          MR DANGEL:   It is totally wrong.

25          THE INTERPRETER:   I am sorry, I can't

26   translate that directly from the tape to the Judge so it

27   does not really, does not --

28   A.   If you can explain to the Judge I was giving

29   advice about my client's knowledge.


157


*Gwen Malone Stenography Services Ltd.*

1          MR DANGEL:  Of lawsuits.

2      A.  And what he should say in document to the board

3  concerning his knowledge of lawsuits.

4          MR BECKMAN:

463    5      Q.  Mr Golden, did you previously testify that you

6  did not know about the substance of the lawsuits?

7          MR DANGEL:  Excuse me, but objection.

8      A.  My recollection as to your question was what was

9  claimed in those lawsuits and I said to you I don't

10  think I knew what was in those lawsuits.  This

11  particular conversation had to do with whether or not

12  the lawsuits, whatever they were, prevented Prestage for

13  the Irish investor from going forward with its purchase.

14  I don't see any conflict between those two statements,

15  sir.

16          MR BECKMAN:

464    17     Q.  Did you, did Mr Prestage tell you that the

18  lawsuits were not preventing Mark land from going

19  forward with the purchase of the Kotva department store?

20     A.  Based on what I heard in this conversation

21  I believe he said something to the effect that he had

22  a letter indicating that they could go forward with

23  their purchase.

465    24     Q.  Now --

25     A.  He had an opinion.

466    26     Q.  I am going to ask you about facts.  Is it your

27  understanding that the lawsuits blocked the sale to the

28  Irish investors?

29     A.  I had no opinion and that is why you heard on the

158

1    tape he said we don't know if that blocked it or not,

2    and I was giving legal advice to the client not to make

3    a statement which is why I am asking the Judge do I have

4    to answer this.

5         MR DANGEL:  Move to strike the question and

6    answer.

7         MR BECKMAN:  I am asking for --

8         MR DANGEL:  Because I think we are in

9    attorney client privilege here.  It is one thing to ask

10   him did Mr Prestage, not a client, did Mr Prestage tell

11   you X, Y and Z, then you have to testify to that.  But

12   if a client told you that Mr Prestage told him or him or

13   her, the lawyer, the information, then it is protected.

14   And if they discussed it, then it is certainly

15   protected.  And you know this Mr Beckman, so please

16   don't do this.

17        MR BECKMAN:  Communications with a third

18   party are not protected and I am asking you,

19   Mr Dangel --

20        MGR TOJNER:  Let's make a five minute break.

21   And in the mean time we will decide how we proceed.

22        MR BECKMAN:  If I may say one last thing and

23   we will take a break.  It is very important to US

24   proceedings that the stenographer is able to take down

25   what I say and Mr Dangel says.  So, I would ask that the

26   Court to instruct Mr Dangel not to interrupt what I am

27   trying to say, what I need to say on record.  I am

28   trying to give him the same professional courtesy, and

29   it is courtesy to the court reporter that we don't talk

159

1    over each other.  And when we are trying to talk about
2    these legal issues he keeps interrupting me and it is
3    going to be very difficult to get a clear record.  So
4    I would just ask that you instruct Mr Dangel not to
5    interrupt.
6            MR DANGEL:  What I would --
7            MGR TOJNER:  Let's make it a five minute
8    break.
9            MR DANGEL:  And what I would like to say on
10   the record is within words of Mr Beckman beginning, he
11   gives the Judge a false impression of what the law is on
12   attorney client privilege, which is a terrible waste of
13   time and I have to believe -- I have been practising
14   a lot longer than he has, but he has read the same
15   privilege law that I have and he knows that his
16   impressions are false.  I will just leave it at that.
17           **(Off the record - 3.45 pm)**
18           **(On the record - 4.11 pm)**
19           MR BECKMAN:
20   Q.  If I could direct your attention, Mr Golden, to
21   Ex No 8, page 2 of the memorandum produced by the
22   Defendants.  I want to direct your attention to the last
23   sentence in the legal section, situation section.  Did
24   you understand that the lawsuits might have made Kotva
25   difficult or even unable to close the deal with the
26   Irish investors?
27   A.  I understand from my discussion -- first of all,
28   your Honour, is this something that he feels I can
29   answer without compromising myself?

                          160

              *Gwen Malone Stenography Services Ltd.*

1          MGR TOJNER:  Yes.

2    A.  Okay.  I understood from Mr Hoffmann exactly that

3  it made it difficult and I seem to recall from the

4  conversation he was saying it might make it impossible.

5  And I asked him if he knew that for a fact and the

6  reason it is written like that is because my advice was:

7  don't make statement you can't prove and you have no

8  idea what this did to Kotva's ability to close this

9  deal.

468     10    Q.  Did you understand that the lawsuits were

11  interfering with the sale to the Irish investors?

12          MR DANGEL:  Object.

13    A.  Yes, I understood that they were interfering with

14  the sale.

15          MR BECKMAN:

469     16    Q.  If I direct your attention to?

17    A.  Can I ask a question first?  You say it is

18  produced, I want to make sure I am answering you

19  correctly.

470     20    Q.  Of course.

21    A.  Do you mean produced in the sense that the

22  discovery was produced or you produced meaning created?

471     23    Q.  No, they actually produced this document in

24  discovery and that is why it has a WP number on.

25    A.  That is fine.  I want to make sure I am answering

26  your question "to produce" correctly.

472     27    Q.  Yes, thank you.  If I could direct your attention

28  again to page 2 of 3.  The section at the bottom which

29  starts with paragraph number 2:  Clean the property.

1       A.   Yes.

473     2       Q.   Do you see that.  I want to direct your attention

3    to the very first sentence in that section in which the

4    memo provides:

5           "*Mr Benda claimed during our last meeting that*

6    *Kotva has financing secured only until the end of this*

7    *year.  He also said that the banks were unwilling to*

8    *extend the financing due to pending lawsuits*".

9           Do you understand that Kotva had financing

10   secured only until the end of the year?

11              MR DANGEL:  Objection.  This is supposed to

12   be of his own knowledge.

13              MR BECKMAN:

474    14       Q.   Did you have any understanding?

