UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
)
KOTVA a.s. and SPV Co.,                          )
)
            Plaintiffs                           )          Case No. 05-10679-WGY
)
            v.                                   )
)
ANDREW WEISS and WEISS ASSET                     )
MANAGEMENT, LLC                                  )
)
            Defendants and                       )
            Counterclaimants,                    )
)
            v.                                    )
)
KOTVA a.s., SPV Co., and RICHARD HARAZIM         )
)
            Counterclaim-Defendants              )
)
_____)


## DEFENDANTS' COUNTER-DESIGNATIONS OF HOWARD GOLDEN DEPOSITION

### INTRODUCTION

        Last Thursday, defense counsel was informed that the Court ordered that deposition
designations for Howard Golden and others were due on Friday, October 19, 2007, although
there was no written order to that effect. Defense counsel attempted to comply but ran into an
unanticipated difficulty. Defendants had only an unofficial transcript from the European court
reporter, so we asked plaintiffs' counsel to provide an official copy at out expense. Plaintiffs'
counsel indicated he was too busy to do that. We contacted the European Court Reporter who
acknowledged that we had ordered an official copy in April but indicated that the approval of
plaintiffs' counsel was needed and it had not been forthcoming. The court reporter contacted
plaintiffs' counsel who indicated that he had given approval in April and this was the Court
Reporter's fault. On that basis, the court reporter e-mailed a copy to the defendants immediately.

        Defense counsel believes that the usual practice—that both parties' deposition excerpts of
Mr. Golden's testimony should be considered by the Court and jury at the same time—should be
followed here. Plaintiffs disagree and filed their designations with defendants' objections last
Friday. The defendants' counter-designations deal with Mr. Golden's attorney-client relationship
with Vladimir Hoffman and on the uncertain origin, authenticity and accuracy of the tapes

1

referred to in plaintiffs' designations, among numerous other subjects. Plaintiffs have indicated that they are too busy to address the defendants' counter-designations right now. Therefore, defendants respectfully submit their designations and transcript pages for the Court's consideration of the Golden deposition as a whole and will substitute a version with plaintiffs' objections when they make them available.

Volume I – April 16, 2007

Page 1 line 15
Page 4 lines 2-10
Page 19 line 1 – page 21 line 6
Page 26 line 29 – page 27 line 10
Page 44 line 28 – page 46 line 2
Page 50 line 17 – page 51 line 11
Page 57 lines 4-21
Page 58 lines 2-27
Page 68 lines 16-26
Page 77 lines 2-24
Page 95 lines 4-21
Page 96 lines 8-28
Page 101 lines 5-8
Page 113 line 17 – page 114 line 2
Page 119 line 26 – page 120 line 4
Page 127 line 18 – page 128 line 16
Page 130 lines 10-27
Page 152 line 19 – page 153 line 7
Page 158 lines 5-23
Page 163 line 18 – page 164 line 6
Page 166 line 18-26
Page 169 line 9 – page 170 line 4

Volume II – April 17, 2007
Page 5 lines 9-24
Page 40 lines 8-14
Page 41 line 1 – page 43 line 22
Page 44 line 12 – page 46 line 8
Page 47 lines 4-15
Page 49 line 14 – page 50 line 11
Page 51 lines 8-16
Page 54 line 24 – page 55 line 1
Page 57 lines 12-16
Page 59 line 14 – page 65 line 25

Page 75 lines 5-13
Page 77 lines 18-23
Page 81 line 1 to page 81 line 10

Respectfully submitted,
ANDREW WEISS and WEISS ASSET
MANAGEMENT, LLC

By their counsel,

___/s/Edward T. Dangel, III___
Edward T. Dangel, III (BBO#113580)
Dangel & Mattchen, LLP
Ten Derne Street
Boston, MA 02114
617-557-4800

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 22, 2007.

___/s/ Edward T. Dangel, III_____

IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856

AND IN THE MATTER OF CIVIL PROCEEDINGS NOW PENDING

BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT

OF MASSACHUSETTS (CIVIL ACTION NO. 05-10679-RCL)


```
_____)
                               )
                               )
KOTVA a.s.                     )
                               )
          Plaintiff            )
                               )
                               )
          v.                   )
                               )
                               )
ANDREW WEISS and WEISS ASSET   )
MANAGEMENT, LLC                )
                               )
                               )
          Defendants           )
_____)
```

Deposition of:

Mr. Howard Golden

Taken at:
Courtroom No 126
District Court for Prague 1,
Ovocny trh 14.

On:  April 16th, 2007
Commencing at 9.30 am

1    **THE DEPOSITION OF MR HOWARD GOLDEN COMMENCED ON 16th**

2    **April 2007 AS FOLLOWS:**

3    　　　　MGR TOJNER:  You are going to be heard as

4    a witness and it is your obligation to tell the truth

5    and nothing but the truth and if you should withhold

6    something you may be committing the crime of perjury.

7    Do you understand this instruction and are you going to

8    tell the truth.

9    　A.  Yes, and yes.

10    　　　　MGR TOJNER:  And now the parties can start

11    asking questions.

12    　　　　**HOWARD GOLDEN, having been duly sworn,**

13    　　　　**gave testimony as follows:**

14    　　　　**Questioned by MR BECKMAN:**

15    　Q.  Could you please state your name?

16    　A.  Yes.  But prior to continuing, I'd like to make

17    my own statement.

18    　Q.  You can't make a statement in a deposition.

19    　　　　MR DANGEL:  Don't interrupt in the middle of

20    an answer, Joel.  Go ahead.

21    　A.  It is the exactly the point, Joel.  I am not

22    involved in this case.  I don't want to be involved in

23    this case.  I have sworn to tell the truth and I will

24    tell the truth.  But I also want you to know that there

25    are certain rights I understand I have under the

26    Constitution of the United States, not the least of

27    which is to avoid self incrimination.

28    　　　　In this particular matter, I understand that

29    Mr Professor Weiss and Engineer Hoffmann have been

1    September 1995.

2        Q.   Since September of 1995 up to the present day,

3    what proportion of your time have you spent in the Czech

4    Republic?

5        A.   That depends on the years and the matters.

6    Sometimes I was here for one week a month and sometimes

7    for as many as a month and a half or a month straight.

8    So that you would have to -- you asked for proportion,

9    so twelve over 52, so it would be 12/52nds of the year

10   till maybe 40%, 45% of the total year.

11       Q.   Thank you.  Do you spend time in the -- let me

12   back up.  Giving your ratios, do you spend other time in

13   the United States during the year?

14       A.   It depends which year, as I said.  But if you are

15   talking this year, I am in the United States sometimes,

16   yes.

17       Q.   And do your children live in the United States;

18   is that correct?

19       A.   Again it depends when.  One of my daughters was

20   living in Switzerland where she was teaching until

21   December.  She returned to the United States last week

22   and hadn't been there for about six or eight months.  My

23   son does not live in the United States, he lives in

24   Israel.  He is currently on a kibbutz.  And my third

25   child, at this stage is, yes, is living in the United

26   States.

27       Q.   Are you represented by counsel today?

28       A.   No, sir.

29       Q.   And Mr Dangel does not represent you; correct?

4



85   1    Q.   Do you have an understanding of the word

2    tunneling?

3        A.   The way the term tunneling is used in the Czech

4    Republic is something I am familiar with.

86   5    Q.   What is your understanding of the term tunneling?

6        A.   We could spend a lot of time on that, sir, if you

7    would like to.

87   8    Q.   I just want your understanding.

9        A.   I have written articles on it and I have objected

10   to the term.  My objection to the term was that there is

11   no need to invent another word for the frank action of

12   embezzlement but it seemed to me a uniquely Czech way of

13   addressing theft by putting a word that has a softer

14   tone to it calling it tunneling.  And when I wrote

15   articles to the paper years ago, I indicated I think

16   that it would have more effect if people would call it

17   what it was, which is embezzlement.

18        With that said, the direct answer to your

19   question as to where I am familiar with it is, my

20   understanding is that tunneling means usually in regard

21   to a corporation that people who had control of

22   a corporation, be it an investment fund, which was where

23   the term first originated in this country, to a large

24   corporation, the people who had the ability to direct

25   the resources of that entity would direct those

26   resources and assets to their own benefit -- friends,

27   pockets, bank accounts, et cetera -- and take that from

28   the shareholders of the company.

88   29   Q.   Can tunneling be done by shareholders of

1   a company as well as opposed to management?

2       A.   If shareholders would have the ability to direct

3   their resources of a company and that is how the

4   management usually got into the position is they elected

5   themselves to the Board of Directors or to positions in

6   the corporation then the answer would be yes.  It is

7   more often than not, in my experience here, that

8   tunneling was done by means of people obtaining shares

9   so that they could get into the position that they could

10  change things.  The shareholders' rights in this country

11  are not of the level we are used to in the United

12  States, so that the -- if I can answer you as fully as

13  I can?

14      Q.   Certainly.

15      A.   The fact you are a shareholder does not give you

16  an ability to tunnel.  It is the use of your status of

17  a shareholder to get into a position where you can sign

18  the check, pay in advance for an advertising campaign to

19  a fake advertising agency or buy real estate at

20  overpriced, inflated price through a friend or

21  something, it is that ability that usually required you

22  as a prerequisite to be a shareholder so you can attain

23  that position.  So, the answer to the question, as

24  I understood it, it mostly was only done by a

25  shareholder because you usually didn't get to be the

26  manager of a fund unless you controlled the ability to

27  appoint yourself, because if the shareholder was

28  different than the person who was doing the tunneling,

29  the shareholder had the ability to hold that person up.

