UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
KOTVA a.s. and SPV Co.,                 )
                                        )
                Plaintiffs              )        Case No. 05-10679-WGY
                                        )
        v.                              )
                                        )
ANDREW WEISS and WEISS ASSET            )
MANAGEMENT, LLC                         )
                                        )
                Defendants and          )
                Counterclaimants,       )
                                        )
        v.                              )
                                        )
KOTVA a.s., SPV Co., and RICHARD HARAZIM )
                                        )
                Counterclaim-Defendants )
                                        )
_____)


## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE ALL OF DEFENDANTS' DAMAGES

On the eve of trial plaintiffs seek dismissal of defendants' remaining counterclaims by making the false assertion that defendants have not been forthcoming in discovery and cannot prove damages. To the contrary, the defendants have provided the discovery plaintiffs have sought, indeed, defendants have been far more forthcoming than the plaintiffs.

Plaintiffs claim that the wrong party, Weiss Asset Management, is seeking abuse of process damages. It should be Weiss Capital, they say. To the contrary, the plaintiffs sued Weiss Asset Management, not Weiss Capital. Weiss Asset Management is the umbrella company to

1

which all profits flow, and it manages a large investment fund. It is the brand name – all of defendants' marketing efforts are in the name of Weiss Asset Management. So, a litigation campaign against the Weiss's business damages Weiss Asset Management quite directly.  The fact that it does not manage the Brookdale Global Opportunity Fund hardly means that it has not suffered damage by being wrongfully sued. The plaintiffs have known for years that they sued the wrong entity, but have stubbornly refused to acknowledge it because the entity they might have named does not have the assets Weiss Asset Management has. That plaintiffs have prosecuted the wrong party on false charges and spread its name around in subpoenas, letters, and other documents.

There is so much to do before trial that a lengthy response to the plaintiffs' motion would itself cause harm. In brief, the Weiss parties' damages were described in a four page answer to SPV Co.'s Interrogatory #15 attached hereto as Exhibit 1. This lawsuit has been, of necessity, the subject of a footnote in Weiss Asset Management's financial statements since 2005.  The financial statements have been in the plaintiffs' possession for months.  The significance of the footnote has been pointed out to them on several occasions in depositions and briefs filed in this Court.  The damage from the required disclosure of a Civil RICO, Extortion and Securities Fraud charges has been outlined in detail to the plaintiffs and has been quantified. This is far more than plaintiffs have been willing to do for defendants.

As the defendants explained in Exhibit 1, the Weiss funds reached the point at which they could not accept further "personal" investment (including 401K's, pension fund and the like) because of government regulations which require a particular ratio of institutional investment (including endowment and foundation investment). Weiss Asset Management, therefore, has had

to market to institutions, particularly endowments and foundations which do their due diligence through gatekeepers, most prominently Cambridge Associates of Cambridge, Massachusetts. The Cambridge Associates form requires full disclosure of pending litigation. The history of Weiss Asset's dealings with Cambridge Associates was outlined in Mrs. Weiss's deposition. Cambridge Associates' form, attached hereto as Exhibit 2, is Defendants' Exhibit GT (not agreed-to). It is a business record of Weiss Asset Management and has been in the defendants' possession for almost a year. It is alluded to in answers to interrogatories. It is self-explanatory.

Further, Weiss Asset provided all of their financial reports for the past several years to the plaintiffs. The basis for the firm's computation of profits – management fees based on the dollars under management and participation in profit – is outlined fully in those documents, which are very few in number and easy to read. Weiss Asset Management's few expenses were disclosed to plaintiffs long ago. The calculation of lost profits from lost investment monies in 2005-2007 could not be more obvious to plaintiffs' counsel.

Andrew Weiss stood quite willing to testify about specific lost business at his deposition but felt that a confidentiality agreement needed to be worked out between the parties. At Eitan Milgram's deposition, the subject of lost investment and its impact of Weiss Asset's profitability was discussed at several places. One of them is attached as Exhibit 3. Confidentiality was a subject at Mr. Milgram's deposition. Counsel did not reach a stipulation or agreement after Mr. Weiss's deposition – which was before present defense counsel entered the case. Plaintiffs' counsel was unwilling to broach the subject with new counsel, so names were, except for Cambridge Associates and Events Capital Markets, another gatekeeper not revealed, until Cal

Tech was mentioned in interrogatory answers and at deposition, and other potential investors, such as Northern Trust and the McKinsey Pension Fund were revealed.

The reticence about potential clients' names arises from the concern that plaintiffs will do what they did to Weiss Asset's largest investors – plaintiffs subpoenaed their records and were completely insensitive to the effect that would have on plaintiffs' business. However, names of prospective customers lost have been identified in subsequent depositions.

Plaintiffs express displeasure with Professor Weiss's original answers to interrogatories and to deposition questions concerning damages. If the record had closed at the end of January, 2007, they may have had a point. But, perhaps not. As of then, Georgiy Nikitin stood ready to testify in his about damages, as defense counsel were informed. The plaintiffs never asked a question of Mr. Nikitin in his deposition about damages. If they were unhappy with Weiss Asset's answers, they could have asked for further Rule 30 (b)(6) depositions, moved to compel, asked questions at the Weiss and Nikitin depositions, or at least informed defense counsel that they needed help with the calculation of lost profits.

