Page 1

1                                    Volume: I

2                                    Pages:  1-157

3                             Exhibits: 8

4          UNITED STATES DISTRICT COURT

5             DISTRICT OF MASSACHUSETTS

6

7    _____

8    KOTVA, a.s.,

9                    Plaintiff

10           vs.                       Docket No.

11   ANDREW WEISS and WEISS ASSET       05-10679-WGY

12   MANAGEMENT, LLC,

13                   Defendants

14   _____

15

16

17          DEPOSITION of BONNIE WEISS

18             October 22, 2007

19            9:57 a.m. - 1:47 p.m.

20         Packenham, Schmidt & Federico

21            Ten St. James Avenue

22            Boston, Massachusetts

23      Reporter:  Cynthia F. Stutz, CSR

24

Bonnie Weiss

1    the date.

2        Q.    How about informally?

3        A.    Well, my husband is a trader and he worked out

4    of the house, so, you know, we had an office in the

5    house and Eitan Milgram worked for him and, I don't

6    know, it was part of my life.

7        Q.    Let's talk about when you formally started

8    working for him.  Was there a company, specific company

9    or entity that you worked for?

10        A.    Andrew pays my salary.  The investors do not

11    pay my salary.  He has just administrative money.  It's

12    his money.  Investors don't pay my salary.

13        Q.    What I'm trying to figure out, is it Weiss

14    Asset Management, Weiss Capital?

15        A.    Weiss Capital -- Well, no, Andrew pays my

16    salary.  I believe it's Weiss Capital, but I'm not

17    sure.

18        Q.    Do you receive a W-2?

19        A.    Yeah, that's Weiss Capital.

20        Q.    Have you ever been an employee of Weiss Asset

21    Management?

22        A.    No.  Weiss Asset Management is our umbrella,

23    our brand name.

24        Q.    Could you explain that to me?

Bonnie Weiss

1    mean, those are prospective investors and we hold the

2    names of our investors confidentially.

3        Q.    I do understand that.  There is a claim,

4    though, that because of this lawsuit, the company was

5    not able to retain investors.

6        A.    Can you rephrase your question?  Make sure I

7    understand it.

8        Q.    Sure.  In 2003 what were the names of the

9    endowments or foundations that you began approaching on

10   behalf of Weiss Capital?

11       A.    People that I actually called?

12       Q.    Yes.

13       A.    From memory, M.I.T., Tufts University, I don't

14   know what year it was, because I've gone to

15   conferences -- Since then Howard -- Not in 2003, we're

16   talking about a range of years, so I don't remember.

17   There was the Wildlife Conservancy in New York City, I

18   called them.  That's a foundation.  I called numerous

19   schools.  I can't recall all of them.

20       Q.    Okay.  What I want to do for purposes of my

21   question is focus on 2003 and 2004 only.  Could you

22   tell me in those two years which endowments or

23   foundations you were able to bring in as investors to

24   Weiss Capital?

Bonnie Weiss

Page 19

1    A.    I don't remember the years that I called

2    these.

3    Q.    Is that information something that Weiss

4    Capital would have in its files?

5    A.    Well, there are e-mails.  I have e-mails,

6    people I spoke with, so it's all, you know, those

7    records have been, I believe you have.

8    Q.    Actually, we don't, but I don't want to

9    belabor that point.  Let me try asking it that way.

10   Putting aside who you may have called, which endowments

11   or foundations became investors in Weiss Capital in the

12   years 2003 through 2004?

13   A.    I'm not the only person who does marketing, so

14   perhaps other entities came in that I'm unaware of.

15   Q.    Okay.  I'm just asking to the best of your

16   knowledge.

17              MR. HALPERN:  Can I have a minute with

18   her?

19              MR. ZAKARIAN:  Well, as soon as she

20   answers the question, then I don't have a problem

21   taking a break.

22   Q.    I'd like you to answer the question.

23   A.    I don't have -- I'm going to say I can't think

24   of any.

Bonnie Weiss

Page 39

1    aware of that.  So you don't normally speak with

2    existing investors, just potential ones?

3        A.   Usually.

4        Q.   Okay.  Are there any existing investors that

5    you do recall having discussions with?

6        A.   Yes.  Occasionally people will come in just

7    making a routine visit to say hi to Andy, how are

8    things going?  And I'll sit in just because it's good

9    for me to hear the conversation.

10       Q.   Who are some of those investors?

11       A.   I believe there was a gentleman from UBS came

12   in.  I just sat in on the meeting.  And Benchmark, I

13   think Benchmark -- They're at Fund to Funds.  There was

14   a gentleman whose name I cannot remember, I'm sorry,

15   that came in who, he was just traveling across the

16   country, stopped in to hello.  And he just wanted to,

17   you know, just say hi, how are things going, just the

18   usual what they do.  It's like, you know, a routine due

19   diligence they come in.

20       Q.   Okay.  With respect to the existing investors

21   that you have had communications with do you know if

22   this litigation was discussed with any of those

23   investors?

24       A.   I don't know.

Bonnie Weiss

1    Q.    During the meetings where you have sat in

2    where they came and met with your husband, did they in

3    any of those meetings discuss this litigation?

4    A.    They'll just ask, someone asked how are things

5    going with your litigation, and that's pretty much it.

6    Q.    I'm sorry, I didn't catch the end of that.

7    A.    They'll just ask, How are things going with

8    your case?

