UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                                      )

KOTVA a.s. and SPV Co.,                 )

               Plaintiffs            )    Case No. 05-10679-WGY

               v.                   )

ANDREW WEISS and WEISS ASSET   )
MANAGEMENT, LLC              )

               Defendants and
               Counterclaimants,

               v.

KOTVA a.s., SPV Co., and RICHARD HARAZIM

               Counterclaim-Defendants
_____

**PARED DOWN DEFENDANTS' DESIGNATIONS OF MARTIN BENDA DEPOSITION**

page 13 lines 1-2; 6-7; 8-14
page 15 line 17 – page 18 line 7
page 19 line 6 – page 22 line 6
page 23 line 23 – page 24 line 13
page 24 line 24 – page 25 line 6
page 42 line 2 – page 43 line 15
page 52 lines 2-7
page 53 lines 3-15
page 55 lines 12-21
page 117 line 16 – page 118 line 17
page 135 line 17 – page 136 line 19
page 166 line 17 – page 167 line 13

Respectfully submitted,
ANDREW WEISS and WEISS ASSET
MANAGEMENT, LLC

By their counsel,

___/s/Edward T. Dangel, III___
Edward T. Dangel, III (BBO#113580)
Dangel & Mattchen, LLP
Ten Derne Street
Boston, MA 02114
617-557-4800

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 31, 2007         __/s/ Edward T. Dangel, III_____

```
                                          1                                                       3
 1        VOLUME 1, PAGES 1 - 174              1   APPEARANCES:
 2           EXHIBITS: 1 - 3                   2
 3    IN THE UNITED STATES DISTRICT COURT      3   For the Defendants/Counterclaim Plaintiffs
 4     FOR THE DISTRICT OF MASSACHUSETTS       4
 5           No. 05-10679-RCL                  5      McDERMOTT WILL & EMERY
 6   ---------------------------               6      28 State Street
 7   KOTVA a.s.,                               7      Boston, Massachusetts 02109
 8        Plaintiffs                           8      617.535.4000  Fax: 617.535.3800
 9        vs.                                  9      bgoldberger@mwe.com
10   ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,  10  eleibensperger@mwe.com
11        Defendants                          11      By: Edward P. Leibensperger, Esq.
12   (Full Caption on Page 2)                 12      and Benjamin A. Goldberger, Esq.
13   _____              13
14                                             14   For Plaintiff/Counterclaim Defendant
15       VIDEOTAPED DEPOSITION OF MARTIN BENDA 15
16                                             16      NYSTROM BECKMAN & PARIS LLP
17       Monday, January 22, 2007, 9:14 a.m   17      10 St. James Avenue
18          McDermott, Will & Emery           18      Boston, Massachusetts 02116
19          28 State Street, 34th Floor       19      617.778.9100  Fax: 617.778.9110
20          Boston, Massachusetts 02109       20      jbeckman@nbparis.com
21                                             21      By: Joel G. Beckman, Esq.
22                                             22
23   Reporter: Dana Welch, CSR, RPR           23   Also Present: Joshua Snider, Videographer, Blanka
24        Certified LiveNote Trainer          24   Owensova, Interpreter, Richard Harazim, Georgiy Nikitin

                                          2                                                       4
 1    IN THE UNITED STATES DISTRICT COURT      1             I N D E X
 2     FOR THE DISTRICT OF MASSACHUSETTS       2   WITNESS:
 3           No. 05-10679-RCL                  3   MARTIN BENDA
 4   ---------------------------               4
 5   KOTVA a.s.,                               5   EXAMINATION:              PAGE:
 6        Plaintiffs,                          6   BY MR. LEIBENSPERGER         6
 7        vs.                                  7   BY MR. BECKMAN             170
 8   ANDREW WEISS and WEISS ASSET MANAGEMENT, LLC,   8   EXHIBITS MARKED:
 9        Defendants,                          9   NO.  DESCRIPTION           PAGE:
10   _____              10   39, having been previously marked in   52
11   ANDREW WEISS, WEISS ASSET MANAGEMENT LLC, 11       another deposition
12   KT, INC. and CVF INVESTMENTS, LTD.,       12   17, February 12, 2003 letter, having been  73
13        Counterclaim-Plaintiffs,             13       previously marked in another
14        v.                                   14       deposition
15                                             15   1, May 15, 2004 statement            86
16   KOTVA a.s., MARTIN BENDA, RICHARD HARAZIM, 16  2, January 12, 2005 statement       116
17                                             17   3, Power of Attorney from Kotva     160
18   FORMINSTER ENTERPRISES, LTD., SPV CO. and 18
19                                             19   QUESTIONS INSTRUCTED NOT TO ANSWER
20   JOHN DOEs 1-5,                            20   Who are the partners in the project?    150
21                                             21
22        Counterclaim-Defendants.             22   Exhibits retained by Attorney Goldberger.
23                                             23
24   ---------------------------               24
```

### 13

1  Q. Do you understand English?
2  A. No
3  Q. Do you speak any languages other than
4  Czech?
5  A. I speak Russian
6  Q. Are you fluent in Russian?
7  A. Not -- not -- not completely.
8  Q. Okay. What is your education, Mr. Benda?
9  A. I have a graduation certificate from high
10 school
11 Q. Any further education?
12 A. No.
13 Q. Did you live in Russia?
14 A. Yes.
15 Q. When?
16 A. Between 1994 and 1997 with breaks
17 Q. Were you -- strike that
18    In Russia, between 1994 and 1997, were you
19 attending university?
20 A. No.
21 Q. Were you working?
22 A. Yes.
23 Q. Where were you working?
24 A. I worked for two companies. One of them