15              MR DANGEL:  Objection.

16       A.   Your Honour?

17              MR BECKMAN:  Let me ask it a different way.

475    18       Q.   Were you aware that Mr Benda explained that Kotva

19   has financing only secured until the end of year?

20       A.   No, sir.

21              MR DANGEL:  Object.

22       A.   I didn't speak to Mr Benda about it.  The only

23   information I had about this allegation was what was

24   written here by Mr Hoffmann.  I had no personal

25   understanding of it nor did I speak to Mr Benda nor

26   Mr Harazim -- and he can confirm it -- as to what their

27   financing situation is.

476    28       Q.   Okay.  Did you have any knowledge as to -- well

29   let me back up.  Were you aware that Mr Benda had said

162

*Gwen Malone Stenography Services Ltd.*

```
         1              MR DANGEL:  Okay.
         2              MR BECKMAN:
486      3    Q.  Mr Golden, were the lawsuits filed to interfere
         4  with the sale to the Irish?
         5              MR DANGEL:  Objection.
         6    A.  Could you repeat that?
         7              MR BECKMAN:
487      8    Q.  Were the lawsuits filed to interfere with the
         9  sale to the Irish?
        10    A.  I cannot answer that question since I didn't file
        11  the lawsuits, I didn't draft the lawsuits, I didn't
        12  advise about the contents of the lawsuits.  I knew there
        13  were pending lawsuits and that is what I knew about
        14  them.
488     15    Q.  But you were advising Mr Hoffmann about the
        16  impact of the lawsuits?
        17    A.  No.  What I was advising Mr Hoffmann about was
        18  his method of presenting the facts that he was telling
        19  me to the Board of Directors and how he would present
        20  them to Mr Professor Weiss so as to best accomplish his
        21  goal of obtaining a settlement and recommending the
        22  settlement that the people at Forminster had offered.
489     23    Q.  Okay.  We are making some progress here.  Tell me
        24  the facts that you are referring to with respect to
        25  Mr Hoffmann explaining why the lawsuits were filed, if
        26  he did do so?
        27              MR DANGEL:  Objection.
        28    A.  The fact as to why?
        29              MR BECKMAN:
```

167

490     1     Q.  Did Mr Hoffmann explain to you why the lawsuits

        2  were filed?

        3     A.  No, not at all.  He told me that there were

        4  a bunch of lawsuits.  I was given this memo and I worked

        5  with this memo as to the best way of presenting it to

        6  the Board.  Frankly, Mr Hoffmann had his own lawyers.

        7  The lawsuits were drafted in Czech.  Either Hoffmann had

        8  his lawyers or whoever else brought the lawsuits had the

        9  lawyers, I don't know, I wasn't involved with it.  But

       10  there were these lawsuits that he mentioned and I don't

       11  know if there was -- I had even understood they won one

       12  or two cases, I am trying to remember from where.

491    13     Q.  But Mr Hoffmann did tell you that the lawsuits

       14  hit the right point; correct?

       15           MR DANGEL:  Objection.

       16     A.  I recall on this day that he used that exact

       17  expression that Mr Benda told him that the lawsuits hit

       18  the right point.

       19           MR BECKMAN:

492    20     Q.  Mr Golden, we are going play for you a portion of

       21  the telephone conversation that you had with Mr Hoffmann

       22  dated October 25, 2004, just a clip of what we have

       23  played in its entirety.

       24        "... they can possibly tunnel this one or two

       25  million, you know, out of there; some of it going to

       26  their pockets, some of it going to Forminster's pockets.

       27  We can't, we just can't put an estimate on this because

       28  we just don't know enough information.

       29  Mr Hoffmann:  Yes.

                                168

                  *Gwen Malone Stenography Services Ltd.*

1    *Mr Golden: So that's the way I would rephrase that*
2    *clause because that, again, gives him a more uncertainty*
3    *rather than a certainty because he would say: No,*
4    *they're not going to delay it. It's too much money.*
5    *It's worth blah, blah. Look at how much, they're*
6    *millionaires, and look at what the time value of money*
7    *is. The only way"* --
8        A.   Okay.
9        Q.   Did you believe that Forminster could possibly
10   tunnel $2 million from the department store's sale?
11       A.   I think I was referring to Mr Harazim and
12   Mr Benda because I remember when I see this that I had
13   a discussion when I was serving on the board of
14   directors why Mr Benda have to drive a very large
15   Mercedes when he is serving on the board of a company
16   that is having financial difficulties. And the answer
17   I was given was as a presentation to other people
18   because he was the chairman of the board of Kotva he had
19   to have such a large car. Now how much it cost, what
20   the leasing payments were and calling it tunneling,
21   I think you would be sensitive also to the fact that you
22   are in a company, a corporation, it is a public company
23   that is losing money and people are leasing very large
24   cars. One of the issues I had when I was serving on the
25   Board was where was the money going, how it was being
26   spent. And, yes, the answer to your question is
27   I certainly believed that it was possible for Forminster
28   to divert, embezzle, tunnel or otherwise find a way to
29   get out of the company one or two million Dollars

169

1    make -- first, one is you can't open it and two is you
2    can't make provisions.  There is two different locks.
3    And listening to this tape I believe that the reference
4    was to a password in order to open the thing.  You have
5    a word that comes over to you as an attachment in
6    an e-mail and you have to put the password in order to
7    unlock that Word programme.

502    8    Q.   What was the password?

9    A.   Well I don't know, their password was their
10    password.

503    11    Q.   You had one to open passwords, to open documents
12    with Mr Hoffmann?

13    A.   Yes, we used Napoleon.

504    14    Q.   What did Napoleon refer to?

15    A.   He was the name, he was the name of a historical
16    figure.

505    17    Q.   I understand.  But did Napoleon also, in your
18    view, refer to Mr Weiss?

19    A.   I swear to you as I am sitting here it never
20    occurred to me until you mentioned it.  But I didn't
21    pick the password.  The password -- I also, as you, have
22    a little difficult with how to set that up, and I recall
23    that there was some document, not maybe this document,
24    that I was sent and I had to have a password to open it
25    and I had to ask what was the password and he made that
26    password.  It wasn't mine.  So I certainly didn't choose
27    that by intimating that Weiss was a little Napoleon.  It
28    didn't occur to me until you just said it.  Whether or
29    not Vlado chose it for that reason I couldn't even begin

172

*Gwen Malone Stenography Services Ltd.*

1    to answer that.  But it is an interesting thought.