89

20

90   1    Q.  When you say direct the resources of the entity,
     2    do you mean divert the resources of the entity; are we
     3    talking about the same thing?
     4    A.   If we are talking about the resources of the
     5    entity not being used for the benefit of the entity,
     6    then we would use the word divert, direct, shift.
     7    There's many words, yes, sir.
91   8    Q.  For how long have you known Vladimir Hoffmann?
     9    A.   My best recollection is that I met him in 1996 or
    10    '97.
92  11    Q.  What were the circumstances of you meeting
    12    Mr Hoffmann in '96 or '97?
    13    A.   Mr Hoffmann at that time was either the owner or
    14    general manager, some position of stature in a brokerage
    15    firm.  I think its name was Delta Brokerage and I was at
    16    that time in charge of a fund investing in the
    17    privatisation funds that were created in the Czech
    18    Republic as a result of the revolution, the change in
    19    government and the change of ownership of the resources
    20    of the country and Mr Hoffmann was one of many brokers.
    21    His brokerage firm, again I am pretty sure its name was
    22    Delta.  For this discussion we will use the name Delta
    23    provided I don't recall the other name.  Delta was one
    24    of the brokerage firms we used to purchase the shares
    25    and I dealt with Mr Hoffmann at that time because his
    26    English was better than most of the other brokers.
93  27    Q.  Have you been involved in business dealings with
    28    Mr Hoffmann over the years since 1996 to '97?
    29    A.   Can you define for me your -- business dealings?

21

1    my mind is because just a few weeks before my father had

2    water in his lung and I remember he had to go to the

3    hospital and they put a needle in and sucked it out, it

4    was very -- he told me it was very unpleasant.  And

5    Vlado mentioned his father had water in there, he was

6    worried it was cancer.  I am sure I would have said to

7    him:  My dad had it, it is not such, don't worry.  So

8    I do recall something about his father.

117    9    Q.  How many children does he have?

10    A.  I am pretty sure he has two.

118    11    Q.  Do you understand Mr Hoffmann -- are you aware

12    Mr Hoffmann was hired by Andrew Weiss to assist in

13    negotiating a sale of the Kotva shares?

14            MR DANGEL:  Objection.

15            MR BECKMAN:  Let me finish the question.

119    16    Q.  -- in or around 2003 or 2004?

17            MR DANGEL:  Objection to the form.

18    A.  It is a compound question.  Again I don't want to

19    be difficult so I am going to answer you and get this

20    thing over with.

21            MR BECKMAN:

120    22    Q.  I appreciate that.

23    A.  You asked me if I'm aware of hiring and then you

24    asked me in the same question about the period of time.

121    25    Q.  Are you aware -- let's break it down.

26    A.  I think it would be better for both us, so

27    I don't say no, if you divided the question so I could

28    answer each part.

122    29    Q.  Absolutely.  Are you aware of Mr Hoffmann being

1    hired by Andrew Weiss to assist in negotiating the sale

2    of the Kotva shares?

3              MR DANGEL:    At any time?    Is that correct?

4              MR BECKMAN:    Let the question stand,

5    Mr Dangel.

6              MR DANGEL:    Objection to the form of the

7    question.

8        A.    My understanding was that Mr Hoffmann was hired

9    by a fund to assist it in retrieving value for the Kotva

10   shares that was owned by the fund.

11             MR BECKMAN:

12       Q.    What fund?

13       A.    Your question is whether I knew Mr Weiss hired

14   him.    If Mr Weiss would have hired him it would have

15   been Mr Weiss's capacity as the representative of the

16   fund and I don't think, I don't think he was hired by

17   Mr Weiss as Mr Weiss to do something.    I mean if that is

18   as full as I can give you.

19       Q.    What fund are you referring to?

20       A.    I think it is Brookvale Global Opportunity Fund

21   which is the fund that owned the shares of Kotva.

22       Q.    To move this on could we refer to that as BGO?

23       A.    Okay.

24       Q.    All right.    Did you assist him in his efforts to

25   sell the Kotva shares?

26             MR DANGEL:    Objection.    Again this, can't we

27   break this into time so that actually it is a question

28   that could be answered in a court room?    Please, just

29   ask the question properly.

27

198    1    Q.    I am impressed with your memory of 373.

       2    A.    It is just something that came up a number of

       3    times, 373, but, um...

199    4    Q.    This is not a memory test, Mr Golden.

       5              MR DANGEL:    Objection.

       6              MR BECKMAN:    I can withdraw that.

       7              MR DANGEL:    Just ask the questions, please.

       8    A.    Okay.   Then how we dealt with the Trend shares

       9    I don't know.   I remember there was something about

       10   looking at the last trade and I don't remember how we

       11   arrived at a number for the Trend shares.  Once again,

       12   the board wanted to be as conservative as possible and

       13   because the prior manager had an interest in making the

       14   shares worth as much as possible because he took, he

       15   took a management fee on the value.  So his interest was

       16   to put as high a value as possible on the shares.  And

       17   since we took over the fund and told the shareholders we

       18   are going to try to get a value, they voted for us.  We

       19   wanted to write off as much of the bad debt as possible

       20   so there wouldn't be a high management fee.  That was

       21   the motivation to try and keep whatever prices were as

       22   low as possible until there was a realisation.

       23             MR BECKMAN:

200    24   Q.    At the time that Brookdale took over the

       25   management of the CVF, had the assets of Trend been

       26   stolen?

       27   A.    Yes, sir.

201    28   Q.    Were you appointed to the Board of Directors of

       29   Kotva at any period of time?

                              44

1    A.  Yes, sir.

202    2    Q.  For what period of time?

3    A.  You say how many months or what was the dates?

203    4    Q.  Approximately when and for what duration?

5    A.  The duration was, I think, four to six months.

6    Mr Harazim would know it better than I.  It was

7    a relatively short period of time and what year was

8    that.  I think 2000, spring.  I am almost sure it was

9    less than a year.  It may have been as long as nine

10    months or eight months but it was less than a year.

204    11    Q.  Did Trend vote in favour of your appointment to

12    the board?

13    A.  I truthfully have no recollection of who voted.

205    14    Q.  Did Forminster vote in favour of your appointment

15    to the board?

16    A.  My recollection is that was the deal, yes.

206    17    Q.  And did BGO vote in favour of appointing Richard

18    Harazim to the Board of Directors of Kotva?

19    A.  I think we did.

207    20    Q.  Did BGO --

21    A.  Are you talking about at the same meeting?

208    22    Q.  Yes.

23    A.  Where I was appointed to the Board?

209    24    Q.  Yes.

25    A.  That meeting my recollection is that yes, the

26    shares were voted.  Forminster applied for not only

27    Mr Harazim but some other people and we voted for them

28    and they voted for us.

210    29    Q.  Did BGO vote in favour of appointing Martin Benda

 1   to the board of directors?

 2       A.   My present recollection is yes.

211  3       Q.   Do you recall when you were serving on the Kotva

 4   board that there were concerns about the bankruptcy of

 5   Kotva.

 6                MR DANGEL:  Objection.

 7       A.   I don't presently recall a discussion about

 8   bankruptcy.  I remember discussions at all times that we

 9   had insufficient funds to manage the company.

10   I remember discussions with Mr Harazim in detail about

11   cashflow and we had to lease apartments in order to

12   bring income.  I remember there was a difficult

13   situation with the financial position of Kotva.  At this

14   minute I can't honestly tell you the word bankruptcy had

15   come up.  It is possible but I don't, I remember it was

16   difficult, I don't remember if we discussed bankruptcy.

212 17       Q.   Do you recall the issue -- let me back up.  When

18   you served as a board member of Kotva, do you recall

19   issues arising with respect to Kotva's securing

20   financing for operating its business?

21       A.   Yes.

22                MR DANGEL:  Objection, but please answer.

23       A.   Yes, I do recall that there were discussions.

24   Just following on my answer to that, we had difficulty

25   and they had the cashflow in the management.

26                MR BECKMAN:  May I approach the witness?

27   Thank you.

28   (**Exhibit 4 marked by Mr Beckman**)

213 29       Q.   Mr Golden, I am handing to you what has been

                                46

1    between Trend and Forminster?  That is a poor question,

2    let me rephrase that.  Did BGO determine not to fight

3    the settlement between Trend and Forminster in June of

4    2002?

5              MR DANGEL:  Objection to the form.

6    A.   Yes, sir.

7              MR BECKMAN:

226    8    Q.   Did BGO fight the settlement at any point in

9    2002?