Instead, they took a different route. They sought additional damages discovery through the deposition of Eitan Milgram and by SPV Co's interrogatories. They chose to depose Bonnie Weiss on the subject, finally, but decided not to depose Professor Steven Ross. A copy of portions of Mrs. Weiss's deposition will be attached to defendants' trial brief when a copy of Mrs. Weiss's transcript is obtained tomorrow. The marketing materials providing the rate of returns of the Weiss Funds is laid out in simple graphs. Exhibit 4. The fact that Weiss Asset Management receives a 1% fee on funds under management and a 25%participation in the funds' profits was disclosed in the financial results of Weiss Asset Management and has often been the

4

subject of discussion among counsel. Figuring out the bottom line is so simple that plaintiffs' counsel, after asking Mrs. Weiss whether she was able to testify to the exact computation which lies behind the damage figures annunciated in answer to SPV Co.'s interrogatories, admitted that he did not need her to do that.

Because the deposition was taken so recently, the plaintiffs may argue that the deposition of Bonnie Weiss came late. There is no fault connected to this. Mrs. Weiss has been offered as a witness since last March. The plaintiffs did not show anything but lip service concerning her testimony until the Court ruled that she could appear as a witness last week.

The plaintiffs are trying to mislead this Court into denying a trial on the only true issues: was this lawsuit merely an effort to get leverage to force the Weiss parties to turn over their Kotva stock for nothing, just a "free shot" at the defendants from the beginning, and what has the plaintiffs litigation campaign cost the plaintiffs in lost business through weakening the defendants' business reputation and denying them the opportunity to obtain repeat and new business? Plaintiffs' motion should be denied.

Respectfully submitted,

ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC

By their counsel,

___/s/Edward T. Dangel, III___
Edward T. Dangel, III (BBO#113580)
Dangel & Mattchen, LLP
Ten Derne Street
Boston, MA 02114
617-557-4800

5

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 22, 2007

        __/s/ Edward T. Dangel, III_____
        Edward T. Dangel, III

Czech legal question and depends upon whether Kotva took action in selling off its assets and merging into CIS and whether that created certain by-back rights. If so, it is beyond the scope of this litigation. It is the Weiss parties' contention that the above-stated parties had expressed an interest in purchasing CVF's shares several times prior to May 12, 2004, but were unwilling to do so at a fair and reasonable price, and wanted to create the conditions under which they would be able to purchase the shares at a bargain basement price.

15.    State the basis of your allegation (Paragraph 35 of the Re-Stated Counterclaim) that "Weiss and WAM have incurred and continue to incur damages in Massachusetts, including damages to reputation, disruption of their business, loss of new business, lost time and attorneys' fees, as a result of the counterclaim-defendants decision to try to gain an unfair advantage in a business negotiation through civil and criminal litigation for the Forminster Conspiracy." Please include in your answer a detailed itemization of each of your alleged damages, including the dollar amount Defendants claim to have suffered with respect to damage to reputation, disruption of their business, loss of new business, lost time and attorneys' fees, identify person(s) with knowledge of the foregoing allegations and identify all documents concerning this allegation.

**ANSWER:**    The damages have two components: attorney's fees and lost profits.

1. Attorney's fees. The counterclaim plaintiffs have already provided a recent billing of McDermott Will and Emery relating to the legal expenses for the civil charges brought by the plaintiffs against the Weiss parties. Together with the other bills of MWE already

11

provided, this brings the balance of fees on the civil matter brought in the United States to approximately $1,350,000. Further, the Weiss parties reserve the right to amend this response to include additional legal fees and expenses, including those of Dangel & Mattchen, LLP, as the case comes closer to trial.

2. Lost Profits. The counterclaim plaintiffs have already provided documents which demonstrate that they have lost well over $100,000,000 in additional potential investment into their Funds as a direct result of the civil charges brought in this litigation. The lost profits from May, 2005 to the present are $12.8 million on the $100,000,000, based on 2005 calendar year return which was the worst year in the last 5 years. The profit and loss statement for 2005 has already been provided. Claims that the counterclaim plaintiffs violated Civil RICO and committed securities fraud, together with subpoenas issued to investors, have directly caused them to lose this business. The Weiss parties' Funds have had 17 consecutive quarters of highly successful positive returns on investors' funds. The Funds are an extremely attractive investment vehicle.

To understand the effect that the abuse of process caused it is necessary to understand why the abuse caused the counterclaim plaintiffs to lose business and profits. Because of federal laws and regulations, the Counterclaim plaintiffs' Funds approached capacity in early 2006. As a result, in order to accept more individual investment funds and to grow the Weiss parties' funds, it was necessary to attract foundation and institutional money into the Funds. Various employees of the funds, including Andrew Weiss, Bonnie Weiss, and others, attempted to attract significant

12

foundation and institutional funds, but were thwarted in this activity as a direct result of the spurious Civil RICO and Securities Fraud charges. Foundations and endowments often use gatekeeper services such as Cambridge Associates to determine whether various Funds are suitable for investment. As the Cambridge Associates form already provided indicates, the Weiss parties were required to disclose this litigation. In addition, the Weiss parties were required, as a matter of good accounting practice, to disclose this pending law suit in their annual statements. Numerous endowment funds required the Weiss parties to provide them with annual statements which disclosed this litigation. There are numerous examples, included within the documents already provided, and to be provided through oral testimony, of foundations' and endowments' unwillingness to proceed with the Weiss Funds as a result of the disclosure of the plaintiffs' abuse of process. As a direct result of the spurious charges brought by the plaintiffs in this case, the Weiss parties have been unable to develop the institutional and endowment investment business as they planned, and therefore, have had to limit new personal investments and repeat personal investments in their funds. An example of lost profits is the refusal of the California Institute of Technology [[CalTech] endowment fund to invest in the Weiss parties' funds as a result of the false civil charges. The practice of endowments and gatekeepers to avoid investing in a fund which is enduring civil action is reflected by their comprehension that civil charges of securities fraud and Civil RICO, as well as other such charges, affects the ability of the Fund to realize its investment potential because of the time taken of the Funds' principals to defend the litigation, the inability of the Fund to contract with important counter-parties, and the stigma that such litigation creates. In this case, a great deal of