9    Q.    Do you know who that was?

10    A.    I can't recall his name.

11    Q.    Do you know if he's still an investor today?

12    A.    Yes.

13    Q.    Looking back to Exhibit 3, have you had any

14    discussions with anyone at Weiss Capital, including

15    your husband, about inquiries made by Kochis Fitz?

16    A.    No.

17    Q.    I'm going to show you what's been marked as

18    Exhibit 4 and I can represent to you that Exhibit 3

19    asks a series of questions and Exhibit 4 provides

20    answers to those questions.

21              (Document handed to the witness.)

22    A.    Okay.

23    Q.    Have you ever seen Exhibit 4 before?

24    A.    No.

Bonnie Weiss

Page 43

1        A.    I don't understand the question.  There's

2    different ways to determine performance.  I just told

3    you that we've had 18 consecutive profitable quarters.

4        Q.    Do you have any knowledge concerning how Weiss

5    Capital last performed since this lawsuit was filed?

6        A.    We've had 18 consecutive profitable quarters.

7        Q.    Would you look back at Exhibit 4, please,

8    Paragraph 2, and I should state this is an e-mail from

9    your husband, correct?

10        A.    From Andrew Weiss, yes.

11        Q.    So Paragraph 2, the last sentence, My role is

12    affected by the time taken in the case, but there is

13    considerable upside potential for our investors.

14                Do you see that?

15        A.    Yes.

16        Q.    Have you had any discussions with anyone at

17    Weiss Capital, including your husband, about the

18    considerable upside potential for the investors from

19    this case?

20        A.    No.

21        Q.    You see the next paragraph, Paragraph 3, six

22    lines down there's a sentence that begins, On the other

23    hand, if our counterclaims are successful, do you see

24    that?

Bonnie Weiss

1    easier.  Look at Exhibit 3 and do it side by side so

2    you can see the question and the answer.  If you look

3    at Exhibit 3, Paragraph 5 a, it says, A list of

4    requests for redemptions, date and amount which you

5    have received since January 1, 2005 for both BIP and --

6       A.    All right, I'm looking in the wrong place.

7    Could you repeat that?

8       Q.    Sure, sure.  Exhibit 3, if you'd look at

9    Paragraph 5 a, would you read that to yourself, please?

10      A.    Uh-hum.  (Witness nodding head up and down.)

11      Q.    Now, would you look at Exhibit 4, please?

12   Paragraph 5 says, This is confidential information.

13   However, the only full withdrawal was by -- blank --

14   who was a Kochis investor.  Do you see that?

15      A.    Yes.

16      Q.    Other than that one individual, are you aware

17   of any investor who have BIP or BGO who has made a full

18   withdrawal of their investment since this lawsuit was

19   filed?

20      A.    No.

21      Q.    If you look again at Exhibit 4, the next

22   sentence, The other withdrawals we have had have been

23   partial redemptions for payments of taxes.

24               Do you see that?

Bonnie Weiss

Page 60

1    Q.   Have you had any, since the filing of this

2  lawsuit have you had any discussion with any endowments

3  or foundations where they told you that they would not

4  invest in Weiss Capital because of this lawsuit?

5    A.   No.

6    Q.   Do you believe that the filing of this lawsuit

7  has impaired your ability to obtain new investors or

8  investments from endowments or foundations?

9    A.   Yes.

10   Q.   Why do you believe that?

11   A.   Because endowments and foundations will not

12  entertain a discussion if there's a lawsuit.  They are

13  strict and they drill deep and they don't have to drill

14  very deep and they will not invest.

15   Q.   But no endowment or foundation has ever said

16  that to you, have they?

17   A.   We were at a major bank in a meeting recently

18  and meeting with the capital introduction specialist

19  for foundations and endowments and we were told that

20  they will drill deep to find out if there is anything

21  to prevent them from introducing us to potential

22  endowments and foundations.

23   Q.   Who told you that?

24   A.   A gentleman at a financial services company in

Bonnie Weiss

Page 61

1    New York City.

2        Q.    What company?

3        A.    Morgan Stanley.

4        Q.    Who was the gentleman?

5        A.    His name is, I believe, Justin Kahn.

6        Q.    During the meeting with Mr. Kahn did this

7    litigation, was this litigation discussed?

8        A.    No.

9        Q.    Was the allegations being made by the Czech

10   government against your husband discussed?

11       A.    No.

12       Q.    Did Mr. Kahn in any way reference this

13   litigation?

14       A.    No.

15       Q.    He just said that they would drill deep into

16   the company?

17       A.    Into any company.  That's policy.

18       Q.    Do you have knowledge concerning management

19   fees that Weiss Capital collects?

20       A.    One and 25.

21       Q.    Could you explain that to me?  I don't

22   understand that.

23       A.    There's a 1% manager's fee and a 25%

24   performance fee.

Bonnie Weiss

1      Q.   Okay.  Where does the 1% management fee come

2   from, 1% of what?

3      A.   Of a performance.

4      Q.   I want to --

5      A.   Well, it's in there, if you would like to

6   know.

7      Q.   And when you say in there, you're referring

8   to?

9      A.   Well, it's in our company presentation.

10     Q.   Do you have any role at all in assessing or

11  collecting management fees?