*[handwritten margin note: "Ack fm Completness"]*

### 14

1  was joint ownership of Czech Ukrainian and the
2  Slovak Republic -- I'm sorry, excuse myself -- it
3  was not Republic. So it was a joint ownership
4  between Czech Ukrainian and Slovak interests.
5  Q. What was the name of that company?
6  A. East West Trading.
7     (Interruption by the reporter.)
8  Q. Where is it located in Russia?
9  A. I don't know what the company is doing
10 now. This has been more than ten years ago.
11 Q. When you worked for East West Trading,
12 where were you located?
13 A. It had headquarters in Brno, in Tranchi
14 (phonetic), which is in Slovakia, and in the
15 Ukraine Mariupol, and in Russia in the city of
16 Kostroma.
17    THE INTERPRETER: K-o-s-t-r-o-m-a.
18 Q. What was the second company you worked for
19 in the period 1994 to 1997?
20 A. The name of the company was TechMach
21 Exports.
22 Q. Which company did you work for first and
23 which company did you work for second?
24 A. I worked for both at the same time.

### 15

1  Q. Did you know Mr. Toman in the period 1994
2  to 1997?
3  A. No.
4  Q. How did you meet Mr. Toman?
5  A. I do not remember exactly, but I suppose
6  it was in Prague at some social occasion
7  Q. When did you meet Mr. Toman?
8  A. I think I have already answered this
9  question, but I will repeat it, that I do not
10 remember exactly.
11 Q. What is your best approximation of when
12 you met Mr. Toman?
13 A. I think it was in the second half of 1997.
14 At this time I think he just left his position of
15 the parliamentary deputy of the federal assembly --
16 assembly and started to work as private lawyer.
17 Q. What did Mr. Toman say to you when he
18 asked you to stand for election for the board of
19 directors of Kotva?
20 A. He told me he represented a client, that
21 this client has -- owns some stock of Kotva, and if
22 I were interested.
23 Q. Why did he ask you?
24    MR. BECKMAN: Objection. You may answer

### 16

1  A. I had no job then. I suppose he liked me,
2  and I really cannot answer for him why he selected
3  me.
4  Q. How many times -- strike that.
5     How well did he know you when he asked you
6  to be on the board?
7     MR. BECKMAN: Objection. You may answer.
8  A. I think we have known each other for
9  approximately one year.
10 Q. And what was the context of your knowing
11 each other for one year?
12 A. I was the employee of his law office.
13 Q. What position in the law office?
14 A. I don't remember the exact position title,
15 but I was some kind of assistant.
16 Q. You -- you are not a lawyer; is that
17 right?
18 A. That's correct.
19 Q. What's your best estimate of the date you
20 started working for Mr. Toman's law office?
21 A. Second half of 1997. But that's just my
22 best estimate. This has been long time ago.
23 Q. What were the nature of your duties when
24 you worked for Mr. Toman's law office?

Page 17

1  A. I was doing simple administrative agenda.
2  Q. Did you do work for clients of the law
3  firm?
4  A. Yes, I did.
5  Q. Was the name of the client that Mr. Toman
6  represented in connection with Kotva Forminster
7  Enterprises?
8  A. Yes.
9  Q. When Mr. Toman asked you to stand for
10 election to the board of directors of Kotva, did
11 you understand he was asking you on behalf of
12 Forminster?
13 A. I do not remember. It's been long time
14 ago.
15 Q. But when Mr. Toman asked you to be on the
16 board, he made -- strike that.
17    When Mr. Toman asked you to be on the
18 board, he told you he was asking you because his
19 client Forminster owned stock in Kotva?
20    MR. BECKMAN: Objection. You may answer.
21 A. I think so.
22 Q. Okay. Did he tell you that Forminster
23 would vote the stock to elect you to the board of
24 directors?

Page 18

1  A. I don't know. This -- this has been long
2  time ago.
3  Q. Did you understand that Forminster owned
4  approximately 56 percent of Kotva?
5     MR. BECKMAN: Objection. You may answer.
6  A. I am not sure. This has been long time
7  ago.
8  Q. Your testimony is that you do not recall
9  what percent of Kotva Forminster owned?
10    MR. BECKMAN: At that time?
11 Q. At that time.
12 A. That's correct.
13 Q. At any time do you recall what percentage
14 of Kotva Forminster says it owns?
15    MR. BECKMAN: Objection.
16    THE WITNESS: Should I answer?
17 Q. Yes.
18 A. We need to repeat a question once again.
19    THE INTERPRETER: Do you want to repeat it
20 or do you want me to repeat it?
21    MR. LEIBENSPERGER: Yes, I'll repeat it.
22 Q. At any time do you know what Forminster's
23 percentage ownership of Kotva was?
24 A. Yes, I do recall.