506    2    Q.  You didn't discuss that with Mr Hoffmann at any

3    time referring to Mr --

4    A.  Weiss as Napoleon?

507    5    Q.  As Napoleon or a little Napoleon?

6    A.  I don't ever recall saying such a thing.  If you

7    have a tape to that effect.

8         MR DANGEL:  While he is going for his next

9    question, my daughter's dog is named Napoleon after her

10    father, I think, I am not sure.

11    A.  Okay.  Weiss as Napoleon, that is good.

12         MR BECKMAN:

508    13    Q.  Mr Golden, we are going to play for you

14    a recording of a telephone conversation between you and

15    Vladimir Hoffmann on October 27th, 2004.

16         "Mr Hoffmann:  Hello.

17    (Mr Golden and Mr Hoffmann speak in a foreign language)

18    Mr Hoffmann:  No, no.  He didn't call.  He didn't send

19    me any e-mail.

20    Mr Golden:  And no flowers either?

21    Mr Hoffmann:  No flowers neither.  I even haven't heard

22    from Georgiy which is very strange because I sent an

23    e-mail yesterday to Georgiy.

24    Mr Golden:  Now, how do you know they got it?

25    Mr Hoffmann:  Well, I left a message on his phone.

26    Mr Golden:  Well, you didn't do it with a receipt?  In

27    other words, often times, he said:  I didn't see that

28    e-mail.  I get so many e-mails every day, I didn't

29    look.

173

*Gwen Malone Stenography Services Ltd.*

1    *Mr Hoffmann:  Okay.  Well, my important e-mail, my*
2    *important e-mail from Monday they received; because on*
3    *Monday night I called Georgiy and Georgiy told me that*
4    *Andy asked him to prepare a summary for him which is,*
5    *I mean, it's so stupid.  I mean, I wrote two*
6    *memorandums, each four pages long and very condensed.*
7    *What summary?  But, however, he asked him to prepare a*
8    *summary.  I have a return receipt even from Yossi.*
9    *Mr Golden:  Oh, so you know Yossi got it, too?*
10   *Mr Hoffmann:  Yes.*
11   *Mr Golden:  That's important because I think Yossi may,*
12   *now that he's involved as a board member, he might ask*
13   *Andy.  He may, he may take some position but, you know,*
14   *Andy has no oversight to any third party.  So he's*
15   *totally independent, and he's the one that tells*
16   *everybody else.  If Yossi says:  Well, why are we doing*
17   *that, or what's the reason, or, you know, he's*
18   *concerned --*
19   *Mr Hoffmann:  Well, he might say that US$5.2 million is*
20   *not bad.*
21   *Mr Golden:  Well, he might say:  How much do you think*
22   *we can get it, Andy?  Or he might say nothing but, at*
23   *least, at the very least, he might say something, and*
24   *Andy has to think about it.  That was the reason why*
25   *I asked you to give it to him, you know.*
26   *Mr Hoffmann:  Yeah.*
27   *Mr Golden:  All right.  Well, the good news is that*
28   *there's only three more days and your 30% discount goes.*
29   *I was thinking about that because I know the way --*

174

**Gwen Malone Stenography Services Ltd.**

1  *well, I know the way Andy thinks.  And he's going to*
2  *say:  If you offered it now and it's next Monday and*
3  *it's November 1st, you're still going to give it because*
4  *you want to get this done.  So your deadline about*
5  *October is bullshit because people work and he knows.*
6  *Mr Hoffmann:  But it's not bullshit.  It simply will*
7  *expire, but you're right.  Maybe I shouldn't even push,*
8  *and on Monday I can say:  Sorry.  I mean, I can't*
9  *imagine that he would say that on 1st November, he would*
10  *say:  Yes, I will accept that offer but only if you*
11  *still give your discount.  I will say:  No.  Because*
12  *once he says that, it would mean that he made the*
13  *decision to accept it.  So, and anyway, he gets more*
14  *than US$4 million and that was, basically, you know, his*
15  *original idea that he should get four million.  That*
16  *even sounded, at that time, completely ridiculous.  So*
17  *he still would be very, very well off.*
18  *Mr Golden:  He's never well off until he gets more than*
19  *the last offer was.  Whatever the last offer is, he*
20  *wants more.  But then you know that.  What can I tell*
21  *you?  All right.  So what would you like from me?  What*
22  *would you like me to tell you or say to you?*
23  *Mr Hoffmann:  Oh, nothing.  I just wanted to complain.*
24  *Also, I learned an interesting thing that Briana told me*
25  *that she was leaving which is a real shame because, you*
26  *know --*
27  *Mr Golden:  Who's leaving?*
28  *Mr Hoffmann:  Briana.*
29  *Mr Golden:  Oh, Briana said she's leaving?*

175

*Gwen Malone Stenography Services Ltd.*

1    *Mr Hoffmann:  Yes.  And so I said it was a shame, and*
2    *she told me that she decided to change careers, and that*
3    *she would work in the kindergarten - nursery school.*
4    *Mr Golden:  So she didn't say, though, that:  I can't*
5    *work with Andy?  She just said --*
6    *Mr Hoffmann:  Oh, no, no, of course not.  Of course not.*
7    *She's just leaving.  I mean, the turnover there is*
8    *pretty fast.  I mean, the turnover of employees.*
9    *Mr Golden:  Which, usually, usually was a due diligence*
10   *point from people when they came to my company.  When*
11   *they were looking, they wanted to know who was there and*
12   *how long had they been there and who was there before*
13   *them, because they see that it's a sign of problems, as*
14   *you can see now yourself.  If the turnover is huge and*
15   *people leave every six months, then something may be*
16   *wrong with the company, and that's the real issue.*
17   *Mr Hoffmann:  Yes.  You're right.  You make a very good*
18   *point.  Maybe, I mean, there is also -- this is good*
19   *that my offer simply expires and I don't have to worry.*
20   *So maybe I shouldn't even push too much.*
21   *Mr Golden:  Yeah.  Well, you've been pushing them,*
22   *I mean, let's be frank.  Tomorrow's a holiday, right?*
23   *Mr Hoffmann:  Yes.*
24   *Mr Golden:  Okay.  And most likely, what's his name's*
25   *out of town on Friday because he takes long holidays.*
26   *Okay?*
27   *Mr Hoffmann:  Yeah.*
28   *Mr Golden:  Okay.  So, therefore, when we're talking*
29   *now, realistically, you're going to hear on Monday.*