10              MR DANGEL:  Objection.

11              MR BECKMAN:

227    12    Q.   Let me withdraw that.  Let me ask a better

13    question.  Did BGO file any lawsuits in 2002 challenging

14    the settlement between Trend and Forminster?

15    A.   I do not think BGO filed a lawsuit challenging,

16    no.

228    17    Q.   Did BGO file any lawsuits in 2003 to fight the

18    settlement between Trend and Forminster?

19    A.   I resigned from this company when I finished my

20    business relationship with Mr Professor Weiss and

21    I think I resigned in December of 2002, so I would not

22    be able to competently testify to what the company did

23    in 2003, sir.

229    24    Q.   In 2002 did BGO determine that the settlement

25    between Trend and Forminster was fair and reasonable?

26              MR DANGEL:  Objection.

27    A.   If you are referring to something here I will

28    need a minute to review this.

29              MR BECKMAN:

50

230    1    Q.  I am not referring to anything, I am just asking

2    about your independent recollection.  I will represent

3    to you there is not in the document that you have in

4    front of you.

5    A.  My present recollection is there is no

6    determination it was fair and reasonable.  The

7    determination about fighting it was based on the

8    realities of the situation, unlikelihood of success,

9    other issues.  But I don't think that the board took

10    a position it was fair or was not fair, I don't remember

11    that position.

12    MR BECKMAN:  If I may approach the witness?

13    Thank you.

14    **(Exhibit 5 marked by Mr Beckman)**

231    15    Q.  I am handing to you what has been marked as

16    Plaintiff's Ex No 5.  I recognise, Mr Golden, this is

17    a very poor quality copy of document, but if you could

18    peruse it.  Do you recognise this as a draft press

19    release prepared by BGO?  And please take your time.

20    A.  I have to take my time because this is like

21    encryption.

232    22    Q.  I will say I have highlighted some sections and

23    it is easier to read when it is highlighted.  If

24    Mr Dangel does not have any objection I can show you

25    this version.

26    MR DANGEL:  So long as you give me the

27    highlights.

28    MR BECKMAN:  Yes, I will do that as well.

29    MR DANGEL:  Let's do that to save time.

1    management of the fund's portfolio?

2        A.   He was also primarily responsible for the funds,

3    the investment portfolio, yes.

247  4        Q.   What do you mean by "primarily responsible"?

5        A.   I was here and I would report to him what

6    I learned here and it may, hopefully may have influenced

7    his decision, I don't know.  But one of the purposes of

8    my coming here was to gather information.

248  9        Q.   What was the cause of the break up between you

10   and Mr Weiss?

11       A.   I married his sister and the reason we created

12   the organisation was -- remember I testified earlier we

13   started in 1991 my business relation, I had been married

14   to his sister since 1976, so we had a long period before

15   we entered into business, forming a business

16   relationship and that was the result of the fact that he

17   and my wife had inherited a small amount of money, his

18   mother inherited some money and he was managing various

19   brokerage companies and I would get statements because

20   it was my wife, so we considered it our money, we didn't

21   separate that.

249  22       Q.   What was the cause of the breakdown.

23              MR DANGEL:  Excuse me, let him finish his

24   answer.

25              MR BECKMAN:

250  26       Q.   Were you done?  I am sorry.

27       A.   No.  I am trying to explain to you how it started

28   and then you want me to cut it, I will cut it.

251  29       Q.   Sorry, I thought you were finished.  Please

57

1    continue.

2        A.    Well I heard her typing and I am trying to speak

3    slowly since I know how difficult it is to record and to

4    type things in a foreign country.

5        Q.    She is not taking down your testimony.

6        A.    Okay.    Well I heard her typing so I thought I had

7    to go slowly.    I am sorry.    It was in 1991 when I said

8    it was better for us to create a fund, a family

9    partnership and put it together and from that he agreed

10   if he did the investing and I did the administrative,

11   pretty much like he wrote in his letter, and that grew

12   into the Brookdale Group.    And so when I finished my

13   relationship with his sister, the only thing that was

14   left was the business relationship and he and I had

15   always had difference of opinion, and we were also in

16   different towns and there was no business reason or

17   non-business reason, let's say, to remain as partners

18   together when I divorced his sister.    And so in order to

19   get my money out, I agreed that he bought me, his money

20   would not be paid to me but would be paid to his sister

21   as part of the divorce settlement so that he would agree

22   to make a payment from my interest in the manager at

23   that time, which was Brookdale.    Does that explain it

24   better?

25       Q.    Absolutely.

26       A.    That is how it started and that's why we ended

27   it.

28       Q.    What were the differences you had with Mr Weiss

29   that you alluded to?

1    going to continue with the questions.

264    2    Q.    Do you recognise the voice of Vladimir Hoffmann?

3         MR DANGEL:    Objection.

4    A.    Without waiving my right not to testify based on

5    my Fifth Amendment right of the United States

6    Constitution I will answer that I do recognise the voice

7    of Vladimir Hoffmann on this tape.

8         MR BECKMAN:

265    9    Q.    Did you have this conversation with Mr Hoffmann?

10        MR DANGEL:    Object.

11   A.    I didn't remember this conversation prior to

12   hearing it on the tape but I believe that I had such

13   a conversation with Mr Hoffmann.

14        MR DANGEL:    Move to strike.

15        MR BECKMAN:

266   16   Q.    Do you believe that this is an accurate recording

17   of your telephone conversation with Mr Hoffmann?

18        MR DANGEL:    Objection.

19   A.    On that I have no recollection, it could have

20   been that I said more or less.  Some of the things that

21   I heard there I now recall saying, but to tell you this

22   is accurate, this is either the entire -- accurate

23   means, in my view, that it is the entire conversation,

24   that there is nothing added or subtracted, it wasn't

25   taken from other conversations or whatever, and that

26   I cannot represent to you, no.

27        MR BECKMAN:

267   28   Q.    Let me play you a portion of the conversation we

29   just heard.

1    so.

283   2        Q.   Was the price of 131 million Czech Crowns

3    unbelievable to you?

4        A.   No, the price was low because it didn't represent

5    the value.  What was unbelievable was that the people in

6    a period of strength, meaning the Forminster group,

7    would be willing to pay something near the true value of

8    the shares because they were a very strong organisation.

9    They had succeeded in defending themselves over the

10   years.  They had excellent lawyers.  They had drawn this

11   thing out.  No-one had ever been prosecuted in the Trend

12   case for ten years.  As you asked me earlier, the Trend

13   theft occurred before I even got into this in 1996.  We

14   were talking in 2008, so for eight years no-one had been

15   prosecuted.  And my experience in the Czech Republic was

16   that people in that position of power usually did not

17   pay anything near the real value for what an asset was

18   worth because they had been used to getting away with

19   taking it for substantially less.  That is the part that

20   was unbelievable.  If I am answering your question

21   correctly, was the price unbelievable from the point of

22   view that it was more than the value or was the price

23   unbelievable for what other purpose, that is the answer

24   I am trying to give you.

284   25       Q.   Okay.  Who came up with 131 million; Andrew Weiss

26   or Vladimir Hoffmann, to your knowledge?

27       A.   I don't know.  From what I heard in the

28   conversation --

29               MR DANGEL:  No, no.  Object.

77

1   I can't give you a legal opinion on that, sir, I just

2   don't know.

3           MR BECKMAN:

311  4   Q.   What compensation were you to be paid?  Was it to

5   come from Mr Hoffmann's success fee if the Kotva shares

6   were sold?

7   A.   That is my recollection.

312  8   Q.   Was this a business arrangement between you and

9   Mr Hoffmann?

10  A.   Well what other, I mean I don't understand the

11  question, sir.

313  12  Q.   Was it a business deal that you reached with

13  Mr Hoffmann?

14  A.   I think I explained to you earlier.

314  15  Q.   But if I could finish the question?

16  A.   Please, sir.

315  17  Q.   Did you reach an agreement with Mr Hoffmann that

18  if you helped him in connection with the negotiations of

19  the Kotva shares that he would share part of his success

20  fee with you?

21  A.   I seem to recall, yes.

316  22  Q.   And that is not an attorney client relationship

23  is it, Mr Golden?

24          MR DANGEL:  Objection.  Of course.

25          MR BECKMAN:  Mr Dangel, you just answered

26  the question.  I am again cautioning you if we have to

27  suspend this deposition we will because of your conduct.