13

Andrew Weiss's and Georgiy Nikitin's time has been taken with defending against Kotva's and SPV Co's spurious charges, the firm has been unable to contract with Charles Schwab and J.P. Morgan— and others—which are important gateways to business opportunities. In Schwab's case, this has prevented the Weiss parties from hedging— that is short-selling— a number of important stocks. In J.P Morgan's case, it has closed off further investment in stocks in India and China, whose stock markets have seen enormous growth from mid-2005-the present. These and other important counter-parties have refused to do business with the Weiss funds. As a result, the endowments and foundations the Weiss parties have sought to attract have invested elsewhere.

The Weiss parties derive profits from management fees generated by investment funds and through their profit participation, all outlined in contracts already provided. The costs of the Funds' operation are covered, almost completely, through separate expense payments made by investors. As a result the 1% management fee on the total under investment and 25% participation in the funds' net income represent profits to WAM. Over the last several years, Andrew Weiss has re-invested almost all of the after-tax profits back into the business in order to grow it. Companies like Weiss Asset Management do go public and are sold or taken over at multiples of earnings or money under management. In a sale of the Weiss Funds the loss of additional funds under management represents a significantly greater loss of profit than the $12.8 million the counterclaim plaintiffs have lost in profits from operations over the past two and a half years.

14

It should be noted that the loss of profits described herein stands in stark contrast to Kotva's and SPV Co's damages claims. Here, the returns on invested funds are fully known and have persistent over the course of several years, and represent the outcome of the investment expertise that has been developed over many years by the counterplaintiffs and acknowledged over time. Rather than speculation about outcomes from management with no investment expertise or relevant experience and that has made very few investments. Further, the Weiss parties audited profit and loss statements show the gains, management fees, and profit figures, whereas SPV Co's statements show only losses. The loss of profits can be easily testified to, whereas, without knowing the costs and risk of investment, SPV Co's claims are sheer speculation. Further, records have been produced which demonstrate the Weiss parties' loss of business opportunity.

CalTech alone represents a significant loss. Professor Steven Ross is a trustee of CalTech and an investor in the Weiss funds and can testify from personal knowledge about the loss of opportunity at CalTech. The other losses of opportunity can be testified to by Bonnie Weiss, Andrew Weiss, and Georgiy Nikitin.

SIGNED AND SWORN under the pains and penalties of perjury this 18th day of September, 2007.

Andrew Weiss, individually, and on behalf of
Weiss Asset Management, LLC

15

**CAMBRIDGE ASSOCIATES LLC**
4100 North Fairfax Drive, Suite 1300 Arlington, VA 22203-1664
Phone: 703-526-8500  Fax: 703-738-2258

**Part 1 – Firm Information**

Firm Name: _____

Questionnaire Completed By: _____ Date Completed: _____

I.  **Organization**

A.  Address: _____

_____

_____

Telephone Number: (_____)_____ Fax Number: (_____)_____

Website Address: _____

B.  Year Founded _____ SEC Registered? _____ AIMR Compliant (Specify Level) _____

C.  Parent Affiliate _____

D.  Type of Organization:

_____ Bank                    _____ Insurance Company

_____ Bank Affiliate          _____ Insurance Company Affiliate

_____ Brokerage Firm          _____ Foreign Company Affiliate

_____ Brokerage Firm Affiliate _____ Holding Company Subsidiary

_____ Independent Investment   _____ Other (please explain)
           Counsel Firm

E.  Do minorities and/or females hold a majority ownership position in the firm ? Yes _____ No _____

If yes, please specify _____

F.  Please describe briefly the firm's ownership structure, including parent and affiliates.  If your firm is an affiliate that is wholly-owned, please indicate the owners and the percent of their ownership.

G.  Is there pending litigation or administrative proceedings against your firm, or its officers, directors, or employees in connection with services rendered by them on behalf of the firm?

Yes _____ No _____

If yes, please attach a brief description of the pending litigation or administrative proceedings.

H.  Firm assets under management as of (**Please Circle One**):  Mar 31 / Jun 30 / Sep 30 / Dec 31, 20_____

Indicate if currency is not in $US

| Total Assets (mil) | Total # of Products | Total Discretionary Assets (mil) | Total Non-Discretionary Assets (mil) |
|---|---|---|---|
| _____ | _____ | _____ | _____ |

1

WP022798

**CAMBRIDGE ASSOCIATES LLC**
4100 North Fairfax Drive, Suite 1300 Arlington, VA 22203-1664
Phone: 703-526-8500  Fax: 703-738-2258

### Part Two - Product Information: Hedge Fund

Firm Name:_____

Fund Name: _____

Date:_____

I.     **INVESTMENT PHILOSOPHY**

Please attach a description of the investment philosophy for this strategy and the process through which it is implemented. Please note if this fund concentrates in any one industry or geographic region.