12     A.   No.

13     Q.   How about in performance fees?

14     A.   No.

15     Q.   Other than the discussion you referenced with

16  me about the bank and your general understanding that

17  endowments or foundations won't invest money in

18  companies that are involved in litigation, is there

19  anything else which you base your belief on that --

20     A.   Yes.

21     Q.   Let me just finish my question.

22     A.   I'm sorry.

23     Q.   In which you base your belief on that this

24  lawsuit has caused damages to your husband or Weiss

Bonnie Weiss

1    Asset Management?

2        A.    Yes.

3        Q.    Okay.  What is that based on?

4        A.    Cambridge Associates is an advisor.  To my

5    understanding their the gold standard on their form,

6    they -- And I believe you have it as an exhibit, that

7    they would like to know if there are any lawsuits.

8        Q.    Okay.  Before we get to Cambridge Associates,

9    the 1% management fee, who's that paid to?

10       A.    Andrew.

11       Q.    Is it paid to him personally or is it paid to

12   Weiss Capital?

13       A.    Well, goes through -- I don't know exactly.  I

14   don't get involved in that probably, so I'm going to

15   say I don't know exactly.

16       Q.    And the 25% performance fee, do you know if

17   that's paid to Andrew personally?

18       A.    I don't know.

19       Q.    Okay.

20            MR. ZAKARIAN:  May we have this marked

21   as the next exhibit, please?

22                (B. Weiss Exhibit No. 7 marked

23                for identification.)

24       Q.    Thank you.  I'd like to show you what's been

Bonnie Weiss

Page 64

1   marked as Exhibit 7.  Would you take a look at that?

2   Once you have had a chance to review it just let me

3   know.

4              (Document handed to the witness.)

5      A.   Uh-hum.

6      Q.   You mentioned Cambridge Associates before.  Is

7   this the form that you were referencing?

8      A.   Yes.

9      Q.   To your knowledge did Weiss Capital complete

10  this form and send it back to Cambridge Associates?

11     A.   No.

12     Q.   Why not?

13     A.   I stopped it because I didn't want to burn our

14  bridges with them.  I mean, it says right there, G, is

15  there pending litigation or administrative proceedings

16  against your firm or its officers, directors or

17  employees in connection with services rendered by them

18  on behalf of the firm?  I made that decision.

19     Q.   Did you ever have any discussions with anyone

20  at Cambridge Associates about this lawsuit?

21     A.   No.

22     Q.   And you never sent them the form disclosing

23  the lawsuit?

24     A.   We sent a -- No, we didn't send this form.  We

Bonnie Weiss

Page 65

1    send a previous one and didn't hear back from them.  I

2    called and I'm not sure -- They didn't tell us why they

3    did not want to take us on as a manager and then the

4    second round, they sent us this.  The first form did

5    not have this question.

6        Q.   When did you complete the first form and send

7    it in?

8        A.   I don't recall the date.

9        Q.   Do you know what year it was?

10       A.   No.

11       Q.   Do you know if it was in 2005?

12       A.   No, I forget.  I really don't remember.

13       Q.   Do you know if it was before or after this

14   lawsuit was filed?

15       A.   Well, if the lawsuit was filed in 2003, it was

16   after, I'm pretty sure.

17       Q.   I can represent to you that this lawsuit was

18   filed in 2005, not 2003.

19       A.   I'm sorry, I misspoke.  It was definitely --

20       Q.   So was the first form sent into Cambridge

21   Associates after this lawsuit was filed?

22       A.   I don't remember, but possibly.

23       Q.   Prior to this lawsuit being filed had you or

24   Weiss Capital made any efforts to solicit, to get

Bonnie Weiss

Page 66

```
 1   listed with Cambridge Associates?

 2       A.   I believe so, but not by me.

 3       Q.   Do you know who made those efforts?

 4       A.   On our file there was a form that was filled

 5   out by, a former employee.

 6       Q.   Who was that employee?

 7       A.   Brianna Dubrow.

 8       Q.   Do you know when Miss Dubrow stopped working

 9   for Weiss Capital?

10       A.   I don't remember the year.

11       Q.   Do you know if it was before or after this

12   lawsuit was filed?

13       A.   I don't remember.

14       Q.   Do you recall what the form indicated?

15       A.   It was a form similar to this -- Well, the

16   form that I saw -- I don't know what that form -- I

17   don't recall it.  I didn't read it carefully.  I didn't

18   have anything to do with that.

19       Q.   Other than seeing that form, are you aware if

20   whether Weiss Capital made any efforts prior to the

21   initiation of this lawsuit to be listed with Cambridge

22   Associates?

23       A.   I just said I saw a form on our file.

24       Q.   Right was.  That before this?
```

Bonnie Weiss

Page 69

1            MR. ZAKARIAN:  I'd also like to request

2    a copy of that document.  Okay.

3        Q.    Have you ever heard the term gatekeeper

4    association?

5        A.    I've heard the term gatekeeper.

6        Q.    Gatekeeper.  Would you consider Cambridge

7    Associates to be a gatekeeper?

8        A.    Yes.

9        Q.    Are there any other gatekeepers that you

10   discussed, that you had discussions with concerning

11   listing Weiss Capital?

12       A.    Yes.

13       Q.    Which gatekeepers?

14       A.    Rogers Casey in Connecticut, Fund Evaluation

15   Group, they're in Chicago, LCG, their main office is in

16   Atlanta and we're on their database, Lyster and Watson.

17   They're in New York.  And most recently New England

18   Pension Fund Foundation.  I just blanked on the full,

19   something like that.  I could give you the exact name.