Page 19

1  Q. What percentage?
2  A. 56 percent.
3  Q. Did you learn that from Dr. Toman?
4  A. Unfortunately, I do not remember where I
5  got this information.
6  Q. When you worked at Mr. Toman's law office
7  from 1997 to 1998, did you work on projects for
8  Forminster?
9  A. I do not understand what you mean by the
10 term "project."
11 Q. Did you work on any matter relating to
12 Forminster?
13 A. I think so.
14 Q. What were the nature of the matters?
15 A. I do not remember.
16 Q. Did you become a member of the board of
17 directors of Forminster?
18 A. Yes, I did.
19 Q. When did you become a member of the board
20 of directors of Forminster?
21 A. It was just after the execution of the
22 settlement agreement between Trend and Forminster.
23 Q. If I tell you the settlement agreement was
24 in late 1999, does that sound right to you?

Page 20

1  A. Yes.
2  Q. Prior to becoming a member of the board of
3  directors of Forminster, did you have any other
4  position for Forminster?
5  A. No.
6  Q. Do you own any shares of Forminster?
7  A. No.
8  Q. Have -- have you ever owned any shares of
9  Forminster?
10 A. No.
11 Q. When you did work for Forminster --
12 withdraw that question.
13    When you became a member of the board of
14 directors of Forminster, did you learn who the
15 beneficial owners of Forminster were?
16 A. No.
17 Q. Did you ever learn the identity of the
18 beneficial owners of Forminster?
19 A. No.
20 Q. How did you receive instructions with
21 respect to what the beneficial owners of Forminster
22 wanted?
23 A. We have not received any instructions on
24 an ongoing basis. We only had one instruction, and

21

1 that instruction was laid down in the settlement
2 agreement with Trend. And the only instruction was
3 to maintain the position of Forminster at long
4 before the agreement on the settlement of the debt
5 that Forminster had to Trend was executed
6 Together with the board of directors of Trend, they
7 also were members of Forminster. We were supposed
8 to perform steps in order to execute the goals of
9 the settlement agreement.
10     Q. How did you receive instructions from
11 Forminster with respect to the settlement with
12 Trend?
13     MR. BECKMAN: Objection. You may answer.
14     A. I was receiving instructions via
15 Mr. Toman.
16     Q. Is Mr. Toman a beneficial owner of Trend?
17 Excuse me. Is Mr. Toman a beneficial owner of
18 Forminster?
19     A. I don't know.
20     Q. In your previous answer, you said that the
21 board of directors of Trend were also members of
22 Forminster; is that correct?
23     MR. BECKMAN: Objection. You may answer.
24     A. Yes.

22

1     Q. What do you mean by members of Forminster?
2     A. The members of the board of directors.
3     Q. Who was the members of the board of
4 directors of Forminster at the time of the
5 settlement with Trend?
6     A. I do not remember.
7     Q. Do you remember Mr. Moffitt?
8     A. Yes.
9     Q. All right. Was he a member of the board
10 of directors of Forminster?
11     A. Yes.
12     Q. Was he a member of the board of directors
13 in 1999?
14     A. After the settlement agreement, yes.
15     Q. Of Forminster, he was a member of the
16 board of directors after the settlement agreement?
17     A. Yes.
18     Q. Do you know Mr. Bluhm?
19     A. Yes.
20     Q. Was he involved in the settlement between
21 Forminster and Trend?
22     A. I do not exactly understand what you mean
23 by involved.
24     Q. Was Mr. Bluhm a member of the board of

23

1 Forminster?
2     A. I think he was.
3     Q. When you were a member of the board of
4 directors of Forminster, did you ever have a
5 meeting?
6     MR. BECKMAN: Objection. You may answer.
7     A. I do not recall.
8     Q. Your testimony is that you do not recall
9 ever meeting in person with other members of the
10 board of directors of Forminster; is that correct?
11     A. No, that's not correct.
12     Q. Do you remember any meeting in person with
13 the members of the board of directors of
14 Forminster?
15     A. Yes.
16     Q. What do you remember?
17     A. The members of the board of directors of
18 Forminster were also on the board of directors of
19 Kotva, where I was a board member. And the board
20 of directors of Kotva met on a regular basis.
21     THE INTERPRETER: I need to ask the
22 witness to speak up.
23     A. And in -- and later on, the representative
24 of --



24

1     THE INTERPRETER: And, I'm sorry, I did
2 not understand the name, BG, Mr. Golden.
3     A. And later on Mr. Golden, the BGO
4 representative, was also a member of the board.
5     Q. I'm asking about the board of directors of
6 Forminster. Was there ever an official meeting of
7 the board of directors of Forminster?
8     MR. BECKMAN: Objection. You may answer.
9     A. As I said before, I do not recall. This
10 has been long time ago.
11     Q. When did you stop being a member of the
12 board of directors of Forminster?
13     A. I think it was sometime around 2003.
14     Q. Did you ever see minutes of meetings of
15 the board of directors of Forminster?
16     A. Unfortunately, I do not recall.
17     Q. During the entire time that you were a
18 member of the board of directors of Forminster,
19 from 1999 to approximately 2003, did you ever know
20 who owns Forminster?
21     A. No.
22     Q. When Mr. Toman asked you -- sorry, start
23 over.
24     Who asked you to be on the board of

25

1  directors of Forminster?
2  A. Dr. Toman.
3  Q. When Mr. Toman asked you to be on the
4  member of the board of directors of Forminster, did
5  you ask him who owned Forminster?
6  A. I do not recall.
7  Q. When did you start working on the
8  negotiation for the settlement between Forminster
9  and Trend?
10 A. I think it was around the time when I
11 became a member of the boards in Kotva, around
12 1998.
13 Q. What was your role with respect to
14 reaching a settlement between Forminster and Trend?
15 A. I was a negotiator.
16 Q. On behalf of what party?
17 A. On behalf of Forminster.
18 Q. Who asked you to be a negotiator on behalf
19 of Forminster?
20 A. Dr. Toman.
21 Q. When Mr. Toman asked you to act on behalf
22 of Forminster, were you aware of the blocking order
23 with respect to the shares that Forminster held of
24 Kotva?