176

1    *Now, Monday's the 1st.  So if Andy says:  Great, we'll*
2    *take it.  You say:  Okay.  Terrific.  I'm glad to hear*
3    *that.  You don't even mention the 30% discount.*
4    *Mr Hoffmann:  No.  I don't mention it at all, of*
5    *course.*
6    *Mr Golden:  And blah, blah, blah; the time comes, you*
7    *send your bill.  When he says:  Wait a minute, you said*
8    *30%.  I say:  Yeah.  But I said it expired in October.*
9    *It was very clear, and it was in writing, and you waited*
10   *until after October.  I assumed you did that because you*
11   *wanted, you didn't care about my discount, and that was*
12   *the least part of your issues was whether or not to do*
13   *the turnover; and when you got around to it, you got*
14   *around to it.  No.  You can't do that, blah, blah, blah.*
15   *Of course I can do that.  I have a contract with you.*
16   *It says this and this.  I made you an offer.  What?*
17   *I should make you an offer, and you would you do that?*
18   *And here's what you would have to say to him, by the*
19   *way:  You'd say to him:  You wouldn't want working for*
20   *you someone who's stupid enough to give you something in*
21   *writing and then accept the further thing.  Why would*
22   *you expect it from me?  We lost a client once when*
23   *somebody made us an offer.*
24   *Mr Hoffmann:  Mm-hmm.*
25   *Mr Golden:  And they said:  Well, give it to me for 15%*
26   *or give it to me for this and this.  Andy looked at him*
27   *and said to him:  You know, if I would accept that*
28   *offer, it would be stupid.  You wouldn't want somebody*
29   *working for you that's stupid.  So I'm not even going to*

177

1   *address it.  You know, something like that.  Some*
2   *asshole thing that you can hear him say.  Okay?*
3   *Mr Hoffmann:  Yes.*
4   *Mr Golden:  So you might say:  Andy, you wouldn't want*
5   *me working for you.*
6   *Mr Hoffmann:  Yes.*
7   *Mr Golden:  If I give you an offer with an end date, you*
8   *then go past the end date, and I extend it unilaterally*
9   *for nothing.  I mean, that would show I'm stupid, and*
10  *you don't want to work with stupid people.  So, you*
11  *know, of course, it expired.  It expired, that's all;*
12  *and the contract is there.  This was a novation,*
13  *a change to a written contract.*
14  *Mr Hoffmann:  Yeah.*
15  *Mr Golden:  And that should have -- it had to be in*
16  *writing.  I put it in writing.  You didn't accept it.*
17  *What's the problem?*
18  *Mr Hoffmann:  Mm-hmm.  Good.  Okay.  Good point.*
19  *Mm-hmm.*
20  *Mr Golden:  Other than that, I don't see -- well, it's*
21  *my money, too.  I mean, I don't want to fight with you.*
22  *So I'd rather it went back to where it was because it*
23  *could mean, it could mean $30,000 to $50,000 for me*
24  *difference, too, if this comes through.*
25  *Mr Hoffmann:  Mm-hmm.*
26  *Mr Golden:  And that's real money right now.*
27  *Mr Hoffmann:  Yes.  I mean, it's real money.  I just*
28  *wonder why he didn't reply.  Maybe he's busy with some*
29  *other things or --*

178

1    *Mr Golden: Well, he didn't reply -- I think I told you.*
2    *I'll just give you a little more information. We're in*
3    *the middle of the Kazakhstan fund. We're settling the*
4    *case. We have all kinds of issues. He, Georgiy is*
5    *sending us all kinds of notes. You know, you're*
6    *supposed to call a meeting. You're not answering me.*
7    *This, that and the other thing. So John Chapman called*
8    *Eitan and talked to Eitan. Eitan said: Look, I know*
9    *you're right. Andy has a bug up his ass. I don't know*
10   *what to tell you. It's not my business. I'm not going*
11   *to get involved. Why don't you call Andy directly? So*
12   *he left two messages on all of - his home phone and his*
13   *mobile phone over the weekend.*
14   *Mr Hoffmann: Mm-hmm.*
15   *Mr Golden: Today is Wednesday. We still haven't heard*
16   *from Andy.*
17   *Mr Hoffmann: Okay.*
18   *Mr Golden: Now, it could be that he took a vacation.*
19   *It could be he went away. It could be, like you said,*
20   *he's involved in something more important. But we also*
21   *haven't heard on a very important issue also.*
22   *Mr Hoffmann: Yeah.*
23   *Mr Golden: So that's your problem. I think you might*
24   *hear Friday, though.*
25   *Mr Hoffmann: Friday? Mm-hmm, mm-hmm. Well, we'll see.*
26   *Mr Golden: Okay.*
27   *Mr Hoffmann: That's fine. I'm not going to push*
28   *anymore. I'm going to wait until that expires, they*
29   *have it in writing, I reminded them. Maybe I should*

179

1    send --
2    Mr Goldman:  Make a note that you reminded them, you
3    know.
4    Mr Hoffmann:  Yeah, I will make a note.  I will send
5    them an e-mail tonight that I haven't heard from them.
6    Mr Golden:  And it's a long weekend now, so it's hard to
7    get a hold of anybody.
8    Mr Hoffmann:  Yes.
9    Mr Golden:  Just to give them, while you, while you have
10   your -- well, you said to them you were going away
11   Wednesday, right?  In that letter you said you were
12   going away Wednesday.
13   Mr Hoffmann:  Yeah.  Originally, I wanted to leave
14   today, but I decided not to go to Austria because the
15   weather is terrible there.  That's the reason why I'm
16   here --
17   Mr Golden:  Yeah.  How's your German?
18   Mr Hoffmann:  How is my German?  I understand
19   everything.  My gramatics is poor, but I come along
20   pretty well.
21   Mr Golden:  That's very nice.
22   Mr Hoffmann:  Mmm.
23   Mr Golden:  All right.
24   Mr Hoffmann:  Okay.
25   Mr Golden:  So as far as this, do you speak French,
26   too?
27   Mr Hoffmann:  Sorry?  No, no.  Unfortunately, I speak no
28   French.  No French at all.  I know a few Hungarian words
29   which is a very difficult language and very different.