28          MR DANGEL:  Excuse me, but your conduct is

29  outrageous.

```
 1    A.  Okay.
 2              MR DANGEL:  So objection.
 3              MR BECKMAN:  Could you read the question
 4    back, please to Mr Golden.
 5    (Previous question read back by the court reporter)
 6    A.  The question is that is not --
 7              MR BECKMAN:
 8    Q.  Let me. . The agreement -- was the agreement that
 9    you reached that you reached with Mr Hoffmann to share
10    in the success fee an attorney client relationship or
11    a business agreement?
12              MR DANGEL:  Objection.
13    A.  The agreement to share in this success fee, and
14    I don't recall if it was reduced to writing or because
15    I was putting in a lot of time here when I said I will
16    give you some money, I just don't, I don't recall that,
17    to be honest with you.  The best answer to you is what
18    Mr Hoffmann viewed it rather than what I viewed it.
19    I always view my discussions with people, because of my
20    legal background, to be confidential and not to be
21    repeated to anyone else.  So, therefore, I viewed it as
22    certainly a confidential relationship either under the
23    aurora of the fact that I was a lawyer so that he would
24    have some protection there, or just because it was
25    confidential.  So, clearly there was a business aspect
26    to it but, as you saw from this particular tape, there
27    was a legal aspect because some of my input had do with
28    the legal method of doing proper things.
29              MR BECKMAN:
```

317

96

1      **(Off the record - 12.53 pm)**

2      **(Lunch adjournment)**

3      **(On the record - 1.52 pm)**

4      MR BECKMAN:

325    5      Q.   Mr Golden, did Mr Hoffmann tell you he was going

6      to resign?

7      A.   Ever?  Yes, he told me that he was going to

8      resign.

326    9      Q.   Did he tell you on or about October 5th, 2004 in

10     a telephone conversation that he was going to resign?

11     A.   Based on what I heard today rather than my own

12     independent recollection the answer would be yes.

327    13     Q.   Now did you tell Mr Hoffmann that you came to the

14     conclusion that, about two years ago when you resigned

15     and left Mr Weiss yourself, that Mr Weiss was, to use

16     Mr Hoffmann's word, an idiot?

17     A.   Assuming that the date that you played of the

18     taped conversation was correct, my best recollection

19     from what I heard would be that I did make that

20     statement.  Is the question the veracity of the

21     statement or whether or not I made it?

328    22     Q.   Did you make the statement?

23     A.   Apparently I did.

329    24     Q.   Yes.  What did you resign from?

25     A.   The Brookdale Group and the Fund.  The Brookdale

26     Global Opportunity Fund and any and all entities that

27     I had in relation with Mr Weiss except for -- well they

28     weren't his things, like the Kazakhstan fund or whatever

29     they had a majority on.

100

360     1     Q.   Mr Weiss was on the board of BGO as well;
        2   correct?
        3     A.   You know I would be surprised.  I think so but
        4   I am surprised.  Because he generally didn't go on
        5   boards of companies.  He had policy not to go on boards
        6   of companies and I was the guy who went on the boards of
        7   companies.  So that was what I thought, or I thought
        8   I understand that Weiss went on the board of BGO.  But,
        9   once again, when I resigned, he wasn't -- I don't think
        10  -- was he on the board?  Hold on a minute, there is an
        11  exhibit here you gave me.  I have no current information
        12  he was on the board.  I think I heard he was, but my
        13  recollection is he did not go on boards so I have two
        14  opinions on that.
        15            MR DANGEL:  Move to strike.
        16            MR BECKMAN:
361     17    Q.   Did you say to Vladimir Hoffmann that you will
        18  support his decision?
        19    A.   His decision to resign, yes.
362     20    Q.   Did you say to Mr Hoffmann that you were not
        21  worried about your money?
        22    A.   I think I did, yes.
363     23    Q.   What did you mean by your reference to "my
        24  money"?
        25    A.   I indicated to you earlier he had promised me to,
        26  we had this whole discussion about attorney client
        27  privilege and he was going to give me part of his fee.
364     28    Q.   Success fee?
        29    A.   And if he resigned he would obviously get zero so

                              113

1    I would get also zero and all the time I put in in

2    advising him would be for zero.

365

3       Q.  Let me play you a tape recording of a telephone

4    call between you and Vladimir Hoffmann dated December

5    22nd, I am sorry, October 22nd, 2004.  I will play the

6    entire call in its entirety?

7       A.  Yes.

366

8       Q.  "*Mr Hoffmann:  Hello.*

9    *Mr Golden:  Hello.  So what's the current situation with*

10   *the most smartest man in the world?*

11   *Mr Hoffmann:  Well, the situation is difficult as it*

12   *usually is.*

13   *Mr Golden:  Come on.  What's new with that?  I said*

14   *what's new.  I didn't say what's old.*

15   *Mr Hoffmann:  Yes.  Well, you know, the good news is*

16   *that we met on Monday; we met Prestage and Benda.  And*

17   *Benda, Benda said that he would agree with 131 million*

18   *for Kotva shares if we withdraw all lawsuits, and*

19   *Prestage said that he would agree to send part of the*

20   *money intended for the purchase of the building directly*

21   *to us for the shares.  So that's the good news.  And the*

22   *bad news is that basically Andy is unable to do any*

23   *decision.  He doesn't want to say anything.  So I sent*

24   *him, yesterday, a very comprehensive memorandum with all*

25   *the numbers I have computed with the net present value*

26   *of us pursuing the lawsuit which is some, you know, 32*

27   *million Crowns because it costs money and it's a lot of*

28   *time, and it's risky.  So the discount rate is very*

29   *high.  And I also pointed out all the risks still*

114

1    if that is a sufficient answer.

2                    MR BECKMAN:

368    3    Q.  Do you have any reason to believe that this is

4    not your voice on that recording?

5    A.  Well, without impuging your clients in any way,

6    I am sure they had plenty of reason to assume that they

7    were bombs in Kotva and the case this Trend fund was

8    mislaid and nobody has been prosecuted for twelve years.

9    There was a lot of strange things, as Mr Hoffmann said

10    on there, that have occurred in this matter in this

11    country.  So I have no reason to possibly believe it

12    could be changed.  Again I don't mean this personally

13    against Mr Harazim or anybody there, but the proper

14    answer to the question, I have a reason to believe but

15    from what I heard it sounded like that was what I was

16    saying.

369    17    Q.  Was that you on the tape?

18                    MR DANGEL:  Objection.

19    A.  Based on what I heard it seemed to be me on the

20    tape, yes.

21                    MR BECKMAN:

370    22    Q.  Did you recognise the voice of Vladimir Hoffmann?

23    A.  Hoffmann's voice I recognised, yes.

371    24    Q.  That was Mr Hoffmann; correct?

25    A.  Yes, it certainly sounded like Mr Hoffmann to me.

372    26    Q.  Now you mentioned bombs, Mr Golden.  Again you

27    are under oath.  Do you have any personal knowledge as

28    to who was involved in the bombs you are referring to?

29                    MR DANGEL:  Objection.

1    A.    Personally, no.   The bomb I was referring to,
2    there was a bomb in the Kotva building in the offices.
3    That occurred, I think, around 2000, something like
4    that.
5              MR BECKMAN:
6        Q.   2000?
7        A.   1999 or 2000 there was a bomb, I think.   I don't
8    remember now exactly what date, but there was
9    a destruction inside the Kotva building.   I have no idea
10    of who planted that, that is why I said I am not
11    impugning your client's reputation.   I said there was
12    strange things that occurred here, I didn't say your
13    clients had anything to do with this.
14        Q.   Did Mr Harazim have anything to do with that
15    bomb?
16              MR DANGEL:   Objection.
17        A.   I have just told you, I have no idea who was
18    responsible for that and I didn't suggest that
19    Mr Harazim or Mr Benda did.   All I am saying is that
20    occurred.   In fact, it occurred in those offices and, to
21    be frank with you, sir, it would be stupid for somebody
22    to plant a bomb in their own office but maybe they
23    would.   I didn't accuse them of that.   I just said one
24    of the events, one of the events that occurred in this
25    case that certainly gives me a belief that it is
26    possible anything can happen.
27              MR BECKMAN:
28        Q.   Have you played squash with Mr Harazim?
29        A.   Yes.

1   state my basis for the objection.  May I state it?

2          MGR TOJNER:  No.

3    A.  I don't feel competent to give an opinion about

4   Czech law.  I am sorry, even if it was under American

5   law, I think I would want to withhold giving my legal

6   opinion when I am here as a factual witness.  But

7   certainly I could not say it is terrific or no, it's

8   illegal when I have not studied Czech law on the issue,

9   I don't know it that well.  I am not a Czech lawyer and

10   I just don't think it is an appropriate thing for me to

11   be replying on at all, let alone in the deposition.

12   I am sorry.

13          MR BECKMAN:

**401**

14    Q.  So are you refusing to answer that question?

15    A.  I don't have sufficient information upon which

16   I can give you an answer to a question concerning Czech

17   law is what I am trying to say.

**402**

18    Q.  In 2002 were you negotiating the sale of Kotva

19   shares for approximately 50 million Czech Crowns?

20    A.  I do recall having discussions with your clients

21   about the sale of the shares.  I have no present

22   recollection if it was for 55 million or 52 million or

23   50.  It does not seem far from where I was, but I can't

24   tell you:  yes, I recall negotiating for 50 million.

25   I am sorry.

**403**

26    Q.  I apologise, Mr Golden, if I asked you this

27   morning, I just don't recall your answer.  But do you

28   have any knowledge that lawsuits were filed against

29   Kotva in the Czech Republic challenging the transfer of

1    the building from Kotva to its subsidiaries?

2                MR DANGEL:  Objection.

3        A.   Knowledge means am I aware that such things

4    happened or was I involved in?