II.     **ASSET INFORMATION**

**Assets Under Management (Unleveraged):**

(Please circle one)  Mar 31 / Jun 30 / Sep 30 / Dec 31, 2003

| | |
|---|---|
| Total Fund Assets | $_____mm |
| Total Firm Assets Managed in this Strategy | $_____mm |
| Total Firm Assets Under Management | $_____mm |

III.     **PERSONNEL**

**Data Contact for this Strategy:**

Name: _____
Title: _____
Telephone: ( ) _____
Fax: ( ) _____
E-mail address: _____

Address: (If Different from Firm Address)

_____
_____

**Portfolio Manager(s):**

Name: _____
Title: _____

Please Attach a Biography.

**New Business Contact for this Strategy:**

Name: _____
Title: _____
Telephone: ( ) _____
Fax: ( ) _____
E-mail address: _____

Address: (If Different from Firm Address)

_____
_____

**Portfolio Manager(s):**

Name: _____
Title: _____

Please Attach a Biography.

2

WP022799

## IV.    INVESTMENT VEHICLES

U.S.-based Limited Partnership:

| | | |
|---|---|---|
| Management Fee: | _____ | Number of days notice for redemption: _____ |
| Incentive Fee: | _____ | Length of lockup: _____ |
| Loss carryforward (Y/N): | _____ | Minimum Account size: _____ |
| Contribution dates: | _____ | Open/Closed to new investors: _____ |
| Withdrawal dates: | _____ | |

Offshore Fund:

| | | |
|---|---|---|
| Management Fee: | _____ | Number of days notice for redemption: _____ |
| Incentive Fee: | _____ | Length of lockup: _____ |
| Loss carryforward (Y/N): | _____ | Minimum Account size: _____ |
| Contribution dates: | _____ | Open/Closed to new investors: _____ |
| Withdrawal dates: | _____ | |

Separately Managed Accounts:

| | | |
|---|---|---|
| Management Fee: | _____ | Number of days notice for redemption: _____ |
| Incentive Fee: | _____ | Length of lockup: _____ |
| Loss carryforward (Y/N): | _____ | Minimum Account size: _____ |
| Contribution dates: | _____ | Open/Closed to new investors: _____ |
| Withdrawal dates: | _____ | |

* Please provide an offering memorandum for each vehicle you manage in this strategy.

## V.    PERFORMANCE

Please attach monthly, quarterly, and annual performance numbers for the fund that are net of management fees and performance related incentive fees since inception. If net performance numbers are not available please provide gross figures.

## VI.    ATTACHMENTS

### Please attach the following information:

An offering memorandum for all of the vehicles you manage in this strategy.

Biographies for all of the key investment personnel.

Monthly, quarterly, and annual performance numbers for the fund, net of management fees and performance-related incentive fees since inception. If net performance numbers are not available please provide gross returns.

Any marketing materials you wish to provide.

WP022800

Eitan Milgram

175

1                                    Volume: II

2                                    Pages: 175-345

3                                    Exhibits: 12-20

4              UNITED STATES DISTRICT COURT

5                DISTRICT OF MASSACHUSETTS

6

7      ----------------------------------

8      KOTVA, a.s.,

9                        Plaintiff,

10       v.                              C.A. No.

11     ANDREW WEISS and WEISS ASSET        05-10679-WGY

12     MANAGEMENT, LLC,

13                        Defendants.

14     ----------------------------------

15

16         VIDEOTAPED DEPOSITION of EITAN MILGRAM

17       Thursday, March 22, 2007, 2:04 to 5:52 p.m.

18          NYSTROM, BECKMAN & PARIS, LLP

19              10 St. James Avenue

20              Boston, Massachusetts

21

22

23      Court Reporter:  Paulette Cook, RPR/RMR

24

Eitan Milgram

321

1      Q.   And sometimes does that turn to litigation?

2           MR. BECKMAN:   Objection.

3      A.   Yes.

4      Q.   Okay.   There was one other thing I wanted to

5   ask you about.

6           Sometimes funds like Weiss Asset

7   Management find themselves in the unfortunate

8   position where they're sued, correct?

9           MR. BECKMAN:   Objection.

10     A.   Yeah.

11     Q.   Are you familiar with Weiss Asset's efforts

12  to get new investment -- new investors into the

13  fund?

14     A.   Somewhat.

15          MR. BECKMAN:   Objection.

16     A.   Yeah, I'm not head of investor relations

17  but, you know, it's a small company.   I do have

18  conversations with people.

19     Q.   Do you know what effect -- strike that.

20          Do you know that certain firms, whether

21  they are in fact the direct investors or

22  representing investors, require the disclosure of

23  litigation as a regular matter?

24          MR. BECKMAN:   Objection.

Eitan Milgram

322

1      A.  Yeah, I think, as I discussed with

2  Mr. Beckman, there were some firms that won't invest

3  in, you know, if a manager is either plaintiff or

4  even -- you know, plaintiff or defendant they just

5  won't -- they won't invest.  You know, so -- and

6  others will require sort of disclosure and, you

7  know, or have different restrictions.

8      Q.  Has this particular litigation, the lawsuit

9  that Mr. Beckman's client has brought against Weiss

10  Asset Management and against Andrew Weiss, had to be

11  disclosed to potential investors?

12              MR. BECKMAN:  Objection.

13      A.  It's -- I believe it's been disclosed in the

14  financial statements.

15      Q.  Okay.  Have you had to disclose -- not just

16  talking about investors.

17              Have you been in a position where you've

18  had to discuss that litigation with anyone?