20       Q.    Okay, let's talk about Rogers Casey.  Is Weiss

21   Capital listed with Rogers Casey?

22       A.    No.

23       Q.    Did Weiss Capital try to get listed with

24   Rogers Casey?

Bonnie Weiss

Page 74

1    nature.

2        Q.    What do you recall his saying about it?

3        A.    I don't recall.

4        Q.    Did you have, did you discuss your decision

5    with anyone else other than your husband?

6        A.    I may have mentioned Eitan Milgram.

7        Q.    Would you mind just spelling that for the

8    court reporter, please?

9        A.    E-i-t-a-n M-i-l-g-r-a-m.

10       Q.    What do you recall telling Mr. Milgram?

11       A.    I had someone hang up on me after I sent

12   materials that included our audit with the note about

13   us with Andrew Weiss' lawsuit mentioned in it.

14       Q.    Who was that who hung up on you?

15       A.    The gentleman from Wildlife Conservation

16   Foundation.

17       Q.    So that would be a foundation?

18       A.    Uh-hum.  (Witness nodding head up and down.)

19       Q.    Okay.  And tell me what you recall about that.

20   What happened?

21       A.    I, about the conversation?

22       Q.    Yes.

23       A.    I called him.  I introduced myself.  And I

24   don't know what he said.  He muttered something and

Bonnie Weiss

Page 75

1    hung up.  That was after our previous introduction call

2    where he was very happy, he asked me for materials, he

3    was very interested in the fund, the funds and it was a

4    follow-up call.

5        Q.    And you don't know what he said before he hung

6    up the phone?

7        A.    I don't recall.

8        Q.    Did you ever try to call back?

9        A.    No.

10       Q.    Do you recall if what he said was audible to

11   you?

12       A.    I don't remember.

13       Q.    Do you know if he said, I have a bad

14   connection, can't hear you, and hung up?

15       A.    No, it wasn't that.  No, it wasn't that.  I

16   don't know what he said.  Something probably not nice,

17   something rude.  I don't know.

18       Q.    When you called did you introduce who you

19   were?

20       A.    Yes.

21       Q.    And but you don't remember what he said back

22   before he hung up?

23       A.    He knew exactly who I was and this was after

24   receiving materials that included our audit with the

Bonnie Weiss

1    note, Number 9 note about the lawsuit.  I already told

2    you that.

3        Q.   Okay.  And the materials you sent also

4    included financial performance?

5        A.   Yes.

6        Q.   It also included minimum investments?

7        A.   I brought -- It included quarterly reports,

8    recent quarterly reports, the company presentation,

9    audit.

10       Q.   So it could have been anything else in those

11   reports, as far as you know, why he hung up, right?

12                MR. HALPERN:  Objection.

13       A.   We have spectacular performance.

14       Q.   I understand that.  My question, though, is

15   you don't know specifically why he hung up, do you?

16       A.   It is my belief --

17       Q.   Okay, it's your belief, but you don't know

18   that, right?

19       A.   Correct.

20       Q.   What else did you tell Mr. Milgram about them

21   hanging up on you?

22       A.   That's pretty much it.  And Mr. Milgram told

23   me that it's, there's something called -- Well, there's

24   a way that people can find out whether there's a

Bonnie Weiss

Page 77

1    lawsuit and that it probably -- Well, they could

2    probably -- They knew from the audit, but he said other

3    people also can find out, so just for me to be aware of

4    it when I'm reaching out to people.  That's very easy

5    to -- I think it's called Pacer.

6        Q.   Okay.  LCG in Atlanta, that was another gate-

7    keeper organization?

8        A.   Yeah.

9        Q.   Did you have any discussions with them?

10       A.   Just the database people.

11       Q.   And did they list Weiss Capital on their

12   database?

13       A.   Yes.

14       Q.   When did they do that?

15       A.   It's been a couple years now.  I don't recall

16   the exact date.

17       Q.   Do you know if it was before or after this

18   lawsuit was filed?

19       A.   I'm not positive.  I don't know.

20       Q.   Do you know if Weiss Capital is still listed

21   in that database?

22       A.   Yes.

23       Q.   Now, once you get listed in the database, do

24   you have to provide any supplemental information to

Bonnie Weiss

Page 82

1          Have you made any efforts to put a value

2    on how much lost business that Weiss Asset Management

3    or your husband have lost as a result of this lawsuit?

4        A.    I think there's been tremendous loss.  There

5    are, and I don't know if you want me to go through it

6    now, I can tell you my thoughts on this.

7        Q.    Please, I would like you to.

8        A.    Foundations, sorry -- Endowments are a, have a

9    lot of peer review and they talk to one another.  I

10   just went to an endowment and foundations conference in

11   Boston on the 10th of this month, 10th of October and

12   there was a panel of three gentlemen from three

13   schools, Ohio State, Penn. State and Connecticut

14   College Foundation.  And in that audience were

15   endowments and foundations and managers and advisors

16   and unsolicited, the gentleman from Ohio State just

17   said to the audience, and looked down at -- and there

18   was clearly a group of endowments and foundations

19   people there because I could tell from the questions.