26

1  MR. BECKMAN: Objection. You may answer.
2  A. I think so.
3  Q. In 1998, you were aware that a prosecutor
4  had frozen Forminster's shares of Kotva on the
5  ground that they were obtained as a result of
6  criminal activity; is that correct?
7  MR. BECKMAN: Objection. You may answer.
8  A. I think so.
9  Q. In 1998, had you met Mr. Halek?
10 A. No.
11 Q. Did you ever meet Mr. Halek?
12 A. Yes.
13 Q. When?
14 A. I think I met him twice or three times at
15 the Kotva general meetings. He was a shareholder,
16 and he was sitting in the rows for -- reserved for
17 shareholders.
18 Q. Where was the first time?
19 MR. BECKMAN: First time you met --
20 A. I think in 2004. But this may not be
21 accurate.
22 Q. Did you ever meet Mr. Halek outside of a
23 meeting of the shareholders of Kotva?
24 A. No.

27

1  Q. You said Mr. Halek was a shareholder of
2  Kotva; is that correct?
3  A. That's correct.
4  Q. Did he own shares in his own name?
5  A. I do not know the answer because he could
6  have been at the -- the general meeting of
7  shareholders on the basis of power of attorney of
8  someone.
9  Q. That's my question, do you know whether
10 Mr. Halek himself, in his name, owned shares of
11 Kotva?
12 A. I don't know.
13 Q. Do you know on whose behalf Mr. Halek was
14 attending the shareholder meetings of Kotva?
15 A. I don't know.
16 Q. Mr. Halek may have been attending the
17 meeting of shareholders of Kotva on behalf of
18 Forminster; is that correct?
19 MR. BECKMAN: Objection. You may answer.
20 A. Definitely not.
21 Q. How do you know that?
22 A. That is very unlikely.
23 Q. You said you don't know who he was
24 representing at the shareholder meeting, correct?

28

1  A. That's correct.
2  Q. So he may have been representing
3  Forminster, correct?
4  MR. BECKMAN: Objection. You may answer.
5  A. He could have, but it's very unlikely.
6  Q. To your knowledge -- strike that.
7  In 1998, 1999, did you understand that
8  Mr. Halek had had a previous relationship with
9  Forminster?
10 MR. BECKMAN: Objection. You may answer.
11 A. I'm not sure. I think I did from the
12 media.
13 Q. All right. And what did you understand
14 in 1999 about Mr. Halek's connection with
15 Forminster?
16 MR. BECKMAN: Objection. You may answer.
17 A. I wasn't thinking about it.
18 Q. What did you understand from any source of
19 information about Mr. Halek's connection to
20 Forminster in 1999?
21 THE INTERPRETER: I need to correct
22 myself. I'm sorry.
23 MR. BECKMAN: Objection. You may answer.
24 A. I really do not recall. This has been

41

1  A. No. As I have mentioned at the beginning,
2  I was also employee of the company Kotva.
3  Q. Other -- other than your employment for
4  Kotva, was your only source of compensation from
5  1998 to 1999 from Czech Investment Holding?
6     MR. BECKMAN: Objection. You may answer.
7  A. I'm sorry, but I do not recall what were
8  my -- all my sources of income in 1998.
9  Q. Okay. So let me ask it this way: Did you
10 receive any compensation for your efforts on --
11 in -- in connection with the settlement of
12 Forminster and Trend?
13    MR. BECKMAN: Objection. You may answer.
14 A. Yes.
15 Q. From --
16 A. It was part of my work in Czech Investment
17 Holdings.
18 Q. How much did you get paid as part of your
19 work at Czech Investment Holdings for your work in
20 connection with the settlement between Forminster
21 and Trend?
22 A. I think I have not received any
23 compensation for the negotiation of the settlement.
24 But as I have already said, this is only my guess

42

1  because this has been long time ago.
2  Q. Did you ask Mr. Harazim to work with you
3  with respect to the settlement between Forminster
4  and Trend?
5  A. I think so, but I am not absolutely sure.
6  This has been long time ago.
7  Q. You do recall that you worked with
8  Mr. Harazim in connection with the settlement
9  between Forminster and Trend, right?
10 A. Yes, I do.
11 Q. All right. Did you ask Mr. Harazim or did
12 Mr. Toman ask Mr. Harazim to work on the matter?
13 A. I recommended Mr. Harazim to Dr. Toman.
14 But Mr. Harazim worked for and had an -- an
15 agreement with -- directly -- directly with
16 Mr. Toman.
17 Q. How did you know Mr. Harazim to recommend
18 him to Mr. Toman?
19 A. That's a very long history. We have
20 worked together on a privatization case in Slovakia
21 sometime around the period 1993 to 1994.
22 Q. Did you work on other matters with
23 Mr. Harazim from 1994 to 1998?
24 A. I cannot recall any specifics right now.