180

1  *Well, in one or two weeks, I will be able to speak*
2  *fluent Russian.  I guess I haven't spoken Russian for*
3  *the last 20 years or so.  I don't even try to speak*
4  *Russian with Georgiy because that would be very funny.*
5  *Mr Golden:  I guess.  Okay.  All right, my friend.*
6  *Thanks for calling.*
7  *Mr Hoffmann:  Good.*
8  *Mr Golden:  Have a good trip.*
9  *Mr Hoffmann:  Thank you very much for your advice.*
10  *Mr Golden:  Always.  Anything I can do for you.*
11  *Mr Hoffmann:  Okay.  Thank you.*
12  *Mr Golden:  Bye.*
13  *Mr Hoffmann:  Bye*".
14      A.  Can you explain to the Judge I was talking about
15  novation, I was talking about legal issues there.  That
16  is pretty legal advice.
17      Q.  I am not going ask you about that.
18      A.  Okay.
19      Q.  Okay.
20      A.  Novation, by the way, is a legal term meaning --
21          MR DANGEL:  The creation of a new document.
22      A.  It is when you have a contract and you change it
23  by some other document you novate.
24          THE INTERPRETER:  Yes, I know.  I didn't
25  hear the word but now I hear it I know what you mean,
26  what novation means.
27      A.  Okay.
28          MR BECKMAN:
29      Q.  Do you recognise your voice on this recording of

181

1      the telephone conversation of October 27, 2004?

2                MR DANGEL:  Objection.

3       A.  I have a question about recognising my voice

4      here.  It seems my voice was much clearer than Vlado's

5      voice, and if Vlado's phone was being tapped then his

6      voice should be clearer than mine.  I would like to know

7      in this investigation that your clients started was my

8      phone tapped also?

9                MR BECKMAN:

512    10      Q.  I don't have to answer your questions but I will

11     say I don't believe so, but I have no idea.  My question

12     is do you recognise your voice on this tape?

13                MR DANGEL:  Objection.

14      A.  Yes.

15                MR BECKMAN:

513    16      Q.  And that is your voice; correct?

17      A.  That was your question.

514    18      Q.  Okay.  Do you recognise the voice of Vladimir

19     Hoffmann on the tape of October 2004?

20                MR DANGEL:  Objection.

21      A.  Yes.

22                MR BECKMAN:

515    23      Q.  Did you have this conversation with Mr Hoffmann?

24                MR DANGEL:  Objection.

25      A.  After listening to this I seem to recall having

26     a conversation about the substance of what was noted in

27     this tape recording.  But, as I said sit here today,

28     I can't tell you if that was the complete discussion or

29     if anything was cut out or added or whether it was word

182

*Gwen Malone Stenography Services Ltd.*

1  for word.  But I do recall a discussion very similar to

2  this.

3          MR BECKMAN:

4  Q.  Mr Golden, I am going to focus your attention on

5  a portion of this recording.

6      "I have a return receipt even from Yossi.

7  Mr Golden:  Oh, so you know Yossi got it, too?

8  Mr Hoffmann:  Yes.

9  Mr Golden:  That's important because I think Yossi may,

10 now that he's involved as a board member, he might ask

11 Andy.  He may, he may take some position but, you know,

12 Andy has no oversight to any third party.  So he's

13 totally independent, and he is the one that tells

14 everybody else.  If" --

15 Did you tell Mr Hoffmann that Andy has no oversight to

16 any third-party?

17         MR DANGEL:  Object.

18 A.  I believe I made such a statement.

19         MR BECKMAN:

20 Q.  Did you tell Mr Hoffmann that he is totally

21 independent?

22         MR DANGEL:  Object.

23 A.  I believe I said that.

24         MR BECKMAN:

25 Q.  Did you tell Mr Hoffmann that he is the one that

26 tells everybody else?

27         MR DANGEL:  Objection.

28 A.  I believe I made such a statement.

29         MR BECKMAN:

183

*Gwen Malone Stenography Services Ltd.*

519    1    Q.  Was Andrew, what did you mean by that, those

2    statements?

3              MR DANGEL:  Object.

4    A.  That when you are in discussion it is usually

5    Mr Professor Weiss who takes the lead position and while

6    he may listen to other people, he usually has his own

7    opinion and he is very strong about his opinion.

8              MR BECKMAN:

520    9    Q.  Was Andrew Weiss making the decision with respect

10    to whether to accept or reject offers for the sale of

11    the Kotva shares held by BGO?

12              MR DANGEL:  Object.  And I would like that

13    read back, please, for my purpose and the witness

14    purpose.

15              MR BECKMAN:  I will state it again.

16              MR DANGEL:  Thank you.

17              MR BECKMAN:

521    18    Q.  Was Andrew Weiss making the decision with respect

19    to whether to accept or reject offers for the purchase

20    of the Kotva shares held by BGO?

21              MR DANGEL:  Objection.  You are asking of

22    his own personal knowledge.

23              MR BECKMAN:  Yes.

24              MR DANGEL:  Well --

25              MR BECKMAN:  You have stated your objection.

26              MR DANGEL:  You say do you know of your own

27    knowledge, okay.  Well go ahead.  Object, but please

28    answer.