5        Q.   Absolutely.  No, I am not asking whether you are

6    involved at all.  I am asking if you have any knowledge

7    whatsoever what lawsuits were filled against Kotva

8    challenging the transfer of the building from Kotva to

9    its subsidiaries.

10                MR DANGEL:  Objection.

11        A.   I think I recall reading in the paper that either

12    Woolf or somebody had filed, maybe a minority

13    shareholder.  I do recall something about an issue as to

14    whether or not the subsidiary could be created and

15    the meeting was proper, so I have some recollection of

16    a lawsuit of the nature you are talking about.

17                MR BECKMAN:

18        Q.   Do you have any knowledge with respect to Andrew

19    Weiss or entities affiliated with Andrew Weiss filed

20    lawsuits challenging the transfer of the building?

21                MR DANGEL:  Objection.

22        A.   My recollection was that that lawsuit I was

23    referring to, was done while I was still there in 2002.

24    I could have --

25                MR BECKMAN:

26        Q.   I am asking about Mr Weiss.

27        A.   I understand, I am trying to give you the answer.

28    So it wouldn't be Mr Weiss's thing, at the time.

29    I separated in my mind, so we are clear, when talking

128

1    prior to September 29th, 2004 when he told you that;

2    correct?

3       A.   Yes.

411    4       Q.   Are you aware that the lawsuits that Mr Hoffmann

5    was referring to were filed in approximately May 2004?

6       A.   No, I am not aware of when.

412    7       Q.   You don't know if they were filed in June of

8    2004?

9       A.   No, I don't know what date they were filed.

413    10      Q.   You were aware that lawsuits were filed?

11      A.   Yes.

414    12      Q.   And are you aware that those lawsuits challenge

13   the transfer of the building?

14              MR DANGEL:  Objection, go ahead.

15      A.   I can't honestly say I know exactly what they

16   challenged.

17              MR BECKMAN:

415    18      Q.   What is your understanding?

19      A.   My understanding is they were challenging

20   shareholder meetings of some nature.  There was always

21   an issue of who owned what shares and that is what was

22   at stake here.  If the transfer was done through

23   shareholder votes, then maybe indirectly I would know

24   because it was, some shareholders meeting was being

25   challenged but I don't recall being told that the object

26   of the shareholders meeting was to transfer the

27   ownership.

416    28      Q.   Do you have any knowledge as to whether the

29   lawsuits that Mr Hoffmann is referring to interfered

130

1    question, then you waive the possibility to have that

2    content confidential or under privilege.

3            MR DANGEL:  And if I might just add, it is

4    not illegal for an American lawyer to advise a Czech

5    national on American law if he is a member of a Bar in

6    the United States, which Mr Golden is.  So I don't see

7    why he can't answer the question.  I don't think you are

8    thinking clearly is what I am saying.

9    A.   Could the Court tell me what penalty, if any,

10   there is in a country if someone is found to be

11   practising law here without a license?

12           MGR TOJNER:  There is no such penalty.

13   A.   Thank you.  So let's move forward, that is the

14   important point I have been trying to get to, whether or

15   not I have a problem.

16           MR DANGEL:  So there is a pending question.

17   A.   What is the pending question?

18           MR BECKMAN:

446  19   Q.   Were you giving legal advice or business advice

20   to Mr Hoffmann?

21   A.   I would categorise this as legal advice.

447  22   Q.   Were you advising Mr Hoffmann on Czech law?

23   A.   Well there are aspects of Czech law in this memo.

24   I don't think that I discuss the issues on the

25   Forminster's line of defence which talked about Czech

26   law.  I think probably did not discuss Czech law.

448  27   Q.   Would you agree you were also giving business

28   advice separate and apart from any purported legal

29   advice?

1      A.   I would agree that the legal advice had business

2   consequences to it and that I was discussing how best to

3   present a legal position to a board and that would, of

4   course, have business consequences to it.

449      5      Q.   Were you giving legal advice with respect to

6   American law?

7      A.   Certainly, there are certain -- yes.

450      8      Q.   New York law, Massachusetts law?

9               MR DANGEL:   Objection.

10               MR BECKMAN:

451      11      Q.   What do you mean by American law?

12      A.   General corporate law, which is very much the

13   same in most States.   There is a uniform code of

14   business, I have forgotten what is it called right now.

452      15      Q.   Mr Golden, not all communication with the client

16   are protected by the attorney client privilege under

17   American law; correct?

18               MR DANGEL:   Objection.

19               MR BECKMAN:

453      20      Q.   Let me rephrase that.   Not all communication with

21   a client are protected by attorney client privilege;

22   correct?

23               MR DANGEL:   Are you asking him for a legal

24   opinion now?

25               MR BECKMAN:   I am asking him for his

26   understanding.

27               MR DANGEL:   Objection.

28               MR BECKMAN:

454      29      Q.   You may answer?

153

1         MR DANGEL:  Of lawsuits.

2     A.  And what he should say in document to the board

3   concerning his knowledge of lawsuits.

4         MR BECKMAN:

463   5     Q.  Mr Golden, did you previously testify that you

6   did not know about the substance of the lawsuits?

7         MR DANGEL:  Excuse me, but objection.

8     A.  My recollection as to your question was what was

9   claimed in those lawsuits and I said to you I don't

10  think I knew what was in those lawsuits.  This

11  particular conversation had to do with whether or not

12  the lawsuits, whatever they were, prevented Prestage for

13  the Irish investor from going forward with its purchase.

14  I don't see any conflict between those two statements,

15  sir.

16        MR BECKMAN:

464   17    Q.  Did you, did Mr Prestage tell you that the

18  lawsuits were not preventing Mark land from going

19  forward with the purchase of the Kotva department store?

20    A.  Based on what I heard in this conversation

21  I believe he said something to the effect that he had

22  a letter indicating that they could go forward with

23. their purchase.

465   24    Q.  Now --

25    A.  He had an opinion.

466   26    Q.  I am going to ask you about facts.  Is it your

27  understanding that the lawsuits blocked the sale to the

28  Irish investors?

29    A.  I had no opinion and that is why you heard on the

158

1    that banks were unwilling to extend the financing due to

2    the pending lawsuits?

3          MR DANGEL:   Objection.   Again of his own

4    personal knowledge.

5          MR BECKMAN:

477

6    Q.   Did you have any knowledge?

7          MR DANGEL:   Objection.

8    A.   The only knowledge I had of that claim was what

9    I received from Mr Hoffmann in this memo or in that

10   conversation that the day before or the day after, but

11   I had no personal discussions with anyone from Kotva

12   regarding the situation.

478

13   Q.   Did Mr Prestage tell you that he had a legal

14   opinion that lawsuits challenging the title to the

15   department store were without merit?

16         MR DANGEL:   What was that question?

17         MR BECKMAN:

479

18   Q.   Did you understand that Mr Prestage had a legal

19   opinion that the lawsuits were without merit?

20         MR DANGEL:   Objection.

21   A.   No.   My independent recollection now, after

22   hearing this conversation, is that I met him in the

23   airport, which I think I explained to you earlier today,

24   and I think part of this quick discussion was:  are you

25   going ahead?  Is it okay?  And he indicated that they

26   had a legal opinion that these lawsuits would not

27   prevent them from taking legal title to the property.

28   The issue was whether or not they would get legal title.

29   I am almost certain that was the question, are sure you

163

1   can get this because of all these lawsuits, I have

2   a legal opinion, a big firm that said I said I still can

3   get legal title, not that the lawsuits were very valid

4   or invalid or whatever, but that it did not effect the

5   legal title that his client or his company would have if

6   they purchased.

480

7       Q.  Did you have any understanding as to whether the

8   Irish would go through with the deal if there was

9   a defect in the title?

10          MR DANGEL:  Objection.

11      A.  I don't remember he ever telling me if it was bad

12  title would he do it.  I really don't remember

13  a discussion with him about that.  The discussion was

14  relatively brief.  I only met him, I think, twice in my

15  life, but as a business point of view of this effecting

16  title it does not make sense to go ahead, but I don't

17  remember having discussion of that nature, sir.

481

18      Q.  Do you have any understanding as to why the

19  lawsuits were filed?

20          MR DANGEL:  Objection.

21      A.  My only understanding about the substance of the

22  lawsuits was that there were discussions with legal

23  counsel in Czech that found technicalities with some

24  issues that were done wrong, improperly, incorrectly by

25  the people of Kotva and that a lawsuit would bring that

26  error before a court in the Czech Republic.

27          MR BECKMAN:

482

28      Q.  What technicalities are you referring to?

29      A.  I don't know the technicalities but you are

164

1   *Mr Golden:  So that's the way I would rephrase that*
2   *clause because that, again, gives him a more uncertainty*
3   *rather than a certainty because he would say:  No,*
4   *they're not going to delay it.  It's too much money.*
5   *It's worth blah, blah.  Look at how much, they're*
6   *millionaires, and look at what the time value of money*
7   *is.  The only way"* --
8       A.   Okay.