19      A.  Well, sure.

20              MR. BECKMAN:  Objection.

21      A.  Numerous counterparties have either refused

22  to deal with us, made it more difficult to deal with

23  us because, you know, they go and Google and see

24  there's a lawsuit.  You know, whether you're right

Eitan Milgram

323

1    or wrong, you know, that they see, you know,

2    someone's filed a lawsuit, and, you know, even if

3    it's frivolous, it's still, you know, on the day --

4    the days we're in, you know, they get concerned.

5            They want their -- compliance has to

6    look into it, their legal has to look into it.  And

7    some -- you know, initially some counterparties

8    said, you know what, we can't -- we can't even deal

9    with you straight out, you know, because there's a

10   lawsuit.

11      Q.   Have you noticed any impact on Mr. Weiss'

12   ability to concentrate and work and maximize his

13   efforts on behalf of shareholders since this

14   litigation was brought by Mr. Beckman and his

15   clients?

16           MR. BECKMAN:   Objection.

17      A.   A tremendous impact.

18      Q.   Can you describe it, please.

19      A.   Sure.  You know, before this lawsuit was

20   filed Andy could dedicate all his time to our

21   employees, to investment decisions, to focusing on

22   future opportunities, to hiring new employees.

23           Once, you know, this lawsuit was filed,

24   the amount of time he's had has gone way down.  He's

Eitan Milgram

324

1    spent a significant, if not the majority, of his

2    time over the last few years on this lawsuit.

3        Q.  Does Mrs. Weiss work in the firm -- Bonnie

4    Weiss work in the firm from time to time?

5        A.  Yes, she does.

6        Q.  And what does she work on?

7        A.  Mainly investor relations but as well as,

8    you know, helping out.  You know, she's very

9    dedicated, you know, to assisting the employees if

10   they need suggestions.  She's an occupational

11   therapist or --

12       Q.  Have you seen an impact on her ability to

13   work and on her efforts since this lawsuit -- series

14   of lawsuits began?

15           MR. BECKMAN:  Objection.

16       A.  Yeah, I mean I think on both Andrew and

17   Bonnie it's been tremendously draining emotionally,

18   physically and time, you know, that they've had to

19   spend dealing with this lawsuit.

20       Q.  Do you think that's impacted -- that is, as

21   to Mr. Weiss, do you think that has impacted the

22   performance whether -- strike that -- the ability of

23   the fund to get new investment?

24           MR. BECKMAN:  Objection.

Eitan Milgram

325

1      Q.  That is that effect on him.

2            MR. BECKMAN:  Objection.

3      A.  I guess there's -- just to clarify, as a new

4  investors or to make investments?

5      Q.  New investors I'm talking about first.  But

6  we can get more specific than that.

7      A.  Okay.  Sure.

8      Q.  Yeah.

9      A.  So, yeah, it probably has.  I mean I know we

10  haven't really been looking for endowments and

11  pension plan investors because they have, you know,

12  very sort of strict -- they're sort of the group

13  that has very strict rules if there's lawsuits

14  outstanding.

15            I think, you know, from speaking --

16  conversations I've had, it's certainly come up with

17  Georgiy and Marta, but, you know, I haven't been in

18  -- you know, my responsibility is Weiss Capital head

19  of trading.  So I haven't been in on, you know,

20  every conversation, but the conversations I've had,

21  you know, has taken time.  Some investors I think

22  have probably said no, and then there's lost

23  opportunity.

24            We couldn't, you know, hold pension

Eitan Milgram

326

1    funds; the amount of money under management is

2    enormous, and we couldn't solicit.

3        Q.  Does the -- does new investment or the lack

4    of new investment impact on the company's -- that is

5    Weiss Asset's -- profits --

6                MR. BECKMAN:  Objection.

7        Q.  --  on how it's doing?

8                MR. BECKMAN:  Objection.

9        A.  Potentially.  You know, if we had more money

10   under management, you know, there would

11   be potentially more management fees.  You know, we

12   could hire new employees, come up with more ideas,

13   but I think it -- you know, I think it would require

14   Andy being freed up to do those things.

15       Q.  What do you mean by freed up?

16       A.  Well, his time.  You know, this is

17   emotionally draining on him, physically draining,

18   taking his time.  You know, Andy is an extremely

19   well-known economist that, you know, people would

20   pay a lot of money to have him consult per day, even

21   per hour.

22               So to have him working on investment

23   ideas -- you know, he was running pretty much a lot

24   of the investment operations from, you know,

Eitan Milgram

327

1   advising from '91 and, you know, just by himself

2   sort of coming up with the recommendations and you

3   could -- you know, the returns were phenomenal.

4           So we've sort of missed -- in our last

5   few years we've missed that 'cause Andy hasn't been

6   able to focus on -- give enough attention to

7   investments.

8      Q.  Okay.

9           MR. DANGEL:  I have no further

10  questions.

11  REDIRECT EXAMINATION BY MR. BECKMAN:

12     Q.  What counterparties have refused to deal

13  with you because of this lawsuit?

14     A.  We had CIBC basically as soon as they

15  researched that there was a lawsuit e-mailed us back

16  saying, you know, we can't -- we can't open a prime

17  brokerage account.  We then had to -- you know, we

18  have a fiduciary duty to our shareholder if, you

19  know, we think a relationship would be valuable to

20  try to establish that relationship.

21          So we then had to speak to their

22  compliance department.  We had to speak to some

23  pretty high people -- people high up at CIBC to try

24  to establish a relationship.