20   He looked at them and said, Just go to Cambridge

21   Associates.  And he said that more than once.  That is

22   the strength that advisors, in particular Cambridge

23   Associates have in this sector.

24       Q.    I think we started off with you explaining to

Bonnie Weiss

1  me the tremendous amount of loss that Weiss Asset

2  Management and your husband have suffered because of

3  this lawsuit, so I want to get back to that.

4      A.    Okay.   Okay.  We strictly adhere to the ERISA

5  rules.  It's benefit plan money and we cap our assets

6  under management, 20%.  The laws are 25%, but we're

7  very conservative, so we do not have any more than 20%

8  of assets under management.  Pensions, for example.  We

9  have existing investors who are queued up with hundreds

10  and millions in dollars to give us additional

11  allocations, but we cannot take the money because we

12  need to offset that with foundation, endowments, non-

13  taxable U.S. money.  So it's not only the direct loss

14  of not having endowment and foundation money, it's the

15  loss that because we can't take in more money from our

16  existing investors because we are following those

17  rules.  We're required to.  And every time we bring in

18  a dollar from a foundation or an endowment, that would

19  offset and we would be able to take in more pension

20  money.  We have had -- I've actually sat with people

21  from pension funds who came in, people who were

22  two years ago in the spring there were a couple of

23  people who came in and wanted to invest, were

24  interested in us for pension money and they heard my

Bonnie Weiss

1    presentation and they said, well, it's just too bad

2    because I told them I couldn't take any pension money

3    and they had pension money to invest.

4        Q.   Who were these people?

5        A.   Northern Trust and for some reason I don't

6    have the name and I tried to look for it of this woman

7    who came from California.  And she said, well, you

8    know, I heard what you just told me and we don't have

9    to carry this on any more.  We have pension money.  I

10   understand you're not taking pension money.  It seems

11   like endowments would really love your funds because of

12   what you have told me.

13       Q.   How much money did Northern Trust want to

14   invest that you had to turn away?

15       A.   It didn't get to that part that deep.  It

16   didn't get to that number.  We have $5 million

17   minimums, so it was probably more than that.  I don't

18   know how much higher, ten million, 15, I don't know.

19       Q.   Did you tell them there was a $5 million

20   minimum?

21       A.   They know.  It's in the company presentation.

22   Yeah, it's all our terms were very clear in the

23   presentation.

24                  They, the other interesting part about

Bonnie Weiss

```
 1   that is that that same gentleman is no longer working

 2   in that area of Northern Trust.  He came back to the

 3   office subsequent to that, very excited, and said, I am

 4   now working with foundations for Northern Trust.  And I

 5   was very excited about the fact that he came back in.

 6   He was interested in us, liked what he had heard, and I

 7   asked Andrew to come in and speak with him, as well.

 8   And he said, I'll get back to you in two weeks and I

 9   didn't hear from him.  And I sent him e-mails, started

10   calling him.  My belief is that perhaps they were able

11   to, that the audit made a difference.

12       Q.   And you're speculating as to that, right?

13       A.   It's my belief.

14       Q.   With respect to the --

15       A.   I went to a, the same conference a year ago

16   and had a gentleman from who's a chief financial

17   officer from Howard University and we talked and we

18   talked and I gave him the company presentation.  He was

19   very interested.  He said, Well, I'm off to Cambridge

20   Associates with your presentation.  Since then Andrew

21   and I met with him and at his office in Washington.  He

22   gave us time, he's very interested in us, but he's

23   married to Cambridge Associates.  When I say married,

24   they're the advisor for Howard University.
```

Bonnie Weiss

Page 86

1     Q.   When was the meeting with Northern Trust?

2     A.   The second meeting?

3     Q.   Let's start with the first meeting.

4     A.   Probably spring two years ago, so 2005.

5     Q.   Okay.  When was the second meeting?

6     A.   Subsequent to that in -- I don't know.  I

7 mean, I could find out.  I don't recall, but there was

8 a period of time.  It was months that elapsed.

9     Q.   And then they came back months later?

10    A.   He came back, yes.

11    Q.   And when was the meeting with the CFO from

12 Howard university?

13    A.   It was in November of 2006.

14    Q.   Now, can you tell me, can you name, identify

15 for me specifically which investors came to you that

16 wanted to invest pension money that were turned away?

17    A.   Came to us, to me to learn about our funds.

18 It was Northern Trust and I cannot recall the name of

19 the person who came.  And it's unusual I wouldn't have

20 her card.  I didn't send her materials.  She just came

21 in and that was it.

22    Q.   And when they came to the meeting, you told

23 them that you weren't able to accept pension money?

24    A.   I told them that at the moment we were not

Bonnie Weiss

1    taking pension money.

2        Q.   When did Weiss Capital hit the cap where it

3    could no longer accept pension money, when was that?

4        A.   I don't know.

5        Q.   Do you know if that was in 2005?

6        A.   I don't know.

7        Q.   Do you know if it was before or after this

8    lawsuit?

9        A.   I don't know.  It's not information I would

10   have at my finger tips.  I don't know.

11       Q.   When you started in 2003 was part of your

12   goals to bring in endowment and foundation money so

13   that the cap accepting pension money could be raised?

14       A.   Just to clarify, my first project was the

15   company presentation and time passed and then I evolved

16   into that role.  Andrew asked me subsequent to my

17   project working on the company presentation, doing the

18   office build-out, purchasing furnishings, working on

19   the Website and then I evolved in.  So I don't recall

20   exactly the date when Andrew said, Bonnie, I'd like you

21   to make calls.