43

1  but it is possible.
2  Q. Did Mr. Harazim join you on the board of
3  Forminster following the settlement between
4  Forminster and Trend?
5  A. Yes, he joined me.
6  Q. Did Mr. Harazim ask you who owned
7  Forminster at that time?
8  A. I do not know. I do not recall.
9  Q. Did Mr. Harazim ask you whether Mr. Halek
10 had some ownership of Forminster?
11 A. I do not recall what Mr. Harazim asked me
12 in 1999.
13 Q. Did Mr. Harazim ask you at any time
14 whether Mr. Halek had some ownership of Forminster?
15 A. I do not recall.
16    MR. LEIBENSPERGER: This probably is a
17 good time to take a morning break.
18    MR. BECKMAN: Okay.
19    THE VIDEOGRAPHER: This marks the end of
20 tape number one in the deposition of Martin
21 Benda. Going off the record. The time is
22 10:44.
23    (Proceedings interrupted at 10:44 a.m. and
24 reconvened at 10:59 a.m.)

44

1     THE VIDEOGRAPHER: Back on the record.
2  Here marks the beginning of tape number two in
3  the deposition of Martin Benda. The time is
4  10:59.
5  BY MR. LEIBENSPERGER:
6  Q. Mr. Benda, when you were working for Czech
7  Investment Holding in 1998 to 1999, was Mr. Harazim
8  also working for Czech Investment Holdings?
9  A. I don't think so.
10 Q. All right. From whom at Czech Investment
11 Holdings did you receive instructions with respect
12 to the negotiations on the Trend settlement?
13 A. From Mr. Becka and Mr. Vlach.
14 Q. For example, do you recall that the
15 settlement agreement involved a potential payment
16 of 310 million korunas?
17 A. I do not recall that number. As far as I
18 remember, the number was 350.
19 Q. So with respect to receiving
20 instructions -- strike that. Start over.
21    With respect to the 350 million, did
22 Mr. Vlach or Mr. Becka instruct you that that was
23 an acceptable number to Forminster?
24    MR. BECKMAN: Objection. You may answer.

49

```
1   Q. Was there an investigation of the bombing?
2   A. Definitely.
3   Q. Was there a determination as to who
4   planted the bomb?
5   A. I don't think so.
6   Q. Was there a prosecution of anyone in
7   connection with the bomb?
8   A. I do not know.
9   Q. You don't remember?
10  MR. BECKMAN: Objection. You may answer
11  A. I do not recall.
12  Q. How close were you to where the bomb went
13  off?
14  MR. BECKMAN: Objection. You may answer.
15  A. I was on a different floor.
16  Q. And how close to where the bomb went off?
17  MR. BECKMAN: Objection. You may answer.
18  A. Approximately 280 meters.
19  Q. Did you suffer any injuries?
20  A. No.
21  Q. What was the relationship between Czech
22  Investment Holdings and Kotva at that time?
23  MR. BECKMAN: Objection. You may answer
24  A. What do you mean by relationship?
```

*[Handwritten note: objection, relevance, 403]*

50

```
1   Q. Any relationship in any connection.
2   MR. BECKMAN: Objection. You may answer.
3   A. The relationship was those were the same
4   people.
5   Q. I don't understand your answer. What do
6   you mean those were the same people?
7   A. Same people who were on the board of the
8   Czech Investment Holding were on the board of
9   Kotva.
10  Q. With respect to the same people that were
11  on the board of Kotva who were also on the board of
12  Czech Investment Holding, were those people elected
13  to the board by Forminster?
14  MR. BECKMAN: Objection. You may answer.
15  A. I do not know, I do not recall.
16  Q. You were elected to the board by
17  Forminster; is that correct?
18  MR. BECKMAN: Objection. You may answer
19  again.
20  A. No. Kotva is a publicly tradable company,
21  or at least it was then, and a general meeting is a
22  meeting of tens of -- of dozens of shareholders and
23  there is a secret vote. So I cannot confirm who
24  actually elected me, and I do not recall who voted
```

51

```
1   then.
2   Q. In 1998 and 1999, Forminster was the
3   controlling shareholder of Kotva; is that correct?
4   MR. BECKMAN: Objection. You may answer.
5   A. I think so.
6   Q. So you would not be elected to the board
7   of directors if Forminster didn't elect you; isn't
8   that correct?
9   A. That's not correct.
10  Q. How could you be elected to the board of
11  directors if Forminster didn't vote for you?
12  A. There are many ways how you can be
13  elected. One of the ways is that not hundred
14  percent of voting shareholders are present at the
15  general meeting. So, for example, if Forminster is
16  not there, other shareholders vote.
17  And I believe, but it's only my belief,
18  I'm not sure about it, that at that time there was
19  some limitation on the voting by Forminster.
20  Because there were approximately 36 business
21  dispute by investment funds Trend and Mercia, and
22  those disputes involved measure the imposing
23  limitation on voting by some shareholders. So I
24  really cannot confirm that I was elected by
```