29    A.  I think we have gone over this a few times that

184

*Gwen Malone Stenography Services Ltd.*

1     Professor Weiss was the lead person, he was also the
2     owner of the management company that was the manager and
3     he sat on the board of directors.  As a legal matter
4     I believe that the board of directors had to make
5     a decision when a recommendation is given by an
6     investment manager to the Board, usually the Board
7     accepts that recommendation.  I cannot tell you the way
8     Weiss Asset Management and the board of this company did
9     their internal decisions, but clearly for the purposes
10    of my discussion with Mr Hoffmann and for the purposes
11    of him addressing the solution to take a settlement
12    here, Mr Weiss was clearly the most influential person
13    especially since Mr Hoffmann was not talking to other
14    board member or members, there was no other person that
15    he could convince except for Mr Weiss.
16              MR DANGEL:  Move to strike, speculation.
17              MR BECKMAN:
18    Q.   Let's go to another clip of the October 27th
19    telephone conversation.
20              MR DANGEL:  Not of personal knowledge.
21              MR BECKMAN:
22              "*October is bullshit because people work and*
23    *he knows.*
24    *Mr Hoffmann:  But it's not bullshit.  It simply will*
25    *expire, but you're right.  Maybe I shouldn't even push,*
26    *and on Monday I can say:  Sorry.  I mean, I can't*
27    *imagine that he would say that on 1st November.  He*
28    *would say:  Yes, I will accept that offer but only if*
29    *you still give your discount.  I will say:  No.  Because*

522

185

1    *once he says that, it would mean that he made the*
2    *decision to accept it.  So, and anyway, he gets more*
3    *than US$4 million, and that was, basically, you know,*
4    *his original idea that he should get four million.  That*
5    *even sounded, at that time, completely ridiculous.  So*
6    *he still would be very, very well off.*
7    *Mr Golden:  He's never well off until he gets more than*
8    *the last offer was.  Whatever the last offer is, he*
9    *wants more.  But then, you know that.  What can I tell*
10   *you? All right.  So what would you like from me?  What*
11   *would you like me to tell you or --*
12   *Mr Hoffmann:  Oh, nothing.  I just wanted to complain".*
13   *Mr Golden --*
14       A.  Sir.
523  15       Q.  Did Vladimir Hoffmann tell you that it was Andrew
16   Weiss's original idea was that he should get four
17   million?
18       A.  I believe that is what Mr Hoffmann said.
19           MR DANGEL:  Objection.
20           MR BECKMAN:
524  21       Q.  Did you finish your answer?
22       A.  Yes.  I believe that is what Mr Hoffmann said to
23   me.
525  24       Q.  Is it your understanding that the $4 million was
25   referring to the price for the Kotva shares?
26       A.  In that conversation I believe that that is what
27   I understood at the time, yes.
526  28       Q.  Did Vladimir Hoffmann tell you that the $4
29   million figure even sounded at that time completely

1    ridiculous?

2            MR DANGEL:  Objection.

3        A.  I don't remember hearing that on the tape, I am

4    sorry.  And ridiculous, no, I don't recall that.

527    5        Q.  We are going to move this along.  We can probably

6    play that section.

7        A.  Well if he said it on the tape then I will tell

8    you yes he said it on the tape.  It doesn't add any more

9    to it.  I don't recall hearing that on the tape.

528    10        Q.  "... 1st November.  He would say: Yes, I will

11    accept that offer but only if you still, you know, give

12    your discount.  I will say: No.  Because once he says

13    that, it would mean that he made the decision to accept

14    it.  So, and anyway, he gets more than US$4 million, and

15    that was, basically, you know, his original idea that he

16    should get four million.  That even sounded, at that

17    time, completely ridiculous".

18        A.  Ridiculous, okay.  I didn't catch that the first

19    time.

529    20        Q.  Did Vladimir Hoffmann tell you that the four

21    million Dollars for the Kotva shares even sounded at

22    that time completely ridiculous?

23        A.  I think what I heard and what he was telling me

24    was --

25            MR DANGEL:  I am objecting but go ahead.

26            MR BECKMAN:  Go ahead, you can answer.

27        A.  Was, one, when Andy, Mr Weiss first suggested

28    four million to Vladimir, meaning six months or two

29    years, whenever he first mentioned it, that Mr Hoffmann

187

*Gwen Malone Stenography Services Ltd.*

1    thought it was ridiculous meaning -- again you are
2    asking my interpretation, meaning that he thought it was
3    an unobtainable sum.  I just want to clarify if you are
4    asking my interpretation here.  I don't think
5    Mr Hoffmann meant it was a ridiculous amount for the
6    shares.  I think it was a ridiculous amount from the
7    point of view that whether the Forminster people would
8    pay that kind of money and whether it was an obtainable
9    objective for him to be given.
530    10    Q.  Did you tell Vladimir Hoffmann that Andrew Weiss
11    was never well off until he gets more than what the last
12    offer was?
13    A.  I am pretty sure I said such a thing.
531    14    Q.  Did you tell Vladimir Hoffmann that whatever the
15    last offer is, Andy wants more?
16    A.  I think that I said such a thing during that
17    conversation.
532    18    Q.  Do you have any knowledge as to whether Andy
19    Weiss originally asked for $4 million for the Kotva
20    shares?
21         MR DANGEL:  Objection.
22    A.  No, I don't remember that number or him telling
23    me.  When I was trying to present he suggested it was
24    worth more, and it was nowhere near the NAV.  He always
25    referred in our discussions as to what the NAV was
26    because that is the way -- I don't know if you realise
27    the business we had, it was a closed end fund arbitrage.
28    The reason we are in Czech is because the privatisation
29    funds were selling the business discount to the sit

188

*Gwen Malone Stenography Services Ltd.*

IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856
AND IN THE MATTER OF CIVIL PROCEEDINGS NOW PENDING
BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF MASSACHUSETTS (CIVIL ACTION NO. 05-10679-RCL)

```
-------------------------------)
                               )
                               )
KOTVA a.s.                     )
                               )
            Plaintiff          )
                               )
                               )
            v.                 )
                               )
                               )
ANDREW WEISS and WEISS ASSET   )
MANAGEMENT, LLC                )
                               )
                               )
            Defendants         )
-------------------------------)
```

Deposition of:

Mr. Howard Golden

Taken at:
Courtroom No 126
District Court for Prague 1,
Ovocny trh 14

On:  April 17th, 2007
Commencing at 9.00 am

*Gwen Malone Stenography Services Ltd.*

1   **THE DEPOSITION OF HOWARD GOLDEN CONTINUED ON 17TH APRIL**

2   **2007 AS FOLLOWS:**

3         **HOWARD GOLDEN, having been previously sworn,**

4         **gave testimony as follows:**

5         **Questioned by MR BECKMAN:**

6     Q.   Mr Golden, I remind you that you are under oath,

7   you understand?