493

9       Q.   Did you believe that Forminster could possibly
10  tunnel $2 million from the department store's sale?
11      A.   I think I was referring to Mr Harazim and
12  Mr Benda because I remember when I see this that I had
13  a discussion when I was serving on the board of
14  directors why Mr Benda have to drive a very large
15  Mercedes when he is serving on the board of a company
16  that is having financial difficulties.  And the answer
17  I was given was as a presentation to other people
18  because he was the chairman of the board of Kotva he had
19  to have such a large car.  Now how much it cost, what
20  the leasing payments were and calling it tunneling,
21  I think you would be sensitive also to the fact that you
22  are in a company, a corporation, it is a public company
23  that is losing money and people are leasing very large
24  cars.  One of the issues I had when I was serving on the
25  Board was where was the money going, how it was being
26  spent.  And, yes, the answer to your question is
27  I certainly believed that it was possible for Forminster
28  to divert, embezzle, tunnel or otherwise find a way to
29  get out of the company one or two million Dollars

169

1    a year.

494

2       Q.   Did you believe that Martin Benda might have

3    separate interests than Forminster?

4       A.   Absolutely.

495

5       Q.   Okay.  And did you believe Mr Richard Harazim

6    might have separate interests than Forminster?

7       A.   Might have is the word you are using and the

8    answer to that question I answered yes.  That is exactly

9    what I said on the tape.  We don't know if these are

10   Forminster or if they are separate from Forminster so

11   that having a salary, once it ends, what would they do?

12   Therefore their interests may not be same as their

13   handlers, their bosses, whatever.  But no-one has been

14   able to find out who was the owner of Forminster, so we

15   don't know.  That is why in the tape you heard the

16   discussion about Andy would understand this kind of

17   point because Andy's view and my view was that we got

18   a percentage of the profits that was transparent, so

19   that my interest and the shareholders interest were the

20   same.  If the shareholders made a profit, I made

21   a profit because I got a percentage of that.  In this

22   case, it was not clear because we did not know if

23   Mr Benda and Mr Harazim were Forminster, so their

24   interests were the same as Forminster.  If Forminster

25   was them with four other people so that it might be

26   better for them in the whole course to take money

27   personally rather than give it to Forminster or if there

28   is some other issue.  So the answer to the question

29   might have other interests is absolutely yes, I thought

IN THE MATTER OF THE FOREIGN TRIBUNALS EVIDENCE ACT 1856
AND IN THE MATTER OF CIVIL PROCEEDINGS NOW PENDING
BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF MASSACHUSETTS (CIVIL ACTION NO. 05-10679-RCL)


```
---------------------------------)
                                 )
                                 )
KOTVA a.s.                       )
                                 )
            Plaintiff            )
                                 )
                                 )
            v.                   )
                                 )
                                 )
ANDREW WEISS and WEISS ASSET     )
MANAGEMENT, LLC                  )
                                 )
                                 )
            Defendants           )
---------------------------------)
```

                    Deposition of:

                     Mr. Howard Golden

                    Taken at:
                    Courtroom No 126
                    District Court for Prague 1,
                    Ovocny trh 14

                    On:  April 17th, 2007
                    Commencing at 9.00 am

1    A.   It is an interesting question.   You use the word,

2    you hear it, you never think of how to define the word.

3    It is how to get a definition of the word blackmail.

4    Trying to extract money or other benefits from someone

5    by threat of usually it was information when you say:

6    I will tell you wife or something, information or some

7    other action which you didn't have a legal right to do

8    it.

9    Q.   Did you have any understanding that Andrew Weiss

10   was seeking more than NAV, net asset value of the

11   department store for the Kotva shares?

12   A.   No, sir, no.

13   Q.   All right.

14   A.   It is the first time I have heard this.

15   Q.   Is it your understanding that Vladimir Hoffmann

16   was concerned that Andrew Weiss was threatening

17   blackmail?

18          MR DANGEL:   Objection.

19   A.   No.   I must say that in my discussions with

20   Vladimir I think his concern was that he felt that the,

21   either the Irish or the Forminster people claimed it was

22   blackmail, not that he was concerned it was blackmail.

23   It was the appearance or the argument on the other side

24   that he said it was.

25   Q.   Who is "they"?

26   A.   The Forminster and the Irish, it was just they

27   were presenting it as that and he didn't like their

28   presentation.   I don't think, he didn't present to me,

29   let's say.   This is the first time I have heard him

5

1    sir.

            MR DANGEL:

2

115        Q.   And you have written articles, in fact, about

4    doing business in the Czech Republic or at least that

5    has been one of the subjects in the articles?

6            MR BECKMAN:   Objection.

7        A.   I have written articles that are published in

8    Czech newspapers and have been interviewed by a number

9    of international publications to discuss the capital

10   market, doing business, what was happening in the Czech

11   Republic, yes, sir.

116   12       Q.   And prior to coming to the Czech Republic you had

13   been a lawyer for many years in the United States, is

14   that correct, and in Israel; is that right?

15       A.   Yes, sir.

117   16       Q.   And in addition to that, you had been involved in

17   an executive capacity, from the very beginning in the

18   operation of what became the Weiss Fund, if I may use

19   that term; is that correct?

20           MR BECKMAN:   Objection.

21       A.   I think Mr Professor Weiss will have a different

22   view of that.

23           MR DANGEL:

118   24       Q.   I want your view.

25           MR BECKMAN:   Objection.

26       A.   My view is that yes, I was the executive part of

27   the Brookdale organisation and Mr Weiss was not pleased

28   with some of those methods of running the executive part

29   so that when it became the Weiss part, I tend to suggest

                        39

1   to you, counsellor, that his position would be:  No,

2   Golden didn't help to set up the executive part of

3   Weiss.  So that part of your question, I have to say my

4   view is that Weiss's view would be different than the

5   view you expressed in the question.  If you understand

6   where I am coming from.

7           MR DANGEL:

8   Q.   Let me put it this way, you parted company with

9   Andrew Weiss?

10  A.   This is with kisses and roses, yes, sir.

11  Q.   Could I suggest --

12  A.   I am sorry, I apologise, I withdraw the answer.

13  Excuse me.

14  Q.   Right.  In September of 2002; is that correct?

15  A.   We signed the contract, as of September 2002 our

16  business relationship was terminated.

17  Q.   And, in fact, not only did the contract say that,

18  but that in fact occurred that your businesses were

19  separate as of that time; correct?

20          MR BECKMAN:  Objection.

21  A.   That is correct.

22          MR DANGEL:

23  Q.   Now at the time of the split up, kisses and roses

24  I think you were joking, weren't you, it was --

25  A.   Yes, sir, I apologise for bringing and attempting

26  to bring in humour.  I think it is pretty clear that the

27  relationship ended on a less than happy note.

28  Q.   It was acrimonious?

29  A.   I think that is a suitable word, sir.

40

1     Q.   Now before the split up between both of you, have
2   you written articles together about the prospects for
3   business in post communist economic regions in eastern
4   Europe?
5               MR BECKMAN:   Objection.
6     A.   I recall that there was one, perhaps two articles
7   that were published on that subject where both our names
8   appeared.   I will admit, for the record, that it was
9   Mr Weiss who did most of the economic concept of it,
10   I did more of the business entity and discussion of the
11   particular situation here.
12               MR DANGEL:
13     Q.   And in addition to articles you wrote together,
14   did Professor Weiss write numerous articles in peer
15   review journals, economic journals on the subject of
16   economic development in post communist countries during
17   the years that you were together?
18               MR BECKMAN:   Objection.
19     A.   I don't know if I would characterise it
20   as numerous because I don't know how many they were.
21   But I remember that resources of the Brookdale Group
22   were directed towards paying some PhD students who were
23   doing and gathering information, and I was requested to
24   direct where they should obtain this information and all
25   of that information was directed towards at least one
26   article -- I don't know numerous -- that was published
27   concerning the development of the post communist economy
28   in Czech.
29     Q.   Had Professor Weiss written in the 1990s and

41

1    and the strong opinions could be characterised as

2    passionate and could be characterised as strong

3    opinions.  I don't want to be put in the position of

4    characterizing Mr Weiss's view on it.

5              MR DANGEL:

6    Q.  Was he, during the period you were together, was

7    he a noted economist in the United States on the subject

8    on the growth and opportunities in eastern Europe in the

9    post communist world for the development of the economy

10   and business?

11             MR BECKMAN:  Objection.

12   A.  You wanted a yes.  Yes.

13             MR DANGEL:

14   Q.  Now from time to time -- strike that.  Was part

15   of your job, your executive capacity with Brookdale,

16   what became Brookdale in the 1990s to gather

17   intelligence about what was going on in the Czech

18   economy and in the Czech business world and to share

19   that information with Professor Weiss?

20             MR BECKMAN:  Objection.

21   A.  Yes, I think that is a fair characterization of

22   a substantial part of my job.

23             MR DANGEL:

24   Q.  And in order to gather that information, what did

25   you do?