Eitan Milgram

328

1          Other counterparties have certainly made

2    it difficult -- you know, almost every counterparty

3    we've had to spend a significant amount of time --

4    Georgiy's time, you know, potentially me listening

5    on the phone, Andy's time, you know, explaining what

6    these lawsuits were, why someone's filed them.  They

7    had to then go back to their legal department.

8          It could have also affected our credit

9    terms because these counterparties would say, well,

10   there's a lawsuit, there's some, you know, risk.

11   Andy's not going to be a hundred percent devoted to

12   investment, and he's going to have to spend time

13   dealing with a lawsuit.

14          So it's -- you know, not knowing how

15   they -- how they factored in their sort of credit

16   terms and how much interest they would charge us for

17   borrowing money, you know, it's quite possible that

18   we were affected, you know, significantly on those

19   terms as well.

20   Q.  What particular investors have refused to

21   deal with you because of this lawsuit?

22          MR. DANGEL:  Objection.

23   A.  Well, as I said, I think, you know, pension

24   funds have had issues.

Eitan Milgram

329

1      Q.  Can you identify them by name?

2              MR. DANGEL:  I think that you have to

3      understand are you going to sign some sort of

4      confidentiality agreement concerning that?

5              MR. BECKMAN:  You're coming a little

6      late to the dance, Mr. Dangel.

7              MR. DANGEL:  Go ahead --

8              MR. BECKMAN:  The plaintiffs --

9              MR. DANGEL:  -- put me in my place.  Go

10     right for it.

11             MR. BECKMAN:  The defendants did not

12     want a confidentiality order entered in this case.

13             MR. DANGEL:  Okay.  Well, now we're in a

14     situation where we're not just disclosing Weiss

15     Asset confidentiality, we're disclosing the

16     confidentiality that is investor confidentiality.

17             Investors wouldn't want to have the name

18     used.  So I'm going to -- we can resolve this very

19     quickly.  As to -- I don't know if he knows any

20     names because this isn't his area, but we may well

21     get into that.

22             Will you agree to keep the names -- any

23     names of investors or investment funds confidential?

24             MR. BECKMAN:  For purposes of this

Eitan Milgram

330

1  litigation?

2          MR. DANGEL:  And you will agree that it

3  won't be disclosed outside of the litigation?

4      Q.  Let me ask do you know of any names?

5          MR. DANGEL:  Objection.

6      A.  Right.  Today I don't recall a list of the

7  names, but I know groups -- you know, pools of

8  money, pension funds, you know, we've basically been

9  -- it hasn't -- they have sort of rules and

10  restrictions.  Different advisors, you know, like

11  Cambridge Associates have sort of issues saying, you

12  know, you have a lawsuit.  You know, we're going to

13  -- we're going to do due diligence on another hedge

14  fund that doesn't have a lawsuit because it's going

15  to take a significant amount of time for us to

16  research this.  They just don't want to get

17  involved.  They say come back to us after the

18  lawsuit is resolved.

19      Q.  Are you able to identify any investors by

20  name sitting here today that have refused to deal

21  with you because of the lawsuit?

22          MR. DANGEL:  Go ahead.  Objection.  But

23  -- and I'll come back on it.  So don't worry.  I'll

24  explain.

**BROOKDALE GLOBAL OPPORTUNITY FUND**
Managed by Weiss Capital, LLC
**29 Commonwealth Avenue, 10th Floor**
**Boston, MA 02116**
Phone: (617) 778-7780 • Fax: (617) 778-7781
info@weisscapitalllc.com • www.weisscapitalllc.com



| NET[1] | Net 2nd Quarter 2007 | Avg. Annual 1-Year Net Return | Avg. Annual 3-Year Net Return | 3-Year Monthly Correlation of Returns | Avg. Annual 6-Year Net Return | Maximum Drawdowns[2] |
|---|---|---|---|---|---|---|
| **BGO** | 3.65% | 17.69% | 17.36% | - | 18.61% | -12.42% |
| MSCI WORLD ex USA | 5.96% | 24.26% | 20.88% | 0.05 | 11.74% | -43.37% |
| CS/Tremont Mkt Neutral | 2.34% | 9.44% | 8.96% | 0.19 | | |
| CS/Tremont Hedge Fund | 5.19% | 16.45% | 12.42% | 0.07 | | |

BGO: Brookdale Global Opportunity Fund
MSCI World ex USA: Morgan Stanley World Index (Excluding US)
CS/Tremont Mkt Neutral: Credit Suisse/Tremont Hedge Fund Index Equity Market Neutral
CS/Tremont Hedge Fund: Credit Suisse/Tremont Hedge Fund Index
[1] Net Returns have been calculated as follows:
9/2000 – 6/2003: 20% performance fee; 1% management fee
7/2003 – present: 25% performance fee; 1% management fee
Management fee paid quarterly. As of July 2005, performance fee accrued quarterly, payable annually.
[2] Maximum drawdown is the largest possible cumulative fall in the value of a shareholder's investment.

### Manager's Comments by Andrew Weiss

I am very pleased that we have completed our 17th consecutive winning quarter. We continue to be roughly market neutral on a global basis and within most individual markets, and are hedged against most of our exposure to changes in interest rates and exchange rates. We have no material exposure to collateralized debt obligations, collateralized loan obligations, collateralized mortgage obligations, sub-prime mortgages, low-grade bonds, credit default swaps, or emerging market debt. We have net long exposure to a few markets where hedging is not cost-effective.