22       Q.   When did Weiss Capital form?

23       A.   Weiss Capital?

24       Q.   Yes.  When did it start?

Bonnie Weiss

Page 88

1      A.    Well, there was a restructuring.  2003, I
2    believe.  I'm not sure.
3      Q.    Prior to 2003 was your husband managing
4    investments for other people, was he running hedge
5    funds?
6      A.    My husband was a trader.
7      Q.    So your husband doesn't run hedge funds?
8      A.    My husband runs hedge funds now.
9      Q.    When did he start?
10     A.    I know when they started hedging was sometime
11   between end of 2002, 2003.
12     Q.    Okay.  You mention that there was a -- trying
13   to remember the word that you used.  In 2003 when Weiss
14   Capital formed, was there any entity that existed
15   before Weiss Capital that became Weiss Capital?
16     A.    There was Brookdale group.  I don't know --
17   It's sort of complicated.  I really don't know how to
18   answer that question.
19     Q.    When did Weiss Asset Management form?
20     A.    What do you mean by form?
21     Q.    Is it a company, is it a stand-alone entity,
22   do you know?
23     A.    Weiss Asset Management is the manager for a
24   Brookdale International Partners.  It's also our brand

Bonnie Weiss

1    name, an umbrella.

2        Q.    Right, I understand that.  Do you know if it's

3    a corporation or an LLC?

4        A.    I know that Weiss Capital is an LLC.  I

5    don't -- partnersh -- I don't know.  I don't know.

6        Q.    When did your husband or any of his companies

7    start looking to bring in investments from endowments

8    and foundations?

9        A.    When he asked me to do it.  That's the best of

10   my knowledge.

11       Q.    Prior to that he never tried to get

12   institutional monies as investments?

13       A.    I think he had spoken with, well, Steve Ross

14   introduced Andy to Cal Tech and Cal Tech will not --

15   Well, you can talk to Steve Ross, will not invest with

16   us because of this lawsuit.

17       Q.    We'll come back to Cal Tech in a minute.  What

18   I'm trying to understand is you have explained to me an

19   issue with inability to accept pension monies because

20   you need more endowment and foundation --

21       A.    Well, that's not fair.  That would help having

22   endowment, we need non-taxable money.

23       Q.    My question is when to your knowledge did

24   Weiss Capital, Weiss Asset Management, whatever company

Bonnie Weiss

Page 94

1  good thing to do.

2      Q.   When did he tell you that?

3      A.   All the time.  That's just a general --

4      Q.   Was that something he's been telling you over

5  the course of your marriage?

6      A.   My husband has extremely -- He is a professor,

7  he's a professor emeritus.  He has his roots in

8  education.  He values education.  And if this is away

9  that he could help endowments make more money, then he

10 would be very happy to do that.  And this is a sincere

11 comment that he's made to me and makes me very proud

12 that he has told me that.

13     Q.   I apologize if my question wasn't clear.  What

14 I'm trying to understand is when do you recall him

15 first saying that to you?

16     A.   I don't know.  Maybe when I first started

17 getting involved with --

18     Q.   In 2003?

19     A.   Possibly, yeah.  2004, whenever I started

20 making my calls.

21     Q.   And possibly it could have been before then?

22     A.   Possibly, but I'm not sure.

23     Q.   Did your husband ever discuss with you the

24 efforts that he had made to bring in endowments or

Bonnie Weiss

1   foundations before he asked you to take on that task?

2       A.   He -- I believe he would from time to time

3   meet with endowments, but I wasn't involved in the

4   business at that time, so I really didn't know much

5   about it.  I was working my profession, raising three

6   children, and it just wasn't something we would talk

7   about.

8       Q.   Have you made any effort to put a value on how

9   much potential investment has been lost because of the

10  filing of this lawsuit?

11      A.   I have not put a dollar value on it, no.

12      Q.   To your knowledge has anyone at Weiss Capital

13  done that?

14      A.   Not to my knowledge.

15      Q.   When you testify at trial do you intend to put

16  a dollar amount on how much you believe potential

17  investment Weiss Capital has lost as a result of this

18  lawsuit being filed?

19      A.   Between now and then I'll speak with my

20  attorney and I do not know what I will say.

21      Q.   Okay.  Well, we're here now and if you have an

22  opinion on a value, I need to know about it.

23      A.   No, I don't.  I mean, I know that because of

24  my husband's distraction, that he lectured at Columbia

Bonnie Weiss

1  want it on the record because of the pending motion on

2  lost profits.

3              MR. ZAKARIAN:  Okay.

4              MR. DANGEL:  Okay.  And with that,

5  please go ahead.  And your last question I think had to

6  do with whether it was a good idea to have filed the

7  lawsuits or something.

8              MR. ZAKARIAN:  Might have had something

9  to do with a lottery ticket, but I'm trying to

10 remember.  Let's move on.  I have other questions here.

11             MR. DANGEL:  Guess what?  You and I

12 should buy lottery tickets the way this guy knows how

13 to do his investing.  Go ahead.

14     Q.   So sitting here today can you identify for me

15 any specific potential investors other than Northern

16 Trust that advised you that they wanted to invest

17 pension money with Weiss Capital and was told that

18 Weiss Capital couldn't take that money in that

19 capacity?