52

```
1   Forminster.
2   Q. You were asked to stand for election by
3   Mr. Toman, correct?
4   A. That's correct.
5   Q. And you understood he was asking you on
6   behalf of Forminster, correct?
7   A. I do not recall.
8   Q. I'm going to show you what was marked as
9   Exhibit 39 in Mr. Harazim's deposition. It's in
10  English, and I will ask the interpreter to assist
11  us.
12  (Exhibit No. 39, having been previously
13  marked in another deposition, was referred
14  to.)
15  Q. This is an e-mail from Mr. Prestage to
16  Mr. Harazim dated July 18, 2003. And in the
17  e-mail, Mr. Prestage talks about a meeting he had
18  with Mr. James Woolf.
19  Do you know who Mr. Prestage is?
20  A. If he is Henry Prestage, yes, I do.
21  Q. How do you know who Henry Prestage is?
22  A. He is the representative of the investor
23  who purchased the assets of Kotva.
24  Q. Okay. And do you know who Mr. James Woolf
```

*[Handwritten note: objection, foundation, hearsay, relevance, 403]*

Page 53

1  is?
2  A. Yes.
3  Q. And how do you know who Mr. Wooll is?
4  A. I do not recall when I heard about him for
5  the first time. It's deep back in history. But I
6  know he was involved in Trend, and I also know that
7  he had some contract with Trend.
8  Q. In this e-mail, Mr. Prestage says that
9  Mr. Wooll told him the following: That seven
10 people have already gone to jail over the Kotva
11 dealings to date and that one man was shot in the
12 head.
13 Are you aware of seven people having gone
14 to jail over the Kotva dealings?
15 A. No.
16 Q. Are you aware of any people who have gone
17 to jail over the Kotva dealings?
18 A. No.
19 Q. Do you know who he was referring to when
20 he said one man was shot in the head?
21 A. No.
22 MR. BECKMAN: Ned, I don't want to
23 interrupt, but just a point of clarification.
24 How can we handle – it seems a little unfair

*[handwritten margin note: Objection foundation, hearsay, relevance 403]*

Page 54

1  to – to take pieces of this without having
2  the entire English – and I don't want to slow
3  you down either, but I'm just thinking about
4  for purposes of the – of the witness and
5  fairness. Because I thought you were going to
6  have the translator –
7  MR. LEIBENSPERGER: I did have the
8  translator translate the – the sentences that
9  I want to bring to his attention. I'm not
10 going to ask him anything about the meaning of
11 the e-mail overall. I'm just using it as a
12 reference to the statements. So let's –
13 let's keep going.
14 MR. BECKMAN: Okay.
15 Q. Do you recall that Mr. Becka was a person
16 who was shot?
17 THE INTERPRETER: Could you please give
18 me, once again, the name of the person?
19 MR. LEIBENSPERGER: Becka.
20 A. I do not know about anyone who would be
21 shot – who would be shot in the head in connection
22 with Kotva dealings. I think this must be some
23 joke of Mr. Wooll.
24 Q. My question is whether Mr. Becka – strike

*[handwritten margin note: Objection relevance hearsay 403]*

Page 55

1  that.
2  Do you know Mr. Becka?
3  A. No.
4  Q. Who – you identified Mr. Becka, didn't
5  you, as a member of the board of directors of Czech
6  Investment Holdings?
7  THE INTERPRETER: This is the interpreter.
8  It is in the name. So it is Mr. Becka, I hope
9  would be the name.
10 MR. LEIBENSPERGER: Thank you Mr. Becka.
11 Start over.
12 Q. Did you identify Mr. Becka as a member of
13 the board of directors of Czech Investment
14 Holdings?
15 A. That's correct.
16 Q. Was Mr. Becka shot?
17 A. Yes. I read that in the newspaper.
18 Q. All right. Mr. Becka was also a member of
19 the board of directors of Kotva?
20 A. I think he was, but I'm not sure about it.
21 You can find it on the Internet.
22 Q. You testified that the members of the
23 board of directors of Czech Investment Holdings
24 were also members of the board of directors of

*[handwritten margin note: Objection relevance, hearsay 403]*

Page 56

1  Kotva in 1999, correct?
2  A. That's correct.
3  Q. When was Mr. Becka shot?
4  A. I cannot – I do not recall – I do not
5  recall the exact timing, but I think it was
6  approximately two years after he left the board of
7  directors of Kotva.
8  Q. Was it after 1999?
9  A. Yes.
10 Q. Was it approximately 2001?
11 A. I really do not recall. That would be a
12 speculation. I read that in a tabloid called
13 Blesk, and the speculation was that they were –
14 that this was the result of some love affair and
15 this could have been probably two years after I saw
16 the gentleman for the last time.
17 Q. Was there also a rumor in the media that
18 Mr. Becka was shot in connection with some Kotva
19 dispute?
20 A. I do not recall.
21 Q. Was there an investigation of the shooting
22 of Mr. Becka?
23 A. I do not know.
24 Q. Do you know whether anyone was ever

*[handwritten margin note: Objection relevance hearsay 403]*

117

1  words "Martin Benda"?
2      A. Looks like it is.
3      Q. And is that your signature at the bottom
4  of page 1 and page 2, also?
5      A. Most likely yes.
6      Q. All right. When you gave this statement
7  to the police, did you consider it important to be
8  truthful?
9      A. Of course. I -- I am always truthful.
10     Q. So at the bottom of page 2, there's a
11 paragraph that begins with the letter N. Would you
12 read that paragraph to the interpreter and have her
13 interpret it?
14     MR. BECKMAN: I see three paragraphs
15 starting with N.
16     Q. Just talking about the bottom of page 2,
17 the last paragraph
18     MR. BECKMAN: Very last. Thank you.
19     A. "Sometime in November 2004, there were
20 first sign of separation between Weiss and Hoffmann
21 and later they started to deal each on his own."
22     Q. Is that a truthful and accurate statement
23 of your knowledge on January 12, 2005?
24     A. Yes.