8     A.   Yes, sir.

9     Q.   Mr Golden, I am going to play for you

10   a recording, the beginning of a recording of

11   a conversation dated November 2, 2004 between Georgiy

12   Nikitin and Vladimir Hoffmann.

13      "*Mr Nikitin:  Hello, Vladimir.  This is Georgiy.*

14   *Mr Hoffmann:  Yes, hi.*

15   *Mr Nikitin:  Sorry I could not speak with you, I just*

16   *had a very important phone call that I was expecting*

17   *from a client.  Vlado, I want to apologise for not*

18   *getting back to you earlier.  But you, I also want you*

19   *to understand that I have been doing a lot of different*

20   *things and the reason I didn't get back to you earlier*

21   *is I didn't have any news and I didn't want to spend*

22   *your and my time just saying nothing basically.*

23   *Mr Hoffmann:  Yes, I understand that.  I mean, there is*

24   *no, there is no need to apologise.  But what I am trying*

25   *to say is really time is running.  We are not doing*

26   *anything.  I told the lawyer and I have been -- what is*

27   *the time for your priority or what you have been working*

28   *on right now? And they said: Well, we are sort of*

29   *waiting for the outcome of the latest proposal and then*

1

1  *we will see, I mean, what happens.  So I have no*
2  *instruction, the lawyers basically have no instruction*
3  *and I believe that, you know, it was -- how long was it*
4  *basically?  Now it is, it was more than two weeks ago*
5  *when we met, when we met Benda and on Monday two weeks*
6  *ago.  So now it is now the third week running when*
7  *basically we didn't give him any answer.  And there are*
8  *two factors.  One factor is the Irish, you know, they*
9  *will not wait forever.  They have to decide what to do*
10  *with the two neighbouring buildings, and either they*
11  *make, make them some sort of independent project or they*
12  *can combine the two projects, combine it with Kotva.*
13  *And then, then there is Benda, I mean also I mean he has*
14  *to make his decision also and once he, once he, you*
15  *know, believes that it is simply worth less to"* --
16        Mr Golden, do you recognise the voice on this
17  recording, one of the voices on this recording to be
18  Vladimir Hoffmann?
19           MR DANGEL:  Object.
20    A.  Yes, it seems to me to be Vladimir Hoffmann's
21  voice.
22           MR BECKMAN:
23    Q.  Do you recognise the other voice on this
24  recording as Georgiy Nikitin?
25           MR DANGEL:  Objection.
26    A.  Truthfully, no.  I have only spoken to Georgiy
27  Nikitin a couple of times in my life and I don't know
28  him well enough.  I can't take a position.  I couldn't
29  say to you I recognise Georgiy.  In other words, if you

2

1    gave me four tapes and said:  Whose voice is this?

2    I couldn't say this is Georgiy.  Really my relationship

3    with him is mostly by e-mail and I only spoke to him on

4    maybe a couple of times.

5           MR BECKMAN:

6    Q.  Did you understand in the fall of 2004 time frame

7    that Mr Hoffmann was having a difficult time getting

8    a decision from Mr Weiss as to what to do?

9           MR DANGEL:  Objection.

10    A.  I do recall some discussions where he said, he

11    couldn't get a decision.

12           MR BECKMAN:

13    Q.  What do you recall about those discussions,

14    Mr Golden?

15           MR DANGEL:  Object.

16    A.  Basically, that he was frustrated that he

17    couldn't get an answer from Andy about going forward and

18    accepting an offer.

19           MR BECKMAN:

20    Q.  Accepting an offer for what?

21           MR DANGEL:  Objection.

22    A.  I recall he was buying the shares of Kotva.

23           MR BECKMAN:

24    Q.  Did you understand that the Irish were interested

25    in purchasing the adjoining buildings to Kotva?

26           MR DANGEL:  Objection.

27    A.  No, I wasn't familiar with that situation.

28           MR BECKMAN:

29    Q.  I want to play --

3

*Gwen Malone Stenography Services Ltd.*

1    A.    This is probably one of the first times, I don't

2    recall that being a discussion either with me or Vlado

3    or in the papers.  I just don't recall such a thing.

4    Q.    Okay.  Let me play another clip of this November

5    2nd, 2004 telephone call between Mr Nikitin and

6    Mr Hoffmann.

7              MR DANGEL:  I object to it on several

8    grounds including incompleteness.  It seems you should

9    play the whole tape first, but that is neither here nor

10   there.  Object.

11   Q.    *"... is to provide you with information to*

12   *discuss with the other party and I simply -- that's,*

13   *that is what I believe.  I mean if price is the NAV or*

14   *very close to NAV, maybe the NAV is 120, maybe the NAV*

15   *is 140, it is not that much different, but it is*

16   *terribly difficult.  I think we cannot go and say we*

17   *want, you know, full NAV plus we want even more for*

18   *that, you know, that is blackmail.*

19   *Mr Nikitin:  Yes"*.

20             Mr Golden, do you recognise the voice on

21   this clip as Mr Hoffmann?

22             MR DANGEL:  Objection.

23   A.    Well I must say it is a little bit scratchy, as

24   you know, but from what I heard it appeared to be the

25   voice of Mr Hoffmann.

26             MR BECKMAN:

27   Q.    Mr Hoffmann uses the term blackmail.  What is

28   your understanding of the term blackmail?