26   A.  I came here one week every month where I spent

27   three weeks in New York and one week in the Czech

28   Republic.  I then met with people, had dinners or

29   lunches.  I met with managers of various funds we had

43

1    invested in, I met and spoke with brokers, journalists,

2    business men, whoever else I could that could give me

3    information about what was happening in Prague

4    specifically and the Czech Republic that would relate to

5    our investments in the area of privatisation of

6    investment funds.

135

7       Q.   Sir, we would agree, would we not, that Prague is

8    one of the most beautiful cities in the world?

9       A.   I have travelled to a large number of cities and

10   it is my considered opinion that Prague is truly one of

11   the most beautiful cities in the world.

136

12      Q.   During your period here, starting in 1995, did

13   you learn that there was an undercurrent or underworld

14   in the business and political community that wasn't so

15   beautiful?

16            MR BECKMAN:   Objection.

17      A.   It is not an yes or no answer.

18            MR DANGEL:

137

19      Q.   Give the answer.

20      A.   Yes, during my period here, I learned that,

21   despite appearances, that there would be a, what I would

22   consider to be a wild west attitude or an attitude that

23   did not protect the minority shareholders, that the

24   governments's view officially stated was that the need

25   to create a Czech middle class overrode the need for

26   minority shareholder protection and the then Prime

27   Minister of the country was both interviewed on the

28   radio and spoke in newspapers basically acknowledging

29   that thefts were occurring from the privatisation funds,

44

1    attitude towards the privatisation thefts.

2    Q.   During your time here in the 1990s, early 2000s,

3    did you have occasion, as you were doing your job in

4    gathering information, to learn that from time to time

5    business matters where there were disagreements, turned

6    violent?

7              MR BECKMAN:   Objection.

8    A.   Yes, sir.

9              MR DANGEL:

10   Q.   Did you report that to Professor Weiss from time

11   to time?

12             MR BECKMAN:   Objection.

13   A.   I don't know where you are going with this, sir,

14   but not only did Professor Weiss get those reports from

15   me, but he had his own sources and he, because at that

16   time we were not at odds, he insisted that I purchase

17   and wear a bullet proof vest in this country.  We had

18   a discussion as to whether I needed it and in the end

19   I gave in.  For a period of a few weeks or months I wore

20   it but I didn't feel it was to that degree that my life

21   was in danger.  But I can assure you that he understood

22   there was issues here and he was aware of it both from

23   my own reports and from his own intelligence gathering.

24   Q.   And he was concerned that business disagreements

25   that he was involved with could turn violent.  Was he

26   concerned about that, did he express concerns like that

27   to you?

28             MR BECKMAN:   Objection.

29   A.   I think I just told you.

46

1        MR BECKMAN:  That is four questions.

2        MR DANGEL:  Yes, there's four questions and

3    I will ask just one question.

143  4    Q.  Did he indicate to you that he was concerned that

5    business matters that Brookdale was concerned with could

6    turn violent?

7        MR BECKMAN:  Objection.

8    A.  Yes, sir.  I think that was the basis for his

9    insisting that I wear a bullet proof vest.  You must

10   also understand at that time in other communist

11   countries people were being killed; in Russia, Ukraine

12   and there is a lot of violence and the question was

13   whether the violence in the Czech Republic would rise to

14   that level and that was a concern that we discussed at

15   least on a few occasions.

16       MR DANGEL:

144  17   Q.  Are you familiar with a company called

18   Forminster?

19   A.  Yes, sir.

145  20   Q.  Have you attempted to find out who the

21   shareholders and the directors of Forminster are?

22       MR BECKMAN:  Objection.

23   A.  Yes, sir.

24       MR DANGEL:

146  25   Q.  Have you been able to find out and discover that?

26       MR BECKMAN:  Objection.

27   A.  No.

28       MR DANGEL:

29   Q.  You smiled in the direction of Mr Harazim.  What

47

1    given by Mr Benda and Mr Harazim to sell them earlier on

2    and not to continue to fight for NAV or a higher amount

3    because I thought that there were, it wouldn't benefit

4    us and it would be unlikely that we would receive it.

153

5       Q.    Now in describing that to Mr Professor Weiss, did

6    you describe I think what Mr Beckman called yesterday

7    certain extraordinary or unusual events that occurred in

8    connection with Kotva transactions?

9              MR BECKMAN:    Objection.

10      A.    Yes, sir.    I am almost certain I explained to him

11   some of the unusual events that occurred around Kotva.

154

12      Q.    And what event did you describe?

13             MR BECKMAN:    Objection.

14      A.    I am certain among the events that we discussed

15   the fact that one of the people who were investigating

16   the Trend Kotva issue, I don't -- it was an investigator

17   who was on the Trend case, which is, of course,

18   collaterally connected with Kotva, committed suicide by

19   putting a gun in his mouth; that there was a bomb that

20   had been placed in the Kotva offices.    He certainly was

21   told that Mr Woolf was roughed up at a Kotva shareholder

22   meeting.    I think he may have spoken to Mr Woolf himself

23   but I know that we discussed that.    I think we discussed

24   that some cars of someone related to Kotva or an

25   investigator of Kotva, I don't recall who it was, but

26   some cars were fire bombed.    Those are specific items

27   that I can think of that I know we discussed because

28   I can recall his reactions to that.    And I think there

29   were other instances but I can't recall right now.

155

1    Q.   Do you call that business as usual, sir?

2         MR BECKMAN:   Objection.

3         MR DANGEL:   I will withdraw that.

156

4    Q.   Let me ask you, you mentioned a Mr Benda,

5    B-e-n-d-a, correct?

6    A.   Yes, sir, that is my understanding of how he

7    spells his name.

157

8    Q.   Is Mr Benda connected to Forminster?

9         MR BECKMAN:   Objection.

10   A.   My understanding is he is either, he is the

11   chairman or their legal representative, I don't know

12   what the legal term is that he used.   But when I was

13   dealing with Forminster it was Mr Harazim and Mr Benda,

14   and Mr Harazim would speak because he English is

15   excellent and Mr Benda who always said he didn't speak

16   English.

158

17   Q.   Now Mr Harazim, was he connected in some way with

18   Forminster?

19        MR BECKMAN:   Objection.

20   A.   It is my information and belief he is, sir.

21        MR DANGEL:

159

22   Q.   You indicated you played squash with him from

23   time to time?

24   A.   I indicated I once played squash with Mr Harazim.

25   I didn't indicate it, it was opposing counsel who

26   brought up the fact that I had played squash with him.

27   I don't want to make this as Mr Harazim is my best

28   friend or my squash partner, but one time we played

29   squash.

51

Cuen Malone Stenography Services Ltd

1    they did would be done through the Cyprus subsidiary to

2    give them tax benefits.  When we took over the Czech

3    Value Fund, which is what the CV, CVF stands for in this

4    company, and I became chairman of the board of the fund,

5    someone had to be become a director of its wholly owned

6    subsidiary and so I was put on that position.  It was

7    not anything that took any activity or actions other

8    than to act as a conduit for purchasing the shares in

9    the country in its name in order to get the tax benefits

10   because Cayman had no tax treaties since there was a tax

11   haven.

12        When I left in 2002, I was totally unaware or

13   I had forgotten that I still was listed legally as an

14   officer or director of this company, otherwise I would

15   have resigned at the time and, of course, Mr Professor

16   Weiss would have insisted I resign from the company at

17   that time, like he had done.  So I took no action.

18   I was not aware of it until I was approached at that

19   time.  I did not realise that I was listed legally as

20   an officer, director of this company.  I just, I am

21   sorry, to take your time, sir, but I had to explain how

22   and why it would be that I would be an officer of

23   a company and I didn't realise it.

169  24   Q.  Yesterday you testified that at the time you got

25   involved?

26   A.  Involved in what?

170  27   Q.  With what became Brookdale, CVF, that the

28   tunneling of Trend had already occurred.  Do you

29   remember that testimony?

54

1    A.    Yes, sir.

171    2    Q.    Okay.  And I think you were asked?

3    A.    I must correct the question.  Brookdale,

4    Brookdale Group, Brookdale Global Opportunity Fund.  If

5    your question is the time I got involved with BGO, which

6    is what we decided yesterday to call the The Brookdale

7    Global Opportunity Fund, which is the successor to the

8    Czech Value Funds, then the answer to your question is

9    yes, I do recall saying that the Trend situation had

10    previously occurred.

172    11    Q.    Well I asked you a specific thing in terms of

12    that, that the tunneling had occurred?

13    A.    Yes.

173    14    Q.    I think you told us yesterday what tunneling is,

15    but since it is my part of the deposition I intend to

16    read this to a jury, I would like you to tell me what

17    tunneling means, please?

18        MR BECKMAN:  Objection.  Asked and answered.

19    A.    In my view tunneling was a Czech attempt to

20    create a word that softened the need to use the word

21    embezzlement or theft.  And it involved the diversion of

22    assets of a fund or corporation into the pockets of

23    either its managers or other individuals to the

24    detriment of the shareholders of that entity.

25        MR DANGEL:

174    26    Q.    And what tunneling had occurred at C --  at Trend

27    prior to your involvement?