Some of our trades involve futures which close near the end of a month, thus our reported position sizes at the end of the quarter do not reflect our peak position sizes toward the end of a typical month, which are often significantly larger than the end of the month positions. Also the futures we buy often are not hedged as well as the rest of our portfolio.

We intend to maintain a roughly market neutral stance. However, as exceptional opportunities arise we may depart from neutrality in specific markets or sectors.

Concerning personnel, two new full-time employees have joined our team: an experienced computer programmer from Oracle and a top Caltech graduate who had previously worked for us as a summer intern. In January, two of our best interns will be graduating early (from Harvard and MIT respectively) to join us as full-time employees. One of our Asia traders/investment analysts has relocated to California, where he continues to trade major positions for us and to maintain the valuation and risk models for the market in which he is principally involved.

Our build-out is complete. We now occupy the entire 10th floor, and most of the 11th floor at 29 Commonwealth Ave. The expansion has provided space for additional traders and investment professionals, meeting rooms and a server room, as well as a gym and cafeteria.



Net Returns: Sept. 2000 - Jun. 2007



| Portfolio Diversification[3] | | |
|---|---|---|
| Total Number of Positions = 1083 | Value, 000's | % of Portfolio |
| Top 1 position | $  17,351 | 4.82% |
| Top 5 positions | $  65,992 | 18.35% |
| Top 10 positions | $  105,332 | 29.28% |
| Top 50 positions | $  218,286 | 60.68% |
| Top 100 positions | $  286,042 | 79.52% |
| Net Long Positions[4] | $  359,718 | 100.00% |
| Net Short Position[5] | $  (248,555) | |
| Currency Hedges | $  (47,425) | |
| Net Asset Value | $  189,418 | |

[3] Many of our holdings are international funds that own diversified portfolios of equities, bonds and cash. Consequently, the diversification of our assets is greater than if our major holdings had been individual equities.
[4,5] Options are valued at their market value. Futures are valued at their economic exposure.

This is not a prospectus, circular or representation intended for use in the purchase or sale of an interest in this, or any other fund, or of any securities mentioned herein. BGO reports data from other sources believed to be reliable, but we cannot be responsible for typographical errors or other entities' data. This report neither constitutes an offer to sell nor a solicitation to invest in Brookdale Global Opportunity Fund ("BGO"). Past performance is not indicative of future results and there is no guarantee that the Fund will meet its investment objectives or be profitable.

**BROOKDALE INTERNATIONAL PARTNERS, L.P.**
General Partner - Weiss Asset Management, LLC
29 Commonwealth Avenue, 10th Floor • Boston, MA 02116
Phone: (617) 778-7780 • Fax: (617) 778-7781
info@weissasset.com • www.weissasset.com



WEISS ASSET MANAGEMENT

| GROSS[1] | Gross 2nd Quarter 2007 | 1-Year Gross Return | Avg. Annual 3-Year Gross Return | 3-Year Monthly Correlation of Returns | Avg. Annual 5-Year Gross Return | Avg. Annual 15-Year Gross Return[3] | Losing Years | Maximum Drawdowns[4] |
|---|---|---|---|---|---|---|---|---|
| BEP/BIP | 5.84% | 27.44% | 27.11% | - | 31.34% | 24.60% | 0 | -18.57% |
| MSCI World ex US | 5.96% | 24.26% | 20.88% | 0.01 | 16.27% | 8.61% | 4 | -49.81% |

| NET[2] | Net 2nd Quarter 2007 | 1-Year Net Return | Avg. Annual 3-Year Net Return | 3-Year Monthly Correlation of Returns | Avg. Annual 5-Year Net Return | Avg. Annual 15-Year Net Return[3] | Losing Years | Maximum Drawdowns[4] |
|---|---|---|---|---|---|---|---|---|
| BEP/BIP | 4.25% | 19.70% | 19.08% | - | 22.17% | 18.40% | 0 | -18.77% |
| CS/Tremont Mkt Neutral | 2.34% | 9.44% | 8.96% | 0.13 | | | | |
| CS/Tremont Hedge Fund | 5.19% | 16.45% | 12.42% | 0.07 | | | | |

BEP: Brookdale Equity Partners L.P. (1991 – 1994)
BIP: Brookdale International Partners L.P. (1994 – present)
MSCI World ex USA: Morgan Stanley World Index (Excluding US)
CS/Tremont Mkt Neutral: Credit Suisse/Tremont Hedge Fund Index Equity Market Neutral
CS/Tremont Hedge Fund: Credit Suisse/Tremont Hedge Fund Index
[1] Gross returns are calculated after expenses are deducted, but before fees are charged.
[2] Net Returns have been calculated as follows:
9/1991 – 10/1994:  15% performance fee; no management fee
11/1994 – 8/2003:  20% performance fee; no management fee
9/2003 – present:  25% performance fee; 1% management fee
Management fee paid quarterly.  As of July 2005, performance fee accrued quarterly, paid annually.
[3] BEP calculated returns quarterly and BIP calculated its returns monthly. Since BIP was established Nov. 1, 1994 and BIP had a loss for the 4th quarter of 1994, we assumed that that entire loss was incurred in October 1994 and used BIP monthly returns for the remainder of the quarter.
[4] Maximum drawdown is the largest possible cumulative fall in the value of a partner's investment.