20             MR. DANGEL:  Does it have to be pension

21 or can it be any kind of investment?

22             MR. ZAKARIAN:  I'm asking about pension

23 money.

24             MR. DANGEL:  Okay, because you

Bonnie Weiss

Page 100

1    understand there were others.

2             MR. ZAKARIAN:  I understand.

3    A.   No.

4    Q.   What about any other non-taxable investments,

5    can you identify any specific investors who came --

6    Would you like me to restate the whole question?

7    A.   Yes.

8    Q.   Why don't I do that so that it's clear.

9             MR. DANGEL:  Means charities,

10   foundations, that sort of thing.

11            MR. ZAKARIAN:  No, let me back up.

12            MR. DANGEL:  Okay.

13   Q.   We were discussing earlier a cap imposed by

14   ERISA.  Do you recall that?

15   A.   Yes.

16   Q.   My question is going to go to any potential

17   investors who would fit within the category of people

18   that are subject to that cap.  Do you understand?

19   A.   Well, there are existing investors who are

20   queued up who have expressed interest, but I, as I've

21   told you before, I do not talk to existing investors.

22   I just know from general information that people are

23   queued up to make further allocations, but they can't

24   because of the cap.

Bonnie Weiss

Page 101

1      Q.    What general information are you referring to?

2      A.    Just knowing that there are investors lined

3  up, queued up.

4      Q.    How do you know that there are investors lined

5  up?

6      A.    Because I've had conversations in the office.

7      Q.    Who are the conversations with?

8      A.    It could be with, even when Georgiy or Marta

9  are looking at that, because it's their job to keep

10  track of those numbers.

11      Q.    What specifically have you heard Mr. Nikitin

12  say about this?

13      A.    Specifically, that we cap at 20%.

14      Q.    What have you specifically have you heard Mr.

15  Nikitin say about there being other investors queued

16  up?

17      A.    I don't know that -- I don't recall if it was

18  Georgiy who said it.  I just told you that it's his

19  business with Marta to keep track of those numbers.

20      Q.    Please understand, I need to ascertain what

21  you're basing your statements on.  That's why I'm

22  asking you what general information you're referring

23  to.

24              MR. DANGEL:  You're not hearing me to

Bonnie Weiss

1  object and I do want you to be as specific as you can.

2              THE WITNESS:  Okay, okay.

3              MR. DANGEL:  It's your in interest to do

4  so and in his right.

5      A.   Right, right.  Maybe it was, could have been

6  Andrew.

7      Q.   You say it could have been.  Do you recall?

8      A.   Yeah, it was probably, if I heard it from

9  anyone, it was Andrew.

10     Q.   What did Mr. Weiss say to you with respect to

11  there being investors queued up?

12     A.   That we have existing investor money that they

13  would like to put in and they can't take it now.

14     Q.   Did he identify any specific investors who

15  were queued up?

16     A.   I don't know if I can divulge that.

17             MR. DANGEL:  You can.

18             THE WITNESS:  I can?

19             MR. DANGEL:  Well, let me put it this

20  way.  I'm going to ask you to keep it confidential.

21             MR. ZAKARIAN:  For purposes of -- If you

22  mean by confidential only to be used for purposes of

23  this litigation, I have no problem with that.  If it's

24  going to be a restriction on how they're used in cross

Bonnie Weiss

1    examination at trial, I --

2                    MR. DANGEL:  No problem with that.  My

3    problem is I don't want to see them, their business

4    destroyed by you bird dogging investors and potential

5    investors.  So it's for purposes of this litigation,

6    yes.  And I trust you not to try to ruin their business

7    in this litigation.  So with that --

8        A.    There's a confidentiality statement that's

9    signed and we keep names confidential.

10                   MR. DANGEL:  You can mention investors

11   who have indicated that they would like to invest more.

12   That's not going to broach any confidentiality.  You're

13   not going to talk about how much each of them

14   individually has and those kinds of confidential

15   details, but please go ahead.

16       A.    McKinsey, for one.

17       Q.    Let me back up for a minute, because I just

18   want to peel this back a little bit.  Have you had,

19   have you personally had any conversations with any

20   existing investors in which they told you that they

21   wanted to invest more money, but couldn't because of

22   this cap?

23       A.    No.

24       Q.    And you're basing your testimony today on

Bonnie Weiss

Page 104

1  things that your husband told you that these investors

2  said to him, is that right?

3      A.   Yes, because it's relevant to my work.  I

4  mean, obviously.

5      Q.   And why is it that you need to know?

6      A.   Because I, if a, if say a Northern Trust comes

7  in and we start a conversation and they say they have

8  pension money, I need to know that we at the moment

9  cannot take it.  Doesn't mean we can't in the future.

10              MR. DANGEL:  Has McKinsey been

11  identified on the record previously?

12              MR. ZAKARIAN:  No.

13              MR. DANGEL:  It's the McKinsey, you know

14  the consulting firm.

15              MR. ZAKARIAN:  I understand.

16              MR. DANGEL:  It's their pension fund.

17      Q.   Let me back up and ask my questions.  What

18  specifically did your husband say to you about

19  McKinsey?

20      A.   That, well, I know that they're a large

21  investor.

22      Q.   What specifically did he say to you about them

23  being queued up to invest more money?