118

1      Q. If you would turn to page 3, the second
2  full paragraph that begins with "Na." Would you
3  read that paragraph to the interpreter and ask her
4  to interpret it?
5      A. "Based on these pressures and in order to
6  document his behavior, we and Hoffmann signed an
7  interim contract which describes all these facts.
8  A copy of the contract and the e-mail
9  correspondence is -- will be submitted to the
10 police for the file."
11     Q. What was the interim contract that you
12 signed with Mr. Hoffmann?
13     A. I do not recall the details of the
14 contract. I can only describe the principles. It
15 was about the -- the sale of Hoffmann -- the sale
16 by Hoffmann to us of the company, I think the name
17 is Gilroy and Balfindor.
18     And the reason why we discussed that was
19 to prove that Hoffmann is in control of these
20 companies in order to be able to provide this
21 evidence for the criminal file and in order to sue
22 him for damages. Because those companies who filed
23 lawsuits were foreign companies and it was
24 difficult to identify their owners. And they had

119

1  no assets, so we could not sue them for damages
2  because we would not be able to recover any
3  damages. So we needed to prove who is in control
4  of these companies in order to be able to recover
5  damages.
6      Q. Do you recall anything else about this
7  interim contract that you signed with Mr. Hoffmann?
8      A. No, I do not recall now.
9      Q. Do you recall the date of this interim
10 contract you signed with Mr. Hoffmann?
11     A. No, I do not recall.
12     Q. This statement to the police is
13 January 12, 2005. Do you recall whether it was
14 within one or two months of January 12, 2005 that
15 you signed the interim contract with Mr. Hoffmann?
16     A. I cannot tell. According to what's
17 written here, it looks like it was signed recently.
18     Q. Did you give the police a copy of the
19 interim contract with Mr. Hoffmann?
20     A. I don't know. This -- this was a matter
21 that was dealt with by our lawyers.
22     Q. Am I correct that your statement says a
23 copy of the contract and the e-mail correspondence
24 will be filed in the police file?

120

1      A. Yes, exactly.
2      Q. When -- when you gave this statement to
3  the police on January 12, 2005, did you take a copy
4  with you?
5      THE INTERPRETER: Meaning from the police?
6      MR. LEIBENSPERGER: From the police.
7      A. No.
8      Q. Same question with respect to your
9  statement to the police of -- of September 14 --
10 sorry -- September 15, 2004, did you obtain a copy
11 of that from the police?
12     A. I don't think so, but I'm not sure.
13     Q. Did -- did your lawyers get copies of the
14 statements you gave to the police?
15     A. That is possible, but I don't know whether
16 yes or no. I don't know to what -- what extent
17 they had -- had access to the file and whether they
18 took any copies from the file.
19     MR. LEIBENSPERGER: We have to break
20 because the tape is about to run out.
21     THE VIDEOGRAPHER: This marks the end of
22 tape number 3 in the deposition of Martin
23 Benda. Going off the record. The time is
24 3:31.

133

1 activities. It has several subsidiaries. Those
2 subsidiaries produce wine, safety matches —
3     (Interruption by the reporter.)
4 A. — wine, safety matches, doors and
5 windows, fish food —
6     THE INTERPRETER: Just for clarification.
7     So just fish produce, not food for fish,
8 but fish for people.
9 A. — real estate activities and trading with
10 receivables. Most of their assets are in real —
11 real estate, and the real estate is rented.
12 Q. Is — is Kotva and all of its subsidiaries
13 now a part of CIS?
14 A. Yes.
15 Q. So SPV CO is now a part of the CIS
16 company?
17 A. Yes.
18 Q. Is CIS a publicly-traded company?
19     THE INTERPRETER: Public —
20 Q. Public traded company?
21 A. No.
22 Q. Who are the owners of CIS?
23 A. I am not exactly sure. But there are
24 approximately five or six large — or majority —

*add completeness*

134

1 not majority — large owners.
2 Q. Can you name the five or six large owners?
3 A. I can only say what I remember as of the
4 date of the merger. Because, of course, the shares
5 are tradable, and any shareholder can sell the
6 shares at any time without notifying anybody.
7     I — I know one of the owners was one
8 Slovak real estate company. I do not recall the
9 name of it. Then a company named Solo, S-O-L-O,
10 Susice. It's a joint stock company. And then Ceska
11 Realitni Spolecnost, which means Czech Real Estate
12 Company. I do not recall the rest of them.
13 Q. Are you the chairman of the supervisory
14 board of CIS?
15 A. No.
16 Q. How many people are on the supervisory
17 board of CIS?
18 A. Three.
19 Q. Who are the other two?
20 A. Martin David and Jaromir David.
21 Q. Were the two individuals you just named
22 also on the board of directors of Kotva?
23 A. No.
24 Q. Have they ever been on the board of

135

1 directors or the supervisory board of Kotva?
2 A. No, they were not. I think they were on
3 the board of some of the Kotva subsidiaries.
4 Q. Well, what are you remembering, what
5 subsidiaries?
6 A. Kotva Obchodni meaning Kotva trading or
7 retail. It was a company that was involved in the
8 activities in the department store of Kotva. After
9 the — the building was sold, they rented the
10 premises and now they are administering the
11 building.
12 Q. And were both of the individuals whose
13 last name is David members of the board of
14 directors of that Kotva subsidiary?
15 A. I think so. Again, it can be easily found
16 on the Internet.
17 Q. Do you recall that in 2004, Kotva reached
18 an agreement with Mr. James Woolf?
19 A. I don't remember reaching an agreement,
20 but I do recall that there was a document on
21 refraining from mutual attacks.
22 Q. With respect to the document refraining
23 from mutual attacks, was that a — an agreement
24 between Kotva and Mr. Woolf?