29             MR DANGEL:  Objection.

4

1    A.   It is an interesting question.  You use the word,
2    you hear it, you never think of how to define the word.
3    It is how to get a definition of the word blackmail.
4    Trying to extract money or other benefits from someone
5    by threat of usually it was information when you say:
6    I will tell you wife or something, information or some
7    other action which you didn't have a legal right to do
8    it.
9    Q.   Did you have any understanding that Andrew Weiss
10   was seeking more than NAV, net asset value of the
11   department store for the Kotva shares?
12   A.   No, sir, no.
13   Q.   All right.
14   A.   It is the first time I have heard this.
15   Q.   Is it your understanding that Vladimir Hoffmann
16   was concerned that Andrew Weiss was threatening
17   blackmail?
18        MR DANGEL:   Objection.
19   A.   No.  I must say that in my discussions with
20   Vladimir I think his concern was that he felt that the,
21   either the Irish or the Forminster people claimed it was
22   blackmail, not that he was concerned it was blackmail.
23   It was the appearance or the argument on the other side
24   that he said it was.
25   Q.   Who is "they"?
26   A.   The Forminster and the Irish, it was just they
27   were presenting it as that and he didn't like their
28   presentation.  I don't think, he didn't present to me,
29   let's say.  This is the first time I have heard him

5

*Gwen Malone Stenography Services Ltd.*

```
 1    asking for more than NAV and I think NAV.
 2              MR DANGEL:  More than what?
 3       A.  More than NAV, and I think it was clear to me, if
 4    that was really Vlado, that is his point that if he
 5    wants more than NAV that would be blackmail.  That is
 6    the words I thought I heard on the scratchy tape.  And
 7    when we discussed with me, we were discussing numbers
 8    that were below NAV, so I don't recall him ever
 9    expressing to me his view that getting less than NAV was
10    blackmail.  Whenever there a discussion or a word
11    and I can still remember from yesterday's discussion on
12    the tape and I still don't remember the word in Czech
13    about blackmail.  I just recall ever hearing that word,
14    and I had difficulty yesterday.  But any discussion that
15    would touch upon his concerns was more the attitude that
16    he was getting from the Forminster people who always
17    resisted it, saying:  It was too much, you are not
18    entitled or...
19              MR BECKMAN:
20       Q.  Was it Mr -- well, would you agree that getting
21    more than NAV would be blackmail?
22              MR DANGEL:  Objection.
23       A.  You are asking my professional opinion?
24              MR BECKMAN:
25       Q.  Yes.
26       A.  No.  I couldn't say.  It depends entirely on the
27    circumstances, sir, because there was a number of years
28    that this had been hanging out there.  I know it was
29    from '98 or so.  There is a lot of circumstances behind
```

6

1    this particular one.  The best way I can explain that to

2    you is when I was doing the takeover of the Czech Value

3    Fund, the old manager Rejen offered more than NAV to

4    some of the shareholders in order to get enough shares

5    so he could vote against me in the shareholders meeting.

6    And when I say me, at the time it was the Brookdale

7    group who was doing the shareholder takeover at the

8    time.  My understanding is the shareholders refused to

9    sell even at above NAV.  All right.  And in this term

10   it's a legitimate use of NAV that is the fund.  In

11   Vlado's discussion in this tape NAV really means book

12   value or something, not quite.  NAV means net asset

13   value and it is usually referred to an investment fund.

14   I don't think that either Rejen, which was the manager

15   that I was fighting against, felt he was being

16   blackmailed when he offered more than NAV.  And I don't

17   think that the shareholders who had been offered it felt

18   it was blackmail.  I could also envision circumstances

19   where it could be considered not blackmail, certainly

20   re-mail or some type of attempt to get more money, but

21   I can't make a blanket statement that in every

22   circumstance or even in most circumstances asking or

23   receiving more than NAV would be either improper or

24   using the word we are using today, blackmail.

25            MR BECKMAN:

26       Q.  When you were doing the takeover of the Czech

27   Value Fund the Trend tunneling scandal was already

28   public?

29       A.  Yes, sir.

                              7

                *Gwen Malone Stenography Services Ltd.*

19    1    Q.  Did you discount the value of Trend shares in the
      2    Czech Value Fund because of the Trend scandal?
      3    A.  Well, I am going try and be precise with the
      4    answer.  We had difficulty -- I was on the board -- in
      5    giving a value to the Trend shares.  Whether it was
      6    discount or premium is a different -- I don't know how
      7    to answer that question.  The real issue is how do you
      8    value it.

20    9    Q.  That is a better question, I apologise.  How did
     10    you value when you now that the Trend tunneling scandal
     11    was out?
     12          MR DANGEL:  I object and I would like to
     13    state for the record that we sought to bring in expert
     14    witnesses and it was opposed by the opposing counsel.
     15    I assume he will withdrew his opposition based on the
     16    fact that he is asking this lay witness brought in for
     17    valuation, valuations and valuation methods and
     18    valuations techniques.
     19          MR BECKMAN:  You are taking up more of my
     20    time of the deposition so it is going to continue.

21   21    Q.  Go ahead and answer, Mr Golden.  Go ahead.
     22    A.  The scandal wasn't the issue in valuing the
     23    shares.  The issue was what assets really were in the
     24    Trend fund at that time.  And since the hard assets,
     25    like the Kotva shares, cash, shares of other companies
     26    that it had, were gone from the portfolio and the
     27    reality what it had was a claim against the manager who
     28    had converted assets or the recipients of those assets.
     29    It is really hard to value a lawsuit or a claim against

8

1    third parties.  So that it is clear, it wasn't the
2    scandal that was the issue in making it a discount or
3    a question of valuation, it was trying to determine what
4    actual assets we could value in the fund so that we
5    could give it a net asset value.  Normally, you would
6    discount an overvalued company.  So if a fund owned
7    shares in a company and we felt that the market price
8    was too high or was not liquid, you would discount that.
9    We didn't have that issue of discounting.  I hope that
10   answer is clear.

11        Q.  I am going play for you, Mr Golden, another clip
12   of the November 2nd telephone conversation between
13   Mr Nikitin and Mr Hoffmann.

14        "... *organise a conference call with Andy, with*
15   *Peterka, with myself, we can, we can discuss it so we*
16   *can discuss how we can present it, what arguments can we*
17   *give, what basically we are allowed to say so that, you*
18   *know, it is not blackmail".*

19        Did Mr Hoffmann ever discuss with you that he was
20   seeking to organise a conference call with Andrew Weiss
21   and Mr Peterka to discuss how to present the offer so it
22   was not viewed as blackmail?

23             MR DANGEL:  Objection.

24        A.  Again it is a compound question.  I don't recall
25   him discussing that with me at all.  No, I am sorry.  To
26   the best of my recollection, he never told me he was
27   having a meeting to discuss whether or not there was an
28   issue of blackmail.  In fact, I think this clip kind of
29   supports my earlier question that his concern was how it

9