28        MR BECKMAN:  Objection.

29        MR DANGEL:  Strike that.

55

1              MR DANGEL:

2         Q.   So let me ask you the question again.  After you

3    became involved with BGO, how did you learn about the

4    tunneling --

5              MR BECKMAN:  Objection.

6              MR DANGEL:  -- at Trend?

7              MR BECKMAN:  -- objection.

8         A.   I spoke to and worked with a Mr Moffitt was the,

9    I think, shareholder or the were the of Trend fund and

10   I recall reviewing the report at some point prepared by

11   the administrator.

12        Q.   Did you pass on the information you learned about

13   tunneling at Trend to Professor Weiss?

14             MR BECKMAN:  Objection.

15        A.   I feel quite certain that I shared the

16.  information with Mr Professor Weiss.

17        Q.   Was this a litigation concerning the tunneling?

18             MR BECKMAN:  Objection.

19             MR DANGEL:

20        Q.   Why don't we call it the alleged tunneling, was

21   there allegations concerning that at Trend?

22             MR BECKMAN:  Objection.

23        A.   Trend was in continual litigation with a number

24   of these, including and not limited to, as far as

25   I recall, Forminster in an attempt to recover the assets

26   that had formally been in the Trend Fund.

27        Q.   Now what was the principal assets the Trend Fund

28   that was tunneled?

29             MR BECKMAN:  Objection.

1    A.   With apologies for my exactitude, because I don't

2    have these papers any more and I didn't study anything

3    for this deposition, my present recollection is the

4    Czech Value Fund which became BGO had owned about 40%

5    plus or minus a few points of the Trend Fund.

189    6    Q.   Now in addition, in addition to the indirect

7    ownership of Kotva from the ownership of Trend shares,

8    did Brookdale, BGO own shares in Kotva directly?

9         MR BECKMAN:   Objection.

10    A.   Yes, sir, my recollection is yes.

11        MR DANGEL:

190    12    Q.   And what percentage of Kotva?

13    A.   I recall it being about 10%.

191    14    Q.   Now, at what point in time did you discuss with

15    Mr Harazim and perhaps others at Forminster the purchase

16    of all of BGO's direct and indirect interests in Kotva,

17    that is the sale of those interests?

18        MR BECKMAN:   Objection.

19    A.   Yes.

192    20    Q.   And when was the first time, let me, to the best

21    of your memory, when was the first time that you had

22    conversations with Mr Harazim or others at Forminster

23    about the purchase of the Kotva interest?

24        MR BECKMAN:   Objection.

25    A.   To the best of my recollection it would have been

26    in either 1999 or 2000.

27        MR DANGEL:

193    28    Q.   Was there ever a time when that subject was not

29    discussed with Mr Harazim or others that was longer than

59

1    sharp negotiators who would make cogent arguments and

2    came to meetings generally prepared.  On the other hand,

3    I would also say that it seemed when we got to a point

4    they always had to adjourn and talk to someone else in

5    order to obtain a permission to make any deals.  So they

6    were, so they presented they were not the deal makers

7    which could be a very astute bargaining position if they

8    were the principals or if they were not the principals,

9    I can't testify as to what it was.

10          MR DANGEL:

11    Q.  Did you ever learn that there was somebody above

12    them?

13    A.  I didn't.

14          MR BECKMAN:  Objection.

15    A.  I didn't learn that, because I don't know who the

16    owners of Forminster are.  But they always indicated to

17    me that there was a principal that they had to consult

18    with before they could come back and respond to any

19    suggestion.

20          MR DANGEL:

21    Q.  Did you ever hear the name Toman?

22    A.  The name Toman is familiar to me because he is

23    a prominent attorney here.  As I sit here today, I seem

24    to recall that he either advised or was the lawyer for

25    Forminster.

26    Q.  For whom?

27    A.  For Forminster.  I think so, but I truthfully am

28    not 100% sure but I do recall the name Toman.

29    Q.  Did you find it difficult to negotiate with

1    unaware.

2       Q.   Okay.   Within a two year period can you place it?

3       A.   Yes, I think this was during the two years,

4    I think it is reasonable.

5       Q.   Okay.   Now as of 2004, did you have any

6    involvement with Weiss Asset Management or with Andrew

7    Weiss or with Brookdale?

8       A.   No, sir.

9       Q.   Did you talk to Mr Weiss or Georgiy Nikitin about

10   Kotva or the Czech Value Fund or Brookdale in 2004?

11              MR BECKMAN:   Objection.

12      A.   To the best of my recollection, I had no

13   discussions at all.

14              MR DANGEL:

15      Q.   Did you have any discussion with them about their

16   efforts to sell the shares that the fund held in Kotva

17   in 2004?

18              MR BECKMAN:   Objection.

19      A.   No, sir.

20              MR DANGEL:

21      Q.   Did you ever inform Mr Weiss or Weiss Asset

22   Management that you were talking with Mr Hoffmann from

23   time to time about that subject?

24              MR BECKMAN:   Objection.

25      A.   No, sir.

26              MR DANGEL:

27      Q.   What were you trying -- who were you trying to

28   help, if anyone, in your conversations with Mr Hoffmann

29   about his efforts to broker the sale of the Kotva

75

1    a conspiracy --

2                    MR BECKMAN:  Objection.

3                    MR DANGEL:

257  4    Q.  -- between let's say Mr Hoffmann and Weiss Asset

5    or Brookdale, were you part of that?

6                    MR BECKMAN:  Objection.

7    A.  I certainly didn't think I was in any way, shape

8    or form.  I didn't do anything here on behalf or with

9    the knowledge of Weiss Asset, and my only communication

10   was with Mr Hoffmann.  I worked with Mr Hoffmann

11   basically because he came to me because he was

12   frustrated, you know, with trying to convince

13   Mr Professor Weiss that this was a good deal.  It

14   initially started as my trying to help a friend and

15   I certainly can't see how, under any circumstances how

16   I was part of any conspiracy or alleged conspiracy, sir.

17                   MR DANGEL:

258  18   Q.  In your conversations with Mr Hoffmann, did you

19   consider at any time that Mr Hoffmann was involved in

20   any illegal conspiracy?

21                   MR BECKMAN:  Objection.

22   A.  It didn't ever occur to me that anything

23   Mr Hoffmann was in was illegal.

24                   MR DANGEL:

259  25   Q.  As we sit here today do you -- I think we should

26   bring out that you were a prosecutor, were you not?

27                   MR BECKMAN:  Objection.

28   A.  Yes.

29                   MR DANGEL:

Owen Malone Stenography Services Ltd

1    Q.  When one side has leverage is it common that the
2    other side tries to get leverage too?
3              MR BECKMAN:  Objection.
4    A.  Yes, sir.  The idea would be to counteract the
5    leverage by taking whatever action you have to do to,
6    the term usually used is to level the playing field
7    because one person has some advantage, i.e. leverage
8    over the other person and you want to do what you have
9    to to take out of the equation his leverage so now you
10   can deal on an equal plain.
11             MR DANGEL:
12   Q.  Did Forminster have leverage in the negotiation
13   of the sale of the Kotva shares during the time period
14   that you were involved?
15             MR BECKMAN:  When?
16             MR DANGEL:  I said 2000 to 2003.
17   A.  Well you said the time frame I was involved so,
18   for the whole time period, for the whole period I was
19   involved, I would say all of the leverage was on the
20   side of Forminster.  They had maneuvered the settlement
21   with the Trend Fund.  One of the objections I had was
22   they put a mortgage on the Kotva building.  I had
23   discussed that with Mr Harazim what business does Kotva
24   have putting a mortgage on it to guarantee a settlement
25   with another party, et cetera.  They were locals.  They
26   knew the system.  They got into the position they were.
27   It was a Cyprus company so that I highly doubted that
28   there was a huge financial base in Forminster.  If this
29   had been a large Czech company and it acquired shares of

81

1   unsuccessful.  Well, I tell you, I would rather not go

2   into each and every one of the pieces of information

3   which led me to that conclusion.  Not only do I think it

4   is not a good idea for my sources nor is it something

5   that is beneficial, but I would prefer to retain

6   confidentiality to my sources.  Let's just say I formed

7   an opinion that it was more than likely that highly

8   placed individuals, either in government or connected

9   with the government, had an interest in assisting

10  Forminster, whether it was by ownership or some other

11  method I cannot testify today that I have reached that

12  conclusion.

13          MR DANGEL:

151 14  Q.   The investigation and the determination and

15  opinion you have of the gathering of information and the

16  investigating you did that led you to this opinion, was

17  it relevant in some way to the consideration of the

18  Kotva shares and Trend shares?

19          MR BECKMAN:   Objection.

20  A.   Yes, sir.

21          MR DANGEL:

152 22  Q.   And what relevance did it have?

23  A.   I advised Professor Weiss that, in my opinion,

24  these were very highly connected people and as I was

25  arguing in the Kazakhstan fund that it makes it a good

26  idea to sell out at some point.  In poker you have, you

27  have got to know when to hold them and when to fold

28  them.  I utilised this information in an attempt to

29  convince Mr Weiss to accept some of the offers I was