### Manager's Comments by Andrew Weiss

I am very pleased that we have completed our 17th consecutive winning quarter. We continue to be roughly market neutral on a global basis and within most individual markets, and are hedged against most of our exposure to changes in interest rates and exchange rates. We have no material exposure to collateralized debt obligations, collateralized loan obligations, collateralized mortgage obligations, sub-prime mortgages, low-grade bonds, credit default swaps, or emerging market debt. We have net long exposure to a few markets where hedging is not cost-effective.

Some of our trades involve futures which close near the end of a month, thus our reported position sizes at the end of the quarter do not reflect our peak position sizes toward the end of a typical month, which are often significantly larger than the end of the month positions. Also the futures we buy often are not hedged as well as the rest of our portfolio.

We intend to maintain a roughly market neutral stance. However, as exceptional opportunities arise we may depart from neutrality in specific markets or sectors.

Concerning personnel, two new full-time employees have joined our team: an experienced computer programmer from Oracle and a top Caltech graduate who had previously worked for us as a summer intern. In January, two of our best interns will be graduating early (from Harvard and MIT respectively) to join us as full-time employees. One of our Asia traders/investment analysts has relocated to California, where he continues to trade major positions for us and to maintain the valuation and risk management models for the market in which he is principally involved.

Our build-out is complete. We now occupy the entire 10th floor, and most of the 11th floor at 29 Commonwealth Ave. The expansion has provided space for additional traders and investment professionals, meeting rooms and a server room, as well as a gym and cafeteria.

### Net Returns: Inception - June 30, 2007



| Portfolio Diversification[5] | | |
|---|---|---|
| Number of Positions = 1129 | Value, 000's | % of Net Long Positions |
| Top 1 position | $ 46,303 | 5.08% |
| Top 5 positions | $ 171,335 | 18.79% |
| Top 10 positions | $ 271,360 | 29.76% |
| Top 50 positions | $ 548,919 | 60.21% |
| Top 100 positions | $ 715,155 | 78.44% |
| Net Long Positions[6] | $ 911,678 | 100.00% |
| Net Short Position[7] | $ (637,083) | |
| Currency Hedges | $ (105,663) | |
| Net Asset Value | $ 433,891 | |

[5] Many of our holdings are international funds that own diversified portfolios of equities, bonds and cash. Consequently, the diversification of our assets is greater than if our major holdings had been individual equities.
[6,7] All options are valued at their market value for computation of Net Short Position. All futures are valued at their notional value.

This is not a prospectus, circular or representation intended for use in the purchase or sale of a partnership interest in this, or any other partnership, or of any securities mentioned herein. BIP reports data from other sources believed to be reliable, but we cannot be responsible for typographical errors or other entities' data. This report neither constitutes an offer to sell nor a solicitation to invest in Brookdale International Partners, L.P. ("BIP"). Past performance is not indicative of future results and there is no guarantee that the Partnership will meet its investment objectives or be profitable.



# Net Performance Since Inception

WEISS ASSET MANAGEMENT

Weiss Asset Management Presentation – June 30, 2007

Millions USD$

— BIP/BEP Net
— MSCI EM
— MSCI World ex USA
— S&P500

$12.46M

$4.01M
$3.80M
$2.86M

* Net value of an investment made at inception of BEP on August 31, 1991 and switched into BIP on November 1, 1994. Since BEP had a loss for the 4th quarter of 1994, we assumed that that entire loss was incurred in October 1994. The fees and expenses varied over time and are NOT the same as the fees and expenses currently being charged to new investors. See page 17 for details.

7



# Net Performance - Hedged

Millions USD$

Legend:
- BIP/BEP Net
- Credit Suisse/Tremont Hedge Fund Index
- Credit Suisse/Tremont Hedge Fund Index Equity Market Neutral

$1.92M
$1.46M
$1.32M

* Net value of an investment made at inception of BEP and switched into BIP in November 1994. Since BEP had a loss for the 4th quarter of 1994, we assumed that that entire loss was incurred in October 1994. The fees and expenses varied over time and are NOT the same as the fees and expenses currently being charged to new investors. See page 17 for details.

8

WEISS ASSET MANAGEMENT

# Annualized Excess Gross Returns

Weiss Asset Management Presentation – June 30, 2007

| BIP/BEP Gross Returns | MSCI Emerging Markets | | MSCI World ex USA | | S&P 500 | |
|---|---|---|---|---|---|---|
| | Excess Return | Beta | Excess Return | Beta | Excess Return | Beta |
| BIP/BEP Quarterly from Q3/1991 | 17% | 0.51 | 19% | 0.62 | 18% | 0.58 |
| P-value* (probability that positive excess return is due to chance) | 0.0000007 | | 0.000010 | | 0.000072 | |
| BIP Monthly from 11/1994 | 19% | 0.40 | 19% | 0.45 | 18% | 0.40 |
| P-value (probability that positive excess return is due to chance) | 0.0000003 | | 0.000006 | | 0.000023 | |
| BIP Monthly - Last Five Years | 27% | 0.15 | 26% | 0.27 | 30% | 0.11 |
| P-value (probability that positive excess return is due to chance) | 0.0000079 | | 0.000001 | | 0.0000004 | |
| Correlation coefficient of monthly returns from 11/1994 | 0.60 | | 0.42 | | 0.38 | |
| Monthly Correlation for the Last Two Years | -0.35 | | -0.25 | | -0.31 | |

* The usual standard for statistical significance is P-value of 5% or 0.05.

Note: These are results from regression analysis. These are gross returns after all expenses are deducted from returns but before management and performance fees are charged. These are NOT the returns an investor would have received. See page 17 for details.

9