24      A.   They have asked him.

Bonnie Weiss

Page 118

1    were very, very interested.  And Steve Ross is

2    extremely distinguished and smart and he would only

3    introduce anyone to the investment --

4                MR. DANGEL:  You need to know that

5    Professor Ross is a member of the board of directors of

6    Cal Tech.  When you identified him, you said he's head

7    of the investment committee at Cal Tech.  He's one

8    member of the board of directors, but he's a professor

9    at M.I.T.

10        A.   I'm sorry.

11        Q.   Can we back up for a minute?  You mentioned

12   that your husband and Mr. Ross met with people at Cal

13   Tech?

14        A.   I believe so, yes.

15        Q.   Do you recall if that was before or after your

16   phone conversation in December of 2006?

17        A.   Long before, yes.

18        Q.   Do you recall, you say long before, how long

19   before?

20        A.   May have been at least a year, if not longer.

21        Q.   If you wanted to find out the approximate date

22   of that, how would you do it?

23        A.   I would, I would ask Andrew if he remembered

24   on which date, what year.  Or maybe there was an e-mail

Bonnie Weiss

1    where he corresponded with Steve and they had a date

2    and when they traveled there, yeah.

3        Q.    In between the time that your husband and Mr.

4    Ross met with people at Cal Tech and the time that you

5    called did he say anything to you about meetings or

6    appointments that he was having with them?

7                MR. DANGEL:  Well, objection to the form

8    of the question.

9        A.    He, I don't -- What kind of meetings?  What

10   are you asking me?

11       Q.    What I'm trying to understand is if you're

12   aware of whether your husband met with these people

13   from Cal Tech or spoke with them after his initial

14   meeting with them with Mr. Ross?

15       A.    I believe he was in California after that.  I

16   think so.  He travels a lot, so it's difficult to keep

17   track, especially within the U.S., so I just don't

18   recall.  I believe so, that he met with them one time

19   subsequent to his visit with Steve Ross, but I'm not

20   sure.

21       Q.    And then you called in December of '06?

22       A.    Uh-hum.  (Witness nodding head up and down.)

23       Q.    When was the call you referenced with Marta,

24   when did she call?

Bonnie Weiss

1      Q.    And can you give me any names?

2      A.    Eureka Hedge.

3      Q.    How do you know that Eureka Hedge would have

4   invested but didn't?

5      A.    They told me.

6      Q.    What did they say?

7      A.    Well, the gentleman came in, had a meeting

8   with me and Georgiy Nikitin, was very excited about us.

9   He wanted to put us in his index, which would have been

10  extraordinary for us to be in that index because of our

11  performance since '91 has been extraordinary.  So that

12  five million -- Well, it was the money, plus that they

13  would invest.  He also said that his boss, with her

14  other business, she would be investing, probably be

15  interested in investing.

16             But the loss was for sure, the

17  investment.  We had a contract, we signed it.  After

18  Georgiy reviewed it and it went back to them and then

19  Andrew was in the office on a given day, I don't

20  remember the day, and he picked up the phone and it was

21  this gentleman who visited us and he said, Well,

22  because of that note in your audit about your lawsuit,

23  we cannot invest.

24     Q.    Now, did Eureka represent more than just $5

Bonnie Weiss

Page 134

1    million?  You mentioned something about an index.

2                    MR. ZAKARIAN:  Objection.

3        A.    Yeah.

4        Q.    What was that about?

5                    MR. ZAKARIAN:  Objection.

6                    MR. DANGEL:  That's a fair objection.

7    But go ahead and answer.  In other words, this is

8    discovery.  She's going to testify at trial.

9        A.    Yeah.

10       Q.    Go ahead.

11       A.    They published the names of all these very

12   successful, you know, hedge funds, not funds.  And it's

13   out there and people see it.  So I think the down side

14   of that is tremendous that we missed out on that also.

15       Q.    So you got a little ahead of me there.

16   There's something called an index.  What is that?  What

17   is this index that you're talking about?

18                   MR. ZAKARIAN:  Objection.

19       A.    Well, it's a listing of hedge funds like us

20   who are with emerging markets and their performance and

21   how they've done so extraordinarily well they deserve

22   to be in this index.  I don't know any more about it,

23   because it didn't get to that level in the

24   conversation.

Bonnie Weiss

1    Q.    Okay.  Are you aware of whether or not -- It's

2    hard to ask this as a non-leading question and get

3    there in the next five minutes, but I'll try.  Does

4    Weiss Asset Management have a niche in the market, in

5    the hedge fund market?

6              MR. ZAKARIAN:  Objection.

7    A.    We're market neutral.

8    Q.    And how does that create a niche?  I mean,

9    what does that mean?

10   A.    It's, to the best of my knowledge, we're fully

11   hedged.  There may be a few assets out there that they

12   can't hedge because that has to be, you know,

13   financially the right number, but pretty much we are

14   fully hedged.

15   Q.    And how does that create a market niche for

16   you?

17             MR. ZAKARIAN:  Objection.

18   A.    We truly hedge.  We are really hedge fund.

19   Q.    But don't most hedge funds --

20   A.    And some people will say they're hedge funds,

21   but they may not be fully hedged.  They may hedge some

22   of their portfolio.  We are fully hedged.  And that

23   allows a greater level of -- That's a greater level of

24   risk management to be fully hedged, to be market