136

1 A. No. But I — Mr. Harazim gave me — I
2 recall that Mr. Harazim gave me this document and
3 the content of the document was that none of the
4 parties in the future will not file lawsuits
5 against each other as a result of their past
6 business activities.
7 Q. And Kotva was a party to that document; is
8 that correct?
9 A. Yes.
10 Q. What did you do with that document?
11 A. I signed it.
12 Q. Then what did you do with it?
13 A. It will most likely be filed somewhere in
14 the archives of our law department. I would also
15 like to state that I signed that document as
16 myself, a physical person, not on behalf of the
17 company. And that was on the request of Mr. Woolf
18 who allegedly wanted me as physical person to sign
19 this document.
20 Q. Did you keep a copy of the signed
21 document?
22 A. No. It will be filed in our law
23 department.
24     MR. LEIBENSPERGER: I'll say to you, Joel,

165

1    A. I do not understand the question.
2    Q. What do you mean when you say the Trend
3    receivable?
4    A. It is a receivable based on the settlement
5    agreement. That is the settlement agreement from
6    1999. And this receivable was based on the
7    settlement agreement regarding the shares of Kotva
8    and other assets blocked by Trend, other Forminster
9    assets blocked by Trend, which means that
10   Forminster was supposed to pay to Trend 350
11   million.
12   Q. So the Trend receivable is the amount that
13   Forminster was supposed to pay Trend?
14   A. That's correct.
15   Q. You testified that you were on the board
16   of Forminster to block Forminster from interfering
17   with that receivable; is that right?
18   A. No, I did not say that. What I said is
19   that the purpose of us being on the board of
20   Forminster is to block dealings of Forminster until
21   the time when Forminster pays to Trend. And in
22   real terms, it meant that in the period between '99
23   and 2003, we were issuing joint instructions
24   regarding voting, voting rights attached to the

166

1    56 percent package of shares. And the — why it
2    was feasible was that at that time, three of
3    present board directors —
4    THE INTERPRETER: I am confused. I need
5    to clarify.
6    A. At the time Forminster was represented by
7    three directors out of the — the total of four;
8    that's why it was possible. Which means that in
9    case Trend representatives who were also in
10   Forminster — if Trend representatives did not
11   agree, then there would not be possible to issue
12   instructions regarding voting rights attached to
13   the 56 percent package of shares held by
14   Forminster. This is how Trend lawyers and Trend
15   statutory bodies made sure that until this
16   receivable is paid, Forminster is paralyzed.
17   Q. What — why was the receivable owed by
18   Forminster to Trend not paid?
19   A. The reason was lengthy criminal
20   proceeding, because the case is so complex. The
21   decision still has not been rendered in this — in
22   those proceedings, despite the fact that this has
23   been going on for 11 years.
24   Back in the history, a state prosecutor

*Objectn, relevnce, 403, hearsay*

167

1    issued a decision stating that the court must
2    decide on deblocking the shares. In the meantime,
3    the case went to court twice and always was
4    returned back for additional investigation. Right
5    now, it's at the court for the third time, and
6    everybody hopes that a decision will be rendered
7    this time. So the reason why the receivable was
8    not paid is that it was not due and payable because
9    the shares were not deblocked.
10   Q. You say the shares were not deblocked.
11   You're talking about the shares Forminster owns of
12   Kotva?
13   A. Yes.
14   Q. All right. You said Forminster was
15   represented by three directors out of four. Were
16   you talking about the Kotva board?
17   A. I did not say represented. I said
18   Forminster dealt via three directors out of four
19   I would — I will explain.
20   After the settlement agreement has been
21   reached, after the settlement has been reached, the
22   powers of Forminster were limited by way of
23   appointing two Trend representatives on the board,
24   and these were nominated by BGO. And only all the

168

1    directors together were allowed to provide
2    instruction on how to vote — how to vote on those
3    shares. And this settlement agreement provided the
4    same procedure also for Kotva
5    The — the situation in Kotva was exactly
6    the same. The articles of association of Kotva
7    were amended so that three out of four directors
8    deal, which meant in real terms that Kotva was
9    unable to perform any steps without representatives
10   of Trend, meaning representatives of BGO.
11   So in that manner, both companies were
12   paralyzed. And without approval of Trend
13   representatives, there — there was no way how to
14   dispose of assets or how to — and this situation
15   was supposed to last until the receivable was
16   finally paid.
17   Q. When — during this period of time, the
18   directors of Forminster directed how to vote the
19   56 percent ownership of Forminster of Kotva; is
20   that correct?
21   MR. BECKMAN: Objection. You may answer.
22   A. Yes.
23   Q. Was the receivable that Forminster owes to
24   Trend sold to another party?